**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 3:18-cv-00995-JD-MGG ) |
| RON NEAL, et al., | ) ) |
| Defendants. | ) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGEMENT

Defendants, Ron Neal, Sarah Abbassi, Christopher Beal, Kenneth Gann, William Lessner, Timothy Redden, Jason Nowatzke, Ryan Statham, Christopher Puetzer, Steven Griffin, Jeremy Dykstra, Promise Blakely, and Anthony Watson (collectively, "Defendants"), by counsel, Michael J. Blinn, Deputy Attorney General, file this Memorandum in support of their motion for summary judgement. Each of Plaintiff's claims requires evidence of subjective intent – not mere negligence or error. Defendants acknowledge that Mr. Devine's death was tragic, and further acknowledge (at this procedural stage) that the response to the fire in his cell, and the precautions in advance, were not perfect. But there is no evidence of any design to harm Mr. Devine, or any other wrongful intent on the part of Defendants. Defendants are entitled to judgment as a matter of law.

**Statement of Undisputed Material Facts**

The record in this case, and the exhibits filed with Defendants' Motion for Summary Judgement, show the following undisputed facts.[1]

1.  At the time of the fire in which Joshua Devine died, Jason Nowatzke was the Correctional Major and he was not on duty during the events of April 7, 2017. [Watson Dep. at 147: 12-17.]

2.  The only individuals who were on duty on the night of April 7, 2017 were Justin Rodriguez, Promise Blakely, Sarah Abbassi, Ryan Statham, Christopher Puetzer, Timothy Redden, Anthony Watson, and Jeremy Dykstra.

3.  Justin Rodriguez, Sarah Abbassi, and Promise Blakely were the three Correctional Officers in B cell house on the night of April 7, 2017 with Rodriguez being the officer in charge. [Redden Dep. at 137:2-13; *see generally* Rodriguez, Abbassi, and Blakeley Deps. *seriatim*].

4.  At the time, Ryan Statham was a Correctional Officer at the Indiana State Prison at who was on duty that night, but not assigned to B-Cell House. [Statham Dep. at 220:6-7, 151:9.]

5.  Christopher Puetzer is and was a Correctional Sergeant at the Indiana State Prison who was on duty that night, but not in B-Cell House. [Statham Dep. 154:17.]

---

[1] Defendants accept these facts as true for purposes of summary judgement only.

6. At the time, Timothy Redden was a Correctional Lieutenant at the Indiana State Prison.  [Redden Dep. at 7:13-19]. A lieutenant's duties included supervising staff, offenders, conducting security assessments and was the assistant shift supervisor. [*Id.* at 37: 10-12.]

7. At the time, Anthony Watson was a Correctional Lieutenant at the Indiana State Prison. [Watson Dep. at 29:10-11.]

8. On April 7, 2017, the highest ranking officer on duty was Captain Jeremy Dykstra and the two assistant shift Supervisors on duty were Timothy Watson and Timothy. [Redden Dep. at 43:2-12]. Dykstra was the shift supervisor that night. [*Id.* at 11:17-24, 40:14-16, 167:25.] Dykstra was never involved in the any of the policy-making or policy amending process. [Dykstra 72:1-5.]

9. When there is a fire, a signal is called advising Control. First responders will then respond along with the offender fire fighters, who will report to the fire station to gear up. [Redden Dep. at 28:21-25]; [Watson Dep 154:11-13]; [Statham Dep at 54:4-11.]

10. That night, Rodriguez was doing security checks and Abbassi and Blakely were completing payroll forms in the counselor's office. [Redden Dep. at 137:13-19; Rodriguez Dep. 114:24-115:14; Blakely Dep. 149:4-8; Abbassi Dep. 124:21-125:2]

11. Custody staff are permitted to complete timesheets during shifts in the unit team or counselor's office, as even in the office, events on the unit are still

audible. [Gann Depo. at 101:01-102:07; Neal Depo. at 188:16-23.] Cell houses are loud and quite common to hear offenders yelling – even late in the evening. [Neal Depo. at 186:1-10.]

