**In The Matter Of:**

*BARBARA DEVINE, et al. v.*
*RON NEAL, et al.*

*ANTHONY WATSON*
*October 30, 2019*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 10-30-19 ANTHONY WATSON.txt
**Min-U-Script® with Word Index**

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 2 of 102

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

BARBARA DEVINE, as Personal)
Representative of the       )
ESTATE OF JOSHUA DEVINE,    )
                            )
            Plaintiff,      )
                            )   Case No.
    vs.                     )  3:18-cv-00995-JD-MGG
                            )
RON NEAL, et al.,           )
                            )
            Defendants.     )

The deposition of ANTHONY WATSON, called for examination pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before APRIL D. HARGETT, a notary public within and for the County of Lake, State of Indiana, Certified Shorthand Reporter at 5816 East 7th Avenue, Gary, Indiana, on October 30, 2019, at the hour of 9:23 o'clock a.m.

BOSS REPORTERS

& VIDEOCONFERENCING

GARY * MERRILLVILLE * VALPARAISO, INDIANA

(219) 769-9090

Page 2

PRESENT:

LOEVY & LOEVY,
(311 North Aderdeen Street, 3rd Floor
Chicago, Illinois 60607), by:
MS. MEGAN PIERCE
        -and-
MR. SAM HEPPELL,
(312) 243-5900
megan@loevy.com
        Appeared on behalf of the Plaintiff;

STATE OF INDIANA, OFFICE OF THE ATTORNEY GENERAL,
(302 West Washington Street, 5th Floor
Indianapolis, Indiana 46204), by:
MR. DANIEL ROTHENBERG,
(317) 232-2472
daniel.rothenberg@atg.in.gov
        Appeared on behalf of the Defendants.

Page 3

I N D E X

Witness:                                          Page

ANTHONY WATSON

EXAMINATION BY MS. PIERCE                          4

EXHIBITS

Watson
Exhibit Nos.                                       Page

1    Indiana State Prison Patrol Report    124
2    Indiana State Prison Evacuation       147
     Plans
3    Shift Report of Incident              175
4    Indiana State Prison 24-Hour          204
     Report
5    Report of Investigation               209
6    After Action Review                   219
7    Letter                                263
8    Report of Investigation               265
9    Employee Work Profile and             272
     Performance Appraisal Report

Page 4

(WHEREUPON, the witness was duly sworn.)

THE WITNESS: Yes, ma'am.

THE REPORTER: Thank you.

ANTHONY WATSON, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. PIERCE:

Q.   My name is Megan Pierce, and I represent the plaintiff, Barbara Devine, in her capacity as the personal representative of the Estate of Joshua Devine.  And my apologies.  Just before we begin questioning, I'm just going to put something on the record.

MS. PIERCE: So during Rule 37 telephone calls with opposing counsel on October 7th and 11th, counsel agreed to -- opposing counsel agreed to provide supplemental responses to several of our discovery requests.  As of yet, those have not been received by the October 18th agreed date.  So we reserve the right to re-open depositions once we receive those documents.

BY MS. PIERCE:

Q.   Mr. Watson, have you ever been a witness

BARBARA DEVINE, et al. v. Cause No. 3:18-cv-00995-JD-MGG ANTHONY WATSON
RON NEAL, et al. October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 3 of 102

Page 5

in a deposition before?
A.  Yes.
Q.  How many times?
A.  Once.
Q.  What were -- what was the circumstance of that case?
A.  It's still pending.
Q.  Are you a party in that case?
A.  No.  I'm more of just a witness.
Q.  A witness.
    Is it a civil matter?
A.  Yes.
Q.  And when were you deposed in that case?
A.  Maybe in, I'd say, July or August of this year.
Q.  And what is the subject matter of that case?
A.  It was an offender that had fell and broke his ankle.  I wrote a statement for the offender.
Q.  Have you ever provided testimony in court before?
A.  Yes.
Q.  How many times?
A.  Maybe once.  Once or twice maybe.

Page 6

Q.  Do you remember what cases those were?
A.  No.  I was a child.
Q.  You were a child?
A.  Yes.
Q.  Have you ever been sued before?
A.  No.
Q.  So I'll just go over the basic rules of the deposition.
    You understand that you're under oath here today?
A.  Yes, ma'am.
Q.  You understand that telling a lie in a deposition is a crime?
A.  Yes, ma'am.
Q.  So the court reporter is going to be taking down everything that we say.  So it's important that you give verbal answers.  So instead of nodding or uh-uh, make sure to give a yes or no so we have a clear record.
A.  Yes, ma'am.
Q.  Along the same lines, it's important that we speak one at a time so the court reporter can take us both down.  So I'll try to do my best to wait until you finish the answer, and I'll just ask that you do the same.

Page 7

A.  Yes.
Q.  And I'm going to try to ask questions that make sense.  Some of them will not.  I will do my best.  If you don't understand, please just ask me to rephrase, and I'll clarify what I'm asking.
A.  Yes, ma'am.
Q.  If you don't ask for clarification and you answer the question, I'm going to assume you understood it; is that fair?
A.  Yes.
Q.  And we can take breaks whenever necessary.  I just ask that no breaks are taken while questions are pending.
A.  Yes, ma'am.
Q.  So are you under any type of medical care that would impede your ability to answer questions honestly and truthfully here today?
A.  No, ma'am.
Q.  Do you have any kind of condition that affects your health or your memory that would affect your ability to testify honestly and truthfully here today?
A.  No, ma'am.
Q.  Is there any reason that you can't give full and accurate testimony here today?

Page 8

A.  No, ma'am.
Q.  Okay.  Have you ever in the past had any conditions that affect your memory?
A.  No, ma'am.
Q.  Did you meet with counsel -- without going into the substance of what you discussed with counsel, did you meet with counsel to prepare for this deposition?
A.  Yes, I did.
Q.  How many times?
A.  A handful of times over the phone.
Q.  Okay.  About how long were those calls?
A.  Maybe 15 minutes to a half an hour.
Q.  Did you review any documents in preparation for the deposition?
A.  Just the document that -- that I was sent -- what's the name of it?
Q.  The interrogatories?
A.  Yes, ma'am.
Q.  Anything else that you reviewed today or for today?
A.  No, ma'am.
Q.  Did you do anything else in preparation for the deposition here today?
A.  As far as?

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 4 of 102

Page 9

Q. Just refreshing your memory?

A. Just went over the interrogatories. That's it.

Q. Have you spoken to any current or former IDOC employees about this deposition or about the litigation?

A. No, ma'am.

Q. So what city do you live in?

A. I live in Michigan City, Indiana.

Q. Do you have any plans to move in the near future?

A. No, ma'am.

Q. Do you have a personal cell phone?

A. Yes, ma'am.

Q. What's your personal cell phone number?

MR. ROTHENBERG: I'm going to object at this time to this being privileged, but you still have to answer.

BY THE WITNESS:

A. My personal cell phone number is area code 219-878-3586.

BY MS. PIERCE:

Q. Do you have a work cell phone?

A. No, ma'am.

Q. Did you have a work cell phone while you

Page 10

were at ISP?

A. No, ma'am.

Q. Do you have an e-mail address?

A. Yes, ma'am.

Q. Can you state your e-mail address for the record?

A. My e-mail address is watson, w-a-t-s-o-n, A as in Adam, T as in Tom, a-h -- I'm sorry -- A as in Adam, H as in Heather, T as in Tom, and J as in James.

Q. Okay.

A. @comcast.net.

Q. Did you have a work e-mail while you were at ISP?

A. Yes, ma'am.

Q. Do you know that e-mail address?

A. It would be awatson@idoc.in.gov.

Q. Was that your work e-mail address the whole time that you were ISP?

A. Yes, ma'am.

Q. Do you have a work e-mail address now?

A. No, ma'am.

Q. Do you use social media?

A. No, ma'am.

Q. No Facebook?

Page 11

A. No, ma'am.

Q. No Twitter?

A. No, ma'am.

Q. So let's start with your education. Did you graduate from high school?

A. Yes, ma'am.

Q. What year did you graduate?

A. In 1992.

Q. Where did you go to high school?

A. Elston Senior High.

Q. And where is that?

A. Michigan City, Indiana.

Q. Did you go on to any college education after that?

A. No, ma'am.

Q. Are you currently employed?

A. Yes, ma'am.

Q. Where do you work?

A. I work for PVS Steel Services.

Q. When did you start working there?

A. March. March 4th of 2019.

Q. And what's your position there?

A. I am a laborer.

Q. So what does that include?

A. Various jobs. So maintenance, some

Page 12

cleaning, some production, loading trucks, unloading trucks. Just basically whatever the plant manager needs.

Q. So when did you leave?

A. I left IDOC in August of 2018.

Q. What was your reason for leaving?

A. To seek better employment.

Q. Any other reasons?

A. No, ma'am.

Q. And did you go straight to PVS Steel Services from there?

A. No. I left IDOC, and I went to work at NLMK.

Q. And when did you start there?

A. I started NLMK, I'd say, September 1st, and I worked there until -- I'd say about -- I think January 25th of 2019.

Q. What did you do there?

A. I was a laborer there as well.

Q. And what was your reason for leaving NLMK?

A. I was terminated.

Q. And what was the reason for your termination?

A. It was more of a disagreement between me

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 5 of 102

Page 13

and another employee. And he made some comments, and I made some comments. He made racial comments. I was upset about his racial comments, and I lost my temper and told him I would punch him. And so we went to -- got sent to HR, and I was terminated.

Q. Okay. And what was the official reason they gave you for your termination?

A. No official reason.

Q. When you left IDOC, did you fill out any type of survey or have an exit interview?

A. No, I did not.

Q. Were you asked to do either of those things?

A. No, I was not.

Q. When you graduated high school, did you go straight to IDOC?

A. No. Graduated from high school. I started working for Taco Bell. I was a shift manager there, and I left -- I left Taco Bell in -- I left Taco Bell in '95, and I went to work for Able Disposal --

Q. What was --

A. -- Garbage Company.

Q. What was your reason for leaving Taco Bell?

Page 14

A. Better employment.

Q. What do you mean by "better employment"?

A. More money because I had just had a child.

Q. And from Taco Bell, you went where?

A. Able Disposal. It's a garbage company in Chesterton, Indiana.

Q. And how long were you there?

A. I was at Able Disposal a little less than a year. I left there, and I started working for Trussway in Michigan City. It's a roof company in Michigan City. I worked there.

Q. What does Trussway do?

A. We build roof trusses, board trusses, steel trusses for homes, businesses, schools, churches. Just construction. I -- like I said, I worked there for ten years, and I left Trussway and started working at the prison in 2007.

Q. And what was your reason for leaving Trussway?

A. The company closed.

Q. So besides NLMK, was there any other job that you were terminated from?

A. No.

Q. And so how did you decide to seek

Page 15

employment with IDOC?

A. Well, the company I was working for, Trussway, they shut their doors, and I needed a job -- house, wife, three kids -- so I decided to apply at the prison. I heard it was a good paying job, guaranteed job unless you do something stupid to lose the job. And it was right in Michigan City, so I didn't have to travel.

Q. And what was the application process for applying?

A. The application process was on-line.

Q. And what position did you apply for?

A. I applied for correctional officer.

Q. And did you interview for that position?

A. Yes, ma'am.

Q. How many people did you interview with?

A. I believe there were three people that interviewed me.

Q. And then were you given an offer after those interviews?

A. Yes, ma'am.

Q. And how -- did you go straight to Indiana State Prison, or did you go to any other area?

A. I was assigned to the Westville

Page 16

facility for the training process; and once the training was completed, then I was assigned to Indiana State Prison.

Q. When did the training process start?

A. I believe it was November of 2007.

Q. How long did that last?

A. I'm going to say maybe the middle of December 2007.

Q. So like four to six weeks?

A. Four to six weeks, yes, ma'am.

Q. And can you tell me a little bit about that training program?

A. The training basically taught us about ethics, be professional, how to conduct yourself as a correctional officer, what to expect in the job. Also, be courteous and kind. Try to use firm, fair consistency when we were doing our job. That's about it.

A lot of logistics of laws of what the offender has -- what the offenders are held under -- laws that bound the correctional officers and anybody that's working in corrections -- what we're supposed to do and what we can and can't do.

Q. Can you give me an example of that?

A. Punishing an offender because of their --

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 6 of 102

Page 17

you happen to hear or find out what the offender is incarcerated for, and then you treat then bias by whatever it is they're incarcerated for. You could be held accountable for that and sued and prosecuted and things like that. That's about it.

Q. And was that mostly classroom based?

A. Yes, ma'am.

Q. Were there tests?

A. Yes. There was a test every week. And if we passed the test, you continued on. If you failed the test, I believe they gave you one other chance to take the test; but it had to be within that day. And if you failed the test, then you were no longer in consideration to be a correctional officer.

Q. Did most people pass through the training?

A. I want to say 90 percent of the people pass.

Q. Did you pass all of the tests?

A. Yes, ma'am.

Q. Were there any other components besides classroom learning and tests that were part of the training?

A. After we were done with the -- just the class -- the six-week class training, then we had

Page 18

on-the-job training. That lasts for another, I want you to say, four weeks.

Q. So is that at Westville?

A. That would be at the facility they would assign you to. So mine was at Indiana State Prison.

Q. And what did that include?

A. That included doing the job as a correctional officer. If we were assigned to a cell house, you were locking, unlocking doors, conducting count, conducting cell searches, helping with meals, breakfast, lunch, dinner. We need officers to help feed, corral the inmates out to the chow hall, and then all the inmates back from the chow hall to their cell house and secure -- secure the unit. That's about it.

Q. Did you have somebody directly supervising you or with you at all times?

A. We were assigned to FTOs, field training officers, and -- and the field training officer could be the sergeant of the cell house, the lieutenant of the cell house, or a lead officer working in that unit.

Q. What's a lead officer?

A. Like the number one. The sergeant is the person that's basically in charge of the everyday

Page 19

runnings of the cell house. Then you have a lead officer. If the sergeant is called away, that officer would take over and continue to be in charge of the other officers that's assigned to a cell house.

Q. Is that the same as the officer in charge?

A. Yes, ma'am.

Q. And so the sergeant is assigned to a specific cell house?

A. Yes.

Q. Do they -- are they ever assigned to like a boarder area than that?

A. Yes. It really depends on the day, what's going on for the day. It could be a day that that cell house has commissary or they'll assign that sergeant of that cell house to be, more or less, what we call on the street because it -- Indiana State Prison is kind of like a city -- a small city.

And so from the cell house to the commissary building, there's a street that we call -- so that sergeant will patrol that street just to make sure there's no robberies going on, fights happening.

Q. Okay.

A. Because inmates fight all of the time.

Page 20

That's what they do. And they would help -- help with the control of getting the inmates from their own unit to the commissary unit, trade their commissary, and escort them back to the room.

Q. So when you were assigned to a field training officer, were you assigned to the same person for the whole four weeks, or were you assigned to different people?

A. Different people.

Q. Okay. And did the field training officer have to go through training themselves to be a field training officer?

A. Yes.

Q. Do you know what training that was?

A. I believe field training officer training.

Q. Were you ever a field training officer?

A. No, ma'am.

Q. Did you ever express interest in being a field training officer?

A. Yes, I did. But a lot of times they -- the field training officers were officers themselves. I was an officer for about two years, maybe two and a half years, and then I got promoted to sergeant. In my head, I was out of the line of being a field

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 7 of 102

Page 21

training officer; but if you were someone that gets promoted, you are still considered a training officer. You're a sergeant. So you're going to be directing all of the officers that are underneath you.

I was a sergeant for about two and a half years, and then I was promoted to lieutenant. Once again, as a lieutenant, you're training the lieutenants -- the sergeants that are underneath you and the officers that are underneath you. Having the title as a field training officer, they just kind of designate that for officers themselves for brand new officers that are coming on. But as far as being a supervisor, you're in constant training -- training mode with, like I said, sergeants, officers that are just coming on.

It doesn't hurt. It's actually really good that the -- if you have a lieutenant that has really good communication with the sergeant, and then that communication goes from the sergeant down to the officers. So --

Q. So who does most of the training during the initial four-week, on-the-job training? Is that officers, or is that lieutenants?

A. That would be officers.

Page 22

Q. Okay. Is there any certain amount of time that they need to be at the prison before they can train other people?

A. They like for them to be there more than a year. Once you -- it takes about six months to get -- once you get your six-month status of working, then you're considered -- you're out of the correctional officer training position. You're a correctional officer.

Q. So you're out of probation?

A. Out of probation, yes, ma'am.

Q. Was there any tests or anything that somebody needs to do to be brought out of probation?

A. Not any written tests. Just more of the field training tests. Can they secure range? Can they count properly? Can they unlock the doors properly in a timely manner? How to conduct themselves when dealing with inmates if there's a problem that arises. Just various different situations that happen. How does an officer handle themselves? Do they get rattled easily, or do they stay calm, cool, and collected? They try to deescalate the situation as much as possible.

Q. And are those written evaluations of those types of assessments of officers on probation?

Page 23

A. Yes, ma'am.

Q. What are those called?

A. We call it a work improvement plan.

Q. Okay. And those are done for everybody on probationary status?

A. Yes, ma'am.

Q. Are there any other types of written evaluations that are done by individual training officers of individuals on probationary status?

A. No, ma'am.

Q. You mentioned a little bit earlier that -- whether or not a sergeant is staffed in a cell house depends on whatever is happening on that day.

How many people are usually staffed in a cell house on a given day?

A. It depends on the cell house. At Indiana State Prison, we have -- I'm going to say the cell house -- A cell house has 300 -- roughly maybe 320 offenders, and they would staff that with a sergeant and possibly three officers. B cell house is 214 -- 216 offenders. They may staff that with a sergeant and two officers.

C cell house is the biggest cell house in the state of Indiana. It has over 400

Page 24

inmates. So you're going to staff that with a sergeant and possibly five officers. And then we have our dorms that house less than 200 people, so they would staff that with just two officers. There will be a lieutenant -- not a sergeant, a lieutenant -- what we call a zone lieutenant that will oversee the two dorms -- have dual responsibility of overseeing the two dorms. You really don't have a sergeant with the responsibility of running the dorms. That's, more or less, for the cell houses.

Dorms is a -- more of an open-living concept. Almost like a military barracks situation. The State said we're allowed to have two officers and use a zone lieutenant to kind of keep the supervision on those units.

Q. Okay. So you said in B cell house, it might just have a sergeant and two officers?

A. Yes, ma'am.

Q. Would it ever be appropriate to just have three officers in B cell house?

A. Yes. It has happened.

Q. Do you think that's sufficient?

A. It doesn't matter if you have a sergeant or two officers or three officers. You have three

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 8 of 102

Page 25

bodies.

Q. So how long were you a correctional officer before you were promoted?

A. I'm going to say two and a half years.

Q. And did you go actively seek that promotion?

A. Yes.

Q. And how did you do that?

A. The State put on-line that there was -- had a sergeant position open. So I applied for the position. I believe when I applied -- I believe there was -- I think there was three sergeant positions that were open. So I applied for one. I'm going to say I think maybe about 30 officers may have applied for three, and I was one of the ones that were chosen.

Q. And when did you start your position as a sergeant?

A. I started in 2007 as an officer. 2010, I believe.

Q. Did you receive additional training as a sergeant?

A. Yes. Once I became a sergeant, then you would get more hands-on training from -- depending on what unit I was assigned to, hands-on training from

Page 26

any other sergeants that were sergeants prior to me. As a brand new sergeant, they're going to try to show you the ropes, train you, making sure you understand policy, procedure.

A lot of times the offenders will not want to deal with an officer. They'll want to deal with a supervisor. So the first person -- if they follow the chain of command, they'll want to talk to a sergeant. So you would get a little bit of training from other sergeants and lieutenants as far as what to do, how to do when you're asked certain questions by offenders. More of a -- that training, more or less, really never stopped. It was constant training because every day working there is a different day. It's not like a cookie-cut-type job.

You know, one day you may be faced with a situation of an offender trying to hurt themselves, harm themselves. You have to have really good communication to try to deescalate the situation to get them not to hurt themselves or hurt others. That may be an eight-hour deal. You have to have some patience and stay calm and cool and know when to say you don't know.

The number one training I got as a sergeant was never to lie to offenders. Tell them

Page 27

straight up. If the answer is no, the answer is no. Or tell them if you don't know, you don't know; but you can try to lead them to someone that may know the answer or refer them to your supervisor, you know, that may better -- that may have a better understanding of what they have going on or may understand what's going on with this offender. Always try to lead them in the right direction.

Q. Did you receive any types of formal evaluations during your initial period of being a sergeant?

A. Yes, ma'am.

Q. What were those called?

A. Still work improvement.

Q. And what were your duties as a sergeant?

A. Well, the duties -- various duties as sergeant. If I was assigned to a cell house, then I would be in charge of that unit itself. I'll just use B cell house as the example. I would have, like I said, maybe two officers. Maybe on a good night three officers if we have a new officer that's started working.

Q. Okay.

A. Securing the unit, running count at the designated count times, making sure we do all

Page 28

security checks, checking windows, checking doors. Once -- it's not really called lockdown, but lights out -- 9:00 o'clock count -- all of the offenders are in their cells.

After 9:00 o'clock count is clear, we'll go through and do our shakedowns for the night. Shakedown is we randomly pick two cells on a range to perform a cell shakedown. We check it for contraband or anything like that. And then we will be responsible for checking the bars on the cell doors, making sure there were no fake bars, or things like that.

Every half an hour we'll do security rounds. We can have at least -- at least one officer or all of the officers doing security rounds on the unit and making sure all of the doors are still secure. There is no offender trying to harm themselves inside the cell. Nobody trying to break out of the cells. That's done every half an hour.

Q. And how long were you in the sergeant position?

A. I was in the sergeant position for two years.

Q. And then -- and then what did you do from there?

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 9 of 102

Page 29

A.   I was promoted to lieutenant in 2012.

Q.   And how did you go about doing that?

A.   I applied.  We had -- I believe we had two lieutenant positions that were open.  I applied for one of the positions.  Once again, I believe -- it was about 30 sergeants that applied for those two positions, and I was picked.

Q.   And so when did you start the lieutenant position?

A.   That would be November of -- I believe it was November of 2012.

Q.   And what were the -- what was the training that you had as you started the position as a lieutenant?  Did you do any training before you started working as a lieutenant?

A.   No, ma'am.  More or less, if you were promoted to lieutenant, you were an outstanding sergeant.  You understood all of the policies and procedures, chain of command, first response procedures.  I'm forgetting -- I'm having a brain fart.

More or less, being an outstanding sergeant, able to communicate, have good communication, able to handle multiple situations at once, able to direct your staff -- direct your staff

Page 30

in a proper way where they all -- your staff is, more or less, an extension of your arm.  If you're a professional and firm, fair, and consistent, your staff is going to be professional, firm, fair, and consistent.  Leadership skills, communication skills.  Just being a good supervisor.

Q.   And these were all things that you were being trained on as a lieutenant?

A.   Yes.  Constantly.

Q.   But this was just on-the-job training?

A.   Yes, ma'am.

Q.   And who was doing that?  Was it other lieutenants, or was it other people?

A.   Other lieutenants, other supervisors.  If the captain -- if I work with them.  So it was, more or less, every day that you came to work, you're just learning as much as possible.

Q.   And were there new policies and procedures that you had to familiarize yourself with as a lieutenant?

A.   Yes.

Q.   And what type of procedures and policies were those?

A.   Policies as far as the IDOC policy and as far as -- I'll use an example.  In the wintertime,

Page 31

there has to be a current standard temperature that the cell house is supposed to be at.  And if that cell house is under that temperature, it is your job as the lieutenant to get with the maintenance department, write it up, referrals to get the cell house together.

If it's too cold, it could be a situation that a heater's not working properly in a certain area of the cell house.  So every day the lieutenant walks around and does his rounds.  That's one thing you're checking for.  You're checking for temperature.  You're checking for curtains.  Usually, towards the end of the year, they really get stiff on the curtains.  Curtains is an impairment of surveillance.  There's cameras inside the cell house.  So if an offender has a curtain up inside their cell, number one, we don't know if they're harming themselves or harming someone else or doing something they're not supposed to be doing, breaking rules and -- but, more or less, harming themselves.

So your understanding of that policy is, more or less, of a zero tolerance thing.  You have to enforce those rules.  But, like I said, toward the end of the year or around the holiday times, that rule is really forced and really tough

Page 32

because of the situation where offenders get home sick.  They don't get to spend time with their family.  A lot of guys may not have some communications with their families, so the pressure sets in.  Things like that.

So our suicide rate usually goes up towards the end of the year from Thanksgiving throughout New Year's.  So just an understanding of that policy and making sure that your sergeants and your staff understand that.  It's a zero tolerance, and we have to stay on top of it.

Q.   So are these all things that you are -- like are -- is there like formal lesson plans or like formal -- any formalized list of things that you're supposed to be instructed on as a new lieutenant, or are these just sort of like ad hoc as you're going through day-to-day things you're being instructed on new --

A.   I believe day to day and -- polices that we're supposed to follow.

Q.   So it's just as you go through new situations, you learn --

A.   Yes, ma'am.

Q.   And there is no list of topics that you have to be trained on to become a lieutenant?

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 10 of 102

ANTHONY WATSON
October 30, 2019

Page 33

A. I want to say no.

Q. Okay. And, again, any sort of evaluation while you were being trained would be in the work improvement plan?

A. Yes, ma'am.

Q. And did you receive all of those?

A. Yes, ma'am.

Q. Is there like -- so there's like a six-month probationary status when you're first hired as an officer.

Is there like a probationary status that you have when you're first appointed to a sergeant position?

A. Yes. I believe it's about the same time.

Q. Okay. And same for a lieutenant?

A. Yes, ma'am.

Q. Okay. And is that like formalized? So you'll receive notice that you're no longer on probation?

A. Yes.

Q. Do you know who would make the work improvement plans?

A. It would be -- you're assigned to -- whatever group you're assigned to -- it would be the captain that's assigned to you. He would make the

Page 34

work improvement plans for his lieutenants. The lieutenants will make the work improvement plans for the sergeant.

Q. Okay.

A. Sergeants make it for the officers.

Q. Okay.

A. So on and so forth.

Q. And how often would they make those? Do you know?

A. Once a year.

Q. Okay. So there wouldn't be multiple ones while you're being trained?

A. There would be if an officer was having some issues.

Q. Okay.

A. But if you were moving along pretty good, learning quickly, getting the hang of things, it would be just one.

Q. And is that separate from your normal yearly assessment?

A. Yes.

Q. Are they -- do they use similar forms, or are they --

A. Excuse me?

Q. Are they the same form?

Page 35

A. No, ma'am. No, different form.

Q. Got you. Okay. And how long were you in the lieutenant position?

A. I was in the lieutenant position five and a half, six years maybe.

Q. Okay. So until probably 2017?

A. Yes.

Q. And then you returned to the officer position?

A. Yes.

Q. And while you were at IDOC, you've also served on some of the emergency squads, right?

A. Yes, ma'am.

Q. So can you go through which ones those were? You were on E squad?

A. I was on E squad.

Q. When were you on E squad?

A. E squad is probably 2008 through 2016, 2017 or something like that.

Q. And what other --

A. And also I was a first responder.

Q. Is that the same as the --

A. Yes, ma'am.

Q. How long were you on the first responder?

A. I was first responder for eight years,

Page 36

nine years.

Q. What's the difference between the two groups?

A. QRT is just any emergency, anything that happens at the facility, you have a group of people -- I'd usually say about four. And that consists of -- it consists of a lieutenant, sergeant, and two officers; two sergeants, two officers; or four officers. It really depends on who is at work.

E squad would be persons -- I hate to say it, but like a squat team. Anything that the QRT team can't handle, then E squad would be called for that disturbance. A riot. It could be an escape situation or things like that. So things that are out of normal that first responders can't handle, then they would call the captain, and then the captain would then call and activate E squad.

Q. Would E squad ever respond to things like fires, or would that be the first responders?

A. That would be the first responders.

Q. Okay. And so what type of -- what is the process for getting put on either of those squads?

A. For the QRT team, there's a training and testing that you have to go through. E squad is -- they like for you to be QRT qualified because then

Page 37

you don't have -- if you're going to be on E squad, you have to be QRT qualified.

Q. Okay.

A. Because when E squad gets activated, they are put in the capacity of -- hypothetically, there is a riot. E squad gets activated. And they get on the scene, and you could have bodies that are bleeding or stab wounds or different situations like that. So, of course, you're going to attend to the hurt first before you attend to just some rowdy, out-of-control inmates. You're going to try to take care of the ones that are injured first. So you still have to have the training of what to do -- what to do when you get there and you see that.

You could have three inmates on the ground with a knife hanging out of them. What do you do? You still have to call -- call the signal, try to get the medical staff in the -- get the inmates to the medical staff before -- give them medical treatment. And you have to have an understanding of if there is an emergency situation and four people show up that are QRT and it's -- the emergency situation turns into a dangerous situation, you have to know when to call for extra aid, when to back out, call kind of a tactical retreat. We're not really

Page 38

running away, but we're kind of stepping back and getting reinforcements. And then you can reengage -- reengage when it is safe for you to reengage.

Q. Do people request to be on the QRT squad or --

A. Yes. They do ask to be on the QRT.

Q. And is it a competitive selection process?

A. For QRT, no.

Q. Okay. Is there any sort of benefit that comes along with being on QRT? Extra pay or --

A. No.

Q. And how frequently did they do -- what type of training did they do before they go on the QRT squad?

A. They have to complete a -- I believe they're in a class -- I believe they're in the class two to three days -- classroom work. And they test out. For E squad, there is classroom work -- constant classroom work, but there is also physical training that you have to pass.

Q. With the QRT, what kind of topics do they do in that two to three days?

A. QRT, they go over fire safety. They go over evacuation. They go over -- it could be

Page 39

inclement weather. There is a series of things they go over; but, more or less, fire safety, bloodborne pathogens, how to use a fire extinguisher, how to -- if you come across a cell and there is an offender hanging in the cell, the training is you don't enter any cell by yourself. You always have to have two people to enter into a cell just in case -- it could be a ploy to get one officer to enter the cell and become a hostage situation. They go over bomb -- bomb threats, things like that. There is a series of topics that they go over in the class.

Q. Is this all in-classroom training, or is some of it hands on?

A. Classroom training and some hands-on.

Q. And are there like training materials that you received while you were doing this type of training?

A. Yes.

Q. Do you still have those materials?

A. No.

Q. Did you take any kind of test while you were in the QRT training?

A. Yes.

Q. Okay.

A. Yes. You had to take a test at the end

Page 40

of the training.

Q. Written test?

A. Written test, yes, ma'am.

Q. And who ran that training?

A. It would be an instructor. A QRT instructor. And to be a QRT, I believe it is a week of training down at the New Castle Training Facility.

Q. Okay.

A. And their training is a little bit more rigorous than just training for a QRT. They have to know all of the policies and procedures behind why we do what we do to become an instructor.

Q. Is a QRT instructor -- is that their only position?

A. Oh, no. That's just one of their many positions that they may have. A QRT instructor can be an officer. It can be a sergeant. It could be a lieutenant. It could be a captain. They just took on that extra job.

Q. Do you remember who was the last QRT instructor while you were at ISP?

A. I believe his name was Sergeant Chenoski and Lieutenant Zimmerman.

Q. And when did you go through the QRT training?

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 12 of 102

Page 41

A. The first QRT I believe I went through was in 2008 maybe and then after that it's a yearly training.

Q. Okay. So it's the same training?

A. Same training, yes, ma'am.

Q. Did they do any other trainings besides the once a year?

A. Yes. We have our 40-hour training, which every year -- every officer goes through the same training that they go through when they apply for the job.

Q. This is officers generally?

A. Well, I'm sorry. I should say -- I call everyone an officer, but everyone. Anyone that is employed at Indiana State Prison goes for a 40-hour training.

Q. Just stick with -- let's just talk about QRT now, and then I'll ask you some additional --

A. QRT trainings? Once a year.

Q. And for three days?

A. For about three days, yes, ma'am.

Q. And everybody who is on the QRT team goes through the same training?

A. Yes, ma'am.

Q. Okay. And you said that they do some

Page 42

fire safety training.

What does that focus on? Fire safety and evacuation?

A. Fire safety focuses on like how to use a fire extinguisher properly, what fire extinguisher do you use if you know it's a chemical fire or if you know it's a regular fire. We had the ABC fire extinguishers, and then we just have the water fire extinguishers. Evacuation plans of the facility. Evacuation plans of the cell house that you may be working in or the area that maybe has the issue. Go over videos and also take tests.

Q. What kind of videos?

A. They'll show a video of a -- I'll say a small -- maybe a fire that starts in the kitchen.

Q. Okay.

A. How do you evacuate the kitchen? How do you get all of the people -- the workers out of the kitchen and the dining hall? How do you get them out?

Q. And so is this -- this testing -- this training on fire extinguishers and evacuation, is this training that other members -- other -- scratch that.

Do other employees at the

Page 43

Indiana State Prison get training on fire safety and evacuation?

A. Yes. I believe it's in our -- don't quote me, but I believe it is in our 40-hour training. They do touch on fire safety and evacuation plans. How to read evacuation plans and things -- things like that.

Q. Does it go through the same things of how to use a fire extinguisher?

A. Yes.

Q. Okay.

A. I believe.

Q. So those trainings are essentially the same?

A. Yes.

Q. So the same training that you would get on fire safety as a QRT?

A. Yes, ma'am.

Q. You would also get as just a regular officer?

A. Yes, ma'am.

Q. Are there training materials associated with the 40-hour training?

A. Yes.

Q. And does that have a name, or is it

Page 44

called the 40-hour training?

A. We -- in-service. That's what they call it.

Q. And how often?

A. It's once a year.

Q. And it's classroom based?

A. Yes, ma'am.

Q. Any practical based -- any practice like practical training?

A. Yes. They were small. Not a lot. But, more or less, everything is PowerPoint, classroom. We may do some demonstration of how to properly put handcuffs on, how to properly take handcuffs off. Things like that.

Q. So if the -- the 40-hour in-service training covers the same topics as the QRT training, then what things are the QRT trained to do that anyone else at the prison is also not trained to do?

A. It's really about the same training.

Q. Okay.

A. Just more -- you are designated as the first responder. The thing is -- I mean, if you're in sight, sound of a situation, they tell you to respond; but, hypothetically, if you're not -- if it's a situation that it's just one officer on the

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 13 of 102

Page 45

range, and there's a situation happening inside of a cell, an officer can't go in that cell by themselves. So they would call for help.

The first people that would respond would be the QRT first responders.

Q. Okay.

A. They're going to respond to help and assist that officer in that situation.

Q. Okay.

A. Whatever it may be.

Q. Okay. So there is no difference in training then? So you basically sit through the same training twice a year?

A. Almost. If you are -- if you are a QRT first responder, it is almost the same training as you would get in your in-service training.

Q. So do you get to skip the in-service training?

A. No. It's mandatory.

Q. So you get trained twice?

A. Yes.

Q. Okay. Are there any drills that the QRT -- the QRT does?

A. Yes.

Q. How frequently do they do drills?

Page 46

A. Usually -- well, I'm going to say -- usually, once a day. Once a shift.

Q. Okay.

A. It could be a situation -- there's a 10-10 call over the radio. A 10-10 is a fight between two offenders. First responders respond. It could be just an assessment that the captain is running wanting to see how quick it takes for the first responders to get from wherever they're assigned to the -- to where the fight is at. Once they get there, what do you do? And that training -- that's every day.

Q. Okay.

A. On the day shift and night shift. That's just to keep the first responders on their toes. When a real situation happens, they get more acquainted in making the decisions, what to do, how to do it, talking clear over the radio, giving us your precise location, and how many offenders are involved.

Q. That happens every day? The drills?

A. I would say every day there is at least one assessment happening, but the thing is the QRT team members don't know that it's a drill.

Q. Okay.

Page 47

A. So every time they hear a call over the radio, it's like the real deal.

Q. And who runs those drills?

A. It will usually be the shift supervisor, which would be the captain.

Q. And are there any sort of documentation or evaluations of those?

A. Yes. Documentation of, like I said, what the situation is, where it's at, where the situation is happening at, all parties that are involved, and how long it took you to get there. Once you got there, what decision are you making when you get there, do you need to do -- do we need to secure the scene? Do we need E squad to be called in? It could be a fire. Do we need the offender fire brigade to be activated? It could be anything.

Q. Who is making that documentation? Is that the -- the QRT team, or is that --

A. It would be the QRT along with the captain because, of course, the captain would be in the command office or his office. He has the cameras. He's watching.

Q. Right.

A. Once they're done, they'll make the reports of what happened, what was the assessment,

Page 48

and, you know, go from there.

Q. And does he go over those assessments?

A. Yes.

Q. And what are those called? Do they have a name?

A. No, not really. Just reports of the incident -- incident report.

Q. Okay. So it's just a normal incident report?

A. Yep.

Q. Does it have a special designation to show that it's a drill?

A. Yes. I can't think of the name of that report, but it's -- it's a report that the captain generates. Security assessment. That's what it would be called. Security assessment training.

Q. Do you know where those are kept?

A. I believe in the captain's office.

Q. And do you know where the -- we talked earlier about the work improvement plans.

Do you know where those are kept?

A. Captain's office.

Q. So those aren't kept in your personnel file?

A. No. Well, hold on. At the end of the --

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 14 of 102

Page 49

with the work improvement plan, there's a copy made that's in the file in the captain's office and then a copy gets sent to HR.

Q. Okay. With the drills that you would do at QRT, what topics -- what were the most common topics that they would cover?

A. Emergency situation like a stabbing. We would call that -- if the officer sees an inmate bleeding or anything, that's a Signal 3000. It's just emergency situation. From the Signal 3000, it could escalate to a 10-10, which is a fight.

Q. Okay.

A. And from a 10-10, it could merge to a Signal 7. Signal 7 means -- that's a weapon that's being involved. So you could have -- have all of the above within a two-minute span. It really depends on the officer or anyone coming upon a situation and what they see.

Q. Okay.

A. It could be just a fight. Two inmates shoving and pushing on each other. An officer could -- I don't want to say panic -- but not call the right call because they call a Signal 7. Signal 7 is an emergency situation because that fight can turn into an emergency situation other than two guys

Page 50

just boxing it out. One guy pulls a knife out or a lock-out. It is really various --

Q. Do you remember any QRT drills about fires?

A. Yes. I'm going to say smoke coming from a cell. And at -- you hear the call, so you think it's the real deal. So you hear smoke coming from a cell. You show up. You know, you ask the question, "Hey, where is it coming from? What cell?"

"300 range on the north side."

Q. Okay.

A. Okay. Before you run upstairs, you grab a fire extinguisher just in case. You run upstairs, grab a fire extinguisher. Go up. On the way down to the cell, it's a hot pot that's just melting down.

Q. And this is a drill that you remember doing?

A. Just a drill.

Q. Okay.

A. Just a hot pot that got overheated. I'm not going to say it didn't -- it wasn't -- I'm not going to say dangerous because anything like that is dangerous. I don't know what to say about that because that could turn into a situation in itself. Smoke is not good for the cell itself, and then the

Page 51

neighbors or the ones above or below.

Q. So when they did these drills, would they actually have the hot pot overheating?

A. Yeah. The hot pot was just overheating.

Q. Did you ever do any evacuations as part of the QRT drills?

A. I'm not going to say QRT, but every cell house planned their -- planned a fire drill. We did do fire drills once a month. Fire drills consist of we get with the fire chief -- the inmate fire chief, I should say, that lives at the prison. We have him set off the fire alarm, and we calculate how fast it takes us to evacuate the whole cell house.

You get all of the inmates out and have the officers go back and sweep the ranges to make sure everybody is out because offenders don't have to leave their cell if they don't want to.

Q. Okay.

A. They hear the fire alarm. "Hey, there is a fire alarm. Everybody out. Everybody out." You're going to get the majority. 90 percent of the people are going to leave. You're always going to have some guy sleeping or got his headphones on so he doesn't hear what's going on. So you have to go to each cell to make sure everybody's out of the cell

Page 52

and then you, yourself, make sure you account for all of the officers and then --

Q. And who runs those fire drills? Is it the firemen, or is it the officers in the cell house?

A. Both. The fire -- the firemen would help us with the fire drill as well.

Q. And do you know when the fire drill is going to happen?

A. No. No. No one knows when the fire drill is going to happen.

Q. Except the people planning it?

A. Yeah. Except for the ones -- if a captain says, "Hey, we need to do a fire drill. The end of the month's coming, and we haven't had a fire drill on the cell house." That's something they will have planned, but only the captain will know about it working along with the offender firemen.

Q. Okay.

A. The officers don't know. So it's almost like a real deal at all times.

Q. And how frequently do those fire drills happen?

A. I would say about every month they usually try to have a fire drill.

Q. Okay. Are there any records of those

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 15 of 102
ANTHONY WATSON
October 30, 2019

Page 53

fire drills made?

A. I don't recall. I would assume there would be. You have to keep records for not having the same fire drill in the same unit every month, so I would believe so.

Q. But you've never seen any records of the fire drills?

A. No, ma'am.

Q. Okay. So while you were at IDOC, did you work both the day and the night shift?

A. Yes, ma'am.

Q. When were you on the night shift?

A. When I first was employed in 2007, I started out on midnights. When did I go to days? I went to days maybe in 2009. I went to days for a short period, and then I was promoted to sergeant and then went back to nights. 2012 when I was promoted to lieutenant, I went back to days. And then for the next -- I worked days three years. For three years, I was on days after being lieutenant. I think my last three years as lieutenant I worked days and nights. It was like one year I was on days; one year I was on nights and vice-versa.

Q. And is staffing usually, more or less, the same on days and nights?

Page 54

A. No. A lot less on nights.

Q. What's the reason for that?

A. Well, during the day, you have -- we have everything going on. Inmates going to school, commissary. We have a lot of the different programs that are happening during the day that you need an officer to cover that area. At nighttime, there is no programs going on. So the staffing on the days is probably about 120 to maybe 130 officers. Staffing on nights is about half of that. About 60 officers.

Q. Okay. As a sergeant, did you have like your own office when you were there?

A. No, ma'am.

Q. As a lieutenant?

A. Yes, ma'am.

Q. And where was the office?

A. On the -- I'm going to say C, Charles, was my first assignment inside of the cell house itself.

Q. Okay.

A. Actually, my office was adjacent with the unit team's office and right across the way would be the officer's station.

Q. So you didn't share that office with anybody else? That was your individual office?

Page 55

A. I can't say yes because there was kind of like a -- like -- almost like a bar door in between my office and the unit team office. There was a lock on it, but I never locked it. The unit team -- they worked from like 5:00 in the morning until 3:00 in the afternoon. After 3:00, I would be the only person there if I was working any overtime or staying afterwards.

So really at 3:00 o'clock nobody is in those offices. Mainly, myself. I wouldn't be in those offices after 3:00. I would lock my office up and mainly work with the sergeant out -- out at the officer's station with the sergeants until it was time for me to go home.

Q. About how much time would you spend in your office as lieutenant?

A. As a lieutenant, I'm going to say maybe -- maybe an hour.

Q. And what would you do in your office?

A. Payroll for the -- offender payroll because we have offenders that work inside of the cell house. Payroll, sending out any work orders that need to be done, or any work that needed to be done on my unit. Communicating with the nighttime sergeant coming in on nights and the nighttime

Page 56

captain what happened during the day at -- in C cell house. What to look for if it was happening.

Q. Okay.

A. Just sending e-mails to the night shift when they come on so the nighttime supervisors receive that and they know what's happening on the unit.

Q. Would you check your e-mail periodically throughout your shift?

A. Yes.

Q. How frequently?

A. Maybe once or twice a day.

Q. And so you would go into the office?

A. Yes, ma'am.

Q. You never had a cell phone in the prison?

A. No. It's against the rules.

Q. As a lieutenant, did you attend any regular meetings?

A. Yes. Every morning was an 8:00 o'clock meeting, and that meeting would be with the warden, deputy wardens, all the zone lieutenants, and any captain that was at work at that time.

Q. Were there any meetings -- minutes related to those meetings?

A. Yes, ma'am.

BARBARA DEVINE, et al. v.     Cause No. 3:18-cv-00995-JD-MGG       ANTHONY WATSON
RON NEAL, et al.                                                             October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 16 of 102

Page 57

Q. Do you know where those are kept?

A. No, ma'am. The -- it would be the superintendent's secretary would be the one that would keep the minutes.

Q. How long would those meetings usually last?

A. Maybe 10, 15 minutes.

Q. And what type of things would you normally talk about?

A. If there was a disturbance that happened the night before. That's the first thing on the topic. Any projects or anything that's coming up within the week. Hypothetically speaking, Monday morning, what we got going on for the rest of the week. If a unit is on lockdown -- we'll put a unit on lockdown. Situations happen. A handful of fights happening off a certain unit.

If IA has given us any information about something that's maybe going to happen right then and there. And at 8:00 o'clock, we'll make the decision to put a unit on lockdown or not to -- try to stop a situation from happening or -- I shouldn't say stop it; but, more or less, prolonging a situation from happening.

Q. Okay.

Page 58

A. A dangerous situation. A -- a note that an officer is going to get hurt today out of A cell house. We will lock it down.

Q. Would you ever bring up things that -- suggestions or --

A. Most definitely.

Q. Policy changes?

A. Most definitely.

Q. During those meetings?

A. Yes, ma'am.

Q. What types of suggestions or policy changes would you bring up?

A. Officer safety, offender safety, security threat groups. You know, those are gangs or different things that we see with certain gangs and -- maybe congregating in areas that they normally don't congregate in. We need to look into that and not wait until something happens. Be proactive instead of reactive.

Q. Were -- did you find that your supervisors were normally receptive to your suggestions?

A. Yes.

Q. Did they ever implement any of your suggestions?

Page 59

A. Security. Security in threat groups. Normally, if -- I'll use the -- where you can tell, number one, is at breakfast time. Normally, if all the offenders eat on the west side, and on this morning they're eating on the east side, that is a big situation. That's something you need to pay attention to, you know.

Q. And so what was your suggestion?

A. My suggestion was talk with our -- talk with IA and see if they can come out and do some interviews, talk with some leaders, see what's going on, or see if there's a situation we can squash before it gets out of hand.

Another situation was how to run breakfast, or, you know, what time breakfast should get started. Breakfast should get started at the time that we allot for. Not any time over that. How to run the cell houses. We usually run about three cell houses together, but there is kind of a strategic way to run them. You want to run the group like -- C, Charles, is the biggest line. It's 400 offenders. And a lot of times some captains run them last.

Well, if we run those guys last, it's going to take them forever to get back in their

Page 60

cells, and they drag their feet. And now it's almost 6:00 o'clock. It's almost shift change, and we're still putting these guys in their cells. "Hey, let's run C, Charles, first. Run them at 3:30 in the morning."

So they have no choice to get out, eat, and get back, and it gives them a little bit longer to get them secure.

Q. Okay.

A. We're not securing C at -- start securing them at 5:30 when they get back to the cell house because it's 5:30 count and now they're securing after 6:00 o'clock. "Hey, let's run those guys first." Just small things like that.

Q. Okay. Did you attend any other meetings regularly?

A. Mental health meetings on Wednesdays. I think that was at 10:00 o'clock.

Q. And what was that?

A. I can't think of the name of what they called it, but it was a meeting with our mental health staff and medical staff dealing with our offenders that have special needs -- special management needs as far as their mental health.

Q. Any other regular meetings?

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 17 of 102

Page 61

A. No. I think that's about it.

Q. Did the first responders -- whoever was assigned to be a first responder that day -- did they have any meeting before the day started?

A. No, ma'am.

Q. And so while you were a lieutenant, who was your direct supervisor? Who would you go to for authorization to do something?

A. My captain.

Q. Okay.

A. Whoever that would be assigned at that time.

Q. So it could be any of the captains?

A. Yes, ma'am.

Q. And it sounds like from what you've been saying is that you'll get switched around to different posts a lot each day.

Is there a reason that's done instead of assigning someone to the same position?

A. Well, depending on who -- who comes to work. You can have a Zone 10. That's off. He's on vacation. Well, I'll use myself as an example. I'm in charge of C cell house, and there could be a zone lieutenant that's on vacation in charge of A. So the captain will ask, "Hey, look after A as well or check

Page 62

in on the unit and make sure the sergeant's okay. Do they need anything."

If there is a situation that happens over there -- they need to talk to a lieutenant -- you know, tell them to call you over the radio. Go over there and try to -- try to help them out. It could be a situation -- like every day you're assigned to your unit, but at lunchtime when it's time for your unit to go to chow, you follow your unit all of the way out to the chow hall. You kind of oversee your unit's chow.

Q. So that's -- I think that's not quite my question. My question was more, you know, they might put an officer in B cell house one day and C cell house the next day.

A. Got you.

Q. What's the reason for moving them around in that way?

A. So the officer doesn't get complacent.

Q. Okay. Is there any concern with doing that that officers aren't -- don't have the experience in different areas to handle the responsibilities of working in that specific area?

A. No. That's pretty good -- a good system because then the officer doesn't get -- a lot of

Page 63

times if an officer just happens -- it could be a month, and they are assigned in the same place.

Q. Okay.

A. A cell house. And they come to work one day, and they're assigned somewhere else. Well, now the officer gets an attitude because maybe you have a bad officer. The officer started trafficking on this unit that they've got used to.

Q. Okay.

A. So now they're not working over there. They're working somewhere else. If you -- I'm not going to say move them around every day, but you give them a different look and they're working in different environments. I think ISP has 11 units. You have 11 different environments. You as an officer has to know how to work into each environment.

Q. Okay.

A. You can't be the -- you can be the same officer by being fair, firm, and consistent; but working on this unit as -- working in a dorm is completely different than working in a cell house.

Q. And so you know a person -- if the person hasn't had experience working in that specific position and they just had the regular amount of

Page 64

training, are they qualified to lead -- be the officer in charge in that cell house?

A. I would say no.

Q. Okay. So if someone has never been assigned to B cell house before, should they -- they should not be the officer in charge in that cell house?

A. If they were assigned as the officer in charge in another unit, but not in B cell house, I then believe they could be the officer in charge of B cell house if they have the experience of being in charge somewhere else. You're doing the same job. Like I say, the atmosphere may be a little bit different; but, number one -- there's one of two things you're going to do. You're going to secure and you're going to do count. That is done exactly the same no matter what cell house you work in day or night. That's done exactly the same.

The atmosphere may be different. Different type of offenders. But if you've never been in a lead position anywhere else and then all of a sudden you're in a lead position on this unit, I'm not a fan of that. It doesn't mean that the officer can't do a good job. If the officer has -- is pretty smart and they can think or they know when to call

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 18 of 102

Page 65

and ask for help, then they can get it done.

I would say if an officer has never been in the lead position and all of a sudden they come into work and they said, "Hey, you're in charge of B cell house tonight," well, the first thing you do is you try to get with a sergeant before you get on your post and just ask a couple of questions.

You know, "Hey, I've never done this before. What should I do?"

And any sergeant or lieutenant will give them direction or say, "Hey, I'll be over there later tonight. I'll help you out. I'll give you a hand."

Q. Okay.

A. But I'm not a fan of that. I'm a fan of helping. I'm not a fan of putting someone brand new on a unit to run it when they've never ran a unit.

Q. So what level of experience or training is necessary for somebody to be an officer in charge?

A. Well, I'm going to say we try to make sure they're out of their probationary period, but a lot of times it doesn't happen. A lot of times -- this is the officer we have to pick from, and we have to pick the best one that we believe could run the unit.

Page 66

Q. Okay.

A. But I believe it should be someone out of their probationary period --

Q. Okay.

A. If you're out of your probationary period, they should be able to run a unit.

Q. Okay.

A. Or have the -- have the ability to run a unit with some help. Have the knowledge of how to do it.

Q. Okay.

A. But having the knowledge and then putting it in -- putting that to work is two different things. But if they're smart and if they -- if they ask the right questions and if they don't try to do too much -- just do the basics. "Hey, we're going to secure, we're going to count, and we're going to do the security walks. If you have any questions, please call."

Q. So if there is an inexperienced officer running a cell house, the sergeant or lieutenant should be looking out for that cell house?

A. Most definitely.

Q. Is that something that a lieutenant or sergeant should do on their own without being asked

Page 67

to do so?

A. Yes.

Q. Or being instructed?

A. Yes. If you're a good sergeant or good lieutenant. Number one, the lieutenants are the ones that make the roster.

Q. Okay.

A. The lieutenant who makes the roster may not know that that officer is not a strong officer; but before I left as lieutenant, I was in charge of doing our roster. And my job -- I took it -- my job is I have to know my people, so I'm going to put someone that -- I hate to use the word "weak" -- but put someone that's weaker than a stronger person in charge.

Q. Okay.

A. I could put a strong person in charge and have an officer that's just not as strong working with him, but I wouldn't have it the opposite way around. But that's -- that's just something I did. I got to know my people. I'm putting my aces in my places. I'm not going to put a strong officer up in a tower and a not-so-strong officer running a unit. I would switch those.

Q. You mentioned that there was a

Page 68

problem with -- you know, you mentioned officers trafficking in cell houses.

Was that a problem at ISP?

A. I believe it's a problem at all our facilities, yes. ISP, yeah, we had our issues.

Q. Was it happening pretty frequently?

A. I'm going to say yes.

Q. Was there efforts being made to cut down on trafficking?

A. Yes.

Q. Were those efforts at all successful?

A. Yes.

Q. Does trafficking still continue at ISP?

A. I can't say yes or no. I don't work there, but --

Q. When you left?

A. When I left? Yes, ma'am.

Q. I think we went over a few of these, but can you tell me as a lieutenant what reports you were responsible for creating?

A. Any incident reports. That's any incident that happens on your unit, you're responsible for the overseeing of the collecting of all the -- all of the reports. Hypothetically speaking, if there's a fight that happens, two

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 19 of 102

Page 69

officers see it. They detain the two inmates. The two officers have to make a report on what they saw.

Did they use a chemical agent? If they use chemical agent, they have to fill out a use of force report. With the use of force report, there's going to be a written statement, use of form report -- incident report, segregation confinement report, a conduct report, and then any reports from the medical staff that you get -- escorted them over to get them checked out by the medical staff.

So the lieutenant would get with those officers and make sure this, this, this is done. The lieutenant would write his own report up at the end just as a collective -- of all of the information that he's got, and then he would then send that to the captain. The captain would then go over those reports and send those out to the superintendent and major and so on.

Q. Any other reports that you're responsible for?

A. Lieutenants would be responsible for -- there's a monthly inspection report.

Q. Inspection of what?

A. The cell house. Inspection of their unit.

Page 70

Q. Is that for like maintenance issues or, you know, safety issues? What kind of things?

A. Maintenance, safety.

Q. Okay.

A. All of the above.

Q. And you said you also did work orders.

What kind of maintenance problems did you guys have?

A. Plumbing, broken windows. And that's from the offenders breaking the windows out. And the more -- we had windows being broken out in the summertime than the wintertime because they're trying to get air in because it's not air-conditioned. So it's hot.

What else? I said plumbing.

Q. Lock issues? Any door lock issues?

A. Yes, most definitely. Because the locks are -- the prison is 150-some years old. So locks -- if an offender tampered with the locks. A lot of guys -- they try to stick a back end of a toothbrush in the lock to try to unlock their own door. They break the toothbrush off in the lock. That officer can't stick the key in the door to either secure the door or unlock the door. Unfortunately, if the inmate does that, he's still stuck in the cell. He's

Page 71

stuck in his cell until we get maintenance to come fix the lock.

What else?

Q. Any electrical problems?

A. Yeah. Electrical outlets. Offenders usually -- each offender has four -- a four-plug outlet in their cell. They overload the outlet because they have a TV, two fans, a hot pot, a keyboard, and they're trying to use them all at the same time. So they make makeshift outlets out of popsicle sticks that they -- like a four-way that they plug inside. And it just kind of overloads the outlet itself.

Q. Okay.

A. But that's usually done -- they do that themselves. They tear that up themselves. If an inmate does have an outlet in their cell that's faulty, they do not waste any time to let any officer on the range know. They let the sergeant know.

Q. Does that happen frequently that the outlets are faulty?

A. They become faulty if the inmate tampers with them. Other than that, any time the inmate moves out of the cell, there's a cell inspection done. And if the outlet is not working or, say, for

Page 72

instance, the face plate is pulled off the outlet and you just have the outlet there, then that cell would be, more or less, shut down until it can get fixed. Don't move no one inside of that cell because of fire safety.

Q. Okay. Do you remember any instance of outlets causing fires?

A. Yes. Inmates, like I said, overload the outlet.

Q. So that was fairly common?

A. Oh, yeah. All of the time.

Q. Okay. So you said you did the maintenance report.

Any other types of reports that you were responsible for?

A. Let's see here. When I worked nights -- usually at night, we had to do -- the lieutenants had to do rounds on the units. Once we do our rounds, then we just had a report we had to write to the deputy warden letting them know -- our job was to do rounds on all our special management units -- our lock-up units, I should say.

Q. Okay.

A. Not any general -- general housing was fine, but he wanted to make sure that the lock-up

BARBARA DEVINE, et al. v.                Cause No. 3:18-cv-00995-JD-MGG                ANTHONY WATSON
RON NEAL, et al.                                                                                        October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 20 of 102

Page 73

units were at least walked by a supervisor or lieutenant or captain or above and -- because these are offenders that are locked in their cells. They only come out of their cells during rec time. That's it. So it's other than general pop and so -- do a report every night on that.

Q. Okay. And what was that report called?

A. Just a memo really.

Q. And those were all of the reports you remember?

A. Yes, ma'am.

MS. PIERCE: Do you guys want to take a five-minute break and go off the record?

MR. ROTHENBERG: Sure.

(WHEREUPON, a short break was taken.)

BY MS. PIERCE:

Q. So as a lieutenant, did you -- were you required to make performance appraisals?

A. Yes.

Q. And what were they called?

A. Work improvement plan.

Q. For anyone?

A. Yes.

Q. And who were those individuals?

Page 74

A. Every year performance appraisals were -- if I was working nights -- that's 60 officers. So that would be split up amongst two lieutenants and three sergeants. Five of us would do the appraisals for 60 officers maybe. I can't remember offhand. Every year they changed --

Q. Okay.

A. -- on who I had and the number I had depending on how many officers I had.

Q. So you would do them just once a year?

A. Yes.

Q. And did you -- were you also in charge of disciplining individuals as well?

A. As far as the discipline, I was not -- if a sergeant or officer needed to be disciplined, I would -- if I had -- if I was their supervisor, I would write up the incident and present it to my captain. The captain would then write whatever he would write up and relay that to the major. And the major would make the decision if discipline needed to be rendered or not.

Q. Okay.

A. All I could do is make a recommendation of discipline. The major would be the one in charge of rendering out the discipline.

Page 75

Q. How often would you say you made a suggestion of -- for someone to be disciplined?

A. I'm going to say not that often.

Q. Okay. About once a month?

A. Oh, no. My philosophy was if I have to discipline you -- if I have to write you up for a discipline, then that means what am I failing as a supervisor. I wasn't doing my job as a supervisor because it's not a hard job as long as you communicate to the person what their requirements are and what they're supposed to do. My philosophy as a supervisor is I have to find out what am I lacking in leading you and what are you lacking. So, therefore, that's where the work improvement plan would come in place. That would come way before any discipline would happen.

Q. Okay. And so you would do a work improvement plan?

A. Yes, if need be.

Q. Okay.

A. A work improvement plan. And that would be, hey, the officer needs to pick it up. The officer needs to show more initiative. The officer needs to remember their job.

Q. And how often would you do that?

Page 76

A. And that was -- I'm going to say not that often. Very rare. My philosophy in supervising is I have to sit down and talk with them. I felt that people learned more from communication face to face than me writing it down and saying, "Hey, read this."

Q. Okay. So how often would you have to sit down and talk to somebody about their work performance in a negative?

A. I'll use one person -- maybe in a six-month period, maybe once, maybe twice.

Q. And how often then -- so maybe -- so less than that you would do a work improvement plan?

A. Yes.

Q. Would that be maybe once a year?

A. Maybe once a year.

Q. And how many times do you think over your career that you disciplined somebody as a lieutenant?

A. Maybe -- maybe three times.

Q. Okay.

A. Maybe three times.

Q. And do you remember what those involved?

A. One situation involved a sergeant -- what's the word I want to use? Actually, it's the same sergeant twice. A sergeant not -- I should say failing to -- failing to do a report. As an example,

Page 77

I called the sergeant around 9:00 o'clock at night to ask, "Can you take care of this report for me?"

"Yes, sir, I'll take care of."

At 1:00 o'clock in the morning, I call back. "I still haven't received that report. What's going on?"

"I'll get to it. I'll get to it right away."

At 4:00 o'clock, he still had not done the report. And so I told the sergeant I was disappointed in his actions and recommended him for discipline. I said at 4:00 o'clock when I call -- at 5:00 o'clock I got the report. And so then I talked to him after that and said, "I wouldn't have had to recommend you for discipline if you just did this report when I asked you to do it." I said, "It was 9:00 o'clock when I called you, and it's count time. So you have a half hour, 45 minutes to do your count, and then we don't count again until midnight. So you have nothing to do."

And I was like, "I was a sergeant before. I did your job. I know what you're doing. There's nothing to do right now. So the report -- that's the reason I called you at the time to ask can you have this report done."

Page 78

There was another incident -- another sergeant was caught trafficking. I was -- unfortunately, I was the one to catch him trafficking, and I recommended him for discipline and possible termination.

Q. Trafficking in what?

A. Trafficking -- he brought an illegal electronic device to an inmate.

Q. Was he terminated?

A. Yes, ma'am.

Q. And you said there was a third time? Do you remember?

A. Oh, the first sergeant was -- there was another incident with -- it was during count time, and I was a lieutenant at night. I was doing a security walk on our administration segregation unit. And I radioed over the radio that I needed an officer on the range to assist me. And the sergeant said, "Stand by. We're doing count."

And so I waited a second, and I said, "We have five officers that can count. There are six officers in this cell house. I need an officer right now with the key to this range." The sergeant radioed back to me and told me to stand by and wait. And so I then left the range because I was

Page 79

all the way up on 500 range. And I come all of the way downstairs, and I removed everybody out of the office. And I sat the sergeant down and explained to him, "When I call you on the radio about a situation that's happening up on the range, I am not to be told I'm going to wait. I don't wait for anyone. This is a serious situation. I need some help, and I don't have the keys. I need an officer up here with the keys. Why are you telling me I need to wait until count's done?"

Q. Okay.

A. "Who is running this cell house?"

Q. Okay.

A. You're in charge of the cell house; but when a lieutenant shows up on a unit, that lieutenant is in charge of that unit. And I tried to say that as nice as I could because I'm -- I try to still lead in the mix of chastising one of my officers. I still try to be professional with them and respectful, but my patience was running thin with him at this time because it was the second time I had to chastise this sergeant. And he's -- he turned out to be -- after the situation, a very good sergeant.

Q. You had mentioned before when you did the QRT drills that you did some fire-related QRT drills.

Page 80

Did those ever involve like an evacuation of the -- did you ever fully evacuate a cell house while doing a drill?

A. I'm going to say no, ma'am.

Q. I'm sorry?

A. No, ma'am.

Q. When you did that, did you ever evacuate like a single cell?

A. Yes.

Q. Okay. And would you bring equipment with you when you did fire simulation?

A. Most definitely a fire extinguisher. I'm not going to say that we had -- brought a gas mask or anything like that. Number one is a fire extinguisher. You can't do anything -- you can't do anything else -- I mean, I can open the door and try to get you out; but if the fire is at the door -- if I don't have a fire extinguisher, then the evacuation is almost null and void. I can't -- it's almost like you can't -- how can I get you out of the cell when the fire is stopping me from getting to you.

Q. Okay. So you would bring a fire extinguisher.

Anything else?

A. Fire extinguisher and a radio. Most

BARBARA DEVINE, et al. v.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 22 of 102

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

Page 81

definitely a radio.

Q. Okay.

A. And at that point knowing your surroundings. If you're on the north side of the building, where do you evacuate. That's -- that goes in training and that's posted. On the north side -- it's posted on the south side of the building, at the front door and the back door of the unit or all units, you know.

Q. But you would never do an evacuation like that as part of a QRT drill?

A. No. If anything, one cell.

Q. Would you include that type of information in the QRT drill report? Would you say, for example, this is what was done and this was the additional steps that were taken if it weren't a drill?

A. Yes, ma'am.

Q. Let's talk about policies.

So there's an emergency manual at ISP; is that correct?

A. Yes, ma'am.

Q. Who has access to that emergency manual?

A. That emergency manual is kept in the captain's office and in the training department.

Page 82

Q. And who is shown that emergency manual?

A. As far as in training, all of the officers. Everyone that's involved for Indiana State Prison will be shown that emergency manual, and then a copy is kept in the captain's office. And the captain will have access, lieutenants, sergeants. If any officers ask to see it, they'll have to come to the captain's office to see it because it's confidential. It's not meant to be kept at the officer's station. Inmates come in and out of the office, and they could see it or anything like that. It's kept for just staff only.

Q. And so how are officers and other staff made aware of emergency protocols or emergency procedures?

A. Well, when they go through their training -- the 40-hour training initially, if any officers are on the QRT or first responder team, they have access to that whenever. All they have to do is ask the captain over the emergency radio. It's no problem.

Q. Okay.

A. If an officer has any questions about any emergencies or anything that happens in an emergency -- what should we do -- they ask the

Page 83

captain. No captain or lieutenant will object to them looking at the book or reading it, making copies of it if they need to so they could be better acquainted in what they should do and what they shouldn't do.

Q. People could make copies of the emergency manual?

A. I'm going to say yes, but it's frowned upon because it's supposed to be kept in the captain's office. I'm not saying nobody has ever not made a copy of it. I'm probably sure that they have.

Q. Do you recall anybody ever coming to look at it?

A. No, not any officers. Not that I know of, no.

Q. Did you ever go to look at the emergency manual for any information about what to do in an emergency?

A. All of the time.

Q. You frequently looked at the emergency manual?

A. Being -- if you are in QRT, that's -- they tell you, you know, go over the book. Being on E squad, number one, that's part of our training. Being a sergeant, being a lieutenant, it's part of

Page 84

your training. You need to know that because a lot of times those questions -- officers are going to be asking you those questions. You need to have an answer. Not, "Oh, I think the book says this or that." You need to have an answer for what's going on.

Q. And it's a pretty big book?

A. Yes, it's thick.

Q. How do they go about teaching what's in the book? How do they go about teaching the important procedures?

A. I would believe -- in the 40-hour training, it's more of a PowerPoint. I'm going to say -- I'm not going to pick out the most important -- number one, it's fire.

Q. You think the fire is the most important?

A. I think so.

Q. Okay.

A. Because it's one of the -- you don't have -- I mean, our firemen that we have at the facility are probably better trained than the firemen on the street, but yet it's in an enclosed facility. It's not like a house fire where you can get three, four fire trucks in to help fight the fire. We just have our fire brigade that comes and does the best

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 23 of 102

Page 85

they can do.

Q. Why do you say they're better trained than firemen on the street?

A. Because our firemen are trained by -- oh, man -- FEMA, I think it is.

Q. Okay.

A. The Federal Emergency Management Agency.

Q. Okay.

A. Our firemen -- I think it was a week-long test that they had to be qualified to be a firemen at the Indiana State Prison. Number one, because the facility is so old. Number two, the different entities that we have at the facility. The majority of our cell houses are five stories high. You're dealing with small confinements once you get inside the cell house as far as how to run a hose, how do you run a line to try to put a fire out, if need be.

Q. Okay.

A. If there is a major structure fire -- so a lot of those -- a lot of issues are in places that kind of hinder them from doing those things. There are different ways, different tactics that they have to train for that specific facility to be able to help put a fire out and to be able to do -- the safest way for them as -- you know, the firemen --

Page 86

and try to do it where the risk is -- the risk for their lives and the risk for losing someone's life is very low.

Q. Okay. But for all these reasons, you think the fire is one of the -- fire is one of the biggest risks?

A. Fire is always the biggest risk. Flood is -- okay. I can deal with a flood. I can't deal with a structure fire.

Q. At ISP, you're talking about?

A. At a facility. Especially a facility as old as ISP.

Q. Were there a lot of discussions about ways to minimize that risk among staff?

A. Among staff?

Q. Or among, you know, lieutenants?

A. Oh, we always -- that was something that was a concern of everybody. We always worried about a fire. You know, if we have a structure fire, where do we put the displaced offenders? Do we have a place to put them if we have to evacuate half the facility? Do we have buses that can come in and bus the guys out? Do we have enough staff to be able to place on the buses? Where are we going to put these guys? Are we going to temporarily house them at

Page 87

Westville, or, you know, where can we temporarily house these guys if something happens and you have half the compound up in a fire? What do we do? That was always a topic of discussion.

Q. Were there specific trainings or policies about evacuating prisoners in a fire?

A. I believe so. I can't quote them.

Q. Do you recall going through any training on that issue?

A. On evacuating?

Q. Prisoners during a fire?

A. During a fire? I can't remember.

Q. Okay. So you don't recall going --

A. I can't recall, no, ma'am.

Q. Okay. So just going through like sort of the initial procedures in a cell house, when an officer would come in and get assigned to, say, B cell house, what would be the first things that they would do after getting that assignment?

A. First thing we do is they would come into the cell house and be briefed by either the sergeant that's working or the officer in charge that's working. Once briefed on what happened for the day or what still needs to be done, the officer in charge would then assign the officers to their ranges,

Page 88

assign them their keys.

Q. And who would brief the officer in charge on --

A. The sergeant.

Q. Okay.

A. If there is a sergeant working, hypothetically speaking. If there's a sergeant working days and I was coming on at nights -- I was the officer in charge coming on nights, you would brief me. If during the day the sergeant was assigned to the unit, but got called away and got reassigned and then you became the officer in charge, when I come on the unit at nighttime, then I would be briefed by you.

Q. So you're basically being briefed by the person you're taking over for?

A. Yes, ma'am.

Q. And then you said that the officer in charge would assign ranges?

A. Assigned ranges to the officers that he had -- he or she has working with him.

Q. And what kind of considerations would he or she make when assigning officers to ranges?

A. As far as?

Q. Like which officers to assign to which

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 24 of 102

Page 89

ranges? How many ranges to assign an officer to?

A. Well, we have five floors. So if it's just an officer in charge with two officers, then the officer in charge would be in charge of the ground floor because that person's in charge of having a door key. The door key is only held by one person.

Q. The front door key?

A. Front door key, yes, ma'am.

Q. Okay.

A. And so then the other two officers will be assigned to ranges. One will have four and five; one would have three and two.

Q. And why does only one person have the front door key?

A. Because then it keeps down the confusion of you got the front door key and then I got the front door key, but he has a front door key in an emergency. Three hours go by and you still think he has the front door key, but I really have the front door key. That's stopping help from getting inside of the door.

Q. Sure. I think my question was slightly different. I don't think I stated it clearly.

Why don't all of the officers in the cell house --

Page 90

A. Have a front door key? I don't know. That's something that the Indiana State Prison policy is. One front door key.

Q. Do you think that one front door key policy causes risks in an emergency situation?

A. I'm going to say no because the officer -- if one officer is on the 400 range working with the front door key and one officer is on the 500 range with the front door key and the officer in charge or the sergeant is on the 300 range -- they all have the front door key, okay? The officer on the 300 range radio's dead, so he doesn't hear the signal. The officer on the 400 range hears half the signal, and the person on 500 doesn't hear anything.

So now we're left with -- you have half communication over the radio and -- maybe somebody stepped on top of you. And what that means is if I key to talk and someone else keys up a talk at the same time, only one frequency is going to go through. It may not be mine. I may be trying to call for help. You know, "Hey, somebody get the front door. You know, I got an emergency up here." Nobody hears it.

If everybody has a front door key, yeah, that's -- in a perfect world, that'd be great.

Page 91

I think it would be awesome; but in a not so perfect -- if we know one person has that front door key, we know that person is also going to be in the area -- supposedly in the area of the ground floor.

Q. Okay.

A. Unless there's a situation that happens where they need to go upstairs, but then they have to run back downstairs to try to open the front door. So if you have three people on the 300 range and they all have a front door key, somebody still has to run downstairs.

Q. Okay. So I think -- am I understanding you correctly to say though it would be -- it would decrease the risk if everybody had a front door key?

A. It could, yeah.

Q. Is there a reason why only one person has a front door key?

A. I have no idea, ma'am.

Q. Would you recommend that everybody have a front door key?

A. If I was someone that was in charge? If I was the major, yes.

Q. Okay. And so you said the person on the 100 level is the officer in charge and has the front door key?

Page 92

A. Yes, ma'am.

Q. Is there any other reason why they have 100 level?

A. Because they have the front door key.

Q. Okay. And then is there any consideration into who has the other levels?

A. No. It's just really -- hypothetically speaking, if it is a weekend where we work Friday, Saturday, Sunday --

Q. Okay.

A. Well, the person that has the 4- and 500 on Friday, when they come back on Saturday, they will work the two and three. You just kind of rotate the ranges like that. So you don't have the same person getting burnt out being up top the whole weekend.

Q. Okay. And then -- scratch that. Sorry.

Each person only has a key to the range to which they are assigned?

A. Yes, ma'am.

Q. And what's the reason for that?

A. Well, the locks are different for each range.

Q. Sorry. Just to clarify. Is there any reason why, say, I'm assigned to the 500 range, I wouldn't have the key -- a key to each level?

BARBARA DEVINE, et al. v.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    ANTHONY WATSON
USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 25 of 102    October 30, 2019

Page 93

A.  No.  You would only have -- the keys that you will have would be a key to the cell doors on whatever range that you're assigned to, and you would have a key to the back gate, back staircase --

Q.  Okay.

A.  And then you would have a key to the front gate -- the front staircase.  And that's just -- either it's the same key or we call it the north side key or the south side key.

Q.  Okay.  But what's the reason for not giving somebody a key to each range?

A.  I don't -- well, not having a key to each range because the keys to the 400 range are different from the keys on the 500 and so on and so forth all of the way down.

Q.  Sure.

A.  Each range -- like the 100 range key, the locks are keyed to just one key.

Q.  Okay.

A.  And the same thing for two, three, four, and five.

Q.  Okay.  My question is slightly different.

And so I was just wondering is there a reason why somebody can't -- each person who is assigned to the cell house can't have all of the keys

Page 94

to open any of the cells?

A.  Oh, no, ma'am.  Because there's only -- I want to say in B cell house, there's only one set of keys -- one set of keys for each range.

Q.  Is there a reason ISP couldn't make additional sets of keys and provide additional sets of keys to each officer?

A.  They can, but I believe -- I don't know if it's a facility rule that they don't --

Q.  Okay.

A.  -- or not.  They only -- ISP does have back-up keys if there is an emergency.  We have keys that are kept inside the sergeant's box.  You have a front door, back door key to all cell houses.  The lock shop has all of the keys -- copies of every key at the facility in the lock shop.

Q.  Where is the sergeant's box?

A.  The sergeant's box is right at the front of the facility -- when you walk into the facility, you go through our shakedown area, and as soon as you hit that first gate, we call that the sergeant's box.

Q.  So there's extra keys to every door there?

A.  Every front door and back door.

Q.  Okay.

Page 95

A.  Yes.

Q.  Okay.

A.  Inside of the armory -- excuse me -- inside the lock shop, there is keys -- copies of keys to every lock in the facility.

Q.  Okay.

A.  Every cell, every range, every front door, back door, gates, individual gates, padlocks, everything.

Q.  Do the first responders have access to emergency back-up keys?

A.  Yes.  The first responders have access to the front door, back door key.

Q.  Of each cell house?

A.  Of each cell house, yes, ma'am.

Q.  And would you bring those with you when you respond to an incident?

A.  No.

Q.  And why not?

A.  I don't know.  I think it's -- it's a practice that someone's calling for help -- I hate to say that they assume that the person who has the front door key or whoever is going to have that front door open for them.

Q.  Okay.

Page 96

A.  But it is a good practice to maybe stop and grab those keys just in case.

Q.  Where would they get those keys?

A.  From the sergeant's box.

Q.  So that's the emergency back-up copy that they have access to?

A.  Yes.

Q.  Okay.  So when you say you expect somebody to open the door for you as a first responder, do they have to open the door and wait for you to come in?

A.  No.  No.

Q.  Are they instructed to open the door and wait for you to come in?

A.  They're instructed to open the door.

Q.  Okay.

A.  If they call the emergency or someone calls an emergency, they should be at the door -- someone should be at the door to let us know where the emergency is at; but if we heard it over the radio and, hypothetically speaking, the emergency is on the ground floor and the sergeant opens the door and goes back in the situation -- whatever situation is going on -- once we get to the unit, we'll be radioing, "Where are you?"

BARBARA DEVINE, et al. v.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 26 of 102

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

Page 97

Q. Okay.

A. Even though they said, you know, "Signal 300 on the north side of A in front of Cell 105."

Q. Okay.

A. But still just because they put that on radio doesn't mean everybody heard it.

Q. Right.

A. I could hear 103. I could 155. So as you're coming in the cell house or you're getting closer to the cell house, you're stating on the radio, "Where are you? Help's on the way. Where are you? Say that again."

Q. Okay.

A. So they can reiterate where they are.

Q. Okay.

A. Because the situation could start at 105 and then it moves down the range. They're fighting or running. Something is happening.

Q. So is -- is there a policy about -- that somebody should be at the door then waiting to let the first responders in?

A. I can't say yes or no if there is a policy that somebody should be waiting at the door.

Q. Do you know people are instructed to be waiting by the door? Is there any training on the

Page 98

issue?

A. Yes, I believe there is.

Q. Okay.

A. But just because there is training doesn't mean it's going to happen.

Q. What do you mean by that?

A. If the person -- if we tell the person wait by the door, they open the door; but it's a fight. It's a Signal 7. The Signal 7 is on the officer with the key to the door. That person is not just going to stand at the door and continue to get assaulted with a weapon. They may run. They may run down the range and try to get away from the inmate.

Q. Okay.

A. I mean, in the perfect world, yes, wait by the door. Wait for us to give us direction on where we're supposed to go.

Q. Okay.

A. But in the real world, it doesn't happen like that.

Q. Okay. Just so I can clarify. You think there is training on what -- the individuals get about how to work with first responders?

A. Yes, ma'am.

Q. Is that part of the annual in-service

Page 99

training?

A. I believe so. I believe it is.

Q. Do you recall the training specifically?

A. No, I don't. Not specifically.

Q. So your explanation of how people should work with first responders and let them into the cell house, that's more from your understanding of how things worked in practice?

A. And how it was practiced, yes, ma'am.

Q. Okay. So you don't have a recollection of what policy was or what training was regarding this?

A. No, ma'am. No, ma'am.

Q. Okay. But you think the practice was that if there were emergency circumstances, a person would not need to wait by the door, but best practice is that they could wait by the door?

A. Yes, ma'am. Yes, ma'am.

Q. Okay. And -- okay. If a person had keys to the range where the problem is, should they be waiting by the door to let you in?

A. No. They should be on the range where the problem is at.

Q. Okay. And you think everybody would understand that as the correct practice?

Page 100

A. Yeah. If the person -- hypothetically speaking, if there is a problem on 200 range and there is an officer assigned to 200, they're the person that's supposed to be the one calling the emergency. Not -- they come down -- they leave the range. Now you take your eyes off the situation. You leave the range, and you call the emergency. First responders show up. "Where are you at?"

Q. Okay.

A. They have the keys. I can't get in the cell if there's somebody in their hanging. You're supposed to be on that range. You don't leave your post. If you call a signal, you don't leave where -- you don't leave that range unless it's a situation like there is five sets of keys and you're assigned to three -- four and five. And for whatever apparent reason you put a set of keys back inside the box. You put -- the signal is on 500 range and you think you put the 400 range keys away, but you put the 500 range keys away.

Q. Okay.

A. So now you get all of the way upstairs and you find out you have the wrong set of keys. You have to run all of the way back downstairs, grab the right set of keys, and run all the way back up the

BARBARA DEVINE, et al. v.  Cause No. 3:18-cv-00995-JD-MGG  ANTHONY WATSON
RON NEAL, et al.  October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 27 of 102

Page 101

stairs.

Q. Yes.

A. That's happened before.

Q. Okay.

A. That can happen.

Q. Okay.

A. In the mix of an adrenaline dump -- it could be somebody hanging and an inmate -- officer has never seen that before. They may freak out. They may freeze. You know, it's that fight -- fight or freeze syndrome. It can happen. But if you have the emergency situation on a range, you are -- you should stay on that range.

Q. Okay. And so when someone calls -- if you're assigned to a cell house and you call for assistance from the first responders, do you still have an obligation to address the emergency until the first responders arrive?

A. Yes.

Q. Do you have an obligation to continue helping with the emergency after the first responders arrive?

A. Yes.

Q. Should you act only based on instructions from the first responders?

Page 102

A. Act only based on instructions from the first responders. When the first responders get there and they take over, they could say, "Hey, we've got it from here. Can you go do this, that, or the other? Can you -- can you radio the captain for me?" We're busy maybe doing CPR or whatever.

Q. Okay.

A. "Can you be my other hand and help me do this?" If it's an emergency situation, I might need somebody to get -- to escort the nurses over to the unit. You know, we're not going to be able to get this guy to them. We need them to come over here.

Q. If the first responders are occupied and they weren't able to give you instructions, is a person still obligated to continue to help with the situation?

A. Yes, ma'am, if they can.

Q. Okay. Going back slightly. You said when a person arrives to the cell house where they're assigned, they get their keys. They get their radio.

A. Uh-huh.

Q. Do they get anything else?

A. They get keys, radio, and their assignment. "Hey, this is what we've got going on on this range."

Page 103

Q. Okay.

A. "Hey, this is what we have going on over here."

Q. Okay. Should a person keep their keys on them at all times during their shift?

A. Yes.

Q. Is there any reason why a person could -- should put their keys somewhere else?

A. If they're using the bathroom.

Q. And what do they do with the keys?

A. They put their keys in the lock box.

Q. And they don't give the keys to another officer on the range?

A. They can. If it's a situation like -- at count time and the officer leaves the officer's station -- even though all of the offenders are going into the cell -- we're putting them in a cell. We lock the officer's station.

Q. Okay.

A. So can't no stray offender come down and vandalize the officer's station. If an officer has to use the bathroom in the mix of that situation, then they would hand their keys off to their partner while they're using the bathroom.

Q. Okay.

Page 104

A. So we don't have a situation -- we have an emergency situation and we have somebody in the restroom.

Q. If the prisoners are all locked in their cells, is it appropriate for one of the officers to give their keys to another officer while they go to use the restroom?

A. Yes.

Q. Okay. So it's just sort of a judgment call?

A. They can give them their keys or they can put their keys in the lock box.

Q. What do you think is the best practice?

A. Both of them gets the job done. If you give the keys to another officer, I mean, the keys are always on somebody's hip. That officer just has to remember, "Hey, I have the keys to the 500 range" because there could be a situation.

"Hey, where are the keys to 500 range?"

"So and so is in bathroom."

"Where are the keys at?"

"Oh, shoot, I have them on my hip. They gave them to me."

Q. Okay.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 28 of 102

Page 105

A. Something like that. It is just more communication, you know, amongst the officers themselves.

Q. Is there any other reason why an officer would -- do officers take breaks? Are there, you know, times to break to eat lunch or dinner when they would also put their keys either in the lock box or give them to --

A. If they're -- if they leave the cell house.

Q. Okay.

A. If they get called to the captain's office for something or they have to go up to do a report on something, then the keys would be put in the lock box.

Q. Okay.

A. Or the keys would be reassigned to another officer. In B cell house, you have an officer in charge and you have three officers. And something happens, and we have to pull an officer. Well, that officer would be then pulled, and those keys would be reassigned to someone else.

Q. Okay. Would it ever be appropriate to only have two people running B cell house if somebody gets called off?

Page 106

A. I'm not going to say it's appropriate; but if it's due to call-offs, that's what we have. It happened a lot.

Q. And does that increase the risk of an emergency situation happening in the cell house?

A. No.

Q. How come?

A. I mean, you can't -- you can be fully staffed and still have an emergency situation. It doesn't negate an emergency happening.

Q. Does it increase the risk of an emergency?

A. No. Once again, emergencies are -- happen just by anything happening. It could be a guy going to a cell and slip and fall down the stairs. That's an emergency situation. That doesn't -- that wasn't caused by not having enough people staffed or anything like that.

Q. Okay.

A. I mean, when you work in a facility like that, it's tough because people will take a day off of work.

Q. Okay.

A. They could be burnt out. If you're used to running a facility at nighttime when you already

Page 107

have a skeleton crew and you've got 60 officers and so now you're down to 45 officers, you know, now the captain is forced to either -- we're going to close a couple of towers to try to make sure we have enough officers inside of the cell house.

Q. Okay.

A. That's never good. You don't -- to me that just raises the issue of having the right amount of people to be able to run the facility. If we have a big call-off, then the captain needs to make a decision to either lock the facility down. Now, if a facility is on lockdown, then you can better run the facility with the least amount of hands. You can't run the facility properly in -- if anything, B cell house is the -- will be the cell house you can run with two people.

Q. Okay.

A. Along with the dorms. That's it. You can't do that in A cell house. They have over 300 offenders. You can't do that in C. You have 400 offenders in C. I'm not saying it has not ever been done before --

Q. Okay.

A. -- due to call-offs, especially in wintertime with people not making it to work. If the

Page 108

captain does not make the decision to lock the facility down, then you're stuck with -- work with two people. It makes it hard on those officers, but for that to increase the emergency risks, no, not at all.

Q. So when an officer -- they get their keys. They get their radio.

Is there any reason they should ever take their radio off?

A. No. Your radio is your lifeline.

Q. Okay. So even when you go to use the restroom --

A. The radio is on. It is -- I mean, it's on your waist. You know, if you have to use the bathroom -- but the radio is turned up so you can hear it.

Q. Okay.

A. What's going on just in case is there is an emergency while you're using the bathroom.

Q. Do individuals need to test their radio before they start their shift?

A. Yes, most definitely.

Q. Is that an instruction that they're given?

A. Not everybody is given it. Not all

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 29 of 102

Page 109

sergeants give that, but they do say, "Hey, make sure the battery is working."

Q. Okay.

A. You know, hello, mic check, mic check to make sure it's working properly. It doesn't mean it's going to work properly all night long because there's times that we've -- you know, within the first hour, everybody's radio's dead. Battery is dead. So you go switch the battery, but the battery that you go switch is a dead battery as well.

So now you're on the phone and you're trying to call around saying, "Can I get a couple -- couple of batteries from control or the sergeant's box? You know, all our batteries are dead for some -- some apparent reason." You go get some fresh batteries and hopefully that lasts while yours is charging. That's kind of an every night thing.

Q. How frequently do you need to charge the batteries in a shift on average?

A. If you have -- if you have good batteries, usually the batteries can last 16, 20 hours maybe.

Q. Okay.

A. Maybe.

Q. So they should --

Page 110

A. That's a brand new battery.

Q. Okay.

A. "Brand new, out of the package" type batteries. The batteries that we had before -- you know if you take a battery out and put it on a charger, if it's not fully dead, then it's going to have that memory. It's only going to charge up to where you had it.

Q. Okay.

A. Well, then we got a new set of batteries that will -- and a charger that will de-charge the batteries and then recharge it all of the way up so it's never left with -- it's green and it lasts two hours.

Q. When did you get that new battery system?

A. Oh, when did we get that? I don't know. Maybe 2012, '13.

Q. So it's been a little while?

A. Yeah, it's been a little while.

Q. So should officers be constantly checking their radios?

A. Yes.

Q. Is that something officers all understand that they should --

A. I don't believe all officers understand

Page 111

that, but that's something that they're told.

Q. Okay.

A. Hey, check, check, check your radio.

Q. Okay.

A. Because the worst thing is being in an emergency situation and you can't call for help.

Q. Right.

Do the radios let you know if your battery is dying? Is there any beeping noise?

A. Yes.

Q. So you should be checking, but you also should be alerted if the battery is dying?

A. Yes.

Q. Is there any reason why the battery will die without beeping?

A. It can, yes.

Q. Have you heard of that happening?

A. Yes.

Q. Is it a frequent problem that people's -- when you were working as a lieutenant, was it a frequent problem that radios would not be working?

A. I'm going to say sometimes in a bad storm the whole airway line -- whatever you want to call it -- would be down. We would have to go to talk-around -- talk-around is on Station 9, but the

Page 112

talk-around also picks up the neighborhood -- the Indiana State Prison is -- there's a neighborhood built around Indiana State Prison. So you would pick up anybody's walkie-talkie traffic, scanner -- police scanner traffic.

Q. Okay.

A. You pick everything up. That makes it difficult to understand because you're constantly hearing radio traffic, but it may not be anyone from the prison.

Q. Okay.

A. Because it's -- like I said, it's talk-around. It's just picking up some type of airway so we have a form of communication. That happened very -- I don't know -- I'd say once every four or five months or something like that. If they're testing the system, they would tell us to go to talk-around because they would want us off the normal airway that they're on because they're doing work to the system or something like that.

Q. Okay.

A. Once every two or three months, they would do that -- come in and try to make the line communication a little bit better for us.

Q. Besides that -- those sort of system-wide

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 30 of 102

Page 113

problems, was it common that an individual person would have their radio fail during a shift?

A. If the battery was dead. That's the only thing.

Q. Was that common?

A. Yeah.

Q. Was it common that the battery would die before the person was able to exchange the battery?

A. Yeah. Yes. If they're not listening for the beep or, like I said, sometimes it doesn't even beep, it's just -- it's dead. They may not realize that until it's time to talk on the radio. "Oh, shoot, my battery is dead."

Q. Is there -- is there continuous talk on the radio so that if a person -- you know, all of the sudden they heard silence on their radio, they would be kind of aware that the radio may be dead?

A. No.

Q. So it's frequent to have silent periods on the radio?

A. Yes, ma'am.

Q. Does the problem of radios dying or -- if they stop working, does that cause issues with addressing emergency situations?

A. It can.

Page 114

Q. Has it in the past?

A. In the mix of someone trying to talk on the radio and the radio just cutting out and they only hear the back end of what they're saying -- it's been a handful of times that, you know, you think someone's calling for help, and you just hear them, you know, say two words and then you don't hear anything else.

Q. Okay.

A. But you could hear that the microphone is keying up, but nothing is coming through. And that goes -- that's just instinct training. That's training that -- you've heard that before, and you know, hey, there's a problem.

Q. Okay.

A. You know, who is that? That's all about training. Knowing your people's voices. Me, as a supervisor, I want to know everybody's voice.

Q. Okay.

A. Because of -- if there is an emergency situation, you're trying to click and you're trying to talk. And I can only hear, "Can somebody help?" And if that's all you hear, "Well, who was that?" "That was officer so and so." "Well, where are they assigned?"

Page 115

"They're in A cell house."

You run over there. You don't wait for a signal to be called. You just get over there as fast as you can.

Q. Okay.

A. And a lot of times it's nothing. They were just talking in general from one officer to another asking, "Hey, can you help me up on 500 range?"

But if I hear somebody say, "help," I'm thinking the worst.

Q. Okay.

A. So I'm on my way.

Q. Right.

A. You know, that happened -- that happens a lot because, like I said, people were stepping on each other. I'm trying to talk and you're trying to talk at the same time, but I hear "help" out of my transmission and the rest of your transmission goes through. I'm like, "Wait a minute. I heard two voices and I heard something else." So it can happen.

Q. So a radio is supposed to be used only for emergency situations, or can they be used in any sort of conversation?

Page 116

A. No conversation. It's more of a quick tidbit of, "Hey" -- I'll give an example. "Unit 5 to Unit 10. Unit 5, can you Signal 8 with me?"

"Okay. Cool."

It's real quick. People having a conversation like me and you having, that is frowned upon on the radio because you're holding up an airway when someone could be trying to call for help.

Q. Okay.

A. So --

Q. Does that happen frequently that people have conversations --

A. They try to. And then it's usually -- when I was working as a lieutenant, I would cut into the conversation and tell them to knock it off.

Q. Okay.

A. Cut -- if you're going to talk, talk on the phone.

Q. Okay.

A. Not on the radio. You have to stop that because there has been times people are trying to call for help and they can't get an open airway because you have someone having a conversation about something stupid.

Q. Okay.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3.18-cv-00995-JD    document 203-1    filed 03/29/21    page 31 of 102

Page 117

A.   Something that happened last night somewhere at the club or whatever.  I don't know.  Keep the radio traffic to business, you know.  That's it.

Q.   Was this something that they were trained on and instructed on?

A.   Most definitely.

Q.   And I know you talked a little bit about other problems with the radio and how that impacted the ability to address situations.

But was it -- was it a frequent problem that a -- radio dying -- would totally die and impact the ability to address a situation in a cell house?

A.   That can happen, yes.

Q.   Did that happen?

A.   I would say yes.

Q.   Was that a problem that people at ISP, including the warden, were aware of?

A.   I would say yes because we -- we had two different -- went to two different types of radios in my time there.  My 11 years there.  That's most definitely the number one concern is just being able to communicate with each other.  If the phone lines are down, we still have to be able to communicate as

Page 118

far as via radio.

Q.   Okay.

A.   Most definitely.  Especially in emergency situations or someone trying to call for help.

Q.   Okay.  So an individual officer would get his or her keys and his or her radio?

A.   Yes, ma'am.

Q.   And those would be -- we already discussed when they would keep those on them.

Would they also get a pipe for doing the rounds?

A.   The security rounds, yes, ma'am.

Q.   And would they keep the pipe on them at all times?

A.   Yes, ma'am.

Q.   Even when they went to the bathroom or whatever?

A.   That's another thing just like the keys.  If, hypothetically, they have to do their pipe run in the next ten minutes and they have to use the restroom --

Q.   Okay.

A.   -- "Hey, man, I have to use the bathroom.  Can you run my pipe for me if I'm not out in time?"
"Yeah, no problem.  Sure."

Page 119

Q.   Okay.  And when they would do rounds -- how frequently were they supposed to do rounds?

A.   Every half hour.

Q.   And so is that like in every half-hour period they have to do it once, or the next time should start within a half hour?

A.   Within a half hour.

Q.   Okay.

A.   From the time that you finished.

Q.   Okay.  So you finish doing rounds at 8:47, the next one needs to start at the very latest by --

A.   8:15 or 9:15.

Q.   Okay.

A.   Something like that, yes.

Q.   And was there an issue with people not doing rounds?

A.   Yes.

Q.   Was that a big problem?

A.   Yes.  Because you had some lazy officers that wouldn't do their pipe rounds.

Q.   They what?

A.   They would not do their pipe rounds.

Q.   Okay.  And would they be disciplined for that?

Page 120

A.   Yes.

Q.   So would somebody be checking the --

A.   Yes.  Every day.

Q.   Who was responsible for that?

A.   The shelter lieutenant would check -- first off, the pipe report would get sent to IA because IA was in charge of the report itself.  And then they would then scan that to the major.  The major would send those out to the shelter lieutenants.  "Hey, guys, somebody missed a pipe round from this time to this time.  Check into it.  Who did the pipe run?  Make sure it is the right time if it's the a.m., p.m.  What was -- if there was an explanation -- what's the explanation or reason why?"

A lot of times a lot of the pipes were being missed because the officer is doing count.  Well, if they forgot the pipe, but were counting -- they're on the range.  They shouldn't be dinged for not taking a wand and pushing on a button.

Q.   Okay.

A.   They had to walk past it to do count and to secure the inmates.

Q.   Okay.

A.   Things like that.  So the lieutenant would have to justify, you know, most definitely if

BARBARA DEVINE, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 32 of 102
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

Page 121

the pipe run was missed during a count time or was count done. Did count clear on that unit? Yes. Did count clear on that unit? Yes. That means the officers walked down the range.

Q. Okay.

A. They just forgot the pipe. I'm not going to ding the officer for not piping when the most important thing they're supposed to do is count.

Q. Okay.

A. Want to make sure nobody -- make sure everybody is there, you know.

Q. Okay.

A. A living and breathing offender. Nobody has escaped. Nobody is hanging, and things like that.

Q. Okay.

A. It is more of a prioritize -- outside of count time, most definitely. They would get disciplined if they didn't do a pipe walk.

Q. What if a pipe walk was about 15 minutes late? Is that a problem?

A. Yes, it is. But then the officer argues, "Didn't I do the pipe walk?"

"Yeah."

The pipe walk started late. No pipe

Page 122

walk's ever done in 30 minutes and then done in the next 30 minutes. You can start them.

Q. Okay.

A. Like we -- I got done at 8:47, and I started the next one at 9:15.

Q. Okay.

A. And about time I get done with the 9:15 pipe run, it's time for me to do another pipe run because the inmate stopped me. This inmate may have got bad news, and they just -- now they're talking to you. So you're going to do everything you can to try to deescalate the situation.

Q. Okay.

A. You know, it may be talking about suicide. You most definitely don't leave a cell. You talk to them. You get on the radio and have somebody call the captain.

"Hey, what's going on?"

"This inmate's talking about suicide. We need him to be seen my mental health. Maybe we need to move him."

That officer stays with that inmate. They just don't -- who cares about you, and they leave and then -- I've seen it happen. In about ten minutes, that person is hanging.

Page 123

Q. So if somebody finishes a pipe run, it's called, at like 9:05, is there any justification not starting another one until 9:50?

A. Should be no justification because they should be starting at about 9:35.

Q. Would you discipline somebody or talk with them?

A. Talk with them like, "Hey, do you know how important this is?"

Q. And why is it important?

A. Number one, it's policy and what we're supposed to do it. Number two, it cuts down on any situation of an offender trying to escape out their cell or an offender trying to harm themselves in their cell. They know they're going to see you within the next half hour.

The crappy thing is they have a half an hour to do what they're going to do. They know I'm going to see you -- if you have a good officer that does their pipe walks every half hour, they know they only have 29 minutes to do whatever they're going to do before they see that officer again.

Q. Okay.

A. So pipe walks are really just to help cut down on anything that -- out of the ordinary that the

Page 124

inmate might try to do inside of their cell.

Q. Okay.

A. If they're trying to hurt themselves or if they're trying to escape. It could be anything.

(The document was thereupon marked for identification as Watson Exhibit No. 1, as of October 30, 2019.)

BY MS. PIERCE:

Q. Have you ever seen a document like this before?

A. Yes, ma'am.

Q. And what is this?

A. This is the bar ringer report.

Q. So this records the pipe walks?

A. Pipe walk report, yes, ma'am.

Q. Okay. Can you tell what cell house this is for?

A. This is B cell house, north side.

Q. Okay. And what's the date on this?

A. April 7th, 2017.

Q. Can you turn to Page 11?

A. (Witness complying.)

Q. So it looks like on B, the pipe walk on the 500 range started at 8:45; is that right?

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 33 of 102

Page 125

Somewhere in the middle.

A. 8:45 is the north side flag front, north side flag middle, and then 500 range middle.

Q. Okay. So it looks like the 500 -- they went to the 500 rear at 8:46, the 500 front at 9:04, and the 500 middle at 9:05?

A. Yes, ma'am.

Q. And the 500 rear at 9:05; is that correct?

A. Yes, ma'am.

Q. And so the next one, if that finished at 9:05, should have started at 9:35, correct?

A. Should start at 9:35.

Q. So if there is no pipe walk at 9:35, that means it didn't happen within a half hour?

A. It means it didn't happen, but this is count time.

Q. What time is count time?

A. 9:00 o'clock.

Q. Okay. So when would count finish?

A. When count is clear.

Q. Okay.

A. So count -- we have 45 minutes for count to be clear, and then we go into emergency count.

Q. What's emergency count?

Page 126

A. Emergency count means go back and count everybody again, but now it's more of an extensive count. Now you're doing body counts, waking everybody up. "Get up. Stand up. ID."

Q. Okay.

A. Because an emergency count means we may have an escape.

Q. Okay. So emergency count only happens if the count --

A. If the count is not clear.

Q. Okay.

A. So at count time -- I could say at count time -- if they started the pipe walk at 500 at 9:00 o'clock and they did what they were supposed to do, if count didn't clear by 9:30, 9:45, they might have an issue with count. They may be on a different range recounting that range.

Q. Okay.

A. Maybe.

Q. Okay.

A. Because what they'll do is -- hypothetically speaking, if it's the 300 south that's having an issue with count, okay? The person that counted it first, that's not going to be the next person to count it again. They're going to have

Page 127

another set of eyes go up there and count.

Q. Okay.

A. They're going to go count. They're going to come back and call the count in. Count's still not clear. Now they're going to send somebody else up there. They're just going to keep alternating until we get that right count. Now -- right now at that time -- the only thing that's the most important right now is getting count clear. So we're not -- I hate to say it, but they're not worried about a pipe walk. They're worried about do we have an escape.

Q. Okay. But if the count clears normally --

A. If the count clears normally --

Q. -- then it should happen?

A. Then it should happen, yes, ma'am. It should happen like that.

Q. Okay. Okay. So if -- what is the policy or practice at Indiana State Prison for a prisoner to get the attention of staff if he needs their attention?

A. He yells out to them, bangs on his bars. You know, the number one thing is medical emergency.

Q. Okay.

A. Because nobody's going to -- I hate to

Page 128

say it, but nobody is going to come and run upstairs if an inmate says, "I need to talk to a CO right now."

Q. Okay.

A. "Well, I just walked past your cell. What do you need to talk about?" He didn't want to talk to me when I was at his cell doing count or doing a security walk; but now all of a sudden he wants to talk to me. That's more of a judgment. That's a judgment call on the officer. If you hear medical emergency, then it's like, okay, it could be somebody fell, having a seizure, hurt themselves.

Q. So are prisoners told to yell out medical emergency or --

A. That's what they come up with.

Q. Okay. So the prisoners aren't given any instruction about how to get your attention?

A. If they are -- if the prisoners are told, "Hey, just yell for an officer, you know, to get the officer's attention," they're going to do the opposite. I'm just saying that's the nature of the beast. They're not -- I mean, they can be told, "Hey, just yell for the officer." That's not going to get their attention. That's like yelling, "I need help" in public. Nobody is going to help you.

Page 129

Q. Okay.

A. But if you yell "fire," somebody is going to help you.

Q. So is there any sort of practice or protocol in place for prisoners to get your attention like an official --

A. I can't say yes or no. Is there an official --

Q. Do you recall any sort of official protocol?

A. No. They have an offender handbook. I'm sure the offender handbook tells them if they have an issue, just stop the officer that's on the range or yell out to the officer on the range what your problem is.

Q. Okay.

A. But the number one to get someone's attention is a medical emergency or yelling "fire."

Q. So our -- is there anything in training about when an officer should respond to a prisoner in his cell?

A. Yes.

Q. What is taught in training?

A. If an offender asks for help, you try to help them. If offenders -- "Hey, CO, I need help,"

Page 130

or "Can you help me? I have an issue." Officers are taught either -- if you have a piece of paper to write it down. Let the offender know, "Hey, I'm going to go downstairs and check and see what's going on, and I'll be back to let you know what the answer is."

If it's a situation where -- medical situation -- "Hey, officer, I need help," the officer is taught -- you know, well, you have to -- what's the word I'm looking for? You have to assess the situation, okay? If the inmate is saying, "I need medical attention."

"Okay. What's wrong with you?"

"I'm bleeding."

But you don't see any blood. Is this guy just giving you a hard time? It's almost a judgment -- judgment call.

Q. So if a -- if a prisoner is yelling, should an officer always go and see what's happening?

A. Yes.

Q. If an offender is calmly saying, "help," should an officer always go and see what's happening?

A. If he's calmly saying help, how can I hear him if he's on the 500 range and I'm on the 100 range? I can't hear him.

Page 131

Q. So is it difficult to hear somebody on the 500 range?

A. You're five stories up on the north side, and I'm on the -- on the south side. I can't hear -- if this is the officer's station and this is the north side -- if the offender on the flag on the north side is talking, I could barely hear him talking. If he's talking calmly like, "Hey, I need some help." You can't hear him.

Q. Will you always be able to hear somebody that's yelling on the 500 range?

A. Yeah. You can -- if he's yelling -- if he's on the 500 range and all the way to the back and he's yelling, you probably can't hear him.

Q. Okay.

A. But you will hear his neighbors because they'll start -- they'll yell for him. That's one thing that the offenders will do. If someone needs some help, they'll yell. It's almost like playing telephone all of the way down the range.

You know, the first guy in the cell gets the message, and he'll start yelling, "Hey, CO, we need help up here on the back of the 500 range." You can then hear that person. That person is yelling, so you can hear them. But if he's all of

Page 132

the way back on the back of 500 and he's yelling by himself, you may not be able to hear him.

Q. So does that make it difficult to respond to an emergency situation like a medical emergency --

A. Yes.

Q. -- if you cannot --

A. Yes, if you can't hear. Because they have TVs that are on. Guys with keyboards -- they hook their keyboard up to their TV. They have music playing. It's not like on TV where lights out and it's quiet. I mean, it's loud.

Q. Okay. So do you think a different policy would be -- would help alleviate the responding to emergency situations?

A. A different policy as far as noise?

Q. No. About -- about how an officer should respond to an emergency situation -- about how prisoners should communicate with officers?

A. I don't know if you put in a policy it will work. I mean, you have a cell house with 200 people. If 100 people are talking, how can I hear somebody yelling for help?

Q. So do you think there needs to be some sort of protocol in place that would allow an inmate to more easily get the attention of staff in an

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 35 of 102

Page 133

emergency?

A. I don't know. I don't know what protocol you could put in place other than an intercom system inside -- inside the cell to the officer's station. I don't know what the State would do as far as that. That's -- I don't know. I don't know if it's possible. I have no idea.

Q. Okay. So you -- if a prisoner was yelling in a cell, an officer should go and help?

A. Yes, most definitely. If they can hear them, they should go.

Q. If an officer can hear somebody banging on their cell, should they go and help?

A. Yeah. Yeah. Yes, ma'am.

Q. If an officer can hear sort of a commotion or a lot of noise coming from a range, should he or she go check it out?

A. Yes, ma'am.

Q. If an officer hears somebody crying, should he or she go check it out?

A. Yes.

Q. If an officer does hear somebody saying "help" calmly, should he or she go check it out?

A. Yes.

Q. Okay. If a -- someone is yelling "help"

Page 134

or banging on their bars and it's unclear where it is coming from, should all of the officers go and check it out?

A. No.

Q. Is there any reason one officer should stay behind?

A. One person to open a door just in case there is a true medical emergency or -- or it could be anything that's going on. So somebody should stay downstairs and wait for it to be radioed.

Q. So one person should stay downstairs --

A. Yes.

Q. -- and everyone else should go up?

A. Yes, ma'am.

Q. Do the cell houses quiet down after 9:00 p.m. count?

A. It depends on the night. If there's a basketball game, it's loud all the way to the morning. Football, basketball, or any sports. Any NASCAR race or anything like that. If nothing like that's going on, a lot of times it could be a pretty okay night. Pretty quiet. You just hear a handful of guys talking. You maybe hear some music playing.

Q. Okay.

A. But for the most part -- other than

Page 135

any -- anything on after 9:00 o'clock that would keep the inmates up, it's relatively quiet.

Q. Okay. Is B cell house a relatively quiet cell house?

A. Yeah. B cell house is, yes, ma'am.

Q. And the person who -- you said somebody should wait behind.

Is that the person who should have the front door key?

A. Yes, ma'am.

Q. So that would be the officer in charge?

A. Officer in charge or whoever -- the officer in charge could be the officer who says, "Hey, I want to go up and see what's going on."

Q. So then would they give --

A. They would then give the front door key to whoever stays behind.

Q. Okay.

A. Yes, ma'am.

Q. How were first responders activated?

A. Via radio.

Q. And so does that mean that someone would specifically call the first responders?

A. First responders would be activated if they hear a signal call over the radio.

Page 136

Q. Has that always been the policy?

A. I believe so.

Q. Okay. So if you heard like a 10-71, you would -- the first responders, what would they do?

A. They would respond to the 10-71 depending on -- well, not depending on -- they would -- if they heard half the radio traffic, they would ask, "Where is that 10-71 at?"

And then the person in control would reiterate where it was being called from.

Q. Okay. And then you would go directly to the place where the --

A. Yes, ma'am.

Q. Would you stop anywhere beforehand or do anything else?

A. No, ma'am.

Q. Okay. And is there always four first responders?

A. With scheduling permitting, yes, ma'am.

Q. And how are the firefighters activated?

A. They would be activated through the captain.

Q. Okay.

A. Somebody on the first responders -- the team supervisor of the first responders will radio to

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 36 of 102

Page 137

the captain and tell them, "Hey, we're going to need the fire department -- fire guys out here." He would then get them ready.

Q. So one of the first responders would check out the situation and then call for the firefighters?

A. Yes, ma'am. Yes, ma'am.

Q. Okay. And so when the first responders or the captain called to activate the firefighters, what would happen?

A. The captain would make a phone call to the fire -- the cell house where the fire chief is at first. He'd call him first. He's the person to be called is the fire chief, and he'll explain to the fire chief what's going on or as much as is relayed to the captain.

Q. Okay.

A. And he could explain to the fire chief what's going on. So then -- so once the fire chief got to the firehouse, he could direct his people. You know, let them know that this is where it's at, this is what we've got going on, how many cells are involved, where the fire is at, or what have you.

Q. And would somebody have to let the fire chief out of his cell?

Page 138

A. Yes.

Q. And who would do that?

A. The officer on that unit.

Q. So that would be the first person who was called?

A. Yes.

Q. And then who would unlock the firehouse?

A. The -- once the signal is called, whoever is sergeant on the street, they -- and if -- sergeant on the street would maintain the street. The captain would then probably radio to the person on the street, "Hey, make sure the firehouse is open for the firemen." That person would then get the firehouse open for the firemen.

Q. Okay. And about how long would it take after a signal was called to activate the firefighters and get them to a situation?

A. I don't know. Maybe -- I'm going to say maybe -- probably take more about five -- five minutes maybe, ten minutes maybe. That's getting the initial call to the captain, captain calling the -- calling the cell houses and letting them know, "Hey, get the fire guy out."

And if the guy's sleeping, he's got to get up, get out -- the officer has to get up to

Page 139

his range, get the door open, get him out, get him over to the firehouse. And then once they get themselves at the firehouse, get themselves dressed, and then be deployed wherever the situation is at. That process is a little bit timely. I don't know what the facility can do to cut down on that time, but that could be a timely manner.

Q. Were there ever any drills done to practice activating the firefighters?

A. I'm not going -- I'm going to say yes. During the day, they have drills. At nighttime, there's no drills. They don't do too many drills dealing with the firefighters at night, but during the day there is.

Q. Are those evacuation drills, or are those activating the firefighter drills?

A. At nighttime, it would be activating the fire guys if there's -- whatever fire. During the day, I'm going to say it's more of a -- more drills during the day.

Q. Do you recall those drills specifically, or are you --

A. No, ma'am.

Q. Okay. So you don't recall any drills being done with the fire --

Page 140

A. I just know they do them. Any time I hear a signal when I was working days, I assumed it was the real deal. If it was -- if I'm working at C, Charles, and something is happening at A, I don't directly know what's going on in A. I could hear the radio traffic.

Q. Okay. So you don't -- so you think drills were done, but you don't have any specific knowledge?

A. I have no specifics, no, ma'am.

Q. Okay. Do you think the training program at ISP was effective?

A. Somewhat effective.

Q. What do you mean by that?

A. I think it needs to be more extensive training.

Q. In what ways?

A. As far as an officer all of the way -- all the way to the top, especially in our emergency situations, we train harder. We train more. Make sure that -- just because if we have a pot of 50 -- 50 people that are trained, it doesn't mean that all 50 got the training. Maybe they just kind of -- they will pass just to say, "Hey, I got the training." They never put it to use. And then when it is time

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 37 of 102

Page 141

to put it to use, then they fail. So I think the training needs to be a little more extensive. That's just my personal opinion.

Q. Yes. I just want your personal opinion on it.

And in what ways do you think would be helpful to make it more rigorous or extensive?

A. Training more often as far as QRT instead of once a year.

Q. Okay.

A. Maybe twice a year. Really as much as we can. I think -- the more training, I think, the better. Training doesn't hurt. All training is going to do is heighten what we can do to help.

Q. Do you think the QRT is adequately trained then?

A. I'm going to say yes. It really depends on the team that's put together. I mean, it's just like -- just because you're adequately trained, it doesn't mean the team that you work with is adequately trained together.

Q. So you think more group training?

A. Yeah, more group training.

Q. Okay.

A. Yes.

Page 142

Q. Okay. And more drills? Is that what you're saying?

A. Most definitely.

Q. You kind of mentioned people sort of like faked their way through training or -- do you have examples of that happening?

A. Just doing enough just to pass and that's it and not -- I could say when I worked there, I was a professional at what I done, meaning I just didn't go to work and just learn how to do my job at work.

Q. Okay.

A. And when I came home, I forgot about it. You read. You study. You try to protect your craft at what you're doing. You try to be better at what you're doing. Analyzing a situation that you've been in and what could I have done better. What could I have done to minimize any injuries to myself or a staff member or to an offender in this situation.

So you're always constantly trying to be better. That's just -- you have to want to do that, and you have to take the initiative to be better. Not everybody has that drive. And if you -- if the State says, "Hey, this is just good enough. You've done your job," okay? Then people feel comfortable with just doing just the bare minimum.

Page 143

I'm not comfortable doing the bare minimum. I'm comfortable going above and beyond and not because I want to and because I want a pat on the back, but I think it's the right thing to do. It makes me a better professional at what I do.

Q. Okay. But you think it was sort of accepted for people to kind of --

A. I'm not going to say it was accepted. They just did just enough to pass -- just enough to pass. If you're the person grading and they pass, they pass.

Q. Okay.

A. Me personally -- when you work with people and you can tell that they didn't put their all in it -- they did just enough to get by -- to me -- my personal opinion is that doesn't cut it. I don't want you on my team if you're just going to do just enough just to get by.

Q. And you mentioned that emergency training specifically -- additional emergency training would be more helpful?

A. Yes, ma'am.

Q. What type of emergency training do you think would be more helpful?

A. Most definitely, like I said, fire

Page 144

earlier.

Q. And what kind of fire?

A. Structural fires.

Q. I'm sorry.
Like fire drills or --

A. Anything and everything that has to do with a fire.

Q. Okay.

A. Anything. Because it can get out of hand quickly.

Q. Okay.

A. And you need -- you need to know what to do. Because if you don't know what to do, that's somebody's life. That's your life or your partner's life. Somebody innocent that, you know, didn't warrant that.

Q. Did you -- did you recall situations where an emergency happened, including a fire, and the person wasn't able to respond properly?

A. Yes.

Q. That happened frequently?

A. Sometimes. Where a person just freezes. It's not anything bad on them. It's just -- it's the nature of the beast. We fight, flight, or freeze. You're going to do one of those. It's going to

BARBARA DEVINE, et al. v.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD     document 203-1     filed 03/29/21     page 38 of 102

Page 145

happen. It's not a bad thing if you freeze. Fine. No big deal. It's not that you're not adequately trained for it. You may have never seen somebody's guts hanging out. So you come upon that situation, and you freeze because you've never seen that before. Well --

Q. But you don't think that reflected inadequate training?

A. No. That could happen to best of the best.

Q. A person wasn't able to respond to an emergency because they were not adequately trained?

A. I don't believe so, no.

MS. PIERCE: Do you want to take a five-minute break?

THE WITNESS: Sure.

(WHEREUPON, a short break was taken.)

BY MS. PIERCE:

Q. So in addition to training, were individuals at ISP required to sign off on post orders?

A. Yes.

Q. How frequently was that?

A. Every 30 days.

Page 146

Q. So what did that include doing?

A. Reading the post orders, make sure you understood what the post orders say. Reading the general post orders, and then there is also specific post orders just -- specific post orders are specific to that cell house.

Q. Okay. So they would be responsible every 30 days for signing off?

A. Yes.

Q. Would those post orders change every 30 days?

A. No.

Q. So it would be just to refamiliarize yourself?

A. Yes, ma'am.

Q. Do you think that officers generally complied with this requirement?

A. Yes, ma'am.

Q. Do you think they read all of the post orders every month?

A. I'm not going to say read. I'm not going to say read it. It really depends on what they did with it. I hate to say that if they signed their name, we assumed that they read it because they signed it. Why sign something that you didn't read?

Page 147

If you have read it, you understand the post orders. If there has not been any changes to the post orders, just basically review it, sign off on it, and go from there.

Q. Were there any other policies that individuals were required to familiarize themselves with on a regular basis?

A. No, ma'am. Post orders is mostly the main ones every 30 days.

Q. And who was responsible for making the post orders?

A. It's made by the major.

Q. The major?

A. Yes.

Q. So in 2017, that would have been Nowatzke?

A. Nowatzke, yes, ma'am.

MS. PIERCE: I would like to hand you what we will mark as Exhibit 2.

(The document was thereupon marked for identification as Watson Exhibit No. 2, as of October 30, 2019.)

BY MS. PIERCE:

Q. If you could turn to Page 8, which would

Page 148

be the B cell house fire evacuation plan.

A. (Witness complying.)

Q. Do you recognize this as the B cell house?

A. Yes, ma'am.

Q. Can you tell me where is the primary entrance to the B cell house?

A. The south entrance.

Q. The south entrance.

So that's where it has "primary entrance"?

A. Yes, ma'am.

Q. Okay. And right next to that is the officer's station?

A. Yes, ma'am.

Q. And at what points are the officers supposed to be in the officer's station?

A. At what points are they?

Q. Yes.

A. In the officer's station?

Q. Yes.

A. Usually -- I'm going to say when they first get assigned to the unit or when they come on the unit.

Q. Okay.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 39 of 102

Page 149

A. That's where they get their assignment or get their keys. Usually, after they get their assignment, they do a round on the ranges. Usually, they are in the officer's station if they're eating, getting something to drink, or answering the phone.

Q. Okay.

A. Getting on the PA -- making an announcement on the PA. Anything like that. So they're -- throughout their 12-hour shift, they're in and out of the officer's station.

Q. Do the officer's usually all eat in the officer's station together, or do they eat at different times?

A. Usually -- sometimes they may eat at the same time. Sometimes they may eat at different times depending on who is supposed to do a security walk at the time.

Q. And then on the opposite side -- on the north side, that's the counselor's office?

A. Yes, ma'am.

Q. What's the counselor's office?

A. Unit team -- if there is a lieutenant assigned on days, that's the office that they would be in.

Q. Okay. Is that usually locked?

Page 150

A. Yes.

Q. Can you hear what's going on from inside of the counselor's office?

A. If somebody is yelling or something or if they're directly right outside of the door, you can hear. It's more of an enclosed -- brick-enclosed office. So once you go in there, a lot of the conversation is more muffled than anything.

Q. Okay. The -- you said that each officer in the cell house would have keys to the staircases, correct?

A. Yes, ma'am.

Q. Are these -- are all of the stairs open all of the time?

A. No.

Q. Which ones are locked?

A. Usually, at night, the back staircase is locked.

Q. Only at night?

A. Only at night.

Q. Okay.

A. Or depending on what's going on. If it's a lockdown, all of the staircases are locked.

Q. Okay. So during the day, both sets of staircases should be open?

Page 151

A. Yes.

Q. And then at night, just the back staircase?

A. Just the back staircase is locked. The front staircase is open.

Q. Okay.

A. The reason why they do that is because at breakfast time, they don't want any inmates going down the back because it's dark in there.

Q. Okay.

A. Going down -- that's where a lot of violence happens, so they lock them to keep them off the back staircase and force everybody out the front door so you could see everybody coming and going off the unit.

Q. Okay. Keep this handy because I may refer to it again.

A. Yes, ma'am.

Q. Can you tell me how the fire alarms work at Indiana State Prison?

A. How they work?

Q. Yes.

A. I really can't tell you how they work.

Q. Let me rephrase.

A. I know when the fire alarm goes off, you

Page 152

hear the beeping and flashing.

Q. Let me rephrase the question.

A. Okay.

Q. The fire alarms, are they separate in each cell house, or are they all connected on one system? For example, if the fire alarm is going off in B cell house --

A. No.

Q. They're separate?

A. Yes.

Q. So if a fire alarm is going off in B cell house, it's just in B cell house?

A. Yes, ma'am.

Q. Are the fire alarms fairly sensitive? Do they -- is it common for them to go off if there's no actual fire?

A. Yes.

Q. Are they loud? Can you hear them from other cell houses?

A. Yes.

Q. When they go off when there is not a fire, how do you turn them off?

A. We call the fire chief. He's the one that turns them off.

Q. Okay.

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 40 of 102

Page 153

A.  But we have to make sure there's no fire most definitely before we do that.

Q.  Okay.  And where are the fire extinguishers kept in the cell house?

A.  There is a -- I believe there is a fire extinguisher on the front of each range -- let me rephrase that.

There should be a fire extinguisher on the front of each range and in the officer's station.

Q.  Does it happen that there might not be a fire extinguisher on the front of each range?

A.  Yes.  Because someone moved the fire extinguisher or an offender took the fire extinguisher and -- and they took it down to the back just being buttheads about things.  Just moving stuff just because they can.

Q.  Is that common?

A.  It happens sometimes.

Q.  So --

A.  It's still on the range, but it's just not where it is supposed to be.  It's on the other side of the range.

Q.  Should officers check to make that --

A.  Yes, they should.  Make sure they're at

Page 154

the front of the range.

Q.  Should that be done every shift?

A.  That should be done every time you do a round, yes.

Q.  Okay.

A.  Yes.

Q.  When a code 10-71 is called over the radio, who is responsible for sending people out to address that?

A.  I don't understand.  Can you -- not repeat the question.  I know who is responsible because when a code 10-71 goes out, the first responders respond.

Q.  Okay.

A.  So anyone other than the first responders, you're asking?

Q.  Yes.  What responsibility does the control room have when --

A.  Control room -- once the officer calls 10-71 in B cell house to the control room, then their job is to -- they control all of the airways.  So they put that emergency out over every airway we have open.  They would say, "Control to all units. Control to all units.  10-71 in B cell house, 500 range.  10-71 in B cell house, 500 range.  All

Page 155

responding -- all responders acknowledge.  Please acknowledge."

So then everybody that's a first responder acknowledges.  My radio was 26.

"26 en route."

"Unit 5 en route."

"Unit 3 en route."

"Sergeant Smith en route."

Q.  Okay.

A.  That let's control know that we've answered it.  We've heard the call, and now we're en route to the call.

Q.  Okay.  So you would -- if you didn't first hear the 10-71 call, then you would respond to the control --

A.  Right.  Yes.

Q.  Sitting here today, do you have a recollection of the April 7th, 2017, fire?

A.  Yes, ma'am.

Q.  Can you tell me everything that you remember about that fire starting from the beginning?

A.  Well, I remember the signal being called. I was in the captain's office.  We were waiting for count to clear.  Me and Lieutenant Redden responded to B cell house.  We get to the unit.  The front door

Page 156

was open.  We're like, "Where is the fire or fire alarm coming from?"

"The 500 range."

I believe it was -- I can't remember what officer said it was -- it was a male officer. He said, "500 range."

We grabbed fire extinguishers.  We ran up to the 500 range.  We could see that the fire was coming out down the range.  From the front of the range, it looked like it was the last cell.  But once we got down there, it was like second to the last or third to the last cell.  We started putting the fire out with the fire extinguishers.

We tried to pop the door from the front of the range because there was a key box in the front of the range.  B cell house is the only unit that has electronic locks where you can open one door at a time, three doors at a time, or the whole range at one time just by hitting switches.

Q.  Okay.

A.  Or you can use the key to put inside the lock and open the door at the door.  We tried to pop the lock at the front of the range.  First, no avail to that.  Once we got down to the cell, we started putting the fire out.  We noticed that the door was

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 41 of 102

Page 157

just kind of -- just like the lock just popped, but it was just adjacent -- but stuck. Started fighting the fire. We got the majority of the fire out. And in the mix of us putting the fire out, with him yelling from the cell -- Mr. Devine -- "help me, help me."

Once we got the fire down as much -- as much as we could with the fire extinguishers, I went to try to grab the door not thinking. I was just responding off of -- in adrenaline. And my partner pulled me back. I'm not thinking it's hot steel. If I would have grabbed the steel bars by my hands, I would have burnt my hands. At that time, we radioed -- radioed the captain and say, "Hey, we're going to need the firemen up here -- firefighters up here."

A lot of black smoke started building. In the mix of the commotion -- because now we're on the 500 range -- you have -- I'm going to say half -- 100 offenders banging on their doors saying, "Help me. Help me. Get me out." So it's loud. My partner was probably from me to him or me to her, and I can't see him. I can hear him trying to talk to me, but I can't see him because the smoke was that dark.

Page 158

We're trying to radio to the captain, you know, telling the captain, "Hey, we're going to have to evacuate the cell house." And in the mix of radio traffic, all we hear is the captain say, "Evacuate." So we started evacuating. You know, not saying we didn't get all his radio traffic because we can't hear. All we could hear was "evacuate." You know, we're trying to radio to him that we need to evacuate. He's trying to radio back and forth. We just hear "evacuate."

We started evacuation on B cell house. Once the firemen got there, we were able to put the rest of the fire out. We were able to -- beating on the door. Beating on the bar. We finally get the door open. We got Mr. Devine out, put him on the gurney. It's still loud in the cell house because I think -- once we got out of the cell house, I think we were still -- we were still in the process of getting everybody out of the cell house, so it's extra loud. People are screaming and yelling.

We're radioing -- radioing to my partner Lieutenant Redden, "Hey, we're coming down the front staircase."

He goes, "No. We can't come down the front staircase. We're still in the mix of

Page 159

evacuating. You got to go down the back staircase." So we take him down the back staircase. That's where medical was staged at the back staircase to help us once we got him down. We put him on top of the gurney. We take Mr. Devine to the custody hall where the nurses were performing CPR on him. I left the nurses with him at the custody hall, and I went back to the cell house to finish the sweep of the cell house and make sure we got all of the rest of the offenders out of the cell house. That's about it.

Q. Okay. I have a few more questions about the evening.

A. Yes, ma'am.

Q. So where were you during count? You said count happened around 9:00 o'clock?

A. In the captain's office.

Q. Where is the captain's office?

A. In the custody hall. It's -- actually, on the east side of the -- the foyer right here in B cell house -- right on the other side of the wall between -- on the other side of the gate is the captain's office (indicating.)

Q. And what were you doing in there during count?

A. Waiting for count to clear.

Page 160

Q. And so after count, you went to the B cell house to tell Officer Abbassi and Officer Blakely to do their A4 information; is that correct?

A. After count?

Q. Yes.

A. If that's what I wrote down. I can't remember.

Q. All right. Just tell me -- when you left the officer's station or the captain's station, what did you do?

A. I went to the B cell house because the signal was called.

Q. So you went straight from the captain's office to B cell house?

A. Yes.

Q. Okay. Did you leave at any time prior to going to B cell house before you -- before the signal was called?

A. Maybe. I can't recall. Maybe. I can't recall.

Q. So when you got to the B cell house, could you already hear yelling inside?

A. I could hear the inmates yelling, "Fire. There's a fire up here." The fire alarm was going

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 42 of 102

Page 161

off. It was loud.
   Q. Could you see smoke when you got to B cell house?
   A. Once I got to B cell house, could I see smoke?
   Q. Yes.
   A. No. But once I got up on the range -- on the 500 range, I could see the fire. Smoke initially was just on the north side.
   Q. Okay.
   A. So I'm coming in on the south side, so I can't see anything.
   Q. Okay.
   A. Until I get up the stairs.
   Q. Could you smell the smoke?
   A. I could smell.
   Q. So when you got to the door of B cell house, was it unlocked?
   A. I believe so.
   Q. Was anybody waiting there to let you in?
   A. No.
   Q. No one was waiting to let you in?
   A. I don't -- I can't say yes or no. I'm going to say I can't remember if there was anyone there. I just remember going in the cell house, and

Page 162

I remember talking to a male officer and running up the stairs -- grabbing a fire extinguisher and running up the stairs.
   Q. Just to back up. You got to the B cell house. You believe it was open?
   A. Right.
   Q. You walked inside, and you could immediately smell the smoke?
   A. I could smell the smoke.
   Q. Could you smell the smoke before you walked in?
   A. Yes, I think so. Yes.
   Q. So before you ran up the range, you talked to a male officer?
   A. I think it was a male officer. I asked him, "We have a fire? What's going on?"
         "Something's going on the 500 range."
         "Okay."
         I run up to 500 range.
   Q. So there was a male officer on the ground level?
   A. I believe so.
   Q. Was it the male officer who was assigned to the B cell house?

Page 163

   A. That was assigned to B cell house?
   Q. Yes.
   A. I assume that it was. He was in the cell house when I got there, so I assume he was assigned to the cell house.
   Q. And who arrived at the cell house with you?
   A. Lieutenant Redden.
   Q. Is he the only one?
   A. Lieutenant Redden -- me and Redden got there together, and then Sergeant Statham or Officer Statham -- he's a sergeant now -- came right behind us.
   Q. Okay.
   A. I know me and Redden got there together, but Statham was a step behind us.
   Q. Okay.
   A. I don't know. 30 seconds behind us or something like that.
   Q. Okay. And so you got in.
         The male officer there told you that the fire was on the 500?
   A. Something is going on on the 500 range.
   Q. And you ran up there.
         Did you see anybody else on the

Page 164

range? Any other officers on the ranges as you were running up?
   A. I can't recall. I just know nobody had the keys. We didn't have the keys. I can't say if it was Abbassi or Blakely that had the keys to 500 range, but somebody had the keys to the 500.
   Q. Okay.
   A. And once we got up on the range, then we took the keys from the -- whoever had it. I can't remember who had the keys.
   Q. Okay.
   A. I can't remember who had the keys, but we then assumed the keys from them.
   Q. So you got the keys when you were already up on the 500 range?
   A. I believe so. I think we got the keys from them while we're on --
   Q. And you got -- oh, sorry.
   A. We got the keys in the mix of being on the 500 or going -- I don't know if they were up there and coming down or we were meeting them, but we snatched the keys from them.
   Q. Okay.
   A. It was one of those -- we're not thinking about the situation. We just need the keys to 500.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3.18-cv-00995-JD    document 203-1    filed 03/29/21    page 43 of 102

Page 165

Q. And you brought fire extinguishers with you?

A. Yes.

Q. Did anybody else give you fire extinguishers or bring fire extinguishers?

A. Not that I know of. Hold on. Can I clarify?

We didn't bring any fire extinguishers with us. We used the fire extinguishers that was on the unit.

Q. Okay.

A. As soon as you walk in B cell house, right by the officer's station, there is fire extinguishers. So we grabbed those fire extinguishers off the wall and ran upstairs.

Q. Okay. And there was another fire extinguisher on the range that you grabbed?

A. I can't remember. I just know I had two in hand running up the stairs.

Q. And about how long do you think it takes you to run from the -- how long do you think it took you that night to run from the front door up to the 500 level where the fire was?

A. 30 seconds. I don't know. Less than a minute maybe.

Page 166

Q. So you think you could get from the front door --

A. To the 500 range?

Q. In 30 seconds?

A. It depends on who's running. If you got a little bit of weight on you, it's going to take you a little bit to get up there. It's five stories. If you're active, you're getting up there quick.

Q. Okay. So under a minute?

A. Oh, yeah. Under a minute. You could walk it in under a minute.

Q. And when you were up there, there was a lot of smoke already?

A. From what I could see, smoke on the back end of the cell house.

Q. Okay. But you could see to the back?

A. The only reason I could see to the back is because of the fire.

Q. Okay.

A. That's the reason why I could see.

Q. So were the flames coming out of the cell at this point?

A. Yes.

Q. And who was up there? Was it just --

A. It was me, Lieutenant Redden, and

Page 167

Statham.

Q. Okay. Were there any other officers up there with you?

A. I can't remember. At that time, I just had tunnel vision. I just know who was there with me that I seen on the range, and it was just those two.

Q. Okay.

A. If Ms. Blakely or Abbassi was up there, I didn't see them. I didn't pay attention to see them. I just seen the ones that went up there. Those were the only two I had accountability of that was there on the range.

Q. And did you run to the cell before you unlocked it, or did you unlock the door before you got to the cell?

A. I can't remember. I think -- I think we tried to pop the door at the front of the range with the switch and then run down or -- I don't know. In the mix of that, I was just running down the range with the fire extinguisher. One of us had the key. I can't tell you if I had the key or Redden or Statham had the key, but somebody had the key because we were trying -- mainly just trying to pop his door as fast as possible. We figured we'd pop his door, his door would open up, and he could get out of the

Page 168

cell.

Q. Okay.

A. But once we got down there, to no avail.

Q. And you don't recall which one of you tried to pop the door?

A. No, I can't remember.

Q. Okay.

A. It was all tunnel vision. I just remember having the fire extinguishers. I remember running up. I remember being in front of the cell trying to put the fire out.

Q. But nobody had opened the door or tried to open the door before you got there?

A. Not that I know of.

Q. So how did you know which cell to open from the front of the range?

A. I didn't know.

Q. Didn't. So did --

A. It was more of a count and see where the fire's at and count back. Like I said, I thought it was the second to the last cell, but it ended up being the third to the last cell.

Q. Okay.

A. So I just kind of counted on the -- whoever opened the door would count on the box.

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 44 of 102

Page 169

Either Cell 540, 542, or 544.

Q. So did you try to pop all three cells?

A. I'm going to say I think so. I can't tell you because I don't remember popping a door. I just had the fire extinguisher, and I was trying to fight the fire.

Q. And who grabbed the fire extinguisher? Do you remember which one of the three of you grabbed the fire extinguishers?

A. We all grabbed them.

Q. Okay.

A. I remember I had two in my hand. I think Redden had one. I think Statham had one. I think we had four fire extinguishers. Three, four, five fire extinguishers.

Q. And do you remember giving any instructions to any other officers about things they should do to help address the situation?

A. Explain that.

Q. Do you remember giving any instructions to the other three officers who were in the cell house? So Rodriguez, Blakely, or Abbassi?

A. As far as what they should and shouldn't do?

Q. Yes.

Page 170

A. I don't remember.

Q. So you said that you guys activated the fire department after you got to the cell and tried to put the fire out?

A. Yes, ma'am.

Q. Was there a reason you waited that long to activate the fire department?

A. If we were able to put the fire out ourselves, then we wouldn't need for the fire department to be activated.

Q. Is that in compliance with policy to wait to activate the fire department until you try to put the fire out yourself?

A. I'm not sure if it is.

Q. Do you recall --

A. I'm not sure. I know the first thing is -- first responders get there. If the first responders can handle the situation, then they handle it. If it becomes a situation outside of what the first responders can handle, then that's when you call for E squad to be activated or fire department to be activated or you call for additional help.

Q. Okay. So that's the policy as you understand it is to allow the first responders to address the situation first?

Page 171

A. Yes, ma'am.

Q. Before activating the fire department?

A. Yes.

Q. Even if a 10-71 is called?

A. If a 10-71 is called, it could just be a fire in a garbage can. I don't need the -- what's the sense of having a fire extinguisher on the unit if I need the fire department? And what's the sense of training officers how to use a fire extinguisher if we need the fire department?

We're trained to handle those situations prior. If the situation gets outside of us handling it, then you call those guys.

Q. Okay.

A. Because they're going to come in with hoses. They have the oxygen tanks and things like that. I didn't have an oxygen tank. I didn't have a mask. I was just up there fighting the fire trying to save someone's life.

Q. I know you said earlier that there's a significant amount of time it takes to activate the firefighters?

A. Yes, ma'am.

Q. So do you think that creates an increased risk to wait to assess the situation before you call

Page 172

the fire department?

A. No.

Q. Why not?

A. Somebody has to assess the situation. What if I don't need the fire department? Then I don't need to call them, but somebody has to go there and assess the situation. If I just call the fire department and have them go deal with the situation, where are the first responders? The first responders has -- they have a job to do, and that job is to assess the situation.

They're the ones that make the call. Even if the officer -- if there was an officer there that's not a first responder -- if an officer made the call, they still want the first responders to be there if it's a situation that -- that has not got out of hand, but a situation that the first responders can handle themselves. You let the first responders handle it. That's just protocol.

Q. Is there any risk to when a 10-71 is called automatically activating the fire department and the first responders?

A. No, I don't think it is. That would be good. That would be great, I think.

Q. Do you think that would be a better

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 45 of 102

Page 173

policy?

A. I think so. I mean, it can't help -- it can't hurt. It can only help.

Q. So when you arrived at this cell house, you said you heard Joshua Devine asking for help?

A. Not when I arrived. When I got in front of the cell.

Q. Okay. So he was still alive when you got in front of the cell?

A. I heard someone yelling out of the -- I couldn't see him, but I heard someone yelling. I'm like, "Okay. Somebody's in there." That's the reason why -- once we got the fire -- we got the fire put down -- you know, it just died down, and I went to grab the door to open the door. That's when I got yanked back because I can hear someone in there. He was yelling, you know, "Help me. Help me."

Q. Could you see him inside of the cell?

A. I just seen his hand. I think I just seen his hand. That's all I seen.

Q. You said Officer Statham was right behind you.

Did you meet him up on the 500 range, or were you with him on the 100 range?

A. He met with us on the 500 range.

Page 174

Q. So did he take a different route up to the 500 range?

A. We went up -- me and Lieutenant Redden got there first. So we were already en route to the 500 range, and then Officer Statham met us up on the 500 range.

Q. Do you think that any policies or practices were -- scratch that.

Do you think any policies were violated that night in reacting to the fire?

A. For who?

Q. From any of the officers in the cell house?

A. I have no idea. I can only account for myself -- what I did. I don't know if any officers violated any policy or procedure before the 10-71 was called or during the 10-71.

Q. Did you observe any violations while you were addressing the fire?

A. Such as?

Q. Just if you observed anybody -- either Officer Redden or Officer Statham or any of the other officers who were there violating any policies that you knew about?

A. No, ma'am.

Page 175

Q. Did you learn about any conduct or behavior after the fire that you believe was a violation of any ISP or IDOC policy or protocol?

A. No, ma'am.

Q. I am going to hand you what's going to be marked as Exhibit 3. It does not have a Bates stamp, but it is a collection of incident reports.

(The document was thereupon marked for identification as Watson Exhibit No. 3, as of October 30, 2019.)

BY MS. PIERCE:

Q. If you turn to Page 9 --

A. Is Page 9 my statement?

Q. Yes.

A. Okay. That's fine.

Q. Do you recognize that as your statement?

A. Yes, ma'am.

Q. Can you take a minute to re-read your statement?

A. (Witness complying.) Okay.

Q. Does that refresh your recollection at all about what happened that night?

A. Yes, ma'am.

Q. So can you tell me what additional things

Page 176

you remember based on reading your statement?

A. The only thing that I didn't say is that Officer Statham called a Signal 3000.

Q. Okay.

A. For Offender Devine.

Q. What's an Signal 3000?

A. Emergency situation.

Q. Okay. Let's look back at -- looking back two pages to Promise Blakely's statement.

A. (Witness complying.) All right.

Q. Do you see that last line there? She says --

A. "Lieutenant Watson" --

Q. I'll read it a little bit louder for the court reporter.

A. Oh, sure. "Lieutenant Watson" --

Q. "Lieutenant" --

A. -- "took my 500 keys and ran up to 500 North."

Q. Do you ever recall Promise Blakely giving you her 500 keys?

A. I don't recall, but I did say one of us grabbed the keys on the way to running upstairs.

Q. Okay.

A. So it was me.

BARBARA DEVINE, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   Cause No. 3:18-cv-00995-JD-MGG   document 203-1   filed 03/29/21   page 46 of 102
ANTHONY WATSON
October 30, 2019

Page 177

Q.  If Promise Blakely was assigned to the 500 range and had the 500 keys, should she have been waiting for you down at the 100 range?

A.  Should she had been waiting?

Q.  Yes.

A.  Yes or no.  She could have been down on the flag waiting for us or up on the 500 range waiting for.

Q.  Okay.

A.  Probably preferably up on the 500 waiting for us.  At least we have a person that still has eyes on the situation.

Q.  So it doesn't matter what the -- if the person with the keys to the area where the problem is happening --

A.  Right.

Q.  It doesn't matter if they're on the flag range or up on the area where the problem is?

A.  I mean, I don't know why -- I don't know.  Maybe she seen the fire and ran down.  Like, "Hey, there's a fire up here or something" in the mix of us getting on the unit.  I just snatched the keys from her and took off running.  If she was downstairs, it's a good thing because now we have the keys.  If she goes upstairs and then -- panicked and hid

Page 178

somewhere -- I don't know.  I can't say what would be better or not be better.

Q.  Should she have, if she saw a fire in Cell 540 or learned that there was a fire in Cell 540, tried to unlock the door?

A.  No, not by herself.

Q.  So in no situation --

A.  Not by herself, no, ma'am.

Q.  So even if a large fire like the one that occurred --

A.  No.

Q.  -- an officer is never permitted to unlock the door by him or her --

A.  By themselves, no, never.

Q.  And is that an official policy?

A.  It is a policy.

Q.  Do you know where that policy comes from?

A.  No, I have no idea.

Q.  But you know that's an official policy?

A.  You're taught that in training.  You're taught that in your initial training as a correctional officer at the -- your institute.  You're taught that in your 40-hour training.  That's drilled in everyone's head.  You don't unlock a door by yourself.

Page 179

Q.  Okay.  Do you know if that's a written policy?

A.  Yes.

Q.  But you don't know the source?

A.  I don't know the source of it.

Q.  So there are no exceptions to that policy?

A.  None.

Q.  Okay.  So it would have been inappropriate for Officer Blakely?  She would have been violating policy if she opened the cell door by herself?

A.  Yeah, she would have been.  I -- someone would frown upon it, but she wouldn't have gotten in trouble.

Q.  But she would have been violating policy?

A.  Somebody in administration would still have a problem with it, so that's why you don't violate the policy.  Then there's no problem.

Q.  If you were the only person there at that cell by yourself and you saw the fire, would you have violated policy and opened the door, or would you have --

MR. ROTHENBERG: I have to object.  It's speculation.

Page 180

BY MS. PIERCE:

Q.  You can answer.

A.  I can say that I have because a person was hanging.  That's just me.  That's not a newer officer that probably never experienced anything like that, so they're going to follow the policy.  They don't have the -- maybe not the training to back up to say, "Hey, it was a life or death situation." It's still policy.  It's policy.  They're going to tell you don't go inside the cell by yourself.  It doesn't happen.

Q.  When you violated that policy, you said, to help an inmate who was trying to commit suicide, did you -- were you reprimanded?

A.  I got told, "Hey, you know you're not supposed to do."
"Yes, I know that."
And I didn't panic.  I just -- it happened.  It wasn't one of those I was thinking about -- you don't think about policy when we're trying to save someone's life.  That's just me personally.

Q.  Can you --

A.  If it had been me by myself in the capacity of a lieutenant when Mr. Devine was -- cell

BARBARA DEVINE, et al. v.                    Cause No. 3:18-cv-00995-JD-MGG                    ANTHONY WATSON
RON NEAL, et al.                                                                                                October 30, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 47 of 102

Page 181

was on fire, I probably would -- I probably would have violated policy and opened the door -- tried to open the door. I mean, that's -- I can't tell you what I would have done. It's should of, would of, could of depending on when that situation was happening. If you see somebody engulfed in flames, I probably would have done it.

If I would have gotten in trouble and got busted down, I'm only getting busted down from a lieutenant to a sergeant or a lieutenant to an officer.

Q. Can you tell me who reprimanded you when you broke the policy in the past?

A. I think it was my captain. He just basically chastised me. He just told me, "Hey, you know you're not supposed to that. I understand what you were trying to do, but it's still policy."

Q. Have you ever spoken with the warden or heard the warden tell anybody that they're not supposed to let somebody out of their cell unless there's another officer?

A. The warden?

Q. Yes.

A. Not really, no.

Q. Would that be a policy that would come

Page 182

from the warden?

A. I don't know if that's -- that's a policy of Indiana State Prison. I don't know if that comes from the warden. I don't know if that is a facility rule or it's a DOC rule -- DOC policy. I don't have the information on that.

Q. Do you remember who the captain was who reprimanded you?

A. No, ma'am. I wasn't reprimanded. I was just counseled.

Q. Counseled?

A. Yes, ma'am.

Q. Counseled.

Have you instructed other officers on this policy and told them not to let anybody out in any situation unless they have another officer present?

A. That's all constant training, yes, ma'am.

Q. Okay. Do you know if this is reflected in any training materials?

A. To not open -- yes, ma'am.

Q. So it's in the written training materials?

A. Yes, ma'am.

Q. So do you know if this was used in any

Page 183

drills where people are told -- a drill occurs and they are -- go to a cell by themselves and they're told to wait until somebody else comes to let them out?

A. Any drill?

Q. Yes.

A. I don't know if that happens or not. I don't have any recollection of that.

Q. Okay. If two officers were -- two officers and no lieutenant or sergeant were at a cell and there was an emergency, would they be authorized to let the prisoner out without getting any sort of okay from --

A. Yes.

Q. -- a supervisor?

A. Yes.

Q. In any sort of emergency?

A. Yes.

Q. Okay. So the only requirement is that there be more than one officer?

A. Yes, ma'am.

Q. Have you ever heard of any other circumstances where somebody let somebody out of their cell during an emergency and they were the only person present?

Page 184

A. Yeah. The fire. When we evacuated the cell house, it's still a -- it's an emergency for the whole unit. So we have officers unlocking the doors to get the rest of the inmates out of the unit.

Q. Okay.

A. So we don't have 216 causalities.

Q. So that was a violation of policy then to evacuate the cell house?

A. No, ma'am. It's not a violation of policy because it's what had to be done. The officers -- okay. In an emergency situation, officers -- if an offender's in there hurting themselves or hanging or doing something like that, you're not allowed to open the door or go in the cell by yourself. You have to have two officers present.

Q. Okay.

A. But every day as a practice, we have to unlock the doors.

Q. Okay.

A. We have to feed the inmates. So if I'm assigned to 500 range, I go down and I unlock each door by myself. There's a difference in that. The difference is just the day-to-day business of doing your job. An emergency situation, an isolated situation where an offender is in that cell by

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 48 of 102

Page 185

themselves -- burning, hanging, whatever -- you don't go in the cell. You don't open the cell door unless there is somebody there with you.

Q. Okay. Got it. So in this case where Joshua Devine was in his cell and there was a fire, the policy either at IDOC or at ISP is you are not allowed to let him out of his cell unless another person is present?

A. Right. Yes.

Q. Thank you for clarifying that.

Did you have any trouble breathing during the fire because of the smoke?

A. Yes.

Q. Did you have any trouble breathing -- with your breathing after the fire?

A. After the fire? Just a little bit, but I wasn't seen by any medical staff or anything like that for -- I probably should have, but I wasn't. I wasn't thinking about myself. I was thinking about others.

Q. And you said the smoke was so thick while you were at Joshua's cell that you couldn't see the person next to you?

A. Yes, ma'am.

Q. Were fires common at ISP?

Page 186

A. Set by inmates, yes, ma'am.

Q. About how often would that happen?

A. Once a day. Inmates get mad about something, especially on our lock-up units, and they set a fire on the range.

Q. What were some other causes of fires?

A. That was it. Mostly all of the fires we ever had were set by inmates by burning toilet paper, newspaper.

Q. You don't remember any other causes of fires?

A. No, ma'am.

Q. You said they happen once a day?

A. Yes. That was a normal at Indiana State Prison. Somebody is burning something. They're mad. The cable is out. They're -- they will set a fire if the cable is out. They will set a fire if chow is too late. They'll start a fire if their laundry doesn't come back. It's what happened every day.

Q. Do you remember any major fires beyond -- besides this April --

A. No.

Q. In any part of the ISP?

A. No, ma'am.

Page 187

MS. PIERCE: We're going to show a quick video. Maybe we can take a five-minute break while we can get that ready.

(WHEREUPON, a short break was taken.)

BY MS. PIERCE:

Q. Just before we start the video, I just want to make sure I understand sort of the timing from your memory.

So you walk in to the cell house. You go up. And with -- you grab the fire extinguishers. You go up. And one of you opens the -- tries to unlock the door.

Do you remember -- there is a box over the electronic panel at the front, correct?

A. Yes, ma'am.

Q. So do you remember if the box was up or down when you arrived there? Did you --

A. Oh, I can't remember.

Q. Okay. But you remember that you tried to unlock the door at that point? You or Officer Redden?

A. Me -- someone tried to unlock the door. I can't say who. I know I grabbed the -- it says I grabbed the keys, but from that time until getting up

Page 188

there with the keys, it doesn't mean I had them once we got to 500.

Q. But one of the three of you --

A. Tried to unlock the door from the key box.

Q. And you guys were the first ones to try to unlock the door?

A. That we knew of.

Q. Okay. And then you get to the cell, and you start trying to put the fire out?

A. Yes, ma'am.

Q. You use the fire extinguishers?

A. Yes, ma'am.

Q. And you realize you can't put the fire out?

A. No avail. It was -- more or less, it kept -- fire was going down. Like I said, we got the fire to where -- I could see in the cell. And there was fire in the back of cell, but as far as the front of the cell -- because we were trying to -- I seen Mr. Devine -- like I said, I seen his hand. It was somewhere near close to the front of the cell.

Our mentality -- I'm going to try to put the fire out at the front of the cell so we can get the door open and get you out of the cell. I

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 49 of 102

Page 189

wasn't worried about the back of the cell at all. I was trying to get him out.

Q. Okay.

A. So, like I said, we used the fire extinguishers, and it barely worked. Really no avail. It really had no effect on the fire. That's when I just tried to pop the door. I tried to grab it, but my partner pulled me back so I wouldn't burn my hands. I didn't really think about my hands being burnt. I was trying to get the door open.

Q. And it was then at that point you then called the firefighters?

A. Yes.

Q. And did you think about calling the firefighters earlier when you saw how big the fire was or how much smoke there was?

A. No. I didn't think about it. If we were successful in putting the fire out, then there would have been no need to call them. We probably would have called them still, but our main objective was trying to put the fire out to get Mr. Devine out of the cell. That was my first objective. I didn't think about the fire -- fire department. I was trying to get him out of the cell.

Q. Okay. So you were just thinking

Page 190

about Joshua Devine, but there was nothing that prevented you from calling the firefighters? There was no problem with the radio or anything like that?

A. No problem with the radio, but I -- like I did state earlier, the communication back and forth was almost next to none.

Q. Okay.

A. Because, like I said, we got over 100 inmates banging and screaming and yelling at you. I mean, the cell right next to him, I have an inmate screaming in my ear, "Get me out of here. I'm going to die." You have everybody yelling the same thing, banging.

So even if I wanted to call -- if I called right then and there, okay; but I stated that our communication was just kind of trampled on. I can talk on the radio, but -- and I'm sure they can hear what I'm saying, but I can't hear nothing coming back because of the noise.

Q. But then you did? At one point, one of the three of you --

A. Right.

Q. One of the three of you called --

A. One of the three of us did call.

Q. And there was no issue with calling them

Page 191

when you did call the firefighters?

A. Well, we called the captain.

Q. And he activated the fire department?

A. He activated them solely. When we call and say, "Hey, we're going to need the fire department," it's really, okay, how fast is he -- okay. Calling the cell house and get these guys ready. Once we make the call, I have no idea what went on after that other than waiting.

Q. But -- so besides noise, there was nothing that affected your ability to call the captain and activate the fire department?

A. No, ma'am.

Q. Okay. Do you -- did you do that over the radio? Was that the way that you were supposed to activate the fire department? You call the captain on the radio or you call him on the phone?

A. Call him on the radio. Why am I going to call him on the phone? I'm not going to waist precious time trying to run down, and now the phone doesn't work because -- for some apparent reason.

Q. Okay.

A. All of the traffic would be done over the radio.

Q. And do you know how the captain is

Page 192

supposed to call from there to activate them?

A. I don't know. He makes a call to -- he has to know exactly where -- what cell house the fire chief's at. He calls the cell house first. He either called them on the radio or called them on the phone. I don't know which one he did. I have no idea.

Q. I'm going to show you a video that we were sent from your interview with internal affairs.

A. Yes, ma'am.

Q. I think it would be easier if you come and sit here (indicating.)

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. Do you remember going to the B cell house to have them go do their A4s?

A. I don't recall. But if I said I did that, that's what I did.

Q. Okay. So you don't have any reason to dispute it --

A. No.

Q. -- but you don't have any independent recollection as you sit here of that happening?

A. Yes, ma'am.

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 50 of 102

Page 193

Q. Okay.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. Do you have any independent recollection as you sit here of hearing anything at the fire -- in B cell house when you went over there -- scratch that. I'll say that again. It was not a good question.

You don't have an independent recollection as you sit here of hearing any noises or whether it was quiet when you were at the door of B cell house?

A. The middle door?

Q. Yes.

A. No, ma'am.

Q. Okay. And if you said it was quiet, you meant that there wasn't really anything --

A. Any ruckus, nobody yelling, screaming, or anything like that, no, ma'am.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So do you recall Officer Blakely -- does

Page 194

this refresh your recollection about Officer Blakely opening the door?

A. I can't remember. Like I said, I couldn't remember if the door was open or somebody let us in. I just -- all I remember is getting to the cell house, getting the fire extinguisher, and getting upstairs.

Q. Okay.

A. It was more a tunnel vision situation.

Q. And you answered all questions during this interview to the best of your ability and as honestly as possible?

A. Yes, ma'am.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So you heard on here that you called for officers to bring fire extinguishers?

A. Uh-huh.

Q. Do you have any reason to dispute that?

A. No, ma'am.

Q. Do you have any independent recollection of that as you sit here today?

A. No, ma'am.

Q. Do you know which officers you would have

Page 195

been referring to?

A. The officers assigned to the cell house.

Q. So you would be referring to Abbassi, Blakely, or Rodriguez?

A. Okay. Yes, ma'am.

Q. Is that correct?

A. Yes, ma'am.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So you heard yourself on the video saying that the fire basically exploded?

A. Uh-huh.

Q. Do you have any independent recollection of that?

A. Yes, ma'am.

Q. You do.

A. Yeah. Like I said, it was like a bomb.

Q. So it was smaller, and then it exploded to a much bigger --

A. Yes, ma'am.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So you heard on the interview that you

Page 196

were calling for the firemen then.

Is that the first time that you believe you were calling for the firemen?

A. Yes, ma'am.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So did you -- you don't know who opened the cells?

A. Yep.

Q. Is that still correct today?

A. Yes, ma'am.

Q. So you have no independent recollection or you never heard anything about who opened the cells?

A. I have no independent recollection, and I don't -- still to this day, I don't know who opened the cell doors.

Q. Okay. And do you have any idea about who called for an evacuation?

A. I do know when we were -- I believe Lieutenant Redden -- when we made the communication to call for the firemen to the captain, I believe -- I think it was Redden that stated, "Do you want us to evacuate?"

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 51 of 102

Page 197

Well, I could him hear him say that, but I can't really hear too much coming back from the captain because of all of the yelling.

Q. Okay.

A. And all we heard was "evacuate," but I'm thinking the captain was in mid-sentence.

Q. Okay.

A. So I guess they evacuated.

Q. Okay. But you -- neither you nor Lieutenant Redden gave any direction for anybody to evacuate?

A. No. We just -- I believe in that instance, we just heard the word "evacuate" that was at the end or the beginning of the captain's sentence over the radio.

Q. Okay.

A. And that's what took place.

Q. And did you open any cells?

A. I didn't open any cells, no, ma'am.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So you said that you gave the keys to the counselor's station to Officer Rodriguez?

A. My keys. As a lieutenant, you have a --

Page 198

the lieutenant has the keys to the unit team office because it's the same key that we share.

Q. Okay.

A. So each lieutenant has a key. So I stated they were supposed to do their A4. And I gave my key to open the counselor's office, and they gave me my set of keys back.

Q. So no one in the -- in the cell house would have a key to --

A. No, not at all. That's locked at all times.

Q. Okay.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So does this video refresh your recollection at all about the night of the fire?

A. Yeah. Yes.

Q. So what additional things do you remember after reviewing the video?

A. Just the situation -- the part before anything ever happening giving them the key to open up the unit team office to do the A4.

Q. So you remember going to do that?

A. Yes, ma'am.

Page 199

Q. And you remember giving the key to Officer Rodriguez to the unit team office?

A. Unit team office, yes.

Q. Is there anything else that you remember after watching this video?

A. No. No, ma'am.

Q. Is there anything that after watching this video you believe is incorrect?

A. No.

Q. Or inaccurate?

A. No, it's accurate.

Q. I'm sorry?

A. It's accurate.

Q. Okay. And you have no reason to believe that you would not have answered each question truthfully?

A. No, ma'am.

Q. And you don't have any recollections beyond what we've discussed here today?

A. No, ma'am.

Q. So can you go through after watching the video the timeline of count -- after count finished until when that 10-71 was called?

A. After count finished to when the 10-71 was called?

Page 200

Q. Yes.

A. Count was finished right before 9:45 like I stated in the video. It was about 9:49-something when I opened the middle gate to give them the key to open the counselor's office so they could do their A4, like I stated in the video. It wasn't five minutes before the signal was called. I responded to the signal, like I stated in the video. Ms. Blakely opened the door. I said earlier I couldn't remember if the door was open or someone opened it for us, but Ms. Blakely opened the door.

Q. Does that mean she unlocked the door, or was it unlocked and she just opened it?

A. I can't remember. Like I said -- I said she opened the door. She could have been opening the door or she opened the door and was just standing down there with the keys in her hand. I can't remember.

Q. Okay.

A. But Ms. Blakely had the 500 keys. I took the keys from her. We ran upstairs. Like I said, I don't know who opened the box -- the key box. I had the keys on me going up, but I don't -- I can't recall if I opened the key box myself. I went down and seen Cell 540 that was on fire. I went down and

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 52 of 102

Page 201

tried to put the fire out with the fire extinguishers. The fire extinguishers didn't work.

I seen Mr. Devine -- seen a hand, like I said. I tried to spray him off and fight the fire that was initially at the front of the cell instead of everything in the back of the -- the whole cell was engulfed. Just basically trying to fight the fire in front of his cell to try to get his door open to get him out.

Once it happened, we called for the fire -- called the captain and said we needed the firemen. Sometime after that, like I stated in the video, the cell door started popping. Somebody was at the front of the range opening the cell doors. In the mix of talking with the captain over the radio, we just heard the word "evacuate." So a decision was made to get everybody out of the cell house. Firemen show up. They finish putting the fire out as much as they can in the front of the cell.

Q. Do you know what they used to put the fire out?

A. Fire extinguishers. Same thing. They didn't have a water hose or anything like that. They just came with more fire extinguishers. They were able to get the fire out as much as possible or -- at

Page 202

to least get to the door. It took them, like I stated, a few minutes to beat on the door, kick on the door to get it open. Finally got the door open. Got Mr. Devine out. We put him on the chair. It's a gurney chair. It's a -- it sits like a chair, but then it could be folded and laid out like a gurney.

I started going down the range. In the mix of going down the range and getting the rest of the offenders off the range itself -- like I said in the video, we went down -- got down to probably the 300 range and radioed, "Hey, we're coming down the front." We were told we can't come down the front. We have a commotion at the front door. We got to take him out of the back -- down the back staircase.

Officer Redden -- Statham went and opened the back staircase for us. That's where -- proceeded to work our way down. Finally got all of the way downstairs, and the medical staff was staged down at the bottom staircase waiting on us. We put him on a gurney. They started the CPR as we were going to the custody hall. Once we got him -- I got him to the custody hall. Then I returned back to the cell house to finish the evacuation of the unit.

Q. When you went to go tell Officer Abbassi

Page 203

and Officer Blakely to do their A4s --

A. Yes, ma'am.

Q. -- how did you get their attention to come to the gate?

A. I just opened the door and just yelled right in there.

Q. Okay.

A. Because right at the front -- on the diagram of B cell house, the front foyer right there in the middle is an old gate that they don't use anymore.

Q. Okay.

A. But it used to be an emergency exit or entrance in and out of B cell house. And so there is a steel gate there. It's just like a wooden door. So you can open the door, and you can literally look right into the officer's station.

Q. Okay.

A. Yell over to them.

Q. Okay.

A. I mean, at that time, it was quiet, so it didn't take much for me to get their attention.

Q. So you didn't actually go into B cell house?

A. No. No, ma'am.

Page 204

Q. So you just yelled through, and it was fairly quiet and they could hear you?

A. Right.

Q. Do you know how long you spoke with them?

A. Like I said, it was not even -- just enough to give them the key. He opened the unit team office and gave me my key back.

Q. Okay.

A. And I closed the door.

MS. PIERCE: Okay. I'm going to hand you what's going to be marked as Exhibit 4.

(The document was thereupon marked for identification as Watson Exhibit No. 4, as of October 30, 2019.)

BY MS. PIERCE:

Q. Do you recognize this document?

A. Yes. This is a shift roster.

Q. Did you make this shift roster?

A. I can't tell you yes or no if it was me that made the shift roster for this date, but one of my jobs was -- as a shared responsibility between me and Lieutenant Redden, we made the roster.

Q. Okay. So it was either you or Lieutenant Redden?

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 53 of 102

Page 205

A.  Me or Lieutenant Redden, yes, ma'am.

Q.  Can you turn to the second to the last page?

A.  (Witness complying.)

Q.  So you see down at the bottom -- it was the quick response team.  That's a QRT, right?

A.  Yes.

Q.  So does that mean that you were in charge of the quick response team?

A.  I would be the team leader or team supervisor, yes, ma'am.

Q.  And that's indicated by the "OIC" right there?

A.  Yes.

Q.  What does that mean to be the officer in charge of QRT?

A.  The officer in charge of the QRT team is just -- they're the person that would give the command to what the QRT would do or should do.  They're not supposed to be directly involved in the incident.  They're, more or less, there for -- assess the scene, making calls back and forth to the captain, or whoever.

Q.  Okay.

A.  But when you have a team with two

Page 206

lieutenants and a sergeant, it really depends on who gets there first.

Q.  Okay.

A.  But me and Lieutenant Redden both got there at the same time.

Q.  Okay.

A.  And so we are both lieutenants.  So, yes, I am the OIC of the team.  But in this situation, I stayed with the body, and Lieutenant Redden left.  So I -- I can't make a decision.  I can't see what's going on other than in front of Cell 540.  I made a decision to stay with the body.  So it was, more or less, I relinquished the OIC to Lieutenant Redden, so he could make the decisions.  One of us can't be in two places at once.

Q.  Okay.  In the B cell house, the only people on staff were J. Rodriguez, S. Abbassi, and P. Blakely?

A.  Yes.

Q.  And what does it mean to have this star by Abbassi's name there?

A.  They would be going -- at 3:00 o'clock in the morning, they would go to kitchen to help feed.

Q.  Okay.

A.  Uh-huh.

Page 207

Q.  So then at that point, there would be two people in the cell house?

A.  Yes.

Q.  And what does it mean -- so the star means feeding and not the BCH, slash, feeding that's next to the --

A.  That, too, as well.  It's the same thing for A cell house.  Same thing for -- there's not one for C cell house, but somebody -- how you see -- how you have the -- in C cell house, where -- underlined 088.  It's kind of like off-colored.  It's not blackened.

Q.  Okay.

A.  But you could see that for all of the officers.  That will be A, B, or C that will be going to the kitchen to feed.  That's also along -- with -- that's also along -- in I cell house as well.  That would be about it.

Q.  So the star and the gray coloring both mean --

A.  Right.  That would indicate -- for that line -- if there's not an officer's name in that line -- but if there is an officer's name in that line, we're going to be using them for a different assignment toward the end of the shift.

Page 208

Q.  What kind of --

A.  More or less, feeding.

Q.  And what's -- what does the "11" next to Officer Abbassi's name mean?

A.  I have no idea.

Q.  Okay.  And if you turn to the last page, in the top, left corner, it says, "J bracket."

A.  Uh-huh.

Q.  What does allotted supervisor 6:00 p to 6:00 a mean?

A.  That's where we're allotted our times that we work, but that's -- that's an old format because the lieutenants and the captains worked the same time.  It's 5:00 to 5:00.  We used to work 6:00 p.m. to 6:00 a.m., but then we backed those hours off and worked 5:00 to 5:00.

Q.  Okay.

A.  5:00 a.m. to 5:00 p.m.

Q.  And so there was -- on this night shift, there was one captain?

A.  Yes, ma'am.

Q.  And that was Captain Dykstra?

A.  Yes.

Q.  There were two lieutenants?

A.  Yes.

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3.18-cv-00995-JD    document 203-1    filed 03/29/21    page 54 of 102

Page 209

Q. And that was you and Lieutenant Redden?
A. Yes.
Q. And there were four sergeants?
A. Yes.
Q. And do you think that's sufficient staffing for a night shift?
A. Four supervisors?
Q. Yes.
A. Yes.
Q. Okay. I'm going to hand you a document that's being marked as Exhibit 5.
        (The document was thereupon
        marked for identification
        as Watson Exhibit No. 5,
        as of October 30, 2019.)
BY MS. PIERCE:
Q. And this document says, "Internal Affairs Division, Report of Investigation." It does not have a Bates stamp.
    Have you ever seen this document before?
A. No, ma'am.
Q. Do you know what this document is?
A. No.
Q. Does it appear to be a report from the

Page 210

Internal Affairs Division?
A. I have no idea.
Q. So I will represent to you that this was produced to us by your counsel as the report from the Internal Affairs Division about the April 7th, 2017, fire.
    So assuming that, I'm going to ask you some questions.
    Can you turn to Page 6?
A. (Witness complying.)
Q. So on the very bottom line, it says that Captain Dykstra activated the firefighters?
A. Okay.
Q. Do you have any reason to dispute that?
A. No, ma'am.
Q. Okay. Turn to the next page.
A. (Witness complying.)
Q. In the second paragraph there that staffs with "with the interviews."
A. Uh-huh.
Q. So I'll read that paragraph. "With the interviews, video was reviewed to verify some statements. Lieutenant Watson stated he had opened the door to BCH and gave the unit team office keys to staff to do their A4. The camera from the custody

Page 211

hall facing Gate 4 was reviewed. At 9:33:35, he opened the door to BCH, and at 9:34:15, he closed the door." Does that sound accurate to you?
A. Yes, ma'am.
Q. Okay. So if you turn back to the front page, there are some times here that it says were identified after a video review. Do you see where I'm talking about?
A. In the middle?
Q. Yes.
A. Yes, ma'am.
Q. So it says here that there was a large flash of light in the cell at 9:34:43.
A. Okay.
Q. So assuming that, does that seem like the fire started when you were at the door or just after?
A. Okay. Yes, I guess.
Q. Okay. So you have no -- no reason to dispute that the fire started before at -- at 9:34, if not before?
A. If the fire started before, that means I was at the door; but the fire could have started at 9:15 if nobody didn't do their job. I didn't hear anything when I opened the middle door.
Q. Okay.

Page 212

A. So I don't know how to answer that yes or no.
Q. Okay. Okay. Turning back to Page 7.
A. (Witness complying.)
Q. We discussed when the security round should have been done earlier?
A. Yes, ma'am.
Q. And it looks like none were done after about 9:05, right? On 500 range?
A. Right.
Q. So do you see that last sentence of the third paragraph says, "Next round should have been started between 2136 and 2146?
A. Yes.
Q. So is that accurate?
A. I would say yes, ma'am.
Q. Okay. Can you turn to Page 8?
A. (Witness complying.)
Q. And look at the second paragraph in the bottom.
A. Yes, ma'am. Second from the bottom?
Q. Yes. So that says, "Copies of all fire drills for the past year and a half were reviewed. Can see no fire drills where any of the staff from BCH participated."

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 55 of 102

Page 213

A. Uh-huh.

Q. "In report from Mr. Griffin, he holds one set of fire drills a quarter."

Does that surprise you that no staff who were in BCH participated in fire drills during their time at ISP?

A. It depends on how long they were working. It really depends on -- hypothetically speaking, if I've been there six months, and every time they have a fire drill and -- if they have a fire drill -- if they start at A cell house all the way through. And every time there's a fire drill, I'm assigned to the different shelter. I'm not saying that can happen, but it can happen.

Q. So is that a problem if the only people staffed in a cell house have never participated in a fire drill?

A. That can be a problem. If that's the case, that's a problem for the whole facility. That's -- if you got -- at that time, probably -- I'm going to say half of our staff is all brand new. So probably they weren't -- haven't participated in any fire drill.

Q. Okay.

A. Maybe -- let alone one fire drill.

Page 214

Q. Okay.

A. I don't know if that's -- if that determines if a person should be able to work in a cell house or not.

Q. Do you think it's important to have someone -- at least one person in every cell house who is -- has done a fire drill or evacuation drill?

A. It would be nice, but that's -- once again, in a perfect setting. You're not going to have that at the setting you have at Indiana State Prison when your turnover rate is very high. You can have half your shift all brand new officers.

Q. Okay.

A. Within that month just starting. They only got a week of training. They're out a week of their on-the-job training, and now you're possibly the officer in charge or second officer. So it makes it difficult.

Q. Does that happen that someone can be a week out of their training and be the officer in charge?

A. Yes, that can happen.

Q. Is that a problem? Do you think?

A. Yes.

Q. Based on what you know about what

Page 215

happened on April 7th, 2017, and after reflecting on the day, is there anything that you would have done differently in your response to the fire?

A. No.

Q. Is there anything that you would have had anyone else do differently in their response to the fire?

A. No, not that I know of. Because responding to the fire and then you're -- you and your two partners are the only ones really involved in this situation. I probably would have liked to have the officer that was in charge of the range be up on the range with us, so that'd give us three people trying to help put the fire out and everything instead of two and one person back and forth with the captain.

We have three of us that can maybe talk with him. The officer -- it doesn't matter if the officer is assigned to the range or just an officer to help us with the doors.

Q. Okay.

A. But what I would have done differently myself -- I think I did everything I possibly could do to try to help save Mr. Devine from succumbing to the fire, but it was just an unfortunate event that

Page 216

happened.

Q. So the thing you would have done differently is have one of the officers from B cell house on the range with to you to fight the fire?

A. Stay up there. I mean, that's -- yeah. If they -- for whatever -- I can't make somebody do something. You have to be willingly or wanting to or have the know how of, "Hey, maybe these guys may need my help. I'm going to stay up there." I can say all I can say. "Hey, I need you up here." If that person don't show up, I'm not going to be chasing some officer that's scared, number one. I think Ms. Blakely was a brand new officer.

Q. Okay.

A. Never been involved in anything like this before. So the fight, flight, or freeze situation -- it's real. I can't be upset at the person. All I can do is just focus on what the task at hand was and trying to get inside of that cell.

Q. Okay. So just to clarify it. So, no, none of the other officers came up or stayed up to help you?

A. Not that I remember. I didn't see them on the range.

Q. Okay.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 56 of 102

Page 217

A. That's all I could say.

Q. You didn't see any officers on the range?

A. No. No.

Q. So the ones on the range were --

A. Me, Redden, and Statham.

Q. Okay. Did you observe -- I mean, you said that Officer Blakely was new.

Did you observe her being frightened, or is that just your impression that she was likely?

A. That's my impression. Likely frightened. Bringing a brand new officer, not out of your probationary period -- like I said, working at Indiana State Prison is not for everybody. It's something completely different than she's probably ever seen in her life. I hate to say it, but probably never experienced a fire in a situation like that where somebody's life is completely in your hands or your actions could cause someone to, you know, be hurt or what you do or what you don't do could cause someone to be hurt. I just think it was just her being a new officer and just -- just circumstances happening that just was overwhelming maybe.

Q. And that opinion is based solely on your

Page 218

understanding that she was a new officer?

A. Yes.

Q. It's not based on anything you observed in her demeanor?

A. She -- from what I remember, she was a good officer. She did everything she was supposed to do. Having never dealt with any situation like that ever in your life is difficult to be able to process it and know what to do if you've never experienced it.

Q. Okay. If she did freeze, should Officer Rodriguez or Officer Abbassi have given her some direction or done anything?

A. Could have. May have. I don't know if all three of them froze. I have no idea.

Q. Okay.

A. It could have been a situation where they all froze.

Q. So you don't recall anything about the behavior of any of the three officers there?

A. No.

Q. All you recall is that when you were up on the range, you didn't see any of the officers up there with you?

A. Yes, ma'am.

Page 219

Q. Okay. And you did not give any instructions to any of the officers to leave the range that you recall?

A. No, ma'am.

Q. After the fact -- you know, after the evening, did you speak with any other staff members or officers about the fire?

A. No, ma'am.

Q. Did you hear anything about the behavior or conduct of Officer Blakely, Officer Rodriguez, or Officer Abbassi?

A. No, ma'am.

Q. Did you speak with any of the prisoners about the fire after the event?

A. No, ma'am.

Q. I'm going to hand you what will be marked as Exhibit 6.

(The document was thereupon marked for identification as Watson Exhibit No. 6, as of October 30, 2019.)

BY MS. PIERCE:

Q. Go ahead and take a minute to look at the exhibit.

For the record, Exhibit 6 is titled,

Page 220

"After Action Review, April 24th, 2017." It does not have a Bates number.

A. (Witness complying.)

Q. Do you know what this document is?

A. No, ma'am.

Q. So I'll represent to you that this was produced to us as notes from an after action review regarding the fire.

At the top, it has a list of names that were present.

Do you see your name there?

A. Yes, ma'am.

Q. So you were present for this after action review?

A. I was present for the after action review, but I'm unaware.

Q. Of this paper?

A. Yes.

Q. Do you recall the after action review?

A. Yes, ma'am.

Q. Where was the after action review held?

A. It was held in IA's conference room.

Q. Is that at ISP?

A. ISP, yes, ma'am.

Q. Do you know what the purpose of the after

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 57 of 102

Page 221

action review was?

A. Yes.

Q. What was the purpose of the after action review?

A. Go over the proceedings of the fire, what caused it, who caused it, who did wrong. That was it.

Q. Do you remember about how long this meeting lasted?

A. About -- I'd say a couple of hours.

Q. Do you remember who ran the meeting?

A. I believe it was Mr. Curry and Mr. Wilson.

Q. Okay.

A. Bill Wilson.

Q. Okay. And Mr. Curry is the executive director of staff development?

A. Yes.

Q. And Mr. Wilson is the executive of adult facility?

A. Yes.

Q. So do those two individuals work at IDOC?

A. Yes.

Q. The state -- do -- they don't work at ISP?

Page 222

A. No.

Q. Okay. Did they ask the individuals who were in the B cell house to talk about what happened during the fire?

A. No.

Q. Did you speak about what happened?

A. Yes, I did.

Q. Did you volunteer information about what happened?

A. I just answered their questions that they had and -- answered the questions they had, and I had questions for both executives because the meeting was, more or less, somebody's at blame for this. So I took offense to that.

Q. You took offense to the -- they were trying to find someone to blame?

A. Yes. Instead of watching the video. The only people that were aware of this situation that happened and was at the crime scene -- I shouldn't say crime scene -- was at the scene were myself, Lieutenant Redden, Officer Statham, the officers that worked on the unit and -- and Captain Dykstra was in the captain's office. I believe the -- the warden and deputy warden and the major -- the executive aspect -- Mr. Curry and Mr. Wilson -- at this time

Page 223

when we had this meeting was three weeks after from the fire. I believe it was three weeks or something like that after the fire.

They still had not watched the video of the fire. They still had not been to B cell house to see where the fire took place, but yet giving an opinion and placing blame on who did wrong and what we should have, would have, could have done.

Q. Did they place blame on anyone?

A. They tried to, but we stopped that.

Q. Who did they try to place blame on?

A. Myself.

Q. What did they say you had done wrong?

A. Why didn't we do this? The whole why didn't you do this or that?

Q. What things did they think you should have done?

A. Why didn't we have the weapons team involved? Why didn't we -- what else was it? Why didn't we set up a triage for the offenders? Things like that. And I stated, "Why don't you watch the video? The video will tell you everything you need know. Have you watched the video?"

"No, we haven't."

"Why are we sitting here? Why am I

Page 224

having this conversation with you if you haven't watched the video? That's unprofessional of you, isn't it, sir?"

We're talking very candid, and I was open. I was very, very offended that any of us was being -- any blame was being placed on them.

Q. Okay.

A. Let alone myself. Watch the video. The video will tell you what happened. It's just like any other thing. A lot of people have a lot of opinions, but if you don't look at the evidence and look at the video -- the video will tell you everything you need to know.

Q. Did --

A. Once -- excuse me, ma'am.

Once we watched the video, then everything changed.

Q. So they watched the video during the meeting?

A. They watched the video, and then all of the pointing fingers stopped. They thanked us for what we done and said there was nothing else you could have done in that situation of trying to fight the fire, trying to get the gentleman out of the cell, and trying to evacuate the cell house so they

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3.18-cv-00995-JD    document 203-1    filed 03/29/21    page 58 of 102

Page 225

wouldn't have any more causalities.

I said, "Sir, that's what I was trying to explain to you at the beginning, but you were pointing your finger." I didn't -- it was who was the first responder team leader and why didn't the first responder make the call and this, this, and that. It's like, well, we have two lieutenants. Both of us are equally qualified to be the first responder team leader. Just because it's placed on a piece of paper that says I'm the OIC doesn't mean I'm going to be acting in that capacity if I'm busy in another capacity.

So it was more of an argument of why didn't we do this or that. It was we did what we did because there were lives at stake. And if that's against policy, if we violated policy -- you think we violated any policy, we didn't. We did everything by the book like we were supposed to. We just didn't do it the way they wanted us to do it. That's basically what it boiled down it.

Q. Do you think it's improper for IDOC to do an investigation into whether any wrongdoing caused the death of Mr. Devine?

A. No.

Q. So the issue you had with them was not

Page 226

viewing the video before they spoke to you?

A. Yes. Because they were already placing blame before -- that's like, "Hey, I know you did something wrong."

"Well, I didn't do anything wrong."

"Oh, yeah, you did.

"Watch the video."

Q. After they watched the video, did they ask for any more information before they ended the review?

A. Yes. We talked just about setting up -- what we can do to prevent this situation from happening again and try to set in place maybe some new policies that the -- that Mr. -- Mr. Curry and Mr. Wilson will have to write up themselves because they are the executive directors of staffing and training and the executive director of adult facilities.

So it would be their responsibility to come up with new policies and procedures to put in place to better help the staff in a situation like this if this ever occurred again. What to do, how to do it, what we should do instead of what we thought we should do, and what we can do in this situation depending on staffing. We have enough staff to do --

Page 227

like Mr. Curry was asking about a triage. We didn't have enough staff for a triage. We were trying to corral 200 angry offenders that were scared to lose their life. So it became a dangerous situation for the staff. Not -- once we got everyone evacuated out of the cell house, then it became dangerous for the staff.

Q. So you say that you told Mr. Curry and Mr. Wilson that no blame should be placed on what happened -- based on what happened?

A. I said no blame should be placed on myself and anyone that was there to help. I didn't believe any blame should have been placed on anyone that did the best we could do to try to alleviate this terrible situation.

Q. Okay.

A. But if it was found that others had violated policy and procedure or didn't do their job, then, I mean, it's self-explanatory that, yes, I believe they should be blamed if they had a part of being negligent.

Q. Okay.

A. But -- yes. But not -- I should say not myself and not the team that I was working -- me and myself, Redden, Statham. Like I said, I can't speak

Page 228

for Ms. Abbassi or Blakely or Rodriguez. I don't know or recall if they violated any policy or procedure.

Q. Was there any discussion during the after action review about whether they violated any policy or procedure?

A. I don't believe so.

Q. Did anyone ask them any questions during the after action review?

A. I don't believe so. I can't -- I'm going to say no.

Q. Do you recall them speaking at any point during the after action review?

A. Not at all.

Q. Did you take any position that no blame should be placed on them during the after action review?

A. I believe I did. At the time, I didn't believe that they did anything wrong. I just believe it was just an unfortunate event that happened. Still even to this day I don't know if they did anything wrong or if they violated any policy and procedure. I have no idea. So if I don't have any idea, I'm going to assume they didn't do anything wrong.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3.18-cv-00995-JD    document 203-1    filed 03/29/21    page 59 of 102

Page 229

Q. Did you make any effort to figure out what they had done to --

A. No, that's not my problem. No, ma'am.

Q. Whose job is that?

A. IA, internal affairs, to investigate the situation. If they find that someone needs to be at fault or if they violated policy and procedure, then they would do what they're supposed to do.

Q. Okay. Did you speak with Lieutenant Redden or Officer Statham about what happened during the fire any time after the fire was over?

A. No, ma'am, I don't believe so.

Q. So you did speak about the fire at this meeting?

A. Yes.

Q. You spoke about the fire during your internal -- your meeting with the internal investigator?

A. Yes.

Q. And there were no other points when you ever spoke about the fire with anyone else?

A. No, ma'am.

Q. Did you ever speak with any family members about the fire?

A. I talked to my wife. I talked to my wife

Page 230

about it.

Q. Do you know what you told your wife about the fire?

A. I told her we had a fire, and someone lost their life.

Q. Okay. Did you speak to any friends about the fire?

A. I don't believe so, no.

Q. So do you think it was correct for you to stand up for Officer Abbassi, Officer Blakely, and Officer Rodriguez if you didn't know what conduct they may or may not have done during the fire?

A. Yes. Nothing had transpired. Nothing was said yet. So it is three weeks into the investigation. If somebody had done something wrong, I mean, probably within -- one of those officers had violated policy, they wouldn't be an officer anymore.

Q. So was there any -- was part of the purpose of the after action review to get more information about what happened during the fire?

A. I have no idea.

Q. So just to clarify, have you spoken with any IDOC employee about the fire beyond the IA interview and the after action review?

A. No, ma'am.

Page 231

Q. After the fire, did you make any suggestions about policy changes that should be made or changes to training that should be made?

A. I can't recall if I did. I don't think I did. I believe I made some statements on what we could do better maybe. I can't recall with what -- what was said though.

Q. Okay. But you believe that you did, but you don't recall any specifics?

A. Yes, ma'am.

Q. I think at the bottom -- do you still have the after action review?

A. Yes.

Q. It says there were several recommendations. Can you read those?

A. Yes, ma'am. "Better communication is key to any emergency. Activate weapons team when emergency is called. Deploy during mass movement. Make sure you know who is in charge of the first responders. Work on fire drills and plans of action with staff."

Q. So what was the first one? Better communication? Do you know what that was targeted at?

A. That was targeted at us still when we

Page 232

explained to them we were trying to communicate over the radio to the captain; but in his communication back to us, we could barely hear him. They weren't understanding that. In my opinion, they've probably never been in a situation that we had been in when you have 100 inmates screaming and yelling, "Save me, save me." And I can't see my partner that's standing next to me. I can't see him because of the smoke. We're trying to talk to each other. We can't hear each other because everybody else is yelling. You hear all the banging and yelling. Of course communication is going to be bad. We can't hear.

Q. Were there any policy changes that were made regarding communication during an emergency that you know of?

A. Not that I know of.

Q. So do you disagree with that recommendation that better communication is necessary?

A. No, I agree with it. But, once again, I took offense to a lot of things they said because it's more of a -- we're still going to write this down. It is a slap in your face because you guys weren't able to communicate with each other.

Q. Okay.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 60 of 102

Page 233

A.  That's not my fault.

Q.  So you took offense to the part that it was sort of accusatory, but you don't disagree that better communication is needed?

A.  Yeah.  Better communication is always great.

Q.  And you don't know of any policy changes that were made?

A.  No, ma'am.

Q.  Okay.  Do you -- the next recommendation was --

A.  Activate the weapons team.

Q.  Do you agree or disagree with that recommendation?

A.  In an emergency situation?  I disagree.

Q.  Why?

A.  Not all emergency situations we need the weapons team.  Emergency situation is -- okay.  Do I need the weapons team for an older offender having a heart attack and collapsing right in front of me?  Do I need the weapons team?  No, I don't.  You bring the weapons team in, and it just aggravates the other inmates.  And it makes the situation -- turns the situation into -- the emergency situation -- try to get the guy on a stretcher and get him to the

Page 234

hospital so the nurses can work on him.

Now it becomes a big fiasco because the weapons team shows up.  When the offenders see the weapons team, they're going to act out.  They're not afraid of the weapons team.  They're not scared.  They're going to do what they do.  So it's a yes and no.  I mean, a fire when you evacuate a cell house, yeah, maybe.

You're going to have some offenders that are going to take advantage of the situation and act out, which we did have.  You know, we had some officers get punched and things like that; but it's really a case by case.  Most definitely for moving -- like I said, moving mass people, yeah, then you want the weapons team involved.

Q.  Do you know if that policy change was made?  Was the weapons team -- are they now --

A.  I have no idea if it was put in place.

Q.  Okay.  But you don't recall it being put in place while you were there?

A.  No, not at all.

Q.  And what about the third recommendation?

A.  Make sure you know who's in charge of the first responders.  Once again, I took personal offense to that.  If we have -- to me, if we have two

Page 235

lieutenants, okay, then one of us can be in charge; but we have two different entities.  We have a fire and a Signal 3000.  Somebody needs help inside of the cell we're trying to get inside of, and we've already started evacuating a cell house.

So you have one lieutenant dealing with one situation, and then you have another lieutenant dealing with another situation.  The lieutenant that's dealing with the fire with the offender can't be involved with evacuating the cell house and the issue at the front door when the offenders become rowdy.  How do you -- you can't be in two places at once.

Q.  So just to clarify.  That recommendation has to do with who on the first responder team is in charge --

A.  Right.

Q.  -- not who is in charge of directing the first responders?

A.  Right.  Right.

Q.  And so you disagree with that?

A.  Yeah.  I mean, it's -- the person -- we always assign a person in charge for a reason; but if the entity becomes two entities, now you have two people in charge.  One person is still in charge of

Page 236

the fire aspect with the offender.  Then the other person, which is a high ranking -- another lieutenant, is in charge of the situation you have at the front door with officers being assaulted.

Q.  Okay.

A.  I mean, it worked out for both of us that I relinquished -- you take over as the -- as the leader -- team leader of the QRT because I'm going to stay with the body.  Somebody has to stay with the offender.

Q.  And what about the last recommendation?

A.  Work on fire drills, number one.

Q.  Do you agree or disagree?

A.  Agree, number one.

Q.  Do you know if more fire drills were done?

A.  After?

Q.  Yes.

A.  I'm going to say yes.  I believe I did see some fire drills happening at the facility after that fire.  Most definitely.  But the sad thing is we shouldn't be doing fire drills after something bad happens.  We should be doing them as safe practice.

Q.  Okay.

A.  I hate to say it, but something terrible

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 61 of 102

Page 237

had to happen in order for us to get it right.

Q. Now you think there are many -- you think there's more fire drills going --

A. More -- more than what we had, but I think -- I haven't been there in a year, but I can say I think more is better.

Q. Okay.

A. Especially so we don't have a reenactment of this situation.

Q. Do you know if there were any other policy changes made regarding fire safety, emergency response?

A. I do know that they talked about making some changes. I don't know if those changes have made it down the pipeline as far as throughout -- through Mr. Curry's office and throughout the DOC.

Q. Do you remember what any of those changes were?

A. No, ma'am. I just -- they talked about a bunch of stuff.

Q. Do you remember if there were any changes discussed about key policies?

A. No, ma'am.

Q. Do you remember if there were any changes discussed about fire extinguishers?

Page 238

A. No, ma'am.

Q. Do you remember if there were any fire changes discussed about activating firefighters?

A. No, ma'am.

Q. And since after the after action review, at no time have you spoken with any IDOC employee about the fire?

A. Not that I -- not that I know of.

Q. You don't recall any times?

A. No.

Q. Okay.

A. No, ma'am.

Q. Did you know Joshua Devine?

A. Not personally, no. I just knew of him as an inmate. He was -- from my knowledge, he stayed to himself. Pretty quiet.

Q. Okay.

A. He wasn't known as a troublemaker or anybody that got in trouble.

Q. Okay.

A. Not that I know of.

Q. Okay. Did you ever have any interactions with him that you recall?

A. "How you doing?" That's about it.

Q. Okay. So you don't have any reason to

Page 239

believe that he ever, you know, caused any disciplinary problems or anything like that?

A. I have no idea, no, ma'am.

Q. At the time, would you have recognized Joshua Devine by his name if you saw him?

A. Would I recognize him by his name? I can't say yes or no because a lot of the -- a lot of the offenders have nicknames, and a lot of the nicknames sound like real names. So what they called them in the cell house -- his name was Slick or, you know, Dollar Bill or whatever, you want to try to find out the offender's name. But you almost -- working at the facility, you almost call that offender what everyone else calls him.

Q. Okay.

A. I'm not going to say there were other offenders that looked like him. So -- and he has a unique name. Devine is really -- I think he was the only Devine in the facility maybe. So he would be called Devine.

Q. Do you know his nickname?

A. No. I didn't know if he had one or not.

Q. Have you ever heard of a prisoner called Spider?

A. Yeah. Three of them.

Page 240

Q. Okay.

A. Everybody's Spider.

MR. HEPPELL: It's a cool nickname.

BY THE WITNESS:

A. If you have a tattoo of a web on your elbow, you're Spider.

BY MS. PIERCE:

Q. Okay. Did you know about any sort of disciplinary problems or anything related to any prisoners named Spider?

A. A person's name, yeah; but it wasn't Mr. Devine.

Q. Okay. So do you have any recollection of any conversations you ever had with Mr. Devine?

A. No. Other than good morning or how you doing, bro, or -- that's about it.

Q. Okay. Was he generally a polite person?

A. Yeah. Yeah. I never had no issue. I never heard of anybody having issues with him.

Q. Do you know of any sort of interests or hobbies or friends he had while he was at ISP?

A. No, ma'am.

Q. Do you know any members of Mr. Devine's family?

A. No.

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD     document 203-1     filed 03/29/21     page 62 of 102

Page 241

Q. Are you familiar with Barbara Devine, his mother?

A. Other than she's the one on the case represented for his estate. That's it.

Q. Okay. You never had any conversations with her?

A. No, ma'am. Not that I know of, no.

Q. Do you know if Mr. Devine had a girlfriend or a partner?

A. I have no idea.

Q. Do you know of Crystal Devine?

A. No, ma'am.

Q. How well do you know Ron Neal?

A. He's -- when I got hired in 2007, he was the deputy warden. In my last five years, he's been the warden. I know him pretty well, I would say.

Q. Do you ever socialize with him outside of work?

A. No, ma'am.

Q. Would you call him a friend?

A. I don't know. Yeah. Yes. No. Acquaintance. I know if I had an issue or anything, he was easy to talk to. I could, you know, go to his office any time and knock on his door and say, "Sir, I need to speak to you."

Page 242

"Sure. Come in."

He was easy to talk to. He wasn't a hard person or rude person to deal with.

Q. Do you think that he was a good warden?

A. I believe so, yes.

Q. What's your familiarity with Kenneth Gann?

A. Mr. Gann? Mr. Gann was -- he came over from Westville. He was a major that came over, and then he was promoted to deputy warden. Mr. Gann is the person that promoted me from officer to sergeant and sergeant to lieutenant. Pretty good relationship with Mr. Gann.

Q. Did you spend time with him outside of work?

A. No, ma'am.

Q. Would you call him a friend?

A. Yes. Same as Mr. Neal, yes.

Q. Do you think that he was good at his job?

A. Yes.

Q. Are you familiar with William Wesner?

A. Yes.

Q. How long did you work with him?

A. Mr. Wesner? I believe Wesner was -- Mr. Wesner came over from Westville shortly after I

Page 243

started. I can't remember, but it's been a long time.

Q. Did you ever socialize with him outside of work?

A. No, ma'am.

Q. Did you have a good working relationship with him?

A. Yes.

Q. How often did you work with him?

A. If there was any incident, stabbing, fight, something happened on any unit that I worked or if I was a first responder on a situation, and if he needed to ask me questions or do any interviews, that's about it.

Q. Do you think that he was good at his job?

A. Mr. Wayland?

Q. Mr. Wesner.

A. Wesner. I'm sorry. Wesner. Yes. Yes. Mr. Wesner was firm, fair. He was more laid back. He wasn't an intimidating person to go talk to if you had to speak with him. Thorough at what he did. That's what I believed. That's just my opinion.

Q. Okay. Are you familiar with Christopher Beal?

A. Yes. Mr. Beal was our training officer

Page 244

for a while. Mr. Beal came from the women's prison down in Indianapolis somewhere, but he transferred up to Indiana State Prison. Mr. Beal also -- he was in charge of our 40-hour training. And I don't think he did any of our QRT. I'm not sure if he did or not.

Q. Okay.

A. But, yeah, Mr. Beal was a really good officer.

Q. Did you ever socialize with him outside of work?

A. No.

Q. You thought he was a good officer?

A. Yes.

Q. Did you ever hear him discuss the policy as the training officer -- did you ever hear him discuss a policy about not opening cells during an emergency unless you had another officer with you?

A. I believe so. The 40-hour training.

Q. Okay. So he would have discussed that during the 40-hour training?

A. Yes.

Q. And you recall that?

A. Yes.

Q. Do you recall Steven Griffin?

A. No, I don't.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 63 of 102

Page 245

Q. Do you recall Jason Nowatzke?

A. Nowatzke, yes.

Q. Did you ever socialize with him outside of work?

A. No.

Q. How long did you work with him at ISP?

A. Major Nowatzke? Since 2007. Since I started. He was a sergeant when I started as an officer.

Q. Okay. Did you have a good working relationship with him?

A. Yes, I did.

Q. Did you think he was effective and good at his job?

A. Yes.

Q. You hesitated a bit.

A. Well, when he became major, it was tough for him because -- I mean, a lot was going on at the prison when he became major. He -- from -- the majors prior to Nowatzke were really tough on rule-breaking offenders and officers. Nowatzke was tough on paperwork. He was more the pencil guy. All of the T's crossed and the I's dotted and things like that.

He was a good major, but a lot

Page 246

different from what we were used to seeing. Our majors before didn't mind locking the facility down if there was a situation -- got a couple of fights happened on the unit -- lock that unit down. And the major didn't care about what the warden said. "I'm locking it down."

Q. Okay.

A. "I'm responsible for the facility and responsible for all of the officers that work at the facility."

So the majors that we had before didn't hesitate to lock the facility down. Nowatzke did -- he tried to use a little more finesse. I'm not saying it was right or wrong. It was just -- he was just different.

Q. But do you think that was less effective, in your opinion?

A. Coming from having two stabbings happen on a unit in less than a half an hour, yes, less effective. We need to lock that facility down. Not the facility, but lock that unit down.

Q. And so he chose not to lock the unit down in that situation?

A. Yeah.

Q. Okay.

Page 247

A. But a lot of times it was -- it wasn't his call. It was the superintendent or deputy warden who made the call for him instead of letting him do his job. Let him make the decisions. He was just kind of caught in the situation that ISP had going on at the time.

Q. Okay.

A. A little bit of an overzealous couple of deputy wardens that -- hey, be the deputy warden. He was a major. Let the major do the job.

Q. Okay.

A. And they were trying to be the deputy warden and the major at the same time. So it kind of caused a little bit of strife amongst them.

Q. Did you ever hear Mr. Nowatzke talk about -- instruct anyone on the policy not to let somebody out of their cell?

A. Oh, no. Never. Policy. He's all about policy. Never.

Q. He doesn't talk about policy?

A. Oh, no, he does talk about policy. Number one, you don't open a cell door absent somebody there with you.

Q. So you've heard him instruct people on that?

Page 248

A. Most definitely.

Q. Okay.

A. He would most definitely tell you about the policy.

Q. Okay. So he would definitely tell -- you know that he's instructed people on that policy before?

A. Yeah. Do not open that door.

Q. Okay.

A. Most definitely.

Q. Okay. And just to clarify the policy is not to the open the door unless you have someone else with you?

A. Yes.

Q. In any circumstances?

A. Yes, ma'am.

Q. How well do you know Timothy Redden?

A. Got hired with Lieutenant Redden. We both got hired together. We served on E squad together. I got promoted to sergeant, and Redden got promoted. So we were getting promoted together. We worked together as officers. I don't think we worked together as sergeants, but as officers we worked together.

Then I got promoted to lieutenant,

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

Page 249

and then I think a year later he was promoted to lieutenant right behind me. We worked together on nights. I was on nights, days, went back to nights, and worked with him again. So pretty well.

Q. Did you ever socialize with him outside of work?

A. I think just working out, but it really wasn't outside of work. We worked out -- at work we had a gym at our facility. So after work we would go hit the gym. That's about it.

Q. Did you have a good working relationship with him?

A. Great working relationship with him.

Q. You thought he was good at his job?

A. Yes.

Q. Do you keep in touch with him at all now that you have left ISP?

A. I have not.

Q. Okay. Have you talked to him at all about this case?

A. No, ma'am.

Q. How well do you Puetzer?

A. Puetzer?

Q. Puetzer.

A. Pretty good. Mr. Puetzer -- he was my --

Page 250

I think my first OIC when I started working on nights. He was the officer in charge on the cell house I was assigned to. Puetzer trained -- did a lot of training with me. I did a lot of training with Puetzer. Once again, like I said, once I got promoted to lieutenant, then Puetzer got promoted to sergeant. We worked on the night shift together.

Q. Okay.

A. I worked side by side with him as a first responder working on the units, feeding. I did a lot with Christopher Puetzer.

Q. And you had a good working relationship with him?

A. Yes.

Q. Were you friends outside of work?

A. We weren't friends. We just knew some of the same people. I believe Puetzer -- Chris Puetzer's daughter was friends with my niece.

Q. Okay.

A. They went to the same school. It was like, "Oh, hey, your daughter is friends with my niece."

Q. So you socialized a little outside of work?

A. If it was like a birthday party or

Page 251

something like that and if his daughter would attend, then I would see him. That's about it.

Q. Do you keep in touch with him at all?

A. No, ma'am.

Q. And you think he was effective and good at his job?

A. Puetzer, yes. Yes.

Q. How well do you know Ryan Statham?

A. Statham was a really good officer. He -- I think I worked with Statham my last couple years or two years at the facility. I do know now -- I think Statham is a sergeant now. He's a good -- good officer. He's by the book. Reads up on policy. We always -- me and Lieutenant Redden -- we worked with him -- worked on nights together. He was an officer, and we kind of put him in a position of training to be a sergeant.

So we just kind of, you know, poured into him policy, procedure. This is what you do in any situation. You do this. If you have any questions, you ask this person. If they can't answer it, you can go here to get the answer. We kind of took him under our wing. We wanted him to make sergeant because we thought he had the communication -- great communication and skills to be

Page 252

a good sergeant. We really poured our training into him. Good officer.

Q. Do you keep in contact with him at all?

A. No, ma'am.

Q. Did you ever socialize with him outside of work?

A. No, ma'am.

Q. How well do you know Justin Rodriguez?

A. Just as far as small time work with him at ISP. That's about it. I didn't know too, too much about Mr. Rodriguez.

Q. Do you know whether or not he was good at his job?

A. No. I didn't know if he was good at his job. I believe he was the officer in charge of B cell house, so I believe he did -- he did a good enough job to become the officer in charge. I'm not sure how long he was an officer in charge or how long he played that role before he came to B cell house. I don't know too, too much about him.

Q. Would you have been familiar with that information at the time of the fire with how -- how long he had been at ISP?

A. Would I have had that?

Q. Yes.

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 65 of 102

Page 253

A. I believe so. I think I would have.

Q. Would you have considered that type of information before putting somebody in the position of officer in charge?

A. Yes. If I was -- if I was making the roster -- if he -- if he had worked with us a while out -- out of his training or -- officer training or his probationary period -- if he's -- if he was an officer in charge of any other unit. If he worked days and was the officer in charge on day shift and he wanted to come to nights. It kind of varies.

Q. What would you have -- what do you think would be the best practice for how much experience a person should have before they can be an officer in charge of a cell house?

A. They should be able to, number one, run their range -- whatever range they're assigned to as just an officer.

Q. Okay.

A. How well you run your range. Can you secure your range? I hate to say secure it without help. There's officers that could severe their ranges, and officers that may need a little bit of help. That really depends on just the entity of that range and the offenders that live on that range.

Page 254

Q. Okay.

A. How well they follow the rules and regulations. Do they come to work prepared? Do they ask questions? Do they want to know why do we do this and why do we do this at this time and how can we do this? I wouldn't put an officer in charge if they -- I hate to say just a regular that comes to work just to punch the clock and that's it. I want people that are kind of go-getters that -- that say, "Hey, I can do that job."

Q. So do you have any recollection of whether Justin Rodriguez would have fit into that category?

A. I cannot remember.

Q. Okay.

A. But I believe if he was an officer in charge, he may have fit that category one way or another. Like I said, I can't remember too, too much about Mr. Rodriguez.

Q. What about Sarah Abbassi?

A. Ms. Abbassi? Ms. Abbassi was -- she was pretty good at her job. I know she worked -- before she worked in B, she worked in A cell house. She was a pretty good officer. She understood the rules and regulations. She didn't get rattled very easily.

Page 255

It's pretty difficult for a female to work in that kind of crazy environment. She stood her ground. She helped out whenever need be. Always asked questions about why we do things and how come and what can she do to be better.

I know she always voiced -- would ask questions if need be or if she had a situation with an offender on the range and she didn't know quite what to do, she would call and ask for help. That's about it.

Q. Do you know about how long she had been at ISP when you --

A. Ms. Abbassi? At the time of the fire -- I do not. I can -- I have no recollection of how long she had been there.

Q. Okay. But likely less time than Justin Rodriguez if he was the officer in charge?

A. Excuse me?

Q. Likely less time than Officer Rodriguez if he was the officer in charge?

A. I believe so.

Q. And what about Promise Blakely?

A. Ms. Blakely? I believe she was -- she was a newer officer when this fire happened. I'm going to say probably a couple months in.

Page 256

Q. Okay.

A. Just right out of her probationary period a couple months in.

Q. Okay.

A. I'm going to say that Ms. Blakely was real quiet. She didn't talk too much. She didn't say too much. She stayed to herself. A little timid at the beginning when she first started. I believed it was because of her age. She was young. I think Ms. Blakely was 19 when she started.

For the most part, I believe she was a good officer. She did her job. Just like Ms. Abbassi, she did her job. She did what she was supposed to do. I can't say she asked too many questions. Like I said, she was very quiet. She really didn't speak a lot. That's all I can remember.

Q. Are you in touch with anybody at ISP or that you knew from ISP?

A. No, ma'am. Not since I left.

Q. Okay.

A. Scratch that. My sister-in-law works for Indiana State Prison.

Q. Okay.

A. That's the only -- it's my wife's sister,

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 66 of 102

Page 257

so I see her.

Q. What does she do at ISP?

A. She is the information officer. She works at the information desk.

Q. What's her name?

A. Her name is Kelly Everett.

Q. Okay.

A. Kelly Everett. And she runs the information desk, visiting room, and all that up front.

Q. Okay. What was the reason you were moved from the position of lieutenant to officer?

A. There was a power outage on February the 6th -- February the something. February 6th. Superbowl Sunday. Power outrage. We lost power. My unit was out to chow and rec, so they were sending everybody back to the cell house. About 20, 30 offenders at a time. In the mix of that, we had our emergency lights on. We were trying to secure the inmates as they're coming inside the cell house.

Then we lost all power. No emergency lights. No phone communication. No radio communication. So I decided to have my officers partner up and go down the ranges. Two officers at a time and put whoever in their cell that would

Page 258

voluntarily go inside their cell. After about -- it seemed like eternity -- but after five minutes, ten minutes of that, I just felt it became too unsafe for my staff to be on the range. I pulled my staff off the range and locked them inside the officer's station.

At that time, a sergeant came over to my door asking if we needed help securing.

I said, "Yes. But go up front. Tell the captain we have no power. We our completely out of power. We have no phone. No radio. No nothing." I was demoted there from lieutenant to officer because the deputy warden stated I did not report that we had no power and we had no phone or radio communication.

I said -- and in the captain's incident report, he states that at 5:15 he was told by Sergeant Lot that C, Charles, has no power and no phone communication and no radio. So the captain stated it in his incident report that I sent somebody up front to tell you guys we need help. They said I didn't. They didn't do an investigation. Three weeks after that incident happened, I was demoted.

I was like, "Where's the investigation? Where's the pre-dep?" That's what

Page 259

they call it when they gather your information, your statement, and everybody's statement. There was no pre-dep. No nothing. I appealed it. I was -- this incident happened on February the 6th. I was demoted March 2nd or something like that. Demoted March 2nd. So I have 30 days from the day of any discipline happening to appeal my case.

I turned my appeal in on March 27th, and the facility held my appeal for five days. And then they put a stamp on it and said received on this date, which is five days past the appeal date. I then proceeded to go through the Stage 2 of the appeal process.

Q. Okay.

A. Because after Stage 1, I got an e-mail from the facility to my home e-mail. I said, "I've been employed with you for 11 years. I've never received an e-mail to my home e-mail. I have a state e-mail. Why are you sending something to my home e-mail?"

They sent my response to my home e-mail. I then started the Stage 2 process. I sent a packet to the -- to Indianapolis to the appeal office. They sent me a response. They had to respond within 15 days. They sent me a response on

Page 260

the fifteenth day. And they stated that -- did I violate a policy and procedure or facility rule in anything I did? No, I did not. So how are you still upholding my demotion?

Well, it's The State of Indiana. You can be demoted, promoted, hired, fired because we're at-will.

Q. So they found in your appeal that you did not violate --

A. I did not violate anything. I said, "How am I still demoted? That doesn't make any sense. I know I didn't do anything. It's not -- I'm not the superintendent or the warden. I'm not responsible for the power."

Q. Okay.

A. I stated in my appeal -- I said, "We have a 100,000, $200,000 generation system. If the power goes out, that's supposed to turn on. This is a major -- it is like a hospital. We are never to be without power because we have dangerous offenders in there. If we have no power, they can get out. I can't control that. That's not -- my job is to lock the doors. And if I can't see to lock the doors, how am I to lock the doors.

Q. Why do you think that happened? Do you

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 67 of 102

Page 261

think that somebody was out to get you or --
A. I have my opinions. I wasn't seeing eye to eye with the deputy warden at the time. And I'm not going to be bullied by someone because you think you know everything. Well, if you have to step -- step into my shoes. I have two circumstances that's happened. We have no power, no radio, or no phone communication. It's a snowstorm at the same time. What do you want me to do?

There's nothing I could do, but I locked my officers in the officer's station for their safety. The offenders -- all the offenders did was sit down on the stairs. No one got hurt. There were no fights. You would figure C, Charles, is the most dangerous cell house in the state of Indiana. You would figure I would have bloodshed. Not one person got into a fight. Nobody got pinched. Nobody got roughed up. Nothing happened. All of the offenders sat down and waited until the lights came on. When the lights came on, they went to their cells.

Q. Who was the deputy superintendent that you weren't seeing eye to eye with?
A. The deputy warden was George Payne.
Q. Is he still at ISP?
A. I believe he is not at ISP.

Page 262

Q. Was he at ISP in April of 2017?
A. No, ma'am. No. That would be Mr. Neal was the warden. Mr. Gann was the deputy warden, and Mr. McBride was the other deputy warden.
Q. And what did you not see eye to eye with him on?
A. Mr. Payne?
MR. ROTHENBERG: I'm going to object as this being irrelevant now.
BY MS. PIERCE:
Q. You can answer.
A. Just that situation with -- that happened on Superbowl Sunday.
Q. What situation happened on Superbowl Sunday?
A. The power outage.
Q. Oh, okay.
A. That started not seeing eye to eye. I didn't get a fair shake. No one talked to me. I was blackballed. The superintendent or the warden wouldn't talk to me. No deputy warden would speak to me. No one spoke to me until I was told at 6:05 that I was being demoted, but at 5:45 it was announced to the facility I was being demoted. Everyone knew I was being demoted, but me.

Page 263

Q. And why do you think that happened?
A. That's what they do.
Q. Why?
A. That's the unprofessionalism of the DOC.
Q. So do you think there was someone who had an issue with you?
A. Had an issue because I can't be bullied. You can't bully me.
Q. Okay.
A. I'm not going to lay down for you just because you think you're a deputy warden. I could careless who you are. Have respect for your staff. If you talk down to your staff, your staff is going to have a problem with you. I had a problem being talked down to. I'm a man just like you are. If you needed me to do something, I will do it. Give me a direct order to do something. No problem.
Q. I'm going to hand you what's marked as Exhibit 7.
(The document was thereupon marked for identification as Watson Exhibit No. 7, as of October 30, 2019.)
BY MS. PIERCE:
Q. This is a letter to you on March 2nd,

Page 264

2018.
A. Yes.
Q. Is this letter discussing the incident that you're talking about?
A. Yes, ma'am.
Q. And it says that you're being demoted to the position of correctional officer, and you will receive a 15 percent decrease in salary.
This is the result of the incident that you were --
A. Yes, ma'am.
Q. Did you have any other discipline while you were at ISP?
A. I'm probably going to say in 2014, 2015.
Q. What happened in 2015?
A. I think they stated I failed to report a use of force.
Q. And can you tell me a little bit more about what happened?
A. There was an offender that stabbed a lieutenant, and it was a situation where a couple individuals were -- stated that they used excessive force on this offender. I was interviewed, and they stated that I may have witnessed or seen this use of -- abuse of force. I told them I did not see or

BARBARA DEVINE, et al. v.
RON NEAL, et al.
USDC IN/ND case 3.18-cv-00995-JD    document 203-1    filed 03/29/21    page 68 of 102
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

Page 265

witness any abuse of force to this -- to this certain offender. They said I did. I said I didn't.

The camera shows where I was standing. There was no possible way I can see any physical abuse being -- happened to this offender. They stated that they did. So I was given a one-day suspension, but then I was told -- it was kind of funny. The person that gave me the one-day suspension told me to appeal it. I was like, "For what?" The person that's giving me the one-day suspension -- the appeal goes to that person. It doesn't make any sense. That's not practical to me.

Q. Okay.

A. So I didn't appeal it. I just took the one-day suspension.

MR. ROTHENBERG: I need to object for being irrelevant as well. This line that you just answered.

(The document was thereupon marked for identification as Watson Exhibit No. 8, as of October 30, 2019.)

BY MS. PIERCE:

Q. This is Exhibit 8. It does not have a Bates stamp.

Page 266

Is this describing the incident that you just told me about?

A. Yes.

Q. Can you turn to Page 3?

A. (Witness complying.)

Q. Do you see the first full paragraph on that page?

A. Yes.

Q. I think it starts with the line "Lieutenant Anthony Watson gave inconsistent statements to State Police investigators."

A. Yes. Yes.

Q. "Offender Utley walked out of his cell and his view was blocked when he went to the shower."

A. Uh-huh.

Q. "He at first stated he was outside of the steel door. And when confronted that he is observed putting his glasses on the sink in SMC one, he stated he was, but did not witness anything."

A. Uh-huh.

Q. "It was determined that Lieutenant Watson was there and observed the use of force of pulling Offender Utley out of the cell unrestrained."

A. Uh-huh.

Q. "No use of force or incident reports were

Page 267

completed by him."

A. Uh-huh.

Q. Do you dispute that?

A. Yes.

Q. But did you not appeal this one?

A. No.

Q. Is this the first time that you learned that the State Police concluded that you provided inconsistent statements?

A. No. The day I was interviewed by the State Police.

Q. They told you that?

A. They told me that. I was like, "Believe what you what to believe." I was like, "Everything I answered to you, you wrote down." I'm like, "I'm not going to play this game with you." The good cop, bad cop thing they were doing.

I was like, "I've answered your questions. Now you're going to ask me the same question and use a different word changing the meaning. I'm not going to do that." So me and the State Police was kind of going back and forth. They called me a liar. I told them I take offense to that. I said, "Don't call me a liar." And I said to them, "I have nothing to lie about. Why do I need to

Page 268

lie for these two individuals?" I said, "Sir, am I getting a bonus? Am I getting a promotion?"

"No."

"So why do I need to lie to protect two other people?" I said, "They gave their statement of what they done. If they done something right or if they done something wrong. I'm telling you what I saw and what I didn't see." I said, "You can't make me say I saw them assault this guy." I said, "Because I'm going to tell you no." I said, "Now, he went in the shower. I'm outside the shower."

Q. Okay.

A. "I'm actually a cell and a half away from the shower. The shower door is closed. I can't see what's going on inside of the shower, but you're telling me that I can." So I said, "Well, have you been upstairs to the unit?"

"Well, no."

"Oh, here we go again. I have a clown."

Q. So did you make any efforts beyond discussing with the state police officers to correct their finding that you made inconsistent statements?

A. No. I -- the deputy warden that

BARBARA DEVINE, et al v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 69 of 102

Page 269

presented it -- that presented it to me told me to appeal it. And I said, "If I appeal it, the appeal goes to the person that's giving me the one-day suspension. I'm not" -- I was frustrated, and I was upset. I said, "I'm not going to appeal it." You're going to make me go through the motions for what?

Q. So you believe it would have been -- it would have been --

A. That's what I believed.

Q. Okay. Do you --

MR. ROTHENBERG: Do you mind if we take a break? I just need to go to the bathroom.

(WHEREUPON, a short break was taken.)

BY MS. PIERCE:

Q. So what is your -- scratch that.

What do you think is the basis for the police department's understanding or conclusion that you gave inconsistent statements?

A. I have no idea.

Q. So you don't think that's supported by the video, like they said?

A. I have no idea. The question was asked were you there. Yes. And when I told them, yeah, I did step in because the guy fell down -- when the guy

Page 270

fell down, I stepped in to try to give a hand to pick this guy up. This guy is over 400 pounds. I stepped in to try to help pick him up. That's when I stepped in. They said, "Were you there?"

"Yeah. I was here until he fell."

Q. Okay.

A. And they didn't like that answer. I was like, "Well, I'm not going to answer the way you want me to answer. I'm going to answer the way I want to answer, and I'm telling you this is what I saw. You can't make me see somebody punch someone or assume they touched them or whatever they said they did to him." I said, "If I didn't see it, I didn't see it. You're not going to make me say I seen it just by trying to scare me into it."

Q. When you were discussing being demoted to correctional officer, you said that was just one more example of IDOC's lack of professionalism.

Can you give any other examples of IDOC's lack of professionalism?

A. If you're going to demote someone, you don't tell them after the whole facility knows. Inmates know before you know. That means you're -- that little letter that we sign every time we do our 40-hour training on confidentiality -- how does an

Page 271

inmate know you are getting demoted before you?

Q. Aside from that --

A. That happened a lot. If someone was getting demoted -- just not myself.

Q. Okay.

A. That's something that happened in general. A lot of talking.

Q. So did a prisoner tell you you were being demoted before you knew?

A. Not a prisoner, but it was a situation -- well, when -- there was a situation where they were going to make a change in the E squad commander -- field commanders position. I was -- inmates said something, and I was like, "How do you know?" And then a couple of hours it comes out. I was like, "We're not being professional in what we do."

Q. Any other examples that you can think of?

A. Not off -- not right offhand.

Q. Okay. I'm just going to hand you a document that we will mark as Exhibit 9. This document does not have a Bates stamp, but it is entitled, "Employee Work Profile and Performance Appraisal Report."

Page 272

(The document was thereupon marked for identification as Watson Exhibit No. 9, as of October 30, 2019.)

BY MS. PIERCE:

Q. Can you tell me what this document is?

A. It's an employee -- this would be like a work improvement.

Q. Okay.

A. Uh-huh.

Q. So this is the same form as the performance appraisal?

A. The only difference is the last page, yes.

Q. So what are the -- it's all blank, so I was just wondering --

A. They leave them blank. I don't know why they do that. They tell us -- fill this out, check annual, leave it blank. The only thing that we fill out is the portion as far as the employee development plan.

Q. Okay. So the employee development is just the last part?

A. Yes.

Q. So what's the reason they mark all of the

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 70 of 102

Page 273

meets during --

A. Oh, hold on. Because this one doesn't have that.

Q. It looks like some sections do. A doesn't, but C does.

A. That would state that you meet expectations.

Q. Okay.

A. Any expectations they have of you, you meet, exceed, or you do not meet.

Q. Okay. So that's part of the development plan?

A. Yes, ma'am.

Q. Okay. But what's the reason that they don't fill out anything in Section A?

A. I have no idea. That's just something that -- it's one of those policies they tell us to do. It's like, "Why are we doing this? It doesn't make any sense."

"We only fill out the back page."

Q. Okay. So did -- when you would sign the back page, would you already have your employee development plan at that time?

A. Yes.

Q. And the 40-hour training, that's just the

Page 274

40-hour in-service training?

A. Uh-huh.

Q. And then "apply for CERT," what does that mean?

A. CERT. That would be one of our emergency response teams. CERT would be just the team that -- they do a lot of the high transport of offenders back and forth to court. They do transport of offenders with lethal weapons just in case there is an escape situation.

Q. Did you apply for CERT?

A. I did not apply for CERT, but I applied for E squad.

Q. Okay. And at this time in 2009, you were still a correctional officer?

A. Yes, ma'am.

Q. Okay. And were you on probationary status? Is that why you got an --

A. Let's see --

Q. -- employee development plan?

A. Yes. I was still on probation.

Q. But you started in 2007?

A. Yes. I didn't get to the facility, I think, until December. So you officially start your probation once you're assigned to your facility.

Page 275

Q. Okay.

A. When you go through your training -- like the six-week training -- that would be done at -- either at Westville or down at New Castle. That's just going through the preliminaries of can you meet our expectations to become a correctional officer trainee, and then you start your on-the-job training.

Q. Got you. Okay. So we talked about the two incidents where you were -- one where you were demoted and one where you were disciplined.

Were there any other incidents where you were disciplined?

A. No, ma'am.

Q. Okay. Any other instances where you were -- someone talked to you about a below average performance?

A. No, ma'am. Never.

Q. Were there any instances when anyone talked to you about performance concerns?

A. No, ma'am.

Q. Did you ever have any complaints or grievances made against you by any prisoners at ISP?

A. Yes.

Q. Were any of them ever substantiated?

A. No.

Page 276

Q. Do you know if all of them were investigated?

A. I believe so, yes.

Q. Okay.

MS. PIERCE: I think we are close to done. Let's take a quick break.

(WHEREUPON, a short break was taken.)

BY MS. PIERCE:

Q. Can we look back at the IA report about the fire? I'm not sure what --

A. Exhibit 6.

Q. Okay. So --

MR. ROTHENBERG: That's the right one.

THE WITNESS: The after action report.

BY MS. PIERCE:

Q. Not the after action report. The IA report.

A. Exhibit 5.

Q. If I recall correctly, on your interview with IA, you said that you -- that count cleared and then you went to go to B cell house to ask them to work on the A4s, correct?

A. I believe so, yes, ma'am.

Q. So if it says here on Page 7 that you

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 71 of 102

Page 277

were at the door at B cell house 9:33, that means count cleared before 9:33, correct?

A. I can't say yes or no. I don't know what time count cleared.

Q. Okay. But did you say during your video interview --

A. We were waiting for count to be clear.

Q. Okay. So you were waiting for count to be clear at that time?

A. Yeah. Yeah.

Q. Can you look at that first page of the IA report?

A. (Witness complying.)

Q. So if it says that at 9:06 p.m. that officer counts, no offenders are out, does that mean that count has cleared?

A. No.

Q. It does not. Okay. What does that mean?

A. That means they started the count process. So at 9:06, nobody is out. That means everybody has been in -- put in their cell, but the officers still have to walk up and down the range to perform the count.

Q. Okay. Is there any document that would record what time count was cleared on the night of

Page 278

April 7th?

A. Yes.

Q. What document is that?

A. That would be mass location.

Q. Mass location?

A. Yes.

Q. Okay.

A. That would tell us what time count was officially cleared. That would be possibly in the captain's shift report.

Q. Okay.

A. On any logs of any cell house because count clears at the same time -- everybody's taking count at the same time.

Q. Okay.

A. So, hypothetically speaking, at 9:30, count could be done, but we didn't get a Signal 1000. Signal 1000 means count is clear.

Q. Okay. Can you tell me again what that document was called? The mass --

A. That would be -- mass location is where count is called into.

Q. Okay.

A. So that is -- the person working in mass location, they're taking count for the whole

Page 279

facility.

Q. Okay.

A. Clearing each cell house. Telling them, yes, you have the right number; or, no, you have the wrong number, go count again.

Q. Okay.

A. Once all counts are called into mass location and they give the thumbs up, they call control, and control will put out a message over the radio system.

Q. Okay.

A. Signal 1000 at 9:45. Signal 1000 at 9:45. It let's everybody know count is clear.

Q. And would they record anywhere what time --

A. Yes. The captain will record it in his shift log -- his shift report.

Q. Okay.

A. All officers on all units will report that on their officer's log.

Q. Okay. And where are all those documents stored?

A. They're stored in the major's office.

Q. And then the mass count is stored in the --

Page 280

A. I believe so. At the end of each month, all of those documents are collected and brought to the major's office. The major's secretary puts them in numerical order, and they're kept for -- the paper is kept for record.

Q. Okay.

A. Yes, ma'am.

Q. Okay. And just to clarify. If B cell house does their count, everybody is -- they have the right count, but the count hasn't cleared for the whole ISP, can they do their security checks while they're waiting for count to clear?

A. Yes, they can.

Q. Okay.

A. If they want to. I'm going to say it's -- it's a practice that -- I'm going to say it doesn't get done because they're waiting.

Q. Okay. Are they instructed to wait?

A. No. No. That's not an instruction. That's something that kind of happens. It really depends on the officer that's in charge. "Hey, just because B cell house" -- their count could be clear -- B cell house count could be clear. If mass location say, "Hey, you're clear." It doesn't mean the rest the facility is clear.

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 72 of 102

Page 281

For example, you could have one inmate from B cell house over at the hospital, okay? So B cell house houses 216 offenders. Your count's going to 215. So they're going to tell you, yes, your count is clear.

Q. Okay.

A. But the hospital has to call their count in.

Q. Right.

A. And their count's going to be we have one from B cell house and so on and so on. Then mass location would tell the hospital their count is clear.

Q. Okay.

A. But then it will be -- it would not be a clear count for the whole facility until everybody's accounted for. And then the people that are gone on a pass to the hospital are subtracted, and now you have a clear count.

Q. Okay. But if B cell house's count was not cleared or they were told their count was not cleared --

A. Right.

Q. -- one of them would have had to be up counting --

Page 282

A. Counting again.

Q. Okay.

A. Rather than doing another security walk, they're going to be concentrating on count.

Q. So their count must have cleared if Officer Rodriguez was back in the officer's station and Officer Blakely and Officer Abbassi were in doing their A4s, correct?

A. Must have been, yes, ma'am.

Q. Okay.

A. B cell house's count could have been cleared, but the facility count may not have been cleared.

Q. Okay.

A. It's safe to say.

Q. Okay. If they had not done checks in the last half hour, was it appropriate for Officer Blakely and Officer Abbassi to do their A4s before starting their next security check?

A. No. They should have did their security round first.

Q. Okay.

A. Or one person go do your A4 and the other person do the security round and then you switch off. That's -- that's just the officer's using their head

Page 283

as far as what's more important. They have all night long to do the A4, but we don't have all night to do that security walk.

Q. So you did not tell them to do their A4 immediately?

A. No. It wasn't -- I told them to do their A4 -- get your A4 done, but it's one of those that -- do I know to stop at the stop light, or do I push on the gas and keep going through the stoplight?

Q. Okay.

A. No. You're supposed to do what is important. What's the most important to the least. A4 could be done at any time.

Q. Okay. Was it -- regardless of whether there were other things that needed to be done, was it appropriate for them to do their A4s together and leave Officer Rodriguez alone to watch over the cell house?

A. They're inside the counselor's office there. It's just like if the officer went and used the bathroom.

Q. Okay.

A. There's -- how is he left alone?

Q. Well, would it be -- would it be inappropriate if there were three individuals

Page 284

assigned to a cell house for two of them to go to use the restroom at the same time?

A. If there is a boy and a girl, yeah. You can't stop somebody from saying, "I have to use the bathroom."

Q. So it's not -- it's not against policy or otherwise against accepted practice to leave one person in a cell house alone to watch --

A. No. All right. They didn't leave the cell house. They went to the counselor's office, which is inside the cell house.

Q. Okay.

A. So they never left the cell house. It would be different if we said, "Hey, come up to the captain's office and do your A4 and leave that one officer in that cell house alone." No, that's not going to happen.

Q. Sure. Are the bathrooms themselves in the cell house?

A. Yes.

Q. Okay. And just, again, to verify, the purpose of the security checks is to make sure that nothing is going wrong in the cells?

A. Most definitely.

Q. Okay.

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 73 of 102

Page 285

A. In the cells or in all of the unit itself.

Q. Okay.

A. Hypothetically speaking, everything's going right in the cells. All of the inmates are in their cells. They're asleep.

Q. Okay.

A. But you get along the back side of 400, and you see there is a pipe leaking. We have a water main that's busted, okay? You would catch that if you're doing your security walk. You have to -- a light fixture. All of the sudden, there's sparks coming out of it. It hasn't caught fire yet, but you see the sparks. That's -- that's what the security walk is for.

Q. Okay.

A. Anything and everything that can go wrong on the unit and making sure the officers are making their rounds checking on the -- number one is checking on the offenders. Number two is making sure there is nothing happening -- that's out of the ordinary that's happening.

Q. Okay.

A. You can have a window -- I mean, if it's wintertime, a window that's froze up and done

Page 286

fell in, and you have glass all over the ground. Nobody -- nobody heard it fall. Nobody head it break. It could be during a situation where a game's on and everybody's yelling and screaming. You have no idea what's going on. You just hear all this commotion.

When you do your security walk, you're checking. Number one, you're checking doors. Making sure the doors are locked. The offenders' doors are locked. Making sure the back door is locked. The windows are closed. The unit team office door is not left open from the daytime or things like that.

Q. Okay.

A. So you're checking -- you're doing a security check. You're checking doors, windows, and making sure nobody is hanging, hurting themselves, or anything like that. So it's more than just looking at the -- checking on the offender. You're checking everything. Everything in the cell house.

Q. And it is important for the offenders -- I'm sorry.

It's important for officers to do a security check to make sure that there is no emergency that needs to be addressed?

Page 287

A. Every half hour. Most definitely.

Q. Do all of the officers understand that in their training?

A. They understand -- they understand it. They say they understand it because you have to sign something -- you sign you understand this, this, this; but it doesn't mean that they practice that.

Q. Okay. But the training includes training on the importance of safety checks?

A. Yes, most definitely.

Q. And as a sergeant and as a lieutenant who was helping with the training of new officers, you emphasized to officers the importance of doing the security checks?

A. Most definitely.

Q. And doing timely security checks?

A. Timely security checks. I even gave -- if it's not your turn or if you -- when in doubt about -- do I do it? I have 15 more minutes or do I have 5 more minutes to do the security check, but just get up and go do it. It's not going to hurt you. If you do it ten minutes earlier than what you're supposed to or -- it's not going to hurt you if you're late doing it, but you still got up and done it because you forgot about the time or you got

Page 288

busy doing something.

Q. Okay.

A. As long as you do the security check. They can show you on the range doing it. If the security check is done a little bit late, okay, we can -- we'll deal with it being late, but you're up on the range. What they can't deal with is when you see blocks of security checks and there is nothing -- there is -- you go an hour without doing a security check. You go 50 minutes without doing it. Okay. That's an issue.

Q. And I think you stated earlier that was a little bit of a problem of officers not doing --

A. Yeah. They're just not practicing good time management.

Q. Was it a major problem?

A. Sometimes, yes, it can be.

Q. Was it a problem that concerned you?

A. Yes, it did.

Q. Okay. Did you ever discuss that problem with any other officers or sergeants or lieutenant?

A. Most definitely. Any sergeants that worked underneath me -- if they may not have worked directly for me, but they work in a different cell house -- number one, I always tell them, "Stay on

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 74 of 102

Page 289

your pipe walks. Make sure your staff is doing their pipe walks."

Nine times out of ten you'll stop a lot of chaos just by doing your pipe walks because the offenders know you're coming around every half hour. They're going to see you every half hour, 40 minutes. Some officers are good about it. They're up every 20 minutes. You know, they're just -- they're walkers. You know, they like to walk. They get their steps in.

Q. Okay.

A. So they're doing pipe walks constantly. It cuts down on the chaos that can happen. The inmates pay attention to you. They know this guy only does his pipe walks every hour. So I have an hour to do wrong -- be doing something I'm not supposed to be doing.

Q. Was there any communications or e-mails or reminders to individuals to make sure they were doing their security checks on time?

A. Most definitely. Usually -- almost every day a major sends out e-mails to the lieutenants, sergeants, you know, keep up on your pipe walks. Pipe walks look good this week. Everybody did really good or, hey, we're slacking on the pipe walks, make

Page 290

sure you're doing your pike walks. That was a constant.

Q. Okay. And so it was always emphasized that pipe walks needed to be done every 30 minutes?

A. Always emphasized. Always.

Q. Okay. Just to make sure I understand what we were talking about earlier.

A. Okay.

Q. So when Officer Abbassi and Officer Blakely were working on their A4s and then Officer Rodriguez was in the officer's station, as soon as they realized that a fire was on the 500 -- was in the B cell house, what did policy require them to do as you understood policy?

A. Policy requires you to respond to wherever the issue is and then whoever -- either both of them or one person make the signal -- make the call on the radio. It doesn't matter if it's either-or or all three of them. They could have all went up together, but only one person can talk on the radio at one time.

Q. So does policy require all three of them to go see what the problem is?

A. It doesn't require all three. It requires someone.

Page 291

Q. Okay.

A. Someone to go see what's going on. It could be a situation where all three get up there and then they get themselves into a situation they can't get out. So now we have three people stuck, and we can't get in the front door initially because someone has the door key on them.

Q. So it's up to the discretion of the officers in the cell house to decide the best way to respond to an emergency --

A. No. No, not the best way. No. Their job is to see the emergency, call for help.

Q. Okay.

A. That's their job. The people that determines how to respond to it are the first responders that show up.

Q. Okay.

A. And -- okay. First responders get there. The first thing we do is assess the scene.

Q. Does policy require the officers in the cell house to do anything besides call for help?

A. I mean, if they can -- if it's a situation -- if it's two of them and they seen it was a small fire and they, you know, call and -- "Oh, we have a signal 10-71," and they're able to open the

Page 292

door and help Mr. Devine get out -- in his situation, help Mr. Devine get out of his cell, yeah, that's what they're required to do.

Q. By policy?

A. Yeah. They're required to -- required to respond and required to, you know, act. You could be held negligent if you don't act. If you just stand and knowingly and willingly -- it is -- knowing something wrong is happening, but you don't care. You're still doing it. Well, then you're wrong. You're going to get in trouble for that.

Q. Okay. So if the -- if any of the three of them didn't take any action beyond calling for help, then that was --

A. That's their job.

Q. Then they did not do their job?

A. No. That is their job. If they called for help --

Q. Then they did everything --

A. They did their job. They called for help.

Q. Okay.

A. If they -- it's up to them if they would like to wait for the first responders to get there and assist them. That's on them. They don't -- no

BARBARA DEVINE, et al. v.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3.18-cv-00995-JD    document 203-1    filed 03/29/21    page 75 of 102

Page 293

policy bounds them that they have to do something. They don't have to enter the cell. They don't have to do anything. They called for help. Help gets there. They directed them to where help is needed, and they go from there.

Q. Okay.

A. That's just -- I'm not going to say that's something personal if you ever want to do that or not. I would think that would be instinctive. If you see someone in need of help -- if you're -- number one, if you're scared to go inside a cell, that's -- there is nothing wrong with being scared. There is nothing wrong with that. As long as you have a radio and called for help. Now back up is on the way. So all you're doing is keeping eyes on the situation.

Q. Okay. So it would be in line with policy to know -- if you know a fire is going on inside a cell to call for help, but to do nothing else and just let --

A. I'm going to say that's policy.

Q. Would that violate policy to do that?

A. To not do anything other than call for help?

Page 294

Q. Yes.

A. No, it wouldn't violate policy.

Q. Okay.

A. Because they would say, "What did you do?"

"I called for help. I got on the radio."

"What else did you do?"

"Made sure the front door was open."

Q. Okay.

A. "I did this. I did that."

"Did you go inside of the cell?"

"No, I didn't."

Q. So, say, for example, all they did was call for help, that's in line with policy?

A. That's in line with policy. That's what they're supposed to do.

Q. Okay.

A. They're not first responders, so they don't have to do anything other than call for help.

Q. Okay. So there's no policies directing officers who aren't first responders to respond to an emergency situation?

Page 295

A. No, ma'am. No, ma'am.

MS. PIERCE: I think we're done.

MR. ROTHENBERG: I don't have any questions.

MS. PIERCE: We're all done.

MR. ROTHENBERG: Waive.

(WHEREUPON, at 3:54 p.m., the deposition was concluded.)

Page 296

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, APRIL D. HARGETT, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 84-4735, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 25th day of January, 2020.

April Hargett
_____
April D. Hargett, CSR
License No. 084-004735

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 76 of 102

**$**

**$200,000 (1)**
260:17

**@**

**@comcastnet (1)**
10:12

**A**

**A4 (12)**
160:3;198:5,23;
200:6;210:25;282:23;
283:2,4,7,7,13;284:15
**A4s (7)**
192:17;203:1;
276:23;282:8,18;
283:16;290:10
**Abbassi (19)**
160:2;164:5;167:8;
169:22;195:3;202:25;
206:17;218:12;219:11;
228:1;230:10;254:20,
21,21;255:13;256:13;
282:7,18;290:9
**Abbassi's (2)**
206:21;208:4
**ABC (1)**
42:7
**ability (7)**
7:16,21;66:8;117:10,
13;191:11;194:11
**Able (29)**
13:21;14:6,9;29:23,
24,25;66:6;85:23,24;
86:23;102:11,14;
107:9;113:8;117:23,
25;131:10;132:2;
144:19;145:11;158:12,
13;170:8;201:25;
214:3;218:8;232:24;
253:16;291:25
**above (5)**
49:16;51:1;70:5;
73:2;143:2
**absent (1)**
247:22
**abuse (3)**
264:25;265:1,5
**accepted (3)**
143:7,8;284:7
**access (6)**
81:23;82:6,19;95:10,
12;96:6
**account (2)**
52:1;174:14
**accountability (1)**
167:11
**accountable (1)**
17:4

**accounted (1)**
281:17
**accurate (5)**
7:25;199:11,13;
211:3;212:15
**accusatory (1)**
233:3
**aces (1)**
67:21
**acknowledge (2)**
155:1,2
**acknowledges (1)**
155:4
**Acquaintance (1)**
241:22
**acquainted (2)**
46:17;83:4
**across (2)**
39:4;54:22
**act (6)**
101:24;102:1;234:4,
11;292:6,7
**acting (1)**
225:11
**Action (20)**
220:1,7,13,15,19,21;
221:1,3;228:5,9,13,16;
230:19,24;231:12,20;
238:5;276:15,17;
292:13
**actions (2)**
77:11;217:19
**activate (11)**
36:17;137:9;138:16;
170:7,12;171:21;
191:12,16;192:1;
231:17;233:12
**activated (14)**
37:4,6;47:16;135:20,
24;136:20,21;170:2,10,
21,22;191:3,4;210:12
**activating (6)**
139:9,16,17;171:2;
172:21;238:3
**active (1)**
166:8
**actively (1)**
25:5
**actual (1)**
152:16
**actually (7)**
21:17;51:3;54:21;
76:23;159:18;203:23;
268:14
**ad (1)**
32:16
**Adam (2)**
10:8,9
**addition (1)**
145:20
**additional (9)**
25:21;41:18;81:16;
94:6,6;143:20;170:22;

175:25;198:19
**address (12)**
10:3,5,7,16,18,21;
101:17;117:10,13;
154:9;169:18;170:25
**addressed (1)**
286:25
**addressing (2)**
113:24;174:19
**adequately (5)**
141:15,19,21;145:2,
12
**adjacent (2)**
54:21;157:2
**administration (2)**
78:16;179:17
**adrenaline (2)**
101:7;157:11
**adult (2)**
221:19;226:17
**advantage (1)**
234:10
**affairs (5)**
192:9;209:17;210:1,
5;229:5
**affect (2)**
7:20;8:3
**affected (1)**
191:11
**affects (1)**
7:20
**afraid (1)**
234:5
**afternoon (1)**
55:6
**afterwards (1)**
55:8
**again (23)**
21:8;29:5;33:2;
77:19;97:12;106:13;
123:22;126:2,25;
151:17;193:9;214:9;
226:13,22;232:20;
234:24;249:4;250:5;
268:20;278:19;279:5;
282:1;284:21
**against (5)**
56:16;225:16;
275:22;284:6,7
**age (1)**
256:9
**Agency (1)**
85:7
**agent (2)**
69:3,4
**aggravates (1)**
233:22
**agree (4)**
232:20;233:13;
236:13,14
**agreed (3)**
4:18,18,21
**a-h (1)**

10:8
**ahead (1)**
219:23
**aid (1)**
37:24
**air (1)**
70:13
**air-conditioned (1)**
70:13
**airway (6)**
111:23;112:14,19;
116:7,22;154:22
**airways (1)**
154:21
**alarm (8)**
51:12,19,20;151:25;
152:6,11;156:2;160:25
**alarms (3)**
151:19;152:4,14
**alerted (1)**
111:12
**alive (1)**
173:8
**alleviate (2)**
132:13;227:14
**allot (1)**
59:17
**allotted (2)**
208:9,11
**allow (2)**
132:24;170:24
**allowed (3)**
24:14;184:14;185:7
**Almost (15)**
24:13;45:14,15;
52:19;55:2;60:1,2;
80:19,19;130:16;
131:19;190:6;239:12,
13;289:21
**alone (6)**
213:25;224:8;
283:17,23;284:8,16
**Along (9)**
6:21;34:16;38:11;
47:19;52:17;107:18;
207:16,17;285:8
**alternating (1)**
127:6
**Always (23)**
27:8;39:6;51:22;
86:7,17,18;87:4;
104:16;130:19,22;
131:10;136:1,17;
142:19;233:5;235:23;
251:14;255:3,6;
288:25;290:3,5,5
**among (3)**
86:14,15,16
**amongst (3)**
74:3;105:2;247:14
**amount (5)**
22:1;63:25;107:8,13;
171:21

**Analyzing (1)**
142:15
**angry (1)**
227:3
**ankle (1)**
5:19
**announced (1)**
262:23
**announcement (1)**
149:8
**annual (2)**
98:25;272:19
**answered (8)**
155:11;194:10;
199:15;222:10,11;
265:18;267:15,18
**ANTHONY (2)**
4:5;266:10
**anymore (2)**
203:11;230:17
**apologies (1)**
4:13
**apparent (3)**
100:16;109:15;
191:21
**appeal (16)**
259:7,8,9,11,13,23;
260:8,16;265:9,11,14;
267:5;269:2,2,2,5
**appealed (1)**
259:3
**appear (1)**
209:25
**application (2)**
15:9,11
**applied (9)**
15:13;25:10,11,13,
15;29:3,4,6;274:12
**apply (6)**
15:5,12;41:10;274:3,
11,12
**applying (1)**
15:10
**appointed (1)**
33:12
**Appraisal (2)**
271:25;272:12
**appraisals (3)**
73:19;74:1,4
**appropriate (6)**
24:20;104:5;105:23;
106:1;282:17;283:16
**April (8)**
124:21;155:18;
186:22;210:5;215:1;
220:1;262:1;278:1
**area (12)**
9:20;15:24;19:13;
31:9;42:11;54:7;62:23;
91:4,4;94:20;177:14,
18
**areas (2)**
58:16;62:22

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 77 of 102

**argues (1)**
121:22
**argument (1)**
225:13
**arises (1)**
22:19
**arm (1)**
30:2
**armory (1)**
95:3
**around (11)**
31:10,24;61:16;
62:17;63:12;67:20;
77:1;109:12;112:3;
159:15;289:5
**arrive (2)**
101:18,22
**arrived (4)**
163:6;173:4,6;
187:18
**arrives (1)**
102:19
**Aside (1)**
271:3
**asleep (1)**
285:6
**aspect (2)**
222:25;236:1
**assault (1)**
268:9
**assaulted (2)**
98:12;236:4
**assess (7)**
130:10;171:25;
172:4,7,11;205:21;
291:19
**assessment (6)**
34:20;46:7,23;47:25;
48:15,16
**assessments (2)**
22:25;48:2
**assign (8)**
18:5;19:16;87:25;
88:1,19,25;89:1;
235:23
**assigned (50)**
15:25;16:2;18:8,18;
19:4,9,12;20:5,6,7;
25:25;27:17;33:23,24,
25;46:10;61:3,11;62:8;
63:2,5;64:5,8;87:17;
88:11,20;89:11;92:18,
24;93:3,25;100:3,15;
101:15;102:20;114:25;
148:23;149:23;162:24;
163:1,4;177:1;184:21;
195:2;213:12;215:19;
250:3;253:17;274:25;
284:1
**assigning (2)**
61:19;88:23
**assignment (6)**
54:18;87:19;102:24;

149:1,3;207:25
**assist (3)**
45:8;78:18;292:25
**assistance (1)**
101:16
**associated (1)**
43:22
**assume (7)**
7:8;53:2;95:22;
163:3,4;228:24;270:11
**assumed (3)**
140:2;146:24;164:13
**assuming (2)**
210:7;211:15
**atmosphere (2)**
64:13,19
**attack (1)**
233:20
**attend (5)**
37:9,10;56:17;60:15;
251:1
**attention (14)**
59:7;127:20,21;
128:17,20,24;129:5,18;
130:12;132:25;167:9;
203:3,22;289:14
**attitude (1)**
63:6
**at-will (1)**
260:7
**August (2)**
5:14;12:5
**authorization (1)**
61:8
**authorized (1)**
183:11
**automatically (1)**
172:21
**avail (4)**
156:23;168:3;
188:16;189:6
**average (2)**
109:19;275:15
**aware (4)**
82:14;113:17;
117:19;222:18
**awatson@idocingov (1)**
10:17
**away (8)**
19:2;38:1;77:8;
88:11;98:13;100:19,
20;268:14
**awesome (1)**
91:1

**B**

**back (88)**
18:13;20:4;37:24;
38:1;51:15;53:17,18;
59:25;60:7,11;70:20;
77:5;78:24;81:8;91:8;
92:12;93:4,4;94:14,24;

95:8,13;96:23;100:17,
24,25;102:18;114:4;
126:1;127:4;130:5;
131:13,23;132:1,1;
143:3;150:17;151:2,4,
9,13;153:15;157:11;
158:9;159:1,2,3,7;
162:4;166:14,16,17;
168:20;173:16;176:8,
8;180:7;186:20;
188:19;189:1,8;190:5,
19;197:2;198:7;201:6;
202:14,14,17,23;204:7;
205:22;211:5;212:3;
215:15;232:3;243:19;
249:3;257:17;267:22;
273:20,22;274:7;
276:10;282:6;285:8;
286:10;293:14
**backed (1)**
208:15
**back-up (3)**
94:12;95:11;96:5
**bad (8)**
63:7;111:22;122:10;
144:23;145:1;232:12;
236:22;267:16
**banging (6)**
133:12;134:1;
157:20;190:9,13;
232:11
**bangs (1)**
127:22
**bar (3)**
55:2;124:14;158:14
**Barbara (2)**
4:11;241:1
**bare (2)**
142:25;143:1
**barely (3)**
131:7;189:5;232:3
**barracks (1)**
24:13
**bars (5)**
28:10,11;127:22;
134:1;157:13
**based (10)**
17:6;44:6,8;101:24;
102:1;176:1;214:25;
217:25;218:3;227:10
**basic (1)**
6:7
**basically (10)**
12:2;16:13;18:25;
45:12;88:15;147:3;
181:15;195:12;201:7;
225:19
**basics (1)**
66:16
**basis (2)**
147:7;269:17
**basketball (2)**
134:18,19

**Bates (5)**
175:6;209:19;220:2;
265:25;271:23
**bathroom (11)**
103:9,22,24;104:21;
108:15,19;118:16,23;
269:12;283:21;284:5
**bathrooms (1)**
284:18
**batteries (10)**
109:13,14,16,19,21,
21;110:4,4,10,12
**battery (15)**
109:2,8,9,9,10;110:1,
5,15;111:9,12,14;
113:3,7,8,13
**BCH (5)**
207:5;210:24;211:2;
212:25;213:5
**Beal (5)**
243:24,25;244:1,3,7
**beast (2)**
128:22;144:24
**beat (1)**
202:2
**beating (2)**
158:14,14
**became (7)**
25:23;88:12;227:4,6;
245:17,19;258:3
**become (7)**
32:25;39:9;40:12;
71:22;235:12;252:17;
275:6
**becomes (3)**
170:19;234:2;235:24
**beep (2)**
113:10,11
**beeping (3)**
111:9,15;152:1
**beforehand (1)**
136:14
**begin (1)**
4:14
**beginning (4)**
155:21;197:14;
225:3;256:8
**behavior (3)**
175:2;218:20;219:9
**behind (9)**
40:11;134:6;135:7,
17;163:13,16,18;
173:21;249:2
**Bell (5)**
13:18,19,20,25;14:5
**below (2)**
51:1;275:15
**benefit (1)**
38:10
**besides (7)**
14:22;17:21;41:6;
112:25;186:22;191:10;
291:21

**best (13)**
6:23;7:4;65:24;
84:25;99:16;104:13;
145:9,10;194:11;
227:14;253:13;291:9,
11
**better (28)**
12:7;14:1,2;27:5,5;
83:3;84:21;85:2;
107:12;112:24;141:13;
142:14,16,20,22;143:5;
172:25;178:2,2;
226:21;231:6,16,22;
232:18;233:4,5;237:6;
255:5
**beyond (6)**
143:2;186:21;
199:19;230:23;268:22;
292:13
**bias (1)**
17:2
**big (7)**
59:6;84:7;107:10;
119:19;145:2;189:15;
234:2
**bigger (1)**
195:20
**biggest (4)**
23:24;59:21;86:6,7
**Bill (2)**
221:15;239:11
**birthday (1)**
250:25
**bit (20)**
16:11;23:11;26:9;
40:9;60:7;64:13;
112:24;117:8;139:5;
166:6,7;176:14;
185:16;245:16;247:8,
14;253:23;264:18;
288:5,13
**black (1)**
157:17
**blackballed (1)**
262:20
**blackened (1)**
207:12
**Blakely (27)**
160:3;164:5;167:8;
169:22;176:20;177:1;
179:10;193:25;194:1;
195:4;200:8,11,20;
203:1;206:18;216:13;
217:7;219:10;228:1;
230:10;255:22,23;
256:5,10;282:7,18;
290:10
**Blakely's (1)**
176:9
**blame (11)**
222:13,16;223:7,9,
11;224:6;226:3;227:9,
11,13;228:15

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 78 of 102

**blamed (1)**
227:20
**blank (3)**
272:15,17,19
**bleeding (3)**
37:8;49:9;130:14
**blocked (1)**
266:14
**blocks (1)**
288:8
**blood (1)**
130:15
**bloodborne (1)**
39:2
**bloodshed (1)**
261:16
**board (1)**
14:14
**boarder (1)**
19:13
**bodies (2)**
25:1;37:7
**body (4)**
126:3;206:9,12;
236:9
**boiled (1)**
225:20
**bomb (3)**
39:9,10;195:18
**bonus (1)**
268:2
**book (7)**
83:2,23;84:4,7,10;
225:18;251:13
**both (13)**
6:23;52:5;53:10;
104:14;150:24;206:4,
7;207:19;222:12;
225:8;236:6;248:19;
290:16
**bottom (6)**
202:20;205:5;
210:11;212:20,21;
231:11
**bound (1)**
16:21
**bounds (1)**
293:1
**box (19)**
94:13,17,18,21;96:4;
100:17;103:11;104:12;
105:7,15;109:14;
156:15;168:25;187:14,
17;188:5;200:22,22,24
**boxing (1)**
50:1
**boy (1)**
284:3
**bracket (1)**
208:7
**brain (1)**
29:20
**brand (9)**

21:12;26:2;65:16;
110:1,3;213:21;
214:12;216:13;217:12
**break (14)**
28:18;70:22;73:13,
15;105:6;145:15,17;
187:2,4;269:12,13;
276:6,7;286:3
**breakfast (6)**
18:11;59:3,15,15,16;
151:8
**breaking (2)**
31:19;70:10
**breaks (3)**
7:11,12;105:5
**breathing (4)**
121:13;185:11,14,15
**brick-enclosed (1)**
150:6
**brief (2)**
88:2,10
**briefed (4)**
87:21,23;88:14,15
**brigade (2)**
47:15;84:25
**bring (9)**
58:4,12;80:10,22;
95:16;165:5,8;194:18;
233:21
**Bringing (1)**
217:12
**bro (1)**
240:16
**broke (2)**
5:19;181:13
**broken (2)**
70:9,11
**brought (5)**
22:13;78:7;80:13;
165:1;280:2
**build (1)**
14:14
**building (4)**
19:21;81:5,7;157:18
**built (1)**
112:3
**bullied (2)**
261:4;263:7
**bully (1)**
263:8
**bunch (1)**
237:20
**burn (1)**
189:8
**burning (3)**
185:1;186:9,16
**burnt (4)**
92:15;106:24;
157:13;189:10
**bus (1)**
86:22
**buses (2)**
86:22,24

**business (2)**
117:3;184:23
**businesses (1)**
14:15
**busted (3)**
181:9,9;285:10
**busy (3)**
102:6;225:11;288:1
**buttheads (1)**
153:16
**button (1)**
120:19

**C**

**cable (2)**
186:17,18
**calculate (1)**
51:12
**call (95)**
19:18,21;23:3;24:6;
36:16,17;37:17,17,24,
25;41:13;44:2;45:3;
46:5;47:1;49:8,22,23,
23;50:6;62:5;64:25;
66:19;77:5,12;79:4;
90:21;93:8;94:21;
96:17;100:7,13;
101:15;104:10;109:12;
111:6,23;116:8,22;
118:4;122:17;127:4;
128:10;130:17;135:23,
25;137:5,11,13;
138:21;152:23;155:11,
12,14;170:21,22;
171:13,25;172:6,7,12,
15;189:19;190:14,24;
191:1,4,8,11,16,17,18,
19;192:1,2;196:23;
225:6;239:13;241:20;
242:17;247:2,3;255:9;
259:1;267:24;279:8;
281:7;290:18;291:12,
21,24;293:19,24;
294:16,21
**called (63)**
4:6;19:2;23:2;27:13;
28:2;36:12;44:1;47:14;
48:4,16;60:21;73:7,21;
77:1,17,24;88:11;
105:12,25;115:3;
123:2;136:10;137:9,
14;138:5,8,16;154:7;
155:22;160:13,19;
171:4,5;172:21;
174:17;176:3;189:12,
20;190:15,23;191:2;
192:5,5;194:17;
196:20;199:23,25;
200:7;201:10,11;
231:18;239:9,20,23;
267:23;278:20,22;
279:7;292:17,20;

293:3,14;294:6
**calling (12)**
95:21;100:4;114:6;
138:21,22;189:14;
190:2,25;191:7;196:1,
3;292:13
**call-off (1)**
107:10
**call-offs (2)**
106:2;107:24
**calls (8)**
4:17;8:12;96:18;
101:14;154:19;192:4;
205:22;239:14
**calm (2)**
22:22;26:22
**calmly (4)**
130:21,23;131:8;
133:23
**came (13)**
30:16;142:12;
163:12;201:24;216:21;
242:8,9,25;244:1;
252:19;258:7;261:19,
20
**camera (2)**
210:25;265:3
**cameras (2)**
31:15;47:22
**can (171)**
6:22;7:11;10:5;
16:11,23,24;22:3,15,
15,16;27:3;28:14;
35:14;38:2;40:16,17;
49:24;59:2,10,12;
61:21;63:19;64:25;
65:1;68:19;72:3;77:2,
24;78:21;80:16,20;
84:23;85:1;86:8,22;
87:1;94:8;97:14;98:21;
101:5,11;102:4,5,5,8,
17;103:14;104:11,11;
106:8;107:12,15;
108:15;109:12,21;
111:16;113:25;114:22,
22;115:4,8,21,24;
116:3;117:15;118:24;
122:2,11;124:17,22;
128:22;130:1,23;
131:12,24,25;132:21;
133:10,12,15;139:6;
141:12,14;143:14;
144:9;148:6;150:2,5;
151:19;152:18;153:17;
154:10;155:20;156:17,
21;157:23;165:6;
170:18,20;171:6;
172:18;173:3,16;
174:14;175:19,25;
180:2,3,23;181:12;
187:2,3;188:24;
190:17,17;199:21;
201:19;203:16,16;

205:2;210:9;212:17,
24;213:13,14,18;
214:11,19,22;215:17;
216:9,10,18;226:12,24;
231:15;234:1;235:1;
237:5;251:22;253:14,
20;254:5,10;255:5,14;
256:16;260:6,21;
262:11;264:18;265:4;
266:4;268:17;270:19;
271:18;272:6;275:5;
276:10;277:11;278:19;
280:11,13;285:17,24;
288:4,6,17;289:13;
290:20;291:22
**candid (1)**
224:4
**capacity (5)**
4:11;37:5;180:25;
225:11,12
**captain (63)**
30:15;33:25;36:16,
17;40:18;46:7;47:5,20,
20;48:14;52:13,16;
56:1,22;61:9,25;69:16,
16;73:2;74:18,18;82:6,
20;83:1,1;102:5;107:3,
10;108:1;122:17;
136:22;137:1,9,11,16;
138:10,21,21;157:14;
158:2,2,4;181:14;
182:7;191:2,12,16,25;
196:23;197:3,6;
201:11,15;205:23;
208:20,22;210:12;
215:16;222:22;232:2;
258:10,19;279:16
**captains (3)**
59:22;61:13;208:13
**captain's (19)**
48:18,22;49:2;81:25;
82:5,8;83:10;105:12;
155:23;159:16,17,22;
160:10,14;197:14;
222:23;258:16;278:10;
284:15
**care (6)**
7:15;37:12;77:2,3;
246:5;292:9
**career (1)**
76:17
**careless (1)**
263:12
**cares (1)**
122:23
**case (17)**
5:6,8,13,17;39:7;
50:13;96:2;108:18;
134:7;185:4;213:19;
234:13,13;241:3;
249:20;259:7;274:9
**cases (1)**
6:1

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 79 of 102

ANTHONY WATSON
October 30, 2019

**Castle (2)**
40:7;275:4
**catch (2)**
78:3;285:10
**category (2)**
254:13,17
**caught (3)**
78:2;247:5;285:13
**causalities (2)**
184:6;225:1
**cause (3)**
113:23;217:19,21
**caused (6)**
106:17;221:6,6;
225:22;239:1;247:14
**causes (3)**
90:5;186:6,11
**causing (1)**
72:7
**cell (336)**
9:13,15,20,23,25;
18:8,10,14,20,21;19:1,
4,10,16,17,20;23:13,
16,17,18,19,21,24,24;
24:11,17,21;27:17,19;
28:8,10,18;31:2,3,5,9,
15,16;39:4,5,6,7,8;
42:10;45:2,2;50:6,8,9,
15,25;51:7,13,17,25,
25;52:4,15;54:18;
55:22;56:1,15;58:2;
59:18,19;60:11;61:23;
62:14,14;63:4,22;64:2,
5,6,9,11,17;65:5;66:21,
22;68:2;69:24;70:25;
71:1,7,17,24,24;72:2,4;
78:22;79:12,14;80:3,8,
20;81:12;85:14,16;
87:16,18,21;89:25;
93:2,25;94:3,14;95:7,
14,15;97:3,9,10;99:6;
100:11;101:15;102:19;
103:17,17;105:9,18,24;
106:5,15;107:5,14,15,
19;115:1;117:14;
122:15;123:14,15;
124:1,17,19;128:5,7;
129:21;131:21;132:20;
133:4,9,13;134:15;
135:3,4,5;137:12,25;
138:22;146:6;148:1,3,
7;150:10;152:5,7,11,
12,19;153:4;154:20,24,
25;155:25;156:10,12,
16,24;157:5;158:3,11,
16,17,19;159:8,8,10,
20;160:2,12,15,18,22;
161:3,4,17,25;162:4,
25;163:1,3,5,6;165:12;
166:15,21;167:13,15;
168:1,10,15,21,22;
169:1,21;170:3;173:4,
7,9,18;174:12;178:4,4;

179:11,21;180:10,25;
181:20;183:2,10,24;
184:2,8,14,25;185:2,2,
5,7,22;187:10;188:9,
18,19,20,22,24,25;
189:1,22,24;190:10;
191:7;192:3,4,16;
193:8,14;194:6;195:2;
196:18;198:8;200:25;
201:5,7,8,13,14,17,19;
202:24;203:9,14,23;
206:11,16;207:2,8,9,
10,17;211:13;213:11,
16;214:4,6;216:3,19;
222:3;223:5;224:25,
25;227:6;234:7;235:4,
5,10;239:10;247:17,
22;250:2;252:16,19;
253:15;254:23;257:17,
20,25;258:1;261:15;
266:13,23;268:14;
276:22;277:1,21;
278:12;279:3;280:8,
22,23;281:2,3,11,20;
282:11;283:17;284:1,
8,10,11,13,16,19;
286:20;288:24;290:13;
291:9,21;292:2;293:2,
11,19;294:13
**cells (21)**
28:4,7,19;60:1,3;
73:3,4;94:1;104:5;
137:22;169:2;196:9,
15;197:18,19;244:16;
261:20;284:23;285:1,
5,6
**CERT (5)**
274:3,5,6,11,12
**certain (6)**
22:1;26:11;31:9;
57:17;58:15;265:1
**chain (2)**
26:8;29:19
**chair (3)**
202:4,5,5
**chance (1)**
17:12
**change (4)**
60:2;146:10;234:16;
271:13
**changed (2)**
74:6;224:17
**changes (14)**
58:7,12;147:2;231:2,
3;232:13;233:7;
237:11,14,14,17,21,24;
238:3
**changing (1)**
267:20
**chaos (2)**
289:4,13
**charge (69)**
18:25;19:3,7;27:18;

61:23,24;64:2,6,9,10,
12;65:4,19;67:10,15,
17;74:12,24;79:14,16;
87:22,24;88:2,9,12,19;
89:3,4,4,5;90:10;91:21,
24;105:19;109:18;
110:7;120:7;135:11,
12,13;205:8,16,17;
214:17,21;215:12;
231:19;234:23;235:1,
16,18,23,25,25;236:3;
244:4;250:2;252:15,
17,18;253:4,9,10,15;
254:6,17;255:17,20;
280:21
**charger (2)**
110:6,11
**charging (1)**
109:17
**Charles (6)**
54:17;59:21;60:4;
140:4;258:18;261:14
**chasing (1)**
216:11
**chastise (1)**
79:21
**chastised (1)**
181:15
**chastising (1)**
79:18
**check (25)**
28:8;56:8;61:25;
109:4,4;111:3,3,3;
120:5,11;130:4;
133:17,20,23;134:2;
137:5;153:24;272:18;
282:19;286:16,24;
287:20;288:3,5,10
**checked (1)**
69:10
**checking (17)**
28:1,1,10;31:11,11,
12;110:20;111:11;
120:2;285:19,20;
286:8,8,15,16,19,19
**checks (10)**
28:1;280:11;282:16;
284:22;287:9,14,16,17;
288:8;289:20
**chemical (3)**
42:6;69:3,4
**Chenoski (1)**
40:22
**Chesterton (1)**
14:7
**chief (9)**
51:10,10;137:12,14,
15,18,19,25;152:23
**chief's (1)**
192:4
**child (3)**
6:2,3;14:4
**choice (1)**

60:6
**chose (1)**
246:22
**chosen (1)**
25:16
**chow (7)**
18:12,13;62:9,10,11;
186:18;257:16
**Chris (1)**
250:17
**Christopher (2)**
243:24;250:11
**churches (1)**
14:16
**circumstance (1)**
5:5
**circumstances (5)**
99:15;183:23;
217:23;248:15;261:6
**city (8)**
9:8,9;11:12;14:11,
12;15:7;19:19,19
**civil (1)**
5:11
**clarification (1)**
7:7
**clarify (9)**
7:5;92:23;98:21;
165:7;216:20;230:22;
235:14;248:11;280:8
**clarifying (1)**
185:10
**class (5)**
17:25,25;38:17,18;
39:11
**classroom (8)**
17:6,22;38:18,19,20;
39:14;44:6,11
**cleaning (1)**
12:1
**clear (26)**
6:19;28:5;46:18;
121:2,3;125:21,24;
126:10,15;127:5,9;
155:24;159:25;277:7,
9;278:18;279:13;
280:12,23,23,24,25;
281:5,13,16,19
**cleared (12)**
276:21;277:2,4,16,
25;278:9;280:10;
281:21,22;282:5,12,13
**Clearing (1)**
279:3
**clearly (1)**
89:23
**clears (3)**
127:12,14;278:13
**click (1)**
114:21
**clock (1)**
254:8
**close (3)**

107:3;188:22;276:5
**closed (5)**
14:21;204:9;211:2;
268:15;286:11
**closer (1)**
97:10
**clown (1)**
268:21
**club (1)**
117:2
**CO (3)**
128:2;129:25;131:22
**code (3)**
9:21;154:7,12
**cold (1)**
31:7
**collapsing (1)**
233:20
**collected (2)**
22:22;280:2
**collecting (1)**
68:23
**collection (1)**
175:7
**collective (1)**
69:14
**college (1)**
11:13
**coloring (1)**
207:19
**comfortable (3)**
142:25;143:1,2
**coming (30)**
21:13,16;49:17;50:5,
7,9;52:14;55:25;57:12;
83:12;88:8,9;97:9;
114:11;133:16;134:2;
151:14;156:2,9;
158:22;161:11;164:21;
166:21;190:18;197:2;
202:11;246:18;257:20;
285:13;289:5
**command (4)**
26:8;29:19;47:21;
205:19
**commander (1)**
271:13
**commanders (1)**
271:14
**comments (4)**
13:1,2,2,3
**commissary (5)**
19:16,21;20:3,4;54:5
**commit (1)**
180:13
**common (8)**
49:5;72:10;113:1,5,
7;152:15;153:18;
185:25
**commotion (4)**
133:16;157:18;
202:13;286:6
**communicate (7)**

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 80 of 102

29:23;75:10;117:24,
25;132:18;232:1,24
**Communicating (1)**
55:24
**communication (28)**
21:19,20;26:19;
29:24;30:5;76:4;90:16;
105:2;112:14,24;
190:5,16;196:22;
231:16,23;232:2,12,14,
18;233:4,5;251:25,25;
257:22,23;258:15,19;
261:8
**communications (2)**
32:4;289:18
**Company (5)**
13:23;14:6,11,21;
15:2
**competitive (1)**
38:7
**complacent (1)**
62:19
**complaints (1)**
275:21
**complete (1)**
38:16
**completed (2)**
16:2;267:1
**completely (4)**
63:22;217:15,18;
258:10
**compliance (1)**
170:11
**complied (1)**
146:17
**complying (12)**
124:23;148:2;
175:21;176:10;205:4;
210:10,17;212:4,18;
220:3;266:5;277:13
**components (1)**
17:21
**compound (1)**
87:3
**concentrating (1)**
282:4
**concept (1)**
24:13
**concern (3)**
62:20;86:18;117:23
**concerned (1)**
288:18
**concerns (1)**
275:19
**concluded (2)**
267:8;295:9
**conclusion (1)**
269:18
**condition (1)**
7:19
**conditions (1)**
8:3
**conduct (6)**

16:14;22:17;69:8;
175:1;219:10;230:11
**conducting (2)**
18:9,10
**conference (1)**
220:22
**confidential (1)**
82:9
**confidentiality (1)**
270:25
**confinement (1)**
69:7
**confinements (1)**
85:15
**confronted (1)**
266:17
**confusion (1)**
89:15
**congregate (1)**
58:17
**congregating (1)**
58:16
**connected (1)**
152:5
**consideration (2)**
17:14;92:6
**considerations (1)**
88:22
**considered (3)**
21:2;22:7;253:2
**consist (1)**
51:9
**consistency (1)**
16:17
**consistent (3)**
30:3,5;63:20
**consists (2)**
36:7,7
**constant (5)**
21:14;26:13;38:20;
182:18;290:2
**Constantly (5)**
30:9;110:20;112:8;
142:19;289:12
**construction (1)**
14:16
**contact (1)**
252:3
**continue (5)**
19:3;68:13;98:11;
101:20;102:15
**continued (1)**
17:10
**continuous (1)**
113:14
**contraband (1)**
28:8
**control (14)**
20:2;109:13;136:9;
154:18,19,20,21,23,24;
155:10,15;260:22;
279:9,9
**conversation (7)**

115:25;116:1,6,15,
23;150:8;224:1
**conversations (3)**
116:12;240:14;241:5
**cookie-cut-type (1)**
26:15
**cool (4)**
22:22;26:22;116:4;
240:3
**cop (2)**
267:16,17
**copies (5)**
83:2,6;94:15;95:4;
212:22
**copy (5)**
49:1,3;82:5;83:11;
96:5
**corner (1)**
208:7
**corral (2)**
18:12;227:3
**correctional (13)**
15:13;16:15,21;
17:14;18:8;22:8,9;
25:2;178:22;264:7;
270:17;274:15;275:6
**corrections (1)**
16:22
**correctly (2)**
91:13;276:20
**counsel (7)**
4:17,18,18;8:5,7,7;
210:4
**counseled (3)**
182:10,11,13
**counselor's (8)**
149:19,21;150:3;
197:24;198:6;200:5;
283:19;284:10
**count (104)**
18:10;22:16;27:24,
25;28:3,5;60:12;64:16;
66:17;77:17,18,19;
78:14,19,21;103:15;
120:16,21;121:1,2,2,3,
8,18;125:17,18,20,21,
23,23,24,25;126:1,1,3,
6,8,9,10,12,12,15,16,
23,25;127:1,3,4,7,9,12,
14;128:7;134:16;
155:24;159:14,15,24,
25;160:1,5;168:19,20,
25;199:22,22,24;
200:2;276:21;277:2,4,
7,8,16,19,23,25;278:8,
13,14,17,18,22,25;
279:5,13,24;280:9,10,
10,12,22,23;281:5,7,
12,16,19,20,21;282:4,
5,11,12
**counted (2)**
126:24;168:24
**counting (3)**

120:17;281:25;282:1
**counts (3)**
126:3;277:15;279:7
**count's (4)**
79:10;127:4;281:3,
10
**couple (12)**
65:7;107:4;109:13,
13;221:10;246:3;
247:8;251:10;255:25;
256:3;264:21;271:16
**course (3)**
37:9;47:20;232:11
**court (5)**
5:21;6:15,22;176:15;
274:8
**courteous (1)**
16:16
**cover (2)**
49:6;54:7
**covers (1)**
44:16
**CPR (3)**
102:6;159:6;202:21
**craft (1)**
142:13
**crappy (1)**
123:17
**crazy (1)**
255:2
**creates (1)**
171:24
**creating (1)**
68:20
**crew (1)**
107:1
**crime (3)**
6:13;222:19,20
**crossed (1)**
245:23
**crying (1)**
133:19
**Crystal (1)**
241:11
**current (2)**
9:4;31:1
**currently (1)**
11:16
**Curry (6)**
221:12,16;222:25;
226:14;227:1,8
**Curry's (1)**
237:16
**curtain (1)**
31:16
**curtains (3)**
31:12,14,14
**custody (6)**
159:5,7,18;202:22,
23;210:25
**cut (6)**
68:8;116:14,17;
123:24;139:6;143:16

**cuts (2)**
123:12;289:13
**cutting (1)**
114:3

## D

**dangerous (8)**
37:23;50:22,23;58:1;
227:4,6;260:20;261:15
**dark (2)**
151:9;157:25
**date (5)**
4:21;124:20;204:21;
259:11,11
**daughter (3)**
250:18,21;251:1
**day (53)**
17:13;19:14,15,15;
23:14,16;26:14,15,16;
30:16;31:9;32:19,19;
46:2,12,14,21,22;
53:10;54:3,6;56:1,12;
61:3,4,17;62:7,14,15;
63:5,12;64:17;87:23;
88:10;106:21;120:3;
139:11,14,19,20;
150:24;184:17;186:3,
14,20;196:17;215:2;
228:21;253:10;259:6;
260:1;267:10;289:22
**days (27)**
38:18,23;41:20,21;
53:14,15,15,18,19,20,
21,22,25;54:8;88:8;
140:2;145:25;146:8,
11;147:9;149:23;
249:3;253:10;259:6,9,
11,25
**daytime (1)**
286:12
**day-to-day (2)**
32:17;184:23
**dead (10)**
90:12;109:8,9,10,14;
110:6;113:3,11,13,17
**deal (14)**
26:6,7,21;47:2;50:7;
52:20;86:8,8;140:3;
145:2;172:8;242:3;
288:6,7
**dealing (7)**
22:18;60:22;85:15;
139:13;235:6,8,9
**dealt (1)**
218:7
**death (2)**
180:8;225:23
**December (2)**
16:8;274:24
**de-charge (1)**
110:11
**decide (2)**

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 81 of 102

14:25;291:9
**decided (2)**
15:4;257:23
**decision (8)**
47:12;57:21;74:20;
107:11;108:1;201:16;
206:10,12
**decisions (3)**
46:17;206:14;247:4
**decrease (2)**
91:14;264:8
**deescalate (3)**
22:23;26:19;122:12
**definitely (29)**
58:6,8;66:23;70:17;
80:12;81:1;108:22;
117:7,23;118:3;
120:25;121:18;122:15;
133:10;142:3;143:25;
153:2;234:13;236:21;
248:1,3,5,10;284:24;
287:1,10,15;288:22;
289:21
**demeanor (1)**
218:4
**demonstration (1)**
44:12
**demote (1)**
270:21
**demoted (15)**
258:12,23;259:4,5;
260:6,11;262:23,24,25;
264:6;270:16;271:1,5,
10;275:10
**demotion (1)**
260:4
**department (20)**
31:5;81:25;137:2;
170:3,7,10,12,21;
171:2,8,10;172:1,5,8,
21;189:23;191:3,6,12,
16
**department's (1)**
269:18
**depending (9)**
25:24;61:20;74:9;
136:5,6;149:16;
150:22;181:5;226:25
**depends (14)**
19:14;23:13,17;36:9;
49:16;134:17;141:17;
146:22;166:5;206:1;
213:7,8;253:24;280:21
**Deploy (1)**
231:18
**deployed (1)**
139:4
**deposed (1)**
5:13
**deposition (8)**
5:1;6:8,13;8:8,15,24;
9:5;295:8
**depositions (1)**

4:22
**deputy (18)**
56:21;72:20;222:24;
241:15;242:10;247:2,
9,9,12;258:13;261:3,
21,23;262:3,4,21;
263:11;268:25
**describing (1)**
266:1
**designate (1)**
21:12
**designated (2)**
27:25;44:21
**designation (1)**
48:11
**desk (2)**
257:4,9
**detain (1)**
69:1
**determined (1)**
266:21
**determines (2)**
214:3;291:15
**development (6)**
221:17;272:20,22;
273:11,23;274:20
**device (1)**
78:8
**Devine (28)**
4:11,13;157:5;
158:15;159:5;173:5;
176:5;180:25;185:5;
188:21;189:21;190:1;
201:3;202:4;215:24;
225:23;238:13;239:5,
18,19,20;240:12,14;
241:1,8,11;292:1,2
**Devine's (1)**
240:23
**diagram (1)**
203:9
**die (4)**
111:15;113:7;
117:12;190:12
**died (1)**
173:14
**difference (5)**
36:2;45:11;184:22,
23;272:13
**different (42)**
20:8,9;22:19;26:15;
35:1;37:8;54:5;58:15;
61:17;62:22;63:13,14,
15,22;64:14,19,20;
66:13;85:12,22,22;
89:23;92:21;93:13,22;
117:21,21;126:16;
132:12,15;149:13,15;
174:1;207:24;213:13;
217:15;235:2;246:1,
15;267:20;284:14;
288:24
**differently (4)**

215:3,6,22;216:3
**difficult (6)**
112:8;131:1;132:3;
214:18;218:8;255:1
**ding (1)**
121:7
**dinged (1)**
120:18
**dining (1)**
42:19
**dinner (2)**
18:11;105:6
**direct (5)**
29:25,25;61:7;
137:20;263:17
**directed (1)**
293:4
**directing (3)**
21:4;235:18;294:23
**direction (5)**
27:8;65:11;98:16;
197:10;218:13
**directly (6)**
18:16;136:11;140:5;
150:5;205:20;288:24
**director (2)**
221:17;226:17
**directors (1)**
226:16
**disagree (6)**
232:17;233:3,13,15;
235:21;236:13
**disagreement (1)**
12:25
**disappointed (1)**
77:11
**disciplinary (2)**
239:2;240:9
**discipline (13)**
74:14,20,24,25;75:6,
7,15;77:12,15;78:4;
123:6;259:6;264:12
**disciplined (7)**
74:15;75:2;76:17;
119:24;121:19;275:10,
12
**disciplining (1)**
74:13
**discovery (1)**
4:20
**discretion (1)**
291:8
**discuss (3)**
244:14,16;288:20
**discussed (8)**
8:6;118:9;199:19;
212:5;237:22,25;
238:3;244:19
**discussing (3)**
264:3;268:23;270:16
**discussion (2)**
87:4;228:4
**discussions (1)**

86:13
**displaced (1)**
86:20
**Disposal (3)**
13:21;14:6,9
**dispute (5)**
192:21;194:20;
210:14;211:19;267:3
**disturbance (2)**
36:13;57:10
**Division (3)**
209:18;210:1,5
**DOC (4)**
182:5,5;237:16;
263:4
**document (23)**
8:16;124:5,10;
147:20;175:8;204:12,
17;209:10,12,17,20,23;
219:18;220:4;263:20;
265:19;271:22,23;
272:1,6;277:24;278:3,
20
**documentation (3)**
47:6,8,17
**documents (4)**
4:23;8:14;279:21;
280:2
**Dollar (1)**
239:11
**done (73)**
17:24;23:4,8;28:19;
47:24;55:23,24;61:18;
64:16,18;65:1,8;69:13;
71:15,25;77:10,25;
79:10;81:15;87:24;
104:14;107:22;121:2;
122:1,1,4,7;139:8,25;
140:8;142:9,16,17,24;
154:2,3;181:4,7;
184:10;191:23;212:6,
8;214:7;215:2,22;
216:2;218:13;223:8,
13,17;224:22,23;
229:2;230:12,15;
236:16;268:6,6,7;
275:3;276:5;278:17;
280:17;282:16;283:7,
13,15;285:25;287:25;
288:5;290:4;295:2,5
**door (158)**
55:2;70:16,21,23,24,
24;80:16,17;81:8,8;
89:6,6,7,8,14,16,17,17,
19,20,21;90:1,3,4,8,9,
11,22,24;91:2,8,10,14,
17,20,25;92:4;94:14,
14,22,24,24;95:8,8,13,
13,23,24;96:9,10,13,
15,18,19,22;97:20,23,
25;98:8,8,10,11,16;
99:16,17,21;134:7;
135:9,16;139:1;150:5;

151:14;155:25;156:14,
17,22,22,25;157:9;
158:14,15;161:17;
165:22;166:2;167:14,
17,23,24,25;168:5,12,
13,25;169:4;173:15,
15;178:5,13,24;179:11,
22;181:2,3;184:14,22;
185:2;187:13,21,23;
188:4,7,25;189:7,10;
193:13,15;194:2,4;
200:9,10,11,12,15,16,
16;201:8,13;202:1,2,3,
3,13;203:5,15,16;
204:9;210:24;211:2,3,
16,22,24;235:11;
236:4;241:24;247:22;
248:8,12;258:8;
266:17;268:15;277:1;
286:10,12;291:6,7;
292:1;294:9
**doors (21)**
15:3;18:9;22:16;
28:1,10,16;93:2;
156:18;157:20;184:3,
18;196:18;201:14;
215:20;260:23,23,24;
286:8,9,10,16
**dorm (1)**
63:21
**dorms (6)**
24:3,7,8,10,12;
107:18
**dotted (1)**
245:23
**doubt (1)**
287:18
**down (96)**
6:16,23;21:20;40:7;
50:14,15;58:3;68:8;
72:3;76:3,5,7;79:3;
89:15;93:15;97:17;
98:13;100:5;103:20;
106:15;107:2,11;
108:2;111:24;117:25;
121:4;123:12,25;
130:3;131:20;134:15;
139:6;151:9,11;
153:15;156:9,11,24;
157:7;158:22,24;
159:1,2,4;160:7;
164:21;167:18,19;
168:3;173:14,14;
177:3,6,20;181:9,9;
184:21;187:18;188:17;
191:20;200:17,24,25;
202:7,8,10,10,11,12,14,
18,20;205:5;225:20;
232:23;237:15;244:2;
246:2,4,6,12,20,21,22;
257:24;261:13,19;
263:10,13,15;267:15;
269:25;270:1;275:4;

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 82 of 102

277:22;289:13
**downstairs (9)**
79:2;91:8,11;100:24;
130:4;134:10,11;
177:23;202:19
**drag (1)**
60:1
**dressed (1)**
139:3
**drill (26)**
46:24;48:12;50:16,
18;51:8;52:6,7,10,13,
15,24;53:4;80:3;81:11,
14,17;183:1,5;213:10,
10,12,17,23,25;214:7,7
**drilled (1)**
178:24
**drills (39)**
45:22,25;46:21;47:3;
49:4;50:3;51:2,6,9,9;
52:3,21;53:1,7;79:25,
25;139:8,11,12,12,15,
16,19,21,24;140:8;
142:1;144:5;183:1;
212:23,24;213:3,5;
231:20;236:12,15,20,
22;237:3
**drink (1)**
149:5
**drive (1)**
142:22
**dual (1)**
24:7
**due (2)**
106:2;107:24
**duly (2)**
4:2,6
**dump (1)**
101:7
**during (44)**
4:16;21:22;27:10;
54:3,6;56:1;58:9;73:4;
78:14;87:11,12;88:10;
103:5;113:2;121:1;
139:11,13,18,20;
150:24;159:14,23;
174:17;183:24;185:12;
194:10;213:5;222:4;
224:18;228:4,8,13,16;
229:10,16;230:12,20;
231:18;232:14;244:16,
20;273:1;277:5;286:3
**duties (3)**
27:15,16,16
**dying (4)**
111:9,12;113:22;
117:12
**Dykstra (3)**
208:22;210:12;
222:22

**E**

**ear (1)**
190:11
**earlier (11)**
23:11;48:20;144:1;
171:20;189:15;190:5;
200:9;212:6;287:22;
288:12;290:7
**easier (1)**
192:11
**easily (3)**
22:21;132:25;254:25
**east (2)**
59:5;159:19
**easy (2)**
241:23;242:2
**eat (7)**
59:4;60:7;105:6;
149:11,12,14,15
**eating (2)**
59:5;149:4
**education (2)**
11:4,13
**effect (1)**
189:6
**effective (6)**
140:12,13;245:13;
246:16,20;251:5
**effort (1)**
229:1
**efforts (3)**
68:8,11;268:22
**eight (1)**
35:25
**eight-hour (1)**
26:21
**either (16)**
13:12;36:22;70:23;
87:21;93:8;105:7;
107:3,11;130:2;169:1;
174:21;185:6;192:5;
204:24;275:4;290:16
**either-or (1)**
290:19
**elbow (1)**
240:6
**electrical (2)**
71:4,5
**electronic (3)**
78:8;156:17;187:15
**else (35)**
8:20,23;31:18;44:18;
54:25;63:5,11;64:12,
21;70:15;71:3;80:16,
24;90:18;102:22;
103:8;105:22;114:8;
115:21;127:5;134:13;
136:15;163:25;165:4;
183:3;199:4;215:6;
223:19;224:22;229:21;
232:10;239:14;248:12;
293:19;294:8
**Elston (1)**
11:10

**e-mail (15)**
10:3,5,7,13,16,18,21;
56:8;259:15,16,18,18,
19,20,22
**e-mails (3)**
56:4;289:18,22
**emergencies (2)**
82:24;106:13
**emergency (98)**
35:12;36:4;37:21,22;
49:7,10,24,25;81:20,
23,24;82:1,4,14,14,20,
25;83:6,16,18,20;85:7;
89:18;90:5,22;94:12;
95:11;96:5,17,18,20,
21;99:15;100:5,7;
101:12,17,21;102:9;
104:2;106:5,9,10,12,
16;108:4,19;111:6;
113:24;114:20;115:24;
118:3;125:24,25;
126:1,6,8;127:23;
128:11,14;129:18;
132:4,4,14,17;133:1;
134:8;140:19;143:19,
20,23;144:18;145:12;
154:22;176:7;183:11,
17,24;184:2,11,24;
203:13;231:17,18;
232:14;233:15,17,18,
24;237:11;244:17;
257:19,22;274:5;
286:25;291:10,12;
294:25
**emphasized (3)**
287:13;290:3,5
**employed (4)**
11:16;41:15;53:13;
259:17
**employee (9)**
13:1;230:23;238:6;
271:24;272:7,20,22;
273:22;274:20
**employees (2)**
9:5;42:25
**employment (4)**
12:7;14:1,2;15:1
**en (6)**
155:5,6,7,8,11;174:4
**enclosed (2)**
84:22;150:6
**end (13)**
31:13,24;32:7;39:25;
48:25;52:14;69:14;
70:20;114:4;166:15;
197:14;207:25;280:1
**ended (2)**
168:21;226:9
**enforce (1)**
31:23
**engulfed (2)**
181:6;201:7
**enough (13)**

86:23;106:17;107:4;
142:7,23;143:9,9,15,
18;204:6;226:25;
227:2;252:17
**enter (4)**
39:5,7,8;293:2
**entities (3)**
85:13;235:2,24
**entitled (1)**
271:24
**entity (2)**
235:24;253:24
**entrance (5)**
148:7,8,9,11;203:14
**environment (2)**
63:17;255:2
**environments (2)**
63:14,15
**equally (1)**
225:8
**equipment (1)**
80:10
**escalate (1)**
49:11
**escape (6)**
36:13;123:13;124:4;
126:7;127:11;274:9
**escaped (1)**
121:14
**escort (2)**
20:4;102:10
**escorted (1)**
69:9
**Especially (6)**
86:11;107:24;118:3;
140:19;186:4;237:8
**essentially (1)**
43:13
**Estate (2)**
4:12;241:4
**eternity (1)**
258:2
**ethics (1)**
16:14
**evacuate (19)**
42:17;51:13;80:2,7;
81:5;86:21;158:3,5,8,9,
10;184:8;196:25;
197:5,11,13;201:16;
224:25;234:7
**evacuated (3)**
184:1;197:8;227:5
**evacuating (6)**
87:6,10;158:5;159:1;
235:5,10
**evacuation (17)**
38:25;42:3,9,10,22;
43:2,6,6;80:2,18;
81:10;139:15;148:1;
158:11;196:20;202:24;
214:7
**evacuations (1)**
51:5

**evaluation (1)**
33:2
**evaluations (4)**
22:24;23:8;27:10;
47:7
**Even (12)**
97:2;103:16;108:11;
113:10;118:16;171:4;
172:13;178:9;190:14;
204:5;228:21;287:17
**evening (2)**
159:12;219:6
**event (3)**
215:25;219:14;
228:20
**Everett (2)**
257:6,8
**everybody (30)**
23:4;41:22;51:16,20,
20;79:2;86:18;90:24;
91:14,19;97:6;99:24;
108:25;121:11;126:2,
4;142:22;151:13,14;
155:3;158:19;190:12;
201:17;217:14;232:10;
257:17;277:21;279:13;
280:9;289:24
**everybody's (8)**
51:25;109:8;114:18;
240:2;259:2;278:13;
281:16;286:4
**everyday (1)**
18:25
**everyone (7)**
41:14,14;82:3;
134:13;227:5;239:14;
262:24
**everyone's (1)**
178:24
**everything's (1)**
285:4
**evidence (1)**
224:11
**exactly (3)**
64:16,18;192:3
**EXAMINATION (1)**
4:8
**examined (1)**
4:7
**example (11)**
16:24;27:19;30:25;
61:22;76:25;81:15;
116:2;152:6;270:18;
281:1;294:15
**examples (3)**
142:6;270:19;271:18
**exceed (1)**
273:10
**Except (2)**
52:11,12
**exceptions (1)**
179:6
**excessive (1)**

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 83 of 102

264:22
**exchange (1)**
113:8
**Excuse (4)**
34:24;95:3;224:15;
255:18
**executive (5)**
221:16,19;222:24;
226:16,17
**executives (1)**
222:12
**Exhibit (21)**
124:7;147:19,22;
175:6,10;204:11,14;
209:11,14;219:17,20,
24,25;263:19,22;
265:21,24;271:22;
272:3;276:12,19
**exit (2)**
13:10;203:13
**expect (2)**
16:15;96:8
**expectations (3)**
273:7,9;275:6
**experience (5)**
62:22;63:24;64:11;
65:18;253:13
**experienced (3)**
180:5;217:17;218:9
**explain (4)**
137:14,18;169:19;
225:3
**explained (2)**
79:3;232:1
**explanation (3)**
99:5;120:14,14
**exploded (2)**
195:12,19
**express (1)**
20:19
**extension (1)**
30:2
**extensive (4)**
126:2;140:15;141:2,
7
**extinguisher (24)**
39:3;42:5,5;43:9;
50:13,14;80:12,15,18,
23,25;153:6,8,12,14,
15;162:2;165:17;
167:20;169:5,7;171:7,
9;194:6
**extinguishers (27)**
42:8,9,22;153:4;
156:7,13;157:9;165:1,
5,5,9,10,14,15;168:9;
169:9,14,15;187:12;
188:12;189:5;194:18;
201:2,2,22,24;237:25
**extra (5)**
37:24;38:11;40:19;
94:22;158:20
**eye (8)**

261:2,3,22,22;262:5,
5,18,18
**eyes (4)**
100:6;127:1;177:12;
293:15

## F

**face (4)**
72:1;76:4,4;232:23
**Facebook (1)**
10:25
**faced (1)**
26:16
**facilities (2)**
68:5;226:18
**facility (52)**
16:1;18:4;36:5;40:7;
42:9;84:21,22;85:12,
13,23;86:11,11,22;
94:9,16,19,19;95:5;
106:20,25;107:9,11,12,
13,14;108:2;139:6;
182:4;213:19;221:20;
236:20;239:13,19;
246:2,8,10,12,20,21;
249:9;251:11;259:9,
16;260:2;262:24;
270:22;274:23,25;
279:1;280:25;281:16;
282:12
**facing (1)**
211:1
**fact (1)**
219:5
**fail (2)**
113:2;141:1
**failed (3)**
17:11,13;264:16
**failing (3)**
75:7;76:25,25
**fair (7)**
7:9;16:16;30:3,4;
63:20;243:19;262:19
**fairly (3)**
72:10;152:14;204:2
**fake (1)**
28:11
**faked (1)**
142:5
**fall (2)**
106:15;286:2
**familiar (4)**
241:1;242:21;
243:23;252:21
**familiarity (1)**
242:6
**familiarize (2)**
30:19;147:6
**families (1)**
32:4
**family (3)**
32:3;229:23;240:24

**fan (4)**
64:23;65:15,15,16
**fans (1)**
71:8
**far (21)**
8:25;21:13;26:10;
30:24,25;60:24;74:14;
82:2;85:16;88:24;
118:1;132:15;133:5;
140:18;141:8;169:23;
188:19;237:15;252:9;
272:20;283:1
**fart (1)**
29:21
**fast (4)**
51:12;115:4;167:24;
191:6
**fault (2)**
229:7;233:1
**faulty (3)**
71:18,21,22
**February (4)**
257:13,14,14;259:4
**Federal (1)**
85:7
**feed (4)**
18:12;184:20;
206:23;207:16
**feeding (4)**
207:5,5;208:2;
250:10
**feel (1)**
142:24
**feet (1)**
60:1
**fell (6)**
5:18;128:12;269:25;
270:1,5;286:1
**felt (2)**
76:3;258:3
**FEMA (1)**
85:5
**female (1)**
255:1
**few (3)**
68:18;159:11;202:2
**fiasco (1)**
234:2
**field (13)**
18:18,19;20:5,10,11,
15,17,20,22,25;21:11;
22:15;271:14
**fifteenth (1)**
260:1
**fight (20)**
19:25;46:5,10;49:11,
20,24;68:25;84:24;
98:9;101:10,10;
144:24;169:6;201:4,7;
216:4,16;224:23;
243:11;261:17
**fighting (3)**
97:17;157:2;171:18

**fights (4)**
19:23;57:16;246:3;
261:14
**figure (3)**
229:1;261:14,16
**figured (1)**
167:24
**file (2)**
48:24;49:2
**fill (6)**
13:9;69:4;272:18,19;
273:15,20
**finally (3)**
158:14;202:3,18
**find (7)**
17:1;58:20;75:12;
100:23;222:16;229:6;
239:12
**finding (1)**
268:24
**fine (3)**
72:25;145:1;175:16
**finesse (1)**
246:13
**finger (1)**
225:4
**fingers (1)**
224:21
**finish (6)**
6:24;119:10;125:20;
159:8;201:18;202:24
**finished (5)**
119:9;125:11;
199:22,24;200:2
**finishes (1)**
123:1
**fire (295)**
38:24;39:2,3;42:1,2,
4,5,5,6,7,7,8,15,22;
43:1,5,9,17;47:15,15;
50:13,14;51:8,9,9,10,
10,12,19,20;52:3,5,6,7,
9,13,14,21,24;53:1,4,7;
72:4;80:11,12,14,17,
18,21,22,25;84:15,16,
23,24,24,25;85:17,19,
24;86:5,5,7,9,19,19;
87:3,6,11,12;129:2,18;
137:2,2,12,12,14,15,18,
19,23,24;138:23;
139:18,18,25;143:25;
144:2,5,7,18;148:1;
151:19,25;152:4,6,11,
14,16,22,23;153:1,3,5,
8,12,13,14;155:18,21;
156:1,1,7,8,12,13,25;
157:3,3,4,7,8;158:13;
160:24,25,25;161:8;
162:2,16;163:22;
165:1,4,5,8,9,13,14,16,
23;166:18;167:20;
168:9,11;169:5,6,7,9,
14,14;170:3,4,7,8,9,12,

13,21;171:2,6,7,8,9,10,
18;172:1,5,7,21;
173:13,13;174:10,19;
175:2;177:20,21;
178:3,4,9;179:21;
181:1;184:1;185:5,12,
15,16;186:5,17,18,19;
187:11;188:10,12,14,
17,18,19,24;189:4,6,
15,18,21,23,23;191:3,
5,12,16;192:3;193:7;
194:6,18;195:12;
198:17;200:25;201:1,
1,2,5,8,11,18,21,22,24,
25;210:6;211:16,19,21,
22;212:22,24;213:3,5,
10,10,12,17,23,25;
214:7;215:3,7,9,14,25;
216:4;217:17;219:7,
14;220:8;221:5;222:4;
223:2,3,5,6;224:24;
229:11,11,13,16,21,24;
230:3,4,7,12,20,23;
231:1,20;234:7;235:2,
9;236:1,12,15,20,21,
22;237:3,11,25;238:2,
7;252:22;255:13,24;
276:11;285:13;290:12;
291:24;293:18
**fired (1)**
260:6
**firefighter (1)**
139:16
**firefighters (14)**
136:20;137:6,9;
138:17;139:9,13;
157:16;171:22;189:12,
15;190:2;191:1;
210:12;238:3
**firehouse (6)**
137:20;138:7,12,13;
139:2,3
**firemen (19)**
52:4,5,17;84:20,21;
85:3,4,9,10,25;138:13,
14;157:15;158:12;
196:1,3,23;201:12,17
**fire-related (1)**
79:25
**fires (9)**
36:19;50:4;72:7;
144:3;185:25;186:7,8,
12,21
**fire's (1)**
168:20
**firm (5)**
16:16;30:3,4;63:20;
243:19
**first (112)**
4:6;26:7;29:19;33:9,
12;35:21,24,25;36:15,
19,20;37:10,12;41:1;
44:22;45:4,5,15;46:6,9,

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-1 filed 03/29/21 page 84 of 102

15;53:13;54:18;57:11;
60:4,14;61:2,3;65:5;
78:13;82:18;87:18,20;
94:21;95:10,12;96:9;
97:21;98:23;99:6;
100:8;101:16,18,21,25;
102:2,2,13;109:8;
120:6;126:24;131:21;
135:20,23,24;136:4,17,
24,25;137:4,8,13,13;
138:4;148:23;154:12,
15;155:3,14;156:23;
170:16,17,17,20,24,25;
172:9,9,14,15,17,18,
22;174:4;188:6;
189:22;192:4;196:2;
206:2;225:5,6,8;
231:19,22;234:24;
235:15,19;243:12;
250:1,9;256:8;266:6,
16;267:7;277:11;
282:21;291:15,18,19;
292:24;294:20,24

**fit (2)**
254:12,17
**five (21)**
24:2;35:4;74:4;
78:21;85:14;89:2,11;
93:21;100:15,16;
112:16;131:3;138:19,
19;166:7;169:14;
200:6;241:15;258:2;
259:9,11
**five-minute (3)**
73:13;145:15;187:2
**fix (1)**
71:2
**fixed (1)**
72:3
**fixture (1)**
285:12
**flag (5)**
125:2,3;131:6;177:7,
17
**flames (2)**
166:21;181:6
**flash (1)**
211:13
**flashing (1)**
152:1
**flight (2)**
144:24;216:16
**Flood (2)**
86:7,8
**floor (3)**
89:5;91:4;96:22
**floors (1)**
89:2
**focus (2)**
42:2;216:18
**focuses (1)**
42:4
**folded (1)**

202:6
**follow (5)**
26:8;32:20;62:9;
180:6;254:2
**follows (1)**
4:7
**Football (1)**
134:19
**force (9)**
69:5,5;151:13;
264:17,23,25;265:1;
266:22,25
**forced (2)**
31:25;107:3
**forever (1)**
59:25
**forgetting (1)**
29:20
**forgot (4)**
120:17;121:6;
142:12;287:25
**form (5)**
34:25;35:1;69:6;
112:14;272:11
**formal (3)**
27:9;32:13,14
**formalized (2)**
32:14;33:17
**format (1)**
208:12
**former (1)**
9:4
**forms (1)**
34:22
**forth (8)**
34:7;93:14;158:10;
190:5;205:22;215:15;
267:22;274:8
**found (2)**
227:17;260:8
**four (18)**
16:9,10;18:2;20:7;
36:6,9;37:21;71:6;
84:24;89:11;93:20;
100:16;112:16;136:17;
169:14,14;209:3,7
**four-plug (1)**
71:6
**four-way (1)**
71:11
**four-week (1)**
21:23
**foyer (2)**
159:19;203:9
**freak (1)**
101:9
**freeze (7)**
101:10,11;144:24;
145:1,5;216:16;218:11
**freezes (1)**
144:22
**frequency (1)**
90:19

**frequent (4)**
111:19,21;113:19;
117:11
**frequently (12)**
38:13;45:25;52:21;
56:11;68:6;71:20;
83:20;109:18;116:11;
119:2;144:21;145:24
**fresh (1)**
109:16
**Friday (2)**
92:8,12
**friend (2)**
241:20;242:17
**friends (6)**
230:6;240:21;
250:15,16,18,21
**frightened (2)**
217:9,11
**front (82)**
81:8;89:7,8,14,16,17,
17,19,19;90:1,3,4,8,9,
11,22,24;91:2,8,10,14,
17,20,24;92:4;93:7,7;
94:14,18,24;95:7,13,
23,23;97:3;125:2,5;
135:9,16;151:5,13;
153:6,9,12;154:1;
155:25;156:9,15,16,23;
158:23,25;165:22;
166:1;167:17;168:10,
16;173:6,9;187:15;
188:19,22,24;201:5,8,
14,19;202:12,13,13;
203:8,9;206:11;211:5;
233:20;235:11;236:4;
257:10;258:9,21;
291:6;294:9
**frown (1)**
179:14
**frowned (2)**
83:8;116:6
**froze (3)**
218:15,18;285:25
**frustrated (1)**
269:4
**FTOs (1)**
18:18
**full (2)**
7:25;266:6
**fully (3)**
80:2;106:8;110:6
**funny (1)**
265:8
**future (1)**
9:11

## G

**game (2)**
134:18;267:16
**game's (1)**
286:3

**gangs (2)**
58:14,15
**Gann (6)**
242:7,8,8,10,13;
262:3
**Garbage (3)**
13:23;14:6;171:6
**gas (2)**
80:13;283:9
**gate (9)**
93:4,7;94:21;159:21;
200:4;203:4,10,15;
211:1
**gates (2)**
95:8,8
**gather (1)**
259:1
**gave (14)**
13:7;17:11;104:24;
197:10,23;198:5,6;
204:7;210:24;265:8;
266:10;268:5;269:19;
287:17
**general (6)**
72:24,24;73:5;115:7;
146:4;271:8
**generally (3)**
41:12;146:16;240:17
**generates (1)**
48:15
**generation (1)**
260:17
**gentleman (1)**
224:24
**George (1)**
261:23
**gets (12)**
21:1;37:4,6;49:3;
59:13;63:6;104:14;
105:25;131:22;171:12;
206:2;293:3
**girl (1)**
284:3
**girlfriend (1)**
241:9
**given (8)**
15:19;23:16;57:18;
108:24,25;128:16;
218:12;265:6
**gives (1)**
60:7
**giving (11)**
46:18;93:11;130:16;
169:16,20;176:20;
198:22;199:1;223:6;
265:10;269:3
**glass (1)**
286:1
**glasses (1)**
266:18
**goes (16)**
21:20;32:6;41:9,15,
22;81:5;96:23;114:12;

115:19;151:25;154:12;
158:24;177:25;260:18;
265:11;269:3
**go-getters (1)**
254:9
**good (56)**
15:5;21:18,19;26:19;
27:20;29:23;30:6;
34:16;50:25;62:24,24;
64:24;67:4,4;79:23;
96:1;107:7;109:20;
123:19;142:23;172:24;
177:24;193:9;218:6;
240:15;242:4,12,19;
243:6,15;244:7,12;
245:10,13,25;249:11,
14,25;250:12;251:5,9,
12,12;252:1,2,12,14,
16;254:22,24;256:12;
267:16;288:14;289:7,
24,25
**grab (8)**
50:12,14;96:2;
100:24;157:9;173:15;
187:11;189:7
**grabbed (10)**
156:7;157:12;
165:14,17;169:7,8,10;
176:23;187:24,25
**grabbing (1)**
162:2
**grading (1)**
143:10
**graduate (2)**
11:5,7
**graduated (2)**
13:15,17
**gray (1)**
207:19
**great (5)**
90:25;172:24;233:6;
249:13;251:25
**green (1)**
110:13
**grievances (1)**
275:22
**Griffin (2)**
213:2;244:24
**ground (7)**
37:16;89:4;91:4;
96:22;162:21;255:2;
286:1
**group (5)**
33:24;36:5;59:20;
141:22,23
**groups (3)**
36:3;58:14;59:1
**guaranteed (1)**
15:6
**guess (2)**
197:8;211:17
**gurney (5)**
158:16;159:5;202:5,

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 85 of 102

6,21

**guts (1)**
145:4

**guy (15)**
50:1;51:23;102:12;
106:14;130:16;131:21;
138:23;233:25;245:22;
268:9;269:25,25;
270:2,2;289:14

**guys (23)**
32:3;49:25;59:24;
60:3,13;70:8,20;73:12;
86:23,25;87:2;120:10;
132:8;134:23;137:2;
139:18;170:2;171:13;
188:6;191:7;216:8;
232:23;258:21

**guy's (1)**
138:24

**gym (2)**
249:9,10

## H

**half (31)**
8:13;20:24;21:7;
25:4;28:13,19;35:5;
54:10;77:18;86:21;
87:3;90:13,16;119:3,6,
7;123:16,17,20;
125:15;136:7;157:20;
212:23;213:21;214:12;
246:19;268:14;282:17;
287:1;289:5,6

**half-hour (1)**
119:4

**hall (10)**
18:12,13;42:19;
62:10;159:5,7,18;
202:22,23;211:1

**hand (22)**
59:13;65:13;102:8;
103:23;144:9;147:18;
165:19;169:12;172:17;
173:19,20;175:5;
188:21;200:17;201:3;
204:10;209:10;216:18;
219:16;263:18;270:1;
271:21

**handbook (2)**
129:11,12

**handcuffs (2)**
44:13,13

**handful (4)**
8:11;57:16;114:5;
134:22

**handle (11)**
22:20;29:24;36:12,
15;62:22;170:18,18,
20;171:11;172:18,19

**handling (1)**
171:13

**hands (7)**

39:13;107:13;
157:13,13;189:9,9;
217:19

**hands-on (3)**
25:24,25;39:14

**handy (1)**
151:16

**hang (1)**
34:17

**hanging (11)**
37:16;39:5;100:11;
101:8;121:14;122:25;
145:4;180:4;184:13;
185:1;286:17

**happen (40)**
17:1;22:20;52:8,10,
22;57:16,19;65:22;
71:20;75:16;98:5,19;
101:5,11;106:14;
115:22;116:11;117:15,
16;122:24;125:15,16;
127:15,16,17;137:10;
145:1,9;153:11;
180:11;186:2,14;
213:13,14;214:19,22;
237:1;246:18;284:17;
289:13

**happened (45)**
24:22;47:25;56:1;
57:10;87:23;101:3;
106:3;112:15;115:15;
117:1;144:18,21;
159:15;175:23;180:19;
186:20;201:10;215:1;
216:1;222:3,6,9,19;
224:9;227:10,10;
228:20;229:10;230:20;
243:11;246:4;255:24;
258:23;259:4;260:25;
261:7,18;262:12,14;
263:1;264:15,19;
265:5;271:4,7

**happening (33)**
19:23;23:13;45:1;
46:23;47:10;54:6;56:2,
6;57:17,22,24;68:6;
79:5;97:18;106:5,10,
14;111:17;130:19,22;
140:4;142:6;177:15;
181:6;192:24;198:22;
217:23;226:13;236:20;
259:7;285:21,22;292:9

**happens (19)**
36:5;46:16,21;58:18;
62:3;63:1;68:22,25;
82:24;87:2;91:6;
105:20;115:15;126:8;
151:12;153:19;183:7;
236:23;280:20

**hard (4)**
75:9;108:3;130:16;
242:3

**harder (1)**

140:20

**harm (3)**
26:18;28:17;123:14

**harming (3)**
31:17,18,20

**hate (10)**
36:10;67:13;95:21;
127:10,25;146:23;
217:16;236:25;253:21;
254:7

**head (4)**
20:25;178:24;
282:25;286:2

**headphones (1)**
51:23

**health (5)**
7:20;60:17,22,24;
122:20

**hear (70)**
17:1;47:1;50:6,7;
51:19,24;90:12,14;
97:8;108:16;114:4,6,7,
10,22,23;115:10,18;
128:10;130:24,25;
131:1,4,7,9,10,14,16,
24,25;132:2,7,21;
133:10,12,15,22;
134:22,23;135:25;
140:2,5;150:2,6;152:1,
18;155:14;157:23;
158:4,7,7,10;160:23,
24;173:16;190:18,18;
197:1,2;204:2;211:23;
219:9;232:3,9,11,12;
244:14,15;247:15;
286:5

**heard (27)**
15:5;96:20;97:6;
111:17;113:16;114:13;
115:20,21;136:3,7;
155:11;173:5,10,11;
181:19;183:22;194:17;
195:11,25;196:14;
197:5,13;201:16;
239:23;240:19;247:24;
286:2

**hearing (3)**
112:9;193:7,12

**hears (3)**
90:13,23;133:19

**heart (1)**
233:20

**heater's (1)**
31:8

**Heather (1)**
10:9

**heighten (1)**
141:14

**held (7)**
16:20;17:4;89:6;
220:21,22;259:9;292:7

**hello (1)**
109:4

**help (93)**
18:11;20:1,1;45:3,7;
52:5;62:6;65:1,12;
66:9;79:7;84:24;85:24;
89:20;90:21;95:21;
102:8,15;111:6;114:6,
22;115:8,10,18;116:8,
22;118:4;123:24;
128:25,25;129:3,24,25,
25;130:1,8,21,23;
131:9,19,23;132:13,22;
133:9,13,23,25;141:14;
157:5,5,21,21;159:3;
169:18;170:22;173:2,
3,5,17,17;180:13;
206:23;215:14,20,24;
216:9,22;226:21;
227:12;235:3;253:22,
24;255:9;258:8,21;
270:3;291:12,21;
292:1,2,14,18,21;
293:3,3,4,10,14,19,25;
294:6,16,22

**helped (1)**
255:3

**helpful (3)**
141:7;143:21,24

**helping (4)**
18:10;65:16;101:21;
287:12

**Help's (1)**
97:11

**HEPPELL (1)**
240:3

**herein (1)**
4:6

**herself (4)**
178:6,8;179:12;
256:7

**hesitate (1)**
246:12

**hesitated (1)**
245:16

**Hey (59)**
50:9;51:19;52:13;
60:3,13;61:25;65:4,8,
11;66:16;75:22;76:5;
90:21;102:3,24;103:2;
104:17,19;109:1;
111:3;114:14;115:8;
116:2;118:23;120:10;
122:18;123:8;128:19,
23;129:25;130:3,8;
131:8,22;135:14;
137:1;138:12,22;
140:24;142:23;157:15;
158:2,22;177:20;
180:8,15;181:15;
191:5;202:11;216:8,
10;226:3;247:9;
250:21;254:10;280:21,
24;284:14;289:25

**hid (1)**

177:25

**high (9)**
11:5,9,10;13:15,17;
85:14;214:11;236:2;
274:7

**himself (2)**
132:2;238:16

**hinder (1)**
85:21

**hip (2)**
104:16,23

**hired (5)**
33:9;241:14;248:18,
19;260:6

**hit (2)**
94:21;249:10

**hitting (1)**
156:19

**hobbies (1)**
240:21

**hoc (1)**
32:16

**hold (3)**
48:25;165:6;273:2

**holding (1)**
116:7

**holds (1)**
213:2

**holiday (1)**
31:24

**home (7)**
32:1;55:14;142:12;
259:16,18,19,21

**homes (1)**
14:15

**honestly (3)**
7:17,21;194:12

**hook (1)**
132:9

**hopefully (1)**
109:16

**hose (2)**
85:16;201:23

**hoses (1)**
171:16

**hospital (6)**
234:1;260:19;281:2,
7,12,18

**hostage (1)**
39:9

**hot (7)**
50:15,20;51:3,4;
70:14;71:8;157:12

**hour (21)**
8:13;28:13,19;55:18;
77:18;109:8;119:3,6,7;
123:16,18,20;125:15;
246:19;282:17;287:1;
288:9;289:6,6,15,16

**hours (6)**
89:18;109:22;
110:14;208:16;221:10;
271:16

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 86 of 102

**house (203)**
15:4;18:9,14,20,21;
19:1,5,10,16,17,20;
23:13,16,17,19,19,21,
24,25;24:3,17,21;
27:17,19;31:2,3,6,9,15;
42:10;51:8,13;52:4,15;
54:18;55:22;56:2;58:3;
60:11;61:23;62:14,15;
63:4,22;64:2,5,7,9,11,
17;65:5;66:21,22;
69:24;78:22;79:12,14;
80:3;84:23;85:16;
86:25;87:2,16,18,21;
89:25;93:25;94:3;
95:14,15;97:9,10;99:7;
101:15;102:19;105:10,
18,24;106:5;107:5,15,
15,19;115:1;117:14;
124:17,19;132:20;
135:3,4,5;137:12;
146:6;148:1,4,7;
150:10;152:5,7,12,12;
153:4;154:20,24,25;
155:25;156:16;158:3,
12,16,17,19;159:8,9,
10,20;160:2,12,15,18,
22;161:3,4,18,25;
162:5,25;163:1,4,5,6;
165:12;166:15;169:22;
173:4;174:13;184:2,8;
187:10;191:7;192:3,4,
16;193:8,14;194:6;
195:2;198:8;201:17;
202:24;203:9,14,24;
206:16;207:2,8,9,10,
17;213:11,16;214:4,6;
216:4;222:3;223:5;
224:25;227:6;234:7;
235:5,11;239:10;
250:3;252:16,19;
253:15;254:23;257:17,
20;261:15;276:22;
277:1;278:12;279:3;
280:9,22,23;281:2,3,
11;283:18;284:1,8,10,
11,13,16,19;286:20;
288:25;290:13;291:9,
21
**houses (10)**
24:11;59:18,19;68:2;
85:14;94:14;134:15;
138:22;152:19;281:3
**house's (2)**
281:20;282:11
**housing (1)**
72:24
**HR (2)**
13:5;49:3
**hurt (15)**
21:17;26:17,20,20;
37:10;58:2;124:3;
128:12;141:13;173:3;

217:20,21;261:13;
287:21,23
**hurting (2)**
184:12;286:17
**hypothetically (13)**
37:5;44:24;57:13;
68:24;88:7;92:7;96:21;
100:1;118:19;126:22;
213:8;278:16;285:4

**I**

**IA (10)**
57:18;59:10;120:6,7;
229:5;230:23;276:10,
17,21;277:11
**IA's (1)**
220:22
**ID (1)**
126:4
**idea (20)**
91:18;133:7;174:14;
178:18;191:8;192:7;
196:19;208:5;210:2;
218:15;228:23,24;
230:21;234:18;239:3;
241:10;269:20,23;
273:16;286:5
**identification (9)**
124:6;147:21;175:9;
204:13;209:13;219:19;
263:21;265:20;272:2
**identified (1)**
211:7
**IDOC (15)**
9:5;12:5,12;13:9,16;
15:1;30:24;35:11;53:9;
175:3;185:6;221:22;
225:21;230:23;238:6
**IDOC's (2)**
270:18,20
**illegal (1)**
78:7
**immediately (2)**
162:8;283:5
**impact (1)**
117:13
**impacted (1)**
117:9
**impairment (1)**
31:14
**impede (1)**
7:16
**implement (1)**
58:24
**importance (2)**
287:9,13
**important (15)**
6:17,21;84:11,15,16;
121:8;123:9,10;127:8;
214:5;283:1,12,12;
286:21,23
**impression (2)**

217:9,11
**improper (1)**
225:21
**improvement (14)**
23:3;27:14;33:4,22;
34:1,2;48:20;49:1;
73:22;75:14,18,21;
76:12;272:8
**inaccurate (1)**
199:10
**inadequate (1)**
145:8
**inappropriate (2)**
179:10;283:25
**incarcerated (2)**
17:2,3
**incident (21)**
48:7,7,8;68:21,22;
69:7;74:17;78:1,14;
95:17;175:7;205:21;
243:10;258:17,20,23;
259:4;264:3,9;266:1,
25
**incidents (2)**
275:9,11
**in-classroom (1)**
39:12
**inclement (1)**
39:1
**include (4)**
11:24;18:6;81:13;
146:1
**included (1)**
18:7
**includes (1)**
287:8
**including (2)**
117:19;144:18
**inconsistent (4)**
266:10;267:9;
268:24;269:19
**incorrect (1)**
199:8
**increase (3)**
106:4,11;108:4
**increased (1)**
171:24
**independent (7)**
192:23;193:6,11;
194:22;195:14;196:13,
16
**Indiana (26)**
9:9;11:12;14:7;
15:23;16:3;18:5;19:18;
23:17,25;41:15;43:1;
82:3;85:11;90:2;112:2,
3;127:19;151:20;
182:3;186:15;214:10;
217:14;244:3;256:23;
260:5;261:15
**Indianapolis (2)**
244:2;259:23
**indicate (1)**

207:21
**indicated (1)**
205:12
**indicating (2)**
159:22;192:12
**individual (5)**
23:8;54:25;95:8;
113:1;118:5
**individuals (13)**
23:9;73:25;74:13;
98:22;108:20;145:21;
147:6;221:22;222:2;
264:22;268:1;283:25;
289:19
**inexperienced (1)**
66:20
**information (15)**
57:18;69:15;81:14;
83:17;160:3;182:6;
222:8;226:9;230:20;
252:22;253:3;257:3,4,
9;259:1
**initial (5)**
21:23;27:10;87:16;
138:21;178:21
**initially (4)**
82:17;161:8;201:5;
291:6
**initiative (2)**
75:23;142:21
**injured (1)**
37:12
**injuries (1)**
142:17
**inmate (21)**
49:8;51:10;70:25;
71:17,22,23;78:8;
98:13;101:8;122:9,9,
22;124:1;128:2;
130:11;132:24;180:13;
190:10;238:15;271:1;
281:2
**inmates (32)**
18:12,13;19:25;20:2;
22:18;24:1;37:11,15,
18;49:20;51:14;54:4;
69:1;72:8;82:10;
120:22;135:2;151:8;
160:24;184:4,20;
186:1,3,9;190:9;232:6;
233:23;257:20;270:23;
271:14;285:5;289:14
**inmate's (1)**
122:19
**innocent (1)**
144:15
**in-service (6)**
44:2,15;45:16,17;
98:25;274:1
**inside (36)**
28:18;31:15,16;45:1;
54:18;55:21;71:12;
72:4;85:15;89:20;

94:13;95:3,4;100:17;
107:5;124:1;133:4,4;
150:2;156:21;160:23;
162:7;173:18;180:10;
216:19;235:3,4;
257:20;258:1,5;
268:16;283:19;284:11;
293:11,18;294:12
**inspection (4)**
69:22,23,24;71:24
**instance (3)**
72:1,6;197:13
**instances (2)**
275:14,18
**instead (9)**
6:17;58:19;61:19;
141:8;201:6;215:15;
222:17;226:23;247:3
**instinct (1)**
114:12
**instinctive (1)**
293:9
**institute (1)**
178:22
**instruct (2)**
247:16,24
**instructed (10)**
32:15,17;67:3;96:13,
15;97:24;117:6;
182:14;248:6;280:18
**instruction (3)**
108:23;128:17;
280:19
**instructions (6)**
101:24;102:1,14;
169:17,20;219:2
**instructor (6)**
40:5,6,12,13,16,21
**interactions (1)**
238:22
**intercom (1)**
133:3
**interest (1)**
20:19
**interests (1)**
240:20
**internal (7)**
192:9;209:17;210:1,
5;229:5,17,17
**interrogatories (2)**
8:18;9:2
**interview (9)**
13:10;15:14,16;
192:9;194:11;195:25;
230:24;276:20;277:6
**interviewed (3)**
15:18;264:23;267:10
**interviews (5)**
15:20;59:11;210:19,
22;243:13
**intimidating (1)**
243:20
**into (31)**

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 87 of 102

8:6;37:23;39:7;
49:25;50:24;56:13;
58:17;63:16;65:4;
87:20;92:6;94:19;99:6;
103:17;116:14;120:11;
125:24;203:17,23;
225:22;230:14;233:24;
251:19;252:1;254:12;
261:6,17;270:15;
278:22;279:7;291:4
**investigate (1)**
229:5
**investigated (1)**
276:2
**Investigation (5)**
209:18;225:22;
230:15;258:22,25
**investigator (1)**
229:18
**investigators (1)**
266:11
**involve (1)**
80:1
**involved (13)**
46:20;47:10;49:15;
76:21,22;82:3;137:23;
205:20;215:10;216:15;
223:19;234:15;235:10
**irrelevant (2)**
262:9;265:17
**I's (1)**
245:23
**isolated (1)**
184:24
**ISP (40)**
10:1,14,19;40:21;
63:14;68:3,5,13;81:21;
86:10,12;94:5,11;
117:18;140:12;145:21;
175:3;185:6,25;
186:24;213:6;220:23,
24;221:25;240:21;
245:6;247:5;249:17;
252:10,23;255:12;
256:18,19;257:2;
261:24,25;262:1;
264:13;275:22;280:11
**issue (18)**
42:11;87:9;98:1;
107:8;119:16;126:16,
23;129:13;130:1;
190:25;225:25;235:11;
240:18;241:22;263:6,
7;288:11;290:16
**issues (9)**
34:14;68:5;70:1,2,
16,16;85:20;113:23;
240:19

**J**

**James (1)**
10:10

**January (1)**
12:17
**Jason (1)**
245:1
**job (52)**
14:22;15:4,6,6,7;
16:15,17;18:7;26:15;
31:3;40:19;41:11;
64:12,24;67:11,11;
72:20;75:8,9,24;77:22;
104:14;142:10,24;
154:21;172:10,10;
184:24;211:23;227:18;
229:4;242:19;243:15;
245:14;247:4,10;
249:14;251:6;252:13,
15,17;254:10,22;
256:12,13;260:22;
291:12,14;292:15,16,
17,20
**jobs (2)**
11:25;204:22
**Joshua (6)**
4:13;173:5;185:5;
190:1;238:13;239:5
**Joshua's (1)**
185:22
**judgment (5)**
104:9;128:9,10;
130:17,17
**July (1)**
5:14
**justification (2)**
123:2,4
**justify (1)**
120:25
**Justin (3)**
252:8;254:12;255:16

**K**

**keep (17)**
24:15;46:15;53:3;
57:4;103:4;117:3;
118:9,13;127:6;135:1;
151:12,16;249:16;
251:3;252:3;283:9;
289:23
**keeping (1)**
293:15
**keeps (1)**
89:15
**Kelly (2)**
257:6,8
**Kenneth (1)**
242:7
**kept (14)**
48:17,21,23;57:1;
81:24;82:5,9,12;83:9;
94:13;153:4;188:17;
280:4,5
**key (68)**
70:23;78:23;89:6,6,

7,8,14,16,17,17,19,20;
90:1,3,4,8,9,11,18,24;
91:3,10,14,17,20,25;
92:4,17,25,25;93:2,4,6,
8,9,9,11,12,17,18;
94:14,15;95:13,23;
98:10;135:9,16;
156:15,21;167:20,21,
22,22;188:4;198:2,4,6,
9,22;199:1;200:4,22,
24;204:6,7;231:16;
237:22;291:7
**keyboard (2)**
71:9;132:9
**keyboards (1)**
132:8
**keyed (1)**
93:18
**keying (1)**
114:11
**keys (85)**
79:8,9;88:1;90:18;
93:1,13,14,25;94:4,4,6,
7,12,12,15,22;95:4,4,
11;96:2,3;99:19;
100:10,15,17,19,20,23,
25;102:20,23;103:4,8,
10,11,12,23;104:6,11,
12,15,15,17,19,22;
105:7,14,17,22;108:7;
118:6,18;149:2;
150:10;164:4,4,5,6,9,
10,12,13,14,16,19,22,
25;176:18,21,23;177:2,
14,22,24;187:25;
188:1;197:23,25;
198:1,7;200:17,20,21,
23;210:24
**kick (1)**
202:2
**kids (1)**
15:4
**kind (41)**
7:19;16:16;19:19;
21:11;24:15;37:25;
38:1,22;39:21;42:13;
55:1;59:19;62:10;70:2,
7;71:12;85:21;88:22;
92:13;109:17;113:17;
140:23;142:4;143:7;
144:2;157:1;168:24;
190:16;207:11;208:1;
247:5,13;251:16,18,22;
253:11;254:9;255:2;
265:7;267:22;280:20
**kitchen (5)**
42:15,17,19;206:23;
207:16
**knew (7)**
174:24;188:8;
238:14;250:16;256:19;
262:24;271:10
**knife (2)**

7,8,14,16,17,17,19,20;
90:1,3,4,8,9,11,18,24;
91:3,10,14,17,20,25;
92:4,17,25,25;93:2,4,6,
8,9,9,11,12,17,18;
94:14,15;95:13,23;
98:10;135:9,16;
156:15,21;167:20,21,
22,22;188:4;198:2,4,6,
9,22;199:1;200:4,22,
24;204:6,7;231:16;
237:22;291:7
**keyboard (2)**
71:9;132:9
**keyboards (1)**
132:8
**keyed (1)**
93:18
**keying (1)**
114:11
**keys (85)**
79:8,9;88:1;90:18;
93:1,13,14,25;94:4,4,6,
7,12,12,15,22;95:4,4,
11;96:2,3;99:19;
100:10,15,17,19,20,23,
25;102:20,23;103:4,8,
10,11,12,23;104:6,11,
12,15,15,17,19,22;
105:7,14,17,22;108:7;
118:6,18;149:2;
150:10;164:4,4,5,6,9,
10,12,13,14,16,19,22,
25;176:18,21,23;177:2,
14,22,24;187:25;
188:1;197:23,25;
198:1,7;200:17,20,21,
23;210:24
**kick (1)**
202:2
**kids (1)**
15:4
**kind (41)**
7:19;16:16;19:19;
21:11;24:15;37:25;
38:1,22;39:21;42:13;
55:1;59:19;62:10;70:2,
7;71:12;85:21;88:22;
92:13;109:17;113:17;
140:23;142:4;143:7;
144:2;157:1;168:24;
190:16;207:11;208:1;
247:5,13;251:16,18,22;
253:11;254:9;255:2;
265:7;267:22;280:20
**kitchen (5)**
42:15,17,19;206:23;
207:16
**knew (7)**
174:24;188:8;
238:14;250:16;256:19;
262:24;271:10
**knife (2)**

37:16;50:1
**knock (2)**
116:15;241:24
**knowing (3)**
81:3;114:17;292:8
**knowingly (1)**
292:8
**knowledge (4)**
66:9,12;140:9;
238:15
**known (1)**
238:18
**knows (2)**
52:9;270:22

**L**

**laborer (2)**
11:23;12:19
**lack (2)**
270:18,20
**lacking (2)**
75:12,13
**laid (2)**
202:6;243:19
**large (2)**
178:9;211:12
**last (23)**
16:6;40:20;53:21;
57:6;59:23,24;109:21;
117:1;156:10,11,12;
168:21,22;176:11;
205:2;208:6;212:11;
236:11;241:15;251:10;
272:13,23;282:17
**lasted (1)**
221:9
**lasts (3)**
18:1;109:16;110:13
**late (6)**
121:21,25;186:19;
287:24;288:5,6
**later (2)**
65:12;249:1
**latest (1)**
119:11
**laundry (1)**
186:19
**laws (2)**
16:19,21
**lay (1)**
263:10
**lazy (1)**
119:20
**lead (10)**
18:21,23;19:1;27:3,
8;64:1,21,22;65:3;
79:17
**leader (5)**
205:10;225:5,9;
236:8,8
**leaders (1)**
59:11

**Leadership (1)**
30:5
**leading (1)**
75:13
**leaking (1)**
285:9
**learn (3)**
32:22;142:10;175:1
**learned (3)**
76:4;178:4;267:7
**learning (3)**
17:22;30:17;34:17
**least (9)**
28:14,14;46:22;73:1;
107:13;177:11;202:1;
214:6;283:12
**leave (19)**
12:4;51:17,22;100:5,
7,12,13,14;105:9;
122:15,24;160:17;
219:2;272:17,19;
283:17;284:7,9,15
**leaves (1)**
103:15
**leaving (4)**
12:6,20;13:24;14:19
**left (23)**
12:5,12;13:9,19,19,
20;14:10,17;67:10;
68:16,17;78:25;90:15;
110:13;159:6;160:9;
206:9;208:7;249:17;
256:20;283:23;284:13;
286:12
**less (29)**
14:9;19:17;24:3,10;
26:13;29:16,22;30:2,
16;31:20,22;39:2;
44:11;53:24;54:1;
57:23;72:3;76:11;
165:24;188:16;205:21;
206:13;208:2;222:13;
246:16,19,19;255:16,
19
**lesson (1)**
32:13
**lethal (1)**
274:9
**letter (3)**
263:25;264:3;270:24
**letting (3)**
72:20;138:22;247:3
**level (6)**
65:18;91:24;92:3,25;
162:22;165:23
**levels (1)**
92:6
**liar (2)**
267:23,24
**lie (5)**
6:12;26:25;267:25;
268:1,4
**lieutenant (103)**

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 88 of 102

18:20;21:7,8,18;
24:5,6,6,15;29:1,4,8,
14,15,17;30:8,20;31:4,
10;32:15,25;33:15;
35:3,4;36:7;40:18,23;
53:18,20,21;54:14;
55:16,17;56:17;61:6,
24;62:4;65:10;66:21,
24;67:5,8,10;68:19;
69:11,13;73:2,18;
76:17;78:15;79:15,15;
83:1,25;111:20;
116:14;120:5,24;
149:22;155:24;158:22;
163:8,10;166:25;
174:3;176:13,16,17;
180:25;181:10,10;
183:10;196:22;197:10,
25;198:1,4;204:23,25;
205:1;206:4,9,13;
209:1;210:23;222:21;
229:9;235:6,8,9;236:3;
242:12;248:18,25;
249:2;250:6;251:14;
257:12;258:12;264:21;
266:10,21;287:11;
288:21

**lieutenants (22)**
21:9,24;26:10;30:13,
14;34:1,2;56:21;67:5;
69:21;72:17;74:3;82:6;
86:16;120:10;206:1,7;
208:13,24;225:7;
235:1;289:22

**life (12)**
86:2;144:14,14,15;
171:19;180:8,21;
217:16,18;218:8;
227:4;230:5

**lifeline (1)**
108:10

**light (3)**
211:13;283:8;285:12

**lights (6)**
28:2;132:10;257:19,
22;261:19,20

**liked (1)**
215:11

**likely (4)**
217:10,11;255:16,19

**line (15)**
20:25;59:21;85:17;
111:23;112:23;176:11;
207:22,23,24;210:11;
265:17;266:9;293:17;
294:16,17

**lines (2)**
6:21;117:24

**list (3)**
32:14,24;220:9

**listening (1)**
113:9

**literally (1)**

203:16

**litigation (1)**
9:6

**little (27)**
14:9;16:11;23:11;
26:9;40:9;60:7;64:13;
110:18,19;112:24;
117:8;139:5;141:2;
166:6,7;176:14;
185:16;246:13;247:8,
14;250:23;253:23;
256:7;264:18;270:24;
288:5,13

**live (3)**
9:8,9;253:25

**lives (3)**
51:11;86:2;225:15

**living (1)**
121:13

**loading (1)**
12:1

**location (8)**
46:19;278:4,5,21,25;
279:8;280:24;281:12

**lock (31)**
55:3,11;58:3;70:16,
16,21,22;71:2;94:15,
16;95:4,5;103:11,18;
104:12;105:7,15;
107:11;108:1;151:12;
156:22,23;157:1;
246:4,12,20,21,22;
260:22,23,24

**lockdown (6)**
28:2;57:15,16,21;
107:12;150:23

**locked (14)**
55:4;73:3;104:4;
149:25;150:16,18,23;
151:4;198:10;258:5;
261:11;286:9,10,11

**locking (3)**
18:9;246:2,6

**lock-out (1)**
50:2

**locks (6)**
70:17,18,19;92:21;
93:18;156:17

**lock-up (3)**
72:22,25;186:4

**log (2)**
279:17,20

**logistics (1)**
16:19

**logs (1)**
278:12

**long (29)**
8:12;14:8;16:6;25:2;
28:20;35:2,24;47:11;
57:5;75:9;109:6;
138:15;165:20,21;
170:6;204:4;213:7;
221:8;242:23;243:1;

245:6;252:18,18,23;
255:11,15;283:2;
288:3;293:13

**longer (3)**
17:14;33:18;60:8

**look (15)**
56:2;58:17;61:25;
63:13;83:12,16;176:8;
203:16;212:19;219:23;
224:11,12;276:10;
277:11;289:24

**looked (3)**
83:20;156:10;239:17

**looking (5)**
66:22;83:2;130:10;
176:8;286:18

**looks (4)**
124:24;125:4;212:8;
273:4

**lose (2)**
15:7;227:3

**losing (1)**
86:2

**lost (4)**
13:3;230:5;257:15,
21

**lot (46)**
16:19;20:21;26:5;
32:3;44:10;54:1,5;
59:22;61:17;62:25;
65:22,22;70:19;84:1;
85:20,20;86:13;106:3;
115:6,16;120:15,15;
133:16;134:21;150:7;
151:11;157:17;166:13;
224:10,10;232:21;
239:7,7,8;245:18,25;
247:1;250:4,4,10;
256:16;258:18;271:4,
8;274:7;289:4

**loud (7)**
132:11;134:18;
152:18;157:22;158:16,
20;161:1

**louder (1)**
176:14

**low (1)**
86:3

**lunch (2)**
18:11;105:6

**lunchtime (1)**
62:8

## M

**ma'am (226)**
4:3;6:11,14,20;7:6,
14,18,23;8:1,4,19,22;
9:7,12,14,24;10:2,4,15,
20,22,24;11:1,3,6,15,
17;12:9;15:15,21;
16:10;17:7,20;19:8;
20:18;22:11;23:1,6,10;

24:19;27:12;29:16;
30:11;32:23;33:5,7,16;
35:1,13,23;40:3;41:5,
21,24;43:18,21;44:7;
53:8,11;54:13,15;
56:14,25;57:2;58:10;
61:5,14;68:17;73:11;
78:10;80:4,6;81:18,22;
87:14;88:17;89:8;
91:18;92:1,19;94:2;
95:15;98:24;99:9,13,
13,18,18;102:17;
113:21;118:7,12,15;
124:12,16;125:7,10;
127:16;133:14,18;
134:14;135:5,10,19;
136:13,16,19;137:7,7;
139:23;140:10;143:22;
146:15,18;147:8,17;
148:5,12,15;149:20;
150:12;151:18;152:13;
155:19;159:13;170:5;
171:1,23;174:25;
175:4,18,24;178:8;
182:9,12,18,21,24;
183:21;184:9;185:24;
186:1,13,25;187:16;
188:11,13;191:13;
192:10,25;193:17,21;
194:13,21,24;195:5,7,
16,21;196:4,12;
197:19;198:25;199:6,
17,20;203:2,25;205:1,
11;208:21;209:22;
210:15;211:4,11;
212:7,16,21;218:25;
219:4,8,12,15;220:5,
12,20,24;224:15;229:3,
12,22;230:25;231:10,
16;233:9;237:19,23;
238:1,4,12;239:3;
240:22;241:7,12,19;
242:16;243:5;248:16;
249:21;251:4;252:4,7;
256:20;262:2;264:5,
11;273:13;274:16;
275:13,17,20;276:24;
280:7;282:9;295:1,1

**mad (2)**
186:3,16

**main (3)**
147:9;189:20;285:10

**Mainly (3)**
55:10,12;167:23

**maintain (1)**
138:10

**maintenance (7)**
11:25;31:4;70:1,3,7;
71:1;72:13

**major (24)**
69:18;74:19,20,24;
85:19;91:22;120:8,9;
147:12,13;186:21;

222:24;242:9;245:7,
17,19,25;246:5;247:10,
10,13;260:19;288:16;
289:22

**majority (3)**
51:21;85:13;157:3

**majors (3)**
245:20;246:2,11

**major's (3)**
279:23;280:3,3

**makes (7)**
67:8;108:3;112:7;
143:4;192:2;214:17;
233:23

**makeshift (1)**
71:10

**making (21)**
26:3;27:25;28:11,16;
32:9;46:17;47:12,17;
83:2;107:25;147:10;
149:7;205:22;237:13;
253:5;285:18,18,20;
286:9,10,17

**male (7)**
156:5;162:1,14,15,
21,24;163:21

**man (3)**
85:5;118:23;263:15

**management (4)**
60:24;72:21;85:7;
288:15

**manager (2)**
12:2;13:19

**mandatory (1)**
45:19

**manner (2)**
22:17;139:7

**manual (8)**
81:20,23,24;82:1,4;
83:7,17,21

**many (14)**
5:3,24;8:10;15:16;
23:15;40:15;46:19;
74:9;76:16;89:1;
137:22;139:12;237:2;
256:14

**March (6)**
11:21,21;259:5,5,8;
263:25

**mark (3)**
147:19;271:22;
272:25

**marked (14)**
124:6;147:21;175:6,
9;204:11,13;209:11,
13;219:16,19;263:18,
21;265:20;272:2

**mask (2)**
80:13;171:18

**mass (11)**
231:18;234:14;
278:4,5,20,21,24;
279:7,24;280:23;

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 89 of 102

281:11
**materials (5)**
39:15,19;43:22;
182:20,23
**matter (8)**
5:11,16;24:24;64:17;
177:13,17;215:18;
290:18
**may (43)**
23:22;25:14;26:16,
21;27:3,5,5,6;32:3;
40:16;42:10;44:12;
45:10;64:13,19;67:8;
90:20,20;98:12,12;
101:9,10;112:9;
113:11,17;122:9,14;
126:6,16;132:2;145:3;
149:14,15;151:16;
216:8;218:14;230:12,
12;253:23;254:17;
264:24;282:12;288:23
**Maybe (62)**
5:14,25,25;8:13;
16:7;20:23;23:19;
25:14;27:20,20;35:5;
41:2;42:11,15;53:15;
54:9;55:18,18;56:12;
57:7,19;58:16;63:6;
74:5;76:9,10,10,11,14,
15,18,18,20;90:16;
96:1;102:6;109:22,24;
110:17;122:21;126:19;
134:23;138:18,19,20,
20;140:23;141:11;
160:20,20;165:25;
177:20;180:7;187:2;
213:25;215:17;216:8;
217:24;226:13;231:6;
234:8;239:19
**McBride (1)**
262:4
**meals (1)**
18:10
**mean (52)**
14:2;44:22;64:23;
80:16;84:20;97:6;98:5,
6,15;104:15;106:8,20;
108:13;109:5;128:22;
132:11,20;135:22;
140:14,22;141:18,20;
173:2;177:19;181:3;
188:1;190:10;200:12;
203:21;205:8,15;
206:20;207:4,20;
208:4,10;216:5;217:6;
225:10;227:19;230:16;
234:7;235:22;236:6;
245:18;274:4;277:15,
18;280:24;285:24;
287:7;291:22
**meaning (2)**
142:9;267:21
**means (15)**

49:14;75:7;90:17;
121:3;125:15,16;
126:1,6;207:5;211:21;
270:23;277:1,19,20;
278:18
**meant (2)**
82:9;193:19
**media (1)**
10:23
**medical (18)**
7:15;37:18,19,19;
60:22;69:9,10;127:23;
128:11,13;129:18;
130:7,12;132:4;134:8;
159:3;185:17;202:19
**meet (7)**
8:5,7;173:23;273:6,
10,10;275:5
**meeting (12)**
56:20,20;60:21;61:4;
164:21;221:9,11;
222:12;223:1;224:19;
229:14,17
**meetings (8)**
56:18,23,24;57:5;
58:9;60:15,17,25
**meets (1)**
273:1
**Megan (1)**
4:10
**melting (1)**
50:15
**member (1)**
142:18
**members (5)**
42:23;46:24;219:6;
229:24;240:23
**memo (1)**
73:8
**memory (5)**
7:20;8:3;9:1;110:7;
187:9
**Mental (4)**
60:17,21,24;122:20
**mentality (1)**
188:23
**mentioned (6)**
23:11;67:25;68:1;
79:24;142:4;143:19
**merge (1)**
49:13
**message (2)**
131:22;279:9
**met (2)**
173:25;174:5
**mic (2)**
109:4,4
**Michigan (5)**
9:9;11:12;14:11,12;
15:7
**microphone (1)**
114:10
**middle (10)**

16:7;125:1,3,3,6;
193:15;200:4;203:10;
211:9,24
**midnight (1)**
77:19
**midnights (1)**
53:14
**mid-sentence (1)**
197:6
**might (6)**
24:18;62:13;102:9;
124:1;126:15;153:11
**military (1)**
24:13
**mind (2)**
246:2;269:11
**mine (2)**
18:5;90:20
**minimize (2)**
86:14;142:17
**minimum (2)**
142:25;143:1
**minute (7)**
115:20;165:25;
166:9,10,11;175:19;
219:23
**minutes (25)**
8:13;56:23;57:4,7;
77:18;118:20;121:20;
122:1,2,25;123:21;
125:23;138:20,20;
200:7;202:2;258:2,3;
287:19,20,22;288:10;
289:7,8;290:4
**missed (3)**
120:10,16;121:1
**mix (14)**
79:18;101:7;103:22;
114:2;157:4,18;158:4,
25;164:19;167:19;
177:21;201:15;202:8;
257:18
**mode (1)**
21:15
**Monday (1)**
57:13
**money (1)**
14:3
**month (8)**
51:9;52:23;53:4;
63:2;75:4;146:20;
214:14;280:1
**monthly (1)**
69:22
**months (6)**
22:5;112:16,22;
213:9;255:25;256:3
**month's (1)**
52:14
**more (82)**
5:9;12:25;14:3;
19:17;22:4,14;24:10,
12;25:24;26:12,13;

29:16,22;30:1,15;
31:20,22;39:2;40:9;
44:11,21;46:16;53:24;
57:23;62:13;70:11;
72:3;75:23;76:4;84:13;
99:7;105:1;116:1;
121:17;126:2;128:9;
132:25;138:19;139:19,
19;140:15,20;141:2,7,
8,12,22,23;142:1;
143:21,24;150:6,8;
159:11;168:19;183:20;
188:16;194:9;201:24;
205:21;206:12;208:2;
222:13;225:1,13;
226:9;230:19;232:22;
236:15;237:3,4,4,6;
243:19;245:22;246:13;
264:18;270:17;283:1;
286:18;287:19,20
**morning (9)**
55:5;56:19;57:14;
59:5;60:5;77:4;134:19;
206:23;240:15
**most (39)**
17:15;21:22;49:5;
58:6,8;66:23;70:17;
80:12,25;84:14,16;
108:22;117:7,22;
118:3;120:25;121:7,
18;122:15;127:8;
133:10;134:25;142:3;
143:25;153:2;234:13;
236:21;248:1,3,10;
256:11;261:14;283:12;
284:24;287:1,10,15;
288:22;289:21
**mostly (3)**
17:6;147:8;186:8
**mother (1)**
241:2
**motions (1)**
269:6
**move (4)**
9:10;63:12;72:4;
122:21
**moved (2)**
153:13;257:11
**movement (1)**
231:18
**moves (2)**
71:24;97:17
**moving (5)**
34:16;62:17;153:16;
234:13,14
**much (20)**
22:23;30:17;55:15;
66:16;137:15;141:11;
157:8,8;189:16;
195:20;197:2;201:18,
25;203:22;252:11,20;
253:13;254:18;256:6,7
**muffled (1)**

150:8
**multiple (2)**
29:24;34:11
**music (2)**
132:9;134:23
**must (2)**
282:5,9
**myself (16)**
55:10;61:22;142:17;
174:15;180:24;184:22;
185:19;200:24;215:23;
222:20;223:12;224:8;
227:12,24,25;271:5

**N**

**name (21)**
4:10;8:17;40:22;
43:25;48:5,13;60:20;
146:24;206:21;207:22,
23;208:4;220:11;
239:5,6,10,12,18;
240:11;257:5,6
**named (1)**
240:10
**names (2)**
220:9;239:9
**NASCAR (1)**
134:20
**nature (2)**
128:21;144:24
**Neal (3)**
241:13;242:18;262:2
**near (2)**
9:10;188:22
**necessary (3)**
7:12;65:19;232:19
**need (71)**
18:11;22:2;47:13,13,
14,15;52:13;54:6;
55:23;58:17;59:6;62:2,
4;75:19;78:22;79:7,8,
9;83:3;84:1,3,5;85:17;
91:7;99:16;102:9,12;
108:20;109:18;122:20,
21;128:2,6,24;129:25;
130:8,11;131:8,23;
137:1;144:12,12;
157:15;158:9;164:25;
170:9;171:6,8,10;
172:5,6;189:19;191:5;
216:8,10;223:22;
224:13;233:17,19,21;
241:25;246:20;253:23;
255:3,7;258:21;
265:16;267:25;268:4;
269:12;293:10
**needed (13)**
15:3;55:23;74:15,20;
78:17;201:11;233:4;
243:13;258:8;263:16;
283:15;290:4;293:4
**needs (18)**

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 90 of 102

ANTHONY WATSON
October 30, 2019

12:3;22:13;60:23,24;
75:22,23,24;87:24;
107:10;119:11;127:20;
131:18;132:23;140:15;
141:2;229:6;235:3;
286:25
**negate (1)**
106:10
**negative (1)**
76:8
**negligent (2)**
227:21;292:7
**neighborhood (2)**
112:1,2
**neighbors (2)**
51:1;131:16
**neither (1)**
197:9
**new (25)**
21:12;26:2;27:21;
30:18;32:8,15,18,21;
40:7;65:16;110:1,3,10,
15;213:21;214:12;
216:13;217:7,12,22;
218:1;226:14,20;
275:4;287:12
**newer (2)**
180:4;255:24
**news (1)**
122:10
**newspaper (1)**
186:10
**next (21)**
53:19;62:15;118:20;
119:5,11;122:2,5;
123:16;125:11;126:24;
148:13;185:23;190:6,
10;207:6;208:3;
210:16;212:12;232:8;
233:10;282:19
**nice (2)**
79:17;214:8
**nickname (2)**
239:21;240:3
**nicknames (2)**
239:8,9
**niece (2)**
250:18,22
**night (32)**
27:20;28:6;46:14;
53:10,12;56:4;57:11;
64:18;72:17;73:6;77:1;
78:15;109:6,17;117:1;
134:17,22;139:13;
150:17,19,20;151:2;
165:22;174:10;175:23;
198:17;208:19;209:6;
250:7;277:25;283:1,2
**nights (17)**
53:17,22,23,25;54:1,
10;55:25;72:16;74:2;
88:8,9;249:3,3,3;
250:2;251:15;253:11

**nighttime (8)**
54:7;55:24,25;56:5;
88:13;106:25;139:11,
17
**nine (2)**
36:1;289:3
**NLMK (4)**
12:13,15,21;14:22
**Nobody (20)**
28:18;55:9;83:10;
90:23;121:10,13,14;
128:1,25;164:3;
168:12;193:20;211:23;
261:17,17;277:20;
286:2,2,2,17
**nobody's (1)**
127:25
**nodding (1)**
6:18
**noise (5)**
111:9;132:15;
133:16;190:19;191:10
**noises (1)**
193:12
**None (4)**
179:8;190:6;212:8;
216:21
**nor (1)**
197:9
**normal (5)**
34:19;36:15;48:8;
112:19;186:15
**normally (7)**
57:9;58:16,21;59:2,
3;127:13,14
**north (14)**
50:10;81:4,6;93:9;
97:3;124:19;125:2,2;
131:3,6,7;149:19;
161:9;176:19
**note (1)**
58:1
**notes (1)**
220:7
**notice (1)**
33:18
**noticed (1)**
156:25
**not-so-strong (1)**
67:23
**November (3)**
16:5;29:10,11
**Nowatzke (9)**
147:16,17;245:1,2,7,
20,21;246:12;247:15
**null (1)**
80:19
**number (32)**
9:15,20;18:24;26:24;
31:17;59:3;64:14;67:5;
74:8;80:14;83:24;
84:15;85:11,12;
117:23;123:11,12;

127:23;129:17;216:12;
220:2;236:12,14;
247:22;253:16;279:4,
5;285:19,20;286:8;
288:25;293:11
**numerical (1)**
280:4
**nurses (4)**
102:10;159:6,7;
234:1

## O

**oath (1)**
6:10
**object (5)**
9:16;83:1;179:24;
262:8;265:16
**objective (2)**
189:20,22
**obligated (1)**
102:15
**obligation (2)**
101:17,20
**observe (3)**
174:18;217:6,8
**observed (4)**
174:21;218:3;
266:17,22
**occupied (1)**
102:13
**occurred (2)**
178:10;226:22
**occurs (1)**
183:1
**o'clock (19)**
28:3,5;55:9;56:19;
57:20;60:2,13,18;77:1,
4,9,12,13,17;125:19;
126:14;135:1;159:15;
206:22
**October (11)**
4:17,21;124:8;
147:23;175:11;204:15;
209:15;219:21;263:23;
265:22;272:4
**off (37)**
44:13;51:12;57:17;
61:21;70:22;72:1;
73:13;100:6;103:23;
105:25;106:21;108:9;
112:18;116:15;120:6;
145:21;146:8;147:3;
151:12,14,25;152:6,11,
15,21,22,24;157:10;
161:1;165:15;177:23;
201:4;202:9;208:16;
258:4;271:20;282:24
**off-colored (1)**
207:11
**offended (1)**
224:5
**offender (43)**

5:18,20;16:20,25;
17:1;26:17;27:7;28:17;
31:16;39:4;47:15;
52:17;55:20;58:13;
70:19;71:6;103:20;
121:13;123:13,14;
129:11,12,24;130:3,21;
131:6;142:18;153:14;
176:5;184:25;233:19;
235:10;236:1,10;
239:14;255:8;264:20,
23;265:2,5;266:13,23;
286:19
**offenders (49)**
16:20;23:20,22;26:5,
12,25;28:3;32:1;46:6,
19;51:16;55:21;59:4,
22;60:23;64:20;70:10;
71:5;73:3;86:20;
103:16;107:20,21;
129:25;131:18;157:20;
159:10;202:9;223:20;
227:3;234:3,9;235:12;
239:8,17;245:21;
253:25;257:18;260:20;
261:12,12,18;274:7,8;
277:15;281:3;285:20;
286:21;289:5
**offenders' (1)**
286:9
**offender's (2)**
184:12;239:12
**offense (6)**
222:14,15;232:21;
233:2;234:25;267:23
**offer (1)**
15:19
**offhand (2)**
74:5;271:20
**office (52)**
47:21,21;48:18,22;
49:2;54:12,16,21,22,
24,25;55:3,3,11,16,19;
56:13;79:3;81:25;82:5,
8,11;83:10;105:13;
149:19,21,23;150:3,7;
155:23;159:16,17,22;
160:15;198:1,6,23;
199:2,3;200:5;204:7;
210:24;222:23;237:16;
241:24;259:24;279:23;
280:3;283:19;284:10,
15;286:12
**officer (259)**
15:13;16:15;17:14;
18:8,19,21,23;19:2,3,6;
20:6,10,12,15,17,20,
23;21:1,3,11;22:8,9,20;
25:3,19;26:6;27:21;
28:14;33:10;34:13;
35:8;39:8;40:17;41:9,
14;43:20;44:25;45:2,8;
49:8,17,21;54:7;58:2,

13;62:14,19,25;63:1,6,
7,7,16,20;64:2,6,8,10,
23,24;65:2,19,23;
66:20;67:9,9,18,22,23;
70:22;71:18;74:15;
75:22,23,23;78:17,23;
79:8;82:23;87:17,22,
24;88:2,9,12,18;89:1,3,
4;90:7,7,8,9,11,13;
91:24;94:7;98:10;
100:3;101:8;103:13,
15,21;104:6,15,16;
105:4,18,19,20,21;
108:6;114:24;115:7;
118:5;120:16;121:7,
22;122:22;123:19,22;
128:10,19,23;129:13,
14,20;130:8,8,19,22;
132:16;133:9,12,15,19,
22;134:5;135:11,12,13,
13;138:3,25;140:18;
150:9;154:19;156:5,5;
160:2,3;162:1,14,15,
21,24;163:12,21;
172:13,13,14;173:21;
174:5,22,22;176:3;
178:12,22;179:10;
180:5;181:11,21;
182:16;183:20;187:22;
193:25;194:1;197:24;
199:2;202:16,25;
203:1;205:15,17;
208:4;214:17,17,20;
215:12,18,19,20;
216:12,13;217:7,12,22;
218:1,6,12,12;219:10,
10,11;222:21;229:10;
230:10,10,11,17;
242:11;243:25;244:8,
12,15,17;245:9;250:2;
251:9,13,15;252:2,15,
17,18;253:4,7,9,10,14,
18;254:6,16,24;255:17,
19,20,24;256:12;257:3,
12;258:13;264:7;
270:17;274:15;275:6;
277:15;280:21;282:6,
7,7,18,18;283:17,20;
284:16;290:9,10,11
**officers (137)**
16:21;18:11,19;19:4;
20:22,22;21:4,10,12,
13,15,21,24,25;22:25;
23:9,21,23;24:2,4,14,
18,21,25,25;25:14;
27:20,21;28:15;34:5;
36:8,8,9;41:12;51:15;
52:2,4,19;54:9,10;
62:21;68:1;69:1,2,12;
74:2,5,9;78:21,22;
79:18;82:3,7,13,18;
83:14;84:2;87:25;
88:20,23,25;89:3,10,

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 91 of 102

24;104:5;105:2,5,19;
107:1,2,5;108:3;
110:20,23,25;119:20;
121:4;130:1;132:18;
134:2;146:16;148:16;
153:24;164:1;167:2;
169:17,21;171:9;
174:12,15,23;182:14;
183:9,10;184:3,11,12,
15;194:18,25;195:2;
207:15;214:12;216:3,
21;217:2;218:20,23;
219:2,7;222:21;
230:16;234:12;236:4;
245:21;246:9;248:22,
23;253:22,23;257:23,
24;261:11;268:23;
277:22;279:19;285:18;
286:23;287:2,12,13;
288:13,21;289:7;
291:9,20;294:24

**officer's (28)**
54:23;55:13;82:10;
103:15,18,21;128:20;
131:5;133:4;148:14,
17,20;149:4,10,11,12;
153:9;160:10;165:13;
203:17;207:22,23;
258:5;261:11;279:20;
282:6,25;290:11

**offices (2)**
55:10,11

**official (7)**
13:6,8;129:6,8,9;
178:15,19

**officially (2)**
274:24;278:9

**often (11)**
34:8;44:4;75:1,3,25;
76:2,6,11;141:8;186:2;
243:9

**OIC (5)**
205:12;206:8,13;
225:10;250:1

**old (5)**
70:18;85:12;86:12;
203:10;208:12

**older (1)**
233:19

**once (71)**
4:22;5:4,25,25;16:1;
21:8;22:5,6;25:23;
28:2;29:5,25;34:10;
41:7,19;44:5;46:2,2,
10;47:11,24;51:9;
56:12;72:18;74:10;
75:4;76:10,14,15;
85:15;87:23;96:24;
106:13;112:15,22;
119:5;137:19;138:8;
139:2;141:9;150:7;
154:19;156:10,24;
157:7;158:12,17;

159:4;161:4,7;164:8;
168:3;173:13;186:3,
14;188:1;191:8;
201:10;202:22;206:15;
214:8;224:15,16;
227:5;232:20;234:24;
235:13;250:5,5;
274:25;279:7

**one (147)**
6:22;17:11;18:24;
25:13,15;26:16,24;
28:14;29:5;31:11,17;
34:18;39:8;40:15;
44:25;46:23;50:1;52:9;
53:22,22;57:3;59:3;
62:14;63:4;64:14,14;
65:24;67:5;72:4;74:24;
76:9,22;78:3;79:18;
80:14;81:12;83:24;
84:15,19;85:11;86:5,5;
89:6,11,12,13;90:3,4,7,
8,19;91:2,16;93:18;
94:3,4;100:4;104:5;
115:7;117:23;119:11;
122:5;123:3,11;
125:11;127:23;129:17;
131:17;134:5,7,11;
137:4;144:25;152:5,
23;156:17,19;161:22;
163:9;164:24;167:20;
168:4;169:8,13,13;
176:22;178:9;180:19;
183:20;187:12;188:3;
190:20,20,23,24;192:6;
198:8;204:21;206:14;
207:8;208:20;213:2,
25;214:6;215:15;
216:3,12;230:16;
231:22;235:1,6,7,25;
236:12,14;239:22;
241:3;247:22;253:16;
254:17;261:13,16;
262:19,22;266:18;
267:5;270:17;273:2,
17;274:5;275:9,10;
276:14;281:1,10,24;
282:23;283:7;284:7,
15;285:19;286:8;
288:25;290:17,20,21;
293:11

**one-day (5)**
265:6,8,10,15;269:3

**ones (14)**
25:15;34:11;35:14;
37:12;51:1;52:12;67:5;
147:9;150:16;167:10;
172:12;188:6;215:10;
217:4

**on-line (2)**
15:11;25:9

**only (50)**
40:13;52:16;55:6;
73:4;82:12;89:6,13;

90:19;91:16;92:17;
93:1;94:2,3,11;101:24;
102:1;105:24;110:7;
113:3;114:4,22;
115:23;123:21;126:8;
127:8;150:19,20;
156:16;163:9;166:17;
167:11;173:3;174:14;
176:2;179:20;181:9;
183:19,24;206:16;
213:15;214:15;215:10;
222:18;239:19;256:25;
272:13,19;273:20;
289:15;290:20

**on-the-job (5)**
18:1;21:23;30:10;
214:16;275:7

**open (54)**
25:10,13;29:4;80:16;
91:8;94:1;95:24;96:9,
10,13,15;98:8;116:22;
134:7;138:12,14;
139:1;150:13,25;
151:5;154:23;156:1,
17,22;158:15;162:5;
167:25;168:13,15;
173:15;181:3;182:21;
184:14;185:2;188:25;
189:10;194:4;197:18,
19;198:6,22;200:5,10;
201:9;202:3,3;203:16;
224:5;247:22;248:8,
12;286:12;291:25;
294:9

**opened (23)**
168:12,25;179:11,
22;181:2;196:8,14,17;
200:4,9,10,11,13,15,16,
22,24;202:17;203:5;
204:6;210:23;211:2,24

**opening (4)**
194:2;200:15;
201:14;244:16

**open-living (1)**
24:12

**opens (2)**
96:22;187:12

**opinion (8)**
141:3,4;143:16;
217:25;223:7;232:4;
243:22;246:17

**opinions (2)**
224:11;261:2

**opposing (2)**
4:17,18

**opposite (3)**
67:19;128:21;149:18

**order (3)**
237:1;263:17;280:4

**orders (14)**
55:22;70:6;145:22;
146:2,3,4,5,5,10,20;
147:1,2,8,11

**ordinary (2)**
123:25;285:22

**others (3)**
26:20;185:20;227:17

**otherwise (1)**
284:7

**ourselves (1)**
170:9

**out (178)**
13:9;17:1;18:12;
20:25;22:7,10,11,13;
28:3,19;36:15;37:16,
24;38:19;42:18,20;
50:1,1;51:14,16,20,20,
25;53:14;55:12,12,22;
58:2;59:10,13;60:6;
62:6,10;65:12,21;66:2,
5,22;69:4,10,17;70:10,
11;71:10,24;73:4;
74:25;75:12;79:2,22;
80:17,20;82:10;84:14;
85:17,24;86:23;92:15;
100:23;101:9;106:24;
110:3,5;114:3;115:18;
118:24;120:9;123:13,
25;127:22;128:13;
129:14;132:10;133:17,
20,23;134:3;137:2,5,
25;138:23,25;139:1;
144:9;145:4;149:10;
151:13;154:8,12,22;
156:9,13,25;157:3,4,
21;158:13,15,17,19;
159:10;166:21;167:25;
168:11;170:4,8,13;
172:17;173:10;181:20;
182:15;183:4,12,23;
184:4;185:7;186:17,
18;188:10,15,24,25;
189:2,18,21,21,24;
190:11;201:1,9,17,18,
21,25;202:4,6,14;
203:14;214:15,20;
215:14;217:12;224:24;
227:5;229:1;234:4,11;
236:6;239:12;247:17;
249:7,8;253:7,7;255:3;
256:2;257:16;258:11;
260:18,21;261:1;
266:13,23;271:16;
272:18,20;273:15,20;
277:15,20;279:9;
285:13,21;289:3,22;
291:5;292:1,2

**outage (2)**
257:13;262:16

**outlet (8)**
71:7,7,13,17,25;72:1,
2,9

**outlets (4)**
71:5,10,21;72:7

**out-of-control (1)**
37:11

**outrage (1)**
257:15

**outside (16)**
121:17;150:5;
170:19;171:12;241:17;
242:14;243:3;244:9;
245:3;249:5,8;250:15,
23;252:5;266:16;
268:11

**outstanding (2)**
29:17,22

**over (64)**
6:7;8:11;9:2;19:3;
23:25;38:24,25,25;
39:2,9,11;42:12;46:5,
18;47:1;48:2;59:17;
62:4,5,6;63:10;65:11;
68:18;69:9,17;76:16;
78:17;82:20;83:23;
88:16;90:16;96:20;
102:3,10,12;103:2;
107:19;115:2,3;
135:25;139:2;154:7,
22;187:15;190:8;
191:14,23;193:8;
197:15;201:15;203:19;
221:5;229:11;232:1;
236:7;242:8,9,25;
258:7;270:2;279:9;
281:2;283:17;286:1

**overheated (1)**
50:20

**overheating (2)**
51:3,4

**overload (2)**
71:7;72:8

**overloads (1)**
71:12

**oversee (2)**
24:7;62:11

**overseeing (2)**
24:8;68:23

**overtime (1)**
55:7

**overwhelming (1)**
217:23

**overzealous (1)**
247:8

**own (5)**
20:3;54:12;66:25;
69:13;70:21

**oxygen (2)**
171:16,17

**P**

**PA (2)**
149:7,8

**package (1)**
110:3

**packet (1)**
259:23

**padlocks (1)**

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 92 of 102

95:8
**Page (18)**
124:22;147:25;
175:13,14;205:3;
208:6;210:9,16;211:6;
212:3,17;266:4,7;
272:13;273:20,22;
276:25;277:11
**pages (1)**
176:9
**panel (1)**
187:15
**panic (2)**
49:22;180:18
**panicked (1)**
177:25
**paper (5)**
130:2;186:9;220:17;
225:10;280:4
**paperwork (1)**
245:22
**paragraph (5)**
210:18,21;212:12,
19;266:6
**part (15)**
17:22;51:5;81:11;
83:24,25;98:25;
134:25;186:24;198:21;
227:20;230:18;233:2;
256:11;272:23;273:11
**participated (4)**
212:25;213:5,16,22
**parties (1)**
47:10
**partner (8)**
103:23;157:11,22;
158:22;189:8;232:7;
241:9;257:24
**partners (1)**
215:10
**partner's (1)**
144:14
**party (2)**
5:8;250:25
**pass (11)**
17:15,18,19;38:21;
140:24;142:7;143:9,
10,10,11;281:18
**passed (1)**
17:10
**past (7)**
8:2;114:1;120:21;
128:5;181:13;212:23;
259:11
**pat (1)**
143:3
**pathogens (1)**
39:3
**patience (2)**
26:22;79:20
**patrol (1)**
19:22
**pay (4)**

38:11;59:6;167:9;
289:14
**paying (1)**
15:5
**Payne (2)**
261:23;262:7
**payroll (3)**
55:20,20,22
**pencil (1)**
245:22
**pending (2)**
5:7;7:13
**people (65)**
15:16,17;17:15,17;
20:8,9;22:3;23:15;
24:3;30:13;36:6;37:21;
38:4;39:7;42:18;45:4;
51:22;52:11;67:12,21;
76:4;83:6;91:9;97:24;
99:5;105:24;106:17,
21;107:9,16,25;108:3;
115:16;116:5,11,21;
117:18;119:16;132:21,
21;137:20;140:22;
142:4,24;143:7,14;
154:8;158:20;183:1;
206:17;207:2;213:15;
215:14;222:18;224:10;
234:14;235:25;247:24;
248:6;250:17;254:9;
268:5;281:17;291:5,14
**people's (2)**
111:19;114:17
**percent (3)**
17:17;51:21;264:8
**perfect (4)**
90:25;91:2;98:15;
214:9
**perform (2)**
28:8;277:23
**performance (7)**
73:19;74:1;76:8;
271:24;272:12;275:16,
19
**performing (1)**
159:6
**period (10)**
27:10;53:16;65:21;
66:3,6;76:10;119:5;
217:13;253:8;256:2
**periodically (1)**
56:8
**periods (1)**
113:19
**permitted (1)**
178:12
**permitting (1)**
136:19
**person (90)**
18:25;20:7;26:7;
55:7;63:23,23;67:14,
17;75:10;76:9;88:16;
89:6,13;90:14;91:2,3,

16,23;92:11,14,17;
93:24;95:22;98:7,7,10;
99:15,19;100:1,4;
102:15,19;103:4,7;
113:1,8,15;122:25;
126:23,25;131:24,24;
134:7,11;135:6,8;
136:9;137:13;138:4,
11,13;143:10;144:19,
22;145:11;177:11,14;
179:20;180:3;183:25;
185:8,23;205:18;
214:3,6;215:15;
216:11,17;235:22,23,
25;236:2;240:17;
242:3,3,11;243:20;
251:21;253:14;261:16;
265:8,10,11;269:3;
278:24;282:23,24;
284:8;290:17,20
**personal (9)**
4:12;9:13,15,20;
141:3,4;143:16;
234:24;293:8
**personally (3)**
143:13;180:22;
238:14
**personnel (1)**
48:23
**persons (1)**
36:10
**person's (2)**
89:5;240:11
**philosophy (3)**
75:5,11;76:2
**phone (21)**
8:11;9:13,15,20,23,
25;56:15;109:11;
116:18;117:24;137:11;
149:5;191:17,19,20;
192:6;257:22;258:11,
14,19;261:7
**physical (2)**
38:20;265:5
**pick (9)**
28:7;65:23,24;75:22;
84:14;112:3,7;270:1,3
**picked (1)**
29:7
**picking (1)**
112:13
**picks (1)**
112:1
**piece (2)**
130:2;225:10
**PIERCE (40)**
4:9,10,16,24;9:22;
73:12,17;124:9;
145:14,19;147:18,24;
175:12;180:1;187:1,6;
192:15;193:5,24;
194:16;195:10,24;
196:7;197:22;198:15;

204:10,16;209:16;
219:22;240:7;262:10;
263:24;265:23;269:15;
272:5;276:5,9,16;
295:2,5
**pike (1)**
290:1
**pinched (1)**
261:17
**pipe (38)**
118:10,13,19,24;
119:21,23;120:6,10,12,
17;121:1,6,19,20,23,
25,25;122:8,8;123:1,
20,24;124:15,16,24;
125:14;126:13;127:10;
285:9;289:1,2,4,12,15,
23,24,25;290:4
**pipeline (1)**
237:15
**pipes (1)**
120:15
**piping (1)**
121:7
**place (16)**
63:2;75:15;86:21,24;
129:5;132:24;133:3;
136:12;197:17;223:6,
9,11;226:13,21;234:18,
20
**placed (6)**
224:6;225:9;227:9,
11,13;228:16
**places (4)**
67:22;85:20;206:15;
235:13
**placing (2)**
223:7;226:2
**plaintiff (1)**
4:11
**plan (13)**
23:3;33:4;49:1;
73:22;75:14,18,21;
76:12;148:1;272:21;
273:12,23;274:20
**planned (3)**
51:8,8;52:16
**planning (1)**
52:11
**plans (11)**
9:10;32:13;33:22;
34:1,2;42:9,10;43:6,6;
48:20;231:20
**plant (1)**
12:2
**plate (1)**
72:1
**play (1)**
267:16
**played (10)**
192:14;193:4,23;
194:15;195:9,23;
196:6;197:21;198:14;

252:19
**playing (3)**
131:19;132:10;
134:23
**please (3)**
7:4;66:19;155:1
**ploy (1)**
39:8
**plug (1)**
71:12
**Plumbing (2)**
70:9,15
**pm (6)**
120:13;134:16;
208:15,18;277:14;
295:7
**point (7)**
81:3;166:22;187:21;
189:11;190:20;207:1;
228:12
**pointing (2)**
224:21;225:4
**points (3)**
148:16,18;229:20
**police (7)**
112:4;266:11;267:8,
11,22;268:23;269:18
**polices (1)**
32:19
**policies (16)**
29:18;30:18,22,24;
40:11;81:19;87:5;
147:5;174:7,9,23;
226:14,20;237:22;
273:17;294:23
**policy (88)**
26:4;30:24;31:21;
32:9;58:7,11;90:2,5;
97:19,23;99:11;
123:11;127:18;132:12,
15,19;136:1;170:11,
23;173:1;174:16;
175:3;178:15,16,17,19;
179:2,7,11,16,19,22;
180:6,9,9,12,20;181:2,
13,17,25;182:2,5,15;
184:7,10;185:6;
225:16,16,17;227:18;
228:2,5,22;229:7;
230:17;231:2;232:13;
233:7;234:16;237:11;
244:14,16;247:16,18,
19,20,21;248:4,6,11;
251:13,19;260:2;
284:6;290:13,14,15,22;
291:20;292:4;293:1,
17,21,22;294:2,16,17
**polite (1)**
240:17
**pop (9)**
73:5;156:14,22;
167:17,23,24;168:5;
169:2;189:7

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 93 of 102

**popped (1)**
157:1
**popping (2)**
169:4;201:13
**popsicle (1)**
71:11
**portion (1)**
272:20
**position (27)**
11:22;15:12,14;22:8;
25:10,11,17;28:21,22;
29:9,13;33:13;35:3,4,
9;40:14;61:19;63:25;
64:21,22;65:3;228:15;
251:16;253:3;257:12;
264:7;271:14
**positions (5)**
25:13;29:4,5,7;40:16
**possible (8)**
22:23;30:17;78:5;
133:7;167:24;194:12;
201:25;265:4
**possibly (5)**
23:21;24:2;214:16;
215:23;278:9
**post (14)**
65:7;100:13;145:21;
146:2,3,4,5,5,10,19;
147:1,2,8,11
**posted (2)**
81:6,7
**posts (1)**
61:17
**pot (6)**
50:15,20;51:3,4;
71:8;140:21
**pounds (1)**
270:2
**poured (2)**
251:18;252:1
**power (14)**
257:13,15,15,21;
258:10,11,14,18;
260:14,17,20,21;261:7;
262:16
**PowerPoint (2)**
44:11;84:13
**practical (3)**
44:8,9;265:12
**practice (17)**
44:8;95:21;96:1;
99:8,14,16,25;104:13;
127:19;129:4;139:9;
184:17;236:23;253:13;
280:16;284:7;287:7
**practiced (1)**
99:9
**practices (1)**
174:8
**practicing (1)**
288:14
**precious (1)**
191:20

**precise (1)**
46:19
**pre-dep (2)**
258:25;259:3
**preferably (1)**
177:10
**preliminaries (1)**
275:5
**preparation (2)**
8:15,23
**prepare (1)**
8:7
**prepared (1)**
254:3
**present (8)**
74:17;182:17;
183:25;184:15;185:8;
220:10,13,15
**presented (2)**
269:1,1
**pressure (1)**
32:4
**pretty (15)**
34:16;62:24;64:24;
68:6;84:7;134:21,22;
238:16;241:16;242:12;
249:4,25;254:22,24;
255:1
**prevent (1)**
226:12
**prevented (1)**
190:2
**primary (2)**
148:6,10
**prior (4)**
26:1;160:17;171:12;
245:20
**prioritize (1)**
121:17
**prison (30)**
14:18;15:5,23;16:3;
18:5;19:19;22:2;23:18;
41:15;43:1;44:18;
51:11;56:15;70:18;
82:4;85:11;90:2;112:2,
3,10;127:19;151:20;
182:3;186:16;214:11;
217:14;244:1,3;
245:19;256:23
**prisoner (8)**
127:19;129:20;
130:18;133:8;183:12;
239:23;271:9,11
**prisoners (11)**
87:6,11;104:4;
128:13,16,18;129:5;
132:18;219:13;240:10;
275:22
**privileged (1)**
9:17
**proactive (1)**
58:18
**probably (26)**

35:6,18;54:9;83:11;
84:21;131:14;138:11,
19;157:22;177:10;
180:5;181:1,1,7;
185:18;189:19;202:10;
213:20,22;215:11;
217:15,17;230:16;
232:4;255:25;264:14
**probation (7)**
22:10,11,13,25;
33:19;274:21,25
**probationary (11)**
23:5,9;33:9,11;
65:21;66:3,5;217:13;
253:8;256:2;274:17
**problem (37)**
22:19;68:1,3,4;
82:21;99:20,23;100:2;
111:19,21;113:22;
114:14;117:12,18;
118:25;119:19;121:21;
129:15;177:14,18;
179:18,19;190:3,4;
213:15,18,19;214:23;
229:3;263:14,14,17;
288:13,16,18,20;
290:23
**problems (6)**
70:7;71:4;113:1;
117:9;239:2;240:9
**procedure (9)**
26:4;174:16;227:18;
228:3,6,23;229:7;
251:19;260:2
**procedures (9)**
29:19,20;30:19,22;
40:11;82:15;84:11;
87:16;226:20
**proceeded (2)**
202:18;259:12
**proceedings (1)**
221:5
**process (12)**
15:9,11;16:1,4;
36:22;38:8;139:5;
158:18;218:8;259:13,
22;277:20
**produced (2)**
210:4;220:7
**production (1)**
12:1
**professional (7)**
16:14;30:3,4;79:19;
142:9;143:5;271:17
**professionalism (2)**
270:18,20
**Profile (1)**
271:24
**program (2)**
16:12;140:11
**programs (2)**
54:5,8
**projects (1)**

57:12
**prolonging (1)**
57:23
**Promise (4)**
176:9,20;177:1;
255:22
**promoted (18)**
20:24;21:2,7;25:3;
29:1,17;53:16,17;
242:10,11;248:20,21,
21,25;249:1;250:6,6;
260:6
**promotion (2)**
25:6;268:2
**proper (1)**
30:1
**properly (10)**
22:16,17;31:8;42:5;
44:12,13;107:14;
109:5,6;144:19
**prosecuted (1)**
17:4
**protect (2)**
142:13;268:4
**protocol (6)**
129:5,10;132:24;
133:2;172:19;175:3
**protocols (1)**
82:14
**provide (2)**
4:19;94:6
**provided (2)**
5:21;267:8
**public (1)**
128:25
**Puetzer (10)**
249:22,23,24,25;
250:3,5,6,11,17;251:7
**Puetzer's (1)**
250:18
**pull (1)**
105:20
**pulled (5)**
72:1;105:21;157:11;
189:8;258:4
**pulling (1)**
266:22
**pulls (1)**
50:1
**punch (3)**
13:4;254:8;270:11
**punched (1)**
234:12
**Punishing (1)**
16:25
**purpose (4)**
220:25;221:3;
230:19;284:22
**push (1)**
283:8
**pushing (2)**
49:21;120:19
**put (62)**

4:14;25:9;36:22;
37:5;44:12;57:15,21;
62:14;67:12,14,17,22;
85:17,24;86:20,21,24;
97:5;100:17,18,19,19;
103:8,11;104:12;
105:7,14;110:5;
132:19;133:3;140:25;
141:1,18;143:14;
154:22;156:21;158:13,
15;159:4;168:11;
170:4,8,12;173:14;
188:10,14,24;189:21;
201:1,20;202:4,20;
215:14;226:20;234:18,
19;251:16;254:6;
257:25;259:10;277:21;
279:9
**puts (1)**
280:3
**putting (13)**
60:3;65:16;66:12,13;
67:21;103:17;156:12,
25;157:4;189:18;
201:18;253:3;266:18
**PVS (2)**
11:19;12:10

## Q

**QRT (53)**
36:4,12,23,25;37:2,
22;38:4,6,9,11,15,22,
24;39:22;40:5,6,10,13,
16,20,24;41:1,18,19,
22;43:17;44:16,17;
45:5,14,23,23;46:23;
47:18,19;49:5;50:3;
51:6,7;79:25,25;81:11,
14;82:18;83:22;141:8,
15;205:6,16,17,19;
236:8;244:5
**qualified (5)**
36:25;37:2;64:1;
85:10;225:8
**quarter (1)**
213:3
**quick (8)**
46:8;116:1,5;166:8;
187:1;205:6,9;276:6
**quickly (2)**
34:17;144:10
**quiet (12)**
132:11;134:15,22;
135:2,3;193:13,18;
203:21;204:2;238:16;
256:6,15
**quite (2)**
62:12;255:9
**quote (2)**
43:4;87:7

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 94 of 102

## R

**race (1)**
134:20
**racial (2)**
13:2,3
**radio (75)**
46:5,18;47:2;62:5;
78:17;79:4;80:25;81:1;
82:20;90:16;96:21;
97:6,11;102:5,20,23;
108:7,9,10,13,15,20;
111:3;112:9;113:2,12,
15,16,17,20;114:3,3;
115:23;116:7,20;
117:3,9,12;118:1,6;
122:16;135:21,25;
136:7,25;138:11;
140:6;154:8;155:4;
158:1,4,6,8,9;190:3,4,
17;191:15,17,18,24;
192:5;197:15;201:15;
232:2;257:22;258:11,
15,19;261:7;279:10;
290:18,21;293:14;
294:7
**radioed (6)**
78:17,24;134:10;
157:14,14;202:11
**radioing (3)**
96:25;158:21,21
**radios (5)**
110:21;111:8,21;
113:22;117:21
**radio's (2)**
90:12;109:8
**raises (1)**
107:8
**ran (10)**
40:4;65:17;156:8;
162:13;163:24;165:15;
176:18;177:20;200:21;
221:11
**randomly (1)**
28:7
**range (137)**
22:15;28:7;45:1;
50:10;71:19;78:18,23,
25;79:1,5;90:7,9,10,12,
13;91:9;92:18,22,24;
93:3,11,13,13,17,17;
94:4;95:7;97:17;98:13;
99:20,22;100:2,6,7,12,
14,18,19,20;101:12,13;
102:25;103:13;104:17,
20;115:9;120:18;
121:4;124:25;125:3;
126:17,17;129:13,14;
130:24,25;131:2,11,13,
20,23;133:16;139:1;
153:6,9,12,21,23;
154:1,25,25;156:3,6,8,

9,10,15,16,18,23;
157:19;161:7,8;
162:13,18,20;163:23;
164:1,6,8,15;165:17;
166:3;167:6,12,17,19;
168:16;173:24,24,25;
174:2,5,6;177:2,3,7,18;
184:21;186:5;201:14;
202:7,8,9,11;212:9;
215:12,13,19;216:4,24;
217:2,4;218:23;219:3;
253:17,17,20,21,25,25;
255:8;258:4,5;277:22;
288:4,7
**ranges (13)**
51:15;87:25;88:19,
20,23;89:1,1,11;92:14;
149:3;164:1;253:23;
257:24
**ranking (1)**
236:2
**rare (1)**
76:2
**rate (2)**
32:6;214:11
**Rather (1)**
282:3
**rattled (2)**
22:21;254:25
**reacting (1)**
174:10
**reactive (1)**
58:19
**read (12)**
43:6;76:5;142:13;
146:19,21,22,24,25;
147:1;176:14;210:21;
231:15
**reading (4)**
83:2;146:2,3;176:1
**Reads (1)**
251:13
**ready (3)**
137:3;187:3;191:8
**real (10)**
46:16;47:2;50:7;
52:20;98:19;116:5;
140:3;216:17;239:9;
256:6
**realize (2)**
113:11;188:14
**realized (1)**
290:12
**really (46)**
19:14;21:18,19;24:9;
26:13,18;28:2;31:13,
25,25;36:9;37:25;
44:19;48:6;49:16;50:2;
55:9;73:8;89:19;92:7;
123:24;141:11,17;
146:22;151:23;181:24;
189:5,6,9;191:6;
193:19;197:2;206:1;

213:8;215:10;234:13;
239:18;244:7;245:20;
249:7;251:9;252:1;
253:24;256:16;280:20;
289:24
**rear (2)**
125:5,8
**reason (43)**
7:24;12:6,20,23;
13:6,8,24;14:19;54:2;
61:18;62:17;77:24;
91:16;92:2,20,24;
93:10,24;94:5;100:17;
103:7;105:4;108:8;
109:15;111:14;120:14;
134:5;151:7;166:17,
20;170:6;173:13;
191:21;192:20;194:20;
199:14;210:14;211:18;
235:23;238:25;257:11;
272:25;273:14
**reasons (2)**
12:8;86:4
**reassigned (3)**
88:12;105:17,22
**rec (2)**
73:4;257:16
**recall (36)**
53:2;83:12;87:8,13,
14;99:3;129:9;139:21,
24;144:17;160:20,21;
164:3;168:4;170:15;
176:20,22;192:18;
193:25;200:24;218:19,
22;219:3;220:19;
228:2,12;231:4,6,9;
234:19;238:9,23;
244:22,24;245:1;
276:20
**receive (7)**
4:23;25:21;27:9;
33:6,18;56:6;264:8
**received (5)**
4:21;39:16;77:5;
259:10,18
**receptive (1)**
58:21
**recharge (1)**
110:12
**recognize (4)**
148:3;175:17;
204:17;239:6
**recognized (1)**
239:4
**recollection (16)**
99:10;155:18;
175:22;183:8;192:24;
193:6,12;194:1,22;
195:14;196:13,16;
198:17;240:13;254:11;
255:14
**recollections (1)**
199:18

**recommend (2)**
77:15;91:19
**recommendation (7)**
74:23;232:18;
233:10,14;234:22;
235:14;236:11
**recommendations (1)**
231:15
**recommended (2)**
77:11;78:4
**record (9)**
4:15;6:19;10:6;
73:13;219:25;277:25;
279:14,16;280:5
**recording (9)**
192:14;193:4,23;
194:15;195:9,23;
196:6;197:21;198:14
**records (4)**
52:25;53:3,6;124:15
**recounting (1)**
126:17
**Redden (31)**
155:24;158:22;
163:8,10,10,15;166:25;
167:21;169:13;174:3,
22;187:22;196:22,24;
197:10;202:16;204:23,
25;205:1;206:4,9,13;
209:1;217:5;222:21;
227:25;229:10;248:17,
18,20;251:14
**reenactment (1)**
237:8
**reengage (3)**
38:2,3,3
**refamiliarize (1)**
146:13
**refer (2)**
27:4;151:17
**referrals (1)**
31:5
**referring (2)**
195:1,3
**reflected (2)**
145:7;182:19
**reflecting (1)**
215:1
**refresh (3)**
175:22;194:1;198:16
**refreshing (1)**
9:1
**regarding (4)**
99:11;220:8;232:14;
237:11
**regardless (1)**
283:14
**regular (7)**
42:7;43:19;56:18;
60:25;63:25;147:7;
254:7
**regularly (1)**
60:16

**regulations (2)**
254:3,25
**reinforcements (1)**
38:2
**reiterate (2)**
97:14;136:10
**related (2)**
56:24;240:9
**relationship (6)**
242:12;243:6;
245:11;249:11,13;
250:12
**relatively (2)**
135:2,3
**relay (1)**
74:19
**relayed (1)**
137:15
**relinquished (2)**
206:13;236:7
**remember (65)**
6:1;40:20;50:3,16;
72:6;73:10;74:5;75:24;
76:21;78:12;87:12;
104:17;155:21,22;
156:4;160:8;161:24,
25;162:1;164:10,12;
165:18;167:4,16;
168:6,9,9,10;169:4,8,
12,16,20;170:1;176:1;
182:7;186:11,21;
187:14,17,19,20;
192:16;194:3,4,5;
198:19,24;199:1,4;
200:9,14,18;216:23;
218:5;221:8,11;
237:17,21,24;238:2;
243:1;254:14,18;
256:17
**reminders (1)**
289:19
**removed (1)**
79:2
**rendered (1)**
74:21
**rendering (1)**
74:25
**re-open (1)**
4:22
**repeat (1)**
154:11
**rephrase (4)**
7:5;151:24;152:2;
153:7
**report (48)**
48:7,9,14,14;69:2,5,
5,7,7,8,8,13,22;72:13,
19;73:6,7;76:25;77:2,
5,10,13,16,23,25;
81:14;105:14;120:6,7;
124:14,16;209:18,25;
210:4;213:2;258:14,
17,20;264:16;271:25;

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 95 of 102

276:10,15,17,18;
277:12;278:10;279:17,
19
**REPORTER (4)**
4:4;6:15,22;176:15
**reports (12)**
47:25;48:6;68:19,21,
24;69:8,17,19;72:14;
73:9;175:7;266:25
**represent (3)**
4:10;210:3;220:6
**representative (1)**
4:12
**represented (1)**
241:4
**reprimanded (4)**
180:14;181:12;
182:8,9
**request (1)**
38:4
**requests (1)**
4:20
**require (4)**
290:13,22,24;291:20
**required (7)**
73:19;145:21;147:6;
292:3,5,5,6
**requirement (2)**
146:17;183:19
**requirements (1)**
75:10
**requires (2)**
290:15,25
**re-read (1)**
175:19
**reserve (1)**
4:22
**respect (1)**
263:12
**respectful (1)**
79:19
**respond (20)**
36:18;44:24;45:4,7;
46:6;95:17;129:20;
132:3,17;136:5;
144:19;145:11;154:13;
155:14;259:25;290:15;
291:10,15;292:6;
294:24
**responded (2)**
155:24;200:7
**responder (16)**
35:21,24,25;44:22;
45:15;61:3;82:18;
96:10;155:4;172:14;
225:5,6,9;235:15;
243:12;250:10
**responders (51)**
36:15,19,20;45:5;
46:6,9,15;61:2;95:10,
12;97:21;98:23;99:6;
100:8;101:16,18,21,25;
102:2,2,13;135:20,23,

24;136:4,18,24,25;
137:4,8;154:13,16;
155:1;170:17,18,20,24;
172:9,9,15,18,19,22;
231:20;234:24;235:19;
291:16,18;292:24;
294:20,24
**responding (4)**
132:13;155:1;
157:10;215:9
**response (10)**
29:19;205:6,9;215:3,
6;237:12;259:21,24,
25;274:6
**responses (1)**
4:19
**responsibilities (1)**
62:23
**responsibility (5)**
24:8,9;154:17;
204:22;226:19
**responsible (14)**
28:10;68:20,23;
69:19,21;72:15;120:4;
146:7;147:10;154:8,
11;246:8,9;260:13
**rest (7)**
57:14;115:19;
158:13;159:9;184:4;
202:8;280:25
**restroom (5)**
104:3,7;108:12;
118:21;284:2
**result (1)**
264:9
**retreat (1)**
37:25
**returned (2)**
35:8;202:23
**review (20)**
8:14;147:3;211:7;
220:1,7,14,16,19,21;
221:1,4;226:10;228:5,
9,13,17;230:19,24;
231:12;238:5
**reviewed (4)**
8:20;210:22;211:1;
212:23
**reviewing (1)**
198:20
**right (69)**
4:22;15:7;27:8;
35:12;47:23;49:23;
54:22;57:19;66:15;
77:8,23;78:23;94:18;
97:7;100:25;107:8;
111:7;115:14;120:12;
124:25;127:7,7,9;
128:2;143:4;148:13;
150:5;155:16;159:19,
20;160:9;162:6;
163:12;165:13;173:21;
176:10;177:16;185:9;

190:10,15,22;200:2;
203:6,8,9,17;204:3;
205:6,12;207:21;
212:9,10;233:20;
235:17,20,20;237:1;
246:14;249:2;256:2;
268:7;271:20;276:14;
279:4;280:10;281:9,
23;284:9;285:5
**rigorous (2)**
40:10;141:7
**ringer (1)**
124:14
**riot (2)**
36:13;37:6
**risk (10)**
86:1,1,2,7,14;91:14;
106:4,11;171:25;
172:20
**risks (3)**
86:6;90:5;108:4
**robberies (1)**
19:23
**Rodriguez (18)**
169:22;195:4;
197:24;199:2;206:17;
218:12;219:10;228:1;
230:11;252:8,11;
254:12,19;255:17,19;
282:6;283:17;290:11
**role (1)**
252:19
**Ron (1)**
241:13
**roof (2)**
14:11,14
**room (6)**
20:4;154:18,19,20;
220:22;257:9
**ropes (1)**
26:3
**roster (8)**
67:6,8,11;204:18,19,
21,23;253:6
**rotate (1)**
92:13
**ROTHENBERG (9)**
9:16;73:14;179:24;
262:8;265:16;269:11;
276:14;295:3,6
**roughed (1)**
261:18
**roughly (1)**
23:19
**round (7)**
120:11;149:3;154:4;
212:5,12;282:21,24
**rounds (15)**
28:14,15;31:10;
72:18,18,21;118:11,12;
119:1,2,10,17,21,23;
285:19
**route (7)**

155:5,6,7,8,12;174:1,
4
**rowdy (2)**
37:10;235:12
**ruckus (1)**
193:20
**rude (1)**
242:3
**Rule (6)**
4:16;31:25;94:9;
182:5,5;260:2
**rule-breaking (1)**
245:21
**rules (6)**
6:7;31:19,23;56:16;
254:2,24
**run (45)**
50:12,13;59:14,18,
18,20,20,22,24;60:4,4,
13;65:17,24;66:6,8;
85:16,17;91:8,10;
98:12,12;100:24,25;
107:9,12,14,15;115:2;
118:19,24;120:12;
121:1;122:8,8;123:1;
128:1;162:20;165:21,
22;167:13,18;191:20;
253:16,20
**running (20)**
24:10;27:24;38:1;
46:8;66:21;67:23;
79:12,20;97:18;
105:24;106:25;162:1,
3;164:2;165:19;166:5;
167:19;168:10;176:23;
177:23
**runnings (1)**
19:1
**runs (3)**
47:3;52:3;257:8
**Ryan (1)**
251:8

**S**

**sad (1)**
236:21
**safe (3)**
38:3;236:23;282:15
**safest (1)**
85:25
**safety (16)**
38:24;39:2;42:1,3,4;
43:1,5,17;58:13,13;
70:2,3;72:5;237:11;
261:12;287:9
**salary (1)**
264:8
**same (53)**
6:21,25;19:6;20:6;
33:14,15;34:25;35:22;
41:4,5,9,23;43:8,14,16;
44:16,19;45:12,15;

53:4,4,25;61:19;63:2,
19;64:12,17,18;71:10;
76:24;90:19;92:14;
93:8,20;115:18;
149:15;190:12;198:2;
201:22;206:5;207:7,8;
208:14;242:18;247:13;
250:17,20;261:8;
267:19;272:11;278:13,
14;284:2
**Sarah (1)**
254:20
**sat (2)**
79:3;261:19
**Saturday (2)**
92:9,12
**save (5)**
171:19;180:21;
215:24;232:6,7
**saw (8)**
69:2;178:3;179:21;
189:15;239:5;268:8,9;
270:10
**saying (19)**
61:16;76:5;83:10;
107:21;109:12;114:4;
128:21;130:11,21,23;
133:22;142:2;157:21;
158:6;190:18;195:11;
213:13;246:14;284:4
**scan (1)**
120:8
**scanner (2)**
112:4,5
**scare (1)**
270:15
**scared (5)**
216:12;227:3;234:5;
293:11,12
**scene (7)**
37:7;47:14;205:22;
222:19,20,20;291:19
**scheduling (1)**
136:19
**school (6)**
11:5,9;13:15,17;
54:4;250:20
**schools (1)**
14:15
**scratch (6)**
42:23;92:16;174:8;
193:8;256:22;269:16
**screaming (6)**
158:20;190:9,11;
193:20;232:6;286:4
**searches (1)**
18:10
**second (9)**
78:20;79:21;156:11;
168:21;205:2;210:18;
212:19,21;214:17
**seconds (3)**
163:18;165:24;166:4

BARBARA DEVINE, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 96 of 102

**secretary (2)**
57:3;280:3
**Section (1)**
273:15
**sections (1)**
273:4
**secure (13)**
18:14,14;22:15;
28:17;47:13;60:8;
64:15;66:17;70:23;
120:22;253:21,21;
257:19
**Securing (5)**
27:24;60:10,10,12;
258:8
**security (35)**
28:1,13,15;48:15,16;
58:13;59:1,1;66:18;
78:16;118:12;128:8;
149:16;212:5;280:11;
282:3,19,20,24;283:3;
284:22;285:11,14;
286:7,16,24;287:14,16,
17,20;288:3,5,8,9;
289:20
**seeing (4)**
246:1;261:2,22;
262:18
**seek (3)**
12:7;14:25;25:5
**seem (1)**
211:15
**seemed (1)**
258:2
**sees (1)**
49:8
**segregation (2)**
69:7;78:16
**seizure (1)**
128:12
**selection (1)**
38:7
**self-explanatory (1)**
227:19
**send (4)**
69:16,17;120:9;
127:5
**sending (5)**
55:22;56:4;154:8;
257:16;259:19
**sends (1)**
289:22
**Senior (1)**
11:10
**sense (6)**
7:3;171:7,8;260:11;
265:12;273:19
**sensitive (1)**
152:14
**sent (10)**
8:17;13:5;49:3;
120:6;192:9;258:20;
259:21,22,24,25

**sentence (2)**
197:14;212:11
**separate (3)**
34:19;152:4,9
**September (1)**
12:15
**sergeant (91)**
18:20,24;19:2,9,17,
22;20:24;21:3,6,19,20;
23:12,20,22;24:2,5,9,
18,24;25:10,12,18,22,
23;26:2,9,25;27:11,15,
17;28:20,22;29:18,23;
33:13;34:3;36:7;40:17,
22;53:16;54:11;55:12,
25;65:6,10;66:21,25;
67:4;71:19;74:15;
76:22,24,24;77:1,10,
21;78:2,13,18,24;79:3,
22,23;83:25;87:21;
88:4,6,7,10;90:10;
96:22;138:9,9;155:8;
163:11,12;181:10;
183:10;206:1;242:11,
12;245:8;248:20;
250:7;251:12,17,24;
252:1;258:7,18;287:11
**sergeants (18)**
21:9,15;26:1,1,10;
29:6;32:9;34:5;36:8;
55:13;74:4;82:6;109:1;
209:3;248:23;288:21,
22;289:23
**sergeant's (7)**
62:1;94:13,17,18,21;
96:4;109:14
**series (2)**
39:1,10
**serious (1)**
79:7
**served (2)**
35:12;248:19
**Services (2)**
11:19;12:11
**set (17)**
51:12;94:3,4;100:17,
23,25;110:10;127:1;
186:1,5,9,17,18;198:7;
213:3;223:20;226:13
**sets (5)**
32:5;94:6,6;100:15;
150:24
**setting (3)**
214:9,10;226:11
**several (2)**
4:19;231:14
**severe (1)**
253:22
**shake (1)**
262:19
**Shakedown (3)**
28:7,8;94:20
**shakedowns (1)**

28:6
**share (2)**
54:24;198:2
**shared (1)**
204:22
**shelter (3)**
120:5,9;213:13
**shift (28)**
13:18;46:2,14,14;
47:4;53:10,12;56:4,9;
60:2;103:5;108:21;
109:19;113:2;149:9;
154:2;204:18,19,21;
207:25;208:19;209:6;
214:12;250:7;253:10;
278:10;279:17,17
**shoes (1)**
261:6
**shoot (2)**
104:23;113:13
**shop (3)**
94:15,16;95:4
**short (6)**
53:16;73:15;145:17;
187:4;269:13;276:7
**shortly (1)**
242:25
**shoving (1)**
49:21
**show (13)**
26:2;37:22;42:14;
48:12;50:8;75:23;
100:8;187:1;192:8;
201:18;216:11;288:4;
291:16
**shower (6)**
266:14;268:11,12,
15,15,16
**shown (2)**
82:1,4
**shows (3)**
79:15;234:3;265:3
**shut (2)**
15:3;72:3
**sick (1)**
32:2
**side (27)**
50:10;59:4,5;81:4,6,
7;93:9,9;97:3;124:19;
125:2,3;131:3,4,6,7;
149:18,19;153:23;
159:19,20,21;161:9,11;
250:9,9;285:8
**sight (1)**
44:23
**sign (7)**
145:21;146:25;
147:3;270:24;273:21;
287:5,6
**signal (34)**
37:17;49:9,10,14,14,
23,23;90:13,14;97:2;
98:9,9;100:13,18;

115:3;116:3;135:25;
138:8,16;140:2;
155:22;160:13,18;
176:3,6;200:7,8;235:3;
278:17,18;279:12,12;
290:17;291:25
**signed (2)**
146:23,25
**significant (1)**
171:21
**signing (1)**
146:8
**silence (1)**
113:16
**silent (1)**
113:19
**similar (1)**
34:22
**simulation (1)**
80:11
**single (1)**
80:8
**sink (1)**
266:18
**sister (1)**
256:25
**sister-in-law (1)**
256:22
**sit (9)**
45:12;76:3,6;192:12,
24;193:7,12;194:23;
261:13
**sits (1)**
202:5
**Sitting (2)**
155:17;223:25
**situation (139)**
22:23;24:13;26:17,
19;31:8;32:1;36:14;
37:21,23,23;39:9;
44:23,25;45:1,8;46:4,
16;47:9,9;49:7,10,17,
24,25;50:24;57:22,24;
58:1;59:6,12,14;62:3,
7;76:22;79:4,7,23;
90:5;91:6;96:23,23;
97:16;100:6,14;
101:12;102:9,16;
103:14,22;104:1,2,18;
106:5,9,16;111:6;
114:21;117:13;122:12;
123:13;130:7,8,11;
132:4,17;137:5;
138:17;139:4;142:15,
18;145:4;164:25;
169:18;170:18,19,25;
171:12,25;172:4,7,8,
11,16,17;176:7;
177:12;178:7;180:8;
181:5;182:16;184:11,
24,25;194:9;198:21;
206:8;215:11;216:16;
217:17;218:7,17;

222:18;224:23;226:12,
21,24;227:4,15;229:6;
232:5;233:15,18,23,24,
24;234:10;235:7,8;
236:3;237:9;243:12;
246:3,23;247:5;
251:20;255:7;262:12,
14;264:21;271:11,12;
274:10;286:3;291:3,4,
23;292:1;293:16;
294:25
**situations (14)**
22:20;29:24;32:22;
37:8;57:16;113:24;
115:24;117:10;118:4;
132:14;140:20;144:17;
171:12;233:17
**six (6)**
16:9,10;22:5;35:5;
78:22;213:9
**six-month (3)**
22:6;33:9;76:10
**six-week (2)**
17:25;275:3
**skeleton (1)**
107:1
**skills (3)**
30:5,5;251:25
**skip (1)**
45:17
**slacking (1)**
289:25
**slap (1)**
232:23
**slash (1)**
207:5
**sleeping (2)**
51:23;138:24
**Slick (1)**
239:10
**slightly (3)**
89:22;93:22;102:18
**slip (1)**
106:15
**small (7)**
19:19;42:15;44:10;
60:14;85:15;252:9;
291:24
**smaller (1)**
195:19
**smart (2)**
64:25;66:14
**SMC (1)**
266:18
**smell (5)**
161:15,16;162:8,9,
10
**Smith (1)**
155:8
**smoke (18)**
50:5,7,25;157:17,24;
161:2,5,8,15;162:8,9,
10;166:13,14;185:12,

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 97 of 102

21;189:16;232:8
**snatched (2)**
164:22;177:22
**snowstorm (1)**
261:8
**social (1)**
10:23
**socialize (6)**
241:17;243:3;244:9;
245:3;249:5;252:5
**socialized (1)**
250:23
**solely (2)**
191:4;217:25
**somebody (66)**
18:16;22:13;65:19;
76:7,17;90:17,21;
91:10;93:11,24;96:9;
97:20,23;100:11;
101:8;102:10;104:2;
105:24;114:22;115:10;
120:2,10;122:17;
123:1,6;127:5;128:12;
129:2;131:1,10;
132:22;133:12,19,22;
134:9;135:6;136:24;
137:24;144:15;150:4;
164:6;167:22;172:4,6;
179:17;181:6,20;
183:3,23,23;185:3;
186:16;194:4;201:13;
207:9;216:6;230:15;
235:3;236:9;247:17,
23;253:3;258:20;
261:1;270:11;284:4
**somebody's (6)**
104:16;144:14;
145:3;173:12;217:18;
222:13
**someone (48)**
21:1;27:3;31:18;
61:19;64:4;65:16;66:2;
67:13,14;75:2;90:18;
91:21;96:17,19;
101:14;105:22;114:2;
116:8,23;118:4;
131:18;133:25;135:22;
153:13;173:10,11,16;
179:13;187:23;200:10;
214:6,19;217:19,21;
222:16;229:6;230:4;
248:12;261:4;263:5;
270:11,21;271:4;
275:15;290:25;291:2,
6;293:10
**someone's (6)**
86:2;95:21;114:6;
129:17;171:19;180:21
**Something's (1)**
162:17
**Sometime (1)**
201:12
**sometimes (7)**

111:22;113:10;
144:22;149:14,15;
153:19;288:17
**Somewhat (1)**
140:13
**somewhere (9)**
63:5,11;64:12;103:8;
117:2;125:1;178:1;
188:22;244:2
**soon (3)**
94:20;165:12;290:12
**sorry (10)**
10:8;41:13;80:5;
92:16,23;144:4;
164:18;199:12;243:18;
286:22
**sort (20)**
32:16;33:2;38:10;
47:6;87:15;104:9;
112:25;115:25;129:4,
9;132:24;133:15;
142:4;143:6;183:12,
17;187:8;233:3;240:8,
20
**sound (3)**
44:23;211:3;239:9
**sounds (1)**
61:15
**source (2)**
179:4,5
**south (7)**
81:7;93:9;126:22;
131:4;148:8,9;161:11
**span (1)**
49:16
**sparks (2)**
285:12,14
**speak (13)**
6:22;219:6,13;222:6;
227:25;229:9,13,23;
230:6;241:25;243:21;
256:16;262:21
**speaking (11)**
57:13;68:25;88:7;
92:8;96:21;100:2;
126:22;213:8;228:12;
278:16;285:4
**special (4)**
48:11;60:23,23;
72:21
**specific (9)**
19:10;62:23;63:24;
85:23;87:5;140:8;
146:4,5,5
**specifically (5)**
99:3,4;135:23;
139:21;143:20
**specifics (2)**
140:10;231:9
**speculation (1)**
179:25
**spend (3)**
32:2;55:15;242:14

**Spider (4)**
239:24;240:2,6,10
**split (1)**
74:3
**spoke (5)**
204:4;226:1;229:16,
21;262:22
**spoken (4)**
9:4;181:18;230:22;
238:6
**sports (1)**
134:19
**spray (1)**
201:4
**squad (21)**
35:15,16,17,18;
36:10,12,17,18,24;
37:1,4,6;38:4,15,19;
47:14;83:24;170:21;
248:19;271:13;274:13
**squads (2)**
35:12;36:22
**squash (1)**
59:12
**squat (1)**
36:11
**stab (1)**
37:8
**stabbed (1)**
264:20
**stabbing (2)**
49:7;243:10
**stabbings (1)**
246:18
**staff (44)**
23:20,22;24:1,4;
29:25,25;30:1,4;32:10;
37:18,19;60:22,22;
69:9,10;82:12,13;
86:14,15,23;127:20;
132:25;142:18;185:17;
202:19;206:17;210:25;
212:24;213:4,21;
219:6;221:17;226:21,
25;227:2,5,7;231:21;
258:4,4;263:12,13,13;
289:1
**staffed (5)**
23:12,15;106:9,17;
213:16
**staffing (6)**
53:24;54:8,9;209:6;
226:16,25
**staffs (1)**
210:18
**Stage (3)**
259:12,15,22
**staged (2)**
159:3;202:19
**staircase (15)**
93:4,7;150:17;151:3,
4,5,13;158:23,25;
159:1,2,3;202:15,17,20

**staircases (3)**
150:10,23,25
**stairs (8)**
101:1;106:15;
150:13;161:14;162:2,
3;165:19;261:13
**stake (1)**
225:15
**stamp (5)**
175:6;209:19;
259:10;265:25;271:23
**Stand (6)**
78:19,24;98:11;
126:4;230:10;292:8
**standard (1)**
31:1
**standing (3)**
200:16;232:7;265:4
**star (3)**
206:20;207:4,19
**start (21)**
11:4,20;12:14;16:4;
25:17;29:8;60:10;
97:16;108:21;119:6,
11;122:2;125:13;
131:17,22;186:19;
187:7;188:10;213:11;
274:24;275:7
**started (43)**
12:15;13:18;14:10,
18;25:19;27:22;29:13,
15;53:14;59:16,16;
61:4;63:7;121:25;
122:5;124:25;125:12;
126:13;156:12,24;
157:2,17;158:5,11;
201:13;202:7,21;
211:16,19,21,22;
212:13;235:5;243:1;
245:8,8;250:1;256:8,
10;259:22;262:18;
274:22;277:19
**starting (5)**
123:3,5;155:21;
214:14;282:19
**starts (2)**
42:15;266:9
**state (37)**
10:5;15:23;16:3;
18:5;19:18;23:18,25;
24:14;25:9;41:15;43:1;
82:3;85:11;90:2;112:2,
3;127:19;133:5;
142:23;151:20;182:3;
186:15;190:5;214:10;
217:14;221:24;244:3;
256:23;259:18;260:5;
261:15;266:11;267:8,
11,22;268:23;273:6
**stated (22)**
89:23;190:15;
196:24;198:5;200:3,6,
8;201:12;202:2;

210:23;223:21;258:13,
20;260:1,16;264:16,22,
24;265:6;266:16,18;
288:12
**statement (10)**
5:19;69:6;175:14,17,
20;176:1,9;259:2,2;
268:6
**statements (6)**
210:23;231:5;
266:11;267:9;268:24;
269:19
**states (1)**
258:17
**Statham (19)**
163:11,12,16;167:1,
22;169:13;173:21;
174:5,22;176:3;
202:16;217:5;222:21;
227:25;229:10;251:8,
9,10,12
**stating (1)**
97:10
**station (25)**
54:23;55:13;82:10;
103:16,18,21;111:25;
131:5;133:4;148:14,
17,20;149:4,10,12;
153:10;160:10,10;
165:13;197:24;203:17;
258:6;261:11;282:6;
290:11
**status (6)**
22:6;23:5,9;33:9,11;
274:18
**stay (13)**
22:22;26:22;32:11;
101:13;134:6,9,11;
206:12;216:5,9;236:9,
9;288:25
**stayed (4)**
206:9;216:21;
238:15;256:7
**staying (1)**
55:7
**stays (2)**
122:22;135:17
**Steel (7)**
11:19;12:10;14:15;
157:12,13;203:15;
266:17
**step (4)**
163:16;261:5,6;
269:25
**stepped (4)**
90:17;270:1,2,3
**stepping (2)**
38:1;115:16
**steps (2)**
81:16;289:10
**Steven (1)**
244:24
**stick (3)**

USDC IN/ND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 98 of 102

41:17;70:20,23
**sticks (1)**
71:11
**stiff (1)**
31:13
**still (54)**
5:7;9:17;21:2;27:14;
28:16;37:13,17;39:19;
60:3;68:13;70:25;77:5,
9;79:17,18;87:24;
89:18;91:10;97:5;
101:16;102:15;106:9;
117:25;127:4;153:21;
158:16,18,18,25;
172:15;173:8;177:11;
179:17;180:9;181:17;
184:2;189:20;196:11,
17;223:4,5;228:21;
231:11,25;232:22;
235:25;260:3,11;
261:24;274:15,21;
277:22;287:24;292:10
**stood (1)**
255:2
**stop (11)**
57:22,23;96:1;
113:23;116:20;129:13;
136:14;283:8,8;284:4;
289:3
**stoplight (1)**
283:9
**stopped (4)**
26:13;122:9;223:10;
224:21
**stopping (2)**
80:21;89:20
**stored (3)**
279:22,23,24
**stories (3)**
85:14;131:3;166:7
**storm (1)**
111:22
**straight (5)**
12:10;13:16;15:22;
27:1;160:14
**strategic (1)**
59:20
**stray (1)**
103:20
**street (9)**
19:18,21,22;84:22;
85:3;138:9,10,10,12
**stretcher (1)**
233:25
**strife (1)**
247:14
**strong (4)**
67:9,17,18,22
**stronger (1)**
67:14
**Structural (1)**
144:3
**structure (3)**

85:19;86:9,19
**stuck (5)**
70:25;71:1;108:2;
157:2;291:5
**study (1)**
142:13
**stuff (2)**
153:16;237:20
**stupid (2)**
15:6;116:24
**subject (1)**
5:16
**substance (1)**
8:6
**substantiated (1)**
275:24
**subtracted (1)**
281:18
**successful (2)**
68:11;189:18
**succumbing (1)**
215:24
**sudden (5)**
64:22;65:3;113:16;
128:8;285:12
**sued (2)**
6:5;17:4
**sufficient (2)**
24:23;209:5
**suggestion (3)**
59:8,9;75:2
**suggestions (5)**
58:5,11,22,25;231:2
**suicide (4)**
32:6;122:15,20;
180:13
**summertime (1)**
70:12
**Sunday (4)**
92:9;257:15;262:13,
15
**Superbowl (3)**
257:15;262:13,14
**superintendent (5)**
69:18;247:2;260:13;
261:21;262:20
**superintendent's (1)**
57:3
**supervising (2)**
18:17;76:2
**supervision (1)**
24:15
**supervisor (16)**
21:14;26:7;27:4;
30:6;47:4;61:7;73:1;
74:16;75:8,8,12;
114:18;136:25;183:15;
205:11;208:9
**supervisors (4)**
30:14;56:5;58:21;
209:7
**supplemental (1)**
4:19

**supported (1)**
269:21
**supposed (34)**
16:23;31:2,19;32:15,
20;75:11;83:9;98:17;
100:4,12;115:23;
119:2;121:8;123:12;
126:14;148:17;149:16;
153:22;180:16;181:16,
20;191:15;192:1;
198:5;205:20;218:6;
225:18;229:8;256:14;
260:18;283:11;287:23;
289:17;294:18
**supposedly (1)**
91:4
**sure (57)**
6:18;19:23;26:3;
27:25;28:11,16;32:9;
51:16,25;52:1;62:1;
65:21;69:12;72:25;
73:14;83:11;89:22;
93:16;107:4;109:1,5;
118:25;120:12;121:10,
10;129:12;138:12;
140:21;145:16;146:2;
153:1,25;159:9;
170:14,16;176:16;
187:8;190:17;231:19;
234:23;242:1;244:5;
252:18;276:11;284:18,
22;285:18,20;286:9,10,
17,24;289:1,19;290:1,
6;294:9
**surprise (1)**
213:4
**surroundings (1)**
81:4
**surveillance (1)**
31:15
**survey (1)**
13:10
**suspension (5)**
265:7,9,11,15;269:4
**sweep (2)**
51:15;159:8
**switch (5)**
67:24;109:9,10;
167:18;282:24
**switched (1)**
61:16
**switches (1)**
156:19
**sworn (2)**
4:2,7
**syndrome (1)**
101:11
**system (8)**
62:24;110:15;
112:17,20;133:3;
152:6;260:17;279:10
**system-wide (1)**
112:25

## T

**Taco (5)**
13:18,19,20,25;14:5
**tactical (1)**
37:25
**tactics (1)**
85:22
**talk (42)**
26:9;41:17;57:9;
59:9,9,11;62:4;76:3,7;
81:19;90:18,18;
113:12,14;114:2,22;
115:17,18;116:17,17;
122:16;123:6,8;128:2,
6,7,9;157:24;190:17;
215:18;222:3;232:9;
241:23;242:2;243:20;
247:15,20,21;256:6;
262:21;263:13;290:20
**talk-around (5)**
111:25,25;112:1,13,
18
**talked (15)**
48:19;77:13;117:8;
162:14;226:11;229:25,
25;237:13,19;249:19;
262:19;263:15;275:8,
15,19
**talking (18)**
46:18;86:10;115:7;
122:10,14,19;131:7,8,
8;132:21;134:23;
162:1;201:15;211:8;
224:4;264:4;271:8;
290:7
**tampered (1)**
70:19
**tampers (1)**
71:22
**tank (1)**
171:17
**tanks (1)**
171:16
**targeted (2)**
231:23,25
**task (1)**
216:18
**tattoo (1)**
240:5
**taught (7)**
16:13;129:23;130:2,
9;178:20,21,23
**teaching (2)**
84:9,10
**team (46)**
36:11,12,23;41:22;
46:24;47:18;55:3,4;
82:18;136:25;141:18,
20;143:17;149:22;
198:1,23;199:2,3;
204:6;205:6,9,10,10,

17,25;206:8;210:24;
223:18;225:5,9;
227:24;231:17;233:12,
18,19,21,22;234:3,4,5,
15,17;235:15;236:8;
274:6;286:11
**teams (1)**
274:6
**team's (1)**
54:22
**tear (1)**
71:16
**telephone (2)**
4:16;131:20
**telling (7)**
6:12;79:9;158:2;
268:7,17;270:10;279:3
**tells (1)**
129:12
**temper (1)**
13:4
**temperature (3)**
31:1,3,12
**temporarily (2)**
86:25;87:1
**ten (7)**
14:17;118:20;
122:24;138:20;258:2;
287:22;289:3
**terminated (4)**
12:22;13:5;14:23;
78:9
**termination (3)**
12:24;13:7;78:5
**terrible (2)**
227:15;236:25
**test (12)**
17:9,10,11,12,13;
38:19;39:21,25;40:2,3;
85:10;108:20
**testified (1)**
4:7
**testify (1)**
7:21
**testimony (2)**
5:21;7:25
**testing (3)**
36:24;42:21;112:17
**tests (7)**
17:8,19,22;22:12,14,
15;42:12
**thanked (1)**
224:21
**Thanksgiving (1)**
32:7
**that'd (2)**
90:25;215:13
**therefore (1)**
75:13
**thereupon (9)**
124:5;147:20;175:8;
204:12;209:12;219:18;
263:20;265:19;272:1

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 99 of 102

**thick (2)**
84:8;185:21
**thin (1)**
79:20
**thinking (9)**
115:11;157:10,12;
164:24;180:19;185:19,
19;189:25;197:6
**third (5)**
78:11;156:12;
168:22;212:12;234:22
**Thorough (1)**
243:21
**though (4)**
91:13;97:2;103:16;
231:7
**thought (5)**
168:20;226:23;
244:12;249:14;251:24
**threat (2)**
58:14;59:1
**threats (1)**
39:10
**three (55)**
15:4,17;23:21;24:21,
25,25;25:12,15;27:21;
37:15;38:18,23;41:20,
21;53:19,19,21;59:18;
74:4;76:18,20;84:23;
89:12,18;91:9;92:13;
93:20;100:16;105:19;
112:22;156:18;169:2,
8,14,21;188:3;190:21,
23,24;215:13,17;
218:15,20;223:1,2;
230:14;239:25;258:22;
283:25;290:19,22,24;
291:3,5;292:12
**throughout (5)**
32:8;56:9;149:9;
237:15,16
**thumbs (1)**
279:8
**tidbit (1)**
116:2
**timeline (1)**
199:22
**timely (5)**
22:17;139:5,7;
287:16,17
**times (35)**
5:3,24;8:10,11;
18:17;20:21;26:5;
27:25;31:25;52:20;
59:22;63:1;65:22,22;
76:16,18,20;84:2;
103:5;105:6;109:7;
114:5;115:6;116:21;
118:14;120:15;134:21;
149:13,15;198:11;
208:11;211:6;238:9;
247:1;289:3
**timid (1)**

256:7
**timing (1)**
187:8
**Timothy (1)**
248:17
**title (1)**
21:11
**titled (1)**
219:25
**today (12)**
6:10;7:17,22,25;
8:20,21,24;58:2;
155:17;194:23;196:11;
199:19
**toes (1)**
46:15
**together (18)**
31:6;59:19;141:18,
21;149:12;163:11,15;
248:19,20,21,22,23,24;
249:2;250:7;251:15;
283:16;290:20
**toilet (1)**
186:9
**told (31)**
13:4;77:10;78:24;
79:5;111:1;128:13,18,
22;163:21;180:15;
181:15;182:15;183:1,
3;202:12;227:8;230:2,
4;258:17;262:22;
264:25;265:7,9;266:2;
267:12,13,23;269:1,24;
281:21;283:6
**tolerance (2)**
31:22;32:10
**Tom (2)**
10:8,9
**tonight (2)**
65:5,12
**took (20)**
40:18;47:11;67:11;
153:14,15;164:9;
165:21;176:18;177:23;
197:17;200:20;202:1;
222:14,15;223:6;
232:21;233:2;234:24;
251:23;265:14
**toothbrush (2)**
70:20,22
**top (7)**
32:11;90:17;92:15;
140:19;159:4;208:7;
220:9
**topic (2)**
57:12;87:4
**topics (6)**
32:24;38:22;39:11;
44:16;49:5,6
**totally (1)**
117:12
**touch (4)**
43:5;249:16;251:3;

256:18
**touched (1)**
270:12
**tough (5)**
31:25;106:21;
245:17,20,22
**toward (2)**
31:24;207:25
**towards (2)**
31:13;32:7
**tower (1)**
67:23
**towers (1)**
107:4
**trade (1)**
20:3
**traffic (9)**
112:4,5,9;117:3;
136:7;140:6;158:4,6;
191:23
**trafficking (8)**
63:7;68:2,9,13;78:2,
4,6,7
**train (5)**
22:3;26:3;85:23;
140:20,20
**trained (19)**
30:8;32:25;33:3;
34:12;44:17,18;45:20;
84:21;85:2,4;117:5;
140:22;141:16,19,21;
145:3,12;171:11;250:3
**trainee (1)**
275:7
**training (159)**
16:1,2,4,12,13;17:16,
23,25;18:1,18,19;20:6,
10,11,12,14,15,16,17,
20,22;21:1,2,8,11,14,
14,22,23;22:8,15;23:8;
25:21,24,25;26:10,12,
14,24;29:13,14;30:10;
36:23;37:13;38:14,21;
39:5,12,14,15,17,22;
40:1,4,7,7,9,10,25;
41:3,4,5,8,10,16,23;
42:1,22,23;43:1,5,16,
22,23;44:1,9,16,16,19;
45:12,13,15,16,18;
46:11;48:16;64:1;
65:18;81:6,25;82:2,17,
17;83:24;84:1,13;87:8;
97:25;98:4,22;99:1,3,
11;114:12,13,17;
129:19,23;140:11,16,
23,24;141:2,8,12,13,
13,22,23;142:5;143:19,
20,23;145:8,20;171:9;
178:20,21,23;180:7;
182:18,20,22;214:15,
16,20;226:17;231:3;
243:25;244:4,15,18,20;
250:4,4;251:16;252:1;

253:7,7;270:25;
273:25;274:1;275:2,3,
7;287:3,8,8,12
**trainings (4)**
41:6,19;43:13;87:5
**trampled (1)**
190:16
**transferred (1)**
244:2
**transmission (2)**
115:19,19
**transpired (1)**
230:13
**transport (2)**
274:7,8
**travel (1)**
15:8
**treat (1)**
17:2
**treatment (1)**
37:20
**triage (3)**
223:20;227:1,2
**tried (18)**
79:16;156:14,22;
167:17;168:5,12;
170:3;178:5;181:2;
187:21,23;188:4;
189:7,7;201:1,4;
223:10;246:13
**tries (1)**
187:13
**trouble (6)**
179:15;181:8;
185:11,14;238:19;
292:11
**troublemaker (1)**
238:18
**trucks (3)**
12:1,2;84:24
**true (1)**
134:8
**trusses (3)**
14:14,14,15
**Trussway (5)**
14:11,13,17,20;15:3
**truthfully (3)**
7:17,21;199:16
**try (48)**
6:23;7:2;16:16;
22:22;26:2,19;27:3,8;
37:11,17;52:24;57:21;
62:6,6;65:6,20;66:15;
70:20,21;79:17,19;
80:16;85:17;86:1;91:8;
98:13;107:4;112:23;
116:13;122:11;124:1;
129:24;142:13,14;
157:9;169:2;170:12;
188:6,23;201:8;
215:24;223:11;226:13;
227:14;233:24;239:11;
270:1,3

**trying (54)**
26:17;28:17,18;
70:12;71:9;90:20;
109:12;114:2,21,21;
115:17,17;116:8,21;
118:4;123:13,14;
124:3,4;142:19;
157:23;158:1,8,9;
167:23,23;168:11;
169:5;171:18;180:13,
21;181:17;188:10,20;
189:2,10,21,24;191:20;
201:7;215:14;216:19;
222:16;224:23,24,25;
225:3;227:2;232:1,9;
235:4;247:12;257:19;
270:15
**T's (1)**
245:23
**tunnel (3)**
167:5;168:8;194:9
**turn (15)**
49:25;50:24;124:22;
147:25;152:22;175:13;
205:2;208:6;210:9,16;
211:5;212:17;260:18;
266:4;287:18
**turned (3)**
79:22;108:15;259:8
**Turning (1)**
212:3
**turnover (1)**
214:11
**turns (3)**
37:23;152:24;233:23
**TV (3)**
71:8;132:9,10
**TVs (1)**
132:8
**twice (7)**
5:25;45:13,20;56:12;
76:10,24;141:11
**Twitter (1)**
11:2
**two (80)**
20:23,23;21:6;23:23;
24:4,7,8,14,18,25;25:4;
27:20;28:7,22;29:4,6;
36:2,8,8,8;38:18,23;
39:6;46:6;49:20,25;
64:14;66:13;68:25;
69:1,2;71:8;74:3;
85:12;89:3,10,12;
92:13;93:20;105:24;
107:16;108:3;110:13;
112:22;114:7;115:20;
117:20,21;123:12;
165:18;167:6,11;
169:12;176:9;183:9,9;
184:15;205:25;206:15;
207:1;208:24;215:10,
15;221:22;225:7;
234:25;235:2,13,24,24;

BARBARA DEVINE, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ANTHONY WATSON
October 30, 2019

USDC INND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 100 of 102

246:18;251:11;257:24;
261:6;268:1,5;275:9;
284:1;285:20;291:23
**two-minute (1)**
49:16
**type (13)**
7:15;13:10;30:22;
36:21;38:14;39:16;
57:8;64:20;81:13;
110:3;112:13;143:23;
253:2
**types (6)**
22:25;23:7;27:9;
58:11;72:14;117:21

## U

**uh-uh (1)**
6:18
**unaware (1)**
220:16
**unclear (1)**
134:1
**under (8)**
6:9;7:15;16:21;31:3;
166:9,10,11;251:23
**underlined (1)**
207:10
**underneath (4)**
21:4,9,10;288:23
**understood (5)**
7:9;29:18;146:3;
254:24;290:14
**unfortunate (2)**
215:25;228:20
**Unfortunately (2)**
70:24;78:3
**unique (1)**
239:18
**unit (81)**
18:14,22;20:3,3;
25:25;27:18,24;28:16;
53:4;54:22;55:3,4,24;
56:7;57:15,15,17,21;
62:1,8,9,10;63:8,21;
64:9,22;65:17,17,25;
66:6,9;67:23;68:22;
69:25;78:16;79:15,16;
81:8;88:11,13;96:24;
102:11;116:2,3,3;
121:2,3;138:3;148:23,
24;149:22;151:15;
155:6,7,25;156:16;
165:10;171:7;177:22;
184:3,4;198:1,23;
199:2,3;202:24;204:6;
210:24;222:22;243:11;
246:4,4,19,21,22;
253:9;257:16;268:18;
285:1,18;286:11
**units (12)**
24:16;63:14;72:18,
21,22;73:1;81:9;

154:23,24;186:4;
250:10;279:19
**unit's (1)**
62:11
**unless (9)**
15:6;91:6;100:14;
181:20;182:16;185:2,
7;244:17;248:12
**unloading (1)**
12:1
**unlock (15)**
22:16;70:21,24;
138:7;167:14;178:5,
13,24;184:18,21;
187:13,21,23;188:4,7
**unlocked (4)**
161:18;167:14;
200:12,13
**unlocking (2)**
18:9;184:3
**unprofessional (1)**
224:2
**unprofessionalism (1)**
263:4
**unrestrained (1)**
266:23
**unsafe (1)**
258:3
**up (140)**
27:1;31:5,16;32:6;
37:22;50:8,14;55:11;
57:12;58:4,12;67:22;
69:13;71:16;74:3,17,
19;75:6,22;79:1,5,8,15;
87:3;90:18,22;92:15;
100:8,25;105:13;
108:15;110:7,12;
112:1,4,7,13;114:11;
115:8;116:7;126:4,4,4;
127:1,6;128:15;131:3,
23;132:9;134:13;
135:2,14;138:25,25;
156:8;157:15,16;
160:25;161:7,14;
162:1,3,4,13,20;
163:24;164:2,8,15,20;
165:19,22;166:7,8,12,
24;167:2,8,10,25;
168:10,21;171:18;
173:23;174:1,3,5;
176:18;177:7,10,18,21;
180:7;187:11,12,17,25;
198:23;200:23;201:18;
215:13;216:5,9,10,11,
21,21;218:22,23;
223:20;226:11,15,20;
230:10;234:3;244:2;
251:13;257:9,24;
258:9,21;261:18;
270:2,3;277:22;279:8;
281:24;284:14;285:25;
287:21,24;288:6;
289:8,23;290:20;

291:3,8,16;292:23;
293:14
**upholding (1)**
260:4
**upon (5)**
49:17;83:9;116:7;
145:4;179:14
**upset (3)**
13:3;216:17;269:5
**upstairs (11)**
50:12,13;91:7;
100:22;128:1;165:15;
176:23;177:25;194:7;
200:21;268:18
**use (41)**
10:23;16:16;24:15;
27:19;30:25;34:22;
39:3;42:4,6;43:9;59:2;
61:22;67:13;69:3,4,4,5,
6;71:9;76:9,23;103:22;
104:7;108:11,14;
118:20,23;140:25;
141:1;156:21;171:9;
188:12;203:10;246:13;
264:17,24;266:22,25;
267:20;284:1,4
**used (13)**
63:8;106:24;115:23,
24;165:9;182:25;
189:4;201:20;203:13;
208:14;246:1;264:22;
283:20
**using (5)**
103:9,24;108:19;
207:24;282:25
**usually (24)**
23:15;31:12;32:6;
36:6;46:1,2;47:4;
52:24;53:24;57:5;
59:18;71:6,15;72:17;
109:21;116:13;148:22;
149:2,3,11,14,25;
150:17;289:21
**Utley (2)**
266:13,23

## V

**vacation (2)**
61:22,24
**vandalize (1)**
103:21
**varies (1)**
253:11
**Various (4)**
11:25;22:19;27:16;
50:2
**verbal (1)**
6:17
**verify (2)**
210:22;284:21
**via (2)**
118:1;135:21

**vice-versa (1)**
53:23
**video (44)**
42:14;187:2,7;192:8,
13;193:3,22;194:14;
195:8,11,22;196:5;
197:20;198:13,16,20;
199:5,8,22;200:3,6,8;
201:13;202:10;210:22;
211:7;222:17;223:4,
22,22,23;224:2,8,9,12,
12,16,18,20;226:1,7,8;
269:22;277:5
**videos (2)**
42:12,13
**view (1)**
266:14
**viewing (1)**
226:1
**violate (6)**
179:19;260:2,9,10;
293:22;294:2
**violated (13)**
174:10,16;179:22;
180:12;181:2;225:16,
17;227:18;228:2,5,22;
229:7;230:17
**violating (3)**
174:23;179:11,16
**violation (3)**
175:3;184:7,9
**violations (1)**
174:18
**violence (1)**
151:12
**vision (3)**
167:5;168:8;194:9
**visiting (1)**
257:9
**voice (1)**
114:18
**voiced (1)**
255:6
**voices (2)**
114:17;115:21
**void (1)**
80:19
**voluntarily (1)**
258:1
**volunteer (1)**
222:8

## W

**waist (2)**
108:14;191:19
**wait (22)**
6:23;58:18;78:25;
79:6,6,9;96:10,14;98:8,
15,16;99:16,17;115:2,
20;134:10;135:7;
170:11;171:25;183:3;
280:18;292:24

**waited (3)**
78:20;170:6;261:19
**waiting (19)**
97:20,23,25;99:21;
155:23;159:25;161:20,
22;177:3,4,7,8,10;
191:9;202:20;277:7,8;
280:12,17
**Waive (1)**
295:6
**waking (1)**
126:3
**walk (24)**
78:16;94:19;120:21;
121:19,20,23,25;
124:16,24;125:14;
126:13;127:11;128:8;
149:16;165:12;166:11;
187:10;277:22;282:3;
283:3;285:11,15;
286:7;289:10
**walked (6)**
73:1;121:4;128:5;
162:7,11;266:13
**walkers (1)**
289:9
**walkie-talkie (1)**
112:4
**walks (15)**
31:10;66:18;123:20,
24;124:15;289:1,2,4,
12,15,23,24,25;290:1,4
**walk's (1)**
122:1
**wall (2)**
159:20;165:15
**wand (1)**
120:19
**wants (1)**
128:9
**warden (29)**
56:20;72:20;117:19;
181:18,19,22;182:1,4;
222:23,24;241:15,16;
242:4,10;246:5;247:2,
9,13;258:13;260:13;
261:3,23;262:3,3,4,20,
21;263:11;268:25
**wardens (2)**
56:21;247:9
**warrant (1)**
144:16
**waste (1)**
71:18
**watch (5)**
223:21;224:8;226:7;
283:17;284:8
**watched (7)**
223:4,23;224:2,16,
18,20;226:8
**watching (5)**
47:22;199:5,7,21;
222:17

USDC INND case 3:18-cv-00995-JD   document 203-1   filed 03/29/21   page 101 of 102

**water (3)**
42:8;201:23;285:9
**WATSON (17)**
4:5,25;10:7;124:7;
147:22;175:10;176:13,
16;204:14;209:14;
210:23;219:20;263:22;
265:21;266:10,21;
272:3
**w-a-t-s-o-n (1)**
10:7
**way (38)**
30:1;50:14;54:22;
59:20;62:10,18;67:19;
75:15;79:1,2;85:25;
93:15;97:11;100:22,
24,25;110:12;115:13;
131:13,20;132:1;
134:18;140:18,19;
142:5;176:23;191:15;
202:18,19;213:11;
225:19;254:17;265:4;
270:8,9;291:9,11;
293:15
**Wayland (1)**
243:16
**ways (4)**
85:22;86:14;140:17;
141:6
**weak (1)**
67:13
**weaker (1)**
67:14
**weapon (2)**
49:14;98:12
**weapons (13)**
223:18;231:17;
233:12,18,19,21,22;
234:3,4,5,15,17;274:9
**weather (1)**
39:1
**web (1)**
240:5
**Wednesdays (1)**
60:17
**week (8)**
17:9;40:6;57:13,15;
214:15,15,20;289:24
**weekend (2)**
92:8,15
**week-long (1)**
85:9
**weeks (8)**
16:9,10;18:2;20:7;
223:1,2;230:14;258:23
**weight (1)**
166:6
**weren't (7)**
81:16;102:14;
213:22;232:3,24;
250:16;261:22
**Wesner (8)**
242:21,24,24,25;

243:17,18,18,19
**west (1)**
59:4
**Westville (6)**
15:25;18:3;87:1;
242:9,25;275:4
**what's (53)**
8:17;9:15;11:22;
18:23;19:15;27:7;36:2;
51:24;54:2;56:6;59:11;
62:17;76:23;77:6;84:5,
9;92:20;93:10;108:18;
120:14;122:18;124:20;
125:25;130:4,9,13,19,
22;135:14;137:15,19;
140:5;149:21;150:2,
22;162:16;171:6,8;
175:5;176:6;204:11;
206:10;208:3;242:6;
257:5;263:18;268:16;
272:25;273:14;283:1,
12;286:5;291:2
**whenever (3)**
7:11;82:19;255:3
**Where's (2)**
258:24,25
**WHEREUPON (16)**
4:1;73:15;145:17;
187:4;192:13;193:3,
22;194:14;195:8,22;
196:5;197:20;198:13;
269:13;276:7;295:7
**wherever (3)**
46:9;139:4;290:16
**whole (14)**
10:19;20:7;51:13;
92:15;111:23;156:18;
184:3;201:6;213:19;
223:14;270:22;278:25;
280:11;281:16
**who's (2)**
166:5;234:23
**Whose (1)**
229:4
**wife (4)**
15:4;229:25,25;
230:2
**wife's (1)**
256:25
**William (1)**
242:21
**willingly (2)**
216:7;292:8
**Wilson (6)**
221:13,15,19;
222:25;226:15;227:9
**window (2)**
285:24,25
**windows (6)**
28:1;70:9,10,11;
286:11,16
**wing (1)**
251:23

**wintertime (4)**
30:25;70:12;107:25;
285:25
**within (11)**
17:12;49:16;57:13;
109:7;119:6,7;123:16;
125:15;214:14;230:16;
259:25
**without (8)**
8:5;66:25;111:15;
183:12;253:21;260:20;
288:9,10
**witness (24)**
4:1,3,6,25;5:9,10;
9:19;124:23;145:16;
148:2;175:21;176:10;
205:4;210:10,17;
212:4,18;220:3;240:4;
265:1;266:5,19;
276:15;277:13
**witnessed (1)**
264:24
**women's (1)**
244:1
**wondering (2)**
93:23;272:16
**wooden (1)**
203:15
**word (6)**
67:13;76:23;130:10;
197:13;201:16;267:20
**words (1)**
114:7
**work (96)**
9:23,25;10:13,18,21;
11:18,19;12:12;13:20;
23:3;27:14;30:15,16;
33:3,21;34:1,2;36:9;
38:18,19,20;48:20;
49:1;53:10;55:12,21,
22,23;56:22;61:21;
63:4,16;64:17;65:4;
66:13;68:14;70:6;
73:22;75:14,17,21;
76:7,12;92:8,13;98:23;
99:6;106:20,22;
107:25;108:2;109:6;
112:20;132:20;141:20;
142:10,10;143:13;
151:19,21,23;191:21;
201:2;202:18;208:12,
14;214:3;221:22,24;
231:20;234:1;236:12;
241:18;242:15,23;
243:4,9;244:10;245:4,
6;246:9;249:6,8,8,9;
250:15,24;252:6,9;
254:3,8;255:1;271:24;
272:8;276:23;288:24
**worked (33)**
12:16;14:12,17;
53:19,21;55:5;72:16;
99:8;142:8;189:5;

208:13,16;222:22;
236:6;243:11;248:22,
22,23;249:2,4,8;250:7,
9;251:10,14,15;253:6,
9;254:22,23,23;288:23,
23
**workers (1)**
42:18
**working (54)**
11:20;13:18;14:10,
18;15:2;16:22;18:21;
22:6;26:14;27:22;
29:15;31:8;42:11;
52:17;55:7;62:23;
63:10,11,13,21,21,22,
24;67:18;71:25;74:2;
87:22,23;88:6,8,21;
90:7;109:2,5;111:20,
21;113:23;116:14;
140:2,3;213:7;217:13;
227:24;239:13;243:6;
245:10;249:7,11,13;
250:1,10,12;278:24;
290:10
**works (2)**
256:22;257:4
**world (3)**
90:25;98:15,19
**worried (4)**
86:18;127:10,11;
189:1
**worst (2)**
111:5;115:11
**wounds (1)**
37:8
**write (10)**
31:5;69:13;72:19;
74:17,18,19;75:6;
130:3;226:15;232:22
**writing (1)**
76:5
**written (8)**
22:14,24;23:7;40:2,
3;69:6;179:1;182:22
**wrong (21)**
100:23;130:13;
221:6;223:7,13;226:4,
5;228:19,22,25;
230:15;246:14;268:7;
279:5;284:23;285:17;
289:16;292:9,10;
293:12,13
**wrongdoing (1)**
225:22
**wrote (3)**
5:19;160:7;267:15

**Y**

**yanked (1)**
173:16
**year (25)**
5:15;11:7;14:10;

22:5;31:13,24;32:7;
34:10;41:7,9,19;44:5;
45:13;53:22,22;74:1,6,
10;76:14,15;141:9,11;
212:23;237:5;249:1
**yearly (2)**
34:20;41:2
**years (18)**
14:17;20:23,24;21:7;
25:4;28:23;35:5,25;
36:1;53:19,19,21;
70:18;117:22;241:15;
251:10,11;259:17
**Year's (1)**
32:8
**yell (8)**
128:13,19,23;129:2,
14;131:17,19;203:19
**yelled (2)**
203:5;204:1
**yelling (28)**
128:24;129:18;
130:18;131:11,12,14,
22,25;132:1,22;133:9,
25;150:4;157:5;
158:20;160:23,24;
173:10,11,17;190:9,12;
193:20;197:3;232:6,
10,11;286:4
**yells (1)**
127:22
**Yep (2)**
48:10;196:10
**young (1)**
256:9

**Z**

**zero (2)**
31:22;32:10
**Zimmerman (1)**
40:23
**zone (5)**
24:6,15;56:21;61:21,
23

**0**

**088 (1)**
207:11

**1**

**1 (2)**
124:7;259:15
**1:00 (1)**
77:4
**10 (3)**
57:7;61:21;116:3
**10:00 (1)**
60:18
**100 (10)**
91:24;92:3;93:17;

USDC INND case 3:18-cv-00995-JD    document 203-1    filed 03/29/21    page 102 of 102

130:24;132:21;157:20;
173:24;177:3;190:8;
232:6
**100,000 (1)**
260:17
**1000 (4)**
278:17,18;279:12,12
**10-10 (4)**
46:5,5;49:11,13
**103 (1)**
97:8
**105 (2)**
97:3,16
**10-71 (17)**
136:3,5,8;154:7,12,
20,24,25;155:14;171:4,
5;172:20;174:16,17;
199:23,24;291:25
**11 (6)**
63:14,15;117:22;
124:22;208:3;259:17
**11th (1)**
4:17
**120 (1)**
54:9
**12-hour (1)**
149:9
**13 (1)**
110:17
**130 (1)**
54:9
**15 (6)**
8:13;57:7;121:20;
259:25;264:8;287:19
**150-some (1)**
70:18
**155 (1)**
97:8
**16 (1)**
109:21
**18th (1)**
4:21
**19 (1)**
256:10
**1992 (1)**
11:8
**1st (1)**
12:15

**2**

**2 (4)**
147:19,22;259:12,22
**20 (3)**
109:22;257:17;289:8
**200 (5)**
24:3;100:2,3;132:20;
227:3
**2007 (8)**
14:18;16:5,8;25:19;
53:13;241:14;245:7;
274:22
**2008 (2)**

35:18;41:2
**2009 (2)**
53:15;274:14
**2010 (1)**
25:19
**2012 (4)**
29:1,11;53:17;
110:17
**2014 (1)**
264:14
**2015 (2)**
264:14,15
**2016 (1)**
35:18
**2017 (9)**
35:6,19;124:21;
147:15;155:18;210:5;
215:1;220:1;262:1
**2018 (2)**
12:5;264:1
**2019 (11)**
11:21;12:17;124:8;
147:23;175:11;204:15;
209:15;219:21;263:23;
265:22;272:4
**2136 (1)**
212:13
**214 (1)**
23:21
**2146 (1)**
212:13
**215 (1)**
281:4
**216 (3)**
23:22;184:6;281:3
**219-878-3586 (1)**
9:21
**24th (1)**
220:1
**25th (1)**
12:17
**26 (2)**
155:4,5
**27th (1)**
259:8
**29 (1)**
123:21
**2nd (3)**
259:5,5;263:25

**3**

**3 (4)**
155:7;175:6,10;
266:4
**3:00 (5)**
55:5,6,9,11;206:22
**3:30 (1)**
60:4
**3:54 (1)**
295:7
**30 (23)**
25:14;29:6;122:1,2;

124:8;145:25;146:8,
11;147:9,23;163:18;
165:24;166:4;175:11;
204:15;209:15;219:21;
257:18;259:6;263:23;
265:22;272:4;290:4
**300 (9)**
23:19;50:10;90:10,
12;91:9;97:3;107:19;
126:22;202:11
**3000 (5)**
49:9,10;176:3,6;
235:3
**320 (1)**
23:19
**37 (1)**
4:16

**4**

**4 (3)**
204:11,14;211:1
**4- (1)**
92:11
**4:00 (2)**
77:9,12
**40 (1)**
289:7
**400 (9)**
23:25;59:21;90:7,13;
93:13;100:19;107:20;
270:2;285:8
**40-hour (15)**
41:8,15;43:4,23;
44:1,15;82:17;84:12;
178:23;244:4,18,20;
270:25;273:25;274:1
**45 (3)**
77:18;107:2;125:23
**4th (1)**
11:21

**5**

**5 (7)**
116:2,3;155:6;
209:11,14;276:19;
287:20
**5:00 (8)**
55:5;77:13;208:14,
14,16,16,18,18
**5:15 (1)**
258:17
**5:30 (2)**
60:11,12
**5:45 (1)**
262:23
**50 (4)**
140:21,22,23;288:10
**500 (60)**
79:1;90:8,14;92:11,
24;93:14;100:18,19;
104:17,19;115:8;

124:25;125:3,4,5,5,6,8;
126:13;130:24;131:2,
11,13,23;132:1;154:24,
25;156:3,6,8;157:19;
161:8;162:17,20;
163:22,23;164:5,6,15,
20,25;165:23;166:3;
173:23,25;174:2,5,6;
176:18,18,21;177:2,2,
7,10;184:21;188:2;
200:20;212:9;290:12
**540 (5)**
169:1;178:4,5;
200:25;206:11
**542 (1)**
169:1
**544 (1)**
169:1

**6**

**6 (5)**
210:9;219:17,20,25;
276:12
**6:00 (6)**
60:2,13;208:9,10,15,
15
**6:05 (1)**
262:22
**60 (4)**
54:10;74:2,5;107:1
**6th (3)**
257:14,14;259:4

**7**

**7 (10)**
49:14,14,23,24;98:9,
9;212:3;263:19,22;
276:25
**7th (6)**
4:17;124:21;155:18;
210:5;215:1;278:1

**8**

**8 (5)**
116:3;147:25;
212:17;265:21,24
**8:00 (2)**
56:19;57:20
**8:15 (1)**
119:13
**8:45 (2)**
124:25;125:2
**8:46 (1)**
125:5
**8:47 (2)**
119:11;122:4

**9**

**9 (5)**

111:25;175:13,14;
271:22;272:3
**9:00 (9)**
28:3,5;77:1,17;
125:19;126:13;134:16;
135:1;159:15
**9:04 (1)**
125:5
**9:05 (5)**
123:2;125:6,8,12;
212:9
**9:06 (2)**
277:14,20
**9:15 (4)**
119:13;122:5,7;
211:23
**9:30 (2)**
126:15;278:16
**9:33 (2)**
277:1,2
**9:33:35 (1)**
211:1
**9:34 (1)**
211:19
**9:34:15 (1)**
211:2
**9:34:43 (1)**
211:13
**9:35 (4)**
123:5;125:12,13,14
**9:45 (4)**
126:15;200:2;
279:12,13
**9:49-something (1)**
200:3
**9:50 (1)**
123:3
**90 (2)**
17:17;51:21
**95 (1)**
13:20