# In The Matter Of:

*BARABARA DEVINE vs*
*RON NEAL, et al.*

*RYAN STATHAM*
*November 5, 2019*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 11-05-19 RYAN STATHAM.txt
**Min-U-Script® with Word Index**

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 2 of 106

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA DEVINE, as Personal )
Representative of the        )
ESTATE OF JOSHUA DEVINE,     )
                             )
          Plaintiff,         )
Vs.                          )Case No.
                             )3:18-cv-00995-JD-MGG
RON NEAL, et al.,            )
                             )
          Defendants.        )

     The Discovery Deposition of RYAN STATHAM, taken at the instance of the Plaintiff, taken pursuant to notice and agreement as to the time and place and pursuant to the Federal Rules of Civil Procedure, before Pamela S. Owen, CSR, RPR, Illinois License No. 084-002294, a Notary Public and a competent and qualified court reporter, at the office of BOSS Reporters & Videoconferencing, 5816 East 7th Avenue, Gary, Indiana, on the 5th day of November, 2019, and commencing at the hour of 9:00 o'clock a.m.

BOSS REPORTERS & VIDEOCONFERENCING

Gary, Merrillville, & Valparaiso, Indiana

(219) 769-9090

Page 2

APPEARANCES

MEGAN PIERCE, ESQ.
SAM HEPPELL, ESQ.
LOEVY & LOEVY
311 North Aberdeen Street, Third Floor
Chicago, Illinois  60607
312.243.5900
Megan@Loevy.com
     appeared on behalf of the Plaintiff,

and

ILENE M. SMITH, ESQ.
Deputy Attorney General
302 West Washington Street,
IGCS Fifth Floor
Indianapolis, Indiana  46204
317.234.7019
Ilene.Smith@Atg.In.Gov
     appeared on behalf of the Defendant.

INDEX

| ITEM | DESCRIPTION | PAGE/LINE | |
|---|---|---|---|
| Direct Exam | By Ms. Pierce | 3 | 5 |
| Cross Exam | By Ms. Smith | 300 | 20 |

EXHIBITS:

| | | | |
|---|---|---|---|
| Statham No. 1 | 10-20-17 Nowatzke Email | 144 | 2 |
| Statham No. 2 | Prison Map | 151 | 17 |
| Statham No. 3 | B Cellhouse Map | 166 | 9 |
| Statham No. 4 | Statham Cell Diagram | 245 | 8 |
| Statham No. 5 | State Fire Marshal Incident Report | 252 | 17 |
| Statham No. 6 | 04-24-17 After Action Review | 252 | 22 |
| Statham No. 7 | Deft. Statham's Responses to Plf. First Set of Interrogatories | 286 | 18 |

Page 3

RYAN STATHAM, called as a witness on behalf of the Plaintiff, was first duly sworn and testified as follows:

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MS. PIERCE:

Q    So my name is Megan Pierce, and I represent the Plaintiff, Barbara Devine, in her capacity as the personal representative of the estate of Joshua Devine.

Before we begin, I'm just going to put a statement on the record.

MS. PIERCE: On October 7th and 11th, counsel engaged in Rule 37 telephone calls discussing outstanding discovery.  During these calls and as we memorialized in our October 15th letter, defense counsel agreed to provide us identified outstanding discovery responses, including requested documents.  Because we have not yet received these items, we reserve the right to reopen any deposition conducted until we receive them.

BY MS. PIERCE:

Q    Okay.  So with that, Mr. Statham, have you ever been a witness in a deposition before?

Page 4

A    Never.

Q    Have you ever given testimony in court before?

A    Yes, I have.

Q    How many times?

A    One time.

Q    What were the circumstances of that testimony?

A    It was a DOC case.

Q    And what happened in that case?

A    I don't understand the question.

Q    A DOC case.  So it was -- had to do with your employment at --

A    Yes.

Q    So what happened in the case then?  What was the litigation about?

A    Me testifying for two inmates fighting.

Q    Okay.  So was it in court?

A    Yeah, it was in court.

Q    It was in court?

A    Yeah.

Q    Okay.  So who was suing?  Who were the parties?

A    It was a criminal.

Q    Okay.

USDC IN/ND case 3:18-cv-00995-JD document 203-3 filed 03/29/21 page 3 of 106

Page 5

A   They were adding charges to another attendant [sic].

Q   Okay.  We'll go over the rules in a little bit more detail, but make sure to wait until I finish my question before you give your answer just so the court reporter can clearly get down --

MS. SMITH: And be sure to speak up.  It's kind of a big room, and I also need to hear what you're saying.

THE WITNESS: Okay.

BY MS. PIERCE:

Q   I'll just do the rules now.

So you understand that you're under oath?

A   Yes.

Q   So you understand that telling a lie at a deposition is a crime?

A   Yes.

Q   So as I mentioned, the court reporter's taking down everything that we say.  And for that reason, it's important to give verbal answers; so "Yes" and "No" instead of "Uh-huh" or "Huh-uh" or shaking your head.  Does that make sense?

A   Yes.

Q   For the same reason, it's also important

Page 6

that -- I'll try to wait until you finish your answer before I start talking, and it's important for you to let me finish my question before you start talking, just to help the court reporter out.

A   Understood.

Q   I'll try to ask questions that make sense.  That might not always be the case.  So if I say anything that's unclear, please just ask.

If you do answer a question, and you don't ask for clarification, I'll assume that you understood what I asked.  Is that fair?

A   Understood.

Q   And if you need a break at all, just let us know, and we can take a break, just not while the question is pending.  So if I've asked a question, I'll ask that you answer it before we take a break.

A   Understood.

Q   So you said that the litigation that you testified in was criminal?

A   Correct.

Q   And it was adding charges onto -- had to do with charges for someone who was already a prisoner at ISP?

A   That is correct.

Q   Okay.  And it had to do with a fight

Page 7

between inmates?

A   That is correct.

Q   Okay.  And so you were just a witness in this case?

A   That is correct.

Q   Is that the only time that you've ever given testimony in court?

A   Yes.

Q   Have you ever been sued before?

A   I've done a tort claim.  I've -- I don't think I've ever been sued.

Q   You were the plaintiff in that tort claim?

A   Yes.

Q   Who were you suing?

A   Sorry.  I was the defendant in the tort claim.

Q   Who sued you?

A   Other inmates.

Q   For what?

A   Lost property that they assumed I was responsible for; failure to protect them, from their perspective.  To my knowledge, none of these have ever -- anything's ever happened with these beyond them filing it.

Q   Okay.  Are you represented by the AG's

Page 8

Office in that case?

A   They never -- tort claims are handled within the facility.  So if it ever made it to court, I don't know about it.

Q   Okay.  So it's not an administrative --

A   Correct.

Q   Have you ever been sued in state or federal court that you know of?

A   No.

Q   Do you know the name of the inmates who brought that administrative complaint against you?

A   I do.

Q   What are their names?

A   Noble Potter.

Q   Okay.

A   And Randy Ybarra.

Q   Are you under any medical care that would impair your ability to testify fully and accurately here today?

A   I am not.

Q   Do you have any medical condition that would affect your ability to testify accurately and fully here today?

A   None that I know of.

Q   Do you have any condition that affects

USDC IN/ND case 3:18-cv-00995-JD document 203-3 filed 03/29/21 page 4 of 106

Page 9

your memory?

A   No, I do not.

Q   Are you taking any medication that would affect your ability to accurately recall and fully testify here today?

A   No, I'm not.

Q   Without getting into the substance of any conversations you had with your attorneys, did you meet with counsel to prepare for this deposition?

A   This is the first time I've ever met anybody from the attorney's office.

Q   Have you spoken with any of them over the phone?

A   Yes.  I spoke with a man named Daniel, last name starts with an R.  And then I spoke with Miss Smith.

Q   And when did you speak with him?

A   Daniel, I spoke with -- a couple months ago when I was supposed to do this the first time. I don't recall the date.  And then when I had to reschedule, that's when Miss Smith began contacting me.

Q   And about how long did you speak with Miss Smith?

A   Sixteen minutes on my lunch break a couple

Page 10

days ago.

Q   Did you review any documents in preparation for today?

A   She told me she would send me documents. I never received those, so I never reviewed any.

Q   Did you do anything else in preparation for today?

A   No.

Q   Have you ever spoken with anyone about your deposition here today?

A   No.  My wife.  I told her I had to come. That's about it.

Q   And you haven't spoken with anyone at IDOC about your deposition here today?

A   No.

Q   What city do you live in?

A   I currently live in Chesterton, Indiana.

Q   Have you recently moved?

A   Recently moved October 1st.

Q   And what was the reason for your move?

A   Bigger apartment.

Q   Do you have any plans to move in the future?

A   I'd like to move into a house by 2022.

Q   Do you have a personal cell phone?

Page 11

A   Yes, I do.

Q   What's your cell phone number?

A   (219)292-9984.

Q   Do you have a personal landline?

A   No, I do not.

Q   Do you have a work cell phone?

A   Yes.

Q   What's your work cell phone number?

A   (219)713-5636.

Q   Have you changed your phone numbers at all recently?

A   My work phone number is new as of September 21st.  My cell phone number's been the same since 2014.

Q   Did you have a work cell phone while you were at ISP?

A   I did not.

Q   Do you have an email address?

A   I do.

Q   What's your email address?

A   Would you like my work or my personal?

Q   Both.

A   My personal email is RStat91@gmail.com. My work is RStatham@idoc.in.gov.

Q   Do you use any social medial?

Page 12

A   Yes, I do.

Q   Do you have a Facebook?

A   I do.

Q   What's your name on Facebook?

A   It would be my name.

Q   Do you have Twitter?

A   I do.

Q   What's your username or handle?

A   Celebrate Stat.

Q   Do you have any other social media?

A   LinkedIn under my name.  Snapchat under the same username as the Twitter handle.  And I have an Instagram.  I couldn't tell you what the username was.  I haven't used it since 2012 or '13.

Q   Any other ones?

A   Not that I can think of.

Q   Okay.  When did you graduate from high school?

A   2010, June.  I'm not sure what date.

Q   And where did you graduate?

A   Donald E. Gavit, Hammond, Indiana.

Q   Did you go to any continuing education after that?

A   Yes, I did.

Q   Where was that?

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-3 filed 03/29/21 page 5 of 106

Page 13

A    Purdue University Calumet.
Q    Did you graduate?
A    I did not.
Q    How long did you study there?
A    Till 2013.
Q    And what did you study?
A    Communication, Public Relations.
Q    What was your reason for leaving?
A    I just took a break from school to start working at the prison, and I actually plan to go back next August.
Q    What was your reason for wanting to be employed at the prison?
A    I have no other reason other than my parents didn't want me to.
Q    Was that your first job?
A    No.
Q    What was your first job?
A    Taco Bell in Highland, Indiana, in 2006.
Q    How long did you work there?
A    Seven years, all the way up till I left for the prison in 2014.
Q    What was your job at Taco Bell?
A    I started as a food-service champion, and then I was a shift manager.

Page 14

Q    What was your reason for leaving Taco Bell?
A    To go work at the prison.
Q    And you said your parents didn't want you to work at the prison?
A    Correct.
Q    Why was that?
A    Both of them were correctional officers in Texas.
Q    And what was their reason for not wanting you to also be a correctional officer?
A    They don't like the lasting effects that it's had on their lives.
Q    What are those effects?
A    I have no idea.  Never discussed it with them.
Q    Have they given you any other explanation?
A    No.
Q    So you started working at IDOC 2014?
A    September 8th, 2014.
Q    What was the application process?
A    Fill out an application.  Do a phone interview.  Go to the facility.  Do a facility tour. Do an interview.  And then do a background check and urinalysis.  Start the job within two weeks.  I had

Page 15

to wait a month because I gave my two weeks, and there wasn't another class starting for another two weeks.  So it was about a month after I did all that, so I didn't start doing work for the DOC until October.
Q    Okay.
A    But my start date on my ID says September 8, 2014.
Q    Did you have any initial training when you started?
A    Yes.
Q    And did that start in September or October?
A    It started in October.
Q    And what was the initial training?
A    Two weeks of Correctional Training Institute in Westville, Indiana.
Q    What is the Correctional Training Institute?
A    It is a place where they teach you the legal aspects of being a correctional staff member.
Q    What do you mean by the "legal aspects"?
A    They taught us the rules and policies that we are to enforce so that if we ever had to go to court, they would be able to defend us in court;

Page 16

meaning, the Attorney General's Office.
Q    So your understanding was that it was for legal purposes to do this training?
A    Absolutely.
Q    Was there any practical component, as well?
A    After the two weeks of Correctional Training Institute, there's four weeks of OJT, or on-the-job training, in which you follow an FTO, which is a field training officer, and you do the job for four weeks prior to doing it by yourself.
Q    Okay.  In the first two weeks, was that all classroom based?
A    All classroom with Powerpoints.
Q    Was there any tests?
A    Yes.
Q    What sorts of policies and rules did you learn about?
A    Use-of-force policies; emergency plans; emergency procedures as they pertain to the DOC, not facility specific; and personal-protection techniques.
Q    Were there exams?
A    Yes.
Q    How often were there exams?

Page 17

A    After every section, every instructor, when they were done instructing their portion of the class, they would then give you a test.  And then another instructor would come; and when they completed what they were instructing, they would give you a test.

Q    Did you pass all of your tests?

A    I passed all of my tests on the first time.

Q    Do you know what percentage of people passed their tests?

A    I don't.

Q    Do you think that that two-week training was effective?

A    I think it was necessary.  I don't know that it -- for me, that it was -- it wasn't effective.  It was more effective to do the on-the-job training than it was to do the Correctional Training Institute.

Q    What do you mean "necessary"?

A    I think that if no one ever explains to you the rules and the things that you're responsible for, then you could go through your job saying you didn't know what you were supposed to do.

Q    What specifically did you learn about the

Page 18

emergency plans and procedures?

A    I learned that there were five levels of emergency plans outlined in the Department of Corrections Emergency Manual.

Q    Did you learn more detail about those five levels?

A    Not at that time.  I didn't learn them until I became a sergeant when I read them myself, which was in November of 2017.

Q    So did you actually see the policies when you were in that initial classroom?

A    I did not.

Q    So how detailed were the instructions that you were given about the rules and policies?

A    I believe in comparison to the actual policies, they were brief.  But as far as in knowledge and necessity, they were adequate.

Q    You said that the emergency plans and procedures that you learned were not facility specific; correct?

A    Correct.

Q    So you didn't learn any evacuation plans related to ISP?

A    Right.  'Cause those are facility based, and Correctional Training Institute is multiple

Page 19

facilities.  So teaching one facility's emergency plans at a Correctional Training Institute would be unbeneficial.

Q    Did you learn anything about responding to emergencies generally?

A    Not in CTI.  But once I took the First Responder Class after my six months, that's when I learned to respond to emergencies.

Q    So let's switch to the four-week, on-the-job training.  Who did you shadow while you were doing that?

A    It's a different person every day.

Q    Make sure I finish my question until you answer, just for the court reporter.

So you shadow a different person every day.  Is there someone who's specifically in charge of your individual training?

A    There is a field training manager, and I don't recall who that was at the time I was going through training.  But I -- in regards to being responsible for what I learned, I would assume it would be the field training manager.

Q    Can you shadow any individual person at ISP, or is it someone who's specifically trained to train you?

Page 20

A    In order to become an FTO, you must take a coaching and motivational interviewing course, which pretty much reinforces how you should talk to people and how you should teach.

And then the field training officer is a voluntary position, so you had to volunteer to be an FTO.

Q    During your time at ISP, had you been a FTO?

A    Yes, I was.

Q    How long were you an FTO?

A    For about four years.

Q    Are you still an FTO?

A    I now hold a new job title; so while I'm still a DOC FTO, I am not a parole FTO.

Q    What's the difference between a DOC and a parole FTO?

A    In order to be a parole FTO, you must take an additional course called "Training the Trainer," and I have not yet taken that course because I don't have a year in parole.

Q    So when you started at IDOC, you were a correctional officer?

A    That is correct.

Q    How long were you a correctional officer?

USDC IN/ND case 3:18-cv-00995-JD document 203-3 filed 03/29/21 page 7 of 106

Page 21

A Until November of 2017. So approximately three years, little longer than three years.

Q And what did you do next?

A I became a correctional sergeant, which is a supervisor of correctional officers.

Q So you became a sergeant in November of 2017?

A November 5th, 2017.

Q And how did you get that position?

A You do an interview as well as a written test. I understand there's no longer a written test; but when I did it, there was a written test and an interview.

Q Did you have to apply for that position?

A Yes, I did, via the IDOC Job Bank.

Q Did anyone tell you that you should apply for that job?

A They had told me I should have applied the past two years, and then I just decided to do it for a raise.

Q Who told you that?

A All of my supervisors.

Q Do you remember anyone specifically?

A Lieutenant Chris Dustin, who's now Captain Chris Dustin. Lieutenant Gillespie. I

Page 22

don't know his first name. And Sergeant Erin Jonas, who's now Investigator Erin Jonas.

Q How long were you a sergeant?

A Up until September 21st of 2019. So a little less than two years.

Q And what did you do after that?

A I became a Parole Agent III, which is a double promotion from a sergeant.

Q So you said Parole Agent III?

A Parole Agent III.

Q So what do you do now?

A I supervise offenders who have completed their time incarcerated behind the wall of a correctional facility, and I supervise them in the community in order to assure public safety and their reentry into society.

Q How many people do you supervise?

A Currently zero. I'm still in training.

Q How long is the training?

A It's dependent on forms that get filled out, and I haven't even began filling out the forms yet because I've been in so many academies, which is why I had to reschedule the deposition the last time I was scheduled.

Q So tell me about these academies.

Page 23

A I go downstate and learn the same type of rules that I learned when I was going through the Correctional Training Institute but as they pertain to parole.

Q And so you've been in these academies for about a month and a half?

A In October I spent three weeks downstate. Two of those weeks were in New Castle, Indiana. One of those weeks was in Indianapolis, Indiana.

Q And what else have you been doing since you left your position as sergeant?

A I've been doing computer-based training in regards to my job and shadowing people as they perform their community supervision in order to see what I'll be responsible for.

Q Will you be responsible for a certain geographic area?

A Yes, I will.

Q What geographic areas?

A Gary, Indiana.

Q Is there a reason that you wanted to switch to a parole position rather than a in-facility position?

A There is not. Other than a pay raise.

Q So you're still employed by the IDOC?

Page 24

A That's correct.

Q So while you were at IDOC as a correctional officer, did you work the night shift or the day shift?

A Both.

Q What did you start with?

A I started with nights.

Q And when did you switch to days?

A January of 2018.

Q And how long were you on the day shift?

A Until September 21st, 2019.

Q Did you request to move to days?

A I did not.

Q Do you know why you were moved to days?

A Every two years sergeants switch, and it was time for sergeants to switch.

Q Did you prefer the day or the night shift?

A I preferred the night shift, but I would never have told any of my supervisors that.

Q Why not?

A I don't complain.

Q And why did you prefer the night shift?

A It was easier for child care.

Q Any other reason?

A No.

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 8 of 106

Page 25

Q   Did most people prefer day shift or night shift?

A   Most people prefer day shift.

Q   Were you at ISP the entire time that you worked at IDOC until your new position in parole?

A   Yes, I was.

Q   Were you ever asked to switch to a different facility?

A   No.

Q   While you were at -- while you've been at IDOC, have any prisoners, beyond the one we already discussed, filed any complaints or grievances against you?

A   Offenders, you know, used an informal grievance process, which is just a request slip that they give to me.  And then beyond that, if they want to try to do a formal grievance, they would need to go above me after attempting the informal.

So I've received a lot of informal, but I've been able to resolve, due to issues, that maybe I didn't know the correct policy or procedure, or I was able to help them with the issues that they were having.

Q   About how many of those informal grievances have you received?

Page 26

A   I would say more than three hundred.

Q   Can you give me some typical examples?

A   I'm not receiving any mail.  My mail is going to another cell location.  I'm not being let out on time to make it to my class.  I'm not being out -- let out after 2:00 o'clock so I can take a shower.  Inadequate food portions through Aramark, which is the food-service contractor for the facility.  Subordinate staff not letting an offender out to go and do things that they need to do, like church, class, or work.  Cleanliness in the segregation unit.

Q   Do you normally find that their complaints have merit?

A   Yes.

Q   Have you ever received any complaints specifically about your conduct?

A   I don't know that I would receive one about my conduct.  They would go -- send an informal to my supervisor about my conduct.

Q   Do you know if that's ever happened?

A   I do not.

Q   You never received any?

A   I would have never known until it went farther.  Or even if the supervisor corrected me, I

Page 27

would believe -- he wouldn't say, offender so-and-so said this; I think you need to correct it.  He would just tell me, hey, don't do this.

Q   Okay.  So you would only find out if it reached a certain level.

A   Correct.

Q   Do the offenders often make complaints or grievances about maintenance issues?

A   In units when I first started working, yes.  But I was very diligent on filling out maintenance work orders.

And then when I had supervisors who would allow me to put in work orders, we would always get work orders handled.

Q   Whose responsibility is it to oversee maintenance work orders?

A   To oversee would be shelter lieutenants; and beyond that, shelter captains.

Q   Okay.  Whose responsibility is it to fill out maintenance orders?

A   Shelter lieutenants.

Q   Okay.  But who would receive the maintenance requests from the prisoners?

A   From a custody perspective, it would be the shelter lieutenant.  Beyond that, I have no

Page 28

clue.

Q   And is there a formal process by which a prisoner can make a maintenance request?

A   As I discussed earlier, there's a request for menu [sic] slip which can go to any staff member in any IDOC facility.  And as far as a way to put in a work order, they could write a request to maintenance.  They could also write a request to the lieutenant of the shelter or the shelter captain.

They can also just verbally tell any staff member who's -- then their responsibility would be to tell the shelter lieutenant or the shelter captain.

Q   What type of maintenance problems did you typically see at ISP?

A   The most typical would be cable, cable not working or cable not connected.

Q   To the televisions?

A   Correct.

Q   Were there a lot of maintenance problems with the televisions themselves?

A   Not the televisions themselves, no.

Q   Okay.

A   To my knowledge.  Sorry.

Q   That's okay.

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 9 of 106

Page 29

You weren't familiar with any maintenance issues then with regard to the televisions?

A   No.

Q   Were there many electrical problems that you remember while you were at ISP?

A   Offenders tend to take the plates off of their electric outlets in order to use the wire to connect heating elements to heat water, to heat food, or anything like that.

And then whenever they want to plug something in, it's then our responsibility to get it fixed and either charge them or write them up for destroying the outlet or just have maintenance fix it.  That's probably the most common.

Beyond that, when offenders move into cells, like light fixtures, having the light bulbs drop out is probably the second most common.

Q   Okay.  And were those both fairly common problems?

A   Common when an offender moved into a cell.  Once it was fixed and the offender was in the cell, not common.

Q   Any other common types of maintenance issues you're aware of?

Page 30

A   Due to being an L-shaped plumbing system, which meant that a plumbing line ran from the first cell on the 500 to the first cell on the 100, and then from the first sell on the 100 to the -- just as an example, 39 cell on the 100, there would be a lot of clogging issues.  And if one clogs, multiple clogs.  But those are generally easy to fix -- fixings.

Q   Okay.  And who responded to the maintenance requests?  Who are the maintenance workers?  Are they prisoners themselves or third party --

A   It is DOC maintenance staff members who escort DOC offenders to do the repairs unless the facility's on lockdown, and then the maintenance staff members do the repairs themselves.

Q   And are the maintenance -- the prisoners on the maintenance team, are them trained at the prison?

A   I have no clue.

Q   Do you have any training in maintenance issues or electrical issues?

A   None whatsoever.

Q   So you said you were part of the QRT team at ISP?

Page 31

A   That is correct.  I was also a QRT instructor.

Q   When did you become a member of the QRT team?

A   February of 2015, six months into my DOC career when I became eligible.

Q   February 2015?

A   Yes.

Q   And so you have to be at ISP for six months before you can be part of the QRT team?

A   That is correct.

Q   And why did you want to be part of the QRT team?

A   It is not voluntary.  I was told I was going to do it.

Q   Can you volunteer?

A   I believe that you could.

Q   Who told you that you were going to be on the QRT team?

A   At the time I believe it was Lieutenant Anthony Watson; and there was a captain, but I do not recall who it was.

Q   At any given time, how many people are on the QRT team?

A   There are four people on the

Page 32

First Responders.  There are four people on the Weapons Team.  And five people on the Cell Extraction Team, but those five can be made up of any of the other eight that are on the other two teams.  And that makes up a QRT team.

Q   If you're on the QRT team, can you be on any of the other teams?

A   You could not be on First Responders and Weapons.  You can be on First Responders and Cell Extraction, but not First Responders and Weapons.

Q   Do you mean at one given time or --

A   Correct.

Q   Okay.  But one day you could be on Weapons, and one day you could be on First Responders?

A   Yes, you can.

Q   Okay.  What sort of training did you have to undergo to be part of the First Responder Team?

A   It's a two-day training, and you learn policy and procedures.  You learn communication.  Then you learn report writing.

After that, you learn cell extraction, which is mandatory movement from a cell.  And then there is a range portion.  I don't

Page 33

exactly recall when the range portion occurs, but that's when you learn how to use the nonlethal weapons.

Q   Okay.  Is that -- and so is that partially classroom based and partially not classroom based?

A   It is all classroom based except for the range portion.

Q   And the range portion is just about using nonlethal weapons?

A   Correct, nonlethal weapons.

Q   Do you think that the first responder -- or sorry, the QRT training was effective?

A   I believe the material is effective.  I think it depends who teaches the course as to whether or not that specific training is effective.  My training was effective.

Q   Who taught your training?

A   At the time Lieutenant Derek Boyan.  He was a captain.  And now he's in charge of hazardous materials.

Q   Have you ever heard of any times where you think it wasn't effective?

A   I have not.

Q   Did you get training on emergency response while you were in the QRT training?

Page 34

A   I don't understand the question.

Q   Did you get training on how to properly respond to an emergency as part of your QRT training?

A   I think that's more field based.  You become the fourth member of the First Response Team, and you follow the other three who are hopefully more experienced first responders, and you learn from experience.

Q   Okay.  So you don't really get any training on how to respond to an emergency until you're doing the field training?

A   Correct.  I don't think there's any, like, formations or -- or anything like that in order -- that you learn.

Q   Is the fourth member of the team always someone in training?

A   It is usually the lowest-ranking person on the team.

Q   So what sorts of policies and procedures did you learn during that training?

A   The same use-of-force policies that we learned in the Correctional Training Institute.  You learn different sets of personal protection and ground techniques to handle hostile offenders.

Page 35

Q   Beyond the personal protection techniques, is there any content that's different from the training that you'd already received as part of your initial training or your in-service training?

A   I would say the biggest difference is the nonlethal weapons; learning what those are, how they're used, when they're used.

Q   Is that part of personal protection techniques?

A   That's a part of the QRT, not personal protection.

Q   Okay.  Are there any other differences between the training that everybody else has that you can think of?

A   None that I can think of.

Q   When you said that -- I believe you said earlier in your testimony that you didn't actually see the emergency manual until you became a sergeant; correct?

A   That's correct.

Q   So you had not seen the emergency manual at the time that you were a QRT member.

A   At the time I was made QRT manual [sic], I had not read the emergency manual.  Everyone has access to the emergency manual.  I just, for

Page 36

whatever reason, did not seek to read it until I was -- became a sergeant.

Q   When you say, "access to the emergency manual," what do you mean?

A   There are facility plans and emergency manuals placed in three locations throughout ISP. I'm not sure about other facilities.  One is in the captain's office, one is in the warden's office, and the other one is in the training department.

Q   And you said that's the emergency plans and the emergency manual?

A   Correct.

Q   What's the difference between those two things?

A   Emergency plans are essentially a checklist.  So if there is a tornado, I pull out the tornado emergency plan, and there is a checklist of things that I need to ensure that I do.

The emergency manual would just be the policies and procedures in regards to using those plans and how to determine whether or not that what is taking place falls under each emergency plan guidelines.

Q   So were you -- you said that individuals have access to them.  So they could go to one of

Page 37

those places and request to look at it, or how would that work?

A   Yes, you can request to look at it.  You cannot take notes, photocopy, take pictures.  You can't do any of that.  You can sit there and read it.

Q   Okay.  Did they -- are people instructed that they should go and look at the emergency plans and emergency manual?

A   With every training that you do, you are given policy and procedure numbers, and they tell you to write this down to review for later.  And in my opinion, you are told that you can -- you can and should go read those policies in order to do your job better.

Q   What do you mean, in your opinion, you're told that?

A   I have heard some people state that they didn't feel that they were being told they could go look at them, but they're put in those areas that everyone has access to so that those things can be read.

Q   In what context were people saying they weren't told they can go look at them?

A   When I became a sergeant, a huge part of

Page 38

what I tried to do was retention because I felt with good training, people would stay.  So I would ask people, hey, did you know this?  And their answer would be, no.  And when I asked why they didn't, they said because they were never given a forum in which they could read it.  And when I told them, hey, did you know you could go here and read this or go there and read that?  And they would say, no, I didn't know that.  Nobody ever did.

So I went out of my way, even at, like, roll call, where the entirety of staff is there, to let everybody know where these things were.  And any time there were policy changes or facility directives, I always made sure to read in my roll call, because as a supervisor, I felt it was my job to train everybody else.

Q   And so why do you think that it is that some people thought they didn't know about policies and procedures in the emergency manual?

A   My opinion on the fact is that they felt it was a job to do, and they didn't feel that they wanted to read and become better.

Q   Do you think that there were supervisors who were not instructing people about how to look at these policies and procedures and manuals?

Page 39

A   That's possible.

Q   Do you know if -- you said, for example, that people told you they didn't know they could go look at the emergency manual.  Do you think they were instructed to go look at the emergency manual?

A   Not until I was their supervisor.

Q   Okay.

A   Most likely.

Q   So you think other supervisors were not instructing people about the ability to go look at the emergency manual?

A   Or it never came up.

Q   So if it never came up, you believe that instructors, supervisors were not instructing people about the existence of the emergency manual and their ability to look at it?

A   Correct.

Q   And you, in fact, did not go look at the emergency manual until you were a sergeant; correct?

A   I was coasting; meaning, I was comfortable at my job all the way up until I decided that I was going to go up for sergeant.  And once I decided that, I decided to make myself as knowledgeable as possible.  I spent extra time reading policies.  I spent extra time becoming a QRT instructor.  I spent

Page 40

a lot of time bettering myself.  And I think once I stopped making it just a job to do, then I was willing to go and do those things.

Q   Do you think a lot of people were coasting at ISP?

A   Absolutely.

Q   What percentage of the people, if you had to break it down, do you believe are coasting at ISP?

A   65 percent.

Q   Do you think this creates risks at ISP?

A   I don't think it creates risks, but I think it can create danger.  Those same people that are coasting are not going to go out and do risky things; such as, cell searches by themselves or anything like that.  But I do think that if a situation were to occur, they would be less inclined to help.

Q   You think people would be less inclined to help in an emergency situation if they're coasting?

A   I do believe that.

Q   And you said that about -- you believe about 65 percent of people are coasting.  Was that true in 2017?

A   I would say that was true up until the

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 12 of 106

Page 41

raise to $16 an hour, and I'm not quite sure as to when that occurred. Once the raise -- once the starting pay of $16 an hour, you started getting more people who were career focused.

Q Do you have an idea about when the raise happened?

A 2017, but I -- I don't know if it was beginning of the year, end of the year.

Q And after the raise, what percentage of people would you think were coasting?

A I would say probably a little over 45 percent.

Q Was the warden aware people were coasting?

A I believe at the end-of-the-year evaluation, there is -- there is room for someone that is coasting and doing the bare minimum. And that's actually on to evaluation: Does not meet expectations, meets expectation, exceeds expectations, or outstanding. And I would say that your coaster falls into that "meets expectations."

Q Do you believe other IDOC officials knew that individuals were coasting at ISP?

A I think, with any job, management is aware that there are some people who are coming to their job solely to get a paycheck and not to make a

Page 42

lasting effect. So I would assume that, yes, there are officials that knew that.

Q Did you ever hear that issue discussed?

A Yes.

Q Who did you hear it discussed with?

A It was a discussion we would have among supervisors in our sergeants' meeting about helping our staff take pride in what they're doing.

And then the other discussion that we would have in our in-service training, we would talk about how unappreciated the staff feel; and if they felt appreciated, they would be inclined to work harder.

Q So this got brought up by your in-service training?

A Yeah. I would say.

Q Does the warden participate in the in-service training?

A There are many classes, and I'm sure that the warden does take one; I just never have had one with the warden.

Q So besides that, your sergeants' meeting, did you ever express concern to other individuals at ISP about people coasting?

A I never expressed concern, but I would

Page 43

engage in -- engage in conversation once it was brought up.

Q And what would you say in those conversations?

A That in order to make people feel appreciated, we needed to change uniforms to where it wasn't just a polo and cargo pants. We needed to go back to deputizing staff, to where they feel important in their community and not just in their facility. And that training needs to be intensive and not classroom -- classroom based. It needs to be fieldwork within the training.

Q Okay. So you -- you told people that you thought there should be more training, field training, as part of the initial two-week training?

A Correct.

And then shortly after my training, so 2016, early 2017, they did switch the field training to prior to the Correctional Training Institute. So they listened to what we were saying and they fixed it.

Q So they changed that in 2016?

A Correct.

Q And do you think that the change they made was sufficient to address your concerns?

Page 44

A Much more sufficient.

Q Did you feel prepared to begin your job after you completed training?

A Personally, I didn't [sic]. But I do know people in my class who -- who were still skeptical if what they learned could be applied in a facility.

Q When you were working as a sergeant in 2017, do you believe that new individuals you saw coming to work at the prison were prepared to do their jobs?

A When they got to me, I feel that I was integral in making them prepared to do their jobs. So prior to coming to me, probably not. But I made sure that they were ready.

Q So you think there were people who were working as officers who were not prepared to do all the responsibilities that they had as an officer?

A I think in order to become an officer, you have to at least meet the minimum requirements that are set by the field training manager. So I don't think anybody could work if they didn't meet the minimum requirements.

Q Okay. So people who meet the minimum requirements are capable of doing the job of a correction officer?

BARABARA DEVINE vs
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    Cause No. 3:18-cv-00995-JD-MGG
document 203-3    filed 03/29/21    page 13 of 106
RYAN STATHAM
November 5, 2019

Page 45

A    Correct.

Q    Do you think it's a problem to not let people take notes regarding the emergency manuals and to only see the emergency manuals upon request?

A    I think it's inconvenient. I don't think it's a problem because confidentiality is important. Because you don't want that information going behind the wall and a paper gets dropped, and now an offender has access to our emergency plans.

Q    So how did they convey the emergency plans during training without using the emergency manuals?

A    The Powerpoints have short bullet Powerpoints on the things that might happen specifically with your Level 5 emergencies, which are -- have to do with on-duty staff. So if an emergency happens in your area, you're told what you're supposed to do.

Q    And -- but those are not facility-specific training on the Powerpoint; correct?

A    I don't know the answer to that. I don't know if other facilities would use a different Powerpoint because I've never been in one.

Q    But the Powerpoints that you looked at were for IDOC generally; correct?

A    Correct.

Page 46

Q    Did you receive any -- during your field training -- when you were trained by the field training officer and you were shadowing, did you receive training on how to respond to emergencies?

A    Not -- not respond to emergencies. From my perspective, responding to the emergency is actively handling the situation that's occurring. But I was trained on what I'm to do in the area in which I'm working. So if a situation is occurring in an area on the left, as a staff member working in that area, it's my job to isolate that area so that First Responders can respond to the situation on the left.

Q    Okay. What type of situation could that be?

A    If there's a fight on the left side of the cellhouse, then it's my responsibility, as unit staff, to move all of the offenders to the right side of the cellhouse.

Q    And you learned that during training, during your shadowing.

A    Yes.

Q    And did you learn that just as situations came up, or were you given -- were there certain situations that they would sit down and explain to

Page 47

you?

A    We would do scenario based, based on the experience of the field training officer I was with.

Q    Okay. So whatever situations were arising on that day at the prison, you would learn based on those situations?

A    Or if the FTO had a situation that stuck out in his mind, he was like, okay, if this happened, this is what you would do; this has happened before, so just make sure this is how you would do it.

Q    Were you ever trained at any point on how to respond to a fire?

A    I've never, like, filled out, like, a training document, like this is how you respond to fires. But the very first time I responded to a fire, I was taught, you know, this is where we get fire extinguishers, this is where the person goes to let out the facility fire department. This person does this. So there was no formal, like, training manual on how to combat a fire.

Q    Was there any sort of formal training at at all about how to combat a fire?

A    No.

Q    So until you responded to a fire, you had

Page 48

never been trained on how to respond to one?

A    Personally, I'd never been trained on how to respond to a fire.

Q    Was there any training regarding fires as part of your first -- as part of the QRT team training?

A    Yes.

Q    Okay. What was that?

A    To -- if the fire's inside of the cell, you take a red fire extinguisher, which is the chemical one. I don't know the name of the fire extinguishers because I'm not a firefighter. But if the fire is outside of the cell, a stack of paper, you take the silver one, which contains water.

Q    Okay. Is that the extent of training on fire response that you were given as part of the QRT team?

A    Correct. Because our facility has a facility fire department, usually it was just our job to control it until the firefighters got there.

Q    And you were instructed that it was your job just to control it until the firefighters got there?

A    Correct. And most times I would say we were able to put it out with what we had. And then

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 14 of 106

Page 49

firefighters came and just cleared out the smoke, and then they did all -- again, I'm not a firefighter, but they would pull everything apart and get rid of all the smolders so that it would stop smoking.

Q   Okay.  So were you instructed about the different fire extinguishers in a Powerpoint?

A   Yes.  And then monthly they would come in and ask if there's this kind of fire, which fire extinguisher would you use.  Say the ABC fire extinguisher.  If there's a certain type of fire, like an electrical fire, then they would ask, if there's this kind of fire, would you use the paper fire extinguisher?

Q   Do you want to scoot over a little bit?

A   Yeah.  That sun...

Q   Okay.  So -- and you said, "they would come in."  Who do you mean by that?

A   Either the firefighters would come in, and he would have a checklist.  And he would ask you, the offender firefighter or the HAZMAT person, which prior to it being Derek Boyan -- I don't remember his name.  But he would always come in, and he would do fire alarm checks.  And then he would ask us questions in regards to fires and HAZMAT materials.

Page 50

Q   Okay.  And how often would they come in?

A   I believe it's monthly.

Q   Okay.  So one or the other would come in, either the firefighter or the HAZMAT?

A   Sometimes they would both come in if they didn't know the other had already came.

Q   Okay.

A   And it's also -- I only worked 15 days a month, so it was possible it was twice a month, and I only saw them one time a month.

Q   And would they quiz you on anything else beyond which fire extinguishers to use?

A   Which exit to use for emergency exits.  They asked me if I knew where the post and evacuation plans were.  And they would ask the last time I used the fire extinguisher and if I knew who to tell the fire extinguisher was empty.

Q   Okay.  Would they check the fire extinguishers or just the fire alarms?

A   They would check the extinguishers with the little tag that's on it.

Q   What would they check on the tag?

A   I don't know.

Q   Where are the fire extinguishers?

A   In every cellhouse was different.  In the

Page 51

area that I usually worked, they were inside the officer's station above the officer's desk on the wall.

Q   Do you know where they were in B Cellhouse?

A   Inside the officer's station above the desk, not on the wall.  The office is covered by a mesh, so they were inside the office strung to the mesh like with a little hook.

Q   Anywhere else in the cellhouse?

A   To my knowledge, no.

Q   Do you know how many there were in the officer's station?

A   Two water and one chemical.  One ABC and two silver water ones.

Q   And so you were instructed just to kind of maintain the situation until the firefighters could come; is that correct?

A   Correct.

Q   Did anybody ever instruct you that you should try to put the fire out yourself?

A   Oh, yes.  That's -- yes, that was -- that's part of controlling it, is attempting to put it out.

Q   Okay.  And who instructed you to do that?

Page 52

A   When you go through training, there's a scenario portion where they talk, blah-dah-dah -- and one of the scenarios specifically talks about a fire in the kitchen.  And it asks, you know, what would you do if there's a fire coming from a grease trap?  The answer is:  You spray it with an ABC fire extinguisher and wait on the fire department to come.

And they say, an offender sets a fire in the range with paper.  What do you do?  You spray it with water from the extinguisher and wait for the firefighters to come and handle it from there.

Q   And when were you given that scenario?

A   During Correctional Training Institute and then again in QRT and then every year in annual in-service.

Q   How long is the training in the annual in-service?

A   It used to be 40 hours, but I believe it's less now.  But they still call it 40-hour in-service training.  I don't know the amount of hours it is now.

Q   And is it basically similar to the training you get before you start your job?

A   It is a refresher, yes.

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 15 of 106

Page 53

Q   So there's no real -- there's no significant differences between your initial training and the in-service training?

A   Correct.  The only time there would be significant differences is if there's significant change.

Q   Okay.  Do you remember any point while you were at ISP when there were significant changes in policies or practices?

A   In regard to fires, no.  But in general, yes.  We had an active-shooter plan.  We got rid of using leads when we escort offenders.  But in regards to fires specifically, no.

Q   What's a "lead"?

A   A lead is, for back of a better term, a leash in which would we would use to escort the offenders when they were in segregation.

Q   Did you stop using those?

A   The connotation of using a "lead" on an offender to escort them.

Q   So you said that you were supposed to maintain the fire until -- or maintain the situation until the firefighters came.

A   Correct.

Q   How would the firefighters be called or

Page 54

activated?

A   When a signal is called using the radio, every unit has a list in the office of where their firefighters live.  And it is the officer in that officer's station responsibility to get their door open, advise them that there's a fire.  And while you're -- the policy says to instruct them as to where the fire is; their job is to report to the fire station.  So, you know, you tell them, hey, the fire's here; you need to go to the fire station, get dressed.

Q   And so that was -- was that always the policy?

A   I believe that would be a procedure and not a policy.

Q   What's the difference?

A   A procedure is the way in which you do things.

The policy would be the way that it's written statewide.

So again, the procedure's done inside the facility.  I don't know if it's a policy because not every facility has a fire department.

Q   Okay.  Do you know if that comes from a written procedure?

Page 55

A   I do not.

Q   So it's just something you are instructed about while you worked at ISP?

A   The list that has the firefighters has instructions on it.

Q   Okay.  And so they would automatically get activated as soon as the fire code was called?

A   Correct.  Whenever a fire was called, it was their job to at least stage inside of the fire station with their gear on in case they were called.

The person that's responsible for going to open the fire station is the yard sergeant.  And the yard sergeant's job is to stay, open up the fire house, and let them stage there.  And then a first responder would call the yard sergeant and tell them that we need the firefighters.

Q   Okay.  So it was always the case -- so it would just take the person -- scratch that.  Let me start again.

Would the -- the order to release the firefighters, would that be just hearing the 10-70 from whoever called the fire, or would that come from the control room or a sergeant or a lieutenant or a captain?

A   I believe the answer would be all of the

Page 56

above.  Because if I hear it on the radio, then the next step would be for the control room to call it.  So the moment in time between me hearing it on the radio and the control room calling it would be a matter of seconds.

So I mean, I would assume that if someone heard it on the radio, they would be, like, well, I'm not going to wait for control to call.  I'm going to go get the firefighters out.

Q   Okay.  Do you know if there's any instruction on when -- the officers are given about when they should release the firefighters?

A   I am not sure.

Q   But your understanding is that you could do it either when control called or when you first heard the signal on the radio?

A   Right, because the paper with the firefighters on it says when a 10-70 or 10-71 is called, these offenders housed here, who work here, which they have normal daytime jobs, too, but if a fire occurs, send these offenders to the firefighters -- or to the fire station, and then in bold words, "immediately," with an exclamation mark.

THE REPORTER: I'm sorry.  What "immediately?"

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 16 of 106

Page 57

THE WITNESS: Just send them to the fire station immediately, and then it's bolded with an explanation mark.

MS. PIERCE: I think we might be speaking a little quickly for you?

THE REPORTER: No. He's trailing off.

THE WITNESS: Sorry.

THE REPORTER: That's okay. Thank you.

BY MS. PIERCE:

Q    So this is a written document that says this?

A    It is, and it's signed by the HAZMAT person. To my knowledge, that is not an executive directive or a procedure.

Q    Okay.

A    It is just a form that the hazardous-material guy has put up in the office for us to follow.

Q    Has that been in the office the whole time that you've worked at ISP, or was there a point at which they started using that form?

A    That's always been there. And then when a firefighter changes jobs, they come in and change it. The HAZMAT guy or the fire chief, who is an offender.

Page 58

Q    The HAZMAT person, was that Griffon? Was that his name?

A    I have no idea. (Witness shaking head.)

Q    Okay. And did he have an office there? Do you know where it was located?

A    Other than speaking with him when he came in, I really didn't associate with him or have any reason to contact him, so I don't know.

Q    You don't know if he worked at the facility or somewhere outside of the facility?

A    Correct. I don't have the answer to that.

Q    Okay. And so you've seen -- is that document in the -- did you say the officer's station in the cellhouse?

A    Correct.

Q    Is it on, like, any kind of board, or where did they keep it?

A    We have a corkboard in every cellhouse. And then every cellhouse also has a -- the clear plastic sheets that you slide papers into. And on the corkboard inside the clear plastic sheet is the paper with the firefighters on it so you know who they were.

Q    And that's in every officer's station?

A    To my knowledge, yes.

Page 59

Q    And you said there's no title or anything to that page?

A    No, there is not a title to that page.

Q    And how often are those updated?

A    Whenever the firefighters change or change jobs.

Q    Were you ever responsible for updating it?

A    Never.

Q    You mentioned earlier that there's a problem with retention at ISP?

A    That is correct.

Q    What do you think is the reason for that problem?

A    I believe it's a problem in all of corrections, and it just has to do with the stress of the job and the -- the pay not being comparable to the stress of the job.

MS. PIERCE: Can we --

THE REPORTER: We can close a blind.

THE WITNESS: I don't think there's anything you can do about it.

(Brief discussion held off the record.)

MS. PIERCE: If it gets to be more of a problem, we can move around.

Page 60

BY MS. PIERCE:

Q    Okay. So when you would -- on a typical day when you would arrive, either the night shift or the day shift at the prison, what would you do? Walk me through the initial part of the day.

A    You would walk in and you would walk through a metal detector. You would get a pat search by a staff. You would walk through a sealed door, show your ID, let them touch it in order to make sure it hasn't been altered in any way. You would walk through two more sealed doors. And then you would make it to the dispatch window, which was operated by a lieutenant. He would tell you where you're going to be stationed and whether or not you were a first responder.

Q    And then what would you do from there?

A    If you were a first responder, you would grab your equipment, which is a 911 tool, which is used to cut paper and string and stuff like that. And then you would report to roll call, wait in line, and listen to the events that occurred in the last couple of days and any new announcements or awards that were given or anything like that.

Q    What type of things would they generally talk about that had happened in the last couple of

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 17 of 106

Page 61

days?

A   If there were fights, if there were staff assaults, fires, medical emergencies.  If there -- if there were awards given, if offenders had certain programs going on that might have extra offenders out of your cellhouse and you didn't know why.

Q   What types of things were awards generally given for?

A   Going above and beyond the call of duty. So, you know, saving an offender's life, saving a visitor's life, saving a staff member's life; keeping an area clean where it's not necessarily your responsibility to have it clean, but you cleaned anyway; excellent report writing; perfect attendance.  Stuff like that.

Q   Okay.  So then from that meeting -- usually how long would that meeting last?

A   You're given 15 minutes.  So the roll call period is 15 minutes prior to your shift, but there have been instances where it goes longer if there's more occurring.

Q   So if you were going a little longer in the roll call meeting, would the shift that had started or they're supposed to get off, would they have to stay a little longer?

Page 62

A   Shift supervisors change shifts at a different time than line staff.  Shift supervisors change shifts -- it used to be an hour.  At the time of the incident, it probably would have been an hour.  Now it's two hours.  So it's your shift that's doing your roll call.  It's not the other shift.

Q   Right.  But there's another shift that has to be on duty in the cellhouses, right, while you're doing roll call?

A   Yes.

Q   Okay.  So would they have to stay a little longer if roll call went long?

A   Yes, they would.

Q   And so after roll call, you would go to your assigned area?  Is that right?

A   That is correct.

Q   And what would you do when you first got to your assigned area?

A   Check all keys and equipment, make sure that everything that is supposed to be there is there.  You get a quick rundown from the person in the cellhouse, which might include offenders that were gone on details, gone for programs, or needed to come out to receive their nightly shower, and

Page 63

just anything pertinent.  Beyond that, I can't think of anything off the top of my head.  And then the night shift would sign [sic] the second line to the day shift's log.  And then if it was the day shift relieving the night shift, they would assign [sic] a second line to the night sheriff's log.

Q   What do you mean, "assign the second line"?

A   Kind of like you're saying that all the keys and equipment are there and that a rundown was given.  So if it's not signed, then that means that you guys didn't check together that all the keys and equipment are there.

Q   Okay.  So you check that together -- the two shifts check that together.

A   Correct.

Q   Is it the officer in charge who's responsible for doing that?

A   It would be the sergeant.  But if there was not a sergeant, then yes, it would be the officer in charge.

Q   Okay.  And so you said you would check the keys.  Would you check them for anything else besides just to make sure they were all there?

A   You would make sure they're all there.

Page 64

And then once you assigned them to somebody, it is that officer's responsibility to check the keys that are on the ring to make sure that everything that's there is supposed to be there.

Q   Okay.  And by that you mean just, like, kind of look at the keys and see which keys are there.

A   Every key ring has a number of keys that should be on the key ring.  And if it's a set of keys that you're regularly holding, you should, number one, check to make sure that the numbers match the number of keys; and number two, you should make sure there's no damage to any of the keys.

Q   Okay.  And so the chit says how many keys are supposed to be on the key ring?

A   Correct.  It will say 11 keys, 10 keys. And if there's another chit, they'll say that this is your 200 keys, this is your 300 keys.

Q   Okay.  What other equipment would you get and check during that period?

A   There's the fire extinguishers.  There's a pair of bolt cutters which are used to cut padlocks from offender doors or cut chains from offender doors.

If you're not a first responder,

Page 65

there is a J blade, a 911 tool I talked about for cutting string and stuff. There is one in every unit connected to the bolt cutters. And then the other thing that you're going to check is the post orders, which is the guidelines and rules for working in the cellhouse that have to be signed every 30 days.

Q So when you say you would check all those things, like, what would you do to check the fire extinguishers?

A Ensure that it's there; ensure that the tag is still there, the pin is still there, and the pressure. There's a little pressure thing; as long as it's green, you're good.

I would still leave the other unit -- or I would still leave the other shift -- if, like, something was wrong with the fire extinguishers; by that, hey, I need to make sure something gets done with this fire extinguisher.

Q And has that ever happened, that the fire extinguishers were not okay and you needed to report it to somebody?

A Not in population. It did happen in segregation, though. Because you use fire extinguishers extensively in segregation.

Page 66

Q Okay. And how many times did that happen in segregation?

A Most times it was portrayed to me, but I would say every other night.

Q Sorry. "Most nights it was portrayed" -- most of the times people told you that that was the case?

A Right. They'd be like, hey, there's like three fire extinguishers we need filled; we've been using all day. Just make sure you get the firefighters over here and get them filled up.

Q Okay. And so how would you alert somebody of that? You would just tell the firefighter?

A You would call the fire chief, who most of the time where I was at, ISP was housed in I Cellhouse. So you would call I Cellhouse, say, hey, send me a couple firefighters; I got some fire extinguishers that need to be filled. Then you would let the yard sergeant know, hey, I got a couple firefighters gonna bring some fire extinguishers, that we need to fill them up.

Q Okay. Was there any sort of form that you filled out to say the fire extinguishers were out?

A Of my unit? I would write it in my daily log: Three fire extinguishers off unit with

Page 67

offender firefighters.

As far as the checkpoint's concerned, like checking fire extinguishers in and out of the firehouse, you know, what they do, I would have no clue.

Q And why were they used so frequently in segregation?

A Offenders like to set fires.

Q So there were a lot of fires in segregation?

A That's correct.

Q How frequently were there fires in segregation?

A Three to four times a day.

Q How often -- were those usually fires that you put out quickly or...

A Yes. They were paper fires.

Q What do you mean by that?

A They would stack paper in front of their cell and set it on fire.

Q Would you normally call the firefighters when you would see a fire like that?

A If we could not put the fire out prior to the smoke becoming uncontrollable, then yes.

Q But you would try and put the fire out

Page 68

before you would call the firefighters?

A Correct.

Q Would you put the -- try to put the fire out before you would call a signal on the radio?

A Repeat the question.

Q Would you try to put the fire out before you would call a signal on the radio?

A I think it depends on the situation; but yes, most times you would attempt to put the fire out and call a signal on the radio.

Q Okay. So it's the practice at ISP that you can try to address the fire yourself before you put in a call to the fire department?

A Right. 'Cause remember, I said the fire department stages at the call of a 10-70 or 10-71, but then you call the yard sergeant and tell the yard sergeant to send the firefighters.

So if I have controlled it, and the smoke alarm or the fire alarm is not going off and the fire's out, then there's no reason to bring the fire department.

Q So what's the policy or what were you trained on at ISP about when you need to call a fire code on the radio?

A Anytime you see a fire or the smoke alarm

BARBARA DEVINE vs. RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 19 of 106

Page 69

is going off. And there's two different codes. There's a 10-70 and a 10-71.

Q   Which one is which?

A   Honestly, when I left the facility -- I don't recall. I don't deal with that type of thing too often anymore. At this moment I can't think of it. Even when you said "10-70" earlier, I couldn't recall which one that was, if that was a smoke alarm or a fire.

Q   Okay. So one is smoke and one is fire?

A   Correct.

Q   And you're instructed that you have to call one of those codes as soon as you see smoke or a fire?

A   Correct.

Q   And you were instructed that during your training?

A   I would actually like to take that back. You do not have to call if you see smoke. You call if the smoke alarm is going off.

Q   Okay. So you call the smoke code only if the -- the fire alarm is going off.

A   Yes. The -- because there's a smoke detection that will go off. We see smoke all the time because offenders would smoke. So if I saw

Page 70

smoke coming from an offender's cell, that wouldn't necessarily mean I would call the signal for smoke. I would wait until the smoke detector went off.

Q   So -- but if the smoke detector is going off, wouldn't they already be alerted to the fact that there's smoke in the cellhouse?

THE REPORTER: I'm sorry?

BY MS. PIERCE:

Q   If a smoke detector or a fire detector is going off, wouldn't people at ISP already be alerted to the fact that there is a -- smoke in the cellhouse?

A   In population, I believe that was true -- that would be true.

In segregation, that is not necessarily the case because a seg unit's kind of tucked off on its own.

THE REPORTER: "Because a seg unit"?

THE WITNESS: Is kind of tucked off on its own, like away from -- from general access.

BY MS. PIERCE:

Q   So does the fire alarm not trigger any sort of alert to the control room or any of the captains or lieutenants?

A   To my knowledge, no. It is staff in the

Page 71

unit's responsibility to hear it and call something.

Q   Okay. Okay. Does it link to any outside fire department?

A   If it does, I don't know about it.

Q   So the fire -- the fire alarm is just to alert the staff in the unit?

A   Correct. It's kind of -- in my opinion, I don't know the functions of it -- it's like a smoke detector in your home.

Q   Okay. So you only call a smoke alarm if the smoke detector is going off?

A   Right.

Q   And the smoke detector goes off only in the cellhouse in which it's in?

A   Correct.

Q   Can you normally hear the smoke detector when it's going off in other cellhouses?

A   D Cellhouse, which is segregation, is off on its own. But if I am on the back side of C Cellhouse and the fire alarm is going off, I can hear it.

Q   Okay. If a fire alarm or a smoke detector is going off in B Cellhouse, would you be able to hear it from the officer's station -- or not from the officer's station. I'm sorry -- from that main

Page 72

entrance room where the captain's office is?

A   I don't have the answer to that. I don't know.

Q   Okay. Can you hear the B Cellhouse alarm from outside of B Cellhouse?

A   During the incident that we're here to discuss, that is how I heard that there was a fire. Prior to hearing it on the radio and prior to hearing anything about a fire, I heard the fire alarm from outside of B Cellhouse.

Q   Okay. So you would call the smoke code, which is either 10-70 or 10-71, when the fire alarm is going off. When were you supposed to call the fire code?

A   If you saw flames, actual flames.

Q   Okay. So anytime you saw flames, you're supposed to immediately call?

A   Correct.

Q   So if you try to put the fire out yourself first, would that be a violation of policy?

A   I don't know. I don't have the answer to that.

Q   Well, you're saying the policy is that as soon as you see flames, you call the fire code over the radio; right?

BARABARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 20 of 106

Page 73

A   Correct.  But --
Q   So then would that be a violation of that policy, to try to put the fire out first before calling the code over the radio?
A   I believe that the time in between those two actions would be minute, so I think that the difference would be neither here nor there because I believe you would put the fire out while calling the signal with your radio, which is a hand mic, which can be used with your cheek so that if you needed to, you could be actively trying to fight the fire and calling the signal.
Q   Okay.  But if, for example, you spent ten minutes trying to put out the fire before you called the fire code, would that be a violation of policy?
A   I don't have the answer to that.  I'm not sure.
Q   As you understand the policy.
A   So your que-- the -- can you repeat the question?
Q   Sure.  As you understand the policy for when you're supposed to call a fire code over the radio, would it be a violation to spend ten minutes fighting a fire before you called a signal over the radio?

Page 74

A   I think that ten minutes is an extensive amount of time.  So in this situation, I believe that that would be a violation of policy.
Q   What about five minutes?
A   I think that's an extensive amount of time, too.
Q   Two minutes?
A   I think if I spray the fire one time and it doesn't go out, it's probably time to call a professional who's trained to fight fires.
Q   Okay.  Okay.  So you would -- when you got to the officer's station -- let's go back to the equipment you would check.  You would check the fire extinguisher, and what else would you check?
A   The bolt cutters, the 911 tool, the logbook.  Make sure there's still a computer, any, like, main electrical equipment that's in the -- in the unit.
Q   So you would just check to make sure that was there, or you would check to make sure that it was functioning?
A   I guess there, because there were times -- there would be times that something would not be functioning or they'd be coming to bring you a new one, but those things would be discussed.

Page 75

Q   Okay.  But you wouldn't, like, test out the bolt cutters and things like that.  You would just make sure they're there?
A   The shelter lieutenant is responsible for testing the bolt cutters.  The duration of time in which they do that is unknown to me.
Q   Okay.  So when you're explaining the equipment, you were tell-- and just for clarity, tell me whether you'd just check to see if it's there or you actually test it to see if it's working.
      So you said the bolt cutters.
A   I would check to see if they were there.
Q   Okay.  The computer?
A   I would check to see if it was there.
Q   The 911 equipment?
A   I would check to see if it was there.
Q   Okay.  And then you would sign the logbook?
A   Correct.
Q   And what about radios?
A   Check to see if they were there.
Q   Would you check to see if the radios were functioning?
A   When we had the old Motorola radios, it

Page 76

was hit or miss as to whether or not those radios worked.
Q   And when did you have those radios?
A   At the time of this incident, the fire in 2017, we still had those Motorola radios.
Q   And when did you get new radios?
A   I don't recall, but it was after the incident with the fire in 2017.
Q   And are there issues with the new radios working?
A   In my experience, I have not had any issues with the new radios.
Q   Okay.  And have you heard about people having issues with the new radios?
A   I have not.
Q   And so you said it was hit or miss with whether the Motorola radios were working.  So would you need to check those radios before you started?
A   Even if you checked it, if one time it worked, it was possible that the next time it would not.
Q   So would you check it before you started?
A   You would check that it turned on, check that it keyed up; but again, as far as usage goes, if you check it at 6:00 p.m., if you tried to use it

Page 77

at 7:00 p.m., it's a possibility it wouldn't work.

Q    In what way would you mean it wouldn't work?

A    Whenever you would attempt to key up, it would make a loud, humming sound, kind of like a flatline in an emergency room --

Q    Uh-huh.

A    -- and would not transmit.

Now, normally, on -- in a normal situation, you would know, okay, I didn't transmit; I need to transmit again.  But I can imagine that in a stressful situation, you probably wouldn't even hear that noise.  So if you transmitted or didn't transmit, it would be unknown to you.

Q    Okay.  When you say, "key up," what do you mean by that?

A    Press the button to talk into the mic or activate the radio.

Q    Okay.  And so you might do it one time, and it doesn't work.  And then if you rekeyed, it would work that time?

A    Correct.

Q    At times when it was not working, would you be able to hear people on the radio?

A    I don't recall.

Page 78

Q    Were there any other problems that the radio would run into?

A    Some radios had to have rubber bands wrapped around them in order to hold the battery in because they were so old.  They had been dropped, been through fights, that the battery would fall out or it could easily slide out.

They would -- I'm not sure of the technology of it, but the new radios are done off a satellite, so there's nothing facility based that can be done to make the radio not work.

The old radios were handled inside the facility.  So if the power went off to the radio room, or whatever, then the radios wouldn't work.

Q    Would that happen frequently, that power would go off to the radio room?

A    Not necessarily the power going off, but I know there would be times where we'd have to call the radio officer to figure out why the radios weren't working.

Q    So at times the whole radio system would not be working?

A    Correct.

Q    How often did that happen?

A    Once, twice a month.

Page 79

Q    And how often would you say it happened that the radios, when you went to use them, would not work in the way that you had described with the humming noise?

A    Quite often.

Q    Would you say once a day?

A    I would say more than once a day.

Q    Would it ever happen that you just couldn't use the radio at all during your shift, you couldn't get it to work?

A    Like the entirety of a shift?

Q    Yes.

A    Yes, that has happened.

Q    So what would you do if your radio wasn't working?

A    The buddy system, keep two people together if possible.

Q    Would you report it to anyone?

A    Yes.  In this situation, I would assume that we were all under the understanding that the radios weren't working.  But yes, if your radio don't work, you would let the shift supervisor know so they could attempt to get the radio room officer to come resolve the issue.

Q    So the shift officer was responsible for

Page 80

calling the radio room officer?

A    Correct.

Q    And the radio room officer would always come?  Sometimes come?

A    They're on call.  They come in when they're called.

Q    Okay.  And would they bring you a new radio?

A    Normally that wouldn't have been the resolution to the issue.  They would go to the radio room and try to figure our out why that specific set of radios weren't working.

Q    Would they take your radio and bring it back with them?

A    No.

Q    Would they -- were there backup radios if they were needed?

A    The control room had a lot of radios that you could "chit out," which is -- a chit has your name on it.  You create a chit for a radio.  But most times if the radios weren't working in that area, no matter what radio you brought into that area, it probably was not going to work.

Q    Okay.  So there were times -- were there times when people told you, you just had to do your

Page 81

shift without a radio?

A   Yes.

Q   How often did that happen?

A   Not often.  Maybe thirty times in my career.

Q   Okay.  Were there issues with the batteries in the radios?

A   Yeah.  As I said, the part that clips the battery in on some of the radios was either broken or worn.  So a lot of people used rubber bands or scotch tape to hold the battery in.

Q   Were there issues with charging the batteries?

A   I don't know.

Q   Did you have to charge batteries during your shift?

A   Whatever batteries you weren't using were in the charger.

Q   So there were extra batteries in the officer's station?

A   Correct.

Q   And how often would you have to change the batteries during your shift?

A   It depends where you work.  If you were just an officer in the cellhouse and not using your

Page 82

radio, it could last you the entire shift.  If you're the OIC or the sergeant, you're constantly using the radio; you might change it once or twice.

Q   Okay.  Was this a well-known problem with the radios at ISP?

A   I believe so.  And I know that it was a DOC thing to get the new radios.  And especially at the end of the older Motorolas, it was especially bad because no one had the parts we needed to fix the things because they were going to the new radio system.

Q   Was this a problem when you started at ISP?

A   If it was, I didn't know about it.  I didn't know about it really until I became an OIC unit and I had to constantly use the radio.

Q   And when was that?

A   February of 2015.

Q   Okay.  So it's been a problem since at least February of 2015?

A   Correct.

Q   And it was a problem until you got the new radios?

A   Correct.

Q   Which was after 2017?

Page 83

A   Correct.

Q   Okay.  Do you believe Warden Neal knew about this radio issue?

A   I don't have the answer to that.

Q   Did Lieutenant Watson know about the radio issue?

A   Yes, because he would regularly have to call in the radio officer.  Now, I don't know who the radio officer reports to, so I don't know who his boss is.

Q   Did Captain Dykstra know about the radio issue?

A   Yes.

Q   Do you know if Major Nowatzke knew about the radio issue?

A   Yes, because he was a captain prior, who had to call in the radio officer.

Q   Do you know if Kenneth Gann knew about the radio issue?

A   Again, I don't know who the radio officer reports to.  So if it was Gann, then I'm sure he knows.  If it was a random person, then I wouldn't know where that line of communication goes.

Q   Did you ever express concern to anybody about the problems with the radios?

Page 84

A   Personally, I did not.  But I know that it was a known issue because, again, when we discussed on roll call that the radios aren't working, "Make sure you guys are being careful."

Personally, I generally would tell my staff to stick with the buddy system anyway just because the radios didn't work.

Q   Do you think this caused dangers or risks, to have radios that don't work?

A   I think it caused dangers.

Q   Can you explain that?

A   If a situation occurred, you needed to use a radio, while the buddy system is great because now there's two of you, but a requirement of that is now one of us has to leave, leaving you alone, and there's no radio other than your buddy running and yelling, hey, there's something going on.

Q   Can you explain that again?  Sorry.

A   The buddy -- the way that the buddy system would work would be if I see a fight or I see a fire, you go and try to help, and buddy is going to run and tell the OIC and say, hey, this is happening; we need this.  So the danger in that would be you've now left whoever you put to control the situation, you've left them by themselves near a

Page 85

situation, and they don't have a radio to use.

Q   Is that officer permitted to let somebody out of their cell in an emergency by themselves?

A   That would be dependent on the situation.

Q   What are you basing that off of?

A   If a offender's attempting to harm himself, then at no point in time would I recommend that an officer let an offender out of a cell.  If an offender is setting a fire in his cell on his own accord because he chose to, at no point in time would I recommend that an officer pull an offender out of a cell.  But if an offender is having a medical issue or there's an accidental fire occurring in the cell or a plumbing issue, there's ways to clean out a toilet, something like that, then I would say, absolutely pull an offender out of his cell by themselves.

Q   What are you basing that off of?  Is that your understanding of best practices, or is that a policy at the ISP?

A   That would be best practices and experience.

The only time that you are not allowed to pull an offender out of a cell would be in segregation, and the requirement is that they

Page 86

have to be handcuffed to pull them out of the cell.

Q   So that's the only policy that you know about letting some staff to do it, an officer, releasing a prisoner by himself.

A   Correct.

Q   Okay.  There's no other written policies or procedures about when an officer can, by himself, release a prisoner from his cell.

A   Not that I know of.

Q   Was there any training that you received on that issue?

A   No.

Q   Okay.  So your understanding is there's no policy one way or the other; it's up to the discretion of the officer based on their experience and best practices?

A   Correct.  And discretion is -- should always -- like, is always using the idea of safety and security of the offender, of the public, of the staff, and of state property.

Q   Okay.  So those are the factors that the officer should consider:  Safety of the public, safety of the prisoner, safety of the officers.  But there's -- but then after they consider those, it's up to their discretion whether to let somebody out

Page 87

by themselves?

A   Correct.

Q   Is that what you instructed individuals when you were training as a field training officer?

A   Even in this exact moment, I cannot think of a time where that would have came up, for me to instruct that to someone.

Q   Okay.  So you don't think that ever came up when you were training individuals?

A   Correct.

Q   Okay.  So if it didn't come up in a scenario, you would not instruct new officers about whether they could let somebody out of their cell by themselves?

A   It -- they regularly let people out of the cells by themselves, but I don't -- in an emergency situation, I don't think that that particular thing would have ever came up.

Q   Okay.  Okay.  So you check the radios. And I -- the other equipment that you would have is the pipes; correct?

A   The Guard1, correct.

THE REPORTER: Guard?

THE WITNESS: Guard1.  It's a pipe.

Page 88

BY MS. PIERCE:

Q   Sorry.  Just to go back to the last question, you said that they -- I think you mean officers -- frequently let people out of their cells by themselves?

A   Correct.

Q   In what situations are those?

A   Regular, day-to-day activities; walking up and telling -- unlocking an offender's door, saying, hey, it's time for school; hey, time for church. I'm opening your door for lunch, it's time to go. Hey, I'm opening your door for breakfast.  Whenever you hear the breakfast bell, it's time to go.  So they're by themselves during those activities, so I could only assume that they can understand that they can let offenders out of their cells by themselves.

Q   Okay.  Is that -- if somebody has to be released from their cell for some reason after the 9:00 p.m. count, can they still be released by an individual officer?

A   Yes, but not without the permission of the OIC.

Q   Okay.  Can they be released during the day without the permission of the OIC?

A   Can they?  Yes.  Is it common practice?

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 24 of 106

Page 89

No.

Q   In what situations can they be released during the day without permission from the OIC?

A   It happens -- the offenders will be like, hey, can I go hop on the phone real quick to call my mom?  Hey, can I run to the shower real quick?  I just got back from class, didn't get a chance to shower.  I need to run down and talk to the unit team staff.  I need to run down and talk to the sergeant.  And while it is against most sergeants' requests, that does happen.

Q   Okay.  And in what circumstances would that happen?

A   An offender would state to an officer that I'm supervising that he needed to come talk to me about something, so the officer would be like -- would open their door and be like, okay, go talk to him.  And then I would have an offender in front me, and I'd be like, how did this guy get out?  It would be because the officer made a judgment call to let the offender out to come talk to me.

Q   And that doesn't violate policy?

A   Policy?  No.  But it does -- like, it's the sergeant's responsibility to maintain safety, security, and control.  And if I don't know at all

Page 90

times who's out, I can't possibly maintain safety, security, and control.

Q   Okay.  And so you said that's during the day.  But after a 9:00 p.m. count at night, you have to get the officer's in charge permission to let somebody out?

A   Correct.  And I believe -- I believe it even goes farther than that.  After 9:00 o'clock, you should have the shift supervisor's permission, unless it's a medical issue.

Q   The shift supervisor.  The captain.

A   Correct.

Q   And is that true if somebody's going to the kitchen to start the breakfast or anything like that?

A   That would be day-to-day activity, but you wouldn't let someone out without an OIC's permission.

Q   So is that some policy that you have to get the OIC's or the shift supervisor's permission?

A   I believe that's more practice.

Q   Okay.

A   Because after 9:00 p.m., no offenders come out unless they're going to medical; which in that case, the way it's always been explained to me,

Page 91

medical after 9:00 p.m. is essentially going to the hospital.  If there's -- you know, if they're going because they need eyedrops, that would be something that they would go in the morning for.  You would call the nurse and say, hey, offender so-and-so says he needs eyedrops.  Can he come see you in the morning?  Okay.  But if his finger's hanging from his hand, then yeah, you would take him to medical and let them handle it.

Q   And you can take him them to medical without getting permission?

A   Correct.  The only permission you need is from the medical staff.

Q   Okay.  So you would call the medical staff before you would release him or her -- or him from his cell?

A   Correct.

Q   Would you do that over the radio?

A   Via the phone.

Q   So if it's a medical emergency, you would go use the phone to call the medical staff before you would release the prisoner from his cell?

A   Not an emergency.  A medical emergency, you would call a signal 3000.  But if it was something -- he just needed to be seen by the

Page 92

doctor, he's bleeding from his fingernail, or he's bleeding from his mouth or something like that, you would just walk him over to medical.  Now, if he's passed out in his cell bleeding, you would call a medical emergency.

Q   Okay.  And would you let that individual out of their cell if they were having a medical emergency?

A   Yes.  Yes, you would.

Q   Would you let an individual out of their cell at night for any type of an emergency?

A   What type of emergency?

Q   Well, let me rephrase.

What type of emergencies would you let somebody out of their cell at night without permission?

A   Without permission?  None.

Q   None.  But didn't you say in a medical emergency, you would let somebody out of their cell without permission?

A   Yeah.  I would say you have the permission of the facility to let someone out of their cell in a medical emergency.

Q   That's just general policy, you mean.

A   Right.  You need to get them out of that

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 25 of 106

Page 93

area.
Q   But I'm talking about specifically calling an officer in charge on the radio or, you know, in person and asking for permission to let somebody out of their cell.  What emergencies would you let somebody out of their cell without getting that type of permission?
A   If they're violently bent over their toilet throwing up, I might open up their door and tell them, come out, let's go downstairs and get you to a hospital.
Suicidal thoughts -- if they're having suicidal thoughts, I would restrain them, walk them downstairs, say, hey, this guy said he's having suicidal thoughts.
You know, like a seizure or something like that, I'm going to call a medical emergency, and I'm going to let him out of his cell, but I'm going to wait for First Responders to get there.  So even that wouldn't be, like, by yourself.
Q   And what about in the case of a fire?
A   You would need to use your discretion as to whether or not this offender set the fire himself; and even so, you really shouldn't respond to signals by yourself.  That's very dangerous.  But

Page 94

if -- and this has happened:  An offender's electrical outlet catches on fire, and there's a fire going on?  Yeah, you would open the door, let them out, tell them to stand by you, and then just wait for responders -- First Responders or the fire department to put it out, let them leave until all the smoke clears, and then you eventually put them back.
Q   Is this a policy that you're articulating, or is this just your understanding of how things should be done at ISP?
A   I don't have an answer to that.  It's my understanding.  I don't know if there is a policy.
Q   Okay.  So it's -- what were you getting this understanding from?  Is it just from your experience at ISP, or did somebody instruct you that that's what you're supposed to do?
A   It is just from my experience.
Q   You were never instructed one way or another on the policy or practice of letting people out of their cells after an emergency situation at night?
A   Correct.
Q   And you said that the officer in charge is supposed to give permission to let somebody out of

Page 95

their cell at night.  Is that a written policy or practice?
A   It is not, but the officer in charge is responsible for safety, security, control.  And in order to have responsibility for that and to be able to keep track of those things, the OIC must know who's out at all times.
Q   Okay.  So okay.  So it just stems from the OIC's responsibility to know what's happening at all times in order for -- to ensure security?
A   Correct.
Q   So there's no training that you were given about asking the OIC for permission to get an offender out of his cell at night?
A   That is correct; there is no formal training on that.
Q   Okay.  You mentioned that there had been electrical fires before where you had to get somebody out of their cell.  When did that happen?
A   I don't recall any specific dates or times, but I know that -- that on occasion there are electrical fires in the cells, and we have to, you know, put the offender out, control the fire, stop the damage, and then ultimately let maintenance come in, check and see why there was a fire, fix the

Page 96

issue, put the offender back.
Q   Have you ever seen that in person?
A   Yes.
Q   How many times?
A   Six, seven times maybe.
Q   How many times have you heard of that happening?
A   Probably about the same.
Q   Okay.  So you've heard of it happening six or seven times beyond the six or seven times you've seen --
A   There would be no reason, other than, like, hearing it in roll call.  And that type of report wouldn't probably even make it into roll call because it's -- it's incidental.  There was no malice in it.  There was nothing like that.  So it was an issue that occurred, it happened and resolved, and then no further issue.  So it could have happened a lot more times than that.  I just wouldn't know about it.
Q   Okay.  Would those type of fires make it into an incident report?
A   It would make it into an incident report?  Yes.
Q   Did you ever fill out an incident report?

BARABARA DEVINE vs
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 26 of 106
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019

Page 97

A   Yes.

Q   Who's responsible for filling out incident reports?

A   Whoever sees or witnesses an event is responsible for doing an incident report.  And then it's the shift supervisor's responsibility to take the incident reports of all the staff and create a comprehensive incident report, which is then given to the warden and whoever else is responsible or whoever else is on that send list.

Q   And just to clarify:  So would you agree that this is a correct statement of policy, that during -- after a count, during the night shift, it's up to the discretion of the individual officer whether to get permission from the officer in charge before letting a prisoner out of his cell in an emergency?

A   I don't understand the question.

Q   So would you agree that this is a correct statement of policy, that an individual officer has discretion whether to seek permission during an emergency situation before letting an officer -- a prisoner out of his cell?

A   I think that even using the word "discretion" means that they have the choice as to

Page 98

whether or not they let them out or seek permission.

Q   Uh-huh.

A   So I don't think that that -- that would be a policy.  That would be based on their discretion.  I don't know the formal policy.

Q   Okay.  So you're saying -- so you agree that there's no formal policy about whether or not to seek permission before letting a prisoner out of his cell at night?

A   It is not that I don't agree that there is not one; it's that I don't know if there is one.

Q   So to your understanding, there's no formal policy.

MS. SMITH: Objection.  He said he didn't know.

BY MS. PIERCE:

Q   To your understanding, there's no formal policy?

A   I'm unsure if there is a formal policy.

Q   You do not recall ever being instructed on such a policy?

A   Correct.

Q   And you were responsible for training new officers; correct?

A   Correct.

Page 99

Q   And you said that you made yourself aware of new policies and practices; correct?

A   Correct.

Q   And did you regularly read and refresh yourself on policies and practices at ISP?

A   Yes, I did.

MS. PIERCE: Do you guys want to take a quick ten-minute break; five-, ten-minute break?

MS. SMITH: Sure.

(A brief recess was taken from 11:22 to 11:37.)

BY MS. PIERCE:

Q   Okay.  So in the scenario -- if a prisoner were in his cell after count at night, and a fire started in his cell, and an officer noticed by himself that a fire had started in his cell, would he be disciplined or violate any rules in any way if he opened the cell door without permission to let the prisoner out?

A   I think as long as they could justify and explain why they were able to do it, use their discretion, that they would be okay.

Q   And how could they justify or explain?

A   I believe that the offender's life was in

Page 100

immediate danger, so I got him out of the cell in an attempt to save him.

Q   So you believe an offender's life being in danger is a sufficient justification to open a door without permission from an officer in charge?

A   Yes, I do.  But I also think that an officer's life being in danger is justification to leave that same door closed.

Q   Okay.  So I guess in the reverse situation, if a prisoner were in his cell and there was a fire and an officer became aware of it, would he be disciplined for not doing anything to release the prisoner and just waiting for help?

A   I think that if you're able to justify that I was attempting to get him out of his cell, he refused to come, come get into a restraint so I could get him away from the situation, or I felt that if I let him out, he was going to attack me due to something that was said or done, then I feel that there would be no repercussions for such an action.

Q   Would an officer be punished if he did nothing to let a prisoner out of his cell when there was a fire in his cell and just waited for more help to come?

A   I believe his sole responsibility -- or

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 27 of 106

Page 101

not his sole responsibility, but his very first responsibility would be to communicate the situation. So if that officer communicated the situation and then waited for help to arrive, I see absolutely no reason why they would be in trouble.

Again, I think that communicating is that person's main responsibility in that moment.

Q    Is it their only responsibility?

A    Yeah, that's why I changed my wording. It's not their sole responsibilty, but that is their main responsibility.

Q    What are the other responsibilities?

A    To assist if you can. When dealing with the offender population, there are some times that regardless of what you're trying to do, the offender population will attempt to go against you. So even if I were attempting to get him out of his cell, I'm getting -- I'll get you out of the cell, they'll say, no, I'm not going to do that. He'd rather stay in a burning cell than go into handcuffs, which is the safest way for the offender and myself.

Q    Okay. If a prisoner was in a cell and there was a fire, and he was asking for help, would an officer be disciplined if he or she did not let him out of the cell and just called for help and

Page 102

waited for help to arrive?

A    No. As long as they can explain why they left him in the cell.

Q    Okay. So you keep referring to this "explain" or "justify." Is this like a procedure that's common in the prison, where someone explains their actions? Or in what scenario or in what situation are you talking about someone justifying their actions?

A    All decisions and discretion are based on the four things that we discussed earlier: Safety and security of the offender, safety and security of the staff, safety and security of the public, and protection of state property.

If I decide that it is too dangerous for me to let this offender out of his cell by himself, and I'm able to explain that to someone, then there's -- I see no way that a person can get in trouble for that.

Q    So let me change my question slightly.

Could an officer be punished if he sees a prisoner in his cell and his cell is on fire and then he calls for help but does nothing to help the prisoner get out of his cell?

A    I'm sorry, but I think my answer remains

Page 103

the same.

Q    Well, I think that's a yes-or-no question of whether or not somebody could be punished for taking that action or inaction.

A    But I think there's also an infinite number of responses to that.

Q    So my question is: Are there cases in which -- taking all of the circumstances that you're sort of noting, are there situations in which an officer could be punished for seeing a fire in a prisoner's cell, calling for help, but not doing anything to open the cell door to let the prisoner out?

A    I think that there is a hypothetical situation in which that could -- in which that could happen, yes.

Q    Okay. So he could be punished for doing that. Under what policy or rule would that be?

A    A rule -- it's one that I -- again, I don't know any rules or policies on fires or anything like that; but if there's an issue and I don't help, then that would be negligence or dereliction of duty. But if I don't help due to my safety or the safety of others, that is a totally different scenario.

Page 104

Q    Okay. Could you describe a scenario in which you believe that an officer could be punished for seeing a fire in a prisoner's cell, calling for help, but not opening the door?

A    If I see fire coming from the electric outlet, the offender voluntarily comes to the cell, gets restrained, and then I just don't open the door, and I let him stay in the cell with the fire, I could see an officer getting in trouble.

Q    Okay. Is that the only situation, or are there others?

A    That's the only one I can think of off the top of my head.

Q    Okay. Just to go back, you said that, you know, a person could justify their actions. Is that -- is that a part of any formal procedure or process, or is that just sort of like an informal -- your supervisor will come to you and say, hey, what happened, and you explain it?

A    I think that when you allow discretion and interpretation in the policies and procedures, you then -- it is required that you be able to justify how you came to that decision and how you used your discretion.

Q    Okay. I understand that, but it's not

BARBARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 28 of 106

Page 105

quite my question.

So I'm just asking if there's like an official procedure by which people justify actions that they've taken at the prison.

A   I don't believe so.

Q   Okay.  So that's just your understanding of -- because the prison allows discretion in its policies, then they should allow somebody to explain their actions?

A   I think that when it comes to legal matters, you must be able to justify and explain yourself.  On a facility level, most incidents stop at the incident report or the IA investigation.

Q   Is there an opportunity to explain an incident report or an IA investigation?

A   There absolutely is.

Q   What is that?

A   You would say in the report that on such-and-such a date, I responded to such-and-such incident; I used my communication device to communicate that there was an incident.  The reason that I did not assist is I felt that this staff member was in significant danger of injury had I assisted.

Q   And had you been asked during your time at

Page 106

ISP to give that type of explanation for your actions?

A   Personally?  I have not.  I have known people who have done that type of thing.

Q   Can you give me an example?

A   Two offenders are fighting.  You call the signal on the radio, and you don't go and try to break them up.  Especially with a smaller staff member or a younger staff member, the fear of getting in between the fight and getting hurt is greater than their willingness to jump into the fight and try to break it up.

Q   And so your understanding is that an officer would not be punished in that situation, for not going in to assist the fight?

A   That is correct.

Q   Okay.  I'm going to go way back a few minutes to when you were talking about the Guard1 pipe.

A   All right.

Q   So you would get a Guard1 pipe when you started your shift for the day; right?

A   If you were going to be assigned one, yes, you would get it when you came into the cellhouse.

Q   And who would be assigned one?

Page 107

A   An officer that is going to be responsible for running Guard1 on a certain set of ranges, which are areas in which the offenders live.

Q   Would that be anyone who's assigned to a cellhouse?

A   Not everyone assigned to a cellhouse would always have a Guard1 pipe.

Q   Who would not have a Guard1 pipe in a cellhouse?

A   If there's four officers, I might have one person who might not have a Guard1 pipe.  If I have five officers, there might be two people that don't.

Q   And how would you make that decision?

A   As an OIC, you would just use your discretion.

Q   Okay.  And so as an OIC or a sergeant in charge of the cellhouse, how many people -- how many ranges would a person typically be assigned to?

A   It would depend on the number of staff in the unit.

Q   And have you had a lot of experience working in B Cellhouse?

A   I have actually never worked in B Cellhouse.

Q   Okay.  How many people do you think is the

Page 108

minimum number that a cellhouse should have, staff, at one shift?

A   The -- this is actually a procedure.  It says, "per the master roster," so it is literally whatever number is assigned to the cellhouse.

Q   So in your opinion, what is -- in your opinion, what's the minimum number of staff that a cellhouse should have to ensure safety and security in a cellhouse?

A   I don't have an opinion on that.

Q   Do you think that it's sufficient to have two people assigned to a single cellhouse?

A   I think that this is where shift supervisors decision making comes into effect, because I truly believe that even today I could walk into a cellhouse and run a cellhouse by myself, and myself and others could be safe.  And I can imagine that there's a hundred people that could be assigned to a cellhouse, and with all hundred being in there, everyone is less safe than me by myself.

Q   Okay.  So you think one is sufficient if you have somebody who has the skills and ability to do their job?

A   I think one could be sufficient.

Q   And you think that you personally would be

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD     document 203-3     filed 03/29/21     page 29 of 106

Page 109

sufficient to run any of the cellhouses at ISP?

A   In day-to-day operations, I believe that that could happen, yes.

Q   Okay.  Do you think that there are risks with having just one person assigned to run a cellhouse by himself?

A   I absolutely do.

Q   So do you think that's a good practice, to have one person running a cellhouse by himself?

A   I do not.

Q   Do you think there are risks to having two people run a cellhouse by themselves?

A   Yes, I do; but I also believe there's risks to having a hundred people running a cellhouse.

Q   Okay.  Let's assume that the people -- the hypothetical people in our discussion are all very capable and trained to do the job correctly.  Do you think that there are risks to having two of those people run a cellhouse by themselves?

A   I do not.

Q   Okay.  Any of the cellhouses?

A   In typical, day-to-day operations, no, I don't think two people is too few.

Q   Okay.  So you said that you would assign

Page 110

individuals to do security checks on specific ranges; correct?

A   That is correct.

Q   So that would be the same people who had the keys for those ranges?

A   Not necessarily.

Q   And can you explain that?

A   If I have four people --

Q   Uh-huh.

A   -- it makes just as much sense to give the person with the keys the Guard1 pipe as it does to not give the people with the keys the Guard1 pipe and have my fourth person run the Guard1 pipe in the entire unit.

Q   Okay.  So you could have, in one cellhouse, just one person doing all the security checks for the cellhouse?

A   That is correct.

Q   Do you think that is a better practice, or it's a better practice to have people do the security checks just for the specific ranges for which they have the keys?

A   I think it's -- it's all choice.  It's all personnel, knowing who you have and what they're capable of.

Page 111

Q   Was there a practice that you used more than the other?

A   It would vary day-to-day depending on who I had.  If I had different personnel, I would do it differently.

Q   And were you trained or instructed that you could do it either way and that either way was fine?

A   There is no instruction other than every 30 to 40 minutes, the Guard1 pipe had to be run.

Q   And that's the rule, every 30 to 40 minutes?

A   Correct.

Q   And is that from when you started the last one, the next one has to be started within 30 minutes from that time; or when you finish the last one, the next one has to be started from 30 minutes of that time?

A   Every unit's piping code is different.  In some units it's the duration -- 30 minutes from the time the first button is hit, and some units it's 30 minutes from the time that the last button was hit.  But with the grace period that you're given, if you did it within 30 minutes from the time your last walk ended, you would almost always hit it on time.

Page 112

Q   What do you mean, "the grace period"?

A   30 to 40 minutes.

Q   Okay.  Okay.  And is there something that happens if you don't do it in the designated time period?

A   Yes.  You can be reprimanded, but you also fill out a Pipe Justification Report, which means I was doing something else and that is why this button might be missed or late.

Q   Okay.  And so will it, like, mark on some sort of form or some system that you're late if you don't hit a pipe within 30 to 40 minutes from the time you hit it before?

A   Yes, it will.

Q   And who will get that report?

A   It's my understanding that's Investigations, because that's who collects the pipes.

Q   Okay.

A   But beyond that, I have no clue.

Q   Do you have to fill out a Pipe Justifications Form if you miss a given time period, or you just do that if you want to try and justify it?

A   If you want to not get reprimanded for it,

Page 113

then you should probably fill one out.

Q    Were you ever reprimanded for not doing a security check on time?

A    I have never been reprimanded for not doing a security check on time.

Q    Have you ever reprimanded staff for not doing a security check on time?

A    Yes, I have.

Q    How often?

A    Ten times, maybe, as a sergeant.  Never as an officer because I didn't have that capacity.

Q    Was this a problem at ISP?

A    Yes, it was.

Q    Was it a problem that concerned you?

A    I did my best in my areas to fix the problem and ameliorate it.

Q    Did it concern you that other people were not doing their security checks on time?

A    On a professional level, it did.  On a personal level, no, because on a personal level, I cared about my area.  On a professional area, my thought was, one day I'll be lieutenant, then I'll be responsible for all of these people missing Guard1 pipe.

Q    Do you think that supervisors were doing a

Page 114

good job of ensuring that officers were doing their security checks on time?

A    I think they were doing a good job of reprimanding them if they weren't.

Q    Do you think they should have been doing more to encourage them to do their security checks on time?

A    I don't know that there's anything you can do, short of taking the Guard1 pipe and doing the walk for them, to make someone walk.

Q    What are the risks or dangers of officers not doing their security checks on time?

A    Offenders can hurt themselves.  Offenders can damage state property.  Offenders can escape.

Q    So you would say it's very important that officers do their security checks on time?

A    It is the most important thing in a correctional environment.

Q    Okay.  Do you believe that everybody at ISP was told that?

A    Undoubtedly.

Q    So it was emphasized that individuals should do their security checks on time?

A    Yes.  And then the results of not doing it were evident when there were people getting

Page 115

suspensions and reprimands for not doing it.

Q    So were people frequently suspended or reprimanded for not doing their security checks on time?

A    I don't know about "suspended," because if someone doesn't show up, I don't know if they were called off or suspended.  But I do know that quite a few people were written up and reprimanded for it.

Q    What happens when you're written up or reprimanded?

A    You're not eligible for a promotion or a raise in that year.

Q    Anything else?

A    To my knowledge, no.  I've also never received one.

Q    Okay.  Were people written up on their first late security check?

A    In general -- no.  And generally having one in a shift was not a big deal.  But if you had multiple throughout the shift or multiple, multiple days in a row or a period of time, like a hundred minutes not running the Guard1 pipe, those were a huge issue.

Q    Okay.  So if you missed -- if you had one late security check every shift that you were on,

Page 116

would that be an issue?

A    Over time, most likely.  They would be -- they would ask you why you're not filling out a justification if every night at 11:00 you're missing the same pipe because you have this form or that form.  I don't know what you could be doing, but just as an example, you know, why?  Why don't you just do a justification and say this walk was late because I was doing this, and I do this every night at this time?

Q    Okay.  Is it a problem if the person doing the security check doesn't have the keys to the cells that they're checking?

A    It is not.

Q    Does that create any dangers?

A    No more dangers than them having the keys.

Q    What if there's an emergency situation where the person needs to be let out of their cell?

A    Then they would call -- they would first call the person who has the key to report to that area immediately, then they would call the signal in order to let everybody know that something was happening and there needed to be assistance.

Q    Does that delay, waiting for the person to come up with the key, create any danger?

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 31 of 106

Page 117

A   It's momentary, but yes, it could.

Q   Do that danger have real consequences?

A   Yes, it could.

Q   So do you still agree that it's -- it doesn't create any more danger to have the person doing the security check not have the keys than it would if the person doing the security check had the keys?

A   Yes, I do, because the dangers are opposite if the person who had the keys doing the security check -- he could let the person out and get stabbed or get beat up, and those dangers still extend that way.

Q   Are there any other dangers that are -- that could occur -- strike that.  Sorry.

Are there any other dangers that are created by having the person with the keys do the security check?

A   The capacity for mistakes.  If the person walking -- and the offender's like, hey, can I get out and call my mom?  And the guy's like, sorry, I'm just running the Guard1 pipe; I don't have the keys.  So then the OIC knows the person that's walking doesn't have the keys to let out more people, so the officer in charge can maintain safety, security, and

Page 118

control.

Q   Any other dangers?

A   Sorry.  Dangers from?

Q   From having the person with the -- doing the security check have the keys.

A   None that I can think of.

Q   When you were either an officer or a sergeant at ISP, did you ever make any recommendations regarding policy changes or practices that you thought should be different at ISP?

A   None in regards to like emergency plans or anything.  I thought there should be things in regards to like new employee training, like giving bonuses for your first six months, first year.  Stuff like that.  Nothing like this, for emergency operations or anything like that.

Q   What things regarding training?

A   Giving staff like a $200 bonus for making it to six months, $200 bonus for staying a year.  Maybe giving somebody a bonus for staying five years in order to just keep their retention.

Q   And anything about like content or substance of training?

A   No.  There's an entire staff development

Page 119

training committee, and they do all of that.

Q   Were you on that committee?

A   No.  That's in New Castle, Indiana.

Q   Okay.  Did you ever express any concerns about problems that you saw at ISP while you were there?

A   Did I ever formally express them?  No, I never wrote like a memorandum and said, I think this is a danger.  But I might tell the lieutenant, hey, I think it's dangerous that we have 25 guys on the shower list at 7:00 p.m.  That's a lot of guys to have out at night.  Stuff like that.

Q   Were there any sort of habitual or, you know, permanent problems that you saw beyond just like one-off incidents that you expressed concern about?

A   No, none that I can think of.

Q   And you mentioned earlier that you have to sign off on post orders every 30 days.  Is that all post orders at ISP?

A   You sign off on the post order of any post that you work within 30 days and anytime you check into a post for the first time, your first time being in that post for the month.

Q   So post orders are just specific to the

Page 120

post that you're assigned to?

A   Yes, they are post specific.

Q   Okay.  Were you supposed to read them every 30 months [sic], or were you supposed to read them more frequently?

A   You're to read them every 30 days.

Q   30 days.

A   Or your first time being on the unit.

Q   Okay.  Thank you for that correction.

Were you given any training on when you should respond or investigate whether a prisoner was having a problem in his cell?

A   Can you explain "investigate"?

Q   The -- go to the cell to see what was happening.

A   As an officer, if an offender told me there was a problem in his cell and he could show me, I'd be like, okay, yes, that does look like a problem and we'll get it fixed.  Other than that, if an officer came down and said, hey, this guy's having a problem in his cell, I'm going to take their word for it and put a work order in because one way or the other, I don't actually do the work order, so there's no harm to me.

Q   Okay.  So what was your understanding of

USDC NND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 32 of 106

Page 121

how a prisoner should communicate to officers that he had an issue or a problem?

A   Verbally.  If -- like if -- I'm not naive to the fact that some officers would either forget or neglect to tell OIC that there was an issue, or they could use a Request for Interview, which we talked about earlier --

Q   Uh-huh.

A   -- and I always encourage the offenders, you know, feel free to write me anytime.  Even if I'm not here, you can write me, and I'll look into it.  And then when the officer's walking past, they would hand him a request, like, okay, this is for sarge or this is for the OIC.  Can you give it to him?  Then they're all given to -- the Request for Interviews of the day.

Q   So they would communicate with officers when officers came by their cells?

A   Correct.

Q   If a prisoner needed something more urgently, and there was no officer nearby, how is he supposed to get the officer's attention?

A   They tend to yell.

Q   You say, "they tend to yell."  Were they told that they should yell to get an officer's

Page 122

attention?

A   It is a violation to yell.  So they were not told that they should yell, but they most definitely do.

Q   So if it's a violation to yell under ISP policy, how should a prisoner get an officer's attention if he has an emergency?

A   I don't have an answer to that.

Q   So there's no way that you know of that a prisoner is supposed to get the attention of an officer if he has an emergency?

A   I guess in an emergency, like the offenders will tend to like yell if he hears his neighbor fall in his room and then he's not answering.  They tend to yell, hey, there's a medical emergency up here.  And that type of yelling would not be an infraction.  But, I guess, if an offender was yelling for a legitimate emergency, that would not be an infraction.  But they tend to yell for things that are not emergencies and could have waited for the next walk.

Q   Is there a written policy for that?

A   There's not.

Q   Okay.  So prisoners are just instructed that that's the policy.

Page 123

A   There is a conduct code for yelling.

Q   Okay.  A conduct code for the prisoners?

A   Correct.

Q   That says don't yell?

A   Correct.

Q   Does it have any -- in the written conduct code, does it have any exceptions for "don't yell"?

A   It does not.

Q   So on paper, according to the conduct code, the prisoner would be violating the code by yelling.

A   Yes.  The code is called "disruptive behavior," and it's any behavior that interrupts the regular living space of any offender or any working space of any staff.

Q   Does that specifically say yelling?

A   It does not specifically say yelling.

Q   But it's your understanding of the conduct code that that includes yelling.

A   That is my interpretation of the conduct code.

Q   Is there any written conduct code or policy that tells a prisoner he can yell in an emergency?

A   Was that he can or cannot?

Page 124

Q   That he can?

A   I don't know.

Q   Okay.  Not that you're aware of then.

A   Not that I'm aware of.

Q   So if a prisoner asked you, hey, how do I get your attention in an emergency?  What would you tell him?

A   To let the officer know, and I guess -- this situation has never come up, but I guess if he absolutely needed me, I guess the only thing I could tell him would be to yell.

Q   So there's no other mechanism by which a prisoner can get an officer's attention in an emergency other than by yelling?

A   Correct.  There's no call button like there is in county jails or anything like that.

Sometimes they bang.  And obviously, when they bang, you can't tell who's banging.  So then you go to that area, and they relay to you what they wanted.  But there's no call button or like emergency button or anything like that.

Q   Can you hear a prisoner on the far end of the 500 Range or the top range in a cellhouse if you're down in the officer's station?

A   Yes, you can most times.  But regardless

BARBARA DEVINE vs.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    RYAN STATHAM
                                                                                    November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 33 of 106

Page 125

of that fact, when one inmate yells, other inmates yell and say the same thing. And it's kind of like -- I'm obviously not an inmate and I've never been one, but it is my understanding that that's in their code of conduct, that they are -- their prison rules that they all do that. So if they yell, medical emergency on 500, then the people on 400 are going to yell, medical emergency on 500. The people on 300 are going to yell, medical emergency on 500, so on and so forth.

Q    Do you think that causes dangers or risks to have that as a system of how staff is notified of an emergency?

A    The danger -- who are you asking is the danger to?

Q    Anyone. To staff or to prisoners.

A    I feel as though it might not be the most efficient way.

Q    Okay. That's not quite my question.
        So whether it's efficient or not is to the side, but does it create any dangers or risks to the prisoners themselves if the only way they can get your attention is by yelling?

A    I suppose it does create a danger, but I do not have a resolution to the situation. So that

Page 126

would be...

Q    Okay. So if you are assigned to a cellhouse and you hear prisoners yelling in their cells, do you have a duty or an obligation to go see what's happening?

A    If I hear offenders yelling, talking about basketball, I do not have an obligation to go upstairs and go see what they're yelling about. I'll just tell the officer, hey, when you go do your next check, tell the guys there's people sleeping, don't yell; or write them up for destructive behavior.
        Now, if I hear them yelling medical emergency or, you know, fire, then yes, I have a duty to go upstairs and check on them.

Q    And is that part of policy at ISP?

A    I don't believe so.

Q    Is that part of your training at ISP?

A    I think that's a part of human nature.

Q    But if it's a part of human nature, that's just your own feeling about what's the right thing to do in a situation. I'm asking if there's a responsibility as part of your job to go see what's happening.

A    That I don't know.

Page 127

Q    You were never instructed one way or another on whether an officer is required to go see what's happening if a prisoner is yelling medical emergency?

A    I have never been instructed to that.

Q    Could a person be disciplined for not responding to somebody yelling medical emergency?

A    I have no -- nothing to base that on. I don't know.

Q    Okay. So then based on your understanding of what's the right thing to do, if an officer -- or excuse me. If a prisoner is yelling and you can't tell what they're yelling about, should you go up and see what's happening?

A    There's nothing wrong with extra supervision, so I don't think it would be a problem to be like, hey, I'm going to go do a round real quick to see what they're talking about.

Q    If a prisoner was yelling in his cell, and you could not tell what they were yelling about, would it be a problem -- sorry. Would it be okay for an officer not to go and check out what was happening?

A    I don't have anything to base that on. I don't know.

Page 128

Q    If a prisoner is yelling in his cell, and the officer can't tell whether they're yelling because they need help or because they're just yelling, should the officer be disciplined if he doesn't go to check it out?

A    That would depend on the end result. If the end result was he ended up needing help, then I -- I -- I don't know. I don't have -- I don't have anything to base that on. Like I -- I have never had a situation where I couldn't understand what an offender was yelling because they are very loud and --

Q    Okay.

A    -- and they harmonize.

Q    Okay. So your position is if the prisoners are yelling, you would agree that you can almost always tell what they're yelling about?

A    Yes.

Q    Okay. Have you ever heard of a situation where prisoners were yelling, and an officer couldn't immediately tell what they were yelling about?

A    Yes. And I mean, I've had that happen. And then I'll look up at somebody on the range -- you know, hey, do you know what he's yelling?

Page 129

Yeah, he's yelling about the basketball game or yeah, he's yelling about this. And in that case, like, all right, go ahead and go do another round and see if that's what he's yelling about.

Q   Okay.  So you would instruct somebody to go do another round and double-check.

A   Correct.  Because there's nothing wrong with more supervision.  There's a problem with less.

Q   So if you could not tell what the yelling was about, you would never just ignore it and keep doing whatever you're doing.

A   I can't see a reason why I would, but I don't know that I absolutely would not.

Q   Okay.  All right.  If an officer hears a prisoner banging on his bars, should he go and see what's happening?

A   On his next round, probably.  I don't -- they regularly bang, scream, holler, so no.

Q   So they wouldn't need to go immediately to check out what was happening?

A   No.

Q   Would you immediately go and check out what was happening if a prisoner was banging on his bars?

Page 130

A   Personally?  No, I would not.

Q   If you hear a disturbance or a commotion on one of the ranges, should an officer immediately go and check it out?

A   Explain "disturbance," please.

Q   A lot of noise and banging, kind of a scuffle.

A   If I hear a scuffle, then yes.

Q   Okay.  If you hear a prisoner in his cell crying, would you go and check it out?

A   I would -- crying?  Like can you explain "crying"?  I'm sorry.

Q   Crying, like a person would normally cry if they're sad or upset.

A   No.

Q   You wouldn't?

A   No.

Q   Okay.

A   I'm sorry.  I've never seen or heard an inmate cry.  I should precursor with that.  So that's a situation I've never dealt with.

Q   But you would not, if you heard an inmate crying, go and check it out?

A   No.  I would assume he probably wants to be left alone.

Page 131

Q   Okay.  When keys are assigned in a cellhouse, how is it determined who gets the keys to which range?

A   Oh, OIC's or sergeant's discretion.

Q   Who generally has the key to the front door?

A   Whoever's going to be closest to the do-- if I'm on the 100, but I'm going to do a walk, then the person on the 500 is going to stay in the office.  The person on the 100 would hand the key to the 500 guy, and he would stay in the office until the 100 officer came back to stay closest to the door.

Q   Okay.  So let me know if I'm understanding this correctly.  The person who has the 100 key generally has the front door key but then it moves around based on who is closest to the door.

A   Correct.  It's also possible that there's someone not assigned to a range who might have the front door key.

Q   Okay.  And is there only one front door key for every cellhouse?

A   It's different for every cellhouse.

Q   What determines whether there's more than one front door key for every cellhouse?

Page 132

A   I have no knowledge on that.

Q   Do you know if B Cellhouse has one front door key or more?

A   I have no idea.

Q   And you said you've never worked in B Cellhouse.

A   Never was assigned to B Cellhouse.  I've never been there for an 8-hour or 12-hour shift, anything like that.

Q   Do you know why you've never been assigned to B Cellhouse?

A   I've worked segregation and C Cellhouse, which is the largest cellhouse, for the majority of my career.

Q   Okay.  So you're usually assigned to those areas.

A   That is correct.

Q   And why is that?

A   I don't have an answer to that.

Q   Are people generally assigned to the same place over and over again, or are people moved around a lot?

A   Generally your newer people are moved around so they can find a niche or something that they're good at, and your veterans are kind of --

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 35 of 106

Page 133

put your aces in their places and leave them there. Or as a sergeant, you get assigned a place, and that's decided by the major. So as a sergeant, the major says, you're in C Cellhouse, you're in segregation, you're here. But as an officer, shift supervisor's discretion.

Q Okay. So the shift supervisor decides where the officers go.

A That is correct.

Q And that would be the captain.

A Or the lieutenant. That's correct.

Q So there's some shifts where there's no captain.

A Or the captain is just off that day.

Q And then the lieutenant's in charge.

A That's correct.

Q On the night shift, is there ever more than one captain?

A Never more than one captain.

Q On the day shift, is there ever more than one captain?

A There's at least three captains.

Q Is the captain always the highest-ranking person on the night shift?

A For the majority of the time, yes. The

Page 134

major might be there there for two, three hours just to sit in and see like how everything is going. But other than that, he doesn't work the night shift.

Q Okay. And the major is the person in the chain of command above the captain?

A That is correct.

Q And who's after the major?

A The deputy warden of operations.

Q And who's after that?

A The warden.

Q Okay. And on the night shift, how many lieutenants are there, usually?

A One to two. It depends on the shift.

Q Okay. And how many sergeants?

A At the time of this incident, there were three.

Q And how many are there now or when you left?

A Seven.

Q That's a pretty big increase; right?

A Yes.

Q What's the reason for that?

A They -- all night shift cellhouses now have a sergeant assigned to them.

Q And that was not the case before?

Page 135

A That's correct.

Q Do you know the reason for that policy change?

A I do not.

Q Do you know when that policy change occurred?

A I do not.

Q So if there's no sergeant who is in charge of a cellhouse...

A Usually the officer with the most experience in the cellhouse. Sometimes they will just move an experienced officer from another cellhouse to run the cellhouse where the sergeant is not.

Q And how much experience is sufficient for a person to be an officer in charge?

A There's -- there's nothing written that says it's a certain length of time. It can be your first day, and you can be an OIC.

Q Do you think that's good practice to have somebody be an OIC on their first day?

A I do not think that's good practice, but I also don't think it's common practice. But I could see it happening.

Q Do you think there's a problem of having

Page 136

inexperienced people being officers in charge?

A Yes, I do. But I also think it's good, too, if you have experienced officers in the cellhouse that are not OICs.

Q Okay. Do you think there were instances where somebody without sufficient experience was put in charge and there was no one else with sufficient experience in the cellhouse?

A Due to the fact that there's no like prerequisite for what's sufficient, I think that there were just OICs. Whether or not they're sufficient isn't really for me to say.

Q Do you think that there were dangers or risks created at any point at ISP because individuals without sufficient experience were staffed in a cellhouse?

A Can you repeat?

Q Do you think that there were ever instances where the people who were staffed to a cellhouse did not have a lot of experience and this created risks or dangers in that cellhouse?

A I don't think that the dangers were due to them being new. I think that the dangers occurred in them being new made them not know -- maybe didn't make them know how to respond.

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 36 of 106

Page 137

Q   Okay.  So it increased the risks that bad things would happen because of dangers that already existed.

A   Correct.

Q   Okay.  If the officer in charge in a cellhouse is the most experienced person there, what do you think in your opinion is a sufficient amount of time of experience to be the officer in charge?

A   I think that everyone's experience is entirely different.  There's officers that have been at the prison for 45 years; and as a sergeant, I would never make them be an OIC.  And there's guys that I've seen coming in three weeks into their career that could really run a unit.  So...

Q   So you would put somebody with three weeks' of experience as the most experienced person in the cellhouse, as the officer in charge?

A   I have seen it, and I have seen them succeed.

Q   Okay.  Would you do that?

A   Personally, I would not.

Q   So what is the minimum amount of experience that you would want somebody to have before you would put them as the officer in charge?

A   I think some -- I don't think it's a time

Page 138

limit.  I think it's a knowledge limit.  I think that someone should be trained to be an OIC.  So the OIC should train the replacement, as a sergeant should always train the replacement, as a lieutenant should train the replacement.  And it could be a week, it could be six weeks depending on the learning curve.  And I think everyone gets ready on a different scale, so I don't think there's a correct answer to that.

Q   Okay.  While you were at ISP, did you ever participate in any fire drills?

A   Yes, I did.

Q   How often?

A   I know that we did them at least once a quarter; but again, I'm only there 15 days a month and on one of four shifts.

Q   Uh-huh.

A   So I don't know how many drills there are in total, but I would say we at least did one a month.

Q   And who ran the fire drills?

A   The shift supervisor.  I don't really -- it was -- like we planned the fire drill.  Custody planned the fire drill.  It was the offenders that didn't know there was a fire drill.  So I would say

Page 139

custody staff ran the fire drill.

Q   So during the fire drills, would you evacuate prisoners?

A   Yes, we did.

Q   And did those occur during the day shift and the night shift?

A   I do not recall ever doing one on nights, but that doesn't mean that there wasn't ever one done on nights.

Q   Would you be surprised if I told you that none of the individuals staffed on B Cellhouse the night of the fire had ever participated in a fire drill?

A   I would be surprised if Officer Abbassi had never been part of a fire drill.

Q   Why Officer Abbassi?

A   She was a day shift transfer.

Q   But you think it's -- you wouldn't be surprised to find out that there weren't fire drills done on the night shift?

A   I would be surprised.

Q   Why is that?

A   Because Captain Baxter and Lieutenant Watson are very -- very big on training, like training exercises and stuff.  And I can't

Page 140

imagine neither one of them not doing a fire drill.

Q   Do you think it would be a problem if staff at the prison did not participate in fire drills?

A   I don't think it would be acceptable.  I don't think we just can't not participate.

Q   Let me rephrase.

Do you think it would create dangers at the prison if fire drills were not run in a way that all staff participated?

A   I would see where that would be a problem, yes.

Q   Why would that be?

A   Because the night shift would only have a written way in which an evacuation should occur.  They would never practice it in the field.

Q   And that would cause a danger?

A   Maybe not a danger, but it would definitely cause confusion.

Q   What do you mean by that?

A   They wouldn't know -- they would almost need the paper in front of them in order to run the fire drill or the evacuation; whereas, if you've practiced it and you've done it, you have it in your muscle memory and in your memory, so this is how we

BARBARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

Page 141

do it.

Q    Why would that cause a problem if they needed the paper in front of them during an evacuation?

A    You don't always have time to grab a piece of paper during an emergency.

Q    Okay.  So would that create more risks or dangers for prisoners and staff if the staff were not trained on how to do an evacuation?

A    Yes, it would.

Q    Did the First Responders participate as First Responders in fire drills?

A    There was no, like, going through the motions, grabbing fire extinguishers, and then going to the location, but we did everything we would do regularly.  And then the firemen have their own fire drills that they do.

Q    Okay.  So there's the firemen's drills and then the custody staff run their own drills.

A    Correct.

Q    They're not run together.

A    To my knowledge, they are not run together.

Q    So during the custody staff's drills, would the firemen be activated?

Page 142

A    No.

Q    Why not?

A    Because the drill was about the evacuation, not putting out of a fire.

Q    Okay.  And what about the drills that the firemen ran?  What would those drills be about?

A    I have never seen them.

Q    Okay.  You've never participated in one.

A    Never.

Q    So the fire drills that you did were just about evacuating people from the cellhouse.

A    Correct.

Q    Did you ever do any drills about calling fire codes and releasing the firemen from their cells?

A    I would not say, "drills," but there's plenty of practice to -- of sending the firefighters out for nonemergencies so that when an emergency comes, then you've had plenty of practice to release them.

Q    By "nonemergencies," you mean there's some type of fire or the fire alarm is going off, but it's not an emergency?

A    Correct, because the fire was handled or it wasn't a fire at all.

Page 143

Q    Okay.  So any time that you called a fire code or activated the firemen, it was because there was actually something going on to cause you to do that?

A    Correct.  Now, it doesn't mean that they didn't occur with others.  Just in my experience, I've never seen it.

Q    Do you know how often the firemen did their own drills?

A    I do not.

Q    Do you know any information about the drills that they did?

A    I say, "real firemen," but they're real firemen, too.  But outside firemen come in.  And there's a field right next to the firehouse; and they do like putting out fires in cars, putting out fires in small areas.  They brought the Jaws of Life in a car, and they did an extraction.  So, like, those are things that I've seen in the paper, but I did personally, like, see it.

Q    And to the best of your knowledge, did staff participate in any of those fire drills --

A    I don't know.

Q    -- or simulations?

Can I hand you a document that we'll

Page 144

mark as Exhibit 1.

(Statham Exhibit No. 1 marked for identification.)

BY MS. PIERCE:

Q    So this exhibit is Bates stamped in the bottom right the corner, Devine 025591; is that correct?

A    Yes.

Q    Okay.  And so this is an email from Jason Nowatzke; is that correct?

A    You said it's from Jason Nowatzke?  Yes, it is.

Q    Uh-huh.

And the email to to which he's responding is from Lori Smales; is that correct?

A    I don't know.

Q    Well, you can see here Jason Nowatzke wrote, "Here's the list of CBTs.  Get this done." Do you see that?

A    Yeah.  Yes, I do.

Q    And then down below it says, from Lori, "Here are the lists that you wanted.  I think that I Group and K Group should get an 'Atta Boy' for being on top of this.  They're doing a great job about having their staff complete these."

BARABARA DEVINE vs
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 38 of 106

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

Page 145

A   Yes, I do.  I see that.

Q   And then it has a list here of people and marks for IREUA, Ethics and Sexual Harassment?

A   Yes, I do see that.

Q   Do you know what CBTs are?

A   Computer-based training.

Q   What does that mean?

A   It's a module on the computer in which you watch a video or watch a slideshow and answer questions.

Q   How often were you supposed to do those?

A   Well, you get annual CBTs.  You get a monthly cyber CBT, which is over random topics.  And then you have yearly CBTs, such as IRUA Ethics and Sexual Harassment.

Q   Okay.  And how would you know that you were supposed to do those?

A   You get an email.

Q   Okay.  And would you check your email regularly?

A   When I'm at work, I check my email twice a day.  When I'm at home, I check it every hour.

Q   And where do you check it at work?

A   On a computer.

Q   Where?  In the --

Page 146

A   In the cellhouse, in the captain's office, in the PDR, the dining room, anywhere.

Q   So you -- would it -- were officers allowed to check their email while they were on duty in a cellhouse?

A   Absolutely.

Q   And where in the cellhouse?  Would it be in the officer's station?

A   Either the lieutenant's office, the Unit Team office, or captain's office.

Q   Is the Unit Team office the officer's station?

A   No.  Unit Team are caseworkers.  Their office is generally right across from officer's station.

Q   Okay.  And were officers allowed to access those offices?

A   Yes.

Q   At any time?

A   You would need to ask, like, hey, we're all going to check our email or we're all going to submit payroll.  Can we get in the office?  And then they open it.

Q   Okay.  And so it didn't violate any policies or rules to check your emails while you are

Page 147

on duty in a cellhouse.

A   Not to my knowledge.

Q   You can put that one down.
    Okay.  As you sit here today, do you remember the fire on the night of April 7th?

A   Yes, I do.

Q   Why don't you tell me everything that you remember.

A   I was walking outside on Main Street with Sergeant Puetzer.  We were checking all the gates on Main Street to make sure they were locked.  And we heard the fire alarm from the outside of B Cellhouse.  We had not heard a signal over the radio; but I told him, I was like, hey, they haven't called a signal, but I'm going to go ahead and walk over there.  He's like, all right.  I'm going to open the firehouse and just sit in there.  And he's like, let me know what's going on.
    And I don't know if I recall hearing a signal, but I recall seeing first responders start making their way toward the B Cellhouse.  So I started making my way toward B Cellhouse.  And even though I was the closest -- there is a door adjoining the captain's office to B Cellhouse.  So the other first responders, which were the two

Page 148

lieutenants, beat me there.  So I was the last responder to make it.
    And I grabbed a red and silver fire extinguisher, and I walked up to the fire.  And I took the red one, Lieutenant Watson took the water one.  And when I made it to the fire, I couldn't even, like, look inside the room; the fire was coming out so hot.  So I waited until there was a slight break in the fire.  I sprayed it with the fire extinguisher.
    Lieutenant Watson saw that I got the fire down, so he was going to go walk across the cell to the other side so we could hit it from both sides.  I grabbed him by the duty belt, pulled him back; and right as I did that, the fire erupted again.  So I sprayed it with the rest of the red fire extinguisher.
    I called the B Cellhouse staff to bring me more red fire extinguishers, not water ones, because by this time I -- in my head I had made the decision that it was from an electrical fire and not a regular one because paper fires don't generally come back from that, especially when you use a red fire extinguisher.  I'm by no means a fire professional, but that's from my correctional

BARBARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 39 of 106

Page 149

experience.

So they brought me one more red fire extinguisher; I used it. And someone else, I don't recall who, had another red fire extinguisher, and came from the back of the range and hit it. And even after that, the fire was still going.

Q   Okay. Is there anything else that you remember?

A   The door was already unlocked, so all we had to do was get the door open.

It's not like required or anything, but most people wear mechanic's gloves, which are just cloth gloves, and they're to touch keys so you don't get calluses on your hands from turning keys a lot. And when I went to grab the door with my gloved hand, it burned through my glove to the point where I couldn't grab the door in order to open it.

So then I'm like, man, I can't get the door open. We waited on the firefighters. And even the firefighter, when he went to pull on the door with his -- they have the fire gloves that firefighters have. They went to pull it, and he said that it was hot, too, and they had a hard time getting the door open. So they're trying to fight the fire and get the door open, and they finally get

Page 150

it open.

And at this point in time, I'm the only staff member left on the range. Lieutenant Redden went with Captain Dykstra to do -- to, like, start planning things. I don't really know what they were going to do. And Lieutenant Watson is a severe asthmatic, so he had to leave. So it was just me and the firefighters out there trying to get this guy out.

We put him into -- I don't know what it's actually called, but it looks like a casket, and it's for moving bodies, moving people from dangerous situations, and it's made of metal and it's weaved. And so we put -- we put the offender in there, and me and the firefighters started carrying him down the stairs.

Q   Anything else?

A   At some point in time during that -- the evacuation started while I was still on the range. So I mean, there's like -- I can only -- I could only focus on what I was focused on, was getting him out of there and him being -- I don't know how to say his name, Devine, getting him out of the cellhouse.

Q   Anything else?

Page 151

A   The incidents after, which had nothing to do with Devine; but once we got Devine to the custody wall, and they were working on him, trying to get him alive, the other offenders started running the burned-out [sic] checkpoint, and they assaulted a lot of staff.

Q   Okay. So what post were you assigned to on the night of April 7th?

A   I was Checkpoint 4, which I was the yard officer. Which I had said earlier, that Checkpoint 2's responsible for opening the firehouse. I was Checkpoint 4. I was assigned to assist him, which is the only reason I would have been on Main Street. Other than that, I would have been on my unit.

Q   I'm going to present you with a map that we'll mark as Exhibit 2.

(Statham Exhibit No. 2 marked for identification.)

BY MS. PIERCE:

Q   Can you mark on the map where Checkpoint 4 is. You can use one of these pens.

A   (Witness examining the exhibit.)

Q   So you recognize this as a map of the prison?

A   I do, but it looks backwards, and I -- I

Page 152

could entirely be wrong, but... (Witness examining the exhibit.)

(Witness marking on the exhibit.)

Q   Okay. Up by Building 37?

A   Yes. And while -- that is the station for Checkpoint 4. Checkpoint 4 is a mobile post.

Q   Okay.

A   So it's -- my responsibility is to assist Checkpoint 2 in all duties. And Checkpoint 2's duties are security checks throughout the entire compound. So that is the station. The station is Checkpoint 4.

Q   Okay. So you were going to different cellhouses doing security checks.

A   Correct.

Q   Is that the same type of security check we discussed earlier, or is that different?

A   The ISP does not put their yard sergeants responsible for pipe walk. But sometimes I would do a pipe walk in the cellhouse, but I would have the officer with me doing the pipe. I would just walk the cellhouse with them.

Q   Okay. So when you would do a security check, you're just doing walks through the cellhouse. You're not doing any cell searches or

BARBARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 40 of 106

Page 153

anything like that.

A    It could be anything, as needed.

Q    Okay.  So you're basically just going cellhouse to cellhouse helping out.

A    (Witness nodding head.)

Q    And what were you doing on Main Street?

A    We were locking all the gates to the hospital.  After 9:00 o'clock, we let -- we walk up to the gate and let the offender and the officer or just the offender into the gate to go into the Medical Services Building.  So the rest of the time it's locked.  And then we also check and make sure all the padlocks to Back Street -- which is an area where offenders aren't allowed at night.  We make sure those are all locked.

Q    Okay.  So that's something you would do every night if you're assigned to Checkpoint 4.

A    Correct.  And nothing said we had to do it together, but just out of -- for the sake of boredom, we would do it together, just to walk and talk at the same time.

Q    Okay.  And where is Main Street?  Can you --

A    The two -- the black dot that I checked.

Q    Uh-huh.

Page 154

A    If you drag your pen left, that's Checkpoint 2.

Q    Okay.

A    And that's all -- all of that is Main Street.

Q    Okay.  Can you go ahead and do that on --

A    (Witness complying.)

Q    Okay.  So you said you were there with Officer Puetzer; correct?

A    Sergeant Puetzer.

Q    And you were doing -- you were locking the gates on Main Street.

A    Yes.

Q    Okay.  Were you a first responder that night?

A    I don't recall.

Q    Okay.  Was Sergeant Puetzer a first responder that night?

A    I don't recall, but I believe so because he said he would come after he unlocked the firehouse.

Q    Are the first responders responsible for unlocking the firehouse?

A    Checkpoint 2 is responsible for unlocking the firehouse.

Page 155

Q    Okay.  And he was assigned to Checkpoint 2; correct?

A    Correct.  It is possible he could be Checkpoint 2 and first responder, but his responsibility would be to unlock the firehouse to let the firefighters in there.

Q    So you hear the fire alarm and immediately he said he's going to go unlock the fire station?

A    Correct.

Q    And do you immediately -- what do you do at that point?

A    At that point I wasn't sure if this was a real fire or maybe just a fire alarm had tripped for some reason or another, so I just started casually walking in that direction.  I made it to the front door and into the cellhouse before even knowing there was an actual fire.

Q    Okay.  So what did you hear then?  What does the fire alarm sound like?

A    Exactly like an ambulance.

Q    Okay.  And how loud is it?

A    Very.

Q    So you could hear it very loudly on Main Street?

A    Yes.

Page 156

Q    And you could more or less tell where it was coming from?

A    Yes.

Q    Okay.  So you knew immediately it was coming from B Cellhouse.

A    Yes, because I was standing directly underneath the horn.  There's an outside horn, too, and I was standing directly underneath the outside horn for the fire.

Q    So the fire alarm goes off inside, but it also goes on outside?

A    Correct.

Q    Is it very loud inside the cellhouse, as well?

A    Very loud, yes.

Q    Okay.  So there's no way somebody would not hear a fire alarm if they were in the cellhouse while it was going off.

A    There's no way, if it were going off inside, you could not hear it.  But as I understand it, the sensors for outside are different from the sensors inside.  So it's possible that it was going off outside but not inside.  I don't know that that was the case with this, but I've been told that that could happen.

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 41 of 106

Page 157

Q So the fire alarm doesn't necessarily go on outside just because it's going on inside?

A And vice versa.

Q So there has to be a fire outside for the outside fire alarms to go on?

A There's a space between the cement ceiling of the cells and the roof of the building, and the outdoor alarm goes off when those sensors are tripped.

Q Okay. So there has to be a good amount of smoke coming out of the cellhouse for it to set the outside alarm off.

A Correct.

Q It can't just be like a small fire inside the cellhouse to cause the outside alarms to go off.

A That is my understanding.

Q Have you ever seen the outside alarms go off before this night?

A Yes.

Q Have you seen fires outside?

A I'm sorry?

Q Were the fires inside the cellhouse when the outside fire alarms went off?

A Yes.

Q Do you know what time the fire alarm

Page 158

started?

A I know it was during 9:00 o'clock count.

Q Okay. But you don't know what time it was?

A I do not.

Q And how long did it take you to -- once you heard the alarm to walk to B Cellhouse?

A 45 seconds, maybe.

Q And when was -- you said you heard the signal called.

A I did not ever hear the signal.

Q Okay. You never heard the signal called.

A Never.

Q Okay. So how did you realize that there was an actual fire?

A When I walked through the front door, Officer Abbassi was standing by the officer's station, and she said, "The fire's on 400."

Q So you -- did you come in the back door of B Cellhouse, or did you go around and come in the front door of the B Cellhouse?

A Back doors are all locked. I came in the front door.

Q Okay. And it took you 45 seconds once you heard the alarm on Main Street to get to the front

Page 159

door?

A Correct.

Q Was the front door open when you got there?

A It was, and Officer Abbassi was standing there.

Q You're sure it was Officer Abbassi?

A I am positive.

Q Do you know how long before you -- the First Responders had arrived?

A I was the last one there. So again, we -- I had to tell her to open the officer's station. I had to go in the officer's station to grab two fire extinguishers. And again, she said, "The fire's on 400." So I made it to 400 and found out the fire wasn't there. So then I made my way to 500 with both fire extinguishers, and that's where I found the fire was.

Q Okay. So you go to the front door, you saw Officer Abbassi. Was the front door unlocked?

A Yes.

Q Okay. She did not unlock it. It was already unlocked.

A Right.

Q Okay. So you came in, you saw her by the

Page 160

officer's station. She told you it was a fire on 400?

A Correct.

Q Did you ask her any questions?

A I said, "Who's up there?"

She said, "The lieutenants."

And I said, "Did they take a fire extinguisher?"

She said, "No."

I said, "Give me both fire extinguishers, and I'll go look."

Q Okay. So she gave you both fire extinguishers out of the officer's station?

A She opened the office; I grabbed the extinguishers.

Q She opened the office. So the officer's station was locked?

A Correct.

Q Do you know why the officer's station was locked?

A Anytime someone is not sitting in the officer's station, it is locked.

Q Okay. Does everyone assigned to a cellhouse have the keys to the officer's station?

A No.

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 42 of 106

Page 161

Q   Who would generally have the keys to the officer's station?

A   The OIC.  Generally, that office ring, as it's called, is assigned to the front door key.

Q   Correct.

A   So those two keys stay together.  And whoever's standing by the front door keeps both of those keys.

Q   Okay.  And so Sarah Abbassi said to you, "Fire on 400 Range; the lieutenants are there."
And you said:  "Did they bring fire extinguishers?"
She said, "No."
So you asked her to give you the two.  Did she say anything else?

A   She did not.

Q   Did you say anything else to her?

A   No.

Q   Was there anybody else down there with her?

A   There was a third officer, and I don't know his name.

Q   Okay.  There was no male officer.

A   No.  I'm sorry.  It was a female, but she had a buzzed head.

Page 162

Q   Okay.  So there was a female officer who was down there.  Where was she?

A   She was standing outside the officer's station also.

Q   Did she say anything?

A   She did not.

Q   Did you say anything to her?

A   I did not.

Q   Was she doing anything?

A   She was not.

Q   How many fire extinguishers were in the officer's station?

A   I grabbed two because that's what I could carry.  I don't know if there were any more besides that.

Q   Okay.  You said typically to your understanding that there's three, correct, earlier?

A   Right.  Well, I know, in the cellhouse I worked, there were three.

Q   Okay.  So then you got the fire extinguishers.  You had two in your hands?

A   I had the red one and a water one.  ABC and a water.

Q   Okay.  And then what did you do?

A   I made my way upstairs.

Page 163

Q   Did you run?  Did you walk?

A   I moved as quickly as I could carrying two fire extinguishers.

Q   At that point did you know whether the fire was big or small?

A   No.  I still had not heard a signal; I still didn't hear a call for the firefighters.  But by that time, I figured out that probably my radio was not functioning.

Q   So your radio was not functioning.

A   Right.

Q   Do you know if anyone else's radio was not functioning that night?

A   I only know because he told me that Rodriguez and Abbassi's radio weren't.

Q   Neither Rodriguez nor Abbassi's radios were working?

A   Correct.  And this becomes third-person information, but he told me he attempted to call it, and he told me that he yelled down and told Abbassi to call it, and neither one worked.

Q   So you made your way up.  Did either of the two female officers who were down on the 100 Range, did either of them seem agitated or nervous or stressed?

Page 164

A   The young lady -- I don't remember her name -- with the shaved head, she seemed scared.
Abbassi was doing what she was told to do.  She was directing people to the area where they were supposed to go.
I had talked earlier about how we all talk about what we do in certain situations.  That's always somebody's job; whoever's coming in the front door needs to know where to go.  And when I made it up the stairs on 400, I'm like looking around trying to find people.  And Rodriguez was standing on 500 and said, "Hey, it's up here."  So then I make it to 500, and I walk up 500, and Rodriguez stayed at the front of the range.

Q   So you're trained that somebody's to stay down by the door and direct people where to go?

A   Yes.

Q   That's part of your training?

A   Not formally, but it's part of the field training.

Q   Okay.  Is that in a written policy anywhere?

A   I don't believe so.

Q   Does everybody understand that's part of the field training?

Page 165

A Probably not.
Q What do you mean by that?
A If nobody's ever told you that, you wouldn't know. But if you've ever had to deal with a situation and you had a debriefing afterwards, then you would know, like, hey, next time you need to let somebody know where the fire's at. Somebody's got to stay. The door key -- if there's a situation going on upstairs or anywhere, that door key needs to stay by the front door.
Q Okay. So a person would not be instructed on the responsibility unless they were in a situation where that needed to happen?
A Or after the situation where that needed to happen, yes.
Q So it's very possible that some people were never trained that somebody needs to stay with the front door to direct people where to go?
A Absolutely.
Q Okay. So you said you made your way up, and Officer Rodriguez told you it was on 500?
A Yes.
Q Was he on 500?
A He was on the front. Without me knowing if you know the layout, the front, the 500 is split

Page 166

between two sides, north and south of B Cellhouse. He was standing on kind of like a front patio to 500, and he told me that it was on 500, on the right side, which I -- I don't recall if that's north or south. And then I walked down the range to Cell 540 where it was.
Q I'll hand you another map of B Cellhouse that we'll mark as Exhibit 3.
        (Statham Exhibit No. 3 marked
        for identification.)
BY MS. PIERCE:
Q Why don't you mark an R for me where Officer Rodriguez was standing.
A This is not three dimensional, so it would be on 500. And where these stairs are, these are all landings in between stairs.
Q Okay.
A So it's like zigzagging stairs left and right --
Q Okay.
A -- to make it --
Q And do you know how long Lieutenant Watson had already been up there when you were making your way up?
A I did not.

Page 167

Q Okay. So your heard Officer Rodriguez call you. You made your way to the front of 500. What did you see when you got up there?
A A lot of smoke.
Q Could you see down to the area where Joshua Devine's cell was?
A I could not.
Q Because of the smoke?
A Yes.
Q Could you see Officer -- or excuse me, could you see Lieutenant Redden and Watson?
A I could not.
Q Do you know where they were?
A Couple cells away. Like when I got there, I couldn't even look in the cell to see what was going on. And I almost ran into Lieutenant Watson's back because I walked up on him.
Q So you made your way down toward the cell.
A Yes.
Q And you had the fire extinguishers with you.
A Yes, I did.
Q Where was Officer Rodriguez?
A He stayed at the front of the block.
Q Okay. Was he doing anything?

Page 168

A He had the keys, so he had hit the button to unlock the door.
Q Okay.
A And so that's how -- that's the only reason I knew the door was unlocked. I walked up. I was like, Hey, guys.
        The door's unlocked so we can get this guy out.
Q And how do you -- how do you know that he unlocked the door?
A Because he told me. No other reason besides that.
Q He told you when you first got up there?
A Yes, that the door was unlocked already.
Q Okay. And you had said earlier that Sarah Abbassi was doing what she was told, to direct people. How do you know that is what she was told?
A Because I had trained her in C Cellhouse prior to her switching over to B Cellhouse. So I was her OIC for a while. So I knew -- or I don't know that she knew. I knew that she was told to make sure to direct people to go where they needed to go.
Q Okay. So you're saying you had trained her to direct people where to go.

USDC IN/ND case 3:18-cv-00995-JD document 203-3 filed 03/29/21 page 44 of 106

Page 169

A   Yes.

Q   But you don't know that anyone that night told her to stay there and direct people where to go.

A   I do not know that night.

Q   Okay.  So you make your way down towards Joshua Devine's cell.

A   Yes.

Q   You run into Lieutenant Watson.  And what were they doing there?

A   They were talking on the radio.  And at this point I can hear them on the radio.  I hand Watson the water fire extinguisher.  I hit it -- I hit the fire with the red one, and it went down significantly.  And then that's where I said he tried to go across, and I grabbed him by the duty belt and pulled him back, and it started ripping again.

Q   Okay.  And so the three of you were by the cell?

A   Yes.

Q   Was Joshua Devine still alive at that time?

A   Yes, he was.

Q   Could you see him?

Page 170

A   Yes, I could.

Q   Could you hear him?

A   Yes, I could.

Q   Was he yelling?

A   Yes, he was.

Q   What was he yelling?

A   He was yelling for us to help him, that he was going to die in there.

Q   Was he yelling anything else?

A   No.

Q   Did you guys -- did any of the three of you speak to him?

A   I did.

Q   What did you say?

A   I started telling him that we were going do our best to get him out of there.  I told him to come stand close to the door where there was air.  And he kept insisting that he was going to crawl under the bed, and so that's what he did.  And I finally talked to him, and I told him, "You need to come to the door."

And at this point Lieutenant Redden had already left to go meet up with Captain Dykstra and let him know what was going on and the severity of the situation.

Page 171

So I'm talking to him, talking to him.  And then there was a point in time when I knew that we just were not going to get him out, and I was talking to him, and I'm telling him to crawl closer to me.  So he finally does.  He crawls closer to me from under the bed.  And like I told you, I touched the bar with my hand, and it burned through my glove pretty bad, and I got hurt significantly.  I don't have a mark or anything, but -- and then he reached out, and he grabbed the bars, and I watched the skin on his hands slip away, and then he died.

Q   Okay.  So when you first got to the cell, he was by the front of the doorway.

A   He -- no.

Q   He was by --

A   He was by the toilet.

Q   Is that in the back of his cell?

A   Yes, it is.

Q   How big was the fire at that point?

A   Very big.

Q   Where was it?

A   Coming from his bed area, going outwards.

Q   Okay.  Was it engulfing the whole cell, or were there areas of the cell where there was no fire?

Page 172

A   The area he was standing was not on fire.

Q   Uh-huh.

A   And he was taking toilet water and putting it on him, I assume, because he was hot.  And there were parts of the cell above him and to the side of him that were on fire, but the area he was standing there wasn't.

Q   And he went from there and crawled under the bed?

A   Yeah.  And I told him -- I kept telling, instructing him to come towards me, like "Try and get to me, try and get to me."

Q   Okay.  Was he on fire when he was under the bed?

A   I couldn't see him when he was under the bed, but I could still hear him, and he was screaming, but he was talking, communicating with me.

Q   So he was over by the toilet.  Where did he go from there?

A   From the toilet he went under the bed because the area on top of the bed was the television and a couple boxes.  And that's what was like the biggest part of the fire.  So I think in his mind, he assumed he could crawl under the bed to

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 45 of 106

Page 173

get to the bars to come to me. And he never -- he never made it that far until it was -- until the fire was pretty bad.

Q   Did he try to come out from under the bed?

A   He did.

Q   And he couldn't?

A   I don't know if he physically couldn't or if his body was not allowing him to or the fire was not allowing him to. But he did eventually make it to the front.

Q   Okay. Could you see him?

A   I could see him.

Q   And where was the fire at that point?

A   Still on top of the -- everything was on fire, including the area he had previously been standing at that point.

Q   And then -- so he's under the bed. The fire is everywhere around him. What happens next?

A   He keeps crawling towards the bars. I'm still talking to him. And like I said, I know like pain is a huge -- like it will make you stop doing something. So when I grabbed that door and it burned and it hurt, I stopped grabbing the door. And so when he reached out and grabbed the door and tried to push, like I literally watched the skin on

Page 174

his hands peel back because it got so hot. And then he fell to his knees and he died, stopped talking. There was fire coming out of his mouth.

Q   Coming out of his mouth?

A   (Witness nodding head.)

Q   About how long was that whole period that you were up there?

A   I could not tell you. It felt like forever.

Q   And who was still up there when he died?

A   I think Watson was still there. I think Watson was there all the way up till he heard the firefighter coming. He's a severe asthmatic. He was having a hard time being up there. But I just know -- and then I started talking to an Offender Miller, Devine's neighbor. Once I realized that Devine was dead, I was like, now I got to try and help somebody else. So I tried to tell Miller, Put a washrag over your face so you can breathe. I said, "Get to the back of your cell; make sure you can breathe." And I started trying to help everybody else.

Q   Which cell was Miller in?

A   I believe Miller's in 40 -- 538.

Q   What else did he say?

Page 175

A   Who?

Q   Miller.

A   He -- "Thank God." He was like, thank you for trying to help him. And then when I saw Miller a couple days later, he was in the medical unit for the smoke inhalation. He said the same thing. He thanked me for trying to help him.

Q   Did any of the other offenders speak to you?

A   No.

Q   Did you speak to any of the other prisoners?

A   I did. I tried to.

Q   Who did you speak to?

A   I tried to talk to everybody on the range, but they were very angry.

Q   Who were they angry at?

A   They were angry at us. They felt like we weren't doing what we could to help him.

Q   And you thought it was legitimate that they were angry?

A   I think from their perspective, that it might have seemed that way.

Q   What do you mean by that?

A   They're inside of a cell. They can only

Page 176

see us standing outside the cell. They can't see the fact that I'm trying to put out the fire. They can't see that I'm trying to open the door. They can't see how bad the fire is.

Q   Were they upset at you and the officers who were there, or were they upset with the officers at B Cellhouse?

A   I think it was a general upset with custody staff and authority.

Q   Did they say anything specifically about what the officers in B Cellhouse had done in response to the fire?

A   They told me that everybody that was there ran away, and I don't -- to this day, I don't know who they're talking about. But even when I hear offenders talk about it, "Everybody ran away." You know? And it's kind of interesting to me because I know I didn't run away. I stayed there the whole time.

Q   Do you believe that other people ran away?

A   I don't know.

Q   Have you asked other people about what they did?

A   I'm going to be honest that this is the second time since the fire that I've talked about it

BARABARA DEVINE vs
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 46 of 106

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

Page 177

with anyone.
Q    What was the first?
A    My job interview at parole.  They asked me what's the most stressful thing I've ever been through in my entire life, and that was it.
Q    And you never spoke with anyone else at any point about the fire?
A    No.
Q    Never spoke with any family?
A    I refused to talk to my wife about it.  But when I got home that night, she knew something was wrong.
Q    So you've never spoken to your wife about it?
A    I told her -- she worked at the prison at that time, so like she has an idea what happened, but I never told her what I saw or anything.
Q    Have you spoken to -- did you speak to anyone in the investigators about what happened?
A    Only what needed to be in my report.
Q    Did you speak to any of the B Cellhouse officers about what happened?
A    No.
Q    Do you think it's important to find out what happened?

Page 178

A    Most of them, if I recall, almost immediately after that, ended up quitting.  That were in there.  As I said, I don't even remember the girl with the short hair's name, but I know Rodriguez eventually started no-call, no-showing.  And he just stopped showing up altogether.
And Abbassi, she left the country for a while.
And then the other girl, I don't think I ever saw her again after that night.
Q    Okay.  Do you know the reasons why they left?
A    I don't.
Q    Okay.  So you never spoke with any of them about it?
A    No.
Q    Did you speak with any of the prisoners about it?
A    I have talked to -- I don't tell the prisoners I was there, but I let them vent to me and talk to me about it.
Q    Okay.  So you have spoken with prisoners about the fire?
A    I have allowed them to speak to me.  I have never talked to them.  Me and Miller had that

Page 179

conversation when he was in the medical unit; but even then, I don't -- I wouldn't confide in an inmate anything like that.
Q    So what did the prisoners tell you about what happened?
A    That everybody ran away.  "Everybody let that guy die."
Q    What else did they tell you?
A    That's it.
Q    Nothing else more specific?
A    Nothing more specific than that.
Q    They didn't tell you which officers ran away?
A    No.
Q    Did they tell you how long the fire was going before anybody came down?
A    They all said it was like 30 minutes.
Q    Which prisoners did you speak to?
A    I've spoken to a lot of offenders.  Miller, I spoke to Offender Gurney (phonetic), who got locked up that night.  He punched an officer in the face and knocked him out, knocked him clean out.  And then I spoke with another offender who said the same thing, because he started assaulting staff.  And I had a good rapport with this offender, and I

Page 180

asked him -- I said, "That's not like you.  Why did you do this?
And he's like, "Man, you guys let that guy die.  I would have assaulted anybody that got in my way."
Q    So all the prisoners that you spoke to, are all their statements consistent?
A    No.
Q    Do they all say that the officers ran away?
A    Yes, they do.
Q    Do they all say that they were yelling that the fire was going on for about 30 minutes?
A    Yes, they do.
Q    And so in what ways are their statements not consistent?
A    They all say that they were yelling.  They all say that everybody was banging.  They say that Officer Rodriguez sat there and stared at the guy for a while.  They say that Officer Abbassi was up there.  I've heard that another officer was up there.  I can't think of the name they said, but it was Officer Allen.  They said Officer Allen was up there, and that's why he's -- he's one of the ones that got assaulted.  They're like, That's why we

USDC NN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 47 of 106

Page 181

assaulted Allen.  And I've heard a lot of inconsistencies but none of it -- I was there.  I knows what's true and what's not.

Q   So these are things that you're saying they all said.  What inconsistencies did you hear between their stories?

A   Which staff were there.  Which staff responded.  How long the fire was going.

Q   You said that they all said the fire was going for about 30 minutes.

A   I've heard them say an hour.  I've heard 20 minutes, 30 minutes.  I've heard them saying they were all yelling.  I've heard them saying he was yelling.

Q   Okay.  Have you ever heard a prisoner say that the fire was going on for less than 20 minutes before someone came to help?

A   No, I have not.

Q   And you say you were there, but you weren't there for the whole time that the fire was going; correct?

A   I was not.

Q   So do you have any knowledge of what happened before you got there?

A   None whatsoever.

Page 182

Q   Have you heard information about what happened before you got there?

A   Not from staff.

Q   Just from prisoners?

A   Yes.

Q   Okay.  So you have no information to know whether what they're telling you is true or not.

A   Correct.  And I'm also not an investigator, so I didn't really take stock in it.

Q   About how many prisoners did you talk to?

A   I would say the majority of prisoners to this day still talk about that when they talk about, like, staff not doing their job.  So anytime they're like, hey, we need mopped up.

We'll be like, We'll get you guys mopped up within an hour.

They'll be like, Ah, yeah, just like you guys let a guy burn alive.

Q   So this is something they talk to all the staff about all the time?

A   Yes, it is.

Q   Did any of them talk to you more specifically or in more detail about what happened --

A   No.

Page 183

Q   -- than they did with other officers?

A   I don't think so.

Q   So, you know, you said none of the prisoners told you that the fire was going for less than 20 minutes.  Did you speak with -- you know, you said you spoke with all the prisoners, basically, at ISP.  Is that right?

A   I have at one point or another spoke to every prisoner at ISP.  That's probably true.

Q   Okay.  And so how many prisoners do you think told you that the fire was going on for a long time like that?  Like 30 prisoners?

A   20 to 30.

Q   20 to 30?

A   Yeah.

Q   Okay.  And how many prisoners do you think told you that Officer Rodriguez ran away or the officers ran away?

A   The same 20 to 30.  But the same thing -- I told you that it felt like forever I was standing there.  So when you're going through stress, I know how long time feels.  You know, whether or not they agree in faction or relation -- like offenders feel what they feel for each other.  And so that's one of them that's burning up, so I understand that they're

Page 184

stressed.  So I never even took too much stock in them saying, oh, it took 30 minutes for you guys to get there, it took an hour for you guys to get there.

Q   You say you didn't take stock in it.  Did you disbelieve it?

A   I did.

Q   What did you not believe it's based on?

A   Because I've responded to many fires, and I would say you generally know that a fire's going in the first minute and a half to two minutes.  It causes a smell because there's nowhere for the smoke escape.  So even if you don't know where the fire is, you generally know there's a fire.

Q   Okay.  So you'll say in almost every case, you would know within one to two minutes there's a fire?

A   Yes.

Q   Would you say in every case you know within one to two minutes that there's a fire?

A   In every case that I have experienced, yes.

Q   Okay.  When you got to the fire, did it seem like the fire had been going for a long time?

A   I'm not a fire expert, so I just knew that

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 48 of 106

Page 185

the fire seemed intense. I have no way of knowing whether it had been going for a while.

Q How many fires have you responded to?

A Easily over a hundred.

Q And so your basis for disbelieving the prisoners when they told you that the fire had been going for at least 20 minutes was just your own experience of how quickly you would know and how quickly you would respond?

A Yes.

Q But you don't know how quickly the officers in B Cellhouse would have responded?

A I do not.

Q And you never talked to them about how quickly they responded.

A No.

Q At what point did Lieutenant Redden leave? Do you know?

A Pretty quickly after I got there and we started spraying the fire.

Q And your radio wasn't working, but were their radios working?

A By the time I made it to them, my radio was working because I could hear them talking on the radio, and that's how I knew where they were.

Page 186

Q Okay. Where were the prisoner-firefighters during this?

A They were still getting their gear on.

Q Do you know who activated them?

A I don't.

Q Were you -- was anyone else calling for them to come?

A I know I was.

Q How were you calling for them to come?

A I told Checkpoint 2, "Send the firefighters."

Q When?

A Once I sprayed it with the red fire extinguisher and the fire came back, I told them to send -- I called B Cellhouse and said, "Bring me more red fire extinguishers," and then I called Checkpoint 2 and told them to send the firefighters.

Q When you say, "called," do you mean on your radio?

A Using the radio.

Q Okay. Did anybody respond to bringing a fire extinguisher?

A Nobody responded to bringing more fire extinguishers; nobody responded to sending me firefighters.

Page 187

Q You said no one responded on the radio. So you wouldn't say they heard you?

A Correct.

Q You say the firefighters were getting ready. How do you know that?

A When -- when the guys inside the cellhouse said they could see the firefighters outside, because there's windows to the cellhouse. And they said, "Hey, they're not letting the firefighters in."

Q So while you were up there, the nearby prisoners said that they could see the firefighters outside?

A Yes.

Q When was that?

A During the fire.

Q You'd already been up there?

A I was already up there, yes.

Q So they weren't outside when you got there.

A (No response.)

Q Were the firefighters outside when you got to B Cellhouse?

A No. No.

Q Okay. So when you called for them on the

Page 188

radio, to your knowledge, is that the first time anyone called for them?

A Yes. I don't even know if they were already in the fire station at that point. So it's possible -- because I never heard a 10-70 or a 10-71 called. I never heard control call it. It's possible that no one even knew to send their firefighters until I called Checkpoint 2 and said, "I need the firefighters."

Q Okay. So you never heard Lieutenant Redden or Lieutenant Watson call for the firefighters.

A I did not. I heard them talking to each other, and I heard them talking to Captain Dykstra.

Q And what were they saying to each other?

A They were saying, "There's a fire in 500." And then they were telling the B Cellhouse guys to get ready for an evacuation.

Q Okay. They were telling the B Cellhouse guys on their radio to get ready for an evacuation?

A Yes.

Q And they were telling Captain Dykstra that there was a fire in B Cellhouse?

A Yes.

Q And what were they telling each other?

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 49 of 106

Page 189

A    I don't recall, but that's why Lieutenant Redden left.  Lieutenant Redden left because they were having miscommunications on the radio.  And what we're afraid of is they would evacuate the entire cellhouse at same time, which is -- ended up being what happened.

Q    And why were you afraid of that?

A    Because that is not how we do evacuations.

Q    Why not?

A    Because exactly what happened, happened. A lot of staff get assaulted, and a lot of state property gets destroyed.

Q    Do you know if anyone did anything in response to the information that Lieutenant Redden and Watson were giving Captain Dykstra?

A    I have no idea.

Q    Do you know if the officers in B Cellhouse did anything in response to them calling for them to prepare for an evacuation?

A    I do not.

Q    Did you see anything after you were up there that any of the B Cellhouse officers were doing?

A    I couldn't see because I -- when I was standing at the front of the range, I couldn't see

Page 190

Lieutenant Watson and Lieutenant Redden.  So when I was standing in the smoke, I couldn't see Officer Rodriguez.

Q    And so no one brought you any additional fire extinguishers?

A    Someone came from the back of the block with a fire extinguisher, and I, to this time, can't -- not the back of the block, the back of the range, with the fire extinguisher.  And I don't know if it was Watson who went around.  I don't know who it was, but somebody sprayed it from the opposite side of me.

Q    Okay.  Wasn't Lieutenant Watson next to you?

A    Yes.  That's why I don't know if he left me to go to the other side.  But somebody sprayed it from the other side.  And this is while I was kneeling down trying to talk to him.

Q    To Joshua Devine.

A    Yes.  And he could have just walked behind me and went to this side and started spraying.

Q    Was he still alive?

A    At that point.

Q    Was he standing at the front or was he down on the ground?

Page 191

A    He crawled from under the bed towards the front, and then he just stood up when he felt it was safe.

Q    Okay.  How long was he standing there at the front?

A    Couple minutes, maybe.

Q    Couple of minutes?

A    Yeah.  We were -- we were talking.  He was still yelling.  And then I think he was still -- I think he was still trying to figure out what was going on.

The reason that this was so, like, traumatic for me is like I could see in his eyes the moment he gave up, when he grabbed that door.  Like I said, pain's a huge stopper.  And he was willing to try anything.  He was pushing on that door while it was burning his hands.

Q    Did he catch fire at any point?

A    I saw fire coming from his mouth and on his arm.  Other than like -- I don't remember if he was wearing clothes.  I couldn't tell you what he was wearing.  I couldn't tell you anything.

Q    Okay.  When you say somebody came around the back of the range with another fire extinguisher, what do you mean by that?

Page 192

A    Ranges are double-sided.  So you can go up the way I went, or you could also go down from the opposite direction.  There's a set of stairs in the back, if you look at the picture.

Q    Uh-huh.

A    And so these are the stairs we regularly use, but someone could walk all the way up the back this way and come up the front with a fire extinguisher.  And so either Watson just stepped to the side or went around, which seems very dangerous, but it wouldn't surprise me if he did it.  Or somebody came from the back and started spraying the fire, too.

Q    Are those back -- is that locked in any ways, or is that open?

A    Generally locked.

Q    Do you know if anybody opened those gates?

A    After 9:00 p.m. count, it is standard practice to leave them open until 3:00 when we get ready to release the offenders.

Q    So you unlock them to allow staff to use them but lock them to keep prisoners from using them.

A    Correct.

Q    Why is that?

USDC NND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 50 of 106

Page 193

A    To make it easier to do the pipe walks.
Q    Why don't you want prisoners using those back stairs?
A    Less lighting, more dangerous back there.
Q    So you said while you were up there, other prisoners nearby were telling you that the firefighters were outside but staff weren't letting them in.
A    Yes.
Q    At what point was that?
A    I don't recall.
Q    Was Joshua Devine still alive?
A    Yes.
Q    How long was that after you had called for the fire -- the firefighters?
A    I made multiple calls for firefighters. It actually got to the point where I couldn't hear what I was saying, and I couldn't hear what anyone else was saying on the radio because everyone was banging and yelling "fire."  So I started cueing my radio and yelling that we needed the firefighters on 500 just in case it was an issue of someone maybe just not hearing me because of all the noise.  And I don't know how long it took between me being there and the firefighters getting there.  I have no idea

Page 194

of the time wise.
Q    How long does it normally take the firefighters to respond?
A    15, 20 seconds.
Q    When the 10-70 is called to when they get to the cellhouse?
A    Yes.
Q    Do they have to go get equipment or anything like that?
A    Yes.  But they --
Q    Go ahead.
A    They leave their equipment, similar to firefighters in the community, they leave their firefighter outfits down so literally all they have to do is jump into them and pull them up, and they're suited.  And then they throw tanks on, and they have their own little fire truck.
Q    So you think they can get to a place in well under a minute?
A    Absolutely.
Q    So did it strike you as a long response time?
A    It did, but I -- when your adrenaline is going, you have no idea how long that time frame is. So it could have been a very short time, but it

Page 195

seemed like forever to me.
Q    So ten minutes, would that be a very long time for the firefighters to respond?
A    It would absolutely be a long time for the firefighters to respond.
Q    Would five minutes be a long time for firefighters to respond?
A    I would say anything longer than a minute would be abnormally long for the firefighters to respond.
Q    Did you ever find out any additional information about why they weren't being let in to the cellhouse?
A    I don't even know that that was the case.
Q    Could you see them outside?
A    I could not.
Q    Okay.  But how could the prisoners see them outside?
A    The guys at the back of 500 have a view out of a window.  There's like a stained glass window in the back of the cellhouse.
Q    Uh-huh.
A    And some of the stains [sic] have been broken and replaced with regular glass, so you're able to see, but everything looks distorted.

Page 196

Q    Was that the side that Joshua Devine's cell was on?
A    It's both sides.
Q    Okay.  So which officer -- or sorry. Which side of the cellhouse were prisoners able to see the firefighters outside?
A    The north side would have been able to see.  The south side would have, too, but I wouldn't have been able to hear people on the south side yelling.
Q    Okay.  So it was the side that you were on.
A    Yes.
Q    And they could see -- they said they could see the firefighters outside?
A    Which, just as easily, they could be wrong or they could be lying, but that is what they said.
Q    Were they giving you consistent statements, that they saw the firefighters outside?
A    I never heard anything more about it other than what they were yelling while I was up there.
Q    Would they have any reason to lie about that?
A    Through working in corrections, I've realized that there's a lot of reasons for them to

Cause No. 3:18-cv-00995-JD-MGG

Page 197

lie.

Q You can't think of any specific reason of why they would want to lie about the firefighters being outside?

A Anything to make custody staff in authority seem worse than it is.

Q Did you ever speak to any of the firefighters about whether or not they were allowed to come inside the cellhouse?

A I did not.

Q As a first responder, were you concerned that maybe staff were not letting the firefighters in to address the fire?

A At the moment I wasn't. And then, like I said, afterwards I did my best to not think about it. And I should also -- like the main reason I never talk to anybody or chose not to is when we all saw IA that night, we all signed nondisclosure agreements to not talk about it until IA completed their case.

Q Why is that?

A That's the way -- so we don't corroborate statements and stuff like that.

Q So they have -- that's a typical thing that they do during investigations?

Page 198

A Yes.

Q And you're not allowed to speak about it with anyone?

A Correct.

Q Until the investigation is over?

A Correct.

Q So after the investigation is done, they'll let you know, and then you can speak about it?

A Right. We had an ER debriefing, which means that Central Office came to ISP, and they told us all that we're able to discuss with them issues in regards to emergency response, not issues regarding the incident. So I just didn't say anything in fear of stepping over my lane and my bounds.

Q So people from IDOC came to the -- to ISP?

A Correct.

Q To ask you guys about what happened during the fire?

A More so how in the future we can stop something like that from happening in -- up to and including the small-scale riot that occurred.

Q But based on the events of that night, they wanted to figure out how to prevent that from

Page 199

happening in the future.

A Correct.

Q So they wanted to know what happened that night; right?

A Correct.

Q And who told you that you could not speak with them?

A No one told me -- no, they told us we could speak with them.

Q And you chose not to speak --

A I didn't want to overstep my bounds. They were like, did I have anything to add. And I said, "No."

Q Why did you think adding anything about what happened would be overstepping your bounds?

A Because they said I wasn't able to talk about the incident in and of itself, just the emergency response part of it. And that was a line I wasn't willing to cross one way or the other.

Q What's the difference between what happened and what the emergency response is?

A When you talk about emergency response, you're talking about in general. You're not talking about this situation in comparison to that one.

Q So just general thoughts about emergency

Page 200

response?

A Correct.

Q And who told you, you weren't allowed to specifically talk about the incident?

A I don't remember which investigator I talked to that night, but I just -- I just remember it.

Q So did the people from IDOC know that you weren't supposed to talk about the incident?

A I don't -- I don't know the answer to that.

Q Were you ever told that the investigation into the fire was complete?

A No. I was advised by Pam James that there was court proceedings to occur.

Q So you were basically told you were never allowed to talk about the incident.

A Right.

Q To this day, you've not been told that you can talk about the incident.

A Yeah -- no, but no one has ever continued to say, Make sure you guys aren't talking about the incident either.

Q Did they tell you that they would let you know when the investigation was completed?

BOSS REPORTERS
(219) 769-9090

Page 201

A    IA told me that, that night; but no one ever told me that again.

Q    And no one ever told you when the investigation was completed.

A    Right.  And I don't think they have a duty to do that either.  So even when he told me that, I was like, "No problem" --

THE REPORTER: "So even when"...

THE WITNESS: Even when they told me it that night, I didn't think I would know when the investigation was over anyway because that's not my concern.

BY MS. PIERCE:

Q    You said that the people from IDOC came -- were part of ERO Team?  Is that --

A    ERO.

Q    ERO.  What's that?

A    Emergency Response Operations.

Q    And what do they do?

A    They wanted to discuss what first responders in the future could do to contain and isolate a situation.

Q    And the people who were part of ERO, do they -- are they involved with emergency response in all of the prisons and the facilities in IDOC?

Page 202

A    Yes.

Q    Do you remember who was part of that?

A    The director is Curry.

Q    Okay.

A    Other than him, I wouldn't know anybody else.

Q    So what was discussed about what should be changed about emergency response in the future?

A    We watched the video of the Main Street and B Cellhouse walkway and how we should have secured different areas while we were moving offenders one way or the other.

Q    Did you watch any of the video having to do with your response to the fire?

A    Not the fire.  To the evacuation.

Q    Did you discuss the response to the fire at all?

A    No, not to my knowledge.  I don't really recall the meeting.  I was also sitting in the back where I couldn't even see the screen.  So the video that they played -- I only know what the video played because they played it again when it was done, and I walked closer to the screen to watch the video again.

Q    Were you told that you had to go to this

Page 203

meeting?

A    It was mandatory.

Q    And were you specifically asked to speak at the meeting?

A    Everybody was asked if they had anything else, independently.

Q    Okay.  And you said no.

A    Yes.

Q    Did others who were there that night discuss what had happened?

A    Yes, they did.

Q    Did anyone who was there addressing the fire discuss what happened, that part of that night?

A    The radio thing came up.

Q    Okay.

A    And then the -- another issue came up with having -- not having keys to every range on the -- on one ring, on one key ring.

Q    And who brought those up?

A    I don't recall.

Q    What was decided about those issues?

A    That having a key to all the doors on one ring would be more dangerous than not having one key.

Q    Why is that?

Page 204

A    Because if an offender got a hold of the key, they would have keys to all the cells.

Q    Does it -- do you recall it ever happening, that a prisoner got a hold of the keys?

A    Oh, yes.

Q    How did that happen?

A    They put a knife to someone's throat and say, give me the key.

Q    How many times do you think that happened while you were at ISP?

A    It just happened three months before I left, and it's happened prior to that.

Or officers drop keys or drop a key off a ring.  So I mean, there's a number of ways that offenders can get keys.

Q    How many times do you actually recall that happening while you were at ISP?

A    Four times, maybe.

Q    You said that, I think, Pam Jones told you there would be court proceedings?

A    Pam James.

Q    Pam James.  Excuse me.

What did she tell you about that?

A    She said that I needed to make sure to check my email and to check my mailbox, and they

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 53 of 106

Page 205

would let me know when or if I had any dates that I needed to do anything.

Q   When did she tell you that?

A   I don't recall.

Q   Was that right after the fire or --

A   Oh, a decent amount of time after the fire.

Q   Do you know if it was after this litigation was already brought?

A   It was this litigation.

Q   Okay.  So it was after the litigation had already been brought.

A   I don't understand the question.

Q   I think this litigation was brought in December of last year.  Do you know if it was after December of 2018?

A   It definitely was.

Q   Do you know if other individuals were told the same thing?

A   Yes.  It was -- I believe it was a group email, and it said that these are the people who are requested for deposition.  Check your emails.  The attorney general -- we have to sign a thing stating that we want representation from the Attorney General's Office, and then you go from there.

Page 206

Q   Okay.  Do you recall who else was on that email?

A   Lieutenant Redden; Captain Dykstra, who at the time was on his way out; and Puetzer, Sergeant Puetzer.

Q   Was Lieutenant Watson on that email?

A   No, because he wouldn't have a state email anymore.

Q   So he'd already left?

A   Yes.

Q   Do you know any of the circumstances behind Lieutenant Watson leaving ISP?

A   No.

Q   Did you hear anything about why he left ISP?

A   I know he had gotten demoted to officer, and then I didn't even know he had left until five months ago maybe.

Q   Were you surprised when he was demoted to officer?

A   Not really.

Q   Why not?

A   Demotions and promotions happen all the time.

Q   Do you know anything about the

Page 207

circumstances of why he was demoted?

A   I do not.

Q   Did you ever speak with any of the prisoner-firefighters about the fire?

A   No, not -- no.  Not -- except the firefighter that I assisted carry the basket during the fire; that's the only one I ever talked to about it.

Q   Did you ever speak to Sergeant Puetzer about the fire station beyond when he went to go open the fire station originally?

A   No.

Q   Did you ever ask him about when the firefighters actually showed up to the fire station?

A   I did not.

Q   When you first got to B Cellhouse because you heard the alarm, was there a lot of yelling inside?

A   Yes.  It was very loud.

Q   Could you hear what people were yelling?

A   "Fire.  Help that man."  Random stuff like that.  It's -- obscenities at the correctional staff.

Q   Did you ever hear about any of the prisoners making any threats to any of the officers

Page 208

who were in B Cellhouse?

A   Yes.

Q   What were those threats?

A   They -- it is a quite regular occurrence for an offender to tell you he's going to kill you.  So that's nothing new.

Q   Okay.  You said you saw Officers Abbassi and Blakley when you came in, and then you went up to the 500 Range.  When was the next time you saw them?

A   Not again the rest of the night.

Q   And you saw Officer Rodriguez when he was up on the 500 Range.

A   (Witness nodding head.)

Q   When was the next time you saw him?

A   Not again the rest of the night.

Q   So after he called you up there, you never saw him again the rest of the night?

A   Yes.  I remember Lieutenant Watson saying that we needed to get them out of there because the inmates were very mad at them.

Q   Do you know who called for the evacuation that night?

A   The only person I heard was Captain Dykstra.  But when we were in the ERO

USDC NN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 54 of 106

Page 209

meeting, I learned that it was Lieutenant Redden that ordered the evacuation. But I heard Dykstra's voice on the radio saying, "evacuate the cellhouse."

Q   So how did Lieutenant Redden call for the evacuation?

A   I don't know 'cause I never heard that.

Q   So who unlocked the doors?

A   The staff that were working the cellhouse took the keys that they had on their person and unlocked the doors.

Now, you had posed the question earlier if people being new is a danger. That's where the danger lied. They released the entire cellhouse at one time and that is not the evacuation procedure.

Q   How do you know that they're the ones who evacuated the cellhouse?

A   They would have been the ones with the keys.

Q   So you're just basing that on your understanding that they had the keys?

A   Yes.

Q   You never heard anyone say that they actually opened the doors.

A   No. I also never read any reports in

Page 210

regard to the situation either.

Q   Do you think it's -- excuse me.

Were you surprised that there were officers up on the 500 Range without fire extinguishers?

A   No, because it's very hard to guess what someone else is going to do. So if I'm coming in and I know there's veteran staff, if there's a fire, I can assume there's a fire extinguisher. So I'm going to walk up there without one because I'm going to assume there already is one.

If it's not veterans, which I saw that it wasn't, and I also peered to see that the fire extinguishers were still in the officer's station, then I would take them.

Q   Lieutenant Watson and Lieutenant Redden were veteran staff at that time; correct?

A   Correct.

Q   Were you surprised that as veteran staff, they were up there without fire extinguishers?

A   At the time, I most definitely was.

Q   Are you no longer surprised by that?

A   No, because as I became a supervisor and I understood what I expect other people to do, I realized they assumed that other people were doing

Page 211

the right thing and took a different course of action.

Q   So the right thing to do in that situation would have been to go up to the fire with fire extinguishers?

A   Correct.

Q   So the officers in B Cellhouse did not do the right thing because they didn't bring fire extinguishers up to the 500 Range.

A   They were not adequately mentally prepared to handle a situation like that.

Q   What are you basing that on?

A   Just my opinion, professional opinion.

Q   Based on what?

A   How I've seen new people react to emergency situations. I don't know -- I -- honestly, Officer Rodriguez, I've probably said ten words to the entire time I've ever known him.

And I didn't even remember Officer Blakley's name until you said it.

So the only one I had any experience dealing with is Officer Abbassi, and she was still moderately new because I was beginning to train her as she left.

Q   Your opinion that they're not adequately

Page 212

prepared to deal with the emergency situation is not based on any knowledge of them as individuals.

A   Just knowledge of the outcome of what had happened.

Q   Is it based on the fact -- well, you said that it's because they're new officers.

A   They were new officers, yes.

Q   So do you think that's a risk of having new officers in a cellhouse, is that they're not adequately prepared to deal with emergency situations?

A   It could be, but all officers are treated the same regardless. So if you're assigned a task, you're expected to do it.

Q   Okay. So your -- would you assume that Lieutenants Watson and Redden were adequately -- were mentally prepared to deal with that type of situation?

A   Yes, they were.

Q   And what is that based on?

A   My experience dealing with them in emergency situations and how willing and able they were to help me attempt to help this guy.

Q   Okay. So it's based on your experience with emergency situations.

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 55 of 106

Page 213

A    Yes.  There's no form that says that this guy's experienced enough.

Q    Okay.  And so is your statement that the B Cellhouse officers were not adequately prepared to deal with this situation, is that based on their lack of training or what resulted from the fire?

A    It was nothing to do with their training because I didn't take part in the steps of their training.  It is that they didn't mentally prepare together, which is not due to anything preparation-wise from the training or department or like that.  But you need to work with each other for long enough to have a plan and action; A, if an emergency happens, this is your responsibility, this is your responsibility, this is yours, and this will be mine.

Q    So do you agree that the B Cellhouse officers did not do what they should that night?

A    Not due to their not wanting to.  It's their lack of experience that led to it.

Q    That's not quite my question.

My question is:  Do you agree that the B Cellhouse officers did what they should have done in response to the fire?

A    No.

Page 214

Q    They did not do what they should have done in response to the fire.

A    No.

Q    I'm sorry; let me say it clearly.

So do you agree that the B Cellhouse officers did not do what they should have done in response to the fire?

A    No, they did not do what they should have done in response to the fire.

Q    Okay.  Thank you for clarifying that.

What should they have done that they did not do?

A    They should have isolated the situation.  They should have taken the fire extinguishers up there, left someone at the door.

Q    Okay.

A    Now, we talked earlier about what the -- his -- their minimum requirement was to do.  Their minimum requirement was to communicate the situation to somebody.  So that called -- you know, I assume he called the signal, because I never heard a signal, but somehow people knew to go there.

Q    Uh-huh.

A    And the fire extinguishers were used.  It -- it's a community effort.  It's not just these

Page 215

people did this, those people did that.  We act as a team anytime we do anything.

Q    But people can be disciplined as individuals for not doing their job; correct?

A    That's correct.

Q    So by not bringing fire extinguishers up to the 500 Range, could the B Cellhouse officers have been disciplined for that?

A    I don't know how it happened; but if Officer Rodriguez was on 500 and never left 500, there's no way that he could have brought a fire extinguisher unless he was just going to carry one on his walk.

Q    Should he have gone down to get one?

A    That would be your discretion.

Q    So the B Cellhouse officers did the minimum that they were required to do by policy?

A    Yes.

Q    But you would have brought a fire extinguisher up there?

A    I -- from Officer Rodriguez's perspective, I think he did what he should have done.

Q    How do you know what Officer Rodriguez did?

A    I don't, but someone responded to the

Page 216

fire, and I was able to know there was a fire.  So even if he didn't, the fire alarm did what it was supposed to do, and he stayed where he was to direct me and tell me where it was.  Because he told me it was in cell 540.

Q    Okay.  So if Officer Rodriguez called for -- called a fire signal and then stood by on the 500 Range without keys and without a fire extinguisher for five minutes, did he do what he should have done?

A    Five -- no.

Q    What should he have done?

A    By that -- by that time -- that would be his discretion.  Could he have done that?  Yes.  But it would not take First Responders that long to get there.  And we're talking about an anomaly, one situation where it might have happened.  And so, me, being the -- knowing me and knowing the way that I work, I would have ran down and grabbed the fire extinguisher.  It is not wrong to stay there and be like, hey, the fire's there.  You bring the fire extinguisher.

Q    If you have the keys to -- if you know that there's a fire on the 500 Range and you have the 500 keys, should you make sure that those keys

USDC NND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 56 of 106

Page 217

get to the 500 Range?

A    That would -- yes.

Q    Should you bring them up there yourself?

A    Not necessarily.

Q    Should you hand them to somebody else who's going up there?

A    Yes.

Q    You said Officer Rodriguez directed you to the fire.

A    Yes.

Q    Did you have any other conversations with him that night?

A    No.  All of the action from the fire up to the offenders assaulting staff and setting fire to things took -- if I'm saying that the fire started shortly after 9:00 o'clock, which is how I remember it, we didn't get done putting the offenders back in their cells from the evacuation until after 3:00.

Q    Uh-huh.

A    We didn't get done with all of our paperwork and reports till almost 7:00.

Q    Uh-huh.

A    And at no point in time after this did I see any of the B Cellhouse officers because I know they were told to get off Main Street and get out of

Page 218

the cellhouse and go sit somewhere.  Where that somewhere was, I don't know.

Q    Okay.  You said that your radio was not working and Redden's radio was not working; correct?

A    I think Redden just couldn't be heard because of all the loud banging and stuff.

Q    And your radio was working when you got to the 500 Range?

A    Yes, because I heard him talk.

Q    When was it not working?

A    I don't know that it wasn't; but if there was a signal call, and if I made the call through to call for the firefighters, that would be two times where -- but I have no way of knowing whether or not the transmission went through.

Q    Do you know if anyone else's radio was not working that night?

A    I do not know.

Q    Did you have any trouble breathing while you were up on the 500 Range?

A    I did.

Q    Did you have trouble breathing afterwards?

A    For a couple days after, I had like black -- black mucus and a raspy throat.  I don't know if it was from the fire or just in general,

Page 219

but... (Witness nodding head.)

Q    If you could go back to that night, is there anything you would do differently?

A    I would say -- I would say I would try to do everything myself, but that sounds like a terrible answer.  Like I -- that it -- my biggest situation that night was not with the fire; it was with the evacuation as a whole.  So is there anything I would do about the fire differently?  No.

Q    But with the evacuation you would.

A    Yes.

Q    Was there anything you would do differently, based on what you know happened, with regard to the other officers?  Let me say that more clearly.

Is there anything that you would -- if you could go back -- have the other officers do differently with regard to responding to the fire?

A    My instinct was to grab the fire extinguisher and go myself.  Right?  And I learned, from being a supervisor, that that's not always the best thing to do, is to be the "doer."  I probably should have had, you know, the other -- Officer Abbassi come with me, or I should have handed Rodriguez a fire extinguisher and be like:

Page 220

Come on.  We're going to go do this together, because more people is always better.

Q    Uh-huh.

A    And maybe that would have changed the outcome of things; maybe it wouldn't.  But I wasn't a supervisor at this time, either.  I was an officer, also.  And maybe giving them more direction than I did just being a "doer."

Q    Do you know what started the fire?

A    I don't.

Q    Did you ever hear any rumors about what started the fire?

A    I did.

Q    What was that?

A    The offender said he was working on his TV that held the charge and caught fire.

Q    What do you mean?

A    The offenders are -- they take apart TVs and put parts from one TV into another TV to try to fix it.

Q    Who did you hear that from?

A    Just other offenders.  I've heard that multiple times from other offenders.  I've never heard that from any staff or -- I know they said they had a FISS [sic] team come in to assess the

USDC NN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 57 of 106

Page 221

fire. I never heard of any reports from that.

Q   What's a FISS team?

A   Fire Investigation -- I don't know what the last two letters are for, but I was told that a fire investigation team would be coming in to do an investigation. Honestly, I don't know if that ever happened, but...

Q   Is that part of the IDOC investigative --

A   No. It's a firefighter group.

Q   And you heard that from?

A   When we were doing that ERO training, they said a FISS team was going to come in and evaluate the -- they said they were going to come in or they had come in at the time of the briefing to check out the fire.

Q   The prisoners that told you that he was -- that his TV started the fire, was that multiple prisoners?

A   No, it was one guy. The one I said I had a good relationship with, he said that the dude was fixing his TV. And he was talking to him while he was fixing the TV, and all of a sudden he stopped talking to him the said there was a fire.

Q   Which prisoner is that?

A   His last name is Campbell, and I know his

Page 222

nickname to be "Bullet Head." I don't know his first name.

Q   And you didn't hear that from anyone else?

A   No. I was trying to figure out why he would assault staff when he typically doesn't do that. I spend a lot of time trying to counsel the offenders; might be a good, like, role model. So I wanted to figure out what took him to that level.

Q   Did you know Joshua Devine personally?

A   I had never met him.

Q   Did you know anything about it him?

A   No.

Q   Do you know whether he usually caused trouble or whether he was pretty quiet?

A   I do not know.

Q   Did you ever hear the name "Spider"?

A   Yes, but not for him.

Q   So there's more than one Spider at ISP?

A   The one that I said has the lawsuits against me, Randy Ybarra, his nickname is Spider.

Q   Okay. So you've never heard Joshua Devine referred as to as Spider?

A   Never.

Q   You don't have any knowledge about him or his personality, his behavior at ISP?

Page 223

A   If I had talked to him, I didn't remember his face or his name or anything.

Q   Did anybody give you any positive or negative feedback about what you did that night?

A   I received a cash spot bonus, which is like a bonus check, for what I did during the fire for like $200. But other than that, they said that we should -- just the evacuation was the only thing I received criticism on.

Q   What was that?

A   That we should have evacuated the range that was in the most danger, which would have been 500. And once 500 was evacuated, went to 400, which is something we knew, and just in practice, we weren't able to do it because we weren't in possession of keys.

Q   Okay. And what was the bonus that you received for?

A   A stressful situation.

Q   So dealing with a stressful situation.

A   Yes.

Q   Did anyone else receive any more bonus?

A   I don't know.

Q   Do you know if anyone else received any criticism?

Page 224

A   I don't know.

Q   Did the warden ever speak to you about what happened that night?

A   No.

Q   Did Major Nowatzke ever speak to you about what happened that night?

A   No.

Q   Did anyone in charge of emergency response or safety talk to you that night?

A   You know what? So those people did speak at that debriefing, but their comments were never directly addressed towards me. They were directed towards that debriefing.

Q   Okay. And that was the only time you ever spoke with anyone in charge with emergency response or safety response?

A   Yes.

Q   Do you know Barbara Devine?

A   No.

Q   Do you know Crystal Devine?

A   No.

MS. PIERCE: Let's take a five- or ten-minute break.

MS. SMITH: Sure.

(A brief recess was taken from

USDC NN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 58 of 106

Page 225

1:55 to 2:23.)

BY MS. PIERCE:

Q    So earlier you testified that you were told not to talk about the specifics of the night of fire.

A    (Witness nodding head.)

Q    Can you tell me who exactly told you to say that -- or not to talk about it?

A    Whatever investigator did the -- our interviews the night of the fire.

Q    That was during your interview on the night of the fire?

A    Yeah.

Q    Did anyone else ever tell you that?

A    No.

Q    Do you know if the other officers were told the same thing?

A    I do not know.

Q    And that was definitely during your interview with them?

A    Yeah, I believe so.

Q    Okay.  And while you've been at ISP, you don't recall any changes in the way that firefighters have been activated?

A    They moved them all to -- not all.  They

Page 226

moved most of them to one unit now, so at that time, if there's a fire, that one unit just has to be responsible for letting the firefighters out.  And I don't know if that was in response to this incident or just turned out to be like that because that unit's also honorary.

Q    What unit is that?

A    I Cellhouse.

Q    Do you know when that change was made?

A    I do not.

Q    But that was after the fire?

A    Yes.

Q    Were there any other changes?

A    They got some new equipment that -- it's like ANSUL, which just takes the air out of the area in order to put out a fire.  And they were getting a backpack, and it was either a staff member or one of the firefighters was going to be trained to use it.  And it's ideal for putting out a fire inside of a cell.

Q    What is it?

A    It's like a backpack with powder inside of it that takes the air out of the room so -- if there's no air, there's no fire.

Q    When did they get that?

Page 227

A    I believe the beginning of this year.  And I don't know if they're using it, but I know we're in possession of it and training for it has started.

Q    Okay.  Do you recall there ever being a different way that the firefighters were activated?

A    When I first started, we used to leave their door, like, open.

Q    Their cell door?

A    Cell door open, so then you just make an intercom announcement.  Then that kind of went away, and I don't know if that was ever the way it was supposed to be done.  I think that was just the way that they were doing it.

Q    And who would make an intercom announcement?

A    Whoever was in charge.

Q    Of the cellhouse?

A    Yes.

Q    And so would they get told by the control room or would they --

A    Yeah, whenever they would hear a signal, they would just announce that there's a fire somewhere, and then the firefighter would run out.

Q    Okay.  So as far as you remember -- sorry.  Scratch that.

Page 228

Was there ever a point where firefighters could only be activated by the control room or the shift supervisor?

A    Not to my knowledge, no.

Q    So they were always activated whenever a 10-70 or a 10-71 was called?

A    Yes.

Q    Either one?

A    Either one.

Q    You said earlier that -- scratch that.  I'm sorry.

Earlier we discussed some, like, policies and practices and areas of discretion that officers have.  Can you go through what you mean -- the difference you understand between, like, a policy and something that's just a practice of ISP?

A    A policy has a number attached to it.  So like the Use of Force Procedure is 0201109.  There's no disagreement on whether or not that policy is statewide because that is statewide.

Q    Uh-huh.

A    A procedure is the way in which that policy is executed by the facility, and it's the -- described through the post orders; through field training; experience; and through just general

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 59 of 106

Page 229

practices; and also executive directors, which are -- executive directives, which are by the warden to discuss how we're going to execute policy.

Q So the only written procedures are executive directives from the warden or post orders?

A Correct.

Q Everything else is just practice based?

A Correct.

Q Can you be disciplined for violating a practice in the same way that you'd be disciplined for violating a procedure?

A I have never seen it, so I don't know.

Q What do you mean by that?

A I've never seen someone disciplined for not -- like not following a practice. I have seen people for violating the policy.

Q Okay. What about for violating procedures?

A I think an example of violating a procedure would be like missing a 30- to-40 minute pipe walk.

Q Uh-huh.

A Not getting offenders out on time for school, not getting offenders out on time for church. Stuff like that.

Page 230

Q Okay. So you could be disciplined for that?

A You could.

Q But you've never heard of somebody being disciplined for not following a practice.

A I have not heard of it, no.

Q Okay. Do procedures tend to have a lot of holes that have to be filled in by practices and training?

A Procedures tend to not. Policies do.

Q Okay. For -- when you're instructing somebody as an FTO officer about practices that are done, do you just use your own knowledge and experience, or do you talk to other individuals at the facility about what the correct practice is?

A There's actually a manual that the OJT -- the trainee carries with them. And it tells you to discuss the importance of such-and-such policy.

Q But it doesn't say to talk about any practices or anything like that?

A No, but then that's the point where you would interject and say, this is how we execute policy such-and-such.

Q Are there disagreements about how policies are executed?

Page 231

A Yes, absolutely.

Q Okay. And how are those worked out?

A I don't think there's ever been like a disagreement so bad that -- so they need to sit down and, like, be fixed. I think it's more when you're working under this supervisor, this is how you execute. When you're working under this supervisor, this is how you execute.

Q So there might be different ways of doing things based on who's your supervisor that shift?

A Correct.

Q So is it important to always ask your supervisor how to do something that may be left up to the discretion of the supervisor?

A Yes. And that's also how I train people. I have let people know, make sure you ask your supervisor how they want them -- how you want something executed. It's just as much your supervisor learning your strengths and weaknesses as it is you learning your supervisor's way that they do things.

Q Do people normally have the same supervisor when they're working?

A Shift supervisor? Generally yes. Shelter supervisor, not necessarily.

Page 232

Q So does it become confusing or difficult for people to keep track of what one shelter supervisor might want versus another one?

A It absolutely could.

Q Is that a problem?

A No, because I don't think that one person's execution of it would get you administratively in trouble. It just might get -- make this other supervisor irritated with the way that you're doing it.

Q Do you think that consistency would make things safer and more efficient at ISP?

A Yes.

Q You mentioned -- sorry. Going back -- that when you first got to ISP, the practice or policy -- so you're not sure which, but the practice at least was to leave the doors of the cells of the firefighters open?

A Correct.

Q Was that the practice or policy in -- at the time of the April 2017 fire?

A Not in my unit that I was regularly assigned to.

Q Do you remember when that changed?

A When I took over and I asked somebody, was

BARBARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 60 of 106

Page 233

it normal to leave the firefighter's doors open? And they said, "No, you don't have to. You can go up there and unlock it whenever there's a fire."

Q    Okay.

A    And I was like, Okay. We'll do that.

Q    So that may have been left up to the discretion of whoever was in charge of that cellhouse or shelter?

A    Correct.

Q    Did policy ever become that that was not allowed to leave the cell doors open?

A    I don't have the answer to that.

Q    So as far as you're aware, there was never any policy that said you could not leave the cell doors of the firemen open.

A    Correct.

Q    And so just to clarify, you never had any discussions with any of the B Cellhouse officers about the fire after the fire happened.

A    Not to my knowledge, no.

Q    You never had any conversation with Officer Rodriguez.

A    I -- no. I can count on one hand the number of conversations I've had with Officer Rodriguez.

Page 234

Q    And you never had any conversation with Officer Abbassi after the fire about the fire.

A    No. She left maybe a month after.

Q    And have you ever had a conversation with Officer Blakley after the fire?

A    I can't recall a conversation with her ever.

Q    And so you never had any conversation with Officer Rodriguez about his actions or his performance on the night of the fire.

A    No. At the time I wasn't a supervisor, so I didn't feel that it was my, like, place to step in and be like, hey, let me tell you what you can do different. You know, I stayed out of it entirely.

Q    If you had been a supervisor, would you?

A    Yes.

Q    And why?

A    Because I would have gave him the same criticism that I gave myself earlier, is that he should have told everybody, hey, this is what you're going to do and not be -- not be the "doer." And then maybe, hey, anytime there's a fire, make sure to bring a fire extinguisher.

Q    Would you have given him any other criticism?

Page 235

A    No.

Q    So you would never have told Officer Rodriguez that he did a good job that night or that he did his job that night?

A    It wouldn't have been my place to do so.

Q    So would you be surprised if Officer Rodriguez said that you told him he did a good job that night?

A    I don't know. Would I be surprised if he said that?

Q    Yeah.

A    No.

Q    Why not?

A    Because that's regularly like my role in the facility, is like, hey, you're doing a great job. Like I'm -- even if I don't necessarily like mean it, like, hey, thanks for coming to work; hey, thanks for coming; we appreciate you being here. That's always been the way I am. I'm a team player.

Q    Didn't you say it wouldn't have been your place to give him feedback that night?

A    Yeah. I don't think I would have given him feedback, like this is what you should have done. But I might have been like, hey, everybody did great. We made it out alive. Something like

Page 236

that, to that extent.

Q    Okay. And you don't recall having any con--

A    No, I don't recall that. One of our main mottos at work is to leave with the same number of holes that we came in with. And that -- like being stabbed. And normally I would tell people, hey, everything's okay. You left with the same amount of holes you came in with.

Q    So that's something you would say to somebody?

A    Yeah.

Q    When you first got to the cellhouse, just to clarify, so to the best of your knowledge, to what you recall, you never told Officer Rodriguez that he did a good job that night?

A    I don't think so. Like I said, I just don't think it would have been my place.

Q    When you first got to the fire, after you heard the fire alarm, did you see smoke?

A    Not when I was on the officer side of the cellhouse, the officer-station side of the cellhouse.

Q    So you didn't see any smoke in front of the front door?

BARBARA DEVINE vs
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 61 of 106
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019

Page 237

A No.
Q Could you smell smoke?
A Yes.
Q Was the smell strong?
A No.
Q Could you smell it before you got to the front door?
A No.
Q But you could smell it distinctively when you got to the front door?
A Yes.
Q Could you see any lights from the fire?
A No.
Q When could you first see smoke?
A I couldn't see smoke until I got to the 500 Range.
Q Were there -- was there smoke on the lower ranges on the other side?
A I didn't go to the side to look down the range. I went straight to the stairs, which are located in the middle, and started curling my way up.
Q So when you got to the 500 Range, was the smoke on the other side? The south side of the --
A No. I don't think -- I don't -- if it

Page 238

ever made it to the other side at all, I don't know about it.
Q Okay. And just to clarify, you said you saw somebody come around the back way while you were trying to put out the fire with another fire extinguisher?
A I saw on the other side of the cell, so I was standing somewhat in front of cell 538. Someone started spraying the fire from the side of cell 542.
Q But you couldn't see who that was?
A I don't recall who it was. I'm prob-- I'm sure I saw who it was. I was probably even talking to them. I just don't remember who it was.
Q Okay. And they just had one fire extinguisher?
A To my knowledge, yes.
Q And you don't know where that fire extinguisher came from.
A No, I don't.
Q And you don't know who brought it up.
A I do not.
Q Did you bring it it up?
A It might have been the same one I had given Lieutenant Watson.
Q Okay.

Page 239

A He might have handed it off to somebody else, or it might have been him.
Q When that person started spraying their fire extinguisher on the fire, had your fire extinguisher already gone out?
A Yes.
Q Was Joshua Devine alive at that time?
A Yes.
Q Was he at the front of the cell at that point?
A I don't recall.
Q I think you said at some point that the -- you were spraying the fire, and it died down and then flared back up?
A Yes.
Q Do you know where Joshua Devine was at that time?
A Still in between the sink and the wall. Not between the sink and the bed. And without being able to, like, picture a cell, I know that's hard to explain, but he was to the side of the toilet that was not closest to the bed.
Q Was he sort of stuck in that area by the fire, or was he able to get out of there?
A If he would have moved, he would have been

Page 240

burned by the fire.
Q So was there anything that Joshua Devine could have done differently, in your mind, that would have saved his life that night?
A Honestly, a couple weeks later I sat and I thought about it, is if he had just put his shoulder down and maybe charged the door, he possibly could have gotten out. He definitely would have been severely burned --
Q Uh-huh.
A -- but he would have survived. But that was -- like I said, I had a week, maybe two weeks to sit there and think about that. And I was like, man, he wouldn't have thought about that because pain is a deterrent.
Q And there's nothing else you can think of that might have made the situation different for him.
A Not him, no.
Q You mentioned earlier that there was a training manual that new officers would carry around with them.
A Yeah.
Q What was that called?
A It's their OJT Manual. It comes in four

BARBARA DEVINE vs
RON NEAL, et al.

USDC NN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 62 of 106

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

Page 241

phases, and it kind of just comes in a little folder.

Q   Has that changed while you've been there?

A   Significantly.

Q   In what ways has it changed?

A   You used to have to sign every section and then sign the -- there's a master of that section. And now it's gone over in the training department, so the section is signed, and then you just sign when that person has showed mastery.

Q   Okay.  Is there any other, like, content that's changed in it?

A   Nothing substantial that I can think of.

Q   Do you know if those changes happened before or after the April 2017 fire?

A   I think it's constantly changing.

Q   Do you have --

A   But none that I can think of, major, that happened after the fire.

Q   So there weren't any major changes that were made in response to the fire.

A   I don't believe so.

Q   Did you know of any policy or procedure or practice changes that were made in response to the fire?

Page 242

A   I do, actually.  We did a facility purge, which was something that was always in -- I don't know if it's policy or procedure, but we only allow offenders to have two boxes of property.  And so when they pack their things, everything that they own should fit into three boxes.

So we went -- we locked the entire facility down, and we went cell to cell and made offenders get rid of property until all of their property in their room could fit into three [sic] boxes.  And this was due to the fact that a lot of the things that set fire in Devine's cell were legal work, papers, and things that are flammable.  And that was the justification I was told.  Whether or not that's true, I don't know.

Q   Okay.  So there was a purge of anything that was flammable.

A   Right.  And there's no longer cardboard boxes allowed in the cells at ISP.

Q   Why were cardboard boxes originally in the cells?

A   Guys kept their legal mail or their property inside of it.

Q   Okay.  Were there any other changes that were made besides the purge?

Page 243

A   None that I can think of.

Q   Were there any statements or videos or anything that were issued by the warden or anybody at IDOC?

A   There was something in the paper about it. I remember reading it.  "Offender dies during a fire at ISP."  I think that was the Michigan City paper. Beyond that, no, I don't know.

Q   Was there any statement that was made to the prisoners at ISP about what had happened?

A   Nothing formal, but I -- nothing formal, but I think the firemen had -- like had more of an idea than staff to try to help the offenders.  And I've heard some firefighters like mentored guys that, hey, they did what they could.  We do what we could.  It happened.  So just kind of -- so nothing formal.

Q   Okay.  So there were no other formal statements that were made?

A   Not that I know of.

Q   I'm trying to see.  I think I have a layout of the cell that I wanted to show you.

A   Okay.

Q   So you could point it out to me.  I'm having trouble finding it, so maybe you could just

Page 244

kind of draw what the cell looks like.

A   Yeah.  A cell looks like a rectangle.  The toilet will be offset to the left of the back, left corner.  The bed would be here.  Cabinet here. Property here and here.

Q   Where's the cell door?

A   This is the door.

Q   And that swings out; right?

A   Yes.  This way.

Q   Okay.

A   So he was standing here while all of this was on fire.

Q   Okay.  Okay.  And so how did he eventually get -- so show me the -- kind of the movement that he made.

A   He went -- crawled this way under the bed.

Q   Uh-huh.

A   And then this way out.

Q   Okay.

A   Which is probably the safest thing he could have done to not interact with the fire that was here (indicating.)

Q   And so when he -- when you got the fire to sort of die down for a minute, he was still back here in this back area?

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 63 of 106

Page 245

A   When I sprayed it with the extinguisher, yes, he was back here. Once it died down and it wasn't like raging flames, that's when he tried to climb under.

Q   Okay. Gotcha.

MS. PIERCE: We can mark that as an exhibit.

(Statham Exhibit No. 4 marked for identification.)

BY MS. PIERCE:

Q   Thank you for clarifying that for me.

A   Yep.

Q   So when you spoke with the investigator on the night of the fire about what happened, did you give him a truthful explanation of what happened?

A   Yes.

Q   Did you give him a full explanation of what happened?

A   The only thing he asked is what I did for the fire. And I said, I used the entirety of my fire extinguisher on it, and then I lifted Devine down. And then I explained to him what I did during the small-scale, like, assault that happened.

Q   Did you think it was important to give the investigator as much information as possible?

Page 246

A   I just answered his questions. I don't -- there -- I don't think there was really, like, room for me to expound on what I wanted to say.

Q   Okay. So you feel like you -- or you agree that you gave him full and complete -- full, complete, and accurate answers to his questions?

A   Yes.

Q   Okay. I'm going to just show you a video of your interview with --

A   Okay.

Q   -- the investigator that night. So if you don't mind coming to sit over here.

A   On that side?

Q   Yeah.

A   (Witness complying.)

Q   You can sit or stand, whatever.

Can you see okay?

A   Yes.

(Video playing.)

BY MS. PIERCE:

Q   Do you remember that investigator?

A   Yeah. I would not have even remembered that it was Miss Abram had you not shown me this.

Q   Okay. You remember speaking with her?

A   I remember her being an investigator, but

Page 247

I did not remember this at all.

Q   Okay. Do you know her well?

A   No.

Q   Is this the only time you've spoken with her?

A   Other than in passing, yes.

Q   And she's the one who told you not to speak about the details during the investigation?

A   Yes.

Q   Can you hear it okay?

A   Not really.

MS. PIERCE: (Counsel adjusting sound.)

(Video playing.)

BY MS. PIERCE:

Q   So does that change your recollection of what happened at all?

A   A part of it does. The part where it says I followed the body to the Hoosier Room?

Q   Uh-huh.

A   I did talk to Rodriguez, because he's the one that sat with Devine in the Hoosier Room, with the body.

Q   Okay.

A   So if I said, "good job" to him, it was at that time when he was sitting with the body.

Page 248

Because he -- I'm sitting with the body in the Hoosier Room, which is a conference room like this. So the body's here. I'm sitting in a chair, and I'm just watching the body. And they come and somebody -- they say, "You got to go prep the weapons."

I'm like, "Somebody's got to watch the body." And Rodriguez relieved me watching the body. So I did speak to him after the whole incident.

Q   Okay. But everything else seems accurate and correct?

A   Yeah.

Q   Doesn't change any testimony that you've given here today?

A   No. I think I was wrong when I told her that it was Lieutenant Redden saying it was on 500. It was Lieutenant Watson.

Q   Okay. Lieutenant Watson was saying the fire was in 500 Range?

A   Yeah.

Q   Or on the radio?

A   Yeah. And Rodriguez being on the front of the range -- I said Redden, but it was Watson. I knew I corrected it later, when she said Redden.

BARBARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 64 of 106

Page 249

And I was like, "No, it was Watson."

Q    It was Watson who was saying --

A    "Fire on 500."

Q    "Fire on 500" on the radio.

A    (Witness nodding head.)

Q    And it was Rodriguez who was at the front of the range.

A    Yes.

Q    And I think you mentioned in this that you heard a 10-71?

A    I don't remember it, but I -- (witness shaking head.)  That was two years ago, so...

Q    And at the end of this video here, are you filling out an incident report or a statement of what happened?

A    I had already done an incident report. Actually, no, I had not done an incident report yet. But even if you do an incident report, you still have to write your verbal statement to IA.

Q    Okay.

A    So even if I'd done three incident reports, whenever I sit with IA and tell them something, I then have to write it on paper, too.

Q    So there's different -- there's two written statements you gave, one to IA and one

Page 250

that's an incident report.

A    Correct.  The incident report is typed, not handwritten.

Q    Gotcha.

And when I listened to the video, I don't hear the investigator at any point tell you that you can't talk about the details of what happened.  Do you remember when she said that to you?

A    I don't.  I remember signing a nondisclosure agreement about this case.

Q    Okay.

A    And like I said, I don't remember meeting with her at all.  I remember that interview, obviously, but I don't remember it being with Miss Abram.

Q    Let me give you a better drawing of the cell, and maybe we can just -- we can mark it as an exhibit after.

So E is the toilet.

A    (Witness nodding head.)

Q    So Joshua Devine was just to the side of that toilet next to the wall; is that correct?

A    Yes.

Q    Okay.  Can you mark where that was?

Page 251

A    He would have -- what is D?  Oh, okay.  He would have been here, crawled under the bed this way.  Make this way that way.

Q    And D, the shelves, do those go down to the ground, or is --

A    It's above ground.  It's above the toilet.

Q    Okay.  Gotcha.

And is the bed all the way against the wall, or is it in the middle like that drawing shows?

A    It is bolted to the ground, touching the wall.

Q    Touching the back wall?

A    No.  The side wall.

Q    So there's some space in between the back of the bed and the back wall?

A    Yes.  That's all space right there.

Q    And that whole area was on fire?

A    Yes.  Even the shelving, the metal of the shelving, was on fire.

And underneath this H, there's a cabinet.  The cabinet was on fire.

Q    And there's another cabinet there in the front where A is?

A    No.  No.  The metal cabinet is here, not

Page 252

here.  So the metal cabinet, A, was underneath the fluorescent light as a TV stand.

Q    Okay.  Can prisoners move the cabinet, or is that bolted to the ground?

A    I've never seen a cell where the cabinet would even fit there.

Q    Okay.

A    And I don't really know -- this would be correct of this instance; but in a formal situation, the TV wouldn't be on the bed.

Q    Okay.

A    Obviously.  An out-- outlet is here in a typical cell.  If his was different, I don't know about it.

MS. PIERCE: Thank you.  We'll mark that as Exhibit 5.

(Statham Exhibit No. 5 marked for identification.)

BY MS. PIERCE:

Q    I'm going to hand you what's marked as Exhibit 6.

(Statham Exhibit No. 6 marked for identification.)

BY MS. PIERCE:

Q    So this does not have a Bates stamp, but

USDC IN/ND case 3:18-cv-00995-JD     document 203-3     filed 03/29/21     page 65 of 106

Page 253

can you read the title up at the top?

A   It doesn't have a what stamp?

Q   A Bates stamp.  A Bates stamp is something we use in litigation to keep track of what the document is.  This document just doesn't have it, so that would be at the bottom.

A   Okay.  Okay.  Okay.  "After Action Review, April 24th, 2017."

Q   Okay.  So are these -- is this the meeting that you had with the people from ERO?

A   I would have no reason for it to be anything else.  So I would assume so.

Q   Why don't you take a minute or two to look it over.

A   (Witness complying.)
Okay.

Q   After reviewing this, does this appear to be the notes from the meeting with the ERO?

A   Yes.  I've never seen these before, so it's -- I don't know when they were made or anything of that nature.

Q   In looking at the first paragraph, is that the people who were present at the meeting?

A   I don't really remember the attendance of it.  The only thing I do recall is that

Page 254

Officer Rodriguez didn't show up, and I noticed that his name is not here.  And my name is also spelled incorrectly.

Q   And your name is spelled incorrectly.

A   Correct.

Q   And you were at this meeting?

A   I was.

Q   And who are the people who are from ERO?

A   Robert Curry, E. Niccum, F. Vanihel, and I believe that would be it.

Q   Okay.  Who's William Wilson?

A   He is the executive director of Adult Facilities.  He would be the warden's boss.

Q   Okay.  So he's not part of the ERO?

A   No.

Q   Is there anything that you see on this After Action Review notes that you believe is inaccurate?

A   I just -- I don't know what the "Tiache area" --

Q   Where is that?

A   Dot No. 3 on the second page.  "Was a Tiache area set up?"

MR. HEPPELL: It's probably triage.

Page 255

BY MS. PIERCE:

Q   That would be my guess, as well, but I'm not positive.
But everything else, to your knowledge, is accurate?

A   Yeah, it's pretty much what we discussed in the meeting.

Q   And Lieutenant Redden and Captain Dykstra spoke during the meeting?

A   If they did -- I remember Redden saying that he called for the evacuation.  I don't remember ever hearing Captain Dykstra speak.  But I believe I was also sent to the meeting late, if I do recall.

Q   Why was that?

A   I was working.

Q   If you see at the end of the second page, right before the last line that says, "meeting was dismissed and tour was given" --

THE REPORTER: And what was given?

MS. PIERCE: Tour, T-O-U-R.

BY MS. PIERCE:

Q   There's a paragraph that's four lines that says, "Mr. Curry asked what we have learned from this."  And so are these the take-aways that were -- these fours lines, are these the take-aways that

Page 256

were brought --

A   I -- I'm sorry.

Q   Were those the take-aways that were reached at the meeting?

A   I assume, but I've never seen these before.

Q   Okay.  So it says the first one is "better communication is key to an emergency."  Do you remember that being discussed?

A   That -- I think that's the radios that -- we were discussing the radio and being able to use them and trust them.

Q   Anything else?

A   No.

Q   Do you remember that -- there being a discussion about radios, or is that what you're assuming?

A   Well, that's what I had said earlier.  I remember someone brought up the radios.  I don't remember who it was.  That we can never trust these radios anyway even if we did call an emergency.

Q   Okay.  Was there any decision about any action that would be taken in response to the problem with the radios?

A   I don't think a decision would ever be

BARABARA DEVINE vs
RON NEAL, et al.

USDC NN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 66 of 106

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

Page 257

made in a group setting.

Q   Do you know who would have been responsible for making a decision to change the radios?

A   I believe it was already in the works regardless, so we were just waiting on our set of radios to come in.  I don't know if this led to an expedition of any radio thing happening, but I think it had already been decided we were getting rid of the old Motorola radios.

Q   What was that based on, that understanding?

A   We were waiting on new radios.

Q   So someone told you, you were waiting on new radios?

A   Yes.  So, like, if one broke, instead of having five in a cellhouse, we would have four, because they're not going to replace a radio when we're getting new ones.

Q   Okay.  Do you know how long you waited after the decision was made to get new radios?

A   I don't.  The decision to get new ones was made prior to me beginning working there.

Q   So it was several years that you were waiting for the radios?

Page 258

A   Yes.

Q   Okay.  The second one -- item listed by -- it looks like Mr. Curry -- was "Active Weapons Team -- I guess that means activate Weapons Team -- "when emergency call deployed during mass movement."

A   Yes.

Q   Do you remember any discussions about that?

A   Yes.  Immediately after this, it was decided that during all signals, the Weapons Team would stage just in case they were needed for an emergency activation.  Prior to this, we were not staging Weapons during fires or medical emergencies.

Q   Was that the only emergency group that was -- or procedures or protocols were changed?

A   It was a procedure, and to my knowledge, ERO was concerned, yes.

Q   So no changes were made to the First Responders?

A   Not that I know of.

Q   Okay.  And the third point in that list is, "Make sure you know who's in charge of First Responders."  Do you remember that being discussed?

Page 259

A   I do.

Q   What was that about?

A   They stated that Lieutenant Watson was in charge of escorting the Fire Team, which included me -- the firefighters and me down the stairs, and he went to go do something else.  And they said that Lieutenant Redden should have made sure that Lieutenant Watson was doing what Lieutenant Redden told him to do.  And the only person that could have called for an evacuation was Lieutenant Redden, not Captain Dykstra.

Q   I'm sorry.  Just to clarify that.  So you said Watson or Redden was in charge?

A   Lieutenant Redden was the QRT team supervisor; he was in charge.

Q   Okay.  And so the conversation was that he should have -- Watson should have made sure to do what Redden told him to do?

A   Correct.

Q   But Watson was not there to help you go down with the body, so that is how he was not listening to Lieutenant Redden?

A   Correct.  And that was attributed to him not being able to breathe any longer.  But in their mind, he just blatantly disregarded what

Page 260

Lieutenant Redden told him to do.

Q   Okay.  And you said that only Lieutenant Redden could have called for the evacuation, not Captain Dykstra?

A   Right, because he was the QRT team supervisor.

Q   Okay.  So Captain Dykstra, even though he's higher on the chain of command, could not have called for the evacuation?

A   Right.  He's not in a position to know what's happening in the unit.  So even if he said, yes, go ahead and evacuate 4- and 500, that doesn't mean that the officers just start evacuating 4- and 500.  That was a communication from Lieutenant Redden to begin evacuating 4- and 500.

Q   Okay.  I see.  So Captain Dykstra could tell Lieutenant Redden to evacuate, but the orders to actually start the evacuation, the direction needed to come from Redden, is what you're saying.

A   Correct.

Q   Okay.  And the last one is, "Work on fire drills and Plan of Action for staff."  Do you remember that being discussed?

A   I remember them discussing fire drills and what they entailed.  I don't remember any plan of

BARBARA DEVINE vs.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 67 of 106

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

Page 261

action.  And even if they made one, I wouldn't have been privy to it.

Q   Okay.  Do you remember if there was any discussion about fire drills being inadequate or not done frequently enough?

A   I don't -- I don't recall that.

Q   Just going back, you said that you signed a nondisclosure agreement?

A   Yes.

Q   Do you remember where you were when you signed that?

A   I don't.  I thought I was in the meeting; but watching the video, it very clearly was not.  So I don't recall, unless it occurred prior to the camera being on.  But I don't believe she came in the room when the camera wasn't on because that's not typically in their practices.

Q   But you're positive you signed one?

A   Yeah.  I signed a lot of them.  And I'm almost positive that one of them was for this.

Q   You signed a lot of them at ISP?

A   That's correct.

Q   As part of your job?

A   Yes.

Q   What other circumstances in which they

Page 262

have you sign them?

A   Active investigations in which legal proceedings might occur.

Q   Is that any active investigation, or only when legal proceedings might occur?

A   I believe it's only when legal proceedings might occur.

Q   And do you know the reason for that?

A   I don't.

Q   Is that a written policy?

A   I believe it's called the "Garrity Notice."  I might be wrong, but I believe that I read an IA policy that references the Garrity notice.

Q   Okay.  And what's your understanding of what the NDA requires you to do or not do?

A   Not talk about it.

Q   Anything else?

A   No, not to my knowledge.

Q   So not talk about what happened that night.

A   Correct.

Q   Anything that happened that night.

A   Correct.

Q   Is there any -- are there any specific

Page 263

people that you're allowed to talk to?

A   I don't know.  I mean, I know when we were going to have a debriefing, that was one of the things that was said.  It was like -- Chris Dustin, he's on this list.  He said that all of you guys have signed the do-not-talk-about-it, you guys can talk about ERO practices, but you cannot discuss incidents in regards to that.

Q   Did that seam like a silly distinction to you at the time?

A   No.

Q   No?  It made sense?

A   Yeah.  I just learned very early in my career to stop questioning things and just do what I'm told.

Q   Why is that?

A   Trying to make sense of something is harder on myself than it is on anyone else.

Q   Is that because things don't make sense or because you're not understanding them?

A   Comprehension is not a prerequisite for compliance, is the best way I can put it.

Q   Okay.  My question's a little bit different.

        Do you think the reason that it's

Page 264

easier just to comply with the direction rather than figuring out why that direction was given is that because there's -- the directions don't really make sense and there's no reason they should be given, or is it because you're just not understanding why the direction should be given?

A   I not now, nor will I ever, want to be an investigator.  So I will never need to give someone a nondisclosure agreement.  So I don't need to know why.  If he tells me to not talk about it, I'm going to go sit in my chair and not talk about it.

Q   So when you say that you weren't really to ask questions, was that specifically about internal investigations, or is that about IDOC or ISP generally?

A   That's about life.  Any boss I've ever had, I don't question what you tell me to do.  If you tell me to do it, I'm going to do it.

Q   So that's outside of ISP, as well?

A   Yes.

Q   So your understanding of the NDA is that you are not allowed to talk to anybody unless you were given some sort of specific authorization from them.

A   Yes.

BARBARA DEVINE vs     Cause No. 3:18-cv-00995-JD-MGG     RYAN STATHAM
RON NEAL, et al.                                                       November 5, 2019
USDC NND, case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 68 of 106

Page 265

Q   Does that include family and friends?

A   I would assume so.

Q   Okay.  So your understanding is that at the After Action Review, at the meeting with ERO, no one there was allowed to talk to the -- to talk about the specifics of what happened on the night of the fire.

A   That is my understanding.  I might be mistaken, but that is the -- I would have had a lot to say; but because I was told not to, I didn't.

Q   Did anybody talk about what happened the night of the fire?  About specifics?

A   Not -- Lieutenant Redden is the only one I really remember talking for any duration of time, and none of it was about the fire.  Most of it was about the evacuation.

Q   So nobody went against that directive that you guys were given not to talk about the specifics of the night of the fire.

A   Right.

Q   So they had a meeting basically to figure out what should have been done differently during the fire, but no one spoke about it?

A   I think the point of AARs is not -- After Action Reviews -- is not what we can do better about

Page 266

this one; it's what we can do better on the next one.

Q   Do you think it's important to understand what happened in the last one to know what can be done better going forward?

A   I do.

Q   So you said you would have had a lot of things to talk about if you had been allowed to talk about them.  What would you have discussed?

A   A lot of them ended up getting touched on; activating the Weapons Team; activating, you know, E Squad, and stuff like that.  And until I read this, I didn't know E Squad was there.

Q   Uh-huh.

A   So it says, "Discussion of what E Squad did."  I didn't know E Squad or Canine was there that night, so -- and I guess it wasn't important for me to know.  But just over all, I agree with the better communication is key.  So they touched on the Powerpoints I would have talked about, but I don't think they knew the extent to which the staff that were working at that time didn't know what was happening.

Q   On the night of the fire?

A   Right.  And I think even to this day,

Page 267

there's probably people who, other than what they could see happening, don't know what happened throughout the rest of the facility.  Because I know I don't know.

Q   Do you think it would have been helpful going forward if you'd had a more complete review of what happened on the night of the fire?

A   I do.

Q   If you could go back and you could change what happened, would you have had them do a more complete review of what happened on the night of the fire?

A   If I were in a more important role, I think I would have.  I don't think at that point in time I had any room to press the issue.

Q   And so you think that there's still a lot of people who are involved who don't know what actually happened that night in response to the fire?

A   Yeah.  And especially because the people that were working that night left.  Like -- and we weren't talking about it.  Like there's no way for me to know:  What was going through your head when you saw a fire?  Because that's the best way to fix it.  What was going through your head?  All right.

Page 268

Well, next time you see it, are you going to know the correct steps to take?

Number one, that wasn't my place with those staff at the time.  And number two, we wouldn't have gotten the chance to discuss it anyway because they ended up leaving.

Q   But you think it would have been helpful to have a more wholesome discussion with them about what they were thinking, what they did, and why or why not they took certain action?

A   Yeah, I think so.

Q   Would that have been helpful for developing new training going forward?

A   I don't know because the people in charge of training weren't in that meeting, and I don't know how much they would take -- this is a meeting that happened at one facility, and all of the facilities that you're dealing with, and we think you should handle some training on this one facility.  I don't know how that would have worked over --

Q   Would it have been helpful for amending policies and procedures going forward?

A   I don't know that anybody in that room is responsible for changing them, so I'm not sure.

BARABARA DEVINE vs
RON NEAL, et al.
USDC NN/ND, case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 69 of 106
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019

Page 269

Q   And just to be clear, after this video that we watched, there was no point in time after this interview that you spoke with anyone else from Internal Investigation; correct?

A   I don't recall.

Q   You don't recall any other time that you spoke with anyone from IA?

A   Again, we talked about the lawsuits that I have earlier and the -- the enormous amount of tort claims. The amount of time that I've spent with investigations kind of melds together, especially from two years ago. So I remember an investigation -- or I remember a discussion with somebody else from IA. I don't remember it being Miss Abram, but I didn't remember that one until you showed me. If you would have told me I had an interview with Miss Abram, I wouldn't have believed you.

Q   So you remember another conversation with a different person from IA about the April 7, 2017, fire?

A   Yes. I could be mistaken, but I don't remember my conversation with her.

Q   Do you remember if that investigator was a man or a woman?

Page 270

A   I remember it being Chris Dustin.

Q   Okay.

A   Which is what I had stated that earlier, that my meeting was with Chris Dustin. And I believed that it was with Chris Dustin. I now see that it wasn't.

Q   Do you know if that conversation with him would have been videotaped or written down?

A   At this point I'm not even sure that it happened.

Q   But you believe you have a memory of that happening?

A   Yeah, I do recall one.

Q   Do you recall having a conversation with Chris Dustin about the fire?

A   If -- if it was not in his capacity as an investigator, then it was definitely going back to your question where you said: Have I talked to anybody else about the fire? It was definitely him.

Q   Do you remember any other conversations with anyone else about the night of the fire?

A   No.

Q   And again, with the interview, is there anything else that we didn't touch on that was -- that you believe was not accurate in your testimony

Page 271

during the -- scratch that. Let me start again.

Is there anything else that we didn't already discuss after watching the interview that you believe was inaccurate in your statement to the IA investigator?

A   Yeah. I think -- I don't -- they were -- Abbassi and Blakley, who I now know her name, were not on the ranges. They were in front of the officer's station. Because otherwise, I would not have been able to get into the officer's station.

Q   So you believe that was inaccurate in your statement to the investigator?

A   Yes.

Q   Is there anything else?

A   None that I can think of.

Q   Do you know why your statement was inaccurate?

A   I think the only -- it seems like the only person on my mind in that interview was Rodriguez, and I don't know if it was due to like how I was feeling in that moment about it or whatever. But I -- 'cause it -- if Blakley were on the ranges, I would have taken the keys from Blakley and had the keys to the door, and none of that would have happened. So I'm positive that she was standing in

Page 272

front of the office.

Q   Okay. So why do you think that you stated what happened incorrectly to the investigator?

A   I have no idea.

Q   You understood it was important to be truthful to the investigator; correct?

A   Yes.

Q   And you say that it seemed like Officer Rodriguez was the only person on your mind. What do you mean by that?

A   Because I mentioned him a couple of times again. And then the -- me saying that the offenders were saying they were going to Rodriguez because he ran away. I don't remember saying that in my interview, but apparently he was on my mind. And I probably -- in that moment, that was the only thing I could think of, is where was Rodriguez? But --

Q   Okay. Was this because you thought Rodriguez was not doing what he should have been doing on the night of the fire?

A   I really don't know why.

Q   Okay. We're going to show you one more video. This one does not have sound.

A   Okay.

Q   Actually, we'll have you look on this

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 70 of 106

Page 273

computer here.

A    You ready for me?

Q    Yeah.  I've got it cued up.  Have you ever seen this video before?

A    No.

Q    Okay.

A    I've seen this one (indicating.)

Q    You've seen that one there --

A    Yes.

Q    -- on the range?

A    I have never seen this camera here.

Q    And did you see this camera on the night of the fire, or you've just seen it before?

A    I said I missed the video during the After Action Review --

Q    Uh-huh.

A    -- and then they just hit play as everybody was leaving.  That was one of the videos that played during that After Action Review.

Q    Okay.  And that one, I believe, is -- do you know which one of those that one is?

A    I don't know.  Which -- oh, no, I don't know.

Q    Okay.  So I am showing you the video from the camera that's titled "BCH North."  And it starts

Page 274

at 9:46:14 is where I'm starting.  And what do you see in the video?

A    Female standing at the door.

Q    What door?

A    The front door to the cellhouse.

Q    Do you know which female officer that is?

A    Not yet.

(Video playing.)

BY MS. PIERCE:

Q    Do you know who it is now?

A    No.

Q    Stopping at 9:46:17.  Do you see individuals at the front door?

A    Yes.  That is me.

Q    That's you?

A    Yes.

Q    Just you?

A    I can't tell yet.

(Video playing.)

BY MS. PIERCE:

Q    So I'm stopping at 9:46:20.  Did you see how many individuals came in?

A    Three individuals.

Q    Do you know who those individuals were?

A    I see Lieutenant Redden, and I can't tell

Page 275

who is behind him.

Q    So did you come in with Lieutenant Redden?

A    Seemingly.  That's Lieutenant Watson.  I can tell by his walk.

(Video playing.)

BY MS. PIERCE:

Q    So is that Lieutenant Watson, and do you know who -- I stopped it at 9:46:29.

A    So they just walked past.  I still could not tell who the officer was.

Q    Did you see where you went?

A    To the officer's station.

Q    Okay.  So you went directly to the officer's station.  Did you see where the other two officers went?

A    I did not.

Q    Starting the video again at 9:46:29.

(Video playing.)

THE WITNESS: That's me with a fire extinguisher.

BY MS. PIERCE:

Q    That's you with a fire extinguisher.  Where were you?

A    Walking -- about to walk up the stairs.

Q    Okay.  I'm stopping at 9:46:36.  That's

Page 276

you down on the 100 level?

A    Yes.

Q    And you have a fire extinguisher in your hand?

A    Yes.

Q    And where are the other officers?

A    I don't know at this point in the video.  But since I've seen a couple seconds ahead, they're up on 400.

Q    Okay.

(Video playing.)

THE WITNESS: That's Officer Abbassi running up the stairs.

BY MS. PIERCE:

Q    Okay.  So I'm stopping the video at 9:46:42.  And you said that's Officer Abbassi?

A    That's officer Abbassi.

Q    And she's on what level?

A    That looks -- 400.

Q    Is anyone else there with you?

A    I can't tell who that is.

Q    But there's another person on the 400 level?

A    There is, in fact.

Q    And that's at 9:46:42.  I'll hit play

Page 277

again.

(Video playing.)

BY MS. PIERCE:

Q    So I'm stopping at 9:46:44.  It looks like there's somebody -- is that the 300 Range?

A    That's Lieutenant Watson.

Q    That's Lieutenant Watson.  So he's behind --

A    The first -- Officer Abbassi and whoever's with her.

Q    Do you have any idea who that other person is?

A    It would most likely be Lieutenant Redden because he's in better shape than the rest of us, so he's probably quicker.

Q    So you can't tell just from looking.

A    Not yet.

Q    Okay.  If you were running from the front door of B Cellhouse to the 500 Range, how long do you think that would take you?

A    12 seconds maybe, 14.

Q    Okay.  So -- do you want to say something?

A    Yes.  At that point, that's me and Lieutenant Redden at the front of the range.

Q    Okay.

Page 278

A    And Lieutenant Watson and someone else walk down the range.

Q    So that's around 9:47.  We'll switch to the other camera and have you look at it a little more closely.

A    Okay.

(Video playing.)

BY MS. PIERCE:

Q    I'm stopping the camera at 9:47:19.  Do you see somebody at the front door?

A    I do.

Q    Do you know who that is?

A    I do not.

(Video playing.)

BY MS. PIERCE:

Q    Were stopping the camera at 9:47:30.  Do you still see someone at the front door?

A    I do.

Q    Is that the same person?

A    It is not the same person that let me in the door.

Q    Do you know who that person is?

A    I don't.

(Video playing.)

THE WITNESS: Okay.  Now I do.

Page 279

BY MS. PIERCE:

Q    Who is that?

A    That would be the officer who's name I didn't know, who I now know is Officer Blakley.

Q    Okay.  We stopped at 9:47:46.  She's still in front of the front door?

A    I know because I remember her --

THE REPORTER: I'm sorry?

THE WITNESS: She had shaved sides of her head.  The sides of her head were shaved.

BY MS. PIERCE:

Q    And at 9:47:36 is she still near the front door?

A    She is.

(Video playing.)

BY MS. PIERCE:

Q    So I'm stopping the camera at 9:48:38.  Can you see a person on the 100 Range?

A    I do.

Q    Do you know who that is?

A    I believe it to be Officer Abbassi because she had a high bun, and she was the only person that was in the area with a high bun in regards to her hair.

(Video playing.)

Page 280

BY MS. PIERCE:

Q    Okay.  So I'm stopping at 9:48:55.  How many people do you see on the 100 Range?

A    Two people.

Q    And do you know who they are?

A    Officer Abbassi and Officer Blakley.

Q    Do you know what Officer Abbassi's doing?

A    She seems to have a water fire extinguisher.

(Video playing.)

BY MS. PIERCE:

Q    Stopping at -- sorry.  Stopping at 9:49:05.  Did you see someone just walk by with a fire extinguisher?

A    I did.

Q    Do you know who that is?

A    Officer Rodriguez.

(Video playing.)

BY MS. PIERCE:

Q    Okay.  Stopping at 9:49:18.  I think I see somebody on the 300 Range; is that correct?

A    Yes, that's correct.

Q    Can you tell who that person is?

A    Officer Abbassi and her fire extinguisher.  And I'd also like to say if it took

Page 281

her that long to make it to 300, it would have definitely taken me a lot longer to make it to 500.

(Video playing.)

BY MS. PIERCE:

Q   Stopping it at 9:49:37.  Can you see a lot of smoke?

A   I do see a lot of smoke.

Q   Let's switch to this camera.  So I'm on -- now on BCH North U4.  Is this the camera that you previously told me you had seen during the After Action Review?

A   Yes, it is.

Q   Actually, on BCH North U4 -- right now I'm double-checking --

(Discussion off the record between Plaintiff's counsel.)

BY MS. PIERCE:

Q   Okay.  Sorry.  I'm now on BCH 500 North. I'm starting at 9:46:58.

(Video playing.)

BY MS. PIERCE:

Q   Did you see a person -- two people just go by?

A   Yes, I did.

Q   Who are those individuals?

Page 282

A   Lieutenant Watson --

Q   Does one of them -- I'm stopping at 9:47:04.  Is one of them running back toward the camera?

A   Yes.

Q   Do you know who that is?

A   Lieutenant Watson.

Q   And the other individual is?

A   I can't tell you.

(Video playing.)

BY MS. PIERCE:

Q   So I'm stopping at 9:47:13.  Are there two individuals right next to the camera?

A   Yes, there are.

Q   Do you know where they're at right there?

A   On the front of 500 North.

Q   And what's right there?

A   The stairway.

(Video playing.)

BY MS. PIERCE:

Q   Okay.  I'm stopping it at 9:47:29.  Are the two individuals walking back towards the fire?

A   Yes, they are.

Q   Can you see the fire pretty brightly?

A   I can.

Page 283

Q   And you said those two individuals are Watson, but you're not sure who the other one is.

A   At this point it's Watson, Redden, and a third individual, and I don't know the third individual.

(Video playing.)

THE WITNESS: B level.

BY MS. PIERCE:

Q   So you think we're at -- you said -- it's around 9:47:31.  Is that when there's three individuals?

A   Yes.  And I'm in this group.  And I believe at this point Redden is not walking down the range.

Q   Okay.

A   We were all jumbled up right here. There's not much room right there.  We were all jumbled up, and I'm pretty sure me and Watson, with Watson being in front of me, walked down the range.

Q   So just the two of you walked down the range?

A   In the video it seems that there's a third person behind me, but I don't recall there being a third person there.

Q   So you think Lieutenant Redden stayed

Page 284

behind?

A   Yes.

Q   And that's at, again, 9:47:31.

(Video playing.)

BY MS. PIERCE:

Q   It looks like around 9:54 it gets fairly dark.  Do you know what happened during then?

A   That's when I used the ABC fire extinguisher to hit the body of the fire.

(Video playing.)

BY MS. PIERCE:

Q   Right around 9:54:26, there's somebody with a flashlight.  Do you know who that is?

A   I don't.

(Video playing.)

BY MS. PIERCE:

Q   Right here at 9:56:42 probably, there's some more people who walked by.  Do you know who those are?

A   Those are the firefighters.  If you were to skip back a couple of seconds, you would have saw a flashlight leave the range.  That was Lieutenant Watson leaving when they said the firefighters were on their way up.

Q   So it's like right here at 9:56:39 that

BARBARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC INND case 3:18-cv-00995-JD     document 203-3     filed 03/29/21     page 73 of 106

Page 285

the firefighters are arriving. Is that right?

A   Yes.

(Video playing.)

BY MS. PIERCE:

Q   Okay. So it's right around 9:56:04 that you see a flashlight. That's Watson leaving?

A   Watson leaving the range. He couldn't handle it anymore. He felt like he was going to have an asthma attack.

(Video playing.)

BY MS. PIERCE:

Q   Okay. There's another flashlight around 9:58:23. Do you know who that is?

A   No, I don't.

(Video playing.)

BY MS. PIERCE:

Q   Around 9:58:42 you see some other people with flashlights. Do you know who they are?

A   More firefighters.

(Video playing.)

BY MS. PIERCE:

Q   Someone comes by right at 9:58:54 and shines a flashlight. Do you know who that is?

A   Looks like Officer Rodriguez.

Q   Do you know what he's looking at?

Page 286

A   The emergency evacuation plan (indicating.)

(Video playing.)

BY MS. PIERCE:

Q   Okay. And the video stops at 9:59:23. So does anything from that video change any of the statements that you gave here today?

A   I don't -- I don't think so. I didn't know -- I wouldn't have known Officer Abbassi followed us up. And it makes sense that a fire extinguisher came from the back after seeing Rodriguez run to the back stairs with a fire extinguisher.

Q   Okay. I'm going to hand you what I'm marking as Exhibit --

THE REPORTER: 7.

MS. PIERCE: -- 7.

(Statham Exhibit No. 7 marked for identification.)

BY MS. PIERCE:

Q   Go ahead and take a minute to look through this document.

A   (Witness applying.)

Okay.

Q   Do you recognize this document?

Page 287

A   I do.

Q   What is it?

A   It's an interrogatory -- is interrogative question -- I don't know. This was given to me by Pam James to fill out, via email.

Q   So it was your responses to the interrogatories sent to you by the Plaintiff. Is that your understanding?

A   I don't understand.

Q   So these are questions that were sent to you by Plaintiff; correct?

A   What is "Plaintiff"?

Q   The Plaintiff in this case.

A   I was under the impression that these came from the attorney, not from the Plaintiff.

Q   Sure. Yeah. That's just a way of expressing it.

So what did Pam James tell you about this document?

A   She said to fill these out to the best of my knowledge and bring them -- print it out, bring them to her office, and there was some stuff I had to sign.

Q   Who is Pam James?

A   She's the -- she does like -- the public

Page 288

information officer.

Q   Okay. And did she -- she told you that these came from Plaintiff's counsel in this case?

A   No. She just told me to fill them out. I just assumed they were from the state's attorney. I never knew they were from the Plaintiff.

Q   Okay. Did you speak with your attorneys at all about these documents?

A   Because I didn't get back to them in a timely manner, Daniel emailed me again and said --

Q   You don't have to tell me any of the substance of the conversations that you had, but just that you talked with them about the document.

A   Okay.

Q   So you did talk with Daniel about the document?

A   Yes.

Q   Did you speak with any other members of -- did you speak with any of your other attorneys about this document?

A   At this time it was only him.

Q   Did you later speak with any other attorneys about this document?

A   No, not until I spoke with her (indicating) Friday.

Page 289

Q   Okay.  And after reviewing this, your answers to these questions, do you believe that they're true and accurate?

A   Yes.

Q   Do you understand that you have a duty to supplement these if you remember new information?

A   I have a duty to add to them?

Q   Uh-huh.

A   Yes.

Q   Okay.

A   I do now.

Q   Okay.  So just to go back, you said that you may have told Officer Rodriguez, while you were in the Hoosier Room, that he did a good job.

A   Yes.

Q   To clarify, that was not based on any knowledge you had about what he did that night.

A   No.  That was in order to make him feel better about having to sit with a dead body.

Q   Okay.  So there was no basis or no knowledge of his actions that supported you making that statement.

A   Right.  I was also in no position to give him such an acknowledgment.

Q   Okay.  And as we discussed today, you

Page 290

actually have some critique or criticisms of what Officer Rodriguez did that night.

A   Correct.

Q   I think we're close to being done.  Maybe we'll take a five-minute -- quick five-minute break and then finish up.

A   Okay.

(A brief recess was taken from 4:06 to 4:11.)

BY MS. PIERCE:

Q   Okay.  So I think just to -- we have a few more minutes, and then we'll be done on our end.  Have you ever had any interactions with Ron Neal?

A   Yes.

Q   How frequently?

A   Three times in my career.

Q   Did you think that he does a good job as a warden?

A   Because I don't know what his job entails, I would have no way to gauge that.

Q   Did you ever speak to him outside of work?

A   Never.

Q   Have you interacted with Kenneth Gann?

A   He left Indiana State Prison when it

Page 291

was -- I was still very early in my career.  So if I've ever had a conversation with him, I don't recall it.

Q   All right.  What about William Lestner (phonetic)?

(Reporter sneezing.)

THE WITNESS: Bless you.

I have had informal conversations with him just in passing, but I've never had a professional conversation with him.

BY MS. PIERCE:

Q   By "informal conversation," what do you mean?

A   Like, hey, how you doing?  My wife works for investigations at another facility.  And he'll say, "When's your wife going to come work here?"

And I'm like, Probably never.

Q   Did your wife work at ISP at one time?

A   Yes, she did.

Q   Was she in investigations?

A   She was not.

Q   What did she do at ISP?

A   She was an officer and a caseworker.

Q   What is a caseworker?

Page 292

A   They help the offenders with reentry, get them into programs, get them placements when it's time for them to go home, help them find jobs prior to leaving the facility.

Q   Why did she leave ISP?

A   As an opportunity to be an investigator.

Q   Where is she an investigator?

A   Westville Correctional Center.

Q   Have you ever interacted with Christopher Biehl?

A   Yes.

Q   In what circumstances?

A   He's the training -- he has had a title in training.  He's a training supervisor, so he taught a lot of my in-service classes, a lot of my CTI classes.  He taught -- he's taught a lot of courses when I was at ISP.

Q   Do you think he was effective in his position as a trainer?

A   I think he was knowledgeable, yes, so that his knowledge was effective.

Q   Do you think he did a good job as a trainer?

A   Yes, I do.

Q   Did you have any criticisms of the work

BARBARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 75 of 106

Page 293

that he did?

A    Not of his work as a trainer.  Just it -- it's hard to hear from someone who has never worked at Indiana State Prison, to listen to them try to train you.  That's the only, I guess, criticism that I have.

Q    He's never worked at Indiana State Prison?

A    Not to my knowledge.

Q    So he works for IDOC.

A    Yes.  He worked for the women's facility.

Q    Before becoming in charge of training?

A    Correct.

Q    Okay.  What about Steven Griffin?

A    I don't even know who that is.

Q    Jason Nowatzke?

A    He was my lieutenant, my captain, and then the major.

Q    Did you have a good relationship with him?

A    Yes.

Q    Did you have any criticisms of his -- how he did his job?

A    Again, I don't know what's entitled in his job, so I don't have a way to gauge that.

Q    Did you have the impression that he was good at his job?

Page 294

A    I don't think he would have been able to obtain his job if he wasn't good at his job.

Q    Did you have any disagreements with him?

A    Never.

Q    Did you interact with him outside of work?

A    We're friends on Facebook, but that's it.

Q    Do you ever talk on Facebook?

A    No.

Q    What about Anthony Watson?

A    What about him?

Q    What -- have you ever interacted with him outside of work?

A    Not outside of work, no.

Q    Did you think that he was good at his job?

A    I think he was very good at his job.

Q    Did you have a good relationship with him?

A    I did.

Q    Did you ever interact with Timothy Redden outside of work?

A    Yes, I did.

Q    Are you guys friends?

A    Yes, we are.

Q    Do you spend time socially?

A    Not recently since I switched jobs; but prior to that, yes.

Page 295

Q    How often would you see each other before you switched jobs?

A    Maybe twice a month we'd go out to eat, and he was also one of the witnesses at my wedding.

Q    So you guys are good friends?

A    Yes.

Q    Have you talked to him since starting your new job?

A    Yes.

Q    Have you spoken with him about the fire?

A    Nothing in regards to it happening.  Just like one time we had a discussion about like the issues in corrections, as far as like mental health and stuff like that.  And he was like -- he made the comment that, you know, after some of the stuff that we've seen, it's just -- he's like, he's surprised we're not all crazy.

Q    So you've never specifically talked to him about the fire?

A    No.  It's not something either one of us want to talk about.  I can't -- if we did, I can't really think -- like I said, we more talk about the effects of the things we see.  Because I worked with him for so long, that there's like an accumulation of events that we discuss.

Page 296

Q    Okay.  How well do you know Christopher Puetzer?

A    Inside work, I know him quite well.

THE REPORTER: I didn't catch the last name.

MS. PIERCE: Puetzer, P-U-E-T-Z-E-R.

BY MS. PIERCE:

Q    Inside work, you know him well?

A    Yes.

Q    Did you ever spend time with him socially?

A    Outside of work, I've seen him at two birthday parties that were for children.  He also has children.  And then I went out with him one time when he got promoted to sergeant.

Q    Do you keep in touch with him?

A    On occasion.  Like I know he's out of work right now.  So I've been checking up on him, making sure he's okay.

Q    Do you text him, or how do you communicate?

A    Facebook Messenger.

Q    Do you ever text him?

A    I don't have his number.

Q    Do you think -- did you have a good relationship with him at work?

Page 297

A   Yes, I did.

Q   Thought he was good at his job?

A   Yes.  He was my FTO a couple of times where he taught me a lot.  And then when I first took over OIC, Officer in Charge, he had already been there 22 years, and he was my officer.

Q   What about Justin Rodriguez?  Do you ever socialize with him outside of work?

A   I haven't seen him since he left the facility.

Q   Did you ever socialize with him outside of work?

A   No.

Q   You said you haven't seen him since he left the facility.  Have you spoken to him in any way?

A   No, I haven't spoken to him.

Q   Beyond what we've already discussed, did you have any impression of how he was at his job?

A   No.  I was -- other people's impression of him is that he was very good, and that's why they made him an OIC of B Cellhouse so quickly.

Q   Whose impression was that?

A   Lieutenant Redden and Lieutenant Watson.

Q   And how well did you know Sarah Abbassi?

Page 298

A   She was my officer for a little bit prior to going to B Cellhouse with Officer Rodriguez.  Professionally, I knew her pretty well.  Personally, not at all.

Q   What was your professional opinion of her?

A   She was good.

Q   Did you have any criticisms of her?

A   No.

Q   Did you ever socialize with her outside of work?

A   I would see her riding her motorcycle on occasion, and I would wave to her.  Other than that, no.

Q   Have you ever been in contact with her after she left?

A   No.  I wouldn't know how to if I wanted to.

Q   And Promise Blakley, did you have an impression of how she was professionally?

A   No.  I -- if I ever worked with her, I don't recall it.

Q   Okay.  You don't recall ever having any conversation with her?

A   No.  And I definitely didn't know her name was Promise.

Page 299

Q   Okay.  Since leaving ISP, are you in contact with anyone besides Lieutenant Redden at ISP?

A   Captain Adam Boots.  He's my daughter's godfather.

Q   Anyone else?

A   Calli Berk.  She's an investigator.  She is Adam Boot's fiancee.

Jamil Canneberry (phonetic), he's a sergeant.  He took my spot when I left.

And Louisus Lopez Jimenez --

THE REPORTER: I'm sorry?

THE WITNESS: Louisus Lopez Jimenez, he was one of my officers.  I still talk to him on occasion.

Izonia Chism.  He was one of my officers, and he was injured pretty badly at work, so I still keep up with him.

Beyond that, just casual Facebook conversations with people.  Nothing like hanging out or doing anything.

BY MS. PIERCE:

Q   Did you ever see, on Facebook, anyone post anything or write any messages about the fire?

A   I did not write -- no, I've never seen

Page 300

anything.  But that night when we went home in the morning, I did make a post that -- something to the extent of:  Everyone hug their families tighter today.

Q   You've never seen any posts specifically about the fire?

A   I have not.

Q   What about on any other social media?

A   I'm not very -- the only one I really ever use is Facebook, so I'm not very active on the others.  So no, I've never seen anything.

MS. PIERCE: Okay.  I don't have any additional questions, but I just want to state for the record that we have an agreement with opposing counsel, Mr. Rosenberg, that he's agreed to re-represent all of the Defendant witnesses after summary judgment should punitive damages still be an issue to discuss their financials.

CROSS EXAMINATION

BY MS. SMITH:

Q   I've just got a couple of brief questions for you, sir.

On the last break you had an opportunity to read over the Plaintiff's Exhibit

USDC IN/ND case 3:18-cv-00995-JD document 203-3 filed 03/29/21 page 77 of 106

No. 7, which is your Responses to the Plaintiff's First Set of Interrogatories; correct?
A Correct.
Q Other than what you already talked to the Plaintiff's counsel about during this deposition, were there any things that you had to add as far as your responses to your interrogatories?
A I think anything I needed to add, we did discuss during the deposition.
Q Okay. And let's see. Is everything that you've told the defense attorney -- I'm sorry, Plaintiff's attorney today, to the best of your ability, true and accurate insofar as you know?
A Yes.
MS. SMITH: Okay. No further questions.
MS. PIERCE: Okay. I think we're done.
THE REPORTER: Signature at all?
MS. SMITH: I'd like signature, please. And then I'm not going to order a copy of the transcript today, but can you give me a call if my office needs one later?
THE REPORTER: Sure.
MS. SMITH: Thank you so much.
THE REPORTER: And you're holding off at this time?

MS. PIERCE: Uh-huh. Thank you.
(Deposition concluded at 4:23 p.m.)
(Signature reserved.)
--oo0oo--

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA DEVINE, as Personal Representative of the ESTATE OF JOSHUA DEVINE, Plaintiff,
Vs.
RON NEAL, et al., Defendants.
Case No. 3:18-cv-00995-JD-MGG

REPORTER'S CERTIFICATE

I, PAMELA S. OWEN, CSR, RPR, and Notary Public for the County of Lake, State of Indiana, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of three hundred and two (302) typewritten pages, is a true and correct transcript of my said stenographic notes.

Signed this 24th day of January, 2020.

PAMELA S. OWEN, CSR, RPR
IL Lic. No. 084-002294
Notary Public, Lake County, IN
My Commission Expires: 8/1/24

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA DEVINE, as Personal Representative of the ESTATE OF JOSHUA DEVINE, Plaintiff,
Vs.
RON NEAL, et al., Defendants.
Case No. 3:18-cv-00995-JD-MGG

DEPONENT'S CERTIFICATE

I, RYAN STATHAM, deponent herein, do hereby certify that I have read the above and foregoing deposition and find the same to be a true, correct, and complete transcript of said deposition, and includes changes, if any, so made by me, given on the 5th day of November, 2019.

I further agreed to read and sign the same.

WITNESS MY HAND this _____ day of _________________, 2020.

RYAN STATHAM, DEPONENT

STATE OF ____________ ) SS:
COUNTY OF ____________ )
Before me, the undersigned, a Notary Public for ____________ County, State of ______________, appeared and acknowledged the execution of the foregoing instrument on this ______ day of ____________________, 2020.
(SEAL)

NOTARY PUBLIC
My Commission Expires:__________

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 78 of 106

Page 305

**E R R A T A   S H E E T**

PAGE  LINE    CORRECTION                    REASON

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____

_____ _____   _____



                    _____
                    RYAN STATHAM, DEPONENT
                    Deposition taken:  11-05-19

STATE OF _____ )
                       ) SS:
COUNTY OF _____  )

Before me, the undersigned, a Notary Public for
_____ County, State of _____,
appeared and acknowledged the execution of the
foregoing instrument this _____ day of_____,
2020.
(SEAL)

                    _____
                    NOTARY PUBLIC
                    My Commission Expires:_____

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 79 of 106

RYAN STATHAM
November 5, 2019

## $

**$16 (2)**
41:1,3
**$200 (3)**
118:19,20;223:7

## [

**[sic] (11)**
5:2;28:5;35:23;44:4;
63:3,5;120:4;151:5;
195:23;220:25;242:10

## A

**AARs (1)**
265:24
**Abbassi (26)**
139:14,16;158:17;
159:5,7,20;161:9;
163:20;164:3;168:16;
178:7;180:20;208:7;
211:22;219:24;234:2;
271:7;276:12,16,17;
277:9;279:21;280:6,
24;286:9;297:25
**Abbassi's (3)**
163:15,16;280:7
**ABC (5)**
49:10;51:14;52:6;
162:22;284:8
**ability (7)**
8:18,22;9:4;39:10,
16;108:22;301:13
**able (27)**
15:25;25:20,22;
48:25;71:23;77:24;
95:5;99:22;100:14;
102:17;104:22;105:11;
195:25;196:5,7,9;
198:12;199:16;212:22;
216:1;223:15;239:20,
24;256:11;259:24;
271:10;294:1
**abnormally (1)**
195:9
**above (9)**
25:18;51:2,6;56:1;
61:9;134:5;172:5;
251:6,6
**Abram (4)**
246:23;250:16;
269:15,17
**Absolutely (14)**
16:4;40:6;85:16;
101:5;105:16;109:7;
124:10;129:14;146:6;
165:19;194:20;195:4;
231:1;232:4
**academies (3)**
22:22,25;23:5

**acceptable (1)**
140:5
**access (7)**
35:25;36:3,25;37:21;
45:9;70:20;146:16
**accidental (1)**
85:13
**accord (1)**
85:10
**according (1)**
123:9
**accumulation (1)**
295:24
**accurate (6)**
246:6;248:11;255:5;
270:25;289:3;301:13
**accurately (3)**
8:18,22;9:4
**aces (1)**
133:1
**acknowledgment (1)**
289:24
**across (3)**
146:14;148:12;
169:16
**act (1)**
215:1
**action (16)**
100:20;103:4;211:2;
213:13;217:13;253:7;
254:17;256:23;260:22;
261:1;265:4,25;
268:10;273:15,19;
281:11
**actions (9)**
73:6;102:7,9;104:15;
105:3,9;106:2;234:9;
289:21
**activate (2)**
77:18;258:4
**activated (9)**
54:1;55:7;141:25;
143:2;186:4;225:24;
227:5;228:2,5
**activating (2)**
266:11,11
**activation (1)**
258:13
**Active (4)**
258:3;262:2,4;
300:10
**actively (2)**
46:7;73:11
**active-shooter (1)**
53:11
**activities (2)**
88:8,14
**activity (1)**
90:16
**actual (4)**
18:15;72:15;155:17;
158:15
**actually (23)**

13:10;18:10;35:17;
41:17;69:18;75:10;
107:23;108:3;120:23;
143:3;150:11;193:17;
204:16;207:14;209:24;
230:16;242:1;249:17;
260:18;267:18;272:25;
281:13;290:1
**Adam (2)**
299:4,8
**add (4)**
199:12;289:7;301:6,
8
**adding (3)**
5:1;6:21;199:14
**additional (4)**
20:19;190:4;195:11;
300:13
**address (5)**
11:18,20;43:25;
68:12;197:13
**addressed (1)**
224:12
**addressing (1)**
203:12
**adequate (1)**
18:17
**adequately (5)**
211:10,25;212:10,
16;213:4
**adjoining (1)**
147:24
**adjusting (1)**
247:12
**administrative (2)**
8:5,11
**administratively (1)**
232:8
**adrenaline (1)**
194:23
**Adult (1)**
254:12
**advise (1)**
54:6
**advised (1)**
200:14
**affect (2)**
8:22;9:4
**affects (1)**
8:25
**afraid (2)**
189:4,7
**afterwards (3)**
165:5;197:15;218:22
**again (33)**
49:2;52:15;54:21;
55:19;76:24;77:11;
83:20;84:2,18;101:6;
103:19;132:21;138:15;
148:16;159:11,14;
169:18;178:10;201:2;
202:22,24;208:11,16,
18;269:8;270:23;

271:1;272:12;275:17;
277:1;284:3;288:10;
293:22
**against (7)**
8:11;25:13;89:10;
101:16;222:20;251:8;
265:17
**Agent (3)**
22:7,9,10
**agitated (1)**
163:24
**ago (5)**
9:19;10:1;206:18;
249:12;269:12
**agree (12)**
97:11,19;98:6,10;
117:4;128:16;183:23;
213:17,22;214:5;
246:5;266:18
**agreed (2)**
3:17;300:16
**agreement (4)**
250:11;261:8;264:9;
300:14
**agreements (1)**
197:19
**AG's (1)**
7:25
**Ah (1)**
182:17
**ahead (7)**
129:3;147:15;154:6;
194:11;260:12;276:8;
286:21
**air (4)**
170:17;226:15,23,24
**alarm (31)**
49:24;68:19,19,25;
69:8,20,22;70:22;71:5,
10,20,22;72:4,10,12;
142:22;147:12;155:7,
13,19;156:10,17;157:1,
8,12,25;158:7,25;
207:17;216:2;236:20
**alarms (5)**
50:19;157:5,15,17,
23
**alert (3)**
66:12;70:23;71:6
**alerted (2)**
70:5,10
**alive (7)**
151:4;169:22;
182:18;190:22;193:12;
235:25;239:7
**Allen (3)**
180:23,23;181:1
**allow (5)**
27:13;104:20;105:8;
192:21;242:3
**allowed (15)**
85:24;146:4,16;
153:14;178:24;197:8;

198:2;200:3,17;
233:11;242:19;263:1;
264:22;265:5;266:8
**allowing (2)**
173:8,9
**allows (1)**
105:7
**almost (8)**
111:25;128:17;
140:21;167:16;178:1;
184:15;217:21;261:20
**alone (2)**
84:15;130:25
**altered (1)**
60:10
**altogether (1)**
178:6
**always (26)**
6:7;27:14;34:16;
38:14;49:23;54:12;
55:17;57:22;80:3;
86:18,18;90:25;107:7;
111:25;121:9;128:17;
133:23;138:4;141:5;
164:8;219:21;220:2;
228:5;231:12;235:19;
242:2
**ambulance (1)**
155:20
**ameliorate (1)**
113:16
**amending (1)**
268:22
**among (1)**
42:6
**amount (10)**
52:21;74:2,5;137:7,
22;157:10;205:6;
236:8;269:9,10
**angry (4)**
175:16,17,18,21
**announce (1)**
227:22
**announcement (2)**
227:10,15
**announcements (1)**
60:22
**annual (3)**
52:15,17;145:12
**anomaly (1)**
216:16
**ANSUL (1)**
226:15
**answered (1)**
246:1
**Anthony (2)**
31:21;294:9
**anymore (3)**
69:6;206:8;285:8
**anything's (1)**
7:23
**apart (2)**
49:3;220:18

**apartment (1)**
10:21
**apparently (1)**
272:15
**appear (1)**
253:17
**application (2)**
14:21,22
**applied (2)**
21:18;44:6
**apply (2)**
21:14,16
**applying (1)**
286:23
**appreciate (1)**
235:18
**appreciated (2)**
42:12;43:6
**approximately (1)**
21:1
**April (6)**
147:5;151:8;232:21;
241:15;253:8;269:20
**Aramark (1)**
26:7
**area (32)**
23:17;45:16;46:8,10,
11,11;51:1;61:12;
62:16,19;80:22,23;
93:1;113:21,21;
116:21;124:19;153:13;
164:4;167:5;171:22;
172:1,6,22;173:15;
226:15;239:23;244:25;
251:18;254:20,23;
279:23
**areas (9)**
23:19;37:20;107:3;
113:15;132:16;143:17;
171:24;202:11;228:13
**arising (1)**
47:4
**arm (1)**
191:20
**around (20)**
59:25;78:4;131:17;
132:22,24;158:20;
164:10;173:18;190:10;
191:23;192:10;238:4;
240:21;278:3;283:10;
284:6,12;285:5,12,17
**arrive (3)**
60:3;101:4;102:1
**arrived (1)**
159:10
**arriving (1)**
285:1
**articulating (1)**
94:9
**aspects (2)**
15:21,22
**assault (2)**
222:5;245:23

**assaulted (5)**
151:6;180:4,25;
181:1;189:11
**assaulting (2)**
179:24;217:14
**assaults (1)**
61:3
**assess (1)**
220:25
**assign (3)**
63:5,7;109:25
**assigned (30)**
62:16,19;64:1;
106:23,25;107:4,6,18;
108:5,12,18;109:5;
120:1;126:2;131:1,19;
132:7,10,15,20;133:2;
134:24;151:7,12;
153:17;155:1;160:23;
161:4;212:13;232:23
**assist (5)**
101:13;105:22;
106:15;151:12;152:8
**assistance (1)**
116:23
**assisted (2)**
105:24;207:6
**associate (1)**
58:7
**assume (16)**
6:10;19:21;42:1;
56:6;79:19;88:15;
109:16;130:24;172:4;
210:9,11;212:15;
214:20;253:12;256:5;
265:2
**assumed (4)**
7:20;172:25;210:25;
288:5
**assuming (1)**
256:17
**assure (1)**
22:15
**asthma (1)**
285:9
**asthmatic (2)**
150:7;174:13
**Atta (1)**
144:23
**attached (1)**
228:17
**attack (2)**
100:18;285:9
**attempt (6)**
68:9;77:4;79:23;
100:2;101:16;212:23
**attempted (1)**
163:19
**attempting (5)**
25:18;51:23;85:6;
100:15;101:17
**attendance (2)**
61:15;253:24

**attendant (1)**
5:2
**attention (7)**
121:22;122:1,7,10;
124:6,13;125:23
**Attorney (7)**
16:1;205:23,24;
287:15;288:5;301:11,
12
**attorneys (4)**
9:8;288:7,19,23
**attorney's (1)**
9:11
**attributed (1)**
259:23
**August (1)**
13:11
**authority (2)**
176:9;197:6
**authorization (1)**
264:23
**automatically (1)**
55:6
**awards (3)**
60:23;61:4,7
**aware (8)**
29:25;41:13,23;99:1;
100:11;124:3,4;233:13
**away (15)**
70:20;100:17;
167:14;171:11;176:14,
16,18,20;179:6,13;
180:10;183:17,18;
227:10;272:14

## B

**back (62)**
13:11;43:8;53:15;
69:18;71:19;74:12;
80:14;88:2;89:7;94:8;
96:1;104:14;106:17;
131:12;148:15,23;
149:5;153:13;158:19,
22;167:17;169:17;
171:17;174:1,20;
186:14;190:6,8,8;
191:24;192:4,7,12,14;
193:3,4;195:19,21;
202:19;217:17;219:2,
17;232:14;238:4;
239:14;244:3,24,25;
245:2;251:13,15,16;
261:7;267:9;270:17;
282:3,22;284:21;
286:11,12;288:9;
289:12
**background (1)**
14:24
**backpack (2)**
226:17,22
**backup (1)**
80:16

**backwards (1)**
151:25
**bad (6)**
82:9;137:1;171:8;
173:3;176:4;231:4
**badly (1)**
299:17
**bands (2)**
78:3;81:10
**bang (3)**
124:17,18;129:19
**banging (7)**
124:18;129:16,24;
130:6;180:18;193:20;
218:6
**Bank (1)**
21:15
**bar (1)**
171:7
**Barbara (2)**
3:8;224:18
**bare (1)**
41:16
**bars (5)**
129:16,25;171:10;
173:1,19
**base (3)**
127:8,24;128:9
**based (29)**
16:13;18:24;33:5,5,
6;34:5;43:11;47:2,2,5;
78:10;86:15;98:4;
102:10;127:10;131:17;
184:8;198:24;211:14;
212:2,5,20,24;213:5;
219:13;229:7;231:10;
257:11;289:16
**basically (5)**
52:23;153:3;183:7;
200:16;265:21
**basing (4)**
85:5,18;209:20;
211:12
**basis (2)**
185:5;289:20
**basket (1)**
207:6
**basketball (2)**
126:7;129:2
**Bates (4)**
144:5;252:25;253:3,
3
**batteries (6)**
81:7,13,15,17,19,23
**battery (4)**
78:4,6;81:9,11
**Baxter (1)**
139:23
**BCH (4)**
273:25;281:9,13,18
**beat (2)**
117:12;148:1
**became (11)**

**18:8;21:4,6;22:7;**
31:6;35:18;36:2;37:25;
82:15;100:11;210:23
**become (7)**
20:1;31:3;34:6;
38:22;44:18;232:1;
233:10
**becomes (1)**
163:18
**becoming (3)**
39:25;67:24;293:11
**bed (20)**
170:19;171:6,22;
172:9,14,16,21,22,25;
173:4,17;191:1;
239:19,22;244:4,16;
251:2,8,16;252:10
**began (2)**
9:21;22:21
**begin (3)**
3:11;44:2;260:15
**beginning (4)**
41:8;211:23;227:1;
257:23
**behalf (1)**
3:2
**behavior (4)**
123:13,13;126:12;
222:25
**behind (8)**
22:13;45:7;190:20;
206:12;275:1;277:8;
283:23;284:1
**Bell (4)**
13:19,23;14:2;88:13
**below (1)**
144:21
**belt (2)**
148:14;169:17
**bent (1)**
93:8
**Berk (1)**
299:7
**besides (6)**
42:22;63:24;162:14;
168:12;242:25;299:2
**best (13)**
85:19,21;86:16;
113:15;143:21;170:16;
197:15;219:22;236:14;
263:22;267:24;287:20;
301:12
**better (14)**
37:15;38:22;53:15;
110:19,20;220:2;
250:17;256:7;265:25;
266:1,5,19;277:14;
289:19
**bettering (1)**
40:1
**beyond (17)**
7:23;25:11,16;27:18,
25;29:16;35:1;50:12;

**BOSS REPORTERS**
**(219) 769-9090**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 81 of 106

RYAN STATHAM
November 5, 2019

61:9;63:1;96:10;
112:20;119:14;207:10;
243:8;297:18;299:19
**Biehl (1)**
292:10
**big (7)**
5:8;115:19;134:20;
139:24;163:5;171:19,
20
**Bigger (1)**
10:21
**biggest (3)**
35:5;172:24;219:6
**birthday (1)**
296:12
**bit (4)**
5:4;49:15;263:23;
298:1
**black (3)**
153:24;218:24,24
**blade (1)**
65:1
**blah-dah-dah (1)**
52:2
**Blakley (8)**
208:8;234:5;271:7,
22,23;279:4;280:6;
298:18
**Blakley's (1)**
211:20
**blatantly (1)**
259:25
**bleeding (3)**
92:1,2,4
**Bless (1)**
291:7
**blind (1)**
59:19
**block (3)**
167:24;190:6,8
**board (1)**
58:16
**bodies (1)**
150:12
**body (11)**
173:8;247:18,22,25;
248:1,4,8,9;259:21;
284:9;289:19
**body's (1)**
248:3
**bold (1)**
56:23
**bolded (1)**
57:2
**bolt (6)**
64:22;65:3;74:15;
75:2,5,12
**bolted (2)**
251:11;252:4
**bonus (7)**
118:19,20,21;223:5,
6,17,22
**bonuses (1)**

118:15
**Boots (1)**
299:4
**Boot's (1)**
299:8
**boredom (1)**
153:20
**boss (3)**
83:10;254:13;264:16
**Both (11)**
11:22;14:8;24:5;
29:19;50:5;148:13;
159:17;160:10,12;
161:7;196:3
**bottom (2)**
144:6;253:6
**bounds (3)**
198:16;199:11,15
**boxes (6)**
172:23;242:4,6,11,
19,20
**Boy' (1)**
144:23
**Boyan (2)**
33:18;49:22
**break (14)**
6:13,14,16;9:25;
13:9;40:8;99:8,9;
106:8,12;148:9;
224:23;290:5;300:24
**breakfast (3)**
88:12,13;90:14
**breathe (3)**
174:19,21;259:24
**breathing (2)**
218:19,22
**brief (6)**
18:16;59:22;99:11;
224:25;290:8;300:22
**briefing (1)**
221:14
**brightly (1)**
282:24
**bring (15)**
66:20;68:20;74:24;
80:7,13;148:19;
161:11;186:15;211:8;
216:21;217:3;234:23;
238:22;287:21,21
**bringing (3)**
186:21,23;215:6
**broke (1)**
257:16
**broken (2)**
81:9;195:24
**brought (16)**
8:11;42:14;43:2;
80:22;143:17;149:2;
190:4;203:19;205:9,
12,14;215:11,19;
238:20;256:1,19
**buddy (7)**
79:16;84:6,13,16,19,

19,21
**Building (3)**
152:4;153:11;157:7
**bulbs (1)**
29:17
**bullet (2)**
45:12;222:1
**bun (2)**
279:22,23
**burn (1)**
182:18
**burned (5)**
149:16;171:7;
173:23;240:1,9
**burned-out (1)**
151:5
**burning (3)**
101:20;183:25;
191:17
**button (8)**
77:17;111:21,22;
112:8;124:15,20,21;
168:1
**buzzed (1)**
161:25

### C

**Cabinet (8)**
244:4;251:22,22,23,
25;252:1,3,5
**cable (3)**
28:16,16,17
**call (73)**
38:11,15;52:20;
55:15;56:2,8;60:20;
61:9,18,23;62:6,10,13,
15;66:14,16;67:21;
68:1,4,7,10,13,15,16,
23;69:13,19,20,21;
70:2;71:1,10;72:11,13,
17,24;73:22;74:9;
78:18;80:5;83:8,17;
84:3;89:5,20;91:5,14,
21,24;92:4;93:17;
96:13,14;106:6;
116:19,20,21;117:21;
124:15,20;163:7,19,21;
167:2;188:6,11;209:4;
218:12,12,13;256:21;
258:5;301:20
**called (45)**
3:2;20:19;53:25;
54:2;55:7,8,10,22;
56:15,19;73:14,24;
80:6;101:25;115:7;
123:12;143:1;147:15;
148:18;150:11;158:10,
12;161:4;186:15,16,
18;187:25;188:2,6,8;
193:14;194:5;208:17,
22;214:20,21;216:6,7;
228:6;240:24;255:11;

259:10;260:3,9;262:11
**Calli (1)**
299:7
**calling (12)**
56:4;73:4,8,12;80:1;
93:2;103:11;104:3;
142:13;186:6,9;189:18
**calls (4)**
3:14,16;102:23;
193:16
**calluses (1)**
149:14
**Calumet (1)**
13:1
**came (38)**
39:12,13;46:24;49:1;
50:6;53:23;58:6;87:6,
8,18;104:23;106:24;
120:20;121:18;131:12;
149:5;158:22;159:25;
179:16;181:17;186:14;
190:6;191:23;192:12;
198:11,17;201:14;
203:14,16;208:8;
236:6,9;238:18;
261:15;274:22;286:11;
287:14;288:3
**camera (13)**
261:15,16;273:11,
12,25;278:4,9,16;
279:17;281:8,9;282:4,
13
**Campbell (1)**
221:25
**can (137)**
5:6;6:14;12:16;
19:23;26:2,6;28:3,5,
10;31:10,16;32:3,6,9,
17;35:14,15;37:3,5,13,
13,21,24;40:13;46:12;
59:18,19,21,25;68:12;
71:16,20;72:4;73:10,
19;77:11;78:11;84:11,
18;86:7;88:15,16,19,
23,25;89:2,5,6;91:6,10;
101:13;102:2,18;
104:12;106:5;108:17;
110:7;112:6;114:8,13,
14,14;117:20,25;
118:6;119:17;120:13;
121:11,14;123:23,25;
124:1,13,22,25;125:22;
128:16;130:11;132:24;
135:18,19;136:17;
143:25;144:17;146:22;
147:3;150:20;151:20,
21;153:22;154:6;
168:7;169:12;174:19,
21;175:25;192:1;
194:18;198:8,21;
200:20;204:15;210:9;
215:3;225:7;228:14;
229:9;233:2,23;

234:13;240:16;241:13,
18;243:1;245:6;
246:16,17;247:10;
250:18,18,25;252:3;
253:1;256:20;263:6,
22;265:25;266:1,4;
271:15;275:4;279:18;
280:23;281:5;282:24,
25;301:20
**Canine (1)**
266:16
**Canneberry (1)**
299:9
**capable (3)**
44:24;109:18;110:25
**capacity (4)**
3:9;113:11;117:19;
270:16
**Captain (33)**
21:25;28:9,13;31:21;
33:19;55:24;83:11,16;
90:11;133:10,13,14,18,
19,21,23;134:5;
139:23;150:4;170:23;
188:14,22;189:15;
206:3;208:25;255:8,
12;259:11;260:4,7,16;
293:16;299:4
**captains (3)**
27:18;70:24;133:22
**captain's (5)**
36:8;72:1;146:1,10;
147:24
**car (1)**
143:18
**cardboard (2)**
242:18,20
**care (2)**
8:17;24:23
**cared (1)**
113:21
**career (8)**
31:6;41:4;81:5;
132:14;137:14;263:14;
290:17;291:1
**careful (1)**
84:4
**cargo (1)**
43:7
**carries (1)**
230:17
**carry (4)**
162:14;207:6;
215:12;240:21
**carrying (2)**
150:16;163:2
**cars (1)**
143:16
**case (26)**
4:9,10,12,15;6:7;7:4;
8:1;55:10,17;66:7;
70:16;90:25;93:21;
129:3;134:25;156:24;

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 82 of 106

184:15,19,21;193:22;
195:14;197:20;250:11;
258:12;287:13;288:3
**cases (1)**
103:7
**caseworker (2)**
291:24,25
**caseworkers (1)**
146:13
**cash (1)**
223:5
**casket (1)**
150:11
**Castle (2)**
23:8;119:3
**casual (1)**
299:19
**casually (1)**
155:14
**catch (2)**
191:18;296:4
**catches (1)**
94:2
**caught (1)**
220:16
**Cause (9)**
18:24;68:14;140:17,
19;141:2;143:3;
157:15;209:6;271:22
**caused (3)**
84:8,10;222:13
**causes (2)**
125:11;184:12
**CBT (1)**
145:13
**CBTs (4)**
144:18;145:5,12,14
**ceiling (1)**
157:6
**Celebrate (1)**
12:9
**cell (120)**
10:25;11:2,6,8,13,
15;26:4;29:21,22;30:3,
3,5;32:3,10,24,25;
40:15;48:9,13;67:20;
70:1;85:3,8,9,12,14,17,
24;86:1,8;87:13;88:18;
91:16,22;92:4,7,11,15,
19,22;93:5,6,18;95:1,
14,19;97:16,23;98:9;
99:15,16,17,19;100:1,
10,15,22,23;101:17,18,
20,22,25;102:3,16,22,
22,24;103:11,12;104:3,
6,8;116:18;120:12,14,
17,21;127:19;128:1;
130:9;148:13;152:25;
166:5;167:6,15,18;
169:7,20;171:12,17,23,
24;172:5;174:20,23;
175:25;176:1;196:2;
216:5;226:20;227:8,9;

233:11,14;238:7,8,9;
239:9,20;242:8,8,12;
243:22;244:1,2,6;
250:18;252:5,13
**cellhouse (150)**
46:17,19;50:25;51:5,
10;58:14,18,19;61:6;
62:23;65:6;66:16,16;
70:6,12;71:14,18,20,
23;72:4,5,10;81:25;
106:24;107:5,6,9,17,
22,24;108:1,5,8,9,12,
16,16,19;109:6,9,12,
15,20;110:16,17;
124:23;126:3;131:2,
22,23,25;132:2,6,7,11,
12,13;133:4;135:9,11,
13,13;136:4,8,16,20,
21;137:6,17;139:11;
142:11;146:1,5,7;
147:1,13,21,22,24;
148:18;150:24;152:20,
22,25;153:4,4;155:16;
156:5,13,17;157:11,15,
22;158:7,20,21;
160:24;162:18;166:1,
7;168:18,19;176:7,11;
177:21;185:12;186:15;
187:6,8,23;188:17,19,
23;189:5,17,22;194:6;
195:13,21;196:5;
197:9;202:10;207:16;
208:1;209:3,8,14,17;
211:7;212:9;213:4,17,
23;214:5;215:7,16;
217:24;218:1;226:8;
227:17;233:8,18;
236:13,22,23;257:17;
274:5;277:19;297:22;
298:2
**cellhouses (6)**
62:9;71:17;109:1,22;
134:23;152:14
**cells (17)**
29:17;87:16;88:4,16;
94:21;95:22;116:13;
121:18;126:4;142:15;
157:7;167:14;204:2;
217:18;232:17;242:19,
21
**cement (1)**
157:6
**Center (1)**
292:8
**Central (1)**
198:11
**certain (9)**
23:16;27:5;46:24;
49:11;61:4;107:2;
135:18;164:7;268:10
**chain (2)**
134:5;260:8
**chains (1)**

64:23
**chair (2)**
248:3;264:11
**champion (1)**
13:24
**chance (2)**
89:7;268:5
**change (19)**
43:6,24;53:6;57:23;
59:5,5;62:1,3;81:22;
82:3;102:20;135:3,5;
226:9;247:15;248:14;
257:3;267:9;286:6
**changed (10)**
11:10;43:22;101:9;
202:8;220:4;232:24;
241:3,5,12;258:16
**changes (11)**
38:13;53:8;57:23;
118:9;225:23;226:13;
241:14,20,24;242:24;
258:19
**changing (2)**
241:16;268:25
**charge (35)**
19:17;29:13;33:19;
63:17,21;81:15;90:5;
93:3;94:24;95:3;97:15;
100:5;107:17;117:25;
133:15;135:8,16;
136:1,7;137:5,8,17,24;
220:16;224:8,15;
227:16;233:7;258:23;
259:4,13,15;268:14;
293:11;297:5
**charged (1)**
240:7
**charger (1)**
81:18
**charges (3)**
5:1;6:21,22
**charging (1)**
81:12
**check (70)**
14:24;50:18,20,22;
62:20;63:12,14,15,22,
23;64:2,11,20;65:4,8,9;
74:13,13,14,19,20;
75:9,13,15,17,22,23;
76:18,22,23,23,25;
87:19;95:25;113:3,5,7;
115:17,25;116:12;
117:6,7,11,18;118:5;
119:22;126:10,15;
127:22;128:5;129:21,
23;130:4,10,23;145:19,
21,22,23;146:4,21,25;
152:16,24;153:12;
204:25,25;205:22;
221:14;223:6
**checked (2)**
76:19;153:24
**checking (4)**

67:3;116:13;147:10;
296:17
**checklist (3)**
36:16,17;49:20
**checkpoint (18)**
151:5,9,10,12,20;
152:6,6,9,9,12;153:17;
154:2,24;155:2,4;
186:10,17;188:8
**checkpoint's (1)**
67:2
**checks (13)**
49:24;110:1,17,21;
113:18;114:2,6,12,16,
23;115:3;152:10,14
**cheek (1)**
73:10
**chemical (2)**
48:11;51:14
**Chesterton (1)**
10:17
**chief (2)**
57:24;66:14
**child (1)**
24:23
**children (2)**
296:12,13
**Chism (1)**
299:16
**chit (5)**
64:14,17;80:19,19,
20
**choice (2)**
97:25;110:23
**chose (3)**
85:10;197:17;199:10
**Chris (7)**
21:24,25;263:4;
270:1,4,5,15
**Christopher (2)**
292:10;296:2
**church (3)**
26:11;88:10;229:25
**circumstances (7)**
4:7;89:12;103:8;
206:11;207:1;261:25;
292:12
**city (2)**
10:16;243:7
**claim (3)**
7:10,12,16
**claims (2)**
8:2;269:10
**clarification (1)**
6:10
**clarify (6)**
97:11;233:17;
236:14;238:3;259:12;
289:16
**clarifying (2)**
214:10;245:11
**clarity (1)**
75:8

**class (7)**
15:2;17:3;19:7;26:5,
11;44:5;89:7
**classes (3)**
42:19;292:15,16
**classroom (8)**
16:13,14;18:11;33:5,
5,6;43:11,11
**clean (4)**
61:12,13;85:15;
179:22
**cleaned (1)**
61:14
**Cleanliness (1)**
26:11
**clear (3)**
58:19,21;269:1
**cleared (1)**
49:1
**clearly (4)**
5:6;214:4;219:15;
261:13
**clears (1)**
94:7
**climb (1)**
245:4
**clips (1)**
81:8
**clogging (1)**
30:6
**clogs (2)**
30:6,7
**close (3)**
59:19;170:17;290:4
**closed (1)**
100:8
**closely (1)**
278:5
**closer (3)**
171:5,5;202:23
**closest (5)**
131:7,12,17;147:23;
239:22
**cloth (1)**
149:13
**clothes (1)**
191:21
**clue (4)**
28:1;30:20;67:5;
112:20
**coaching (1)**
20:2
**coaster (1)**
41:20
**coasting (11)**
39:20;40:4,8,14,20,
23;41:10,13,16,22;
42:24
**code (21)**
55:7;68:24;69:21;
72:11,14,24;73:4,15,
22;111:19;123:1,2,7,
10,10,12,19,21,22;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 83 of 106

RYAN STATHAM
November 5, 2019

125:5;143:2
**codes (3)**
69:1,13;142:14
**collects (1)**
112:17
**combat (2)**
47:21,23
**comfortable (1)**
39:20
**coming (23)**
41:24;44:9,13;52:5;
70:1;74:24;104:5;
137:13;148:8;156:2,5;
157:11;164:8;171:22;
174:3,4,13;191:19;
210:7;221:5;235:17,
18;246:12
**command (2)**
134:5;260:8
**comment (1)**
295:15
**comments (1)**
224:11
**committee (2)**
119:1,2
**common (9)**
29:15,18,19,21,23,
24;88:25;102:6;135:23
**commotion (1)**
130:2
**communicate (6)**
101:2;105:21;121:1,
17;214:19;296:20
**communicated (1)**
101:3
**communicating (2)**
101:6;172:17
**Communication (7)**
13:7;32:21;83:23;
105:20;256:8;260:14;
266:19
**community (5)**
22:15;23:14;43:9;
194:13;214:25
**comparable (1)**
59:16
**comparison (2)**
18:15;199:24
**complain (1)**
24:21
**complaint (1)**
8:11
**complaints (4)**
25:12;26:13,16;27:7
**complete (6)**
144:25;200:13;
246:5,6;267:6,11
**completed (6)**
17:5;22:12;44:3;
197:19;200:25;201:4
**compliance (1)**
263:22
**comply (1)**

264:1
**complying (3)**
154:7;246:15;253:15
**component (1)**
16:5
**compound (1)**
152:11
**Comprehension (1)**
263:21
**comprehensive (1)**
97:8
**computer (5)**
74:16;75:14;145:8,
24;273:1
**computer-based (2)**
23:12;145:6
**con- (1)**
236:3
**concern (6)**
42:23,25;83:24;
113:17;119:15;201:12
**concerned (4)**
67:2;113:14;197:11;
258:18
**concerns (2)**
43:25;119:4
**concluded (1)**
302:2
**condition (2)**
8:21,25
**conduct (11)**
26:17,19,20;123:1,2,
6,9,18,20,22;125:5
**conducted (1)**
3:22
**conference (1)**
248:2
**confide (1)**
179:2
**confidentiality (1)**
45:6
**confusing (1)**
232:1
**confusion (1)**
140:19
**connect (1)**
29:9
**connected (2)**
28:17;65:3
**connotation (1)**
53:19
**consequences (1)**
117:2
**consider (2)**
86:22,24
**consistency (1)**
232:11
**consistent (3)**
180:7,16;196:18
**constantly (3)**
82:2,16;241:16
**contact (3)**
58:8;298:14;299:2

**contacting (1)**
9:21
**contain (1)**
201:21
**contains (1)**
48:14
**content (3)**
35:2;118:23;241:11
**context (1)**
37:23
**continued (1)**
200:21
**continuing (1)**
12:22
**contractor (1)**
26:8
**control (18)**
48:20,22;55:23;56:2,
4,8,15;70:23;80:18;
84:24;89:25;90:2;95:4,
23;118:1;188:6;
227:20;228:3
**controlled (1)**
68:18
**controlling (1)**
51:23
**conversation (16)**
43:1;179:1;233:21;
234:1,4,6,8;259:16;
269:19,23;270:7,14;
291:2,10,12;298:23
**conversations (8)**
9:8;43:4;217:11;
233:24;270:20;288:12;
291:8;299:20
**convey (1)**
45:10
**copy (1)**
301:19
**corkboard (2)**
58:18,21
**corner (2)**
144:6;244:4
**corrected (2)**
26:25;248:25
**correction (2)**
44:25;120:9
**correctional (23)**
14:8,11;15:16,18,21;
16:7;17:19;18:25;19:2;
20:23,25;21:4,5;22:14;
23:3;24:3;34:23;43:19;
52:14;114:18;148:25;
207:22;292:8
**Corrections (4)**
18:4;59:15;196:24;
295:13
**correctly (2)**
109:18;131:15
**corroborate (1)**
197:22
**counsel (9)**
3:14,17;9:9;222:6;

247:12;281:16;288:3;
300:15;301:5
**count (7)**
88:19;90:4;97:13;
99:15;158:2;192:18;
233:23
**country (1)**
178:7
**county (1)**
124:16
**couple (18)**
9:18,25;60:22,25;
66:17,20;167:14;
172:23;175:5;191:6,7;
218:23;240:5;272:11;
276:8;284:21;297:3;
300:22
**course (5)**
20:2,19,20;33:14;
211:1
**courses (1)**
292:16
**court (15)**
4:2,18,19,20;5:6,19;
6:4;7:7;8:4,8;15:25,25;
19:14;200:15;204:20
**covered (1)**
51:7
**crawl (3)**
170:18;171:4;172:25
**crawled (4)**
172:8;191:1;244:16;
251:2
**crawling (1)**
173:19
**crawls (1)**
171:5
**crazy (1)**
295:17
**create (10)**
40:13;80:20;97:7;
116:15,25;117:5;
125:21,24;140:8;141:7
**created (3)**
117:17;136:14,21
**creates (2)**
40:11,12
**crime (1)**
5:17
**criminal (2)**
4:24;6:19
**criticism (5)**
223:9,25;234:19,25;
293:5
**criticisms (4)**
290:1;292:25;
293:20;298:7
**critique (1)**
290:1
**cross (2)**
199:19;300:20
**cry (2)**
130:13,20

**crying (5)**
130:10,11,12,13,23
**Crystal (1)**
224:20
**CTI (2)**
19:6;292:15
**cued (1)**
273:3
**cueing (1)**
193:20
**curling (1)**
237:21
**currently (2)**
10:17;22:18
**Curry (4)**
202:3;254:9;255:23;
258:3
**curve (1)**
138:7
**custody (8)**
27:24;138:23;139:1;
141:19,24;151:3;
176:9;197:5
**cut (3)**
60:19;64:22,23
**cutters (6)**
64:22;65:3;74:15;
75:2,5,12
**cutting (1)**
65:2
**cyber (1)**
145:13

**D**

**daily (1)**
66:24
**damage (3)**
64:13;95:24;114:14
**damages (1)**
300:18
**danger (18)**
40:13;84:23;100:1,4,
7;105:23;116:25;
117:2,5;119:9;125:14,
15,24;140:17,18;
209:12,13;223:12
**dangerous (7)**
93:25;102:15;
119:10;150:13;192:10;
193:4;203:23
**dangers (20)**
84:8,10;114:11;
116:15,16;117:9,12,14,
16;118:2,3;125:11,21;
136:13,21,22,23;137:2;
140:8;141:8
**Daniel (4)**
9:14,18;288:10,15
**dark (1)**
284:7
**date (4)**
9:20;12:19;15:7;

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 84 of 106

105:19

**dates (2)**
95:20;205:1

**daughter's (1)**
299:4

**day (36)**
19:12,16;24:4,10,17;
25:1,3;32:14,15;47:5;
60:3,4,5;63:4,4;66:10;
67:14;79:6,7;88:23;
89:3;90:4;106:22;
113:22;121:16;133:14,
20;135:19,21;139:5,
17;145:22;176:14;
182:12;200:19;266:25

**days (16)**
10:1;24:8,12,14;
50:8;60:22;61:1;65:7;
115:21;119:19,22;
120:6,7;138:15;175:5;
218:23

**daytime (1)**
56:20

**day-to-day (5)**
88:8;90:16;109:2,23;
111:3

**dead (2)**
174:17;289:19

**deal (7)**
69:5;115:19;165:4;
212:1,10,17;213:5

**dealing (5)**
101:13;211:22;
212:21;223:20;268:18

**dealt (1)**
130:21

**debriefing (5)**
165:5;198:10;
224:11,13;263:3

**December (2)**
205:15,16

**decent (1)**
205:6

**decide (1)**
102:15

**decided (8)**
21:19;39:21,22,23;
133:3;203:21;257:9;
258:11

**decides (1)**
133:7

**decision (9)**
104:23;107:13;
108:14;148:21;256:22,
25;257:3,21,22

**decisions (1)**
102:10

**defend (1)**
15:25

**defendant (2)**
7:15;300:16

**defense (2)**
3:17;301:11

**definitely (10)**
122:4;140:19;
205:17;210:21;225:19;
240:8;270:17,19;
281:2;298:24

**delay (1)**
116:24

**demoted (3)**
206:16,19;207:1

**Demotions (1)**
206:23

**Department (13)**
18:3;36:9;47:19;
48:19;52:7;54:23;
68:13,15,21;71:3;94:6;
213:11;241:8

**depend (2)**
107:19;128:6

**dependent (2)**
22:20;85:4

**depending (2)**
111:3;138:6

**depends (4)**
33:14;68:8;81:24;
134:13

**deployed (1)**
258:5

**deposition (11)**
3:21,25;5:17;9:9;
10:10,14;22:23;
205:22;301:5,9;302:2

**deputizing (1)**
43:8

**deputy (1)**
134:8

**Derek (2)**
33:18;49:22

**dereliction (1)**
103:23

**describe (1)**
104:1

**described (2)**
79:3;228:24

**designated (1)**
112:4

**desk (2)**
51:2,7

**destroyed (1)**
189:12

**destroying (1)**
29:14

**destructive (1)**
126:11

**detail (3)**
5:4;18:5;182:23

**detailed (1)**
18:13

**details (3)**
62:24;247:8;250:7

**detection (1)**
69:24

**detector (10)**
60:7;70:3,4,9,9;71:9,

11,13,16,22

**determine (1)**
36:21

**determined (1)**
131:2

**determines (1)**
131:24

**deterrent (1)**
240:15

**developing (1)**
268:13

**development (1)**
118:25

**device (1)**
105:20

**Devine (20)**
3:8,10;144:6;150:23;
151:2,2;169:22;
174:17;190:19;193:12;
222:9,21;224:18,20;
239:7,16;240:2;
245:21;247:21;250:22

**Devine's (5)**
167:6;169:7;174:16;
196:1;242:12

**die (4)**
170:8;179:7;180:4;
244:24

**died (5)**
171:11;174:2,10;
239:13;245:2

**dies (1)**
243:6

**difference (7)**
20:16;35:5;36:13;
54:16;73:7;199:20;
228:15

**differences (3)**
35:12;53:2,5

**different (30)**
19:12,15;25:8;34:24;
35:2;45:21;49:7;50:25;
62:2;69:1;103:25;
111:4,19;118:10;
131:23;137:10;138:8;
152:13,17;156:21;
202:11;211:1;227:5;
231:9;234:14;240:17;
249:24;252:13;263:24;
269:20

**differently (7)**
111:5;219:3,9,13,18;
240:3;265:22

**difficult (1)**
232:1

**diligent (1)**
27:10

**dimensional (1)**
166:14

**dining (1)**
146:2

**DIRECT (8)**
3:5;164:16;165:18;

168:16,22,25;169:3;
216:3

**directed (2)**
217:8;224:12

**directing (1)**
164:4

**direction (7)**
155:15;192:3;220:7;
260:18;264:1,2,6

**directions (1)**
264:3

**directive (2)**
57:14;265:17

**directives (3)**
38:14;229:2,5

**directly (4)**
156:6,8;224:12;
275:13

**director (2)**
202:3;254:12

**directors (1)**
229:1

**disagreement (2)**
228:19;231:4

**disagreements (2)**
230:24;294:3

**disbelieve (1)**
184:6

**disbelieving (1)**
185:5

**disciplined (12)**
99:18;100:12;
101:24;127:6;128:4;
215:3,8;229:9,10,14;
230:1,5

**discovery (2)**
3:15,18

**discretion (21)**
86:15,17,25;93:22;
97:14,21,25;98:5;
99:23;102:10;104:20,
24;105:7;107:15;
131:4;133:6;215:15;
216:14;228:13;231:14;
233:7

**discuss (14)**
72:7;198:12;201:20;
202:16;203:10,13;
229:3;230:18;263:7;
268:5;271:3;295:25;
300:18;301:9

**discussed (18)**
14:15;25:12;28:4;
42:3,5;74:25;84:2;
102:11;152:17;202:7;
228:12;255:6;256:9;
258:25;260:23;266:9;
289:25;297:18

**discussing (3)**
3:15;256:11;260:24

**discussion (11)**
42:6,9;59:22;109:17;
256:16;261:4;266:15;

268:8;269:13;281:15;
295:12

**discussions (2)**
233:18;258:8

**dismissed (1)**
255:18

**dispatch (1)**
60:12

**disregarded (1)**
259:25

**disruptive (1)**
123:12

**distinction (1)**
263:9

**distinctively (1)**
237:9

**distorted (1)**
195:25

**disturbance (2)**
130:2,5

**do- (1)**
131:7

**DOC (10)**
4:9,12;15:4;16:20;
20:15,16;30:13,14;
31:5;82:7

**doctor (1)**
92:1

**document (13)**
47:15;57:10;58:13;
143:25;253:5,5;
286:22,25;287:19;
288:13,16,20,23

**documents (4)**
3:19;10:2,4;288:8

**doer (3)**
219:22;220:8;234:21

**Donald (1)**
12:21

**done (41)**
7:10;17:2;54:21;
65:18;78:9,11;94:11;
100:19;106:4;139:9,
20;140:24;144:18;
176:11;198:7;202:23;
213:24;214:1,6,9,11;
215:22;216:10,12,14;
217:17,20;227:12;
230:13;235:24;240:3;
244:21;249:16,17,21;
261:5;265:22;266:5;
290:4,12;301:16

**do-not-talk-about-it (1)**
263:6

**door (81)**
54:5;60:9;88:9,11,
12;89:17;93:9;94:3;
99:19;100:4,8;103:12;
104:4,8;131:6,13,16,
17,20,21,25;132:3;
147:23;149:9,10,15,17,
19,21,24,25;155:16;
158:16,19,21,23;159:1,

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 85 of 106

3,19,20;161:4,7;164:9,
16;165:8,9,10,18;
168:2,5,10,14;170:17,
21;173:22,23,24;
176:3;191:14,16;
214:15;227:7,8,9;
236:25;237:7,10;
240:7;244:6,7;271:24;
274:3,4,5,13;277:19;
278:10,17,21;279:6,13
**doors (12)**
60:11;64:23,24;
158:22;203:22;209:7,
10,24;232:17;233:1,11,
15
**door's (1)**
168:7
**doorway (1)**
171:13
**dot (2)**
153:24;254:22
**double (1)**
22:8
**double-check (1)**
129:7
**double-checking (1)**
281:14
**double-sided (1)**
192:1
**down (47)**
5:6,20;37:12;40:8;
46:25;89:8,9;120:20;
124:24;144:21;147:3;
148:12;150:16;161:19;
162:2;163:20,23;
164:16;166:5;167:5,
18;169:6,14;179:16;
190:18,25;192:2;
194:14;215:14;216:19;
231:4;237:19;239:13;
240:7;242:8;244:24;
245:2,22;251:4;259:5,
21;270:8;276:1;278:2;
283:13,19,20
**downstairs (2)**
93:10,14
**downstate (2)**
23:1,7
**drag (1)**
154:1
**draw (1)**
244:1
**drawing (2)**
250:17;251:9
**dressed (1)**
54:11
**drill (9)**
138:23,24,25;139:1,
13,15;140:1,23;142:3
**drills (23)**
138:11,18,21;139:2,
19;140:4,9;141:12,17,
18,19,24;142:5,6,10,

13,16;143:9,12,22;
260:22,24;261:4
**drop (3)**
29:18;204:13,13
**dropped (2)**
45:8;78:5
**dude (1)**
221:20
**due (10)**
25:20;30:1;100:18;
103:23;136:9,22;
213:10,19;242:11;
271:20
**duly (1)**
3:3
**duration (3)**
75:5;111:20;265:14
**During (52)**
3:15;20:8;34:21;
45:11;46:1,20,21;
52:14;64:20;69:16;
72:6;79:9;81:15,23;
88:14,23;89:3;90:3;
97:13,13,21;105:25;
139:2,5;141:3,6,24;
150:18;158:2;186:2;
187:16;197:25;198:19;
207:6;223:6;225:11,
19;243:6;245:22;
247:8;255:9;258:5,11,
14;265:22;271:1;
273:14,19;281:10;
284:7;301:5,9
**Dustin (7)**
21:24,25;263:4;
270:1,4,5,15
**duties (2)**
152:9,10
**duty (12)**
61:9;62:9;103:23;
126:4,15;146:4;147:1;
148:14;169:16;201:5;
289:5,7
**Dykstra (14)**
83:11;150:4;170:23;
188:14,22;189:15;
206:3;208:25;255:8,
12;259:11;260:4,7,16
**Dykstra's (1)**
209:2

**E**

**earlier (22)**
28:4;35:17;59:9;
69:7;102:11;119:18;
121:7;151:10;152:17;
162:17;164:6;168:15;
209:12;214:17;225:3;
228:10,12;234:19;
240:20;256:18;269:9;
270:3
**early (3)**

43:18;263:13;291:1
**easier (3)**
24:23;193:1;264:1
**easily (3)**
78:7;185:4;196:16
**easy (1)**
30:7
**eat (1)**
295:3
**education (1)**
12:22
**effect (2)**
42:1;108:14
**effective (10)**
17:14,17,17;33:12,
13,15,16,22;292:18,21
**effects (3)**
14:12,14;295:23
**efficient (3)**
125:18,20;232:12
**effort (1)**
214:25
**eight (1)**
32:4
**either (23)**
29:13;49:19;50:4;
56:15;60:3;72:12;81:9;
111:7,7;118:7;121:4;
146:9;163:22,24;
192:9;200:23;201:6;
210:1;220:6;226:17;
228:8,9;295:20
**electric (2)**
29:8;104:5
**electrical (8)**
29:5;30:22;49:12;
74:17;94:2;95:18,22;
148:21
**elements (1)**
29:9
**eligible (2)**
31:6;115:11
**else (58)**
10:6;23:10;35:13;
38:16;50:11;51:10;
63:23;74:14;97:9,10;
112:8;115:13;136:7;
149:3,7;150:17,25;
161:15,17,19;170:9;
174:18,22,25;177:6;
179:8,10;186:6;
193:19;202:6;203:6;
206:1;210:7;217:5;
222:3;223:22,24;
225:14;229:7;239:2;
240:16;248:11;253:12;
255:4;256:13;259:6;
262:18;263:18;269:3,
14;270:19,21,24;271:2,
14;276:20;278:1;299:6
**else's (2)**
163:12;218:16
**email (16)**

11:18,20,23;144:9,
14;145:18,19,21;146:4,
21;204:25;205:21;
206:2,6,7;287:5
**emailed (1)**
288:10
**emails (2)**
146:25;205:22
**emergencies (10)**
19:5,8;45:14;46:4,5;
61:3;92:14;93:5;
122:20;258:14
**emergency (99)**
16:19,20;18:1,3,4,
18;19:1;33:24;34:3,11;
35:18,21,24,25;36:3,5,
10,11,15,17,19,22;
37:8,9;38:19;39:4,5,11,
15,19;40:20;45:3,4,9,
10,11,16;46:6;50:13;
77:6;85:3;87:16;91:20,
23,23;92:5,8,11,12,19,
23;93:17;94:21;97:17,
22;116:17;118:12,16;
122:7,11,12,16,18;
123:24;124:6,14,21;
125:7,8,9,13;126:14;
127:4,7;141:6;142:18,
23;198:13;199:18,21,
22,25;201:18,24;
202:8;211:16;212:1,
10,22,25;213:14;224:8,
15;256:8,21;258:5,13,
15;286:1
**emphasized (1)**
114:22
**employed (2)**
13:13;23:25
**employee (1)**
118:14
**employment (1)**
4:13
**empty (1)**
50:17
**encourage (2)**
114:6;121:9
**end (8)**
41:8;82:8;124:22;
128:6,7;249:13;
255:16;290:12
**ended (6)**
111:25;128:7;178:2;
189:6;266:10;268:6
**end-of-the-year (1)**
41:14
**enforce (1)**
15:24
**engage (2)**
43:1,1
**engaged (1)**
3:14
**engulfing (1)**
171:23

**enormous (1)**
269:9
**enough (3)**
213:2,13;261:5
**ensure (5)**
36:18;65:11,11;
95:10;108:8
**ensuring (1)**
114:1
**entailed (1)**
260:25
**entails (1)**
290:20
**entire (10)**
25:4;82:1;110:14;
118:25;152:10;177:5;
189:5;209:13;211:18;
242:7
**entirely (3)**
137:10;152:1;234:14
**entirety (3)**
38:11;79:11;245:20
**entitled (1)**
293:22
**entrance (1)**
72:1
**environment (1)**
114:18
**equipment (13)**
60:18;62:20;63:10,
13;64:19;74:13,17;
75:8,16;87:20;194:8,
12;226:14
**ER (1)**
198:10
**Erin (2)**
22:1,2
**ERO (13)**
201:15,16,17,23;
208:25;221:11;253:10,
18;254:8,14;258:18;
263:7;265:4
**erupted (1)**
148:15
**escape (2)**
114:14;184:13
**escort (4)**
30:14;53:12,16,20
**escorting (1)**
259:4
**especially (6)**
82:7,8;106:8;148:23;
267:20;269:11
**essentially (2)**
36:15;91:1
**estate (1)**
3:10
**Ethics (2)**
145:3,14
**evacuate (5)**
139:3;189:5;209:3;
260:12,17
**evacuated (3)**

**BOSS REPORTERS**
**(219) 769-9090**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 86 of 106

209:17;223:11,13
**evacuating (3)**
142:11;260:13,15
**evacuation (27)**
18:22;50:15;140:15,
23;141:4,9;142:4;
150:19;188:18,20;
189:19;202:15;208:22;
209:2,5,14;217:18;
219:8,10;223:8;
255:11;259:10;260:4,
9,18;265:16;286:1
**evacuations (1)**
189:8
**evaluate (1)**
221:12
**evaluation (2)**
41:15,17
**even (50)**
22:21;26:25;38:10;
69:7;76:19;77:12;87:5;
90:8;93:20,24;96:14;
97:24;101:16;108:15;
121:10;147:22;148:7;
149:6,20;155:16;
167:15;176:15;178:3;
179:2;184:1,13;188:3,
7;195:14;201:6,8,9;
202:20;206:17;211:19;
216:2;235:16;238:12;
246:22;249:18,21;
251:19;252:6;256:21;
260:7,11;261:1;
266:25;270:9;293:14
**event (1)**
97:4
**events (3)**
60:21;198:24;295:25
**eventually (4)**
94:7;173:9;178:5;
244:13
**everybody (17)**
35:13;38:12,16;
114:19;116:22;164:24;
174:22;175:15;176:13,
16;179:6,6;180:18;
203:5;234:20;235:24;
273:18
**Everyone (8)**
35:24;37:21;107:6;
108:20;138:7;160:23;
193:19;300:3
**everyone's (1)**
137:9
**everything's (1)**
236:8
**everywhere (1)**
173:18
**evident (1)**
114:25
**exact (1)**
87:5
**exactly (4)**

33:1;155:20;189:10;
225:7
**EXAMINATION (2)**
3:5;300:20
**examining (2)**
151:22;152:1
**example (6)**
30:5;39:2;73:13;
106:5;116:7;229:19
**examples (1)**
26:2
**exams (2)**
16:23,25
**exceeds (1)**
41:18
**excellent (1)**
61:14
**except (2)**
33:6;207:5
**exceptions (1)**
123:7
**exclamation (1)**
56:23
**excuse (4)**
127:12;167:10;
204:22;210:2
**execute (4)**
229:3;230:22;231:7,
8
**executed (3)**
228:23;230:25;
231:18
**execution (1)**
232:7
**executive (5)**
57:13;229:1,2,5;
254:12
**exercises (1)**
139:25
**Exhibit (20)**
144:1,2,5;151:16,17,
22;152:2,3;166:8,9;
245:7,8;250:19;
252:16,17,21,22;
286:15,18;300:25
**existed (1)**
137:3
**existence (1)**
39:15
**exit (1)**
50:13
**exits (1)**
50:13
**expect (1)**
210:24
**expectation (1)**
41:18
**expectations (3)**
41:18,19,20
**expected (1)**
212:14
**expedition (1)**
257:8

**experience (27)**
34:9;47:3;76:11;
85:22;86:15;94:16,18;
107:21;135:11,15;
136:6,8,15,20;137:8,9,
16,23;143:6;149:1;
185:8;211:21;212:21,
24;213:20;228:25;
230:14
**experienced (7)**
34:8;135:12;136:3;
137:6,16;184:21;213:2
**expert (1)**
184:25
**explain (17)**
46:25;84:11,18;
99:22,24;102:2,5,17;
104:19;105:8,11,14;
110:7;120:13;130:5,
11;239:21
**explained (2)**
90:25;245:22
**explaining (1)**
75:7
**explains (2)**
17:21;102:6
**explanation (5)**
14:17;57:3;106:1;
245:15,17
**expound (1)**
246:3
**express (4)**
42:23;83:24;119:4,7
**expressed (2)**
42:25;119:15
**expressing (1)**
287:17
**extend (1)**
117:13
**extensive (2)**
74:1,5
**extensively (1)**
65:25
**extent (4)**
48:15;236:1;266:21;
300:3
**extinguisher (49)**
48:10;49:10,11,14;
50:16,17;52:7,11;
65:19;74:14;148:4,10,
17,24;149:3,4;160:8;
169:13;186:14,22;
190:7,9;191:25;192:9;
210:9;215:12,20;
216:9,20,22;219:20,25;
234:23;238:6,15,18;
239:4,5;245:1,21;
275:20,22;276:3;
280:9,14,24;284:9;
286:11,13
**extinguishers (41)**
47:18;48:12;49:7;
50:12,19,20,24;64:21;

65:10,17,21,25;66:9,
18,21,23,25;67:3;
141:14;148:19;159:14,
17;160:11,13,15;
161:12;162:11,21;
163:3;167:20;186:16,
24;190:5;210:5,14,20;
211:5,9;214:14,24;
215:6
**extra (5)**
39:24,25;61:5;81:19;
127:15
**Extraction (4)**
32:3,10,24;143:18
**eyedrops (2)**
91:3,6
**eyes (1)**
191:13

**F**

**face (3)**
174:19;179:22;223:2
**Facebook (8)**
12:2,4;294:6,7;
296:21;299:19,23;
300:10
**facilities (6)**
19:1;36:7;45:21;
201:25;254:13;268:18
**facility (39)**
8:3;14:23,23;16:21;
18:19,24;22:14;25:8;
26:9;28:6;36:5;38:14;
43:10;44:6;47:19;
48:18,19;54:22,23;
58:10,10;69:4;78:10,
13;92:22;105:12;
228:23;230:15;235:15;
242:1,8;267:3;268:17,
20;291:16;292:4;
293:10;297:10,15
**facility's (2)**
19:1;30:15
**facility-specific (1)**
45:18
**fact (11)**
38:20;39:18;70:5,11;
121:4;125:1;136:9;
176:2;212:5;242:11;
276:24
**faction (1)**
183:23
**factors (1)**
86:21
**failure (1)**
7:21
**fair (1)**
6:11
**fairly (2)**
29:19;284:6
**fall (2)**
78:6;122:14

**falls (2)**
36:22;41:20
**familiar (1)**
29:1
**families (1)**
300:3
**family (2)**
177:9;265:1
**far (10)**
18:16;28:6;67:2;
76:24;124:22;173:2;
227:24;233:13;295:13;
301:6
**farther (2)**
26:25;90:8
**fear (2)**
106:9;198:15
**February (4)**
31:5,7;82:18,20
**federal (1)**
8:8
**feedback (3)**
223:4;235:21,23
**feel (15)**
37:19;38:21;42:11;
43:5,8;44:2,11;100:19;
121:10;125:17;183:23,
24;234:12;246:4;
289:18
**feeling (2)**
126:21;271:21
**feels (1)**
183:22
**fell (1)**
174:2
**felt (11)**
38:1,15,20;42:12;
100:17;105:22;174:8;
175:18;183:20;191:2;
285:8
**female (5)**
161:24;162:1;
163:23;274:3,6
**few (4)**
106:17;109:24;
115:8;290:11
**fiancee (1)**
299:8
**field (18)**
16:10;19:18,22;20:5;
34:5,12;43:14,18;
44:20;46:1,2;47:3;
87:4;140:16;143:15;
164:19,25;228:24
**fieldwork (1)**
43:12
**fight (9)**
6:25;46:16;73:11;
74:10;84:20;106:10,
12,15;149:24
**fighting (3)**
4:17;73:24;106:6
**fights (2)**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 87 of 106

RYAN STATHAM
November 5, 2019

61:2;78:6
**figure (7)**
78:19;80:11;191:10;
198:25;222:4,8;265:21
**figured (1)**
163:8
**figuring (1)**
264:2
**filed (1)**
25:12
**filing (1)**
7:24
**Fill (10)**
14:22;27:19;66:21;
96:25;112:7,21;113:1;
287:5,20;288:4
**filled (7)**
22:20;47:14;66:9,11,
18,23;230:8
**filling (5)**
22:21;27:10;97:2;
116:3;249:14
**finally (3)**
149:25;170:20;171:5
**financials (1)**
300:19
**find (8)**
26:13;27:4;132:24;
139:19;164:11;177:24;
195:11;292:3
**finding (1)**
243:25
**fine (1)**
111:8
**fingernail (1)**
92:1
**finger's (1)**
91:7
**finish (6)**
5:5;6:1,3;19:13;
111:16;290:6
**fire (411)**
47:13,17,18,19,21,
23,25;48:3,10,11,13,
16,19;49:7,9,9,10,11,
12,13,14,24;50:12,16,
17,18,19,24;51:21;
52:4,5,6,7,9;53:22;
54:6,8,9,10,23;55:7,8,
9,12,14,22;56:21,22;
57:1,24;64:21;65:9,17,
19,20,24;66:9,14,17,
20,23,25;67:3,20,22,
23,25;68:3,6,9,12,13,
15,19,21,23,25;69:9,
10,14,22;70:9,22;71:3,
5,5,20,22;72:7,9,9,12,
14,19,24;73:3,8,11,14,
15,22,24;74:8,13;76:4,
8;84:21;85:9,13;93:21,
23;94:2,3,6;95:23,25;
99:15,17;100:11,23;
101:23;102:22;103:10;

104:3,5,8;126:14;
138:11,21,23,24,25;
139:1,2,12,12,15,19;
140:1,3,9,23;141:12,
14,16;142:4,10,14,22,
22,24,25;143:1,22;
147:5,12;148:3,4,6,7,9,
10,12,15,17,19,22,24,
24;149:2,4,6,21,25;
155:7,8,13,13,17,19;
156:9,10,17;157:1,4,5,
14,23,25;158:15;
159:13,15,17,18;160:1,
7,10,12;161:10,11;
162:11,20;163:3,5;
167:20;169:13,14;
171:19,25;172:1,6,13,
24;173:3,8,13,15,18;
174:3;176:2,4,12,25;
177:7;178:23;179:15;
180:13;181:8,9,16,20;
183:4,11;184:13,14,17,
20,23,24,25;185:1,6,
20;186:13,14,16,22,23;
187:16;188:4,16,23;
190:5,7,9;191:18,19,
24;192:8,13;193:15,
20;194:17;197:13;
198:20;200:13;202:14,
15,16;203:13;205:5,7;
207:4,7,10,11,14,21;
210:4,8,9,14,20;211:4,
4,8;213:6,24;214:2,7,9,
14,24;215:6,11,19;
216:1,1,2,7,8,19,21,24;
217:9,13,14,15;218:25;
219:7,9,18,19,25;
220:9,12,16;221:1,3,5,
15,17,23;223:6;225:5,
10,12;226:2,11,16,19,
24;227:22;232:21;
233:3,19,19;234:2,2,5,
10,22,23;236:19,20;
237:12;238:5,5,9,14,
17;239:4,4,4,13,24;
240:1;241:15,19,21,25;
242:12;243:6;244:12,
21,23;245:14,20,21;
248:20;249:3,4;
251:18,20,22;259:4;
260:21,24;261:4;
265:7,12,15,19,23;
266:24;267:7,12,19,24;
269:21;270:15,19,21;
272:20;273:13;275:19,
22;276:3;280:8,14,24;
282:22,24;284:8,9;
286:10,12;295:10,19;
299:24;300:6
**firefighter (12)**
48:12;49:3,21;50:4;
57:23;66:13;149:20;
174:13;194:14;207:6;

221:9;227:23
**firefighters (74)**
48:20,22;49:1,19;
51:17;52:12;53:23,25;
54:4;55:4,16,21;56:9,
12,18,22;58:22;59:5;
66:11,17,20;67:1,21;
68:1,17;142:17;
149:19,22;150:8,15;
155:6;163:7;186:11,
17,25;187:4,7,9,12,22;
188:8,9,12;193:7,15,
16,21,25;194:3,13;
195:3,5,7,9;196:6,15,
19;197:3,8,12;207:14;
218:13;225:24;226:3,
18;227:5;228:2;
232:18;243:14;259:5;
284:20,24;285:1,19
**firefighter's (1)**
233:1
**firehouse (8)**
67:4;143:15;147:17;
151:11;154:21,23,25;
155:5
**firemen (11)**
141:16,25;142:6,14;
143:2,8,13,14,14;
233:15;243:12
**firemen's (1)**
141:18
**fires (24)**
47:16;48:4;49:25;
53:10,13;61:3;67:8,9,
12,15,17;74:10;95:18,
22;96:21;103:20;
143:16,17;148:22;
157:20,22;184:9;
185:3;258:14
**fire's (8)**
48:9;54:10;68:20;
158:18;159:14;165:7;
184:10;216:21
**first (77)**
3:3;9:10,19;13:16,
18;16:12;17:8;19:6;
22:1;27:9;30:2,3,4;
32:1,8,9,10,16,19;
33:11;34:6,8;46:12;
47:16;48:5;55:15;
56:15;60:15,17;62:18;
64:25;72:20;73:3;
93:19;94:5;101:1;
111:21;115:17;116:19;
118:15,15;119:23,23;
120:8;135:19,21;
141:11,12;147:20,25;
154:14,17,22;155:4;
159:10;168:13;171:12;
177:2;184:11;188:1;
197:11;201:20;207:16;
216:15;222:2;227:6;
232:15;236:13,19;

237:14;253:22;256:7;
258:19,24;277:9;
297:4;301:2
**FISS (3)**
220:25;221:2,12
**fit (3)**
242:6,10;252:6
**five (12)**
18:2,5;32:2,3;74:4;
107:12;118:21;195:6;
206:17;216:9,11;
257:17
**five- (2)**
99:8;224:22
**five-minute (2)**
290:5,5
**fix (7)**
29:14;30:7;82:9;
95:25;113:15;220:20;
267:24
**fixed (5)**
29:13,22;43:21;
120:19;231:5
**fixing (2)**
221:21,22
**fixings (1)**
30:8
**fixtures (1)**
29:17
**flames (5)**
72:15,15,16,24;
245:3
**flammable (2)**
242:13,17
**flared (1)**
239:14
**flashlight (5)**
284:13,22;285:6,12,
23
**flashlights (1)**
285:18
**flatline (1)**
77:6
**fluorescent (1)**
252:2
**focus (1)**
150:21
**focused (2)**
41:4;150:21
**folder (1)**
241:2
**follow (3)**
16:9;34:7;57:18
**followed (2)**
247:18;286:10
**following (2)**
229:15;230:5
**follows (1)**
3:3
**food (2)**
26:7;29:10
**food-service (2)**
13:24;26:8

**Force (1)**
228:18
**forever (3)**
174:9;183:20;195:1
**forget (1)**
121:4
**form (8)**
57:16,21;66:22;
112:11,22;116:5,6;
213:1
**formal (16)**
25:17;28:2;47:20,22;
95:15;98:5,7,13,17,19;
104:16;243:11,11,17,
18;252:9
**formally (2)**
119:7;164:19
**formations (1)**
34:14
**forms (2)**
22:20,21
**forth (1)**
125:10
**forum (1)**
38:5
**forward (4)**
266:5;267:6;268:13,
23
**found (2)**
159:15,17
**four (14)**
16:8,11;20:12;31:25;
32:1;67:14;102:11;
107:10;110:8;138:16;
204:18;240:25;255:22;
257:17
**fours (1)**
255:25
**fourth (3)**
34:6,16;110:13
**four-week (1)**
19:9
**frame (1)**
194:24
**free (1)**
121:10
**frequently (8)**
67:6,12;78:15;88:4;
115:2;120:5;261:5;
290:16
**Friday (1)**
288:25
**friends (4)**
265:1;294:6,21;
295:5
**front (58)**
67:19;89:18;131:5,
16,20,21,25;132:2;
140:22;141:3;155:15;
158:16,21,23,25;159:3,
19,20;161:4,7;164:8,
14;165:10,18,24,25;
166:2;167:2,24;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 88 of 106

171:13;173:10;189:25;
190:24;191:2,5;192:8;
236:24,25;237:7,10;
238:8;239:9;248:23;
249:6;251:24;271:8;
272:1;274:5,13;
277:18,24;278:10,17;
279:6,6,12;282:16;
283:19

**FTO (13)**
16:9;20:1,7,9,11,13,
15,15,17,18;47:7;
230:12;297:3

**full (3)**
245:17;246:5,5

**fully (3)**
8:18,23;9:4

**functioning (6)**
74:21,24;75:24;
163:9,10,13

**functions (1)**
71:8

**further (2)**
96:18;301:15

**future (5)**
10:23;198:21;199:1;
201:21;202:8

## G

**game (1)**
129:2

**Gann (3)**
83:18,21;290:24

**Garrity (2)**
262:11,13

**Gary (1)**
23:20

**gate (2)**
153:9,10

**gates (4)**
147:10;153:7;
154:12;192:17

**gauge (2)**
290:21;293:23

**gave (8)**
15:1;160:12;191:14;
234:18,19;246:5;
249:25;286:7

**Gavit (1)**
12:21

**gear (2)**
55:10;186:3

**general (10)**
53:10;70:20;92:24;
115:18;176:8;199:23,
25;205:23;218:25;
228:25

**generally (20)**
19:5;30:7;45:24;
60:24;61:7;84:5;
115:18;131:5,16;
132:20,23;146:14;

148:23;161:1,3;
184:10,14;192:16;
231:24;264:15

**General's (2)**
16:1;205:25

**geographic (2)**
23:17,19

**gets (8)**
45:8;59:24;65:18;
104:7;131:2;138:7;
189:12;284:6

**Gillespie (1)**
21:25

**girl (2)**
178:4,9

**given (35)**
4:2;7:7;14:17;18:14;
31:23;32:12;37:11;
38:5;46:24;48:16;
52:13;56:11;60:23;
61:4,8,18;63:11;95:12;
97:8;111:23;112:22;
120:10;121:15;234:24;
235:22;238:24;248:15;
255:18,19;264:2,4,6,
23;265:18;287:4

**giving (6)**
118:14,19,21;
189:15;196:18;220:7

**glass (2)**
195:20,24

**glove (2)**
149:16;171:8

**gloved (1)**
149:16

**gloves (3)**
149:12,13,21

**God (1)**
175:3

**godfather (1)**
299:5

**goes (9)**
47:18;61:20;71:13;
76:24;83:23;90:8;
156:10,11;157:8

**gonna (1)**
66:20

**good (31)**
38:2;65:14;109:8;
114:1,3;132:25;
135:20,22;136:2;
157:10;179:25;221:20;
222:7;235:3,8;236:16;
247:24;289:14;290:18;
292:22;293:18,25;
294:2,14,15,16;295:5;
296:24;297:2,21;298:6

**Gotcha (3)**
245:5;250:4;251:7

**grab (6)**
60:18;141:5;149:15,
17;159:13;219:19

**grabbed (10)**

148:3,14;160:14;
162:13;169:16;171:10;
173:22,24;191:14;
216:19

**grabbing (2)**
141:14;173:23

**grace (2)**
111:23;112:1

**graduate (3)**
12:17,20;13:2

**grease (1)**
52:5

**great (4)**
84:13;144:24;
235:15,25

**greater (1)**
106:11

**green (1)**
65:14

**grievance (2)**
25:15,17

**grievances (3)**
25:12,25;27:8

**Griffin (1)**
293:13

**Griffon (1)**
58:1

**ground (6)**
34:25;190:25;251:5,
6,11;252:4

**Group (7)**
144:23,23;205:20;
221:9;257:1;258:15;
283:12

**Guard (1)**
87:23

**Guard1 (16)**
87:22,24;106:18,21;
107:2,7,8,11;110:11,
12,13;111:10;113:24;
114:9;115:22;117:22

**guess (12)**
74:22;100:9;122:12,
17;124:8,9,10;210:6;
255:2;258:4;266:17;
293:5

**guidelines (2)**
36:23;65:5

**Gurney (1)**
179:20

**guy (13)**
57:17,24;89:19;
93:14;131:11;150:9;
168:8;179:7;180:4,19;
182:18;212:23;221:19

**guys (27)**
63:12;84:4;99:7;
119:10,11;126:10;
137:12;168:6;170:11;
180:3;182:15,18;
184:2,3;187:6;188:17,
20;195:19;198:19;
200:22;242:22;243:14;

263:5,6;265:18;
294:21;295:5

**guy's (3)**
117:21;120:20;213:2

## H

**habitual (1)**
119:13

**hair (1)**
279:24

**hair's (1)**
178:4

**half (2)**
23:6;184:11

**Hammond (1)**
12:21

**hand (14)**
73:9;91:8;121:13;
131:10;143:25;149:16;
166:7;169:12;171:7;
217:5;233:23;252:20;
276:4;286:14

**handcuffed (1)**
86:1

**handcuffs (1)**
101:20

**handed (2)**
219:25;239:1

**handle (8)**
12:8,12;34:25;52:12;
91:9;211:11;268:19;
285:8

**handled (4)**
8:2;27:14;78:12;
142:24

**handling (1)**
46:7

**hands (5)**
149:14;162:21;
171:11;174:1;191:17

**handwritten (1)**
250:3

**hanging (2)**
91:7;299:21

**happen (19)**
45:13;65:23;66:1;
78:15,24;79:8;81:3;
89:11,13;95:19;
103:16;109:3;128:23;
137:2;156:25;165:13,
15;204:6;206:23

**happened (69)**
4:10,15;7:23;26:21;
41:6;47:9,10;60:25;
65:20;79:1,13;94:1;
96:17,19;104:19;
177:16,19,22,25;179:5;
181:24;182:2,24;
189:6,10,10;198:19;
199:3,15,21;203:10,13;
204:9,11,12;212:4;
215:9;216:17;219:13;

221:7;224:3,6;233:19;
241:14,19;243:10,16;
245:14,15,18,23;
247:16;249:15;250:8;
262:20,23;265:6,11;
266:4;267:2,7,10,11,
18;268:17;270:10;
271:25;272:3;284:7

**happening (25)**
84:23;95:9;96:7,9;
116:23;120:15;126:5,
24;127:3,14,23;129:17,
21,24;135:24;198:22;
199:1;204:4,17;257:8;
260:11;266:23;267:2;
270:12;295:11

**happens (6)**
45:16;89:4;112:4;
115:9;173:18;213:14

**Harassment (2)**
145:3,15

**hard (5)**
149:23;174:14;
210:6;239:20;293:3

**harder (2)**
42:13;263:18

**harm (2)**
85:6;120:24

**harmonize (1)**
128:14

**hazardous (1)**
33:19

**hazardous-material (1)**
57:17

**HAZMAT (6)**
49:21,25;50:4;57:12,
24;58:1

**head (20)**
5:23;58:3;63:2;
104:13;148:20;153:5;
161:25;164:2;174:5;
208:14;219:1;222:1;
225:6;249:5,12;
250:21;267:23,25;
279:10,10

**health (1)**
295:13

**hear (46)**
5:8;42:3,5;56:1;71:1,
16,21,24;72:4;77:13,
24;88:13;124:22;
126:3,6,13;130:2,8,9;
155:7,18,23;156:17,20;
158:11;163:7;169:12;
170:2;172:16;176:15;
181:5;185:24;193:17,
18;196:9;206:14;
207:20,24;220:11,21;
222:3,16;227:21;
247:10;250:6;293:3

**heard (54)**
33:21;37:18;56:7,16;
72:7,9;76:13;96:6,9;

BARABARA DEVINE vs
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 89 of 106

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

128:19;130:19,22;
147:12,13;158:7,9,12,
25;163:6;167:1;
174:12;180:21;181:1,
11,11,12,13,15;182:1;
187:2;188:5,6,10,13,
14;196:20;207:17;
208:24;209:2,6,23;
214:21;218:5,9;
220:22,24;221:1,10;
222:21;230:4,6;
236:20;243:14;249:10
**hearing (8)**
55:21;56:3;72:8,9;
96:13;147:19;193:23;
255:12
**hears (2)**
122:13;129:15
**heat (2)**
29:9,9
**heating (1)**
29:9
**held (2)**
59:22;220:16
**help (33)**
6:4;25:22;40:18,20;
84:21;100:13,23;
101:4,23,25;102:1,23,
23;103:11,22,23;
104:4;128:3,7;170:7;
174:18,21;175:4,7,19;
181:17;207:21;212:23,
23;243:13;259:20;
292:1,3
**helpful (4)**
267:5;268:7,12,22
**helping (2)**
42:7;153:4
**HEPPELL (1)**
254:24
**Here's (1)**
144:18
**hey (44)**
27:3;38:3,7;54:9;
65:18;66:8,17,19;
84:17,22;88:10,10,12;
89:5,6;91:5;93:14;
104:18;117:20;119:9;
120:20;122:15;124:5;
126:9;127:17;128:25;
146:20;147:14;164:12;
165:6;168:6;182:14;
187:9;216:21;234:13,
20,22;235:15,17,17,24;
236:7;243:15;291:14
**high (3)**
12:18;279:22,23
**higher (1)**
260:8
**highest-ranking (1)**
133:23
**Highland (1)**
13:19

**himself (7)**
85:7;86:4;93:24;
99:17;102:17;109:6,9
**hit (15)**
76:1,16;111:21,22,
25;112:12,13;148:13;
149:5;168:1;169:13,
14;273:17;276:25;
284:9
**hold (5)**
20:14;78:4;81:11;
204:1,4
**holding (2)**
64:10;301:24
**holes (3)**
230:8;236:6,9
**holler (1)**
129:19
**home (5)**
71:9;145:22;177:11;
292:3;300:1
**honest (1)**
176:24
**Honestly (4)**
69:4;211:17;221:6;
240:5
**honorary (1)**
226:6
**hook (1)**
51:9
**Hoosier (4)**
247:18,21;248:2;
289:14
**hop (1)**
89:5
**hopefully (1)**
34:7
**horn (3)**
156:7,7,9
**hospital (3)**
91:2;93:11;153:8
**hostile (1)**
34:25
**hot (4)**
148:8;149:23;172:4;
174:1
**hour (8)**
41:1,3;62:3,5;
145:22;181:11;182:16;
184:3
**hours (4)**
52:19,21;62:5;134:1
**house (2)**
10:24;55:14
**housed (2)**
56:19;66:15
**hug (1)**
300:3
**huge (4)**
37:25;115:23;
173:21;191:15
**Huh-uh (1)**
5:22

**human (2)**
126:19,20
**humming (2)**
77:5;79:4
**hundred (6)**
26:1;108:18,19;
109:14;115:21;185:4
**hurt (4)**
106:10;114:13;
171:8;173:23
**hypothetical (2)**
103:14;109:17

**I**

**IA (13)**
105:13,15;197:18,
19;201:1;249:19,22,
25;262:13;269:7,14,
20;271:5
**ID (2)**
15:7;60:9
**idea (12)**
14:15;41:5;58:3;
86:18;132:4;177:16;
189:16;193:25;194:24;
243:13;272:4;277:11
**ideal (1)**
226:19
**identification (7)**
144:3;151:18;
166:10;245:9;252:18,
23;286:19
**identified (1)**
3:18
**IDOC (19)**
10:13;14:19;20:22;
21:15;23:25;24:2;25:5,
11;28:6;41:21;45:24;
198:17;200:8;201:14,
25;221:8;243:4;
264:14;293:9
**ignore (1)**
129:11
**III (3)**
22:7,9,10
**imagine (3)**
77:11;108:17;140:1
**immediate (1)**
100:1
**immediately (14)**
56:23,25;57:2;72:17;
116:21;128:21;129:20,
23;130:3;155:7,10;
156:4;178:2;258:10
**impair (1)**
8:18
**importance (1)**
230:18
**important (14)**
5:21,25;6:2;43:9;
45:6;114:15,17;
177:24;231:12;245:24;

266:3,17;267:13;272:5
**impression (6)**
287:14;293:24;
297:19,20,23;298:19
**inaccurate (4)**
254:18;271:4,11,17
**inaction (1)**
103:4
**Inadequate (2)**
26:7;261:4
**incarcerated (1)**
22:13
**incident (32)**
62:4;72:6;76:4,8;
96:22,23,25;97:2,5,7,8;
105:13,15,20,21;
134:15;198:14;199:17;
200:4,9,17,20,23;
226:4;248:10;249:14,
16,17,18,21;250:1,2
**incidental (1)**
96:15
**incidents (4)**
105:12;119:15;
151:1;263:8
**inclined (3)**
40:17,19;42:12
**include (2)**
62:23;265:1
**included (1)**
259:4
**includes (1)**
123:19
**including (3)**
3:19;173:15;198:23
**inconsistencies (2)**
181:2,5
**inconvenient (1)**
45:5
**incorrectly (3)**
254:3,4;272:3
**increase (1)**
134:20
**increased (1)**
137:1
**independently (1)**
203:6
**Indiana (11)**
10:17;12:21;13:19;
15:17;23:8,9,20;119:3;
290:25;293:4,7
**Indianapolis (1)**
23:9
**indicating (4)**
244:22;273:7;286:2;
288:25
**individual (10)**
19:17,23;88:20;92:6,
10;97:14,20;282:8;
283:4,5
**individuals (23)**
36:24;41:22;42:23;
44:8;87:3,9;110:1;

114:22;136:15;139:11;
205:18;212:2;215:4;
230:14;274:13,22,23,
24;281:25;282:13,22;
283:1,11
**inexperienced (1)**
136:1
**in-facility (1)**
23:23
**infinite (1)**
103:5
**informal (8)**
25:14,18,19,24;
26:19;104:17;291:8,12
**information (10)**
45:7;143:11;163:19;
182:1,6;189:14;
195:12;245:25;288:1;
289:6
**infraction (2)**
122:17,19
**inhalation (1)**
175:6
**initial (7)**
15:9,15;18:11;35:4;
43:15;53:2;60:5
**injured (1)**
299:17
**injury (1)**
105:23
**inmate (5)**
125:1,3;130:20,22;
179:3
**inmates (6)**
4:17;7:1,18;8:10;
125:1;208:21
**in-service (9)**
35:4;42:10,14,18;
52:16,18,20;53:3;
292:15
**inside (26)**
48:9;51:1,6,8;54:21;
55:9;58:21;78:12;
148:7;156:10,13,20,22,
23;157:2,14,22;
175:25;187:6;197:9;
207:18;226:19,22;
242:23;296:3,8
**insisting (1)**
170:18
**insofar (1)**
301:13
**Instagram (1)**
12:13
**instance (1)**
252:9
**instances (3)**
61:20;136:5,19
**instead (2)**
5:22;257:16
**instinct (1)**
219:19
**Institute (10)**

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 90 of 106

15:17,19;16:8;17:19;
18:25;19:2;23:3;34:23;
43:20;52:14
**instruct (6)**
51:20;54:7;87:7,12;
94:16;129:6
**instructed (17)**
37:7;39:5;48:21;
49:6;51:16,25;55:2;
69:12,16;87:3;94:19;
98:20;111:6;122:24;
127:1,5;165:11
**instructing (7)**
17:2,5;38:24;39:10,
14;172:11;230:11
**instruction (2)**
56:11;111:9
**instructions (2)**
18:13;55:5
**instructor (4)**
17:1,4;31:2;39:25
**instructors (1)**
39:14
**integral (1)**
44:12
**intense (1)**
185:1
**intensive (1)**
43:10
**interact (3)**
244:21;294:5,18
**interacted (3)**
290:24;292:9;294:11
**interactions (1)**
290:13
**intercom (2)**
227:10,14
**interesting (1)**
176:17
**interject (1)**
230:22
**internal (2)**
264:13;269:4
**interpretation (2)**
104:21;123:20
**interrogative (1)**
287:3
**interrogatories (3)**
287:7;301:2,7
**interrogatory (1)**
287:3
**interrupts (1)**
123:13
**interview (16)**
14:23,24;21:10,13;
121:6;177:3;225:11,
20;246:9;250:14;
269:3,17;270:23;
271:3,19;272:15
**interviewing (1)**
20:2
**Interviews (2)**
121:16;225:10

**into (36)**
9:7;10:24;22:16;
29:16,21;31:5;41:20;
58:20;77:17;78:2;
80:22;96:14,22,23;
100:16;101:20;106:11,
24;108:14,16;119:23;
121:11;137:13;150:10;
153:10,10;155:16;
167:16;169:9;194:15;
200:13;220:19;242:6,
10;271:10;292:2
**investigate (2)**
120:11,13
**investigation (15)**
105:13,15;198:5,7;
200:12,25;201:4,11;
221:3,5,6;247:8;262:4;
269:4,13
**Investigations (7)**
112:17;197:25;
262:2;264:14;269:11;
291:15,21
**investigative (1)**
221:8
**Investigator (20)**
22:2;182:9;200:5;
225:9;245:13,25;
246:11,21,25;250:6;
264:8;269:24;270:17;
271:5,12;272:3,6;
292:6,7;299:7
**investigators (1)**
177:19
**involved (2)**
201:24;267:17
**IREUA (1)**
145:3
**irritated (1)**
232:9
**IRUA (1)**
145:14
**isolate (2)**
46:11;201:22
**isolated (1)**
214:13
**ISP (70)**
6:23;11:16;18:23;
19:24;20:8;25:4;28:15;
29:6;30:25;31:9;36:6;
40:5,9,11;41:22;42:24;
53:8;55:3;57:20;59:10;
66:15;68:11,23;70:10;
82:5,13;85:20;94:11,
16;99:5;106:1;109:1;
113:12;114:20;118:8,
11;119:5,20;122:5;
126:16,18;136:14;
138:10;152:18;183:7,
9;198:11,17;204:10,
17;206:12,15;222:18,
25;225:22;228:16;
232:12,15;242:19;

243:7,10;261:21;
264:14,19;291:19,23;
292:5,17;299:1,3
**issue (25)**
42:3;79:24;80:10;
83:3,6,12,15,19;84:2;
85:13,14;86:11;90:10;
96:1,17,18;103:21;
115:23;116:1;121:2,5;
193:22;203:16;267:15;
300:18
**issued (1)**
243:3
**issues (17)**
25:20,22;27:8;29:2,
25;30:6,22,22;76:9,12,
14;81:6,12;198:12,13;
203:21;295:13
**item (1)**
258:2
**items (1)**
3:20
**Izonia (1)**
299:16

## J

**jails (1)**
124:16
**James (6)**
200:14;204:21,22;
287:5,18,24
**Jamil (1)**
299:9
**January (1)**
24:9
**Jason (4)**
144:10,11,17;293:15
**Jaws (1)**
143:17
**Jimenez (2)**
299:11,13
**job (59)**
13:16,18,23;14:25;
16:11;17:23;20:14;
21:15,17;23:13;37:15;
38:16,21;39:21;40:2;
41:23,25;44:2,24;
46:11;48:20,22;52:24;
54:8;55:9,13;59:16,17;
108:23;109:18;114:1,
3;126:23;144:24;
164:8;177:3;182:13;
215:4;235:3,4,8,16;
236:16;247:24;261:23;
289:14;290:18,20;
292:22;293:21,23,25;
294:2,2,14,15;295:8;
297:2,19
**jobs (8)**
44:10,12;56:20;
57:23;59:6;292:3;
294:24;295:2

**Jonas (2)**
22:1,2
**Jones (1)**
204:19
**Joshua (13)**
3:10;167:6;169:7,22;
190:19;193:12;196:1;
222:9,21;239:7,16;
240:2;250:22
**judgment (2)**
89:20;300:17
**jumbled (2)**
283:16,18
**jump (2)**
106:11;194:15
**June (1)**
12:19
**justification (6)**
100:4,7;112:7;116:4,
8;242:14
**Justifications (1)**
112:22
**justify (9)**
99:21,24;100:14;
102:5;104:15,22;
105:3,11;112:23
**justifying (1)**
102:8
**Justin (1)**
297:7

## K

**keep (11)**
58:17;79:16;95:6;
102:4;118:22;129:11;
192:22;232:2;253:4;
296:15;299:18
**keeping (1)**
61:12
**keeps (2)**
161:7;173:19
**Kenneth (2)**
83:18;290:24
**kept (3)**
170:18;172:10;
242:22
**key (26)**
64:8,9,15;77:4,15;
116:20,25;131:5,10,15,
16,20,22,25;132:3;
161:4;165:8,10;
203:18,22,24;204:2,8,
13;256:8;266:19
**keyed (1)**
76:24
**keys (53)**
62:20;63:10,12,23;
64:2,6,6,8,10,12,13,14,
16,16,18,18;110:5,11,
12,22;116:12,16;117:6,
8,10,17,22,24;118:5;
131:1,2;149:13,14;

160:24;161:1,6,8;
168:1;203:17;204:2,4,
13,15;209:9,19,21;
216:8,23,25,25;223:16;
271:23,24
**kill (1)**
208:5
**kind (22)**
5:8;49:9,13;51:16;
58:16;63:9;64:6;70:16,
19;71:7;77:5;125:2;
130:6;132:25;166:2;
176:17;227:10;241:1;
243:16;244:1,14;
269:11
**kitchen (2)**
52:4;90:14
**kneeling (1)**
190:18
**knees (1)**
174:2
**knew (23)**
41:21;42:2;50:14,16;
83:2,14,18;156:4;
168:5,20,21,21;171:2;
177:11;184:25;185:25;
188:7;214:22;223:14;
248:25;266:21;288:6;
298:3
**knife (1)**
204:7
**knocked (2)**
179:22,22
**knowing (7)**
110:24;155:16;
165:24;185:1;216:18,
18;218:14
**knowledge (32)**
7:22;18:17;28:24;
51:11;57:13;58:25;
70:25;115:14;132:1;
138:1;141:22;143:21;
147:2;181:23;188:1;
202:18;212:2,3;
222:24;228:4;230:13;
233:20;236:14;238:16;
255:5;258:17;262:19;
287:21;289:17,21;
292:21;293:8
**knowledgeable (2)**
39:23;292:20
**known (5)**
26:24;84:2;106:3;
211:18;286:9
**knows (3)**
83:22;117:23;181:3

## L

**lack (2)**
213:6,20
**lady (1)**
164:1

**landings (1)**
166:16
**landline (1)**
11:4
**lane (1)**
198:15
**largest (1)**
132:13
**last (22)**
9:15;22:23;50:15;
60:22,25;61:17;82:1;
88:2;111:14,16,22,24;
148:1;159:11;205:15;
221:4,25;255:17;
260:21;266:4;296:4;
300:24
**lasting (2)**
14:12;42:1
**late (6)**
112:9,11;115:17,25;
116:8;255:13
**later (6)**
37:12;175:5;240:5;
248:25;288:22;301:21
**lawsuits (2)**
222:19;269:8
**layout (2)**
165:25;243:22
**lead (3)**
53:14,15,19
**leads (1)**
53:12
**learn (18)**
16:18;17:25;18:5,7,
22;19:4;23:1;32:20,21,
22,23;33:2;34:8,15,21,
24;46:23;47:5
**learned (12)**
18:2,19;19:8,21;
23:2;34:23;44:6;46:20;
209:1;219:20;255:23;
263:13
**learning (4)**
35:6;138:7;231:19,
20
**leash (1)**
53:16
**least (8)**
44:19;55:9;82:20;
133:22;138:14,19;
185:7;232:17
**leave (19)**
65:15,16;84:15;94:6;
100:8;133:1;150:7;
185:17;192:19;194:12,
13;227:6;232:17;
233:1,11,14;236:5;
284:22;292:5
**leaving (11)**
13:8;14:1;84:15;
206:12;268:6;273:18;
284:23;285:6,7;292:4;
299:1

**led (2)**
213:20;257:7
**left (39)**
13:21;23:11;46:10,
13,16;69:4;84:24,25;
102:3;130:25;134:18;
150:3;154:1;166:18;
170:23;178:7,12;
189:2,2;190:15;
204:12;206:9,14,17;
211:24;214:15;215:10;
231:13;233:6;234:3;
236:8;244:3,3;267:21;
290:25;297:9,15;
298:15;299:10
**legal (9)**
15:21,22;16:3;
105:10;242:12,22;
262:2,5,6
**legitimate (2)**
122:18;175:20
**length (1)**
135:18
**less (10)**
22:5;40:17,19;52:20;
108:20;129:9;156:1;
181:16;183:4;193:4
**Lestner (1)**
291:4
**letter (1)**
3:17
**letters (1)**
221:4
**letting (10)**
26:9;86:3;94:20;
97:16,22;98:8;187:9;
193:7;197:12;226:3
**level (11)**
27:5;45:14;105:12;
113:19,20,20;222:8;
276:1,18,23;283:7
**levels (2)**
18:2,6
**lie (4)**
5:16;196:22;197:1,3
**lied (1)**
209:13
**Lieutenant (76)**
21:24,25;27:25;28:9,
12;31:21;33:18;55:23;
60:13;75:4;83:5;
113:22;119:9;133:11;
138:4;139:24;148:5,
11;150:3,6;166:22;
167:11,16;169:9;
170:22;185:17;188:10,
11;189:2,2,14;190:1,1,
13;206:3,6,12;208:19;
209:1,4;210:16,16;
238:24;248:17,18,19;
255:8;259:3,7,8,8,10,
14,22;260:1,3,15,17;
265:13;274:25;275:2,

3,7;277:6,7,13,24;
278:1;282:1,7;283:25;
284:23;293:16;297:24,
24;299:2
**lieutenants (8)**
27:17,21;70:24;
134:12;148:1;160:6;
161:10;212:16
**lieutenant's (2)**
133:15;146:9
**life (10)**
61:10,11,11;99:25;
100:3,7;143:17;177:5;
240:4;264:16
**lifted (1)**
245:21
**light (3)**
29:17,17;252:2
**lighting (1)**
193:4
**lights (1)**
237:12
**likely (3)**
39:8;116:2;277:13
**limit (2)**
138:1,1
**line (9)**
30:2;60:21;62:2;
63:3,6,8;83:23;199:18;
255:17
**lines (2)**
255:22,25
**link (1)**
71:2
**LinkedIn (1)**
12:11
**list (8)**
54:3;55:4;97:10;
119:11;144:18;145:2;
258:22;263:5
**listed (1)**
258:2
**listen (2)**
60:21;293:4
**listened (2)**
43:20;250:5
**listening (1)**
259:22
**lists (1)**
144:22
**literally (3)**
108:4;173:25;194:14
**litigation (7)**
4:16;6:18;205:9,10,
11,14;253:4
**little (17)**
5:3;21:2;22:5;41:11;
49:15;50:21;51:9;57:5;
61:22,25;62:12;65:13;
194:17;241:1;263:23;
278:4;298:1
**live (4)**
10:16,17;54:4;107:3

**lives (1)**
14:13
**living (1)**
123:14
**located (2)**
58:5;237:21
**location (2)**
26:4;141:15
**locations (1)**
36:6
**lock (1)**
192:22
**lockdown (1)**
30:15
**locked (11)**
147:11;153:12,15;
158:22;160:17,20,22;
179:21;192:14,16;
242:7
**locking (2)**
153:7;154:11
**log (3)**
63:4,6;66:25
**logbook (2)**
74:16;75:19
**long (39)**
9:23;13:4,20;20:11,
25;22:3,19;24:10;
52:17;61:17;62:13;
65:13;99:21;102:2;
158:6;159:9;166:22;
174:6;179:15;181:8;
183:11,22;184:24;
191:4;193:14,24;
194:2,21,24;195:2,4,6,
9;213:13;216:15;
257:20;277:19;281:1;
295:24
**longer (11)**
21:2,11;61:20,22,25;
62:13;195:8;210:22;
242:18;259:24;281:2
**look (24)**
37:1,3,8,20,24;
38:24;39:4,5,10,16,18;
64:6;120:18;121:11;
128:24;148:7;160:11;
167:15;192:4;237:19;
253:13;272:25;278:4;
286:21
**looked (1)**
45:23
**looking (4)**
164:10;253:22;
277:16;285:25
**looks (10)**
150:11;151:25;
195:25;244:1,2;258:3;
276:19;277:4;284:6;
285:24
**Lopez (2)**
299:11,13
**Lori (2)**

144:15,21
**Lost (1)**
7:20
**lot (39)**
25:19;28:20;30:6;
40:1,4;67:9;80:18;
81:10;96:19;107:21;
119:11;130:6;132:22;
136:20;149:15;151:6;
167:4;179:19;181:1;
189:11,11;196:25;
207:17;222:6;230:7;
242:11;261:19,21;
265:9;266:7,10;
267:16;281:2,5,7;
292:15,15,16;297:4
**loud (7)**
77:5;128:12;155:21;
156:13,15;207:19;
218:6
**loudly (1)**
155:23
**Louisus (2)**
299:11,13
**lower (1)**
237:17
**lowest-ranking (1)**
34:18
**L-shaped (1)**
30:1
**lunch (2)**
9:25;88:11
**lying (1)**
196:17

## M

**mad (1)**
208:21
**mail (3)**
26:3,3;242:22
**mailbox (1)**
204:25
**main (17)**
71:25;74:17;101:7,
11;147:9,11;151:13;
153:6,22;154:5,12;
155:24;158:25;197:16;
202:9;217:25;236:4
**maintain (6)**
51:17;53:22,22;
89:24;90:1;117:25
**maintenance (20)**
27:8,11,16,20,23;
28:3,8,14,20;29:2,14,
24;30:10,10,13,15,17,
18,21;95:24
**Major (10)**
83:14;133:3,4;134:1,
4,7;224:5;241:18,20;
293:17
**majority (3)**
132:13;133:25;

BOSS REPORTERS
(219) 769-9090

BARABARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RYAN STATHAM
November 5, 2019
USDC IN/ND case 3:18-cv-00995-JD     document 203-3     filed 03/29/21     page 92 of 106

182:11
**makes (3)**
32:5;110:10;286:10
**making (11)**
40:2;44:12;108:14;
118:19;147:21,22;
166:23;207:25;257:3;
289:21;296:17
**male (1)**
161:23
**malice (1)**
96:16
**man (6)**
9:14;149:18;180:3;
207:21;240:14;269:25
**management (1)**
41:23
**manager (4)**
13:25;19:18,22;
44:20
**mandatory (2)**
32:24;203:2
**manner (1)**
288:10
**Manual (20)**
18:4;35:18,21,23,24,
25;36:4,11,19;37:9;
38:19;39:4,5,11,15,19;
47:21;230:16;240:21,
25
**manuals (5)**
36:6;38:25;45:3,4,11
**many (29)**
4:5;22:17,22;25:24;
29:5;31:23;42:19;
51:12;64:14;66:1;96:4,
6;107:17,17,25;134:11,
14,17;138:18;162:11;
182:10;183:10,16;
184:9;185:3;204:9,16;
274:22;280:3
**map (4)**
151:15,20,23;166:7
**mark (13)**
56:23;57:3;112:10;
144:1;151:16,20;
166:8,12;171:9;245:6;
250:18,25;252:15
**marked (8)**
144:2;151:17;166:9;
245:8;252:17,20,22;
286:18
**marking (2)**
152:3;286:15
**marks (1)**
145:3
**mass (1)**
258:6
**master (2)**
108:4;241:7
**mastery (1)**
241:10
**match (1)**

64:12
**material (1)**
33:13
**materials (2)**
33:20;49:25
**matter (2)**
56:5;80:22
**matters (1)**
105:11
**may (3)**
231:13;233:6;289:13
**maybe (26)**
25:21;81:4;96:5;
113:10;118:21;136:24;
140:18;155:13;158:8;
191:6;193:22;197:12;
204:18;206:18;220:4,
5,7;234:3,22;240:7,12;
243:25;250:18;277:21;
290:4;295:3
**mean (36)**
15:22;17:20;32:12;
36:4;37:16;49:18;56:6;
63:7;64:5;67:18;70:2;
77:2,16;88:3;92:24;
112:1;128:23;139:8;
140:20;142:21;143:5;
145:7;150:20;165:2;
175:24;186:18;191:25;
204:14;220:17;228:14;
229:13;235:17;260:13;
263:2;272:10;291:13
**meaning (2)**
16:1;39:20
**means (6)**
63:11;97:25;112:7;
148:24;198:11;258:4
**meant (1)**
30:2
**mechanic's (1)**
149:12
**mechanism (1)**
124:12
**media (2)**
12:10;300:8
**medial (1)**
11:25
**medical (31)**
8:17,21;61:3;85:13;
90:10,24;91:1,8,10,13,
14,20,21,23;92:3,5,7,
18,23;93:17;122:16;
125:7,8,9;126:13;
127:3,7;153:11;175:5;
179:1;258:14
**medication (1)**
9:3
**meet (6)**
9:9;41:17;44:19,21,
23;170:23
**meeting (25)**
42:7,22;61:16,17,23;
202:19;203:1,4;209:1;

250:13;253:9,18,23;
254:6;255:7,9,13,17;
256:4;261:12;265:4,
21;268:15,16;270:4
**meets (2)**
41:18,20
**Megan (1)**
3:7
**melds (1)**
269:11
**member (13)**
15:21;28:5,11;31:3;
34:6,16;35:22;46:10;
105:23;106:9,9;150:3;
226:17
**members (3)**
30:13,16;288:18
**member's (1)**
61:11
**memorandum (1)**
119:8
**memorialized (1)**
3:16
**memory (4)**
9:1;140:25,25;
270:11
**mental (1)**
295:13
**mentally (3)**
211:10;212:17;213:9
**mentioned (8)**
5:19;59:9;95:17;
119:18;232:14;240:20;
249:9;272:11
**mentored (1)**
243:14
**menu (1)**
28:5
**merit (1)**
26:14
**mesh (2)**
51:8,9
**messages (1)**
299:24
**Messenger (1)**
296:21
**met (2)**
9:10;222:10
**metal (5)**
60:7;150:13;251:19,
25;252:1
**mic (2)**
73:9;77:17
**Michigan (1)**
243:7
**middle (2)**
237:21;251:9
**might (32)**
6:7;45:13;57:4;61:5;
62:23;77:19;82:3;93:9;
107:10,11,12;112:9;
119:9;125:17;131:19;
134:1;175:23;216:17;

222:7;231:9;232:3,8;
235:24;238:23;239:1,
2;240:17;262:3,5,7,12;
265:8
**Miller (7)**
174:16,18,23;175:2,
4;178:25;179:20
**Miller's (1)**
174:24
**mind (8)**
47:8;172:25;240:3;
246:12;259:25;271:19;
272:9,15
**mine (1)**
213:16
**minimum (10)**
41:16;44:19,22,23;
108:1,7;137:22;
214:18,19;215:17
**minute (8)**
73:6;184:11;194:19;
195:8;229:20;244:24;
253:13;286:21
**minutes (37)**
9:25;61:18,19;73:14,
23;74:1,4,7;106:18;
111:10,12,16,17,20,22,
24;112:2,12;115:22;
179:17;180:13;181:10,
12,12,16;183:5;184:2,
11,16,20;185:7;191:6,
7;195:2,6;216:9;
290:12
**miscommunications (1)**
189:3
**Miss (10)**
9:16,21,24;76:1,16;
112:22;246:23;250:16;
269:15,17
**missed (3)**
112:9;115:24;273:14
**missing (3)**
113:23;116:4;229:20
**mistaken (2)**
265:9;269:22
**mistakes (1)**
117:19
**mobile (1)**
152:6
**model (1)**
222:7
**moderately (1)**
211:23
**module (1)**
145:8
**mom (2)**
89:6;117:21
**moment (8)**
56:3;69:6;87:5;
101:7;191:14;197:14;
271:21;272:16
**momentary (1)**
117:1

**month (12)**
15:1,3;23:6;50:9,9,
10;78:25;119:24;
138:15,20;234:3;295:3
**monthly (3)**
49:8;50:2;145:13
**months (9)**
9:18;19:7;31:5,10;
118:15,20;120:4;
204:11;206:18
**mopped (2)**
182:14,16
**more (62)**
5:4;17:17;18:5;26:1;
34:5,8;41:4;43:14;
44:1;59:24;60:11;
61:21;79:7;90:21;
96:19;100:23;111:1;
114:6;116:16;117:5,
24;120:5;121:20;
129:9;131:24;132:3;
133:17,19,20;141:7;
148:19;149:2;156:1;
162:14;179:10,11;
182:22,23;186:16,23;
193:4;196:20;198:21;
203:23;219:14;220:2,
7;222:18;223:22;
231:5;232:12;243:12;
267:6,10,13;268:8;
272:22;278:5;284:18;
285:19;290:12;295:22
**morning (3)**
91:4,7;300:2
**most (31)**
25:1,3;28:16;29:15,
18;39:8;48:24;66:3,5,
6,14;68:9;80:21;89:10;
105:12;114:17;116:2;
122:3;124:25;125:17;
135:10;137:6,16;
149:12;177:4;178:1;
210:21;223:12;226:1;
265:15;277:13
**motions (1)**
141:14
**motivational (1)**
20:2
**motorcycle (1)**
298:11
**Motorola (4)**
75:25;76:5,17;
257:10
**Motorolas (1)**
82:8
**mottos (1)**
236:5
**mouth (4)**
92:2;174:3,4;191:19
**move (9)**
10:20,22,24;24:12;
29:16;46:18;59:25;
135:12;252:3

BARABARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 93 of 106
RYAN STATHAM
November 5, 2019

**moved (10)**
10:18,19;24:14;
29:21;132:21,23;
163:2;225:25;226:1;
239:25
**movement (3)**
32:24;244:14;258:6
**moves (1)**
131:16
**moving (3)**
150:12,12;202:11
**much (11)**
20:3;44:1;110:10;
135:15;184:1;231:18;
245:25;255:6;268:16;
283:17;301:23
**mucus (1)**
218:24
**multiple (8)**
18:25;30:6;115:20,
20,20;193:16;220:23;
221:17
**muscle (1)**
140:25
**must (4)**
20:1,18;95:6;105:11
**myself (11)**
18:8;39:23;40:1;
101:21;108:16,17,20;
219:5,20;234:19;
263:18

**N**

**naive (1)**
121:3
**name (28)**
3:7;8:10;9:15;12:4,5,
11;22:1;48:11;49:23;
58:2;80:20;150:23;
161:22;164:2;178:4;
180:22;211:20;221:25;
222:2,16;223:2;254:2,
2,4;271:7;279:3;296:5;
298:24
**named (1)**
9:14
**names (1)**
8:13
**nature (3)**
126:19,20;253:21
**NDA (2)**
262:16;264:21
**Neal (2)**
83:2;290:14
**near (2)**
84:25;279:12
**nearby (3)**
121:21;187:11;193:6
**necessarily (9)**
61:12;70:2,16;78:17;
110:6;157:1;217:4;
231:25;235:16

**necessary (2)**
17:15,20
**necessity (1)**
18:17
**need (34)**
5:8;6:13;25:17;
26:10;27:2;36:18;
54:10;55:16;65:18;
66:9,18,21;68:23;
76:18;77:11;84:23;
89:8,9;91:3,12;92:25;
93:22;128:3;129:20;
140:22;146:20;165:6;
170:20;182:14;188:9;
213:12;231:4;264:8,9
**needed (26)**
43:6,7;62:24;65:21;
73:10;80:17;82:9;
84:12;89:15;91:25;
116:23;121:20;124:10;
141:3;153:2;165:13,
14;168:22;177:20;
193:21;204:24;205:2;
208:20;258:12;260:19;
301:8
**needing (1)**
128:7
**needs (8)**
43:10,11;91:6;
116:18;164:9;165:10,
17;301:21
**negative (1)**
223:4
**neglect (1)**
121:5
**negligence (1)**
103:22
**neighbor (2)**
122:14;174:16
**neither (4)**
73:7;140:1;163:16,
21
**nervous (1)**
163:24
**new (40)**
11:12;20:14;23:8;
25:5;44:8;60:22;74:24;
76:6,9,12,14;78:9;
80:7;82:7,10,22;87:12;
98:23;99:2;118:14;
119:3;136:23,24;
208:6;209:12;211:15,
23;212:6,7,9;226:14;
240:21;257:13,15,19,
21,22;268:13;289:6;
295:8
**newer (1)**
132:23
**next (19)**
13:11;21:3;56:2;
76:20;111:15,17;
122:21;126:10;129:18;
143:15;165:6;173:18;

190:13;208:9,15;
250:23;266:1;268:1;
282:13
**Niccum (1)**
254:9
**niche (1)**
132:24
**nickname (2)**
222:1,20
**night (94)**
24:3,17,18,22;25:1;
60:3;63:3,5,6;66:4;
90:4;92:11,15;94:22;
95:1,14;97:13;98:9;
99:15;116:4,9;119:12;
133:17,24;134:3,11,23;
139:6,12,20;140:14;
147:5;151:8;153:14,
17;154:15,18;157:18;
163:13;169:2,5;
177:11;178:10;179:21;
197:18;198:24;199:4;
200:6;201:1,10;203:9,
13;208:11,16,18,23;
213:18;217:12;218:17;
219:2,7;223:4;224:3,6,
9;225:4,10,12;234:10;
235:3,4,8,21;236:16;
240:4;245:14;246:11;
262:21,23;265:6,12,19;
266:17,24;267:7,11,18,
21;270:21;272:20;
273:12;289:17;290:2;
300:1
**nightly (1)**
62:25
**nights (4)**
24:7;66:5;139:7,9
**Noble (1)**
8:14
**Nobody (4)**
38:9;186:23,24;
265:17
**nobody's (1)**
165:3
**no-call (1)**
178:5
**nodding (7)**
153:5;174:5;208:14;
219:1;225:6;249:5;
250:21
**noise (4)**
77:13;79:4;130:6;
193:23
**nondisclosure (4)**
197:18;250:11;
261:8;264:9
**none (18)**
7:22;8:24;30:23;
35:15;92:17,18;118:6,
12;119:17;139:11;
181:2,25;183:3;
241:18;243:1;265:15;

271:15,24
**nonemergencies (2)**
142:18,21
**nonlethal (4)**
33:2,9,10;35:6
**nor (3)**
73:7;163:16;264:7
**normal (3)**
56:20;77:9;233:1
**normally (9)**
26:13;67:21;71:16;
77:9;80:9;130:13;
194:2;231:22;236:7
**north (8)**
166:1,4;196:7;
273:25;281:9,13,18;
282:16
**no-showing (1)**
178:5
**notes (4)**
37:4;45:3;253:18;
254:17
**Notice (2)**
262:12,14
**noticed (2)**
99:16;254:1
**notified (1)**
125:12
**noting (1)**
103:9
**November (4)**
18:9;21:1,6,8
**Nowatzke (6)**
83:14;144:10,11,17;
224:5;293:15
**nowhere (1)**
184:12
**number (19)**
11:2,8,12;64:8,11,12,
12;103:6;107:19;
108:1,5,7;204:14;
228:17;233:24;236:5;
268:3,4;296:23
**numbers (3)**
11:10;37:11;64:11
**number's (1)**
11:13
**nurse (1)**
91:5

**O**

**oath (1)**
5:14
**Objection (1)**
98:14
**obligation (2)**
126:4,7
**obscenities (1)**
207:22
**obtain (1)**
294:2
**obviously (4)**

124:17;125:3;
250:15;252:12
**occasion (4)**
95:21;296:16;
298:12;299:15
**occur (9)**
40:17;117:15;139:5;
140:15;143:6;200:15;
262:3,5,7
**occurred (8)**
41:2;60:21;84:12;
96:17;135:6;136:23;
198:23;261:14
**occurrence (1)**
208:4
**occurring (4)**
46:7,9;61:21;85:14
**occurs (2)**
33:1;56:21
**o'clock (5)**
26:6;90:8;153:8;
158:2;217:16
**October (7)**
3:13,17;10:19;15:5,
13,14;23:7
**off (49)**
29:7;57:6;59:22;
61:24;63:2;66:25;
68:19;69:1,20,22,24;
70:3,5,10,17,19;71:11,
13,17,18,20,23;72:13;
78:9,13,16,17;85:5,18;
104:12;115:7;119:19,
21;133:14;142:22;
156:10,18,19,23;157:8,
12,15,18,23;204:14;
217:25;239:1;281:15;
301:24
**offender (48)**
26:9;27:1;29:21,22;
45:9;49:21;52:9;53:20;
57:25;64:23,23;67:1;
85:8,9,11,12,16,24;
86:19;89:14,18,21;
91:5;93:23;95:14,23;
96:1;101:14,15,21;
102:12,16;104:6;
120:16;122:18;123:14;
128:11;150:14;153:9,
10;174:15;179:20,23,
25;204:1;208:5;
220:15;243:6
**offenders (51)**
22:12;25:14;27:7;
29:7,16;30:14;34:25;
46:18;53:12,17;56:19,
21;61:4,5;62:23;67:8;
69:25;88:16;89:4;
90:23;106:6;107:3;
114:13,13,14;121:9;
122:13;126:6;138:24;
151:4;153:14;175:8;
176:16;179:19;183:23;

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 94 of 106

192:20;202:12;204:15;
217:14,17;220:18,22,
23;222:7;229:23,24;
242:4,9;243:13;
272:12;292:1
**offender's (8)**
61:10;70:1;85:6;
88:9;94:1;99:25;100:3;
117:20
**Office (30)**
8:1;9:11;16:1;36:8,
8;51:7,8;54:3;57:17,
19;58:4;72:1;131:10,
11;146:1,9,10,10,11,
14,22;147:24;160:14,
16;161:3;198:11;
205:25;272:1;287:22;
301:21
**officer (157)**
14:11;16:10;20:5,23,
25;24:3;44:17,18,25;
46:3;47:3;54:4;63:17,
21;78:19;79:23,25;
80:1,3;81:25;83:8,9,17,
20;85:2,8,11;86:3,7,15,
22;87:4;88:20;89:14,
16,20;93:3;94:24;95:3;
97:14,15,20,22;99:16;
100:5,11,21;101:3,24;
102:21;103:10;104:2,
9;106:14;107:1;
113:11;117:25;118:7;
120:16,20;121:21;
122:11;124:8;126:9;
127:2,11,22;128:2,4,
20;129:15;130:3;
131:12;133:5;135:10,
12,16;137:5,8,17,24;
139:14,16;151:10;
152:21;153:9;154:9;
158:17;159:5,7,20;
161:21,23;162:1;
165:21;166:13;167:1,
10,23;179:21;180:19,
20,21,23,23;183:17;
190:3;196:4;206:16,
20;208:12;211:17,20,
22;215:10,21,23;
216:6;217:8;219:24;
220:7;230:12;233:22,
25;234:2,5,9;235:3,7;
236:15,21;254:1;
272:9;274:6;275:10;
276:12,16,17;277:9;
279:3,4,21;280:6,6,7,
17,24;285:24;286:9;
288:1;289:13;290:2;
291:24;297:5,6;298:1,
2
**officers (62)**
14:8;21:5;44:16;
56:11;86:23;87:12;
88:4;98:24;107:10,12;

114:1,11,16;121:1,4,
17,18;133:8;136:1,3;
137:10;146:3,16;
163:23;176:5,6,11;
177:22;179:12;180:9;
183:1,18;185:12;
189:17,22;204:13;
207:25;208:7;210:4;
211:7;212:6,7,9,12;
213:4,18,23;214:6;
215:7,16;217:24;
219:14,17;225:16;
228:14;233:18;240:21;
260:13;275:15;276:6;
299:14,16
**officer's (40)**
51:2,2,6,13;54:5;
58:13,24;64:2;71:24,
25;74:12;81:20;90:5;
100:7;121:12,22,25;
122:6;124:13,24;
146:8,11,14;158:17;
159:12,13;160:1,13,16,
19,22,24;161:2;162:3,
12;210:14;271:9,10;
275:12,14
**officer-station (1)**
236:22
**offices (1)**
146:17
**official (1)**
105:3
**officials (2)**
41:21;42:2
**offset (1)**
244:3
**often (17)**
16:25;27:7;50:1;
59:4;67:15;69:6;78:24;
79:1,5;81:3,4,22;
113:9;138:13;143:8;
145:11;295:1
**OIC (22)**
82:2,15;84:22;88:22,
24;89:3;95:6,13;
107:14,16;117:23;
121:5,14;135:19,21;
137:12;138:2,3;161:3;
168:20;297:5,22
**OICs (2)**
136:4,11
**OIC's (4)**
90:17,20;95:9;131:4
**OJT (3)**
16:8;230:16;240:25
**old (4)**
75:25;78:5,12;
257:10
**older (1)**
82:8
**once (20)**
19:6;29:22;39:22;
40:1;41:2,2;43:1;64:1;

78:25;79:6,7;82:3;
138:14;151:2;158:6,
24;174:16;186:13;
223:13;245:2
**on-duty (1)**
45:15
**One (180)**
4:6;17:21;19:1;23:8;
25:11;26:18;30:6;
32:12,14,15;36:7,8,9,
25;42:20,20;45:22;
48:1,11,14;50:3,10;
51:14,14;52:3;64:11;
65:2;69:3,8,10,10,13;
74:8,25;76:19;77:19;
82:9;84:15;86:14;
94:19;98:11,11;
103:19;104:12;106:23,
25;107:10;108:2,21,
24;109:5,9;110:15,16;
111:15,15,17,17;113:1,
22;115:15,19,24;
120:23;125:1,4;127:1;
130:3;131:21,25;
132:2;133:18,19,21;
134:13;136:7;138:16,
19;139:7,8;140:1;
142:8;147:3;148:5,6,
22;149:2;151:21;
159:11;162:22,22;
163:21;169:14;180:24;
183:8,24;184:16,20;
187:1;188:7;190:4;
199:8,19,24;200:21;
201:1,3;202:12;
203:18,18,22,23;207:7;
209:14;210:10,11;
211:21;215:12,14;
216:16;220:19;221:19,
19;222:18,19;226:1,2,
17;228:8,9;232:2,3,6;
233:23;236:4;238:14,
23;247:7,21;249:25,
25;256:7;257:16;
258:2;260:21;261:1,
18,20;263:3;265:5,13,
23;266:1,2,4;268:3,17,
19;269:15;270:13;
272:22,23;273:7,8,18,
20,21,21;282:2,3;
283:2;291:19;295:4,
12,20;296:13;299:14,
16;300:9;301:21
**one-off (1)**
119:15
**ones (8)**
12:15;51:15;148:20;
180:24;209:16,18;
257:19,22
**only (55)**
7:6;27:4;45:4;50:8,
10;53:4;69:21;71:10,
13;85:23;86:2;88:15;

91:12;101:8;104:10,
12;124:10;125:22;
131:21;138:15;140:14;
150:3,20,21;151:13;
163:14;168:4;175:25;
177:20;202:21;207:7;
208:24;211:21;223:8;
224:14;228:2;229:4;
242:3;245:19;247:4;
253:25;258:15;259:9;
260:2;262:4,6;265:13;
271:18,18;272:9,16;
279:22;288:21;293:5;
300:9
**on-the-job (3)**
16:9;17:18;19:10
**onto (1)**
6:21
**oo0oo- (1)**
302:5
**open (29)**
54:6;55:12,13;89:17;
93:9;94:3;100:4;
103:12;104:7;146:23;
147:17;149:10,17,19,
24,25;150:1;159:3,12;
176:3;192:15,19;
207:11;227:7,9;
232:18;233:1,11,15
**opened (5)**
99:19;160:14,16;
192:17;209:24
**opening (4)**
88:11,12;104:4;
151:11
**operated (1)**
60:13
**operations (5)**
109:2,23;118:17;
134:8;201:18
**opinion (12)**
37:13,16;38:20;71:7;
108:6,7,10;137:7;
211:13,13,25;298:5
**opportunity (3)**
105:14;292:6;300:25
**opposing (1)**
300:15
**opposite (3)**
117:10;190:11;192:3
**order (25)**
20:1,18;22:15;23:14;
28:7;29:8;34:14;37:14;
43:5;44:18;55:20;60:9;
78:4;95:5,10;116:22;
118:22;119:21;120:22,
24;140:22;149:17;
226:16;289:18;301:19
**ordered (1)**
209:2
**orders (12)**
27:11,13,14,16,20;
65:5;119:19,20,25;

228:24;229:5;260:17
**originally (2)**
207:11;242:20
**others (6)**
103:24;104:11;
108:17;143:6;203:9;
300:11
**otherwise (1)**
271:9
**out (184)**
6:4;14:22;22:21,21;
26:5,6,6,10;27:4,10,20;
29:18;36:16;38:10;
40:14;47:8,14,19;
48:25;49:1;51:21,24;
56:9;61:6;62:25;66:23,
23;67:3,16,23,25;68:4,
6,10,20;72:19;73:3,8,
14;74:9;75:1;78:6,7,
19;80:11,19;85:3,8,12,
15,16,24;86:1,25;
87:13,15;88:4,16;
89:19,21;90:1,6,17,24;
92:4,7,10,15,19,22,25;
93:4,6,10,18;94:4,6,21,
25;95:7,14,19,23;
96:25;97:2,16,23;98:1,
8;99:20;100:1,15,18,
22;101:17,18,25;
102:16,24;103:13;
112:7,21;113:1;116:3,
18;117:11,21,24;
119:12;127:22;128:5;
129:21,23;130:4,10,23;
139:19;142:4,18;
143:16,16;148:8;
150:8,9,22,23;153:4,
19;157:11;159:15;
160:13;163:8;168:8;
170:16;171:3,10;
173:4,24;174:3,4;
176:2;177:24;179:22,
22;191:10;195:11,20;
198:25;206:4;208:20;
217:25;221:14;222:4,
8;226:3,5,15,16,19,23;
227:23;229:23,24;
231:2;234:14;235:25;
238:5;239:5,24;240:8;
243:24;244:8,18;
249:14;264:2;265:22;
287:5,20,21;288:4;
295:3;296:13,16;
299:21
**out- (1)**
252:12
**outcome (2)**
212:3;220:5
**outdoor (1)**
157:8
**outfits (1)**
194:14
**outlet (4)**

BOSS REPORTERS
(219) 769-9090

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 95 of 106

29:14;94:2;104:6;
252:12
**outlets (1)**
29:8
**outlined (1)**
18:3
**outside (44)**
48:13;58:10;71:2;
72:5,10;143:14;147:9,
12;156:7,8,11,21,23;
157:2,4,5,12,15,17,20,
23;162:3;176:1;187:7,
13,19,22;193:7;195:15,
18;196:6,15,19;197:4;
264:19;290:22;294:5,
12,13,19;296:11;297:8,
11;298:9
**outstanding (3)**
3:15,18;41:19
**outwards (1)**
171:22
**over (33)**
5:3;9:12;41:11;
49:15;66:11;72:24;
73:4,22,24;91:18;92:3;
93:8;116:2;132:21,21;
145:13;147:13,16;
168:19;172:19;174:19;
185:4;198:5,15;
201:11;232:25;241:8;
246:12;253:14;266:18;
268:21;297:5;300:25
**oversee (2)**
27:15,17
**overstep (1)**
199:11
**overstepping (1)**
199:15
**own (12)**
70:17,20;71:19;85:9;
126:21;141:16,19;
143:9;185:7;194:17;
230:13;242:6

**P**

**pack (1)**
242:5
**padlocks (2)**
64:22;153:13
**page (4)**
59:2,3;254:22;
255:16
**pain (2)**
173:21;240:15
**pain's (1)**
191:15
**pair (1)**
64:22
**Pam (7)**
200:14;204:19,21,
22;287:5,18,24
**pants (1)**

43:7
**paper (18)**
45:8;48:13;49:13;
52:10;56:17;58:22;
60:19;67:17,19;123:9;
140:22;141:3,6;
143:19;148:22;243:5,
7;249:23
**papers (2)**
58:20;242:13
**paperwork (1)**
217:21
**paragraph (2)**
253:22;255:22
**parents (2)**
13:15;14:4
**parole (11)**
20:15,17,18,21;22:7,
9,10;23:4,22;25:5;
177:3
**part (38)**
30:24;31:10,12;
32:19;34:3;35:3,8,10;
37:25;43:15;48:5,5,16;
51:23;60:5;81:8;
104:16;126:16,18,19,
20,23;139:15;164:18,
19,24;172:24;199:18;
201:15,23;202:2;
203:13;213:8;221:8;
247:17,17;254:14;
261:23
**partially (2)**
33:4,5
**participate (6)**
42:17;138:11;140:3,
6;141:11;143:22
**participated (3)**
139:12;140:10;142:8
**particular (1)**
87:17
**parties (2)**
4:23;296:12
**parts (3)**
82:9;172:5;220:19
**party (1)**
30:12
**pass (1)**
17:7
**passed (3)**
17:8,11;92:4
**passing (2)**
247:6;291:9
**past (3)**
21:19;121:12;275:9
**pat (1)**
60:7
**patio (1)**
166:2
**pay (3)**
23:24;41:3;59:16
**paycheck (1)**
41:25

**payroll (1)**
146:22
**PDR (1)**
146:2
**peel (1)**
174:1
**peered (1)**
210:13
**pen (1)**
154:1
**pending (1)**
6:15
**pens (1)**
151:21
**people (130)**
17:10;20:3;22:17;
23:13;25:1,3;31:23,25;
32:1,2;37:7,18,23;38:2,
3,18,24;39:3,10,14;
40:4,7,13,19,23;41:4,
10,13,24;42:24;43:5,
13;44:5,15,23;45:3;
66:6;70:10;76:13;
77:24;79:16;80:25;
81:10;87:15;88:4;
94:20;105:3;106:4;
107:12,17,25;108:12,
18;109:12,14,16,17,20,
24;110:4,8,12,20;
113:17,23;114:25;
115:2,8,16;117:24;
125:7,8;126:10;
132:20,21,23;136:1,19;
142:11;145:2;149:12;
150:12;164:4,11,16;
165:16,18;168:17,22,
25;169:3;176:20,22;
196:9;198:17;200:8;
201:14,23;205:21;
207:20;209:12;210:24,
25;211:15;214:22;
215:1,1,3;220:2;
224:10;229:16;231:15,
16,22;232:2;236:7;
253:10,23;254:8;
263:1;267:1,17,20;
268:14;280:3,4;
281:22;284:18;285:17;
299:20
**people's (1)**
297:20
**per (1)**
108:4
**percent (3)**
40:10,23;41:12
**percentage (3)**
17:10;40:7;41:9
**perfect (1)**
61:14
**perform (1)**
23:14
**performance (1)**
234:10

**period (8)**
61:19;64:20;111:23;
112:1,5,22;115:21;
174:6
**permanent (1)**
119:14
**permission (23)**
88:21,24;89:3;90:5,
9,18,20;91:11,12;
92:16,17,20,21;93:4,7;
94:25;95:13;97:15,21;
98:1,8;99:19;100:5
**permitted (1)**
85:2
**person (66)**
19:12,15,23;34:18;
47:18,19;49:21;55:11,
18;57:13;58:1;62:22;
83:22;93:4;96:2;
102:18;104:15;107:11,
18;109:5,9;110:11,13,
16;116:11,18,20,24;
117:5,7,10,11,17,19,
23;118:4;127:6;
130:13;131:9,10,15;
133:24;134:4;135:16;
137:6,16;165:11;
208:24;209:9;239:3;
241:10;259:9;269:20;
271:19;272:9;276:22;
277:11;278:19,20,22;
279:18,22;280:23;
281:22;283:23,24
**personal (11)**
3:9;10:25;11:4,21,
23;34:24;35:1,8,10;
113:20,20
**personality (1)**
222:25
**Personally (11)**
44:4;48:2;84:1,5;
106:3;108:25;130:1;
137:21;143:20;222:9;
298:3
**personal-protection (1)**
16:21
**personnel (2)**
110:24;111:4
**person's (2)**
101:7;232:7
**perspective (5)**
7:22;27:24;46:6;
175:22;215:21
**pertain (2)**
16:20;23:3
**pertinent (1)**
63:1
**phases (1)**
241:1
**phone (13)**
9:13;10:25;11:2,6,8,
10,12,13,15;14:22;
89:5;91:19,21

**phonetic (3)**
179:20;291:5;299:9
**photocopy (1)**
37:4
**physically (1)**
173:7
**picture (2)**
192:4;239:20
**pictures (1)**
37:4
**piece (1)**
141:5
**PIERCE (71)**
3:6,7,13,23;5:11;
57:4,9;59:18,24;60:1;
70:8,21;88:1;98:16;
99:7,13;144:4;151:19;
166:11;201:13;224:22;
225:2;245:6,10;
246:20;247:12,14;
252:15,19,24;255:1,20,
21;274:9,20;275:6,21;
276:14;277:3;278:8,
15;279:1,11,16;280:1,
11,19;281:4,17,21;
282:11,20;283:8;
284:5,11,16;285:4,11,
16,21;286:4,17,20;
290:10;291:11;296:6,
7;299:22;300:12;
301:16;302:1
**pin (1)**
65:12
**pipe (23)**
87:24;106:19,21;
107:7,8,11;110:11,12,
13;111:10;112:7,12,
21;113:24;114:9;
115:22;116:5;117:22;
152:19,20,21;193:1;
229:21
**pipes (2)**
87:21;112:18
**piping (1)**
111:19
**place (10)**
15:20;36:22;132:21;
133:2;194:18;234:12;
235:5,21;236:18;268:3
**placed (1)**
36:6
**placements (1)**
292:2
**places (2)**
37:1;133:1
**Plaintiff (9)**
3:2,8;7:12;287:7,11,
12,13,15;288:6
**Plaintiff's (6)**
281:16;288:3;
300:25;301:1,5,12
**plan (8)**
13:10;36:17,22;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 96 of 106

53:11;213:13;260:22, 25;286:1
**planned (2)**
138:23,24
**planning (1)**
150:5
**plans (16)**
10:22;16:19;18:1,3, 18,22;19:2;36:5,10,15, 21;37:8;45:9,10;50:15; 118:12
**plastic (2)**
58:20,21
**plates (1)**
29:7
**play (2)**
273:17;276:25
**played (4)**
202:21,22,22;273:19
**player (1)**
235:19
**playing (28)**
246:19;247:13; 274:8,19;275:5,18; 276:11;277:2;278:7, 14,24;279:15,25; 280:10,18;281:3,20; 282:10,19;283:6; 284:4,10,15;285:3,10, 15,20;286:3
**please (3)**
6:8;130:5;301:18
**plenty (2)**
142:17,19
**plug (1)**
29:11
**plumbing (3)**
30:1,2;85:14
**pm (9)**
76:25;77:1;88:19; 90:4,23;91:1;119:11; 192:18;302:3
**point (42)**
47:12;53:7;57:20; 85:7,10;136:14; 149:16;150:2,18; 155:11,12;163:4; 169:12;170:22;171:2, 19;173:13,16;177:7; 183:8;185:17;188:4; 190:23;191:18;193:10, 17;217:23;228:1; 230:21;239:10,12; 243:24;250:6;258:22; 265:24;267:14;269:2; 270:9;276:7;277:23; 283:3,13
**policies (25)**
15:23;16:17,19; 18:10,14,16;34:20,22; 36:20;37:14;38:18,25; 39:24;53:9;86:6;99:2, 5;103:20;104:21;

105:8;146:25;228:13; 230:10,24;268:23
**policy (64)**
25:21;32:21;37:11; 38:13;54:7,13,15,19, 22;68:22;72:20,23; 73:3,15,18,21;74:3; 85:20;86:2,14;89:22, 23;90:19;92:24;94:9, 13,20;95:1;97:12,20; 98:4,5,7,13,18,19,21; 103:18;118:9;122:6, 22,25;123:23;126:16; 135:2,5;164:21; 215:17;228:16,17,19, 23;229:3,16;230:18, 23;232:16,20;233:10, 14;241:23;242:3; 262:10,13
**polo (1)**
43:7
**population (4)**
65:23;70:13;101:14, 16
**portion (6)**
17:2;32:25;33:1,7,8; 52:2
**portions (1)**
26:7
**portrayed (2)**
66:3,5
**posed (1)**
209:11
**position (11)**
20:6;21:9,14;23:11, 22,23;25:5;128:15; 260:10;289:23;292:19
**positive (6)**
159:8;223:3;255:3; 261:18,20;271:25
**possession (2)**
223:16;227:3
**possibility (1)**
77:1
**possible (12)**
39:1,24;50:9;76:20; 79:17;131:18;155:3; 156:22;165:16;188:5, 7;245:25
**possibly (2)**
90:1;240:7
**post (17)**
50:14;65:4;119:19, 20,21,21,23,24,25; 120:1,2;151:7;152:6; 228:24;229:5;299:23; 300:2
**posts (1)**
300:5
**Potter (1)**
8:14
**powder (1)**
226:22

**power (3)**
78:13,15,17
**Powerpoint (3)**
45:19,22;49:7
**Powerpoints (5)**
16:14;45:12,13,23; 266:20
**practical (1)**
16:5
**practice (27)**
68:11;88:25;90:21; 94:20;95:2;109:8; 110:19,20;111:1; 135:20,22,23;140:16; 142:17,19;192:19; 223:14;228:16;229:7, 10,15;230:5,15;232:15, 16,20;241:24
**practiced (1)**
140:24
**practices (14)**
53:9;85:19,21;86:16; 99:2,5;118:10;228:13; 229:1;230:8,12,20; 261:17;263:7
**precursor (1)**
130:20
**prefer (4)**
24:17,22;25:1,3
**preferred (1)**
24:18
**prep (1)**
248:5
**preparation (2)**
10:3,6
**preparation-wise (1)**
213:11
**prepare (3)**
9:9;189:19;213:9
**prepared (9)**
44:2,9,12,16;211:10; 212:1,10,17;213:4
**prerequisite (2)**
136:10;263:21
**present (2)**
151:15;253:23
**Press (2)**
77:17;267:15
**pressure (2)**
65:13,13
**pretty (11)**
20:3;134:20;171:8; 173:3;185:19;222:14; 255:6;282:24;283:18; 298:3;299:17
**prevent (1)**
198:25
**previously (2)**
173:15;281:10
**pride (1)**
42:8
**print (1)**
287:21

**prior (17)**
16:11;43:19;44:13; 49:22;61:19;67:23; 72:8,8;83:16;168:19; 204:12;257:23;258:13; 261:14;292:3;294:25; 298:1
**prison (21)**
13:10,13,22;14:3,5; 30:19;44:9;47:5;60:4; 102:6;105:4,7;125:5; 137:11;140:3,9; 151:24;177:15;290:25; 293:4,7
**prisoner (39)**
6:23;28:3;86:4,8,23; 91:22;97:16,23;98:8; 99:14,20;100:10,13,22; 101:22;102:22,24; 103:12;120:11;121:1, 20;122:6,10;123:10, 23;124:5,13,22;127:3, 12,19;128:1;129:16, 24;130:9;181:15; 183:9;204:4;221:24
**prisoner-firefighters (2)**
186:2;207:4
**prisoners (40)**
25:11;27:23;30:11, 17;122:24;123:2; 125:16,22;126:3; 128:16,20;139:3; 141:8;175:12;178:17, 20,22;179:4,18;180:6; 182:4,10,11;183:4,6, 10,12,16;185:6; 187:12;192:22;193:2, 6;195:17;196:5; 207:25;221:16,18; 243:10;252:3
**prisoner's (2)**
103:11;104:3
**prisons (1)**
201:25
**privy (1)**
261:2
**prob- (1)**
238:11
**probably (26)**
29:15,18;41:11; 44:13;62:4;74:9;77:12; 80:23;96:8,14;113:1; 129:18;130:24;163:8; 165:1;183:9;211:17; 219:22;238:12;244:20; 254:24;267:1;272:16; 277:15;284:17;291:18
**problem (29)**
45:2,6;59:10,13,14, 25;82:4,12,19,22; 113:12,14,16;116:11; 120:12,17,19,21;121:2; 127:16,21;129:9;

135:25;140:2,11; 141:2;201:7;232:5; 256:24
**problems (8)**
28:14,20;29:5,20; 78:1;83:25;119:5,14
**procedure (18)**
25:21;37:11;54:14, 17,25;57:14;102:5; 104:16;105:3;108:3; 209:15;228:18,22; 229:11,20;241:23; 242:3;258:17
**procedures (16)**
16:20;18:1,19;32:21; 34:20;36:20;38:19,25; 86:7;104:21;229:4,18; 230:7,10;258:16; 268:23
**procedure's (1)**
54:21
**proceedings (5)**
200:15;204:20; 262:3,5,6
**process (4)**
14:21;25:15;28:2; 104:17
**professional (7)**
74:10;113:19,21; 148:25;211:13;291:10; 298:5
**Professionally (2)**
298:3,19
**programs (3)**
61:5;62:24;292:2
**Promise (2)**
298:18,25
**promoted (1)**
296:14
**promotion (2)**
22:8;115:11
**promotions (1)**
206:23
**properly (1)**
34:2
**property (10)**
7:20;86:20;102:14; 114:14;189:12;242:4, 9,10,23;244:5
**protect (1)**
7:21
**protection (5)**
34:24;35:1,8,11; 102:14
**protocols (1)**
258:16
**provide (1)**
3:18
**Public (6)**
13:7;22:15;86:19,22; 102:13;287:25
**Puetzer (9)**
147:10;154:9,10,17;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 97 of 106

206:4,5;207:9;296:2,6
**P-U-E-T-Z-E-R (1)**
    296:6
**pull (9)**
    36:16;49:3;85:11,16,
    24;86:1;149:20,22;
    194:15
**pulled (2)**
    148:14;169:17
**punched (1)**
    179:21
**punished (7)**
    100:21;102:21;
    103:3,10,17;104:2;
    106:14
**punitive (1)**
    300:18
**Purdue (1)**
    13:1
**purge (3)**
    242:1,16,25
**purposes (1)**
    16:3
**push (1)**
    173:25
**pushing (1)**
    191:16
**put (43)**
    3:12;27:13;28:6;
    37:20;48:25;51:21,23;
    57:17;67:16,23,25;
    68:3,3,6,9,13;72:19;
    73:3,8,14;84:24;94:6,
    7;95:23;96:1;120:22;
    133:1;136:6;137:15,
    24;147:3;150:10,14,
    14;152:18;174:18;
    176:2;204:7;220:19;
    226:16;238:5;240:6;
    263:22
**putting (6)**
    142:4;143:16,16;
    172:3;217:17;226:19

**Q**

**QRT (21)**
    30:24;31:1,3,10,12,
    19,24;32:5,6;33:12,25;
    34:3;35:10,22,23;
    39:25;48:5,16;52:15;
    259:14;260:5
**quarter (1)**
    138:15
**que- (1)**
    73:19
**question's (1)**
    263:23
**quick (6)**
    62:22;89:5,6;99:8;
    127:18;290:5
**quicker (1)**
    277:15

**quickly (9)**
    57:5;67:16;163:2;
    185:8,9,11,15,19;
    297:22
**quiet (1)**
    222:14
**quite (8)**
    41:1;79:5;105:1;
    115:7;125:19;208:4;
    213:21;296:3
**quitting (1)**
    178:2
**quiz (1)**
    50:11

**R**

**radio (83)**
    54:2;56:1,4,7,16;
    68:4,7,10,24;72:8,25;
    73:4,9,23,25;77:18,24;
    78:2,11,13,16,19,21;
    79:9,14,21,23;80:1,3,8,
    10,13,20,22;81:1;82:1,
    3,10,16;83:3,5,8,9,11,
    15,17,19,20;84:13,16;
    85:1;91:18;93:3;106:7;
    147:14;163:8,10,12,15;
    169:11,12;185:21,23,
    25;186:19,20;187:1;
    188:1,20;189:4;
    193:19,21;203:14;
    209:3;218:3,4,7,16;
    248:22;249:4;256:11;
    257:8,18
**radios (47)**
    75:21,23,25;76:1,3,5,
    6,9,12,14,17,18;78:3,9,
    12,14,19;79:2,21;
    80:12,16,18,21;81:7,9;
    82:5,7,23;83:25;84:3,7,
    9;87:19;163:16;
    185:22;256:10,16,19,
    21,24;257:4,7,10,13,
    15,21,25
**raging (1)**
    245:3
**raise (7)**
    21:20;23:24;41:1,2,
    5,9;115:12
**ran (15)**
    30:2;138:21;139:1;
    142:6;167:16;176:14,
    16,20;179:6,12;180:9;
    183:17,18;216:19;
    272:14
**random (3)**
    83:22;145:13;207:21
**Randy (2)**
    8:16;222:20
**range (52)**
    32:25;33:1,7,8;
    52:10;124:23,23;

128:24;131:3,19;
    149:5;150:3,19;
    161:10;163:24;164:14;
    166:5;175:15;189:25;
    190:9;191:24;203:17;
    208:9,13;210:4;211:9;
    215:7;216:8,24;217:1;
    218:8,20;223:11;
    237:16,20,23;248:20,
    24;249:7;273:10;
    277:5,19,24;278:2;
    279:18;280:3,21;
    283:14,19,21;284:22;
    285:7
**ranges (10)**
    107:2,18;110:2,5,21;
    130:3;192:1;237:18;
    271:8,22
**rapport (1)**
    179:25
**raspy (1)**
    218:24
**rather (3)**
    23:22;101:19;264:1
**reached (4)**
    27:5;171:10;173:24;
    256:4
**react (1)**
    211:15
**read (20)**
    18:8;35:24;36:1;
    37:5,14,22;38:6,7,8,14,
    22;99:4;120:3,4,6;
    209:25;253:1;262:13;
    266:12;300:25
**reading (2)**
    39:24;243:6
**ready (7)**
    44:14;138:7;187:5;
    188:18,20;192:20;
    273:2
**real (8)**
    53:1;89:5,6;117:2;
    127:17;143:13,13;
    155:13
**realize (1)**
    158:14
**realized (3)**
    174:16;196:25;
    210:25
**really (21)**
    34:10;58:7;82:15;
    93:24;136:12;137:14;
    138:22;150:5;182:9;
    202:18;206:21;246:2;
    247:11;252:8;253:24;
    264:3,12;265:14;
    272:21;295:22;300:9
**reason (33)**
    5:21,25;10:20;13:8,
    12,14;14:1,10;23:21;
    24:24;36:1;58:8;59:12;
    68:20;88:18;96:12;

101:5;105:21;129:13;
    134:22;135:2;151:13;
    155:14;168:5,11;
    191:12;196:22;197:2,
    16;253:11;262:8;
    263:25;264:4
**reasons (2)**
    178:11;196:25
**recall (47)**
    9:4,20;19:19;31:22;
    33:1;69:5,8;76:7;
    77:25;95:20;98:20;
    139:7;147:19,20;
    149:4;154:16,19;
    166:4;178:1;189:1;
    193:11;202:19;203:20;
    204:3,16;205:4;206:1;
    225:23;227:4;234:6;
    236:2,4,15;238:11;
    239:11;253:25;255:13;
    261:6,14;269:5,6;
    270:13,14;283:23;
    291:3;298:21,22
**receive (7)**
    3:22;26:18;27:22;
    46:1,4;62:25;223:22
**received (13)**
    3:20;10:5;25:19,25;
    26:16,23;35:3;86:10;
    115:15;223:5,9,18,24
**receiving (1)**
    26:3
**recently (4)**
    10:18,19;11:11;
    294:24
**recess (3)**
    99:11;224:25;290:8
**recognize (2)**
    151:23;286:25
**recollection (1)**
    247:15
**recommend (2)**
    85:7,11
**recommendations (1)**
    118:9
**record (4)**
    3:12;59:23;281:15;
    300:14
**rectangle (1)**
    244:2
**red (12)**
    48:10;148:3,5,16,19,
    24;149:2,4;162:22;
    169:14;186:13,16
**Redden (43)**
    150:4;167:11;
    170:22;185:17;188:11;
    189:2,2,14;190:1;
    206:3;209:1,4;210:16;
    212:16;218:5;248:17,
    24,25;255:8,10;259:7,
    8,10,13,14,18,22;
    260:1,3,15,17,19;

265:13;274:25;275:2;
    277:13,24;283:3,13,25;
    294:18;297:24;299:2
**Redden's (1)**
    218:4
**reentry (2)**
    22:16;292:1
**references (1)**
    262:13
**referred (1)**
    222:22
**referring (1)**
    102:4
**refresh (1)**
    99:4
**refresher (1)**
    52:25
**refused (2)**
    100:16;177:10
**regard (5)**
    29:2;53:10;210:1;
    219:14,18
**regarding (5)**
    45:3;48:4;118:9,18;
    198:14
**regardless (4)**
    101:15;124:25;
    212:13;257:6
**regards (11)**
    19:20;23:13;36:20;
    49:25;53:13;118:12,
    14;198:13;263:8;
    279:23;295:11
**Regular (5)**
    88:8;123:14;148:22;
    195:24;208:4
**regularly (10)**
    64:10;83:7;87:15;
    99:4;129:19;141:16;
    145:20;192:6;232:22;
    235:14
**reinforces (1)**
    20:3
**rekeyed (1)**
    77:20
**related (1)**
    18:23
**relation (1)**
    183:23
**Relations (1)**
    13:7
**relationship (4)**
    221:20;293:18;
    294:16;296:25
**relay (1)**
    124:19
**release (8)**
    55:20;56:12;86:8;
    91:15,22;100:12;
    142:19;192:20
**released (5)**
    88:18,19,23;89:2;
    209:13

**releasing (2)**
    86:4;142:14
**relieved (1)**
    248:8
**relieving (1)**
    63:5
**remains (1)**
    102:25
**remember (59)**
    21:23;29:6;49:22;
    53:7;68:14;147:5,8;
    149:8;164:1;178:3;
    191:20;200:5,6;202:2;
    208:19;211:19;217:16;
    223:1;227:24;232:24;
    238:13;243:6;246:21,
    24,25;247:1;249:11;
    250:8,10,13,14,15;
    253:24;255:10,11;
    256:9,15,19,20;258:8,
    24;260:23,24,25;261:3,
    10;265:14;269:12,13,
    14,15,19,23,24;270:1,
    20;272:14;279:7;289:6
**remembered (1)**
    246:22
**reopen (1)**
    3:21
**repairs (2)**
    30:14,16
**Repeat (3)**
    68:5;73:19;136:17
**repercussions (1)**
    100:20
**rephrase (2)**
    92:13;140:7
**replace (1)**
    257:18
**replaced (1)**
    195:24
**replacement (3)**
    138:3,4,5
**report (25)**
    32:22;54:8;60:20;
    61:14;65:21;79:18;
    96:14,22,23,25;97:5,8;
    105:13,15,18;112:7,15;
    116:20;177:20;249:14,
    16,17,18;250:1,2
**reporter (20)**
    5:6;6:4;19:14;56:24;
    57:6,8;59:19;70:7,18;
    87:23;201:8;255:19;
    279:8;286:16;291:6;
    296:4;299:12;301:17,
    22,24
**reporter's (1)**
    5:19
**reports (8)**
    83:9,21;97:3,7;
    209:25;217:21;221:1;
    249:22
**represent (1)**

3:8
**representation (1)**
    205:24
**representative (1)**
    3:9
**represented (1)**
    7:25
**reprimanded (8)**
    112:6,25;113:2,4,6;
    115:3,8,10
**reprimanding (1)**
    114:4
**reprimands (1)**
    115:1
**request (12)**
    24:12;25:15;28:3,4,
    7,8;37:1,3;45:4;121:6,
    13,15
**requested (2)**
    3:19;205:22
**requests (3)**
    27:23;30:10;89:11
**required (4)**
    104:22;127:2;
    149:11;215:17
**requirement (4)**
    84:14;85:25;214:18,
    19
**requirements (3)**
    44:19,22,24
**requires (1)**
    262:16
**re-represent (1)**
    300:16
**reschedule (2)**
    9:21;22:23
**reserve (1)**
    3:21
**reserved (1)**
    302:4
**resolution (2)**
    80:10;125:25
**resolve (2)**
    25:20;79:24
**resolved (1)**
    96:18
**respond (20)**
    19:8;34:3,11;46:4,5,
    12;47:13,15;48:1,3;
    93:24;120:11;136:25;
    185:9;186:21;194:3;
    195:3,5,7,10
**responded (13)**
    30:9;47:16,25;
    105:19;181:8;184:9;
    185:3,12,15;186:23,24;
    187:1;215:25
**Responder (12)**
    19:7;32:19;33:11;
    55:15;60:15,17;64:25;
    148:2;154:14,18;
    155:4;197:11
**Responders (20)**

32:1,8,9,10,16;34:8;
    46:12;93:19;94:5,5;
    141:11,12;147:20,25;
    154:22;159:10;201:21;
    216:15;258:20,24
**responding (5)**
    19:4;46:6;127:7;
    144:15;219:18
**response (30)**
    33:24;34:6;48:16;
    176:12;187:21;189:14,
    18;194:21;198:13;
    199:18,21,22;200:1;
    201:18,24;202:8,14,16;
    213:24;214:2,7,9;
    224:8,15,16;226:4;
    241:21,24;256:23;
    267:18
**responses (5)**
    3:19;103:6;287:6;
    301:1,7
**responsibilities (2)**
    44:17;101:12
**responsibility (25)**
    27:15,19;28:11;
    29:12;46:17;54:5;
    61:13;64:2;71:1;89:24;
    95:5,9;97:6;100:25;
    101:1,2,7,8,11;126:23;
    152:8;155:5;165:12;
    213:14,15
**responsibilty (1)**
    101:10
**responsible (24)**
    7:21;17:22;19:21;
    23:15,16;55:11;59:7;
    63:18;75:4;79:25;95:4;
    97:2,5,9;98:23;107:1;
    113:23;151:11;152:19;
    154:22,24;226:3;
    257:3;268:25
**rest (7)**
    148:16;153:11;
    208:11,16,18;267:3;
    277:14
**restrain (1)**
    93:13
**restrained (1)**
    104:7
**restraint (1)**
    100:16
**result (2)**
    128:6,7
**resulted (1)**
    213:6
**results (1)**
    114:24
**retention (3)**
    38:1;59:10;118:22
**reverse (1)**
    100:9
**review (10)**
    10:2;37:12;253:7;

254:17;265:4;267:6,
    11;273:15,19;281:11
**reviewed (1)**
    10:5
**reviewing (2)**
    253:17;289:1
**Reviews (1)**
    265:25
**rid (4)**
    49:4;53:11;242:9;
    257:9
**riding (1)**
    298:11
**right (63)**
    3:21;18:24;46:18;
    56:17;62:8,9,16;66:8;
    68:14;71:12;72:25;
    92:25;106:20,22;
    126:21;127:11;129:3,
    15;134:20;143:15;
    144:6;146:14;147:16;
    148:15;159:24;162:18;
    163:11;166:3,19;
    183:7;198:10;199:4;
    200:18;201:5;205:5;
    211:1,3,8;219:20;
    242:18;244:8;251:17;
    255:17;260:5,10;
    265:20;266:25;267:25;
    281:13;282:13,15,17;
    283:16,17;284:12,17,
    25;285:1,5,22;289:23;
    291:4;296:17
**ring (9)**
    64:3,8,9,15;161:3;
    203:18,18,23;204:14
**riot (1)**
    198:23
**ripping (1)**
    169:17
**risk (1)**
    212:8
**risks (14)**
    40:11,12;84:8;109:4,
    11,14,19;114:11;
    125:11,21;136:14,21;
    137:1;141:7
**risky (1)**
    40:14
**Robert (1)**
    254:9
**Rodriguez (42)**
    163:15,16;164:11,
    13;165:21;166:13;
    167:1,23;178:5;
    180:19;183:17;190:3;
    208:12;211:17;215:10,
    23;216:6;217:8;
    219:25;233:22,25;
    234:9;235:3,7;236:15;
    247:20;248:8,23;
    249:6;254:1;271:19;
    272:9,13,17,19;280:17;

285:24;286:12;289:13;
    290:2;297:7;298:2
**Rodriguez's (1)**
    215:21
**role (3)**
    222:7;235:14;267:13
**roll (12)**
    38:11,15;60:20;
    61:18,23;62:6,10,13,
    15;84:3;96:13,14
**Ron (1)**
    290:14
**roof (1)**
    157:7
**room (32)**
    5:8;41:15;55:23;
    56:2,4;70:23;72:1;
    77:6;78:14,16;79:23;
    80:1,3,11,18;122:14;
    146:2;148:7;226:23;
    227:20;228:3;242:10;
    246:2;247:18,21;
    248:2,2;261:16;
    267:15;268:24;283:17;
    289:14
**Rosenberg (1)**
    300:15
**roster (1)**
    108:4
**round (4)**
    127:17;129:4,7,18
**row (1)**
    115:21
**RStat91@gmailcom (1)**
    11:23
**RStatham@idocingov (1)**
    11:24
**rubber (2)**
    78:3;81:10
**Rule (4)**
    3:14;103:18,19;
    111:11
**rules (12)**
    5:3,12;15:23;16:17;
    17:22;18:14;23:2;65:5;
    99:18;103:20;125:6;
    146:25
**rumors (1)**
    220:11
**run (24)**
    78:2;84:22;89:6,8,9;
    108:16;109:1,5,12,20;
    110:13;111:10;135:13;
    137:14;140:9,22;
    141:19,21,22;163:1;
    169:9;176:18;227:23;
    286:12
**rundown (2)**
    62:22;63:10
**running (10)**
    84:16;107:2;109:9,
    14;115:22;117:22;
    151:5;276:13;277:18;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 99 of 106

282:3
**RYAN (1)**
   3:1

## S

**sad (1)**
   130:14
**safe (3)**
   108:17,20;191:3
**safer (1)**
   232:12
**safest (2)**
   101:21;244:20
**safety (17)**
   22:15;86:18,22,23,
   23;89:24;90:1;95:4;
   102:11,12,13;103:24,
   24;108:8;117:25;
   224:9,16
**sake (1)**
   153:19
**same (31)**
   5:25;11:14;12:12;
   23:1;34:22;40:13;96:8;
   100:8;103:1;110:4;
   116:5;125:2;132:20;
   152:16;153:21;175:6;
   179:24;183:19,19;
   189:5;205:19;212:13;
   225:17;229:10;231:22;
   234:18;236:5,8;
   238:23;278:19,20
**Sarah (3)**
   161:9;168:16;297:25
**sarge (1)**
   121:14
**sat (3)**
   180:19;240:5;247:21
**satellite (1)**
   78:10
**save (1)**
   100:2
**saved (1)**
   240:4
**saving (3)**
   61:10,10,11
**saw (27)**
   44:8;50:10;69:25;
   72:15,16;119:5,14;
   148:11;159:20,25;
   175:4;177:17;178:10;
   191:19;196:19;197:18;
   208:7,9,12,15,18;
   210:12;238:4,7,12;
   267:24;284:21
**saying (28)**
   5:9;17:23;37:23;
   43:20;63:9;72:23;88:9;
   98:6;168:24;181:4,12,
   13;184:2;188:15,16;
   193:18,19;208:19;
   209:3;217:15;248:17,

19;249:2;255:10;
   260:19;272:12,13,14
**scale (1)**
   138:8
**scared (1)**
   164:2
**scenario (8)**
   47:2;52:2,13;87:12;
   99:14;102:7;103:25;
   104:1
**scenarios (1)**
   52:3
**scheduled (1)**
   22:24
**school (4)**
   12:18;13:9;88:10;
   229:24
**scoot (1)**
   49:15
**scotch (1)**
   81:11
**scratch (4)**
   55:18;227:25;
   228:10;271:1
**scream (1)**
   129:19
**screaming (1)**
   172:17
**screen (2)**
   202:20,23
**scuffle (2)**
   130:7,8
**sealed (2)**
   60:8,11
**seam (1)**
   263:9
**search (1)**
   60:8
**searches (2)**
   40:15;152:25
**second (8)**
   29:18;63:3,6,7;
   176:25;254:22;255:16;
   258:2
**seconds (7)**
   56:5;158:8,24;194:4;
   276:8;277:21;284:21
**section (4)**
   17:1;241:6,7,9
**secured (1)**
   202:11
**security (35)**
   86:19;89:25;90:2;
   95:4,10;102:12,12,13;
   108:8;110:1,16,21;
   113:3,5,7,18;114:2,6,
   12,16,23;115:3,17,25;
   116:12;117:6,7,11,18,
   25;118:5;152:10,14,16,
   23
**seeing (4)**
   103:10;104:3;
   147:20;286:11

**seek (4)**
   36:1;97:21;98:1,8
**seem (3)**
   163:24;184:24;197:6
**seemed (5)**
   164:2;175:23;185:1;
   195:1;272:8
**Seemingly (1)**
   275:3
**seems (5)**
   192:10;248:11;
   271:18;280:8;283:22
**sees (2)**
   97:4;102:22
**seg (2)**
   70:16,18
**segregation (13)**
   26:12;53:17;65:24,
   25;66:2;67:7,10,13;
   70:15;71:18;85:25;
   132:12;133:5
**seizure (1)**
   93:16
**sell (1)**
   30:4
**send (11)**
   10:4;26:19;56:21;
   57:1;66:17;68:17;
   97:10;186:10,15,17;
   188:7
**sending (2)**
   142:17;186:24
**sense (8)**
   5:23;6:6;110:10;
   263:12,17,19;264:4;
   286:10
**sensors (3)**
   156:21,22;157:8
**sent (3)**
   255:13;287:7,10
**September (6)**
   11:13;14:20;15:7,12;
   22:4;24:11
**sergeant (40)**
   18:8;21:4,6;22:1,3,8;
   23:11;35:19;36:2;
   37:25;39:19,22;44:7;
   55:12,15,23;63:19,20;
   66:19;68:16,17;82:2;
   89:10;107:16;113:10;
   118:8;133:2,3;134:24;
   135:8,13;137:11;
   138:3;147:10;154:10,
   17;206:4;207:9;
   296:14;299:10
**sergeants (4)**
   24:15,16;134:14;
   152:18
**sergeants' (3)**
   42:7,22;89:10
**sergeant's (3)**
   55:13;89:24;131:4
**Services (1)**

153:11
**set (13)**
   44:20;64:9;67:8,20;
   80:11;93:23;107:2;
   157:11;192:3;242:12;
   254:23;257:6;301:2
**sets (2)**
   34:24;52:9
**setting (3)**
   85:9;217:14;257:1
**Seven (5)**
   13:21;96:5,10,10;
   134:19
**several (1)**
   257:24
**severe (2)**
   150:7;174:13
**severely (1)**
   240:9
**severity (1)**
   170:24
**Sexual (2)**
   145:3,15
**shadow (3)**
   19:10,15,23
**shadowing (3)**
   23:13;46:3,21
**shaking (3)**
   5:23;58:3;249:12
**shape (1)**
   277:14
**shaved (3)**
   164:2;279:9,10
**sheet (1)**
   58:21
**sheets (1)**
   58:20
**shelter (12)**
   27:17,18,21,25;28:9,
   9,12,13;75:4;231:24;
   232:2;233:8
**shelves (1)**
   251:4
**shelving (2)**
   251:19,20
**sheriff's (1)**
   63:6
**shift (61)**
   13:25;24:3,4,10,17,
   18,22;25:1,2,3;60:3,4;
   61:19,23;62:1,2,5,7,8;
   63:3,4,5;65:16;79:9,11,
   22,25;81:1,16,23;82:1;
   90:9,11,20;97:6,13;
   106:22;108:2,13;
   115:19,20,25;132:8;
   133:5,7,17,20,24;
   134:3,11,13,23;138:22;
   139:5,6,17,20;140:14;
   228:3;231:10,24
**shifts (5)**
   62:1,3;63:15;133:12;
   138:16

**shift's (1)**
   63:4
**shines (1)**
   285:23
**short (4)**
   45:12;114:9;178:4;
   194:25
**shortly (2)**
   43:17;217:16
**shoulder (1)**
   240:6
**show (8)**
   60:9;115:6;120:17;
   243:22;244:14;246:8;
   254:1;272:22
**showed (3)**
   207:14;241:10;
   269:16
**shower (5)**
   26:7;62:25;89:6,8;
   119:11
**showing (2)**
   178:6;273:24
**shown (1)**
   246:23
**shows (1)**
   251:10
**side (31)**
   46:16,19;71:19;
   125:21;148:13;166:4;
   172:5;190:12,16,17,21;
   192:10;196:1,5,7,8,9,
   11;236:21,22;237:18,
   19,24,24;238:1,7,9;
   239:21;246:13;250:22;
   251:14
**sides (5)**
   148:14;166:1;196:3;
   279:9,10
**sign (10)**
   63:3;75:18;119:19,
   21;205:23;241:6,7,9;
   262:1;287:23
**signal (24)**
   54:2;56:16;68:4,7,
   10;70:2;73:9,12,24;
   91:24;106:7;116:21;
   147:13,15,20;158:10,
   11,12;163:6;214:21,
   22;216:7;218:12;
   227:21
**signals (2)**
   93:25;258:11
**Signature (3)**
   301:17,18;302:4
**signed (11)**
   57:12;63:11;65:6;
   197:18;241:9;261:7,
   11,18,19,21;263:6
**significant (5)**
   53:2,5,5,8;105:23
**significantly (3)**
   169:15;171:8;241:4

BARABARA DEVINE vs
RON NEAL; et al.
USDC INND case 3:18-cv-00995-JD
Cause No. 3:18-cv-00995-JD-MGG
document 203-3 filed 03/29/21 page 100 of 106
RYAN STATHAM
November 5, 2019

| | | | | |
|---|---|---|---|---|
| **signing (1)** | **slight (1)** | 192:12;214:20;217:5; | **speak (33)** | **stack (2)** |
| 250:10 | 148:9 | 230:4,12;232:25; | 5:7;9:17,23;170:12; | 48:13;67:19 |
| **silly (1)** | **slightly (1)** | 236:11;238:4;239:1; | 175:8,11,14;177:18,21; | **staff (76)** |
| 263:9 | 102:20 | 248:5;269:14;277:5; | 178:17,24;179:18; | 15:21;26:9;28:5,11; |
| **silver (3)** | **slip (3)** | 278:10;280:21;284:12 | 183:5;197:7;198:2,8; | 30:13,16;38:11;42:8, |
| 48:14;51:15;148:3 | 25:15;28:5;171:11 | **somebody's (5)** | 199:6,9,10;203:3; | 11;43:8;45:15;46:10, |
| **similar (2)** | **Smales (1)** | 90:13;164:8,15; | 207:3,9;224:2,5,10; | 18;60:8;61:2,11;62:2; |
| 52:23;194:12 | 144:15 | 165:8;248:7 | 247:8;248:9;255:12; | 70:25;71:6;84:6;86:3, |
| **simulations (1)** | **small (3)** | **somehow (1)** | 288:7,18,19,22;290:22 | 20;89:9;91:13,14,21; |
| 143:24 | 143:17;157:14;163:5 | 214:22 | **speaking (3)** | 97:7;102:13;105:22; |
| **single (1)** | **smaller (1)** | **someone (35)** | 57:4;58:6;246:24 | 106:8,9;107:19;108:1, |
| 108:12 | 106:8 | 6:22;19:16,24;34:17; | **specific (14)** | 7;113:6;118:19,25; |
| **sink (2)** | **small-scale (2)** | 41:15;56:7;87:7;90:17; | 16:21;18:20;33:15; | 123:15;125:12,16; |
| 239:18,19 | 198:23;245:23 | 92:22;102:6,8,17; | 80:11;95:20;110:1,21; | 139:1;140:3,10;141:8, |
| **sit (13)** | **smell (5)** | 114:10;115:6;131:19; | 119:25;120:2;179:10, | 8,19;143:22;144:25; |
| 37:5;46:25;134:2; | 184:12;237:2,4,6,9 | 138:2;149:3;160:21; | 11;197:2;262:25; | 148:18;150:3;151:6; |
| 147:4,17;218:1;231:4; | **SMITH (11)** | 181:17;190:6;192:7; | 264:23 | 176:9;179:24;181:7,7; |
| 240:13;246:12,16; | 5:7;9:16,21,24; | 193:22;210:7;214:15; | **specifically (18)** | 182:3,13,20;189:11; |
| 249:22;264:11;289:19 | 98:14;99:10;224:24; | 215:25;229:14;238:8; | 17:25;19:16,24; | 192:21;193:7;197:5, |
| **sitting (5)** | 300:21;301:15,18,23 | 256:19;257:14;264:8; | 21:23;26:17;45:14; | 12;207:23;209:8; |
| 160:21;202:19; | **smoke (43)** | 278:1,17;280:13; | 52:3;53:13;93:2; | 210:8,17,19;217:14; |
| 247:25;248:1,3 | 49:1;67:24;68:19,25; | 285:22;293:3 | 123:16,17;176:10; | 220:24;222:5;226:17; |
| **situation (57)** | 69:8,10,13,20,20,21,23, | **someone's (1)** | 182:23;200:4;203:3; | 243:13;260:22;266:21; |
| 40:17,20;46:7,9,12, | 24,25;70:1,2,3,4,6,9, | 204:7 | 264:13;295:18;300:5 | 268:4 |
| 14;47:7;51:17;53:22; | 11;71:8,10,11,13,16, | **Sometimes (5)** | **specifics (4)** | **staffed (3)** |
| 68:8;74:2;77:10,12; | 22;72:11;94:7;157:11; | 50:5;80:4;124:17; | 225:4;265:6,12,18 | 136:16,19;139:11 |
| 79:19;84:12,25;85:1,4; | 167:4,8;175:6;184:12; | 135:11;152:19 | **spelled (2)** | **staff's (1)** |
| 87:17;94:21;97:22; | 190:2;236:20,24; | **somewhat (1)** | 254:2,4 | 141:24 |
| 100:10,17;101:3,4; | 237:2,14,15,17,24; | 238:8 | **spend (4)** | **stage (3)** |
| 102:8;103:15;104:10; | 281:6,7 | **somewhere (4)** | 73:23;222:6;294:23; | 55:9,14;258:12 |
| 106:14;116:17;124:9; | **smoking (1)** | 58:10;218:1,2; | 296:10 | **stages (1)** |
| 125:25;126:22;128:10, | 49:5 | 227:23 | **spent (6)** | 68:15 |
| 19;130:21;165:5,9,13, | **smolders (1)** | **soon (3)** | 23:7;39:24,25,25; | **staging (1)** |
| 14;170:25;199:24; | 49:4 | 55:7;69:13;72:24 | 73:13;269:10 | 258:14 |
| 201:22;210:1;211:3, | **Snapchat (1)** | **Sorry (31)** | **Spider (4)** | **stained (1)** |
| 11;212:1,18;213:5; | 12:11 | 7:15;28:24;33:12; | 222:16,18,20,22 | 195:20 |
| 214:13,19;216:17; | **sneezing (1)** | 56:24;57:7;66:5;70:7; | **split (1)** | **stains (1)** |
| 219:7;223:19,20; | 291:6 | 71:25;84:18;88:2; | 165:25 | 195:23 |
| 240:17;252:9 | **so-and-so (2)** | 102:25;117:15,21; | **spoke (18)** | **stairs (13)** |
| **situations (13)** | 27:1;91:5 | 118:3;127:21;130:12, | 9:14,15,18;177:6,9; | 150:16;164:10; |
| 46:23,25;47:4,6; | **social (3)** | 19;157:21;161:24; | 178:14;179:20,23; | 166:15,16,18;192:3,6; |
| 88:7;89:2;103:9; | 11:25;12:10;300:8 | 196:4;214:4;227:24; | 180:6;183:6,8;224:15; | 193:3;237:20;259:5; |
| 150:13;164:7;211:16; | **socialize (3)** | 228:11;232:14;256:2; | 245:13;255:9;265:23; | 275:24;276:13;286:12 |
| 212:11,22,25 | 297:8,11;298:9 | 259:12;279:8;280:12; | 269:3,7;288:24 | **stairway (1)** |
| **six (9)** | **socially (2)** | 281:18;299:12;301:11 | **spoken (11)** | 282:18 |
| 19:7;31:5,9;96:5,9, | 294:23;296:10 | **sort (11)** | 9:12;10:9,13;177:13, | **stamp (4)** |
| 10;118:15,20;138:6 | **society (1)** | 32:18;47:22;66:22; | 18;178:22;179:19; | 252:25;253:2,3,3 |
| **Sixteen (1)** | 22:16 | 70:23;103:9;104:17; | 247:4;295:10;297:15, | **stamped (1)** |
| 9:25 | **sole (3)** | 112:11;119:13;239:23; | 17 | 144:5 |
| **skeptical (1)** | 100:25;101:1,10 | 244:24;264:23 | **spot (2)** | **stand (4)** |
| 44:5 | **solely (1)** | **sorts (2)** | 223:5;299:10 | 94:4;170:17;246:16; |
| **skills (1)** | 41:25 | 16:17;34:20 | **spray (3)** | 252:2 |
| 108:22 | **somebody (48)** | **sound (4)** | 52:6,10;74:8 | **standard (1)** |
| **skin (2)** | 64:1;65:22;66:12; | 77:5;155:19;247:12; | **sprayed (6)** | 192:18 |
| 171:11;173:25 | 85:2;86:25;87:13; | 272:23 | 148:9,16;186:13; | **standing (22)** |
| **skip (1)** | 88:17;90:6;92:15,19; | **sounds (1)** | 190:11,16;245:1 | 156:6,8;158:17; |
| 284:21 | 93:4,6;94:16,25;95:19; | 219:5 | **spraying (6)** | 159:5;161:7;162:3; |
| **sleeping (1)** | 103:3;105:8;108:22; | **south (5)** | 185:20;190:21; | 164:11;166:2,13; |
| 126:10 | 118:21;127:7;128:24; | 166:1,5;196:8,9; | 192:12;238:9;239:3,13 | 172:1,6;173:16;176:1; |
| **slide (2)** | 129:6;135:21;136:6; | 237:24 | **Squad (4)** | 183:20;189:25;190:2, |
| 58:20;78:7 | 137:15,23;156:16; | **space (5)** | 266:12,13,15,16 | 24;191:4;238:8; |
| **slideshow (1)** | 165:7,17;174:18; | 123:14,15;157:6; | **stabbed (2)** | 244:11;271:25;274:3 |
| 145:9 | 190:11,16;191:23; | 251:15,17 | 117:12;236:7 | **stared (1)** |

BOSS REPORTERS
(219) 769-9090

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 101 of 106

180:19
**start (16)**
6:2,4;13:9;14:25;
15:4,7,12;24:6;52:24;
55:19;90:14;147:20;
150:5;260:13,18;271:1
**started (44)**
13:24;14:19;15:10,
14;20:22;24:7;27:9;
41:3;57:21;61:24;
76:18,22;82:12;99:16,
17;106:22;111:14,15,
17;147:22;150:15,19;
151:4;155:14;158:1;
169:17;170:15;174:15,
21;178:5;179:24;
185:20;190:21;192:12;
193:20;217:15;220:9,
12;221:17;227:3,6;
237:21;238:9;239:3
**starting (6)**
15:2;41:3;274:1;
275:17;281:19;295:7
**starts (2)**
9:15;273:25
**Stat (1)**
12:9
**state (12)**
8:7;37:18;86:20;
89:14;102:14;114:14;
189:11;206:7;290:25;
293:4,7;300:13
**stated (3)**
259:3;270:3;272:2
**statement (11)**
3:12;97:12,20;213:3;
243:9;249:14,19;
271:4,12,16;289:22
**statements (8)**
180:7,15;196:19;
197:23;243:2,19;
249:25;286:7
**state's (1)**
288:5
**statewide (3)**
54:20;228:20,20
**STATHAM (9)**
3:1,24;144:2;151:17;
166:9;245:8;252:17,
22;286:18
**stating (1)**
205:23
**station (45)**
51:2,6,13;54:5,9,10;
55:10,12;56:22;57:2;
58:13,24;71:24,25;
74:12;81:20;124:24;
146:8,12,15;152:5,11,
11;155:8;158:18;
159:12,13;160:1,13,17,
19,22,24;161:2;162:4,
12;188:4;207:10,11,
14;210:15;271:9,10;

275:12,14
**stationed (1)**
60:14
**stay (16)**
38:2;55:13;61:25;
62:12;101:19;104:8;
131:9,11,12;161:6;
164:15;165:8,10,17;
169:3;216:20
**stayed (6)**
164:13;167:24;
176:18;216:3;234:14;
283:25
**staying (2)**
118:20,21
**stems (1)**
95:8
**step (2)**
56:2;234:12
**stepped (1)**
192:9
**stepping (1)**
198:15
**steps (2)**
213:8;268:2
**Steven (1)**
293:13
**stick (1)**
84:6
**still (46)**
20:13,15;22:18;
23:25;44:5;52:20;
65:12,12,15,16;74:16;
76:5;88:19;117:4,12;
149:6;150:19;163:6,7;
169:22;172:16;173:14,
20;174:10,11;182:12;
186:3;190:22;191:9,9,
10;193:12;210:14;
211:22;239:18;244:24;
249:18;267:16;275:9;
278:17;279:5,12;
291:1;299:14,18;
300:18
**stock (3)**
182:9;184:1,5
**stood (2)**
191:2;216:7
**stop (7)**
49:5;53:18;95:23;
105:12;173:21;198:21;
263:14
**stopped (7)**
40:2;173:23;174:2;
178:6;221:22;275:8;
279:5
**stopper (1)**
191:15
**Stopping (16)**
274:12,21;275:25;
276:15;277:4;278:9,
16;279:17;280:2,12,12,
20;281:5;282:2,12,21

**stops (1)**
286:5
**stories (1)**
181:6
**straight (1)**
237:20
**Street (12)**
147:9,11;151:13;
153:6,13,22;154:5,12;
155:24;158:25;202:9;
217:25
**strengths (1)**
231:19
**stress (3)**
59:15,17;183:21
**stressed (2)**
163:25;184:1
**stressful (4)**
77:12;177:4;223:19,
20
**strike (2)**
117:15;194:21
**string (2)**
60:19;65:2
**strong (1)**
237:4
**strung (1)**
51:8
**stuck (2)**
47:7;239:23
**study (2)**
13:4,6
**stuff (14)**
60:19;61:15;65:2;
118:16;119:12;139:25;
197:23;207:21;218:6;
229:25;266:12;287:22;
295:14,15
**submit (1)**
146:22
**Subordinate (1)**
26:9
**substance (3)**
9:7;118:24;288:12
**substantial (1)**
241:13
**succeed (1)**
137:19
**such-and-such (4)**
105:19,19;230:18,23
**sudden (1)**
221:22
**sued (4)**
7:9,11,17;8:7
**sufficient (14)**
43:25;44:1;100:4;
108:11,21,24;109:1;
135:15;136:6,7,10,12,
15;137:7
**Suicidal (3)**
93:12,13,15
**suing (2)**
4:22;7:14

**suited (1)**
194:16
**summary (1)**
300:17
**sun (1)**
49:16
**supervise (3)**
22:12,14,17
**supervising (1)**
89:15
**supervision (3)**
23:14;127:16;129:9
**supervisor (31)**
21:5;26:20,25;38:15;
39:6;79:22;90:11;
104:18;133:7;138:22;
210:23;219:21;220:6;
228:3;231:6,7,10,13,
14,17,19,23,24,25;
232:3,9;234:11,15;
259:15;260:6;292:14
**supervisors (11)**
21:22;24:19;27:12;
38:23;39:9,14;42:7;
62:1,2;108:14;113:25
**supervisor's (5)**
90:9,20;97:6;133:6;
231:20
**supplement (1)**
289:6
**supported (1)**
289:21
**suppose (1)**
125:24
**supposed (23)**
9:19;17:24;45:17;
53:21;61:24;62:21;
64:4,15;72:13,17;
73:22;94:17,25;120:3,
4;121:22;122:10;
145:11,17;164:5;
200:9;216:3;227:12
**sure (55)**
5:4,7;12:19;19:13;
36:7;38:14;41:1;42:19;
44:14;47:10;56:13;
60:10;62:20;63:24,25;
64:3,11,13;65:18;
66:10;73:17,21;74:16,
19,20;75:3;78:8;83:21;
84:4;99:10;147:11;
153:12,15;155:12;
159:7;168:22;174:20;
200:22;204:24;216:25;
224:24;231:16;232:16;
234:22;238:12;258:23;
259:7,17;268:25;
270:9;283:2,18;
287:16;296:18;301:22
**surprise (1)**
192:11
**surprised (11)**
139:10,14,19,21;

206:19;210:3,19,22;
235:6,9;295:16
**survived (1)**
240:11
**suspended (3)**
115:2,5,7
**suspensions (1)**
115:1
**swings (1)**
244:8
**switch (9)**
19:9;23:22;24:8,15,
16;25:7;43:18;278:3;
281:8
**switched (2)**
294:24;295:2
**switching (1)**
168:19
**sworn (1)**
3:3
**system (9)**
30:1;78:21;79:16;
82:11;84:6,13,19;
112:11;125:12

### T

**Taco (3)**
13:19,23;14:2
**tag (3)**
50:21,22;65:12
**take-aways (3)**
255:24,25;256:3
**talk (56)**
20:3;42:10;52:2;
60:25;77:17;89:8,9,15,
17,21;153:21;164:7;
175:15;176:16;177:10;
178:21;182:10,12,12,
19,22;190:18;197:17,
19;199:16,22;200:4,9,
17,20;218:9;224:9;
225:4,8;230:14,19;
247:20;250:7;262:17,
20;263:1,7;264:10,11,
22;265:5,5,11,18;
266:8,8;288:15;294:7;
295:21,22;299:14
**talked (19)**
65:1;121:7;164:6;
170:20;176:25;178:19,
25;185:14;200:6;
207:7;214:17;223:1;
266:20;269:8;270:18;
288:13;295:7,18;301:4
**talking (29)**
6:2,4;93:2;102:8;
106:18;126:6;127:18;
169:11;171:1,1,4;
172:17;173:20;174:2,
15;176:15;185:24;
188:13,14;191:8;
199:23,23;200:22;

BARABARA DEVINE vs
RON NEAL; et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 102 of 106

216:16;221:21,23;
238:12;265:14;267:22
**talks (1)**
52:3
**tanks (1)**
194:16
**tape (1)**
81:11
**task (1)**
212:13
**taught (7)**
15:23;33:17;47:17;
292:14,16,16;297:4
**teach (2)**
15:20;20:4
**teaches (1)**
33:14
**teaching (1)**
19:1
**team (35)**
30:18,24;31:4,10,13,
19,24;32:2,3,5,6,19;
34:6,16,19;48:5,17;
89:9;146:10,11,13;
201:15;215:2;220:25;
221:2,5,12;235:19;
258:4,5,11;259:4,14;
260:5;266:11
**teams (2)**
32:5,7
**techniques (4)**
16:22;34:25;35:1,9
**technology (1)**
78:9
**telephone (1)**
3:14
**television (1)**
172:23
**televisions (4)**
28:18,21,22;29:3
**tell- (1)**
75:8
**telling (11)**
5:16;88:9;170:15;
171:4;172:10;182:7;
188:17,19,22,25;193:6
**tells (3)**
123:23;230:17;
264:10
**ten (6)**
73:13,23;74:1;
113:10;195:2;211:17
**tend (8)**
29:7;121:23,24;
122:13,15,19;230:7,10
**ten-minute (3)**
99:8,8;224:23
**term (1)**
53:15
**terrible (1)**
219:6
**test (7)**
17:3,6;21:11,12,12;

75:1,10
**testified (3)**
3:3;6:19;225:3
**testify (3)**
8:18,22;9:5
**testifying (1)**
4:17
**testimony (6)**
4:2,8;7:7;35:17;
248:14;270:25
**testing (1)**
75:5
**tests (4)**
16:15;17:7,8,11
**Texas (1)**
14:9
**thanked (1)**
175:7
**thanks (2)**
235:17,18
**thinking (1)**
268:9
**third (7)**
30:11;161:21;
258:22;283:4,4,22,24
**third-person (1)**
163:18
**thirty (1)**
81:4
**though (4)**
65:24;125:17;
147:23;260:7
**thought (11)**
38:18;43:14;113:22;
118:10,13;175:20;
240:6,14;261:12;
272:18;297:2
**thoughts (4)**
93:12,13,15;199:25
**threats (2)**
207:25;208:3
**three (26)**
21:2,2;23:7;26:1;
34:7;36:6;66:9,25;
67:14;133:22;134:1,
16;137:13,15;162:17,
19;166:14;169:19;
170:11;204:11;242:6,
10;249:21;274:23;
283:10;290:17
**throat (2)**
204:7;218:24
**throughout (4)**
36:6;115:20;152:10;
267:3
**throw (1)**
194:16
**throwing (1)**
93:9
**Tiache (2)**
254:19,23
**tighter (1)**
300:3

**Till (4)**
13:5,21;174:12;
217:21
**timely (1)**
288:10
**times (38)**
4:5;33:21;48:24;
66:1,3,6;67:14;68:9;
74:22,23;77:23;78:18,
21;80:21,24,25;81:4;
90:1;95:7,10,21;96:4,5,
6,10,10,19;101:14;
113:10;124:25;204:9,
16,18;218:13;220:23;
272:11;290:17;297:3
**Timothy (1)**
294:18
**title (5)**
20:14;59:1,3;253:1;
292:13
**titled (1)**
273:25
**to-40 (1)**
229:20
**today (15)**
8:19,23;9:5;10:3,7,
10,14;108:15;147:4;
248:15;286:7;289:25;
300:4;301:12,20
**together (12)**
63:12,14,15;79:16;
141:21,23;153:19,20;
161:6;213:10;220:1;
269:11
**toilet (11)**
85:15;93:9;171:16;
172:3,19,21;239:21;
244:3;250:20,23;251:6
**told (97)**
10:4,11;21:18,21;
24:19;31:14,18;37:13,
17,19,24;38:6;39:3;
43:13;45:16;66:6;
80:25;114:20;120:16;
121:25;122:3;139:10;
147:14;156:24;160:1;
163:14,19,20,20;164:3;
165:3,21;166:3;
168:11,13,16,17,21;
169:3;170:16,20;
171:6;172:10;176:13;
177:15,17;183:4,11,17,
20;185:6;186:10,14,
17;198:11;199:6,8,8;
200:3,12,16,19;201:1,
2,3,6,9;202:25;204:19;
205:18;216:4;217:25;
221:4,16;225:4,7,17;
227:19;234:20;235:2,
7;236:15;242:14;
247:7;248:16;257:14;
259:9,18;260:1;
263:15;265:10;269:16;

281:10;288:2,4;
289:13;301:11
**took (18)**
13:9;19:6;148:5,5;
158:24;184:1,2,3;
193:24;209:9;211:1;
217:15;222:8;232:25;
268:10;280:25;297:5;
299:10
**tool (3)**
60:18;65:1;74:15
**top (7)**
63:2;104:13;124:23;
144:24;172:22;173:14;
253:1
**topics (1)**
145:13
**tornado (2)**
36:16,17
**tort (5)**
7:10,12,15;8:2;269:9
**total (1)**
138:19
**totally (1)**
103:24
**touch (4)**
60:9;149:13;270:24;
296:15
**touched (3)**
171:7;266:10,19
**touching (2)**
251:11,13
**tour (3)**
14:23;255:18,20
**T-O-U-R (1)**
255:20
**toward (4)**
147:21,22;167:18;
282:3
**towards (7)**
169:6;172:11;
173:19;191:1;224:12,
13;282:22
**track (3)**
95:6;232:2;253:4
**trailing (1)**
57:6
**train (8)**
19:25;38:16;138:3,4,
5;211:23;231:15;293:5
**trained (18)**
19:24;30:18;46:2,8;
47:12;48:1,2;68:23;
74:10;109:18;111:6;
138:2;141:9;164:15;
165:17;168:18,24;
226:18
**trainee (1)**
230:17
**Trainer (4)**
20:19;292:19,23;
293:2
**training (117)**

15:9,15,16,18;16:3,8,
9,10;17:13,18,19;
18:25;19:2,10,17,18,
20,22;20:5,19;22:18,
19;23:3,12;30:21;
32:18,20;33:12,15,16,
17,24,25;34:2,4,11,12,
17,21,23;35:3,4,4,13;
36:9;37:10;38:2;42:10,
15,18;43:10,12,14,15,
15,17,19,19;44:3,20;
45:11,19;46:2,3,4,20;
47:3,15,20,22;48:4,6,
15;52:1,14,17,21,24;
53:3,3;69:17;86:10;
87:4,4,9;95:12,16;
98:23;118:14,18,24;
119:1;120:10;126:18;
139:24,25;145:6;
164:18,20,25;213:6,7,
9,11;221:11;227:3;
228:25;230:9;240:21;
241:8;268:13,15,19;
292:13,14,14;293:11
**transcript (1)**
301:20
**transfer (1)**
139:17
**transmission (1)**
218:15
**transmit (4)**
77:8,10,11,14
**transmitted (1)**
77:13
**trap (1)**
52:6
**traumatic (1)**
191:13
**treated (1)**
212:12
**triage (1)**
254:24
**tried (8)**
38:1;76:25;169:16;
173:25;174:18;175:13,
15;245:3
**trigger (1)**
70:22
**tripped (2)**
155:13;157:9
**trouble (8)**
101:5;102:19;104:9;
218:19,22;222:14;
232:8;243:25
**truck (1)**
194:17
**true (11)**
40:24,25;70:13,14;
90:13;181:3;182:7;
183:9;242:15;289:3;
301:13
**truly (1)**
108:15

BARBARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 103 of 106

**trust (2)**
256:12,20
**truthful (2)**
245:15;272:6
**try (24)**
6:1,6;25:17;51:21;
67:25;68:3,6,12;72:19;
73:3;80:11;84:21;
106:7,12;112:23;
172:11,12;173:4;
174:17;191:16;219:4;
220:19;243:13;293:4
**trying (19)**
73:11,14;101:15;
149:24;150:8;151:3;
164:10;174:21;175:4,
7;176:2,3;190:18;
191:10;222:4,6;238:5;
243:21;263:17
**tucked (2)**
70:17,19
**turned (2)**
76:23;226:5
**turning (1)**
149:14
**TV (8)**
220:15,19,19;
221:17,21,22;252:2,10
**TVs (1)**
220:18
**twice (5)**
50:9;78:25;82:3;
145:21;295:3
**Twitter (2)**
12:6,12
**two (62)**
4:17;14:25;15:1,2,
16;16:7,12;21:19;22:5;
23:8;24:15;32:4;36:13;
51:14,15;60:11;62:5;
63:15;64:12;69:1;73:6;
74:7;79:16;84:14;
106:6;107:12;108:12;
109:11,19,24;134:1,13;
147:25;153:24;159:13;
161:6,14;162:13,21;
163:2,23;166:1;
184:11,16,20;218:13;
221:4;240:12;242:4;
249:12,24;253:13;
268:4;269:12;275:14;
280:4;281:22;282:12,
22;283:1,20;296:11
**two-day (1)**
32:20
**two-week (2)**
17:13;43:15
**type (18)**
23:1;28:14;46:14;
49:11;60:24;69:5;
92:11,12,14;93:6;
96:13,21;106:1,4;
122:16;142:22;152:16;

212:17
**typed (1)**
250:2
**types (2)**
29:24;61:7
**typical (6)**
26:2;28:16;60:2;
109:23;197:24;252:13
**typically (5)**
28:15;107:18;
162:16;222:5;261:17

## U

**U4 (2)**
281:9,13
**ultimately (1)**
95:24
**unappreciated (1)**
42:11
**unbeneficial (1)**
19:3
**unclear (1)**
6:8
**uncontrollable (1)**
67:24
**under (25)**
5:13;8:17;12:11,11;
36:22;79:20;103:18;
122:5;170:19;171:6;
172:8,13,15,21,25;
173:4,17;191:1;
194:19;231:6,7;
244:16;245:4;251:2;
287:14
**undergo (1)**
32:19
**underneath (4)**
156:7,8;251:21;
252:1
**Understood (6)**
6:5,11,12,17;210:24;
272:5
**Undoubtedly (1)**
114:21
**uniforms (1)**
43:6
**unit (27)**
26:12;46:17;54:3;
65:3,15;66:24,25;
70:18;71:6;74:18;
82:16;89:8;107:20;
110:14;120:8;137:14;
146:10,11,13;151:14;
175:5;179:1;226:1,2,7;
232:22;260:11
**units (3)**
27:9;111:20,21
**unit's (4)**
70:16;71:1;111:19;
226:6
**University (1)**
13:1

**unknown (2)**
75:6;77:14
**unless (7)**
30:14;90:10,24;
165:12;215:12;261:14;
264:22
**unlock (6)**
155:5,8;159:22;
168:2;192:21;233:3
**unlocked (10)**
149:9;154:20;
159:20,23;168:5,7,10,
14;209:7,10
**unlocking (3)**
88:9;154:23,24
**unsure (1)**
98:19
**up (131)**
5:7;13:21;22:4;
29:13;32:3,5;39:12,13,
21,22;40:25;42:14;
43:2;46:24;55:13;
57:17;66:11,21;76:24;
77:4,15;86:14,25;87:6,
9,11,18;88:8;93:9,9;
97:14;106:8,12;115:6,
8,9,16;116:25;117:12;
122:16;124:9;126:11;
127:13;128:7,24;
148:4;152:4;153:8;
160:5;163:22;164:10,
12,13;165:20;166:23,
24;167:3,17;168:5,13;
170:23;174:7,10,12,14;
178:2,6;179:21;
180:20,21,23;182:14,
16;183:25;187:11,17,
18;189:6,21;191:2,14;
192:1,7,8;193:5;
194:15;196:21;198:22;
203:14,16,19;207:14;
208:8,13,17;210:4,10,
20;211:4,9;214:14;
215:6,20;217:3,6,13;
218:20;231:13;233:3,
6;237:22;238:20,22;
239:14;253:1;254:1,
23;256:19;266:10;
268:6;273:3;275:24;
276:9,13;283:16,18;
284:24;286:10;290:6;
296:17;299:18
**updated (1)**
59:4
**updating (1)**
59:7
**upon (1)**
45:4
**upset (4)**
130:14;176:5,6,8
**upstairs (4)**
126:8,15;162:25;
165:9

**urgently (1)**
121:21
**urinalysis (1)**
14:25
**usage (1)**
76:24
**use (31)**
11:25;29:8;33:2;
45:21;49:10,13;50:12,
13;53:16;65:24;76:25;
79:2,9;82:16;84:12;
85:1;91:21;93:22;
99:22;107:14;121:6;
148:24;151:21;192:7,
21;226:18;228:18;
230:13;253:4;256:11;
300:10
**used (21)**
12:14;25:14;35:7,7;
50:16;52:19;60:19;
62:3;64:22;67:6;73:10;
81:10;104:23;105:20;
111:1;149:3;214:24;
227:6;241:6;245:20;
284:8
**Use-of-force (2)**
16:19;34:22
**username (3)**
12:8,12,13
**using (18)**
33:8;36:20;45:11;
53:12,18,19;54:2;
57:21;66:10;81:17,25;
82:3;86:18;97:24;
186:20;192:22;193:2;
227:2
**usually (9)**
34:18;48:19;51:1;
61:17;67:15;132:15;
134:12;135:10;222:13

## V

**Vanihel (1)**
254:9
**vary (1)**
111:3
**vent (1)**
178:20
**verbal (2)**
5:21;249:19
**verbally (2)**
28:10;121:3
**versa (1)**
157:3
**versus (1)**
232:3
**veteran (3)**
210:8,17,19
**veterans (2)**
132:25;210:12
**via (3)**
21:15;91:19;287:5

**vice (1)**
157:3
**video (50)**
145:9;202:9,13,20,
21,24;246:8,19;
247:13;249:13;250:5;
261:13;269:1;272:23;
273:4,14,24;274:2,8,
19;275:5,17,18;276:7,
11,15;277:2,278:7,14,
24;279:15,25;280:10,
18;281:3,20;282:10,
19;283:6,22;284:4,10,
15;285:3,10,15,20;
286:3,5,6
**videos (2)**
243:2;273:18
**videotaped (1)**
270:8
**view (1)**
195:19
**violate (3)**
89:22;99:18;146:24
**violating (6)**
123:10;229:9,11,16,
17,19
**violation (7)**
72:20;73:2,15,23;
74:3;122:2,5
**violently (1)**
93:8
**visitor's (1)**
61:11
**voice (1)**
209:3
**voluntarily (1)**
104:6
**voluntary (2)**
20:6;31:14
**volunteer (2)**
20:6;31:16

## W

**wait (10)**
5:4;6:1;15:1;52:7,
11;56:8;60:20;70:3;
93:19;94:5
**waited (7)**
100:23;101:4;102:1;
122:21;148:8;149:19;
257:20
**waiting (6)**
100:13;116:24;
257:6,13,14,25
**Walk (32)**
60:5,6,6,8,11;92:3;
93:14;108:15;111:25;
114:10,10;116:8;
122:21;131:8;147:15;
148:12;152:19,20,21;
153:8,20;158:7;163:1;
164:13;192:7;210:10;

USDC IN/ND case 3:18-cv-00995-JD   document 203-3   filed 03/29/21   page 104 of 106

215:13;229:21;275:4,
24;278:2;280:13
**walked (11)**
148:4;158:16;166:5;
167:17;168:5;190:20;
202:23;275:9;283:19,
20;284:18
**walking (9)**
88:8;117:20,23;
121:12;147:9;155:15;
275:24;282:22;283:13
**walks (2)**
152:24;193:1
**walkway (1)**
202:10
**wall (12)**
22:13;45:8;51:3,7;
151:3;239:18;250:23;
251:9,12,13,14,16
**wants (1)**
130:24
**warden (13)**
41:13;42:17,20,21;
83:2;97:9;134:8,10;
224:2;229:2,5;243:3;
290:19
**warden's (2)**
36:8;254:13
**washrag (1)**
174:19
**watch (5)**
145:9,9;202:13,23;
248:7
**watched (4)**
171:10;173:25;
202:9;269:2
**watching (4)**
248:4,8;261:13;
271:3
**water (12)**
29:9;48:14;51:14,15;
52:11;148:5,19;
162:22,23;169:13;
172:3;280:8
**Watson (50)**
31:21;83:5;139:24;
148:5,11;150:6;
166:22;167:11;169:9,
13;174:11,12;188:11;
189:15;190:1,10,13;
192:9;206:6,12;
208:19;210:16;212:16;
238:24;248:18,19,24;
249:1,2;259:3,8,13,17,
20;275:3,7;277:6,7;
278:1;282:1,7;283:2,3,
18,19;284:23;285:6,7;
294:9;297:24
**Watson's (1)**
167:16
**wave (1)**
298:12
**way (79)**

13:21;28:6;38:10;
39:21;54:17,19;60:10;
77:2;79:3;84:19;86:14;
90:25;94:19;99:18;
101:21;102:18;106:17;
111:7,7;117:13;
120:23;122:9;125:18,
22;127:1;140:9,15;
147:21,22;156:16,19;
159:16;162:25;163:22;
165:20;166:24;167:2,
18;169:6;174:12;
175:23;180:5;185:1;
192:2,7,8;197:22;
199:19;202:12;206:4;
215:11;216:18;218:14;
225:23;227:5,11,12;
228:22;229:10;231:20;
232:9;235:19;237:21;
238:4;244:9,16,18;
251:3,3,3,8;263:22;
267:22,24;284:24;
287:16;290:21;293:23;
297:16
**ways (6)**
85:15;180:15;
192:15;204:14;231:9;
241:5
**weaknesses (1)**
231:19
**Weapons (14)**
32:2,9,11,15;33:3,9,
10;35:6;248:6;258:4,5,
11,14;266:11
**wear (1)**
149:12
**wearing (2)**
191:21,22
**weaved (1)**
150:14
**wedding (1)**
295:4
**week (2)**
138:6;240:12
**weeks (15)**
14:25;15:1,3,16;
16:7,8,11,12;23:7,8,9;
137:13;138:6;240:5,12
**weeks' (1)**
137:16
**well-known (1)**
82:4
**weren't (23)**
29:1;37:24;78:20;
79:21;80:12,21;81:17;
114:4;139:19;163:15;
175:19;181:20;187:19;
193:7;195:12;200:3,9;
223:15,15;241:20;
264:12;267:22;268:15
**Westville (2)**
15:17;292:8
**What's (33)**

11:2,8,20;12:4,8;
20:16;36:13;53:14;
54:16;68:22;95:9;
108:7;126:5,21,23;
127:3,11,14;129:17;
134:22;136:10;147:18;
177:4;181:3,3;199:20;
201:17;221:2;252:20;
260:11;262:15;282:17;
293:22
**whatsoever (2)**
30:23;181:25
**whenever (9)**
29:11;55:8;59:5;
77:4;88:12;227:21;
228:5;233:3;249:22
**When's (1)**
291:16
**whereas (1)**
140:23
**Where's (1)**
244:6
**Whoever's (4)**
131:7;161:7;164:8;
277:9
**whole (9)**
57:19;78:21;171:23;
174:6;176:18;181:20;
219:8;248:9;251:18
**wholesome (1)**
268:8
**who's (20)**
19:16,24;21:24;22:2;
28:11;63:17;74:10;
90:1;95:7;97:2;107:4;
124:18;134:7,9;160:5;
217:6;231:10;254:11;
258:23;279:3
**Whose (3)**
27:15,19;297:23
**wife (6)**
10:11;177:10,13;
291:15,16,19
**William (2)**
254:11;291:4
**willing (4)**
40:3;191:15;199:19;
212:22
**willingness (1)**
106:11
**Wilson (1)**
254:11
**window (3)**
60:12;195:20,21
**windows (1)**
187:8
**wire (1)**
29:8
**wise (1)**
194:1
**within (10)**
8:3;14:25;43:12;
111:15,24;112:12;

119:22;182:16;184:16,
20
**Without (23)**
9:7;45:11;81:1;
88:21,24;89:3;90:17;
91:11;92:15,17,20;
93:6;99:19;100:5;
136:6,15;165:24;
210:4,10,20;216:8,8;
239:19
**witness (34)**
3:2,4,25;5:10;7:3;
57:1,7;58:3;59:20;
70:19;87:24;151:22;
152:1,3;153:5;154:7;
174:5;201:9;208:14;
219:1;225:6;246:15;
249:5,11;250:21;
253:15;275:19;276:12;
278:25;279:9;283:7;
286:23;291:7;299:13
**witnesses (3)**
97:4;295:4;300:17
**woman (1)**
269:25
**women's (1)**
293:10
**word (2)**
97:24;120:22
**wording (1)**
101:9
**words (2)**
56:23;211:18
**work (66)**
11:6,8,12,15,21,24;
13:20;14:3,5;15:4;
24:3;26:11;27:11,13,
14,16;28:7;37:2;42:12;
44:9,21;56:19;77:1,3,
20,21;78:11,14;79:3,
10,22;80:23;81:24;
84:7,9,20;119:22;
120:22,23;134:3;
145:21,23;213:12;
216:19;235:17;236:5;
242:13;260:21;290:22;
291:17,19;292:25;
293:2;294:5,12,13,19;
296:3,8,11,16,25;
297:8,12;298:10;
299:17
**worked (21)**
25:5;50:8;51:1;55:3;
57:20;58:9;76:2,20;
107:23;132:5,12;
162:19;163:21;177:15;
231:2;268:20;293:3,7,
10;295:23;298:20
**workers (1)**
30:11
**working (42)**
13:10;14:19;27:9;
28:17;44:7,16;46:9,10;

65:6;75:11;76:10,17;
77:23;78:20,22;79:15,
21;80:12,21;84:3;
107:22;123:14;151:3;
163:17;185:21,22,24;
196:24;209:8;218:4,4,
7,10,17;220:15;231:6,
7,23;255:15;257:23;
266:22;267:21
**works (3)**
257:5;291:15;293:9
**worn (1)**
81:10
**worse (1)**
197:6
**wrapped (1)**
78:4
**write (12)**
28:7,8;29:13;37:12;
66:24;121:10,11;
126:11;249:19,23;
299:24,25
**writing (2)**
32:22;61:14
**written (21)**
21:10,11,12;54:20,
25;57:10;86:6;95:1;
115:8,9,16;122:22;
123:6,22;135:17;
140:15;164:21;229:4;
249:25;262:10;270:8
**wrong (9)**
65:17;127:15;129:8;
152:1;177:12;196:16;
216:20;248:16;262:12
**wrote (2)**
119:8;144:18

## Y

**yard (8)**
55:12,13,15;66:19;
68:16,17;151:9;152:18
**Ybarra (2)**
8:16;222:20
**year (9)**
20:21;41:8,8;52:15;
115:12;118:15,20;
205:15;227:1
**yearly (1)**
145:14
**years (13)**
13:21;20:12;21:2,2,
19;22:5;24:15;118:21;
137:11;249:12;257:24;
269:12;297:6
**yell (18)**
121:23,24,25;122:2,
3,5,13,15,20;123:4,7,
23;124:11;125:2,6,8,9;
126:11
**yelled (1)**
163:20

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RYAN STATHAM
November 5, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-3    filed 03/29/21    page 105 of 106

**yelling (48)**
84:17;122:16,18;
123:1,11,16,17,19;
124:14;125:23;126:3,
6,8,13;127:3,7,12,13,
19,20;128:1,2,4,11,16,
17,20,21,25;129:1,2,4,
10;170:4,6,7,9;180:12,
17;181:13,14;191:9;
193:20,21;196:10,21;
207:17,20
**yells (1)**
125:1
**Yep (1)**
245:12
**yes-or-no (1)**
103:2
**young (1)**
164:1
**younger (1)**
106:9

## Z

**zero (1)**
22:18
**zigzagging (1)**
166:18

## 0

**0201109 (1)**
228:18
**025591 (1)**
144:6

## 1

**1 (2)**
144:1,2
**1:55 (1)**
225:1
**10 (1)**
64:16
**100 (11)**
30:3,4,5;131:8,10,12,
15;163:23;276:1;
279:18;280:3
**10-70 (9)**
55:21;56:18;68:15;
69:2,7;72:12;188:5;
194:5;228:6
**10-71 (7)**
56:18;68:16;69:2;
72:12;188:5;228:6;
249:10
**11 (1)**
64:16
**11:00 (1)**
116:4
**11:22 (1)**
99:12
**11:37 (1)**

99:12
**11th (1)**
3:13
**12 (1)**
277:21
**12-hour (1)**
132:8
**13 (1)**
12:14
**14 (1)**
277:21
**15 (5)**
50:8;61:18,19;
138:15;194:4
**15th (1)**
3:17
**1st (1)**
10:19

## 2

**2 (10)**
151:16,17;152:9;
154:2,24;155:2,4;
186:10,17;188:8
**2:00 (1)**
26:6
**2:23 (1)**
225:1
**20 (8)**
181:12,16;183:5,13,
14,19;185:7;194:4
**200 (1)**
64:18
**2006 (1)**
13:19
**2010 (1)**
12:19
**2012 (1)**
12:14
**2013 (1)**
13:5
**2014 (5)**
11:14;13:22;14:19,
20;15:8
**2015 (4)**
31:5,7;82:18,20
**2016 (2)**
43:18,22
**2017 (15)**
18:9;21:1,7,8;40:24;
41:7;43:18;44:8;76:5,
8;82:25;232:21;
241:15;253:8;269:20
**2018 (2)**
24:9;205:16
**2019 (2)**
22:4;24:11
**2022 (1)**
10:24
**219292-9984 (1)**
11:3
**219713-5636 (1)**

11:9
**21st (3)**
11:13;22:4;24:11
**22 (1)**
297:6
**24th (1)**
253:8
**25 (1)**
119:10
**2's (2)**
151:11;152:9

## 3

**3 (3)**
166:8,9;254:22
**3:00 (2)**
192:19;217:18
**30 (24)**
65:7;111:10,11,15,
17,20,21,24;112:2,12;
119:19,22;120:4,6,7;
179:17;180:13;181:10,
12;183:12,13,14,19;
184:2
**30- (1)**
229:20
**300 (5)**
64:18;125:9;277:5;
280:21;281:1
**3000 (1)**
91:24
**37 (2)**
3:14;152:4
**39 (1)**
30:5

## 4

**4 (8)**
151:9,12,20;152:6,6,
12;153:17;245:8
**4- (3)**
260:12,13,15
**4:06 (1)**
290:9
**4:11 (1)**
290:9
**4:23 (1)**
302:2
**40 (6)**
52:19;111:10,11;
112:2,12;174:24
**400 (11)**
125:7;158:18;
159:15,15;160:2;
161:10;164:10;223:13;
276:9,19,22
**40-hour (1)**
52:20
**45 (4)**
41:12;137:11;158:8,
24

## 5

**5 (3)**
45:14;252:16,17
**500 (49)**
30:3;124:23;125:7,8,
9;131:9,11;159:16;
164:11,13,13;165:21,
23,25;166:3,3,15;
167:2;188:16;193:22;
195:19;208:9,13;
210:4;211:9;215:7,10,
10;216:8,24,25;217:1;
218:8,20;223:13,13;
237:16,23;248:17,20;
249:3,4;260:12,14,15;
277:19;281:2,18;
282:16
**538 (2)**
174:24;238:8
**540 (2)**
166:5;216:5
**542 (1)**
238:9
**5th (1)**
21:8

## 6

**6 (2)**
252:21,22
**6:00 (1)**
76:25
**65 (2)**
40:10,23

## 7

**7 (5)**
269:20;286:16,17,
18;301:1
**7:00 (3)**
77:1;119:11;217:21
**7th (3)**
3:13;147:5;151:8

## 8

**8 (1)**
15:8
**8-hour (1)**
132:8
**8th (1)**
14:20

## 9

**9:00 (9)**
88:19;90:4,8,23;
91:1;153:8;158:2;
192:18;217:16
**9:46:14 (1)**

274:1
**9:46:17 (1)**
274:12
**9:46:20 (1)**
274:21
**9:46:29 (2)**
275:8,17
**9:46:36 (1)**
275:25
**9:46:42 (2)**
276:16,25
**9:46:44 (1)**
277:4
**9:46:58 (1)**
281:19
**9:47 (1)**
278:3
**9:47:04 (1)**
282:3
**9:47:13 (1)**
282:12
**9:47:19 (1)**
278:9
**9:47:29 (1)**
282:21
**9:47:30 (1)**
278:16
**9:47:31 (2)**
283:10;284:3
**9:47:36 (1)**
279:12
**9:47:46 (1)**
279:5
**9:48:38 (1)**
279:17
**9:48:55 (1)**
280:2
**9:49:05 (1)**
280:13
**9:49:18 (1)**
280:20
**9:49:37 (1)**
281:5
**9:54 (1)**
284:6
**9:54:26 (1)**
284:12
**9:56:04 (1)**
285:5
**9:56:39 (1)**
284:25
**9:56:42 (1)**
284:17
**9:58:23 (1)**
285:13
**9:58:42 (1)**
285:17
**9:58:54 (1)**
285:22
**9:59:23 (1)**
286:5
**911 (4)**
60:18;65:1;74:15;

**BOSS REPORTERS**
**(219) 769-9090**