# In The Matter Of:

*BARABARA DEVINE vs*
*RON NEAL, et al.*

*JEREMY DYKSTRA*
*August 7, 2019*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 08-07-19 JEREMY DYKSTRA.txt
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARABARA DEVINE, as Personal )
Representative of the        )
ESTATE OF JOSHUA DEVINE,     )
                             )
            Plaintiff,       )
                             )Cause No.
vs.                          )3:18-cv-00995-JD-MGG
                             )
RON NEAL, et al.,            )
                             )
            Defendants.      )

        The Discovery Deposition of JEREMY DYKSTRA, taken at the instance of the Plaintiff, taken pursuant to notice and agreement as to the time and place and pursuant to the Federal Rules of Civil Procedure, before Pamela S. Owen, CSR, RPR, Illinois License No. 084-002294, a Notary Public and a competent and qualified court reporter, at the office of BOSS Reporters & Videoconferencing, 5816 E. 7th Avenue, Gary, Indiana, on the 7th day of August, 2019, and commencing at the hour of 9:00 o'clock a.m.

BOSS REPORTERS
A BOLES-OWEN STENOGRAPHER SERVICE
Pamela S. Owen, CSR, RPR
2115 West 81st Avenue
Merrillville, Indiana  46410
(219) 769-9090

APPEARANCES

SAM HEPPELL, ESQ.
& MEGAN PIERCE, ESQ.
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois  60607
312.243.5900
Megan@loevy.com
     appeared on behalf of the Plaintiff,

and

JONATHAN P. NAGY, ESQ.
OFFICE OF the ATTORNEY GENERAL
CURTIS T. HILL, JR.
302 W. Washington Street, ISGC 5th Floor
Indianapolis, Indiana  46204
317.233.8296
Jonathan.Nagy@atg.in.gov
     appeared on behalf of the Defendants.


                    INDEX

| ITEM | DESCRIPTION | PAGE | LINE |
|------|-------------|------|------|
| Direct Exam | By Mr. Heppell | 6 | 7 |
| Cross Exam | By Mr. Nagy | 349 | 4 |
| Redirect Exam | By Mr. Heppell | 352 | 18 |

EXHIBITS:

| | | | |
|------|-------------|------|------|
| Dykstra Ex. A | ISP Diagram | 100 | 3 |
| Dykstra Ex. B | 04/07/17 Shift Report of Incident | 218 | 13 |
| Dykstra Ex. C | ISO 24-Hour Roster | 238 | 11 |
| Dykstra Ex. D | IPS B Cellhouse Fire Evacuation Plans | 305 | 19 |
| Dykstra Ex. E | Notice of Administrative Investigation | 328 | 2 |

JEREMY DYKSTRA                                    3
Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA,

called as a witness on behalf of the Plaintiff, was

first duly sworn and testified as follows:

THE WITNESS:  Yes.

MR. HEPPELL:  All right.  Good morning, sir.  My name is Sam Heppell.  I represent the Plaintiff, Barbara Devine, in her capacity as the personal representative of the estate of Joshua Devine.  With my apologies to the witness, but before we begin, I just want to put something on the record regarding the status of discovery in this case.

Plaintiff first served a set of requests for production of documents on March 19, 2019, on the defendants who were then named as defendants in the case; and to date, we still have not received a formal written response to that -- a formal written response to that set of requests for production.  And I recognize defendants have produced a number of documents in the case and also acknowledge, for the record, defendants' willingness to work with us in expediting the production of certain documents prior to the expiring of the statute of limitations and also agreeing to rolling

production.

And I also want to recognize that the prior lead defense counsel was experiencing medical issues which impacted his available time to litigate the case and there's been a recent change in lead counsel.

With that being said, however, the lack of a formal written response to our request for production has made it exceedingly difficult for us to assess the completeness of the document production.  And in defendants' most recent motion seeking a further extension of the deadline within which to respond to plaintiff's request for production, it was asserted that all documents had been produced, and the only pending item was the formal written response; however, our review of the document production to date suggests to us that that's not the case.

For example, we're missing personnel files from the vast majority of defendants, including Defendant Jeremy Dykstra, who's the deponent today.  We also appear to be missing a substantial array of policy documents and training materials.

JEREMY DYKSTRA                                    5
Cause No. 3:18-cv-00995-JD-MGG

And additionally, there's been an agreed ESI protocol in place since June 12th, 2019, which calls for the search of email accounts, documents servers, text messages, and social media for responsive documents according to the search protocols set forth in that document; and to date we have not received any ESI materials produced pursuant to that protocol, including emails or other electronic communications from the deponent, Defendant Jeremy Dykstra.

And finally, a set of interrogatories was served on all defendants on June 7th, 2019; and to date, we have not received any responses to those interrogatories, including responses from Defendant Dykstra.

So with that being said, while we intend to move forward with Defendant Dykstra's deposition today as noticed, both in order to ensure that we continue to make progress in discovery as the discovery deadline approaches and because we've been informed by counsel that he will be moving shortly out of state, I want to put on the record that we reserve the right to seek to reopen Mr. Dykstra's deposition in

JEREMY DYKSTRA                                              6
Cause No. 3:18-cv-00995-JD-MGG

order to question him regarding materials that have not yet been provided in the case.

And I don't know if you want to put anything on the record before we get started, Jonathan.

MR. NAGY:  No.

DIRECT EXAMINATION

BY MR. HEPPELL:

Q    Okay.  All right.  With my apologies for that brief interlude, would you please state and spell your full name for the record.

A    Jeremy Dean Dykstra.  J-E-R-E-M-Y, Dean, D-E-A-N, D-Y-K-S-T-R-A.

Q    Are you currently employed?

A    No.

Q    Can I call you Mr. Dykstra?

A    That's fine.

Q    Mr. Dykstra, have you ever testified at a deposition before?

A    Yes.

Q    Approximately how many occasions?

A    Couldn't give you an exact number.

Q    What's your best approximation of the number of depositions you've testified at before?

A    Probably five or six.

**JEREMY DYKSTRA**                                    **7**
**Cause No. 3:18-cv-00995-JD-MGG**

Q    I want to go over some guidelines or rules for how the deposition is going to go here today, and some of these may be familiar to you from your prior depositions, but I always find it useful for both me, as the attorney, and for witnesses to have a refresher before we get started.

As you know, there's a court reporter here making a written record of my questions and your answers.  And for that reason, it's important that you answer my questions verbally without relying on gestures or head shakes or things like uh-huh or huh-uh, which are really easy in the room for us to understand and then on the written transcript are really difficult later on.  Does that make sense?

A    Yes.

Q    For that same reason, it's important for you to let me get all the way to the end of my question before you jump in with your answer.  Okay?

A    Yes.

Q    And that's even if you know exactly where I'm going.  You could save us both a bunch of time by jumping in with your answer, but that would mean I just have to restate my question to make a clean record, and it actually --

JEREMY DYKSTRA                                    8
Cause No. 3:18-cv-00995-JD-MGG

A    So how about you telling me when you're done with your question then.

Q    That sounds fair.  Just let me --

A    Okay.

Q    -- get all the way to the end and wait for a pause, and then you can jump in --

A    All right.

Q    -- with your answer.  Okay?

A    Yes.

Q    There may be some objections that your attorney makes to my questions.  There's no judge here to rule on those objections, so those objections are mostly being made for the record.  But again, so there is a clear record, it's important for you to let me get my question out, give your attorney a chance to make the objection, let your attorney finish making his objection for the record, and then unless you're directly instructed by your attorney not to answer the question, you can go right ahead then and put your answer to the question on the record once we're done.  Okay?

A    Okay.

Q    I may ask you questions sometimes that are bad questions, that I phrase them poorly or you can

tell from what I'm saying that I misunderstood you, somewhere along the way we've lost each other. Okay?

A    (Witness nodding head).

Q    If at any point you don't understand the question that I'm asking or there's something about the question that you can tell we've lost each other, please let me know; I'll gladly rephrase the question or we can figure out what we need to do to get back on the same page.  Okay?

A    Okay.

Q    If you go ahead and answer the question, I'm going to assume that you were able to understand it.  Okay?

A    Yes.

Q    Your testimony here today is under oath, just as if you were testifying in a courtroom; but again, as I've said, we're not in a courtroom and we're pretty informal, just, you know, around a conference room table.  And so if you need to take a break at any point in time, that's fine.  Just let me know.  We'll go off the record and take a break for whatever reason.  Okay?

A    Okay.

Q    The only stipulation around that is if

JEREMY DYKSTRA                                10
Cause No. 3:18-cv-00995-JD-MGG

I've asked a question, it's important for me to get my -- for you to give your complete answer to that question, and then we can go off the record before I ask my next question.  Okay?

A    Yes.

Q    With that background in terms of what we're here to do today, do you have any conditions that might affect your ability to provide truthful and accurate testimony today?

A    No.

Q    Do you have any conditions affecting your memory?

A    No.

Q    Are you taking any medications that might affect your ability to provide truthful and accurate testimony?

A    No.

Q    Are you taking any medications affecting your memory?

A    No.

Q    Is there anything else you can think of that might affect your ability to testify today truthfully and accurately to the best of your ability?

A    It happened a few years ago.  I mean...

Q    So other than the normal passage of time?

A    Yes.

Q    Anything else you can think of?

A    No.

Q    Is there anything particular to you that makes that passage of time more significant than it would for an average witness being asked if, in fact, a couple years ago?

A    Well, it's not an average job, so there's hundreds and hundreds of incidents that have occurred after that.  You know, so...

Q    So other than the passage of time and the hundreds and hundreds of incidents that have occurred since then, is there anything else that would affect your memory?

A    No.

Q    Mr. Dykstra, were you present at Indiana State Prison on April 7, 2017, which is the night that there was a fire in B Cellhouse and Joshua Devine died?

A    Yes.

Q    Did you serve as shift supervisor that night?

A    Yes.

Q    Reflecting back on that night, did you see

or hear any correctional officer act in a way that violated or was inconsistent with the policies and procedures of Indiana State Prison?

A    No.

Q    What about the policies and procedures of the Indiana Department of Correction?

A    No.

Q    Reflecting back on that night, did you do anything that violated or was inconsistent with the policies and procedures of Indiana State Prison?

A    No.

Q    What about the policies and procedures of Indiana Department of Correction?

A    No.

Q    And since that night, have you learned anything about the incident that reveals to you that any officer did anything that violated or was inconsistent with the policies and procedures of either the Indiana State Prison or the Indiana Department of Correction?

A    Not to my knowledge.

Q    Reflecting back on that night, is there anything that you would do differently?

A    Nope, no at all.

Q    In reflecting back on that night, is there

**JEREMY DYKSTRA**                                        13
**Cause No. 3:18-cv-00995-JD-MGG**

anything that you wish others had done differently?

A    No.  My staff did the best of their ability.

Q    And I believe you stated earlier you're not currently employed.  Is that correct?

A    No.

Q    And I believe you're planning a move out of state in the future?

A    Yes.

Q    Is that correct?

A    Yes.

Q    When is your move planned?

A    Wednesday.

Q    That's next Wednesday?

A    The 14th.

Q    August 14th, 2019?

A    Yes.

Q    Do you have employment lined up?

A    No.

Q    Where do you currently reside?

A    In LaPorte, Indiana.  Staying with a friend of the family.  I don't know the address off the top of my head.

Q    So you're staying with friends in LaPorte, Indiana, and you don't know the address?

A    Not off the top of my head, no.  I had the same address I had for 16 years before this.

Q    What's the city and state you'll be moving to?

A    Chandler, Arizona.

Q    What's the address that you'll be moving to?

A    I would have to look.  You want it?

THE WITNESS:  Do I need to give it, or can I give it to you?

MR. NAGY:  If you don't have it, you can give it to me.

THE WITNESS:  I'd have to look in my cell phone.  Give me a second.  It's not like the old days where you remember all this stuff.

(Witness displaying cell phone to counsel).

BY MR. HEPPELL:

Q    So the address is 1606 West Bentrup Court B-E-N-T-R-U-P, in Chandler, 85224.

(Counsel tendering cell phone).

Q    Thank you.

And is that an address that you plan on staying at for the foreseeable future?

A    It's my cousin's house.

JEREMY DYKSTRA                    15
Cause No. 3:18-cv-00995-JD-MGG

Q    When you get to Chandler, are you planning then on looking for a place of your own?

A    What's that have to do with this case?  I mean, really.  I mean, I'm being honest with you.

Yeah, I plan on finding a job.  I plan on living in Arizona.  I mean, I think it's kind of irrelevant to the Devine case.

Q    Are you -- do you know what line of work you will plan on looking for?

A    No, I don't.  I want a career change.

Q    Okay.  So something outside the field of corrections?

A    Yeah.  I did almost twenty years of corrections.

Q    Other than something outside of the field of corrections, do you have any --

A    No.

Q    -- ideas on what field --

A    I don't even --

Q    -- you want to pursue?

A    I don't even know.

Q    What's your telephone number?

A    (219)379-7074.

Q    Is that a personnel cell phone?

A    Yes.

BOSS REPORTERS
(219) 769-9090

JEREMY DYKSTRA                                16
Cause No. 3:18-cv-00995-JD-MGG

Q    Are you going to keep that number after your move to Arizona?

A    Have no idea.  It depends on AT&T.  Once you move out of state, they'll want you to change to a number in a different state.

Q    And did you previously have a separate work cell phone?

A    No.

Q    So during your time with the Indiana Department of Correction, you just had a personal cell phone?

A    The same cell phone since iPhone came out with AT&T, same number.

Q    Same number?

A    Yep.

Q    Did you have a work email address?

A    Yes.

Q    What was your work email address?

A    "Jddykstra" -- what is the rest of it?  I forget the ending part.  What is it?  Like I -- "in.idoc.gov."

Q    Your first initial, last name, "@" whatever the standard --

A    It was J, then my middle initial, and then Dykstra.

**JEREMY DYKSTRA**                              17
**Cause No. 3:18-cv-00995-JD-MGG**

Q    "Jddykstra"?

A    Yeah.

Q    Got it.

Do you use any social media?

A    Yeah, Facebook.  That's about it.

Q    So you have a personal Facebook account?

A    Uh-huh.

Q    Do you use Twitter?

A    No.

Q    At the time that you were employed by the Indiana Department of Correction, did you use your personal cell phone to send text messages to colleagues?

A    Actually, the State -- I was in charge of the E Squad prison -- I guess you could say -- for you guys that don't understand, it's like a prison SWAT team.  I was in charge of that, so the State let me bring my personal cell phone to work.

Q    Because of your responsibilities in charge of E Squad --

A    Yes.

Q    -- you had permission to bring your personal cell phone --

A    Yes.

Q    -- into the prison?

A    Yes.  Because I didn't want a work phone and a -- my own phone.

Q    Was it the custom for other correctional officers, who didn't have that responsibility, to have a separate work cell phone in addition to their personal cell phone?

A    That's all left up to the warden.  I mean, who he authorizes to bring in cell phones, that's all on the warden.  So I couldn't tell you who had -- who had their cell phones or who didn't.  You know what I mean?  Or who was authorized.  But typical line officers, no, they don't have cell phones there.

Q    They don't have work cell phones?

A    (Witness shaking head).

Q    And they're not --

A    They're not allowed to --

Q    So your shaking your head.

A    No, they're not allowed to bring in their cell phones.

Q    Okay.

A    That has changed now; but back then, no, they weren't allowed to bring in their cell phones unless it was authorized by the warden, like I said.

Q    And when you say, "back then," are you

referring to the 2017 period of time?

A     Yes, sir.

Q     When you say, "it's changed now," what do you mean by that?

A     They have a program for cell phones now. Happened after I left the State.

Q     After you left employment with the --

A     Yes.

Q     -- department?

A     (Witness nodding head).

Q     What's your understanding of their current program for cell phones?

A     You'd have to talk to Major Nowatzke or Mr. Payne or Mr. Neal, Deputy Warden Payne or Warden Neal.  It would be their program.

Q     How did you come to learn, after you left, that there was a cell phone program that had been instituted at the prison?

A     Because I was still getting work emails on my cell phone.

Q     When did you open your Facebook account?

A     I couldn't tell you.

Q     Did you have that Facebook account throughout the 2017 period of time?

A     Yes.

JEREMY DYKSTRA                         20
Cause No. 3:18-cv-00995-JD-MGG

Q    Are you married?

A    No.

Q    Do you have any children?

A    Yes.

Q    How many children do you have?

A    One.

Q    Is it a son or a daughter?

A    It's -- I mean, this is personal.  This ain't nothing to do with the case.  What's it your business to know if it's my son or -- that -- what's that have to do with anything?

Q    It's just pretty standard background information.

A    Okay.  Well, you can run a background check.  You want my social?

Q    Sure.

A

Q    Okay.

A    You'll find all that information there.

Q    How old is your child?

A    I guess you'll find out when you run a background check.  I think this is getting personal.  This has nothing to do with this case.

Q    So are you refusing to answer my question as to the gender or age of your child?

JEREMY DYKSTRA                    21
Cause No. 3:18-cv-00995-JD-MGG

A    He'll be 17.

Q    Okay.  You stated you served almost twenty years with the Indiana Department of Corrections.

A    Yes.

Q    Is that correct?

When did you end your employment with IDOC?

A    July 1st.

Q    July 1st of 2019?

A    Yes.

Q    What was the -- how did you come to leave your employment with the --

A    I was terminated.

Q    -- Indiana Department of Corrections?

Why were you terminated?

A    You'll have to ask my attorney, Arman Sarkisian.

Q    Can you spell that, please?

A    I don't know how to spell it off the top of my head.

Q    Arman --

A    Sarkisian in Portage, Indiana.

Q    When did you retain Mr. Sarkisian?

A    He's been my lawyer for years.

Q    He's been your personal lawyer?

**JEREMY DYKSTRA**                                              22
**Cause No. 3:18-cv-00995-JD-MGG**

A    Yes.

Q    When did you retain Mr. Sarkisian in relation to your recent termination from the department?

A    In May.

Q    Okay.  May of '2019?

A    Actually, yeah, May -- say mid-May, 2019, yes.

Q    When did you find out that you were being terminated from your position with the Indiana Department of Corrections?

A    July 1st.

Q    Was July 1st the last day that you were on the job?

A    No.

Q    When was the last day that you were on the job?

A    I'll tell you in a second.  (Witness viewing cell phone).  May 11th.

Q    So May 11th, 2019, was the last day that you were physically on site at the Indiana State Prison?

A    Well, it would be actually whatever that Wednesday was physically at the job.

Q    Okay.

A    So that would have been May 8th.

Q    So the Wednesday prior to May 11th, May 8th, was your last day physically on site?

A    Yes.

Q    And that was at Indiana State Prison?

A    Yes.

Q    In Michigan City?

A    Yes.

Q    What -- did you know when you left your shift on May 8, 2019, that that would be the last shift that you would be working at the prison?

A    No.

Q    When was your next scheduled shift to return to the prison after May 8th?

A    That Monday.

Q    When did you find out that you would not be coming back to the prison to work your regular shift on Monday?

A    May 11th.

Q    What happened on May 11th?

A    You'll have to go through my attorneys for that.

Q    Well, what's your -- how did you learn --

A    You'll have to go through my attorneys for all that information.

**JEREMY DYKSTRA**                                    **24**
**Cause No. 3:18-cv-00995-JD-MGG**

Q    Are you --

A    Yeah, I'm not -- I don't feel it's relevant for this case.  Nothing from my suspension or my termination has anything to do with any offender or anything.  So if you want to know all that information, go through Arman Sarkisian, or you can contact these guys down at the office and pull all my records.

Q    Well, we certainly will be doing that, but with respect, Mr. Dykstra, you're here for a deposition; we're entitled to ask you questions.

A    Yeah, but really -- honestly.

MR. NAGY:  Just so it's clear, Jeremy, when you talk about the advice of your counsel, you're talking about your personally retained --

THE WITNESS:  Yes.  I'm talking about --

MR. NAGY:  -- counsel --

THE WITNESS:  Yes.

MR. NAGY:  -- that has given you this advice.

THE WITNESS:  Yes.

MR. NAGY:  Okay.  And was that advice given to you because you have an administrative appeal of your termination?

JEREMY DYKSTRA                                25
Cause No. 3:18-cv-00995-JD-MGG

THE WITNESS:  Yes, I have an administration appeal going on.  I'm on Step 2.  Getting ready probably to go to SEAC hearing for the State of Indiana.

THE REPORTER:  Probably getting ready to go see?

THE WITNESS:  It's called -- there's step process for Indiana.  There's Step 1 that goes to your warden, Step 2 that goes to the State Personnel Department.  That's where I'm at right now.  If it gets denied there, I go to a SEAC hearing.  SEAC hearing, I couldn't tell you off the top of my head exactly how it works.  I have to do -- it's like an appeal process.

THE REPORTER:  Are you saying, CI caring or --

THE WITNESS:  No.  SEAC.  It's like S-E-C -- it stands for something.  I don't know off the top of my head.

MR. NAGY:  I believe it's S-E-A-C.

THE WITNESS:  Yeah, there you go.

THE REPORTER:  Thank you.

THE WITNESS:  My bad.

THE REPORTER:  When I interrupt it's

JEREMY DYKSTRA                                26
Cause No. 3:18-cv-00995-JD-MGG

because I didn't catch a word.

THE WITNESS:  No, that's fine.

BY MR. HEPPELL:

Q    So you're asserting a refusal to answer questions related to your termination based on advice that was given to you by Mr. Sarkisian, who's your privately retained employment attorney; is that correct?

A    Yes.

MR. HEPPELL:  Are you also advising him to that effect, Jonathan?

MR. NAGY:  No, but I don't think his termination is relevant.  But if he's been given advice by his own lawyer, I --

THE WITNESS:  We're going into something that is right field, and you guys are going left field.  We should be talking about right field here; you know?  I mean...

BY MR. HEPPELL:

Q    Well, so unless you're asserting a Fifth Amendment right, in that your claiming that the answers to the questions might serve to incriminate you in criminal proceedings or that there's some privilege being asserted to the contents of the information, which I haven't heard, I don't believe

there's any basis to refuse to answer the questions.

A    Well, that's what you believe, not what I believe.

Q    And --

A    All my personal information on why that case -- my case is has nothing to do with this Devine case.

Q    I mean, so far, I haven't even heard an objection from your counsel on any basis to the question.  And I can tell you if there's a relevance objection, I'm extremely confident that inquiring into the circumstances that you were terminated from your employment with the department, which is the employment position that you were involved, being related to your status as a defendant in this case is highly relevant.  And so I don't think there's any proper basis to refuse to answer those questions.

So I -- I'm open to proposals on how to -- Jonathan, yeah.

MR. NAGY:  Jeremy, were you terminated in connection with any alleged misconduct regarding an offender?

THE WITNESS:  No.

MR. NAGY:  Were you terminated for abusing

or mistreating an offender?

THE WITNESS:  No.

MR. NAGY:  Would the reasons for your termination likely be reflected in and documented in your employment file?

THE WITNESS:  Yes.

BY MR. HEPPELL:

Q    Well, and, you know, this also goes to the issue I already said at the start of the deposition, which is, you know, we have not been provided with the employment file, so I have no ability to evaluate what the -- what the basis for that termination -- frankly, I don't think the discoverability of that information, in terms of what's appropriately within the scope of this deposition, hinges on the specific reasons for that. So I'm intending to -- at some point we should call the judge to seek guidance on this, and I'm going to request that the judge order you to answer that line of questions.

But I'm happy to continue on with my questions, and we can do that when we've reached a, you know, break in the deposition.  We can get the judge on the line.

MR. NAGY:  Were you terminated in

connection with anything you did with regard to the fire in which Mr. Devine perished?

THE WITNESS:  No, sir.

MR. HEPPELL:  I mean, I appreciate what you're trying to do, Jonathan.  I don't think there's a line of questions that would satisfy me that this is an area --

MR. NAGY:  I'm just making a record, and now I'm going to object to relevancy.

MR. HEPPELL:  Okay.  And you -- are you instructing him not to answer based on your --

MR. NAGY:  I'm not instructing him not to answer.

MR. HEPPELL:  -- relevancy objection?

MR. NAGY:  I'm objecting to relevance.

MR. HEPPELL:  Understood.  And are we -- we're in agreement --

MR. NAGY:  If you feel you need to call the court, I cannot stop you from --

MR. HEPPELL:  Right.  No.  I understand.  Okay.  Well, let's -- I'm going to continue on.

THE WITNESS:  I mean, the personnel file and stuff, that's not my fault you don't have that information.

MR. HEPPELL:  I understand.

**JEREMY DYKSTRA**                              30
**Cause No. 3:18-cv-00995-JD-MGG**

THE WITNESS:  I mean, I can't just bring it to you and give it to you.  You know, I mean, that's nothing I have to do.  But to be honest with you, it's a whole different case.  It has nothing to do with the offender, it has nothing to do with my job performance at ISP.

BY MR. HEPPELL:

Q    I understand that that's your perspective. I understand that that perspective is shared by your counsel here.

A    Well, that's 19, almost 20 years' perspective, so...

THE REPORTER:  That's almost 19, 20 years?

THE WITNESS:  Perstective [sic], how ever you say --

THE REPORTER:  Perspective?

THE WITNESS:  Yeah, there you go.

THE REPORTER:  Thank you.

MR. NAGY:  Here's an idea:  Why don't we take a five-minute break.  Let me talk to Jeremy.

MR. HEPPELL:  Okay.  I'm fine with that. We'll go off the record.

(A brief recess was taken from 9:22 to 9:31.)

MR. HEPPELL:  We'll go back on the record.

Any updates or change in position you want to advise me based on --

MR. NAGY:  Maybe you would want to, like, reask the question and see if you can't restart the dialogue.

THE WITNESS:  You want to know why I was terminated?  I was dating a subordinate.

BY MR. HEPPELL:

Q    Okay.  Those are the allegations that have been --

A    Yes.

Q    -- made against you, that led to your termination?

A    Yes.

Q    Do you or are you intending to dispute the factual basis for your termination?

A    Yes.

Q    It's your position that you were not dating a subordinate?

A    No.  I was.

Q    Okay.  But you dispute that termination was warranted as a remedy for that?

A    Rephrase the question.

Q    So if I understand what you're saying, you

JEREMY DYKSTRA                                    32
Cause No. 3:18-cv-00995-JD-MGG

don't dispute that you were dating a subordinate.

A    No, I don't.

Q    But you do dispute that you should have been terminated as a result.

A    I shouldn't have been, yes.

Q    Okay.  And is that the -- is that why -- is that the subject matter of the upcoming administrative proceedings?

A    Yes.

Q    Whether or not it was appropriate to terminate you based on the --

A    Yes.

Q    -- fact you were dating a subordinate.

A    (Witness nodding head).

Q    What's the name of the individual that you were dating?

A    Kelly Opal Flores.

Q    Is she still employed at --

A    Yes.

Q    -- the prison?

        Are you still dating her?

A    Depends on which day.

Q    She's not planning on moving with you to Arizona, is she?

A    Don't know.

**JEREMY DYKSTRA**                                    33
**Cause No. 3:18-cv-00995-JD-MGG**

Q    Do you have a collective bargaining agreement or contract?

A    No.

Q    What is the -- what's your understanding of the procedural rights that you have related to your former employment at Indiana State Prison?

A    I don't get what you're saying, actually.

Q    You made reference earlier to --

A    Dating a subordinate.  Is that what you're talking about?

Q    So you made reference earlier to an upcoming hearing; is that correct?

A    Yes.

Q    That's an administrative hearing that Mr. Sarkisian is representing you in?

A    Yes.

Q    What decision-making body is that hearing in front of?

A    State personnel.

Q    It's the State personnel board or agency?

A    I guess it would be people down in Central Office down there, the head of -- the head people for personnel for the State of Indiana.  For state employees.

Q    What date is that hearing scheduled for?

JEREMY DYKSTRA                          34
Cause No. 3:18-cv-00995-JD-MGG

A    There isn't a date.  It's a time frame when you do this.  Like Step 1, you have to respond in 30 days.  Then they have to respond back to you in 15 days.  And then after that, you got 15 days to send your information to state personnel, and they got a time frame to get back to you.  So that's what I'm waiting on, for them to get back to me to tell me my next step.

Q    Do you plan on continuing those proceedings even after you've left the state?

A    Yes.

Q    What are you seeking in terms of a remedy or relief in those proceedings?

A    I think it was overbearing that I got terminated for this.

Q    Are you asking to be reinstated, like to have your old job back?

A    No.

Q    So you want some other form of compensation for the fact that you contend you were unjustly terminated?

A    Yes.

Q    Are there other allegations of violations of policy --

A    No.

JEREMY DYKSTRA                      35
Cause No. 3:18-cv-00995-JD-MGG

Q    -- beyond the dating a subordinate?

A    No.

Q    When you told me earlier that you found out about this on May 11th but that your -- strike that.

You told me earlier that you found out that you weren't being allowed back to work on May 11th; is that correct?

A    Yes.

Q    Your formal last day of employment was July 1st; is that correct?

A    No.  That's the day I was terminated.

Q    So there was a period of time prior to that, that you were suspended but not terminated?

A    Yes.

Q    Were there internal proceedings within the prison that you're aware of between May 11th and July 1st?

A    Yes.  There was a I & I investigation. Don't ask me the dates on it because I don't remember all them by off of my head.

Q    What does I & I refer to?

A    What is it?  Internal investigation?

Q    And that's a division within Indiana State Prison?

JEREMY DYKSTRA                                          36
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    And were you interviewed as part of that investigation?

A    Yes.

Q    Okay.  And did you agree to make a statement to them?

A    Yes.

Q    Did you tell the truth during that interview?

A    Yes.

Q    Was that interview video-recorded?

A    Yes.

Q    Were there multiple interviews that you gave in connection with your suspension that led to your termination?

A    Two.

Q    Do you remember the dates on those?

A    No.

Q    Were those in May?

A    Yes.

Q    Do you have any knowledge of the other steps that were taken during your investigation?

A    No.  I had to sign a confidential statement not to talk about any of it, so...

Q    So you weren't allowed to talk about the

steps that you were aware of with others?

A    As far as I know, I'm still not supposed to talk about any of it.  And that's why I'm not trying -- (indicating).

Q    But you found out on July 1st that the result of --

A    Yes.

Q    -- the internal processes were that you were being terminated.

A    Yes.

Q    Were you represented by Mr. Sarkisian at the time of the internal investigation?

A    Are you asking if he was sitting there next to me during the investigation?  No.

Q    So that's -- I appreciate the clarification.  He was not present with you during the interviews; is that correct?

A    No.

Q    Had you already retained him as your attorney at that time?

A    Yes.

Q    What was the position that you held at the Indiana State Prison at the time you were terminated?

A    Correctional captain.

JEREMY DYKSTRA                              38
Cause No. 3:18-cv-00995-JD-MGG

Q    And you testified earlier you had an almost twenty-year career --

A    Yes.

Q    -- with the department; is that correct?

A    Yes.

Q    When did you first join the Indiana Department of Correction?

A    3/6, 2000.

Q    Why did you seek employment with the Indiana Department of Correction?

A    Got laid off from my job.

Q    What job were you laid off of?

A    I was in the painters' union.

Q    What was it that attracted you specifically to the Department of Correction over pursuing other types of work?

A    Really nothing at all.  I just wanted a steady job, so I called Westville Correctional Facility, and they hired me over the phone because of my Military background and...

Q    Where's Westville Correctional Center located?

A    In Westville.

Q    Did you have any correctional experience prior to March 2000 when you were hired by Westville

JEREMY DYKSTRA                    39
Cause No. 3:18-cv-00995-JD-MGG

Correctional?

A    No.

Q    Did you have any law enforcement experience prior to that?

A    Just I was in the Military.

Q    When did you serve?

A    '96 to '99.

Q    Were you honorably discharged?

A    Yes.

Q    What branch --

A    Army.

Q    -- did you serve?

And then after you left the Military, you were working with a painters' union?

A    I framed houses, and then I went to the painters' union.  I was only out maybe a year before I started corrections.

Q    What position were you hired onto at Westville Correctional?

A    Officer.  Do you just want me to give you my whole information up to ISP?

Q    Sure.

A    Okay.  I was in the Army after high school.

And then after the Army, I worked

**JEREMY DYKSTRA**                                          40
**Cause No. 3:18-cv-00995-JD-MGG**

construction for probably five, six months.  It's a long time ago.

Then I was in the painters' union until I started Westville in 3/6, 2000.

And then 2000 to 2002 I was an officer, and then I made sergeant -- correctional sergeant from 2002 to 2007.

2007 I went to Camp Summit Juvenile Boot Camp.  From 2007 I was a Youth Service Instructor 4, and then got promoted as a Youth Service Instructor 3 probably a year later.

And then 2014 I went to Indiana State Prison as a correctional lieutenant.

And then approximately three years from right now, you know, before I made correctional captain.

Q    So it was in 2014 that you first started working at Indiana State Prison?

A    Yeah, as a correctional lieutenant.

Q    Do you remember the month in 2014 that you started?

A    No, I don't.  It was around, I want to say, October, November.

Q    And have you held a correctional lieutenant position prior to that?

A     No.  My rank structure at Camp Summit was different in juvenile --

THE REPORTER:  I'm sorry?  Your what at Camp Summit.

THE WITNESS:  My rank structure at Camp Summit was different, was classified different.  Like I think at the time it all bases -- all your rank structure's based on pay.

Actually, I think I was -- at Camp Summit Boot Camp, I was actually between a lieutenant and a captain.  And then when I went to -- I wouldn't say it was a demotion.  It was kind of like more of a lateral transfer because I was Youth Services Instructor 3, so I was like a Pat [sic] 3 or something.  The rank structure is called different, but the -- it's hard to explain because it's juvenile and it's adult.

BY MR. HEPPELL:

Q     Sure.  So just -- just to make it so I can make sure I understand, you were working in the juvenile boot camp which had a different rank structure --

A     Like when I went from correctional sergeant from Westville, it was a raise.  So I got a

JEREMY DYKSTRA                                          42
Cause No. 3:18-cv-00995-JD-MGG

promotion going into juvenile boot camp.

When I went from juvenile -- when I was there for a year, I got another promotion at the juvenile boot camp.

So at the time I was probably between a correctional lieutenant at a adult facility and a correctional captain, like, between them.

Then when I went to Indiana State Prison, I wouldn't say it was a demotion because I didn't, you know, get loss in pay or anything.  I went to a correctional lieutenant.  If that makes any sense to you.

It's just a rank structure in -- we're the only juvenile boot camp in the state of Indiana, so their expectations were a lot higher. You either had to have a bachelor's degree to work there, military, or been a correctional sergeant or higher for five years.  And you had to take a PT test every six months to keep your job.

Q    PT refers to?

A    Physical.  You know, physical training. You know, push-ups, sit-ups, run a mile -- or a mile and a half.

Q    What made you want to leave the juvenile boot camp?

BOSS REPORTERS
(219) 769-9090

JEREMY DYKSTRA                              43
Cause No. 3:18-cv-00995-JD-MGG

A    It was closing down.

Q    So it was not a voluntary switch over to ISP?

A    No.

Q    Was there something specific about ISP that attracted you, or was that just where you could find a position?

A    I was asked by -- well, when you have an official close date -- I don't know if you ever went through anything like that.  You're losing a job you really like, you love; you start trying to find a home, so you call people you know.

So Mr. Wilson, he was the warden, actually, going -- the regional director at the time for the Department of Corrections.  I contacted him.

And he said, Why don't you go to ISP, Indiana State Prison, as a correctional lieutenant?

So I went through the interview process.  Not given, but went through the interview process, and that's what happened.

Q    Mr. Wilson was the warden at ISP at the time?

A    He was still technically the warden, but he was regional -- going to regional director.

Q    And did you know Mr. Wilson prior to

JEREMY DYKSTRA                                44
Cause No. 3:18-cv-00995-JD-MGG

having that interaction with him?

    A    Yes.  I worked with him at Westville
Correctional Facility.

    Q    Were there additional training or
certifications that you were required to take before
assuming the role of correctional lieutenant at
Indiana State Prison in late 2014?

    A    Yes.  I had to go back through the
in-service academy.

    Q    And what did that entail?

    A    I -- it's for adults.  So I had to refresh
myself on all the adult stuff and changes from, you
know, being out of the adult system for seven years.

    Q    So was that training conducted at the
prison, or was that at a centralized facility?

    A    Indiana State Prison.

    Q    How long was that in-service academy?

    A    I think it was a few weeks.  And then I
had an FTO, like a field training guy, to do my
correctional lieutenant packet.

              Every time you work for the State of
Indiana, any rank change, you have to do like --
like get mentored by somebody of your same rank, but
they usually try to put somebody that's a rank
higher than you to do your packet, you know, to go

JEREMY DYKSTRA                45
Cause No. 3:18-cv-00995-JD-MGG

over some policies and procedures and what maintains
[sic] to your job.

Q    Does "FTO" refer to field training
officer?

A    Yes.

Q    And just to make sure I understood your
testimony, that person needs to be at least the same
rank as you, but they try and make it someone who's
a higher rank?  Is that correct?

A    Yes.  Yes.

Q    And they're responsible for going through
what you referred to as your packet?

A    It's like a packet for each rank; like
your expectations for your job, general knowledge of
being a correctional lieutenant or sergeant or
whatever your rank is that, you know, you're up for.

Q    So is that like a packet of written
materials that you're given associated with:  You're
coming on as a lieutenant.  Here's a stack of papers
that --

A    Yeah.  It would be like:  How do you drink
this water?  They explain to you how to drink this
water.  They initial off and you initial off.

Q    So is it like a checklist of things that
your field training officer has to go through with

**JEREMY DYKSTRA**                                   46
**Cause No. 3:18-cv-00995-JD-MGG**

you in terms of:  These are the policies, these are
the procedures?

     A    Not all the policies and all of the
procedures because then you're talking about a stack
of policies and procedures that's as big as this
room.  You know, it's the general knowledge of your
job and expectations of your job.

     Q    More geared towards like:  These are the
everyday --

     A    Yes.

     Q    -- day-to-day things that you're going to
encounter --

     A    Yes.

     Q    -- in this position?

     A    Yes.

     Q    And the water example was sort of a --

     A    A watered-down version.

     Q    A watered-down version, but basically
those kind of --

     A    Yes.

     Q    -- day-to-day tasks --

     A    Yes.

     Q    -- and here's how you do them?

     A    Yes.

     Q    In -- so in the packet -- was the packet

JEREMY DYKSTRA                          47
Cause No. 3:18-cv-00995-JD-MGG

just that checklist of things that the FTO needed to go through with you?

A    Yes.

Q    There weren't other materials or policies provided to you in that packet?

A    No.

Q    In addition to the packet, were you also provided with copies of policies and procedures or like an employee manual or handbook, anything like that?

A    Yeah.  The -- every year you go through in-service.  They'll not give you a copy of all the policies, but they'll go over the updated versions.

And then throughout the year, for correctional sergeants, lieutenants, and captains the policies come out; you have to read them and sign them.

Q    So just so I understand that, every correctional officer goes through yearly in-service training?

A    Yes.

Q    And as part of that yearly in-service training, they go over the policies?

A    I wouldn't say every policy, because you go through through it.  But like some policies never

**JEREMY DYKSTRA**                          48
**Cause No. 3:18-cv-00995-JD-MGG**

change.  Like as simple as the water thing, moving it from here to there.  But they'll go over more of the updated policies or changes throughout -- you know, that had happened.

But you got to remember, the in-service is going all year long, so it depends on where you -- like you might go this month, I might go six months later.

Q    And again, just so I understand, every individual gets in-service once a year?

A    Yes.

Q    But it's sort of rolling throughout the year --

A    Yes.

Q    -- that people are cycling in and out of their training?

A    Yes.

Q    Who at ISP, in the 2014 to 2017 period of time, who was responsible for setting the curriculum for the in-service training?

A    Christopher Beal.  He's the training coordinator.

Q    So to your knowledge, he would be the individual who would determine, like, these are the policies that we're going to focus on --

**JEREMY DYKSTRA**                    49
**Cause No. 3:18-cv-00995-JD-MGG**

A    Then it also comes from, I'd say, Central Office, whoever that training department is for the State, and I don't know who that is.

Q    I appreciate that.  Just try to let me get to the end of my questions just so we're not --

A    Oh.

Q    -- my questions don't trail off, so it's clear what question you're answering.

A    (Witness nodding head).

Q    So in addition to Christopher Beal, you think there also would have been input from Central Office in terms of the contents of what updated policies would be that should be trained on?

A    Yes, sir.

Q    Broadly speaking, if I understand you correctly, there wouldn't be like comprehensive training on:  This is every policy?  The in-service training would just focus on policies that had changed?  Is that fair to say?

A    Yes.  And there -- well, and there's curriculum that you're mandated to do every year.

Q    What's the mandatory part of the curriculum?

A    It depends because -- like for instance, I'll give you one example:  Like CPR is every other

year.  You know, and then they have set guidelines where they have to go through like use of force every year.  So I couldn't tell you every one off the top of my head.

Q    Use of force and CPR are two that stick out to you as being part of that mandatory curriculum, either annually or --

A    It's just what --

Q    -- semiannually?

A    -- I'm thinking -- coming to my head right now.

Q    Are there other ones that you can think of right know that are part of the mandatory curriculum?

A    No.  I don't know.

Q    Were there written training materials associated with that annual in-service training?

A    Both.  Both that and like PowerPoint, videos.

Q    So you -- the officers attending the training would have like written handouts, and there would also be PowerPoints or training videos shown?

A    Yes.  And an instructor teaching the class.

Q    Right.  And someone to go through the

JEREMY DYKSTRA                51
Cause No. 3:18-cv-00995-JD-MGG

PowerPoint or show the video?

     A     Yes.

     Q     Not totally automated.

     A     Yes.

     Q     And you testified earlier that Christopher Beal was the training coordinator who was, at the facility level, responsible for setting the curriculum.

          Was Christopher Beal also one of the trainers?

     A     Yes.

     Q     Were there other individuals who served as trainers --

     A     Yes.

     Q     -- in addition to Christopher Beal?

          Who were those individuals?

     A     In 2017, I could not tell you.  People come and go in the Department of Corrections.

     Q     Did those individuals have to be of a specific rank or hold a specific title or position within the facility to be someone who would be a trainer?

     A     They go through an interview process, and then they get classified as training officers.

     Q     Is that something that you ever pursued?

**JEREMY DYKSTRA**                52
**Cause No. 3:18-cv-00995-JD-MGG**

A    No.

Q    Is that something that you could have pursued?

A    It would have been a real demotion for me.

Q    Why do you say that?

A    I was a correctional captain.  I'm not trying to lose like 20-something percent of my pay.

Q    So was it a full-time position that a training officer -- like that would be their full-time job?

A    Yes.

Q    I see.  And they -- did they serve under Christopher Beal's direction?

A    Yes.

Q    So it was like a separate department of --

A    Just think being an officer.  The rank structuring in the Department of Corrections for adult is officer, sergeant, lieutenant, captain, major.  You know, so training officer is just an officer working in training.

Q    And were also training sergeants --

A    No.  Just training officer.

Q    Training officers -- what was above the training officer in the Training Division?

A    Chris Beal, the director of training.  I

JEREMY DYKSTRA                53
Cause No. 3:18-cv-00995-JD-MGG

don't know if they get a raise; but I mean, I've

already -- you know, I don't know how that works,

actually.

Q    And so the in-service academy that you

referred to earlier, that you had to go through when

you first came to ISP because you'd been out of the

adult system for approximately seven years, was that

just you rotated into a class at the annual

in-service training, or was that a separate

program --

A    I had some stuff that I had to go through,

like a brand-new employee; and then I had some stuff

that I went through as just in-service.

Q    Okay.

A    Because at the time, when I worked at a

juvenile boot camp, I was still in charge of

Westville's E Squad and part of their E Squad.  So I

already had a lot of the adult training underneath

me because I still -- being a E Squad -- being part

of E Squad and being a E Squad field commander, I

dealt with adults still, if that makes any sense to

you.  So a lot of these classes I already had; but

coming to a new facility, they still want you to go

through their training.

Q    So there was some assessment made specific

JEREMY DYKSTRA                    54
Cause No. 3:18-cv-00995-JD-MGG

to you of what your current levels of training were?

A    Every prison's different.  Their layouts are different.  And some of their training is mandated from Central Office, but some of their training's mandated from their facility because Westville Correctional Facility is all open doors.  ISP you have cellhouses, so you need to know -- you know, the facility kind of dictates on some of the training itself, if that makes sense to you.

Q    I think it does.

And again, just so I'm clear, it sounds like there's some new employee training that is geared towards folks who are coming in brand new, off the street.

A    Yes.

Q    And there were -- a portion of that, that you took because you were new to the facility; and then you also took a portion of the regular in-service training that existing officers were taking.

A    Yes.

Q    And with those two aspects combined, that made up your in-service academy that you needed to take to get on at ISP; is that correct?

A    Yes.

**JEREMY DYKSTRA**                                                    55
**Cause No. 3:18-cv-00995-JD-MGG**

Q    Have you kept or maintained any of the
written materials that you received as part of that
in-service academy?

A    No.

Q    Do you have any -- in your personal
possession, any written materials from any of the
training that you received at any point at ISP?

A    Gotten rid of it all.

Q    I could ask --

A    I'm moving to Arizona, so I'm going in one
SUV with my dog, and I'm packing the car and going.
So all the stuff that's not important to me in life,
I've sold everything or, you know, shredded the
rest.

Q    At this point in time, you don't have any
papers in connection with your employment at Indiana
State Prison of Indiana Department of Correction?

A    Just my case, myself.

Q    Just papers related to your termination --

A    Yes.

Q    -- and your proceedings challenging that
information?

A    Yes.

Q    You made reference to getting rid of that
in preparation for your move, shredding papers.

JEREMY DYKSTRA                56
Cause No. 3:18-cv-00995-JD-MGG

Were there papers that you did have previously?

A    I've been doing this, like I said, 19 years.  I've been through so many in-services, it's like -- most of the time I'm in class, it's already stuff I've already -- it's like going over a lot of the same stuff, so...  Year in, year out.  You know.

Q    Would it be fair to say that you weren't particularly eager to hang on to copies of the materials from those training?

A    No.  Most of the time I gave them back to the trainer so they can give it to a new employee or somebody that needed it more than I did instead of cutting down the trees.

Q    You made reference earlier to written policies and procedures and that there would be training and updates to those, but there would also be, you know --

A    Well, not every policy and procedure. You're going to have training.  Some of it, they want you to read through material.  It could be -- like for example, we're having a new religions service.  So they put down the policy about the new religious service.  You read through it, and you initial off on it.  Put your name, initial off. It's just -- you know, so there's not a training on

**JEREMY DYKSTRA**                    **57**
**Cause No. 3:18-cv-00995-JD-MGG**

every single policy or procedure.

Q    When you were a new employee at the Indiana State Prison in late 2014, how were you made aware of what the universe of policies and procedures were that were in effect at Indiana State Prison?

A    I learned from my captain.  Captain Tibbles at the time.

Q    Was Captain Tibbles your field training officer?

A    Actually, Captain Cowell [sic] was my field training officer.

Q    And Tibbles was your -- was he your supervisor?

A    He was my shift supervisor.

Q    How did Captain Tibbles make you aware of what the existing policies and procedures at Indiana State Prison were?

A    Anything I had a question on, or he would tell me, Hey, you need to review this.  This is important.  I kind of latched onto that captain.

Q    So was there -- just -- if I understand what you're saying, there was a set of written policies that were out there somewhere --

A    No.  They all -- any new policy gets

printed off and sent from the Major's Office to the Shift Supervisor Office.  The shift supervisor's responsibility, her or him, to have his lieutenants on his shift and himself sign those policies.

Q    And that's how it works.  If there's a new policy --

A    Yes.

Q    -- or a change in the policy that's made; is that correct?

A    Yes.

Q    And that goes down all the way to the lieutenant level, that they --

A    Yes.  I mean --

Q    -- all have to sign off on --

A    -- that's part --

THE REPORTER:  Excuse me.  One person at a time.

THE WITNESS:  Okay.

THE REPORTER:  So try to --

THE WITNESS:  Well, just restate the question you want to know then.

BY MR. HEPPELL:

Q    So just to make sure that I understand what you're saying, the procedure that you were just describing, when there's a new policy passed or a

JEREMY DYKSTRA                    59
Cause No. 3:18-cv-00995-JD-MGG

change made to an existing policy, is that a copy of that new or updated policy is provided to the shift supervisor; is that correct?

A    Yes.  It comes from the Major's Office with a list of names on it; every captain, every lieutenant.  And then the captain of the shift's responsibility for him signing it and having his lieutenant sign it.

Now, how the sergeants or officers sign that policy or review that policy, I have no idea.  If that answers your question.

Q    That does answer my question.

So that was the policy that was in effect when you came on to ISP as a lieutenant; is that correct?

A    Yes.

Q    And so you were on the list of people -- your specific name was there, that you had to sign off on every new or updated policy?

A    Yes.

Q    Did you have any responsibilities for providing copies of that policy or showing or in any way informing anyone else about that policy --

A    As a lieutenant?

THE REPORTER:  Excuse me.

JEREMY DYKSTRA                        60
Cause No. 3:18-cv-00995-JD-MGG

THE WITNESS:  As a lieutenant?

BY MR. HEPPELL:

Q    Correct.

A    Oh, no.

Q    And then later on, you were promoted to the position of captain; correct?

A    Yes.

Q    And in your position as captain, if I understood your prior testimony, you had responsibility for making sure that lieutenants under your command signed off on new or updated policies; is that correct?

A    Yes.

Q    Did you, as captain, have any responsibility for either obtaining signatures from or providing copies of the policy to anyone outside of the lieutenants who were working under you?

A    No.

Q    As you sit here today, do you have any knowledge or understanding of how individual staff members, other than the major, captains, and lieutenants, would be informed about new or updated policies or would receive copies of new or updated policies?

A    As me as a captain, if it was a policy

JEREMY DYKSTRA                   61
Cause No. 3:18-cv-00995-JD-MGG

that I thought was very important, if it wasn't just a sentence update, I would read it at roll call.

Q   So as the captain, you had the discretion to decide which updates or which new policies you would highlight at roll call.  Is that fair to say?

A   Yes.

Q   Was that -- was that process, where the captain -- where you, as a captain, would have discretion to select --

A   Let me rephrase that.

I would say the major would tell us if we had to read it at roll call or not.

Q   Okay.

A   Now that I'm thinking back.

Q   So as you're thinking back, do you recall conversations with the major or interactions with the major where the major would say, this is one you need to read out at roll call?

A   Yes.

Q   Was that Major Nowatzke?

A   Yes.

Q   Did he serve as the major at Indiana State Prison during the entire time that you were at the facility?

A   No.

JEREMY DYKSTRA                                          62
Cause No. 3:18-cv-00995-JD-MGG

Q    Was there a different major when you
started there?

A    Yes.  When I started there, it was
Major Gann.  And then after him, it was
Major Tibbles.  And then it was Major Nowatzke.

Q    Fair to say that your intersections with
the major were greater after you'd attained the rank
of captain?

A    Yes.

Q    Was Major Nowatzke the major when you
attained the rank of captain?

A    Yes.

Q    So again, just to make sure that I'm
clear, when you served as a correctional lieutenant
at Indiana State Prison, you didn't have any
responsibilities for informing anyone else in terms
of new or updated policies?

A    No.

Q    And then after you obtained the rank of
captain, you had responsibility for reading certain
policies, either new policies or based on the
direction you were given by the major as to whether
it was an important policy?

A    Yes.

Q    Other than reading at roll call, were

JEREMY DYKSTRA                63
Cause No. 3:18-cv-00995-JD-MGG

there any other ways that you're aware of that officers, other than the majors, the captain, or lieutenants, would be made aware of new or updated policies?

A    They might be in my email, but I'm not sure.

Q    If you, as a lieutenant and then a captain, wanted to find out if there was a policy on a certain topic or what the policy was on a certain topic, how would you go about doing that?

A    Looked on the shared file of policies and procedures.

THE REPORTER:  I'm sorry.  Could you keep your voice up, please.

THE WITNESS:  Looked at the shared file for the policies and procedures if they're not restricted, because some policies and procedures are restricted.  And then I guess there's a state website you can go to, too.

BY MR. HEPPELL:

Q    How were you informed about the existence of this shared file?

A    I don't even remember.  It's been so long.

Q    At some point you came to understand that there was a shared file with policies and

JEREMY DYKSTRA                         64
Cause No. 3:18-cv-00995-JD-MGG

procedures?

A    I mean, I've had to look at them for years.  On certain I looked for, for E Squad, years and years ago.  So I kind of always knew about it.  Every facility has one, so...

Q    And again, just so I understand exactly what you're describing, is that like a shared drive --

A    It's like a facility shared drive.  And I don't know if there's one statewide, but every facility has like -- for -- you know, they have simple forms, like a healthcare request, you know, stuff like that.

Q    So there's, like for example, administrative forms that employees would need --

A    Yes.

Q    -- that they would pull a copy of the updated version --

A    Well, like I said, it depends on -- it goes by your rank.  Like a regular officer, they're not going to be able to get in there.  But a certain sergeant has access, lieutenants have certain access, captains have certain access to certain things, so..

Q    Okay.  So is it your understanding that at

JEREMY DYKSTRA                              65
Cause No. 3:18-cv-00995-JD-MGG

the period of time you were at ISP, regular line

level correctional officers didn't have access to

the share drive at all?

    A   I think they do, but it's for general

forms.

    Q   They would not have had access to the

policies and procedures on the shared drive?

    A   I doubt, 0unless it's general policy.  I

think the policies are classified in a few different

ways.  I know there's classified, where -- and

there's like highly restrictive, and then there's

general.

    Q   And then the higher the rank you had, the

greater the access you would have to the materials

on the shared drive.  Is that fair to say?

    A   Yes, sir.

    Q   So was there like a particular log-in

credential you would log into a computer --

    A   No.  Like a straight log-on.  Like they

know when I log onto a computer, I'm a correctional

captain.

    Q   Okay.  So there's some like user name and

password you have to input to log onto a computer to

see --

    A   Yeah.  Everybody's computer.

JEREMY DYKSTRA                        66
Cause No. 3:18-cv-00995-JD-MGG

THE REPORTER:  Excuse me.  One at a time. Your answer again, please.

THE WITNESS:  Yeah.  Yes, everybody has to log onto a computer with a user name and password.

BY MR. HEPPELL:

Q    And then no matter which computer at the facility you log onto, you're logged on with a correctional user name and password -- a captain user name and password; you would have access to the captain's level of authorization.

A    Yes.

Q    Was there any way to access that shared drive, to your knowledge, other than logging onto physical computers located at the prison?

A    Just at work.

Q    Other than logging onto the shared drive, do you know of any other way that you or any other correctional officer could review a particular policy or procedure?

A    Only way I know -- only way I know, you have to go to like "IN.gov," maybe you can find policies and procedures that way, like through the State website.

Q    Okay.  There might be some made available

in the State website.

A   You would have to look.  I mean, I've looked before, and it's really complicated to seem to find it.  And I'm not Mr. Computer Guru; so if I needed something, I'd either ask my major or another captain if he had it or show me how to get it because I'm not Mr. Tech Guy with computers.

Q   Well, you can't see what's on the other side of here.  It could be a total mess, for all you know.

A   Hey, I have 5 million archives on my computer.  You know?

Q   Is it your understanding that there were certain policies and procedures that applied statewide across all Indiana Department of Correction facilities?

A   Yes.

Q   And then would there be some policies and procedures that were specific to a particular facility?

A   Yes.

Q   Were those -- was there different terminology for describing the different levels of policies and procedures?

A   All right.  Can we just -- a policy comes

JEREMY DYKSTRA                    68
Cause No. 3:18-cv-00995-JD-MGG

out from Central Office.  It is a policy that is overall all.  Like for adult corrections, it's overall what they want, for whatever reason they want.

Now, a facility can put amendments on that to make it work for their facility because every facility's designed, shaped different, different level of offenders, and all of that.  So that's when you get procedures going to the policy.

And then there's like administrative, where they make it work for their facility.  And I don't know how all that works, but it makes it -- like Westville Prison, like I said, is all open dormitories.  Westville, you have a bunch -- or ISP, you have a bunch of cellhouses.  Well, that policy might be over -- the way we had to make changes to make it work for our cellhouses, just like they had to make changes to make it work for their dorms.

So that's about all I know at the -- you know, one instance.  You know, that's what I'm saying.  So there's like amendments to the policy to make it work for your facility.

Q    And just so I'm clear, is it your -- what you're describing, is it that there would be a specific policy that would come from Central that

JEREMY DYKSTRA                    69
Cause No. 3:18-cv-00995-JD-MGG

would apply statewide, and the individual facility could actually make changes to that policy?

A    Yes.  And then they get it approved through Central Office, the changes.

Q    Okay.

A    It's not actually changing the top portion of the policy.  It's making add-ons to make it work for your facility.

Q    Okay.  So is it -- I guess, is it more like more specifics, or how --

A    More pacific.

Q    Okay.  How are these top line things going to actually work out in practice at this facility.

A    Yes.

Q    And you described it physically or like spatially, like there's a top portion, and then a portion that the facility fills in?  Is that how they look on paper?

A    I don't -- it depends on what policy.  I mean, one policy might be thirty pages, one might be one page or one paragraph that works for everybody.  You know, so I couldn't tell you that.

Q    What's your understanding of that -- the process by which the facility-specific portion of a policy gets developed?

JEREMY DYKSTRA                70
Cause No. 3:18-cv-00995-JD-MGG

A    There's a policy coordinator.  You can contact her.  Her name's Rhonda Brannon.  She can give you more pacifics on that.

Q    Can you spell that, or can you --

A    I don't know.  Her name's Rhonda Brennan, you can ask her.  She's actually the PREA coordinator and the policy coordinator.

THE REPORTER:  I'm sorry.  The first...

THE WITNESS:  PREA.

MR. HEPPELL:  P-R-E-A.

THE WITNESS:  Coordinator and policy coordinator.

THE REPORTER:  Thank you.

BY MR. HEPPELL:

Q    And is it your understanding that she, like, is actually responsible for setting the policy or --

A    No.  She's responsible for getting the policy, getting it out, and then putting the add-ons.  And then it goes back to the warden for his approval, and I think she sends it downstate.  But you'd have to ask her the details on that.  So anything you want to know about policy, contact her.

Q    Okay.  And we're certainly not going to end the case by just talking --

A    Yeah.

Q    -- to you; but I do want to, you know --

A    Yeah.

Q    -- get my best understanding of what you're aware of in terms of those pieces of the process.

So take -- you know, I guess taking -- for example, a new policy that is passed, you know, out of the Central Office, on, you know, whatever subject matter, and that obviously needs to have Indiana State Prison fill in how is that specifically going to work here.

What's your understanding of who the people were in the 2014 to 2017 time period who would be responsible at the facility level for coming up with what that facility-specific part of the policy is?

A    I would say Major Nowatzke, Rhonda Brennan, might even have like the safety HAZMAT guy in that, too.

Q    And then ultimately, if I understood your earlier testimony, would it be the warden that had to give his formal sign-off?

A    He would review it and then sign off it or make the changes he wanted to them.

JEREMY DYKSTRA                 72
Cause No. 3:18-cv-00995-JD-MGG

Q    Since you -- I guess, during the entire period of time you served at Indiana State Prison, first as a lieutenant and later as a captain, were you ever involved in that policy-making or policy-amendment process?

A    No.  I've got asked ideas what I've thought but never really the process.

Q    Sorry.  I didn't hear what you said.  What was the first part you said?  You had ideas?

A    I've been asked for ideas, but I don't even remember what they were, but I didn't the -- you know, the writing or that.  That's not my forte.

Q    So just so I'm clear, you were consulted with:  What do you think about this?  How would this work?  Based on your experience, that kind of thing?

A    Yes.  Like primary, secondary, or third exit, what would I -- what I would think.

You know, good example:  I was a member of E Squad.  It's like a SWAT team.  So floor plans, layouts, stuff like that, building assaults, stuff like that, that's what they would come to me and ask.  So if they had something saying, what's the best exit to, you know, say, get everybody out, I would say, this one.

Q    And then based on your input, then someone

**JEREMY DYKSTRA**                    73
**Cause No. 3:18-cv-00995-JD-MGG**

else would --

A    Yeah, they'd do whatever they wanted.

Q    And even in your role as the head of E Squad, you weren't part of the policy-making process in terms of needing your formal sign-off on --

A    No, sir.

Q    So if I understood what you've described, you've described situations where, based on your particular expertise or position within the facility, people would come to you and say, what do you think about this policy, idea, this -- something like that?  Is that fair to say?

A    Yes.

Q    Were there any cases where it went the other way, that you would go up the chain and say, hey, I think we need to change this policy or I think we need a new policy on this?

A    No.  I don't -- no.

Q    Based on your recollection, at no point during your time at Indiana State Prison did you suggest a new policy or suggest changes to an existing policy?

A    No.  The only thing I ever did for the facility is do all the facility floor plans.

JEREMY DYKSTRA                           74
Cause No. 3:18-cv-00995-JD-MGG

Q    When you say, "facility floor plans," are you referring to -- well, what are you referring to as facility floor plans?

A    Floor plans like primary, secondary, and third way out of a building.

Q    So are you --

A    If available.

Q    Are you referring to like evacuation procedures?

A    Building assaults.

Q    Was that primarily in your capacity as head of the E Squad?

A    Yes.

Q    And so those were -- those floor plans were geared towards situations --

A    Disturbances.

Q    -- where members of the E Squad, which you've described as like a SWAT team, would have to --

A    Enter.

Q    -- enter and exit different buildings --

A    Yes.

Q    -- at the facility?

A    (Witness nodding head).

Q    So those weren't like emergency

evacuation --

A    No.

Q    -- routes.

A    No.  The safety HAZMAT coordinator has all control of that.  And at that time it would have been Steve Griffin.  And then the new safety HAZMAT guy is Mr. Boyn, Mr. Derrick Boyn.  So if he's made any changes to that from when Mr. Griffin had it till now, that would be the person to contact for evacuation plans and that stuff.

Q    What you were describing earlier in the process; whereby, people come to you to run ideas by you that fell within your area of expertise, who was the person that would come to you and discuss those potential policy changes with you?

A    Mr. Griffin asked me a few times what I thought the best way in and the best way out of a few buildings were, and I gave him my suggestions. What he did with those suggestions, I have no idea.

Q    If I understand what you're describing, he was asking you that based on your expertise doing floor plans for the E Squad, he was looking for advice for building his own policies for emergency evacuation?

A    I don't know if he was building policies

or if he was making new evacuation plans or what.  I
couldn't tell you that.

Q    You don't know what exactly his idea --

A    No.  He was just getting my thoughts on
if -- prisons are very notorious for adding gates
and taking away gates.  So sometimes they add gates
and sometimes they take gates away.  I know it
sounds crazy, but every cellhouse depends on what
kind of offenders, what kind of levels you have.

You know, so he was new to the
prison, too.  So he -- I was there probably six
months to a year before him, because he worked with
me at Camp Summit.  And I walked him around the
prison.  And he said, What are your thoughts on some
of the units?  You know, I gave him my thoughts.
That was it.

Q    And that was Mr. Griffin, you said?

A    Yes.

Q    Other than the example you just described
with Mr. Griffin, are there other individuals that
ever contacted you --

A    No, sir.

Q    Was that just one occasion that you recall
with Mr. Griffin, or were there multiple occasions?

A    I think there was a few times he asked me.

Q    All related to that same type of subject matter?

A    Yes.

Q    Going back to what we were talking about earlier in terms of the shared file with the policies and procedures that you could log in or review, was there any point during your transition from another facility to ISP where you were asked to familiarize yourself with all the policies and procedures that existed?

A    No.  It would be like me asking you, do you know every law book in Illinois?  You know, that's kind of the same thing.

Q    So if I'm taking that analogy -- and I appreciate that, because that's helpful for me as a lawyer, not working in corrections -- was the approach along the lines of:  There's a bunch of policies out there, and as needed, familiarize yourself with the ones you need to?

A    And there's policy and procedures or -- or policies; a big, long book -- it's probably as long as this table -- up in the Training Department.  So during in-service, if you want to review policies or procedures, you can go up there.  And I wouldn't say at any given time, because you still have a job to

JEREMY DYKSTRA                   78
Cause No. 3:18-cv-00995-JD-MGG

do; but during the in-service training week, you can look through them if you want to.

Q   So there is a --

A   There's availability.

Q   There's like a binder with all the policies in it?

A   I don't know if all of them are there.  I wouldn't be correct to answer you that, but there is a lot of them.  There's probably more facility based than statewide based because statewide based, you're probably going to fill up this room, just like your guys' law books.  You know.  So I'm just saying it's -- it's a lot to go through.  I mean, almost twenty years in corrections, and I don't know them all.

Q   Just so I'm clear, it was your understanding that there was --

A   Yes.

Q   -- a physical copy of some number of policies that was available and that was in the Training Room?  Is that what you said?

A   Training Department.

Q   In the Training Department.  And again, if if I understood your testimony, folks had jobs to do, so couldn't wander in there any hour of the day;

JEREMY DYKSTRA                    79
Cause No. 3:18-cv-00995-JD-MGG

but during their in-service training, they would be able to review those if they wanted to?

A    Yes, sir.

Q    Okay.  How were you made aware of that possibility, that availability?

A    The Training Department told us.

Q    Was that -- was it a requirement or a recommendation that folks do that?

A    I mean, I guess it's up to the individual. You know, if I want to look up something, then I go look it up probably the same as you.  You know what I mean?  You want to look up something in the law, I'm sure you go look it up so you know the information.  I mean, I'm sure there's a bunch of lawyer mumbo-jumbo that you care less not to read, just like there's a lot of policies that, to me, is just blah.  You know?

Q    I think you're probably right about that.

Did you personally ever exercise that opportunity to go review that physical copy of policies in that Training Department?

A    I've read, you know, hundreds and hundreds.  But to me, you know, there's three types of learning for everybody.  There's one where you can read it and you're perfect at it.  Me, I could

JEREMY DYKSTRA                  80
Cause No. 3:18-cv-00995-JD-MGG

sit there and read it all day and not understand it.

But you explain it to me and show me, then I'll

never forget.

Just like some people with the street

address, they're fine with it. You know, I'm

talking before the cell phone days. You know, me,

if you show me a location, I'll never forget it. So

learning -- reading and showing are two different

learning.

Q    And the showing that you described, that

for you is a more effective way --

A    Yes.

Q    -- of learning the policies, was that

through the in-service training that you described

earlier?

A    In-service; learning from other staff

members; learning from people above me, some below

me. You know? It's just like, you know, there's

sergeants there that have taught me a lot because

they've been there 25, 30 years.

Q    And that -- that learning from others, did

that just happen sort of organically, based on

situations that came up --

A    Yes, sir.

Q    -- and you would learn about new policies

JEREMY DYKSTRA                81
Cause No. 3:18-cv-00995-JD-MGG

or learn details of existing policies that you
didn't know before through encountering new
situations?

    A    Yes, sir.

    Q    Is it your impression, from working at the
facility, that that same approach was shared by
others?

    A    I think that's just shared in general.  I
mean, inside and outside of work.  I mean, yeah, I
mean, if you needed to know something -- I had no
problem, being a correctional captain, asking a
sergeant that was -- been in that situation, that
had been there for many years; or going to my major
or my warden for advice or saying, I don't
understand this.  Can you break it down?

    Just like when you go to the doctor's
office, and they start giving you all the
mumbo-jumbo; and you're like, can you just break it
down to me in real words?

    Q    You testified earlier that you became a
correctional captain -- if I understood your
testimony, it was probably three years before today,
so would that be sometime in 2016?

    A    Yes.

    Q    Okay.

JEREMY DYKSTRA                                    82
Cause No. 3:18-cv-00995-JD-MGG

A    It's been a little less than three years. I think I got promoted in August, so a little less than three years.

Q    August of 2016?

A    Yes.

Q    So coming up right on three years.

A    Yeah.

Q    Okay.  Did you -- was that a promotion that you pursued?

A    Yes.

Q    What was the reason for pursuing that promotion?

A    To me, it -- it was always a goal.  I always believed myself as a leader, not a follower. And not too many people in their career ever make correctional captain.  There's only five people at the prison that are captains, so...

Q    Was there -- strike that.

What were the steps that you needed to complete in order to attain the rank of captain?

A    Do my job.  Be the best at what I do. Be -- you know, when you go for captain, you're going against other lieutenants, other lieutenants from other facilities.  You know?

Q    So it was a competitive process.

JEREMY DYKSTRA                          83
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.  Interview based.

Q    Okay.  So it was interviewed based and, obviously, they were, through the interview and just through knowing you, they were looking at your performance to evaluate who they were promoting out of the lieutenants?

A    Yes.  I mean, you would have to ask the major, deputy warden, and then the warden, you know, why they picked me.

Q    Those are the individuals who interviewed you for the position?

A    The first interview was from Major Nowatzke and Deputy Warden Gann.  And then when I got promoted, the warden sat me down and talked to me.

Q    Was -- at the time that you were pursuing that promotion, was there one position available?

A    Yes.  They don't come open very often.

Q    And that's because there's a fixed number of captain positions at the facility?

A    Yes.

Q    So one comes open if someone gets promoted up or leaves for some other reason, and that's it?

A    Uh-huh.  Yes, sir.

Q    How many lieutenants were there at the

JEREMY DYKSTRA                      84
Cause No. 3:18-cv-00995-JD-MGG

facility at the time?

A    I want to say -- I'm trying to think.  I'd say about twenty, twenty-something.  But when you have a position like that open, lieutenants from other facilities will apply for them jobs.

Q    And I think you said this earlier.  Did you say there were five captain positions at the facility?

A    Yes.  Well, no.  There's six.  My bad.  Six.

Q    Six captain positions?

A    Yeah.

Q    And do you know what caused the vacancy that you ended up filling?

A    One captain transferred downstate to a different location, and then -- I'm trying to think when I got promoted.  Yeah, the captain went downstate to another promotion.  I think I filled his spot.  Or he -- I forgot which way.  Or the major got promoted.  One of the two.  I forget.

Q    So there were a couple different moves around the same time, but you ended up filling one of the captain positions?

A    Yeah.

Q    You indicated you were competing with

JEREMY DYKSTRA                                     85
Cause No. 3:18-cv-00995-JD-MGG

lieutenants from your own facility as well as

lieutenants from other facilities --

    A    Yes.

    Q    -- for the captain position.

    A    Yes, sir.

    Q    Do you know how many people you were

competing against that you attained that position?

    A    I have no idea.

    Q    At the time -- strike that.

    You first joined ISP as a

correctional lieutenant; correct?

    A    Yes.

    Q    What were your job duties as a

correctional lieutenant?

    A    I was an assistant shift supervisor for

about three months.

    Q    What are the job duties of an assistant

shift supervisor?

    A    Vacations, call-offs, managing the roster,

selecting or helping out with who's on

First Responders, Weapons Team, Cell Extraction

Team, First Responders, running of the shift,

walking the unit.

    Q    Did you have a set shift that you worked

as assistant shift supervisor?

A    When I worked assistant shift supervisor, I worked -- each group, it was 5:00 in the morning till 5:00 at night.  Worked that for about three months, and then I went to Night Shift as assistant shift supervisor.  Same duties as I've stated before as Days.  I did that for approximately a year, maybe a little less than a year.  And then I went to lockup lieutenant back on Day Shift where I worked Monday through Friday -- or Sunday through Thursday, 7:00 to 3:00, and I was responsible for the Lockup Units.

Q    What are the Lockup Units?

A    Restricted Housing Units.

Q    Is that like Segregation?

A    Yes.

Q    But the terminology that's used at ISP is "Restricted Housing"?

A    Yes.

Q    Referred to as "Lockup"?

A    Yes.

Q    What were -- so you had the two assistant shift supervisor positions and then the lockup lieutenant position.

A    And then I went from 5:00 and 2:00 to correct-- or lockup lieutenant to correctional

JEREMY DYKSTRA                87
Cause No. 3:18-cv-00995-JD-MGG

captain where I was on -- I was on Day Shift, I want to say.  Yeah, I was on Day Shift as a correctional captain for a while.  And then I went to -- no.  I was on Night Shift.  My bad.  I'm trying to think because I got moved so many times in five years there.  I went to nighttime as correctional captain when -- then I went to Days as a correctional -- well, captain.  And then I went to shelter captain, and then I was terminated.

Q    Are there standard shifts across the facility, or does it depend on the specific position, what the shifts are?

A    There's mainly five groups.

Q    Okay.

A    There's H -- H and I, both Day Shifts. They work -- you know, correctional officers work 5:45 to 6:00 at night or 5:45 at night till 6:00 in the morning.

And then there's "Five and Two" staff that work Monday through Friday, 7:00 to 3:00.  So there's four groups, H, I, J, K.  And then there's Five and Two staff that work Monday through Friday.

Q    Okay.  Sorry.  Just so I'm clear on the different groups, you said five different groups?

A    Yeah.  Well, they call it H, I, J, K; and

then there's -- yeah, there's five groups total, and then the Five and Two group.

Q    So Five and Two is the name of one group?

A    Yeah.

Q    So the H and I groups, are those the like regular -- are those like the 6:00 a.m. to 6:00 p.m. shift?

A    Yes.

Q    And so is H the Day, and I the Night Shift?

A    H and I are both Day Shifts.  J and K are both Night Shifts.  Correctional officers and correctional sergeants and correctional lieutenants, they work 5:45 till -- or 6:00 o'clock at night and 5:45 p.m. to 6:00 in the morning.

The captains, now, they work -- and their assistant shift supervisors, which would be their lieutenants, they work 4:00 to 4:00.  Both ways.

Q    So that, for example, the -- strike that.

So the J and K Shift, it's the same time.  It just depends on what days of the week you're working or -- strike that.

What's the difference between the J and the K group?

JEREMY DYKSTRA                89
Cause No. 3:18-cv-00995-JD-MGG

A    Okay.  Like say H works today.  They --
they -- H works today.  J would work that night.  So
they would work like two days.  I don't know.  You
want to break down the shifts?  Is that what you're
trying to do?

Q    I'm just trying to understand how the
schedule works, but --

A    You got to remember there's 24-hour
coverage.  So H, I, J, K, that covers your whole
year.  H, I, J, K.  They're 12-hour shifts.

Q    12-hour shifts.  So --

A    They cover the whole year, every day of
the year.

The Five and Two work Monday through
Friday.  They're off on weekends.  They're more like
specialty jobs, like clothing or something that only
needs to be open Monday through Friday; or
commissary, where the offenders get their food.  So
I don't know what "yearly" means.

Q    So on a particular day at the prison,
there would be either H Shift or I Shift and either
J Shift or K Shift.

A    Yes, sir.

Q    And then the next day would be different
or the same?

JEREMY DYKSTRA                    90
Cause No. 3:18-cv-00995-JD-MGG

A    No.  Like say if you -- I'm just going to -- like H -- and say it's Monday today.  H and J would work Monday and Tuesday; then be off Wednesday, Thursday; work Friday, Saturday, and Sunday.  The next week they would be off Monday, Tuesday; work Wednesday, Thursday; off Friday, Saturday, Sunday.  And other groups go --

Q    So you had that same pattern switching back and forth.  So you are either two on, two off, three on; and then two off, two on, three off.

A    Yes.

Q    Back and forth, same pattern.

A    Yes.

Q    Except for that Five and Two Shift, which, like you were saying, is Monday through Friday.

A    Yes.

Q    And you said the CO shifts were 5:45 to 6:00.

A    Yes.

Q    So 12 hours, plus that 15 minutes.

A    Yeah.

Q    And then was it a different shift time for positions higher up the ranks?

A    If you're a shift supervisor and you have an assistant shift supervisor -- like on Days, the

shift supervisor has two lieutenants.  That shift supervisor and two lieutenants work 4:00 in the morning till 4:00 in the afternoon.  And then the Night Shift supervisor, he has -- it's a captain and one lieutenant is the assistant shift supervisor, and they work 4:00 p.m. to 4:00 a.m. because you got to get time to get your roster set, deal with the call-offs, and all that stuff.

MR. HEPPELL:  Can we go off the record, take a break for a couple minutes?

MR. NAGY:  Sure.

(A brief recess was taken from 10:31 to 10:37.)

MR. HEPPELL:  Go back on the record.

BY MR. HEPPELL:

Q    Mr. Dykstra, when you first joined the Indiana Department of Correction, was there a specific course of training that you had to take?

A    I thought we went all over this with the in-service training.  You know, having FTO, having a packet for my rank.

Q    Sorry.  Just so I'm clear, I'm not referring to joining ISP.

Back when you started your career with the department as a correctional officer, was

**JEREMY DYKSTRA**                          92
**Cause No. 3:18-cv-00995-JD-MGG**

it that same process that you described?

    A    I had to go to an academy downstate in New Castle, Indiana.

    Q    How long was the academy training?

    A    I think it was a month long, but that was only a portion of it.  And then you had to go back and do training at the facility.  I forget how many weeks.  That's been a long time.

    Q    So there was an initial training for you being a brand new correction officer, which was approximately a month of downstate academy training --

    A    Yes.

    Q    -- and some number of weeks continued training back at the facility?

    A    Yes.

    Q    And that was at Westville that you first started at?

    A    Yes.

    Q    Do you remember the topics that were covered in that initial training?

    A    No.

    Q    Either at the academy or the facility training?

    A    No.  Been twenty years almost.

JEREMY DYKSTRA                    93
Cause No. 3:18-cv-00995-JD-MGG

Q    Once you completed that initial batch of training as a brand-new corrections officer, throughout your career, was it just that manual end -- annual, mandatory, in-service training that you had described before?

A    Yes.

Q    Was there any training that you received along the way throughout your career outside of that annual in-service training?

A    Are you talking about my extra training? Is that what you're looking for?

Q    Right.  Was there extra training outside of the in-service training?

A    Like for every employee or just myself?

Q    For you specifically.

A    Oh, I've had basic leadership, advance [sic] leadership, E Squad academies, advanced chemical agent academies, PREA, FTO trainer.  I mean, I'm probably forgetting a lot, and it's all in my file.  That's just some of the list.

Q    Okay.  So there's -- your understanding is that your training record would be maintained in your personnel file?

A    Yes.

Q    And if I understood -- well, let me ask

JEREMY DYKSTRA                     94
Cause No. 3:18-cv-00995-JD-MGG

you the question.

Is it true that the only mandatory training that you were required to take was that annual in-service training?

A    Yes.

Q    But there were opportunities for you to take additional training based on --

A    Yes.

Q    -- your personal goals for career advancement or gaining information in additional areas?

A    Yes, sir.

Q    And those were the topics you listed, like the E Squad academies, PREA training, et cetera.

A    Yes.

Q    Were there additional mandatory trainings that were associated with your rise through the ranks?

A    Every year they do -- I forgot to think this, but it came out of my -- the top of my head. They started it, I forget how many years ago, but it's been say the last, I don't know, probably eight, nine years, CBT training once a year, too, that every employee has to go to.  And it used to be like regular officers would have so many CBTs they

JEREMY DYKSTRA                95
Cause No. 3:18-cv-00995-JD-MGG

had to do, and then is supervisors would have additional ones.  And then there's been years where everybody's had the same ones.  So it's all been on whoever makes the CBT training, computer-based training, downstate, what requirements are for that year.

Q    So CBT is computer-based training?

A    Yes.

Q    And so that's in addition to the classroom mandatory in-service training you were describing?

A    Yes.

Q    Do you know when the CBT was instituted?

A    That's what I was telling you.  I don't remember how many years ago.  It was probably eight, nine years ago.

Q    And was that mandatory for every --

A    Yes.

Q    -- every individual, as well?

A    Yeah.  You have to complete it within a year.  The State year, from July 1st to the end of June.

Q    And what does that CBT training consist of?

A    It changes every year.  It must be on topics that are, I guess you could say, hot in the

prison system that year.

Q    Approximately how -- well, strike that.

Are those like videos you have to watch or --

A    Videos.  Some video, some reading, some -- you know, it's like multiple choice at the end.  You know.  And you have to get a pacific score on it.  I think 80 or higher to pass the test.

Q    So some videos and some written materials to make sure you've actually watched them and not just set it and wandered off?  There's like a multiple choice at the end of it?

A    Yes.

Q    Do you know approximately how long you had to spend within a given year on going through that CBT training to --

A    I couldn't tell you because every year's been different.  Some years we've had twenty of them to do, some years we had fifty of them to do.  So me, if I had any downtime, I'd knock out one or two.  You know, one might take five minutes, one might take a half hour.  So it's probably -- I don't know.  Probably, an average person, probably 16 to 20 hours worth of, you know, training, depending on your knowledge, too.

JEREMY DYKSTRA                97
Cause No. 3:18-cv-00995-JD-MGG

Q    So if it was something that was familiar to you, you can move more quickly through it?

A    Yeah, you could just go through it, answer questions.  You know.  If it's not, then you have to read everything.

Q    So other than the mandatory classroom in-service training, that CBT training, and the training that you described that you sought out, which wasn't mandatory, but you sought out for interests in career development, any other types of training that you've received during the course of your career as a correctional officer?

A    No, sir.

Q    You testified earlier that you were on duty on April 7th, 2017, at Indiana State Prison, the evening of the fire in B Cellhouse; correct?

A    Yes.

Q    Do you recall the shift that you were working?

A    J.

Q    And what was J Shift for you?

A    Nighttime.

Q    And was that the 4:00 p.m. to 4:00 a.m. shift?

A    I think at that time we were working

JEREMY DYKSTRA                         98
Cause No. 3:18-cv-00995-JD-MGG

5:00 p.m. -- or 5:00 p.m. to 5:00 a.m.  I think about a year after that, they switched it to 4:00 to 4:00 for the shift supervisors.

Q    And you were serving as a correctional captain, as a shift supervisor; correct?

A    Yes.

Q    What were your job duties that evening?

A    The same ones I list before, earlier in the testimony.  The same as assistant supervisors. It's the same for shift supervisors.  A shift supervisor maintains the roster; the QRT list, which is the First Responders, Weapons Team, Cell Extraction Team, you know, any trips going out, staff call-offs, staff vacations, performance appraisals.

Q    So the job duties you were just describing, are those like administrative job duties that, like, require paperwork or require approving people's, you know, requests for different assignments or time off?

A    Yes.

Q    Okay.  And --

A    I think on Night Shift I was in charge of about a hundred staff.

Q    And so was there a particular place that

**JEREMY DYKSTRA**                                99
**Cause No. 3:18-cv-00995-JD-MGG**

on that Night Shift, working in the shift supervisor position, that you would be located as your sort --

A    Yes.

Q    -- of main location during your shift?

A    (Witness nodding head).

Q    Where was that location?

A    In the Guard Hall.

Q    Can you describe where the Guard Hall is located in relation to the rest of the prison?

A    Have you ever been in Indiana State Prison?

Q    I have a couple times.

A    Have you?

Q    But I probably haven't been given the full tour.

A    When you went into Indiana State Prison, you had the shakedown area; correct?  You remember that?  And then there's a gate.  Then there's an officer working in that box.  You go through that gate.  The Shift Supervisor Office is through that gate and to the left.  You had like three gates to go through.  And then the Shift Supervisor Office is right after that.  Then you got a series of gates to get outside the wall.  I mean, I guess I could draw it for you, if you wanted.

**JEREMY DYKSTRA**                                100
**Cause No. 3:18-cv-00995-JD-MGG**

Q    I think I can do you one better.

A    Okay.

(Dykstra Exhibit A marked for

identification.)

BY MR. HEPPELL:

Q    Before you start marking that one up, I've got one that's been marked by the court reporter as an exhibit that we're going to use for you, and that's just a copy for your lawyer so he can follow along and doesn't feel left out.

So I've placed in front of you an exhibit.  It's been marked by the court reporter as Dykstra Exhibit A, and it's got a Bates stamp on it, just for the record, Devine Production 5873.

Do you recognize what this document depicts?

A    Yes.

Q    What does that document depict?

A    A layout of Indiana State Prison.

Q    Does this appear to you, based on your recollection, having worked there, to be an accurate representation of the layout of the prison?

A    Yes.

Q    Okay.  And you had stated earlier that you worked -- that your, sort of, base of operations or

where you were primarily located as a shift
supervisor was out of the Guard Hall; correct?

     A     Yes.

     Q     Where on the map is the Guard Hall
located?

     A      24.  Custody Hall.

     Q     Custody Hall?  And that's what you were
referring to as "Guard Hall"?

     A     Yeah.

     Q     Was there an office within the area that's
marked on the map as 24 that you were located in?

     A     Yeah, there's -- there's an office.  Yeah,
there's two of them.

     Q     And it was one of those two offices that
was your --

     A     Yes.

     Q     -- standard place that you would work out
of during that shift?

     A     (Witness nodding head).

     Q     Looking at the list on the left-hand side
of all the different locations, under 24,
Custody Hall, it lists a bunch of, I guess,
subtopics under there.  Are those all located in
24 --

     A     It's --

Q    -- in Custody Hall?

A    It's kind of deceptive.  I don't know. This is -- they should have broke it down like to the area more.  I mean, 24 is covering quite a bit of area, because there's some hallways there.

Q    Okay.

A    I mean, you can't really tell by looking at this -- this -- never mind.  I was going to say, "crap."  You know what I mean?

Q    In terms of -- you're not finding the map to be super helpful in terms of breaking down that Custody Hall area?

A    Yeah.  Not to me.

Q    Could you -- the room that you were specifically working in, is it listed on that left-hand side under Custody Hall?

A    Yeah, "Shift Supervisor."

Q    Okay.  So that's the -- the name of the room was just like a Shift Supervisor Office?

A    Captain's Office, yeah.

Q    Are you able to mark, I guess with a dot on that exhibit, sort of where within 24 that Shift Supervisor Office was --

A    I'll show you.

Q    -- to the best of your ability?

A    Like you walked through them gates --

Q    Yeah.

A    You walked through.  This is like the main door.  You went through shakedown probably like midway area here.  And then my office would have been like -- this is terrible.  Have you got a pen?

Q    I have a pen that --

A    Yeah.

Q    -- might work a little better than the highlighter.

A    It would be like -- I'll just put a little dot here.

Q    Okay.  And so you've just marked, with a little blue ink dot right to the left of the 24 on Exhibit A in front of you, an approximate location of that Shift Supervisor Office?

A    Yes.

Q    Okay.  And during a regular shift as a shift supervisor in the 2017 time period, are there other locations that you would visit throughout your shift?

A    I could visit anything in the prison.

Q    Did you have like a regular practice of like touring or patrolling other areas?

A    No, sir.

**JEREMY DYKSTRA**                                      104
**Cause No. 3:18-cv-00995-JD-MGG**

Q    So if you were visiting another area, would it be because there was a specific incident or just a need that had arisen, that you needed to go somewhere outside of the Shift Supervisor Office?

A    You might not know about corrections much, but you never set a pattern in corrections, as like a lieutenant or a sergeant or a captain; because you set a pattern, staff and offenders know when you're coming.  So no, there ain't -- if I was going out to walk around or do the perimeter, you know, I'd just pick different times randomly.

Q    Okay.  So -- and again, just so I understand what your typical job duties looked like, you had job duties that were, you know, administrative that you were accomplishing in the Shift --

A    Basically --

Q    -- Supervisor's Office; correct?

A    Basically, there's a lot of paperwork to do in that office.

Q    Okay.

A    A lot of -- you know, any incident, anything, anything from, say, a staff gets -- slams his finger in a door.  So you got to do a report; you know?  So it's a lot of reports.

JEREMY DYKSTRA                                    105
Cause No. 3:18-cv-00995-JD-MGG

                     And then people, you know, no call,
no show, so there's paperwork to do that way to send
to Personnel and the major and them.  So -- and then
there's fact file entries you got to do daily on --
people call off, you know, stuff like that.  So it's
a lot of paperwork.

          Q    So a lot of paperwork that you would do in
the Shift Supervisor Office; correct?

          A    Yes.

          Q    And then I assume -- correct me if I'm
wrong -- that there might be incidents or things
that would arise at particular locations in the
prison that would cause you to need to go out to
respond to something?

          A    No, I don't.

          Q    Okay.

          A    As a correctional captain, being a shift
supervisor, I stay in that office.  I don't leave
the office.

          Q    Well, what about what you were describing
in terms of patrolling the perimeter?

          A    Like for me to leave the office, I have to
leave one of my assistant shift supervisors.
Somebody has to be in that office 24 hours a day, 7
days a week.  It's like your control point.  You

know?  Even though you have of a Control Room, I'm -- the correctional captain is making decisions or your supervisor -- your assistant.

So if there was nothing going on -- you know, I work Night Shifts.  Sometimes there was a dry spell from 11:00 till 1:00 or 2:00 in the morning where most people are sleeping.  If we don't have any incidents, yes, I'd go walk different units just to see what staff were doing, plus offenders doing.  And sometimes it's just good to get out there to the offender population so they know who you are.  But if there aren't any incident, I'd go right back to the office.

Q    Thank you for that clarification.

And the, sort of, patrolling that you were just describing, if there was a quiet period, if I understood your testimony correctly, you would need to have then someone substitute for you who's staying in that shift supervisor room?

A    Yeah.  It would be one of my assistant shift supervisors.

Q    And the assistant supervisors were lieutenants; is that correct?

A    Yes.

Q    As the shift supervisor, as a that

correctional captain on the Night Shift, were you the highest ranking officer that was physically present on site?

A    In the prison?  Yes.

Q    Okay.  So in terms of the chain of command, the only people above you -- well, actually, can you describe the chain of command that was above you as a correctional captain?

A    Correction -- it would be Major Nowatzke at the time.  He would have been my direct supervisor.

And then at that time, that year, that date, it would have been a Mr. Gann.  He was deputy warden.  I think they called them assistant superintendents back then.

And then Warden Neal, which he was a superintendent back then.  They changed the name like a year ago or so, back from assistant superintendents and superintendents to wardens and deputy wardens.

And my warden did live on grounds, too, but I would have been in charge of everything else.

Q    So the warden actually had -- his home was sort of on the grounds of the prison?

A    Yes, sir.

Q    Was it outside the perimeter or inside the perimeter?

A    No. 49 (indicating).

Q    Got it.  And so that's outside of the secure --

A    Well, it's outside the wall, but it's in the perimeter.

Q    Within the perimeter of the property, but outside the wall, the facility.

A    Yes.

Q    So he was present --

A    Well, he probably was sleeping.

Q    Right.  You were the only person who was on -- you were the highest ranking person on duty; correct?

A    Yes, sir.

Q    And the highest ranking person who was physically present within the walls of the prison.

A    Yes.

Q    And probably the highest ranking person who was awake on the grounds.  Based on the time.

A    Yes.

Q    And that's because the major, the deputy warden, and the warden all work Day Shift as a

JEREMY DYKSTRA                           109
Cause No. 3:18-cv-00995-JD-MGG

regular shift; is that right?

A    Yes, sir.

Q    Can you describe what that Shift Supervisor Office looked like on the interior and what its layout was?

A    Not a very big room.  Say probably 10 feet wide by 15 feet long maybe.  As soon as you walked into the door, to the right there was a desk with the computer.  As soon as -- and then when you walked to the door on the left, there was a computer against the wall and a desk.  And then there was some filing cabinets in there.

Q    So two desks with a computer set up on them --

A    Yes.

Q    -- and some file cabinets?

A    Yes.

Q    Any other major furniture in the room?

A    Just cabinets that we store like -- like equipment in.  That's it.

Q    Was there anyone else who worked out of that room with you?

A    Yes.

Q    Who?  Who was that?

A    At that time Lieutenant Redden and

Lieutenant Watson.

Q    And those were your assistant shift supervisors?

A    Yes.

Q    And that's the position that you had previously held?

A    Yeah.

Q    Not directly previously, but at a prior point in time at ISP --

A    Yes.

Q    -- you held the position of assistant shift supervisor as a correctional lieutenant; correct?

A    Yes.

Q    And if I recall your testimony correctly, but correct me if I'm wrong, your duties as an assistant shift supervisor --

A    They're the same as a shift supervisor. Just when the captain's there, I'm the one directing traffic and delegating stuff to them to do while I'm doing that.  But if I'm not there, they have the same pool of -- you know, if I'm off today, and I put Lieutenant Redden in charge, he would be the shift supervisor, which -- and therefore -- I wouldn't say he has the rank of captain, but he

**JEREMY DYKSTRA**                                     111
**Cause No. 3:18-cv-00995-JD-MGG**

would do the same thing as I would do.

Q    So there would be times where -- if the shift supervisor, the captain, had time off for whatever reason, the position of shift supervisor on a particular shift would be filled by a correctional lieutenant?

A    Yes, sir.

Q    And so in terms of their abilities and job duties, they overlapped, in terms of what you could do as captain; just if you were both there, you would obviously outrank --

A    Yes.

Q    -- the lieutenants.

A    Yes.

Q    And if I understood what you were describing earlier, in terms of you staying in the office, if there was an incident that took place while you were shift supervisor, would it be the assistant shift supervisors, the lieutenants, who would leave the Shift Supervisor Office to be physically responding, and you would stay back in the Shift Supervisor Office?

A    Yes.

Q    Is there a written policy or procedure, a written procedure that sets out what you just

described to me in terms of the captain, the shift supervisor, staying in that office?

A   Yeah, there's a -- there's called, "post orders" for job assignment.  And I think there's a facility directive.  I don't know if it's a policy, but...

Q   So post orders and a facility directive, and those are different types of written, procedural --

A   Post orders are job based.

Q   Okay.

A   A facility directive would be more pacific, kind of getting into policies or procedures.

Q   And it would be those documents that set forth, among other things, what you were just describing in terms of the shift supervisor being -- you're in that office, you're not leaving it unless you've found someone to cover for your.  Is that right?

A   During an incident, if I'm the highest ranking person there, yes, I'm not leaving that office.

Q   Do you know why that's the policy?

A   Because I'm the highest ranking, I have

JEREMY DYKSTRA                        113
Cause No. 3:18-cv-00995-JD-MGG

the most knowledge.  I'm supposed to be directing traffic and delegating duties to everybody else.

Q    Are there -- what else is included in the post orders related to the shift supervisor position?

A    I don't remember the whole thing word by word.  I couldn't -- I don't have an answer for you.

Q    Are there any other topics that you remember, beyond the one we've talked about, in terms of physical --

A    I mean, there's -- there's a lot of books in the Shift Supervisor -- there's books.  You know, who you call if, you know, you have to transfer somebody from -- we had -- we do have -- I'm just giving an incident.  We do have an outside prison that's a lower level outside the wall.  So say two offenders get in trouble there, there's a -- kind of like a little checklist of who you have to call to get the offender moved into this prison.  You know, so there's like general guidelines on who you call, kind of what you do.

Q    And are those part of the post orders?

A    No.  It's just a book of, I call it, knowledge.  You know, it's just -- you know, the more incidents you've been through, people kind of

write down like -- you know, working at a prison, you go through some stuff that you've never seen in your life, and then you kind of make guidelines up to -- so if somebody else has something happen, it might help them out in the future.

Q   And just so I'm clear on what you're describing, is this like a physical book that's located -- or at the time was located in the Shift Supervisor's Office?

A   Yes.

Q   And you referred to it as the "book of knowledge."  Did it have a formal title?

A   Not that I know of.

Q   And what you described to me, to me sounded like a checklist that you, as the shift supervisor and other shift supervisors, would like create based on your experiences --

A   Well, it might be created on a policy. It's just -- if you pull out policy on, say, something on -- I'm going to give you an example of a bomb threat.  You can't sit there and read thirty pages of bomb threats.  So you're making it simplified so you bam, bam, bam.  You know.  So they're probably based on the policy.  Sorry I didn't say it that way.

JEREMY DYKSTRA                    115
Cause No. 3:18-cv-00995-JD-MGG

It's just you make it simplified so you can have it click faster for -- 'cause like some -- there's captains -- we're all different. We're different people.  Me, I'm better when stuff does happen, I just know how to do it, than -- some people kind of freakout, and they need a list.  You know?

Q    I appreciate that, and I appreciate the clarification.

So your approach was less reliant on what was written in that binder --

A    I've been -- yes.  And reasons being: I've been -- I was part of the E Squad for going on 19 years before I was terminated.  I was a field commander at Westville for seven or eight years.  I was a field commander in charge of ISP's E Squad for four years.  And before that I was in, you know, the Army.  You know, so making decisions and when stuff happens, bad stuff, it's -- you know, if you want to freak me out, give me a public speech; I'll freeze. You want to see me clam up and want to pass out, there you go.  But something -- when bad situations happen, that's where -- it just clicks to me.

And that goes with hundreds and thousands of incidents, including riots and

JEREMY DYKSTRA                    116
Cause No. 3:18-cv-00995-JD-MGG

everything else I've been through in my life.

Q    Got it.  But that "book of knowledge" that you were describing, that was available in the Shift Supervisor's Office?

A    Yes.  And it has phone numbers in there; who to contact, the warden, deputy wardens, the major.

Q    And I don't want to belabor the point, but just so I'm clear, the -- is that -- is it a binder or --

A    Yes.

Q    Okay.  And you described, sort of, there being formal policies that then kind of get simplified down into like key steps --

A    Yes.

Q    -- for easy reference, I guess.  Is that fair to say?

A    (Witness nodding head).

Q    Is that a fair characterization of --

A    Yes.

Q    Does the binder itself contain the actual policy, or is the binder just that sort of checklist?

A    No.  Once again, if you put all the policies in a book, and you're trying to scrummage

JEREMY DYKSTRA                    117
Cause No. 3:18-cv-00995-JD-MGG

through a table full of policies, all hell's already broke loose.  You know?

Q    And to your knowledge, were the checklists, or whatever you want to call it, contained in that binder, in the "book of knowledge," were those written out by different correctional captains?

A    It might have been correctional captains, might have been the warden, might have been -- could have been the E Squad, canine member.  You know what I mean?

Q    Did you contribute any checklists or any content to that "book of knowledge"?

A    No.

Q    Did you ever have cause to refer to or use the "book of knowledge"?

A    Yes, for phone numbers.

Q    Other than for phone numbers?

A    No, sir.

Q    But your understanding of other office -- of other shift supervisors and shift -- let me start over.

A    It's --

Q    Sorry.  I just messed up my question.  Let me just ask the question so there's a clear record.

JEREMY DYKSTRA                                118
Cause No. 3:18-cv-00995-JD-MGG

Is it your understanding that the practice of other shift supervisors or assistant shift supervisors, that they would refer to the checklists or contents of that book?

A    Yes.  It's a great book for people that might not know what's going on in a situation.

Q    To your knowledge, at the time that you left the prison, back in May of 2019, was that book still in the Shift Supervisor's Office?

A    As far as I know, but before -- before that job, I was the shelter captain, so I was in charge of all the units for about a year and a half or so.

Q    What were your job duties as shelter captain?

A    I was in charge of every unit at ISP.

Q    And sort of on that day-to-day basis or during the course of your shift, what were you tasked with?

A    I would make sure the lieutenants were doing their jobs, the sergeants were doing their jobs.  I would be checking if they had like curtains up.  I don't know if you know what that means, but they got cell bars.  They like to put curtains up so you can't see in there.  So you don't know if a guy

JEREMY DYKSTRA                    119
Cause No. 3:18-cv-00995-JD-MGG

is living or dying.  So I would walk every unit

almost every day, make sure them were down, make

sure the units were clean, make sure -- you know,

lighting, stuff like that.

Q    When you were describing your job duties

as shift supervisor earlier, I think you described

part of it as sort of like directing traffic.  Do

you recall that?

A    Yes.

Q    Was that -- did that involve actually like

you physically opening gates or opening access for

folks to get into different areas of the prison?

A    Okay.  I'll reclarify.  It ain't directing

traffic like that, but it's managing people; where

to go, what to do.  If something does happen, I need

you guys to go there.  If they didn't know already.

Because when stuff happens, some people tend to

forget things because of the adrenaline pumping or

whatever's going on.  So you have to redirect them.

So sometimes I would stand at the office door.  "I

need you guys to go over there, I need you to go do

that, I need you to go get me this."  And that

traffic could be -- not just me standing there.  It

could be on the radio.  Most of it is on the radio.

Q    What equipment or tools did you have in

the Shift Supervisor's Office that you would use to accomplish your job duties?

A    Well, we got computers.  I mean -- we got that.  I don't know where you're going with this.  I mean, we had a QRT cabinet because at that time we had different levels of OC, which is -- you guys would know it as like pepper spray.  We had different levels of that.  So if you're a First Responder, you got different levels of pepper spray and cutting tools, and you would have to issue them out and then get theirs, you know, so they make sure -- like one for one, turn it in.

Q    And I think you called me out on asking an unclear question, so I'll try and be a little more specific, but the answer you gave was helpful.

So one of the things that you had in the office was a cabinet with a variety of tools for equipping QRT folks; correct?

A    Yes.

Q    And what does QRT stand for?

A    Quick Response Team.

Q    And what is the Quick Response Team?

A    When a signal's called -- like Signal 3000 means medical emergency.  They're the ones that go to the area and make sure the area is safe for

JEREMY DYKSTRA                    121
Cause No. 3:18-cv-00995-JD-MGG

medical staff to treat the victim, offender or

staff.  And they have different equipment on them to

make sure the, you know, security -- the area is

secured, so it's safe for staff and offender.

Q    And so that --

A    I was just giving you an example of a

medical emergency.

Q    Sure, and I appreciate that.  I appreciate

that because it's helpful.

So taking that example, who -- so

who's on the Quick Response Team?

A    It's probably training people that have

been through QRT training.  You can only be a member

of the First Responders Weapons Team or Cell

Extraction Team if you went to this training through

the Training Department.  And you are chose,

usually, by your shift supervisor to go through the

training.  And the approval -- the person that let's

you go through the training is the major.  And

that's anywhere from officer all the way up to

lieutenant.

Q    And so you have used a few different terms

both in that answer and previously, so I just want

to make sure how they all fit together.

So you referred to the Quick Response

Team or QRT; correct?  That's the one --

A    Okay.

Q    And you made reference to something, "First Responders."

A    Okay.  QRT has three teams within QRT.

Q    Got it.

A    You got your First Responders, you got your Weapons Team, and Cell Extraction Team.  You could put them in any order you want, but there has to be so many members on each team.  And they can change out from each team.  You know, so you put a list together so everybody knows what their job duties are for that night.  So if somebody can be -- he could be on First Responders today, and tomorrow I could put him on Cell Extraction.  They're -- the training they go through is for all three.

Q    Okay.  So any given correctional officer or sergeant or whomever, they are qualified as just a QRT member, and they could serve on any one of the three sub-teams.

A    Yes.

Q    But on any particular shift, they're going to be assigned to one specific team.

A    Yes, sir.

Q    Is that correct?

And is there a set number of individuals on a specific team so that like on a particular shift at the prison, there's always a certain number of First Responders and a certain number of Weapons Team, a certain number of Cell Extraction?

A    Yes.

Q    Do you remember what those numbers are?

A    The thing is, you have to go with -- everybody has to be trained to be on a team, so I can't just say, yeah, I think you'll do a good job and put you on it because you're not certified in the equipment.  So it all goes based on staff shortages too.  So your first team you'd really want to fill is your First Responders.  You know, them are four individuals.

Your second team you would want to have filled is your Weapons Team because when the First Responders get activated, the Weapons Team already goes to -- automatically goes to the Weapons Room.

Yes, you want them all filled, you know, to have different people on it, but your Cell Extraction would be your last team because the fill -- by staff -- you know, if you're short, and

JEREMY DYKSTRA                    124
Cause No. 3:18-cv-00995-JD-MGG

you don't have enough members, you want to fill that team last because most of the time if you're -- if you got an unruly offender in a cell, he's not going to really need to be cell extracted in two seconds, so you could actually take some of them members from the First Responder or the Weapons Team to fill that team if you had to.

A perfect world scenario, you're fully staffed and nobody calls off, and nobody does no-call/no-show, and you can have every team filled.

Q    Maybe I misheard you.  Is it like a filled First Responder Team on a particular shift is four individuals?

A    Yes.

Q    And is that the same for the Weapons Team?

A    The Weapons Team -- well, couldn't tell you now because it's been a few years, and they've changed stuff.  So they reconfigured the Weapons Team.  Should be in my report, who was in what.  In that paperwork there, who was on what.

Q    Okay.  Got it.

A    But they've changed it around because we've got different weapons in the state of Indiana, and I can't remember how many is on the Weapons Team exactly.

JEREMY DYKSTRA                     125
Cause No. 3:18-cv-00995-JD-MGG

Q    And then the Cell Extraction, again --

A    You have -- I remember that because that hasn't changed.  You have five, six, seven, eight.  Eight people on that.

Q    Got it.

And so these would be people who would be assigned -- they are QRT trained, who are on shift with regular jobs at the facility, but they also know, in addition to their regular position, they're assigned to one of those three teams within the QRT.  Is that how that works?

A    Yes.  They -- most of your First Responders, you want them more accessible, if that makes sense.  Like where they have most posts that are more open, that they don't have to worry about shutting down a post to get to where they're at.

Weapons Team, yes, they can work units, but they have to -- you read it off in roll call, what they're assigned to.  So the people working with them in their cellhouses or units know when a signal's called, that they have to leave the unit to go to their area.

Q    And that kind -- I guess that goes along with the prioritization you were describing in terms

of filling the teams, too.  It's based on urgency, and then it's also an assignment based on -- the more urgent team, you want them more readily accessible --

A    You want the -- you always want the First Responders and Weapons Team, period. Cell Extraction -- yes, on a perfect day, you have all the teams filled.  But if you don't, you always make sure the first two are always filled.

Q    You've described this a little bit, but can you explain what the different responsibilities or functions are of those different sub-teams?

A    The First Responders are also -- wherever the signal or the disturbance or whatever is going on, they're the first ones to go to that area. They're supposed to group up before they go in there and work as a team to secure the scene or take control of the incident.

And then they contact me and tell me if they do have to go to a Weapons Team.  And the Weapons Team is standing by in them sally port gates that you actually walked through.  And they're -- with their gear on, ready to go with the weapons if I have to call -- if the First Responders call me to activate the Weapons Team.

As soon as the signal's called, they all know the location because the officer on the unit will say, "Signal 7," which is assault on staff, wherever.  They'll say -- wherever.  They know -- they group up.

Most good -- there's a team leader of the First Responders, and there's a team leader of the Weapons Team.  When the Weapons Team gets there, the team leader in the First Responders takes control of the Weapons Team.

And, you know, most good teams, they get together, and they discuss -- say, if an incident happens, we're meeting here.  You don't want individuals going into a situation by their self.  You always want -- I always say, "the buddy system," but there's four of them.  They should have four people with them.  And the Weapons Teams stands by.  And when the Weapons Team leaves, they all go together.

Q   So you have referred to the calling of a signal as being the triggering event that causes people to --

A   It's auto -- it's automatic.

Q   Can you help me understand exactly how that works or how that worked in practice --

JEREMY DYKSTRA                    128
Cause No. 3:18-cv-00995-JD-MGG

A    Okay.  Say --

Q    -- in the 2017 time period?

A    Okay.  Say -- say a fire's called in B Cellhouse.  First thing, the responders are already -- they hear -- they know there's a fire in B Cellhouse, so they automatically get together, and they go to B Cellhouse.

The Weapons Team, wherever they're at, they go report to the Weapons Room.  And it's within -- you know, they should be aware of they're going within a minute or so, a few minutes.  It's quick.

Q    And so the First Responders, did they come to a central location to congregate together before they go out to the location of the incident?

A    If it was called at a cellhouse, most the time since -- they would meet at the front door.  It's like automatic.  You know, every incident's different.  We could throw loopholes in every situation.  But if it's at a cellhouse, like where I said it was, B Cellhouse, they'd come to the front door, make sure all four of them were with each other, and then they assess the scene.

But since we're on the fire thing in B Cellhouse, we have a fire department that are

offender firemen that automatically go to Checkpoint 4 and get the key from the sergeant working there to get into the fire station to get their equipment.  And once they group up, they go to the fire.

Q    Okay.

A    If the First Responders can't put it out their selves, by the fire extinguishers in the cellhouse.

Q    So what you just described with the prisoner firefighters, that's sort of an added layer that's specific to the --

A    We're the only --

Q    -- incident where there's a fire?

A    We're the only prison in the United States that have offender firemen that are certified and all that.

Q    So what are -- is there a specific written policy which sets out what you just described for me in terms of congregating at the front door of the cellhouse?

A    I don't -- there's a QRT policy that says that they're all supposed to enter whatever unit, any area, whatever you want to call it, together as a group.  That's for each other's safety.

Q    And that's a written QRT policy?

A    Yes.  You go through it in QRT training.

Q    And that -- is that a --

A    That's a yearly thing.

Q    Is that an Indiana State Prison specific policy?

A    No.  That's a statewide policy.

Q    Statewide.

What -- is there like a defined list of the different types of signals or incidents that cause the First Responders to be activated?

A    Any -- any emergency code.

Q    Is there -- you made reference to, I think, Signal 3000?  Is that correct?

A    Medical emergency.

Q    And then there's other different codes for specific types of incidents; is that correct?

A    Yes.

Q    Like I think you made reference to a staff assault.

A    That's Signal 7.

Q    Signal 7.

A    10-10's fight.  A Single 7's more geared towards staff.  10-10's for like fight.  10-71, fire.

JEREMY DYKSTRA                    131
Cause No. 3:18-cv-00995-JD-MGG

Q    Is there a written list somewhere of all
the different --

A    Yes.

Q    -- codes that are used?

A    Yes.

Q    Where is that kept?

A    You get that form when you go through
training.  There's a list in the Shift Supervisor
Office.  Every new employee gets a little like
laminated card with all the different codes; you
know, 10-4.  You know, Signal 8, that means come to
me.  You know, they get all that.

Q    What's a 10-70?

A    Fire.

Q    What's 10-71?

A    God, off the top of my head, I've heard
them call both things -- I think we use them both
for fire.

Q    So those are like -- as far as you
understood them and used them, those were
interchangeable codes to mean fire?

A    I can't remember all the codes.

Q    Okay.  But there was a written, I guess,
cheat sheet for them all that folks would have?

A    Yeah.  I haven't had one in years.

Q    Sorry.  You said you hadn't had one in years?

A    No.

Q    But there would be ones posted in the office, as well, for you to review?

A    I think it's in the post orders, too.  It might be in every individual's post orders, but I'm not sure on that.  I haven't checked post orders on the units in years.

Q    Is that because you don't need to check back on them because you've worked there --

A    Well, post orders change yearly, and it changes by the housing unit.  And with the State of Indiana, just like -- they like to start new programs, so post orders change frequently.  So if you -- like B Cellhouse, back in 2000 [sic] when this happened, it was kind of more of a nice cellhouse.  I mean, most of the offenders in there, you never had any issues.  And now, today, it's -- half of it's a drug unit, so the post orders have changed.

So when they start new programs, in the State of Indiana, your post orders change during -- you know, for whatever unit, whatever program they're trying out.

JEREMY DYKSTRA                    133
Cause No. 3:18-cv-00995-JD-MGG

Q    What's a drug unit?

A    People have drug problems.

Q    Sounds like some of the codes or signals that would be used weren't emergency codes; they were just ways of communicating over the radio?

A    Yes.

Q    Was there like a specific subset of them, that these are emergency codes that are going to cause the QRT --

A    Yeah, they have them like -- like you have your signal codes, you have your 10 codes.  And some of them, it will say like, "emergency codes," and they have a list of them.

Q    Okay.  And again, so it's on -- that's on the document, that list of codes that you're describing?

A    Yes.

Q    And there was a specific section that was a section of emergency codes?

A    Yes.

Q    And those are the codes that if any one of those codes were called, that's what would cause the quick response teams to be activated?

A    Yes.

Q    And would all three quick response teams

**JEREMY DYKSTRA**                                                134
Cause No. 3:18-cv-00995-JD-MGG

be activated --

A    No.

Q    -- in response to any given code?

A    For any -- okay.  Your first two teams are always -- they -- for any emergency code, they're -- they respond, they go to the areas.  The First Responders go to the incident first.  The Weapons Team sits in the Weapons Room till I activate them to go.  The only reason you would take Weapons to a unit is if the First Responders can't handle it, and they say, We need the Weapons Team. And they contact me through the radio, and I activate the Weapons Team because there's no sense in them going and get their weapons, go all the way to the unit, and it's a guy that had a seizure.  You know?  Why am I going to bring all them guns and stuff out there to the incident when they handled it, they made sure the nurses were safe, and took the guy back to whatever.

So now, the Cell Extraction Team is when the First Responders can't handle -- the guy still won't come out of his cell, and then they're going to request that we activate a Cell Extraction Team.

Q    So that Cell Extraction Team, which is

**JEREMY DYKSTRA**                                135
Cause No. 3:18-cv-00995-JD-MGG

that third team, is only activated upon a specific request --

A    Yep.

Q    -- like the incidents -- we've assessed it, and we need the Cell Extraction Team?

A    Yes.

Q    The First Responders and Weapons Team are activated no matter what the emergency code?

A    Yes.

Q    But the First Responders are going to go to the incident, and the Weapons Team held back in reserve, waiting the shift supervisor to say, we need the Weapons Team.

A    Yes.

Q    Is there specific equipment that the First Responders will bring with them in their response to an incident?

A    They get that at the beginning of their shift.  The first, number one First Responder has an MK-90, which is -- to you guys is the big can of pepper spray.  Looks like a mini fire extinguisher. Number two has a taser.  I don't know the nomenclature on it.  And then the next two, they have Little 3 OC.  And every one of them have a cutter.  It's like a little cutting tool.  It looks

JEREMY DYKSTRA                                    136
Cause No. 3:18-cv-00995-JD-MGG

like -- it's called a "J blade."  So if somebody's hanging in a cell, they can cut down the thing with the little cutter.  Every one of them have it.  And they carry that equipment their whole shift.

Q    The cutter is like a knife?

A    It looks like a little pocket knife; but when you pull it out, it looks like a little hook.  So it's not like a knife-knife, like you can stab somebody.  It's round, so if somebody's hanging, you can cut the material.

Q    Is that what it's primarily designed for --

A    Yes.

Q    -- is somebody --

A    Or if somebody needed their clothing cut off, so you wouldn't want a knife.  You can put it down their shirt, if the nurses need to get to their chest.  Heart attack.

Q    So that's equipment that they just have on them when they're doing their regular job duties on the shift --

A    Yes.

Q    -- because they're assigned to the First Responder Team that day?

A    Yes.

Q    All four have cutters, two have just like regular handheld pepper spray.

A    Yes.

Q    One has a big can of pepper spray.

A    Yes.

Q    And one has a taser.

A    Yes.

Q    Is there additional equipment that the First Responder Team has available to it to use but that's not something that they would carry with them?

A    No, sir.

Q    So when you were describing certain equipment that was in the Shift Supervisor Office, that was for, you said, the QRT teams -- can you remind me what that equipment was?

A    That was the equipment I just described.

Q    Okay.  So that would be like extras or for when a new shift comes for them to --

A    No.  It's like, when you come in, there's a QRT checklist for -- 'cause I'm giving you a taser; I need to write down what time you got it. There's a little test for the taser.  You got to actually test it every day, every shift to make sure the battery's not dead.  MK-90, I'm' logging it out

JEREMY DYKSTRA                    138
Cause No. 3:18-cv-00995-JD-MGG

to you.  So, you know, whoever you are, I'm putting your name down.  I initial it, so if they accidentally take it home, I know who to call.  Or actually, the next shift supervisor knows who to get this equipment from.

Q    Because they're trying to give it out to the next person --

A    Because I work 4:00 to 4:00, or back then I worked 5:00 to 5:00.  When they're getting it -- they're leaving at 6:00; they're turning their equipment to a different captain.  So the next captain has the sheet -- I wrote down, hey, Sergeant So-and-So had the taser, or Lieutenant So-and-So had that big can of pepper spray.  They had the Level 3 OC.  So they know who to get the equipment from.

Q    And then the Weapons Team, are they carrying with them on their regular shift any additional equipment?

A    No.

Q    But they're, when they're activated, coming back to the Weapons Room; is that correct?

A    No.  They'd go to the Weapons Room; and each one's pacifically assigned, like one, two, three four, a different weapon, and they know which weapon to grab.  And all's they do is get their

equipment on, their helmets on, and stand by with their weapons until they're activated.

Q    They have weapons and the additional protective clothing?

A    Yes.

Q    The First Responders, do they have additional protective clothing?

A    No.

Q    And then the Cell Extraction Team, if activated, where would they go?

A    Same thing, is the Weapons Room.

Q    And they have their own specifically assigned, you've got this --

A    There's like a QRT cabinet for all the -- not a QRT, like a weapons cabinet for all the weapons members.  There's a Cell Extraction cabinet with all the cell extraction equipment.  Because each member of the Cell Extraction wears different equipment.  And don't ask me the nomenclature of all the pieces of equipment.  They're like marked by bags, like No. 1 wears all this.

Q    And I think you stated that you were -- you could be on different ranks, and you could all be eligible to serve on the QRT.  Is that correct?

A    Most captains aren't QRT qualified.  I was

JEREMY DYKSTRA                        140
Cause No. 3:18-cv-00995-JD-MGG

qualified because I was a member of E Squad.  So

being a member of E Squad, it's a qualification we

have to have.  You know, so -- but I would never be

on that team, being a shift supervisor.

Q    Because you had to stay in the office.

A    Yes.

Q    So the E Squad, that's something

different; is that right?

A    Yes.

Q    What's the E Squad?

A    It's an Emergency Squad.  Say -- easy way

to break it down, it's the First Responders, the

Weapons Team.  The facility can't handle what's

going on, then we're activated.

Q    And is the E Squad, same idea, that

they're E Squad members just working the regular

shift --

A    E Squad members work every shift,

different shifts.  It's a group.  You can have 27

people on it.  You have 2 squads of 13 and one field

commander.  And they're activated by a thing called

"The One Call System."  It like calls your phone

till you answer and emails you till you answer.  And

the person that can only activate the E Squad is the

warden.

**JEREMY DYKSTRA** 141
**Cause No. 3:18-cv-00995-JD-MGG**

Q    So you would be called in from off your shift, that there's an incident that you need to come to the prison for?

A    Yes.

Q    So that -- you sort of went through with the QRT, the sort of different levels of -- you know, if it escalates --

A    Well, you go to -- you go to the least -- hopefully the staff on the unit can handle it.  If they can't, then the First Responders.  If they can't, the Weapons Team.  And then after that, it's E Squad, Canine activation, or whatever the warden wants, E Squad or just Canine.  It's up to his description.

Q    So is Canine, then, a separate team, as well?

A    Canine and E Squad are two separate things.

Q    Okay.

A    And then you have a SERT Team.  That's a statewide team.  S-E-R-T.  They are the ones that handle hostage situations.  E Squad can't do a hostage.

Q    Okay.  Is that sort of the one limitation on E Squad, is no hostage?

A     Yes.  We do like bomb search, crowd control.  You know, for -- break it down, you guys: Riots, disturbances, anything that the normal staff on their shifts can't handle.

Q     Would it be fair to say that everything that's a level higher up than First Responder has like a security or threat response as its main focus and would only come into play if there was like a security issue or a threat?

A     Yeah, or escape.  Handle that too.

Q     Okay.  Or an escape.

A     Yeah.

Q     I guess some -- a prisoner who's posing a flight risk, something like that.

A     (Witness nodding head).

Q     Whereas, the First Responders, they can be used in those type of situations, but they also can be used in situations where there's no security or threat issues that arises.

A     Once E Squad comes in, the QRT and Weapons Team, they stand down, and they just make a perimeter for the unit so nobody outside the area can get outside of it.

And then E Squad comes in.  We take control of the thing.  The only person, as a E Squad

commander, I listen to is the major and warden.  I get my rules of engagement from them and then move forward.

Q   I guess what I'm trying to get at is:  You would only escalate above the First Responder level if there was some security threat component to whatever the incident would be.

A   Yes.  Disturbance, where they can't handle it.

Q   So for example, you could have a really serious -- for example, a fire; but if there was no threat or security component, that wouldn't lead to anything other than the First Responders being activated?  Is that fair to say?

A   First Responders.  And you got to remember there is a Offender Fire Department there.  So they're -- anytime a fire is called in the Indiana State Prison, wherever them offender firemen live, they have like -- it looks like a little license plate by their cell.  Any unit they live, posted on the board, there's a list of offender firemen, and it's their job to get them offender firemen out of the unit as fast as they can.

Q   When you say, "their job," you're referring to the staff working that cellhouse.

JEREMY DYKSTRA                                    144
Cause No. 3:18-cv-00995-JD-MGG

A    Staff, yes.  It's their job to get them out as quick as possible.

And most offender firemen -- I mean, the luxury of working a Level 4, that's the highest level we have in the state of Indiana -- is most of them offender firemen have been offender firemen for a long time, so everybody knows who they are.

And the staff working them units know who they are, so -- and another thing is:  As shift supervisor, we're mandated to do two QRT drills a month.  So sometimes might throw a monkey wrench and say you're having a fire somewhere just to see the Response Team for the staff getting there and the Response Team for the offender firemen getting there and how fast they are getting off the units.

Q    Okay.  The drills you were just describing, did you say that was twice a month?

A    Yes.

Q    That there were QRT drills that you, as shift supervisor, were responsible for running?

A    Yes.

Q    Was there -- was that a written policy that set that out, that the drills would be twice a month?

A    I don't know if it's a written policy.  I

JEREMY DYKSTRA                                  145
Cause No. 3:18-cv-00995-JD-MGG

don't know if that's statewide, but that's something my major had always had us do.  And there was actually a form that you filled out for response times and all that, that was sent to him monthly.

And it wasn't like he dictated to us captains what we did.  It could be -- I mean, I've done all different ones.  I've done fires.  I've done, you know, medical emergency.  I've done it where I've tried to get a staff member to bring his cell phone through the front door.  You know, I've done hundreds and hundreds of different ones.  So you got -- you can't do the same ones over and over in the same location because staff -- like I was telling you earlier, you never want to make the same round exactly at 10:00 o'clock 'cause they know Kevin Dykstra's coming through, and they're all going to be away.  You know?

Q    So you're not sure whether that was a written policy or a just a practice that your major had --

A    I think it actually came from the director of ERO, and that would be Mr. Curry.

Q    And what is the director of ERO?

A    He is actually the director of ERO, slash, staff development and training for the State of

JEREMY DYKSTRA                     146
Cause No. 3:18-cv-00995-JD-MGG

Indiana.

Q    So that's a Central Office position?

A    I think he's based in New Castle; but yes, it would be a Central Office position.  He's the one that approves and, I guess, denies what training goes on during QRT, E Squad, Canine, SERT.  He's like in charge of all of it.

Q    In charge of like the curriculum for those training programs?

A    Yes, and changing of weapons or configurations or anything like that.

Q    And you mentioned -- I think you had a role as -- I'm not going to get the name of it correct, but like as a commander for the E Squad?

A    Yeah.  I was E Squad field commander.

Q    And is that a position that's specific to Indiana State Prison?

A    No.  That's -- any facility that has E Squad has -- E Squad field commander, the commander is technically the major, but he's not the one doing the training for E Squad.  It would be the field commander and like my squad leaders.

And there's mandated training monthly.  There's a monthly reporter that we have to send down to Mr. Curry's office, which is the SERT

commander, Mr. Nickham (phonetic).  And there's a 12-month booklet, you would say, that mandates our training, what we do every month, and how many hours we get, and all that.

Q    And if I understood you correctly earlier, you described like a 27-member with two 13-member squads, and then one field commander on top of both of the squads?

A    Yes.

Q    So --

A    That makes 27.

Q    So would it -- did it -- strike that.

Would you, as field commander, be activated regardless of which of the two squads was activated for an incident?

A    No, sir.  There's a Canine field commander, so we're like equals.

Q    So is the -- I thought Canine was a separate unit outside of E Squad.

A    It is.  It's still at the prison.  They have normal staff members working there just like I did.

Q    But as E Squad field commander, you could be in charge of either one of the two squads of 13?

A    (Witness shaking head).

JEREMY DYKSTRA                          148
Cause No. 3:18-cv-00995-JD-MGG

Q    So one squad of 13 is E Squad and one squad is Canine?  You're going to have to help me --

A    27 people total on E Squad.  I think Canine has seven or eight people --

Q    Okay.

A    -- total, maybe nine.  I'm not sure on their numbers.

Could the warden put me in charge of both teams?  Yes, it's his discretion.  But should it -- by -- technically by ERO?  I'm the field commander of E Squad.  Say' you're commander of Canine.  We're like equals.  We're supposed to work together for whatever mission.  Can they get activated without E Squad?  Yes.  Can E Squad get activated without them?  Yes.  Or can you both get activated together?  Yes.  But our commander would be Major Nowatzke.

And then after that -- you know, and then the warden's making a call to Major Nowatzke, what we do.  Goes back down.  Only people not in our chain of command, when E Squad or Canine are activated, is the deputy wardens.  They have nothing to do with us.

Q    What does ERO stand for?

A    Emergency Response Operations.

JEREMY DYKSTRA                                          149
Cause No. 3:18-cv-00995-JD-MGG

Q    And that's a division within the statewide leadership that Mr. Curry --

A    That's --

Q    -- was the director of?

A    Yes.  That covers E Squad, Canine, SERT, CITCON, CISM.  There's five teams in the state of Indiana.

Q    For my benefit and also so the record is clear, can you describe what each of those acronyms --

A    CISM is like after the action.  I don't know the acronym, do you, for CISM?

MR. NAGY:  I do not.

THE WITNESS:  The best way to describe it, like say there was a fire.  We'll go back to B Cellhouse.  You know, this fire.  And the staff need people to talk to after the incident.  They talk to the staff, see if they need extra help, if they have distress.

BY MR. HEPPELL:

Q    Is it C-I-S-M?

A    I think so.  Yeah, sounds right.  It's Critical Incident Situation Management, I think.

Q    Okay.

A    Not -- never mind forte, but they're the

JEREMY DYKSTRA                                150
Cause No. 3:18-cv-00995-JD-MGG

ones that after a bad situation, like the B Cellhouse fire with Mr. Devine, they can -- the warden can ask Mr. Curry if we can have the CISM members come and talk to the staff to see if they're okay.

Q    Is that like counseling for --

A    Yes.

Q    -- if folks have been through a stressful or traumatic incident?

A    Yes.

And CITCON is hostage negotiators. That's what their job is.  Pretty self-explanatory there.

Them two teams are regionalized. There's like a northern -- I don't know if there's three teams, I don't know if there's two.  I'm pretty sure there's a northern and a southern of CITCON and CISM because they're not utilized as much as E Squad and Canine.  And so there's some members, you know, at ISP, some at Westville.  And then they have a field commander, too.

So if there's a bad situation at ISP, they might activate the ones at Westville to come talk to them instead of people they already know. You know, you might be more open talking about your

problems with somebody you don't know versus

somebody you work with every day.

And the hostage negotiators, they're

spread out throughout the state.

And everything has a time frame.

Like E Squad's activation time from like -- we get

called -- it's like an hour response time.  We have

a hour to get to the facility.  So, hopefully, it's

not that bad, because we got a hour to get there.

Start getting ready, so it's taking longer.

CITCON and CISM, I think it's like a

few hours.

Q    The QRT drills that you were describing

that the major had you do --

A    Uh-huh.

Q    -- is it your understanding that every

shift was doing its own QRT drills at least twice a

month?

A    Every shift's mandated to do it per the

major twice a month and turn in a copy in to him.

Q    And when you say, "turn in a copy" --

A    I would .pdf, scan all it, because I hate

when stuff gets lost and the major is down your

throat saying, "I didn't get this."  And I could

import the email with the .pdf file saying, "You did

JEREMY DYKSTRA                    152
Cause No. 3:18-cv-00995-JD-MGG

get mine."

Q    Was there a standard form you had to fill out?

A    Yes.

Q    Okay.  Do you remember what the form was called?

A    No.

Q    But it was used only --

A    I think it was called like QRT Emergency Drills.

Q    It was a specific form for QRT drills?

A    Yes.

Q    And what kind of information would you record on the form?

A    It would have like start time, end time, response time, who was involved.  You know, like the First Responders, the Weapons Team people, Cell Extraction wasn't on it.  And at the bottom there was like a summary.  You know, how they did, what happened, what can they work on better.  Like a little area for notes.  Like, hey, the response time was great, but they need to work on this or -- you know, whatever you seen, you know, that you thought they could -- or hey, three of the First Responders showed up in 30 seconds, and the last one showed up

a minute later.  You know?  Just general notes.

Q    It was like a narrative portion of that form?

A    Yes.

Q    And is that something that you, as the shift supervisor, would fill out?

A    Yes.

Q    The entire form?

A    And I had both of them on the same form. So if I did one today and I did one two weeks later, I put it on the same form because the top is like cut in half; you know?  One for the first one, one for the second one.  Scan it, email it to them. Whatever.

Q    So like one form with your two monthly drills on it.

A    Yes.  And you put in the dates and all that.

Q    And you put it into --

A    Major Nowatzke.  Or put the form or fill it out and send it out.  Whatever.

Q    I just didn't hear what was you said.

A    I don't even remember.

Q    And as the shift supervisor, did you have like full discretion in terms of coming up with the

JEREMY DYKSTRA                                154
Cause No. 3:18-cv-00995-JD-MGG

rotation of different scenarios for those drills?

A    Yes.

Q    Was there, I guess, like a set, like, book up options, or were you just like, based on your experience and your imagination, were coming up with different scenarios to test the different aspects of --

A    Come up --

Q    -- QRTs?

A    Come up with whatever I wanted.

Q    Okay.  So it wasn't like you would have a rotation, like throughout the year, we're going to do two fires, four medical emergencies?  It was just you coming up with different scenarios.

A    Personally, I tried to -- I mean, staff and corrections rotate very often.  I mean, it's like a revolving door.  You know?  You gain twenty, you lose thirty.  It seems like you're always rotating because the job's just not for everybody.

So me, I would try to do -- I would try to do some of the scenarios a few times a year because you got different staff.  Just because today we did a fire doesn't mean I'm going to have the same staff four months from now.

So I couldn't give you a time based

on ho many I did a year or what I did every year. Sometimes it was hot topics of what was going on at the prison that time; or if a situation happened a week ago, a fight, and the response times just sucked, you know, I would have a scenario of a fight so my shift knew what was going on. You know? So it kind of like -- the prison dictated kind of -- you know, if we were having people having a problem trafficking cell phones in there, I would try to beat the staff up front, trying to get in a cell phone or something. So kind of what was going on in the time frame is what I kind of did.

Q   So to some extent was responsive to issues that were arising in the prison.

A   Yes. But you always want to do like a fire. You always want to do, you know, a medical emergency. You always want to do, you know, a staff assault. You know, stuff like that.

Q   Did you have any like written materials that were sort of laying out these different scenarios?

A   No. I had come up with them myself.

Q   And just whatever description you would put in the QRT reports would be sort of describing what happened?

A   I mean, there -- you don't really have to write a lot when you say, there's a fire in B Cellhouse on the 400 Range or whatever. So the rest is on them to come up -- you know what I mean?

Less writing, less people sitting around, and less telling anybody what you're going to do is the best option because people love to talk. You know?

I mean, if I -- I didn't even tell my lieutenants. I tell them, then they'd go tell the staff, hey, we're going to do a fire tonight or this. So they already know the game plan.

And sometimes I'd do drills back-to-back just to see how they'd act.

Q   What was your understanding of -- well, strike that.

What would you do as the captain if there were a QRT drill that you conducted that in your opinion identified a deficiency in someone's performance or it revealed that the response was not satisfactory?

A   Pull them all in as a group and go over the scenario and tell them what I thought they did wrong and then tell them what I think they could do better at.

And if they did that poorly on it, within the next few months I'd probably run the similar, same drill.  Not the exact same one but pretty close.

Q   Did you do -- would you do that kind of debrief, pull everyone in and talk about the scenario, regardless of how well folks had done, or was that only if there were deficiencies?

A   No.  If they did a good job, I'd contact all of them.  I mean, I wouldn't pull them in a group because we still have work to do.  But I would contact them and let the No. 1's from each of their team -- tell them they did a good job or I'd announce it at roll call the next day.  "Hey, you did a great job on your drill" the next day.

Q   Is that something that would be documented on the drill form, like whether you had brought them in as a group?

A   It's -- no.  It's up to the shift supervisor on that.  Me, that I'm more military-minded, and E Squad in my life, so it's always -- I've always been part of some kind of team, so that's more what I do.  Other captains, I don't know what they do.

Q   And I just didn't quite understand what

**JEREMY DYKSTRA**                    158
**Cause No. 3:18-cv-00995-JD-MGG**

you were -- the point you were making.  Because you were more military-minded, that meant that you did or didn't document those small group meetings on the --

A    I didn't document it because it's training.  It's -- you don't -- I don't think you should have to report -- I mean, yeah, they made a mistake, it's in the report; but me talking to them?  No.  I'm just trying to make them better and give them my suggestions.

Q    So the --

A    It's not supposed to be a dragged-out, five-page report on something.  It's supposed to be quick, simple -- they learn by their mistakes; hopefully they don't do it again.  You know?  It's not supposed to be an incident report for the whole thing.

Q    Did you do anything to monitor patterns over time, if it was like the same types of problems coming up through the scenarios?

A    No.  I mean, I pretty much knew my staff, and I knew my First Responders and, you know, Weapons Team and all them.  If I seen something wrong or they were doing something wrong, I corrected it right then and there.

JEREMY DYKSTRA                               159
Cause No. 3:18-cv-00995-JD-MGG

Q    So would it be fair to say that you didn't like go back and look through -- strike that.

Did you keep files or keep copies of QRT drill reports?

A    Yeah.

Q    You testified earlier, one reason for doing that was in case it didn't get to the major, you could just have a copy to forward right along?

A    Yes.  I had a little folder on my desktop that said, "QRT drills."  So every time I was done with one in a month, I'd put it in there.  So when he said he didn't get it, I could forward him an email.  But if I -- if that was five hundred or thousands of emails before, I'd look in that folder and just resend it to him.

And that could kind of tell me what we've done in the last four or five months, by looking at scenarios, too, so we weren't doing the same thing.

Q    And was that part of your practice, to look back through the most recent QRT reports to --

A    That was my practice.

Q    In order to make sure you weren't repeating the same drills over and over again?

A    Yes.

JEREMY DYKSTRA                        160
Cause No. 3:18-cv-00995-JD-MGG

Q    That was your practice?

A    That was mine.

Q    Was it your practice to look back, not just at the type of drill that had been conducted, but to look back at the results of the drill to look for patterns in terms of whether they were the same problems coming up over time?

A    Well, if you really -- I mean, you could do a quick scenario or you could do a long, drawn out one.  So it's kind of -- it depends on how thoughtful I got with it.

So no, I didn't really look back to see.  'Cause the same people are pretty much on QRT and Weapons Team and, you know, Cell Extraction Team daily, you know, within that group.  So you learn them.  And you might get a new person on QRT Team. Maybe a few every six months or maybe a few a year. So you kind of know how they're going to react before they're going to react to the situations.

And, you know, I worked at three different institutions.  So I have to say:  One thing about Indiana State Prison, when stuff happens, they are far -- by far one of the best facilities I've ever seen get to situations.

Q    Can you explain what you mean by that?

JEREMY DYKSTRA                161
Cause No. 3:18-cv-00995-JD-MGG

A    I worked at Westville for seven years.  It seemed like situations would happen, and more people would freak out, you know, about little stuff.

Indiana State Prison, since there's many and hundreds of incidents, I think the staff are -- I wouldn't say better trained.  I would just say they've dealt with more incidents, so it happens they learn quicker.

Q    Your read on the situation, based on your experience in the system, that they -- is based on the volume of incidents?

A    Yeah.

Q    At ISP?

A    Because it's just like if you do -- you know, you never played basketball in your life, you're going to suck at the beginning.  But if you do it every single day, you get better at it.  You know?

So I think the Indiana State Prison just do an outstanding job on response times and situations, better than I've seen at any other institution.  And I've been to almost every one of them in the state.

Q    What's the reason for there being more incidents at ISP than at the other facilities you

JEREMY DYKSTRA                    162
Cause No. 3:18-cv-00995-JD-MGG

were at?

        A     It's a high-level prison.

        Q     "High level," referring to the security level?

        A     Yes.  Anybody there from -- you know, most people are going to live there till they die.  So you got the ones coming in that are young that just don't care till they figure it out.  And then you got the ones that figured it out, once they got older, and they don't cause no problems.

        Q     Do you have any understanding of whether either the major or folks higher up in the chain of command were reviewing those QRT Drill Forms that you were submitting to look and identify patterns of whether there were problems that were arising in the course of those drills?

        A     In the Warden's Office, I know there's a situation board.  It's kind of like a map like this (indicating) of the prison, but it's blown up bigger (demonstrating).  And I think he has one -- I'm not sure if it's monthly or if it's yearly.  He has like little stickies he puts on there.  Like, hey, there was a fight in this unit 15 times this year.  You know?  And they monitor it like that.  And they do monitor all the incidents at the prison on a yearly

**JEREMY DYKSTRA**                    163
**Cause No. 3:18-cv-00995-JD-MGG**

basis and monthly basis.

And then I think they take that information and see what we can do better by putting cameras or whatever.  But he's -- I think there's a little committee, actually, on that.  I wasn't part of it.

Q    You weren't part of that committee?

A    No.

Q    Do you know who was on that committee?

A    No.

Q    Do you know the name of the committee?

A    I forget.  I don't -- I did enough at the prison.  I didn't want to be on more stuff than I already was.

Q    Sure.

A    So...

Q    And just so I'm clear, what you were referring to with the board that the warden was tracking, those were actual incidents; correct?

A    Yes.  But for QRT, I don't think there was.  But my information -- I'm just saying, my information for QRT went to the major.  And then what he did with it, you would have to ask Major Nowatzke.

Q    At any point in time do you ever recall

**JEREMY DYKSTRA**                                    164
**Cause No. 3:18-cv-00995-JD-MGG**

Major Nowatzke or anyone else coming to you to discuss the contents of those c with you?

A    Only when he said he didn't get one.

Q    Okay.  Anything about the contents of the reports beyond, "I didn't get it," and then you sent it along to him?

A    No.

Q    So turning to April 7th, 2017, do you -- as you sit here today, do you have an independent recollection of what happened that night?

A    Yes.

Q    What's the first memory that you have of your shift on April 27, 2017?

A    What do you mean?  I mean, rephrase the question or ask it again.

Q    Sure.  And so would it be, I mean, fair to say that some of the events that happened that night were pretty unusual and out of the ordinary; correct?

A    Yes.

Q    Would it be also fair to say that some parts of your shift and maybe particularly the earlier parts of your shift were unremarkable and perfectly ordinary?

A    I mean, it started off like a normal

JEREMY DYKSTRA                    165
Cause No. 3:18-cv-00995-JD-MGG

shift.

Q    So I guess as you sit here today, do you have an independent, specific memory of the first part of your shift?  You can call back in your mind and say, yes, I remember this was me clocking in on April 7th, 2017?

A    Yes.

Q    Okay.  Can you describe your memory of clocking in on April 7th, 2017?

A    Well, we don't clock in.  I just come in and relieve the other captain.

Q    Okay.

A    And then we're short-staffed, like normal.

Q    So you remember coming in and relieving the captain on April 7, 2017?

A    Yes.

Q    Who was the captain that you relieved?

A    Oh, God, I'd have to look at the date.  I don't remember who the captain was.  I really don't. It would have been H Group, so Captain Boots (phonetic).

Q    And what do you remember about relieving Captain Boots on April 7th, 2017?

A    Nothing.  Not really.  I mean, typical day.  Nothing pacific.  Just normal day.  Hey, how's

JEREMY DYKSTRA                    166
Cause No. 3:18-cv-00995-JD-MGG

it going; you know?

Q    Was that something that happened frequently, that you would relieve Captain Boots?

A    Yeah.  I mean, we -- I mean, there's only one change from Night Shift.  I'd had the same captain for like two days.  And then when I finish in the morning, on a day that he already finished up, it's the captain from a different group.

So relieving him, I mean, he would tell me what happened throughout the day.  I mean, if there was anything major.  If there wasn't nothing major, it was like, "You good?"

"I'm good."

"Okay, man.  See you tomorrow."

Q    And I guess what I'm trying to get at is, again, as you sit here today, is there a specific memory of that day, that you can remember relieving Captain Boots on that day?

A    No.

Q    So would it be fair to say that that was a routine part of your schedule, was coming in and relieving Captain Boots, and you've got generalized memories of those kinds of interactions over a period of time?

A    Yes.  'Cause the only thing I'm focused on

JEREMY DYKSTRA                167
Cause No. 3:18-cv-00995-JD-MGG

at that point is to start getting my roster going.

Q    And do you have -- again, as you're sitting here right now, a specific memory of getting your roster done form April 7th --

A    No.

Q    -- over any other day you would have done that task?

A    No.

Q    What is the first memory that you have where, again, sitting here today, you can be like: I remember that this was something that happened specifically on April 7, 2017?

A    The call for the fire in B Cellhouse?

Q    Tell me what you remember about the call for the fire in B Cellhouse.

A    They called for a fire, and the First Responders were activated.  So I got on the camera, looking through the cameras to try to find the fire.  I found the fire, and it just looked like smoke coming out.  I mean, started off kind of small.  And next you know, it was shooting out like a fire-breathing dragon.

Q    So just to help me break that down, where were you when you --

A    Shift Supervisor Office.

Q    When you first learned that something was wrong, you were in the Shift Supervisor's Office?

A    Yes.

Q    And you say that they called for a fire?

A    Yes.

Q    Who specifically called for a fire?

A    One of the officers in B Cellhouse.  I can't remember the name.  I'd have to go through the report.

Q    How did that officer call for a fire?  How did that logistically work?

A    Emergency code.

Q    And what's an emergency code?

A    I just went overall the codes with you earlier.

Q    So that's like just --

A    Emergency code, like 10-70 she called for fire.  I think she might have even called for assistance.  But called the fire, and the fire department was activated, First Responders went.

Q    So -- and I think you --

A    I mean, I'm not trying to be rude or say much; but I mean, once you talk to some other guys that actually were in there, they're going to know a

lot more, you know, for visual purposes than me being in there.  Because being in the Shift Supervisor Office, I'm hearing it, making sure the firemen are out.  When there's an emergency code called, all radio traffic ceases, besides the people in that -- dealing with the incident.

Q    Got it.

And I don't think you're being rude at all, and I appreciate that.  And I guess just so you're clear, I'm not trying to be rude when I'm asking you questions that, you know --

A    Just seems like repetitive on some stuff.

Q    Well, I'm doing my best not to be repetitive.  I certainly don't always achieve that goal.  And one of the things that's important for me -- it's just as important to figure out what you don't know as well as you do know.  So, you know, I hope you bear with me through that.

But the -- I believe you testified you didn't remember specifically --

A    Can I see the incident report?  Do you got it?

Q    Yeah.  So I'm --

A    Can I see it?

Q    What I'd like to do is sort of go through

with you what you remember without the report in
front of you, and then I'm going to show you the
report.  Are you trying to pull it up on your phone?
Do you have that in front of you?

A    I'm not sure.  I just --

Q    'Cause I --

A    I mean, we're going in pacifics now, and
I'm not going to remember every little single
detail.  You know.

MR. NAGY:  If you don't remember, you
don't remember.

THE WITNESS:  Okay.

BY MR. HEPPELL:

Q    Right, exactly.  And then we can look on
your report.  And if there are additional details in
your report, we're going to go over that.

I'm not trying to play games.  I just
want to get, you know, stuff that's actually in your
mind as you sit here right now.  And then there'll
be more stuff that you wrote down at the time that
maybe you don't remember right now, but it's in your
report, and we're going to go over that, too.

I believe you testified that you did
not remember the name of the officer --

A    Who called it?

JEREMY DYKSTRA                           171
Cause No. 3:18-cv-00995-JD-MGG

Q    -- who called it.  But then I think you made reference to it being a female officer.  Do you remember whether it was a female officer?

A    If it was, it was Abbassi, I think.  I think that's her name.  She's been gone from there for a long time now.

Q    And is it -- you remember it was a female officer specifically?

A    No, I don't remember.

Q    Okay.  And just so I'm clear, have you been like looking for documents on your phone?

A    No.  I was actually looking at "Let Go" because I'm selling stuff.

Q    Okay.

A    I mean, you can look.  I mean, 'cause I'm trying to get rid of furniture before I go.

Q    Sure.  I understand.

A    No.  I haven't checked my email.  There's four there, so...

Q    Okay.  Got it.

So you don't remember which of the officers in the cellhouse called it, but it was a call that you received on the radio.

A    Yes.

Q    And at the time, like how did those radio

systems work in terms of like who would receive calls that could come in?

A    The Control Room gets that -- once a signal's called, the Control Room has a system in there.  So if you have a radio and I have a radio, and then if I -- if I say a signal, it pops up on the computer that Captain Dykstra just called this.

Now, if you're working the units, and you're just line staff -- all them radios are assigned to that unit, so when somebody -- they're assigned like one, two, three, four, how many people working there.  So in the Control Room there's B Cellhouse.  You know, so they don't -- they might not catch if it was a man or a woman on the radio that called, but they know it was called in B Cellhouse.  And they'll repeat the traffic.  You know, there's a Signal 100.  In fact, that means no radio traffic.  There's a 10-70, a fire, in B Cellhouse.  All reporting staff report to your -- you know, your locations.

Q    Okay.  So just to break it down, and this may seem really obvious to you, but this is all new to me.

So there's an offer in B Cellhouse, and they had a rodeo on; correct?  Is it like a

JEREMY DYKSTRA                173
Cause No. 3:18-cv-00995-JD-MGG

walkie-talkie that's strapped to their belt --

A    (Witness demonstrating).

Q    -- or is it like -- it's one of those chest ones --

A    Yes.

Q    -- and you just squeeze it to activate it?

A    (Witness nodding head).

Q    So for an officer in a particular cellhouse, who is able to hear like directly when they go on the radio?

A    Everybody in the facility.

Q    Okay.  So it's one channel across the whole facility that everyone's on at the same time?

A    Well, the Level 1, 2, outside the facility, they're on their own channel because they're a little different facility.  And the only other channel at that time would have been the two Lockup Units, 'cause they run D Cellhouse and IVU [sic].  They run Rec all night long, so you don't want to hear them overriding that.

But when the Control Room gets on, it overrides every channel, and it goes to every channel.  So it doesn't -- the D Cellhouse staff would have heard it.  Everybody on the radio, they like have a override for everybody, so...  Because

the Control Room can hear the outside facility, the Lockup Units, and everybody in the ISP all at the same time, all day long.

Q    Got it.

So again, just so I'm clear, basically, the whole facility is on one channel except for a couple small exceptions, which you articulated --

A    Yes.

Q    -- being the lower security that's actually outside -- on the grounds, but outside. And then was it --

A    The Lockup Units, since they run Rec 24 hours a day, they're telling people to open cells or get these offenders out.  So they're radio traffic is nonstop.

Q    And so on a different channel.

A    Yes.

Q    So folks outside of the Lockup Unit aren't hearing their back and the forth, and the folks in the Lockup aren't hearing the back and forth.

A    Yes.

Q    But -- and again, if I think I understood you correctly, one of the people who's on that main channel that's shared by almost the whole facility

JEREMY DYKSTRA                                175
Cause No. 3:18-cv-00995-JD-MGG

is the Control Room; is that correct?

     A    Yeah.  ISP Control controls all the radio traffic.

     Q    And what is "ISP Control"?

     A    It's just a general location where a Control Room officer works in there, and she monitors all the radio traffic and, you know, phone calls coming into the facility.

     Q    And -- all right.  Is that one of the numbered --

     A    It would be like 35 Area.  24, 35 Area.

     Q    Okay.

     A    It's kind of hard to tell by that many.

     Q    Okay.

     A    I guess it would be in -- I guess it would be in -- it says, "Control Room and 24."  So we'll go with that.

     Q    Okay.  It says, "Control Room."  It says, "Close by to the Shift Supervisor Office" --

     A    That --

          THE REPORTER:  Excuse me.  It says what?
BY MR. HEPPELL:

     Q    That's close by to the Shift Supervisor Office?

     A    I'd have to go through one, two, three

gates to get in there.

Q    Okay.

A    You're talking walking distance or -- I mean, it's not that far walking distance.  But to get through -- you know, you close a door, you got to wait for it to shut.  They'll open another door.  Well, actually, four gates.

Q    Gotcha.

And that's a room that is staffed by a specific persona around the clock to be in charge of the radio traffic?

A    Yes.

Q    Does that position -- is there like a position, title for that person?

A    Control Room officer.  They're trained in there for the needs of the Control Room.

Q    And that's specific to radio traffic?

A    Pacific for radio traffic.  That's where, like I say, vehicle keys are stored, too, like for emergency trips, stuff like that.

Q    Is it just vehicle keys or other kind of keys that are stored in the Control Room?

A    No.  Emergency keys, but that's -- in that same little area -- like when you walked into ISP, you went through them two gates.  You seen that

JEREMY DYKSTRA                177
Cause No. 3:18-cv-00995-JD-MGG

sergeant there saying, "Let me see your ID," or whatever.  That and the Control Room are connected. You actually passed the Control Room.  There's a little window outside in the lobby, and it goes back to that box sergeant.  So...

Q    Okay.

A    The box sergeant would be in control of the emergency keys.

Q    What are the emergency keys?

A    Sets of keys.  So if there's an emergency and, say, somebody already has the keys out for that area, you can go to that general location and get the keys so you can get into whatever you need to. There's different sets for like -- there's zones. Like this zone will get you through this area.

Q    And so, again, if I understood you correctly, once that Control Room officer hears an emergency code, that Control Room officer is then going to put a hold on all radio traffic across the facility?

A    She calls a Signal 100.  That means -- that's telling everybody there's no radio traffic, and you'll -- every radio will have like a little bleep on it.  You'll hear it.  Like every so many seconds, "bleep."  So you know there's an emergency

going into effect.

So if you're not already in a situation, you're going about your normal job, you're just not calling your -- hey, can you signal 8 to 500 Range of where ever you're at, at the time, it -- it's telling you not to talk.

Q   So she has some setting that she can force that periodic beep over everyone's radios?

A   Yeah.  And she can see the traffic going on the computer system, like who's keying it up, all that stuff.

Q   That's like visually she can see who's activating their radios?

A   Yes.

Q   Officer by officer?

A   It would be -- it wouldn't be named by the officer.  The only people that have named radios would be the lieutenants and captains.

Q   Everyone else is like a number?

A   Yes.  There's certain radios with their numbers assigned to them units, that they don't leave ever.

Q   Do you have any knowledge of whether there are records kept of that radio traffic in -- well, I guess let me ask it two ways.

Do you have any knowledge of whether there are records kept of like those activations, like Radio No. 4 was activated at this time and like that's stored in a computer somewhere?

A    I have no idea.

Q    And do you have any knowledge of whether the actual like audible radio traffic is recorded and preserved anywhere?

A    Not that I know of.  That's a good question, though.

Q    Thank you.

A    I never asked that one when I was working there.  And I got to tell my buddy to ask that.

Q    Well, if you get an answer, tell your lawyer, and he'll tell me.

So my understanding, from your description, was that that Control Room officer would then also do something so that the folks in the Lockup and the other -- outside of the walls, there's --

A    I think there's like a master -- she's like the master override for anything.  So when she gets on the radio during an emergency, I don't know if she has to hit a few buttons or one or two or three, or if she just hits one, and it tells

JEREMY DYKSTRA                         180
Cause No. 3:18-cv-00995-JD-MGG

everybody on the outside of the facility, inside the facility, Maintenance -- 'cause maintenance is on a different channel, too -- Maintenance or any of the grounds crew, you know, saying -- you know, depending on what time it is.  And there is projects that do go on at night.  You know, we've got a broken water main; they might have a crew out there. It tells -- what she says on that radio, everybody hears.

Q    Got it.

And so does she repeat back the emergency signal?

A    Yes.

Q    So if someone from B cellhouse called a 10-70 --

A    Yeah.  She's going to be like:  There's a 10-70 called in B Cellhouse, an emergency was declared in B Cellhouse.  She might -- depending on who works in there, they usually repeat it a few times.

Q    Okay.

A    And they say, "A signal 100 in effect, please hold your traffic."

Q    And then the people even on those other radio channels will hear that person, the

Control Room officer, because she's got some override.

A    Yeah.  She'll like -- she'll kick out my radio traffic.

Q    Once that Signal 100 is in effect, is everyone then like hearing all the ongoing emergency radio traffic?

A    No.

Q    Just the people who are on that radio channel.

A    Yes.  Unless they switch over to that channel.

Q    And does everyone have the ability to switch between those different channels?

A    Yes.

Q    Okay.  Got it.

But it's not a requirement or expectation that they would be monitoring emergency if the emergency wasn't in the area?

A    You got to remember, the reason why the Control Room officer can do that, 'cause you got to think, inside this wall, you got a few Lockup Units. They might be members of the First Responders or the Weapons Team, so they need to know that so they can get to their area where they need to stage.

JEREMY DYKSTRA                182
Cause No. 3:18-cv-00995-JD-MGG

Q    And that makes sense, and I appreciate you flagging that situation.

In that situation, if someone's working Lockup but they're on the First Responder roster, once they hear that emergency relayed to them by the Control Room and Signal 100, is that their signal then to get to the location of the incident?

A    Yeah.  They got to go.

Q    And is it the policy or practice that that person would switch over to the radio traffic so they're getting then updates from the people who are responding to the emergency?

A    Yeah.  They would switch to whatever channel they needed to be on to hear the situation.

Q    So if someone was in the Lockup --

A    They would go to a regular ISP channel, which I think it's 1.  They would go to that channel because they need to hear me.  They need to hear whoever's the shift supervisor.  They need to hear the team leader, so yes.

Q    Got it.

Do you know if that's written down anywhere, that sort of radio switch that you were just describing?

BOSS REPORTERS
(219) 769-9090

JEREMY DYKSTRA                183
Cause No. 3:18-cv-00995-JD-MGG

A    I don't know if it's written or anything, but -- I don't know.  It might be.

Q    Do you remember the specific words that you heard when you first learned that there was a fire in B Cellhouse?

A    No, sir.

Q    Do you remember anything in terms of the substance that was conveyed to you beyond that it was a fire that was reported in B Cellhouse?

A    What do you mean?  At the start of it?

Q    At the start of it.  So that initial call, the radio traffic from the cellhouse and then repeated by the Control Room officer.

A    No.  I mean, I've dealt with hundreds and hundreds of fires there, you know, in cells, outside the cells.  So you hear "fire."  It was kind of odd that night because it's in B Cellhouse.  Usually you have fires in IDU all the time and D Cellhouse, the Lockup Units.  But to hear one in B, it was kind of odd.  That's why I jumped to the cameras as fast as I could.

Q    What's IDU?

A    It's another restrictive housing unit.

Q    So IDU and did you say D Cellhouse?

A    Yeah, D Cellhouse.

**JEREMY DYKSTRA**                                184
**Cause No. 3:18-cv-00995-JD-MGG**

Q    Is that the Lockup?

A    That's a Lockup, yeah.  Restrictive housing.

Q    D Cellhouse is No. 14 on the map; is that right?

A    Yes.

Q    And then the IDU, is that interchangeable with --

A    IDU would have been -- the top floor is 17.

Q    Okay.  So 17 has, in that building, I Cellhouse and X Row and IDU?

A    Yes.

Q    And are those all different levels of more secure housing?

A    I Cellhouse is like an honor cellhouse. You know, they have XBOXes and stuff like that. It's four tiers tall and then two tiers -- like say it goes like this (demonstrating) four tiers up and two on this side.  On one side there's two tiers of X Row.

Q    What's X Row?

A    Death Row.

Q    And you said that --

A    And then IDU is two floors -- it's two

floors above that.  It's like a whole different unit.  It's two floors that have two sides with two ranges.

Q    And so you stated, I think, you, during the time you've been at ISP, heard hundreds of fire calls?

A    We've had hundred-- yeah, lots of fires.

Q    But the majority of those, based on your recollection, are from -- are out of D Cellhouse and IDU?

A    Yes, sir.  I mean, every once in a while, when you get one in a regular cellhouse, like A, B, or C, it's kind of odd because that's general population.  I don't think the whole time I've been there I've ever seen a fire in the dorms.  I think we had an electrical outlet, somebody plugged it in, and it was like a little electrical fire.  But nothing -- usually like set files, it's mostly in the Lockup Units.  Usually when general population have it, it's somebody really mad or they owe a debt, and they're trying to go to Lockup.

Q    What's that electrical outlet issue you were just describing?

A    A guy cut his wire off, and he was trying to spark so he could light a cigarette or marijuana

**JEREMY DYKSTRA**                                    **186**
**Cause No. 3:18-cv-00995-JD-MGG**

or whatever.

Q    And when did you learn about that?

A    I don't know what day, what time.  I mean, that's how most of them -- they mess with their outlets and put little pieces of metal in there so they can get a spark.

Q    So you don't have a specific memory of the date or time or details of that incident?

A    No.  I mean, it's hundreds.  You're talking hundreds.  I mean, between D and IDU, and all, you're talking hundreds of fires.  You know, I walked into D one day, and there was eight of them going on at one time.

Q    How did you deal with that?

A    Started clearing one range at a time with the Offender Fire Department.  Do the best you can.

Q    But it was unusual in your experience for it to be in B Cellhouse?

A    Yeah.  In the general population cellhouses, I mean, you would have a fire once in a while, like a hotpot catching on fire because a guy left it on with nothing in it and went out to Rec. Then they're calling a fire, putting out a fire in a guy's cell because he plugged in his hotpot and had nothing in it, and it just overheated and caught

JEREMY DYKSTRA                      187
Cause No. 3:18-cv-00995-JD-MGG

fire.  You know what I mean?  Something like -- I know it sounds funny, but it does happen.  I guess if you did it at your house, the same thing could happen.

But you asked me dates and times on all these fires.  Go pull every incident there is for the last five years.  Probably a few hundred.

Q    As a shift supervisor, what responsibility did you have in terms of when there was a fire?

A    Send the First Responders, make sure they're going there.  And then listening to the radio, make sure -- I'm not on the radio, but I'm calling the units that I know the offender firemen are on because staff are staff.

I'm not saying everybody's perfect, but I always double-check and make sure I call I Cellhouse 'cause there's usually a bunch of offender firearm in I.  And then the dorms, 'cause they're more kind of honor, too.  I'd call dorm, "Make sure you let your offender firemen out."

And they'll be like, "Oh, they're already gone."

You know, just double-checking, crossing your Ts and Is, you know, when stuff happens.

JEREMY DYKSTRA                      188
Cause No. 3:18-cv-00995-JD-MGG

Q    When you say you're not on the radio --
did I hear you correctly?

A    Yeah.  Why would I want to be on the radio
when I got a phone?  I could call them.  I don't
want to cause more radio traffic to the units when
my First Responders might need that radio traffic.

Q    And so when you say, "I'm not on the
radio," you mean you're not using the radio to place
those calls.

A    No.  I'm using the phone.

Q    You're on the radio in the sense that
you're able to --

A    Yes.

Q    -- hear what's going on, on the radio.

A    Yeah.

Q    Okay.  I got it.

A    There might be radio traffic going on, but
it might be between the First Responders --

Q    Sure.

A    -- between each other, but I'm trying to
listen to that, plus call the units to make sure the
offender firemen are there.  And then I'm calling
the other units to make sure the First Responders go
there.  And then I can see the Weapons Team come
through sally port because it's right in front of my

office.  So I could see Officer Wood came through, check.  This person -- as I'm doing all three of these things or two of the things; you know, listening on the radio, on the phone, and checking off people as they're going through the Weapons Room.  Because the First Responders, I might not see at all because they might be out in the facility.

Q   When there's a fire and you're the shift supervisor, are there documents that you have to create, a report you have to create?

A   An incident report.

Q   And is that any time there's a fire that happens while you're shift supervisor, you have to prepare an incident report?

A   Yeah, an incident report's done.  And I think for the safety HAZMAT guy, the offender fire chief does an incident report -- or I don't know if it's an incident report like ours, but they do some kind of report and turn it int o the fire -- safety HAZMAT guy.  Like after -- you know, for them guys, whatever they do.

Q   And you were describing earlier, you know, that -- the QRT drills that you would do, and there would be a narrative portion where you would sort of

**JEREMY DYKSTRA**                                                    190
**Cause No. 3:18-cv-00995-JD-MGG**

evaluate the response and if there were issues that came up with the response.  Is that something that you would include --

A    Not the same report in that, no.

Q    Sorry.  Could you repeat that?

A    Not the same report in that -- like the QRT report, for that, no.  The incident report is basically just putting a story together of the information from what I got -- gathered from the staff, what time frames I got from the Control Room. You know, 'cause the Control Room's monitoring -- besides doing their Control Room duties, they're monitoring what time it started, what time the signal is called.  They can even -- you know, signal was called at a certain time.  I could call the Control Room.  Because, you know, it's not like I'm sitting there writing down exactly what time.  I'm thinking ahead of the situation.  So might have to call back them and ask, hey, what time was that signal called?

Q    Got it.

So again, just so I'm clear, going back to the incident reports that you would complete after every fire --

A    Yes.

JEREMY DYKSTRA                          191
Cause No. 3:18-cv-00995-JD-MGG

Q    -- whether serious or minor --

A    Yeah.

Q    -- would you include in that incident report your assessment of how successful the response was or if there were issues that came up in the response?

A    No.  The report would say itself and gets turned in to the major, deputy warden, and warden. So they would dictate if they wanted to do something like that.

Q    Well, how would the warden or deputy warden know if there had been an issue that came up?

A    They get all the reports.  They should read them.

Q    So as the shift supervisor, you didn't see it as your responsibility to proactively flag issues like, I think this is a problem.  It was more -- this is my narrative of what happened, and if someone's reading these --

A    I mean, you can --

Q    -- and sees an issue --

A    You can --

Q    -- they'll get back to me.  Is that fair to say?

A    No, no.  It's -- I think you're misjudging

it, and you're not used to the prison system that has hundreds and hundreds of fires. I mean, if there's a fire in D Cellhouse, a guy puts some toilet paperwork out there, starts it on, is it a major incident? Not to me, because he started a little fire. The staff walks down there with a water and fire extinguisher, puts it out, and reports it to me. It's like a two-sentence incident report. So if you walk down there and put it out, it's a successful day. Didn't destroy anything, nobody got hurt, offender didn't get hurt, nothing else. You know? Then it gets turned in to them. I mean, it's a very common thing.

Q    Sure. But it could also be true that you had a relatively minor incident where nothing bad ended up happening --

A    But --

Q    -- during the course of the emergency response, you -- it was revealed that people weren't doing things properly or were not sure how to proceed. Is that something that would get put in the facts of the report that you created?

A    Everything factual, yes.

Q    Beyond listing those in the report, did you ever take any affirmative steps to reach out to

anyone else and say, hey, this issue came up, and I think we should -- we need to address it somehow?

A    Yeah, I've talked to my boss, the major. Yes.

Q    And --

A    Have I ever had to discipline somebody on an incident?  Yes.

Q    Can you explain what you mean by that?

A    Somebody OC'ing offender, basically, because he said somebody got -- he threw pee on him. Then we play back the video, and the offender didn't really throw -- he threw some pee or water down on the side of him, and the officer just sprayed him to spray him.  So yes, you have to take action for that.

Q    Specifically related to fires, have you ever disciplined an officer related to their response to a fire?

A    No.

Q    Have you ever had any conversation with the major or any superior officer related to a response that was made in relation to a fire?

A    No.  No, no.

Q    So going -- again, going back to April 7, 2017, you remember hearing on the radio but don't

**JEREMY DYKSTRA**                                      194
**Cause No. 3:18-cv-00995-JD-MGG**

remember the specific officer or the specific words that were used, that there was a fire in B Cellhouse.

A    I really remember Control calling it more than anything.

Q    And --

A    I think.  I don't know.  I -- it's been a few years.  I more -- I don't know.  I don't know what to say.  Keep on going.

Q    Okay.  And that's fair.

So the memory you have is mostly of Control; but based on your knowledge of how the radio system works, you know that for Control to be calling you, first there would have been a call from the cellhouse.  Is that fair to say?

A    Yes.

Q    Again, with respect to the call from Control, fair to stay you don't remember any specific words that were used to first alert you of the fire?

A    No.

Q    What was the first thing that you did in response to receiving that call?

A    I pulled up the camera system.  That's what I remember.

JEREMY DYKSTRA                                           195
Cause No. 3:18-cv-00995-JD-MGG

Q    What time did you learn about the fire in B Cellhouse?

A    When Control called it.

Q    As you sit here today, do you have an independent memory of what the time was?

A    No.

Q    At the time you received the call, did you take any steps to make yourself aware of what the time was or to document the time that the call came in?

A    I might have wrote it down.  I'm not sure, but I could have called Control later and got the pacific times.  Because when stuff started happening, it's not like I'm sitting there worried about the time.  I'm worried about the offender firemen getting to the unit, I'm worried about the First Responders getting to the unit more than a pacific, exact time in my eyes.  'Cause you're thinking:  I don't want staff to get hurt.  I don't want offenders to get hurt.

Q    What was your reaction to hearing that there was a fire in B Cellhouse?

A    I just thought it was odd, personally. 'Cause we went through that.

Q    And I think you said something along the

lines of:  That's why you pulled up the camera system?

A     Yes.

Q     If the fire report had been in a different cellhouse, say in the IDU, would you have responded differently?

A     I mean, you still want to pull up the cameras, but it's more common to have them up there. Sometimes you know -- because there's -- you know, a lot of times there's a sergeant in them units, so the sergeant would be their direct supervisor.  So sometimes they've already -- they call -- they dealt with the situation, put the fire out.  Now they're giving me the -- in detail.  Now, would I rush to go look at the camera?  No.  Because sometimes they've already put out the fire, already dealt with it, and I'm getting their report saying, Hey, nobody got hurt, offender's fine; or, Hey, the offender did get his hand burned.  He has to go over to Medical and see them, and I'm getting it after the fact.

So sometimes -- and I wasn't always on the radio channel.  I didn't hear them so -- and sometimes they didn't call because it was so common. And then they tell me after the fact, and then I write the report and turn it in.  Then I'd go back

and look at the camera, but it was just -- to me, it's more odd hearing one coming out of a regular cellhouse, a population cellhouse.  So you tend to think, what's going on over here?  You know, curiosity.  You know, when you're dealing with -- you're used to the other units doing this, and the staff working in them units deal with them all the time.  So usually they're only calling a bad signal, if it's bad.  You know what I mean?

I mean, I remember having a little fire in C cellhouse.  A guy set out a little fire there, and them staff freaked out, thought it was the biggest fire in the world.  But they don't -- it was really not much.  You know what I mean?

So I guess it's -- all depends on the staff and how they react.  But here in a general pop cellhouse, it's more odd, so that's why I jumped on the cameras right away.

Q    Is there a written or unwritten policy that says, you know, as part of the fire response procedure, when you receive the call, as shift supervisor, you should jump on the cameras?

A    No.

Q    Is that just what your personal practice was?

JEREMY DYKSTRA                   198
Cause No. 3:18-cv-00995-JD-MGG

A      That's mine.

Q      Do you know if other shift supervisors had different personal practices?

A      I don't know.  You'd have to talk to them.

Q      You're not aware of any rule that said you were supposed to hop on the cameras right --

A      No.

Q      So you -- as far as you know, you wouldn't have been breaking any rules if you hadn't pulled up the cameras.

A      No.  It gets hectic.  I mean, you're talking on the phone, listening to the radio, trying to pull up cameras, monitoring people coming in.  I mean, you got to think, it's going like this (demonstrating).  You know, it's going fast.

Q      And in the answer you gave about distinguishing from -- between different types of fires you might learn about, it sounded like one major distinction would be some fires you would only learn about after the fact, sometimes over the radio, and sometimes even just being told about, so you could write the report.  Is that fair to say?

A      Yeah, they already had their reports done. I'm just doing the incident report based on their reports, and then I'd go back and review the camera

**JEREMY DYKSTRA**                    199
**Cause No. 3:18-cv-00995-JD-MGG**

to see what it was.

Q    Okay.  And in those situations, you would know, at the time you first learned about it, that the situation was over.

A    Yes.

Q    And fair to say that in this situation, when you first learned about it, you knew that it was an ongoing issue, you knew that it wasn't like, we had a fire but it's over.  Is that fair to say?

A    Correct.

Q    Okay.

A    I knew what was going on when I was there, and the whole process, yes.

Q    Can you describe the setup in the Shift Supervisor's Office in terms of viewing the cameras?

A    Just get on your computer systems. There's a little icon you click on, and then it lists them down in columns.  You know, B Cellhouse, this range.  There's different -- there's some cameras that shoot down the range, there's some that are on the wall shooting towards the cells.

Q    So that's just like the regular computer or one of the two computers that you were describing earlier in the Shift Supervisor Office?

A    Well, there's different levels.  The

JEREMY DYKSTRA                                200
Cause No. 3:18-cv-00995-JD-MGG

camera access -- only lieutenants or higher have access to the cameras. I have a higher level than a lieutenant. The major has a little higher than me, and the warden has the highest.

Q    So you would have to be logged in -- using your user name and password -- onto the computer?

A    Yes. And then I hit my user user name and login for the camera system.

Q    You have of a separate login --

A    Once you look into the computer, you would have a camera system, and then you could log in that way. But if you already logged into that computer, it's saved there.

Q    Got it.

A    So it's not like I had to log in and log in again. And not all the computers I could go to -- in ISP is just pull up the cameras. It's usually around where your work. So -- because the I & I people, they control the camera system for our facility. They'd have to come and put that program on that pacific computer before you can even get into it.

Q    And once that program is installed on that computer, it's just like opening a program on a computer, and then you're able to --

A    Yeah.  And there's like different servers, because there's so many cameras.  You can't put -- you can only put so many cameras on each server.

Q    So you have to navigate:  Oh, I need to get to this server --

A    Yeah.  There was --

Q    -- to get to the cameras for B Cellhouse.

A    Yeah.  They're like Server 1, 2, 3, 4, 5, 6, 7.  I don't know how many servers.  But you go to one.  You kind of scroll down.  You see B.  You start to kind of hit them at 4, because some of the wall cameras are labeled weird.  You can understand range cameras, because there's one going down there -- it'd be like 500 East, 5 -- or 500 North, 500 South.  Them are easy to find, but some of the wall ones are like like upper -- upper three.  Well, upper three might show the 4 and 5.  You know?  So they're kind of confusing.  So I've scrolled, you know, four cameras of the five, fighting the fire, and put it on the camera.

Q    How -- so just so I'm understanding the camera system that you're describing -- so for example, within B Cellhouse, there's a -- there's a variety of different camera positions; is that correct?

JEREMY DYKSTRA                  202
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    And from what you're describing, sounds to me like some of them are specific to a particular range.

A    Yes.

Q    And they're set to look down the range. And those would be clearly labeled, you could see what those cameras are?

A    Yes.

Q    And then there would be other cameras --

A    They say like B Cellhouse, East 2 upper. Or B Cellhouse East 5 upper. And it kind of shows different areas. You kind of know when it says, "B upper 500," you kind of look at that one, but it will show like maybe two other 3 Ranges of -- like say the range goes like that (demonstrating), and that wall -- say this is the wall pointing at the cells this way (indicating), it would kind of focus on maybe Cell 32, the 18 on 4 and 500. So sometimes you might find another camera that might be a better view of that area than another one.

Q    Are you able to view multiple cameras at once --

A    Yes.

Q    -- using that software program?

JEREMY DYKSTRA                203
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    Is that your practice, to -- when you're trying to find something like that?

A    I do four at a time, because any more than that is just confusing.

Q    To the best of your recollection, is that the view you used on April 7th when you were trying to locate the fire?

A    As long as I've been doing it, that's how I've always done it.  Until I find the camera I want, and then I click on that camera, blow it up, and then I can zoom in cell.

Q    How much time, to the best of your recollection, passed between you first learning that the fire had been called in, to you getting into the computer system and then finding the correct camera view that showed the fire?

A    Well, first of all, when I come to work I log into my computer, and my camera system's already pulled up.  So it might be mine is down, so it's just plussing it back up, it's on my screen.  So I would say within a minute or so I'm already on it because I'm right there.

Q    Is there anything else that you did in between receiving the call and getting to the point

JEREMY DYKSTRA                204
Cause No. 3:18-cv-00995-JD-MGG

where you'd first identified the view of the fire on the camera system?

A    No.  Waiting on word from the First Responders.

Q    So that's something that should happen automatically, doesn't require any intervention from you to get the First Responders to activate; is that correct?

A    No.

Q    Just so it's clear, I'm correct that you --

A    Yes --

Q    -- that nothing's required.

A    You're correct, yeah.

Q    Can you describe what you saw when you pulled up a camera and were able to see the fire for the first time?

A    It just looked like -- first, there was like black smoke coming out, and there was a little -- little bit of fire.

And then it got really smoky, where you couldn't see nobody.  I mean, it got really smoky, where you could tell there was like a little bit of fire going.  And it got so smoky I couldn't even tell who was on the ranges, what staff were on

JEREMY DYKSTRA                               205
Cause No. 3:18-cv-00995-JD-MGG

the ranges.

And then it got where it was like shooting out the cell, probably like 5, 6 feet.  And then you see it -- I don't know if you ever seen the movies, but with fire, where it like goes down to like a little flashpoint, and it just looked like it blew up, coming back out, like a fire-breathing dragon again.  And you could not see nothing.  And there was smoke.  The smoke was so thick and black, I couldn't tell who was who.

It was coming all the way -- because B Cellhouse is right by the Guard Hall -- there's a door there.  I had dispatched that, opened that door, put some fans blowing in fresh air into the cellhouse.  And there was smoke coming all the way out the front of the building.

Q   So what you just described to me, it sounded like at least sort of three different stages in terms of what you were seeing on the camera.

So it took you approximately a minute before you called it up on the camera and were first able to see the fire; correct?

A   Yeah.

Q   And at that point, when you first saw it --

A    It was just like -- looked like -- you could tell the fire was going.  You know, you couldn't really tell who.  And I couldn't tell who was there.

And then I started shooting out, like I said.  And then I don't know if they kind of put it out to that point and it blew up.  I'm not -- I wasn't there to see it.  You know, I mean, I couldn't even see on the cameras, but the light.  You know, I mean, you got -- I don't know if you guys got the video or not, but --

Q    And so how long -- so was there a -- an initial stage where you remember seeing some black smoke coming out and a little bit of fire; and then there was a period of time where it got even more smoky; and then it was after that, that there was the shooting out of fire that you were seeing?

A    I don't remember.  I would have to re-watch the video.  Just like --

Q    Do you recall approximately how long from when you first started watching the video to when you saw the --

A    No.

Q    -- the first sort of like noticeable flames shooting out of the cell?

A    No.  Didn't seem long.

Q    Did you -- did you take any additional steps or do anything or learn any new information, other than what you were learning from watching the camera, up to the point you just described where you saw the burst of flames out of the cell?

A    Not that I remember, no.

Q    So you didn't get on the radio with anyone in the cellhouse to find out what the status of --

A    My lieutenant said it was --

Q    Sorry.  Just so my -- answer my question:

You didn't get on the radio with anyone in the cellhouse to find out what the status of their efforts were in the cellhouse?

A    No.  I was listening to their radio traffic, trying to gather what was going on.

Q    So what -- was there radio traffic that was happening during this period of time that you were just describing, that you were watching the video cameras?

A    Yes.  Lieutenant Redden and Lieutenant Watson were -- I can't remember word for word what they were saying on the radio.  And then at one point Lieutenant Redden called and asked me to evacuate the cellhouse.

JEREMY DYKSTRA                          208
Cause No. 3:18-cv-00995-JD-MGG

And then I said to evacuate the 500. And then when I said, evacuate -- start with the 500, to evacuate the cellhouse, the staff in that cellhouse heard, "evacuate" and hit every button for every cell in the cellhouse.

Q    The interaction that you just described, how long after you first were alerted to the fire did that conversation take place?

A    I have no idea.  I'd have to look at the report and see times.  I'm not going to tell you times.

Q    And the request that you just described, the evacuation request, that came from Lieutenant Redden?

A    Yes.

Q    And his request was to evacuate the entire cellhouse?

A    His request was to evacuate, and I said to evacuate -- start with the 500.  And when I said that, next I know, the staff in here (indicate) heard "evacuate," and I think freaked out and just hit -- unlocked every cell door in the whole unit.

Q    How did Redden communicate the request or --

A    Through radio.

JEREMY DYKSTRA                    209
Cause No. 3:18-cv-00995-JD-MGG

Q    And you communicated back to him through radio?

A    Yes.

Q    What information did you have that you were making your decision at that point that -- only to evacuate the 500 Range?

A    It's a cellhouse.  There's a lot of offenders.  There's still Level 4 offenders.  Smoke, you know, usually -- it was really bad up there, so I wanted to kind of have some kind of order on evacuating all these offenders.  And I wanted to start with the 500 since the fire was up there.  You had staff up there.  You had an offender firemen up there.  I didn't know the status of the offender in the cell at that moment, so I wanted to start with the 500 and work simultaneously down.

And another reason was the offender that was -- well, I didn't know at that time, but burning, was on the 500, so I'd rather get them offenders out of the situation so they don't have to see it, and staff safety.

Q    What do you mean by "and staff safety"?

A    Staff safety.  You start letting the offenders out.  That smoky -- I mean, my offenders -- or my staff didn't have no gear.

Offender firemen have gear, but none of my staff have oxygen masks and all that.  They're breathing all that stuff in just like the other offenders.  The only -- other thing with the offenders up there, they could put a curtain over their cell bars and maybe some fresh air.  But my staff are sitting there, right at that cell, breathing in that smoke.

So I'm thinking, let's get the 500 out.  As soon as said that, like I said, they don't -- the staff in that unit opened up every cell.

Bad situation, that dark.  The lighting -- you know, it's that smoky.  Level 4 offenders, you don't know what they're going to do.  Staff and offender safety.  Bad situation.

Q    Is there any information that you could have had that would have led you to order an immediate evacuation of that entire cellhouse as opposed to just the 500 level?

A    I mean, what's the point now?  I mean, there ain't nothing -- I mean, you could sit here and go:  Would have, could have, should have all day long.  But when I say, evacuate the 4 -- we'd start at the 5, the staff unlocked every cell in the cellhouse.  So they evacuated the whole cellhouse.

JEREMY DYKSTRA                 211
Cause No. 3:18-cv-00995-JD-MGG

Q    Well, so my question to you is:  Is there any scenario in which you would have ordered an evacuation of the whole cellhouse?

A    Yeah, a natural disaster, like tornado or something.

Q    And in the context of a fire, is there any context in which you would have ordered --

A    No.  Usually we don't evacuate --

THE REPORTER:  Excuse me.

THE WITNESS:  Oh, sorry.

THE REPORTER:  May I have the question again, please.

BY MR. HEPPELL:

Q    Yes.  In the context of a fire, is there any scenario in which you would have ordered the evacuation of the whole cellhouse?

A    Don't know.  Haven't been in that situation until that fire, something like -- that bad.  And I'm not a fireman, so...

Q    What --

A    I mean, I -- so -- it was a bad, bad situation.

Q    What steps did you take, if any, to determine how serious the fire was before deciding that only the 500 level should --

JEREMY DYKSTRA                     212
Cause No. 3:18-cv-00995-JD-MGG

A     When Lieutenant --

(Reporter interrupting.)

BY MR. HEPPELL:

Q     What steps, if any, did you take to learn information about the severity of the fire or the severity of the situation in B Cellhouse before making the decision to order an evacuation of the 500 level only?

A     I listened to my lieutenant.  He wanted to evacuate the whole cellhouse, so I made a decision, being a captain, you start with the 500.  Period.

Q     What information --

A     I'm going off his information.  Him telling me on the radio, "It's this bad."

Q     Do you recall any of the details that --

A     No, I don't.

Q     Let me finish my question.

Do you recall any of the details the lieutenant gave you over the radio that led you to the determination that only the 500 level should be evacuated?

A     Hearing it in his voice.  His stress level.  Knowing it was that bad.  Knowing my staff. So him saying, "We need to evacuate," I said, "We're going to start on the 500."

JEREMY DYKSTRA                  213
Cause No. 3:18-cv-00995-JD-MGG

Q    Did you understand him to be requesting
that you evacuate the whole cellhouse?

A    Yeah, I understand that he asked for it.

Q    And you decided that a different approach
was necessary.

A    Yes.

Q    An approach that was only evacuating the
500 level.

A    Yes.  I said we'd start on the 4 -- or 5
and move to the 4.

Q    And you had no additional information
beyond the tone of his voice conveying how serious
it was; is that correct?

A    I told you, the Shift Supervisor's Office
is right there.  There's a door going into
B Cellhouse.  I couldn't see anything.

Q    I'm sorry.  You couldn't see anything?

A    There's a door going into B, like I had
told you.  I opened that door to get the -- you
know, I had fans blowing in there, and you couldn't
see like 10 feet in there; 10, 15 feet maybe.

Q    And did that suggest to you that it was a
serious situation?

A    Yes.

Q    But it wasn't sufficiently serious for you

JEREMY DYKSTRA                    214
Cause No. 3:18-cv-00995-JD-MGG

to order the immediate evacuation of the entire cellhouse; is that correct?

        A     Nope.

        Q     Are there any additional signs of seriousness that you can think of that would have convinced you in that moment to evacuate the entire cellhouse?

        A     No.

        Q     And that -- the request to evacuate the cellhouse, that came after you'd already got the fan set up; correct?

        A     I don't know.  I had the Guard Hall staff doing that.  I told them, Get some fan -- get the door open.  I had a dispatcher and Gate 4 officer, so I told them to get some fans.

        Q     So I want to go back to the radio traffic that you heard between first learning that the fire had taken place and the recent conversation you were describing with Lieutenant Redden requesting the evacuation.

                Do you remember any of the radio traffic that took place between those two moments?

        A     No.

        Q     Do you recall if there were additional radio transmissions made by any of the officers in

JEREMY DYKSTRA                     215
Cause No. 3:18-cv-00995-JD-MGG

B Cellhouse?

A    No, not -- not that I remember.

Q    Just so I'm clear, is it that your best memory is that there weren't or you can't remember one way or the other?

A    I don't remember.

Q    What about additional transmissions from any of the First Responders between learning that there was initially an incident and Lieutenant Redden contacting you regarding an evacuation?

A    I don't remember word for word what they said.

Q    Do you remember anything about the substance of what they were saying, even if you don't remember word for word?

A    I'm not going to say.  I don't remember. I don't know.  Not word for word.  I don't remember a substance or however you're going to word this.

Q    Well, just so I'm clear, I understand you don't remember it word for word.

        Do you remember anything about the topics that they were talking about --

A    No, I don't.

Q    -- or the type of information they were

**JEREMY DYKSTRA**                                216
Cause No. 3:18-cv-00995-JD-MGG

conveying?

A    No, I don't.

Q    Do you remember that there were radio transmissions from the First Responders between first learning that there was a fire and Lieutenant Redden's transmission?

A    I'm pretty sure they were on the radio quite a bit.  All of them.

Q    You just don't remember anything about what they were saying.

A    No.  It was over two years ago.  No, I don't remember.

Q    Is that something that you would have remembered at the time, like in the hours after the incident, you would have remembered what that back and forth was?

A    Every splittin' and detail of everything? I don't know.  You tell me.  I mean, I'm being honest with you.

Q    Sure.

A    Are you gonna -- have you been in any kind of situation like that before?  No, I doubt it.  But I mean, am I going to remember every pacific detail, every word said?  No.  But is it going to be close? Yes.  So, you know, I wrote that report over there

that you have.  You can read it a hundred times, and that's what happened.

Q    What specific --

A    I'd like a break.

MR. HEPPELL:  Yeah, take a break.

MR. NAGY:  Yeah, it's about that time. Maybe ten minutes?

MR. HEPPELL:  Yeah, that's fine.

(A brief recess was taken from 1:10 to 1:21.)

BY MR. HEPPELL:

Q    Mr. Dykstra, before we took a break just now, we were talking about the fire incident in B Cellhouse on April 7th, 2017.

From your perspective, being in the Shift Commander's Office, specifically, you had referenced some actions that you took in response to the information you were learning.  You described going on the computer and pulling up the camera system and viewing the fire, and you also described an interaction that you had with Lieutenant Redden in terms of directing him to evacuate 500 level of B Cellhouse.  And you also described monitoring radio traffic that had taken place prior to your conversation with Lieutenant Redden; although, I

think you testified you didn't remember the substance of that radio traffic as you sit here today.

Is that a fair summary of what we were just talking about before the break?

A    Yep.

Q    Are there any other steps that you took during that period of time related to the fire that we haven't talked about?

A    No.

MR. HEPPELL:  Okay.  Could we mark this as Dykstra Exhibit B.

(Dykstra Exhibit B marked for identification.)

BY MR. HEPPELL:

Q    So Mr. Dykstra, the court reporter's just handed you a stack of documents that's been marked as Dykstra Exhibit B.  And in addition to that exhibit number, just to identify it for the record, it's also got Bates stamps, and those are the little printed numbers in the right-hand corner starting with 1756 -- Devine Production 1756 and running consecutively through Devine Production 1812 on the back page.

Are we on the same page about the

**JEREMY DYKSTRA**                                                219
Cause No. 3:18-cv-00995-JD-MGG

documents that are in front of you?

A    Yes.

Q    And specifically looking at the first page of that packet, Bates stamped Devine Production 1756, and it's a document with -- at the very top, titled on the left-hand side, "Indiana State Prison," and then on the right-hand side, "Shift Report of Incident."

Are we looking at the same document?

A    Yes.

Q    Do you recognize this document?

A    Yep.

Q    What is this document?

A    Incident report.

Q    Do you recognize this as a specific incident report?

A    Yeah, Devine, Joshua Devine, DOC 119856.

Q    And this is, in fact, your incident report --

A    Yes.

Q    -- that you created in relation to the fire that we've just been talking about; correct?

A    Yes.

Q    And when you made some comments earlier about wanting the opportunity to see your report in

JEREMY DYKSTRA                          220
Cause No. 3:18-cv-00995-JD-MGG

terms of providing additional details that you may
not be able to remember today, is this the report
you were referring to?

        A    Yes.

        Q    Okay.  What is this type of report used
for?

        A    Exactly what it says, "incident report."

        Q    And is that sort of anything -- any
disturbance or anything out of the unusual that
occurs at the facility that was -- rose to some
level of noteworthiness would be documented on this
type of report?

        A    Yes.  You could put anything on this, if
you want.

        Q    So it doesn't have to be -- it could be --

        A    It don't have to be any of these little
boxes.

        Q    Could be something really minor, but still
seemed worth making a report on, or it could be
something very serious.

        A    Yes.

        Q    That this same format of report would be
used.

        A    Yes.

        Q    And you're listed at the top left-hand

JEREMY DYKSTRA                221
Cause No. 3:18-cv-00995-JD-MGG

corner as the reporting employee; correct?

A    Yes.

Q    And then the date and time of the incident is listed as 4/7/17, 9:45 p.m.

A    Yes.

Q    And what does that time specifically refer to in terms of the time of the incident?

A    What do you mean?

Q    Well --

A    I mean, approximately 9:45, that's when it started or when the signal was called.

Q    So that -- the time that's in the top left-hand corner, that's just referring back to the time that's listed in the narrative portion of your report, which is when you were first alerted to the incident based on the signal being called.

A    Yes.

Q    Okay.  Did you do any additional investigation to determine when the fire itself started in terms of choosing a time to list, or did you just go off when the signal was called?

A    I went off the time the signal was called.

Q    Okay.  Then the location is listed BCH 540 North; correct?

A    Yes.

JEREMY DYKSTRA                    222
Cause No. 3:18-cv-00995-JD-MGG

Q    And that refers to B Cellhouse, Cell No. 540, which is on the north side of that cellhouse?

A    Yes.

Q    And the -- there are two boxes that have been checked, and those are offender homicide, slash, death; and medical emergency, Signal 3000; is that correct?

A    Yes.

Q    And fair to say those boxes are checked because at the time you completed this report --

A    Yes.

Q    -- you --

A    Go ahead.

Q    Fair to say that those two boxes are checked because at the time you completed this report, you were aware that Mr. Devine had passed away?

A    Yes.

Q    So it was an offender death involved?

A    Yes.

Q    And also, at a point prior to him passing away, he was in medical distress, and so there was a medical emergency.  Is that fair to stay?

A    Yes.

**JEREMY DYKSTRA** 223
**Cause No. 3:18-cv-00995-JD-MGG**

Q    Do you -- strike that.

The -- there is a box on the form right under "offender homicide/death," and right above "medical emergency" that's a specific check box for fire or Code 10-70; is that correct?

A    Yes.

Q    Do you know why you didn't check off the fire box when you were completing this form?

A    Probably just forgot.

Q    Is there any way, from looking at this document, to determine when you created this report?

A    No.

Q    And there's -- turning to the --

A    Well, I guess it probably gives me a time. Probably -- let me see.  I don't know why it did that, but there's usually a day, of course, but there's usually a time on it, too.  I don't know why it's not on there, but whatever.

Q    So just so I'm clear what you're referring to, that is on the second page of the report, which is Bates stamped Devine Production 1757.  There's a line that says, "date and time of initial report," and above that is the date 4/7/2017, but there's no time listed; correct?

A    Correct.

JEREMY DYKSTRA                                    224
Cause No. 3:18-cv-00995-JD-MGG

Q    That's what you were just referring to?

A    Yes.

Q    Do you want a few minutes to sort of orient yourself through that stack of documents?

A    No.  Go ahead.  I don't want to be here any longer than I have to be.

Q    Do you -- as you sit here today, do you have an independent recollection of creating this report?

A    It came from me, so yeah, I wrote it.

Q    Okay.  I understand that you're not disputing that you wrote it --

A    I mean, that was two years ago, so do I remember every detail when I did it?  No.  Am I going to remember what time?  No.

The report was 4/7, 9:45.  It was probably written after midnight, believe it or not.  You know, to be honest with you.  Because as you see all these other statements, I have to kind of collect before I can send all this out.

Q    Sure.  And actually, you know, looking at the narrative portion of the report on the front page -- and as far as I can tell, and let me know if you think differently, there's duplicates, and the file was produced to us, as I understand it, how it

JEREMY DYKSTRA                                              225
Cause No. 3:18-cv-00995-JD-MGG

was maintained, and there's extra copies.  So I don't think there's any difference --

A    No.

Q    -- between those first three copies, but let me know if you see any difference or if you can think of why there could be differences.

A    Probably 'cause -- the reason why there's probably three different copies -- I don't know if they just copied this whole stack, but like -- I don't know why they'd do that, but maybe they did -- but one whole copy goes to the major, one whole copy goes to the deputy warden, one whole copy goes to the warden.  Plus, you know, I think at that time I -- and I wanted a whole copy, you know, because it was a death.  So there's probably many copies floating around --

Q    Sure.

A    -- you know, to people that wanted them.

Q    And again, I -- you know, I don't know exactly the source of where we -- you know, how we got this stack or how it was maintained like this, but that's not uncommon that we would have something like that.  I just --

A    I don't know why they did that either, but they're all the same.

JEREMY DYKSTRA                226
Cause No. 3:18-cv-00995-JD-MGG

Q    You don't see any differences, nor can you think of any reason why there would be differences in these reports?

A    No.  If there would have been a change, one of these would have had the fire code box marked on it.

Q    Fair.

Looking at the narrative portion of your report, at the very bottom, it -- the most -- sort of the -- the latest time that's referenced is actually a 1:43 a.m. time, and that was after the count was -- not to jump far ahead in events, but that was after a count had been called, an emergency count, and then it was cleared.  You see what I'm referring to at the very bottom?

A    Yes.

Q    So fair to say that in terms of your estimation of when you wrote the report, we know for a fact you wrote the report after 1:43 a.m.; correct?

A    That's not necessarily true either, because -- yeah, I would say it was after that because I had to email Op's office downstate, so I'm looking at the time frame there on Devine Production 001766.  See where I'm talking about?

JEREMY DYKSTRA                 227
Cause No. 3:18-cv-00995-JD-MGG

Q    Got it.

A    See, this is already -- you see Operation Center.  They get all the critical incidents.  And any major incident reports, they get reported to Central Office.

So that was sent at 2:44, so I'm assuming this report was probably done about 2:00 o'clock in the morning probably.

Q    Okay.  And how --

A    I mean, I bet there was parts of it going throughout -- like after the incident; you know? 'Cause you got bosses calling on the phone or -- you know, I don't know where we're at on dealing with the fire.  We're at this incident report.

Q    Yeah.  So what I'm wanting to find out from you right now is about how -- how your report gets created --

A    How --

Q    -- and specifically, because you look a little confused --

A    Yeah, I do.

Q    I haven't gotten to the punch line in my question yet.

A    Yeah.  That's what I was waiting for.

Q    So for example, you know, is it a -- like

JEREMY DYKSTRA                                       228
Cause No. 3:18-cv-00995-JD-MGG

a set program, like a report-writing program you open on the computer, where you pull it up and fill in the fields on the report?

A    This is just a Word-created document from from ISP for incident reports.  It's not a state form or anything.  It's just what they utilized.  So it's just, you know, a blank incident report, and then you go through filling it out.

Q    And I think what I was getting at earlier is that you don't have a specific memory, as you sit here today, of sitting down at a computer, opening up a blank incident report for this specific report. Fair to say?

A    No.

Q    But you filled out many of these reports during the course of your career; is that correct?

A    Yes, sir.

Q    And each time you filled one out, is it the same process, where you open up a Word document that has this form saved in it and then fill it out?

A    I have one saved on my desktop, and I usually copy it 'cause I can have the one saved as blank and then I start filling it out.

Q    So recognizing that you don't remember starting to fill out this specific report, based on

your practice at the time, your best guess is what would have done is on your computer in the Shift Supervisor's Office, open up a blank report you had saved on your computer and started filling it in.

A    Yes, sir.

Q    Was it your practice to wait until the end of an incident and fill the narrative out all at once, or was it your practice to start filling stuff out on an incident report, even if the incident was still underway?

A    The way I do it, I try to get -- if I have time, and I'm not on the phone, not on the radio, you know, I try to start filling it out as best as I can.  And then I -- because you don't know the whole -- you don't know the whole basis, story, on everything till you start getting -- when the situation clams down and you start getting people calmed down.  So you kind of have -- as you see, there's many statements from other people in here, so you got to kind of take what they're saying and put it in to what you got to write.  This is kind of like an overview of -- I'd say a shorter overview of what happened for the whole picture.

Q    If I understand what you're saying, as shift supervisor, it's your responsibility, when

JEREMY DYKSTRA                                230
Cause No. 3:18-cv-00995-JD-MGG

you're writing your narrative portion of the incident report, not only to include things that you have personal knowledge of, because you saw or heard or did them --

A    Yeah.

Q    -- but also a broader overview of what happened during the incident based on what you can piece together from other people.  Is that fair to say?

A    Yes, sir.

Q    And is that a different responsibility than if you were just a line level CO writing an incident report?

A    Yes.  Line level CO, they would just write a statement on -- they call it like a memo form, like a form like this.  I don't know if you want one.  001806.  And they'd write down what they did during the emergency.

Q    And so it would be kind of less formal in terms of the format of the report?

A    Yes.

Q    And also, is it true that a line level CO is just responsible for conveying their personal knowledge, what they saw or heard or did?

A    What they did during the incident.

**JEREMY DYKSTRA**                                    231
**Cause No. 3:18-cv-00995-JD-MGG**

Q    During the incident?

A    Yeah, what they saw.  I don't know.  I mean, I guess, yeah, I saw, heard, did.  Yes.

Q    But not sort of trying to piece together from other sources --

A    I don't --

Q    -- a bigger picture --

A    I don't really say heard --

Q    -- of the incident?  Just --

THE REPORTER:  I'm sorry.  Start over.

THE WITNESS:  I don't want to really say just heard because you can -- during a situation like that, it's so loud, I'd rather have visual facts than just hearing something.  You know, unless it was something extravagant, you know what I mean?  Where -- but I mean, like, people kind to tend to hear what they want to hear, and I like to have them say visual, but I just have them write their honest -- what they did during the situation, and then I'll sort it out at the end.

BY MR. HEPPELL:

Q    Got it.

If I understood what you were describing in terms of your practice of making the

narrative, you might have started filling this in with some early details if you had a spare five minutes in the middle of the events that are described here and then come back to it later on and added to it if you -- as you learned additional information about the incident?

A    Yes, sir.

Q    To your knowledge, based on your understanding of that system of creating the report, would there be any copies preserved of partial drafts of the report?

A    No, 'cause I didn't, like, reopen a new file to do this.  If I -- if I needed to change something or something, I just deleted it and then put it in.  Or I'd start writing it, and then I'd add into what I wanted, and then I'd read it and then change words.

I'm not the perfect report writer or -- I'm just one that tries to get what I'm saying out and thinking what happened, and then I'll take what everybody tells me and then try to put the story together the best I can.

Q    As you sit here today, do you remember there being details that you deleted that were in an earlier version --

A    No.  I probably had the general information in here, like approximately 9:45 Officer Abbassi called 10-71, B Cellhouse.  I started looking at the cameras because that's what I did.  You know, and then after -- some people deal with stress quite well, and maybe they need, after a situation like this, 15, 20 minutes, half hour to sit there and reflect on what they do before I get the story out of them because sometimes they're very frantic.

Some people can sit there, just like me, and be like:  This is what happened, what happened, and good.  But some people need some extra time.  Well, go relax and come back and write it when you got a minute.

Q    Turning to the first section of your narrative, would you just read for me the first two sentences of your report?

A    "On 4/7, 2017, at approximately 9:45 p.m., Officer Abbassi, white female" -- that's the WF, "called a 10-71 in B Cellhouse.  I, Kevin Dykstra, white male, started looking at the cameras to see the fire coming from the cell of 500 North Range but could not tell what cell it was coming from due to the smoke."

JEREMY DYKSTRA                           234
Cause No. 3:18-cv-00995-JD-MGG

Q    And fair to say that's what we were talking about earlier, when you were going from your memory of what happened?

A    Uh-huh.

Q    The specific additional detail that I see is that this -- the report reflects that it was Officer Abbassi who called in the code.

A    Okay.

Q    And is that -- do you have any -- recognizing that as you sit here today, you don't remember that it was her, do you have any reason to doubt that that was correct based on what you knew at the time?

A    I don't doubt it.  I don't really remember it totally.  You know.

Q    Would you have put her name in the report if you weren't sure when you wrote the report that it had been her?

A    No, I wouldn't have wrote it if it wasn't her.  I mean, nobody -- I don't know why anybody would lie about who called the signal.  You know, I mean, it's kind of pointless.  And the other staff are just going to be:  That was Abbassi anyway.  You know?

Q    So you might have done that based on you,

yourself, remembering and recognizing her voice, or you might have done it based on --

A    I'd even --

Q    Sorry.  Just let me get my question out.

Or you might have meant based on someone telling you, oh, yeah, Abbassi called the code in?

A    She could have told me.

Q    She could have told you or someone else could have told you.

A    No.  Yeah, she could have said, I called it.  You know, simple question.

Q    10-71 is the code that's listed in your report as the code that she called; correct?

A    Yeah.

Q    And I think I'd asked you that earlier.

A    I -- I don't know why -- it's supposed to be -- I mean, I don't know why ISP, but they've always called 10-71 even though it lists 10-70.  So I'd have to look at the code sheet.  I mean, I've worked at two other facilities.  We always said 10-70, but she said 10-71.

Q    Is there a distinction between someone seeing fire versus someone seeing smoke in terms of a code that's called in?

A    Most the time, if she sees smoke, you're going to have fire, so...

Q    I guess that's what they say, isn't it?

A    I mean, you kind of answered your own question there; but no, they're still going to call a 10-70 or 10-71.

Q    So based on your understanding of how they were used, those codes were interchangeable.

A    Yeah.

Q    And the time that's listed on the narrative portion of the report that that code was called in was 9:45 p.m.; is that correct?

A    Correct.

Q    And --

A    Approximately.

Q    At approximately 9:45 p.m.

Do you recall how you determined that that was the time -- the approximate time that that call came in?

A    I probably checked with the Control Room. And I had a outstanding dispatcher at the time. Both the dispatchers -- I don't remember which one was there, either Officer Karl Keller or Officer Kenny Jones, and either one of them are -- they know when.  Additional to the Control Room, they're

JEREMY DYKSTRA                                237
Cause No. 3:18-cv-00995-JD-MGG

additional great help with writing down times for
incidents.

Q    Can I get you to turn to Page 1798 in this
set of documents?

A    Let me see.  Okay.

Q    And do you recognize this document?

A    This was an email sent by Officer Sinder.
She was probably working in the Control Room that
night, and she was writing down -- or had her email
up, writing down times of radio traffic.  But I
don't remember this.  I don't -- I mean -- I mean,
it's outstanding how she did this, but I don't
remember the document personally.

Q    Sure.  But I -- so, I guess, to be more
precise, you don't recognize the document; but based
on seeing it and knowing the back story, you know
what this is.

A    Yeah.  It looked like she was working in
the Control Room.  Either in this Control Room or
ISO's Control Room.

Q    What's ISO?

A    The Level 1-2 outside the facility.
There's a Control Room over there, too.

Q    What does ISO stand for?

A    I have no idea.  But she -- she worked a

lot of them two units.

So me, just assuming, if I don't have a roster in this paperwork, she was probably in one of them two Control rooms.  But if you have a roster from that night, I can tell you where she was at.

Q    I do have a roster.  And as much as you might think that I would rather have you guess, I would not.  I would rather have you look at the correct document, so let me just see if I can find that.

(Dykstra Exhibit C marked for identification.)

BY MR. HEPPELL:

Q    So the court reporter's handed you a set of documents marked as Dykstra Exhibit 3 -- C.  And again, just for the record -- oh, these are not -- these are not Bates stamped, but it's a six-page -- six pages of roster.

Do you recognize this formatted document?

A    Yes.

Q    And are you able to tell, based on this document, where Sara Sinder was working?

A    Yeah, she was working ISO Control.

Q    So that was -- and just so I'm clear, what

page are you referring to that --

A    The second to the last.  Right here.

Q    I see.  And it's in the -- so bottom right-hand quadrant, No. 143 J Bracket --

A    Yeah.

Q    -- ISO Control is listed as S. Sinder. And that's that lower security on the grounds but outside the perimeter of ISP?

A    Yeah.  Yeah.

Q    And --

A    She's a Control Room officer just like ISP, which ISP Control Room officer would have been -- well, it says, "Key Control Officer," but it's ISP Control, J. Ficklen, Officer Ficklen. Actually, she should have sent something like that, but Sinder did.

Q    Okay.

A    'Cause Sinder's more a pay-attention-to-detail-type person.

Q    You know both Officer Ficklen and Officer Sinder?

A    Yes.

Q    What's Officer Ficklen's first name?

A    I think it's Janice.

Q    Do you know if she's still at the

**JEREMY DYKSTRA** 240
**Cause No. 3:18-cv-00995-JD-MGG**

facility?

A   I'm pretty sure.  Yes, on the same group, Day Group.

Q   And based on the -- your understanding of the practices at the time, would this have been something that you would have had to request from Officer Sinder --

A   Most --

Q   -- or Ficklen?

A   Most of the time, they -- they log it down, then you have to call them.  But she was nice enough to email it.

Q   Okay.  Also possible that you called and requested it, and then this was sent in response to a call that you made?  Is that --

A   I'm pretty sure she just sent it to me.

Q   She just sent it?  All right.

You have no memory of making that request?

A   No.  I had other things to worry about.

Q   Did you have an understanding of how, at 10:29 p.m., Sarah Sinder is able to list the chronology of calls going back 45 minutes earlier?  And that's on 1798.

A   I'm flipping back to it.

What do you mean?

Q    Well -- so this -- this email was sent at 10:29 p.m.

A    She probably finished the last thing -- probably finished the last thing and sent it out. She might have been typing it on her computer as she went.

Q    And I guess -- and this is a question that's perhaps better directed to her.  But I don't have her; I have you.  So I'm going with the best information I can get from you.

Do you have knowledge of how they go about generating a timeline like this, whether they have to be creating it in realtime as they're hearing it versus there's some record they can look back to and see, oh, this call was made at this time?

A    Well, even though she's in charge of ISO, Level 2, this isn't really her responsibility.  This is just her being attentive of what's going on. Janice Ficklen probably wrote it down in her logbook in the Control Room, wrote it down this way (demonstrating).  That's why we usually call -- in a logbook, that's a daily log for her shift.  But Sinder must have been typing it as we went.  'Cause

when she worked ISP Control, she -- when an incident happened, I would call her, hey, I need some times.

And she'd be like, I'll email it to you.

Q    Again, recognizing that you weren't a Control Room officer but had occasion to interact with Control Room officers, your understanding that their practice was that they would keep either handwritten or typewritten records as incidents were being called in so that after the fact, someone like you could ask them for times and like when did this signal get called, and they'd be able to give that to you?

A    Yes.

Q    Okay.

A    It's their job but, I mean, this is kind of going out of the way -- beyond.  You know what I mean?  Above and beyond?

Q    Is there a synchronized time system across the different systems at ISP, to your knowledge, or was there one in effect that -- in 2017?

A    I don't know.  Like what, clocks and stuff?

Q    Yes.  I guess, for example --

A    I mean --

Q    -- the time that is being looked at by Sarah Sinder typing this up versus the time that you're looking at a shift supervisor in your office versus the time stamp on the camera system, say, which I know has a time stamp on it.

A    I don't know.  We always went off the computers.  And I think they're all networked in one, so that would be a good question for IOT, you know, them people.  But pretty much every computer I've looked -- all these -- all the times matched. The only thing different would be like the clocks with batteries.  You know what I mean?  But we always went by the computer time or the camera times.

Q    Did you ever have occasion to consciously compare or notice whether or not the camera time and the computer time were synchronized?

A    You pretty much -- I think I've looked before.  I think at one or two times in my career they've been off.  And we let I & I know, and then they fixed the problem.  But I don't -- I don't know all that.  It's not like I went around checking every computer to see, hey, is it 10:28?  Okay. It's 10:29.  Well, it could of been -- time change. You know what I mean?

JEREMY DYKSTRA                          244
Cause No. 3:18-cv-00995-JD-MGG

Q    Sure.  But your recollection is that, as a general, that was the same -- you'd look at the camera time, and it would be --

A    Yeah, that's --

Q    -- linked up with the computer time.

A    That's why we always put "approximately."

Q    So the next sentence in the report that you -- the next sentence of the narrative portion of your report, coming after the first two sentences that you had read previously states, "At this time Lieutenant T. Redden, black male, called at approximately 9:58 p.m. and stated that he need to evacuate the cellhouse; and by the time I could say anything, because offenders were being let out of the cellhouse already."

A    No, I told him to evacuate the 500.  Next thing you know, they were coming out.  But he says -- I think -- maybe he didn't hear me.  I don't -- (witness shaking head).

Q    Okay.  As you reflected in your report here, basically, by the time you gave your direction, they were already being let out?

A    (Witness nodding head).

Q    Is that correct?

A    I don't know -- I don't know -- yes.  And

JEREMY DYKSTRA                    245
Cause No. 3:18-cv-00995-JD-MGG

I -- the best of my knowledge, when he said, "evacuate," I said, "Start with the 500."  And next you know, it was like instant, they heard "evacuate," and next, all the cells in the cellhouse were -- and there's hundreds of people coming out -- or coming down to the bottom.

Q    How did you first come to learn that the entire cellhouse was being evacuated?

A    I looked out my office through the door that the fans were blowing, and everybody was running.  Because the front of the block is like right there, and you could turn to see.  And I want to say my dispatcher or the gate floor officer was standing there, and they're like, "Dykstra, everybody's running down."

And I looked.  And I'm like, "Oh, this ain't good."

Q    Is that what's supposed to happen?

A    What do you mean?

Q    Well, if -- if an officer, in this case, Lieutenant Redden, requests permission to evacuate a cellhouse, and you give a direction to direct -- you give him a direction that the 500 level should be evacuated, and then, sort of, immediately upon you giving that direction, the entire cellhouse is

evacuated --

A    I honestly think that he didn't hear what I said exactly.  'Cause it was loud; a lot of people screaming, yelling.  You know, I remember there was approximately like 200-something offenders in that cellhouse.  I think it's 32 per range, I want to say.  And there's ten ranges.  So whatever that is.  And they're loud; screaming, "smoke."  You know, people want breathing treatments and everything else.  Just screaming like mad men.

I think when he -- he said, "evacuate," I heard -- think the staff just heard "evacuate" and just hit every door lock in that place.  And that's -- and when I was saying, the 500, it was already late.

Q    So your best -- just so I'm clear, that's your inference about what likely happened, based on the pieces of the puzzle that you know from your end; correct?

A    Yes.

Q    You haven't talked to -- strike that.

Have you talked to the B Cellhouse staff at any point and asked them why they evacuated the entire cellhouse when --

A    Lieutenant Redden told me he talked to

them and said they just heard "evacuate," so they hit all the doors.

Q    So you learned that from Lieutenant Redden?

A    Yes.

Q    Okay.

A    And he -- and I think he said he couldn't really hear what I said, and it was already too late.

Q    So it's not -- and just so I'm clear, it's not that Lieutenant Redden misheard you and conveyed a clear direction to the B Cellhouse officers --

A    They didn't -- the staff in B Cellhouse did it on their own without actually being told to do it.

Q    Is there an evacuation plan or an evacuation policy that sets forth the procedures that should be followed when --

A    There's a evacuation plan on each door for each cellhouse and where they go.

Q    And what you're describing, is that just like a physical chart of the evacuation routes?

A    Yes.

Q    Is there any evacuation plan or procedure or policy that dictates who has authority to order

an evacuation or how an evacuation should be handled?

A    The shift supervisor.  I mean, I was the highest-ranking authority there, so it's my call to make it evacuation or not.  And I was basing it on the lieutenant; so I said, "Let's start with the 500 to get organized."

Q    Is there a written policy or written procedure or document that says that you, as shift supervisor, are the person who has to make the call on whether or not to evacuate, and if so, how to evacuate?

A    I don't know if it says me pacifically, but there's a policy on fire evacuation.

Now, do I know what that says word for word?  No, I don't.

Q    What's your understanding of what that policy says in substance?

A    There's a fire escape plan; follow it. But it's a judgment call on -- I guess it's anybody's judgment call on evacuating any cells. But I mean, really, it's a concrete cell; you know? So -- and dealing with Level 4 offenders, so you're trying to control the situation the best you can and make a judgment call.

JEREMY DYKSTRA                          249
Cause No. 3:18-cv-00995-JD-MGG

Q    Fair to --

A    But all that's thrown out the window.  I mean, they all got let out, so....

Q    That's not how it transpired in practice; fair to say?

A    No, it didn't happen the way I wanted it to happen.

Q    And it didn't happen the way it was supposed to happen, based on your understanding of what was supposed to happen.  Is that fair to say?

A    Not on the way I wanted it to happen, yes. How I wanted -- I would have organized it.

Q    Right.  And I guess what I'm getting at, it's not just your -- like a personal preference. It's based on your understanding of how the procedures should be followed.  Is that fair to say?

A    I guess the situation would dictate itself, and every situation's different.  I mean, every fire's different, every location's different. So I wanted -- I made my judgment call, and I stick to it.

Q    Certainly, it was Lieutenant Redden's understanding, at least based on his behavior, that he needed to get your sign-off on evacuating the cellhouse; correct?

JEREMY DYKSTRA                                   250
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    He didn't believe that he had authority to order the evacuation.

A    No.  I think he was looking for my approval.

I would of -- my confidence in Lieutenant Redden -- he's a great, outstanding lieutenant, one of the best that I've ever had in my life.  So I would have took his judgment call about everything.  But I thought it was a little extreme to do the whole cellhouse.

I have would have started at the 5. That way we could have had more control with the offenders, where they're going. 'Cause working in a prison with Level 4 offenders, when stuff happens, they take advantage of the situation.  And I didn't want other offenders getting hurt, plus my staff.

So like I said, I'll back my decision.  I mean, it didn't go the way I wanted it to, but that's life.

Q    Does it concern you that you gave a direction, in your capacity as shift commander, on how this incident was to be handled, but instead it got handled differently?

A    Am I concerned?  Yes.  But I'm putting

myself in that predicament of that 18-year-old kid, 19-year-old kid, 20-year-old kid that's never been involved in a situation in their life.  And how they react and I react are two different things.  So that goes on the base of:  I've been through hundreds and thousand of incidents.  Some of these people never seen a fire in their life or been -- they're in a Level 4 facility with very, very -- not very great people, and they're scared to death.  So I can't -- I can't vouch -- did I think all my staff for that night, for what happened, did an outstanding job? Yes.

Q    And that's in the -- in that description of that "outstanding job," you're including the staff that didn't follow the directions and evacuated the entire cellhouse prematurely before your order; is that correct?

A    Yes.

Q    The reference you just made to "18-year-old, 19-year-old, 20-year-old," is there a specific staff member or staff members that you're referencing with those ages?

A    I'm just referencing that somebody new to the Department of Corrections maybe never been in a the lot of situations.

JEREMY DYKSTRA                 252
Cause No. 3:18-cv-00995-JD-MGG

Q    And is it your recollection that the officers in B Cellhouse that night were newer officers?

A    Yeah, they were -- they were pretty new. Let me see the --

Q    And again, I mean, I'm sure it's in the documents, and you can see later on with their reports, but my understanding is that it was Officer Abbassi --

A    There's more.  Yeah.

Q    -- Officer Promise Blakely --

A    Uh-huh.

Q    -- and Officer Justin Rodriguez were the officers --

A    All pretty new, yeah.

Q    Okay.  You have a memory of those three officers, and you recall them being --

A    I don't really -- I remember Abbassi and Rodriguez.  I don't really remember Blakely, whatever name you said.

Q    Promise Blakely.

A    Yeah, I don't really remember her that well.

I've seen hundreds and hundreds of staff come and go.  I'm better with faces than

names.

Q    Is -- are you familiar with the "officer in charge" designation for a particular cellhouse?

A    OIC?

Q    Yeah.

A    That's usually the person with the most time on the unit or one that myself or the lieutenants think they can handle the unit.

Q    Is there always an officer in charge designated for a particular cellhouse?

A    It's usually the No. 1 officer, yes.  If they don't have a sergeant, yeah.

Q    Is there a particular -- well, strike that.

What additional responsibilities or additional authority does the officer in charge have?

A    They -- it's not really additional responsibilities, but they might know how to work the unit, they know how to do the logbook.  They've been taught by somebody else that's been on that unit that knows how to do a count letter, knows how to do the daily running of the unit.  So they're usually trained by somebody else that's been there, and it kind of tickles down.

JEREMY DYKSTRA                254
Cause No. 3:18-cv-00995-JD-MGG

Like if I've been working there six months, and you're brand new, and you come work with me, I'm going to try and show you everything I know. And a lot of people that are OICs on units, then they've -- it's like a stepping stone to become sergeant.

Q    So that designation is given to someone in the absence of a sergeant if there's no sergeant being staffed?

A    If there's no sergeant there.  But they have no -- they have no more authority than another officer.

Q    Would it be fair to say that one of the purposes of that designation is to sort of formalize there being someone who has more experience and who can provide some additional guidance to the other officers on the unit?

A    Yeah, that's fair to say.

Q    Is there a particular amount of time that, in your view, it would be appropriate for someone to have before taking on an officer in charge?

A    My personal opinion, no.  My first day at Westville training, they said, "Here you go, 80/80. Have fun there."

Q    What's "80/80"?

JEREMY DYKSTRA                           255
Cause No. 3:18-cv-00995-JD-MGG

A    80 offenders on one side, 80 on the other. 160 by myself.

So my personal opinion?  No.  That's just me.

Q    So you don't put a lot of stock in the officer-in-charge designation?

A    I think it's a good thing.  It's better than when I was probably trained and saying, "80/80."  But you got your pros and cons on that. And I'm just more of an idealist when it comes to that, 'cause -- I went through it.  They said, "Here's 80/80.  Hopefully you'll last."  You know?

Now it's a little different.  They want you more trained.  So we try our best of our ability to put somebody that's worked that unit and kind of knows that unit with people maybe that don't know that unit as well to a roster that's kind of -- kind of short.  A lot of veterans don't like working nights, so you got more new staff on nights.  So you do the best you can with what you got.

Q    Based on your recollection of your practices at the time, what did -- well, strike that.

As the shift supervisor, was it your responsibility to build the roster?

A    Yes.

Q    So you would have responsibility for assigning different officers to different cellhouses?

A    I had a dispatcher at the time, so he fills in the roster based on where -- I had a dispatcher, so he kind of fills it out the best way, where people have been working.  Then I look at it, and then I make changes.  Because an officer dispatcher is not a bad thing, and is awesome, and it was great to have, but sometimes they put their buddies with their buddies, and I need to split up.  Sometimes there's conflict between Joe and Sally.  They can't work together because they came to me for problems, but the dispatcher doesn't know.  So then I have to move them around.

Q    So the dispatcher does like the first draft to help you, so you're not working off a blank slate.

A    Then I take it --

Q    Is that fair to say?

A    -- and I go, Move this person.  Move this person.  Do that.  Do that.

Q    And you could make those moves, for whatever reason, if a particular proposed assignment

was giving you concerns that it was not a good assignment.

A    Yes.

Q    And you had discretion to do that.

A    Yes.

Q    And you also were responsible for ensuring that the assignments, you know, across the board was a good assignment for the prison that night.  Is that fair to say?

A    Yeah, the best of my ability.

Q    There was no one signing off on the assignments or double-checking your work to make sure that it was an appropriate staffing situation.

A    Only -- only -- the major would come to me if to, say, the person had like a personal issue, that he didn't feel comfortable talking to me or the lieutenants with.  And then would tell me, Hey -- like Lockup Units, they can be very stressful after a time.  He would be the one decided if they could stay in there or not.  If they went to the major, and he said, pull them out, he would email me or call me and say, this person's no longer working in D.  So sometimes that did come from higher up. "Hey, this person can't work here."  I didn't question it.  I just moved him somewhere else.

Q    How did -- so if I understand your role in building the roster, you had the ability to move people around from position to position within that, sort of, scope of positions that they were qualified for.  Is that fair to say?

A    Yes.

Q    Were you responsible for making assignments, like between Day and Night Shift?

A    No.

Q    How did that process work in terms of people getting on a particular shift?

A    It all goes through the major.

Q    So it's the major who gets to decide who goes on Day Shift, who goes on Night Shift?

A    Yes.  And based on the needs of the facility.

Q    Is there -- do you have any understanding of what the system is or the criteria that are used to --

A    Okay.

Q    -- make those decisions?

A    You want to balance every group.  So the Night Shift has less than Day Shift, generally.  Say -- I don't know the numbers.  Say there's 97 officers per Night Shift and say there's 110 or 120

JEREMY DYKSTRA                    259
Cause No. 3:18-cv-00995-JD-MGG

on every Day Shift bracket.  So you get a new class of four officers, and you got a hundred and hundred and ninety and ninety, and one goes to every shift.

But say three people quit from one shift, you might want to fill them back up to get strength.  So it's a numbers game.  You try to keep everything balanced.

And then there's -- another thing is you want to keep male and female balance ratio, too.  You don't want, you know, a shift dominant of all females or a shift, all dominant males.  We're trying to well balance all the shifts.

Q    Were officers able to express a preference?  Like I really want --

A    When they first start, they can request their dream list of what shift they want to go to.  And they try to put them people on the shifts they want to go to.  It might not be what group they want.  But if they prefer a Day Shift, they might go to Day Shift or they go to nights.  But it's all based on the needs of the facility.

Q    Do you know what criteria the major used, you know, recognizing that not everyone can get what they want, sort of how to pick who got the dream shift that they wanted versus who got a shift they

didn't want because the needs of the facility dictated it?

A    Numbers.  It's all numbers.  I mean, if one shift's short -- say Night Shift, you know, you had a hundred people on one shift, and they're full, and the other shift's ten short, where are you going to put them; you know?

Q    Right.  And do you know what criteria the major would use in terms of saying, no one's -- no one has expressed a preference for Night Shift.  I got to move five folks onto night.  Like how he's picking which ones to pick?

A    When you sign up for the job, it says, you can go to any shift at any given time.  So it's all about numbers and male/female ratio.

Q    Fair to say that you knew the staff that were on your shift, that you were scheduling, in terms of like you knew them by name, you knew --

A    Oh, I didn't know everybody by name.  I mean, I knew their names, but -- I mean, looking at them.  But like seeing everybody walk by?  No.

Q    Looking down the roster, would you be able to recognize that's a more senior officer, that's a more junior officer?

A    Pretty much, yes.

JEREMY DYKSTRA                261
Cause No. 3:18-cv-00995-JD-MGG

Q    And if you had, you know, a memory lapse or like, oh, man, I can't remember if that person's been here for ten years or if they just signed up last week, you could look into the system and see how senior they were?  Is that fair to say?

A    Yes.  And they all had fact files in the office, so I could just pull up their fact file and see when they started.

Q    Is that something you took into account when building the roster, was sort of balancing, making sure there was sufficient seniority in each of the areas of the prison?

A    The facility kind of dictates itself. It's a prison.  So, you know, if you're having problems in one area, you kind of got to move some stronger officers to that area.  And then it seems like -- it's a balancing act.  I mean, it's not your typical, normal job of working at Walmart, where you're going to have the same thing day and day.

Each one of these cellhouses are totally different.  Like I said, back then, B Cellhouse was actually a really peaceful cellhouse.  You know?  A was a little worse.  C was terrible for general pop.  Then you got the Lockup Unit.  So it all dictates on the day of the

JEREMY DYKSTRA                                    262
Cause No. 3:18-cv-00995-JD-MGG

week, the month, and what's going on.

It could dictate on what happened that day.  You know, Day Shift, it was ten fights in C cellhouse.  You think I'm going to put a bunch of new people in there?  No.  I'm going to put more veterans in there and put the newer people somewhere else.

Q    If you had been concerned that you didn't have enough experienced officers to appropriately staff the roster, is there someone you could have raised that concern with?

A    The major.

Q    Is that ever a conversation you had?

A    When the major's your boss, you fight for everything, and then you get what you get.  So I mean, you got to make it work regardless.  It's your job.  You got to do the best you can.  It's not like I could say, well, we're shutting down the prison for a day; you know?

Q    Was there ever any point in time when you went to the major and requested or suggested that more senior officers be assigned to the J Bracket on that shift that you were responsible for?

A    Every day.  I mean -- I mean, when you're -- you always want to be fully staffed.

Period.  You don't want no call-offs.  You don't

want any of that.  But I mean, you don't want people

on FMLA; you know?  You don't want -- you want them

all at work, but it just doesn't work that way.

So yeah, I always told the major,

every class that came up, I wanted all the people.

But do I get that?  No.

Q    And just so I understand, what you're

referring to, you're referring to like new -- when

there would be new recruits to fill in gaps in the

schedule?  Is that what you're referring to?

A    Yes.

Q    Okay.  And what about specifically

making -- you know, requesting that you have more

experienced officers assigned to the Night Shift

versus the Day Shift?  Is that ever a conversation

you had with the major?

A    Yeah.  You're always going to fight; you

want more experienced people.  But, you know, the

people that's 5, 10, 15 years, once they get to Day

Shift, they ain't trying to leave it; you know?  But

same with the same veterans on the Night Shift.  The

ones that have 5, 10, 15, 20, 25 years, if they're

going to stay on nights, they're going to stay on

nights their whole career.

So most people fight to get to days. Once they get to days, they don't -- they try to stay there.

Q    So is it generally a trend that the more experienced officers tend to migrate to Day Shift?

A    I would say it's like a 60/40 thing. 'Cause Day Shift's very, very busy.  Night Shift's a lot slower.  So it depends on how you want to do your 12 hours, kind of slow or you want to be busy all day and make time go really quick.  I guess it's on the person, but I'd say it's about 60/40.

Q    60 percent people tend to prefer the Day Shift, 40 percent people tend to prefer the Night Shift.

A    Yeah.

Q    And so if I understood you correctly, you did have conversations with the major where you were pushing to have more senior officers assigned to the Night Shift?

A    I wouldn't say "more senior."  Just more staff.

Q    Just staff, period?

A    Yes.

Q    So is it fair to say that other than just pushing for more numbers of staff assigned to the

Night Shift, you didn't have any communications with the major where you were requesting that there be more senior officers assigned to the Night Shift?

A    I was kind of decent on senior officers on the nights back then.

Q    You don't ever recall having that specific subject of the conversation with the major at any point during your career?  Is that --

A    I don't -- I don't remember.  I might have; I might not have.  I don't know.  We used to argue about a lot of things.

Q    If you would have had that kind of conversation, would you have documented it in any way?

A    No.

Q    Based on the fact that you can't recall any such conversation as you sit here today, can you think of anything that would jog your memory, that would say, oh, yes, actually, I did have that kind of conversation?

A    Lieutenant Redden is always -- you talking to major, when we did see him, we want more staff, but that's every shift supervisor.  Any one you could talk to, that runs a shift, wants more staff. Plain and simple.

JEREMY DYKSTRA                266
Cause No. 3:18-cv-00995-JD-MGG

Q    The conversations you would have with the major about the staffing levels, was Lieutenant Redden part of those conversations?

A    Sometimes, yes.

Q    Anyone else part of those conversations sometimes?

A    Lieutenant Watson might have been there. I'm not sure if he was or not.

Q    Other than those two lieutenants, any other individuals that might have been there?

A    No. I doubt it.

Q    Do you know what the significance is of the asterisk by certain officers on the roster?

A    Like "one-one"?

Q    Well, that's -- what's -- do you know --

A    I don't know why that's there.

Q    You don't know what the significance of the one-one is?

A    No.

Q    What about the little star, for example, by Officer Abbassi under --

A    I don't see no star.

Q    It's by the little -- under -- by BCH officer --

A    That's -- that's the OIC.

**JEREMY DYKSTRA**                                        **267**
**Cause No. 3:18-cv-00995-JD-MGG**

Q   So the little asterisk, that star is OIC destination?

A   Yeah, the darker spot.

Q   Okay.  And is it -- so there's like a highlighting on some --

A   See where it's darker?

Q   Yeah.

A   That's where the OIC is.

Q   That's the OIC?

A   Yeah.

Q   So every -- does every cellhouse have an OIC?

A    I don't know why there's not one in D here.  I don't know if he was, but I'd have to say in that -- would have been Officer Rucker or Chambers in charge of that unit.  Just like they should have moved like Officer Stone's name down to the one in like E Dorm (indicating).  And just like Miss Duncan, P. Duncan, should have been in that slot where it was asterisked down there because that's who it was, OIC, that night.

I can tell you by looking at the names.  I don't know why the dispatcher did that.  I should have corrected it.

Just like PCU officer should have

**JEREMY DYKSTRA**                                    **268**
**Cause No. 3:18-cv-00995-JD-MGG**

been K. Fredericks.  She would have been PCU

officer.  But then they did -- you know, Officer

Acko (phonetic) would have been NSB.  I don't know

why they didn't do that.

Q    How would a person know that they were

officer in charge, other than it being designated on

the roster like this?

A    In every logbook.

Q    And so how would that destination get in

the logbook?

A    The OIC would put into names.  It will say

like sergeant, slash, OIC.  And then they put their

name.  And then they put like the lieutenants on

shift and who the captain is.

Q    So was the OIC the same person night after

night?

A    Most cases, yes.  Most.  Let me see who

called off that night.  Trying think who worked --

Officer K. Boyer, she usually ran B Cellhouse.  She

was authorized day off.  K. Boyer is usually in

charge of B Cellhouse when she worked there.

Q    And she was authorized with a vacation

day?

A    Authorized day off.  She might have got

approval from the major.

Q    Is that like VAC in that -- you're looking at the back page; correct?  The very last page?

A    This one here?

Q    Yeah.

A    Authorized day off (indicating).

Q    And then in the far right-hand side of that, looks like it says VA, and it's cut off.

A    Vacation.

Q    Vacation.

A    So like on this shift alone, I had one, two, three, four, five, six, seven, eight, nine, ten eleven, twelve, thirteen, fourteen, fifteen, sixteen.  And then some people call off like a half hour and a whole day, so going into the shift like almost twenty people short.

Q    Was that a frequent occurrence?

A    Yeah.

Q    And so K. Boyer was ordinarily assigned to B Cellhouse?

A    Yeah.  That was her cellhouse.

Q    What's her first name?

A    Krystal, I want to say.

Q    And so if she hadn't taken that vacation time, she would have been assigned to B Cellhouse and would have been assigned the officer in charge?

JEREMY DYKSTRA                          270
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    But in her absence, it was Officer Abbassi that was assigned the officer in charge position?

A    Yes.

Q    Is it possible that that's also a typo and it was a different officer?

A    It might have been.  I don't know.

Q    Do you recall whether in Officer Boyer's absence, it would have been Officer Rodriguez, Officer Abbassi, or Officer Blakely who would have been assigned?

A    It wouldn't have been Blakely.  She was assigned to feeding crew, so it wouldn't have been her.

Q    But it could have been Rodriguez if it was the same issue with just the --

A    I'd have to -- you got the logbook page?

Q    I don't.  The logbook, it's like a paperwork that would have been maintained in the cellhouse?

A    Yeah.  And they take it out once a month.

Q    And is it your understanding that those records are maintained?

A    Yes.

Q    And what would be recorded in the logbook?

JEREMY DYKSTRA                                271
Cause No. 3:18-cv-00995-JD-MGG

A    Daily activities.

Q    What kind of activities are recorded in the logbook?

A    Everything that happens in the cellhouse, chow lines, that -- 10-71, everything.

Q    So there would also be a recording of the emergency call made in the logbook, the fire call.

A    Yes.

Q    Who's responsible for maintaining the logbook?

A    OIC or sergeant.

Q    You were talking earlier about the evacuation, when you made reference to there being a policy on fire evacuation, but I don't think you could recall the specifics of where that policy was located or what form it took.  Is that fair to stay?

A    Sure.

Q    If you were still at the prison and trying to locate that policy, how would you go about doing that?

A    I don't know.  I don't work there anymore. I mean, they could have moved stuff around in the last few of months.

Q    Maybe my question is a bad one.

If it was April 8, 2017, and it was a

JEREMY DYKSTRA                    272
Cause No. 3:18-cv-00995-JD-MGG

day after this incident, and you're like, man, that evacuation seemed like it didn't quite go according to plan, I want to see what the policy is on this, how would you have gone about it then?

A    I could have probably looked it up in the share drive or probably a policy book. I'd just have to figure out what number it was.

Q    How would you figure out what number it was?

A    I don't know. I've been out of the loop doing that for a minute, so -- it's been probably two years since I was really looking for policies.

Q    And the policy book that you're referring to, is that like a physical book, with paper copies of the policies?

A    It's the same book I was telling you about twenty times now. The size of this table.

Q    In the training room?

A    Yeah. Or there's books in the Shift Supervisor's Office that have policies in it. They're smaller binders. But they have numbers on it, so you have to kind of figure out what number it is. Or I'd ask somebody, Hey, do you know the policy number on it? Or I could email somebody like Rhonda Brennan, or ask Rhonda Brennan to send me a

JEREMY DYKSTRA                 273
Cause No. 3:18-cv-00995-JD-MGG

copy of the policy if it's not restricted.

Q    Based on your understanding of the fire evacuation policy that was in place at Indiana State Prison on April 7th, 2017, did a line level correctional officer in a cellhouse need authorization to evacuate a prisoner from a cell?

A    Evacuate a prisoner from a cell?

Q    To remove a prisoner from a cell as a result of an emergency.

A    I guess I'm -- I don't know.  That's a judgment call, so I -- I would say the First Responders -- I would wait till the First Responders arrived and let them make that judgment call.

Q    That's your understanding of the policy that was in place at the time?

A    Yeah.

Q    Is that the correctional officer should wait till the First Responders arrive before removing a prisoner from a cell --

A    I mean --

Q    -- in the event of an emergency?

A    I mean, it's always safer to work in numbers.  So if you have somebody with you, yes, I would -- extensive [sic] to -- a general thing.  But

**JEREMY DYKSTRA**                 274
**Cause No. 3:18-cv-00995-JD-MGG**

that fire happened so quick, I -- I think they did the right thing and waited for First Responders, because they were there quick.

Q    And just so I'm clear, and I just went to make sure we're not misunderstanding each other, the way you're phrasing your answer makes it -- it's sounding to me like you're sort of giving your personal opinion on what was the right approach to take.  And some of my questions are geared at that.  I'm not saying I don't want that.

But in this specific question, what I'm also -- what I'm trying to get at is what your understanding is of what the policy at the prison was, what it said about the authority of a line level correction officer to remove a prisoner from a cell in the event of an emergency.

A    She could have removed him.

Q    What's -- why do you say that that's your understanding of the policy?

A    I don't know the policy like the back of my hand, so I really don't have an answer for you. You're kind of like beating a dead bush right here, man.

Q    It could just be the answer's:  I don't know.  Is that correct --

A    Yeah.  I --

Q    -- you don't know one way or the another whether the policy in effect at the time permitted a line level correctional officer to remove a prisoner from a cell in case of emergency without authorization?

A    I don't know.  You probably have to contact them and read the policy because I haven't read it in a long time.

Q    Do the First Responders have -- carry keys with them?

A    What do you mean?

Q    So, I guess, the First Responders who were charged with --

A    Do they have keys to every cellhouse and every door?  No.

Q    Okay.

A    You -- to carry them -- I'm not even strong enough to carry all them keys.

Q    The key system that was in place on April 7, 2017, at Indiana State Prison, was it a separate key for each individual cell?

A    No.  There's one key per range and then that cellhouse to have electronic doors.  So you can go in the range and flip the doors up, and they'll

**JEREMY DYKSTRA** 276
**Cause No. 3:18-cv-00995-JD-MGG**

automatically lock.  Or you can use a key.

Q    So it's a single key that's going to unlock all the cells on the 500 --

A    That pacific range, yes.

Q    And just so we're clear, we're -- I think I know what you mean, but so the record's clear, when you say, "range," you're talking about a specific level, like fifth floor is the 500 Range; correct?

A    Yes.

Q    And it B Cellhouse, on April 7th, 2017, there -- were there a total of ten ranges?

A    Yes.

Q    Because that's one through five, going up in the ground floor up to the highest floor, both north and south?

A    Yes.

Q    So the north side of 500 Range had a separate key than the south side?

A    I'm not sure pacifically on that unit if that key works on both sides, because some units, both of them work on that side, some units have a key that only works for the 500 North.  So I couldn't tell you, and I couldn't tell you if that key works on both sides or not.  I'm not sure if

they have one for the north and one for the south.

Q    So it could be a total of five different keys, or it could be a total of ten different keys needed to unlock all the different cells in the B Cellhouse.

A    True.  And there's usually -- like that night, three officers, probably one person had the four and five, one person had the three and four, and one person had the -- the one hundred, both sides.

Q    And why do you say that's probably the division that they had?

A    Because there's three people in there.

Q    And is that the standard division, like ground floor by itself, two and three, four and five?

A    Usually OIC takes the ground floor, and then they split up the other two or the last four units with two people.  It's not something written in stone.

Q    Is there only one key for each range in the cellhouse at any given time?

A    There should be two keys.

Q    Where's the second key kept?

A    In the key box in the officer's station.

JEREMY DYKSTRA                278
Cause No. 3:18-cv-00995-JD-MGG

Q    Okay.  So there's -- is that a full second set of keys?

A    Individual keys.

Q    So for example, the scenario you just described, where the OIC would have the 100 Level key, someone else would have the two and three, someone else the four and five, and then there would be a full set, one, two, three, four, five, in the key box in the officer's station?

A    Yeah.

Q    Is the key box locked?

A    Yes.

Q    Who has the key to the key box?

A    I think each one of them had a key to the padlock to get into the box.  In order to get a key, you have to give 'em a chit, put a chit on there with your name on it so you know who draw out the keys [sic].

Q    There's a chit and then also something to unlock the --

A    Well, you got a set of keys, so usually the OIC gets into the box.  At end of shift, they put all their keys away.  The OIC issues out the key, take the chit, puts it in the box.  And then I think everybody that has a key can get into that box

if they need a different set of keys.

Q    So there's two sets of keys on the unit.

A    Yes.

Q    One on the officers and one set kept in the key box?

A    (Witness nodding head).

Q    Where else are there keys to the cells in B Cellhouse other than those two sets you just described?

A    The Control Room.

Q    And that's the Control Room where the radio traffic is monitored?

A    Yep.  The box sergeant controls them, any emergency keys.

Q    And that's -- one additional set is kept there?

A    No.  There's a set for every unit in ISP there.

Q    And one additional set per cellhouse?

A    Yes.

Q    So two sets in B Cellhouse and a third set kept in the Control Room?

A    Yeah.

Q    And is that the entire -- are there other sets of B Cellhouse keys that are maintained in this

JEREMY DYKSTRA                                    280
Cause No. 3:18-cv-00995-JD-MGG

timed period?

A    Yeah.  The Lock Shop.

Q    Where's the Lock Shop?

A    You walk in the front doors of ISP, right underneath.

Q    And is that where extra keys are made if extra keys are needed to be made?

A    Yes.

Q    Is the Lock Shop accessible at all during Night Shift?

A    They're on call 24 hours a day, 7 days a week, 365 days a year.

Q    You would have to call someone from off site to go into the Lock Shop?

A    After hours, yes.

Q    So in terms of the range of keys that are readily accessible within a short period of time, it's the two in the unit, one on and off, one in the lock box, plus the one kept in the Control Room.  Is that fair to say?

A    Yes.

Q    The -- and then you had also mentioned there was an electronic system for unlocking the cells; is that correct?

A    Yes.

JEREMY DYKSTRA                    281
Cause No. 3:18-cv-00995-JD-MGG

Q    Can you describe that system?

A    At the end of the range, there's two pillars.  There's a little box in there; it lights up.  You hit them -- it's just like a little toggle switch.  Turn it on.  Green means open, red means locked.

Q    And at the -- when you say at the end of the range, there's a separate panel for each level?

A    Yep.

Q    Okay.  And does the panel say, on the 500 Range, only unlock the doors on the 500 level?

A    There's each individual cell -- you know, toggle switches for every cell that's labeled.

Q    And only the 500 level cells are on that 500 level panel?

A    It would be a panel.  Say you're on the north side.  When you come up the stairs, it goes zig-zaggie up.  There's a panel.  You open it up, and it says, you know, 501, 503, you know, whatever, all the way down there.

Q    And you'd have to go down to the 400 level to unlock the 400 cells, for example.

A    Yes.  It doesn't take long.  You open the box and just flip all the switches, and there.

Q    Is there -- are those switches kept under

BOSS REPORTERS
(219) 769-9090

JEREMY DYKSTRA                 282
Cause No. 3:18-cv-00995-JD-MGG

lock?

A    Yeah.  It's a box built into concrete.  It has a steel door.

Q    So it's not like a glass front.  It's like a steel --

A    It's a glass front.  You can see in it, but it's like that thick of Lexan.

Q    Would you be able to smash through the glass in case of emergency?

A    No.

Q    Who has the key to unlock that box?

A    Each person -- the people working them ranges.

Q    Is that a different key or is that the same key as like the --

A    Different key on the same key ring.

Q    Is it a different lock --

A    It's a total -- you know those old-school big keys that look like old skeleton keys?

Q    Yeah.

A    That's what it looks like.  The cell keys kind of look like -- a little bit bigger than -- probably like the size of your car key, just a little thicker.

Q    And then the panel key is like a big,

thick, old skeleton key?

A    Yeah.  You can't mix them up.

Q    Is there -- are there separate locks requiring separate keys for each of the different panels?

A    It goes by your range.  500 row up in that -- them boxes.  So the 400 row's in that box.  Vice versa.

Q    So only the officer with the 500 level cell key would have the 500 -- would have the right key to unlock the control panel of the 500 level.

A    Yes.  Unless they went and got the spare keys.

Q    And is there a spare --

A    The same keys I just explained, the same way for that, for the spare sides.  Same, exact keys.  Same number of keys on each key ring.  I couldn't tell you how many is on each one, but that's how it works.

Q    Is there any centralized mechanism of operating that electronic panel other than being like physically present at the face of that panel?

A    No.

Q    How long, prior to 2017, was that electronic locking mechanism in place?

A   I have no idea.

Q   Predated your arrival at Indiana State Prison?

A   I was almost there for five years, so yes.

Q   And that whole time it's been that same system, where you need a designated key to unlock that lock box?

A   Yes.

Q   And access to the switches.

A   Yes.

Q   You discussed earlier the different types of drills you would do for the QRT drills.  Would there be evacuation drills?

A   Safety HAZMAT coordinator handles all them safety evacuation drills.  Back then it was Steve Griffin.  And as I stated, again, the new one is Derrick Boyn.

Q   Do you recall how frequently evacuation drills were conducted?

A   Monthly.

Q   And what did an evacuation drill consist of?

A   I don't run it, so you'd have to ask them guys.

Q   Are those done on Day Shift or Night

JEREMY DYKSTRA                                285
Cause No. 3:18-cv-00995-JD-MGG

Shift?

A    They come in different times and do it.

Q    But as a shift supervisor during the Night Shift, they could come in and do an evacuation drill, but you wouldn't --

A    No.  They would tell me they were doing it.  But if I had other stuff to do, I didn't go help.

Q    Okay.

A    That's his gig.

Q    Did you ever see an evacuation drill take place?

A    Yes.

Q    What did it consist of when you saw it take place?

A    Offenders coming out the cellhouse.

Q    And how is it run, in terms of the staff operating the drill?

A    I assume they grab all the keys, all the logbooks, make sure every offender's out the cellhouse by checking each individual cell to make sure there's nobody or staff in there.  Everybody gets accountable.  They have designated areas where they have to do a count and make sure everybody's there.

Q    During the evacuation drills, did they practice with unlocking the cells individually or flipping the switches?

A    Depends on what cellhouse.

Q    Who would have -- who was responsible for -- well, strike that.

Was there a specific policy, that you're aware of, that said only two keys in the cellhouse, one for the officers, one in the lock box, and then a third set in the Control Room?

A    You'd have to talk to the locksmith.  His name is Sergeant Reed, Sergeant Timothy Reed.  I'm sure it's under a key control policy, and you'd have to read that yourself because I -- that's another book I don't want to read.

Q    So your -- the best of your understanding is there would have been a written policy called the "Key Control Policy" that dictated --

A    Yep.

Q    -- how many keys were allowed out in the different areas?

A    And it goes up -- and it's based on a facility base, so it's one of them policies that you have to make work for your facility.  And that gets approved by the major, the warden, deputy warden,

JEREMY DYKSTRA                    287
Cause No. 3:18-cv-00995-JD-MGG

somebody higher than me.

Q    Would that be the same policy that talked about what types of keys were you used to unlock the control panels for the switches?

A    I don't think it gets that pacific, to tell you which key, because -- I don't know if you know.  ISP was built when President Lincoln was president, so most of our cellhouses are over a hundred years old.  And B Cellhouse, their locking mechanisms and their doors are fairly new.  I'd say within the last twenty years.  Versus C Cellhouse, which are probably a hundred-and-something years old.

So we have all different types of locks, all different times [sic] of the keys.  B Cellhouse are the easiest cells to get into, by key-wise.

Q    And that's just based on the newness of the locks?

A    Yes.  And doors.

THE REPORTER:  Excuse me.  Were you saying D or C -- excuse me.  B or --

THE WITNESS:  C -- or B Cellhouse has the new locks.  C Cellhouse has -- I don't know.  They're probably over 115 years old.

JEREMY DYKSTRA                             288
Cause No. 3:18-cv-00995-JD-MGG

THE REPORTER:  Excuse me.  I thought you said D Cellhouse is the --

THE WITNESS:  B.  B, boy.

THE REPORTER:  Thank you.

BY MR. HEPPELL:

Q    Were you -- as the shift supervisor, were you ultimately responsible for running evacuations in case of an emergency that developed during a shift you were supervising?

A    Running an evacuation, yes, I'd be the guy.

Q    Okay.

A    Let's go with the thousand questions now.

Q    So in retrospect, do you feel like it would have been helpful for you to be paying more attention to the evacuation drills that you were -- that were being conducted, given that it was your responsibility to run evacuations in case of an emergency?

A    I don't know.  I think I'm fairly good at everything I do in corrections, so...

Q    Okay.

A    Been doing it a long time, so...

Q    So you didn't need that experience from the drills?

JEREMY DYKSTRA                                289
Cause No. 3:18-cv-00995-JD-MGG

A    Any experience is better.  But, I mean, I'm not going to say it the way you want it.

Q    Okay.  Because, in fact, the evacuation that you ran on April 7, 2017, didn't go quite the way you had intended it.  Is that fair to say?

A    I think we've been over this a dozen times.  You can go back in your notes.

Q    Do you agree with me, that it didn't go the way you intended it?

A    Yeah.  Over and over and over.

Q    Take a break for five minutes?

A    I want to keep on going.  I got stuff I got to do.

MR. NAGY:  Do you guys need to --

MR. HEPPELL:  Yeah.  I mean, I'm not going to take a long break.  I just want a chance to look over my notes.  And I appreciate you want to get out of here; and you can believe me or not believe me, but it will be quicker if I get a chance to gather my thoughts rather than if I press forward and ask my questions.

Go off the record.

(A brief recess was taken from 2:55 to 2:58.)

MR. HEPPELL:  Back on the record.

JEREMY DYKSTRA                          290
Cause No. 3:18-cv-00995-JD-MGG

BY MR. HEPPELL:

Q    Mr. Dykstra, in your time at Indiana State Prison, have you ever either personally observed or experienced or heard of a cell door being unlocked using the electronic mechanism but not able to open?

A    No.

Q    Okay.  Or what about being unlocked with a key, but the door jammed or was stuck?  Is that something you ever heard of?

A    No.  Usually -- usually it's the opposite, where they're unlocked, and we can't get them locked.

Q    How many times has that been something you've experienced?

A    Oh, quite a few.

Q    Do you know what the cause of that is?

A    Offenders putting stuff in the locking device.

Q    Is that something that was a frequent problem at ISP?

A    Some of them do it, some of them -- I wouldn't say frequent, but yeah, it's been done quite often.

Q    Are there -- you mentioned earlier there were different designs of locks in the different

units depending on the age.  Do you know if there were ones that were more susceptible to that than others?

A    Actually, the newer locks, I would say, are worse than the old locks for offenders stuffing stuff in the locks to keep their doors open.  The old school way was actually better.

Q    But you haven't seen it the other way, where the door will get stuck even if it's unlocked?

A    On the newer locks, no.  Some of the old ones -- have I seen that happen in some of the old ones?  I've seen it where I've had to open it up because maybe the hinges were rusty or something.

Q    Are officers supposed to test their radios before they start a shift to make sure they're working?

A    Test them?  No, they don't do a test call or anything.  Usually look at the battery levels to see if you've got a full battery or not.

Q    If an officer determined that their radio wasn't working mid-shift, is there a policy that they should -- that they need to do something about that?

A    Contact the Shift Supervisor's Office and let me know that their radio's not working, and I'll

JEREMY DYKSTRA                           292
Cause No. 3:18-cv-00995-JD-MGG

get them another one out of the Control Room.

Q    Is that something that you've experienced at your time at ISP, an officer contacting you with a radio not working?

A    No.  We got a new radio system probably like four years ago, so we really haven't had any problems.

Q    If you're in one of the cellhouses and, I guess, specifically, you know, referring to B Cellhouse, and you're on the ground floor level, what can you hear in terms of people communicating to you from the ranges up above?

A    What do you mean?  Yelling or regular-wise?

Q    Yelling.

A    It depends on how loud the offender population was.  I mean, it's not the best way to communicate, by yelling down, I mean, if they're loud.  I mean, if it's quiet and they're sleeping, you really don't want to yell to wake them up, to irritate them.  So best way is always by the radio, if you can, unless you really need to yell, but most people don't yell.

Q    What about prisoners on the range just trying to contact staff?

A    Oh, they can -- they'll yell.

Q    Okay.  Is that something that staff on the cellhouse are able to hear?

A    It depends.  It depends on how many people are yelling and talking to each other.  You know, there's hundreds of offenders in there, and some of them are talking to each other from the 1 to 500. Plus, somebody might be yelling for help, and you might not be able to hear nothing.

Q    Is it generally quieter on the ranges in the evenings, like after count?

A    It depends, because some of these guys live their sentence by sleeping most of the day and being up all night.  And some of them do their daily -- you know, they're up during the day.  So it's like 50/50 on that.

I mean, it's hard to determine on the noise level.  I mean, there could be a sporting event going on, and they're all loud all night long; you know?  But I couldn't say.  It's -- maybe it's a tad bit quieter at night, but not always.

Q    Were there -- you were discussing earlier the different equipment that was available in the the Shit Supervisor's Office, the different QRT equipment.  Do you recall that line of questioning?

**JEREMY DYKSTRA**                           **294**
**Cause No. 3:18-cv-00995-JD-MGG**

A    Yep.

Q    Were there bolt cutters or bar cutters available at the time that you worked at ISP?

A    There's bolt cutters, but not bar cutters.

Q    What are the bolt cutters for?

A    They have a little lock, a little chain that goes out the door so they can lock their cell when they go out to like chow in the morning, so other offenders can't get into their cells.

Q    And that's where the bolt cutters can be used, to snip through that chain?

A    Or if they lock their self in a cell and they don't want to come out, and they're hurting their self, the staff can unlock or use the bolt cutters.  But there's a set of bolt cutters in each cellhouse, too, that will cut that chain.

Q    Is there any equipment at the prison that you're aware of that could be used to cut through the bars of a cell if for some reason the cell door was not able to be unlocked or --

A    Yes.

Q    -- was jammed?

A    There's K-12 saw.

Q    Where's the K-12 saw kept?

A    In the Control Room.

**JEREMY DYKSTRA**                           **295**
**Cause No. 3:18-cv-00995-JD-MGG**

Q    Is there a policy, either written or unwritten, that you're aware of that dictates when that saw should be --

A    Somebody that has to be trained has to use it.

Q    Was there anyone working the Night Shift, that you're aware of on April 7th, who was trained to use that saw?

A    Me.

Q    You were trained to use that?

A    Yeah, I'm trained.

Q    Were there other officers that you're aware of?

A    On that shift?  Let's see.  Watson might have -- probably was trained.  I don't know if he was current or not at that time.  Lieutenant Watson.

Q    Under what circumstances would you have -- assuming Watson was trained, would you have directed Watson to take that piece of equipment into B Cellhouse?

A    For that scenario, with that fire?

Q    Correct.

A    Probably not as long as the fire was going.  'Cause it's a gas operating machine.  I wouldn't want gas around a flame.  Maybe after the

JEREMY DYKSTRA                  296
Cause No. 3:18-cv-00995-JD-MGG

fact, if they could not get the door open.  After the fire was put out and it was a safe, secure area, then I would.

Q   So it would be fair to say there's no piece of equipment that you're aware of that was at ISP on the night of April 7, 2017, which could be safely used in the vicinity of a fire to open a cell door where the locking mechanism was jammed or the door was jammed.

A   I didn't know the door was jammed.  I thought the door was jammed because the door swelled up from the heat of the fire.

Q   Well, just to be --

A   So I don't know about you.  I don't know how many doors you've cut off, but I've cut off a few in my time, and I'm trained on the arc air.  I don't know if you know what that is.  It will cut through like half-inch steel.  It's like a rod that will go through.  But you would have to cut all the way around that door to get that door off, as hot as it was.  And -- from what I hear, so...

Q   Where did you hear that about the door being swollen up?

A   From Lieutenant Watson and Lieutenant Redden and the -- I forget what offender

JEREMY DYKSTRA                    297
Cause No. 3:18-cv-00995-JD-MGG

fireman, but they said -- they were telling me that Lieutenant Watson was getting ready to grab the door when it was all heated, and they stopped him from doing it because he would have burnt his hands because offender firemen were telling me they could feel the heat through their firemen gloves, trying to yank on that door to open it up.

Q    Were these conversations -- just so I'm clear, were these conversations that you had personally with on the offender firefighters?

A    Yeah.

Q    Was that --

A    This was after -- you know, after the fact.  You know, weeks down the road, or a week down the road.

Q    Turning to your report that we were looking at, at Devine Production 1576, you didn't document any radio traffic between the 9:45 p.m. call from Officer Abbassi and the 9:58 p.m. call from Lieutenant Redden; is that correct?

A    If it's in the report, correct.

Q    Okay.  Why didn't you document any of the information about the radio traffic that was going on during that 13-minute period?

A    I have no idea, to be honest with you.

JEREMY DYKSTRA                    298
Cause No. 3:18-cv-00995-JD-MGG

Q    As you sit here today, you just don't know one way or the other why you didn't include those details?

A    No, I don't.  Maybe because there's a lot that took place after this radio traffic, like staff getting hit, staff getting assaulted, people getting knocked down.  I don't know.  I don't know what was going through my head at that time.  And that time in the morning when I wrote this report, I could have been tired or I was worried about everybody else's safety.  I don't know.

Q    Would you agree with me that in terms of evaluating the response that was made to this fire, that's a pretty important 13-minute period?

A    I mean, yes.

Q    Did you at any point learn additional information about what took place during that 13-minute period?

A    Not to my knowledge.  Just what I told you today.

Q    And if you had learned additional information about what was going on in that 13-minute period, is that something you would have included in your report?

A    Yes.

Q    What was your responsibility in terms of monitoring the rescue efforts to make sure that they were being conducted appropriately?

A    What do you mean?

Q    When you were -- you testified earlier that it wasn't your responsibility to attend personally on the scene of an incident in your role as shift supervisor; you were required to stay back in the Shift Supervisor's Office.  Correct?

A    Yes.

Q    But you were also the officer -- the most senior officer on duty at the facility; correct?

A    Yes.

Q    What responsibility did you have to be monitoring the progress of the rescue efforts?

A    That's not -- that's not really my responsibility, for the rescue thing.  That would be the No. 1 job of the No. 1 First Responder, which is Lieutenant Watson.  So you would have to ask him them details.

Q    So based on your understanding of the different roles that people were playing that night, Lieutenant Watson had primary responsibility for supervising the rescue efforts?

A    He was the No. 1 First Responder that was

JEREMY DYKSTRA                           300
Cause No. 3:18-cv-00995-JD-MGG

in charge of the First Responders, and he would be making the calls of what he needed to do on that range with that fire and everything else.  That's why he's QRT trained for, because I'm not sitting there watching it myself.  So his decision-making skills and mine might be totally different.

Q    Your report continues on after the sentence documenting the 9:58 p.m. call that he made to you regarding the evacuation.  Well, I'm going to reread that sentence just so it's clear.  It says, "At this time Lieutenant T. Redden, black male, called at approximately 9:58 p.m. and stated that he needed to evacuate the cellhouse, and by the time I could say anything because offenders were being let out of the cellhouse already, then Lieutenant Redden activated the fire department."

Do you see what I'm referring to?

A    The fire department should have been already activated when the signal is called.

Q    Okay.  So does it concern you, reading back on your report, that it reflects that the ISP Fire Department wasn't activated until after Lieutenant Redden's call to you at 9:58 p.m.?

A    Yes.  I could have wrote this report better, I guess, now looking back at it.

JEREMY DYKSTRA                     301
Cause No. 3:18-cv-00995-JD-MGG

Q    Well, are you -- is it your testimony that the statement in the report that Lieutenant Redden activated the ISP Fire Department after that 9:58 call is inaccurate?

A    He might have called for them again, and maybe that's why I put that in there.  I don't -- maybe he called for them again.  I don't know.  I wasn't on scene, but they should have been activated as soon as the signal was called for the fire.

Q    Whose responsibility was it to activate the fire department?

A    Staff working the units.  As soon as the fire code's called, no matter what, they're supposed to report to Checkpoint 4, just like I told you before.  Go back through your notes, please.

Q    So you have no explanation for why your report reflects that Lieutenant Redden activated the ISP Fire Department after 9:58 p.m.?

A    I don't know.  Maybe they weren't getting there quick enough.  I don't know.  It's been a long time.

Q    And then your report goes on to list various activities and incidents that took place after the evacuation --

A    Uh-huh.

JEREMY DYKSTRA                                    302
Cause No. 3:18-cv-00995-JD-MGG

Q   -- involving a Signal 7, where there was an assault on an officer and the events that followed.  Do you see what I'm referring to?

A   Yeah.  I'm looking at the same thing as you.

Q   The information that's contained in your report to that effect, is that information that you personally witnessed or that you gathered through your conversations with other individuals?

A   Well, a Signal 3000 was called, so that's information everybody would know.  A Signal 7 was called, so there -- there's another thing that Control Room would have been monitoring.  And then there was Sergeant Puetzer there.  That's a supervisor.  I mean, so, yeah, you have to take parts of their story, plus, their call-in signals, too.  So it had to be a very situation [sic] for all this happening --

THE REPORTER:  I'm sorry.  I can't quite hear you.

THE WITNESS:  A very bad situation happening after this fire happening, and then they're going right into this.  It's all back-to-back-to-back.

BY MR. HEPPELL:

Q    Did you remain in the Shift Supervisor's Office while the event -- while those events listed in your report were taking place?

A    I stayed in the office till -- I don't remember what time I came out of the office, because I called my major.  I called Major Nowatzke when all this was happening.  He came in.  Mr. Neal came in. I contacted Deputy Warden Gann, which was Assistant Superintendent Gann.  So the major came in.  And I want to say that I activated E Squad members to come in, too.

Q    And was that in response to what was happening --

A    This is after --

Q    -- outside?

A    This was when they started evacuating all the offenders, this all started taking place.

Q    When was the first time that you contacted someone who was not on duty at the facility to alert them as to what happened?

A    When I seen this fire getting out of control on the cameras.

Q    So that was prior to Lieutenant Redden's call at 9:58 p.m.?

A    I couldn't tell you exact time.

Q    And what did you do when you saw the fire getting out of control on the cameras?

A    Well, I've already walked you through this.  I opened the door, put some fans there, probably making calls.  A lot going on.

Q    Well, I guess specifically, terms of contacting someone who is not on duty, on site at facility.

A    Any major incident -- and I seen this major incident happening.  I want to say it was right after they hit every door of the cellhouse, I contacted somebody.

Q    And who was the first person you contacted?

A    I called -- I started off with my chain of command; Major Nowatzke, Mr. Gann, Mr. Neal.

Q    And were you the person making those calls, or did Major Nowatzke call Gann and Gann called Neal?

A    No.  I called all three.  Major Nowatzke came into the facility with Captain Boyn, because Captain Boyn was in charge of Canine, our field commander.  And then other people started coming in to help out.  So after Major Nowatzke came in, he

JEREMY DYKSTRA                           305
Cause No. 3:18-cv-00995-JD-MGG

would be in charge of everything.

Q    Do you recall when Major Nowatzke arrived on site?

A    No.

Q    Were you present when CPR was attempted on Mr. Devine?

A    No.

Q    Did you see Mr. Devine's body being removed from the cell block?

A    No.

Q    Did you ever see Mr. Devine's body?

A    Yes.  They brought him through the Guard Hall with a sheet over the top of him.

Q    And that was the first time you saw his body?

A    Yes.

MR. HEPPELL:  Mark this as Exhibit D, please.

(Dykstra Exhibit D marked for identification.)

BY MR. HEPPELL:

Q    The court reporter's handed you a document that's been marked Dykstra D, and it's Bates stamped Devine Production 6233.  Are we looking at the same document?

A     Yeah.

Q     Do you recognize this document?

A     Yeah.

Q     What is this document?

A     It's a fire escape plan, just likes what it says.

Q     And that for B Cellhouse; correct?

A     Yes.

Q     And this includes sort of a layout of the configuration of B Cellhouse; correct?

A     Correct.

Q     And it's got an officer station in the southeast corner of B Cellhouse; correct?

A     Yep.

Q     And then it shows two different staircases; correct?

A     Yes.

Q     Two different -- I guess two different sets of staircases, one on the north side, the far west -- well, one set to the far west, one set to the fart east on both north and south sides; correct?

A     Uh-huh.  Yeah.

Q     Do you recall whether both of those sets of staircases were in operation, were useable, the

JEREMY DYKSTRA                      307
Cause No. 3:18-cv-00995-JD-MGG

night of the fire, on April 7, 2017?

     A    All them staircases are operational.

     Q    Was there any staircases or other access passages that night that were locked in B Cellhouse?

     A    The back stairwell could be locked.  They can lock all them gates.  They can lock every gate on there.

     Q    And is the stairwell that you're referring to as the "back stairwell," is that depicted on this --

     A    Here.  These back ones (indicating).

     Q    So those two back ones --

     A    These are like the primary ones you use, like on a day-to-day basis, and the back ones are usually locked.

     Q    Just so the record's clear, the ones you're pointing to as the back ones are the ones to the top of the page, and looking at the compass directions, are on the west side of B Cellhouse; correct?

     A    Yeah.  On the west, yeah.

     Q    And is it your recollection of the practice at the time that it was to lock both of those back stairwells?

     A    Yeah.

Q   And so if an officer was trying to get up to -- from the ground floor up to the -- say the 500 level, the -- they wouldn't be able to use that back stairwell unless they were unlocking each individual -- well, can you describe how it was locked when it was locked?

A   They like -- it's like each other one is locked.  So you'd have to unlock like three gates, kind of, to get to the top.  So you would have to unlock three gates, I want to say.  And that's a common padlock key, so like you wouldn't -- if the lieutenants or First Responders that are like sergeant or higher, they would have a key to that padlock to get out.

Q   And would the -- the officers on the unit would have a key to that, as well?

A   Yes.

Q   Where were the panels located, the unlocking panels you were describing earlier?

A   At the end of each range.  Each one of these ranges had like a platform.  The stairs go like (demonstrating) up, and each one has a -- like a little floor area where you can walk around.  Like the stairs come up, and they kind of set off so you can walk around.  And there's like a pillar that

JEREMY DYKSTRA                                    309
Cause No. 3:18-cv-00995-JD-MGG

goes all the way up, like to hold the floors.  And it's right there (indicating), like it ends like right here (indicating).

Q    And can you actually just mark on that exhibit where that -- where those panels are located?

A    (Witness complying).

Q    And you've drawn two sort of blue squares in blue ink on the the east side of the bottom of that page; correct?

A    Uh-huh.

Q    How long would it take someone to get from the ground floor up to one of those panels?

A    There's a panel on the bottom floor, so...

Q    Sorry.  I asked a bad question.

How long would it take someone to get from the bottom floor up to the panel on the 500 Range?

A    That's a good question.  It depends on where they're at the cellhouse at that time.  You know?  I mean, if you're running from an officer station up there -- I don't know, 15 -- I don't know, 10, 15 seconds maybe.  I mean, it depends on your height, weight, activities.  You know?

Q    So if you're --

JEREMY DYKSTRA                    310
Cause No. 3:18-cv-00995-JD-MGG

A    I mean, me and you, I mean, I probably go up stairs a lot quicker than you because I walked them my whole life.  You know?  Versus somebody that doesn't.

So they were kind of younger kids.  So if I'm guessing, ten seconds maybe.  It doesn't take that long to get up there because it's not like full flights.  You know.

Q    So -- and I won't offer to race you afterwards, but I think you might be right about your agility.

So if someone was in that east side of the cellhouse, close to the officer's station, going full speed, and assuming they were, you know, relatively athletic, could be as few as 10, 15 seconds to get --

A    If --

Q    -- from the --

A    If less --

Q    -- ground floor up to the 500 level?

A    If less than that.  You know, I mean, it really -- because you're skipping stairs.  I mean, you're going.  You're not thinking about it.  You do it.  Somebody -- I don't -- people working there that night, they're all -- two of them were in

decent shape.  Promise Blakely, she probably was in the worst of shape.  Worse.  You know.  But the other two kids there -- I mean, I call them "kids" because they're a lot younger than me.  They're in their early twenties.

Q    So recognizing, you know, you're not her doctor, but based on your assessment of Promise's shape, are you talking then like -- more like 15 to 20 seconds?

A    Probably.

Q    So maybe a little slower, but a matter of seconds slower.

A    Yeah.

Q    Are you familiar with a document called the "Emergency Manual"?

A    Yes.

Q    What is the Emergency Manual?

A    It's different sections in it for different things.

Q    And we were discussing earlier different policies that were in effect.  For example, you made reference to a policy regarding fire evacuations.

A    Okay.

Q    Were you referring to the Emergency Manual, or were you referring to a different set of

policies?

A    I -- I don't know.  There's -- there's like I don't know how many in the Emergency Manual. I couldn't tell you off the top of my head.  They could be in there.  It could not.  But usually the Emergency Manual's highly restricted.

Q    Right.  So not every officer could access the Emergency Manual; is that fair to stay?

A    No.  No.

Q    And was there a copy maintained on site at the prison?

A    I think it's in the Major's Office and the Warden's Office.  Or it might just be in the Warden's Office.

Q    So in terms of the policy that line level officers would be able to review and, you know, make sure they were following properly, fair to say the Emergency Manual would not be one of those policies that line level officers were expected to be familiar with and to follow?

A    No.  I mean, to follow?  I don't -- I mean, that's kind of a gray area there.  So I bet if you went down there and asked Warden Neal if you wanted to read part of the Emergency Manual, he might actually allow it and probably let you read

it.

Q    But it certainly wasn't an expectation that every line officer be familiar with --

A    No.  You start getting into that more when you're on like Canine, E Squad.  But you only -- kind of each section -- like E Squad's is 13, so...

Q    Do you -- did you play any role in any of the investigations that were conducted into the fire in relation to the April 7, 2017, fire?

A    Like trying to figure it out?  No.

Q    I'm sorry?

A    Like trying to figure it out?

Q    Correct.

A    Every little detail, every little thing?  No.  That would be in I & I.  And I think the state fire marshal came up, too, to do an investigation.

Q    And you gave an interview to the I & I folks; is that correct?

A    I'm sure I did.

Q    Do you remember giving that interview?

A    I don't remember word for word.

And then we had a debriefing about it with people from downstate and the ERO director and everything else.

Q    Aside from the interview with the I & I --

and that's Internal Investigations; is that correct?

A    Yes.

Q    Aside from your interview with Internal Investigations and the debriefing with the folks downstate that you just described, did you play any role in relation to this incident, after the incident was over, other than completing the report that we've looked at?

A    No.

Q    Were you kept informed of the progress of either the I & I investigation or the state fire marshal investigation?

A    No.

Q    What do you recall about the briefing that you were just describing with folks from downstate?

A    It was just a discussion on what happened from start to end about, you know, the pros and cons of everything.

Q    Do you recall when that took place?

A    I don't remember a date.  It was probably like a week later.  Maybe longer.  Week, week and a half.

Q    If I were to represent to you that there were documents that I've seen in the case to suggest that that took place on April 24, 2017, would that

sound right to you?

A    Sure.

Q    And is -- are we talking about the same thing if I'm talking about an After Action Review? Is that phrase familiar to you?

A    Yeah.  Yes.

Q    Have you participated in After Action Reviews before?

A    Yes.

Q    When are After Action Reviews conducted?

A    It's up to the warden.

Q    The warden has the ability to call for an After Action Review?

A    Yes.

Q    What other circumstances have you participated in an After Action Review for?

A    A riot in C2 at Westville, a new Castle riot.  What else?  A IDU incident up there where offenders were being unruly.  There have been quite a few.  I can't remember them all.

Q    What do you remember about the substance of the After Action Review that you attended in relation to the April 7, 2017, fire?

A    I don't really remember much because I was kind of irritated with everybody because I kind of

JEREMY DYKSTRA                            316
Cause No. 3:18-cv-00995-JD-MGG

just shut them out.  Kind of just let them talk.

Q    So fair to say you weren't paying close attention to what was going on during that After Action Review?

A    Actually, no.  I was kind of irritated with what people had to say, playing Monday morning quarterback.  So I was kind of just toning them out and just wanted to get out of the meeting.

Q    What was it that people were saying or doing that was irritating you?

A    Everybody can say you can do something better, but they're not part of that situation when it's going on.

Q    What were the things that people were saying that could have been done better that in your view was Monday morning quarterbacking?

A    They're acting like we were fully staffed. They didn't realize how short we were.  Stuff like that.  So I'm not -- you know, they're acting like we had a perfect, full roster, with every single person being there and every unit being fully staffed, and it should have went -- the way they -- or some of them people think it should have went -- they want it to go, and then it just ended up being a big argument, a lot of it.  So I kind of just shut

up and let them say what they had to say so I could get out of there.

Q    In your view what did being short staffed do in terms of the response that was given to the fire?

A    It wasn't about the fire.  It was more after the fire happened and the situations after that.  Assault on staff; I could have had more people in that unit.

Q    So was the main focus of the After Action Review on the staff assault that took place after the fire rather than the fire and the rescue effort?

A    They discussed the fire, showed the video about the fire with everybody that was involved that night and discussed the staff assaults and everything else.

Q    The Monday morning quarterbacking that you were referring to, was that in reference to the discussion of the fire or the after-fact-assaults or both?

A    More with -- more with assaults and then evacuating the whole cellhouse.

Q    What was the Monday morning quarterbacking regarding the evacuation?

A    That we should have done it a range at a

JEREMY DYKSTRA                     318
Cause No. 3:18-cv-00995-JD-MGG

time, basically.

Q    Did you pipe up and say that that's what you asked to have happen, but --

A    Yeah, but at that point it's already done and over with.  And like I said, I was kind of irritated.

Q    Was there someone taking notes at that meeting that you're aware of?

A    I have no idea.

Q    Are you familiar with any policies that dictates when and how those After Action Reviews are supposed to be conducted?

A    No.  They called me into one of them meetings; I go.  They tell me I have to be there; I go.

Q    But they can't make you pay attention; right?

A    When you're irritated and you just want to get out of there and you -- I -- you know, regardless of what you guys think or this lawyer thinks or anybody in this room, I praise everybody that went through that night.  And, I mean, it's really bad somebody passed away; but for what we had and what we did, I thought we did an outstanding job, and I'll stick by that.

JEREMY DYKSTRA                    319
Cause No. 3:18-cv-00995-JD-MGG

Q    Do you recall there being a discussion at the After Action Review that Officer Rodriguez went up to Mr. Devine's cell but that he didn't have the key, so he went back down the range to get the key?

A    I don't really remember.  I'm trying to think back to it, but I don't recall hearing about it.  Maybe that was after the fact.  I don't remember that at all.

Q    Would that concern you if, in fact, that were true, that Officer Rodriguez was at Mr. Devine's cell while Mr. Devine was still alive, but he was unable to open the cell because he didn't have the key on him?

A    It would concern me.

Q    Would that change your opinion about whether this was a tragedy, but everyone on staff at the facility did everything they could and it was unavoidable?

A    Well, if you don't know about it, and for -- I mean, you can't change the fact that it did happen, so I can't really say or think in the past like that.  You know, so I guess my opinion doesn't really matter.

Q    To your knowledge, would it have violated any Indiana State Prison or Indiana Department of

JEREMY DYKSTRA                                320
Cause No. 3:18-cv-00995-JD-MGG

Correction policy if all three of the officers in the cellhouse had gone up to investigate what was going on rather than just Officer Rodriguez?

A    No, there ain't no policy saying they had to or didn't have to.  You know, so if you think there's a situation going on, my personal opinion, always have somebody with you.  Two people are always better than one; you know?  But all three of them?  No.  I would have said somebody should -- I wouldn't say had to stay in the officer's station, but you don't know what the incident is.  It probably would have been safer for somebody to stay in the officer's station and then maybe the other two go.  But that's -- I mean, you don't know what's going on, so...  It could be this offender yelling, he wants to talk to you for a second.  That happens daily.  So it's one of them judgment calls.

Q    Once Officer Rodriguez arrived at the cell front and located the source of the incident and realized he did not have the correct key, how long should it have taken someone with the correct key to be able to get up to the cell front or the panel in in order to unlock that cell?

            MR. NAGY:  Objection.  Calls for speculation.

JEREMY DYKSTRA                 321
Cause No. 3:18-cv-00995-JD-MGG

BY MR. HEPPELL:

Q    You can go ahead.

MR. NAGY:  You can answer it if you can.

THE WITNESS:  I choose not to if he's objecting.

MR. NAGY:  Well, no.  You can still answer.  I'm not instructing you to not answer the question.

THE WITNESS:  Okay.  Like I said, I don't -- that's one of the things you'd have to review the cameras at that time, that one moment.  So if somebody was already at the bottom right, where your cell was right here, and has to cover every gate to get the keys or was on this side and had to go to the officer's station to get the keys, or if somebody was on a different range, so the time frames -- I can't say the word.  It doesn't really matter.  But I mean, if they're sitting in the officer's station and had to run up there, like I said, probably 10 to 20 seconds to get the keys.  But that depends on where the staff are on that unit, so I can't answer that question.  I mean, totally -- honestly; you know?  What if somebody was in the bathroom?

BOSS REPORTERS
(219) 769-9090

JEREMY DYKSTRA                 322
Cause No. 3:18-cv-00995-JD-MGG

BY MR. HEPPELL:

Q    And I understand that -- well, strike that.

Can you think of any reason that it would have been appropriate to refuse to go up to the 500 Range on -- with the keys to unlock the cell upon being -- upon learning that there was a fire in that cell?

A    No.

Q    We talked earlier about the First Responders coming to the cellhouse; and if I recall your testimony, the policy was that they were to gather all together outside of the cellhouse?

A    They were supposed to gather before they enter.

Q    With the specific geography of B Cellhouse, where did the First Responders gather, if you know?

A    If they did gather, it would be at the primary exit right here.

Q    And that's -- your gesturing on the map to the -- yes, can you mark that on the map?

A    (Witness complying).

Q    You've marked a blue X by what you were just referring to as the primary exit.  In fact,

JEREMY DYKSTRA                                      323
Cause No. 3:18-cv-00995-JD-MGG

you -- it's marked as primary exit on the document, isn't it?

A    Uh-huh.

Q    And that's where the First Responders should have gathered, according to policy.

A    Yes.

Q    Do you have any first-hand knowledge whether or not that's where they gathered?

A    As far as I know, they went in the front door.  We call it the front door, but it's the back door.  I mean, to get in this door, you really have to get the other keys or have them walk it.  The reason most people go to this door (indicating), 'cause they got the keys to these doors, and they're usually -- somebody's usually close to the officer's station.

Q    So do the First Responders require someone from inside the cellhouse to unlock the door to the cellhouse before they can enter?

A    They can do it two ways, have them open it up, or somebody should have already ran to Tower 11 and got the front door keys.

Q    Can you explain what you mean by that?

A    There's a tower on this map.  I want to say it's 25.  No.  That's fire station.  I don't

BOSS REPORTERS
(219) 769-9090

JEREMY DYKSTRA                                      324
Cause No. 3:18-cv-00995-JD-MGG

know why they don't have it on here.  There's a
tower -- can I write on this?

Q    Sure.

A    Right here in the middle of it
(indicating).  I don't know why it's not on here,
but they can lower down the keys to all the front
doors to any unit.

Q    When you say, lower it down, is that like
physically down from the tower, that --

A    It's like a bucket.  I mean, it sounds
funny, but it's old school, like a little pale, and
like you put the keys in it and lower it down to the
lieutenant or sergeant.

Q    And how far is that from B Cellhouse?

A    There's B Cellhouse (indicating).

Q    And according to the policy, who should
have been -- who should have gone to obtain those
keys from Tower 11?

A    Any of them.

Q    Any of the First Responders?

A    (Witness nodding head).

Q    And is that something that they should
have gone to do first rather than waiting to try and
get someone from inside the cellhouse to --

A    Or they --

JEREMY DYKSTRA                            325
Cause No. 3:18-cv-00995-JD-MGG

Q    -- lower the key?

A    Or they could have been asking for the front door open or they already had -- usually with a fire or something like that, they'll automatically open the front door, have it ready, one officer, so they can get in there quicker, and the Offender Fire Department.

But if they went to that door, they grouped up and seen it wasn't open, they could go to the tower and get the keys.  But the No. 1 First Responder would tell them to go to Tower 11 to get the front door key.

Q    If I understood -- something you said in that answer, was it the policy that officers in the cellhouse, once they called in a code, could have unlocked the door --

A    Yes.

Q    -- to let the First Responders in?

A    Yes.  It's not the policy.  I don't know what the policy states.  It's just a natural thing, so you open the door so people aren't waiting out there, so you can get the Offender Fire Department in because they're coming through with all their gear.

Q    Would that individual officer who unlocked

JEREMY DYKSTRA                          326
Cause No. 3:18-cv-00995-JD-MGG

the door then need to stand by that door --

A    Yeah, they --

Q    -- with the key?

A    They should stand by the door or close by the door.

Q    And why is that?

A    'Cause you don't want offenders leaving. I mean -- I mean, there's always a case -- everybody was locked in their cell that night.  But like I said, in a lot of them electronic things, there could be a door left open or a human error leaving a door open, and next you know, an offender's trying to walk out the door.

Q    Would that be an appropriate reason not to go up and bring your keys to unlock the --

A    Leaving the doors open?  There was three officers in there, so somebody should have went up there and got the keys.  The OIC should have kind of directed traffic in their cellhouse.

Q    So it would have been the OIC's responsibility with those three people, direct who should be where.

A    Yeah.  Get on the radio, grab these keys, or stand here by the door while I run up there and get them.

JEREMY DYKSTRA                     327
Cause No. 3:18-cv-00995-JD-MGG

Q    What if the OIC's radio wasn't working? Is there a backup way that they should be directing traffic?

A    Well, in that unit, there is a spare radio in that office because on Day Shift, I think there's like -- there's like four or five radios in there. Don't quote me on the number.  I think there's five in there.

Q    But at a minimum, there should be a spare radio.  There should be no reason that's someone's got a radio --

A    Well, Night Shift, you're --

Q    -- that isn't working?

A    -- only using like three officers.  Day Shift runs with the morning.  Our radios don't leave the unit.  So saying the radio's not working or a dead battery, get in the officer's station, and get you a battery.  It's right there.  You can still watch the front door by the officer's station.

Q    Did you receive a -- a warning with regard to the internal investigation that you had to sign prior to giving an interview in relation to the fire?

A    I don't know what you mean.

MR. HEPPELL:  Would you mark this as

Exhibit E, please.

(Dykstra Exhibit E marked for identification.)

BY MR. HEPPELL:

Q    Are you familiar with this format of document?

A    Yes.

Q    The title of the document is "Notice of Administrative Investigation"?

A    Yes.  No, I don't think I got one of these.

Q    Okay.  Do you know why some of the officers would have been required to sign this notice and others weren't?

A    Well, me, I was supervisor.  I was in the office, so it's not like -- I guess you could say I didn't do anything wrong because I'm in that office just acquiring information.  So maybe at this time, maybe they felt maybe they were doing their investigation; but anytime they do an investigation, they have everybody sign this, you know, besides the-- probably they had everybody in the cellhouse sign this, that was working that day.

Q    Did you tell the truth, to the best of your ability, during your interview with the I & I

**JEREMY DYKSTRA**                                     329
Cause No. 3:18-cv-00995-JD-MGG

investigator?

    A    Yes.

    Q    I'd actually like to just play for you a portion of that interview.  Just one second here. Actually, I'll do that -- I'll get that set up in a minute.

              Do you have any criminal convictions?

    A    No.

    Q    Have you ever been charged with a crime?

    A    I Class B misdemeanor.

    Q    And how was that Class B misdemeanor case resolved?

    A    I did six months probation for failure to stop.

    Q    And was that as a result of a guilty plea or a trial?

    A    That was whatever my lawyer did.  I didn't have to go to a trial or anything.

    Q    Is it your understanding that you pled guilty to that misdemeanor?

    A    As far as I know, yes.

    Q    Any other criminal charges other than that?

    A    No.  Never even had a speeding ticket.

    Q    What were the circumstances that led to

that guilty plea for that misdemeanor?

A    Failure to stop.  I hit a picket.  You know what a picket is?

Q    Like a picket fence?

A    Like a picket that was in the ground.  I misjudged a corner and I hit the picket and I left.

Q    So you -- yours was the only vehicle involved in the accident?

A    Yes.

Q    What's your understanding of why that led to criminal charges being brought against you?

A    I have no idea.  I guess somebody seen me do it, and it was their picket.  But I didn't even have to pay for the picket.

Q    What jurisdiction was that case brought in?

A    LaPorte County.

Q    Do you recall what law enforcement agency it was?

A    LaPorte.  LaPorte County Sheriffs.

Q    Other than the discipline that we talked about earlier in the deposition that led to you being terminated from your position, that's the subject of ongoing proceedings, have you ever received any other employment-related discipline

**JEREMY DYKSTRA**                                331
**Cause No. 3:18-cv-00995-JD-MGG**

during your time with the Indiana Department of
Correction?

    A    Yeah.  I got a written recommend [sic] for
doing that picket incident.

    Q    Other than that, any other written or
verbal discipline in connection with your position
as a correctional officers?

    A    Not that I can recall.

    Q    Do you know who Joshua Devine is?

    A    Personally?  No.

    Q    Other than seeing his dead body being
wheeled out on a gurney, can you recall any
interactions you had with him as a prisoner?

    A    No.  I never really knew the guy.

    Q    Do you know anything about his mental or
physical health on the night of April 7th?

    A    No, sir.

    Q    Do you know anything about his personal
life or his personality?

    A    No.

    Q    Have you ever met or spoken with any
members of Joshua Devine's family, to your
knowledge?

    A    Not that I know of.

    Q    I have these --

JEREMY DYKSTRA                              332
Cause No. 3:18-cv-00995-JD-MGG

MR. NAGY:  Now, at this point, I would just like to politely point out that under Rule 30 and the Case Management Plan that's in place for this case, there's a seven-hour time limit on depositions.  This deposition started at approximately 9:00 a.m., which means we are rapidly closing in on the seven-hour limit, and I concede two things; number one, that the rule is a little unclear on what you do with break time.  In fact, it's silent on the issue.  And number two, in an effort to avoid any sort of a controversy, I am interested in your thoughts on what would appear to be an expiration of the seven-hour limit and what we can do to accommodate both you and your questions and the witness, because the CMP indicates you can extend that by agreement.

MR. HEPPELL:  Sure.

MR. NAGY:  But as you can see, Mr. Dykstra is not going to agree to sit for longer than the Rule 30 time limit.

MR. HEPPELL:  I appreciate you raising the issue.  With regard to breaks, my practice has always been -- but perhaps it's just because it benefits me not to count breaks toward the

JEREMY DYKSTRA                                    333
Cause No. 3:18-cv-00995-JD-MGG

seven hours, but I agree the rule is silent on that.  I am cognizant, also, we're approaching the seven hours.  I was not intending to go past the seven hours, so I've been, in my mind, attempting to keep things moving in that direction.

I -- my assumption is always in situations like this, that the counsel presenting the witness isn't going to have a ton questions.  I am happy for you to ask as many questions as you want, so I'm not planning on -- and I finished in other cases -- using that as a sword and a shield to cut you off, but, you know, obviously subject to whatever your negotiations with Mr. Dykstra are on that front, but --

MR. NAGY:  I probably have five minutes of questions.  They're very, very -- a quick hit.  I would be willing to -- you know, assuming you exhausted the seven hours, if you want ten minutes to -- as follow-up, would that be okay?

MR. HEPPELL:  I think that's reasonable.

MR. NAGY:  I think you'll find that's going to be an appropriate amount of time, given what I'm going to ask him.

JEREMY DYKSTRA                                              334
Cause No. 3:18-cv-00995-JD-MGG

MR. HEPPELL:  That all makes sense to me. What I'm going to do is I'm going to awkwardly reposition myself so I can have you -- is it Dykstra or Dykstra?

THE WITNESS:  Dykstra.

MR. HEPPELL:  I'm glad I wasn't saying that wrong all day.  Mr. Dykstra, I'm going to reposition so you can see the video, but so that I can see.

THE WITNESS:  What video are we watching?

BY MR. HEPPELL:

Q    For the record, this has been produced to us in discovery, and it's, what I understand to be, a video-recording of your interview --

A    Okay.

Q    -- with the I & I folks.

And let me know if you are having difficulty hearing that.

So there's some -- let me -- there's a time stamp in the top left-hand corner of the video, which reads 04/08/2017, Saturday, 3:40:24.

Is it your understanding, based on your recollection of the timing that night, that that would have been 3:20 -- sorry, 3:40 a.m., just a few hours after midnight, shortly after the fire?

A    Sure.  Yes.

Q    All right.  I'm going to start the video playing.

A    All right.  How long is this?

Q    It's pretty short.

(Video playing.)

THE WITNESS:  I must have signed one of them.

BY MR. HEPPELL:

Q    So just --

A    I'm thinking that's the document, but --

Q    So you're seeing on the screen that you have a piece of paper in front of you?

A    Yeah.

Q    And based on --

A    I'm assuming that's this (indicating).

Q    Can you think of any other piece of paper that you would have had in front of you that you would have been handwriting on other than one of those forms?

A    No, unless they wanted a copy of that incident report that I wrote.

MR. HEPPELL:  Okay.  Resuming the video.

(Video playing.)

JEREMY DYKSTRA                    336
Cause No. 3:18-cv-00995-JD-MGG

BY MR. HEPPELL:

Q    Just pausing the video at the 3:42:12 mark, you just narrated on the video not being able to see the First Responders on the range and something about a fire extinguisher, attempting to put out the fire.

Based on reviewing that and recalling back the incident, are you narrating something that you personally observed while watching the incident through the cameras?

A    No.  I -- I'm pretty sure I seen 'em going through the -- where the door is, 'cause my office is like right -- like my office is here.  The door for B Cellhouse was open with the fans going, and I seen 'em him going with the extinguish.  I'm pretty sure that's how I seen --

Q    So that was something -- you saw them go in, seeing out your office, not seeing them on the cameras?

A    Yes.

Q    And in terms of the efforts to extinguish, is that something you saw happen on the camera, or is that something you learned about later?

A    Well, that's -- that's when I -- I told you before I seen like the fire blazing, and then it

JEREMY DYKSTRA                337
Cause No. 3:18-cv-00995-JD-MGG

went down to like a little dot, and then it like

blew up again.

MR. HEPPELL:  I'm resuming the video.

(Video playing.)

BY MR. HEPPELL:

Q    Just pausing the video again at 3:42:23.
It sounded to me like you described the situation at
that point in time like "mad chaos," basically.  Is
that an accurate description of what you told the
investigator?

A    Sure.  You got it on video.

Q    What did you mean by that?

A    You got to remember, this is after the
incident, so the whole thing was mass chaos.  And
this is at 3:42 in the morning, so I probably got a
lot of stuff going through my head.  I mean, I'm
being honest with you.  I'm probably thinking of the
whole incident.  I mean, now you're -- I understand
it's your job to dissect every little thing, but
come on, man.  I mean, I don't know what to answer
to you.

Q    As you sit here today, you don't have an
explanation of why --

A    No, I don't have one.

Q    -- in the midst of your --

A    Don't have one.  Don't have one.

Q    You have no explanation for why you use that phrase?

A    No, I don't.

Q    Do you disagree with that characterization of what was going on at the time in the events that you were just narrating?

A    Sure, whatever you say.

Q    Well --

A    I mean, come on, man.  You're going a little farfetched here.

Q    I understand you're --

A    I mean, come on.  You're using every little word.  You got to think, this is how many hours after the incident?  Four -- seven hours?  Eight hours; you know?  So I'm probably thinking about the whole thing.

Q    So my question for you is just -- it's a pretty simple question.

As you sit here today, do you disagree with characterizing the state of the incident at that point in time in the narrative as "mad chaos"?

A    Yes.  Play on.

(Video playing.)

JEREMY DYKSTRA                                    339
Cause No. 3:18-cv-00995-JD-MGG

BY MR. HEPPELL:

Q    Just pausing the video again at 3:42:32. Do you recall -- well, strike that.

It sounded to me on the video just now you were describing attempting to reach the other officers on the radio but them not being able to hear you.  Is that --

A    Yeah.  I don't remember that.

Q    Do you agree that's what your statement was on the video?

A    I -- I don't know.  I mean, it's been a long time.  I probably did.  I don't know.

Q    As you sit here today, do you have any reason to dispute that that's what happened?

A    No, I don't.  There was a lot going on.

Q    But you have no recollection of attempting to use a radio to contact the officers and being unable to do so?

A    No.  I was trying probably to get a hold of Redden if I was trying to get ahold of anybody.

Q    Is that something you've ever experienced before in an incident, not being able to reach someone on the radio?

A    Yes.

Q    Based on the noise of the incident?

A    I mean, it's -- you're trying to get ahold of something, and they're rolling around on the ground with an offender, how hard is it to use a radio?

Q    Outside of situations where someone's engaged in physical combat with an offender, have there been other situations where you've tried to reach someone by radio and haven't been able to?

A    Yes.

Q    What other types of occasions?

A    Oh, God.  Thousands.

Q    So not an uncommon occurrence?  Is that fair to say?

A    I mean, every situation's different.  I mean, if they're in the heat of the moment, they might not even be paying attention to their radio.

Q    Is that an expectation, though, that First Responders are monitoring the radio traffic for --

A    They should be, but if they're dealing with a situation -- I don't know.  You ask them people.

Q    You don't have any opinion on that one way or the other?

A    They should answer their radio at all times; but, you know, we are human.

JEREMY DYKSTRA                    341
Cause No. 3:18-cv-00995-JD-MGG

Q    Does it concern you that that didn't
happen when you tried to contact them by radio?

A    With probably all the noise in the
cellhouse, yes, it's concerning.  But I mean, did I
blame them?  I -- it doesn't matter.

(Video playing.}

MR. HEPPELL:  I'm going to back up the
video for a second.  So backing it up to the
3:42:21 time stamp.

(Video playing.)

BY MR. HEPPELL:

Q    So pausing again at 3:42:45, and we were
talking earlier about the statement in your report
regarding Redden's request to activate the
fire department, and you repeated that statement on
the video with the investigator just now.  Is that
correct?

A    Okay.

Q    Am I correct?

A    You're correct.

Q    Does that do anything to refresh your
recollection about the sequence of events that night
and when Lieutenant Redden activated the prisoner
fire department?

A    Should have been activated already, but I

JEREMY DYKSTRA                                  342
Cause No. 3:18-cv-00995-JD-MGG

don't know why he called for them again, but we went through this.

Q    You have no additional information?

A    No, I don't.

(Playing video.)

BY MR. HEPPELL:

Q    Sorry.  Were you trying to say something?

A    No.  Talking to myself.  Sorry.

(Video playing.)

THE WITNESS:  Maybe I remember that.  I don't --

BY MR. HEPPELL:

Q    Just pausing again at 3:43:19.  Was there something you think you might have remembered incorrectly?

A    I don't -- I thought I told him -- I thought -- I don't know.  Now looking back on it, maybe my thoughts about -- maybe he did ask to do the four and five and not the full cellhouse.  But it's been a long time, so maybe it -- I don't know. I'm confused right here.

Q    So you're referring to the fact that your recollection when we testified -- when testifying earlier was that Lieutenant Redden asked to evacuate the whole building, but in your --

JEREMY DYKSTRA                343
Cause No. 3:18-cv-00995-JD-MGG

A    Yeah.

Q    -- statement just now, it was referring to him --

A    Asking for the four and five.

Q    Just asking for four and five.

A    So that's kind of -- it's fuzzy to me. I'm not going to lie to you.  I knew it was one way or another, but --

Q    Okay.

A    Okay.

Q    And resuming the video at 3:43:19.

(Video playing.)

BY MR. HEPPELL:

Q    Pausing the video at 3:47:25.  The -- you were just describing for the interviewer that procedure for activating the firefighters; correct?

A    Yes.  I know where you're going with this.

Q    So it sounded to me like the procedure you were describing on the video was a little different from what you had testified earlier in terms of it being something they needed to be activated either by a shift supervisor or the First Responder or potentially a judgment call made by one of the officers in the B Cellhouse if they felt the fire was bad enough.  Is that a fair summary of the

substance of the --

A    Yes.

Q    -- statements you made on the interview?

A    Yes.  Now, I -- I'll explain this, and this is maybe why I was thinking this way, because I think now it's reflecting my memory a little bit better.

After this fire happened and the severity of it, that's when they said any time a fire or a 10 code will be called, that the firemen are automatically -- automatically activated to go to it.  So --

Q    Got it.

A    So I -- it was a judgment call for the officer, Lieutenant Redden.  But then they -- after the fact of this fire and the situation, that they then make -- start making everybody do it.  But it's been so long, I thought it was in place then.  But like I said, I don't remember everything to a T.

Q    No.  And I appreciate that, and I appreciate your clarification.

Are there other changes that you're aware of in policies or practices that were made as a result of this incident, other than the one you just described?

A    Not that I know of.  QRT's changed, but that's just weapons configurations, not how they actually go to their areas or respond.  It's just different -- different things.

Like now that I'm looking at this, and we either had the taser back then or we had the Ultron stun device, which is a handheld stun device. I don't remember what was in effect at that time.

So probably my statement before saying we had a taser -- if we didn't have the taser at the time, we had a stun device that looks like -- where you hold it to somebody, and it shocks them that way.  Then we went to a taser.

So now that I'm looking back at this, I don't know if we had the taser at that time or the stun device.

Q    And those weren't changes that were made in response to this incident; correct?

A    No.  No.

Q    Anything that can you think of beyond what you've already testified to in terms of changes that were made in response to the incident?

A    No.  No.

Q    I don't have -- I'm not going to show you any more remaining portions of the video.

Did you have any involvement in annual health and safety inspections at the facility?

A    Annual health and safety inspections? Being more -- health inspections?  No, I would never be -- health inspection --

Q    Or safety inspections at the facility?

A    Safety inspections?  I did security assessments.

Q    Do you have any knowledge of assessments made on the electrical systems?

A    No.  That would all be Maintenance Department.  That would be Mr. Kaufman. And that cell was locked down for the state fire marshal.

MR. HEPPELL:  Could I -- could we go off the record for one minute?  I know I'm pushing into my time.  I just want one minute to confer.

(A brief recess was taken from 4:13 to 4:14.)

MR. HEPPELL:  Go back on the record.

BY MR. HEPPELL:

Q    Mr. Dykstra, you were testifying earlier about the prevalence of fires at the Indiana State

Prison during the time that you were working there.

At any point did you undertake to suggest or request improvements to any of the fire prevention policies or procedures in place at the prison?

A    Only thing I ever suggested was instead of having a all offender fire department, I think there should be a -- like a staff per shift on that fire department, if they get activated.

Q    And to whom did you make that suggestion?

A    Captain Boyn at the time and Major Nowatzke.

Q    Was that suggestion made before or after the April 2017?

A    I think I've been saying that for the five -- almost five years I've been there.

Q    Can you explain why you made that suggestion?

A    I did -- offenders are still offenders. And even though they're certified and they do a great job, I just feel like it would be a good opportunity for a staff member to be in charge of them offenders during a fire.

Q    What response did you get to that suggestion when you made that?

**JEREMY DYKSTRA**                    348
**Cause No. 3:18-cv-00995-JD-MGG**

A    They would think about it.

Q    Did anything ever come of that?

A    No.

Q    Did you ever make any suggestions in terms of changes to the policies or procedures for fire -- rescue or fire evacuation as a result of the prevalence of fires that you observed at Indiana State Prison?

A    That we -- like I've seen them foam pack things, like they spray foam so you can use them on any kind of fire, and you can use them on people's bodies, too.  To have one of them placed in the Supervisor's Office.

Q    When did you make that suggestion?

A    That was after the fire.

Q    After the fire.  Was that a suggestion you made as a result of what you observed with the fire?

A    The aftermath, yes.

Q    What was the response you got to that suggestion?

A    They got them fire extinguishers.

Q    So that was a change that was made in response to the circumstances of this fire, to your knowledge?

A    Yes.  And then all the other fires that

happened at ISP.

MR. HEPPELL:  I don't have any further questions at this time.

CROSS EXAMINATION

BY MR. NAGY:

Q    Okay.  Mr. Dykstra, the testimony that you have given today in this deposition, is that testimony given to the best of your recollection of events that happened two years ago?

A    Yes.

Q    A little while ago you were shown a video, a video of a statement that you made hours after the fire in question.

Is your memory of what happened in April 2017 better today than it was at the time you gave that statement to IA?

A    No.

Q    If your testimony today in any way differs from the testimony that's on the video, are you prepared to defer to the video as being the correct testimony?

A    Yes, sir.

Q    For purposes of this deposition, are you holding yourself out to be an expert in DOC's policy and procedures?

JEREMY DYKSTRA                                350
Cause No. 3:18-cv-00995-JD-MGG

A    No, sir.

Q    Did the DOC require its correctional captains to have every policy or procedure memorized?

A    No.

Q    If you had a question regarding a policy or a procedure, was it your standard practice to go and pull that policy and look up the answer?

A    Yes.

Q    Did you have the opportunity or have occasion to do that during your approximately twenty years as a correctional staff member with DOC?

A    Yes, sir.

Q    As a correctional captain in April of 2017, were you responsible for inspecting and maintaining the fire extinguishers in the cellblocks?

A    No, sir.

Q    As a correctional captain in April of 2017 at the Indiana State Prison, were you responsible for determining the physical placement of fire extinguishers?

A    No, sir.

Q    For purposes of this deposition, are you holding yourself out to be an expert in the use and

JEREMY DYKSTRA                351
Cause No. 3:18-cv-00995-JD-MGG

operation of the Indiana State Prison's camera

surveillance system?

    A    No, sir.

    Q    As a correctional captain in April 2017,

were you responsible for inspecting and maintaining

any smoke alarms?

    A    No, sir.

    Q    As a correctional captain, were you

responsible for the placement of the physical

location of smoke alarms?

    A    No, sir.

    Q    In your opinion and based on your

experience as a correctional captain, did ISP

staffing issues cause Joshua Devine's death?

        MR. HEPPELL:  Object to the form.

    Foundation.

        THE WITNESS:  No, sir.

BY MR. NAGY:

    Q    Well, what killed Joshua Devine.

        MR. HEPPELL:  Object to form.  Foundation.

        THE WITNESS:  The fire that he set in his

    cell.

BY MR. NAGY:

    Q    Now, were you involved in the cause and

origin investigation of the fire after the fire?

A    No, sir.

Q    Do you have any specialized training in arson investigation or fire investigation?

A    No, sir.

Q    Have you received any advance training in firefighting techniques or fire prevention?

A    No, sir.

Q    You never attended a firefighter's academy?

A    No, sir.

Q    Prior to us meeting today, had you ever had the opportunity to review the video that you were shown --

A    No.

Q    -- of your IA interview?

A    No.

MR. NAGY:  I'll pass the witness.

REDIRECT EXAMINATION

BY MR. HEPPELL:

Q    Just a brief follow-up on that.

You were asked a question about whether the Department of Correction required its correctional captains to memorize the policies and procedures, and your answer was no.  Do you recall that question and answer?

JEREMY DYKSTRA                                   353
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    Did the Department of Correction require its correctional captains to be familiar with its policies and procedures?

A    Familiar, yes.

Q    You were asked some questions about your responsibility or lack of responsibility for various pieces of fire safety or fire suppression equipment.

What's your understanding of who was responsible for the placement of fire extinguishers in cellhouses in April of 2017?

A    Safety HAZMAT.

Q    And was that Mr. Griffin?

A    Yes.

Q    Is that the same answer for smoke detectors?

A    I would say Mr. Griffin or there might be a contract on them.  I don't know.

Q    But if there was a contract, it would be ultimately Mr. Griffin for overseeing that contract?

A    Yes.

Q    Was there a sprinkler system in place at Indiana State Prison in April of 2017?

A    Sprinkler system?  I don't know that. (Witness shaking head).

**JEREMY DYKSTRA**                                   354
**Cause No. 3:18-cv-00995-JD-MGG**

Q    You made reference in one of your answers in relation to the cause of Mr. Devine's death -- I believe your testimony was the cause of his death was the fire that he set in his cell. Do you recall giving that answer?

A    Yes.

Q    Do you have any firsthand knowledge as to what caused the fire on April 7, 2017?

A    No. There was a fire in the cell.

Q    And are you aware if the results of the state fire marshal's investigation into that fire and what caused it?

A    No. I just heard it hit like 1800 degrees. That's the only thing I heard.

Q    Do you have any basis for believing that the fire in Mr. Devine's cell was set intentionally by him?

A    I don't know if it was set intentionally. I'm just going by hearsay from offenders that lived around him saying that he was messing with something in there and that it started smoking. And the guys next to him, to the right and left, were asking if he was okay, and he said he had it. And next thing they know, that it just got out of control.

Q    And were those conversations that you had

JEREMY DYKSTRA                                    355
Cause No. 3:18-cv-00995-JD-MGG

with those offenders, specifically?

A     Offenders -- we're talking about it every day, and I couldn't tell you the names of the offenders, but I had many offenders come up to me and say the same story.

Q     And beyond those -- hearing statements made by those individual prisoners whose identities you can't recall, is there any other basis you have to offer a view on what caused the fire in Mr. Devine's cell?

A     No.

MR. HEPPELL:  I don't have any further questions either at this time.

MR. NAGY:  Thank you, sir.

MR. HEPPELL:  Thank you very much for your time today, Mr. Dykstra.  I appreciate it.

THE REPORTER:  Any orders at this time?

MR. HEPPELL:  We're not going to order a copy at this time.

(A brief discussion was held off the record.)

MR. NAGY:  I'll definitely want a copy. E-copy.

THE REPORTER:  They haven't ordered he original.  Do you want me to hold off on your

JEREMY DYKSTRA 356
Cause No. 3:18-cv-00995-JD-MGG

copy, or would you like to order the original?

Do you understand what I'm --

MR. NAGY:  Yes, I do.

Yeah, I'll take the original.

(The deposition concluded at

4:24 p.m.)

* * * * *

BOSS REPORTERS
(219) 769-9090

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARABARA DEVINE, as Personal )
Representative of the        )
ESTATE OF JOSHUA DEVINE,     )
                             )
            Plaintiff,       )
                             )Cause No.
vs.                          )3:18-cv-00995-JD-MGG
                             )
RON NEAL, et al.,            )
                             )
            Defendants.      )


              REPORTER'S CERTIFICATE

      I, PAMELA S. OWEN, CSR, RPR, and Notary Public
for the County of Lake, State of Indiana, do hereby
certify that I reported in machine shorthand the
foregoing proceedings had in the above-entitled
matter, at the time and place herein before set
forth; and I do further certify that the foregoing
transcript, consisting of three hundred and
fifty-six (356) typewritten pages, is a true and
correct transcript of my said stenographic notes.

            Signed this 3rd day of September, 2019.


                              _____
                              PAMELA S. OWEN, CSR, RPR
                              IL Lic. No. 084-002294
                              Notary Public, Lake County, IN
                              My Commission Expires:  8/1/24

BARBARA DEVINE vs
RON NEAL, et al.

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 359 of 395

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

**[**

**[sic] (12)**
30:14;41:16;45:2;
57:11;93:17;132:16;
173:19;273:25;
278:18;287:15;
302:17;331:3

**A**

**Abbassi (12)**
171:4;233:3,20;
234:7,23;235:6;
252:9,18;266:21;
270:2,10;297:19
**abilities (1)**
111:8
**ability (13)**
10:8,15,22,24;
13:3;28:11;102:25;
181:13;255:15;
257:10;258:2;
315:12;328:25
**able (28)**
9:13;64:21;79:2;
102:21;173:9;
188:12;200:25;
202:22;204:16;
205:22;220:2;
238:22;240:22;
242:12;259:13;
260:22;282:8;290:5;
293:3,9;294:20;
308:3;312:16;
320:22;336:3;339:6,
22;340:8
**above (10)**
52:23;80:17;107:6,
8;143:5;185:1;223:4,
23;242:18;292:12
**absence (3)**
254:8;270:2,9
**abusing (1)**
27:25
**academies (3)**
93:17,18;94:14
**academy (10)**
44:9,17;53:4;
54:23;55:3;92:2,4,11,
23;352:9
**access (14)**
64:22,23,23;65:2,6,
14;66:10,13;119:11;
200:1,2;284:9;307:3;
312:7
**accessible (4)**
125:13;126:4;
280:9,17
**accident (1)**
330:8
**accidentally (1)**

**138:3**
**accommodate (1)**
332:15
**accomplish (1)**
120:2
**accomplishing (1)**
104:15
**according (4)**
5:5;272:2;323:5;
324:16
**account (4)**
17:6;19:21,23;
261:9
**accountable (1)**
285:23
**accounts (1)**
5:3
**accurate (4)**
10:9,15;100:21;
337:9
**accurately (1)**
10:23
**achieve (1)**
169:14
**acknowledge (1)**
3:21
**Acko (1)**
268:3
**acquiring (1)**
328:18
**acronym (1)**
149:12
**acronyms (1)**
149:10
**across (6)**
67:15;87:10;
173:12;177:19;
242:19;257:7
**act (3)**
12:1;156:14;
261:17
**acting (2)**
316:17,19
**action (12)**
149:11;193:14;
315:4,7,10,13,16,22;
316:4;317:10;
318:11;319:2
**actions (1)**
217:17
**activate (10)**
126:25;134:9,13,
23;140:24;150:23;
173:6;204:7;301:10;
341:14
**activated (33)**
123:19;130:11;
133:23;134:1;135:1,
8;138:20;139:2,10;
140:14,21;143:14;
147:14,15;148:14,15,
16,22;167:17;
168:20;179:3;

**300:16,19,22;301:3,
8,17;303:11;341:23,
25;343:21;344:11;
347:9**
**activating (2)**
178:13;343:16
**activation (2)**
141:12;151:6
**activations (1)**
179:2
**activities (4)**
271:1,2;301:23;
309:24
**actual (3)**
116:21;163:19;
179:7
**actually (47)**
7:25;17:14;22:7,
23;33:7;41:10,11;
43:14;53:3;57:11;
69:2,6,13;70:6,16;
96:10;107:7,24;
119:10;124:5;
126:22;137:24;
138:4;145:3,21,24;
163:5;168:25;
170:18;171:12;
174:11;176:7;177:3;
224:21;226:11;
239:15;247:14;
261:22;265:19;
291:4,7;309:4;
312:25;316:5;329:3,
5;345:3
**add (2)**
76:6;232:16
**added (2)**
129:11;232:5
**adding (1)**
76:5
**addition (7)**
18:5;47:7;49:10;
51:15;95:9;125:9;
218:18
**additional (30)**
44:4;94:7,10,16;
95:2;137:8;138:18;
139:3,7;170:15;
207:2;213:11;214:4,
24;215:7;220:1;
221:18;232:5;234:5;
236:25;237:1;
253:15,16,18;254:16;
279:15,19;298:16,21;
342:3
**additionally (1)**
5:1
**add-ons (2)**
69:7;70:20
**address (10)**
13:22,25;14:2,6,19,
23;16:16,18;80:5;
193:2

**administration (1)**
25:2
**administrative (8)**
24:24;32:8;33:14;
64:15;68:10;98:17;
104:15;328:9
**adrenaline (1)**
119:18
**adult (8)**
41:18;42:6;44:12,
13;52:18;53:7,18;
68:2
**adults (2)**
44:11;53:21
**advance (2)**
93:16;352:5
**advanced (1)**
93:17
**advancement (1)**
94:10
**advantage (1)**
250:16
**advice (7)**
24:14,21,23;26:6,
14;75:23;81:14
**advise (1)**
31:3
**advising (1)**
26:10
**affect (4)**
10:8,15,22;11:15
**affecting (2)**
10:11,18
**affirmative (1)**
192:25
**after-fact-assaults (1)**
317:19
**aftermath (1)**
348:18
**afternoon (1)**
91:3
**afterwards (1)**
310:10
**again (40)**
8:14;9:18;48:9;
54:11;62:13;64:6;
66:2;78:23;104:12;
116:24;125:1;
133:14;158:15;
159:24;164:15;
166:16;167:2,10;
174:5,23;177:16;
190:22;193:24;
194:17;200:16;
205:8;211:12;
225:19;238:16;
242:5;252:6;284:16;
301:5,7;337:2,6;
339:2;341:12;342:1,
13
**against (5)**
31:13;82:23;85:7;
109:11;330:11

**age (2)**
20:25;291:1
**agency (2)**
33:20;330:18
**agent (1)**
93:18
**ages (1)**
251:22
**agility (1)**
310:11
**ago (14)**
10:25;11:8;40:2;
64:4;94:21;95:14,15;
107:18;155:4;
216:11;224:13;
292:6;349:9,11
**agree (6)**
36:5;289:8;298:12;
332:20;333:1;339:9
**agreed (1)**
5:1
**agreeing (1)**
3:25
**agreement (3)**
29:17;33:2;332:17
**ahead (7)**
8:20;9:12;190:18;
222:14;224:5;
226:12;321:2
**ahold (2)**
339:20;340:1
**ain't (7)**
20:9;104:9;119:13;
210:21;245:17;
263:21;320:4
**air (3)**
205:14;210:6;
296:16
**alarms (2)**
351:6,10
**alert (2)**
194:19;303:20
**alerted (2)**
208:7;221:15
**alive (1)**
319:11
**allegations (2)**
31:10;34:23
**alleged (1)**
27:22
**allow (1)**
312:25
**allowed (6)**
18:17,19,23;35:7;
36:25;286:20
**all's (1)**
138:25
**almost (13)**
15:13;21:2;30:11,
13;38:2;78:13;92:25;
119:2;161:22;
174:25;269:15;
284:4;347:16

USDC IN/ND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 360 of 395

**alone (1)**
269:10
**along (8)**
9:2;77:17;93:8;
100:10;125:24;
159:8;164:6;195:25
**although (1)**
217:25
**always (40)**
7:4;64:4;82:13,14;
123:3;126:5,8,9;
127:15,15;134:5;
145:2;154:18;
155:15,16,17;157:22,
22;169:14;187:16;
196:21;203:10;
235:19,21;243:6,13;
244:6;253:9;262:25;
263:5,18;265:21;
273:23;292:21;
293:21;320:7,8;
326:8;332:24;333:7
**Amendment (1)**
26:21
**amendments (2)**
68:5,21
**among (1)**
112:16
**amount (2)**
254:19;333:24
**analogy (1)**
77:14
**announce (1)**
157:14
**annual (7)**
50:17;53:8;93:4,9;
94:4;346:2,4
**annually (1)**
50:7
**answered (1)**
236:4
**answer's (1)**
274:24
**anymore (1)**
271:21
**apologies (2)**
3:9;6:9
**appeal (3)**
24:25;25:2,14
**appear (3)**
4:23;100:20;
332:13
**applied (1)**
67:14
**apply (2)**
69:1;84:5
**appraisals (1)**
98:15
**appreciate (15)**
29:4;37:15;49:4;
77:15;115:8,8;121:8,
8;169:9;182:1;
289:17;332:22;

344:20,21;355:16
**approach (6)**
77:17;81:6;115:10;
213:4,7;274:8
**approaches (1)**
5:21
**approaching (1)**
333:2
**appropriate (6)**
32:10;254:20;
257:13;322:5;
326:14;333:24
**appropriately (3)**
28:15;262:9;299:3
**approval (4)**
70:21;121:18;
250:5;268:25
**approved (2)**
69:3;286:25
**approves (1)**
146:5
**approving (1)**
98:18
**approximate (2)**
103:15;236:18
**Approximately (20)**
6:21;40:14;53:7;
86:6;92:11;96:2,14;
205:20;206:20;
221:10;233:2,19;
236:15,16;244:6,12;
246:5;300:12;332:6;
350:11
**approximation (1)**
6:23
**April (33)**
11:18;97:15;164:8,
13;165:6,9,15,23;
167:4,12;193:24;
203:7;217:14;
271:25;273:4;
275:20;276:11;
289:4;295:7;296:6;
307:1;313:9;314:25;
315:23;331:16;
347:14;349:15;
350:14,19;351:4;
353:11,23;354:8
**arc (1)**
296:16
**archives (1)**
67:11
**area (30)**
29:7;75:13;99:17;
101:10;102:4,5,12;
103:5;104:1;120:25,
25;121:3;125:23;
126:15;129:24;
142:22;152:21;
175:11,11;176:24;
177:12,15;181:19,25;
202:21;261:15,16;
296:2;308:23;312:22

**areas (9)**
94:11;103:24;
119:12;134:6;
202:13;261:12;
285:23;286:21;345:3
**argue (1)**
265:11
**argument (1)**
316:25
**arise (1)**
105:12
**arisen (1)**
104:3
**arises (1)**
142:19
**arising (2)**
155:14;162:15
**Arizona (5)**
14:5;15:6;16:2;
32:24;55:10
**Arman (3)**
21:17,21;24:6
**Army (4)**
39:11,23,25;
115:18
**around (21)**
9:19,25;40:22;
76:13;84:22;104:10;
124:22;156:6;
176:10;200:18;
225:16;243:22;
256:16;258:3;
271:22;295:25;
296:20;308:23,25;
340:2;354:20
**array (1)**
4:24
**arrival (1)**
284:2
**arrive (1)**
273:19
**arrived (3)**
273:13;305:2;
320:18
**arson (1)**
352:3
**articulated (1)**
174:8
**Aside (2)**
313:25;314:3
**aspects (2)**
54:22;154:6
**assault (6)**
127:3;130:20;
155:18;302:2;317:8,
11
**assaulted (1)**
298:6
**assaults (4)**
72:20;74:10;
317:15,21
**asserted (2)**
4:15;26:24

**asserting (2)**
26:4,20
**assess (2)**
4:10;128:23
**assessed (1)**
135:4
**assessment (3)**
53:25;191:4;311:7
**assessments (2)**
346:9,10
**assigned (21)**
122:23;125:7,10,
20;136:23;138:23;
139:13;172:10,11;
178:21;262:22;
263:15;264:18,25;
265:3;269:18,24,25;
270:3,11,13
**assigning (1)**
256:3
**assignment (5)**
112:4;126:2;
256:25;257:2,8
**assignments (4)**
98:20;257:7,12;
258:8
**assistance (1)**
168:19
**assistant (22)**
85:15,17,25;86:1,4,
21;88:17;90:25;91:5;
98:9;105:23;106:3,
20,22;107:14,18;
110:2,11,17;111:19;
118:2;303:9
**associated (3)**
45:18;50:17;94:17
**assume (3)**
9:13;105:10;
285:19
**assuming (7)**
44:6;227:7;238:2;
295:18;310:14;
333:19;335:16
**assumption (1)**
333:7
**asterisk (2)**
266:13;267:1
**asterisked (1)**
267:20
**AT&T (2)**
16:3,13
**athletic (1)**
310:15
**attack (1)**
136:18
**attain (1)**
82:20
**attained (3)**
62:7,11;85:7
**attempted (1)**
305:5
**attempting (4)**

333:5;336:5;339:5,
16
**attend (1)**
299:6
**attended (2)**
315:22;352:8
**attending (1)**
50:20
**attention (4)**
288:16;316:3;
318:16;340:16
**attentive (1)**
241:20
**attorney (8)**
7:5;8:11,16,17,19;
21:16;26:7;37:20
**attorneys (2)**
23:21,24
**attracted (2)**
38:14;43:6
**audible (1)**
179:7
**August (3)**
13:16;82:2,4
**authority (6)**
247:25;248:4;
250:2;253:16;
254:11;274:14
**authorization (3)**
66:11;273:6;275:6
**authorized (6)**
18:11,24;268:20,
22,24;269:5
**authorizes (1)**
18:8
**auto (1)**
127:23
**automated (1)**
51:3
**automatic (2)**
127:23;128:18
**automatically (8)**
123:20;128:6;
129:1;204:6;276:1;
325:4;344:11,11
**availability (2)**
78:4;79:5
**available (9)**
4:4;66:25;74:7;
78:20;83:17;116:3;
137:9;293:23;294:3
**average (3)**
11:7,9;96:23
**avoid (1)**
332:11
**awake (1)**
108:22
**aware (21)**
35:17;37:1;57:4,
16;63:1,3;71:5;79:4;
128:10;195:8;198:5;
222:17;286:8;
294:18;295:2,7,13;

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 361 of 395

296:5;318:8;344:23;
354:10
**away (8)**
76:6,7;145:17;
197:18;222:18,23;
278:23;318:23
**awesome (1)**
256:10
**awkwardly (1)**
334:2

**B**

**bachelor's (1)**
42:16
**back (101)**
9:10;11:25;12:8,
22,25;18:22,25;
23:17;31:1;34:3,6,7,
17;35:7;44:8;56:10;
61:14,15;70:20;77:4;
86:8;90:9,12;91:14,
24;92:6,15;106:13;
107:15,17,18;111:21;
118:8;132:11,16;
134:19;135:11;
138:8,21;148:20;
149:15;159:2,21;
160:3,5,12;165:4;
174:20,21;177:4;
180:11;190:19,23;
191:23;193:11,24;
196:25;198:25;
203:21;205:7;209:1;
214:16;216:15;
218:24;221:13;
232:4;233:14;
237:16;240:23,25;
241:16;250:18;
259:5;261:21;265:5;
269:2;274:20;
284:15;289:7,25;
299:8;300:21,25;
301:15;307:5,9,11,
12,14,17,24;308:4;
319:4,6;323:10;
336:8;341:7;342:17;
345:6,14;346:22
**background (5)**
10:6;20:12,14,22;
38:20
**backing (1)**
341:8
**back-to-back (1)**
156:14
**back-to-back-to-back (1)**
302:24
**backup (1)**
327:2
**bad (26)**
8:25;25:24;84:9;
87:4;115:19,22;
150:1,22;151:9;

192:15;197:8,9;
209:9;210:12,15;
211:19,21,21;212:14,
23;256:10;271:24;
302:21;309:15;
318:23;343:25
**bags (1)**
139:21
**balance (3)**
258:22;259:9,12
**balanced (1)**
259:7
**balancing (2)**
261:10,17
**bam (3)**
114:23,23,23
**bar (2)**
294:2,4
**Barbara (1)**
3:7
**bargaining (1)**
33:1
**bars (3)**
118:24;210:5;
294:19
**base (3)**
100:25;251:5;
286:23
**based (65)**
26:5;29:11;31:3;
32:11;41:8;62:21;
72:15,25;73:9,20;
75:21;78:9,10,10;
80:22;83:1,2;94:7;
100:20;108:22;
112:10;114:17,24;
123:13;126:1,2;
146:3;154:4,25;
161:9,10;185:8;
194:12;198:24;
221:16;228:25;
230:7;232:8;234:12,
25;235:2,5;236:7;
237:15;238:22;
240:4;246:17;249:9,
15,23;255:21;256:6;
258:15;259:21;
265:16;273:2;
286:22;287:18;
299:21;311:7;
334:22;335:15;
336:7;339:25;351:12
**bases (1)**
41:8
**basic (1)**
93:16
**basically (9)**
46:18;104:17,19;
174:6;190:8;193:9;
244:21;318:1;337:8
**basing (1)**
248:5
**basis (12)**

27:1,9,17;28:12;
31:17;118:17;163:1,
1;229:15;307:14;
354:15;355:8
**basketball (1)**
161:15
**batch (1)**
93:1
**Bates (6)**
100:13;218:20;
219:4;223:21;
238:17;305:23
**bathroom (1)**
321:25
**batteries (1)**
243:12
**battery (4)**
291:18,19;327:17,
18
**battery's (1)**
137:25
**BCH (2)**
221:23;266:23
**Beal (6)**
48:21;49:10;51:6,
9,15;52:25
**Beal's (1)**
52:13
**bear (1)**
169:18
**beat (1)**
155:10
**beating (1)**
274:22
**became (1)**
81:20
**become (1)**
254:5
**beep (1)**
178:8
**begin (1)**
3:10
**beginning (2)**
135:18;161:16
**behalf (1)**
3:2
**behavior (1)**
249:23
**belabor (1)**
116:8
**believing (1)**
354:15
**below (1)**
80:17
**belt (1)**
173:1
**benefit (1)**
149:8
**benefits (1)**
332:25
**Bentrup (1)**
14:19
**B-E-N-T-R-U-P (1)**

14:20
**besides (3)**
169:5;190:12;
328:21
**best (35)**
6:23;10:23;13:2;
71:4;72:23;75:17,17;
82:21;102:25;
149:14;156:7;
160:23;169:13;
186:16;203:6,13;
215:3;229:1,13;
232:22;241:10;
245:1;246:16;
248:24;250:8;
255:14,20;256:7;
257:10;262:17;
286:16;292:17,21;
328:24;349:8
**bet (2)**
227:10;312:22
**better (22)**
100:1;103:9;115:4;
152:20;156:25;
158:9;161:6,17,21;
163:3;202:20;241:9;
252:25;255:7;289:1;
291:7;300:25;
316:12,15;320:8;
344:7;349:15
**beyond (10)**
35:1;113:9;164:5;
183:8;192:24;
213:12;242:17,18;
345:20;355:6
**big (9)**
46:5;77:21;109:6;
135:20;137:4;
138:14;282:19,25;
316:25
**bigger (3)**
162:19;231:7;
282:22
**biggest (1)**
197:13
**binder (6)**
78:5;115:11;116:9,
21,22;117:5
**binders (1)**
272:21
**bit (9)**
102:4;126:10;
204:20,24;206:14;
216:8;282:22;
293:21;344:6
**black (5)**
204:19;205:9;
206:13;244:11;
300:11
**blade (1)**
136:1
**blah (1)**
79:17

**Blakely (6)**
252:11,19,21;
270:10,12;311:1
**blame (1)**
341:5
**blank (5)**
228:7,12,23;229:3;
256:18
**blazing (1)**
336:25
**bleep (2)**
177:24,25
**blew (3)**
205:7;206:7;337:2
**block (2)**
245:11;305:9
**blow (1)**
203:11
**blowing (3)**
205:14;213:20;
245:10
**blown (1)**
162:19
**blue (4)**
103:14;309:8,9;
322:24
**board (5)**
33:20;143:21;
162:18;163:18;257:7
**bodies (1)**
348:12
**body (5)**
33:17;305:8,11,15;
331:11
**bolt (6)**
294:2,4,5,10,14,15
**bomb (3)**
114:21,22;142:1
**book (19)**
77:12,21;113:23;
114:7,11;116:2,25;
117:5,13,16;118:4,5,
8;154:3;272:6,13,14,
16;286:15
**booklet (1)**
147:2
**books (4)**
78:12;113:11,12;
272:19
**Boot (8)**
40:9;41:11,22;
42:1,4,14,25;53:16
**Boots (5)**
165:20,23;166:3,
18,22
**boss (2)**
193:3;262:14
**bosses (1)**
227:12
**both (29)**
5:19;7:5,22;50:18,
18;87:15;88:11,12,
18;111:10;121:23;

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 362 of 395

131:17,17;147:7;
148:9,15;153:9;
236:22;239:20;
276:15,21,22,25;
277:9;306:21,24;
307:23;317:20;
332:15
**bottom (9)**
152:18;226:9,15;
239:3;245:6;309:9,
14,17;321:13
**box (25)**
99:19;177:5,7;
223:2,5,8;226:5;
277:25;278:9,11,13,
15,22,24,25;279:5,
13;280:19;281:3,24;
282:2,11;283:7;
284:7;286:10
**boxes (5)**
220:17;222:5,10,
15;283:7
**boy (1)**
288:3
**Boyer (3)**
268:19,20;269:18
**Boyer's (1)**
270:8
**Boyn (6)**
75:7,7;284:17;
304:22,23;347:11
**Bracket (3)**
239:4;259:1;
262:22
**branch (1)**
39:10
**brand (3)**
54:13;92:10;254:2
**brand-new (2)**
53:12;93:2
**Brannon (1)**
70:2
**break (19)**
9:21,22;28:23;
30:20;81:15,18;89:4;
91:10;140:12;142:2;
167:23;172:21;
217:4,5,12;218:5;
289:11,16;332:9
**breaking (2)**
102:11;198:9
**breaks (2)**
332:23,25
**breathing (3)**
210:2,7;246:9
**Brennan (4)**
70:5;71:19;272:25,
25
**brief (8)**
6:10;30:24;91:12;
217:9;289:23;
346:20;352:20;
355:20

**briefing (1)**
314:14
**bring (10)**
17:18,22;18:8,19,
23;30:1;134:16;
135:16;145:9;326:15
**broader (1)**
230:6
**Broadly (1)**
49:15
**broke (2)**
102:3;117:2
**broken (1)**
180:7
**brought (4)**
157:17;305:12;
330:11,15
**bucket (1)**
324:10
**buddies (2)**
256:12,12
**buddy (2)**
127:15;179:13
**build (1)**
255:25
**building (10)**
72:20;74:5,10;
75:23,25;184:11;
205:16;258:2;
261:10;342:25
**buildings (2)**
74:21;75:18
**built (2)**
282:2;287:7
**bunch (8)**
7:22;68:14,15;
77:17;79:14;101:22;
187:17;262:4
**burned (1)**
196:19
**burning (1)**
209:19
**burnt (1)**
297:4
**burst (1)**
207:6
**bush (1)**
274:22
**business (1)**
20:10
**busy (2)**
264:7,9
**button (1)**
208:4
**buttons (1)**
179:24

## C

**C2 (1)**
315:17
**cabinet (5)**
120:5,17;139:14,

15,16
**cabinets (3)**
109:12,16,19
**call (83)**
6:16;28:17;29:18;
43:12;61:2,5,12,18;
62:25;87:25;105:1,5;
113:13,18,20,23;
117:4;125:20;
126:24,24;129:24;
131:17;138:3;
140:22;148:19;
157:14;165:4;
167:13,14;168:10;
171:23;183:11;
187:16,19;188:4,21;
190:15,19;194:14,17,
23;195:7,9;196:12,
23;197:21;203:25;
230:15;236:5,19;
240:11,15;241:16,23;
242:2;248:4,10,20,
21,25;249:20;250:9;
257:22;269:13;
271:7,7;273:11,14;
280:11,13;291:17;
297:19,19;300:8,23;
301:4;303:25;
304:19;311:3;
315:12;323:10;
343:23;344:14
**called (83)**
3:2;25:7;38:18;
41:17;107:14;112:3;
120:13,23;125:22;
127:1;128:3,16;
133:22;136:1;
140:21;141:1;
143:17;151:7;152:6,
9;167:16;168:4,6,17,
18,19;169:5;170:25;
171:1,22;172:4,7,15,
15;180:14,17;190:14,
15,20;195:3,12;
203:15;205:21;
207:24;221:11,16,21,
22;226:13;233:3,21;
234:7,21;235:6,11,
14,19,25;236:12;
240:13;242:10,12;
244:11;268:18;
286:17;300:12,19;
301:5,7,9,13;302:10,
12;303:7,7;304:16,
20,21;311:14;
318:13;325:15;
342:1;344:10
**call-in (1)**
302:16
**calling (9)**
127:20;178:4;
186:23;187:13;
188:22;194:4,14;

197:8;227:12
**call-offs (4)**
85:19;91:8;98:14;
263:1
**calls (14)**
5:3;124:9;140:22;
172:2;175:8;177:21;
185:6;188:9;240:23;
300:2;304:6,19;
320:17,24
**calmed (1)**
229:18
**came (26)**
16:12;53:6;59:14;
63:24;80:23;94:20;
145:21;189:1;190:2;
191:5,12;193:1;
195:9;208:13;
214:10;224:10;
236:19;256:14;
263:6;303:6,8,8,10;
304:22,25;313:16
**camera (30)**
167:18;194:24;
196:1,15;197:1;
198:25;200:1,8,11,
19;201:20,22,24;
202:20;203:10,11,16,
19;204:2,16;205:19,
21;207:5;217:19;
243:4,13,16;244:3;
336:22;351:1
**cameras (31)**
163:4;167:18;
183:20;196:8;
197:18,22;198:6,10,
13;199:15,20;200:2,
17;201:2,3,7,12,13,
19;202:8,10,22;
206:9;207:20;233:4,
22;303:23;304:3;
321:11;336:10,19
**Camp (14)**
40:8,9;41:1,4,6,10,
11,22;42:1,4,14,25;
53:16;76:13
**Can (181)**
6:16;8:6,20,25;9:7,
9;10:3,21;11:3;14:9,
11;20:14;21:18;24:7;
27:10;28:22,23;
41:20;50:12;56:11;
63:19;66:22;67:25;
68:5;70:1,2,4,4,6;
77:24;78:1;79:25;
81:15,18;91:9;97:2;
99:8;100:1,9;107:7;
109:3;115:2;121:13;
122:10,13;124:10;
125:18;126:11;
127:24;135:20;
136:2,8,10,16;137:4,
15;138:14;140:19,

24;141:9;142:16,17,
23;143:23;148:13,14,
15;149:9;150:2,3,3;
152:20;160:25;
163:3;165:4,8;
166:17;167:10;
169:21,24;170:14;
171:15;174:1;
177:12,13;178:4,7,9,
12;181:21,24;186:6,
16;188:24;190:14;
191:20,22;193:8;
199:14;200:21;
201:3,12;203:12;
204:15;214:5;217:1;
224:20,23;225:5;
226:1;228:22;
229:14;230:7;
231:12;232:22;
233:11;237:3;238:5,
9;241:11,15;248:24;
252:7;253:8;254:16;
255:20;257:18;
259:15,23;260:14;
262:17;265:17;
267:22;275:24;
276:1;278:25;281:1;
282:6;289:7,18;
292:11,22;293:1;
294:7,10,14;307:6,6;
308:5,23,25;309:4;
316:11,11;321:2,3,3,
6;322:4,22;323:19,
20,23;324:2,6;325:6,
22;327:18;331:8,12;
332:14,16,19;334:3,
8,9;335:17;345:20;
347:17;348:10,11
**canine (16)**
117:10;141:12,13,
15,17;146:6;147:16,
18;148:2,4,12,21;
149:5;150:19;
304:23;313:5
**capacity (3)**
3:7;74:11;250:22
**captain (85)**
37:25;40:16;41:12;
42:7;52:6,18;57:7,7,
9,11,16,21;59:5,6;
60:6,8,14,25;61:3,8,
8;62:8,11,20;63:2,8;
65:21;66:9;67:6;
72:3;81:11,21;82:16,
20,22;83:20;84:7,11,
15,17,23;85:4;87:1,3,
6,8,8;91:4;98:5;
104:7;105:17;106:2;
107:1,8;110:25;
111:3,10;112:1;
118:11,15;138:11,12;
156:17;165:11,15,17,
19,20,23;166:3,6,8,

BARABARA DEVINE vs
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 363 of 395

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

18,22;172:7;212:11;
268:14;304:22,23;
347:11;350:14,19;
351:4,8,13
**captains (15)**
47:15;60:21;64:23;
82:17;88:16;115:3;
117:7,8;139:25;
145:6;157:23;
178:18;350:3;
352:23;353:3
**captain's (3)**
66:11;102:20;
110:19
**car (2)**
55:11;282:23
**card (1)**
131:10
**care (2)**
79:15;162:8
**career (13)**
15:10;38:2;82:15;
91:24;93:3,8;94:9;
97:10,12;228:16;
243:19;263:25;265:8
**caring (1)**
25:16
**carry (5)**
136:4;137:10;
275:10,18,19
**carrying (1)**
138:17
**case (30)**
3:12,16,21;4:5,19;
6:2;15:3,7;20:9,23;
24:3;27:6,6,7,15;
30:4;55:18;70:25;
159:7;245:20;275:5;
282:9;288:8,18;
314:24;326:8;
329:11;330:15;
332:3,4
**cases (3)**
73:15;268:17;
333:12
**Castle (3)**
92:3;146:3;315:17
**catch (2)**
26:1;172:14
**catching (1)**
186:21
**caught (1)**
186:25
**cause (41)**
105:13;115:2;
117:15;130:11;
133:9,22;137:21;
145:15;160:13;
162:10;166:25;
170:6;171:15;
173:18;180:2;
181:21;187:17,18;
188:5;190:11;

195:18,24;225:7;
227:12;228:22;
232:12;239:18;
241:25;246:3;
250:14;255:11;
264:7;290:16;
295:24;323:14;
326:7;336:12;
351:14,24;354:2,3
**caused (4)**
84:13;354:8,12;
355:9
**causes (1)**
127:21
**CBT (7)**
94:23;95:4,7,12,
22;96:16;97:7
**CBTs (1)**
94:25
**ceases (1)**
169:5
**cell (104)**
14:13,16,21;15:24;
16:7,11,12;17:12,18,
23;18:5,6,8,10,12,14,
20,23;19:5,12,17,20;
22:19;80:6;85:21;
98:12;118:24;
121:14;122:8,15;
123:6,24;124:3,4;
125:1;126:7;134:20,
22,23,25;135:5;
136:2;139:9,16,17,
18;143:20;145:10;
152:17;155:9,10;
160:14;186:24;
202:19;203:12;
205:3;206:25;207:6;
208:5,22;209:15;
210:5,7,11,24;222:1;
233:23,24;248:22;
273:6,7,8,20;274:16;
275:5,22;281:12,13;
282:21;283:10;
285:21;290:4;294:7,
12,19,19;296:7;
305:9;319:3,11,12;
320:18,22,23;321:13;
322:6,8;326:9;
346:14;351:22;
354:4,9,16;355:10
**cellblocks (1)**
350:17
**Cellhouse (172)**
11:19;76:8;97:16;
128:4,6,7,16,20,21,
25;129:9,21;132:16,
18;143:25;149:16;
150:2;156:3;167:13,
15;168:7;171:22;
172:13,16,19,24;
173:9,18,23;180:14,
17,18;183:5,9,12,17,

18,24,25;184:4,12,
16,16;185:9,12;
186:18;187:17;
192:3;194:3,15;
195:2,22;196:5;
197:3,3,11,17;
199:18;201:7,23;
202:11,12;205:12,15;
207:9,13,14,25;
208:3,4,5,17;209:7;
210:18,25,25;211:3,
16;212:6,10;213:2,
16;214:2,7,10;215:1;
217:14,23;222:1,3;
233:3,21;244:13,15;
245:4,8,22,25;246:6,
22,24;247:12,13,20;
249:25;250:11;
251:16;252:2;253:3,
10;261:22,23;262:4;
267:11;268:19,21;
269:19,20,24;270:20;
271:4;273:5;275:15,
24;276:11;277:5,22;
279:8,19,21,25;
285:16,21;286:4,9;
287:9,11,16,23,24;
288:2;292:10;293:3;
294:16;295:20;
300:13,15;304:12;
306:7,10,13;307:4,
19;309:20;310:13;
317:22;320:2;
322:11,13,17;323:18,
19;324:14,15,24;
325:15;326:19;
328:22;336:14;
341:4;342:19;343:24
**cellhouses (10)**
54:7;68:15,17;
125:21;186:20;
256:4;261:20;287:8;
292:8;353:11
**cells (16)**
174:14;183:15,16;
199:21;202:18;
245:4;248:21;276:3;
277:4;279:7;280:24;
281:14,22;286:2;
287:16;294:9
**Center (2)**
38:21;227:3
**Central (12)**
33:21;49:1,11;
54:4;68:1,25;69:4;
71:9;128:14;146:2,4;
227:5
**centralized (2)**
44:15;283:20
**certain (17)**
3:23;62:20;63:9,9;
64:3,21,22,23,23;
67:14;123:4,4,5;

137:13;178:20;
190:15;266:13
**certainly (5)**
24:9;70:24;169:14;
249:22;313:2
**certifications (1)**
44:5
**certified (3)**
123:12;129:16;
347:20
**cetera (1)**
94:14
**chain (9)**
73:16;107:5,7;
148:21;162:12;
294:6,11,16;304:16
**challenging (1)**
55:21
**Chambers (1)**
267:16
**chance (3)**
8:16;289:16,20
**Chandler (3)**
14:5,20;15:1
**change (21)**
4:6;15:10;16:4;
31:2;44:22;48:1;
58:8;59:1;73:17;
122:11;132:12,15,23;
166:5;226:4;232:13,
17;243:24;319:15,
20;348:22
**changed (9)**
18:22;19:3;49:19;
107:17;124:18,22;
125:3;132:21;345:1
**changes (17)**
44:12;48:3;68:16,
18;69:2,4;71:25;
73:22;75:8,15;95:24;
132:13;256:9;
344:22;345:17,21;
348:5
**changing (2)**
69:6;146:10
**channel (15)**
173:12,15,17,22,
23;174:6,17,25;
180:3;181:10,12;
182:15,17,18;196:22
**channels (2)**
180:25;181:14
**chaos (3)**
337:8,14;338:23
**characterization (2)**
116:19;338:5
**characterizing (1)**
338:21
**charge (29)**
17:14,17,19;53:16;
98:23;107:22;
110:23;115:16;
118:12,16;146:7,8;

147:24;148:8;
176:10;241:18;
253:3,9,16;254:21;
267:16;268:6,21;
269:25;270:3;300:1;
304:23;305:1;347:22
**charged (2)**
275:14;329:9
**charges (2)**
329:22;330:11
**chart (1)**
247:22
**cheat (1)**
131:24
**check (6)**
20:15,22;132:10;
189:2;223:4,7
**checked (6)**
132:8;171:18;
222:6,10,16;236:20
**checking (4)**
118:22;189:4;
243:22;285:21
**checklist (6)**
45:24;47:1;113:18;
114:15;116:23;
137:21
**checklists (3)**
117:4,12;118:4
**Checkpoint (2)**
129:2;301:14
**chemical (1)**
93:18
**chest (2)**
136:18;173:4
**chief (1)**
189:18
**child (2)**
20:20,25
**children (2)**
20:3,5
**chit (4)**
278:16,16,19,24
**choice (2)**
96:6,12
**choose (1)**
321:4
**choosing (1)**
221:20
**chose (1)**
121:16
**chow (2)**
271:5;294:8
**Chris (1)**
52:25
**Christopher (6)**
48:21;49:10;51:6,
9,15;52:13
**chronology (1)**
240:23
**CI (1)**
25:16
**cigarette (1)**

USDC INND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 364 of 395

185:25
**circumstances (5)**
27:12;295:17;
315:15;329:25;
348:23
**CISM (6)**
149:6,11,12;150:3,
18;151:11
**C-I-S-M (1)**
149:21
**CITCON (4)**
149:6;150:11,18;
151:11
**city (2)**
14:3;23:7
**claiming (1)**
26:21
**clam (1)**
115:21
**clams (1)**
229:17
**clarification (4)**
37:16;106:14;
115:9;344:21
**class (7)**
50:24;53:8;56:4;
259:1;263:6;329:10,
11
**classes (1)**
53:22
**classified (4)**
41:6;51:24;65:9,10
**classroom (2)**
95:9;97:6
**clean (2)**
7:24;119:3
**clear (33)**
8:14;24:13;49:8;
54:11;62:14;68:23;
72:13;78:16;87:23;
91:22;114:6;116:9;
117:25;149:9;
163:17;169:10;
171:10;174:5;
190:22;204:10;
215:3,20;223:19;
238:25;246:16;
247:10,12;274:4;
276:5,6;297:9;
300:10;307:16
**cleared (1)**
226:14
**clearing (1)**
186:15
**clearly (1)**
202:7
**click (3)**
115:2;199:17;
203:11
**clicks (1)**
115:23
**clock (2)**
165:10;176:10

**clocking (2)**
165:5,9
**clocks (2)**
242:22;243:11
**close (10)**
43:9;157:4;175:19,
23;176:5;216:24;
310:13;316:2;
323:15;326:4
**closing (2)**
43:1;332:7
**clothing (4)**
89:16;136:15;
139:4,7
**CMP (1)**
332:16
**CO (4)**
90:17;230:12,14,
22
**code (20)**
130:12;134:3,5;
135:8;168:12,13,17;
169:4;177:18;223:5;
226:5;234:7;235:7,
13,14,20,25;236:11;
325:15;344:10
**codes (17)**
130:16;131:4,10,
21,22;133:3,4,8,11,
11,12,15,19,21,22;
168:14;236:8
**code's (1)**
301:13
**cognizant (1)**
333:2
**colleagues (1)**
17:13
**collect (1)**
224:20
**collective (1)**
33:1
**columns (1)**
199:18
**combat (1)**
340:6
**combined (1)**
54:22
**comfortable (1)**
257:16
**coming (38)**
23:17;45:19;50:10;
53:23;54:13;71:16;
82:6;104:9;138:21;
145:16;153:25;
154:5,14;158:20;
160:7;162:7;164:1;
165:14;166:21;
167:20;175:8;197:2;
198:13;204:19;
205:7,11,15;206:14;
233:23,24;244:9,17;
245:5,6;285:16;
304:24;322:11;

325:23
**command (6)**
60:11;107:6,7;
148:21;162:13;
304:17
**commander (21)**
53:20;115:15,16;
140:21;143:1;
146:14,15,19,20,22;
147:1,7,13,17,23;
148:11,11,16;150:21;
250:22;304:24
**Commander's (1)**
217:16
**comments (1)**
219:24
**commissary (1)**
89:18
**committee (4)**
163:5,7,9,11
**common (4)**
192:13;196:8,23;
308:11
**communicate (2)**
208:23;292:18
**communicated (1)**
209:1
**communicating (2)**
133:5;292:11
**communications (2)**
5:10;265:1
**compare (1)**
243:16
**compass (1)**
307:18
**compensation (1)**
34:20
**competing (2)**
84:25;85:7
**competitive (1)**
82:25
**complete (4)**
10:2;82:20;95:19;
190:23
**completed (3)**
93:1;222:11,16
**completeness (1)**
4:10
**completing (2)**
223:8;314:7
**complicated (1)**
67:3
**complying (2)**
309:7;322:23
**component (2)**
143:6,12
**comprehensive (1)**
49:16
**computer (35)**
65:18,20,23,25;
66:4,7;67:4,12;109:9,
10,13;172:7;178:10;
179:4;199:16,22;

200:6,10,12,21,24,
25;203:16,19;
217:19;228:2,11;
229:2,4;241:6;243:9,
13,17,23;244:5
**computer-based (2)**
95:4,7
**computers (6)**
66:15;67:7;120:3;
199:23;200:16;243:7
**concede (1)**
332:8
**concern (6)**
250:21;262:11;
300:20;319:9,14;
341:1
**concerned (2)**
250:25;262:8
**concerning (1)**
341:4
**concerns (1)**
257:1
**concluded (1)**
356:5
**concrete (2)**
248:22;282:2
**conditions (2)**
10:7,11
**conducted (9)**
44:14;156:18;
160:4;284:19;
288:17;299:3;313:8;
315:10;318:12
**confer (1)**
346:19
**conference (1)**
9:20
**confidence (1)**
250:6
**confident (1)**
27:11
**confidential (1)**
36:23
**configuration (1)**
306:10
**configurations (2)**
146:11;345:2
**conflict (1)**
256:13
**confused (2)**
227:20;342:21
**confusing (2)**
201:18;203:5
**congregate (1)**
128:14
**congregating (1)**
129:20
**connected (1)**
177:2
**connection (5)**
27:22;29:1;36:14;
55:16;331:6
**cons (2)**

255:9;314:17
**consciously (1)**
243:15
**consecutively (1)**
218:23
**consist (3)**
95:22;284:21;
285:14
**construction (1)**
40:1
**consulted (1)**
72:13
**contact (14)**
24:7;70:2,23;75:9;
116:6;126:19;
134:12;157:9,12;
275:8;291:24;
292:25;339:17;341:2
**contacted (6)**
43:15;76:21;303:9,
19;304:13,15
**contacting (3)**
215:10;292:3;
304:8
**contain (1)**
116:21
**contained (2)**
117:5;302:6
**contend (1)**
34:20
**content (1)**
117:13
**contents (5)**
26:24;49:12;118:4;
164:2,4
**context (3)**
211:6,7,14
**continue (3)**
5:20;28:21;29:21
**continued (1)**
92:14
**continues (1)**
300:7
**continuing (1)**
34:9
**contract (4)**
33:2;353:18,19,20
**contribute (1)**
117:12
**control (77)**
75:5;105:25;106:1;
126:18;127:10;
142:2,25;172:3,4,12;
173:21;174:1;175:1,
2,4,6,16,18;176:15,
16,22;177:2,3,7,17,
18;179:17;181:1,21;
182:6;183:13;
190:10,11,12,16;
194:4,12,13,18;
195:3,12;200:19;
236:20,25;237:8,19,
19,20,23;238:4,24;

USDC INND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 365 of 395

239:6,11,12,13,14;
241:22;242:1,6,7;
248:24;250:13;
279:10,11,22;280:19;
283:11;286:10,13,18;
287:4;292:1;294:25;
302:13;303:23;
304:3;354:24
**controls (2)**
175:2;279:13
**controversy (1)**
332:12
**conversation (10)**
193:20;208:8;
214:18;217:25;
262:13;263:16;
265:7,13,17,20
**conversations (9)**
61:16;264:17;
266:1,3,5;297:8,9;
302:9;354:25
**conveyed (2)**
183:8;247:11
**conveying (3)**
213:12;216:1;
230:23
**convictions (1)**
329:7
**convinced (1)**
214:6
**coordinator (9)**
48:22;51:6;70:1,7,
7,11,12;75:4;284:14
**copied (1)**
225:9
**copies (12)**
47:8;56:8;59:22;
60:16,23;159:3;
225:1,4,8,15;232:10;
272:14
**copy (20)**
47:12;59:1;64:17;
78:19;79:20;100:9;
151:20,21;159:8;
225:11,11,12,14;
228:22;273:1;
312:10;335:21;
355:19,22;356:1
**corner (6)**
218:21;221:1,13;
306:13;330:6;334:20
**correct- (1)**
86:25
**corrected (2)**
158:25;267:24
**Correction (18)**
12:6,13,20;16:10;
17:11;38:7,10,15;
55:17;67:16;91:17;
92:10;107:9;274:15;
320:1;331:2;352:22;
353:2
**correctional (70)**

12:1;18:3;37:25;
38:18,21,24;39:1,19;
40:6,13,15,19,24;
41:24;42:6,7,11,17;
43:17;44:3,6,20;
45:15;47:15,19;52:6;
54:6;62:14;65:2,20;
66:9,19;81:11,21;
82:16;85:11,14;
86:25;87:2,6,7,16;
88:12,13,13;91:25;
97:12;98:4;105:17;
106:2;107:1,8;
110:12;111:5;117:7,
8;122:17;273:5,18;
275:4;331:7;350:2,
12,14,19;351:4,8,13;
352:23;353:3
**corrections (19)**
15:12,14,16;21:3,
14;22:11;39:17;
43:15;51:18;52:17;
68:2;77:16;78:14;
93:2;104:5,6;154:16;
251:24;288:21
**correctly (8)**
49:16;106:17;
110:15;147:5;
174:24;177:17;
188:2;264:16
**counsel (10)**
4:3,6;5:22;14:17,
21;24:14,18;27:9;
30:10;333:8
**counseling (1)**
150:6
**count (7)**
226:12,13,14;
253:22;285:24;
293:11;332:25
**County (2)**
330:17,20
**couple (5)**
11:8;84:21;91:10;
99:12;174:7
**course (7)**
91:18;97:11;
118:18;162:16;
192:18;223:16;
228:16
**court (8)**
7:7;14:19;29:19;
100:7,12;218:16;
238:14;305:22
**courtroom (2)**
9:17,18
**cousin's (1)**
14:25
**cover (3)**
89:12;112:19;
321:14
**coverage (1)**
89:9

**covered (1)**
92:21
**covering (1)**
102:4
**covers (2)**
89:9;149:5
**Cowell (1)**
57:11
**CPR (3)**
49:25;50:5;305:5
**crap (1)**
102:9
**crazy (1)**
76:8
**create (3)**
114:17;189:11,11
**created (5)**
114:18;192:22;
219:21;223:11;
227:17
**creating (3)**
224:8;232:9;
241:14
**credential (1)**
65:18
**crew (3)**
180:4,7;270:13
**crime (1)**
329:9
**criminal (4)**
26:23;329:7,22;
330:11
**criteria (3)**
258:18;259:22;
260:8
**Critical (2)**
149:23;227:3
**CROSS (1)**
349:4
**crossing (1)**
187:24
**crowd (1)**
142:1
**curiosity (1)**
197:5
**current (3)**
19:11;54:1;295:16
**currently (3)**
6:14;13:5,20
**curriculum (7)**
48:19;49:21,23;
50:7,14;51:8;146:8
**Curry (3)**
145:22;149:2;
150:3
**Curry's (1)**
146:25
**curtain (1)**
210:5
**curtains (2)**
118:22,24
**Custody (6)**
101:6,7,22;102:1,

12,16
**custom (1)**
18:3
**cut (13)**
136:2,10,15;
153:12;185:24;
269:7;294:16,18;
296:15,15,17,19;
333:13
**cutter (3)**
135:25;136:3,5
**cutters (9)**
137:1;294:2,2,4,4,
5,10,15,15
**cutting (3)**
56:13;120:10;
135:25
**cycling (1)**
48:15

## D

**daily (7)**
105:4;160:15;
241:24;253:23;
271:1;293:15;320:17
**dark (1)**
210:12
**darker (2)**
267:3,6
**date (14)**
3:16;4:18;5:7,14;
33:25;34:1;43:9;
107:13;165:18;
186:8;221:3;223:22,
23;314:20
**dates (4)**
35:20;36:17;
153:17;187:5
**dating (8)**
31:8,20;32:1,13,16,
21;33:9;35:1
**daughter (1)**
20:7
**day (78)**
22:13,16,20;23:3;
32:22;35:10,12;
78:25;80:1;86:8;
87:1,2,15;88:9,11;
89:12,20,24;105:24;
108:25;119:2;126:7;
136:24;137:24;
151:2;157:14,15;
161:17;165:25,25;
166:7,10,17,18;
167:6;174:3,14;
186:3,12;192:10;
210:22;223:16;
240:3;254:22;258:8,
14,23;259:1,19,20;
261:19,19,25;262:3,
3,19,24;263:16,20;
264:5,7,10,12;

12,16
**custom (1)**
18:3
**cut (13)**
136:2,10,15;
153:12;185:24;
269:7;294:16,18;
296:15,15,17,19;
333:13
**cutter (3)**
135:25;136:3,5
**cutters (9)**
137:1;294:2,2,4,4,
5,10,15,15
**cutting (3)**
56:13;120:10;
135:25
**cycling (1)**
48:15

268:20,23,24;269:5,
14;272:1;280:11;
284:25;293:13,15;
327:5,14;328:23;
334:7;355:3
**days (16)**
14:15;34:3,4,4;
80:6;86:6;87:7;
88:22;89:3;90:25;
105:25;166:6;264:1,
2;280:11,12
**day-to-day (4)**
46:11,21;118:17;
307:14
**dead (4)**
137:25;274:22;
327:17;331:11
**deadline (2)**
4:13;5:21
**deal (4)**
91:7;186:14;197:7;
233:5
**dealing (5)**
169:6;197:5;
227:13;248:23;
340:19
**dealt (5)**
53:21;161:7;
183:14;196:12,16
**Dean (2)**
6:12,12
**D-E-A-N (1)**
6:13
**Death (8)**
184:23;222:7,20;
225:15;251:9;
351:14;354:2,3
**debrief (1)**
157:6
**debriefing (2)**
313:22;314:4
**debt (1)**
185:21
**decent (2)**
265:4;311:1
**deceptive (1)**
102:2
**decide (2)**
61:4;258:13
**decided (2)**
213:4;257:19
**deciding (1)**
211:24
**decision (4)**
209:5;212:7,10;
250:19
**decision-making (2)**
33:17;300:5
**decisions (3)**
106:2;115:18;
258:21
**declared (1)**
180:18

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 366 of 395

**Defendant (5)**
4:22;5:10,16,18;
27:15
**defendants (5)**
3:15,16,20;4:21;
5:13
**defendants' (2)**
3:22;4:11
**defense (1)**
4:3
**defer (1)**
349:20
**deficiencies (1)**
157:8
**deficiency (1)**
156:19
**defined (1)**
130:9
**definitely (1)**
355:22
**degree (1)**
42:16
**degrees (1)**
354:14
**delegating (2)**
110:20;113:2
**deleted (2)**
232:14,24
**demonstrating (7)**
162:20;173:2;
184:19;198:15;
202:16;241:23;
308:22
**demotion (3)**
41:13;42:9;52:4
**denied (1)**
25:11
**denies (1)**
146:5
**Department (53)**
12:6,13,20;16:10;
17:11;19:9;21:3,14;
22:4,11;25:10;27:13;
38:4,7,10,15;43:15;
49:2;51:18;52:15,17;
55:17;67:15;77:22;
78:22,23;79:6,21;
91:17,25;121:16;
128:25;143:16;
168:20;186:16;
251:24;300:16,18,22;
301:3,11,18;319:25;
325:7,22;331:1;
341:15,24;346:13;
347:7,9;352:22;
353:2
**depend (1)**
87:11
**depending (4)**
96:24;180:5,18;
291:1
**depends (19)**
16:3;32:22;48:6;

49:24;64:19;69:19;
76:8;88:22;160:10;
197:15;264:8;286:4;
292:16;293:4,4,12;
309:19,23;321:22
**depict (1)**
100:18
**depicted (1)**
307:9
**depicts (1)**
100:16
**deponent (2)**
4:22;5:10
**deposition (14)**
5:19,25;6:19;7:2;
24:11;28:9,16,23;
330:22;332:5;349:7,
23;350:24;356:5
**depositions (3)**
6:24;7:4;332:5
**Deputy (13)**
19:14;83:8,13;
107:14,20;108:24;
116:6;148:22;191:8,
11;225:12;286:25;
303:9
**Derrick (2)**
75:7;284:17
**describe (10)**
99:8;107:7;109:3;
149:9,14;165:8;
199:14;204:15;
281:1;308:5
**described (32)**
69:15;73:8,9;
74:18;76:19;80:10,
14;92:1;93:5;97:8;
112:1;114:14;
116:12;119:6;
126:10;129:10,19;
137:17;147:6;
205:17;207:5;208:6,
12;217:18,20,23;
232:4;278:5;279:9;
314:5;337:7;344:25
**describing (36)**
58:25;64:7;67:23;
68:24;75:11,20;
95:10;98:17;105:20;
106:16;111:16;
112:17;114:7;116:3;
119:5;125:25;
133:16;137:13;
144:17;151:13;
155:24;182:25;
185:23;189:23;
199:23;201:22;
202:2;207:19;
214:19;231:25;
247:21;308:19;
314:15;339:5;
343:15,19
**description (5)**

141:14;155:23;
179:17;251:13;337:9
**designated (4)**
253:10;268:6;
284:6;285:23
**designation (4)**
253:3;254:7,14;
255:6
**designed (2)**
68:7;136:11
**designs (1)**
290:25
**desk (2)**
109:8,11
**desks (1)**
109:13
**desktop (2)**
159:9;228:21
**destination (2)**
267:2;268:9
**destroy (1)**
192:10
**detail (7)**
170:9;196:14;
216:17,23;224:14;
234:5;313:14
**details (11)**
70:22;81:1;170:15;
186:8;212:15,18;
220:1;232:2,24;
298:3;299:20
**detectors (1)**
353:16
**determination (1)**
212:20
**determine (5)**
48:24;211:24;
221:19;223:11;
293:17
**determined (2)**
236:17;291:20
**determining (1)**
350:21
**developed (2)**
69:25;288:8
**development (2)**
97:10;145:25
**device (5)**
290:18;345:7,7,11,
16
**Devine (22)**
3:7,9;11:20;15:7;
27:7;29:2;100:14;
150:2;218:22,23;
219:4,17,17;222:17;
223:21;226:24;
297:17;305:6,24;
319:11;331:9;351:19
**Devine's (9)**
305:8,11;319:3,11;
331:22;351:14;
354:2,16;355:10
**dialogue (1)**

31:6
**dictate (3)**
191:9;249:17;
262:2
**dictated (4)**
145:5;155:7;260:2;
286:18
**dictates (6)**
54:8;247:25;
261:13,25;295:2;
318:11
**die (1)**
162:6
**died (1)**
11:20
**difference (3)**
88:24;225:2,5
**differences (3)**
225:6;226:1,2
**different (125)**
16:5;30:4;41:2,6,7,
17,22;54:2,3;62:1;
65:9;67:22,23;68:7,
8;74:21;80:8;84:16,
21;87:24,24;89:24;
90:22;96:18;98:19;
101:21;104:11;
106:8;112:8;115:3,4;
117:6;119:12;120:6,
8,9;121:2,22;123:23;
124:23;126:11,12;
128:19;130:10,16;
131:2,10;138:11,24;
139:18,23;140:8,19;
141:6;145:7,11;
154:1,6,6,14,22;
155:20;160:21;
166:8;173:16;
174:17;177:14;
180:3;181:14;
184:14;185:1;196:4;
198:3,17;199:19,25;
201:1,24;202:13;
205:18;213:4;225:8;
230:11;242:20;
243:11;249:18,19,19;
251:4;255:13;256:3,
3;261:21;270:6;
277:2,3,4;279:1;
282:14,16,17;283:4;
284:11;285:2;
286:21;287:14,15;
290:25,25;293:23,24;
299:22;300:6;
306:15,18,18;311:18,
19,20,25;321:17;
340:14;343:19;
345:4,4
**differently (5)**
12:23;13:1;196:6;
224:24;250:24
**differs (1)**
349:18

**difficult (2)**
4:9;7:14
**difficulty (1)**
334:18
**DIRECT (5)**
6:7;107:10;196:11;
245:22;326:21
**directed (3)**
241:9;295:18;
326:19
**directing (6)**
110:19;113:1;
119:7,13;217:22;
327:2
**direction (9)**
52:13;62:22;
244:22;245:22,23,25;
247:12;250:22;333:6
**directions (2)**
251:15;307:19
**directive (3)**
112:5,7,12
**directly (3)**
8:18;110:8;173:9
**director (8)**
43:14,24;52:25;
145:21,23,24;149:4;
313:23
**disagree (2)**
338:5,21
**disaster (1)**
211:4
**discharged (1)**
39:8
**discipline (4)**
193:6;330:21,25;
331:6
**disciplined (1)**
193:17
**discoverability (1)**
28:14
**discovery (4)**
3:12;5:21,21;
334:13
**discretion (5)**
61:3,9;148:9;
153:25;257:4
**discuss (3)**
75:14;127:12;
164:2
**discussed (3)**
284:11;317:13,15
**discussing (2)**
293:22;311:20
**discussion (4)**
314:16;317:19;
319:1;355:20
**dispatched (1)**
205:13
**dispatcher (9)**
214:14;236:21;
245:13;256:5,7,10,
15,17;267:23

**dispatchers (1)**
236:22
**displaying (1)**
14:16
**dispute (5)**
31:16,22;32:1,3;
339:14
**disputing (1)**
224:12
**dissect (1)**
337:19
**distance (2)**
176:3,4
**distinction (2)**
198:19;235:23
**distinguishing (1)**
198:17
**distress (2)**
149:19;222:23
**disturbance (3)**
126:14;143:8;
220:9
**Disturbances (2)**
74:16;142:3
**division (5)**
35:24;52:24;149:1;
277:12,14
**DOC (3)**
219:17;350:2,12
**DOC's (1)**
349:24
**doctor (1)**
311:7
**doctor's (1)**
81:16
**document (34)**
4:11,18;5:6;
100:15,18;133:15;
158:3,5;195:9;219:5,
9,11,13;223:11;
228:4,19;237:6,13,
15;238:9,20,23;
248:9;297:18,22;
305:22,25;306:2,4;
311:14;323:1;328:6,
8;335:11
**documented (4)**
28:5;157:16;
220:11;265:13
**documenting (1)**
300:8
**documents (17)**
3:14,20,24;4:15,
24;5:4,5;112:15;
171:11;189:10;
218:17;219:1;224:4;
237:4;238:15;252:7;
314:24
**dog (1)**
55:11
**dominant (2)**
259:10,11
**done (25)**

8:2,22;13:1;145:7,
7,8,8,11;157:7;
159:10,17;167:4,6;
189:16;198:23;
203:10;227:7;229:2;
234:25;235:2;
284:25;290:22;
316:15;317:25;318:4
**door (66)**
103:4;104:24;
109:8,10;119:20;
128:17,22;129:20;
145:10;154:17;
176:5,6;205:13,14;
208:22;213:15,18,19;
214:14;245:9;
246:13;247:19;
275:16;282:3;290:4,
8;291:9;294:7,19;
296:1,8,9,10,11,11,
20,20,22;297:2,7;
304:5,12;323:10,10,
11,11,13,18,22;
325:3,5,8,12,16,21;
326:1,1,4,5,11,12,13,
24;327:19;336:12,13
**doors (13)**
54:6;247:2;275:24,
25;280:4;281:11;
287:10,20;291:6;
296:15;323:14;
324:7;326:16
**dorm (2)**
187:19;267:18
**dormitories (1)**
68:14
**dorms (3)**
68:18;185:15;
187:18
**dot (4)**
102:21;103:12,14;
337:1
**double-check (1)**
187:16
**double-checking (2)**
187:23;257:12
**doubt (5)**
65:8;216:22;
234:12,14;266:11
**down (76)**
24:7;33:21,22;
43:1;56:13,22;58:11;
81:15,19;83:14;89:4;
102:3,11;114:1;
116:14;119:2;
125:16;136:2,17;
137:22;138:2,12;
140:12;142:2,21;
146:25;148:20;
151:23;167:23;
170:20;172:21;
182:23;190:17;
192:6,9;193:12;

195:11;199:18,20;
201:10,13;202:6;
203:20;205:5;
209:16;228:11;
229:17,18;230:17;
237:1,9,10;240:11;
241:21,22;245:6,15;
253:25;260:22;
262:18;267:17,20;
281:20,21;292:18;
297:14,14;298:7;
312:23;319:4;324:6,
8,9,12;337:1;346:14
**downstate (10)**
70:21;84:15,18;
92:2,11;95:5;226:23;
313:23;314:5,15
**downtime (1)**
96:20
**dozen (1)**
289:6
**draft (1)**
256:18
**drafts (1)**
232:11
**dragged-out (1)**
158:12
**dragon (2)**
167:22;205:8
**draw (2)**
99:24;278:17
**drawn (2)**
160:9;309:8
**dream (2)**
259:16,24
**drill (12)**
156:18;157:3,15,
17;159:4;160:4,5;
162:13;284:21;
285:5,11,18
**drills (23)**
144:10,16,19,23;
151:13,17;152:10,11;
153:16;154:1;
156:13;159:10,24;
162:16;189:24;
284:12,12,13,15,19;
286:1;288:16,25
**drink (2)**
45:21,22
**drive (8)**
64:8,9;65:3,7,15;
66:14,17;272:6
**drug (3)**
132:20;133:1,2
**dry (1)**
106:6
**due (1)**
233:24
**duly (1)**
3:3
**Duncan (2)**
267:19,19

**duplicates (1)**
224:24
**during (46)**
16:9;36:8,22;
37:14,16;61:23;72:1;
73:21;77:7,23;78:1;
79:1;97:11;99:4;
101:18;103:18;
112:21;118:18;
132:24;146:6;
179:23;185:4;
192:18;207:18;
218:8;228:16;230:7,
18,25;231:1,12,20;
265:8;280:9;285:3;
286:1;288:8;293:15;
297:24;298:17;
316:3;328:25;331:1;
347:1,23;350:11
**duties (17)**
85:13,17;86:5;
98:7,16,17;104:13,
14;110:16;111:9;
113:2;118:14;119:5;
120:2;122:13;
136:20;190:12
**duty (5)**
97:15;108:15;
299:12;303:20;304:8
**dying (1)**
119:1
**DYKSTRA (36)**
3:1;4:22;5:11,16;
6:12,16,18;11:17;
16:25;24:10;91:16;
100:3,13;172:7;
217:12;218:12,13,16,
18;233:21;238:11,
15;245:14;290:2;
305:19,23;328:2;
332:19;333:15;
334:4,4,5,7;346:24;
349:6;355:16
**D-Y-K-S-T-R-A (1)**
6:13
**Dykstra's (3)**
5:18,25;145:16

**E**

**eager (1)**
56:8
**earlier (46)**
13:4;33:8,11;35:3,
6;38:1;51:5;53:5;
56:14;71:22;75:11;
77:5;80:15;81:20;
84:6;97:14;98:8;
100:24;111:16;
119:6;145:14;147:5;
159:6;164:23;
168:15;189:23;
199:24;219:24;

228:9;232:25;234:2;
235:16;240:23;
271:12;284:11;
290:24;293:22;
299:5;308:19;
311:20;322:10;
330:22;341:13;
342:24;343:20;
346:24
**early (2)**
232:2;311:5
**easiest (1)**
287:16
**East (6)**
201:14;202:11,12;
306:21;309:9;310:12
**easy (4)**
7:12;116:16;
140:11;201:15
**E-copy (1)**
355:23
**effect (11)**
26:11;57:5;59:14;
178:1;180:22;181:5;
242:21;275:3;302:7;
311:21;345:8
**effective (1)**
80:11
**effort (2)**
317:12;332:11
**efforts (5)**
207:14;299:2,15,
24;336:21
**eight (9)**
94:23;95:14;
115:15;125:3,4;
148:4;186:12;
269:11;338:16
**either (24)**
12:19;42:16;50:7;
60:15;62:21;67:5;
89:21,21;90:9;92:23;
147:24;162:12;
225:24;226:21;
236:23,24;237:19;
242:8;290:3;295:1;
314:11;343:21;
345:6;355:13
**electrical (4)**
185:16,17,22;
346:11
**electronic (7)**
5:9;275:24;280:23;
283:21,25;290:5;
326:10
**eleven (1)**
269:12
**eligible (1)**
139:24
**else (31)**
10:21;11:3,14;
59:23;62:16;73:1;
107:23;109:21;

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 368 of 395

113:2,3;114:4;116:1;
164:1;178:19;
192:12;193:1;
203:24;235:9;
246:10;253:21,24;
257:25;262:7;266:5;
278:6,7;279:7;300:3;
313:24;315:18;
317:16
**else's (1)**
298:11
**em (3)**
278:16;336:11,15
**email (16)**
5:3;16:16,18;63:5;
151:25;153:13;
159:13;171:18;
226:23;237:7,9;
240:12;241:2;242:3;
257:21;272:24
**emails (4)**
5:9;19:19;140:23;
159:14
**emergencies (1)**
154:13
**emergency (59)**
74:25;75:23;
120:24;121:7;
130:12,15;133:4,8,
12,19;134:5;135:8;
140:11;145:8;
148:25;152:9;
155:17;168:12,13,17;
169:4;176:20,23;
177:8,9,10,18,25;
179:23;180:12,17;
181:6,18,19;182:5,
13;192:18;222:7,24;
223:4;226:13;
230:18;271:7;273:9,
22;274:16;275:5;
279:14;282:9;288:8,
19;311:15,17,24;
312:3,6,8,18,24
**employed (4)**
6:14;13:5;17:10;
32:18
**employee (9)**
47:9;53:12;54:12;
56:11;57:2;93:14;
94:24;131:9;221:1
**employees (2)**
33:24;64:15
**employment (13)**
13:18;19:7;21:6,
12;26:7;27:13,14;
28:5,11;33:6;35:10;
38:9;55:16
**employment-related (1)**
330:25
**encounter (1)**
46:12
**encountering (1)**

81:2
**end (18)**
7:18;8:5;21:6;
49:5;70:25;93:4;
95:20;96:6,12;
152:15;229:6;
231:21;246:19;
278:22;281:2,7;
308:20;314:17
**ended (4)**
84:14,22;192:16;
316:24
**ending (1)**
16:20
**ends (1)**
309:2
**enforcement (2)**
39:3;330:18
**engaged (1)**
340:6
**engagement (1)**
143:2
**enough (7)**
124:1;163:12;
240:12;262:9;
275:19;301:20;
343:25
**ensure (1)**
5:20
**ensuring (1)**
257:6
**entail (1)**
44:10
**Enter (5)**
74:20,21;129:23;
322:15;323:19
**entire (12)**
61:23;72:1;153:8;
208:16;210:18;
214:1,6;245:8,25;
246:24;251:16;
279:24
**entitled (1)**
24:11
**entries (1)**
105:4
**equals (2)**
147:17;148:12
**equipment (26)**
109:20;119:25;
121:2;123:13;129:4;
135:15;136:4,19;
137:8,14,16,17;
138:5,11,15,18;
139:1,17,19,20;
293:23,25;294:17;
295:19;296:5;353:8
**equipping (1)**
120:18
**ERO (6)**
145:22,23,24;
148:10,24;313:23
**error (1)**

326:11
**escalate (1)**
143:5
**escalates (1)**
141:7
**escape (4)**
142:10,11;248:19;
306:5
**ESI (2)**
5:2,7
**estate (1)**
3:8
**estimation (1)**
226:18
**et (1)**
94:14
**evacuate (32)**
207:25;208:1,2,3,4,
16,18,19,21;209:6;
210:23;211:8;
212:10,24;213:2;
214:6,9;217:22;
244:13,16;245:2,4,
21;246:12,13;247:1;
248:11,12;273:6,7;
300:13;342:24
**evacuated (7)**
210:25;212:21;
245:8,24;246:1,23;
251:16
**evacuating (6)**
209:11;213:7;
248:21;249:24;
303:17;317:22
**evacuation (41)**
74:8;75:1,10,24;
76:1;208:13;210:18;
211:3,16;212:7;
214:1,20;215:11;
247:16,17,19,22,24;
248:1,1,5,14;250:3;
271:13,14;272:2;
273:3;284:13,15,18,
21;285:4,11;286:1;
288:10,16;289:3;
300:9;301:24;
317:24;348:6
**evacuations (3)**
288:7,18;311:22
**evaluate (3)**
28:12;83:5;190:1
**evaluating (1)**
298:13
**even (31)**
7:21;15:19,21;
27:8;34:10;63:23;
71:19;72:11;73:3;
106:1;153:23;156:9;
168:18;180:24;
190:14;198:21;
200:21;204:25;
206:9,15;215:15;
229:9;235:3,19;

241:18;275:18;
291:9;329:24;
330:13;340:16;
347:20
**evening (2)**
97:16;98:7
**evenings (1)**
293:11
**event (5)**
127:21;273:22;
274:16;293:19;303:3
**events (8)**
164:17;226:12;
232:3;302:2;303:3;
338:6;341:22;349:9
**everybody (32)**
66:3;69:21;72:23;
79:24;113:2;122:12;
123:10;144:7;
154:19;173:11,24,25;
174:2;177:22;180:1,
8;232:21;245:10;
260:19,21;278:25;
285:22;298:10;
302:11;315:25;
316:11;317:14;
318:21;326:8;
328:21,22;344:17
**Everybody's (5)**
65:25;95:3;187:15;
245:15;285:24
**everyday (1)**
46:9
**everyone (6)**
157:6;178:19;
181:6,13;259:23;
319:16
**everyone's (2)**
173:13;178:8
**exact (5)**
6:22;157:3;195:18;
283:16;304:1
**exactly (12)**
7:21;25:13;64:6;
76:3;124:25;127:24;
145:15;170:14;
190:17;220:7;
225:20;246:3
**EXAMINATION (3)**
6:7;349:4;352:18
**example (21)**
4:20;46:16;49:25;
56:21;64:14;71:8;
72:18;76:19;88:20;
114:20;121:6,10;
143:10,11;201:23;
227:25;242:24;
266:20;278:4;
281:22;311:21
**exceedingly (1)**
4:9
**Except (2)**
90:14;174:7

**exceptions (1)**
174:7
**Excuse (8)**
58:16;59:25;66:1;
175:21;211:9;
287:21,22;288:1
**exercise (1)**
79:19
**exhausted (1)**
333:20
**Exhibit (17)**
100:3,8,12,13;
102:22;103:15;
218:12,13,18,19;
238:11,15;305:17,19;
309:5;328:1,2
**existed (1)**
77:10
**existence (1)**
63:21
**existing (5)**
54:19;57:17;59:1;
73:23;81:1
**exit (6)**
72:17,23;74:21;
322:20,25;323:1
**expectation (3)**
181:18;313:2;
340:17
**expectations (3)**
42:15;45:14;46:7
**expected (1)**
312:19
**expediting (1)**
3:23
**experience (10)**
38:24;39:4;72:15;
154:5;161:10;
186:17;254:15;
288:24;289:1;351:13
**experienced (8)**
262:9;263:15,19;
264:5;290:4,14;
292:2;339:21
**experiences (1)**
114:17
**experiencing (1)**
4:3
**expert (2)**
349:24;350:25
**expertise (3)**
73:10;75:13,21
**expiration (1)**
332:13
**expiring (1)**
3:24
**explain (9)**
41:18;45:22;80:2;
126:11;160:25;
193:8;323:23;344:4;
347:17
**explained (1)**
283:15

**explanation (3)**
301:16;337:23;
338:2
**express (1)**
259:13
**expressed (1)**
260:10
**extend (1)**
332:17
**extension (1)**
4:12
**extensive (1)**
273:25
**extent (1)**
155:13
**extinguish (2)**
336:15,21
**extinguisher (3)**
135:21;192:7;
336:5
**extinguishers (5)**
129:8;348:21;
350:16,22;353:10
**extra (7)**
93:10,12;149:19;
225:1;233:13;280:6,
7
**extracted (1)**
124:4
**Extraction (19)**
85:21;98:13;
121:15;122:8,15;
123:6,24;125:1;
126:7;134:20,23,25;
135:5;139:9,16,17,
18;152:18;160:14
**extras (1)**
137:18
**extravagant (1)**
231:15
**extreme (1)**
250:10
**extremely (1)**
27:11
**eyes (1)**
195:18

## F

**face (1)**
283:22
**Facebook (4)**
17:5,6;19:21,23
**faces (1)**
252:25
**facilities (7)**
67:16;82:24;84:5;
85:2;160:24;161:25;
235:21
**Facility (81)**
38:19;42:6;44:3,
15;51:7,21;53:23;
54:5,6,8,17;61:24;

64:5,9,11;66:8;
67:20;68:5,6,11,22;
69:1,8,13,17;71:15;
73:11,25,25;74:1,3,
23;77:8;78:9;81:6;
83:20;84:1,8;85:1;
87:11;92:7,15,23;
108:10;112:5,7,12;
125:8;140:13;
146:18;151:8;
173:11,13,15,16;
174:1,6,25;175:8;
177:20;180:1,2;
189:8;200:20;
220:10;237:22;
240:1;251:8;258:16;
259:21;260:1;
261:13;286:23,24;
299:12;303:20;
304:9,22;319:17;
346:3,7
**facility's (1)**
68:7
**facility-specific (2)**
69:24;71:16
**fact (24)**
11:8;32:13;34:20;
105:4;172:17;
196:20,24;198:20;
219:18;226:19;
242:10;261:6,7;
265:16;289:3;296:1;
297:14;319:7,9,20;
322:25;332:10;
342:22;344:16
**facts (2)**
192:22;231:14
**factual (2)**
31:17;192:23
**failure (2)**
329:13;330:2
**fair (52)**
8:3;49:19;56:7;
61:5;62:6;65:15;
73:13;116:17,19;
142:5;143:14;159:1;
164:16,21;166:20;
191:23;194:10,15,18;
198:22;199:6,9;
218:4;222:10,15,24;
226:7,17;228:13;
230:8;234:1;249:1,5,
10,16;254:13,18;
256:21;257:9;258:5;
260:16;261:5;
264:24;271:16;
280:20;289:5;296:4;
312:8,17;316:2;
340:13;343:25
**fairly (2)**
287:10;288:20
**familiar (11)**
7:3;97:1;253:2;

311:14;312:20;
313:3;315:5;318:10;
328:5;353:3,5
**familiarize (2)**
77:9,18
**family (2)**
13:22;331:22
**fan (2)**
214:10,13
**fans (6)**
205:14;213:20;
214:15;245:10;
304:5;336:14
**far (16)**
27:8;37:2;118:10;
131:19;160:23,23;
176:4;198:8;224:23;
226:12;269:6;
306:19,20;323:9;
324:14;329:21
**farfetched (1)**
338:11
**fart (1)**
306:21
**fast (4)**
143:23;144:15;
183:20;198:15
**faster (1)**
115:2
**fault (1)**
29:23
**feeding (1)**
270:13
**feel (7)**
24:2;29:18;100:10;
257:16;288:14;
297:6;347:21
**feet (5)**
109:6,7;205:3;
213:21,21
**fell (1)**
75:13
**felt (2)**
328:19;343:24
**female (5)**
171:2,3,7;233:20;
259:9
**females (1)**
259:11
**fence (1)**
330:4
**few (26)**
10:25;44:18;65:9;
75:16,18;76:25;
121:22;124:17;
128:11;151:12;
154:21;157:2;
160:17,17;179:24;
180:19;181:22;
187:7;194:8;224:3;
271:23;290:15;
296:16;310:15;
315:20;334:25

**Ficklen (5)**
239:14,14,20;
240:9;241:21
**Ficklen's (1)**
239:23
**field (25)**
15:11,15,18;26:16,
17,18;44:19;45:3,25;
53:20;57:9,12;
115:14,16;140:20;
146:15,19,22;147:7,
13,16,23;148:10;
150:21;304:23
**fields (1)**
228:3
**fifteen (1)**
269:12
**Fifth (2)**
26:20;276:8
**fifty (1)**
96:19
**fight (8)**
130:23,24;155:4,5;
162:23;262:14;
263:18;264:1
**fighting (1)**
201:19
**fights (1)**
262:3
**figure (8)**
9:9;162:8;169:16;
272:7,8,22;313:10,12
**figured (1)**
162:9
**file (16)**
28:5,11;29:22;
63:11,15,22,25;77:5;
93:20,23;105:4;
109:16;151:25;
224:25;232:13;261:7
**files (4)**
4:20;159:3;185:18;
261:6
**filing (1)**
109:12
**fill (15)**
71:11;78:11;
123:15,25;124:1,6;
152:2;153:6,20;
228:2,20,25;229:7;
259:5;263:10
**filled (11)**
84:18;111:5;
123:18,22;124:10,11;
126:8,9;145:3;
228:15,18
**filling (9)**
84:14,22;126:1;
228:8,23;229:4,8,13;
232:1
**fills (3)**
69:17;256:6,7
**finally (1)**

5:12
**find (20)**
7:4;20:19,21;22:9;
23:16;43:7,11;63:8;
66:22;67:4;167:18;
201:15;202:20;
203:3,10;207:9,13;
227:15;238:9;333:23
**finding (3)**
15:5;102:10;
203:16
**fine (7)**
6:17;9:21;26:2;
30:22;80:5;196:18;
217:8
**finger (1)**
104:24
**finish (3)**
8:17;166:6;212:17
**finished (4)**
166:7;241:4,5;
333:12
**fire (195)**
11:19;29:2;97:16;
128:5,24,25;129:3,5,
8,14;130:25;131:14,
18,21;135:21;143:11,
16,17;144:12;149:15,
16;150:2;154:23;
155:16;156:2,11;
167:13,15,16,19,19;
168:4,6,10,18,19,20;
172:18;183:5,9,16;
185:5,15,17;186:16,
20,21,23,23;187:1,9;
189:9,13,17,20;
190:24;192:3,6,7;
193:18,22;194:2,20;
195:1,22;196:4,13,
16;197:11,11,13,20;
199:9;201:19;203:8,
15,17;204:1,16,20,
24;205:5,22;206:2,
14,17;208:7;209:12;
211:6,14,18,24;
212:5;214:17;216:5;
217:13,20;218:8;
219:22;221:19;
223:5,8;226:5;
227:14;233:23;
235:24;236:2;
248:14,19;251:7;
271:7,14;273:2;
274:1;295:21,23;
296:2,7,12;298:13;
300:3,16,18,22;
301:3,9,11,13,18;
302:22;303:22;
304:2;306:5;307:1;
311:22;313:8,9,16;
314:11;315:23;
317:5,6,7,12,12,13,
14,19;322:7;323:25;

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 370 of 395

325:4,6,22;327:23;
334:25;336:5,6,25;
341:15,24;343:24;
344:8,10,16;346:14;
347:3,7,9,23;348:5,6,
11,15,16,17,21,23;
349:13;350:16,21;
351:21,25,25;352:3,
6;353:8,8,10;354:4,8,
9,11,11,16;355:9
**firearm (1)**
187:18
**fire-breathing (2)**
167:22;205:7
**firefighters (3)**
129:11;297:10;
343:16
**firefighter's (1)**
352:8
**firefighting (1)**
352:6
**fireman (2)**
211:19;297:1
**firemen (19)**
129:1,16;143:18,
21,22;144:3,6,6,14;
169:4;187:13,20;
188:22;195:16;
209:13;210:1;297:5,
6;344:10
**fires (14)**
145:7;154:13;
183:15,18;185:7;
186:11;187:6;192:2;
193:16;198:18,19;
346:25;348:7,25
**fire's (2)**
128:3;249:19
**first (135)**
3:3,13;16:22;38:6;
40:17;53:6;70:8;
72:3,9;83:12;85:10,
21,22;91:16;92:17;
98:12;120:9;121:14;
122:4,7,14;123:4,14,
15,19;124:6,12;
125:13;126:6,9,13,
15,24;127:7,9;128:4,
13;129:7;130:11;
134:4,7,7,10,21;
135:7,10,16,19,19;
136:24;137:9;139:6;
140:12;141:10;
142:6,16;143:5,13,
15;152:17,24;
153:12;158:22;
164:12;165:3;167:9,
17;168:1,20;181:23;
182:4;183:4;187:10;
188:6,18,23;189:6;
194:14,19,22;195:17;
199:3,7;203:14,18;
204:1,4,7,17,18;

205:21,24;206:21,24;
208:7;214:17;215:8;
216:4,5;219:3;
221:15;225:4;
233:16,17;239:23;
244:9;245:7;254:22;
256:17;259:15;
269:21;273:12,13,19;
274:2;275:10,13;
299:18,25;300:1;
303:19;304:14;
305:14;308:12;
322:11,17;323:4,17;
324:20,23;325:11,18;
336:4;340:17;343:22
**firsthand (1)**
354:7
**first-hand (1)**
323:7
**fit (1)**
121:24
**five (41)**
6:25;40:1;42:18;
82:16;84:7;87:5,13,
19,22,24;88:1,2,3;
89:14;90:14;96:21;
125:3;149:6;159:13,
17;187:7;201:19;
232:2;260:11;
269:11;276:14;
277:2,8,16;278:7,8;
284:4;289:11;327:6,
7;333:17;342:19;
343:4,5;347:16,16
**five-minute (1)**
30:20
**five-page (1)**
158:13
**fixed (2)**
83:19;243:21
**flag (1)**
191:16
**flagging (1)**
182:2
**flame (1)**
295:25
**flames (2)**
206:25;207:6
**flashpoint (1)**
205:6
**flight (1)**
142:14
**flights (1)**
310:8
**flip (2)**
275:25;281:24
**flipping (2)**
240:25;286:3
**floating (1)**
225:16
**floor (21)**
72:19;73:25;74:1,
3,4,14;75:22;184:9;

245:13;276:8,15,15;
277:15,17;292:10;
308:2,23;309:13,14,
17;310:20
**floors (4)**
184:25;185:1,2;
309:1
**Flores (1)**
32:17
**FMLA (1)**
263:3
**foam (2)**
348:9,10
**focus (5)**
48:25;49:18;142:7;
202:18;317:10
**focused (1)**
166:25
**folder (2)**
159:9,14
**folks (17)**
54:13;78:24;79:8;
119:12;120:18;
131:24;150:8;157:7;
162:12;174:19,20;
179:18;260:11;
313:18;314:4,15;
334:16
**follow (5)**
100:9;248:19;
251:15;312:20,21
**followed (3)**
247:18;249:16;
302:3
**follower (1)**
82:14
**following (1)**
312:17
**follows (1)**
3:3
**follow-up (2)**
333:21;352:20
**food (1)**
89:18
**force (3)**
50:2,5;178:7
**foreseeable (1)**
14:24
**forget (9)**
16:20;80:3,7;
84:20;92:7;94:21;
119:18;163:12;
296:25
**forgetting (1)**
93:19
**forgot (3)**
84:19;94:19;223:9
**form (24)**
34:19;131:7;145:3;
152:2,5,11,14;153:3,
8,9,11,15,20;157:17;
167:4;223:2,8;228:6,
20;230:15,16;

271:16;351:15,20
**formal (10)**
3:17,18;4:8,16;
35:10;71:23;73:5;
114:12;116:13;
230:19
**formalize (1)**
254:14
**format (3)**
220:22;230:20;
328:5
**formatted (1)**
238:19
**former (1)**
33:6
**forms (5)**
64:12,15;65:5;
162:13;335:20
**forte (2)**
72:12;149:25
**forth (8)**
5:6;90:9,12;
112:16;174:20,21;
216:16;247:17
**forward (5)**
5:18;143:3;159:8,
12;289:21
**found (5)**
35:3,6;37:5;
112:19;167:19
**Foundation (2)**
351:16,20
**four (33)**
87:21;115:17;
123:16;124:12;
127:16,17;128:22;
137:1;138:24;
154:13,24;159:17;
171:19;172:11;
176:7;184:18,19;
201:19;203:4;259:2;
269:11;277:8,8,15,
18;278:7,8;292:6;
327:6;338:15;
342:19;343:4,5
**fourteen (1)**
269:12
**frame (5)**
34:1,6;151:5;
155:12;226:24
**framed (1)**
39:15
**frames (2)**
190:10;321:17
**frankly (1)**
28:13
**frantic (1)**
233:10
**freak (2)**
115:20;161:3
**freaked (2)**
197:12;208:21
**freakout (1)**

115:6
**Fredericks (1)**
268:1
**freeze (1)**
115:20
**frequent (3)**
269:16;290:19,22
**frequently (3)**
132:15;166:3;
284:18
**fresh (2)**
205:14;210:6
**Friday (8)**
86:9;87:20,22;
89:15,17;90:4,6,15
**friend (1)**
13:22
**friends (1)**
13:24
**front (31)**
33:18;100:11;
103:15;128:17,21;
129:20;145:10;
155:10;170:2,4;
188:25;205:16;
219:1;224:22;
245:11;280:4;282:4,
6;320:19,22;323:9,
10,22;324:6;325:3,5,
12;327:19;333:16;
335:13,18
**FTO (5)**
44:19;45:3;47:1;
91:20;93:18
**full (12)**
6:11;99:14;117:1;
153:25;260:5;278:1,
8;291:19;310:8,14;
316:20;342:19
**full-time (2)**
52:8,10
**fully (4)**
124:9;262:25;
316:17,21
**fun (1)**
254:24
**functions (1)**
126:12
**funny (2)**
187:2;324:11
**furniture (2)**
109:18;171:16
**further (3)**
4:12;349:2;355:12
**future (3)**
13:8;14:24;114:5
**fuzzy (1)**
343:6

## G

**gain (1)**
154:17

**gaining (1)**
94:10
**game (2)**
156:12;259:6
**games (1)**
170:17
**Gann (8)**
62:4;83:13;107:13;
303:9,10;304:17,19,
19
**gaps (1)**
263:10
**gas (2)**
295:24,25
**gate (7)**
99:18,20,21;
214:14;245:13;
307:6;321:14
**gates (15)**
76:5,6,6,7;99:21,
23;103:1;119:11;
126:21;176:1,7,25;
307:6;308:8,10
**gather (6)**
207:16;289:20;
322:13,14,17,19
**gathered (4)**
190:9;302:8;323:5,
8
**gave (11)**
36:14;56:10;75:18;
76:15;120:15;
198:16;212:19;
244:21;250:21;
313:17;349:16
**gear (4)**
126:23;209:25;
210:1;325:24
**geared (5)**
46:8;54:13;74:15;
130:23;274:9
**gender (1)**
20:25
**general (18)**
45:14;46:6;65:4,8,
12;81:8;113:20;
153:1;175:5;177:12;
185:13,19;186:19;
197:16;233:1;244:2;
261:24;273:25
**generalized (1)**
166:22
**generally (3)**
258:23;264:4;
293:10
**generating (1)**
241:13
**geography (1)**
322:16
**gestures (1)**
7:11
**gesturing (1)**
322:21

**gets (21)**
25:11;48:10;57:25;
69:25;83:22;104:23;
127:8;131:9;151:23;
172:3;173:21;
179:23;191:7;
192:12;198:11;
227:17;258:13;
278:22;285:23;
286:24;287:5
**gig (1)**
285:10
**given (20)**
24:20,24;26:6,14;
43:19;45:18;62:22;
77:25;96:15;99:14;
122:17;134:3;254:7;
260:14;277:22;
288:17;317:4;
333:25;349:7,8
**gives (1)**
223:14
**giving (11)**
81:17;113:15;
121:6;137:21;
196:14;245:25;
257:1;274:7;313:20;
327:22;354:5
**glad (1)**
334:6
**gladly (1)**
9:8
**glass (3)**
282:4,6,9
**gloves (1)**
297:6
**goal (2)**
82:13;169:15
**goals (1)**
94:9
**God (3)**
131:16;165:18;
340:11
**goes (33)**
25:8,9;28:8;47:19;
58:11;64:20;70:20;
115:24;123:13,20,20;
125:24;146:6;
148:20;173:22;
177:4;184:19;
202:16;205:5;
225:11,12,12;251:5;
258:12,14,14;259:3;
281:17;283:6;
286:22;294:7;
301:22;309:1
**gonna (1)**
216:21
**Good (20)**
3:5;72:18;106:10;
123:11;127:6,11;
157:9,13;166:12,13;
179:9;233:13;243:8;

245:17;255:7;257:1,
8;288:20;309:19;
347:21
**Gotcha (1)**
176:8
**grab (4)**
138:25;285:19;
297:2;326:23
**gray (1)**
312:22
**great (8)**
118:5;152:22;
157:15;237:1;250:7;
251:8;256:11;347:21
**greater (2)**
62:7;65:14
**Green (1)**
281:5
**Griffin (10)**
75:6,8,16;76:17,20,
24;284:16;353:13,17,
20
**ground (9)**
276:15;277:15,17;
292:10;308:2;
309:13;310:20;
330:5;340:3
**grounds (6)**
107:21,25;108:22;
174:11;180:4;239:7
**group (20)**
86:2;88:2,3,25;
126:16;127:5;129:4,
25;140:19;156:22;
157:11,18;158:3;
160:15;165:20;
166:8;240:2,3;
258:22;259:18
**grouped (1)**
325:9
**groups (7)**
87:13,21,24,24;
88:1,5;90:7
**Guard (8)**
99:7,8;101:2,4,8;
205:12;214:12;
305:13
**guess (48)**
17:15;20:21;33:21;
63:18;69:9;71:7;
72:1;79:9;95:25;
99:24;101:22;
102:21;116:16;
125:24;131:23;
142:13;143:4;146:5;
154:3;165:2;166:15;
169:9;175:15,15;
178:25;187:2;
197:15;223:14;
229:1;231:3;236:3;
237:14;238:7;241:8;
242:24;248:20;
249:13,17;264:10;

273:10;275:13;
292:9;300:25;304:7;
306:18;319:22;
328:16;330:12
**guessing (1)**
310:6
**guidance (2)**
28:18;254:16
**guidelines (4)**
7:1;50:1;113:20;
114:3
**guilty (3)**
329:15,20;330:1
**guns (1)**
134:16
**gurney (1)**
331:12
**Guru (1)**
67:4
**guy (16)**
44:19;67:7;71:20;
75:7;118:25;134:15,
19,21;185:24;
186:21;189:17,21;
192:3;197:11;
288:11;331:14
**guys (16)**
17:16;24:7;26:16;
119:16,21;120:6;
135:20;142:2;
168:24;189:21;
206:11;284:24;
289:14;293:12;
318:20;354:21
**guys' (1)**
78:12
**guy's (1)**
186:24

## H

**half (8)**
42:23;96:22;
118:12;132:20;
153:12;233:7;
269:13;314:22
**half-inch (1)**
296:18
**Hall (14)**
99:7,8;101:2,4,6,7,
8,22;102:1,12,16;
205:12;214:12;
305:13
**hallways (1)**
102:5
**hand (2)**
196:19;274:21
**handbook (1)**
47:9
**handed (3)**
218:17;238:14;
305:22
**handheld (2)**

137:2;345:7
**handle (9)**
134:11,21;140:13;
141:9,22;142:4,10;
143:8;253:8
**handled (4)**
134:17;248:2;
250:23,24
**handles (1)**
284:14
**handouts (1)**
50:21
**hands (1)**
297:4
**handwriting (1)**
335:19
**handwritten (1)**
242:9
**hang (1)**
56:8
**hanging (2)**
136:2,9
**happen (21)**
80:22;114:4;115:5,
23;119:15;161:2;
187:2,4;204:5;
245:18;249:6,7,8,9,
10,11;291:11;318:3;
319:21;336:22;341:2
**happened (35)**
10:25;19:6;23:20;
43:20;48:4;132:17;
152:20;155:3,25;
164:10,17;166:2,10;
167:11;191:18;
217:2;229:23;230:7;
232:20;233:12,13;
234:3;242:2;246:17;
251:11;262:2;274:1;
303:21;314:16;
317:7;339:14;344:8;
349:1,9,14
**happening (9)**
192:16;195:14;
207:18;302:18,22,22;
303:8,14;304:11
**happens (10)**
115:19;119:17;
127:13;160:23;
161:7;187:25;
189:14;250:15;
271:4;320:16
**happy (2)**
28:21;333:10
**hard (4)**
41:17;175:13;
293:17;340:3
**hate (1)**
151:22
**HAZMAT (7)**
71:20;75:4,6;
189:17,21;284:14;
353:12

**head (36)**
7:11;9:4;13:23;
14:1;18:15,18;19:10;
21:20;25:13,20;
32:14;33:22,22;
35:21;49:9;50:4,10;
73:3;74:12,24;94:20;
99:5;101:19;116:18;
131:16;142:15;
147:25;173:7;
244:19,23;279:6;
298:8;312:4;324:21;
337:16;353:25
**health (5)**
331:16;346:2,4,5,6
**healthcare (1)**
64:12
**hear (31)**
12:1;72:8;128:5;
153:22;173:9,20;
174:1;177:24;
180:25;182:5,15,19,
19,20;183:16,19;
188:2,14;196:22;
231:17,18;244:18;
246:2;247:8;292:11;
293:3,9;296:21,22;
302:20;339:7
**heard (22)**
26:25;27:8;131:16;
173:24;183:4;185:5;
208:4,21;214:17;
230:3,24;231:3,8,12;
245:3;246:12,12;
247:1;290:4,9;
354:13,14
**hearing (20)**
25:3,12,12;33:12,
14,17,25;169:3;
174:20,21;181:6;
193:25;195:21;
197:2;212:22;
231:14;241:15;
319:6;334:18;355:6
**hears (2)**
177:17;180:9
**hearsay (1)**
354:19
**Heart (1)**
136:18
**heat (3)**
296:12;297:6;
340:15
**heated (1)**
297:3
**hectic (1)**
198:11
**height (1)**
309:24
**held (6)**
37:22;40:24;110:6,
11;135:11;355:20
**hell's (1)**

117:1
**helmets (1)**
139:1
**help (10)**
114:5;127:24;
148:2;149:19;
167:23;237:1;
256:18;285:8;293:8;
304:25
**helpful (5)**
77:15;102:11;
120:15;121:9;288:15
**helping (1)**
85:20
**HEPPELL (79)**
3:5,6;6:8;14:18;
26:3,10,19;28:7;29:4,
10,14,16,20,25;30:7,
22;31:1,9;41:19;
58:22;60:2;63:20;
66:6;70:10,14;91:9,
14,15;100:5;149:20;
170:13;175:22;
211:13;212:3;217:5,
8,11;218:11,15;
231:22;238:13;
288:5;289:15,25;
290:1;303:1;305:17,
21;321:1;322:1;
327:25;328:4;
332:18,22;333:22;
334:1,6,11;335:9,23;
336:1;337:3,5;339:1;
341:7,11;342:6,12;
343:13;346:16,22,23;
349:2;351:15,20;
352:19;355:12,15,18
**Here's (4)**
30:19;45:19;46:23;
255:12
**Hey (20)**
57:20;67:11;73:17;
138:12;152:21,24;
156:11;157:14;
162:22;165:25;
178:4;190:19;193:1;
196:17,18;242:2;
243:23;257:17,24;
272:23
**high (2)**
39:24;162:3
**higher (15)**
42:15,18;44:25;
45:9;65:13;90:23;
96:8;142:6;162:12;
200:1,2,3;257:23;
287:1;308:13
**highest (9)**
107:2;108:15,18,
21;112:21,25;144:4;
200:4;276:15
**highest-ranking (1)**
248:4

**high-level (1)**
162:2
**highlight (1)**
61:5
**highlighter (1)**
103:10
**highlighting (1)**
267:5
**highly (3)**
27:16;65:11;312:6
**himself (1)**
58:4
**hinges (2)**
28:16;291:13
**hired (3)**
38:19,25;39:18
**hit (14)**
179:24;200:7;
201:11;208:4,22;
246:13;247:2;281:4;
298:6;304:12;330:2,
6;333:18;354:13
**hits (1)**
179:25
**ho (1)**
155:1
**hold (7)**
51:20;177:19;
180:23;309:1;
339:19;345:12;
355:25
**holding (2)**
349:24;350:25
**home (3)**
43:12;107:24;
138:3
**homicide (1)**
222:6
**homicide/death (1)**
223:3
**honest (7)**
15:4;30:4;216:19;
224:18;231:20;
297:25;337:17
**honestly (3)**
24:12;246:2;
321:24
**honor (2)**
184:16;187:19
**honorably (1)**
39:8
**hook (1)**
136:7
**hop (1)**
198:6
**hope (1)**
169:18
**hopefully (4)**
141:9;151:8;
158:15;255:12
**hostage (5)**
141:22,23,25;
150:11;151:3

**hot (3)**
95:25;155:2;
296:20
**hotpot (2)**
186:21,24
**hour (7)**
78:25;96:22;151:7,
8,9;233:7;269:14
**hours (19)**
90:20;96:23;
105:24;147:3;
151:12;174:14;
216:14;264:9;
280:11,15;333:1,3,4,
20;334:25;338:15,15,
16;349:12
**house (2)**
14:25;187:3
**houses (1)**
39:15
**Housing (6)**
86:13,17;132:13;
183:23;184:3,15
**how's (1)**
165:25
**huh-uh (1)**
7:12
**human (2)**
326:11;340:25
**hundred (9)**
98:24;159:13;
187:7;217:1;259:2,2;
260:5;277:9;287:9
**hundred- (1)**
185:7
**hundred-and-something (1)**
287:12
**hundreds (23)**
11:10,10,13,13;
79:22,23;115:24;
145:11,11;161:5;
183:14,15;185:5;
186:9,10,11;192:2,2;
245:5;251:5;252:24,
24;293:6
**hurt (6)**
192:11,11;195:19,
20;196:18;250:17
**hurting (1)**
294:13

**I**

**IA (2)**
349:16;352:15
**icon (1)**
199:17
**ID (1)**
177:1
**idea (15)**
16:3;30:19;59:11;
73:12;75:19;76:3;
85:8;140:15;179:5;

208:9;237:25;284:1;
297:25;318:9;330:12
**idealist (1)**
255:10
**ideas (5)**
15:18;72:6,9,10;
75:12
**identification (5)**
100:4;218:14;
238:12;305:20;328:3
**identified (2)**
156:19;204:1
**identify (2)**
162:14;218:19
**identities (1)**
355:7
**IDOC (1)**
21:7
**IDU (11)**
183:18,22,24;
184:7,9,12,25;
185:10;186:10;
196:5;315:18
**Illinois (1)**
77:12
**I'm' (1)**
137:25
**imagination (1)**
154:5
**immediate (2)**
210:18;214:1
**immediately (1)**
245:24
**impacted (1)**
4:4
**import (1)**
151:25
**important (11)**
7:9,17;8:15;10:1;
55:12;57:21;61:1;
62:23;169:15,16;
298:14
**impression (1)**
81:5
**improvements (1)**
347:3
**inaccurate (1)**
301:4
**incident (91)**
12:16;104:2,22;
106:12;111:17;
112:21;113:15;
126:18;127:13;
128:15;129:14;
134:7,17;135:11,17;
141:2;143:7;147:15;
149:18,23;150:9;
158:16;169:6,21;
182:8;186:8;187:6;
189:12,15,16,18,19;
190:7,23;191:3;
192:5,8,15;193:7;
198:24;215:9;

USDC IN/ND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 373 of 395

216:15;217:13;
219:8,14,16,18;
220:7;221:3,7,16;
227:4,11,14;228:5,7,
12;229:7,9,9;230:2,7,
13,25;231:1,9;232:6;
242:1;250:23;272:1;
299:7;304:10,11;
314:6,7;315:18;
320:11,19;331:4;
335:22;336:8,9;
337:14,18;338:15,22;
339:22,25;344:24;
345:18,22
**incidents (20)**
11:10,13;105:11;
106:8;113:25;
115:25;130:10,17;
135:4;161:5,7,11,25;
162:25;163:19;
227:3;237:2;242:9;
251:6;301:23
**incident's (1)**
128:18
**include (4)**
190:3;191:3;230:2;
298:2
**included (2)**
113:3;298:24
**includes (1)**
306:9
**including (5)**
4:21;5:9,15;
115:25;251:14
**inconsistent (3)**
12:2,9,18
**incorrectly (1)**
342:15
**incriminate (1)**
26:22
**independent (4)**
164:9;165:3;195:5;
224:8
**Indiana (75)**
11:17;12:3,6,10,13,
19,19;13:21,25;16:9;
17:11;21:3,14,22;
22:10,21;23:5;25:4,
8;33:6,23;35:24;
37:23;38:6,10;40:12,
18;42:8,15;43:17;
44:7,16,22;55:16,17;
57:3,5,17;61:22;
62:15;67:15;71:11;
72:2;73:21;91:17;
92:3;97:15;99:10,16;
100:19;124:23;
130:5;132:14,23;
143:17;144:5;146:1,
17;149:7;160:22;
161:4,19;219:6;
273:3;275:21;284:2;
290:2;319:25,25;

331:1;346:25;348:7;
350:20;351:1;353:23
**indicate (1)**
208:20
**indicated (1)**
84:25
**indicates (1)**
332:16
**indicating (13)**
37:4;108:4;162:19;
202:18;267:18;
269:5;307:11;309:2,
3;323:13;324:5,15;
335:16
**individual (14)**
32:15;48:10,24;
60:20;69:1;79:9;
95:18;275:22;278:3;
281:12;285:21;
308:5;325:25;355:7
**individually (1)**
286:2
**individuals (11)**
51:12,16,19;76:20;
83:10;123:2,16;
124:13;127:14;
266:10;302:9
**individual's (1)**
132:7
**inference (1)**
246:17
**informal (1)**
9:19
**information (38)**
20:13,19;23:25;
24:6;26:25;27:5;
28:14;29:24;34:5;
39:21;55:22;79:14;
94:10;152:13;163:3,
21,22;190:9;207:3;
209:4;210:16;212:5,
12,13;213:11;
215:25;217:18;
232:6;233:2;241:11;
297:23;298:17,22;
302:6,7,11;328:18;
342:3
**informed (4)**
5:22;60:22;63:21;
314:10
**informing (2)**
59:23;62:16
**INgov (1)**
66:22
**inidocgov (1)**
16:21
**initial (13)**
16:22,24;45:23,23;
56:24,24;92:9,21;
93:1;138:2;183:11;
206:13;223:22
**initially (1)**
215:9

**ink (2)**
103:14;309:9
**input (3)**
49:11;65:23;72:25
**inquiring (1)**
27:11
**in-service (28)**
44:9,17;47:12,19,
22;48:6,10,20;49:17;
50:17;53:4,9,13;
54:19,23;55:3;77:23;
78:1;79:1;80:14,16;
91:20;93:4,9,13;
94:4;95:10;97:7
**in-services (1)**
56:3
**inside (6)**
81:9;108:2;180:1;
181:22;323:18;
324:24
**inspecting (2)**
350:15;351:5
**inspection (1)**
346:6
**inspections (5)**
346:2,4,5,7,8
**installed (1)**
200:23
**instance (2)**
49:24;68:20
**instant (1)**
245:3
**instead (4)**
56:12;150:24;
250:23;347:6
**instituted (2)**
19:18;95:12
**institution (1)**
161:22
**institutions (1)**
160:21
**instructed (1)**
8:19
**instructing (3)**
29:11,12;321:7
**Instructor (4)**
40:10,11;41:15;
50:23
**int (1)**
189:20
**intend (1)**
5:17
**intended (2)**
289:5,9
**intending (3)**
28:17;31:16;333:3
**intentionally (2)**
354:16,18
**interact (1)**
242:6
**interaction (3)**
44:1;208:6;217:21
**interactions (3)**

61:16;166:23;
331:13
**interchangeable (3)**
131:21;184:7;
236:8
**interested (1)**
332:12
**interests (1)**
97:10
**interior (1)**
109:4
**interlude (1)**
6:10
**internal (7)**
35:16,23;37:8,12;
314:1,3;327:21
**interrogatories (2)**
5:12,15
**interrupt (1)**
25:25
**interrupting (1)**
212:2
**intersections (1)**
62:6
**intervention (1)**
204:6
**interview (18)**
36:9,11;43:18,19;
51:23;83:1,3,12;
313:17,20,25;314:3;
327:22;328:25;
329:4;334:14;344:3;
352:15
**interviewed (3)**
36:2;83:2,10
**interviewer (1)**
343:15
**interviews (2)**
36:13;37:17
**into (49)**
17:25;26:15;27:12;
42:1;53:8;65:18;
99:16;109:8;112:13;
113:19;116:14;
119:12;127:14;
129:3;142:8;153:19;
175:8;176:24;
177:13;178:1;
186:12;200:10,12,22;
203:15,19;205:14;
213:15,18;232:16;
261:4,9;268:11;
269:14;278:15,22,25;
280:14;282:2;
287:16;294:9;
295:19;302:23;
304:22;313:4,8;
318:13;346:18;
354:11
**investigate (1)**
320:2
**investigation (18)**
35:19,23;36:3,22;

37:12,14;221:19;
313:16;314:11,12;
327:21;328:9,20,20;
351:25;352:3,3;
354:11
**investigations (3)**
313:8;314:1,4
**investigator (3)**
329:1;337:10;
341:16
**involve (1)**
119:10
**involved (8)**
27:14;72:4;152:16;
222:20;251:3;
317:14;330:8;351:24
**involvement (1)**
346:1
**involving (1)**
302:1
**IOT (1)**
243:8
**iPhone (1)**
16:12
**irrelevant (1)**
15:7
**irritate (1)**
292:21
**irritated (4)**
315:25;316:5;
318:6,18
**irritating (1)**
316:10
**ISO (5)**
237:21,24;238:24;
239:6;241:18
**ISO's (1)**
237:20
**ISP (51)**
30:6;39:21;43:3,5,
16,21;48:18;53:6;
54:7,24;55:7;59:14;
65:1;68:14;77:8;
85:10;86:16;91:23;
110:9;118:16;
150:20,22;161:13,25;
174:2;175:2,4;
176:24;182:17;
185:5;200:17;228:5;
235:18;239:8,12,12,
14;242:1,20;279:17;
280:4;287:7;290:20;
292:3;294:3;296:6;
300:21;301:3,18;
349:1;351:13
**ISP's (1)**
115:16
**issue (12)**
28:9;120:10;142:9;
185:22;191:12,21;
193:1;199:8;257:15;
270:16;332:10,23
**issues (9)**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 374 of 395

4:4;132:19;142:19;
155:13;190:1;191:5,
16;278:23;351:14
**item (1)**
4:16
**IVU (1)**
173:18

### J

**jammed (6)**
290:8;294:22;
296:8,9,10,11
**Janice (2)**
239:24;241:21
**Jddykstra (2)**
16:19;17:1
**JEREMY (7)**
3:1;4:22;5:11;
6:12;24:13;27:21;
30:21
**J-E-R-E-M-Y (1)**
6:12
**job (55)**
11:9;15:5;22:14,
17,24;30:6;34:17;
38:11,12,18;42:19;
43:10;45:2,14;46:7,
7;52:10;77:25;82:21;
85:13,17;98:7,16,17;
104:13,14;111:8;
112:4,10;118:11,14;
119:5;120:2;122:12;
123:11;136:20;
143:22,24;144:1;
150:12;157:9,13,15;
161:20;178:3;
242:16;251:11,14;
260:13;261:18;
262:17;299:18;
318:25;337:19;
347:21
**jobs (6)**
78:24;84:5;89:16;
118:21,22;125:8
**job's (1)**
154:19
**Joe (1)**
256:13
**jog (1)**
265:18
**join (1)**
38:6
**joined (2)**
85:10;91:16
**joining (1)**
91:23
**Jonathan (4)**
6:5;26:11;27:20;
29:5
**Jones (1)**
236:24
**Joshua (7)**

3:9;11:20;219:17;
331:9,22;351:14,19
**judge (4)**
8:11;28:18,19,24
**judgment (10)**
248:20,21,25;
249:20;250:9;
273:11,14;320:17;
343:23;344:14
**July (8)**
21:8,9;22:12,13;
35:11,18;37:5;95:20
**jump (4)**
7:19;8:6;197:22;
226:12
**jumped (2)**
183:20;197:17
**jumping (1)**
7:23
**June (3)**
5:2,13;95:21
**junior (1)**
260:24
**jurisdiction (1)**
330:15
**Justin (1)**
252:13
**Juvenile (10)**
40:8;41:2,18,22;
42:1,2,4,14,24;53:16

### K

**K-12 (2)**
294:23,24
**Karl (1)**
236:23
**Kaufman (1)**
346:13
**keep (12)**
16:1;42:19;63:13;
159:3,3;194:9;242:8;
259:6,9;289:12;
291:6;333:5
**Keller (1)**
236:23
**Kelly (1)**
32:17
**Kenny (1)**
236:24
**kept (12)**
55:1;131:6;178:24;
179:2;277:24;279:4,
15,22;280:19;
281:25;294:24;
314:10
**Kevin (2)**
145:16;233:21
**key (52)**
116:14;129:2;
239:13;275:20,22,23;
276:1,2,19,21,23,25;
277:21,24,25;278:6,

9,11,13,13,14,15,24,
25;279:5;282:11,14,
15,16,16,23,25;
283:1,10,11,17;
284:6;286:13,18;
287:6;290:8;308:11,
13,16;319:4,4,13;
320:20,21;325:1,12;
326:3
**keying (1)**
178:10
**keys (55)**
176:19,21,22,23;
177:8,9,10,11,13;
275:10,15,19;277:3,
3,23;278:2,3,18,21,
23;279:1,2,7,14,25;
280:6,7,16;282:19,
19,21;283:4,13,15,
17,17;285:19;286:8,
20;287:3,15;321:14,
16,21;322:6;323:12,
14,22;324:6,12,18;
325:10;326:15,18,23
**key-wise (1)**
287:17
**kick (1)**
181:3
**kid (3)**
251:1,2,2
**kids (3)**
310:5;311:3,3
**killed (1)**
351:19
**kind (89)**
15:7;41:13;46:19;
54:8;57:21;64:4;
72:15;76:9,9;77:13;
102:2;112:13;
113:17,21,25;114:3;
115:6;116:13;
125:24;132:17;
152:13;155:7,7,11,
12;157:5,22;159:16;
160:10,18;162:18;
167:20;175:13;
176:21;183:16,19;
185:13;187:19;
189:20;201:10,11,18;
202:12,13,14,18;
206:6;209:10,10;
216:21;224:19;
229:18,20,21;230:19;
231:17;234:22;
236:4;242:16;
253:25;255:16,17,18;
256:7;261:13,15;
264:9;265:4,12,19;
271:2;272:22;
274:22;282:22;
308:9,24;310:5;
312:22;313:6;
315:25,25;316:1,5,7,

25;318:5;326:18;
343:6;348:11
**kinds (1)**
166:23
**knew (14)**
64:4;155:6;158:21,
22;199:7,8,12;
234:12;260:16,18,18,
20;331:14;343:7
**knife (3)**
136:5,6,16
**knife-knife (1)**
136:8
**knock (1)**
96:20
**knocked (1)**
298:7
**knowing (4)**
83:4;212:23,23;
237:16
**knowledge (34)**
12:21;36:21;45:14;
46:6;48:23;60:20;
66:14;96:25;113:1,
24;114:12;116:2;
117:3,6,13,16;118:7;
178:23;179:1,6;
194:12;230:3,24;
232:8;241:12;
242:20;245:1;
298:19;319:24;
323:7;331:23;
346:10;348:24;354:7
**knows (6)**
122:12;138:4;
144:7;253:22,22;
255:16
**Krystal (1)**
269:22

### L

**labeled (3)**
201:12;202:7;
281:13
**lack (2)**
4:7;353:7
**laid (2)**
38:11,12
**laminated (1)**
131:10
**LaPorte (5)**
13:21,24;330:17,
20,20
**lapse (1)**
261:1
**last (22)**
16:22;22:13,16,20;
23:3,10;35:10;94:22;
123:24;124:2;
152:25;159:17;
187:7;239:2;241:4,5;
255:12;261:4;269:2;

271:23;277:18;
287:11
**latched (1)**
57:21
**late (4)**
44:7;57:3;246:15;
247:9
**later (12)**
7:14;40:11;48:8;
60:5;72:3;153:1,10;
195:12;232:4;252:7;
314:21;336:23
**lateral (1)**
41:14
**latest (1)**
226:10
**law (5)**
39:3;77:12;78:12;
79:12;330:18
**lawyer (9)**
21:24,25;26:14;
77:16;79:15;100:9;
179:15;318:20;
329:17
**layer (1)**
129:11
**laying (1)**
155:20
**layout (4)**
100:19,22;109:5;
306:9
**layouts (2)**
54:2;72:20
**lead (3)**
4:3,6;143:12
**leader (5)**
82:14;127:6,7,9;
182:21
**leaders (1)**
146:22
**leadership (3)**
93:16,17;149:2
**learn (15)**
19:16;23:23;80:25;
81:1;158:14;160:15;
161:8;186:2;195:1;
198:18,20;207:3;
212:4;245:7;298:16
**learned (10)**
12:15;57:7;168:1;
183:4;199:3,7;232:5;
247:3;298:21;336:23
**learning (14)**
79:24;80:8,9,13,16,
17,21;203:14;207:4;
214:17;215:8;216:5;
217:18;322:7
**least (5)**
45:7;141:8;151:17;
205:18;249:23
**leave (10)**
21:11;42:24;
105:18,22,23;111:20;

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 375 of 395

125:22;178:22;
263:21;327:15
**leaves (2)**
83:23;127:18
**leaving (6)**
112:18,22;138:10;
326:7,11,16
**led (7)**
31:13;36:14;
210:17;212:19;
329:25;330:10,22
**left (17)**
18:7;19:6,7,16;
23:9;26:17;34:10;
39:13;99:21;100:10;
103:14;109:10;
118:8;186:22;
326:11;330:6;354:22
**left-hand (6)**
101:20;102:16;
219:6;220:25;
221:13;334:20
**less (12)**
79:15;82:1,2;86:7;
115:10;156:5,5,6;
230:19;258:23;
310:19,21
**letter (1)**
253:22
**letting (1)**
209:23
**level (53)**
51:7;58:12;65:2;
66:11;68:8;71:15;
113:16;138:14;
142:6;143:5;144:4,5;
162:3,4;173:14;
200:2;209:8;210:13,
19;211:25;212:8,20,
23;213:8;217:22;
220:11;230:12,14,22;
237:22;241:19;
245:23;248:23;
250:15;251:8;273:4;
274:15;275:4;276:8;
278:5;281:8,11,14,
15,21;283:9,11;
292:10;293:18;
308:3;310:20;
312:15,19
**levels (11)**
54:1;67:23;76:9;
120:6,8,9;141:6;
184:14;199:25;
266:2;291:18
**Lexan (1)**
282:7
**license (1)**
143:19
**lie (2)**
234:21;343:7
**lieutenant (78)**
40:13,19,25;41:11;

42:6,11;43:17;44:6,
20;45:15,19;52:18;
58:12;59:6,8,14,24;
60:1;62:14;63:7;
72:3;85:11,14;86:8,
23,25;91:5;104:7;
109:25;110:1,12,23;
111:6;121:21;
138:13;200:3;
207:10,21,22,24;
208:14;212:1,9,19;
214:19;215:10;
216:6;217:21,25;
244:11;245:21;
246:25;247:4,11;
248:6;249:22;250:7,
8;265:21;266:3,7;
295:16;296:24,25;
297:2,20;299:19,23;
300:11,15,23;301:2,
17;303:24;324:13;
341:23;342:24;
344:15
**lieutenants (30)**
47:15;58:3;60:10,
17,22;63:3;64:22;
82:23,23;83:6,25;
84:4;85:1,2;88:13,
18;91:1,2;106:23;
111:13,19;118:20;
156:10;178:18;
200:1;253:8;257:17;
266:9;268:13;308:12
**life (11)**
55:12;114:3;116:1;
157:21;161:15;
250:9,20;251:3,7;
310:3;331:19
**light (2)**
185:25;206:9
**lighting (2)**
119:4;210:13
**lights (1)**
281:3
**likely (2)**
28:4;246:17
**likes (1)**
306:5
**limit (4)**
332:5,7,14,21
**limitation (1)**
141:24
**limitations (1)**
3:25
**Lincoln (1)**
287:7
**line (20)**
15:8;18:12;28:19,
24;29:6;65:1;69:12;
172:9;223:22;
227:22;230:12,14,22;
273:4;274:14;275:4;
293:25;312:15,19;

313:3
**lined (1)**
13:18
**lines (3)**
77:17;196:1;271:5
**linked (1)**
244:5
**list (18)**
59:5,17;93:20;
98:8,11;101:20;
115:6;122:12;130:9;
131:1,8;133:13,15;
143:21;221:20;
240:22;259:16;
301:22
**listed (11)**
94:13;102:15;
220:25;221:4,14,23;
223:24;235:13;
236:10;239:6;303:3
**listen (2)**
143:1;188:21
**listened (1)**
212:9
**listening (4)**
187:11;189:4;
198:12;207:15
**listing (1)**
192:24
**lists (3)**
101:22;199:18;
235:19
**litigate (1)**
4:5
**little (67)**
82:1,2;86:7;103:9,
11,14;113:18;
120:14;126:10;
131:9;135:24,25;
136:3,6,7;137:23;
143:19;152:21;
159:9;161:3;162:22;
163:5;170:8;173:16;
176:24;177:4,23;
185:17;186:5;192:6;
197:10,11;199:17;
200:3;204:20,20,23;
205:6;206:14;
218:20;220:16;
227:20;250:10;
255:13;261:23;
266:20,23;267:1;
281:3,4;282:22,24;
294:6,6;308:23;
311:11;313:14,14;
324:11;332:9;337:1,
19;338:11,14;
343:19;344:6;349:11
**live (5)**
107:21;143:18,20;
162:6;293:13
**lived (1)**
354:19

**living (2)**
15:6;119:1
**lobby (1)**
177:4
**locate (2)**
203:8;271:19
**located (14)**
38:22;66:15;99:2,
9;101:1,5,11,23;
114:8,8;271:16;
308:18;309:6;320:19
**location (14)**
80:7;84:16;99:4,6;
103:15;127:2;
128:14,15;145:13;
175:5;177:12;182:7;
221:23;351:10
**locations (4)**
101:21;103:20;
105:12;172:20
**location's (1)**
249:19
**lock (17)**
246:13;276:1;
280:2,3,9,14,19;
282:1,17;284:7;
286:9;294:6,7,12;
307:6,6,23
**locked (11)**
278:11;281:6;
290:12;307:4,5,15;
308:6,6,8;326:9;
346:14
**locking (4)**
283:25;287:9;
290:17;296:8
**locks (9)**
283:3;287:15,19,
24;290:25;291:4,5,6,
10
**locksmith (1)**
286:11
**lockup (22)**
86:8,10,12,19,22,
25;173:18;174:2,13,
19,21;179:19;
181:22;182:4,16;
183:19;184:1,2;
185:19,21;257:18;
261:25
**log (12)**
65:18,20,23;66:4,
8;77:6;200:11,15,15;
203:19;240:10;
241:24
**logbook (11)**
241:21,24;253:20;
268:8,10;270:17,18,
25;271:3,7,10
**logbooks (1)**
285:20
**logged (3)**
66:8;200:5,12

**logging (3)**
66:14,17;137:25
**login (2)**
200:8,9
**log-in (1)**
65:17
**logistically (1)**
168:11
**log-on (1)**
65:19
**long (38)**
40:2;44:17;48:6;
63:23;77:21,21;92:4,
5,8;96:14;109:7;
144:7;160:9;171:6;
173:19;174:3;203:9;
206:12,20;207:1;
208:7;210:23;275:9;
281:23;283:24;
288:23;289:16;
293:19;295:23;
301:20;309:12,16;
310:7;320:20;335:4;
339:12;342:20;
344:18
**longer (5)**
151:10;224:6;
257:22;314:21;
332:20
**look (39)**
14:8,13;64:2;67:2;
69:18;78:2;79:10,11,
12,13;159:2,14,21;
160:3,5,5,12;162:14;
165:18;170:14;
171:15;196:15;
197:1;200:10;202:6,
14;208:9;227:19;
235:20;238:8;
241:15;244:2;256:8;
261:4;282:19,22;
289:17;291:18;350:8
**Looked (18)**
63:11,15;64:3;
67:3;104:13;109:4;
167:19;204:18;
205:6;206:1;237:18;
243:1,10,18;245:9,
16;272:5;314:8
**looking (34)**
15:2,9;75:22;83:4;
93:11;101:20;102:7;
159:18;167:18;
171:11,12;219:3,9;
223:10;224:21;
226:8,24;233:4,22;
243:3;250:4;260:20,
22;267:22;269:1;
272:12;297:17;
300:25;302:4;
305:24;307:18;
342:17;345:5,14
**Looks (8)**

BARBARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 376 of 395

135:21,25;136:6,7;
143:19;269:7;
282:21;345:11
**loop (1)**
272:10
**loopholes (1)**
128:19
**loose (1)**
117:2
**lose (2)**
52:7;154:18
**losing (1)**
43:10
**loss (1)**
42:10
**lost (3)**
9:2,7;151:23
**lot (35)**
42:15;53:18,22;
56:5;78:9,13;79:16;
80:19;93:19;104:19,
22,25;105:6,7;
113:11;156:2;169:1;
196:10;209:7;238:1;
246:3;251:25;254:4;
255:5,18;264:8;
265:11;298:4;304:6;
310:2;311:4;316:25;
326:10;337:16;
339:15
**lots (1)**
185:7
**loud (6)**
231:13;246:3,8;
292:16,19;293:19
**love (2)**
43:11;156:7
**lower (7)**
113:16;174:10;
239:7;324:6,8,12;
325:1
**luxury (1)**
144:4

### M

**machine (1)**
295:24
**mad (4)**
185:20;246:10;
337:8;338:23
**main (6)**
99:4;103:3;142:7;
174:24;180:7;317:10
**mainly (1)**
87:13
**maintained (8)**
55:1;93:22;225:1,
21;270:19,23;
279:25;312:10
**maintaining (3)**
271:9;350:16;
351:5

**maintains (2)**
45:1;98:11
**Maintenance (4)**
180:2,2,3;346:13
**Major (82)**
19:13;52:19;60:21;
61:11,16,17,17,20,
22;62:1,4,5,5,7,10,10,
22;67:5;71:18;81:13;
83:8,13;84:20;105:3;
107:9;108:24;
109:18;116:7;
121:19;143:1;145:2,
19;146:20;148:17,
19;151:14,20,23;
153:20;159:7;
162:12;163:22,24;
164:1;166:11,12;
191:8;192:5;193:3,
21;198:19;200:3;
225:11;227:4;
257:14,20;258:12,13;
259:22;260:9;
262:12,21;263:5,17;
264:17;265:2,7,22;
266:2;268:25;
286:25;303:7,7,10;
304:10,11,17,19,21,
25;305:2;347:12
**majority (2)**
4:21;185:8
**majors (1)**
63:2
**Major's (4)**
58:1;59:4;262:14;
312:12
**makes (12)**
8:11;11:6;42:11;
53:21;54:9;68:12;
95:4;125:14;147:11;
182:1;274:6;334:1
**making (24)**
7:8;8:17;29:8;
60:10;69:7;76:1;
106:2;114:22;
115:18;148:19;
158:1;169:3;209:5;
212:7;220:19;
231:25;240:18;
258:7;261:11;
263:14;300:2;304:6,
18;344:17
**male (4)**
233:22;244:11;
259:9;300:11
**male/female (1)**
260:15
**males (1)**
259:11
**man (7)**
166:14;172:14;
261:2;272:1;274:23;
337:20;338:10

**Management (2)**
149:23;332:3
**managing (2)**
85:19;119:14
**mandated (6)**
49:21;54:4,5;
144:10;146:23;
151:19
**mandates (1)**
147:2
**mandatory (10)**
49:22;50:6,13;
93:4;94:2,16;95:10,
16;97:6,9
**manual (9)**
47:9;93:3;311:15,
17,25;312:3,8,18,24
**Manual's (1)**
312:6
**many (35)**
6:21;20:5;56:3;
81:13;82:15;83:25;
85:6;87:5;92:7;
94:21,25;95:14;
122:10;124:24;
147:3;155:1;161:5;
172:11;175:13;
177:24;201:2,3,9;
225:15;228:15;
229:19;283:18;
286:20;290:13;
293:4;296:15;312:3;
333:10;338:14;355:4
**map (8)**
101:4,11;102:10;
162:18;184:4;
322:21,22;323:24
**March (2)**
3:14;38:25
**marijuana (1)**
185:25
**mark (7)**
102:21;218:11;
305:17;309:4;
322:22;327:25;336:3
**marked (16)**
100:3,7,12;101:11;
103:13;139:20;
218:13,17;226:5;
238:11,15;305:19,23;
322:24;323:1;328:2
**marking (1)**
100:6
**married (1)**
20:1
**marshal (3)**
313:16;314:12;
346:15
**marshal's (1)**
354:11
**masks (1)**
210:2
**mass (1)**

337:14
**master (2)**
179:21,22
**matched (1)**
243:10
**material (2)**
56:20;136:10
**materials (12)**
4:25;5:8;6:1;
45:18;47:4;50:16;
55:2,6;56:9;65:14;
96:9;155:19
**matter (10)**
32:7;66:7;71:10;
77:2;135:8;301:13;
311:11;319:23;
321:18;341:5
**may (23)**
7:3;8:10,24;22:5,6,
7,19,20;23:1,2,3,10,
14,19,20;35:4,8,17;
36:19;118:8;172:22;
211:11;220:1
**Maybe (43)**
31:4;39:16;66:22;
86:6;109:7;124:11;
148:6;160:17,17;
164:22;170:21;
202:15,19;210:6;
213:21;217:7;
225:10;233:6;
244:18;251:24;
255:16;271:24;
291:13;293:20;
295:25;298:4;301:6,
7,19;309:23;310:6;
311:11;314:21;
319:7;320:13;
328:18,19,19;342:10,
18,18,20;344:5
**mean (180)**
7:23;10:25;15:4,4,
6;18:7,11;19:4;20:8;
26:18;27:8;29:4,22;
30:1,3;53:1;58:13;
64:2;67:2;69:20;
78:13;79:9,12,14;
81:9,9,10;83:7;
93:19;99:24;102:4,7,
9;113:11;117:11;
120:3,5;131:21;
132:18;144:3;145:6;
154:15,16,23;156:1,
4,9;157:10;158:7,21;
160:8,25;164:14,14,
16,25;165:24;166:4,
4,9,10;167:20;
168:23,24;170:7;
171:15,15;176:4;
183:10,14;185:11;
186:3,9,10,20;187:1;
188:8;191:20;192:2,
13;193:8;196:7;

197:9,10,14;198:11,
14;204:22;206:8,10;
209:22,24;210:20,20,
21;211:21;216:18,
23;221:8,10;224:13;
227:10;231:3,16,16;
234:20,22;235:18,20;
236:4;237:11,11;
241:1;242:16,18,25;
243:12,25;245:19;
248:3,22;249:3,18;
250:19;252:6;260:3,
20,20;261:17;262:16,
24,24;263:2;271:22;
273:21,23;275:12;
276:6;289:1,15;
292:13,17,18,19;
293:17,18;298:15;
299:4;302:15;
309:21,23;310:1,1,
21,22;311:3;312:21,
22;318:22;319:20;
320:14;321:19,23;
323:11,23;324:10;
326:8,8;327:24;
337:12,16,18,20;
338:10,13;339:11;
340:1,14,15;341:4
**means (9)**
89:19;118:23;
120:24;131:11;
172:17;177:21;
281:5,5;332:6
**meant (2)**
158:2;235:5
**mechanism (4)**
283:20,25;290:5;
296:8
**mechanisms (1)**
287:10
**media (2)**
5:5;17:4
**medical (13)**
4:4;120:24;121:1,
7;130:15;145:8;
154:13;155:16;
196:19;222:7,23,24;
223:4
**medications (2)**
10:14,18
**meet (1)**
128:17
**meeting (4)**
127:13;316:8;
318:8;352:11
**meetings (2)**
158:3;318:14
**member (11)**
72:19;117:10;
121:13;122:19;
139:18;140:1,2;
145:9;251:21;
347:22;350:12

USDC NND case 3:18-cv-00995-JD     document 203-4     filed 03/29/21     page 377 of 395

**members (16)**
60:21;74:17;80:17;
122:10;124:1,5;
139:16;140:16,18;
147:21;150:4,19;
181:23;251:21;
303:11;331:22
**memo (1)**
230:15
**memories (1)**
166:23
**memorize (1)**
352:23
**memorized (1)**
350:4
**memory (21)**
10:12,19;11:15;
164:12;165:3,8;
166:17;167:3,9;
186:7;194:11;195:5;
215:4;228:10;234:3;
240:18;252:16;
261:1;265:18;344:6;
349:14
**men (1)**
246:10
**mental (1)**
331:15
**mentioned (3)**
146:12;280:22;
290:24
**mentored (1)**
44:23
**mess (2)**
67:9;186:4
**messages (2)**
5:4;17:12
**messed (1)**
117:24
**messing (1)**
354:20
**met (1)**
331:21
**metal (1)**
186:5
**Michigan (1)**
23:7
**middle (3)**
16:24;232:3;324:4
**mid-May (1)**
22:7
**midnight (2)**
224:17;334:25
**mid-shift (1)**
291:21
**midst (1)**
337:25
**midway (1)**
103:5
**might (73)**
10:8,14,22;26:22;
48:7,7;63:5;66:25;
68:16;69:20,20;

71:19;96:21,21;
103:9;104:5;105:11;
114:5,18;117:8,9,9;
118:6;132:7;144:11;
150:23,25;160:16;
168:18;172:13;
180:7,18;181:23;
183:2;188:6,17,18;
189:6,7;190:18;
195:11;198:18;
201:17;202:20,20;
203:20;232:1;
234:25;235:2,5;
238:7;241:6;253:19;
259:5,18,19;265:9,
10;266:7,10;268:24;
270:7;293:8,9;
295:14;300:6;301:5;
310:10;312:13,25;
340:16;342:14;
353:17
**migrate (1)**
264:5
**mile (2)**
42:22,22
**Military (4)**
38:20;39:5,13;
42:17
**military-minded (2)**
157:21;158:2
**million (1)**
67:11
**mind (5)**
102:8;149:25;
165:4;170:19;333:4
**mine (5)**
152:1;160:2;198:1;
203:20;300:6
**mini (1)**
135:21
**minimum (1)**
327:9
**minor (3)**
191:1;192:15;
220:18
**minute (9)**
128:11;153:1;
203:22;205:20;
233:15;272:11;
329:6;346:17,18
**minutes (12)**
90:20;91:10;96:21;
128:11;217:7;224:3;
232:3;233:7;240:23;
289:11;333:17,21
**misconduct (1)**
27:22
**misdemeanor (4)**
329:10,11,20;
330:1
**misheard (2)**
124:11;247:11
**misjudged (1)**

330:6
**misjudging (1)**
191:25
**Miss (1)**
267:19
**missing (2)**
4:20,23
**mission (1)**
148:13
**mistake (1)**
158:8
**mistakes (1)**
158:14
**mistreating (1)**
28:1
**misunderstanding (1)**
274:5
**misunderstood (1)**
9:1
**mix (1)**
283:2
**MK-90 (2)**
135:20;137:25
**moment (4)**
209:15;214:6;
321:12;340:15
**moments (1)**
214:22
**Monday (15)**
23:15,18;86:9;
87:20,22;89:14,17;
90:2,3,5,15;316:6,16;
317:17,23
**monitor (3)**
158:18;162:24,25
**monitored (1)**
279:12
**monitoring (9)**
181:18;190:11,13;
198:13;217:23;
299:2,15;302:13;
340:18
**monitors (1)**
175:7
**monkey (1)**
144:11
**month (13)**
40:20;48:7;92:5,
11;144:11,17,24;
147:3;151:18,20;
159:11;262:1;270:21
**monthly (7)**
145:4;146:24,24;
153:15;162:21;
163:1;284:20
**months (13)**
40:1;42:19;48:8;
76:12;85:16;86:4;
154:24;157:2;
159:17;160:17;
254:2;271:23;329:13
**more (78)**
11:6;41:14;46:8;

48:2;56:12;69:9,10,
11;70:3;78:9;80:11;
89:15;97:2;102:4;
112:12;113:25;
120:14;125:13,15;
126:3,3;130:23;
132:17;150:25;
157:20,23;158:2;
161:2,7,24;163:13;
169:1;170:20;
184:14;187:19;
188:5;191:17;194:4,
8;195:17;196:8;
197:2,17;203:4;
206:15;237:14;
239:18;250:13;
252:10;254:11,15;
255:10,14,19;260:23,
24;262:5,22;263:14,
19;264:4,18,20,20,
25;265:3,22,24;
288:15;291:2;311:8;
313:4;317:6,8,21,21;
345:25;346:5
**morning (16)**
3:5;86:2;87:18;
88:15;91:3;106:7;
166:7;227:8;294:8;
298:9;316:6,16;
317:17,23;327:15;
337:15
**most (32)**
4:11;56:4,10;
106:7;113:1;119:24;
124:2;125:12,14;
127:6,11;128:16;
132:18;139:25;
144:3,5;159:21;
162:5;186:4;226:9;
236:1;240:8,10;
253:6;264:1;268:17,
17;287:8;292:22;
293:13;299:11;
323:13
**mostly (3)**
8:13;185:18;
194:11
**motion (1)**
4:12
**move (15)**
5:18;13:7,12;16:2,
4;55:25;97:2;143:2;
213:10;256:16,22,22;
258:2;260:11;261:15
**moved (5)**
87:5;113:19;
257:25;267:17;
271:22
**moves (2)**
84:21;256:24
**movies (1)**
205:5
**moving (7)**

5:23;14:3,6;32:23;
48:1;55:10;333:5
**much (13)**
104:5;150:18;
158:21;160:13;
168:24;197:14;
203:13;238:6;243:9,
18;260:25;315:24;
355:15
**multiple (5)**
36:13;76:24;96:6,
12;202:22
**mumbo-jumbo (2)**
79:15;81:18
**must (3)**
95:24;241:25;
335:7
**myself (11)**
44:12;55:18;82:14;
93:14;155:22;251:1;
253:7;255:2;300:5;
334:3;342:8

**N**

**NAGY (37)**
6:6;14:11;24:13,
18,20,23;25:21;
26:12;27:21,25;28:3,
25;29:8,12,15,18;
30:19;31:4;91:11;
149:13;170:10;
217:6;289:14;
320:24;321:3,6;
332:1,19;333:17,23;
349:5;351:18,23;
352:17;355:14,22;
356:3
**name (31)**
3:6;6:11;16:22;
32:15;56:24;59:18;
65:22;66:4,9,10;
88:3;102:18;107:17;
138:2;146:13;
163:11;168:8;
170:24;171:5;200:6,
7;234:16;239:23;
252:20;260:18,19;
267:17;268:13;
269:21;278:17;
286:12
**named (3)**
3:15;178:16,17
**names (6)**
59:5;253:1;260:20;
267:23;268:11;355:3
**name's (2)**
70:2,5
**narrated (1)**
336:3
**narrating (2)**
336:8;338:7
**narrative (13)**

USDC INND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 378 of 395

153:2;189:25;
191:18;221:14;
224:22;226:8;229:7;
230:1;232:1;233:17;
236:11;244:8;338:22
**natural (2)**
211:4;325:20
**navigate (1)**
201:4
**Neal (7)**
19:14,15;107:16;
303:8;304:17,20;
312:23
**necessarily (1)**
226:21
**necessary (1)**
213:5
**need (53)**
9:9,20;14:9;29:18;
54:7;57:20;61:18;
64:15;73:17,18;
77:19;104:3;105:13;
106:18;115:6;
119:15,21,21,22;
124:4;132:10;
134:11;135:5,13;
136:17;137:22;
141:2;149:17,19;
152:22;177:13;
181:24,25;182:19,19,
20;188:6;193:2;
201:4;212:24;233:6,
13;242:2;244:12;
256:12;273:5;279:1;
284:6;288:24;
289:14;291:22;
292:22;326:1
**needed (17)**
47:1;54:23;56:12;
67:5;77:18;81:10;
82:19;104:3;136:15;
182:15;232:13;
249:24;277:4;280:7;
300:2,13;343:21
**needing (1)**
73:5
**needs (7)**
45:7;71:10;89:17;
176:16;258:15;
259:21;260:1
**negotiations (1)**
333:15
**negotiators (2)**
150:11;151:3
**networked (1)**
243:7
**new (53)**
53:23;54:12,13,17;
56:11,21,22;57:2,25;
58:5,25;59:2,19;
60:11,22,23;61:4;
62:17,21;63:3;71:8;
73:18,22;75:6;76:1,

10;80:25;81:2;92:2,
10;131:9;132:14,22;
137:19;146:3;
160:16;172:22;
207:3;232:12;
251:23;252:4,15;
254:2;255:19;259:1;
262:5;263:9,10;
284:16;287:10,24;
292:5;315:17
**newer (4)**
252:2;262:6;291:4,
10
**newness (1)**
287:18
**next (24)**
10:4;13:14;23:13;
34:8;37:14;89:24;
90:5;135:23;138:4,7,
11;157:2,14,15;
167:21;208:20;
244:7,8,16;245:2,4;
326:12;354:22,23
**nice (2)**
132:17;240:11
**Nickham (1)**
147:1
**night (71)**
11:18,23,25;12:8,
15,22,25;86:3,4;87:4,
17,17;88:9,12,14;
89:2;91:4;98:23;
99:1;106:5;107:1;
122:13;164:10,17;
166:5;173:19;180:6;
183:17;237:9;238:5;
251:11;252:2;257:8;
258:8,14,23,25;
260:4,10,11;263:15,
22;264:7,13,19;
265:1,3;267:21;
268:15,16,18;277:7;
280:10;284:25;
285:3;293:14,19,21;
295:6;296:6;299:22;
307:1,4;310:25;
317:15;318:22;
326:9;327:12;
331:16;334:23;
341:22
**nights (6)**
255:19,19;259:20;
263:24,25;265:5
**nighttime (2)**
87:6;97:22
**nine (4)**
94:23;95:15;148:6;
269:11
**ninety (2)**
259:3,3
**nobody (8)**
124:9,9;142:22;
192:11;196:17;

204:22;234:20;
285:22
**no-call/no-show (1)**
124:10
**nodding (13)**
9:4;19:10;32:14;
49:9;74:24;99:5;
101:19;116:18;
142:15;173:7;
244:23;279:6;324:21
**noise (3)**
293:18;339:25;
341:3
**nomenclature (2)**
135:23;139:19
**none (1)**
210:1
**nonstop (1)**
174:16
**Nope (2)**
12:24;214:3
**nor (1)**
226:1
**normal (8)**
11:1;142:3;147:21;
164:25;165:13,25;
178:3;261:18
**North (11)**
201:14;221:24;
222:2;233:23;
276:16,18,23;277:1;
281:17;306:19,21
**northern (2)**
150:15,17
**notes (6)**
152:21;153:1;
289:7,17;301:15;
318:7
**noteworthiness (1)**
220:11
**nothing's (1)**
204:13
**notice (3)**
243:16;328:8,14
**noticeable (1)**
206:24
**noticed (1)**
5:19
**notorious (1)**
76:5
**November (1)**
40:23
**Nowatzke (19)**
19:13;61:20;62:5,
10;71:18;83:13;
107:9;148:17,19;
153:20;163:24;
164:1;303:7;304:17,
19,21,25;305:2;
347:12
**NSB (1)**
268:3
**number (27)**

3:20;6:22,24;
15:22;16:1,5,13,14;
78:19;83:19;92:14;
123:1,4,5,5;135:19,
22;178:19;218:19;
272:7,8,22,24;
283:17;327:7;332:8,
11
**numbered (1)**
175:10
**numbers (15)**
116:5;117:17,18;
123:8;148:7;178:21;
218:21;258:24;
259:6;260:3,3,15;
264:25;272:21;
273:24
**nurses (2)**
134:18;136:17

## O

**oath (1)**
9:16
**object (3)**
29:9;351:15,20
**objecting (2)**
29:15;321:5
**objection (6)**
8:16,17;27:9,11;
29:14;320:24
**objections (3)**
8:10,12,13
**observed (4)**
290:3;336:9;348:7,
17
**obtain (1)**
324:17
**obtained (1)**
62:19
**obtaining (1)**
60:15
**obvious (1)**
172:22
**obviously (4)**
71:10;83:3;111:11;
333:14
**OC (3)**
120:6;135:24;
138:15
**occasion (4)**
76:23;242:6;
243:15;350:11
**occasions (3)**
6:21;76:24;340:10
**occurred (2)**
11:11,14
**occurrence (2)**
269:16;340:12
**occurs (1)**
220:10
**OC'ing (1)**
193:9

**o'clock (3)**
88:14;145:15;
227:8
**October (1)**
40:23
**odd (6)**
183:16,20;185:13;
195:23;197:2,17
**off (73)**
9:22;10:3;13:22;
14:1;21:19;25:13,20;
30:23;35:21;38:11,
12;45:23,23;49:7;
50:3;54:14;56:24,24;
58:1,14;59:19;60:11;
71:24;89:15;90:3,5,6,
9,10,10;91:9;96:11;
98:20;105:5;110:22;
111:3;124:9;125:19;
131:16;136:16;
141:1;144:15;
164:25;167:20;
185:24;189:5;
212:13;221:21,22;
223:7;243:6,20;
256:18;257:11;
268:18,20,24;269:5,
7,13;280:13,18;
289:22;296:15,15,20;
304:16;308:24;
312:4;333:13;
346:16;355:20,25
**offender (48)**
24:5;27:23;28:1;
30:5;106:11;113:19;
121:1,4;124:3;129:1,
16;143:16,18,21,22;
144:3,6,6,14;186:16;
187:13,18,20;188:22;
189:17;192:11;
193:9,11;195:15;
196:18;209:13,14,17;
210:1,15;222:6,20;
223:3;292:16;
296:25;297:5,10;
320:15;325:6,22;
340:3,6;347:7
**offenders (42)**
68:8;76:9;89:18;
104:8;106:9;113:17;
132:18;174:15;
195:20;209:8,8,11,
20,24,25;210:3,4,14;
244:14;246:5;
248:23;250:14,15,17;
255:1;285:16;
290:17;291:5;293:6;
294:9;300:14;
303:18;315:19;
326:7;347:19,19,23;
354:19;355:1,2,4,4
**offender's (3)**
196:18;285:20;

BARBARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

USDC IWND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 379 of 395

326:12
**offer (3)**
172:24;310:9;
355:9
**office (85)**
24:7;33:22;49:2,
12;54:4;58:1,2;59:4;
68:1;69:4;71:9;
81:17;99:20,22;
101:10,12;102:19,20,
23;103:5,16;104:4,
18,20;105:8,18,19,
22,24;106:13;109:4;
111:17,20,22;112:2,
18,23;114:9;116:4;
117:20;118:9;
119:20;120:1,17;
131:9;132:5;137:14;
140:5;146:2,4,25;
162:17;167:25;
168:2;169:3;175:19,
24;189:1;199:15,24;
213:14;217:16;
226:23;227:5;229:3;
243:3;245:9;261:7;
272:20;291:24;
293:24;299:9;303:3,
5,6;312:12,13,14;
327:5;328:16,17;
336:12,13,18;348:13
**officer (119)**
12:1,17;39:20;
40:6;45:4,25;47:19;
52:9,16,18,19,20,22,
24;57:10,12;64:20;
66:19;91:25;92:10;
93:2;97:12;99:19;
107:2;121:20;
122:17;127:2;
168:10;170:24;
171:2,3,8;173:8;
175:6;176:15;
177:17,18;178:15,15,
17;179:17;181:1,21;
183:13;189:1;
193:13,17,21;194:1;
214:14;233:2,20;
234:7;236:23,23;
237:7;239:11,12,13,
14,20,21,23;240:7;
242:6;245:13,20;
252:9,11,13;253:2,9,
11,16;254:12,21;
256:9;260:23,24;
266:21,24;267:15,17,
25;268:2,2,6,19;
269:25;270:2,3,6,8,9,
10,10;273:5,18;
274:15;275:4;283:9;
291:20;292:3;
297:19;299:11,12;
302:2;306:12;308:1;
309:21;312:7;313:3;

319:2,10;320:3,18;
325:5,25;344:15
**officer-in-charge (1)**
255:6
**officers (52)**
18:4,12;50:20;
51:24;52:23;54:19;
59:9;63:2;65:2;
87:16;88:12;94:25;
168:7;171:22;
214:25;242:7;
247:12;252:2,3,14,
17;254:17;256:3;
258:25;259:2,13;
261:16;262:9,22;
263:15;264:5,18;
265:3,4;266:13;
277:7;279:4;286:9;
291:14;295:12;
308:15;312:16,19;
320:1;325:14;
326:17;327:14;
328:13;331:7;339:6,
17;343:24
**officer's (10)**
277:25;278:9;
310:13;320:10,13;
321:15,19;323:15;
327:17,19
**offices (1)**
101:14
**official (1)**
43:9
**often (3)**
83:18;154:16;
290:23
**OIC (16)**
253:4;266:25;
267:1,8,9,12,21;
268:11,12,15;271:11;
277:17;278:5,22,23;
326:18
**OICs (1)**
254:4
**OIC's (2)**
326:20;327:1
**old (13)**
14:15;20:20;34:17;
282:19;283:1;287:9,
13,25;291:5,7,10,11;
324:11
**older (1)**
162:10
**old-school (1)**
282:18
**once (25)**
8:21;16:3;48:10;
93:1;94:23;116:24;
129:4;142:20;162:9;
168:24;172:3;
177:17;181:5;182:5;
185:11;186:20;
200:10,23;202:23;

229:8;263:20;264:2;
270:21;320:18;
325:15
**One (197)**
20:6;49:25;50:3;
51:9;55:10;58:16;
61:17;64:5,10;66:1;
68:20;69:20,20,21,
21;72:24;76:23;
79:24;83:17,22;
84:15,20,22;88:3;
91:5;96:20,21,21;
100:1,6,7;101:14;
105:23;106:20;
110:19;113:9;
120:12,12,16;122:1,
19,23;125:10;
131:25;132:1;
133:21;135:19,24;
136:3;137:4,6;
138:23;140:20,22;
141:24;146:4,21;
147:7,24;148:1,1;
152:25;153:10,10,12,
12,12,13,15;157:3;
159:6,11;160:10,21,
23;161:22;162:20;
164:3;166:5;168:7;
169:15;172:11;
173:3,12;174:6,24;
175:9,25;179:12,24,
25;183:19;184:20;
185:12;186:12,13,15;
197:2;198:18;
199:23;201:10,13;
202:14,21;207:24;
215:5;225:11,11,12;
226:5;228:18,21,22;
230:17;232:19;
236:22,24;238:3;
242:21;243:8,19;
250:8;253:7;254:13;
255:1;257:11,19;
259:3,4;260:4,5,10;
261:15,20;265:23;
267:13,18;269:3,10;
271:24;275:2,23;
276:14;277:1,1,7,8,9,
9,21;278:8,14;279:4,
4,15,19;280:18,18,
19;283:18;284:16;
286:9,9,23;292:1,8;
298:2;306:19,20,20;
308:7,20,22;309:13;
312:18;318:13;
320:8,17;321:10,11;
325:5;328:10;329:4;
332:8;335:7,19;
337:24;338:1,1;
340:22;343:7,23;
344:24;346:17,18;
348:12;354:1
**one-one (2)**

266:14,18
**ones (30)**
50:12;77:19;95:2,
3;98:8;120:24;
126:15;132:4;
141:21;145:7,11,12;
150:1,23;162:7,9;
173:4;201:16;
260:12;263:23;
291:2,11,12;307:11,
12,13,14,16,17,17
**one's (2)**
138:23;260:9
**ongoing (3)**
181:6;199:8;
330:24
**only (55)**
4:16;9:25;39:16;
42:14;66:21,21;
73:24;82:16;89:16;
92:6;94:2;107:6;
108:14;121:13;
129:13,15;134:9;
135:1;140:24;142:8,
25;143:5;148:20;
152:8;157:8;164:3;
166:4,25;173:16;
178:17;197:8;
198:19;200:1;201:3;
209:5;210:4;211:25;
212:8,20;213:7;
230:2;243:11;
257:14,14;276:23;
277:21;281:11,14;
283:9;286:8;313:5;
327:14;330:7;347:6;
354:14
**onto (10)**
39:18;57:21;65:20,
23;66:4,8,14,17;
200:6;260:11
**Opal (1)**
32:17
**open (35)**
19:21;27:19;54:6;
68:13;83:18,22;84:4;
89:17;125:15;
150:25;174:14;
176:6;214:14;228:2,
19;229:3;281:5,18,
23;290:5;291:6,12;
296:1,7;297:7;
319:12;323:20;
325:3,5,9,21;326:11,
12,16;336:14
**opened (4)**
205:13;210:10;
213:19;304:5
**opening (4)**
119:11,11;200:24;
228:11
**operating (3)**
283:21;285:18;

295:24
**Operation (3)**
227:2;306:25;
351:1
**operational (1)**
307:2
**operations (2)**
100:25;148:25
**opinion (9)**
156:19;254:22;
255:3;274:8;319:15,
22;320:6;340:22;
351:12
**opportunities (1)**
94:6
**opportunity (5)**
79:20;219:25;
347:22;350:10;
352:12
**opposed (1)**
210:19
**opposite (1)**
290:10
**Op's (1)**
226:23
**option (1)**
156:7
**options (1)**
154:4
**order (17)**
5:19;6:1;28:19;
82:20;122:9;159:23;
209:10;210:17;
212:7;214:1;247:25;
250:3;251:17;
278:15;320:23;
355:18;356:1
**ordered (4)**
211:2,7,15;355:24
**orders (13)**
112:4,7,10;113:4,
22;132:6,7,8,12,15,
20,23;355:17
**ordinarily (1)**
269:18
**ordinary (2)**
164:18,24
**organically (1)**
80:22
**organized (2)**
248:7;249:12
**orient (1)**
224:4
**origin (1)**
351:25
**original (3)**
355:25;356:1,4
**others (6)**
13:1;37:1;80:21;
81:7;291:3;328:14
**other's (1)**
129:25
**ours (1)**

BARBARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 380 of 395

189:19
**out (180)**
5:23;8:15;9:9;
13:7;16:4,12;20:21;
22:9;23:16;35:4,7;
37:5;39:16;44:13;
47:16;48:15;50:6;
53:6;56:6;57:24;
61:18;63:8;68:1;
69:13;70:19;71:9;
72:23;74:5;75:17;
77:18;83:5;85:20;
94:20;96:20;97:8,9;
98:13;100:10;101:2,
17;104:9;105:13;
106:10;109:21;
111:25;114:5,19;
115:20,21;117:6;
120:11,13;122:11;
128:15;129:7,19;
132:25;134:17,22;
136:7;137:25;138:6;
143:22;144:2,23;
145:3;151:4;152:3;
153:6,21,21;155:20;
160:10;161:3;162:8,
9;164:18;167:20,21;
169:4,16;174:15;
177:11;180:7;181:3;
185:9;186:22,23;
187:20;189:7;192:4,
7,9,25;196:13,16;
197:2,11,12;204:19;
205:3,7,16;206:5,7,
14,17,25;207:6,9,13;
208:21;209:20,24;
210:9;220:9;224:20;
227:15;228:8,15,18,
20,23,25;229:7,9,13;
231:21;232:20;
233:9;235:4;241:5;
242:17;244:14,17,22;
245:5,9;249:2,3;
256:7;257:21;
270:21;272:7,8,10,
22;278:17,23;285:16,
20;286:20;289:18;
292:1;294:7,8,13;
296:2;300:15;303:6,
22;304:3,25;308:14;
313:10,12;316:1,7,8;
317:2;318:19;
325:21;326:13;
331:12;332:2;336:6,
18;349:24;350:25;
354:24
**outlet (2)**
185:16,22
**outlets (1)**
186:5
**outrank (1)**
111:11
**outside (31)**

15:11,15;60:16;
81:9;93:8,12;99:24;
104:4;108:2,5,7,10;
113:15,16;142:22,23;
147:19;173:14;
174:1,11,11,19;
177:4;179:19;180:1;
183:15;237:22;
239:8;303:16;
322:13;340:5
**outstanding (7)**
161:20;236:21;
237:12;250:7;
251:11,14;318:24
**over (49)**
7:1;38:15,19;43:2;
45:1;47:13,23;48:2;
56:5;68:16;91:19;
117:22;119:21;
133:5;145:12,12;
156:22;158:19;
159:24,24;160:7;
166:23;167:6;
170:16,22;178:8;
181:11;182:11;
196:19;197:4;
198:20;199:4,9;
210:5;212:19;
216:11,25;231:10;
237:23;287:8,25;
289:6,10,10,10,17;
305:13;314:7;318:5
**overall (3)**
68:2,3;168:14
**overbearing (1)**
34:14
**overheated (1)**
186:25
**overlapped (1)**
111:9
**override (3)**
173:25;179:22;
181:2
**overrides (1)**
173:22
**overriding (1)**
173:20
**overseeing (1)**
353:20
**overview (3)**
229:22,22;230:6
**owe (1)**
185:20
**own (10)**
15:2;18:2;26:14;
75:23;85:1;139:12;
151:17;173:15;
236:4;247:14
**oxygen (1)**
210:2

**P**

**pacific (11)**
69:11;96:7;112:13;
165:25;176:18;
195:13,18;200:21;
216:23;276:4;287:5
**pacifically (3)**
138:23;248:13;
276:20
**pacifics (2)**
70:3;170:7
**pack (1)**
348:9
**packet (11)**
44:20,25;45:12,13,
17;46:25,25;47:5,7;
91:21;219:4
**packing (1)**
55:11
**padlock (3)**
278:15;308:11,14
**page (14)**
9:10;69:21;218:24,
25;219:3;223:20;
224:23;237:3;239:1;
269:2,2;270:17;
307:18;309:10
**pages (3)**
69:20;114:22;
238:18
**painters' (4)**
38:13;39:14,16;
40:3
**pale (1)**
324:11
**panel (12)**
281:8,10,15,16,18;
282:25;283:11,21,22;
309:14,17;320:22
**panels (6)**
283:5;287:4;
308:18,19;309:5,13
**paper (4)**
69:18;272:14;
335:13,17
**papers (5)**
45:19;55:16,19,25;
56:1
**paperwork (9)**
98:18;104:19;
105:2,6,7;124:20;
192:4;238:3;270:19
**paragraph (1)**
69:21
**part (27)**
16:20;36:2;47:22;
49:22;50:6,13;53:17,
19;55:2;58:15;71:16;
72:9;73:4;113:22;
115:13;119:7;
157:22;159:20;
163:5,7;165:4;
166:21;197:20;
266:3,5;312:24;

316:12
**partial (1)**
232:10
**participated (2)**
315:7,16
**particular (20)**
11:5;65:17;66:19;
67:19;73:10;89:20;
98:25;105:12;111:5;
122:22;123:3;
124:12;173:8;202:3;
253:3,10,13;254:19;
256:25;258:11
**particularly (2)**
56:8;164:22
**parts (4)**
164:22,23;227:10;
302:16
**pass (3)**
96:8;115:21;
352:17
**passage (3)**
11:1,6,12
**passages (1)**
307:4
**passed (6)**
58:25;71:8;177:3;
203:14;222:17;
318:23
**passing (1)**
222:22
**password (5)**
65:23;66:5,9,10;
200:6
**past (2)**
319:21;333:4
**Pat (1)**
41:16
**patrolling (3)**
103:24;105:21;
106:15
**pattern (4)**
90:8,12;104:6,8
**patterns (3)**
158:18;160:6;
162:14
**pause (1)**
8:6
**pausing (6)**
336:2;337:6;339:2;
341:12;342:13;
343:14
**pay (5)**
41:9;42:10;52:7;
318:16;330:14
**pay-attention-to-detail-type (1)**
239:19
**paying (3)**
288:15;316:2;
340:16
**Payne (2)**
19:14,14
**PCU (2)**

267:25;268:1
**pdf (2)**
151:22,25
**peaceful (1)**
261:22
**pee (2)**
193:10,12
**pen (2)**
103:6,7
**pending (1)**
4:16
**people (111)**
33:21,22;43:12;
48:15;51:17;59:17;
71:14;73:11;75:12;
80:4,17;82:15,16;
85:6;105:1,5;106:7;
107:6;113:25;115:4,
6;118:5;119:14,17;
121:12;123:23;
125:4,6,20;127:17,
22;133:2;140:20;
148:3,4,20;149:17;
150:24;152:17;
155:8;156:5,7;
160:13;161:2;162:6;
169:5;172:11;
174:14,24;178:17;
180:24;181:9;
182:12;189:5;
192:19;198:13;
200:19;225:18;
229:17,19;230:8;
231:17;233:5,11,13;
243:9;245:5;246:3,9;
251:6,9;254:4;
255:16;256:8;258:3,
11;259:4,17;260:5;
262:5,6;263:2,6,19,
20;264:1,12,13;
269:13,15;277:13,19;
282:12;292:11,23;
293:4;298:6;299:22;
304:24;310:24;
313:23;316:6,9,14,
23;317:9;320:7;
323:13;325:21;
326:21;340:21
**people's (2)**
98:19;348:11
**pepper (6)**
120:7,9;135:21;
137:2,4;138:14
**per (6)**
151:19;246:6;
258:25;275:23;
279:19;347:8
**percent (3)**
52:7;264:12,13
**perfect (6)**
79:25;124:8;126:7;
187:15;232:18;
316:20

Min-U-Script®

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 381 of 395

**perfectly (1)**
164:24
**performance (4)**
30:6;83:5;98:14;
156:20
**perhaps (2)**
241:9;332:24
**perimeter (8)**
104:10;105:21;
108:2,3,8,9;142:22;
239:8
**period (24)**
19:1,24;35:13;
48:18;65:1;71:14;
72:2;103:19;106:16;
126:6;128:2;166:24;
206:15;207:18;
212:11;218:8;263:1;
264:22;280:1,17;
297:24;298:14,18,23
**periodic (1)**
178:8
**perished (1)**
29:2
**permission (2)**
17:22;245:21
**permitted (1)**
275:3
**person (36)**
45:7;58:16;75:9,
14;96:23;108:14,15,
18,21;112:22;
121:18;138:7;
140:24;142:25;
160:16;176:14;
180:25;182:11;
189:2;239:19;
248:10;253:6;
256:22,23;257:15,24;
264:11;268:5,15;
277:7,8,9;282:12;
304:14,18;316:21
**persona (1)**
176:10
**personal (24)**
3:8;16:10;17:6,12,
18,23;18:6;20:8,22;
21:25;27:5;55:5;
94:9;197:24;198:3;
230:3,23;249:14;
254:22;255:3;
257:15;274:8;320:6;
331:18
**personality (1)**
331:19
**personally (11)**
24:15;79:19;
154:15;195:23;
237:13;290:3;
297:10;299:7;302:8;
331:10;336:9
**personnel (10)**
4:20;15:24;25:10;

29:22;33:19,20,23;
34:5;93:23;105:3
**person's (2)**
257:22;261:2
**perspective (5)**
30:8,9,12,16;
217:15
**Perstective (1)**
30:14
**phone (34)**
14:14,16,21;15:24;
16:7,11,12;17:12,18,
23;18:1,2,5,6;19:17,
20;22:19;38:19;80:6;
116:5;117:17,18;
140:22;145:10;
155:11;170:3;
171:11;175:7;188:4,
10;189:4;198:12;
227:12;229:12
**phones (9)**
18:8,10,13,14,20,
23;19:5,12;155:9
**phonetic (3)**
147:1;165:21;
268:3
**phrase (3)**
8:25;315:5;338:3
**phrasing (1)**
274:6
**Physical (13)**
42:21,21;66:15;
78:19;79:20;113:10;
114:7;247:22;
272:14;331:16;
340:6;350:21;351:9
**physically (10)**
22:21,24;23:3;
69:15;107:2;108:19;
111:21;119:11;
283:22;324:9
**pick (3)**
104:11;259:24;
260:12
**picked (1)**
83:9
**picket (8)**
330:2,3,4,5,6,13,
14;331:4
**picking (1)**
260:12
**picture (2)**
229:23;231:7
**piece (6)**
230:8;231:4;
295:19;296:5;
335:13,17
**pieces (5)**
71:5;139:20;186:5;
246:18;353:8
**pillar (1)**
308:25
**pillars (1)**

281:3
**pipe (1)**
318:2
**place (29)**
5:2;15:2;98:25;
101:17;111:17;
188:8;208:8;214:18,
22;217:24;246:14;
273:3,16;275:20;
283:25;285:12,15;
298:5,17;301:23;
303:4,18;314:19,25;
317:11;332:4;
344:18;347:4;353:22
**placed (2)**
100:11;348:12
**placement (3)**
350:21;351:9;
353:10
**Plain (1)**
265:25
**Plaintiff (3)**
3:2,7,13
**plaintiff's (1)**
4:14
**plan (13)**
14:23;15:5,6,9;
34:9;156:12;247:16,
19,24;248:19;272:3;
306:5;332:3
**planned (1)**
13:12
**planning (4)**
13:7;15:1;32:23;
333:11
**plans (9)**
72:20;73:25;74:1,
3,4,14;75:10,22;76:1
**plate (1)**
143:20
**platform (1)**
308:21
**play (7)**
142:8;170:17;
193:11;313:7;314:5;
329:3;338:24
**played (1)**
161:15
**playing (11)**
299:22;316:6;
335:3,6,24;337:4;
338:25;341:10;
342:5,9;343:12
**playing} (1)**
341:6
**plea (2)**
329:15;330:1
**please (10)**
6:10;9:8;21:18;
63:14;66:2;180:23;
211:12;301:15;
305:18;328:1
**pled (1)**

329:19
**plugged (2)**
185:16;186:24
**plus (8)**
90:20;106:9;
188:21;225:13;
250:17;280:19;
293:8;302:16
**plussing (1)**
203:21
**pm (21)**
88:6,15;91:6;
97:23;98:1,1;221:4;
233:19;236:12,16;
240:22;241:3;
244:12;297:18,19;
300:8,12,23;301:18;
303:25;356:6
**pocket (1)**
136:6
**point (32)**
9:5,21;28:17;55:7,
15;63:24;73:20;77:7;
105:25;110:9;116:8;
158:1;163:25;167:1;
203:25;205:24;
206:7;207:5,24;
209:5;210:20;
222:22;246:23;
262:20;265:8;
298:16;318:4;332:1,
2;337:8;338:22;
347:2
**pointing (2)**
202:17;307:17
**pointless (1)**
234:22
**policies (73)**
12:2,5,10,12,18;
45:1;46:1,3,5;47:4,8,
13,16,23,25;48:3,25;
49:13,18;56:15;57:4,
17,24;58:4;60:12,23,
24;61:4;62:17,21,21;
63:4,11,16,17,25;
65:7,9;66:23;67:14,
18,24;75:23,25;77:6,
9,18,21,23;78:6,20;
79:16,21;80:13,25;
81:1;112:13;116:13,
25;117:1;272:12,15,
20;286:23;311:21;
312:1,18;318:10;
344:23;347:4;348:5;
352:23;353:4
**policy (110)**
4:24;34:24;47:24;
49:17;56:18,22;57:1,
25;58:6,8,25;59:1,2,
10,10,13,19,22,23;
60:16,25;62:23;63:8,
9;65:8;66:20;67:25;
68:1,9,15,21,25;69:2,

7,19,20,25;70:1,7,11,
16,19,23;71:8,17;
73:12,17,18,22,23;
75:15;77:20;111:24;
112:5,24;114:18,19,
24;116:22;129:19,
22;130:1,6,7;144:22,
25;145:19;182:10;
197:19;247:17,25;
248:8,14,18;271:14,
15,19;272:3,6,13,24;
273:1,3,15;274:13,
19,20;275:3,8;286:7,
13,17,18;287:2;
291:21;295:1;
311:22;312:15;
320:1,4;322:12;
323:5;324:16;
325:14,19,20;349:24;
350:3,6,8
**policy-amendment (1)**
72:5
**policy-making (2)**
72:4;73:4
**politely (1)**
332:2
**pool (1)**
110:22
**poorly (2)**
8:25;157:1
**pop (2)**
197:16;261:24
**pops (1)**
172:6
**population (6)**
106:11;185:14,19;
186:19;197:3;292:17
**port (2)**
126:21;188:25
**Portage (1)**
21:22
**portion (16)**
54:16,18;69:6,16,
17,24;92:6;153:2;
189:25;221:14;
224:22;226:8;230:1;
236:11;244:8;329:4
**portions (1)**
345:25
**posing (1)**
142:13
**position (37)**
22:10;27:14;31:2,
19;37:22;39:18;
40:25;43:7;46:14;
51:20;52:8;60:6,8;
73:10;83:11,17;84:4;
85:4,7;86:23;87:12;
99:2;110:5,11;111:4;
113:5;125:9;146:2,4,
16;176:13,14;258:3,
3;270:3;330:23;
331:6

USDC INND case 3:18-cv-00995-JD     document 203-4     filed 03/29/21     page 382 of 395

**positions (8)**
83:20;84:7,11,23;
86:22;90:23;201:24;
258:4
**possession (1)**
55:6
**possibility (1)**
79:5
**possible (3)**
144:2;240:13;
270:5
**post (13)**
112:3,7,10;113:4,
22;125:16;132:6,7,8,
12,15,20,23
**posted (2)**
132:4;143:20
**posts (1)**
125:14
**potential (1)**
75:15
**potentially (1)**
343:23
**PowerPoint (2)**
50:18;51:1
**PowerPoints (1)**
50:22
**practice (22)**
69:13;103:23;
118:2;127:25;
145:19;159:20,22;
160:1,3;182:10;
197:24;203:2;229:1,
6,8;231:25;242:8;
249:4;286:2;307:23;
332:23;350:7
**practices (4)**
198:3;240:5;
255:22;344:23
**praise (1)**
318:21
**PREA (4)**
70:6,9;93:18;94:14
**P-R-E-A (1)**
70:10
**precise (1)**
237:15
**Predated (1)**
284:2
**predicament (1)**
251:1
**prefer (3)**
259:19;264:12,13
**preference (3)**
249:14;259:14;
260:10
**prematurely (1)**
251:16
**preparation (1)**
55:25
**prepare (1)**
189:15
**prepared (1)**

349:20
**present (7)**
11:17;37:16;107:3;
108:12,19;283:22;
305:5
**presenting (1)**
333:8
**preserved (2)**
179:8;232:10
**President (2)**
287:7,8
**press (1)**
289:21
**pretty (21)**
9:19;20:12;150:12,
17;157:4;158:21;
160:13;164:18;
216:7;240:2,16;
243:9,18;252:4,15;
260:25;298:14;
335:5;336:11,15;
338:19
**prevalence (2)**
346:25;348:7
**prevention (2)**
347:4;352:6
**previously (6)**
16:6;56:1;110:6,8;
121:23;244:10
**primarily (3)**
74:11;101:1;
136:11
**primary (7)**
72:16;74:4;299:23;
307:13;322:20,25;
323:1
**printed (2)**
58:1;218:21
**prior (17)**
3:24;4:3;7:4;23:2;
35:13;38:25;39:4;
40:25;43:25;60:9;
110:8;217:24;
222:22;283:24;
303:24;327:22;
352:11
**prioritization (1)**
125:25
**Prison (95)**
11:18;12:3,10,19;
17:15,16,25;19:18;
22:22;23:5,11,14,17;
32:20;33:6;35:17,25;
37:23;40:13,18;42:9;
43:17;44:7,15,16;
55:17;57:3,6,18;
61:23;62:15;66:15;
68:13;71:11;72:2;
73:21;76:11,14;
82:17;89:20;96:1;
97:15;99:9,11,16;
100:19,22;103:22;
105:13;107:4,25;

108:19;113:15,19;
114:1;118:8;119:12;
123:3;129:15;130:5;
141:3;143:18;
146:17;147:20;
155:3,7,14;160:22;
161:4,19;162:2,19,
25;163:13;192:1;
219:7;250:15;257:8;
261:12,14;262:18;
271:18;273:4;
274:13;275:21;
284:3;290:3;294:17;
312:11;319:25;
347:1,5;348:8;
350:20;353:23
**prisoner (10)**
129:11;142:13;
273:6,7,8,20;274:15;
275:4;331:13;341:23
**prisoners (2)**
292:24;355:7
**prisons (1)**
76:5
**prison's (2)**
54:2;351:1
**privately (1)**
26:7
**privilege (1)**
26:24
**proactively (1)**
191:16
**Probably (75)**
6:25;25:3,5;40:1,
11;42:5;76:11;77:21;
78:9,11;79:11,18;
81:22;93:19;94:22;
95:14;96:22,23,23;
99:14;103:4;108:13,
21;109:6;114:24;
121:12;157:2;187:7;
205:3;223:9,14,15;
224:17;225:7,8,15;
227:7,8;233:1;
236:20;237:8;238:3;
241:4,5,21;255:8;
272:5,6,11;275:7;
277:7,11;282:23;
287:12,25;292:5;
295:15,23;304:6;
310:1;311:1,10;
312:25;314:20;
320:12;321:21;
328:22;333:17;
337:15,17;338:16;
339:12,19;341:3;
345:9
**probation (1)**
329:13
**problem (5)**
81:11;155:8;
191:17;243:21;
290:20

**problems (9)**
133:2;151:1;
158:19;160:7;
162:10,15;256:15;
261:15;292:7
**procedural (2)**
33:5;112:9
**procedure (13)**
56:18;57:1;58:24;
66:20;111:24,25;
197:21;247:24;
248:9;343:16,18;
350:3,7
**procedures (36)**
12:3,5,10,12,18;
45:1;46:2,4,5;47:8;
56:15;57:5,17;63:12,
16,18;64:1;65:7;
66:23;67:14,19,24;
68:9;74:9;77:6,10,20,
24;112:14;247:17;
249:16;347:4;348:5;
349:25;352:24;353:4
**proceed (1)**
192:21
**proceedings (7)**
26:23;32:8;34:10,
13;35:16;55:21;
330:24
**process (17)**
25:8,15;43:19,20;
51:23;61:7;69:24;
71:6;72:5,7;73:5;
75:12;82:25;92:1;
199:13;228:19;
258:10
**processes (1)**
37:8
**produced (5)**
3:20;4:15;5:8;
224:25;334:12
**production (16)**
3:14,19,23;4:1,9,
11,14,18;100:14;
218:22,23;219:4;
223:21;226:24;
297:17;305:24
**program (12)**
19:5,12,15,17;
53:10;132:25;
200:20,23,24;202:25;
228:1,1
**programs (3)**
132:15,22;146:9
**progress (3)**
5:20;299:15;
314:10
**projects (1)**
180:5
**Promise (3)**
252:11,21;311:1
**Promise's (1)**
311:7

**promoted (7)**
40:10;60:5;82:2;
83:14,22;84:17,20
**promoting (1)**
83:5
**promotion (6)**
42:1,3;82:8,12;
83:17;84:18
**proper (1)**
27:17
**properly (2)**
192:20;312:17
**property (1)**
108:9
**proposals (1)**
27:19
**proposed (1)**
256:25
**pros (2)**
255:9;314:17
**protective (2)**
139:4,7
**protocol (2)**
5:2,8
**protocols (1)**
5:6
**provide (3)**
10:8,15;254:16
**provided (5)**
6:2;28:10;47:5,8;
59:2
**providing (3)**
59:22;60:16;220:1
**PT (2)**
42:18,20
**public (1)**
115:20
**Puetzer (1)**
302:14
**pull (16)**
24:7;64:17;114:19;
136:7;156:22;157:6,
10;170:3;187:6;
196:7;198:13;
200:17;228:2;
257:21;261:7;350:8
**pulled (5)**
194:24;196:1;
198:9;203:20;204:16
**pulling (1)**
217:19
**pumping (1)**
119:18
**punch (1)**
227:22
**purposes (4)**
169:1;254:14;
349:23;350:24
**pursuant (1)**
5:8
**pursue (1)**
15:20
**pursued (3)**

---

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 383 of 395

51:25;52:3;82:9
**pursuing (3)**
38:16;82:11;83:16
**pushing (3)**
264:18,25;346:17
**push-ups (1)**
42:22
**put (62)**
3:11;5:24;6:3;
8:20;44:24;56:22,24;
68:5;103:11;110:23;
116:24;118:24;
122:9,11,15;123:12;
129:7;136:16;148:8;
153:11,17,19,20;
155:24;159:11;
177:19;186:5;192:9,
21;196:13,16;
200:20;201:2,3,20;
205:14;206:6;210:5;
220:13;229:21;
232:15,21;234:16;
244:6;255:5,15;
256:11;259:17;
260:7;262:4,5,6;
268:11,12,13;278:16,
23;296:2;301:6;
304:5;324:12;336:6
**puts (4)**
162:22;192:3,7;
278:24
**putting (7)**
70:19;138:1;163:3;
186:23;190:8;
250:25;290:17
**puzzle (1)**
246:18

## Q

**QRT (45)**
98:11;120:5,18,20;
121:13;122:1,5,5,19;
125:7,11;129:22;
130:1,2;133:9;
137:15,21;139:14,15,
24,25;141:6;142:20;
144:10,19;146:6;
151:13,17;152:9,11;
155:24;156:18;
159:4,10,21;160:13,
16;162:13;163:20,
22;189:24;190:7;
284:12;293:24;300:4
**QRTs (1)**
154:9
**QRT's (1)**
345:1
**quadrant (1)**
239:4
**qualification (1)**
140:2
**qualified (4)**

122:18;139:25;
140:1;258:4
**quarterback (1)**
316:7
**quarterbacking (3)**
316:16;317:17,23
**Quick (15)**
120:21,22;121:11,
25;128:12;133:23,
25;144:2;158:14;
160:9;264:10;274:1,
3;301:20;333:18
**quicker (4)**
161:8;289:19;
310:2;325:6
**quickly (1)**
97:2
**quiet (2)**
106:16;292:19
**quieter (2)**
293:10,21
**quit (1)**
259:4
**quite (10)**
102:4;157:25;
216:8;233:6;272:2;
289:4;290:15,23;
302:19;315:19
**quote (1)**
327:7

## R

**race (1)**
310:9
**radio (91)**
119:24,24;133:5;
134:12;169:5;
171:23,25;172:5,5,
14,18;173:10,24;
174:15;175:2,7;
176:11,17,18;177:19,
22,23;178:24;179:3,
7,23;180:8,25;181:4,
7,9;182:11,24;
183:12;187:12,12;
188:1,3,5,6,8,8,11,14,
17;189:4;193:25;
194:13;196:22;
198:12,21;207:8,12,
15,17,23;208:25;
209:2;212:14,19;
214:16,21,25;216:3,
7;217:24;218:2;
229:12;237:10;
279:12;291:20;
292:4,5,21;297:18,
23;298:5;326:23;
327:1,4,10,11;339:6,
17,23;340:4,8,16,18,
24;341:2
**radios (8)**
172:9;178:8,13,17,

20;291:14;327:6,15
**radio's (2)**
291:25;327:16
**raise (2)**
41:25;53:1
**raised (1)**
262:11
**raising (1)**
332:22
**ran (3)**
268:19;289:4;
323:21
**randomly (1)**
104:11
**Range (33)**
156:3;178:5;
186:15;199:19,20;
201:13;202:4,6,16;
209:6;233:23;246:6;
275:23,25;276:4,7,8,
18;277:21;280:16;
281:2,8,11;283:6;
292:24;300:3;
308:20;309:18;
317:25;319:4;
321:17;322:6;336:4
**ranges (10)**
185:3;202:15;
204:25;205:1;246:7;
276:12;282:13;
292:12;293:10;
308:21
**rank (23)**
41:1,5,8,16,22;
42:13;44:22,23,24;
45:8,9,13,16;51:20;
52:16;62:7,11,19;
64:20;65:13;82:20;
91:21;110:25
**ranking (6)**
107:2;108:15,18,
21;112:22,25
**ranks (3)**
90:23;94:18;
139:23
**rapidly (1)**
332:7
**rather (8)**
209:19;231:13;
238:7,8;289:20;
317:12;320:3;324:23
**ratio (2)**
259:9;260:15
**reach (4)**
192:25;339:5,22;
340:8
**reached (1)**
28:22
**react (5)**
160:18,19;197:16;
251:4,4
**reaction (1)**
195:21

**read (25)**
47:16;56:20,23;
61:2,12,18;79:15,22,
25;80:1;97:5;114:21;
125:19;161:9;
191:14;217:1;
232:16;233:17;
244:10;275:8,9;
286:14,15;312:24,25
**readily (2)**
126:3;280:17
**reading (6)**
62:20,25;80:8;
96:5;191:19;300:20
**reads (1)**
334:21
**ready (6)**
25:3,5;126:23;
151:10;297:2;325:5
**real (2)**
52:4;81:19
**realize (1)**
316:18
**realized (1)**
320:20
**really (55)**
7:12,14;15:4;
24:12;38:17;43:11;
67:3;72:7;102:7;
123:14;124:4;
143:10;156:1;160:8,
12;165:19,24;
172:22;185:20;
193:12;194:4;
197:14;204:21,22;
206:3;209:9;220:18;
231:8,11;234:14;
241:19;247:8;
248:22;252:18,19,22;
253:18;259:14;
261:22;264:10;
272:12;274:21;
292:6,20,22;299:16;
310:22;315:24;
318:23;319:5,21,23;
321:18;323:11;
331:14
**realtime (1)**
241:14
**reask (1)**
31:5
**reason (22)**
7:9,17;9:23;68:3;
82:11;83:23;111:4;
134:9;159:6;161:24;
181:20;209:17;
225:7;226:2;234:11;
256:25;294:19;
322:4;323:13;
326:14;327:10;
339:14
**reasonable (1)**
333:22

**reasons (3)**
28:3,16;115:12
**Rec (3)**
173:19;174:13;
186:22
**recall (32)**
61:15;76:23;97:18;
110:15;119:8;
163:25;206:20;
212:15,18;214:24;
236:17;252:17;
265:6,16;270:8;
271:15;284:18;
293:25;305:2;
306:24;314:14,19;
319:1,6;322:12;
330:18;331:8,12;
339:3;352:24;354:4;
355:8
**recalling (1)**
336:7
**receive (4)**
60:23;172:1;
197:21;327:20
**received (11)**
3:17;5:7,14;55:2,7;
93:7;97:11;171:23;
195:7;330:25;352:5
**receiving (2)**
194:23;203:25
**recent (5)**
4:6,12;22:3;
159:21;214:18
**recess (5)**
30:24;91:12;217:9;
289:23;346:20
**reclarify (1)**
119:13
**recognize (10)**
3:19;4:2;100:15;
219:11,15;237:6,15;
238:19;260:23;306:2
**recognizing (6)**
228:24;234:10;
235:1;242:5;259:23;
311:6
**recollection (16)**
73:20;100:21;
164:10;185:9;203:6,
14;224:8;244:1;
252:1;255:21;
307:22;334:23;
339:16;341:22;
342:23;349:8
**recommend (1)**
331:3
**recommendation (1)**
79:8
**reconfigured (1)**
124:18
**record (32)**
3:11,22;5:24;6:4,
11;7:8,25;8:13,14,18,

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 384 of 395

21;9:22;10:3;29:8;
30:23;31:1;91:9,14;
93:22;100:14;
117:25;149:8;
152:14;218:19;
238:16;241:15;
289:22,25;334:12;
346:17,22;355:21
**recorded (3)**
179:7;270:25;
271:2
**recording (1)**
271:6
**records (5)**
24:8;178:24;179:2;
242:9;270:23
**record's (2)**
276:6;307:16
**recruits (1)**
263:10
**red (1)**
281:5
**Redden (28)**
109:25;110:23;
207:21,24;208:14,23;
214:19;215:10;
217:21,25;244:11;
245:21;246:25;
247:4,11;250:7;
265:21;266:3;
296:25;297:20;
300:11,15;301:2,17;
339:20;341:23;
342:24;344:15
**Redden's (5)**
216:6;249:22;
300:23;303:24;
341:14
**redirect (2)**
119:19;352:18
**Reed (2)**
286:12,12
**refer (5)**
35:22;45:3;117:15;
118:3;221:6
**reference (14)**
33:8,11;55:24;
56:14;116:16;122:3;
130:13,19;171:2;
251:19;271:13;
311:22;317:18;354:1
**referenced (2)**
217:17;226:10
**referencing (2)**
251:22,23
**referred (6)**
45:12;53:5;86:19;
114:11;121:25;
127:20
**referring (29)**
19:1;74:2,2,8;
91:23;101:8;143:25;
162:3;163:18;220:3;

221:13;223:19;
224:1;226:15;239:1;
263:9,9,11;272:13;
292:9;300:17;302:3;
307:8;311:24,25;
317:18;322:25;
342:22;343:2
**refers (2)**
42:20;222:1
**reflect (1)**
233:8
**reflected (2)**
28:4;244:20
**Reflecting (5)**
11:25;12:8,22,25;
344:6
**reflects (3)**
234:6;300:21;
301:17
**refresh (2)**
44:11;341:21
**refresher (1)**
7:6
**refusal (1)**
26:4
**refuse (3)**
27:1,17;322:5
**refusing (1)**
20:24
**regard (3)**
29:1;327:20;
332:23
**regarding (9)**
3:11;6:1;27:23;
215:10;300:9;
311:22;317:24;
341:14;350:6
**regardless (4)**
147:14;157:7;
262:16;318:20
**regional (3)**
43:14,24,24
**regionalized (1)**
150:14
**regular (19)**
23:17;54:18;64:20;
65:1;88:6;94:25;
103:18,23;109:1;
125:8,9;136:20;
137:2;138:17;
140:16;182:17;
185:12;197:2;199:22
**regular-wise (1)**
292:14
**reinstated (1)**
34:16
**related (10)**
26:5;27:15;33:5;
55:19;77:1;113:4;
193:16,17,21;218:8
**relation (9)**
22:3;99:9;193:22;
219:21;313:9;314:6;

315:23;327:22;354:2
**relatively (2)**
192:15;310:15
**relax (1)**
233:14
**relayed (1)**
182:5
**relevance (2)**
27:10;29:15
**relevancy (2)**
29:9,14
**relevant (3)**
24:3;26:13;27:16
**reliant (1)**
115:10
**relief (1)**
34:13
**relieve (2)**
165:11;166:3
**relieved (1)**
165:17
**relieving (5)**
165:14,22;166:9,
17,22
**religions (1)**
56:21
**religious (1)**
56:23
**relying (1)**
7:11
**remain (1)**
303:2
**remaining (1)**
345:25
**remedy (2)**
31:23;34:12
**remember (98)**
14:15;35:21;36:17;
40:20;48:5;63:23;
72:11;89:8;92:20;
95:14;99:17;113:6,9;
123:8;124:24;125:2;
131:22;143:15;
152:5;153:23;165:5,
14,19,22;166:17;
167:11,14;168:8;
169:20;170:1,8,10,
11,21,24;171:3,7,9,
21;181:20;183:3,7;
193:25;194:1,4,18,
25;197:10;206:13,
18;207:7,22;214:21;
215:2,4,6,12,14,16,
17,18,21,22;216:3,9,
12,23;218:1;220:2;
224:14,15;228:24;
232:23;234:11,14;
236:22;237:11,13;
246:4;252:18,19,22;
261:2;265:9;303:6;
313:20,21;314:20;
315:20,21,24;319:5,
8;337:13;339:8;

342:10;344:19;345:8
**remembered (3)**
216:14,15;342:14
**remembering (1)**
235:1
**remind (1)**
137:16
**remove (3)**
273:8;274:15;
275:4
**removed (2)**
274:17;305:9
**removing (1)**
273:20
**reopen (2)**
5:25;232:12
**repeat (4)**
172:16;180:11,19;
190:5
**repeated (2)**
183:13;341:15
**repeating (1)**
159:24
**repetitive (2)**
169:12,14
**rephrase (4)**
9:8;31:24;61:10;
164:14
**report (101)**
104:24;124:19;
128:9;158:7,8,13,16;
168:9;169:21;170:1,
3,15,16,22;172:19;
189:11,12,15,18,19,
20;190:4,6,7,7;191:4,
7;192:9,22,24;196:4,
17,25;198:22,24;
208:10;216:25;
219:8,14,16,19,25;
220:2,5,7,12,19,22;
221:15;222:11,17;
223:11,20,22;224:9,
16,22;226:9,18,19;
227:7,14,16;228:3,7,
12,12,25;229:3,9;
230:2,13,20;232:9,
11,18;233:18;234:6,
16,17;235:14;
236:11;244:7,9,20;
297:16,21;298:9,24;
300:7,21,24;301:2,
14,17,22;302:7;
303:4;314:7;335:22;
341:13
**reported (2)**
183:9;227:4
**reporter (30)**
7:7;25:5,16,23,25;
30:13,16,18;41:3;
58:16,19;59:25;
63:13;66:1;70:8,13;
100:7,12;146:24;
175:21;211:9,11;

212:2;231:10;
287:21;288:1,4;
302:19;355:17,24
**reporter's (3)**
218:16;238:14;
305:22
**reporting (2)**
172:19;221:1
**reports (15)**
104:25;155:24;
159:4,21;164:5;
190:23;191:13;
192:8;198:23,25;
226:3;227:4;228:5,
15;252:8
**report's (1)**
189:16
**report-writing (1)**
228:1
**reposition (2)**
334:3,8
**represent (2)**
3:6;314:23
**representation (1)**
100:22
**representative (1)**
3:8
**represented (1)**
37:11
**representing (1)**
33:15
**request (17)**
4:8,14;28:19;
64:12;134:23;135:2;
208:12,13,16,18,23;
214:9;240:6,19;
259:15;341:14;347:3
**requested (2)**
240:14;262:21
**requesting (4)**
213:1;214:19;
263:14;265:2
**requests (4)**
3:13,19;98:19;
245:21
**require (6)**
98:18,18;204:6;
323:17;350:2;353:2
**required (6)**
44:5;94:3;204:13;
299:8;328:13;352:22
**requirement (2)**
79:7;181:17
**requirements (1)**
95:5
**requiring (1)**
283:4
**reread (1)**
300:10
**rescue (6)**
299:2,15,17,24;
317:12;348:6
**resend (1)**

BARBARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JEREMY DYKSTRA
August 7, 2019

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 385 of 395

159:15
**reserve (2)**
5:24;135:12
**reside (1)**
13:20
**resolved (1)**
329:12
**respect (2)**
24:10;194:17
**respond (6)**
4:13;34:2,3;
105:14;134:6;345:3
**responded (1)**
196:5
**Responder (13)**
120:9;124:6,12;
135:19;136:24;
137:9;142:6;143:5;
182:4;299:18,25;
325:11;343:22
**Responders (64)**
85:21,22;98:12;
121:14;122:4,7,14;
123:4,15,19;125:13;
126:6,13,24;127:7,9;
128:4,13;129:7;
130:11;134:7,10,21;
135:7,10,16;139:6;
140:12;141:10;
142:16;143:13,15;
152:17,24;158:22;
167:17;168:20;
181:23;187:10;
188:6,18,23;189:6;
195:17;204:4,7;
215:8;216:4;273:12,
13,19;274:2;275:10,
13;300:1;308:12;
322:11,17;323:4,17;
324:20;325:18;
336:4;340:18
**responding (2)**
111:21;182:13
**response (42)**
3:17,18;4:8,17;
120:21,22;121:11,25;
133:23,25;134:3;
135:17;142:7;
144:13,14;145:3;
148:25;151:7;
152:16,21;155:4;
156:20;161:20;
190:1,2;191:5,6;
192:19;193:18,22;
194:23;197:20;
217:17;240:14;
298:13;303:13;
317:4;345:18,22;
347:24;348:19,23
**responses (2)**
5:14,15
**responsibilities (6)**
17:19;59:21;62:16;

126:11;253:15,19
**responsibility (23)**
18:4;58:3;59:7;
60:10,15;62:20;
187:8;191:16;
229:25;230:11;
241:19;255:25;
256:2;288:18;299:1,
6,14,17,23;301:10;
326:21;353:7,7
**responsible (20)**
45:11;48:19;51:7;
70:16,18;71:15;
86:10;144:20;
230:23;257:6;258:7;
262:23;271:9;286:5;
288:7;350:15,20;
351:5,9;353:10
**responsive (2)**
5:5;155:13
**rest (4)**
16:19;55:14;99:9;
156:4
**restart (1)**
31:5
**restate (2)**
7:24;58:20
**restricted (6)**
63:17,18;86:13,17;
273:1;312:6
**restrictive (3)**
65:11;183:23;
184:2
**result (7)**
32:4;37:6;273:9;
329:15;344:24;
348:6,17
**results (2)**
160:5;354:10
**Resuming (3)**
335:23;337:3;
343:11
**retain (2)**
21:23;22:2
**retained (3)**
24:16;26:7;37:19
**retrospect (1)**
288:14
**return (1)**
23:14
**revealed (2)**
156:20;192:19
**reveals (1)**
12:16
**review (21)**
4:17;57:20;59:10;
66:19;71:24;77:7,23;
79:2,20;132:5;
198:25;312:16;
315:4,13,16,22;
316:4;317:11;319:2;
321:11;352:12
**reviewing (2)**

162:13;336:7
**Reviews (3)**
315:8,10;318:11
**revolving (1)**
154:17
**re-watch (1)**
206:19
**Rhonda (5)**
70:2,5;71:19;
272:25,25
**rid (3)**
55:8,24;171:16
**right (73)**
3:5;5:24;6:9;8:7,
20,25;11:26:16,17,
21;29:20;40:15;
50:10,13,25;67:25;
79:18;82:6;93:12;
99:23;103:14;
106:13;108:14;
109:1,8;112:20;
140:8;149:22;
158:25;159:8;167:3;
170:14,19,21;175:9;
184:5;188:25;
197:18;198:6;
203:23;205:12;
210:7;213:15;223:3,
3;227:16;239:2;
240:17;245:12;
249:13;260:8;274:2,
8,22;280:4;283:10;
302:23;304:12;
309:2,3;310:10;
312:7;315:1;318:17;
321:13,13;322:20;
324:4;327:18;335:2,
4;336:13;342:21;
354:22
**right-hand (4)**
218:21;219:7;
239:4;269:6
**rights (1)**
33:5
**ring (2)**
282:16;283:17
**riot (2)**
315:17,18
**riots (2)**
115:25;142:3
**rise (1)**
94:17
**risk (1)**
142:14
**road (2)**
297:14,15
**rod (1)**
296:18
**rodeo (1)**
172:25
**Rodriguez (8)**
252:13,19;270:9,
15;319:2,10;320:3,18

**role (7)**
44:6;73:3;146:13;
258:1;299:7;313:7;
314:6
**roles (1)**
299:22
**roll (7)**
61:2,5,12,18;
62:25;125:19;157:14
**rolling (3)**
3:25;48:12;340:2
**room (66)**
7:12;9:20;46:6;
78:11,21;102:14,19;
106:1,19;109:6,18,
22;123:21;128:9;
134:8;138:21,22;
139:11;172:3,4,12;
173:21;174:1;175:1,
6,16,18;176:9,15,16,
22;177:2,3,17,18;
179:17;181:1,21;
182:6;183:13;189:6;
190:10,12,16;236:20,
25;237:8,19,19,20,
23;239:11,12;
241:22;242:6,7;
272:18;279:10,11,22;
280:19;286:10;
292:1;294:25;
302:13;318:21
**rooms (1)**
238:4
**Room's (1)**
190:11
**rose (1)**
220:10
**roster (20)**
85:19;91:7;98:11;
167:1,4;182:5;238:3,
4,6,18;255:17,25;
256:6;258:2;260:22;
261:10;262:10;
266:13;268:7;316:20
**rotate (1)**
154:16
**rotated (1)**
53:8
**rotating (1)**
154:19
**rotation (2)**
154:1,12
**round (2)**
136:9;145:15
**routes (2)**
75:3;247:22
**routine (1)**
166:21
**Row (5)**
184:12,21,22,23;
283:6
**row's (1)**
283:7

**Rucker (1)**
267:15
**rude (3)**
168:23;169:8,10
**rule (6)**
8:12;198:5;332:3,
8,21;333:1
**rules (3)**
7:1;143:2;198:9
**run (13)**
20:14,21;42:22;
75:12;157:2;173:18,
19;174:13;284:23;
285:17;288:18;
321:20;326:24
**running (9)**
85:22;144:20;
218:22;245:11,15;
253:23;288:7,10;
309:21
**runs (2)**
265:24;327:15
**rush (1)**
196:14
**rusty (1)**
291:13

## S

**safe (4)**
120:25;121:4;
134:18;296:2
**safely (1)**
296:7
**safer (2)**
273:23;320:12
**safety (19)**
71:19;75:4,6;
129:25;189:17,20;
209:21,22,23;210:15;
284:14,15;298:11;
346:2,4,7,8;353:8,12
**sally (3)**
126:21;188:25;
256:13
**Sam (1)**
3:6
**same (76)**
7:17;9:10;14:2;
16:12,13,14;44:23;
45:7;56:6;77:1,13;
79:11;81:6;84:22;
86:5;88:21;89:25;
90:8,12;92:1;95:3;
98:8,9,10;110:18,22;
111:1;124:15;
139:11;140:15;
145:12,13,14;153:9,
11;154:24;157:3,3;
158:19;159:19,24;
160:6,13;166:5;
173:13;174:3;
176:24;187:3;190:4,

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 386 of 395

6;218:25;219:9;
220:22;225:25;
228:19;240:2;244:2;
261:19;263:22,22;
268:15;270:16;
272:16;282:15,16;
283:15,15,16,17;
284:5;287:2;302:4;
305:24;315:3;
353:15;355:5
**Sara (1)**
238:23
**Sarah (2)**
240:22;243:2
**Sarkisian (8)**
21:17,22,23;22:2;
24:6;26:6;33:15;
37:11
**sat (1)**
83:14
**satisfactory (1)**
156:21
**satisfy (1)**
29:6
**Saturday (3)**
90:4,7;334:21
**save (1)**
7:22
**saved (5)**
200:13;228:20,21,
22;229:4
**saw (17)**
204:15;205:24;
206:22;207:6;230:3,
24;231:2,3;285:14;
294:23,24;295:3,8;
304:2;305:14;
336:17,22
**Say' (1)**
148:11
**saying (38)**
9:1;25:16;31:25;
33:7;57:23;58:24;
68:21;72:22;78:12;
81:14;90:15;151:24,
25;163:21;177:1;
180:4;187:15;
196:17;207:23;
212:24;215:15;
216:10;229:20,24;
232:19;246:14;
255:8;260:9;274:10;
287:21;316:9,15;
320:4;327:16;334:6;
345:10;347:15;
354:20
**scan (2)**
151:22;153:13
**scared (1)**
251:9
**scenario (9)**
124:8;155:5;
156:23;157:7;160:9;

211:2,15;278:4;
295:21
**scenarios (7)**
154:1,6,14,21;
155:21;158:20;
159:18
**scene (4)**
126:17;128:23;
299:7;301:8
**schedule (3)**
89:7;166:21;
263:11
**scheduled (2)**
23:13;33:25
**scheduling (1)**
260:17
**school (3)**
39:24;291:7;
324:11
**scope (2)**
28:15;258:4
**score (1)**
96:7
**screaming (3)**
246:4,8,10
**screen (2)**
203:21;335:12
**scroll (1)**
201:10
**scrolled (1)**
201:18
**scrummage (1)**
116:25
**SEAC (4)**
25:3,12,12,18
**S-E-A-C (1)**
25:21
**search (3)**
5:3,6;142:1
**S-E-C (1)**
25:19
**second (11)**
14:14;22:18;
123:17;153:13;
223:20;239:2;
277:24;278:1;
320:16;329:4;341:8
**secondary (2)**
72:16;74:4
**seconds (9)**
124:4;152:25;
177:25;309:23;
310:6,16;311:9,12;
321:21
**section (4)**
133:18,19;233:16;
313:6
**sections (1)**
311:18
**secure (4)**
108:6;126:17;
184:15;296:2
**secured (1)**

121:4
**security (10)**
121:3;142:7,9,18;
143:6,12;162:3;
174:10;239:7;346:8
**seeing (11)**
205:19;206:13,17;
235:24,24;237:16;
260:21;331:11;
335:12;336:18,18
**seek (3)**
5:25;28:18;38:9
**seeking (2)**
4:12;34:12
**seem (3)**
67:3;172:22;207:1
**seemed (3)**
161:2;220:19;
272:2
**seems (3)**
154:18;169:12;
261:16
**sees (2)**
191:21;236:1
**Segregation (1)**
86:14
**seizure (1)**
134:15
**select (1)**
61:9
**selecting (1)**
85:20
**self (3)**
127:15;294:12,14
**self-explanatory (1)**
150:12
**selling (1)**
171:13
**selves (1)**
129:8
**semiannually (1)**
50:9
**send (8)**
17:12;34:5;105:2;
146:25;153:21;
187:10;224:20;
272:25
**sends (1)**
70:21
**senior (8)**
260:23;261:5;
262:22;264:18,20;
265:3,4;299:12
**seniority (1)**
261:11
**sense (9)**
7:15;42:12;53:21;
54:9;125:14;134:13;
182:1;188:11;334:1
**sent (11)**
58:1;145:4;164:5;
227:6;237:7;239:15;
240:14,16,17;241:2,5

**sentence (6)**
61:2;244:7,8;
293:13;300:8,10
**sentences (2)**
233:18;244:9
**separate (13)**
16:6;18:5;52:15;
53:9;141:15,17;
147:19;200:9;
275:21;276:19;
281:8;283:3,4
**sequence (1)**
341:22
**sergeant (30)**
40:6,7;41:25;
42:17;45:15;52:18;
64:22;81:12;104:7;
122:18;129:2;
138:12;177:1,5,7;
196:10,11;253:12;
254:6,8,8,10;268:12;
271:11;279:13;
286:12,12;302:14;
308:13;324:13
**sergeants (6)**
47:15;52:21;59:9;
80:19;88:13;118:21
**series (1)**
99:23
**serious (7)**
143:11;191:1;
211:24;213:12,23,25;
220:20
**seriousness (1)**
214:5
**SERT (4)**
141:20;146:6,25;
149:5
**S-E-R-T (1)**
141:21
**serve (8)**
11:22;26:22;39:6,
12;52:12;61:22;
122:19;139:24
**served (6)**
3:13;5:13;21:2;
51:12;62:14;72:2
**server (3)**
201:3,5,8
**servers (3)**
5:4;201:1,9
**Service (4)**
40:9,11;56:22,23
**Services (1)**
41:15
**serving (1)**
98:4
**set (43)**
3:13,18;5:6,12;
50:1;57:23;85:24;
91:7;96:11;104:6,8;
109:13;112:15;
123:1;144:23;154:3;

185:18;197:11;
202:6;214:11;228:1;
237:4;238:14;278:2,
8,21;279:1,4,15,17,
19,21;286:10;
294:15;306:20,20;
308:24;311:25;
329:5;351:21;354:4,
16,18
**sets (11)**
111:25;129:19;
177:10,14;247:17;
279:2,8,21,25;
306:19,24
**setting (4)**
48:19;51:7;70:16;
178:7
**setup (1)**
199:14
**seven (12)**
44:13;53:7;115:15;
125:3;148:4;161:1;
269:11;333:1,3,4,20;
338:15
**seven-hour (3)**
332:4,7,14
**severity (3)**
212:5,6;344:9
**shakedown (2)**
99:17;103:4
**shakes (1)**
7:11
**shaking (5)**
18:15,18;147:25;
244:19;353:25
**shape (3)**
311:1,2,8
**shaped (1)**
68:7
**share (2)**
65:3;272:6
**shared (15)**
30:9;63:11,15,22,
25;64:7,9;65:7,15;
66:13,17;77:5;81:6,
8;174:25
**sheet (4)**
131:24;138:12;
235:20;305:13
**shelter (3)**
87:8;118:11,14
**Sheriffs (1)**
330:20
**shield (1)**
333:13
**shift (218)**
11:22;23:10,11,13,
18;57:15;58:2,2,4;
59:2;85:15,18,22,24,
25;86:1,4,5,8,22;
87:1,2,4;88:7,10,17,
21;89:21,21,22,22;
90:14,22,24,25;91:1,

BARABARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JEREMY DYKSTRA
August 7, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 387 of 395

1,4,5;97:18,21,24;
98:3,5,10,10,23;99:1,
1,4,20,22;101:1,18;
102:17,19,22;103:16,
18,19,21;104:4,16;
105:8,17,23;106:19,
21,25;107:1;108:25;
109:1,3;110:2,12,17,
18,24;111:3,4,5,18,
19,20,22;112:1,17;
113:4,12;114:8,15,
16;116:4;117:21,21;
118:2,3,9,18;119:6;
120:1;121:17;
122:22;123:3;
124:12;125:8;131:8;
135:12,19;136:4,21;
137:14,19,24;138:4,
17;140:4,17,18;
141:2;144:9,20;
151:17;153:6,24;
155:6;157:19;
164:13,22,23;165:1,
4;166:5;167:25;
168:2;169:2;175:19,
23;182:20;187:8;
189:9,14;191:15;
197:21;198:2;
199:14,24;213:14;
217:16;219:7;229:2,
25;241:24;243:3;
248:3,9;250:22;
255:24;258:8,11,14,
14,23,23,25;259:1,3,
5,10,11,16,19,20,25,
25;260:4,5,10,14,17;
262:3,23;263:15,16,
21,22;264:5,13,14,
19;265:1,3,23,24;
268:14;269:10,14;
272:19;278:22;
280:10;284:25;
285:1,3,4;288:6,9;
291:15,24;295:6,14;
299:8,9;303:2;327:5,
12,15;343:22;347:8
**shifts (14)**
87:10,12,15;88:11,
12;89:4,10,11;90:17;
106:5;140:19;142:4;
259:12,17
**shift's (6)**
59:6;151:19;260:4,
6;264:7,7
**shirt (1)**
136:17
**Shit (1)**
293:24
**shocks (1)**
345:12
**shoot (1)**
199:20
**shooting (6)**

167:21;199:21;
205:3;206:5,17,25
**Shop (4)**
280:2,3,9,14
**short (9)**
123:25;255:18;
260:4,6;269:15;
280:17;316:18;
317:3;335:5
**shortages (1)**
123:14
**shorter (1)**
229:22
**shortly (2)**
5:23;334:25
**short-staffed (1)**
165:13
**show (11)**
51:1;67:6;80:2,7;
102:24;105:2;170:2;
201:17;202:15;
254:3;345:24
**showed (4)**
152:25,25;203:17;
317:13
**showing (3)**
59:22;80:8,10
**shown (3)**
50:22;349:11;
352:13
**shows (2)**
202:12;306:15
**shredded (1)**
55:13
**shredding (1)**
55:25
**shut (3)**
176:6;316:1,25
**shutting (2)**
125:16;262:18
**side (20)**
67:9;101:20;
102:16;184:20,20;
193:13;219:6,7;
222:2;255:1;269:6;
276:18,19,22;281:17;
306:19;307:19;
309:9;310:12;321:15
**sides (6)**
185:2;276:21,25;
277:10;283:16;
306:21
**sign (13)**
36:23;47:17;58:4,
14;59:8,10,18;71:24;
260:13;327:21;
328:13,21,23
**Signal (34)**
120:23;126:14;
127:3,21;130:14,21,
22;131:11;133:11;
172:6,17;177:21;
178:4;180:12,22;

181:5;182:6,7;
190:14,14,20;197:8;
221:11,16,21,22;
222:7;234:21;
242:12;300:19;
301:9;302:1,10,11
**signals (3)**
130:10;133:3;
302:16
**signal's (4)**
120:23;125:22;
127:1;172:4
**signatures (1)**
60:15
**signed (3)**
60:11;261:3;335:7
**significance (2)**
266:12,17
**significant (1)**
11:6
**signing (2)**
59:7;257:11
**sign-off (3)**
71:23;73:5;249:24
**signs (1)**
214:4
**silent (2)**
332:10;333:1
**similar (1)**
157:3
**simple (6)**
48:1;64:12;158:14;
235:12;265:25;
338:19
**simplified (3)**
114:23;115:1;
116:14
**simultaneously (1)**
209:16
**Sinder (9)**
237:7;238:23;
239:6,16,21;240:7,
22;241:25;243:2
**Sinder's (1)**
239:18
**single (6)**
57:1;130:23;
161:17;170:8;276:2;
316:20
**sit (22)**
60:19;80:1;114:21;
164:9;165:2;166:16;
170:19;195:4;
210:21;218:2;224:7;
228:10;232:23;
233:8,11;234:10;
265:17;298:1;
332:20;337:22;
338:20;339:13
**site (7)**
22:21;23:3;107:3;
280:14;304:8;305:3;
312:10

**sits (1)**
134:8
**sitting (10)**
37:13;156:5;167:3,
10;190:17;195:14;
210:6;228:11;300:4;
321:19
**situation (42)**
81:12;118:6;
127:14;128:20;
149:23;150:1,22;
155:3;161:9;162:18;
178:3;182:2,3,15;
190:18;196:13;
199:4,6;209:20;
210:12,15;211:18,22;
212:6;213:23;
216:22;229:17;
231:13,20;233:7;
248:24;249:17;
250:16;251:3;
257:13;302:17,21;
316:12;320:6;337:7;
340:20;344:16
**situations (18)**
73:9;74:15;80:23;
81:3;115:22;141:22;
142:17,18;160:19,24;
161:2,21;199:2;
251:25;317:7;333:7;
340:5,7
**situation's (2)**
249:18;340:14
**sit-ups (1)**
42:22
**six (14)**
6:25;40:1;42:19;
48:8;76:11;84:9,10,
11;125:3;160:17;
238:18;254:1;
269:11;329:13
**six-page (1)**
238:17
**sixteen (1)**
269:13
**size (2)**
272:17;282:23
**skeleton (2)**
282:19;283:1
**skills (1)**
300:6
**skipping (1)**
310:22
**slams (1)**
104:23
**slash (3)**
145:24;222:7;
268:12
**slate (1)**
256:19
**sleeping (4)**
106:7;108:13;
292:19;293:13

**slot (1)**
267:20
**slow (1)**
264:9
**slower (3)**
264:8;311:11,12
**small (3)**
158:3;167:21;
174:7
**smaller (1)**
272:21
**smash (1)**
282:8
**smoke (15)**
167:20;204:19;
205:9,9,15;206:14;
209:8;210:7;233:25;
235:24;236:1;246:8;
351:6,10;353:15
**smoking (1)**
354:21
**smoky (6)**
204:21,23,24;
206:16;209:24;
210:13
**snip (1)**
294:11
**So-and-So (2)**
138:13,13
**social (3)**
5:4;17:4;20:15
**software (1)**
202:25
**sold (1)**
55:13
**somebody (43)**
44:23,24;56:12;
105:24;113:14;
114:4;122:13;136:9,
14,15;151:1,2;
172:10;177:11;
185:16,20;193:6,9,
10;251:23;253:21,
24;255:15;272:23,
24;273:24;287:1;
293:8;295:4;304:13;
310:3,24;318:23;
320:7,9,12;321:12,
16,25;323:21;
326:17;330:12;
345:12
**somebody's (3)**
136:1,9;323:15
**somehow (1)**
193:2
**someone (32)**
45:8;50:25;51:21;
72:25;83:22;106:18;
112:19;180:14;
182:16;235:6,9,23,
24;242:10;254:7,15,
20;262:10;278:6,7;
280:13;303:20;

USDC NWND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 388 of 395

304:8;309:12,16;
310:12;318:7;
320:21;323:17;
324:24;339:23;340:8
**someone's (5)**
156:19;182:3;
191:19;327:10;340:5
**sometime (1)**
81:23
**sometimes (23)**
8:24;76:6,7;106:5,
10;119:20;144:11;
155:2;156:13;196:9,
12,15,21,23;198:20,
21;202:19;233:9;
256:11,13;257:23;
266:4,6
**somewhere (8)**
9:2;57:24;104:4;
131:1;144:12;179:4;
257:25;262:6
**son (2)**
20:7,10
**soon (6)**
109:7,9;127:1;
210:9;301:9,12
**sorry (21)**
41:3;63:13;70:8;
72:8;87:23;91:22;
114:24;117:24;
132:1;190:5;207:11;
211:10;213:17;
231:10;235:4;
302:19;309:15;
313:11;334:24;
342:7,8
**sort (37)**
46:16;48:12;80:22;
99:2;100:25;102:22;
106:15;107:25;
116:12,22;118:17;
119:7;129:11;141:5,
6,24;155:20,24;
169:25;182:24;
189:25;205:18;
206:24;220:8;224:3;
226:10;231:4,21;
245:24;254:14;
258:4;259:24;
261:10;274:7;306:9;
309:8;332:11
**sought (2)**
97:8,9
**sound (1)**
315:1
**sounded (6)**
114:15;198:18;
205:18;337:7;339:4;
343:18
**sounding (1)**
274:7
**sounds (8)**
8:3;54:12;76:8;

133:3;149:22;187:2;
202:2;324:10
**source (2)**
225:20;320:19
**sources (1)**
231:5
**South (5)**
201:15;276:16,19;
277:1;306:21
**southeast (1)**
306:13
**southern (1)**
150:17
**spare (6)**
232:2;283:12,14,
16;327:4,9
**spark (2)**
185:25;186:6
**spatially (1)**
69:16
**speaking (1)**
49:15
**specialized (1)**
352:2
**specialty (1)**
89:16
**specific (48)**
28:16;43:5;51:20,
20;53:25;59:18;
67:19;68:25;87:11;
91:18;104:2;120:15;
122:23;123:2;
129:12,18;130:5,17;
133:7,18;135:1,15;
146:16;152:11;
165:3;166:16;167:3;
176:10,17;183:3;
186:7;194:1,1,19;
202:3;217:3;219:15;
223:4;228:10,12,25;
234:5;251:21;265:6;
274:11;276:8;286:7;
322:16
**specifically (18)**
38:15;71:12;93:15;
102:15;139:12;
167:12;168:6;
169:20;171:8;
193:16;217:16;
219:3;221:6;227:19;
263:13;292:9;304:7;
355:1
**specifics (2)**
69:10;271:15
**speculation (1)**
320:25
**speech (1)**
115:20
**speed (1)**
310:14
**speeding (1)**
329:24
**spell (5)**

6:11;21:18,19;
70:4;106:6
**spend (1)**
96:15
**split (2)**
256:12;277:18
**splittin' (1)**
216:17
**spoken (1)**
331:21
**sporting (1)**
293:18
**spot (2)**
84:19;267:3
**spray (8)**
120:7,10;135:21;
137:2,4;138:14;
193:14;348:10
**sprayed (1)**
193:13
**spread (1)**
151:4
**sprinkler (2)**
353:22,24
**Squad (57)**
17:15,20;53:17,17,
19,20,20;64:3;72:19;
73:4;74:12,17;75:22;
93:17;94:14;115:13,
16;117:10;140:1,2,7,
10,11,15,16,18,24;
141:12,13,17,22,25;
142:20,24,25;146:6,
14,15,19,19,21,22;
147:19,23;148:1,1,2,
3,11,14,14,21;149:5;
150:19;157:21;
303:11;313:5
**squads (5)**
140:20;147:7,8,14,
24
**Squad's (2)**
151:6;313:6
**squares (1)**
309:8
**squeeze (1)**
173:6
**stab (1)**
136:8
**stack (6)**
45:19;46:4;218:17;
224:4;225:9,21
**staff (100)**
13:2;60:20;80:16;
87:19,22;98:14,14,
24;104:8,23;106:9;
121:1,2,4;123:13,25;
127:4;130:19,24;
141:9;142:3;143:25;
144:1,8,13;145:9,13,
25;147:21;149:17,
18;150:4;154:15,22,
24;155:10,17;

156:11;158:21;
161:5;172:9,19;
173:23;187:14,14;
190:10;192:6;
195:19;197:7,12,16;
204:25;208:3,20;
209:13,21,22,23,25;
210:1,6,10,15,24;
212:23;214:12;
234:22;246:12,23;
247:13;250:17;
251:10,15,21,21;
252:25;255:19;
260:16;262:10;
264:21,22,25;265:22,
24;285:17,22;
292:25;293:2;
294:14;298:5,6;
301:12;317:8,11,15;
319:16;321:22;
347:8,22;350:12
**staffed (7)**
124:9;176:9;254:9;
262:25;316:17,22;
317:3
**staffing (3)**
257:13;266:2;
351:14
**stage (2)**
181:25;206:13
**stages (1)**
205:18
**staircases (5)**
306:16,19,25;
307:2,3
**stairs (5)**
281:17;308:21,24;
310:2,22
**stairwell (4)**
307:5,8,9;308:4
**stairwells (1)**
307:24
**stamp (5)**
100:13;243:4,5;
334:20;341:9
**stamped (4)**
219:4;223:21;
238:17;305:23
**stamps (1)**
218:20
**stand (9)**
119:20;120:20;
139:1;142:21;
148:24;237:24;
326:1,4,24
**standard (7)**
16:23;20:12;87:10;
101:17;152:2;
277:14;350:7
**standing (3)**
119:23;126:21;
245:14
**stands (2)**

25:19;127:17
**star (3)**
266:20,22;267:1
**start (37)**
28:9;43:11;81:17;
100:6;117:21;
132:14,22;151:10;
152:15;167:1;
183:10,11;201:11;
208:2,19;209:12,15,
23;210:23;212:11,
25;213:9;228:23;
229:8,13,16,17;
231:10;232:15;
245:2;248:6;259:15;
291:15;313:4;
314:17;335:2;344:17
**started (33)**
6:4;7:6;39:17;40:4,
17,21;62:2,3;91:24;
92:18;94:21;164:25;
167:20;186:15;
190:13;192:5;
195:13;206:5,21;
221:11,20;229:4;
232:1;233:3,22;
250:12;261:8;
303:17,18;304:16,24;
332:5;354:21
**starting (2)**
218:21;228:25
**starts (1)**
192:4
**state (83)**
5:23;6:10;11:18;
12:3,10,19;13:8;
14:3;16:4,5;17:14,
17;19:6;22:21;23:5;
25:4,9;33:6,19,20,23,
23;34:5,10;35:24;
37:23;40:12,18;42:8,
14;43:17;44:7,16,21;
49:3;55:17;57:3,5,
18;61:22;62:15;
63:19;66:24;67:1;
71:11;72:2;73:21;
95:20;97:15;99:10,
16;100:19;124:23;
130:5;132:13,23;
143:18;144:5;
145:25;146:17;
149:6;151:4;160:22;
161:4,19,23;219:6;
228:5;273:3;275:21;
284:2;290:2;313:15;
314:11;319:25;
338:21;346:14,25;
348:8;350:20;351:1;
353:23;354:11
**stated (9)**
13:4;21:2;86:5;
100:24;139:22;
185:4;244:12;

284:16;300:12
**statement (11)**
36:6,24;230:15;
301:2;339:9;341:13,
15;343:2;345:9;
349:12,16
**statements (4)**
224:19;229:19;
344:3;355:6
**States (3)**
129:15;244:10;
325:20
**statewide (10)**
64:10;67:15;69:1;
78:10,10;130:7,8;
141:21;145:1;149:1
**station (14)**
129:3;277:25;
278:9;306:12;
309:22;310:13;
320:10,13;321:16,20;
323:16,25;327:17,19
**status (5)**
3:12;27:15;207:9,
13;209:14
**statute (1)**
3:24
**stay (14)**
105:18;111:21;
140:5;194:18;
222:24;257:20;
263:24,24;264:3;
271:16;299:8;312:8;
320:10,12
**stayed (1)**
303:5
**Staying (6)**
13:21,24;14:24;
106:19;111:16;112:2
**steady (1)**
38:18
**steel (3)**
282:3,5;296:18
**Step (6)**
25:2,7,8,9;34:2,8
**stepping (1)**
254:5
**steps (10)**
36:22;37:1;82:19;
116:14;192:25;
195:8;207:3;211:23;
212:4;218:7
**Steve (2)**
75:6;284:16
**stick (3)**
50:5;249:20;
318:25
**stickies (1)**
162:22
**still (26)**
3:16;19:19;32:18,
21;37:2;43:23;53:16,
19,21,23;77:25;

118:9;134:22;
147:20;157:11;
196:7;209:8;220:18;
229:10;236:5;
239:25;271:18;
319:11;321:6;
327:18;347:19
**stipulation (1)**
9:25
**stock (1)**
255:5
**stone (2)**
254:5;277:20
**Stone's (1)**
267:17
**stop (3)**
29:19;329:14;
330:2
**stopped (1)**
297:3
**store (1)**
109:19
**stored (3)**
176:19,22;179:4
**story (7)**
190:8;229:15;
232:22;233:9;
237:16;302:16;355:5
**straight (1)**
65:19
**strapped (1)**
173:1
**street (2)**
54:14;80:4
**strength (1)**
259:6
**stress (2)**
212:22;233:6
**stressful (2)**
150:8;257:18
**strike (16)**
35:4;82:18;85:9;
88:20,23;96:2;
147:12;156:16;
159:2;223:1;246:21;
253:13;255:22;
286:6;322:2;339:3
**strong (1)**
275:19
**stronger (1)**
261:16
**structure (5)**
41:1,5,16,23;42:13
**structure's (1)**
41:8
**structuring (1)**
52:17
**stuck (2)**
290:8;291:9
**stuff (48)**
14:15;29:23;44:12;
53:11,12;55:12;56:5,
6;64:13;72:20,21;

75:10;91:8;105:5;
110:20;114:2;115:4,
18,19;119:4,17;
124:18;134:17;
151:23;155:18;
160:22;161:3;
163:13;169:12;
170:18,20;171:13;
176:20;178:11;
184:17;187:24;
195:13;210:3;229:8;
242:23;250:15;
271:22;285:7;
289:12;290:17;
291:6;316:18;337:16
**stuffing (1)**
291:5
**stun (4)**
345:7,7,11,16
**subject (6)**
32:7;71:10;77:1;
265:7;330:24;333:14
**submitting (1)**
162:14
**subordinate (6)**
31:8,20;32:1,13;
33:9;35:1
**subset (1)**
133:7
**substance (7)**
183:8;215:15,19;
218:2;248:18;
315:21;344:1
**substantial (1)**
4:24
**substitute (1)**
106:18
**sub-teams (2)**
122:20;126:12
**subtopics (1)**
101:23
**successful (2)**
191:4;192:10
**suck (1)**
161:16
**sucked (1)**
155:5
**sufficient (1)**
261:11
**sufficiently (1)**
213:25
**suggest (5)**
73:22,22;213:22;
314:24;347:3
**suggested (2)**
262:21;347:6
**suggestion (7)**
347:10,13,18,25;
348:14,16,20
**suggestions (4)**
75:18,19;158:10;
348:4
**suggests (1)**

4:18
**summary (3)**
152:19;218:4;
343:25
**Summit (6)**
40:8;41:1,4,6,10;
76:13
**Sunday (3)**
86:9;90:5,7
**super (1)**
102:11
**superintendent (2)**
107:17;303:10
**superintendents (3)**
107:15,19,19
**superior (1)**
193:21
**supervising (2)**
288:9;299:24
**supervisor (86)**
11:22;57:14,15;
58:2;59:3;85:15,18,
25;86:1,5,22;90:24,
25;91:1,2,4,5;98:5,
11;99:1,20,22;101:2;
102:17,19,23;103:16,
19;104:4;105:8,18;
106:3,19,25;107:11;
109:4;110:12,17,18,
24;111:3,4,18,20,22;
112:2,17;113:4,12;
114:16;119:6;
121:17;131:8;
135:12;137:14;
138:4;140:4;144:10,
20;153:6,24;157:20;
167:25;169:3;
175:19,23;182:20;
187:8;189:10,14;
191:15;196:11;
197:22;199:24;
229:25;243:3;248:3,
10;255:24;265:23;
285:3;288:6;299:8;
302:15;328:15;
343:22
**supervisors (15)**
88:17;95:1;98:3,9,
10;105:23;106:21,
22;110:3;111:19;
114:16;117:21;
118:2,3;198:2
**supervisor's (16)**
58:2;104:18;114:9;
116:4;118:9;120:1;
168:2;199:15;
213:14;229:3;
272:20;291:24;
293:24;299:9;303:2;
348:13
**supposed (17)**
37:2;113:1;126:16;
129:23;148:12;

158:12,13,16;198:6;
235:17;245:18;
249:9,10;291:14;
301:13;318:12;
322:14
**suppression (1)**
353:8
**Sure (80)**
20:16;39:22;41:20,
21;45:6;58:23;60:10;
62:13;63:6;79:13,14;
91:11;96:10;118:20;
119:2,3,3;120:12,25;
121:3,8,24;126:9;
128:22;132:8;
134:18;137:24;
145:18;148:6;
150:17;159:23;
162:21;163:15;
164:16;169:3;170:5;
171:17;187:10,12,16,
20;188:19,21,23;
192:14,20;195:11;
216:7,20;224:21;
225:17;234:17;
237:14;240:2,16;
244:1;252:6;257:13;
261:11;266:8;
271:17;274:5;
276:20,25;285:20,22,
24;286:13;291:15;
299:2;312:17;
313:19;315:2;324:3;
332:18;335:1;
336:11,16;337:11;
338:8
**surveillance (1)**
351:2
**susceptible (1)**
291:2
**suspended (1)**
35:14
**suspension (2)**
24:3;36:14
**SUV (1)**
55:11
**SWAT (3)**
17:17;72:19;74:18
**swelled (1)**
296:11
**switch (7)**
43:2;181:11,14;
182:11,14,24;281:5
**switched (1)**
98:2
**switches (6)**
281:13,24,25;
284:9;286:3;287:4
**switching (1)**
90:8
**swollen (1)**
296:23
**sword (1)**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 390 of 395

333:13
**sworn (1)**
  3:3
**synchronized (2)**
  242:19;243:17
**system (32)**
  44:13;53:7;96:1;
  127:16;140:22;
  161:10;172:4;
  178:10;192:1;
  194:13,24;196:2;
  200:8,11,19;201:22;
  203:16;204:2;
  217:20;232:9;
  242:19;243:4;
  258:18;261:4;
  275:20;280:23;
  281:1;284:6;292:5;
  351:2;353:22,24
**systems (4)**
  172:1;199:16;
  242:20;346:11
**system's (1)**
  203:19

**T**

**table (4)**
  9:20;77:22;117:1;
  272:17
**tad (1)**
  293:21
**talk (19)**
  19:13;24:14;30:20;
  36:24,25;37:3;
  149:17,18;150:4,24;
  156:8;157:6;168:24;
  178:6;198:4;265:24;
  286:11;316:1;320:16
**talked (10)**
  83:15;113:9;193:3;
  218:9;246:21,22,25;
  287:2;322:10;330:21
**talking (33)**
  24:15,17;26:17;
  33:10;46:4;70:25;
  77:4;80:6;93:10;
  150:25;158:8;176:3;
  186:10,11;198:12;
  215:23;217:13;
  218:5;219:22;
  226:25;234:2;
  257:16;265:21;
  271:12;276:7;293:5,
  7;311:8;315:3,4;
  341:13;342:8;355:2
**tall (1)**
  184:18
**taser (10)**
  135:22;137:6,22,
  23;138:13;345:6,10,
  10,13,15
**task (1)**

167:7
**tasked (1)**
  118:19
**tasks (1)**
  46:21
**taught (2)**
  80:19;253:21
**teaching (1)**
  50:23
**team (84)**
  17:17;72:19;74:18;
  85:21,22;98:12,13;
  120:21,22;121:11,14,
  15;122:1,8,8,10,11,
  23;123:2,5,10,14,17,
  18,19,24;124:2,6,7,
  10,12,15,16,19,24;
  125:18;126:3,6,17,
  20,21,25;127:6,7,8,8,
  9,10,18;128:8;134:8,
  11,13,20,24,25;
  135:1,5,7,11,13;
  136:24;137:9;
  138:16;139:9;140:4,
  13;141:11,15,20,21;
  142:21;144:13,14;
  152:17;157:13,23;
  158:23;160:14,14,16;
  181:24;182:21;
  188:24
**teams (14)**
  122:5;125:10;
  126:1,8;127:11,17;
  133:23,25;134:4;
  137:15;148:9;149:6;
  150:14,16
**Tech (1)**
  67:7
**technically (3)**
  43:23;146:20;
  148:10
**techniques (1)**
  352:6
**telephone (1)**
  15:22
**telling (12)**
  8:1;95:13;145:14;
  156:6;174:14;
  177:22;178:6;
  212:14;235:6;
  272:16;297:1,5
**tells (3)**
  179:25;180:8;
  232:21
**ten (10)**
  217:7;246:7;260:6;
  261:3;262:3;269:11;
  276:12;277:3;310:6;
  333:20
**tend (6)**
  119:17;197:3;
  231:17;264:5,12,13
**tendering (1)**

14:21
**terminate (1)**
  32:11
**terminated (18)**
  21:13,15;22:10;
  27:12,21,25;28:25;
  31:8;32:4;34:15,21;
  35:12,14;37:9,24;
  87:9;115:14;330:23
**termination (12)**
  22:3;24:4,25;26:5,
  13;28:4,13;31:14,17,
  22;36:15;55:19
**terminology (2)**
  67:23;86:16
**terms (52)**
  10:6;28:14;34:12;
  46:1;49:12;62:16;
  71:5;73:5;77:5;
  102:10,11;105:21;
  107:5;111:8,9,16;
  112:1,17;113:10;
  121:22;125:25;
  129:20;153:25;
  160:6;172:1;183:7;
  187:9;199:15;
  205:19;217:22;
  220:1;221:7,20;
  226:17;230:20;
  231:25;235:24;
  258:10;260:9,18;
  280:16;285:17;
  292:11;298:12;
  299:1;304:7;312:15;
  317:4;336:21;
  343:20;345:21;348:4
**terrible (2)**
  103:6;261:24
**test (8)**
  42:19;96:8;137:23,
  24;154:6;291:14,17,
  17
**testified (15)**
  3:3;6:18,24;38:1;
  51:5;81:20;97:14;
  159:6;169:19;
  170:23;218:1;299:5;
  342:23;343:20;
  345:21
**testify (1)**
  10:22
**testifying (3)**
  9:17;342:23;
  346:24
**testimony (19)**
  9:16;10:9,16;45:7;
  60:9;71:22;78:24;
  81:22;98:9;106:17;
  110:15;301:1;
  322:12;349:6,8,18,
  19,21;354:3
**the- (1)**
  328:22

**theirs (1)**
  120:11
**therefore (1)**
  110:24
**there'll (1)**
  170:19
**thick (3)**
  205:9;282:7;283:1
**thicker (1)**
  282:24
**thinking (12)**
  50:10;61:14,15;
  190:18;195:19;
  210:8;232:20;
  310:23;335:11;
  337:17;338:16;344:5
**third (5)**
  72:16;74:5;135:1;
  279:21;286:10
**thirteen (1)**
  269:12
**thirty (3)**
  69:20;114:21;
  154:18
**though (6)**
  106:1;179:10;
  235:19;241:18;
  340:17;347:20
**thought (16)**
  61:1;72:7;75:17;
  91:19;147:18;
  152:23;156:23;
  195:23;197:12;
  250:10;288:1;
  296:11;318:24;
  342:16,17;344:18
**thoughtful (1)**
  160:11
**thoughts (6)**
  76:4,14,15;289:20;
  332:12;342:18
**thousand (2)**
  251:6;288:13
**thousands (3)**
  115:25;159:14;
  340:11
**threat (6)**
  114:21;142:7,9,19;
  143:6,12
**threats (1)**
  114:22
**three (46)**
  40:14;79:23;81:22;
  82:1,3,6;85:16;86:3;
  90:10,10;99:21;
  122:5,16,20;125:10;
  133:25;138:24;
  150:16;152:24;
  160:20;172:11;
  175:25;179:25;
  189:2;201:16,17;
  205:18;225:4,8;
  252:16;259:4;

269:11;277:7,8,13,
  15;278:6,8;304:21;
  308:8,10;320:1,8;
  326:16,21;327:14
**threw (2)**
  193:10,12
**throat (1)**
  151:24
**throughout (11)**
  19:24;47:14;48:3,
  12;93:3,8;103:20;
  151:4;154:12;
  166:10;227:11
**throw (3)**
  128:19;144:11;
  193:12
**thrown (1)**
  249:2
**Thursday (3)**
  86:9;90:4,6
**Tibbles (5)**
  57:8,9,13,16;62:5
**ticket (1)**
  329:24
**tickles (1)**
  253:25
**tiers (4)**
  184:18,18,19,20
**till (15)**
  75:9;86:3;87:17;
  88:14;91:3;106:6;
  134:8;140:23,23;
  162:6,8;229:16;
  273:12,19;303:5
**timed (1)**
  280:1
**timeline (1)**
  241:13
**times (31)**
  75:16;76:25;87:5;
  99:12;104:11;111:2;
  145:4;154:21;155:4;
  161:20;162:23;
  180:20;187:5;
  195:13;196:10;
  208:10,11;217:1;
  237:1,10;242:2,11;
  243:10,14,19;272:17;
  285:2;287:15;289:7;
  290:13;340:25
**timing (1)**
  334:23
**Timothy (1)**
  286:12
**tired (1)**
  298:10
**title (4)**
  51:20;114:12;
  176:14;328:8
**titled (1)**
  219:6
**today (39)**
  4:23;5:19;7:2;

**BARBARA DEVINE vs**
**RON NEAL, et al.**
Cause No. 3:18-cv-00995-JD-MGG
**JEREMY DYKSTRA**
August 7, 2019

USDC INND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 391 of 395

9:16;10:7,9,22;
60:19;81:22;89:1,2;
90:2;110:22;122:14;
132:19;153:10;
154:22;164:9;165:2;
166:16;167:10;
195:4;218:3;220:2;
224:7;228:11;
232:23;234:10;
265:17;298:1,20;
337:22;338:20;
339:13;349:7,15,18;
352:11;355:16
**together (15)**
121:24;122:12;
127:12,19;128:6,14;
129:24;148:13,16;
190:8;230:8;231:4;
232:22;256:14;
322:13
**toggle (2)**
281:4,13
**toilet (1)**
192:4
**told (20)**
35:3,6;79:6;
198:21;213:14,19;
214:13,15;235:8,9,
10;244:16;246:25;
247:14;263:5;
298:19;301:14;
336:24;337:9;342:16
**tomorrow (2)**
122:14;166:14
**ton (1)**
333:9
**tone (1)**
213:12
**tonight (1)**
156:11
**toning (1)**
316:7
**took (18)**
54:17,18;111:17;
134:18;205:20;
214:22;217:12,17;
218:7;250:9;261:9;
271:16;298:5,17;
301:23;314:19,25;
317:11
**tool (1)**
135:25
**tools (3)**
119:25;120:10,17
**top (22)**
13:23;14:1;21:19;
25:13,20;50:4;69:6,
12,16;94:20;131:16;
147:7;153:11;184:9;
219:5;220:25;
221:12;305:13;
307:18;308:9;312:4;
334:20

**topic (2)**
63:9,10
**topics (6)**
92:20;94:13;95:25;
113:8;155:2;215:23
**tornado (1)**
211:4
**total (8)**
67:9;88:1;148:3,6;
276:12;277:2,3;
282:18
**totally (5)**
51:3;234:15;
261:21;300:6;321:24
**tour (1)**
99:15
**touring (1)**
103:24
**toward (1)**
332:25
**towards (5)**
46:8;54:13;74:15;
130:24;199:21
**Tower (7)**
323:21,24;324:2,9,
18;325:10,11
**tracking (1)**
163:19
**traffic (41)**
110:20;113:2;
119:7,14,23;169:5;
172:16,18;174:15;
175:3,7;176:11,17,
18;177:19,22;178:9,
24;179:7;180:23;
181:4,7;182:11;
183:12;188:5,6,17;
207:16,17;214:16,22;
217:24;218:2;
237:10;279:12;
297:18,23;298:5;
326:19;327:3;340:18
**trafficking (1)**
155:9
**tragedy (1)**
319:16
**trail (1)**
49:7
**trained (16)**
49:13;123:10;
125:7;161:6;176:15;
253:24;255:8,14;
295:4,7,10,11,15,18;
296:16;300:4
**trainer (3)**
51:22;56:11;93:18
**trainers (2)**
51:10,13
**training (107)**
4:25;42:21;44:4,
14,19;45:3,25;47:20,
23;48:16,20,21;49:2,
17,18;50:16,17,21,

22;51:6,24;52:9,19,
20,21,22,23,24,24,25;
53:9,18,24;54:1,3,9,
12,19;55:7;56:9,16,
19,25;57:9,12;77:22;
78:1,21,22,23;79:1,6,
21;80:14;91:18,20;
92:4,7,9,12,15,21,24;
93:2,4,7,9,10,12,13,
22;94:3,4,7,14,23;
95:4,5,7,10,22;96:16,
24;97:7,7,8,11;
121:12,13,15,16,18,
19;122:16;130:2;
131:8;145:25;146:5,
9,21,23;147:3;158:6;
254:23;272:18;
352:2,5
**trainings (1)**
94:16
**training's (1)**
54:5
**transcript (1)**
7:14
**transfer (2)**
41:14;113:13
**transferred (1)**
84:15
**transition (1)**
77:7
**transmission (1)**
216:6
**transmissions (3)**
214:25;215:7;
216:4
**transpired (1)**
249:4
**traumatic (1)**
150:9
**treat (1)**
121:1
**treatments (1)**
246:9
**trees (1)**
56:13
**trend (1)**
264:4
**trial (2)**
329:16,18
**tried (4)**
145:9;154:15;
340:7;341:2
**tries (1)**
232:19
**triggering (1)**
127:21
**trips (2)**
98:13;176:20
**trouble (1)**
113:17
**true (6)**
94:2;192:14;
226:21;230:22;

277:6;319:10
**truth (2)**
36:8;328:24
**truthful (2)**
10:8,15
**truthfully (1)**
10:23
**try (18)**
44:24;45:8;49:4;
58:19;120:14;
154:20,21;155:9;
167:18;229:11,13;
232:21;254:3;
255:14;259:6,17;
264:2;324:23
**trying (46)**
29:5;37:4;43:11;
52:7;84:2,16;87:4;
89:5,6;116:25;
132:25;138:6;143:4;
155:10;158:9;
166:15;168:23;
169:10;170:3,17;
171:16;185:21,24;
188:20;198:12;
203:3,7;207:16;
231:4;248:24;
259:12;263:21;
268:18;271:18;
274:12;292:25;
297:6;308:1;313:10,
12;319:5;326:12;
339:19,20;340:1;
342:7
**Ts (1)**
187:24
**Tuesday (2)**
90:3,6
**turn (8)**
120:12;151:20,21;
189:20;196:25;
237:3;245:12;281:5
**turned (2)**
191:8;192:12
**turning (5)**
138:10;164:8;
223:13;233:16;
297:16
**twelve (1)**
269:12
**twenties (1)**
311:5
**twenty (11)**
15:13;21:2;78:14;
84:3;92:25;96:18;
154:17;269:15;
272:17;287:11;
350:11
**twenty-something (1)**
84:3
**twenty-year (1)**
38:2
**twice (4)**

144:17,23;151:17,
20
**Twitter (1)**
17:8
**Two (99)**
36:16;50:5;54:22;
80:8;84:20;86:21;
87:19,22;88:2,3;89:3,
14;90:9,9,10,10,14;
91:1,2;96:20;101:13,
14;109:13;113:16;
124:4;126:9;134:4;
135:22,23;137:1;
138:23;141:17;
144:10;147:6,14,24;
150:14,16;153:10,15;
154:13;166:6;
172:11;173:17;
175:25;176:25;
178:25;179:24;
184:18,20,20,25,25;
185:2,2,2;189:3;
199:23;202:15;
214:22;216:11;
222:5,15;224:13;
233:17;235:21;
238:1,4;243:19;
244:9;251:4;266:9;
269:11;272:12;
277:15,18,19,23;
278:6,8;279:2,8,21;
280:18;281:2;286:8;
306:15,18,18;307:12;
309:8;310:25;311:3;
320:7,14;323:20;
332:8,11;349:9
**two-sentence (1)**
192:8
**type (6)**
77:1;142:17;160:4;
215:25;220:5,12
**types (12)**
38:16;79:23;97:10;
112:8;130:10,17;
158:19;198:17;
284:11;287:3,14;
340:10
**typewritten (1)**
242:9
**typical (4)**
18:12;104:13;
165:24;261:18
**typing (3)**
241:6,25;243:2
**typo (1)**
270:5

**U**

**ultimately (3)**
71:21;288:7;
353:20
**Ultron (1)**

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 392 of 395

345:7

**unable (2)**
319:12;339:18

**unavoidable (1)**
319:18

**unclear (2)**
120:14;332:9

**uncommon (2)**
225:22;340:12

**under (14)**
9:16;52:12;60:11,
17;101:21,23;
102:16;223:3;
266:21,23;281:25;
286:13;295:17;332:2

**underneath (2)**
53:18;280:5

**Understood (17)**
29:16;45:6;60:9;
71:21;73:8;78:24;
81:21;93:25;106:17;
111:15;131:20;
147:5;174:23;
177:16;231:24;
264:16;325:13

**undertake (1)**
347:2

**underway (1)**
229:10

**union (4)**
38:13;39:14,16;
40:3

**unit (48)**
85:23;118:16;
119:1;125:23;127:3;
129:23;132:13,20,24;
133:1;134:10,15;
141:9;142:22;
143:20,23;147:19;
162:23;172:10;
174:19;183:23;
185:2;195:16,17;
208:22;210:10;
253:7,8,20,22,23;
254:17;255:15,16,17;
261:25;267:16;
276:20;279:2,17;
280:18;308:15;
316:21;317:9;
321:23;324:7;327:4,
16

**United (1)**
129:15

**units (35)**
76:15;86:11,12,13;
106:8;118:12;119:3;
125:19,21;132:9;
144:8,15;172:8;
173:18;174:2,13;
178:21;181:22;
183:19;185:19;
187:13;188:5,21,23;
196:10;197:6,7;

238:1;254:4;257:18;
276:21,22;277:19;
291:1;301:12

**universe (1)**
57:4

**unjustly (1)**
34:21

**unless (10)**
8:18;18:24;26:20;
112:18;181:11;
231:15;283:12;
292:22;308:4;335:21

**unlock (16)**
276:3;277:4;
278:20;281:11,22;
282:11;283:11;
284:6;287:3;294:14;
308:8,10;320:23;
322:6;323:18;326:15

**unlocked (9)**
208:22;210:24;
290:4,7,11;291:9;
294:20;325:16,25

**unlocking (4)**
280:23;286:2;
308:4,19

**unremarkable (1)**
164:23

**unruly (2)**
124:3;315:19

**unusual (3)**
164:18;186:17;
220:9

**unwritten (2)**
197:19;295:2

**up (151)**
13:18;18:7;39:21;
45:16;54:23;63:14;
71:16;73:16;77:22,
24;78:11;79:9,10,11,
12,13;80:23;82:6;
83:23;84:14,22;
90:23;100:6;109:13;
114:3;115:21;
117:24;118:23,24;
121:20;126:16;
127:5;129:4;141:13;
142:6;152:25,25;
153:25;154:4,5,8,10,
14;155:10,22;156:4;
157:19;158:20;
160:7;162:12,19;
166:8;170:3;172:6;
178:10;184:19;
190:2;191:5,12;
192:16;193:1;
194:24;196:1,7,8;
198:9,13;200:17;
203:11,20,21;204:16;
205:7,21;206:7;
207:5;209:9,12,13,
13;210:4,10;214:11;
217:19;228:2,12,19;

229:3;237:10;243:2;
244:5;256:12;
257:23;259:5;
260:13;261:3,7;
263:6;272:5;275:25;
276:14,15;277:18;
281:4,17,18,18;
283:2,6;286:22;
291:12;292:12,20;
293:14,15;296:12,23;
297:7;308:1,2,22,24;
309:1,13,17,22;
310:2,7,20;313:16;
315:11,18;316:24;
317:1;318:2;319:3;
320:2,22;321:20;
322:5;323:21;325:9;
326:15,17,24;329:5;
337:2;341:7,8;350:8;
355:4

**upcoming (2)**
32:7;33:12

**update (1)**
61:2

**updated (11)**
47:13;48:3;49:12;
59:2,19;60:11,22,23;
62:17;63:3;64:18

**updates (4)**
31:2;56:16;61:4;
182:12

**upon (4)**
135:1;245:24;
322:7,7

**upper (6)**
201:16,16,17;
202:11,12,14

**urgency (1)**
126:1

**urgent (1)**
126:3

**use (24)**
17:4,8,11;50:2,5;
100:8;117:15;120:1;
131:17;137:9;260:9;
276:1;294:14;295:4,
8,10;307:13;308:3;
338:2;339:17;340:3;
348:10,11;350:25

**useable (1)**
306:25

**used (25)**
86:16;94:24;
121:22;131:4,20;
133:4;142:17,18;
152:8;192:1;194:2,
19;197:6;203:7;
220:5,23;236:8;
258:18;259:22;
265:10;287:3;294:5,
11,18;296:7

**useful (1)**
7:4

**user (7)**
65:22;66:4,9,10;
200:6,7,7

**using (8)**
188:8,10;200:5;
202:25;290:5;
327:14;333:12;
338:13

**usually (31)**
44:24;121:17;
180:19;183:17;
185:18,19;187:17;
197:8;200:18;209:9;
211:8;223:16,17;
228:22;241:23;
253:6,11,24;268:19,
20;277:6,17;278:21;
290:10,10;291:18;
307:15;312:5;
323:15,15;325:3

**utilized (2)**
150:18;228:6

### V

**VA (1)**
269:7

**VAC (1)**
269:1

**vacancy (1)**
84:13

**vacation (4)**
268:22;269:8,9,23

**Vacations (2)**
85:19;98:14

**variety (2)**
120:17;201:24

**various (2)**
301:23;353:7

**vast (1)**
4:21

**vehicle (3)**
176:19,21;330:7

**verbal (1)**
331:6

**verbally (1)**
7:10

**versa (1)**
283:8

**version (4)**
46:17,18;64:18;
232:25

**versions (1)**
47:13

**versus (9)**
151:1;235:24;
241:15;243:2,4;
259:25;263:16;
287:11;310:3

**veterans (3)**
255:18;262:6;
263:22

**Vice (1)**

283:8

**vicinity (1)**
296:7

**victim (1)**
121:1

**video (41)**
51:1;96:5;193:11;
206:11,19,21;207:20;
317:13;334:8,10,21;
335:2,6,23,24;336:2,
3;337:3,4,6,11;
338:25;339:2,4,10;
341:6,8,10,16;342:5,
9;343:11,12,14,19;
345:25;349:11,12,19,
20;352:12

**video-recorded (1)**
36:11

**video-recording (1)**
334:14

**videos (5)**
50:19,22;96:3,5,9

**view (9)**
202:21,22;203:7,
17;204:1;254:20;
316:16;317:3;355:9

**viewing (3)**
22:19;199:15;
217:20

**violated (4)**
12:2,9,17;319:24

**violations (1)**
34:23

**visit (2)**
103:20,22

**visiting (1)**
104:1

**visual (3)**
169:1;231:14,19

**visually (1)**
178:12

**voice (4)**
63:14;212:22;
213:12;235:1

**volume (1)**
161:11

**voluntary (1)**
43:2

**vouch (1)**
251:10

### W

**wait (5)**
8:5;176:6;229:6;
273:12,19

**waited (1)**
274:2

**waiting (6)**
34:7;135:12;204:3;
227:24;324:23;
325:21

**wake (1)**

USDC IN/ND case 3:18-cv-00995-JD   document 203-4   filed 03/29/21   page 393 of 395

292:20
**walk (10)**
104:10;106:8;
119:1;192:9;260:21;
280:4;308:23,25;
323:12;326:13
**walked (10)**
76:13;103:1,3;
109:7,10;126:22;
176:24;186:12;
304:4;310:2
**walkie-talkie (1)**
173:1
**walking (3)**
85:23;176:3,4
**walks (1)**
192:6
**wall (11)**
99:24;108:7,10;
109:11;113:16;
181:22;199:21;
201:12,16;202:17,17
**walls (2)**
108:19;179:19
**Walmart (1)**
261:18
**wander (1)**
78:25
**wandered (1)**
96:11
**wants (3)**
141:13;265:24;
320:16
**warden (43)**
18:7,9,24;19:14,
15;25:9;43:13,21,23;
70:20;71:22;81:14;
83:8,8,13,14;107:14,
16,21,24;108:25,25;
116:6;117:9;140:25;
141:12;143:1;148:8;
150:3;163:18;191:8,
8,11,12;200:4;
225:12,13;286:25,25;
303:9;312:23;
315:11,12
**wardens (4)**
107:19,20;116:6;
148:22
**warden's (4)**
148:19;162:17;
312:13,14
**warning (1)**
327:20
**warranted (1)**
31:23
**watch (2)**
96:4;327:19
**watched (1)**
96:10
**watching (6)**
206:21;207:4,19;
300:5;334:10;336:9

**water (7)**
45:22,23;46:16;
48:1;180:7;192:7;
193:12
**watered-down (2)**
46:17,18
**Watson (11)**
110:1;207:22;
266:7;295:14,16,18,
19;296:24;297:2;
299:19,23
**way (63)**
7:18;8:5;9:2;12:1;
58:11;59:23;66:13,
18,21,21,23;68:16;
73:16;74:5;75:17,17;
80:11;84:19;93:8;
105:2;114:25;
121:20;134:14;
140:11;149:14;
200:12;202:18;
205:11,15;215:5;
223:10;229:11;
241:22;242:17;
249:6,8,11;250:13,
19;256:7;263:4;
265:14;274:6;275:2;
281:20;283:16;
289:2,5,9;291:7,8;
292:17,21;296:20;
298:2;309:1;316:22;
327:2;340:22;343:7;
344:5;345:13;349:18
**ways (6)**
63:1;65:10;88:19;
133:5;178:25;323:20
**weapon (2)**
138:24,25
**Weapons (55)**
85:21;98:12;
121:14;122:8;123:5,
18,19,21;124:6,15,
16,19,23,24;125:18;
126:6,20,21,23,25;
127:8,8,10,17,18;
128:8,9;134:8,8,10,
11,13,14;135:7,11,
13;138:16,21,22;
139:2,3,11,15,16;
140:13;141:11;
142:21;146:10;
152:17;158:23;
160:14;181:24;
188:24;189:6;345:2
**wears (2)**
139:18,21
**website (3)**
63:19;66:24;67:1
**Wednesday (6)**
13:13,14;22:24;
23:2;90:4,6
**week (12)**
78:1;88:22;90:5;

105:25;155:4;261:4;
262:1;280:12;
297:14;314:21,21,21
**weekends (1)**
89:15
**weeks (5)**
44:18;92:8,14;
153:10;297:14
**weight (1)**
309:24
**weird (1)**
201:12
**weren't (19)**
18:23;35:7;36:25;
47:4;56:7;73:4;
74:25;133:4;159:18,
23;163:7;192:19;
215:4;234:17;242:5;
301:19;316:2;
328:14;345:17
**West (5)**
14:19;306:20,20;
307:19,21
**Westville (18)**
38:18,21,23,25;
39:19;40:4;41:25;
44:2;54:6;68:13,14;
92:17;115:15;
150:20,23;161:1;
254:23;315:17
**Westville's (1)**
53:17
**WF (1)**
233:20
**whatever's (1)**
119:19
**What's (46)**
6:23;14:3,6;15:3,
22;19:11;20:9,10;
23:23;28:15;32:15;
33:4;49:22;67:8;
69:23;71:13;72:22;
88:24;118:6;131:13,
15;133:1;140:10,13;
161:24;164:12;
168:13;183:22;
184:22;185:22;
188:14;197:4;
210:20;237:21;
239:23;241:20;
245:18;248:17;
254:25;262:1;
266:15;269:21;
274:18;320:14;
330:10;353:9
**wheeled (1)**
331:12
**Whereas (1)**
142:16
**whereby (1)**
75:12
**Where's (4)**
38:21;277:24;

280:3;294:24
**wherever (5)**
126:13;127:4,4;
128:8;143:18
**white (2)**
233:20,22
**whoever's (1)**
182:20
**whole (37)**
30:4;39:21;89:9,
12;113:6;136:4;
158:16;173:13;
174:6,25;185:1,14;
199:13;208:22;
210:25;211:3,16;
212:10;213:2;225:9,
11,11,12,14;229:15,
15,23;250:11;
263:25;269:14;
284:5;310:3;317:22;
337:14,18;338:17;
342:25
**whomever (1)**
122:18
**who's (11)**
4:22;26:6;45:8;
85:20;106:18;
121:11;142:13;
174:24;178:10,12;
271:9
**Whose (2)**
301:10;355:7
**wide (1)**
109:7
**willing (1)**
333:19
**willingness (1)**
3:22
**Wilson (3)**
43:13,21,25
**window (2)**
177:4;249:2
**wire (1)**
185:24
**wish (1)**
13:1
**within (25)**
4:13;28:15;35:16,
24;51:21;73:10;
75:13;95:19;96:15;
101:10;102:22;
108:9,19;122:5;
125:10;128:10,11;
149:1;157:2;160:15;
201:23;203:22;
258:3;280:17;287:11
**without (6)**
7:10;148:14,15;
170:1;247:14;275:5
**witness (73)**
3:2,4,10;9:4;11:7;
14:9,13,16;18:15;
19:10;22:18;24:17,

19,22;25:1,7,18,22,
24;26:2,15;27:24;
28:2,6;29:3,22;30:1,
14,17;31:7;32:14;
41:5;49:9;58:18,20;
60:1;63:15;66:3;
70:9,11;74:24;99:5;
101:19;116:18;
142:15;147:25;
149:14;170:12;
173:2,7;211:10;
231:11;244:19,23;
279:6;287:23;288:3;
302:21;309:7;321:4,
9;322:23;324:21;
332:16;333:9;334:5,
10;335:7;342:10;
351:17,21;352:17;
353:25
**witnessed (1)**
302:8
**witnesses (1)**
7:5
**woman (1)**
172:14
**Wood (1)**
189:1
**word (23)**
26:1;113:6,7;
204:3;207:22,23;
215:12,12,16,16,18,
18,19,21,21;216:24;
228:19;248:15,16;
313:21,21;321:18;
338:14
**Word-created (1)**
228:4
**words (5)**
81:19;183:3;194:1,
19;232:17
**work (72)**
3:22;15:8;16:7,16,
18;17:18;18:1,5,14;
19:19;23:17;35:7;
38:16;42:16;44:21;
66:16;68:6,11,17,18,
22;69:7,13;71:12;
72:15;81:9;87:16,16,
20,22;88:14,16,18;
89:2,3,14;90:3,4,6;
91:2,6;101:17;103:9;
106:5;108:25;
125:18;126:17;
138:8;140:18;
148:12;151:2;
152:20,22;157:11;
168:11;172:1;
200:18;203:18;
209:16;253:19;
254:2;256:14;
257:12,24;258:10;
262:16;263:4,4;
271:21;273:23;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JEREMY DYKSTRA
August 7, 2019

276:22;286:24
**worked (24)**
39:25;44:2;53:15;
76:12;85:24;86:1,2,3,
8;100:21,25;109:21;
127:25;132:11;
138:9;160:20;161:1;
235:21;237:25;
242:1;255:15;
268:18,21;294:3
**working (51)**
23:11;39:14;40:18;
41:21;52:20;60:17;
77:16;81:5;88:23;
97:19,25;99:1,19;
102:15;114:1;
125:21;129:3;
140:16;143:25;
144:4,8;147:21;
172:8,12;179:12;
182:4;197:7;237:8,
18;238:23,24;
250:14;254:1;
255:18;256:8,18;
257:22;261:18;
282:12;291:16,21,25;
292:4;295:6;301:12;
310:24;327:1,13,16;
328:23;347:1
**works (17)**
25:14;53:2;58:5;
68:12;69:21;89:1,2,
7;125:11;127:25;
175:6;180:19;
194:13;276:21,23,25;
283:19
**world (2)**
124:8;197:13
**worried (4)**
195:14,15,16;
298:10
**worry (2)**
125:15;240:20
**worse (3)**
261:23;291:5;
311:2
**worst (1)**
311:2
**worth (2)**
96:24;220:19
**wrench (1)**
144:11
**write (11)**
114:1;137:22;
156:2;196:25;
198:22;229:21;
230:14,17;231:19;
233:14;324:2
**writer (1)**
232:18
**writing (9)**
72:12;156:5;
190:17;230:1,12;

232:15;237:1,9,10
**written (38)**
3:17,18;4:8,17;7:8,
13;45:17;50:16,21;
55:2,6;56:14;57:23;
96:9;111:24,25;
112:8;115:11;117:6;
129:18;130:1;131:1,
23;144:22,25;
145:19;155:19;
182:23;183:1;
197:19;224:17;
248:8,8;277:19;
286:17;295:1;331:3,
5
**wrong (8)**
105:11;110:16;
156:24;158:24,24;
168:2;328:17;334:7
**wrote (15)**
138:12;170:20;
195:11;216:25;
224:10,12;226:18,19;
234:17,19;241:21,22;
298:9;300:24;335:22

**X**

**XBOXes (1)**
184:17

**Y**

**yank (1)**
297:7
**year (38)**
39:16;40:11;42:3;
47:11,14;48:6,10,13;
49:21;50:1,3;56:6,6;
76:12;86:6,7;89:10,
12,13;94:19,23;95:6,
20,20,24;96:1,15;
98:2;107:12,18;
118:12;154:12,21;
155:1,1;160:17;
162:23;280:12
**yearly (7)**
47:19,22;89:19;
130:4;132:12;
162:21,25
**years (56)**
10:25;11:8;14:2;
15:13;21:3,24;30:13;
40:14;42:18;44:13;
53:7;56:3;64:3,3,4;
78:14;80:20;81:13,
22;82:1,3,6;87:5;
92:25;94:21,23;95:2,
14,15;96:18,19;
115:14,15,17;124:17;
131:25;132:2,9;
161:1;187:7;194:8;
216:11;224:13;

261:3;263:20,23;
272:12;284:4;287:9,
11,12,25;292:6;
347:16;349:9;350:12
**years' (1)**
30:11
**year's (1)**
96:17
**yell (4)**
292:20,22,23;
293:1
**yelling (7)**
246:4;292:13,15,
18;293:5,8;320:15
**Yep (9)**
16:15;135:3;218:6;
219:12;279:13;
281:9;286:19;294:1;
306:14
**young (1)**
162:7
**younger (2)**
310:5;311:4
**Youth (3)**
40:9,10;41:15

**Z**

**zig-zaggie (1)**
281:18
**zone (1)**
177:15
**zones (1)**
177:14
**zoom (1)**
203:12

**0**

**001766 (1)**
226:25
**001806 (1)**
230:17
**04/08/2017 (1)**
334:21
**0unless (1)**
65:8

**1**

**1 (12)**
25:8;34:2;139:21;
173:14;182:18;
201:8;253:11;293:7;
299:18,18,25;325:10
**1:00 (1)**
106:6
**1:10 (1)**
217:10
**1:21 (1)**
217:10
**1:43 (2)**
226:11,19

**10 (10)**
109:6;133:11;
213:21,21;263:20,23;
309:23;310:15;
321:21;344:10
**10:00 (1)**
145:15
**10:28 (1)**
243:23
**10:29 (3)**
240:22;241:3;
243:24
**10:31 (1)**
91:13
**10:37 (1)**
91:13
**100 (6)**
172:17;177:21;
180:22;181:5;182:6;
278:5
**10-10's (2)**
130:23,24
**10-4 (1)**
131:11
**10-70 (9)**
131:13;168:17;
172:18;180:15,17;
223:5;235:19,22;
236:6
**10-71 (9)**
130:24;131:15;
233:3,21;235:13,19,
22;236:6;271:5
**11 (3)**
323:21;324:18;
325:11
**11:00 (1)**
106:6
**110 (1)**
258:25
**115 (1)**
287:25
**119856 (1)**
219:17
**11th (8)**
22:19,20;23:2,19,
20;35:4,8,17
**12 (2)**
90:20;264:9
**1-2 (1)**
237:22
**120 (1)**
258:25
**12-hour (2)**
89:10,11
**12-month (1)**
147:2
**12th (1)**
5:2
**13 (4)**
140:20;147:24;
148:1;313:6
**13-member (1)**

147:6
**13-minute (4)**
297:24;298:14,18,
23
**14 (1)**
184:4
**143 (1)**
239:4
**14th (2)**
13:15,16
**15 (13)**
34:4,4;90:20;
109:7;162:23;
213:21;233:7;
263:20,23;309:22,23;
310:15;311:8
**1576 (1)**
297:17
**16 (2)**
14:2;96:23
**160 (1)**
255:2
**1606 (1)**
14:19
**17 (3)**
21:1;184:10,11
**1756 (3)**
218:22,22;219:5
**1757 (1)**
223:21
**1798 (2)**
237:3;240:24
**18 (1)**
202:19
**1800 (1)**
354:14
**1812 (1)**
218:23
**18-year-old (2)**
251:1,20
**19 (5)**
3:14;30:11,13;
56:2;115:14
**19-year-old (2)**
251:2,20
**1's (1)**
157:12
**1st (8)**
21:8,9;22:12,13;
35:11,18;37:5;95:20

**2**

**2 (7)**
25:2,9;140:20;
173:14;201:8;
202:11;241:19
**2:00 (3)**
86:24;106:6;227:7
**2:44 (1)**
227:6
**2:55 (1)**
289:24

USDC INND case 3:18-cv-00995-JD    document 203-4    filed 03/29/21    page 395 of 395

**2:58 (1)**
289:24
**20 (7)**
30:11,13;96:23;
233:7;263:23;311:9;
321:21
**2000 (5)**
38:8,25;40:4,5;
132:16
**2002 (2)**
40:5,7
**2007 (3)**
40:7,8,9
**200-something (1)**
246:5
**2014 (7)**
40:12,17,20;44:7;
48:18;57:3;71:14
**2016 (2)**
81:23;82:4
**2017 (39)**
11:18;19:1,24;
48:18;51:17;71:14;
97:15;103:19;128:2;
164:8,13;165:6,9,15,
23;167:12;193:25;
217:14;233:19;
242:21;271:25;
273:4;275:21;
276:11;283:24;
289:4;296:6;307:1;
313:9;314:25;
315:23;347:14;
349:15;350:15,19;
351:4;353:11,23;
354:8
**2019 (10)**
3:14;5:2,13;13:16;
21:9;22:6,7,20;
23:10;118:8
**20-something (1)**
52:7
**20-year-old (2)**
251:2,20
**219379-7074 (1)**
15:23
**24 (13)**
101:6,11,21,24;
102:4,22;103:14;
105:24;174:13;
175:11,16;280:11;
314:25
**24-hour (1)**
89:8
**25 (3)**
80:20;263:23;
323:25
**27 (4)**
140:19;147:11;
148:3;164:13
**27-member (1)**
147:6

**3**

**3 (8)**
40:11;41:15,16;
135:24;138:14;
201:8;202:15;238:15
**3/6 (2)**
38:8;40:4
**3:00 (2)**
86:10;87:20
**3:20 (1)**
334:24
**3:40 (1)**
334:24
**3:40:24 (1)**
334:21
**3:42 (1)**
337:15
**3:42:12 (1)**
336:2
**3:42:21 (1)**
341:9
**3:42:23 (1)**
337:6
**3:42:32 (1)**
339:2
**3:42:45 (1)**
341:12
**3:43:19 (2)**
342:13;343:11
**3:47:25 (1)**
343:14
**30 (5)**
34:3;80:20;152:25;
332:3,21
**3000 (4)**
120:23;130:14;
222:7;302:10
**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 (1)**
20:17
**32 (2)**
202:19;246:6
**35 (2)**
175:11,11
**365 (1)**
280:12

**4**

**4 (18)**
40:10;129:2;144:4;
179:3;201:8,11,17;
202:19;209:8;
210:13,23;213:9,10;
214:14;248:23;
250:15;251:8;301:14
**4/7 (2)**
224:16;233:19
**4/7/17 (1)**
221:4
**4/7/2017 (1)**
223:23

**4:00 (12)**
88:18,18;91:2,3,6,
6;97:23,23;98:2,3;
138:8,8
**4:13 (1)**
346:21
**4:14 (1)**
346:21
**4:24 (1)**
356:6
**40 (1)**
264:13
**400 (4)**
156:3;281:21,22;
283:7
**45 (1)**
240:23
**49 (1)**
108:4

**5**

**5 (11)**
67:11;201:8,14,17;
202:12;205:3;
210:24;213:9;
250:12;263:20,23
**5:00 (8)**
86:2,3,24;98:1,1,1;
138:9,9
**5:45 (5)**
87:17,17;88:14,15;
90:17
**50/50 (1)**
293:16
**500 (45)**
178:5;201:14,14,
15;202:14,19;208:1,
3,19;209:6,12,16,19;
210:8,19;211:25;
212:8,11,20,25;
213:8;217:22;
233:23;244:16;
245:2,23;246:15;
248:6;276:3,8,18,23;
281:11,11,14,15;
283:6,9,10,11;293:7;
308:3;309:18;
310:20;322:6
**501 (1)**
281:19
**503 (1)**
281:19
**540 (2)**
221:23;222:2
**5873 (1)**
100:14

**6**

**6 (2)**
201:9;205:3
**6:00 (8)**

**4:00 (12)** continued
87:17,17;88:6,6,14,
15;90:18;138:10
**60 (1)**
264:12
**60/40 (2)**
264:6,11
**6233 (1)**
305:24

**7**

**7 (19)**
11:18;105:24;
127:3;130:21,22;
165:15;167:12;
193:24;201:9;
275:21;280:11;
289:4;296:6;302:1,
11;307:1;313:9;
315:23;354:8
**7:00 (2)**
86:10;87:20
**7's (1)**
130:23
**7th (13)**
5:13;97:15;164:8;
165:6,9,23;167:4;
203:7;217:14;273:4;
276:11;295:7;331:16

**8**

**8 (4)**
23:10;131:11;
178:5;271:25
**80 (3)**
96:8;255:1,1
**80/80 (4)**
254:23,25;255:9,
12
**85224 (1)**
14:20
**8th (3)**
23:1,3,14

**9**

**9:00 (1)**
332:6
**9:22 (1)**
30:25
**9:31 (1)**
30:25
**9:45 (8)**
221:4,10;224:16;
233:2,19;236:12,16;
297:18
**9:58 (8)**
244:12;297:19;
300:8,12,23;301:3,
18;303:25
**96 (1)**
39:7

**97 (1)**
258:24
**99 (1)**
39:7