# In The Matter Of:

*BARBARA DEVINE, et al. vs*
*RON NEAL, ET. AL.*

*JUSTIN RODRIGUEZ*
*November 4, 2019*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 11-04-19 Justin Rodriguez (BACKWRITE).txt
**Min-U-Script® with Word Index**

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 2 of 82

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA DEVINE, as Personal )
Representative of the ESTATE )
OF JOSHUA DEVINE, )
                   )
     Plaintiff, )
                   )
vs.              )   Case No.
              )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL., )
                   )
     Defendants. )
                   )

The Deposition of JUSTIN RODRIGUEZ

Date:     Monday, November 4, 2019

Time:     9:29 o'clock a.m.

Place:    5816 East 7th Avenue
             Gary, Indiana

Called as a witness, by the Plaintiff, in accordance with the Federal Rules of Civil Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

**Page 2**

APPEARANCES:

MEGAN PIERCE, ESQ.
SARAH GRADY, ESQ.
     Loevy & Loevy
     311 North Aberdeen Street, 3rd Floor
     Chicago, Illinois  60607
     PHONE:  (312) 243-5900
     FAX:    (312) 243-5902
     megan@loevy.com

On Behalf of the Plaintiff;

ILENE M. SMITH, ESQ.
     Deputy Attorney General
     Office of the Attorney General
     302 West Washington Street
     IGCS Fifth Floor
     Indianapolis, Indiana  46204
     PHONE:  (317) 234-7019
     FAX:    (317) 232-7979
     ilene.smith@atg.in.gov

On Behalf of the Defendants.

**Page 3**

THE DEPOSITION OF JUSTIN RODRIGUEZ

DIRECT EXAMINATION
  By Ms. Pierce......................... Page   5
CROSS EXAMINATION
  By Ms. Smith......................... Page 245
REDIRECT EXAMINATION
  By Ms. Pierce......................... Page 247

E  X  H  I  B  I  T  S

| DEFENDANT'S | MARKED | IDENTIFIED |
|---|---|---|
| Exhibit No. 1 | 171 | 171 |
| Exhibit No. 2 | 186 | 186 |
| Exhibit No. 3 | 197 | 198 |
| Exhibit No. 4 | 200 | 200 |
| Exhibit No. 5 | 210 | 210 |
| Exhibit No. 6 | 211 | 211 |
| Exhibit No. 7 | 214 | 214 |

* * *

**Page 4**

JUSTIN RODRIGUEZ, called as a witness, by the Defendants, having first been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

MS. PIERCE: My name is Megan Pierce, and I represent the plaintiff, Barbara Devine, in her capacity as personal representative of Joshua Devine's estate. My apologies, I'm just going to read a quick statement into the record before we start with questioning.

On October 7th and 11th, counsel engaged in Rule 37 telephone calls discussing outstanding discovery in this case. During these calls, which has been memorialized in our October 15th letter, defense counsel agreed to provide us identified outstanding discovery responses, including requested documents. Because we have not yet received these items, we reserve the right to reopen any deposition conducted until we receive them.

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 3 of 82

Page 5

DIRECT EXAMINATION

BY MS. PIERCE:

Q    So Mr. Rodriguez, have you ever been a witness in a deposition before?

A    No.

Q    Have you ever given testimony in court before?

A    No.

Q    Have you ever been a party in a lawsuit before?

A    No.

Q    Have you ever been sued before at any point?

A    No.

Q    Okay.  So I'm just going to go over the basic rules of a deposition.  If you have any questions, please let me know.

A    Okay.

Q    So do you understand you are under oath?

A    Yes.

Q    Do you understand that telling a lie at a deposition is a crime?

A    Yes.

Q    So the court reporter is going to be taking down everything that we say.  For that reason, it's important to give verbal answers, rather than uh-huh or huh-uh or shaking or nodding

Page 6

your head.

A    Right, okay.

Q    On the same line, to ease the court reporter's job, I'm going to wait until you finish giving your answer before I ask another question, and I ask that you wait until I finish my question before you give an answer, just so the court reporter can get everything down.

A    Okay.

Q    I'll try to ask questions that make sense. That won't always happen.  So if you have any questions about what I'm asking, just ask me and I'll rephrase it.

A    Uh-huh.

Q    If you answer a question and you don't ask for clarification, I'll assume that you understand it.

A    Okay.

Q    Is that fair?

A    Yes.

Q    And I think your counsel told you, you can take a break at any point, just not while a question is pending.  So I'll ask that any question that's been asked you give an answer and then we can take a break.

Page 7

A    Okay.

Q    Are you under any type of medical care that would impact your ability to give honest and truthful testimony here today?

A    No.

Q    Do you have any condition that would affect -- medical condition, that would affect your ability to testify here honestly and truthfully today?

A    No.

Q    Is there any reason that you can't give full and accurate testimony here today?

A    No.

Q    Do you now or have you at anytime in the past had any condition that affects your memory?

A    No.

Q    Are you taking any medication that might affect your memory?

A    No.

Q    Did you meet with your counsel to prepare for your deposition today?

A    No.

Q    Without going into the substance of any conversations, have you spoken with your counsel at any point about your deposition

Page 8

here today?

A    Yes.

Q    How many times did you speak with counsel?

A    Three.

Q    About how long did you speak with counsel?

A    Each time or --

Q    Uh-huh.

A    The first couple times, maybe about five, ten minutes; the third time, maybe about 20, 30 minutes.

Q    Okay.  Did you do anything else to prepare for your deposition today?

A    Just take notes.

Q    What did you take notes on?

A    Questioning, and when I was talking to my counsel when he was asking me the same questions, I would just try to take notes and what I can respond with.

Q    Did you review any documents in preparation for the deposition today?

A    The deposition questions.  I'm not sure what it was.  It's one of the -- the third time, when I talked to him the third time, just all the questions.  I don't remember what it was.

Q    Is that the interrogatory answers?

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 4 of 82

Page 9

A    Yes, yes.

Q    And that's the only thing that you've reviewed for your deposition here today?

A    Yes.

Q    Have you spoken to any current or former IDOC employees in preparation for your deposition today?

A    No.

Q    Mr. Rodriguez, what city do you live in?

A    I live in Rensselaer, Indiana.

Q    Have you recently moved?

A    Yes.

Q    Where did you live prior?

A    Lowell.  Lowell, Indiana.

Q    When did you move?

A    The end of September.  No, the end of October.  August, August, sorry.

Q    The end of August?

A    Yes.

Q    What was the reason for your move?

A    Just a bigger place.

Q    And do you have a personal cell phone?

A    Yes.

Q    What's your personal cell phone number?

A    219-775-8305.

Page 10

Q    Do you have a personal land line phone?

A    No.

Q    Do you have a work phone?

A    No.

Q    Do you have an E-mail address?

A    Yes.

Q    What's your E-mail address?

A    Jrodriguezsky@aol.com.

Q    Did you have an E-mail address when you were working at ISP?

A    Yes.

Q    What was that E-mail address?

A    The same E-mail address.

Q    As your personal E-mail address?

A    Yes.

Q    Did you also have a work E-mail address?

A    I believe so, but I don't recall what it was.  It was just on the Indiana website, Indiana State website, I believe.

Q    Okay.  Do you still have access to that E-mail address?

A    I'm not sure.  I've never been on it.

Q    Do you use social media?

A    Yes.

Q    Do you have a Facebook?

Page 11

A    Yes.

Q    What's your user name on Facebook?

A    Just Justin Rodriguez.

Q    Do you have a Twitter?

A    Yes.

Q    Do you know your user name on Twitter?

A    No.  I haven't used it in a long time.

Q    Do you have an Instagram?

A    Yes, but I think it's connected through my Facebook.

Q    Do you have any other social media accounts?

A    No.  Well, Snapchat.  I don't know if that's -- is it?

Q    Yeah.

A    Okay.  Yes.

Q    Okay.  And no other ones besides that?

A    No.

Q    When did you graduate from high school?

A    2012.

Q    What high school did you go to?

A    Plainfield East High School.

Q    Did you continue with your education after high school?

A    Not college.  I took an -- started taking EMT classes.

Page 12

Q    Where did you take EMT classes?

A    St. Anthony's Hospital.

Q    How long were those?

A    It was about for a year.

Q    Did you complete your EMT course?

A    Yes.

Q    Did you work as an EMT?

A    No.

Q    Why didn't you work as an EMT?

A    I completed my course.  I kind of -- I took the state exam and ended up failing twice, and so I just never followed through for the third time to take it.

Q    And when did you finish the EMT course?

A    2014.

Q    And when did you take the EMT exam?

A    I don't remember.

Q    Do you know how long you waited between the two EMT exams?

A    About a month.

Q    So what did you do immediately after you graduated from high school?

A    It was the EMT classes.  It was like right after high school I took those classes.

Q    Okay.  What was your first job?

Page 13

A    McDonald's.
Q    When did you start working there?
A    2013 or -- yeah, 2013.
Q    What was your position there?
A    Just a cook.
Q    And when did you leave McDonald's?
A    Well, I was there on and off for a while.  So, I mean, I had been there for about five years, I guess.
Q    And why were you there on and off?
A    Just prior positions.  When I quit there, I kind of went back as a manager.  When I quit the prison, I went back, and stuff.
Q    So when you left McDonald's the first time, when was that?
A    When I got hired into the prison.
Q    And when did you start at the prison?
A    In 2016, I believe.
Q    Do you know what month?
A    October.
Q    What was your position at the prison?
A    Correctional officer.
Q    And what did you do to get employment at the prison?  What was the application process?
A    It was on the Indiana website.  I applied

Page 14

through there.
Q    And what did you have to do as part of that application process?
A    I think there was a background check and drug screening, physical, I believe, and then it was like a walk-through, like an orientation type, and I think that was about it.
Q    Did you do any interviews as part of the process?
A    Oh, yes, I did interview.  It was a face-to-face interview with a lieutenant and a sergeant, I believe.
Q    Did you have to take any tests as part of that interview process?
A    No.
Q    So you started in October of 2016 as a correction officer.  Did you work anywhere besides Indiana State Prison?
A    I worked -- I had worked part-time at McDonald's still.
Q    While you were a correctional officer --
A    Yes.
Q    -- you worked part-time at McDonald's?
A    Yes.
Q    And you were -- were you at any other

Page 15

facilities besides Indiana State Prison?
A    No.
Q    And how long were you at Indiana State Prison?
A    About ten months.
Q    So you left in 2017?
A    Yes.
Q    Do you know what month you left?
A    June.
Q    Why did you leave?
A    Mainly because I just thought it was boring.  I kept getting death threats, so.
Q    Who were you getting death threats from?
A    Prisoners, inmates.
Q    Why were you getting death threats?
A    Because of what happened in B-Cell house with the -- they all think that the officers in there let him die.
Q    All the prisoners believed that the officers let Joshua Devine die?
A    Yes.
Q    And so they threatened you because of that?
A    Yes.
Q    Any of the other officers, did they receive death threats as well?
A    Yes.

Page 16

Q    And you spoke to them about it?
A    Yes.
Q    Which officers specifically?
A    Officer Abbassi and Officer Blakely, I believe.
Q    And you're getting threatened -- you were getting threatened by multiple people?
A    Well, it was mainly officers telling me that I was getting threats from -- that if I ever stepped back in B-Cell house, they were going to kill me.
Q    Other officers would tell you that?
A    Yes.
Q    Which officers?
A    I don't remember his name.  Yeah, I don't remember his name.
Q    You don't remember the name of the officer who told you --
A    No, I --
       COURT REPORTER: Wait, wait.  You need to let her finish her question.
BY MS. PIERCE:
Q    You don't remember the name of the officer who told you you were getting death threats?
A    No.

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 6 of 82

Page 17

Q   Did you know this officer?
A   I worked with him a couple times, but that was about it.
Q   What is his position at ISP?
A   At the time he was a correctional officer as well.
Q   What is he now?
A   I'm not sure. I haven't talked to him.
Q   Okay. Was there any other reason that you left ISP?
A   No.
Q   Did you give notice, two weeks' notice when you resigned?
A   Not two weeks' notice because I was getting hired at a current position, at another position. I had to leave right away.
Q   Where are you -- what position did you get after you left ISP?
A   It was like a steel scrapper.
Q   And where is that?
A   It was in Hebron, Indiana.
Q   And what's the name of the place?
A   I don't remember. I only worked there for about a month.
Q   Why did you leave?

Page 18

A   It just didn't seem for me.
        COURT REPORTER: It just didn't?
        THE WITNESS: Seem for me.
BY MS. PIERCE:
Q   It didn't seem like a good fit you mean?
A   Yes, yes.
Q   And why is that?
A   I didn't really understand what -- the work, and stuff, so.
Q   In what way did you not understand the work?
A   I guess I just -- I don't know. It just kind of didn't seem like work I wanted to really -- was into, so.
Q   Was there any other reason that you left?
A   No.
Q   Where did you go after that?
A   I went back to McDonald's.
Q   As a manager you said?
A   Yes.
Q   And how long were you at McDonald's again?
A   For about a year.
Q   And then you left?
A   Uh-huh.
Q   And why did you leave?
A   I got a better position working at the

Page 19

railroad.
Q   What railroad?
A   Pacific Railroad partnered with CSX in Bedford, Illinois.
Q   And what do you do there?
A   Hostler driver and ground man.
Q   What's a hostler driver?
A   We drive trucks, trailers, and we deliver to -- we deliver the freight to the side of the tracks so they can -- so the cranes can load the freight, and everything.
Q   Are you still working there?
A   No.
Q   When did you leave?
A   I want to say in April.
Q   Of this year?
A   Yes.
Q   And why did you leave?
A   I wanted something closer. It was too far of a drive.
Q   How far of a drive was it?
A   About an hour.
Q   And where are you working now?
A   TruGreen.
Q   And what's that?

Page 20

A   It's a lawn care company.
Q   And how long have you been there?
A   Since May.
Q   Okay. And are you working anywhere else?
A   I'm about to start at FedEx.
Q   Will you be doing both positions?
A   No. This is kind of a seasonal job.
Q   And what will you be doing at FedEx?
A   Delivering packages.
Q   When you were getting death threats at ISP, did you talk to any of your supervisors about this?
A   No.
Q   Why not?
A   I didn't really feel like they would do anything.
Q   Why?
A   Just because it happens all the time.
Q   Death threats happen all the time?
A   Yeah, to officers that are like -- prisoners that don't like officers, so.
Q   Is there a reason that officers usually get death threats?
A   Sometimes it's just prisoners that don't like the way things -- that officers do things.

Page 21

They just don't like them.

Q   Are there any other reasons that officers get death threats?

A   I don't think so.  I don't know.

Q   Do you know any other officers who received death threats before?

A   I seen like officers hurt before, just not, just not -- I mean, I guess not threats, but I've seen them get hurt, so.

Q   Okay.  But you've never heard about specific instances of other officers getting threats?

A   Oh, yes, I have.  And like with Officer Abbassi, she received a threat like maybe, I don't know, about like when the guy got out, he was going to rape her, so.

Q   Did you ever speak to Promise Blakely about whether she was getting threats?

A   Abbassi?

Q   Promise Blakely.

A   Oh, about Blakely?

Q   No, sorry.  Have you ever spoken with Promise Blakely about whether or not she was receiving threats?

A   No, I don't think so.

Q   Do you think that there was any legitimacy to

Page 22

the prisoners' anger with you?

A   No.

Q   Why not?

A   Because it really wasn't -- it wasn't our fault.  So I just don't think it was a really rational reason for them to think -- to want to kill me because I didn't do anything.

Q   Do you think it was rational for them to be angry with you in relation to the fire and Joshua Devine's death?

A   No.

Q   Did you speak to anyone else about the death threats beyond Abbassi?

A   No.

Q   So you spoke only with the person who told you about the threats and with Abbassi.

A   Yes.

Q   Can you tell us a little more about your conversation with Sarah Abbassi about the threats you were receiving?

A   As far as what?

Q   What did Sarah Abbassi tell you about the threats that she was receiving, that she would be raped when the prisoner left?

A   She was just coming back from a walk, a pipe

Page 23

walk, and then she came into the office and started telling us that the offender threatened to rape her when she just -- when he got out.

Q   Was this in B-Cell house?

A   Yes.

Q   So you were working in B-Cell house after the fire?

A   No, this was before.

Q   This was before the fire?

A   Yeah.

Q   So someone threatened Sarah Abbassi that she would be raped before the fire?

A   Yes.

Q   Okay.  Did you have a conversation with Sarah Abbassi about the threats you received after the fire?

A   Yes.  It was just more that they were going to -- the same thing that I was hearing, that they were going to hurt them -- hurt her if she ever went back to B-Cell house.

Q   You were telling Sarah about this?

A   No, she was telling me this.  It was basically what I heard from the other officer and basically the same what she heard from an

Page 24

offender.

Q   And when -- was this just on one occasion that you had this conversation with Sarah Abbassi?

A   Yes, I think so.

Q   Do you know the name of the prisoner who threatened her?

A   No.

Q   Did she know the name of the prisoner who threatened her?

A   I'm not sure.

Q   Do you know if she had any conversations with any supervisors about the threats?

A   No.

Q   You don't know or --

A   I don't know.

Q   Did you ask her if she had any conversations --

A   No.

Q   -- with any supervisors?

A   No.

Q   You've got to wait until I finish.

A   Oh, sorry.

Q   For how long did you work with Sarah Abbassi after the fire?

A   Maybe about a couple weeks.  I believe she

Page 25

quit.

Q    She quit before you left?

A    Yes.

Q    Do you know the reason that she quit?

A    She said she got another position.

Q    Did she leave at all because of the threats?

A    I'm not sure.

Q    Did you tell her about the threats that you received?

A    Yes.

Q    Do you know if she received threats directly or was she also told secondhand from another officer?

A    I'm not sure.  She just told me what she heard.

Q    Okay.  And you said that you didn't believe the supervisors would do anything about the threats.  Can you tell me why you believe that?

A    It was just mainly because I feel like it just happened all the time where officers would get threats and they would just be like write them up.  So it's just that kind of deal, where they just tell you to write them up and that will be it.

Page 26

Q    So you think IDOC was not taking safety seriously?

A    In a way, yeah.

Q    Why is that?

A    As far as just the threats, just like -- it just seemed like they just tell you to write them up and they would stop, so.

Q    And just to be clear, no one threatened you directly.

A    No.

Q    When you left IDOC, did you fill out any sort of exit survey or have an exit interview?

A    No.

Q    Were you asked to do any sort of exit survey or have an exit interview?

A    No.

Q    While you were at the IDOC were you ever promoted?

A    No.

Q    Did you ever apply for any promotions while you were at IDOC?

A    No.

Q    Did you ever have any prisoners file any complaints or grievances about you while you were at IDOC?

Page 27

A    No.

Q    How would you learn if any prisoners filed any complaints or grievances about you at IDOC?

A    You would get something in the mail.

Q    From who?

A    It would be -- there was like an officer mailbox.  I believe it would be from the offender and a counselor, I believe.

Q    So the prisoner would write to you directly?

A    It would be on a grievance and then they would have to give it to a counselor and I believe the counselor would have to put it in your mailbox.

Q    And how were the grievances or complaints dealt with?

A    I believe they would send you something in the mail.  I'm not too sure.  I never really got a grievance in the mail.

Q    Okay.  Do you know if there's any sort of person in charge of assessing whether grievances have merit or deciding what sort of action to take in relation to the grievance?

A    I believe the captain.  I'm not sure, though.

Q    Have you ever been disciplined while you worked at IDOC?

Page 28

A    No.

Q    Have you ever had any supervisor talk to you about any dissatisfaction with your work at IDOC?

A    No.

Q    Did you ever receive a performance appraisal or work improvement plan?

A    No.

Q    Do you know why you didn't receive a performance appraisal or work improvement plan?

A    No.

Q    Did you ever receive any sort of evaluation of your work at IDOC?

A    No, I don't believe so.

Q    Did you work the night shift or the day shift at IDOC?

A    The night shift.

Q    Did you ever work the day shift?

A    No.

Q    Did you request the night shift?

A    I think I requested the day shift.

Q    What areas were you assigned to while you were at IDOC?

A    A-Cell house, B-Cell house, C-Cell house, F

USDC JN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 9 of 82

Page 29

Frank, and some other ones. I don't recall what they were.

Q Did you have the training and experience to work at any post at IDOC?

A Yes.

Q When was the first time that you worked as an officer in charge?

A I don't remember the day or date.

Q Do you know about how long you had been at ISP before you were asked to be an officer in charge?

A About six months.

Q Was there one area of the prison where you worked more frequently than others?

A B-Cell house.

Q And why was that?

A I think because I was used to there, they thought -- they just kept putting me there.

Q So they felt like you were acquainted with B-Cell house and they --

A Yeah.

Q -- wanted to keep you there?

A Yes.

Q How many people usually worked in B-Cell house at a time?

Page 30

A Average three.

Q Was there ever less than three?

A Yes.

Q Was there ever just one person working in B-Cell house?

A No.

Q So the lowest amount it ever was was two people?

A Yes.

Q Do you think that two people was sufficient to maintain security and safety in B-Cell house?

A No.

Q Do you think three people was sufficient to maintain safety and security in B-Cell house?

A Yes.

Q And why was two people not sufficient?

A If someone would -- if it was only two people, someone would have to work three ranges instead of just two. So it made it more easier to work just two ranges than three.

Q Was there any other reason?

A No.

Q What were your hours on the night shift?

A 12 hours.

Q Did you frequently work overtime?

Page 31

A No.

Q How often did you work overtime?

A I never got overtime.

Q Okay. In the whole time you were at ISP you never worked overtime?

A No.

Q Was that common?

A Yes. I believe you had to apply for it or write that you want to work overtime and they had to approve it.

Q Okay. And why would someone apply to work overtime?

A Just to get more hours.

Q But it was never out of necessity for staffing purposes?

A No.

Q What were the hours on the night shift?

A 6:30 p.m. to 6:30 a.m.

Q What would you do when you arrived to ISP for your shift?

A We would have to go through security and just take off our jackets, boots, and just put everything on the metal detector so they could go through it and check everything, and then we would get everything back on and just be on

Page 32

our way.

Q What would you do once you went through security?

A Just go through the security, then we would have to go to our assigned -- or we'd go to the person who assigns us to our checked in areas, and then we'd go to the meeting room and have about a ten, 15 minute meeting.

Q Who would assign you to your area?

A I don't remember what he was called. We just check in, go and check in where we were -- where he would assign us.

Q Okay. So you'd go through security, and then someone who you don't remember who would tell you what your assignment was?

A Yeah.

Q Were you usually the officer in charge?

A No.

Q How often were you the officer in charge?

A Just a couple times. I believe it was when we were low on staff, or something.

Q Okay. So normally someone else would be an officer in charge?

A Yes.

Q Normally was it someone with a higher rank

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 10 of 82

Page 33

than correctional officer?

A No, not necessarily.

Q How would they decide who was the officer in charge?

A Just someone who's been there for a while.

Q So it was about experience?

A Yes.

Q Did you feel that you were -- did you feel that you had the training and experience to be an officer in charge?

A Yes.

Q Did you feel capable of handling all the duties and responsibilities of being an officer in charge?

A Yes.

Q So once you got your assignment, you said you would go to a meeting. Who was generally part of that meeting?

A All the officers on night shift and the lieutenants and captain, sergeants, just everyone on the night shift.

Q So would that be before the night shift took over, so the day shift was still out on the post?

A Yes.

Page 34

Q What would you talk about in this meeting?

A Things that went on during the day, things that you need to work on, and just safety and just everything about that.

Q What types of things that went on during the day would you discuss?

A Something like if an offender hit an officer or fights going on or -- just activity like that.

Q What were the things that you were generally told you needed to work on?

A Walking the ranges more to check on the offenders, make sure they're not doing anything they're not supposed to or making sure that they're all okay.

Q So doing regular security checks?

A Yes.

Q Was that an issue at ISP?

A Sort of, a little bit. Some days were better than others, I guess, because they would say we're okay one day and then we need to work on it the next day.

Q Okay. So it was a common thing that they would tell people they weren't doing security checks frequently enough?

Page 35

A Yes.

Q Did anyone ever directly speak to you about not doing security checks frequently enough?

A No.

Q Did you ever have any disciplinary action for not doing security checks frequently enough?

A No.

Q There was a third thing you said you would speak about at the meeting; what things happened during the day, what things needed to be worked on. What was the third one?

A I think it was safety.

Q Safety. What kind of things about safety would you discuss?

A Just -- they would just tell you to be careful, and just little things like that, be safe and just always -- I mean, just things like that. I don't really remember now.

Q So just generic statements about being safe?

A Yeah.

Q Not any specific instructions about safety regulations or fire policies, or anything like that?

A No.

Q Did you regularly attend any other types of

Page 36

meetings?

A Did I regularly attend?

Q Uh-huh.

A The meetings were every day that I would attend. So, yes.

Q Were there any other meetings besides those morning meetings that you would regularly attend?

A No.

Q Do you remember being a part of any other types of meetings at ISP?

A No.

Q So who was your direct supervisor?

A Captain Dykstra.

Q Captain Dykstra. So any issues you would go to Captain Dykstra?

A No, it was mainly going to Lieutenant Watson or Lieutenant Redden.

Q Were they always the lieutenants on the night shift?

A Yes.

Q Were there any other lieutenants on the night shift?

A No.

Q Was there any other captain on the night

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 11 of 82

Page 37

shift?

A    No.

Q    So Captain Dykstra was on every night shift?

A    Yes.

Q    Was that just on your like -- you were in J Staffing Group or is there different staffing letters?

A    Yeah, I believe it was because we were on -- I don't remember what it was.  But, yeah, it was J Staffing Group.  That's why, yeah.  He was on there all the time.

Q    Okay.  So you generally always worked with the same group of people?

A    Yes.

Q    Okay.  Did you work closely with Captain Dykstra?

A    No.

Q    Did you ever have any issues with Captain Dykstra?

A    No.

Q    Did you ever have any issues with Lieutenant Watson?

A    No.

Q    Did you ever have any issues with Lieutenant Redden?

Page 38

A    No.

Q    Did you ever have any issues with any supervisor?

A    No.

Q    So what would you do after your morning meeting?

A    We would go to our assigned areas and we'd basically check if all our equipment is there, radios, keys, and then we would relieve the day shift.

Q    Okay.  So you'd go to your assigned area and relieve the day shift.

A    (Witness nodding head.)

Q    What equipment would you get first?

A    What equipment would we get in there?

Q    Uh-huh.

A    Well, we would get our radios and then we'd get our keys on.  The officer in charge would assign who gets what range and -- yeah, we'd get our radios, and that's about it.

Q    How does the officer in charge decide who to assign to which range?

A    I guess it would have to be more who's been there longer, who has more experience, who they've been working with more.  Mainly, the

Page 39

officer in charge would assign who has more experience to work the lower ranges and who has the less experience to work the upper ranges.

Q    Why is that?

A    Mainly because they would probably assign the ones who do the lowest ranges to try to work the harder ranges.  I don't know.

Q    Which are the harder ranges?

A    It's just more the upper ranges.  Not really harder, it's just so they don't have to walk, the ones with more experience, like walk all the way to four and five, and stuff.

Q    So you make the newer people walk up to the higher ranges?

A    Yeah.

Q    Why is that?

A    It's just mainly just something that's common there.

Q    Okay.  And you don't know why?

A    No.

Q    So what ranges would the officer in charge take?

A    The officer in charge is supposed to take the lower range, first range.

Page 40

Q    Why is that?

A    Just because so they're down there all the time because they're the ones who are supposed to hold the keys to the main gate.

Q    So just one person has the keys to the main gate?

A    Yeah.

Q    Why is that?

A    It's mainly the officer in charge has the only key, so they're supposed to hold on to them, the key to the main gate.

Q    And do you know why the officer in charge is supposed to keep the keys to the main gate?

A    I don't know.  Just because they're the officer in charge.

Q    You don't know any reason beyond that?

A    No, huh-uh.

Q    Do you know why the other officers in the cell house don't also have a key to the main gate?

A    There's only one, so I'm not sure.

Q    Do you know why there's only one?

A    No.

Q    Did you ever ask anyone why there weren't additional keys for the main gate?

A    No.

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 12 of 82

Page 41

Q   Did you ever wonder about why there weren't additional keys for the main gate?

A   Not really, because I believe it was probably so no one could just -- because someone could just take it off of another officer's belt, or something, and they just have the key to walk out.

Q   So you could just get it from another officer?

A   No, I believe it was because some offender would like jump another officer and take the key to the main gate and, you know, just walk out, or something.

Q   Was there an issue with offenders taking the keys from officers?

A   No, but it was always a precaution for safety.

Q   So keys were limited to keep prisoners from getting those keys?

A   Yes.

Q   Did someone explain that to you or why do you believe that was the reason for limiting the number of keys?

A   I believe someone explained like in the beginning of training that's why we only keep that amount of keys, is just so an offender wouldn't like try to grab it, because I

Page 42

believe it has been an issue in the past, but it was never an issue when I was there.

Q   So you remember being told that in your training?

A   Yeah.

Q   Do you remember who told you that in training?

A   I don't remember his name. It was the main -- I believe it was the main instructor who taught us.

Q   Is that in your training before you started actually working at ISP?

A   Well, I started working and then I started training, so. Is that what you're asking or --

Q   Sure. Why don't we -- scratch that.
Why don't you tell me about your training at ISP. What was your initial training?

A   Training was more about they'd go over all the safety precautions and things of what they would want us to keep an eye for and just -- I guess it was mainly more PowerPoints and presentation for a couple weeks, and then it was physical, like try to defend yourself, for like a couple weeks too as well, so.

Page 43

Q   Okay. So you -- let's go back a little bit.
So you got your offer to work at ISP.

A   Uh-huh.

Q   You did some classroom training, it sounds like, before you actually went to work at ISP itself?

A   Yes.

Q   How long was that?

A   I want to say about a month.

Q   Okay. And where was that?

A   Mainly in the -- at ISP in the upper rooms when you walk in and then some training at Westville prison.

Q   Okay. So you did -- before you actually worked as a correctional officer, you did a month of training at ISP and at Westville.

A   Uh-huh.

Q   And that was all classroom-based training?

A   Most of it was classroom-based trainings. We had to go through where we would go during the day to spend a couple hours at a location just to get the hang of things.

Q   At a location, do you mean --

A   Like at a cell house, in a cell house, A, B, C.

Page 44

Q   But always at ISP?

A   Yes.

Q   And what other components did the training have besides PowerPoint?

A   Like I said, it was just physical for like a couple weeks where you just try to defend yourself.

Q   What do you mean by that?

A   They had us come in like just in regular clothes and they had like physical training, like where they would like teach you like moves in case an offender would try to hurt you, or anything.

Q   Okay. So like self-defense training?

A   Yes, self-defense.

Q   Okay. Did you have any other nonclassroom training beyond the self-defense training?

A   No.

Q   Did you have any sort of training about emergencies while you were in that initial four-week training?

A   As far as emergencies, what do you mean?

Q   What you would do in an emergency situation on the job.

A   I believe so, but I don't recall.

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 13 of 82

Page 45

Q    You don't recall any training on emergencies?

A    Yeah.

Q    Did you do any training on like first aid?

A    I want to say yes. But, again, I don't recall.

Q    Do you recall any training about fire safety?

A    Yes, a few.

Q    What did you do in that training?

A    It was just mainly a PowerPoint presentation what to do if there's a fire, or anything.

Q    What were you supposed to do if there was a fire?

A    You would go and address the fire, and then if there was a fire, an actual where you visualize a fire, you'd try to go and you would let control know that there's a fire in whatever location you're in, and then you'd try to go and get a fire extinguisher and try to put it out.

Q    How did you let control know there was a fire?

A    On the radio. You just, control, B-Cell house -- I don't remember the code, ten something like in B-Cell house, and additional officers or lieutenants would come try to help you.

Page 46

Q    Okay. Would you let control know about any fire no matter how big or small the fire was?

A    Yeah, you were to let control know about any fire, yeah.

Q    Okay. And then what responsibilities did you have after you let control know?

A    Mainly to be there to open the gate for additional officers and to let the firemen, the offender firemen, out so they could go and help try to put it out too, as well.

Q    How would you let the offender firemen out?

A    We'd have to go to their cells and let them out.

Q    So you were responsible to --

A    Not me, not just me. It would be the other officers too that would just help to get the other offenders out to address that fire.

Q    Okay. I just want to make sure I understand this correctly. So in your training they told you part of the response to a fire is that you should go and let prison firefighters out of their cells?

A    Oh, no, that wasn't part of the training, no. That was just something that you were supposed to do as part of the -- if there was a fire,

Page 47

because that's what they're there for.

Q    So how did you learn that that's what you were supposed to do in a fire?

A    I think it was more in training in the cell houses when they were telling me what we do in case there was a fire, and stuff.

Q    So you got additional training after the four-week training?

A    It was just more like, yeah, more them letting me know like what to do in the situation. Like if I was like shadowing an officer, they would tell me like you should do this.

Q    So you were supposed to shadow officers on the job at the beginning?

A    It was during training. It was like during classroom training; classroom training for a couple hours, shadowing for another couple hours.

Q    And so during that process you were told by an officer that you were shadowing that you were supposed to let prison firefighters out of their cell.

A    Yes.

Q    And he said that you guys specifically would go and let the firemen out if you saw a fire?

Page 48

A    It would basically be whoever was assigned to a range, four or five, one, two, two or three, whoever had the keys for those cells we would just all go and let whoever needed to be let out.

Q    So you didn't have responsibility to address the fire yourself; you would call for help and then go get the firemen?

A    Yeah.

Q    Okay. So you were told by people you were shadowing that you don't try to put the fire out yourself?

A    Well, I was told from them that that's what they would do, but I believe you were to go try to get a fire extinguisher because they do have them in the cell houses.

Q    So do you know who was telling you this information?

A    Just officers I'd work with. I'm not sure who.

Q    You don't remember the specific officers that directed you on what to do in case of a fire?

A    No.

Q    Okay. So were you told -- scratch that. So let's just -- so when there's a fire,

Page 49

the first thing you do is let control know about the fire.

A    Uh-huh.

Q    What were you told to do next?

A    As far as training, I don't remember all of it, but that's what we did. And I believe it was to try to go -- wait for someone to -- for additional people to come in and help you address the fire.

Q    Okay. So you believe -- your understanding of the practice at ISP is that when there's a fire, you call control and then you wait for more people to come and help with the fire?

A    Yeah.

Q    Okay. And you were told to do this.

A    Yes.

Q    By officers or other people during your training.

A    Yeah.

Q    Okay. But you don't remember any of the specific people.

A    No, huh-uh.

Q    Were you ever affirmatively told not to go address the fire yourself?

A    Was I ever told?

Page 50

Q    Yeah, or trained on that.

A    No.

Q    So no one ever told you not to go address the fire.

A    Yes.

Q    But they did tell you to call control and to wait for more help.

A    Yes.

Q    Okay. And you were told to go get a fire extinguisher as well?

A    Yes.

Q    So were you supposed to wait for more help or go get a fire extinguisher?

A    We were supposed to wait for more help and then go try to put it out with a fire extinguisher.

Q    Okay. So you call control, you wait for more people to help, and then you're supposed to go get a fire extinguisher and help put out the fire when more help comes.

A    Yes.

Q    And that's your understanding of the policy at ISP.

A    Yes.

Q    And that's what you were trained to do.

Page 51

A    Yes, I believe so.

Q    That's the training you recall.

A    That's the training I recall, yes.

Q    Okay. Do you know if there's any written information you received about that?

A    Possibly. I don't know if I did or not.

Q    Okay. Were you trained to go get the prisoner firefighters out yourself?

A    Was I trained?

Q    Uh-huh.

A    As far as working inside a cell house and shadowing other officers, I believe that's what they told me to do.

Q    So you would leave the cell house and go get the prison firefighters.

A    No, the cell house -- the firefighters, offender firefighters, would be everywhere in the ISP. You would just have to let out the ones that are in your cell houses, and then you'd have to let them go to their firehouse and get their gear, and then they would have to come to wherever the fire is.

Q    Okay. So you would just let out the firemen in your cell house.

A    Yes.

Page 52

Q    And you would do that immediately.

A    Yes.

Q    Without being told to do that by anyone else.

A    Yes.

Q    Did you know who the prison firefighters were in your cell house?

A    I don't remember their names, but, yes, I did know which ones they were.

Q    Okay. So you were told at the time which people to --

A    Yeah.

Q    -- let out.

A    They're also like listed on the board. In case anyone doesn't know, they're listed whoever needs to be let out during a fire.

Q    And just try to let me finish my question before you answer.

A    Oh, sorry.

Q    That's okay. So where was this board that listed who the firemen were?

A    It was in the officer main room, I guess you could call it. It was just on a board there.

Q    In the cell house?

A    Yes.

Q    Was there any other information on this board?

Page 53

A    As far as firefighters?

Q    Just in general.

A    Yeah, information like if they were to -- if they're like workers, or anything, or what type of workers they are, it's always like color-coded and labeled of what each offender was.

Q    Okay.  So you mean like job assignments if someone worked in the kitchen, or something like that?

A    Yes.

Q    So then you would know when to let them out.

A    Yes.

Q    Any other information that was on the board?

A    I don't believe so.

Q    Were the post orders on the board?

A    Post orders, I believe, were like in a book. I'm not too sure, though.

Q    You don't recall where the post orders were?

A    No.

Q    Were you supposed to read the post orders regularly?

A    I believe so, yes.

Q    Do you know how regularly you were supposed to read the post orders?

Page 54

A    Maybe every week, or so.

Q    And did you have to sign anything saying that you read the post orders?

A    Yes.

Q    Did people generally read the post orders?

A    Yeah.  I mean, I did.  I don't know if anybody else did.

Q    What kind of information was in the post order?

A    I don't recall.

Q    Was there any other training on fires or emergency situations that you recall getting?

A    No.

Q    Did you ever get any training or information on how to evacuate the cell house?

A    No.

Q    You were never told any evacuation routes?

A    Huh-uh.

Q    Did you ever go through --

A    As far as exits you mean or just how to evacuate the whole cell house?

Q    Yes.  Did you get any training on how to evacuate the whole cell house?

A    No, I don't believe so.

Q    You don't recall any training on evacuation.

Page 55

A    No.

Q    But you knew where the doors were --

A    Yes.

Q    -- in and out of the cell house.

A    Yes.

Q    Did you ever get any training on how to use a fire extinguisher?

A    Yes.

Q    Did you ever get any training on how to use any other fire equipment?

A    No.

Q    Where were the fire extinguishers in the cell house?

A    In the office in the cell house.

Q    Only in the office?

A    Yes.

Q    Were there any fire extinguishers anywhere else in the cell house?

