## In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*PROMISE BLAKELY*
*January 15, 2021*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 01-15-21 PROMISE BLAKELY.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 2 of 78

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the )
ESTATE OF JOSHUA DEVINE, )
                          )
        Plaintiff,        )
                          )
vs.                       )  Cause No.
                          )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,        )
                          )
        Defendants.       )
_____)

        Videoconference Deposition of PROMISE BLAKELY

        Date:     Friday, January 15, 2021

        Time:     10:06 o'clock a.m.

        Place:    Via Zoom & 5816 East 5th Avenue
                  Gary, Indiana

        Called as a witness, by the Plaintiff, in
        accordance with the Federal Rules of Civil
        Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

                BOSS REPORTERS
              & VIDEOCONFERENCING
    GARY * MERRILLVILLE * VALPARAISO, INDIANA
                (219) 769-9090

Page 2

APPEARANCES:

SAM HEPPELL, ESQ.   (Via Zoom)
MEGAN PIERCE, ESQ.  (Via Zoom)
        Loevy & Joevy
        311 North Aberdeen Street
        Chicago, Illinois  60607
        PHONE:   (312) 243-5900
        FAX:     (312) 243-5902
        sam@loevy.com
        megan@loevy.com

On Behalf of the Plaintiff;


ARCHER ROSE, ESQ. (Via Zoom)
        Office of the Attorney General
        Deputy Attorney General
        Civil Litigation
        302 West Washington Street
        IGCS Fifth Floor
        Indianapolis, Indiana  46204
        PHONE:   (317) 232-6201
        FAX:     (317) 232-7979
        archer.rose@atg.in.gov

On Behalf of the Defendants.

Page 3

VIDEOCONFERENCE DEPOSITION OF PROMISE BLAKELY
DIRECT EXAMINATION
    By Mr. Heppell......................... Page   4
CROSS EXAMINATION
    By Mr. Rose........................... Page 202
REDIRECT EXAMINATION
    By Mr. Heppell......................... Page 220


                E  X  H  I  B  I  T  S

PLAINTIFF'S           MARKED     IDENTIFIED

Exhibit A               226           15
Exhibit B               202          202
Exhibit C               205          205
Exhibit D               209          209
Exhibit E               210          211


                    *   *   *

Page 4

PROMISE BLAKELY, called as a witness, by the Plaintiff, having first been duly sworn, was examined and testified as follows:

THE WITNESS: Yes, I do.

DIRECT EXAMINATION

BY MR. HEPPELL:

Q    Good morning, Promise.  I introduced myself off the record, but to do it formally on the record now that we've started the deposition, my name is Sam Heppell, and I'm one of the attorneys that represents the plaintiff in this case.  The plaintiff is Denise Dwyer, who is serving as the special representative of the Estate of Joshua Devine, who was a prisoner at Indiana State Prison.

Could you please state and spell your full name for the record?

A    Yes.  Promise, P-R-O-M-I-S-E, and then my middle name is LaJoy, L-A, capital J-O-Y, and then Blakely, B-L-A-K-E-L-Y.

Q    Thank you.  Do you prefer if I call you Promise?  Is that okay?

A    Yeah, that's fine.

Q    Okay.  You can call me Sam.  Thank you,

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 3 of 78

Page 5

Promise.

A    Uh-huh.

Q    Before we jump into the substance of the deposition there are some preliminary things that I want to cover.

MR. HEPPELL: First of all -- and I could have done this before we jumped into the question and answer, but just to put on the record, as we have done in previous depositions, I want to say on behalf of plaintiff, in light of the public health situation related to the ongoing COVID-19 pandemic, we as a plaintiff are agreeing to conduct the deposition by remote video, at least partially by remote video. I understand we have the deponent in person at the court reporter's office at Boss Reporters.

But myself, plaintiff's counsel, my colleague Megan, and then Randy Rose is the counsel for the other defendants in the case, we stipulate to conducting the deposition in this manner. Promise, are you okay to move forward with the deposition in this fashion today?

THE WITNESS: Uh-huh.

Page 6

MR. HEPPELL: Okay. And on behalf of the other defendants, Counsel, if you just want to put that on the record as well.

MR. ROSE: Certainly, Sam. We so stipulate.

MR. HEPPELL: Okay. Thank you.

BY MR. HEPPELL:

Q    Promise, just to get to one thing, I understand that you, as you sit here today, you prefer to use he/him pronouns; is that correct?

A    Yes.

Q    Okay. And I will do my utmost to remember that and respect that. That's certainly my intention, and I apologize in advance if I slip up at any point.

A    Uh-huh.

Q    If I do slip up, I hope to correct myself. By the way, if I slip up and I don't notice and correct myself, please feel free to correct me because I want to be accurate and respectful of the pronouns that we use. Okay?

A    Okay.

Q    There are some pieces of background procedure in terms of how the deposition is going to

Page 7

move forward today that I want to bring to your attention to make sure that we are on the same page about so things go smoothly. Okay?

A    Okay.

Q    Have you ever sat for a deposition before?

A    No.

Q    Okay. So do you understand that you were given an oath by the court reporter and your testimony today is under oath? Do you understand that?

A    Yes.

Q    Okay. And you understand that that oath is the same oath that you would swear in a courtroom and it's your obligation, as you're sitting here today, to give truthful and accurate testimony to the best of your memory and ability. Do you understand that?

A    Yes.

Q    Okay. I mentioned a courtroom, but obviously we are not in a court. There's no judge here and we can be a lot less formal than we would be if we were in a courtroom. Okay?

A    Okay.

Q    And so by that I mean, if you need to take a break at any point in time, that's no problem.

Page 8

Just let me know and we can go off the record, take a pause in the deposition, you can step away for whatever reason. It's no problem to take a break, and certainly I may be requesting to take some breaks during the deposition today as well. Okay?

A    Okay.

Q    So if you need to take a break at any point in time, just let me know. Okay?

A    Okay.

Q    The only stipulation or rule around that is that if I've asked a question, I would ask you to give your full answer to that question before we step away and take a break and then we can start off the deposition when we come back with a fresh question after the break. Okay?

A    Okay.

Q    As I mentioned, there is no judge and we're not in a courtroom, but just like we would be in a courtroom, there's a court reporter who is making a written record of my questions and your answers. Do you understand that?

A    Uh-huh.

Q    And in addition, we are using the video-record

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 4 of 78

Page 9

feature on the Zoom to preserve a video recording of the deposition as well, and both the video and the court reporter's transcript is to ensure that we have as complete and accurate as possible a record of your testimony today.  Does that make sense?

A    Uh-huh.

Q    And I want to make sure that I'm giving you a fair opportunity to give truthful and accurate testimony.  So I want to make sure that I'm asking questions that you can understand.  Okay?

A    Uh-huh.

Q    And so if I ask you a question at any point in time that you don't understand -- maybe it's the way I phrased something or you maybe can tell from my question, from what I'm asking, you can tell that I've misunderstood you or there's something -- there's some aspect of my question that's not right.  If any of that happens, please let me know and I will gladly work with you to rephrase my question to make sure you can understand it.  Okay?

A    Okay.

Q    If you go ahead and give your answer to a

Page 10

question, I'm going to assume that you were able to understand it.  Okay?

A    All right.

Q    Another thing that is a little trickier with a deposition as opposed to just a conversation that you and I might have, because there's a court reporter making a written record of question, answer, question, answer, it's important that you let me get all the way to the end of my question before you jump in with your answer.  Does that make sense?

A    Uh-huh.

Q    It's a very unnatural way of having a conversation.  Most times in normal conversation people talk over each other all the time, but it's important that we try and avoid that.  Okay?

A    Okay.

Q    And similarly, for the same reason, it's important that I ask my questions and you give your answers using full words and full sentences without relying on gestures like nodding your head or things like uh-huh, huh-uh, because those are very clear in the moment as we're going through it, but almost

Page 11

impossible for the court reporter to make a good, clear record afterwards.  Okay?

A    Okay.

Q    And so I may ask you to repeat an answer just if something is not clear for the record, even if I could understand you, and I hope you'll bear with me.  I just want to make sure that the testimony you give is recorded accurately in the transcript that the court reporter is making.  Okay?

A    Okay.

Q    There may be some objections that get made to some of the questions that get asked at the deposition today.  There is no judge in the room to rule on those objections.  So unlike in a courtroom, the objections are just being made for the record.  So I would ask that you just give a pause to let the attorney make the objection for the record and once the objection has been made, you can go ahead and state your answer to the question.  Okay?

A    Okay.

Q    Just in terms of how we're going to go forward, I'm going to start with some questions that I have.  I'm going to do my

Page 12

best to be respectful of your time.  At the same time, this is, you know, an important case.  There's a number of areas that I need to cover and I only get one opportunity to have you testify at a deposition.  I can't get back to you and make you come back again and again.  So it may take a number of hours before we get through today.  Okay?

A    Okay.

Q    Once I've asked the questions that I have, Mr. Rose, who is the attorney representing the other defendants in the case, may have some questions for you as well.  Okay?

A    Okay.

Q    And then there may be some follow-up back and forth questions that attorneys always think of things based on things that someone asks, but I promise you that part will be much shorter, the back and forth questions for that.  Okay?

A    All right.

Q    With all of that sort of background and preliminary stuff out of the way, do you have any questions or issues that you need to be clarified about how the deposition is going proceed today or what you're here to do today?

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 5 of 78

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

Page 13

A No.

Q Okay. Can you think of any reason that you are not able to give truthful and accurate testimony to the best of your ability and to the best of your memory as you sit here today?

A No.

Q And do you suffer from any medical conditions or are you taking any medication that in any way affects your memory or would affect your ability to truthfully and accurately testify today?

A No.

Q Okay. Promise, where are you currently staying?

A Currently, I'm at my mom's house right now. I was just in town for my grandma's funeral and just for the holidays.

Q And I should -- I think this may have been on the record earlier and will be reflected in the transcript, but just so I'm clear, right now you are sitting in the office of the court reporter and that's in Gary, Indiana; is that correct?

A Yes.

Q Okay. And you said right now you're staying

Page 14

at your mom's house; is that correct?

A Yes.

Q And your mom is Michelle Blakely?

A Yes.

Q What is the address of the house where you're staying right now?

A 914 Chickadee Drive, Michigan City, Indiana, 46360.

Q And how long have you been staying at your mom's house?

A I've been there since -- my grandma passed on the 5th, and I got here around like the 7th. So I've been here since like November 7th.

Q Okay. And just to make sure I understand your answer -- well, first of all, I want to say I'm sorry for your loss, the loss of your grandmother. I'm sorry to hear that.

You said that your grandmother passed on the 5th. Are you referring to November 5th?

A Yes, November 5th, and I was here around November 7th.

Q Okay. So November 5, 2020 is when your grandma passed and you've been in the Michigan City or Northern Indiana area since around November 7, 2020?

Page 15

A Yes. Can I show you something?

Q Sure, go ahead.

A Yeah, I think it shows November 5th and her funeral was November 13th.

Q And thank you for showing that, Promise. Would you leave that out for just one second?

A Uh-huh.

Q It's a little hard to see on the video. It looks like the name on that was it Willie May Washington?

A Yes.

Q And that's your grandmother's name?

A Uh-huh.

Q Okay. And the paper that you're showing is a copy of the flyer pamphlet for the celebration of life or the memorial that was held for your grandmother?

A Yes.

Q Okay. Would you mind if on a break that the court reporter take a photocopy of that document?

A Uh-huh.

Q Just so we have that as part of the record.

A Uh-huh.

Q Okay. We'll definitely make that Exhibit A

Page 16

and ask the court reporter to make a photocopy of that. I obviously don't want to take your copy of that. Just so we have the information on there for the record, that will show that the memorial was held on November 13, 2020; is that correct?

A Yes, at Divinity. It was in like East Chicago. Yeah, it was a funeral home.

Q Okay. And you have been staying at your mom's house at that address on Chickadee in Michigan City since approximately November 7th; is that correct?

A A little bit. A week afterwards, like the week before my grandma's funeral, and then I went and stayed with my girlfriend in Chicago, but I came back. I was just visiting my girlfriend, so.

Q Okay.

A Yeah.

Q And your girlfriend, can you clarify who you're referring to?

A Shantel Hickman.

Q Shantel Hickman?

A Uh-huh.

Q And she's staying in Chicago right now; is

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 6 of 78

Page 17

that correct?

A  Yes.

Q  Is she staying with her dad in Chicago or a different place?

A  No, she has her own place.

Q  Do you know the address of where she stays at in Chicago?

A  I don't know her address.

Q  Okay.  Do you know approximately where in the city she's staying at?

A  I think it's the west side.

Q  On the west side?

A  I'm not too --

Q  And is it a -- sorry, go ahead.

A  I'm not too familiar with Chicago, so I'm not -- but I believe it's the west side.

Q  And is it like a house or an apartment?

A  It's a house, but she's just in a room in the house.

Q  She has roommates in the house?

A  Yes.

Q  Do you know the names of any of her roommates?

A  I haven't really met them like that.  I was only there for like two days.

Q  Okay.  Got it.  Before you came up to Michigan

Page 18

City in early November after your grandma had passed, where had you been staying before that?

A  It's been a rollercoaster.  As I was telling the investigator, since 2017 I left my mom's house because she doesn't agree with my sexuality and she's very strong on that, and I've been staying -- I was at Goldfinch over there.  It's actually right down the street from her house.  And I couldn't afford the rent anymore, so I stayed at my friend's house at Woodland Crossing in Michigan City, and I ended up leaving his place and I was staying in my car in Chicago around 2018 to like 2019, and then I left and I just decided to go to Atlanta.

My friend offered a place at her mom's house and I went there and stayed with her for a while, and then we ended up on the streets for real, like in front of the Family Dollar and sleeping in a storage unit.  So I haven't had an address.  My mom wasn't contacting me and I wasn't contacting my sister or my dad.  They didn't really want to have relations with me.  My dad left, so I haven't seen him since

Page 19

he left a while ago, since I was in high school.  And my mom and my sister just don't really talk to me like that until the passing of my grandma.  So we've become closer together.  So I haven't got any mail.  I haven't received any mail at all until I got back literately this year from my grandma's funeral, so.

Q  Okay.  Well, thank you for explaining some of that, and it sounds like you've gone through a challenging period in your life.  So, you know, I'm sorry to hear that and hope that those challenging periods are behind you.

I just want to break down some of the pieces that you were just talking about to make sure that I understand them clearly and to make sure that I understand the timeline.

So you had mentioned -- I think you started off your answer by saying that there was a period of time in 2017 or prior to 2017 when you had been staying with your mom; is that correct?

A  Yes.  When I was working at the prison, I was staying with my mom, but then when I ended up getting like more of like my own money, I

Page 20

ended up moving into Goldfinch Lane.  It's right there up the street.  It's in the same apartment complex.  I ended up getting an apartment with the girl I was with at the time and one of my other friends that I was in the military with and another friend.  And then around like 2018, the beginning of 2018, I moved to Woodland Crossing with my friend.  It wasn't in my name.  I was just staying with him for the time being, and then the summertime of 2018 is when I started staying in my car, and around that time my phone wasn't really on like that because I was just kind of just in between and I didn't have a lot of money and not really having a lot of money of my own.

So I was always trying to use WiFi or try to keep my phone on, and this has actually been the longest I've been able to keep my phone on.  But recently I just broke my phone so I'm use an android, but I gave the investigator that number, but I told him not to save it because today I'm supposed to go try and get my replacement phone for the same number that I provided when I was in Atlanta.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 7 of 78

Page 21

Q    Okay.  Got it.  And again, I appreciate you being, you know, forthcoming and laying out all those details and I, again, just want to make sure I'm breaking them down to make sure I understand each piece.

A    Oh, I'm sorry.

Q    No, don't apologize.  That's fine.

A    Oh, and I forgot.  When I got down to Atlanta, I had told him the address that he went to I was just using that for mailing so I could start getting the mail because I was figuring I wasn't getting the mail for like this case and for the mail I needed.  So I asked my friend Princess if she would let me to use her mailing address just to get my mail.  So I wasn't staying there.  I was still homeless staying in like a storage unit, and whatnot, and I told him he can actually call that storage unit because they actually kicked us out that day they found out we were staying in there.  So, that's very true.  That happened.

But I was just using her mailing address just to get mail, but I ended up not even getting that mail as well.  I kept asking her and she said she wasn't getting any mail for

Page 22

me.  So I don't know what happened.  I don't know if it was just the post office and it was still going to my mom's house.  I don't know what happened, why it didn't go through.

Q    Okay.  And again, I appreciate your answers and I just want to make sure that I understand each piece and make each piece clear for the record, and it's not because I think you were being unclear.  I'm pretty sure I understand you, but I just want to make sure there isn't any misunderstanding and make sure each piece of it is clear for the record.

A    I understand.

Q    So to start off, you had referred a couple of times in your answers to an investigator, and are you referring to Morton Smith?

A    Yes.

Q    And you understand that Morton Smith is an investigator who's working with our office who's working with the plaintiff --

A    Yes.

Q    -- in the lawsuit.  You understand that; correct?

A    Yes.

Q    And Morton drove you to the deposition today;

Page 23

is that correct?

A    Yes.

Q    Okay.  And you had made reference to an address.  I think this was an address in Georgia that you referred to where you were not really staying, but you had been trying to use that address to receive mail at.  Did I understand that correctly?

A    It's Shiloh Road in Kennesaw, Georgia.

Q    Okay.

A    I don't remember the beginning of the address.

Q    Okay.  So an address that I have where we had been looking for you is Apartment 813 at an apartment complex at 1750 Shiloh, S-H-I-L-O-H.

A    Yeah.

Q    In Kennesaw, Georgia.  Is that the address that you're referring to?

A    Yes, that's the address.

Q    Okay.  So you were never staying there, but you were trying to receive mail there; is that correct?

A    Yes.

Q    Were you ever actually able to receive any mail that was sent to that address?

A    We had one piece of mail we received and that

Page 24

was for Shantel.  I didn't get any mail.

Q    Do you know what the problems were with you getting mail at that address?

A    It kept saying Return To Sender, but I kept asking my -- I asked my mom if she was getting the mail, but she wasn't answering me and, you know, just we're still not in contact, so.

Q    And this address was where a friend of yours lived.  You never lived there; is that correct?

A    Yes, that's correct.

Q    What's the name of your friend?

A    Princess.  I don't know how to say her last name.  It's like an African last name.  It's very long.

Q    Okay.  So her first name is Princess and she has an African last name that you don't know how to pronounce or spell it.

A    Yes.

Q    Okay.  And going back to the timeline of your housing, I understand you testified that when you were working at the prison, you were staying with your mom at the address on Chickadee; is that correct?

A    Yes, at the beginning of working at the

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 8 of 78

Page 25

prison.

Q   Okay.  And then do you remember when you stopped working at the prison?

A   It was like June, because the girl I was staying with, she had a baby and she left her baby at home, and knowing like myself, that's going to go on me if anything happens to that baby.  So I had to stay home and take care of the baby.  And I had told them I couldn't come into work, and they told me if I couldn't come into work that I would actually lose my job, and there was nothing much else I could do, so I ended up quitting.

Q   Okay.  And that was, you said, June.  Is that June of 2017?

A   Of 2017, yes.

Q   And so at that point had you already -- in June of 2017 when you left work at the prison, had you already moved out of your mom's house or were you still staying there?

A   I had moved out of my mom's.

Q   You had already moved out?

A   Yes.

Q   Okay.  And you said you moved out to an apartment, I think you said, on Goldfinch

Page 26

and --

A   I believe it was 1711 Goldfinch Lane.  It's still Canterbury Apartments.

Q   So part of the same apartment complex, just a different apartment?

A   Just a different apartment number.

Q   Okay.  And you had some roommates that were staying with you at the time there?

A   Yes.

Q   And was it -- it was a different woman who you were with at the time who had a baby?  It was not Shantel?

A   It was not Shantel.

Q   Okay.  And then what were you doing for work after you left your job at the prison?

A   After that, I started working at McDonald's.

Q   And you were working at McDonald's for a period of time while staying at the place on Goldfinch?

A   Yes, I was.

Q   Okay.  And then at some point you stopped living at the apartment on Goldfinch; is that correct?

A   Yes, I did.

Q   Where did you go after the apartment on

Page 27

Goldfinch?

A   I went to Woodland Crossing Apartments.  They're actually across from the welfare office.  It's down the street from Canterbury Apartments.

Q   Okay.  So same area of Michigan City --

A   Yes.

Q   -- as you had been staying at previously?

A   Uh-huh.  Yes.

Q   And the name of the apartment complex was Woodman Apartments?

A   No, Woodland Crossing Apartments.

Q   Woodland Crossing, got it.  And was that a house or an apartment that you were renting in your name or were you staying with someone else?

A   I was staying with my friend.  He was -- he had the apartment he was renting.

Q   Okay.  And so you were staying with him.  Were you on the lease or was that sort of informal that you were staying with him?

A   Informal.

Q   And approximately how long were you staying at the address at Woodland Crossing?

A   I'm trying to remember.

Page 28

Q   Would it have been --

A   It was like in May.

Q   I'm sorry, go ahead.

A   It was like until May.  It was a little after my birthday I left.

Q   And when is your birthday?

A   April 9th.

Q   April 9th.  And so was it a little after your birthday in 2018 that you left?

A   Yes.

Q   So sometime after April of 2018 you left the apartment on --

A   It was right before I went back to the military.

Q   I'm sorry, could you repeat that?

A   It was right before I went back to the military.

Q   Okay.  And when you say you went back to the military, was there a period of time before all of this that you had served in the military?

A   Yes, right in 2017, when I came back to my mom's, that's right before -- well, that was right after I had came back from the military.

Q   Okay.  What's your date of birth?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 9 of 78

Page 29

A    What's my date of birth you said?

Q    Yes.

A    04-09-1998.

Q    1998?

A    Yes.

Q    Okay.  April 9, 1998.  And so when did you first begin your military service?

A    It was, I believe, 2015 of April.

Q    April of 2015?

A    Uh-huh.

Q    Okay.  So you would have been -- had you just turned 17 or just turned 18?

A    17.

Q    You had just turned 17.

A    Uh-huh.

Q    Okay.  And what branch of the military did you serve in?

A    The first beginning was National Guard and then after I left my friend's apartment, I went active duty.

Q    So from 2015 to 2017, you were serving in the National Guard; is that correct?

A    Yes.

Q    And were you living with your mom at that Chickadee address during that time?

Page 30

A    Yes.  Well -- yes, yes, yes.

Q    Okay.  And was that a full-time job that you were serving in the National Guard during that time?

A    Oh, wait, before that.  When I first joined before I left, we were staying in Merrillville and then we went to live with my mom in Michigan City.

Q    Okay.  When you say "we" were in Merrillville, do you mean you and your mom were staying together at a different address or you were staying with someone else?

A    It was me, my mom, and my sister, because I was still in high school.

Q    Okay.  And then you all moved together to the address on Chickadee?

A    Yes.

Q    Okay.  And I think you've referred a couple times to your sister.  Is that Monique Blakely?

A    Yes.

Q    Okay.  And when you were serving in the National Guard was that a full-time --

A    Part-time.

Q    -- commission?  Part-time?

Page 31

A    Yes.  I was still in high school.

Q    Got it.  What high school were you attending?

A    Merrillville High School.

Q    And did you graduate from Merrillville High School?

A    Yes.

Q    When did you graduate?

A    2016.

Q    Okay.  And after -- was that May of 2016?

A    It was June, June 3, 2016.

        COURT REPORTER: 2015, 1-5?

        THE WITNESS: 16.

        COURT REPORTER: Okay.  Sorry.

        MR. HEPPELL: That's fine.  I should have said upfront, but I hope you know this, Beth, from working with us before.  I hope you will interrupt to let me know if you can't hear something or you need clarification because, obviously, everyone here is interested in getting an accurate transcript.

        COURT REPORTER: Absolutely.

BY MR. HEPPELL:

Q    So after you graduated in June of 2016, did you continue serving in the National Guard?

A    Yes.  Around that time my dad lost his limb,

Page 32

so I stayed with him for a little bit just to help him out when he got out of the hospital before I shipped out to go to Fort Sam in Texas.

Q    Okay.  And what's your dad's name?

A    Melvin Timothy Blakely, Jr.

        COURT REPORTER: Melvin?  Could you repeat that?

        THE WITNESS: Timothy Blakely, Jr.

        COURT REPORTER: Thank you.

BY MR. HEPPELL:

Q    And his first name is Melvin?

A    Yes.

Q    And so your dad became disabled and you stayed with him for a period of time; is that correct?

A    Yeah, I was helping him out.  It wasn't like so much staying with him.  It was just kind of on weekends going over there to help him out, but, yeah.

Q    And then you referenced, I think, a period of time where you actually got deployed as a member of the National Guard, is that correct, or was sent to another location out of Northern Indiana?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 10 of 78

Page 33

A    I went to Fort Sam for training.
Q    And where is that located?
A    I'm so sorry. I went to Fort Sill for training first for boot camp, but I went to Fort Sam for AIT.
Q    What is AIT?
A    That's when you do your job training, I'm sorry. But I went to Fort Sill in Oklahoma for basic training and then I came back home. I finished my senior year, because I joined the military my junior year, the end of my junior year. I came back home, I finished high school, and then I went to Fort Sam in San Antonio, Texas for my training, my job training, after all that for high school.
Q    Okay. And was there a particular position within the National Guard that you were being trained for?
A    Yes, dental.
Q    You said dental?
A    Yes.
Q    Okay. So it was sort of like a medical job position within the National Guard --
A    Yes.
Q    -- that you were being trained for?

Page 34

A    Uh-huh.
Q    And did you complete that dental training?
A    I did not.
Q    Why did you not complete that dental training?
A    I ended up actually getting sick while I was in the military.
Q    And so did you end or put a hold on your military service at that time as a result of your illness?
A    Yes. I wasn't able to do my physical test.
Q    Okay. And was that considered a discharge at that time or was there sort of a different term for your separation from the military at that time?
A    A discharge.
Q    Okay. And what was the nature of that discharge?
A    It was honorable.
Q    Okay. And had you been -- prior to that honorable discharge for those medical reasons that you just testified to, had you been working full-time in that military service?
A    Yes. Well, it's pretty much full-time when you're on base.
Q    Okay. And so that had changed after you

Page 35

graduated high school. You went from part-time to full-time?
A    Yes, because when you -- yeah, you're considered active duty when you're on base.
Q    Okay. And after you -- and I apologize for jumping around a little bit. This is all prior to you working at Indiana State Prison; is that correct?
A    Yes.
Q    Do you recall, approximately, when you received that honorable discharge from the National Guard for medical reasons that you had just been referring to?
A    I believe it was November, December of 2016.
Q    Okay. And after you left the National Guard, at that time where were you -- where did you go after you left your active duty?
A    To my mom's. I stayed with her and then I started working at the prison January 9, 2017.
Q    Did you say January 9, 2017?
A    Yes.
Q    Okay. And why did you pursue a job at Indiana State Prison?
A    I wanted to go to the police academy, but I was still dabbling with a lot of my health

Page 36

issues that I just found out about. I ended up getting blood clots in my lungs, so I was having difficulties doing the physical part. So my mom had told me about the prison was hiring and so I went ahead and, you know, applied.
Q    And your mom was working at Indiana State Prison at the time; is that correct?
A    No.
Q    Had she previously worked at Indiana State Prison?
A    Yes, she started working there after I worked there.
Q    Oh, she -- so your mom worked at the prison after you worked at the prison.
A    Yes. She's a manager at a DNA company.
        COURT REPORTER: I'm sorry, she's what?
        THE WITNESS: She's a manager at a DNA company.
        COURT REPORTER: Thank you.
BY MR. HEPPELL:
Q    And are you saying that's her job now or that's her job before she worked at the prison?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 11 of 78

Page 37

A    That's her job now and before she worked at the prison.

Q    Okay.  So she left that job, worked at the prison for a period of time after you had worked there, and then went back to that same job.

A    She didn't leave.  She just worked, you know, here and there because she mostly had people working there.  She just switched part-time when she started working at the prison.

Q    Got it.  Understood.  I am going to come back and have a number of questions to ask you about your time at the prison, but before focusing on that I do want to go back and finish the questions around your living situation more recently after you had left the prison.

And I think where I had left off I had been asking you questions related to you staying at an apartment, a friend's apartment at Woodland Crossing, and that you left in 2018, in approximately May of 2018; is that correct?

A    Yes, around that time.

Q    Okay.

Page 38

A    And I went to go stay with my dad right before I left because that was -- I was getting -- what was it.  I was going to the Valpo office to get my paperwork started to do active duty.  So I was staying in South Bend with him at his address, that I'm pretty sure you all have already, before I actually shipped out.

Q    Okay.  So there was a period of time that you were staying with your dad in South Bend after you left that Woodland Crossing apartment; is that correct?

A    Yes.  I believe I left to go active duty like June.  It was June or July.  No, it was May something that I left, yeah.

Q    May of 2018?

A    May of 2018.

Q    Okay.

A    I was swore in, I believe, May 13th or 15th.

Q    And that was returned to active duty military service at that time; is that correct?

A    Yes.

Q    And what branch of the military were you serving in at that time?

A    Army active duty.

Q    Army active duty.  How long did you serve Army

Page 39

active duty in this second stint of military service?

A    It was till August, September.

Q    So from May to sometime in August, September of 2018 you served active duty?

A    Yes, in Oklahoma, and it was honorable again.

Q    You received an honorable discharge in August or September of 2018; is that correct?

A    Yes.

Q    And what was the reason for you leaving military service this second time?

A    Still the same health issues.  I thought it was resolved.  It still wasn't.

Q    Okay.  So you were unable to pass the physical?

A    Yes, I wasn't able to do my physical.

Q    Okay.  You were serving in Oklahoma through the duration of your active duty Army service; is that correct?

A    Yes, at Fort Sill.

Q    And after you left your service with the Army, where did you stay after that?

A    After that, I was jumping around a lot of places, honestly.  I was kind of mostly in my car.  So I was kind of jumping from staying in

Page 40

my car, going to my friend's place in Merrillville and just chilling real quick, and then I just officially went to Chicago and stayed in my car full-time, and then my girlfriend, she left her dad's place and stayed with me in my car, and it just went downhill from there.

Q    Okay.  And so would it be fair to say that from -- well, strike that.

When you were serving active duty in the Army in Oklahoma were you staying on base?

A    Yes.

Q    And would it be fair to say that after you left the Army there was an extended period of time where you did not have stable housing?

A    Yes.

Q    Okay.  And I think, if I understood the answer you just gave, there was a long period of time where you were staying out of your car; is that correct?

A    Yes.

Q    And was this all in the Northern Indiana, Northern Illinois area?

A    Yes.  In Chicago, I was actually working at Pizza Hut and when the manager found out I was

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 12 of 78

Page 41

staying in my car, they let me go because they said they couldn't hire homeless people.

Q   Wow. I'm sorry to hear you had that experience.

A   It was in Skokie.

Q   And approximately how long was this period of time where you were staying in your car or having short stays with friends before you established a more stable address or were staying somewhere more permanently?

A   I believe it was -- I'm trying to remember correctly. I think around -- I know around 2019. I believe it was March. It couldn't have been before my birthday. Hold on. Actually -- okay, I'm starting to remember. Around the -- I'm sorry, I can't exactly remember, but I know around 2019 we actually found a place in Huntington Cove in Merrillville and stayed there a little bit, and then we left to go to Indianapolis, and then came back and stayed with my mom for a short period of time, and then we stayed back in the car, and then we went to Atlanta. The time frame, I don't exactly remember that.

Q   And just to make sure I understood the answer,

Page 42

you were staying with Shantel at the time; is that correct?

A   She was kind of staying with me because the car was in my name.

Q   Got it.

A   So we were together, yes.

Q   You were together, understood.

A   Uh-huh.

Q   And at various times you got an apartment with her where you were staying together; is that correct?

A   Yes. I'm sure you guys can look that up, because I don't exactly remember when we got that apartment, but I know it was Huntington Cove in Merrillville, Indiana.

Q   Okay. You had talked -- well, strike that.
       And then you mentioned at some point briefly you returned to stay with your mom; is that correct?

A   I came there because my mom said she was going to help me get another car, and me and my sister ended up getting into an altercation because she got upset that I had let her know how I felt just with personal things, and my mom then told me to give her her key and I

Page 43

couldn't stay there anymore or contact her or my sister.

Q   Okay. And do you remember approximately when that happened?

A   It was like -- it was cold. So it was like -- it was after Thanksgiving. It was a little after Thanksgiving, so like November 30th, you know, around that time. It was before Christmastime because we left to Atlanta like the middle of January of 2020.

Q   Got it. So that was around the winter of 2019, late 2019, and then you went down to Atlanta in January of 2020?

A   Yes.

Q   And then were you down in the Atlanta area from January of 2020 through November of 2020?

A   No, it was up until like October, and then I went to Dallas because I was actually -- I actually found out that Megabus no longer goes from Atlanta to Chicago. So I went to Dallas to go ask my cousin to help me because my mom and my sister and my dad were not allowing me to come back to see my grandma before she passed, saying that I needed to wait until like they knew if, you know, it was getting

Page 44

worse, but I didn't want to wait, personally. So I asked my cousin if she would be able to help me, and she had me come to Dallas to try to help me out and give me funds to be able to do it. She bought my ticket, which I actually could pull up in my E-mail, if you want it.

Q   That's okay. I don't think we need to pull that up.

A   Okay. But she bought my ticket from Dallas to Memphis, and then I went from Memphis to Indiana. That was like around November 7th, because I found out she passed November 5th.

Q   Okay. Understood. Without making you rehash the details and not meaning to get into the details, but I understood from your earlier testimony that during the period of time you were staying in Atlanta you did not have stable housing, and that included a period of time where you had been staying in a storage unit and also a period of time where you were staying on the street; is that correct?

A   Yes.

Q   Okay. You mentioned also earlier in your deposition about issues you were having with your phone.

DENISE DWYER, et al. v.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 13 of 78

Page 45

As you sit here right now, do you have a phone number?

A   I got a phone from the Broadway Youth Center. So, yes, but, no. So that's why I told him, the investigator -- I forgot his name, that my mom is supposed to be helping me today because I broke my phone. The phone number is 404-820-0219 number. I had broke it when I was getting off the train. I did not have insurance on it, but they're actually saying that they're willing to help me get my replacement phone. So I should still have the same number, but if I don't, I told him I will give him my new number, and I provided him with this number and I told him I'd send him the number if it's a different number.

Q   Again, just to make sure I understood that, so right now you have a phone number that is 404-820-0219; is that correct?

A   That's the number for the phone that I broke, but the number that I have right now is 312-785-8463 number.

Q   312-785-8463?

A   Yes.

Q   Okay. And what phone does that number go to?

Page 46

A   This phone that's in my pocket right now. It's an Android.

Q   Okay. And so that's not the broken phone?

A   No.

Q   So does that phone belong to you or does it belong to someone else?

A   The Broadway Youth Center, it's in Chicago, they help youth like from 16 to 25. They just provided me with a phone that was prepaid to help me until I get, you know, on my feet with another phone.

Q   Okay. Got it. So that's like a prepaid phone that you're able to use for right now, but you think that that number is not going to be a good number for you going forward because --

A   They only pay it for like a month.

Q   Okay. And so after that prepaid phone runs out, right now you think that the 0219 number is possibly still going to be a good number for you, but just attached to a new phone; is that correct?

A   Yes, because while I was in Dallas my wallet and my other things, like my clothes and stuff, were stolen. So I'm in the process of -- I just got my I.D. from Michigan City.

Page 47

I just got that and I'm in the process of getting my social again and my bank accounts, and stuff like that. And I had told them what had happened around that time, because that's kind of like what made it where I couldn't go into the store because I don't have my identification, so I couldn't provide identification to be able to fix what was going on with my phone.

So when I did get my identification, they said that I might not have to pay all the back payments for, you know, the missed time on the phone bill, but they're trying to. So that's why I'm kind of letting you know it might be that number, but if not, I told him I would let him know if it's a different number.

Q   Okay. Got it. And that 0219 number, has that been a number that you have had associated with your phone going back a number of years or a number of months?

A   A number of months in Atlanta, yes.

Q   That was the number you got when you were in Atlanta?

A   Yes.

Q   Okay. We have talked -- just now we've gone

Page 48

over an extended period of time after you left the prison several places that you lived.

Were there other phone numbers that you had previously?

A   Yes, a lot.

Q   Okay. None of those phone numbers are good numbers to reach you at anymore. Is that fair to say?

A   Not that I know of.

Q   Okay. And without going back through all the details of that, it sounds like there were a bunch of different phone numbers and possibly a bunch of different phones that you had over that period of time?

A   Yes. I was on my mom's phone plan for a while, and then she basically was just like, no. So then I had to try to figure it out. I was young and I didn't know what to do. So I ended up selling my phone, trying to get another phone, and keep that on for however long I could, trying to find a job. It was just a lot of back and forth, but I'm older and wiser now.

Q   And during that period of time were there chunks of that time where you did not have a

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 14 of 78

Page 49

working phone number at all?

A  A majority of the time.  The longest time that my phone was ever on was probably like a month.

Q  Okay.  And those periods of time where you didn't have a working phone, was that because you didn't want to have a working phone and didn't want people to be able to reach you or was that just because of your personal circumstances made it challenging for you to keep a working phone?

A  No, personal circumstances, just trying to find a place to stay, and then when I find a place to stay, find a job, and then trying to keep that job, and then if I'm not in that place, I have to find another place to go and get another job.  So it was just a lot of back and forth just trying to find stable housing so I can keep a stable job to keep my phone on.

Q  Got it.  Do you have an E-mail account that you use or check regularly?

A  Yes.

Q  What's your E-mail address?

A  Joyjoy, like J-O-Y-J-O-Y, God bless,

Page 50

G-O-D-B-L-E-S-S, 16 at G-mail dot com.

Q  Okay.  That was joyjoygodbless16@gmail.com?

A  Yes.

Q  Okay.  Do you check that E-mail address regularly?

A  Every day.

Q  Okay.  And is it your plan to keep maintaining and keep checking that E-mail address going forward?

A  Yes.  I've had that E-mail address since high school.

Q  Okay.  And fair to say then that even if there's a period of time in the future, a gap where you may not have a working phone, that E-mail address is a place where you would be able to be reached?

A  Yes.  I can find WiFi somewhere and get ahold of my E-mail.

Q  Okay.  And to make sure I understood that answer, even if you've got -- if you don't have a phone number that's in service, you still have a phone that you'd be able to connect to WiFi and check that E-mail; is that correct?

A  Yes, as long as I have a phone in that period

Page 51

of time.  If I don't have a phone, I try to use whoever's phone is next to me to check my E-mail.

Q  Got it.  And during the period of time that we had just talked to from, I guess, when you first left your mom's place in 2017 up to the present day, during that entire period of time was there ever a chunk of time where you were reliably receiving mail at any particular address?

A  Honestly, no.  I have not really been stable since 2017.

Q  Okay.  And after you left the address on Chickadee in 2017, do you know what was happening to mail that was sent to that address, to you at that address?

A  I really don't know.

Q  Did you at any point receive mail sent to you, addressed to you, to the address on Chickadee, did you ever receive any mail after you left in 2017?

A  When I came back in 2020, that's when I received a big bag of mail.

Q  Okay.  Was that from your mom?

A  Yes.

Page 52

Q  So your mom had -- it sounds like your mom had just thrown all the mail to you in a bag and gave it to you this past November?

A  Yes.

Q  At any point prior to that had your mom told you anything about the mail that had been coming for you?

A  No.

Q  Okay.  So she didn't say anything like, hey, there was some letters that look important or what look like court papers in the mail for you?

A  No.  They just kept stacking all my mail together with my name on it and put it in a bag.

Q  Okay.  And I think you had mentioned that your relationship with your mom over that period of time had been kind of strained.  Is that fair to say?

A  Yes.

Q  Okay.  Going forward, do you know approximately how long you plan on staying at the address on Chickadee?

A  I told him today I leave for Atlanta on Monday.

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 15 of 78

Page 53

Q    You're going back to Atlanta on Monday?
A    Yes.
Q    Okay.  And do you know where you're going in Atlanta?
A    Yes.
Q    Where are you going in Atlanta?
A    I don't know the address, but I do know I'm going to my friend's girlfriend's house.
Q    And your friend's girlfriend lives in Atlanta?
A    Yes.
Q    And your friend's girlfriend is willing to let you stay with her for a period of time?
A    Yes.
Q    Okay.  What is your friend's girlfriend's name?
A    That, I don't know.  Not even going to lie about it.  She just got a new girlfriend, so I don't really have a clue.  Her phone is off right now and she just hit me up on Instagram?  She doesn't know now that I'm actually about to surprise her.  I let her brother know I'm coming.  So he asked the girlfriend and she said, oh, yeah, it's cool.  So that's just where I'm staying so I can surprise my friend come Monday.

Page 54

Q    Oh, got it.  So is your friend staying down in Atlanta as well with the girlfriend?
A    Yes.
Q    Okay.  What is your friend's name?
A    Meme Miller.
Q    You said Meme Miller?
A    Yes, M-E-M-E and then Miller.
Q    So it's Meme Miller's girlfriend is where you'll be staying in Atlanta?
A    Yes.
Q    Okay.  And does Meme Miller have a phone number?
A    No.
Q    Okay.  Meme doesn't have a working phone right now?
A    No.
Q    Okay.  Who's going to get you the address so you know where to go in Atlanta?
A    I can ask the girlfriend today, because I actually just found out yesterday because I ended up getting paid early.  I'm supposed to get paid on the 19th, but I got paid last night around 10:00.
Q    So how are you in contact with Meme's girlfriend?

Page 55

A    On Instagram.
Q    On Instagram, okay.
A    Uh-huh.
Q    Do you know what her Instagram label is?
A    Her Instagram name?
Q    Yeah.
A    (Witness checking phone.)  Under score, dot, 4X15.
Q    Is that lower case X or capital X?
A    Lower case.
Q    Under score, dot, 4, lower case X, 15, and that's her Instagram label.
A    Yes.
Q    Okay.  And you said you're planning on traveling down there on Monday?
A    Yes, I think at 10:15 at night I'm leaving on Monday with Greyhound.
Q    What are your sort of plans once you get to Atlanta in terms of work and housing?
A    Work?  I'm actually supposed to try to get back working at my job at Lenox Mall and then just go from there, because my mom, she just basically kind of just let me know and asked me when are you going back to Atlanta, kind of want you to go back to Atlanta.  Kind of just

Page 56

forced my hand, so there's really not much I can do about it.  So that's just where I'm going to go from there.
Q    Okay.  So you said there's a job you had at Lenox Mall previously?
A    Yes.
Q    That you're going to try to get back working there again?
A    Yes.
Q    And what job is that?
A    Chipotle.
Q    There's a Chipotle in Lenox Mall?
A    Lenox Square Mall, to be exact.  That's what it's called.
Q    Lenox Square Mall?
A    Yes.
Q    Okay.  And you worked at the Chipotle there and you think you're going to be able to hopefully get a job back there again?
A    Yes.
Q    Okay.  And is that -- have you reached out to your old boss there and started looking at that idea or is that just based on how you left things with him?
A    Oh, it's based on how I left.  I had let him

USDC NND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 16 of 78

Page 57

know what's going on with my grandma. It's just because of the extended period of time that I was gone he had no choice but to, you know, say I couldn't still work there anymore because they needed to fill the position until I'm back in town.

Q Got it. But you left things on good terms there and you think there's a good chance that you will get back there?

A Yes.

Q If that doesn't work out for some reason, do you know what your plans are in terms of looking for other work?

A Yes, just keep applying wherever I can.

Q And I just, you know, pulled up Lenox Square Mall on a map in front of me. It looks like it's in the sort of north side of Atlanta, kind of a little bit to the east and a little bit to the north of the downtown area.

A Yes.

Q And I apologize because I don't know the city very well, but is that the area of Atlanta that you think you're going to be going back to?

A I believe so.

Page 58

Q Okay.

A If not, I believe it's Austell that her girlfriend stays in, and based off how she explained like what buses she was getting on to get to the mall, I believe she's in Austell, Georgia.

Q Okay. Got it. So to the best of your information --

A Yeah, just going off context clues of just the bus, that's where I believe she's at, the area.

Q And that's where you're going to be going right away to stay there with Meme's girlfriend.

A Yes.

Q Got it. And then in terms of -- is it your plan to look for your own place at some point after you get into town?

A Definitely.

Q And do you know what area of the city you would plan on looking for housing in?

A I want to stay in a hotel, the Red Roof Inn Plus. It's in Atlanta. There's a couple different locations, but it's just Atlanta-Cumberland. That's the hotel I

Page 59

usually go to. They actually know us very well because they would help us with rooms every once in a while to keep us out from the cold. So I do really appreciate them a lot. So I want to try to go there and then, you know, eventually get my own place, like an apartment.

Q Okay. Got it. And again, just looking at a map here, I see that there's a Red Roof Inn called Red Roof Atlanta-Cumberland on Winchester Parkway? Is that the one you're --

A Yes. There's a Waffle House right across the street.

Q Got it. There's a Waffle House right across the street, and that's in Smyrna, George; is that right?

A Yes. It's kind of weird. It's Atlanta, but it's -- yeah, they're like very close to each other. Sometimes it will pull up on the map as Atlanta. Sometimes it will pull up on the map as Smyrna.

Q Okay. That's the Red Roof at 1200 Winchester Parkway, based on what I'm seeing on the map here. And so that's where you're planning on staying if you have to leave Meme's

Page 60

girlfriend's place before you can find your own place?

A Yes.

Q Okay. All right. Promise, when did you first learn that there was a lawsuit about what happened to Joshua Devine and that you were being named as a defendant in the lawsuit?

A I first learned that right before I left my mom's house, and I talked to my mom about it. Because I was only like 18, 19, so I didn't understand what was going on. And she told me, basically, she's like, oh, it will blow over, they're just basically letting you know what's going on. So I said, oh, okay. And I left her place because I thought that that was it, like that was all that was going to go on.

Q Okay. And so when -- in terms of a time period, if I remember from your previous answer, you had testified that you left your mom's sometime in the summer of 2017; is that correct?

A Yes.

Q And how did you find out at that period of time that you were named in a lawsuit?

A Because I was staying in my place when, you

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC-NND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 17 of 78
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

Page 61

know, when the fire had happened, but I went over to her place to ask her about it because that's where I got my mail at. I wasn't getting mail at my address.

Q   Okay. And so it was a piece of mail that you received that let you know there was a lawsuit?

A   No, I think it was the investigator that brought the summons.

Q   Okay. And I just want to make sure that I understand the timing and I guess to give you some context. So, there may have been other lawsuits filed about the fire that happened at the Indiana State Prison in April 2017. In fact, I know there were other lawsuits that were filed. I don't know who were named as defendants in those other lawsuits and whether you were named as a defendant in those other lawsuits.

But the lawsuit that I am an attorney for and that you're testifying about at the deposition today brought by Mr. Devine's estate and his family as a representative of the estate, that lawsuit was filed in December of 2018.

Page 62

A   Oh. That's when I found out about like just generally what was going on. I didn't know about when this was. I didn't know that.

Q   So in terms of what you've been testifying to earlier with regards to a conversation with your mom back in the summer of 2017 --

A   Yes.

Q   -- can you tell me a little more specifically what you remember about that conversation?

A   If I remember right, she said that an investigator brought a summons. I remember before she said that, that my dad said that somebody came to his house asking him where I was at and then they came to my mom's house and brought a summons. And she basically read over it and was just telling me, oh, it's okay, it's just about the fire and saying that this should just all blow over. So I was like, okay. She said, but, you know, just be on the lookout and I'll let you know if anything happens that's important, and I didn't hear anything from there.

Q   Do you still have a copy of that summons?

A   No.

Q   But your mom told you at that time, basically,

Page 63

that it would all blow over and she would let you know if she heard anything else?

A   Yes.

Q   Is that fair to say? Did your mom at any point tell you that she heard anything else or bring anything else to your attention about it?

A   No, she did not.

Q   Okay.

A   The only thing that she really did tell me was that he came another time to the house, and that was it.

Q   And did your mom give you contact information for the person who was coming to the house?

A   No, she did not.

Q   Okay. And I'm happy to show you this document on the screen if you want to look at it, but I can just identify it for the record. It's been filed on the docket in the case as Document No. 98 in Dwyer V. Neal, et. al., Docket No. 18-CV-995, in the Northern District of Indiana, and a proof of service that was filed, signed by Morton Smith, who is an investigator working for our office. And according to the proof of service that was

Page 64

filed in the case, Morton Smith indicates on that document that he served you personally with a copy of the summons and a copy of the complaint on September 12, 2019 at an address on B Court in Merrillville.

Do you want me to show you that document or are you familiar with that interaction that I'm referring to?

A   B Court? I think that was -- he didn't serve me personally. I was at work. I believe he gave it to Shantel because I was not at the house.

Q   Well, was there -- there was an address listed on the summons as 2082 B Court, Apartment 2B, in Merrillville.

A   Yeah, that was our apartment in Huntington Cove.

Q   Okay. And so you don't have a memory of personally interacting with an investigator on that date?

A   No, I did not personally interact with him. I was not there. I was at work. But I do remember that Shantel let me know that he did come to the house and he dropped it off.

Q   Okay.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 18 of 78

Page 65

A   My friend, she said that she's the one who opened the door and then Shantel came to the door and got the piece of mail. I guess he just got the proof that I was there, I guess, you know, that I lived there, and I guess that's proof that he served me, but I wasn't there.

Q   Okay. So you don't remember interacting with anyone in connection with that piece of paper; is that correct?

A   No.

Q   Okay. But you were living at that address on B Court --

A   Yes.

Q   -- at that time; is that correct?

A   Yes.

Q   Okay. And you received a copy of the paperwork connected with this case after it was given to you when you were residing at that address; is that correct?

A   Yes.

MR. HEPPELL: Okay. And I want to -- actually, can we take a break for five minutes? We'll come back at 11:30 a.m. Central time, if that works for everyone?

Page 66

MR. ROSE: That works perfectly fine with me. Do you want to go ahead and do just a slightly longer break to accommodate getting a quick lunch or something?

MR. HEPPELL: That's fine. That works for me. If that's okay with you, Promise? When do you propose coming back, Randy?

MR. ROSE: It doesn't matter to me. I mean, I just got to go downstairs. It may take Promise or you longer. I don't know. Promise, how much time? Would you want to get lunch now or do you want to keep pressing on?

THE WITNESS: I'm good pressing. I didn't know how long this was going to be. I have something to do later, but I'm not going to press you.

MR. ROSE: That's fine. Are saying you want to just do, say, 10 or 15 minutes to get a bite and get back? Is that fine with everyone?

MR. HEPPELL: Yeah, that's fine. Let's say a quarter to. So 20 minutes from now, 11:45 Central, we'll come back on the record.

Page 67

MR. ROSE: Okay.

MR. HEPPELL: All right. Thanks, everyone. Promise, we'll come back on the record at that time then.

THE WITNESS: Okay.

(Lunch recess.)

MR. HEPPELL: I'm going to resume the Zoom video recording and we'll go back on the record.

BY MR. HEPPELL:

Q   Before we took that break, Promise, I had been asking you some questions related to you finding out about the lawsuit that was filed against you.

A   Uh-huh.

Q   And you had mentioned at least one conversation that you had had with your mom at some point in time where she had brought to your attention that someone was coming to the house looking for you in connection with a lawsuit. Do you recall giving that testimony earlier in the deposition?

A   Yes.

Q   And if I understood your testimony correctly, you had understood her to be saying to you,

Page 68

you know, this will blow over and I'll let you know if I hear anymore about it, and you never heard from her; is that correct?

A   She told me that first and then she told me one more time that someone did come to the house.

Q   Okay. Those are two separate conversations you had with your mom?

A   Yes.

Q   Do you remember approximately how far apart those conversations were?

A   It was around the time me and her got back talking when I went back to the military. So it was around 2018.

Q   Okay. That second conversation, other than your mom telling you, hey, someone came by the house again, did your mom tell you any other information about what had happened or about the lawsuit?

A   She just let me know that somebody had came back around to the house, and it was before I was going back to the military. And when you go back, they take your phone. So, I didn't have my phone again.

Q   Did your mom pass along any message or contact

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 19 of 78

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

Page 69

information for the person who had come looking for you?

A   No, she didn't give me any contact information. She just said that she had a piece of mail for me when I got back.

Q   Okay. Did your mom tell you anything about what that mail was or what you should do about the situation?

A   No. She just told me she wasn't going to open it or look at it.

Q   Okay. Other than those two conversations with your mom, who else have you spoken with about the lawsuit that you are named as a defendant in?

A   My dad, when I had said earlier that he had let me know before he went to my mom's house that he went to my dad's house, and he let me know that they were looking for me.

Q   And approximately when was that?

A   Before he came to my mom's house. So it was still in that 2017 time.

Q   Sometime in 2017 or -- is that the best of your memory that that was in 2017?

A   Yes.

Q   Is it possible that it was in 2018 or 2019 or

Page 70

are you for sure it was in 2017?

A   No, it wasn't anytime later than that. It was around 2017.

Q   Okay. And then did your dad pass along any message from the person who had been looking for you?

A   He just gave me a phone number and I did call.

Q   You did call that number?

A   Yes.

Q   And did you reach the person at that phone number?

A   I did, but I really don't remember that conversation. I'm not going to lie.

Q   Okay. So you do remember calling back from that, but you don't remember anything about the person you spoke with or what that conversation was?

A   No, I don't. I remember it was like an Hispanic man.

Q   It was an Hispanic man that you spoke to on the phone after you called that phone number.

A   Yes.

Q   And this was sometime in 2017.

A   Yes.

Q   Okay. And I'm just going to note for the

Page 71

record -- and obviously, Promise's testimony is what it is and the records in this case is what is it, but just to put on the record, this lawsuit was filed in December of 2018, and I do know, again from what I've seen, there have been other lawsuits filed related to this fire. I don't know whether --

A   So whatever it was. 2017 is completely different from this?

Q   You know, I can't -- I can't testify about my opinions, Promise, but I guess let me ask you this, based on what you remember, do you know for sure that that conversation with this Hispanic person was related to this specific lawsuit brought by Joshua Devine's family or is it possible it was some other matter in connection with the fire at the prison?

A   I just remember he said it was something about the fire at the prison.

Q   As you sit here today, are you -- do you know one way or the other whether you have been named as a defendant in multiple lawsuits related to the fire at the prison?

A   Those are the only occasions I knew about something.

Page 72

Q   Okay. So other than the two conversations with your mom that you testified to, the conversation with your dad, and the conversation with the Hispanic man who you called back whose number you got from your dad, who else have you spoken with in connection with any lawsuit related to the fire at the prison?

A   When I was in Atlanta I contacted you and I think it was someone else. I can't remember exactly who else it was, but I know I talked to them and I think I talked to them about what was going on. He clarified everything I was misunderstanding from the case. That was when I was in Atlanta. So that's when stuff started making sense to me about what was going on, when you guys started explaining to me what was going on and what was happening.

Q   Okay. And do you remember approximately when that was, the best of your memory?

A   It had to be around September, August that we talked.

Q   Okay.

A   I know it was before I came back to -- it was really close before I left to go to Dallas to

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 20 of 78

Page 73

come here.

Q   Okay.  Got it.  And I just want to note for the record that, you know, according to my records, I have notes, as well as E-mail correspondence on which the counsel for the other defendants have been copied, where some of the facts about these conversations were relayed.

And according to those records that I have, I spoke to you on Monday, August 24, 2020 --

A   Yeah.

Q   -- at the 0219 number and then again on Wednesday, August 26, 2020.

A   Yeah, that was --

Q   Does that sound approximately right to you?

A   Yeah, that sounds right.  It was around August, September.

Q   Okay.  And in addition to -- well, strike that.

What do you remember about those conversations?

A   I remember that Shantel told me somebody texted her saying they were looking for me and then she passed along the number to me.  I

Page 74

called them, and I believe the plaintiff's representative -- I don't remember exactly who it was, but I spoke with them, and then I was confused about what was going on, and then I spoke with you.

If that's -- I don't remember the first person I spoke with, unless you were the first person I spoke with.  I don't remember, but I do remember I called someone.  I got a little confused about what was going on because they were basically telling me that they technically couldn't be really talking to me because they represented the plaintiff, and whatnot, and then let me know what was going on, and then I spoke with you.

Q   Okay.  And just, you know, again, just so I'm clear and I want to know what your memory is of the conversation, but I'm one of the attorneys who represents the plaintiff.

A   Uh-huh.

Q   And so I know that --

A   I know that you told me that.  I think I talked to someone else and they gave me -- they gave me three numbers and you were one of the numbers, and I picked to call you after I

Page 75

had spoken with -- I don't remember the name, but I remember I spoke with -- I think it was a lady that I spoke with, or it was a man.  I can't remember, but I did speak with them.  I was confused about what was going on.  So I called you and then you explained like everything to me, and then you had let me know I needed to do this deposition this way and just trying to figure out how we were going to go about it because I was still in Atlanta.

Q   Okay.  And is it -- so you remember someone providing you with three names to contact; is that correct?

A   Yes.

Q   Okay.  And is it possible that I was the person that provided you with those three names and phone numbers as possible attorneys and then --

A   It is possible.

Q   -- you called three other people?

A   It is possible, because I wasn't getting any answers.  I remember talking to you, but I don't remember who else I talked to.

Q   Okay.  And do you remember being provided with phone numbers of lawyers who were representing

Page 76

other defendants in the lawsuit?

A   Yes, I believe so.

Q   Okay.  And did you call each of the numbers that you were given?

A   Yes.

Q   Okay.  And were you able to connect with anyone at any of the three numbers that you were given?

A   No, I was only able to talk to you.

Q   Okay.  Did you leave messages at any of the numbers that you were given?

A   I did not.

Q   Okay.  And do you know why you didn't leave messages?

A   I think because I was really just -- like after I heard what's happening, I was kind of in so much of a rush to try to get someone to answer I didn't think to do that.

MR. HEPPELL: Okay.  Hold on one second.  Okay?  I need to go off the record.  Just give me one moment, if that's okay.

THE WITNESS: Uh-huh.

(Brief pause.)

BY MR. HEPPELL:

Q   Promise, do you remember the name Mike Blinn?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

Page 77

A    Yes.

Q    Was that one of the people that you tried to reach?

A    Yes.

Q    Okay. And do you remember whether or not you were able to speak with a person named Mike Blinn?

A    I don't remember if I was able to reach him, but I think I was having a hard time getting ahold of anyone, but I don't remember. I just remember speaking to you, honestly.

Q    Okay. What about Benjamin Ellis, do you recognize that name?

A    I remember that name too.

Q    Was that one of the three names you were given?

A    I don't remember if it was one -- I don't remember the list of names, but I do remember that name.

Q    Okay. And what about Archer Rose or Randy Rose, do you remember that name?

A    I don't remember that name.

Q    Okay. Is it possible that you did speak with one of those three individuals and then told me later that you had made contact with one of

Page 78

those three individuals?

A    I might have spoken to Mike because that's starting to sound familiar, but I don't remember who I talked to before you, but I talked to somebody. I know that.

Q    So based on your memory as you sit here today, the best of your memory it's possible you spoke with Mike, but you're not for sure?

A    Either Mike or Mitch because I remember those names.

Q    And what, if anything, do you remember about the conversation that you had that was either with Mike or Mitch?

A    I just remember, because I was sitting on break before I was -- like that's when I was at Chipotle. I was talking to them about they were telling me that they've been trying to reach me and they've been trying to find someone to represent me, and that's just what I remember.

Q    At any point prior to those phone calls at the end of August 2020, at any point prior to that, had you ever had a telephone conversation with any attorney from the Indiana Attorney General's Office in

Page 79

connection with this case?

A    I don't believe so, that I remember.

Q    Okay. At any point prior to those conversations in August of 2020, had you ever been visited in person either by an attorney from the Attorney General's Office or an investigator from the Attorney General's Office who was trying to reach you about this case?

A    No.

Q    Without getting into the content of anything that may have been said to you, but prior to that August of 2020 date, did you at any point receive any mail that was sent to you from the Indiana Attorney General's Office?

A    No.

Q    Were you ever told by your mom or by anyone else that mail had arrived for you that was addressed from attorneys from the office of the Indiana Attorney General's Office?

A    No.

Q    Okay. Promise, as you sit here today, you understand that you are named as a defendant in this lawsuit; is that correct?

A    Yes.

Page 80

Q    Okay. And you don't have a lawyer representing you right now; is that correct?

A    Correct.

Q    Okay. Is it your preference that you go forward in this case without a lawyer or would you prefer to have a lawyer represent you?

A    I would like to have a lawyer.

Q    Then if there were a lawyer from the office of the Indiana Attorney General who was willing to represent you, would you be willing to accept representation from the Attorney General's Office?

A    Yes.

Q    Okay. If that attorney -- well, strike that.
    If an attorney from the Attorney General's Office or any other attorney was willing to represent you, would you be willing to work with them and cooperate with them in this lawsuit?

A    Yes.

Q    And would you be willing to return messages if they left messages for you or sent mail for you?

A    Yes.

Q    And would you be willing to update them on

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC-NND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 22 of 78
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

Page 81

changes in your contact information, change of address, things of that nature?

A Yes.

Q And would you be willing to spend time on the phone with them or meeting with them, if they needed to speak with you or meet with you, to help prepare your defense in this case?

A Yes.

Q At any point from the first time you became aware of this lawsuit until the present have you ever knowingly or intentionally failed to cooperate with any attorney who either represented you or was offering to represent you in this case?

A No. This is the most I've been very informed about this case.

Q Okay. At any point prior to today have you ever intentionally or knowingly failed to cooperate or failed to follow up on messages from anyone related to this case?

A No.

Q What assurances are you able to give that going forward, if there were an attorney willing to represent you, that you would be able and willing to cooperate with them in

Page 82

your defense?

A Well, the assurance that I have, like I think the person that fully gets it right now is the investigator because he spoke with me and told me -- he asked my mom, actually, the night before we spoke on the phone about coming here on Friday, if I was there and she said no and I was there. So it just goes to show like I have to just get this information myself. So that's why I let him know the number that I have now while I work to get a phone, so that he will be able to contact me so I can get the information myself so that I can make sure this case, you know, I'm informed of it.

Q Just to make sure that I understand the testimony you just gave, is it your understanding, based on the information that you have been able to piece together, that members of your family have been giving out incorrect information to folks who have been coming around asking for you?

A Yes, because he said he went there December 21st, I believe, to my dad's house and my dad knows I've been here since November 7th, and him and his wife told him I

Page 83

was still in Atlanta homeless, but I'm here.

Q Okay. So based on the information that you have, someone went around to your dad's house in December looking for you and --

A Yes, and I have texts with him, and he did not let me know about that. I didn't find that out until today.

Q And so, again, just to be clear and so the record is clear, in December of 2020 you were staying in Michigan City; is that correct?

A Yes.

Q When was the first time you learned that members of your family have been telling folks in December of 2020 that you were still down in Atlanta?

A Today on the way here he let me know that he talked to my mom and my dad and they gave him false information.

Q At any point have you requested or instructed any member of your family, or anyone else, to give wrong information about your whereabouts?

A No. I don't speak to my dad. I have the text messages with my dad back and forth. We basically just say good morning, good night. Me and him just had a conversation about me

Page 84

being a fool. He did not let me know anyone came to his house, and I just visited him before the 21st.

Q Do you know why members of your family would be giving out incorrect information about your whereabouts?

A I really don't know why my dad did that. I can ask him today, but I don't know why he did it. I don't know if he -- I don't have a clue why they did not let me know. I told them to let me know what was going on after I found out in Atlanta the matter of the case. So I told them to let me know.

Q But regardless, is it fair to say that going forward in this case any information that you are given, whether it's given to you by attorneys directly or whether it's given to you by your family, that you're committed to following up on that going forward?

A Yes.

Q Okay. Give me one second here. Before I jump to a whole new section of questioning, just a couple of other things that you testified to earlier that I just want to make sure I followed up on.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 23 of 78

Page 85

You've given some details about your plans for the future and places you might be and potential phone numbers that might be good for you going forward, but I understand there's some uncertainty around all those details at this point. Is that fair to say?

A   Yes. I do prefer that they don't speak with other people, but if -- because I will be able to have contact information from this point going forward, so there's no need, because it kind of caused an issue when they went to Shantel's father's house. He got a bit upset because she hasn't been there since she left. So, yeah, I just -- I would prefer if he can just try to limit trying. I'm not on social media like that. I'm not a social media person. My name's not -- I don't go by Promise, so, yeah.

Q   Okay. So fair to say it's your preference going forward that people not have to track you down by contacting friends or family members or family members of friends or --

A   Yes. They can contact me.

Q   Okay. And fair to say that's one of the reasons why you're committed to keeping your

Page 86

contact information up to date and giving folks up-to-date info, so that they can contact you directly and not be reaching out to other folks about your case; is that correct?

A   Yes.

Q   I think you said a little bit in your answer just now that you don't go by Promise anymore. Can you explain what you mean by that?

A   I'm transitioning from female to male, so I go by Jai now, J-A-I, but I don't go by Promise. Broadway Youth Center is helping me get into legally changing my name, but it's going to take a minute. So I told her I would let them know when it's been officially changed.

Q   Sure. And I'm happy to call you Jai, if you prefer to go by Jai.

A   I mean for the case being right now and like, you know, what's on file, I'm okay with Promise.

Q   Okay. And so I think you're saying your preferred name is Jai Blakely; is that correct?

A   It's not even Blakely either, but I'm not -- I'm okay with just, you know, Promise Blakely

Page 87

right now.

Q   Okay. Got it. And I appreciate your clarifying that. You haven't legally changed you name, and for purposes of the lawsuit you understand that you've been named as a defendant as Promise Blakely; is that correct?

A   Yes.

Q   You have -- if I understand your testimony, it's your intention to change your name legally at some point in the future; is that correct?

A   Yes.

Q   And do you know right now what legal name you plan on changing to?

A   I'm in the process of trying to find a last name, but I know the first name will be Jai.

Q   Okay. Your first name will be Jai, spelled J-A-I?

A   Yes.

Q   And you're not sure right now what last name you're going to legally change it to.

A   No. I'm trying to think of something.

Q   At this point in time you're not planning on having that be Blakely; is that correct?

A   No.

Page 88

Q   Okay. Even though it's not legally changed right now, do you go by Jai for, you know, for friends and family, people that know you?

A   Yes.

Q   Okay. Is there a last name other than Blakely that you are using right now?

A   No. Like I had chose Morrison at one point in time just in remembrance of my friend, but it's not what I've been trying to like go by.

Q   Okay. So people who know you now call you Jai without really any last name?

A   Yes.

Q   Got it. Do you know at this point in time what -- where you will be filing the paperwork to legally change your name?

A   No. I just know that the Broadway Youth Center just connected me with someone named Angel and they said they will get back in contact with me because I still have to get my birth certificate and my social. So that's kind of holding up the process right now.

Q   And is that another piece of information that you are willing and able to keep updated with folks; if that formally changes that you'll let folks know?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 24 of 78

Page 89

A    Yes.

Q    Going back to the questions I had asked you earlier about your conversation with -- you thought that it might have been with either Mike Blinn or Ben Ellis.  Did I remember that correctly?

A    Yeah, one of them, I believe.  I don't remember exactly who I talked to.

Q    To the best of your memory, during those conversations did you ask for either of those attorneys to represent you in this lawsuit?

A    I remember someone gave me the numbers and said to ask one of the three to represent me, but I'm not even going to lie.  I know I'm on record, but I don't want to like mess up.  I don't remember exactly what I said, honestly.

Q    Okay.  So just to make sure that I understand what you just said, you remember speaking with someone who gave you their contact information --

A    Yes.

Q    -- and said that you should ask for representation?

A    Yes.

Q    Did I understand that correctly?

Page 90

A    Yes.

Q    But then you don't remember the details of any conversation that you had with either Mike Blinn or Ben Ellis; is that correct?

A    No, I just remember someone just confused me just a bit.

Q    Okay.  All right.  I appreciate your patience going through that sort of background information and I appreciate your candor.  I recognize that we've touched on some issues and difficulties in your personal life and I appreciate your willingness to talk through that at the deposition.
         I want to turn a little bit now towards the period of time when you worked at Indiana State Prison as a correctional officer.  Okay?

A    Okay.

Q    And I know we had talked briefly about that previously, but to reconnect with that, what date do you recall starting work at the prison?

A    January 9, 2017.

Q    Sorry, I didn't mean to cut you off.  Can you repeat that?

A    January 9th of 2017.

Page 91

Q    Okay.  And you -- what position did you hold at Indiana State Prison?

A    I was a correctional officer.

Q    And were you a correctional -- I believe you testified earlier that you worked there until June of 2017; is that correct?

A    Yes.

Q    Did you have that same position, correctional officer, during the entirety of your time at the prison?

A    Yes.

Q    What do you remember about the application process for being hired on as a correctional officer at the prison?

A    Like the application I put in?

Q    Correct.

A    I remember just answering the questions, giving my diploma, and coming in for the interview and drug test, all that.

Q    Okay.  And to the best of your memory, your first day on the job was on or about January 9th of 2017?

A    I believe it was the first day.  I don't remember if that was like -- yeah, that was when we started training.

Page 92

Q    Okay.  Started training on January the 9th.

A    Uh-huh.

Q    And you testified earlier that before working at the prison you had prior work experience in the military; is that correct?

A    Yes.

Q    Did you have any prior law enforcement or correctional work experience prior to starting at the Indiana State Prison?

A    No.

Q    Any training related to corrections or prison operations that you had had prior to starting with the Indiana State Prison?

A    I was in high school, so, no.

Q    Okay.  So fair to say coming in to work as a correctional officer you were starting from a blank slate in terms of training on how to be a correctional officer?

A    Yes.

Q    So you were relying on the prison to provide you with whatever training you would need to be able to do your job as a correctional officer; is that correct?

A    I mean, in a sense.  My dad worked as a respected cop for a long time and he worked at

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 25 of 78

Page 93

a juvenile center. I watched a lot of it. I used to as a kid do like little small training classes he had. I had a lot of military training, and all that. So, not exactly, no. Just on the basics of the job, yes. But for just attention to detail and things like that, no.

Q Right. So fair to say you were coming in with certain life skills and abilities that you anticipated you would need to use as a correctional officer and I think you indicated like attention to detail?

A Yes.

Q And if I understood your testimony just now, your dad, Melvin, had served as a police officer as well; is that correct?

A Yes, for a very long time, yes.

Q And so as a child you had occasion to sort of observe his work in law enforcement and sort of see some of his efforts at training as well?

A Yes.

Q But beyond that, in terms of specific training on how to be a correctional officer and specific training on how the prison at Indiana

Page 94

State Prison was run and the policies and procedures at ISP, those were all areas where you were relying upon the prison to provide you with training; correct?

A Yes.

Q Did you have any prior training or work experience either from the military or from any other source related to fire rescue or fire response?

A In the military, yes.

Q Okay. What military experience or military training did you have related to fire rescue or fire response?

A Like in boot camp you have to know in any situation how to help everyone. So, basically, like that.

Q So that was training that you received through your military boot camp; is that correct?

A Yes.

Q And can you describe a little bit what you remember about that fire response training that you received in the military?

A Basically, just letting us know the same procedure they provided at the prison, but just not, of course, not with their buildings

Page 95

because we're in the field. So it was a little different, but, you know, it was -- when I got into training at ISP, it just kind of rang a bell, and everything like that, what was going on. I felt like their training at ISP was a little more like less intense than in the military, if it was like a procedure that needed to happen.

Q Can you explain what you mean by that?

A Along the lines of what are you looking for?

Q So if I understood the testimony you just gave, you said that it was your impression that the training you received at ISP was, I think you said, less intense than what you received in the military?

A Yeah. Theirs is more basic. It's like here's the fire, you know, making sure if this happens, here's what you need to do. In the military it's more along the lines of this is life or death, you need to do this, you know, like that.

Q Okay. Was it your impression that the seriousness or severity of fire response was treated more seriously in your military training than it was in your training at ISP?

Page 96

A No, they was both serious. I'm just saying it's just not -- it wasn't like the same as along the lines of military because, of course, military is, you know, different from working at a prison, but they made it that it's important to know so that you know what to do.

Q Okay. And so in terms of general training on the importance of responding -- well, strike that.

What specifically do you remember about your prior military training in terms of fire response in terms of what you were trained to do, things you were trained not to do? Any specifics that you can remember.

A Honestly, it's all so vague. It was just basically -- it's just the basic stuff, honestly. It's really not complicated. It's basically what anybody can Google, but they just train you, you know, more, you know, harder in the military to make sure that you really get it because, you know, that's what the military does. They make sure they establish, you know, that guidance in you to make it important for that. That's a lot, you

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

Page 97

know.

And ISP did the same thing. They made it important. Like, you know, people in here have a story, so don't judge them by what they're going through, but make sure that their life is important to you because at the end of the day when you clock in, their life is in your hands, so.

Q    And so you understood that working as a correctional officer at Indiana State Prison that you had an obligation to, you know, protect the lives of the prisoners who are living in the area that you were working to guard. Is that fair to say?

A    Yes, as I did every shift.

Q    Other than the fire response training that you just -- well, strike that.

Is there anything else beyond what you just testified to that you can remember about the fire training you received in the military?

A    No, that's all.

Q    Okay. Other than the fire training was there other training that you had received in the military that when you got to ISP you either

Page 98

were trained on similar subjects that jogged a memory for you or that you found you were relying on in the course of your duties as a correctional officer?

A    I mean, of course, CPR, you know, different things like that, but nothing else pretty much major, no.

Q    Can you describe what -- can you describe or explain how much training you received at Indiana State Prison and how that training was provided to you?

A    I'm not going to lie. I don't remember how long we had training, but I know it was a good amount of weeks before we started going into the prison and actually working.

Q    Okay. So fair to say in your memory there was some number of weeks that you were receiving, was it, classroom-based training before you even set foot in a prison?

A    Classroom, and then like behind the, you know, the wall, they call it, training, yes.

Q    Okay. And so can you explain what you mean by behind the wall training?

A    Basically, in the prison. They just call it behind the wall.

Page 99

Q    Would that -- just so I'm clear, was that like on-the-job type of training or --

A    Yes, on-the-job.

Q    And so was there a period of time after you entered the prison for the first time as an employee, but you were still going through on-the-job training?

A    Yes.

Q    Do you remember about how long that on-the-job training lasted?

A    No, I don't, but I do know it was like a week or two they give you to, you know, get used to it and get the feel of things.

Q    Was there a specific supervisor who you worked with to provide you on-the-job training or was there a variety of people you worked with?

A    A variety. They make sure you go to different cell houses.

Q    And do you remember the names of any of the officers who gave you on-the-job training?

A    No.

Q    Did you receive fire response or emergency response training as part of the classroom training, as part of the on-the-job training, or both?

Page 100

A    I'm not going to lie to you. It was -- I believe it was a mixture, just from my memory.

Q    And what do you remember specifically about the classroom training that you received as it related to fire response or emergency response?

A    Very detailed, making sure that we understood, went over it. A lot of times we had tests, you know, that we had to take to make sure and ensure that we attained the knowledge, that we are understanding what they were saying to us.

Q    And what do you remember about on-the-job training you received related to fire response or emergency response?

A    I mean, it was pretty much -- it wasn't like it was just special. It was just making sure we understood, you know, in person what we learned in class.

Q    Okay. And specifically before you -- well, let me back up a little bit.

Was there some period of time when you sort of transitioned from working behind the wall, but in an on-the-job training status to being just like regular shifts as a correctional officer?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 27 of 78

Page 101

A    You said was there a period of time between there?

Q    Was there like some date when that change happened?

A    Pretty much, yeah, they let you know that's your training shift and this is when you start working, but they still made sure, you know, you felt like you got to ask questions.

Q    Okay.  So even once you started working regular shifts, you felt you could ask questions, but you were no longer in any sort of formal training.

A    Work, yes.

Q    Okay.  Do you remember when you made that transition from on-the-job training to working regular shifts?

A    No.

Q    Do you understand that this lawsuit relates to a fire that took place in B-cell house in April of 2017?

A    Yes, that's what I figured why you're asking about, you know, what did you know about fires, and stuff like that.  I'm just waiting on, you know, the questions for the fire that night.

Page 102

Q    Sure.  Do you, as you sit here right now, do you specifically remember the date of the fire?

A    No, I don't.

Q    What date it was?

A    I do not.

Q    Okay.  I'm going to represent to you that the records in the case, all the information I have, is that the fire took place on April 7th of 2017.  Does that sound approximately correct to you?

A    Yes.  It was close around my birthday.

Q    Okay.  Do you remember -- I understand that you don't remember a specific date that you changed from on-the-job training to working regular shifts.

Are you able to remember approximately how many days or weeks before the fire it had been that you had come off of training and become a regular officer?

A    It had been a while, like at least two months.

Q    Okay.  And you were working in B-cell house on the night of April 7, 2017; is that correct?

A    Yes, I was.

Q    How many times prior to that night had you

Page 103

worked in B-cell house?

A    A couple times.  I was the only 18-year-old working there.  So I was known around there.  They knew I was only 18 years old there.  I was the youngest person working at the prison.

Q    And when you say a couple times, are you talking like literally a couple times, like two times?

A    I can't be -- I cannot be exact with you, but I know it was more than two times.

Q    More than two times, but somewhere in that range of like three or four, or less?

A    To the point that they know me in there.  They knew who I was.

Q    When you say "they", are you referring to --

A    The prisoners knew who --

COURT REPORTER: Wait, wait.  One at a time, please.

THE WITNESS: Oh, I'm sorry.

COURT REPORTER: I didn't get the question.

BY MR. HEPPELL:

Q    When you say they knew you in B-cell house, you were referring to the prisoners; correct?

A    Yes.

Page 104

Q    And you had worked enough shifts in B-cell house that the prisoners knew who you were.

A    Yes.  Not all of them, just some of them.

Q    Got it.  To the best of your memory, would you say it was less than ten shifts that you were at B-cell house?

A    I don't remember.  I think they -- I don't remember, honestly.

Q    On the night of April 7, 2017, you were working in B-cell house with Sarah Abbassi; correct?

A    Yes.

Q    How many times had you worked with Officer Abbassi prior to that night?

A    We worked about at least -- I know at least over three shifts together.

Q    What was your impression of Officer Abbassi as a correctional officer?

A    Very nice, very good at her job.  She made sure I understood what to do and very helpful to me, you know.

Q    Would you -- how would you describe your relationship with her?

A    I just knew of her as a co-worker.

Q    Did you have a friendly relationship?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 28 of 78

Page 105

A    No.  I wasn't friends with anyone working at that prison.

Q    And you were also working with Justin Rodriguez at the time of the fire.

A    Yeah.  He was the lead person that night.

Q    Are you familiar with the phrase officer in charge?

A    Yes.

Q    Was Officer Rodriguez the officer in charge on the night of the fire in B-cell house?

A    Yes.

Q    Had you ever worked any shifts with Officer Rodriguez prior to the night of the fire?

A    Yes.  I think I only worked like two, three shifts with him.

Q    And what were your impressions of Officer Rodriguez as a correctional officer, generally?

A    He looked like, you know, he had a couple times that he's been the officer in charge. So he knew what we needed to do, and right when we got there we just started working.  He was like make sure you get this mail done, you know.  He was just very good at, you know, making sure there was -- honestly, really, it

Page 106

was like the best shift that I worked.  It was great working on it and we made sure things were getting done.

Q    Going back briefly to your training, I had asked you generally about fire response and emergency response training.
    Specifically, did you receive any training about emergency evacuation procedures, evacuating prisoners from their cells in the event of an emergency?

A    And like I said, there's no prisoners in the military, so just general things, you know. So, of course, at the prison it's different. It's prisoners.  So that's -- but evacuating people, yes.

Q    And I guess for now -- and I appreciate the clarification because I had asked you before about your military training.  For now focusing just on the training you received at ISP --

A    Yes.

Q    -- did you receive any training related to emergency evacuations, evacuating prisoners from their cells?

A    Yes.

Page 107

Q    What training did you -- what specifically were you trained on in terms of evacuating prisoners from their cells?

A    They let us know who to call, what to do, the steps to take, and when we are allowed to take the prisoners out.

Q    And what specifically were you told during your training, to the best of your recollection, in terms of what those steps were and when you were allowed to take prisoners out of their cells?

A    I'm not even going to lie to you.  I do not remember exactly.  So I don't even to the best of my ability have an answer for that.  I just remembered those specific things.  That's it.

Q    Okay.  So understanding you don't remember exactly, but you don't even remember generally enough to offer any information about the substance of those topics as you were trained on them; is that correct?

A    Just the points I brought up and what they told us, that's what I remember.

Q    Okay.  Well, one of the aspects you just referred to, I think, as you were describing that training was something along the lines of

Page 108

when you were allowed to let prisoners out of their cells; is that correct?

A    Yes.

Q    Okay.  Is it your recollection that you were trained that there were restrictions on when you as a correctional officer were allowed to release a prisoner from his cell in the event of an emergency?

A    Restrictions?  I don't quite remember that, but I do know the officer in charge, they know exactly when you're supposed to and they know what we're supposed to do.  And we had one of the -- I believe it's a lieutenant that was there that knew what happened that also helped us to make sure everything goes right, and we checked on them during the course of the time too to make sure because the fire was not that bad around the time it was happening.

Q    Can you explain what you mean by what you just said about the fire not being that bad?

A    Do you want me to talk about what happened or do you want me to like just explain that part?

Q    Just explain that part and I am going to -- I am eventually going to get to asking you some more detailed questions about the fire, but I

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 29 of 78

Page 109

want to make sure I understood the answer you just gave.

A    Okay. And you said to explain what part?

Q    You said something along the lines of the fire was not that bad and I just want you to explain that.

A    That's when we just saw smoke. So when we smelled smoke and saw smoke, that's when we immediately started getting on top of what we needed to do, because the lieutenant came in and took me and Abbassi to this other room to do our, you know, payroll because that's how they do it there at the prison. You have to do it on a computer, put your hours in manually to get your paycheck. So the officer in charge was watching himself and we were with the lieutenant, and then that's when we smelled the smoke and we started following what we needed to do, and the lieutenant was, you know, helping us.

Q    Okay. So it's your recollection that you were with the lieutenant at the time you started to smell smoke?

A    Not the time we smelled smoke, but he was there to take us into the room, which was

Page 110

actually a little bit away from the cell house. So, yeah, we started asking him.

Q    I'm sorry, go ahead, I didn't mean to cut you off.

A    Oh, no. That's just what I remember.

Q    Okay. I am going to get to that and ask you to explain all of that, but I want to finish the questions I have about your training, and I've asked you about what you were trained on in terms of emergency evacuation procedures.
        And just to make sure I understand your testimony, is it fair to say that you remember receiving training on that topic and specifically there was training around when your -- when prisoners could be released from their cells, but you don't specifically remember what that training was?

A    Yes.

Q    Okay. Did you receive any training about the prisoner firefighter program or the prisoner firefighters as part of your training as a correctional officer?

A    Yes, and I remember calling them too.

Q    When you say you remember calling them, are you referring to the night of the fire on

Page 111

April 7th?

A    Yes.

Q    Okay. In terms of the training that you received, what were you -- what training did you receive related to the emergency firefighter department?

A    I just remember them informing us about them and that they would be able to help in the case of a fire happened.

Q    What training did you receive in terms of who was responsible for activating the prisoner firefighters and when the prisoner firefighter department should be activated?

A    Like I really don't have much memory to what that was, but I just know that they just let us know to call them, and the officer in charge already knew what to do. So that's just all that I remember along those lines.

Q    Okay. So it sounds like you remember relying a lot on the officer in charge to have a clear understanding of all the procedures that needed to be followed. Is that fair to say?

A    No, I'm relying on that it was a couple years ago. At that time it was fresh, but right now a lot of other things been on my mind, so, no.

Page 112

Q    Do you remember whether or not you received training on how to activate the prisoner firefighter department in the event of a fire?

A    Yes, I remember that I did, because I remember we were just really fast on what we needed to do.

Q    Did you receive training related to -- well, strike that.
        Did you receive any training about how prisoners were supposed to alert staff or get the staff's attention in the event of an emergency?

A    Yes, and he didn't because -- and I don't know if they have it on file, he was cooking meth. They'd hide a lot of drugs. I tried to find them. But in the event at that time, I did not find any drugs in his cell.

Q    I'm sorry, who are you referring to when you're talking about cooking meth?

A    The prisoner that was burned to death. I was informed that in his cell he was cooking meth.

Q    So as you sit here today, you have a memory of being told that the fire was related to someone who had been cooking meth in his cell?

A    The one that was burned to death, yes.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 30 of 78

Page 113

Q   And that's related to this fire on April 7, 2017?
A   Yes.
Q   As you sit here today, do you remember the name of the prisoner who died in that fire?
A   I believe it was Joshua.
Q   Does the name Joshua Devine sound familiar to you?
A   Not the last name, but the first name because he was on my floor that I was working that night.
Q   Okay.  So who told you that Joshua Devine was cooking meth in his cell?
A   One of the other workers from another shift I was working.  They were letting me know because I had no clue what was going on.  I just know a fire started and we needed to make sure that everybody was okay.
Q   Okay.  And when you say one of the other workers, are you talking about a prisoner worker or another correctional officer?
A   Correctional officer.
Q   Okay.  So it was a correctional officer from another shift?
A   Yes.

Page 114

Q   Do you remember the name of the correctional officer who told you that?
A   No.
Q   Was it a male or a female officer?
A   Male.
Q   Okay.  Was this officer just like a C/O rank or was he a supervisor?
A   No, just a C/O rank.  He just saw -- he just saw I was one of the people, because I had to start getting I think like escorted, you know, to pass that cell house because a lot of prisoners were upset about that night and what happened.  So he was like talking to me and I didn't really know who he was.
Q   Okay.  So just to make sure that I understand you correctly, at any point prior to the fire did you have any information either firsthand or secondhand that Joshua Devine had been involved in anything illegal, like cooking meth in his cell?
A   No, but I know that I had to check his cell a couple times, not for meth, but I did have to check his cell a couple times.
Q   When you say you had to check his cell a couple times, what do you mean by that?

Page 115

A   When you work there you have to check their cells if they let you know that they feel like someone is using drugs or trying to smuggle things or just in case we have to check their cells, that's what we do.
Q   Sure.  Is that like a search --
A   Yes.
Q   -- of a prisoner's cell?
A   Yes.
Q   Do you call that a shakedown?
A   Yes.
Q   Okay.  And so there were a couple times that you were asked to shake down Joshua Devine's cell?
A   Yes, there was.
Q   Okay.  And this was prior to the fire; correct?
A   Yes.
Q   Okay.  Fair to say that in your job as a correctional officer shaking down cells was something that happened relatively frequently?
A   Almost like every day, yeah.
Q   Okay.  And is it your understanding that there are random cell shakedowns?
A   Yes.

Page 116

Q   So a prisoner's cell could be shaken down for no particular reason other than just random searches that take place at the prison?
A   I wouldn't say it's just because it's random.  It's mostly because they cause like -- we observe a lot of things and they are very crafty on the way they hide things.  So you have to find it, you know.  So if they feel like someone while they're walking, doing their, you know, walk-throughs that someone is doing something, then we're not going to be rude.  We're going to say, just go, hey, we're going to just go ahead and shake down and not be rude, just be polite, you know, and then shake them down, shake the cell.
Q   Sure.  Let me ask it this way, though, is it your understanding and memory that there was a policy in place at the prison that some number of cell shakedowns took place without any suspicion or basis to think there was a problem at all, just as a routine matter of shaking down a prisoner's cell?
A   Not for me.  I do not remember anybody just shaking down for no reason.
Q   Okay.  To the best of your memory, you shook

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 31 of 78

Page 117

down Joshua Devine's cell. Did you say it was on two occasions?

A I didn't say two, just like -- I just remember a couple times, maybe like -- I know sometimes a couple means like two, but as a trainee I know I was like observing and trying to do it myself as well.

Q Okay. What date did you shake down Joshua Devine's cell?

A I don't remember. That was years ago. I do not remember that.

Q No memory one way or the other on the date you shook down his cell?

A No.

Q Okay. During the course of your career as a correctional officer at Indiana State Prison, how many cell shakedowns did you either personally conduct or participate in or observe?

A It's been a lot. It was almost like every day. So it's been a lot.

Q Fair to say that it would be hundreds, probably, cell shakedowns that you either observed or participated in?

A I wouldn't say hundreds. Probably just

Page 118

like -- I'd probably say like 20. A good amount, like over 20, a little over 20.

Q Over 20. Okay. Would it be fair to say that it was an everyday occurrence or almost every day there would be a shakedown of a cell that you would observe or participate in?

A Well, I didn't work every day, but I worked in different cell houses, so. That I participated in, about over 20.

Q Okay. And I understand you worked different cell houses and I'm not referring specifically to B-cell house, but just generally during your time at the prison -- and I understand you didn't work every day, but every shift that you worked, would it be fair to say that every shift or most shifts that you worked there would be at least one cell shakedown that you would observe or participate in?

A Not every shift, no.

Q Okay. About how many times a week would you either observe a cell shakedown or participate in a cell shakedown?

A So I worked -- I'd say at least like two, two a week.

Q At least two a week?

Page 119

A Uh-huh.

Q And what other prisoners do you specifically remember that you shook down their cell when you worked there in 2017?

A At the time I didn't know his name, but I remember his cell for Joshua when we were shaking down that cell, but I don't remember exactly all their names. I just know most of the time I was kind of just in training watching, and then it's been like -- probably out of those 20, probably just like a little under ten that I did by myself.

Q When you searched Joshua Devine's cell, did you find any contraband?

A Well, the one time, no, that I did it. The other time I was watching.

Q Okay. So there was one time that you personally conducted a shakedown of Joshua Devine's cell and you did not find contraband; is that correct?

A Nothing was there.

Q Okay. What about the time that you observed his cell being shaken down?

A I don't exactly remember that time. I do remember that they just kind of like -- they

Page 120

were kind of like showing us different cell shakedowns. So they were just kind of like, okay, look and then go ahead and follow this person and go watch how to do this. So it was kind of just bouncing around. So I don't remember exactly what they were doing.

Q Okay. Fair to say that you don't remember anyone finding contraband in Joshua Devine's cell on that occasion either?

A No.

Q So as you sit here today, you have no memory of you personally ever seeing contraband in Joshua Devine's cell.

A No, I do not.

Q Okay. And I believe that you had a recollection of someone asking you to shake down Joshua Devine's cell?

A They didn't like ask me. They just basically said we're going to go shake down a cell, and at that time I didn't know his name. I just know the area because I remember when I went to work that night of the fire I was like, oh, I remember this cell house, we were on this floor before.

Q Were you ever given any information about why

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 32 of 78

Page 121

Joshua Devine's cell was being shaken down?

A    No, just that's -- just told us to watch and I just did that.

Q    Okay. And then going back to the conversation you had with a male correctional officer after the fire, tell me specifically, to the best of your memory, what you remember that officer telling you.

A    It was literally like two minutes before I was about to start my shift and he was, I guess, appointed to just basically help me get across, because I'm passing B-cell house and some of them, the B-cell house people, were going to be coming back and if they saw me, they didn't want to take a risk of them like doing anything to harm me. So he was just kind of talking to me saying like, man, that was crazy how that happened that night, that prisoner, he was cooking up meth in his cell. I'm like, what? I just walked away and I went to work. That's what I remember from that.

Q    Did that person give you any information about how that male officer learned information about Joshua Devine cooking meth in his cell?

A    That was literally just it. That was pretty

Page 122

much the conversation because I was rushing to get to work. So he was just -- his only job was to just get me over there to the other cell house.

Q    And you never saw Joshua Devine cooking meth in his cell; correct?

A    When I passed him, he was just reading a book. When I checked on him, I asked him was he okay. He said, yes.

Q    And fair to say, based on the procedures that were in place in the prison, if someone had been determined to be cooking meth in their cell, that would be in an incident report; right?

A    That would be.

Q    Okay. Have you ever seen any incident report or any paperwork about Joshua Devine cooking meth in his cell?

A    I did not see anything.

Q    So other than that one mentioned by that one male correctional officer, who you don't remember who it is, that's the only information you ever received about Joshua Devine being connected with cooking meth in his cell; correct?

Page 123

A    Yes.

Q    What were -- you just described a memory of interacting with Joshua Devine. I think you described checking up on him and he was reading a book; is that correct?

A    When I had got there, basically, they -- because of just how they have it set up at the prison, they don't really want females working on the higher levels because it will be harder to get to them if something happened. So the officer in charge put me on the fifth and the fourth floor and then she was on the lower level and he took another level. I can't remember exactly what levels they worked, but I know I had four and five.

So I passed out their mail and I did another walk-through, just checking on them, making sure -- looking and making sure no one was doing anything they're not supposed to, no one is hurting themselves or, you know, just making sure they're okay, because I'm just conversing. I don't judge them off of what they've been through. I talk to them. They know me as a nice person. And so I was making sure that they were okay. And when I passed

Page 124

him up, he was just reading a book and minding his business, kind of cleaning up. I'm just like you good, you all right, need anything? He's like, no, I'm fine.

Q    This interaction that you're remembering and describing, was this the night of the fire or was this --

A    Yes.

Q    -- a prior shift at B-cell house?

A    No, the night of the fire.

Q    Do you have any other -- do you have any memories of interacting with Joshua Devine other than this interaction and in your description earlier of remembering shaking down his cell?

A    No.

Q    Did you have enough interactions with Joshua to develop any impression about what he was like as a person?

A    No, but he seemed like he was an okay person when I talked to him that day.

Q    Fair to say that you have no knowledge or information about anything related to his background or what he had going on outside of prison, family life conditions, nothing about

Page 125

him beyond what you learned from those brief interactions?

A    Yes.

Q    During your training were you given any training on what the written policies were at Indiana State Prison?

A    They probably was in there.

Q    At the time you worked as a correctional officer was there any policy at Indiana State Prison that dictated how correctional officers were supposed to respond in the event of a fire?

A    It was for every situation that they let us know, that I remember.

Q    Can you explain what you mean by that?

A    Just common preparedness.  They let us know anything can happen, you know, and that's just pretty much why they kind of touched on whatever seemed very important, including fire, and just, you know, if someone gets out of their cell or if someone tries to escape, you know, just letting us know those certain things and touching on that.

Q    You don't specifically remember ever being trained on any written policy that said these

Page 126

are the steps you should take in the event of a fire?

A    Probably at that moment I remembered, but after years, no.

Q    What about any sort of written policy that talked about when and how to activate the prisoner fire department?

A    That's like, honestly, just any type of training.  Probably at that time I could very much remember, but at this time, no.

Q    And I appreciate that.  Fair to say then that you don't have any memory one way or the other of whether there was a written policy that --

COURT REPORTER: I didn't catch that question.

MR. HEPPELL: Sure.  Let me reask the question.  And again, I know it's cumbersome, but if you can just let me get the full end of my question before you jump in with your answer.

THE WITNESS: Okay.

BY MR. HEPPELL:

Q    Is it fair to say that you have no memory one way or the other about whether there was a written policy that you were trained on that

Page 127

talked about when and how to activate prisoner firefighters?

A    At that time I remember my training, you know, whatever needed to happen.  It's kind of like, you know, if you work somewhere, at McDonald's or something, you remember that stuff, but if you've got some kind of years being away from it, then you kind of need a refresher again. So currently at this moment, no, I don't remember a lot of the training.  But at that time I do remember that I did remember a lot of stuff, and if anybody didn't remember something, we bounced off each other, oh, I remember this, I remember that, so.

Q    What do you remember about fire drills at the prison during the time that you worked there?

A    Pretty much just the basics of how to -- with cells, you know, different cell houses have different doors, and everything like that.  So just, basically, when you get to that cell house, they'll just tell you, basically, how to go about it.  Like if anything happens, this is the door right over here that you go out of and this is what you do.

Q    What shift did you work at the prison?

Page 128

A    6:00 p.m. to 6:00 a.m.

Q    And were you working that same night shift the whole time you worked at ISP?

A    Yes, I did.

Q    And so the fire drills that you remember, who was it that led the fire drills, performed the fire drills?

A    I do not remember that.

Q    Do you remember whether it was another correctional officer or whether it was members of the prisoner fire department that led the fire drills?

A    No, I do not remember.

Q    Okay.  And what happens during the fire drills at Indiana State Prison?

A    Like I just know that they let us know the cell house, basically, just the procedures. Like if -- just basically what you need to do because every cell house is just different. So it's not like you can sit and just train and then you know everything.  When you go to the cell house, they have different things and different prisoners.  So they let you know, you know, what you need to do.

Q    And was it just like verbally describing what

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 34 of 78

Page 129

you should do for the fire drill?

A    Pretty much.

Q    Was there any part of the fire drill that involved actually evacuating prisoners from their cells?

A    No.

Q    Was there any part of the fire drill that ever involved, you know, you practicing, you know, physically going to get a fire extinguisher and bringing it to a cell?

A    Yes.

Q    Okay.  Did you practice that in B-cell house?

A    I don't believe so.  I don't remember what cell house it was.

Q    There's at least one fire drill that you remember actually physically going to get a fire extinguisher?

A    Yes, because there was another fire that had happened before on one of my shifts.  I had -- it was a small one that a prisoner had kind of set off and we had to actually do that.  So I had prior training actually doing something about a fire before that fire.

Q    Okay.  And the fire you were just describing, that took place before the April 2017 fire?

Page 130

A    Yes.

Q    Okay.  And do you remember what cell house that fire was in?

A    Yes, I think that was C-cell house.

Q    Do you remember the date of the fire?

A    No.

Q    Approximately, how long before the April 2017 fire was this fire?

A    It was around the time that I was training.  So it had to be like around February, March.

Q    Okay.  And do you remember personally helping to respond to that fire?

A    Yes, because it was on my floor.

Q    And can you describe what happened during that fire?

A    I just remember seeing fire because we were just getting done letting out the people that go to work and then we turned around and someone started a fire.  So they were explaining to me, you know, they're like, okay, if something like this happens, this is what you need to do, and that's what we went ahead and we did that, and no one was harmed.  It just was, you know, a fire they let off.  I think it was just because they were cooking.

Page 131

Q    To the best of your memory, it was like an accidental fire --

A    Yes.

Q    -- that got set, basically, with cooking equipment?

A    That I remember, yes, that it was an accidental fire.

Q    And did you personally help in extinguishing the fire or you were made aware of it?

A    Personally helped, and I had to help with the cell too, like cleaning up and helping along the lines of that.

Q    Was the prisoner in his cell at the time of that fire?

A    No, he just came back and he was like, oh, there's a fire and he's like, oh, no.  So we went ahead and followed the procedure that we needed to do, and we had to file a report too about it.

Q    Got it.  And just to be clear, this wasn't a fire drill.  This was actually a real fire --

A    Real fire.

Q    -- that you had at the prison.

A    Yes, real fire.

Q    Okay.  Other than that fire and the fire on

Page 132

April 7, 2017, were there other fires that broke out while you were on shift?

A    No.

Q    You just remember those two.

A    Yes.

Q    Okay.  And then other than the two real fires that you experienced, during any of the fire drills were you ever called upon to like go and get an extinguisher and actually physically practice that aspect of fire response?

A    Yes.  Then you had asked me which cell house it was, and I don't remember which cell house it was.

Q    Okay.  So there was a drill where you actually went and got a fire extinguisher as part of the drill?

A    Yes.  It was prior to that first fire.  So that kind of just helped in that moment, that I didn't panic so much on what to do.

Q    Were there any of the fire drills that you participated in where you practiced unlocking the cells?

A    Yeah, but like not to the point it was like everybody, but it was just -- it was a drill.

Page 133

So they just kind of just like, you know, kind of like one or two people this is what you do.

Q Okay. And who was it that ran through that aspect of things with you during your drill?

A Whoever was my trainer that day, and then I went to grab the fire extinguisher whatever cell house I worked at that night. I just remember it was a black lady. That's it.

Q And so as part of that fire drill that you remember did you physically like take your keys and practice unlocking a cell during a fire drill?

A Yes.

Q Okay. And you understood through that drill and through your training, through common sense that during the time of a fire releasing a prisoner from a locked cell was going to be an important part of responding to a fire; right?

A Yes.

Q Were you given any training related to what to do with your keys in the event of a fire?

A I mean, in the heat of the moment -- like they trained us, but in the heat of the moment, by the time we got up there, which was very fast,

Page 134

his lock was already melted. So we couldn't do anything about getting him out, and I just remember they told me to go back downstairs and the lieutenants and everybody else went up there to try to resolve the issue.

Q Okay. And I'm definitely going to ask you to talk about the night of the fire specifically, but just focusing now on the training you received, what do you remember about your training related to what to do with keys in the event of a fire?

A Just unlock the cell.

Q And was it your understanding, based on your training, that if there was a fire on a range that you were responsible for, the correctional officer was responsible to unlock the cell?

A Of course.

Q And was there any part of your training or any part of the policy at the prison that you were ever made aware of that said it was not allowed to give your keys to another officer for that officer to unlock the cell?

A That, I don't remember.

Q Okay. You just don't remember that one way or

Page 135

the other?

A No, because I don't exactly remember that policy, ever hearing that.

Q Just so I'm clear, you don't remember ever hearing about any policy that says you're not allowed to give your keys to another officer.

A No, I don't remember that.

Q Okay. Was there -- I think I had asked you earlier about training about how prisoners get staff's attention in the event of an emergency.

Did you receive training on the different ways that prisoners could bring issues to an officer's attention?

A Issues, yes. Fire related? I don't remember that, but if they have issues, yes.

Q Okay. And not to put words in your mouth, but when you're talking about if they have issues, you're referring to grievance procedures and ways in nonemergency situations prisoners can bring things to staff's attention to get taken care of?

A I don't have exact details, but I know that like just if they -- I just remember that they let us know if they have anything just to --

Page 136

you know, they could let us know if anything is going on, like if they feel like someone is going to hurt them, or something like that.

Q In terms of like in the event of an emergency, something that's really time sensitive like a fire, fair to say that if a prisoner is in a locked cell, the only means they have of getting an officer's attention is just by yelling out, yelling out in the cell house; is that correct?

A Yes.

Q There's no other means that a prisoner would have of getting staff attention if the prisoner --

(Brief discussion held regarding difficulty with audio.)

MR. HEPPELL: I'll reask the question and I appreciate you bringing the audio information to my attention.

BY MR. HEPPELL:

Q Other than a prisoner yelling out, a prisoner who's in a locked cell had no other way of getting staff attention; is that correct?

A Yes.

Q Okay. And so you understood as a correctional

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 36 of 78

Page 137

officer that during periods of times when prisoners are locked in their cells, them yelling is the only way that a prisoner could bring an issue or emergency to your attention.

A   Yes.

Q   Okay.

A   Well, it depends on the time because sometimes some of them are out, but around that time it's time for them to kind of all get locked in.  So around that time, yes, that was his only option, but if it was earlier, someone could have ran down, or something, because some of them are out during the time before they all get locked in.

Q   Got it.  So there's sometimes in the prison when some prisoners might be out and they could run down and get staff attention; correct?

A   Yes.

Q   But specifically on the night of the fire and after the 9:00 p.m. count, everyone is locked in their cell, so the only way is yelling or somehow making noise to bring attention to an issue; is that correct?

A   Yes.

Page 138

Q   Were you trained about conducting security checks at the prison?

A   Oh, is that a question?

Q   Yes, sorry.

A   Oh, I didn't hear what you said, I'm sorry.

Q   Were you trained about conducting regular checks or rounds at the prison?

A   Oh, of course, a lot.  We had to -- it's actually like a little magnet, a little bar that proves that we had to keep walking through.  So it's like -- it was like where you just hit it and prove that you walked through, and personally, just me, I liked to check on everybody.  I don't want to just walk and then just say I just walked through.  I personally checked on everyone, made sure everything was okay, just because of other cell houses when I was working, I think some people slit their wrist, you know, just certain things.  I just want to make sure that they're okay.

Q   What was your -- what's your understanding of what the policy was for how often you had to do those rounds or checks?

A   I believe it had to be every 30 minutes or

Page 139

hour.

Q   And just so I'm clear, you don't remember whether it was 30 minutes or an hour or you remember it depended on a situation?

A   No, I just don't remember exactly.  It was either 30 minutes or every hour.

Q   Okay.  And you understood that doing those rounds and keeping that regular schedule is important; right?

A   Yes.

Q   Okay.  To your knowledge were there any exceptions in the policy that said if you're tied up with something else, you can skip or delay your security rounds, security check?

A   Oh, no, you cannot skip that.  If you have to do something, there's always going to be somebody in that office or somebody else to do security checks.

Q   And during a typical night shift in B-cell house -- well, strike that.
     You testified earlier that you worked the 6:00 p.m. to 6:00 a.m. shift; correct?

A   Yes.

Q   And you worked in a number of different cell houses, including B-cell house, before the

Page 140

night of the fire; correct?

A   Yes.

Q   And after -- well, strike that.
     What time were counts conducted at the prison, if you remember?

A   Like I said, pretty much either just every 30 minutes or every hour that somebody was doing a check.

Q   Sorry, I may be asking my question in a confusing way.  I'm talking about like the prisoner count when everyone is -- all the prisoners are counted.

A   Oh, oh, the count, okay.  Wow, if I can remember back then.  I know not exact times, but I remember right when we get there pretty much we started, you know, counting and then let some of them out to go to work or to medical or to dinner, something like that, and then at least there was like two or three times I remember that we had to count them before we locked them in officially for the night.

Q   And the official locking them in for the night, do you remember what time that happened?

Page 141

A    If I remember right, at least 9:00 or 10:00.

Q    Okay.  And at whatever time that lock-in for the night happened, after that point no prisoners are supposed to be out of their cells; is that correct?

A    Depends on their jobs or if they're doing something for somebody.  It just depends.

Q    Okay.  Other than if they have some specific job, a reason to get out of their cell, after that lock-in time at night everyone is in their cell; correct?

A    Yes.

Q    Okay.  As a correctional officer, after that lock-in time on the night shift, other than doing those regular security rounds that you had been talking about with the wand and the sensors, other than that, what were your job tasks or job duties that you were supposed to do as a correctional officer on the night shift in a cell house?

A    Just make sure paperwork is done, handing out letters.  I'm trying to remember everything.  It mostly consisted of checking on them a lot.  So just between paperwork and making sure to prepare for the next -- for the morning,

Page 142

that's pretty much it.

Q    I want to ask you some questions specifically about the night of April 7, 2017 and, again, the night that there was a fire in B-cell house that led to the death of Joshua Devine.
    Without necessarily remembering the exact date, but do you know the night that I'm referring to?

A    Yes.

Q    Okay.  And you worked the 6:00 p.m. to 6:00 a.m. shift on that night as well?

A    Yes.

Q    What's the first thing you remember about your shift on that night?

A    I remember pretty much right when I got in, the officer in charge was on it.  He was like here's the letters.  I'm like trying to put my stuff down, you know, and he was like here's the letters, let's get the letters done, let's check on them, you know, because there's only three of us that night and usually it's more people.  It's usually either like four or five people working.  So, you know, like everyone kind of gets their own floor, but that night it was just three of us.  So we were trying to

Page 143

make sure we were on top of things and making sure things were getting done.  So I just remember getting the letters and starting to hand them out.

Q    When you say the letters, can you explain what you're referring to?

A    Their mail that they receive.

Q    So that was letters that prisoners were receiving.

A    Yes, their mail.

Q    And if I understand your testimony correctly, you were saying something about there ordinarily being more than three officers on a shift for B-cell house.  Did I understand you correctly?

A    I didn't say B-cell house, just in general.

Q    Okay.  Just in general there would usually be at least four officers on night shift?

A    It's not a requirement.  It's just what I saw mostly.  It was mostly more people.  It just runs better and more efficiently that way, but it can work good with three people as long as they work hard to make sure everything is done.

Q    And on April 7, 2017, do you remember which

Page 144

floors or ranges you were assigned to?

A    Yes.  As I stated before, the fourth and the fifth.

Q    Okay.  And do you remember the ranges that the other officers were assigned to?

A    No.  I stated that too, that I do not remember exactly what floors they were on.

Q    Okay.

A    But I know that the officer in charge usually is on the first floor so that they stay close to the hall.  So that might have been his floor because usually that's where the officer in charge floor is, that first floor, so that they stay close to the office in case of an emergency.

Q    And did you understand -- well, strike that.
    So you had -- each officer had assigned keys that lined up with their respective assigned floors?

A    Yes.

Q    So that night --

A    And in the case --

Q    Go ahead.

A    And in the case of that night, I believe I remember -- and this is just off of just I

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021
USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 38 of 78

Page 145

think so, that when you leave, you leave your keys with the officer in charge if you're stepping away. So I believe that night that the officer in charge had my keys and Abbassi's keys when we went to go do our payroll.

Q Okay. And I'm going to have you walk through the timeline and get to the payroll, but just so I understand the answer you just gave, is that your -- are you saying that because that's your memory of what the policy or practice was or because you have a specific memory from that night of giving Rodriguez your keys, or is it a bit of both?

A Kind of a bit of both. I don't remember giving him my keys, but I remember something along the lines I just think that you have to give your keys to someone else when you're stepping away to do something so that in the case of an emergency, they can be able to go to that floor and do what they need to do if somebody's in trouble, or something.

Q Okay. So to the best of your memory as you sit here today, Officer Rodriguez had the keys to the 500 range when you stepped into the

Page 146

office to do your payroll?

A I hope I remember right. I just -- I can't remember. I think -- I think so.

Q Okay. So you had been testifying -- you just testified a few minutes ago about remembering the start of your shift on that night, including interacting with the officer in charge and him giving you the letters to hand out; is that correct?

A Yes.

Q What's the next thing that you remember happening on that shift after that start of the shift?

A I remember helping Abbassi on her floor too, and then because I was done doing my check, I was making sure she was okay because, you know, when you're in a prison, they try to gravitate towards women. So sometimes they try to harass women and sometimes they harass her. So I was making sure she was okay and that she was getting everything done on her floor and then kind of just helping him out too, you know. So we were all kind of just working together making sure everything was getting done.

Page 147

Q Okay. And so do you have a specific memory of going down to one of Officer Abbassi's floors?

A Yeah, I do remember that.

Q Helping out?

A Yeah.

Q What specifically did you help her out with?

A I think it was just -- I think it was a prisoner just harassing her. He kept trying to ask her a bunch of questions, just kind of harassing her. So I was just kind of making sure she got away from him, because some of them, like I said, are out, they can be out, so making sure she was okay.

Q Okay. And so it was your understanding that the policy at the time permitted officers to go to floors other than the ones they were assigned to assist with other situations, if necessary. Is that fair to say?

A You said that there is one that says that we're permitted from doing that?

Q That you're permitted, you're allowed to do that.

A Oh, I mean, just like it's -- not really. I don't believe that there's a policy that you can't go to someone else's floor. Because in

Page 148

the event that you have three people and two people need to do something, that one person is going to check every floor. So it's just the fact of trying to have organization and then making sure accountability goes right. So it's not like, oh, I'll go do this floor, I'll go do this floor. It's kind of keeping organization, but it doesn't mean that that's just like you strictly -- that's just strictly your floor and I can't go up there.

Q Fair to say that you understood that between the three of you as correctional officers in B-cell house, you shared responsibility for doing your best to ensure the safety of all of the prisoners in the cell house, not just those on your assigned floor; is that correct?

A Yes.

Q And you understood that it was your responsibility to work together, three officers together, in the event of any sort of emergency situation.

A Yes.

Q And so you had been describing what you remembered about your shift on April 7, 2017, and you had just described remembering going

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 39 of 78

Page 149

down to help out Officer Abbassi with something going on on her floor. What do you remember happening next?

A After that, I remember we put everyone in their cell. I remember first, before that, the lieutenant called and said that me and Abbassi needed to do our payroll information that night, that he was going to stop by; and after we had done our final count and, you know, putting them in, then he came and he took me and Abbassi to go do our payroll information. And then I faintly just remember seeing Rodriguez run up the steps all the way to the fifth floor and he was just saying fire, fire, and we started smelling the smoke. We ran out from the computer room to see what was going on, and then we just went from there.

Q Okay. And so I want to back up a little bit to make sure I understand all the different steps along that way.
So you had referenced that the lieutenant called at some point prior to the final count to talk to you about payroll; is that correct?

Page 150

A Yes.

Q Which lieutenant was that?

A I don't remember his name, but he was like a tall black man.

Q Okay. Do you remember the names Watson and Redden?

A I remember Watson, but I don't remember if that was him, but he was an older man, older black man.

Q Okay. When you say he called, was that a telephone call? Did he call on the radio to you?

A I don't remember that. I just know that the C/O told me when I came back up like that's what's about to happen.

Q Okay. So before the count you didn't speak personally with the lieutenant.

A No.

Q Is that correct?

A No, not me.

Q Was it Rodriguez then who told you that that had happened?

A Yes.

Q So Officer Rodriguez told you that the lieutenant had called and said that you needed

Page 151

to do something with your payroll.

A Yes.

Q Got it. And did you understand what the issue was with your payroll or what needed to happen?

A That's just what you have to do. You just have to enter in the information manually.

Q Is it like entering in your hours, entering in your time?

A Yes.

Q Okay. Is that something that you had done previously?

A Yeah. Everybody does it.

Q Is that something that happens every shift or just every couple weeks before payroll goes out?

A It's just before payroll.

Q And is it your understanding that was the usual practice at the prison, that folks would complete that during their shift?

A Yes. But in the event -- like some days if you didn't work the day that they do it, then they come and just get you and do it the day that you do work.

Q Okay. And you stated that you learned that

Page 152

information before the count; correct?

A Yes.

Q Do you remember the count at the prison on April 7, 2017, that evening count?

A Not exactly. I just know that I did check on them individually. That's just what I do when I do my count, make sure that they're okay and that they don't have to do anything before they, you know, get locked in finally, because I don't want them to be locked in and then they have something that they want to do or that they need to do and then they can't do it.

Q Okay. So it sounds like you have a general memory of what your practice was during the count, but nothing sticks out specifically from your memory of the count on April 7th?

A No.

Q Do you remember whether you saw Joshua Devine during the count on April 7?

A I did not know his name until after when I found out about this case. I just know -- like I just knew of like him when I saw him.

Q Okay. And do you remember what the cell number was that the fire actually started in?

Page 153

A    No.  I just know it was in the 500s and it was like the very end like towards -- it was close to the camera because we watched the footage of what happened that night.  Yeah, it was the closest one facing the camera on this side.

Q    And if I can represent to you that the documents that I've seen in the case and there's been testimony that suggested it's Cell 540, does that sound approximately right to you?

A    It was five something.  I know it was on that side, so.

Q    Do you have any reason to doubt that it was Cell No. 540?

A    I don't have any reason to doubt, no.

Q    Okay.  Do you have any memory of what -- do you have any memory of seeing anything inside Cell 540 or in connection with Cell 540 during the 9:00 p.m. count that night?

A    I would have to like physically see the cell to remember the cell that he was in.  I remember physically what cell he was in, not the number.

Q    Okay.  Do you remember anything in connection with the physical cell that you know Joshua

Page 154

Devine was in?  Do you remember anything about that cell or anyone in it from the count that night?

A    I just remember him minding his business, honestly.  That's just pretty much it.  No one gave me problems that night.

Q    And you had testified earlier about seeing Joshua Devine with a book when checking in on him.  Was that during the count that you remembered seeing that?

A    No, I just -- it's just like a flashing memory.  I just remember he was like kind of organizing his cell.  I just remember when I passed, I seen like the book.  He was just -- I don't know if he was just cleaning up or just about to read, but he was just kind of like sitting and then getting up and kind of just doing his thing, kind of had his back towards me.  So he just kind of looked back when I asked him, you know, are you okay, everything good, you need anything or need me to do anything.

Q    Understood.  And what did you do immediately following the completion of the final count?

A    After that, then you have to just basically

Page 155

take your numbers downstairs and then they have to, you know, call in the count to make sure that the count is right.

Q    And then what happened after that?

A    After that, we sat and waited, and then the lieutenant -- like this is just off of my memory, the lieutenant came in.  I just remember him coming in and taking me and Abbassi in to go do our payroll information.

Q    So it was the lieutenant that came in that directed you at that time to go into the office and complete your payroll; is that correct?

A    Yes.

Q    Do you remember approximately what time that took place?

A    No.  It was just after the final count, which would be, you know, around like 9:00, 10:00.

Q    Okay.  And what specifically do you remember about that conversation or that interaction with the lieutenant?

A    Not much, just putting in our information.

Q    Where did you have the conversation with the lieutenant when he told you you needed to do your payroll?

Page 156

A    We didn't have a conversation with him.  It's just what the C/O told me, that he was going to come and have us go do our payroll, and that's just what we did.

Q    Okay.  What you just described, the C/O telling you that, that took place before the 9:00 p.m. count; correct?

A    Yeah, that was before we did the count.

Q    And then after the count, if I understood your testimony correctly, the lieutenant came to the cell house; is that correct?

A    Uh-huh.

Q    Okay.  And did the lieutenant talk to you at that time?

A    No, we didn't really -- I don't remember us really having much of a conversation.

Q    Well, did he say anything to you?

A    He might have.  I mean, I just don't remember that night exactly and I don't want to say anything that's like -- I don't know.  I just don't remember exactly.  I just remember us going in there and doing -- I just remember, because the night was just so horrible to me what happened, I just remember just vague things, just remembering like vaguely what

Page 157

happened because it was just -- I was 18. It was like the worse thing that ever happened to me.

Q   And so where did you -- strike that.
    Where were you when the lieutenant came into the cell house that night for the first time?

A   I believe that we were in the office.

Q   Okay. And can you describe the location of the office in connection with the rest of the cell house?

A   Yeah. Like it shows in the video, it's just right next to the cells.

Q   And was there anyone else with you in the office when the lieutenant came into the cell house that first time?

A   I mean, all of us. I pretty much believe we were just in the office.

Q   When you say all of us, you're referring to Officer Abbassi and Officer Rodriguez?

A   Yes, the three of us that worked that night.

Q   Okay. Do you remember what you were doing in that office before the lieutenant arrived?

A   No.

Q   What other kinds of tasks that you had as a

Page 158

correctional officer on the night shift that needed to take place in that office?

A   I think I kind of just answered that before. Basically, just paperwork, walks, and whatever, you know, the C/O tells us we need to do.

Q   Sure. And the walks, obviously, don't take place in the office; right? The walks take place physically going up and down the ranges?

A   Of course, yes.

Q   So in terms of tasks that take place specifically in the office, is that just paperwork kind of tasks?

A   Pretty much.

Q   And at that time it's your memory that the three of you were in the office together?

A   That I remember, yes.

Q   Do you recall any policy or practices at the prison related to the number of officers at one time that could be or were supposed to be in the office versus out on the ranges?

A   No. It doesn't matter.

Q   So you were never told or received any training that there should always be at least one officer out on the ranges versus having

Page 159

them in the office at the same time?

A   It's not like a thing that you need to do that. The only thing that's really important is doing the checks after certain times, but to have somebody just standing outside, it's kind of not needed.

Q   Okay. If you were -- was the office like an enclosed space or did it have open doors or open windows?

A   Open door, open window. You could see through it.

Q   Okay. And in terms of hearing things, if there were shouts for help coming from the range, you'd be able to hear that in the office. Is that fair to say?

A   Yes, you can.

Q   Okay. Do you remember what it was like in B-cell house after the final count on April 7, 2017, the atmosphere, generally, before the fire?

A   It wasn't anything special, like nobody really gave issues that night.

Q   Do you remember the background level of volume in the cell house that night, whether it was a loud night or a quiet night?

Page 160

A   It was quiet.

Q   And fair to say that that's fairly common on the night shift, that things quiet down after the 9:00 p.m. count?

A   Yes.

Q   So there would have been no issue -- if someone is standing in the office, there would be no issue for anyone hearing shouts for help coming off the ranges.

A   As long as it's quiet, sure thing.

Q   It was quiet that night.

A   That I remember before we left. Like during the time that we weren't there, I don't know. But during the time before I left, which was very fresh when we just put them in, it was not quiet, but like -- of course they were talking, but it wasn't like to the point it was so loud, hey, quiet down. They were just, you know, respectful that night at that time.

Q   Normal volume level.

A   I'm sorry?

Q   It was a normal volume level --

A   Yeah.

Q   -- for that prison cell house after hours like that.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 42 of 78

Page 161

A Yeah.

Q So you -- if I understood your testimony, the three of you, you, Abbassi, and Rodriguez, were in the office when the lieutenant came into the cell house?

A Like I said, I don't really exactly remember. I just believe that's what it was.

Q Okay. And it sounds like you don't remember specifically the interaction or conversation you had with the lieutenant, but you understood him to be telling you to go do your payroll; is that right?

A Yes.

Q Okay. And so what happened after that?

A After that, I remember hearing "fire", like after that it was just really kind of just like -- I just know that Rodriguez started running upstairs.

Q Well, let me back up a little bit. Did you -- after the lieutenant came into the cell house, did you leave the office and go somewhere else?

A We did, but it's like -- if I remember right, and it's on the video too, the computer room is close by. So we weren't exactly gone, but

Page 162

we were in a computer room.

Q And when you say "we", are you referring to both yourself and Officer Abbassi?

A Yes.

Q And was it your understanding that both of you needed to go complete your payroll?

A Yes.

Q Was she also told by the lieutenant to go complete her payroll?

A Yes.

Q What's the name of the room that you went to?

A I don't know. I just know computers are in there, so I'm just going to call it a computer room.

Q Okay. And you testified earlier having some memory or recollection of handing off keys to Officer Rodriguez. Do you remember testifying about that?

A No, I didn't say that. I said that I remember that some way that I could have possibly given him the keys if that's what was supposed to happen, but I don't remember exactly, but it should show on the video. It should be proof of what happened, but I don't exactly remember just on the record if I gave him the keys or

Page 163

if I had the keys myself.

Q Okay. But if you gave him the keys, this is when that would have happened; is that right?

A Yes.

Q In the office before you went to the computer room.

A Yes.

Q Okay. And you said that that would be shown on video. Is it your understanding that there's video cameras that capture the inside of the office?

A Uh-huh. Yes.

Q Okay.

A Yeah, we watched it the day after, I believe it was, the video.

Q And you watched video footage that showed you and Abbassi and Officer Rodriguez together in the office before the fire?

A I don't remember that part. I just remember that we saw a video. I don't remember, you know, all the details of what we saw, but I do remember there was a video that I watched a couple years ago.

Q Okay. Specifically, in terms of there being video that shows the inside of the office, is

Page 164

that something that you remember?

A I just remember one angle that we saw, and it was kind of like just pointing towards the door and then the office right there and then there's the cells. So it wasn't really switching to different cameras. It doesn't mean there isn't other cameras, but that's the view that we watched.

Q Okay. So you watched -- just to let me clarify, the video that you watched, that you remember watching the night of the fire, did that show the inside of the office?

A Like I said, I don't know that. I just know that it shows one angle and you can see the office and the open windows and the doors are open. So like you can pretty much see somewhat inside the office, but of course there's other cameras, I believe. So if you guys need to see it like to know if we were in there, I'm pretty sure they got it.

Q Okay. And --

A Because I don't have the answer for you.

Q Understood. And then you testified that you went to the computer room with Officer Abbassi; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 43 of 78

Page 165

A    Yes.

Q    Okay.  So what happened once you got to the computer room with Officer Abbassi?

A    Do what we were called to do, the payroll.

Q    And how long -- do you have a specific memory of sitting in the computer room that night completing your payroll?

A    I just remember that's what I did.  Specifics, and stuff like that, no.

Q    That was something that you had to do every pay period; correct?

A    Whenever we did it.  Honestly, I don't exactly remember.

Q    How long would it take you to complete your payroll for a given pay period?

A    Exact time I don't know, but it doesn't take that long.

Q    Ballpark -- well, strike that.
         Do you recall specifically what it entails, like putting it in a computer and having to input what kind of information?

A    You just put in your hours.

Q    Just the hours of the shift that you work?

A    Yes.

Q    And did you always work the same number of

Page 166

hours?

A    I don't know.  Are you asking if me and Abbassi worked the same amount of hours or in general we just worked the same amount of hours?

Q    Just for you, for you putting in your payroll, was it having to go back and calculate different hours for different shifts or was it just like the same shift and just the days you worked?

A    I think I had to calculate because I think I missed a day of work, but I can't quite remember.  I think I had to call off because I was sick.

Q    Okay.  So there was like one day that you had to scratch out that you weren't entering hours for and the others were just your regular shift?

A    Possibly.  I could ask them.

Q    Okay.  What's your best ballpark estimate on how long it would have taken you to complete inputting your payroll on that night?

A    Probably like ten, 15 minutes.

Q    About ten to 15 minutes?

A    I believe so, yeah.  Sometimes the computer

Page 167

runs slow.  It just depends on what happens.

Q    Okay.  And then same thing for Abbassi?

A    Could have been.

Q    On the night of the fire, April 7, 2017, do you remember if Officer Abbassi went first doing payroll or you don't remember?

A    No, I don't remember.

Q    Can you describe physically the layout of the computer room that you were in with Officer Abbassi?

A    No.

Q    That's just because you don't remember it?

A    Yeah, I don't remember it.  I just don't.

Q    Was there one computer or two computers?

A    I really don't remember, but I'm pretty sure they can show you.  I mean, the room should still be there.

Q    To the best of your memory, do you remember whether you and Officer Abbassi were able to input your payroll at the same time or whether you had to take turns?

A    No, I don't remember that.

Q    Okay.  Was the -- was there windows in the computer room?

A    I mean, like I said, they can show you.  I

Page 168

don't remember.

Q    Okay.  Do you remember if you left the door to the computer room open or closed?

A    I don't remember, no.

Q    Okay.  Is it possible that you left it open?

A    It's possible.  I just don't want to give you a false answer, you know, and then you later -- I just don't remember that.

Q    Sure, and I appreciate that.  And would you agree with me that it would generally make sense to leave the door open so that you can hear what's going on in the cell house?

A    Uh-huh.  Yes.

Q    That would have been a good idea to leave it open; right?

A    It wasn't open?

Q    No, I'm asking you.  I understand you don't remember one way or the other, but would you agree with me that it would have been a good idea to leave it open?

A    Yes.  Well, generally, you can still hear anyway with it closed.  Yes, it's smart, but you could still hear.

Q    So your memory from working in that cell house and from being inside that room is that either

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

Page 169

way, door open or closed, you could hear what was going on in the rest of the cell house?

A   I don't remember if it was open or closed, but I remember hearing when somebody said fire.

Q   Okay.  So whether the door was open or closed, the layout and the materials in that cell house were such that you could hear what people were yelling off the ranges even when you were in that computer room; is that correct?

A   Yes.

MR. HEPPELL: Okay.  Can we take five or ten minutes?  All right.  So let's go back on the record at 2:10 p.m.  Let's take ten minutes.

(Brief recess.)

BY MR. HEPPELL:

Q   Before we took the break you had been testifying about being in the computer station, computer room, doing your payroll; correct?

A   Yes.

Q   And do you recall specifically the process that night of working on your payroll and submitting it?

Page 170

A   No.

Q   Do you remember whether or not you completed your payroll before learning about the fire?

A   No, I don't remember.

Q   Okay.  So if there were records in the case which suggested that Officer Abbassi submitted her payroll that evening, but that yours wasn't submitted until two days later, do you have any reason to think that's not correct?

A   No, I think -- that's why I kind of like think I do vaguely remember not finishing it.

Q   So you were, based on that then, you were in the middle of filling out your payroll when you first learned that something was going on in the cell house?

A   Yeah.

Q   Okay.  Tell me what you remember about the first -- about first learning that something was going on out of the ordinary in B-cell house on April 7, 2017.

A   I just remember someone saying fire and then smelling smoke, and that was pretty much where it went from there.

Q   When you say you remember someone saying fire, do you know if that was one of the prisoners

Page 171

saying fire, another officer saying fire, or you're not sure either way?

A   I'm not sure either way because we were in the room.  So I'm not positive.

Q   But you heard it distinctly, clearly enough that someone was yelling the word fire.

A   Yeah.

Q   Okay.  And then you also described smelling smoke; is that correct?

A   Yes.

Q   And when do you first remember smelling smoke?

A   Like when we got out towards the cell house, because it wasn't really a lot, but you could tell like it was happening.

Q   Okay.  So you first remember smelling smoke after you left the computer room?

A   It was either after or it was like when we were going through the door.

Q   Okay.  So it was pretty shortly after you heard someone yell fire that you started smelling smoke?

A   Yeah.  It happened all so fast.

Q   And had you heard anything while you were in the counselor's office -- strike that.

Had you heard anything when you were in

Page 172

that computer room prior to that moment when you heard fire?

A   No.

Q   Okay.  If there had been yelling and -- if prisoners on the ranges had been yelling at that time or there had been people banging on their bars to try and get people's attention, is that something that you would have heard from inside of the computer room?

A   I believe so.

Q   What was the first thing that you did after someone -- after you heard someone yell fire?

A   I just remember we stepped out, and I don't exactly like want to go off my memory because I don't remember like step by step, but I know that like when we watched the video, it showed everything we did, so.

Q   Sure.  And just to be clear, obviously, there's evidence from different sources in the case, including video and other folks' testimony, and I appreciate that you want to be accurate.  What I'm asking for right now, at least in the next few questions, is for you to go back to the best of your memory and recount how things happened, the way that you

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021
USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 45 of 78

Page 173

remember them.

And I understand there may be areas where you just don't remember because of the passage of time or where you're not sure and I want you to be clear and express those areas, but I am interested in hearing your memory of what took place that night. Okay?

A   Yes. I just want to be exactly accurate because just also me knowing that there's video, I just kind of -- and knowing that I'm kind of vague on the memory, I don't want to say anything that's just like -- and I'm on the record, I don't want to say anything that's off or that's not accurate, so.

Q   Sure. And again, I appreciate that and I want you to be as accurate as possible, and if the truthful answer is I don't remember, that's the answer you should give. I have reviewed the video and, obviously, it shows what it shows. There's no sound on the video to some limitation and there's also a limited number of camera angles. So it's helpful, but it doesn't show everything. It's no substitute for what it was like to be in that cell house that night, and that's why I'm interested in

Page 174

your testimony from your specific experience.

Where did you go once you left the computer room after hearing someone yell fire?

A   I remember going -- from what I remember, I remember going outside and standing like close to the front of just seeing like the cells.

Q   Is there a name for that area of the cell house?

A   Not to my memory right now.

Q   Okay. Why did you decide to go there?

A   Because that's where the view was of where the fire was. So just kind of generally getting an idea of what was happening and then taking action.

Q   Okay. And what were you able to learn once you got into that position?

A   Where the fire was located.

Q   And you learned that the fire was located on the 500 range?

A   Yes.

Q   Okay. And you learned that by visually seeing that the fire was up on that range?

A   Yes.

Q   Okay. And you were able to see and learn that as soon as you came out into that open area

Page 175

from being in the computer room; is that correct?

A   Yes.

Q   Okay. Between the time that you heard someone yell fire and the time that you reached that position out in the open that you just described, do you know what Officer Rodriguez was doing or saying?

A   Not exactly. I just do remember him running up there.

Q   Okay. What about Officer Abbassi, do you remember if she came out of the computer room with you at the same time?

A   Yes.

Q   And do you remember where she went?

A   No. I think I vaguely remember her going to the office, but I don't remember exactly. The moment I really just remember is just standing there, and then I know we did other things after that, and then I remember the firehouse, you know, the prisoners that work with the firehouse coming, and then letting them out.

Q   Okay. Well, going back to the moment that you described where you came out into that area of the cell house where you were able to observe

Page 176

that the fire was up on the 500 range, what did you do next after that?

A   Like that's where I said there's a gap. I just don't remember. I just do remember we were doing the steps of whatever we needed to do at that point in time, and then I just remember, you know, the firehouse prisoners coming in and other like coworkers and people coming in trying to help us.

Q   Okay. So just to make sure that I understand your testimony, obviously, there are -- your memory is not perfect as you sit here today, but you do have a memory of being in the computer room, hearing someone yell fire, running out into an area of the prison where you could see more, and looking up and seeing that there was a fire on the 500 range. You have a memory of that; is that correct?

A   Yes.

Q   And then did I understand you correctly that after that there's a gap in your memory that is not clear on exactly what you did next?

A   Yeah, like just exactly what we were doing.

Q   Okay. At that point in time do you believe that you had the keys to the 500 range or do

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 46 of 78

Page 177

you believe that a different officer had the keys to the 500 range?

A  I think I had them, but I think he might have had them. I just don't exactly remember.

Q  So it's possible -- strike that.
The fact that you're not sure who had them, that's just based on the fact that it's been a number of years since the fire happened. Is that fair to say?

A  Yeah. Like if you would have asked me possibly like the next day, I would have remembered if I had them or not.

Q  Right. And certainly at the time the fire was going on you knew who had the keys to the 500 range; correct?

A  Yes, just -- yeah. Just currently, right now, I don't exactly remember.

Q  Got it. And at the time of the fire you also knew that there was only one set of keys in the cell house to the 500 range; correct?

A  Some cell houses have copies, but I don't remember if B-cell house did.

Q  Fair to say that whoever had the keys to the 500 range was going to need to be the person to unlock a cell if there was a prisoner

Page 178

locked in his cell; correct?

A  Yes.

Q  And you knew at the time that it was after final count, so all of the prisoners were locked in their cells; correct?

A  Yes.

Q  Were you aware that the fire that you could see was coming from inside someone's cell?

A  No, I didn't know until we got up there that he was inside the cell, but I was pretty sure it had to be inside of the cell.

Q  Even based on what you were seeing just from that initial look that you got, it appeared to you that it was coming from at least nearby the cell?

A  Yes.

Q  And based on what you were able to observe from that position, fair to say that you were aware that all of the prisoners in the vicinity of that fire were in danger?

A  Yes.

Q  Okay. And anyone in the position you were standing, looking up and seeing what you were seeing, that would have been an obvious conclusion, based on what you were able to

Page 179

see, that anyone up in that area was in danger. Is that fair to say?

A  Yes.

Q  Can you describe what the fire looked like at the time you were able to look up and see it?

A  No. I just -- no, not exactly, no. It just didn't look that bad. It just looked like it was just starting.

Q  Okay. And do you have any -- are you able to offer any details beyond that conclusion in terms of what it looked like, the extent of smoke or flames you were able to observe at the time you first emerged from the office into that open area of the cell house?

A  No.

Q  And is that just because with the memory and passage of time you don't recall specifically?

A  Yeah, just not exactly how it looked.

Q  Okay. And you were aware in April of 2017 that there was no rule or prison policy that prevented you from going up to the 500 range at that time; is that correct?

A  Very true.

Q  And there was no one that ordered you not to go up to the 500 range; correct?

Page 180

A  Very true.

Q  Were you aware of where Officer Rodriguez was at the time that you were standing and looking up and seeing the fire on the 500 range?

A  I believe, if my memory serves right, he went up there.

Q  Okay. What's your memory of when Officer Rodriguez went up there?

A  I think that he said that the lock was melted and that we needed to do something to try to get him out.

Q  And how did that -- how was that communicated to you?

A  That, I don't remember. Like I think it was him just yelling.

Q  Okay. Do you know how many times Officer Rodriguez went up to the 500 range?

A  No.

Q  Sorry, was that a no?

A  No, I don't.

Q  Do you recall there being an issue with Officer Rodriguez's radio?

A  No, I don't.

Q  You have no memory of there being an issue that his radio wasn't working?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

Page 181

A    Huh-uh.  No.
Q    Okay.  I understand that you don't remember exactly who had the keys, but fair to say that you understood at the time that if you had the keys, Officer Rodriguez going up to the 500 range would not be able to unlock the cell; correct?
A    That would be correct.
Q    Okay.  Did Officer Rodriguez ask you at the time he was going up to the 500 range to give you the keys -- or for you to give him the keys rather?  Let me reask that question.
       At the time that Officer Rodriguez first ran up to the 500 range did he ask you to give him the keys to the 500 range?
A    That, I don't remember.
Q    Okay.  I understand that there are limitations in your memory about, you know, exactly what happened in the cell house that night.
       As you sit here today, can you think of any reason that you did not personally go up to the 500 range when you saw that there was a fire up there?
A    I think mostly because we just kind of told each other what we needed to do.  So it wasn't

Page 182

so much of I didn't want to go or didn't need to go.  I was told not to go.  It's just whatever, you know, task you were given, it was do that, you know, and I think you felt as C/O that that's what he was going up there to do.
Q    When you say that's what he was going up there to do, what are you referring to?
A    Go up there, I guess, like during the time of what happened.
Q    Okay.  Fair to say that, as you sit here today, you have no memory of Officer Rodriguez telling you don't come up, stay on 100 level?  Is that fair to say?
A    I do not remember that.
Q    Okay.
A    It's starting to sound a little familiar, but I don't know.  I don't know, because I do remember being on the first floor because I was talking to a couple of the first floor prisoners, checking on them because some of them were complaining about the smoke, and stuff like that, and when they were going to get out.  So I -- I don't know.  It might have happened.  I just don't exactly remember.

Page 183

Q    Okay.  And so prisoners on the first floor complaining about the smoke, that interaction that you were just describing, did that happen right around that same time that you first came out and saw the fire on the 500 range or did that happen later?
A    It happened a little later, I believe.  I'm not positive.
Q    Okay.  And when you --
A    And I don't --
Q    Go ahead.
A    I don't think the camera would catch that angle because it was towards the back of the first floor, like the middle.  I know that the camera probably wouldn't catch that, but I'm not positive.
Q    Okay.  When you first came out into the open area of the prison coming out of the computer room were you able to smell smoke at that time?
A    Yeah.
Q    And was there smoke visible like in the air in front of you at that time?
A    No, it wasn't like it was like that.  It was just like you could tell something was

Page 184

burning.
Q    Okay.  And then were you able to see visible smoke coming off the 500 range as well?
A    I believe so, yeah.
Q    And so in response to the question of why you didn't go up to the 500 range, if I understood your testimony, you had some -- well, strike that.
       You don't have any particular memory of anyone telling you not to go up there; correct?
A    No, but when you said that, it kind of sparked my memory a little bit that possibly he did tell me, but I don't exactly remember.
Q    And other than someone telling you specifically don't come up to the 500 range, can you think of any other reason why you would not have gone up to the 500 range?
A    No.
Q    Okay.  Because you knew that you were responsible for the safety of the prisoners on that range; correct?
A    Yes.
Q    And if you had the 500 range keys, you knew it was only those keys that could unlock the

USDC INND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 48 of 78

Page 185

cells to let the prisoners out of the cells on that range; correct?

A   Yes.

Q   Did you -- you had your radio on you at the time; correct?

A   I believe so.

Q   Did you make any calls for anyone to come and offer assistance at that time?

A   Possibly.

Q   You have no memory of making any calls for emergency assistance?

A   No.

Q   Okay.  And did you do anything to cause the prisoner firefighters who were housed in other cell houses to come and assist with the situation?

A   It might have happened.

Q   You have no memory of you taking any action like that.  Is that fair to say?

A   I just remember that I had stuff to do, but I just don't remember exactly like, you know, like what happened.

Q   Do you have any memory -- strike that.
     Other than the general memory that you had stuff to do, do you have any specific

Page 186

memory of what any of those tasks or responsibilities were?

A   No.

Q   So fair to say that, as you sit here today, you aren't able to articulate any specific step that you took in response to learning there was a fire in B-cell house to try and either rescue prisoners on the 500 range or take any other steps to try and respond to the fire situation?

A   No.  I remember I had to do tasks that I was told to do, but I just don't remember exact -- like I remember I was -- I just remember running around doing what I had to do, like whatever, because it was like three of us and we're trying to run up and figure out what to do and then calling the right people like we're supposed to, making sure that the prisoners are okay, and a lot of them were complaining about, you know, a lot of stuff.
     We were just trying to make sure -- just a lot of everything, make sure we get them out and take all the steps that we needed to.  So it was kind of like so fast and a whole bunch of things going on that it's like -- it was

Page 187

just a lot going on.

Q   I understand that.  What you described just now is sort of a general memory of there being a lot going on and you having tasks that you were responsible to do.  Is that fair to say?

A   Yes.

Q   Beyond that general memory of there being a lot going on and you having tasks, are you able to offer any specifics, based on your memory, of specific steps that you took in response to the fire?

A   I just remember asking him what he needed me to do and what he wanted me to do, and then he was letting me know what we needed to do, like call this person, that person, you know, at that time.  And I don't even have an exact, but I know like the lieutenant, you know, different people that we needed to call to be able to get the prisoners out because that was my main concern, getting them out, especially the one in the cell.
     So I don't know exactly what he was trying to do.  I know it was -- I think I remember that this was kind of his first or second shift being the lead, you know, the

Page 188

C/O.  So it was kind of like it was fresh to him.  So he was trying to, you know, help us on what to do, but he was kind of -- I do remember him panicking a lot.  He was really, you know, scared and we were trying to keep him in check, but he'd keep us in check.

Q   And when you say "he", are you referring to Officer Rodriguez?

A   Yes.

Q   Okay.  And in terms of when you say he was panicking, can you explain what you mean by that?

A   If I remember right, like he just started to kind of like, oh, my gosh, I don't know what to do.  It was kind of like what you call a mini panic attack.

Q   And what specifically do you remember him saying that led you to that conclusion?

A   I think it's just because there was a lot going on with three of us that he was just trying to figure out what to do and what needed to be done and he was panicking because his cell, you know, the lock was melted.  So he was just panicking.  He was trying to get all the right people there and everybody that

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 49 of 78

Page 189

we needed to call.

Q    And so did these conversations of what you just described take place before Rodriguez went up to the 500 range for the first time or afterwards?

A    No, it had to be afterwards because there was more people that had showed up to help us.

Q    Okay.  You have no memory of any -- well, strike that.

Do you have any memory of anything specifically that Officer Rodriguez said to you that night?

A    Not personally, no.  I just remember after the fact of everything he checked on me and made sure I was okay.

Q    And that was after everything had happened?

A    Yeah.

Q    What about Officer Abbassi, what do you remember Officer Abbassi doing after you first saw the fire on the 500 range?

A    She was kind of out of my view.  We were kind of all like in different places.  I do remember her making calls too and checking on her floor, different things like that.

Q    Is that something you specifically remember

Page 190

observing her do?

A    That's what I remember seeing her do.

Q    Okay.  So you don't remember what you were doing specifically at this time; correct?

A    Not really, no.

Q    That's where there's a gap in your memory?

A    I mean, there's a gap regardless because it was just so far, you know, back, but I just do remember we had things to do.  Like I remember some things that I did and then some things she did and some things he did, but not everything or a timeline or how exactly it went down or this happened this time, this happened this time, this person got here, that person got here, or this exact person's name.

I just remember he told me what I needed to do and I tried to -- I didn't make any calls, but I know Abbassi made calls, and I was basically just kind of -- I remember being on the first floor and I do remember -- I don't know.  I just remember mostly the first floor and a lot of prisoners complaining about it, and then I remember going up to the fifth floor when we started letting them out.

Q    Okay.  You did not go up to the fifth floor at

Page 191

any point before the fire was extinguished; is that correct?

A    That I remember, no.

Q    You have no memory of going up to the fifth floor at anytime before the fire was already out; correct?

A    No, I did.  I did.

Q    You did go up to the fifth floor before the fire was out?

A    If I remember right, I did.  I do remember running up and down the stairs.

Q    When did you run up and down the stairs?

A    Like it was before we let them out, at least like two times.

Q    And it's your testimony that you went up to the 500 range?

A    It might have been the 500, but I just remember running up the stairs.  That's just all that I remember like just in my memory right now.

Q    Okay.  So you have a memory from the night of the fire about running up the stairs.

A    Yes.

Q    But you don't remember where you were running to?

Page 192

A    No, but I --

Q    You don't remember -- sorry, go ahead.

A    But I believe it had to have been -- one of the times was the fifth floor because I believe that I remember them asking me to go do something after the lieutenant and -- what's his name, Rodriguez, asking me to go back downstairs and do something.

Q    Okay.  That was after the lieutenant had arrived to the cell house?

A    Yes.

Q    Okay.  Do you remember being on the 500 range at the time when the fire was still going in Joshua Devine's cell?

A    I don't remember that.

Q    You talked about having a memory of being told by Officer Rodriguez that, you know, that there were certain things you needed to do and that you remember doing those things; correct?

A    Yes.

Q    You don't remember the specifics of any of the steps that -- well, strike that.

You don't remember the specifics of any of the things that Officer Rodriguez told you to do; correct?

Page 193

A    Yes.

Q    You don't remember the specifics of you doing any of those things; correct?

A    I remember I was doing something, but like what and exactly the timeline, no.

Q    Okay.  This conversation that you remember when Rodriguez told you to do certain things, was that before he first went up to the 500 range?

A    Like I said, nothing was ever really like a sit or like a long conversation.  It was either like yelling from upstairs or it was -- it wasn't like, oh, let me talk to you real quick.  It was mostly like, hey, can you do this, make sure you go do that, like that.  Kind of -- kind of just craziness.

Q    Okay.  If other correctional officers in the case testified that you never went up to the 500 range, would you dispute that testimony?

A    No, because that probably did happen.

Q    Probably did not happen?  You mean it's possible that you never went up to the 500 range?

A    It's possible, but I do remember talking to the lieutenant about doing something, but I do

Page 194

remember I had to let them out from the fourth floor.

Q    Okay.  And when you say you let them out from the fourth floor, that's when the entire cell house was being evacuated; correct?

A    Yes.

Q    And that was after the fire in Cell 540 had been put out; correct?

A    Possibly.  I don't know if it was put out.

Q    Okay.  If the other testimony and evidence in the case suggested that the prisoners were not evacuated from the cell house until the fire in Cell 540 was put out, would you have any reason to dispute that?

A    No, because that's proof.

Q    Okay.  At any point did you go and get a fire extinguisher?

A    One of us did.

Q    You have no specific memory that you went and got a fire extinguisher; is that correct?

A    No.

Q    Were you aware that there was a prisoner firefighter housed in B-cell house on the night of the fire?

A    No.

Page 195

Q    You didn't know that there was a firefighter housed in B-cell house?

A    I'm not positive, no.

Q    Okay.  Were you aware that -- well, strike that.
     What was your understanding of the policy at ISP about releasing prisoner firefighters in the cell house in the event of a fire in the cell house?

A    I mean, I think in anybody's common sense you'd let them out to help.

Q    Did you take any steps to release any prisoner firefighters on the night of the fire?

A    If it shows so, yeah.

Q    You have no memory of doing that.

A    No.

Q    Do you have any memory of seeing anyone else taking any steps to release prisoner firefighters from their cells either in B-cell house or asking for firefighters from another cell house to respond?

A    No.

Q    Okay.  Do you remember any -- you had testified earlier about having conversations with prisoners complaining about smoke.  Do

Page 196

you recall that?

A    Yes.

Q    Do you remember hearing anything else that prisoners were yelling or saying in B-cell house while the fire was going on?

A    Saying that it was our fault letting him die.

Q    People were saying that while the fire was still going on?

A    I just remember it being said.

Q    Okay.  Do you remember hearing anything the prisoners up on the 500 range were yelling about the fire while the fire was still going on?

A    No.

Q    Okay.  Do you remember whether Rodriguez gave you the keys to the 100 range at any point?

A    No.

Q    Do you know who -- well, strike that.
     Do you have a memory of other officers arriving in the cell house other than you, Abbassi, and Rodriguez?

A    I remember just mostly like kind of like higher rank people coming in.  Names and specifics, no, I don't remember their names.

Q    Understanding you don't remember their names,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IND/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 51 of 78

Page 197

do you remember when higher rank people came into the cell house?

A   Timeline exactly, no, just -- they came pretty quick.

Q   Okay.  Do you -- where were you when those officers came into the cell house?

A   Honestly, wherever I was, honestly, I don't remember.  In that timeline, whenever they came in, that's wherever I was.  I was somewhere around the first floor, possibly.

Q   Do you remember being the one that let them into the cell house?

A   I believe so because I think that's why I was on the first floor.

Q   Okay.  What do you -- strike that.
    What did you do after you let those officers into the cell house?

A   I don't remember that.  Honestly, I don't.

Q   Do you remember giving a video-recorded interview with one of the investigators at the prison after the fire?

A   I remember we went into a room, but, no.

Q   You don't remember going into a room with an investigator?

A   I don't know if it was an investigator, but I

Page 198

know we -- I know afterwards they just took us to a room.

Q   Okay.  Do you remember answering any questions about what had happened during the fire?

A   I think it was more along the lines they were trying to check on us to make sure we were okay.

Q   Okay.  If someone had asked you questions about what had happened, would you have told the truth?

A   Exactly, yes, whatever I remembered.

Q   You would have told the truth to the best of your memory to anyone who asked you questions that night about what had happened?

A   Yes.

Q   Going back to when you first learned of the fire, do you remember if it was just the word fire or do you remember someone saying fire on 500 or some other variation?

A   No, I don't remember.  It was something along the lines of that.

Q   It was something along those lines, but it definitely had the word fire in it?  Is that what you're saying?

A   Yes.

Page 199

Q   It could have been fire on 500.

A   Could have been.

Q   Did you -- you would agree with me that it would not be reasonable for you not to have done anything to assist with rescuing Joshua Devine from his cell once you learned that there was a fire on the 500 range; correct?

A   I'm sorry, say that one more time.

Q   You would agree with me that it would not be reasonable for you to not have done nothing in response to learning that there was a fire on the 500 range; correct?

A   It would be appropriate to do what I had been told to do.

Q   You don't specifically remember what that was; correct?

A   No, sir.

Q   Okay.  Why did you -- strike that.
    You would agree with me that you had a responsibility to act even if no one gave you instructions on what to do; correct?

A   It's tricky when it's a federal job or a government job.  You do what you're told.

Q   Understood.  But you didn't need someone to tell you to act to try and rescue people from

Page 200

a burning cell; right?  Based on your training you knew that that was something you could do without anyone specifically authorizing you to do that; is that correct?

A   If that's what I was -- if that's what it's supposed to be and if that's what the job training had said, then, yes.  If I had the keys, yes.

Q   Well, I guess I'm asking you -- I wasn't there for the job training.  So my question is, did you have a responsibility to do something even without anyone instructing you what to do?

A   I mean, all common sense, yes, it would be my responsibility.  It's my floor.  It's just human right and human nature to do the right thing to let somebody out if they're burning. We don't want someone burning alive, you know, because that could be my brother or that could be my dad.  So I would make sure whatever I need to do.  If I have the keys, I let him out.  If I'm told to do something different, then I do that.  That's just all I can say.

Q   Right.  And I understand that that's within the guidelines of your personal morality or personal views, but you understood also that

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 52 of 78

Page 201

was part of your job responsibility as a correctional officer, to take steps to rescue people from danger in that kind of situation; correct?

A   Of course.

Q   And other than your general memory that you were doing things that you were told to do by someone else, is there any other reason that you can think of, as you sit here today, for why you didn't go up to the 500 range immediately upon seeing that there was a fire up there?

A   No.

MR. HEPPELL: Okay.  I'm cognizant of the time issue and I know that Randy, I'm sure, is going to have some questions he wants to ask you as well.  If we can go off the record briefly to take a break, I just want to check on one thing and then we can jump back on.

THE WITNESS: Sure thing.

(Brief pause.)

MR. HEPPELL: Cognizant of the time and opportunity to ask you questions, I'm going to pass it to Mr. Rose to ask you some

Page 202

questions.

MR. ROSE: We're back on the record.  Thank you, Sam.

(Defendant's Deposition Exhibit B remotely marked for identification by Attorney Rose.)

CROSS EXAMINATION

BY MR. ROSE:

Q   Sir, my name is Randy Rose.  I know that we're running short on time, so I'll keep it short.  I heard you talk about a lieutenant earlier, and I want to share on the screen -- let me know if you can see what I'm about to show you.  Can you see it on your screen?

A   Yes.  Yes, that's him.

Q   That's him.  That's the lieutenant you were talking about?

A   Yes.

Q   Okay.  When I say the lieutenant you were talking about, you were asked about a Lieutenant Watson.  You described him -- and I'll paraphrase, as an African-American male, older; is that right?

A   Yes.

Q   Okay.  You've identified the person that's in

Page 203

what I've identified as Blakely Depo Exhibit B as being Lieutenant Watson; is that correct?

A   Yes.

Q   Got you.  All right.  I'll stop share on Exhibit B.  Now, a couple -- these are questions Sam didn't ask.

What's an A4?  This is all when you were a correctional officer at Indiana State Prison.  What would be an A4?

A   Honestly, at this point in time I don't remember.

Q   That's okay.  What about a 10-71?

A   I'm guessing these are like mostly kind of like different calls, but --

Q   Yeah, and if you don't remember, that's fine.

A   Yeah, I don't remember.

Q   Do you remember what that code is for?

A   You said 10-4?

Q   10-71.

A   Oh, 10-71.  No, I'm sorry.

Q   Okay.  What about a Signal 3000?

A   Oh, that sounds so familiar.  That sounds familiar.

Q   Okay.  I take it then you don't recall what that code stood for either, as we sit here

Page 204

now?

A   No, but it sounds so familiar.

Q   Okay.  All right.  So you were asked about whether or not you were called to an interview after the fire with an investigator.

Did I understand you correctly that you remember sitting down with somebody after the fire and talk about it?

A   I remember we were just basically being asked like were we okay, but I don't remember.  But I do remember we did come and sit and watch the video, you know, together, and stuff like that.  But an investigator, I think I faintly remember a little bit, but, no.

Q   That's okay.

(Defendant's Deposition Exhibit C remotely marked for identification by Attorney Rose.)

BY MR. ROSE:

Q   All right.  I want to show you -- again sharing on the screen, do you see the document on the screen now?

A   It's popping up.  Yeah, I remember writing that, yes.

Q   All right.  Let me scroll down right quick,

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 53 of 78

Page 205

and I've got this document that I'm sharing with you now.  It's screen labeled Blakely Depo Exhibit C.

A    Uh-huh.

Q    Do you see that, where I've got it labeled?

A    Yes.

Q    All right.  And is that your signature?

A    Yes, it is.

Q    All right.  Did I take it then that you recognize this document?

A    Yeah, I remember writing it.

Q    Okay.  When did you write this?

A    That was on the 8th.  That was like the day after.

Q    The day after?  Now was this while you were still on your shift after the fire?

A    I believe so.  No, I don't -- I just remember writing it.

Q    That's okay.  Take a moment and read the document.  I know you have some problems.  We're talking about almost four years ago at this point.  So this document was written by you the day after the fire.  Take a moment and read it.  This, I hope, refreshes your memory as to some of the events.

Page 206

A    (Witness complies.)

Q    Okay.  You've had a chance to read through Exhibit C now?

A    Yes.

Q    And earlier you testified that anything that you would have told that investigator or other people after the fire about the fire were true; correct?

A    Yes.

Q    And what you put into this document that you wrote the day after the fire, is that likewise true?

A    Yeah, because it was like very fresh after that, yeah.

Q    Exactly.  Now you wrote it hours after the fire versus now we're talking about something that was almost four years ago; correct?

A    Yeah.  So now I remember, yeah, A4 is basically when we do the payroll and I believe like a 10-71 would be like the signal about a fire.

Q    Signal about a fire is a 10-71?

A    That's what I believe.

Q    Sure, sure.  I can tell you're looking back at it.  Do you need another moment to look at it

Page 207

or are you okay?

A    No, I got it.

Q    Okay.  And then I gather here -- you were asked about what happened with the keys to the 500 range, and then looking at this, you previously identified the man pictured in Exhibit B I showed you as being Lieutenant Watson?

A    Yes.

Q    Now that I've had you look at Exhibit C, does that refresh your recollection as to what you did with the keys?

A    Yeah.  Now, yeah.

Q    Okay.  And what did you do with the keys?

A    It says right there I gave it to him.  I do remember being on the first floor, now that gave me --

Q    Now do you -- I'm so sorry.  Now do you recall, now having looked at that, who would have told you to stay on the bottom -- in fact, let's call it the tank, the bottom of the range?

A    I think it's -- it's pretty much just the bottom.

Q    All right.  And then you were talking about

Page 208

Officer Rodriguez telling you to do some things and then you were asked about why didn't you go up to 500 range.

A    Uh-huh.

Q    Did I understand your testimony to be that you were told to stay down?

A    I told him that it was possible that I was told because I didn't exactly remember.

Q    Okay.  Having looked at the document here, Exhibit C, does that refresh your recollection as to who gave you any directions that may be relative about not going on the 500 range?

A    It still doesn't, but it does help me remember that I was on the first floor and that I did still have my keys.

Q    Sure.  And you were asked about what you did, and does this refresh your recollection about what you did after learning of the fire?

A    Yes.

Q    Okay.  And what you did is reflected in this document; is that correct?

A    I think I just pretty much did state like, basically, like that, yeah.

Q    Okay.  I'm going to stop share on C and then -- let's see here.  I'm going to show you

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 54 of 78

Page 209

another screen share of another document.

A    Okay.

        (Defendant's Deposition Exhibit D remotely marked for identification by Attorney Rose.)

BY MR. ROSE:

Q    Now, I'm going to submit to you what this is is an excerpt from the investigative report. Can you read it clearly on your end?

A    It's kind of covered up on the right-hand side, but --

Q    Okay. Hold on one moment. What about now?

A    It's still covered on that side, but --

Q    How about now?

A    That's good. I can read that.

Q    Okay. Yeah, take your time. I was saying that what I was submitting to you is that this is an excerpt from an investigative report relative to the fire.

A    Uh-huh.

Q    And an excerpt or a synopsis of your interview with that investigator. Take a moment and take a look at it. I don't think I've identified it yet. This is Exhibit D to this deposition.

Page 210

A    (Witness complies.) Uh-huh.

Q    I just heard you say uh-huh. I take it you've had an opportunity to take a look at it. Does that accurately reflect what you told the investigator?

A    During that time it's quite possible, yes. Yes, it is.

Q    Okay. And you said quite possible. Earlier you said or testified that what you would have told was true, and this summary here is the truth as to what you remembered while it was fresh in your mind about the events of that evening; is that correct?

A    Yes.

        MR. HEPPELL: Objection to form and foundation. Sorry, you can go ahead.

BY MR. ROSE:

Q    Okay. And I believe I understood your answer to be yes. Is that correct?

A    Yes.

        (Defendant's Deposition Exhibit E remotely marked for identification by Attorney Rose.)

BY MR. ROSE:

Q    All right. So I'm going to stop share on D.

Page 211

You were asked about training, sir. Let me show you what I've labeled as Exhibit E on the screen share. Can you see it?

A    It's loading.

Q    Got it. Let me blow it up a little bit. Can you see it all right?

A    Yeah.

Q    All right. And I've identified this document for purposes of this deposition as Blakely Depo Exhibit E. And do you recognize this document?

A    Yeah. I mean, I don't think I've ever seen it, but I do know that they had it.

Q    When you say "they", you mean at the prison, the Indiana State Prison?

A    Yeah. I don't think they like gave us a copy to keep, but --

Q    Got you. This would have been a certificate you would have received -- am I correct that this would have been a certificate you would have received acknowledging that you completed your training to be a certified correctional officer?

A    Yes.

Q    All right. And that was done, according to

Page 212

this exhibit, on February 27, 2017; is that right?

A    Yes.

Q    Would that have been around the time when you transitioned from class training into kind of what you described to be behind-the-wall training?

A    It kind of was still the same, like when you're in training, you still do your class and you do like a little bit of, you know, behind the wall they call it, but, you know, yeah.

Q    All right. Stop share on that. Why did you want to be a correctional officer at the Indiana State Prison?

A    It wasn't like it was a personal goal. I just wanted to stay along the lines of going towards being a police officer. So I wanted to do some type of job that was kind of similar, you know.

Q    Sure. Yeah, I get that. So you were in the Army. You were talking about Fort Sam earlier. Is that talking about Fort Sam Houston in San Antonio, Texas?

A    Yes.

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 55 of 78

Page 213

Q    Got you.  All right.  So back on point, when you were 17 you joined the Army; right?

A    Yes.

Q    You were honorably discharged.  Thereafter is when you applied to be a correctional officer; is that right?

A    Yes.

Q    All right.  And then you resigned from that position as correctional officer in June of 2017?  Does that sound right?

A    Yes.

Q    Okay.  Why did you resign?

A    As I told Sam, I had personal things going on. I basically had my girlfriend staying with me. She wasn't taking responsibility for her baby. She left the baby in the house, left the baby by himself.  And that would go on me, you know, legally, if the police came to my house. It's in my name, so I would be responsible for what happened.  And I asked my mom or my sister if they could watch the baby.  They said they had to work.  So I told them I had to call off, and they said I couldn't call off because I already had like two other, I think, call-offs before.  So they said either I had

Page 214

to be at work or I have to be gone.  So I resigned.

Q    Got you.  Now, you were asked about an investigator from Mr. Heppell's firm, Mr. Smith.  Do you remember that?

A    On who?

Q    Mr. Smith, an investigator with Mr. Heppell, Sam Heppell's firm?

A    Oh, that Sam.  I didn't know his last name, sorry.

MR. HEPPELL: Morton Smith.

THE WITNESS: Oh, okay.

BY MR. ROSE:

Q    Morton Smith.

A    Yeah.  Yes.

Q    You remember that now?  Did you all have a conversation at any point about what happened the evening of the fire?

A    Like after the fire, like right after?

Q    No, no.  Sam's investigator, Mr. Smith, Morton Smith, have you all talked about what happened that evening, April 7, 2017, in B-cell house?

A    The most I just told him is that like it hurt me a lot, like I cried, mostly because it just -- I felt really horrible about what

Page 215

happened.  That's pretty much what I told him, but not along the lines of like details of what happened.

Q    All right.  So I understand -- that led to one of my next questions, how did this make you feel when Mr. Devine passed away?

A    Really horrible, honestly, because I'm just -- I'm just a strong Christian and I really did want to be -- I just didn't like the way some of the correctional officers treated some people, like they were better than them, and I seen the way my dad has been an officer for a long time.  So I wanted to make it a thing to be, you know, that one person that at least they could talk to if they needed to be checked on or just not be looked at for what they've done.

So it made me feel horrible, like I didn't do enough, you know.  I was young.  I just -- I don't know.  At that time I don't know exactly what all did happen, but I felt really horrible because I felt like I didn't do enough personally.

Q    You feel that way now.  At the time do you feel that you did what you needed to do?

Page 216

A    No, at that time I really didn't feel like I did enough personally and I took it really hard.

Q    Yeah.  Now, reflecting back on it, do you think that, hey -- how do you feel now, reflecting now almost four years later?

A    I still feel the same way.  Honestly, I really feel like I wish I could go back in time and just exactly remember like what could have been better, what could have been done better. Because I kind of just felt like I didn't really have a say-so that day and it was my floor.  So it was like the blame was going to be put on me anyway, but I felt like I literally had no say-so on what to do.

Q    Help me understand that.  What do you mean by had no say-so on what to do?  Who do you attribute that to or what to?

A    I feel like everyone was just telling me what to do, like give me the keys, let me do this or you do that.  You know, like it just felt like I was just -- like my brain was all over the place, like what do I do, but I'm being told what to do.  So I'm like, okay, I guess this is what I do.  But I felt like I

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021
USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 56 of 78

Page 217

should -- personally, I felt like I should have just did something different, just on my own conscious wanted to do something different.

Q Am I correct, sir, that that -- is that based upon what happened to the man, the end result, or something else?

A Like along the night of the fire?

Q In the sense that the man passed away. That's terrible.

A Yes.

Q Is that where that self soul-searching is coming from, that could I have done more?

A Even if he didn't pass away, just that it even happened. Even if he would have made it out alive, just like why did it even happen or how did it happen.

Q That's certainly admirable. You hold yourself to a high standard, sir. Let me take a look at a few other questions I may have.

You were talking about seeing Mr. Devine or who you knew to be Joshua at the time. Am I correct?

A Yeah.

Q All right. And I want to make it clear on

Page 218

that. Did you know the man's name before he passed away or did you just recognize him?

A I just recognized him by just seeing him.

Q Okay. So when you were talking about you saw him, you didn't know his name at the time, but you do recognize and know and put the pieces together who we're talking about when you said I passed by his cell and I asked if he was okay, he said yeah, and you recall him reading a book; is that right?

A Yes, he was doing like just various things, yeah.

Q Yeah. And I'm asking, did he make any complaints to you at that time or anytime prior about any of the electrical outlets or other electrical components in his cell?

A No.

Q No? Okay. Do you recall if he had a TV in his cell?

A I think he might have, probably.

Q Sure.

A Because most of them did have TVs.

Q Okay. Bear with me one moment.

A Uh-huh.

Q Unit team office out there in B-cell house, is

Page 219

that language interchangeable with the captain's office?

A I'm sorry?

Q Is that one and the same place or are they different places?

A You said the captain's office in B-cell house is a different place?

Q I was just reading back through some of these statements, and I see unit team office and captain's office. Are they the same place?

A The captain's office, I believe, if I remember right, is like kind of -- you got to walk out and go to another place to get to the captain's office and the unit office is, basically, just like where we sit at when we're doing like the paperwork, and stuff, in the cell house.

Q Got you. So when you're talking about doing your payroll, was that -- which office would that have been in?

A It was like -- it was right over there, yeah, because we were still in the cell house.

Q Okay. Where is Gate 4 in B-cell house in relation to where you were doing your payroll?

A Gate 4?

Page 220

Q Yeah. If you recall.

A I don't remember that one.

Q That's quite all right. This is, again, almost four years ago now. So if you don't remember, that's perfectly fine.

MR. ROSE: All right, sir. I don't believe I have anything further at this time. Mr. Heppell may have some follow-up questions for you. Okay?

THE WITNESS: All right.

MR. HEPPELL: Just a couple of brief follow-up, and I understand the time crunch we're in.

REDIRECT EXAMINATION

BY MR. HEPPELL:

Q You gave some testimony describing how the event impacted you and I guess the emotional impact of going through the experience you had in B-cell house. Do you remember those questions?

A Yes.

Q In terms of your demeanor and emotional state on the night of the fire while you were responding to it and I know you had -- well, strike that.

Page 221

In terms of your demeanor and emotional state at the time you were responding to the fire, was there any point in time when you panicked?

A    No, I don't remember panicking. I kind of let it all hit me right afterwards.

Q    Okay. So that the reaction that you had in terms of, you know, significant emotional reaction, that took place after the incident was over; correct?

A    Like during the time I really wanted him to just be okay, but like I told him, it just felt like I was getting told what to do. So it was like I wasn't able to do what I was feeling. Like it was mostly do this, do that. We already know what we're about to do, so make sure you stay and do this. That's why I kind of don't remember everything that I was doing because it was like really little tasks. Like I wasn't really responsible so much, even though that was my floor.

So that's why I kind of like beat myself up a lot about that because it was my floor. So like prisoners coming down and getting upset at me because they knew that was my

Page 222

floor and I was checking on them, and they was like you did this, you did this, and I'm just like okay. Like it was just really -- I had to just let them say what they were saying because the ultimate goal was just making sure he was okay. So I didn't let my emotions like get in the way during that time.

Q    So fair to say that during the incident while the incident was happening, your responses in terms of what you were doing wasn't clouded by emotion or panic or fear, or anything like that?

A    No, just worry. I would say that's the emotion that I had.

Q    You were asked, I think, some questions about going back what you could do, thinking about it what you could do if you could go back.

If you could go back in time and go through that event over again, would you run up to the 500 range with the keys regardless of what else was going on?

A    I honestly don't even remember why I wasn't able to. It's not like I didn't want to, or anything like that. I don't know why it didn't happen.

Page 223

Q    You don't have any explanation for that; correct?

A    I don't. But in a perfect world I wish that he would have just been out, honestly.

Q    All right. And I know you talked earlier about -- well, strike that.

Are there any reasons you can think of, as you sit here today, that you were not able to go up to the 500 range?

A    I don't remember why I was not able to. I don't know if it was because his cell was already -- the lock was already melted, or not. I don't know why.

Q    As you sit here today, beyond what you've already testified to in this deposition, there's no reason that you can think of that you were not able to go up to the 500 range; correct?

A    Yes.

Q    All right. And you were asked some questions and shown some documents in terms of either statements that you yourself wrote or summaries of statements you made to others.

Fair to say that you have included in those statements and in those answers you have

Page 224

told the investigators, you have included in those statements all of the steps you personally took in response to the fire; correct?

A    Yes.

Q    You wouldn't have left out things that you did to try to save Joshua Devine; correct?

A    No.

Q    Everything you did would be included in those; correct?

A    Yes.

MR. HEPPELL: Okay. I don't have any further questions at this time. I don't know if Randy has any follow-up based on what I've said.

MR. ROSE: No, Sam. Sir, I'm going to leave it there because I know you got to go.

THE WITNESS: I don't even know what time it is.

MR. HEPPELL: Okay. Thank you, Promise. Just briefly, at some point someone may order a transcript of the deposition, at which point you, as a witness, you have the right to reserve your signature, which means

Page 225

that when it's ordered, you have a copy sent to you and you get to review it. You don't get to change any of your answers, like I wish I would have given a better answer than this. But if there's errors in the transcription, things that the court reporter took down that you remember you testified to differently, you can mark that on a separate sheet.

You can do that or you can do what's called waiving your signature, which means I testified here today, the court reporter is going to take down the transcript, and I trust that that process is going to happen accurately and I don't need to look at the transcript before it gets produced. So it's your choice. You can reserve signature or waive your signature.

THE WITNESS: Do I tell you?

MR. HEPPELL: Yeah, just put it on the record so the court reporter knows what to do.

THE WITNESS: I'm going to waive it. You know, I said what I said. You guys made sure everything was done accurately, so I have good faith in her.

Page 226

MR. HEPPELL: Got it. Thank you very much for your time today and your cooperation. We'll get you to where you need to go. So thank you. I'm going to stop recording and go off the record.

THE WITNESS: Thank you.

(Plaintiff's Deposition Exhibit A remotely marked for identification by Attorney Rose.)

(Signature waived.)

(Proceedings concluded at 3:34 p.m.)

* * *

Page 227

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE, )
                         )
        Plaintiff,       )
                         )
vs.                      )     Cause No.
                         )     3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
        Defendants.      )
_____)

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of two hundred twenty-six (226) typewritten pages, is a true and correct transcript of my said stenographic notes.
Signed this 5th day of February, 2021.

_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires:  6/13/22

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 59 of 78

## A

**A4 (3)**
203:7,9;206:18
**Abbassi (26)**
104:10,14,17;
109:11;146:14;149:1,
7,11;155:9;157:20;
161:3;162:3;163:17;
164:25;165:3;166:3;
167:2,5,10,19;170:6;
175:11;189:18,19;
190:18;196:21
**Abbassi's (2)**
145:5;147:2
**abilities (1)**
93:9
**ability (4)**
7:17;13:4,10;107:14
**able (49)**
10:2;13:3;20:19;
23:23;34:10;39:16;
44:2,4;46:13;47:8;
49:8;50:16,22;56:18;
76:6,9;77:6,8;81:22,
25;82:12,18;85:8;
88:23;92:22;102:17;
111:8;145:20;159:14;
167:19;174:15,24;
175:25;178:17,25;
179:5,9,12;181:6;
183:19;184:2;186:5;
187:9,19;221:14;
222:23;223:8,10,17
**Absolutely (1)**
31:21
**academy (1)**
35:24
**accept (1)**
80:11
**accidental (2)**
131:2,7
**accommodate (1)**
66:3
**according (4)**
63:25;73:3,9;211:25
**account (1)**
49:21
**accountability (1)**
148:5
**accounts (1)**
47:2
**accurate (10)**
6:21;7:16;9:5,9;
13:3;31:20;172:22;
173:8,14,16
**accurately (5)**
11:8;13:10;210:4;
225:14,24
**acknowledging (1)**
211:21
**across (4)**

27:3;59:12,14;
121:12
**act (2)**
199:20,25
**action (2)**
174:14;185:18
**activate (3)**
112:2;126:6;127:1
**activated (1)**
111:13
**activating (1)**
111:11
**active (12)**
29:20;35:4,17;38:4,
12,19,24,25;39:1,5,18;
40:10
**actually (34)**
18:9;20:18;21:18,19;
23:23;25:11;27:3;
32:22;34:5;38:7;40:24;
41:15,17;43:18,19;
44:5;45:10;53:20;
54:20;55:20;59:1;
65:23;82:5;98:15;
110:1;129:4,16,21,22;
131:21;132:9,15;
138:9;152:25
**addition (2)**
8:25;73:19
**address (44)**
14:5;16:10;17:6,8;
18:22;21:9,15,22;23:4,
4,7,11,12,16,18,24;
24:3,8,23;27:24;29:25;
30:11,16;38:6;41:9;
49:24;50:4,8,10,15;
51:10,13,16,16,19;
52:23;53:7;54:17;61:4;
64:4,13;65:12,20;81:2
**addressed (2)**
51:19;79:19
**admirable (1)**
217:18
**advance (1)**
6:15
**affect (1)**
13:9
**affects (1)**
13:9
**afford (1)**
18:10
**African (2)**
24:14,17
**African-American (1)**
202:22
**afterwards (6)**
11:2;16:13;189:5,6;
198:1;221:6
**again (24)**
12:6,7;21:1,3;22:5;
39:6;45:17;47:2;56:8,
19;59:8;68:17,24;71:5;
73:13;74:16;83:8;

126:17;127:8;142:3;
173:15;204:20;220:3;
222:19
**against (1)**
67:14
**ago (8)**
19:1;111:24;117:10;
146:5;163:23;205:21;
206:17;220:4
**agree (6)**
18:6;168:10,19;
199:3,9,19
**agreeing (1)**
5:13
**ahead (16)**
9:25;11:20;15:2;
17:14;28:3;36:5;66:2;
110:3;116:13;120:3;
130:23;131:17;144:23;
183:11;192:2;210:16
**ahold (2)**
50:17;77:10
**air (1)**
183:22
**AIT (2)**
33:5,6
**al (1)**
63:20
**alert (1)**
112:10
**alive (2)**
200:17;217:16
**allowed (7)**
107:5,10;108:1,6;
134:22;135:6;147:21
**allowing (1)**
43:22
**almost (8)**
10:25;115:22;
117:20;118:4;205:21;
206:17;216:6;220:4
**along (18)**
68:25;70:4;73:25;
95:10,19;96:3;107:25;
109:4;111:18;131:11;
145:17;149:21;198:5,
20,22;212:17;215:2;
217:8
**altercation (1)**
42:22
**always (5)**
12:16;20:17;139:16;
158:24;165:25
**amount (4)**
98:14;118:2;166:3,4
**android (2)**
20:21;46:2
**Angel (1)**
88:18
**angle (3)**
164:2,14;183:13
**angles (1)**
173:22

**answered (1)**
158:3
**anticipated (1)**
93:10
**Antonio (2)**
33:14;212:24
**anymore (6)**
18:11;43:1;48:7;
57:4;68:2;86:8
**apart (1)**
68:10
**apartment (24)**
17:17;20:3,4;23:13,
14;25:25;26:4,5,6,22,
25;27:10,14,18;28:12;
29:19;37:20,20;38:10;
42:9,14;59:7;64:14,16
**Apartments (5)**
26:3;27:2,5,11,12
**apologize (4)**
6:15;21:7;35:5;
57:21
**appeared (1)**
178:13
**application (2)**
91:12,15
**applied (2)**
36:6;213:5
**applying (1)**
57:14
**appointed (1)**
121:11
**appreciate (13)**
21:1;22:5;59:4;87:2;
90:7,9,12;106:16;
126:11;136:18;168:9;
172:21;173:15
**appropriate (1)**
199:13
**approximately (17)**
16:11;17:9;27:23;
35:10;37:22;41:6;43:3;
52:22;68:10;69:19;
72:19;73:16;102:10,
17;130:7;153:9;155:15
**April (27)**
28:7,8,11;29:6,8,9;
61:14;101:20;102:9,
23;104:9;111:1;113:1;
129:25;130:7;132:1;
142:3;143:25;148:24;
152:4,17,20;159:18;
167:4;170:20;179:19;
214:22
**Archer (1)**
77:20
**area (17)**
14:24;27:6;40:23;
43:15;57:19,22;58:11,
20;97:13;120:21;
174:7,25;175:24;
176:15;179:1,14;
183:18

**areas (4)**
12:3;94:2;173:2,5
**Army (9)**
38:24,25,25;39:18,
21;40:11,14;212:22;
213:2
**around (45)**
8:11;14:12,20,24;
18:14;20:7,12;31:25;
35:6;37:15,24;39:23;
41:12,12,16,17;43:8,
11;44:11;47:4;54:23;
68:12,14,21;70:3;
72:21;73:17;82:21;
83:3;85:5;102:12;
103:3;108:18;110:14;
120:5;130:9,10,18;
137:8,10;155:18;
183:4;186:14;197:10;
212:4
**arrived (3)**
79:18;157:23;192:10
**arriving (1)**
196:20
**articulate (1)**
186:5
**aspect (3)**
9:19;132:10;133:4
**aspects (1)**
107:23
**assigned (6)**
144:1,5,17,19;
147:17;148:16
**assist (3)**
147:17;185:15;199:5
**assistance (2)**
185:8,11
**associated (1)**
47:18
**assume (1)**
10:1
**assurance (1)**
82:2
**assurances (1)**
81:22
**Atlanta (33)**
18:16;20:25;21:8;
41:23;43:9,13,15,20;
44:17;47:21,23;52:24;
53:1,4,6,9;54:2,9,18;
55:19,24,25;57:17,22;
58:23;59:17,20;72:9,
15;75:10;83:1,15;
84:12
**Atlanta-Cumberland (2)**
58:25;59:10
**atmosphere (1)**
159:19
**attached (1)**
46:20
**attack (1)**
188:16
**attained (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 60 of 78
PROMISE BLAKELY
January 15, 2021

100:10
**attending (1)**
31:2
**attention (17)**
7:2;63:6;67:19;93:6,
12;112:11;135:10,14,
21;136:8,13,19,23;
137:4,17,23;172:7
**attorney (23)**
11:18;12:11;61:20;
78:24,25;79:5,6,7,15,
20;80:9,11,14,15,15,
16;81:12,23;202:6;
204:18;209:5;210:23;
226:9
**attorneys (7)**
4:12;12:16;74:19;
75:17;79:19;84:17;
89:11
**attribute (1)**
216:18
**audio (2)**
136:16,19
**August (10)**
39:3,4,7;72:21;
73:10,14,18;78:22;
79:4,13
**Austell (2)**
58:2,6
**authorizing (1)**
200:3
**avoid (1)**
10:17
**aware (9)**
81:10;131:9;134:21;
178:7,19;179:19;
180:2;194:22;195:4
**away (13)**
8:3,14;58:13;110:1;
121:20;127:7;145:3,
19;147:11;215:6;
217:9,14;218:2

**B**

**baby (9)**
25:5,6,8,9;26:11;
213:15,16,16,21
**back (85)**
8:16;12:6,6,15,19;
16:16;19:7;24:20;
28:13,16,18,22,24;
33:9,12;37:5,11,14;
41:21,22;43:23;47:12,
19;48:10,22;49:17;
51:22;53:1;55:21,24,
25;56:7,19;57:6,9,23;
62:6;65:24;66:7,20,24;
67:3,8;68:12,13,21,22,
23;69:5;70:14;72:5,24;
83:23;88:18;89:2;
100:20;106:4;121:4,
14;131:15;134:3;

140:14;149:19;150:14;
154:18,19;161:19;
166:7;169:14;172:24;
175:23;183:13;190:8;
192:8;198:16;201:19;
202:2;206:24;213:1;
216:4,8;219:8;222:16,
17,18
**background (5)**
6:24;12:21;90:8;
124:24;159:23
**bad (4)**
108:18,20;109:5;
179:7
**bag (3)**
51:23;52:2,15
**Ballpark (2)**
165:18;166:20
**banging (1)**
172:6
**bank (1)**
47:2
**bar (1)**
138:9
**bars (1)**
172:7
**base (3)**
34:24;35:4;40:11
**based (20)**
12:17;56:23,25;58:3;
59:23;71:12;78:6;
82:17;83:2;122:10;
134:13;170:12;177:7;
178:12,17,25;187:9;
200:1;217:5;224:14
**basic (3)**
33:9;95:16;96:17
**basically (29)**
48:16;55:23;60:12,
13;62:15,25;74:11;
83:24;94:16,23;96:17,
19;98:24;120:18;
121:11;123:6;127:20,
21;128:17,18;131:4;
154:25;158:4;190:19;
204:9;206:19;208:23;
213:14;219:15
**basics (2)**
93:5;127:17
**basis (1)**
116:20
**B-cell (32)**
101:19;102:22;
103:1,23;104:1,6,10;
105:10;118:12;121:12,
13;124:9;129:12;
139:19,25;142:4;
143:14,16;148:13;
159:18;170:19;177:22;
186:7;194:23;195:2,
19;196:4;214:22;
218:25;219:6,23;
220:19

**bear (2)**
11:7;218:23
**beat (1)**
221:22
**became (2)**
32:14;81:9
**become (2)**
19:4;102:20
**begin (1)**
29:7
**beginning (4)**
20:7;23:11;24:25;
29:18
**behalf (2)**
5:10;6:1
**behind (6)**
19:13;98:20,23,25;
100:22;212:11
**behind-the-wall (1)**
212:6
**bell (1)**
95:4
**belong (2)**
46:5,6
**Ben (2)**
89:5;90:4
**Bend (2)**
38:5,9
**Benjamin (1)**
77:12
**best (23)**
7:16;12:1;13:4,5;
58:7;69:22;72:20;78:7;
89:9;91:20;104:4;
106:1;107:8,13;
116:25;121:6;131:1;
145:23;148:14;166:20;
167:18;172:24;198:12
**Beth (1)**
31:16
**better (5)**
143:21;215:11;
216:10,10;225:4
**beyond (6)**
93:23;97:18;125:1;
179:10;187:7;223:14
**big (1)**
51:23
**bill (1)**
47:13
**birth (3)**
28:25;29:1;88:20
**birthday (5)**
28:5,6,9;41:14;
102:12
**bit (21)**
16:13;32:1;35:6;
41:19;57:18,19;85:12;
86:7;90:6,14;94:20;
100:20;110:1;145:14,
15;149:19;161:19;
184:13;204:14;211:5;
212:10

**bite (1)**
66:20
**black (3)**
133:8;150:4,9
**BLAKELY (15)**
4:1,21;14:3;30:20;
32:6,9;86:22,24,25;
87:6,24;88:5;203:1;
205:2;211:9
**B-L-A-K-E-L-Y (1)**
4:21
**blame (1)**
216:13
**blank (1)**
92:17
**bless (1)**
49:25
**Blinn (4)**
76:25;77:7;89:5;
90:4
**blood (1)**
36:2
**blow (5)**
60:12;62:18;63:1;
68:1;211:5
**book (6)**
122:7;123:5;124:1;
154:8,14;218:10
**boot (3)**
33:4;94:14,18
**Boss (2)**
5:17;56:22
**both (7)**
9:2;96:1;99:25;
145:14,15;162:3,5
**bottom (3)**
207:20,21,24
**bought (2)**
44:5,9
**bounced (1)**
127:13
**bouncing (1)**
120:5
**brain (1)**
216:22
**branch (2)**
29:16;38:22
**break (13)**
7:25;8:4,8,14,16;
15:19;19:14;65:23;
66:3;67:11;78:15;
169:18;201:18
**breaking (1)**
21:4
**breaks (1)**
8:5
**Brief (6)**
76:23;125:1;136:15;
169:16;201:22;220:12
**briefly (5)**
42:18;90:18;106:4;
201:18;224:22
**bring (6)**

7:1;63:6;135:13,21;
137:4,23
**bringing (2)**
129:10;136:18
**Broadway (4)**
45:3;46:7;86:12;
88:16
**broke (5)**
20:20;45:7,8,20;
132:2
**broken (1)**
46:3
**brother (2)**
53:21;200:18
**brought (7)**
61:9,22;62:11,15;
67:18;71:15;107:21
**buildings (1)**
94:25
**bunch (4)**
48:12,13;147:9;
186:24
**burned (2)**
112:20,25
**burning (4)**
184:1;200:1,16,17
**bus (1)**
58:10
**buses (1)**
58:4
**business (2)**
124:2;154:4

**C**

**C/O (8)**
114:6,8;150:14;
156:2,5;158:5;182:5;
188:1
**calculate (2)**
166:7,11
**call (27)**
4:22,25;21:18;70:7,
8;74:25;76:3;86:16;
88:10;98:21,24;107:4;
111:16;115:10;150:11,
11;155:2;162:13;
166:13;187:15,18;
188:15;189:1;207:21;
212:11;213:23,23
**called (17)**
4:2;56:14;59:10;
70:21;72:5;74:1,9;
75:6,20;132:8;149:6,
23;150:10,25;165:4;
204:4;225:10
**calling (4)**
70:14;110:23,24;
186:17
**call-offs (1)**
213:25
**calls (7)**
78:21;185:7,10;

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 61 of 78

189:23;190:18,18;
203:14
**came (39)**
16:16;17:25;28:22,
24;33:9,12;41:21;
42:20;51:22;62:13,14;
63:11;65:2;68:16,20;
69:20;72:24;84:2;
109:10;131:15;149:10;
150:14;155:7,10;
156:10;157:5,15;
161:4,20;174:25;
175:12,24;183:5,17;
197:1,3,6,9;213:18
**camera (5)**
153:3,5;173:22;
183:12,15
**cameras (4)**
163:10;164:6,7,18
**camp (3)**
33:4;94:14,18
**can (88)**
4:25;7:21;8:1,2,15;
9:11,16,18,23;11:20;
13:2;15:1;16:20;21:18;
42:12;49:19;50:17;
53:24;54:19;56:2;
57:14;60:1;62:8;63:18;
65:23;82:12,13;84:8;
85:14,23;86:2,9;90:23;
94:20;95:9;96:15,19;
97:19;98:8,8,22;
108:19;125:15,17;
126:18;128:20;130:14;
135:20;139:13;140:13;
143:5,22;145:20;
147:12;153:6;157:9;
159:16;164:14,16;
167:8,16,25;168:11,21;
169:12;179:4;181:20;
184:17;188:11;193:14;
200:22;201:9,17,19;
202:13,14;206:24;
209:9,15;210:16;
211:3,5;223:7,16;
225:8,9,9,16
**candor (1)**
90:9
**Canterbury (2)**
26:3;27:4
**capital (2)**
4:20;55:9
**captain's (5)**
219:2,6,10,11,14
**capture (1)**
163:10
**car (12)**
18:14;20:12;39:25;
40:1,4,6,19;41:1,7,23;
42:4,21
**care (2)**
25:8;135:22
**career (1)**

117:15
**case (38)**
4:13;5:20;12:3,12;
21:12;55:9,10,11;
63:19;64:1;65:18;71:2;
72:14;79:1,9;80:5;
81:7,14,16,20;82:14;
84:12,15;86:4,18;
102:8;111:9;115:4;
144:14,22,24;145:20;
152:22;153:7;170:5;
172:20;193:18;194:11
**catch (3)**
126:14;183:12,15
**cause (2)**
116:5;185:13
**caused (1)**
85:11
**C-cell (1)**
130:4
**celebration (1)**
15:15
**cell (145)**
99:18;108:7;110:1;
112:17,21,24;113:13;
114:11,20,21,23,24;
115:8,14,24;116:1,15,
19,22;117:1,9,13,17,
23;118:5,8,11,17,21,
22;119:3,6,7,13,19,23;
120:1,9,13,17,19,23;
121:1,19,24;122:4,6,
13,18,25;124:15;
125:21;127:18,20;
128:17,19,22;129:10,
14;130:2;131:11,13;
132:12,13;133:7,11,17;
134:12,17,23;136:7,9,
22;137:22;138:18;
139:24;141:9,11,20;
148:15;149:5;152:24;
153:9,14,18,18,20,21,
22,25;154:2,13;
156:11;157:6,11,15;
159:24;160:24;161:5,
20;168:12,24;169:2,6;
170:15;171:12;173:24;
174:7;175:25;177:20,
21,25;178:1,8,10,11,
15;179:14;181:6,19;
185:15;187:21;188:23;
192:10,14;194:4,7,12,
13;195:8,9,21;196:20;
197:2,6,12,17;199:6;
200:1;218:8,16,19;
219:17,22;223:11
**cells (21)**
106:10,24;107:3,11;
108:2;110:16;115:2,5,
20;127:18;129:5;
132:23;137:2;141:5;
157:13;164:5;174:6;
178:5;185:1,1;195:19

**Center (5)**
45:3;46:7;86:12;
88:17;93:1
**Central (2)**
65:25;66:24
**certain (6)**
93:9;125:22;138:20;
159:4;192:18;193:7
**Certainly (5)**
6:4,14;8:4;177:13;
217:18
**certificate (3)**
88:20;211:18,20
**certified (1)**
211:22
**challenging (3)**
19:11,13;49:10
**chance (2)**
57:8;206:2
**change (6)**
81:1;87:9,21;88:15;
101:3;225:3
**changed (5)**
34:25;86:15;87:3;
88:1;102:15
**changes (2)**
81:1;88:24
**changing (2)**
86:13;87:14
**charge (14)**
105:7,9,20;108:10;
109:16;111:17,20;
123:11;142:16;144:9,
13;145:2,4;146:8
**check (20)**
49:22;50:4,23;51:2;
114:21,23,24;115:1,4;
138:14;139:14;140:8;
142:20;146:15;148:3;
152:5;188:6,6;198:6;
201:19
**checked (5)**
108:16;122:8;
138:16;189:14;215:16
**checking (9)**
50:8;55:7;123:4,17;
141:23;154:8;182:21;
189:23;222:1
**checks (5)**
138:2,7,24;139:18;
159:4
**Chicago (11)**
16:8,15,25;17:3,7,
15;18:14;40:3,24;
43:20;46:7
**Chickadee (8)**
14:7;16:10;24:24;
29:25;30:16;51:14,19;
52:23
**child (1)**
93:18
**chilling (1)**
40:2

**Chipotle (4)**
56:11,12,17;78:16
**choice (2)**
57:3;225:16
**chose (1)**
88:7
**Christian (1)**
215:8
**Christmastime (1)**
43:9
**chunk (1)**
51:8
**chunks (1)**
48:25
**circumstances (2)**
49:10,12
**City (12)**
14:7,24;16:11;17:10;
18:1,12;27:6;30:8;
46:25;57:21;58:20;
83:10
**clarification (2)**
31:18;106:17
**clarified (2)**
12:24;72:13
**clarify (2)**
16:20;164:10
**clarifying (1)**
87:3
**class (3)**
100:18;212:5,9
**classes (1)**
93:3
**Classroom (3)**
98:20;99:23;100:4
**classroom-based (1)**
98:18
**cleaning (3)**
124:2;131:11;154:15
**clear (18)**
10:24;11:2,5;13:20;
22:7,12;74:17;83:8,9;
99:1;111:20;131:20;
135:4;139:2;172:18;
173:5;176:22;217:25
**clearly (3)**
19:16;171:5;209:9
**clock (1)**
97:7
**close (8)**
59:18;72:25;102:12;
144:10,14;153:2;
161:25;174:5
**closed (5)**
168:3,22;169:1,3,5
**closer (1)**
19:4
**closest (1)**
153:5
**clothes (1)**
46:23
**clots (1)**
36:2

**clouded (1)**
222:10
**clue (3)**
53:18;84:9;113:16
**clues (1)**
58:9
**code (2)**
203:17,25
**cognizant (2)**
201:14,23
**cold (2)**
43:5;59:4
**colleague (1)**
5:19
**com (1)**
50:1
**coming (24)**
52:7;53:22;63:14;
66:7;67:19;82:6,21;
91:18;92:15;93:8;
121:14;155:8;159:13;
160:9;175:22;176:8,9;
178:8,14;183:18;
184:3;196:23;217:13;
221:24
**commission (1)**
30:25
**committed (2)**
84:18;85:25
**common (5)**
125:16;133:15;
160:2;195:10;200:13
**communicated (1)**
180:12
**company (2)**
36:16,20
**complaining (5)**
182:22;183:2;
186:20;190:22;195:25
**complaint (1)**
64:4
**complaints (1)**
218:14
**complete (9)**
9:4;34:2,4;151:20;
155:12;162:6,9;
165:14;166:21
**completed (2)**
170:2;211:21
**completely (1)**
71:8
**completing (1)**
165:7
**completion (1)**
154:24
**complex (4)**
20:3;23:14;26:4;
27:10
**complicated (1)**
96:18
**complies (2)**
206:1;210:1
**components (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 62 of 78
PROMISE BLAKELY
January 15, 2021

218:16
**computer (26)**
109:14;149:16;
161:24;162:1,13;
163:5;164:24;165:3,6,
20;166:25;167:9,14,
24;168:3;169:9,19,20;
171:16;172:1,9;174:3;
175:1,12;176:14;
183:18
**computers (2)**
162:12;167:14
**concern (1)**
187:20
**concluded (1)**
226:11
**conclusion (3)**
178:25;179:10;
188:18
**conditions (2)**
13:7;124:25
**conduct (2)**
5:14;117:18
**conducted (2)**
119:18;140:4
**conducting (3)**
5:21;138:1,6
**confused (4)**
74:4,10;75:5;90:5
**confusing (1)**
140:10
**connect (2)**
50:23;76:6
**connected (3)**
65:18;88:17;122:24
**connection (8)**
65:9;67:20;71:17;
72:7;79:1;153:18,24;
157:10
**conscious (1)**
217:3
**considered (2)**
34:11;35:4
**consisted (1)**
141:23
**contact (16)**
24:7;43:1;54:24;
63:13;68:25;69:3;
75:12;77:25;81:1;
82:12;85:9,23;86:1,3;
88:19;89:19
**contacted (1)**
72:9
**contacting (3)**
18:22,23;85:21
**content (1)**
79:11
**context (2)**
58:9;61:12
**continue (1)**
31:24
**contraband (4)**
119:14,19;120:8,12

**conversation (28)**
10:5,14,15;62:5,9;
67:17;68:15;70:13,17;
71:13;72:3,4;74:18;
78:12,24;83:25;89:3;
90:3;121:4;122:1;
155:20,23;156:1,16;
161:9;193:6,11;214:17
**conversations (10)**
68:7,11;69:11;72:1;
73:7,22;79:4;89:10;
189:2;195:24
**conversing (1)**
123:22
**cooking (14)**
112:14,19,21,24;
113:13;114:19;121:19,
24;122:5,12,17,24;
130:25;131:4
**cool (1)**
53:23
**cooperate (4)**
80:18;81:12,19,25
**cooperation (1)**
226:3
**cop (1)**
92:25
**copied (1)**
73:6
**copies (1)**
177:21
**copy (8)**
15:15;16:3;62:23;
64:3,3;65:17;211:16;
225:1
**correctional (43)**
90:16;91:3,4,8,13;
92:8,16,18,22;93:11,
24;97:10;98:4;100:25;
104:18;105:17;108:6;
110:22;113:21,22,23;
114:1;115:20;117:16;
121:5;122:21;125:8,
10;128:10;134:16;
136:25;141:13,19;
148:12;158:1;193:17;
201:2;203:8;211:22;
212:14;213:5,9;215:10
**corrections (1)**
92:11
**correctly (11)**
23:8;41:12;67:24;
89:6,25;114:16;
143:11,15;156:10;
176:20;204:6
**correspondence (1)**
73:5
**counsel (4)**
5:18,20;6:2;73:5
**counselor's (1)**
171:24
**count (27)**
137:21;140:11,13,

20;149:9,24;150:16;
152:1,3,4,7,16,17,20;
153:19;154:2,9,24;
155:2,3,17;156:7,8,9;
159:18;160:4;178:4
**counted (1)**
140:12
**counting (1)**
140:16
**counts (1)**
140:4
**couple (20)**
22:14;30:18;58:23;
84:23;103:2,6,7;
105:19;111:23;114:22,
23,25;115:12;117:4,5;
151:15;163:23;182:20;
203:5;220:11
**course (13)**
94:25;96:4;98:3,5;
106:13;108:16;117:15;
134:18;138:8;158:10;
160:16;164:17;201:5
**court (29)**
5:16;7:8,20;8:21;
9:3;10:7;11:1,9;13:21;
15:20;16:1;31:11,13,
21;32:7,10;36:17,21;
52:11;64:5,9,14;65:13;
103:17,20;126:14;
225:6,11,20
**courtroom (6)**
7:14,19,22;8:20,21;
11:16
**cousin (2)**
43:21;44:2
**Cove (3)**
41:18;42:15;64:17
**cover (2)**
5:5;12:4
**covered (2)**
209:10,13
**COVID-19 (1)**
5:12
**co-worker (1)**
104:24
**coworkers (1)**
176:8
**CPR (1)**
98:5
**crafty (1)**
116:7
**craziness (1)**
193:16
**crazy (1)**
121:18
**cried (1)**
214:24
**CROSS (1)**
202:7
**Crossing (8)**
18:12;20:8;27:2,12,
13,24;37:21;38:10

**crunch (1)**
220:13
**cumbersome (1)**
126:18
**currently (4)**
13:13,15;127:9;
177:16
**cut (2)**
90:23;110:3

**D**

**dabbling (1)**
35:25
**dad (22)**
17:3;18:23,25;31:25;
32:14;38:1,9;43:22;
62:12;69:15;70:4;72:3,
6;82:24;83:17,22,23;
84:7;92:24;93:15;
200:19;215:12
**dad's (5)**
32:5;40:5;69:17;
82:23;83:3
**Dallas (6)**
43:18,20;44:3,9;
46:22;72:25
**danger (3)**
178:20;179:2;201:3
**date (14)**
28:25;29:1;64:20;
79:13;86:1;90:20;
101:3;102:2,5,14;
117:8,12;130:5;142:7
**day (24)**
21:20;50:6;51:7;
91:21,23;97:7;115:22;
117:21;118:5,7,14;
124:21;133:5;151:22,
23;163:14;166:12,15;
177:11;205:13,15,23;
206:11;216:12
**days (5)**
17:24;102:18;
151:21;166:9;170:8
**death (4)**
95:20;112:20,25;
142:5
**December (7)**
35:14;61:24;71:4;
82:23;83:4,9,14
**decide (1)**
174:10
**decided (1)**
18:15
**defendant (6)**
60:7;61:18;69:13;
71:22;79:23;87:6
**defendants (6)**
5:20;6:2;12:12;
61:17;73:6;76:1
**Defendant's (4)**
202:4;204:16;209:3;

210:21
**defense (2)**
81:7;82:1
**definitely (4)**
15:25;58:19;134:6;
198:23
**delay (1)**
139:14
**demeanor (2)**
220:22;221:1
**Denise (1)**
4:13
**dental (4)**
33:19,20;34:2,4
**department (5)**
111:6,13;112:3;
126:7;128:11
**depended (1)**
139:4
**depends (4)**
137:7;141:6,7;167:1
**deployed (1)**
32:22
**Depo (3)**
203:1;205:3;211:10
**deponent (1)**
5:16
**deposition (30)**
4:10;5:4,14,21,23;
6:25;7:5;8:2,6,15;9:2;
10:5;11:14;12:5,24;
22:25;44:24;61:22;
67:22;75:8;90:13;
202:4;204:16;209:3,
25;210:21;211:9;
223:15;224:23;226:7
**depositions (1)**
5:10
**describe (8)**
94:20;98:8,8;104:22;
130:14;157:9;167:8;
179:4
**described (11)**
123:2,4;148:25;
156:5;171:8;175:7,24;
187:2;189:3;202:21;
212:6
**describing (7)**
107:24;124:6;
128:25;129:24;148:23;
183:3;220:16
**description (1)**
124:14
**detail (2)**
93:6,12
**detailed (2)**
100:7;108:25
**details (11)**
21:3;44:14,15;48:11;
85:1,6;90:2;135:23;
163:21;179:10;215:2
**determined (1)**
122:12

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 63 of 78

**develop (1)**
124:18
**Devine (19)**
4:15;60:6;113:7,12;
114:18;121:24;122:5,
17,24;123:3;124:12;
142:5;152:19;154:1,8;
199:6;215:6;217:21;
224:7
**Devine's (12)**
61:22;71:15;115:13;
117:1,9;119:13,19;
120:8,13,17;121:1;
192:14
**dictated (1)**
125:10
**die (1)**
196:6
**died (1)**
113:5
**different (42)**
17:4;26:5,6,10;
30:11;34:12;45:16;
47:16;48:12,13;58:24;
71:9;95:2;96:4;98:5;
99:17;106:13;118:8,
10;120:1;127:18,19;
128:19,22,23;135:13;
139:24;149:20;164:6;
166:8,8;172:19;177:1;
187:18;189:22,24;
200:21;203:14;217:2,
4;219:5,7
**differently (1)**
225:7
**difficulties (2)**
36:3;90:11
**difficulty (1)**
136:16
**dinner (1)**
140:18
**diploma (1)**
91:18
**DIRECT (1)**
4:6
**directed (1)**
155:11
**directions (1)**
208:11
**directly (2)**
84:17;86:3
**disabled (1)**
32:14
**discharge (6)**
34:11,15,17,20;
35:11;39:7
**discharged (1)**
213:4
**discussion (1)**
136:15
**dispute (2)**
193:19;194:14
**distinctly (1)**

171:5
**District (1)**
63:21
**Divinity (1)**
16:7
**DNA (2)**
36:16,20
**docket (2)**
63:19,21
**document (16)**
15:21;63:16,20;64:2,
6;204:21;205:1,10,20,
22;206:10;208:9,21;
209:1;211:8,11
**documents (2)**
153:7;223:21
**Dollar (1)**
18:20
**done (22)**
5:7,9;105:23;106:3;
130:17;141:21;142:19;
143:2,24;146:15,21,25;
149:9;151:11;188:22;
199:5,10;211:25;
215:17;216:10;217:13;
225:24
**door (10)**
65:2,3;127:23;
159:10;164:4;168:2,
11;169:1,5;171:18
**doors (3)**
127:19;159:8;164:15
**dot (3)**
50:1;55:7,11
**doubt (2)**
153:13,15
**down (45)**
18:9;19:14;21:4,8;
27:4;43:12,15;54:1;
55:15;83:14;85:21;
115:13,20;116:1,13,15,
22,24;117:1,8,13;
119:3,7,23;120:17,19;
121:1;124:15;137:12,
17;142:18;147:2;
149:1;158:9;160:3,18;
190:13;191:11,12;
204:7,25;208:6;
221:24;225:6,12
**downhill (1)**
40:7
**downstairs (4)**
66:10;134:3;155:1;
192:8
**downtown (1)**
57:19
**drill (12)**
129:1,3,7,15;131:21;
132:15,17,25;133:4,9,
12,14
**drills (8)**
127:15;128:5,6,7,12,
14;132:8,21

**Drive (1)**
14:7
**dropped (1)**
64:24
**drove (1)**
22:25
**drug (1)**
91:19
**drugs (3)**
112:15,17;115:3
**duly (1)**
4:3
**duration (1)**
39:18
**during (37)**
8:5;29:25;30:3;
44:16;48:24;51:4,7;
89:9;91:9;107:7;
108:16;117:15;118:12;
125:4;127:16;128:14;
130:14;132:7;133:4,
11,16;137:1,13;
139:19;151:20;152:15,
20;153:18;154:9;
160:12,14;182:9;
198:4;210:6;221:11;
222:7,8
**duties (2)**
98:3;141:18
**duty (12)**
29:20;35:4,17;38:4,
12,19,24,25;39:1,5,18;
40:10
**Dwyer (2)**
4:13;63:20

**E**

**earlier (22)**
13:19;44:15,23;62:5;
67:22;69:15;84:24;
89:3;91:5;92:3;124:14;
135:9;137:11;139:21;
154:7;162:15;195:24;
202:11;206:5;210:8;
212:23;223:5
**early (2)**
18:1;54:21
**East (2)**
16:7;57:18
**efficiently (1)**
143:21
**efforts (1)**
93:20
**Either (28)**
78:9,12;79:5;81:12;
86:24;89:4,10;90:3;
94:7;97:25;114:17;
117:17,23;118:21;
120:9;139:6;140:6;
142:22;168:25;171:2,
3,17;186:8;193:12;
195:19;203:25;213:25;

223:21
**electrical (2)**
218:15,16
**Ellis (3)**
77:12;89:5;90:4
**else (28)**
25:12;27:16;30:12;
46:6;63:2,5,6;69:12;
72:6,10,11;74:23;
75:23;79:18;83:20;
97:18;98:6;134:4;
139:13,17;145:18;
157:14;161:22;195:17;
196:3;201:8;217:7;
222:21
**else's (1)**
147:25
**E-mail (11)**
44:6;49:21,24;50:4,
8,10,15,18,23;51:3;
73:4
**emerged (1)**
179:13
**emergency (18)**
99:22;100:5,14;
106:6,8,10,23;108:8;
110:10;111:5;112:12;
135:11;136:4;137:4;
144:15;145:20;148:21;
185:11
**emotion (2)**
222:11,14
**emotional (4)**
220:17,22;221:1,8
**emotions (1)**
222:6
**employee (1)**
99:6
**enclosed (1)**
159:8
**end (9)**
10:10;33:11;34:7;
78:22;97:7;126:19;
153:2;209:9;217:6
**ended (12)**
18:13,19;19:24;20:1,
3;21:23;25:13;34:5;
36:1;42:22;48:19;
54:21
**enforcement (2)**
92:7;93:19
**enough (7)**
104:1;107:18;
124:17;171:5;215:19,
23;216:2
**ensure (3)**
9:4;100:10;148:14
**entails (1)**
165:20
**enter (1)**
151:7
**entered (1)**
99:5

**entering (3)**
151:8,8;166:16
**entire (2)**
51:7;194:4
**entirety (1)**
91:9
**equipment (1)**
131:5
**errors (1)**
225:5
**escape (1)**
125:21
**escorted (1)**
114:10
**especially (1)**
187:20
**establish (1)**
96:24
**established (1)**
41:9
**Estate (3)**
4:15;61:23,24
**estimate (1)**
166:20
**et (1)**
63:20
**evacuated (2)**
194:5,12
**evacuating (5)**
106:9,14,23;107:2;
129:4
**evacuation (2)**
106:8;110:10
**evacuations (1)**
106:23
**even (25)**
11:5;21:23;50:12,20;
53:16;86:24;88:1;
89:14;98:19;101:9;
107:12,13,17;169:8;
178:12;187:16;199:20;
200:11;217:14,14,15,
16;221:20;222:22;
224:19
**evening (5)**
152:4;170:7;210:13;
214:18,22
**event (17)**
106:10;108:7;112:3,
11,16;125:11;126:1;
133:22;134:11;135:10;
136:4;148:1,20;
151:21;195:8;220:17;
222:19
**events (2)**
205:25;210:12
**eventually (2)**
59:6;108:24
**everybody (6)**
113:18;132:25;
134:4;138:14;151:13;
188:25
**everyday (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

118:4
**everyone (12)**
31:19;65:25;66:21;
67:3;94:15;137:21;
138:16;140:11;141:10;
142:23;149:4;216:19
**evidence (2)**
172:19;194:10
**exact (9)**
56:13;103:9;135:23;
140:14;142:7;165:16;
186:12;187:16;190:15
**exactly (50)**
41:16,24;42:13;
72:11;74:2;89:8,16;
93:4;107:13,17;
108:11;119:8,24;
120:6;123:14;135:2;
139:5;144:7;152:5;
156:19,21;161:6,25;
162:22,24;165:12;
172:14;173:8;175:9,
17;176:22,23;177:4,
17;179:6,18;181:3,18;
182:25;184:14;185:21;
187:22;190:12;193:5;
197:3;198:11;206:15;
208:8;215:21;216:9
**EXAMINATION (3)**
4:6;202:7;220:14
**examined (1)**
4:3
**exceptions (1)**
139:12
**excerpt (3)**
209:8,18,21
**Exhibit (17)**
15:25;202:4;203:1,5;
204:16;205:3;206:3;
207:7,10;208:10;
209:3,24;210:21;
211:2,10;212:1;226:7
**experience (7)**
41:4;92:4,8;94:7,11;
174:1;220:18
**experienced (1)**
132:7
**explain (13)**
86:9;95:9;98:9,22;
108:19,22,23;109:3,6;
110:7;125:15;143:5;
188:11
**explained (2)**
58:4;75:6
**explaining (3)**
19:9;72:17;130:20
**explanation (1)**
223:1
**express (1)**
173:5
**extended (3)**
40:14;48:1;57:2
**extent (1)**

179:11
**extinguished (1)**
191:1
**extinguisher (7)**
129:9,17;132:9,16;
133:6;194:17,20
**extinguishing (1)**
131:8

## F

**facing (1)**
153:5
**fact (6)**
61:15;148:4;177:6,7;
189:14;207:21
**facts (1)**
73:7
**failed (3)**
81:11,18,19
**faintly (2)**
149:12;204:13
**fair (43)**
9:9;40:8,13;48:7;
50:12;52:18;63:4;
84:14;85:6,19,24;
92:15;93:8;97:14;
98:16;110:12;111:22;
115:19;117:22;118:3,
15;120:7;122:10;
124:22;126:11,23;
136:6;147:18;148:11;
159:15;160:2;177:9,
23;178:18;179:2;
181:3;182:11,14;
185:19;186:4;187:5;
222:8;223:24
**fairly (1)**
160:2
**faith (1)**
225:25
**false (2)**
83:18;168:7
**familiar (9)**
17:15;64:7;78:3;
105:6;113:7;182:17;
203:22,23;204:2
**Family (12)**
18:20;61:23;71:15;
82:19;83:13,20;84:4,
18;85:21,22;88:3;
124:25
**far (2)**
68:10;190:8
**fashion (1)**
5:23
**fast (4)**
112:5;133:25;
171:22;186:24
**father's (1)**
85:12
**fault (1)**
196:6

**fear (1)**
222:11
**feature (1)**
9:1
**February (2)**
130:10;212:1
**federal (1)**
199:22
**feel (14)**
6:20;99:13;115:2;
116:8;136:2;215:6,18,
24,25;216:1,5,7,8,19
**feeling (1)**
221:15
**feet (1)**
46:10
**felt (14)**
42:24;95:5;101:8,10;
182:4;214:25;215:21,
22;216:11,14,21,25;
217:1;221:13
**female (2)**
86:10;114:4
**females (1)**
123:8
**few (3)**
146:5;172:23;217:20
**field (1)**
95:1
**fifth (8)**
123:11;144:3;
149:14;190:23,25;
191:4,8;192:4
**figure (4)**
48:17;75:9;186:16;
188:21
**figured (1)**
101:21
**figuring (1)**
21:11
**file (3)**
86:19;112:14;131:18
**filed (9)**
61:13,16,24;63:19,
23;64:1;67:13;71:4,6
**filing (1)**
88:14
**fill (1)**
57:5
**filling (1)**
170:13
**final (6)**
149:9,24;154:24;
155:17;159:18;178:4
**finally (1)**
152:9
**find (17)**
48:21;49:13,13,14,
16,18;50:17;60:1,23;
78:18;83:6;87:15;
112:15,17;116:8;
119:14,19
**finding (2)**

67:13;120:8
**fine (11)**
4:24;21:7;31:14;
66:2,5,18,21,22;124:4;
203:15;220:5
**finish (2)**
37:15;110:7
**finished (2)**
33:10,12
**finishing (1)**
170:11
**fire (193)**
61:1,13;62:17;71:7,
17,19,23;72:8;94:8,9,
12,13,21;95:17,23;
96:12;97:16,20,23;
99:22;100:5,13;
101:19,24;102:3,9,18;
105:4,10,13;106:5;
108:17,20,25;109:4;
110:25;111:9;112:3,
23;113:1,5,17;114:16;
115:16;120:22;121:6;
124:6,10;125:12,20;
126:2,7;127:15;128:5,
6,7,11,12,14;129:1,3,7,
9,15,17,18,23,23,24,25;
130:3,5,8,8,12,15,16,
19,24;131:2,7,9,14,16,
21,21,22,24,25,25;
132:7,10,16,18,21;
133:6,9,12,16,18,22;
134:7,11,14;135:15;
136:6;137:20;140:1;
142:4;149:15,15;
152:25;159:20;161:15;
163:18;164:11;167:4;
169:4;170:3,21,24;
171:1,1,6,20;172:2,12;
174:3,12,17,18,22;
175:5;176:1,14,17;
177:8,13,18;178:7,20;
179:4;180:4;181:23;
183:5;186:7,10;
187:11;189:20;191:1,
5,9,22;192:13;194:7,
12,16,20,24;195:9,13;
196:5,7,12,12;197:21;
198:4,17,18,18,23;
199:1,7,11;201:11;
204:5,8;205:16,23;
206:7,7,11,16,21,22;
208:18;209:19;214:18,
19;217:8;220:23;
221:3;224:3
**firefighter (6)**
110:20;111:6,12;
112:3;194:23;195:1
**firefighters (8)**
110:21;111:12;
127:2;185:14;195:8,
13,19,20
**firehouse (3)**

175:20,22;176:7
**fires (3)**
101:23;132:1,6
**firm (2)**
214:4,8
**first (56)**
4:2;5:6;14:15;24:16;
29:7,18;30:5;32:12;
33:4;51:6;60:4,8;68:4;
74:6,7;81:9;83:12;
87:16,17;91:21,23;
99:5;113:9;132:18;
142:13;144:10,13;
149:5;157:6,16;167:5;
170:14,18,18;171:11,
15;172:11;179:13;
181:13;182:19,20;
183:1,4,14,17;187:24;
189:4,19;190:20,21;
193:8;197:10,14;
198:16;207:16;208:14
**firsthand (1)**
114:17
**five (5)**
65:23;123:15;
142:22;153:11;169:13
**fix (1)**
47:8
**flames (1)**
179:12
**flashing (1)**
154:11
**floor (43)**
113:10;120:24;
123:12;130:13;142:24;
144:10,12,13,13;
145:21;146:14,22;
147:25;148:3,6,7,10,
16;149:2,14;182:19,
20;183:1,14;189:24;
190:20,22,24,25;191:5,
8;192:4;194:2,4;
197:10,14;200:14;
207:16;208:14;216:13;
221:21,23;222:1
**floors (5)**
144:1,7,19;147:2,16
**flyer (1)**
15:15
**focusing (3)**
37:14;106:19;134:8
**folks (7)**
82:20;83:13;86:2,4;
88:24,25;151:19
**folks' (1)**
172:20
**follow (2)**
81:19;120:3
**followed (3)**
84:25;111:22;131:17
**following (3)**
84:19;109:18;154:24
**follows (1)**

**BOSS REPORTERS**
**(219) 769-9090**

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 65 of 78

4:4
**follow-up (4)**
12:15;220:8,12;
224:14
**fool (1)**
84:1
**foot (1)**
98:19
**footage (2)**
153:3;163:16
**forced (1)**
56:1
**forgot (2)**
21:8;45:5
**form (1)**
210:15
**formal (2)**
7:21;101:12
**formally (2)**
4:9;88:24
**Fort (9)**
32:3;33:1,3,5,8,13;
39:20;212:22,23
**forth (5)**
12:16,19;48:22;
49:18;83:23
**forthcoming (1)**
21:2
**forward (13)**
5:23;7:1;11:24;
46:15;50:9;52:21;80:5;
81:23;84:15,19;85:4,
10,20
**found (11)**
21:20;36:1;40:25;
41:18;43:19;44:12;
54:20;62:1;84:11;98:2;
152:22
**foundation (1)**
210:16
**four (8)**
103:12;123:15;
142:22;143:18;205:21;
206:17;216:6;220:4
**fourth (4)**
123:12;144:2;194:1,
4
**frame (1)**
41:24
**free (1)**
6:20
**frequently (1)**
115:21
**fresh (6)**
8:16;111:24;160:15;
188:1;206:13;210:12
**Friday (1)**
82:7
**friend (11)**
18:17;20:6,8;21:14;
24:8,12;27:17;53:24;
54:1;65:1;88:8
**friendly (1)**

104:25
**friends (6)**
20:5;41:8;85:21,22;
88:3;105:1
**friend's (9)**
18:11;29:19;37:20;
40:1;53:8,9,11,14;54:4
**front (4)**
18:20;57:16;174:6;
183:23
**full (5)**
4:18;8:13;10:21,21;
126:19
**full-time (6)**
30:2,23;34:22,23;
35:2;40:4
**fully (1)**
82:3
**funds (1)**
44:4
**funeral (5)**
13:16;15:4;16:8,14;
19:8
**further (2)**
220:7;224:13
**future (3)**
50:13;85:2;87:10

## G

**gap (5)**
50:13;176:3,21;
190:6,7
**Gary (1)**
13:22
**Gate (2)**
219:23,25
**gather (1)**
207:3
**gave (26)**
20:21;40:18;52:3;
64:11;70:7;74:23,24;
82:16;83:17;89:12,19;
95:12;99:20;109:2;
145:9;154:6;159:22;
162:25;163:2;196:15;
199:20;207:15,17;
208:11;211:16;220:16
**General (11)**
80:9;96:8;106:12;
143:16,17;152:14;
166:4;185:24;187:3,7;
201:6
**generally (9)**
62:2;105:18;106:5;
107:17;118:12;159:19;
168:10,21;174:12
**General's (7)**
78:25;79:6,7,15,20;
80:12,16
**George (1)**
59:15
**Georgia (4)**

23:5,9,16;58:6
**gestures (1)**
10:22
**gets (4)**
82:3;125:20;142:24;
225:15
**girl (2)**
20:4;25:4
**girlfriend (15)**
16:15,17,20;40:5;
53:9,11,17,22;54:2,8,
19,25;58:3,14;213:14
**girlfriend's (3)**
53:8,14;60:1
**given (17)**
7:8;65:19;76:4,8,11;
77:16;84:16,16,17;
85:1;120:25;125:4;
133:21;162:20;165:15;
182:3;225:4
**giving (10)**
9:8;67:21;82:19;
84:5;86:1;91:18;
145:13,16;146:8;
197:19
**gladly (1)**
9:21
**G-mail (1)**
50:1
**goal (2)**
212:16;222:5
**God (1)**
49:25
**G-O-D-B-L-E-S-S (1)**
50:1
**goes (5)**
43:19;82:8;108:15;
148:5;151:15
**Goldfinch (7)**
18:8;20:1;25:25;
26:2,19,22;27:1
**Good (22)**
4:8;11:2;46:15,19;
48:6;57:7,8;66:14;
83:24,24;85:3;98:13;
104:19;105:24;118:1;
124:3;143:22;154:21;
168:14,19;209:15;
225:25
**Google (1)**
96:19
**gosh (1)**
188:14
**government (1)**
199:23
**grab (1)**
133:6
**graduate (2)**
31:4,7
**graduated (2)**
31:23;35:1
**grandma (6)**
14:11,23;18:1;19:4;

43:23;57:1
**grandma's (3)**
13:16;16:14;19:7
**grandmother (3)**
14:17,18;15:17
**grandmother's (1)**
15:12
**gravitate (1)**
146:18
**great (1)**
106:2
**Greyhound (1)**
55:17
**grievance (1)**
135:19
**Guard (11)**
29:18,22;30:3,23;
31:24;32:23;33:17,23;
35:12,15;97:14
**guess (12)**
51:5;61:11;65:3,4,5;
71:11;106:16;121:10;
182:9;200:9;216:24;
220:17
**guessing (1)**
203:13
**guidance (1)**
96:24
**guidelines (1)**
200:24
**guys (4)**
42:12;72:17;164:19;
225:23

## H

**hall (1)**
144:11
**hand (3)**
56:1;143:4;146:8
**handing (2)**
141:21;162:16
**hands (1)**
97:8
**happen (15)**
95:8;125:17;127:4;
150:15;151:5;162:22;
183:3,6;193:20,21;
215:21;217:16,17;
222:25;225:14
**happened (54)**
21:21;22:1,4;43:4;
47:4;60:6;61:1,13;
68:18;101:4;108:14,
21;111:9;114:13;
115:21;121:18;123:10;
129:19;130:14;140:25;
141:3;150:22;153:4;
155:4;156:24;157:1,2;
161:14;162:24;163:3;
165:2;171:22;172:25;
177:9;181:19;182:10,
25;183:7;185:17,22;

189:16;190:13,14;
198:4,9,14;207:4;
213:20;214:17,21;
215:1,3;217:6,15
**happening (9)**
51:15;72:18;76:16;
108:18;146:12;149:3;
171:14;174:13;222:9
**happens (9)**
9:21;25:7;62:21;
95:18;127:22;128:14;
130:21;151:14;167:1
**happy (2)**
63:16;86:16
**harass (2)**
146:19,19
**harassing (2)**
147:8,10
**hard (4)**
15:8;77:9;143:23;
216:3
**harder (2)**
96:21;123:9
**harm (1)**
121:16
**harmed (1)**
130:23
**he/him (1)**
6:10
**head (1)**
10:23
**health (3)**
5:11;35:25;39:12
**hear (13)**
14:17;19:12;31:18;
41:3;62:22;68:2;138:5;
159:14;168:12,21,23;
169:1,7
**heard (14)**
63:2,5;68:3;76:16;
171:5,20,23,25;172:2,
8,12;175:4;202:11;
210:2
**hearing (11)**
135:3,5;159:12;
160:8;161:15;169:4;
173:6;174:3;176:14;
196:3,10
**heat (2)**
133:23,24
**held (3)**
15:16;16:5;136:15
**help (26)**
32:2,19;42:21;43:21;
44:3,4;45:11;46:8,10;
59:2;81:7;94:15;111:8;
121:11;131:8,10;
147:6;149:1;159:13;
160:8;176:9;188:2;
189:7;195:11;208:13;
216:16
**helped (3)**
108:14;131:10;

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 66 of 78

132:19
**helpful (2)**
104:20;173:22
**helping (9)**
32:17;45:6;86:12;
109:20;130:11;131:11;
146:14,22;147:4
**HEPPELL (37)**
4:7,11;5:6;6:1,6,7;
31:14,22;32:11;36:22;
65:22;66:5,22;67:2,7,
10;76:19,24;103:22;
126:16,22;136:17,20;
169:12,17;201:14,23;
210:15;214:7,11;
220:8,11,15;224:12,21;
225:19;226:1
**Heppell's (2)**
214:4,8
**here's (4)**
95:16,18;142:17,18
**hey (6)**
52:9;68:16;116:12;
160:18;193:14;216:5
**Hickman (2)**
16:22,23
**hide (2)**
112:15;116:7
**high (12)**
19:1;30:14;31:1,2,3,
4;33:13,15;35:1;50:10;
92:14;217:19
**higher (3)**
123:9;196:23;197:1
**himself (2)**
109:16;213:17
**hire (1)**
41:2
**hired (1)**
91:13
**hiring (1)**
36:5
**Hispanic (4)**
70:19,20;71:14;72:4
**hit (3)**
53:19;138:12;221:6
**hold (6)**
34:7;41:14;76:19;
91:1;209:12;217:18
**holding (1)**
88:21
**holidays (1)**
13:17
**home (5)**
16:8;25:6,8;33:9,12
**homeless (3)**
21:16;41:2;83:1
**honestly (19)**
39:24;51:11;77:11;
89:16;96:16,18;104:8;
105:25;126:8;154:5;
165:12;197:7,7,18;
203:10;215:7;216:7;

222:22;223:4
**honorable (5)**
34:18,20;35:11;39:6,
7
**honorably (1)**
213:4
**hope (7)**
6:18;11:6;19:12;
31:15,17;146:2;205:24
**hopefully (1)**
56:19
**horrible (5)**
156:23;214:25;
215:7,18,22
**hospital (1)**
32:2
**hotel (2)**
58:22,25
**hour (4)**
139:1,3,6;140:7
**hours (12)**
12:7;109:14;151:8;
160:24;165:22,23;
166:1,3,5,8,16;206:15
**house (121)**
13:15;14:1,5,10;
16:10;17:17,18,19,20;
18:6,10,11,18;22:3;
25:19;27:14;53:8;
59:12,14;60:9;62:13,
14;63:11,14;64:12,24;
67:20;68:6,17,21;
69:16,17,20;82:23;
83:3;84:2;85:12;
101:19;102:22;103:1,
23;104:2,6,10;105:10;
110:2;114:11;118:12;
120:23;121:12,13;
122:4;124:9;127:21;
128:17,19,22;129:12,
14;130:2,4;132:12,13;
133:7;136:9;139:20,
25;141:20;142:5;
143:14,16;148:13,15;
156:11;157:6,11,16;
159:18,24;160:24;
161:5,20;168:12,24;
169:2,7;170:15,20;
171:12;173:24;174:8;
175:25;177:20,22;
179:14;181:19;186:7;
192:10;194:5,12,23;
195:2,8,9,20,21;196:5,
20;197:2,6,12,17;
213:16,18;214:22;
218:25;219:6,17,22,23;
220:19
**housed (3)**
185:14;194:23;195:2
**houses (8)**
99:18;118:8,11;
127:18;138:18;139:25;
177:21;185:15

**housing (6)**
24:21;40:15;44:18;
49:18;55:19;58:21
**Houston (1)**
212:24
**huh-uh (2)**
10:24;181:1
**human (2)**
200:15,15
**hundreds (2)**
117:22,25
**Huntington (3)**
41:18;42:14;64:16
**hurt (2)**
136:3;214:23
**hurting (1)**
123:20
**Hut (1)**
40:25

# I

**ID (1)**
46:25
**idea (4)**
56:23;168:14,20;
174:13
**identification (8)**
47:7,8,10;202:5;
204:17;209:4;210:22;
226:8
**identified (5)**
202:25;203:1;207:6;
209:24;211:8
**identify (1)**
63:18
**illegal (1)**
114:19
**Illinois (1)**
40:23
**illness (1)**
34:9
**immediately (3)**
109:9;154:23;201:11
**impact (1)**
220:18
**impacted (1)**
220:17
**importance (1)**
96:9
**important (14)**
10:9,16,20;12:2;
52:10;62:21;96:6,25;
97:3,6;125:19;133:18;
139:9;159:3
**impossible (1)**
11:1
**impression (4)**
95:12,22;104:17;
124:18
**impressions (1)**
105:16
**incident (5)**

122:13,16;221:9;
222:8,9
**included (4)**
44:18;223:24;224:1,
9
**including (4)**
125:19;139:25;
146:7;172:20
**incorrect (2)**
82:20;84:5
**Indiana (32)**
4:16;13:22;14:7,24;
32:25;35:7,22;36:7,10;
40:22;42:15;44:11;
61:14;63:22;78:25;
79:15,20;80:9;90:15;
91:2;92:9,13;93:25;
97:10;98:10;117:16;
125:6,9;128:15;203:8;
211:15;212:15
**Indianapolis (1)**
41:20
**indicated (1)**
93:11
**indicates (1)**
64:1
**individually (1)**
152:6
**individuals (2)**
77:24;78:1
**info (1)**
86:2
**informal (2)**
27:20,22
**information (37)**
16:3;58:8;63:13;
68:18;69:1,4;81:1;
82:9,13,17,20;83:2,18,
21;84:5,15;85:9;86:1;
88:22;89:20;90:9;
102:8;107:18;114:17;
120:25;121:22,23;
122:23;124:23;136:19;
149:7,12;151:7;152:1;
155:9,22;165:21
**informed (3)**
81:15;82:14;112:21
**informing (1)**
111:7
**initial (1)**
178:13
**Inn (2)**
58:22;59:9
**input (2)**
165:21;167:20
**inputting (1)**
166:22
**inside (10)**
153:17;163:10,25;
164:12,17;168:25;
172:9;178:8,10,11
**Instagram (6)**
53:19;55:1,2,4,5,12

**instructed (1)**
83:19
**instructing (1)**
200:12
**instructions (1)**
199:21
**insurance (1)**
45:10
**intense (2)**
95:6,14
**intention (2)**
6:15;87:9
**intentionally (2)**
81:11,18
**interact (1)**
64:21
**interacting (5)**
64:19;65:8;123:3;
124:12;146:7
**interaction (6)**
64:7;124:5,13;
155:20;161:9;183:2
**interactions (2)**
124:17;125:2
**interchangeable (1)**
219:1
**interested (3)**
31:20;173:6,25
**interrupt (1)**
31:17
**interview (4)**
91:19;197:20;204:4;
209:21
**into (34)**
5:3,7;20:1;25:10,11;
42:22;44:14;47:6;
58:18;79:11;86:12;
95:3;98:14;109:25;
145:25;155:11;157:6,
15;161:5,20;174:16,
25;175:24;176:15;
179:14;183:17;197:2,
6,12,17,22,23;206:10;
212:5
**introduced (1)**
4:8
**investigative (2)**
209:8,18
**investigator (21)**
18:5;20:22;22:15,19;
45:5;61:8;62:11;63:24;
64:19;79:7;82:4;
197:24,25;204:5,13;
206:6;209:22;210:5;
214:4,7,20
**investigators (2)**
197:20;224:1
**involved (3)**
114:19;129:4,8
**ISP (10)**
94:2;95:3,6,13,25;
97:2,25;106:20;128:3;
195:7

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 67 of 78

**issue (10)**
  85:11;134:5;137:4,
  24;151:3;160:6,8;
  180:21,24;201:15
**issues (10)**
  12:23;36:1;39:12;
  44:24;90:10;135:14,
  15,16,18;159:22

## J

**Jai (8)**
  86:11,16,17,22;
  87:16,17;88:2,10
**J-A-I (2)**
  86:11;87:18
**January (9)**
  35:19,20;43:10,13,
  16;90:22,25;91:22;
  92:1
**job (36)**
  25:11;26:15;30:2;
  33:7,14,22;35:22;
  36:23,24;37:1,3,6;
  48:21;49:14,15,17,19;
  55:21;56:4,10,19;
  91:21;92:22;93:5;
  104:19;115:19;122:2;
  141:9,17,18;199:22,23;
  200:6,10;201:1;212:19
**jobs (1)**
  141:6
**jogged (1)**
  98:1
**joined (3)**
  30:5;33:10;213:2
**Joshua (32)**
  4:15;60:6;71:15;
  113:6,7,12;114:18;
  115:13;117:1,8;119:6,
  13,18;120:8,13,17;
  121:1,24;122:5,17,23;
  123:3;124:12,17;
  142:5;152:19;153:25;
  154:8;192:14;199:5;
  217:22;224:7
**J-O-Y (1)**
  4:20
**Joyjoy (1)**
  49:25
**J-O-Y-J-O-Y (1)**
  49:25
**joyjoygodbless16@gmailcom (1)**
  50:2
**Jr (2)**
  32:6,9
**judge (5)**
  7:20;8:19;11:14;
  97:4;123:22
**July (1)**
  38:13
**jump (5)**
  5:3;10:10;84:21;

126:19;201:19
**jumped (1)**
  5:7
**jumping (3)**
  35:6;39:23,25
**June (11)**
  25:4,14,15,18;31:10,
  10,23;38:13,13;91:6;
  213:9
**junior (2)**
  33:11,12
**Justin (1)**
  105:3
**juvenile (1)**
  93:1

## K

**keep (18)**
  20:18,19;48:20;
  49:11,15,19,19;50:7,8;
  57:14;59:3;66:13;
  88:23;138:10;188:5,6;
  202:10;211:17
**keeping (3)**
  85:25;139:8;148:7
**Kennesaw (2)**
  23:9,16
**kept (5)**
  21:24;24:4,4;52:13;
  147:8
**key (1)**
  42:25
**keys (39)**
  133:11,22;134:10,
  22;135:6;144:18;
  145:2,4,5,14,16,18,24;
  162:16,21,25;163:1,2;
  176:25;177:2,14,19,23;
  181:3,5,11,12,15;
  184:24,25;196:16;
  200:8,20;207:4,12,14;
  208:15;216:20;222:20
**kicked (1)**
  21:19
**kid (1)**
  93:2
**kind (80)**
  20:14;32:18;39:24,
  25;42:3;47:5,14;52:18;
  55:23,24,25;57:18;
  59:17;76:16;85:11;
  88:21;95:3;119:9,25;
  120:1,2,5;121:17;
  124:2;125:18;127:4,7,
  8;129:20;132:19;
  133:1,1;137:9;142:24;
  145:15;146:22,23;
  147:9,10;148:7;
  154:12,16,17,18,19;
  158:3,13;159:6;
  161:16;164:3;165:21;
  170:10;173:10,11;

174:12;181:24;184:12;
  186:24;187:24;188:1,
  3,14,15;189:21,21;
  190:19;193:16,16;
  196:22;201:3;203:13;
  209:10;212:5,8,19;
  216:11;219:12;221:5,
  18,22
**kinds (1)**
  157:25
**knew (20)**
  43:25;71:24;103:4,
  14,16,23;104:2,24;
  105:21;108:14;111:17;
  152:23;177:14,19;
  178:3;184:20,24;
  200:2;217:22;221:25
**knowing (3)**
  25:6;173:9,10
**knowingly (2)**
  81:11,18
**knowledge (3)**
  100:10;124:22;
  139:11
**known (1)**
  103:3
**knows (2)**
  82:24;225:20

## L

**L-A (1)**
  4:20
**label (2)**
  55:4,12
**labeled (3)**
  205:2,5;211:2
**lady (2)**
  75:3;133:8
**LaJoy (1)**
  4:20
**Lane (2)**
  20:1;26:2
**language (1)**
  219:1
**last (10)**
  24:13,14,17;54:22;
  87:15,20;88:5,11;
  113:9;214:9
**lasted (1)**
  99:10
**late (1)**
  43:12
**later (8)**
  66:16;70:2;77:25;
  168:8;170:8;183:6,7;
  216:6
**law (2)**
  92:7;93:19
**lawsuit (21)**
  22:22;60:5,7,24;
  61:7,20,24;67:13,21;
  68:19;69:13;71:4,15;

72:7;76:1;79:24;80:19;
  81:10;87:4;89:11;
  101:18
**lawsuits (6)**
  61:13,15,17,19;71:6,
  22
**lawyer (5)**
  80:1,5,6,7,8
**lawyers (1)**
  75:25
**laying (1)**
  21:2
**layout (2)**
  167:8;169:6
**lead (2)**
  105:5;187:25
**learn (3)**
  60:5;174:15,24
**learned (11)**
  60:8;83:12;100:18;
  121:23;125:1;151:25;
  170:14;174:18,21;
  198:16;199:6
**learning (5)**
  170:3,18;186:6;
  199:11;208:18
**lease (1)**
  27:20
**least (17)**
  5:15;67:16;102:21;
  104:15,15;118:17,23,
  25;129:15;140:19;
  141:1;143:18;158:24;
  172:23;178:14;191:13;
  215:14
**leave (13)**
  15:6;37:7;52:24;
  59:25;76:10,13;145:1,
  1;161:21;168:11,14,
  20;224:17
**leaving (3)**
  18:13;39:10;55:16
**led (5)**
  128:6,11;142:5;
  188:18;215:4
**left (49)**
  18:5,15,25;19:1;
  25:5,18;26:15;28:5,9,
  11;29:19;30:6;35:15,
  17;37:3,16,18,21;38:2,
  10,12,14;39:21;40:5,
  14;41:20;43:9;48:1;
  51:6,13,20;56:24,25;
  57:7;60:8,15,19;72:25;
  80:22;85:13;160:12,
  14;168:2,5;171:16;
  174:2;213:16,16;224:6
**legal (1)**
  87:13
**legally (7)**
  86:13;87:3,10,21;
  88:1,15;213:18
**Lenox (6)**

55:21;56:5,12,13,15;
  57:15
**less (5)**
  7:21;95:6,14;103:12;
  104:5
**letters (9)**
  52:10;141:22;
  142:17,19,19;143:3,5,
  8;146:8
**letting (10)**
  47:14;60:13;94:23;
  113:15;125:22;130:17;
  175:22;187:14;190:24;
  196:6
**level (6)**
  123:13,13;159:23;
  160:20,22;182:13
**levels (2)**
  123:9,14
**lie (6)**
  53:16;70:13;89:14;
  98:12;100:1;107:12
**lieutenant (34)**
  108:13;109:10,17,
  19,22;149:6,23;150:2,
  17,25;155:6,7,10,21,
  24;156:10,13;157:5,15,
  23;161:4,10,20;162:8;
  187:17;192:6,9;
  193:25;202:11,16,19,
  21;203:2;207:7
**lieutenants (1)**
  134:4
**life (8)**
  15:16;19:11;90:11;
  93:9;95:20;97:6,7;
  124:25
**light (1)**
  5:11
**liked (1)**
  138:13
**likewise (1)**
  206:11
**limb (1)**
  31:25
**limit (1)**
  85:15
**limitation (1)**
  173:21
**limitations (1)**
  181:17
**limited (1)**
  173:21
**lined (1)**
  144:18
**lines (13)**
  95:10,19;96:3;
  107:25;109:4;111:18;
  131:12;145:17;198:5,
  21,22;212:17;215:2
**list (1)**
  77:18
**listed (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 68 of 78

64:13
**literally (4)**
    103:7;121:9,25;
    216:15
**literately (1)**
    19:7
**little (34)**
    10:4;15:8;16:13;
    28:4,8;32:1;35:6;
    41:19;43:6;57:18,18;
    62:8;74:9;86:7;90:14;
    93:2;94:20;95:2,6;
    100:20;110:1;118:2;
    119:11;138:9,9;
    149:19;161:19;182:17;
    183:7;184:13;204:14;
    211:5;212:10;221:19
**live (1)**
    30:7
**lived (4)**
    24:9,9;48:2;65:5
**lives (2)**
    53:9;97:12
**living (5)**
    26:22;29:24;37:15;
    65:12;97:13
**loading (1)**
    211:4
**located (3)**
    33:2;174:17,18
**location (2)**
    32:24;157:9
**locations (1)**
    58:24
**lock (4)**
    134:1;180:9;188:23;
    223:12
**locked (12)**
    133:17;136:7,22;
    137:2,9,14,21;140:21;
    152:9,10;178:1,5
**lock-in (3)**
    141:2,10,14
**locking (1)**
    140:23
**long (23)**
    14:9;24:15;27:23;
    38:25;40:18;41:6;
    48:21;50:25;52:22;
    66:15;92:25;93:17;
    98:13;99:9;130:7;
    143:22;160:10;165:5,
    14,17;166:21;193:11;
    215:13
**longer (4)**
    43:19;66:3,11;
    101:11
**longest (2)**
    20:19;49:2
**look (16)**
    42:12;52:10,11;
    58:17;63:17;69:10;
    120:3;178:13;179:5,7;

206:25;207:10;209:23;
    210:3;217:19;225:14
**looked (9)**
    105:19;154:19;
    179:4,7,11,18;207:19;
    208:9;215:16
**looking (18)**
    23:13;56:22;57:13;
    58:21;59:8;67:20;69:2,
    18;70:5;73:24;83:4;
    95:10;123:18;176:16;
    178:23;180:3;206:24;
    207:5
**lookout (1)**
    62:20
**looks (2)**
    15:9;57:16
**lose (1)**
    25:11
**loss (2)**
    14:16,16
**lost (1)**
    31:25
**lot (36)**
    7:21;20:15,15;35:25;
    39:23;48:5,22;49:17;
    59:4;93:1,3;96:25;
    100:8;111:20,25;
    112:15;114:11;116:6;
    117:20,21;127:10,11;
    138:8;141:23;171:13;
    186:19,20,22;187:1,4,
    8;188:4,19;190:22;
    214:24;221:23
**loud (2)**
    159:25;160:18
**lower (4)**
    55:9,10,11;123:12
**lunch (3)**
    66:4,13;67:6
**lungs (1)**
    36:2

**M**

**magnet (1)**
    138:9
**mail (38)**
    19:5,6;21:11,12,13,
    15,23,24,25;23:7,20,
    24,25;24:1,3,6;51:9,15,
    18,20,23;52:2,6,11,13;
    61:3,4,5;65:3;69:5,7;
    79:14,18;80:22;
    105:23;123:16;143:7,
    10
**mailing (3)**
    21:10,15,22
**main (1)**
    187:20
**maintaining (1)**
    50:7
**major (1)**

98:7
**majority (1)**
    49:2
**making (26)**
    8:22;10:7;11:10;
    44:13;72:16;95:17;
    100:7,16;105:25;
    123:18,18,21,24;
    137:23;141:24;143:1;
    146:16,20,24;147:10,
    13;148:5;185:10;
    186:18;189:23;222:5
**male (7)**
    86:10;114:4,5;121:5,
    23;122:21;202:22
**Mall (7)**
    55:21;56:5,12,13,15;
    57:16;58:5
**man (11)**
    70:19,20;72:4;75:3;
    121:17;150:4,8,9;
    207:6;217:6,9
**manager (3)**
    36:16,19;40:25
**manner (1)**
    5:22
**man's (1)**
    218:1
**manually (2)**
    109:15;151:7
**many (6)**
    102:18,25;104:13;
    117:17;118:20;180:16
**map (5)**
    57:16;59:9,19,21,23
**March (2)**
    41:13;130:10
**mark (1)**
    225:8
**marked (5)**
    202:5;204:17;209:4;
    210:22;226:8
**materials (1)**
    169:6
**matter (5)**
    66:9;71:16;84:12;
    116:21;158:22
**may (27)**
    8:4;11:4,12;12:7,12,
    15;13:18;15:9;28:2,4;
    31:9;37:22;38:13,15,
    16,18;39:4;50:14;
    61:12;66:11;79:12;
    140:9;173:2;208:11;
    217:20;220:8;224:23
**maybe (3)**
    9:15,16;117:4
**McDonald's (3)**
    26:16,17;127:5
**mean (31)**
    7:24;30:10;66:10;
    86:9,18;90:23;92:24;
    95:9;98:5,22;100:15;

108:19;110:3;114:25;
    125:15;133:23;147:23;
    148:8;156:18;157:17;
    164:7;167:16,25;
    188:11;190:7;193:21;
    195:10;200:13;211:12,
    14;216:16
**meaning (1)**
    44:14
**means (5)**
    117:5;136:7,12;
    224:25;225:11
**media (2)**
    85:16,16
**medical (5)**
    13:7;33:22;34:20;
    35:12;140:18
**medication (1)**
    13:8
**meet (1)**
    81:6
**meeting (1)**
    81:5
**Megabus (1)**
    43:19
**Megan (1)**
    5:19
**melted (4)**
    134:1;180:9;188:23;
    223:12
**Melvin (4)**
    32:6,7,12;93:15
**member (2)**
    32:23;83:20
**members (6)**
    82:19;83:13;84:4;
    85:22,22;128:10
**Meme (5)**
    54:5,6,8,11,14
**M-E-M-E (1)**
    54:7
**Meme's (3)**
    54:24;58:13;59:25
**memorial (2)**
    15:16;16:5
**memories (1)**
    124:12
**memory (80)**
    7:16;13:5,9;64:18;
    69:23;72:20;74:17;
    78:6,7;89:9;91:20;
    98:2,16;100:2;104:4;
    111:14;112:22;116:17,
    25;117:12;120:11;
    121:7;123:2;126:12,
    23;131:1;145:11,13,
    23;147:1;152:15,17;
    153:16,17;154:12;
    155:7;158:15;162:16;
    165:5;167:18;168:24;
    172:14,24;173:6,11;
    174:9;176:12,13,18,21;
    179:16;180:5,7,24;

181:18;182:12;184:9,
    13;185:10,18,23,24;
    186:1;187:3,7,10;
    189:8,10;190:6;191:4,
    19,21;192:16;194:19;
    195:15,17;196:19;
    198:13;201:6;205:24
**Memphis (2)**
    44:10,10
**mentioned (8)**
    7:19;8:19;19:18;
    42:17;44:23;52:16;
    67:16;122:20
**Merrillville (9)**
    30:6,9;31:3,4;40:2;
    41:19;42:15;64:5,15
**mess (1)**
    89:15
**message (2)**
    68:25;70:5
**messages (6)**
    76:10,14;80:21,22;
    81:19;83:23
**met (1)**
    17:23
**meth (13)**
    112:14,19,21,24;
    113:13;114:20,22;
    121:19,24;122:5,12,18,
    24
**Michelle (1)**
    14:3
**Michigan (9)**
    14:7,23;16:10;17:25;
    18:12;27:6;30:8;46:25;
    83:10
**middle (4)**
    4:20;43:10;170:13;
    183:14
**might (15)**
    10:6;47:11,15;78:2;
    85:2,3;89:4;137:16;
    144:11;156:18;177:3;
    182:24;185:17;191:17;
    218:20
**Mike (8)**
    76:25;77:6;78:2,8,9,
    13;89:5;90:3
**military (40)**
    20:6;28:14,17,19,21,
    24;29:7,16;33:11;34:6,
    8,13,22;38:19,22;39:1,
    11;68:13,22;92:5;93:3;
    94:7,10,11,11,18,22;
    95:7,15,19,24;96:3,4,
    12,21,23;97:21,25;
    106:12,18
**Miller (4)**
    54:5,6,7,11
**Miller's (1)**
    54:8
**mind (3)**
    15:19;111:25;210:12

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 69 of 78

PROMISE BLAKELY
January 15, 2021

**minding (2)**
124:1;154:4
**mini (1)**
188:16
**minute (1)**
86:14
**minutes (13)**
65:24;66:20,23;
121:9;138:25;139:3,6;
140:7;146:5;166:23,
24;169:13,15
**missed (2)**
47:12;166:12
**misunderstanding (2)**
22:11;72:14
**misunderstood (1)**
9:18
**Mitch (2)**
78:9,13
**mixture (1)**
100:2
**mom (43)**
14:3;18:22;19:2,21,
24;24:5,23;29:24;30:7,
10,13;36:4,7,14;41:21;
42:18,20,25;43:21;
45:6;51:24;52:1,1,5,
17;55:22;60:9;62:6,25;
63:4,13;67:17;68:8,16,
17,25;69:6,12;72:2;
79:17;82:5;83:17;
213:20
**moment (16)**
10:25;76:21;126:3;
127:9;132:19;133:23,
24;172:1;175:18,23;
205:19,23;206:25;
209:12,22;218:23
**mom's (18)**
13:15;14:1,10;16:9;
18:5,17;22:3;25:19,21;
28:23;35:18;48:15;
51:6;60:9,20;62:14;
69:16,20
**Monday (6)**
52:25;53:1,25;55:15,
17;73:10
**money (3)**
19:25;20:15,16
**Monique (1)**
30:19
**month (2)**
46:16;49:4
**months (3)**
47:20,21;102:21
**morality (1)**
200:24
**more (23)**
19:25;37:16;41:9,10;
62:8;68:5;95:6,16,19,
24;96:20;103:10,11;
108:25;142:21;143:13,
20,21;176:16;189:7;

198:5;199:8;217:13
**morning (3)**
4:8;83:24;141:25
**Morrison (1)**
88:7
**Morton (8)**
22:16,18,25;63:23;
64:1;214:11,14,20
**Most (6)**
10:14;81:15;118:16;
119:8;214:23;218:22
**mostly (13)**
37:8;39:24;116:5;
141:23;143:20,20;
181:24;190:21;193:14;
196:22;203:13;214:24;
221:15
**mouth (1)**
135:17
**move (2)**
5:22;7:1
**moved (6)**
20:8;25:19,21,22,24;
30:15
**moving (1)**
20:1
**much (35)**
12:18;25:12;32:18;
34:23;56:1;66:12;
76:17;98:6,9;100:15;
101:5;111:14;122:1;
125:18;126:10;127:17;
129:2;132:20;140:6,
16;142:1,15;154:5;
155:22;156:16;157:17;
158:14;164:16;170:22;
182:1;207:23;208:22;
215:1;221:20;226:2
**multiple (1)**
71:22
**myself (11)**
4:8;5:18;6:18,20;
25:6;82:9,13;117:7;
119:12;163:1;221:22

**N**

**name (58)**
4:11,18,20;15:9,12;
20:9;24:12,14,14,16,
17;27:10,15;32:5,12;
42:4;45:5;52:14;53:15;
54:4;55:5;75:1;76:25;
77:13,14,19,21,22;
86:13,22;87:4,9,13,16,
16,17,20;88:5,11,15;
113:5,7,9,9;114:1;
119:5;120:20;150:3;
152:21;162:11;174:7;
190:15;192:7;202:9;
213:19;214:9;218:1,5
**named (10)**
60:7,24;61:16,18;

69:13;71:22;77:6;
79:23;87:5;88:17
**names (12)**
17:22;75:12,17;
77:15,18;78:10;99:19;
119:8;150:5;196:23,
24,25
**name's (1)**
85:17
**National (10)**
29:18,22;30:3,23;
31:24;32:23;33:17,23;
35:12,15
**nature (3)**
34:16;81:2;200:15
**Neal (1)**
63:20
**nearby (1)**
178:14
**necessarily (1)**
142:6
**necessary (1)**
147:18
**need (32)**
7:24;8:8;12:3,23;
31:18;44:7;76:20;
85:10;92:21;93:10;
95:18,20;124:3;127:8;
128:18,24;130:22;
145:21;148:2;152:12;
154:21,21;158:5;
159:2;164:19;177:24;
182:1;199:24;200:20;
206:25;225:14;226:3
**needed (34)**
21:13;43:24;57:5;
75:8;81:6;95:8;105:21;
109:10,19;111:22;
112:5;113:17;127:4;
131:18;149:7;150:25;
151:4;155:24;158:2;
159:6;162:6;176:5;
180:10;181:25;186:23;
187:12,14,18;188:22;
189:1;190:16;192:18;
215:15,25
**new (4)**
45:14;46:20;53:17;
84:22
**next (10)**
51:2;141:25;146:11;
149:3;157:13;172:23;
176:2,22;177:11;215:5
**nice (2)**
104:19;123:24
**night (76)**
54:23;55:16;82:5;
83:24;101:25;102:23,
25;104:9,14;105:5,10,
13;110:25;113:11;
114:12;120:22;121:18;
124:6,10;128:2;133:7;
134:7;137:20;139:19;

140:1,22,24;141:3,10,
14,19;142:3,4,7,11,14,
21,24;143:18;144:21,
24;145:3,13;146:6;
149:8;153:4,19;154:3,
6;156:19,23;157:6,21;
158:1;159:22,24,25,25;
160:3,11,19;164:11;
165:6;166:22;167:4;
169:24;173:7,25;
181:19;189:12;191:21;
194:24;195:13;198:14;
217:8;220:23
**nobody (1)**
159:21
**nodding (1)**
10:23
**noise (1)**
137:23
**None (1)**
48:6
**nonemergency (1)**
135:20
**normal (3)**
10:14;160:20,22
**north (2)**
57:17,19
**Northern (5)**
14:24;32:25;40:22,
23;63:21
**note (2)**
70:25;73:2
**notes (1)**
73:4
**notice (1)**
6:19
**November (18)**
14:13,19,20,21,22,
25;15:3,4;16:5,11;
18:1;35:14;43:7,16;
44:11,12;52:3;82:25
**number (51)**
12:3,7;20:22,25;
26:6;37:12;45:2,7,8,13,
14,15,16,16,18,20,21,
22,25;46:14,15,18,19;
47:15,16,17,18,19,20,
21,22,25;49:1;50:21;
54:12;70:7,8,11,21;
72:5;73:13,25;82:10;
98:17;116:18;139:24;
152:25;153:23;158:19;
165:25;173:21;177:8
**numbers (14)**
48:3,6,7,12;74:24,
25;75:17,25;76:3,7,11;
85:3;89:12;155:1

**O**

**oath (4)**
7:8,9,12,13
**objection (3)**

11:19,20;210:15
**objections (3)**
11:12,15,16
**obligation (2)**
7:14;97:11
**observe (9)**
93:19;116:6;117:19;
118:6,18,21;175:25;
178:17;179:12
**observed (2)**
117:24;119:22
**observing (2)**
117:6;190:1
**obvious (1)**
178:24
**obviously (8)**
7:19;16:2;31:19;
71:1;158:7;172:18;
173:19;176:11
**occasion (2)**
93:18;120:9
**occasions (2)**
71:24;117:2
**occurrence (1)**
118:4
**October (1)**
43:17
**off (32)**
4:9;8:1,15;19:19;
22:14;37:18;45:9;
53:18;58:3,9;64:24;
76:20;90:23;102:19;
110:4;123:22;127:13;
129:21;130:24;144:25;
155:6;160:9;162:16;
166:13;169:8;172:14;
173:14;184:3;201:17;
213:23,23;226:5
**offer (4)**
107:18;179:10;
185:8;187:9
**offered (1)**
18:17
**offering (1)**
81:13
**office (56)**
5:17;13:21;22:2,19;
27:4;38:3;63:24;78:25;
79:6,8,15,19,20;80:8,
12,16;139:17;144:14;
146:1;155:12;157:8,
10,15,18,23;158:2,8,
12,16,21;159:1,7,15;
160:7;161:4,21;163:5,
11,18,25;164:4,12,15,
17;171:24;175:17;
179:13;218:25;219:2,
6,9,10,11,14,14,19
**officer (103)**
90:16;91:3,9,14;
92:16,18,23;93:11,16,
24;97:10;98:4;100:25;
102:20;104:13,17,18;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021
USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 70 of 78

105:6,9,9,12,16,17,20;
108:6,10;109:15;
110:22;111:16,20;
113:21,22,23;114:2,4,
6;115:20;117:16;
121:5,7,23;122:21;
123:11;125:9;128:10;
134:16,22,23;135:6;
137:1;141:13,19;
142:16;144:9,12,17;
145:2,4,24;146:7;
147:2;149:1;150:24;
157:20,20;158:1,25;
162:3,17;163:17;
164:24;165:3;167:5,9,
19;170:6;171:1;175:7,
11;177:1;180:2,7,16,
22;181:5,9,13;182:12;
188:8;189:11,18,19;
192:17,24;201:2;
203:8;208:1;211:23;
212:14,18;213:5,9;
215:12

**officers (14)**
99:20;125:10;
143:13,18;144:5;
147:15;148:12,20;
158:19;193:17;196:19;
197:6,17;215:10

**officer's (2)**
135:14;136:8

**official (1)**
140:23

**officially (3)**
40:3;86:15;140:21

**often (1)**
138:23

**Oklahoma (4)**
33:8;39:6,17;40:11

**old (2)**
56:22;103:4

**older (4)**
48:22;150:8,8;
202:23

**once (9)**
11:19;12:10;55:18;
59:3;101:9;165:2;
174:2,15;199:6

**one (77)**
4:11;6:8;12:4;15:6;
20:5;23:25;59:11;65:1;
67:16;68:5;71:21;
74:18,24;76:19,21;
77:2,15,17,24,25;
84:21;85:24;88:7;89:7,
13;103:17;107:23;
108:12;112:25;113:14,
19;114:9;117:12;
118:17;119:15,17;
122:20,20;123:18,20;
126:12,23;129:15,19,
20;130:23;133:2;
134:25;147:2,19;

148:2;153:5;154:5;
158:20,25;164:2,14;
166:15;167:14;168:18;
170:25;177:19;179:24;
187:21;192:3;194:18;
197:11,20;199:8,20;
201:19;209:12;215:4,
14;218:23;219:4;220:2

**ones (1)**
147:16

**ongoing (1)**
5:12

**only (21)**
8:11;12:4;17:24;
46:16;60:10;63:10;
71:24;76:9;103:2,4;
105:14;122:2,22;
136:7;137:3,11,22;
142:20;159:3;177:19;
184:25

**on-the-job (11)**
99:2,3,7,9,15,20,24;
100:12,23;101:15;
102:15

**open (20)**
69:9;159:8,9,10,10;
164:15,16;168:3,5,11,
15,16,20;169:1,3,5;
174:25;175:6;179:14;
183:17

**opened (1)**
65:2

**operations (1)**
92:12

**opinions (1)**
71:11

**opportunity (4)**
9:9;12:4;201:24;
210:3

**opposed (1)**
10:5

**option (1)**
137:11

**order (1)**
224:23

**ordered (2)**
179:24;225:1

**ordinarily (1)**
143:13

**ordinary (1)**
170:19

**organization (2)**
148:4,8

**organizing (1)**
154:13

**others (2)**
166:17;223:23

**out (111)**
12:22;15:6;21:2,20,
20;25:19,21,22,24;
32:2,2,3,17,19,24;36:1;
38:7;40:19,25;43:19;
44:4,12;46:18;48:17;

54:20;56:21;57:11;
59:3;60:23;62:1;67:13;
75:9;82:19;83:7;84:5,
12;86:3;107:6,11;
108:1;119:11;123:16;
125:20;127:24;130:17;
132:2;134:2;136:9,9,
21;137:8,13,16;
140:17;141:4,9,21;
143:4;146:9,22;147:4,
6,12,12;149:1,16;
151:16;152:16,22;
158:21,25;166:16;
170:13,19;171:12;
172:13;174:25;175:6,
12,22,24;176:15;
180:11;182:24;183:5,
17,18;185:1;186:16,
22;187:19,20;188:21;
189:21;190:24;191:6,
9,13;194:1,3,8,9,13;
195:11;200:16,21;
217:15;218:25;219:12;
223:4;224:6

**outlets (1)**
218:15

**outside (3)**
124:24;159:5;174:5

**over (24)**
10:15;18:8;32:19;
48:1,13;52:17;60:13;
61:2;62:16,18;63:1;
68:1;100:8;104:16;
118:2,2,3,9;122:3;
127:23;216:22;219:21;
221:10;222:19

**own (8)**
17:5;19:25;20:16;
58:17;59:6;60:2;
142:24;217:3

---

**P**

**page (1)**
7:3

**paid (3)**
54:21,22,22

**pamphlet (1)**
15:15

**pandemic (1)**
5:13

**panic (3)**
132:20;188:16;
222:11

**panicked (1)**
221:4

**panicking (5)**
188:4,11,22,24;
221:5

**paper (2)**
15:14;65:9

**papers (1)**
52:11

**paperwork (9)**
38:4;65:18;88:14;
122:17;141:21,24;
158:4,13;219:16

**paraphrase (1)**
202:22

**Parkway (2)**
59:11,23

**part (19)**
12:18;15:23;26:4;
36:3;99:23,24;108:22,
23;109:3;110:21;
129:3,7;132:16;133:9,
18;134:19,20;163:19;
201:1

**partially (1)**
5:15

**participate (4)**
117:18;118:6,18,21

**participated (3)**
117:24;118:9;132:22

**particular (4)**
33:16;51:9;116:2;
184:9

**Part-time (4)**
30:24,25;35:2;37:9

**pass (6)**
39:14;68:25;70:4;
114:11;201:25;217:14

**passage (2)**
173:4;179:17

**passed (15)**
14:11,18,23;18:2;
43:24;44:12;73:25;
122:7;123:16,25;
154:14;215:6;217:9;
218:2,8

**passing (2)**
19:3;121:12

**past (1)**
52:3

**patience (1)**
90:7

**pause (4)**
8:2;11:18;76:23;
201:22

**pay (4)**
46:16;47:11;165:11,
15

**paycheck (1)**
109:15

**payments (1)**
47:12

**payroll (33)**
109:12;145:6,8;
146:1;149:7,11,24;
151:1,4,15,17;155:9,
12,25;156:3;161:12;
162:6,9;165:4,7,15;
166:6,22;167:6,20;
169:20,24;170:3,7,13;
206:19;219:19,24

**people (38)**

10:15;37:8;41:2;
49:8;75:20;77:2;85:8,
20;88:3,10;97:3;99:16;
106:15;114:9;121:13;
130:17;133:2;138:19;
142:22,23;143:20,22;
148:1,2;169:8;172:6;
176:8;186:17;187:18;
188:25;189:7;196:7,
23;197:1;199:25;
201:3;206:7;215:11

**people's (1)**
172:7

**perfect (2)**
176:12;223:3

**perfectly (2)**
66:1;220:5

**performed (1)**
128:6

**period (33)**
19:11,20;26:18;
28:19;32:15,21;37:4;
38:8;40:14,18;41:6,22;
44:16,18,20;48:1,14,
24;50:13,25;51:4,7;
52:17;53:12;57:2;
60:18,23;90:15;99:4;
100:21;101:1;165:11,
15

**periods (3)**
19:13;49:5;137:1

**permanently (1)**
41:10

**permitted (3)**
147:15,20,21

**person (30)**
5:16;63:14;69:1;
70:5,10,16;71:14;74:7,
8;75:16;77:6;79:5;
82:3;85:17;100:17;
103:5;105:5;120:4;
121:22;123:24;124:19,
20;148:2;177:24;
187:15,15;190:14,15;
202:25;215:14

**personal (8)**
42:24;49:9,12;90:11;
200:24,25;212:16;
213:13

**personally (20)**
44:1;64:2,10,19,21;
117:18;119:18;120:12;
130:11;131:8,10;
138:13,16;150:17;
181:21;189:13;215:23;
216:2;217:1;224:3

**person's (1)**
190:15

**phone (60)**
20:12,18,20,20,24;
44:25;45:2,3,7,7,12,18,
20,25;46:1,3,5,9,11,12,
17,20;47:9,13,19;48:3,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 71 of 78

6,12,15,19,20;49:1,3,6,
7,11,19;50:14,21,22,
25;51:1,2;53:18;54:11,
14;55:7;68:23,24;70:7,
10,21,21;75:17,25;
78:21;81:5;82:6,11;
85:3
**phones (1)**
48:13
**photocopy (2)**
15:20;16:1
**phrase (1)**
105:6
**phrased (1)**
9:16
**physical (5)**
34:10;36:3;39:15,16;
153:25
**physically (8)**
129:9,16;132:10;
133:10;153:20,22;
158:9;167:8
**picked (1)**
74:25
**pictured (1)**
207:6
**piece (11)**
21:5;22:7,7,11;
23:25;61:5;65:3,9;
69:5;82:18;88:22
**pieces (3)**
6:24;19:15;218:6
**Pizza (1)**
40:25
**place (42)**
17:4,5;18:13,17;
26:18;40:1,5;41:18;
49:13,14,16,16;50:15;
51:6;58:17;59:6;60:1,
2,15,25;61:2;101:19;
102:9;116:3,18,19;
122:11;129:25;155:16;
156:6;158:2,8,9,11;
173:7;189:3;216:23;
219:4,7,10,13;221:9
**places (5)**
39:24;48:2;85:2;
189:22;219:5
**Plaintiff (8)**
4:2,12,13;5:11,13;
22:20;74:13,19
**plaintiff's (3)**
5:18;74:1;226:7
**plan (6)**
48:15;50:7;52:22;
58:17,21;87:14
**planning (3)**
55:14;59:24;87:23
**plans (3)**
55:18;57:12;85:2
**please (4)**
4:17;6:20;9:21;
103:18

**Plus (1)**
58:23
**pm (9)**
128:1;137:21;
139:22;142:10;153:19;
156:7;160:4;169:14;
226:12
**pocket (1)**
46:1
**point (43)**
6:16;7:25;8:8;9:14;
25:17;26:21;42:17;
51:18;52:5;58:17;63:5;
67:18;78:21,22;79:3,
13;81:9,17;83:19;85:6,
9;87:10,23;88:7,13;
103:13;114:16;132:24;
141:3;149:23;160:17;
176:6,24;191:1;
194:16;196:16;203:10;
205:22;213:1;214:17;
221:3;224:22,24
**pointing (1)**
164:3
**points (1)**
107:21
**police (4)**
35:24;93:15;212:18;
213:18
**policies (2)**
94:1;125:5
**policy (17)**
116:18;125:9,25;
126:5,13,25;134:20;
135:3,5;138:23;
139:12;145:11;147:15,
24;158:18;179:20;
195:7
**polite (1)**
116:14
**popping (1)**
204:23
**position (10)**
33:16,23;57:5;91:1,
8;174:16;175:6;
178:18,22;213:9
**positive (4)**
171:4;183:8,16;
195:3
**possible (18)**
9:5;69:25;71:16;
75:15,17,19,21;77:23;
78:7;168:5,6;173:16;
177:5;193:22,24;
208:7;210:6,8
**possibly (9)**
46:19;48:12;162:20;
166:19;177:11;184:13;
185:9;194:9;197:10
**post (1)**
22:2
**potential (1)**
85:3

**practice (6)**
129:12;132:10;
133:11;145:12;151:19;
152:15
**practiced (1)**
132:22
**practices (1)**
158:18
**practicing (1)**
129:8
**prefer (6)**
4:22;6:10;80:6;85:7,
14;86:17
**preference (2)**
80:4;85:19
**preferred (1)**
86:22
**preliminary (2)**
5:4;12:22
**prepaid (3)**
46:9,12,17
**prepare (2)**
81:7;141:25
**preparedness (1)**
125:16
**present (2)**
51:7;81:10
**preserve (1)**
9:1
**press (1)**
66:17
**pressing (2)**
66:13,14
**pretty (27)**
22:9;34:23;38:6;
98:6;100:15;101:5;
121:25;125:18;127:17;
129:2;140:6,15;142:1,
15;154:5;157:17;
158:14;164:16,20;
167:15;170:22;171:19;
178:10;197:3;207:23;
208:22;215:1
**prevented (1)**
179:21
**previous (2)**
5:9;60:18
**previously (7)**
27:8;36:10;48:4;
56:5;90:19;151:12;
207:6
**Princess (3)**
21:14;24:13,16
**prior (26)**
19:20;34:19;35:7;
52:5;78:21,22;79:3,12;
81:17;92:4,7,8,12;
94:6;96:12;102:25;
104:14;105:13;114:16;
115:16;124:9;129:22;
132:18;149:23;172:1;
218:15
**Prison (83)**

4:16;19:23;24:22;
25:1,3,18;26:15;35:7,
19,23;36:4,8,11,14,15,
25;37:2,4,10,13,17;
48:2;61:14;71:17,19,
23;72:8;90:16,21;91:2,
10,14;92:4,9,11,13,20;
93:25;94:1,3,24;96:5;
97:10;98:10,15,19,24;
99:5;103:5;105:2;
106:13;109:13;116:3,
18;117:16;118:13;
122:11;123:8;124:25;
125:6,10;127:16,25;
128:15;131:23;134:20;
137:15;138:2,7;140:5;
146:17;151:19;152:3;
158:19;160:24;176:15;
179:20;183:18;197:21;
203:9;211:14,15;
212:15
**prisoner (31)**
4:16;108:7;110:20,
20;111:11,12;112:2,
20;113:5,20;121:19;
126:7;127:1;128:11;
129:20;131:13;133:17;
136:6,12,14,21,21;
137:3;140:11;147:8;
177:25;185:14;194:22;
195:7,12,18
**prisoners (46)**
97:12;103:16,24;
104:2;106:9,11,14,23;
107:3,6,11;108:1;
110:15;112:10;114:12;
119:2;128:23;129:4;
135:9,13,20;137:2,16;
140:12;141:4;143:8;
148:15;170:25;172:5;
175:21;176:7;178:4,
19;182:21;183:1;
184:21;185:1;186:8,
19;187:19;190:22;
194:11;195:25;196:4,
11;221:24
**prisoner's (3)**
115:8;116:1,22
**probably (14)**
49:3;117:23,25;
118:1;119:10,11;
125:7;126:3,9;166:23;
183:15;193:20,21;
218:20
**problem (3)**
7:25;8:3;116:21
**problems (3)**
24:2;154:6;205:20
**procedure (4)**
6:24;94:24;95:7;
131:17
**procedures (7)**
94:2;106:9;110:10;

111:21;122:10;128:17;
135:19
**proceed (1)**
12:25
**Proceedings (1)**
226:11
**process (7)**
46:24;47:1;87:15;
88:21;91:13;169:23;
225:13
**produced (1)**
225:15
**program (1)**
110:20
**PROMISE (26)**
4:1,8,19,23;5:1,22;
6:8;12:18;13:13;15:5;
60:4;66:7,11,12;67:3,
11;71:11;76:25;79:22;
85:18;86:8,11,20,25;
87:6;224:22
**P-R-O-M-I-S-E (1)**
4:19
**Promise's (1)**
71:1
**pronounce (1)**
24:18
**pronouns (2)**
6:10,22
**proof (6)**
63:22,25;65:4,6;
162:23;194:15
**propose (1)**
66:7
**protect (1)**
97:12
**prove (1)**
138:12
**proves (1)**
138:10
**provide (4)**
47:7;92:20;94:3;
99:15
**provided (7)**
20:25;45:14;46:9;
75:16,24;94:24;98:11
**providing (1)**
75:12
**public (1)**
5:11
**pull (4)**
44:6,7;59:19,20
**pulled (1)**
57:15
**purposes (2)**
87:4;211:9
**pursue (1)**
35:22
**put (20)**
5:8;6:3;34:7;52:14;
71:3;91:15;109:14;
123:11;135:17;142:17;
149:4;160:15;165:22;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD document 203-6 filed 03/29/21 page 72 of 78

194:8,9,13;206:10;
216:14;218:6;225:19
**putting (4)**
149:10;155:22;
165:20;166:6

## Q

**quarter (1)**
66:23
**quick (5)**
40:2;66:4;193:14;
197:4;204:25
**quiet (7)**
159:25;160:1,3,10,
11,16,18
**quite (5)**
108:9;166:12;210:6,
8;220:3
**quitting (1)**
25:13

## R

**radio (4)**
150:11;180:22,25;
185:4
**ran (4)**
133:3;137:12;
149:16;181:14
**random (3)**
115:24;116:2,4
**Randy (6)**
5:19;66:8;77:20;
201:15;202:9;224:14
**rang (1)**
95:4
**range (50)**
103:12;134:14;
145:25;159:14;174:19,
22;176:1,17,25;177:2,
15,20,24;179:21,25;
180:4,17;181:6,10,14,
15,22;183:5;184:3,6,
16,18,22,24;185:2;
186:8;189:4,20;
191:16;192:12;193:9,
19,23;196:11,16;199:7,
12;201:10;207:5,22;
208:3,12;222:20;
223:9,17
**ranges (8)**
144:1,4;158:9,21,25;
160:9;169:8;172:5
**rank (4)**
114:6,8;196:23;
197:1
**rather (1)**
181:12
**reach (7)**
48:7;49:8;70:10;
77:3,8;78:18;79:8
**reached (3)**

50:16;56:21;175:5
**reaching (1)**
86:3
**reaction (2)**
221:7,9
**read (7)**
62:15;154:16;
205:19,24;206:2;
209:9,15
**reading (5)**
122:7;123:5;124:1;
218:9;219:8
**real (7)**
18:20;40:2;131:21,
22,24;132:6;193:13
**really (52)**
17:23;18:24;19:3;
20:13,15;23:6;51:11,
17;53:18;56:1;59:4;
63:10;70:12;72:25;
74:12;76:15;84:7;
88:11;96:18,22;
105:25;111:14;112:5;
114:14;123:8;136:5;
147:23;156:15,16;
159:3,21;161:6,16;
164:5;167:15;171:13;
175:18;188:4;190:5;
193:10;214:25;215:7,
8,22;216:1,2,7,12;
221:11,19,20;222:3
**reask (3)**
126:16;136:17;
181:12
**reason (16)**
8:3;10:19;13:2;
39:10;57:11;116:2,24;
141:9;153:13,15;
170:9;181:21;184:17;
194:14;201:8;223:16
**reasonable (2)**
199:4,10
**reasons (4)**
34:20;35:12;85:25;
223:7
**recall (14)**
35:10;67:21;90:20;
158:18;165:19;169:23;
179:17;180:21;196:1;
203:24;207:19;218:9,
18;220:1
**receive (16)**
23:7,20,23;51:18,20;
79:14;99:22;106:7,22;
110:19;111:5,10;
112:7,9;135:12;143:7
**received (24)**
19:6;23:25;35:11;
39:7;51:23;61:6;65:17;
94:17,22;95:13,15;
97:20,24;98:9;100:4,
13;106:19;111:4;
112:1;122:23;134:9;

158:23;211:19,21
**receiving (4)**
51:9;98:17;110:13;
143:9
**recently (2)**
20:20;37:16
**recess (2)**
67:6;169:16
**recognize (6)**
77:13;90:10;205:10;
211:10;218:2,6
**recognized (1)**
218:3
**recollection (8)**
107:9;108:4;109:21;
120:16;162:16;207:11;
208:10,17
**reconnect (1)**
90:19
**record (35)**
4:9,10,18;5:9;6:3;
8:1,22;9:5;10:7;11:2,5,
17,19;13:19;15:23;
16:4;22:8,12;63:18;
66:25;67:4,9;71:1,3;
73:3;76:20;83:9;89:15;
162:25;169:14;173:13;
201:18;202:3;225:20;
226:5
**recorded (1)**
11:8
**recording (3)**
9:2;67:8;226:5
**records (5)**
71:2;73:4,9;102:8;
170:5
**recount (1)**
172:25
**Red (4)**
58:22;59:9,10,22
**Redden (1)**
150:6
**REDIRECT (1)**
220:14
**reference (1)**
23:3
**referenced (2)**
32:21;149:22
**referred (4)**
22:14;23:5;30:18;
107:24
**referring (18)**
14:19;16:21;22:16;
23:17;35:13;64:8;
103:15,24;110:25;
112:18;118:11;135:19;
142:8;143:6;157:19;
162:2;182:8;188:7
**reflect (1)**
210:4
**reflected (2)**
13:19;208:20
**reflecting (2)**

216:4,6
**refresh (3)**
207:11;208:10,17
**refresher (1)**
127:8
**refreshes (1)**
205:24
**regarding (1)**
136:15
**regardless (3)**
84:14;190:7;222:20
**regards (1)**
62:5
**regular (9)**
100:24;101:10,16;
102:16,20;138:6;
139:8;141:15;166:17
**regularly (2)**
49:22;50:5
**rehash (1)**
44:13
**related (23)**
5:12;37:19;67:12;
71:6,14,23;72:7;81:20;
92:11;94:8,12;100:5,
13;106:22;111:5;
112:7,23;113:1;
124:23;133:21;134:10;
135:15;158:19
**relates (1)**
101:18
**relation (1)**
219:24
**relations (1)**
18:24
**relationship (3)**
52:17;104:23,25
**relative (2)**
208:12;209:19
**relatively (1)**
115:21
**relayed (1)**
73:8
**release (3)**
108:7;195:12,18
**released (1)**
110:15
**releasing (2)**
133:16;195:7
**reliably (1)**
51:9
**relying (6)**
10:22;92:20;94:3;
98:3;111:19,23
**remember (368)**
6:13;23:11;25:2;
27:25;41:11,15,17,24;
42:13;43:3;60:18;62:9,
10,11;64:23;65:8;
68:10;70:12,14,15,18;
71:12,18;72:10,19;
73:21,23;74:2,6,8,9;
75:1,2,4,11,22,23,24;

76:25;77:5,8,10,11,14,
17,18,18,21,22;78:4,9,
11,14,20;79:2;89:5,8,
12,16,18;90:2,5;91:12,
17,24;94:21;96:11,15;
97:19;98:12;99:9,19;
100:3,12;101:14;
102:2,13,14,17;104:7,
8;107:13,16,17,22;
108:9;110:5,12,17,23,
24;111:7,18,19;112:1,
4,4;113:4;114:1;
116:23;117:3,10,11;
119:3,6,7,24,25;120:6,
7,21,23;121:7,21;
122:22;123:14;125:14,
24;126:10;127:3,6,10,
11,11,12,14,14,15;
128:5,8,9,13;129:13,
16;130:2,5,11,16;
131:6;132:4,13;133:8,
10;134:3,9,24,25;
135:2,4,7,15,24;139:2,
4,5;140:5,14,15,20,24;
141:1,22;142:13,15;
143:3,25;144:4,6,25;
145:15,16;146:2,3,11,
14;147:3;149:3,4,5,12;
150:3,5,7,7,13;152:3,
19,24;153:21,22,24;
154:1,4,12,13;155:8,
15,19;156:15,18,21,21,
22,24;157:22;158:17;
159:17,23;160:12;
161:6,8,15,23;162:17,
19,22,24;163:19,19,20,
22;164:1,2,11;165:8,
13;166:13;167:5,6,7,
12,13,15,18,22;168:1,
2,4,8,18;169:3,4;170:2,
4,11,17,21,24;171:11,
15;172:13,15;173:1,3,
17;174:4,4,5;175:9,12,
15,16,17,18,20;176:4,
4,7;177:4,17,22;
180:14;181:2,16;
182:15,19,25;184:14;
185:20,21;186:11,12,
13,13;187:12,24;188:4,
13,17;189:13,19,23,25;
190:2,3,9,9,16,19,20,
21,23;191:3,10,10,18,
19,24;192:2,5,12,15,
19,21,23;193:2,4,6,24;
194:1;195:23;196:3,9,
10,15,22,24,25;197:1,
8,11,18,19,22,23;
198:3,17,18,20;199:15;
203:11,15,16,17;204:7,
9,10,11,14,23;205:11,
17;206:18;207:16;
208:8,13;214:5,16;
216:9;219:11;220:2,5,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 73 of 78

19;221:5,18;222:22;
223:10;225:7
**remembered (7)**
107:15;126:3;
148:24;154:10;177:12;
198:11;210:11
**remembering (6)**
124:5,14;142:6;
146:5;148:25;156:25
**remembrance (1)**
88:8
**remote (2)**
5:14,15
**remotely (5)**
202:5;204:17;209:4;
210:22;226:8
**rent (1)**
18:11
**renting (2)**
27:14,18
**repeat (4)**
11:4;28:15;32:8;
90:24
**rephrase (1)**
9:22
**replacement (2)**
20:24;45:12
**report (5)**
122:13,16;131:18;
209:8,18
**reporter (21)**
7:8;8:21;10:7;11:1,
9;13:22;15:20;16:1;
31:11,13,21;32:7,10;
36:17,21;103:17,20;
126:14;225:6,12,20
**Reporters (1)**
5:17
**reporter's (2)**
5:17;9:3
**represent (10)**
78:19;80:6,10,17;
81:13,24;89:11,13;
102:7;153:6
**representation (2)**
80:11;89:23
**representative (3)**
4:14;61:23;74:2
**represented (2)**
74:13;81:13
**representing (3)**
12:11;75:25;80:2
**represents (2)**
4:12;74:19
**requested (1)**
83:19
**requesting (1)**
8:5
**requirement (1)**
143:19
**rescue (5)**
94:8,12;186:8;
199:25;201:2

**rescuing (1)**
199:5
**reserve (2)**
224:25;225:16
**residing (1)**
65:19
**resign (1)**
213:12
**resigned (2)**
213:8;214:2
**resolve (1)**
134:5
**resolved (1)**
39:13
**respect (1)**
6:14
**respected (1)**
92:25
**respectful (3)**
6:21;12:1;160:19
**respective (1)**
144:18
**respond (4)**
125:11;130:12;
186:9;195:21
**responding (4)**
96:9;133:18;220:24;
221:2
**response (20)**
94:9,13,21;95:23;
96:13;97:16;99:22,23;
100:5,6,13,14;106:5,6;
132:11;184:5;186:6;
187:11;199:11;224:3
**responses (1)**
222:9
**responsibilities (1)**
186:2
**responsibility (7)**
148:13,19;199:20;
200:11,14;201:1;
213:15
**responsible (7)**
111:11;134:15,16;
184:21;187:5;213:19;
221:20
**rest (2)**
157:10;169:2
**restrictions (2)**
108:5,9
**result (2)**
34:8;217:6
**resume (1)**
67:7
**Return (2)**
24:4;80:21
**returned (2)**
38:19;42:18
**review (1)**
225:2
**reviewed (1)**
173:18
**right (118)**

9:20;10:3;12:20;
13:15,20,25;14:6;
16:25;18:9;20:2;28:13,
16,22,23,24;38:1;45:1,
18,21;46:1,13,18;
53:19;54:14;58:13;
59:12,14,16;60:4,8;
62:10;67:2;73:16,17;
80:2;82:3;86:18;87:1,
13,20;88:2,6,21;90:7;
93:8;102:1;105:21;
108:15;111:24;122:14;
124:3;127:23;133:19;
139:9;140:15;141:1;
142:15;146:2;148:5;
153:9;155:3;157:13;
158:8;161:12,23;
163:3;164:4;168:15;
169:13;172:22;174:9;
177:13,16;180:5;
183:4;186:17;188:13,
25;191:10,20;200:1,15,
15,23;202:23;203:4;
204:3,20,25,25;205:7,
9;207:15,25;210:25;
211:6,8,25;212:2,13;
213:1,2,6,8,10;214:19;
215:4;217:25;218:10;
219:12,21;220:3,6,10;
221:6;223:5,20;224:25
**right-hand (1)**
209:10
**risk (1)**
121:15
**Road (1)**
23:9
**Rodriguez (32)**
105:4,9,13,17;
145:13,24;149:13;
150:21,24;157:20;
161:3,17;162:17;
163:17;175:7;180:2,8,
17;181:5,9,13;182:12;
188:8;189:3,11;192:7,
17,24;193:7;196:15,
21;208:1
**Rodriguez's (1)**
180:22
**rollercoaster (1)**
18:4
**Roof (4)**
58:22;59:9,10,22
**room (32)**
11:15;17:18;109:11,
25;149:16;161:24;
162:1,11,14;163:6;
164:24;165:3,6;167:9,
16,24;168:3,25;169:9,
20;171:4,16;172:1,9;
174:3;175:1,12;
176:14;183:19;197:22,
23;198:2
**roommates (3)**

17:20,22;26:7
**rooms (1)**
59:2
**Rose (25)**
5:19;6:4;12:11;66:1,
9,18;67:1;77:20,21;
201:25;202:2,6,8,9;
204:18,19;209:5,6;
210:17,23,24;214:13;
220:6;224:16;226:9
**rounds (5)**
138:7,24;139:8,14;
141:15
**routine (1)**
116:21
**rude (2)**
116:12,14
**rule (3)**
8:11;11:15;179:20
**run (6)**
94:1;137:17;149:13;
186:16;191:12;222:19
**running (9)**
161:18;175:9;
176:15;186:14;191:11,
18,22,24;202:10
**runs (3)**
46:17;143:21;167:1
**rush (1)**
76:17
**rushing (1)**
122:1

## S

**safety (2)**
148:14;184:21
**Sam (15)**
4:11,25;6:4;32:3;
33:1,5,13;202:3;203:6;
212:22,23;213:13;
214:8,9;224:16
**same (29)**
7:3,13;10:19;12:2;
20:2,24;26:4;27:6;
37:5;39:12;45:13;91:8;
94:23;96:2;97:2;128:2;
159:1;165:25;166:3,4,
9;167:2,20;175:13;
183:4;212:8;216:7;
219:4,10
**Sam's (1)**
214:20
**San (2)**
33:14;212:24
**Sarah (1)**
104:10
**sat (2)**
7:5;155:5
**save (2)**
20:23;224:7
**saw (16)**
109:7,8;114:8,9;

121:14;122:5;143:19;
152:19,23;163:20,21;
164:2;181:22;183:5;
189:20;218:4
**saying (29)**
19:19;24:4;36:23;
43:24;45:10;62:17;
66:19;67:25;73:24;
86:21;96:1;100:11;
121:17;143:12;145:10;
149:14;170:21,24;
171:1,1;175:8;188:18;
196:4,6,7;198:18,24;
209:16;222:4
**say-so (3)**
216:12,15,17
**scared (1)**
188:5
**schedule (1)**
139:8
**school (11)**
19:2;30:14;31:1,2,3,
5;33:13,15;35:1;50:11;
92:14
**score (2)**
55:7,11
**scratch (1)**
166:16
**screen (8)**
63:17;202:12,14;
204:21,22;205:2;
209:1;211:3
**scroll (1)**
204:25
**search (1)**
115:6
**searched (1)**
119:13
**searches (1)**
116:3
**second (7)**
15:6;39:1,11;68:15;
76:20;84:21;187:25
**secondhand (1)**
114:18
**section (1)**
84:22
**security (5)**
138:1;139:14,14,18;
141:15
**seeing (19)**
59:23;120:12;
130:16;149:13;153:17;
154:7,10;174:6,21;
176:16;178:12,23,24;
180:4;190:2;195:17;
201:11;217:21;218:3
**seemed (2)**
124:20;125:19
**self (1)**
217:12
**selling (1)**
48:19

**send (1)**
45:15
**Sender (1)**
24:4
**senior (1)**
33:10
**sense (9)**
9:6;10:11;72:16;
92:24;133:16;168:11;
195:10;200:13;217:9
**sensitive (1)**
136:5
**sensors (1)**
141:17
**sent (7)**
23:24;32:24;51:15,
18;79:14;80:22;225:1
**sentences (1)**
10:22
**separate (2)**
68:7;225:8
**separation (1)**
34:13
**September (6)**
39:3,4,8;64:4;72:21;
73:18
**serious (1)**
96:1
**seriously (1)**
95:24
**seriousness (1)**
95:23
**serve (3)**
29:17;38:25;64:9
**served (5)**
28:20;39:5;64:2;
65:6;93:15
**serves (1)**
180:5
**service (11)**
29:7;34:8,22;38:20;
39:2,11,18,21;50:21;
63:22,25
**serving (8)**
4:14;29:21;30:3,22;
31:24;38:23;39:17;
40:10
**set (5)**
98:19;123:7;129:21;
131:4;177:19
**several (1)**
48:2
**severity (1)**
95:23
**sexuality (1)**
18:7
**shake (7)**
115:13;116:13,15,
15;117:8;120:16,19
**shakedown (6)**
115:10;118:5,17,21,
22;119:18
**shakedowns (5)**

115:24;116:19;
117:17,23;120:2
**shaken (3)**
116:1;119:23;121:1
**shaking (5)**
115:20;116:22,24;
119:7;124:14
**Shantel (10)**
16:22,23;24:1;26:12,
13;42:1;64:11,23;65:2;
73:23
**Shantel's (1)**
85:12
**share (7)**
202:12;203:4;
208:24;209:1;210:25;
211:3;212:13
**shared (1)**
148:13
**sharing (2)**
204:21;205:1
**sheet (1)**
225:8
**shift (34)**
97:15;101:6;106:1;
113:14,24;118:14,16,
19;121:10;124:9;
127:25;128:2;132:2;
139:19,22;141:14,20;
142:11,14;143:14,18;
146:6,12,13;148:24;
151:14,20;158:1;
160:3;165:23;166:9,
18;187:25;205:16
**shifts (12)**
100:24;101:10,16;
102:16;104:1,5,16;
105:12,15;118:16;
129:19;166:8
**Shiloh (2)**
23:9,14
**S-H-I-L-O-H (1)**
23:14
**shipped (2)**
32:3;38:7
**shook (3)**
116:25;117:13;119:3
**short (4)**
41:8,22;202:10,10
**shorter (1)**
12:18
**shortly (1)**
171:19
**shouts (2)**
159:13;160:8
**show (14)**
15:1;16:4;63:16;
64:6;82:8;162:23;
164:12;167:16,25;
173:23;202:13;204:20;
208:25;211:2
**showed (4)**
163:16;172:16;

189:7;207:7
**showing (3)**
15:5,14;120:1
**shown (2)**
163:8;223:21
**shows (7)**
15:3;157:12;163:25;
164:14;173:19,20;
195:14
**sick (2)**
34:5;166:14
**side (8)**
17:11,12,16;57:17;
153:5,12;209:11,13
**Signal (3)**
203:21;206:20,22
**signature (6)**
205:7;224:25;
225:10,16,17;226:10
**signed (1)**
63:23
**significant (1)**
221:8
**Sill (3)**
33:3,8;39:20
**similar (2)**
98:1;212:20
**similarly (1)**
10:19
**sister (8)**
18:23;19:2;30:13,19;
42:22;43:2,22;213:21
**sit (23)**
6:9;13:5;45:1;71:20;
78:6;79:22;102:1;
112:22;113:4;120:11;
128:20;145:24;176:12;
181:20;182:11;186:4;
193:11;201:9;203:25;
204:11;219:15;223:8,
14
**sitting (6)**
7:15;13:21;78:14;
154:17;165:6;204:7
**situation (10)**
5:12;37:16;69:8;
94:15;125:13;139:4;
148:21;185:16;186:10;
201:3
**situations (2)**
135:20;147:17
**skills (1)**
93:9
**skip (2)**
139:13,15
**Skokie (1)**
41:5
**slate (1)**
92:17
**sleeping (1)**
18:21
**slightly (1)**
66:3

**slip (3)**
6:16,18,19
**slit (1)**
138:19
**slow (1)**
167:1
**small (2)**
93:2;129:20
**smart (1)**
168:22
**smell (2)**
109:23;183:19
**smelled (3)**
109:8,18,24
**smelling (6)**
149:15;170:22;
171:8,11,15,21
**Smith (10)**
22:16,18;63:23;64:1;
214:5,7,11,14,20,21
**smoke (19)**
109:7,8,8,18,23,24;
149:15;170:22;171:9,
11,15,21;179:12;
182:22;183:2,19,22;
184:3;195:25
**smoothly (1)**
7:3
**smuggle (1)**
115:3
**Smyrna (2)**
59:15,21
**social (4)**
47:2;85:15,16;88:20
**somebody (12)**
62:13;68:20;73:23;
78:5;139:17,17;140:7;
141:7;159:5;169:4;
200:16;204:7
**somebody's (1)**
145:22
**somehow (1)**
137:23
**someone (48)**
12:17;27:15;30:12;
46:6;67:19;68:5,16;
72:10;74:9,23;75:11;
76:17;78:19;83:3;
88:17;89:12,19;90:5;
112:24;115:3;116:9,
10;120:16;122:11;
125:20,21;130:19;
136:2;137:11;145:18;
147:25;160:7;170:21,
24;171:6,20;172:12,
12;174:3;175:4;
176:14;184:15;198:8,
18;199:24;200:17;
201:8;224:22
**someone's (1)**
178:8
**sometime (5)**
28:11;39:4;60:20;

69:22;70:23
**Sometimes (8)**
59:19,20;117:4;
137:7,15;146:18,19;
166:25
**somewhat (1)**
164:17
**somewhere (6)**
41:10;50:17;103:11;
127:5;161:21;197:10
**soon (1)**
174:25
**sorry (29)**
14:16,17;17:14;
19:12;21:6;28:3,15;
31:13;33:3,8;36:17;
41:3,16;90:23;103:19;
110:3;112:18;138:4,5;
140:9;160:21;180:19;
192:2;199:8;203:20;
207:18;210:16;214:10;
219:3
**sort (14)**
12:21;27:20;33:22;
34:12;55:18;57:17;
90:8;93:18,19;100:22;
101:11;126:5;148:20;
187:3
**soul-searching (1)**
217:12
**sound (8)**
73:16;78:3;102:10;
113:7;153:9;173:20;
182:17;213:10
**sounds (10)**
19:10;48:11;52:1;
73:17;111:19;152:14;
161:8;203:22,22;204:2
**source (1)**
94:8
**sources (1)**
172:19
**South (2)**
38:5,9
**space (1)**
159:8
**sparked (1)**
184:12
**speak (7)**
75:4;77:6,23;81:6;
83:22;85:7;150:16
**speaking (2)**
77:11;89:18
**special (3)**
4:14;100:16;159:21
**specific (15)**
71:14;93:23,25;
99:14;102:14;107:15;
141:8;145:12;147:1;
165:5;174:1;185:25;
186:5;187:10;194:19
**specifically (33)**
62:8;96:11;100:3,19;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 75 of 78

102:2;106:7;107:1,7;
110:14,16;118:11;
119:2;121:6;125:24;
134:7;137:20;142:2;
147:6;152:16;155:19;
158:12;161:9;163:24;
165:19;169:23;179:17;
184:16;188:17;189:11,
25;190:4;199:15;200:3
**specifics (7)**
96:15;165:8;187:9;
192:21,23;193:2;
196:24
**spell (2)**
4:17;24:18
**spelled (1)**
87:17
**spend (1)**
81:4
**spoke (13)**
70:16,20;73:10;74:3,
5,7,8,15;75:2,3;78:8;
82:4,6
**spoken (4)**
69:12;72:6;75:1;
78:2
**Square (3)**
56:13,15;57:15
**stable (6)**
40:15;41:9;44:18;
49:18,19;51:11
**stacking (1)**
52:13
**staff (4)**
112:10;136:13,23;
137:17
**staff's (3)**
112:11;135:10,21
**stairs (4)**
191:11,12,18,22
**standard (1)**
217:19
**standing (6)**
159:5;160:7;174:5;
175:18;178:23;180:3
**start (9)**
8:15;11:24;21:11;
22:14;101:6;114:10;
121:10;146:6,12
**started (29)**
4:10;19:19;20:11;
26:16;35:19;36:12;
37:10;38:4;56:22;
72:16,17;91:25;92:1;
98:14;101:9;105:22;
109:9,18,22;110:2;
113:17;130:19;140:16;
149:15;152:25;161:17;
171:20;188:13;190:24
**starting (9)**
41:15;78:3;90:20;
92:8,12,16;143:3;
179:8;182:17

**State (25)**
4:16,17;11:21;35:7,
23;36:7,10;61:14;
90:16;91:2;92:9,13;
94:1;97:10;98:10;
117:16;125:6,9;
128:15;203:8;208:22;
211:15;212:15;220:22;
221:2
**stated (3)**
144:2,6;151:25
**statements (5)**
219:9;223:22,23,25;
224:2
**station (1)**
169:20
**status (1)**
100:23
**stay (17)**
25:8;38:1;39:22;
42:18;43:1;49:13,14;
53:12;58:13,22;
144:10,14;182:13;
207:20;208:6;212:17;
221:17
**stayed (11)**
16:15;18:11,18;32:1,
14;35:18;40:4,6;41:19,
21,22
**staying (58)**
13:14,25;14:6,9;
16:9,25;17:3,10;18:2,8,
13;19:21,24;20:9,11;
21:16,17,20;23:6,19;
24:23;25:5,20;26:8,18;
27:8,15,17,19,21,23;
30:6,10,12;32:18;
37:20;38:5,9;39:25;
40:11,19;41:1,7,10;
42:1,3,10;44:17,19,21;
52:22;53:24;54:1,9;
59:25;60:25;83:10;
213:14
**stays (3)**
17:6;41:8;58:3
**step (5)**
8:2,14;172:15,15;
186:6
**stepped (2)**
145:25;172:13
**stepping (2)**
145:3,19
**steps (14)**
107:5,9;126:1;
149:13,21;176:5;
186:9,23;187:10;
192:22;195:12,18;
201:2;224:2
**sticks (1)**
152:16
**still (36)**
21:16;22:3;24:7;
25:20;26:3;30:14;31:1;

35:25;39:12,13;45:12;
46:19;50:22;57:4;
62:23;69:21;75:10;
83:1,14;88:19;99:6;
101:7;167:17;168:21,
23;192:13;196:8,12;
205:16;208:13,15;
209:13;212:8,9;216:7;
219:22
**stint (1)**
39:1
**stipulate (2)**
5:21;6:5
**stipulation (1)**
8:11
**stolen (1)**
46:24
**stood (1)**
203:25
**stop (6)**
149:8;203:4;208:24;
210:25;212:13;226:4
**stopped (2)**
25:3;26:21
**storage (4)**
18:21;21:17,19;
44:19
**store (1)**
47:6
**story (1)**
97:4
**strained (1)**
52:18
**street (6)**
18:9;20:2;27:4;
44:21;59:13,15
**streets (1)**
18:19
**strictly (2)**
148:9,9
**strike (24)**
40:9;42:16;73:19;
80:14;96:9;97:17;
112:8;139:20;140:3;
144:16;157:4;165:18;
171:24;177:5;184:7;
185:23;189:9;192:22;
195:4;196:18;197:15;
199:18;220:25;223:6
**strong (2)**
18:7;215:8
**stuff (16)**
12:22;46:24;47:3;
72:15;96:17;101:23;
127:6,12;142:18;
165:9;182:23;185:20,
25;186:20;204:12;
219:16
**subjects (1)**
98:1
**submit (1)**
209:7
**submitted (2)**

170:6,8
**submitting (2)**
169:25;209:17
**substance (2)**
5:3;107:19
**substitute (1)**
173:23
**suffer (1)**
13:7
**suggested (3)**
153:8;170:6;194:11
**summaries (1)**
223:23
**summary (1)**
210:10
**summer (2)**
60:20;62:6
**summertime (1)**
20:11
**summons (6)**
61:9;62:11,15,23;
64:3,14
**supervisor (2)**
99:14;114:7
**supposed (15)**
20:23;45:6;54:21;
55:20;108:11,12;
112:10;123:19;125:11;
141:4,18;158:20;
162:21;186:18;200:6
**sure (103)**
7:2;9:8,10,23;11:7;
14:14;15:2;19:16,17;
21:4,4;22:6,9,10,11;
38:6;41:25;42:12;
45:17;50:19;61:10;
70:1;71:13;78:8;82:13,
15;84:24;86:16;87:20;
89:17;95:17;96:21,23;
97:5;99:17;100:7,9,16;
101:7;102:1;104:20;
105:23,25;106:2;
108:15,17;109:1;
110:11;113:18;114:15;
115:6;116:16;123:18,
18,21,25;126:16;
138:16,20;141:21,24;
143:1,2,23;146:16,20,
24;147:11,13;148:5;
149:20;152:7;155:3;
158:7;160:10;164:20;
167:15;168:9;171:2,3;
172:18;173:4,15;
176:10;177:6;178:10;
186:18,21,22;189:15;
193:15;198:6;200:19;
201:16,21;206:24,24;
208:16;212:21;218:21;
221:17;222:5;225:24
**surprise (2)**
53:21,24
**suspicion (1)**
116:20

**swear (1)**
7:13
**switched (1)**
37:9
**switching (1)**
164:6
**swore (1)**
38:18
**sworn (1)**
4:3
**synopsis (1)**
209:21

**T**

**talk (13)**
10:15;19:3;76:9;
90:12;108:21;123:23;
134:7;149:24;156:13;
193:13;202:11;204:8;
215:15
**talked (20)**
42:16;47:25;51:5;
60:9;72:11,12,22;
74:23;75:23;78:4,5;
83:17;89:8;90:18;
124:21;126:6;127:1;
192:16;214:21;223:5
**talking (27)**
19:15;68:13;74:12;
75:22;78:16;103:7;
112:19;113:20;114:13;
121:17;135:18;140:10;
141:16;160:17;182:20;
193:24;202:17,20;
205:21;206:16;207:25;
212:22,23;217:21;
218:4,7;219:18
**tall (1)**
150:4
**tank (1)**
207:21
**task (1)**
182:3
**tasks (9)**
141:18;157:25;
158:11,13;186:1,11;
187:4,8;221:19
**team (2)**
218:25;219:9
**technically (1)**
74:12
**telephone (2)**
78:23;150:11
**telling (14)**
18:4;62:16;68:16;
74:11;78:17;83:13;
121:8;156:6;161:11;
182:13;184:10,15;
208:1;216:19
**tells (1)**
158:5
**ten (6)**

USDC IN/ND case 3:18-cv-00995-JD   document 203-6   filed 03/29/21   page 76 of 78

104:5;119:12;
166:23,24;169:13,15
**term (1)**
34:13
**terms (29)**
6:25;11:23;55:19;
57:7,12;58:16;60:17;
62:4;92:17;93:23;96:8,
12,13;107:2,9;110:10;
111:3,10;136:4;
158:11;159:12;163:24;
179:11;188:10;220:22;
221:1,8;222:10;223:21
**terrible (1)**
217:10
**test (2)**
34:10;91:19
**testified (21)**
4:3;24:21;34:21;
60:19;72:2;84:23;91:5;
92:3;97:19;139:21;
146:5;154:7;162:15;
164:23;193:18;195:24;
206:5;210:9;223:15;
225:7,11
**testify (3)**
12:5;13:10;71:10
**testifying (5)**
61:21;62:4;146:4;
162:17;169:19
**testimony (28)**
7:9,16;9:6,10;11:8;
13:4;44:16;67:21,24;
71:1;82:16;87:8;93:14;
95:11;110:12;143:11;
153:8;156:10;161:2;
172:21;174:1;176:11;
184:7;191:15;193:19;
194:10;208:5;220:16
**tests (1)**
100:8
**Texas (3)**
32:4;33:14;212:24
**texted (1)**
73:24
**texts (1)**
83:5
**Thanks (1)**
67:2
**Thanksgiving (2)**
43:6,7
**Theirs (1)**
95:16
**Thereafter (1)**
213:4
**thinking (1)**
222:16
**though (3)**
88:1;116:16;221:21
**thought (3)**
39:12;60:15;89:4
**three (25)**
74:24;75:12,16,20;

76:7;77:15,24;78:1;
89:13;103:12;104:16;
105:14;140:19;142:21,
25;143:13,22;148:1,12,
19;157:21;158:16;
161:3;186:15;188:20
**thrown (1)**
52:2
**ticket (2)**
44:5,9
**tied (1)**
139:13
**till (1)**
39:3
**timeline (7)**
19:17;24:20;145:8;
190:12;193:5;197:3,8
**times (27)**
10:14;22:15;30:19;
42:9;100:8;102:25;
103:2,6,7,8,10,11;
104:13;105:20;114:22,
23,25;115:12;117:4;
118:20;137:1;140:14,
20;159:4;180:16;
191:14;192:4
**timing (1)**
61:11
**Timothy (2)**
32:6,9
**today (39)**
5:24;6:9;7:1,9,15;
8:6;9:6;11:14;12:8,25,
25;13:5,11;20:23;
22:25;45:6;52:24;
54:19;61:22;71:20;
78:6;79:22;81:17;83:7,
16;84:8;112:22;113:4;
120:11;145:24;176:12;
181:20;182:12;186:4;
201:9;223:8,14;
225:11;226:2
**together (16)**
19:5;30:11,15;42:6,
7,10;52:14;82:18;
104:16;146:24;148:19,
20;158:16;163:17;
204:12;218:7
**told (70)**
20:22;21:9,18;25:9,
10;36:4;42:25;45:4,13,
15;47:3,15;52:5,24;
60:11;62:25;68:4,4;
69:9;73:23;74:22;
77:24;79:17;82:4,25;
84:10,13;86:14;107:7,
22;112:23;113:12;
114:2;121:2;134:3;
150:14,21,24;155:24;
156:2;158:23;162:8;
181:24;182:2;186:12;
190:16;192:16,24;
193:7;198:9,12;

199:14,23;200:21;
201:7;206:6;207:20;
208:6,7,8;210:4,10;
213:13,22;214:23;
215:1;216:24;221:12,
13;224:1
**took (19)**
67:11;101:19;102:9;
109:11;116:19;123:13;
129:25;149:11;155:16;
156:6;169:18;173:7;
186:6;187:10;198:1;
216:2;221:9;224:3;
225:6
**top (2)**
109:9;143:1
**topic (1)**
110:13
**topics (1)**
107:19
**touched (2)**
90:10;125:18
**touching (1)**
125:23
**towards (8)**
90:14;146:18;153:2;
154:19;164:3;171:12;
183:13;212:18
**town (3)**
13:16;57:6;58:18
**track (1)**
85:20
**train (3)**
45:9;96:20;128:20
**trained (14)**
33:18,25;96:13,14;
98:1;107:2,19;108:5;
110:9;125:25;126:25;
133:24;138:1,6
**trainee (1)**
117:5
**trainer (1)**
133:5
**training (102)**
33:1,4,7,9,14,15;
34:2,4;91:25;92:1,11,
17,21;93:2,4,20,23,25;
94:4,6,12,17,21;95:3,5,
13,25,25;96:8,12;
97:16,20,23,24;98:9,
10,13,18,21,23;99:2,7,
10,15,20,23,24,24;
100:4,13,23;101:6,12,
15;102:15,19;106:4,6,
8,18,19,22;107:1,8,25;
110:8,13,14,17,19,21;
111:3,4,10;112:2,7,9;
119:9;125:4,5;126:9;
127:3,10;129:22;
130:9;133:15,21;
134:8,10,14,19;135:9,
12;158:24;200:1,7,10;
211:1,22;212:5,7,9

**transcript (7)**
9:3;11:9;13:20;
31:20;224:23;225:12,
15
**transcription (1)**
225:5
**transition (1)**
101:15
**transitioned (2)**
100:22;212:5
**transitioning (1)**
86:10
**traveling (1)**
55:15
**treated (2)**
95:24;215:10
**trickier (1)**
10:4
**tricky (1)**
199:22
**tried (3)**
77:2;112:15;190:17
**tries (1)**
125:21
**trouble (1)**
145:22
**true (6)**
21:21;179:23;180:1;
206:8,12;210:10
**trust (1)**
225:13
**truth (3)**
198:10,12;210:11
**truthful (4)**
7:15;9:9;13:3;
173:17
**truthfully (1)**
13:10
**try (20)**
10:16;20:18,24;44:3;
48:17;51:1;55:20;56:7;
59:5;76:17;85:15;
134:5;146:17,19;
172:7;180:10;186:7,9;
199:25;224:7
**trying (35)**
20:17;23:6,20;27:25;
41:11;47:13;48:19,21;
49:12,14,18;75:9;
78:17,18;79:8;85:15;
87:15,22;88:9;115:3;
117:6;141:22;142:17,
25;147:8;148:4;176:9;
186:16,21;187:23;
188:2,5,21,24;198:6
**turn (1)**
90:14
**turned (4)**
29:12,12,14;130:18
**turns (1)**
167:21
**TV (1)**
218:18

**TVs (1)**
218:22
**two (26)**
17:24;68:7;69:11;
72:1;99:12;102:21;
103:8,10,11;105:14;
117:2,3,5;118:23,23,
25;121:9;132:4,6;
133:2;140:19;148:1;
167:14;170:8;191:14;
213:24
**type (3)**
99:2;126:8;212:19
**typical (1)**
139:19

## U

**ultimate (1)**
222:5
**unable (1)**
39:14
**uncertainty (1)**
85:5
**unclear (1)**
22:9
**under (4)**
7:9;55:7,11;119:12
**Understood (32)**
37:11;40:17;41:25;
42:7;44:13,15;45:17;
50:19;67:24,25;93:14;
95:11;97:9;100:7,17;
104:20;109:1;133:14;
136:25;139:7;148:11,
18;154:23;156:9;
161:2,11;164:23;
181:4;184:6;199:24;
200:25;210:18
**unit (7)**
18:21;21:17,19;
44:20;218:25;219:9,14
**unless (1)**
74:7
**unlike (1)**
11:15
**unlock (6)**
134:12,16,23;
177:25;181:6;184:25
**unlocking (2)**
132:22;133:11
**unnatural (1)**
10:13
**up (105)**
6:16,18,19;17:25;
18:13,19;19:24;20:1,2,
3;21:23;25:13;34:5;
36:2;42:12,22;43:17;
44:6,8;48:19;51:6;
53:19;54:21;57:15;
59:19,20;81:19;84:19,
25;86:1;88:21;89:15;
100:20;107:21;121:19;

DENISE DWYER, et al. v.
RON NEAL; et al.

Cause No. 3:18-cv-00995-JD-MGG

PROMISE BLAKELY
January 15, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 77 of 78

123:4,7;124:1,2;
131:11;133:25;134:4;
139:13;144:18;148:10;
149:13,19;150:14;
154:15,17;158:9;
161:19;174:22;175:10;
176:1,16;178:9,23;
179:1,5,21,25;180:4,6,
8,17;181:5,10,14,21,
23;182:5,7,9,13;184:6,
10,16,18;186:16;189:4,
7;190:23,25;191:4,8,
11,12,15,18,22;193:8,
18,22;196:11;201:10,
12;204:23;208:3;
209:10;211:5;221:23;
222:20;223:9,17

**update (1)**
80:25

**updated (1)**
88:23

**upfront (1)**
31:15

**upon (4)**
94:3;132:8;201:11;
217:6

**upset (4)**
42:23;85:12;114:12;
221:25

**upstairs (2)**
161:18;193:12

**up-to-date (1)**
86:2

**use (10)**
6:10,22;20:17,21;
21:14;23:7;46:13;
49:22;51:2;93:10

**used (2)**
93:2;99:12

**using (6)**
8:25;10:21;21:10,22;
88:6;115:3

**usual (1)**
151:19

**usually (6)**
59:1;142:21,22;
143:17;144:9,12

**utmost (1)**
6:13

**V**

**vague (3)**
96:16;156:24;173:11

**vaguely (3)**
156:25;170:11;
175:16

**Valpo (1)**
38:3

**variation (1)**
198:19

**variety (2)**
99:16,17

**various (2)**
42:9;218:11

**verbally (1)**
128:25

**versus (3)**
158:21,25;206:16

**vicinity (1)**
178:20

**video (23)**
5:14,15;9:1,3;15:8;
67:8;157:12;161:24;
162:23;163:9,10,15,16,
20,22,25;164:10;
172:16,20;173:10,19,
20;204:12

**video-record (1)**
8:25

**video-recorded (1)**
197:19

**view (3)**
164:8;174:11;189:21

**views (1)**
200:25

**visible (2)**
183:22;184:2

**visited (2)**
79:5;84:2

**visiting (1)**
16:16

**visually (1)**
174:21

**volume (3)**
159:23;160:20,22

**W**

**Waffle (2)**
59:12,14

**wait (5)**
30:5;43:24;44:1;
103:17,17

**waited (1)**
155:5

**waiting (1)**
101:23

**waive (2)**
225:17,22

**waived (1)**
226:10

**waiving (1)**
225:10

**walk (3)**
138:14;145:7;219:12

**walked (3)**
121:20;138:12,15

**walking (2)**
116:9;138:10

**walks (3)**
158:4,7,8

**walk-through (1)**
123:17

**walk-throughs (1)**
116:10

**wall (5)**
98:21,23,25;100:23;
212:11

**wallet (1)**
46:22

**wand (1)**
141:16

**wants (1)**
201:16

**Washington (1)**
15:10

**watch (4)**
120:4;121:2;204:11;
213:21

**watched (9)**
93:1;153:3;163:14,
16,22;164:8,9,10;
172:16

**watching (4)**
109:16;119:10,16;
164:11

**Watson (5)**
150:5,7;202:21;
203:2;207:8

**way (33)**
6:19;9:16;10:9,13;
12:22;13:9;71:21;75:8;
83:16;116:7,16;
117:12;126:12,24;
134:25;136:22;137:3,
22;140:10;143:21;
149:13,21;162:20;
168:18;169:1;171:2,3;
172:25;215:9,12,24;
216:7;222:7

**ways (2)**
135:13,20

**Wednesday (1)**
73:14

**week (6)**
16:13,14;99:11;
118:20,24,25

**weekends (1)**
32:19

**weeks (4)**
98:14,17;102:18;
151:15

**weird (1)**
59:17

**welfare (1)**
27:3

**weren't (3)**
160:13;161:25;
166:16

**west (3)**
17:11,12,16

**whatnot (2)**
21:17;74:14

**What's (20)**
24:12;28:25;29:1;
32:5;49:24;57:1;60:14;
76:16;86:19;138:22;
142:13;146:11;150:15;

162:11;166:20;168:12;
180:7;192:7;203:7;
225:10

**Whenever (2)**
165:12;197:8

**whereabouts (2)**
83:21;84:6

**wherever (3)**
57:14;197:7,9

**whoever's (1)**
51:2

**whole (3)**
84:22;128:3;186:24

**who's (4)**
22:19,20;54:17;
136:22

**whose (1)**
72:5

**wife (1)**
82:25

**WiFi (3)**
20:17;50:17,23

**Willie (1)**
15:9

**willing (12)**
45:11;53:11;80:9,10,
17,17,21,25;81:4,24,
25;88:23

**willingness (1)**
90:12

**Winchester (2)**
59:11,22

**window (1)**
159:10

**windows (3)**
159:9;164:15;167:23

**winter (1)**
43:11

**wiser (1)**
48:23

**wish (3)**
216:8;223:3;225:3

**within (3)**
33:17,23;200:23

**without (10)**
10:22;44:13;48:10;
79:11;80:5;88:11;
116:19;142:6;200:3,12

**witness (22)**
4:2,5;5:25;31:12;
32:9;36:19;55:7;66:14;
67:5;76:22;103:19;
126:21;201:21;206:1;
210:1;214:12;220:10;
224:19,24;225:18,22;
226:6

**woman (1)**
26:10

**women (2)**
146:18,19

**Woodland (8)**
18:12;20:8;27:2,12,
13,24;37:21;38:10

**Woodman (1)**
27:11

**word (3)**
171:6;198:17,23

**words (2)**
10:21;135:17

**work (42)**
9:22;25:10,11,18;
26:14;55:19,20;57:4,
11,13;64:10,22;80:18;
82:11;90:20;92:4,8,15;
93:19;94:6;101:13;
115:1;118:7,14;
120:22;121:21;122:2;
127:5,25;130:18;
140:17;143:22,23;
148:19;151:22,24;
165:23,25;166:12;
175:21;213:22;214:1

**worked (41)**
36:10,12,14,15,24;
37:1,3,5,7;56:17;
90:15;91:5;92:24,25;
99:14,16;103:1;104:1,
13,15;105:12,14;
106:1;118:7,10,15,16,
23;119:4;123:14;
125:8;127:16;128:3;
133:7;139:21,24;
142:10;157:21;166:3,
4,10

**worker (1)**
113:21

**workers (2)**
113:14,20

**working (54)**
19:23;22:19,20;
24:22,25;25:3;26:16,
17;31:16;34:22;35:7,
19;36:7,12;37:9,10;
40:24;49:1,6,7,11;
50:14;54:14;55:21;
56:7;63:24;92:3;96:5;
97:9,13;98:15;100:22;
101:7,9,15;102:15,22;
103:3,5;104:10;105:1,
3,22;106:2;113:10,15;
123:8;128:2;138:18;
142:23;146:24;168:24;
169:24;180:25

**works (3)**
65:25;66:1,6

**world (1)**
223:3

**worry (1)**
222:13

**worse (2)**
44:1;157:2

**Wow (2)**
41:3;140:13

**wrist (1)**
138:19

**write (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD    document 203-6    filed 03/29/21    page 78 of 78
Cause No. 3:18-cv-00995-JD-MGG
PROMISE BLAKELY
January 15, 2021

205:12
**writing (3)**
204:23;205:11,18
**written (8)**
8:22;10:7;125:5,25;
126:5,13,25;205:22
**wrong (1)**
83:21
**wrote (3)**
206:11,15;223:22

**Y**

**year (4)**
19:7;33:10,11,12
**years (12)**
47:19;103:4;111:23;
117:10;126:4;127:7;
163:23;177:8;205:21;
206:17;216:6;220:4
**yell (5)**
171:20;172:12;
174:3;175:5;176:14
**yelling (13)**
136:9,9,21;137:3,22;
169:8;171:6;172:4,5;
180:15;193:12;196:4,
11
**yesterday (1)**
54:20
**young (2)**
48:18;215:19
**youngest (1)**
103:5
**Youth (5)**
45:3;46:7,8;86:12;
88:16

**Z**

**Zoom (2)**
9:1;67:8

**0**

**0219 (3)**
46:18;47:17;73:13
**04-09-1998 (1)**
29:3

**1**

**10 (1)**
66:19
**10:00 (3)**
54:23;141:1;155:18
**10:15 (1)**
55:16
**100 (2)**
182:13;196:16
**10-4 (1)**
203:18
**10-71 (5)**

203:12,19,20;
206:20,22
**11:30 (1)**
65:24
**11:45 (1)**
66:24
**12 (1)**
64:4
**1200 (1)**
59:22
**13 (1)**
16:5
**13th (2)**
15:4;38:18
**15 (4)**
55:11;66:19;166:23,
24
**1-5 (1)**
31:11
**15th (1)**
38:18
**16 (3)**
31:12;46:8;50:1
**17 (4)**
29:12,13,14;213:2
**1711 (1)**
26:2
**1750 (1)**
23:14
**18 (4)**
29:12;60:10;103:4;
157:1
**18-CV-995 (1)**
63:21
**18-year-old (1)**
103:2
**19 (1)**
60:10
**1998 (2)**
29:4,6
**19th (1)**
54:22

**2**

**2:10 (1)**
169:14
**20 (7)**
66:23;118:1,2,2,3,9;
119:11
**2015 (4)**
29:8,9,21;31:11
**2016 (5)**
31:8,9,10,23;35:14
**2017 (48)**
18:5;19:20,20;25:15,
16,18;28:22;29:21;
35:19,20;51:6,12,14,
21;60:20;61:14;62:6;
69:21,22,23;70:1,3,23;
71:8;90:22,25;91:6,22;
101:20;102:10,23;
104:9;113:2;119:4;

129:25;130:7;132:1;
142:3;143:25;148:24;
152:4;159:19;167:4;
170:20;179:19;212:1;
213:10;214:22
**2018 (16)**
18:14;20:7,7,11;
28:9,11;37:22,22;
38:15,16;39:5,8;61:25;
68:14;69:25;71:4
**2019 (7)**
18:14;41:13,17;
43:12,12;64:4;69:25
**2020 (15)**
14:22,25;16:5;43:10,
13,16,16;51:22;73:11,
14;78:22;79:4,13;83:9,
14
**2082 (1)**
64:14
**21st (2)**
82:23;84:3
**24 (1)**
73:10
**25 (1)**
46:8
**26 (1)**
73:14
**27 (1)**
212:1
**2B (1)**
64:14

**3**

**3 (1)**
31:10
**3:34 (1)**
226:12
**30 (4)**
138:25;139:3,6;
140:6
**3000 (1)**
203:21
**30th (1)**
43:7
**312-785-8463 (2)**
45:22,23

**4**

**4 (3)**
55:11;219:23,25
**404-820-0219 (2)**
45:8,19
**46360 (1)**
14:8
**4X15 (1)**
55:8

**5**

**5 (1)**

14:22
**500 (45)**
145:25;174:19;
176:1,17,25;177:2,14,
20,24;179:21,25;180:4,
17;181:5,10,14,15,22;
183:5;184:3,6,16,18,
24;186:8;189:4,20;
191:16,17;192:12;
193:8,19,22;196:11;
198:19;199:1,7,12;
201:10;207:5;208:3,
12;222:20;223:9,17
**500s (1)**
153:1
**540 (6)**
153:9,14,18,18;
194:7,13
**5th (6)**
14:12,19,19,20;15:3;
44:12

**6**

**6:00 (6)**
128:1,1;139:22,22;
142:10,11

**7**

**7 (14)**
14:25;102:23;104:9;
113:1;132:1;142:3;
143:25;148:24;152:4,
20;159:18;167:4;
170:20;214:22
**7th (9)**
14:12,13,21;16:11;
44:11;82:25;102:9;
111:1;152:17

**8**

**813 (1)**
23:13
**8th (1)**
205:13

**9**

**9 (4)**
29:6;35:19,20;90:22
**9:00 (6)**
137:21;141:1;
153:19;155:18;156:7;
160:4
**914 (1)**
14:7
**98 (1)**
63:20
**9th (5)**
28:7,8;90:25;91:22;
92:1