**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*KENNETH GANN*
*July 24, 2020*
*Cause No. 3:18-CV-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 07-24-20 KENNETH GANN.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 2 of 51

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the )
ESTATE OF JOSHUA DEVINE, )
)
          Plaintiff,    )
)
vs.                     )  Cause No.
)  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,      )
)
          Defendants.   )
_____)

The Videoconference Deposition of KENNETH GANN

          Date:    Friday, July 24, 2020

          Time:    9:07 o'clock a.m.

          Place:   Via Zoom

          Called as a witness, by the Plaintiff, in
          accordance with the Federal Rules of Civil
          Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

Page 2

APPEARANCES:

MEGAN PIERCE, ESQ.
SAM HEPPEL, ESQ.
          Loevy & Joevy
          311 North Aberdeen Street
          Chicago, Illinois  60607
          PHONE:  (312) 243-5900
          FAX:    (312) 243-5902
          megan@loevy.com
          sam@loevy.com

On Behalf of the Plaintiff;

BENJAMIN ELLIS, ESQ.
          Office of the Attorney General
          Deputy Attorney General
          Civil Litigation
          302 West Washington Street
          IGCS Fifth Floor
          Indianapolis, Indiana  46204
          PHONE:  (317) 232-6201
          FAX:    (317) 232-7979
          benjamin.ellis@atg.in.gov

On Behalf of the Defendants.

Page 3

THE VIDEOCONFERENCE DEPOSITION OF KENNETH GANN

DIRECT EXAMINATION
    By Ms. Pierce.......................... Page    5
CROSS EXAMINATION
    By Mr. Ellis.......................... Page 138

          E  X  H  I  B  I  T  S
PLAINTIFF'S          MARKED      IDENTIFIED
Exhibit No. 1          88           89
Exhibit No. 2         118          118

NOTE:  Plaintiff's Exhibit Nos. 1 and 2 were
retained by Attorney Pierce.

*  *  *

Page 4

          MS. PIERCE: Before we swear in the witness, the parties just need to stipulate for the record that the parties will not object to a swearing in of the witness over Zoom for admission of his testimony.

          MR. ELLIS: Did you say for the admission of his testimony?

          MS. PIERCE: Yes.

          MR. ELLIS: We don't object to swearing him in over Zoom, but we reserve the right to object to use of his testimony consistent with federal rules.

          MS. PIERCE: Sure, sorry.  I mean the admission of his testimony being done and swearing in of the witness over Zoom.

          MR. ELLIS: Oh, yes, no objection.

          MS. PIERCE: Okay, great.  So the parties agree.

          KENNETH GANN, called as a witness, by the Plaintiff, having first been duly sworn, was examined and testified as follows:

          THE WITNESS: I do.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 3 of 51

Page 5

DIRECT EXAMINATION

BY MS. PIERCE:

Q    Mr. Gann, could you please state and spell your name for the record?

A    My name is Kenneth Gann. It's G-A-N-N. I'm the deputy warden at the Westville Correctional Facility at this time.

Q    Okay. Thank you. Mr. Gann, my name is Megan Pierce and I represent the plaintiff in this matter.
     Have you ever participated in a deposition before?

A    No.

Q    I'm just going to go over the rules of a deposition, which is going to be especially important since we're doing this over Zoom. So, first, please keep your answers verbal and audible. So make sure to speak loudly, and instead of shaking or nodding your head, make sure to say yes or no.
     And this one is for both of us, I'll make sure to let you finish your answer as best I can before asking another question, and I just ask that you make sure to let me finish my question before answering so that we can

Page 6

allow the court reporter to clearly take down both of our testimony. Is that okay?

A    Okay.

Q    All right. And then I'll try my best to ask clear questions, but sometimes they might not be as clear as I would like. So if you don't understand what I'm asking, please ask for clarification and I'll be happy to reword my question. If you don't ask for clarification, I'll assume that you understand my question. Is that fair?

A    Yes.

Q    And then, your attorney may object, but you can still answer the question unless he instructs you not to. And then, if you need to take a break at any point during the deposition, that's fine. We can definitely take a break. I just ask that you answer any questions that are pending before we take a break. Okay?

A    That's fine.

Q    Mr. Gann, do you have any conditions that might affect your ability to provide truthful and accurate testimony here today?

A    No.

Page 7

Q    Are you taking any medication that might affect your ability to provide truthful and accurate testimony here today?

A    No.

Q    Is there anything else that might affect your ability to provide truthful and accurate testimony here today?

A    No.

Q    Did you review any documents to prepare for this deposition today?

A    No.

Q    Okay. Did you speak with anyone to prepare for this deposition today?

A    I spoke to my attorney.

Q    Okay. Did you speak to anyone other than your attorney?

A    No.

Q    Okay. Mr. Gann, when did you learn about this lawsuit?

A    Well, two years ago I want to say.

Q    And how did you learn about this lawsuit?

A    I received the court documentation to where the State's got to represent us and I signed for it.

Q    Okay. Have you spoken with anybody besides

Page 8

your attorneys about this lawsuit?

A    No.

Q    Okay. Have you spoken with your family or friends about this lawsuit?

A    Besides stating that I'm being sued, no.

Q    Okay. Have you spoken with any of the other defendants in this case about this lawsuit?

A    I spoke to Mr. Neal.

Q    What was the substance of your conversation with Mr. Neal about this lawsuit?

A    Asked him if he was being sued like I was.

Q    Okay. Is there anything else you discussed?

A    No.

Q    Did he make any comments about the lawsuit?

A    As far as what? Would you mind clarifying? He made a comment as far as -- I'm sorry, I interrupted you. He made the comment that it's part of our job, which we all know it is.

Q    Okay. So what do you --

A    We get sued all the time, ma'am.

Q    About how many times have you been sued?

A    30 times.

Q    Okay. Have you ever been found liable by a jury in any of those instances?

A    No.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 4 of 51

Page 9

Q    Have you -- have any other cases ever been settled against you?

A    I have no idea.

Q    Have you ever been at a trial before, a witness at a trial?

A    No.

Q    Have you ever been a plaintiff in a lawsuit before?

A    Clarify.  Plaintiff is the person that's been sued?

Q    The plaintiff is the person who is doing the suing.

A    No.

Q    Have you ever been a defendant in a criminal action before?

A    No.

Q    Okay.  Mr. Gann, I'm going to use the term independent recollection, and what I mean by that is what you actually recall as you sit here today without the aide of any documents or anything else that you may have reviewed in preparation for this deposition.  Do you understand that definition?

A    Yes, I do.

Q    Do you have any independent recollection as

Page 10

you sit here today of Joshua Devine?

A    Mr. Devine was parked on B-cell house at Indiana State Prison on April 7, 2017.

Q    Do you know anything else about Mr. Devine?

A    No.

Q    Did you ever have any interactions with Mr. Devine personally?

A    I'm sure I did.  I mean, when you're dealing with about 2,000 offenders, I'm sure I met him.  But to say that I can recall, no.

Q    Okay.  Do you have any independent recollection of the April 2017 fire?

A    Except for Captain Dykstra called me the evening of April 7th and informed me there was a fire on B-cell house.  I advised him I had been out of work since 4-5 with back problems and I advised him to call the warden.

Q    Okay.  So you were out from the period of -- was that April 5th?

A    Yes.

Q    Until when?

A    4-20.

Q    Okay.  So you were out for just 15 days?

A    20 days, the weekends.  20 days total.

Q    Okay.  Who was the -- I'm sorry, go ahead.

Page 11

A    Sorry, you're right.  It is 15 days.

Q    And who was covering your position while you were out?

A    It really was nobody covering.  I was on sick leave.  I mean, the warden was the warden.  He was in charge.

Q    Okay.  So beyond that call, do you have any other independent recollection of the April 7, 2017 fire?

A    No.

Q    What else did Captain Dykstra say to you on the phone?

A    That was it.  There was a fire and I advised him I could not get out of my couch, call the warden.

Q    Around what time did he call you?

A    I want to say it was around 10:00 in the evening.  I don't know the exact time.

Q    And about how long was that conversation?

A    A minute and a half.

Q    Do you have any independent recollection of any conversations you had about the fire beyond that one?

A    No.

Q    Did you speak with anybody about the fire in

Page 12

the days following the fire?

A    No.

Q    Do you have any independent recollection of any investigation into the April 7, 2017 fire?

A    I can tell you I know there was an investigation, but after I came back to work on the 20th, I was there a week and then I was off for the following two and a half months for my back issues.

Q    Okay.  Beyond there being an investigation, do you recall anything about it?

A    No.

Q    Okay.  Mr. Gann, did you graduate from high school?

A    Yes.

Q    What year did you graduate from high school?

A    1987.

Q    And what city did you go to high school in?

A    Hammond, Indiana.

Q    Okay.  And after you graduated from high school, what did you do?

A    I worked at odd jobs until I joined the military in 1982.

Q    Okay.  And what were those odd jobs?

A    I worked at the Goldblatt's, I was a

DENISE DWYER, et al. v.
RON NEAL, et al.

Page 13

bartender, I was a carpet salesman.

Q    Okay.  Were you ever fired from any of those positions?

A    No.

Q    When you joined the military in 1982 which branch of the military did you join?

A    United States Army.

Q    What was your rank?

A    E-4.

Q    Okay.  How long were you in the Army?

A    Until 1987.

Q    Okay.  And what rank did you leave the Army in in 1987?

A    E-4.

Q    Okay.  And was your -- what were the circumstances of your leaving the Army?

A    I got tired of it.

Q    So were you honorably discharged?

A    Yes, I was.

Q    Okay.  And why did you get tired of the military?

A    I did five years.  I served my country.  I decided to come back home with my parents.

Q    Okay.  And what did you do when you came back home?

Page 14

A    Got a job with the Indiana Department of Corrections.

Q    Okay.  And what was the process for getting that job?

A    The unemployment office put in my application, I had to come out here to get an interview, and then started when they selected me.

Q    Okay.  And what was your position when you started with ISP?

A    Correctional officer.

Q    Which facility did you work at?

A    Westville Correctional Facility.

Q    What were your job responsibilities at Westville as a correctional officer?

A    I was a dorm officer.  I worked our segregation unit.  I worked the perimeter.  I was multi-tasked, so I did any job they asked me to do.

Q    Okay.  And how long were you a correctional officer at Westville?

A    Approximately, five years.

Q    Okay.  And then what did you do after that?

A    I was promoted to correctional sergeant.

Q    Still at Westville?

A    Yes.

Page 15

Q    And how long were you the sergeant at Westville?

A    Approximately, six or seven years.  I'm not sure exactly.

Q    And what were your job responsibilities as sergeant?

A    I ran a PC unit, which is the protective custody unit, I ran dorms, I ran the segregation unit, and I ran the yards.

Q    Okay.  And after you were the sergeant at Westville, what did you do next?

A    Correctional lieutenant.

Q    Still at Westville?

A    Yes.

Q    And how long were you the correctional lieutenant at Westville?

A    Probably 12 years, roughly.

Q    Okay.  And then what did you do?

A    Became a correctional captain here at Westville.

Q    And how long were you the correctional captain?

A    I can't tell you how long, but I think until 2010, so.

Q    What were your job responsibilities as a

Page 16

correctional captain?

A    I managed shifts.  I was the lead captain at one time.  I ran a complex.

Q    Okay.  And what did you do in 2010?

A    I was promoted to major at the Indiana State Prison.

Q    Okay.  And why did you switch facilities?

A    Because the promotion was there.

Q    Okay.  And how long were you a major at Indiana State Prison?

A    Approximately, five and a half years.

Q    So about 2015?

A    Sounds right, yeah.

Q    And then what happened after that?

A    I was promoted to deputy warden at the Indiana State Prison.

Q    Okay.  And how long were you the deputy warden?

A    Until I was moved in 2017.

Q    Okay.  Why were you moved in 2017?

A    Because I was told to.

Q    Did they give you any reason for why you were being moved?

A    No.

Q    Did you ask about why you were being moved?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 6 of 51

Page 17

A    No.  You don't ask.

Q    Okay.  Where were you moved to?

A    Westville again.

Q    Who took over your position at ISP?

A    George Payne.

Q    And did you take over a vacant spot or did you -- or was somebody else transferred for you to go --

A    No, they flipped me and George Payne for that.

Q    Okay.  And you didn't have any other reason -- any idea of why they did that.

A    No.  Administrative needs is what I was told.

Q    Okay.  And you're still the deputy warden at Westville?

A    Yes, ma'am.

Q    What were your duties as deputy warden at Indiana State Prison?

A    My duties were over custody, I was over maintenance, assuring the safety and security of the institution were done.

Q    Can you explain to me a little bit more what you did regarding custody?

A    Made sure the shifts were manned, made sure my major did his rounds, made sure that -- am I speaking too fast?  I'm sorry.  Just assure

Page 18

that normal operations were done, I guess.  Like I said, with custody it's more keeping the staffing levels the same level in all four groups.

Q    And what are the four groups?

A    What are they?

Q    Yes.

A    The groups are H, I, J, and K.

Q    And did you have any issues with staffing at ISP?

A    Did I have issues?  It was always sometimes hard to keep people.  It still is in the department because this job isn't made for everyone.

Q    When you say it's hard to keep people, are you ever understaffed because you don't have enough people?

A    No, I don't believe so.  I mean, we have to adapt to situations, but, no.

Q    Has staffing ever created a safety risk at Indiana State Prison while you were the deputy warden?

A    No.

Q    Okay.  Were you ever concerned about staffing levels?

Page 19

A    I'm concerned every day in my business.

Q    Okay.  That's not quite my question.  Were you ever concerned that you had inadequate staffing levels at Indiana State Prison?

A    Concerned, yes.

Q    Okay.  And why were you concerned?

A    Because when you have a lot of terminations, a lot of people quit, it takes a while to get them back online.  So when you lose 12 people, it's going to take you almost two months to get those 12 back online.  So that takes training, and everything else, to get them back online.  A person can't just come off the street and start working as a correctional officer.  They have to be properly trained.  So that would be the time I'm concerned for.

Q    Okay.  So you're sometimes concerned that staff -- there's not enough adequately trained staff?

A    I don't like the way you're putting it.  I guess I would say I'm not concerned on the -- are you trying to say because I have a lack staff?  We've always managed with what we have.

Q    Okay.  And I just want to understand because

Page 20

you said you sometimes have concerns about staffing, so I just want to understand exactly what those concerns are.  So I appreciate you correcting my characterization of it.

So do you ever feel like you do not have enough adequately trained staff or fully trained staff to run a shift?

A    No.

Q    What is the training process for new staff?

A    They go through an OJT process.  I mean, it's like almost a five or six-week class.  They do OJT.  The training is done, but there's three different tiers that they're trained at.  I don't fully know the breakdown.

Q    Okay.  So what were your responsibilities as deputy warden with regard to maintenance at ISP?

A    Maintenance would be I made sure that the maintenance department did their work orders, made sure that they had enough employees, made sure the buildings and the concerns were done.

Q    Okay.  And how did you -- tell me a little bit more about how you did that.

A    I dealt with the PPD, the physical plant director, and made sure that he kept on his

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 7 of 51

Page 21

work orders and his people on his staff.

Q And how did you do that?

A By talking to him, by observing, by going on rounds.

Q Okay. Were there any -- what were the most significant maintenance issues or the frequent maintenance issues at ISP?

A Probably the water.

Q And what was wrong with the water?

A There was nothing wrong with the water. It's just that we had some plumbing issues when I first got there. We got them corrected. There was a lot of changes done inside the prison to make the water a better flow.

Q Okay. So there was some issues when you started with the flow of water and the plumbing?

A Yeah.

Q Okay. And what sort of issue was that? Was there leaking, was there not water flowing?

A It was leaking.

Q Anything else?

A No.

Q Okay. Besides water, plumbing issues, what other frequent maintenance issues were there

Page 22

at Indiana State Prison?

A It's like any prison. I mean, we all have maintenance. You're talking about light bulbs, you're talking about things come up, the kitchen, the crew. If it breaks down, you get them fixed. If the boilers would break down, you got them fixed. We had a couple of steam leaks. We worked 12, 13-hour days. We got them fixed.

Q Okay. And who would do most of the maintenance work? Was it outside folks, was it staff, was it prisoners?

A It was staff with offenders, and there was also some things that were beyond their scope and was done by outside crews.

Q Okay. Do you remember any problems with the electrical system at Indiana State Prison?

A No.

Q You don't remember any problems with the electrical system?

A No.

Q Okay. Were there any problems with electrical outlets at Indiana State Prison?

A Not that I'm aware of.

Q Okay. If a prisoner had a maintenance issue

Page 23

that they wanted to flag, how would they do that?

A They would talk to the officer on the dorm or the sergeant or even the lieutenant. They'd get a work order on anything that dealt with their cell and/or area that they lived in.

Q Okay. So they would just orally report it to someone or was there some sort of written mechanism to --

A They would report it to -- I'm sorry, didn't mean that. They would report it to the sergeant, the officer. They would have a work order put in to the -- I don't remember. There's a certain procedure about putting on a work order program. I don't remember what it's called because I've been down here for the last two years, but it's a work order process.

Q Okay. So just to clarify, there is no way for a prisoner to put in a work order directly. They only thing they could do is make an oral statement to an officer about a concern.

A They could put a request slip in, a pink request slip, and they could send it to somebody. I got those all the time, like my

Page 24

light bulb is having problems, things like that, and we'd get the work orders on them. So you could, but it was not the regular procedure.

Q Okay. Did that ever happen, that prisoners would put in those pink slips directly?

A When I was a major, yes, ma'am.

Q Okay. And did you ever get those directly or who would they go to?

A Yes, I got them directly as the major.

Q Okay. And how frequently would you get those?

A Probably one a month.

Q Okay. And what would they generally be about?

A My light switch is not working, my outlet is not working.

Q Okay.

A And I would get maintenance to go take care of it.

Q Okay. Did you ever get any or hear about any issues with sparking outlets?

A Probably, ma'am. I'm not going to say a hundred percent sure. I'm sure I did, yes.

Q And so what would you do when you got those slips?

A I would get maintenance right over there ASAP.

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 8 of 51

Page 25

Q    Okay.  And how would you -- would you take any steps to follow up that problem?

A    Yes, I would talk with maintenance and I would ask them what was in it.

Q    What was in what?

A    What was in the outlet.  Normally, the sparking is because they're trying to light their cigarettes, ma'am.  They would stick things in their outlets.

Q    Okay.  So this is a common issue?

A    Common issue with offenders, yes, ma'am.

Q    Okay.  About how frequently would you hear about that?

A    Once a month at least.

Q    Okay.  And you said that you would send maintenance ASAP.  Why would you send them ASAP?

A    Because I don't like sparking.  It's dangerous, ma'am.

Q    Okay.  And these maintenance requests, how long would they be kept, the records?

A    I have no idea, ma'am.

Q    Do you know where they would be kept?

A    I'd hope to say the facility.

Q    But you don't know --

Page 26

A    I don't know, no.

Q    Okay.  Did you ever file them yourself?

A    No.

Q    So what would you do with them after you had received them?

A    The actual pink slip, I would give it to the maintenance guy to make sure that they went to that cell.

Q    Okay.  And was there anybody who would sort of filter or review those slips before you?  So what I mean by that, is there someone who would get them first and then decide which ones you needed to see?

A    Besides me, no, I have no -- I mean, they would normally go to the maintenance department, to Mr. Kaufman.

Q    Okay.  So would they go to the maintenance department before they would go to you?

A    Not always.  People would write directly to me when I was the major.

Q    Okay.  But if it just was a pink slip, then it would normally go straight to the maintenance department?

A    It would depend on who they addressed it to, ma'am.

Page 27

Q    Okay.  So what is the pink slip exactly?  Is that something that people use for a lot of different things?

A    Yes, ma'am.

Q    Okay.  What specific things are they used for?

A    Oh, they'll send it for I'm not getting along with my bunk, I need a toothbrush, I need toothpaste.

Q    Okay.

A    They'd use it for a thousand things, ma'am.

Q    Okay.  So it wasn't specific to maintenance.

A    No, ma'am.

Q    Was there any sort of paperwork that was or -- let me start that again.

Was there any type of request slip that was specific to maintenance?

A    From an offender?

Q    From anyone.

A    There was the work order system.  That's what was done.  That was done by, as I explained, the sergeant and/or lieutenant.  That was on the work order system.  They would submit the work order.

Q    Okay.  Thank you for clarifying that.

A    Okay.

Page 28

Q    Is there any kind of log that's kept of the work orders?

A    I'm sure there is.  I'm not aware of where it is, but I'm sure there is.

Q    Okay.  Did you ever review the log?

A    No, ma'am.

Q    Okay.  Were there any other frequent maintenance issues at ISP?

A    There's always something, ma'am.  I guess I'm trying to think what you -- what are you exactly -- with an old place you always have issues going on, but most of them -- I mean, again, like I said, we had boilers go down, we have coolers go down.  We fix it, address it.  I'm trying to think.  I mean, there's always an issue because of people smoking.  They have a tendency to blow out their outlet because they want to put things inside so they can light their cigarette, so we had to stay on it.  It was an everyday process.

Q    Okay.  So was a part of your job to keep track of like trends in maintenance issues or to try to come up with, you know, systematic ways to address maintenance problems, like the outlet problems that you were describing?

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 9 of 51

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

Page 29

A    No, ma'am.

Q    Okay. Was that -- did anybody have that job, to keep track of recurring maintenance problems or trends in maintenance problems?

A    My physical plant director.

Q    And who was that?

A    Art Kaufman at that time.

Q    And did you ever speak with him about any recurring problems or ways to address recurring problems?

A    No, ma'am.

Q    And did you supervise Mr. Kaufman?

A    Yes.

Q    Okay. So that was part of your job responsibility?

A    Yes.

Q    Okay. Were you generally satisfied with Mr. Kaufman's job performance?

A    Yes.

Q    Okay. So you said your main responsibilities as deputy warden related to custody, maintenance, and safety, general safety at the facility.
     Before we move on to general safety, is there anything else that was part of your

Page 30

responsibility with regard to maintenance that we haven't discussed?

A    No, ma'am.

Q    Did you take any steps to ensure that Mr. Kaufman was keeping track of recurring or trends -- let me start again.
     Did you take any steps to make sure that Mr. Kaufman was tracking and addressing recurring maintenance problems at Indiana State Prison?

A    Every day I had a meeting with him in the morning and, yes, everything that we saw that we -- I made sure that I knew of, yes, we addressed those.

Q    Okay. So tell me about your responsibilities with regard to general safety and security at Indiana State Prison when you were deputy warden.

A    Make sure the offenders were safe and secure in their cells, ma'am, that they got what they needed. What I mean is -- sorry, if I interrupted you.

Q    No, no, please go ahead.

A    What I mean by that is basically make sure that they got their base needs.

Page 31

Q    Okay. And what did you do specifically to make sure they got their basic needs?

A    Made sure that the heat ran, the electrical ran, water ran, complaints were dealt with as quickly as possible, made sure that they got their programs they wanted, made sure that they -- again, we go back to toothpaste, toilet paper.

Q    What did you do specifically to make sure that they got all of those things?

A    Making sure that the people responsible for this, made sure that they had signatures where they showed that they received them.

Q    Okay. So was that a lot of reviewing paperwork?

A    Yes.

Q    What paperwork specifically were you reviewing?

A    Basically, sign-in sheets.

Q    Okay. You mentioned making sure that they had proper heating. Can you tell me more about that?

A    Well, sometimes people wanted the heat turned on quicker than the temperature would allow. Somebody was colder than another guy.

Page 32

Q    Did you ever have problems with the heat system not working?

A    Did we have problems? Yes, ma'am. It's an old place.

Q    Okay. Did you have frequent complaints about the temperature at ISP?

A    Once we got the heat on, they were fine. It's how quick, ma'am.

Q    And so why were there delays in turning the heat on or why did people complain about delays with turning the heat on?

A    Because as some of us get older, we get a little colder quicker than others.

Q    But when was the heat -- what was necessary to turn the heat on, like what temperature levels needed to be reached?

A    Temperature-wise, I would never let nothing get under 35.

Q    Okay. 35 outside?

A    Actually, inside, because the inside was colder, so it bothered me.

Q    Okay. So if it -- you would never let the temperature get below 35 inside the facility without turning the heat on?

A    Yes, ma'am.

