**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*RON NEAL*
*July 15, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 07-15-20 RON NEAL.txt
**Min-U-Script® with Word Index**

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 2 of 85

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the )
ESTATE OF JOSHUA DEVINE, )
                         )
        Plaintiff,       )
                         )
vs.                      )   Cause No.
                         )   3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
        Defendants.      )
_____)

        The Videoconference Deposition of RON NEAL

        Date:    Wednesday, July 15, 2020

        Time:    9:14 o'clock a.m.

        Place:   Via Zoom

        Called as a witness, by the Plaintiff, in
        accordance with the Federal Rules of Civil
        Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

                BOSS REPORTERS
              & VIDEOCONFERENCING
    GARY * MERRILLVILLE * VALPARAISO, INDIANA
                (219) 769-9090

Page 2

APPEARANCES:

SARAH GRADY, ESQ.
        Loevy & Joevy
        311 North Aberdeen Street
        Chicago, Illinois  60607
        PHONE:  (312) 243-5900
        FAX:    (312) 243-5902
        sarah@loevy.com

On Behalf of the Plaintiff;


MICHAEL BLINN, ESQ.
        Office of the Attorney General
        Deputy Attorney General
        Civil Litigation
        302 West Washington Street
        IGCS Fifth Floor
        Indianapolis, Indiana  46204
        PHONE:  (317) 232-6201
        FAX:    (317) 232-7979
        michael.blinn@atg.in.gov

On Behalf of the Defendants.

Page 3

THE VIDEOCONFERENCE DEPOSITION OF RON NEAL

DIRECT EXAMINATION
  By Ms. Grady.......................... Page   4
CROSS EXAMINATION
  By Mr. Blinn.......................... Page 226


E  X  H  I  B  I  T  S

| PLAINTIFF'S | MARKED | IDENTIFIED |
| --- | --- | --- |
| Exhibit No. 1 | 52 | 52 |
| Exhibit No. 2 | 55 | 56 |
| Exhibit No. 3 | 65 | 65 |
| Exhibit No. 4 | 129 | 129 |
| Exhibit No. 5 | 136 | 136 |
| Exhibit No. 6 | 141 | 141 |
| Exhibit No. 7 | 174 | 174 |
| Exhibit No. 8 | 203 | 230 |

                    *  *  *

Page 4

        RON NEAL,
called as a witness, by the Plaintiffs, having first
been duly sworn, was examined and testified as
follows:
        THE WITNESS: I do.
        DIRECT EXAMINATION
BY MS. GRADY:
Q    Warden, can you please state and spell your
     name for the record?
A    Yes.  My name is Ron, R-O-N, Neal, N-E-A-L.
        MS. GRADY: Okay.  Let's actually
     just go off the record for one minute, please.
        (Brief pause; technical issue with
     Zoom.)
        MS. GRADY: Okay.  Let's go back
     on the record.  And one housekeeping matter
     that I think we've been doing in our other
     cases, just to put on the record that the
     parties are stipulating to the swearing in of
     the witness via video.  On plaintiff's behalf,
     we so stipulate.  Can counsel for the
     defendants agree to that stipulation?
        MR. BLINN: Agreed.
        MS. GRADY: Okay.  Thank you.

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 3 of 85

Page 5

BY MS. GRADY:

Q Warden, my name is Sarah Grady. I am the attorney for the plaintiff in this case, Denise Dwyer. She has brought this lawsuit as personal representative of the Estate of Joshua Devine.

Have you ever been deposed before?

A I have, yes.

Q Okay. So you'll probably know most of the rules, but I'd like to go over them, especially because we're here on video and that can tend to make things a little complicated if we don't do our best to stay out of each other's way.

The first is that if you have any confusion about any of the questions that I ask, feel free to let me know and I'm happy to rephrase or clarify my question. Okay?

A Yes, that's fine.

Q On the flip side, if you don't ask me to clarify or otherwise express your confusion, I'm going to assume that you've understood my question and that your response is an answer to my question. Okay?

A Understood.

Page 6

Q The second, which you're already doing a nice job of, is please, especially given the video, make sure to speak your answers audible and verbal. So make sure to say yes or no, instead of a nod or a shake of the head, and please also make sure to keep your voice up. Okay?

A Yes.

Q The next one is really a rule for both us. Again, given that we're on video, it's going to be especially important that you let me finish my question in its entirety before you begin your answer, and likewise, I'm going to do my best to let you finish your answer in its entirety before I begin my next question. It's pretty important that we stay -- we don't try to talk over each other because, otherwise, the transcript can get muddled. Okay?

A I understand.

Q Do you have any conditions that might affect your ability to provide truthful and accurate testimony here today?

A No, I do not.

Q Do you have any conditions that affect your

Page 7

memory?

A No, I do not.

Q And do you take any medications or are there any other reasons that might -- any other factors that might affect your ability to provide truthful and accurate testimony today?

A Nothing that would affect my memory or my ability to provide truthful answers, no.

Q As we get started, I want to first ask you about your independent recollection about the events that we're here to talk about today. Can you tell me, do you have -- well, before we begin, let me make sure it's clear what I mean when I say independent recollection.

When I use that phrase, I mean a memory that you have without relying on documents that you've reviewed or something that someone else has told, but instead a memory in your mind that you can recall without relying on documents or statements from somebody else.

Do you understand what I mean when I use the phrase independent recollection?

A I do, yes.

Q Do you have an independent recollection of the fire in B-cell house on April 7, 2017?

Page 8

A I do.

Q Okay. Can you tell me everything that you independently recall about that event?

A I recall on that particular evening I was at home, and by home, I live in a residence here on the grounds at the prison. So I'm a couple hundred feet from the front door of the prison. I remember getting a call that night from my shift supervisor, which was Captain Jeremy Dykstra, and I remember it being around 10:00 p.m., or shortly after that I received the call. And I remember Captain Dykstra being very excited, in a state of panic almost, and he was trying to -- he did relay to me that we had a fire in one of the cells in B-cell house and he was trying to get answers from the scene, from the supervisors on the scene. So he was relaying partial information to me as we were talking back and forth about the fire.

I asked him -- you know, I was asking him questions, such as how bad is the fire, do we need to begin evacuations, is it in a single cell, is it a range on fire. I was trying to get specific information from him.

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 4 of 85

Page 9

And I remember him telling me that it was a fire started inside of a cell on the 500 range of B-cell house and that they were responding to it as we speak, but he had gotten reports that there was smoke in the cell house and was starting to ask me if we want to evacuate the cell house.

So it was very hectic, Sarah, because he was receiving information from the scene, which was very, very loud, and he was trying to relay information to me and also, you know, obtain instruction or direction on what to do. I remember telling Captain Dykstra to evacuate if it was on the 500 range. I know that's the top range of our cell houses, especially the auburn brick-style cell houses. So I told him, by all means, you know, let's try to evacuate the 500 range, but, I mean, obviously, we need to get the fire knocked down and get the individual out of the cell.

As we were talking, he said, well, too late, Mr. Neal. After a few more minutes of him trying to get information on the radio from the scene, he relayed to me it's too late, that they're already evacuating the

Page 10

entire cell house. And I said, okay, that's fine, I'm on my way in, go ahead and try to finish getting the cell house evacuated, get as many people as possible to the scene to help with crowd control, and I will be in in just a few minutes to open the command center and be back in touch with you. So I remember that being the conversation with Captain Dykstra.

I know right after I hung up with him I was grabbing clothes to put on and dressing. At the same time I'm calling my immediate supervisor at that time, which was Bill Wilson was the regional director that was over my facility. So I had quickly called Bill and told him what was going on; that, you know, that I got a call from Captain Dykstra there was a fire in B, we were evacuating the cell house, I didn't have real good information or specifics at that time, but that I'm going in to open the command center, you know, to help deal with the situation and that I would be back in touch. So I remember that conversation with Bill.

Then I remember coming into the

Page 11

facility. And I came in and I opened the command center, and then I tried to again establish -- well, I did establish communication via phone with Captain Dykstra. And I remember him telling me at that point that -- that as they were evacuating the cell house, that several of the offenders were very upset, very loud, very rowdy, that there had been several staff assaults outside the front door of the cell house, that the offenders had burned down Checkpoint 7, which is a small checkpoint or building approximately 20 feet outside the front door of the cell house.

So it was cool that evening, I mean, not freezing, but it was cold. But they had broke into Checkpoint 7, had began to trash the building and somehow started a fire inside Checkpoint 7, which caused significant damage within Checkpoint 7. I, in the interim, had activated members of my executive staff, my E-squad, my K-9. So I had other emergency teams en route. And as staff showed up as this went on, I stepped in two different locations to assist, but it was mainly to assist with crowd control at that point.

Page 12

I remember Jeremy telling me what had happened, that he didn't have the full picture yet, and we didn't have the full picture until much later in the night, but I remember Jeremy telling me that they were unable to successfully get Mr. Devine, and by that point he was able to tell me it was Josh Devine on 500 range of B. I think he said -- I believe it was Cell 540, but he said that they were unable to get him out in time, that they did finally get the door open and they were able to get him out and get him onto a crash cart. By that time a Signal 3000 had been called, which is -- well, 10-71 was called first when the fire first began. 10-71 is a fire.

So that was called very quickly as things started. The fire alarms went off. The 10-71 was called by one of the officers working that night, one of the three officers on that unit. So that begins to get the offender firefighters activated to respond to the scene. Later in the night the Signal 3000 was called after the 10-71, and that gets nursing staff activated to come to the scene to help with, you know, whatever emergent

Page 13

needs need to be taken care of. I remember us talking about by that point all the offenders were outside. There were still some squirmishes going on in different locations.

Checkpoint 7 was being put out because it was burning. Firefighters were beginning to show up. So some of the firefighters were putting out the fire at Checkpoint 7. Some of the firefighters were having trouble even getting inside the building themselves -- remember, these are offender firefighters, because they were being challenged and basically pushed and, you know, they were having some squirmishes with the offender population coming out of the B-cell house as they're trying to go in B-cell house to go assist with the fire.

So, finally the offender firefighters get in the building, at least that's what I was told, and by the time they got up to the 500 range, the door had not yet been opened by staff, that there were flames shooting out the front of the cell, and staff, just with what staff had on, didn't have any -- they didn't have any fire personal protective equipment

Page 14

with them. I know once the firemen got there, they were able to grab the door, because staff had popped the lock on the door electronically prior to the firefighters getting there and it hadn't released the door, but due to the fire and temperature of the cell and fire shooting out of the cell, I guess it swelled the frame of the door.

So even though they popped the cell open trying to get Mr. Devine out, it didn't freely open all the way because of that swelling and it was hot. I know one of the officers said they attempted to touch the door and they couldn't. It was just almost glowing at that point, I believe is the way it was described to me. So, anyway, by the time the offenders got there, of course they're dressed in their fire apparel and gloves, and one of the firemen had grabbed the door, or a couple, and they were able to pull the door open and they were able to assist getting Mr. Devine out of the cell and onto the gurney. Nursing staff was checking vitals, trying to do CPR.

I remember having a discussion with Captain Dykstra about taking him out the back

Page 15

stairwell of the cell house because of all this other squirmish and, you know, incident that I spoke about was happening outside the front door. So they did successfully bring him outside the back door, or the secondary evacuation route of the cell house, brought him around the opposite side of the building of where the offenders were evacuated to, brought him into the guard hall, and then into what we call the Hoosier room, which is a conference room.

Q  Okay. So in your answer about your recollection, it sounds to me as though some of the things that you just testified about were things that were told to you by somebody else and some of those things were things that you personally experienced or personally did as part of the response to the fire; correct?

A  That is correct, yes.

Q  Okay. So let me just see if I can understand which is which.

You testified that you first became aware of the fire because of a phone call from Captain Dykstra on April 7, 2017; correct?

A  Yes, at approximately 10:00 p.m. or shortly

Page 16

after.

Q  And how long is that phone call?

A  I was on the phone with him maybe a matter of minutes, three or four minutes probably.

Q  And what was your understanding about the state of the fire at that point? At the time of your phone call, did he tell you whether or not the firefighters from ISP had responded to the cell house?

A  You know, I don't remember him specifically saying that. I remember him saying we had a serious fire in B-cell house. It's on the 500 range. It was started inside a cell. Fire alarms are going off. I heard an officer call 10-71 over the radio while I was on the phone with him. We then were trying to talk about evacuations and whether evacuations were needed. He had, like I said, very minimal information at that time and was having a great deal of trouble hearing the staff on scene, which were inside the cell house, because you had the fire going on, the fire alarm going off, and 200 offenders yelling. So, yeah, it was very garbled communication, at best.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

Page 17

Q   And you testified that you, after receiving that phone call, got dressed and went onto the grounds of the facility, which are simply a few hundred feet from your residence; is that correct?

A   That is correct.  Before I came down I called my supervisor, but then I came into the facility, correct.

Q   Can you tell me approximately how long, between when you received that phone call from Captain Dykstra, approximately how long it was until you arrived on the grounds of Indiana State Prison?

A   Approximately, ten to 15 minutes before I was in my office here at the facility.

Q   And was that the first place you went after entering the prison?

A   Yes, I came directly to my office because my office also serves as the emergency command center during any emergency.

Q   Was there anyone in your office when you arrived?

A   No, ma'am.

Q   And you said it served as the emergency command center; is that correct?

Page 18

A   During any emergency this office is the emergency command center for this facility, that is correct.

Q   And can you tell me what does that mean, an emergency command center?

A   That means that whatever the emergency may happen to be -- a fire, a hostage situation, whatever the case may be, orders come out of this office.  I have communication with the shift supervisor's office, my field commanders report here, such as I have an E-squad, an emergency squad.  I'll have E-squad stage in a different location, and that's in their post order or their orders.  I'll have a K-9 commander as well, but the commanders of those teams report directly to me and get information from me on where I want them to go or what I need them to do.

My executive staff, such as the deputy wardens, public information officer, anybody that may show up from central office will come to this office.  So this office is guarded with an officer at the front door and we create a list of who's authorized inside the emergency command center and those are the

Page 19

people that are let in this room.  So in this room I have video conferencing capability with central office.  I have phones directly to central office, to the commissioner's command center in Indianapolis.  I have phones to the governor's residence, you know, for executions.  So, yeah.

Q   When you're communicating with folks under you in the chain of command during this period of time during an emergency, are you communicating with them primarily by phone, radio, or some other way?

A   Primarily by phone if it's out in the field, if they're inside the facility in the field.  If it's central office, I mean, typically, they'll call me and ask for us to, you know, turn on video and we'll hook up via videoconference.

Q   And can you tell me approximately how long you stayed on the grounds on the night of April 7, 2017?

A   I was here, like I said, until, approximately, 10:15, 10:20 after I received the call until -- I can't recall, but it was until everything was done.  What I mean by done, I

Page 20

mean the county coroner's office had been here, several -- I think the state police had been here.  Mr. Devine had already been taken out of the facility.  We had cleared B-cell house of all the smoke and, you know, we had basically cleared everything and we had returned offenders to the cell house.  We returned them in very small groups, by ten at a time, but that was after this building had been cleared of smoke.

I know we had some offenders that were requesting breathing treatments and I know we had nursing staff also seeing some offenders, you know, for breathing treatments as well.  I was here most of that night, but I couldn't tell you what time it was.  It would be a complete guess, Sarah.

Q   Sure, and I don't want you to guess.  I'm just trying to get a ballpark.  Like are we -- would you, based on your recollection, would you say that you lasted into the next morning, would you say you lasted midday the next day, would you say -- I'm just trying to get an approximation.

A   I would say it would be until the middle of

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 7 of 85

Page 21

the night, very early morning. It would have been probably around 3:30, 4:00 a.m., somewhere in that neighborhood.

Q Okay. At any point between -- at any point during the period of time that you were at ISP responding to this emergency, did you go on site to B-cell house?

A I did not, no.

Q Did you go anywhere other than your office during that night?

A No. My job, my policy during an emergency scenario is to open and operate the emergency command center until its conclusion.

Q One of the things that you talked about was that you -- was about the firefighters having trouble getting into the B-cell house. That was something that was reported to you; correct?

A That is correct.

Q Can you tell me who reported that to you?

A I believe it was Captain Dykstra that immediately -- or that told me that evening. I know I heard it from some of the other staff that evening as well, but I can't recall who they were. But, yes, they were the ones

Page 22

reporting to me that the firefighters were having trouble getting into the unit.

Q And it was your memory that the report you got was that the reason they were having trouble gaining entrance to the unit was because other prisoners were prohibiting them from getting in; is that correct?

A That is correct.

Q Did you ever speak with any of the firefighters directly about whether they had any difficulties in gaining entrance to the unit and what, if any, sources of those difficulties were?

A If I did, it would have been sometime later. I mean, I believe that Mr. Miln and I had a conversation a couple weeks after. But you have to understand, I mean, right after the fire they were being interviewed by several people. They were being interviewed by my own internal affairs team, they were being interviewed by the state fire marshal, they were being interviewed by the state police, they were being interviewed by the DOC's fire chief. So, you know, they were -- they were busy being interviewed and I didn't want to

Page 23

talk to them until the investigation portion was over because I didn't want it to be, you know, construed that I was attempting to interfere, or anything of that nature.

But I do remember talking with Offender Miln, and this may have been two, may have been three weeks afterwards, just kind of, you know, talking about the fire in itself. I remember Offender Miln -- he's the chief of the offender fire department, I remember he wrote me a letter and he kind of was telling me a little bit about the fire. He had asked to speak with me to talk about some possible changes or things we could work on moving forward, and I know he and I had a discussion after I received that letter. But, again, I don't know whether that was two weeks, three weeks, I don't know.

Q At the time that the fire occurred Mr. Miln was the chief of the firefighters, to your recollection?

A That is true, yes.

Q And did you know Mr. Miln before April 7th?

A Yes.

Q Did you interact with him on a regular basis

Page 24

before April 7th?

A Well, on several occasions, at several previous firefighter functions, yes.

Q Can you give me an idea of what the types of activities were that would prompt you to interact with Mr. Miln?

A Well, I mean, I know several occasions I saw him on Main Street of the facility. The offender fire department is on Main Street of the facility. That's where the fire department guys hang out during the day, you know, waiting for a fire to be called. They also handle other duties, such as, you know, if we have levels of heat index, and so they handle the sprinkler systems and the cooling stations for the facility when we reach level, you know one, two, and three heat indexes. So there may have been several, you know, just brief conversations in passing. I know -- I can recall talking to him once during one of the annual trainings for the fire department.

But, yeah, it would have just been in passing when I would have been inside the facility walking around and had bumped into him, with the exception of the meeting that we

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 8 of 85

Page 25

talked about after he had wrote me. He had made some suggestions and we had met and talked about possible things we could do to make improvements or make changes in the facility. So on that occasion I met with a group of firemen. I don't know who all was there, but there was a group of firemen that were in that meeting.

Q   Had Mr. Miln been the chief of the firefighters for long before the fire?

A   Honestly, I can't recall, Sarah.

Q   Sure. And that letter came, you said, approximately two or three weeks after the fire?

A   That's my guess, yes.

Q   Can you tell me, as best you recall, what that letter said?

A   The only thing I can specifically recall the letter mentioning was placement of fire extinguishers in the facility. I remember he had suggested -- because at that time the fire extinguishers were kept in the officer's station locked up, and one of his suggestions was to hang them on the end of each range so that they would be easily accessible for the

Page 26

firemen. I know that was one of his suggestions. I mean, we made some changes after that, but to tell you they were in his letter or not, I can't remember, Sarah.

Q   And can you tell me what -- one of the things that he asked you in that letter was to have a meeting to discuss changes; is that correct?

A   Yes.

Q   What did you do with that letter after you received it?

A   Honestly, I don't know. I haven't went back to look. It could be in the file. It could be in -- it could be in a variety of places, but I don't know where it's at off the top of my head.

Q   You did have that meeting that Mr. Miln requested; correct?

A   We did meet after I received his letter, yes.

Q   You said you met with a group of -- there were multiple firefighters who attended that meeting?

A   There were several, yes.

Q   And other than yourself were any ISP employees present?

A   You know, I want to say there was, but I

Page 27

honestly don't recall for sure who was there.

Q   Do you know whether or not any of your supervisors attended the meeting?

A   Not that meeting that I'm talking about. It's possible that Mr. Wilson was there, but I don't know, Sarah. I can't really recall whether he was or not.

Q   And can you tell me what you recall about what happened at that meeting?

A   I just remember us discussing the fire itself. I remember them telling me about that evening, about, you know, their response time, how difficult it was to get in the cell house that evening. Then we began talking about their recommendations for changes moving forward, such as the moving of the fire extinguishers to the individual ranges. I mean, we discussed several security concerns with that, because we couldn't just hang them on the end of the ranges or any offender could grab a fire extinguisher, use it as a weapon. You know, there could be various problems with that.

We also talked about whether or not to encase it in a type of a cage with a cover and

Page 28

a lock. And I think, you know, what we ended up agreeing to was that we would deploy them on each range, as they suggested, and that we put them in the midway. And by the midway I mean, if you can picture a cell house, our cell houses are five tiers high with cells on both sides, and in the middle of those cells is a midway, and in that midway is all of your plumbing and your pipe chases, and things of that nature. So there's a gate at the end of each range that you can open up to get in that midway.

So I remember our conversation ended up being, well, if we're going to have to build a new apparatus for a fire extinguisher, we might as well just place the fire extinguisher inside the midway because it's not accessible to offenders anyway. It's already there. We don't have to build anything, but it still would be a much quicker way to access the fire extinguisher than what was currently happening at that time. I believe we also discussed a couple of other things, and these ideas came from Director Orme and, I believe, Chip Dudley, because we were also talking about,

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 9 of 85

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

Page 29

you know, ways we could improve or, you know, things that we could do to help fire response in the future, and Kevin had suggested a couple pieces of equipment.

He suggested that we look into purchasing some foam backpack dispensers, and these are -- they're very expensive, but it's actually a backpack that's filled with compressed foam and it has a spray nozzle that a firefighter would wear on his back and, you know, he would wear that directly to the scene and, you know, they would spray foam on the fire, which is a very new apparatus for firefighting. A lot of city fire departments, you know, don't even have that apparatus, and that's one of the things we discussed, or I discussed with the firemen, and we ended up purchasing, I believe, two of those units for this facility fire department.

We also talked about Kevin had recommended purchasing a -- I forget the name of the piece of equipment, but it's a smoke evacuation system. So it's a portable piece of equipment that you would carry to a fire for use inside in a building or a cell house.

Page 30

And, you know, a building is full of smoke, this is a smoke evacuation system that would help you evacuate smoke from a building quickly, and we did purchase one of those as well. And after we purchased those items I know there was some training given to the firemen, and I'm pretty sure that was sponsored and conducted by Chip Dudley, the state's fire chief, and there might have been others that he brought in to assist with that training, or not. I can't remember, but Chip basically is the guy that coordinates most of the offender firefighter training for the state.

Q    And the people that you just mentioned, one is Chip Dudley. He's the state's fire chief. Is that for the Indiana Department of Corrections or for the State of Indiana as a whole?

A    It's for the Indiana Department of Correction as a whole, and then he travels to each facility within the Indiana Department of Correction and he typically works with each facility safety manager, some facilities have also a fire, slash, safety manager, but here we have a staff person that's a safety manager

Page 31

and may supervise the offender firefighters.

Q    And you said Director Orme. Is that -- could you tell me Director Orme's first name?

A    It's Orme, O-R-M-E, and his first name is Kevin, and Kevin is the director of construction services for the State of Indiana.

Q    Okay. Just to turn back to that meeting that you had with the firefighters at Indiana State Prison, and I understand that you got recommendations about purchasing additional equipment from IDOC staff, but I want to focus on the suggestions and recommendations that the firefighters at Indiana State Prison raised during that meeting.

You mentioned one had to do with the extinguishers on individual ranges. Were there other recommendations, suggestions, or requests that the firefighters raised as part of that particular meeting?

A    There were. I know that they wanted to talk about improving their response time and they wanted us to have -- they wanted us to figure out a way to basically make the officers working the cell houses respond faster to

Page 32

letting them out of their cells whenever a Signal 10-71, or a fire, is called so that they can get there quicker. I know they complained that at least in one unit that they didn't feel the officer got to their cells and let them out as fast as they should have, which, you know, I don't know if they did or not.

But I know we did talk about doing some training between the offender firemen and the supervisory staff for custody, which would have been my major, my lead captain, some of my shift supervisors which are captains, and possibly some of the lieutenants, so they could work on better dialogue. And I believe that meeting took place as well, so they could discuss how to improve working relations, but I don't know when that was and who was in attendance, but I do believe that meeting took place.

Q    Okay. And any other recommendations, suggestions, or requests that the firefighters brought to your attention during that meeting a couple of weeks after the Devine fire?

A    I'm trying to recall, Sarah, but I don't know.

Page 33

I mean, if I saw the paper, then, you know, that would refresh my memory. I recall that when we were meeting and I was talking about the, you know, the backpack suppression system and the smoke evacuation system that we were looking at purchasing, they were very pleased because they knew that that was, you know, a nice piece of equipment that they would be receiving in the fire department. We also -- I mean, we put these guys through a lot of training.

They go through the Homeland Security Firefighter Certification I and Homeland Security Firefighter Certification II. You know, we bring Homeland Security in with Mr. Dudley, Mr. Orme, and others, and put them through that training so that we're a certified general fire department. So we put a lot of money in their equipment, making sure they have good equipment, you know, respirator masks, functional hoses and nozzles that they may need. We even renovated their small fire truck that was kept in the fire department. So I know there were a lot of things done to improve that operation.

Page 34

Q   Okay. And was any documentation created reflecting the contents of the discussion during that meeting?

A   Do I think there were notes taken of that meeting? No. I mean, were there purchase orders for the stuff that I mentioned that we bought? Yeah, I'm sure there was.

Q   Sure. But to your recollection, no one was there taking notes on the meeting; correct?

A   Not to my recollection. It was just an informal meeting to discuss ways of improvement moving forward and, you know, what I had to share with them with the new pieces of equipment, but --

Q   And where did the meeting take place?

A   I believe it took place in a classroom in the NSB building.

Q   Okay. Can you tell me anything else that you have an independent recollection of participating in with respect to an investigation or conversations regarding the Devine fire?

A   I'm trying to think of what that would have been. I recall sitting in on an after action review, which was conducted sometime well

Page 35

after the fire.

Q   Anything else?

A   Not that I recall, no.

Q   After action reviews, are those -- is that an event that occurs with regularity or was that a one-time event that occurred because of this particular event?

A   It's something that occurs after any significant emergency situation.

Q   Who decides that the situation that has occurred warrants an after action review?

A   Usually, that's the -- I mean, we always will do an internal after action review, but the one I'm referring to is normally directed by the deputy commissioner, Jim Basinger, or the director of emergency response operations, Richard Curry. Sometimes it might be one of the regional directors that asks for an after action review, but they're normally conducted by ERO, emergency response operations, and Director Curry.

Q   And do you know who directed that an after action review should be held following the Devine fire?

A   I do not know who directed that one to happen,

Page 36

but I know that Director Curry came to this facility with a couple of his staff and we pulled together everybody that was involved in the fire and we met down at the basement of internal affairs and we had an after action review of the incident there.

Q   And you said that these after action reviews are typically led by, I'm sorry, who?

A   His name is Richard Curry, C-U-R-R-Y, and he's the director of ERO, or emergency response operations, for the department of correction.

Q   Did he conduct any investigation, to your knowledge, prior to the after action review?

A   He didn't, no, not to my knowledge, no.

Q   And can you tell me, in general terms, what an after action review -- what it is and what it does?

A   What it is, is it gives everybody that was involved in the incident an opportunity to basically rehash what happened, and then Rich and his team will typically intervene with what policies we should have done in that situation, and in the end, basically, we kind of have that discussion on, okay, what went well, what could have been better, and, you

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC NND Case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 11 of 85

Page 37

know, we allow basically a lot of team members that may have been frustrated by the incident or, you know, wanted to get something off their chest could.  It's just kind of a review of the incident and trying to take a look at it critically on what went well, what didn't go well, you know, what policies we should have done versus what actually happened, and that's basically what the purpose of it is.

Q    Do prisoners ever attend these after action reviews or are they limited to staff?

A    They are limited to staff.

Q    Are they documented in any way?

A    I believe they are, yes.  I think Director Curry would have record of that after action review.

Q    Are notes taken during the meeting?

A    Excuse me?

Q    Are they documented through notes that are taken during the meeting?

A    I believe one of his guys were taking notes, yes.

Q    And do you receive a copy of those notes afterwards?

A    You know, usually, I do.

Page 38

Q    Okay.  Do you know whether or not you received the notes in this instance after the after action review?

A    Honestly, I do not.  I don't know if I did or not, Sarah, to be honest with you.  I mean, I remember the key points of the after action review.  I'm assuming I got, you know, a copy of those notes, but I've not seen them since then and I really don't know where they are.  I mean, they're probably in a file, but I've not seen them lately.

Q    Can you tell me what you recall about this particular after action review?

A    I remember the key points of the after action review.  It actually became quite heated conversation between the staff and between Director Curry and some of his staff because, for example, in a fire, policy says that for evacuations, if there's a fire, policy dictates that you first evacuate the area affected, wherever that may be, and then you go to the top ranges and you begin to evacuate range by range by range, because smoke rises, obviously.

And policy also requires that your first

Page 39

responders and any other additional staff that you may have would have showed up at the scene staged at the front door of the cell house and orderly assisted in evacuation of the cell house range by range.  And I remember Mr. Curry trying to make the point that if we would have --

COURT REPORTER: I'm sorry, that cut out.  Mr. Curry was trying to make the point that if we would have?

A    That if we would have used the first responders and any other available staff to stage at the front door of B-cell house as we did the evacuation range by range in a very orderly fashion, that those staff could have better controlled that evacuation and we may not have had, you know, the staff assaults that took place and the burning down of Checkpoint 7 and the problems that we encountered as we evacuated the housing unit.  And I remember some of my staff then, you know, trying to explain that, you know, you weren't there and you don't understand how this happened and, you know, they described what happened from their perspective.

Page 40

And, you know, from their perspective they were describing, look, there were three of us in the cell house, it was 10:00 at night, one of us was in the officer's station, two of us at that time we had just finished our security checks for the 9:00 round, and the lieutenant told us that we had to get our A-4's done, which is their time sheets.  So I recall Rodriguez saying that he was in the officer's station.  The other two had not done their A-4's yet, so their lieutenant told them they need to go in the unit team office, get on the computer, and do their time sheets, or what we call A-4's.  So that's where they were at the time.  Okay?

And then they described, you know, they began to hear yelling, and, of course, you know, the after action review you kind of play devil's advocate, at least Director Curry and his staff does, and, you know, I remember there were questions.  Well, when you heard that yelling, did you go respond to see what was going on.  And, you know, I remember the staff saying there's 220 men in the cell house.  There's yelling all the time, you

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 12 of 85

Page 41

know. But, finally, I think it was Rodriguez said that he had heard yelling as well in the officer's station, and at first he didn't think much about it. He just thought two offenders were arguing with each other, and then the yelling continued, and I remember him saying he ran up to the 200 range, and then he heard them yelling fire in 540, and he ran back downstairs, and they were basically just describing how hectic the scene was.

You know, at that time all the offenders were screaming and yelling there's smoke, you know, smoke in the unit and fire in 540, and they were trying to communicate with the captain, who was trying to communicate with me, and then they internally -- Lieutenant Watson spoke up and said, you know, look, my thought process or my decision was to evacuate the cell house. He was the highest ranking person on the unit at that time and he thought the smoke was getting thick enough and bad enough that it could have affected other offenders.

So, basically, he ordered the staff on the unit to just let them out, and, you know,

Page 42

I guess it was done pretty much all at once, that the doors were just let out, you know, all at the same time. So you had 200 and however many guys evacuating the cell house, basically, simultaneously, which created confusion at the front door, no question about it, and I remember Mr. Curry in the after action review trying to make that a point of issue.

BY MS. GRADY:

Q    You cut out again, Warden. You said point of issue and then we lost you.

A    Okay. I remember Mr. Curry trying to make his point that if we would have slowed down or they would have slowed down and evacuated the cell house range by range, as policy called for, that we could have avoided some of that staff assault and Checkpoint 7 being burned down and had better control on the evacuation. I remember my staff being upset by that because, you know, their rebuttal was, look, we were there, we made the decision based on the amount of smoke in the unit to let them out and evacuate the cell house, and we didn't have time to do it range by range, and they

Page 43

felt that, you know, further loss of life or injury would have resulted if they would have slowed down and did it range by range as the book called for, you know.

So they were defending their position that they thought they did the right thing, that they thought they saved injury or life, and, yeah, it's unfortunate that a few staff were injured and assaulted and it's unfortunate that Checkpoint 7 was burned, but they still felt they did the right thing. And that's typically what happens in an after action review. You have what policy says you should do and you have what the staff did, and there's always two sides to the story. So, you know, those are the main points of what I remember in the after action review.

Q    It sounds from your testimony like there were two main points of discussion; one was with respect to, as you just testified, the process in which prisoners were let out of their cells versus the process with which policy dictates prisoners should be let out of their cells. Fair?

A    That's fair.

Page 44

Q    And was the other point of discussion about the response by Rodriguez and the other two officers to the yells by the men in B-cell house?

A    No, the other point was mainly about, again, procedural, that it was loud in the cell, that it was filling up with smoke. Mr. Curry was still trying to make the point of you should have followed the book and done it range by range. And the officers were, like I said, getting upset and defending their position, that they thought they made the right call because if they would have slowed down and followed the book, there would have been further loss of life possibly or smoke inhalation problems. So they were kind of upset that he wasn't supporting what they did, and that's why I said it became tense.

And I remember at the end of it Director Curry was trying to tell everyone in the room, look, we're here to kind of go over the incident. You know, we're not enemies. We're not here to fight with each other, you know, and was trying to appease everyone and put things back in perspective, but I know the

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 13 of 85

Page 45

staff still felt like they were not supported in what they did and they still felt like they did the right thing.

Q   Can you tell me who were the people, in your recollection, that most felt that they weren't being supported?

A   Probably Lieutenant Watson would be the main person.  Other than him, I would say Redden and Statham.

Q   Did Promise Blakely attend the after action review?

A   Honestly, I don't know.  I would have to go back and look at the attendance log for that after action review to see who was there.  I don't recall specifically whether she was there or not.

Q   What about Officer Rodriguez?

A   Yeah, I think I would need to look at the log.

Q   Okay.  And what, if any, recommendations came out of the after action review?

A   Those were the key points.  I mean, Director Curry wasn't too upset with anything that they did or didn't do.  His recommendations was he thought they should have slowed down, followed policy, stage the first responders better at

Page 46

the front door so that they could have more efficiently handled the evacuation of the cell house.  And the staff that were there that night felt like they did the right thing and by doing what they did, yes, it created a little bit more chaos and problems, but they felt that they, you know, potentially saved further injury or loss of life from the offenders.  So it was kind of agreed to disagree, is how that one ended.

Q   And was there any discussion during the after action review about anything that could have been done to save Joshua Devine's life?

A   (No immediate response.)

Q   Could you hear me?

A   Yeah, I'm just thinking, actually.

Q   Oh.

A   I'm trying to recall whether or not that specific topic came up during that.  You know, what I recall is I remember those that were involved, Officer Rodriguez, I remember him giving his testimony of him saying that he first ran up to the 200 range because he didn't know what was going on.  He just heard screaming.  Then I recall him saying he ran

Page 47

back downstairs to the flag, or the bottom range, and he yelled at the other two officers, Blakely and Abbassi, that were in the unit team office that there's a fire, I need your assistance.

And so I remember, you know, him talking about what he did and then others talking about when they got there, what they did.  I mean, I remember Sergeant Statham and Lieutenant Watson got up there pretty quick as first responders, and I remember, you know, them testifying or them telling the group during this after action review that -- I mean, they were crying as they repeated this story, that they were on the 500 range in heavy smoke next to this man's cell.

They had emptied three containers of fire extinguishers in that cell and on Mr. Devine, and they had popped the lock to try to get the door open, but the door was so hot that they couldn't touch it, that there were flames shooting out the fire, and I remember them just talking about how helpless of a feeling it was not being able to pull him out of his cell.  So I remember that

Page 48

conversation.  Yeah, it was emotional, but, you know, so I do remember that part of it.

Q   Anything else you recall about the after action review regarding the Devine fire?

A   I think that pretty much covers it.

Q   Okay.  I'd like to turn and talk a little bit about what you did to prepare for today's deposition.

Can you tell me what, if any, documents you reviewed to prepare for your deposition here today?

A   I looked at -- I looked at some of the case notes from the INI file of the fire and, you know, honestly, I just -- I reflected in my own mind what took place that evening.  I spoke to Mr. Blinn on Monday to kind of go over my --

MR. BLINN: I would jump in. Don't talk about what we talked about, but go on.

A   I'm just saying I had conversation with Mr. Blinn on Monday, but that's basically it, Sarah.

BY MS. GRADY:

Q   Did you talk with anyone other than Mr. Blinn

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 14 of 85

Page 49

about the fire or your expected testimony at this deposition?

A    No, I did not, and most of those people are no longer here, unfortunately, but, no, I did not.

Q    Other than the case notes from the INI file, did you review any other documents to prepare for today's deposition?

A    No.

Q    Did you ever speak with Barbara Devine, Joshua Devine's mother, for any reason?

A    You know, I know one of us would have called her after the fire to advise her of her son's death and passing, but, honestly, I don't know if that was me or someone else. I don't recall speaking with Barbara Devine. So I'm thinking that was one of the deputy wardens or the chaplain that maybe had made that call. I don't recall speaking to her, ma'am, I don't.

Q    Do you recall speaking with anyone connected to Joshua Devine on the outside, a girlfriend, a sibling, anyone like that?

A    I don't recall that, no.

Q    Do you recall ever being made aware of Joshua Devine's loved ones, including his family or

Page 50

girlfriend, contacting people in custody to ask about what happened?

A    You know, there were a lot of rumors, Sarah, but, specifically, do I remember who called who and what questions were asked? I mean, you know, I remember hearing, for example, from my INI staff that they were hearing rumors that some of the offenders were calling Devine's family and trying to, you know, talk them into filing a lawsuit and that some of the offenders in the -- I mean, there were a lot of rumors, let me just put it that way. But do I know specifically who called who and what the conversation was? No, I don't. I mean, I'm sure it probably happened, but I couldn't tell you for sure who called who and what was said.

Q    Promise Blakely, Sarah Abbassi, and, I believe, Justin Rodriguez were in B-cell house on the night of the fire; correct?

A    I believe that's correct, yes.

Q    And you became aware that they all resigned shortly after the fire; right?

A    I don't know when they resigned, but, yes, they ended up leaving state service, yes.

Page 51

Q    Did that surprise you that they left?

A    I mean, we have a high turnover, Sarah. So, we try to do exit interviews with staff to see, you know, what the issues are and why they're resigning. I don't know if exit interviews were done with those three or not, but, you know, I see it all the time, especially in high-tense situations or, you know, critical incidents, as we call them. You know, the officers come in here, they're making at that time, I think, 12 dollars and something an hour and they deal with very difficult offenders and very real critical situations. So it's not uncommon that staff leave after being a part of a major critical incident.

Q    I'm going to show you what I'll make Exhibit 1.

MR. BLINN: Can I just ask, as a point of order, are these going to be at some point compiled and transmitted to us at the end of this? I assume so.

MS. GRADY: Yes. How we've been doing it before -- we can do this off the record.

Page 52

(Brief discussion held.)

MS. GRADY: We can go back on the record.

(Document titled Exhibit 1 identified for the record.)

BY MS. GRADY:

Q    Okay. I am showing you what we'll mark as Exhibit 1. This is a document Bates stamped Devine Production 1820 to 1821. This is an E-mail from a woman named Lori Bootz to -- I'm sorry, it's actually an E-mail from Michele Masley to a number of individuals, and it details staff at Indiana State Prison and then it details about the action, or RFN.

Is this the type of E-mail that you're familiar with?

A    Yes. Michele Masley, as it says at the bottom, is the Human Resource Generalist 1 for Indiana State Prison. So she puts this E-mail out probably once a week that notifies leadership staff of who separated, and it's basically a tracking form and, you know, an information form.

Q    And you see that, according to this E-mail, as of June 4, 2017, Sarah Abbassi resigned with

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 15 of 85

Page 53

notice; correct?

A    I see that, yes.

Q    You don't have any reason to dispute that Ms. Abbassi did, in fact, resign her employment with notice as of June 4, 2017?

A    I have no reason to dispute that, no.

Q    Okay.  And that's just less than two months after the Devine fire; right?

A    Yes.

Q    Okay.  Can you tell me whether or not you or anyone else at Indiana State Prison conducted an exit interview of Ms. Abbassi in June of 2017?

A    I can tell you it should have happened and I would have to check the state personnel file to see if it did happen.  But am I aware of it today?  No, I don't know if it did or not.

Q    When an exit interview is conducted, where, if anywhere, is the record of that interview kept?

A    Yes, it's usually kept, back in those days, in 2017, it's kept in the state employee's personnel file.

Q    And do you remember Officer Abbassi?

A    I remember Sarah, briefly.  I didn't know her

Page 54

well, but, yes, I knew who she was.

Q    I'll show you to see if this helps refresh your recollection a photograph of Ms. Abbassi. This is page 2 of Exhibit 1, 1821.
       Can you tell me what, if anything, you recall about her?

A    I just remember that she was a fairly new officer.  I know she was a fairly young, attractive female and I was - but she was a good officer.  I remember there was talk about, you know, that she would have a hard time in this environment because the offenders would be hitting on her, and things of that nature, but, you know, I don't think any of that -- she handled herself well, let me put it that way.  So I don't recall anything negative or bad about her.  I do recall her, yes.

Q    Do you recall anything that stood out about her as a positive?

A    Like I said, other than she seemed to handle herself professionally and well, I didn't know her that well.

Q    And tell me what you mean by that.  What struck you as -- what about her struck you

Page 55

that led you to the opinion that she handled herself well?

A    Well, because I'm sure that she was approached or, you know, hit on by offenders because this is a prison full of guys that are here for the rest of their life and that's what they do. So most young, halfway attractive females will be approached, will be hit on by the offender population, and all of them seem to handle it in different ways.  Some of them handle it in a professional fashion and they're able to handle themselves and tell the offender I'm not going to tolerate that, I'm not interested, I will write you up if you keep pushing the issue, and there are those that will succumb and traffic and have relationships and a variety of other things. And I don't ever recall hearing from my internal affairs staff that Ms. Abbassi was one of those that was being looked at for potential trafficking, or anything of that nature.  That's why I say I -- from what I recall she handled herself pretty well.
       (Document titled Exhibit 2 identified for the record.)

Page 56

BY MS. GRADY:

Q    I'm showing you Exhibit 2, which is a document that was produced and it's Bates marked Devine Production 1828 to 1829, and this is, again, a document from a different HR person reflecting that Promise Blakely had resigned as of June 4, 2017; correct?

A    Yes.

Q    It says, resignation TER/RSN.  Can you tell me what, if anything, that means to you?

A    Terminated or resigned would be, I believe, what that terminology is because it's action and reason.  But, I mean, I don't know what this is referencing specifically.

Q    Okay.  But you are familiar with this general type of an E-mail that reflects personnel changes.

A    Yes.

Q    Okay.  And can you tell me from looking at this exhibit whether or not Promise Blakely left employment with the Indiana Department of Correction because she was terminated or because she resigned?

A    I mean, to me, honestly, this is a little confusing because, I mean, it shows her

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 16 of 85

Page 57

separation date and under Action, slash, Reason, it seems to indicate terminated was the reason, which -- I would have to check the human resources or state personnel log to see if something else was involved with her that maybe came up later. I mean, I don't know. I'd have to check with personnel.

Q And can you tell me whether or not Officer Blakely received an exit interview?

A We went over that earlier. I'd have to check the file and see if one was done.

Q Okay. And do you have a recollection of Promise Blakely?

A As I told you just a few minutes ago, I remember who she was, and I don't recall anything bad about her, but I did not know her well.

Q Okay. And I'm going to turn to the second page of this exhibit, which has the photograph of Promise Blakely. This is a document Bates stamped 1829.

Do you recall any interactions with her before the Devine fire on April 7, 2017?

A I do not, no.

Q And just to be clear, you said you recall that

Page 58

she was an officer and you don't affirmatively recall having a negative opinion of her; is that correct?

A I'm sorry, I thought you were still talking about Abbassi. Ms. Blakely, Promise Blakely, I mean, I know the name, I know she was an officer, but I can't say I knew her, Sarah.

Q Okay. As you sit here today, do you recall interacting with her at any point before the Devine fire in April of 2017?

A No, I do not.

Q When officers are hired to work at Indiana State Prison, can you tell me how, if at all, you interact with them as a part of their on-boarding?

A Well, all employees that are hired on go through what we call an NEO training, new employee orientation. That would be after they went through at least one interview with could be a variety of staff. We use lieutenants, we us captains, we use unit managers, we use casework managers. We use a variety of supervisory staff to conduct interviews for correctional officers. So after the interviews are done, those are

Page 59

compiled and turned into HR or a state personnel.

If the interview team feels like the employee scored high enough and they're recommending this person for employment, then that's provided to HR. HR will then run a background check on those individuals, and then they will send that background check to me for review and approval. So, I see the paperwork on all employees. On occasion, when I have time, I will go up during an NEO class and introduce myself and talk to the class. Times when I can't make it, I'll send one of the deputy wardens or major to, you know, do that part for me.

So sometimes I'll do second interviews if I see, by looking at their paperwork and their background check, if there's something that concerns me that I need further clarification on or I just want to interview this person personally, I'll have HR schedule an appointment with them to come in for a second interview. So a lot of employees I see that way as part of the on-boarding process. But, yeah, a lot of employees I don't see

Page 60

until, you know, after they've hit shift somewhere, and if they go on night shift, I mean, I might not see them for a long time, you know. We have a lot of turnover.

Q Can you say a little bit more about the turnover? Do you have greater turnover than other facilities in the Indiana Department of Correction?

A I wouldn't say we have more than any other. As a matter of fact, until this recent coronavirus outbreak we never had a problem hiring staff and we always, you know, maintained a vacancy rate to offset our budget to make sure we had a little wiggle room, but we never had a problem hiring staff here. It's just that, like I said, this job isn't for everyone. So you get a lot of people who come in the door and, you know, it's not -- like today, I mean, today it's better than it was back in 2017.

Today a correctional officer comes in at $16 an hour with benefits the state offers, but still it's a tough job. I mean, you know, they're working at a maximum security prison with a bunch of men that are here for the rest

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 17 of 85

Page 61

of their lives.  They're running up and down
five flights of steps every 30 minutes doing
security checks.  It's a tough job.  It's not
for everyone, and a lot of new people,
unfortunately, realize after a few weeks that,
you know, I can't do this either physically or
mentally and they, you know, bow out, and
that's common at all DOC facilities.

Q    And what, if anything, have you done to try
and address the problem regarding turnover?

A    We do a lot of things.

MR. BLINN: Go ahead and answer.

A    We do a lot of things.  A couple of years ago
we brought on a position called recruitment
and retention coordinator.  That person's job
is to do nothing more than go out and help
with recruitment events, hiring events.  I
also ask that person to spend a lot of time
inside the facility on all shifts, on all
brackets, talking directly with employees,
frontline employees.  I ask that person to be
a primary liaison between an employee who is
having problems or has complaints and I ask
them to bring those complaints to my attention
so that we can attempt to resolve any problems

Page 62

or issues that employee may be having,
because, obviously, I've invested time and
money in these people and I don't want to lose
them, you know.  So we did add that position
to try to help reduce the turnover rate.

I mean, there's several things we do.
We have a lot of special events throughout the
year.  I mean, we just paid in Special
Olympics.  You know, once a year we have a
team of officers who participate in the
Special Olympics playing pool (sic).  We also
do -- I forget the term, but Dive in for Water
to raise money for Special Olympics.  We just
paid in local parades.  We have officer teams
that participate in softball tournaments.  We
have food sales, at least before COVID-19
broke out we do food sales for the employees
once or twice a week.  When an employee's
immediate family member passes away, I have an
employee appreciation committee and through
those fundraisers, like the food sales and
things that I mentioned, that money is in that
employee appreciation committee fund and we'll
send flowers to that employee family member's
funeral.

Page 63

I mean, there's a lot of other things we
try to do for employees directly through my
employee appreciation committee, but, you
know, I'd have to go back and look at the file
to tell you what all we do do.  But, I mean,
we try to make the employees happy.  You know,
I mean, we try to give them special events.
We try to create opportunities for them to
become more part of the team.  I have people
out there, like the recruitment and retention
coordinator, that if they have an issue, even
if it's just a personality conflict with their
supervisor, then, you know, that's what I want
my retention recruitment coordinator to bring
back to my attention so that -- I mean, I'm
happy to change their shift to keep them and
make that employee happy rather than have them
resign.

I know for a lot of employees who are
going back to school and have college
schedules, we've adjusted staff schedules to
work around their college schedules.  I had an
employee last week that's been with me for a
year, a very good officer, but all of a sudden
his daughter gets very ill in Chicago, she's

Page 64

got two grandchildren, she's a single mother.
So, you know, he comes to me and says, you
know, I have to quit, I've got to go help take
care of my daughter and granddaughter.

So I'm talking to him saying, you know,
before you do that, why don't you take a leave
of absence and I'll approve that for you, take
30 days off and go deal with your family, and
then at the end of that 30 days let's see
where you're at, and if she's, you know, good
by then and you're able to come back home and
you want -- you know, because he asked can I
leave in good standing, which meant he wanted
to come back.  So, you know, I gave him 30
days off to go handle his issue and see if he
could help his family and if it was resolved
at the end of that 30 days, then we can just
bring him back to work and wouldn't have to go
through all the new on-boarding process again.
So I bend over every way possible to try to
help my staff and let them know they're
appreciated.

MS. GRADY: I'm going to show you
what we'll make Exhibit 3, and we're going to
make Exhibit 3 a single page that will be --

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 18 of 85

Page 65

this is not Bates stamped, unfortunately. This is the second page of Rodriguez's personnel packet and we will circulate it, but this was produced by the defendant.

(Document titled Exhibit 3 identified for the record.)

BY MS. GRADY:

Q    What I'm showing you is a single page from a personnel file that was produced by the defendants in this case. This is an E-mail from Justin Rodriguez to Dixie Phelan regarding his resignation that he is submitting to be effective immediately.

Do you know who Dixie Phelan is?

A    Yeah, Dixie Phelan was an SPD rep. I believe she was a Level 3, but she was one of our SPD reps that worked at both Westville and she worked here at ISP for a short time before she too resigned with the State of Indiana.

Q    Do you recall Justin Rodriguez?

A    I recall meeting Justin Rodriguez. Again, I did not know him well, but I did know who he was, yeah.

Q    Did you have any interactions with him before the Devine fire?

Page 66

A    Not that I can recollect, no.

Q    Did you come to have any opinion of him as an employee of the Indiana Department of Correction?

A    With him, no, I can't say that I did. I don't recall him that well.

Q    Okay. There was no discipline imposed as a result of the Devine fire on April 7, 2017; correct?

A    I don't think that there was, but I would have to review that file to be sure. I don't think there was though, no.

Q    And to your recollection, did you or anybody else ever recommend that discipline be imposed?

A    Not to my knowledge, no.

Q    Do you have any recollection of considering whether to impose discipline?

A    I don't remember any glaring issue that stood out that made me want to conduct discipline on somebody or, honestly, I would have. But, no, I don't remember any -- I don't remember any issue like that, no.

Q    And as you sit here today, do you recall whether anybody else asked or suggested to you

Page 67

that discipline should be imposed?

A    I do not recall that anyone asked or suggested that discipline should be imposed, no.

MS. GRADY: Okay. Let's go off the record for a second.

(Brief recess.)

MS. GRADY: We can go back on the record.

BY MS. GRADY:

Q    Okay. You said that you had sat for a deposition before. Can you tell me how many times you've been deposed?

A    It would be a guess, Sarah, but several times, somewhere between five and ten.

Q    Okay. And in the cases for which you sat for a deposition were you -- strike that.

You understand you're a defendant in this case; correct?

A    I do.

Q    Were you a defendant in the other cases for which you sat for a deposition?

A    Yes.

Q    Have you ever, to your recollection, sat for a deposition where you were not named as a defendant?

Page 68

A    Yes.

Q    You have sat for a deposition in which you were not named as a defendant.

A    Right.

Q    Can you --

MS. GRADY: Let's go off the record for a second.

(Brief discussion regarding difficulty hearing.)

MS. GRADY: We can go back on the record.

BY MS. GRADY:

Q    Can you tell me how many times you've been deposed as a third-party witness as opposed to a defendant?

A    Once or twice that I specifically remember.

Q    When was the most recent time you were deposed before today?

A    It would have been -- it would have been probably last year, as an employee who was terminated had filed suit against the state, the department of correction, myself, for wrongful termination.

Q    And so one of the categories of lawsuits that you've been deposed about involved employment

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 19 of 85

Page 69

and alleged wrongful termination?

A   Yes.

Q   And you understand that you're sitting for a deposition here today concerning a lawsuit over mistreatment toward a person in custody, alleged mistreatment toward a person in custody; correct?

A   I do understand that, yes.

Q   How many other times have you sat for a deposition concerning allegations that a person in custody was mistreated?

A   I honestly don't recall.  Not -- maybe one other time, but normally they get settled before I get to, you know, the deposition stage.  I've never been to court over one of these types of cases.  So, you know, not a lot.

Q   Can you tell me of the other -- would you say it's more than twice that you've sat for a deposition concerning allegations that a person in custody was mistreated?

A   I would say beyond this one, I would say one other time that I can recall.

Q   And what did that -- what allegations of mistreatment were a part of that case?

Page 70

A   It was an offender alleging that he did not receive the proper medical care for an injury that he had and he didn't think he was receiving the proper medical care.  So, you know, the facility and I always get brought into those cases, so that's what it was about.

Q   And you said that you did not testify in court in that case; is that correct?

A   It did not go to court, that is correct.

Q   When did you sit for that deposition, approximately?

A   Three years ago, two or three years ago.

Q   What was the outcome of that lawsuit, if you know?

A   It was dismissed.

Q   Do you know whether or not any money was paid to dismiss the case when it was settled?

A   It was dismissed by the court.  It wasn't a settlement.

Q   And have you ever personally paid money out of your pocket to settle claims against you for any reason?

A   I have not, no.

Q   To your knowledge has anyone ever paid money to settle claims against you on your behalf?

Page 71

A   Not to my knowledge, no.

Q   Have you ever attended a settlement conference?

A   You know, I'll have occasionally the chief legal counsel through the department and one of the exec staff will typically ask myself and the SPD staff that's over that particular case if we will agree to a settlement amount on a medical claims case.  I don't know if it's the same thing as a settlement conference or not.  But beyond that, no, I've not been involved in anything beyond that.

Q   Have you ever sat for a deposition concerning a fire at any correctional facility?

A   No.

Q   Have you ever been retained as an expert witness?

A   No.

Q   Have you ever been a plaintiff in a civil lawsuit?

A   No.

Q   And can you estimate for me how many times you've been named as a defendant in a civil lawsuit, to your knowledge?

A   A lot.  I mean, there are lawsuits every day,

Page 72

it seems like, that an offender is suing for one thing or another and, of course, as the facility head or warden I'm named in all of those, but the number is high, but I don't know how many.  It would be a guess.

Q   Can you tell me how many -- strike that.  As you sit here today, do you recall whether or not you've ever been named in a lawsuit before this one -- strike that.

As you sit here today, do you recall whether or not you've ever been named in a lawsuit other than this one concerning allegations about a fire at a correctional facility?

A   I have not, no.

Q   So as you sit here today, you don't recall ever having been named as a defendant in a case involving a fire in a correctional facility; is that correct?

A   That is correct, I do not recall being named in any lawsuit involving a fire.

Q   You said that you've never testified in cases where you've been a defendant; is that correct?

A   I have never testified in court for any DOC

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 20 of 85

Page 73

case that --

Q   Have you ever testified in court for any reason?

A   I remember testifying in court when I was a kid and, you know, in a -- a kid got injured playing little league softball and I got drug into court and I had to testify on that case, but I don't ever recall testifying in court other than that.

Q   Okay.  Have you ever been convicted of a crime?

A   No.

Q   Can you give me a background -- can you give me an overview of your educational background?

A   Sure.  I have a bachelors degree in criminal justice from Indiana University.

Q   And when did you obtain that degree?

A   2007.

Q   Was that a bachelors of art?

A   Yes, bachelor of arts in criminal justice, yeah.

Q   And when did you first enroll in Indiana University?

A   I believe it was 2003.

Q   Can you tell me what year you graduated high

Page 74

school?

A   1985.

Q   Between 1985 and 2003, did you ever attend any other schools?

A   Just briefly I had a few Ivy Tech courses, but, no, not really.

Q   Okay.  Did you obtain any other degrees or certificates before you enrolled in Indiana University in 2003?

A   Not that I can recall.  I mean, I worked at the state hospital for a while before I got my degree and there were courses we went through for treatment of the mentally ill and mentally retarded and, you know, they were certificate programs, and there were credit hours from Ivy Tech, but, I mean, you know, it was nothing serious.

Q   And have you obtained any other degrees, certificates, or other educational achievements following your bachelors degree in 2007 from Indiana University?

A   No.  I have not been back to school since that time, no.

Q   Can you give me an overview of your work history?

Page 75

A   Yeah, sure.  I graduated high school in 1985.  Actually, I went in basic training in 1984 for the military.  So I took basic training in 1984, came back, finished my senior year of high school in '85, went back and finished advanced individual training in 1986.  And when I got back, I started working in November of 1985 at the state hospital in New Castle, and I worked there from November of 1985 to July of 1986 as a psychiatric attendant for a little while and a rehab therapy assistant for a little while.  I then transferred to the Correctional Industrial Complex, which was what it was called at that time, in 1987.  No, I'm sorry, it was 1989, and I worked as a correctional officer, correctional sergeant, recreation leader, administrative assistant in a couple different capacities.

Then I went to, after CIF, I went to the New Castle Correctional Facility after it turned into a prison and was built as a correctional facility.  I transferred there as the executive assistant to the superintendent.  So I was there in that capacity for two or three years.  Then they privatized it and GEO

Page 76

took over that facility.  So I had left, went back into state service.  At that time I transferred back to CIF again as a sergeant.  I was there for a few months when they replaced the warden in New Castle with a person that was a good friend of mine.  He asked me to come work for him under the GEO Corporation.  So I went back to New Castle.  I worked there for approximately a year as unit team manager, and that's about the same time I started going back to school to get my degree while working.

So I stayed with GEO for, approximately, a year.  While I was there, I had applied for an assistant superintendent position.  I was told at that time by the commissioner that I needed to be a state employee to be able to be promoted to the next level, and so I made the decision to go back into the department of correction stateside instead of the privatized.  So I transferred to the Pendleton Correctional Facility.  I was there a month as the director of community services, and then the commissioner gave me the promotion to assistant superintendent at the Westville

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC NND Case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 21 of 85

RON NEAL
July 15, 2020

Page 77

Correctional Facility.

So I was there -- I believe that was in 2007. I was at Westville for, approximately, a year before the commissioner transferred me to the Indiana State Prison. I want to say that was -- I want to say that was either late 2007 or early 2008, as an assistant superintendent here at the Indiana State Prison, and essentially, I've been here ever since. I was promoted to warden, I believe, in I want to say 2016, but I'd have to go back and look to be sure, and I've been here since that time. So the whole AIT basic thing. Obviously, I was in the National Guard during that time and I went back and finished my degree or I completed my degree while working.

Q    Okay. So you enlisted in the National Guard that was like immediately after high school; is that correct?

A    When I was 17, I enlisted in the National Guard. I was a junior in high school. So I went that summer, did my basic training, came home, finished my senior year of high school. After high school was over, I went back, finished my advanced individual training, came

Page 78

back home. I was then in the National Guard. Right about the same time I came back home, shortly after, November, I started working at the New Castle State Hospital.

Q    And were you ever called out to serve in your capacity as a member of the National Guard?

A    I was never -- I mean, we had short activations, but no combat activations during my stay. That was from -- I was in from 1984 to 1990 and two years inactive after that, but I was never activated for a combat situation, no.

Q    Were you ever activated in a situation in which you were called out to use force against folks?

A    No.

Q    And what was the nature of your discharge from the National Guard?

A    Honorable.

Q    And can you tell me -- you went over the various positions you've had in corrections, including at ISP.

Can you tell me when you first arrived at Indiana State Prison?

A    Okay. I first arrived at the Indiana State

Page 79

Prison, like I said, I believe it was -- I believe it was December of 2007 is when I first arrived at the Indiana State Prison.

Q    And you said that you believe you were promoted to warden in 2016?

A    It was either 2014 or '16. I'd have to go back and look, but --

Q    And what was your position immediately before you were promoted to warden?

A    Deputy warden, but in those days they called it assistant superintendent, and instead of wardens they had superintendents. So, that's the terminology change, but --

Q    Okay. Can you tell me what, if any, discipline has been imposed on you during your tenure as an employee for the Indiana Department of Corrections?

A    Yeah. I've had -- let me see, I think it was 2015, I received a written reprimand from my supervisor because we had -- we had a disagreement about whether or not the entire facility should have been locked down, and he said he ordered me to lock the entire facility down and I didn't -- I didn't take it that way, and so one of the units weren't locked

Page 80

down. So I've had a written reprimand in 2015, I think it was, and I had another written reprimand back in 2007, and that was because an offender escaped. He escaped through a fence in the back of the Westville Correctional Facility after I had been there for two months, and he actually went through an old pole barn and a fence, went on top of the pole barn and over the pole barn.

So he went through the interior fence, through the back of the pole barn, and then he scaled the back fence, and escaped from the facility. And I got written up as part of the exec staff because a fence was built over the top of a building 30 years before I got there. So, yeah, that was just kind of taking one for the team, you know, that had nothing to do with me. But, whatever, I still have a written reprimand on my record. Other than that, I've had no disciplinary action.

Q    You said that in 2015, I believe you said, you got a written reprimand related to a lockdown incident.

Can you tell me what prompted the decision by you or your supervisor to lock

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 22 of 85

Page 81

some portion of the facility down?

A   What had happened was that we were having issues with drugs inside the prison at that time.  I was at that time, I think, either acting superintendent -- I think I was acting superintendent at that time.  Anyway, Mr. Wilson had given me a call and we were talking about what was going on at the facility, and I told him what all I had done, what housing units I had locked down, and he said, okay, that's good.  And so next thing we know -- I mean, that conversation ended.  Three days later the facility was still locked down, most of the facility.

The units I told him were locked down were still locked down, but our lockup unit, we still run a few activities on the lockup unit, such as escorting them to showers, because by policy they have to have a shower at least once every five days on a segregation unit.  So, anyway, one of those guys that was in the lockup unit came out, was being escorted to a shower, slipped his handcuffs, assaulted a staff person, and, of course, we report all incidents to central office.  So

Page 82

the next thing I know, then my supervisor at the time was calling me saying I thought we were locked down, how did this happen?

And I said, Bill, I told you what housing units were locked down and which ones weren't and we have always -- because I had worked with him for six years prior to that incident, and I reminded him that, you know, we have never stopped showers in the lockup unit when the prison is locked down unless the incident is directly involved in that lockup unit.  So, anyway, we had a disagreement of what he instructed me to do and what I did and he gave me a written reprimand over it that -- you know, it is what it is.  That's what happened.

Q   Okay.  Can you walk me through what a typical day looks like for you as warden at Indiana State Prison?

A   They're all different, but, typically, I'll come in at 7:00 or 8:00 in the morning, start off with whatever voice mails I have left on my phone.  Usually, between -- well, I mean, I work, basically, 24/7 fielding phone calls, E-mails.  You know, as warden you never get

Page 83

away.  Any incident in the prison that happens 24-hours a day, two offenders get in a fight, they call me.  If an offender assaults a staff person, they call me.  If an offender overdoses, they call me.  So I come in, I deal with whatever is going on through the day, whatever happens to be on my schedule.

That could be second interviews of employees, that could be a variety of meetings, that could be a number of things.  So my secretary schedules events on my calendar that I have to be a part of.  During the times when I'm not at meetings or, you know, on the phone or processing an abundance of paperwork that comes through my office, I try to have an open door policy to meet with staff with any issues they have.  So I oftentimes spend at least -- it depends.  Some days I have a line outside my door and people waiting; other times it might be, you know, one or two people.

When I get the opportunity, I leave for lunch, come back, and we dive back into whatever is on the schedule for the day.  I try to find time to leave the facility, to

Page 84

leave my office, and go inside and walk around the prison and see what's going on and talk to offenders, talk to staff, and somewhere around 3:00, 4:00, sometimes later, every day I go home, which, again, is 200 feet from the prison, and that's where I am.  And then, like I said, I receive calls all throughout the day, all throughout the night, and that's a typical day.

Q   And are there meetings that you attend as part of, you know, the regular course of your job?

A   There are many, yes.

Q   Can you give me an idea of what types of meetings you typically attend?

A   Once a week I have a department head meeting -- or executive staff meeting, excuse me, with my exec staff.  That's comprised of deputy wardens, healthcare administrator, HR director, physical plant director, and the custody supervisor.  So we talk about a variety of things, what might be going on in the facility, where we recently had fights, assaults.  It could be problems with security threat groups, it could be drug drops, it could be new construction efforts, it could

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 23 of 85

Page 85

be -- it could be a variety of things. It could be mommy phone calls that we receive from family members that, you know, has complaints about how their loved one is being treated. It could be a wide variety of things, so.

Q   And can you tell me, did you ever have or do you in your role as warden have regular meetings with staff or firefighters related to fire safety at Indiana State Prison?

A   No, there's no scheduled regular meetings with line staff or with offender firefighters, no.

Q   Okay. You said that you're notified for a wide variety of events both when you're on site at the facility and also when you're at your home, which I understand is also on the grounds.
     Are you notified every time there's a fire in the facility?

A   Usually. It depends. I mean, if it's a small, insignificant fire, let's say a single offender on the disciplinary restricted housing unit started a small fire inside his cell and the range officer put it out with the fire extinguisher in a matter of seconds and

Page 86

there was no injury to either offender or a staff person, will they call me for that? No. But if there's ten offenders setting fires on a range because of a particular issue or problem that they're having, will they call me for that? Absolutely.

Q   How often do you receive calls either on site or when you're at home related to fires at the prison?

A   It's rare. I mean, we have -- the types of fires we have, usually, are set fires inside the cells, usually on our restricted housing unit, and that happens, I would say, once every two or three months.

Q   And what about meetings related to equipment, do you have regular meetings with staff or other folks related to Indiana Department of Correction about the status of the equipment at the prison?

A   Sometimes. I used to have a physical plant director as a direct report; meaning, I directly supervised him. So when I did, I had several meetings with him because we would always discuss physical plant concerns in the prison, what needed to be done, pending

Page 87

projects, capital projects, status of ongoing projects, and he oversees the work order program that staff send in work orders based on broken windows, broken equipment, whatever they see. Anybody can submit a work order.
     My safety manager also ensures that daily we clean, monthly inspections are done in each area, and the safety manager also develops a monthly report, deficiencies, list of deficiencies, and she follows up to make sure that work orders are done as well. And then she also -- her job is to follow up on those list of deficiencies with her monthly report to ensure that problem areas or broken equipment gets fixed or replaced.

Q   What is her name?

A   My current safety manager is Danielle Brown, B-R-O-W-N.

Q   What about in April of 2017, who was the safety manager at that time?

A   His name was Steve Griffin.

Q   And it was Mr. Griffin's responsibility to do monthly inspections of the equipment in the various areas at Indiana State Prison and document any equipment that was not in working

Page 88

condition; correct?

A   Him and others, yes.

Q   Fair to say he was chiefly responsible for ensuring that that task took place?

A   Well, like I said, he does monthly inspections of every area and he does -- he cites what deficiencies he finds and turns in a work order for that deficiency. We also have -- let's say it's in a cell house. In a cell house I have a unit manager that's assigned over a cell house. I have a lieutenant that's assigned over a cell house. There are also case managers, there's sergeants, and the officers.
     So any one of those people assigned to any particular cell house or location can also turn in a work order and say, hey, we've got a broken whatever, a light fixture that needs replaced. So they, too, are part of turning in work orders and the work order process, and then the safety manager will pick that deficiency up on their report as well. So there could be more than one person following one work order, is what I'm saying.

Q   And the monthly inspections, do they result in

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 24 of 85

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

Page 89

a report that is created?

A   There is a monthly report, yes.

Q   And is that monthly report provided to you?

A   That monthly report usually is provided to me, yes.

Q   Do you review it?

A   When I get the opportunity, I do, but I do have an assistant superintendent who is now in charge of the physical plant department, so I put a lot of that responsibility on him.

Q   Who's is the assistant superintendent?

A   Jason Nowatzke, N-O-W-A-T-Z-K-E.

Q   And what about in April of 2017 was Mr. Nowatzke the assistant superintendent at that time?

A   I would say in April 2017, Ken Gann was the assistant superintendent at that time.

Q   And back in April 2017, did these assistant superintendents have responsibilities to oversee the physical plant operations?

A   Yes.  Yes.

Q   That monthly report details all the -- strike that.
        Does that monthly report call for the safety manager to affirmatively perform checks

Page 90

of equipment to ensure they are in working order?

A   Well, it's -- does she actually pick up the -- it depends.  I mean, if she sees something that's broken, for example, like if she goes through the maintenance shop and she sees a circular saw, okay, that has the wrong plug on it, her job is to deadline that piece of equipment.  So she'll put a red tag on it, a deadline tag on that piece of equipment, and it will be taken out of service until the deficiency is corrected.  So, yes, she does inspect equipment and deadlines that equipment, if necessary.

Q   And just so I understand the process, it's my understanding from your testimony that any officer or any other member of IDOC staff can complete a work order --

A   Right.

Q   -- even when they come to realize that something in the facility is not in working order; right?

A   That's correct.

Q   But there is an affirmative obligation on the safety manager to create monthly reports that

Page 91

affirmatively go around to the various areas within the prison and check to see that the physical plant contains things in working order; correct?

A   That's correct.  But understand this, that every area does a weekly inspection.  Okay?  So there might be 20 areas within the facility that does a weekly safety inspection.  Those inspections are forwarded to their bosses and to the safety manager.  So when the safety manager does their monthly inspection, they're looking at the compilation of all the weekly inspections.  So they see what deficiencies have already been cited, which ones have already had a work order turned in for.  So when they do their walk or their safety inspection, they are not only looking for new problem issues, but also the issues that's been cited on the weekly inspections.

Q   Understood.  Are radios included as part of the equipment that is inspected as part of a weekly inspection?

A   No, no.  That's more of a custody function that falls under the major, the custody supervisor, and we have a radio manager that

Page 92

takes care of radios.

Q   Who is the radio manager?

A   Ken Osborne.

Q   What about in April of 2017?

A   Oh, good question.  It could have been Ken.  I would have to look back and see.  I'm not positive.  It may have been Ken.

Q   And the radio manager answers to the custody supervisor in the chain of command; is that correct?

A   Yeah, the radio manager could be -- it's a custody function or an operation within the uniformed officers, but custody.  So it can be assigned to an officer or a sergeant and, yes, they report to the lead manager -- the lead captain, the major, and the deputy warden of operations.

Q   Is the deputy warden of operations a different person than the assistant superintendent?

A   It's the same person.  The title changed a couple years ago.  So you have a deputy warden of reentry, which used to be called the assistant superintendent of reentry, and you have a deputy warden of operations, which used to be called the assistant superintendent of

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 25 of 85

Page 93

operations. Same person, but --

Q    And I'm having a little trouble hearing you now, just so you know, so if you could keep your voice up, that would be really helpful.

Ken Gann, who you testified was the assistant superintendent in April of 2017, he was the -- that would be the title that would be assistant warden of operations; correct?

A    Yes, correct.

Q    And what, if any, periodic reports are created to reflect the working status of radios at Indiana State Prison?

A    There's an inspection that's done biannually by the radio manager who takes care of the assistant custody supervisor. But more so -- radios are something that's watched very closely. So if a radio is out of service or is broken, it gets reported almost immediately to the shift supervisor, who then notifies the radio manager and the custody supervisor, and we try to get that fixed and/or replaced as soon as possible.

Q    You say that you keep a close eye on the working status of the radios; is that right?

A    That's correct.

Page 94

Q    Can you tell me why is it that you keep such a close eye on the working status of the radio?

A    Because it's just a very important tool in this business that we have functional radios so that people can effectively communicate.

Q    Do you agree that radios are a critical piece of ensuring the safety and security of prisoners and staff at Indiana State Prison; correct?

A    Absolutely, yes.

Q    And assigning staff inoperable radios could put the safety of prisoners and staff alike at risk; correct?

A    Certainly, yes, if they had an inoperable radio, yeah, but I don't know why that would happen because if they had an inoperable radio, all they would have to do is turn it in for an operable radio.

Q    What documents, if any -- you mentioned work orders for -- I think we talked maybe about the lights at the facility.

What, if any, documentation is created reflecting a radio that is not in working condition?

A    There is a report that's filled out. I don't

Page 95

know the title of it off the top of my head, but it's a report specifically for radios. It's basically a broken radio report, and then you describe what's broken, and that's what gets sent to the radio coordinator so that he can follow up and make repairs.

Q    And are the repairs performed on site or are they sent off site to another group?

A    All of our radios are Motorola, so a lot of them are -- if it can be repaired on site, it is. If it's beyond on site, you know, repairable, then it's sent back to Motorola for repair or a replacement.

Q    Back in -- it's my understanding that at some point in 2018 or 2019 new radios were obtained for use at the Indiana State Prison. Is that something that is consistent with your recollection?

A    You know, I think we would -- I don't remember all new radios coming in in '18 or '19. I mean, we're always getting some new radios to repair or replace old radios, but I think that's something we would probably need to check logs on within, you know, that area. I say that because I've had my same radio for at

Page 96

least five years. So I don't, you know, remember it being replaced in the last three years.

Q    I see. So it's your testimony that in April of 2017 that your radio was the same as the one that you have and use today; is that correct?

A    That's correct.

MS. GRADY: Let's go off the record for one second.

(Brief pause; changing headphones.)

MS. GRADY: Okay. Let's go back on the record. Sorry about that interruption.

BY MS. GRADY:

Q    Okay. So, again, it's my understanding that other defendants in this case have testified that sometime after the Devine fire a full new set of radios were obtained. It's your testimony that that was not the case.

MR. BLINN: Object to form. You can answer.

A    I do not know if all --

BY MS. GRADY:

Q    I think we just lost you, I'm sorry. Warden,

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 26 of 85

Page 97

we had lost you for a second. You cut out there. I think what I heard was, I do not know if all --

A I don't know if radios, a facility-wide radio replacement was done after the Devine fire. As a matter of fact, I do not think it was.

Q Do you have the authority to authorize the purchase of additional radios?

A I do, but that typically would go through -- that's something that's handled by my major or custody supervisor and he requests radio replacements. There's a chain for that as well. I mean, that goes through -- Ken Osborne is my facility radio manager. He tells the major how many radios are broken or damaged, and when the major realizes that we have several that are inoperable, then he will notify Mark Hahn, who is over that for the State of Indiana. He works under the deputy commissioner of finance, who I believe is Christina Rico, and radios are purchased as needed.

Q So is it your testimony that you alone do not have the authority to obtain new radios for your prison; is that correct?

Page 98

A Right, right, I do not go buy them myself or have -- I can't. I do not have the authority, correct.

Q But the custody supervisor can contact Mr. Hahn, or his predecessor, directly to request authorization for the purchase of new radios; is that correct?

A Yeah, close. I mean, Mr. Hahn would take his request through the deputy commissioner that he works for to try to get approval to buy replacement radios, yes.

Q Who is the custody supervisor today?

A His name is Doug Wardlow, W-A-R-D-L-O-W.

Q And what about in April of 2017, who was the custody supervisor at that time?

A I believe it was Jason Nowatzke.

Q And sorry, not to rehash our old ground, but just to be clear, Mr. Nowatzke, back in April of 2017, did not require your approval to seek the authority to obtain radios for ISP; is that correct?

A Yeah, they can do it on their own, Sarah, but what you need to understand is, the major, the deputy wardens, they report to me. Okay? So, yes, they have things that they can do

Page 99

individually, but if it's something big, like a warden, I'm going to request 50 some radios to go through, they let me know before they do it.

Q And what type of documents are created in order to request the purchase of additional radios?

A Honestly, I -- I don't recall.

Q Is there a form, is it -- strike that. How is it typically -- how is the request typically transmitted? Is it transmitted via E-mail or in some other way?

A Oh, I'm sure there's a form. There's a form for everything. I just don't know what the name of it is off the top of my head.

Q And how often -- you testified that requests for new radios -- strike that. I'm trying to get a sense of how often these requests occur. How often are requests submitted to the commissioner of finance for new radios at Indiana State Prison?

A It's not very often because they're very expensive. I mean, I want to say a facility will have its radios completely replaced maybe once every ten to 15 years. It's not a

Page 100

frequent occurrence, but facilities will occasionally have to send in smaller orders, depending how many radios got broken or damaged during that time period. Does that make sense?

Q Yes. So including those, the giant orders where you're asking to replace an entire set, and the smaller orders, how often, based on your experience at Indiana State Prison, has a request for some amount of new radios at Indiana State Prison been submitted to the commissioner of finance?

A I would say that might happen once a year, but I would like to, you know, check records to see.

Q And were you aware of a problem in April 2017 with a large number of radios being in inoperable condition?

A No, I was not.

Q That's something you would expect to have been brought to your attention; correct?

A Absolutely.

Q And it's your testimony, not that you don't recall one way or the other, but that you affirmatively were never made aware of such an

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 27 of 85

Page 101

issue; correct?

A   That is correct.

Q   Were you made aware of a problem with a large number of radios being in inoperable condition after April of 2017?

A   I do not.

Q   It's your testimony -- and that includes up to the present date; correct?

A   Well, I mean, I know that -- like I said, I know some radios were replaced sometime maybe in 2018, 2019, but it wasn't a facility-wide replacement.

Q   And what was the --

MR. BLINN: I'm just going to put a continuing objection. I think the use of a large number of radios is a little vague. So I'm just going to put a continuing objection to that. Go ahead.

MS. GRADY: It's fine for you to note your continuing objection. You also just anticipated my question.

BY MS. GRADY:

Q   When we're talking about that order, can you give me an approximate number of how many radios were ordered at that time?

Page 102

A   Like I said, Sarah, I mean, I really think at this point it would be best if we just looked at the logs that's kept, you know, from the major and the radio manager and then we'll know exactly how many radios were replaced when because I don't know. I'm just guessing, you know, based on what I recall and my memory is vague about that, so.

Q   Sure. And I understand, you know, but frankly I'd love to have those logs, but I don't have them. So, unfortunately, I'm forced to rely on exhausting your memory at this time for those logs.

So is there a document that you have access to in your office there that might provide you additional details about how many radios or approximately how many radios were requested as part of the requests for radios after the Devine fire?

A   There's not, no. I mean, I just don't keep that in this office. That's kept with the radio manager and custody supervisor and -- yeah, I just don't know. So, I guess you can consider me exhausted on that topic.

Q   You were made aware that Officer Rodriguez

Page 103

reported that he was unable to communicate with the other officers in the cell block without physically going to where they were located because his radio was inoperable; correct?

A   That's not correct. What I remember being told was that several staff were having trouble communicating on that particular night because of the noise in the cell house. I never heard anything about a radio malfunctioning. I was told about, you know, the volume of noise. It was just literally impossible to communicate over a radio.

Q   Okay. So it's your testimony that you were never made aware that Mr. Rodriguez's radio was inoperable on the night of April 7, 2017; is that correct?

A   That's correct. I never heard that then nor during the after action review.

Q   And did you -- strike that.

Can you tell me what the policy requires with respect to an officer being assigned a radio? Is he required to confirm that that radio is in working condition when he begins his shift?

Page 104

A   There is a policy, I believe, on radios that discusses, yes, that each officer when issued their radio for the day is supposed to ensure that the radio is, in fact, operational and if it's not, what the process is for obtaining a replacement radio.

Q   And that's an important policy; correct?

A   Well, yes. Yes.

Q   It's your expectation that that policy is followed when officers are assigned a radio before they begin taking over supervision of a cell house; right?

A   I expect all the radios to be in working order for the officer and offender safety, absolutely.

Q   Well, but you also expect the officers to appropriately ensure that the radios are in working order so that if one happens to not be in working order, it can be replaced; correct?

A   Agreed, yes. I expect them to check the serviceability of their radio, yes.

Q   And have you ever disciplined anyone for failing to ensure their radio was in working order after they -- after an incident occurred and they noted that their radio was not

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL

July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 28 of 85

Page 105

working?

A    You know, not one that I can think of off the top of my head.  I'm sure that it's happened and it probably would have been a dereliction of duty charge that an employee was disciplined for.  But, I mean, just hypothetically, if a serious situation happened, let's say an officer was assaulted or stabbed and his fellow officer had a radio that was not functional and he or she knew that in the beginning of the shift and did nothing about it, then, certainly, that individual would be disciplined.  But I don't know of a specific case that, you know, that I can cite or that I disciplined.

Q    Has it ever been brought to your attention and do you recall that an officer failed to confirm his or her radio was in working order before taking over his or her job responsibilities for the shift?

A    Yeah, I mean, I'm sure I've heard it at times that, you know, as one of the supervisors were walking the units or doing inspections they, you know, came across an officer whose radio wasn't working and, you know, when questioned

Page 106

why they didn't have a functional radio, I mean, I'm sure those conversations have happened, but I don't know of any specific day or incident.

Q    Okay.  And can you tell me -- we talked about the paperwork that would be created for radios.  Let's talk about some different paperwork.  What paperwork -- strike that.

    Does anyone monitor the temperatures in the various cell houses at Indiana State Prison?

A    Every day on every shift, yes.

Q    And how is the temperature measured?

A    Every cell house or housing unit has a thermometer and they are asked to take temps at various locations in the cell house; on the flag, which is the bottom range, and up on the 500 range, to determine what the temperatures are, and those are reported on daily shift reports.

Q    So the temperature that is measured as part of every shift throughout the various areas of each cell house, that's reported as part of the daily shift report; is that correct?

A    Yeah, the shift supervisor, one of his

Page 107

reports, that's a part of his daily shift report is a temperature log showing the temperatures in each housing unit.

Q    And does that daily shift report include all of the measured temperatures or just some of them?

A    I mean, all of them.

Q    The thermometer that's used to measure the temperatures inside, like in Illinois we have a little gun that you shoot at a thing and it measures the temperature where you're pointing it.

    Is that the same thermometer that's used in the Indiana State Prison?

A    It is.  I know there are those kind and there's also a desktop unit that they use primarily for the lower ranges.  But they're changed out often, Sarah, as they break, you know, and then we try to replace those with the gun or laser-type that you're referring to.

Q    And the daily shift report, how is that -- is that E-mail or is that a form that's used?

A    Well, both.  There's several forms that compiles a shift report.

Page 108

Q    And that's then for every shift; correct?

A    Yes.

Q    How many shifts per day?

A    Two shifts per day.  6:00 a.m. to 6:00 p.m. and 6:00 p.m. to 6:00 a.m.

Q    Is there anywhere other than the shift report where the temperature logs are maintained?

A    (Inaudible; technical issue.)

Q    You know, Warden, let me just stop you because we missed the whole first part of your answer.  Can you just restart your answer, please.

A    They're maintained also in the custody supervisor's office, and all of his shift reports are also kept in the custody supervisor's office.

Q    So there's a document that reflects the temperature logs for each shift on its own that's maintained in the custody supervisor's office; is that correct?

A    That is correct.

Q    And is each cell house responsible for maintaining those?

A    Yes, they are.

Q    Do the records reflect where the temperature was obtained?  I think you testified they take

Page 109

them in a variety of different areas?

A Yeah, I believe that they do, but I would rather think it specifies two different locations.

MR. BLINN: Just for the record, I didn't catch most of that last answer. I don't know if the court reporter did.

(Answer read back by reporter.)

THE WITNESS: I said I would rather check the report to verify, but I believe it does specify two different locations.

COURT REPORTER: Thank you, Mr. Blinn.

BY MS. GRADY:

Q And you receive a copy of the daily shift report; correct?

A It does come out every day, correct.

Q And that is a document that also contains the information about what's been happening at the facility during the shift in question; right?

A That is correct.

Q And that's important information for you to know as the warden of the facility; right?

A Absolutely, yes.

Page 110

Q And so you review those shift reports pretty closely; right?

A I review them. I've also been called about every major event that happened prior to that shift report ever coming out. So, usually it's a review of what I've already been told about.

MR. BLINN: And again, I think part of that answer may have dropped out.

MS. GRADY: I'll ask my question again, if that's all right, and maybe that way we can avoid trying to fill in the gap.

BY MS. GRADY:

Q You review that shift report carefully; correct?

A I do look at that shift report, but I have usually already been told by the shift supervisor about any major incident --

MR. BLINN: He cut out again.

A So, you know, if I've been called about, let's say, a stabbing at, you know, 2:00 p.m. and I've had three follow-up phone calls about he went to the hospital and he was life-lined to St. Anthony, and how many stitches he had, and he's alive, and, you know, so I'm going to get

Page 111

a shift report then, approximately, at the end of that shift at 6:00. So am I going to read that very thoroughly? I mean, no, because I'm intimately involved in that situation.

MR. BLINN: And again, I'm just going to state I think we lost part of the answer, but as long as Ms. Grady doesn't have a problem with that and understands that the transcript might not capture everything.

MS. GRADY: I think that's fine. I'll ask a couple more details that I think might illustrate any parts that we missed.

BY MS. GRADY:

Q So I understand that major incidents you expect and require that folks will contact you outside of the daily shift reports to keep you informed about; correct?

A That is correct.

Q But the daily shift report will also reflect the minor or day-to-day proceedings that will give you an indication about what has taken place on the shift and what you might be walking into when you enter the prison for your work the next morning; right?

A There's a variety of other things on the shift

Page 112

report, such as minor incidents, such as when units went to chow, when Signal 1000's or clear counts took place, but I should not walk into a surprise on a shift report that I have not already been notified about.

MR. BLINN: And again, we got a dropped answer there.

MS. GRADY: Yeah. Let's go off the record for a second.

THE WITNESS: Sure.

(Brief discussion held, technical issues.)

(Lunch recess taken.)

MS. GRADY: We can go back on the record, if everybody is ready.

BY MS. GRADY:

Q Before we took the break, Warden, we were talking a little bit about shift reports and temperature logs, and I want to pick back up where we left off with that conversation.

Can you tell me what, if any, heating system exists for cell houses at Indiana State Prison?

A The facility -- or the heat throughout this prison is steam heat and it's controlled

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 30 of 85

Page 113

through our facility powerhouse, and it's a system called a Medassist system that allows the powerhouse to set temps in most all locations throughout the prison.

Q   Can the powerhouse set temperatures individually within the various cell houses?

A   Yes, yes.  And basically what happens is usually an officer or someone will say it's extremely hot in whatever particular cell house, and then that information will get to one of the exec staff, which will then call the powerhouse and say, hey, we need to turn on the exhaust fans or, you know, whatever, to bring down the temperature in that respective area.

Q   Okay.  And so are there certain times of the year that the steam heat is activated?

A   Yeah.  I mean, usually, there's a date and policy that talks about the usual time that we need to turn on the heat.  But, honestly, up here in Northwest Indiana we're a little different than most of the rest of the Indiana Department of Corrections.  So it really just depends on the weather up here and what the temperature is in the cell houses and, you

Page 114

know, if the offenders are yelling I'm cold, then, you know, I know for me anyway, I will go ahead and turn on the heat, but we do track the temps.  You know, if they're yelling I'm cold and it's 70 degrees in the cell house, then, no, I don't turn it on then, but, you know, when it starts getting cold enough that it's -- you know, down in the 60's or lower and they're saying they're cold, then we'll turn on the heat.

Q   And how quickly between when you decide to turn on the heat -- well, strike that.

How long does it take when you decide to turn on the heat for the heat to become activated?  Is there some delay in order to turn on the Medassist system?

A   I would say by the time -- yeah, there's some delay because it's, obviously, a very large facility and, you know, it takes time for the steam to build up in respective areas.  So we're talking a matter of hours, usually.

Q   And is there any policy with respect to the ranges of acceptable temperatures within a cell house?

MR. BLINN: I'm just going to

Page 115

object.  You probably can ask your question, but can you give me some sense what relevance this has to this case?

MS. GRADY: I mean, I think it's relevant to the fact that we're talking about a history of fires.

MR. BLINN: The policy determining what temperature range is acceptable is relevant to a fire starting?

MS. GRADY: Yes.

MR. BLINN: I mean, okay.  I just -- okay.  I mean, I'm just saying this is getting pretty far afield.  I'll let you keep going, but at some point we're going to have to move on, I think.

MS. GRADY: Okay.  Fine, we can note your objection for the record.

BY MS. GRADY:

Q   Warden, can you answer my question, please?

A   I honestly can't remember.  Like I said, I know there is a policy that references specific times of the year that heat is turned on and, you know, usually when it's turned off, but like I said, it's not anything that, you know, that you have to do kind of thing.

Page 116

I turn it on and turn it off based on the temperature readings that we're getting in the shelters and, you know, what the offenders are telling me and what the staff is telling me.

Q   And have you become aware of complaints that in the winter months that cell houses remain quite cold?

MR. BLINN: Same objection.  This has got nothing to do with the fire.  I mean, if we can reach an agreement, that's great.  If we need to get the judge on the phone, that's fine.  I want to let you have your discovery in this case, but I don't see what this has to do with this case.

MS. GRADY: Okay.  Well, I mean, your unilateral assertion of relevance is not a basis to stop a deposition.

MR. BLINN: I understand.  That's why I'm suggesting we try to reach an agreement or we call the magistrate.

MS. GRADY: Okay.  Are you directing the witness not to answer my question?

MR. BLINN: I'm not directing the witness not to answer, but what I'm saying is

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 31 of 85

Page 117

I'm asking you what's the relevance, because your question is at what point is it too cold to turn the heat on. How does that relate to this case? I mean, we're not trying to build a database for other cases. We want to focus on this one.

MS. GRADY: Mike, I do not need to build a database in a deposition with Warden Neal for other cases. I've got a list a mile long.

MR. BLINN: Okay.

MS. GRADY: So let's be clear. There's absolutely no basis for you to accuse me of conducting discovery in any case other than this one nor does Loevy & Loevy have any cases concerning Indiana State Prison other than this one. If you need me to articulate the basis of relevance, I can do that, but I'm going to ask the witness to be put into a waiting room because it's improper to have a witness present while I articulate --

MR. BLINN: I'm more than happy to go off the record and chat about this. I'm happy to do that.

MS. GRADY: Okay, great. I'm

Page 118

going to put Warden Neal in a breakout room here. Hold on.

(Brief discussion held off the record outside of witness's presence.)

MS. GRADY: Okay. We can get started again. Beth, do you have my last question?

(Question read back by reporter.)

BY MS. GRADY:

Q    Do you have the question in your mind, Warden?

A    Is that what you want me to answer?

Q    Yes, please.

A    Okay. I mean, sure, every year I hear from offenders in various locations that they feel it's cold, can we turn up the heat, and like I said, we normally just assess those individual areas. I mean, I've got staff on the unit every day. We'll go watch that unit and see what the temp is, and if it's cold, then, you know, we'll have the powerhouse turn up the heat.

Q    And how are you made aware of those complaints?

A    A variety of ways. Sometimes offenders will tell me personally when they see me, sometimes

Page 119

they'll send me a letter, occasionally a staff person will say, hey, it's cold over here, but that's very rare. But when we do hear those types of complaints -- and it's usually always at the beginning of the season, you know, when it starts to get cold and we kick the heat on, there's a few complaints until everything gets leveled out. And at the end of the, you know, the heating season we'll get the same complaint, it's too hot, turn the heat off, you know, and so that's usually the times I hear about it. But throughout the wintertime it's rare that I get complaints that we're too cold or --

Q    Have you ever been made aware that the heating system is inadequate to sufficiently heat a cell house at Indiana State Prison?

A    No.

Q    Was your answer no? Is that correct that the answer to my question was no?

A    My answer is no, that's correct.

Q    Can you tell me how many times during your tenure at Indiana State Prison you were made aware of a fire being set in any area of the prison for any reason?

Page 120

A    It depends on the year, but I believe we said earlier it usually happens -- I'm trying to recall if I've ever been made aware of a fire anywhere other than a fire set inside a offender's cell, and that usually is within our restricted housing unit, guys that are serving -- it used to be called segregation. It's now called restricted housing. That's always where the fires are set at, and like I said, there's different levels of fires.

But I can't recall a time where there was a fire in a cell house or housing unit other than D-cell house, which is the restricted housing unit. But as far as frequency, it depends. It depends on what's going on in the prison, you know. If I had to estimate, I would say four, five times in a year they might set fires in D-cell house.

Q    And it's your testimony that those fires, only that those fires that are set within a person's cell are only set in D-cell house? Is that your testimony?

A    That's the only ones I can remember being reported to me during my tenure here at the Indiana State Prison, yes.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 32 of 85

Page 121

Q    Well, Joshua Devine's fire did not occur in D-cell house; right?

A    Well, I said in D-cell house or an offender's cell throughout the prison, but most of them are in D-cell house.

Q    Okay.  I appreciate that clarification.  So the two places, to your recollection -- the only two places, to your recollection, where you've ever been informed that a fire was set was either in D-cell house or in a prisoner's cell; is that correct?

A    Yes.

Q    And you've been made aware of fires set by prisoners other than Joshua Devine in their cell that was not in D-cell house; correct?

A    Certainly, Joshua Devine's, and again, I'm trying to remember if I remember a specific instance of a fire in the other cell houses, in a specific offender's cell other than Mr. Devine, but, honestly, I don't recall one.  If I had -- it would be rare if it happened, but I can't recall one.

Q    What about Ryan Neece (Phonetic), do you recall that fire that Ryan Neece set?

A    I do not.

Page 122

        MR. BLINN: Object to form.

BY MS. GRADY:

Q    And is it your testimony that you don't recall a fire being set by a prisoner in his cell anywhere other than D house, apart from Joshua Devine's case?

A    I certainly remember Joshua Devine.  The vast majority of fires take place in D-cell house.  I do not remember a fire that was reported to me in another offender's cell outside of D-cell house other than Mr. Devine's.

Q    Have you ever been -- well, strike that.
        You've been made aware that prisoners have set fires in their cells to keep warm; correct?

A    No, no, I mean, but you have to understand that offenders will spark outlets inside their cells to light tobacco or whatever they want to light.  So they will oftentimes spark an outlet with a wire or, you know, something they have in their possession to start a small fire or light, but I've never heard of an offender starting a fire in his cell for warmth, no.

Q    A report of a fire, even a fire that was able

Page 123

to be controlled quickly, that's something that would be provided to you as part of the daily shift report; correct?

A    As I testified earlier, there could be a small fire, like I just mentioned.  We'll say an offender sparks fire in his outlet and the outlet catches on fire, the staff on the range see it, grab the fire extinguisher, put it out.  There was no serious damage, no staff injury, no offender injury.  Would a shift supervisor call me about that?  Some would, some wouldn't.  Certainly, if there were any injury involved, they would be calling.  If there was any serious property damage involved, they would be calling.  But, you know, those are very, very rare.  Like I said, I can't recall one other than Josh's outside of D-cell house.

Q    I understand that, you know, when we talked earlier about the fact that you wouldn't necessarily get a phone call for a fire that didn't result in injury and was able to be controlled, but policy requires that would still be included as part of the shift report; correct?

Page 124

A    It should be, yes.  It should be documented.

Q    And wherever the fire occurs, you agree it's important for staff to report that such a fire has occurred even if it was able to be controlled; right?

A    Any fire, yes, should be reported.

Q    And why is it important to report the fact that a fire has occurred in a cell house?

A    Well, it's mainly a safety and security issue.  I mean, any fire that takes place we want to investigate.  We want to make sure that there's not a faulty outlet or electrical device, or something of that nature.  That's one of the jobs that safety hazard managers go and investigate any alleged fires or fires that have taken place.  So, you know, primarily, it's a safety issue.  Secondary, we're looking at is there any property damage, did they burn out the outlet, is there, you know, flames or smoke residue on the walls, you know, did the bed catch on fire, did -- you know, so property damage is also a concern.

Q    And when you spoke earlier, you talked about someone sparking their outlet, I think is the

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

Page 125

phrase you used. Can you explain what you mean by that?

A    What I said, a lot of times offenders in here will have tobacco, marijuana, or other elicit substances, such as K-2 or the offenders call it various things, but it's a synthetic marijuana, and oftentimes when they have that contraband or those drugs or illegal substances, then they'll need to light it somehow. So they oftentimes will spark their outlet to obtain a light, and they do that by finding, usually, a piece of metal or a paperclip or something that they stick in the outlet that conducts electricity and starts a fire so that they can light their cigarette, or whatever they're doing.

Q    And what, if any, steps have you taken to address the susceptibility of the outlets in the cells at Indiana State Prison to being manipulated and sparked?

        MR. BLINN: Object to form. You can answer.

A    I mean, if an offender does it and he's seen by staff doing it or there's residue around his outlet to substantiate that he's been

Page 126

doing it, they're written up for destruction of state property. Sometimes they'll do it so much that they've burned the outlet up, and not only will they be written up for destruction of property, but they'll be charged for replacement of the outlet and any other damage that may have been caused.

        They could be sanctioned through the disciplinary hearing board, based on their conduct report, to disciplinary restricted housing time. So they could be moved to a different location. If it's happening on D-cell house, the area that I mentioned earlier where offenders routinely set fires for, you know, disciplinary reasons, we have put in systems in that cell house where the outlets or the power can be shut down to those cells within the midway.

BY MS. GRADY:

Q    Anything else that you've done?

A    Not that I can think of, no.

Q    Have you ever taken steps to refashion the electrical outlet so they cannot be susceptible to manipulation?

        MR. BLINN: Object to form.

Page 127

A    It's not possible, to my knowledge. I mean, I've got some very knowledgeable maintenance staff, construction engineers, and various other people, and, I mean, you have to understand that inside these guy's cell for, you know, for a good offender who's just doing his time and, you know, following the rules and want to just do his time the best he can, they do have TV, they do have hot pods, they have radios. I mean, they have other electrical devices that they need to plug in, so they do need an electrical source for those purposes. So, you know, we don't want to take electricity away from them because you've got some bad apples that sparked an outlet. But I'm not aware of an outlet that can't be sparked.

BY MS. GRADY:

Q    Okay. And you've -- well, strike that.

        Do you -- have you ever taken any steps to address the availability to gain access to the electrical wiring behind the outlets in the cell houses in Indiana State Prison?

A    Can you repeat that question?

Q    Sure. Have you at any point during your

Page 128

tenure at Indiana State Prison taken any steps to ensure that the wiring within the electrical outlet is secured and cannot be exposed in the cell houses?

A    Well, like I said, we've looked at various projects within D-cell house, where most of the fires take place. We had our electricians put a shut-off system in place where, you know, if we have an offender that's continually damaging the outlet or sparking fires and just, you know, won't behave, then we have put in systems so we can shut off power to individual cells or banks of cells. But other than that, no, I mean, nothing I can think of.

Q    Can you tell me whether if -- strike that.

        Can you tell me whether there is any policy or practice at Indiana State Prison to evaluate the electrical grid in the cell houses or other areas?

A    I mean, there's an annual construction services audit, an annual physical plant audit. There's biannual audits by fire and safety. So, yeah, there is annual audits that inspect all areas of the facility, including

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 34 of 85

Page 129

the electric grid.

(Document titled Exhibit 4 identified for the record.)

BY MS. GRADY:

Q   Okay.  I'm going to show you what I'll mark as Exhibit 4.  This is a 2016 Annual Fire, Health, and Safety Inspection.  It is Bates marked 5931 and it goes to 5961.

Are you familiar with this type of a document, Warden?

A   Yeah, that's part of one of the annual reports that I'm referring to that's done by Greg Lintz, who's the safety manager.  He's part of the DOC construction services team and he's one of the individuals that inspects facilities annually.  He also trains new safety managers.  So, yes, I mean, to answer your question, we see this -- this inspection takes place once a year, every year, and whatever deficiencies Mr. Lintz cites on his annual fire safety inspection has to be abated.

So all of those violations are cited, and then the facility maintenance staff, physical plant director and his staff work to

Page 130

abate each of those violations.  And when they do that, they generally will take a picture of, you know, the violation as he found it, they'll take a picture of what they did to fix it.  And they then forward that to Mr. Lintz, and he'll mark those areas and he'll normally come back and do a reinspection to, basically, grant you a pass or a successful completion of your annual fire safety audit.

Q   Okay.  And so you testified that the person who conducts this fire safety audit is who?

A   The guy that wrote the report that you're looking at, Greg Lintz.

Q   Okay.  And is he still the -- sorry, what is his title?

A   He has on here risk manager.  I don't know exactly.  It's something like that.  I thought it was the director of safety hazard through the State of Indiana, but it might have changed to risk manager.  I'm not sure.

Q   Okay.  And he's an Indiana Department of Correction employee; correct?

A   Yes.

Q   And he in this report, talking about the formatting of this report, on the left side of

Page 131

the report when he does the annual review, he identifies deficiencies; correct?

A   Correct.

Q   And does he -- does he discuss those with staff at ISP in realtime or is this the first time you learn of any deficiencies at your facility when you receive this report?

A   It depends.  I mean, normally what happens when Greg comes and does his annual inspection, it's a part of a bigger inspection.  He has safety, fire safety.  He will normally do his inspection with himself, Chip Dudley, the fire safety guy I mentioned to you earlier, and he might bring a safety manager from another facility.  So they do an inspection of this prison, normally in a group of three, and that is a part of the annual facility construction services inspection.  So there are other groups that also come out and inspect other areas of the facility, such as roofing and gutters and, you know, drainage systems, sewer systems.

So he's part and parcel of a bigger inspection, but he's normally here for three to four days a week when he does that annual

Page 132

inspection.  At the end of that inspection, we usually sit down -- when I say we, Greg and his inspection team, myself, the local safety hazard manager, the facility physical plant director, sometimes physical plant supervisors, sometimes deputy wardens, sometimes the major, and basically, they will go over, okay, we finished your audit and these are the violations that we found.  And they'll each talk about the violations that they found and what they're going to cite on their report, and so that's the first time I'm made aware of issues that he cites on his annual report.

Then I normally get that report a week or two after we've had that exit interview from the audit, but, you know, we're already beginning to work on any violations that were cited before we get the report, and we have to fix them all to get the certificate of completion for the year.  But it's possible that something he cited could have also been turned in previously on a work order, you know, so it may not be the first time I've seen it.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

Page 133

Q  Okay. I want to draw your attention -- I'm going to go down this document through the maintenance department. I want to draw your attention, this is the maintenance department. Do you see that?

A  Yeah.

Q  Do the entries underneath here refer to an area, to a physical area of maintenance or to things that are the responsibility of maintenance?

A  It depends. What he's saying there, like that first violation 1?

Q  Yes.

A  It says, I/S maintenance. Do you see that?

Q  Yes.

A  It says, dash, plumbing area, the fan is missing ground. So what he's referring to is inside the maintenance shop, plumbing division has a fan that's missing a ground plug.

Q  I see. Okay. And to the right of this document, do you see where I've highlighted? This is a space that contains the ability to enter what's called a plan of correction? Do you see that?

A  Right.

Page 134

Q  And the details on this form indicate that the appropriate department head shall forward the corrective action plan to the safety office within ten working days of receipt. This document does not contain any plan of correction, and I'm happy to show you that by going through the document. Is that common or uncommon?

A  Well, you have to -- it depends on what stage of this document that you're looking at. What you're looking at here looks like the initial report that's been written by Greg and his team and it's been provided to the facility. After it's been provided to the facility in written format, then that respective department head or our safety manager or physical plant director will write that plan of action, okay, what they're going to do to fix that violation, and sometimes they'll have to ask for an extension. The next column is proposed correction date. So they might write in there that, you know, that their plan is to replace that plug on that fan that you cited earlier within the next five days, and they'll cite that in the

Page 135

proposed correction date beside that. Bigger issues where you have to order parts, and things, they'll submit a plan of correction and it may be possible that it has to be extended, so they'll ask for a 30-day extension, or whatever the case is. My point is that you'll see that form at different stages of completion until it's fully abated.

Q  Okay. And so some version of this form does get submitted to the safety office within ten days; is that correct?

A  Yes.

Q  And you mentioned a certificate of completion. Can you tell me what that is?

A  When all of those violations on that annual inspection have been fixed or abated, then Greg, the same guy who did the audit, will issue a certificate of compliance to the facility, and then that certificate of compliance usually gets put in the physical plant department's file, Greg keeps a copy of it, a copy of it goes in our ACA, American Correctional Association file.

MS. GRADY: I going to draw your attention to this document, which is entitled

Page 136

Rodriguez Memo. We'll make it Exhibit 5. It's Devine 133778.

(Document titled Exhibit 5 identified for the record.)

BY MS. GRADY:

Q  If you would -- well, strike that. Have you ever seen this document before I've shown it to you just now?

A  It's possible, but don't know for sure. Yeah, I'm sure I read this or came across this as a part of the investigative file afterwards, yeah.

Q  Can you tell me, when there's an investigation into an event that happens at the prison are you given a report about the conclusions that were drawn as a result of the investigation?

A  Yes.

Q  And do you review the underlying materials that were considered by internal affairs in reaching its determinations about the investigation? You heard my question, right, sir?

A  I said yes.

Q  Oh, I'm so sorry. I did not hear you. Okay.

MR. BLINN: Let me jump in. You

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 36 of 85

Page 137

may have gone to mute there for a second because I'm seeing that icon next to the phone icon on the participant screen. That might be why we're having trouble hearing you.

THE WITNESS: Okay. I mean, my phone is beside me on the --

MR. BLINN: Never mind. My mistake, sorry about that.

BY MS. GRADY:

Q    Okay. So I want to give you a moment to look at this document. Let me first ask you, are you familiar with this type of a document?

A    Yeah, this is a -- I am familiar with this type of document, yes.

Q    And what is this type of document typically used for at Indiana State Prison?

A    Well, this type of document is used, basically, for any reportable incident.

Q    Okay. Would you take a minute and review this document and let me know once you've had an opportunity to review it?

A    Okay. I've read it.

Q    And you see here, I'm going to -- well, I'm going to highlight the section I'd like to draw your attention to.

Page 138

Do you see there where Officer Rodriguez reports that he started to smell smoke and that's when I told Officer Abbassi to call the Signal 10-71 due to myself having radio failure. Do you see that part of his memo?

A    I see that, yes.

Q    You never took any action to investigate what Officer Rodriguez meant when he said he had radio failure; correct?

A    Well, it could have been part of the internal affairs investigation. It could have been part of any one of the several investigations that took place after this incident. But like I said, there were several people reviewing or investigating this fire and obvious death of Mr. Devine, so I don't know if it was part and parcel of any of those investigations or not. I don't recall, to be honest with you.

Q    Sure. But you never took any action to follow up about what Officer Rodriguez said when he -- meant when he said that he was having radio failure; correct?

A    I myself because of this -- I mean, I wouldn't have seen this, first of all, until well after the fact, and, I mean, that could be

Page 139

interpreted to be a lot of different things. The answer to your question is, no, I did not, but that could be because his battery went dead. That could be a lot of reasons. But, no, I didn't do anything with that incident report.

Q    And you never asked him if the reference to his having radio failure was because his battery was dead; right?

A    It would be something my investigators and the others would investigate, not myself, right.

Q    And did you take any action to ensure that the investigators had, in fact, investigated what Officer Rodriguez meant when he said he had had radio failure?

A    Did I question the investigators, the state fire marshal, the -- no, I didn't question any of those investigative groups as to whether or not they questioned Rodriguez specifically about his radio failure, but it could be in the report.

Q    The investigative report?

A    In one of those investigative reports.

Q    And you agree that if an investigator is following leads and asking an officer to

Page 140

explain something that happened as part of an emergency, you agree that that should appear within the investigative report; right?

A    If they've asked that question of that individual and found it to be relevant in a serious matter, they would have put it in the report.

Q    And you agree that having radio failure during a time when a fire is enveloping a cell, that's a relevant detail; right?

A    Having operational radios is a relevant detail at any time, yes.

Q    The investigative report that you testified they would have generated, was that the case report?

A    There are several different investigative reports. There's a report that was done by the internal affairs department in coordination with Mr. Dudley. I believe the coroner's office also wrote a report of investigation. I believe there was also a separate report from Homeland Security. There was also a partial report, best of my knowledge, from the state police, there usually is. I've not reviewed all those

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 37 of 85

Page 141

lately, but there are several investigations.

Q    But the one that happened by staff under your direction, that's the internal affairs division; right?

A    That is ISP Internal Affairs Division, yes.

Q    You're saying ISP.  That's the Indiana State Police?

A    Indiana State Prison.

Q    I'm sorry, my mistake.  Okay.  I'm going to share this with you and we'll make it our next exhibit.

MS. GRADY: Okay.  I'm going to make this Exhibit 6.  It is the case report.  I don't believe it has a Bates stamp, but it is entitled Indiana Department of Correction Internal Affairs Division, Report of Investigation, Monday, May 1, 2017.  It is a ten-page document, and we will send this document via E-mail.  It has been produced in discovery.

(Document titled Exhibit 6 identified for the record.)

BY MS. GRADY:

Q    Warden, can you tell me whether this is the report that is typically generated by the

Page 142

internal affairs office at ISP when they conduct an investigation into an event at the prison?

A    Yeah, that looks like the format that they use.

Q    And you receive a copy of this report; correct?

A    Excuse me?

Q    You receive a copy of this report; correct?

A    I do receive a copy of the completed investigation report.

Q    And you review those reports that you get; right?

A    Yes.

Q    Okay.  And I want to take a minute -- strike that.

When was the last time that you reviewed this report?

A    I glanced through part of that report yesterday, but, honestly, I've not had time to thoroughly go through that case file.

Q    Okay.  Can you tell me -- well, strike that.

As you sit here today, you don't recall anyone ever following up with Officer Rodriguez about his radio failure; correct?

Page 143

A    I honestly don't know if that was a question that was posed by any of the investigators or not.  I do not know.

Q    Would it surprise you to learn that Officer Rodriguez testified that it was a frequent problem that radios were inoperable at Indiana State Prison during his tenure?

A    Would it surprise me what he thought?  I mean, Officer Rodriguez, in my opinion, is like a lot of the young officers that we get here that end up getting frustrated and resigning and they start citing issues that are as much their fault as anybody's.  What I mean by that is, they'll check out a radio and they'll see on the radio that it's got a partial battery capability.  So instead of replacing that battery in the control room before they go to their assigned post, they'll take that with them, and then when they get there, somewhere throughout the shift their radio is no longer functional because the battery is dead, and they'll cite issues such as that as ongoing problems with radios.

But that wouldn't surprise -- it would and it wouldn't.  I mean, you know, some

Page 144

people are disgruntled when they leave, so they start citing everything and anything they can think of.  But, honestly, I'm not aware of staff routinely saying they have problems with their radios.

Q    And that's the kind of thing that you would expect to be brought to your attention.  Is that true?

A    If I had a big problem with radios every day, we would have a big problem.  I mean, we would have people in here to fix that problem, whether it's buying new radios or replacing or fixing the ones that are damaged.  But like I said, that's normally not the case.

Q    Okay.  And you agree that if you had a repeated problem with radios, a response to correct that problem so that every member would have an operable radio would be required; right?

A    Absolutely.  I mean, that's why I have a radio coordinator, that's why I have a custody supervisor, that's why I have a deputy warden of operations.  All those people oversee the uniform staff, which is custody, and they all need operable radios.  So, yeah, if I've got a

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 38 of 85

Page 145

big radio problem, then I would expect that to have been dealt with and brought to my attention.

Q But you testified earlier today that your radio, which I think you pointed to and might be behind you, you use the same radio day in and day out; right?

A I do have the same assigned radio, yes.

Q And what about other supervisory staff, do they have the same assigned radio or do they get assigned a radio at random?

A Most staff, especially line staff or field staff, have a radio issued to them.

Q What about supervisory staff? Let's take the assistant warden.

A They have an assigned radio.

Q And what about the captains?

A They have an assigned radio. It usually goes down to the lieutenant rank that has their own assigned radios. I honestly can't recall whether any sergeants have an assigned radio or not, but it's somewhere in that area is where the break is.

Q Okay. And can you tell me what, if any -- strike that.

Page 146

Are there logs kept about who has which radio on a given day?

A The radio manager -- oh, on any given day? I'm trying to recall, because the radios are passed out through the control room and they're passing out the radios as officers who need them and based on where their assignment is for the day or whether they're relieving a person and when to give them the radio that they're relieving. I don't -- I can't say off the top of my head whether that's logged in the control room or not, who has what radio. I'm not sure.

Q I want to ask you a little bit about your firefighter program.

Can you tell me, was the firefighter program in place when you first began working at Indiana State Prison?

A Yes.

Q And can you tell me what, if any, changes that you have made to the firefighter program itself at any point during your tenure?

A Many. When I first came here, it was -- there was an offender firefighter program. It wasn't very organized. Their equipment was

Page 147

outdated. They weren't a very functional group, in my opinion. When I first transferred up here, I transferred up here into the position of deputy warden. At that time it was called assistant superintendent of operations. So I began to work with Director Orme and Director Dudley to bring some attention to the offender firefighter program. We started talking about -- well, first of all, we assessed the equipment that they were using, and a lot of their equipment was upgraded or replaced with better equipment.

Through my coordination with both Kevin and Chip, and others, we also started the annual training that we put them through with Homeland Security. So today, like I mentioned earlier, they're certified as Certified Firefighters Level I and II, which is the same certification a city firefighter would carry. We've upgraded their equipment to the point where, like I said earlier, I believe they have probably better equipment than a lot of city fire departments have throughout this country. I don't know very many fire departments that have foam backpack

Page 148

suppression systems and smoke evacuation systems such as we have.

Q Can you tell me what is the purpose, to your knowledge, of having a firefighter program at the Indiana State Prison?

A For safety and security, to save lives, to save equipment. We're the only -- well, until recently we were the only facility in the Indiana Department of Correction who had an offender firefighter program. Most facilities rely upon the city's fire department and they call them when they have a major fire that they can't put out themselves with fire extinguishers. So they're waiting on the city to respond, to process into the prison, to make it to the scene, and, you know, to do their job.

So here at the Indiana State Prison -- again, I don't know who started it or how long it's been in existence, but well before my time here, and we've always seen it as a very positive thing because, I mean, we know that we can get them trained up to today's standards, which we have. We know that they can respond to a fire wherever it may be much,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 39 of 85

Page 149

much quicker than the city fire department can.

You know, we've ran annual fire drills in collaboration with the Michigan City Fire Department just to make sure that they know our physical layout, that they know what, you know, our offender fire department is all about, what equipment they have. So we have collaborated with them in the past, but the value of having our own fire department is response time is going to be much faster and much greater and they're going to, therefore, save destruction of property, possibly save lives, and it provides offenders credible jobs.

Q And the firefighters are responsible for training officers about how to respond in the event of a fire; correct?

A They're not responsible to train officers, no. I mean, we have had some meetings where we have talked to our supervisory staff -- we touched on it briefly earlier, that one of the things we discussed after the Devine fire was communication, better communication with some of the supervisory staff. So I believe in one

Page 150

of those meetings we brought a lot of the lieutenants and captains into one of those meetings to discuss how they can work together better, you know, for response time improvements, and things of that nature.

The only reason I hesitate on that, Sarah, is that we will never put an offender in charge of a staff person. It just won't happen. But do offenders in that fire department have wisdom as far as firefighting greater than some of the staff? Sure. So we have had training to try to facilitate a good working collaboration between custody staff and the offender firefighters.

Q And can you tell me what is the content of the -- strike that. Let me ask an initial question.

Who is responsible for ensuring that officers who work at Indiana State Prison are adequately trained? Is that you or is that somebody else?

A There's the training department. All the staff go through the same training curriculum, whether they're a new hire, and then once you're here, they go through annual in-service

Page 151

training, and they also have numerous computer-based training sessions that they have to complete throughout a year. So there's a facility training department and a department-wide training department. That's who's responsible for training.

Q The facility training department, do they answer to you in the chain of command?

A They report directly to my assistant superintendent in the chain of command.

Q And that assistant superintendent reports to you; correct?

A Correct.

Q And so I understand that there's some training that's provided to every correctional officer who works for the Indiana Department of Correction and that's handled by the central training department; correct?

A There's a department of correction training department that's central or a state-based training department, okay, and then each facility has their own individual training department. So I have a training department here at the Indiana State Prison on the third floor of the administration building. I have,

Page 152

I think, five staff in the training department. I also have some adjunct trainers, and what I mean, adjunct trainers would be such as my gunsmith shop, and he'll do -- he's an adjunct trainer when we have to do qualifications with handguns or rifles, or things of that nature. But there are in addition to -- there's three full-time trainers and two support staff and then adjunct staff here at the Indiana State Prison in the training department.

Q And there's nothing that bars you from ordering or creating additional training for staff at Indiana State Prison; right?

A Well, yeah, there is. I mean, the training curriculum is developed by staff's development and training department-wide and that training curriculum is their responsibility for new employee orientation and what gets covered in annual in-service training, as well as the EBT (sic) courses that's offered. Can I change the curriculum as I see fit? I mean, no, I can't. I have to go through them to modify that training curriculum. Little things can I have added?

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 40 of 85

Page 153

For example, I know like recently I've had a half-hour space that I've ordered to be included in the training curriculum so that I can have internal affairs staff focus on security threat groups a little bit more during in-service training, but I can't change the curriculum on my own.

Q Well, just to be clear, I'm not asking about changing the curriculum, certainly, like initial on-boarding training, or anything like that.

But if you had decided that additional training was necessary for staff to ensure the safety and security of your prison on a particular issue or a particular series of issues, you have the power to order that training be conducted; correct?

A Well, like I said, that's something that I wouldn't do through the training department because it wouldn't be specific to all staff. It would be training that would have to be specialized. I would have to bring in trainers from around the state who are certified in fire and safety, and I would probably do that the way we tried to do it,

Page 154

bring staff together and offenders together and, you know, have some joint training.

We never quite got that far, as I can recall. I think we did have some initial conversations after the fire and after that initial letter I received, and I know we had a meeting where we talked about, you know, working together more cooperatively, but I don't think we ever got to the point where staff were put through firefighter training, no.

Q Okay. I'm asking more generally, but let's turn specifically to training about fire safety.

It's your responsibility to ensure that fire drills are conducted with adequate sufficiency to train staff about how to respond in the event of a fire; correct?

A The responsibility of fire drills to be conducted is the responsibility of the safety hazard manager.

Q Who answers to you; correct?

A Yes.

Q And what's your understanding of the fire drill policy with respect to overnight shift

Page 155

staff?

A Should be conducted quarterly. Every shelter or housing unit should have at least a quarterly fire drill per shift.

Q And tell me, when you say fire drill, what does that entail according to ISP's policies?

A I mean, what it should entail is -- what it should entail is evacuation of the building and the proper way to evacuate a cell house and how long it takes to evacuate the cell house, and those types of things. Yeah, that's what it should entail.

Q But you know that that is not what the practice is at Indiana State Prison; right?

MR. BLINN: Object to form.

BY MS. GRADY:

Q You can answer.

A What I know is that there's been simulated fire drills on many occasions, and that's been with a variety of different safety hazard managers for a variety of reasons, and those reasons mainly being safety and security. So, yes, I know that they have been simulated on occasion, but I also know that occasionally they do run fire drills.

Page 156

Q Prior to April 2017, you were aware that simulated fire drills were not being run -- well, strike that. Let me understand how you use the word simulated.

When you say simulated, you're referring to a fire drill in which people are not taken out of their cells as part of the drill; is that correct?

A You know, I would have to probably ask Steve what he did, because I -- I can assume what I think he did, but I think it would be better to ask him what he did in the form of simulation. I mean, my assumption is that he did a -- well, I don't want to guess, but I think that's a question we need to probably ask Steve how he conducted fire drills back in 2017 on the night shift.

Q Okay. But my question is directed to you. I mean, you were aware that as of April 2017 fire drills were not being conducted on a quarterly basis for staff who worked the overnight shift; correct?

A I was aware that fire drills were being put on paper and that they were being simulated in the different shelters. What I'm saying is

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 41 of 85

Page 157

that I don't know how far that simulation went.

Q    Right.  And all I'm asking about is the things that you knew about.  You testified that you were aware that fire drills were, quote, being put on paper.
     You knew that they were not involving prisoners leaving their cells; right?

A    I was aware that they were being simulated, and I assume that simulation meant offenders were not being brought out of their cells, correct.

Q    And what, if any, action did you take to ensure that the so-called simulated fire drills were adequate to ensure that staff were properly trained about what to do in the event of a fire during the overnight shift?

A    Well, what my understanding was, was that even though occasional simulated fire drills took place, that there were also live fire drills that were also taking place.  So I had every -- I mean, I would assume staff would know their jobs and what their responsibility is during a fire.

Q    Well, okay, let's take the first part of that

Page 158

answer.
     Tell me everything that you relied on in reaching your assumption that fire drills were actually being conducted as well.

A    What the safety hazard manager reported to me.

Q    It's your testimony that the safety hazard manager reported to you that as of April 2017 fire drills were, in fact, being conducted and not just simulated fire drills during the overnight shift; is that correct?

A    Correct, yes.

Q    And that person was Mr. Nowatzke.  Is that true?

A    No, Mr. Nowatzke is a deputy warden and in 2017 he was assistant supervisor.  The safety hazard manager in 2017 was Steve Griffin.

Q    Thank you.  Would it surprise you to learn that the three officers who were in B-cell house on the night of Joshua Devine's fire each testified that they had never participated in any fire drill at any point during their tenure with Indiana Department of Correction?

A    Would that surprise me?  Yeah, that would surprise me.

Page 159

Q    Is that concerning to you?

A    Yes, it is.

Q    Why?

A    Because a fire drill should take place.  I mean, I understand occasionally that you have to simulate a fire drill because of a variety of reasons, because there might be another major event going on in the facility so there's not time or staffing, you know, stop what we're doing and have a fire drill.  It could be that we're short of staff on that particular day.  So the shift supervisor tells the safety manager, I'm sorry, but I don't have enough staff to help you conduct a fire drill today.  We're going to have to simulate this one, so make sure you talk to staff about what their responsibilities will be during a normal fire or evacuation.  But I also know that he reported that there were actual evacuations taking place on the night shift while he was the safety hazard manager.

Q    Tell me about the circumstances in which Mr. Griffin reported to you that fire drills were taking place during the night shift.

A    I just remember in general conversation with

Page 160

Steve, as we were talking about him, his duties, such as during annual appraisal time, for example, when we would talk about his performance, you know, those topics would come up.  You know, how often are you doing fire drills and, you know, how many are being simulated versus how many are actually being conducted, and other things, you know, issues he was having with fire alarms, fire alarm panels, or getting things repaired, or whatever issues he might be having in his job.  And I know clearly he reported during that time, certainly annual appraisal time, and I know there were other times that Steve reported as well that he had a successful fire drill last night, you know.  So, more than one occasion.  It wasn't like a surprise thing that an actual fire drill took place.

Q    Did you ever take any action to raise with him any concerns about performing simulated fire drills in lieu of actual fire drills?

A    Just in conversation.  I mean, I remember talking to Steve about why we needed to do live fire drills.  Did I discipline him over his performance specifically in that regard?

DENISE DWYER, et al. v.
RON NEAL; et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 42 of 85

Page 161

No, not specifically in that regard because normally there was a good reason why the live actual evacuation didn't take place when it was scheduled to be.

Q    And tell me, did you raise with him the concern -- well, strike that.

Tell me what you told him about the reason that it was important to have live fire drills.

A    Mainly for familiarity so that staff knows their job, what they're supposed to do during a live event, what the evacuation procedures are, where the primary evacuation route is, where the secondary evacuation route is, where the keys to those doors are; for, again, familiarization for the offenders to know how an evacuation of a cell house takes place; that it's supposed to start at the affected area and then go to the top range and then downward from there.  They also need to know where their staging area is outside of a shelter.  So all of those things were talked about then.  Steve knew they were supposed to be understood by the staff.

Q    And you communicated to him that it was

Page 162

important to practice the correct response to a fire in order to ensure that if and when a fire did occur, staff would be able to rely on that live training in, you know, choosing their response; correct?

A    Yes, that's correct.

Q    And you recognize that the failure to conduct a fire drill might lead to a circumstance like in Mr. Devine's case where staff did not know how to act in accordance with policies, correct, with IDOC policies; correct?

MR. BLINN: Object to form.

A    I would not agree with that, no.

BY MS. GRADY:

Q    Tell me how that statement isn't correct.

A    Well, just to say that it isn't correct because staff somewhere in their tenure, unless they've been with us only a very, very short time, should have been through a fire drill, should have received training on a fire drill and how to evacuate a housing unit or shelter.  It's also written in their post orders, both their specific post order for whatever area they're working and it's also part of the master post orders what to do in

Page 163

case of a fire and evacuation.

So they would have read about it, they would have been trained on it, and they should have been part of an actual evacuation during their tenure at the Indiana State Prison.  So just because a simulation may have taken place here and there, that had nothing to do with what happened on the night of Mr. Devine's fire.

Q    Sure.  I understand your testimony.  So let me ask it in a slightly different sense.

You agree that live fire drills are important to ensure that staff don't panic in the event of a fire and forget the training that they've learned only through reading; correct?

A    Live training is always better than simulated training, I would agree, yes.

Q    Well, in the event of a thing like a fire, which requires proper decision-making in the moment that a fire occurs, live training is especially important; correct?

A    Again, as we said, it's important.  I mean, staff needs to know what they're doing, period.

Page 164

Q    Failing to provide adequate training to staff on how to respond if and when a fire does occur at Indiana State Prison puts prisoners and staff alike at risk of harm; right?

A    Yeah, that's your words.  I mean, I didn't say that.  I didn't say that there was a failure of training.  I said they may have had an occasional simulated training, but they still should have been part of a live evacuation drill.  They still should have been through training on an evacuation.  It would have been written in their post orders.  They should have read it there, which they have to sign off on every 30 days.

So, even if they had an occasional simulated drill, they should have been through a live activation, a live drill.  They should have read what their job responsibilities and duties are from a variety of places.  So I wouldn't think it would be chaos or they didn't know what to do because there was a fire that night.

Q    You agree that written instructions on how to respond to a fire is insufficient training to ensure fire preparedness; correct?

DENISE DWYER, et al. v.
RON NEAL; et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 43 of 85

Page 165

A    Live activation is always best.

Q    But my question is slightly different. You agree that providing written instruction and no more is insufficient to adequately train staff about how to respond in the event of a fire; correct?

A    Like I said, I would agree that live activation training is the best method of training.

Q    Well, but, again, sir, I don't mean to keep belaboring the point, but what I'm asking is different. Of course more training is always better, but that's not my question.
My question is whether written instruction and written instruction alone is insufficient to adequately train staff on how to respond to a fire in a correctional facility.

A    I'm just thinking. To be honest with you, because there are so many activities in the department of correction or so many job duties whereby staff receives written training or training in a classroom or simulated training on what their job duty is and that is sufficient for them to know their job duty and

Page 166

be able to perform their job duty when they're out in the housing unit or wherever they may be. So, I mean, honestly, I would have to check the policy to see. I mean, I know the policy talks about, you know, fire drills on a quarterly basis. I'm not even sure that it's quarterly. It might be semi-annual, but I give it the benefit of the doubt and say that it's quarterly. Is live training better? Yes, yes, it is.

Q    So I still don't think I have an answer to my question, so I need to ask it again.
In your experience, based on your tenure with the Indiana Department of Correction and the other correctional organizations that you worked with before, is providing written instruction to staff about what to do in the event of a fire and nothing else sufficient to train them for how to respond in the event of a fire in a correctional facility?

MR. BLINN: I'll object to form. It's been asked and answered several times, but go ahead and answer it again.

A    And I'll state the same thing again. If it were me and I was that officer and I had been

Page 167

an officer 33 years ago, was it sufficient for me to have only classroom instruction and simulation instruction? That was sufficient for me. I knew how to conduct an evacuation of a cell house and I hadn't been through an actual fire drill while I was a correctional officer. So, again, I would say that live activations and experience are always better, Sarah.
But do I think, based on the fact that an officer hasn't been through a live activation of a cell house, therefore, they have no idea or it's insufficient, that they don't know what they're doing? No, I don't buy that. It's not that difficult. I mean, we're talking about -- even in writing, think about it, I mean, if there's a fire, that's sufficient enough; that an offender has to be released from his cell or that smoke has filled the building to the extent that a call has been made that we need to evacuate ranges, then policy and post orders tell us that we start with the area affected.
If that was on the 300 range, then we would evacuate -- obviously, the individual's

Page 168

cell would be our first priority. Evacuating that range would be second. We then would go to the top floor, because smoke rises, to evacuate the 500, the 400, then 200, and 100, because the 300 was already evacuated. So, I mean, I just think it's a common sense question, so I'm struggling with that.

BY MS. GRADY:

Q    Is it your opinion Officer Rodriguez took appropriate action in response to the fire in Joshua Devine's cell on April 7, 2017?

MR. BLINN: Object to form. Go ahead.

THE WITNESS: I'm not sure I caught all that. Could you say that again?

MS. GRADY: Sure. Can you reread my question.

(Question read back by reporter.)

A    I do not know. I mean, I would have to go back and thoroughly read that file, read the statements, read her statement, to even know what action she took specifically and did not take. I mean, I'm just not that fluent to answer that today.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 44 of 85

Page 169

BY MS. GRADY:

Q   Okay.  And just to be clear --

MR. BLINN: Let me ask a quick question.  At your convenience, are we nearing a break point at some point?

MS. GRADY: Yes.  I have a few more questions and then we can take a break.

MR. BLINN: Okay, that's fine.  Whenever you get there, that's fine.  It's been a couple hours.

MS. GRADY: Sure.

BY MS. GRADY:

Q   And just to be clear, Officer Rodriguez is a male.

As you sit here today, you did testify that you didn't see any reason to impose discipline on any of the officers involved; correct?

A   That is correct, yes.

Q   And it was your job to, as warden of the facility, to determine, based upon your review of all of the information, whether the officers who work underneath you had taken appropriate action in response to the fire; right?

Page 170

A   Yes and no.  And I say yes and no simply because during any investigation or recommendation for disciplinary action from any supervisor, a lot of recommendations come to me, be it through an investigative file or through just a report from a supervisor.  For example, in this case we talked about internal affairs conducted an investigation of the fire and all the incidents surrounding what happened during that fire, who did what, and statements were taken from every employee.

At the end of that investigative file we also discussed earlier that they -- they, internal affairs, whoever is investigating or writing the case report or investigating the case, writes a summary of what they think the conclusion is of the incident, whether someone was at fault, whether it was accidental, whether staff were negligent, or whatever the case may be, and usually -- well, in all internal affairs case files, if they feel through the investigative process that they have concluded that an officer or a person somehow violated the rules or didn't fulfill the obligations of their job, they'll say that

Page 171

at the bottom of the case file; that officer so and so was negligent of policy whatever, for dereliction of duty.

I mean, it's spelled out.  So recommendations are made in the case report to me.  Now, occasionally, I will get investigative files or I'll get recommendations written from supervisors recommending disciplinary action on a subordinate employee that I won't agree with; therefore, I don't carry out the discipline, but oftentimes it's also the other way, as I just described.

Q   Okay.  And so as you sit here today, do you recall -- well, strike that.

You have no recollection of ever forming an opinion that Officer Rodriguez took an action that you deemed to be inappropriate in response to the fire; correct?

A   I do not recall anyone being disciplined, so, no, I don't recall having that thought.

Q   And do you have an opinion as to whether the actions taken by Officer Abbassi were appropriate in response to the fire on April 7, 2017?

Page 172

MR. BLINN: Object to form.  Go ahead.

A   Same answer as before.  I mean, no one was disciplined.

BY MS. GRADY:

Q   Okay.  And it's not about discipline, but do you have an opinion as to whether or not her actions taken in response to the fire were appropriate or not?

MR. BLINN: Same objection.

A   I believe that those officers did the best they could on that particular evening; therefore, it didn't warrant disciplinary action.

BY MS. GRADY:

Q   And what about Promise Blakely, do you have an opinion as to whether or not the response that she took to the fire in Joshua Devine's cell was appropriate?

MR. BLINN: Same objection.  Go ahead.

A   Same as before, I do not recall anything specific about Promise Blakely being derelict or somehow not fulfilling the duties of her job.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IND/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 45 of 85

Page 173

MS. GRADY: Okay. This is a good time for a break. How long do you want, Mike?

MR. BLINN: I mean, are you comfortable telling me how much longer you've got to go? I mean, you got time left, but --

MS. GRADY: I have a couple of other topics to hit. I've got maybe, probably, two hours.

MR. BLINN: Okay. I mean, do you want to break for like ten minutes?

MS. GRADY: Sure.

MR. BLINN: All right. Thanks.

(Brief recess.)

MS. GRADY: We can go back on the record if everyone is ready.

THE WITNESS: I'm ready on this end.

BY MS. GRADY:

Q    Okay. At the beginning of our deposition we talked about that while you were on the phone with Captain Dykstra, you heard someone calling a 10-71; correct?

A    Yes.

Q    And that was a woman's voice; right?

A    Yes, I believe that was Officer Abbassi that

Page 174

called the 10-71.

MS. GRADY: Okay. I am going to share what we'll make Exhibit 7. These are cell phone records for Warden Neal, and this exhibit is three pages. It's Bates stamped Devine 133450 to 133452.

(Document titled Exhibit 7 identified for the record.)

BY MS. GRADY:

Q    Is this -- can you see the document in front of you?

A    I see the document, yes.

Q    And this number, 219-877-8856, that's your cell phone number; correct?

A    That is correct.

Q    I'd like to turn your attention -- I'm going to try and zoom in here. I'd like to turn your attention to this entry on 4-7 at 10:13 p.m. There is a call from 219-363-7142 to your cell phone. Do you see that there on this document, page 1 of Exhibit 7?

A    I do see that, yes.

Q    Are you familiar with that number, 219-363-7142?

A    Off the top of my head I'm not familiar with

Page 175

that number, but I would guess -- I'm not familiar with that number.

Q    Do you know whether phones -- do you know whether Captain Dykstra was calling you from his cell phone or from a landline?

A    No, I don't know, but Captain Dykstra was the E-squad commander for the facility, so he was authorized to carry his cell phone with him on grounds. So it's possible that he called me from his cell phone.

Q    Do landlines at Indiana State Prison have a common prefix in the set of three numbers? Do you know what I'm asking?

A    It should be -- you mean like the area code?

Q    Well, no, the area code would be geographic location. For example, I'm from a small town and all of the phone numbers in my small town are 712. That's the area code for western Iowa, but then the town is so small that they also all have a 243 number.

So my question to you is whether or not you know if landlines in Indiana State Prison would all have the same area code, but do they also share, to your knowledge, a common three numbers that follow the area code?

Page 176

A    No, I don't know, Sarah.

Q    Okay. You mentioned that -- I think you said B-cell house was an auburn-style brick cell house?

A    All of our major cell houses, A-cell house, B-cell house, C-cell house, E-cell house, and I-cell house are all auburn-style cell houses, yes.

Q    What does that mean to be an auburn-style cell house?

A    It's the style of construction of the cell house. In other words, this is a brick exterior, a brick building with a metal roof, and it has five branches, or five tiers, but the five tiers is not indicative, necessarily, because some have three tiers, but it's where the cell house style is that the cells are side by side or the backs of them -- the backs of them butt up against one another with a midway in between, and then the ranges are stacked on top of each other, if that makes sense.

Q    I think it does. I want to talk to you a little bit about key control policies.

Can you tell me who in any given cell

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 46 of 85

Page 177

house has responsibility for the keys to the cell house?

A   You mean like on a particular shift?

Q   Right.  So let's do a typical overnight shift. I mean, how many people are staffed in a cell house on a particular overnight shift?

A   It depends on how many staffing we have, but usually three to four in D-cell house, which is restricted housing.  We have more because they're problem offenders.  But in a general population cell house, such as this one, B-cell house where Mr. Devine was, you're going to have between three and four, if you're lucky, but usually three.

Q   And of those three officers, are they all given some amount of keys?

A   Yeah, yeah, in a -- in each cell house there's a key box and keys for that specific housing unit are kept in that key box, and that's inside the officer's station.  Now, we did switch over to Morse Watchman system, which is an electronic key control system that we use today, but I don't know -- I can't recall whether that was in B-cell house at that time or not.

Page 178

Q   And can you describe that electronic system that you use today?

A   Well, the electronic system that we use, again, is called the Morse Watchman KeyWatcher key system, and it's a metal box that closes and there's a swipe system.  So every employee has to swipe their I.D., punch in their code to be able to open the box.  They also have to type in what key they're extracting and then the box door will pop open.  The key will light up with a light above the key and the officers pull the key.  And, of course, KeyWatcher system remotely -- I mean, it tracks when keys are pulled, who pulled them, how long they were out, all those kind of things.  But now that I think about it a little longer, I don't think that those were in play at B-cell house in 2017.

Q   So even after adoption of that system, though, there were still physical keys; they were just controlled by an electronic system, which would release keys with particular I.D. numbers, et cetera; right?

A   That's correct.

Q   Can you tell me, do all of the -- if there are

Page 179

three officers working a cell house on an overnight shift, do the three officers each get keys for all of the areas in that cell house or do some get some set of keys, while others get a different set of keys?

A   They get different sets of keys depending on what their job assignment is.

Q   And tell me more about that.

A   It just depends.  I mean, like the OIC unit may have the key that has a key to the front door, a key to the fire alarm system.  The OIC key ring may have a few more keys on it than the typical range keys do that the officers are using on the range.

Q   And OIC refers to officer in charge; correct? I don't think we caught that, but that's a yes?

A   Yes, correct.

Q   There is an officer in charge assigned to each cell house for each shift; correct?

A   Correct.

Q   Can you tell me what is the relevance of the designation that a person is the OIC for that shift?

A   Typically, it's designated by the shift

Page 180

supervisor, and if we don't have enough staff there where you have a typical officer, sergeant, lieutenant chain of command -- for example, there's a sergeant assigned to every housing unit or shelter.  There's also a lieutenant assigned to every housing unit or shelter, but oftentimes the sergeant and lieutenant are working day shift and are not there at night.

So we try, and I emphasize try, to keep the same officers on the same units so that they can become familiar with the units and then the shift supervisor will dictate, based on knowledge, experience, performance, who the OIC is if there happens to be three officers working the same cell house.

Q   Is there -- what responsibilities or benefits does the person who is serving as the OIC have in the cell house during their shift?

A   They're basically the person with the most knowledge that's -- you know, it's a constant struggle, because officers often argue that you're just an officer just like me, you're not my supervisor, and there's a lot of those kind of battles that take place.  But,

Page 181

actually, if they're the OIC and designated as the OIC for the night, then they're the acting sergeant. They're the person in charge.

Q   Does the officer in charge have a key that would enable him or her to unlock every cell in the cell house?

A   Well, there's -- those keys exist in the key box, but whether they carry them with them at all times, they probably would not because it would be a very big and heavy key ring. So, oftentimes, those are kept locked in the key box and they're just carrying the lighter keyset which lets them, you know, open up cells, open up the shower door, open up the front door, things of that nature. And then if they need to get out the master set of keys or larger key ring, then they would, you know, go get those keys.

Q   I'm not sure that we're on the same page, so let me try and clarify.
     Does the officer -- so I understand that there are going to be lots of doors that actually aren't to cells that might require a key if they're secured or might require a key to unlock, but does the officer -- but in your

Page 182

answer you testified that they typically carry keys to the cells.
     Does the officer in charge carry a key that would enable him to open every cell of every person who's occupying a cell in the cell house?

     MR. BLINN: I'm going to object because I'm not entirely sure I understand your question, but I won't say why until he answers unless you'd rather --

     MS. GRADY: No, that's fine.

A   I'm not sure I'm following either. B-cell house had electronic locks in the -- that was controlling the cells. So at the end of the range there's a key box, okay, and so if you would envision a square at the end of the range mounted on the wall with a cover, that box has to be opened and then the officer can either open an entire range by selecting the entire range or flipping all the individual switches or they can flip the switch for an individual cell and electronically open that cell. So B-cell house was switched from the old keylock system to electronic locks.

Page 183

BY MS. GRADY:

Q   And just so I understand, and tell me if this is incorrect, a person who has access to the key box at the end of the 500 range, let's say, in B-cell house, can go to that key box at the end of the range up on the 500 range and can either open the cells of all the men on 500 range or choose a single cell to open, as he's standing there at the end of the range in the 500 range; correct?

A   That is correct. If he had the keys to that key box on that range, yes.

Q   Okay. So that's my next question. So the key box is obviously kept secure; you have to have a key to access the key box; right?

A   That's correct.

Q   And does the officer in charge keep keys for all the key boxes in all five -- for all five ranges in a cell house?

A   On his person? I mean, it's in the cell house, but does he keep them all on his person? Usually not, no.

Q   Isn't that just five keys at most, though?

A   Well, there's a lot of other keys on there for other doors, the front door, the fire alarm

Page 184

panels. I mean, they can become quite big and cumbersome. I mean -- and the other thing you have to keep in mind is, oftentimes, we don't put all the keys to open every door, every cell in a cell house on a single key ring because if those keys became lost, then we might have to replace 30 locks instead of 300. So a lot of times keys are broke down to specific ranges or specific areas. So, there are multiple keys that are broken down for that purpose.

Q   But, again, the key boxes, just in terms of numbers, I'm correct that there are five keys that you would need to gain access to the controls to open all of the cells in B-cell house; is that correct?

A   I mean, you might be fair. I mean, honestly, I'm not the key control guy. I'm not -- I'm not as proficient at my locksmith would be or my custody supervisor would be. I mean, they would be the people to give you more specific answers in regard to keys than I. I mean, you know, I'm the warden here, but, you know, honestly, I've not been an officer working in a cell house in the Indiana State Prison. So

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

Page 185

I'm not used to pulling those keys every day. I just know what I'm sharing with you.

Q    Sure, and that's all we're asking is about what you have knowledge of through your experience and your role as the warden.
      Do you agree that a policy to ensure that a person who is in a cell that has an emergency that's critical, that there is a policy to ensure that that person can be removed from their cell, if necessary, immediately; right?

A    Yes.

Q    Okay.  And would it surprise you to learn that on the night of April 7, 2017 Officer Rodriguez testified that he did not have the key to unlock the key box on the 500 range when he responded upon hearing shouting that led him to go up to the 500 range?

A    I mean, what you're saying doesn't surprise me.  But, I mean, I do remember, in just looking back at the case file, that Officer Rodriguez was the OIC that night.  He was the officer that was in the officer's station.  The other two officers were in the unit team office doing their payroll, as we discussed

Page 186

earlier.  So I believe that what Officer Rodriguez said was he heard yelling, but as we clarified earlier, you always hear yelling in a cell house, typically, even at 10:00 at night.
      So, hearing yelling in itself is not unusual, but in this case he continued to hear yells and screams to the point that it got his attention, that he was looking around and couldn't see an issue.  So he ran up to the 200 range, at which time he began to hear clearly that there's a fire on 540, 500 range, at which time he started yelling for help with the other two officers.  So, yeah, I think he took off trying to find out what was going on and didn't have the keys on his person at that time.

Q    And it's your testimony that that's consistent with ISP policy for the officer in charge not to have a key that would allow him to unlock the key box on a range in a cell house for which he was the officer in charge?

      MR. BLINN: Object to form.  Go ahead.

A    Again, there might be -- there are various

Page 187

keys to a cell house that are broke up in different sections for security purposes so if they're lost that we don't have to spend a million dollars replacing every lock in the cell house.  If one set of keys were lost, it could only control maybe 20 cells, which would be a much less cost.  So they're broken up in individual sections for a reason.

BY MS. GRADY:

Q    Okay.  But that wasn't my question.  My question was just whether or not it was consistent with the policy.
      It's your testimony that it is consistent with the policy that on the night of April 7, 2017 Officer Rodriguez was the officer in charge that did not have a key to the key box to the 500 range; correct?

      MR. BLINN: Object to form again.

A    Not correct.  And again, I mean, I'm not trying to be argumentative either, but a policy doesn't stipulate one way or another, that I can recall, that says that the OIC or the sergeant of a cell house will have keys to every cell on his possession at all times.  I mean, I don't think that exists in a policy.

Page 188

BY MS. GRADY:

Q    Okay.  Is it your testimony that Officer Rodriguez's failure to have the key to unlock the key box to 500 range on B-cell house on April 7, 2017 during which time he was the officer in charge was inconsistent with IDOC policy?

      MR. BLINN: Object to form.  I think the ambiguity here is it's not clear to me when you say "have".  Do you mean on his person on do you mean have access to, because those are different things and using that word is then creating some ambiguity here.

      MS. GRADY: Sure.  Let me clarify.

BY MS. GRADY:

Q    Can you tell me whether Officer Rodriguez's failure to have a key to unlock the key box on the 500 range in B-cell house on his person on the night of April 7, 2017 was consistent or inconsistent with policy at the Indiana State Prison?

A    My answer is I don't think policy answers that question one way or the other.  I can tell you that the keys to the 500 range were in the officer's station on B-cell house that night

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 49 of 85

Page 189

and could have been accessed if they knew what area they were going to.

Q   You read in the reports that you reviewed to prepare for your deposition at the time of the fire Officers Abbassi and Blakely were in an adjacent room completing their A-4's; correct?

A   I believe I recall seeing that they were ordered by their lieutenant to go into the unit team office, which has a computer, so that they could complete or fill out their A-4, or time sheet, because it was the end of the pay period.  So, yes.

Q   And can you tell me whether that's consistent or inconsistent with policy of Indiana State Prison for officers to go into an adjacent room to complete their A-4s during their shifts?

A   I don't believe there's a policy that that's specific that says where an officer has to complete his A-4 or what location or where, or anything of that nature; simply that employees are responsible for completing their own A-4 at the end of the pay period.

Q   It's not inconsistent -- strike that.  Let me ask about the practice.

Page 190

You're aware that there's a practice by which officers either voluntarily or are ordered to complete their time sheet during the period of time that they're assigned to be working at a cell house; correct?

A   I would say we try to relieve officers to come off of the cell house with a relief officer so that they can come up to the custody hall or a different area and complete their time sheet.  But I would admit that on occasion, if they were short-staffed that night and they didn't have enough relief staff to go around and relief officers -- I mean, I believe in reviewing the file that Lieutenant Watson had instructed them to go into the unit team office and complete their A-4 as they had not done so.

Q   Do you think it was a good idea to order two of the three officers responsible for monitoring the cell house to go into an adjacent room at the same time leaving only the officer in charge while they completed their A-4's?

MR. BLINN: Object to form.

A   You have to understand that -- I mean, they're

Page 191

still in the cell house.  I mean, Rodriguez is in the officer's station, which is on the bottom range, or the flag.  The unit team office is also in the bottom range, or the flag, of the cell house.  It's a different office.  So it wasn't like they went in there and closed the door and locked the door.  I mean, you know, I believe Rodriguez said in his written statement that once he found out that there was a fire going on and he began to run back down from the 200 range that he yelled at those two that there's a fire, I need your assistance, and they came and assisted.

I think it was also -- I believe they also just performed a security check, where they had walked the ranges, shortly before this fire broke out and there were no issues or concerns at that time.  So, you know, I think that was their judgment that there were no problems in the cell house, so, you know, they made that decision to follow the lieutenant's order and complete their A-4.

BY MS. GRADY:

Q   The check that you just referenced, can you

Page 192

tell me what that is?

A   It's a security check.  A lot of times staff will refer to them as a pipe log or a pipe round, and it's a pipe and button system, whereby on each range there are buttons.  Okay?  So there's a button installed at the front of the range, there's a button installed in the middle of the range, and at the back of the range, and there's a pipe that the staff carry that, as they walk the ranges and go by those buttons, they're checking cells.  So they're checking on the well-being of offenders, and as they walk a range, then they will be logged three places; the front, the middle, and the end of the range.  And that system logs when rounds were made, where they were made, and what pipe was used to make that round.

Q   What's the purpose of conducting checks?

A   To check on the safety of -- the safety and security of the population.

Q   And how often are checks to be conducted?

A   Well, we ask that they be conducted every -- we ask that they be conducted every 30 minutes, but it's routine that they take a

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 50 of 85

Page 193

little longer than 30 minutes.  As a matter of fact, we oftentimes discipline staff because they've taken over an hour between security rounds.  So that's one of those things I mentioned to you earlier.  We take it very seriously and make staff walk the ranges and perform their security checks, but it's very difficult on officers because you're talking about walking up and down five tiers of ranges every 30 minutes for a 12-hour shift.  So, you know, a lot of officers -- a lot of people, in general, just can't handle that physical exertion to perform that job.

Q   And you said that -- well, strike that.
    Why is it a problem when officers fail to conduct checks within a 30-minute time frame?

A   It's simply the more frequently you can perform a check, then the more assured you are that you know nothing serious is happening inside that cell; for example, an offender isn't hanging himself or attempting to hang himself or attempting to self-mutilate or cut himself, or a variety of things.  But the longer between security checks, obviously, the

Page 194

more opportunity for something bad to happen inside a cell.

Q   How do prisoners communicate from where they are in the cell house, we'll say outside of the 100 range, which I understand to be on the lowest level; right?

A   Right.

Q   Okay.  So leaving aside the 100 range, what mechanisms are available for prisoners who need help or need staff attention to communicate with the staff when they are not performing a check?

A   They basically yell.  These are all open cell fronts, and by open cell front I mean there are bars on the front of each cell.  So there's not like a door that's closed to the cell.  So it's very loud when they start yelling.  And, you know, if they have a big problem or have an issue, then they'll start yelling for just about anything.  I mean, for example, when I walk in the cell house you'll hear the echo system of one offender on the flag will scream, warden's on the unit, and that will go to the 200, 300, 400, 500, and you'll here it 50 times, you know.  So they

Page 195

yell at each other, basically, or they yell at staff.

Q   And so fair to say that prisoners also communicate with each other, I guess, apart from being right next to them in their cells, through an elevated or raised voice; right?

A   Correct.

Q   And without responding to the situation, an officer can't determine whether it's something routine, as you mentioned, or it's something that's emergent; right?

A   Yeah, it's hard for them to ascertain where it's coming from.

Q   But it sounds like when you enter a cell house, you can, at the very least, hear -- make out what's being said by the folks on the 100 range; right?

A   Yes, you can hear the yelling for sure, yes.

Q   Can you make out the words of what's being yelled by people on the 500 range?

A   Not necessarily.  I mean, sometimes you can if it's quiet in the rest of the cell house, but, you know, it depends on how loud the offender yells, if it's quiet in the cell house.  But as you might imagine, once you get, you know,

Page 196

three, four, 20, 50, a hundred offenders yelling, it's very hard to determine where a voice is coming from.

Q   You testified that there was a report to you by some other members that there was always -- that they were always hearing yelling in B-cell house on the overnight shift.  Do you recall us talking about that?

A   I mean, I remember us talking about yelling, but I don't remember us talking about a specific report sent to me about noise overnight in B-cell house.  I think it was common that there could be yelling going on in cell houses sometimes throughout the night, but certainly in the evening hours.

Q   And is that based on your knowledge of the facility or is that based on something that somebody told you specific about B house?

A   In the three years.

Q   But you agree there's a difference between the typical type of yelling you would see on any given night at approximately 9:00 to 9:30 p.m. and the type of yelling that typically occurs when prisoners are shouting down to staff because of an emergency; right?

USDC INND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 51 of 85

Page 197

A    I mean, you would like to think so, but it just depends, Sarah. I mean, for example, if there's as playoff game going on in a cell house or the Super Bowl, or something of that nature, it is deafening from the time you walk in the front door because they're all yelling and it's just a very, very loud environment in this type of a cell house. On a general night, I mean, it just depends.

You don't know how many rowdy offenders you have or how many offenders are arguing with each other versus, you know, somebody that truly needs help. So, I mean, you would hope that the officers would be able to distinguish this is a yell for help versus just arguments, or whatever. But, you know, until you put yourself in that scenario and listen to all the different yelling and screaming and reasons why, then, you know, it's hard to understand that.

Q    So it's your testimony that it's difficult to differentiate between yelling that might occur as a result of an emergency situation and yelling that might occur because of something that is exciting, but not an emergency

Page 198

situation; right?

A    That's correct. That's oftentimes the case.

Q    Do you know whether or not there was an entertaining event or something else that was causing excitement on the night of April 7, 2017?

A    I honestly do not know.

Q    Can you tell me a little bit about who is responsible for deciding which officers get put into which assignments on a given shift?

A    The shift supervisors.

Q    Is there any policy that dictates how much seniority the most senior person on that unit has to have?

A    No, not these days. I can tell you there used to be. When we had union representation years ago, staff could bid on posts based on years of service, seniority, and things like that. Today, the way things are, like I said, we try to keep staff in the same area, especially in cell houses, so that they're familiar with that cell house and its operation and its offenders, but seniority does not dictate who works where these days.

Q    Would it surprise -- strike that.

Page 199

Are there any concerns, to your mind, with assigning officers who have all had less than one year tenure to a single cell house?

A    Would that surprise me? No.

Q    Would it concern you?

A    A lot of things concern me, but, you know, we deal with what we have and a lot of times, like I said, due to the turnover, we do have a variety of new staff. Actually, I think having three staff in the same cell house with, roughly, a year of service each is pretty good these days, especially on night shift. I wish it were better. It's just not the case.

Q    And you agree that that increases the importance of training; right?

A    Training is always important.

Q    You testified at one point that the firefighters handled the sprinklers with regard to the level of heat index? Do you remember talking about that? Can you just explain what that is?

MR. BLINN: Back up. I didn't pick up the answer to the last question. Did the court reporter get that?

Page 200

COURT REPORTER: I didn't think there was an answer. It just went right into the question.

MS. GRADY: I'll just rephrase it.

COURT REPORTER: Okay.

BY MS. GRADY:

Q    Do you remember telling me earlier in the deposition that the firefighters were responsible for the sprinklers vis-a-vis the level of heat index?

A    I remember talking about that, yes.

Q    Can you just explain what you mean by that?

A    When it's a hot day and there's different levels of heat stress or heat index indicated, normally the powerhouse keeps track of the official temperature, humidity, and all those kind of things for the facility, and when the temperature, the heat index, and all those things, you know, rise to the level that it's heat stress index of one, two, or three, he then, in turn, notifies the shift supervisor and the safety manager, and then they have the offender firefighters bring out a sprinkler system.

It's basically fire hoses that are

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 52 of 85

Page 201

hooked to fire hydrants with a sprinkler system attached to it, which usually there's two or three locations that they put them in. But, yeah, it's like a big sprinkler system that offenders are able to walk through to cool off on hot days. So those are like three areas that are designated as cool-off areas or areas to cool down. There's also air conditioned spaces that are designated as cool-down areas to prevent heat stroke, and things like that.

Q Okay. You talked about after action reviews, and one of the things that you said was that even if Richard Curry or someone else in a similar position didn't order an after action review that we always -- these are your words, we always do an informal one. Do you remember telling me that?

A I remember telling you that, yes.

Q Can you tell me, in the instances when a formal after action review is not performed, tell me what an informal after action review looks like.

A To start off every day, Monday through Friday, the deputy warden of operations, the deputy

Page 202

warden of reentry, the major, the shift supervisors, and most department heads attend a meeting at 8:00 every morning that's called the incident review committee, or IRC you'll here it referred to by staff, and that IRC is a review of the previous day's incidents. It's usually the deputy warden of operations or the major that leads that meeting. Oftentimes, they'll invite the staff who were involved in the incident, if it's a serious incident, to that meeting so they can talk to them directly or hear from them directly, but they basically review any serious incidents that happened on the previous day.

Q That's a daily meeting that occurs?

A Monday through Friday, 8:00 a.m.

Q And is any documentation kept of that meeting?

A Every -- yes, for every meeting that's held.

Q Are fires ever discussed during those meetings?

A It really would be, yes.

Q How often are fires discussed during those meetings?

A When there's a fire or, I mean, when there's a serious fire, that's brought up during those

Page 203

meetings.

MS. GRADY: I want to show you what we'll make Exhibit 8. This is a Word document, so it has no Bates number, but it is a document that was produced in discovery that's entitled After Action Review. The date on this document is April 24, 2017.

(Document titled Exhibit 8 identified for the record.)

BY MS. GRADY:

Q I will represent to you, Warden, that this is an after action review of the fire that caused Joshua Devine's death. Is this a document that you've seen before today?

A Possibly. Honestly, I don't remember whether I got that or not, but that is the after action review that we spoke about earlier.

Q Okay. And do you see here that there are notes that appear to sort of outline what is happening as part of this meeting or as part of this review? Do you see that?

A The first bullet point?

Q Sure. Do you see the first bullet point?

A Yeah.

Q Can you tell me who, to your knowledge,

Page 204

created this particular document?

A I do not know.

Q Okay. You see that you are listed as being in attendance for the after action review; correct?

A That is correct.

Q And you see that Robert Curry and William Wilson were also in attendance; right?

A That's Richard Curry, but, yes, I do.

Q Oh, I see, that's a typo. I mean, it says Robert Curry in this document; right? I can represent to you that I did not change that name in this Word document.

A I haven't changed anything and it does say Robert, but it should be Richard.

Q Got it. Okay. And you see that Sarah Abbassi or S. Abbassi is also listed as being in attendance; correct?

A I see that, yes.

Q You agree that Officer Rodriguez is not listed as being in attendance; correct?

A Correct.

Q And you see that Officer Blakely is also not listed as being in attendance.

A Well, right there is P. Blakely at the end of

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

Page 205

Line 3.

Q    Okay.  Do you know whether or not this refers to Promise Blakely as opposed to someone else?

A    I think that's a typo in the way they spelled it, but I think that is Promise Blakely.  I don't know of any other P. Blakely that works here, or did work here.

Q    Okay.  Do you recall reviewing the video of the fire in B-cell house?

A    I do.

Q    Was the after action review the first time you had reviewed that footage?

A    No, it was not.

Q    When was the first time you reviewed that footage?

A    It may have been the next day, but shortly after the fire.

Q    Do you have access to that footage at your home?

A    At my home?  No, I do not.

Q    Okay.

A    I mean, unless I took the disk home with me and watched it, but, I mean, it's on a disk.

Q    I think I meant more like a live feed.  You don't have the ability to monitor what's

Page 206

happening in Indiana State Prison from your home; right?

A    I do not, no.

Q    Does it concern you that Officer Rodriguez did not attend this review, according to this document?

A    I mean, you know, we try to get everyone to come.  But, again, the after action review is held on, many times, a day and time that's convenient to people that are hosting the meeting and not necessarily the staff.  So, you know, there are always legitimate reasons why people cannot attend meetings, but as you see, that was pretty well-attended.

Q    Did you ever have any conversations with Officer Rodriguez about this meeting or any questions that were raised from this meeting after the after action review?

A    Not to my knowledge, no.

Q    Do you see here that on the second bullet point -- tell you what, why don't I just give you an opportunity to read the second bullet point and let me know once you've had a chance to do that.

A    Okay.  I've read it.

Page 207

Q    Do you see that one of the first questions Mr. Curry had following the convening of this meeting, according to this exhibit, is why Officer Rodriguez did not have the key?  Do you see that?

A    I see that, yeah.  That was a question that was asked, yeah.

Q    Do you agree that if Officer Rodriguez had the key when he went up to the 500 range the first time on the night of April 7, 2017, Joshua Devine may be alive today?

        MR. BLINN: Object to form.

A    I mean, I -- I would love to say yes, but, I mean, we know what happened here.  I mean, this is describing what we already discussed.  Lieutenant Watson says that he opened the door from B-cell house.  Notice that it says, from custody hall.  Okay?  So that's a door that is not the entrance door to B-cell house nor is it the back door to B-cell house.  That's a door that's connected to custody hall.  So Lieutenant Watson would have walked outside the shift supervisor's office and walked into the foyer, and there's a back door or side door, however you want to describe it, to

Page 208

B-cell house.

    So there's a steel mesh gate in front of that door, but he's able to open that side door, open up the door slightly, and yell at the staff that -- I think that's when he was yelling at them to do their A-4.  So he says he sees at that time Rodriguez running up the stairs, but he sees no noise, no smoke.  Well, that's when we talked about earlier that Rodriguez was the officer in the officer's station that heard yelling, ran out on the range to investigate what was going on, got as far as the 200 range before he got clarification from the offenders that there was a fire on the 500 range, at which time he turned around, came back down two flights of stairs, and yelled at the other two officers that there was a fire and he needed help.

    So, I mean, I'm sure in that meeting that the same thing we discussed was discussed in that meeting, that he was investigating what was going on, where it was coming from, and that's why he didn't have the keys on his person.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 54 of 85

Page 209

BY MS. GRADY:

Q   Okay.  So that wasn't my question whether or not the failure was reasonable.  My question was whether or not you agree that had Rodriguez had the keys on his person that Joshua Devine may be alive today?

MR. BLINN: Object to form.  Seeks opinion testimony.

A   That's a possibility.  I mean, I have no way of knowing that, but --

BY MS. GRADY:

Q   Did you take any action to change the key policy following Joshua Devine's death?

A   The key policy did not change following Mr. Devine's death, no.

Q   Do you see at the end of this meeting -- and I'm happy to give you time to read through all of this, but I just want to focus on what I think is the most relevant here, that according to these notes Mr. Curry asked what we have learned from this and then there are four lines of text before it's indicated the meeting was dismissed.

Do you recall Mr. Curry asking what was learned from the fire that killed Joshua

Page 210

Devine?

A   I know that he always tries to conclude after action reviews with that because that's the purpose of an after action review.  But as I expressed earlier when we were discussing the after action review, this one in particular became a very heated after action review because the officers and staff here at the Indiana State Prison felt like they did everything possible to save Mr. Devine's life and, yes, they made the decision themselves to evacuate the cell house on their own, even though it was en masse, simultaneously, and not by policy.

So the staff were very defensive during this after action review.  But, I mean, I see that those are questions that were posed by Mr. Curry and I have no reason to doubt that whoever took those notes that's what they wrote.

Q   Do you see that one of the things that was discussed was that better communication is key to any emergency?  Do you see that?

A   Sure.

Q   Do you recall that being discussed as part of

Page 211

the after action review?

A   We discussed the communication during that after action review, and there were several issues, as we've discussed throughout this deposition.  I mean, there was very poor communication between the captain and myself as he was trying to relay what was going on to me because it was so loud in the cell house, that he was getting pieces of information.  There was poor communication from the site supervisors and the shift supervisor because of, again, the noise in the cell house.

There was poor communication within the cell house because you had 200 offenders yelling and screaming while the staff are trying to coordinate their response.  So, yeah, communication was discussed and, you know, again, staff were trying to defend their position because of the noise factor.

Q   And did you agree that improvements could have been made to the communication from the emergency?

A   You know, it's easy to sit back and Monday morning quarterback or after action review an incident, but when you're there and it's

Page 212

happening, it's a completely different story.  So, I mean, I remember supporting my staff and I remember having that discussion during the after action review.  I mean, we can always say, yeah, it would have been better if communication was better.  But, you know, if the noise level is deafening because of what's happening, then how much does that mean or how effective is that to make that statement?

Q   And the third entry is, make sure you know who's in charge of first responders.  Do you see that?

A   I see that.

Q   What did you understand that to mean, based on your recollection of the after action review on April 24th?

A   Again, for every shift there are first responders who's designated that respond to emergency situations.  So in this particular case a lot of the conversation in the after action review is what should have happened by policy.  And as I mentioned earlier, by policy, policy talks about, you know, that the cell house should have been evacuated by policy, which would have meant the affected

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 55 of 85

Page 213

area, the top range, and work your way down a range at a time, very methodically, while you stage your first responders and any additional support staff you have outside the front door so that they can help and assist with crowd control.

So Mr. Curry was trying to, you know, follow the party line or the policy line by saying, you know, if we would have followed the policy, by policy, that maybe we could have avoided the staff assaults that took place outside the cell house and maybe we could have avoided Checkpoint 7 being severely damaged.

And, again, the staff's rebuttal of that, which is not in these notes, was simply that you weren't there and you didn't understand how this played out and how loud it was and, you know, what the situation was, and that they were standing by one another, at least during that after action review, that they made the right call and they felt like they saved additional lives by releasing offenders the way they did. And, yeah, it was unfortunate that a couple staff got assaulted

Page 214

and a building got damaged, but they still stood by, you know, the actions that they took.

Q What about the last entry there, work on fire drills and plan of action for staff. Do you recall that being discussed during the after action review?

A I do not, no.

Q Does it concern you that there was a recommendation or a discussion about a need to work on fire drills in your facility?

A No. I mean, you have to understand what an after action review does. I mean, you know, if it was a serious staff assault, that an officer was murdered, then, you know, one of the recommendations is going to be -- the recommendation is always going to be geared towards the incident itself. So I think that's just a comment that was thrown in there, you know, because a serious fire took place and, unfortunately, a man died, regardless of how hard the staff tried to save his life.

Q Well, it didn't say to, for example, you know, increase the number of fire extinguishers. It

Page 215

pointed to particular action with respect to training; right?

MR. BLINN: Can you scroll that back down a little, please, so I can see the bullet point?

MS. GRADY: Sure.

A Yeah, I mean, it says work on fire drills and plan of action for staff. So I do not remember us specifically talking about fire drills during that after action review. That comment about plan of action for staff, I'm sure in Mr. Curry's mind it was reiterating to staff to follow policy and I'm sure that's what that statement is from.

BY MS. GRADY:

Q Do you see here in the third bullet point from the bottom the notes reflect that a question was asked about was there a debriefing? Yes. What time? Directly after offenders were secured. Do you see that in this document?

A I see that.

Q Do you recall there being a debriefing after the prisoners in B-cell house were secured back into their cells?

A The only thing I can say is that the staff may

Page 216

have gathered themselves and, you know, had a discussion on what took place as they left here or someplace in the facility, but that wasn't the official debriefing or after action review that we do.

Q Were you part of that debriefing?

A This one that's referred to here, no.

Q Okay. Did you provide any statements to prisoners or the prison at large about the Devine fire?

A I'm trying to think. I know that sometime after the fire and after Mr. Devine's death I did do a video for the offender population and I talked about -- I talked about the fire and I talked about Mr. Devine's death. The video was in regard to a property purge that we were doing throughout the facility. So I did do a video about the property purge and I did reference the fire in that video. So, yes, via that video I'm sure I did.

Q Can you tell me how that video was shared with people in the prison?

A Over the offender broadcast system.

Q And was that broadcast live or was that recorded and then broadcast?

Page 217

A    Recorded and then broadcast.

Q    Where is that video stored, if you know?

A    Honestly, I'm not sure. I'd have to find it, but I'm not sure.

Q    And if you would, I would be grateful for that and then -- you know, we've been asking for that video. So if you can locate it in your files and then coordinate with your attorneys, we want to make sure to get that video.

MR. BLINN: Reserve an objection to that characterization, but go ahead. We can talk about it later.

MS. GRADY: Sure.

BY MS. GRADY:

Q    You talked about a property purge. Can you tell me what you meant by that?

A    Yeah. Shortly after that fire we held a property purge. Every facility by policy, whether it's minimum, medium, or maximum security, has levels of property and levels of allowable property that offenders can have in their cells. At ISP, this was shortly after I was promoted to warden that this incident took place, that one of the things that was already on my agenda was to do a property purge at the

Page 218

Indiana State Prison because there was excess property in a lot of cells here at the state prison and I wanted them to get back within policy limits and regulations.

And, you know, I remember discussing during the video -- I didn't say it had anything to do with the cause of the fire or the reason for the fire or anything to do with Mr. Devine, but I did say that excess property and clutter, and things of that nature, inside your cells, unfortunately, if a fire did break out or would break out, they could, you know, be part of the fire hazard. So that was another reason why we were doing a property purge.

So, yeah, it was to bring them back within policy limits and get rid of a lot of the clutter and excess property that offenders kept in their cells. I mean, you have to remember, this is a maximum security prison and guys are here for -- a lot of men anyway, for life or the equivalent of life, so they have a tendency to hoard stuff and every once in a while we've got to purge. So that's what we did.

Page 219

Q    And one of the reasons why there are limitations on the amount of property that people can have in their cells is because of the fire hazard that it would present; correct?

A    A fire hazard is a part of the reason, yes.

Q    And you testified that that had been on your list since you became warden of Indiana State Prison?

A    Actually, it had been on my list since I was deputy warden, but I didn't have the authority to make it happen until I became the warden and, unfortunately, this event happened before, you know, I was able to pull that trigger and make that happen. But, yes, it had been on my list for some time.

Q    And there was nothing that prevented you from taking this action in terms of authority or any permission; correct?

A    Well, of course, there was.

Q    That's a bad question. Let me ask it a different way.

You had full authority to authorize and enforce this property purge that occurred after the Devine fire; right?

Page 220

A    I mean, I had the authority to do it as warden, but you have to understand how this works. We all have a boss, okay, and I have an executive director that I answer to, who answers to a deputy commissioner, who answers to a commissioner, who answer to the governor. So anytime something big like that is done, I mean, doing a property purge of the Indiana State Prison, it goes up the chain of command and we make sure that everyone is on the same page and no one has any objections to it.

So, yes, everyone has to sign off on that, and the reason for that is, again, these guys are lifers. They're here for the rest of their lives. So, you know, if I hadn't shared that with anyone above me and I just started to do a property purge and a riot broke out at the Indiana State Prison, then I'm going to have several supervisors that aren't too pleased with me that I didn't share that with them beforehand. So did I have the authority? Yes, but I needed their blessing as well.

Q    When was the first time that you sought their blessing?

A    When I pulled the trigger a month or two after

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 57 of 85

Page 221

the fire.

Q   Can you tell me how, if at all, you were first alerted to the fact of this lawsuit?

A   I remember hearing about a lawsuit in this case or potential lawsuit -- honestly, I couldn't even tell you when.  I've heard it three or four times since the fire.

Q   And who, if anyone, did you discuss this lawsuit with other than your attorneys?

A   Oh, I mean, I haven't -- I really haven't discussed it with anybody.  I just mean I've heard about it from -- part of one of my staff duties is litigation liaison.  So they --

MR. BLINN: I'm going to jump in.  I'm going to instruct you not to talk about pending litigation to the extent that your role as litigation liaison involves communication with outside counsel.  I'm not sure where you're going with this, but I just want to make sure we're all clear that you're not talking about anything that you do that has to do with other pending litigation.

A   All I was going to say is my litigation liaison had brought this to my attention on two or three other occasions about possible

Page 222

litigation in this case.  Then I remember her telling me once that something -- I think I heard that the mother passed away, and so I had heard about it two or three times, but not to the point that I had, you know, had meetings or reviewed documents or talked to people, or anything of that nature.

BY MS. GRADY:

Q   Well, sure, and I understand you'd be testifying that you didn't have any meetings about the lawsuit other than perhaps with your attorneys.

But, you know, I mean, some lawsuits are routine and they are not typically the subject of discussion at the prison because they happen frequently, but other lawsuits do become a topic of conversation either because of the subject matter they involve, the people that they target, the people who have brought them or, you know, a variety of other factors that might make it ripe for gossip within the facility.

So my question to you, understanding that there are different kinds of lawsuits, you know, some of which create conversation

Page 223

that aren't necessarily formal meetings, but are sort of the subject of gossip or discussion among your colleagues, did you ever have any conversations with anyone of any sort, other than your attorneys and litigation coordinator, about this lawsuit or the allegations that it set forth?

MR. BLINN: And I'm going to step in and just ask a question only to protect the work product privilege.  Were you involved in investigating the fire incident -- strike that.

Did you participate in the investigation of this incident at some point after you became aware that a lawsuit had been filed in this case?

THE WITNESS: No.

MR. BLINN: Okay.  Go ahead and answer.

BY MS. GRADY:

Q   Do you have my question in mind?  Warden, do you have my question in mind?  Would you like us to read it back to you?

A   I kind of lost it, but I think I remember the gist of it, and that was just simply that I

Page 224

have not met with anyone or discussed this case with anyone.  So, gossip or otherwise, I just haven't had any conversations with people about this case.  So, I think that covers it.

MS. GRADY: Okay.  Give me just one minute.  I'm going to see if I have anything else.

MR. BLINN: Okay.

(Brief pause.)

MS. GRADY: Okay.  I don't think I have anything further.

MR. BLINN: Can we go off the record for five or ten minutes?  I'll just have a quick conversation with my client and see if we have any follow-up.

MS. GRADY: So I don't think that it's permissible under the rules to discuss the content of testimony in the middle of a deposition with your client.

MR. BLINN: I disagree.  As long as there's no question pending, we're going to talk off the record and then come back and then I may have some questions or I may have some follow-up or I may not, but I do have the right to ask questions of my client privately

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 58 of 85

Page 225

so long as there's not a question pending, which there's not right now. You can put an objection on the record to those questions. That's fine. We've taken breaks already, so.

MS. GRADY: Oh, I don't have an objection to the break at all. A break is fine. I have an objection to the talking to your client. So why don't I just put that on the record and we can take a break.

MR. BLINN: Fair enough. Let's take, what, five, ten?

MS. GRADY: It's up to you, whatever you want.

MR. BLINN: Okay. Let's take ten.

MS. GRADY: Okay. Can we just go on the record real quick?

COURT REPORTER: That was all on the record. I never went off the record.

MS. GRADY: That's fine. I'll just say for the record that we object to the extent that counsel intends to discuss the content of testimony or the content of expected testimony with his client during the break. And we can go off the record.

MR. BLINN: Okay.

Page 226

(Brief recess.)

MR. BLINN: All right. Are we back on the record?

COURT REPORTER: Yes.

CROSS EXAMINATION

BY MR. BLINN:

Q    Mr. Neal, do you remember testifying earlier that it is currently the practice at Indiana State Prison to take temperature readings on the range throughout the day?

A    Yes.

Q    Do you recall, as you sit here today, whether that was the practice in April of 2017?

A    I do not recall.

MR. BLINN: I don't have any other questions.

MS. GRADY: I don't have anything based on that.

MR. BLINN: We will take signature and I would like an electronic transcript, please.

COURT REPORTER: Ms. Grady, are you ordering?

MS. GRADY: I think we're waiting to order.

Page 227

COURT REPORTER: Okay. Very good. Thank you.

MS. GRADY: Okay. Great. I'm going to end the video.

(Signature reserved.)

(Proceedings concluded at 4:05 p.m.)

* * *

Page 228

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the      )
ESTATE OF JOSHUA DEVINE,   )
                           )
        Plaintiff,         )
                           )
vs.                        )    Cause No.
                           )    3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,         )
                           )
        Defendants.        )
_____)

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of two hundred twenty-seven (227) typewritten pages, is a true and correct transcript of my said stenographic notes.

Signed this 11th day of September, 2020.

_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires:  6/13/22

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 59 of 85

Page 229

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE, )
                         )
        Plaintiff,       )
                         )
vs.                      )  Cause No.
                         )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
        Defendants.      )
_____)

RON NEAL

I hereby acknowledge that I have read the foregoing deposition transcript regarding the above-mentioned matter, taken Wednesday, July 15, 2020, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the additions or changes, if any, as noted on the attached errata sheet.

_____
RON NEAL

Subscribed and sworn to me this

_____day of_____,
2020, A.D.

_____
Notary Public
State of_____
County of_____
My Commission Expires:_____

Page 230

DEPOSITION ERRATA SHEET

Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____
Page No.____ Line No._____Change to:_____
Reason for change:_____

SIGNATURE:_____DATE:_____
          RON NEAL
          Date of Deposition:  July 15, 2020

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 60 of 85

## $

**$16 (1)**
60:22

## A

**A-4 (6)**
189:11,20,22;
190:16;191:23;208:6
**A-4s (1)**
189:16
**A-4's (5)**
40:8,11,14;189:6;
190:23
**abate (1)**
130:1
**abated (3)**
129:22;135:8,16
**Abbassi (15)**
47:3;50:18;52:25;
53:4,12,24;54:3;55:19;
58:5;138:3;171:23;
173:25;189:5;204:16,
17
**ability (5)**
6:22;7:5,8;133:22;
205:25
**able (19)**
12:7,11;14:2,20,21;
47:24;55:11;64:11;
76:17;122:25;123:22;
124:4;162:3;166:1;
178:8;197:14;201:5;
208:3;219:14
**above (2)**
178:11;220:16
**absence (1)**
64:7
**Absolutely (7)**
86:6;94:10;100:22;
104:15;109:25;117:13;
144:20
**abundance (1)**
83:14
**ACA (1)**
135:22
**acceptable (2)**
114:23;115:8
**access (8)**
28:20;102:15;
127:21;183:3,15;
184:14;188:11;205:18
**accessed (1)**
189:1
**accessible (2)**
25:25;28:17
**accidental (1)**
170:18
**accordance (1)**
162:10
**according (5)**

52:24;155:6;206:5;
207:3;209:20
**accurate (2)**
6:22;7:6
**accuse (1)**
117:13
**A-cell (1)**
176:5
**achievements (1)**
74:20
**across (2)**
105:24;136:10
**act (1)**
162:10
**acting (3)**
81:5,5;181:2
**action (78)**
34:24;35:4,11,13,19,
23;36:5,7,13,16;37:10,
15;38:3,6,13,14;40:18;
42:8;43:13,17;45:10,
14,20;46:12;47:13;
48:4;52:14;56:12;57:1;
80:20;103:19;134:3,
18;138:7,19;139:12;
157:13;160:19;168:10,
22;169:24;170:3;
171:9,18;172:14;
201:12,15,21,22;203:6,
12,17;204:4;205:11;
206:8,18;209:12;
210:3,4,6,7,16;211:1,3,
24;212:4,15,21;
213:21;214:5,7,13;
215:1,8,10,11;216:4;
219:18
**actions (3)**
171:23;172:8;214:2
**activated (7)**
11:20;12:21,24;
78:11,13;113:17;
114:15
**activation (4)**
164:17;165:1,8;
167:12
**activations (3)**
78:8,8;167:8
**activities (3)**
24:5;81:17;165:20
**actual (6)**
159:19;160:18,21;
161:3;163:4;167:6
**actually (15)**
4:11;29:8;37:8;
38:15;46:16;52:11;
75:2;80:7;90:3;158:4;
160:7;181:1,23;199:9;
219:10
**add (1)**
62:4
**added (1)**
152:25
**addition (1)**

152:8
**additional (9)**
31:11;39:1;97:8;
99:6;102:16;152:13;
153:12;213:3,23
**address (3)**
61:10;125:18;127:21
**adequate (3)**
154:16;157:15;164:1
**adequately (3)**
150:20;165:4,16
**adjacent (3)**
189:6,15;190:21
**adjunct (4)**
152:2,3,5,10
**adjusted (1)**
63:21
**administration (1)**
151:25
**administrative (1)**
75:17
**administrator (1)**
84:18
**admit (1)**
190:10
**adoption (1)**
178:19
**advanced (2)**
75:6;77:25
**advise (1)**
49:13
**advocate (1)**
40:19
**affairs (14)**
22:20;36:5;55:19;
136:19;138:11;140:18;
141:3,5,16;142:1;
153:4;170:8,14,21
**affect (4)**
6:21,25;7:5,7
**affected (5)**
38:21;41:22;161:18;
167:23;212:25
**affirmative (1)**
90:24
**affirmatively (4)**
58:1;89:25;91:1;
100:25
**afield (1)**
115:13
**afterwards (3)**
23:7;37:24;136:11
**Again (38)**
6:10;11:2;23:16;
42:11;44:5;56:4;64:19;
65:21;76:3;84:5;96:16;
110:8,11,19;111:5;
112:6;118:6;121:16;
148:19;161:15;163:23;
165:10;166:12,23,24;
167:7;168:15;178:4;
184:12;186:25;187:18,
19;206:8;211:12,18;

212:17;213:15;220:13
**against (5)**
68:21;70:21,25;
78:14;176:19
**agenda (1)**
217:25
**ago (7)**
57:14;61:13;70:12,
12;92:21;167:1;198:17
**agree (22)**
4:22;71:8;94:6;
124:2;139:24;140:2,8;
144:15;162:13;163:12,
18;164:23;165:3,7;
171:10;185:6;196:20;
199:15;204:20;207:8;
209:4;211:20
**Agreed (3)**
4:23;46:9;104:20
**agreeing (1)**
28:2
**agreement (2)**
116:10,20
**ahead (11)**
10:2;61:12;101:18;
114:3;166:23;168:13;
172:2,21;186:24;
217:11;223:18
**air (1)**
201:8
**AIT (1)**
77:13
**alarm (4)**
16:23;160:9;179:11;
183:25
**alarms (3)**
12:17;16:14;160:9
**alerted (1)**
221:3
**alike (2)**
94:12;164:4
**alive (3)**
110:25;207:11;209:6
**allegations (5)**
69:10,20,24;72:13;
223:7
**alleged (3)**
69:1,6;124:15
**alleging (1)**
70:1
**allow (2)**
37:1;186:20
**allowable (1)**
217:21
**allows (1)**
113:2
**almost (3)**
8:14;14:14;93:18
**alone (2)**
97:23;165:15
**always (24)**
35:12;43:15;60:12;
70:5;82:6;86:24;95:21;

119:4;120:9;148:21;
163:17;165:1,12;
167:8;186:3;196:5,6;
199:17;201:16,17;
206:12;210:2;212:4;
214:17
**ambiguity (2)**
188:9,13
**American (1)**
135:22
**among (1)**
223:3
**amount (5)**
42:23;71:8;100:10;
177:16;219:2
**and/or (1)**
93:21
**annual (20)**
24:21;128:21,22,24;
129:6,11,21;130:9;
131:1,9,17,25;132:14;
135:15;147:15;149:3;
150:25;152:20;160:2,
13
**annually (1)**
129:16
**answered (1)**
166:22
**Anthony (1)**
110:24
**anticipated (1)**
101:21
**apart (2)**
122:5;195:4
**apparatus (3)**
28:15;29:13,15
**apparel (1)**
14:18
**appear (2)**
140:2;203:19
**appease (1)**
44:24
**apples (1)**
127:15
**applied (1)**
76:14
**appointment (1)**
59:22
**appraisal (2)**
160:2,13
**appreciate (1)**
121:6
**appreciated (1)**
64:22
**appreciation (3)**
62:20,23;63:3
**approached (2)**
55:3,8
**appropriate (6)**
134:2;168:10;
169:24;171:24;172:9,
19
**appropriately (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 61 of 85

104:17
**approval (3)**
59:9;98:10,19
**approve (1)**
64:7
**approximate (1)**
101:24
**approximately (15)**
11:12;15:25;17:9,11,
14;19:19,22;25:13;
70:11;76:9,13;77:3;
102:17;111:1;196:22
**approximation (1)**
20:24
**April (34)**
7:25;15:24;19:20;
23:23;24:1;57:23;
58:10;66:8;87:19;
89:13,16,18;92:4;93:6;
96:4;98:14,18;100:16;
101:5;103:16;156:1,
19;158:7;168:11;
171:25;185:14;187:15;
188:5,19;198:5;203:7;
207:10;212:16;226:13
**area (25)**
38:20;87:8;88:6;
91:6;95:24;113:15;
119:24;126:13;133:8,
8,16;145:22;161:19,
21;162:24;167:23;
175:14,15,18,23,25;
189:2;190:9;198:20;
213:1
**areas (18)**
87:14,24;91:1,7;
106:22;109:1;114:20;
118:17;128:20,25;
130:6;131:20;179:3;
184:9;201:7,7,8,10
**argue (1)**
180:22
**arguing (2)**
41:5;197:11
**argumentative (1)**
187:20
**arguments (1)**
197:16
**around (13)**
8:10;15:7;21:2;
24:24;63:22;84:1,3;
91:1;125:24;153:23;
186:9;190:12;208:16
**arrived (5)**
17:12,22;78:23,25;
79:3
**art (1)**
73:19
**articulate (2)**
117:17,21
**arts (1)**
73:20
**ascertain (1)**

195:12
**aside (1)**
194:8
**assault (2)**
42:18;214:14
**assaulted (4)**
43:9;81:24;105:8;
213:25
**assaults (5)**
11:9;39:17;83:3;
84:23;213:11
**assertion (1)**
116:16
**assess (1)**
118:16
**assessed (1)**
147:10
**assigned (18)**
88:10,12,15;92:14;
103:22;104:10;143:18;
145:8,10,11,16,18,20,
21;179:19;180:4,6;
190:4
**assigning (2)**
94:11;199:2
**assignment (2)**
146:7;179:7
**assignments (1)**
198:10
**assist (6)**
11:24,25;13:17;
14:21;30:10;213:5
**assistance (2)**
47:5;191:13
**assistant (23)**
75:11,17,23;76:15,
25;77:7;79:11;89:8,11,
14,17,18;92:19,23,25;
93:6,8,15;145:15;
147:5;151:9,11;158:15
**assisted (2)**
39:4;191:14
**Association (1)**
135:23
**assume (5)**
5:22;51:22;156:10;
157:10,22
**assuming (1)**
38:7
**assumption (2)**
156:13;158:3
**assured (1)**
193:19
**attached (1)**
201:2
**attempt (1)**
61:25
**attempted (1)**
14:13
**attempting (3)**
23:3;193:22,23
**attend (8)**
37:10;45:10;74:3;

84:10,14;202:2;206:5,
13
**attendance (7)**
32:19;45:13;204:4,8,
18,21,24
**attendant (1)**
75:10
**attended (3)**
26:20;27:3;71:2
**attention (17)**
32:23;61:24;63:15;
100:21;105:16;133:1,
4;135:25;137:25;
144:7;145:3;147:8;
174:16,18;186:9;
194:10;221:24
**attorney (1)**
5:3
**attorneys (4)**
217:8;221:9;222:12;
223:5
**attractive (2)**
54:9;55:7
**auburn (1)**
9:16
**auburn-style (3)**
176:3,7,9
**audible (1)**
6:3
**audit (7)**
128:22,23;130:9,11;
132:8,17;135:17
**audits (2)**
128:23,24
**authority (9)**
97:7,24;98:2,20;
219:11,18,23;220:1,21
**authorization (1)**
98:6
**authorize (2)**
97:7;219:23
**authorized (2)**
18:24;175:8
**availability (1)**
127:21
**available (2)**
39:12;194:9
**avoid (1)**
110:12
**avoided (3)**
42:17;213:11,13
**aware (26)**
15:23;49:24;50:22;
53:16;100:16,25;
101:3;102:25;103:15;
116:5;118:22;119:15,
24;120:3;121:13;
122:13;127:16;132:13;
144:3;156:1,19,23;
157:5,9;190:1;223:15
**away (4)**
62:19;83:1;127:14;
222:3

## B

**bachelor (1)**
73:20
**bachelors (3)**
73:15,19;74:20
**back (75)**
4:15;8:19;10:7,23;
14:25;15:5;26:11;
29:10;31:8;41:9;44:25;
45:13;47:1;52:2;53:21;
60:20;63:4,15,20;
64:11,14,18;67:7;
68:10;74:22;75:4,5,7;
76:2,3,8,11,19;77:11,
15,24;78:1,2;79:7;
80:3,5,11,12;83:23,23;
89:18;92:6;95:12,14;
96:13;98:18;109:8;
112:14,19;118:8;
130:7;156:16;168:18,
20;173:14;185:21;
191:11;192:8;199:23;
207:20,24;208:16;
211:23;215:4,24;
218:3,16;223:23;
224:22;226:3
**background (5)**
59:7,8,18;73:13,14
**backpack (4)**
29:6,8;33:4;147:25
**backs (2)**
176:18,18
**bad (7)**
8:22;41:21;54:17;
57:16;127:15;194:1;
219:21
**ballpark (1)**
20:19
**banks (1)**
128:13
**Barbara (2)**
49:10,16
**barn (4)**
80:8,9,9,11
**bars (2)**
152:12;194:15
**based (17)**
20:20;42:22;87:3;
100:8;102:7;116:1;
126:9;146:7;166:13;
167:10;169:21;180:13;
196:16,17;198:17;
212:14;226:18
**basement (1)**
36:4
**basic (4)**
75:2,3;77:13,22
**basically (24)**
13:13;20:6;30:12;
31:24;36:20,23;37:1,9;
41:9,24;42:5;48:22;

52:22;82:24;95:3;
113:7;130:7;132:7;
137:18;180:20;194:13;
195:1;200:25;202:13
**Basinger (1)**
35:15
**basis (6)**
23:25;116:17;
117:13,18;156:21;
166:6
**Bates (8)**
52:8;56:3;57:20;
65:1;129:7;141:14;
174:5;203:4
**battery (5)**
139:3,9;143:15,17,
21
**battles (1)**
180:25
**B-cell (33)**
7:25;8:16;9:3;13:15,
16;16:12;20:4;21:7,16;
39:13;44:3;50:19;
158:18;176:3,6;
177:12,24;178:18;
182:12,23;183:5;
184:15;188:4,18,25;
196:7,12;205:9;
207:17,19,20;208:1;
215:23
**became (9)**
15:22;38:15;44:18;
50:22;184:6;210:7;
219:8,12;223:15
**become (6)**
63:9;114:14;116:5;
180:12;184:1;222:17
**bed (1)**
124:21
**beforehand (1)**
220:21
**began (8)**
11:16;12:15;27:14;
40:17;146:17;147:6;
186:11;191:10
**begin (6)**
6:13,15;7:13;8:23;
38:22;104:11
**beginning (5)**
13:6;105:11;119:5;
132:18;173:19
**begins (2)**
12:20;103:24
**behalf (2)**
4:20;70:25
**behave (1)**
128:11
**behind (2)**
127:22;145:6
**belaboring (1)**
165:11
**bend (1)**
64:20

**BOSS REPORTERS**
**(219) 769-9090**

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 62 of 85

**benefit (1)**
166:8
**benefits (2)**
60:22;180:17
**beside (2)**
135:1;137:6
**best (10)**
5:13;6:14;16:25;
25:16;102:2;127:8;
140:23;165:1,8;172:11
**Beth (1)**
118:6
**better (19)**
32:15;36:25;39:16;
42:19;45:25;60:19;
147:12,22;149:24;
150:4;156:11;163:17;
165:13;166:9;167:8;
199:13;210:22;212:5,6
**beyond (4)**
69:22;71:11,12;
95:11
**biannual (1)**
128:23
**biannually (1)**
93:13
**bid (1)**
198:17
**big (9)**
99:1;144:9,10;145:1;
181:10;184:1;194:18;
201:4;220:7
**bigger (3)**
131:10,23;135:1
**Bill (4)**
10:13,15,24;82:4
**bit (9)**
23:12;46:6;48:6;
60:5;112:18;146:14;
153:5;176:24;198:8
**Blakely (18)**
45:10;47:3;50:18;
56:6,20;57:9,13,20;
58:5,5;172:16,23;
189:5;204:23,25;
205:3,5,6
**blessing (2)**
220:22,24
**BLINN (63)**
4:23;48:16,18,22,25;
51:19;61:12;96:21;
101:14;109:5,14;
110:8,19;111:5;112:6;
114:25;115:7,11;
116:8,18,24;117:11,22;
122:1;125:21;126:25;
136:25;137:7;155:15;
162:12;166:21;168:12;
169:3,8;172:1,10,20;
173:3,9,12;182:7;
186:23;187:18;188:8;
190:24;199:23;207:12;
209:7;215:3;217:10;

221:14;223:8,18;
224:8,12,20;225:10,14,
25;226:2,6,15,19
**block (1)**
103:2
**board (1)**
126:9
**book (3)**
43:4;44:9,14
**Bootz (1)**
52:10
**boss (1)**
220:3
**bosses (1)**
91:9
**both (7)**
6:9;28:7;65:17;
85:14;107:24;147:13;
162:23
**bottom (7)**
47:1;52:18;106:17;
171:1;191:3,4;215:17
**bought (1)**
34:7
**bow (1)**
61:7
**Bowl (1)**
197:4
**box (19)**
177:18,19;178:5,8,
10;181:8,12;182:15,
18;183:4,5,12,14,15;
185:16;186:21;187:17;
188:4,17
**boxes (2)**
183:18;184:12
**brackets (1)**
61:20
**branches (1)**
176:14
**break (13)**
107:18;112:17;
145:23;169:5,7;173:2,
10;218:11,12;225:6,6,
9,24
**breakout (1)**
118:1
**breaks (1)**
225:4
**breathing (2)**
20:12,14
**brick (3)**
176:3,12,13
**brick-style (1)**
9:16
**Brief (11)**
4:13;24:19;52:1;
67:6;68:8;96:11;
112:11;118:3;173:13;
224:9;226:1
**briefly (3)**
53:25;74:5;149:22
**bring (12)**

15:4;33:15;61:24;
63:14;64:18;113:14;
131:14;147:7;153:22;
154:1;200:23;218:16
**broadcast (4)**
216:23,24,25;217:1
**broke (6)**
11:15;62:17;184:8;
187:1;191:18;220:17
**broken (12)**
87:4,4,14;88:18;
90:5;93:18;95:3,4;
97:15;100:3;184:10;
187:7
**brought (16)**
5:4;15:6,9;30:10;
32:23;61:14;70:5;
100:21;105:16;144:7;
145:2;150:1;157:11;
202:25;221:24;222:19
**Brown (1)**
87:17
**B-R-O-W-N (1)**
87:18
**budget (1)**
60:13
**build (5)**
28:14,19;114:20;
117:4,8
**building (16)**
11:12,17;13:10,19;
15:7;20:9;29:25;30:1,
3;34:17;80:15;151:25;
155:8;167:20;176:13;
214:1
**built (2)**
75:21;80:14
**bullet (6)**
203:22,23;206:20,
22;215:5,16
**bumped (1)**
24:24
**bunch (1)**
60:25
**burn (1)**
124:19
**burned (4)**
11:11;42:18;43:10;
126:3
**burning (2)**
13:6;39:18
**business (1)**
94:4
**busy (1)**
22:25
**butt (1)**
176:19
**button (3)**
192:4,6,7
**buttons (2)**
192:5,11
**buy (3)**
98:1,10;167:15

**buying (1)**
144:12

**C**

**cage (1)**
27:25
**calendar (1)**
83:12
**call (34)**
8:8,12;10:17;15:10,
23;16:2,7,14;17:2,10;
19:16,23;40:14;44:12;
49:18;51:9;58:17;81:7;
83:3,4,5;86:2,5;89:24;
113:11;116:20;123:11,
21;125:5;138:3;
148:12;167:20;174:19;
213:22
**called (34)**
4:2;10:15;12:13,14,
16,18,23;17:6;24:12;
32:2;42:16;43:4;49:12;
50:4,13,16;61:14;
75:14;78:5,14;79:10;
92:22,25;110:3,20;
113:2;120:7,8;133:23;
147:5;174:1;175:9;
178:4;202:3
**calling (7)**
10:12;50:8;82:2;
123:13,15;173:22;
175:4
**calls (5)**
82:24;84:7;85:2;
86:7;110:22
**came (20)**
11:1;17:6,7,18;
25:12;28:23;36:1;
45:19;46:19;57:6;75:4;
77:22,25;78:2;81:22;
105:24;136:10;146:23;
191:13;208:16
**can (178)**
4:8,21;5:12;6:18;
7:12,19;8:2;15:20;
17:9;18:4;19:19;21:20;
24:4,20;25:16,18;26:5;
27:8;28:5,11;32:3;
34:18;36:15;38:12;
45:4;48:9;51:19,24;
52:2;53:10,14;54:5;
56:9,19;57:8;58:13;
60:5;61:25;64:12,17;
66:1;67:7,11;68:5,10,
13;69:18,23;71:22;
72:6;73:13,13,25;
74:10,24;78:20,23;
79:14;80:24;82:17;
84:13;85:7;87:5;88:16;
90:17;92:13;94:1,5;
95:6,10;96:22;98:4,22,
25;101:23;102:23;

103:21;104:19;105:2,
15;106:5;108:11;
110:12;112:14,21;
113:5;115:1,2,16,19;
116:10;117:18;118:5,
15;119:22;120:23;
125:1,15,22;126:17,21;
127:8,24;128:12,14,16,
17;135:14;136:13;
141:24;142:22;144:3;
145:24;146:16,20;
148:3,23,25;149:2;
150:3,15;152:21,24;
153:4;154:3;155:17;
156:10;168:16;169:7;
173:14;174:10;176:25;
178:1,25;179:22;
180:12;182:18,21;
183:5,7;184:1;185:9;
187:22;188:16,23;
189:13;190:8;191:25;
193:18;195:15,18,19,
21;198:8,15;199:21;
200:12;201:20;202:11;
203:25;204:11;212:4;
213:5;215:3,4,25;
216:21;217:7,12,15,21;
219:3;221:2;224:12;
225:2,9,15,24
**capability (2)**
19:2;143:16
**capacities (1)**
75:18
**capacity (2)**
75:24;78:6
**capital (1)**
87:1
**Captain (17)**
8:9,12;9:13;10:8,17;
11:4;14:25;15:24;
17:11;21:21;32:12;
41:15;92:16;173:21;
175:4,6;211:6
**captains (4)**
32:13;58:21;145:17;
150:2
**capture (1)**
111:9
**care (6)**
13:1;64:4;70:2,4;
92:1;93:14
**carefully (1)**
110:14
**carry (8)**
29:24;147:19;
171:11;175:8;181:8;
182:1,3;192:10
**carrying (1)**
181:12
**cart (1)**
12:12
**case (48)**
5:3;18:8;48:12;49:6;

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 63 of 85

65:10;67:18;69:25;
70:8,17;71:8,9;72:18;
73:1,7;88:13;96:17,20;
105:14;115:3;116:13,
14;117:4,14;122:6;
135:6;140:14;141:13;
142:21;144:14;162:9;
163:1;170:7,15,16,20,
21;171:1,5;185:21;
186:7;198:2;199:14;
212:20;221:5;222:1;
223:16;224:2,4

**cases (9)**
4:18;67:15,20;69:16;
70:6;72:22;117:5,9,16

**casework (1)**
58:22

**Castle (5)**
75:8,20;76:5,8;78:4

**catch (2)**
109:6;124:21

**catches (1)**
123:7

**categories (1)**
68:24

**caught (2)**
168:15;179:16

**cause (1)**
218:7

**caused (3)**
11:18;126:7;203:12

**causing (1)**
198:5

**C-cell (1)**
176:6

**cell (165)**
8:24;9:2,5,7,15,16,
20;10:1,3,18;11:6,10,
13;12:9;13:23;14:6,7,
9,22;15:1,6;16:9,13,21;
20:7;27:13;28:5,6;
29:25;31:25;39:3,4;
40:3,24;41:19;42:4,16,
24;44:6;46:2;47:16,18,
25;85:24;88:9,9,11,12,
16;103:2,9;104:12;
106:10,14,16,23;
108:21;112:22;113:6,
9,25;114:5,24;116:6;
119:17;120:5,12,21;
121:4,11,15,18,19;
122:4,10,23;124:8;
126:16;127:5,23;
128:4,19;140:9;155:9,
10;161:17;167:5,12,
19;168:1,11;172:18;
174:4,14,20;175:5,8,
10;176:3,5,7,9,11,17,
25;177:2,5,11,17;
179:1,3,20;180:16,19;
181:5,6;182:4,5,6,22,
23;183:8,19,20;184:5,
5,25;185:7,10;186:4,

21;187:1,5,23,24;
190:5,7,20;191:1,5,21;
193:21;194:2,4,13,14,
15,17,21;195:14,22,24;
196:14;197:3,8;
198:21,22;199:3,10;
210:12;211:8,12,14;
212:24;213:12

**cells (33)**
8:15;28:6,7;32:1,5;
43:21,23;86:12;
122:14,18;125:19;
126:18;128:13,13;
156:7;157:8,11;
176:17;181:14,23;
182:2,14;183:7;
184:15;187:6;192:11;
195:5;215:24;217:22;
218:2,11,19;219:3

**center (10)**
10:6,21;11:2;17:20,
25;18:2,5,25;19:5;
21:13

**central (7)**
18:21;19:3,4,15;
81:25;151:17,20

**certain (1)**
113:16

**Certainly (8)**
94:14;105:12;
121:16;122:7;123:12;
153:9;160:13;196:15

**certificate (5)**
74:14;132:20;
135:13,18,19

**certificates (2)**
74:8,19

**Certification (3)**
33:13,14;147:19

**certified (4)**
33:18;147:17,17;
153:24

**cetera (1)**
178:23

**chain (7)**
19:9;92:9;97:12;
151:8,10;180:3;220:9

**challenged (1)**
13:12

**chance (1)**
206:23

**change (7)**
63:16;79:13;152:21;
153:6;204:12;209:12,
14

**changed (4)**
92:20;107:18;
130:20;204:14

**changes (7)**
23:14;25:4;26:2,7;
27:15;56:17;146:20

**changing (2)**
96:11;153:9

**chaos (2)**
46:6;164:20

**chaplain (1)**
49:18

**characterization (1)**
217:11

**charge (15)**
89:9;105:5;150:8;
179:15,19;181:3,4;
182:3;183:17;186:19,
22;187:16;188:6;
190:22;212:11

**charged (1)**
126:6

**chases (1)**
28:9

**chat (1)**
117:23

**check (20)**
53:15;57:3,7,10;
59:7,8,18;91:2;95:24;
100:14;104:20;109:10;
143:14;166:4;191:16,
25;192:2,20;193:19;
194:12

**checking (3)**
14:23;192:11,12

**Checkpoint (11)**
11:11,12,16,18,19;
13:5,8;39:19;42:18;
43:10;213:13

**checks (8)**
40:6;61:3;89:25;
192:19,22;193:7,16,25

**chest (1)**
37:4

**Chicago (1)**
63:25

**chief (7)**
22:24;23:9,20;25:9;
30:9,16;71:4

**chiefly (1)**
88:3

**Chip (6)**
28:24;30:8,11,16;
131:13;147:14

**choose (1)**
183:8

**choosing (1)**
162:4

**chow (1)**
112:2

**Christina (1)**
97:21

**CIF (2)**
75:19;76:3

**cigarette (1)**
125:15

**circular (1)**
90:7

**circulate (1)**
65:3

**circumstance (1)**

162:8

**circumstances (1)**
159:22

**cite (4)**
105:15;132:11;
134:25;143:22

**cited (6)**
91:14,19;129:23;
132:19,22;134:24

**cites (3)**
88:6;129:20;132:13

**citing (2)**
143:12;144:2

**city (6)**
29:14;147:19,23;
148:14;149:1,4

**city's (1)**
148:11

**civil (2)**
71:19,23

**claims (3)**
70:21,25;71:9

**clarification (3)**
59:20;121:6;208:14

**clarified (1)**
186:3

**clarify (4)**
5:18,21;181:20;
188:14

**class (2)**
59:11,12

**classroom (3)**
34:16;165:23;167:2

**clean (1)**
87:7

**clear (10)**
7:13;57:25;98:18;
112:3;117:12;153:8;
169:2,13;188:9;221:20

**cleared (3)**
20:4,6,10

**clearly (2)**
160:12;186:12

**client (5)**
224:14,19,25;225:8,
23

**close (3)**
93:23;94:2;98:8

**closed (2)**
191:7;194:16

**closely (2)**
93:17;110:2

**closes (1)**
178:5

**clothes (1)**
10:11

**clutter (2)**
218:10,18

**code (6)**
175:14,15,18,23,25;
178:7

**cold (12)**
11:15;114:1,5,7,9;

116:7;117:2;118:15,
19;119:2,6,14

**collaborated (1)**
149:9

**collaboration (2)**
149:4;150:13

**colleagues (1)**
223:3

**college (2)**
63:20,22

**column (1)**
134:21

**combat (2)**
78:8,11

**comfortable (1)**
173:4

**coming (7)**
10:25;13:15;95:20;
110:5;195:13;196:3;
208:22

**command (16)**
10:6,21;11:2;17:19,
25;18:2,5,25;19:4,9;
21:13;92:9;151:8,10;
180:3;220:9

**commander (2)**
18:15;175:7

**commanders (2)**
18:10,15

**comment (2)**
214:19;215:11

**commissioner (10)**
35:15;76:16,24;77:4;
97:20;98:9;99:20;
100:12;220:5,6

**commissioner's (1)**
19:4

**committee (4)**
62:20,23;63:3;202:4

**common (6)**
61:8;134:7;168:6;
175:12,24;196:13

**communicate (8)**
41:14,15;94:5;103:1,
13;194:3,11;195:4

**communicated (1)**
161:25

**communicating (3)**
19:8,11;103:8

**communication (14)**
11:4;16:24;18:9;
149:24,24;210:22;
211:2,6,10,13,17,21;
212:6;221:18

**community (1)**
76:23

**compilation (1)**
91:12

**compiled (2)**
51:21;59:1

**compiles (1)**
107:25

**complained (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGC

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 64 of 85

32:4
**complaint (1)**
119:10
**complaints (8)**
61:23,24;85:4;116:5;
118:23;119:4,7,13
**complete (10)**
20:17;90:18;151:3;
189:10,16,20;190:3,9,
16;191:23
**completed (3)**
77:16;142:10;190:22
**completely (2)**
99:24;212:1
**completing (2)**
189:6,22
**completion (4)**
130:8;132:21;135:8,
13
**Complex (1)**
75:13
**compliance (2)**
135:18,20
**complicated (1)**
5:13
**compressed (1)**
29:9
**comprised (1)**
84:17
**computer (2)**
40:13;189:9
**computer-based (1)**
151:2
**concern (6)**
124:23;161:6;199:5,
6;206:4;214:9
**concerning (7)**
69:4,10,20;71:13;
72:12;117:16;159:1
**concerns (6)**
27:18;59:19;86:24;
160:20;191:19;199:1
**conclude (1)**
210:2
**concluded (2)**
170:23;227:6
**conclusion (2)**
21:13;170:17
**conclusions (1)**
136:15
**condition (5)**
88:1;94:24;100:18;
101:4;103:24
**conditioned (1)**
201:9
**conditions (2)**
6:21,25
**conduct (9)**
36:12;58:23;66:20;
126:10;142:2;159:14;
162:7;167:4;193:16
**conducted (18)**
30:8;34:25;35:19;

53:11,18;153:17;
154:16,20;155:2;
156:16,20;158:4,8;
160:8;170:8;192:22,
23,24
**conducting (2)**
117:14;192:19
**conducts (2)**
125:14;130:11
**conference (3)**
15:11;71:3,10
**conferencing (1)**
19:2
**confirm (2)**
103:23;105:18
**conflict (1)**
63:12
**confusing (1)**
56:25
**confusion (3)**
5:16,21;42:6
**connected (2)**
49:20;207:21
**consider (1)**
102:24
**considered (1)**
136:19
**considering (1)**
66:17
**consistent (6)**
95:17;186:18;
187:12,14;188:19;
189:13
**constant (1)**
180:21
**construction (7)**
31:6;84:25;127:3;
128:21;129:14;131:18;
176:11
**construed (1)**
23:3
**contact (2)**
98:4;111:15
**contacting (1)**
50:1
**contain (1)**
134:5
**containers (1)**
47:17
**contains (3)**
91:3;109:19;133:22
**content (4)**
150:15;224:18;
225:22,22
**contents (1)**
34:2
**continually (1)**
128:10
**continued (2)**
41:6;186:7
**continuing (3)**
101:15,17,20
**contraband (1)**

125:8
**control (11)**
10:5;11:25;42:19;
143:17;146:5,12;
176:24;177:22;184:18;
187:6;213:6
**controlled (6)**
39:16;112:25;123:1,
23;124:5;178:21
**controlling (1)**
182:14
**controls (1)**
184:15
**convenience (1)**
169:4
**convenient (1)**
206:10
**convening (1)**
207:2
**conversation (16)**
10:8,24;22:16;28:13;
38:16;48:1,21;50:14;
81:12;112:20;159:25;
160:22;212:20;222:17,
25;224:14
**conversations (7)**
24:19;34:21;106:2;
154:5;206:15;223:4;
224:3
**convicted (1)**
73:10
**cool (3)**
11:14;201:6,8
**cool-down (1)**
201:10
**cooling (1)**
24:15
**cool-off (1)**
201:7
**cooperatively (1)**
154:8
**coordinate (2)**
211:16;217:8
**coordinates (1)**
30:12
**coordination (2)**
140:19;147:13
**coordinator (6)**
61:15;63:11,14;95:5;
144:21;223:6
**copy (8)**
37:23;38:7;109:16;
135:21,22;142:6,9,10
**coronavirus (1)**
60:11
**coroner's (2)**
20:1;140:20
**Corporation (1)**
76:8
**corrected (1)**
90:12
**Correction (22)**
30:19,22;36:11;

56:22;60:8;66:4;68:22;
76:20;86:18;130:22;
133:23;134:6,21;
135:1,3;141:15;148:9;
151:17,19;158:23;
165:21;166:14
**correctional (19)**
58:24;60:21;71:14;
72:13,18;75:13,16,16,
20,22;76:22;77:1;80:6;
135:23;151:15;165:17;
166:15,20;167:6
**Corrections (4)**
30:17;78:21;79:17;
113:23
**corrective (1)**
134:3
**cost (1)**
187:7
**counsel (4)**
4:21;71:5;221:18;
225:21
**country (1)**
147:24
**counts (1)**
112:3
**county (1)**
20:1
**couple (14)**
8:6;14:19;22:16;
28:23;29:4;32:24;36:2;
61:13;75:18;92:21;
111:11;169:10;173:6;
213:25
**course (8)**
14:17;40:17;72:2;
81:24;84:11;165:12;
178:12;219:20
**courses (3)**
74:5,12;152:21
**COURT (19)**
39:8;69:15;70:7,9,
18;72:25;73:2,4,7,8;
109:7,13;199:25;
200:1,5;225:17;226:4,
22;227:1
**cover (2)**
27:25;182:17
**covered (1)**
152:19
**covers (2)**
48:5;224:4
**COVID-19 (1)**
62:16
**CPR (1)**
14:23
**crash (1)**
12:12
**create (4)**
18:24;63:8;90:25;
222:25
**created (9)**
34:1;42:5;46:5;89:1;

93:10;94:22;99:5;
106:6;204:1
**creating (2)**
152:13;188:13
**credible (1)**
149:14
**credit (1)**
74:15
**crime (1)**
73:11
**criminal (2)**
73:15,20
**critical (5)**
51:9,13,15;94:6;
185:8
**critically (1)**
37:6
**CROSS (1)**
226:5
**crowd (3)**
10:5;11:25;213:5
**crying (1)**
47:14
**cumbersome (1)**
184:2
**current (1)**
87:17
**currently (2)**
28:21;226:8
**curriculum (8)**
150:23;152:16,18,
22,24;153:3,7,9
**Curry (23)**
35:17,21;36:1,9;
37:15;38:17;39:6,9;
40:19;42:7,13;44:7,20;
45:22;201:14;204:7,9,
11;207:2;209:20,24;
210:18;213:7
**C-U-R-R-Y (1)**
36:9
**Curry's (1)**
215:12
**custody (29)**
32:11;50:1;69:5,7,
11,21;84:20;91:23,24;
92:8,12,13;93:15,20;
97:11;98:4,12,15;
102:22;108:12,14,18;
144:21,24;150:13;
184:20;190:8;207:18,
21
**cut (5)**
39:9;42:11;97:1;
110:19;193:23

**D**

**daily (11)**
87:7;106:19,24;
107:1,4,22;109:16;
111:16,19;123:3;
202:15

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 65 of 85
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

**damage (6)**
11:18;123:9,14;
124:18,22;126:7
**damaged (5)**
97:16;100:4;144:13;
213:14;214:1
**damaging (1)**
128:10
**Danielle (1)**
87:17
**dash (1)**
133:16
**database (2)**
117:5,8
**date (6)**
57:1;101:8;113:18;
134:22;135:1;203:6
**daughter (2)**
63:25;64:4
**day (32)**
20:22;24:11;71:25;
82:18;83:2,6,24;84:4,8,
9;104:3;106:3,12;
108:3,4;109:18;
118:18;144:9;145:6,7;
146:2,3,8;159:12;
180:8;185:1;200:13;
201:24;202:14;205:16;
206:9;226:10
**days (18)**
53:21;64:8,9,15,17;
79:10;81:13,20;83:19;
131:25;134:4,25;
135:11;164:14;198:15,
24;199:12;201:6
**day's (1)**
202:6
**day-to-day (1)**
111:20
**D-cell (14)**
120:13,18,21;121:2,
3,5,10,15;122:8,11;
123:18;126:13;128:6;
177:8
**dead (3)**
139:4,9;143:21
**deadline (2)**
90:8,10
**deadlines (1)**
90:13
**deafening (2)**
197:5;212:7
**deal (6)**
10:22;16:20;51:12;
64:8;83:5;199:7
**dealt (1)**
145:2
**death (7)**
49:14;138:15;
203:13;209:13,15;
216:12,15
**debriefing (4)**
215:18,22;216:4,6

**December (1)**
79:2
**decide (2)**
114:11,13
**decided (1)**
153:12
**decides (1)**
35:10
**deciding (1)**
198:9
**decision (6)**
41:18;42:22;76:19;
80:25;191:22;210:11
**decision-making (1)**
163:20
**deemed (1)**
171:18
**defend (1)**
211:18
**defendant (9)**
65:4;67:17,20,25;
68:3,15;71:23;72:17,
23
**defendants (3)**
4:22;65:10;96:17
**defending (2)**
43:5;44:11
**defensive (1)**
210:15
**deficiencies (8)**
87:9,10,13;88:7;
91:13;129:20;131:2,6
**deficiency (3)**
88:8,22;90:12
**degree (7)**
73:15,17;74:12,20;
76:11;77:16,16
**degrees (3)**
74:7,18;114:5
**delay (2)**
114:15,18
**Denise (1)**
5:4
**department (55)**
23:10;24:9,11,21;
29:19;30:17,19,21;
33:9,18,23;36:11;
56:21;60:7;66:3;68:22;
71:5;76:19;79:17;
84:15;86:17;89:9;
113:23;130:21;133:3,
4;134:2,16;140:18;
141:15;148:9,11;
149:1,5,7,10;150:10,
22;151:4,5,7,16,18,19,
20,21,23,23;152:2,11;
153:19;158:22;165:21;
166:14;202:2
**departments (3)**
29:14;147:23,25
**department's (1)**
135:21
**department-wide (2)**

151:5;152:17
**depending (2)**
100:3;179:6
**depends (15)**
83:18;85:20;90:4;
113:24;120:1,15,15;
131:8;133:11;134:9;
177:7;179:9;195:23;
197:2,9
**deploy (1)**
28:2
**deposed (5)**
5:7;67:12;68:14,17,
25
**deposition (22)**
48:8,10;49:2,8;
67:11,16,21,24;68:2;
69:4,10,14,20;70:10;
71:13;116:17;117:8;
173:19;189:4;200:8;
211:5;224:19
**deputy (22)**
18:19;35:15;49:17;
59:14;79:10;84:18;
92:16,18,21,24;97:19;
98:9,24;132:6;144:22;
147:4;158:14;201:25,
25;202:7;219:11;220:5
**derelict (1)**
172:23
**dereliction (2)**
105:4;171:3
**describe (3)**
95:4;178:1;207:25
**described (4)**
14:15;39:24;40:16;
171:13
**describing (3)**
40:2;41:10;207:15
**designated (5)**
179:25;181:1;201:7,
9;212:18
**designation (1)**
179:23
**desktop (1)**
107:16
**destruction (3)**
126:1,5;149:13
**detail (2)**
140:10,11
**details (6)**
52:13,14;89:22;
102:16;111:11;134:1
**determinations (1)**
136:20
**determine (4)**
106:18;169:21;
195:9;196:2
**determining (1)**
115:7
**developed (1)**
152:16
**development (1)**

152:16
**develops (1)**
87:9
**device (1)**
124:13
**devices (1)**
127:11
**devil's (1)**
40:19
**Devine (38)**
5:6;12:6,7;14:10,21;
20:3;32:24;34:22;
35:24;47:19;48:4;
49:10,16,21;52:9;53:8;
56:3;57:23;58:10;
65:25;66:8;96:18;97:5;
102:19;121:14,20;
122:7;136:2;138:16;
149:23;174:6;177:12;
207:11;209:6;210:1;
216:10;218:9;219:25
**Devine's (19)**
46:13;49:11,25;50:9;
121:1,16;122:6,11;
158:19;162:9;163:8;
168:11;172:18;203:13;
209:13,15;210:10;
216:12,15
**dialogue (1)**
32:15
**dictate (2)**
180:13;198:23
**dictates (3)**
38:20;43:22;198:12
**died (1)**
214:21
**difference (1)**
196:20
**different (34)**
11:23;13:4;18:13;
55:10;56:5;75:18;
82:20;92:18;106:7;
109:1,3,11;113:22;
120:10;126:12;135:7;
139:1;140:16;155:20;
156:25;163:11;165:2,
12;179:5,6;187:2;
188:12;190:9;191:5;
197:18;200:13;212:1;
219:22;222:24
**differentiate (1)**
197:22
**difficult (5)**
27:13;51:13;167:15;
193:8;197:21
**difficulties (2)**
22:11,13
**difficulty (1)**
68:9
**DIRECT (2)**
4:6;86:21
**directed (4)**
35:14,22,25;156:18

**directing (2)**
116:22,24
**direction (2)**
9:12;141:3
**directly (14)**
17:18;18:16;19:3;
22:10;29:11;61:20;
63:2;82:11;86:22;98:5;
151:9;202:12,12;
215:19
**director (25)**
10:14;28:24;31:2,3,
5;35:16,21;36:1,10;
37:14;38:17;40:19;
44:19;45:21;76:23;
84:19,19;86:21;
129:25;130:18;132:5;
134:17;147:6,7;220:4
**directors (1)**
35:18
**disagree (2)**
46:10;224:20
**disagreement (2)**
79:21;82:12
**discharge (1)**
78:17
**disciplinary (8)**
80:20;85:22;126:9,
10,15;170:3;171:9;
172:13
**discipline (12)**
66:7,14,18,20;67:1,
3;79:15;160:24;
169:17;171:11;172:6;
193:2
**disciplined (6)**
104:22;105:6,13,15;
171:20;172:4
**discovery (4)**
116:13;117:14;
141:20;203:5
**discuss (9)**
26:7;32:17;34:11;
86:24;131:4;150:3;
221:8;224:17;225:21
**discussed (20)**
27:18;28:22;29:16,
17;149:23;170:13;
185:25;202:19,22;
207:15;208:20,20;
210:22,25;211:2,4,17;
214:6;221:11;224:1
**discusses (1)**
104:2
**discussing (3)**
27:10;210:5;218:5
**discussion (16)**
14:24;23:15;34:2;
36:24;43:19;44:1;
46:11;52:1;68:8;
112:11;118:3;212:3;
214:10;216:2;222:15;
223:3

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 66 of 85

RON NEAL
July 15, 2020

**disgruntled (1)**
144:1
**disk (2)**
205:22,23
**dismiss (1)**
70:17
**dismissed (3)**
70:15,18;209:23
**dispensers (1)**
29:6
**dispute (2)**
53:3,6
**distinguish (1)**
197:15
**Dive (2)**
62:12;83:23
**division (4)**
133:18;141:4,5,16
**Dixie (3)**
65:11,14,15
**DOC (3)**
61:8;72:25;129:14
**DOC's (1)**
22:23
**Document (44)**
52:4,8;55:24;56:2,5;
57:20;65:5;87:25;
102:14;108:16;109:19;
129:2,10;133:2,21;
134:5,7,10;135:25;
136:3,7;137:11,12,14,
15,17,20;141:18,19,21;
174:7,10,12,21;203:4,
5,7,8,13;204:1,11,13;
206:6;215:20
**documentation (3)**
34:1;94:22;202:17
**documented (3)**
37:13,19;124:1
**documents (7)**
7:16,20;48:9;49:7;
94:19;99:5;222:6
**dollars (2)**
51:11;187:4
**done (25)**
19:25,25;33:24;
36:22;37:8;40:8,10;
42:1;44:9;46:13;51:6;
57:11;58:25;61:9;81:9;
86:25;87:7,11;93:13;
97:5;126:20;129:12;
140:17;190:17;220:7
**door (45)**
8:7;11:10,13;12:11;
13:21;14:2,3,5,8,13,19,
20;15:4,5;18:23;39:3,
13;42:6;46:1;47:20,20;
60:18;83:16,19;
178:10;179:11;181:14,
15;183:25;184:4;
191:7,7;194:16;197:6;
207:16,18,19,20,21,24,
25;208:3,4,4;213:4

**doors (4)**
42:2;161:15;181:22;
183:25
**doubt (2)**
166:8;210:18
**Doug (1)**
98:13
**down (38)**
9:20;11:11;17:6;
36:4;39:18;42:14,15,
19;43:3;44:13;45:24;
61:1;79:22,24;80:1;
81:1,10,14,15,16;82:3,
5,10;113:14;114:8;
126:17;132:2;133:2;
145:19;184:8,10;
191:11;193:9;196:24;
201:8;208:16;213:1;
215:4
**downstairs (2)**
41:9;47:1
**downward (1)**
161:20
**drainage (1)**
131:21
**draw (4)**
133:1,3;135:24;
137:25
**drawn (1)**
136:16
**dressed (2)**
14:17;17:2
**dressing (1)**
10:11
**drill (19)**
154:25;155:4,5;
156:6,7;158:21;159:4,
6,10,15;160:16,18;
162:8,20,21;164:10,16,
17;167:6
**drills (28)**
149:3;154:16,19;
155:19,25;156:2,16,20,
23;157:5,15,19,20;
158:3,8,9;159:23;
160:6,21,21,24;161:9;
163:12;166:5;214:5,
11;215:7,10
**dropped (2)**
110:9;112:7
**drops (1)**
84:24
**drug (2)**
73:6;84:24
**drugs (2)**
81:3;125:8
**Dudley (7)**
28:25;30:8,16;33:16;
131:13;140:19;147:7
**due (3)**
14:5;138:4;199:8
**duly (1)**
4:3

**during (59)**
17:20;18:1;19:9,10;
21:5,10,11;24:11,20;
31:15;32:23;34:3;
37:17,20;46:11,19;
47:13;59:11;77:14;
78:8;79:15;83:12;
100:4;103:19;109:21;
119:22;120:24;127:25;
140:8;143:7;146:22;
153:6;157:17,24;
158:9,22;159:17,24;
160:2,12;161:11;
163:4;170:2,10;
180:19;188:5;189:16;
190:3;202:19,22,25;
210:15;211:2;212:3;
213:21;214:6;215:10;
218:6;225:23
**duties (6)**
24:13;160:2;164:19;
165:21;172:24;221:13
**duty (5)**
105:5;165:24,25;
166:1;171:3
**Dwyer (1)**
5:4
**Dykstra (13)**
8:10,12;9:13;10:9,
17;11:4;14:25;15:24;
17:11;21:21;173:21;
175:4,6

**E**

**earlier (22)**
57:10;120:2;123:4,
20;124:24;126:14;
131:14;134:24;145:4;
147:17,21;149:22;
170:13;186:1,3;193:5;
200:7;203:17;208:9;
210:5;212:22;226:7
**early (2)**
21:1;77:7
**easily (1)**
25:25
**easy (1)**
211:23
**EBT (1)**
152:20
**E-cell (1)**
176:6
**echo (1)**
194:22
**educational (2)**
73:14;74:19
**effective (2)**
65:13;212:9
**effectively (1)**
94:5
**efficiently (1)**
46:2

**efforts (1)**
84:25
**either (13)**
61:6;77:6;79:6;81:4;
86:1,7;121:10;182:12,
19;183:7;187:20;
190:2;222:17
**electric (1)**
129:1
**electrical (7)**
124:12;126:23;
127:11,12,22;128:3,19
**electricians (1)**
128:7
**electricity (2)**
125:14;127:14
**electronic (7)**
177:22;178:1,3,21;
182:13,24;226:20
**electronically (2)**
14:3;182:22
**elevated (1)**
195:6
**elicit (1)**
125:4
**else (18)**
7:18,20;15:16;34:18;
35:2;48:3;49:15;53:11;
57:5;66:14,25;126:20;
150:21;166:18;198:4;
201:14;205:3;224:7
**E-mail (10)**
52:10,11,15,19,24;
56:16;65:10;99:12;
107:23;141:19
**E-mails (1)**
82:25
**emergency (26)**
11:21;17:19,20,24;
18:1,2,5,6,12,25;19:10;
21:6,11,12;35:9,16,20;
36:10;140:2;185:8;
196:25;197:23,25;
210:23;211:22;212:19
**emergent (2)**
12:25;195:11
**emotional (1)**
48:1
**emphasize (1)**
180:10
**employee (20)**
58:18;59:4;61:22;
62:1,20,23,24;63:3,17,
23;66:3;68:20;76:17;
79:16;105:5;130:22;
152:19;170:11;171:10;
178:6
**employees (13)**
26:23;58:16;59:10,
23,25;61:20,21;62:17;
63:2,6,19;83:9;189:21
**employee's (2)**
53:22;62:18

**employment (4)**
53:5;56:21;59:5;
68:25
**emptied (1)**
47:17
**en (2)**
11:22;210:13
**enable (2)**
181:5;182:4
**encase (1)**
27:25
**encountered (1)**
39:20
**end (25)**
25:24;27:19;28:10;
36:23;44:19;51:22;
64:9,17;111:1;119:8;
132:1;143:11;170:12;
173:17;182:14,16;
183:4,6,9;189:11,23;
192:15;204:25;209:16;
227:4
**ended (6)**
28:1,13;29:17;46:10;
50:25;81:12
**enemies (1)**
44:22
**enforce (1)**
219:24
**engineers (1)**
127:3
**enlisted (2)**
77:17,20
**enough (9)**
41:21,22;59:4;114:7;
159:14;167:18;180:1;
190:12;225:10
**enroll (1)**
73:22
**enrolled (1)**
74:8
**ensure (16)**
87:14;90:1;104:3,17,
23;128:2;139:12;
153:13;154:15;157:14,
15;162:2;163:13;
164:25;185:6,9
**ensures (1)**
87:6
**ensuring (3)**
88:4;94:7;150:18
**entail (4)**
155:6,7,8,12
**enter (3)**
111:23;133:23;
195:14
**entering (1)**
17:17
**entertaining (1)**
198:4
**entire (6)**
10:1;79:21,23;100:7;
182:19,20

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-9 filed 03/29/21 page 67 of 85

**entirely (1)**
182:8
**entirety (2)**
6:12,15
**entitled (3)**
135:25;141:15;203:6
**entrance (3)**
22:5,11;207:19
**entries (1)**
133:7
**entry (3)**
174:18;212:10;214:4
**enveloping (1)**
140:9
**environment (2)**
54:12;197:7
**envision (1)**
182:16
**equipment (29)**
13:25;29:4,22,24;
31:12;33:8,19,20;
34:14;86:15,18;87:4,
15,23,25;90:1,9,10,13,
14;91:21;146:25;
147:10,11,12,20,22;
148:7;149:8
**equivalent (1)**
218:22
**ERO (2)**
35:20;36:10
**escaped (3)**
80:4,4,12
**escorted (1)**
81:23
**escorting (1)**
81:18
**especially (9)**
5:11;6:2,11;9:15;
51:8;145:12;163:22;
198:20;199:12
**E-squad (4)**
11:21;18:11,12;
175:7
**essentially (1)**
77:9
**establish (2)**
11:3,3
**Estate (1)**
5:5
**estimate (2)**
71:22;120:17
**et (1)**
178:23
**evacuate (15)**
9:6,13,18;30:3;
38:20,22;41:18;42:24;
155:9,10;162:21;
167:21,25;168:4;
210:12
**evacuated (6)**
10:3;15:8;39:20;
42:15;168:5;212:24
**evacuating (5)**

9:25;10:18;11:6;
42:4;168:1
**evacuation (22)**
15:6;29:23;30:2;
33:5;39:4,14,16;42:19;
46:2;148:1;155:8;
159:18;161:3,12,13,14,
17;163:1,4;164:9,11;
167:4
**evacuations (5)**
8:23;16:17,17;38:19;
159:20
**evaluate (1)**
128:19
**even (18)**
13:9;14:9;29:15;
33:22;63:11;90:20;
122:25;124:4;157:18;
164:15;166:6;167:16;
168:21;178:19;186:4;
201:14;210:12;221:6
**evening (9)**
8:4;11:14;21:22,24;
27:11,14;48:15;
172:12;196:15
**event (19)**
8:3;35:5,6,7;110:4;
136:14;142:2;149:18;
154:18;157:16;159:8;
161:12;163:14,19;
165:5;166:18,19;
198:4;219:13
**events (7)**
7:11;61:17,17;62:7;
63:7;83:11;85:14
**everybody (3)**
36:3,18;112:15
**everyone (8)**
44:20,24;60:17;61:4;
173:15;206:7;220:10,
12
**exactly (2)**
102:5;130:17
**EXAMINATION (2)**
4:6;226:5
**examined (1)**
4:3
**example (12)**
38:18;50:6;90:5;
153:1;160:3;170:7;
175:16;180:4;193:21;
194:21;197:2;214:24
**exception (1)**
24:25
**excess (3)**
218:1,9,18
**excited (1)**
8:13
**excitement (1)**
198:5
**exciting (1)**
197:25
**Excuse (3)**

37:18;84:16;142:8
**exec (4)**
71:6;80:14;84:17;
113:11
**executions (1)**
19:7
**executive (5)**
11:20;18:19;75:23;
84:16;220:4
**exertion (1)**
193:13
**exhaust (1)**
113:13
**exhausted (1)**
102:24
**exhausting (1)**
102:12
**Exhibit (25)**
51:18;52:4,8;54:4;
55:24;56:2,20;57:19;
64:24,25;65:5;129:2,6;
136:1,3;141:11,13,21;
174:3,5,7,21;203:3,8;
207:3
**exist (1)**
181:7
**existence (1)**
148:20
**exists (2)**
112:22;187:25
**exit (6)**
51:3,5;53:12,18;
57:9;132:16
**expect (7)**
100:20;104:13,16,
20;111:15;144:7;145:1
**expectation (1)**
104:9
**expected (2)**
49:1;225:23
**expensive (2)**
29:7;99:23
**experience (5)**
100:9;166:13;167:8;
180:14;185:5
**experienced (1)**
15:17
**expert (1)**
71:16
**explain (5)**
39:22;125:1;140:1;
199:22;200:12
**exposed (1)**
128:4
**express (1)**
5:21
**expressed (1)**
210:5
**extended (1)**
135:5
**extension (2)**
134:20;135:6
**extent (3)**

167:20;221:16;
225:21
**exterior (1)**
176:13
**extinguisher (6)**
27:21;28:15,16,21;
85:25;123:8
**extinguishers (7)**
25:20,22;27:16;
31:17;47:18;148:14;
214:25
**extracting (1)**
178:9
**extremely (1)**
113:9
**eye (2)**
93:23;94:2

**F**

**facilitate (1)**
150:12
**facilities (6)**
30:23;60:7;61:8;
100:1;129:16;148:10
**facility (77)**
10:15;11:1;17:3,8,
15;18:2;19:14;20:4;
24:8,10,16,24;25:5,20;
29:19;30:21,23;36:2;
61:19;70:5;71:14;72:3,
14,19;75:20,22;76:1,
22;77:1;79:22,23;80:6,
13;81:1,9,13,14;83:25;
84:22;85:15,19;90:21;
91:7;94:21;97:14;
99:23;109:21,24;
112:24;113:1;114:19;
128:25;129:24;131:7,
15,18,20;132:4;134:13,
14;135:19;148:8;
151:4,7,22;159:8;
165:18;166:20;169:21;
175:7;196:17;200:17;
214:11;216:3,17;
217:18;222:22
**facility-wide (2)**
97:4;101:11
**fact (13)**
53:4;60:10;97:6;
104:4;115:5;123:20;
124:7;138:25;139:13;
158:8;167:10;193:2;
221:3
**factor (1)**
211:19
**factors (2)**
7:5;222:20
**fail (1)**
193:15
**failed (1)**
105:17
**failing (2)**

104:23;164:1
**failure (13)**
138:5,9,22;139:8,15,
20;140:8;142:25;
162:7;164:6;188:3,17;
209:3
**Fair (6)**
43:24,25;88:3;
184:17;195:3;225:10
**fairly (2)**
54:7,8
**falls (1)**
91:24
**familiar (10)**
52:16;56:15;129:9;
137:12,13;174:23,25;
175:2;180:12;198:21
**familiarity (1)**
161:10
**familiarization (1)**
161:16
**family (7)**
49:25;50:9;62:19,24;
64:8,16;85:3
**fan (3)**
133:16,19;134:24
**fans (1)**
113:13
**far (6)**
115:13;120:14;
150:10;154:3;157:1;
208:13
**fashion (2)**
39:15;55:11
**fast (1)**
32:6
**faster (2)**
31:25;149:11
**fault (2)**
143:13;170:18
**faulty (1)**
124:12
**feed (1)**
205:24
**feel (4)**
5:17;32:5;118:14;
170:21
**feeling (1)**
47:24
**feels (1)**
59:3
**feet (4)**
8:7;11:12;17:4;84:5
**fellow (1)**
105:9
**felt (9)**
43:1,11;45:1,2,5;
46:4,7;210:9;213:22
**female (1)**
54:9
**females (1)**
55:7
**fence (5)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 68 of 85
RON NEAL
July 15, 2020

80:5,8,10,12,14
**few (12)**
9:22;10:6;17:4;43:8;
57:14;61:5;74:5;76:4;
81:17;119:7;169:6;
179:12
**field (4)**
18:10;19:13,14;
145:12
**fielding (1)**
82:24
**fight (2)**
44:23;83:2
**fights (1)**
84:22
**figure (1)**
31:23
**file (20)**
26:12;38:10;48:13;
49:6;53:15,23;57:11;
63:4;65:9;66:11;
135:21,23;136:11;
142:21;168:20;170:5,
12;171:1;185:21;
190:14
**filed (2)**
68:21;223:16
**files (3)**
170:21;171:7;217:8
**filing (1)**
50:10
**fill (2)**
110:12;189:10
**filled (3)**
29:8;94:25;167:20
**filling (1)**
44:7
**finally (3)**
12:11;13:18;41:1
**finance (3)**
97:20;99:20;100:12
**find (3)**
83:25;186:15;217:3
**finding (1)**
125:12
**finds (1)**
88:7
**fine (12)**
5:19;10:2;101:19;
111:10;115:16;116:12;
169:8,9;182:11;225:4,
7,19
**finish (3)**
6:12,14;10:3
**finished (7)**
40:5;75:4,5;77:15,
23,25;132:8
**fire (257)**
7:25;8:15,20,22,24;
9:2,19;10:18;11:17;
12:15,15,17;13:8,17,
25;14:5,6,18;15:18,23;
16:6,12,13,22,22;18:7;

22:18,21,23;23:8,10,
12,19;24:9,10,12,21;
25:10,14,19,21;27:10,
16,21;28:15,16,20;
29:2,13,14,19,24;30:9,
16,24;32:2,24;33:9,18,
22,23;34:22;35:1,24;
36:4;38:18,19;41:8,13;
47:4,18,22;48:4,13;
49:1,13;50:20,23;53:8;
57:23;58:10;65:25;
66:8;71:14;72:13,18,
21;85:10,19,21,23,25;
96:18;97:5;102:19;
115:9;116:9;119:24;
120:3,4,12;121:1,9,18,
24;122:4,9,22,23,25;
25;123:5,6,7,8,21;
124:2,3,6,8,10,21;
125:15;128:23;129:6,
21;130:9,11;131:11,
13;138:15;139:17;
140:9;147:23,24;
148:11,12,13,25;149:1,
3,4,7,10,18,23;150:9;
153:24;154:5,13,16,18,
19,24;155:4,5,19,25;
156:2,6,16,20,23;
157:5,14,17,19,20,24;
158:3,8,9,19,21;159:4,
6,10,14,18,23;160:5,9,
9,15,18,20,21,24;
161:8;162:2,3,8,19,20;
163:1,9,12,14,19,21;
164:2,22,24,25;165:6,
17;166:5,18,20;167:6,
17;168:10;169:24;
170:8,10;171:19,24;
172:8,18;179:11;
183:25;186:12;189:5;
191:10,12,18;200:25;
201:1;202:24,25;
203:12;205:9,17;
208:15,18;209:25;
214:4,11,20,25;215:7,
9;216:10,12,14,19;
217:17;218:7,8,11,13;
219:4,6,25;221:1,7;
223:11
**firefighter (14)**
24:3;29:10;30:13;
33:13,14;146:15,16,21,
24;147:8,19;148:4,10;
154:10
**firefighters (27)**
12:21;13:6,7,9,11,
18;14:4;16:8;21:15;
22:1,10;23:20;25:10;
26:20;31:1,9,14,19;
32:22;85:9,12;147:18;
149:16;150:14;199:19;
200:8,23
**firefighting (2)**

29:14;150:10
**firemen (8)**
14:1,19;25:6,7;26:1;
29:17;30:7;32:10
**fires (20)**
86:3,8,11,11;115:6;
120:9,10,18,19,20;
121:13;122:8,14;
124:15,15;126:14;
128:7,11;202:19,22
**first (44)**
4:2;5:15;7:9;12:14,
15,15;22;17:16;31:3,4;
38:20,25;39:11;41:3;
45:25;46:23;47:11;
73:22;78:23,25;79:3;
108:10;131:5;132:12,
24;133:12;137:11;
138:24;146:17,23;
147:2,9;157:25;168:1;
203:22,23;205:11,14;
207:1,9;212:11,17;
213:3;220:23;221:2
**fit (1)**
152:22
**five (18)**
28:6;61:2;67:14;
81:20;96:1;120:17;
134:25;152:1;176:14,
14,15;183:18,18,23;
184:13;193:9;224:13;
225:11
**fix (4)**
130:4;132:20;
134:19;144:11
**fixed (3)**
87:15;93:21;135:16
**fixing (1)**
144:13
**fixture (1)**
88:18
**flag (5)**
47:1;106:17;191:3,5;
194:23
**flames (3)**
13:22;47:22;124:20
**flights (2)**
61:2;208:16
**flip (2)**
5:20;182:21
**flipping (1)**
182:20
**floor (2)**
151:25;168:3
**flowers (1)**
62:24
**fluent (1)**
168:23
**foam (4)**
29:6,9,12;147:25
**focus (4)**
31:12;117:5;153:4;
209:18

**folks (5)**
19:8;78:15;86:17;
111:15;195:16
**follow (7)**
87:12;95:6;138:19;
175:25;191:22;213:8;
215:13
**followed (5)**
44:9,14;45:24;
104:10;213:9
**following (10)**
35:23;74:20;88:23;
127:7;139:25;142:24;
182:12;207:2;209:13,
14
**follows (2)**
4:4;87:10
**follow-up (3)**
110:22;224:15,24
**food (3)**
62:16,17,21
**footage (3)**
205:12,15,18
**force (1)**
78:14
**forced (1)**
102:11
**forget (3)**
29:21;62:12;163:14
**form (25)**
52:22,23;96:21;99:9,
13,13;107:23;122:1;
125:21;126:25;134:1;
135:7,9;155:15;
156:12;162:12;166:21;
168:12;172:1;186:23;
187:18;188:8;190:24;
207:12;209:7
**formal (2)**
201:21;223:1
**format (2)**
134:15;142:4
**formatting (1)**
130:25
**forming (1)**
171:16
**forms (1)**
107:24
**forth (2)**
8:20;223:7
**forward (5)**
23:15;27:15;34:12;
130:5;134:2
**forwarded (1)**
91:9
**found (5)**
130:3;132:9,11;
140:5;191:9
**four (8)**
16:4;120:17;131:25;
177:8,13;196:1;
209:22;221:7
**foyer (1)**

207:24
**frame (2)**
14:7;193:17
**frankly (1)**
102:9
**free (1)**
5:17
**freely (1)**
14:10
**freezing (1)**
11:15
**frequency (1)**
120:15
**frequent (2)**
100:1;143:5
**frequently (2)**
193:18;222:16
**Friday (2)**
201:24;202:16
**friend (1)**
76:6
**front (21)**
8:7;11:9,13;13:23;
15:4;18:23;39:3,13;
42:6;46:1;174:10;
179:10;181:15;183:25;
192:7,14;194:14,15;
197:6;208:2;213:4
**frontline (1)**
61:21
**fronts (1)**
194:14
**frustrated (2)**
37:2;143:11
**fulfill (1)**
170:24
**fulfilling (1)**
172:24
**full (6)**
12:2,3;30:1;55:5;
96:18;219:23
**full-time (1)**
152:8
**fully (1)**
135:8
**function (2)**
91:23;92:12
**functional (6)**
33:21;94:4;105:10;
106:1;143:21;147:1
**functions (1)**
24:3
**fund (1)**
62:23
**fundraisers (1)**
62:21
**funeral (1)**
62:25
**further (5)**
43:1;44:15;46:8;
59:19;224:11
**future (1)**
29:3

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 69 of 85

## G

**gain (2)**
127:21;184:14
**gaining (2)**
22:5,11
**game (1)**
197:3
**Gann (2)**
89:16;93:5
**gap (1)**
110:12
**garbled (1)**
16:24
**gate (2)**
28:10;208:2
**gathered (1)**
216:1
**gave (3)**
64:14;76:24;82:14
**geared (1)**
214:17
**general (7)**
33:18;36:15;56:15;
159:25;177:10;193:12;
197:8
**Generalist (1)**
52:18
**generally (2)**
130:2;154:12
**generated (2)**
140:14;141:25
**GEO (3)**
75:25;76:7,13
**geographic (1)**
175:15
**gets (8)**
12:23;63:25;87:15;
93:18;95:5;119:7;
135:20;152:19
**giant (1)**
100:6
**girlfriend (2)**
49:21;50:1
**gist (1)**
223:25
**given (11)**
6:2,10;30:6;81:7;
136:15;146:2,3;
176:25;177:16;196:22;
198:10
**gives (1)**
36:18
**giving (1)**
46:22
**glanced (1)**
142:19
**glaring (1)**
66:19
**gloves (1)**
14:18
**glowing (1)**

14:14
**goes (6)**
90:5;97:13;129:8;
135:22;145:18;220:9
**good (16)**
10:19;33:20;54:10;
63:24;64:10,13;76:6;
81:11;92:5;127:6;
150:12;161:2;173:1;
190:18;199:12;227:1
**gossip (3)**
222:21;223:2;224:2
**governor (1)**
220:6
**governor's (1)**
19:6
**grab (3)**
14:2;27:20;123:8
**grabbed (1)**
14:19
**grabbing (1)**
10:11
**graduated (2)**
73:25;75:1
**GRADY (102)**
4:7,11,15,24;5:1,2;
42:10;48:24;51:23;
52:2,6;56:1;64:23;
65:7;67:4,7,9;68:6,10,
12;96:9,13,15,24;
101:19,22;109:15;
110:10,13;111:7,10,13;
112:8,14,16;115:4,10,
16,18;116:15,21;117:7,
12,25;118:5,9;122:2;
126:19;127:18;129:4;
135:24;136:5;137:9;
141:12,23;155:16;
162:14;168:8,16;
169:1,6,11,12;172:5,
15;173:1,6,11,14,18;
174:2,9;182:11;183:1;
187:9;188:1,14,15;
191:24;200:4,6;203:2,
10;209:1,11;215:6,15;
217:13,14;222:8;
223:20;224:5,10,16;
225:5,12,15,19;226:17,
22,24;227:3
**grandchildren (1)**
64:1
**granddaughter (1)**
64:4
**grant (1)**
130:8
**grateful (1)**
217:5
**great (4)**
16:20;116:10;
117:25;227:3
**greater (3)**
60:6;149:12;150:11
**Greg (7)**

129:12;130:13;
131:9;132:2;134:12;
135:17,21
**grid (2)**
128:19;129:1
**Griffin (3)**
87:21;158:16;159:23
**Griffin's (1)**
87:22
**ground (3)**
98:17;133:17,19
**grounds (6)**
8:6;17:3,12;19:20;
85:17;175:9
**group (7)**
25:6,7;26:19;47:12;
95:8;131:16;147:2
**groups (5)**
20:8;84:24;131:19;
139:18;153:5
**guard (7)**
15:9;77:14,17,21;
78:1,6,18
**guarded (1)**
18:22
**guess (11)**
14:7;20:17,18;25:15;
42:1;67:13;72:5;
102:23;156:14;175:1;
195:4
**guessing (1)**
102:6
**gun (2)**
107:10,20
**gunsmith (1)**
152:4
**gurney (1)**
14:22
**gutters (1)**
131:21
**guy (5)**
30:12;130:12;
131:13;135:17;184:18
**guys (9)**
24:11;33:10;37:21;
42:4;55:5;81:21;120:6;
218:21;220:14
**guy's (1)**
127:5

## H

**Hahn (3)**
97:18;98:5,8
**half-hour (1)**
153:2
**halfway (1)**
55:7
**hall (4)**
15:9;190:8;207:18,
21
**handcuffs (1)**
81:23

**handguns (1)**
152:6
**handle (8)**
24:13,15;54:21;55:9,
10,12;64:15;193:12
**handled (7)**
46:2;54:15;55:1,23;
97:10;151:17;199:19
**hang (4)**
24:11;25:24;27:19;
193:22
**hanging (1)**
193:22
**happen (11)**
18:7;35:25;53:16;
82:3;94:16;100:13;
150:9;194:1;219:12,
15;222:16
**happened (24)**
12:2;27:9;36:20;
37:8;39:24,25;50:2,15;
53:14;81:2;82:16;
105:3,8;106:3;110:4;
121:21;140:1;141:2;
163:8;170:10;202:14;
207:14;212:21;219:13
**happening (9)**
15:3;28:21;109:20;
126:12;193:20;203:20;
206:1;212:1,8
**happens (10)**
43:12;83:1,7;86:13;
104:18;113:7;120:2;
131:8;136:14;180:15
**happy (8)**
5:17;63:6,16,17;
117:22,24;134:6;
209:17
**hard (5)**
54:11;195:12;196:2;
197:20;214:22
**harm (1)**
164:4
**hazard (12)**
124:14;130:18;
132:4;154:21;155:20;
158:5,6,16;159:21;
218:13;219:4,6
**head (11)**
6:5;26:15;72:3;
84:15;95:1;99:15;
105:3;134:2,16;
146:11;174:25
**headphones (1)**
96:12
**heads (1)**
202:2
**Health (1)**
129:7
**healthcare (1)**
84:18
**hear (13)**
40:17;46:15;118:13;

119:3,12;136:24;
186:3,7,11;194:22;
195:15,18;202:12
**heard (19)**
16:14;21:23;40:21;
41:2,8;46:24;97:2;
103:10,18;105:21;
122:22;136:21;173:21;
186:2;208:11;221:6,
12;222:3,4
**hearing (12)**
16:20;50:6,7;55:18;
68:9;93:2;126:9;137:4;
185:17;186:6;196:6;
221:4
**heat (25)**
24:14,17;112:24,25;
113:17,20;114:3,10,12,
14,14;115:22;117:3;
118:15,21;119:6,10,16;
199:20;200:10,14,14,
18,20;201:10
**heated (2)**
38:15;210:7
**heating (3)**
112:21;119:9,15
**heavy (2)**
47:16;181:10
**hectic (2)**
9:8;41:10
**held (7)**
35:23;52:1;112:11;
118:3;202:18;206:9;
217:17
**help (17)**
10:5,21;12:25;29:2;
30:3;61:16;62:5;64:3,
16,21;159:14;186:13;
194:10;197:13,15;
208:18;213:5
**helpful (1)**
93:4
**helpless (1)**
47:23
**helps (1)**
54:2
**herself (4)**
54:15,22;55:2,23
**hesitate (1)**
150:6
**hey (3)**
88:17;113:12;119:2
**high (11)**
28:6;51:2;59:4;72:4;
73:25;75:1,5;77:18,21,
23,24
**highest (1)**
41:19
**highlight (1)**
137:24
**highlighted (1)**
133:21
**high-tense (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 70 of 85
RON NEAL
July 15, 2020

51:8
**himself (4)**
131:12;193:22,23,24
**hire (1)**
150:24
**hired (2)**
58:12,16
**hiring (3)**
60:12,15;61:17
**history (2)**
74:25;115:6
**hit (4)**
55:4,8;60:1;173:7
**hitting (1)**
54:13
**hoard (1)**
218:23
**Hold (1)**
118:2
**home (13)**
8:5,5;64:11;77:23;
78:1,2;84:5;85:16;
86:8;205:19,20,22;
206:2
**Homeland (5)**
33:12,13,15;140:22;
147:16
**honest (3)**
38:5;138:18;165:19
**Honestly (25)**
25:11;26:11;27:1;
38:4;45:12;48:14;
49:14;56:24;66:21;
69:12;99:8;113:20;
115:20;121:20;142:20;
143:1;144:3;145:20;
166:3;184:17,24;
198:7;203:15;217:3;
221:5
**Honorable (1)**
78:19
**hook (1)**
19:17
**hooked (1)**
201:1
**Hoosier (1)**
15:10
**hope (1)**
197:14
**hoses (2)**
33:21;200:25
**hospital (4)**
74:11;75:8;78:4;
110:23
**hostage (1)**
18:7
**hosting (1)**
206:10
**hot (7)**
14:12;47:21;113:9;
119:10;127:9;200:13;
201:6
**hour (3)**

51:12;60:22;193:3
**hours (5)**
74:15;114:21;
169:10;173:8;196:15
**house (148)**
7:25;8:16;9:3,5,7;
10:1,3,19;11:7,10,13;
13:15,16;15:1,6;16:9,
12,21;20:5,7;21:7,16;
27:13;28:5;29:25;39:3,
5,13;40:3,25;41:19;
42:4,16,24;44:4;46:3;
50:19;88:9,10,11,12,
16;103:9;104:12;
106:14,16,23;108:21;
113:10;114:5,24;
119:17;120:12,13,18,
21;121:2,3,5,10,15;
122:5,8,11;123:18;
124:8;126:13,16;
128:6;155:9,11;
158:19;161:17;167:5,
12;176:3,4,5,6,6,7,10,
12,17;177:1,2,6,8,11,
12,17,24;178:18;179:1,
4,20;180:16,19;181:6;
182:6,13,23;183:5,19,
21;184:5,16,25;186:4,
21;187:1,5,23;188:4,
18,25;190:5,7,20;
191:1,5,21;194:4,21;
195:15,22,24;196:7,12,
18;197:4,8;198:22;
199:3,10;205:9;
207:17,19,20;208:1;
210:12;211:8,12,14;
212:24;213:12;215:23
**housekeeping (1)**
4:16
**houses (17)**
9:15,16;28:6;31:25;
106:10;112:22;113:6,
25;116:6;121:18;
127:23;128:4,20;
176:5,7;196:14;198:21
**housing (19)**
39:20;81:10;82:5;
85:23;86:12;106:14;
107:3;120:6,8,12,14;
126:11;155:3;162:21;
166:2;177:9,18;180:5,
6
**HR (6)**
56:5;59:1,6,6,21;
84:18
**Human (2)**
52:18;57:4
**humidity (1)**
200:16
**hundred (3)**
8:7;17:4;196:1
**hung (1)**
10:10

**hydrants (1)**
201:1
**hypothetically (1)**
105:7

## I

**I/S (1)**
133:14
**I-cell (1)**
176:7
**icon (2)**
137:2,3
**ID (2)**
178:7,22
**idea (4)**
24:4;84:13;167:13;
190:18
**ideas (1)**
28:23
**identified (8)**
52:5;55:25;65:6;
129:3;136:4;141:22;
174:8;203:9
**identifies (1)**
131:2
**IDOC (4)**
31:12;90:17;162:11;
188:6
**II (2)**
33:14;147:18
**ill (2)**
63:25;74:13
**illegal (1)**
125:8
**Illinois (1)**
107:9
**illustrate (1)**
111:12
**imagine (1)**
195:25
**immediate (3)**
10:12;46:14;62:19
**immediately (6)**
21:22;65:13;77:18;
79:8;93:18;185:11
**importance (1)**
199:16
**important (13)**
6:11,16;94:3;104:7;
109:23;124:3,7;161:8;
162:1;163:13,22,23;
199:17
**impose (2)**
66:18;169:16
**imposed (5)**
66:7,15;67:1,3;79:15
**impossible (1)**
103:13
**improper (1)**
117:20
**improve (3)**
29:1;32:17;33:25

**improvement (1)**
34:12
**improvements (3)**
25:4;150:5;211:20
**improving (1)**
31:22
**inactive (1)**
78:10
**inadequate (1)**
119:16
**inappropriate (1)**
171:18
**Inaudible (1)**
108:8
**incident (26)**
15:2;36:6,19;37:2,5;
44:22;51:16;80:23;
82:8,11;83:1;104:24;
106:4;110:18;137:18;
138:13;139:5;170:17;
202:4,10,11;211:25;
214:18;217:23;223:11,
14
**incidents (7)**
51:9;81:25;111:14;
112:1;170:9;202:6,13
**include (1)**
107:4
**included (3)**
91:20;123:24;153:3
**includes (1)**
101:7
**including (4)**
49:25;78:22;100:6;
128:25
**inconsistent (4)**
188:6,20;189:14,24
**incorrect (1)**
183:3
**increase (1)**
214:25
**increases (1)**
199:15
**independent (5)**
7:10,14,22,24;34:19
**independently (1)**
8:3
**index (6)**
24:14;199:20;
200:10,14,18,20
**indexes (1)**
24:17
**Indiana (83)**
17:12;30:17,18,19,
21;31:7,9,14;52:13,19;
53:11;56:21;58:12;
60:7;65:19;66:3;73:16,
22;74:8,21;77:5,8;
78:24,25;79:3,16;
82:18;85:10;86:17;
87:24;93:12;94:8;
95:16;97:19;99:21;
100:9,11;106:10;

107:14;112:22;113:21,
22;117:16;119:17,23;
120:25;125:19;127:23;
128:1,18;130:19,21;
137:16;141:6,8,15;
143:6;146:18;148:5,9,
18;150:19;151:16,24;
152:10,14;155:14;
158:22;163:5;164:3;
166:14;175:11,22;
184:25;188:20;189:14;
206:1;210:9;218:1;
219:8;220:8,18;226:8
**Indianapolis (1)**
19:5
**indicate (2)**
57:2;134:1
**indicated (2)**
200:14;209:22
**indication (1)**
111:21
**indicative (1)**
176:15
**individual (13)**
9:20;27:17;31:17;
75:6;77:25;105:13;
118:16;128:13;140:5;
151:22;182:20,22;
187:8
**individually (2)**
99:1;113:6
**individuals (3)**
52:12;59:7;129:15
**individual's (1)**
167:25
**Industrial (1)**
75:13
**informal (3)**
34:11;201:17,22
**information (15)**
8:19,25;9:9,11,23;
10:19;16:19;18:17,20;
52:23;109:20,23;
113:10;169:22;211:9
**informed (2)**
111:17;121:9
**inhalation (1)**
44:16
**INI (3)**
48:13;49:6;50:7
**initial (5)**
134:11;150:16;
153:10;154:4,6
**injured (2)**
43:9;73:5
**injury (9)**
43:2,7;46:8;70:2;
86:1;123:10,10,13,22
**inoperable (9)**
94:11,14,16;97:17;
100:18;101:4;103:4,
16;143:6
**in-service (3)**

**BOSS REPORTERS**
**(219) 769-9090**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGC
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 71 of 85

150:25;152:20;153:6
**inside (24)**
9:2;11:17;13:10;
16:13,21;18:24;19:14;
24:23;28:17;29:25;
61:19;81:3;84:1;85:23;
86:11;107:9;120:4;
122:17;127:5;133:18;
177:20;193:21;194:2;
218:10
**insignificant (1)**
85:21
**inspect (3)**
90:13;128:25;131:20
**inspected (1)**
91:21
**inspection (19)**
91:6,8,11,17,22;
93:13;129:7,18,21;
131:10,11,12,16,18,24;
132:1,1,3;135:16
**inspections (8)**
87:7,23;88:5,25;
91:9,13,19;105:23
**inspects (1)**
129:15
**installed (2)**
192:6,7
**instance (2)**
38:2;121:18
**instances (1)**
201:20
**instead (6)**
6:5;7:18;76:20;
79:11;143:16;184:7
**instruct (1)**
221:15
**instructed (2)**
82:13;190:15
**instruction (7)**
9:12;165:3,15,15;
166:17;167:2,3
**instructions (1)**
164:23
**insufficient (4)**
164:24;165:4,16;
167:13
**intends (1)**
225:21
**interact (3)**
23:25;24:6;58:14
**interacting (1)**
58:9
**interactions (2)**
57:22;65:24
**interested (1)**
55:14
**interfere (1)**
23:4
**interim (1)**
11:19
**interior (1)**
80:10

**internal (15)**
22:20;35:13;36:5;
55:19;136:19;138:10;
140:18;141:3,5,16;
142:1;153:4;170:7,14,
21
**internally (1)**
41:16
**interpreted (1)**
139:1
**interruption (1)**
96:14
**intervene (1)**
36:21
**interview (9)**
53:12,18,19;57:9;
58:19;59:3,20,23;
132:16
**interviewed (6)**
22:18,19,21,22,23,25
**interviews (6)**
51:3,6;58:24,25;
59:16;83:8
**intimately (1)**
111:4
**into (34)**
10:25;11:16;15:9,9;
17:7;20:21;21:16;22:2;
24:24;29:5;50:10;59:1;
70:6;73:7;75:21;76:2,
19;83:23;111:23;
112:4;117:19;136:14;
142:2;147:4;148:15;
150:2;189:8,15;
190:15,20;198:10;
200:2;207:23;215:24
**introduce (1)**
59:12
**invested (1)**
62:2
**investigate (5)**
124:11,15;138:7;
139:11;208:12
**investigated (1)**
139:13
**investigating (5)**
138:15;170:14,15;
208:21;223:11
**investigation (14)**
23:1;34:21;36:12;
136:13,16,21;138:11;
140:21;141:17;142:2,
11;170:2,8;223:14
**investigations (3)**
138:12,17;141:1
**investigative (11)**
136:11;139:18,22,
23;140:3,13,16;170:5,
12,22;171:7
**investigator (1)**
139:24
**investigators (4)**
139:10,13,16;143:2

**invite (1)**
202:9
**involve (1)**
222:18
**involved (13)**
36:3,19;46:21;57:5;
68:25;71:12;82:11;
111:4;123:13,15;
169:17;202:10;223:10
**involves (1)**
221:17
**involving (3)**
72:18,21;157:7
**Iowa (1)**
175:19
**IRC (2)**
202:4,5
**ISP (12)**
16:8;21:5;26:23;
65:18;78:22;98:20;
131:5;141:5,6;142:1;
186:19;217:22
**ISP's (1)**
155:6
**issue (17)**
4:13;42:9,12;55:15;
63:11;64:15;66:19,23;
86:4;101:1;108:8;
124:9,17;135:18;
153:15;186:10;194:19
**issued (2)**
104:2;145:13
**issues (16)**
51:4;62:1;81:3;
83:17;91:18,18;
112:12;132:13;135:2;
143:12,22;153:16;
160:8,11;191:18;211:4
**items (1)**
30:5
**Ivy (2)**
74:5,15

**J**

**Jason (2)**
89:12;98:16
**Jeremy (3)**
8:10;12:1,4
**Jim (1)**
35:15
**job (23)**
6:2;21:11;60:16,23;
61:3,15;84:11;87:12;
90:8;105:19;148:17;
160:11;161:11;164:18;
165:21,24,25;166:1;
169:20;170:25;172:25;
179:7;193:13
**jobs (3)**
124:14;149:15;
157:23
**joint (1)**

154:2
**Josh (1)**
12:7
**Josh's (1)**
123:17
**Joshua (18)**
5:6;46:13;49:10,21,
24;121:1,14,16;122:5,
7;158:19;168:11;
172:18;203:13;207:10;
209:6,13,25
**judge (1)**
116:11
**judgment (1)**
191:20
**July (1)**
75:10
**jump (3)**
48:18;136:25;221:14
**June (4)**
52:25;53:5,12;56:7
**junior (1)**
77:21
**justice (2)**
73:16,20
**Justin (4)**
50:19;65:11,20,21

**K**

**K-2 (1)**
125:5
**K-9 (2)**
11:21;18:14
**keep (16)**
6:6;55:14;63:16;
93:3,23;94:1;102:20;
111:16;115:13;122:14;
165:10;180:10;183:17,
21;184:3;198:20
**keeps (2)**
135:21;200:15
**Ken (6)**
89:16;92:3,5,7;93:5;
97:13
**kept (14)**
25:22;33:23;53:20,
21,22;102:3,21;
108:14;146:1;177:19;
181:11;183:14;202:17;
218:19
**Kevin (5)**
29:3,20;31:5,5;
147:13
**key (50)**
38:6,14;45:21;
176:24;177:18,19,22;
178:5,9,10,11,12;
179:10,10,11,12;181:4,
7,10,11,17,24,24;
182:3,15;183:4,5,12,
13,15,15,18;184:5,12,
18;185:16,16;186:20,

21;187:16,17;188:3,4,
17,17;207:4,9;209:12,
14;210:22
**keylock (1)**
182:24
**keys (35)**
161:15;177:1,16,18;
178:14,20,22;179:3,4,
5,6,12,13;181:7,16,18;
182:2;183:11,17,23,24;
184:4,6,8,10,13,22;
185:1;186:16;187:1,5,
23;188:24;208:23;
209:5
**keyset (1)**
181:13
**KeyWatcher (2)**
178:4,13
**kick (1)**
119:6
**kid (2)**
73:5,5
**killed (1)**
209:25
**kind (17)**
23:7,11;36:23;37:4;
40:18;44:16,21;46:9;
48:16;80:16;107:15;
115:25;144:6;178:15;
180:25;200:17;223:24
**kinds (1)**
222:24
**knew (9)**
33:7;54:1;58:7;
105:10;157:4,7;
161:23;167:4;189:1
**knocked (1)**
9:19
**knowing (1)**
209:10
**knowledge (16)**
36:13,14;66:16;
70:24;71:1,24;127:1;
140:24;148:4;175:24;
180:14,21;185:4;
196:16;203:25;206:19
**knowledgeable (1)**
127:2
**knows (1)**
161:10

**L**

**landline (1)**
175:5
**landlines (2)**
175:11,22
**large (5)**
100:17;101:3,16;
114:18;216:9
**larger (1)**
181:17
**laser-type (1)**

BOSS REPORTERS
(219) 769-9090

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 72 of 85

107:20
**last (9)**
63:23;68:20;96:2;
109:6;118:6;142:17;
160:16;199:24;214:4
**lasted (2)**
20:21,22
**late (3)**
9:22,25;77:6
**lately (2)**
38:11;141:1
**later (7)**
12:4,22;22:14;57:6;
81:13;84:4;217:12
**lawsuit (16)**
5:4;50:10;69:4;
70:13;71:20,24;72:8,
12,21;221:3,4,5,9;
222:11;223:6,15
**lawsuits (5)**
68:24;71:25;222:13,
16,24
**layout (1)**
149:6
**lead (4)**
32:12;92:15,15;
162:8
**leader (1)**
75:17
**leadership (1)**
52:21
**leads (2)**
139:25;202:8
**league (1)**
73:6
**learn (4)**
131:6;143:4;158:17;
185:13
**learned (3)**
163:15;209:21,25
**least (11)**
13:19;32:4;40:19;
58:19;62:16;81:20;
83:18;96:1;155:3;
195:15;213:21
**leave (7)**
51:15;64:6,13;83:22,
25;84:1;144:1
**leaving (4)**
50:25;157:8;190:21;
194:8
**led (3)**
36:8;55:1;185:18
**left (8)**
51:1;56:21;76:1;
82:22;112:20;130:25;
173:5;216:2
**legal (1)**
71:5
**legitimate (1)**
206:12
**less (3)**
53:7;187:7;199:2

**lets (1)**
181:13
**letter (11)**
23:11,16;25:12,17,
19;26:4,6,9,18;119:1;
154:6
**letting (1)**
32:1
**level (9)**
24:16;65:16;76:18;
147:18;194:6;199:20;
200:10,19;212:7
**leveled (1)**
119:8
**levels (5)**
24:14;120:10;
200:14;217:20,20
**liaison (4)**
61:22;221:13,17,24
**lieu (1)**
160:21
**lieutenant (14)**
40:7,11;41:16;45:7;
47:10;88:11;145:19;
180:3,6,8;189:8;
190:14;207:16,22
**lieutenants (3)**
32:14;58:21;150:2
**lieutenant's (1)**
191:23
**life (10)**
43:1,7;44:15;46:8,
13;55:6;210:10;
214:23;218:22,22
**life-lined (1)**
110:23
**lifers (1)**
220:14
**light (9)**
88:18;122:18,19,22;
125:9,11,15;178:11,11
**lighter (1)**
181:12
**lights (1)**
94:21
**likewise (1)**
6:13
**limitations (1)**
219:2
**limited (2)**
37:11,12
**limits (2)**
218:4,17
**line (6)**
83:19;85:12;145:12;
205:1;213:8,8
**lines (1)**
209:22
**Lintz (4)**
129:13,20;130:5,13
**list (7)**
18:24;87:9,13;117:9;
219:8,10,16

**listed (4)**
204:3,17,20,24
**listen (1)**
197:18
**literally (1)**
103:12
**litigation (7)**
221:13,16,17,22,23;
222:1;223:5
**little (23)**
5:12;23:12;46:6;
48:6;56:24;60:5,14;
73:6;75:11,12;93:2;
101:16;107:10;112:18;
113:21;146:14;152:24;
153:5;176:24;178:17;
193:1;198:8;215:4
**live (20)**
8:5;157:20;160:24;
161:2,8,12;162:4;
163:12,17,21;164:9,17,
17;165:1,7;166:9;
167:7,11;205:24;
216:24
**lives (5)**
61:1;148:6;149:14;
213:23;220:15
**local (2)**
62:14;132:3
**locate (1)**
217:7
**located (1)**
103:4
**location (5)**
18:13;88:16;126:12;
175:16;189:20
**locations (8)**
11:24;13:4;106:16;
109:4,12;113:4;
118:14;201:3
**lock (6)**
14:3;28:1;47:19;
79:23;80:25;187:4
**lockdown (1)**
80:22
**locked (12)**
25:23;79:22,25;
81:10,13,15,16;82:3,5,
10;181:11;191:7
**locks (3)**
182:13,24;184:7
**locksmith (1)**
184:19
**lockup (5)**
81:16,17,22;82:9,11
**Loevy (2)**
117:15,15
**log (5)**
45:13,18;57:4;107:2;
192:3
**logged (2)**
146:11;192:14
**logs (9)**

95:24;102:3,10,13;
108:7,17;112:19;
146:1;192:16
**long (15)**
16:2;17:9,11;19:19;
25:10;60:3;111:7;
114:13;117:10;148:19;
155:10;173:2;178:15;
224:20;225:1
**longer (6)**
49:4;143:20;173:4;
178:17;193:1,25
**look (15)**
26:12;29:5;37:5;
40:2;41:17;42:21;
44:21;45:13,18;63:4;
77:12;79:7;92:6;
110:16;137:10
**looked (5)**
48:12,12;55:20;
102:2;128:5
**looking (11)**
33:6;56:19;59:17;
91:12,17;124:18;
130:13;134:10,11;
185:21;186:9
**looks (4)**
82:18;134:11;142:4;
201:23
**Lori (1)**
52:10
**lose (1)**
62:3
**loss (3)**
43:1;44:15;46:8
**lost (8)**
42:12;96:25;97:1;
111:6;184:6;187:3,5;
223:24
**lot (42)**
29:14;33:10,19,24;
37:1;50:3,12;59:23,25;
60:4,17;61:4,11,13,18;
62:7;63:1,19;69:17;
71:25;89:10;95:9;
125:3;139:1,4;143:10;
147:11,22;150:1;
170:4;180:24;183:24;
184:8;192:2;193:11,
11;199:6,7;212:20;
218:2,17,21
**lots (1)**
181:22
**loud (8)**
9:10;11:8;44:6;
194:17;195:23;197:7;
211:8;213:18
**love (2)**
102:10;207:13
**loved (2)**
49:25;85:4
**lower (2)**
107:17;114:8

**lowest (1)**
194:6
**lucky (1)**
177:14
**lunch (2)**
83:23;112:13

## M

**ma'am (2)**
17:23;49:19
**magistrate (1)**
116:20
**mails (1)**
82:22
**Main (5)**
24:8,9;43:16,19;45:7
**mainly (5)**
11:24;44:5;124:9;
155:22;161:10
**maintained (4)**
60:13;108:7,12,18
**maintaining (1)**
108:22
**maintenance (9)**
90:6;127:2;129:24;
133:3,4,8,10,14,18
**major (19)**
32:12;51:15;59:14;
91:24;92:16;97:10,15,
16;98:23;102:4;110:4,
18;111:14;132:7;
148:12;159:8;176:5;
202:1,8
**majority (1)**
122:8
**makes (1)**
176:21
**making (2)**
33:19;51:11
**male (1)**
169:14
**malfunctioning (1)**
103:11
**man (1)**
214:21
**manager (38)**
30:23,24,25;76:10;
87:6,8,17,20;88:10,21;
89:25;90:25;91:10,11,
25;92:2,8,11,15;93:14,
20;97:14;102:4,22;
129:13;130:16,20;
131:15;132:4;134:16;
146:3;154:21;158:5,7,
16;159:13,21;200:22
**managers (6)**
58:22,22;88:13;
124:14;129:17;155:21
**manipulated (1)**
125:20
**manipulation (1)**
126:24

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 73 of 85

**man's (1)**
47:16
**many (30)**
10:4;42:4;67:11;
68:13;69:9;71:22;72:5,
6;84:12;97:15;100:3;
101:24;102:5,16,17;
108:3;110:24;119:22;
146:23;147:24;155:19;
160:6,7;165:20,21;
177:5,7;197:10,11;
206:9
**marijuana (2)**
125:4,7
**mark (4)**
52:7;97:18;129:5;
130:6
**marked (2)**
56:3;129:8
**marshal (2)**
22:21;139:17
**masks (1)**
33:21
**Masley (2)**
52:12,17
**masse (1)**
210:13
**master (2)**
162:25;181:16
**materials (1)**
136:18
**matter (9)**
4:16;16:3;60:10;
85:25;97:6;114:21;
140:6;193:1;222:18
**maximum (3)**
60:24;217:19;218:20
**may (34)**
18:6,8,21;23:6,6;
24:18;31:1;33:22;37:2;
38:21;39:2,16;62:1;
92:7;110:9;126:7;
132:24;135:4;137:1;
141:17;148:25;163:6;
164:7;166:2;170:20;
179:10,12;205:16;
207:11;209:6;215:25;
224:23,23,24
**maybe (12)**
16:3;49:18;57:6;
69:12;94:20;99:24;
101:10;110:11;173:7;
187:6;213:10,12
**mean (175)**
7:14,15,21;9:18;
11:14;18:4;19:15,25;
20:1;22:15,17;24:7;
26:2;27:17;28:5;33:1,
10;34:5;35:12;38:5,10;
45:21;47:9,14;50:5,11,
15;51:2;54:24;56:13,
24,25;57:6;58:6;60:3,
19,23;62:6,8;63:1,5,7,

15;71:25;74:10,16;
78:7;81:12;82:23;
85:20;86:10;90:4;
95:21;97:13;98:8;
99:23;101:9;102:1,20;
105:6,21;106:2;107:7;
111:3;113:18;115:4,
11,12;116:9,15;117:4;
118:13,17;122:16;
124:10;125:2,23;
127:1,4,10;128:14,21;
129:17;131:8;137:5;
138:23,25;143:8,13,25;
144:10,20;148:22;
149:20;152:3,15,22;
155:7;156:13,19;
157:22;159:5;160:22;
163:23;164:5;165:10;
166:3,4;167:15,17;
168:6,19,23;171:4;
172:3;173:3,5,9;
175:14;176:9;177:3,5;
178:13;179:9;183:20;
184:1,2,17,17,20,22;
185:19,20;187:19,25;
188:10,11;190:13,25;
191:1,8;194:14,20;
195:21;196:9;197:1,2,
9,13;200:12;202:24;
204:10;205:22,23;
206:7;207:13,14,14;
208:19;209:9;210:16;
211:5;212:2,4,8,14;
214:12,13;215:7;
218:19;220:1,8;
221:10,11;222:13
**meaning (1)**
86:21
**means (3)**
9:17;18:6;56:10
**meant (8)**
64:13;138:8,21;
139:14;157:10;205:24;
212:25;217:16
**measure (1)**
107:8
**measured (3)**
106:13,21;107:5
**measures (1)**
107:11
**mechanisms (1)**
194:9
**Medassist (2)**
113:2;114:16
**medical (3)**
70:2,4;71:9
**medications (1)**
7:3
**medium (1)**
217:19
**meet (2)**
26:18;83:16
**meeting (41)**

24:25;25:8;26:7,16,
21;27:3,4,9;31:8,15,20;
32:16,19,23;33:3;34:3,
5,9,11,15;37:17,20;
65:21;84:16,16;154:7;
202:3,8,11,15,17,18;
203:20;206:11,16,17;
207:3;208:19,21;
209:16,23
**meetings (19)**
83:10,13;84:10,14;
85:9,11;86:15,16,23;
149:20;150:1,3;
202:20,23;203:1;
206:13;222:6,10;223:1
**member (4)**
62:19;78:6;90:17;
144:17
**members (4)**
11:20;37:1;85:3;
196:5
**member's (1)**
62:24
**Memo (2)**
136:1;138:5
**memory (8)**
7:1,7,15,18;22:3;
33:2;102:7,12
**men (5)**
40:24;44:3;60:25;
183:7;218:21
**mentally (3)**
61:7;74:13,13
**mentioned (14)**
30:15;31:16;34:6;
62:22;94:19;123:5;
126:13;131:13;135:13;
147:16;176:2;193:5;
195:10;212:22
**mentioning (1)**
25:19
**mesh (1)**
208:2
**met (5)**
25:2,5;26:19;36:4;
224:1
**metal (3)**
125:12;176:13;178:5
**method (1)**
165:8
**methodically (1)**
213:2
**Michele (2)**
52:11,17
**Michigan (1)**
149:4
**midday (1)**
20:22
**middle (5)**
20:25;28:7;192:8,15;
224:18
**midway (8)**
28:4,4,8,8,12,17;

126:18;176:20
**might (34)**
6:21;7:4,5;28:16;
30:9;35:17;60:3;83:20;
84:21;91:7;100:13;
102:15;111:9,12,22;
120:18;130:19;131:14;
134:22;137:3;145:5;
159:7;160:11;162:8;
166:7;181:23,24;
184:7,17;186:25;
195:25;197:22,24;
222:21
**Mike (2)**
117:7;173:2
**mile (1)**
117:9
**military (1)**
75:3
**million (1)**
187:4
**Miln (8)**
22:15;23:6,9,19,23;
24:6;25:9;26:16
**mind (9)**
7:19;48:15;118:10;
137:7;184:3;199:1;
215:12;223:21,22
**mine (1)**
76:6
**minimal (1)**
16:18
**minimum (1)**
217:19
**minor (2)**
111:20;112:1
**minute (4)**
4:12;137:19;142:15;
224:6
**minutes (12)**
9:22;10:6;16:4,4;
17:14;57:14;61:2;
173:10;192:25;193:1,
10;224:13
**missed (2)**
108:10;111:12
**missing (2)**
133:17,19
**mistake (2)**
137:8;141:9
**mistreated (2)**
69:11,21
**mistreatment (3)**
69:5,6,25
**modify (1)**
152:23
**moment (2)**
137:10;163:21
**mommy (1)**
85:2
**Monday (6)**
48:16,22;141:17;
201:24;202:16;211:23

126:18;176:20
**money (7)**
33:19;62:3,13,22;
70:16,20,24
**monitor (2)**
106:9;205:25
**monitoring (1)**
190:20
**month (2)**
76:22;220:25
**monthly (13)**
87:7,9,13,23;88:5,
25;89:2,3,4,22,24;
90:25;91:11
**months (5)**
53:7;76:4;80:7;
86:14;116:6
**more (28)**
9:22;46:1,6;60:5,9;
61:16;63:9;69:19;
88:23;91:23;93:15;
111:11;117:22;153:5;
154:8,12;160:16;
165:4,12;169:7;177:9;
179:8,12;184:21;
193:18,19;194:1;
205:24
**morning (6)**
20:21;21:1;82:21;
111:24;202:3;211:24
**Morse (2)**
177:21;178:4
**most (20)**
5:9;20:15;30:12;
45:5;49:3;55:7;68:17;
81:14;109:6;113:3,22;
121:4;128:6;145:12;
148:10;180:20;183:23;
198:13;202:2;209:19
**mother (3)**
49:11;64:1;222:3
**Motorola (2)**
95:9,12
**mounted (1)**
182:17
**move (1)**
115:15
**moved (1)**
126:11
**moving (4)**
23:14;27:15,16;
34:12
**much (15)**
12:4;28:20;41:4;
42:1;48:5;126:3;
143:12;148:25;149:1,
11,12;173:4;187:7;
198:12;212:8
**muddled (1)**
6:18
**multiple (2)**
26:20;184:10
**murdered (1)**
214:15

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 74 of 85

**mute (1)**
137:1
**myself (9)**
59:12;68:22;71:6;
98:1;132:3;138:4,23;
139:11;211:6

## N

**name (13)**
4:9,10;5:2;29:21;
31:3,4;36:9;58:6;
87:16,21;98:13;99:15;
204:13
**named (9)**
52:10;67:24;68:3;
71:23;72:3,8,11,17,20
**National (6)**
77:14,17,20;78:1,6,
18
**nature (13)**
23:4;28:10;54:14;
55:22;78:17;124:13;
150:5;152:7;181:15;
189:21;197:5;218:10;
222:7
**NEAL (7)**
4:1,10;9:22;117:9;
118:1;174:4;226:7
**N-E-A-L (1)**
4:10
**nearing (1)**
169:4
**necessarily (5)**
123:21;176:15;
195:21;206:11;223:1
**necessary (3)**
90:14;153:13;185:10
**Neece (2)**
121:23,24
**need (31)**
8:23;9:19;13:1;
18:18;33:22;40:12;
45:18;47:5;59:19;
95:23;98:23;113:12,
20;116:11;117:7,17;
125:9;127:11,12;
144:25;146:7;156:15;
161:20;166:12;167:21;
181:16;184:14;191:13;
194:10,10;214:10
**needed (7)**
16:18;76:17;86:25;
97:22;160:23;208:18;
220:22
**needs (4)**
13:1;88:18;163:24;
197:13
**negative (2)**
54:17;58:2
**negligent (2)**
170:19;171:2
**neighborhood (1)**

21:3
**NEO (2)**
58:17;59:11
**new (28)**
28:15;29:13;34:13;
54:7;58:17;61:4;64:19;
75:8,20;76:5,8;78:4;
84:25;91:17;95:15,20,
21;96:18;97:24;98:6;
99:17,20;100:10;
129:16;144:12;150:24;
152:18;199:9
**next (16)**
6:9,15;20:21,22;
47:16;76:18;81:11;
82:1;111:24;134:21,
25;137:2;141:10;
183:13;195:5;205:16
**nice (2)**
6:1;33:8
**night (37)**
8:8;12:4,19,22;
19:20;20:15;21:1,10;
40:4;46:4;50:20;60:2;
84:8;103:8,16;156:17;
158:19;159:20,24;
160:16;163:8;164:22;
180:9;181:2;185:14,
22;186:5;187:14;
188:19,25;190:11;
196:14,22;197:9;
198:5;199:12;207:10
**nod (1)**
6:5
**noise (7)**
103:9,12;196:11;
208:8;211:12,19;212:7
**nor (3)**
103:18;117:15;
207:19
**normal (1)**
159:18
**normally (13)**
35:14,19;69:13;
118:16;130:6;131:8,
12,16,24;132:15;
144:14;161:2;200:15
**Northwest (1)**
113:21
**note (2)**
101:20;115:17
**noted (1)**
104:25
**notes (15)**
34:4,9;37:17,19,21,
23;38:2,8;48:13;49:6;
203:19;209:20;210:19;
213:16;215:17
**notice (3)**
53:1,5;207:17
**notified (3)**
85:13,18;112:5
**notifies (3)**

52:20;93:19;200:21
**notify (1)**
97:18
**November (3)**
75:7,9;78:3
**Nowatzke (6)**
89:12,14;98:16,18;
158:12,14
**N-O-W-A-T-Z-K-E (1)**
89:12
**nozzle (1)**
29:9
**nozzles (1)**
33:21
**NSB (1)**
34:17
**number (15)**
52:12;72:4;83:10;
100:17;101:4,16,24;
174:13,14,23;175:1,2,
20;203:4;214:25
**numbers (5)**
175:12,17,25;
178:23;184:13
**numerous (1)**
151:1
**nursing (3)**
12:24;14:22;20:13

## O

**Object (18)**
96:21;115:1;122:1;
125:21;126:25;155:15;
162:12;166:21;168:12;
172:1;182:7;186:23;
187:18;188:8;190:24;
207:12;209:7;225:20
**objection (11)**
101:15,17,20;
115:17;116:8;172:10,
20;217:10;225:3,6,7
**objections (1)**
220:11
**obligation (1)**
90:24
**obligations (1)**
170:25
**obtain (6)**
9:12;73:17;74:7;
97:24;98:20;125:11
**obtained (4)**
74:18;95:15;96:19;
108:25
**obtaining (1)**
104:5
**obvious (1)**
138:15
**obviously (8)**
9:19;38:24;62:2;
77:14;114:18;167:25;
183:14;193:25
**occasion (5)**

25:5;59:10;155:24;
160:17;190:10
**occasional (3)**
157:19;164:8,15
**occasionally (6)**
71:4;100:2;119:1;
155:24;159:5;171:6
**occasions (4)**
24:2,7;155:19;
221:25
**occupying (1)**
182:5
**occur (6)**
99:18;121:1;162:3;
164:3;197:22,24
**occurred (7)**
23:19;35:6,11;
104:24;124:4,8;219:24
**occurrence (1)**
100:1
**occurs (6)**
35:5,8;124:2;163:21;
196:23;202:15
**off (37)**
4:12;12:17;16:14,23;
26:14;37:3;51:24;64:8,
15;67:4;68:6;82:22;
95:1,8;96:9;99:15;
105:2;112:8,20;
115:24;116:1;117:23;
118:3;119:10;128:12;
146:10;164:14;174:25;
186:15;190:7;201:6,
24;220:12;224:12,22;
225:18,24
**offender (42)**
12:21;13:11,14,18;
23:5,9,10;24:9;27:20;
30:13;31:1;32:10;55:8,
12;70:1;72:1;80:4;
83:3,4;85:12,22;86:1;
104:14;122:23;123:6,
10;125:23;127:6;
128:9;146:24;147:8;
148:10;149:7;150:7,
14;167:18;193:21;
194:22;195:23;200:23;
216:13,23
**offenders (48)**
11:7,10;13:2;14:16;
15:8;16:23;20:7,11,13;
28:18;41:5,11,23;46:9;
50:8,11;51:13;54:12;
55:4;83:2;84:3;86:3;
114:1;116:3;118:14,
24;122:17;125:3,5;
126:14;149:14;150:9;
154:1;157:10;161:16;
177:10;192:13;196:1;
197:10,11;198:23;
201:5;208:14;211:14;
213:24;215:19;217:21;
218:18

**offender's (4)**
120:5;121:3,19;
122:10
**offered (1)**
152:21
**offers (1)**
60:22
**office (35)**
17:15,18,19,21;18:1,
9,10,21,22,22;19:3,4,
15;20:1;21:9;40:12;
47:4;81:25;83:15;84:1;
102:15,21;108:13,15,
19;134:3;135:10;
140:20;142:1;185:25;
189:9;190:16;191:4,6;
207:23
**officer (83)**
16:14;18:20,23;32:5;
45:17;46:21;53:24;
54:8,10;57:8;58:1,7;
60:21;62:14;63:24;
75:16;85:24;90:17;
92:14;102:25;103:22;
104:2,14;105:8,9,17,
24;113:8;138:1,3,8,20;
139:14,25;142:24;
143:4,9;151:15;
166:25;167:1,7,11;
168:9;169:13;170:23;
171:1,17,23;173:25;
179:15,19;180:2,23;
181:4,21,25;182:3,18;
183:17;184:24;185:14,
21,23;186:1,19,22;
187:15,16;188:2,6,16;
189:19;190:7,22;
195:9;204:20,23;
206:4,16;207:4,8;
208:10;214:15
**officers (49)**
12:18,19;14:12;
31:24;44:3,10;47:3;
51:10;58:12,24;62:10;
88:14;92:13;103:2;
104:10,16;143:10;
146:6;149:17,19;
150:19;158:18;169:17,
23;172:11;177:15;
178:12;179:1,2,13;
180:11,15,22;185:24;
186:14;189:5,15;
190:2,6,13,19;193:8,
11,15;197:14;198:9;
199:2;208:17;210:8
**officer's (9)**
25:22;40:4,10;41:3;
177:20;185:23;188:25;
191:2;208:10
**official (2)**
200:16;216:4
**offset (1)**
60:13

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 75 of 85

**often (11)**
86:7;99:16,18,19,22;
100:8;107:18;160:5;
180:22;192:22;202:22
**oftentimes (11)**
83:18;122:19;125:7,
10;171:12;180:7;
181:11;184:3;193:2;
198:2;202:9
**OIC (10)**
179:9,11,15,23;
180:15,18;181:1,2;
185:22;187:22
**old (4)**
80:8;95:22;98:17;
182:24
**Olympics (3)**
62:9,11,13
**on-boarding (4)**
58:15;59:24;64:19;
153:10
**once (20)**
14:1;24:20;42:1;
52:20;62:9,18;68:16;
81:20;84:15;86:13;
99:25;100:13;129:19;
137:20;150:24;191:9;
195:25;206:23;218:23;
222:2
**one (100)**
4:12,16;6:9;8:15;
12:18,19;14:12,18;
21:14;24:17,20;25:23;
26:1,5;29:16;30:4,15;
31:16;32:4;34:8;35:14,
17,25;37:21;40:4;
43:19;46:10;49:12,17;
55:20;57:11;58:19;
59:13;65:16;68:24;
69:12,15,22,22;71:5;
72:2,9,12;79:25;80:16;
81:21;83:21;85:4;
88:15,23,24;96:6,10;
100:24;104:18;105:2,
22;106:25;113:11;
117:6,15,17;121:20,22;
123:17;124:14;129:11,
15;138:12;139:23;
141:2;149:22,25;
150:2;159:16;160:16;
172:3;176:19;177:11;
187:5,21;188:23;
193:4;194:22;199:3,
18;200:20;201:13,17;
207:1;210:6,21;
213:20;214:15;216:7;
217:24;219:1;220:11;
221:12;224:6
**ones (6)**
21:25;49:25;82:5;
91:14;120:23;144:13
**one-time (1)**
35:6

**ongoing (2)**
87:1;143:22
**only (17)**
25:18;91:17;120:19,
21,23;121:8;126:4;
148:7,8;150:6;162:18;
163:15;167:2;187:6;
190:21;215:25;223:9
**onto (3)**
12:12;14:22;17:2
**open (26)**
10:6,21;12:11;14:9,
11,20;21:12;28:11;
47:20;83:16;178:8,10;
181:13,14,14;182:4,19,
22;183:7,8;184:4,15;
194:13,14;208:3,4
**opened (4)**
11:1;13:21;182:18;
207:16
**operable (3)**
94:18;144:18,25
**operate (1)**
21:12
**operation (3)**
33:25;92:12;198:22
**operational (2)**
104:4;140:11
**operations (13)**
35:16,20;36:11;
89:20;92:17,18,24;
93:1,8;144:23;147:6;
201:25;202:7
**opinion (11)**
55:1;58:2;66:2;
143:9;147:2;168:9;
171:17,22;172:7,17;
209:8
**opportunities (1)**
63:8
**opportunity (6)**
36:19;83:22;89:7;
137:21;194:1;206:22
**opposed (2)**
68:14;205:3
**opposite (1)**
15:7
**order (30)**
18:14;51:20;87:2,5;
88:8,17,20,24;90:2,18,
22;91:4,15;99:6;
101:23;104:13,18,19,
24;105:18;114:15;
132:23;135:2;153:16;
162:2,23;190:18;
191:23;201:15;226:25
**ordered (6)**
41:24;79:23;101:25;
153:2;189:8;190:3
**ordering (2)**
152:13;226:23
**orderly (2)**
39:4,15

**orders (14)**
18:8,14;34:6;87:3,
11;88:20;94:20;100:2,
6,8;162:23,25;164:12;
167:22
**organizations (1)**
166:15
**organized (1)**
146:25
**orientation (2)**
58:18;152:19
**Orme (5)**
28:24;31:2,4;33:16;
147:7
**O-R-M-E (1)**
31:4
**Orme's (1)**
31:3
**Osborne (2)**
92:3;97:14
**others (7)**
30:10;33:16;47:7;
88:2;139:11;147:14;
179:5
**other's (1)**
5:14
**otherwise (3)**
5:21;6:18;224:2
**out (78)**
5:14;9:20;12:10,12;
13:5,8,15,22;14:7,10,
21,25;18:8;19:13;20:4;
24:11;31:24;32:1,6;
39:9;41:25;42:2,11,24;
43:21,23;45:20;47:22,
25;52:20;54:19;61:7,
16;62:17;63:10;66:20;
70:20;78:5,14;81:22;
85:24;90:11;93:17;
94:25;97:1;107:18;
109:18;110:5,9,19;
119:8;123:9;124:19;
131:19;143:14;145:7;
146:5,6;148:13;156:7;
157:11;166:2;171:4,
11;178:15;181:16;
186:15;189:10;191:9,
18;195:16,19;200:23;
208:11;213:18;218:12,
12;220:17
**outbreak (1)**
60:11
**outcome (1)**
70:13
**outdated (1)**
147:1
**outlet (16)**
122:20;123:6,7;
124:12,19,25;125:11,
14,25;126:3,6,23;
127:15,16;128:3,10
**outlets (4)**
122:17;125:18;

126:17;127:22
**outline (1)**
203:19
**outside (17)**
11:9,13;13:3;15:3,5;
49:21;83:19;111:16;
118:4;122:10;123:17;
161:21;194:4;207:22;
213:4,12;221:18
**over (30)**
5:10;6:17;10:14;
16:15;23:2;44:21;
48:17;57:10;64:20;
69:5,15;71:7;76:1;
77:24;78:20;80:9,14;
82:14;88:11,12;97:18;
103:13;104:11;105:19;
119:2;132:8;160:24;
177:21;193:3;216:23
**overdoses (1)**
83:5
**overnight (9)**
154:25;156:22;
157:17;158:10;177:4,
6;179:2;196:7,12
**oversee (2)**
89:20;144:23
**oversees (1)**
87:2
**overview (2)**
73:14;74:24
**own (10)**
22:19;48:15;98:22;
108:17;145:19;149:10;
151:22;153:7;189:22;
210:12

**P**

**packet (1)**
65:3
**page (8)**
54:4;57:19;64:25;
65:2,8;174:21;181:19;
220:11
**pages (1)**
174:5
**paid (5)**
62:8,14;70:16,20,24
**panels (2)**
160:10;184:1
**panic (2)**
8:13;163:13
**paper (3)**
33:1;156:24;157:6
**paperclip (1)**
125:13
**paperwork (6)**
59:10,17;83:15;
106:6,8,8
**parades (1)**
62:14
**parcel (2)**

131:23;138:17
**part (48)**
15:18;31:19;48:2;
51:15;58:14;59:15,24;
63:9;69:25;80:13;
83:12;84:10;88:19;
91:20,21;102:18;
106:21,23;107:1;
108:10;110:9;111:6;
123:2,24;129:11,13;
131:10,17,23;136:11;
138:5,10,12,16;140:1;
142:19;156:7;157:25;
162:25;163:4;164:9;
203:20,20;210:25;
216:6;218:13;219:6;
221:12
**partial (3)**
8:18;140:23;143:15
**participant (1)**
137:3
**participate (3)**
62:10,15;223:13
**participated (1)**
158:21
**participating (1)**
34:20
**particular (20)**
8:4;31:20;35:7;
38:13;71:7;86:4;88:16;
103:8;113:9;153:15,
15;159:12;172:12;
177:3,6;178:22;204:1;
210:6;212:19;215:1
**parties (1)**
4:19
**parts (2)**
111:12;135:2
**party (1)**
213:8
**pass (1)**
130:8
**passed (2)**
146:5;222:3
**passes (1)**
62:19
**passing (4)**
24:19,23;49:14;
146:6
**past (1)**
149:9
**pause (3)**
4:13;96:11;224:9
**pay (2)**
189:12,23
**payroll (1)**
185:25
**pending (5)**
86:25;221:16,22;
224:21;225:1
**Pendleton (1)**
76:21
**people (33)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 76 of 85

RON NEAL
July 15, 2020

10:4;19:1;22:19;
30:15;45:4;49:3;50:1;
60:17;61:4;62:3;63:9;
83:19,21;88:15;94:5;
127:4;138:14;144:1,
11,23;156:6;177:5;
184:21;193:11;195:20;
206:10,13;216:22;
219:3;222:7,18,19;
224:3

**per (3)**
108:3,4;155:4
**perform (5)**
89:25;166:1;193:7,
13,19
**performance (3)**
160:4,25;180:14
**performed (3)**
95:7;191:16;201:21
**performing (2)**
160:20;194:12
**perhaps (1)**
222:11
**period (7)**
19:9;21:5;100:4;
163:25;189:12,23;
190:4
**periodic (1)**
93:10
**permissible (1)**
224:17
**permission (1)**
219:19
**person (42)**
30:25;41:20;45:8;
56:5;59:5,21;61:18,21;
69:5,6,11,21;76:6;
81:24;83:4;86:2;88:23;
92:19,20;93:1;119:2;
130:10;146:9;150:8;
158:12;170:23;179:23;
180:18,20;181:3;
182:5;183:3,20,22;
185:7,9;186:16;
188:11,18;198:13;
208:24;209:5
**personal (2)**
5:5;13:25
**personality (1)**
63:12
**personally (5)**
15:17,17;59:21;
70:20;118:25
**personnel (8)**
53:15,23;56:16;57:4,
7;59:2;65:3,9
**person's (2)**
61:15;120:21
**perspective (3)**
39:25;40:1;44:25
**Phelan (3)**
65:11,14,15
**phone (27)**

11:4;15:23;16:2,3,7,
15;17:2,10;19:11,13;
82:23,24;83:14;85:2;
110:22;116:11;123:21;
137:2,6;173:20;174:4,
14,20;175:5,8,10,17
**phones (3)**
19:3,5;175:3
**Phonetic (1)**
121:23
**photograph (2)**
54:3;57:19
**phrase (3)**
7:15,22;125:1
**physical (16)**
84:19;86:20,24;89:9,
20;91:3;128:22;
129:25;132:4,5;133:8;
134:17;135:20;149:6;
178:20;193:12
**physically (2)**
61:6;103:3
**pick (4)**
88:21;90:3;112:19;
199:24
**picture (5)**
12:2,3;28:5;130:2,4
**piece (7)**
29:22,23;33:8;90:8,
10;94:6;125:12
**pieces (3)**
29:4;34:13;211:9
**pipe (6)**
28:9;192:3,3,4,9,17
**place (33)**
17:16;28:16;32:16,
20;34:15,16;39:18;
48:15;88:4;111:22;
112:3;122:8;124:10,
16;128:7,8;129:19;
138:13;146:17;157:20,
21;159:4,20,24;
160:18;161:3,17;
163:6;180:25;213:12;
214:21;216:2;217:24
**placement (1)**
25:19
**places (5)**
26:13;121:7,8;
164:19;192:14
**plaintiff (2)**
5:3;71:19
**Plaintiffs (1)**
4:2
**plaintiff's (1)**
4:20
**plan (9)**
133:23;134:3,5,17,
23;135:3;214:5;215:8,
11
**plant (12)**
84:19;86:20,24;89:9,
20;91:3;128:22;

129:25;132:4,5;
134:17;135:21
**play (2)**
40:18;178:18
**played (1)**
213:18
**playing (2)**
62:11;73:6
**playoff (1)**
197:3
**please (9)**
4:8,12;6:2,6;108:11;
115:19;118:12;215:4;
226:21
**pleased (2)**
33:6;220:20
**plug (4)**
90:7;127:11;133:19;
134:23
**plumbing (3)**
28:9;133:16,18
**pm (8)**
8:11;15:25;108:4,5;
110:21;174:19;196:22;
227:7
**pocket (1)**
70:21
**pods (1)**
127:9
**point (42)**
11:5,25;12:6;13:2;
14:15;16:6;21:4,4;
39:6,10;42:8,11,14;
44:1,5,8;51:20,21;
58:9;95:15;102:2;
115:14;117:2;127:25;
135:6;146:22;147:20;
154:9;158:21;165:11;
169:5,5;186:8;199:18;
203:22,23;206:21,23;
215:5,16;222:5;223:14
**pointed (2)**
145:5;215:1
**pointing (1)**
107:11
**points (5)**
38:6,14;43:16,19;
45:21
**pole (4)**
80:8,9,9,11
**police (4)**
20:2;22:22;140:24;
141:7
**policies (6)**
36:22;37:7;155:6;
162:10,11;176:24
**policy (52)**
21:11;38:18,19,25;
42:16;43:13,22;45:25;
81:19;83:16;103:21;
104:1,7,9;113:19;
114:22;115:7,21;
123:23;128:18;154:25;

129:25;132:4,5;
134:17;135:21
166:4,5;167:22;171:2;
185:6,9;186:19;
187:12,14,21,25;188:7,
20,22;189:14,18;
198:12;209:13,14;
210:14;212:22,23,23,
25;213:8,10,10;
215:13;217:18;218:4,
17
**pool (1)**
62:11
**poor (3)**
211:5,10,13
**pop (1)**
178:10
**popped (3)**
14:3,9;47:19
**population (5)**
13:15;55:9;177:11;
192:21;216:13
**portable (1)**
29:23
**portion (2)**
23:1;81:1
**posed (2)**
143:2;210:17
**position (9)**
43:5;44:11;61:14;
62:4;76:15;79:8;147:4;
201:15;211:19
**positions (1)**
78:21
**positive (3)**
54:20;92:7;148:22
**possession (2)**
122:21;187:24
**possibility (1)**
209:9
**possible (13)**
10:4;23:13;25:3;
27:5;64:20;93:22;
127:1;132:21;135:4;
136:9;175:9;210:10;
221:25
**possibly (4)**
32:14;44:15;149:13;
203:15
**post (7)**
18:13;143:18;
162:22,23,25;164:12;
167:22
**posts (1)**
198:17
**potential (2)**
55:21;221:5
**potentially (1)**
46:7
**power (3)**
126:17;128:13;
153:16
**powerhouse (6)**
113:1,3,5,12;118:20;
200:15

**practice (7)**
128:18;155:14;
162:1;189:25;190:1;
226:8,13
**predecessor (1)**
98:5
**prefix (1)**
175:12
**prepare (4)**
48:7,10;49:7;189:4
**preparedness (1)**
164:25
**presence (1)**
118:4
**present (4)**
26:24;101:8;117:21;
219:4
**pretty (10)**
6:16;30:7;42:1;
47:10;48:5;55:23;
110:1;115:13;199:12;
206:14
**prevent (1)**
201:10
**prevented (1)**
219:17
**previous (3)**
24:3;202:6,14
**previously (1)**
132:23
**primarily (4)**
19:11,13;107:17;
124:17
**primary (2)**
61:22;161:13
**prior (5)**
14:4;36:13;82:7;
110:4;156:1
**priority (1)**
168:1
**prison (89)**
8:6,8;17:13,17;
31:10,14;52:13,19;
53:11;55:5;58:13;
60:24;75:21;77:5,9;
78:24;79:1,3;81:3;
82:10,19;83:1;84:2,6;
85:10;86:9,19,25;
87:24;91:2;93:12;94:8;
95:16;97:25;99:21;
100:9,11;106:11;
107:14;111:23;112:23,
25;113:4;117:16;
119:17,23,25;120:16,
25;121:4;125:19;
127:23;128:1,18;
131:16;136:14;137:16;
141:8;142:3;143:7;
146:18;148:5,15,18;
150:19;151:24;152:10,
14;153:14;155:14;
163:5;164:3;175:11,
22;184:25;188:21;

DENISE DWYER, et al. v.
RON NEAL; et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 77 of 85

189:15;206:1;210:9;
216:9,22;218:1,3,20;
219:9;220:9,18;
222:15;226:9
**prisoner (1)**
122:4
**prisoners (16)**
22:6;37:10;43:21,23;
94:8,12;121:14;
122:13;157:8;164:3;
194:3,9;195:3;196:24;
215:23;216:9
**prisoner's (1)**
121:10
**privately (1)**
224:25
**privatized (2)**
75:25;76:21
**privilege (1)**
223:10
**probably (17)**
5:9;16:4;21:2;38:10;
45:7;50:15;52:20;
68:20;95:23;105:4;
115:1;147:22;153:25;
156:9,15;173:8;181:9
**problem (19)**
60:11,15;61:10;86:5;
87:14;91:18;100:16;
101:3;111:8;143:6;
144:9,10,11,16,17;
145:1;177:10;193:15;
194:19
**problems (10)**
27:22;39:19;44:16;
46:6;61:23,25;84:23;
143:23;144:4;191:21
**procedural (1)**
44:6
**procedures (1)**
161:12
**proceedings (2)**
111:20;227:6
**process (10)**
41:18;43:20,22;
59:24;64:19;88:20;
90:15;104:5;148:15;
170:22
**processing (1)**
83:14
**produced (5)**
56:3;65:4,9;141:19;
203:5
**product (1)**
223:10
**Production (2)**
52:9;56:4
**professional (1)**
55:11
**professionally (1)**
54:22
**proficient (1)**
184:19

**program (8)**
87:3;146:15,17,21,
24;147:8;148:4,10
**programs (1)**
74:15
**prohibiting (1)**
22:6
**projects (4)**
87:1,1,2;128:6
**Promise (11)**
45:10;50:18;56:6,20;
57:13,20;58:5;172:16,
23;205:3,5
**promoted (5)**
76:18;77:10;79:5,9;
217:23
**promotion (1)**
76:24
**prompt (1)**
24:5
**prompted (1)**
80:24
**proper (4)**
70:2,4;155:9;163:20
**properly (1)**
157:16
**property (21)**
123:14;124:18,22;
126:2,5;149:13;
216:16,18;217:15,18,
20,21,25;218:2,9,14,
18;219:2,24;220:8,17
**proposed (2)**
134:21;135:1
**protect (1)**
223:9
**protective (1)**
13:25
**provide (6)**
6:22;7:6,8;102:16;
164:1;216:8
**provided (7)**
59:6;89:3,4;123:2;
134:13,14;151:15
**provides (1)**
149:14
**providing (2)**
165:3;166:16
**psychiatric (1)**
75:10
**public (1)**
18:20
**pull (4)**
14:20;47:24;178:12;
219:14
**pulled (4)**
36:3;178:14,14;
220:25
**pulling (1)**
185:1
**punch (1)**
178:7
**purchase (5)**

30:4;34:5;97:8;98:6;
99:6
**purchased (2)**
30:5;97:21
**purchasing (5)**
29:6,18,21;31:11;
33:6
**purge (10)**
216:16,18;217:15,
18,25;218:15,24;
219:24;220:8,17
**purpose (5)**
37:9;148:3;184:11;
192:19;210:4
**purposes (2)**
127:13;187:2
**pushed (1)**
13:13
**pushing (1)**
55:15
**put (36)**
4:18;10:11;13:5;
28:4;33:10,16,18;
44:24;50:12;54:15;
85:24;89:10;90:9;
94:12;101:14,17;
117:19;118:1;123:8;
126:16;128:8,12;
135:20;140:6;147:15;
148:13;150:7;154:10;
156:23;157:6;184:4;
197:17;198:10;201:3;
225:2,8
**puts (2)**
52:19;164:3
**putting (1)**
13:8

## Q

**qualifications (1)**
152:6
**quarterback (1)**
211:24
**quarterly (6)**
155:2,4;156:21;
166:6,7,9
**quick (4)**
47:10;169:3;224:14;
225:16
**quicker (3)**
28:20;32:3;149:1
**quickly (5)**
10:15;12:16;30:4;
114:11;123:1
**quiet (2)**
195:22,24
**quit (1)**
64:3
**quite (4)**
38:15;116:7;154:3;
184:1
**quote (1)**

157:5

## R

**radio (68)**
9:23;16:15;19:12;
91:25;92:2,8,11;93:14,
17,20;94:2,15,17,18,
23;95:3,5,25;96:5;
97:4,11,14;102:4,22;
103:4,10,13,15,23,24;
104:3,4,6,10,21,23,25;
105:9,18,24;106:1;
138:4,9,22;139:8,15,
20;140:8;142:25;
143:14,15,20;144:18,
20;145:1,5,6,8,10,11,
13,16,18,21;146:2,3,9,
12
**radios (55)**
91:20;92:1;93:11,16,
24;94:4,6,11;95:2,9,15,
20,21,22;96:19;97:4,8,
15,21,24;98:7,11,20;
99:2,7,17,20,24;100:3,
10,17;101:4,10,16,25;
102:5,17,17,18;104:1,
13,17;106:7;127:10;
140:11;143:6,23;
144:5,9,12,16,25;
145:20;146:4,6
**raise (3)**
62:13;160:19;161:5
**raised (4)**
31:15,19;195:6;
206:17
**ran (7)**
41:7,8;46:23,25;
149:3;186:10;208:11
**random (1)**
145:11
**range (81)**
8:24;9:2,14,15,18;
12:8;13:21;16:13;
25:24;28:3,11;38:23,
23,23;39:5,5,14,14;
41:7;42:16,16,25,25;
43:3,3;44:9,10;46:23;
47:2,15;85:24;86:4;
106:17,18;115:8;
123:7;161:19;167:24;
168:2;179:13,14;
182:15,17,19,20;183:4,
6,6,8,9,10,12;185:16,
18;186:11,12,21;
187:17;188:4,18,24;
191:3,4,11;192:5,7,8,9,
13,15;194:5,8;195:17,
20;207:9;208:12,13,
15;213:1,2;226:10
**ranges (14)**
27:17,20;31:17;
38:22;107:17;114:23;

167:21;176:20;183:19;
184:9;191:17;192:10;
193:6,9
**rank (1)**
145:19
**ranking (1)**
41:19
**rare (5)**
86:10;119:3,13;
121:21;123:16
**rate (2)**
60:13;62:5
**rather (4)**
63:17;109:3,10;
182:10
**reach (3)**
24:16;116:10,19
**reaching (2)**
136:20;158:3
**read (17)**
109:8;111:2;118:8;
136:10;137:22;163:2;
164:13,18;168:18,20,
20,21;189:3;206:22,
25;209:17;223:23
**reading (1)**
163:15
**readings (2)**
116:2;226:9
**ready (3)**
112:15;173:15,16
**real (3)**
10:19;51:13;225:16
**realize (2)**
61:5;90:20
**realizes (1)**
97:16
**really (9)**
6:9;27:6;38:9;74:6;
93:4;102:1;113:23;
202:21;221:10
**realtime (1)**
131:5
**reason (20)**
22:4;49:11;53:3,6;
56:13;57:2,3;70:22;
73:3;119:25;150:6;
161:2,8;169:16;187:8;
210:18;218:8,14;
219:6;220:13
**reasonable (1)**
209:3
**reasons (9)**
7:4;126:15;139:4;
155:21,22;159:7;
197:19;206:12;219:1
**rebuttal (2)**
42:21;213:15
**recall (83)**
7:19;8:3,4;19:24;
21:24;24:20;25:11,16,
18;27:1,6,8;32:25;
33:2;34:24;35:3;38:12;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RON NEAL
July 15, 2020
USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 78 of 85

40:9;45:15;46:18,20,
25;48:3;49:16,19,20,
23,24;54:6,16,17,19;
55:18,23;57:15,22,25;
58:2,8;65:20,21;66:6,
24;67:2;69:12,23;72:7,
10,16,20;73:8;74:10;
99:8;100:24;102:7;
105:17;120:3,11;
121:20,22,24;122:3;
123:17;138:18;142:23;
145:20;146:4;154:4;
171:15,20,21;172:22;
177:23;187:22;189:7;
196:8;205:8;209:24;
210:25;214:6;215:22;
226:12,14
**receipt (1)**
134:4
**receive (10)**
37:23;70:2;84:7;
85:2;86:7;109:16;
131:7;142:6,9,10
**received (11)**
8:11;17:10;19:23;
23:16;26:10,18;38:1;
57:9;79:19;154:6;
162:20
**receives (1)**
165:22
**receiving (4)**
9:9;17:1;33:9;70:4
**recent (2)**
60:10;68:17
**recently (3)**
84:22;148:8;153:1
**recess (4)**
67:6;112:13;173:13;
226:1
**recognize (1)**
162:7
**recollect (1)**
66:1
**recollection (21)**
7:10,14,22,24;15:13;
20:20;23:21;34:8,10,
19;45:5;54:3;57:12;
66:13,17;67:23;95:18;
121:7,8;171:16;212:15
**recommend (1)**
66:14
**recommendation (3)**
170:3;214:10,17
**recommendations (11)**
27:15;31:11,13,18;
32:21;45:19,23;170:4;
171:5,8;214:16
**recommended (1)**
29:21
**recommending (2)**
59:5;171:9
**record (40)**
4:9,12,16,18;37:15;

51:25;52:3,5;53:19;
55:25;65:6;67:5,8;
68:7,11;80:19;96:10,
14;109:5;112:9,15;
115:17;117:23;118:4;
129:3;136:4;141:22;
173:15;174:8;203:9;
224:13,22;225:3,9,16,
18,18,20,24;226:3
**recorded (2)**
216:25;217:1
**records (3)**
100:14;108:24;174:4
**recreation (1)**
75:17
**recruitment (4)**
61:14,17;63:10,14
**red (1)**
90:9
**Redden (1)**
45:8
**reduce (1)**
62:5
**reentry (3)**
92:22,23;202:1
**refashion (1)**
126:22
**refer (2)**
133:7;192:3
**reference (2)**
139:7;216:19
**referenced (1)**
191:25
**references (1)**
115:21
**referencing (1)**
56:14
**referred (2)**
202:5;216:7
**referring (5)**
35:14;107:20;
129:12;133:17;156:5
**refers (2)**
179:15;205:2
**reflect (4)**
93:11;108:24;
111:19;215:17
**reflected (1)**
48:14
**reflecting (3)**
34:2;56:5;94:23
**reflects (2)**
56:16;108:16
**refresh (2)**
33:2;54:2
**regard (5)**
160:25;161:1;
184:22;199:20;216:16
**regarding (5)**
34:21;48:4;61:10;
65:12;68:8
**regardless (1)**
214:22

**regional (2)**
10:14;35:18
**regular (5)**
23:25;84:11;85:8,11;
86:16
**regularity (1)**
35:5
**regulations (1)**
218:4
**rehab (1)**
75:11
**rehash (2)**
36:20;98:17
**reinspection (1)**
130:7
**reiterating (1)**
215:12
**relate (1)**
117:3
**related (5)**
80:22;85:9;86:8,15,
17
**relations (1)**
32:17
**relationships (1)**
55:17
**relay (3)**
8:14;9:11;211:7
**relayed (1)**
9:24
**relaying (1)**
8:18
**release (1)**
178:22
**released (2)**
14:5;167:19
**releasing (1)**
213:23
**relevance (5)**
115:2;116:16;117:1,
18;179:22
**relevant (6)**
115:5,9;140:5,10,11;
209:19
**relied (1)**
158:2
**relief (3)**
190:7,12,13
**relieve (1)**
190:6
**relieving (2)**
146:8,10
**rely (3)**
102:11;148:11;162:3
**relying (2)**
7:16,19
**remain (1)**
116:6
**remember (86)**
8:8,10,12;9:1,13;
10:7,23,25;11:5;12:1,
4;13:1,11;14:24;16:10,
11;23:5,9,10;25:20;

26:4;27:10,11;28:13;
30:11;38:6,14;39:5,21;
40:20,23;41:6;42:7,13,
20;43:17;44:19;46:20,
21;47:6,9,11,23,25;
48:2;50:4,6;53:24,25;
54:7,10;57:15;66:19,
22,22;68:16;73:4;
95:19;96:2;103:6;
115:20;120:23;121:17,
17;122:7,9;159:25;
160:22;185:20;196:9,
10;199:21;200:7,11;
201:17,19;203:15;
212:2,3;215:9;218:5,
20;221:4;222:1;
223:24;226:7
**reminded (1)**
82:8
**remotely (1)**
178:13
**removed (1)**
185:10
**renovated (1)**
33:22
**rep (1)**
65:15
**repair (2)**
95:13,22
**repairable (1)**
95:12
**repaired (2)**
95:10;160:10
**repairs (2)**
95:6,7
**repeat (1)**
127:24
**repeated (2)**
47:14;144:16
**rephrase (2)**
5:18;200:4
**replace (5)**
95:22;100:7;107:19;
134:23;184:7
**replaced (10)**
76:5;87:15;88:19;
93:21;96:2;99:24;
101:10;102:5;104:19;
147:12
**replacement (6)**
95:13;97:5;98:11;
101:12;104:6;126:6
**replacements (1)**
97:12
**replacing (3)**
143:16;144:12;187:4
**report (76)**
18:11,16;22:3;81:25;
86:21;87:9,14;88:22;
89:1,2,3,4,22,24;92:15;
94:25;95:2,3;98:24;
106:24;107:2,4,22,25;
108:6;109:10,17;

110:5,14,16;111:1,19;
112:1,4;122:25;123:3,
24;124:3,7;126:10;
130:12,24,25;131:1,7;
132:12,14,15,19;
134:12;136:15;139:6,
21,22;140:3,7,13,15,
17,20,22,23;141:13,16,
25;142:6,9,11,18,19;
151:9;170:6,15;171:5;
196:4,11
**reportable (1)**
137:18
**reported (15)**
21:17,20;93:18;
103:1;106:19,23;
120:24;122:9;124:6;
158:5,7;159:19,23;
160:12,15
**REPORTER (13)**
39:8;109:7,8,13;
118:8;168:18;199:25;
200:1,5;225:17;226:4,
22;227:1
**reporting (1)**
22:1
**reports (16)**
9:4;90:25;93:10;
106:20;107:1;108:14;
110:1;111:16;112:18;
129:11;138:2;139:23;
140:17;142:12;151:11;
189:3
**represent (2)**
203:11;204:12
**representation (1)**
198:16
**representative (1)**
5:5
**reprimand (6)**
79:19;80:1,3,19,22;
82:14
**reps (1)**
65:17
**request (6)**
98:6,9;99:2,6,11;
100:10
**requested (2)**
26:17;102:18
**requesting (1)**
20:12
**requests (7)**
31:19;32:22;97:11;
99:16,18,19;102:18
**require (4)**
98:19;111:15;
181:23,24
**required (2)**
103:23;144:19
**requires (4)**
38:25;103:21;
123:23;163:20
**reread (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 79 of 85

168:16
**Reserve (1)**
  217:10
**reserved (1)**
  227:5
**residence (3)**
  8:5;17:4;19:6
**residue (2)**
  124:20;125:24
**resign (2)**
  53:4;63:18
**resignation (2)**
  56:9;65:12
**resigned (7)**
  50:22,24;52:25;56:6,
  11,23;65:19
**resigning (2)**
  51:5;143:11
**resolve (1)**
  61:25
**resolved (1)**
  64:16
**Resource (1)**
  52:18
**resources (1)**
  57:4
**respect (6)**
  34:20;43:20;103:22;
  114:22;154:25;215:1
**respective (3)**
  113:14;114:20;
  134:15
**respirator (1)**
  33:20
**respond (13)**
  12:21;31:25;40:22;
  148:15,25;149:17;
  154:18;164:2,24;
  165:5,17;166:19;
  212:18
**responded (2)**
  16:8;185:17
**responders (7)**
  39:1,12;45:25;47:11;
  212:11,18;213:3
**responding (3)**
  9:3;21:6;195:8
**response (22)**
  5:23;15:18;27:12;
  29:2;31:22;35:16,20;
  36:10;44:2;46:14;
  144:16;149:11;150:4;
  162:1,5;168:10;
  169:24;171:19,24;
  172:8,17;211:16
**responsibilities (5)**
  89:19;105:20;
  159:17;164:18;180:17
**responsibility (9)**
  87:22;89:10;133:9;
  152:18;154:15,19,20;
  157:23;177:1
**responsible (10)**

88:3;108:21;149:16,
  19;150:18;151:6;
  189:22;190:19;198:9;
  200:9
**rest (5)**
  55:6;60:25;113:22;
  195:22;220:14
**restart (1)**
  108:11
**restricted (7)**
  85:22;86:12;120:6,8,
  14;126:10;177:9
**result (5)**
  66:8;88:25;123:22;
  136:16;197:23
**resulted (1)**
  43:2
**retained (1)**
  71:16
**retarded (1)**
  74:14
**retention (3)**
  61:15;63:10,14
**returned (2)**
  20:7,8
**review (69)**
  34:25;35:11,13,19,
  23;36:6,13,16;37:4,16;
  38:3,7,13,15;40:18;
  42:8;43:13,17;45:11,
  14,20;46:12;47:13;
  48:4;49:7;59:9;66:11;
  89:6;103:19;110:1,3,6,
  14;131:1;136:18;
  137:19,21;142:12;
  169:21;201:16,21,22;
  202:4,6,13;203:6,12,
  17,21;204:4;205:11;
  206:5,8,18;210:4,6,7,
  16;211:1,3,24;212:4,
  15,21;213:21;214:7,
  13;215:10;216:5
**reviewed (8)**
  7:17;48:10;140:25;
  142:17;189:3;205:12,
  14;222:6
**reviewing (3)**
  138:14;190:14;205:8
**reviews (5)**
  35:4;36:7;37:11;
  201:12;210:3
**RFN (1)**
  52:14
**Rich (1)**
  36:20
**Richard (5)**
  35:17;36:9;201:14;
  204:9,15
**Rico (1)**
  97:21
**rid (1)**
  218:17
**rifles (1)**

152:6
**right (67)**
  10:10;22:17;43:6,11;
  44:12;45:3;46:4;50:23;
  53:8;68:4;78:2;90:19,
  22;93:24;98:1,1;
  104:12;109:21,24;
  110:2,11;111:24;
  121:2;124:5;133:20,
  25;136:21;139:9,11;
  140:3,10;141:4;
  142:13;144:19;145:7;
  152:14;155:14;157:3,
  8;164:4;169:25;
  173:12,24;177:4;
  178:23;183:15;185:11;
  194:6,7;195:5,6,11,17;
  196:25;198:1;199:16;
  200:2;204:8,11,25;
  206:2;213:22;215:2;
  219:25;224:25;225:2;
  226:2
**ring (4)**
  179:12;181:10,17;
  184:5
**riot (1)**
  220:17
**ripe (1)**
  222:21
**rise (1)**
  200:19
**rises (2)**
  38:23;168:3
**risk (4)**
  94:13;130:16,20;
  164:4
**Robert (3)**
  204:7,11,15
**Rodriguez (36)**
  40:9;41:1;44:2;
  45:17;46:21;50:19;
  65:11,20,21;102:25;
  136:1;138:1,8,20;
  139:14,19;142:25;
  143:5,9;168:9;169:13;
  171:17;185:15,22;
  186:2;187:15;191:1,8;
  204:20;206:4,16;
  207:4,8;208:7,10;
  209:5
**Rodriguez's (4)**
  65:2;103:15;188:3,
  16
**role (3)**
  85:8;185:5;221:17
**RON (2)**
  4:1,10
**R-O-N (1)**
  4:10
**roof (1)**
  176:13
**roofing (1)**
  131:21

**room (14)**
  15:10,11;19:1,2;
  44:20;60:14;117:20;
  118:1;143:17;146:5,
  12;189:6,16;190:21
**roughly (1)**
  199:11
**round (3)**
  40:6;192:4,18
**rounds (2)**
  192:16;193:4
**route (4)**
  11:22;15:6;161:13,
  14
**routine (3)**
  192:25;195:10;
  222:14
**routinely (2)**
  126:14;144:4
**rowdy (2)**
  11:8;197:10
**rule (1)**
  6:9
**rules (4)**
  5:10;127:7;170:24;
  224:17
**rumors (3)**
  50:3,8,12
**run (5)**
  59:6;81:17;155:25;
  156:2;191:11
**running (2)**
  61:1;208:7
**Ryan (2)**
  121:23,24

**S**

**safety (52)**
  30:23,24,25;85:10;
  87:6,8,17,20;88:21;
  89:25;90:25;91:8,10,
  10,16;94:7,12;104:14;
  124:9,14,17;128:24;
  129:7,13,17,21;130:9,
  11,18;131:11,11,13,14;
  132:3;134:3,16;
  135:10;148:6;153:14,
  24;154:14,20;155:20,
  22;158:5,6,15;159:13,
  21;192:20,20;200:22
**sales (3)**
  62:16,17,21
**same (33)**
  10:12;42:3;71:10;
  76:10;78:2;92:20;93:1;
  95:25;96:5;107:13;
  116:8;119:9;135:17;
  145:6,8,10;147:18;
  150:23;166:24;172:3,
  10,20,22;175:23;
  180:11,11,16;181:19;
  190:21;198:20;199:10;

208:20;220:10
**sanctioned (1)**
  126:8
**Sarah (24)**
  5:2;9:8;20:17;25:11;
  26:4;27:6;32:25;38:5;
  48:23;50:3,18;51:2;
  52:25;53:25;58:7;
  67:13;98:22;102:1;
  107:18;150:7;167:9;
  176:1;197:2;204:16
**sat (8)**
  67:10,15,21,23;68:2;
  69:9,19;71:13
**save (7)**
  46:13;148:6,7;
  149:13,13;210:10;
  214:22
**saved (3)**
  43:7;46:7;213:23
**saw (3)**
  24:7;33:1;90:7
**saying (20)**
  16:11,11;40:9,24;
  41:7;46:22,25;48:21;
  64:5;82:2;88:24;114:9;
  115:12;116:25;133:11;
  141:6;144:4;156:25;
  185:19;213:9
**scaled (1)**
  80:12
**scenario (2)**
  21:12;197:17
**scene (12)**
  8:17,18;9:9,24;10:4;
  12:22,24;16:21;29:11;
  39:2;41:10;148:16
**schedule (3)**
  59:21;83:7,24
**scheduled (2)**
  85:11;161:4
**schedules (4)**
  63:21,21,22;83:11
**school (10)**
  63:20;74:1,22;75:1,
  5;76:11;77:18,21,23,24
**schools (1)**
  74:4
**scored (1)**
  59:4
**scream (1)**
  194:23
**screaming (4)**
  41:12;46:25;197:19;
  211:15
**screams (1)**
  186:8
**screen (1)**
  137:3
**scroll (1)**
  215:3
**season (2)**
  119:5,9

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 80 of 85

**second (15)**
6:1;57:18;59:16,23;
65:2;67:5;68:7;83:8;
96:10;97:1;112:9;
137:1;168:2;206:20,22
**secondary (3)**
15:5;124:17;161:14
**seconds (1)**
85:25
**secretary (1)**
83:11
**section (1)**
137:24
**sections (2)**
187:2,8
**secure (1)**
183:14
**secured (4)**
128:3;181:24;
215:20,23
**security (25)**
27:18;33:12,14,15;
40:6;60:24;61:3;84:23;
94:7;124:9;140:22;
147:16;148:6;153:5,
14;155:22;187:2;
191:16;192:2,21;
193:3,7,25;217:20;
218:20
**seeing (3)**
20:13;137:2;189:7
**seek (1)**
98:19
**Seeks (1)**
209:7
**seem (1)**
55:9
**seemed (1)**
54:21
**seems (2)**
57:2;72:1
**sees (4)**
90:4,6;208:7,8
**segregation (2)**
81:20;120:7
**selecting (1)**
182:19
**self-mutilate (1)**
193:23
**semi-annual (1)**
166:7
**send (7)**
59:8,13;62:24;87:3;
100:2;119:1;141:18
**senior (3)**
75:4;77:23;198:13
**seniority (3)**
198:13,18,23
**sense (6)**
99:18;100:5;115:2;
163:11;168:6;176:22
**sent (4)**
95:5,8,12;196:11

**separate (1)**
140:22
**separated (1)**
52:21
**separation (1)**
57:1
**Sergeant (9)**
47:9;75:16;76:3;
92:14;180:3,4,7;181:3;
187:23
**sergeants (2)**
88:13;145:21
**series (1)**
153:15
**serious (12)**
16:12;74:17;105:7;
123:9,14;140:6;
193:20;202:10,13,25;
214:14,20
**seriously (1)**
193:6
**serve (1)**
78:5
**served (1)**
17:24
**serves (1)**
17:19
**service (6)**
50:25;76:2;90:11;
93:17;198:18;199:11
**serviceability (1)**
104:21
**services (5)**
31:6;76:23;128:22;
129:14;131:18
**serving (2)**
120:7;180:18
**sessions (1)**
151:2
**set (23)**
86:11;96:19;100:7;
113:3,5;119:24;120:4,
9,18,20,21;121:9,13,
24;122:4,14;126:14;
175:12;179:4,5;
181:16;187:5;223:7
**sets (1)**
179:6
**setting (1)**
86:3
**settle (2)**
70:21,25
**settled (2)**
69:13;70:17
**settlement (4)**
70:19;71:2,8,10
**several (23)**
11:7,9;20:2;22:18;
24:2,2,7,18;26:22;
27:18;62:6;67:13;
86:23;97:17;103:7;
107:24;138:12,14;
140:16;141:1;166:22;

211:3;220:19
**severely (1)**
213:13
**sewer (1)**
131:22
**shake (1)**
6:5
**shall (1)**
134:2
**share (5)**
34:13;141:10;174:3;
175:24;220:20
**shared (2)**
216:21;220:15
**sharing (1)**
185:2
**sheet (3)**
189:11;190:3,9
**sheets (2)**
40:8,13
**shelter (5)**
155:2;161:22;
162:22;180:5,7
**shelters (2)**
116:3;156:25
**shift (71)**
8:9;18:10;32:13;
60:1,2;63:16;93:19;
103:25;105:11,20;
106:12,19,22,24,25;
107:1,4,22,25;108:1,6,
13,17;109:16,21;110:1,
5,14,16,17;111:1,2,16,
19,22,25;112:4,18;
123:3,10,24;143:20;
154:25;155:4;156:17,
22;157:17;158:10;
159:12,20,24;177:3,4,
6;179:2,20,24,25;
180:8,13,19;193:10;
196:7;198:10,11;
199:13;200:21;202:1;
207:23;211:11;212:17
**shifts (4)**
61:19;108:3,4;
189:17
**shoot (1)**
107:10
**shooting (3)**
13:22;14:6;47:22
**shop (3)**
90:6;133:18;152:4
**short (4)**
65:18;78:7;159:11;
162:19
**shortly (8)**
8:11;15:25;50:23;
78:3;191:17;205:16;
217:17,22
**short-staffed (1)**
190:11
**shouting (2)**
185:17;196:24

**show (8)**
13:7;18:21;51:17;
54:2;64:23;129:5;
134:6;203:2
**showed (2)**
11:22;39:2
**shower (3)**
81:19,23;181:14
**showers (2)**
81:18;82:9
**showing (4)**
52:7;56:2;65:8;
107:2
**shown (1)**
136:8
**shows (1)**
56:25
**shut (2)**
126:17;128:12
**shut-off (1)**
128:8
**sibling (1)**
49:22
**sic (2)**
62:11;152:21
**side (7)**
5:20;15:7;130:25;
176:18,18;207:24;
208:3
**sides (2)**
28:7;43:15
**sign (2)**
164:13;220:12
**Signal (5)**
12:13,22;32:2;112:2;
138:4
**signature (2)**
226:19;227:5
**significant (2)**
11:18;35:9
**similar (1)**
201:15
**simply (6)**
17:3;170:1;189:21;
193:18;213:16;223:25
**simulate (2)**
159:6,15
**simulated (16)**
155:18,23;156:2,4,5,
24;157:9,14,19;158:9;
160:7,20;163:17;
164:8,16;165:23
**simulation (5)**
156:13;157:1,10;
163:6;167:3
**simultaneously (2)**
42:5;210:13
**single (8)**
8:24;64:1,25;65:8;
85:21;183:8;184:5;
199:3
**sit (12)**
58:8;66:24;70:10;

72:7,10,16;132:2;
142:23;169:15;171:14;
211:23;226:12
**site (8)**
21:7;85:15;86:7;
95:7,8,10,11;211:10
**sitting (2)**
34:24;69:3
**situation (13)**
10:22;18:7;35:9,10;
36:23;78:11,13;105:7;
111:4;195:8;197:23;
198:1;213:19
**situations (3)**
51:8,14;212:19
**six (1)**
82:7
**slash (2)**
30:24;57:1
**slightly (3)**
163:11;165:2;208:4
**slipped (1)**
81:23
**slowed (5)**
42:14,15;43:3;44:13;
45:24
**small (10)**
11:11;20:8;33:22;
85:21,23;122:21;
123:4;175:16,17,19
**smaller (2)**
100:2,8
**smell (1)**
138:2
**smoke (22)**
9:5;20:5,10;29:22;
30:1,2,3;33:5;38:23;
41:12,13,21;42:23;
44:7,15;47:16;124:20;
138:2;148:1;167:19;
168:3;208:8
**so-called (1)**
157:14
**softball (2)**
62:15;73:6
**somebody (6)**
7:20;15:15;66:21;
150:21;196:18;197:12
**somehow (4)**
11:17;125:10;
170:24;172:24
**someone (8)**
7:17;49:15;113:8;
124:25;170:17;173:21;
201:14;205:3
**someplace (1)**
216:3
**sometime (5)**
22:14;34:25;96:18;
101:10;216:11
**Sometimes (13)**
35:17;59:16;84:4;
86:20;118:24,25;

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 81 of 85

126:2;132:5,6,7;
134:19;195:21;196:14
**somewhere (7)**
21:3;60:2;67:14;
84:3;143:19;145:22;
162:17
**son's (1)**
49:13
**soon (1)**
93:22
**sorry (13)**
36:8;39:8;52:11;
58:4;75:15;96:14,25;
98:17;130:14;136:24;
137:8;141:9;159:13
**sort (3)**
203:19;223:2,5
**sought (1)**
220:23
**sounds (3)**
15:13;43:18;195:14
**source (1)**
127:12
**sources (1)**
22:12
**space (2)**
133:22;153:2
**spaces (1)**
201:9
**spark (3)**
122:17,19;125:10
**sparked (3)**
125:20;127:15,17
**sparking (2)**
124:25;128:10
**sparks (1)**
123:6
**SPD (3)**
65:15,16;71:7
**speak (5)**
6:3;9:4;22:9;23:13;
49:10
**speaking (3)**
49:16,19,20
**special (5)**
62:7,8,11,13;63:7
**specialized (1)**
153:22
**specific (17)**
8:25;46:19;105:14;
106:3;115:22;121:17,
19;153:20;162:23;
172:23;177:18;184:9,
9,21;189:19;196:11,18
**specifically (14)**
16:10;25:18;45:15;
50:4,13;56:14;68:16;
95:2;139:19;154:13;
160:25;161:1;168:22;
215:9
**specifics (1)**
10:20
**specifies (1)**

109:3
**specify (1)**
109:11
**spell (1)**
4:8
**spelled (2)**
171:4;205:4
**spend (3)**
61:18;83:18;187:3
**spoke (5)**
15:3;41:17;48:16;
124:24;203:17
**sponsored (1)**
30:8
**spray (2)**
29:9,12
**sprinkler (4)**
24:15;200:23;201:1,
4
**sprinklers (2)**
199:19;200:9
**squad (1)**
18:12
**square (1)**
182:16
**squirmish (1)**
15:2
**squirmishes (2)**
13:4,14
**St (1)**
110:24
**stabbed (1)**
105:9
**stabbing (1)**
110:21
**stacked (1)**
176:21
**staff (157)**
11:9,20,22;12:24;
13:22,23,24;14:2,22;
16:20;18:19;20:13;
21:23;30:25;31:12;
32:11;36:2;37:11,12;
38:16,17;39:1,12,15,
17,21;40:20,24;41:24;
42:18,20;43:8,14;45:1;
46:3;50:7;51:3,14;
52:13,21;55:19;58:20,
23;60:12,15;63:21;
64:21;71:6,7;80:14;
81:24;83:3,17;84:3,16,
17;85:9,12;86:2,16;
87:3;90:17;94:8,11,12;
103:7;113:11;116:4;
118:17;119:1;123:7,9;
124:3;125:24;127:3;
129:24,25;131:5;
141:2;144:4,24;145:9,
12,12,13,14;149:21,25;
150:8,11,13,23;152:1,
9,10,14;153:4,13,20;
154:1,10,17;155:1;
156:21;157:15,22;

159:11,14,16;161:10,
24;162:3,9,17;163:13,
24;164:1,4;165:5,16,
22;166:17;170:19;
180:1;190:12;192:2,9;
193:2,6;194:10,11;
195:2;196:24;198:17,
20;199:9,10;202:5,9;
206:11;208:5;210:8,
15;211:15,18;212:2;
213:4,11,25;214:5,14,
22;215:8,11,13,25;
221:12
**staffed (1)**
177:5
**staffing (2)**
159:9;177:7
**staff's (2)**
152:16;213:15
**stage (6)**
18:12;39:13;45:25;
69:15;134:9;213:3
**staged (1)**
39:3
**stages (1)**
135:8
**staging (1)**
161:21
**stairs (2)**
208:8,17
**stairwell (1)**
15:1
**stamp (1)**
141:14
**stamped (4)**
52:8;57:21;65:1;
174:5
**standards (1)**
148:24
**standing (3)**
64:13;183:9;213:20
**start (9)**
82:21;122:21;
143:12;144:2;161:18;
167:23;194:17,19;
201:24
**started (16)**
7:9;9:2;11:17;12:17;
16:13;75:7;76:11;78:3;
85:23;118:6;138:2;
147:9,14;148:19;
186:13;220:16
**starting (3)**
9:6;115:9;122:23
**starts (3)**
114:7;119:6;125:14
**state (89)**
4:8;8:13;16:6;17:13;
20:2;22:21,22;30:14,
18;31:6,9,14;50:25;
52:13,19;53:11,15,22;
57:4;58:13;59:1;60:22;
65:19;68:21;74:11;

75:8;76:2,17;77:5,8;
78:4,24,25;79:3;82:19;
85:10;87:24;93:12;
94:8;95:16;97:19;
99:21;100:9,11;
106:10;107:14;111:6;
112:22;117:16;119:17,
23;120:25;125:19;
126:2;127:23;128:1,
18;130:19;137:16;
139:16;140:24;141:6,
8;143:7;146:18;148:5,
18;150:19;151:24;
152:10,14;153:23;
155:14;163:5;164:3;
166:24;175:11,22;
184:25;188:20;189:14;
206:1;210:9;218:1,2;
219:8;220:9,18;226:9
**state-based (1)**
151:20
**statement (5)**
162:15;168:21;
191:9;212:9;215:14
**statements (4)**
7:20;168:21;170:11;
216:8
**state's (2)**
30:9,16
**stateside (1)**
76:20
**Statham (2)**
45:9;47:9
**station (9)**
25:23;40:4,10;41:3;
177:20;185:23;188:25;
191:2;208:11
**stations (1)**
24:16
**status (5)**
86:18;87:1;93:11,24;
94:2
**stay (3)**
5:13;6:16;78:9
**stayed (2)**
19:20;76:13
**steam (3)**
112:25;113:17;
114:20
**steel (1)**
208:2
**step (1)**
223:8
**stepped (1)**
11:23
**steps (5)**
61:2;125:17;126:22;
127:20;128:1
**Steve (8)**
87:21;156:9,16;
158:16;160:1,14,23;
161:23
**stick (1)**

125:13
**still (20)**
13:3;28:19;43:11;
44:8;45:1,2;58:4;
60:23;80:18;81:13,16,
17;123:24;130:14;
164:8,10;166:11;
178:20;191:1;214:1
**stipulate (2)**
4:21;187:21
**stipulating (1)**
4:19
**stipulation (1)**
4:22
**stitches (1)**
110:24
**stood (3)**
54:19;66:19;214:2
**stop (3)**
108:9;116:17;159:9
**stopped (1)**
82:9
**stored (1)**
217:2
**story (3)**
43:15;47:15;212:1
**Street (2)**
24:8,9
**stress (2)**
200:14,20
**strike (24)**
67:16;72:6,9;89:22;
99:9,17;103:20;106:8;
114:12;122:12;127:19;
128:16;136:6;142:15,
22;145:25;150:16;
156:3;161:6;171:15;
189:24;193:14;198:25;
223:11
**stroke (1)**
201:10
**struck (2)**
54:25,25
**struggle (1)**
180:22
**struggling (1)**
168:7
**stuff (2)**
34:6;218:23
**style (2)**
176:11,17
**subject (3)**
222:14,18;223:2
**submit (2)**
87:5;135:3
**submitted (3)**
99:19;100:11;135:10
**submitting (1)**
65:13
**subordinate (1)**
171:10
**substances (2)**
125:5,9

**BOSS REPORTERS**
**(219) 769-9090**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 203-9   filed 03/29/21   page 82 of 85
RON NEAL
July 15, 2020

**substantiate (1)**
125:25
**successful (2)**
130:8;160:15
**successfully (2)**
12:6;15:4
**succumb (1)**
55:16
**sudden (1)**
63:24
**sufficiency (1)**
154:17
**sufficient (5)**
165:25;166:18;
167:1,3,18
**sufficiently (1)**
119:16
**suggested (6)**
25:21;28:3;29:3,5;
66:25;67:2
**suggesting (1)**
116:19
**suggestions (6)**
25:2,23;26:2;31:13,
18;32:22
**suing (1)**
72:1
**suit (1)**
68:21
**summary (1)**
170:16
**summer (1)**
77:22
**Super (1)**
197:4
**superintendent (18)**
75:23;76:15,25;77:8;
79:11;81:5,6;89:8,11,
14,17;92:19,23,25;
93:6;147:5;151:10,11
**superintendents (2)**
79:12;89:19
**supervise (1)**
31:1
**supervised (1)**
86:22
**supervision (1)**
104:11
**supervisor (32)**
8:9;10:13;17:7;
63:13;79:20;80:25;
82:1;84:20;91:25;92:9;
93:15,19,20;97:11;
98:4,12,15;102:22;
106:25;110:18;123:11;
144:22;158:15;159:12;
170:4,6;180:1,13,24;
184:20;200:21;211:11
**supervisors (10)**
8:17;27:3;32:13;
105:22;132:6;171:8;
198:11;202:2;211:11;
220:19

**supervisor's (5)**
18:10;108:13,15,18;
207:23
**supervisory (6)**
32:11;58:23;145:9,
14;149:21,25
**support (2)**
152:9;213:4
**supported (2)**
45:1,6
**supporting (2)**
44:17;212:2
**supposed (4)**
104:3;161:11,18,23
**suppression (2)**
33:4;148:1
**sure (65)**
6:3,4,6;7:13;20:18;
25:12;27:1;30:7;33:19;
34:7,8;50:15,16;55:3;
60:14;66:11;73:15;
75:1;77:12;87:11;
99:13;102:9;105:3,21;
106:2;112:10;118:13;
124:11;127:25;130:20;
136:9,10;138:19;
146:13;149:5;150:11;
159:16;163:10;166:6;
168:14,16;169:11;
173:11;181:19;182:8,
12;185:3;188:14;
195:18;203:23;208:19;
210:24;212:10;215:6,
12,13;216:20;217:3,4,
9,13;220:10;221:19,
20;222:9
**surprise (13)**
51:1;112:4;143:4,8,
24;158:17,24,25;
160:17;185:13,19;
198:25;199:4
**surrounding (1)**
170:9
**susceptibility (1)**
125:18
**susceptible (1)**
126:24
**swearing (1)**
4:19
**swelled (1)**
14:7
**swelling (1)**
14:11
**swipe (2)**
178:6,7
**switch (2)**
177:21;182:21
**switched (1)**
182:23
**switches (1)**
182:21
**sworn (1)**
4:3

**synthetic (1)**
125:6
**system (28)**
29:23;30:2;33:4,5;
112:22;113:2,2;
114:16;119:16;128:8;
177:21,22;178:1,3,5,6,
13,19,21;179:11;
182:24;192:4,16;
194:22;200:24;201:2,
4;216:23
**systems (7)**
24:15;126:16;
128:12;131:22,22;
148:1,2

**T**

**tag (2)**
90:9,10
**talk (25)**
6:17;7:11;16:16;
23:1,13;31:21;32:9;
48:6,19,25;50:9;54:10;
59:12;84:2,3,20;106:7;
132:10;159:16;160:3;
176:23;202:11;217:12;
221:15;224:22
**talked (22)**
21:14;25:1,3;27:24;
29:20;48:19;94:20;
106:5;123:19;124:24;
149:21;154:7;161:22;
170:7;173:20;201:12;
208:9;216:14,14,15;
217:15;222:6
**talking (35)**
8:19;9:21;13:2;23:5,
8;24:20;27:4,14;28:25;
33:3;47:6,7,23;58:4;
61:20;64:5;81:8;
101:23;112:18;114:21;
115:5;130:24;147:9;
160:1,23;167:16;
193:8;196:8,9,10;
199:21;200:11;215:9;
221:21;225:7
**talks (3)**
113:19;166:5;212:23
**target (1)**
222:19
**task (1)**
88:4
**team (17)**
22:20;36:21;37:1;
40:12;47:4;59:3;62:10;
63:9;76:10;80:17;
129:14;132:3;134:13;
185:24;189:9;190:15;
191:3
**teams (3)**
11:22;18:16;62:14
**Tech (2)**

74:5,16
**technical (3)**
4:13;108:8;112:11
**telling (15)**
9:1,13;11:5;12:1,5;
23:11;27:11;47:12;
116:4,4;173:4;200:7;
201:18,19;222:2
**tells (2)**
97:15;159:12
**temp (1)**
118:19
**temperature (16)**
14:6;106:13,21;
107:2,11;108:7,17,24;
112:19;113:14,25;
115:8;116:2;200:16,
18;226:9
**temperatures (7)**
106:9,18;107:3,5,9;
113:5;114:23
**temps (3)**
106:15;113:3;114:4
**ten (11)**
17:14;20:8;67:14;
86:3;99:25;134:4;
135:10;173:10;224:13;
225:11,14
**tend (1)**
5:12
**tendency (1)**
218:23
**ten-page (1)**
141:18
**tense (1)**
44:18
**tenure (11)**
79:16;119:23;
120:24;128:1;143:7;
146:22;158:22;162:17;
163:5;166:13;199:3
**TER/RSN (1)**
56:9
**term (1)**
62:12
**Terminated (4)**
56:11,22;57:2;68:21
**termination (2)**
68:23;69:1
**terminology (2)**
56:12;79:13
**terms (3)**
36:15;184:12;219:18
**testified (24)**
4:3;15:14,22;17:1;
43:20;72:22,25;73:2;
93:5;96:17;99:16;
108:25;123:4;130:10;
140:13;143:5;145:4;
157:4;158:20;182:1;
185:15;196:4;199:18;
219:7
**testify (3)**

70:7;73:7;169:15
**testifying (5)**
47:12;73:4,8;222:10;
226:7
**testimony (25)**
6:23;7:6;43:18;
46:22;49:1;90:16;96:4,
20;97:23;100:23;
101:7;103:14;120:19,
22;122:3;158:6;
163:10;186:18;187:13;
188:2;197:21;209:8;
224:18;225:22,23
**Thanks (1)**
173:12
**therapy (1)**
75:11
**therefore (4)**
149:12;167:12;
171:11;172:13
**thermometer (3)**
106:15;107:8,13
**thick (1)**
41:21
**thinking (3)**
46:16;49:17;165:19
**third (3)**
151:24;212:10;
215:16
**third-party (1)**
68:14
**thoroughly (3)**
111:3;142:21;168:20
**though (7)**
14:9;15:13;66:12;
157:19;178:19;183:23;
210:13
**thought (12)**
41:4,18,20;43:6,7;
44:12;45:24;58:4;82:2;
130:17;143:8;171:21
**threat (2)**
84:24;153:5
**three (42)**
12:19;16:4;23:7,17;
24:17;25:13;40:2;
47:17;51:6;70:12,12;
75:25;81:13;86:14;
96:2;110:22;131:17,
24;152:8;158:18;
174:5;175:12,24;
176:16;177:8,13,14,15;
179:1,2;180:15;
190:19;192:14;196:1,
19;199:10;200:20;
201:3,6;221:7,25;
222:4
**throughout (15)**
62:7;84:7,8;106:22;
112:24;113:4;119:12;
121:4;143:20;147:23;
151:3;196:14;211:4;
216:17;226:10

**thrown (1)**
    214:19
**tiers (5)**
    28:6;176:14,15,16;
    193:9
**Times (26)**
    59:13;67:12,13;
    68:13;69:9;71:22;
    83:13,20;105:21;
    113:16;115:22;119:11,
    22;120:17;125:3;
    160:14;166:22;181:9;
    184:8;187:24;192:2;
    194:25;199:7;206:9;
    221:7;222:4
**title (4)**
    92:20;93:7;95:1;
    130:15
**titled (8)**
    52:4;55:24;65:5;
    129:2;136:3;141:21;
    174:7;203:8
**tobacco (2)**
    122:18;125:4
**today (31)**
    6:23;7:6,11;48:11;
    53:17;58:8;60:19,19,
    21;66:24;68:18;69:4;
    72:7,10,16;96:6;98:12;
    142:23;145:4;147:16;
    159:15;168:24;169:15;
    171:14;177:23;178:2;
    198:19;203:14;207:11;
    209:6;226:12
**today's (3)**
    48:7;49:8;148:23
**together (5)**
    36:3;150:3;154:1,1,8
**told (20)**
    7:18;9:16;10:16;
    13:20;15:15;21:22;
    40:7,11;57:14;76:16;
    81:9,15;82:4;103:7,11;
    110:6,17;138:3;161:7;
    196:18
**tolerate (1)**
    55:13
**took (27)**
    32:16,19;34:16;
    39:18;48:15;75:3;76:1;
    88:4;112:3,17;138:7,
    13,19;157:19;160:18;
    168:9,22;171:17;
    172:18;186:15;205:22;
    210:19;213:11;214:3,
    20;216:2;217:23
**tool (1)**
    94:3
**top (14)**
    9:15;26:14;38:22;
    80:8,15;95:1;99:15;
    105:3;146:11;161:19;
    168:3;174:25;176:21;

213:1
**topic (3)**
    46:19;102:24;222:17
**topics (2)**
    160:4;173:7
**touch (4)**
    10:7,23;14:13;47:21
**touched (1)**
    149:22
**tough (2)**
    60:23;61:3
**tournaments (1)**
    62:15
**toward (2)**
    69:5,6
**towards (1)**
    214:18
**town (3)**
    175:16,17,19
**track (2)**
    114:3;200:15
**tracking (1)**
    52:22
**tracks (1)**
    178:14
**traffic (1)**
    55:16
**trafficking (1)**
    55:21
**train (5)**
    149:19;154:17;
    165:4,16;166:19
**trained (4)**
    148:23;150:20;
    157:16;163:3
**trainer (1)**
    152:5
**trainers (4)**
    152:3,3,9;153:23
**training (68)**
    30:6,11,13;32:10;
    33:11,17;58:17;75:2,3,
    6;77:22,25;147:15;
    149:17;150:12,22,23;
    151:1,2,4,5,6,7,14,18,
    19,21,22,23;152:1,11,
    13,15,17,17,20,24;
    153:3,6,10,13,17,19,
    21;154:2,10,13;162:4,
    20;163:14,17,18,21;
    164:1,7,8,11,24;165:8,
    9,12,22,23,23;166:9;
    199:16,17;215:2
**trainings (1)**
    24:21
**trains (1)**
    129:16
**transcript (3)**
    6:18;111:9;226:20
**transferred (7)**
    75:12,22;76:3,21;
    77:4;147:3,3
**transmitted (3)**

51:21;99:11,12
**trash (1)**
    11:16
**travels (1)**
    30:20
**treated (1)**
    85:5
**treatment (1)**
    74:13
**treatments (2)**
    20:12,14
**tried (3)**
    11:2;153:25;214:22
**tries (1)**
    210:2
**trigger (2)**
    219:15;220:25
**trouble (8)**
    13:9;16:20;21:16;
    22:2,4;93:2;103:8;
    137:4
**truck (1)**
    33:23
**true (3)**
    23:22;144:8;158:13
**truly (1)**
    197:13
**truthful (3)**
    6:22;7:6,8
**try (26)**
    6:17;9:17;10:2;
    47:20;51:3;61:9;62:5;
    63:2,6,7,8;64:20;83:16,
    25;93:21;98:10;
    107:19;116:19;150:12;
    174:17;180:10,10;
    181:20;190:6;198:19;
    206:7
**trying (39)**
    8:14,16,25;9:10,23;
    13:16;14:10,23;16:16;
    20:19,23;32:25;34:23;
    37:5;39:6,9,22;41:14,
    15;42:8,13;44:8,20,24;
    46:18;50:9;99:17;
    110:12;117:4;120:2;
    121:17;146:4;186:15;
    187:20;211:7,16,18;
    213:7;216:11
**turn (24)**
    19:17;31:8;48:6;
    57:18;88:17;94:17;
    113:12,20;114:3,6,10,
    12,14,16;116:1,1;
    117:3;118:15,20;
    119:10;154:13;174:16,
    17;200:21
**turned (7)**
    59:1;75:21;91:15;
    115:22,23;132:23;
    208:16
**turning (1)**
    88:19

**turnover (7)**
    51:2;60:4,6,6;61:10;
    62:5;199:8
**turns (1)**
    88:7
**TV (1)**
    127:9
**twice (3)**
    62:18;68:16;69:19
**two (41)**
    11:23;23:6,17;24:17;
    25:13;29:18;40:5,10;
    41:4;43:15,19;44:2;
    47:2;53:7;64:1;70:12;
    75:24;78:10;80:7;83:2,
    21;86:14;108:4;109:3,
    11;121:7,8;132:16;
    152:9;173:8;185:24;
    186:14;190:18;191:12;
    200:20;201:3;208:16,
    17;220:25;221:25;
    222:4
**type (13)**
    27:25;52:15;56:16;
    99:5;129:9;137:12,14,
    15,17;178:9;196:21,
    23;197:8
**types (6)**
    24:4;69:16;84:13;
    86:10;119:4;155:11
**typical (6)**
    82:17;84:9;177:4;
    179:13;180:2;196:21
**typically (18)**
    19:15;30:22;36:8,21;
    43:12;71:6;82:20;
    84:14;97:9;99:10,11;
    137:15;141:25;179:25;
    182:1;186:4;196:23;
    222:14
**typo (2)**
    204:10;205:4

**U**

**unable (3)**
    12:5,10;103:1
**uncommon (2)**
    51:14;134:8
**under (7)**
    19:8;57:1;76:7;
    91:24;97:19;141:2;
    224:17
**underlying (1)**
    136:18
**underneath (2)**
    133:7;169:23
**understands (1)**
    111:8
**understood (4)**
    5:22,25;91:20;
    161:24
**unfortunate (3)**

43:8,10;213:25
**unfortunately (7)**
    49:4;61:5;65:1;
    102:11;214:21;218:11;
    219:13
**uniform (1)**
    144:24
**uniformed (1)**
    92:13
**unilateral (1)**
    116:16
**union (1)**
    198:16
**unit (44)**
    12:20;22:2,5,12;
    32:4;39:20;40:12;
    41:13,20,25;42:23;
    47:4;58:21;76:9;81:16,
    18,21,22;82:10,12;
    85:23;86:13;88:10;
    106:14;107:3,16;
    118:17,18;120:6,12,14;
    155:3;162:21;166:2;
    177:19;179:9;180:5,6;
    185:24;189:9;190:15;
    191:3;194:23;198:13
**units (9)**
    29:18;79:25;81:10,
    15;82:5;105:23;112:2;
    180:11,12
**University (4)**
    73:16,23;74:9,21
**unless (4)**
    82:10;162:18;
    182:10;205:22
**unlock (6)**
    181:5,25;185:16;
    186:20;188:3,17
**unusual (1)**
    186:7
**up (69)**
    6:6;10:10;11:22;
    13:7,20;18:21;19:17;
    25:23;28:2,11,13;
    29:17;39:2;41:7,17;
    44:7;46:19,23;47:10;
    50:25;55:14;57:6;
    59:11;61:1;80:13;
    87:10,12;88:22;90:3;
    93:4;95:6;101:7;
    106:17;112:19;113:20,
    24;114:20;118:15,20;
    126:1,3,4;138:20;
    142:24;143:11;147:3,
    3;148:23;160:5;
    176:19;178:11;181:13,
    14,14;183:6;185:18;
    186:10;187:1,7;190:8;
    193:9;199:23,24;
    202:25;207:9;208:4,7;
    220:9;225:12
**upgraded (2)**
    147:12,20

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RON NEAL
July 15, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 84 of 85

**upon (3)**
148:11;169:21;
185:17
**upset (5)**
11:8;42:20;44:11,17;
45:22
**use (19)**
7:15,21;27:21;29:25;
58:20,21,22,22;78:14;
95:16;96:6;101:15;
107:16;142:5;145:6;
156:4;177:22;178:2,3
**used (14)**
39:11;86:20;92:22,
24;107:8,13,23;120:7;
125:1;137:16,17;
185:1;192:17;198:15
**using (3)**
147:11;179:14;
188:12
**usual (1)**
113:19
**Usually (29)**
35:12;37:25;53:21;
82:23;85:20;86:11,12;
89:4;110:5,17;113:8,
18;114:21;115:23;
119:4,11;120:2,5;
125:12;132:2;135:20;
140:25;145:18;170:20;
177:8,14;183:22;
201:2;202:7

## V

**vacancy (1)**
60:13
**vague (2)**
101:16;102:8
**value (1)**
149:10
**variety (19)**
26:13;55:17;58:20,
23;83:9;84:21;85:1,5,
14;109:1;111:25;
118:24;155:20,21;
159:6;164:19;193:24;
199:9;222:20
**various (13)**
27:22;78:21;87:24;
91:1;106:10,16,22;
113:6;118:14;125:6;
127:3;128:5;186:25
**vast (1)**
122:7
**verbal (1)**
6:4
**verify (1)**
109:10
**version (1)**
135:9
**versus (5)**
37:8;43:22;160:7;

197:12,15
**via (6)**
4:20;11:4;19:17;
99:12;141:19;216:20
**video (18)**
4:20;5:11;6:2,10;
19:2,17;205:8;216:13,
15,18,19,20,21;217:2,
7,9;218:6;227:4
**videoconference (1)**
19:18
**violated (1)**
170:24
**violation (3)**
130:3;133:12;134:19
**violations (6)**
129:23;130:1;132:9,
10,18;135:15
**vis-a-vis (1)**
200:9
**vitals (1)**
14:23
**voice (6)**
6:6;82:22;93:4;
173:24;195:6;196:3
**volume (1)**
103:12
**voluntarily (1)**
190:2

## W

**waiting (5)**
24:12;83:20;117:20;
148:14;226:24
**walk (10)**
82:17;84:1;91:16;
112:3;192:10,13;
193:6;194:21;197:5;
201:5
**walked (3)**
191:17;207:22,23
**walking (4)**
24:24;105:23;
111:23;193:9
**wall (1)**
182:17
**walls (1)**
124:20
**Warden (46)**
4:8;5:2;42:11;72:3;
76:5;77:10;79:5,9,10;
82:18,25;85:8;92:16,
18,21,24;93:8;96:25;
99:2;108:9;109:24;
112:17;115:19;117:8;
118:1,10;129:10;
141:24;144:22;145:15;
147:4;158:14;169:20;
174:4;184:23;185:5;
201:25;202:1,7;
203:11;217:23;219:8,
11,12;220:2;223:21

**wardens (7)**
18:20;49:17;59:14;
79:12;84:18;98:24;
132:6
**warden's (1)**
194:23
**Wardlow (1)**
98:13
**W-A-R-D-L-O-W (1)**
98:13
**warm (1)**
122:14
**warmth (1)**
122:24
**warrant (1)**
172:13
**warrants (1)**
35:11
**watch (1)**
118:18
**watched (2)**
93:16;205:23
**Watchman (2)**
177:21;178:4
**Water (1)**
62:12
**Watson (6)**
41:17;45:7;47:10;
190:14;207:16,22
**way (27)**
5:14;10:2;14:11,15;
19:12;28:20;31:24;
37:13;50:12;54:16;
59:24;64:20;79:25;
99:12;100:24;110:11;
153:25;155:9;171:12;
187:21;188:23;198:19;
205:4;209:9;213:1,24;
219:22
**ways (4)**
29:1;34:11;55:10;
118:24
**weapon (1)**
27:21
**wear (2)**
29:10,11
**weather (1)**
113:24
**week (6)**
52:20;62:18;63:23;
84:15;131:25;132:15
**weekly (5)**
91:6,8,12,19,22
**weeks (7)**
22:16;23:7,17,18;
25:13;32:24;61:5
**well-attended (1)**
206:14
**well-being (1)**
192:12
**weren't (6)**
39:23;45:5;79:25;
82:6;147:1;213:17

**western (1)**
175:18
**Westville (4)**
65:17;76:25;77:3;
80:5
**what's (12)**
84:2;95:4;109:20;
117:1;120:15;133:23;
154:24;192:19;195:16,
19;205:25;212:7
**whenever (2)**
32:1;169:9
**whereby (2)**
165:22;192:5
**wherever (4)**
38:21;124:2;148:25;
166:2
**whole (4)**
30:18,20;77:13;
108:10
**who's (8)**
18:24;89:11;127:6;
129:13;151:6;182:5;
212:11,18
**whose (1)**
105:24
**wide (2)**
85:5,14
**wiggle (1)**
60:14
**William (1)**
204:7
**Wilson (4)**
10:13;27:5;81:7;
204:8
**windows (1)**
87:4
**winter (1)**
116:6
**wintertime (1)**
119:12
**wire (1)**
122:20
**wiring (2)**
127:22;128:2
**wisdom (1)**
150:10
**wish (1)**
199:13
**within (22)**
11:19;30:21;91:2,7;
92:12;95:24;113:6;
114:23;120:5,20;
126:18;128:2,6;134:4,
24;135:10;140:3;
193:16;211:13;218:3,
17;222:21
**without (4)**
7:16,19;103:3;195:8
**witness (15)**
4:2,5,20;68:14;
71:17;109:9;112:10;
116:22,25;117:19,21;

137:5;168:14;173:16;
223:17
**witness's (1)**
118:4
**woman (1)**
52:10
**woman's (1)**
173:24
**word (4)**
156:4;188:12;203:3;
204:13
**words (4)**
164:5;176:12;
195:19;201:16
**work (34)**
23:14;32:15;58:12;
63:22;64:18;74:24;
76:7;82:24;87:2,3,5,
11;88:7,17,20,20,24;
90:18;91:15;94:19;
111:24;129:25;132:18,
23;147:6;150:3,19;
169:23;205:7;213:1;
214:4,11;215:7;223:10
**worked (9)**
65:17,18;74:10;75:9,
15;76:9;82:7;156:21;
166:16
**working (34)**
12:19;31:25;32:17;
60:24;75:7;76:12;
77:16;78:3;87:25;90:1,
21;91:3;93:11,24;94:2,
23;103:24;104:13,18,
19,23;105:1,18,25;
134:4;146:17;150:13;
154:8;162:24;179:1;
180:8,16;184:24;190:5
**works (7)**
30:22;97:19;98:10;
151:16;198:24;205:6;
220:3
**write (3)**
55:14;134:17,22
**writes (1)**
170:16
**writing (2)**
167:16;170:15
**written (21)**
79:19;80:1,3,13,19,
22;82:14;126:1,4;
134:12,15;162:22;
164:12,23;165:3,14,15,
22;166:16;171:8;191:9
**wrong (1)**
90:7
**wrongful (2)**
68:23;69:1
**wrote (5)**
23:11;25:1;130:12;
140:20;210:20

USDC IN/ND case 3:18-cv-00995-JD    document 203-9    filed 03/29/21    page 85 of 85

## Y

**year (22)**
62:8,9;63:24;68:20;
73:25;75:4;76:9,14;
77:4,23;100:13;
113:17;115:22;118:13;
120:1,18;129:19,19;
132:21;151:3;199:3,11
**years (15)**
61:13;70:12,12;
75:25;78:10;80:15;
82:7;92:21;96:1,3;
99:25;167:1;196:19;
198:16,17
**yell (5)**
194:13;195:1,1;
197:15;208:4
**yelled (4)**
47:2;191:12;195:20;
208:17
**yelling (30)**
16:23;40:17,22,25;
41:2,6,8,12;114:1,4;
186:2,3,6,13;194:18,
20;195:18;196:2,6,9,
13,21,23;197:6,18,22,
24;208:6,11;211:15
**yells (3)**
44:3;186:8;195:24
**yesterday (1)**
142:20
**young (3)**
54:8;55:7;143:10

## Z

**Zoom (2)**
4:14;174:17

## 1

**1 (8)**
51:18;52:4,8,18;
54:4;133:12;141:17;
174:21
**10:00 (4)**
8:11;15:25;40:3;
186:4
**10:13 (1)**
174:19
**10:15 (1)**
19:23
**10:20 (1)**
19:23
**100 (4)**
168:4;194:5,8;
195:17
**1000's (1)**
112:2
**10-71 (9)**
12:14,15,18,23;

16:15;32:2;138:4;
173:22;174:1
**12 (1)**
51:11
**12-hour (1)**
193:10
**133450 (1)**
174:6
**133452 (1)**
174:6
**133778 (1)**
136:2
**15 (2)**
17:14;99:25
**16 (1)**
79:6
**17 (1)**
77:20
**18 (1)**
95:20
**1820 (1)**
52:9
**1821 (2)**
52:9;54:4
**1828 (1)**
56:4
**1829 (2)**
56:4;57:21
**19 (1)**
95:20
**1984 (3)**
75:2,4;78:9
**1985 (5)**
74:2,3;75:1,8,9
**1986 (2)**
75:6,10
**1987 (1)**
75:14
**1989 (1)**
75:15
**1990 (1)**
78:10

## 2

**2 (3)**
54:4;55:24;56:2
**2:00 (1)**
110:21
**20 (4)**
11:12;91:7;187:6;
196:1
**200 (11)**
16:23;41:7;42:3;
46:23;84:5;168:4;
186:11;191:11;194:24;
208:13;211:14
**2003 (3)**
73:24;74:3,9
**2007 (6)**
73:18;74:21;77:3,7;
79:2;80:3
**2008 (1)**

77:7
**2014 (1)**
79:6
**2015 (3)**
79:19;80:2,21
**2016 (3)**
77:11;79:5;129:6
**2017 (42)**
7:25;15:24;19:21;
52:25;53:5,13,22;56:7;
57:23;58:10;60:20;
66:8;87:19;89:13,16,
18;92:4;93:6;96:5;
98:14,19;100:16;
101:5;103:16;141:17;
156:1,17,19;158:7,15,
16;168:11;171:25;
178:18;185:14;187:15;
188:5,19;198:6;203:7;
207:10;226:13
**2018 (2)**
95:15;101:11
**2019 (2)**
95:15;101:11
**219-363-7142 (2)**
174:19,24
**219-877-8856 (1)**
174:13
**220 (1)**
40:24
**24 (1)**
203:7
**24/7 (1)**
82:24
**243 (1)**
175:20
**24-hours (1)**
83:2
**24th (1)**
212:16

## 3

**3 (5)**
64:24,25;65:5,16;
205:1
**3:00 (1)**
84:4
**3:30 (1)**
21:2
**30 (11)**
61:2;64:8,9,14,17;
80:15;164:14;184:7;
192:24;193:1,10
**300 (4)**
167:24;168:5;184:7;
194:24
**3000 (2)**
12:13,22
**30-day (1)**
135:5
**30-minute (1)**
193:16

**33 (1)**
167:1

## 4

**4 (5)**
52:25;53:5;56:7;
129:2,6
**4:00 (2)**
21:2;84:4
**4:05 (1)**
227:7
**400 (2)**
168:4;194:24
**4-7 (1)**
174:18

## 5

**5 (2)**
136:1,3
**50 (3)**
99:2;194:25;196:1
**500 (24)**
9:2,14,18;12:8;
13:21;16:12;47:15;
106:18;168:4;183:4,6,
8,10;185:16,18;
186:12;187:17;188:4,
18,24;194:24;195:20;
207:9;208:15
**540 (4)**
12:9;41:8,13;186:12
**5931 (1)**
129:8
**5961 (1)**
129:8

## 6

**6 (2)**
141:13,21
**6:00 (5)**
108:4,4,5,5;111:2
**60's (1)**
114:8

## 7

**7 (27)**
7:25;11:11,16,18,19;
13:5,8;15:24;19:20;
39:19;42:18;43:10;
57:23;66:8;103:16;
168:11;171:25;174:3,
7,21;185:14;187:15;
188:5,19;198:5;
207:10;213:13
**7:00 (1)**
82:21
**70 (1)**
114:5
**712 (1)**

175:18
**7th (2)**
23:23;24:1

## 8

**8 (2)**
203:3,8
**8:00 (3)**
82:21;202:3,16
**85 (1)**
75:5

## 9

**9:00 (2)**
40:6;196:22
**9:30 (1)**
196:22