## In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*30(b)(6) WARDEN RON NEAL*
*September 22, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-22-20 Ron Neal.txt
**Min-U-Script® with Word Index**

USDC IN/ND case 3:18-cv-00995-JD document 203-11 filed 03/29/21 page 2 of 42

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the ESTATE OF )
JOSHUA DEVINE, )
            Plaintiff, )
        vs.             ) No. 3:18-cv-00995
RON NEAL, et al., )
            Defendants. )

THIS DEPOSITION CONTAINS CONFIDENTIAL INFORMATION

The deposition of RON NEAL, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken in the above-entitled cause, on September 22, 2020, appearing remotely from LaPorte County, Indiana, at 9:15 a.m. CDT.

Reporter: Kimberly D. Bures, CSR, RDR, CRR, CRC.

Illinois CSR License No.: 084-003292.

Appearing remotely from Lake County, Indiana.

BOSS REPORTERS AND VIDEOCONFERENCING

GARY * MERRILLVILLE * VALPARAISO, INDIANA

219.769.9090

Page 2

REMOTE APPEARANCES:

LOEVY & LOEVY, by:
MR. D. SAMUEL HEPPELL,
311 North Aberdeen Street, Third Floor,
Chicago, Illinois 60607,
(312) 243-5900,
sam@loevy.com,
        representing the plaintiff;

STATE OF INDIANA
OFFICE OF THE ATTORNEY GENERAL, by:
MR. GUSTAVO JIMENEZ,
Deputy Attorney General,
Indiana Government Center South, 5th Floor,
302 West Washington Street,
Indianapolis, Indiana 46204,
(317) 232-6201,
gustavo.jimenez.atg.in.gov,
        representing the defendants;

STATE OF INDIANA
OFFICE OF THE ATTORNEY GENERAL, by:
MS. LAUREN JACOBSEN,
Deputy Attorney General,
Indiana Government Center South, 5th Floor,
302 West Washington Street,
Indianapolis, Indiana 46204,
(317) 234-2900,
lauren.jacobsen@atg.in.gov,
        representing the Indiana Department of
        Correction.

* * * * *

Page 3

I N D E X

WITNESS                                    EXAMINATION

RON NEAL

    By Mr. Heppell........................  5

E X H I B I T S

NUMBER                              MARKED FOR ID

Neal Deposition

    Exhibit 1.............................  9

    Exhibit 2.............................  27

    Exhibit 3.............................  61

        (Exhibits retained by Mr. Heppell.)

Page 4

MR. HEPPELL: I'm going to start the Zoom recording here, and we can go ahead and swear in the witness.

        (Witness sworn.)

MR. HEPPELL: Good morning, Warden Neal. Thank you for taking the time to be here with us again today.

THE WITNESS: You're welcome. Good morning.

MR. HEPPELL: I should state before we jump into the deposition just to put on the record the stipulation amongst the parties and, I guess, also the counsel for Mr. Neal, for Warden Neal in his capacity as a 30(b)(6) deponent that everyone has agreed that in light of the public health emergency and all of the extenuating circumstances that everyone stipulated to conduct the deposition virtually by Zoom today with folks, the deponent and the lawyers and the court reporter, all in different physical locations but coming together via Zoom to conduct the deposition. So stipulated on behalf of the plaintiff. Is that stipulated by defendants and by counsel for IDOC?

MS. JACOBSEN: Yes. For IDOC.

THE WITNESS: Yes for me.

MR. JIMENEZ: Yes for me.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC N/ND case 3:18-cv-00995-JD document 203-11 filed 03/29/21 page 3 of 42

Page 5

MR. HEPPELL: Thanks, everyone.

RON NEAL, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HEPPELL:

Q. Warden Neal, I know that you have recently given a deposition in your individual capacity as a defendant in this case, so I know you're familiar not only with the general protocols of doing a deposition but also specifically doing one over Zoom, but if you don't mind, just to sort of give everyone a refresher, I'm going to briefly go over the protocols for going forward with the deposition today, okay?

A. Yeah, sure.

Q. Because there is -- in addition to the Zoom video recording, there's a written transcript being prepared by the court reporter, it is important that I ask my questions using words and you give your answers using words rather than relying on gestures or things like uh-huh, uh-uh. Does that make sense?

A. Yes, it does.

Q. And, similarly, although it's maybe less

Page 6

of a natural way of having a conversation, it's important that I -- that you let me get all the way to the end of my question before jumping in with your answer, okay?

A. I understand.

Q. And, similarly, I'd better do the same for you to let you get your answer out before I jump in with my next question.

A. Understood.

Q. And that way we can make the court reporter's job a little easier and make sure there's a clear record of your testimony today, okay?

A. Yes. I agree.

Q. And it's obviously a little trickier doing this over a video recording rather than in person, and if there's any technical issues with you being able to hear my questions or anyone else being able to hear my questions, please do let me know, okay?

A. Yeah. I sure will.

Q. And, similarly, keep your voice up on your answers, but if there's any issue we have hearing with you, we'll let you know, okay?

A. Sounds good.

Q. And, relatedly, if there's any question

Page 7

that I ask that you don't understand what I'm asking or you didn't hear the question, anything like that, you can tell that I've gotten off track somehow with what I'm asking, please do let me know. I'll gladly clarify my question, okay?

A. Yes.

Q. If you go ahead and answer the question, I'm going to assume that you were able to understand the question, okay?

A. Understood.

Q. There may be some objections that are raised to some of my questions today. Unlike in a courtroom where there's a judge to rule on those, those are just being made for the record, so unless you are directly instructed not to answer a question, give a moment to let the objection be made for the record, and then you can go ahead and answer the question, okay?

A. Understood.

Q. If at any point in time you need to take a break, that's fine, and I may ask for a break, or one of the other lawyers may ask for a break, and the only stipulation around that is, you know, I'd ask that you give your full and complete answer to any question that's pending, and then after my

Page 8

question and your answer's complete, we can go ahead and go off the record and take a break, okay?

A. Okay.

Q. And with those understandings out of the way, is there anything that you can think of that -- either any medications or conditions you have or anything else that would affect your ability to provide truthful and accurate testimony here today to the best of your ability?

A. No issues on my end.

Q. Okay. Warden Neal, could you go ahead and state and spell your name for the record?

A. Yeah. My name is Ron, R-o-n, Neal, N-e-a-l.

Q. And what is your current employment position?

A. I'm currently the warden at the Indiana State Prison for the Indiana Department of Corrections.

Q. And is it your understanding, Warden Neal, that you are here today to give testimony not on your own behalf but as a designated representative of the Indiana Department of Correction?

A. I understand, yes.

MR. HEPPELL: Okay. And I'm going to pull up

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 4 of 42

Page 9

an exhibit, a copy of the 30(b)(6) deposition notice, so give me one second here, and I will pull up that document.

(Whereupon, Neal Deposition Exhibit 1 remotely introduced.)

BY MR. HEPPELL:

Q. So I've marked -- I guess marked or designated this as Exhibit 1. It's the Rule 30(b)(6) notice of depositions, and it's a four-page document, and the first page is pulled up on the screen here. Warden Neal, are you able to see the document that I have pulled up on my screen here?

A. Yes, I am.

Q. And you see your name listed on the first page of the document here?

A. I do.

Q. Are you -- and then just to show you -- and I'll go into this in more detail. The subsequent pages of the document have a number of numbered paragraphs listing different topics. Are you familiar with this document?

A. I am, yes.

Q. Okay. And you see on the front page of the document it reflects that you've been

Page 10

designated on Topics 1 through 3, Topic 6, Topic 8, Topic 12 and Topic 14. Is that correct?

A. Well, the only question I have is I was designated for Topics 2, 3, 6, 8, 12 and 14, and I know my name was listed as a backup to Question 1, but I believe we had Chip Dudley, director of fire and risk management for the state, as the person directed to answer Question 1.

MR. HEPPELL: Okay.

MS. JACOBSEN: And just -- we do have him, and he is intending to testify about that in his deposition later this week. I believe he's this week. Next week. Or sorry. Tomorrow.

MR. HEPPELL: Tomorrow or Thursday?

MS. JACOBSEN: Oh, sorry. Thursday, yes.

MR. HEPPELL: That's no problem. I just wanted to make sure that I had that calendared correctly.

So, I mean, obviously it's within IDOC's purview to designate whoever it wants on the topics. I just want to be clear. Are you withdrawing Mr. -- Warden Neal's designation on Topic No. 1? I also see that Greg Lintz has been designated on Topic No. 1.

MS. JACOBSEN: Yeah. It's my understanding that that was done previously via e-mail along with

Page 11

that it was agreed to limit the years rather than from 2010 to 2017 to be from 2000 -- January 1, 2015, to December 31, 2017, as far as when active policies are.

MR. HEPPELL: That's -- I agree in terms of the limited designation as to the years, and I don't think we issued a revised notice, but I certainly was intending to and will put that on the record when I go through the topics. So with that understanding, then, is it Mr. Dudley who has been designated to testify fully and completely as to everything covered within Topic No. 1 such that --

MS. JACOBSEN: Yes.

MR. HEPPELL: Okay. And so neither Mr. Lintz nor Mr. Neal are designated on that topic anymore.

MS. JACOBSEN: Correct.

MR. HEPPELL: Okay. All right. Thank you for that confirmation.

BY MR. HEPPELL:

Q. And so with that understanding, then, Mr. Neal -- and I appreciate you raising that. It's my understanding that you have been designated today to give binding testimony on behalf of the Indiana Department of Correction with regard to Topic 2, 3, 6, 8, 12 and 14. Is that correct?

Page 12

A. That is correct.

Q. And just to go through those with you briefly so that we're all on the same page at the outset, so turning to -- and as your counsel noted, there's been a subsequent agreement to limit the date range for each of these topics, so the date range that's listed on the page has been amended by agreement of the -- of counsel to run from December 1, 2015, through -- sorry -- January 1, 2015, through December 31, 2017.

But setting that amendment on the table, Topic No. 2 on which you've been designated is relating to the Indiana Department of Correction's policies, practices, customs, rules and regulations and/or systems in effect at Indiana State Prison from January 1, 2015, through December 31, 2017, relating to removing and/or releasing prisoners from their cells in the case of an emergency, including during a fire, medical problem or other event presenting a risk to health and safety. Is that correct?

A. Correct.

Q. And you're prepared to give binding testimony on behalf of the Indiana Department of Correction on that topic here today, correct?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 5 of 42

Page 13

A. Correct.

Q. And then as to Topic No. 3, that topic reflects the Indiana Department of Correction's policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison between April -- strike that -- between January 1, 2015, and December 31, 2017, relating to communication between prisoners and employees or staff, including methods of contacting, communicating or requesting help from staff, filing grievances, submitting maintenance requests and notifying staff of an emergency situation. That's your understanding of that topic as well?

A. That is correct.

Q. And you agree that you're prepared to give binding testimony on behalf of IDOC on that topic here today?

A. Yes.

Q. And then as to Topic No. 6, as reflected in the notice, that topic is relating to the Indiana Department of Correction's policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison from January 1, 2015, through December 31, 2017, relating to keys or other tools used to unlock or

Page 14

open secured doors at ISP, including key and lock creation, key storage, including storage of copies of keys, individuals or assigned positions who are required or prohibited from carrying keys, including which keys and when, key and lock repair, key and lock testing and audits or reviews of the locks and keys at Indiana State Prison, including the number and substance of reviews or audits and any conclusions reached or corrective action plans imposed as a result. Is that your understanding of that topic?

A. Yes.

Q. And you're prepared to give binding testimony today as to that topic on behalf of the Indiana Department of Correction.

A. Yes.

Q. And looking at Topic No. 8, that relates to the Indiana Department of Correction's policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison from January 1, 2015, through December 31, 2017, relating to when, on what occasions and in what manner cell doors of prisoners are secured. Is that your understanding of that topic as well?

A. Yes.

Page 15

Q. And you're prepared to give binding testimony today on that topic on behalf of the Indiana Department of Correction. Is that correct?

A. That is correct.

Q. And as to Topic No. 12, the topic relates to the Indiana Department of Correction's policies, practices, customs, rules and/or regulations in effect at Indiana State Prison from January 1, 2015, through December 31, 2017, relating to the electrical system at Indiana State Prison, including identification of issues or problems with the electrical systems, the process of reviewing, communicating and placing requests for maintenance to the electrical system, reviews and audits of the electrical systems, including the number and substance of review or audits and any conclusions reached or corrective action plans imposed as a result and repairs to the electrical system performed during the time period. Is that your understanding of that topic?

A. Yes. That's correct.

Q. And you're prepared to give binding testimony as to that topic on behalf of the Indiana Department of Correction today.

A. Yes.

Page 16

Q. And then Topic No. 14 just reflects the person with final policy-making authority over the policies, practices, customs, rules and/or regulations identified in those above topics. And are you prepared to give binding testimony related to who the final policy-making authority is for the topics that we just went through on which you've been designated?

A. Yes.

Q. Warden Neal, I'm going to preface this line of questioning by saying I don't want you to tell me anything about the substance of any communication you may have had with any lawyer who's representing you either in your individual capacity or as a designated witness in terms of what you said to them or what they said to you. Did you meet with anyone or speak with anyone in preparation for your deposition today?

A. I did work with my facility policy coordinator to assist me in pulling necessary documents, and there's a wide variety of documents that relate to each of these questions, so I did work with Rhonda Brennan, who is my facility policy coordinator here at the Indiana State Prison. She helped me pull documents relative to these

USDC IN/ND case 3:18-cv-00995-JD   document 203-11   filed 03/29/21   page 6 of 42

Page 17

questions.

Q. And approximately how long did you spend working with Ms. Brennan to help pull documents for you?

A. A couple hours.

Q. Was that last week or earlier this week?

A. It was earlier this week.

Q. Other than spending a couple of hours working with Ms. Brennan to pull documents related to these topics, is there anyone else you met with or spoke with to prepare for your deposition today?

A. No.

Q. Have you reviewed any documents in preparation for your deposition today?

A. I have reviewed the policies that have -- that I planned to present today, yes.

Q. Okay. And do you have those policy documents in front of you?

A. I do.

Q. Okay. And are there any documents that you reviewed to prepare for your deposition other than the policy documents that you have in front of you?

A. No. Everything I've reviewed I have in front of me.

Page 18

Q. Okay. And can you let me know what the documents are that you have in front of you?

A. Yeah. Do you want to do it question by question, or do you want me to name them all right now, or --

Q. Yeah. Why don't you just go ahead and name them all. I would appreciate that.

A. Okay. Sure. For Question 2 I have ISP's evacuation plan from our emergency manual dated June 1, 2015. I have ISP's fire plan from our emergency manual, and there's two copies in there, one from June 1 of 2015 and another from December 1, 2016.

I have a post order from the Indiana State Prison which is titled general post orders dated March 31, 2014. Those are more for Question 2.

For Question 3 I have a policy and an administrative procedure which is 00-02-301, which is offender grievance process, and there's several dates for that.

I have a facility operation directive, 02-14, which is communication between staff and offenders dated September 16, 2013. It's a little bit before, but I also have a 2016 copy in there as well. I also have the offender handbook from the

Page 19

Indiana State Prison, several pages, also 2011 and 2016.

Question 6, I have operational procedures, 02-03-106, key control, dated May 20, 2013, and July 1, 2017. I have operational procedures for policy 02-03-108, security inspections, January 13, 2009, and January 1, 2017.

I have a post order for the lock shop dated May 9, 2014. I have a key ring equipment log for B cell house. I have a Morse Watchmans report. It's a live key in use or overdue key report. That's dated December 21, 2020.

I have another post order which is general post order -- this is under Question No. 8 -- which is dated March 31, 2014. I have another post order, general daily routine master, dated March 13, 2014, and March 12, 2020. Those were under Question 8.

Under Question 12 I have administrative procedures for Policy 04-02-101, the establishment of standards for the maintenance of correctional facilities. I also have administrative procedures for Policy 04-02-102, which is construction services.

I have a facility directive, 91-23, which

Page 20

is lockout/tagout procedures. I have a facility directive, 91-30, which is hazard communication. I have another facility directive, 00-09, which is fire prevention practices. Those were for Question 12.

And for Question 14 I have administrative procedures for Policy 00-00-101, the organization and operation of the Department of Correction, and I also have administrative procedures for Policy 00-04-102, the establishment, distribution, maintenance, review and disposition of administrative records.

Those are the documents that I have with me today.

MS. JACOBSEN: Really quick, Counsel, I just want to add too -- I believe Warden Neal forgot. We had a 30-minute phone call on Friday to discuss.

THE WITNESS: I thought he said I didn't have to list conversations with my attorneys.

BY MR. HEPPELL:

Q. And I apologize if I was unclear. My question -- and I appreciate the opportunity to clarify. I don't -- the contents of that conversation is protected by privilege, but the fact that you had the conversation and the

DENISE DWYER, et al. v.
RON NEAL, et al.                          Cause No. 3:18-cv-00995-JD-MGG                          30(b)(6) WARDEN RON NEAL
                                                                                                   September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-11   filed 03/29/21   page 7 of 42

Page 21

approximate duration of the conversation is sort of fair game, and so I apologize for any confusion. I appreciate the correction there.

And thank you for going through those documents, and I believe that some of those documents have been produced in discovery in the case. I'm not sure if all of those policy documents have been produced at this point, so we may be asking for those to be produced, but we can address that as we go along after the deposition.

Looking at the issue of emergency release of prisoners, Warden Neal, I believe that you had testified that there were three different written policies which you had reviewed related to that topic. That was the evacuation plan from the emergency manual, the fire plan from the emergency manual and then the general post orders. Is that correct?

A. That is correct.

Q. Are there any other written policies that were in effect at Indiana State Prison during the time period of January 1, 2015, through December 31, 2017, that provided any direction related to when prisoners could or should or must be released from their cells in the event of an emergency?

Page 22

A. Not to my knowledge. I can tell you this. There could possibly be a healthcare service directive or an ancillary document that partially covers some of what's listed in the documents that I have pulled for this response, so I'm not saying this is an exhaustive list. But working with my knowledge of what exists and my policy coordinator's knowledge of what all exists, I tried to pull the most relevant documents that directly answers the questions that you posed, so I think these are the driving forces and the most relevant policies for the questions that were asked.

Q. And I appreciate that, and just so we're clear about the purpose of your deposition today and the capacity in which you're giving a deposition, you know, I understand that we had previously taken your deposition related to your personal knowledge of facts or information relevant to events at issue in this case.

And your role today here is a little different and not just limited to personal knowledge that you walked in with. But, you know, it's my understanding that you've been designated by the Indiana Department of Correction to give binding testimony on all of the topics that you've

Page 23

been designated for today, and so, you know, I guess I'm a little concerned to the extent that your answer just now suggested that there may be other written policies out there that would touch on this topic that you're not aware of.

So, you know, I guess -- going back to my -- the question that I'd asked previously, are you in a position today to give, you know, binding and exhaustive testimony on behalf of the Indiana Department of Correction with regard to the topics on which you've been designated, including Topic No. 2?

A. I have pulled all of the relevant documents that I'm aware of that addresses that specific question.

Q. Okay. And, you know, so just so we're clear, you know, you're giving testimony not just to the extent of your knowledge, binding on the Indiana Department of Correction, so what you're able to testify to today versus the department, that's it. Are we on the same page and same understanding as to that?

A. I believe so.

Q. And there are no additional documents you would need to review on this topic or any other

Page 24

topic before you were in a position where you felt you could give that binding testimony on behalf of the department. Is that fair to say?

A. That's fair to say.

Q. So turning to the emergency manual documents that -- my understanding of the emergency manual is that it's split into different numbered sections. Does that comport with the formatting of the documents you have in front of you?

A. That is correct, yes.

Q. You've mentioned that it was the fire plan and the evacuation plan. Can you tell me what the numbered sections are of those documents that are in front of you?

A. The evacuation plan from the emergency manual is Section 9. The fire plan from the emergency manual is Appendix C.

Q. Thank you. And is there a date on the Appendix C that you have in front of you?

A. Yes. There's a couple different copies that I had pulled. The first one that I pulled is dated June 1, 2015, and, again, that is Section 9, and the second one for Appendix C is dated December 1, 2016. There's an update date of the last one, but since the fire took place in 2017, I mean, the

USDC-NND Case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 8 of 42

Page 25

most relevant document would be the one that was in force at the time of the fire, is the one dated December 1, 2016.

Q. From January 1, 2015, through December 31, 2017, was it the policy of the Indiana Department of Correction in effect at Indiana State Prison during that time period that correctional staff were required to release a prisoner from a locked cell when there was a fire in that cell?

A. Yes. I mean, within that fire plan it covered an evacuation of a fire danger zone if the situation warrants.

It further goes on throughout that document that the control room will immediately call a fire emergency, 10-7, by radio. Any staff person witnessing a fire should immediately notify the control room by radio, telephone of the nature of the situation, the location, the extent of the fire if known. The shift supervisor will immediately dispatch bolt cutters to the scene of the fire.

But, I mean, to answer your question, yes, but as we go through the document, it tells you step by step what is supposed to happen, and I can cover that, or I can wait till you ask those

Page 26

questions.

Q. So let me -- in terms of sources of written policy that line-level correctional officers are made aware of and required to follow, the emergency manual is a document that is not made available -- well, strike that.

The copies of the emergency manual are not made available in the housing units or generally available throughout the facility. Is that correct?

A. That is correct, yeah. The copies of the emergency manual are kept in secure locations outside of the secure confines of the facility, but all staff review the emergency manual during training when they're hired in, new orientation training, new employee orientation.

They also review emergency manuals during in-service training which they place every year, but the document that is inside the facility with the officers that they generally work from is their post orders.

Q. Okay. And I believe you'd indicated that it was the general post orders was one of the documents you had in front of you related to the evacuation of prisoners. Is that correct?

Page 27

A. That is correct.

Q. Is there any written policy that a line-level correctional officer would be required to follow at Indiana State Prison during the designated time period that would dictate when and how they should rescue or evacuate a prisoner from a cell where there was a fire? Is there any aspect of the written policy directing them what to do in that situation that is contained only in the emergency manual and not contained in the post orders?

A. To my knowledge, everything that gives them step-by-step instructions that is also in the emergency manual is also in their general post orders, and I can go through that with you if you wish.

(Whereupon, Neal Deposition Exhibit 2 remotely introduced.)

BY MR. HEPPELL:

Q. I'm going to turn to that post order, and I'm going to designate this as Exhibit 2, and the version of the general post order that you have in front of you, Warden Neal, that is the general post orders dated March 31, 2014. Is that correct?