12. In B cell house, the keys kept by on-duty custody staff operate a key box with electronic door controls on each range. [Neal Depo. at 182:12-184:11.] Cell doors are opened-and-closed using the electronic door controls on the corresponding range or with a key specific to the range. [*Id.*; IDOC 30(b)(6) Beal Depo. at 37:02-13, IDOC 30(b)(6) Neal Depo. at 44:08-53:23, 56:05-57:13.]

13. While Abbassi and Blakely were doing their payroll paperwork in the counselor's office, Rodriguez saw a fire on the 500 range. His radio malfunctioned, so he immediately yelled for Blakely and Abbassi to assist. In the confusion, Rodriguez directed Blakely to stand by the gate and await responders, so he then had to send Abbassi to retrieve the 500 range keys from Blakely. When Lieutenants Watson and Redden returned with those keys, Rodriguez attempted to open the cell, but was unable to do so. [Rodriguez Dep. 114:24-116:15].

14. Abbassi and Blakely responded as soon as they heard Rodriguez yelling for them. [Abbassi Dep. 124:21-126:12; Blakely Dep. 149:4-18].

**Fire Signal is Called**

15. On April 7, 2017, at approximately 9:45 pm, a fire signal was called inside B-Call House. [Redden Dep. at 246:25- 247:2.]

16. The first responder team on April 7, 2017 included Timothy Redden, Anthony Watson, Ryan Statham and Christopher Puetzer. [Redden Dep. 122:14-20]; [Statham Dep. at 31:1-2.] When the fire was called, the first responders were activated. [Dykstra Dep. 167:16-17.]

17. Redden and Watson were in the shift supervisor's office when they first learned of the fire. [Redden Dep. at 137: 20-23]; [Watson Dep. at 155:22-24].

18. Statham and Puetzer were checking the gates on Main Street when they heard the alarm from outside of B Cell House. [Statham Dep. at 147:9-11.]

19. Redden and Watson immediately responded and were inside B Cell House in less than 30 seconds.  [Redden Dep 146:22-25]; [Watson Dep. at 155:22-24].

20. Statham saw them make their way to B Cell House and he made his way there too while Puetzer went over to open the firehouse. [Statham Dep. at 147:13-17, 20-21.]

21.  Dykstra stayed in the office as was required for the Correctional Captain on duty. [Redden Dep. at 147:7-9]; [Dykstra Dep. 299:5-9].

22. Meanwhile in B-Cell House, upon arriving inside B-Cell House, neither Watson nor Redden could see any smoke nor could they see a fire. [Redden Dep. at 176:7-10]; [Watson Dep. at 161:7-8].

23. The noise inside B Cell House was not more than usual for a cell house full of inmates.  [Redden Dep. at 168:19-22, 171:2-3, 172:5-7]

24. Watson got the keys to the 500 range from Officer Blakely and he and Redden quickly made their way to the 500 range. [Watson Dep. at 163:19-22, 176:8-25;] [Redden Dep. at 175: 5-10].

25. Statham was just behind them. [Watson Dep. at 163:15-19.]

26. It took Statham less than a minute to arrive in B-cell house from the time he heard the alarm. [Statham Dep. at 158:6-8.] When Statham arrived inside B-Cell H-house, he could not see any smoke or fire either. [Statham Dep. at 237:15-16.]

27. When Statham arrived, he learned that the lieutenants had already gone up so he grabbed fire extinguishers from the officer's station and quickly made his way up to the 500 range too. [Statham Dep. 159:12-18, 160:5-15, 163:2-3.]

28. When Redden and Watson first got to the 500 range, they saw flames coming out of the cell. [Redden Dep at 184:6-8]; [Watson Dep. at 166:19-22.]  Flames were rolling over the roof of the cell itself so it was not possible to stand in front of the cell. [Redden Dep at 184:13-15.] The fire was about five feet out and occupying the walkway on the range. [Redden 185: 13-20.]

29. The men tried to pop the door open from the front of the range since there was a key box at the front of the range. [Watson Dep. 156:14-16.] The door had been unlocked, but the door would not open. [*Id.* at 168:3]; [Statham Dep. 168:1-6, 12]. Their goal was to pop the door open as soon as possible. [Watson Dep 167:14-16.]