A    Actually, yes, I believe they're -- there might have been a couple in the middle of the ranges, but I don't recall.

Q    So up on each floor on the ranges?

A    I don't think it was on each floor.  I think it was maybe on like in between third floor. I don't recall, though.

Page 56

Q    Are you talking about the area by like the stairs?

A    Yes.

Q    Okay.  Do you know how many fire extinguishers were in the cell house?

A    About three.

Q    Who was in charge of checking the fire extinguishers?

A    I'm not sure.

Q    Were you in charge of checking the fire extinguishers?

A    I was never told to check them.  So I'm not sure.

Q    Were you ever trained on how to check the fire extinguishers?

A    No.

Q    Did the location or number of the fire extinguishers ever change while you were at ISP?

A    No.

Q    It was always the same number and in the same place.

A    Yes.

Q    Was it the same in each cell house?

A    No, I don't believe so.  They might have had a

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 16 of 82

Page 57

different amount.

Q In different cell houses?

A Yes, in different areas.

Q Why is that?

A I think it just depends on how big the cell house is.

Q Was B-Cell house a large or a small cell house?

A I think it was smaller.

Q Did you ever see anyone checking the fire extinguishers?

A I think I did. It was like a fire safety person. I'm not sure, though.

Q Was that a staff person or was that a prisoner?

A No, I believe -- he could have been a staff person. I didn't -- I mean, I didn't recognize him, so.

Q Was it frequent that somebody would be in the cell house that you didn't recognize?

A No.

Q So did it get your attention at all that somebody you didn't recognize was in the cell house checking fire extinguishers?

A I did, but I wasn't in charge at the time. So

Page 58

whoever let him in, let him in. So obviously he was probably someone to check all of those.

Q Okay. So the officer in charge let somebody in to check the fire extinguishers.

A Yes.

Q Did that happen once or more than once?

A I only recall once.

Q Was this in B-Cell house?

A No, I think it was in D David.

Q Did the person replace any of the fire extinguishers?

A No. I believe he might have just checked everything.

Q So you know he was checking them?

A Yeah.

Q Okay. And how did you know that?

A Well, I mean, he was by them and just like looking at them and he had -- I don't know. It just looked like he was checking them, so.

Q But you don't know for a fact that that's what he was doing.

A No.

Q Do you remember ever hearing about any processes for checking the fire extinguishers?

A Yes. I mean, I remember them. They were

Page 59

supposed to check, I think, every year or so, I'm not sure, to see if they're like good to use.

Q When did you hear that?

A I think maybe during classroom training.

Q But you don't recall specifically?

A Yeah.

Q Do you remember ever hearing any other information that we haven't covered about the fire extinguishers?

A No.

Q Do you remember ever participating in a fire drill?

A While at ISP?

Q Uh-huh.

A No.

Q Do you know you never participated in a fire drill?

A Like ever?

Q Yes.

A Yeah.

Q Okay. So you never in your whole time at ISP ever participated in a fire drill.

A No.

Q Did you ever ask any questions about fire

Page 60

drills?

A No.

Q Were you ever given any instruction about the fire alarm system?

A No.

Q Did you ever hear the fire alarms go off?

A Yes.

Q When did you hear the fire alarms go off?

A The day of the fire.

Q Okay. And when did the fire alarms go off on the day of the fire?

A Time specifically, I don't recall.

Q Where were you when the fire alarms went off?

A Up on five range.

Q So you were already up on the five range when the fire alarm went off?

A Yes.

Q Do you recall any other time at ISP hearing the fire alarms go off?

A No.

Q Could you hear the fire alarms go off in other cell houses?

A I don't believe so.

Q Did you receive any other training or instruction on fires that we haven't gone

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 17 of 82

Page 61

over?

A   No.

Q   Going back to when you arrive in the cell house on a given day, you said that you would receive your radio and your keys. Was there any other equipment you would get?

A   Just there's a couple pipes where you just do security checks, and everything. That was about it.

Q   And what is the pipe?

A   The pipe is just to go around the whole cell house and just check and make sure you're walking the whole ranges and doing your security checks.

Q   And what do you do with the pipe?

A   You just scanned it. It's a metal pipe where you scan it. There's three on each range where you're supposed to scan it and make sure you're walking from the beginning to the end.

Q   So it's a way to confirm that people are doing their security checks on time.

A   Yes.

Q   So when you would get the keys, you would get the keys for the range that the officer in charge assigned you to; correct?

Page 62

A   Uh-huh. Yes.

Q   So you would get the key to the range and then whoever was the officer in charge would keep the front door key.

A   Yes.

Q   Were there any other keys that would be distributed?

A   No.

Q   And you would get those keys from the person whose shift you were taking over?

A   Yes.

Q   Were there any other sets of keys in the cell house?

A   It was all in a key box. It was just for, I believe, for like the gates. That's just about it.

Q   So they were in a -- is the key box locked?

A   Key box is normally locked, but whoever is taking over or -- we usually just take the keys from who we're relieving, so.

Q   Who has the keys to the key box?

A   The officer in charge.

Q   Are there any backup keys in the key box?

A   No.

Q   Where would the backup keys be in the ISP?

Page 63

A   Maybe in the captain's office. I'm not sure, though.

Q   Okay. So you were never instructed where backup keys were?

A   No. I honestly don't know if there were backup keys.

Q   Were you instructed to keep the keys on you at all times?

A   Yes.

Q   Would you take the keys in with you if you went to use the restroom?

A   Yes.

Q   If you were called out of the cell house, would you take the keys with you?

A   No.

Q   What would you do with the keys?

A   Gave them to the officer in charge.

Q   What if you were the officer in charge?

A   Then you would have to give them to the next person, leave them in charge and they would have the keys.

Q   Would that happen, that the officer in charge would be called out of a cell house?

A   No. And if it did, they would have someone come and relieve that person.

Page 64

Q   Okay. So another person would come in to be the officer in charge?

A   Yes.

Q   Someone like a lieutenant or sergeant?

A   Yes.

Q   But if you weren't the officer in charge, you wouldn't give your keys to the officer in charge if you were asked to leave the cell house.

A   Yes.

Q   And the radio, would you keep your radio on you at all times?

A   Yes.

Q   Would you ever take your radio off?

A   No.

Q   How did you get your radio at the start of a shift?

A   There's radios in each area. So usually they took like three or four radios in each area. So you just would go in and then there would be the radios on the stand where they're charging, and everything, so you would just get them.

Q   Where is that?

A   In each -- it's in each -- the officer room.

BARBARA DEVINE, et al. vs. RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 18 of 82

Page 65

Q   Okay.  So you would get the radio from where they were charging.  You wouldn't get it from the people who you were taking over from.

A   Yes.

Q   So they wouldn't have a radio on them.  They would put their radios to charge.

A   Yeah.

Q   And then you would go and get the radio?

A   Yes.

Q   Were there any backup radios usually in the cell house?

A   No.  Typically, you would have to go try and find one, if there wasn't enough radios or any backup radios.

Q   Where would you go find one?

A   To basically -- there's one up front or in the captain's office, or something.

Q   Did that happen to you?

A   There was a couple times where the radios were malfunctioning, yeah.  Sometimes there would be no extra radios and they'd just have to kind of work with it.

Q   When you say malfunctioning, what do you mean?

A   Sometimes they just wouldn't work, like you'd have to press it a couple times.  They just

Page 66

wouldn't go off, like we wouldn't be able to talk to anybody.

Q   So no one would be able to hear you?

A   Yeah.

Q   Would you be able to hear anyone else?

A   Yes.

Q   So you would be able to hear other people, but they wouldn't be able to hear you.

A   Yes.

Q   And this was a common problem?

A   Yes.

Q   It happened to you a few times.

A   Yes.

Q   Did you ever tell any supervisors about that?

A   Yeah.  There's mainly -- because there was no extra radios, you couldn't do anything about it.  Everyone -- I guess a full shift, sometimes they just have no extra radios to use.

Q   So the supervisors would tell you just deal with the radio that you had.

A   Or they couldn't do anything about it.

Q   So you would go to a supervisor and tell them my radio is malfunctioning and they'd say we can't do anything?

Page 67

A   Mainly go to the officer in charge, or something.

Q   So do you remember specifically having any conversations with any supervisors telling them your radio wasn't working?

A   No.

Q   You don't remember talking to anybody about it?

A   No.

Q   But you said you remember your radio malfunctioning.

A   Yeah.

Q   But you don't remember ever telling anyone?

A   No.

Q   So it might be that you never told anyone your radio was malfunctioning?

A   Yeah.

Q   Okay.  But you know that the supervisors knew that radios were malfunctioning.

A   Yes.

Q   How do you know that?

A   Because sometimes their radios wouldn't work, so.

Q   So you remember supervisors having radios that didn't work.

Page 68

A   Uh-huh.  Yes.

Q   Do you remember any of the names of those supervisors?

A   No.

Q   Do you know if Captain Dykstra knew that radios weren't working?

A   Yes.

Q   How do you know that?

A   I believe because he had to get extra radios before.  He had another lieutenant that had to answer for him before.

Q   I'm sorry?

A   A lieutenant had to answer for him before when someone was calling him on the radio.

Q   Okay.  So the captain's radio didn't work in the past.

A   Yeah.

Q   Do you remember the circumstances of that event?

A   No.  I believe he just got another radio.

Q   Do you know if Lieutenant Watson knew that some of the radios were malfunctioning?

A   Yes.

Q   How do you know that?

A   Just because it was just a big thing where

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 19 of 82

Page 69

radios weren't working.  I never really heard like his radio not working, but I'm not sure.

Q   So this was a widely known thing at the prison.

A   Yeah.

Q   Everybody knew that.

A   Yes.

Q   Was it almost on every shift that a radio was not working?

A   It was a big issue.  I don't know if it was on every shift, though.

Q   Did they malfunction in any other ways besides you not being able to talk to anybody on the radio?

A   No.

Q   That was the only way they malfunctioned?

A   Yes.

Q   Were there any issues with the batteries?

A   Yes, sometimes they wouldn't charge and you had to get a different battery in them.

Q   Were there backup batteries?

A   Yeah, all scattered throughout the prison.

Q   Were there backup batteries in each cell house?

A   No.

Page 70

Q   So you would have to go out and look for another battery?

A   Yes.

Q   If you had to go find another radio or another battery, would the day shift person stay in the cell house until you did that?

A   No.

Q   So you would relieve them, they would leave, and you would go find another battery or --

A   Yeah.

Q   Were you instructed to do that?

A   No.

Q   Where would you typically go look for another radio or another battery?

A   Typically, we would just call up another cell house or another location and see if they had any extra batteries or extra radios and they would give it to us or we would go get it from them.

Q   You would call them on the phone?

A   Yes.

Q   So when you got your radio were you instructed to check your radio at the beginning of each shift?

A   Like in training, or something?

Page 71

Q   Yeah, what training did you receive about the radio?

A   I don't think I got any training on that.  I don't remember having to check the radio, just I think it was make sure there was radios there and they were at least somewhat functional.

Q   What do you mean by make sure they were somewhat functional?

A   Sometimes some pieces had to be -- like a battery needed to be replaced or charged or maybe a different like hand-held, or something.

Q   How would you know the battery needed to be replaced?

A   If it wouldn't charge.  You leave it on the charger and it's not charging.

Q   How can you tell whether or not it's charging?

A   Typically, it would be just -- it would tell you, like it would light up.  It would like light up the charger, or something.  So where you would have if it was like green, it was good.  If it was red, it was bad.  If it was like on yellow, it was charging.

Q   How long did it take them to charge?

Page 72

A   About an hour.

Q   So you would use a different battery and charge one while you were using a different battery?

A   Yes.

Q   Would you ever just work without a radio because you didn't have a battery that was working?

A   I think couple times, yeah, I had to.

Q   Did you ever tell anybody that you were doing that before you did it?

A   Mainly the officer in charge.

Q   So you would always tell the officer in charge if you had a radio that wasn't --

A   Yeah, or sometimes they would work for a little bit and then they would go out.

Q   How would you know?  Would you get alerted if they went out?

A   It would mainly be if you were to -- if you were talking to them like a couple minutes ago and then a couple minutes later it's not letting you talk to anybody.

Q   How does it know you -- how do you know that you aren't being able to talk to anyone?  Can you hear like -- is there like a beep that

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 20 of 82

Page 73

doesn't happen or you can just tell that?

A   Yeah, usually there's a beep like if it's going through, or something.

Q   So if there's no beep, you would know then no one could hear you?

A   Or if they're just not responding.

Q   Is there normally a lot of talk on the radios? Like would you -- is there a period where it's just silent or would there always be something kind of going on with the radio?

A   Depending on how busy it was, I guess. If there was like chow going on, or anything, there would be a lot of radio activity. Most of the time during the night, though, it was pretty silent.

Q   Okay. So it could be silent for an hour and that wouldn't be weird?

A   No.

Q   So you were never instructed to test your radio before the shift started?

A   No.

Q   Was that something that you normally did before the shift started?

A   Yeah.

Q   Why was that?

Page 74

A   Just make sure I had a functioning radio and make sure I was able to talk through it.

Q   So you would test it to see if people could hear you?

A   Yeah. Normally that's what officers would do, just test them, press the button to make sure it's working.

Q   So is that the practice that most people did then, they would test their radio?

A   Yes.

Q   But you were never instructed to do that.

A   No, I don't believe so.

Q   Were there people who didn't test their radio before the shift started?

A   Not that I recall.

Q   Okay. And so sometimes people would test their radio and they wouldn't be working, but nothing would be done about it.

A   Yes.

Q   And that was common?

A   Yes.

Q   Was there any sort of plan you would have if your radio wasn't working about how to communicate with the other officers?

A   Normally you just have to yell or make -- yell

Page 75

and make sure someone could hear you. If you had something, like you would go to the front gate and yell, try to get their attention.

Q   So if you used yelling to get people's attention, could you hear someone yelling from basically any part of the B-Cell house?

A   Well, depending on how loud it was, but, yeah, normally you could.

Q   Okay. So if you were at the far end of the 500 range and someone was yelling to you from the door, you'd be able to hear it?

A   Like I said, it would depend on how loud it was. If there was a lot of like talking, or whatever, probably not. But if it was silent, then yeah.

Q   So you would get -- you would keep your radio on you at all times. Would you keep your pipe on you at all times?

A   It would just be whoever was walking the range at the time to take the pipe.

Q   Okay. So, otherwise, you'd leave it at the officer's station?

A   Yes.

Q   Were there any sort of cameras in the officer's station?

Page 76

A   Yeah, I believe two, one or two. I don't remember.

Q   Were there -- so just to clarify, were there cameras that were watching inside the officer's station?

A   Yes.

Q   Okay. And then were there screens where you could watch the cameras in the B-Cell house from the officer's station?

A   Yes.

Q   And when would you watch those?

A   Typically, they're just right there, so you just keep an eye on it at all times.

Q   Is somebody in charge of keeping an eye on those?

A   Well, it's mainly by the officer in charge's area. So, yeah.

Q   Is that something that you're trained to do as the officer in charge?

A   I don't know if we got any training on it, but yeah, typically, the officer in charge would keep an eye on the cameras.

Q   And when you say keep an eye on it, would you watch it the entire time or check it every five minutes or every 20 minutes or --

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 21 of 82

Page 77

A    Maybe every couple minutes.

Q    Every couple minutes, okay.  Is there anything else you would do on the computer in the office?

A    No.

Q    Okay.  So it was only used for monitoring the cameras.

A    Yes.

Q    So would you have the camera screen up all the time?

A    Yeah, it would be up all the time.

Q    Okay.  And so you could see what was happening in any of the -- throughout the cell house at any given time?

A    Yes.

Q    So what were your responsibilities in a cell house when you were there for the night shift?  What were your duties and responsibilities?

A    Just make -- again, just making sure like everyone is -- through pipe walks, and stuff, security checks, just making sure everyone was okay, not doing anything they weren't supposed to, letting them out when chow time comes, locking them back up, or let workers out, or escorting offenders if they need to go to like

Page 78

the hospital, or anything.

Q    Okay.  So it seems like what you're saying the main things were doing security checks and letting prisoners in and out of their cells.

A    Yeah.

Q    When you weren't doing either of those things, where were you generally?

A    Typically in the office.

Q    Okay.  So you would go in the office when you weren't doing either of those things?

A    Yes.

Q    Would you ever just stay out in the cell house during that time?

A    Stay out in the cell house?

Q    Like outside of the office or station.

A    Yes.

Q    What would you consider in deciding whether to go into the office or station or staying outside the officer's station?

A    I mean, mainly you'd just go to the office just to sit down or do -- like because we have paperwork.  We have to sort through the mail, and stuff, and hand it out, or passes for the next morning if they're supposed to go to an assigned area for anything.  There's typically

Page 79

work to do in the office, so then we'd be in the office.  But if there was not, we'd just typically be outside of the officer room.

Q    How long would it take you to do a security check?

A    Maybe about 15, 20 minutes.

Q    Okay.  And would all of the officers in the cell house do their security checks at the same time?

A    It depends.  Sometimes in some cell houses they'd just take turns of someone just doing the whole security check through the whole cell house.

Q    Okay.  So you could either just do your ranges or somebody could do the security check for the full cell house.

A    Yes.

Q    Were you instructed that either one was okay?

A    Yeah, as long as it was getting done.

Q    And how frequently did they have to get done?

A    Sometimes they change the times.  Sometimes it was every -- depending on where it was too.  Like in D David, it was probably like every 15 minutes or every 30 minutes.  Typically, in a normal cell house, it would be every hour or

Page 80

they'd switch it to every half hour so it would be getting done more.

Q    So it would change how frequently you were supposed to do security checks?

A    Yeah, like -- again, like bringing back to earlier, like if someone wasn't doing the normal security checks and they were checking that, they'd bring it down more where it needs to be getting done more.

Q    Who would make that decision about how frequently the security check needed to be done?

A    Lieutenants and captain.

Q    And they would tell you do the security check every hour or do the security check every half hour?

A    Yeah.

Q    Did that change frequently?

A    Not frequently.  It happened a couple times.  It wasn't like a common thing, though.

Q    What was your understanding, generally, of how frequently they should be done in the B-Cell house?

A    About every hour.

Q    Every hour.  So between the time when one

BARBARA DEVINE, et al vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 22 of 82

Page 81

finished it should be an hour before you start the next one?

A Yes.

Q And you were taught that in your training?

A Yes. But they also said if you wanted to you could just check it as many times as you wanted, but it was mainly mandatory every hour.

Q Okay. And what was the reason that it was mandatory every hour?

A Just to make sure, again, that everyone was safe and everyone was -- wasn't doing, again, what they were supposed to, and stuff.

Q What do you mean doing what they're supposed to?

A Like doing drugs, or anything, or just trying -- just mainly around that stuff.

Q So making sure the prisoners weren't doing anything that they weren't supposed to be doing.

A Yes.

Q Did it create a safety concern if the security checks weren't done on time?

A Yes.

Q What kind of security concerns?

Page 82

A Like, again, they would have to bring it down, like after every half hour if they weren't -- if they weren't getting done on time.

Q So that's not quite my question. My question was, what security concerns might arise if the security checks weren't being done on time?

A Oh. Safety issue, like especially if they -- they decreased it during holidays in case of safety. Like as far as offenders, like they get really depressed around this time of year, holidays, can't be home with their family, they hurt themselves, and just stuff like that.

Q What other type of security concerns?

A I mean, that was basically it, just mainly that they were all there and not like, again, picking on their door cell, or anything.

Q That they were what?

A Picking at their door cell or trying to like get in trouble, or something.

Q What do you mean picking at their door? Kicking or picking?

A Picking at their door. Like sometimes you would have like offenders like keeping -- like try to keep their cell door open so they could

Page 83

get out.

Q Okay. So you're talking about the lock.

A Yeah.

Q Any other safety or security concerns?

A No.

Q So in the B-Cell house would you normally have one person do all the security checks or would you each be responsible for your own ranges?

A I think it just depends. We'd all like agree in the beginning if we wanted to just do our own security checks or just take turns doing it every hour.

Q And how would you decide?

A Again, we'd just talk to the other officers and just see what they wanted to do.

Q What was your typical preference?

A I think it was trying to just do our own ranges.

Q Is there any way to see who did which, the security check for which range?

A It would just mainly be who was assigned to like two or three range or four and five range.

Q Okay. So if a person did the security check for the whole range, would they use their own

Page 84

pipe or --

A No, the pipe would just automatically scan. The pipes are just to make sure that everything is getting walked around the cell house.

Q So if you were doing the whole cell house, would you take everybody's pipe or would you just use your own pipe?

A No, you could just use any pipe to walk the cell house.

Q And is there any documentation that shows which pipe was used?

A I'm not sure.

Q Okay. Was that consistent with policy and training, that one person could go around and use their pipe to check all of the security points on the ranges?

A What do you mean?

Q Did anybody instruct you that that was consistent with policy for one person to do the security check for the entire cell house?

A No, it wasn't like a thing on policy where one person -- they just said as long as it's getting done someone has to keep doing security checks.

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 23 of 82

Page 85

Q    Who told you that?
A    I think that was in training.
Q    So as long as it's getting done, it doesn't
     matter who's doing it.
A    Yeah.
Q    Okay.  And so what are the other people
     supposed to be doing while one person is doing
     the security check?
A    Again, I think just paperwork, whatever needed
     to be done in the office, or something like
     that.
Q    And so if one person is doing the entire
     security check, what responsibilities --
     scratch that.
         What responsibilities go with being
     assigned to a range if one person can do all
     the security checks?
A    What responsibilities for the officers?
Q    Uh-huh.
A    Just -- again, I can't -- it was just whatever
     was being done at the time in the office, or
     something.  So, I mean, it wasn't really -- I
     guess I didn't really have any other
     responsibilities.
Q    Okay.  If you're assigned to a range, what

Page 86

     that means is that you're assigned -- you're
     responsible for the security check on that
     range, but it doesn't mean anything else.
A    When you're assigned to a range, you're
     responsible for all the locks and like you
     have the keys for those ranges.  You could do
     the security checks for those ranges and --
     yeah, mainly that's your area.
Q    If somebody does a security check for the
     whole cell house, would everybody give them
     their keys or would they just keep the key for
     the range they were assigned to?
A    No, they would just keep the key for the range
     they were assigned to.  There's a key on --
     each of the range keys is where it opens like
     the back gates where you can get on the
     ranges, and stuff, and they can go all the way
     up and they can go all the way down if they
     needed to.
Q    Okay.  So they have keys that allow them to
     get from one range to the next.
A    Yes.
Q    Does that mean each range is locked?
A    From the back way, yes.  There was usually
     like a way we did it, like a zigzag way like

Page 87

     to go up and then come back down.
Q    But one side of the range is always unlocked?
A    The front is usually unlocked.  The back is
     usually locked.
Q    Okay.  So the back is usually locked, the
     front's usually open, and you were told that
     one person could just go up and do the
     security checks, but they wouldn't take all of
     the keys to do that.
A    Yeah.
Q    Okay.  And that's consistent with policy and
     practice at ISP.
A    Yeah.
Q    Okay.  Do you think that creates any risks by
     having just one person do the security check
     and not have all the keys?
A    Yeah, possibly.
Q    What kind of risk?
A    If there was -- if they do find out something,
     like if they do find something when they're
     doing a security check, like an offender is
     just laying there on the ground, or something,
     they can't open the gate.  They advise you not
     to open the gate anyway until another officer
     is with you to make sure like they're not

Page 88

     faking it, or anything, so.  But, yeah, they
     couldn't open the gate if they didn't have the
     right keys to that range.
Q    Did that ever happen to you before, where
     somebody was doing a security check by
     themselves and they didn't have the key to
     open the door in an emergency?
A    Yeah, I think it happened to me before.  I
     didn't have the -- I didn't have the right key
     to a range and I had to call a person to come
     up there because the guy was just laying there
     on the floor.
Q    It happened to you just one time?
A    Yeah.
Q    And what was wrong with that person?
A    I believe he had overdosed, or something.
Q    And so how did you call someone for help?
A    I called on the radio that I needed whatever
     key -- whatever range I was on, 400 keys, I
     need you to come up here.
Q    And were you on the -- did somebody bring the
     keys to you when you called on the radio?
A    Yeah.
Q    How long did it take that person to bring the
     keys?

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 24 of 82

Page 89

A    Maybe about a minute.

Q    Okay.  And where were they when they came to bring you the keys?

A    Downstairs in the office, probably.

Q    And do you remember who that person was?

A    No.

Q    Did you have any concerns about having to wait for the person to bring the key?

A    I just couldn't get to them.

Q    Did you ever talk to anybody afterwards about any concerns, safety concerns, with having to wait for someone to bring you a key in an emergency situation?

A    No.

Q    Do you remember when that happened, that you had to call for the person to bring the keys?

A    No, not a specific date, or anything like that.

Q    Do you know if that happened before or after the April 7, 2017 fire?

A    I believe it happened before.

Q    Do you know what cell house it was in?

A    I want to say C, C-Cell house.

Q    And what happened to the offender?  Was the offender treated?

Page 90

A    Yeah, he was treated.

Q    He was okay?

A    Yeah, he was okay.

Q    And so you said that you were instructed to wait for another person before opening the door.  Is that something you were trained to do?

A    Yes.

Q    Do you remember who trained you to do that?

A    The instructor.

Q    So that was a widely accepted practice.

A    Yes.

Q    Was that in every situation when you would need to open the door?

A    Yes.

Q    So you would never open a door without somebody else present with you.

A    No, you didn't.

Q    Were there any exceptions to that rule?

A    No.

Q    What was the reason behind that rule?

A    In case the offender tried to fake it, or anything, try to get out of his cell.  It was just a safety issue for officers.

Q    Okay.  Was there any other reason behind that

Page 91

practice, that rule?

A    Just a safety issue.

Q    Okay.  And just to clarify, you were instructed on that policy.  That was a widely known policy?

A    Yes.

Q    Do you know if it was written anywhere?

A    I don't remember.

Q    Do you know if it was in any PowerPoint information?

A    I believe so.

        MS. PIERCE: Okay.  Do you want to take a quick five or ten-minute break?

        MS. SMITH: I think we should.

        MS. PIERCE: Okay.  If you need a break at any point, just let us know.

        (Brief recess.)

BY MS. PIERCE:

Q    So you did the initial four-week training and some shadowing was part of that training; correct?

A    Yes.

Q    Did you do any other trainings while you were at ISP?

A    No.

Page 92

Q    No periodic trainings, or anything like that?

A    No, I don't think so.

Q    Any sort of in-service training that you recall?

A    No.

Q    How were you told if there were new policies or protocols, anything like that?

A    During like meetings when we'd first get there.

Q    Okay.  So you were just told orally about those new policies.

A    Yes.

Q    Did you receive written copies?

A    Yes.

Q    Did you keep any of those written copies?

A    No.

Q    Did you read the written copies?

A    Yes.

Q    Did you have to sign that you read them?

A    Yes.

Q    Do you know what that was called, that sheet you would sign?

A    What the policies were called?

Q    What type of -- do you know what the sheet was called that you would sign off to say that you

BARBARA DEVINE, et al vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 25 of 82

Page 93

had read and received the new policy?

A    I don't recall.

Q    Do you know who you turned those into?

A    I believe the lieutenants.

Q    Do you know if those were kept in your personnel file?

A    No, I don't.

Q    Did you ever see your personnel file?

A    No.

Q    Do you think the training you received at IDOC was effective?

A    Yes.

Q    You thought it was adequate to give you the skills to do your job?

A    Yes.

Q    Did you think that there were any big gaps in your training that you received?

A    No.

Q    Did you ever talk to any of your supervisors about any concerns you had at ISP while you were working there?

A    No.

Q    Did you ever go to them with any issues that you thought needed to be changed about policies and protocols?

Page 94

A    No.

Q    Were you ever told that you could go to anyone with any concerns that you had?

A    I believe so.

Q    When were you told that?

A    I think in training.

Q    Do you specifically recall being told that in training?

A    I feel like I do, but I couldn't be sure.

Q    So you don't have a specific memory of being told that in training.

A    No.

Q    And you never went and told anybody about any recommendations or concerns that you had regarding policies and practices?

A    No.

Q    Do you know if anybody else went and talked to people in charge at ISP about concerns about policies or practices?

A    No, I don't.

Q    And you said you had an E-mail while you were at ISP.

A    Yes.

Q    Did you check it regularly?

A    No.

Page 95

Q    How often did you check it?

A    I think I only checked it a handful of times while I was there.

Q    And what would you typically check it for?

A    To see if I got any messages, I guess.

Q    So were you told that you needed to regularly check your E-mail at ISP?

A    I don't recall.

Q    Do you remember any instruction about your E-mail at ISP?

A    No.

Q    If you did check your E-mail, where would you check it?

A    It was usually a computer room where everyone could log into their A-4s or check their E-mails if you wanted to.

Q    You said there's usually a computer room. Is that -- is there a computer room at ISP?

A    There is a computer room.

Q    Just a general computer room?

A    Yes.

Q    So you wouldn't check it in the individual cell house.

A    No.

Q    Would there ever be any reason that you would

Page 96

check it while on duty in the cell house?

A    They weren't -- I don't think you were able to check it. The only computer where you could check it was in the counselor's room, and we wouldn't be allowed to go in there.

Q    Who would let you go into the counselor's room?

A    The lieutenants or the captain.

Q    Would there be any reason that you would go in there?

A    Sometimes to do the A-4s, yeah, they would let you. They would have to come to the cell house and unlock the door and then they would let you do your A-4s or check the computer.

Q    How frequently did you so your A-4s?

A    Every couple weeks.

Q    And you would always do them while you were on duty?

A    Yes.

Q    And someone would come and tell you to do them?

A    The captain and lieutenant would have to check them, and whoever doesn't -- hasn't turned it in, yeah, they would have to come and let you know that you had to do it.

Page 97

Q    Were you responsible for knowing when your A-4s were due and doing them yourself or did you wait for somebody to tell you to do that?

A    No, we were responsible for doing our A-4s.

Q    Okay.  So if somebody came and told you to do them that's because you had missed the deadline and hadn't done them?

A    If someone had to tell you, it was more that you have to do it before.  They'd let you know prior, before the deadline.

Q    Okay.  So the deadline's coming up, so they come and let you know.

A    Yeah.

Q    So where would you normally do your A-4s?

A    I would usually do my A-4s in the computer room.

Q    Where was the computer room?

A    Past security.  It's where the conference room is.

Q    How many computers are in there?

A    I want to say four.

Q    So would you do it before or after a shift?

A    I would do it before.

Q    Okay.  So you'd just go through security, you'd go do that, and then you'd go to your

Page 98

morning meeting?

A    Uh-huh.

Q    And you said you could do your A-4s or other computer stuff in the counselor's office.
    What other types of computer stuff would you do in the counselor's office?

A    That's about it.

Q    Just the A-4s?

A    Yes.

Q    Was there ever anything else that was done on those computers?

A    No.

Q    So why were those computers in the counselor's office?

A    Those are for the counselors to do their job.

Q    Okay.  So the counselors would meet with prisoners in the counselor's office?

A    Yes.

Q    You said other types of paperwork would need to be done in the officer's station.  Could you just kind of run through what that paperwork was?

A    Like I said, it was checking -- we'd get like a couple bags of mail and like we'd have to sort it all out for ranges, and stuff, and

Page 99

we'd have to do paperwork on what -- as far as the mail thing, I can't really remember what all the paperwork was about, but it was mainly just doing all that.

Q    Okay.  So the mail stuff, would you keep any sort of log in the cell house?

A    Yes, a log, yes.

Q    So who was in charge of filling out the log?

A    The OIC and it was -- it would just depend if the officers were willing to help, or something.

Q    Okay.  So the OIC was in charge of doing the logbook?

A    Yeah.

Q    Was it like a book or was it a sheet, or what kind of thing was the log?

A    I think it was a -- it's in a book.  It's, I think, a log sheet in a book.

Q    Does anyone else go over those?

A    I'm not sure.

Q    Who would you submit it to as officer in charge?

A    I think that was more a day shift thing to take care of.  I'm really not too sure.  At night shift we would always have to fill it

Page 100

all out, but I don't remember who it was submitted to.

Q    What kind of information would you put on the logbook?

A    Their DOC number, the name, the date, and just things like that.

Q    Whether they were moving, or things like that?

A    Yes.

Q    Would you put like if somebody made a complaint to you, if a prisoner made a complaint, would you put that in the logbook?

A    No, I don't think so.  Wait.  Actually, no, I don't think so, no.

Q    So if, for example, a prisoner was having a medical issue, what would you -- would you document that anywhere?

A    Oh, yes, on the log sheet, if they were having like a medical issue, or something.  The log sheet, yeah, was mainly used for if they had to like go somewhere or medical, stuff like that, or any activity going on in the cell house or around the prison.

Q    Okay.  If like there was a maintenance issue that a prisoner told you about, where would you log that, or would you log that?

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 27 of 82

Page 101

A    I don't know if we would have logged that. I'm not sure.

Q    Did a prisoner ever have a maintenance request that they gave you?

A    Yes, and I think we had to call about it, call like a sergeant, or something, and they would have to put in a work order, or something.

Q    Okay. So would you put in a work order yourself?

A    No.

Q    What types of maintenance problems were there?

A    Just if there's like lights weren't working or like they were having trouble with their water, or something, just little things like that.

Q    Were there frequent maintenance problems?

A    No, not that I know of.

Q    Was it generally quiet or noisy in the B-Cell house at night?

A    Before they were in for the night it was pretty noisy, but like as soon as they got settled in it was pretty quiet.

Q    When were they settled in for the night?

A    9:00 p.m., I think.

Q    So after the night count?

Page 102

A    Yes.

Q    So then it would get petty quiet?

A    Yes.

Q    Could you hear pretty well what was going on in the cell house?

A    Yes.

Q    What kind of things would you hear at night?

A    Just TVs going off or music playing, just little things like that, conversations, if one offender is talking to another.

Q    Did you ever fill out incident reports, or anything like that?

A    I don't remember.

Q    You don't remember filling out any incident reports?

A    Huh-uh.

Q    Were you ever given any instruction or training about incident reports?

A    Yeah, just the sheet to fill it out, and stuff.

Q    So if there was any sort of like incident in the cell house while you were on duty that you were involved in or witnessed, you were supposed to fill out an incident report?

A    Yes.

Page 103

Q    But you don't recall ever filling out an incident report.

A    Yes.

Q    Do you think you did fill out an incident report?

A    Yeah, I think so.

Q    But you just don't recall any of the substance of any of them?

A    Yes.

Q    Were you ever trained on how prisoners should get your attention if they needed you for any reason?

A    Were we trained how for them to get our attention?

Q    Uh-huh.

A    I don't think so.

Q    So you were never given any instruction about what to tell a prisoner about how they could get your attention if they needed you?

A    No.

Q    Did you ever talk to any prisoners about how they should get your attention if they needed you?

A    No.

Q    What would a prisoner normally do if they

Page 104

needed your attention?

A    Yell, scream, if they're in their cell houses -- or if they're in their cells. They would typically just yell "C/O", or whatnot.

Q    And were you trained about whether or not you should respond to a prisoner who was yelling?

A    Were we trained how to respond?

Q    Or whether you should?

A    I don't recall the training. I don't remember.

Q    What was the policy at ISP if a prisoner was yelling?

A    Like for help?

Q    Just if a prisoner was yelling, what would be the policy about what you should do while you're on duty?

A    Go and try to see what he wants, what the issue is.

Q    That was the policy at ISP?

A    I don't know about the policy. I think that's just what we just normally did.

Q    So that was what people normally did.

A    Uh-huh.

Q    Okay. So you would go check it out if a prisoner was yelling.

Page 105

A    Yeah.

Q    Would you go -- was it practice to go check it out if a prisoner was banging on the bars?

A    No.

Q    So you wouldn't go up if a prisoner was banging on the bars?

A    It wasn't practice, but I would if he was banging on the bars.

Q    You would personally, but it wasn't the policy or practice --

A    No.

Q    -- at ISP to go check and --

A    I don't think so.

Q    Just wait until I finish.

A    Oh, sorry.

Q    So just to restate it for clarity, it wasn't a policy or practice that an officer needed to go check on what was happening if a prisoner was banging on the bars.

A    No.

Q    You personally would do that, but there was no policy requiring you to go check if a prisoner was banging on the bars.

A    Yes.

Q    Did you ever go and respond when prisoners

Page 106

were banging on the bars?

A    There was never a circumstance where that happened.

Q    Okay.  So that's never happened to you in the past.

A    No.

Q    But if it did happen, you believe you would have gone to check on it.

A    Yes.

Q    So you would -- it was policy and practice that you were required to go if somebody was yelling?

A    If someone was yelling for help, yeah.

Q    It was a practice.

A    Yes.

Q    But you were never trained or given any policy about what to do in that situation.

A    No.

Q    So it's just your understanding from what you saw other people do.

A    Yes.

Q    Okay.  What about if a prisoner was crying, would it be practice to go and check on the prisoner?

A    If he was crying?

Page 107

Q    Uh-huh.

A    I don't think it was a practice for that.

Q    Okay.  Would you go and check if somebody was crying?

A    Yeah.

Q    Did that ever happen to you?

A    No.

Q    What if there was a commotion, a lot of noise and scuffling, and things like that, would it be practice to go and see what was happening?

A    If there was a commotion, I think there might have been, but I'm not sure.

Q    Did that ever happen while you were there?

A    No.

Q    Did you ever get any sort of training beyond security checks when you should go and see what was happening with prisoners in the cell house?

A    Beyond security checks and when we go to our assigned areas?

Q    Uh-huh.

A    To check commotions?

Q    Let me clarify.

A    Okay.

Q    I think I worded that poorly.  So you were

Page 108

trained that you should go do security checks at a given hour, or whatever it was, to see if prisoners were okay.

    Were you given any additional training about other times when you should go and see if prisoners were okay?

A    No.

Q    So you weren't given any training about going to do additional checks beyond the normal security checks.

A    No.

Q    Okay.  Did any prisoners ever express concern to you about not being able to get your attention if they needed it?

A    No.

Q    Do you know if this was a concern that prisoners expressed generally?

A    No.

Q    Were you ever assigned to the 500 range in B-Cell house?

A    Yes.

Q    Was it your experience that you could hear what was going on from the 500 range in B-Cell house at night?

A    Was it my experience that I was able to hear?

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 29 of 82

Page 109

Q   Uh-huh.

A   It was pretty loud.  So, I mean, I was able to hear.  I don't know if it had to do with experience, but --

Q   But I just mean in your experience when you worked on the upper ranges in the B-Cell house, was it your experience that you could hear what was happening in the cell house, generally, from the 500 range?

A   Yeah.