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND Case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 10 of 51
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

Page 33

Q   Okay. Did it frequently get to 35 degrees inside the facility?
A   No, ma'am.
Q   About how often would it get that low?
A   I have no idea, ma'am.
Q   Okay. Were there problems with radios at Indiana State Prison?
A   Which radios are we talking about, ma'am?
Q   Why don't you tell me what radios there are at Indiana State Prison.
A   There's radios offenders buy and radios that my officers use.
Q   Okay. So I'm talking about radios that the officers use.
A   Not that I'm aware of.
Q   So you never heard any complaints about issues with the radios?
A   Unless it was batteries, and stuff, no. I would get complaints, but that's because they did not change the batteries out properly.
Q   Okay. So you would get complaints about the batteries not working?
A   It would be the batteries that needed to be changed out.
Q   Okay. And what sort of circumstances would

Page 34

you hear these complaints?
A   When an officer comes in, Mr. Gann, can I get another battery.
Q   Okay. Did you ever hear about issues of radios not working when officers were trying to use them?
A   Not that I can say of, no.
Q   Okay. When they came to get a new battery from you was it because the battery didn't work at all or it was just not charged?
A   It wasn't charging properly.
Q   So it was -- it wasn't that someone had failed to charge the battery; it was that the battery itself was not charging?
A   Right. Batteries go out, ma'am.
Q   Okay. About how often would that happen?
A   Maybe twice a month.
Q   Okay. Was there a way that staff would test the battery to see whether it was charging properly?
A   The charger itself would show a light on it.
Q   Okay. So there would be no light if the battery wasn't charging?
A   Well, you would put the battery in the charger. The light would light up red if was

Page 35

charging, a solid light. If it would blink, then you knew there was a problem with the battery.
Q   Okay. And were staff instructed about this?
A   Yes, ma'am.
Q   Did you instruct them about this?
A   No, ma'am, I had a person that done it.
Q   And who was that?
A   Shemanowski (phonetic) I think was his name. He was our armor at that time.
Q   Okay. And what were his responsibilities?
A   He had the armory, he had weapons, he had batteries. He made sure that we all had flashlights and our radios.
Q   Okay. So you told him to instruct staff about the battery issue?
A   Actually, at roll call they were told by the captains about batteries. It's one of our basic skills that we get taught at training is making sure our batteries stay charged properly.
Q   Okay. So this was -- so how do you know that this was taught at the basic training?
A   At that time when I went through basic training it was taught. I can't tell you now

Page 36

because I've not been trained in 33 years.
Q   Okay. So at the time that you were deputy warden at ISP, you don't know whether or not issues about batteries were taught at basic training?
A   I would say that we'd need to talk to training. They'd have that information.
Q   Okay. But do you, as you sit here, have any knowledge about that?
A   No, ma'am.
Q   Okay. And you said that captains would tell them at roll call about their batteries. How do you know that?
A   I went to roll calls.
Q   Okay. So you heard captains inform staff about batteries?
A   Yes, ma'am.
Q   And what did the captains say about batteries?
A   Make sure your batteries stay charged.
Q   Did anybody ever instruct staff about checking to see whether or not the lights were blinking versus steady to make sure that the batteries were charging?
A   I can't say a hundred percent. So I don't know, ma'am.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC-NND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 11 of 51

Page 37

Q   Okay.  Did you take any steps to make sure that staff knew that this could be a problem?

A   No, ma'am.

Q   Okay.  Did the battery issue -- did the fact that batteries were failing about twice a month concern you at all?

A   Anytime batteries fail concerns me, ma'am. That's why we kept a very good storage of them, ma'am.

Q   What do you mean a very good storage?

A   I mean you had backup batteries because batteries fail at one time or another.

Q   Okay.  And why does it concern you if a battery fails?

A   They can't communicate to each other.

Q   And what -- does that pose any risk at the facility?

A   Well, yes, if an officer is in distress, they need their radio, ma'am.

Q   Okay.  Do you recall any problems with an officer being in distress or some other urgent issue when a radio was not working?

A   No.  The only problem I heard of is that, basically, like a person trying to call and the battery is dead and they had to go switch

Page 38

it out, is what I heard.

Q   Okay.  Would it concern you if one of the officers who responded to the April 7, 2017 fire reported that his radio was not working when he went to respond?

A   Would it concern me?

Q   Yes.

A   Yes.

Q   Why is that?

A   Because it didn't work.

Q   And so why does it concern you that it didn't work?

A   Because, just what I said before, if they needed assistance and the radio did not work, that's a concern.

Q   Okay.  Was there any other -- was there any other issue besides the battery not charging that we already discussed that would cause the radios not to work during that time period?

A   Not --

        MR. ELLIS: Objection, calls for speculation.  You can answer.

A   Not that I'm aware of.

BY MS. PIERCE:

Q   Okay.  Were any steps taken to make sure that

Page 39

batteries that were not working be identified before they stopped working?

A   Can I ask you to clarify?

Q   Yeah.  So you said you had backup batteries and people could come to you to get a battery replaced when it stopped working.
    Were there any steps taken to try to identify the batteries or radios that were not working before they stopped working -- before they were in -- let me ask this question.
    So it's a problem if a radio is not working while an officer is trying to use it; correct?

A   Yes.

Q   Okay.  Were there any steps that were taken to try to identify or fix radios that weren't working before an officer went to use them?

A   Radios or batteries?  Please clarify.

Q   Either.

A   Well, radios would be turned in when there was some kind of problem.  I mean, it went to our radio shop and if a person had to send them off to get them redone, or whatever the problem was, they'd be looked at.  Batteries, the concern would be always, and that's what

Page 40

we preached to our staff about those lights.

Q   Okay.  Did you ever receive any performance reviews while you worked at Indiana State Prison?

A   Did I?

Q   Yes.

A   Yes.

Q   Did you ever receive any negative performance reviews?

A   No.

Q   Were you ever disciplined in any way while you were working at Indiana State Prison?

A   Never.

Q   Okay.  Did you have responsibilities for disciplining staff at Indiana State Prison?

A   Yes.

Q   Did you ever discipline staff at Indiana State Prison?

A   Yes.

Q   And what reasons did you discipline staff at Indiana State Prison?

A   A lot of different reasons, unauthorized leave, failing to follow instructions.  We have a code of conduct, so there was all kinds.  Trafficking.

USDC NND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 12 of 51

Page 41

Q    Okay.  What was the process for disciplining staff?

A    If we had a recommendation, it would come to my office from a captain or any other supervisor to recommend that a staff member disciplined.  They'd come to my office, I would have a meeting with them, tell them what the charge is, and then they would tell me their side of the coin, and I would make a decision.

Q    Okay.  Was anybody else involved in that decision-making process?

A    I dealt with human resources.

Q    Okay.  And what was human resources' involvement in that?

A    In regards to what their previous discipline was, I would check exactly how much discipline they had in their career and it would show exactly what my next step would be.

Q    Okay.  Were you involved in any training of staff at Indiana State Prison?

A    No.

Q    Okay.  Did you participate in any training at Indiana State Prison?

A    As far as?  Clarify, please.

Page 42

Q    Sure, yeah.  Were you -- did you receive any training while you were at Indiana State Prison?

A    I went to my 40 hours, yes.

Q    Did you receive any additional training?

A    During my five years I've been trained.  I went to deputy warden retreats.  I went to a custody supervisor meeting.  These are all training sessions done in Indianapolis.

Q    Okay.  Did you receive any training while you were at Indiana State Prison about responding to emergencies?

A    It was part of the 40-hour training.

Q    Okay.  And what was the training relating to responding to emergencies?

A    What do you -- I need you to clarify.

Q    Yeah.  What did the training involve with regard to responding to emergencies?

A    You responded to emergencies.

Q    And that was the entirety of the training?

A    The basics.  I mean, you got to make sure your scene is safe.  You got to know what you're coming into.  I mean, sometimes you just don't know.

Q    Okay.  So what did they tell you about making

Page 43

sure the scene is safe?

A    Well, there's areas that you have to be careful of.  When you walk into a dorm or a cell house and you're opening the door and there's 20 guys waiting for you, that's not a good number to go against.

Q    Okay.  So what were you taught in training about dealing with those situations?

A    Just make sure that when the alarm was called on the radio that multiple staff was en route.

Q    And how did you do that?

A    By running to the situation you could see who was with you.

Q    Okay.  Were you taught anything else at your training?

A    Not that I can remember, ma'am.

Q    Okay.  Were you given any specific training regarding fire and fire safety?

A    No, ma'am.

Q    You didn't receive any training while you were at Indiana State Prison with regard to fire safety?

A    No, ma'am.

Q    While you were at Indiana State Prison do you recall participating in any fire drills?

Page 44

A    I was at some fire drills, yes, as the major.

Q    What do you mean by that, you were at some fire drills?

A    Actually outside the doors running offenders outside for the fire drills.

Q    And that was while you were a major at Indiana State Prison?

A    Yes.

Q    Did that ever happen while you were the deputy warden?

A    No.

Q    Okay.  And you were the deputy warden for two years?

A    Yes, ma'am.

Q    Okay.  And whose responsibility was it to carry out fire drills?

A    It's health and safety and it was Steve Griffin at the time.

Q    Did you supervise Steve Griffin?

A    No, I did not.

Q    Who supervised Steve Griffin?

A    I believe Mr. Ron Neal.

Q    Okay.  Was there any other instruction you remember getting or -- that you remember getting while you were the deputy warden at

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 13 of 51

Page 45

Indiana State Prison with regard to fire safety or fire drills?

A   No, ma'am.

Q   Okay.  Did that concern you at all in the two years you were a deputy warden that you didn't participate in any fire drills at Indiana State Prison?

A   No, it did not.

Q   And why not?

A   Because it didn't, ma'am.

Q   Do you think that running fire drills is an important -- is important?

A   Yes.

Q   And why is it important?

A   It's important so they know what to do in case of a fire, ma'am.

Q   Okay.  But it didn't concern you that you didn't participate in any in the two years that you were deputy warden?

A   No, ma'am.

Q   And why not?

A   I have no answer for that, ma'am.

Q   Okay.  This is my one chance to speak to you today and I want to make sure that I'm fully understanding, you know, what was going on at

Page 46

Indiana State Prison and everything that you've seen and experienced.  So I appreciate you trying the best that you can to answer my question.

So I just want to make sure that I understand, you said that fire drills are important for safety reasons; correct?

A   Yes.

Q   Do you think -- how frequently do you think that fire drills should be carried out?

A   At least quarterly.

Q   Okay.  And so you said that you didn't participate in any in that two-year period, which is a lot more than quarterly; right?

A   Uh-huh.

Q   Okay.  But that didn't raise any safety concerns for you?

A   That's my custody supervisor's responsibility, ma'am.  That's why I did it when I was a major, ma'am.

Q   Okay.  All right.  So if something wasn't in your responsibilities, it didn't -- so you were only -- let me try that again.

Did you ever raise concerns about things that were not within your job

Page 47

responsibilities?

A   Yes, ma'am.

Q   Can you give me some examples?

A   Some examples, what I did like and what I did go to was watching the offender firefighting team do their training.

Q   I'm sorry, can you say that again?  I didn't --

A   The offender firefighter squad that was trained, I watched all that training.  I watched them exercise and practice their auditions for new offenders to be trained.

Q   Okay.  And why did you watch that?

A   Because that was a part that I enjoyed.  I thought it was good responsibility to be a participant.

Q   So that's not quite what my question was.  My question was whether or not you had ever raised any concerns about issues at Indiana State Prison that fell outside of your own job responsibilities.

A   No, ma'am.

Q   And why is that?

A   I have no reason, ma'am.

Q   Okay.  Did you ever have concerns about things

Page 48

that were outside your job responsibilities?

A   No, ma'am.

Q   Okay.  Do you know what the first responders' positions were at Indiana State Prison?

A   Do I know what, ma'am?  Sorry.

Q   The first responder positions were at Indiana State Prison.

A   If I remember correctly, it was three people that responded, if I'm not mistaken, but it might be four.  It's been a while up there.

Q   Okay.  And what did the four first responders do?

A   They responded to any emergency on any unit.

Q   Did you ever have the position of a first responder?

A   When I was an officer, yes.

Q   Okay.  And was that at Indiana State Prison?

A   No.

Q   Okay.  Did you ever supervise the first responders at Indiana State Prison?

A   No.

Q   Who was in charge of that?

A   The shift supervisor.

Q   And so that would have been Captain Dykstra?

A   At that time I believe it was, yes.  You mean

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 14 of 51

Page 49

at the time of the fire?

Q   Uh-huh.

A   Yes.

Q   And who's responsible for training of the first responders?

A   Training.

Q   Okay.  You said the firefighter program was a good program; is that right?

A   Yes, ma'am.

Q   Why did you think that?

A   Because they take a lot of extra training.  It came from downstate by a fire chief.  It was actually they ran through fire training.  It was great training, ma'am.

Q   Okay.  And beyond that they received great training, what do you think the benefits of the firefighter program were?

A   Fast response, that we have people that could respond.

Q   And did you think it was a good program that helped the prisoners who participated in it?

A   Yes.

Q   Do you think that the firefighter program was supported by staff?

A   Yes.

Page 50

Q   Do you think that -- did you ever speak with any of the firefighters who were in the firefighter program?

A   Yes, ma'am.

Q   Did they ever raise any concerns to you?

A   No, ma'am.

Q   Okay.  Did you ever hear any concerns that staff weren't letting firefighters out of their cells to respond to fires at Indiana State Prison?

A   No, ma'am.

Q   Okay.  If there was a fire at Indiana State Prison, what was the proper response to the fire that should be done?

A   When a 10-70 was called, then offenders on the housing units that were identified as firefighters were left off the unit to go over to the firehouse to get their equipment and proceed to the fire.

Q   Okay.  Should a 10-70 or 10-71 be called every time there is a fire at Indiana State Prison?

A   Should it be?

Q   Yes.

A   Yes.

Q   Is it a problem if there are fires and a 10-70

Page 51

or 10-71 isn't being called?

A   This would be a concern to me.

Q   Okay.  Is it, in your opinion, is it ever proper for staff to respond to a fire without calling a 10-70 or 10-71?

A   No.

Q   Okay.  And why do you think that?

A   It's a fire, ma'am.  Anytime you go to a fire, if you had to go running into a house at some fire on the street, if you have a fire, that's what we got firefighters for, ma'am.

Q   Okay.  So even if it's a small fire, a 10-70 or 10-71 should still be called?

A   Yes, in my opinion.

Q   Okay.  Were there a lot -- or let me ask it differently.
About how many fires did you -- about how many fires were there at Indiana State Prison while you were the deputy warden?

A   Maybe two.

Q   Okay.  And how would you learn about fires at Indiana State Prison?

A   From an incident report.

Q   Okay.  Did you review all of the incident reports at Indiana State Prison?

Page 52

A   Sorry, I can't hear you, ma'am.

Q   Sorry.  Did you review all of the incident reports at Indiana State Prison?

A   I looked at a majority of them, yes.

Q   Okay.  Who else was responsible for looking at incident reports at Indiana State Prison?

A   Custody supervisor.

Q   And who was that at the time?

A   At that time it was Major Tibbles, I believe.

Q   Okay.  And how -- you said you looked at the majority of incident reports.  How would you decide which incident reports to review?

A   The ones I looked at were the ones that would be called critical incidents.  Fires always bothered me, deaths.  I mean, we had all kind of things, ma'am.

Q   So who would decide what a critical incident report was?

A   We have a procedure for that, ma'am.

Q   What's that procedure?

A   Critical incident, always.

Q   Okay.  So who would mark it as a critical or identify it as a critical incident report?

A   The deputy warden.  Me, ma'am.

Q   Okay.  So you said you would only review the

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC NND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 15 of 51

Page 53

ones that were critical incident reports.

A    Uh-huh.

Q    So how would you know which ones were critical incident reports if you were the one designating them?

A    Because I was the one that would be called about them. I got called on everything.

Q    Okay. So you would get called about an incident, and then you would decide that that incident was a critical one, and then you would follow up by reviewing the incident report and --

A    No, then I would go -- the next day I would go in and put it on a critical incident mapping form, showing that it was a critical incident.

Q    Okay. And so would that happen before the incident report was done?

A    No, the incident report was done right at the incident.

Q    Okay. And when you reviewed incident reports, did you do anything to keep track of recurring issues or recurring problems at Indiana State Prison?

A    We kept a mapping.

Q    What's the mapping?

Page 54

A    It's showing where hotspots could be, problem areas, where the offenders were using drugs, or things like that. It's a mapping system which was kept every month.

Q    Okay. And so it basically kept track of statistics and locations for incidents?

A    Yes, ma'am.

Q    Okay. And what steps did you take to address frequent or recurring problems?

A    We did shakedowns when it was drugs. I guess it would depend on the problem.

Q    Okay. You said that fires always bothered you.

A    Yes.

Q    Why is that?

A    Because a fire can burn people.

Q    Okay. So did you take any steps to address recurring problems of fires at Indiana State Prison?

A    Take steps. I need you to clarify.

Q    Yeah. So was there an issue with fires? Was there a problem with fires at Indiana State Prison?

A    No. No, ma'am.

Q    Okay. What was the cause of the fires that

Page 55

you did see at Indiana State Prison?

A    A hot pot.

Q    That was the only cause you remember seeing?

A    Yes, ma'am.

Q    Okay. Was there ever a problem with prisoners setting fires in Indiana State Prison?

A    Oh. Yes, ma'am.

Q    Okay. Did you see fires -- or see incident reports about fires that were set by prisoners?

A    Yes, ma'am.

Q    About how many of those did you see while you were deputy warden?

A    Four a month.

Q    Four a month, okay. So there were -- because I think earlier you testified that there were two fires a year.

A    The two fires -- what I mean by fires, I'll clarify, fires are the ones are caused by, to me, are ones that are caused by electrical as far as the hot pots. The fires the offenders set, they were just attention getters. So, I mean, I feel like the ones the fires -- we had D-cell house, which is our AS unit. Offenders just like starting fires to watch our staff

Page 56

run and put them out.

Q    Okay. So were there any other types or categories of fires that -- so you said you would count like electrical or hot pot fires and there were about two of those a year and then there were fires that offenders set and you said about four of those a month.
     Were there any other types of fires that we haven't discussed?

A    Not that I'm aware of, ma'am.

Q    Okay. So did you keep track of the fires that were set by prisoners?

A    We kept incident reports, ma'am.

Q    Okay. Did you do mapping in your mapping program that we discussed?

A    Yes, ma'am.

Q    And did you take any steps to either try to minimize those fires or to make sure that there was a safe response to those fires?

A    Take steps. Can I ask you to clarify?

Q    Yeah. Did you just do -- was there any action or anything that you did in response or to -- let me ask this to you.
     Was there any action that you took to try to minimize or make safer the issue of

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 16 of 51

Page 57

prisoners setting fires?

A I talked to the offenders on D-cell house. I would go talk to them and try to find out why they wanted to set fires.

Q Okay. Anything else?

A No.

Q Okay. Were there any other critical -- categories of critical incidents that you would keep track of?

A Anything that was listed on our policy that said critical incident, ma'am.

Q And what were those?

A In regards to drug overdoses, things like that, ma'am.

Q Were those frequent problems at Indiana State Prison?

A At that time, yes, ma'am.

Q About how many of those would there be a month?

A I do not remember, ma'am.

Q Okay. More than ten?

A No.

Q Less than ten?

A No.

Q Less than ten?

Page 58

A It would be less than ten.

Q Okay. You also said that you would get critical incident reports about prisoner deaths. How many prisoner deaths were there in the time you were deputy warden?

A Approximately, eight, I believe.

Q Okay. And what were the causes of those deaths?

A I really cannot say at this time. I'd have to look at the records before I actually said.

Q And was Joshua Devine included in that number?

A No, actually, I was sick at that time, so I didn't feel that I should count that incident.

Q So there were -- I understand you were on leave at that time. So there were actually nine in the two-year period that you were --

A Yeah.

Q -- deputy warden.

A Yeah.

Q Do you recall any of the causes of death of any of the other eight people?

A There was some overdoses. There was a murder, a homicide, and there was a few suicides.

Q Okay. Was there a policy -- and just to clarify going forward, unless I say otherwise

Page 59

I'm specifically referring to the period that you were a deputy warden at Indiana State Prison.
Was there a policy or any instruction given to staff about what to do if a prisoner was in distress in his cell?

A Nothing I can speak of, ma'am.

Q Okay. If a prisoner was locked in his cell and in distress, should staff open the door to his cell to let him out?

A I guess it would depend on the situation, ma'am. Clarify.

Q Sure. So if a -- let me ask this question, if a prisoner was in his cell and appeared to be in distress, either having a medical situation or in the case of a fire like in Joshua Devine's case, is it appropriate for a staff member by himself to open the door to assist the prisoner?

A Yes.

Q Okay. Is staff given any instruction about how to assess the situation if a prisoner is in distress?

A They have suicide training in the training part. These are questions I would put to my

Page 60

training department, ma'am.

Q Okay. And can you talk to me about the key system at Indiana State Prison, specifically which -- who has which keys to the cell house?

A It's been a while. I'm not saying how it is now, but what I remember is, basically, there was a key set for each range that's kept down in the officer's station on the flag. Depending on what officer is assigned to what range, he or she would have the keys to that range.

Q Okay. So there's just one set of keys for each range that the officers have?

A Again, it's been a while, but at that time I do believe that's correct. I think there is a supervisor set down there, but I don't know what's on that key ring.

Q Okay. If an officer assigned to a cell house has to leave the cell house for any reason, what do they do with the keys to the range they're assigned to?

A It should be put back up on the hook, which would be in a box inside the officer's station.

Q Okay. And who has the keys to the front door

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 17 of 51

Page 61

of the cell house?

A    The officer in charge.

Q    Okay.  And if there's an emergency situation and staff are called to assist with the emergency situation, is there a policy about when the door to the cell house should be opened?

A    Is there a policy.  No, not that I can think of, ma'am.

Q    Okay.  The front door of the cell house is generally locked; is that correct?

A    Yes.

Q    Okay.  So is there any instruction given to staff about when to open the front door or if to open the front door in an emergency?

A    As soon as possible.  But is there anything in writing?  No, ma'am.

Q    Okay.  And how is this instructed to staff that they should open the door as soon as possible?

A    I have no idea, ma'am.

Q    So what are you basing it on, your understanding of that policy on?

A    About me, ma'am.  I mean, if you call an emergency, it would be a smart thing to open

Page 62

the door, ma'am.

Q    Okay.  So that's just your opinion about what should be done, but you don't know if there's any instruction given about that.

A    I have no idea, ma'am.

Q    Okay.  And can you tell me a little bit what the difference is between how things work at -- let me ask this again.
       In your experiences are there major differences between how Westville and Indiana State Prison are run?

A    Clarify.

Q    Yeah.  So you've had the same position at Westville and Indiana State Prison.

A    Yes, ma'am.

Q    Were there any issues that you noticed at Indiana State Prison, any problems with how things are run at Indiana State Prison that were run differently at Westville?

A    No, ma'am.

Q    Were they run in pretty much the same structure?

A    Yes, ma'am.

Q    Okay.  Do fires occur with the same or similar frequency at Westville as they do at Indiana

Page 63

State Prison?

A    No, ma'am.

Q    Do they occur with lower frequency?

A    Clarify, please.

Q    Yeah.  Are there more fires -- and I'm including fires both caused by electrical issues and set by prisoners themselves, are there more fires at Indiana State Prison than at Westville?

A    Yes.

Q    And do you know why that is?

A    Because this is an open dorm area here.  I mean, there's really not much they can put on fire.  It's a different environment.  Up at the city it's cells, so they use that as an attention getter.  Here it's an open dorm floor, so there's really not much they can put on fire.

Q    Okay.  Is Westville a lower security institution?

A    Yes, ma'am.

Q    Okay.  When you were a deputy warden at Indiana State Prison were there ever problems with prisoners not doing their rounds?

A    With prisoners not doing their rounds?

Page 64

Q    I'm sorry, with officers not doing their rounds?

A    There was occurrences, yes.

Q    Okay.  How frequently would that happen?

A    I would say in my time as major -- you're only asking for two years, so.

Q    I'm happy for you to give both answers in your time as major and as deputy warden.

A    As a major, I think I did four recommendations on staff in my almost five years.

Q    Okay.  And what about as deputy warden?

A    I think I seen two or three.

Q    Okay.  And would you -- was monitoring done to make sure that staff was doing -- staff were doing their rounds?

A    Yes, there was a system.

Q    And what's that system?

A    I'm trying to think of the name.  OnGuard.

Q    Okay.  And how did that system work?

A    There is a -- I don't know how to explain it properly.  There is a tap button and a wand.  You walk by and you wand it as you go by.  They're on the walls.  I think in the city they're on each cell range.

Q    And how frequently are staff supposed to do

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 18 of 51

Page 65

their rounds?

A Every 30 minutes.

Q Okay. So not more than 30 minutes should pass from doing -- from touching your wand to one spot before when you touch it again?

A I guess it depends on what's going on. Sometimes you have a problem. It could be that there's something going on in the cell house or sometimes it took them 32 minutes. Sometimes it took them 33 minutes.

Q Okay. And so when would you consider it a problem that needed to be corrected, like how much time would need to pass between --

A If it goes 45 minutes without at least one check gets me worried.

Q Okay. And why was the 30 minutes -- do you know why 30 minutes was chosen as the time to do rounds?

A No, ma'am.