A. That is correct.

Page 28

Q. And that was the general post orders in effect covering the entirety of the time period on which you've been designated today. Is that correct?

A. Correct.

Q. And it's my understanding that the post orders have been designated as confidential, so in terms of handling the transcript, it's always a little clunky, but I think before I show you that -- I'll put on the record the Bates range in the nonconfidential part of the exhibit. So I know you're looking at a version of it which I assume does not have Bates.

The version that I have that I'm going to put on my screen Bates-stamped Devine 32761 through 32777. It's a 17-page document, and it's titled general post orders with a revision date of March 31, 2014, and it reflects on the first page, Page 1 of 17. Is that the same -- based on that description, is that the same document you have in front of you, Warden?

A. Yes. It is a 17-page document. I believe it sounds to be the same document, yes.

(Whereupon, the following proceedings were designated as confidential:)

USDC IN/ND case 3:18-cv-00995-JD document 203-11 filed 03/29/21 page 9 of 42

Page 29

C O N F I D E N T I A L

BY MR. HEPPELL:

Q. Okay. And so I think, then, if -- obviously I followed the guidance of counsel for the IDOC and defense counsel on this, but if I'm going to pull up a confidential document and read from that, I think we're going to designate this as a confidential portion of the deposition transcript. Does that make sense?

A. Sure. I mean, to explain, it's listed as a confidential document because post orders are kept in the location that the officers are working, so in this case every officer's post has both post orders, general post orders and the specific post post orders.

So they're kept confidential because obviously they're not to be shared with the offender population, so they have to be kept under lock and key at all times, so that's why they're labeled confidential documents.

MR. HEPPELL: And is that the preference of the counsel of IDOC, that we designate this portion of the transcript as confidential?

MS. JACOBSEN: Yes, it is.

MR. HEPPELL: So designated, and I will do my

Page 30

C O N F I D E N T I A L

best to remember to make a clear notation when we come out of that, and if anyone else notices me veering into unrelated topics and I have forgotten to do that, I'd appreciate the reminder just so we have a clear transcript.

So with that designation made now in the confidential portion of the transcript, I'm going to again share my screen and pull up a copy of that document which I've marked as Exhibit 2, and it has that Bates range that I put on the record before, but to put it on the record in the confidential portion as well, it's Devine 32761 through 32777.

BY MR. HEPPELL:

Q. And turning to Page -- turning to Section P of that document on Page 7, 7 and 8 of the documents, are you -- is it easier for you to follow along with what I'm sharing on the screen or follow along with the document in front of you, Warden Neal?

A. Either/or. They're the same thing.

Q. Well, so seeing Section P at the bottom of Page 7 and going on to the top of Page 8 listing fire, there's a list of six bullet points under that section. Do you see what I'm referring to?

Page 31

C O N F I D E N T I A L

A. I do.

Q. And are those the written policies that were in effect at Indiana State Prison in the relevant time period that governed the requirement of correctional officers to evacuate prisoners from a cell, from their cell in the event of a fire within that cell?

A. That's the general post orders that were in effect for officers to follow at that time, correct.

Q. And this is the section of those general post orders that specifically relate to --

A. Fire.

Q. -- to fire. Is that correct?

A. Yes.

Q. And No. 4 on that list is a requirement that an officer remove offenders that are in the immediate area of the fire. Is that correct?

A. That is correct.

Q. Okay. And that would include releasing or rescuing a prisoner from their cell if there is a fire in that cell. Is that fair to say?

A. That's fair to say.

Q. And that's a requirement that every

Page 32

C O N F I D E N T I A L

correctional officer had to follow in that time period. Is that fair to say?

A. Fair to say.

Q. And in the event of a fire in a cell house, it would be the responsibility of all of the officers in that cell house working together to ensure that these emergency response steps were followed. Is that fair to say?

A. Yes. They should follow the steps outlined in 1 through 6, correct.

Q. And there's no unwritten exceptions to the rule that officers are required to remove prisoners from their cell when there's a fire in the cell. Is that fair to say?

A. Yes.

Q. And the policy requires correctional officers to take whatever steps are necessary to release a prisoner from a locked cell, correct?

A. Again, it's step by step. I mean, there's a contact with the control room to report the fire. Then they're supposed to grab the bolt cutters, take that with them because some cells have chains on them.

Step 3 is assess the scene of the fire.

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 10 of 42

Page 33

C O N F I D E N T I A L

Step 4 is remove offenders that are in the immediate area of the fire. 5, if possible, extinguish the fire with the extinguishers on hand. 6, remove offenders in the general area of the fire if they are in immediate danger.

Q. And the policy doesn't list specific directions for exactly how they are to accomplish each of those tasks. Is that correct?

A. It doesn't get any more specific than what we're talking about or what I just read, correct.

Q. And so fair to say that the policy requires officers to take the steps that are necessary to accomplish those requirements that are listed in the policy even if those additional steps aren't specifically listed in the policy. Fair to say?

A. Yes.

Q. So, for example, the prisoner is in a fire in a locked cell. In order to remove that prisoner from the immediate area of the fire, it requires unlocking the cell, correct?

A. If at all possible, absolutely, yes.

Q. And that would require -- following this written policy, the correctional officer would be

Page 34

C O N F I D E N T I A L

required to obtain the keys in order to accomplish the task of removing that prisoner from the area of the fire, correct?

A. Yes.

(Whereupon, testimony designated as confidential concludes.)

Page 35

BY MR. HEPPELL:

Q. And I'm going to stop sharing that section now, and I'm going to ask you some general questions related to keys and unlocked cells, and I don't think those general questions require confidential designation, but if you -- we need to review a confidential document, we can go back under a confidential section of the transcript, but I'm going to note for the record that we're coming out of the confidential section of the deposition transcript for now, okay?

A. Okay.

Q. During what portion of the day at Indiana State Prison -- and I'm asking as a specific example B cell house over the designated period. What portion of the time period were prisoners locked in their cells?

A. It varies throughout the day. I believe that's addressed in another question actually, which is kind of where I save that for, but you actually have to work on a daily routine for each cell house and what's going on at different times throughout the day in that specific cell house to see when offenders could be out of their cell or when they would be locked in their cell.

Page 36

Q. So as a general matter, fair to say that there are certain portions of the day where the cells would be unlocked and prisoners would have the ability to enter and exit the cells of their own volition and then certain other portions of the day where they would be locked in their cells and would not be able to exit their cells without the assistance of a staff member, correct?

A. That is true, yes. Everything is ran by control of movement, but that -- yes. That is true.

Q. And one of the sections of the day or of the routine at the prison in effect at that time was after the 9:00 p.m. count that prisoners would be locked in their cells. Is that correct?

A. That is -- the vast majority of prisoners would be locked in their cells, yes.

Q. And specifically during the relevant time period in B cell house, those prisoners would be locked in their cells during that time period. Is that correct?

A. Yeah. I mean, it's possible that they could have had an offender sanitation crew out at that time of night, but the vast majority of offenders would have been locked in their cells, if

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 11 of 42

Page 37

not all, yes.

Q. And just to, I guess, get some clarification around the exception you articulated, that would be like a specific situation where someone had like a work crew designation that they were actually absent from their cell engaged in some work task. Is that fair to say?

A. That's correct, yes.

Q. You would not have a situation where a prisoner was in a cell after the 9:00 p.m. count but just with the door unlocked and the ability to enter or exit the cell of his own volition. Is that fair to say?

A. That's fair to say.

Q. Okay. Is there a written policy that provides for that?

A. Offender accountability is probably the best policy that EKLs, line offenders are allowed in or out of their cells and for what purposes, whether that's a count letter that lets them out to go to a specific location for a specific purpose, whether it's a work line for their particular job or whether they have a pass to go from their cell to whatever, medical or the doctor or whatever the purpose may be, but...

Page 38

Q. And is that -- is that a written policy that also provides that sort of the general default rule is that after 9:00 p.m. count, all prisoners at least in B cell house would be locked in their cells?

A. Yes.

Q. Okay. And during the designated time period in B cell house, what were the different methods by which a prisoner's cell door could be unlocked and opened such that they would be able to exit from their cell?

A. Are we talking about after 9:00 p.m.? Was that the question?

Q. Correct.

A. Correct?

Q. Correct, yes. After 9:00 p.m.

A. The only time a cell door would be opened after 9:00 p.m. would be if there was an emergency in that particular cell or the offender was having a seizure, a medical emergency. Then, of course, the cell would be opened. The offender would be removed, taken to medical or for whatever that purpose may be.

If there would have to be -- on occasion there are after-hours sanitation workers that are

Page 39

on count letter sometime after 9:00 p.m., and they could have been let out based on a count letter for a purpose such as that, but, again, that would be sporadic, but typically after 9:00 p.m. at night, again, most offenders are secure in their cells.

Q. And can you describe the physical mechanism in place during the relevant time period, so how did that physical locking mechanism operate on the cells in B cell house?

A. Yes. Each cell door has its own lock, its own specific lock. On the 500 range of B cell house where this took place, there are both electronic locks, and there's also -- offenders over the years were found to be manipulating those locking devices, jamming the locks. Therefore, they could tamper with the locking mechanism and open up the cell doors, so there's a system in place.

A lot of offenders were allowed to use a chain to secure their door and secure it with a padlock of their own, but typically a cell door would be opened with a key assigned to the officers, and, of course, the offender would have the key to his own padlock, but there's also various padlock keys on the officers' key rings

Page 40

assigned to B cell house.

Q. Okay. And I want to break that down a little to make sure that I understood it. And so in terms of the locking mechanisms that were or could be in place for a cell in B cell house during the designated time period, if I understood your testimony, you described a few different types of locking mechanisms that were or might be in place, correct?

A. Correct.

Q. So you had -- and I'm going to ask you for some additional details about these, but you had described an electronic locking mechanism, correct?

A. Correct.

Q. And you had also described, I guess, for lack of a better term, a nonelectronic mechanical locking mechanism that would be installed by the prison and operated by prison staff. Is that correct?

A. Correct.

Q. And then you'd also described that some prisoners may have their own personal padlock that they could use to secure their own cells. Is that correct?

A. Yes.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NNND, case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 12 of 42

Page 41

Q. And that would be like a padlock and chain mechanism in terms of the prisoner-operated lock?

A. Yes.

Q. And that's something that prisoners were permitted to have to sort of ensure the security of their own belongings and their own personal space during periods of time when -- during the day when the cells on the range might be left open. Is that fair to say?

A. Fair to say.

Q. And is that the reason why bolt cutters are listed as one of the required items that someone responding to a fire is required to obtain and take with them?

A. That is correct, yes.

Q. And that's to be able to cut through any prisoner-operated, prisoner-installed lock and chain mechanism that might be otherwise preventing the cell from being opened, correct?

A. That is correct.

Q. Okay. Is there any policy in effect at the prison that dictated whether prisoners were required to, permitted to or precluded from having that locking padlock, their own locking mechanism locking a cell during the night after 9:00 p.m.

Page 42

count?

A. Is there a policy that references an offender being required to lock his own cell at night? Is that your question?

Q. Is there any policy that addresses one way or the other whether prisoners were allowed to or required to or prevented from having their personal locking mechanisms in -- you know, in place during the evening, during the night?

A. Well, there's several. The policies that I mentioned. 02-03-106, key control, discusses keys and locks throughout the facility. Operational procedures for administrative procedures, 02-03-106, also discuss the electronic key management system, how that works.

There's also -- well, in the operational procedures for Policy 02-03-108, security inspections, covers locks and lock boxes. Operational procedures, again, for 02-03-108 covers that, and lock shop-specific post orders deals with safety and security, locking of cells, what locks are available and what locks exist. So there are several documents out there that talk about locks or locking of cells.

Q. And I understand that those set of

Page 43

documents, those policies -- rather than go through a variety of different specific topics related to locking mechanisms and key control, my question is specific to the locking mechanisms that prisoners were permitted to have and permitted to use and operate themselves and whether there's any policy that dictated whether and how the prisoners were permitted to have those locking mechanisms in place in the evenings or when they're in their own cell.

A. To my knowledge, there's no policy that exists that talks about offenders being -- using their own locks just for their cell, no.

Q. So that was sort of left up to their own discretion on when to have those in place, correct?

A. Yes.

Q. So setting aside the locking mechanism that prisoners could use for their own -- for their own personal privacy and security of their belongings, there were two additional locking mechanisms that would be in place to secure a cell when it was locked in B cell house, is that correct, the electronic locking mechanism and then the physical locking mechanism?

A. Well, the electronic locking mechanism or the physical locking mechanism works in tandem, so

Page 44

typically if a cell isn't secured with an offender chain and padlock, a cell in B cell house could be opened by the officer at the end of the range by pushing that specific cell and popping it electronically, so the electronic locking system and the cell door worked cooperatively, if it's not -- make sense?

Q. Yes. And I have some -- I'm going to ask some additional questions on that, but in a situation assuming that there's no padlock and chain on the door, then the prison-installed locking mechanism can be operated in a couple of different ways. Is that correct?

A. Yes. It could be popped at the end of the range to open that cell door, and you can also insert a key into the lock manually on the cell door and open it that way, yes.

Q. And the electronic mechanism that you described, that is a panel with -- is it buttons or switches sort of aligned in a row specific for each cell? Is that correct?

A. That is correct, yes.

Q. Okay. And how does that -- can you describe the process by which an officer would use that mechanism to open a cell in B cell house

Page 45

during the designated time period?

A. Again, an officer would go to the end of the range. There are five ranges in each cell house, 100, 200, 300, 400, 500. So he would go to the end of the range where the panel is, and he would push the button for the specific cell that he wanted to open to electronically open that particular cell.

If for some reason the cell door did not open by the push of the button, the officer can go down the range to wherever the specific cell is to see if there's something jamming the locking mechanism, if there's a chain and padlock around the cell door or can he open the door with the key itself.

Q. And so when you push that button, sort of physically what happens at the cell front? Like how does that -- go ahead.

A. There's an indicator light that shows green for open or red for secure.

Q. And that's on the panel or at the cell front, the indicator light?

A. That's on the panel.

Q. Okay. And if you have a door that's indicated as secure and you push the button to open

Page 46

it to -- mechanically at the cell front, what does -- what does that look like? How does that work?

A. Well, you just push the button, and they should all be secured especially at that time of night, so you should push the button for the specific cell that you're trying to open. It should turn to green if it opened. If it didn't turn to green or didn't open, then you have to physically go check it yourself.

Q. And maybe I'm asking this in an unclear way. I guess what I'm trying to get at is: So what effect does that -- does pushing that button have at the cell front? So, for example, does it cause, you know, like the door to sort of, you know, mechanically swing open or roll to the side, or does it just cause, you know, the lock to shift and you would -- go ahead.

A. It should release the latch so that the door would become unsecured.

Q. Okay. And that would cause the door itself to open, become unsecured such that you could from inside the cell push on the door and swing it open at that point. Is that correct?

A. If it's not blocked by anything else,

Page 47

correct, yes.

Q. And the doors swing -- they're not sort of side-to-side sliding doors. They swing outwards. Is that correct?

A. They push open, yes, outwards.

Q. And is there a key that's required to operate that panel, that electronic control panel?

A. There's various keys in the cell house. There's gates at the front of the range. There's gates at the back of the range. There's -- and there's keys for those gates. There's keys for each specific range, 100, 200, 300, 400, 500. There's keys for the staff bathrooms, and there's keys for two different types of offender padlocks that our offenders are allowed to use.

Q. Okay. And thank you for that. And so specifically -- let me break this down into a couple steps. So if there's an officer in the -- at the officers station, say, in B cell house on the 100 level of the range, do they need any key to be able to get through any secured areas for them to move, you know, from being downstairs on the 100 range to get to that control panel?

A. To get to that control panel, they would need the key ring, 9-E1, which holds a 3-B-39 key.

Page 48

That key accesses the front and back gate, as I mentioned. On that 9-E1 key it also has the 500 range keys so they could open, again, the front and back gates. It also has an EB-10 on it, which controls restrooms. It has the B-58 and the B-66 keys, which open offender padlocks.

Q. So just to make sure that I'm understanding you correctly, in terms of the -- you know, an officer who's physically present standing down on the 100 level who wants to get up to that control panel with the electronic locking mechanism, what are the barriers in terms of the officer being physically present on the 100 level to getting the officer physically present at that control panel? What, if any, barriers are there that require an officer to use a key to get through those barriers?

A. There are gates at the front and back of the ranges, so they have to go through the gates on each range to get up to the next range and so on and so forth until you get to the top of the cell house.

Q. And so each of those gates are locked, is that correct, per policy?

A. They are typically locked, yes.

USDC NND, case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 14 of 42

Page 49

Q. Okay. And during what times of day are those gates locked?

A. Primarily during count times or after hours.

Q. Okay. So how many locked gates would an officer need to get through to get up to the 500 range from the 100 range?

A. Depends on how many of those gates were secured, and I don't know that. I mean, it could be as many as five that were secured to get up to the 500 range. I do not know how many of those were secured on, you know, that particular night.

Q. Was there any policy that set forth whether those -- when and whether those gates should be locked versus left unlocked?

A. No. I mean, it specifically -- the policy specifically referenced the securing of offenders, but it specifically doesn't detail when the gates should and shouldn't be locked, to my knowledge.

Q. So is that left to the discretion of the officers in the cell house in terms of when and whether to lock those gates?

A. Yes, it is.

Q. Is there any guidance given to officers in terms of how to use that discretion or what kind of

Page 50

things they should consider in leaving those gates locked versus leaving them unlocked?

A. Again, to my knowledge, there's no specific direction outlined for that purpose.

Q. Setting aside any of those -- well, strike that.

And just so I'm clear, if those gates are locked but there's no -- there would be no way around that, you would need a key to get through each of those gates to get up to the 500 level. Is that correct?

A. You would need the 3B-39 key to get through any gate in that house, same key, and that key is on multiple key rings in that specific housing unit, so all officers should have that key on their key ring at all times.

Q. And so that's a key that every officer on duty in the cell house would have with them on their person, the ability to unlock any of those gates, correct?

A. 3B-39 key would unlock any of those gates, yes.

Q. Okay. And then once an officer got physically to the control panel, would they need an additional key to access that control panel?

Page 51

A. Well, yes. To be honest with you, I can't remember whether or not that has a secured lock on it or if it's open face. I would have to ask my locksmith to get more in-depth detail.

Q. Is that --

A. I'm not --

Q. Okay. So you're not able to offer testimony one way or the other at this point in time in terms of whether a specific additional key was required to operate that panel or whether an officer, you know, could just walk up to that control panel and push the button to unlock the cell. Is that correct?

A. You know, I am pretty sure that there is a cover that has to be opened to press the button on that control panel, but, yeah, I'm not 100 percent sure.

Q. Okay. In terms of whether that cover is locked or unlocked or -- and if locked what key specifically would be required to unlock it and who would be assigned that key, those aren't topics you're able to offer testimony on today. Is that correct?

A. That's correct. I think it would be better if the facility locksmith or someone that I

Page 52

shared with my counsel addressed those questions.

MR. HEPPELL: And I guess I would just then note for the record it's our position that that is something that is fairly within the scope of Topic No. 6 on the 30(b)(6), and so given Warden Neal's inability to cover that topic, we would seek to have someone designated to cover those areas of questioning.

BY MR. HEPPELL:

Q. Setting the electronic control mechanism aside, you had also testified to there being a way to accomplish the same function not using electronic means but through a key at the cell front. Is that correct?

A. Correct.

Q. And in terms of the mechanism, is it fair to say that that's the same locking mechanism as is operated using the electronic button system and it's just you can cause that locking mechanism to activate and deactivate either by pushing the button on the panel or by turning a key in the lock of the cell front?

A. The cell front door itself is the same lock that can be unlocked manually with the key or can be disengaged by pushing the electronic lock at

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 15 of 42

Page 53

the end of the range.

Q. So it's one lock and just two different methods of activating and deactivating the lock.

A. It can be popped electronically, or it can be manually opened with a key, yes.

Q. Okay. And in terms of the manual key opening mechanism, does each individual cell have its own designated key, or is there sort of one key that opens a group of cells?

A. Yeah. All the cells on the same range would be the same key and same lock.

Q. Okay. And when you say the same range, are you referring to like the 500 level, 400 level, 300 level?

A. I am, yes.

Q. Okay. And is that both like the north and south sides of the range would be the same key?

A. Yes.

Q. Okay. So for any cell on that 500 level range, you could manually open at the cell front using that single key that is designated for all of those locks.

A. Yes.

Q. What is the policy in effect during the designated time period for how many keys for each

Page 54

range were present in the cell house itself during a shift?

A. Well, what I can tell you is how many keys are assigned to B cell house and was assigned to B cell house at that time, and that's basically a spreadsheet that shows B cell house unit keys, and it lists the key ring, slash, equipment, the required number of keys on that key ring and what keys or locations those keys access and what their ID numbers are.

Q. Okay. And are you referring to a specific document you have in front of you?

A. Yes.

Q. And is that a document that is something that's specific to a particular date or time period?

A. It is -- it's a document that the lock shop keeps, and it's kind of the master inventory of locks for that specific unit or keys for that specific unit. I'm sorry.

Q. And my understanding is that document has not been produced to us in discovery, so I'd make a request that we do have that document produced to us.

But going forward with the deposition for

Page 55

now, is there a title on the specific document that you are referring to that's in front of you?

A. At the top of the document, it says unit, B cell house, and then it starts off with those items I just mentioned, the keys, the number of keys, what range they access and the ID numbers.

Q. And is there a date on that document that you have in front of you?

A. There's not a date on the document, no.

Q. Okay. What's your understanding, then, of the time period that that document reflects in terms of, you know, what time period that the key configuration, the key assignment that's reflected in that document covers?

A. My understanding is that this document covers the keys that were assigned to that unit for many years. It hasn't changed in several years.

Q. So that would have -- the designations on that document would cover the key assignments at B cell house during the time frame covered by the designated topic today and also, you know, through till today. Is that fair to say?

A. That's fair to say.

Q. Okay. And so just so I understand what that document reflects, that document reflects the

Page 56

actual like physical keys that were physically present in B cell house at any given time. Is that correct?

A. Yes.

Q. Okay. And one of those types of keys would be the key that would be -- that would physically open the cell doors on the 500 range. Is that correct?