30. By the time, they got up to the 500 range, it was foggy due to the smoke making it difficult to see [Redden Dep. at 188:19-22] [Statham Dep. 167:4-9.]

31. At some point while the three men where upstairs, Statham handed Watson a fire extinguisher. [Watson Dep. at 169:13]; [Statham, Dep. at 148:3-6, 169:13.]

32. Statham could not see into the cell but attempted to put out the fire and was able to get down significantly. [Redden Dep at 207:12-21]; [Watson Dep. at 157:9-10]; [Statham Dep. at 148:6-10, 169:13-15.]

33. A signal was made to call in/activate the firefighters. [Watson Dep. at 170:2-5]; [Statham Dep. 186:13-17].

34. There were a few seconds where the men thought they could get inside. [Redden Dep. at 208:23-25.]

35. When the fire was down, Watson tried to grab and door and open it. [Watson Dep. at 157:9-11, 173:10-16]. "[Watson] put himself at the greater risk. He almost got burned up too. Because when we put the fire out, he was the one that tried to rush in real quick. And right before it roared back up and got back out, Statham actually grabbed him by the coat and got him out of the way before he got engulfed." [Redden Dep. at 124:4-11, 192:13-22] [Watson Dep. at 189:4-10 ("That's when I just tried to op the door. I tried to grab it, but my partner pulled me back so I wouldn't burn my hands. I didn't really think about my hands being burnt. I was trying to get the door open.")]; [Statham Dep. at 148:14-17, 169:16-18.]

36. Watson was as physically close to front of the door trying to find a way to get it to open without touching it including like trying to kick it with his foot." [Redden Dep at 208:25 – 209:3]

37. Statham was also trying to get the door open since it was already unlocked, but when he went to grab the door, it burned though his glove to the point where he couldn't open it. [Statham Dep. at 149:9-17.]

38. While the three men on the 500 range where trying to put out the fire, Redden was communicating with Puetzer through the radios asking about where the offender fire fighters were. [Redden Dep. at 217:14-16.]

39. Puetzer was at the fire station with the firefighters providing updates to the other three first responders on the 500 range as to what the fire fighters were doing, how far they were, how long it was going to be, and where they were at each point. [Redden Dep. at 217:7-11.]

40. Though communication was difficult given the noise and circumstances of the fire, the communication between Redden and Puetzer continued. [Redden Dep. at 218:18-219:7.]

41. During this time, Mr. Devine was still calling out for help and Statham started telling him that they were doing the best they could to get him out of the cell. [See Statham Dep. 169:22-170:21.]

42. The smoke has growing and building up making it even more difficult hard to see and difficult to breathe. [Redden Dep. at 193:23-24]; [Watson Dep. at 157:17-18, 185:14-20]; [Statham Dep. at 218:19-21].

43. Meanwhile, because the smoke grew thicker, Dykstra was not able to see anything or see who was on the range [Dykstra Dep. 204:22-205:1.]

44. Dykstra then opened a door to B-Cell House, put some fans blocking in fresh air into the cell house given the large amount of smoke coming from B-Cell House at that point. [Dykstra Dep. at 205:11-16.]

45. Dykstra was still on the radio trying to determine what was happening. [Dykstra Dep. 207:15-16.]

46. The three first responders on the 500 range stayed on the range waiting for the offender fire-fighters to get there because they did not have the equipment at that point to deal with the fire. [Redden Dep. at 198:22-24, 213:15-17]; [Watson Dep. at 171:15-19 ("They have the oxygen tanks and things like that. I didn't have an oxygen tank. I didn't have a mask. I was just up there fighting the fire trying to save someone's life."). Redden himself was getting burnt. [Redden Dep. at 193:19.]

47. Redden tried to radio Dykstra while he was still by Devine's cell on the 500 range as the freighters were arriving there. [Redden Dep 229:3-9.] Dykstra attempted to answer but Redden could not hear anything because communication was difficult given the circumstances. [Redden Dep at 229:13-19]; [Statham Dep. at 189:2-3.]

48. Four firefighters made it up and used quite a few extinguishers to put out the fire. [Redden Dep. at 198:24 – 199:1]; [Watson Dep. 185:12-13, 201:17-19.]