Q   How long would it take you to get from the front door to get to the top of 500 range?

A   I want to say about 40, 45 seconds, probably, like if you ran.

Q   If you ran, okay.  Did you ever see any emergency manual while you were at ISP?

A   Not that I recall.

Q   Did anybody ever instruct you about an emergency manual while you were at ISP?

A   No, I don't believe so.

Q   Do you know anything about how the prisoner firefighters were activated at ISP?

A   How the prisoner firefighters?

Q   Uh-huh.

A   If there was a call on -- if there was a fire

Page 110

from control, that's just when you would let them out.

Q   So somebody would be in charge of letting them out?

A   For each cell house, yeah.

Q   So if you heard -- would control tell you to let them out specifically?

A   No.  I just think if control announced there was a fire in whatever area that you were just supposed to let your firefighters out.

Q   So when control announced it?

A   Yes.

Q   Not when somebody called a fire code, but when control themselves said there was a fire, then you would let them out?

A   Yes.

Q   Did you ever have to release the firefighters in any of the cell houses?

A   I believe once, once before.

Q   When was that?

A   I don't recall.  I don't remember the date.

Q   Do you know if it was before April of 2017?

A   Yeah, it was before.

Q   What cell house were you in when that happened?

Page 111

A   C-Cell house.

Q   Do you recall any changes while you were at ISP in how the firemen were activated?

A   No.

Q   Was there a cell house that most of the firemen were in?

A   No, they were just all scattered everywhere.

Q   Do you know why that was?

A   No.

Q   They had a firehouse; correct?

A   Yes.

Q   Do you know who had the keys to the firehouse?

A   The sergeant working one of the checkpoints, I believe.

Q   Okay.  As you sit here today, do you have a recollection of the April 7, 2017 fire?

A   A recollection?

Q   Do you have any memories of the fire itself as you sit here today?

A   Yeah, I remember it.  It's been a while, so I kind of vaguely remember it, but I remember a lot of it.

Q   Okay.  You remember a lot of it?

A   (Witness nodding head.)

Q   Have you since the time of the fire reviewed

Page 112

any documents or any other reports about the fire?

A   No, I don't believe so.

Q   Have you met with anybody and discussed the fire after the fire?

A   That same day, I believe, after the fire they brought us in.  I don't remember the room, but we were being asked and questioned about what happened, and stuff, so.

Q   Who was questioning you?

A   Investigations.  I don't remember what it was, but --

Q   And have you spoken with anybody else about the fire since that time?

A   No.

Q   You haven't spoken with anybody at ISP?

A   No.

Q   But you did speak with Sarah about threats that you were receiving from prisoners?

A   Yes.

Q   About the fire.

A   Yes.

Q   But you didn't speak about the fire itself.

A   Like as far as just anything or --

Q   Uh-huh, yes.

Page 113

A    I don't recall.  I don't remember.

Q    You don't recall any conversations you had about the fire with anyone?

A    Maybe that same day, after we were out of the B-Cell house, me and Officer Blakely and Office Abbassi were just sitting in a conference room while everything cooled down and I think we were just talking about it.

Q    And that was before you met with the investigator?

A    Yes.

Q    They had you all in a conference room and you were all talking?

A    Yeah.  It was just me, Officer Abbassi, and Blakely at that time.

Q    Okay.  And do you remember what -- tell me what was said in that conversation.

A    Just more like this is crazy or -- I vaguely remember that conversation.  I don't know.  Just talking about the aftermath of it, I guess.

Q    Did you discuss what happened during the fire?

A    I think it was more about the prisoners like threatening us at the time.

Q    So prisoners were threatening you during the

Page 114

fire?

A    Yeah.

Q    Do you remember who put you in the conference room together to interview you?

A    I think it was Major Nowatzke.

Q    Did Major Nowatzke, or anyone else, tell you not to discuss the fire or what happened that night?

A    No.

Q    Have you spoken with any family or friends about the fire?

A    I have, yes.

Q    Who have you spoken with about the fire?

A    I think it was mainly just my girlfriend and a couple friends, I think.

Q    Do you remember any conversations you had about the fire with them?

A    Just telling them the whole situation.

Q    So you went through what happened with them?

A    Yeah.

Q    Did you talk with anybody else at ISP about the fire?

A    No.

Q    Why don't you walk me through what you remember from the night of the fire, starting

Page 115

with when you did your security check around 9:00, or whatever it was.

A    So after 9:00 count time, Lieutenant Watson came in a couple minutes after count time because he needed Abbassi and Blakely to finish their A-4s.  So he opened up the conference room to let them do their A-4s.  So he left and let them do their A-4s, and while they were doing their A-4s, I was in the office and I started hearing 500 on -- or fire on 500 range, fire on 500 range.  So immediately I just went up to the 500 range, and I went to the cell and I just noticed that there was a big fire in the cell.

So that's at the time when I ran down.  My radio wasn't working at the time.  So I had to run down and call Officer Blakely and Officer Abbassi to assist me, and that's when Officer Abbassi came up, and I needed to use her radio to call for a fire, but I believe she just called for the fire through control.  I believe she -- after the control announced that there was a fire in B-Cell house, that's when we told Blakely to wait by the door so they could -- we gave her the gate keys, and

Page 116

that's when we ran upstairs to try to open the cell house, but we didn't have the keys.  Officer Blakely had the keys to those.

That's when Officer Abbassi ran down to get the keys from her, and as I waited, that's when Lieutenant Watson and Redden came up with the 500 keys.  And I opened it up through the electronic box on the front of the range, and then we all ran down to the cell, and that's when, I guess, it wouldn't open.  I guess the bars expanded, or something, and it wasn't opening.  So we ran down to get the fire extinguishers.  We came back up and they tried to put it out, and that's when I -- they told me to get the firefighters out.

I let the firefighters out, and I had to -- we had to get all the offenders out.  And that's when offenders started getting rowdy and threatening me and the other two officers that were in there, and that's when they told me, Officer Blakely, and Abbassi to just stay to the side while other additional officers came and helped with the situation.  And then offenders were getting rowdy again and started hitting other officers, and that's

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 31 of 82

Page 117

when we had to push all the offenders outside, and I guess they were so rowdy that they lit a fire on Checkpoint 2 that was next to B-Cell house. And as far as -- I mean, that was about it at that time. We were just kind of aside while the other officers handled the situation.

Q    Do you remember anything else?

A    After a while the captain -- just Captain Dykstra called us into the office and we had to fill out what happened, and that's when we went to the conference room.

Q    Anything else?

A    No.

Q    Okay. So you said that Watson came by after count time. Does that mean count had cleared?

A    Yes.

Q    So count cleared and then Lieutenant Watson came by.

A    Yes.

Q    Where did he come? Did he come to the front gate?

A    Yeah, he came by the gate. I mean, we had to open it, and then that's when he said if anyone needed to do their A-4s. So that's

Page 118

when he opened up the conference room and let Officer Abbassi and Blakely in to do their A-4s.

Q    Okay. So he came to the front door and called for you guys?

A    Yeah.

Q    So who went to the door to talk to him?

A    Me.

Q    So you went to the door and you let him in?

A    Uh-huh.

Q    And he came into the cell house?

A    Yes.

Q    Did he unlock the door?

A    Yes.

Q    So he didn't give you the keys. He came in himself and unlocked the door?

A    No, I unlocked the door for him. He opened up the conference room door.

Q    Okay. So he came in the cell house, unlocked the conference door and --

A    Yes.

Q    -- then he left.

A    Yes.

Q    Was the cell house quiet at that time?

A    Yes.

Page 119

Q    There was no noise in the cell house?

A    No, I don't believe so.

Q    So after he left, what happened next? Officer Abbassi and Officer Blakely went in to do their A-4s?

A    Yes.

Q    They went straight in?

A    Yeah.

Q    Did he tell them to do their A-4s immediately or --

A    Yes.

Q    He said it needed to be done right at that moment?

A    Yes.

Q    Okay. Why was there a rush to get the A-4s done right at that moment?

A    Before the deadline.

Q    When was the deadline?

A    I think around 11:00 or midnight, or so. I think he was going around the whole facility to unlock the conference room doors so whoever needed to do their A-4s could do their A-4s.

Q    Okay. So Lieutenant Watson was going around to tell everyone to do their A-4s, that they were due.

Page 120

A    Yeah.

Q    And they were due that night.

A    Yes.

Q    Was he by himself?

A    Yes.

Q    Had you already done your A-4s?

A    Yes.

Q    What happens if the A-4s aren't done by the deadline?

A    I never really found out. I don't know if you don't get paid, or not.

Q    Okay. So when he came by, what were the three of you guys doing?

A    We were in the office sorting through mail, I believe.

Q    And how long had you been staying in the office after count had cleared?

A    Maybe five minutes, or so.

Q    So how do you know count cleared? Did they tell you?

A    They announced it on the radio.

Q    Okay. So they announced count cleared and you were in the office for like five minutes, or so?

A    Yeah.

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 32 of 82

Page 121

Q    Going through the mail?
A    Yes.
Q    Okay. And could you hear -- is it easy to hear if someone's at the front door if you're in the office?
A    Yes. The front door is by where -- right by the office.
Q    Okay. And is the officer station open, like are there, you know, doors or windows or anything that would keep you at all from hearing what's going on outside?
A    No, it's just gated. The office is gated.
Q    And what about the counselor's office?
A    That's closed at the door.
Q    Okay. So they went in to do their A-4s and you went back inside the officer's station?
A    Yes.
Q    And what were you doing?
A    I think I just started going through the mail.
Q    So about how long were you in there before you started to hear yelling?
A    A couple minutes.
Q    Less than five minutes?
A    Maybe five minutes. I'm not too sure. I don't remember.

Page 122

Q    And when you started to hear yelling was it loud?
A    I started hearing -- I started hearing noise. I couldn't make out what they were saying at first. Everyone -- there was a few offenders screaming all at once. I couldn't tell what they were saying, but I finally heard and that's when I went up.
Q    Okay. So you started to hear people yelling, and things like that, but you didn't do anything for a few minutes?
A    No, it was more like I couldn't make it out for a couple seconds, or so.
Q    So it was just a couple seconds that you heard yelling and didn't do anything?
A    Yeah.
Q    Okay. So you started to hear yelling, you said, for a couple seconds?
A    Uh-huh.
Q    And then you hear them say 500 fire or --
A    Fire on 500, yes.
Q    And so the first thing you then did is run all the way up to the 500 range?
A    Yes.
Q    And you said that takes about 45 seconds?

Page 123

A    Yeah.
Q    Okay. So you ran up to the 500 range.
A    Yes.
Q    So what did you see when you got up to the 500 range?
A    I saw -- it looked like all his like shelves or boxes, whatever he had in the back, it was all lit up on fire and like he was against the cell door.
Q    How big was the fire at that time?
A    It covered like the back of his wall, like it was like from one end of the wall to the other.
Q    Okay. But it wasn't up past the wall yet?
A    No.
Q    Was there a lot of smoke?
A    Yes.
Q    Okay. Could you see him?
A    Yes.
Q    Was he scared?
A    Yes.
Q    Was he asking for help?
A    He was more screaming.
Q    He was screaming?
A    Yes.

Page 124

Q    Loudly.
A    Yes.
Q    Okay. And other people were screaming.
A    No, by the time I got up there they weren't really screaming anymore because they saw me up there.
Q    Okay. So people stopped screaming.
A    Yeah.
Q    Was the fire alarm going off when you were up there?
A    Not when I went up there, no.
Q    Okay. Did you know before you went up there that your radio wasn't working?
A    No.
Q    Did you test your radio before the --
A    Yes.
Q    -- shift that day?
A    Yes.
Q    And you talked on the radio during the shift?
A    Yes.
Q    And then when you got up there, what happened?
A    When I got up there, what happened after or --
Q    Did you try to use your radio or --
A    Yeah, I tried calling for Officer Abbassi and Blakely and that's when my radio cut out. It

BARBARA DEVINE, et al vs
RON NEAL, ET. AL.
Cause No. 3:18-cv-00995-JD-MGG
JUSTIN RODRIGUEZ
November 4, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 33 of 82

Page 125

wasn't working.

Q    Did you talk to Joshua Devine at all while you were up there?

A    I said I'll be right back.

Q    Okay.  So then what did you do?

A    That's when I ran down and tried to yell for Officer Abbassi and Blakely so I could get one of their radios or they could call the fire for me.

Q    Where did you run to?

A    I ran to the front of the range and I started like going down just kind of yelling for them, screaming for them.

Q    Did you go all the way back down?

A    I got to like the halfway point when they finally heard me and came out of the counselor's office, and then they heard what I was saying.

Q    Okay.  And what did they do?

A    Officer Abbassi came up and I told her to call for the fire, so that's when she did.

Q    What were you yelling to them?

A    I need your radios, I need your radios, there's a fire on 500 range.

Q    So you yelled to them that there was a fire on

Page 126

500 range?

A    Yes.

Q    And what did Promise do when you yelled to her?

A    She was just down there when Officer Abbassi came up to me.

Q    She didn't come up?

A    No.

Q    Do you know why she didn't come up?

A    No.

Q    Did you expect her to come up?

A    At the time, no.  I just -- I saw Officer Abbassi coming up, so I didn't expect anything.

Q    Okay.  But you knew the fire was on 500 range.

A    Yes.

Q    And Promise Blakely was assigned to the 500 range?

A    Yes.

Q    So you knew she had the 500 keys?

A    Yes.

Q    Did you make any effort to go get the 500 keys?

A    At the time I was more trying to let everyone know that there was a fire so we could get

Page 127

help to put it out.

Q    So did you think that you should try to let Joshua Devine out of his cell?

A    Yeah, that's -- after we called for control, that's when I said that Blakely had the keys and that's when Abbassi went down to get them.

Q    Okay.  So you went down to the 200 or 300 range, you said.

A    It was the 300 range.

Q    The 300.  And did you -- you waited there?

A    Yes.

Q    Okay.  So Abbassi came up and met you on the 300 range?

A    Yes.

Q    Did she call the fire code before she got there or after?

A    She called it after.

Q    After she got up there?

A    Yeah.

Q    So you're both on the 300 range and you stop and she calls the fire code.

A    Yes.

Q    And then what do you do?

A    I said that Blakely had the keys, and that's when Abbassi went to go down and get them.

Page 128

Q    But you stayed on the 300 range?

A    I ran up to the 500 range.

Q    Why did you run up to the 500 range?

A    So we could be ready to open the gate, open the door.

Q    Okay.  So you didn't run down to help get the keys?

A    No.

Q    Okay.  So what did you do when you got to the 500 range?

A    I waited for either Officer Blakely to come up or Officer Abbassi to come up with the keys.

Q    Were you just waiting there silently?

A    Yeah.

Q    So where were you standing?  Were you at the front or were you over by Joshua Devine?

A    I was over by the front.

Q    Why did you wait at the front?

A    Because there's an electronic box right there, that way if we could have opened it, he could have just pressed it open himself.

Q    Okay.  So you just waited at the 500 range for somebody to bring the keys?

A    Yeah.

Q    Okay.  Could you see the fire when you were at

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 34 of 82

Page 129

the front of the range?

A    I could see smoke.

Q    Was the smoke increasing?

A    Yes.

Q    What could you hear?

A    Like yelling, I guess.  That's when the offenders started getting rowdy too, that they couldn't breathe.

Q    So the yelling increased?

A    Yes.

Q    Could you see through the smoke down to the cell?

A    At the time, yes, but it started getting worse.

Q    Did you have trouble breathing?

A    I think after Lieutenant Watson and Redden came to hand me the keys, that's when it just started getting everywhere and that's when it was hard to see down there.

Q    While you were waiting could you hear Joshua Devine?

A    I couldn't hear him.  It was like -- it was just everywhere loud.  I couldn't hear just him.

Q    So you couldn't hear Joshua Devine yelling for

Page 130

help?

A    No.

Q    Did you hear anyone screaming?

A    I could hear everyone just yelling and getting rowdy.

Q    Could you hear anyone screaming like they were afraid or in pain?

A    No.

Q    How long were you waiting there before Lieutenant Watson and Lieutenant Redden came up?

A    Just about a minute.

Q    Just a minute?

A    Yes.

Q    When they came up, did you go to the cell with them?

A    Yes.

Q    Who opened the door?

A    I did.  They handed me the keys and I opened the -- well, I opened it from the electronic one in the beginning of the range and then we both -- and then we all went down there.

Q    Who handed you the keys?

A    Officer Watson.

Q    And he was with Lieutenant Redden?

Page 131

A    Yes.

Q    Was anyone else with them?

A    No.

Q    And where was Promise Blakely and Sarah Abbassi?

A    Down on the one range.

Q    So did either Lieutenant Watson or Lieutenant Redden, did they tell you to unlock the door?

A    They didn't tell me.  I just did it.

Q    So they handed you the keys and you just unlocked it?

A    Yeah.

Q    Then what happened?

A    Then we all ran down to the cell, his cell, and I think that's when they realized that the door wasn't opening.

Q    Did it open at all?

A    No.

Q    What did you see in the cell?

A    More fire, more smoke, him still.  He was like -- he was leaning against the cell door.

Q    How big was the fire at that point when you went back?

A    It was covering the back of the wall and like above the wall too.

Page 132

Q    So it was coming out --

A    Or the ceiling.

Q    So it was on the ceiling of the cell or coming out of the cell?

A    It was coming -- it was on the ceiling of the cell, I believe.

Q    Was Joshua Devine on fire at that point?

A    No, I don't believe so.

Q    He was still alive at that point?

A    Yes.

Q    Was he screaming?

A    Yes.

Q    Was he saying anything to you?

A    No.

Q    What was he screaming?

A    He was just screaming.

Q    And he was pressed again the front of the cell?

A    Yes.

Q    What did the three of you do?

A    They told me to get the fire extinguishers and that's what I did.  I think that it was me and Redden went to go get them, and then I gave it to Lieutenant Watson and Lieutenant Redden and they tried to put the fire out.

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.
Cause No. 3:18-cv-00995-JD-MGG
JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 35 of 82

Page 133

Q    So did Lieutenants Redden and Watson say anything to Joshua Devine?

A    I don't recall.

Q    Did you say anything to Joshua Devine?

A    No.

Q    And so when Lieutenants Redden and Watson came up, did they bring fire extinguishers with them?

A    Yes.

Q    So they had fire extinguishers?

A    When they came up at first?

Q    Yes.

A    No.

Q    Okay.  So no one had any fire extinguishers.

A    No.

Q    Did Sarah Abbassi or Promise Blakely bring up fire extinguishers?

A    I think Sarah Abbassi did.

Q    When?

A    When we were told to go get them.

Q    So was she up there with you?

A    No, I think she helped me get them and I brought them to Lieutenant Watson and Redden.

Q    Okay.  So Lieutenants Redden and Watson were with you at the cell.

Page 134

A    Yeah.

Q    And they said to you go get the fire extinguishers.

A    Yes.

Q    How long were you at the cell before they told you to go get the fire extinguishers?

A    A couple seconds.

Q    Okay.  So you ran down to go get the fire extinguishers.

A    Yes.

Q    And you saw Sarah Abbassi down there?

A    Yes.

Q    Where was Sarah Abbassi?

A    In front of one range, I believe.

Q    In the front of one range, okay.  Was the 500 cell in the back of the range?

A    Yes.

Q    So she was just standing in front of the 100 range.

A    Yes.

Q    What was she doing?

A    Just waiting, waiting for additional procedures.  I'm not sure.

Q    Okay.  So just waiting for people to tell her what to do?

Page 135

A    Yeah.

Q    Okay.  Had the firefighters been released at that point in the B-Cell house?

A    We released them -- we released ours after, I believe, we brought the fire extinguishers to them.

Q    Did you see Promise Blakely when you ran down?

A    No.

Q    You don't know where she was?

A    No.

Q    So where did you get the fire extinguishers from?

A    From the office.

Q    Were there any fire extinguishers on the ranges?

A    Not that I recall.

Q    So you didn't see any fire extinguishers on the ranges?

A    No.

Q    How many fire extinguishers were in the office?

A    Three.

Q    So did you bring all three up with you between you and Sarah Abbassi?

A    Yes.

Page 136

Q    Are the fire extinguishers heavy?

A    A little bit, yeah.

Q    But you were able to carry all three of them up?

A    Well, Sarah Abbassi helped me and then I took the other ones, yeah.

Q    And you guys ran up with the fire extinguishers?

A    Yes.

Q    What did you do when you got to the 500 range?

A    I gave them to Lieutenant Watson and Redden and then we were told to let the offenders out.

Q    They told you to let the offenders out?

A    I think they were -- we waited for the captain to tell us to let the offenders out.

Q    And did the captain tell you directly or did Lieutenants Watson and Redden tell you to let the offenders out?

A    I think he told the lieutenants and that's when they told me.

Q    And Lieutenants Redden and Watson were up at the door the whole time?

A    Yes.

Q    Did anybody else come at any point?

BARBARA DEVINE, et al vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 36 of 82

Page 137

A    Other officers from different cell houses, yeah, they came.  I don't remember who they all were.

Q    You don't remember?  Do you know how many other people came?

A    Maybe about ten.

Q    Ten other people came?

A    Yes.

Q    What were Redden and Watson doing while they were waiting for the fire extinguishers?

A    I'm not too sure.  I think trying to get the door open.

Q    How were they trying to get the door open?

A    I'm not sure.  That's when I ran down to get the fire extinguishers.

Q    Did you see them doing anything when you came back up?

A    I think they were trying to use cardboard to open it.

Q    Cardboard to open the door?

A    Yeah.

Q    So you saw them with cardboard trying to open the door?

A    Yes.

Q    What were they doing exactly?

Page 138

A    Pulling, trying to pull the door open.

Q    So they were using that as like a buffer, is that what you mean?

A    No.  I think the cell door was kind of hot and they couldn't grab it.

Q    So what were they doing with the cardboard?

A    Using it as like gloves trying to get it open.

Q    And were they able to do that?

A    No.

Q    Were they able to pull on it using it as a glove?

A    Yeah.

Q    You saw them do that?

A    I think it got too hot, but, yeah.

Q    Okay.  So it was too hot to do that?

A    They did it, but then it started like burning through they were saying.

Q    They were saying that to you?

A    They were just saying it out loud.

Q    Were they talking to Joshua Devine at all?

A    No, I don't think so.

Q    What was he doing when you came back up with fire extinguishers?

A    Still just against the cell door in a blanket.

Q    In a blanket?

Page 139

A    Yeah.

Q    He had a blanket wrapped over him?

A    Yeah.

Q    He had put that on himself?

A    Yes.

Q    To try to keep the fire away?

A    Yes.

Q    Was he screaming?

A    Yes.

Q    Okay.  So you gave them the fire extinguishers, and then what did you do?  You were told to let the other prisoners out?

A    Yes.

Q    So did you go unlock the other doors?

A    Yes.

Q    So which levels did you unlock first?

A    I think I unlocked five range and then I went down to unlock the one range, because I think those are the keys I had at the time.

Q    So you got the 500 keys -- or you had the 500 keys because Watson gave them to you.

A    Yes.

Q    So you unlocked all the 500 range.  Did you unlock the 400 range?

A    No, I believe Blakely came up and unlocked

Page 140

those.

Q    So you went down and got Blakely?

A    Yeah, I went down after I unlocked the 500 range, and that's when I told them that we need to let all the offenders out.

Q    Okay.  So that's when Blakely came back up?

A    Yes.

Q    Where was Blakely when you told her that?

A    By Abbassi in the front of one range, I believe.

Q    Okay.  So they were just standing there waiting in front of one range?

A    Yes.

Q    But Abbassi had gone up with you to give them the fire extinguishers.

A    Yes.

Q    So she came back down with you?

A    Yes.

Q    And then you --

A    Well, she went back down when I went to go give them the fire extinguishers.

Q    She ran back down.  So you took all the fire extinguishers up yourself?

A    Yeah.

Q    And she waited --

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 37 of 82

Page 141

A    I think another officer was there. I don't remember who it was. I think he might have been there to help put the fire out.

Q    Is that Officer Statham?

A    Yes.

Q    So was there anyone else that you saw up on the ranges in the B-Cell house?

A    No.

Q    No one else came up on the ranges?

A    No, I don't think so.

Q    Okay. So what happened with Officer Statham? You ran into him on the range?

A    Yeah. I think he ran up there as well with me and Abbassi too, and then that's when we went to give the extinguishers to Watson and Redden.

Q    Who gave the fire extinguishers to Watson and Redden?

A    Me, but then I think Statham pulled out one and handed one to Watson, I believe, too.

Q    Okay. So Abbassi ran back down rather than take the fire extinguishers up.

A    Yeah.

Q    And she was down there waiting with Promise Blakely?

Page 142

A    Yes.

Q    And they were just standing there?

A    Yes.

Q    Who let Lieutenants Redden and Watson into the firehouse -- or into the cell house?

A    Blakely, I believe, Officer Blakely.

Q    And you were the officer in charge that night; correct?

A    Yes.

Q    Wouldn't you have had the front door key?

A    Yes. I handed her the keys to wait by the door.

Q    When did you hand her the keys?

A    I believe I handed them to Abbassi and then that's when she handed them to Blakely.

Q    Okay. So you handed them --

A    After she came up to radio, that's when I -- we had to get the 500 keys, and that's when I handed her the door keys to give to Blakely.

Q    Okay. And then you ran back down.

A    Yes.

Q    Without getting the 500 keys.

A    Yes.

Q    And so you let out the 500 level and the 100 level?

Page 143

A    Yes.

Q    And you said some of the prisoners were threatening you?

A    Yes.

Q    What were they saying?

A    Just like you guys let him die, and they were just getting really aggressive, and like other officers were just trying to keep them back.

Q    Do you think they were justified in thinking those things and saying those things?

A    No.

Q    Why not?

A    Because I believe we did everything we could.

Q    Do you believe that you should have gone down to get the 500 keys?

A    Myself? Maybe. I just don't -- I ran upstairs while Abbassi was trying to get them. I was just trying to be up there to be ready for it, so.

Q    Do you agree that was more important to go get the 500 keys to open the door?

A    I think it was more important for additional help to help us put it out.

Q    Why is that?

A    Because I don't think we could have just did

Page 144

it. As big as that fire was, I don't think we could have did it by ourselves.

Q    So you think it was sufficient to just go call for more help and not do anything else to address the fire?

A    I think both, just call for more help and maybe try to do something.

Q    So you agree you should have gone down to get the 500 keys?

A    Again, I think I probably just should have waited for help anyway.

Q    You think it was sufficient just to wait for help.

A    Yeah, probably.

Q    You don't think you needed to go down and get the 500 keys.

A    Again, even if I did, I don't think I could have just done everything by myself anyway.

Q    You don't think you could have opened the door by yourself?

A    No.

Q    Why not?

A    Because as far as -- as big as that fire was, it was getting hot and smoky, and I don't think I could have done it myself.

Page 145

Q    You couldn't have opened the door by yourself.
A    Yeah.
Q    You don't think you could have used the electronic door to unlock the door?
A    No.
Q    Did you later use the key to unlock the electronic door?
A    Yeah, but it didn't unlock.
Q    Do you think that if you had unlocked the door immediately when the fire started that it would have opened?
A    Probably not.
Q    Why not?
A    As big as that fire was, I don't think it would have.
Q    Why not?
A    Because of the -- it was already hot over there, so.
Q    It was already hot when you went up?
A    Yeah.
Q    Did the fire -- you said the fire increased and got a lot bigger when you went up the second time; correct?
A    Yes.
Q    So the fire was a lot bigger when you went up

Page 146

with Lieutenants Watson and Redden when you first went up?
A    Yes.
Q    Okay. So when you first went up there, the fire was just at the back; correct?
A    Yeah.
Q    So you don't believe that you should have gone and unlocked the door at that time?
A    I mean, I could have, but I just didn't have the keys on me.
Q    You didn't have the keys, but you didn't go get the keys; correct?
A    Yeah.
Q    So tell me every reason that you think the door wouldn't have opened even if you had tried to unlock it at the very beginning when you first realized a fire was happening.
A    Just, again, it was -- I mean, the only reason is it was just hot. The bars were expanded, it sounded like, and I couldn't even touch the bars when I got up there.
Q    Any other reason?
A    No.
Q    Why do you say the bars were expanding? Could you physically see that the bars were

Page 147

expanding?
A    No, just because they couldn't get the door open. Everything was unlocked and the doors couldn't open.
Q    The second time when you actually unlocked the door.
A    Yeah.
Q    Did you try to touch the bars yourself at any point?
A    No.
Q    Did you approach the bars when you first went up there?
A    I was by them. I don't know if I was too close to it, but, yeah.
Q    How far were you from the bars?
A    A couple feet.
Q    A couple feet. To be clear, you didn't take any action to unlock the door before you were given the keys by Watson and Redden.
A    Yes.
Q    No, you didn't take any action.
A    No.
Q    Do you think it was following policy for Promise Blakely to wait downstairs when you yelled that there was a fire on the range that

Page 148

she was responsible for?
A    No.
Q    It was against policy.
A    Well, yeah, she needed to wait by the door for someone to get let in.
Q    To be clear, she didn't have the keys until you gave them to Sarah Abbassi to bring down; correct?
A    Yes.
Q    So was it -- did it violate policy for Promise Blakely not come when you originally yelled down to them that there was a fire on the 500 range?
A    I don't know if it violated policy, but I just needed a radio so we could signal for a fire.
Q    Were officers responsible for addressing emergencies on the ranges to which they were assigned?
A    No, I think it was just every officer to try to address the situation if it happened.
Q    Every officer there is responsible for addressing that situation in a cell house?
A    Yes, or whoever witnessed it.
Q    Do you think that Promise Blakely had additional responsibility since she had the

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 39 of 82

Page 149

500 keys?

A   To unlock the door, then yeah.

Q   She had the responsibility to try to unlock the door you think?

A   Yeah.

Q   Do you think she should have gone up and responded?

A   Yes.

Q   Did you tell anyone that?

A   No.

Q   Did you ever tell anyone -- did you ever talk to anyone about Officer Blakely or Officer Abbassi's actions on the night of the fire?

A   I think we just discussed everything that happened just with the investigation after it happened.

Q   I'm sorry, who discussed everything that happened?

A   Well, we had to write it all down and we were all in the room to talk to someone from within investigations to discuss our stories, and everything like that.

Q   Did you ever ask Promise Blakely why she didn't come up?

A   I think I told her, I was calling you to come

Page 150

up.

Q   What did she say to that?

A   She said, I didn't hear you.

Q   She said she didn't hear you?

A   Yeah.

Q   Do you believe she didn't hear you?

A   Yeah, it was really loud in there at the time.

Q   She was with Officer Abbassi; correct?

A   Yes.

Q   Officer Abbassi heard you?

A   Yes.

Q   So do you think it's believable that Promise Blakely didn't hear you?

A   Yeah.

Q   Why is that?

A   Just because Abbassi I think -- I had to shout at them a couple times what was happening, and that's when Abbassi came up and gave me her radio.

Q   At the time the prisoners were yelling fire on 500 range; correct?

A   Yes.

Q   So she would have heard the prisoners yelling fire on 500 range; correct?

A   They both didn't hear them.  It was only me

Page 151

that heard them.

Q   No one else heard the prisoners?

A   No.

Q   Even when they came out of the counselor's office?

A   Yes.  They said they kept hearing things, but they didn't -- I guess they said they didn't know what they were yelling or they didn't -- I don't know.  They didn't -- I don't know what was going on.

Q   You don't know what happened.

A   No.

Q   There was a lot of yelling.

A   There was, yeah, a lot of yelling, and when I had to call them, like they didn't -- they said they heard yelling after everything had happened, but didn't know what it was about.

Q   And you said after the fire you went to Captain Dykstra's office.

A   Yes.

Q   The three of you went together?

A   Yes.

Q   Did the three of you discuss the fire with Captain Dykstra at that time?

A   I think we just had to make a statement.

Page 152

Q   Did you discuss it?  Did you make an oral statement or a written statement?

A   A written statement.

Q   Did you discuss it orally while you were sitting there?

A   No, I don't believe so.

Q   Captain Dykstra didn't ask you a single question about the fire?

A   Not that I recall, no, just that we had to just make a statement of everything.

Q   There was no discussion with Captain Dykstra about what had happened beyond making a statement?

A   Not that I remember.

Q   Did you guys write your statements together?

A   Separate.  Well, we were in the same room together, but, yeah.

Q   Did you discuss it at all as you were writing your statement?

A   I don't recall.

Q   But you might have discussed the --

A   Yeah.

        COURT REPORTER: I'm sorry.  You need to let her finish the question.

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 40 of 82

Page 153

BY MS. PIERCE:

Q But you might have discussed the fire, the three of you, as you were writing your statement?

A Yes.

Q And so you wrote your statement for Captain Dykstra, and then Major Nowatzke came and asked you to go into a conference room together?

A Yes.

Q Anything else happen in between those times?

A No.

Q And how long were you waiting in the conference room?

A About two hours.

Q So you were sitting in there for two hours?

A Yes.

Q Did anybody come in to talk to you?

A I think it was Major Nowatzke just telling us that we did our jobs and that was it.

Q He told you that you did your job?

A Yeah.

Q Did he ask you any questions before he told you that you did your job?

A No.

Page 154

Q What did you understand him to mean by that?

A That we did everything that we could.

Q And what was he basing that on?

A As far as probably what they saw on the cameras, and everything.

Q So you think they had watched the camera video at that point?

A Yes.

Q But he hadn't spoken with you.

A No.

Q Did you say anything in response to him?

A No. I think we were all just kind of worn out from the situation.

Q Did Officer Abbassi say anything in response to him?

A I don't remember.

Q Did Officer Blakely say anything in response to him?

A I don't remember.

Q What other conversations did you have that you recall while you were with those other two?

A Not much. I don't remember.

Q So you didn't have any conversations with Officer Blakely or Officer Abbassi while you were sitting in the conference room for two

Page 155

hours after the fire?

A It was just more like we were kind of just there sitting quietly, and then I think it was more it's just been a crazy night or this was all crazy, that type of conversation.

Q So you didn't have any conversations about what had just happened in the two hours that you were sitting in the conference room?

A Other than like, I was calling you, like I didn't hear you, to Officer Blakely.

Q You said that to Officer Blakely while you were in there?

A Yes.

Q And what did she say?

A She said, I didn't hear you.

Q What did Officer Abbassi say?

A I don't think she said anything.

Q And there were no other discussions about what happened during the fire?

A Not that I recall.

Q Is it possible that you had other comments or conversations about what happened that you don't recall?

A It's possible.

Q Okay. And you said you were receiving threats

Page 156

from the prisoners while you were evacuating them?

A They were just more being aggressive.

Q What do you mean by that?

A Like yelling and then like getting in our faces.

Q Were they upset?

A Yes.

Q Do you think it was reasonable that they were upset?

A They were more upset of the fact that they couldn't breathe and that we should have let them out sooner.

Q Do you think that was reasonable?

A Yes.

Q Was there a lot of smoke in the cell house?

A Yes.

Q Were they having trouble breathing?

A Yes.

Q Do you think they were scared?

A Yes.

Q Did anyone make any actual verbal, oral threat to you while you were evacuating them?

A Not that I recall.

Q Had you ever received a threat prior to the

BARBARA DEVINE, et al vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 41 of 82

Page 157

fire?

A    Personally, no.

Q    After you evacuated the prisoners on the 100 range, where did you go?

A    We were just kind of escorting offenders out, but that's when they started being aggressive and other officers told me, Officer Blakely, and Officer Abbassi to just move aside, step aside and they'll handle it.

Q    Who told you that?

A    A couple officers. I don't remember.

Q    You don't remember who any of them were?

A    No.

Q    Were they your superiors?

A    No, they were just more additional other officers that came to help with the situation.

Q    And why did they tell you to step aside?

A    Just because they were aggressive toward us.

Q    To you three specifically?

A    Yes.

Q    Because of the fire?

A    Yes.

Q    And again, you had never been threatened at any point prior to the fire.

A    No.

Page 158

Q    Had Joshua Devine ever threatened you at any point prior to the fire?

A    No.

Q    Did you know Joshua Devine?

A    No, not personally. I mean, I've seen him. I saw him in the cell house, but that was about it.

Q    Did you ever have any conversations with him prior to the fire?

A    No, not that I recall.

Q    Did he ever cause any problems?

A    No.

Q    Was he known as being just generally an easy-going prisoner?

A    Yes. He usually kept to himself, as I remember.

Q    And you never heard anything about him causing any problems?

A    No.

Q    Did you ever speak to any of the prisoners about the fire afterwards?

A    Not that I recall.

Q    Did any of them approach you about the fire?

A    I think some -- I think one person, actually. It was the same guy that night who was getting

Page 159

in our faces, and they had to put him in D-Cell house under lockup because he was making threats to other officers too, I believe.

Q    Other officers in the B-Cell house?

A    Yes.

Q    You mean officers about you and Blakely?

A    No, I think it was more additional officers than him too.

Q    What was this prisoner's name?

A    I don't remember.

Q    Do you know what range he was on?

A    Four range, maybe.

Q    400 range?

A    Yes.

Q    And when was he moved to D-Cell house?

A    The day after.

Q    And he was moved to D-Cell house because he was getting in people's faces, I think you said?

A    Yeah. He was being really aggressive. I don't remember the whole situation. I think he did hit an officer, but I'm not sure.

Q    What did this prisoner look like?

A    Maybe five-six, Caucasian. I don't remember

Page 160

his face too well.

Q    Would you recognize him if you saw a picture of him?

A    Probably.

Q    Was there anybody else that was moved because of their behavior during the fire?

A    Not that I remember.

Q    So you heard prisoners yelling fire on 500 before you left the officer's station.

A    Yes.

Q    Do you know who was yelling that?

A    It was a bunch of different offenders. I don't know where it was coming from.

Q    And you heard noise before that, but you didn't hear -- but you didn't react until you heard somebody say fire on 500 range.

A    I started hearing yelling like from way down and then it started closer and closer and that's when I was able to make it out.

        MS. PIERCE: Okay. If we can take maybe a five or ten-minute break.

        (Brief recess.)

BY MS. PIERCE:

Q    Just to go back and clarify one thing, so you didn't receive any -- you didn't have any

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 42 of 82

Page 161

confrontations with any of the prisoners from when the fire started until you started to evacuate; correct?

A Not threats, but, yeah, they were getting into our faces.

Q Before you started the evacuation?

A After we did the evacuation.

Q So there was no confrontation or threats --

A No.

Q Wait until I finish.

A I'm sorry.

Q So there were no confrontations or threats from the time that you first enter the fire until you started evacuating.

A No.

Q So after you were waiting in the room, you went and got called one by one to speak with the investigator; is that correct?

A Yes.