Q Okay. If a prisoner was having an emergency or an urgent problem in his cell, how was he able to get the staff's attention?

A They usually yelled.

Q Was there any other way that they could get the staff's attention?

Page 66

A Not that I'm aware of, ma'am.

Q Okay. You're familiar with B-cell house; correct?

A Yes, ma'am.

Q Okay. So if somebody was yelling from one end of B-cell house, would the staff be able to hear the person yelling, basically, from any place in the cell house?

MR. ELLIS: Objection, calls for speculation.

A I don't know.

BY MS. PIERCE:

Q Okay. So was there ever any concern that a prisoner might be having an urgent problem in his cell and staff wouldn't be able to hear the prisoner?

A Not that I'm aware of, ma'am.

Q Okay. So you were responsible as deputy warden for ensuring the general safety and that the needs were met of the prisoners; correct?

A Yes, ma'am.

Q Okay. So did you ever take any action to make sure that prisoners would be able to get the attention of guards if they had an emergency?

Page 67

A Clarify.

Q Sure. So you said that prisoners could yell if they were having an emergency, but you didn't know necessarily if they could hear the prisoner if they were yelling in B-cell house; is that correct?

A Yes.

Q So was there ever any concern that a prisoner might have an emergency and not be able to get the attention of the guards?

A I don't know.

Q Okay. Was that ever a concern that you had?

A No.

Q Okay. Was any instruction given to prisoners about how to contact or get the attention of guards during an emergency?

A Not that I'm aware of.

Q Okay. Was there ever any instruction given to staff about what to do and how to respond if a prisoner was yelling from his cell?

A I would probably go back to that might be a training question. I have no idea, ma'am.

Q Did you ever give any instruction, either as a major or a deputy warden, to staff about what to do if a prisoner was yelling?

Page 68

A If a prisoner is yelling, I would say we respond if we hear it.

Q Okay.

A As a major, sorry.

Q No, no, I appreciate you giving a full answer. So is it your opinion that if a prisoner is yelling, staff should always respond and go see if that prisoner is okay?

A Yes.

Q Okay. And is that based on your opinion about what the correct thing to do is or is that a policy at Indiana State Prison?

A It's what I believe a person should do.

Q Okay. And did Indiana State Prison have any policy regarding what to do if a prisoner was yelling?

A Not that I'm aware of, ma'am.

Q Okay. Did you ever hear of any incidents where a prisoner complained that he was trying to get the guards' attention and the guards were not responding?

A No, not really.

Q What do you mean by not really?

A I mean, you have complaints all the time where they want their water ran or something to

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 19 of 51

Page 69

where they would say the officer didn't come fast enough.

Q Did you ever do anything to follow up or investigate whether officers were timely responding to prisoners?

A The one that I can remember was over getting their mail, just to put their mail in their gate, their cell door, and then if our officers would not pick it up in the time that they demanded it to be picked up, they would say our officers were late.

Q Were there any other situations where you heard complaints about officers not timely responding to prisoners?

A No, ma'am.

Q Were there any qualifications or training that a staff member should have before being placed in the position of officer in charge of a cell house?

A Again, I would regard that to training, ma'am.

Q Okay. You were in charge -- actually, let me ask, were you in charge of assignments, staffing assignments while you were the deputy warden?

A No.

Page 70

Q Okay. Were you in charge of staffing assignments while you were the major?

A No.

Q Okay. Who was in charge of the staffing assignments?

A Shift supervisors.

Q Okay. Did you supervise staffing assignments?

A Clarify.

Q Yeah. Were you in charge of overseeing that staffing assignments were done correctly?

A Yes.

Q Okay. And was that in your position as major or as deputy warden?

A Major.

Q Okay. Does the deputy warden have any responsibility for overseeing staffing assignments?

A No.

Q While you were a major, what did you do to ensure that staffing was done appropriately?

A I watched how much time they had in the department. Mainly we're talking our lockup units. That requires at least six months. So I made sure that they met the requirements to go over to that unit.

Page 71

Q And is that for anybody working in the lockup unit or is that for the officer in charge of the lockup unit?

A Any officer working the lockup unit.

Q Okay. And why is having that six months important?

A Dealing with offenders that's locked up, but under the AS or the DS clause requires a mentality that just takes a little bit more patience.

Q In your opinion is there a certain level of experience that a staff member should have before being made officer in charge of a nondisciplinary housing unit?

A In my opinion, I would try to keep the same thing, six months, but that's not possible.

Q Okay. And why isn't that possible?

A Because of the turnover rate.

Q Okay.

A And call-offs, I'm sorry.

Q Okay. Thank you for clarifying. Were there ever any problems that occurred while you were deputy warden because the officer in charge of a cell house didn't have enough experience to know how to handle a situation?

Page 72

A Not that I'm aware of.

Q Do you think that one officer can work a cell house like B-cell house by himself or herself?

A I would prefer not.

Q And why is that?

A Because I think it takes two officers at least to run a cell house.

Q And you think two is sufficient?

A I'd like 20, but I don't think that's reasonable, ma'am.

MS. PIERCE: Okay. We've been going for about an hour and a half. Why don't we take a ten-minute break and come back at 10:40?

THE WITNESS: Sounds good.

(Brief recess.)

BY MS. PIERCE:

Q Mr. Gann, we discussed what staff should do if a prisoner needed help or was in distress in his cell.

Who was responsible for making sure that the staff received proper instructions about how to address the prisoners' needs?

A I do not know.

Q Okay. Who was responsible for overseeing

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 20 of 51

Page 73

staff to make sure that they were following any policies or procedures at ISP?

A Custody supervisor would be the one that has to hold them accountable.

Q Okay. And who was the custody supervisor when you were deputy warden?

A Major Tibbles.

Q So Major Tibbles was in charge of making sure that staff and officers were following the instructions -- or sorry, following the practices and procedures of Indiana State Prison?

A Yes.

Q Okay. Is there anything that would refresh your recollection about who was in charge of providing instruction on policies and practices to staff members?

A Clarify.

Q Is there any documentation that would set out who was responsible for providing instruction to staff members about the policies and practices at ISP?

A I would say that's a training question.

Q Okay. So that would be whoever is in charge of training?

Page 74

A Yes.

Q Okay. Who would you go to at ISP if you had a question about what the policy or practice was regarding a certain issue?

A There was a policy manual that was in my secretary's office that I could refer to if there was a policy issue.

Q Did you ever refer to this policy manual?

A Yes.

Q Okay. How frequently would you refer to this policy manual?

A Twice, three times a month.

Q Okay. Did all staff have a copy of the policy manual?

A They have to sign. There is a recording of signing of all policies that's kept in the training office, I do believe, yes.

Q Okay. And so who would be responsible for making sure that a 10-70 or 10-71 was called every time there was a fire?

A I would have to say the shift supervisor.

Q Okay. And, again, that would be Mr. Tibbles?

A No, the shift supervisor was Dykstra at night.

Q Okay. Okay. Is the shift supervisor always the captain?

Page 75

A Yes.

Q Okay.

A Unless he calls off, I'm sorry, that would be the only time.

Q Okay. Is the captain the highest ranking person at the prison at night?

A Yes.

Q During your time at Indiana State Prison, either as a major or as a deputy warden, did you ever participate in an after action review?

A Yes.

Q How many did you participate in?

A 12, 13. I don't know exactly.

Q What was the process for doing an after action review?

A There were like 13 different questions trying to find out who was involved, what we could have done better. I cannot remember exactly the 13, but like I say, there are 12 or 13 questions asked about the situation, how would you do things better, what were some of the issues that were brought out from the issue itself.

Q Okay. And who would decide --

Page 76

A I'm sorry, I'm having a problem hearing you.

Q Oh, I'm sorry.

A No, you're all right.

Q Can you hear me now okay?

A Yes, yes.

Q Great. Who would decide whether to do an after action review?

A The policy did.

Q What was the policy?

A Critical incident policy.

Q Okay. So any critical incident an after action review would be done?

A Yes.

Q Okay. And so were there only 12 or 13 critical incidents while you were at Indiana State Prison?

A No. You said the ones that I was involved with. I was not always there, so there were some I missed, I'm sure.

Q Okay. So the policy says that any critical incident that there would be an after action review.

A Yes.

Q Okay. And who would run the after action review?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 21 of 51

Page 77

A Sometimes it would be the ERO, Mr. Curry. Sometimes it would be me.

Q Okay. How would it be decided whether it would be you or Mr. Curry?

A If the ERO was involved, Mr. Curry was there. If it was an institution thing, I would be there or the custody supervisor would be there.

Q And what sort of incidents would cause ERO to be involved?

A If there was a riot.

Q Anything else?

A Hostage.

Q Would the ERO be involved anytime there was a prisoner death?

A No.

Q Do you know if ERO was involved in Mr. Devine's death?

A I have no idea.

Q Did you participate in the after action review for Mr. Devine's death?

A No, I did not.

Q Okay. How would it be determined who would participate in the after action review? What level of involvement in the incident was

Page 78

required?

A Any staff member that was part of the incident itself; responders, all staff that were on the initial report would be lined up, plus if investigators were there, they would come. Whoever was involved in the situation.

Q Okay. And so whoever was involved would fill out these answers to these 13 questions?

A Exactly what would happen is that we would all meet in a room and we would send these questions to our staff and find out their responses and then a response would be made as a total.

Q And the questions were always the same across all after action reviews?

A Yes.

Q Okay. Is there a form that has those questions?

A Yes.

Q Okay. What's that form called?

A Critical incident report.

Q Okay. And who would run the after action review meeting? It would either be you or Mr. Curry?

A It would be myself, Mr. Curry. It could be

Page 79

the custody supervisor and/or the warden.

Q Okay. And so you would get input from all participants about all of the questions?

A Yes.

Q Would each person be required to provide an answer to the questions?

A Clarify.

Q Sure. So how were the questions presented and answered during the meeting?

A For example, I would read Question 1. Question 1 was, what was the event, if I remember right. So I would read the event. Next question would be what conditions -- and I do not remember the order, so I'm doing the best I can. But one of the questions is what could we have done differently and what is currently still there that could be changed, and then we would ask everybody what did they think that we could have done differently.

Q Okay. And would each person who was participating be required to provide an answer to each question or was it just sort of voluntarily who wanted to give an answer?

A It was voluntary.

Q And so was anything done at the meeting

Page 80

besides providing answers to these 13 questions?

A At the end it was usually asked if anybody has any other concerns.

Q Okay. Were any minutes taken at these meetings or any reports made following these meetings?

A Yes.

Q What were those?

A Critical incident reports.

Q Okay. And who would complete the critical incident report?

A I would, the major.

Q Okay. And the critical incident report would include any recommendations or input about what could be done differently?

A Yes.

Q And who was -- what would be the process for deciding whether to implement the changes discussed?

A Well, I would say -- could I get you to clarify that?

Q Yeah. So it seems like in the after action review one of the things that -- one of the main purposes was to figure out what could

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 22 of 51

Page 81

have been done differently; is that right?

A   Yes.  Sometimes, yes.

Q   Okay.  So if there were -- if there was input given about what changes could be made or what things could be done differently in the future, was there any process for deciding how to make those changes?

A   Yes.  In regards to if there was something that was a maintenance issue, then we would have our maintenance people line up a way where we could improve something.  If it was more something about that custody needs to be dealt with, the custody supervisor would address it.  It would really depend on the subject matter at hand and who was the person that we needed to correct the item.

Q   Okay.  So who decided to whether or not make those changes in the first place would depend on what the issue was.

A   As a group, I would say myself, the warden, and custody supervisor.

Q   Okay.  And would the three of you be in charge of following up on those changes or making sure that those changes were completed?

A   Yes.

Page 82

Q   And how would you do that?

A   By making sure if there was a maintenance issue that they corrected the item.  If it's a custody issue, depending on what the issue is.  For example, whether or not an officer should -- I can't think of a recommendation.  It would depend on the issue, again, depending on what it -- I think it's easier for me to say, well, we think we should put more fans on the unit?  Then it's a maintenance issue and I would make sure that Mr. Kaufman took care of it.

Q   Okay.  Was there any other -- sorry, where would the critical incident reports be filed?

A   There is a critical incident report mapping system that's on our drives.

Q   Did the critical incident report look different than the normal incident report?

A   Yes.

Q   Okay.  What is the formatting of the critical incident report?

A   It's hard to explain, ma'am.  It's the same as an incident report except for it does more details.  It asks specific staff involved, injuries to staff, injuries to offenders.  It

Page 83

asks more questions.

Q   Okay.  Was anybody responsible -- so you would complete the critical incident report; is that correct?

A   Yes.

Q   Okay.  Was there anybody responsible for reviewing the critical incident reports after you completed them?

A   It's on the drive, so anybody can review them.  I don't know if anybody does.

Q   Okay.  Did anybody ever follow up with you about any issues in a critical incident report or otherwise indicate that they were reviewing your critical incident report?

A   Not that I can think of, ma'am.

Q   Do you know if the warden had any responsibility to review the critical incident reports?

A   No, ma'am.

Q   Do you know if the critical incident reports were sent to anybody outside of the institution, like somebody at IDOC's, you know, central office?

A   The one that's on the drive, it goes down to central office.

Page 84

Q   Okay.  And would they ever do any follow-up with you about critical incidents?

A   No.  I can say, no.  Nope.

Q   Okay.  Was there any other documentation done at the after action review, any note-taking, any presentations, anything like that?

A   No.

Q   After the April 7, 2017 fire were there any policy or practices that were changed at Indiana State Prison?

A   Not that I'm aware of.

Q   Okay.  Were there any changes to prisoner property following the fire?

A   I do believe so.  I think they cut back on the quantity of some items, but I'm not a hundred percent sure.

Q   Okay.  Anything else that you can recall that was changed after the April 7, 2017 fire?

A   No.  Again, I was off for the next two and a half months, so not that I'm aware of.

Q   And when you came back to work after that, did prisoners express any concerns to you or ever speak to you about the fire?

A   No.  Actually, no.

Q   Did any staff members ever speak to you about

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 23 of 51

Page 85

the fire, express any concerns?

A    No, ma'am.

Q    Did you have any discussions about the fire with anyone after you returned?

A    No, ma'am.

Q    Okay.  Are there inspections done at Indiana State Prison of the facility?

A    Clarify.

Q    Are there any -- does anyone have any responsibility to go around the facility and look for any issues at the facility with regard to the physical facility itself, the infrastructure at Indiana State Prison?

A    Physical plant director.

Q    And so would he do inspections of the facility?

A    Yes.

Q    How frequently?

A    Daily.

Q    Did he do reports related to these facility inspections?

A    There is a daily report done.  I just don't know if he does it or he has his staff do it, but there is daily, weekly, and monthly reports done on inspections.  It really

Page 86

depends on what you're looking at.  There's different types of inspections.

Q    So what are the different types of inspections?

A    Sanitation.  There are safety security concerns.  There's maintenance concerns.

Q    Okay.  And is the plant -- I'm sorry, his title is plant manager?

A    PPD, physical plant director.

Q    Physical plant director, thank you.  Is he responsible for all of those inspections?

A    No.

Q    Okay.  Which one is he responsible for?

A    His maintenance inspections.

Q    And who's responsible for the other inspections?

A    Actually, sergeants are responsible for the weekly ones, the officer on the units are responsible for their daily ones, and your lieutenants are responsible on your monthly ones.

Q    Okay.  And who is responsible for reviewing any reports made about these inspections?

A    Custody supervisor.

Q    Okay.  So that would be at this time Captain

Page 87

Dykstra?

A    No, he is the shift supervisor.  The custody supervisor was Mr. Tibbles.

Q    And what would he do to review the inspections?

A    I can't speak for him, ma'am.

Q    Okay.  What did you do while you were major to review the inspections?

A    I'd look and see if there was any discrepancies, and if there was a maintenance issue that I needed to get them over, I would get them over.  If it was a security concern, I went over and looked at it to see what we could do better.

Q    Okay.  And as deputy warden were you in charge of making sure that Mr. Tibbles did his review of the inspections?

A    Yes.

Q    What did you do to make sure that he was doing his review of the inspection?

A    I would talk to Mr. Tibbles every day.

Q    Okay.  And what did he tell you about the inspections?

A    That he was on his maintenance ones and he was on the ones on the safety concerns and,

Page 88

basically, the ones he was -- the biggest ones he was having right now is offenders blocking the trashcan in the doorway, obstruction.  It was a never-ending battle.

Q    Okay.  So did he ever come to you for instruction about how to address an issue?

A    He dealt with the issue, ma'am.

Q    Okay.  Did you ever have to authorize any action to address problems that were identified during inspections?

A    No.

Q    And so he had the authority to take any action to address a problem identified during an inspection?

A    Any action underneath his control, yes, ma'am.

Q    Okay.  Were there ever any issues that were not within his control or the control of the PPD?

A    Not that I'm aware of, ma'am.

        MS. PIERCE: I'm going to share with you what I'll mark as Exhibit 1.
        (Plaintiff's Exhibit No. 1 remotely marked for identification by Attorney Pierce.)

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 24 of 51

Page 89

BY MS. PIERCE:

Q    Can you see this document?

A    Yes.

Q    This is Exhibit 1, and the Bates number is Devine 75011 to 75012.  This is an E-mail from Warden Neal to yourself from July 24, 2015; is that correct?

A    Yes.

Q    And so he says, FYI, let's talk, and he's forwarding you an E-mail from Kevin Orme.  Do you know who that is?

A    Yes, I do.

Q    And who is that?

A    He's the State -- he's over the physical plant director of every facility.

Q    So he's E-mailing Ron Neal, Greg Lintz.  Do you know who Greg Lintz is?

A    Yes, he's one of Mr. Orme's supporters, as far as he works for Mr. Orme.

Q    Do you know who Bob Gipson is?

A    Yes, he's another one that works for Mr. Orme.

Q    Okay.  So this E-mail from July 24, 2015, the subject line is annual facility audit.  What is the annual facility audit?

A    Exactly what it says, the annual facility

Page 90

audit.  It's when they come around and look at all kinds of things for your -- it's like a sanitation, slash, safety hazards report.

Q    Okay.  And who is in charge of the annual facility audit?

A    Who's in charge or who does it?

Q    Who does it?

A    Who does it would be Mr. Orme and the guys that he selects.

Q    So what would happen?  They would come into the facility?

A    Yes, and they would go to areas and look for problems and things that we needed to correct.

Q    Okay.  And you said whoever he selects.  Are those people outside of the facility or are they people that work at the facility?

A    Usually, it's like one out of the facility, but a majority of them is outside of the facility.

Q    Would anybody from the facility participate in the audit with them or the inspection?

A    Safety hazards manager.

Q    Okay.  So he would go around and do the inspection with them?

A    He would be with them keeping notes.

Page 91

Q    Okay.  Is any sort of report done?

A    Yes.

Q    And what's that report called?

A    Safety -- the annual facility audit, similar to what this is titled.

Q    And who would review the facility audit?

A    Normally, the warden.

Q    Okay.  Anyone else?

A    Not that I'm aware of.

Q    Why don't you take a minute to read this E-mail.  When you get down to the bottom here, let me know and I'll scroll down further.

A    Okay.  (Witness complies.)  Scroll.

Q    Yes.

A    Okay.

Q    Do you recall getting this E-mail?

A    Yes.

Q    What was done in response to this E-mail?

A    Mr. East was demoted.

Q    What was he demoted to?

A    Maintenance -- Maintenance 4, I believe.  I don't remember exactly.

Q    Okay.  And who took over for Mr. East?

A    Mr. Griffin.

Q    Okay.  And were there concerns about

Page 92

Mr. East's performance before this letter?

A    Not that I'm aware of.

Q    Who was in charge of supervising Mr. East?

A    The warden.  He works for the warden.

Q    Okay.  So the E-mail from warden says, FYI, let's talk.  Do you recall the conversation that you had with him?

A    Yes.

Q    What was said during the conversation?

A    That we need to get a replacement for our safety hazard man.

Q    Anything else?

A    I had to hold him accountable.

Q    And why did you have to hold him accountable?

A    Because he failed in his position.

Q    Okay.  And were you responsible for overseeing him in his position?

A    I was given the responsibility based on the discipline.

Q    So you had the responsibility to discipline him; is that correct?

A    Yes.

Q    Who had the responsibility to oversee him to make sure he was doing his job?

A    I believe the warden.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC_NND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 25 of 51

Page 93

Q    Okay.  Did the warden express any concern to you about these inspections not happening correctly?

A    Not that I can recall.

Q    Did this letter raise any concerns for you about inspections of the facility?

A    Yes, it meant I needed to get a new safety hazards manager.  He wasn't doing his job.

Q    Following the realization that he was not doing his job, were any changes made to make sure that this next safety manager was being properly supervised?

A    Yes, he had to report some more reports to Mr. Neal that I'm aware of.  The fire -- I made sure about the fire alarms.  Besides that, I can't think of anything.

Q    When you say there were additional reports, was it reports about the items identified in this letter or was it just general reports that he had to do based on his inspections of the facility?

A    Based his on inspections of the facility.

Q    Okay.  And so what were those reports called?

A    I have no idea.

Q    And those reports were given to you or to the

Page 94

warden?

A    To the warden.

Q    Do you know how frequently they had to be submitted to the warden?

A    I have no idea.

Q    Okay.  Were there any changes in the responsibilities of the safety manager who took over?

A    Not that I'm aware of.

Q    Okay.  So you said that you demoted Mr. East.  Were you in charge of identifying the next safety manager?

A    No.

Q    Who did that?

A    I can't answer that question.  I do believe it was Mr. Orme, but I'm not a hundred percent.

Q    Okay.  Did you take any action to address any of the problems identified in the letter?

A    No.

Q    Okay.  Were any steps taken, to your knowledge, to address the issue with the fire alarm?

A    Yes.

Q    What was that?

A    We made sure they got fixed, got ahold of

Page 95

maintenance, which was under me, and we made sure they got fixed.  We got an outside company to come in, did every one of those, and fixed the ones that were brought up.

Q    Okay.  And was that action that you took specifically?

A    I ensured that Mr. Kaufman got it done.

Q    And how did you ensure that Mr. Kaufman got it done?

A    I followed through and went on the housing units.

Q    Okay.  And did you provide any instruction to Mr. Kaufman to make sure this was done?

A    Yes, I instructed him.

Q    So as PPD, was inspecting the fire alarms something that Mr. Kaufman was responsible for doing?

A    I think that's a question for Mr. Kaufman.  I don't know.

Q    You're in charge of overseeing Mr. Kaufman; correct?

A    Yes.

Q    So it was important for you to know what Mr. Kaufman's responsibilities were; correct?

A    Yes.

Page 96

Q    So you don't know whether it was Mr. Kaufman's responsibility to inspect and monitor the fire alarms?

A    No.

Q    For the sanitation and safety inspection, did Mr. Kaufman have any responsibility for carrying that out?

A    No.

Q    Okay.  So who was in charge of carrying that out?

A    Actually, the captains, the lieutenants on the housing units, and the unit team managers.

Q    Okay.  And so was Mr. East's role to oversee them?

A    No, his role was basically to point out items that we needed to correct.  So sanitation and safety, his report should have shown that he opened the door on C Charlie and there was something in the stairwell.  That's his job.  Our job is to make sure it's followed through.

Q    So what's the difference between the inspections that Mr. East would do and the inspections that other staff would do regarding the safety and sanitation?

A    It wasn't much except for East dealt with like

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 26 of 51

Page 97

maintenance areas, areas that custody would not normally have access to.

Q Okay. So they kind of complemented each other? They would be looking at different areas?

A Yes.

Q Okay. So did you take any steps after this to make sure that the other inspections were being done properly?

A I went with Mr. Kaufman to the areas that we were talking, the areas that fell under the maintenance areas as far as needing to be cleaned. I made sure that those areas were cleaned.

Q And how did you make sure that those areas were cleaned?

A I went there, ma'am.

Q Okay. And what about the other areas that don't fall within maintenance?

A I guess I would have to say -- could you clarify?

Q Well, you said that if the area fell within maintenance, you would have gone to Mr. Kaufman and made sure that they were cleaned. Were there areas that weren't within

Page 98

maintenance?

A Yeah, those are the areas that our officers, sergeants, and lieutenants would be responsible for.

Q Okay. And so did you take any action to make sure that those -- the inspections of those areas were done properly and adequately?

A When I made my rounds, I would look at all safety and security concerns based on I would open doors they did not like me to open because they'd sweep their dust under a door, if you know what I mean.

Q Can you explain a little bit more about that?

A Well, a door that's not normally opened on a daily basis, staff would and offenders would decide that this is where they could sweep their dust. I would open them and I would make them clean it.

Q So you mean literal dust would be --

A Yes, yes.

Q Okay. So besides cleaning were there any other things that were supposed to be looked at during the inspections of the nonmaintenance area?

A Cleaning, blockage of the stairwells.