A. Yes.

Q. Does that key have a particular designation?

A. It does, yes.

Q. What's the designation of that key?

A. 9-E1.

Q. So if you could -- an officer standing on the 500 range would need the 9-E1 key to open any of the doors of the cells on the 500 range, correct?

A. That is correct.

Q. How many copies of the 9-E1 key were per that policy assigned to be physically present in the B cell house?

A. There is one set of keys that has the 500 range keys on them. That set of keys has six different keys on that key ring but only one set of

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND, case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 16 of 42

Page 57

keys for the 500 range on the unit. Then there's a backup set of keys in the control room for the facility and then another emergency backup set in the lock shop at the facility.

Q. Okay. There is one key required to open the 500 level cells in the cell house, a backup in the control room and an emergency backup in addition to that. Is that correct?

A. In the lock shop. That's correct.

Q. In the lock shop. So a total of three copies of those -- of that key but only one kept in B cell house.

A. That is correct.

Q. And you mentioned that that sheet also designates -- in addition to listing the specific keys that are present, it also sort of designates -- you know, groups the keys together. Is that correct?

A. Yes. It's an inventory of the keys that are in the Morse Watchmans box in B cell house that exist on that unit, yes.

Q. And how many groups of keys or sets of keys are designated that would be in B cell house?

A. One, two, three, four, five, six -- there could be a total of 57 keys in the key box in B

Page 58

cell house.

Q. And into how many groups are those keys organized?

A. Looks like 13 different groups.

Q. And is each of those 13 groups like a separate key ring?

A. Yes.

Q. And one of those 13 key rings has the 500 range key on it that we were discussing, the 9-E1 key.

A. That is correct, yes.

Q. Is there any -- strike that.

Is there any policy that specifies that there may only be one copy of that key present in B cell house at any given time?

A. Yes. It should be in -- the B cell house post orders should outline specifically what keys are in that cell house at that time.

Q. Okay. So in terms of designating what officer would have what key on their person at any given time, that's something that would be set out in the B cell house post orders?

A. It could be. Typically the way it works is you have a sergeant or an OIC, an officer in charge, that's in charge of the housing unit.

Page 59

Inside that housing unit, depending on how many officers you have, you divide up assignments for what officers are responsible for what ranges.

So you could have an officer -- if they have five staff, then obviously they're going to have one range apiece. If you have less staff than that, then they're going to cover multiple ranges. So depending on what the officer was assigned by the sergeant or OIC would dictate what keys that officer would need to carry for the night.

Q. Okay. And so if I understood that process that you just described, it would be the OIC who gets to designate which officer is in charge of which range. Is that correct?

A. The sergeant or OIC, sometimes the -- sometimes there's a unit team lieutenant, and it could have possibly been a lieutenant, but it's usually a sergeant or an OIC, yes.

Q. Okay. And so, for example, if you had, you know, B cell house, which has five different ranges, and if you had a shift with only three officers on duty in that cell house, they would need to divide those five ranges amongst the three officers, correct?

A. That is correct.

Page 60

Q. And it would be the OIC who would be the senior officer in charge on duty assigned to that unit, whether a lieutenant, a sergeant or just an officer designated OIC, be that individual who would make that determination. Is that correct?

A. That's correct.

Q. Is there any written policy that sets forth that process that sort of states it's the OIC who designates which officer is assigned to which range?

A. Again, I believe that -- no. I don't think it goes that in depth as far as specifying what officer's assigned to what range. I believe it does discuss that process we just talked about that officers are assigned different ranges based on need or based on what the sergeant or OIC dictates.

Q. And when you say you believe it does discuss that, what document are you referring to?

A. B cell house post orders.

Q. Okay. Do you have those in front of you?

A. I was just checking. Hang on a minute. I did not pull the B cell house post orders, no.

MR. HEPPELL: Okay. I have a copy of that which I can show to you, and I will -- that's also

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND, case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 17 of 42

Page 61

designated as a confidential document.

Before we go on to the confidential portion of the transcript, just so the record is clear, the Bates range of that document is Bates-stamped Devine 32879 through 32886, and it's a version of the B cell house post orders dated -- I believe it's dated April 15, 2015, but let me pull that up to verify. One second. Just as soon as I go to open it, my computer freezes. One moment.

Dated April 1, 2015, is the date on the document. I'm going to mark that as Exhibit 3, and with that I'll designate the following portion of the transcript as being confidential.

(Whereupon, Neal Deposition
Exhibit 3 remotely introduced.)
(Whereupon, the following proceedings
were designated as confidential:)

Page 62

C O N F I D E N T I A L

BY MR. HEPPELL:

Q. And then I will pull that up and share it with you on my screen here. Are you able to see that document shared on my screen?

A. Yes, I am.

Q. And that's the marked-as-confidential post orders listed as BCH-specific dated April 1, 2015. Is that correct?

A. Yes.

Q. And that's an eight-page document. Is that correct?

A. It says 1 of 8, yes.

Q. Are you able to read that if I'm zoomed at that level, or do you --

A. Yes.

Q. -- need me to zoom in more?

Okay. I guess let me -- I guess I'll just ask you to review this document and let me know when you need me to turn the page, and let me know when you get to the section of this document that you were referring to in terms of providing the written policy around the process we were just discussing in terms of assigning different ranges to different officers.

Page 63

C O N F I D E N T I A L

A. All right. You can go to the next page.

Go to the next page.

You can go to the next page.

Okay. You can go to the next page.

Next.

All right. Next.

Okay. I do not see a listing of keys for the housing unit that specifies what key is listed in that housing unit in the B cell house post orders.

Q. So in terms of the process that you described, in terms of the OIC designating, you know, the split of the ranges between the officers, that would be the process that was in place at the time that would be an unwritten policy as opposed to a written policy that would set that out. Is that fair to say?

A. That's fair to say.

Q. Are there any unwritten guidance or limits to how the OIC could split up the ranges amongst the officers?

A. No. I mean, to my knowledge, they have discretion. They talk amongst themselves, you know, who would be assigned what range, and then

Page 64

C O N F I D E N T I A L

the OIC or the sergeant assigns staff at his discretion to those ranges.

Q. Okay. And whatever officer was assigned the 500 range, was that officer required to have the -- that set of keys that included the key for the cells on the 500 range, was that officer required to have those keys on his or her person during their shift?

A. Again, it's not something you would find in a written document, but if you were assigned to the 500 range, then, yes, you should have had the keys that access the 500 range on your person.

Q. And that's something that you would -- and I appreciate your clarification. So that's not set out in any written policy, but that's an unwritten policy that you would carry those keys with you during your shift.

A. Yes.

Q. And so, for example, if you were in the -- at the officers station, you would have those keys with you, and if you were touring through the cell house, for example, doing your wand check, you would have those keys with you at that time as well. Fair to say?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND, case 3:18-cv-00995-JD   document 203-11   filed 03/29/21   page 18 of 42

Page 65

C O N F I D E N T I A L

A.  You should have, yes.  I mean, officers are required to do security checks on each range throughout the night, so, yes, the officers that were assigned to each specific range should have the keys for those ranges on their person unless that officer had to be pulled off the unit or moved or whatever the case may be, and then those keys could have been passed or chitted to the next person.

Q.  Okay.  And you anticipated my next question, I think, so I appreciate that.  Was there any written policy that restricted or limited officers' ability to pass those keys back and forth from one person to another as needed to accomplish their duties in the cell house?

A.  Policy discusses in depth key control and the importance of good key control, so that's what you're going to find in writing in policy.  Common sense, though, inside a housing unit is that if you have to exchange keys with another officer, then that officer should give you a chit for acceptance of those keys.  And otherwise that chit has the officer's name on it, and it would be put on the ring that the officer took possession of those

Page 66

C O N F I D E N T I A L

keys.

Q.  Okay.  Is there a written policy that sets forth that chit procedure in terms of the exchange of keys between officers during a shift?

A.  I believe it is referred to, yes.  Again, that's operational procedures 02-03-106, key control.  Within that policy Page 6, Section VIII, key chits, talks about ISP shall use a key chit issue system to maintain staff accountability for issued keys.

Keys shall be imprinted with the staff person's name.  A maximum of five chits shall be issued to any one staff person.  And it goes through the process, and the next section is key board, which talks about how the keys are set up.

Q.  Okay.  And I have -- the document you referred to is the operational procedures for Policy 02-03-106, key control.  Is that correct?

A.  That is correct.

Q.  And is that version of the document you're looking at dated May 20, 2013?

A.  The version I'm looking at is dated July 1, 2017, but I believe I have both in here.

Q.  And it would have been the May 20, 2013,

Page 67

C O N F I D E N T I A L

version in effect on the date of the fire.  Is that correct?

A.  That is correct.

Q.  And that's a 15-page document.  Is that correct?

A.  The one that would have been in effect, I believe, is a 16-page document.

Q.  I see.  16 pages.  Actually the version that I'm looking at, on the front page it says Page 1 of 15, but actually if you flip to the next page, it says Page 2 of 16, and it carries on.  It is a total of 16 pages.

A.  That is correct.

Q.  And so just to identify for the record, I assume the version you have is not a Bates-stamped version, but I do have a Bates-stamped version of that document that is Bates-stamped Devine 33596 through 33611, and maybe I'll pull that up on my screen just for the record to confirm we're looking at the same document.  Is this -- are you able to see that document?

A.  Yes.

Q.  And is that the same version -- is that the same document that you're looking at in front

Page 68

C O N F I D E N T I A L

of you?

A.  It is the same document, yes.

Q.  Okay.  All right.  And you had testified specifically that it was the key chit section of the document, Section VIII on Page 6 going on to Page 7, the key board section that discussed the -- that key chit system that you had been describing.

A.  Yes.  Section VIII discusses key chits, but, I mean, the whole policy discusses handling of keys.

Q.  Is there a specific portion of this or any other written policy that describes or sets forth the policy in effect governing circumstance where one officer on the range has been -- one officer in the cell house has been assigned the keys for a particular range and needs to pass those off to another officer to -- you know, to address a need that has arisen during the course of their job duties?

A.  So, again, that would be covered under -- that would be covered under -- hang on a sec -- yeah.  It's covered under key handling.

Q.  And can you direct my attention to the specific portion of that policy that would govern

USDC IN/ND case 3:18-cv-00995-JD document 203-11 filed 03/29/21 page 19 of 42

Page 69

C O N F I D E N T I A L

the situation I just described?

A. Section 7 or Page 7, Section X, key handling, XA.1, keys shall not be thrown to another staff person or slid from one point to another across a desk or floor. Keys shall be removed from the locking device after actuation and shall not be used to lift or pull open a lockable door or latch. Locking devices that bind or not function shall be reported immediately to the appropriate supervisor or staff.

Item 2, the sole responsibility for duplicating, altering or making keys -- hang on a minute. I'm trying to find specifically where it talks about chits being passed from person to person.

Well, I guess the best area that talks about it is key chits, which is Section VIII, and it just talks about the use of the key chit issue system to maintain staff ability for -- staff accountability for issued keys. Then it describes, of course, what a chit is and what they're used for.

Q. Fair to say that the section of the policy that we're looking at, the key chit section,

Page 70

C O N F I D E N T I A L

doesn't specifically address the situation that we were discussing in terms of one officer being assigned a set of keys but then would, you know, transfer them to another officer during the course of their shift as either need arose during the shift?

A. It apparently doesn't break it down to that much detail.

Q. Okay. So that would be something that would be sort of an unwritten policy, that officers were permitted to do that as a need arose on their shift provided they were following the sort of broader policy set forth in key control in terms of, you know, keeping the security of keys, making sure they were not handled recklessly, not lost or discarded, anything like that. Is that fair to say?

A. That's fair to say.

Q. And we've discussed earlier in the context of discussing the requirements to rescue a prisoner from a cell that was on fire, that if the cell was locked, that would require an officer to obtain the necessary key to open that cell, correct?

A. Correct. They would have to have the keys

Page 71

C O N F I D E N T I A L

to that range to open that cell, yes.

Q. Would you agree with me that there was no policy, whether written or unwritten, in effect at Indiana State Prison during the designated time period that prohibited or in any way restricted the discretion of officers to within a cell house hand off keys from one to another as needed to respond to that kind of emergency situation?

A. There's no policy that specifically addresses it to that level of detail, no.

Q. And no written policy or unwritten procedure or protocol that would restrict an officer's ability to transfer keys as needed in response to an emergency. Is that fair to say?

A. Fair to say, yes. It was more of a common-sense factor that you're going to need the keys to that range to be able to open cell doors on that range. Agreed it's not in writing.

Q. And, in fact, would you agree with me that not only is there no policy that prohibits it, but applying the policy in terms of the need to rescue prisoners from a cell where they're in danger, I mean, if they have a fire, following that policy would require either the officer assigned the

Page 72

C O N F I D E N T I A L

necessary set of keys to go themselves to the cell front or, if that officer were not going to go to the cell front, for them to pass off the necessary keys to a different officer to respond? Is that fair to say?

A. Yes. They would have to have the keys for that range to respond and open that cell door, yes.

Q. Was there a requirement that the officers that are on duty in the cell house would work together and cooperate together and coordinate together, including the transfer of keys as needed, to respond appropriately to an emergency situation like that? Is that fair to say?

A. Fair to say, yes.

(Whereupon, testimony designated as confidential concludes.)

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
30(b)(6) WARDEN RON NEAL
September 22, 2020
USDC NND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 20 of 42

Page 73

MR. HEPPELL: I'm going to stop the screen share, and I think that -- I think I left that all in the confidential section of the transcript, looking at those different policy documents, but we can come out of the confidential section for now.

And actually I think this would be a good time to just take a five-minute break, if that works for you, Warden Neal, just so I can look at my notes and orient myself to efficiently go through the next section of testimony. Does that work for everyone to take five or ten?

THE WITNESS: A ten-minute break would be great with me. Can you tell me this: Do you have any idea roughly how long, how much longer this will be throughout the day just for planning purposes?

MR. HEPPELL: Sure. And recognizing that I'm often the worst estimator of my own time in accomplishing tasks, I would not anticipate more than two more hours and potentially shorter than that, so -- and I will obviously do my best to be as efficient and respectful of your time as possible.

So we'll take a ten-minute break. We'll go to 11:16 Central Time, 12:16 Eastern Time, we'll come back.

Page 74

THE WITNESS: Sounds good.

MR. HEPPELL: So I'm going to pause the recording, and we can go off the record and come back at that point. Thank you.

(Recess taken.)

MR. HEPPELL: We're going to resume the Zoom recording, and we can go back on the record.

BY MR. HEPPELL:

Q. Warden Neal, regarding the policy areas that we had talked about before we went on the break and, I guess, taking those areas one at a time, we talked about the policies around the requirements for rescuing a prisoner from his cell in the event of a fire in the cell. Do you recall the specific areas of policy that we discussed earlier in the deposition on that topic?

A. Flip back to it. That would have been under the evacuation plan or the fire plan or the post orders in Section 2. So, I mean, we didn't get in great detail about evacuation, Section IX of the emergency manual, but it does obviously talk about evacuation of an individual area or location and how an evacuation is to take place. Fire plan also talks about that evacuation and how to report a fire and deal with the fire technically, but I

Page 75

believe the section that we talked about specifically was in the general post orders under Section P, fire, 1 through 6, right?

Q. Right. And specifically just talking about the circumstances of a prisoner confined in a locked cell where there's a fire in that cell and the obligation of officers and the specific direction given to officers regarding releasing that -- the prisoner from that cell. That was sort of the specific topic that we discussed earlier. Fair to say?

A. Fair to say.

Q. Did anything about that specific policy change at all during the time frame covered by this deposition at any point from January 1, 2015, to December 31, 2017, any changes in that aspect of the policy?

A. No.

Q. And then recognizing that there may have been some changes to, you know, key control policies broadly speaking at the prison, but with regard to the specific policies that we talked about in terms of -- you know, whether written or unwritten policies in terms of the assignment of keys within a housing unit to different officers

Page 76

and the ability of those officers to transfer keys between one another and the locking mechanisms applicable to the cells in B cell house, did anything change in those policies during the designated time period?

A. No. I believe the operational procedures were -- 02-03-106, key control, that we reviewed was dated May 20, 2015. There was a small section in key control operation procedures dated July 1, 2017, that changed. There were no major changes, no.

Q. Any changes that touched on the substance of the specific areas that we discussed early in your deposition?

A. Can you give me just a moment so I can --

Q. Yeah. Take as much time as you need.

A. Thanks. There was a small change in the policy, the operational procedures for policy 02-03-106, key control, dated July 1, 2017, under Section VII on Page 5, Section VII, issuance of keys, Section A. Do you have that operational procedure?

Q. Yes. Just give me one second. So that was in which subsection?

A. It was in Section VII. Hang on a second.

Page 77

Let me make sure it wasn't an update. Yeah. It looks like it was changed. Again, it was Section VII, Page 5. It starts off with issuance of keys. Are you with me?

Q. I'm with you.

A. Okay. Section VII, Subsection A, 24-hour, slash, seven-days-per-week post. Keys for 24 hours seven days per week post shall exchange keys at the assigned post or work location. Staff assigned to a 24-hour/seven-day-per-week post shall go directly to the assigned post.

Once the staff person arrives at the post, that staff person shall relieve the staff person finishing the shift and obtain any keys for the assignment and exchange chits.

The staff person beginning the shift shall note in the post log or in another approved manner that -- should be he or she has received any keys or other equipment from the staff person leaving the post. It shall not be necessary to exchange or use key chits in these cases.

The staff person leaving the post shall initial the entry in the logbook or other approved manner. While exchanging equipment, the staff person leaving the post shall advise the staff

Page 78

person arriving of any special information regarding the post that is not fully explained in the post log.

So that has a little bit more in detail about post keys, other equipment than the previous version did.

Q. And that was Section A of the policy you were looking at?

A. Section VII, Page 5, under issuance of keys, so under Section VII, issuance of keys, it's Subsection A.

Q. And looking at the older version of the policy, the 2013, May 2013, version, Subsection VII, issuance of keys, but Section VII-E, I believe, does address that same area of substance that you were just referring to, if you want to take a look at that.

A. Yeah. It does cover it. It just looks like they changed format is all.

Q. Okay. So in terms of any substantive changes in the specific areas of policy that we had discussed earlier in the deposition, no changes of note. Is that fair to say?

A. That is fair to say.

Q. As the warden at Indiana State Prison, did

Page 79

you have the authority to alter the policy or add to the policy related to rescuing prisoners from a locked cell in the event of a fire?

A. Typically in a facility the major or custody supervisor is the person who specifically is assigned the task of dealing with keys, key issuance or what keys should be issued to whom. Can I order the major to update a post order or change a post order? Yes.

Q. So if you believed that the policy was deficient in some manner or that additional detail should be set out in the written policy, that's something that you could direct those individuals under your supervision in the chain of command under you to initiate those policy changes. Is that fair to say?

A. That's fair to say, yes.

Q. And any changes at their instigation or those proposed changes, would those require your signoff before they came into effect?

A. I do sign all operation directives, facility operation directives and operational procedures, yes.

Q. I want to talk about communications between prisoners and staff. I know that's one of

Page 80

the designated topics. And specifically I want to ask you about a situation in which prisoners who are locked in their cells during the night shift after the 9:00 p.m. count have the need to bring an issue to the attention of prison staff, some emergency or other issue that they need to bring to the attention of prison staff.

Following the policies, whether written or unwritten, that were in effect at Indiana State Prison during the designated time period, what are the ways that a prisoner in that situation could use to get the attention of and, you know, convey information to correctional staff?

A. There's a variety of ways. I mean, you could make a recommendation to share a concern. The most general form of communication is through an offender request slip, or offenders oftentimes will write letters, handwritten letters.

Some offenders may have access due to their job -- may have access to a stand-alone computer or typewriter, will sometimes even type a letter. Other methods of communication or complaint would be through the grievance process.

Q. Fair to say that none of those methods of communication that you just described would be

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
30(b)(6) WARDEN RON NEAL
September 22, 2020

Page 81

effective methods of communication to draw -- to alert prison staff to an emergency in a period of time where the prisoners were locked in their cells during the night shift?  Is that fair to say?

A.  Well, there is an emergency grievance which is outlined in --

THE COURT REPORTER: I'm sorry, Mr. Neal. Could you keep your voice up please?  I'm having trouble hearing you.

THE WITNESS: Okay.  There is an emergency grievance that's outlined in the offender grievance process, 00-02-301.  So it talks about the use of the emergency grievance process and how that's to be handled.

BY MR. HEPPELL:

Q.  The -- well, I mean, let me ask it this way.  Is the emergency grievance process the process that prisoners should follow to alert correctional staff to the existence of a fire?

A.  No.  If there was a fire or an emergent issue happening as we speak, then they should get the attention of the staff people working that location, whether that be the correctional officers, the reentry staff, supervisors or administrator staff that -- really to get the

Page 82

attention of any staff person to tell them about an emergency can be done verbally.

Q.  And in the context of a situation where prisoners are, you know, locked in their cells and the correctional staff at the time are not present on the range, that verbal method of communication could take the form of yelling or shouting for attention.  Is that fair to say?

A.  Absolutely, yes.

Q.  And there's no policy that precludes that or in any way designates that as an inappropriate means of gaining the attention of correctional staff to address an emergent issue like a fire.  Is that fair to say?

A.  That's fair to say.

Q.  And in terms of the obligation of correctional officers to respond to that kind of emergency communication, is there any written policy that describes the obligation of a correctional officer to respond in that type of situation?

A.  There should be a section outlined in information and standards of conduct for departmental staff.  I did not print that policy because that's not what I thought the intent of

Page 83

that question was about, communicating between offenders and staff.

Q.  But it's your understanding that there's an aspect of that policy -- would you mind repeating the title of the policy you just described?

A.  It's information and standards of conduct for departmental staff.

Q.  And it's your testimony that that's where a written policy would address the obligation of correctional staff to respond to those kinds of emergency verbal requests for --

A.  Exactly.

Q.  -- for assistance or attention.

Let me see if I have access to that policy, and if I do I could pull it up on the screen here rather than have you have to go and print that.  So I --

A.  The policy --

Q.  Go ahead.

A.  The policy is 04-03-103.

Q.  And I do see that.  I was able to pull that up.  I have a version of that policy with an effective date of December 1, 2012.  Do you know if that would be the version of the policy that would

Page 84

have been in effect during the designated time period?

A.  That should have been the one in effect during that time period, yes.

Q.  Okay.  And so I can -- I can pull that up and share that with you on the screen here.  It's a 34-page document.  It's Bates-stamped Devine 34352 through 34385.  I can flip to a specific section of it if you are familiar with the section, or you can just let me know to go through the pages until you see the section that you'd like me to stop at.