**The Evacuation**

49. Once the firefighters arrived with their lights and respirators, Redden began making his way down the range to inform Captain Dykstra about the situation and to evacuate the cell house. [Redden Dep. 223:20-22]; [Statham Dep. at 150:3-5]; [Dykstra Dep. at 207:21-25.]

50. Dykstra had wanted to start the evacuation process with the 500 range because that was where the fire was, where the offender firefighters were, where the offenders closest to the incident were, and where the staff were who did have not any protective gear and breathing in the smoke. [Dykstra Dep. 209:7-201:7.]

51. Throughout the incident, Dykstra was "worried about the offender firemen getting to unit, [] worried about the First Responders getting to the unit . . . 'cause you're thinking: I don't want staff to get hurt. I don't want offenders to get hurt." [*Id.* at 195:15-20.

52. The staff began evacuating the entire B-cell house. [Statham Dep. at 209:6-10]; [Dykstra Dep. at 209:1-5].

53. Redden said not to go down the front stairs with the gurney carrying Mr., Devine because they were still in the mix of evacuating [Watson Dep. at 158:24-159:1]; [Statham Dep. at 150:18-19.]

54. Instead, Mr. Devine was taken down the back staircase and medical was stationed and ready to help them once they came down. [Watson Dep 158:1-4.] Mr. Devine was taken to the custody hall where the nurses performed CPR on him [Watson Dep. 158:5-6.]

55. Watson left the nurses and went back to the cell house to finish helping with the evacuation of the cell house. [Watson Dep. 158:6-10.]

**After the evacuation**

56. After the cell-house evacuation, offenders started assaulting officers. [Redden Dep at 240:1-5]; [Statham Dep. at 151:4-6.]; [Dykstra Dep. at 298:4-7]. Offenders started rioting and were hitting officers, which included Mr. Puetzer and the offenders even started setting fires at various check points. [Redden Dep. at 242:4-15.] Approximately 200 of the offenders who were evacuated offenders were chanting "burn, burn, burn." [Redden Dep at 242:23-25]. Even the offenders firefighters were being hit with rocks and other things because they were helping the staff put out the fires at check points [Redden Dep 243:4-8.]

57. According to Redden as a lieutenant, he did not see or hear any of the staff act in a way that violated or was not consistent with the policies and procedures of ISP or IDOC. [Redden Dep. at 11:3-13.]

58. According to Watson as a lieutenant, he did not see or hear any of the staff act in a way that violated or was not consistent with the policies and procedures of ISP or IDOC. [Watson Dep. at 11:3-13.]

59. Statham had no knowledge of what happened in B Cell house before he got there either. [Statham Dep. at 181:23-25.]

60. According to Dykstra, he did not see or hear any correctional officer act in any way that violated or was inconsistent with the policies and procedures. [Dykstra Dep. at 11:25-12:4.]

61. During the events of that night, Dykstra contacted those individuals in his chain of command who had not been present – Jason Nowatzke, Kenneth Gann, and Warden Ron Neal. [Dykstra Dep. at 304:16-21.]

62. Mr. Devine died from the burns sustained by the fire.

**Training and Polices**

63. Christopher Beal is a correctional training officer at the ISP. [Beal Depo. at 10:09-12:04, 24:14-25.] He does not have the authority to alter the training he provides – as that is a role reserved for IDOC Central Office. [*Id*. at 16:04-25.] He was not present at the time of the incident fire nor was he involved in the subsequent investigation. [*Id*. at 13:16-20; 195:05-11.]

64. Ron Neal is the Warden of ISP and so employed since 2016. [Neal Depo. at 77:02-13; IDOC 30(b)(6) Neal Depo. at 8:11-19.] On the night of the incident fire, Mr. Neal was on-site – as his residence is located on the grounds of ISP. [*Id*. at 8:02-15:11.] That evening, he received a call from Mr. Dykstra informing him of the fire. [*Id*. at 17:09-20.] In accordance with policy and procedure, Mr. Neal responded to his office, where he remained until the situation was brought under control. [*Id*. at 21:09-13.]

65. After the incident fire, a number of considerations were undertaken, including improvements to the offender firefighter program and making fire

extinguishers more readily accessible – while weighing those considerations in light of safety and security concerns. [*Id*. at 27:02-31:20, 146:14-149:15.]