Q Do you remember the name of the investigator you spoke to?

A I don't.

Q Did you understand that it was important to tell him everything that happened and to tell him the truth about what happened?

Page 162

A Yes.

Q Why was that important?

A Just so they could fairly do their investigation on everything, what happened, how the fire started.

Q So you understood that it was important to tell the investigator and your superiors what happened so they could understand what happened during the fire?

A Yes.

Q Was it also important so that they could prevent similar emergencies from happening in the future?

A Yes.

Q Did you speak with anyone else as part of the investigation besides speaking with the investigator on the night of the fire?

A I don't believe so.

Q What did you tell the investigator?

A Just everything that happened, from what I heard to when I had to evacuate everybody.

Q Did you tell him all the details that you could remember?

A Yes.

Q Did you tell him that you were calling to

Page 163

Officer Blakely and she didn't respond?

A I believe so, but I don't remember.

Q Why do you believe that you told him that?

A Just because I was calling for the 500 keys and I don't think she heard me.

Q But why do you believe that you told the investigator that you were calling for the 500 keys or that you called for Promise Blakely to come up and she didn't respond?

A Because I feel like it was important for them to know everything.

Q It was important for them to know that specifically?

A Just everything I told, everything I remembered, so.

Q Do you think it was specifically important for them to know that you were calling for Officer Blakely and she didn't respond?

A Yes.

Q Why?

A We possibly could have just gotten the keys faster.

Q You think you would have gotten the key faster if Officer Blakely had responded to you yelling?

Page 164

A Yes.

Q And I can't remember, what did you say was the reason for her that she gave you for not responding?

A She didn't hear me.

Q When did she tell you that?

A In the conference room, I think.

Q In the conference room she told you that she couldn't hear you?

A Yes.

Q Did she tell you what she could hear?

A No.

Q She didn't say anything about why she couldn't hear you?

A That it was loud.

Q So she could hear the officers yelling -- scratch that. She could hear the prisoners yelling?

A Yes.

Q Did she tell you she could hear what they were saying?

A No.

Q Did she tell you why, if she could hear you yelling and she could hear the prisoners yelling, why she didn't come?

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 43 of 82

Page 165

A    What she heard from the offenders or --

Q    If she heard -- did she tell you -- let me start that again.
      Officer Blakely told you that she could hear yelling and that's why she couldn't hear what you were saying.

A    Yes.

Q    Did she gave you a reason for saying that she didn't respond when she heard both you and the prisoners yelling?

A    I don't think she gave me a reason other than she couldn't hear me.

Q    Did you ask her why she didn't respond when she heard everybody yelling?

A    No.

Q    Were you curious about why she didn't respond when she heard everybody yelling?

A    A little, because it was loud and offenders were yelling pretty loud, and I couldn't really make out why Abbassi and Blakely didn't come out until I had to come out and yell that I needed a radio.

Q    So you don't understand why they didn't come as soon as they heard yelling?

A    Yes.

Page 166

Q    Does that concern you?

A    Yeah.

Q    You would have gone when you heard yelling; correct?

A    If I had heard yelling, I would have came out, yes.

Q    So the fact they can hear yelling and didn't respond is concerning?

A    Yes.

Q    Why?

A    It seems like they were more focused on what they were doing in there and just didn't pay attention to what was going on out at the cell house.

Q    So you think they were more concerned with doing their A-4s than checking on the well-being of the prisoners in the cell house?
      MS. SMITH: At this point I'm going to object to speculation.
   BY MS. PIERCE:

Q    You can answer.

A    Can you read the question again or --
      (Question read back by reporter.)
      MS. SMITH: Same objection. She's right, you can answer.

Page 167

      THE WITNESS: Yeah, I don't know.
      MS. PIERCE: Sorry?
      THE WITNESS: I don't have to answer?
      MS. PIERCE: You do have to answer.
      THE WITNESS: I do have to answer? I'm sorry, I'm just confused.
      MS. SMITH: You have to answer unless I say don't answer, but I just said you can go ahead and answer.
      THE WITNESS: Oh, okay. I'm confused. Sorry.
      MS. SMITH: Sorry about that.
   BY MS. PIERCE:

Q    Do you need the court reporter to read the question again?

A    No. I just think they were more -- it was just more of a -- I think it was more just paying attention and just didn't end up hearing them, I guess. I don't know.

Q    You said there was loud yelling at that point; correct?

A    Yeah.

Q    They couldn't hear you, you think, because of

Page 168

      the loud yelling.

A    Yes.

Q    If there's loud yelling is that an indicator that there could be an emergency?

A    Not necessarily, because offenders usually just yell like when there's like a big sporting game on or something they're watching all at the same time or -- just something like that.

Q    So you think it's okay to assume that there's just a big sporting event and not respond --

A    No, I don't think it's okay.

Q    Sorry, let me finish the question.
      MS. PIERCE: Could you read my question.
      (Question read back by reporter.)
   BY MS. PIERCE:

Q    If you hear yelling?

A    No, I don't think it's okay just to assume that it's just from a sporting event, but --

Q    Why?

A    It was more common just -- you said why?

Q    Uh-huh.

A    Just because it could be a safety issue or someone could be hurt.

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 44 of 82

Page 169

Q   So you think if you hear yelling, you should respond because there's a potential that it could be an emergency?

A   Yes.

Q   Do you think when there was yelling in the cell house, they should have responded because it could have been an emergency?

A   I'm sorry?

Q   I'll rephrase. So you agree that when you hear yelling in the cell house, you should respond because there can be an emergency?

A   Yes.

Q   So you agree when Officer Abbassi and Officer Blakely were in the counselor's station and there was loud yelling, the appropriate action would have been to respond?

A   Yes.

Q   Okay. Was there any type of meeting after the fire to discuss what happened?

A   They gave us -- if we needed to talk to someone, we could have talked to someone, but they never had like a meeting, or anything, about it.

Q   Are there -- after events at ISP, do they normally have what's called an after action

Page 170

review?

A   I'm not sure.

Q   Have you ever heard of an after action review?

A   I believe so.

Q   Have you ever participated in an after action review?

A   No.

Q   What's your understanding of what an after action review is?

A   Just everything that happened after a situation.

Q   I'm sorry?

A   Just after everything that happened after a situation, or something.

Q   So it's a meeting after a situation?

A   You said what's my understanding of it?

Q   Uh-huh.

A   I'm not -- I'm not too sure how to answer.

Q   So you said you've heard of an after action review; correct?

A   Yes.

Q   And in what situation or context did you hear about an after action review?

A   Maybe someone sits down and talks to you about everything.

Page 171

Q   What's the source of your knowledge about an after action review? Have you been trained on it, is there a policy that discusses after action reviews?

A   No, I don't think so.

Q   So you've just generally heard the term after action review?

A   Yes.

Q   But you've never been told what an after action review is?

A   No, I don't believe so.

Q   Do you remember the context of hearing after action review discussed?

A   No.

MS. PIERCE: I'm going to pull out what we'll mark as Exhibit 1.

(Defendant's Exhibit No. 1 marked for identification.)

BY MS. PIERCE:

Q   Okay. So this does not have Bates stamps. It's titled After Action Review, April 24, 2017. Is that correct?

A   Yes.

Q   Have you ever seen this document before?

A   I don't remember.

Page 172

Q   Why don't you take a minute or two to look it over.

A   (Witness complies.) Okay.

Q   What do you believe this document is?

A   Just an understanding of the whole situation and everyone's perspective on it.

Q   What situation?

A   The fire in B-Cell house.

Q   On April 7, 2017?

A   Yes.

Q   So this is -- these are notes or a discussion of what happened during the fire?

A   Yes.

Q   So it says at the beginning of the first paragraph, those present were, and then it has a list of names. Do you see that?

A   Yes.

Q   So does that mean this was a meeting that people were physically present for?

MS. SMITH: At this point I'm going to object for vagueness of the question. It's not clear if he's ever even seen this before or if he participated or has any actual knowledge of this to even provide an answer to the question.

USDC-INND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 45 of 82

Page 173

BY MS. PIERCE:

Q    You can still answer the question.

A    I think I do remember this, but I don't think I was present for it.

Q    Do you know why you weren't present?

A    This was on April 24th?

Q    The document says it was on April 24th.

A    Yeah, my daughter was just born, so.

Q    So you were out because your daughter was just born?

A    Yes.

Q    When was your daughter born?

A    April 17th.

Q    Okay. How long were you out after your daughter was born?

A    About a week.

Q    So you said you know about this event, you remember this event, but you weren't there?

A    Yes.

Q    What do you remember about the event?

A    I think I remember getting that we had to be at a meeting, but I wasn't here. So, I'm not sure.

Q    Did people talk to you about the after action review after it happened?

Page 174

A    No.

Q    Did people talk to you about it before it happened?

A    Just that we had to be at the meeting, or something.

Q    Do you remember who told you that?

A    I think it was the captain and lieutenants.

Q    Captain Dykstra?

A    Yes.

Q    Did anybody ask you, since you couldn't attend the meeting, ask you for your input or your opinions?

A    No.

Q    So do you know who Robert Curry is?

A    I don't remember.

Q    It says that he -- on this sheet it says that he's the executive director of staff development. Is that what it says?

A    Yes.

Q    Have you ever had any interaction with him before?

A    I don't believe so.

Q    Have you ever heard his name before?

A    Not that I recall.

Q    Do you know what the executive director of

Page 175

staff development does?

A    No.

Q    Do you know who William Wilson is, the next person listed as being present?

A    No.

Q    It says he's the executive of adult facility; is that right?

A    Yes.

Q    Do you know what that position is responsible for?

A    No.

Q    The next person listed is D. Hoffer. Do you know who that is?

A    Yes.

Q    Who's that?

A    That was an officer working here at the time.

Q    An officer or was he a sergeant or a lieutenant?

A    Just an officer.

Q    Where was he working?

A    I think he was in A-Cell house.

Q    What did he have to do with the fire?

A    I think he just came for additional help.

Q    During the evacuation?

A    Yeah.

Page 176

Q    Did he go up onto the range in B-Cell house?

A    No, I don't believe so.

Q    E. Trute, do you know who that is?

A    No.

Q    And S. Abbassi, that would be Sarah Abbassi?

A    Yes.

Q    So she was present at the meeting it says?

A    She might have been. I'm not sure.

Q    K. Fahey, do you know who that is?

A    I don't remember.

Q    E. Niccum?

A    No.

Q    F. Vanihel?

A    No.

Q    K. Gann?

A    No.

Q    You don't know K. Gann?

A    No.

Q    Captain Dykstra?

A    Yes.

Q    P. Blakely?

A    Yes.

Q    C. Dustin?

A    No.

Q    You don't know who C. Dustin is?

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 46 of 82

Page 177

A    No.
Q    R. Neal?
A    Yes.
Q    Who's R. Neal?
A    I've heard of him before. I just -- I'm not sure.
Q    It says next to his name, warden. Is he the warden?
A    I believe so. I never heard that term for him over there before, so.
Q    Is the head of the prison also called the superintendent?
A    Yes.
Q    Who was the superintendent while you worked there?
A    Ron Neal, I think.
Q    Okay. Did you ever interact with him?
A    No.
Q    Did he ever discuss the fire with you?
A    I don't believe so.
Q    Do you recall having any conversation with him?
A    Not that I recall, no.
Q    What about M. Rular?
A    No.

Page 178

Q    W. Taylor?
A    No.
Q    C. Chambers?
A    Yes, I know him. He was just another officer there.
Q    Who helped with the evacuation?
A    Yes.
Q    Lieutenant Redden?
A    Yes.
Q    D. Bate?
A    No.
Q    T. Dillon?
A    No.
Q    C. Burke?
A    No.
Q    A. Watson?
A    Is that Lieutenant Watson?
Q    I believe so.
A    Yes.
Q    F. Fritter?
A    No.
Q    E. Lasco?
A    No.
Q    D. McBride?
A    No.

Page 179

Q    Major Nowatzke?
A    Yes.
Q    Captain Boyan?
A    I think I've seen him before.
Q    R. Statham?
A    Yes.
Q    And he responded to the ranges; correct?
A    Yes.
Q    Lieutenant C. Wilson?
A    No.
Q    D. Koen?
A    No.
Q    W. Parnell?
A    No.
Q    J. Brown?
A    No.
Q    Sergeant J. Fizer?
A    No.
Q    Sergeant D. Henning?
A    No.
Q    So was it common for you to work with people you didn't know at ISP?
A    No, it wasn't really common. I'd usually just work with the same people.
Q    Who did you normally work with?

Page 180

A    I worked with Hoffer, Abbassi, Statham, Chambers. Everyone that I can remember is usually who I worked with.
Q    Okay. Do you keep in touch with any of them since you left ISP?
A    No, I haven't.
Q    Have you spoken to anyone from IDOC since you left ISP?
A    No.
Q    Did you ever work with Promise Blakely at McDonald's?
A    No.
Q    Did you ever talk to any of your coworkers outside of work?
A    When I was working there, we went to breakfast a few times. That was about it.
Q    You mean you went to breakfast after you worked?
A    Yes.
Q    Who did you normally do that with?
A    Just a couple of people from when I was working in D-Cell house at the time.
Q    So you only did it with people that you worked in D-Cell house with?
A    No, it was just more I think just a couple

BARBARA DEVINE, et al vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 47 of 82

Page 181

times that I went out with them.

Q   Did you ever go out for breakfast or anything else with Sarah Abbassi?

A   No.

Q   Did you ever go out and spend time outside of work with Promise Blakely?

A   No.

Q   What about with Lieutenant Redden?

A   No.

Q   Lieutenant Watson?

A   No.

Q   Statham?

A   No.

Q   Did you ever text with any of your coworkers outside of work?

A   No.

Q   After you left ISP on the night of the fire or, you know, the morning of the fire, did you go straight home?

A   Yes.

Q   What did you do when you got home?

A   I think I showered and went to bed.

Q   Did you talk to anybody about the fire when you got home?

A   My girlfriend at the time.

Page 182

Q   Anyone else?

A   No.

Q   If you turn to the second page of the after action review, the last line says:  Meeting was dismissed and tour was given.  Correct?

A   Yes.

Q   The paragraph right before that, there's four lines.  The first line says:  Better communication is key to any emergency.
     Do you think there was a problem with communication on the night of the fire?

A   Yes.

Q   Why is that?

A   Just radios weren't working and the fact that no one was able to hear me at first, so.

Q   Anything else?

A   No.

Q   What do you think could have improved that?

A   Working radios.

Q   Anything else?

A   No.

Q   The second line says:  Active weapons team when emergency called, deploy during mass movement.
     What's the weapons team?

Page 183

A   It's usually some officers that come in during like when they have to extract an offender or just try to get a situation under control, I guess.

Q   Do they have weapons on them?

A   I think it's more like vests, as far as I remember.  I don't really remember what they usually use.  I think it was pellet guns.  I'm not too sure, though.

Q   Was the weapons team brought in on the night of the fire?

A   I don't remember.

Q   The third line says:  Make sure you know who's in charge of first responders.  Do you know what that means?

A   Making sure who's responsible to let them all out or to get into their -- first responders is -- I'm not too sure.  Is that for firefighters, or something?

Q   What do you understand first responders to mean?

A   Just I think whoever comes and just helps with the medical situation, or something.

Q   Is there a group of people who are identified as first responders at ISP?

Page 184

A   I believe so.

Q   Have you -- what's your understanding of what that group is?

A   Just, again, being there for just medical reasons or situations, just things like that.

Q   So were you ever given any training or instruction about how to work with first responders?

A   Not that I recall.

Q   Do you know, did anybody show up that night who's part of the first responders?

A   I don't recall.

Q   Have you ever heard of a quick response team or a QRT team?

A   I believe so.

Q   What's that?

A   Just basically used for emergencies.  I'm not too sure.

Q   So you haven't been given any instruction about a quick response team or a QRT team?

A   No, not that I remember.

Q   Do you know why Lieutenants Watson and Redden came on the night of the fire?

A   I think they're supposed to address any control issue.

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 48 of 82

Page 185

Q   Lieutenants Redden and Watson were supposed to address any control issue. By that do you mean anything that was called by control?

A   Yes.

Q   Is it because they're lieutenants?

A   I'm not too sure.

Q   Okay. The last line of the paragraph in the after action review says: Work on fire drills and plan of action for staff.
Do you think it's important to have fire drills and an emergency plan at ISP?

A   Yes.

Q   Why?

A   Just so they take better precautions of any future event, or anything.

Q   In what ways -- can you expand on that a little bit more?

A   Maybe addressing things that you should do first, from first to last, or something.

Q   In the case of an emergency?

A   Yes.

Q   Do you think it would have helped if you had had more practice with emergencies before the April 7, 2017 fire?

A   Do I think it would have helped? Possibly,

Page 186

but I don't know what more could have been done.

Q   Were there additional fire drills or emergency training that were done after the fire?

A   Not while I was still there.

Q   Were there any statements by IDOC or by the warden about the fire that were issued?

A   Not that I remember.

Q   Do you remember any changes that were made after the April 2017 fire?

A   No.

MS. PIERCE: Do you mind if we take a quick break? I'm going to get another document that we'll mark as Exhibit 2.

(Brief pause.)

(Defendant's Exhibit No. 2 marked for identification.)

BY MS. PIERCE:

Q   I'm handing you what we've marked as Exhibit 2. This does not have a Bates stamp, but the first page says, Indiana State Prison, Shift Report of Incident. Is that correct?

A   Yes.

Q   What is your understanding of what this document is?

Page 187

A   Just feel like it's just everything that occurred that night, what codes were used, emergencies, and everything.

Q   And this is the night of the fire; correct?

A   Yes.

Q   Was this written by Captain Dykstra?

A   Yes.

Q   So did he write this based on the information that you guys had given him?

A   Yes.

Q   So did Captain Dykstra write this report while you were in the office with him?

A   I'm not sure. I don't know.

Q   Did you see Captain Dykstra writing a report in the office when you were writing your reports?

A   Not that I recall.

Q   At the top the Date and Time says, 4-7-17, 6:10 p.m. Is that correct?

A   Yes.

Q   Do you know why it says 6:10 p.m.?

A   No.

Q   Take a minute to look at his description of the event.

A   (Witness complies.)

Page 188

Q   So you've now had a chance to read what Captain Dykstra wrote about what happened on the night of the fire; correct?

A   Yes.

Q   Does he mention you anywhere in this description?

A   Not that I see.

Q   Do you have any reason to dispute anything that he wrote here?

A   No.

Q   On Line 5 he wrote: Then Lieutenant Redden activated ISP fire department. Do you see that?

A   Yes.

Q   Is that a correct statement of what he wrote?

A   Yes.

Q   Do you recall Lieutenant Redden activating the fire department?

A   No, I don't remember.

Q   Do you know what that means when it says that he activated the fire department?

A   Letting the offenders out, the offender firefighters.

Q   Letting them out in B-Cell house?

A   Yes.

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 49 of 82

Page 189

Q Does it mean anything else?
A I'm not sure.
Q Turn to Page 6.
A (Witness complies.)
Q There's no page number, so just --
A Okay.
Q Turn it one more page.
A Okay.
Q There should be a picture there; correct?
A Yes.
Q Do you recognize that individual?
A Yes.
Q Who is that?
A Joshua Devine.
Q Do you recall any other interaction or information about him other than what you previously testified here to today?
A No.
Q Turn to the next page.
A (Witness complies.)
Q What is this document?
A I think this was what I wrote to Captain Dykstra when we were making our statements.
Q Is that your signature at the bottom of the page?

Page 190

A Yes.
Q Do you recall writing this?
A Yes.
Q Why don't you take a minute to read over what you wrote.
A (Witness complies.) Okay.
Q Is everything that you wrote here true and accurate?
A I'm not too sure. It looks like I messed up.
Q It looks like you messed up in your statement?
A Yeah.
Q In what way?
A That it wasn't until I actually got to the cell and saw Devine there in the fire, that's when I ran back and told Abbassi. That's when I was calling Abbassi and Blakely to come up there with me.
Q So you're incorrect when you said that you called them before you went to the cell; is that correct?
A Yes.
Q So your testimony today was correct, that when you heard the yelling, you ran first to the cell and then came back and yelled?
A Yes.

Page 191

Q Did you understand when you were writing this that it was important to give an accurate and complete statement of what happened?
A Yes.
Q Do you know why you didn't give an accurate and complete statement of what happened?
A I think at the time I was just trying to remember everything because it all happened so fast.
Q Did you feel rushed to write this statement?
A A little bit, yeah.
Q Why did you feel rushed?
A Because they called us all in there and told us just to write everything. I would have liked the day to gather everything to write it.
Q Did Captain Dykstra tell you that you only had a short amount of time to write the statement?
A No, he just told us we need to get it done.
Q So there was nothing that stopped you from taking the time to write a full statement of what happened; correct?
A Correct.
Q And this statement is about 13 lines; correct?
A Yes.

Page 192

Q Do you think that's short?
A A little short, yeah.
Q Do you think there was additional information that could have been provided?
A Yes.
Q So we talked a lot about what happened the night of the fire; right?
A Yes.
Q What other things are missing from this statement? A lot of what we've talked about is missing; correct?
A Yes.
Q Do you think it would have been important to provide your superiors and the investigators with more detailed information about what happened?
A Yeah, probably.
Q Why?
A So they get every single detail of what happened.
Q And why would that have been important?
A Just for investigation and saying if we did our job.
Q Did anybody ask you for additional detail?
A No.

BARBARA DEVINE, et al vs.
RON HILL, et al
Cause No. 3:18-cv-00995-JD
November 4, 2019
JUSTIN RODRIGUEZ
page 50 of 82

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 50 of 82

**Page 193**

Q  Did anyone note that there was not a lot of detail in your explanation?

A  No one said anything to me.

Q  Did you volunteer any additional details in the time or days after the fire?

A  No.

Q  Why not?

A  It just seemed after that day I was done and no one ever asked about it.

Q  No one ever asked about it after that day?

A  Yeah.

Q  Why do you think that is?

A  They probably reviewed the cameras and just got our statements and that was it.

Q  Turn two more pages.

A  (Witness complies.)

Q  What's on this page?

A  Blakely's statement.

Q  This statement is even shorter; right?  It's about six lines?

A  Yes.

Q  Have you seen this statement before?

A  No.

Q  The first line says:  On the date of April 7, 2017, at approximately 9:40 p.m., I was in the

**Page 194**

unit team room when I heard Officer Rodriguez yelling my name.

So does that indicate that she did hear you yelling?

A  Yes.

Q  But she later told you that she did not hear you yelling?

A  Yes.

Q  So that seems inconsistent; correct?

A  Yes.

Q  The next line says:  I ran out of the office and I heard Officer Rodriguez yelling for a Signal 10-71.

So that means that she heard you yelling and she heard you saying that there was a Signal 10-71.

A  (Witness nodding head.)

Q  Is that correct?

A  Yes.

Q  Turn two more pages.

A  (Witness complies.)

Q  What's written on this page, or what is this document?

A  Lieutenant Watson's statement.

Q  Take a minute or two to read Lieutenant

**Page 195**

Watson's statement.

A  (Witness complies.)  Okay.

Q  So you've had a chance to read Officer Watson's statement?

A  Yes.

Q  Does he mention you anywhere in this statement?

A  No.

Q  Does he discuss any of the actions you took during the fire?

A  No.

Q  Does he mention any actions that you took during the fire?

A  No.

Q  Turn two more pages.

A  (Witness complies.)

Q  What's that page?

A  Officer Statham's statement.

Q  Take a few minutes to read Officer Statham's statement, please.

A  (Witness complies.)  Okay.

Q  Does he mention any actions you took during the fire?

A  No.

Q  And you've had a chance to completely read

**Page 196**

Officer Statham's statement?

A  Yes.

Q  Does he mention you anywhere in this statement?

A  No.

Q  I need you to turn back three pages.

A  (Witness complies.)

Q  Are you looking at Lieutenant Redden's statement?

A  Yes.

Q  Can you take a few minutes to read that?

A  (Witness complies.)  Okay.

Q  You've had a chance to read Lieutenant Redden's statement?

A  Yes.

Q  Does he mention any action you took in response to the fire?

A  No.

Q  Does he mention you in his statement?

A  No.

Q  Looking back on the night of April 7, 2017, is there anything that you would have done differently, if you could go back, in response to the fire?

A  Not that I can think of.

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.
Cause No. 3:18-cv-00995-JD-MGG
JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 51 of 82

Page 197

Q    There's nothing you would have done differently?

A    No.

Q    Is there anything you would have had someone else do differently?

A    Maybe get Officer Blakely to come up there with the keys.

Q    Anything else?

A    No.

Q    On the night of the fire you guys had a security check around 9:00 p.m.; correct?

A    Yeah.

Q    Do you remember if you divided up that security check, if you each did your own ranges, or if one person did the entire security check?

A    I think we did our own ranges.

MS. PIERCE: Okay.  I'm going to hand you what we're marking as Exhibit 3.

(Defendant's Exhibit No. 3 marked for identification.)

BY MS. PIERCE:

Q    Do you recognize this document?

A    Yes.

Q    What is it?

Page 198

A    It's interrogatories.

Q    These are your responses to the interrogatories?

A    Yes.

Q    Turn to the last page, or the second to the last page, sorry.

A    (Witness complies.)

Q    Is that your signature?

A    Yes.

Q    Did you prepare these responses?

A    Yes.

Q    Did you speak with counsel when preparing these responses?

A    Yes.

Q    Take a few minutes just to look over your responses.

A    (Witness complies.)  Okay.

Q    You've had a chance to review your interrogatory responses?

A    Yes.

Q    Do you believe they're still accurate as you review them today?

A    Yes.

Q    You understand that you have an ongoing responsibility to supplement them with any

Page 199

information, additional information you might remember.

A    Okay.

Q    Can you look at Interrogatory No. 7?

A    (Witness complies.)

Q    The first part of the question is:  Were you prevented in any way from taking action to remove Joshua Devine from his cell and/or open or unlock the cell door immediately upon learning that there was a fire in the cell on April 7, 2017?  Your response is:  I did take action to attempt to remove Joshua Devine from his cell.

Was there anything that prevented you in any way from taking any additional action?

A    Just that I didn't have the keys.

Q    Nothing else?

A    No.

Q    Turn to Response No. 9.

A    (Witness complies.)

Q    Are you there?

A    Yes.

Q    So your response to that interrogatory is -- which asks about the key control policy, among other things, your response is:  There is a

Page 200

key control policy, but it is also up to the officer in charge.

A    Yes.

Q    What do you mean by it's up to the officer in charge?

A    Who gets what keys to each range.

Q    Is there anything else that the officer in charge has authority to decide with regard to the keys?

A    As far as just keys?

Q    Uh-huh.

A    No, there isn't.

MS. PIERCE: Okay.  I'm going to hand you a document which we'll mark as Exhibit 4.

(Defendant's Exhibit No. 4 marked for identification.)

BY MS. PIERCE:

Q    So this is Bates stamped Devine 001992; is that correct?

A    Yes.

Q    It's an E-mail from Lori Bootz?

A    Yes.

Q    So the first line says:  Below is a list of names of staff that have not completed their

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 52 of 82

Page 201

annual in-service CBT's.  Do you know what that means?

A    Is that the shots?

Q    I don't know.

A    I don't know, no.

Q    You don't know what that means?

A    No.

Q    Okay.  Do you see your name on this list?

A    No.

MS. PIERCE: Okay.  I'm going to show you a video, but let's take a quick five-minute break while I set it up.

(Brief recess.)

BY MS. PIERCE:

Q    So I'll represent to you that this is the surveillance from B-Cell house that defense counsel had produced to us in the discovery process.

A    Okay.

Q    Do you recognize the image on the screen?

A    Yes.

Q    Is that B-Cell house?

A    Yes.

Q    Is that the front or the back of B-Cell house?

A    That's the front.

Page 202

Q    Okay.  I'm going to start the video at 9:42:01 p.m.  Do you see the time stamp?

A    Yes.

Q    I'm stopping the frame at 9:42:20; is that correct?

A    Yes.

Q    Is that the front door of B-Cell house?

A    Yes.

Q    Okay.  I'm stopping the video at 9:43:57.

A    Uh-huh.

Q    Do you see an individual on the first floor of the cell house?

A    Yes.

Q    Who is that individual?

A    That's me.

Q    Do you know what you're doing in this moment?

A    Going up to see where the fire is.

Q    Okay.  I'm stopping the video at 9:44:42.  It looks like there's somebody on the 300 range; is that correct?

A    Uh-huh.

Q    Do you know who that person is?

A    That's me.

Q    What were you doing at that moment?

A    That's when I called for Abbassi and Blakely.

Page 203

Q    So you had to come back down from the 500 range?

A    I was calling them, but, yeah, I was on 300 when they heard me.

Q    And I'm stopping the video at 9:44:45.  Can you see two individuals on the 100 range?

A    Yes.

Q    And who are those individuals?

A    Officer Blakely and Officer Abbassi.

Q    You can see them, basically, in the seconds leading up to where I stopped it coming out from maybe the officer's room over there or --

A    Yeah.

Q    Okay.  But they're making their way out to the front of the range 100 level; correct?

A    Yeah.

Q    Do you see one -- so I'm playing it at 9:44:45?

A    Uh-huh.

Q    And I just froze it at 9:44:47.  Did you see one person hand something to another individual?

A    Yes.

Q    Who was that?

A    Abbassi handed something to Blakely.

Page 204

Q    Do you know what she handed to Blakely?

A    Maybe the door key.  I'm not sure.

Q    And I'm playing it now and at 9:44:51 I stopped the video.  In the seconds leading up to this, what happened?  What did Officer Abbassi do?

A    Ran back to the office.

Q    And what is Officer Blakely doing?

A    Just right there.

Q    Standing there?

A    Yeah.

Q    Okay.  Now I just stopped it at 9:44:56, and what did Officer Blakely just do?

A    Go into the office.

Q    And what did Officer Abbassi do?

A    Run up the stairs.

Q    I'm stopping it at 9:46:12.  Do you see somebody there at the front door?

A    Yeah.

Q    Who is that?

A    Lieutenant Watson or Redden, I'm not sure.

Q    Does somebody open the door for them?

A    Yes.

Q    Do you know who that is?

A    Blakely.

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 53 of 82

Page 205

Q    I think there were three individuals who came in; is that correct?
A    Yes.
Q    Do you know who the third individual is?
A    Officer Statham.
Q    I'm going to stop the video at 9:47:19. Can you see an individual there by the front door?
A    Yes.
Q    Do you know who that is?
A    Officer Blakely. I'm not sure.
Q    I'm going to stop the video at 9:47:35. Do you see an individual just standing beyond the front door?
A    Yes.
Q    Is that individual taking any action?
A    No.
Q    Do you know who that individual is?
A    Officer Blakely.
Q    I'm stopping the video at 9:48:55. Do you see any individuals in the video?
A    Looks like Officer Abbassi and Blakely.
Q    And they're both on the 100 level?
A    Yes.
Q    I'm stopping the video at 9:49:04. Do you see an individual walking on 100 level?

Page 206

A    Yes.
Q    Who is that?
A    Me, I believe.
Q    What do you have in your hand?
A    A fire extinguisher.
Q    I'm going to stop the video here at 9:50:02.
     Do you know if Joshua Devine had any nicknames?
A    No.
Q    Have you ever heard the nickname Spider?
A    No.
Q    Do you know Barbara Devine?
A    No.
Q    Do you know Crystal Devine?
A    No.
Q    Have you ever spoken to anyone from Joshua Devine's family?
A    No.
Q    Do you know Kenneth Gann?
A    No.
Q    Do you know William Lessner?
A    No.
Q    Do you know Christopher Beal?
A    No.
Q    Do you know Steven Griffin?

Page 207

A    No.
Q    Do you know Jason Nowatzke?
A    Yes.
Q    Did you ever spend anytime with Mr. Nowatzke outside of work?
A    No.
Q    Did you interact with him at work?
A    No.
Q    Have you spoken to him since you left ISP?
A    Just when they were trying to get ahold of me about the case.
Q    Did you speak with him about the case at that point?
A    No.
Q    Did you ever spend anytime outside of work with Anthony Watson?
A    No.
Q    Timothy Redden?
A    No.
Q    Christopher Puetzer?
A    No.
Q    Ryan Statham?
A    No.
Q    Have you spoken to anyone at ISP about this lawsuit?

Page 208

A    No.
Q    Have you spoken to any of your family about this lawsuit?
A    I think a while ago, but not recently.
Q    Have you discussed this lawsuit with your girlfriend?
A    Yes.
Q    Recently?
A    Yes.
Q    What did you talk to her about this lawsuit?
A    Just the whole situation.
Q    What do you mean by that?
A    Just that we were just getting sued.
Q    Did you talk to them about why you were being sued?
A    About this event, yeah, about the April 7th fire.
Q    Tell me the entirety of the conversation to the best you can remember.
A    Just it was mainly about how he, the offender, set a fire and now we're getting sued because he died and we didn't get him out.
Q    Okay. Just to be clear, I don't want just a summary of it. I want all the things that you remember.

Page 209

A     That was basically it.  I didn't go into full details.

Q     So you just said that there was a fire and that you were being sued is the entirety of the conversation?

A     Yeah.

Q     Did you discuss your opinions about the legitimacy of the lawsuit?

A     Just that I think it was crazy.

Q     You think the lawsuit was crazy?

A     Yeah.

Q     And why is that?

A     Because we did everything that we could to try to help him.

Q     Did you discuss with them what you thought the outcome of the lawsuit would be?

A     No.

Q     Did you speak with anyone else about the lawsuit?

A     No.

Q     And just to be clear, you haven't spoken with anyone at IDOC except Major Nowatzke since this lawsuit has been filed?

A     No, I haven't spoken with anyone else.

Q     You said earlier in your testimony that you

Page 210

had never been disciplined for any reason; correct?

A     I believe so.

        MS. PIERCE: Okay.  I'm going to hand you what's being marked as Exhibit 5.
        (Defendant's Exhibit No. 5 marked for identification.)

BY MS. PIERCE:

Q     Okay.  What's marked as Exhibit 5 does not have a Bates stamp, but on the top left corner it says, Written Counseling; correct?

A     Yes.

Q     And the date on this form is June 3, 2017?

A     Yes.

Q     Under Nature of Issue it says:  On 5-29-17 and 5-30-17, Officer J. Rodriguez did not run the guard one pipe on his assigned ranges.  This is a clear violation of agency rules and policies.  Officer J. Rodriguez, you are receiving a counseling for not running the guard one pipe.  Any future violations of this or any other agency rules, clause, or policies will result in disciplinary action up to and including dismissal.  Do you recall this?

A     No, I don't.

Page 211

Q     Did you sign this form?

A     Yeah, it looks like my signature.

Q     So is this a counseling, a reprimand, for not doing your security checks?

A     I believe so.

Q     This was just about a month and a half after the fire; correct?

A     Yes.

Q     So you have been disciplined before at ISP?

A     Yes.

        MS. PIERCE: I'm going to hand you what's being marked as Exhibit 6.
        (Defendant's Exhibit No. 6 marked for identification.)

BY MS. PIERCE:

Q     So this does not have Bates stamps again, but this is a four-page document; correct?

A     Yes.

Q     The first page has a letter from Captain Michael Calloway on April 27, 2017; is that correct?

A     Yes.

Q     Would you take a minute to look through the document?

A     (Witness complies.)  Okay.

Page 212

Q     Are these letters disciplining you for taking time off when you didn't have approved leave time?

A     Yes.

Q     There's four of these letters; correct?

A     Yes.

Q     So can you -- you understand you're under oath; right?

A     Yes.

Q     So can you tell me why you earlier said that you had not been -- that you had not received any discipline at ISP, given that you now can see that you twice -- at least five times were disciplined at ISP?

A     I didn't remember any of these.

Q     You didn't recall any of the instances as to why you were disciplined?

A     No.

Q     Not of the five instances?

A     No.

Q     Did you take it seriously when your superiors told you that you had violated IDOC or ISP policy?

A     Yes.

Q     But not seriously enough to remember it?

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 55 of 82

Page 213

A    I don't work there anymore, so I didn't remember.

Q    Okay.  Part of ISP policy is to follow the chain of command in any situation; is that correct?

A    Yes.

Q    Can you explain to me the chain of command if you're the officer in charge -- or start at the lowest level officer.

A    Just officer, officer in charge, sergeant, lieutenant, captain, and major, I believe.

Q    And is it common for, say, the captain to give direction to an officer or does it usually go down the rank, so officers are only getting commands from officers in charge?

A    No, anyone higher could command anybody lower than them.

Q    And if you had a concern or a question, who would you generally go to?

A    Maybe a lieutenant or a captain.

Q    And if you had -- for example, we discussed earlier that as an officer you might have a radio that wasn't working; correct?

A    Yes.

Q    And if you went to your officer in charge and

Page 214

your officer in charge said he or she couldn't do anything, should you go further up the command?

A    Yeah, you can.  There is always just so many radios in there, so.

Q    Did you ever go further up the chain of command to express concerns about radios?

A    No.

Q    Did you ever go up the chain of command to discuss any concerns about key policies?

A    No.

MS. PIERCE: I'm going to hand you what is being marked as Exhibit 7.

(Defendant's Exhibit No. 7 marked for identification.)

BY MS. PIERCE:

Q    Again, Exhibit 7 does not have a Bates stamp, but at the top it says, Indiana Department of Correction, Internal Affairs Division, Report of Investigation, Monday, May 1, 2017; is that correct?

A    Yes.

Q    So is this -- have you seen this document before?

A    I don't recall.

Page 215

Q    But this would be a report from the internal investigation; correct?

A    Yes.

Q    Okay.  Turn to Page 2.  I'm sorry, stay on Page 1.  Do you see the last line?

A    Yes.

Q    It says:  Offender Ochea, Cell 542, was interviewed by Investigator William Lessner.  Do you see that?

A    Yes.

Q    So this paragraph, that goes on to Page 2, discusses his interview with William Lessner.
     Look down at the third line to the end of that paragraph.  It says:  That Offender Ochea stated when the officer came down the alarm was ringing, but before that everyone was screaming.  Do you see that?

A    Yes.

Q    Do you dispute that the prisoners were all screaming before you came down?

A    Yeah.

Q    You dispute that?

A    Oh.  No.

Q    Look at the next paragraph.  It says:  Offender Brown 136446, Cell 544, was

Page 216

interviewed by Mr. Lessner.  Do you see that?

A    Yes.

Q    Line 2, it says:  He stated he smelled smoke and everyone was yelling "fire, fire, 540", and about ten minutes later the officer came up and then walked away.
     Do you dispute that people were yelling "fire, fire 540" for ten minutes before you came up?

A    Yes.  It was not ten minutes.