Page 99

Q Okay. So is it correct then -- I mean, you said you went to make sure that things weren't swept into the closet, and things like that.
So does that basically mean that you did your own inspection every day of those areas of the facility?

A No.

Q So what did you do then?

A I did inspections when I made my rounds. At least three times a week I made them, as a major sometimes five days a week. I mean, it would just depend on what was going on that day.

Q Okay. So did you have, as a deputy warden, responsibility for overseeing the inspections of the nonmaintenance areas?

A Could you clarify?

Q Well, so you said that the sergeants, the lieutenants, the officers were in charge of inspecting the nonmaintenance areas; is that correct?

A Yes.

Q How frequently were they in charge of doing that?

A The officers were supposed to conduct one

Page 100

daily, sergeants are weekly, lieutenants are monthly.

Q Okay. So were you responsible for overseeing those?

A No, they went to the custody supervisor.

Q And so that would have been Mr. Tibbles.

A Yes.

Q Okay. Did he ever express any concerns to you that those were not being done?

A No, he did not.

Q After you got this letter did you talk with Mr. Tibbles to confirm whether or not those were being done?

A I cannot remember.

Q Okay. After you got this letter did you take any action to make sure that those inspections were being done?

A I cannot remember.

Q Okay. Did you ever have any -- were there ever any issues with Mr. Griffin's performance after he took over for Mr. East?

A Not that I'm aware of.

Q Did you take any additional steps to monitor him besides the extra reports he had to do?

A No.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 27 of 51

Page 101

Q    When are officers supposed to fill out their time sheets?
A    The end of the pay period.
Q    Do they do it while they're on shift?
A    Yes.
Q    And where do they do it?
A    The best place to do it is on the housing unit.
Q    Okay.  And where would they do it in the housing unit?
A    The counselor's office, the unit team manager's office.
Q    Okay.  If there's three people working on a housing unit is it appropriate for two people to be filling out their time sheets at the same time?
A    If there's only one computer, I would say, no.
Q    If there's multiple computers?
A    I would rather not.
Q    And why not?
A    Because you need two officers on the unit.
Q    Okay.  So if somebody is filling out their time sheet in the counseling office, does that mean that they're not really on the unit?
A    It's better there than up in the custody hall

Page 102

so they're on the unit for any kind of emergency, but you're just asking what I preferred.
Q    Okay.  And why -- are staff who are in the counselor's office, are they able to see and hear what's going on in the unit?
A    Yes.
Q    Okay.  The annual inspection that we looked at earlier that was referenced in the letter, were there any other annual inspections that were done at the facility?
A    That was their normal one that I'm aware of.
Q    And would you have to fill out any types of reports to show that you had addressed issues that were identified in the inspection?
A    No.
Q    So how would IDOC ensure that any identified issues were properly addressed?
A    The warden would ensure.
Q    And how would the warden do that?
A    Depends on what area it fell under, and he would call us all in and tell us what areas that we needed to correct.
Q    Okay.  So the warden would come in and tell you what areas you needed to correct.  Did he

Page 103

document that anywhere?
A    I have no idea.
Q    And so would he give you instructions about the areas that needed to be corrected orally or in writing?
A    We'd get a copy of the report.
Q    Okay.  Would you get any other written instruction?
A    Not that I'm aware of, no.
Q    Okay.  And would you always be involved as deputy warden in those meetings concerning areas to work on?
A    If it fell under my command, yes.
Q    Okay.  As deputy warden did you always receive a copy of the annual inspection report?
A    To my recollection, yes.
Q    Okay.  Did you ever express concerns about any issues identified in the annual safety inspection report to anyone?
A    No.
Q    Did you ever have any concerns about anything that was identified in the annual inspections?
A    Like any other person when somebody tells you something is wrong, I feel like it's a personal thing and I want to make sure that

Page 104

it's corrected in a timely manner.
Q    Okay.  So what types of issues besides the one we just discussed were identified in the annual safety report?
A    Clarify.
Q    So, for example, like there were issues with the fire alarm.  Were there any other types of issues like that?
A    Not that I'm aware of.
Q    You don't recall any specific problems that were identified in the annual inspection?
A    No, ma'am.
Q    Okay.  With regard to the lieutenant's monthly reports, what sort of -- or monthly inspections, what sort of documents or documentation would they make of those inspections?
A    That would actually be the monthly inspection report.  It's a standard form.
Q    Okay.  And were there similar ones for the weekly ones done by the sergeants?
A    Yes.
Q    You said as deputy warden you would do rounds sometimes three times week, sometimes five times a week.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 28 of 51

Page 105

Can you tell me about a typical day as deputy warden?

A   Well, the morning would start going over your incident reports. You look to try to see if there was anything that you could correct right away. We had an 8:00 meeting. We went. That's when we talked to all our department heads. I talked to captains. I'd go back and see the custody supervisor, and if nothing was planned in the other meeting, we would make our rounds.

Q   Okay. And tell me about the rounds. What would you do during the rounds?

A   Talk to the offenders, talk to the staff, see if there's any issues I could deal with, that I could correct, or what we needed to work on.

Q   So when you did the rounds, would you go to every part of the prison?

A   Not always, no.

Q   How would you decide which part of the prison to go to?

A   I tried to make sure that I got around to everywhere, so I'd do it differently. A cell house a day, sometimes it would be -- depending on a meeting or something else I had

Page 106

to get back to, it would be one or two ranges. Sometimes it was the full C-cell house, five ranges, both sides.

Q   Okay. When you did a round, would you ever do multiple cell houses at once?

A   No.

Q   So you would just do a round to one cell house and then you'd go do other activities and then maybe do another round?

A   Yes.

Q   Okay. Would you do more than one round a day?

A   Sometimes.

Q   And how long would a round usually last?

A   C-cell house would take me probably four hours.

Q   Okay.

A   D-cell house could take me six hours, and that's because the offenders got to talk to you at every door. So it really depends on what communication they want to talk about.

Q   So when you went to the cell house was there anything that you were -- on your rounds, was there anything that you were looking for specifically, any examination you were doing of the cell house?

Page 107

A   Well, you always look for injuries to offenders, things that were blatantly out of compliance.

Q   Okay. Would you ask any questions of staff in the cell houses?

A   Yes.

Q   What kind of questions would you ask them?

A   Ask them how their day is going, any problems, any concerns, anything that we can do to help you.

Q   Okay. Anything else?

A   No.

Q   Did they -- was it common for them to have concerns that they would raise to you?

A   No.

Q   About how often a week, in a given week, about how often would they raise concerns to you during rounds?

A   The staff members?

Q   Yes.

A   Maybe once a month.

Q   Okay. And what types of concerns would those be usually?

A   Concerns about whether or not the offenders should be let out early, would be the times

Page 108

they wanted to take them to the showers, things like that. It was personal items.

Q   Did they ever have any concerns about the physical facility itself, the infrastructure?

A   Not to my recollection.

Q   Okay. When you did the rounds, would you ask questions of the prisoners or would you speak to them only if they raised a concern to you?

A   I would speak to the offenders all the time.

Q   Would you ask them -- would you initiate conversations with them or would they typically initiate conversations with you?

A   Both sides.

Q   What kind of questions would you ask the prisoners?

A   Ask them how they're doing, anything going on, any kind of problems.

Q   Okay. And it seems like from your testimony that they raised a lot of concerns to you; is that correct?

A   Yeah, they have their concerns.

Q   Okay. Would you say that prisoners raised concerns every time you did a round?

A   If you want to say that they have a complaint, yes, I could say every day.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 29 of 51

Page 109

Q    Okay. What do you mean by that, if you want to say they have a complaint?

A    A complaint is something about their personal, what they would like. They'd like to be let out more, they'd like more rec time, they'd like more -- it's all about them on that situation. It's not what's best for the facility. It's what's for them. That's what I mean by every day you can get a complaint like that.

Q    Okay. Did prisoners ever raise things that you wouldn't qualify as complaints in that manner? Did they ever raise concerns about the facility?

A    They would say they want better water pressure. They did not like the new system that was put in about the showers. They wanted more free reign when it come to the water.

Q    And what was the new system with the water?

A    Well, the offenders had a tendency to leave the water running in the shower when nobody was in it. The new system was put in to where it would -- they'd push the button, it would run for 60 to 90 seconds, and it would turn

Page 110

off if you didn't push the button again. Water conservation.

Q    Okay. Were there any other changes that were made to the water system?

A    Not that I'm aware of.

Q    Were there any limitations on the amount of water that a prisoner could use in his cell?

A    No.

Q    Were there any limitations on the number of times he could flush his toilet?

A    I do believe that there was a system put in in regard to how many times they could flush it, but I don't remember that a hundred percent. I do know there was something put in, yes.

Q    Okay. Do you know when that was put in?

A    I can't remember.

Q    Was it while you were deputy warden?

A    I think it was while I was a major.

Q    Okay. Did prisoners have sinks in their cells?

A    Yes.

Q    Was there any limitation on the amount of water they could get out of the sink?

A    I do believe that they did. I think there was a button to push on those. I think it cut the

Page 111

concentration, make sure that they weren't leaving it running.

Q    Did prisoners ever raise concerns about the facility to you other than the water system?

A    Not that I can think of, no.

Q    Did prisoners ever raise concerns to you about staff?

A    Clarify, please.

Q    Yeah. Did they ever raise concerns -- so I think there's one category of complaints that you sort of identified that are issues about things that they would like more, more recreation, things like that.
        Did they ever raise any complaints or concerns about staff's treatment of the prisoner?

A    You always have complaints like that.

Q    Okay. What were those complaints like?

A    Why did Johnson write me up, why is Johnson messing with me, he won't leave me alone, he writes me up if I do something wrong, why.

Q    Were there ever complaints that staff were mistreating prisoners?

A    They were investigated by INI (sic) at that time. If there was a complaint, then it was

Page 112

investigated by internal affairs.

Q    Did you ever refer any complaints to internal affairs?

A    Yes.

Q    How often did you do that?

A    As often as I got a report of something that should be looked at by internal affairs. I had one case that I can think of. I don't remember all the details, but it's like the offender said he felt like the officer shook him down too personally, if you know what I mean. I referred that to INI. Anything that needed to be looked at, I had INI. Mainly, we have PREA (sic). We have everything that looks at -- if it's reported to them such that if there's any kind of question on that mark, I can get internal affairs involved in it.

Q    Okay. And did you ever follow up after you reported -- or referred those complaints to internal affairs?

A    As far as -- clarify, please.

Q    Sure. Did you ever follow up to see whether or not the investigation was completed and any discipline or other action was taken with regard to the officer?

Page 113

A   I would receive the internal affairs investigation report and so I would -- yes, the answer is yes to your question.

Q   Okay.  And were prisoners informed about the resolution of their complaints?

A   I have no idea.

Q   Okay.  Were there any policies or practices about informing prisoners about the outcome of a complaint they made?

A   I don't know the PREA situation.  I'm sure there is, but I don't know exactly.  So, I don't know.

Q   As deputy warden is it important for you to know the policies of following up with a complaint or a problem that a prisoner raises?

A   It's always a concern, ma'am, but you cannot see everything.  Again, I've read all the internal investigations, but about knowing whether or not he was notified too, no, I don't know.

Q   Okay.  When you were making rounds, did prisoners ever raise issues about the electrical system to you?

A   In regards -- can you clarify, please?

Q   You know, lights not working, outlets not

Page 114

working, things sparking?

A   I thought I answered that.  But, yes.

Q   Okay.  And you would -- are those things that you would report to someone else?

A   I would make sure maintenance went if they were sparking.

Q   Okay.  Would you make sure that maintenance went if lights or outlets were not working?

A   Yes.  If I was on the round, I would make sure.  If not, I would make sure the work order was put in.

Q   Okay.  Is there anything else that you would do on rounds besides speak with the prisoners and the staff members?

A   No.

Q   Okay.  As part of your job as deputy warden, did you ever speak with the prisoner firefighters to see if they had any concerns about how things were happening at the facility?

A   I talked to the firefighters all the time.

Q   Okay.  And how frequently then did you speak with the firefighters?

A   How what?

Q   How frequently did you speak with the

Page 115

firefighters?

A   I would say maybe once a month.

Q   Okay.  And would you speak with any particular firefighter or how would you decide which firefighters to speak with?

A   It would be whoever I saw up there in the chow line.

Q   Okay.  And what sort of things would you talk about with them?

A   Ask them how it was going in the firehouse.  We'd talk about their training, what they liked about doing the firefighting.

Q   Did they ever express any concerns to you?

A   Not that I can recall.

Q   Okay.  Did you check in with the firefighters because it was one of your job responsibilities or just because it was something that you wanted to do?

A   Something I wanted to do.

Q   Would you ever document these conversations?

A   No.

Q   Would you ever discuss these conversations with anyone else?

A   No.

Q   Whose job was it -- I understand you said you

Page 116

spoke to the firefighters because you wanted to.

Whose job was it to sort of oversee them and make sure that they didn't have any concerns?

A   I don't know about that, but, I mean, the safety hazards manager is the one that made sure they had what they needed.

Q   Okay.  If they did have concerns, would you have discussed those with the safety hazard --

A   If he brought them to me.

Q   Okay.  But they never expressed any concerns to you?

A   No.

Q   Okay.  Did the safety and hazard person -- who I believe at that point was Mr. Griffin, did he ever express any concerns to you about the firefighter program?

A   Not that I can recall.

Q   Did he ever express any concern to you about fire safety?

A   Not that I can recall.

Q   And if he had concerns about fire safety, who would he bring those to?

A   I would hope he would bring them to me and/or

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 31 of 51

Page 117

the warden.

Q Okay. And why do you hope he would bring them to you and/or the warden?

A Well, the warden should know if there's any concerns.

Q So was there any policy in place to designate how and when concerns should be raised by the safety and hazards manager?

A Policy? Not that I'm aware of.

Q Okay. So how was the safety and hazards manager -- was he ever given any instruction about what to do if he had a concern?

A Instruction. I don't know.

Q Okay. So did you ever do anything to find out whether the safety and hazards manager had any concerns?

A No.

Q Okay. In a place like a prison, do you think it's important to have a formalized structure for reporting and addressing concerns?

A Yes.

Q Okay. Were you ever concerned that there was no formal procedure for identifying and reporting safety and hazard concerns at the facility?

Page 118

A There must be a procedure. I just don't know of it right now.

Q Okay. Well, as deputy warden would it be important for you to know what the procedures are?

A Yes, ma'am.

Q Okay. But you don't know what those procedures were?

A I don't know exactly what it is. I do not have a policy in front of me, ma'am.

Q Okay. Is there a policy that would refresh your memory about what to do?

A I would have to look, ma'am.

Q Okay. As far as you know, there was no policy for reporting safety and hazard concerns.

A As far as I know.

MS. PIERCE: Okay. I'm going to share with you Exhibit 2.

(Plaintiff's Exhibit No. 2 remotely marked for identification by Attorney Pierce.)

BY MS. PIERCE:

Q This is the IA report related to the April 7, 2017 fire.

A Okay.

Page 119

Q The Bates number, for the record, is 133712 to 133808. Within this IA report are letters or reports from several of the firefighters. Did you ever see this IA report?

A No.

Q Did you ever review any IA reports?

A No.

Q Was that part of --

A Not this one. I'm sorry. I have reviewed some, but this one I never saw, ma'am.

Q Okay. While you were out who would have been responsible for reviewing this investigation?

A They had deputy -- let me see exactly. They had two people covering for my two and a half months I was off. One was Ann Bane, the other one was Don Buss.

Q What were their positions?

A They were unit team managers.

Q Okay. Did Mr. Lessner, was he at all responsible for reviewing internal investigation reports?

A Mr. Lessner was in charge of internal investigations.

Q Okay. So it was part of his responsibilities to review internal investigation reports?

Page 120

A Yes.

Q Did you have any responsibility for overseeing Mr. Lessner?

A Mr. Lessner?

Q Yes.

A No.

Q Who was responsible for overseeing him?

A The warden.

Q Okay. So did you know Daniel Milne?

A Yes.

Q He was the fire chief?

A Yes, I do remember the name.

Q Okay. Do you recall ever having any conversations with him?

A Yes.

Q Did you have a good relationship with Mr. Milne?

A That I remember, yes.

Q Did he ever express any concerns to you?

A I don't remember.

Q So this is part of his letter. Will you take a minute to read this page and tell me when you're done.

A (Witness complies.) Okay.

Q Do you have any reason to dispute the issues

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 32 of 51

Page 121

that Mr. Milne is raising in his letter here?

A  I can't speak to dispute.

Q  Well, in your experience as a deputy warden at Indiana State Prison at this time -- well, let me start this again.

So he says several things in his letter, including that, you know, staff doesn't take the fires seriously, that they are not getting out the firefighters in a timely manner, that they think that they can handle the fire without help from the firefighters, and that they don't seem to know where the correct keys are to get him the correct keys.

So if these things that he's saying are true in his letter, do you have any reason to dispute them in your experience, based on your experience at Indiana State Prison?

A  No.

Q  Okay. Did he ever raise any concerns like --

A  I'm having problems hearing you again.

Q  Sorry about that. Can you hear me now?

A  Yeah.

Q  Okay, good. Did he ever raise any concerns like this to you?

A  Not that I can recall. I'm not saying he did

Page 122

or he didn't, not that I can recall.

Q  You said that you recall having several conversations with him. What do you recall about those conversations?

A  How's it going. I can't remember exactly. I mean, it was always more of a friendly talk. Wanting more time for training, things like that. I'm trying to think exactly. That's all I can remember, ma'am.

Q  Okay. And besides Mr. Milne, did you ever hear anyone else raise any issues like the ones he addressed in this letter?

A  Not that I'm aware of.

Q  Okay. Do the issues raised in this letter concern you?

A  Yes.

Q  Okay. And why do they concern you?

A  Because they shouldn't be taking that long to get them out.

Q  Okay. Were any steps taken to make sure that the firefighters were being timely released in the case of a fire?

A  I don't have the answer to that.

Q  Did you take any steps to --

A  No.

Page 123

Q  Make sure to let me finish my question just for the record.

A  Okay. Sorry.

Q  That's okay. I'll just ask it again for the record. Did you take any steps to ensure that firefighters were timely released in the case of a fire?

A  No.

Q  And whose responsibility would that be to ensure that firefighters were timely released?

A  Custody supervisor.

Q  And that would be Mr. Tibbles again?

A  Yes.

Q  Okay. If you were reviewing this internal investigation, what steps would you take to address the concerns raised in Mr. Milne's letter?

A  I would remind the shift supervisor to talk to their staff of ensuring that the offenders got let out when a 10-70 or 10-71 was called immediately.

Q  Is there anything else you would do?

A  No.

Q  Okay. Do you know if that was done in response to this investigation?

Page 124

A  No, I do not.

Q  Okay. And there's another letter, which is the Station 57 incident report. Have you ever seen these before?

A  No.

Q  So I believe this was filled out by Randy Miller. Do you know Mr. Miller?

A  I can't remember the name.

Q  Okay. So some of the areas that Mr. Miller -- a concern that Mr. Miller identified are here. Why don't you take a minute to read this and let me know when you're done.

A  (Witness complies.) Okay.

Q  Based on your experience as deputy warden, do you have any reason to dispute his assertion that staff had no clue how to respond to the situation that occurred that night?

A  I can't speak. I was not there that night.

Q  Okay. But based on your experience as deputy warden were staff instructed about how to deal with an emergency situation like the one that occurred that night?

A  I don't think anybody is prepared, depending on the situation. Again, I cannot speak. I was not there that night. I think they're

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 33 of 51

Page 125

trained to respond to an emergency by training, but I don't think it specifically dictates a fire.

Q What do you mean by that, specifically dictates a fire?

A I mean a fire is a little different. I mean, it's just -- reading this opinion of his, I mean, he brings up some good ideas.

Q And what are those?

A Well, about the exhaust fan.

Q Okay. Do you know if any changes were made about the exhaust fan?

A I do believe there were some changes with the exhaust fans, but I'm not a hundred percent positive.

Q Why do you believe that? What's that based on?

A Because I do remember seeing something after I got down here where they were put in or something was bought. That's all I can tell you. I'm not absolutely sure.

Q Okay. Does he raise any other ideas that you think are good from this suggestion?

A I'm not against the thing about more fire drill practice.

Page 126

Q And why is that?

A Because of what he says.

Q Can you explain that a little more?

A Basically, I mean, he's saying that they're just doing a cell house evacuation, but that's because it's not an actual fire, if you know what I mean. It's not the drama of an actual fire. So nobody really gets training of a real fire if it's not an actual fire. Does that make sense?

Q I think so. So you think that there should be more fire drill practice to basically imitate what would happen in a real fire?

A Yes.

Q Okay. Who was responsible for making sure that fire drill practices were done?

A Custody supervisor.

Q So, again, Mr. Tibbles?

A Yes.

Q Okay.

A And the safety hazard man, I'm sorry.

Q Okay. And so you said that staff are trained to deal with emergency situations, but that's different than a fire. What did you mean by that?

Page 127

A Fires are just more unpredictable. I'm not saying it's -- I wasn't there. I don't know, but, I mean, to say how a person is going to react on a fire, I don't know if anybody's ever prepared no matter what training you get.

Q Okay. So do you think specific fire response training is important?

A Are you asking my personal opinion or professional opinion?

Q Both.

A My personal opinion is yes.

Q And what's your professional opinion?

A I would say yes also, ma'am.

Q And why is that?

A Because of this situation here, I would say.

Q Okay. So it's important to have -- would it be correct to say, or sorry, scratch that.
Would you agree with the statement that it's important to have fire specific training so that when a fire emergency does occur, staff have an understanding of how they should respond?

A I would say that they would require more of an intensive requirement to dealing with fire specifically.

Page 128

Q Can you explain that a little more?

A I thought I was clear. I mean, basically, that, obviously, with a fire here, just reading this here, they're saying how trained they were, which I see and I'm not going to argue. I think it's a good point, whether or not we should have staff trained more.

Q And so you think you should have staff trained more in the way that the -- similar to the way that the firefighters were trained?

A I think it's not a bad idea.

Q Okay. He references cell house evacuations. Do you know how those were done?

A They emptied the whole dorm, make an accountability count, and they brought them back.

Q And who would run that?

A The officer. Sometimes it would be a sergeant and/or a lieutenant.

Q Okay. And do you know how often those were done?

A Quarterly.

Q And were those announced ahead of time or were they like surprise evacuations?

A Sometimes it was announced head of time.

DENISE DWYER, et al. v.
RON NEAL; et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 34 of 51

Page 129

Sometimes it would be a surprise.

Q  And by surprise, do you mean it was a surprise to the staff who are supposed to be running them or to the prisoners who are being evacuated?

A  The offenders.

Q  Okay. So the staff always knew it was happening ahead of time?

A  Yes.

Q  Okay. Was there any drills or evacuations done, to your knowledge, that were a surprise to staff, so, basically, to get staff to respond in a surprise or out-of-the-blue scenario?

A  Not that I'm aware of.

Q  Okay. Do you think having that kind of training would be important?

A  I would not be against it.

Q  Okay. So when you say you would not be against it, do you think it's training that should be affirmatively implemented?

A  Yes.

Q  Why is that?

A  Because you asked my opinion.

Q  Sure. And I just want to know the reasons

Page 130

behind your opinion.

A  By reading this letter right here.

Q  Okay. So you think, basically, what happened, the problems of the response to the fire could be improved or even prevented by having the type of training that we just discussed.

A  Yes.

Q  Okay. Do you know what the practice or policy is for releasing prisoner firefighters during a fire?

A  Could you repeat the question?

Q  Sure. Do you want me to rephrase the question or just repeat it?

A  Just repeat it.

Q  Okay. Do you know what the policy or practice is for releasing prisoner firefighters during a fire?

A  When they call them, they release them.

Q  And how are they called?

A  I can't honestly say. I would say over the radio, but I'm not a hundred percent sure.

Q  Okay. So are they automatically released when a 10-70 or 10-71 is called or do you know if they have to specifically be called for their release over the radio?

Page 131

A  I don't know.

Q  Okay. Who was in charge or who had the responsibility for making sure that they're released properly during a fire?

A  Shift supervisor.

Q  So that would have been Captain Dykstra in this situation.

A  Yes.

Q  Okay. And who's responsible for instructing staff about what to do to release prisoner firefighters and when to release them?

A  It would be the shift supervisors, the captains.

Q  Okay. And when a call for the firefighter release is made, however that's done, who is responsible for letting the firefighters out of their cells?

A  The officer on the housing unit and/or dorm.

Q  Okay. And did they have to go to each cell to let them out or how would they let them out of their cells?

A  The ones that were in private cells would have to be let out. The ones that are in the dorm would just be let off the dorm.

Q  Okay. If there's a fire in a cell house where

Page 132

a firefighter is living, should that firefighter be immediately released to deal with the fire?

A  Personal opinion, yes.

Q  Is there any policy or practice about that?

A  Not that I'm aware of.