A.  We can do it that way, or you can give me five minutes so I can look through it myself.

Q.  Oh, do --

A.  Can we do that?

Q.  Yeah, absolutely.  I didn't realize you had access to a copy in front of you.  I didn't see that you had been able to pull that up.

A.  I have a policy rack in my office, so I can pull it out and look through it real quick, and I just believe I haven't -- I believe there has to be a section in there that talks about staff responding to emergency situations, so, yeah, if you can give me five minutes so that I can review that.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND, case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 23 of 42

Page 85

MR. HEPPELL: Okay. That's fine. Why don't we just -- so we're not all hanging out staring at each other, it's 11:41. Let's just take a brief break. We can go off the record, come back at 11:46 Central, 12:46 Eastern and give you a chance to review that. Does that work for everyone?

MS. JACOBSEN: Yep. That works.

MR. HEPPELL: So I'm going to pause the recording. We'll go off the record briefly, come back in five minutes.

(Recess taken.)

MR. HEPPELL: Resuming the recording, and then we can go back on the record.

BY MR. HEPPELL:

Q. Warden Neal, did you have a chance to review the policy that you had wanted a chance to look at?

A. Yes. What I was thinking of is the mission of -- the Indiana State Prison mission is to provide a secure environment for staff and offenders that promotes public safety and provides an opportunity for staff development and offender programming to ensure safety and cost-effectiveness.

So due to the fact that the safety and

Page 86

security of the facility is our first and foremost responsibility in corrections -- and that includes staff, offenders and the public -- that's what made me think of information and standards of conduct for departmental staff.

So looking at that policy, information and standards of conduct for departmental staff, Page 7, under code of ethics, I mean, it doesn't specifically say that if an offender brings an emergency situation to my attention I will be alerted immediately, but it does talk about code of ethics, maintaining a high standard of honesty, integrity and impartiality, free from any personal considerations, favoritism, et cetera, shall be courteous, considerate, prompt when dealing with the public, realizing that as a state employee and employees of the department we serve the public, shall maintain mutual respect and professionalism, professional cooperation in my duties. So in a general sense that's one area that refers to it.

On Page 27 of that same policy, dereliction of duty, staff is required to remain awake, alert and devote their full attention to their assigned duties and areas of responsibility during working hours.

Page 87

A staff person is required to fully perform his or her job duties and to give appropriate attention to the performance of any assigned duty. An act or omission of a staff person indicating neglect of his or her assigned job duties for the safe and proper care and control of offenders will be considered dereliction or neglect of duty.

So that's what I was thinking of. That's as much that it goes into detail about that specific issue.

Q. I appreciate that, and I appreciate you bringing those specific sections of that written policy to my attention. And so if I understood the point you were making -- but please correct me if I'm wrong -- those are the specific written policies that touch on the obligation of correctional officers to respond, you know, effectively and expediently to whatever job-related situations they might find themselves confronting. Is that fair to say?

A. Yes. That they're expected to fully perform their job duties, and it specifically says if they did anything that would indicate neglect of their duties for the safe and proper care and

Page 88

control of offenders would be considered dereliction or neglect of duty.

So if an offender, to get back to your question, advised a staff person of an emergent situation and that staff person didn't immediately deal with it, in my opinion, that would be dereliction of duty.

Q. Right.

A. And if it was reported, but certainly it would be something that we would take action on.

Q. Right. And so obviously that written policy does not set forth every specific situation in which that might arise, but --

A. Of course not, but --

Q. -- an application of that policy would apply to those kinds of circumstances such that correctional staff following the policy are required to respond to verbal indications of an emergency situation brought to their attention by prisoners.

A. Right.

Q. And is it also fair to say that applying that same policy that prison staff, the correctional officers in the cell house would be required to investigate a commotion or disturbance

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC INND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 24 of 42

Page 89

to determine whether it was indicative of some emergency situation, for example, if they heard prisoners yelling but they couldn't hear what they were yelling?

A. Certainly. They should investigate, yes.

Q. Okay. It would be inconsistent, it would be a violation of that policy even if that specific circumstance is not set out, it would be a violation of that principle in the policy for a correctional officer to ignore yelling.

A. I would say this, that each situation has to be looked at independently what it is. Now, this is a maximum security prison. One of our cell houses, for example, C cell house, houses 380 offenders. If you're an officer in a cell house, it is quite loud, so to hear offenders yelling is not an uncommon thing. It happens all day every day.

So, you know, to say that they are required to or should respond anytime an offender yells I think would be a stretch, but, you know, at 10:00 o'clock at night or 9:30 at night if offenders are yelling consistently trying to get the attention of staff, staff should certainly investigate and see what's going on, yes.

Page 90

Q. And I appreciate your drawing a specific distinction, and obviously these are situationally specific requirements in terms of what -- what actions are appropriate. But if you have -- if I understood your testimony just now, if you have a situation where it's after count, it's in the evening, the cell house is relatively quiet and then it's no longer quiet and there's a lot of yelling, that's a situation that would require investigation.

A. Yes.

Q. No change in that policy during the time period that is at issue in this deposition. Is that fair to say?

A. Where you're referring to the information and standards of conduct?

Q. Correct. And both, you know, the written specifics of the policy that you read out.

A. That's the policy you're referencing, though, right?

Q. Correct.

A. Yes. No major changes in that that I'm aware of since that time.

Q. And no changes in terms of the unwritten ways in which it's an expectation that correctional

Page 91

staff apply that policy at the prison.

A. Correct. No significant changes to try to address every detail, no, not to my knowledge.

Q. Okay. One of the areas that you've been designated to give testimony on today relates to the prison's electrical system, is that correct, under Topic No. 12?

A. That's correct.

Q. Okay. And there's obviously a variety of different ways in which, you know, the electrical system at Indiana State Prison is addressed by policies, but one aspect of the electrical system that the prison has policies related to is ensuring that the electrical system does not pose a fire hazard. Is that fair to say?

A. Yes, yeah. That's fair to say.

Q. Because it's understood that, you know, defects or faults in an electrical system is a potential cause of fire ignition, correct?

A. Yes. We have a very detailed safety and sanitation program, inspection program, and if deficiencies in the electrical system are noted, they are corrected as soon as possible, so yes.

Q. And one of those ways in which that -- the safety of the electrical system is monitored at the

Page 92

prison is through weekly fire safety and sanitation inspections. Is that correct?

A. That is correct.

Q. And I believe those inspections are described and discussed in the fire prevention and practices policy. Is that correct?

A. I believe there's a specific policy that deals with that specifically.

Q. And the requirement of the weekly safety checks is a requirement for department heads to conduct those checks. Is that correct?

A. The way it works is you have daily inspections, weekly inspections and monthly inspections, so the daily inspections of a unit or an area are typically done by the staff person that's assigned to that unit on a given day.

You then have the area supervisor that is supposed to do a weekly inspection of that area, and then you have the department heads that are supposed to do monthly inspections of the area.

And all of those inspections, whether that be daily, weekly or monthly, are turned in to the facility safety manager, who then turns in work orders and follows up on those work orders. She turns the work orders in to the maintenance staff,

USDC NND, case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 25 of 42

Page 93

and she follows up or he follows up on those work orders or deficient areas on a regular basis until they've been abated or corrected.

Q. And just so I understand those different types of inspections, so the daily inspections, if I understood your testimony, those would be inspections conducted by the line-level correctional staff assigned to a given unit. Is that fair to say?

A. Right. Those are just inspections that are done by the people that are there every day that can report an issue or can write a work order, so those are more informal inspections, but the weekly inspections are written weekly inspections of an area, and the monthly inspections are also written, documented inspections of a given area.

Q. And so -- and I appreciate you making that distinction. In terms of the daily inspections, then, which you described as more informal, is that along the lines of just, you know, keep your eyes and ears open to anything that you see that might, you know, pose a safety hazard or a potential safety hazard and, if so, you know, bring that to someone's attention?

A. Yeah. It's everyone's duty to maintain

Page 94

the safety and security of the facility, which would include conditions of confinement. So, you know, if we're talking about the electrical system, for example, offenders in prison oftentimes like to what we like to call spark their outlets to set a fire or start a fire, and due to that oftentimes staff will notice that an outlet has been burned up or is no longer functional. Or when an offender moves out of the cell and a new offender goes in a cell, there's a cell inspection.

So, yes, every staff person, including correctional officers, can report an issue or deficiency and turn in a work order.

Q. In terms of that daily inspection, that takes the form of just if you notice an issue, put in the appropriate paperwork or bring it to the appropriate person's attention. Is that fair to say?

A. Fair to say, yeah.

Q. There's not sort of a comprehensive or systematic inspection of different areas of the prison through the use of those daily inspections. Is that fair to say?

A. Fair to say. As I said, a daily inspection would be if you see something as the

Page 95

staff person assigned to that area, you would call your supervisor or maintenance staff to put in a work order to fix that. The weekly inspections -- dailies are informal, aren't documented unless a work order's turned in, but the weeklies would be documented, and the monthlies would be documented.

Q. Is a weekly -- who conducts the weekly inspection?

A. The weekly inspection should be done by the supervisor of the area, or we call it midlevel management. So in a cell house, for example, your weekly should be done by your sergeant or lieutenant, but a lieutenant will also do a monthly inspection on occasion, but then, of course, you have the safety manager that also does a facility monthly inspection, and that's outlined in a policy that I'm trying to locate.

Q. Do you need to or want to reference that policy to continue your testimony in response to that pending question, or should I move on to another question?

A. Can you tell me the question one more time? I think we've gotten off track a little bit, but...

Q. Well, that's fine, and I believe you

Page 96

answered the question, but perhaps the court reporter could read back the question and refresh both of our memories as to exactly what I'd asked you, and then you can determine whether you think you answered it completely or not.

A. All right. I appreciate that.

(Record read as requested.)

THE WITNESS: Okay. I think we're fine.

BY MR. HEPPELL:

Q. Does the weekly inspection include a comprehensive and systematic inspection of all of the different areas of a cell house, including the interior of prisoners' cells?

A. I would have to look at the form, but, yeah, I believe it does.

Q. Okay. Is there a specific form that you would need to refer to to see exactly what areas are covered?

A. Yeah. There's a specific form for a weekly inspection, and it -- depending on the area that you're in, but I don't need to reference the form. I mean, if you're doing an inspection of a cell house, offenders' cells should be inspected, yes.

Q. Okay. And what does that -- what does

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NIND, case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 26 of 42

Page 97

that inspection entail in terms of the level of scrutiny that's given to the interior of a prisoner's cell during the weekly inspection?

A. During a weekly inspection it's going to be basically a walk-through of a cell house by whoever's doing the inspection, and they're going to basically look in each offender's cells, and if they see the light fixture ripped out, that's obviously going to be noted and put on the report.

If they see the outlet's been ripped out of the wall or the vent cover's missing or -- any obvious physical issues that they see would be documented, but they're not going to go as far as to remove an offender from his cell to go inside and do a very, you know, in-depth or thorough inspection.

Q. So that would be sort of a visual inspection conducted sort of by walking on the gallery sort of outside of the cells and sort of looking into each cell. Is that fair to say?

A. That's fair to say. It would also encompass the rest of the building as well, not just the cells, but yes.

Q. Is that the same manner of inspection for the monthly inspection?

Page 98

A. Well, the monthly inspections are typically done by higher level employees or the safety manager, so, I mean, you would expect a little bit better inspection at that point because keep in mind the weeklies get turned in each week, so you typically know when you're doing the monthly what was reported on the weeklies for that specific area, so you would expect them to drill down a little further on do those issues still exist on the monthly as well as those staff persons are a little bit more seasoned, so they should be looking a little bit more in depth on the monthly inspection.

Q. Is there any policy at the prison either written or unwritten that required any systematic inspection of electrical outlets or electrical fixtures in a cell in terms of an actual up-close examination of those outlets or testing of those outlets beyond defects that could be observed visually from outside of the cell?

A. No, no. I can tell you that there is an annual construction services inspection of the facility, and that annual inspection is conducted by a division of construction services for the Department of Correction.

Page 99

So that is typically made up of several people, the director of construction services, the director of fire risk management, the director of safety hazards for the State of Indiana, and it encompasses a wide variety of, you know, inspections for the facility. So would that be a part of their annual inspection? Yes, yes, it would be.

It's also -- we also have a -- we are inspected by the American Correctional Association. Once every three years we go through an inspection or an accreditation process, so we have an inspection for -- it typically lasts three to four days by three or four different auditors that come and inspect the facility.

Q. And so those two inspections that you referenced, the annual inspection, which I understood to be something conducted by officials with the Indiana Department of Corrections -- is that correct?

A. Correct. The construction services division, yes.

Q. And then a separate, a different inspection is part of the American Correctional Association accreditation or auditing process?

Page 100

A. Correct.

Q. Okay. Do either of those inspections involve comprehensive inspection sort of up close of electrical fixtures within prisoners' cells?

A. I can tell you that in the past it has at times noted specific offender cells that electrical irregularities were cited, so I would say yes.

Q. And just so I'm clear, that's the type of inspection where they're going into like every cell and examining fixtures, or is it spot-checking certain cells, going in up close, or is it just examining up close only cells where there's some sort of external manifestation or information that's leading them to do a closer inspection of a particular cell?

A. Honestly, it depends on the auditor, okay? I mean, most auditors, whether it be construction services -- construction services are normally more thorough really than the ACA auditors are because they know what they're looking for, so it depends on the auditor.

I mean, will they go through every cell, every 2,367? No. But they will certainly spot-check different cells, and depending on the auditor if they see an issue from the outside, they

Page 101

will go inside the cell and look further.

MR. HEPPELL: Got it. I think I'm getting close to the end of the questions that I have for you. If you wouldn't mind indulging me with another sort of short five-minute break just so I can review my notes, make sure I haven't missed anything, and then we can go back on the record. So if we come back at, say, 12:21, if we take five minutes, 12:21 Central, does that work for everyone?

MS. JACOBSEN: Okay.

THE WITNESS: Works for me.

MR. HEPPELL: Okay. All right. I'll pause the recording, and we'll go off the record briefly.

(Recess taken.)

MR. HEPPELL: Okay. So I'm resuming the recording and back on the record, and I don't have any additional questions at this time. I don't know if either your counsel or counsel for the defendants have any follow-up questions, but those are my questions for now.

MS. JACOBSEN: I don't have any follow-up questions.

MR. JIMENEZ: I don't have any follow-up questions either.

Page 102

MR. HEPPELL: Thank you very much for your time today, Warden Neal. I appreciate it.

THE WITNESS: You're very welcome. Thank you.

THE COURT REPORTER: And do you need to order the transcript right now?

MR. HEPPELL: We're not going to order at this time, no.

(Proceedings concluded at 12:22 p.m. CDT.)

Page 103

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal        )
Representative of the ESTATE OF  )
JOSHUA DEVINE,                   )
            Plaintiff,           )
      vs.                        ) No. 3:18-cv-00995
RON NEAL, et al.,                )
            Defendants.          )

REPORTER'S CERTIFICATE

I, KIMBERLY D. BURES, CSR, RDR, CRR, CRC, and Notary Public for the County of Lake, State of Indiana, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of 102 typewritten pages, is a true and correct transcript of my said stenographic notes.

Signed this 29th of November 2020.

_____

KIMBERLY D. BURES, CSR, RDR, CRR, CRC

Illinois License No. 084-003292

Notary Public, Lake County, Indiana

My Commission Expires April 10, 2025

Page 104

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal        )
Representative of the ESTATE OF  )
JOSHUA DEVINE,                   )
            Plaintiff,           )
      vs.                        ) No. 3:18-cv-00995
RON NEAL, et al.,                )
            Defendants.          )

This is to certify that I have read the transcript of my deposition taken in the above-entitled cause by Kimberly D. Bures, Certified Shorthand Reporter, on September 22, 2020, and that the foregoing transcript accurately states the questions asked and the answers given by me as they now appear.

_____
                RON NEAL

SUBSCRIBED AND SWORN TO

before me this _____, day

of _____ 20___.

_____

Notary Public

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC NND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 28 of 42

Page 105

**E R R A T A   S H E E T**

PAGE  LINE    CORRECTION          REASON

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

____  ____    _____     _____

_____
RON NEAL
            September 22, 2020
STATE OF _____)
                       )  SS:
COUNTY OF _____)

Before me, the undersigned, a Notary Public for
_____ County, State of _____,
appeared and acknowledged the execution of the
foregoing instrument this _____ day of _____
20___.

_____
NOTARY PUBLIC
My Commission Expires:_____

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 29 of 42

## A

**abated (1)**
93:3
**ability (9)**
8:8,9;36:4;37:11;
50:19;65:14;69:20;
71:14;76:1
**able (17)**
6:18,18;7:8;9:11;
23:20;36:7;38:10;
41:16;47:21;51:7,22;
62:4,14;67:21;71:18;
83:22;84:18
**above (1)**
16:4
**above-entitled (1)**
104:11
**absent (1)**
37:6
**absolutely (3)**
33:23;82:9;84:16
**ACA (1)**
100:19
**acceptance (1)**
65:22
**access (8)**
50:25;54:9;55:6;
64:13;80:19,20;83:15;
84:17
**accesses (1)**
48:1
**accomplish (5)**
33:8,14;34:2;52:12;
65:15
**accomplishing (1)**
73:18
**accountability (3)**
37:17;66:10;69:21
**accreditation (2)**
99:12,25
**accurate (1)**
8:8
**accurately (1)**
104:14
**across (1)**
69:6
**act (1)**
87:4
**action (3)**
14:9;15:17;88:10
**actions (1)**
90:4
**activate (1)**
52:20
**activating (1)**
53:3
**active (1)**
11:3
**actual (2)**
56:1;98:17
**actually (6)**

35:19,21;37:6;67:9,
11;73:6
**actuation (1)**
69:7
**add (2)**
20:16;79:1
**addition (3)**
5:17;57:8,15
**additional (9)**
23:24;33:15;40:12;
43:19;44:9;50:25;51:9;
79:11;101:18
**address (7)**
21:10;68:18;70:2;
78:15;82:13;83:10;
91:3
**addressed (3)**
35:19;52:1;91:11
**addresses (3)**
23:14;42:5;71:11
**administrative (7)**
18:18;19:19,22;20:6,
9,12;42:13
**administrator (1)**
81:25
**advise (1)**
77:25
**advised (1)**
88:4
**affect (1)**
8:7
**after-hours (1)**
38:25
**again (15)**
4:6;24:22;30:9;
32:20;39:3,5;42:19;
45:2;48:3;50:3;60:11;
64:10;66:6;68:21;77:2
**agree (5)**
6:14;11:5;13:15;
71:3,20
**agreed (3)**
4:14;11:1;71:19
**agreement (2)**
12:5,8
**ahead (9)**
4:2;7:7,17;8:2,11;
18:6;45:18;46:18;
83:20
**alert (3)**
81:2,18;86:23
**alerted (1)**
86:11
**aligned (1)**
44:20
**allowed (4)**
37:18;39:19;42:6;
47:15
**along (5)**
10:25;21:10;30:18,
19;93:20
**alter (1)**
79:1

**altering (1)**
69:13
**although (1)**
5:25
**always (1)**
28:8
**amended (1)**
12:7
**amendment (1)**
12:11
**American (2)**
99:10,24
**amongst (4)**
4:11;59:23;63:21,24
**ancillary (1)**
22:3
**and/or (7)**
12:15,17;13:5,22;
14:19;15:7;16:3
**annual (4)**
98:22,23;99:7,17
**answered (2)**
96:1,5
**answer's (1)**
8:1
**anticipate (1)**
73:18
**anticipated (1)**
65:11
**anymore (1)**
11:15
**apiece (1)**
59:6
**apologize (2)**
20:21;21:2
**apparently (1)**
70:8
**appear (1)**
104:15
**Appendix (3)**
24:17,19,23
**applicable (1)**
76:3
**application (1)**
88:15
**apply (2)**
88:16;91:1
**applying (2)**
71:22;88:22
**appreciate (14)**
11:21;18:7;20:22;
21:3;22:13;30:5;64:15;
65:12;87:12,12;90:1;
93:17;96:6;102:2
**appropriate (5)**
69:10;87:3;90:4;
94:16,17
**appropriately (1)**
72:13
**approved (2)**
77:17,23
**approximate (1)**
21:1

**approximately (1)**
17:2
**April (4)**
13:6;61:7,11;62:8
**area (19)**
31:19;33:3,5,21;
34:3;69:17;74:22;
78:15;86:20;92:15,17,
18,20;93:15,16;95:1,
10;96:20;98:8
**areas (13)**
47:21;52:7;74:9,11,
15;76:13;78:21;86:24;
91:4;93:2;94:21;96:12,
17
**arise (1)**
88:13
**arisen (1)**
68:19
**arose (2)**
70:6,12
**around (6)**
7:23;37:3;45:13;
50:9;62:23;74:12
**arrives (1)**
77:12
**arriving (1)**
78:1
**articulated (1)**
37:3
**aside (3)**
43:16;50:5;52:11
**aspect (4)**
27:7;75:16;83:4;
91:12
**assess (1)**
32:25
**assigned (30)**
14:3;39:22;40:1;
51:21;54:4,4;55:16;
56:21;59:8;60:2,9,13,
15;63:25;64:4,11;65:5;
68:16;70:4;71:25;77:9,
9,11;79:6;86:24;87:4,
5;92:16;93:8;95:1
**assigning (1)**
62:24
**assignment (3)**
55:13;75:24;77:15
**assignments (2)**
55:19;59:2
**assigns (1)**
64:2
**assist (1)**
16:20
**assistance (2)**
36:8;83:14
**Association (2)**
99:10,25
**assume (3)**
7:8;28:12;67:16
**assuming (1)**
44:10

**attention (17)**
68:24;80:5,7,12;
81:22;82:1,8,12;83:14;
86:10,23;87:3,14;
88:19;89:24;93:24;
94:17
**attorneys (1)**
20:19
**auditing (1)**
99:25
**auditor (3)**
100:16,21,25
**auditors (3)**
99:14;100:17,19
**audits (4)**
14:6,8;15:14,16
**authority (3)**
16:2,6;79:1
**available (4)**
26:6,8,9;42:22
**awake (1)**
86:23
**aware (4)**
23:5,14;26:4;90:23