66. Kenneth Gann is a former Deputy Warden at ISP and was employed in that role from 2015 to 2017. [Gann Depo. at 16:09-21.] On the night of the fire, Mr. Gann was not present and did not respond to the fire. [*Id*. at 10:11-27.]

67. At the time of the incident fire, Mr. Griffin was the safety hazard supervisor at ISP responsible for fire drills and monthly inspections at ISP. [Gann Depo. at 44:01-22, 93:09-16; Neal Depo. at 87:19-88:08.] Training with live fire drills was preferable but not always done. [Neal Depo. at 158:17-168:07; IDOC 30(b)(6) Beal Depo. at 39:07-40:20.] Nevertheless, custody staff were informed how to respond in the event of a live fire emergency. [*Id*.; IDOC 30(b)(6) Beal Depo. at 14:10-16:01, 28:05-31:23, 39:07-40:20, 46:02-47:02; IDOC 30(b)(6) Neal Depo. at 25:04-.27:16, 31:03-34:05]

## Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). To survive a motion for summary judgment, the non-moving party must specify admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) (internal quotation and citation omitted).

Accordingly, while Defendants reserve the right to contest certain of the facts stated above, they accept them as undisputed for purposes of his Motion for Summary Judgment.

### Argument

Defendants are entitled to judgment as a matter of law under all claims in this matter, because there is no evidence that they acted with the intent necessary to establish the claims under either federal or state law.

## I. Plaintiff's Section 1983 in this case fail as a matter of law.

All three federal claims in this matter fail as a matter of law. There is no evidence that the Defendants acted with "deliberate indifference," as required to establish a failure-to-protect claim (Count I); there is no evidence of a conspiracy among the Defendants (Count II); and there is no evidence that any Defendant acted with intent to ignore Mr. Devine's constitutional rights, as required to establish Section 1983 liability under a "failure to intervene" theory (Count III). Finally, no Defendant can be liable under Section 1983 for acts that they did not know were illegal.

### a. There is no evidence that Defendants acted with "deliberate indifference" to Mr. Devine's constitutional rights.

In order to establish a section 1983 claim against prison officials for failure to protect, he must establish: (1) that he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) that the defendants acted with "deliberate indifference" to his health or safety. *Santiago v. Walls*, 599

F.3d 749, 756 (7th Cir. 2010) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

The first prong of a failure to protect claim—considered the objective prong—requires a plaintiff to allege that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citing *Farmer,* 511 U.S. at 834). To satisfy this prong, a plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that that serious harm might actually occur. The Supreme Court has made clear that for allegations of serious harm, "the deprivation alleged must be objectively, sufficiently serious," amounting to a "denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (citations and internal quotations omitted). In other words, "[t]he question under the Eighth Amendment is whether prison officials ... exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Farmer,* 511 U.S. at 843, (quoting *Helling v. McKinney,* 509 U.S. 25, 35 (1993)).

To meet the second, subjective prong of a failure to protect claim, a plaintiff must establish his custodians' deliberate indifference to that substantial risk of serious harm. As the Court stated in *Farmer,* "a prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 838. The Plaintiff

has the burden of proving of subjective prong of the test. *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997).

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832. The Eighth Amendment deliberate indifference standard applies to prison conditions affecting fire safety though not all unsafe conditions constitute punishment under the Eighth Amendment. *Boyd v. Anderson*, 265 F. Supp. 2d 952, 965 (N.D. Ind. 2003) (citing *Standish v. Bommel*, 82 F.3d 190, 191 (8th Cir.1996)). The Eighth Amendment does not demand that prison guards perform this task flawlessly; it does not even hold them to the negligence standard. *See Helling v. McKinney,* 509 U.S. 25 (1993). Prison officials also aren't expected to eliminate the possibility of all dangers. *McGill v. Duckworth*, 944 F.2d 344, 345 (7th Cir. 1991). A prison official only violates the Eighth Amendment if he is deliberately indifferent to conditions posing a substantial risk of serious harm. *Crook v. Neal*, No. 3:20-CV-757-RLM-MGG, 2020 WL 7078314, at *1 (N.D. Ind. Dec. 3, 2020) (citing *Farmer*, 511 U.S. at 834-35).