Q    Okay.  The next paragraph it says:  Offender Miller 148638, Cell 538, was interviewed next by Investigator Chris Dustin.
     And if you go down to seven lines from the bottom, it starts with the word, responders, period?

A    Where is that?

Q    Seventh line from the bottom, starts with, responders.

A    Uh-huh.

Q    It says:  He stated the flames were so bad it came around into his cell so he laid down.  He stated him and his neighbor were yelling for at least 15 minutes before the whole cell house started in.  He identified Rodriguez as

BARBARA DEVINE, et al vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 56 of 82

Page 217

the first staff who came up on the range.

Do you dispute that they were yelling for at least 15 minutes?

A   Yes.

Q   Turn to the next page, Page 3.  The first paragraph says:  Offender Dunn 212869, Cell 536, was interviewed by Investigator Dustin.

The third line down:  He stated he and Lee, his neighbor, began to yell fire.  He stated about five to ten minutes later the officer showed up.  Do you dispute that?

A   Yes.

Q   Do you think that all of these prisoners were incorrect about how long they were yelling?

A   Yes.

Q   And why is that?

A   Because I was right there.  The office is right next to them.  I don't believe it was five to ten minutes that they were yelling for, plus Lieutenant Watson was in there prior to before the five, ten minutes that they said that they were yelling for.

Q   So you're saying that if they were yelling, you would have heard them?

A   Yes.

Page 218

Q   So there's no way you believe that they could have been yelling for five to ten minutes?

A   Yes.

Q   Turn to Page 7.

A   (Witness complies.)

Q   Do you see the first full paragraph there that starts, with the interview video?

A   Yes.

Q   So on that line it says:  Lieutenant Watson stated he had opened the door to BCH and gave the unit team office keys to staff to do their A-4s.  The camera from the custody hall facing Gate 4 was reviewed.  At 9:33:35 he opened the door to BCH and at 9:34:15 he closed the door.  Correct?

A   Yes.

Q   Turn back to Page 1.

A   (Witness complies.)

Q   Do you see there it says:  Initial timeline was determined from the video review which is listed below?

A   Uh-huh.

Q   So it says:  At 9:34:43 there was a large flash of light in the cell.

That must have been the fire; correct?

Page 219

A   Yes.

Q   So the fire had started at least at 9:34?

A   Yes.

Q   And it says you ran up at 9:43?

A   Yes.

Q   So there was ten minutes between at least when we know when the fire was going on before you ran up there?

A   Yes.

Q   So do you still agree that it's possible that they were yelling for ten minutes?  Do you still disagree that it was possible they were yelling for ten minutes before you went up to the 500 range?

A   Yes.

Q   Why?

A   Because when someone starts yelling, the whole cell house starts yelling.  So that's when -- that's when I started hearing it a little bit, and then that's when it just got loud and that's when they all -- it's kind of like an echo.

Q   So you heard them start yelling before you actually went to go see what was happening?

A   Yeah.  It took me a couple of seconds to hear

Page 220

what they were saying, but, yes.

Q   And you're -- scratch that.  If they were yelling, you would have heard them.

A   Yes.

Q   And Officer Blakely and Officer Abbassi would have heard them.

A   They were in the office, like I said before.  They couldn't hear it even when it was louder, but I can hear them.

MS. PIERCE: I think we're getting close to the end.  We'll take a five or ten-minute break to confer.

(Brief recess.)

BY MS. PIERCE:

Q   So we spoke briefly earlier about how prisoners would make maintenance requests, that that would happen.

A   (Witness nodding head.)

Q   Were you at all responsible for addressing any maintenance issues at ISP?

A   No.

Q   Were you at all responsible for doing any maintenance order or facilitating any maintenance order at ISP?

A   No.

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 57 of 82

Page 221

Q   Were you responsible for addressing any maintenance issues related to TV sets at ISP?

A   No.

Q   Were you familiar with any problems, common problems, related to TV sets at ISP?

A   No.

Q   So you aren't aware of any common problems relating to TV sets at ISP?

A   No.

Q   Were you aware or familiar with any electrical problems at ISP?

A   Not that I recall.

Q   Was it your practice while you were at ISP to learn about any maintenance electrical problems while you were there?

A   No.

Q   Okay.  Were fires very common at ISP?

A   No.

Q   How often do you think fires occurred?

A   While I was --

        MS. SMITH: I'm sorry, go ahead.

A   While I was there?

BY MS. PIERCE:

Q   Uh-huh.

A   I think there was only three while I was

Page 222

there.

Q   Do you remember the context of those fires?

A   One I remember is when offenders would just get mad and just light like tissue paper, or something, on fire and put it in the front of their cells.

Q   You remember that happening?

A   Yes.

Q   Was that a cell house you were working in?

A   No.

Q   What cell house was that?

A   I think D-Cell house.

Q   Okay.  Do you know why they did that?

A   No.

Q   How did you learn about that fire?

A   I heard it from another officer.

Q   Do you remember which officer?

A   No.

Q   Do you remember what he told you about those fires?

A   That they were lighting paper and throwing it in front of their cells.

Q   Do you know what the context of that conversation was?  Were you talking to him in person?

Page 223

A   I think he might have been working.  He might have worked at that time, or something.

Q   So were you in a meeting with him or ran into him?

A   I think we were just working together and he mentioned it.

Q   Oh, okay.

A   Yeah.

Q   So you were working with him at one point and he mentioned a previous fire that had happened?

A   Yeah.

Q   Okay.  What was the context of the second fire that you remember?

A   I'm not sure.

Q   So you believe there were two or three, but you don't remember?

A   I remember a fire being called over the radio, but I don't remember the whole situation.

Q   Do you know where the fire was?

A   I can't remember.

Q   What about the third time?

A   That was just the April 7th fire.

Q   Okay.  You said at one point you released firefighters from their cells in response to a

Page 224

fire; right?

A   Yes.

Q   Was that in a different cell house?

A   I think C-Cell house.

Q   You think C-Cell house?

A   Yes.

Q   And you said that was before the April 7, 2017 fire?

A   Yes.

Q   Do you remember the names of the firefighters you let out?

A   No.

Q   Do you remember anything about that fire?

A   No.

Q   Did you participate in any meetings about that fire after the fact?

A   Not that I remember.

Q   Do you remember receiving any information about that fire?

A   No.

Q   Do you know if that was a serious fire?

A   I think it was just a little fire.

Q   Do you know if the fire alarm went off?

A   No.

Q   Do you know how long the firefighters were

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 58 of 82

Page 225

gone?

A    Half an hour.

Q    Is that everything that you can recall about that situation?

A    Yes.

Q    We discussed the radios briefly earlier. I know you said you would get your radio from the stand where they were charging.

A    (Witness nodding head.)

Q    Did the radios each have their own unique identification number?

A    Not that I remember.

Q    Did you sign out the radios in any way?

A    No.

Q    Was there any sort of chip system for the radio?

A    No.

Q    There was a chip system for the keys; correct?

A    Yes.

Q    So you would give a chip and then you would get the key?

A    Yes.

Q    But there wasn't a system like that for the radios?

A    No.

Page 226

Q    Did you mark or indicate on any form in any way which radio you took?

A    No.

Q    If one of the radios was having problems and wasn't functioning, how would you report that?

A    Just to the OIC that the radio is not working, start calling other cell houses, see if they have any extra radios or extra batteries.

Q    But if a radio isn't working, it would probably need to be repaired; isn't that correct?

A    Yes.

Q    Would it be important to report that it needed to be repaired?

A    Yes.

Q    Would you as the officer who had the radio report to anyone in any way so that it would be repaired?

A    I would probably just report it to the OIC.

Q    And who would the OIC report it to?

A    Maybe a sergeant or a lieutenant.

Q    When you were acting as the OIC, did you ever report that a radio wasn't working?

A    No. I never really had problems.

Q    Did anyone ever give you any instruction or

Page 227

training on what to do -- scratch that.

Did you ever get any instruction or training on how to fill out a report concerning a radio that wasn't working?

A    Not that I recall.

Q    Did you get any instruction at all about reporting that a radio wasn't working?

A    No, not that I recall.

Q    Do you think that was an issue, that there was no system to track and report which radios weren't working?

A    Yes.

Q    Why?

A    So everyone could have functioning radios.

Q    What risks were there with not keeping track of who had functioning radios?

A    Just the safety issues in case we needed anything.

Q    In an emergency?

A    Yes.

Q    How many times before April 7th did you work as an officer in charge?

A    Maybe twice.

Q    Do you feel confident that you had the training you needed to be an officer in

Page 228

charge?

A    Yes.

Q    Did anyone ask you if you had -- if you felt confident to be an officer in charge before they gave you that position?

A    No.

Q    Did you get any instruction about what to do if you were an officer in charge and there was an emergency situation?

A    Any instruction, no.

Q    Do you know what started the fire on April 7, 2017?

A    I kept hearing rumors, but I wasn't entirely sure.

Q    What rumors did you hear?

A    That he was trying to make drugs.

Q    Did you hear any other rumors?

A    No.

Q    Did you ever take any steps to investigate what caused the fire?

A    No, because when they told me the rumors, I assumed that's what it was.

Q    Did you ever hear what the investigation found the cause of the fire to be?

A    No.

BARBARA DEVINE, et al vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 59 of 82

Page 229

Q   Did you ever look at any report of the investigation into the fire?

A   No.

Q   Do you have any experience with fire safety or fire investigation?

A   Yes.  I mean, I've taken EMT classes and a fire science class before.

Q   So do you -- what's your understanding of how to investigate what the cause of a fire was?

A   I'm sorry, I think I misunderstood your question.

Q   So what was your experience with fire safety and fire investigation that you learned from being an EMT or taking EMT classes?

A   Fire investigation, again, I think I misunderstood the question before.  I don't know -- I know how to handle fires.  I don't know how to investigate them.

Q   Okay.  So what did you learn from your EMT training about how to handle fires?

A   Just always make sure that there is a fire before you try to do anything.

Q   Make sure that there is a fire?

A   Yes, first try to visualize the fire before you take any extra precautions.

Page 230

Q   Why is that?

A   Just making sure you're not responding to something that is not needed to be put out, or anything.

Q   So it's your understanding that you should go see the fire before you do any other steps?

A   Yes.

Q   You should do that before you call for additional help?

A   Yes.

Q   Why is that?

A   So you're not signaling for a fire in case it's not a fire at all.

Q   Do you think the risk is greater if you wait to call for additional help to figure out that the fire is there rather than -- do you think -- scratch that, I'll ask it again.
        Do you agree that it creates a bigger risk to wait until you see a fire before asking for help than asking for help immediately on being told that there's a fire?
        MS. SMITH: I'm going to object to the extent it calls for expert testimony and there's no foundation for him to be an expert on this issue.  You can still answer.

Page 231

A   No.

BY MS. PIERCE:

Q   It doesn't cause a risk to wait?

A   No, I don't think so.

Q   Why not?

A   Because you need to approach any fire situation in kind of the correct way, handle it the correct way.

Q   Is responding quickly important in a fire, in a situation where there's a fire?

A   Responding quickly?

Q   Uh-huh.

A   Important?  Yes.

Q   Why?

A   To make sure that there is a fire and that way you take the right steps to put it out.

Q   So it's important to respond quickly to take the right steps to put the fire out?

A   Yes.

Q   As an EMT were you told -- were you trained that it's important to get someone out of the way of a fire?
        MS. SMITH: I'm going to object to the extent he never actually was an EMT.
        MS. PIERCE: I'll rephrase.

Page 232

BY MS. PIERCE:

Q   In your training as an EMT were you taught that it's important to get somebody out of the way of a fire?
        MS. SMITH: Same objection.

A   No, because as far as EMT -- as far as EMT training, no.  It was more of my fire science classes.

BY MS. PIERCE:

Q   When did you take fire science classes?

A   That was in my senior year of high school, college courses.

Q   Where did you take fire science classes?

A   Joliet Junior College.

Q   Okay.  So while you were in high school you took fire science classes?

A   Yes.

Q   And those classes taught you that you should move somebody out of the way of a fire?

A   We should move somebody out of the way of a fire?

Q   Uh-huh.

A   I don't remember that specifically.

Q   So what were you referring to when you said -- when you referred to those classes you said, I

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 60 of 82

Page 233

learned in those classes, what were you specifically referring to that you learned in your fire safety classes?

A   Basic situations how to put a fire out.

Q   Okay.  So the fire safety class taught you how to put a fire out?

A   How to handle fires, yes.

Q   How long was this class?

A   A year.

Q   And who taught it?

A   I can't remember my lieutenant's name.

Q   By lieutenant, it was a lieutenant in the fire department?

A   Yes.

Q   Okay.  And so they taught you how to handle a fire, you said?

A   Yeah.  It was just a basic fire science course.

Q   So what do you mean by fire science?  What else did you learn?

A   A little bit about building construction, just the basics.

Q   What do you mean by the basics?  I've never taken a fire safety class.

A   I couldn't remember anyway either.  Just the

Page 234

safety precautions.

Q   About how to not start a fire or about how to put out a fire?

A   What to do in case of a fire.

Q   Were you taught about evacuations during a fire?

A   About evacuations?  Yes, but I don't remember.

Q   Were you taught about getting people out of the way of a fire that was ablaze?

A   Possibly, but I don't recall.

Q   Okay.  Do you recall anything specific from your fire safety class?

A   Anything that we covered?  Probably not.

Q   Did you recall anything from that class when you were responding to the fire in Joshua Devine's cell?

A   No, not necessarily.

Q   Do you know if you recalled anything about that class when you were responding to the fire?

A   No.

Q   Have you ever used anything that you learned in that fire safety course?

A   Fire extinguishers.

Q   So you've used fire extinguishers based on the

Page 235

training you received in that course?

A   Yes.

Q   Anything else?

A   No.

Q   Did you use anything you learned on the night of the fire in Joshua Devine's cell?

A   Did I use anything?

Q   That you had learned in that course.

A   No.

Q   When you were told that you could talk to somebody about what happened on the night of the fire, was it like a counselor, or something like that, that you were talking about?

A   The night of the fire?

Q   Uh-huh.

A   Investigations.  I don't --

Q   Were you told by anyone that you could -- I think you testified earlier that you were told you could speak to somebody if you needed to about what happened on the night of the fire.  Am I remembering that?

A   Oh, yes.  What was the question?

Q   Am I remembering that correctly, that you said you were told that you could speak with

Page 236

somebody about what happened?

A   Yeah, we were told after the fire if we needed to talk to someone about -- like just to talk, I guess, that we could.

Q   Like with a counselor, or something?

A   Yes.

Q   And when did they tell you that?

A   When I was talking to investigations.

Q   Okay.  So it was during your interview with the IA investigator?

A   Yes.

Q   You mentioned also that while you were waiting in the conference room with Officers Blakely and Abbassi that Major Nowatzke said you did your job.

A   Yes.

Q   Did anyone else give you any positive or negative feedback about what happened that night?

A   Officer Statham came up to me afterwards and said I did a good job, and then Lieutenant Watson announced in the conference room the next day that we all did our job and did everything we needed to do.

Q   When did Officer Statham tell you that you did

BARBARA DEVINE, et al. vs.
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 61 of 82

Page 237

your job?

A    In the parking lot after work.

Q    Tell me everything that you remember about that conversation.

A    I was just talking with my friends and he just drove by and said, good job, proud of you guys.

Q    Good job what?

A    Proud of you guys.

Q    Were you talking to your friends about the fire?

A    No.

Q    And your friends were coworkers?

A    Yes.

Q    Tell me everything about what Lieutenant Watson said in the conference room the next day.

A    He just announced that he thought that B-Cell house, the officers that were in there and everyone that came to help, did everything that we were supposed to do, that we did a good job, and that we don't need to talk about anything that happened anymore, that it's done and over with.

Q    Had he spoken with you at all about what

Page 238

happened on the night of the fire?

A    No.

Q    Do you know why he said that you don't need to discuss it with anyone else?

A    Just that it happened and it's done.

Q    What did you understand his statement to mean?

A    Move on, just continue to do your job.

Q    Do you think it's appropriate to move on the day after a prisoner dies during an emergency at a cell house?

        MS. SMITH: Objection. One, relevancy. Two, he's not a professional, so he doesn't have professional expertise to have an expert opinion on that.

BY MS. PIERCE:

Q    You can answer.

A    Can you read the question back, please?

        MS. SMITH: I'm going to do a standing objection so I don't have to keep interrupting you.

        (Question read back by reporter.)

A    As far as trying to keep focused and trying to do your job, yeah.

BY MS. PIERCE:

Q    Do you think it's important to fully

Page 239

investigate what happened to cause a prisoner to die in his cell?

A    Yes.

Q    Did you understand Lieutenant Watson to be telling you not to talk about what happened on the night of the fire?

A    No.

Q    Did anyone instruct you not to talk about what happened on the night of the fire?

A    No.

Q    Had you ever heard a supervisor make a statement like Lieutenant Watson's before?

A    No.

Q    Did anyone else make any statement in response to what Lieutenant Watson said?

A    Not that I recall.

Q    And why were you all in the conference room when Lieutenant Watson made that statement?

A    It wasn't the conference room. It was the meeting room the next day.

Q    So in the daily meeting that you described earlier?

A    Yes.

Q    That you would do before you went to your assignment.

Page 240

A    Yes.

Q    Was there any other discussion about the fire during the meeting the next day?

A    No.

Q    Why do you think Lieutenant Watson felt that way?

A    I just feel like he thought that we all just did our job.

Q    Why do you think he felt the need to say that?

A    Just in case whoever wasn't there or whoever didn't respond to the fire doesn't bother anybody about what happened.

Q    So you think he was worried about other officers or other staff at ISP discussing the fire with you, Officer Abbassi, and Officer Blakely?

A    Or about the whole situation about -- the other officers that were responding that night.

Q    Why do you think he was concerned about that?

A    Just to keep everyone focused and just, again, do their job.

Q    Just to clarify, when you said that you dispute the prisoners' statement that said they were yelling for five to ten minutes

BARBARA DEVINE, et al vs       Cause No. 3:18-cv-00995-JD-MGG          JUSTIN RODRIGUEZ
RON NEAL, ET. AL.                                                                        November 4, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 62 of 82

Page 241

before you came to Joshua Devine's cell, is that based on your familiarity with the cell house?

A   Yes.

Q   And because of your familiarity with the cell house your understanding is that you would have heard them if they were yelling?

A   Yes.

Q   When you arrived to your shift on April 7, 2017, do you recall testing your radio?

A   Yes.

Q   As you sit here today, you have a specific memory of testing your radio that day?

A   Yes.

Q   What do you recall about testing the radio?

A   You just normally just press the button, it beeps, talk through it.

Q   And that's what you normally do.  Do you specifically recall hearing it beep on the day that you started your shift of the fire?

A   Yes.

Q   Why do you specifically recall hearing it that day?

A   If it wasn't working, I wouldn't have had it on me.

Page 242

Q   That's your general understanding of what you would have done; correct?

A   Yes.

Q   But do you have a specific memory of that day?

A   No.

Q   You don't have a specific memory of that day.

A   No.

Q   So your understanding is that you would have done that normally.

A   Yes.

Q   How many times have you tested your radio before?

A   I tested it every day I was there.

Q   You're positive that you tested it every day?

A   Yes.

Q   Where were you when you would test it?

A   In the office.

Q   In the officer's station?

A   Yes.

Q   Where in the officer's station?

A   By the radios.

Q   And how often would you say it was working versus when it was not working?

A   It wasn't working maybe a handful of times.  It was working most of the times.

Page 243

Q   Would you say it was more than ten times or less than ten times?

A   Less than ten times.

COURT REPORTER: I'm sorry.  Could we take a break.  My computer stopped working.

(Brief pause.)

(Question and answer read back by reporter.)

BY MS. PIERCE:

Q   So you said, before we took a quick break, that there was a handful of times, probably less than ten times that your radio wasn't working?

A   Yes.

Q   And during those times would you go to find alternate radios or alternate batteries?

A   Yes.

Q   Did you ever have to work without a working radio because you couldn't find an alternative?

A   No.

Q   So you've never gone -- you've never continued on duty knowing that your radio was not working?

A   No.

Page 244

Q   How many times have you had your radio stop working while you were working?

A   Maybe about five or six.

Q   And what did you do those times?

A   I would have to go down and get a new battery or see if someone had another radio.

Q   Did you ever have to continue working because you couldn't find somebody with a new battery or a new radio?

A   No.  We would -- if we were switching off ranges, someone would give me their radio and I'd go up there and do what I needed to do.

Q   So you'd borrow someone else's radio in the cell house to go up and do the pipe walks?

A   Yes.

Q   So somebody in the cell house would be short a radio?

A   Yes.  If that ever happened, yes.

Q   You don't recall that happening?

A   No.

MS. PIERCE: Okay.  So I just want to put on the record that during the last deposition that we did in this case opposing Counsel Rothenberg agreed that he would re-present all of the witnesses, defendant

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

Page 245

witnesses, after summary judgment with regard to punitive damages and financial information. So we're expecting that Officer Rodriguez will be part of that.

MS. SMITH: Okay.

MS. PIERCE: And one additional thing before we finish up, we understand from your counsel that when you moved, you didn't update them on your address. So we would expect going forward that you understand you have an obligation to keep them updated of any changes in your contact information.

THE WITNESS: Yes.

MS. PIERCE: Is that fair?

THE WITNESS: Yes.

MS. PIERCE: I think we're done.

MS. SMITH: Now I get to ask questions. I'll be short, don't worry.

CROSS EXAMINATION

BY MS. SMITH:

Q    On the night of the fire, approximately how many officers total came to the cell block to assist, if you know?

A    About ten.

Q    Do you know where typically they would have

Page 246

come from?

A    The main gate.

Q    Before they came to the main gate, though, where did they come from?

A    Different areas around the prison, A-Cell house, wherever they were assigned that night.

Q    I see. And if that many officers came to your cell from these other areas of the prison and there wasn't a fire, could that potentially have been a safety risk?

A    Yes.

Q    How so?

A    Because there was less officers wherever they were assigned to and other officers had to probably take other keys from them and they'd have to -- there'd only be like a couple, two in like a cell house, and it would cause more of a safety issue for less officers handling all these offenders.

MS. SMITH: I see. No further questions.

MS. PIERCE: Just a few follow-up questions.

Page 247

REDIRECT EXAMINATION

BY MS. PIERCE:

Q    When you say about ten people came, did they come to help with the evacuation or with the fire itself?

A    The evacuation.

Q    Would ten people normally come if you call a fire code?

A    No.

MS. PIERCE: Okay. We're done.

(Signature reserved off the record.)

(Proceedings concluded at 3:20 p.m.)

* * *

Page 248

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA DEVINE, as Personal      )
Representative of the ESTATE     )
OF JOSHUA DEVINE,                )
                                 )
        Plaintiff,               )
                                 )
vs.                              )   Case No.
                                 )   3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,               )
                                 )
        Defendants.              )
_____)

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of two hundred forty-seven (247) typewritten pages, is a true and correct transcript of my said stenographic notes. Signed this 17th day of January, 2020.

_Beth Barnette_

_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires:  6/13/22

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 64 of 82

Page 249

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA DEVINE, as Personal    )
Representative of the ESTATE   )
OF JOSHUA DEVINE,              )
                              )
        Plaintiff,            )
                              )
vs.                           )  Case No.
                              )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,            )
                              )
        Defendants.           )
_____)

JUSTIN RODRIGUEZ

        I hereby acknowledge that I have read the foregoing deposition transcript regarding the above-mentioned matter, taken Monday, November 4, 2019, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the additions or changes, if any, as noted on the attached errata sheet.


                    _____
                    JUSTIN RODRIGUEZ

                    Subscribed and sworn to me this

                    _____day of_____,
                    2020, A.D.


                    _____
                    Notary Public
                    State of_____
                    County of_____
                    My Commission Expires:_____

Page 250

                    DEPOSITION ERRATA SHEET

Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____

SIGNATURE:_____DATE:_____
           JUSTIN RODRIGUEZ
           Date of Deposition:  November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 65 of 82

## A

**A-4s (27)**
95:15;96:11,14,15;
97:2,4,14,15;98:3,8;
115:6,7,8,9;117:25;
118:3;119:5,9,15,22,
22,24;120:6,8;121:15;
166:16;218:12
**Abbassi (68)**
16:4;21:13,18;22:13,
16,19,22;23:12,16;
24:3,23;113:6,14;
115:5,18,19;116:4,21;
118:2;119:4;124:24;
125:7,20;126:5,13;
127:6,12,25;128:12;
131:5;133:16,18;
134:11,13;135:24;
136:5;140:9,14;
141:14,21;142:14;
143:17;148:7;150:8,
10,16,18;154:14,24;
155:16;157:8;165:20;
169:13;176:5,5;180:1;
181:3;190:15,16;
202:25;203:9,25;
204:6,15;205:21;
220:5;236:14;240:15
**Abbassi's (1)**
149:13
**ability (2)**
7:3,8
**ablaze (1)**
234:9
**able (18)**
66:1,3,5,7,8;69:13;
72:24;74:2;75:11;96:2;
108:13,25;109:2;
136:3;138:8,10;
160:19;182:15
**above (1)**
131:25
**accepted (1)**
90:11
**access (1)**
10:20
**accounts (1)**
11:11
**accurate (5)**
7:12;190:8;191:2,5;
198:21
**A-Cell (3)**
28:25;175:21;246:5
**acquainted (1)**
29:19
**acting (1)**
226:22
**action (27)**
27:22;35:5;147:18,
21;169:15,25;170:3,5,
9,19,23;171:2,4,7,10,

13,21;173:24;182:4;
185:8,9;196:16;199:7,
12,15;205:15;210:23
**actions (4)**
149:13;195:9,12,22
**activated (4)**
109:22;111:3;
188:12,21
**activating (1)**
188:17
**Active (1)**
182:22
**activity (3)**
34:8;73:13;100:21
**actual (3)**
45:14;156:22;172:23
**actually (10)**
42:11;43:5,14;55:19;
100:12;147:5;158:24;
190:13;219:24;231:24
**additional (24)**
40:24;41:2;45:23;
46:8;47:7;49:8;108:4,
9;116:22;134:22;
143:22;148:25;157:15;
159:8;175:23;186:3;
192:3,24;193:4;199:1,
15;230:9,15;245:6
**address (19)**
10:5,7,9,12,13,14,16,
21;45:13;46:17;48:6;
49:9,24;50:3;144:5;
148:20;184:24;185:2;
245:9
**addressing (5)**
148:16,22;185:18;
220:19;221:1
**adequate (1)**
93:13
**adult (1)**
175:6
**advise (1)**
87:23
**Affairs (1)**
214:19
**affect (3)**
7:6,7,18
**affects (1)**
7:15
**affirmatively (1)**
49:23
**afraid (1)**
130:7
**aftermath (1)**
113:20
**afterwards (3)**
89:10;158:21;236:20
**again (26)**
18:20;45:4;77:19;
80:5;81:11,12;82:1,16;
83:14;85:9,20;116:24;
132:17;144:10,17;
146:18;157:23;165:3;

166:22;167:17;184:4;
211:16;214:17;229:15;
230:17;240:21
**against (4)**
123:8;131:21;
138:24;148:3
**agency (2)**
210:18,22
**aggressive (5)**
143:7;156:3;157:6,
18;159:21
**ago (2)**
72:20;208:4
**agree (7)**
83:9;143:20;144:8;
169:9,13;219:10;
230:18
**agreed (2)**
4:18;244:24
**ahead (2)**
167:11;221:21
**ahold (1)**
207:10
**aid (1)**
45:3
**alarm (5)**
60:4,16;124:9;
215:16;224:23
**alarms (6)**
60:6,8,10,13,19,21
**alerted (1)**
72:17
**alive (1)**
132:9
**allow (1)**
86:20
**allowed (1)**
96:5
**almost (1)**
69:8
**alternate (2)**
243:16,16
**alternative (1)**
243:20
**always (15)**
6:11;35:17;36:19;
37:12;41:15;44:1;53:5;
56:21;72:13;73:9;87:2;
96:17;99:25;214:4;
229:21
**among (1)**
199:24
**amount (4)**
30:7;41:24;57:1;
191:18
**and/or (1)**
199:8
**anger (1)**
22:1
**angry (1)**
22:9
**announced (7)**
110:8,11;115:22;

120:21,22;236:22;
237:18
**annual (1)**
201:1
**Anthony (1)**
207:16
**Anthony's (1)**
12:2
**anymore (3)**
124:5;213:1;237:23
**apologies (1)**
4:10
**application (2)**
13:24;14:3
**applied (1)**
13:25
**apply (3)**
26:20;31:8,11
**appraisal (2)**
28:6,10
**approach (3)**
147:11;158:23;231:6
**appropriate (2)**
169:15;238:8
**approve (1)**
31:10
**approved (1)**
212:2
**approximately (2)**
193:25;245:21
**April (21)**
19:15;89:20;110:22;
111:16;171:21;172:9;
173:6,7,13;185:24;
186:10;193:24;196:21;
199:11;208:16;211:20;
223:23;224:7;227:21;
228:11;241:9
**area (10)**
29:13;32:9;38:11;
56:1;64:18,19;76:17;
78:25;86:8;110:9
**areas (7)**
28:23;32:7;38:7;
57:3;107:20;246:5,8
**arise (1)**
82:5
**around (13)**
61:11;81:17;82:10;
84:4,15;100:22;115:1;
119:19,20,23;197:11;
216:22;246:5
**arrive (1)**
61:3
**arrived (2)**
31:19;241:9
**aside (4)**
117:6;157:8,9,17
**assessing (1)**
27:20
**assign (6)**
32:9,12;38:19,22;
39:1,6

**assigned (21)**
28:23;32:5;38:7,11;
48:1;61:25;78:25;
83:21;85:16,25;86:1,4,
12,14;107:20;108:19;
126:17;148:18;210:17;
246:6,14
**assignment (3)**
32:15;33:16;239:25
**assignments (1)**
53:8
**assigns (1)**
32:6
**assist (2)**
115:18;245:23
**assume (3)**
6:16;168:10,19
**assumed (1)**
228:22
**attempt (1)**
199:12
**attend (5)**
35:25;36:2,5,8;
174:10
**attention (11)**
57:22;75:3,5;103:11,
14,19,22;104:1;
108:14;166:13;167:20
**August (3)**
9:17,17,18
**authority (1)**
200:8
**automatically (1)**
84:2
**Average (1)**
30:1
**aware (2)**
221:7,10
**away (3)**
17:16;139:6;216:6

## B

**back (50)**
13:12,13;16:10;
18:17;22:25;23:21;
31:25;43:1;61:3;77:24;
80:5;86:16,24;87:1,3,
5;116:13;121:16;
123:7,11;125:4,14;
131:23,24;134:16;
137:17;138:22;140:6,
17,20,22;141:21;
142:20;143:8;146:5;
160:24;166:23;168:16;
190:15,24;196:6,21,23;
201:24;203:1;204:7;
218:17;238:17,21;
243:7
**background (1)**
14:4
**backup (8)**
62:23,25;63:4,6;

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 66 of 82

65:10,14;69:21,23
**bad (2)**
71:23;216:21
**bags (1)**
98:24
**banging (6)**
105:3,6,8,19,23;
106:1
**Barbara (2)**
4:7;206:12
**bars (14)**
105:3,6,8,19,23;
106:1;116:11;146:19,
21,24,25;147:8,11,15
**based (3)**
187:8;234:25;241:2
**basic (3)**
5:13;233:4,17
**basically (10)**
23:23,25;38:8;48:1;
65:16;75:6;82:15;
184:17;203:10;209:1
**basics (2)**
233:22,23
**basing (1)**
154:3
**Bate (1)**
178:10
**Bates (6)**
171:20;186:20;
200:19;210:10;211:16;
214:17
**batteries (6)**
69:18,21,23;70:17;
226:8;243:16
**battery (12)**
69:20;70:2,5,9,14;
71:11,14;72:2,4,7;
244:5,8
**B-Cell (38)**
15:15;16:10;23:5,7,
21;28:25;29:15,20,24;
30:5,11,14;45:21,23;
57:7;58:8;75:6;76:8;
80:22;83:6;101:18;
108:20,23;109:6;
113:5;115:23;117:3;
135:3;141:7;159:5;
172:8;176:1;188:24;
201:16,22,24;202:7;
237:18
**BCH (2)**
218:10,14
**Beal (1)**
206:23
**bed (1)**
181:22
**Bedford (1)**
19:4
**beep (4)**
72:25;73:2,4;241:19
**beeps (1)**
241:17

**began (1)**
217:9
**beginning (8)**
41:23;47:14;61:19;
70:23;83:10;130:21;
146:16;172:14
**behavior (1)**
160:6
**behind (2)**
90:21,25
**believable (1)**
150:12
**Below (2)**
200:24;218:21
**belt (1)**
41:5
**besides (7)**
11:16;14:18;15:1;
36:6;44:4;69:12;
162:16
**best (1)**
208:19
**better (4)**
18:25;34:19;182:8;
185:14
**beyond (8)**
22:13;40:16;44:17;
107:15,19;108:9;
152:12;205:12
**big (13)**
46:2;57:5;68:25;
69:10;93:16;115:14;
123:10;131:22;144:1,
23;145:14;168:6,11
**bigger (4)**
9:21;145:22,25;
230:18
**bit (8)**
34:19;43:1;72:16;
136:2;185:17;191:11;
219:19;233:21
**Blakely (69)**
16:4;21:16,19,20,22;
113:5,15;115:5,17,24;
116:3,21;118:2;119:4;
124:25;125:7;126:17;
127:5,24;128:11;
131:4;133:16;135:7;
139:25;140:2,6,8;
141:25;142:6,6,15,19;
147:24;148:11,24;
149:12,23;150:13;
154:17,24;155:10,11;
157:7;159:7;163:1,8,
18,24;165:4,20;
169:14;176:21;180:10;
181:6;190:16;197:6;
202:25;203:9,25;
204:1,8,13,25;205:10,
18,21;220:5;236:13;
240:16
**Blakely's (1)**
193:18

**blanket (3)**
138:24,25;139:2
**block (1)**
245:22
**board (6)**
52:13,19,22,25;
53:14,16
**book (4)**
53:17;99:15,17,18
**boots (1)**
31:22
**Bootz (1)**
200:22
**boring (1)**
15:10
**born (4)**
173:8,10,12,15
**borrow (1)**
244:13
**both (7)**
20:6;127:20;130:22;
144:6;150:25;165:9;
205:22
**bother (1)**
240:11
**bottom (3)**
189:24;216:15,18
**box (7)**
62:14,17,18,21,23;
116:8;128:19
**boxes (1)**
123:7
**Boyan (1)**
179:3
**break (10)**
6:22,25;91:13,16;
160:21;186:13;201:12;
220:12;243:5,10
**breakfast (3)**
180:15,17;181:2
**breathe (2)**
129:8;156:12
**breathing (2)**
129:15;156:18
**Brief (6)**
91:17;160:22;
186:15;201:13;220:13;
243:6
**briefly (2)**
220:15;225:6
**bring (13)**
80:8;82:1;88:21,24;
89:3,8,12,16;128:23;
133:7,16;135:23;148:7
**bringing (1)**
80:5
**brought (4)**
112:7;133:23;135:5;
183:10
**Brown (2)**
179:15;215:25
**buffer (1)**
138:2

**building (1)**
233:21
**bunch (1)**
160:12
**Burke (1)**
178:14
**burning (1)**
138:16
**busy (1)**
73:11
**button (2)**
74:6;241:16

**C**

**C/O (1)**
104:4
**call (24)**
48:7;49:12;50:6,17;
52:22;70:15,20;88:10,
17;89:16;101:5,5;
109:25;115:17,20;
125:8,20;127:15;
144:3,6;151:15;230:8,
15;247:7
**called (25)**
4:2;32:10;63:13,23;
88:18,22;92:21,23,25;
110:13;115:21;117:10;
118:4;127:4,17;
161:17;163:8;169:25;
177:11;182:23;185:3;
190:19;191:13;202:25;
223:18
**calling (11)**
68:14;124:24;
149:25;155:9;162:25;
163:4,7,17;190:16;
203:3;226:7
**Calloway (1)**
211:20
**calls (4)**
4:14,16;127:21;
230:23
**came (57)**
23:1;89:2;97:5;
115:4,19;116:6,13,23;
117:15,19,23;118:4,11,
15,19;120:12;125:16,
20;126:6;127:12;
129:17;130:10,15;
133:6,11;137:2,5,7,16;
138:22;139:25;140:6,
17;141:9;142:17;
150:18;151:4;153:7;
157:16;166:5;175:23;
184:23;190:24;205:1;
215:15,20;216:5,9,22;
217:1;236:20;237:20;
241:1;245:22;246:3,7;
247:3
**camera (3)**
77:9;154:6;218:12

**cameras (7)**
75:24;76:4,8,22;
77:7;154:5;193:13
**can (42)**
6:8,21,25;8:18;
19:10,10;22:18;25:18;
71:18;72:24;73:1;
85:16;86:16,17,18;
160:20;166:7,21,22,25;
167:11;169:11;173:2;
180:2;185:16;196:11,
25;199:4;203:5,10;
205:6;208:19;212:7,
10,12;213:7;214:4;
220:9;225:3;230:25;
238:16,17
**capable (1)**
33:12
**capacity (1)**
4:8
**captain (36)**
27:23;33:20;36:14,
15,16,25;37:3,15,18;
68:5;80:13;96:8,22;
117:9,9;136:15,17;
151:19,24;152:7,11;
153:6;174:7,8;176:19;
179:3;187:6,11,14;
188:2;189:22;191:17;
211:19;213:11,12,20
**captain's (3)**
63:1;65:17;68:15
**cardboard (4)**
137:18,20,22;138:6
**care (3)**
7:2;20:1;99:24
**careful (1)**
35:16
**carry (1)**
136:3
**case (15)**
4:15;44:12;47:6;
48:22;52:14;82:8;
90:22;185:20;207:11,
12;227:17;230:12;
234:4;240:10;244:23
**Caucasian (1)**
159:25
**cause (6)**
158:11;228:24;
229:9;231:3;239:1;
246:17
**caused (1)**
228:20
**causing (1)**
158:17
**CBT's (1)**
201:1
**C-Cell (5)**
28:25;89:23;111:1;
224:4,5
**ceiling (3)**
132:2,3,5