Q  And when you say personal opinion, yes, what's the reasoning behind that?

A  He's a firefighter. I know their training.

Q  Okay. And so they're --

A  I -- I'm sorry, go ahead.

Q  No, please go ahead.

A  I just know their training ability. I would use it to my advantage. I'm sorry I interrupted you.

Q  No, no, that's fine. I appreciate you giving full answers to the questions.

So if I understand you correctly, the firefighters have the skills to deal with the fire, so they should be the ones let out to address it; is that correct?

A  Yes.

Q  Okay. Did you know Officer Justin Rodriguez?

A  No.

Q  Did you know Officer Promise Blakely?

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 35 of 51

Page 133

A    No.

Q    Did you know Officer Sarah Abbassi?

A    I know the names. They were officers, but do I know them? No.

Q    Okay. You said there was a lot of turnover with staff; is that correct?

A    Yes.

Q    Were there ever any assessments done to figure out why there was so much turnover?

A    Yes.

Q    What was done? What were those assessments?

A    There was an assessment done in central office on how we could perform -- a recruitment retention policy came out of that, trying to look at why people did not want to stay in the department of corrections.

Q    And what was -- how was that carried out? Did people talk with staff members who were leaving or what else was done to determine why people were leaving?

A    There was exit surveys done. We began to talk with people what we could do to keep them in regards to that, finding out exactly why they wanted to leave.

Q    These exit surveys, did you review those?

Page 134

A    Yes, I saw several of them.

Q    Did you review all of them?

A    No.

Q    Who was in charge of reviewing all of them?

A    HR, human resources.

Q    Okay. And do you know where these were filed?

A    In the human resources office.

Q    Okay. And what would cause you to review an exit survey, a particular exit survey?

A    If they complained about a supervisor that I needed to look at. If it was besides another job because they're paying me more, there's nothing I can do about it if a job is paying them more. But if there's some other reason that we could do to work with them, if they were talking about, basically, I need to go to college, I want to take classes, but I need to go on nights, these are things that we can easily adjust.

Q    Okay. What were the reasons, the main reasons for people leaving or quitting their jobs at IDOC?

A    Money.

Q    Okay. Anything besides money?

A    Not the job for them.

Page 135

Q    What do you mean by that?

A    That's what they told me. I tried to get some things out of them and it was just like it's just not the job for me.

Q    Were there any specific complaints about ISP or the way ISP was run?

A    Not that I'm aware of.

Q    Okay. Do you know if the warden ever reviewed the exit surveys?

A    Yes.

Q    Did he review all of the exit surveys?

A    I can't speak on that.

Q    Did you ever discuss the exit surveys with the warden?

A    We discussed the ones that I looked at and I had questions to talk to him about.

Q    Did you ever make any changes at ISP to try to increase retention?

A    No.

Q    Okay. Did you know Captain Dykstra?

A    Did I what? Sorry.

Q    Did you know Captain Dykstra?

A    Yes.

Q    Did you have any concerns about his job performance?

Page 136

A    No.

Q    Did you know Lieutenant Watson?

A    Yes.

Q    Did you have any concerns about his job performance?

A    No.

Q    Did you know Lieutenant Redden?

A    Yes.

Q    Did you have any concerns about his job performance?

A    No.

Q    Did you know Sergeant Statham, or Statham?

A    Ryan, I believe?

Q    Yeah, I think that's correct.

A    Yes.

Q    Did you have any concerns about his job performance?

A    No.

Q    Did you ever know Officer Pitser (phonetic)?

A    I know the name, but nothing beyond that.

     MS. PIERCE: Okay. I think I might be close to finishing. Why don't we take a ten-minute break.

     THE WITNESS: Sounds good.

     MS. PIERCE: All right. Thank

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 36 of 51

Page 137

you.
(Brief recess.)
MS. PIERCE: I have no further questions, so I think I'm ready to wrap up unless Mr. Ellis has any questions for you.
MR. ELLIS: I need to have a quick call with Mr. Gann, I think. There's just a few things I believe I need to clarify, so I'm going to give him a call.
MS. PIERCE: Okay. And again, I think we've done this in all the depositions, but we'll object to your conversing with him about the deposition before questioning him.
MR. ELLIS: That's fine. The custom and practice is perfectly within the rules to do so. So your objection is noted. If you wouldn't mind muting your -- do you have the mute button there, Mr. Gann? Okay, and make sure I've got your number here. Okay. I'm going to go off the record now.
(Brief recess.)
MR. ELLIS: We can go back on the record.

Page 138

CROSS EXAMINATION
BY MR. ELLIS:
Q Okay. Mr. Gann, early on in your deposition you were asked about whether or not you had reviewed any documents before your deposition in preparation, and I just wanted to make sure it's clear whether or not you reviewed anything at all.
A I reviewed my answers to my interrogatories, I think it's called.
Q Okay. And then you had answered some questions relating to Mr. Lessner, who at least at one point in time was the and I think currently is still the head of investigations at ISP.
Do you know whether he or Chuck Whelan or some other person was head of investigations at the time of the fire?
A At the time of the fire, I think it was Chuck Whelan.
Q Okay. But Mr. Lessner was present at ISP at that time?
A Yes.
Q Okay. And he was working in investigations even if he wasn't in charge of it?

Page 139

A Yes.
MR. ELLIS: Okay. No further questions.
MS. PIERCE: Okay. I have no follow up, so I think we're done. Thank you very much for your time, Mr. Gann. I appreciate you speaking with us.
THE WITNESS: Thank you.
MR. ELLIS: All right. Thanks. And we'll have him read and sign.
(Signature reserved.)
(Proceedings concluded at 12:23 p.m.)
* * *

Page 140

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the )
ESTATE OF JOSHUA DEVINE, )
)
Plaintiff, )
)
vs. ) Cause No.
) 3:18-cv-00995-JD-MGG
RON NEAL, ET. AL., )
)
Defendants. )
_____ )

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of one hundred thirty-nine (139) typewritten pages, is a true and correct transcript of my said stenographic notes.
Signed this 2nd day of November, 2020.

_Beth Barnette_

_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires: 6/13/22

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND  case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 37 of 51

Page 141

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE,  )
                          )
         Plaintiff,       )
                          )
vs.                       )  Cause No.
                          )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,        )
                          )
         Defendants.      )
_____)

KENNETH GANN

I hereby acknowledge that I have read the foregoing deposition transcript regarding the above-mentioned matter, taken Friday, July 24, 2020, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the additions or changes, if any, as noted on the attached errata sheet.

_____
KENNETH GANN

Subscribed and sworn to me this

_____day of_____,
2020, A.D.

_____
Notary Public
State of_____
County of_____
My Commission Expires:_____

Page 142

DEPOSITION ERRATA SHEET

Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____C3ange to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____

SIGNATURE:_____DATE:_____
         KENNETH GANN
         Date of Deposition:  July 24, 2020

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 38 of 51

## A

**Abbassi (1)**
133:2
**ability (4)**
6:23;7:2,6;132:13
**able (6)**
65:22;66:6,15,24;
67:9;102:5
**absolutely (1)**
125:21
**access (1)**
97:2
**accountability (1)**
128:15
**accountable (3)**
73:4;92:13,14
**accurate (3)**
6:24;7:3,6
**across (1)**
78:14
**action (24)**
9:15;56:21,24;66:23;
75:10,15;76:7,12,21,
24;77:20,24;78:15,22;
80:23;84:5;88:9,12,15;
94:17;95:5;98:5;
100:16;112:24
**activities (1)**
106:8
**actual (4)**
26:6;126:6,7,9
**actually (13)**
9:19;32:20;35:17;
44:4;49:13;58:10,12,
15;69:21;84:24;86:17;
96:11;104:18
**adapt (1)**
18:19
**additional (3)**
42:5;93:17;100:23
**address (14)**
28:14,24;29:9;54:8,
17;72:23;81:14;88:6,9,
13;94:17,21;123:16;
132:21
**addressed (5)**
26:24;30:14;102:14,
18;122:12
**addressing (2)**
30:8;117:20
**adequately (3)**
19:18;20:6;98:7
**adjust (1)**
134:19
**Administrative (1)**
17:12
**admission (3)**
4:5,7,14
**advantage (1)**
132:14
**advised (3)**

10:15,17;11:13
**affairs (6)**
112:1,3,7,17,20;
113:1
**affect (3)**
6:23;7:2,5
**affirmatively (1)**
129:21
**again (23)**
17:3;27:14;28:13;
30:6;31:7;46:23;47:7;
60:14;62:8;65:5;69:20;
74:22;82:7;84:19;
110:1;113:17;121:5,
20;123:4,12;124:24;
126:18;137:10
**against (5)**
9:2;43:6;125:24;
129:18,20
**ago (1)**
7:20
**agree (2)**
4:18;127:18
**ahead (6)**
10:25;30:23;128:23;
129:8;132:11,12
**ahold (1)**
94:25
**aide (1)**
9:20
**alarm (3)**
43:9;94:22;104:7
**alarms (3)**
93:15;95:15;96:3
**allow (2)**
6:1;31:24
**almost (3)**
19:10;20:11;64:10
**alone (1)**
111:20
**along (1)**
27:6
**always (22)**
18:11;19:23;26:19;
28:9,11,15;39:25;
52:14,21;54:12;68:7;
74:24;76:18;78:14;
103:10,14;105:19;
107:1;111:17;113:16;
122:6;129:7
**amount (2)**
110:6,22
**and/or (7)**
23:6;27:21;79:1;
116:25;117:3;128:19;
131:18
**Ann (1)**
119:15
**announced (2)**
128:23,25
**annual (12)**
89:23,24,25;90:4;
91:4;102:8,10;103:15,

18,22;104:4,11
**answered (3)**
79:9;114:2;138:11
**appeared (1)**
59:14
**application (1)**
14:5
**appreciate (5)**
20:3;46:2;68:5;
132:16;139:7
**appropriate (2)**
59:17;101:14
**appropriately (1)**
70:20
**Approximately (4)**
14:21;15:3;16:11;
58:6
**April (10)**
10:3,12,14,19;11:8;
12:4;38:3;84:8,18;
118:23
**area (5)**
23:6;63:12;97:22;
98:24;102:21
**areas (23)**
43:2;54:2;90:12;
97:1,1,5,10,11,12,13,
15,18,25;98:2,7;99:5,
16,20;102:22,25;103:4,
12;124:9
**argue (1)**
128:6
**armor (1)**
35:10
**armory (1)**
35:12
**Army (4)**
13:7,10,12,16
**Around (6)**
11:16,17;85:10;90:1,
23;105:22
**Art (1)**
29:7
**ASAP (3)**
24:25;25:16,17
**assertion (1)**
124:15
**assess (1)**
59:22
**assessment (1)**
133:12
**assessments (2)**
133:8,11
**assigned (3)**
60:9,18,21
**assignments (7)**
69:22,23;70:2,5,7,10,
17
**assist (2)**
59:18;61:4
**assistance (1)**
38:14
**assume (1)**

6:10
**assure (1)**
17:25
**assuring (1)**
17:19
**attention (8)**
55:22;63:16;65:22,
25;66:25;67:10,15;
68:20
**attorney (5)**
6:13;7:14,16;88:24;
118:21
**attorneys (1)**
8:1
**audible (1)**
5:18
**audit (7)**
89:23,24;90:1,5,21;
91:4,6
**auditions (1)**
47:12
**authority (1)**
88:12
**authorize (1)**
88:8
**automatically (1)**
130:22
**aware (27)**
22:24;28:3;33:15;
38:23;56:10;66:1,17;
67:17;68:17;72:1;
84:11,20;88:19;91:9;
92:2;93:14;94:9;
100:22;102:12;103:9;
104:9;110:5;117:9;
122:13;129:15;132:6;
135:7
**away (1)**
105:6

## B

**back (18)**
10:16;12:6,9;13:23,
24;19:9,11,13;31:7;
60:22;67:21;72:13;
84:14,21;105:8;106:1;
128:16;137:22
**backup (2)**
37:11;39:4
**bad (1)**
128:11
**Bane (1)**
119:15
**bartender (1)**
13:1
**base (1)**
30:25
**based (9)**
68:10;92:18;93:20,
22;98:9;121:16;
124:14,19;125:16
**basic (5)**

31:2;35:19,23,24;
36:4
**basically (15)**
30:24;31:19;37:24;
54:5;60:6;66:7;88:1;
96:15;99:4;126:4,12;
128:2;129:12;130:3;
134:16
**basics (1)**
42:21
**basing (1)**
61:22
**basis (1)**
98:15
**Bates (2)**
89:4;119:1
**batteries (23)**
33:18,20,22,23;
34:15;35:13,18,20;
36:4,12,16,18,19,22;
37:5,7,11,12;39:1,4,8,
18,24
**battery (15)**
34:3,8,9,13,13,19,23,
24;35:3,16;37:4,14,25;
38:17;39:5
**battle (1)**
88:4
**B-cell (6)**
10:2,15;66:2,6;67:5;
72:3
**Became (1)**
15:19
**began (1)**
133:21
**behind (2)**
130:1;132:8
**below (1)**
32:23
**benefits (1)**
49:16
**besides (14)**
7:25;8:5;21:24;
26:14;38:17;80:1;
93:15;98:21;100:24;
104:2;114:13;122:10;
134:11,24
**best (6)**
5:23;6:4;46:3;79:15;
101:7;109:7
**better (6)**
21:14;75:19,22;
87:14;101:25;109:15
**beyond (6)**
11:7,23;12:10;22:14;
49:15;136:20
**biggest (1)**
88:1
**bit (5)**
17:21;20:22;62:6;
71:9;98:13
**Blakely (1)**
132:25

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 39 of 51

**blatantly (1)**
107:2
**blink (1)**
35:1
**blinking (1)**
36:21
**blockage (1)**
98:25
**blocking (1)**
88:2
**blow (1)**
28:17
**Bob (1)**
89:20
**boilers (2)**
22:6;28:13
**both (7)**
5:21;6:2;63:6;64:7;
106:3;108:13;127:10
**bothered (3)**
32:21;52:15;54:12
**bottom (1)**
91:11
**bought (1)**
125:20
**box (1)**
60:23
**branch (1)**
13:6
**break (6)**
6:16,18,20;22:6;
72:13;136:23
**breakdown (1)**
20:14
**breaks (1)**
22:5
**Brief (3)**
72:16;137:2,21
**bring (3)**
116:24,25;117:2
**brings (1)**
125:8
**brought (4)**
75:23;95:4;116:11;
128:15
**buildings (1)**
20:21
**bulb (1)**
24:1
**bulbs (1)**
22:4
**bunk (1)**
27:7
**burn (1)**
54:16
**business (1)**
19:1
**Buss (1)**
119:16
**button (5)**
64:21;109:24;110:1,
25;137:18
**buy (1)**

33:11

## C

**call (13)**
10:17;11:7,14,16;
35:17;36:12;37:24;
61:24;102:22;130:18;
131:14;137:7,9
**called (22)**
4:20;10:13;23:16;
43:9;50:15,20;51:1,13;
52:14;53:6,7,8;61:4;
74:19;78:20;91:3;
93:23;123:20;130:19,
23,24;138:10
**calling (1)**
51:5
**call-offs (1)**
71:20
**calls (4)**
36:14;38:21;66:9;
75:3
**came (6)**
12:6;13:24;34:8;
49:12;84:21;133:14
**can (57)**
5:23,25;6:14,17;
10:10;12:5;17:21;
28:18;31:21;34:2,7;
38:22;39:3;43:16;46:3;
47:3,7;54:16;56:20;
59:7;60:2;61:8;62:6;
63:13,17;69:6;72:2;
76:4;79:15;83:9,15;
84:3,17;89:2;93:4;
98:13;105:1;107:9;
109:9;111:5;112:8,17;
113:24;115:14;116:19,
22;121:10,21,25;122:1,
9;125:20;126:3;128:1;
134:13,18;137:22
**Captain (14)**
10:13;11:11;15:19,
22;16:1,2;41:4;48:24;
74:25;75:5;86:25;
131:6;135:20,22
**captains (7)**
35:18;36:11,15,18;
96:11;105:8;131:13
**care (2)**
24:17;82:11
**career (1)**
41:18
**careful (1)**
43:3
**carpet (1)**
13:1
**carried (2)**
46:10;133:17
**carry (1)**
44:16
**carrying (2)**

96:7,9
**case (7)**
8:7;45:15;59:16,17;
112:8;122:22;123:6
**cases (1)**
9:1
**categories (2)**
56:3;57:8
**category (1)**
111:10
**cause (5)**
38:18;54:25;55:3;
77:9;134:8
**caused (3)**
55:19,20;63:6
**causes (2)**
58:7,20
**C-cell (2)**
106:2,14
**cell (36)**
23:6;26:8;43:4;59:6,
8,10,14;60:4,18,19;
61:1,6,10;64:24;65:8,
21;66:8,15;67:20;69:8,
18;71:24;72:2,7,20;
105:23;106:5,7,21,25;
107:5;110:7;126:5;
128:12;131:19,25
**cells (7)**
30:20;50:9;63:15;
110:20;131:17,21,22
**central (3)**
83:23,25;133:12
**certain (3)**
23:14;71:11;74:4
**chance (1)**
45:23
**change (1)**
33:20
**changed (4)**
33:24;79:17;84:9,18
**changes (14)**
21:13;80:19;81:4,7,
18,23,24;84:12;93:10;
94:6;110:3;125:11,13;
135:17
**characterization (1)**
20:4
**charge (31)**
11:6;34:13;41:8;
48:22;61:2;69:18,21,
22;70:1,4,9;71:2,13,23;
73:8,15,24;81:22;
87:15;90:4,6;92:3;
94:11;95:20;96:9;
99:19,23;119:22;
131:2;134:4;138:25
**charged (3)**
34:10;35:20;36:19
**charger (2)**
34:21,25
**charging (7)**
34:11,14,19,23;35:1;

36:23;38:17
**Charlie (1)**
96:18
**check (3)**
41:17;65:15;115:15
**checking (1)**
36:20
**chief (2)**
49:12;120:11
**chosen (1)**
65:17
**chow (1)**
115:6
**Chuck (2)**
138:16,20
**cigarette (1)**
28:19
**cigarettes (1)**
25:8
**circumstances (2)**
13:16;33:25
**city (3)**
12:18;63:15;64:23
**clarification (2)**
6:8,9
**Clarify (26)**
9:9;23:19;39:3,18;
41:25;42:16;54:20;
55:19;56:20;58:25;
59:12;62:12;63:4;67:1;
70:8;73:18;79:7;80:22;
85:8;97:21;99:17;
104:5;111:8;112:21;
113:24;137:8
**clarifying (3)**
8:15;27:24;71:21
**class (1)**
20:11
**classes (1)**
134:17
**clause (1)**
71:8
**clean (1)**
98:18
**cleaned (4)**
97:13,14,16,25
**cleaning (2)**
98:21,25
**clear (4)**
6:5,6;128:2;138:7
**clearly (1)**
6:1
**close (1)**
136:22
**closet (1)**
99:3
**clue (1)**
124:16
**code (1)**
40:24
**coin (1)**
41:9
**colder (3)**

31:25;32:13,21
**college (1)**
134:17
**coming (1)**
42:23
**command (1)**
103:13
**comment (2)**
8:16,17
**comments (1)**
8:14
**common (3)**
25:10,11;107:13
**communicate (1)**
37:15
**communication (1)**
106:20
**company (1)**
95:3
**complain (1)**
32:10
**complained (2)**
68:19;134:10
**complaint (7)**
108:24;109:2,3,9;
111:25;113:9,15
**complaints (18)**
31:4;32:5;33:16,19,
21;34:1;68:24;69:13;
109:12;111:10,14,17,
18,22;112:2,19;113:5;
135:5
**complemented (1)**
97:3
**complete (2)**
80:11;83:3
**completed (3)**
81:24;83:8;112:23
**complex (1)**
16:3
**compliance (1)**
107:3
**complies (3)**
91:13;120:24;124:13
**computer (1)**
101:17
**computers (1)**
101:18
**concentration (1)**
111:1
**concern (23)**
23:22;37:6,13;38:2,
6,11,15;39:25;45:4,17;
51:2;66:13;67:8,12;
87:12;93:1;108:8;
113:16;116:20;117:12;
122:15,17;124:10
**concerned (9)**
18:24;19:1,3,5,6,16,
17,21;117:22
**concerning (1)**
103:11
**concerns (57)**

BOSS REPORTERS
(219) 769-9090

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 40 of 51

20:1,3,21;37:7;
46:17,24;47:19,25;
50:5,7;80:4;84:22;
85:1;86:6,6;87:25;
91:25;93:5;98:9;100:8;
103:17,21;107:9,14,17,
22,24;108:3,19,21,23;
109:13;111:3,6,9,15;
114:18;115:13;116:5,
9,12,17,23;117:5,7,16,
20,24;118:15;120:19;
121:19,23;123:16;
135:24;136:4,9,16
**concluded (1)**
139:12
**conditions (2)**
6:22;79:13
**conduct (2)**
40:24;99:25
**confirm (1)**
100:12
**conservation (1)**
110:2
**consider (1)**
65:11
**consistent (1)**
4:12
**contact (1)**
67:15
**control (3)**
88:15,17,17
**conversation (4)**
8:9;11:19;92:6,9
**conversations (8)**
11:22;108:11,12;
115:20,22;120:14;
122:3,4
**conversing (1)**
137:12
**coolers (1)**
28:14
**copy (3)**
74:13;103:6,15
**corrected (5)**
21:12;65:12;82:3;
103:4;104:1
**correcting (1)**
20:4
**Correctional (12)**
5:7;14:10,12,14,19,
23;15:12,15,19,21;
16:1;19:14
**Corrections (2)**
14:2;133:16
**correctly (4)**
48:8;70:10;93:3;
132:18
**couch (1)**
11:14
**counseling (1)**
101:23
**counselor's (2)**
101:11;102:5

**count (3)**
56:4;58:13;128:15
**country (1)**
13:22
**couple (1)**
22:7
**court (2)**
6:1;7:22
**covering (3)**
11:2,4;119:14
**created (1)**
18:20
**crew (1)**
22:5
**crews (1)**
22:15
**criminal (1)**
9:14
**critical (33)**
52:14,17,21,22,23;
53:1,3,10,14,15;57:7,8,
11;58:3;76:10,11,15,
20;78:21;80:10,11,14;
82:14,15,17,20;83:3,7,
12,14,17,20;84:2
**CROSS (1)**
138:1
**currently (2)**
79:17;138:14
**Curry (5)**
77:1,4,5;78:24,25
**custody (24)**
15:8;17:18,22;18:2;
29:21;42:8;46:18;52:7;
73:3,5;77:7;79:1;
81:12,13,21;82:4;
86:24;87:2;97:1;100:5;
101:25;105:9;123:11;
126:17
**custom (1)**
137:15
**cut (2)**
84:14;110:25

# D

**Daily (6)**
85:19,22,24;86:19;
98:15;100:1
**dangerous (1)**
25:19
**Daniel (1)**
120:9
**day (12)**
19:1;30:11;53:13;
87:21;99:5,13;105:1,
24;106:11;107:8;
108:25;109:9
**days (7)**
10:23,24,24;11:1;
12:1;22:8;99:11
**D-cell (3)**
55:24;57:2;106:17

**dead (1)**
37:25
**deal (5)**
105:15;124:20;
126:23;132:2,19
**dealing (4)**
10:8;43:8;71:7;
127:24
**dealt (7)**
20:24;23:5;31:4;
41:13;81:13;88:7;
96:25
**death (4)**
58:20;77:15,18,21
**deaths (4)**
52:15;58:4,4,8
**decide (9)**
26:12;52:12,17;53:9;
75:25;76:6;98:16;
105:20;115:4
**decided (3)**
13:23;77:3;81:17
**deciding (2)**
80:19;81:6
**decision (1)**
41:10
**decision-making (1)**
41:12
**defendant (1)**
9:14
**defendants (1)**
8:7
**definitely (1)**
6:17
**definition (1)**
9:23
**degrees (1)**
33:1
**delays (2)**
32:9,11
**demanded (1)**
69:10
**demoted (3)**
91:19,20;94:10
**Department (10)**
14:1;18:13;20:19;
26:16,18,23;60:1;
70:22;105:7;133:16
**depend (7)**
26:24;54:11;59:11;
81:14,18;82:7;99:12
**Depending (5)**
60:9;82:4,7;105:25;
124:23
**depends (4)**
65:6;86:1;102:21;
106:19
**deposition (9)**
5:12,15;6:17;7:10,
13;9:22;137:13;138:3,
5
**depositions (1)**
137:11