## B

**B-58 (1)**
48:5
**B-66 (1)**
48:5
**back (19)**
23:6;35:7;47:10;
48:1,4,18;65:14;73:25;
74:4,7,17;85:4,10,13;
88:3;96:2;101:7,8,17
**backup (5)**
10:5;57:2,3,6,7
**barriers (3)**
48:12,15,17
**based (4)**
28:19;39:2;60:15,16
**basically (3)**
54:5;97:5,7
**basis (1)**
93:2
**Bates (4)**
28:10,13;30:11;61:4
**Bates-stamped (6)**
28:15;61:5;67:16,17,
18;84:7
**bathrooms (1)**
47:13
**BCH-specific (1)**
62:8
**become (2)**
46:20,22
**beginning (1)**
77:16
**behalf (10)**
4:21;8:22;11:23;
12:24;13:16;14:14;
15:2,23;23:9;24:2

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-11   filed 03/29/21   page 30 of 42

**belongings (2)**
41:6;43:19
**BEND (1)**
104:3
**best (5)**
8:9;30:2;37:18;
69:17;73:20
**better (4)**
6:6;40:16;51:25;
98:4
**beyond (1)**
98:19
**bind (1)**
69:9
**binding (11)**
11:23;12:23;13:16;
14:13;15:1,22;16:5;
22:25;23:8,18;24:2
**bit (6)**
18:24;78:4;95:23;
98:4,11,12
**blocked (1)**
46:25
**board (2)**
66:16;68:7
**bolt (3)**
25:20;32:22;41:11
**both (6)**
29:13;39:12;53:16;
66:24;90:17;96:3
**bottom (1)**
30:22
**box (2)**
57:20,25
**boxes (1)**
42:18
**break (13)**
7:21,21,22;8:2;40:2;
47:17;70:8;73:7,12,23;
74:11;85:4;101:5
**Brennan (3)**
16:23;17:3,9
**brief (1)**
85:3
**briefly (4)**
5:13;12:3;85:9;
101:14
**bring (4)**
80:4,6;93:23;94:16
**bringing (1)**
87:13
**brings (1)**
86:9
**broader (1)**
70:14
**broadly (1)**
75:21
**brought (1)**
88:19
**building (1)**
97:22
**bullet (1)**
30:24

**Bures (1)**
104:11
**burned (1)**
94:7
**button (11)**
45:6,10,16,25;46:4,6,
13;51:12,15;52:18,21
**buttons (1)**
44:19

### C

**calendared (1)**
10:17
**call (5)**
20:17;25:15;94:5;
95:1,10
**called (1)**
5:3
**came (1)**
79:20
**can (62)**
4:2;6:10;7:3,17;8:1,
5;18:1;21:9;22:1;
24:12;25:24,25;27:15;
35:7;39:6;44:12,15,23;
45:10,14;52:19,24,25;
53:4,4;54:3;60:25;
63:2,4,5;68:24;73:5,8,
13;74:3,7;76:15,15;
79:8;82:2;84:5,5,8,9,
12,12,13,15,20,24,24;
85:4,13;93:12,12;
94:12;95:22;96:4;
98:21;100:5;101:6,7
**capacity (4)**
4:13;5:8;16:15;
22:15
**care (2)**
87:6,25
**carries (1)**
67:12
**carry (2)**
59:10;64:17
**carrying (1)**
14:4
**case (6)**
5:9;12:18;21:7;
22:19;29:13;65:8
**cases (1)**
77:21
**cause (6)**
46:15,17,21;52:19;
91:19;104:11
**CDT (1)**
102:9
**cell (149)**
14:23;19:10;25:9,9;
27:7;31:7,7,8,22,23;
32:5,7,14,14,19;33:20,
22;35:15,22,23,24,25;
36:19;37:6,10,12,23;
38:4,8,9,11,17,19,21;

39:9,10,11,17,21;40:1,
5,5;41:19,25;42:3;
43:9,12,20,21;44:1,2,2,
4,6,15,16,21,25,25;
45:3,6,8,9,11,14,17,21;
46:1,7,14,23;47:8,19;
48:21;49:21;50:18;
51:13;52:13,22,23;
53:7,19,20;54:1,4,5,6;
55:4,20;56:2,7,22;57:6,
12,20,23;58:1,15,16,
18,22;59:20,22;60:20,
23;61:6;63:10;64:22;
65:16;68:16;70:22,22,
24;71:2,7,18,23;72:2,4,
8,10;74:13,14;75:6,6,9;
76:3;79:3;88:24;89:13,
14,15;90:7;94:9,10,10;
95:11;96:12,23;97:3,5,
14,20;98:17,20;100:9,
15,22;101:1
**cells (40)**
12:18;21:25;32:23;
35:4,17;36:3,4,6,7,15,
17,20,25;37:19;38:5;
39:5,9;40:23;41:8;
42:21,24;53:9,10;
56:17;57:6;64:7;76:3;
80:3;81:3;82:4;96:13,
23;97:7,19,23;100:4,6,
11,12,24
**Central (3)**
73:24;85:5;101:9
**certain (3)**
36:2,5;100:11
**certainly (5)**
11:7;88:9;89:5,24;
100:23
**Certified (1)**
104:12
**certify (1)**
104:9
**cetera (1)**
86:14
**chain (7)**
39:20;41:1,18;44:2,
11;45:13;79:14
**chains (1)**
32:23
**chance (3)**
85:5,15,16
**change (5)**
75:14;76:4,17;79:9;
90:12
**changed (4)**
55:17;76:10;77:2;
78:19
**changes (12)**
75:16,20;76:10,12;
78:21,22;79:15,18,19;
90:22,24;91:2
**charge (4)**
58:25,25;59:13;60:2

**check (2)**
46:10;64:23
**checking (1)**
60:22
**checks (3)**
65:3;92:10,11
**Chip (1)**
10:6
**chit (9)**
65:22,23;66:4,9;
68:5,8;69:19,22,25
**chits (7)**
66:9,13;68:9;69:15,
18;77:15,21
**chitted (1)**
65:9
**circumstance (2)**
68:14;89:8
**circumstances (3)**
4:15;75:5;88:16
**cited (1)**
100:7
**clarification (2)**
37:3;64:15
**clarify (2)**
7:5;20:23
**clear (9)**
6:12;10:20;22:14;
23:17;30:2,6;50:7;
61:4;100:8
**close (4)**
100:3,11,12;101:3
**closer (1)**
100:14
**clunky (1)**
28:9
**code (2)**
86:8,11
**coming (2)**
4:19;35:9
**command (1)**
79:14
**Common (1)**
65:19
**common-sense (1)**
71:17
**commotion (1)**
88:25
**communicating (3)**
13:10;15:13;83:1
**communication (10)**
13:8;16:13;18:22;
20:2;80:16,22,25;81:1;
82:6,18
**communications (1)**
79:24
**complaint (1)**
80:23
**complete (2)**
7:24;8:1
**completely (2)**
11:11;96:5
**comport (1)**

24:8
**comprehensive (3)**
94:20;96:11;100:3
**computer (2)**
61:9;80:21
**concern (1)**
80:15
**concerned (1)**
23:2
**concluded (1)**
102:8
**concludes (2)**
34:7;72:17
**conclusions (2)**
14:9;15:16
**conditions (2)**
8:6;94:2
**conduct (8)**
4:16,20;82:23;83:7;
86:4,7;90:16;92:11
**conducted (4)**
93:7;97:18;98:23;
99:18
**conducts (1)**
95:7
**confidential (22)**
28:7,25;29:6,8,11,16,
20,23;30:8,12;34:7;
35:6,7,8,10;61:1,2,14,
18;72:17;73:3,5
**configuration (1)**
55:13
**confined (1)**
75:5
**confinement (1)**
94:2
**confines (1)**
26:13
**confirm (1)**
67:20
**confirmation (1)**
11:18
**confronting (1)**
87:20
**confusion (1)**
21:2
**consider (1)**
50:1
**considerate (1)**
86:15
**considerations (1)**
86:14
**considered (2)**
87:7;88:1
**consistently (1)**
89:23
**construction (7)**
19:23;98:22,24;99:2,
21;100:17,18
**contact (1)**
32:21
**contacting (1)**
13:9

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 31 of 42

**contained (2)**
27:9,10
**contents (1)**
20:23
**context (2)**
70:20;82:3
**continue (1)**
95:19
**control (30)**
19:4;25:14,17;32:21;
36:10;42:11;43:3;47:7,
23,24;48:11,15;50:24,
25;51:12,16;52:10;
57:2,7;65:17,18;66:8,
19;70:14;75:20;76:7,9,
19;87:6;88:1
**controls (1)**
48:5
**conversation (4)**
6:1;20:24,25;21:1
**conversations (1)**
20:19
**convey (1)**
80:12
**cooperate (1)**
72:11
**cooperation (1)**
86:19
**cooperatively (1)**
44:6
**coordinate (1)**
72:11
**coordinator (2)**
16:20,24
**coordinator's (1)**
22:8
**copies (7)**
14:2;18:11;24:20;
26:7,11;56:20;57:11
**copy (6)**
9:1;18:24;30:9;
58:14;60:24;84:17
**corrected (2)**
91:23;93:3
**Correction (13)**
8:23;11:24;12:25;
14:15;15:3,24;20:8;
21:3;22:24;23:10,19;
25:6;98:25
**correctional (25)**
19:21;25:7;26:3;
27:3;31:6;32:2,17;
33:25;80:13;81:19,23;
82:5,12,17,20;83:11;
87:18;88:17,24;89:10;
90:25;93:8;94:12;
99:10,24
**Corrections (3)**
8:19;86:2;99:19
**Correction's (5)**
12:13;13:3,21;14:18;
15:6
**corrective (2)**

14:9;15:17
**correctly (2)**
10:17;48:8
**cost-effectiveness (1)**
85:24
**counsel (11)**
4:12,22;12:4,8;
20:15;29:4,5,22;52:1;
101:19,19
**count (10)**
36:14;37:10,20;38:3;
39:1,2;42:1;49:3;80:4;
90:6
**couple (5)**
17:5,8;24:20;44:12;
47:18
**course (7)**
38:20;39:23;68:19;
69:22;70:5;88:14;
95:14
**court (7)**
4:18;5:19;6:10;81:7;
96:1;102:4;104:1
**courteous (1)**
86:15
**courtroom (1)**
7:13
**cover (8)**
25:25;51:15,18;52:6,
7;55:19;59:7;78:18
**covered (8)**
11:12;25:11;55:20;
68:21,22,23;75:14;
96:18
**covering (1)**
28:2
**covers (5)**
22:4;42:18,19;55:14,
16
**cover's (1)**
97:11
**creation (1)**
14:2
**crew (2)**
36:23;37:5
**current (1)**
8:15
**currently (1)**
8:17
**custody (1)**
79:5
**customs (6)**
12:14;13:4,22;14:19;
15:7;16:3
**cut (1)**
41:16
**cutters (3)**
25:20;32:22;41:11

## D

**dailies (1)**
95:4

**daily (10)**
19:16;35:21;92:12,
14,22;93:5,18;94:14,
22,24
**danger (3)**
25:11;33:6;71:23
**date (11)**
12:6,6;24:18,24;
28:17;54:15;55:7,9;
61:11;67:2;83:24
**dated (21)**
18:9,15,23;19:4,9,12,
15,16;24:22,23;25:2;
27:24;61:6,7,11;62:8;
66:22,23;76:8,9,19
**dates (1)**
18:20
**day (14)**
35:13,18,23;36:2,6,
12;41:7;49:1;73:15;
89:17,18;92:16;93:11;
104:22
**days (2)**
77:8;99:14
**deactivate (1)**
52:20
**deactivating (1)**
53:3
**deal (2)**
74:25;88:6
**dealing (2)**
79:6;86:15
**deals (2)**
42:20;92:8
**December (16)**
11:3;12:8,10,16;
13:7,24;14:21;15:9;
18:12;19:12;21:22;
24:23;25:3,4;75:16;
83:24
**default (1)**
38:2
**defects (2)**
91:18;98:19
**defendant (1)**
5:9
**defendants (3)**
4:22;101:20;104:7
**defense (1)**
29:5
**deficiencies (1)**
91:22
**deficiency (1)**
94:13
**deficient (2)**
79:11;93:2
**DENISE (1)**
104:4
**Department (24)**
8:18,23;11:24;12:13,
24;13:3,21;14:15,18;
15:3,6,24;20:8;22:24;
23:10,19,20;24:3;25:5;

86:17;92:10,19;98:25;
99:19
**departmental (4)**
82:24;83:8;86:5,7
**depending (4)**
59:1,8;96:20;100:24
**Depends (3)**
49:8;100:16,20
**deponent (2)**
4:13,17
**deposition (28)**
4:10,16,20;5:8,11,
14;9:1,4;10:12;16:18;
17:11,14,21;21:10;
22:14,16,17;27:17;
29:8;35:10;54:25;
61:15;74:16;75:15;
76:14;78:22;90:13;
104:10
**depositions (1)**
9:9
**depth (3)**
60:12;65:17;98:12
**dereliction (4)**
86:22;87:7;88:2,7
**describe (2)**
39:6;44:24
**described (12)**
40:7,13,15,21;44:19;
59:12;63:13;69:2;
80:25;83:6;92:5;93:19
**describes (3)**
68:13;69:21;82:19
**describing (1)**
68:8
**description (1)**
28:20
**designate (6)**
10:19;27:21;29:7,22;
59:13;61:13
**designated (40)**
8:22;9:8;10:1,4,23;
11:11,15,22;12:12;
16:8,15;22:23;23:1,11;
27:5;28:3,7,25;29:25;
34:6;35:15;38:7;40:6;
45:1;52:7;53:8,21,25;
55:21;57:23;60:4;61:1,
18;71:5;72:16;76:5;
80:1,10;84:1;91:5
**designates (4)**
57:15,17;60:9;82:11
**designating (2)**
58:19;63:13
**designation (7)**
10:21;11:6;30:7;
35:6;37:5;56:11,13
**designations (1)**
55:18
**desk (1)**
69:6
**detail (10)**
9:19;49:18;51:4;

70:9;71:11;74:20;78:4;
79:11;87:10;91:3
**detailed (1)**
91:20
**details (1)**
40:12
**determination (1)**
60:5
**determine (2)**
89:1;96:4
**development (1)**
85:22
**device (1)**
69:7
**devices (2)**
39:15;69:9
**Devine (6)**
28:15;30:13;61:5;
67:18;84:7;104:5
**devote (1)**
86:23
**dictate (2)**
27:5;59:9
**dictated (2)**
41:22;43:7
**dictates (1)**
60:17
**different (29)**
4:19;9:21;21:13;
22:21;24:7,20;35:22;
38:8;40:7;43:2;44:13;
47:14;53:2;56:25;58:4;
59:20;60:15;62:24,25;
72:5;73:4;75:25;91:10;
93:4;94:21;96:12;
99:14,23;100:24
**direct (2)**
68:24;79:13
**directed (1)**
10:8
**directing (1)**
27:8
**direction (3)**
21:23;50:4;75:8
**directions (1)**
33:8
**directive (5)**
18:21;19:25;20:2,3;
22:3
**directives (2)**
79:21,22
**directly (3)**
7:15;22:9;77:10
**director (4)**
10:6;99:2,3,3
**discarded (1)**
70:17
**discovery (2)**
21:6;54:22
**discretion (6)**
43:14;49:20,25;
63:24;64:3;71:7
**discuss (4)**

DENISE DWYER, et al, v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-11   filed 03/29/21   page 32 of 42

20:17;42:14;60:14, 19

**discussed (7)**
68:7;70:20;74:15; 75:10;76:13;78:22; 92:5

**discusses (4)**
42:11;65:17;68:9,10

**discussing (4)**
58:9;62:24;70:3,21

**disengaged (1)**
52:25

**dispatch (1)**
25:20

**disposition (1)**
20:11

**distinction (2)**
90:2;93:18

**distribution (1)**
20:10

**DISTRICT (2)**
104:1,2

**disturbance (1)**
88:25

**divide (2)**
59:2,23

**division (3)**
98:24;99:22;104:3

**doctor (1)**
37:24

**document (58)**
9:3,10,12,16,20,22, 25;22:3;25:1,14,23; 26:5,19;28:16,20,22, 23;29:6,11;30:10,16, 19;35:7;54:12,14,17, 21,23;55:1,3,7,9,11,14, 15,19,25,25;60:19; 61:1,4,12;62:5,11,19, 21;64:11;66:17,21; 67:5,8,18,21,22,25; 68:3,6;84:7

**documented (5)**
93:16;95:4,6,6;97:13

**documents (27)**
16:21,21,25;17:3,9, 13,18,20,22;18:2; 20:13;21:5,6,8;22:4,9; 23:14,24;24:6,9,13; 26:24;29:20;30:17; 42:23;43:1;73:4

**done (7)**
10:25;82:2;92:15; 93:11;95:9,12;98:2

**door (21)**
37:11;38:9,17;39:10, 20,21;44:6,11,15,17; 45:9,14,14,24;46:15, 20,21,23;52:23;69:8; 72:8

**doors (8)**
14:1,23;39:17;47:2, 3;56:7,17;71:18

**down (6)**
40:2;45:11;47:17; 48:10;70:8;98:8

**downstairs (1)**
47:22

**draw (1)**
81:1

**drawing (1)**
90:1

**drill (1)**
98:8

**driving (1)**
22:11

**Dudley (2)**
10:6;11:10

**due (3)**
80:19;85:25;94:6

**duly (1)**
5:3

**duplicating (1)**
69:13

**duration (1)**
21:1

**during (42)**
12:19;15:19;21:21; 25:7;26:14,17;27:4; 35:13;36:18,20;38:7; 39:7;40:5;41:7,7,25; 42:8,9;45:1;49:1,3; 53:24;54:1;55:20;64:9, 18;66:5;68:19;70:5,6; 71:5;75:14;76:4;80:3, 10;81:4;84:1,4;86:25; 90:12;97:3,4

**duties (8)**
65:16;68:20;86:19, 24;87:2,6,23,25

**duty (10)**
50:18;59:22;60:2; 72:10;86:22;87:4,8; 88:2,7;93:25

**DWYER (1)**
104:4

## E

**earlier (6)**
17:6,7;70:20;74:16; 75:10;78:22

**early (1)**
76:13

**ears (1)**
93:21

**easier (2)**
6:11;30:17

**Eastern (2)**
73:24;85:5

**EB-10 (1)**
48:4

**effect (22)**
12:15;13:5,23;14:20; 15:8;21:21;25:6;28:2; 31:4,10;36:13;41:21;

46:13;53:24;67:2,7; 68:14;71:4;79:20;80:9; 84:1,3

**effective (2)**
81:1;83:24

**effectively (1)**
87:19

**efficient (1)**
73:21

**efficiently (1)**
73:9

**eight-page (1)**
62:11

**either (9)**
8:6;16:14;52:20; 70:6;71:25;98:14; 100:2;101:19,25

**Either/or (1)**
30:21

**EKLs (1)**
37:18

**electrical (17)**
15:10,12,14,15,18; 91:6,10,12,14,18,22, 25;94:3;98:16,16; 100:4,6

**electronic (13)**
39:13;40:13;42:14; 43:22,24;44:5,18;47:7; 48:11;52:10,13,18,25

**electronically (3)**
44:5;45:7;53:4

**else (5)**
6:18;8:7;17:10;30:3; 46:25

**e-mail (1)**
10:25

**emergency (43)**
4:14;12:18;13:12; 18:9,11;21:11,16,16, 25;24:5,6,15,17;25:15; 26:5,7,12,14,17;27:10, 14;32:8;38:18,20;57:3, 7;71:9,15;72:13;74:21; 80:6;81:2,5,10,13,17; 82:2,18;83:12;84:23; 86:10;88:19;89:2

**emergent (3)**
81:20;82:13;88:4

**employee (2)**
26:16;86:16

**employees (3)**
13:8;86:17;98:2

**employment (1)**
8:15

**encompass (1)**
97:22

**encompasses (1)**
99:5

**end (8)**
6:3;8:10;44:3,14; 45:2,5;53:1;101:3

**engaged (1)**

37:6

**ensure (3)**
32:8;41:5;85:23

**ensuring (1)**
91:13

**entail (1)**
97:1

**enter (2)**
36:4;37:12

**entirety (1)**
28:2

**entry (1)**
77:23

**environment (1)**
85:20

**equipment (5)**
19:9;54:7;77:19,24; 78:5

**especially (1)**
46:5

**establishment (2)**
19:20;20:10

**estimator (1)**
73:17

**et (1)**
86:14

**ethics (2)**
86:8,12

**evacuate (2)**
27:6;31:6

**evacuation (11)**
18:9;21:15;24:12,15; 25:11;26:25;74:18,20, 22,23,24

**even (3)**
33:15;80:21;89:7

**evening (2)**
42:9;90:7

**evenings (1)**
43:9

**event (6)**
12:20;21:25;31:7; 32:5;74:14;79:3

**events (1)**
22:19

**everyone (7)**
4:13,16;5:1,13; 73:11;85:6;101:10

**everyone's (1)**
93:25

**exactly (4)**
33:8;83:13;96:3,17

**EXAMINATION (2)**
5:5;98:18

**examined (1)**
5:4

**examining (2)**
100:10,12

**example (10)**
33:19;35:15;46:14; 59:19;64:20,23;89:2, 14;94:4;95:11

**exception (1)**

37:3

**exceptions (1)**
32:12

**exchange (5)**
65:21;66:4;77:8,15, 20

**exchanging (1)**
77:24

**exhaustive (2)**
22:6;23:9

**exhibit (9)**
9:1,5,8;27:18,21; 28:11;30:10;61:12,16

**exist (3)**
42:22;57:21;98:9

**existence (1)**
81:19

**exists (3)**
22:7,8;43:11

**exit (4)**
36:4,7;37:12;38:11

**expect (2)**
98:3,8

**expectation (1)**
90:25

**expected (1)**
87:22

**expediently (1)**
87:19

**explain (1)**
29:10

**explained (1)**
78:2

**extent (3)**
23:2,18;25:18

**extenuating (1)**
4:15

**external (1)**
100:13

**extinguish (1)**
33:4

**extinguishers (1)**
33:4

**eyes (1)**
93:20

## F

**face (1)**
51:3

**facilities (1)**
19:22

**facility (22)**
16:19,23;18:21; 19:25;20:1,3;26:9,13, 19;42:12;51:25;57:3,4; 79:4,22;86:1;92:23; 94:1;95:15;98:23;99:6, 15