Deliberate indifference is comparable to criminal recklessness and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). This total disregard for a prisoner's safety is the "functional equivalent of wanting harm to come to the prisoner." *McGill v. Duckworth,* 944 F.2d 344, 347 (7th Cir.1991). A defendant must have "actual knowledge of impending harm easily preventable, so that a conscious, culpable

refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010) (quotation marks and citation omitted). Mere awareness of the facts giving rise to a substantial risk is not enough to establish deliberate indifference. *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). Even incompetence doesn't state a claim of deliberate indifference. *Walker v. Peters*, 233 F.3d 494 (7th Cir.2000).

Here, while there may be a dispute as to the adequacy of Defendants' precautions against and response to the fire – whether it could have been better, or even whether it failed to meet reasonable professional standards – such a dispute is immaterial and does not suffice for Plaintiff's claims to survive summary judgment. It is undisputed that procedures were in place at all levels of the facility to ensure safety. It is undisputed that that all Defendants who were involved in responding to the fire reacted promptly and tried to rescue Mr. Devine before it was too late. Even if the Defendants made mistakes, there is no evidence that they intended for Mr. Devine to be harmed, or otherwise held the level of culpability required to establish deliberate indifference. Count I of the Second Amended Complaint fails as a matter of law.

### b. There is no evidence of a conspiracy among the Defendants.

To establish a conspiracy under Section 1983, a plaintiff must show that defendants reached an understanding to deprive Plaintiff of his constitutional rights and that defendants were willful participants in the joint activity. *Reynolds v. Jamison*, 488 F.3d 756 (7th Cir. 2007). A plaintiff must show "the parties,

general purposes, and approximate date." *Walker v. Thompson*, 288 F.3d 1005, 1007-08 (7th Cir. 2002).

Here, just as there is no evidence of culpable intent to harm Mr. Devine, there is likewise no evidence of a conspiracy among the Defendants (or any subset of them). Count II of the Second Amended Complaint, alleging Section 1983 liability under a conspiracy theory, fails as a matter of law.

### c. To the extent Plaintiff's failure-to-intervene theory is distinct from its failure-to-protect theory, it fails as a matter of law.

The Seventh Circuit recognizes that "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail to do so" may be held liable. *Miller v. Smith,* 220 F.3d 491, 495 (7th Cir.2000) (citing *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir.1994)). This is what has become known as a "failure to intervene" theory. *Fillmore v. Page,* 358 F.3d 496 (7th Cir. 2004); *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir.1982), *accord Spence v. Staras,* 507 F.2d 554, 557 (7th Cir.1974). This language merely reiterates the long-established rule that "[a]n official satisfies the personal responsibility requirement of Section 1983 if she acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir.1982).

To the extent that Count III articulates a claim distinct from Count I's deliberate-indifferent claim, it fails for the same reason. While there may be evidence of mistake or even negligence, there is no evidence that any of the Defendants acted with "deliberate or reckless disregard" for Mr. Devine's rights, *see*

*Crowder*, 687 F.2d at 1005, let alone that any Defendant "had an opportunity to set forward and prevent" such action by another. *See Miller*, 220 F.3d at 495. Defendants are entitled to judgment as a matter of law.

### d. Defendants are entitled to qualified immunity.

Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The court must determine "whether a reasonable [government actor] could have believed that [his] conduct was constitutional in light of the clearly established law and the information [he] possessed at the time." *Frazell v. Flanigan*, 102 F.3d 877, 886 (7th Cir. 1996). There are two aspects to the inquiry: (1) whether the officials' actions violate the Constitution, and (2) whether the constitutional right was clearly established at the time of the officials' alleged misconduct. *Abbott v. Sangamon County., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013).