**BOSS REPORTERS
(219) 769-9090**

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 67 of 82

JUSTIN RODRIGUEZ
November 4, 2019

**cell (139)**
9:22,24;40:18;43:24,
24;47:4,22;48:16;
51:11,14,16,19,24;
52:6,23;54:15,21,23;
55:4,12,14,18;56:5,24;
57:2,5,7,20,23;60:22;
61:3,11;62:12;63:13,
23;64:8;65:11;69:23;
70:6,15;77:13,16;
78:12,14;79:8,10,13,
16,25;82:17,19,25;
84:4,6,10,21;86:10;
89:22;90:23;95:23;
96:1,12;99:6;100:21;
102:5,22;104:2;
107:17;109:8;110:5,
18,24;111:5;115:13,
14;116:2,9;118:11,19,
24;119:1;123:9;127:3;
129:12;130:15;131:14,
14,19,21;132:3,4,6,18;
133:25;134:5,16;
137:1;138:4,24;142:5;
148:22;156:16;158:6;
166:13,17;169:6,10;
190:14,19,24;199:8,9,
10,13;202:12;215:7,
25;216:12,22,24;
217:6;218:24;219:18;
222:9,11;224:3;226:7;
234:16;235:6;238:10;
239:2;241:1,2,5;
244:14,16;245:22;
246:8,17
**cells (8)**
46:12,22;48:3;78:4;
104:3;222:6,22;223:25
**chain (4)**
213:4,7;214:6,9
**Chambers (2)**
178:3;180:2
**chance (5)**
188:1;195:3,25;
196:13;198:18
**change (4)**
56:18;79:21;80:3,18
**changed (1)**
93:24
**changes (3)**
111:2;186:9;245:12
**charge (61)**
27:20;29:7,11;32:17,
19,23;33:4,10,14;
38:18,21;39:1,22,24;
40:9,12,15;56:7,10;
57:25;58:3;61:25;62:3,
22;63:17,18,20,22;
64:2,6,8;65:6;67:1;
69:19;71:16,25;72:3,
12,13;76:14,19,21;
94:18;99:8,12,22;
110:3;142:7;183:14;

200:2,5,8;213:8,10,15,
25;214:1;227:22;
228:1,4,8
**charged (1)**
71:11
**charger (2)**
71:17,21
**charge's (1)**
76:16
**charging (6)**
64:22;65:2;71:17,18,
24;225:8
**check (59)**
14:4;31:24;32:11,11;
34:12;38:8;56:12,14;
58:2,4;59:1;61:12;
70:23;71:4;76:24;79:5,
12,15;80:11,14,15;
81:6;83:20,24;84:16,
21;85:8,13;86:2,9;
87:15,21;88:5;94:24;
95:1,4,7,12,13,15,22;
96:1,3,4,14,22;104:24;
105:2,12,18,22;106:8,
23;107:3,22;115:1;
197:11,14,16
**checked (3)**
32:6;58:12;95:2
**checking (10)**
56:7,10;57:10,24;
58:14,19,24;80:7;
98:23;166:16
**Checkpoint (1)**
117:3
**checkpoints (1)**
111:13
**checks (26)**
34:16,25;35:3,6;
61:8,14,21;77:21;78:3;
79:8;80:4,7;81:23;
82:6;83:7,11;84:25;
85:17;86:7;87:8;
107:16,19;108:1,9,10;
211:4
**chip (3)**
225:15,18,20
**chow (2)**
73:12;77:23
**Chris (1)**
216:13
**Christopher (2)**
206:23;207:20
**circumstance (1)**
106:2
**circumstances (1)**
68:18
**city (1)**
9:9
**clarification (1)**
6:16
**clarify (5)**
76:3;91:3;107:23;
160:24;240:23

**clarity (1)**
105:16
**class (7)**
229:7;233:5,8,24;
234:12,14,19
**classes (14)**
11:25;12:1,23,24;
229:6,14;232:8,10,13,
16,18,25;233:1,3
**classroom (4)**
43:4;47:16,16;59:5
**classroom-based (2)**
43:18,19
**clause (1)**
210:22
**clear (7)**
26:8;147:17;148:6;
172:22;208:23;209:21;
210:18
**cleared (5)**
117:16,18;120:17,
19,22
**close (2)**
147:14;220:11
**closed (2)**
121:14;218:14
**closely (1)**
37:15
**closer (3)**
19:19;160:18,18
**clothes (1)**
44:10
**code (5)**
45:22;110:13;
127:15,21;247:8
**codes (1)**
187:2
**college (3)**
11:24;232:12,14
**color-coded (1)**
53:6
**coming (8)**
22:25;97:11;126:13;
132:1,3,5;160:13;
203:11
**command (6)**
213:4,7,16;214:3,7,9
**commands (1)**
213:15
**comments (1)**
155:21
**common (13)**
31:7;34:23;39:18;
66:10;74:20;80:20;
168:22;179:21,23;
213:12;221:4,7,17
**commotion (2)**
107:8,11
**commotions (1)**
107:22
**communicate (1)**
74:24
**communication (2)**

182:9,11
**company (1)**
20:1
**complaint (2)**
100:10,11
**complaints (3)**
26:24;27:3,14
**complete (3)**
12:5;191:3,6
**completed (2)**
12:10;200:25
**completely (1)**
195:25
**complies (19)**
172:3;187:25;189:4,
20;190:6;193:16;
194:21;195:2,16,21;
196:7,12;198:7,17;
199:5,20;211:25;
218:5,18
**components (1)**
44:3
**computer (13)**
77:3;95:14,17,18,19,
20;96:3,14;97:15,17;
98:4,5;243:5
**computers (3)**
97:20;98:11,13
**concern (5)**
81:22;108:12,16;
166:1;213:18
**concerned (2)**
166:15;240:20
**concerning (2)**
166:8;227:4
**concerns (13)**
81:25;82:5,14;83:4;
89:7,11,11;93:20;94:3,
14,18;214:7,10
**concluded (1)**
247:13
**condition (3)**
7:6,7,15
**conducted (1)**
4:22
**confer (1)**
220:12
**conference (21)**
97:18;113:7,12;
114:3;115:7;117:12;
118:1,18,20;119:21;
153:8,14;154:25;
155:8;164:7,8;236:13,
22;237:16;239:17,19
**confident (2)**
227:24;228:4
**confirm (1)**
61:20
**confrontation (1)**
161:8
**confrontations (2)**
161:1,12
**confused (2)**

167:8,13
**connected (1)**
11:9
**consider (1)**
78:17
**consistent (3)**
84:14,20;87:11
**construction (1)**
233:21
**contact (1)**
245:12
**context (5)**
170:22;171:12;
222:2,23;223:13
**continue (3)**
11:22;238:7;244:7
**continued (1)**
243:22
**control (24)**
45:16,20,21;46:1,3,
6;49:1,12;50:6,17;
110:1,6,8,11,14;
115:21,22;127:4;
183:3;184:25;185:2,3;
199:24;200:1
**conversation (11)**
22:19;23:15;24:3;
113:17,19;155:5;
177:21;208:18;209:5;
222:24;237:4
**conversations (12)**
7:24;24:11,17;67:4;
102:9;113:2;114:16;
154:20,23;155:6,22;
158:8
**cook (1)**
13:5
**cooled (1)**
113:7
**copies (3)**
92:13,15,17
**corner (1)**
210:10
**correction (2)**
14:17;214:19
**Correctional (5)**
13:22;14:21;17:5;
33:1;43:15
**correctly (2)**
46:19;235:24
**counsel (12)**
4:13,17;6:21;7:20,
25;8:3,5,16;198:12;
201:17;244:24;245:8
**Counseling (3)**
210:11,20;211:3
**counselor (5)**
27:8,11,12;235:12;
236:5
**counselors (2)**
98:15,16
**counselor's (10)**
96:4,6;98:4,6,13,17;

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.
Cause No. 3:18-cv-00995-JD-MGG
USDC, IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 68 of 82
JUSTIN RODRIGUEZ
November 4, 2019

121:13;125:17;151:4;
169:14
**count (9)**
101:25;115:3,4;
117:16,16,18;120:17,
19,22
**couple (37)**
8:8;17:2;24:25;
32:20;42:23,25;43:21;
44:6;47:17,17;55:20;
61:7;65:19,25;72:9,20,
21;77:1,2;80:19;96:16;
98:24;114:15;115:4;
121:22;122:13,14,18;
134:7;147:16,17;
150:17;157:11;180:21,
25;219:25;246:16
**course (7)**
12:5,10,14;233:18;
234:23;235:1,8
**courses (1)**
232:12
**court (9)**
5:6,22;6:3,7;16:20;
18:2;152:23;167:16;
243:4
**covered (3)**
59:9;123:11;234:13
**covering (1)**
131:24
**coworkers (3)**
180:13;181:14;
237:13
**cranes (1)**
19:10
**crazy (5)**
113:18;155:4,5;
209:9,10
**create (1)**
81:22
**creates (2)**
87:14;230:18
**crime (1)**
5:20
**CROSS (1)**
245:19
**crying (3)**
106:22,25;107:4
**Crystal (1)**
206:14
**CSX (1)**
19:3
**curious (1)**
165:16
**current (2)**
9:5;17:15
**Curry (1)**
174:14
**custody (1)**
218:12
**cut (1)**
124:25

# D

**daily (1)**
239:21
**damages (1)**
245:2
**date (7)**
29:8;89:17;100:5;
110:21;187:18;193:24;
210:13
**daughter (4)**
173:8,9,12,15
**David (2)**
58:9;79:23
**day (38)**
28:16,19,22;29:8;
33:23;34:2,6,21,22;
35:10;36:4;38:10,12;
43:21;60:9,11;61:4;
70:5;99:23;112:6;
113:4;124:17;159:17;
191:15;193:8,10;
236:23;237:17;238:9;
239:20;240:3;241:13,
19,23;242:4,6,13,14
**days (2)**
34:19;193:5
**D-Cell (6)**
159:2,16,18;180:22,
24;222:12
**deadline (5)**
97:7,10;119:17,18;
120:9
**deadline's (1)**
97:11
**deal (2)**
25:23;66:20
**dealt (1)**
27:15
**death (12)**
15:11,12,14,24;
16:24;20:10,19,23;
21:3,6;22:10,12
**decide (4)**
33:3;38:21;83:13;
200:8
**deciding (2)**
27:21;78:17
**decision (1)**
80:10
**decreased (1)**
82:8
**defend (2)**
42:24;44:6
**defendant (1)**
244:25
**Defendants (1)**
4:2
**Defendant's (7)**
171:17;186:16;
197:20;200:16;210:6;
211:13;214:14

**defense (2)**
4:17;201:16
**deliver (2)**
19:8,9
**Delivering (1)**
20:9
**department (5)**
188:12,18,21;
214:18;233:13
**depend (2)**
75:12;99:9
**Depending (3)**
73:11;75:7;79:22
**depends (3)**
57:5;79:10;83:9
**deploy (1)**
182:23
**deposition (12)**
4:22;5:4,14,20;7:21,
25;8:12,20,21;9:3,6;
244:23
**depressed (1)**
82:10
**described (1)**
239:21
**description (2)**
187:23;188:6
**detail (3)**
192:19,24;193:2
**detailed (1)**
192:15
**details (3)**
162:22;193:4;209:2
**detector (1)**
31:23
**determined (1)**
218:20
**development (2)**
174:18;175:1
**Devine (21)**
4:8;15:19;125:2;
127:3;128:16;129:21,
25;132:7;133:2,4;
138:20;158:1,4;
189:14;190:14;199:8,
12;200:19;206:7,12,14
**Devine's (6)**
4:9;22:10;206:17;
234:16;235:6;241:1
**die (4)**
15:17,19;143:6;
239:2
**died (1)**
208:22
**dies (1)**
238:9
**different (12)**
37:6;57:1,2,3;69:20;
71:12;72:2,3;137:1;
160:12;224:3;246:5
**differently (3)**
196:23;197:2,5
**Dillon (1)**

178:12
**DIRECT (2)**
5:1;36:13
**directed (1)**
48:22
**direction (1)**
213:13
**directly (5)**
25:11;26:9;27:9;
35:2;136:17
**director (2)**
174:17,25
**disagree (1)**
219:12
**disciplinary (2)**
35:5;210:23
**discipline (1)**
212:12
**disciplined (5)**
27:24;210:1;211:9;
212:14,17
**disciplining (1)**
212:1
**discovery (3)**
4:15,19;201:17
**discuss (16)**
34:6;35:14;113:22;
114:7;149:21;151:23;
152:1,4,18;169:19;
177:19;195:9;209:7,
15;214:10;238:4
**discussed (9)**
112:4;149:14,17;
152:21;153:2;171:13;
208:5;213:21;225:6
**discusses (2)**
171:3;215:12
**discussing (2)**
4:14;240:14
**discussion (3)**
152:11;172:11;240:2
**discussions (1)**
155:18
**dismissal (1)**
210:24
**dismissed (1)**
182:5
**dispute (7)**
188:8;215:19,22;
216:7;217:2,11;240:24
**dissatisfaction (1)**
28:3
**distributed (1)**
62:7
**divided (1)**
197:13
**Division (1)**
214:19
**DOC (1)**
100:5
**document (13)**
100:16;171:24;
172:4;173:7;186:14,

25;189:21;194:23;
197:23;200:14;211:17,
24;214:23
**documentation (1)**
84:11
**documents (3)**
4:20;8:19;112:1
**done (35)**
74:18;79:19,20;80:2,
9,12,22;81:23;82:3,6;
84:24;85:3,10,21;97:7;
98:10,20;119:12,16;
120:6,8;144:18,25;
186:2,4;191:19;193:8;
196:22;197:1;237:23;
238:5;242:2,9;245:16;
247:10
**door (67)**
62:4;75:11;82:17,19,
21,23,25;88:7;90:6,14,
16;96:13;109:12;
115:24;118:4,7,9,13,
16,17,18,20;121:4,6,
14;123:9;128:5;
130:18;131:8,16,21;
136:23;137:12,13,20,
23;138:1,4,24;142:10,
12,19;143:21;144:19;
145:1,4,4,7,9;146:8,15;
147:2,6,18;148:4;
149:2,4;199:9;202:7;
204:2,18,22;205:7,13;
218:10,14,14
**doors (5)**
55:2;119:21;121:9;
139:14;147:3
**down (57)**
5:23;6:8;40:2;78:21;
80:8;82:1;86:18;87:1;
113:7;115:15,17;
116:4,9,12;125:6,12,
14;126:5;127:6,7,25;
128:6;129:11,19;
130:22;131:6,14;
134:8,11;135:7;
137:14;139:18;140:2,
3,17,20,22;141:21,24;
142:20;143:14;144:8,
15;148:7,12;149:19;
160:17;170:24;203:1;
213:14;215:13,15,20;
216:14,22;217:8;244:5
**Downstairs (2)**
89:4;147:24
**drill (3)**
59:13,18,23
**drills (4)**
60:1;185:8,11;186:3
**drive (3)**
19:8,20,21
**driver (2)**
19:6,7
**drove (1)**

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.
Cause No. 3:18-cv-00995-JD-MGG
USDC, IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 69 of 82
JUSTIN RODRIGUEZ
November 4, 2019

237:6
**drug (1)**
  14:4
**drugs (2)**
  81:16;228:16
**due (3)**
  97:2;119:25;120:2
**duly (1)**
  4:3
**Dunn (1)**
  217:6
**During (34)**
  4:15;34:2,5;35:10;
  43:20;47:15,15,19;
  49:17;52:15;59:5;
  73:14;78:13;82:8;92:8;
  113:22,25;124:19;
  155:19;160:6;162:9;
  172:12;175:24;182:23;
  183:1;195:10,13,22;
  234:5;236:9;238:9;
  240:3;243:15;244:22
**Dustin (4)**
  176:23,25;216:13;
  217:7
**duties (2)**
  33:13;77:18
**duty (5)**
  96:1,18;102:22;
  104:16;243:23
**Dykstra (20)**
  36:14,15,16;37:3,16,
  19;68:5;117:10;
  151:24;152:7,11;
  153:7;174:8;176:19;
  187:6,11,14;188:2;
  189:23;191:17
**Dykstra's (1)**
  151:19

## E

**earlier (8)**
  80:6;209:25;212:10;
  213:22;220:15;225:6;
  235:19;239:22
**ease (1)**
  6:3
**easier (1)**
  30:20
**East (1)**
  11:21
**easy (1)**
  121:3
**easy-going (1)**
  158:14
**echo (1)**
  219:22
**education (1)**
  11:22
**effective (1)**
  93:11
**effort (1)**

126:22
**either (7)**
  78:6,10;79:14,18;
  128:11;131:7;233:25
**electrical (2)**
  221:10,14
**electronic (5)**
  116:8;128:19;
  130:20;145:4,7
**else (44)**
  8:11;20:4;22:12;
  32:22;52:3;54:7;55:18;
  66:5;77:3;86:3;90:17;
  94:17;98:10;99:19;
  112:13;114:6,21;
  117:8,13;131:2;
  136:25;141:6,9;144:4;
  151:2;153:11;160:5;
  162:15;181:3;182:1,
  16,20;189:1;197:5,8;
  199:17;200:7;209:18,
  24;233:20;235:3;
  236:17;238:4;239:14
**else's (1)**
  244:13
**E-mail (13)**
  10:5,7,9,12,13,14,16,
  20;94:21;95:7,10,12;
  200:22
**E-mails (1)**
  95:16
**emergencies (8)**
  44:20,22;45:1;
  148:17;162:12;184:17;
  185:23;187:3
**emergency (18)**
  44:23;54:12;88:7;
  89:13;109:16,19;
  168:4;169:3,7,11;
  182:9,23;185:11,20;
  186:3;227:19;228:9;
  238:9
**employees (1)**
  9:6
**employment (1)**
  13:23
**EMT (18)**
  11:24;12:1,5,7,9,14,
  16,19,23;229:6,14,14,
  19;231:20,24;232:2,6,6
**end (9)**
  9:16,16,18;61:19;
  75:9;123:12;167:20;
  215:13;220:11
**ended (1)**
  12:11
**engaged (1)**
  4:14
**enough (5)**
  34:25;35:3,6;65:13;
  212:25
**enter (1)**
  161:13

**entire (4)**
  76:24;84:21;85:12;
  197:15
**entirely (1)**
  228:13
**entirety (2)**
  208:18;209:4
**equipment (5)**
  38:8,14,15;55:10;
  61:6
**escorting (2)**
  77:25;157:5
**especially (1)**
  82:7
**estate (1)**
  4:9
**evacuate (5)**
  54:15,21,23;161:3;
  162:21
**evacuated (1)**
  157:3
**evacuating (3)**
  156:1,23;161:14
**evacuation (8)**
  54:17,25;161:6,7;
  175:24;178:6;247:4,6
**evacuations (2)**
  234:5,7
**evaluation (1)**
  28:13
**even (8)**
  144:17;146:15,20;
  151:4;172:22,24;
  193:19;220:8
**event (9)**
  68:19;168:11,20;
  173:17,18,20;185:15;
  187:24;208:16
**events (1)**
  169:24
**Everybody (5)**
  69:6;86:10;162:21;
  165:14,17
**everybody's (1)**
  84:7
**everyone (17)**
  33:21;66:17;77:20,
  21;81:11,12;95:14;
  119:24;122:5;126:24;
  130:4;180:2;215:16;
  216:4;227:14;237:20;
  240:21
**everyone's (1)**
  172:6
**everywhere (4)**
  51:17;111:7;129:18,
  23
**exactly (1)**
  137:25
**exam (2)**
  12:11,16
**EXAMINATION (3)**
  5:1;245:19;247:1

**examined (1)**
  4:3
**example (2)**
  100:14;213:21
**exams (1)**
  12:19
**except (1)**
  209:22
**exceptions (1)**
  90:19
**executive (3)**
  174:17,25;175:6
**Exhibit (17)**
  171:16,17;186:14,
  16,20;197:19,20;
  200:15,16;210:5,6,9;
  211:12,13;214:13,14,
  17
**exit (4)**
  26:12,12,14,15
**exits (1)**
  54:20
**expand (1)**
  185:16
**expanded (2)**
  116:11;146:19
**expanding (2)**
  146:24;147:1
**expect (3)**
  126:11,13;245:10
**expecting (1)**
  245:3
**experience (14)**
  29:3;33:6,9;38:24;
  39:2,3,12;108:22,25;
  109:4,5,7;229:4,12
**expert (3)**
  230:23,24;238:14
**expertise (1)**
  238:13
**explain (2)**
  41:19;213:7
**explained (1)**
  41:22
**explanation (1)**
  193:2
**express (2)**
  108:12;214:7
**expressed (1)**
  108:17
**extent (2)**
  230:23;231:24
**extinguisher (8)**
  45:18;48:15;50:10,
  13,16,19;55:7;206:5
**extinguishers (41)**
  55:12,17;56:4,8,11,
  15,18;57:11,24;58:4,
  11,24;59:10;116:13;
  132:21;133:7,10,14,17;
  134:3,6,9;135:5,11,14,
  17,20;136:1,8;137:10,
  15;138:23;139:11;

140:15,21,23;141:15,
  17,22;234:24,25
**extra (9)**
  65:21;66:16,18;68:9;
  70:17,17;226:8,8;
  229:25
**extract (1)**
  183:2
**eye (5)**
  42:21;76:13,14,22,
  23

## F

**face (1)**
  160:1
**Facebook (3)**
  10:25;11:2,10
**faces (4)**
  156:6;159:1,19;
  161:5
**face-to-face (1)**
  14:11
**facilitating (1)**
  220:23
**facilities (1)**
  15:1
**facility (2)**
  119:20;175:6
**facing (1)**
  218:12
**fact (5)**
  58:20;156:11;166:7;
  182:14;224:16
**Fahey (1)**
  176:9
**failing (1)**
  12:11
**fair (2)**
  6:19;245:14
**fairly (1)**
  162:3
**fake (1)**
  90:22
**faking (1)**
  88:1
**familiar (2)**
  221:4,10
**familiarity (2)**
  241:2,5
**family (4)**
  82:11;114:10;
  206:17;208:2
**far (22)**
  19:19,21;22:21;26:5;
  44:22;49:5;51:11;53:1;
  54:20;75:9;82:9;99:1;
  112:24;117:4;144:23;
  147:15;154:4;183:6;
  200:10;232:6,6;238:22
**fast (1)**
  191:9
**faster (2)**

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 70 of 82

JUSTIN RODRIGUEZ
November 4, 2019

163:22,23
**fault (1)**
22:5
**FedEx (2)**
20:5,8
**feedback (1)**
236:18
**feel (12)**
20:15;25:20;33:8,8,
12;94:9;163:10;187:1;
191:10,12;227:24;
240:7
**feet (2)**
147:16,17
**felt (4)**
29:19;228:3;240:5,9
**few (9)**
45:7;66:12;122:5,11;
180:16;195:19;196:11;
198:15;246:22
**fights (1)**
34:8
**figure (1)**
230:15
**file (3)**
26:23;93:6,8
**filed (2)**
27:2;209:23
**fill (8)**
26:11;99:25;102:11,
19,24;103:4;117:11;
227:3
**filling (3)**
99:8;102:14;103:1
**finally (2)**
122:7;125:16
**financial (1)**
245:2
**find (9)**
65:13,15;70:4,9;
87:19,20;243:15,19;
244:8
**finish (12)**
6:4,6;12:14;16:21;
24:21;52:16;105:14;
115:6;152:24;161:10;
168:13;245:7
**finished (1)**
81:1
**fire (318)**
22:9;23:8,10,13,17;
24:24;35:22;45:6,10,
12,13,14,15,16,18,20;
46:2,2,4,17,20,25;47:3,
6,25;48:7,11,15,22,25;
49:2,9,12,13,24;50:4,9,
13,15,19,20;51:22;
52:15;55:7,10,12,17;
56:4,7,10,14,17;57:10,
12,24;58:4,10,24;
59:10,12,17,23,25;
60:4,6,8,9,10,11,13,16,
19,21;89:20;109:25;

110:9,13,14;111:16,18,
25;112:2,5,5,6,14,21,
23;113:3,22;114:1,7,
11,13,17,22,25;115:10,
11,14,20,21,23;116:12;
117:3;122:20,21;
123:8,10;124:9;125:8,
21,24,25;126:15,25;
127:15,21;128:25;
131:20,22;132:7,21,25;
133:7,10,14,17;134:2,
6,8;135:5,11,14,17,20;
136:1,7;137:10,15;
138:23;139:6,10;
140:15,21,22;141:3,17,
22;144:1,5,23;145:10,
14,21,21,25;146:5,17;
147:25;148:12,15;
149:13;150:20,24;
151:18,23;152:8;
153:2;155:1,19;157:1,
21,24;158:2,9,21,23;
160:6,8,16;161:2,13;
162:5,9,17;169:19;
172:8,12;175:22;
177:19;181:17,18,23;
182:11;183:11;184:23;
185:8,10,24;186:3,4,7,
10;187:4;188:3,12,18,
21;190:14;192:7;
193:5;195:10,13,23;
196:17,24;197:10;
199:10;202:17;206:5;
208:17,21;209:3;
211:7;216:4,4,8,8;
217:9;218:25;219:2,7;
222:5,15;223:10,13,18,
20,23;224:1,8,13,16,
19,21,22,23;228:11,20,
24;229:2,4,5,7,9,12,13,
15,21,23,24;230:6,12,
13,16,19,21;231:6,9,
10,15,18,22;232:4,7,
10,13,16,19,21;233:3,
4,5,6,12,16,17,19,24;
234:2,3,4,6,9,12,15,20,
23,24,25;235:6,12,15,
21;236:2;237:11;
238:1;239:6,9;240:2,
11,15;241:20;245:21;
246:9;247:5,8
**firefighters (20)**
46:21;47:21;51:8,15,
16,17;52:5;53:1;
109:22,23;110:10,17;
116:15,16;135:2;
183:19;188:23;223:25;
224:10,25
**firehouse (4)**
51:20;111:10,12;
142:5
**firemen (9)**
46:8,9,11;47:25;

48:8;51:23;52:20;
111:3,6
**fires (9)**
54:11;60:25;221:17,
19;222:2,20;229:17,
20;233:7
**first (41)**
4:2;8:8;12:25;13:14;
29:6;38:14;39:25;45:3;
49:1;92:8;122:5,22;
133:11;139:16;146:2,
4,17;147:11;161:13;
172:14;182:8,15;
183:14,17,20,25;184:7,
11;185:19,19;186:21;
190:23;193:24;199:6;
200:24;202:11;211:19;
217:1,5;218:6;229:24
**fit (1)**
18:5
**five (24)**
8:8;13:8;39:13;48:2;
60:14,15;76:25;83:22;
91:13;120:18,23;
121:23,24;139:17;
160:21;212:13,19;
217:10,19,21;218:2;
220:11;240:25;244:3
**five-minute (1)**
201:12
**five-six (1)**
159:25
**Fizer (1)**
179:17
**flames (1)**
216:21
**flash (1)**
218:24
**floor (5)**
55:22,23,24;88:12;
202:11
**focused (3)**
166:11;238:22;
240:21
**follow (1)**
213:3
**followed (1)**
12:12
**following (1)**
147:23
**follows (1)**
4:4
**follow-up (1)**
246:22
**form (3)**
210:13;211:1;226:1
**former (1)**
9:5
**forward (1)**
245:10
**found (2)**
120:10;228:23
**foundation (1)**

230:24
**four (8)**
39:13;48:2;64:19;
83:22;97:21;159:13;
182:7;212:5
**four-page (1)**
211:17
**four-week (3)**
44:21;47:8;91:19
**frame (1)**
202:4
**Frank (1)**
29:1
**freight (2)**
19:9,11
**frequent (2)**
57:19;101:16
**frequently (12)**
29:14;30:25;34:25;
35:3,6;79:20;80:3,11,
18,19,22;96:15
**friends (5)**
114:10,15;237:5,10,
13
**Fritter (1)**
178:20
**front (31)**
62:4;65:16;75:2;
87:3;109:12;116:8;
117:21;118:4;121:4,6;
125:11;128:16,17,18;
129:1;132:17;134:14,
15,18;140:9,12;
142:10;201:24,25;
202:7;203:15;204:18;
205:7,13;222:5,22
**front's (1)**
87:6
**froze (1)**
203:20
**full (6)**
7:11;66:17;79:16;
191:21;209:1;218:6
**fully (1)**
238:25
**functional (2)**
71:7,9
**functioning (4)**
74:1;226:5;227:14,
16
**further (3)**
214:2,6;246:20
**future (3)**
162:13;185:15;
210:21

**G**

**game (1)**
168:7
**Gann (3)**
176:15,17;206:19
**gaps (1)**

93:16
**gate (20)**
40:4,6,11,13,19,24;
41:2,11;46:7;75:3;
87:23,24;88:2;115:25;
117:22,23;128:4;
218:13;246:2,3
**gated (2)**
121:12,12
**gates (2)**
62:15;86:16
**gather (1)**
191:15
**Gave (16)**
63:17;101:4;115:25;
132:23;136:11;139:10,
21;141:17;148:7;
150:18;164:3;165:8,
11;169:20;218:10;
228:5
**gear (1)**
51:21
**general (3)**
53:2;95:20;242:1
**generally (12)**
33:17;34:10;37:12;
54:5;78:7;80:21;
101:18;108:17;109:9;
158:13;171:6;213:19
**generic (1)**
35:19
**gets (2)**
38:19;200:6
**girlfriend (3)**
114:14;181:25;208:6
**given (16)**
5:6;60:3;61:4;77:14;
102:17;103:17;106:16;
108:2,4,8;147:19;
182:5;184:6,19;187:9;
212:12
**giving (1)**
6:4
**glove (1)**
138:11
**gloves (1)**
138:7
**goes (1)**
215:11
**good (7)**
18:5;59:2;71:23;
236:21;237:6,8,22
**grab (2)**
41:25;138:5
**graduate (1)**
11:18
**graduated (1)**
12:22
**greater (1)**
230:14
**green (1)**
71:22
**grievance (3)**

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 71 of 82

27:10,18,22
**grievances (4)**
26:24;27:3,14,21
**Griffin (1)**
206:25
**ground (2)**
19:6;87:22
**Group (5)**
37:6,10,13;183:24;
184:3
**guard (2)**
210:17,21
**guess (20)**
13:9;18:11;21:8;
34:20;38:23;42:22;
52:21;66:17;73:11;
85:23;95:5;113:21;
116:10,10;117:2;
129:6;151:7;167:21;
183:4;236:4
**guns (1)**
183:8
**guy (3)**
21:14;88:11;158:25
**guys (10)**
47:24;118:5;120:13;
136:7;143:6;152:15;
187:9;197:10;237:7,9

### H

**half (5)**
80:1,15;82:2;211:6;
225:2
**halfway (1)**
125:15
**hall (1)**
218:12
**hand (10)**
78:23;129:17;
142:13;197:19;200:14;
203:21;206:4;210:5;
211:11;214:12
**handed (11)**
130:19,23;131:10;
141:20;142:11,14,15,
16,19;203:25;204:1
**handful (3)**
95:2;242:24;243:11
**hand-held (1)**
71:12
**handing (1)**
186:19
**handle (6)**
157:9;229:17,20;
231:7;233:7,15
**handled (1)**
117:6
**handling (2)**
33:12;246:18
**hang (1)**
43:22
**happen (12)**

6:11;20:19;58:6;
63:22;65:18;73:1;88:4;
106:7;107:6,13;
153:11;220:17
**happened (68)**
15:15;25:21;35:10;
66:12;80:19;88:8,13;
89:15,19,21,24;106:3,
4;110:25;112:9;
113:22;114:7,19;
117:11;119:3;124:21,
22;131:13;141:11;
148:20;149:15,16,18;
151:11,17;152:12;
155:7,19,22;161:24,25;
162:4,8,9,20;169:19;
170:10,13;172:12;
173:25;174:3;188:2;
191:3,6,8,22;192:6,16,
20;204:5;223:11;
235:11,21;236:1,18;
237:23;238:1,5;239:1,
5,9;240:12;244:18
**happening (11)**
77:12;105:18;
107:10,17;109:8;
146:17;150:17;162:12;
219:24;222:7;244:19
**happens (2)**
20:18;120:8
**hard (1)**
129:19
**harder (3)**
39:8,9,11
**head (7)**
6:1;38:13;111:24;
177:11;194:17;220:18;
225:9
**hear (70)**
59:4;60:6,8,21;66:3,
5,7,8;72:25;73:5;74:4;
75:1,5,11;102:4,7;
108:22,25;109:3,8;
121:3,4,21;122:1,9,17,
20;129:5,20,22,23,25;
130:3,4,6;150:3,4,6,13,
25;155:10,15;160:15;
164:5,9,11,14,16,17,20,
23,24;165:5,5,12;
166:7;167:25;168:18;
169:1,10;170:22;
182:15;194:3,6;
219:25;220:8,9;
228:15,17,23
**heard (50)**
21:10;23:24,25;
25:15;69:1;110:6;
122:7,14;125:16,17;
150:10,23;151:1,2,16;
158:17;160:8,14,16;
162:21;163:5;165:1,2,
9,14,17,24;166:3,5;
170:3,19;171:6;

174:23;177:5,9;
184:13;190:23;194:1,
12,14,15;203:4;
206:10;217:24;219:23;
220:3,6;222:16;
239:11;241:7
**hearing (16)**
23:19;58:23;59:8;
60:18;115:10;121:11;
122:3,3;151:6;160:17;
167:21;171:12;219:19;
228:13;241:19,22
**heavy (1)**
136:1
**Hebron (1)**
17:21
**help (36)**
45:24;46:10,16;48:7;
49:8,13;50:7,12,14,18,
19,20;88:17;99:10;
104:13;106:13;123:22;
127:1;128:6;130:1;
141:3;143:23,23;
144:4,6,11,13;157:16;
175:23;209:14;230:9,
15,20,20;237:20;247:4
**helped (6)**
116:23;133:22;
136:5;178:6;185:22,25
**helps (1)**
183:22
**Henning (1)**
179:19
**high (8)**
11:18,20,21,23;
12:22,24;232:11,15
**higher (3)**
32:25;39:15;213:16
**himself (5)**
118:16;120:4;
128:21;139:4;158:15
**hired (2)**
13:16;17:15
**hit (2)**
34:7;159:23
**hitting (1)**
116:25
**Hoffer (2)**
175:12;180:1
**hold (2)**
40:4,10
**holidays (2)**
82:8,11
**home (4)**
82:11;181:19,21,24
**honest (1)**
7:3
**honestly (2)**
7:8;63:5
**Hospital (2)**
12:2;78:1
**Hostler (2)**
19:6,7

**hot (7)**
138:4,14,15;144:24;
145:17,19;146:19
**hour (16)**
19:22;72:1;73:16;
79:25;80:1,15,16,24,
25;81:1,8,10;82:2;
83:12;108:2;225:2
**hours (11)**
30:23,24;31:13,17;
43:21;47:17,18;
153:15,16;155:1,7
**house (135)**
15:15;16:10;23:5,7,
21;28:25,25,25;29:15,
20,24;30:5,11,14;
40:19;43:24,24;45:22,
23;51:11,14,16,24;
52:6,23;54:15,21,23;
55:4,13,14,18;56:5,24;
57:6,7,8,20,24;58:8;
61:4,12;62:13;63:13,
23;64:9;65:11;69:24;
70:6,16;75:6;76:8;
77:13,17;78:12,14;
79:8,13,16,25;80:23;
83:6;84:5,6,10,21;
86:10;89:22,23;95:23;
96:1,13;99:6;100:22;
101:19;102:5,22;
107:18;108:20,24;
109:7,8;110:5,24;
111:1,5;113:5;115:23;
116:2;117:4;118:11,
19,24;119:1;135:3;
141:7;142:5;148:22;
156:16;158:6;159:2,5,
16,18;166:14,17;169:6,
10;172:8;175:21;
176:1;180:22,24;
188:24;201:16,22,24;
202:7,12;216:25;
219:18;222:9,11,12;
224:3,4,5;237:19;
238:10;241:3,6;
244:14,16;246:6,17
**houses (10)**
47:5;48:16;51:19;
57:2;60:22;79:10;
104:3;110:18;137:1;
226:7
**huh-uh (5)**
5:25;40:17;49:22;
54:18;102:16
**hurt (7)**
21:7,9;23:20,20;
44:12;82:12;168:25

### I

**IA (1)**
236:10
**identification (8)**

171:18;186:17;
197:21;200:17;210:7;
211:14;214:15;225:11
**identified (3)**
4:18;183:24;216:25
**IDOC (18)**
9:5;26:1,11,17,21,
25;27:3,25;28:4,14,17,
24;29:4;93:10;180:7;
186:6;209:22;212:22
**Illinois (1)**
19:4
**image (1)**
201:20
**immediately (7)**
12:21;52:1;115:12;
119:9;145:10;199:9;
230:21
**impact (1)**
7:3
**important (21)**
5:24;143:20,22;
161:23;162:2,6,11;
163:10,12,16;185:10;
191:2;192:13,21;
226:13;231:9,13,17,21;
232:3;238:25
**improved (1)**
182:18
**improvement (2)**
28:7,10
**incident (8)**
102:11,14,18,21,24;
103:2,4;186:22
**including (2)**
4:19;210:24
**inconsistent (1)**
194:9
**incorrect (2)**
190:18;217:14
**increased (2)**
129:9;145:21
**increasing (1)**
129:3
**Indiana (11)**
9:10,14;10:18,18;
13:25;14:18;15:1,3;
17:21;186:21;214:18
**indicate (2)**
194:3;226:1
**indicator (1)**
168:3
**individual (11)**
95:22;189:11;
202:11,14;203:22;
205:4,7,12,15,17,25
**individuals (4)**
203:6,8;205:1,20
**information (19)**
48:18;51:5;52:25;
53:3,14;54:8,14;59:9;
91:10;100:3;187:8;
189:16;192:3,15;

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 72 of 82

199:1,1;224:18;245:2,
12
**initial (4)**
42:17;44:20;91:19;
218:19
**inmates (1)**
15:13
**input (1)**
174:11
**in-service (2)**
92:3;201:1
**inside (3)**
51:11;76:4;121:16
**Instagram (1)**
11:8
**instances (3)**
21:11;212:16,19
**instead (1)**
30:19
**instruct (3)**
84:19;109:18;239:8
**instructed (9)**
63:3,7;70:11,22;
73:19;74:11;79:18;
90:4;91:4
**instruction (12)**
60:3,25;95:9;102:17;
103:17;184:7,19;
226:25;227:2,6;228:7,
10
**instructions (1)**
35:21
**instructor (2)**
42:8;90:10
**interact (2)**
177:17;207:7
**interaction (2)**
174:20;189:15
**Internal (2)**
214:19;215:1
**interrogatories (2)**
198:1,3
**interrogatory (4)**
8:25;198:19;199:4,
23
**interrupting (1)**
238:20
**interview (9)**
14:10,11,14;26:12,
15;114:4;215:12;
218:7;236:9
**interviewed (4)**
215:8;216:1,12;
217:7
**interviews (1)**
14:8
**into (22)**
4:11;7:23;13:16;
18:13;23:1;78:18;93:3;
95:15;96:6;117:10;
118:11;141:12;142:4,
5;153:8;161:4;183:17;
204:14;209:1;216:22;