**deputy (47)**
5:6;16:15,17;17:13,
16;18:21;20:16;29:21;
30:17;36:2;42:7;44:9,
12,25;45:5,19;51:19;
52:24;55:13;58:5,18;
59:2;63:22;64:8,11;
66:18;67:24;69:23;
70:13,15;71:23;73:6;
75:9;87:15;99:14;
103:11,14;104:23;
105:2;110:17;113:13;
114:16;118:3;119:13;
121:3;124:14,19
**describing (1)**
28:25
**designate (1)**
117:6
**designating (1)**
53:5
**details (2)**
82:24;112:9
**determine (1)**
133:19
**determined (1)**
77:23
**Devine (6)**
10:1,2,4,7;58:11;
89:5
**Devine's (3)**
59:17;77:18,21
**dictates (2)**
125:3,5
**difference (2)**
62:7;96:21
**differences (1)**
62:10
**different (11)**
20:13;27:3;40:22;
63:14;75:17;82:18;
86:2,3;97:4;125:6;
126:24
**differently (8)**
51:16;62:19;79:16,
19;80:16;81:1,5;
105:23
**DIRECT (1)**
5:1
**directly (5)**
23:20;24:6,8,10;
26:19
**director (6)**
20:25;29:5;85:14;
86:9,10;89:15
**discharged (1)**
13:18
**discipline (7)**
40:17,20;41:16,17;
92:19,20;112:24
**disciplined (2)**
40:11;41:6
**disciplining (2)**
40:15;41:1

**discrepancies (1)**
87:10
**discuss (2)**
115:22;135:13
**discussed (11)**
8:12;30:2;38:18;
56:9,15;72:18;80:20;
104:3;116:10;130:6;
135:15
**discussions (1)**
85:3
**dispute (4)**
120:25;121:2,16;
124:15
**distress (7)**
37:18,21;59:6,9,15,
23;72:19
**document (3)**
89:2;103:1;115:20
**documentation (4)**
7:22;73:19;84:4;
104:16
**documents (4)**
7:9;9:20;104:15;
138:5
**Don (1)**
119:16
**done (57)**
4:14;17:20;18:1;
20:12,21;21:13;22:15;
27:20,20;35:7;42:9;
50:14;53:17,18;62:3;
64:13;70:10,20;75:19;
76:12;79:16,19,25;
80:16;81:1,5;84:4;
85:6,22,25;91:1,18;
95:7,9,13;97:9;98:7;
100:9,13,17;102:11;
104:21;120:23;123:24;
124:12;126:16;128:13,
21;129:11;131:15;
133:8,11,12,19,21;
137:11;139:5
**door (15)**
43:4;59:9,18;60:25;
61:6,10,14,15,19;62:1;
69:8;96:18;98:11,14;
106:19
**doors (2)**
44:4;98:10
**doorway (1)**
88:3
**dorm (9)**
14:15;23:3;43:3;
63:12,16;128:14;
131:18,23,24
**dorms (1)**
15:8
**down (13)**
6:1;22:5,7;23:16;
28:13,14;60:7,16;
83:24;91:11,12;
112:11;125:19

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 41 of 51

**downstate (1)**
49:12
**drama (1)**
126:7
**drill (3)**
125:25;126:12,16
**drills (11)**
43:25;44:1,3,5,16;
45:2,6,11;46:6,10;
129:10
**drive (2)**
83:9,24
**drives (1)**
82:16
**drug (1)**
57:13
**drugs (2)**
54:2,10
**DS (1)**
71:8
**duly (1)**
4:21
**during (15)**
6:16;38:19;42:6;
67:16;75:8;79:9;88:10,
13;92:9;98:23;105:13;
107:18;130:9,16;131:4
**dust (3)**
98:11,17,19
**duties (2)**
17:16,18
**Dykstra (8)**
10:13;11:11;48:24;
74:23;87:1;131:6;
135:20,22

**E**

**E-4 (2)**
13:9,14
**earlier (2)**
55:16;102:9
**early (2)**
107:25;138:3
**easier (1)**
82:8
**easily (1)**
134:19
**East (7)**
91:19,23;92:3;94:10;
96:22,25;100:21
**East's (2)**
92:1;96:13
**eight (2)**
58:6,21
**Either (6)**
39:19;56:17;59:15;
67:23;75:9;78:23
**electrical (8)**
22:17,20,22;31:3;
55:20;56:4;63:6;
113:23
**ELLIS (12)**

4:6,9,16;38:21;66:9;
137:5,6,14,22;138:2;
139:2,9
**else (25)**
7:5;8:12;9:21;10:4;
11:11;17:7;19:12;
21:22;29:25;41:11;
43:14;52:5;57:5;77:12;
84:17;91:8;92:12;
105:25;107:11;114:4,
12;115:23;122:11;
123:22;133:19
**E-mail (7)**
89:5,10,22;91:11,16,
18;92:5
**E-mailing (1)**
89:16
**emergencies (4)**
42:12,15,18,19
**emergency (15)**
48:13;61:3,5,15,25;
65:20;66:25;67:3,9,16;
102:2;124:21;125:1;
126:23;127:20
**employees (1)**
20:20
**emptied (1)**
128:14
**en (1)**
43:10
**end (3)**
66:5;80:3;101:3
**enjoyed (1)**
47:14
**enough (6)**
18:17;19:18;20:6,20;
69:2;71:24
**ensure (7)**
30:4;70:20;95:8;
102:17,19;123:5,10
**ensured (1)**
95:7
**ensuring (2)**
66:19;123:19
**entirety (1)**
42:20
**environment (1)**
63:14
**equipment (1)**
50:18
**ERO (5)**
77:1,5,9,14,17
**especially (1)**
5:15
**evacuated (1)**
129:5
**evacuation (1)**
126:5
**evacuations (3)**
128:12,24;129:10
**even (4)**
23:4;51:12;130:5;
138:25

**evening (2)**
10:14;11:18
**event (2)**
79:11,12
**everybody (1)**
79:18
**everyday (1)**
28:20
**everyone (1)**
18:14
**everywhere (1)**
105:23
**exact (1)**
11:18
**exactly (17)**
15:4;20:2;27:1;
28:11;41:17,19;75:14,
19;78:9;89:25;91:22;
113:11;118:9;119:13;
122:5,8;133:23
**EXAMINATION (3)**
5:1;106:24;138:1
**examined (1)**
4:21
**example (3)**
79:10;82:5;104:6
**examples (2)**
47:3,4
**Except (3)**
10:13;82:23;96:25
**exercise (1)**
47:11
**exhaust (3)**
125:10,12,14
**Exhibit (5)**
88:21,22;89:4;
118:18,19
**exit (7)**
133:21,25;134:9,9;
135:9,11,13
**experience (7)**
71:12,24;121:3,16,
17;124:14,19
**experienced (1)**
46:2
**experiences (1)**
62:9
**explain (6)**
17:21;64:20;82:22;
98:13;126:3;128:1
**explained (1)**
27:20
**express (9)**
84:22;85:1;93:1;
100:8;103:17;115:13;
116:17,20;120:19
**expressed (1)**
116:12
**extra (2)**
49:11;100:24

**F**

**facilities (1)**
16:7
**Facility (38)**
5:7;14:11,12;25:24;
29:23;32:23;33:2;
37:17;85:7,10,11,12,
16,20;89:15,23,24,25;
90:5,11,15,16,17,19,
20;91:4,6;93:6,21,22;
99:6;102:11;108:4;
109:8,14;111:4;
114:20;117:25
**fact (1)**
37:4
**fail (2)**
37:7,12
**failed (2)**
34:12;92:15
**failing (2)**
37:5;40:23
**fails (1)**
37:14
**fair (1)**
6:11
**fall (1)**
97:19
**familiar (1)**
66:2
**family (1)**
8:3
**fan (2)**
125:10,12
**fans (2)**
82:9;125:14
**far (9)**
8:15,16;41:25;55:21;
89:18;97:12;112:21;
118:14,16
**fast (3)**
17:25;49:18;69:2
**federal (1)**
4:12
**feel (4)**
20:5;55:23;58:13;
103:24
**fell (5)**
47:20;97:11,22;
102:21;103:13
**felt (1)**
112:10
**few (2)**
58:23;137:8
**figure (2)**
80:25;133:8
**file (1)**
26:2
**filed (2)**
82:14;134:6
**fill (3)**
78:7;101:1;102:13
**filled (1)**
124:6
**filling (2)**

101:15,22
**filter (1)**
26:10
**find (4)**
57:3;75:18;78:11;
117:14
**finding (1)**
133:23
**fine (5)**
6:17,21;32:7;132:16;
137:14
**finish (3)**
5:22,24;123:1
**finishing (1)**
136:22
**fire (88)**
10:12,15;11:9,13,22,
25;12:1,4;38:4;43:18,
18,21,25;44:1,3,5,16;
45:1,2,6,11,16;46:6,10;
49:1,12,13;50:12,14,
19,21;51:4,8,8,10,10,
12;54:16;59:16;63:14,
18;74:20;84:8,13,18,
23;85:1,3;93:14,15;
94:21;95:15;96:2;
104:7;116:21,23;
118:24;120:11;121:10;
122:22;123:7;125:3,5,
6,24;126:6,8,9,9,12,13,
16,24;127:4,6,19,20,
24;128:3;130:4,10,17;
131:4,25;132:3,20;
138:18,19
**fired (1)**
13:2
**firefighter (11)**
47:9;49:7,17,23;
50:3;115:4;116:18;
131:14;132:1,2,9
**firefighters (23)**
50:2,8,17;51:11;
114:18,21,23;115:1,5,
15;116:1;119:3;121:9,
11;122:21;123:6,10;
128:10;130:9,16;
131:11,16;132:19
**firefighting (2)**
47:5;115:12
**firehouse (2)**
50:18;115:10
**fires (36)**
50:9,25;51:17,18,21;
52:14;54:12,18,21,22,
25;55:6,8,9,17,18,18,
19,21,23,25;56:3,4,6,8,
11,18,19;57:1,4;62:24;
63:5,6,8;121:8;127:1
**first (11)**
4:20;5:17;21:12;
26:12;48:3,6,11,14,19;
49:5;81:18
**five (9)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 42 of 51

13:22;14:21;16:11;
20:11;42:6;64:10;
99:11;104:24;106:2
**fix (2)**
28:14;39:16
**fixed (6)**
22:6,7,9;94:25;95:2,
4
**flag (2)**
23:1;60:8
**flashlights (1)**
35:14
**flipped (1)**
17:9
**floor (1)**
63:17
**flow (2)**
21:14,16
**flowing (1)**
21:20
**flush (2)**
110:10,12
**folks (1)**
22:11
**follow (8)**
25:2;40:23;53:11;
69:3;83:11;112:18,22;
139:5
**followed (2)**
95:10;96:20
**following (10)**
12:1,8;73:1,9,10;
80:6;81:23;84:13;93:9;
113:14
**follows (1)**
4:22
**follow-up (1)**
84:1
**form (4)**
53:15;78:17,20;
104:19
**formal (1)**
117:23
**formalized (1)**
117:19
**formatting (1)**
82:20
**forward (1)**
58:25
**forwarding (1)**
89:10
**found (1)**
8:23
**four (9)**
18:3,5;48:10,11;
55:14,15;56:7;64:9;
106:14
**free (1)**
109:18
**frequency (2)**
62:25;63:3
**frequent (6)**
21:6,25;28:7;32:5;

54:9;57:15
**frequently (12)**
24:11;25:12;33:1;
46:9;64:4,25;74:10;
85:18;94:3;99:23;
114:22,25
**friendly (1)**
122:6
**friends (1)**
8:4
**front (5)**
60:25;61:10,14,15;
118:10
**full (3)**
68:5;106:2;132:17
**fully (3)**
20:6,14;45:24
**further (3)**
91:12;137:3;139:2
**future (1)**
81:6
**FYI (2)**
89:9;92:5

## G

**GANN (14)**
4:19;5:3,5,8;6:22;
7:18;9:17;12:13;34:2;
72:18;137:7,18;138:3;
139:6
**G-A-N-N (1)**
5:5
**gate (1)**
69:8
**general (5)**
29:22,24;30:16;
66:19;93:19
**generally (3)**
24:13;29:17;61:11
**George (2)**
17:5,9
**gets (2)**
65:15;126:8
**getter (1)**
63:16
**getters (1)**
55:22
**Gipson (1)**
89:20
**given (12)**
43:17;59:5,21;61:13;
62:4;67:14,18;81:4;
92:18;93:25;107:16;
117:11
**giving (2)**
68:5;132:16
**goes (2)**
65:14;83:24
**Goldblatt's (1)**
12:25
**good (13)**
37:8,10;43:6;47:15;

49:8,20;72:15;120:16;
121:23;125:8,23;
128:6;136:24
**graduate (2)**
12:13,16
**graduated (1)**
12:20
**great (4)**
4:17;49:14,15;76:6
**Greg (2)**
89:16,17
**Griffin (5)**
44:18,19,21;91:24;
116:16
**Griffin's (1)**
100:20
**group (1)**
81:20
**groups (3)**
18:4,5,8
**guards (4)**
66:25;67:10,16;
68:20
**guards' (1)**
68:20
**guess (7)**
18:1;19:21;28:9;
54:10;59:11;65:6;
97:20
**guy (2)**
26:7;31:25
**guys (2)**
43:5;90:8

## H

**half (6)**
11:20;12:8;16:11;
72:12;84:20;119:14
**hall (1)**
101:25
**Hammond (1)**
12:19
**hand (1)**
81:15
**handle (2)**
71:25;121:10
**happen (8)**
24:5;34:16;44:9;
53:16;64:4;78:9;90:10;
126:13
**happened (2)**
16:14;130:3
**happening (3)**
93:2;114:19;129:8
**happy (2)**
6:8;64:7
**hard (3)**
18:12,15;82:22
**hazard (6)**
92:11;116:10,15;
117:24;118:15;126:21
**hazards (7)**

90:3,22;93:8;116:7;
117:8,10,15
**head (4)**
5:19;128:25;138:14,
17
**heads (1)**
105:8
**health (1)**
44:17
**hear (15)**
24:19;25:12;34:1,4;
50:7;52:1;66:7,15;
67:4;68:2,18;76:4;
102:6;121:21;122:11
**heard (5)**
33:16;36:15;37:23;
38:1;69:13
**hearing (2)**
76:1;121:20
**heat (9)**
31:3,23;32:1,7,10,11,
14,15,24
**heating (1)**
31:21
**help (3)**
72:19;107:9;121:11
**helped (1)**
49:21
**herself (1)**
72:3
**high (4)**
12:13,16,18,20
**highest (1)**
75:5
**himself (2)**
59:18;72:3
**hold (3)**
73:4;92:13,14
**home (2)**
13:23,25
**homicide (1)**
58:23
**honestly (1)**
130:20
**honorably (1)**
13:18
**hook (1)**
60:22
**hope (3)**
25:24;116:25;117:2
**Hostage (1)**
77:13
**hot (3)**
55:2,21;56:4
**hotspots (1)**
54:1
**hour (1)**
72:12
**hours (3)**
42:4;106:15,17
**house (32)**
10:2,15;43:4;51:9;
55:24;57:2;60:4,18,19;

61:1,6,10;65:9;66:2,6,
8;67:5;69:19;71:24;
72:3,3,7;105:24;106:2,
7,14,17,21,25;126:5;
128:12;131:25
**houses (2)**
106:5;107:5
**housing (8)**
50:16;71:14;95:10;
96:12;101:7,10,14;
131:18
**How's (1)**
122:5
**HR (1)**
134:5
**human (4)**
41:13,14;134:5,7
**hundred (7)**
24:22;36:24;84:15;
94:16;110:13;125:14;
130:21

## I

**IA (4)**
118:23;119:2,4,6
**idea (13)**
9:3;17:11;25:22;
33:5;61:21;62:5;67:22;
77:19;93:24;94:5;
103:2;113:6;128:11
**ideas (2)**
125:8,22
**identification (2)**
88:23;118:20
**identified (14)**
39:1;50:16;88:10,13;
93:18;94:18;102:15,
17;103:18,22;104:3,
11;111:11;124:10
**identify (3)**
39:8,16;52:23
**identifying (2)**
94:11;117:23
**IDOC (2)**
102:17;134:22
**IDOC's (1)**
83:22
**imitate (1)**
126:12
**immediately (2)**
123:21;132:2
**implement (1)**
80:19
**implemented (1)**
129:21
**important (15)**
5:16;45:12,12,14,15;
46:7;71:6;95:23;
113:13;117:19;118:4;
127:7,16,19;129:17
**improve (1)**
81:11

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 43 of 51

**improved (1)**
130:5
**inadequate (1)**
19:3
**incident (48)**
51:23,24;52:2,6,11,
12,17,21,23;53:1,4,9,
10,11,14,15,17,18,19,
20;55:8;56:13;57:11;
58:3,13;76:10,11,21;
77:25;78:2,21;80:10,
12,14;82:14,15,17,18,
21,23;83:3,7,12,14,17,
20;105:4;124:3
**incidents (7)**
52:14;54:6;57:8;
68:18;76:15;77:9;84:2
**include (1)**
80:15
**included (1)**
58:11
**including (2)**
63:6;121:7
**increase (1)**
135:18
**independent (6)**
9:18,25;10:11;11:8,
21;12:3
**Indiana (69)**
10:3;12:19;14:1;
16:5,10,15;17:17;
18:21;19:4;22:1,17,23;
30:9,17;33:7,10;40:3,
12,15,17,21;41:21,24;
42:2,11;43:21,24;44:6;
45:1,6;46:1;47:19;
48:4,6,17,20;50:9,12,
21;51:18,22,25;52:3,6;
53:22;54:18,22;55:1,6;
57:15;59:2;60:3;62:10,
14,17,18,25;63:8,23;
68:12,14;73:11;75:8;
76:15;84:10;85:6,13;
121:4,17
**Indianapolis (1)**
42:9
**indicate (1)**
83:13
**inform (1)**
36:15
**information (1)**
36:7
**informed (2)**
10:14;113:4
**informing (1)**
113:8
**infrastructure (2)**
85:13;108:4
**INI (3)**
111:24;112:12,13
**initial (1)**
78:4
**initiate (2)**

108:10,12
**injuries (3)**
82:25,25;107:1
**input (3)**
79:2;80:15;81:3
**inside (7)**
21:13;28:18;32:20,
20,23;33:2;60:23
**inspect (1)**
96:2
**inspecting (2)**
95:15;99:20
**inspection (12)**
87:20;88:14;90:21,
24;96:5;99:5;102:8,15;
103:15,19;104:11,18
**inspections (31)**
85:6,15,21,25;86:2,4,
11,14,16,23;87:5,8,17,
23;88:10;93:2,6,20,22;
96:22,23;97:8;98:6,23;
99:9,15;100:16;
102:10;103:22;104:15,
17
**instances (1)**
8:24
**instead (1)**
5:19
**institution (4)**
17:20;63:20;77:6;
83:22
**instruct (3)**
35:6,15;36:20
**instructed (4)**
35:4;61:18;95:14;
124:20
**instructing (1)**
131:9
**instruction (15)**
44:23;59:4,21;61:13;
62:4;67:14,18,23;
73:16,20;88:6;95:12;
103:8;117:11,13
**instructions (4)**
40:23;72:22;73:10;
103:3
**instructs (1)**
6:15
**intensive (1)**
127:24
**interactions (1)**
10:6
**internal (11)**
112:1,2,7,17,20;
113:1,18;119:20,22,25;
123:14
**interrogatories (1)**
138:9
**interrupted (3)**
8:17;30:22;132:15
**interview (1)**
14:6
**into (6)**

12:4;42:23;43:3;
51:9;90:10;99:3
**investigate (1)**
69:4
**investigated (2)**
111:24;112:1
**investigation (10)**
12:4,6,10;112:23;
113:2;119:12,21,25;
123:15,25
**investigations (5)**
113:18;119:23;
138:14,18,24
**investigators (1)**
78:5
**involve (1)**
42:17
**involved (13)**
41:11,20;75:18;
76:17;77:5,10,14,17;
78:6,7;82:24;103:10;
112:17
**involvement (2)**
41:15;77:25
**ISP (16)**
14:9;17:4;18:10;
20:17;21:7;28:8;32:6;
36:3;73:2,22;74:2;
135:5,6,17;138:15,21
**issue (25)**
21:19;22:25;25:10,
11;28:16;35:16;37:4,
22;38:17;54:21;56:25;
74:4,7;75:23;81:9,19;
82:3,4,4,7,10;87:11;
88:6,7;94:21
**issues (37)**
12:9;18:9,11;21:6,7,
11,15,24,25;24:20;
28:8,12,22;33:16;34:4;
36:4;47:19;53:22;
62:16;63:7;75:23;
83:12;85:11;88:16;
100:20;102:14,18;
103:18;104:2,6,8;
105:15;111:11;113:22;
120:25;122:11,14
**item (2)**
81:16;82:3
**items (4)**
84:15;93:18;96:15;
108:2

**J**

**job (32)**
8:18;14:1,4,13,17;
15:5,25;18:13;28:21;
29:2,14,18;46:25;
47:20;48:1;92:24;93:8,
10;96:19,20;114:16;
115:16,25;116:3;
134:12,13,25;135:4,24;

136:4,9,16
**jobs (3)**
12:22,24;134:21
**Johnson (2)**
111:19,19
**join (1)**
13:6
**joined (2)**
12:22;13:5
**Joshua (3)**
10:1;58:11;59:16
**July (2)**
89:6,22
**jury (1)**
8:24
**Justin (1)**
132:23

**K**

**Kaufman (15)**
26:16;29:7,12;30:5,
8;82:11;95:7,8,13,16,
18,20;96:6;97:10,24
**Kaufman's (3)**
29:18;95:24;96:1
**keep (10)**
5:17;18:12,15;28:21;
29:3;53:21;56:11;57:9;
71:15;133:22
**keeping (3)**
18:2;30:5;90:25
**KENNETH (2)**
4:19;5:5
**kept (11)**
20:25;25:21,23;28:1;
37:8;53:24;54:4,5;
56:13;60:7;74:16
**Kevin (1)**
89:10
**key (3)**
60:2,7,17
**keys (7)**
60:4,10,12,20,25;
121:12,13
**kind (10)**
28:1;39:21;52:15;
97:3;102:1;107:7;
108:14,17;112:16;
129:16
**kinds (2)**
40:25;90:2
**kitchen (1)**
22:5
**knew (4)**
30:13;35:2;37:2;
129:7
**knowing (1)**
113:18
**knowledge (3)**
36:9;94:21;129:11

136:4,9,16
**jobs (3)**
12:22,24;134:21

**L**

**lack (1)**
19:22
**last (2)**
23:17;106:13
**late (1)**
69:11
**lawsuit (8)**
7:19,21;8:1,4,7,10,
14;9:7
**lead (1)**
16:2
**leaking (2)**
21:20,21
**leaks (1)**
22:8
**learn (3)**
7:18,21;51:21
**least (7)**
25:14;46:11;65:14;
70:23;72:6;99:10;
138:13
**leave (8)**
11:5;13:12;40:23;
58:15;60:19;109:21;
111:20;133:24
**leaving (5)**
13:16;111:2;133:19,
20;134:21
**left (1)**
50:17
**Less (3)**
57:23,25;58:1
**Lessner (6)**
119:19,22;120:3,4;
138:12,21
**letter (16)**
92:1;93:5,19;94:18;
100:11,15;102:9;
120:21;121:1,6,15;
122:12,14;123:17;
124:2;130:2
**letters (1)**
119:2
**letting (2)**
50:8;131:16
**level (3)**
18:3;71:11;77:25
**levels (4)**
18:3,25;19:4;32:15
**liable (1)**
8:23
**lieutenant (7)**
15:12,16;23:4;27:21;
128:19;136:2,7
**lieutenants (5)**
86:20;96:11;98:3;
99:19;100:1
**lieutenant's (1)**
104:13
**light (10)**

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 44 of 51

22:3;24:1,14;25:7;
28:19;34:21,22,25,25;
35:1
**lights (4)**
36:21;40:1;113:25;
114:8
**liked (1)**
115:12
**limitation (1)**
110:22
**limitations (2)**
110:6,9
**line (3)**
81:10;89:23;115:7
**lined (1)**
78:4
**Lintz (2)**
89:16,17
**listed (1)**
57:10
**literal (1)**
98:19
**little (9)**
17:21;20:22;32:13;
62:6;71:9;98:13;125:6;
126:3;128:1
**lived (1)**
23:6
**living (1)**
132:1
**locations (1)**
54:6
**locked (3)**
59:8;61:11;71:7
**lockup (4)**
70:22;71:1,3,4
**log (2)**
28:1,5
**long (12)**
11:19;13:10;14:19;
15:1,15,21,23;16:9,17;
25:21;106:13;122:18
**look (12)**
58:10;82:17;85:11;
87:9;90:1,12;98:8;
105:4;107:1;118:13;
133:15;134:11
**looked (10)**
39:24;52:4,10,13;
87:13;98:22;102:8;
112:7,13;135:15
**looking (4)**
52:5;86:1;97:4;
106:23
**looks (1)**
112:15
**lose (1)**
19:9
**lot (11)**
19:7,8;21:13;27:2;
31:14;40:22;46:14;
49:11;51:15;108:19;
133:5