**fact (3)**
20:25;71:20;85:25

**factor (1)**
71:17

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 33 of 42

**facts (1)**
22:18
**fair (54)**
21:2;24:3,4;31:23,
24;32:3,4,9,15;33:12,
16;36:1;37:7,13,14;
41:9,10;52:16;55:22,
23;63:18,19;64:25;
69:24;70:17,19;71:15,
16;72:6,14,15;75:11,
12;78:23,24;79:16,17;
80:24;81:4;82:8,14,15;
87:21;88:22;90:14;
91:15,16;93:9;94:17,
19,23,24;97:20,21
**fairly (1)**
52:4
**familiar (3)**
5:9;9:22;84:9
**far (3)**
11:3;60:12;97:13
**faults (1)**
91:18
**favoritism (1)**
86:14
**felt (1)**
24:1
**few (1)**
40:7
**filing (1)**
13:10
**final (2)**
16:2,6
**find (4)**
64:10;65:19;69:14;
87:20
**fine (4)**
7:21;85:1;95:25;
96:8
**finishing (1)**
77:14
**fire (55)**
10:6;12:19;18:10;
20:4;21:16;24:11,16,
25;25:2,9,10,11,15,16,
19,21;27:7;30:24;31:7,
14,15,19,23;32:5,14,
21,25;33:3,4,5,19,21;
34:4;41:13;67:2;70:22;
71:24;74:14,18,23,25,
25;75:3,6;79:3;81:19,
20;82:13;91:14,19;
92:1,5;94:6,6;99:3
**first (6)**
5:3;9:10,15;24:21;
28:18;86:1
**five (12)**
45:3;49:10;57:24;
59:5,20,23;66:13;
73:11;84:13,24;85:10;
101:8
**five-minute (2)**
73:7;101:5

**fix (1)**
95:3
**fixture (1)**
97:8
**fixtures (3)**
98:17;100:4,10
**flip (3)**
67:11;74:17;84:8
**floor (1)**
69:6
**folks (1)**
4:17
**follow (8)**
26:4;27:4;30:18,19;
31:10;32:2,10;81:18
**followed (2)**
29:4;32:9
**following (8)**
28:24;33:24;61:13,
17;70:13;71:24;80:8;
88:17
**follows (4)**
5:4;92:24;93:1,1
**follow-up (3)**
101:20,22,24
**force (1)**
25:2
**forces (1)**
22:11
**foregoing (1)**
104:13
**foremost (1)**
86:1
**forgot (1)**
20:16
**forgotten (1)**
30:4
**form (7)**
80:16;82:7;94:15;
96:14,16,19,22
**format (1)**
78:19
**formatting (1)**
24:8
**forth (8)**
48:21;49:13;60:8;
65:14;66:4;68:13;
70:14;88:12
**forward (2)**
5:14;54:25
**found (1)**
39:14
**four (3)**
57:24;99:13,14
**four-page (1)**
9:10
**frame (2)**
55:20;75:14
**free (1)**
86:13
**freezes (1)**
61:9
**Friday (1)**

20:17
**front (33)**
9:24;17:18,22,25;
18:2;24:9,14,19;26:24;
27:23;28:21;30:19;
45:17,22;46:1,14;47:9;
48:1,3,18;52:14,22,23;
53:20;54:12;55:2,8;
60:21;67:10,25;72:3,4;
84:17
**full (2)**
7:24;86:23
**fully (4)**
11:11;78:2;87:1,22
**function (2)**
52:12;69:9
**functional (1)**
94:8
**further (3)**
25:13;98:9;101:1

**G**

**gaining (1)**
82:12
**gallery (1)**
97:19
**game (1)**
21:2
**gate (2)**
48:1;50:13
**gates (18)**
47:9,10,11;48:4,18,
19,23;49:2,5,8,14,18,
22;50:1,7,10,20,21
**general (22)**
5:10;18:15;19:13,16;
21:17;26:23;27:14,22,
23;28:1,17;29:14;31:9,
12;33:5;35:3,5;36:1;
38:2;75:2;80:16;86:20
**generally (2)**
26:8,20
**gestures (1)**
5:22
**gets (1)**
59:13
**given (12)**
5:8;49:24;52:5;56:2;
58:15,21;75:8;92:16;
93:8,16;97:2;104:15
**gives (1)**
27:12
**giving (2)**
22:15;23:17
**gladly (1)**
7:5
**goes (5)**
25:13;60:12;66:14;
87:10;94:9
**Good (6)**
4:5,8;6:24;65:18;
73:6;74:1

**govern (1)**
68:25
**governed (1)**
31:5
**governing (1)**
68:14
**grab (1)**
32:22
**great (2)**
73:12;74:20
**green (3)**
45:20;46:8,9
**Greg (1)**
10:22
**grievance (7)**
18:19;80:23;81:5,11,
11,13,17
**grievances (1)**
13:11
**group (1)**
53:9
**groups (5)**
57:17,22;58:2,4,5
**guess (12)**
4:11;9:7;23:2,6;
37:2;40:15;46:12;52:2;
62:18,18;69:17;74:11
**guidance (3)**
29:4;49:24;63:20

**H**

**hand (2)**
33:4;71:7
**handbook (1)**
18:25
**handled (2)**
70:16;81:14
**handling (4)**
28:8;68:10,23;69:4
**handwritten (1)**
80:18
**Hang (4)**
60:22;68:22;69:13;
76:25
**hanging (1)**
85:2
**happen (1)**
25:24
**happening (1)**
81:21
**happens (2)**
45:17;89:17
**hazard (4)**
20:2;91:15;93:22,23
**hazards (1)**
99:4
**heads (2)**
92:10,19
**health (2)**
4:14;12:20
**healthcare (1)**
22:2

**hear (5)**
6:18,19;7:2;89:3,16
**heard (1)**
89:2
**hearing (2)**
6:22;81:9
**help (2)**
13:10;17:3
**helped (1)**
16:25
**HEPPELL (41)**
4:1,5,9;5:1,6;8:25;
9:6;10:9,14,16;11:5,14,
17,19;20:20;27:19;
29:2,21,25;30:14;35:1;
52:2,9;60:24;62:2;
73:1,16;74:2,6,8;
81:15;85:1,8,12,14;
96:9;101:2,13,16;
102:1,6
**herein (1)**
5:3
**high (1)**
86:12
**higher (1)**
98:2
**hired (1)**
26:15
**holds (1)**
47:25
**honest (1)**
51:1
**Honestly (1)**
100:16
**honesty (1)**
86:12
**hours (6)**
17:5,8;49:4;73:19;
77:7;86:25
**house (60)**
19:10;32:6,7;35:15,
22,23;36:19;38:4,8;
39:9,12;40:1,5;43:21;
44:2,25;45:4;47:8,19;
48:22;49:21;50:13,18;
54:1,4,5,6;55:4,20;
56:2,22;57:6,12,20,23;
58:1,15,16,18,22;
59:20,22;60:20,23;
61:6;63:10;64:23;
65:16;68:16;71:7;
72:10;76:3;88:24;
89:14,15;90:7;95:11;
96:12,23;97:5
**houses (2)**
89:14,14
**housing (8)**
26:8;50:15;58:25;
59:1;63:9,10;65:20;
75:25

**I**

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 34 of 42

**ID (2)**
54:10;55:6
**idea (1)**
73:14
**identification (1)**
15:11
**identified (1)**
16:4
**identify (1)**
67:15
**IDOC (5)**
4:22,23;13:16;29:5,
22
**IDOC's (1)**
10:18
**ignition (1)**
91:19
**ignore (1)**
89:10
**immediate (4)**
31:19;33:3,6,21
**immediately (6)**
25:14,16,20;69:10;
86:11;88:5
**impartiality (1)**
86:13
**importance (1)**
65:18
**important (2)**
5:20;6:2
**imposed (2)**
14:10;15:17
**imprinted (1)**
66:12
**inability (1)**
52:6
**inappropriate (1)**
82:11
**include (3)**
31:21;94:2;96:10
**included (1)**
64:6
**includes (1)**
86:2
**including (12)**
12:19;13:9;14:1,2,5,
7;15:11,15;23:11;
72:12;94:11;96:12
**inconsistent (1)**
89:6
**independently (1)**
89:12
**in-depth (2)**
51:4;97:15
**Indiana (40)**
8:17,18,23;11:24;
12:13,15,24;13:3,5,21,
23;14:7,15,18,20;15:3,
6,8,10,23;16:24;18:14;
19:1;21:21;22:24;23:9,
19;25:5,6;27:4;31:4;
35:13;71:5;78:25;80:9;
85:19;91:11;99:4,19;

104:2
**indicate (1)**
87:24
**indicated (2)**
26:22;45:25
**indicating (1)**
87:5
**indications (1)**
88:18
**indicative (1)**
89:1
**indicator (2)**
45:19,22
**individual (5)**
5:8;16:14;53:7;60:4;
74:22
**individuals (2)**
14:3;79:13
**indulging (1)**
101:4
**informal (3)**
93:13,19;95:4
**information (9)**
22:18;78:1;80:13;
82:23;83:7;86:4,6;
90:15;100:13
**initial (1)**
77:23
**initiate (1)**
79:15
**insert (1)**
44:16
**in-service (1)**
26:18
**inside (6)**
26:19;46:23;59:1;
65:20;97:14;101:1
**inspect (1)**
99:15
**inspected (2)**
96:23;99:10
**inspection (35)**
91:21;92:18;94:10,
14,21,25;95:8,9,14,16;
96:10,11,20,22;97:1,3,
4,6,16,18,24,25;98:4,
13,16,22,23;99:7,11,
13,17,24;100:3,9,14
**inspections (26)**
19:6;42:18;92:2,4,
13,13,14,14,20,21;
93:5,5,7,10,13,14,14,
15,16,18;94:22;95:3;
98:1;99:6,16;100:2
**installed (1)**
40:17
**instigation (1)**
79:18
**instructed (1)**
7:15
**instructions (1)**
27:13
**integrity (1)**

86:13
**intending (2)**
10:11;11:8
**intent (1)**
82:25
**interior (2)**
96:13;97:2
**into (11)**
4:10;9:19;24:7;30:4;
44:16;47:17;58:2;
79:20;87:10;97:20;
100:9
**introduced (3)**
9:5;27:18;61:16
**inventory (2)**
54:18;57:19
**investigate (3)**
88:25;89:5,25
**investigation (1)**
90:10
**involve (1)**
100:3
**irregularities (1)**
100:7
**ISP (2)**
14:1;66:9
**ISP's (2)**
18:8,10
**issuance (6)**
76:20;77:3;78:9,10,
14;79:7
**issue (15)**
6:22;21:11;22:19;
66:10;69:19;80:5,6;
81:21;82:13;87:11;
90:13;93:12;94:12,15;
100:25
**issued (5)**
11:7;66:11,14;69:21;
79:7
**issues (5)**
6:17;8:10;15:11;
97:12;98:9
**Item (1)**
69:12
**items (2)**
41:12;55:5
**IX (1)**
74:20

**J**

**JACOBSEN (11)**
4:23;10:10,15,24;
11:13,16;20:15;29:24;
85:7;101:11,22
**jamming (2)**
39:15;45:12
**January (12)**
11:2;12:9,16;13:6,
24;14:21;15:8;19:6,7;
21:22;25:4;75:15
**JIMENEZ (2)**

4:25;101:24
**job (7)**
6:11;37:22;68:19;
80:20;87:2,6,23
**job-related (1)**
87:19
**JOSHUA (1)**
104:5
**judge (1)**
7:13
**July (4)**
19:5;66:23;76:9,19
**jump (2)**
4:9;6:7
**jumping (1)**
6:3
**June (3)**
18:10,12;24:22

**K**

**keep (4)**
6:21;81:8;93:20;
98:5
**keeping (1)**
70:15
**keeps (1)**
54:18
**kept (5)**
26:12;29:12,16,18;
57:11
**key (93)**
14:1,2,5,6;19:4,9,11,
11;29:19;39:22,24,25;
42:11,15;43:3;44:16;
45:14;47:6,20,25,25;
48:1,2,16;50:9,12,13,
14,14,15,16,17,21,25;
51:9,19,21;52:13,21,
24;53:5,6,8,8,11,17,21;
54:7,8;55:12,13,19;
56:6,10,13,16,20,25;
57:5,11,25;58:6,8,9,10,
14,20;63:9;64:6;65:17,
18;66:7,9,9,15,19;68:5,
7,8,9,23;69:3,18,19,25;
70:14,24;75:20;76:7,9,
19;77:21;79:6
**keys (90)**
13:25;14:3,4,5,7;
34:2;35:4;39:25;42:12;
47:8,11,11,13,14;48:3,
6;53:25;54:3,6,8,9,9,
19;55:5,6,16;56:1,5,23,
24,24,25;57:1,2,16,17,
19,22,23,25;58:2,17;
59:9;63:8;64:6,8,13,17,
21,24;65:6,8,14,21,23;
66:2,5,11,12,16;68:11,
16;69:4,6,13,21;70:4,
15,25;71:8,14,18;72:2,
5,7,12;75:25;76:1,21;
77:4,7,8,14,18;78:5,10,

10,14;79:6,7
**Kimberly (1)**
104:11
**kind (5)**
35:20;49:25;54:18;
71:9;82:17
**kinds (2)**
83:11;88:16
**knowledge (12)**
22:1,7,8,18,22;
23:18;27:12;43:10;
49:19;50:3;63:23;91:3
**known (1)**
25:19

**L**

**labeled (1)**
29:20
**lack (1)**
40:16
**last (2)**
17:6;24:24
**lasts (1)**
99:13
**latch (2)**
46:19;69:8
**later (1)**
10:12
**lawyer (1)**
16:13
**lawyers (2)**
4:18;7:22
**leading (1)**
100:14
**least (1)**
38:4
**leaving (5)**
50:1,2;77:19,22,25
**left (5)**
41:8;43:13;49:15,20;
73:2
**less (2)**
5:25;59:6
**lets (1)**
37:20
**letter (4)**
37:20;39:1,2;80:22
**letters (2)**
80:18,18
**level (13)**
47:20;48:10,13;
50:10;53:13,13,14,19;
57:6;62:15;71:11;97:1;
98:2
**lieutenant (5)**
59:16,17;60:3;95:13,
13
**lift (1)**
69:8
**light (4)**
4:14;45:19,22;97:8
**limit (2)**

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 35 of 42

11:1;12:5
**limited (3)**
11:6;22:21;65:13
**limits (1)**
63:20
**line (3)**
16:11;37:18,22
**line-level (3)**
26:3;27:3;93:7
**lines (1)**
93:20
**Lintz (2)**
10:22;11:14
**list (5)**
20:19;22:6;30:24;
31:17;33:7
**listed (10)**
9:15;10:5;12:7;22:4;
29:10;33:15,16;41:12;
62:8;63:9
**listing (4)**
9:21;30:23;57:15;
63:8
**lists (1)**
54:7
**little (13)**
6:11,15;18:23;22:20;
23:2;28:9;40:3;78:4;
95:23;98:4,9,11,12
**live (1)**
19:11
**locate (1)**
95:17
**location (6)**
25:18;29:12;37:21;
74:22;77:9;81:23
**locations (3)**
4:19;26:12;54:9
**lock (26)**
14:1,5,6;19:8;29:19;
39:10,11;41:2,17;42:3,
18,20;44:16;46:17;
49:22;51:2;52:21,24,
25;53:2,3,11;54:17;
57:4,9,10
**lockable (1)**
69:8
**locked (28)**
25:8;32:19;33:20;
35:17,25;36:6,15,17,
20,25;38:4;43:21;
48:23,25;49:2,5,15,19;
50:2,8;51:19,19;70:23;
75:6;79:3;80:3;81:3;
82:4
**locking (31)**
39:8,15,16;40:4,8,13,
17;41:24,24,25;42:8,
21,24;43:3,4,8,16,19,
22,23,24,25;44:5,12;
45:12;48:11;52:17,19;
69:7,9;76:2
**lockout/tagout (1)**

20:1
**locks (11)**
14:7;39:13,15;42:12,
18,21,22,23;43:12;
53:22;54:19
**locksmith (2)**
51:4,25
**log (3)**
19:9;77:17;78:3
**logbook (1)**
77:23
**long (2)**
17:2;73:14
**longer (3)**
73:14;90:8;94:8
**look (9)**
46:2;73:8;78:17;
84:13,20;85:17;96:14;
97:7;101:1
**looked (1)**
89:12
**looking (16)**
14:17;21:11;28:12;
66:22,23;67:10,20,25;
69:25;73:4;78:8,12;
86:6;97:20;98:11;
100:20
**Looks (3)**
58:4;77:2;78:18
**lost (1)**
70:16
**lot (2)**
39:19;90:8
**loud (1)**
89:16

## M

**maintain (4)**
66:10;69:20;86:18;
93:25
**maintaining (1)**
86:12
**maintenance (6)**
13:11;15:13;19:21;
20:11;92:25;95:2
**major (4)**
76:10;79:4,8;90:22
**majority (2)**
36:16,24
**making (4)**
69:13;70:15;87:15;
93:17
**management (4)**
10:7;42:15;95:11;
99:3
**manager (3)**
92:23;95:15;98:3
**manifestation (1)**
100:13
**manipulating (1)**
39:14
**manner (5)**

14:23;77:17,24;
79:11;97:24
**manual (16)**
18:9,11;21:16,17;
24:5,7,16,17;26:5,7,12,
14;27:10,14;53:6;
74:21
**manually (4)**
44:16;52:24;53:5,20
**manuals (1)**
26:17
**many (11)**
49:5,8,10,11;53:25;
54:3;55:17;56:20;
57:22;58:2;59:1
**March (6)**
18:16;19:15,16,17;
27:24;28:17
**mark (1)**
61:12
**marked (3)**
9:7,7;30:10
**marked-as-confidential (1)**
62:7
**master (2)**
19:16;54:18
**matter (1)**
36:1
**maximum (2)**
66:13;89:13
**may (20)**
7:11,21,22;16:13;
19:4,9;21:9;23:3;
37:25;38:23;40:22;
58:14;65:8;66:22,25;
75:19;76:8;78:13;
80:19,20
**maybe (3)**
5:25;46:11;67:19
**mean (21)**
10:18;24:25;25:10,
22;29:10;32:20;36:22;
49:9,16;63:23;65:2;
68:10;71:24;74:19;
80:14;81:16;86:8;
96:22;98:3;100:17,22
**means (2)**
52:13;82:12
**mechanical (1)**
40:16
**mechanically (2)**
46:1,16
**mechanism (23)**
39:7,8,16;40:13,17;
41:2,18,24;43:16,22,
23,24,25;44:12,18,25;
45:13;48:12;52:10,16,
17,19;53:7
**mechanisms (8)**
40:4,8;42:8;43:3,4,8,
20;76:2
**medical (4)**
12:19;37:24;38:20,

22
**medications (1)**
8:6
**meet (1)**
16:17
**member (1)**
36:8
**memories (1)**
96:3
**mentioned (5)**
24:11;42:11;48:2;
55:5;57:14
**met (1)**
17:10
**method (1)**
82:6
**methods (6)**
13:9;38:9;53:3;
80:22,24;81:1
**midlevel (1)**
95:10
**might (6)**
40:8;41:8,18;87:20;
88:13;93:21
**mind (4)**
5:12;83:4;98:5;
101:4
**minute (2)**
60:22;69:14
**minutes (4)**
84:13,24;85:10;
101:9
**missed (1)**
101:6
**missing (1)**
97:11
**mission (2)**
85:19,19
**moment (3)**
7:16;61:10;76:15
**monitored (1)**
91:25
**monthlies (1)**
95:6
**monthly (11)**
92:13,20,22;93:15;
95:13,16;97:25;98:1,6,
10,12
**more (15)**
9:19;18:16;33:10;
51:4;62:17;71:16;
73:18,19;78:4;93:13,
19;95:22;98:11,12;
100:18
**morning (2)**
4:5,8
**Morse (2)**
19:10;57:20
**most (6)**
22:9,11;25:1;39:5;
80:16;100:17
**move (2)**
47:22;95:20

moved (1)
65:7
**movement (1)**
36:10
**moves (1)**
94:9
**much (5)**
70:9;73:14;76:16;
87:10;102:1
**multiple (2)**
50:14;59:7
**must (1)**
21:24
**mutual (1)**
86:18
**myself (2)**
73:9;84:13

## N

**name (8)**
8:12,13;9:15;10:5;
18:4,7;65:24;66:13
**natural (1)**
6:1
**nature (1)**
25:17
**Neal (25)**
4:5,12,12;5:2,7;8:11,
13,20;9:4,11;11:15,21;
16:10;20:16;21:12;
27:17,23;30:20;61:15;
73:8;74:9;81:7;85:15;
102:2;104:18
**N-e-a-l (1)**
8:14
**Neal's (2)**
10:21;52:5
**necessary (7)**
16:20;32:18;33:14;
70:24;72:2,4;77:20
**need (27)**
7:20;23:25;35:6;
47:20,25;49:6;50:9,12,
24;56:16;59:10,23;
60:16;62:17,20;68:18;
70:6,12;71:17,22;
76:16;80:4,6;95:18;
96:17,21;102:4
**needed (4)**
65:15;71:8,14;72:12
**needs (1)**
68:17
**neglect (4)**
87:5,8,24;88:2
**neither (1)**
11:14
**new (3)**
26:15,16;94:9
**next (14)**
6:8;10:13;48:20;
63:2,3,4,5,6,7;65:9,11;
66:15;67:11;73:10

**night (13)**
36:24;39:4;41:25;
42:4,9;46:6;49:12;
59:10;65:4;80:3;81:4;
89:22,22
**nonconfidential (1)**
28:11
**none (1)**
80:24
**nonelectronic (1)**
40:16
**nor (1)**
11:15
**normally (1)**
100:18
**north (1)**
53:16
**NORTHERN (1)**
104:2
**Notary (1)**
104:25
**notation (1)**
30:2
**note (4)**
35:9;52:3;77:17;
78:23
**noted (4)**
12:4;91:22;97:9;
100:6
**notes (2)**
73:9;101:6
**notice (6)**
9:2,9;11:7;13:20;
94:7,15
**notices (1)**
30:3
**notify (1)**
25:16
**notifying (1)**
13:12
**number (5)**
9:20;14:8;15:15;
54:8;55:5
**numbered (3)**
9:21;24:7,13
**numbers (2)**
54:10;55:6

**O**

**objection (1)**
7:16
**objections (1)**
7:11
**obligation (5)**
75:7;82:16,19;83:10;
87:17
**observed (1)**
98:19
**obtain (4)**
34:2;41:13;70:23;
77:14
**obvious (1)**