Plaintiff bears the burden of demonstrating the violation of a clearly established right. *Hernandez ex rel. Hernandez v. Foster,* 657 F.3d 463, 473 (7th Cir.2011); *Forman v. Richmond Police Dep't.*, 104 F.3d 950, 957–958 (7th Cir. 1997). A violation is only "clearly established where: (1) a closely analogous case establishes that the conduct is unconstitutional; or (2) the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution." *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001). In *Plumhoff v. Rickard*,

572 U.S. 765, 778-79 (2014), the Supreme Court held that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." The second prong of the qualified immunity inquiry is "whether, in light of precedent existing at the time, [the officials were] plainly incompetent" in their actions. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (finding a police officer was not plainly incompetent, and thus entitled to qualified immunity, when entering a third-party's residence while in hot pursuit of a misdemeanor suspect). Since qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," courts must determine whether a defendant is entitled to qualified immunity as early as possible during the proceedings. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

Here, even if there were otherwise an actionable constitutional violation – as opposed to a tragic accident – there is no evidence of any action by any Defendant that that Defendant subjectively knew violated Mr. Devine's constitutional rights. Defendants are entitled to qualified immunity as a matter of law.

## II. Plaintiff's claims under Indiana state law fail because there is no evidence of "willful and wanton" misconduct by any Defendant.

Indiana law bars negligence claims against state employees acting within the scope of their duties.[2] Ind. Code § 34-13-3-5. A plaintiff suing a state employee in

---

[2] It is undisputed that all Defendants are such employees. [Dkt. 43 ¶¶ 9-15].

his individual capacity must therefore establish one of a list of enumerated additional facts establishing higher culpability, including (as alleged here) "willful and wanton" conduct by the employee. *Id.* § 5(c)(4).

As a threshold matter, this defeats Count VI, alleging Negligent Infliction of Emotions Distress (NIED). Count VI alleges that certain Defendants "breached their duty of care," (i.e., negligence), but not that they engaged in willful and wanton acts. [*See* Dkt. 43 ¶¶ 66-69]. Count VI fails as a matter of law.

So too do Counts IV, V, and VII, the remaining claims under Indiana law. Affirming summary judgment, the Indiana Court of Appeals has instructed that "willful and wanton misconduct has two elements: 1) the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and 2) the actor's conduct must have exhibited an indifference to the consequences of his own conduct." *Miner v. Southwest School Corp.*, 755 N.E.2d 1110, 1113 (Ind. Ct. App. 2001) (internal quotation and citation omitted). "Willfulness cannot exist without purpose or design," *Speedrome Speedway, Inc. v. Clark*, 49 N.E.3d 653, 661 (Ind. Ct. App. 2016), and constructive knowledge of a risk is insufficient. *Id.* at 664.

As with the other claims in this case, there is no evidence to meet this standard. The undisputed evidence shows that Defendants took steps to protect against a risk of fire, and, when the fire started, they reacted quickly and attempted to rescue Mr. Devine. Whatever criticisms anyone might have about the precautions taken ahead of time, or the response once the fire started, there is no evidence of "purpose or

design" on the part of Defendants. *See Speedrome*, 49 N.E.3d at 653. There is no evidence of subjective knowledge of danger, misconduct calculated to cause injury, or indifference on the part of any Defendant toward the consequences of his own conduct. *See Miner*, 755 N.E.2d 1110. There is no evidence of willful and wanton misconduct by any Defendant. Defendants are immune under Indiana law to all state-law claims, and they are entitled to judgment as a matter of law as to Counts IV, V, VI, and VII of the Second Amended Complaint.

## Conclusion

For all of the above reason, Defendants, by counsel, respectfully request that this Court **grant** summary judgment in favor of Defendants and against Plaintiff on all claims in this matter.

Respectfully Submitted,

THEODORE E. ROKITA
Indiana Attorney General
Attorney No. 18857-49

Date: <u>March 29, 2021</u>    By:    Michael J. Blinn, 28473-49
Deputy Attorney General
Indiana Government Center South –
5th Fl.
302 W. Washington Street
Indianapolis, IN  46204-2770
Phone: (317) 233-6506
Fax:  (317) 232-7979
Email:  Michael.Blinn@atg.in.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2021, a copy of the foregoing document was

filed via the CM/EFS and served on all counsel of record via electronic filing.


Michael J. Blinn, 28473-49
Deputy Attorney General

Office of Attorney General
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Telephone:  (317) 233-6506
Facsimile:  (317) 232-7979
E-mail: Michael.Blinn@atg.in.gov