223:3;229:2
**investigate (4)**
228:19;229:9,18;
239:1
**investigation (11)**
149:15;162:4,16;
192:22;214:20;215:2;
228:23;229:2,5,13,15
**Investigations (4)**
112:11;149:21;
235:17;236:8
**investigator (11)**
113:10;161:18,20;
162:7,17,19;163:7;
215:8;216:13;217:7;
236:10
**investigators (1)**
192:14
**involved (1)**
102:23
**ISP (66)**
10:10;17:4,10,18;
20:10;29:9;31:4,19;
34:18;36:11;42:11,17;
43:2,5,11,16;44:1;
49:11;50:23;51:18;
56:19;59:14,22;60:18;
62:25;87:12;91:24;
93:20;94:18,22;95:7,
10,18;104:11,19;
105:12;109:16,19,22;
111:3;112:16;114:21;
169:24;179:22;180:5,
8;181:17;183:25;
185:11;188:12;207:9,
24;211:9;212:12,14,
22;213:3;220:20,24;
221:2,5,8,11,13,17;
240:14
**issue (19)**
34:18;41:13;42:1,2;
69:10;82:7;90:24;91:2;
100:15,18,23;104:18;
168:24;184:25;185:2;
210:15;227:9;230:25;
246:18
**issued (1)**
186:7
**issues (10)**
36:15;37:18,21,24;
38:2;69:18;93:23;
220:20;221:2;227:17
**items (1)**
4:21

**J**

**jackets (1)**
31:22
**Jason (1)**
207:2
**job (22)**
6:4;12:25;20:7;

44:24;47:14;53:8;
93:14;98:15;153:21,
24;192:23;236:15,21,
23;237:1,6,8,22;238:7,
23;240:8,22
**jobs (1)**
153:20
**Joliet (1)**
232:14
**Joshua (22)**
4:9;15:19;22:10;
125:2;127:3;128:16;
129:20,25;132:7;
133:2,4;138:20;158:1,
4;189:14;199:8,12;
206:7,16;234:15;
235:6;241:1
**Jrodriguezsky@aolcom (1)**
10:8
**judgment (1)**
245:1
**jump (1)**
41:10
**June (2)**
15:8;210:13
**Junior (1)**
232:14
**justified (1)**
143:9
**JUSTIN (2)**
4:1;11:3

**K**

**keep (27)**
29:22;40:13;41:16,
23;42:21;62:3;63:7;
64:11;75:16,17;76:13,
22,23;82:25;84:24;
86:11,13;92:15;99:5;
121:10;139:6;143:8;
180:4;238:19,22;
240:21;245:11
**keeping (3)**
76:14;82:24;227:15
**Kenneth (1)**
206:19
**kept (6)**
15:11;29:18;93:5;
151:6;158:15;228:13
**key (29)**
40:10,11,19;41:6,11;
62:2,4,14,17,18,21,23;
86:11,13,14;88:6,9,19;
89:8,12;142:10;145:6;
163:23;182:9;199:24;
200:1;204:2;214:10;
225:21
**keys (90)**
38:9,18;40:4,5,13,
24;41:2,14,16,17,21,
24;48:3;61:5,23,24;
62:6,9,12,20,21,23,25;

63:4,6,7,10,14,16,21;
64:7;86:6,11,15,20;
87:9,16;88:3,19,22,25;
89:3,16;111:12;
115:25;116:2,3,5,7;
118:15;126:20,23;
127:5,24;128:7,12,23;
129:17;130:19,23;
131:10;139:19,20,21;
142:11,13,18,19,22;
143:15,21;144:9,16;
146:10,11,12;147:19;
148:6;149:1;163:4,8,
21;197:7;199:16;
200:6,9,10;218:11;
225:18;246:15
**Kicking (1)**
82:22
**kill (2)**
16:11;22:7
**kind (24)**
12:10;13:12;18:11;
20:7;25:23;35:13;54:8;
65:22;73:10;81:25;
87:18;98:21;99:16;
100:3;102:7;111:21;
117:5;125:12;138:4;
154:12;155:2;157:5;
219:21;231:7
**kitchen (1)**
53:9
**knew (7)**
55:2;67:18;68:5,21;
69:6;126:15,20
**knowing (2)**
97:1;243:23
**knowledge (2)**
171:1;172:24
**known (3)**
69:3;91:5;158:13
**Koen (1)**
179:11

**L**

**labeled (1)**
53:6
**laid (1)**
216:22
**land (1)**
10:1
**large (2)**
57:7;218:23
**Lasco (1)**
178:22
**last (7)**
182:4;185:7,19;
198:5,6;215:5;244:22
**later (5)**
72:21;145:6;194:6;
216:5;217:10
**lawn (1)**
20:1

**lawsuit (10)**
5:8;207:25;208:3,5,
10;209:8,10,16,19,23
**laying (2)**
87:22;88:11
**leading (2)**
203:11;204:4
**leaning (1)**
131:21
**learn (6)**
27:2;47:2;221:14;
222:15;229:19;233:20
**learned (6)**
229:13;233:1,2;
234:22;235:5,8
**learning (1)**
199:10
**least (6)**
71:6;212:13;216:24;
217:3;219:2,6
**leave (15)**
13:6;15:9;17:16,25;
18:24;19:14,18;25:6;
51:14;63:20;64:8;70:8;
71:16;75:21;212:2
**Lee (1)**
217:9
**left (19)**
13:14;15:5,7;17:10,
18;18:14,22;22:24;
25:2;26:11;115:8;
118:22;119:3;160:9;
180:5,8;181:17;207:9;
210:10
**legitimacy (2)**
21:25;209:8
**less (8)**
30:2;39:3;121:23;
243:2,3,12;246:13,18
**Lessner (4)**
206:21;215:8,12;
216:1
**letter (2)**
4:17;211:19
**letters (3)**
37:7;212:1,5
**letting (7)**
47:9;72:22;77:23;
78:4;110:3;188:22,24
**level (6)**
142:24,25;203:15;
205:22,25;213:9
**levels (1)**
139:16
**lie (1)**
5:19
**lieutenant (51)**
14:11;36:17,18;
37:21,24;64:4;68:10,
13,21;96:22;115:3;
116:6;117:18;119:23;
129:16;130:10,10,25;
131:7,7;132:24,24;

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 73 of 82

JUSTIN RODRIGUEZ
November 4, 2019

133:23;136:11;175:18;
178:8,17;179:9;181:8,
10;188:11,17;194:24,
25;196:8,13;204:21;
213:11,20;217:20;
218:9;226:21;233:12,
12;236:21;237:15;
239:4,12,15,18;240:5
**lieutenants (19)**
33:20;36:19,22;
45:24;80:13;93:4;96:8;
133:1,6,24;136:18,20,
22;142:4;146:1;174:7;
184:22;185:1,5
**lieutenant's (1)**
233:11
**light (4)**
71:20,21;218:24;
222:4
**lighting (1)**
222:21
**lights (1)**
101:12
**liked (1)**
191:15
**limited (1)**
41:16
**limiting (1)**
41:20
**line (17)**
6:3;10:1;182:4,8,22;
183:13;185:7;188:11;
193:24;194:11;200:24;
215:5,13;216:3,18;
217:8;218:9
**lines (4)**
182:8;191:24;
193:20;216:14
**list (3)**
172:16;200:24;201:8
**listed (6)**
52:13,14,20;175:4,
12;218:21
**lit (2)**
117:2;123:8
**little (15)**
22:18;34:19;35:16;
43:1;72:16;101:14;
102:9;136:2;165:18;
185:17;191:11;192:2;
219:19;224:22;233:21
**live (3)**
9:9,10,13
**load (1)**
19:11
**location (5)**
43:21,23;45:17;
56:17;70:16
**lock (1)**
83:2
**locked (5)**
62:17,18;86:23;87:4,
5

**locking (1)**
77:24
**locks (1)**
86:5
**lockup (1)**
159:2
**log (10)**
95:15;99:6,7,8,16,
18;100:17,18,25,25
**logbook (3)**
99:13;100:4,11
**logged (1)**
101:1
**long (26)**
8:5;11:7;12:3,18;
15:3;18:20;20:2;24:23;
29:9;43:8;71:25;79:4,
19;84:23;85:3;88:24;
109:11;120:16;121:20;
130:9;134:5;153:13;
173:14;217:14;224:25;
233:8
**longer (1)**
38:24
**look (11)**
70:1,13;159:24;
172:1;187:23;198:15;
199:4;211:23;215:13,
24;229:1
**looked (2)**
58:19;123:6
**looking (3)**
58:18;196:8,21
**looks (5)**
190:9,10;202:19;
205:21;211:2
**Lori (1)**
200:22
**lot (16)**
73:7,13;75:13;107:8;
111:22,23;123:16;
145:22,25;151:13,14;
156:16;192:6,10;
193:1;237:2
**loud (15)**
75:7,12;109:2;122:2;
129:23;138:19;150:7;
164:15;165:18,19;
167:22;168:1,3;
169:15;219:20
**louder (1)**
220:8
**Loudly (1)**
124:1
**low (1)**
32:21
**Lowell (2)**
9:14,14
**lower (3)**
39:2,25;213:16
**lowest (3)**
30:7;39:7;213:9

**M**

**mad (1)**
222:4
**mail (10)**
27:4,17,18;78:22;
98:24;99:2,5;120:14;
121:1,19
**mailbox (2)**
27:7,13
**main (14)**
40:4,5,11,13,19,24;
41:2,11;42:7,8;52:21;
78:3;246:2,3
**Mainly (27)**
15:10;16:8;25:20;
36:17;38:25;39:6,18;
40:9;42:22;43:11;45:9;
46:7;66:15;67:1;72:12,
19;76:16;78:20;81:7,
17;82:15;83:21;86:8;
99:3;100:19;114:14;
208:20
**maintain (2)**
30:11,14
**maintenance (10)**
100:23;101:3,11,16;
220:16,20,23,24;221:2,
14
**Major (8)**
114:5,6;153:7,19;
179:1;209:22;213:11;
236:14
**making (10)**
34:14;77:19,21;
81:18;152:12;159:3;
183:16;189:23;203:14;
230:2
**malfunction (1)**
69:12
**malfunctioned (1)**
69:16
**malfunctioning (7)**
65:20,23;66:24;
67:11,16,19;68:22
**man (1)**
19:6
**manager (2)**
13:12;18:18
**mandatory (2)**
81:7,10
**manual (2)**
109:16,19
**many (13)**
8:3;29:24;56:4;81:6;
97:20;135:20;137:4;
214:4;227:21;242:11;
244:1;245:22;246:7
**mark (4)**
171:16;186:14;
200:14;226:1
**marked (12)**

171:17;186:16,19;
197:20;200:16;210:5,
6,9;211:12,13;214:13,
14
**marking (1)**
197:19
**mass (1)**
182:23
**matter (2)**
46:2;85:4
**May (2)**
20:3;214:20
**maybe (31)**
8:8,9;21:13;24:25;
54:1;55:24;59:5;63:1;
71:12;77:1;79:6;89:1;
113:4;120:18;121:24;
137:6;143:16;144:7;
159:13,25;160:21;
170:24;185:18;197:6;
203:12;204:2;213:20;
226:21;227:23;242:24;
244:3
**McBride (1)**
178:24
**McDonald's (8)**
13:1,6,14;14:20,23;
18:17,20;180:11
**mean (46)**
13:8;18:5;21:8;
35:17;43:23;44:8,22;
53:8;54:6,20;57:17;
58:17,25;65:23;71:8;
78:20;81:14;82:15,21;
84:18;85:22;86:3,23;
109:2,5;117:4,16,23;
138:3;146:9,18;154:1;
156:4;158:5;159:7;
172:18;180:17;183:21;
185:3;189:1;200:4;
208:12;229:6;233:19,
23;238:6
**means (6)**
86:1;183:15;188:20;
194:14;201:2,6
**media (2)**
10:23;11:11
**medical (7)**
7:2,7;100:15,18,20;
183:23;184:4
**medication (1)**
7:17
**meet (2)**
7:20;98:16
**meeting (21)**
32:7,8;33:17,18;
34:1;35:9;38:6;98:1;
169:18,22;170:15;
172:18;173:22;174:4,
11;176:7;182:4;223:3;
239:20,21;240:3
**meetings (7)**
36:1,4,6,7,11;92:8;

224:15
**Megan (1)**
4:6
**memorialized (1)**
4:16
**memories (1)**
111:18
**memory (6)**
7:15,18;94:10;
241:13;242:4,6
**mention (7)**
188:5;195:6,12,22;
196:3,16,19
**mentioned (3)**
223:6,10;236:12
**merit (1)**
27:21
**messages (1)**
95:5
**messed (2)**
190:9,10
**met (3)**
112:4;113:9;127:12
**metal (2)**
31:23;61:16
**Michael (1)**
211:20
**middle (1)**
55:20
**midnight (1)**
119:19
**might (15)**
7:17;55:20;56:25;
58:12;67:15;82:5;
107:11;141:2;152:21;
153:2;176:8;199:1;
213:22;223:1,1
**Miller (1)**
216:12
**mind (1)**
186:12
**minute (9)**
32:8;89:1;130:12,13;
172:1;187:23;190:4;
194:25;211:23
**minutes (34)**
8:9,10;72:20,21;
76:25,25;77:1,2;79:6,
24,24;115:4;120:18,
23;121:22,23,24;
122:11;195:19;196:11;
198:15;216:5,8,10,24;
217:3,10,19,21;218:2;
219:6,11,13;240:25
**missed (1)**
97:6
**missing (2)**
192:9,11
**misunderstood (2)**
229:10,16
**moment (4)**
119:13,16;202:16,24
**Monday (1)**

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 74 of 82

214:20
**monitoring (1)**
77:6
**month (7)**
12:20;13:19;15:7;
17:24;43:9,16;211:6
**months (2)**
15:4;29:12
**more (65)**
22:18;23:18;29:14;
30:19;31:13;34:12;
38:23,24,25;39:1,10,
12;42:19,22;47:4,9,9;
49:13;50:7,12,14,17,
20;58:6;80:2,8,9;97:8;
99:23;113:18,23;
122:12;123:23;126:24;
131:20,20;143:20,22;
144:4,6;155:2,4;156:3,
11;157:15;159:8;
166:11,15;167:18,19,
19;168:22;180:25;
183:6;185:17,23;
186:1;189:7;192:15;
193:15;194:20;195:15;
232:7;243:1;246:17
**morning (5)**
36:7;38:5;78:24;
98:1;181:18
**Most (5)**
43:19;73:13;74:8;
111:5;242:25
**move (7)**
9:15,20;157:8;
232:19,20;238:7,8
**moved (5)**
9:11;159:16,18;
160:5;245:8
**movement (1)**
182:24
**moves (1)**
44:12
**moving (1)**
100:7
**much (1)**
154:22
**multiple (1)**
16:7
**music (1)**
102:8
**must (1)**
218:25
**Myself (3)**
143:16;144:18,25

### N

**name (19)**
4:6;11:2,6;16:15,16,
17,23;17:22;24:5,8;
42:7;100:5;159:10;
161:20;174:23;177:7;
194:2;201:8;233:11

**names (5)**
52:7;68:2;172:16;
200:25;224:10
**Nature (1)**
210:15
**Neal (3)**
177:2,4,16
**necessarily (3)**
33:2;168:5;234:17
**necessity (1)**
31:14
**need (20)**
16:21;34:3,21;77:25;
88:20;90:14;91:15;
98:19;125:23,23;
140:5;152:24;167:16;
191:19;196:6;226:10;
231:6;237:22;238:3;
240:9
**needed (35)**
34:11;35:10;48:4;
71:11,14;80:11;85:9;
86:19;88:18;93:24;
95:6;103:11,19,22;
104:1;105:17;108:14;
115:5,19;117:25;
119:12,22;144:15;
148:4,15;165:22;
169:20;226:13;227:17,
25;230:3;235:20;
236:2,24;244:12
**needs (2)**
52:15;80:8
**negative (1)**
236:18
**neighbor (2)**
216:23;217:9
**new (6)**
92:6,11;93:1;244:5,
8,9
**newer (1)**
39:14
**next (22)**
34:22;49:4;63:19;
78:24;81:2;86:21;
117:3;119:3;175:3,12;
177:7;189:19;194:11;
215:24;216:11,12;
217:5,18;236:23;
237:16;239:20;240:3
**Niccum (1)**
176:11
**nickname (1)**
206:10
**nicknames (1)**
206:8
**night (51)**
28:16,18,21;30:23;
31:17;33:19,21,22;
36:19,22,25;37:3;
73:14;77:17;99:25;
101:19,20,23,25;102:7;
108:24;114:8,25;

120:2;142:7;149:13;
155:4;158:25;162:17;
181:17;182:11;183:10;
184:10,23;187:2,4;
188:3;192:7;196:21;
197:10;235:5,11,15,21;
236:19;238:1;239:6,9;
240:19;245:21;246:6
**nodding (6)**
5:25;38:13;111:24;
194:17;220:18;225:9
**noise (4)**
107:8;119:1;122:3;
160:14
**noisy (2)**
101:18,21
**nonclassroom (1)**
44:16
**normal (3)**
79:25;80:7;108:9
**normally (20)**
32:22,25;62:18;73:7,
22;74:5,25;75:8;83:6;
97:14;103:25;104:21,
22;169:25;179:25;
180:20;241:16,18;
242:9;247:7
**note (1)**
193:1
**notes (4)**
8:13,14,17;172:11
**notice (3)**
17:12,12,14
**noticed (1)**
115:13
**Nowatzke (9)**
114:5,6;153:7,19;
179:1;207:2,4;209:22;
236:14
**number (7)**
9:24;41:21;56:17,21;
100:5;189:5;225:11

### O

**oath (2)**
5:17;212:8
**object (4)**
166:19;172:21;
230:22;231:23
**objection (4)**
166:24;232:5;
238:11,19
**obligation (1)**
245:11
**obviously (1)**
58:1
**occasion (1)**
24:2
**occurred (2)**
187:2;221:19
**Ochea (2)**
215:7,15

**October (5)**
4:13,17;9:16;13:20;
14:16
**off (20)**
13:7,10;31:22;41:5;
60:6,8,10,13,16,19,21;
64:14;66:1;92:25;
102:8;124:9;212:2;
224:23;244:10;247:11
**offender (24)**
23:2;24:1;27:8;34:7;
41:9,24;44:12;46:9,11;
51:17;53:6;87:21;
89:24,25;90:22;
102:10;183:2;188:22;
208:20;215:7,14,25;
216:11;217:6
**offenders (25)**
34:13;41:13;46:17;
77:25;82:9,24;116:17,
18,24;117:1;122:5;
129:7;136:12,14,16,19;
140:5;157:5;160:12;
165:1,18;168:5;
188:22;222:3;246:19
**offer (1)**
43:2
**office (44)**
23:1;55:14,15;63:1;
65:17;77:4;78:8,9,15,
18,20;79:1,2;85:10,21;
89:4;98:4,6,14,17;
113:6;115:10;117:10;
120:14,17,23;121:5,7,
12,13;125:17;135:13,
21;151:5,19;187:12,
15;194:11;204:7,14;
217:17;218:11;220:7;
242:17
**officer (156)**
13:22;14:17,21;16:4,
4,17,23;17:1,5;21:12;
23:24;25:13;27:6;29:7,
10;32:17,19,23;33:1,3,
10,14;34:7;38:18,21;
39:1,22,24;40:9,12,15;
41:8,10;43:15;47:11,
20;52:21;58:3;61:24;
62:3,22;63:17,18,22;
64:2,6,7,25;67:1;72:12,
13;76:16,19,21;79:3;
87:24;99:21;105:17;
113:5,14;115:17,18,19;
116:3,4,21;118:2;
119:3,4;121:8;124:24;
125:7,20;126:5,12;
128:11,12;130:24;
141:1,4,11;142:6,7;
148:19,21;149:12,12;
150:8,10;154:14,17,24,
24;155:10,11,16;157:7,
8;159:23;163:1,17,24;
165:4;169:13,13;

175:16,17,19;178:4;
194:1,12;195:3,18,19;
196:1;197:6;200:2,4,7;
203:9,9;204:5,8,13,15;
205:5,10,18,21;210:16,
19;213:8,9,10,10,13,
22,25;214:1;215:15;
216:5;217:11;220:5,5;
222:16,17;226:16;
227:22,25;228:4,8;
236:20,25;240:15,15;
245:3
**officers (61)**
15:16,18,23;16:3,8,
12,14;20:20,21,22,25;
21:2,5,7,11;25:21;
33:19;40:18;41:14;
45:24;46:8,16;47:13;
48:19,21;49:17;51:12;
74:5,24;79:7;83:14;
85:18;90:24;99:10;
116:20,23,25;117:6;
137:1;143:8;148:16;
157:7,11,16;159:3,5,7,
8;164:16;183:1;
213:14,15;236:13;
237:19;240:14,18;
245:22;246:7,13,14,18
**officer's (12)**
41:5;75:22,25;76:5,
9;78:19;98:20;121:16;
160:9;203:12;242:18,
20
**often (5)**
31:2;32:19;95:1;
221:19;242:22
**OIC (6)**
99:9,12;226:6,19,20,
22
**once (8)**
32:2;33:16;58:6,6,7;
110:19,19;122:6
**one (71)**
8:22;24:2;26:8;
29:13;30:4;34:21;
35:11;40:5,20,21;41:4;
48:2;50:3;65:13,15,16;
66:3;72:3;73:5;76:1;
79:18;80:25;81:2;83:7;
84:15,20,22;85:7,12,
16;86:21;87:2,7,15;
88:13;102:9;111:13;
123:12;125:7;130:21;
131:6;133:14;134:14,
15;139:18;140:9,12;
141:9,19,20;151:2;
158:24;160:24;161:17,
17;182:15;189:7;
193:3,9,10;197:15;
203:17,21;210:17,21;
222:3;223:9,24;226:4;
238:11;245:6
**ones (8)**

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 75 of 82
JUSTIN RODRIGUEZ
November 4, 2019

11:16;29:1;39:7,12;
40:3;51:19;52:8;136:6
**ongoing (1)**
198:24
**only (21)**
9:2;17:23;22:15;
30:17;40:9,20,21;
41:23;55:15;58:7;
69:16;77:6;95:2;96:3;
146:18;150:25;180:23;
191:17;213:14;221:25;
246:16
**onto (1)**
176:1
**open (29)**
46:7;82:25;87:6,23,
24;88:2,7;90:14,16;
116:1,10;117:24;
121:8;128:4,4,21;
131:17;137:12,13,19,
20,22;138:1,7;143:21;
147:3,4;199:8;204:22
**opened (14)**
115:6;116:7;118:1,
17;128:20;130:18,19,
20;144:19;145:1,11;
146:15;218:10,13
**opening (3)**
90:5;116:12;131:16
**opens (1)**
86:15
**opinion (1)**
238:14
**opinions (2)**
174:12;209:7
**opposing (1)**
244:23
**oral (2)**
152:1;156:22
**orally (2)**
92:10;152:4
**order (5)**
54:9;101:7,8;220:23,
24
**orders (7)**
53:16,17,19,21,25;
54:3,5
**orientation (1)**
14:6
**originally (1)**
148:11
**others (2)**
29:14;34:20
**otherwise (1)**
75:21
**ours (1)**
135:4
**ourselves (1)**
144:2
**out (122)**
21:14;23:4;26:11;
31:14;33:23;41:7,12;
45:19;46:9,10,11,13,

17,21;47:21,25;48:5,
12;50:15,19;51:8,18,
23;52:12,15;53:12;
55:4;63:13,23;70:1;
72:16,18;77:23,24;
78:4,12,14,23;83:1;
87:19;90:23;98:25;
99:8;100:1;102:11,14,
19,24;103:1,4;104:24;
105:3;110:2,4,7,10,15;
113:4;116:14,15,16,17;
117:11;120:10;122:4,
12;124:25;125:16;
127:1,3;132:1,4,25;
136:13,14,16,19;
138:19;139:12;140:5;
141:3,19;142:24;
143:23;151:4;154:12;
156:13;157:5;160:19;
165:20,21,21;166:5,13;
171:15;173:9,14;
181:1,2,5;183:17;
188:22,24;194:11;
203:11,14;208:22;
224:11;225:13;227:3;
230:3,15;231:16,18,21;
232:3,19,20;233:4,6;
234:3,8
**outcome (1)**
209:16
**outside (10)**
78:15,19;79:3;117:1;
121:11;180:14;181:5,
15;207:5,15
**outstanding (2)**
4:15,18
**over (19)**
5:13;33:23;42:19;
61:1;62:10,19;65:3;
99:19;128:16,17;
139:2;145:17;172:2;
177:10;190:4;198:15;
203:12;223:18;237:24
**overdosed (1)**
88:16
**overtime (6)**
30:25;31:2,3,5,9,12
**own (8)**
83:8,11,17,25;84:8;
197:14,17;225:10

## P

**Pacific (1)**
19:3
**packages (1)**
20:9
**page (20)**
182:3;186:21;189:3,
5,7,19,25;193:17;
194:22;195:17;198:5,
6;211:19;215:4,5,11;
217:5,5;218:4,17

**pages (4)**
193:15;194:20;
195:15;196:6
**paid (1)**
120:11
**pain (1)**
130:7
**paper (2)**
222:4,21
**paperwork (6)**
78:22;85:9;98:19,22;
99:1,3
**paragraph (9)**
172:15;182:7;185:7;
215:11,14,24;216:11;
217:6;218:6
**parking (1)**
237:2
**Parnell (1)**
179:13
**part (15)**
14:2,8,13;33:17;
36:10;46:20,23,25;
75:6;91:20;162:15;
184:11;199:6;213:3;
245:4
**participate (1)**
224:15
**participated (4)**
59:17,23;170:5;
172:23
**participating (1)**
59:12
**partnered (1)**
19:3
**part-time (2)**
14:19,23
**party (1)**
5:8
**passes (1)**
78:23
**past (6)**
7:14;42:1;68:16;
97:18;106:5;123:14
**pause (2)**
186:15;243:6
**pay (1)**
166:12
**paying (1)**
167:20
**pellet (1)**
183:8
**pending (1)**
6:23
**people (47)**
16:7;29:24;30:8,10,
13,16,17;34:24;37:13;
39:14;48:10;49:8,13,
17,21;50:18;52:10;
54:5;61:20;65:3;66:7;
74:3,8,13,16;85:6;
94:18;104:22;106:20;
122:9;124:3,7;134:24;

137:5,7;172:19;
173:24;174:2;179:21,
24;180:21,23;183:24;
216:7;234:8;247:3,7
**people's (2)**
75:4;159:19
**performance (2)**
28:6,10
**period (2)**
73:8;216:16
**periodic (1)**
92:1
**person (38)**
22:15;27:20;30:4;
32:6;40:5;57:13,14,17;
58:10;62:9;63:20,25;
64:1;70:5;83:7,24;
84:15,20,23;85:7,12,
16;87:7,15;88:10,15,
24;89:5,8,16;90:5;
158:24;175:4,12;
197:15;202:22;203:21;
222:25
**personal (5)**
4:8;9:22,24;10:1,14
**personally (4)**
105:9,21;157:2;
158:5
**personnel (2)**
93:6,8
**perspective (1)**
172:6
**petty (1)**
102:2
**phone (5)**
9:22,24;10:1,3;70:20
**physical (4)**
14:5;42:24;44:5,10
**physically (2)**
146:25;172:19
**picking (5)**
82:17,19,21,22,23
**picture (2)**
160:2;189:9
**pieces (1)**
71:10
**PIERCE (51)**
4:6,7;5:2;16:22;
18:4;91:12,15,18;
153:1;160:20,23;
166:20;167:2,5,15;
168:14,17;171:15,19;
173:1;186:12,18;
197:18,22;200:13,18;
201:10,14;210:4,8;
211:11,15;214:12,16;
220:10,14;221:23;
231:2,25;232:1,9;
238:15,24;243:9;
244:21;245:6,14,16;
246:22;247:2,10
**pipe (18)**
22:25;61:10,11,15,

16;75:17,20;77:20;
84:1,2,7,8,9,12,16;
210:17,21;244:14
**pipes (2)**
61:7;84:3
**place (3)**
9:21;17:22;56:22
**Plainfield (1)**
11:21
**plaintiff (1)**
4:7
**plan (5)**
28:7,11;74:22;185:9,
11
**playing (3)**
102:8;203:17;204:3
**please (3)**
5:15;195:20;238:17
**plus (1)**
217:20
**pm (8)**
31:18;101:24;
187:19,21;193:25;
197:11;202:2;247:14
**point (20)**
5:11;6:22;7:25;
91:16;125:15;131:22;
132:7,9;135:3;136:25;
147:9;154:7;157:24;
158:2;166:18;167:22;
172:20;207:13;223:9,
24
**points (1)**
84:17
**policies (10)**
35:22;92:6,11,23;
93:25;94:15,19;
210:19,22;214:10
**policy (26)**
50:22;84:14,20,22;
87:11;91:4,5;93:1;
104:11,15,19,20;105:9,
17,22;106:10,16;
147:23;148:3,10,14;
171:3;199:24;200:1;
212:23;213:3
**poorly (1)**
107:25
**position (10)**
13:4,21;17:4,15,16,
17;18:25;25:5;175:9;
228:5
**positions (2)**
13:11;20:6
**positive (2)**
236:17;242:14
**possible (4)**
155:21,24;219:10,12
**Possibly (5)**
51:6;87:17;163:21;
185:25;234:10
**post (10)**
29:4;33:24;53:16,17,

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

JUSTIN RODRIGUEZ
November 4, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 203-5    filed 03/29/21    page 76 of 82

19,21,25;54:3,5,8
**potential (1)**
169:2
**potentially (1)**
246:9
**PowerPoint (3)**
44:4;45:9;91:9
**PowerPoints (1)**
42:22
**practice (16)**
49:11;74:8;87:12;
90:11;91:1;105:2,7,10,
17;106:10,14,23;107:2,
10;185:23;221:13
**practices (2)**
94:15,19
**precaution (1)**
41:15
**precautions (4)**
42:20;185:14;
229:25;234:1
**preference (1)**
83:16
**preparation (2)**
8:19;9:6
**prepare (3)**
7:20;8:11;198:10
**preparing (1)**
198:12
**present (7)**
90:17;172:15,19;
173:4,5;175:4;176:7
**presentation (2)**
42:23;45:9
**press (3)**
65:25;74:6;241:16
**pressed (2)**
128:21;132:17
**pretty (6)**
73:15;101:21,22;
102:4;109:2;165:19
**prevent (1)**
162:12
**prevented (2)**
199:7,14
**previous (1)**
223:10
**previously (1)**
189:17
**prior (8)**
9:13;13:11;97:10;
156:25;157:24;158:2,
9;217:20
**prison (21)**
13:13,16,17,21,24;
14:18;15:1,3;29:13;
43:13;46:21;47:21;
51:15;52:5;69:4,22;
100:22;177:11;186:21;
246:5,8
**prisoner (28)**
22:24;24:5,8;27:9;
51:7;57:15;100:10,14,

24;101:3;103:18,25;
104:6,11,14,25;105:3,
5,18,22;106:22,24;
109:21,23;158:14;
159:24;238:9;239:1
**Prisoners (38)**
15:13,18;20:20,24;
26:23;27:2;41:16;78:4;
81:18;98:17;103:10,
21;105:25;107:17;
108:3,6,12,17;112:19;
113:23,25;139:12;
143:2;150:20,23;
151:2;156:1;157:3;
158:20;160:8;161:1;
164:17,24;165:10;
166:17;215:19;217:13;
220:16
**prisoners' (2)**
22:1;240:24
**prisoner's (1)**
159:10
**probably (19)**
39:6;41:3;58:2;
75:14;79:23;89:4;
109:13;144:10,14;
145:12;154:4;160:4;
192:17;193:13;226:10,
19;234:13;243:11;
246:15
**problem (2)**
66:10;182:10
**problems (11)**
101:11,16;158:11,
18;221:4,5,7,11,15;
226:4,24
**procedures (1)**
134:23
**Proceedings (1)**
247:13
**process (6)**
13:24;14:3,9,14;
47:19;201:18
**processes (1)**
58:24
**produced (1)**
201:17
**professional (2)**
238:12,13
**Promise (17)**
21:16,19,21;126:3,
17;131:4;133:16;
135:7;141:24;147:24;
148:10,24;149:23;
150:12;163:8;180:10;
181:6
**promoted (1)**
26:18
**promotions (1)**
26:20
**protocols (2)**
92:7;93:25
**proud (2)**

237:6,9
**provide (3)**
4:18;172:24;192:14
**provided (1)**
192:4
**Puetzer (1)**
207:20
**pull (3)**
138:1,10;171:15
**pulled (1)**
141:19
**Pulling (1)**
138:1
**punitive (1)**
245:2
**purposes (1)**
31:15
**push (1)**
117:1
**put (29)**
27:12;31:22;45:19;
46:10;48:11;50:15,19;
65:6;100:3,9,11;101:7,
8;114:3;116:14;127:1;
132:25;139:4;141:3;
143:23;159:1;222:5;
230:3;231:16,18;
233:4,6;234:3;244:22
**putting (1)**
29:18

# Q

**QRT (2)**
184:14,20
**quick (7)**
4:10;91:13;184:13,
20;186:13;201:11;
243:10
**quickly (3)**
231:9,11,17
**quiet (4)**
101:18,22;102:2;
118:24
**quietly (1)**
155:3
**quit (5)**
13:11,12;25:1,2,4
**quite (1)**
82:4

# R

**radio (75)**
45:21;61:5;64:11,11,
14,16;65:1,5,8;66:21,
24;67:5,10,16;68:14,
15,20;69:2,8,14;70:4,
14,22,23;71:2,4;72:6,
14;73:10,13,20;74:1,9,
13,17,23;75:16;88:18,
22;115:16,20;120:21;
124:13,15,19,23,25;

142:17;148:15;150:19;
165:22;213:23;223:18;
225:7,16;226:2,6,9,16,
23;227:4,7;241:10,13,
15;242:11;243:12,19,
23;244:1,6,9,11,13,17
**radios (42)**
38:9,17,20;64:18,19,
21;65:6,10,13,14,19,
21;66:16,18;67:19,22,
24;68:6,9,22;69:1;
70:17;71:5;73:7;125:8,
23,23;182:14,19;214:5,
7;225:6,10,13,24;
226:4,8;227:10,14,16;
242:21;243:16
**railroad (3)**
19:1,2,3
**ran (29)**
109:14,15;115:15;
116:1,4,9,12;123:2;
125:6,11;128:2;
131:14;134:8;135:7;
136:7;137:14;140:22;
141:12,13,21;142:20;
143:16;190:15,23;
194:11;204:7;219:4,8;
223:3
**range (87)**
38:19,22;39:25,25;
48:2;60:14,15;61:17,
24;62:2;75:10,19;
83:20,22,23,25;85:16,
25;86:3,4,12,13,15,21,
23;87:2;88:3,10,19;
108:19,23;109:9,12;
115:11,11,12;116:8;
122:23;123:2,5;
125:11,24;126:1,15,18;
127:8,9,13,20;128:1,2,
3,10,22;129:1;130:21;
131:6;134:14,15,16,19;
136:10;139:17,18,23,
24;140:4,9,12;141:12;
147:25;148:13;150:21,
24;157:4;159:12,13,
14;160:16;176:1;
200:6;202:19;203:2,6,
15;217:1;219:14
**ranges (33)**
30:18,20;34:12;39:2,
4,7,8,9,10,15,22;55:21,
22;61:13;79:14;83:8,
18;84:17;86:6,7,17;
98:25;109:6;135:15,
18;141:7,9;148:17;
179:7;197:15,17;
210:17;244:11
**rank (2)**
32:25;213:14
**rape (2)**
21:15;23:3
**raped (2)**

22:24;23:13
**rather (3)**
5:24;141:21;230:16
**rational (2)**
22:6,8
**react (1)**
160:15
**read (24)**
4:10;53:21,25;54:3,
5;92:17,19;93:1;
166:22,23;167:16;
168:14,16;188:1;
190:4;194:25;195:3,
19,25;196:11,13;
238:17,21;243:7
**ready (2)**
128:4;143:18
**realized (2)**
131:15;146:17
**really (24)**
18:8,12;20:15;22:4,
5;27:17;35:18;39:10;
41:3;69:1;82:10;85:22,
23;99:2,24;120:10;
124:5;143:7;150:7;
159:21;165:20;179:23;
183:7;226:24
**reason (25)**
5:23;7:11;9:20;17:9;
18:14;20:22;22:6;25:4;
30:21;40:16;41:20;
81:9;90:21,25;95:25;
96:9;103:12;146:14,
18,22;164:3;165:8,11;
188:8;210:1
**reasonable (2)**
156:9,14
**reasons (2)**
21:2;184:5
**recall (66)**
10:17;29:1;44:25;
45:1,5,6;51:2,3;53:19;
54:10,12,25;55:21,25;
58:7;59:6;60:12,18;
74:15;92:4;93:2;94:7;
95:8;103:1,7;104:9;
109:17;110:21;111:2;
113:1,2;133:3;135:16;
152:9,20;154:21;
155:20,23;156:24;
158:10,22;174:24;
177:21,23;184:9,12;
187:17;188:17;189:15;
190:2;210:24;212:16;
214:25;221:12;225:3;
227:5,8;234:10,11,14;
239:16;241:10,15,19,
22;244:19
**recalled (1)**
234:18
**receive (10)**
4:22;15:23;28:6,9,
13;60:24;61:5;71:1;

BARBARA DEVINE, et al. vs
RON NEAL, ET. AL.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 77 of 82
JUSTIN RODRIGUEZ
November 4, 2019

92:13;160:25
**received (13)**
4:20;21:5,13;23:16;
25:9,11;51:5;93:1,10,
17;156:25;212:11;
235:1
**receiving (7)**
21:22;22:20,23;
112:19;155:25;210:20;
224:18
**recently (3)**
9:11;208:4,8
**recess (4)**
91:17;160:22;
201:13;220:13
**recognize (7)**
57:18,20,23;160:2;
189:11;197:23;201:20
**recollection (2)**
111:16,17
**recommendations (1)**
94:14
**record (3)**
4:11;244:22;247:12
**red (1)**
71:23
**Redden (30)**
36:18;37:25;116:6;
129:16;130:10,25;
131:8;132:23,24;
133:1,6,23,24;136:11,
18,22;137:9;141:16,
18;142:4;146:1;
147:19;178:8;181:8;
184:22;185:1;188:11,
17;204:21;207:18
**Redden's (2)**
196:8,14
**REDIRECT (1)**
247:1
**referred (1)**
232:25
**referring (2)**
232:24;233:2
**regard (2)**
200:8;245:1
**regarding (1)**
94:15
**regular (2)**
34:16;44:9
**regularly (7)**
35:25;36:2,7;53:22,
24;94:24;95:6
**regulations (1)**
35:22
**related (2)**
221:2,5
**relating (1)**
221:8
**relation (2)**
22:9;27:22
**release (1)**
110:17