**loudly (1)**
5:18
**low (1)**
33:4
**lower (2)**
63:3,19

## M

**ma'am (115)**
8:20;17:15;24:7,21;
25:8,11,19,22;26:25;
27:4,10,12;28:6,9;29:1,
11;30:3,20;32:3,8,25;
33:3,5,8;34:15;35:5,7;
36:10,17,25;37:3,7,9,
19;43:16,19,23;44:14;
45:3,10,16,20,22;
46:19,20;47:2,22,24;
48:2,5;49:9,14;50:4,6,
11;51:8,11;52:1,16,19,
24;54:7,24;55:4,7,11;
56:10,13,16;57:11,14,
17,20;59:7,12;60:1;
61:9,17,21,24;62:1,5,
15,20,23;63:2,21;
65:19;66:1,4,17,22;
67:22;68:17;69:15,20;
72:10;82:22;83:15,19;
85:2,5;87:6;88:7,15,
19;97:17;104:12;
113:16;118:6,10,13;
119:10;122:9;127:13
**mail (2)**
69:7,7
**main (3)**
29:20;80:25;134:20
**Mainly (2)**
70:22;112:13
**maintenance (47)**
17:19;20:16,18,19;
21:6,7,25;22:3,11,25;
24:17,25;25:3,16,20;
26:7,15,17,22;27:11,
16;28:8,22,24;29:3,4,
22;30:1,9;81:9,10;
82:2,10;86:6,14;87:10,
24;91:21,21;95:1;97:1,
12,19,23;98:1;114:5,7
**major (27)**
16:5,9;17:24;24:7,
10;26:20;44:1,6;46:20;
52:9;62:9;64:5,8,9;
67:24;68:4;70:2,12,14,
19;73:7,8;75:9;80:13;
87:7;99:11;110:18
**majority (3)**
52:4,11;90:18
**Making (13)**
31:11,20;35:20;
42:25;72:21;73:8;
74:19;81:23;82:2;
87:16;113:21;126:15;

131:3
**man (2)**
92:11;126:21
**managed (2)**
16:2;19:23
**manager (10)**
86:8;90:22;93:8,11;
94:7,12;116:7;117:8,
11,15
**managers (2)**
96:12;119:18
**manager's (1)**
101:12
**manned (1)**
17:23
**manner (3)**
104:1;109:13;121:9
**manual (4)**
74:5,8,11,14
**many (8)**
8:21;51:17,18;55:12;
57:18;58:4;75:13;
110:12
**mapping (7)**
53:14,24,25;54:3;
56:14,14;82:15
**mark (3)**
52:22;88:21;112:16
**marked (2)**
88:23;118:20
**matter (3)**
5:10;81:15;127:5
**may (2)**
6:13;9:21
**Maybe (5)**
34:17;51:20;106:9;
107:21;115:2
**mean (50)**
4:13;9:18;10:8;11:5;
18:18;20:10;22:2;
23:11;26:11,14;28:12,
15;30:21,24;37:10,11;
39:21;42:21,23;44:2;
48:25;52:15;55:18,23;
61:24;63:13;68:23,24;
98:12,19;99:1,4,11;
101:24;109:1,9;
112:12;116:6;122:6;
125:4,6,6,8;126:4,7,24;
127:3;128:2;129:2;
135:1
**meant (1)**
93:7
**mechanism (1)**
23:9
**medical (1)**
59:15
**medication (1)**
7:1
**meet (1)**
78:10
**meeting (9)**
30:11;41:7;42:8;

78:23;79:9,25;105:6,
10,25
**meetings (3)**
80:6,7;103:11
**Megan (1)**
5:8
**member (5)**
41:5;59:18;69:17;
71:12;78:2
**members (6)**
73:17,21;84:25;
107:19;114:14;133:18
**memory (1)**
118:12
**mentality (1)**
71:9
**mentioned (1)**
31:20
**messing (1)**
111:20
**met (3)**
10:9;66:20;70:24
**might (9)**
6:5,23;7:1,5;48:10;
66:14;67:9,21;136:22
**military (4)**
12:23;13:5,6,21
**Miller (4)**
124:7,7,9,10
**Milne (4)**
120:9,17;121:1;
122:10
**Milne's (1)**
123:16
**mind (2)**
8:15;137:17
**minimize (2)**
56:18,25
**minute (4)**
11:20;91:10;120:22;
124:11
**minutes (8)**
65:2,3,9,10,14,16,17;
80:5
**missed (1)**
76:19
**mistaken (1)**
48:9
**mistreating (1)**
111:23
**Money (2)**
134:23,24
**monitor (2)**
96:2;100:23
**monitoring (1)**
64:13
**month (12)**
24:12;25:14;34:17;
37:6;54:4;55:14,15;
56:7;57:19;74:12;
107:21;115:2
**monthly (6)**
85:24;86:20;100:2;

104:13,14,18
**months (7)**
12:8;19:10;70:23;
71:5,16;84:20;119:15
**more (35)**
17:21;18:2;20:23;
31:21;46:14;57:21;
63:5,8;65:3;71:9;
81:12;82:9,23;83:1;
93:13;98:13;106:11;
109:5,5,6,18;111:12,
12;122:6,7;125:24;
126:3,12;127:1,23;
128:1,7,9;134:12,14
**morning (2)**
30:12;105:3
**most (3)**
21:5;22:10;28:12
**move (1)**
29:24
**moved (5)**
16:19,20,23,25;17:2
**much (9)**
41:17;62:21;63:13,
17;65:13;70:21;96:25;
133:9;139:6
**multiple (3)**
43:10;101:18;106:5
**multi-tasked (1)**
14:17
**murder (1)**
58:22
**must (1)**
118:1
**mute (1)**
137:18
**muting (1)**
137:17
**myself (2)**
78:25;81:20

## N

**name (8)**
5:4,5,8;35:9;64:18;
120:12;124:8;136:20
**names (1)**
133:3
**Neal (6)**
8:8,10;44:22;89:6,
16;93:14
**necessarily (1)**
67:4
**necessary (1)**
32:14
**need (15)**
4:2;6:15;27:7,7;
36:6;37:19;42:16;
54:20;65:13;92:10;
101:21;134:16,17;
137:6,8
**needed (19)**
26:13;30:21;32:16;

USDC IN/ND case 3:18-cv-00995-JD   document 203-8   filed 03/29/21   page 45 of 51

33:23;38:14;65:12;
72:19;81:16;87:11;
90:13;93:7;96:16;
102:23,25;103:4;
105:16;112:13;116:8;
134:11
**needing (1)**
97:12
**needs (6)**
17:12;30:25;31:2;
66:20;72:23;81:12
**negative (1)**
40:8
**never-ending (1)**
88:4
**new (7)**
20:9;34:8;47:12;
93:7;109:16,20,23
**next (7)**
15:11;41:19;53:13;
79:13;84:19;93:11;
94:11
**night (6)**
74:23;75:6;124:17,
18,22,25
**nights (1)**
134:18
**nine (1)**
58:16
**nobody (3)**
11:4;109:22;126:8
**nodding (1)**
5:19
**nondisciplinary (1)**
71:14
**nonmaintenance (3)**
98:24;99:16,20
**Nope (1)**
84:3
**normal (3)**
18:1;82:18;102:12
**Normally (6)**
25:6;26:15,22;91:7;
97:2;98:14
**noted (1)**
137:16
**notes (1)**
90:25
**note-taking (1)**
84:5
**noticed (1)**
62:16
**notified (1)**
113:19
**number (6)**
43:6;58:11;89:4;
110:9;119:1;137:19

## O

**object (5)**
4:4,9,11;6:13;137:12
**objection (4)**

4:16;38:21;66:9;
137:16
**observing (1)**
21:3
**obstruction (1)**
88:3
**obviously (1)**
128:3
**occur (3)**
62:24;63:3;127:20
**occurred (3)**
71:22;124:17,22
**occurrences (1)**
64:3
**odd (2)**
12:22,24
**off (10)**
12:8;19:13;39:23;
50:17;75:3;84:19;
110:1;119:15;131:24;
137:20
**offender (4)**
27:17;47:5,9;112:10
**offenders (25)**
10:9;22:13;25:11;
30:19;33:11;44:4;
47:12;50:15;54:2;
55:21,24;56:6;57:2;
71:7;82:25;88:2;98:15;
105:14;106:18;107:2,
24;108:9;109:21;
123:19;129:6
**office (13)**
14:5;41:4,6;74:6,17;
83:23,25;101:11,12,23;
102:5;133:12;134:7
**officer (34)**
14:10,14,15,20;
19:15;23:3,12,22;34:2;
37:18,21;39:12,17;
48:16;60:9,18;61:2;
69:1,18;71:2,4,13,23;
72:2;82:5;86:18;
112:10,25;128:18;
131:18;132:23,25;
133:2;136:19
**officers (18)**
33:12,14;34:5;38:3;
60:13;64:1;69:4,9,11,
13;72:6;73:9;98:2;
99:19,25;101:1,21;
133:3
**officer's (2)**
60:8,23
**often (7)**
33:4;34:16;107:16,
17;112:5,6;128:20
**OJT (2)**
20:10,12
**old (2)**
28:11;32:4
**older (1)**
32:12

**Once (5)**
25:14;32:7;106:5;
107:21;115:2
**one (44)**
5:21;11:23;16:3;
24:12;35:18;37:12;
38:2;45:23;53:4,6,10;
60:12;65:4,14;66:5;
69:6;72:2;73:3;79:15;
80:24,24;83:24;86:13;
89:18,21;90:17;95:3;
99:25;101:17;102:12;
104:2;106:1,7,11;
111:10;112:8;115:16;
116:7;119:9,10,15,16;
124:21;138:13
**ones (24)**
26:13;52:13,13;53:1,
3;55:19,20,23;76:17;
86:18,19,21;87:24,25;
88:1,1;95:4;104:20,21;
122:12;131:22,23;
132:20;135:15
**OnGuard (1)**
64:18
**online (3)**
19:9,11,13
**only (10)**
23:21;37:23;46:23;
52:25;55:3;64:5;75:4;
76:14;101:17;108:8
**open (11)**
59:9,18;61:14,15,19,
25;63:12,16;98:10,10,
17
**opened (3)**
61:7;96:18;98:14
**opening (1)**
43:4
**operations (1)**
18:1
**opinion (16)**
51:3,14;62:2;68:6,
10;71:11,15;125:7;
127:8,9,11,12;129:24;
130:1;132:4,7
**oral (1)**
23:21
**orally (2)**
23:7;103:4
**order (10)**
23:5,13,15,17,20;
27:19,22,23;79:14;
114:11
**orders (4)**
20:19;21:1;24:2;
28:2
**Orme (5)**
89:10,19,21;90:8;
94:16
**Orme's (1)**
89:18
**others (1)**

32:13
**otherwise (2)**
58:25;83:13
**out (51)**
10:16,18,23;11:3,14;
14:6;28:17;33:20,24;
34:15;38:1;44:16;
46:10;50:8;56:1;57:3;
59:10;73:19;75:18,23;
78:8,11;80:25;90:17;
96:7,10,15;101:1,15,
22;102:13;107:2,25;
109:5;110:23;117:14;
119:11;121:9;122:19;
123:20;124:6;131:16,
20,20,23;132:20;133:9,
14,17,23;135:3
**outcome (1)**
113:8
**outlet (4)**
24:14;25:6;28:17,24
**outlets (5)**
22:23;24:20;25:9;
113:25;114:8
**out-of-the-blue (1)**
129:13
**outside (11)**
22:11,15;32:19;44:4,
5;47:20;48:1;83:21;
90:15,18;95:2
**over (23)**
4:5,10,15;5:14,16;
17:4,6,18,18;24:25;
50:17;69:6;70:25;
87:11,12,13;89:14;
91:23;94:8;100:21;
105:3;130:20,25
**overdoses (2)**
57:13;58:22
**oversee (3)**
92:23;96:13;116:3
**overseeing (9)**
70:9,16;72:25;92:16;
95:20;99:15;100:3;
120:2,7
**own (2)**
47:20;99:5

## P

**page (1)**
120:22
**paper (1)**
31:8
**paperwork (3)**
27:13;31:15,17
**parents (1)**
13:23
**parked (1)**
10:2
**part (14)**
8:18;28:21;29:14,25;
42:13;47:14;59:25;

78:2;105:18,20;
114:16;119:8,24;
120:21
**participant (1)**
47:16
**participants (1)**
79:3
**participate (9)**
41:23;45:6,18;46:13;
75:10,13;77:20,24;
90:20
**participated (2)**
5:11;49:21
**participating (2)**
43:25;79:21
**particular (2)**
115:3;134:9
**parties (3)**
4:2,3,18
**pass (2)**
65:3,13
**patience (1)**
71:10
**pay (1)**
101:3
**paying (2)**
134:12,13
**Payne (2)**
17:5,9
**PC (1)**
15:7
**pending (1)**
6:19
**people (28)**
18:12,15,17;19:8,9;
21:1;26:19;27:2;28:16;
31:11,23;32:10;39:5;
48:8;49:18;54:16;
58:21;81:10;90:15,16;
101:13,14;119:14;
133:15,18,20,22;
134:21
**percent (7)**
24:22;36:24;84:16;
94:16;110:13;125:14;
130:21
**perfectly (1)**
137:15
**perform (1)**
133:13
**performance (9)**
29:18;40:2,8;92:1;
100:20;135:25;136:5,
10,17
**perimeter (1)**
14:16
**period (6)**
10:18;38:19;46:13;
58:16;59:1;101:3
**person (16)**
9:9,11;19:13;35:7;
37:24;39:22;66:7;
68:13;75:6;79:5,20;

USDC IN/ND case 3:18-cv-00995-JD document 203-8 filed 03/29/21 page 46 of 51

81:15;103:23;116:15;
127:3;138:17
**personal (7)**
103:25;108:2;109:3;
127:8,11;132:4,7
**personally (2)**
10:7;112:11
**phone (1)**
11:12
**phonetic (2)**
35:9;136:19
**physical (8)**
20:24;29:5;85:12,14;
86:9,10;89:14;108:4
**pick (1)**
69:9
**picked (1)**
69:10
**PIERCE (21)**
4:1,8,13,17;5:2,9;
38:24;66:12;72:11,17;
88:20,24;89:1;118:17,
21,22;136:21,25;137:3,
10;139:4
**pink (5)**
23:23;24:6;26:6,21;
27:1
**Pitser (1)**
136:19
**place (7)**
28:11;32:4;66:8;
81:18;101:7;117:6,18
**placed (1)**
69:17
**Plaintiff (5)**
4:20;5:9;9:7,9,11
**Plaintiff's (2)**
88:22;118:19
**planned (1)**
105:10
**plant (8)**
20:24;29:5;85:14;
86:7,8,9,10;89:14
**please (11)**
5:3,17;6:7;30:23;
39:18;41:25;63:4;
111:8;112:21;113:24;
132:12
**plumbing (3)**
21:11,17,24
**plus (1)**
78:4
**pm (1)**
139:13
**point (5)**
6:16;96:15;116:16;
128:6;138:13
**policies (6)**
73:2,16,21;74:16;
113:7,14
**policy (28)**
57:10;58:24;59:4;
61:5,8,23;68:12,15;

74:3,5,7,8,11,13;76:8,
9,10,20;84:9;117:6,9;
118:10,11,14;130:8,15;
132:5;133:14
**pose (1)**
37:16
**position (9)**
11:2;14:8;17:4;
48:14;62:13;69:18;
70:12;92:15,17
**positions (4)**
13:3;48:4,6;119:17
**positive (1)**
125:15
**possible (5)**
31:5;61:16,20;71:16,
17
**pot (2)**
55:2;56:4
**pots (1)**
55:21
**PPD (4)**
20:24;86:9;88:18;
95:15
**practice (8)**
47:11;74:3;125:25;
126:12;130:8,15;
132:5;137:15
**practices (6)**
73:11,17,22;84:9;
113:7;126:16
**PREA (2)**
112:14;113:10
**preached (1)**
40:1
**prefer (1)**
72:4
**preferred (1)**
102:3
**preparation (2)**
9:22;138:6
**prepare (2)**
7:9,12
**prepared (2)**
124:23;127:5
**present (1)**
138:21
**presentations (1)**
84:6
**presented (1)**
79:8
**pressure (1)**
109:16
**pretty (1)**
62:21
**prevented (1)**
130:5
**previous (1)**
41:16
**Prison (73)**
10:3;16:6,10,16;
17:17;18:21;19:4;
21:14;22:1,2,17,23;

30:10,17;33:7,10;40:4,
12,15,18,21;41:21,24;
42:3,11;43:21,24;44:7;
45:1,7;46:1;47:20;
48:4,7,17,20;50:10,13,
21;51:19,22,25;52:3,6;
53:23;54:19,23;55:1,6;
57:16;59:3;60:3;62:11,
14,17,18;63:1,8,23;
68:12,14;73:12;75:6,8;
76:16;84:10;85:7,13;
105:18,20;117:18;
121:4,17
**prisoner (31)**
22:25;23:20;58:3,4;
59:5,8,14,19,22;65:20;
66:14,16;67:5,8,20,25;
68:1,6,8,15,19;72:19;
77:15;84:12;110:7;
111:16;113:15;114:17;
130:9,16;131:10
**prisoners (30)**
22:12;24:5;49:21;
55:5,10;56:12;57:1;
63:7,24,25;66:20,24;
67:2,14;69:5,14;84:22;
108:7,15,22;109:11;
110:19;111:3,6,23;
113:4,8,22;114:13;
129:4
**prisoners' (1)**
72:23
**private (1)**
131:22
**Probably (6)**
15:17;21:8;24:12,21;
67:21;106:14
**problem (19)**
25:2;35:2;37:2,23;
39:11,21,24;50:25;
54:1,11,22;55:5;65:7,
12,21;66:14;76:1;
88:13;113:15
**problems (31)**
10:16;22:16,19,22;
24:1;28:24,25;29:4,4,9,
10;30:9;32:1,3;33:6;
37:20;53:22;54:9,18;
57:15;62:17;63:23;
71:22;88:9;90:13;
94:18;104:10;107:8;
108:17;121:20;130:4
**procedure (6)**
23:14;24:4;52:19,20;
117:23;118:1
**procedures (4)**
73:2,11;118:4,8
**proceed (1)**
50:19
**Proceedings (1)**
139:12
**process (10)**
14:3;20:9,10;23:18;

28:20;41:1,12;75:15;
80:18;81:6
**professional (2)**
127:9,12
**program (9)**
23:15;49:7,8,17,20,
23;50:3;56:15;116:18
**programs (1)**
31:6
**Promise (1)**
132:25
**promoted (3)**
14:23;16:5,15
**promotion (1)**
16:8
**proper (4)**
31:21;50:13;51:4;
72:22
**properly (11)**
19:15;33:20;34:11,
20;35:21;64:21;93:12;
97:9;98:7;102:18;
131:4
**property (1)**
84:13
**protective (1)**
15:7
**provide (6)**
6:23;7:2,6;79:5,21;
95:12
**providing (3)**
73:16,20;80:1
**purposes (1)**
80:25
**push (3)**
109:24;110:1,25
**put (22)**
14:5;23:13,20,23;
24:6;28:18;34:24;
53:14;56:1;59:25;
60:22;63:13,17;69:7;
82:9;109:17,23;
110:11,14,15;114:11;
125:19
**putting (2)**
19:20;23:14

**Q**

**qualifications (1)**
69:16
**qualify (1)**
109:12
**quantity (1)**
84:15
**quarterly (3)**
46:11,14;128:22
**quick (2)**
32:8;137:6
**quicker (2)**
31:24;32:13
**quickly (1)**
31:5

**quit (1)**
19:8
**quite (2)**
19:2;47:17
**quitting (1)**
134:21

**R**

**radio (9)**
37:19,22;38:4,14;
39:11,22;43:10;
130:21,25
**radios (14)**
33:6,8,9,11,11,13,17;
34:5;35:14;38:19;39:8,
16,18,20
**raise (17)**
46:16,24;50:5;93:5;
107:14,17;109:11,13;
111:3,6,9,14;113:22;
121:19,23;122:11;
125:22
**raised (7)**
47:19;108:8,19,22;
117:7;122:14;123:16
**raises (1)**
113:15
**raising (1)**
121:1
**ran (10)**
15:7,8,8,9;16:3;31:3,
4,4;49:13;68:25
**Randy (1)**
124:6
**range (6)**
60:7,10,11,13,20;
64:24
**ranges (2)**
106:1,3
**rank (2)**
13:8,12
**ranking (1)**
75:5
**rate (1)**
71:18
**rather (1)**
101:19
**reached (1)**
32:16
**react (1)**
127:4
**read (7)**
79:10,12;91:10;
113:17;120:22;124:11;
139:10
**reading (3)**
125:7;128:4;130:2
**ready (1)**
137:4
**real (2)**
126:9,13
**realization (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 47 of 51

93:9
**really (11)**
    11:4;58:9;63:13,17;
    68:22,23;81:14;85:25;
    101:24;106:19;126:8
**reason (8)**
    16:22;17:10;47:24;
    60:19;120:25;121:15;
    124:15;134:14
**reasonable (1)**
    72:10
**reasoning (1)**
    132:8
**reasons (6)**
    40:20,22;46:7;
    129:25;134:20,20
**rec (1)**
    109:5
**recall (19)**
    9:19;10:10;12:11;
    37:20;43:25;58:20;
    84:17;91:16;92:6;93:4;
    104:10;115:14;116:19,
    22;120:13;121:25;
    122:1,2,3
**receive (8)**
    40:2,8;42:1,5,10;
    43:20;103:14;113:1
**received (5)**
    7:22;26:5;31:13;
    49:15;72:22
**recess (3)**
    72:16;137:2,21
**recollection (9)**
    9:18,25;10:12;11:8,
    21;12:3;73:15;103:16;
    108:5
**recommend (1)**
    41:5
**recommendation (2)**
    41:3;82:6
**recommendations (2)**
    64:9;80:15
**record (7)**
    4:3;5:4;119:1;123:2,
    5;137:20,23
**recording (1)**
    74:15
**records (2)**
    25:21;58:10
**recreation (1)**
    111:13
**recruitment (1)**
    133:13
**recurring (9)**
    29:3,9,10;30:5,9;
    53:21,22;54:9,18
**red (1)**
    34:25
**Redden (1)**
    136:7
**redone (1)**
    39:23

**refer (4)**
    74:6,8,10;112:2
**referenced (1)**
    102:9
**references (1)**
    128:12
**referred (2)**
    112:12,19
**referring (1)**
    59:1
**refresh (2)**
    73:14;118:11
**regard (11)**
    20:16;30:1,16;42:18;
    43:21;45:1;69:20;
    85:12;104:13;110:12;
    112:25
**regarding (5)**
    17:22;43:18;68:15;
    74:4;96:24
**regards (5)**
    41:16;57:13;81:8;
    113:24;133:23
**regular (1)**
    24:3
**reign (1)**
    109:18
**related (3)**
    29:21;85:20;118:23
**relating (2)**
    42:14;138:12
**relationship (1)**
    120:16
**release (5)**
    130:18,25;131:10,
    11,15
**released (6)**
    122:21;123:6,10;
    130:22;131:4;132:2
**releasing (2)**
    130:9,16
**remember (28)**
    22:16,19;23:13,15;
    43:16;44:24,24;48:8;
    55:3;57:20;60:6;69:6;
    75:19;79:12,14;91:22;
    100:14,18;110:13,16;
    112:9;120:12,18,20;
    122:5,9;124:8;125:18
**remind (1)**
    123:18
**remotely (2)**
    88:23;118:20
**repeat (3)**
    130:11,13,14
**rephrase (1)**
    130:12
**replaced (1)**
    39:6
**replacement (1)**
    92:10
**report (39)**
    23:7,10,11;51:23;

52:18,23;53:12,17,18;
    78:4,21;80:12,14;
    82:15,17,18,21,23;
    83:3,12,14;85:22;90:3;
    91:1,3;93:13;96:17;
    103:6,15,19;104:4,19;
    112:6;113:2;114:4;
    118:23;119:2,4;124:3
**reported (3)**
    38:4;112:15,19
**reporter (1)**
    6:1
**reporting (3)**
    117:20,24;118:15
**reports (34)**
    51:25;52:3,6,11,12;
    53:1,4,20;55:9;56:13;
    58:3;80:6,10;82:14;
    83:7,18,20;85:20,25;
    86:23;93:13,17,18,19,
    23,25;100:24;102:14;
    104:14;105:4;119:3,6,
    21,25
**represent (2)**
    5:9;7:23
**request (3)**
    23:23,24;27:15
**requests (1)**
    25:20
**require (1)**
    127:23
**required (3)**
    78:1;79:5,21
**requirement (1)**
    127:24
**requirements (1)**
    70:24
**requires (2)**
    70:23;71:8
**reserve (1)**
    4:10
**reserved (1)**
    139:11
**resolution (1)**
    113:5
**resources (3)**
    41:13;134:5,7
**resources' (1)**
    41:14
**respond (11)**
    38:5;49:19;50:9;
    51:4;67:19;68:2,7;
    124:16;125:1;127:22;
    129:13
**responded (4)**
    38:3;42:19;48:9,13
**responder (2)**
    48:6,15
**responders (4)**
    48:11,20;49:5;78:3
**responders' (1)**
    48:3
**responding (6)**