97:12
**obviously (11)**
6:15;10:18;29:4,17;
59:5;73:20;74:21;
88:11;90:2;91:9;97:9
**occasion (2)**
38:24;95:14
**occasions (1)**
14:22
**o'clock (1)**
89:22
**off (13)**
7:3;8:2;55:4;65:7;
68:17;71:8;72:4;74:3;
77:3;85:4,9;95:23;
101:14
**offender (22)**
18:19,25;29:18;
36:23;37:17;38:19,21;
39:23;42:3;44:1;47:14;
48:6;80:17;81:11;
85:22;86:9;88:3;89:20;
94:8,9;97:14;100:6
**offenders (24)**
18:23;31:18;33:2,5;
35:24;36:25;37:18;
39:5,13,19;43:11;
47:15;49:17;80:17,19;
83:2;85:21;86:3;87:7;
88:1;89:15,16,23;94:4
**offenders' (1)**
96:23
**offender's (1)**
97:7
**offer (2)**
51:7,22
**office (1)**
84:19
**officer (46)**
27:3;31:18;32:2;
33:25;44:3,24;45:2,10;
47:18;48:9,13,14,16;
49:6;50:17,23;51:11;
56:15;58:20,24;59:4,8,
10,13;60:2,4,9;64:4,5,
7;65:7,21,22,25;68:15,
15,18;70:3,5,23;71:25;
72:3,5;82:20;89:10,15
**officers (38)**
26:4,20;29:12;31:6,
10;32:7,13,18;33:13;
39:23;47:19;49:21,24;
50:15;59:2,3,22,24;
60:15;62:25;63:14,22;
64:21;65:2,4;66:5;
70:11;71:7;72:9;75:7,
8,25;76:1;81:24;82:17;
87:18;88:24;94:12
**officers' (2)**
39:25;65:14
**officer's (4)**
29:13;60:13;65:24;
71:14

**officials (1)**
99:18
**often (1)**
73:17
**oftentimes (3)**
80:17;94:4,6
**OIC (12)**
58:24;59:9,12,15,18;
60:1,4,8,16;63:13,21;
64:2
**older (1)**
78:12
**omission (1)**
87:4
**once (3)**
50:23;77:12;99:11
**one (46)**
5:11;7:22;9:2;18:12;
24:21,23,24;25:1,2;
26:23;36:12;41:12;
42:5;51:8;53:2,8;56:5,
23,25;57:5,11,24;58:8,
14;59:6;61:8,9;65:15;
66:14;67:7;68:15,15;
69:5;70:3;71:8;74:11;
76:2,23;79:25;84:3;
86:20;89:13;91:4,12,
24;95:22
**only (11)**
5:10;7:23;10:3;27:9;
38:17;56:25;57:11;
58:14;59:21;71:21;
100:12
**open (32)**
14:1;39:17;41:8;
44:15,17,25;45:7,7,10,
14,20,25;46:7,9,16,22,
24;47:5;48:3,6;51:3;
53:20;56:7,16;57:5;
61:9;69:8;70:24;71:2,
18;72:8;93:21
**opened (9)**
38:10,17,21;39:22;
41:19;44:3;46:8;51:15;
53:5
**opening (1)**
53:7
**opens (1)**
53:9
**operate (4)**
39:8;43:6;47:7;
51:10
**operated (3)**
40:18;44:12;52:18
**operation (5)**
18:21;20:8;76:9;
79:21,22
**operational (11)**
19:3,5;42:13,16,19;
66:7,18;76:6,18,21;
79:22
**opinion (1)**
88:6

**opportunity (2)**
20:22;85:22
**opposed (1)**
63:16
**order (17)**
18:14;19:8,13,14,16;
27:20,22;33:20;34:2;
79:8,8,9;93:12;94:13;
95:3;102:4,6
**orders (30)**
18:15;21:17;26:21,
23;27:11,15,24;28:1,7,
17;29:11,14,14,15;
31:9,13;42:20;58:17,
22;60:20,23;61:6;62:8;
63:11;74:19;75:2;
92:24,24,25;93:2
**order's (1)**
95:5
**organization (1)**
20:7
**organized (1)**
58:3
**orient (1)**
73:9
**orientation (2)**
26:15,16
**otherwise (2)**
41:18;65:23
**out (23)**
6:7;8:4;23:4;30:3;
35:10,24;36:23;37:19,
20;39:2;42:23;58:21;
63:17;64:16;73:5;
79:12;84:20;85:2;89:8;
90:18;94:9;97:8,10
**outlet (1)**
94:7
**outlets (4)**
94:5;98:16,18,19
**outlet's (1)**
97:10
**outline (1)**
58:17
**outlined (6)**
32:11;50:4;81:6,11;
82:22;95:16
**outset (1)**
12:4
**outside (4)**
26:13;97:19;98:20;
100:25
**outwards (2)**
47:3,5
**over (6)**
5:11,13;6:16;16:2;
35:15;39:14
**overdue (1)**
19:11
**own (20)**
8:22;36:5;37:12;
39:10,11,21,24;40:22,
23;41:6,6,24;42:3;

43:9,12,13,17,18;53:8;
73:17

**P**

**padlock (9)**
39:21,24,25;40:22;
41:1,24;44:2,10;45:13
**padlocks (2)**
47:14;48:6
**page (30)**
9:10,16,24;12:3,7;
23:21;28:18,18;30:15,
16,23,23;62:20;63:2,3,
4,5;66:8;67:10,11,12,
12;68:6,7;69:3;76:20;
77:3;78:9;86:8,21
**pages (5)**
9:20;19:1;67:9,13;
84:10
**panel (16)**
44:19;45:5,21,23;
47:7,7,23,24;48:11,15;
50:24,25;51:10,12,16;
52:21
**paperwork (1)**
94:16
**paragraphs (1)**
9:21
**part (3)**
28:11;99:7,24
**partially (1)**
22:3
**particular (8)**
37:22;38:19;45:8;
49:12;54:15;56:10;
68:17;100:15
**parties (1)**
4:11
**pass (4)**
37:23;65:14;68:17;
72:4
**passed (2)**
65:9;69:15
**past (1)**
100:5
**pause (3)**
74:2;85:8;101:13
**pending (2)**
7:25;95:20
**people (3)**
81:22;93:11;99:2
**per (3)**
48:24;56:20;77:8
**percent (1)**
51:16
**perform (2)**
87:2,23
**performance (1)**
87:3
**performed (1)**
15:19
**perhaps (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 37 of 42

96:1
**period (26)**
15:19;21:22;25:7;
27:5;28:2;31:5;32:3;
35:15,16;36:19,20;
38:8;39:7;40:6;45:1;
53:25;54:16;55:11,12;
71:6;76:5;80:10;81:2;
84:2,4;90:13
**periods (1)**
41:7
**permitted (6)**
41:5,23;43:5,5,8;
70:12
**person (32)**
6:16;10:7;16:2;
25:16;50:19;58:20;
64:8,13;65:6,10,15;
66:14;69:5,15,16;
77:12,13,13,16,19,22,
25;78:1;79:5;82:1;
87:1,5;88:4,5;92:15;
94:11;95:1
**personal (8)**
22:18,21;40:22;41:6;
42:7;43:18;86:13;
104:4
**persons (1)**
98:10
**person's (2)**
66:13;94:17
**phone (1)**
20:17
**physical (7)**
4:19;39:6,8;43:23,
25;56:1;97:12
**physically (9)**
45:17;46:10;48:9,13,
14;50:24;56:1,7,21
**place (13)**
24:25;26:18;39:7,12,
18;40:5,8;42:8;43:8,
14,20;63:15;74:23
**placing (1)**
15:13
**plaintiff (1)**
4:21
**plan (12)**
18:9,10;21:15,16;
24:11,12,15,16;25:10;
74:18,18,23
**planned (1)**
17:16
**planning (1)**
73:15
**plans (2)**
14:9;15:17
**please (4)**
6:19;7:4;81:8;87:15
**pm (11)**
36:14;37:10;38:3,12,
16,18;39:1,4;41:25;
80:4;102:8

**point (9)**
7:20;21:8;46:24;
51:8;69:5;74:4;75:15;
87:15;98:4
**points (1)**
30:24
**policies (24)**
11:4;12:14;13:4,21;
14:18;15:6;16:3;17:15;
21:14,20;22:12;23:4;
31:3;42:10;43:1;74:12;
75:21,22,24;76:4;80:8;
87:17;91:12,13
**policy (108)**
16:19,23;17:17,22;
18:17;19:6,20,23;20:7,
9;21:7;22:7;25:5;26:3;
27:2,8;32:17;33:7,12,
15,16,25;37:15,18;
38:1;41:21;42:2,5,17;
43:6,10;48:24;49:13,
16;53:24;56:21;58:13;
60:7;62:23;63:16,17;
64:16,17;65:13,17,19;
66:3,8,19;68:10,13,14,
25;69:24;70:11,14;
71:4,10,12,21,22,24;
73:4;74:9,15;75:13,17;
76:18,18;78:7,13,21;
79:1,2,10,12,15;82:10,
19,24;83:4,5,10,16,19,
21,23,25;84:19;85:16;
86:6,21;87:14;88:12,
15,17,23;89:7,9;90:12,
18,19;91:1;92:6,7;
95:16,19;98:14
**policy-making (2)**
16:2,6
**popped (2)**
44:14;53:4
**popping (1)**
44:4
**population (1)**
29:18
**portion (10)**
29:8,22;30:8,13;
35:13,16;61:3,13;
68:12,25
**portions (2)**
36:2,5
**pose (2)**
91:14;93:22
**posed (1)**
22:10
**position (4)**
8:16;23:8;24:1;52:3
**positions (1)**
14:3
**possession (1)**
65:25
**possible (5)**
33:3,23;36:22;73:22;
91:23

**possibly (2)**
22:2;59:17
**post (50)**
18:14,15;19:8,13,14,
15;21:17;26:21,23;
27:10,14,20,22,23;
28:1,6,17;29:11,13,13,
14,14,15;31:9,13;
42:20;58:17,22;60:20,
23;61:6;62:7;63:10;
74:19;75:2;77:7,8,9,10,
11,12,17,20,22,25;
78:2,3,5;79:8,9
**potential (2)**
91:19;93:22
**potentially (1)**
73:19
**practices (8)**
12:14;13:4,22;14:19;
15:7;16:3;20:4;92:6
**precluded (1)**
41:23
**precludes (1)**
82:10
**preface (1)**
16:10
**preference (1)**
29:21
**preparation (2)**
16:18;17:14
**prepare (2)**
17:11,21
**prepared (7)**
5:19;12:23;13:15;
14:13;15:1,22;16:5
**present (10)**
17:16;48:9,13,14;
54:1;56:2,21;57:16;
58:14;82:5
**presenting (1)**
12:20
**press (1)**
51:15
**pretty (1)**
51:14
**prevented (1)**
42:7
**preventing (1)**
41:18
**prevention (2)**
20:4;92:5
**previous (1)**
78:5
**previously (3)**
10:25;22:17;23:7
**Primarily (1)**
49:3
**principle (1)**
89:9
**print (2)**
82:24;83:18
**Prison (37)**
8:18;12:15;13:5,23;

14:7,20;15:8,10;16:24;
18:15;19:1;21:21;25:6;
27:4;31:4;35:14;36:13;
40:18,18;41:22;71:5;
75:21;78:25;80:5,7,10;
81:2;85:19;88:23;
89:13;91:1,11,13;92:1;
94:4,22;98:14
**prisoner (13)**
25:8;27:6;31:22;
32:19;33:19,20;34:3;
37:10;70:21;74:13;
75:5,9;80:11
**prisoner-installed (1)**
41:17
**prisoner-operated (2)**
41:2,17
**prisoners (30)**
12:17;13:8;14:23;
21:12,24;26:25;31:6;
32:13;35:16;36:3,14,
16,19;38:3;40:22;41:4,
22;42:6;43:4,7,17;
71:23;79:2,25;80:2;
81:3,18;82:4;88:20;
89:3
**prisoners' (2)**
96:13;100:4
**prisoner's (2)**
38:9;97:3
**prison-installed (1)**
44:11
**prison's (1)**
91:6
**privacy (1)**
43:18
**privilege (1)**
20:24
**probably (1)**
37:17
**problem (2)**
10:16;12:19
**problems (1)**
15:11
**procedure (4)**
18:18;66:4;71:13;
76:22
**procedures (17)**
19:3,5,20,22;20:1,7,
9;42:13,14,17,19;66:7,
18;76:6,9,18;79:23
**proceedings (3)**
28:24;61:17;102:8
**process (17)**
15:12;18:19;44:24;
59:11;60:8,14;62:23;
63:12,15;66:15;80:23;
81:12,13,17,18;99:12,
25
**produced (5)**
21:6,8,9;54:22,23
**professional (1)**
86:19

**professionalism (1)**
86:18
**program (2)**
91:21,21
**programming (1)**
85:23
**prohibited (2)**
14:4;71:6
**prohibits (1)**
71:21
**promotes (1)**
85:21
**prompt (1)**
86:15
**proper (2)**
87:6,25
**proposed (1)**
79:19
**protected (1)**
20:24
**protocol (1)**
71:13
**protocols (2)**
5:10,14
**provide (2)**
8:8;85:20
**provided (2)**
21:23;70:13
**provides (3)**
37:16;38:2;85:21
**providing (1)**
62:22
**public (6)**
4:14;85:21;86:3,16,
17;104:25
**pull (18)**
8:25;9:2;16:25;17:3,
9;22:9;29:6;30:9;
60:23;61:8;62:3;67:19;
69:8;83:16,22;84:5,18,
20
**pulled (7)**
9:10,12;22:5;23:13;
24:21,21;65:7
**pulling (1)**
16:20
**purpose (6)**
22:14;37:21,25;
38:23;39:3;50:4
**purposes (2)**
37:19;73:15
**purview (1)**
10:19
**push (9)**
45:6,10,16,25;46:4,6,
23;47:5;51:12
**pushing (4)**
44:4;46:13;52:20,25
**put (10)**
4:10;11:8;28:10,15;
30:11,12;65:24;94:15;
95:2;97:9

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 38 of 42

## Q

**quick (2)**
20:15;84:20
**quiet (2)**
90:7,8
**quite (1)**
89:16

## R

**rack (1)**
84:19
**radio (2)**
25:15,17
**raised (1)**
7:12
**raising (1)**
11:21
**ran (1)**
36:9
**range (54)**
12:6,7;28:10;30:11;
39:11;41:8;44:3,15;
45:3,5,11;47:9,10,12,
20,23;48:3,20,20;49:7,
7,11;53:1,10,12,17,20;
54:1;55:6;56:7,16,17,
24;57:1;58:9;59:6,14;
60:10,13;61:4;63:25;
64:5,7,12,13;65:3,5;
68:15,17;71:2,18,19;
72:8;82:6
**ranges (12)**
45:3;48:19;59:3,7,
21,23;60:15;62:24;
63:14,21;64:3;65:6
**rather (5)**
5:21;6:16;11:1;43:1;
83:17
**reached (2)**
14:9;15:17
**read (7)**
29:6;33:11;62:14;
90:18;96:2,7;104:9
**real (1)**
84:20
**realize (1)**
84:16
**realizing (1)**
86:16
**Really (3)**
20:15;81:25;100:19
**reason (2)**
41:11;45:9
**recall (1)**
74:14
**received (1)**
77:18
**recently (1)**
5:7
**Recess (3)**

74:5;85:11;101:15
**recklessly (1)**
70:16
**recognizing (2)**
73:16;75:19
**recommendation (1)**
80:15
**record (24)**
4:10;6:12;7:14,17;
8:2,12;11:8;28:10;
30:11,12;35:9;52:3;
61:3;67:15,20;74:3,7;
85:4,9,13;96:7;101:7,
14,17
**recording (9)**
4:2;5:18;6:16;74:3,
7;85:9,12;101:14,17
**records (1)**
20:12
**red (1)**
45:20
**reentry (1)**
81:24
**refer (1)**
96:17
**reference (2)**
95:18;96:21
**referenced (2)**
49:17;99:17
**references (1)**
42:2
**referencing (1)**
90:19
**referred (2)**
66:6,18
**referring (8)**
30:25;53:13;54:11;
55:2;60:19;62:22;
78:16;90:15
**refers (1)**
86:20
**reflected (2)**
13:19;55:13
**reflects (7)**
9:25;13:3;16:1;
28:18;55:11,25,25
**refresh (1)**
96:2
**refresher (1)**
5:13
**regard (3)**
11:24;23:10;75:22
**regarding (3)**
74:9;75:8;78:2
**regular (1)**
93:2
**regulations (6)**
12:14;13:4,22;14:19;
15:7;16:4
**relate (2)**
16:22;31:13
**related (10)**
16:5;17:9;21:14,23;

22:17;26:24;35:4;43:2;
79:2;91:13
**relatedly (1)**
6:25
**relates (3)**
14:17;15:5;91:5
**relating (7)**
12:13,17;13:7,20,25;
14:22;15:9
**relative (1)**
16:25
**relatively (1)**
90:7
**release (4)**
21:11;25:8;32:19;
46:19
**released (1)**
21:24
**releasing (3)**
12:17;31:21;75:8
**relevant (8)**
22:9,11,18;23:13;
25:1;31:5;36:18;39:7
**relieve (1)**
77:13
**relying (1)**
5:22
**remain (1)**
86:22
**remember (2)**
30:2;51:2
**reminder (1)**
30:5
**remotely (3)**
9:5;27:18;61:16
**remove (6)**
31:18;32:13;33:2,5,
20;97:14
**removed (2)**
38:22;69:6
**removing (2)**
12:17;34:3
**repair (1)**
14:5
**repairs (1)**
15:18
**repeating (1)**
83:5
**report (7)**
19:10,11;32:21;
74:24;93:12;94:12;
97:9
**reported (3)**
69:10;88:9;98:7
**reporter (6)**
4:18;5:19;81:7;96:2;
102:4;104:12
**reporter's (1)**
6:11
**representative (1)**
8:22
**representing (1)**
16:14

**request (2)**
54:23;80:17
**requested (1)**
96:7
**requesting (1)**
13:10
**requests (3)**
13:11;15:13;83:12
**require (7)**
33:24;35:5;48:16;
70:23;71:25;79:19;
90:9
**required (25)**
14:4;25:8;26:4;27:3;
32:13;34:2;41:12,13,
23;42:3,7;47:6;51:10,
20;54:8;57:5;64:5,8;
65:3;86:22;87:1;88:18,
25;89:20;98:15
**requirement (6)**
31:5,17,25;72:9;
92:9,10
**requirements (4)**
33:14;70:21;74:13;
90:3
**requires (3)**
32:17;33:13,21
**rescue (3)**
27:6;70:21;71:22
**rescuing (3)**
31:22;74:13;79:2
**respect (1)**
86:18
**respectful (1)**
73:21
**respond (10)**
71:8;72:5,8,13;
82:17,20;83:11;87:18;
88:18;89:20
**responding (2)**
41:13;84:23
**response (4)**
22:5;32:8;71:15;
95:19
**responsibility (4)**
32:6;69:12;86:2,24
**responsible (1)**
59:3
**rest (1)**
97:22
**restrict (1)**
71:13
**restricted (2)**
65:13;71:6
**restrooms (1)**
48:5
**result (2)**
14:10;15:18
**resume (1)**
74:6
**Resuming (2)**
85:12;101:16
**review (11)**

15:16;20:11;23:25;
26:14,17;35:7;62:19;
84:24;85:6,16;101:6
**reviewed (6)**
17:13,15,21,24;
21:14;76:7
**reviewing (1)**
15:12
**reviews (3)**
14:6,8;15:14
**revised (1)**
11:7
**revision (1)**
28:17
**Rhonda (1)**
16:23
**right (15)**
11:17;18:4;63:2,7;
68:4;75:3,4;88:8,11,
21;90:20;93:10;96:6;
101:13;102:5
**ring (8)**
19:9;47:25;50:16;
54:7,8;56:25;58:6;
65:25
**rings (3)**
39:25;50:14;58:8
**ripped (2)**
97:8,10
**risk (3)**
10:7;12:20;99:3
**role (1)**
22:20
**roll (1)**
46:16
**RON (3)**
5:2;8:13;104:18
**R-o-n (1)**
8:13
**room (5)**
25:14,17;32:21;57:2,
7
**roughly (1)**
73:14
**routine (3)**
19:16;35:21;36:13
**row (1)**
44:20
**rule (4)**
7:13;9:9;32:13;38:3
**rules (6)**
12:14;13:4,22;14:19;
15:7;16:3
**run (1)**
12:8

## S

**safe (2)**
87:6,25
**safety (16)**
12:20;42:21;85:21,
23,25;91:20,25;92:1,9,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

30(b)(6) WARDEN RON NEAL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 39 of 42

23;93:22,23;94:1;
95:15;98:3;99:4
**same (25)**
6:6;12:3;23:21,21;
28:19,20,23;30:21;
50:13;52:12,17,23;
53:10,11,11,12,17;
67:21,24,25;68:3;
78:15;86:21;88:23;
97:24
**sanitation (4)**
36:23;38:25;91:21;
92:1
**save (1)**
35:20
**saying (2)**
16:11;22:5
**scene (2)**
25:20;32:25
**scope (1)**
52:4
**screen (11)**
9:11,12;28:15;30:9,
18;62:4,5;67:20;73:1;
83:17;84:6
**scrutiny (1)**
97:2
**seasoned (1)**
98:11
**sec (1)**
68:22
**second (5)**
9:2;24:23;61:8;
76:23,25
**Section (44)**
24:16,22;30:15,22,
25;31:12;35:2,8,10;
62:21;66:8,15;68:5,6,7,
9;69:3,3,18,24,25;73:3,
5,10;74:19,20;75:1,3;
76:8,20,20,21,25;77:3,
6;78:7,9,10,14;82:22;
84:8,9,11,22
**sections (4)**
24:8,13;36:12;87:13
**secure (10)**
26:12,13;39:5,20,20;
40:23;43:20;45:20,25;
85:20
**secured (9)**
14:1,23;44:1;46:5;
47:21;49:9,10,12;51:2
**securing (1)**
49:17
**security (10)**
19:6;41:5;42:17,21;
43:18;65:3;70:15;86:1;
89:13;94:1
**seeing (1)**
30:22
**seek (1)**
52:6
**seizure (1)**