**released (4)**
135:2,4,4;223:24
**relevancy (1)**
238:12
**relieve (4)**
38:9,12;63:25;70:8
**relieving (1)**
62:20
**remember (122)**
8:24;12:17;16:15,16,
17,23;17:23;29:8;
32:10,14;35:18;36:10;
37:9;42:3,6,7;45:22;
48:21;49:5,20;52:7;
58:23,25;59:8,12;67:3,
7,10,13,24;68:2,18;
71:4;76:2;89:5,15;
90:9;91:8;95:9;99:2;
100:1;102:13,14;
104:10;110:21;111:20,
21,21,23;112:7,11;
113:1,16,19;114:3,16,
25;117:8;121:25;
137:2,4;141:2;152:14;
154:16,19,22;157:11,
12;158:16;159:11,22,
25;160:7;161:20;
162:23;163:2;164:2;
171:12,25;173:3,18,20,
21;174:6,15;176:10;
180:2;183:7,7,12;
184:21;186:8,9;
188:19;191:8;197:13;
199:2;208:19,25;
212:15,25;213:2;
222:2,3,7,17,19;
223:14,17,18,19,21;
224:10,13,17,18;
225:12;232:23;233:11,
25;234:7;237:3
**remembered (1)**
163:15
**remembering (2)**
235:22,24
**remove (2)**
199:8,12
**Rensselaer (1)**
9:10
**reopen (1)**
4:21
**repaired (3)**
226:10,14,18
**rephrase (3)**
6:13;169:9;231:25
**replace (1)**
58:10
**replaced (2)**
71:11,15
**report (17)**
102:24;103:2,5;
186:22;187:11,14;
214:19;215:1;226:5,
13,17,19,20,23;227:3,

10;229:1
**reporter (11)**
5:22;6:8;16:20;18:2;
152:23;166:23;167:16;
168:16;238:21;243:4,8
**reporter's (1)**
6:3
**reporting (1)**
227:7
**reports (5)**
102:11,15,18;112:1;
187:16
**represent (2)**
4:7;201:15
**re-present (1)**
244:25
**representative (1)**
4:9
**reprimand (1)**
211:3
**request (2)**
28:21;101:3
**requested (2)**
4:19;28:22
**requests (1)**
220:16
**required (1)**
106:11
**requiring (1)**
105:22
**reserve (1)**
4:21
**reserved (1)**
247:11
**resigned (1)**
17:13
**respond (17)**
8:18;104:6,7;105:25;
163:1,9,18;165:9,13,
16;166:8;168:11;
169:2,11,16;231:17;
240:11
**responded (4)**
149:7;163:24;169:6;
179:7
**responders (8)**
183:14,17,20,25;
184:8,11;216:16,19
**responding (8)**
73:6;164:4;230:2;
231:9,11;234:15,19;
240:18
**response (14)**
46:20;154:11,14,17;
184:13,20;196:17,23;
199:11,19,23,25;
223:25;239:14
**responses (6)**
4:19;198:2,10,13,16,
19
**responsibilities (8)**
33:13;46:5;77:16,18;
85:13,15,18,24

**responsibility (4)**
48:6;148:25;149:3;
198:25
**responsible (14)**
46:14;83:8;86:2,5;
97:1,4;148:1,16,21;
175:9;183:16;220:19,
22;221:1
**restate (1)**
105:16
**restroom (1)**
63:11
**result (1)**
210:23
**review (18)**
8:19;170:1,3,6,9,20,
23;171:2,7,10,13,21;
173:25;182:4;185:8;
198:18,22;218:20
**reviewed (4)**
9:2;111:25;193:13;
218:13
**reviews (1)**
171:4
**right (24)**
4:21;6:2;12:23;
17:16;76:12;88:3,9;
119:12,16;121:6;
125:4;128:19;166:25;
175:7;182:7;192:7;
193:19;204:9;212:8;
217:17,18;224:1;
231:16,18
**ringing (1)**
215:16
**risk (5)**
87:18;230:14,19;
231:3;246:10
**risks (2)**
87:14;227:15
**Robert (1)**
174:14
**RODRIGUEZ (10)**
4:1;5:3;9:9;11:3;
194:1,12;210:16,19;
216:25;245:3
**Ron (1)**
177:16
**room (40)**
32:7;52:21;64:25;
79:3;95:14,17,18,19,
20;96:4,7;97:16,17,18;
112:7;113:7,12;114:4;
115:7;117:12;118:1,
18;119:21;149:20;
152:16;153:8,14;
154:25;155:8;161:16;
164:7,8;194:1;203:12;
236:13,22;237:16;
239:17,19,20
**rooms (1)**
43:11
**Rothenberg (1)**

244:24
**routes (1)**
54:17
**rowdy (5)**
116:19,24;117:2;
129:7;130:5
**Rular (1)**
177:24
**Rule (4)**
4:14;90:19,21;91:1
**rules (3)**
5:14;210:18,22
**rumors (4)**
228:13,15,17,21
**run (8)**
98:21;115:17;
122:22;125:10;128:3,
6;204:16;210:16
**running (1)**
210:20
**rush (1)**
119:15
**rushed (2)**
191:10,12
**Ryan (1)**
207:22

### S

**safe (3)**
35:17,19;81:12
**safety (31)**
26:1;30:11,14;34:3;
35:12,13,13,21;41:15;
42:20;45:6;57:12;
81:22;82:7,9;83:4;
89:11;90:24;91:2;
168:24;227:17;229:4,
12;233:3,5,24;234:1,
12,23;246:10,18
**same (18)**
6:3;8:16;10:13;
23:19,25;37:13;56:21,
21,24;79:9;112:6;
113:4;152:16;158:25;
166:24;168:8;179:24;
232:5
**Sarah (18)**
22:19,22;23:12,15,
22;24:3,23;112:18;
131:4;133:16,18;
134:11,13;135:24;
136:5;148:7;176:5;
181:3
**saw (13)**
47:25;106:20;123:6;
124:5;126:12;134:11;
137:22;138:13;141:6;
154:4;158:6;160:2;
190:14
**saying (18)**
54:2;78:2;122:4,7;
125:18;132:13;138:17,

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 78 of 82

18,19;143:5,10;
164:21;165:6,8;
192:22;194:15;217:23;
220:1
**scan (3)**
61:17,18;84:2
**scanned (1)**
61:16
**scared (2)**
123:20;156:20
**scattered (2)**
69:22;111:7
**school (8)**
11:18,20,21,23;
12:22,24;232:11,15
**science (7)**
229:7;232:7,10,13,
16;233:17,19
**scrapper (1)**
17:19
**scratch (7)**
42:15;48:24;85:14;
164:17;220:2;227:1;
230:17
**scream (1)**
104:2
**screaming (15)**
122:6;123:23,24;
124:3,5,7;125:13;
130:3,6;132:11,15,16;
139:8;215:17,20
**screen (2)**
77:9;201:20
**screening (1)**
14:5
**screens (1)**
76:7
**scuffling (1)**
107:9
**seasonal (1)**
20:7
**second (6)**
145:23;147:5;182:3,
22;198:5;223:13
**secondhand (1)**
25:12
**seconds (9)**
109:13;122:13,14,
18,25;134:7;203:10;
204:4;219:25
**security (58)**
30:11,14;31:21;32:3,
4,13;34:16,24;35:3,6;
61:8,14,21;77:21;78:3;
79:4,8,12,15;80:4,7,11,
14,15;81:22,25;82:5,6,
14;83:4,7,11,20,24;
84:16,21,25;85:8,13,
17;86:2,7,9;87:8,15,21;
88:5;97:18,24;107:16,
19;108:1,10;115:1;
197:11,14,16;211:4
**seem (4)**

18:1,3,5,12
**seemed (2)**
26:6;193:8
**seems (3)**
78:2;166:11;194:9
**self-defense (3)**
44:14,15,17
**send (1)**
27:16
**senior (1)**
232:11
**sense (1)**
6:10
**Separate (1)**
152:16
**September (1)**
9:16
**sergeant (9)**
14:12;64:4;101:6;
111:13;175:17;179:17,
19;213:10;226:21
**sergeants (1)**
33:20
**serious (1)**
224:21
**seriously (3)**
26:2;212:21,25
**set (2)**
201:12;208:21
**sets (4)**
62:12;221:2,5,8
**settled (2)**
101:22,23
**seven (1)**
216:14
**Seventh (1)**
216:18
**shadow (1)**
47:13
**shadowing (6)**
47:11,17,20;48:11;
51:12;91:20
**shaking (1)**
5:25
**sheet (8)**
92:21,24;99:15,18;
100:17,19;102:19;
174:16
**shelves (1)**
123:6
**shift (38)**
28:16,16,18,19,21,
22;30:23;31:17,20;
33:19,21,22,23;36:20,
23;37:1,3;38:10,12;
62:10;64:17;66:17;
69:8,11;70:5,24;73:20,
23;74:14;77:17;97:22;
99:23,25;124:17,19;
186:22;241:9,20
**short (5)**
191:18;192:1,2;
244:16;245:18

**shorter (1)**
193:19
**shots (1)**
201:3
**shout (1)**
150:16
**show (2)**
184:10;201:11
**showed (1)**
217:11
**showered (1)**
181:22
**shows (1)**
84:11
**side (3)**
19:9;87:2;116:22
**sign (6)**
54:2;92:19,22,25;
211:1;225:13
**signal (3)**
148:15;194:13,16
**signaling (1)**
230:12
**signature (4)**
189:24;198:8;211:2;
247:11
**silent (4)**
73:9,15,16;75:14
**silently (1)**
128:13
**similar (1)**
162:12
**single (2)**
152:7;192:19
**sit (4)**
78:21;111:15,19;
241:12
**sits (1)**
170:24
**sitting (6)**
113:6;152:5;153:16;
154:25;155:3,8
**situation (29)**
44:23;47:10;89:13;
90:13;106:17;114:18;
116:23;117:7;148:20,
22;154:13;157:16;
159:22;170:11,14,15,
22;172:5,7;183:3,23;
208:11;213:4;223:19;
225:4;228:9;231:7,10;
240:17
**situations (3)**
54:12;184:5;233:4
**six (3)**
29:12;193:20;244:3
**skills (1)**
93:14
**small (2)**
46:2;57:7
**smaller (1)**
57:9
**smelled (1)**

216:3
**SMITH (16)**
91:14;166:18,24;
167:9,14;172:20;
221:21;230:22;231:23;
232:5;238:11,18;
245:5,17,20;246:20
**smoke (7)**
123:16;129:2,3,11;
131:20;156:16;216:3
**smoky (1)**
144:24
**Snapchat (1)**
11:12
**social (2)**
10:23;11:11
**somebody (29)**
57:19,23;58:3;76:14;
79:15;86:9;88:5,21;
90:17;97:3,5;100:9;
106:11;107:3;110:3,
13;128:23;160:16;
202:19;204:18,22;
232:3,19,20;235:11,20;
236:1;244:8,16
**someone (41)**
23:12;30:17,18;
31:11;32:14,22,25;
33:5;41:4,19,22;49:7;
53:9;58:2;63:24;64:4;
68:14;75:1,5,10;79:11;
80:6;84:24;88:17;
89:12;96:20;97:8;
106:13;148:5;149:20;
168:25;169:21,21;
170:24;197:4;219:17;
231:21;236:3;244:6,
11,13
**someone's (1)**
121:4
**Sometimes (14)**
20:24;65:20,24;
66:18;67:22;69:19;
71:10;72:15;74:16;
79:10,21,21;82:23;
96:11
**somewhat (2)**
71:6,9
**somewhere (1)**
100:20
**soon (2)**
101:21;165:24
**sooner (1)**
156:13
**sorry (21)**
9:17;21:21;24:22;
52:18;68:12;105:15;
149:17;152:23;161:11;
167:2,8,13,14;168:13;
169:8;170:12;198:6;
215:4;221:21;229:10;
243:4
**sort (16)**

26:11,14;27:19,21;
28:13;34:19;44:19;
74:22;75:24;78:22;
92:3;98:25;99:6;
102:21;107:15;225:15
**sorting (1)**
120:14
**sounded (1)**
146:20
**sounds (1)**
43:4
**source (1)**
171:1
**speak (16)**
8:3,5;21:16;22:12;
35:2,9;112:18,23;
158:20;161:17;162:15;
198:12;207:12;209:18;
235:20,25
**speaking (1)**
162:16
**specific (10)**
21:10;35:21;48:21;
49:21;89:17;94:10;
234:11;241:12;242:4,6
**specifically (14)**
16:3;47:24;59:6;
60:12;67:3;94:7;110:7;
157:19;163:13,16;
232:23;233:2;241:19,
22
**speculation (1)**
166:19
**spend (4)**
43:21;181:5;207:4,
15
**Spider (1)**
206:10
**spoke (4)**
16:1;22:15;161:21;
220:15
**spoken (16)**
7:24;9:5;21:21;
112:13,16;114:10,13;
154:9;180:7;206:16;
207:9,24;208:2;
209:21,24;237:25
**sporting (3)**
168:7,11,20
**St (1)**
12:2
**staff (10)**
32:21;57:14,16;
174:17;175:1;185:9;
200:25;217:1;218:11;
240:14
**staffing (4)**
31:14;37:6,6,10
**stairs (2)**
56:2;204:16
**stamp (4)**
186:20;202:2;
210:10;214:17

**stamped (1)**
200:19
**stamps (2)**
171:20;211:16
**stand (2)**
64:21;225:8
**standing (7)**
128:15;134:18;
140:11;142:2;204:10;
205:12;238:19
**start (12)**
4:11;13:2,17;20:5;
64:16;81:1;165:3;
202:1;213:8;219:23;
226:7;234:2
**started (38)**
11:24;14:16;23:2;
42:10,12,12;73:20,23;
74:14;115:10;116:18,
25;121:19,21;122:1,3,
3,9,17;125:11;129:7,
13,18;138:16;145:10;
157:6;160:17,18;
161:2,2,6,14;162:5;
216:25;219:2,19;
228:11;241:20
**starting (1)**
114:25
**starts (5)**
216:15,18;218:7;
219:17,18
**State (6)**
10:19;12:11;14:18;
15:1,3;186:21
**stated (7)**
215:15;216:3,21,23;
217:8,10;218:10
**statement (38)**
4:11;151:25;152:2,2,
3,10,13,19;153:4,6;
188:15;190:10;191:3,
6,10,18,21,24;192:10;
193:18,19,22;194:24;
195:1,4,7,18,20;196:1,
4,9,14,19;238:6;
239:12,14,18;240:24
**statements (5)**
35:19;152:15;186:6;
189:23;193:14
**Statham (10)**
141:4,11,19;179:5;
180:1;181:12;205:5;
207:22;236:20,25
**Statham's (3)**
195:18,19;196:1
**station (14)**
75:22,25;76:5,9;
78:15,18,19;98:20;
121:8,16;160:9;
169:14;242:18,20
**stay (5)**
70:5;78:12,14;
116:22;215:4

**stayed (1)**
128:1
**staying (2)**
78:18;120:16
**steel (1)**
17:19
**step (2)**
157:8,17
**stepped (1)**
16:10
**steps (4)**
228:19;230:6;
231:16,18
**Steven (1)**
206:25
**still (13)**
10:20;14:20;19:12;
33:23;131:20;132:9;
138:24;173:2;186:5;
198:21;219:10,12;
230:25
**stop (6)**
26:7;127:20;205:6,
11;206:6;244:1
**stopped (6)**
124:7;191:20;
203:11;204:4,12;243:5
**stopping (7)**
202:4,9,18;203:5;
204:17;205:19,24
**stories (1)**
149:21
**straight (2)**
119:7;181:19
**stuff (17)**
13:13;18:9;39:13;
47:6;77:20;78:23;
81:13,17;82:12;86:17;
98:4,5,25;99:5;100:20;
102:20;112:9
**submit (1)**
99:21
**submitted (1)**
100:2
**substance (2)**
7:23;103:7
**sued (5)**
5:11;208:13,15,21;
209:4
**sufficient (5)**
30:10,13,16;144:3,
12
**summary (2)**
208:24;245:1
**superintendent (2)**
177:12,14
**superiors (4)**
157:14;162:7;
192:14;212:21
**supervisor (5)**
28:2;36:13;38:3;
66:23;239:11
**supervisors (11)**

20:11;24:12,19;
25:17;66:14,20;67:4,
18,24;68:3;93:19
**supplement (1)**
198:25
**supposed (29)**
34:14;39:24;40:3,10,
13;45:11;46:24;47:3,
13,21;50:12,14,18;
53:21,24;59:1;61:18;
77:22;78:24;80:4;
81:13,14,19;85:7;
102:24;110:10;184:24;
185:1;237:21
**sure (69)**
8:21;10:22;17:8;
24:10;25:7,14;27:17,
23;34:13,15;40:20;
42:15;46:18;48:19;
53:18;56:9,13;57:13;
59:2;61:12,18;63:1;
69:2;71:5,8;74:1,2,6;
75:1;77:19,21;81:11,
18;84:3,13;87:25;94:9;
99:20,24;101:2;
107:12;121:24;134:23;
137:11,14;159:23;
170:2,18;173:23;
176:8;177:6;183:9,13,
16,18;184:18;185:6;
187:13;189:2;190:9;
204:2,21;205:10;
223:15;228:14;229:21,
23;230:2;231:15
**surveillance (1)**
201:16
**survey (2)**
26:12,14
**switch (1)**
80:1
**switching (1)**
244:10
**sworn (1)**
4:3
**system (5)**
60:4;225:15,18,23;
227:10

---

## T

**talk (33)**
20:11;28:2;34:1;
66:2;69:13;72:22,24;
73:7;74:2;83:14;89:10;
93:19;103:21;114:21;
118:7;125:2;149:11,
20;153:18;169:20;
173:24;174:2;180:13;
181:23;208:10,14;
235:10;236:3,3;
237:22;239:5,8;241:17
**talked (7)**
8:23;17:8;94:17;

124:19;169:21;192:6,
10
**talking (16)**
8:15;56:1;67:7;
72:20;75:13;83:2;
102:10;113:8,13,20;
138:20;222:24;235:13;
236:8;237:5,10
**talks (1)**
170:24
**taught (9)**
42:9;81:4;232:2,18;
233:5,10,15;234:5,8
**Taylor (1)**
178:1
**teach (1)**
44:11
**team (9)**
182:22,25;183:10;
184:13,14,20,20;194:1;
218:11
**telephone (1)**
4:14
**telling (12)**
5:19;16:8;23:2,22,
23;47:5;48:17;67:4,13;
114:18;153:19;239:5
**ten (24)**
8:8;15:4;32:8;45:22;
137:6,7;216:5,8,10;
217:10,19,21;218:2;
219:6,11,13;240:25;
243:1,2,3,12;245:24;
247:3,7
**ten-minute (3)**
91:13;160:21;220:12
**term (2)**
171:6;177:9
**test (8)**
73:19;74:3,6,9,13,
16;124:15;242:16
**tested (3)**
242:11,13,14
**testified (3)**
4:3;189:17;235:19
**testify (1)**
7:8
**testimony (6)**
5:6;7:4,12;190:22;
209:25;230:23
**testing (3)**
241:10,13,15
**tests (1)**
14:13
**there'd (1)**
246:16
**thinking (1)**
143:9
**third (12)**
8:9,22,23;12:12;
35:8,11;55:24;183:13;
205:4;215:13;217:8;
223:22

**though (10)**
27:23;53:18;55:25;
57:13;63:2;69:11;
73:14;80:20;183:9;
246:3
**thought (7)**
15:10;29:18;93:13,
24;209:15;237:18;
240:7
**threat (3)**
21:13;156:22,25
**threatened (10)**
15:21;16:6,7;23:3,
12;24:6,9;26:8;157:23;
158:1
**threatening (4)**
113:24,25;116:19;
143:3
**threats (33)**
15:11,12,14,24;16:9,
24;20:10,19,23;21:3,6,
8,11,17,23;22:13,16,
20,23;23:16;24:12;
25:6,8,11,18,22;26:5;
112:18;155:25;159:3;
161:4,8,12
**Three (24)**
8:4;30:1,2,13,18,20;
48:2;56:6;61:17;64:19;
83:22;120:12;132:20;
135:22,23;136:3;
151:21,23;153:3;
157:19;196:6;205:1;
221:25;223:16
**throughout (2)**
69:22;77:13
**throwing (1)**
222:21
**timeline (1)**
218:19
**times (35)**
8:3,8;17:2;32:20;
63:8;64:12;65:19,25;
66:12;72:9;75:17,18;
76:13;79:21;80:19;
81:6;95:2;108:5;
150:17;153:11;180:16;
181:1;212:13;227:21;
242:11,24,25;243:1,2,
3,11,12,15;244:1,4
**Timothy (1)**
207:18
**tissue (1)**
222:4
**titled (1)**
171:21
**today (15)**
7:4,9,12,21;8:1,12,
20;9:3,7;111:15,19;
189:17;190:22;198:22;
241:12
**together (6)**
114:4;151:21;

BARBARA DEVINE, et al, vs
RON NEAL, ET. AL.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 80 of 82

JUSTIN RODRIGUEZ
November 4, 2019

152:15,17;153:9;223:5
**told (78)**
6:21;16:18,24;22:15;
25:12,14;34:11;42:3,6;
46:19;47:19;48:10,13,
24;49:4,15,23,25;50:3,
9;51:13;52:3,9;54:17;
56:12;67:15;85:1;87:6;
92:6,10;94:2,5,7,11,13;
95:6;97:5;100:24;
115:24;116:14,21;
125:20;132:21;133:20;
134:5;136:12,14,20,21;
139:12;140:4,8;
149:25;153:21,23;
157:7,10;163:3,6,14;
164:8;165:4;171:9;
174:6;190:15;191:13,
19;194:6;212:22;
222:19;228:21;230:21;
231:20;235:10,18,19,
25;236:2
**took (15)**
11:24;12:10,24;
33:22;64:19;136:5;
140:22;195:9,12,22;
196:16;219:25;226:2;
232:16;243:10
**top (4)**
109:12;187:18;
210:10;214:18
**total (1)**
245:22
**touch (3)**
146:20;147:8;180:4
**tour (1)**
182:5
**toward (1)**
157:18
**track (2)**
227:10,15
**tracks (1)**
19:10
**trailers (1)**
19:8
**trained (16)**
50:1,25;51:7,9;
56:14;76:18;90:6,9;
103:10,13;104:5,7;
106:16;108:1;171:2;
231:20
**training (74)**
29:3;33:9;41:23;
42:4,6,10,13,17,18,19;
43:4,12,16,18;44:3,10,
14,17,17,19,21;45:1,3,
6,8;46:19,23;47:4,7,8,
15,16,16;49:5,18;51:2,
3;54:11,14,22,25;55:6,
9;59:5;60:24;70:25;
71:1,3;76:20;81:4;
84:15;85:2;91:19,20;
92:3;93:10,17;94:6,8,

11;102:18;104:9;
107:15;108:4,8;184:6;
186:4;227:1,3,25;
229:20;232:2,7;235:1
**trainings (3)**
43:19;91:23;92:1
**treated (2)**
89:25;90:1
**tried (6)**
90:22;116:13;
124:24;125:6;132:25;
146:16
**trouble (4)**
82:20;101:13;
129:15;156:18
**trucks (1)**
19:8
**true (1)**
190:7
**TruGreen (1)**
19:24
**Trute (1)**
176:3
**truth (1)**
161:25
**truthful (1)**
7:4
**truthfully (1)**
7:9
**try (34)**
6:10;8:17;39:7;
41:25;42:24;44:6,12;
45:15,18,18,24;46:10;
48:11,15;49:7;50:15;
52:16;65:12;75:3;
82:25;90:23;104:17;
116:1;124:23;127:2;
139:6;144:7;147:8;
148:19;149:3;183:3;
209:13;229:22,24
**trying (18)**
81:17;82:19;83:17;
126:24;137:11,13,18,
22;138:1,7;143:8,17,
18;191:7;207:10;
228:16;238:22,22
**turn (14)**
182:3;189:3,7,19;
193:15;194:20;195:15;
196:6;198:5;199:19;
215:4;217:5;218:4,17
**turned (2)**
93:3;96:23
**turns (2)**
79:11;83:11
**TV (3)**
221:2,5,8
**TVs (1)**
102:8
**twice (3)**
12:11;212:13;227:23
**Twitter (2)**
11:4,6

**two (29)**
12:19;17:12,14;30:7,
10,16,17,19,20;48:2,2;
76:1,1;83:22;116:19;
153:15,16;154:21,25;
155:7;172:1;193:15;
194:20,25;195:15;
203:6;223:16;238:12;
246:16
**type (7)**
7:2;14:7;53:5;82:14;
92:24;155:5;169:18
**types (6)**
34:5;35:25;36:11;
98:5,19;101:11
**typical (1)**
83:16
**Typically (13)**
65:12;70:13,15;
71:19;76:12,21;78:8,
25;79:3,24;95:4;104:4;
245:25

## U

**under (6)**
5:17;7:2;159:2;
183:3;210:15;212:7
**understood (1)**
162:6
**unique (1)**
225:10
**unit (2)**
194:1;218:11
**unless (1)**
167:10
**unlock (16)**
96:13;118:13;
119:21;131:8;139:14,
16,18,24;145:4,6,8;
146:16;147:18;149:2,
3;199:9
**unlocked (14)**
87:2,3;118:16,17,19;
131:11;139:17,23,25;
140:3;145:9;146:8;
147:3,5
**up (120)**
12:11;25:23,24;26:7;
39:14;55:22;60:14,15;
65:16;70:15;71:20,21;
77:9,11,24;86:18;87:1,
7;88:11,20;97:11;
105:5;115:6,12,19;
116:6,7,13;118:1,17;
122:8,23;123:2,4,8,14;
124:4,6,9,11,12,21,22;
125:3,20;126:6,7,9,11,
13;127:12,18;128:2,3,
11,12;130:11,15;133:7,
11,16,21;135:23;136:4,
7,22;137:17;138:22;
139:25;140:6,14,23;

141:6,9,13,22;142:17;
143:18;145:19,22,25;
146:2,4,21;147:12;
149:6,24;150:1,18;
163:9;167:20;176:1;
184:10;190:9,10,16;
197:6,13;200:1,4;
201:12;202:17;203:11;
204:4,16;210:23;
214:2,6,9;216:6,9;
217:1,11;219:4,8,13;
236:20;244:12,14;
245:7
**update (1)**
245:9
**updated (1)**
245:11
**upon (1)**
199:9
**upper (4)**
39:3,10;43:11;109:6
**upset (3)**
156:7,10,11
**upstairs (2)**
116:1;143:17
**use (18)**
10:23;55:6,9;59:3;
63:11;66:19;72:2;
83:25;84:8,9,16;
115:19;124:23;137:18;
145:6;183:8;235:5,7
**used (11)**
11:7;29:17;75:4;
77:6;84:12;100:19;
145:3;184:17;187:2;
234:22,25
**user (2)**
11:2,6
**using (4)**
72:3;138:2,7,10
**usually (22)**
20:22;29:24;32:17;
62:19;64:18;65:10;
73:2;86:24;87:3,4,5,6;
95:14,17;97:15;
158:15;168:5;179:23;
180:3;183:1,8;213:13

## V

**vaguely (2)**
111:21;113:18
**vagueness (1)**
172:21
**Vanihel (1)**
176:13
**verbal (2)**
5:24;156:22
**versus (1)**
242:23
**vests (1)**
183:6
**video (15)**

154:6;201:11;202:1,
9,18;203:5;204:4;
205:6,11,19,20,24;
206:6;218:7,20
**violate (1)**
148:10
**violated (2)**
148:14;212:22
**violation (1)**
210:18
**violations (1)**
210:21
**visualize (2)**
45:15;229:24
**volunteer (1)**
193:4

## W

**wait (27)**
6:4,6;16:20,20;
24:21;49:7,12;50:7,12,
14,17;89:7,12;90:5;
97:3;100:12;105:14;
115:24;128:18;142:11;
144:12;147:24;148:4;
161:10;230:14,19;
231:3
**waited (8)**
12:18;116:5;127:10;
128:11,22;136:15;
140:25;144:11
**waiting (12)**
128:13;129:20;
130:9;134:22,22,24;
137:10;140:12;141:24;
153:13;161:16;236:12
**walk (10)**
22:25;23:1;39:11,12,
14;41:6,11;43:12;84:9;
114:24
**walked (2)**
84:4;216:6
**Walking (5)**
34:12;61:13,19;
75:19;205:25
**walks (2)**
77:20;244:14
**walk-through (1)**
14:6
**wall (5)**
123:11,12,14;
131:24,25
**wants (1)**
104:17
**warden (3)**
177:7,8;186:7
**watch (3)**
76:8,11,24
**watched (1)**
154:6
**watching (2)**
76:4;168:7

USDC IN/ND case 3:18-cv-00995-JD document 203-5 filed 03/29/21 page 81 of 82

**water (1)**
101:14
**Watson (43)**
36:17;37:22;68:21;
115:3;116:6;117:15,
18;119:23;129:16;
130:10,24;131:7;
132:24;133:1,6,23,24;
136:11,18,22;137:9;
139:21;141:15,17,20;
142:4;146:1;147:19;
178:16,17;181:10;
184:22;185:1;204:21;
207:16;217:20;218:9;
236:22;237:16;239:4,
15,18;240:5
**Watson's (4)**
194:24;195:1,4;
239:12
**way (34)**
18:10;20:25;26:3;
32:1;39:13;61:20;
69:16;83:19;86:17,18,
24,25,25;122:23;
125:14;128:20;160:17;
190:12;199:7,15;
203:14;218:1;225:13;
226:2,17;231:7,8,15,
22;232:4,19,20;234:9;
240:6
**ways (2)**
69:12;185:16
**weapons (4)**
182:22,25;183:5,10
**website (3)**
10:18,19;13:25
**week (2)**
54:1;173:16
**weeks (5)**
24:25;42:23,25;44:6;
96:16
**weeks' (2)**
17:12,14
**weird (1)**
73:17
**well-being (1)**
166:17
**weren't (23)**
34:24;40:23;41:1;
64:6;68:6;69:1;77:22;
78:6,10;81:18,19,23;
82:2,3,6;96:2;101:12;
108:8;124:4;173:5,18;
182:14;227:11
**Westville (2)**
43:13,16
**whatnot (1)**
104:4
**What's (21)**
9:24;10:7;11:2;
17:22;19:7,25;121:11;
169:25;170:8,16;
171:1;182:25;184:2,

16;193:17;194:22;
195:17;210:5,9;
211:12;229:8
**wherever (3)**
51:22;246:6,13
**whole (21)**
31:4;54:21,23;59:22;
61:11,13;79:12,12;
83:25;84:6;86:10;
114:18;119:20;136:23;
159:22;172:5;208:11;
216:24;219:17;223:19;
240:17
**who's (8)**
33:5;38:23;85:4;
175:15;177:4;183:13,
16;184:11
**whose (1)**
62:10
**widely (3)**
69:3;90:11;91:4
**William (4)**
175:3;206:21;215:8,
12
**willing (1)**
99:10
**Wilson (2)**
175:3;179:9
**windows (1)**
121:9
**within (1)**
149:20
**Without (6)**
7:23;52:3;72:6;
90:16;142:22;243:18
**witness (34)**
4:2,5;5:3;18:3;
38:13;111:24;167:1,3,
7,12;172:3;187:25;
189:4,20;190:6;
193:16;194:17,21;
195:2,16,21;196:7,12;
198:7,17;199:5,20;
211:25;218:5,18;
220:18;225:9;245:13,
15
**witnessed (2)**
102:23;148:23
**witnesses (2)**
244:25;245:1
**wonder (1)**
41:1
**word (1)**
216:15
**worded (1)**
107:25
**work (58)**
10:3,16;12:7,9;
14:17;18:8,10,12;
24:23;28:3,7,10,14,16,
19;29:4;30:18,20,25;
31:2,9,11;34:3,11,21;
37:15;39:2,3,7;43:2,5;

48:19;65:22,24;67:22,
25;68:15;72:6,15;79:1;
101:7,8;179:21,24,25;
180:10,14;181:6,15;
184:7;185:8;207:5,7,
15;213:1;227:21;
237:2;243:18
**worked (21)**
14:19,19,23;17:2,23;
27:25;29:6,14,24;31:5;
35:11;37:12;43:15;
53:9;109:6;177:14;
180:1,3,18,23;223:2
**workers (3)**
53:4,5;77:24
**working (56)**
10:10;13:2;18:25;
19:12,23;20:4;23:7;
30:4;38:25;42:11,12;
51:11;67:5;68:6;69:1,
2,9;72:8;74:7,17,23;
93:21;101:12;111:13;
115:16;124:13;125:1;
175:16,20;180:15,22;
182:14,19;213:23;
222:9;223:1,5,9;226:6,
9,23;227:4,7,11;
241:24;242:22,23,24,
25;243:5,13,18,24;
244:2,2,7
**worn (1)**
154:12
**worried (1)**
240:13
**worry (1)**
245:18
**worse (1)**
129:14
**wrapped (1)**
139:2
**write (14)**
25:22,24;26:6;27:9;
31:9;149:19;152:15;
187:8,11;191:10,14,15,
18,21
**writing (6)**
152:18;153:3;
187:14,15;190:2;191:1
**written (10)**
51:4;91:7;92:13,15,
17;152:2,3;187:6;
194:22;210:11
**wrong (1)**
88:15
**wrote (8)**
153:6;188:2,9,11,15;
189:22;190:5,7

233:9
**years (1)**
13:8
**yell (9)**
74:25,25;75:3;104:2,
4;125:6;165:21;168:6;
217:9
**yelled (5)**
125:25;126:3;
147:25;148:11;190:24
**yelling (75)**
75:4,5,10;104:6,12,
14,25;106:12,13;
121:21;122:1,9,15,17;
125:12,22;129:6,9,25;
130:4;150:20,23;
151:8,13,14,16;156:5;
160:8,11,17;163:25;
164:16,18,24,25;165:5,
10,14,17,19,24;166:3,
5,7;167:22;168:1,3,18;
169:1,5,10,15;190:23;
194:2,4,7,12,14;216:4,
7,23;217:2,14,19,22,
23;218:2;219:11,13,17,
18,23;220:3;240:25;
241:7
**yellow (1)**
71:24

**Z**

**zigzag (1)**
86:25

**0**

**001992 (1)**
200:19

**1**

**1 (5)**
171:16,17;214:20;
215:5;218:17
**100 (7)**
134:18;142:24;
157:3;203:6,15;
205:22,25
**10-71 (2)**
194:13,16
**11:00 (1)**
119:19
**11th (1)**
4:13
**12 (1)**
30:24
**13 (1)**
191:24
**136446 (1)**
215:25
**148638 (1)**
216:12

**15 (5)**
32:8;79:6,23;216:24;
217:3
**15th (1)**
4:17
**17th (1)**
173:13

**2**

**2 (7)**
117:3;186:14,16,20;
215:4,11;216:3
**20 (3)**
8:9;76:25;79:6
**200 (1)**
127:7
**2012 (1)**
11:19
**2013 (2)**
13:3,3
**2014 (1)**
12:15
**2016 (2)**
13:18;14:16
**2017 (17)**
15:5;89:20;110:22;
111:16;171:22;172:9;
185:24;186:10;193:25;
196:21;199:11;210:13;
211:20;214:20;224:7;
228:12;241:10
**212869 (1)**
217:6
**219-775-8305 (1)**
9:25
**24 (1)**
171:21
**24th (2)**
173:6,7
**27 (1)**
211:20

**3**

**3 (4)**
197:19,20;210:13;
217:5
**3:20 (1)**
247:14
**30 (2)**
8:9;79:24
**300 (8)**
127:7,9,10,13,20;
128:1;202:19;203:3
**37 (1)**
4:14

**4**

**4 (3)**
200:15,16;218:13
**40 (1)**

**109:13**
**400 (3)**
   88:19;139:24;159:14
**45 (2)**
   109:13;122:25
**4-7-17 (1)**
   187:18

---

### 5

**5 (4)**
   188:11;210:5,6,9
**500 (48)**
   75:10;108:19,23;
   109:9,12;115:10,11,11,
   12;116:7;122:20,21,
   23;123:2,4;125:24;
   126:1,15,17,20,22;
   128:2,3,10,22;134:15;
   136:10;139:20,20,23;
   140:3;142:18,22,24;
   143:15,21;144:9,16;
   148:12;149:1;150:21,
   24;160:8,16;163:4,7;
   203:1;219:14
**5-29-17 (1)**
   210:15
**5-30-17 (1)**
   210:16
**536 (1)**
   217:7
**538 (1)**
   216:12
**540 (2)**
   216:4,8
**542 (1)**
   215:7
**544 (1)**
   215:25

---

### 6

**6 (3)**
   189:3;211:12,13
**6:10 (2)**
   187:19,21
**6:30 (2)**
   31:18,18

---

### 7

**7 (15)**
   89:20;111:16;172:9;
   185:24;193:24;196:21;
   199:4,11;214:13,14,17;
   218:4;224:7;228:11;
   241:9
**7th (4)**
   4:13;208:16;223:23;
   227:21

---

### 9

**9 (1)**
   199:19
**9:00 (4)**
   101:24;115:2,3;
   197:11
**9:33:35 (1)**
   218:13
**9:34 (1)**
   219:2
**9:34:15 (1)**
   218:14
**9:34:43 (1)**
   218:23
**9:40 (1)**
   193:25
**9:42:01 (1)**
   202:2
**9:42:20 (1)**
   202:4
**9:43 (1)**
   219:4
**9:43:57 (1)**
   202:9
**9:44:42 (1)**
   202:18
**9:44:45 (2)**
   203:5,18
**9:44:47 (1)**
   203:20
**9:44:51 (1)**
   204:3
**9:44:56 (1)**
   204:12
**9:46:12 (1)**
   204:17
**9:47:19 (1)**
   205:6
**9:47:35 (1)**
   205:11
**9:48:55 (1)**
   205:19
**9:49:04 (1)**
   205:24
**9:50:02 (1)**
   206:6

USDC IN/ND case 3:18-cv-00995-JD   document 203-5   filed 03/29/21   page 82 of 82