42:11,15,18;68:21;
    69:5,14
**response (9)**
    49:18;50:13;56:19,
    22;78:12;91:18;
    123:25;127:6;130:4
**responses (1)**
    78:12
**responsibilities (16)**
    14:13;15:5,25;20:15;
    29:20;30:15;35:11;
    40:14;46:22;47:1,21;
    48:1;94:7;95:24;
    115:17;119:24
**responsibility (17)**
    29:15;30:1;44:15;
    46:18;47:15;70:16;
    83:17;85:10;92:18,20,
    23;96:2,6;99:15;120:2;
    123:9;131:3
**responsible (27)**
    31:11;49:4;52:5;
    66:18;72:21,25;73:20;
    74:18;83:2,6;86:11,13,
    15,17,19,20,22;92:16;
    95:16;98:4;100:3;
    119:12,20;120:7;
    126:15;131:9,16
**retention (2)**
    133:14;135:18
**retreats (1)**
    42:7
**returned (1)**
    85:4
**review (31)**
    7:9;26:10;28:5;
    51:24;52:2,12,25;
    75:11,16;76:7,12,22,
    25;77:20,24;78:23;
    80:24;83:9,17;84:5;
    87:4,8,16,20;91:6;
    119:6,25;133:25;
    134:2,8;135:11
**reviewed (7)**
    9:21;53:20;119:9;
    135:8;138:5,7,9
**reviewing (10)**
    31:14,18;53:11;83:7,
    13;86:22;119:12,20;
    123:14;134:4
**reviews (3)**
    40:3,9;78:15
**reword (1)**
    6:8
**right (19)**
    4:11;6:4;11:1;16:13;
    24:25;34:15;46:14,21;
    49:8;53:18;76:3;79:12;
    81:1;88:2;105:6;118:2;
    130:2;136:25;139:9
**ring (1)**
    60:17
**riot (1)**

77:11
**risk (2)**
    18:20;37:16
**Rodriguez (1)**
    132:23
**role (2)**
    96:13,15
**roll (3)**
    35:17;36:12,14
**Ron (2)**
    44:22;89:16
**room (1)**
    78:10
**roughly (1)**
    15:17
**round (7)**
    106:4,7,9,11,13;
    108:23;114:9
**rounds (20)**
    17:24;21:4;63:24,25;
    64:2,15;65:1,18;98:8;
    99:9;104:23;105:11,
    12,13,17;106:22;
    107:18;108:6;113:21;
    114:13
**route (1)**
    43:10
**rules (3)**
    4:12;5:14;137:16
**run (12)**
    20:7;56:1;62:11,18,
    19,21;72:7;76:24;
    78:22;109:25;128:17;
    135:6
**running (7)**
    43:12;44:4;45:11;
    51:9;109:22;111:2;
    129:3
**Ryan (1)**
    136:13

**S**

**safe (4)**
    30:19;42:22;43:1;
    56:19
**safer (1)**
    56:25
**safety (40)**
    17:19;18:20;29:22,
    22,24;30:16;43:18,22;
    44:17;45:2;46:7,16;
    66:19;86:5;87:25;90:3,
    22;91:4;92:11;93:7,11;
    94:7,12;96:5,17,24;
    98:9;103:18;104:4;
    116:7,10,15,21,23;
    117:8,10,15,24;118:15;
    126:21
**salesman (1)**
    13:1
**same (8)**
    18:3;62:13,21,24;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 48 of 51

71:15;78:14;82:22;
101:16
**Sanitation (5)**
86:5;90:3;96:5,16,24
**Sarah (1)**
133:2
**satisfied (1)**
29:17
**saw (4)**
30:12;115:6;119:10;
134:1
**saying (6)**
60:5;121:14,25;
126:4;127:2;128:4
**scenario (1)**
129:14
**scene (2)**
42:22;43:1
**school (4)**
12:14,16,18,21
**scope (1)**
22:14
**scratch (1)**
127:17
**scroll (2)**
91:12,13
**seconds (1)**
109:25
**secretary's (1)**
74:6
**secure (1)**
30:19
**security (6)**
17:19;30:16;63:19;
86:5;87:12;98:9
**seeing (2)**
55:3;125:18
**seem (1)**
121:12
**seems (2)**
80:23;108:18
**segregation (2)**
14:16;15:9
**selected (1)**
14:7
**selects (2)**
90:9,14
**send (6)**
23:24;25:15,16;27:6;
39:22;78:10
**sense (1)**
126:10
**sent (1)**
83:21
**sergeant (9)**
14:23;15:1,6,10;
23:4,12;27:21;128:18;
136:12
**sergeants (5)**
86:17;98:3;99:18;
100:1;104:21
**seriously (1)**
121:8

**served (1)**
13:22
**sessions (1)**
42:9
**set (10)**
55:9,22;56:6,12;
57:4;60:7,12,16;63:7;
73:19
**setting (2)**
55:6;57:1
**settled (1)**
9:2
**seven (1)**
15:3
**several (4)**
119:3;121:6;122:2;
134:1
**shakedowns (1)**
54:10
**shaking (1)**
5:19
**share (2)**
88:20;118:18
**sheet (1)**
101:23
**sheets (3)**
31:19;101:2,15
**Shemanowski (1)**
35:9
**shift (11)**
20:7;48:23;70:6;
74:21,23,24;87:2;
101:4;123:18;131:5,12
**shifts (2)**
16:2;17:23
**shook (1)**
112:10
**shop (1)**
39:22
**show (3)**
34:21;41:18;102:14
**showed (1)**
31:13
**shower (1)**
109:22
**showers (2)**
108:1;109:17
**showing (2)**
53:15;54:1
**shown (1)**
96:17
**sic (2)**
111:24;112:14
**sick (2)**
11:4;58:12
**side (1)**
41:9
**sides (2)**
106:3;108:13
**sign (2)**
74:15;139:10
**Signature (1)**
139:11

**signatures (1)**
31:12
**signed (1)**
7:23
**significant (1)**
21:6
**sign-in (1)**
31:19
**signing (1)**
74:16
**similar (4)**
62:24;91:4;104:20;
128:9
**sink (1)**
110:23
**sinks (1)**
110:19
**sit (3)**
9:19;10:1;36:8
**situation (16)**
43:12;59:11,15,22;
61:3,5;71:25;75:21;
78:6;109:7;113:10;
124:17,21,24;127:15;
131:7
**situations (4)**
18:19;43:8;69:12;
126:23
**six (5)**
15:3;70:23;71:5,16;
106:17
**six-week (1)**
20:11
**skills (2)**
35:19;132:19
**slash (1)**
90:3
**slip (6)**
23:23,24;26:6,21;
27:1,15
**slips (3)**
24:6,24;26:10
**small (1)**
51:12
**smart (1)**
61:25
**smoking (1)**
28:16
**solid (1)**
35:1
**somebody (7)**
17:7;23:25;31:25;
66:5;83:22;101:22;
103:23
**someone (4)**
23:8;26:11;34:12;
114:4
**sometimes (21)**
6:5;18:11;19:17;
20:1;31:23;42:23;65:7,
9,10;77:1,2;81:2;
99:11;104:24,24;
105:24;106:2,12;

128:18,25;129:1
**soon (2)**
61:16,19
**sorry (28)**
4:13;8:16;10:25;
11:1;17:25;23:10;
30:21;47:7;48:5;52:1,
2;64:1;68:4;71:20;
73:10;75:3;76:1,2;
82:13;86:7;119:9;
121:21;123:3;126:21;
127:17;132:11,14;
135:21
**sort (13)**
21:19;23:8;26:9;
27:13;33:25;77:9;
79:22;91:1;104:14,15;
111:11;115:8;116:3
**Sounds (3)**
16:13;72:15;136:24
**sparking (5)**
24:20;25:7,18;114:1,
6
**speak (23)**
5:18;7:12,15;11:25;
29:8;45:23;50:1;59:7;
84:23,25;87:6;108:7,9;
114:13,17,22,25;115:3,
5;121:2;124:18,24;
135:12
**speaking (2)**
17:25;139:7
**specific (9)**
27:5,11,16;43:17;
82:24;104:10;127:6,
19;135:5
**specifically (11)**
31:1,9,17;59:1;60:3;
95:6;106:24;125:2,4;
127:25;130:24
**speculation (2)**
38:22;66:10
**spell (1)**
5:3
**spoke (3)**
7:14;8:8;116:1
**spoken (3)**
7:25;8:3,6
**spot (2)**
17:6;65:5
**squad (1)**
47:9
**staff (83)**
19:18,19,23;20:6,7,
9;21:1;22:12,13;34:18;
35:4,15;36:15,20;37:2;
40:1,15,17,20;41:2,5,
21;43:10;49:24;50:8;
51:4;55:25;59:5,9,17,
21;61:4,14,18;64:10,
14,14,25;66:6,15;
67:19,24;68:7;69:17;
71:12;72:18,22;73:1,9,

17,21;74:13;78:2,3,11;
82:24,25;84:25;85:23;
96:23;98:15;102:4;
105:14;107:4,19;
111:7,22;114:14;
121:7;123:19;124:16,
20;126:22;127:21;
128:7,8;129:3,7,12,12;
131:10;133:6,18
**staffing (13)**
18:3,9,20,24;19:4;
20:2;69:23;70:1,4,7,10,
16,20
**staff's (3)**
65:22,25;111:15
**stairwell (1)**
96:19
**stairwells (1)**
98:25
**standard (1)**
104:19
**start (5)**
19:14;27:14;30:6;
105:3;121:5
**started (3)**
14:7,9;21:16
**starting (1)**
55:25
**state (69)**
5:3;10:3;16:5,10,16;
17:17;18:21;19:4;22:1,
17,23;30:10,17;33:7,
10;40:3,12,15,17,21;
41:21,24;42:2,11;
43:21,24;44:7;45:1,7;
46:1;47:20;48:4,7,17,
20;50:10,12,21;51:18,
22,25;52:3,6;53:22;
54:18,22;55:1,6;57:15;
59:2;60:3;62:11,14,17,
18;63:1,8,23;68:12,14;
73:11;75:8;76:16;
84:10;85:7,13;89:14;
121:4,17
**statement (2)**
23:22;127:18
**States (1)**
13:7
**State's (1)**
7:23
**Statham (2)**
136:12,12
**stating (1)**
8:5
**station (3)**
60:8,24;124:3
**statistics (1)**
54:6
**stay (4)**
28:19;35:20;36:19;
133:15
**steady (1)**
36:22

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

KENNETH GANN
July 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 49 of 51

**steam (1)**
22:8
**step (1)**
41:19
**steps (19)**
25:2;30:4,7;37:1;
38:25;39:7,15;54:8,17,
20;56:17,20;94:20;
97:7;100:23;122:20,
24;123:5,15
**Steve (3)**
44:17,19,21
**stick (1)**
25:8
**still (8)**
6:14;14:24;15:13;
17:13;18:12;51:13;
79:17;138:14
**stipulate (1)**
4:3
**stopped (3)**
39:2,6,9
**storage (2)**
37:8,10
**straight (1)**
26:22
**street (2)**
19:14;51:10
**structure (2)**
62:22;117:19
**stuff (1)**
33:18
**subject (2)**
81:15;89:23
**submit (1)**
27:22
**submitted (1)**
94:4
**substance (1)**
8:9
**sued (5)**
8:5,11,20,21;9:10
**sufficient (1)**
72:8
**suggestion (1)**
125:23
**suicide (1)**
59:24
**suicides (1)**
58:23
**suing (1)**
9:12
**supervise (4)**
29:12;44:19;48:19;
70:7
**supervised (2)**
44:21;93:12
**supervising (1)**
92:3
**supervisor (24)**
41:5;42:8;48:23;
52:7;60:16;73:3,5;
74:21,23,24;77:7;79:1;

81:13,21;86:24;87:2,3;
100:5;105:9;123:11,
18;126:17;131:5;
134:10
**supervisors (2)**
70:6;131:12
**supervisor's (1)**
46:18
**supported (1)**
49:24
**supporters (1)**
89:18
**supposed (5)**
64:25;98:22;99:25;
101:1;129:3
**Sure (97)**
4:13;5:18,20,22,24;
10:8,9;15:4;17:23,23,
24;20:18,20,21,25;
24:22,22;26:7;28:3,4;
30:7,13,19,24;31:2,3,5,
6,9,11,12,20;35:13,20;
36:19,22;37:1;38:25;
42:1,21;43:1,9;45:24;
46:5;56:18;59:13;
64:14;66:24;67:2;
70:24;72:21;73:1,8;
74:19;76:19;79:8;
81:24;82:2,11;84:16;
87:16,19;92:24;93:11,
15;94:25;95:2,13;
96:20;97:8,13,15,24;
98:6;99:2;100:16;
103:25;105:22;111:1;
112:22;113:10;114:5,
7,10,10;116:4,8;
122:20;123:1;125:21;
126:15;129:25;130:12,
21;131:3;137:19;138:6
**surprise (6)**
128:24;129:1,2,2,11,
13
**survey (2)**
134:9,9
**surveys (5)**
133:21,25;135:9,11,
13
**swear (1)**
4:1
**swearing (3)**
4:4,10,15
**sweep (2)**
98:11,16
**swept (1)**
99:3
**switch (3)**
16:7;24:14;37:25
**sworn (1)**
4:21
**system (18)**
22:17,20;27:19,22;
32:2;54:3;60:3;64:16,
17,19;82:16;109:16,20,

23;110:4,11;111:4;
113:23
**systematic (1)**
28:23

**T**

**talk (20)**
23:3;25:3;36:6;57:3;
60:2;87:21;89:9;92:6;
100:11;105:14,14;
106:18,20;115:8,11;
122:6;123:18;133:18,
21;135:16
**talked (4)**
57:2;105:7,8;114:21
**talking (8)**
21:3;22:3,4;33:8,13;
70:22;97:11;134:16
**tap (1)**
64:21
**taught (6)**
35:19,23,25;36:4;
43:7,14
**team (4)**
47:6;96:12;101:11;
119:18
**tells (1)**
103:23
**temperature (4)**
31:24;32:6,15,23
**Temperature-wise (1)**
32:17
**ten (4)**
57:21,23,25;58:1
**tendency (2)**
28:17;109:21
**ten-minute (2)**
72:13;136:23
**term (1)**
9:17
**terminations (1)**
19:7
**test (1)**
34:18
**testified (2)**
4:21;55:16
**testimony (9)**
4:5,7,11,14;6:2,24;
7:3,7;108:18
**Thanks (1)**
139:9
**thought (3)**
47:15;114:2;128:2
**thousand (1)**
27:10
**three (8)**
20:12;48:8;64:12;
74:12;81:22;99:10;
101:13;104:24
**Tibbles (11)**
52:9;73:7,8;74:22;
87:3,16,21;100:6,12;

123:12;126:18
**tiers (1)**
20:13
**timely (7)**
69:4,13;104:1;121:9;
122:21;123:6,10
**times (9)**
8:21,22;74:12;99:10;
104:24,25;107:25;
110:10,12
**tired (2)**
13:17,20
**title (1)**
86:8
**titled (1)**
91:5
**today (8)**
6:24;7:3,7,10,13;
9:20;10:1;45:24
**toilet (2)**
31:8;110:10
**told (5)**
16:21;17:12;35:15,
17;135:2
**took (9)**
17:4;56:24;65:9,10;
82:11;91:23;94:8;95:5;
100:21
**toothbrush (1)**
27:7
**toothpaste (2)**
27:8;31:7
**total (2)**
10:24;78:13
**touch (1)**
65:5
**touching (1)**
65:4
**track (7)**
28:21;29:3;30:5;
53:21;54:5;56:11;57:9
**tracking (1)**
30:8
**Trafficking (1)**
40:25
**trained (15)**
19:15,18;20:6,7,13;
36:1;42:6;47:10,12;
125:1;126:22;128:4,7,
8,10
**training (51)**
19:12;20:9,12;35:19,
23,25;36:5,7;41:20,23;
42:2,5,9,10,13,14,17,
20;43:7,15,17,20;47:6,
10;49:4,6,11,13,14,16;
59:24,24;60:1;67:22;
69:16,20;73:23,25;
74:17;115:11;122:7;
125:2;126:8;127:5,7,
19;129:17,20;130:6;
132:9,13
**transferred (1)**

17:7
**trashcan (1)**
88:3
**treatment (1)**
111:15
**trends (3)**
28:22;29:4;30:6
**trial (2)**
9:4,5
**tried (2)**
105:22;135:2
**true (1)**
121:15
**truthful (3)**
6:23;7:2,6
**try (11)**
6:4;28:22;39:7,16;
46:23;56:17,25;57:3;
71:15;105:4;135:17
**trying (13)**
19:22;25:7;28:10,15;
34:5;37:24;39:12;46:3;
64:18;68:19;75:17;
122:8;133:14
**turn (2)**
32:15;109:25
**turned (2)**
31:23;39:20
**turning (3)**
32:9,11,24
**turnover (3)**
71:18;133:5,9
**twice (3)**
34:17;37:5;74:12
**two (21)**
7:20;12:8;19:10;
23:17;44:12;45:4,18;
51:20;55:17,18;56:5;
64:6,12;72:6,8;84:19;
101:14,21;106:1;
119:14,14
**two-year (2)**
46:13;58:16
**type (2)**
27:15;130:6
**types (8)**
56:2,8;86:2,3;
102:13;104:2,7;107:22
**typical (1)**
105:1
**typically (1)**
108:12

**U**

**unauthorized (1)**
40:22
**under (7)**
32:18;71:8;95:1;
97:11;98:11;102:21;
103:13
**underneath (1)**
88:15

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 50 of 51

**understaffed (1)**
18:16
**unemployment (1)**
14:5
**unit (24)**
14:16;15:7,8,9;
48:13;50:17;55:24;
70:25;71:2,3,4,14;
82:10;96:12;101:8,10,
11,14,21,24;102:1,6;
119:18;131:18
**United (1)**
13:7
**units (5)**
50:16;70:23;86:18;
95:11;96:12
**unless (5)**
6:14;33:18;58:25;
75:3;137:5
**unpredictable (1)**
127:1
**up (27)**
22:4;25:2;28:23;
34:25;48:10;53:11;
60:22;63:14;69:3,9,10;
71:7;78:4;81:10,23;
83:11;95:4;101:25;
111:19,21;112:18,22;
113:14;115:6;125:8;
137:4;139:5
**urgent (3)**
37:21;65:21;66:14
**use (12)**
4:11;9:17;27:2,10;
33:12,14;34:6;39:12,
17;63:15;110:7;132:14
**used (1)**
27:5
**using (1)**
54:2
**usually (5)**
65:23;80:3;90:17;
106:13;107:23

**V**

**vacant (1)**
17:6
**verbal (1)**
5:17
**versus (1)**
36:22
**voluntarily (1)**
79:23
**voluntary (1)**
79:24

**W**

**waiting (1)**
43:5
**walk (2)**
43:3;64:22

**walls (1)**
64:23
**wand (3)**
64:21,22;65:4
**warden (72)**
5:6;10:17;11:5,5,15;
16:15,18;17:13,16;
18:22;20:16;29:21;
30:18;36:3;42:7;44:10,
12,25;45:5,19;51:19;
52:24;55:13;58:5,18;
59:2;63:22;64:8,11;
66:19;67:24;69:24;
70:13,15;71:23;73:6;
75:9;79:1;81:20;83:16;
87:15;89:6;91:7;92:4,
4,5,25;93:1;94:1,2,4;
99:14;102:19,20,24;
103:11,14;104:23;
105:2;110:17;113:13;
114:16;117:1,3,4;
118:3;120:8;121:3;
124:14,20;135:8,14
**watch (2)**
47:13;55:25
**watched (3)**
47:10,11;70:21
**watching (1)**
47:5
**water (18)**
21:8,9,10,14,16,20,
24;31:4;68:25;109:15,
19,20,22;110:2,4,7,23;
111:4
**Watson (1)**
136:2
**way (9)**
19:20;23:19;34:18;
40:11;65:24;81:10;
128:9,9;135:6
**ways (2)**
28:23;29:9
**weapons (1)**
35:12
**week (7)**
12:7;99:10,11;
104:24,25;107:16,16
**weekends (1)**
10:24
**weekly (4)**
85:24;86:18;100:1;
104:21
**weren't (5)**
39:16;50:8;97:25;
99:2;111:1
**Westville (18)**
5:6;14:12,14,20,24;
15:2,11,13,16,20;17:3,
14;62:10,14,19,25;
63:9,19
**What's (14)**
52:20;53:25;60:17;
64:17;65:6;78:20;91:3;

96:21;102:6;109:7,8;
125:16;127:12;132:7
**Whelan (2)**
138:16,20
**whole (1)**
128:14
**who's (4)**
49:4;86:15;90:6;
131:9
**whose (4)**
44:15;115:25;116:3;
123:9
**within (7)**
46:25;88:17;97:19,
22,25;119:2;137:15
**without (5)**
9:20;32:24;51:4;
65:14;121:11
**witness (12)**
4:2,4,15,20,23;9:5;
72:15;91:13;120:24;
124:13;136:24;139:8
**work (30)**
10:16;12:6;14:11;
20:19;21:1;22:11;23:5,
12,15,17,20;24:2;
27:19,22,23;28:2;
34:10;38:10,12,14,19;
62:7;64:19;72:2;84:21;
90:16;103:12;105:16;
114:10;134:15
**worked (6)**
12:22,25;14:15,16;
22:8;40:3
**working (23)**
19:14;24:14,15;32:2;
33:22;34:5;37:22;38:4;
39:1,2,6,9,9,12,17;
40:12;71:1,4;101:13;
113:25;114:1,8;138:24
**works (3)**
89:19,21;92:4
**worried (1)**
65:15
**wrap (1)**
137:4
**write (2)**
26:19;111:19
**writes (1)**
111:21
**writing (2)**
61:17;103:5
**written (2)**
23:8;103:7
**wrong (4)**
21:9,10;103:24;
111:21

**Y**

**yards (1)**
15:9
**year (3)**

12:16;55:17;56:5
**years (14)**
7:20;13:22;14:21;
15:3,17;16:11;23:17;
36:1;42:6;44:13;45:5,
18;64:6,10
**yell (1)**
67:2
**yelled (1)**
65:23
**yelling (8)**
66:5,7;67:5,20,25;
68:1,7,16

**Z**

**Zoom (4)**
4:5,10,15;5:16

**1**

**1 (5)**
79:10,11;88:21,22;
89:4
**10:00 (1)**
11:17
**10:40 (1)**
72:14
**10-70 (8)**
50:15,20,25;51:5,12;
74:19;123:20;130:23
**10-71 (7)**
50:20;51:1,5,13;
74:19;123:20;130:23
**12 (7)**
15:17;19:9,11;22:8;
75:14,20;76:14
**12:23 (1)**
139:13
**13 (7)**
75:14,17,20,20;
76:14;78:8;80:1
**133712 (1)**
119:1
**133808 (1)**
119:2
**13-hour (1)**
22:8
**15 (2)**
10:23;11:1
**1982 (2)**
12:23;13:5
**1987 (3)**
12:17;13:11,13

**2**

**2 (2)**
118:18,19
**2,000 (1)**
10:9
**20 (4)**
10:24,24;43:5;72:9

**2010 (2)**
15:24;16:4
**2015 (3)**
16:12;89:6,22
**2017 (10)**
10:3,12;11:9;12:4;
16:19,20;38:3;84:8,18;
118:24
**20th (1)**
12:7
**24 (2)**
89:6,22

**3**

**30 (5)**
8:22;65:2,3,16,17
**32 (1)**
65:9
**33 (2)**
36:1;65:10
**35 (4)**
32:18,19,23;33:1

**4**

**4 (1)**
91:21
**40 (1)**
42:4
**40-hour (1)**
42:13
**4-20 (1)**
10:22
**45 (1)**
65:14
**4-5 (1)**
10:16

**5**

**57 (1)**
124:3
**5th (1)**
10:19

**6**

**60 (1)**
109:25

**7**

**7 (7)**
10:3;11:8;12:4;38:3;
84:8,18;118:23
**75011 (1)**
89:5
**75012 (1)**
89:5
**7th (1)**
10:14

USDC IN/ND case 3:18-cv-00995-JD    document 203-8    filed 03/29/21    page 51 of 51

**8**

**8:00 (1)**
  105:6

**9**

**90 (1)**
  109:25