38:20
**senior (1)**
60:2
**sense (5)**
5:23;29:9;44:7;
65:20;86:20
**separate (2)**
58:6;99:23
**September (2)**
18:23;104:13
**sergeant (8)**
58:24;59:9,15,18;
60:3,16;64:2;95:12
**serve (1)**
86:17
**service (1)**
22:2
**services (7)**
19:24;98:22,24;99:2,
21;100:18,18
**set (19)**
42:25;49:13;56:23,
24,25;57:2,3;58:21;
63:17;64:6,15;66:16;
70:4,14;72:2;79:12;
88:12;89:8;94:5
**sets (4)**
57:22;60:7;66:3;
68:13
**setting (4)**
12:11;43:16;50:5;
52:10
**seven (1)**
77:8
**seven-days-per-week (1)**
77:7
**several (6)**
18:19;19:1;42:10,23;
55:17;99:1
**shall (16)**
66:9,12,13;69:4,6,7,
9;77:8,10,13,16,20,22,
25;86:14,18
**share (5)**
30:9;62:3;73:2;
80:15;84:6
**shared (3)**
29:17;52:1;62:5
**sharing (2)**
30:18;35:2
**sheet (1)**
57:14
**shift (14)**
25:19;46:17;54:2;
59:21;64:9,18;66:5;
70:6,7,13;77:14,16;
80:3;81:4
**shop (5)**
19:8;54:18;57:4,9,10
**shop-specific (1)**
42:20
**short (1)**
101:5

**shorter (1)**
73:19
**Shorthand (1)**
104:12
**shouting (1)**
82:7
**show (3)**
9:18;28:9;60:25
**shows (2)**
45:19;54:6
**side (1)**
46:16
**sides (1)**
53:17
**side-to-side (1)**
47:3
**sign (1)**
79:21
**significant (1)**
91:2
**signoff (1)**
79:20
**similarly (3)**
5:25;6:6,21
**single (1)**
53:21
**situation (23)**
13:12;25:12,18;27:9;
37:4,9;44:10;69:2;
70:2;71:9;72:13;80:2,
11;82:3,21;86:10;88:5,
12,19;89:2,11;90:6,9
**situationally (1)**
90:2
**situations (2)**
84:23;87:20
**six (3)**
30:24;56:24;57:24
**slash (2)**
54:7;77:7
**slid (1)**
69:5
**sliding (1)**
47:3
**slip (1)**
80:17
**small (2)**
76:8,17
**sole (1)**
69:12
**somehow (1)**
7:4
**someone (4)**
37:5;41:13;51:25;
52:7
**someone's (1)**
93:24
**sometime (1)**
39:1
**sometimes (3)**
59:15,16;80:21
**soon (2)**
61:8;91:23

**sorry (5)**
10:13,15;12:9;54:20;
81:7
**sort (23)**
5:12;21:1;38:2;41:5;
43:13;44:20;45:16;
46:15;47:2;53:8;57:16;
60:8;70:11,13;75:9;
94:20;97:17,18,19,19;
100:3,13;101:5
**Sounds (3)**
6:24;28:23;74:1
**sources (1)**
26:2
**south (2)**
53:17;104:3
**space (1)**
41:6
**spark (1)**
94:5
**speak (2)**
16:17;81:21
**speaking (1)**
75:21
**special (1)**
78:1
**specific (50)**
23:15;29:14;33:7,10;
35:14,23;37:4,21,21;
39:11;43:2,4;44:4,20;
45:6,11;46:7;47:12;
50:4,14;51:9;54:11,15,
19,20;55:1;57:15;65:5;
68:12,25;74:15;75:7,
10,13,22;76:13;78:21;
84:8;87:11,13,16;
88:12;89:7;90:1,3;
92:7;96:16,19;98:7;
100:6
**specifically (21)**
5:11;31:13;33:16;
36:18;47:17;49:16,17,
18;51:20;58:17;68:5;
69:14;70:2;71:10;75:2,
4;79:5;80:1;86:9;
87:23;92:8
**specifics (1)**
90:18
**specifies (2)**
58:13;63:9
**specifying (1)**
60:12
**spell (1)**
8:12
**spend (1)**
17:2
**spending (1)**
17:8
**split (3)**
24:7;63:14,21
**spoke (1)**
17:11
**sporadic (1)**

39:4
**spot-check (1)**
100:24
**spot-checking (1)**
100:10
**spreadsheet (1)**
54:6
**staff (69)**
13:9,10,12;18:22;
25:7,15;26:14;36:8;
40:18;47:13;59:5,6;
64:2;66:10,12,14;69:5,
11,20,20;77:9,12,13,
13,16,19,22,24,25;
79:25;80:5,7,13;81:2,
19,22,24,25;82:1,5,13,
24,25;83:2,8,11;84:22;
85:20,22;86:3,5,7,22;
87:1,4;88:4,5,17,23;
89:24,24;91:1;92:15,
25;93:8;94:7,11;95:1,
2;98:10
**stand-alone (1)**
80:20
**standard (1)**
86:12
**standards (6)**
19:21;82:23;83:7;
86:4,7;90:16
**standing (2)**
48:9;56:15
**staring (1)**
85:2
**start (2)**
4:1;94:6
**starts (2)**
55:4;77:3
**state (26)**
4:9;8:12,18;10:7;
12:15;13:5,23;14:7,20;
15:8,10;16:24;18:14;
19:1;21:21;25:6;27:4;
31:4;35:14;71:5;78:25;
80:9;85:19;86:16;
91:11;99:4
**states (3)**
60:8;104:1,14
**station (2)**
47:19;64:21
**step (6)**
25:24,24;32:20,20,
25;33:2
**step-by-step (1)**
27:13
**steps (6)**
32:8,10,18;33:13,15;
47:18
**still (1)**
98:9
**stipulated (3)**
4:16,20,21
**stipulation (2)**
4:11;7:23

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 40 of 42

**stop (3)**
35:2;73:1;84:11
**storage (2)**
14:2,2
**stretch (1)**
89:21
**strike (4)**
13:6;26:6;50:5;
58:12
**submitting (1)**
13:11
**SUBSCRIBED (1)**
104:21
**subsection (4)**
76:24;77:6;78:11,13
**subsequent (2)**
9:20;12:5
**substance (5)**
14:8;15:16;16:12;
76:12;78:15
**substantive (1)**
78:20
**suggested (1)**
23:3
**supervision (1)**
79:14
**supervisor (6)**
25:19;69:10;79:5;
92:17;95:2,10
**supervisors (1)**
81:24
**supposed (4)**
25:24;32:22;92:18,
20
**sure (15)**
5:16;6:11,20;10:17;
18:8;21:7;29:10;40:3;
48:7;51:14,17;70:16;
73:16;77:1;101:6
**swear (1)**
4:2
**swing (4)**
46:16,24;47:2,3
**switches (1)**
44:20
**sworn (3)**
4:4;5:4;104:21
**system (18)**
15:10,14,18;39:17;
42:15;44:5;52:18;
66:10;68:8;69:20;91:6,
11,12,14,18,22,25;94:3
**systematic (3)**
94:21;96:11;98:15
**systems (6)**
12:15;13:5,23;14:20;
15:12,15

**T**

**table (1)**
12:11
**talk (5)**

42:23;63:24;74:21;
79:24;86:11
**talked (5)**
60:14;74:10,12;75:1,
22
**talking (4)**
33:11;38:12;75:4;
94:3
**talks (9)**
43:11;66:9,16;69:15,
17,19;74:24;81:12;
84:22
**tamper (1)**
39:16
**tandem (1)**
43:25
**task (3)**
34:3;37:7;79:6
**tasks (2)**
33:9;73:18
**team (1)**
59:16
**technical (1)**
6:17
**technically (1)**
74:25
**telephone (1)**
25:17
**tells (1)**
25:23
**ten (1)**
73:11
**ten-minute (2)**
73:12,23
**term (1)**
40:16
**terms (34)**
11:5;16:15;26:2;
28:8;40:4;41:2;48:8,
12;49:21,25;51:9,18;
52:16;53:6;55:12;
58:19;62:22,24;63:12,
13;66:4;70:3,14;71:22;
75:23,24;78:20;82:16;
90:3,24;93:18;94:14;
97:1;98:17
**testified (4)**
5:4;21:13;52:11;
68:4
**testify (3)**
10:11;11:11;23:20
**testimony (25)**
6:12;8:8,21;11:23;
12:24;13:16;14:14;
15:2,23;16:5;22:25;
23:9,17;24:2;34:6;
40:7;51:8,22;72:16;
73:10;83:9;90:5;91:5;
93:6;95:19
**testing (2)**
14:6;98:18
**Thanks (2)**
5:1;76:17

**Therefore (1)**
39:15
**thinking (2)**
85:18;87:9
**thorough (2)**
97:15;100:19
**though (2)**
65:20;90:20
**thought (2)**
20:18;82:25
**three (8)**
21:13;57:10,24;
59:21,23;99:11,13,14
**throughout (7)**
25:13;26:9;35:18,23;
42:12;65:4;73:15
**thrown (1)**
69:4
**Thursday (2)**
10:14,15
**till (2)**
25:25;55:22
**times (6)**
29:19;35:22;49:1,3;
50:16;100:6
**title (2)**
55:1;83:5
**titled (2)**
18:15;28:16
**today (29)**
4:7,17;5:15;6:12;
7:12;8:9,21;11:23;
12:25;13:17;14:14;
15:2,24;16:18;17:11,
14,16;20:14;22:14,20;
23:1,8,20;28:3;51:22;
55:21,22;91:5;102:2
**together (6)**
4:19;32:7;57:17;
72:11,11,12
**Tomorrow (2)**
10:13,14
**took (3)**
24:25;39:12;65:25
**tools (1)**
13:25
**top (3)**
30:23;48:21;55:3
**Topic (38)**
10:1,1,2,2,22,23;
11:12,15,25;12:12,25;
13:2,2,13,16,19,20;
14:11,14,17,24;15:2,5,
5,20,23;16:1;21:15;
23:5,11,25;24:1;52:4,
6;55:21;74:16;75:10;
91:7
**topics (15)**
9:21;10:1,4,20;11:9;
12:6;16:4,7;17:10;
22:25;23:10;30:4;43:2;
51:21;80:1
**total (3)**

57:10,25;67:13
**touch (2)**
23:4;87:17
**touched (1)**
76:12
**touring (1)**
64:22
**track (2)**
7:3;95:23
**training (3)**
26:15,16,18
**transcript (14)**
5:18;28:8;29:9,23;
30:6,8;35:8,11;61:3,
14;73:3;102:5;104:10,
14
**transfer (4)**
70:5;71:14;72:12;
76:1
**trickier (1)**
6:15
**tried (1)**
22:8
**trouble (1)**
81:9
**true (2)**
36:9,11
**truthful (1)**
8:8
**try (1)**
91:2
**trying (5)**
46:7,12;69:14;89:23;
95:17
**turn (5)**
27:20;46:8,9;62:20;
94:13
**turned (3)**
92:22;95:5;98:5
**turning (5)**
12:4;24:5;30:15,15;
52:21
**turns (2)**
92:23,25
**two (7)**
18:11;43:19;47:14;
53:2;57:24;73:19;
99:16
**type (3)**
80:21;82:20;100:8
**types (4)**
40:7;47:14;56:5;
93:5
**typewriter (1)**
80:21
**typically (11)**
39:4,21;44:1;48:25;
58:23;79:4;92:15;98:2,
6;99:1,13

**U**

**uh-uh (1)**

5:22
**unclear (2)**
20:21;46:11
**uncommon (1)**
89:17
**under (18)**
19:14,17,19;29:18;
30:24;35:8;68:21,22,
23;74:18;75:2;76:19;
78:9,10;79:14,15;86:8;
91:7
**understandings (1)**
8:4
**Understood (11)**
6:9;7:10,19;40:3,6;
59:11;87:14;90:5;
91:17;93:6;99:18
**unit (20)**
50:15;54:6,19,20;
55:3,16;57:1,21;58:25;
59:1,16;60:3;63:9,10;
65:7,20;75:25;92:14,
16;93:8
**UNITED (1)**
104:1
**units (1)**
26:8
**unless (3)**
7:14;65:6;95:4
**Unlike (1)**
7:12
**unlock (5)**
13:25;50:19,21;
51:12,20
**unlocked (8)**
35:4;36:3;37:11;
38:10;49:15;50:2;
51:19;52:24
**unlocking (1)**
33:22
**unrelated (1)**
30:4
**unsecured (2)**
46:20,22
**unwritten (11)**
32:12;63:16,20;
64:16;70:11;71:4,12;
75:24;80:9;90:24;
98:15
**up (34)**
6:21;8:25;9:3,10,12;
29:6;30:9;39:17;43:13;
48:10,20;49:6,10;
50:10;51:11;59:2;61:8;
62:3;63:21;66:16;
67:19;81:8;83:16,23;
84:5,18;92:24;93:1,1;
94:7;99:1;100:3,11,12
**up-close (1)**
98:17
**update (3)**
24:24;77:1;79:8
**use (15)**

USDC IN/ND case 3:18-cv-00995-JD    document 203-11    filed 03/29/21    page 41 of 42

19:11;39:19;40:23;
43:5,17;44:24;47:15;
48:16;49:25;66:9;
69:19;77:21;80:12;
81:12;94:22
**used (3)**
13:25;69:8,22
**using (6)**
5:20,21;43:11;52:12,
18;53:21
**usually (1)**
59:18

## V

**varies (1)**
35:18
**variety (5)**
16:21;43:2;80:14;
91:9;99:5
**various (2)**
39:25;47:8
**vast (2)**
36:16,24
**veering (1)**
30:4
**vent (1)**
97:11
**verbal (3)**
82:6;83:12;88:18
**verbally (1)**
82:2
**verify (1)**
61:8
**version (17)**
27:22;28:12,14;61:6;
66:21,23;67:2,9,16,17,
17,24;78:6,12,13;
83:23,25
**versus (3)**
23:20;49:15;50:2
**via (2)**
4:20;10:25
**video (2)**
5:18;6:16
**VII (8)**
76:20,20,25;77:3,6;
78:9,10,14
**VII-E (1)**
78:14
**VIII (4)**
66:8;68:6,9;69:18
**violation (2)**
89:7,9
**virtually (1)**
4:17
**visual (1)**
97:17
**visually (1)**
98:20
**voice (2)**
6:21;81:8
**volition (2)**

36:5;37:12
**vs (1)**
104:6

## W

**wait (1)**
25:25
**walk (1)**
51:11
**walked (1)**
22:22
**walking (1)**
97:18
**walk-through (1)**
97:5
**wall (1)**
97:11
**wand (1)**
64:23
**wants (2)**
10:19;48:10
**Warden (20)**
4:5,12;5:7;8:11,17,
20;9:11;10:21;16:10;
20:16;21:12;27:23;
28:21;30:20;52:5;73:8;
74:9;78:25;85:15;
102:2
**warrants (1)**
25:12
**Watchmans (2)**
19:10;57:20
**way (16)**
6:1,2,10;8:5;42:5;
44:17;46:12;50:8;51:8;
52:11;58:23;71:6;
81:17;82:11;84:12;
92:12
**ways (6)**
44:13;80:11,14;
90:25;91:10,24
**week (8)**
10:12,13,13;17:6,6,
7;77:8;98:5
**weeklies (3)**
95:5;98:5,7
**weekly (16)**
92:1,9,13,18,22;
93:14,14;95:3,7,7,9,12;
96:10,20;97:3,4
**welcome (2)**
4:8;102:3
**what's (5)**
22:4;35:22;55:10;
56:13;89:25
**Whereupon (7)**
9:4;27:17;28:24;
34:6;61:15,17;72:16
**wherever (1)**
45:11
**whoever's (1)**
97:6

**whole (1)**
68:10
**who's (2)**
16:14;48:9
**wide (2)**
16:21;99:5
**wish (1)**
27:16
**withdrawing (1)**
10:21
**within (9)**
10:18;11:12;25:10;
31:8;52:4;66:8;71:7;
75:25;100:4
**without (1)**
36:7
**witness (13)**
4:3,4,8,24;5:3;16:15;
20:18;73:12;74:1;
81:10;96:8;101:12;
102:3
**witnessing (1)**
25:16
**words (2)**
5:20,21
**work (21)**
16:19,23;26:20;
35:21;37:5,7,22;46:3;
72:10;73:11;77:9;85:6;
92:23,24,25;93:1,12;
94:13;95:3,5;101:9
**worked (1)**
44:6
**workers (1)**
38:25
**working (7)**
17:3,9;22:6;29:12;
32:7;81:22;86:25
**works (7)**
42:15;43:25;58:23;
73:8;85:7;92:12;
101:12
**worst (1)**
73:17
**write (2)**
80:18;93:12
**writing (2)**
65:19;71:19
**written (33)**
5:18;21:13,20;23:4;
26:3;27:2,8;31:3;
33:25;37:15;38:1;60:7;
62:23;63:17;64:11,16;
65:13;66:3;68:13;71:4,
12;75:23;79:12;80:8;
82:18;83:10;87:13,16;
88:11;90:17;93:14,16;
98:15
**wrong (1)**
87:16

## X

**XA1 (1)**
69:4

## Y

**year (1)**
26:18
**years (6)**
11:1,6;39:14;55:17,
17;99:11
**yelling (7)**
82:7;89:3,4,10,16,
23;90:9
**yells (1)**
89:21
**Yep (1)**
85:7

## Z

**zone (1)**
25:11
**Zoom (7)**
4:1,17,20;5:12,18;
62:17;74:6
**zoomed (1)**
62:14

## 0

**00-00-101 (1)**
20:7
**00-02-301 (2)**
18:18;81:12
**00-04-102 (1)**
20:10
**00-09 (1)**
20:3
**02-03-106 (7)**
19:4;42:11,14;66:7,
19;76:7,19
**02-03-108 (3)**
19:6;42:17,19
**02-14 (1)**
18:22
**04-02-101 (1)**
19:20
**04-02-102 (1)**
19:23
**04-03-103 (1)**
83:21

## 1

**1 (38)**
9:5,8;10:1,5,8,22,23;
11:2,12;12:9,9,16;13:6,
24;14:21;15:8;18:10,
12,13;19:5,7;21:22;
24:22,24;25:3,4;28:18;
32:11;61:11;62:8,13;
66:24;67:11;75:3,15;
76:9,19;83:24

**10:00 (1)**
89:22
**100 (8)**
45:4;47:12,20,22;
48:10,13;49:7;51:16
**10-7 (1)**
25:15
**11:16 (1)**
73:24
**11:41 (1)**
85:3
**11:46 (1)**
85:5
**12 (8)**
10:2,4;11:25;15:5;
19:17,19;20:5;91:7
**12:16 (1)**
73:24
**12:21 (2)**
101:8,9
**12:22 (1)**
102:8
**12:46 (1)**
85:5
**13 (5)**
19:6,17;58:4,5,8
**14 (5)**
10:2,4;11:25;16:1;
20:6
**15 (2)**
61:7;67:11
**15-page (1)**
67:5
**16 (4)**
18:23;67:9,12,13
**16-page (1)**
67:8
**17 (1)**
28:19
**17-page (2)**
28:16,22

## 2

**2 (12)**
10:4;11:25;12:12;
18:8,16;23:12;27:18,
21;30:10;67:12;69:12;
74:19
**2,367 (1)**
100:23
**20 (4)**
19:4;66:22,25;76:8
**20_ (1)**
104:23
**200 (2)**
45:4;47:12
**2000 (1)**
11:2
**2009 (1)**
19:7
**2010 (1)**
11:2

**2011 (1)**
    19:1
**2012 (1)**
    83:24
**2013 (6)**
    18:23;19:4;66:22,25;
    78:13,13
**2014 (6)**
    18:16;19:9,15,17;
    27:24;28:18
**2015 (18)**
    11:3;12:9,9,16;13:7,
    24;14:21;15:9;18:10,
    12;21:22;24:22;25:4;
    61:7,11;62:8;75:15;
    76:8
**2016 (5)**
    18:13,24;19:2;24:24;
    25:3
**2017 (17)**
    11:2,3;12:10,16;
    13:7,24;14:21;15:9;
    19:5,7;21:23;24:25;
    25:5;66:24;75:16;
    76:10,19
**2020 (3)**
    19:12,17;104:13
**21 (1)**
    19:12
**22 (1)**
    104:13
**24 (1)**
    77:7
**24-hour (1)**
    77:6
**24-hour/seven-day-per-week (1)**
    77:10
**27 (1)**
    86:21

---

**3**

**3 (8)**
    10:1,4;11:25;13:2;
    18:17;32:25;61:12,16
**3:18-cv-00995 (1)**
    104:6
**300 (3)**
    45:4;47:12;53:14
**30b6 (4)**
    4:13;9:1,9;52:5
**30-minute (1)**
    20:17
**31 (14)**
    11:3;12:10,16;13:7,
    24;14:21;15:9;18:16;
    19:15;21:23;25:4;
    27:24;28:18;75:16
**32761 (2)**
    28:15;30:13
**32777 (2)**
    28:16;30:13
**32879 (1)**

61:5
**32886 (1)**
    61:5
**33596 (1)**
    67:18
**33611 (1)**
    67:19
**34352 (1)**
    84:7
**34385 (1)**
    84:8
**34-page (1)**
    84:7
**380 (1)**
    89:14
**3B-39 (2)**
    50:12,21
**3-B-39 (1)**
    47:25

---

**4**

**4 (2)**
    31:17;33:2
**400 (3)**
    45:4;47:12;53:13

---

**5**

**5 (4)**
    33:3;76:20;77:3;
    78:9
**500 (20)**
    39:11;45:4;47:12;
    48:2;49:6,11;50:10;
    53:13,19;56:7,16,17,
    23;57:1,6;58:8;64:5,7,
    12,13
**57 (1)**
    57:25

---

**6**

**6 (11)**
    10:1,4;11:25;13:19;
    19:3;32:11;33:5;52:5;
    66:8;68:6;75:3

---

**7**

**7 (7)**
    30:16,16,23;68:7;
    69:3,3;86:8

---

**8**

**8 (9)**
    10:1,4;11:25;14:17;
    19:14,18;30:16,23;
    62:13

---

**9**

**9 (3)**
    19:9;24:16,22
**9:00 (10)**
    36:14;37:10;38:3,12,
    16,18;39:1,4;41:25;
    80:4
**9:30 (1)**
    89:22
**91-23 (1)**
    19:25
**91-30 (1)**
    20:2
**9-E1 (6)**
    47:25;48:2;56:14,16,
    20;58:9

---