**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*CHRISTOPHER BEAL*

*July 30, 2020*

*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*

*Gary \* Merrillville \* Valparaiso, Indiana*

*3893 East Lincoln Highway (Rt. 30)*

*Merrillville, Indiana  46410*

*(219) 769-9090*



Original File 07-30-20 Christopher Beal.txt

**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 2 of 78

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as            )
Personal Representative     )
of the ESTATE OF            )
JOSHUA DEVINE,              )
                            )
           Plaintiff,       )   Case No.
                            )   3:18-cv-00995-JD-MGG
     vs.                    )
                            )
RON NEAL, et al.,           )
                            )
           Defendants.      )

The videotaped videoconference deposition of CHRISTOPHER BEAL, called for examination pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before APRIL D. HARGETT, a notary public within and for the County of Lake, State of Indiana, Certified Shorthand Reporter, on July 30, 2020, at the hour of 9:03 o'clock a.m.

BOSS REPORTERS

& VIDEOCONFERENCING

GARY * MERRILLVILLE * VALPARAISO, INDIANA

(219) 769-9090

Page 2

PRESENT:

LOEVY & LOEVY,
(311 North Aberdeen Street,
Chicago, Illinois 60607), by:
MR. SAM HEPPELL
     -and-
MS. MEGAN PIERCE,
(312) 243-5900
megan@loevy.com
     Appeared by videoconference on behalf
     of the Plaintiff;

OFFICE OF THE ATTORNEY GENERAL,
(302 West Washington Street, Fifth Floor,
Indianapolis, Indiana 46204), by:
MR. BENJAMIN C. ELLIS,
(317) 232-6201
     Appeared by videoconference on behalf
     of the Defendants.

Page 3

I N D E X

Witness:                                    Page

CHRISTOPHER BEAL

EXAMINATION BY MR. HEPPELL                    5
EXAMINATION BY MR. ELLIS                    205


EXHIBITS

Beal
Exhibit Nos.                                Page

1    Adult Facility New Training            40
     Process
2    Policy and Administrative              88
     Procedure
3    Job Description                       108
4    Annual Training Needs Assessment      116
5    Learning Plan Transcript              160
6    Fire Evacuation Drills                164
7    E-mail                                184
8    E-mail                                186

Page 4

MR. HEPPELL: I just want to put on the record, as we have done with the prior depositions that we've done in this case, that I understand that all parties are in agreement and have no objection to conducting the deposition by Zoom, including using Zoom and having the court reporter connected remotely to swear in the witness and take the testimony. There is no objection to that, and subject to all of the ordinary objections you might have under the federal rules to be used in the actual testimony at trial.

Is that a fair recitation of our agreement then?

MR. ELLIS: I think that's fair.

MR. HEPPELL: Okay. Well, with that -- and, yes, if you would go ahead and swear in the witness, please.

Thank you.

(WHEREUPON, the witness was duly sworn.)

THE WITNESS: I do.

THE REPORTER: Thank you.

CHRISTOPHER BEAL, called as a witness herein, having been first duly sworn, was examined and testified as follows:

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 3 of 78

Page 5

EXAMINATION

BY MR. HEPPELL:

Q. Good morning, Mr. Beal. Thank you for being with us this morning, at least, virtually.

How are you doing?

A. I'm doing fine.

Q. Good. My name is Sam Heppell, and I am one of the attorneys representing the plaintiff in this case, Denise Dwyer, who is the representative of the Estate of Joshua Devine. I believe one of my colleagues, Megan Pierce, will be joining us later in the deposition, so you may see her pop up on the Zoom as well shortly. Although, you're primarily going to be talking with me this morning.

Mr. Beal, will you go ahead and state and spell your full name just for the record?

A. Yeah. Christopher, C-h-r-i-s-t-o-p-h-e-r, B-e-a-l.

Q. Mr. Beal, have you ever testified at a deposition before?

A. No, I have not.

Q. Okay. So I'm going to go over some background rules just to orient you as to how we're going to proceed today, and it'll be a refresher for me and other folks on the call.

Page 6

If you have any questions about these rules, let me know as I go through them, okay?

A. Okay.

Q. First of all, you understand that your testimony during this deposition is under oath just as if you've been sworn in in a courtroom proceeding, correct?

A. Yes.

Q. Okay. There is a written transcript being made by the court reporter. A written record of my questions and your answers, in addition to the recording of this Zoom that we're doing today. And because there is a written transcript being prepared, it's important that I ask my questions and you give your answers using words without relying on gestures or things like uh-huhs or uh-uhs, which are easy for us to understand in the moment, but make it very difficult for the court reporter to make a clean record. Does that make sense?

A. Understood.

Q. Similarly, it's a very unnatural way of communicating. Because in human conversations, we would talk over each other, jump in and finish each other's sentences, and that kind of stuff. During a deposition, that makes it next to impossible for the

Page 7

court reporter to make a clean transcript. So for that reason, it's important for you to let me get all of the way to the end of my question before you jump in with your answer. Does that make sense?

A. Understood.

Q. Similarly, I've got to let you finish your answers before I jump in with the next question. So it is a two-way street here.

Another thing to try to bear in mind is that your attorney may make some objections to some of the questions that I ask today. Unlike in a court room where there's a judge that can rule on those objections right away, here those objections are just being made for the record. And so unless your attorney directly instructs you not to answer a question, you can go ahead and answer the question after your attorney has stated his objection, okay?

A. Understood.

Q. And that is just another factor that is -- it is easy to say and hard to do, but we'll do our best for the three of us not to be talking over each other. So for me to get my question, your attorney to get an objection out if he has one, and then for you to wait until that's all done before you proceed with your answer, okay?

Page 8

A. Yes, sir.

Q. And we'll bear with each other. And if you catch me talking over you, let me know, and I'll do the same just because I only get to ask the questions once, and it's important for everyone that there's a clear record of what your testimony is, okay?

A. Understood.

Q. If you don't understand a question that I ask -- it might be that I phrased something poorly or you could tell from what I'm asking from the question that I misunderstood something that you said previously in the deposition -- at any time if that happens, please let me know, okay, and I'll be happy to rephrase my question, and we can work out what the miscommunication is. Does that make sense?

A. Understood.

Q. Similarly, you know, we're all doing our best in these unusual times and proceeding by Zoom remotely instead of having a deposition in person. If at any point you're not able to understand me or see me or hear me because of the technology is causing a problem, just let me know. We can take a break, figure out what we need to do to make sure this is all working as intended, okay?

USDC IN/ND case 3:18-cv-00995-JD document 203-12 filed 03/29/21 page 4 of 78

Page 9

A. Understood.

Q. If I don't hear anything from you and you go ahead and answer my question, I'm going to assume that you were able to hear and understand the question, okay?

A. Understood.

Q. We are probably going to take some breaks throughout the course of the deposition here today. We could take short breaks. We can take a longer break for lunch if you need one, depending on how long the deposition is. I'm probably going to be asking for some breaks, and I want to let you know that, if at any point in time, if you need to take a break, that's no problem. Just let me know, and we can go off the record and take that break, okay?

A. Understood.

Q. The only rule around that is, if I've asked the question, I would ask you to give your full and complete answer to that question before we go off the record, and I can ask the next question when we get back from the break, okay?

A. Understood.

Q. With that background and orientation to what we are planning to do at the deposition, do you have any questions or concerns about proceeding with

Page 10

the deposition today?

A. No, sir.

Q. Do you have any conditions or are you taking any medications that affect your memory in any way or that might otherwise in any way impact your ability to give truthful and accurate testimony to the best of your recollection?

A. No, sir.

Q. Okay. Mr. Beal, on April 7th, 2017, you were employed at Indiana State Prison as the head of the prison's training department; is that correct?

A. Correct.

Q. Okay. And you've held that position since approximately September of 2013; is that correct?

A. October of 2013.

Q. October 2013. Got it. And do you currently still hold that position?

A. Yes.

Q. During your career at Indiana State Prison, at any point have you personally made any changes to the prison's training programs or training protocols regarding fire safety?

A. No.

Q. Is that a task that you have assigned or

Page 11

delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point have you personally made any changes to the prison's training programs or training protocols regarding fire drills?

A. No.

Q. Is that a task that you have assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point did you make any changes to the prison's training programs or protocols that trained officers in cellhouses on when and how to activate the prisoner fire department?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point did you personally make any changes to the prison's training programs or protocols that trained officers in cellhouses on when and how to release prisoner firefighters from their cells in the event of an emergency?

Page 12

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point did you personally make any changes to the prison's training programs or training protocols that trained officers in cellhouses on when and how to evacuate a prisoner from a locked cell?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point did you personally make any changes to the prison's training programs or protocols that trained officers in cellhouses on when or how to investigate a disturbance or commotion that might be going on in a cellhouse?

A. Can you rephrase that question?

Q. Sure. During your career at the Indiana State Prison, at any point did you personally make any changes to the prison's training programs or training protocols around training officers assigned to cellhouses on what they should do to investigate

DENISE DWYER, et al. v.        Cause No. 3:18-cv-00995-JD-MGG        CHRISTOPHER BEAL
RON NEAL, et al.                                                          July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 5 of 78

Page 13

any disturbance or commotion that's going on in that cellhouse?

A. No.

Q. And is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point did you personally make any changes to the prison's training programs or training protocols that trained officers in cellhouses on how to respond when there's a fire?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. Now, you were not present at Indiana State Prison on April 7th, 2017, during the fire in D cellhouse that killed Joshua Devine; is that correct?

A. Correct. I was not present.

Q. Okay. Have you reviewed any reports, investigations or other materials that describe what happened that night?

A. No.

Q. Have you had any conversations with

Page 14

anyone who was present or who has reviewed any such materials to learn facts about what happened at the prison that night?

A. No.

Q. And why is it that you have not reviewed any materials or talked to any people to learn about what happened at the prison that night?

A. I was not asked to be part of any investigation, nor any type of post-procedures for -- to take care of any problems in the future.

Q. And is that -- it's fair to say that that represents your usual practice with regards to incidents at the prison? Unless you're directly asked by someone to be part of an investigation, you don't review any materials regarding incidents that happen at the prison?

A. Yeah. The -- I'm not on the mailing list for that, I guess you would say. So, no, I don't even receive those reports.

Q. So it would be fair to say that because you haven't reviewed any such materials or talked to anyone else who has either reviewed materials or was present that night during the fire, you have no knowledge or opinion one way or the other as to whether any of the correctional staff who were on

Page 15

duty that night acted in a way that was contrary to the training programs that you oversaw and implemented at Indiana State Prison?

A. Correct.

Q. And you've taken no steps to determine whether any of the correction staff who were on duty that night acted in any way that was contrary to the training programs that you oversaw and implemented at Indiana State Prison; is that correct?

A. Correct.

Q. And that's consistent with your usual practices. Fair to say?

A. Correct.

Q. Fair to say, then, given that you have not reviewed any materials or spoken to anyone at the incident and you personally were not present, you have not made any changes to the training programs or training curricula or protocols at Indiana State Prison as a result of this incident, correct?

A. Correct.

Q. And to be clear, by "this incident," I'm referring to the fire in April of 2017, correct?

A. Correct.

Q. And is that consistent with your usual

Page 16

practices?

A. As far as me implementing a change, correct.

Q. Okay. Is it your understanding that someone else has responsibility to make changes to the training programs at the facility?

A. The only way a change could be made to the curriculum that we administer comes from staff development and training in New Castle.

Q. And is that -- are you referring to a central -- like, IDOC-wide central training staff at New Castle?

A. Yes. That is the central training hub, and that's where all of the curriculum would come from.

Q. So is it your testimony that you have no ability to influence the curriculum that staff at Indiana State Prison are trained on with regard to fire safety or fire response measures?

MR. ELLIS: Objection to form.

But you can answer.

BY THE WITNESS:

A. Yeah. I do submit annual paperwork, but I don't actually -- what's the word I'm looking for? I have no authority to make those changes. The

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 6 of 78

Page 17

changes are -- the curriculum is developed at staff development, and it is our job to implement the curriculum that has been approved from staff development and training.

BY MR. HEPPELL:

Q.   Just so I understand your testimony, is it your testimony then that you in your role as training coordinator at Indiana State Prison have not made any changes to any of the training programs or training procedures or curriculum at Indiana State Prison on any topic during the time that you've been the training coordinator?

A.   Correct.

Q.   Mr. Beal, do you have a work cell phone assigned to you in connection with your job at Indiana State Prison?

A.   No, I do not.

Q.   Have you ever had a work cell phone through Indiana State Prison?

A.   No.

Q.   And I understand that you have a work e-mail address associated with your work at the prison; is that correct?

A.   Correct.

Q.   And do you also have a personal e-mail

Page 18

address?

A.   I have my own personal e-mail address that's not related to work, yes.

Q.   Do you ever use that personal e-mail address to communicate with other staff at Indiana State Prison or in the department of correction?

A.   On an official basis or personal basis?

Q.   On any basis.

A.   Yes.  I've communicated with other staff via e-mail.

Q.   And by your personal e-mail?

A.   Yes.

Q.   Okay.  What -- what prison staff do you communicate with by your personal e-mail?

A.   That I can't recall.  I just know in the past I may have e-mailed somebody.  Maybe kept track with a former employee who has left employment, and that's how we would correspond.  I can't even remember names, to be honest with you.

Q.   Okay.

A.   I just want to answer the question as honestly as possible.

Q.   And I appreciate that.  And throughout this deposition, if there is, you know -- you can

Page 19

give me part of the answer and the other part you don't remember or you want to make clear for me what the extent of what your memory is, please do.  I may ask questions at times that go beyond the scope of what you remember.  And I hope you'll bear with me when I do that, but I just want to get -- I get -- you know, again, like I said earlier, I get one shot at asking you questions, and I want to make sure I explore the full extent of what you do know and what you don't know.

So you testified just now that you've used your personal e-mail, for example, to communicate with what might have been a former employee with the Department of Corrections that -- who had left the department, and you wanted to keep in touch with them.  You gave me that example, but you don't recall any specific names.  Is that fair to say?

A.   Correct.

Q.   Have you used your personal e-mail to communicate with current Department of Corrections employees or Indiana State Prison employees?

A.   Not that I can recall.

Q.   Mr. Beal, do you use any social media?

A.   Yes.

Page 20

Q.   What social media do you use?

A.   Facebook.  YouTube.

Q.   And do you post content on YouTube, or do you just use it to view videos that other people have created?

A.   I actually have my own channel where I post content.

Q.   Okay.  What kind of stuff do you post on your YouTube?

A.   It's a combination of my camping adventures and my sermons or Bible studies from my church.

Q.   And are your Facebook and YouTube -- well, strike that.

Are there other social media platforms that you use?

A.   I just recently started one called Parler, and I do have a Twitter account.

Q.   And what is Parler?

A.   It's, like, a conservative Twitter.

Q.   And are your accounts on Facebook under your own name, or do you use an alias?

A.   Some are my name, and I have a few aliases.

Q.   Okay.  What are the aliases that you use

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USRC-INND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 7 of 78

Page 21

for your social media accounts?

A. My YouTube is "Wilderness Preacher." And -- hold on. Let me check my phone, and I could tell you the other ones.

My Facebook is actually me, Christopher M. Beal. Let's see for Parler. I'm trying to bring it up here. Here we go. B-R-O-K-J-V short for "Brother King James Version," and my Twitter account is "H00zier," H, zero, zero, z-i-e-r.

Q. Do you use any of those social media accounts to communicate with anyone from Indiana State Prison or the Department of Correction?

A. That would be Facebook. A lot of current and former staff members on Facebook.

Q. Okay. And you are Facebook friends with a number of current and former ISP staff members?

A. Correct.

Q. And do you use Facebook's messaging feature in addition to public posts on Facebook?

A. Yes.

Q. Including with current or former, I guess, ISP personnel?

A. Yes.

Q. Do you talk about work sometimes over direct messenger on Facebook with your Facebook

Page 22

friends who are Department of Correction employees?

A. I try not to, but people will reach out to me being the training director with various questions about, you know, "When is our pay stub due?" You know, "When am I going to earn my days?" Various questions. A lot of newer staff sometimes will hit me with that. Same thing with former employees may contact me and say, "Hey, is the prison hiring?" or things of that nature.

Q. The folks will reach out to you through Facebook as a way to get in touch with you with those kinds of inquiries?

A. Yes.

Q. Do you -- you testified earlier -- well, strike that.

You testified earlier you don't have a work cell phone; is that correct?

A. Correct.

Q. Do you have a personal cell phone?

A. Yes.

Q. And do you use that cell phone for text messaging?

A. Yes.

Q. And do you text message with anyone from Indiana State Prison or the Department of Correction?

Page 23

A. Yes.

Q. Okay. And do you talk about work-related matters by text message as well?

A. The majority of the time, if work is being discussed, it's while I'm at work. It's -- I use my own phone to communicate in running my department and things of that nature.

Q. Because you haven't been assigned a work cell phone through the prison, you might be using your personal cell phone for work-related messages while you're at the prison. Is that fair to say?

A. Correct.

Q. And is that -- your communications might be with other individuals on their personal cell phones or it might be sending messages to their work cell phone if they have a work cell phone?

A. To my knowledge, it's only personal cell phones.

Q. Who are the individuals that you communicate with by text message who are Indiana State Prison employees?

A. I would say 99.9 percent of the time it would be the three people that work for me -- my secretary, Lori Smales, my field training manager, Angelica Miller, and my training officer,

Page 24

Charles Wilson.

Q. And those are the three individuals that work under you in the training department?

A. Yes.

Q. And do all three of those individuals directly report to you?

A. Yes.

Q. Mr. Beal, do you live alone, or do you have a family?

A. I live alone.

Q. Whereabouts do you live? Just what city do you live in?

A. Michigan City.

Q. Okay. And I know you testified earlier that -- well, at the time of the Devine fire and presently today, you serve as head of the Indiana State Prison training department.

Is there a formal -- I want to make sure I'm using the right term. Is there a formal title for that position?

A. Actually, it's an informal. I would be considered Correctional Training Officer 3 is the formal title. Training coordinator is the informal.

Q. Okay. Training coordinator?

A. Yes.

Min-U-Script®                    BOSS REPORTERS                    (6) Pages 21 - 24
(219) 769-9090

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 8 of 78

Page 25

Q. Okay. And so as I understand it then, Correctional Training Officer 3 is, like, the official department designation in terms of payroll at human resources and job description purposes. Is that fair to say?

A. We have our own HR department, but, yeah, I do approve the people's payrolls once they've been submitted.

Q. And maybe I asked the question -- I phased my question poorly.

Just so I understand, Correctional Training Officer 3, that's, like, the official title of the position that would be used within the Department of Correction?

A. Correct.

Q. And then that's a bit of a mouthful and also I'm not very descriptive, so people call you the training coordinator, which is the descriptive title for the position?

A. Correct. It actually describes more of what I do.

Q. My understanding of the different designations -- at least with regard to other positions -- is that the smaller the number associated with a position, the more senior level

Page 26

that position is in terms of the formal job title. Is that your understanding also?

A. To my understanding, yes.

Q. So, for example, is there anyone working under you that has the formal job title of Correctional Training Officer 4?

A. Yes, Mr. Wilson.

Q. The Charles Wilson you referenced earlier?

A. Yes.

Q. Does he have an informal job title?

A. Just training officer.

Q. Is there anyone at the prison who has a Correctional Training Officer 2 or Correctional Training Officer 1 designation?

A. Not at this facility.

Q. Are you aware that those designations exist at other facilities?

A. There may or may not down at CTI, the Correctional Training Institute. That I'm not sure. I've never looked into it.

Q. But in terms of at Indiana State Prison, you're the most senior person whose responsibilities are -- are over the training department. Is that fair to say?

Page 27

A. Correct.

Q. And I think you testified earlier that you held that position since October of 2013?

A. Correct.

Q. And prior to that, did you hold a position in the training department at ISP?

A. Yeah. For the year prior, I was the training officer, Correctional Training Officer 4. And the year prior to that, I was just an officer assigned to training as an adjunct instructor.

Q. So just -- just so I understand that -- so for -- was it approximately one year -- so from somewhere in the fall of 2012 to 2013 that you served as Correctional Training Officer 4 within the training department of ISP?

A. Correct.

Q. And then was that also approximately one full year prior to that -- so somewhere in fall of 2011 to 2012 -- that you would have been assigned to the department, but not formally designated a training officer?

A. I came up in February of 2011 as an adjunct instructor.

Q. And what is the difference between an officer who is assigned to the training department as

Page 28

an adjunct instructor versus someone who holds the position of training officer?

A. An adjunct instructor is still classified as a custody officer, a correctional officer, and they're simply on loan from the custody staff to whatever department it is that they are assigned to.

Q. In terms of the day-to-day job duties, are there any differences in job duties between being an adjunct instructor on loan to the training department versus someone who is permanently assigned to the training department as a training officer?

A. Yes and no. It depends on what training is taking place. Most of the time your adjunct instructors are going to be geared more toward skill-based training and/or involved with the on-the-job training process. It just varies from facility to facility and schedule.

Q. And how did your job duties change from your time as an adjunct instructor at Indiana State Prison from approximately February of 2011 through the fall of 2012 versus the time frame fall of 2012 to '13 that you served as a formal -- formally assigned training officer within the department?

A. When I was promoted to training officer, I then became the program manager of annual

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 9 of 78

Page 29

in-service. So I went from various tasks to training the veteran staff on their annual in-service training, maintaining the documentation, and things of that nature.

Q. Just -- just so I make sure I understand you. That was -- even at the level when you were training officer, the CTO4, you had been assigned as program manager of the annual in-service training; is that correct?

A. Correct.

Q. Was there a training coordinator who worked above you in the chain of command during the period of time that you were an adjunct instructor and a training officer?

A. Yes.

Q. Who was that person?

A. Ivan Jones.

Q. When did Mr. Jones leave Indiana State Prison?

A. April of 2013.

Q. Was there someone who replaced him from that April to October period of time?

A. I was the acting training coordinator for those months.

Q. When did you first join the

Page 30

Indiana Department of Correction?

A. In March of 2003.

Q. And from March of 2003 up to February of 2011 where you told me that you became assigned as an adjunct instructor, what different positions within IDOC have you held?

A. Prior to that, I was only a correctional officer.

Q. So that was straight through from March 2003 to February 2011 you served as a correctional officer?

A. Strictly as correctional officer, correct.

Q. What different facilities did you work at over that period of time?

A. Indiana Women's Prison in Indianapolis, and then I transferred to the Indiana State Prison in November of 2010.

Q. Is that a transfer that you pursued, or were you just reassigned to ISP?

A. It was voluntary.

Q. Was there a reason that you pursued that transfer?

A. It was a family issue at the time when I was married.

Page 31

Q. Okay. Was that, like, wanting just a clean break from something or geographically wanting to move areas?

A. Yeah. I needed to get my wife and the stepkids up here to Michigan City at that point in time.

Q. And what caused you to pursue a career in training as opposed to remaining as a line level correctional officer?

A. I believe it was around 2006 I was approached by the training staff at the Indiana Women's Prison about being sent off to get certification to become an adjunct instructor. And so it just kind of went from there for the next four years. I built up a resume, and then when I transferred up to the state prison, a position came open, and I was fully qualified to do various tasks that they needed done.

Q. Have you served as an adjunct instructor at the women's prison at any point?

A. I was an adjunct instructor, but I was not assigned to the training department. I still worked my shift at the women's prison.

Q. What -- how does -- how do the job duties of an adjunct instructor who's not assigned to the

Page 32

training department differ from a -- just a regular correctional officer?

A. If you're just a normal adjunct instructor, you'll come in and work your regular shift and your regular post, and then when there is a need for the training department to use your services, you'll be pulled from your post and you'll go train.

Q. As opposed to an adjunct instructor who is assigned to the training department who's, essentially, full-time doing training work; although, they are on the custody side. Is that fair to say?

A. Correct.

Q. What were the job duties of the correctional training officer for a position -- training officer position that you held from fall of 2012 through to, I guess, April 2013 when you became the acting coordinator?

A. You know, stated previously, the primary duties were the program manager over in-service. That's usually a smaller facility like myself where you only have one training officer. In-service is -- that's given to them.

Q. The in-service would be given to the less senior employee; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 10 of 78

Page 33

A.  Correct.

Q.  So as program manager of the in-service training, what are the job duties associated with that responsibility?

A.  They will be the primary instructor.  You know, obviously, unless they're out sick or on vacation.  So they do the majority of the instructing.  They're also responsible for maintaining all of the paperwork and things of that nature.  They kind of oversee everything on -- when it comes to making sure everybody receives their in-service training.

Q.  And then, I guess, since 2013 when you became acting -- well, strike that.

Was there any difference in job duties or job responsibilities between the period of time that you were serving as acting training coordinator versus the period of time since October 2013 when you formally obtained that position in a non-acting capacity?

A.  Yeah.  The -- your classroom time -- while I still will be in the classroom, it diminished as your Training Officer 4 will always be in the classroom more than you.  And then you take on different responsibilities; performance appraisals,

Page 34

fact files, absentee reports, payroll, depositions, and things of that nature.

Q.  Okay.  And I think I may be phrasing my question not as clearly as I could have.

So when -- there was a period of time that you served as the acting training coordinator, correct?

A.  Correct.

Q.  And that was from April to October of 2013?

A.  Correct.

Q.  And then October 2013 onward, you were non-acting training coordinator permanently assigned to the training coordinator position?

A.  Correct.

Q.  Was there any difference between your job duties or responsibilities between the acting period of time versus after you were formally assigned that position on an official basis?

A.  No.  I mean, once you become -- officially become it and as you do it longer, you find out more things that you have to do, but it start right off the bat with, you know, managing the department.

Q.  And, obviously, you know, recognizing

Page 35

that all of us in whatever job or career we're in, you know, are hopefully constantly growing in our positions and going through professional development.

In terms of what your responsibilities were and your obligations that were given to you, that was the same starting April 2013 as it is today.  Is that fair to say?

A.  Correct.

Q.  And I think -- I think the answer you previously gave where maybe there was a little confusion with my question.

You were describing the differences between the training officer position, the CTO4 position, versus the training coordinator or CTO3 position.  Is that what you were describing previously?

A.  As far as their duties?

Q.  Yeah.  Well, maybe -- just so there is a clean record in the transcript.  Perhaps, I could trouble you -- I'll ask the question cleanly again, and you can give your answer on record.

Could you describe for me the differences in job duties and responsibilities between the training officer position at the CTO4 level versus the training coordinator position at the

Page 36

CTO3 level that you currently hold?

A.  Certainly.  Correctional Training Officer 3 or the training coordinator is more managing the department and, you know, handling a lot of the paperwork, performance appraisals fact files, payroll, you know, coordinating scheduling, and things of that nature as to where the Training Officer 4 is predominantly in the classroom.

Q.  And you used the phrase, I think, "fact file."  Can you explain what you mean by that?

A.  Sure.  It's just what it sounds like. It's a file that you maintain facts on staff.  So if staff did a really good job doing something or went out of the way, you make sure you go in there and give them a positive fact file.  And if, you know, you had to have a -- if you had to sit down and counsel somebody on -- for being late, then you're going to put that in the fact file that they were counseled on being tardy because you're trying to get corrected.  And, therefore, you need a file with facts on it to show the history that that was addressed.

Q.  Okay.  And just so I'm clear, those files that you're maintaining, is that for staff across the facility, or is that only for the employees that are

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NAND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 11 of 78

Page 37

working under you in the training department?

A. Just the ones that work under me.

Q. So you don't --

A. No. Sorry.

Q. I was just going to say so -- as the training coordinator, you didn't have any performance appraisal responsibilities? You weren't maintaining files on correctional staff? Like, custody officers in the housing units or anything like that? It was just the three employees who were working under you?

A. The three employees, and then we will maintain them on new employees until their training is done. And then they're sent to shift.

Q. Okay. So in addition to the folks who are sort of regular staff under your supervision and leadership within the training department, you also maintain fact files for new employees; is that correct?

A. Correct.

Q. Okay. And over -- can you kind of walk me through the time frame or the life cycle of a new employee coming into the department and flag for me what period of time you would have that fact file for that person?

A. Sure. Say you started this past Monday.

Page 38

You would have received 40 hours of, what we call, Phase 1 training, which is all your skill-based training. You would then -- the following week, you would receive first aid/CPR training and then 68 hours of what we call on-the-job training. And that's where you would go out into the field and work with a certified field training officer.

You will then report to our regional side, which is Westville, for two weeks of what we call Phase 3 or, it used to be called, the preservice academy. That's classroom-based training. And then they will report back to me, and they will have another 96 hours of on-the-job training with a certified field training officer in the field.

At which point in time, they'll take a written test, and then they will report to whatever shift they've been assigned to. They will no longer be under my supervision, nor do they have to work with a field training officer after meeting all those requirements and passing the test.

Q. Got it. And so that's -- if I understand you correctly, that's a four phase process?

A. At my facility, yes. If it was the juvenile facility, there's an additional phase.

Q. Okay. Is that four-phase process -- has

Page 39

that been the same throughout the period of time that you've been working in the training department at ISP?

A. No. It used to just be broken down into new orientation -- new orientation, then they would go straight to the academy, and then they would come back. And then, I believe, it was 80 hours of on-the-job training, if memory serves me correct. It's been quite a while since staff development changed the curriculum to what we're currently on.

Q. Do you recall approximately when that change took place?

A. I believe it was 2015.

Q. Sometime at least a year or two in advance of the April 2017 fire. Is that fair to say?

A. It was prior, correct.

Q. Okay. And to the best of your recollection, that was 2015 that that change took place?

A. Correct. To the best of my recollection.

Q. Okay. I'm going to show you an exhibit using the share screen function on Zoom in just a minute here. So I'm going to call it Exhibit 1, and it is a one-page document.

It's Bates stamped. And that's just

Page 40

referring to the little code down at the bottom, right-hand corner, which you may or may not be able to see because it's pretty small on this document. But it's Bates stamped Devine 068373.

(The document was thereupon marked for identification as Beal Exhibit No. 1, as of July 30, 2020.)

BY MR. HEPPELL:

Q. Let me -- are you able to see that document that I pulled up on the screen?

A. Yes.

Q. Okay. For the record and so we're on the same page here, you're looking at a document that's titled "Adult Facility New Employee Training Process" with "Fiscal 2017/2018" listed in the top, right-hand corner; is that correct?

A. Correct.

Q. Okay. Is this the four phase training process -- well, strike that.

Does this document, with this sort of breakdown of Phase 1, 2, 3, and 4, align with that new employee training that you had just described?

A. Yes. It's an older one. I see a few differences, but for the most part, that is what we

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 12 of 78

Page 41

currently use.

Q. Okay. And then, again, I think you had testified, to the best of your recollection, this new four-phase process was brought in somewhere around 2015.

Is it your understanding and recollection that what's set forth in this document would have been by and large the process that was used in -- starting in 2015 as well?

A. To the best of my recollection, yes. I see that they have first aid, CPR in Phase 4. So I vaguely remember them getting that when they came back from the academy. It has now been moved since to Phase 2.

Other than that, it appears to be the document and the schedule that we were using in that year, yes.

Q. And so it sounds like one change that you perceive is a difference between -- it's -- strike that.

If I understood you correctly, one change that has taken place during this new Phase 4 employee training process is moving what phase the first aid/CPR training takes place in; is that correct?

Page 42

A. Yes.

Q. Is it fair to say that's not a change to the total overall content or scope of the training that's received? It's just a change in the order of when that training is received?

A. Correct.

Q. Is there other changes that you can recall or that you see based on the document in front of you other than that change in the CPR?

A. Not that I can see.

Q. And to the best of your recollection and understanding, have there been any changes in the four-phase, new employee training process since 2015 other than that shifting of when the CPR and first aid training changed that we already spoke to?

A. Not that I can see.

Q. Nothing that you can see in the document and also none that you recall. Is that fair to say?

A. Correct.

Q. And it's listed on this document that there's a training credit of 311 hours.

Do you see that? It's in the middle of the document.

A. Yes, sir, I see it.

Q. Okay. And does that reflect the total

Page 43

number of hours of training that an officer receives through these four phases of the process?

A. Correct.

Q. And is that the minimum number of hours of training that an officer must go through before they are permitted to take a shift at the facility without being directly supervised by a field training officer?

A. Correct. They would have to meet the minimum number of hours, which would mean a completion of all of the phases, including the test before they could work unsupervised.

Q. Okay. And I know you walked me through this earlier, but just so -- to drill down a little bit and make sure I understand it.

The Phase 1, 2, and 4 -- those phases take place at the facility itself; is that correct?

A. Correct.

Q. And then it's that Phase 3, which on this sheet is broken down into two different weeks of Phase 3 -- that's sort of the academy type of training that -- that folks go through at the central facility; is that correct?

A. Correct.

Page 44

Q. And so in your capacity as the facility training coordinator or the training coordinator at Indiana State Prison, you are directly overseeing the training in Phase 1, Phase 2, and Phase 4; is that correct?

A. Yes.

Q. And if I understood your description -- well, strike that.

Broadly speaking and based on my review of the documents and my understanding from the testimony, it's my understanding that there is some component of this that is classroom-based training and some component that's on-the-job training. Is that fair to say?

A. Correct.

Q. Can you walk me through which of the four phases and which aspects of the four phases is classroom versus which are on-the-job training?

A. Yes. Phase 1 is classroom-based training, and then Phase 3 would be classroom-based training. Phase 2 and Phase 4, minus the CPR, which is classroom-based training, would be all in the field on-the-job training.

Q. Okay. And to your knowledge, that breakdown has been the same throughout the duration

USDC NND, case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 13 of 78

Page 45

of this four-phase, new employee training process?

A. Correct.

Q. And as the training coordinator, do you have supervision over both the classroom-based components of the training and the on-the-job training?

A. Yeah. Ultimately, I supervise it all, yes.

Q. Okay.

A. Except for the Phase 3, which is supervised by whoever's at Westville.

Q. Got it. How do you as -- well, strike that.

What are your goals or perspective or responsibility as the supervisor of the new employee training process?

A. Well, your goal is always to make sure people are trained to the best of our abilities. We want people to be safe, and they're here to learn to treat everybody as a human being and simply come in and maintain safety, security, and custody and go home.

Q. How would you -- and during your time as training coordinator at ISP, how would you go about supervising the classroom components of the

Page 46

four-phase training? So I guess that's Phase 1, as well as the CPR and first aid training.

How would you supervise that to ensure that folks were being trained appropriately and adequately?

A. Well, there's a schedule that's already given to us from staff development, so it's making sure that we follow the schedule that they have given us and following the curriculum that's in that schedule.

The Phase 1 is skill-based, so it's hands-on training. They have to be trained and have to actually pass a test on frisk search, pat searches, use of restraints, and then what we call personal protection -- defensive tactics, personal protection. So we follow the curriculum given to us by staff development and make sure that they can test out at a proficient rate in order to move on to the next phase.

Q. Are there any other -- strike that.

Can you explain what you mean by skill-based training? You used that phrase, I guess, to distinguish that type of training as opposed to different types of training.

A. It's tactile training.

Page 47

Q. Okay.

A. Use of your hands compared to knowledge-based training where you sit and listen to a lecture. You actually have to physically search somebody. You have to physically use restraints. You have to physically do personal protection techniques and things of that nature. That would be what we call skilled-based.

Q. And you described that use of restraints in the searches and the defensive tactics and personal protection aspects of Phase 1.

Are there any other components of the Phase 1 skill-based training other than what you've just described?

A. No. Like I said, CPR kind of floats around on its own. And it's both. It's classroom and, of course, you'll have to do a hands-on practicum to show proficiency with CPR skills.

Q. And CPR, first aid is currently Phase 2, if I understood you correctly.

On the document we have in front of us, it's listed in Phase 4?

A. It is now in Phase 2.

Q. I'm going to stop this screen share.

In terms of -- again, just to

Page 48

confirm -- going back to Phase 1 specifically. If I understood your testimony correctly, Phase 1 is entirely skills-based, and the aspects -- the topics covered in Phase 1 training are use of restraints, searching prisoners, and defensive tactics and personal protection. Is that fair to say?

A. There is -- there is also some knowledge-based mixed in with it, but it is predominantly skill-based. You're -- we just don't bring in restraints and start putting them on each other. There is several lesson plans and PowerPoints that are covered with the staff. You know, things of that nature. And, of course, they're trained to search everyone that enters the facility and not just offenders.

Q. Got it. And just -- again, just so I'm clear, those -- the knowledge-based aspects of the training that you were just referencing, do those all relate to the same topics that I've just gone through?

A. Correct.

Q. Okay. No additional topics beyond those ones that we've listed --

A. You're going --

Q. -- that --

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 14 of 78

Page 49

A.  Sorry.  I apologize.

You're going to have use of force and mental preparation, which go with personal protection, and then you're going to have -- security skills is broken down into legal aspects, basic security principles, pat, search, and frisk, use of restraints, and strip searches, which go with the security skills hands-on.

Q.  Okay.  And, primarily, skills-based, but some knowledge-based work associated with those topics as well?

A.  Correct.

Q.  And is there any component of that Phase 1 training that relates to fire safety or emergency response to fires?

A.  As far as the skill-based training?

Q.  Anything in Phase 1, whether it is skill-based or knowledge-based?

A.  Not in the classroom portion, no.

Q.  And Phase 1 is entirely classroom; is that correct?

A.  Correct.

Q.  And what -- will you remind me how many -- of that 311 hours through the total of training, how many hours is associated with Phase 1?

Page 50

A.  Forty.

Q.  It's, like, a full week of training?

A.  Correct.

Q.  And is that something that is only offered, like, periodically for people who are new employees at the facility, or is it whenever there happens to be one or more new people hired?

A.  Yeah.  We actually run off a standard schedule that we try to coordinate with the schedules that's set up for the preservice academy at Westville.  So we just -- we just had one two weeks ago.  I think I'll have another one August 10th.  So, yes, we do have a standard schedule to run new employee training.

Q.  And approximately how many times a year do you offer the new employee training?

A.  Right now that would be a minimum of 12.  Hiring practices will dictate that.  Obviously, if they hired in 30 people next week, I can't wait until the 10th to run a training.  I'd have to run it this week.

Q.  Is there, like, a minimum or maximum number of participants in the new employee training?  Like, you wouldn't run it with fewer than that or have no more than, you know, going through the

Page 51

training at one time?

A.  As far as minimum, if it's -- if it's -- we're actually scheduled to run it and I have two people, we'll run a new employee training class.  I've never had two large classes that I can recall.  We have certain parameters set up for skilled-based training.  So if it's -- right now, if the -- it requires 1 instructor per 15 participants and things of that nature, but no minimum or maximum.  If it is time to run it or we need to run it, we're going to run it.

Q.  And you had made reference to a fact file earlier where you would keep, you know, information about new employees or trainees as they were going through the four phases of the process.

Would you fact file on the participants of the new employee training program in Phase 1?

A.  If it was necessary.  Like I said, it's not just for negative things.  You can also put positive things.  It's very rare that you're going to have a positive fact file when they're just coming to class every week.  It's extremely rare.  Now, if they were late two or three times during week one, there may be a fact file sitting there for them, so we can

Page 52

try to get the tardiness corrected.

Q.  After -- strike that.

What's your understanding of what happens to a new employee's fact file that's been developed or generated through the training process after they've completed the four phases of that training process?

A.  It goes to the shift supervisor.

Q.  Okay.

A.  Whoever they're assigned to.

Q.  Okay.  Is it your understanding that that is something that would go in that -- in that individual's personnel file, or is that a different type of file?

A.  No.  It goes into their -- their file for their supervisor to maintain.

Q.  Okay.  And can you explain for me what you mean by the file that a supervisor maintains?

A.  It's just like the ones that I maintain throughout the year.  And then I will take that fact file at the end of the year when we do performance appraisals, and anything that can be used off that fact file into, A, writing a performance appraisal, and then a copy of that fact file will be attached to the performance appraisal.  So the shift supervisors

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD    Cause No. 3:18-cv-00995-JD-MGG    document 203-12    filed 03/29/21    page 15 of 78    CHRISTOPHER BEAL
July 30, 2020

Page 53

will do that for the people they supervise.

Q. And it's your understanding that that's different from an employee's personnel file that would be maintained, say, for human resources that would have, you know, changes in job classification -- those types of documents?

A. Correct. To my knowledge, that is entirely different.

Q. Okay. And those are, to your understanding, maintained -- once someone finishes through the training program, those are maintained at the facility level by the different supervisors; is that correct?

A. Yeah. Whoever's the shift supervisor department head. If they were non-custody -- say they went down to classification, then the department head of classification maintains those fact files.

Q. Do you have any knowledge of where on the custody side of things -- like, officers assigned to cellhouses -- where those fact files would be physically maintained at the prison?

A. They would be secured in the captain's office if they're custody staff.

Q. What's your understanding of what happens to the fact file information after an employee leaves

Page 54

service at the prison?

A. I'm not really sure.

Q. It's -- by and large, you don't have folks -- the folks that leave you, they're leaving because they're graduating through the training, and you pass the fact files on to wherever they're going after?

A. Correct.

Q. Just, again, to make sure I understood your testimony -- and I asked you limited to Phase 1 previously. But it's quite possible that in Phase 1 someone might not have any fact file for them that would, by and large, be only if there was some issues with their tardiness or attendance or performance or something that you needed to note that that would generate something to be put in the fact file. Is that fair to say?

A. Correct. Yeah. It's very rare that you would, you know, have a positive fact file for someone who is just starting that first week.

Q. You also maintain that same fact file through Phase 2 and, I guess, Phase 4 at that new employee training as well?

A. No. I would maintain that through the entire process. The majority of them -- there's --

Page 55

there's nothing on them. They go straight back to the shift supervisor. You may have a staff member who did a really good job shaking down and -- and somebody was trying to traffic it, and they caught. So you want to make sure you acknowledge them in the fact file. You may have them calling off sick, and they don't have any time. So you have to write it down in there. It is just a really generic form to keep track of somebody's activities -- factual activities through the course of the year.

Q. And from -- just so I understand, sir, physically what these are like -- is there, like, a file folder that you've got maintained for every single person and just some of them are empty if there's nothing to note, or you, like, create one the first time that there's an issue with someone or something you need to note?

A. Yeah. You're going to create them when they hire in and then put documentation in there if needed, and then once they complete the program, it will go back to the shift supervisor.

Q. And is it, like, a file folder? That kind of -- or an envelope? What does it physically look like that is getting maintained by you through those four phases and then passed along?

Page 56

A. I predominately maintain them electronically, and then I can print them up and send them off to the shift supervisors when they graduate.

Q. So is it, like, an electronic folder on a computer? Would there be somewhere where you can save -- save documents -- create and save them for a particular person?

A. Yeah, something like that.

Q. Okay. And through the four phases of the training, is it -- are there some people who would go through the training and not have anything in their fact file at all just because noteworthy, positive or negative, comes up?

A. It could be very generic. It could say started on such-and-such date and completed on such-and-such date.

Q. So there would always be something in that file, but it might just be as simple as documenting that they completed the training process?

A. Something that simple.

Q. Is there a standard form that you'd use to document the positive or negative things that would go into the fact file?

A. Yeah. There is a standard fact file form.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 16 of 78

Page 57

Q.  Okay.  Do you know if it has a particular formal name or designation?  What that form is called at the prison?

A.  Not offhand.  I just know it is a fact file.

Q.  That's -- that's not, like, an unusual term that you've created?  That's what people generally at the prison would understand it to be known as?

A.  Department wide, yes, sir.

Q.  Okay.  And is it your understanding that it's that same standard type of fact file form that would be used after you pass off the file to wherever they're going -- to their shift supervisor or whoever -- form would be used to document their activities going forward?

A.  Yes.

Q.  And is it your understanding that -- that that would get added to the same file?  So once an officer goes on to the housing unit and has, you know, passed through their employee training, whatever positive or negative notes they had through their training process would be the same file and then have added to that file stuff that was written up through the course of their regular job duties?

Page 58

A.  That's the idea, yes.

Q.  Okay.  And is it your understanding that that's primarily maintained electronically?

A.  It's maintained electronically by me.  I will then print it off and send it to them.  It is probably at that point in time now maintained physically written.

Q.  Understood.  The second and fourth phases of the process that you had described earlier -- aside from the CPR, first aid training, which you had mentioned -- other than that, the second and fourth phases were on-the-job training; is that correct?

A.  Correct.

Q.  And can you -- I think you might have mentioned this earlier, but can you refresh my memory as to the timing associated with those different phases?

A.  Yeah.  Currently, Phase 2 will consist of 68 hours of on-the-job training, and Phase 4 is 96 hours of on-the-job training.

Q.  And is it your understanding that those lengths of the phases has been consistent since the approximately 2015 period of time when this four-phase process was instituted?

A.  No, sir.  If you'll go back and look at

Page 59

that document you showed me, I believe the hours were a little bit different in the time frame that you're asking.  I think that has changed in the last couple of years.  See, if you look at it -- it just says "two weeks of OJT," which would only give you 80 hours of on-the-job training.

Q.  Okay.

A.  And now it's 96.

Q.  Okay.  And so has that increased, then, in the total number of hours?  So if someone went through the employee training process today, they would get more than 311 hours?

A.  Let's see.  40 -- it's not showing how many for Phase 2, so I can't say.

Q.  Okay.  As you sit here today, what's your understanding of the total number of hours of training that a new employee receives through the new employee training process if they were starting that process next week or --

A.  If they were going to start now -- you will have to bear with me.  I'm not a mathematician.  So you're going to get 40 and 12 and 68, which makes 80.  So 40 and 80 is 120.  And then you're going to get another 80.  That puts us at 200, and then you've got the 96.  So it looks like it's 296, if my

Page 60

mathematics skills are correct.

Q.  And just so I'm clear, that's -- the 40 hours of that first week classroom is primarily skill-based training.  Phase 2 currently has 68 hours of on-the-job training, plus an additional 12 hours of CPR, first aid training; is that correct?

A.  Correct.

Q.  And that was how you got the 12 plus 68 for Phase 2?

A.  Yes.  Currently.

Q.  And Phase 2 is straight two weeks, eight hours of training, correct?

A.  Uh-huh.

Q.  And then Phase 4 is the 96 hours?

A.  Yes.

Is there more to this document?  Can you scroll down?  Do you have a second page to this?

Q.  That's the only page that I pulled out.  Now, this, I think, came from an e-mail attachment.  It was attached to an e-mail.  My recollection of the following pages is it then had similar charts for, like, a juvenile facility and new employee training process is my recollection of what's on the next page after that.

A.  Okay.  Also, along with this is -- there

USDC NNND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 17 of 78

Page 61

are computer-based training modules that will add to the hours of training. I just can't tell you what the numbers are now. I want to say it's 17 hours, but I can't say for sure. But there are two phases of computer-based training modules that are associated with Phase 1.

Q. Understood. And so that might be how we get from the 296 that we added up, you know, up over 300 or maybe somewhere in that range of 311. Let's see if it was -- 11 plus 4 -- it would be 15. If it was 15 hours of CBT training, that would hit right on that 311 mark, I think, if my math is correct.

But in any event, something along those lines is your understanding of the current process and also how it's been for the past number of years in terms of total hours in that new employee training?

A. To the best of my knowledge, yes, sir.

Q. And the CBT training that you just referenced -- somewhere approximating 17 hours, you think -- are those just completed by the new employees on their own?

A. They will -- they can do it. People, including veteran staff, can do computer-based training at home, but they will be offered time in

Page 62

the computer lab to complete that training and that does not go against their on-the-job training hours.

Q. Okay. So they can do those at the facility, but then they have to do the extra hours on-the-job training in addition?

A. Right. So let's say that you came into class and it took you two days to get all of the computer-based training done. Well, that's 16 hours that I need to hold you over from when you complete your training to get that in-the-field training.

Q. Can you describe -- well, strike that.

So setting aside the portion of Phase 2 or Phase 4 under the process -- the CPR, first aid because I understand that's separate and it is classroom-based.

So carving that out, is the on-the-job training at -- in Phase 2 and Phase 4 basically the same? It's just a continuation of the same process, or is there a different structure or different curriculum for that portion of on-the-job training?

A. The only difference would be is when they come back from the academy. We'll get them scheduled to where they'll actually go on shift and at OJT 12-hour shifts instead of coming up and reporting on

Page 63

a Monday-through-Friday basis to prepare them for working the 12-hour shifts.

Q. So the duties and responsibilities of a trainee and the on-the-job training -- and the field training officer is the same through Phase 2 and Phase 4, but it is just like a scheduling difference for the trainee? They transition from the regular 9:00 to 5:00 kind of schedule to the 12-hour-shift-based schedule after that?

A. Correct.

Q. What is the curriculum or how is the content of the on-the-job training determined?

A. It is -- once again, that came from -- the schedule came from staff development and training as broken down into four phases or what we call sessions, I should say. Four sessions. So you have Session 1, which is an across the board consistent -- Session 1 for all facilities throughout the state. So whether you hired down at Wabash Valley as a maintenance man or you transferred up here to Westville as a correctional officer, you're going to take that same Session 1 as everybody else.

And then Session 2, 3, and 4 for our custody staff is just different tasks and topics varied throughout on -- to help train them to prepare

Page 64

to work as a correctional officer.

Q. Could you describe what it contained in Session 1?

A. Session 1, like I said, those are mandatory topics. Off my head -- and it's been a while since I've looked at one of the Session 1s, but it is very -- very basic training. You know, telephone etiquette, radio procedures, emergency procedures, how to use the fleet credit cards, how -- I think it is how to fill out an incident report. Things of that nature.

Q. Okay. And so who leads the -- so this is Session 1 in Phase 2; is that correct?

A. Correct.

Q. Who leads the training that you've just described? This Session 1 basic, generic "everyone does the same" training?

A. Currently right now, it'd be Angelica Miller who is the officer assigned to training. She has the unofficial title of field training manager.

Q. So that's something that is done by an employee within the training department and not by a field training officer?

A. Well, no. She just oversees it, but she -- she debriefs the OJTs on a daily basis. She

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 18 of 78

Page 65

checks to make sure that their training logs are getting done, answering any questions that need to get done, and then she assigns them with a field training manager -- excuse me -- field training officer to work in the field.

Q. Okay. And I think I understand sort of conceptional and content wise that aspect you've just described. I guess I'm just struggling a little bit to understand the on-the-job training nature of it.

How -- what is the format that the Session 1 of Phase 2 contents is -- is conveyed to the new trainees?

A. So they're given a booklet that has the tasks sheets for each individual task. Like, I mentioned some of the topics earlier. The field training manager will actually go over every topic with them, including the steps with them, answer questions, and then the person will then go out into the field and work. And then when the various topics show up, like, how to take counts, there is a task sheet on how to take counts, but they also need to be able to physically take counts.

So we go in the -- basically, our OJT program is built on -- you verbally instruct, you show, you then have the person verbally talk back to

Page 66

you what it is that they've learned, and then you have them physically show. You know, it's the "see and do" aspect of training. So you're trying to build a knowledge base and a tactile skill.

Q. It sounds to me from what you've just described that there's some portion of Phase 2 and Phase 4 training that is deliberately instructional, and then there's some portion that is going out and actually doing it in the facility the same way that, you know, a non-trainee officer would go out and do that task in the facility. Am I understanding it correctly?

A. Yeah. They go hand in hand. You know, I can't just tell you how to do something. I need to show you, but they both need to be done.

Q. Okay.

A. Now, I'm just using taking count as an example because that's a very common one.

Q. Okay.

A. And so I need to explain to you why we take count, why we do count correctly, but then I'm going to show you how to do it. Then I'm actually going to have you -- the next round I'm going to have you take count. As your field training officer, I'm going to follow you and make sure I'm doing it

Page 67

correctly.

Q. Is it a one-to-one relationship between a field training officer and a new trainee?

A. We do our absolute best to keep it one-to-one, yes.

Q. Okay. Have there been times when the staffing needs with a particular big class it's been, like, one-to-two?

A. If you have a big class and an, of course, with staff shortages, the "rona epidemic" and things of that nature, you can't always achieve a one-on-one, but that's our desired result is a one-on-one.

Q. Ever go higher than a one-on-two?

A. To my knowledge, yes, in low offender populated areas, like, maybe the warehouse where they're being trained on how to search boxes that are coming in.

Q. Okay. And Session 1 that you described where everyone takes the same curriculum, is that something done in more of a classroom setting, or is that still that one-on-one field training officer to trainee?

A. Yeah. It's not classroom training. Like I said, my field training manager will cover the

Page 68

material with them, but that's to get them explaining what it is they're doing. Session 1 is a lot of knowledge-based training. I mean, you know, earthquake procedures. I mean -- you know, I can't just simulate an earthquake. That is -- you go over with them verbally. "Do you understand this? Do you have any questions?" Things of that nature.

The field training officer is going to sit down with them when maybe it's count time or a downtime, and they're going to pull the book out and they're going to go through, "Hey, you know, there's an earthquake, what do you do? Who do you talk to about getting assigned the gas card?" Things of that nature.

Q. I guess to make sure I understand, even in the Session 1 portion of Phase 2, which you've mentioned was the same contents for everyone coming in regardless of what position they're in, that's still contents that's being delivered, you know, while those employees are still out in the prison, sort of job shadowing more generally. Is that fair to say?

A. Not actually job shadowing. They will have that manual with them. And they're working, but they're working with that field training officer.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 19 of 78

Page 69

They cannot work unsupervised.

Q. And so, for example, during Session 1, if you've got a new employee who is coming in to be in custody staff, even in Session 1 of Phase 2, they're going to be out, say, in the cellhouse, but the contents they're going to be working on with their field training officer will be that more generic -- like you were saying earlier, earthquake preparedness or filling out forms -- that would be the content, alongside of working in the cellhouse with the day-to-day jobs that a custody officer would do?

A. Correct. Because, you know, in a prison environment, anything can happen. So, you know, it may be your first day in the field, and you and your field training officer just confiscated suspect intoxicants from an offender. So you're way past Session 1 now because you're learning how to do a conduct report and a -- the process for taking the suspect intoxicant up to the custody hall to get tested to see that it has actual alcohol and things of that nature. It's a very -- it's very different.

Q. Okay. What kind of documents exist that sort of list out the curriculum for the different topics that have to be covered through the different phases of the on-the-job training?

Page 70

A. They're all maintained by their sessions and/or classification as far as that goes. For the individual task sheets, it's maintained electronically.

Q. And so, for example, if I wanted to pull up what a -- what topics are covered for a new custody officer through the on-the-job training, that would just be, like, through the electronic files -- the facility and the training department -- you could pull up all of the different task sheets for each of the different sessions within those phases of on-the-job training?

A. Correct.

Q. And what are the different -- so Session 1 of Phase 2 is the same for everyone; is that correct?

A. Session 1, Phase 2, correct, that is the same for everyone.

Q. And then after Session 1 of Phase 2, how many different streams of on-the-job training or classifications -- depending on the word you use -- how many different classifications of on-the-job training are there?

A. You know, I don't know the total number of different classifications we have offhand, but

Page 71

they would then go -- and then Session 2 is going to be specifically geared towards their classification. So if they're an accountant or, you know, they're working in a mailroom or whatever, that Session 2 is going to be geared job specific for them just like custody staff's Sessions 2, 3, and 4 are geared specifically for custody.

Q. Okay. And those are four sessions all within Phase 2? What you just described?

A. Excuse me?

Q. You described four different sessions. Are those all within Phase 2?

A. No. I'm sorry. Session 2 is facility specific. Custody staff has an additional Session 3 and 4 that non-custody does not have. So a non-custody staff person, when they come back from Westville Academy, their training is complete. It's the custody staff that has that additional 96 hours and two more sessions.

Q. I see. So Sessions 3 and 4 are in Phase 4, and that's only for custody staff?

A. Correct.

Q. So that -- that document that I showed you before that totaled that 311 hours with the four phases, Phase 4 would be locked off essentially for

Page 72

the non-custody staff? They would be done with their training after Phase 3?

A. Correct.

Q. I'm going to focus on the custody staff because that's, obviously, what's at issue in this case.

Can you describe to me what those documents look like that are the materials that are used to train officers during the field training portion in Phase 2 and Phase 4?

A. Sure.

And after I answer this, can we take a quick break? I need to use the restroom.

Q. Absolutely. Absolutely.

A. All right. There'll be a standardized sign-off sheet that shows the topic, and then it will have a place for the trainee's initials. It will have a place for the trainer, whoever that PO was, his initials. The date that the task was covered, and that's one standardized sheet that's actually used to physically write in proof of training. And there are signatures and things on that that are needed.

And then each -- the secondary will be the task sheets themselves that are coordinated

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND, case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 20 of 78

Page 73

with that sign-off sheet where there is no writing done on the task sheets anymore. They used to, and the format has changed over the years to cut down on the amount of writing.

Q. Both that --

MR. HEPPELL: Sorry. We'll go off the record and take a break and come back anywhere between five and ten minutes.

THE WITNESS: Yes.

MR. HEPPELL: So I'm going to stop the recording, and we'll go off the record.

THE WITNESS: Thank you.

MR. HEPPELL: Thank you.

(WHEREUPON, a short break was taken.)

MR. HEPPELL: Back on the record.

And then, Ben, you wanted to put something on record.

MR. ELLIS: Yes. I just wanted to object. I think this deposition is straining on the scope of Rule 26(b). Although, there were some questions that were related to the lawsuit, the claims and facts that are relevant to the lawsuit at the beginning, we've spent the bulk of this deposition exploring the training regimen at ISP. There's no failure to train

Page 74

claim in this lawsuit. It's not relevant to any of the claims that are pending against any of the defendants.

So I would just encourage counsel to restrict questioning to topics that are relevant, and if you believe that I'm mistaken about my assessment, you can tell me where you're headed here and how this connects in any way to the lawsuit, I would appreciate that.

MR. HEPPELL: Sure. I mean, I'm not, you know -- obviously, I'm not under any obligation to explain on a question-by-question basis the relevancy of my questions, but I'm -- you know, to reassure you that I'm not going far-field here beyond what's appropriate -- you know, it's certainly our position and my understanding is claims are alleging that -- there is a claim as relates to Mr. Beal as a defendant relating to his role as -- as the training coordinator and allegations around failure to adequately train employees at the facility. That was one of the causal factors leading to the death of Mr. Devine.

I understand we have disagreement -- perhaps, sharp disagreements about the merits of the claim, but those allegations are in our complaint.

Page 75

And I think I'm entitled to explore and discover both in terms of Mr. Beal's potential liability as a defendant and also in terms of what the training was that the various officers who were on duty the night of the fire had gone through.

So that's generally my nutshell response to your objection. I appreciate --

MR. ELLIS: Sure. I just need a little clarification. I've looked at the -- what I believe is the second amended complaint, the active complaint in this lawsuit -- there is an allegation in factual paragraph -- factual allegation paragraph 12 that there was not adequate training, but that seems to be a factual allegation. It's unrelated to any claim. There is no actual claim in this lawsuit. Unless I'm mistaken. You tell me if I'm wrong. There's no actually claim for failure to protect. Is that --

MR. HEPPELL: For failure to train, you mean?

MR. ELLIS: Failure to train, I mean. There is a failure to protect, but not a failure to train. Am I mistaken about your claims?

MR. HEPPELL: You know, I'm not prepared to speak at the -- you know, an objection at the deposition. I'm not prepared to speak conclusively about the nature of all of our claims. And,

Page 76

obviously, the -- you know, the complaint speaks for itself, but the -- you know, there is an Eighth Amendment Claim for failure to protect for deliberate indifference, and I believe that's -- I would direct you to Paragraph 42 of the second amendment complaint. That's Docket 43, Page 10, which, you know, describes the nature of our failure to protect claim as against Defendants Neal, Dan Lester, Beal, Griffen, and Nor, who obviously were not present at the facility at the night of the fire, but alleging they knew of the serious risks of an emergency like a fire. But then in Paragraph 43, that they did not take adequate steps to address that failure risk, including failure to train and instruct stuff, which is specifically referenced in Paragraph 43.

I'm happy to -- you know, to discuss with you more at a more appropriate setting if you have questions, I guess, about exactly what the nature of those claims are. I know that you're not required to plead legal theories in the complaint, but that's sort of the -- that's the -- in part, the aspects of the complaint that I see as being relevant to this deposition and relevant to the lines of questioning that I'm going to get into today.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 21 of 78
CHRISTOPHER BEAL
July 30, 2020

Page 77

MR. ELLIS: Okay. I do see those allegations. As long as you could stream your questioning to a relevant inquiry into appropriate training, appropriate knowledge, I think that's perfectly fine. If you want to spend another hour asking him questions about general training regimens, I think we may need to get the magistrate judge on the line.

MR. HEPPELL: You're entitled to call the judge at any point if you think that's appropriate. I'll -- as I always do, I'll do my best to keep my line of questioning focused on relevant issues as may -- I would recognize sometimes that I don't succeed in that, and I think there's probably areas where we would disagree whether I'm succeeding. But as always, I appreciate your putting your views on the record.

MR. ELLIS: Okay. Let's proceed. I don't want to take up any more of anyone else's time.

BY MR. HEPPELL:

Q. Mr. Beal, are you ready to go forward with some more questions?

A. Yes, sir.

Q. Okay. Thank you. Before we took our break, you had been describing the documents that

Page 78

existed to lay out the different -- the contexts of on-the-job training component in Phase 2 and Phase 4 related to -- specifically related to custody staff. And if I understood your testimony earlier, you have described two types of documents. One being a sign-off sheet where there'll actually be handwritten sign-off from the trainee as they were going through the different topics and then also a secondary sheet, which as the -- as the training regimen exists now, it doesn't require any handwritten sign-off, but that provides some additional details about the different tasks and the topics that are being covered.

Is that generally a fair description of the paperwork that you have described before we went on the break?

A. Yes. I was just bringing up the fact that it used to -- the task sheet needed to be initialled, and it's just no longer there. The task sheets -- that's the only change that has occurred.

Q. And do you know approximately when that change occurred?

A. Within the last two or three years would be my estimate.

Q. And so if I understood that correctly then for each individual new employee -- for each

Page 79

trainee, there is a set of those documents that's specific to that person, but then as they're going through the different topics in the on-the-job training, they're signing off on each stage of that; is that correct?

A. Correct. There would be -- they would have a sign-off sheet for Session 1, Session 2, and then if they're custody staff, they would have the Session 3 and Session 4 sign-off sheets.

Q. Okay. And then the task sheets, is that where it sort of lists out the contents of the different topics that were covered in each of those sessions?

A. Correct. Each topic would have its own task sheet.

Q. What's your understanding of -- well, strike that.

While an employee is going through the new employee training, who is responsible for maintaining those sign-up sheets and the task sheets?

A. Maintaining as far as that they're being done? Is that your question?

Q. I guess who has physical -- well, strike that.

Are those paper sheets, or are those

Page 80

maintained electronically?

A. No. They're paper sheets. They go with the employee, and then any certified field training officer that they're with is qualified to sign off on them.

Q. So it's the -- it's the trainee and employee who sort of keeps physical control of the paper sheets, and then they get -- whoever their field training officer is is signing off as they're going through the different topics?

A. Correct. And then once Session 1 is done, they turn in their Session 1 book, and they're given Session 2.

Q. Okay.

A. And when they come back from academy, they'll get their Session 3 and Session 4.

Q. Once -- what happens to those physical sheets of paper once someone completes the new employee training and goes off to work on their own there at the facility?

A. They will then be scanned into a program file and maintained electronically.

Q. And is that maintained electronically within the training department?

A. It's actually on the staff

DENISE DWYER, et al. v.                    Cause No. 3:18-cv-00995-JD-MGG                    CHRISTOPHER BEAL
RON NEAL, et al.                                                                                                         July 30, 2020
USDC NND, case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 22 of 78

Page 81

development's -- I don't know the proper term for it, but there is a training drive that is directly maintained by them. Like, I only have access to my facility on that training drive.

Q. So -- if I understand you correctly, that training drive, that's, like -- the drive includes those training records from staff from across different facilities within the Department of Correction; is that correct?

A. Yes. Every facility has its own file.

Q. And then you as the facility training coordinator specific for ISP has the ability to access those records for ISP staff; is that correct?

A. I am.

Q. Okay.

A. Among my secretary and my training officer, and I believe my field training manager now has access as well.

Q. Okay. And those are maintained -- well, strike that.

Are those maintained after an employee leaves service as well? Quits their job?

A. Yeah. They will -- if someone quits, whatever files we have on them -- if I have somebody quit, you know, very early on, I won't have very much

Page 82

documentation. It goes into what we call the archives file.

Q. And so if I wanted to access a copy of those, like, scanned paper sheets for the new employee training that a new officer went through in 2016 and that officer subsequently left the facility -- it's an archived folder within that staff development training drive is where someone would look to see find those documents?

A. You would go to the archived files for their personal file. You would then have to go to the program files to pull up, like, their tests and things of that nature. So we have two different type of files. Tests and OJT sheets and things like that go to a program file. A learner transcript, any type of in-service itinerary, your prison rape elimination act acknowledgment form, any type of certificates, instructor certification, that goes into their actual live file, which would go into an archived file once they have left.

Q. I appreciate that.

And what's your understanding of how long those archived files are maintained after someone leaves?

A. They're electronic, so they're there

Page 83

forever.

Q. And is there a -- like, the blank versions of those documents or, like, the generic versions of someone new going through training, are those maintained somewhere electronically in the files that you have access to as training coordinator?

A. Yes. Yes.

Q. Have those checklists or task sheets changed since 2016 or 2017 for the new employee training?

A. It's quite possible that the -- whoever the FTM was at the time might have went in, made a -- say, a policy change or a procedure change that there might have been -- there might have been some changes made to the actual task itself just to make sure we're staying current in the policy.

Q. And just so I'm clear on what you're describing, what do you mean by "FTM"?

A. Field training manager.

Q. And that's someone above the facility level? They're working in a central position for department-wide training; is that correct?

A. No, sir. The field training manager is that generic title for the officer that's assigned up

Page 84

here, which is currently Angelica Miller.

Q. I understand. So she has the authority to make changes to the on-the-job training task sheets?

A. Yes. If a policy or procedure changed, obviously, we need to make sure staff is being trained the current policy, so you would have to go in and change that task. Let's say that -- steps to a strip search. Let's say strip search's policy changed and now requires two staff members present instead of one. She would have to go into the task sheet and change that, that way we -- we make sure they're being trained the current policy.

Q. So based on the description you just gave, those task sheets then for the on-the-job training portion of an employee training, those are specific to Indiana State Prison; is that correct?

A. Everything will be facility specific as it meets the facility. Let's take entrance procedures. Obviously, entrance procedures for South Bend, which is a Level 1 work release, and Indiana State Prison, which is a Level 4 maximum security, we have different entrance procedures. So staff is still trained on entrance procedures. It's just how the facility deems your entrance will be.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 23 of 78

Page 85

Q. Is there some set curriculum that's set by centralized DOC in terms of, like, broadly speaking, the topics you have to cover during that new employee training? The on-the-job training portion?

A. Yes, sir. Session 1 is mandated by staff development as having mandatory topics. Now, a facility can add to those topics, but they cannot take away from those topics.

Q. And what about Sessions 2, 3, 4? And I'm limiting the questions to custody staff because that's the focus of this case.

Are the topics that are covered in the on-the-job training custody staff also mandated centrally?

A. No. The topics are not mandated for Sessions 2, 3, 4. It will be facility specific.

Q. And -- and who has authority at the facility level at ISP to add to, alter, or remove topics from the on-the-job training portion in Sessions 2, 3, and 4?

A. If a topic needs to be added and it is submitted, then it has to be approved by the field training manager, by myself, and by at least one

Page 86

member of the training committee.

Q. Okay. So in this scenario that -- there's a few different things I want to follow up on in the answer you just gave. I'll start with -- you referenced a training committee. Did I hear you correctly?

A. Yes.

Q. I think that's not something that we've talked about yet.

Can you explain what the training committee is?

A. The training committee is -- it's mandated by the training policy. Specific people have to be on the training committee. Offhand, I can't remember all of the names and titles that have to be there. I, obviously, am one. And people that would be assigned by the policy, and we meet quarterly. And we have a specific agenda that we have to discuss during those quarterly meetings.

Q. And when you say a specific agenda you have to discuss during the course of the meetings, that's set by central DOC policy in terms of what you have to go through in that --

A. Yes. There is a specific agenda in the

Page 87

policy that we have to cover, and then, of course, any various topics that we feel free to add to it.

Q. Got it. And so in addition to yourself -- I think you testified you don't recall exactly everyone who is on the training committee.

Who do you recall as you sit here right now who is on the training committee in addition to yourself?

A. Well, by policy, it will be myself. It will be the recruitment and retention manager. It will be the regional training manager. It will be the regional training specialist, the field training manager. Custody-wise, it has to be at least a captain or above. So the captain or the major, which it's usually our major. It has to be one person from unit team, the safety hazmat manager. That's all I can think off the top of my brain right now.

Q. And so I'm going to pull up a copy of a document. It's the staff development training policy and administrative procedure out of the IDOC manual policy and procedures. And I think this is Exhibit 2. I believe that's the second document I've shown you. This is a -- it is a 60-page PDF that I

Page 88

have.

(The document was thereupon marked for identification as Beal Exhibit No. 2, as of July 30, 2020.)

BY MR. HEPPELL:

Q. It starts with a Bates range Devine 33791 -- and I'm just going to scroll to put on the record that that goes through to Devine 33850.

This is the policy with an effective date of August 15th, 2016, which I understand was the version that was in effect at the time of the fire in April 2017. I'm not going to have you read through the entirety of this document because we would be here for many hours, but I'm going to draw your attention, I guess, to the first page, which shows this is Policy No. 1-05-101 with the title "Staff Development and Training." Do you see where I'm referring to?

A. Yes.

Q. And then scrolling down farther to page -- I lost it. My apologies.

Looking at Page 10 of the document Devine 33800, Section 6 -- vi -- Roman Numeral vi talks about training committee

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 24 of 78

Page 89

appointments, and it continues on the next page. It says "Each facility shall have a training committee of at least five persons. Members of the facility training committee shall consist of the regional training manager/designee, facility training coordinator, field training officer, re-entry staff member, safety hazard manager, and a staff member from operations." Do you see where I've read through in the policy document there?

A. Yes.

Q. Is this the policy that you were referring to when you described it being a requirement by central IDOC policy to have that training committee?

A. Yes.

Q. And then going -- skipping ahead to Section 8 starting on Devine 33803 and continuing on to the next page, this describes the responsibilities of the facility training committee. And, again, I'm not going to read through those in detail, but that section of the policy is that -- the section that applies -- to layout what responsibilities the facility training committee has and you as a member of the facility training committee have with regard to that quarterly meeting process?

Page 90

A. Correct.

Q. Okay. I'm going to put that document down for now. I may come back to it.

So if I understood what you had described earlier, changes to the contents of the on-the-job training would need to be approved by yourself, the field training manager, and at least one other member of the training committee; is that correct?

A. Correct.

Q. As the training coordinator, is one of your responsibilities making sure that the topics covered in the on-the-job training are sufficient to provide training to new officers? And to yourself propose or recommend additions or changes to the on-the-job training tasks or topics as needed?

A. Actually, anyone can come up with a suggestion and/or write -- that's a field training officer, whether they're a line staff, sergeant, lieutenant, captain. They can say, "Hey, people need trained on this. This is not getting done right," or "This is deficient" or "Why isn't it?" It's not just up to me to say, "Hey, we need to train on this topic." Anybody that's a -- can suggest a topic and/or field training officers are taught how to

Page 91

create a task sheet on their own and submit it for us to review and possibly add it to the training.

Q. Understood. And just to clarify that then -- so I understand from your testimony that sort of open for all, you know, welcoming of suggestions for how the on-the-job training could be improved. Is that fair to say?

A. Yeah. Yes.

Q. So setting aside that anyone's welcome to have input, do you as the facility training coordinator have a specific responsibility to not just input if you feel like it, but to ensure that that field training -- the on-the-job training curriculum is adequate to equip new employees with the skills and tools they need to respond to the situations that may arise at the prison?

MR. ELLIS: Objection. Calls for speculation.

You can answer.

BY THE WITNESS:

A. Yeah. Not so much situations. Most of the situational training that they're going to receive is probably during the Phase 3 academy, which is knowledge-based training. The majority of your phase -- excuse me -- sessions -- it used to be

Page 92

called phase. Sessions 2, 3, and 4 are more skilled-based training because there's a plethora of situations that they can face. So the knowledge-based training is actually what prepares them mostly, I would say, for situations that they will face.

BY MR. HEPPELL:

Q. Okay. So maybe I am -- I phrased something poorly or overly specifically, so let me try asking you a little more broadly.

As the training coordinator at Indiana State Prison, do you have a responsibility to ensure that the contents of the on-the-job training curriculum in Phase 2 and 4 of the new employee training is adequate to equip employees coming out of that training process and starting their job?

A. Correct.

MR. ELLIS: Objection to form.

BY MR. HEPPELL:

Q. And would you agree with me that you have -- as part of that responsibility, you have the responsibility to -- on an ongoing basis evaluate the effectiveness and sufficiency of that on-the-job training and an obligation to make additions and changes as needed to address any deficiencies that

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC NND, case 3:18-cv-00995-JD document 203-12 filed 03/29/21 page 25 of 78
CHRISTOPHER BEAL
July 30, 2020

Page 93

you determine?

MR. ELLIS: Object to form.

You can answer.

BY THE WITNESS:

A. Yes. Ultimately, all responsibility does come up to me.

BY MR. HEPPELL:

Q. Okay. Can you describe the steps that you take as facility training coordinator to monitor or evaluate the effectiveness of the on-the-job training contents or curriculum and specifically whether they're -- strike that.

Let me -- can you please describe what steps you take as training coordinator to monitor and evaluate the on-the-job training portion of the new employee training to ensure that both the scope of topics covered and the depth in which they're covered are sufficient to meet the needs of the employees?

MR. ELLIS: Objection. Compound.

You can answer.

BY THE WITNESS:

A. It's kind of a difficult question. There is many things in place to ensure the quality of the training. Not only with myself, my field training

Page 94

manager, but staff development and training actually comes to the facility and will do an audit on the on-the-job training process based off of the end-of-training SurveyMonkey that they actually have to fill out, if you're familiar with SurveyMonkey. And so -- and that they actually go through an audit on that and find any deficiencies that are there.

On the home front, we do a daily debriefing with the OJTs, talk with them individually and as a group to see how the training's going, how they're feeling comfortable doing the job, and things of that nature.

BY MR. HEPPELL:

Q. Is there any aspect of the -- well, strike that.

So if I understood you correctly, you've described there being this SurveyMonkey audit process to evaluate the on-the-job training, and you also described a daily debriefing with the field training officers. Did I understand you correctly?

A. Correct. We will do a daily debriefing both verbally and in written form. Some people aren't comfortable speaking in front of others, so that gives them the opportunity to write it down. There's also -- like I said, at the end of the

Page 95

training, there's -- there -- actually, at the end of each week, there's a weekly wrap-up report. And then at the end of training, there's a final one that actually goes straight down to staff development and training that will help assess our OJT program to see where any corrections need to be made, were there any deficiencies, where we're doing good at, and things of that nature.

Q. Aside from those two techniques that you just described, using the surveys that come generated through the end of the training process and through the daily debriefs with the trainers themselves, are there any other ways that you monitor the effectiveness of the new employee training program?

A. Exit reviews from HR.

Q. Okay. And exit reviews from HR, that's when an employee leaves employment, they might have feedback about any aspect of their job and that could include feedback about the on-the-job training; is that correct?

A. Yes. There's actually a specific question in the exit review that states "Did you feel that you were trained sufficiently for your job?" A question of that nature. It is specifically and directly related to training. When I get the

Page 96

feedback, that's the question I go and directly look at to see and -- you know, when the majority of your exit reviews say yes, then that's another way to say that you are most likely on a good track.

Q. And other than those three aspects then -- the audit process, the daily debriefs, and then that feedback through the exit interviews through HR -- any other ways that you, as the training coordinator, monitor the effectiveness of the on-the-job training program?

A. When I do have the time -- which is not all of the time -- but when I do have the time, I go out into the field and visually see how they're doing.

Q. So that -- put that on the list, and I appreciate you adding that.

Anything else other than what you've testified to?

A. No. My field training manager does that as well, obviously, more than I do. But as far as me, I will go -- I do try to get out and make some physical appearances.

Q. Okay.

A. You know, are they actually training? You know, are they -- how are they doing where

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND, case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 26 of 78

Page 97

they're training? Things of that nature. Talking with people individually. Talking with them after they've completed training and asking them how they're doing now that they're no longer a trainee and they're on their own.

Q. Anything other than the methods that you've testified to?

A. Not that I can think of.

Q. Okay. This goes for this answer, but I guess for any answer you give during the deposition. If there's something that you think of as you're sitting here that relates back to a previous question and answer and you want to add some additional detail that you recall or anything like that, please just let me know, and we can put that on the record as well, okay?

A. Okay.

MR. ELLIS: I'm going to actually object.

Mr. Beal, don't offer any testimony in this deposition unless it's in response to a question. We can discuss at the end of the deposition if there are clarifications or any additional information that you believe ought to be added to the record, but there is no obligation to just offer up information unless it is responsive to

Page 98

a pending question.

THE WITNESS: Yes, sir.

BY MR. HEPPELL:

Q. I'm not going to contradict instructions given to you by your counsel, Mr. Beal. I'm just going to say that -- for the record, if I've asked you a question and you've given your answer on the record, I'm going to take that answer as given to the best of your memory unless -- unless you add to that, recognizing that I only get one chance to ask you questions. And if you come in at some future point to offer information in addition to or contradictory to anything that you've testified to under oath here today, that we're going to deal with that noting that you had the opportunity to add additional information.

But, again, that's really neither here nor there in terms of the question. So let me come up with a question to ask you.

Mr. Beal, do any aspect of -- strike that.

At what point in the four phases of the on-the-job training are new employees -- and, again, referencing specifically custody employees -- at what point are new employees trained on policies

Page 99

and procedures of Indiana State Prison that they should follow?

A. Well, as far as policies and procedures go, they're actually given policies and procedures during Phase 1 when they hire. I mean, the use of force policy, entrance procedures -- because they've already had a job shadow. So it starts way before they're actual on-the-job training.

Q. The policies and procedures that you're given in Phase 1, those -- those relate specifically to the topics that are covered in Phase 1?

A. For the most part, yes.

Q. Okay. So they're not given, like, a full policy manual of every policy and procedure at the facility at the offset. Is that fair to say?

A. Well, no, sir. We couldn't give that out. And it's about five feet long. So they do have access to the policy manual as there is a copy of it up in the training part. And so they're taught, like, where it is and how to use it. Then they have the ability to go through it when they're up there if they're ever needing to access some information.

Q. Okay. So I understand that it's made available to them if they need to refer to it, and that's one way that staff can be educated or educate

Page 100

themselves on the policies and procedures that are in place at ISP. Is that fair to say?

A. Correct.

Q. Aside from giving the opportunity for employees to come reference the policy manual themselves, at what different phases of the new employee training are new staff -- new custody staff trained on different Indiana State Prison policies and procedures?

A. You know, the DOC policies in themselves -- it would depend on if -- whether or not that task -- whatever task that might be associated with said policy. As far as the procedures go, the majority of the procedures are going to come from the post orders on the post that they're assigned to, which they have to read.

Q. Is there any aspect -- strike that.

I was asking you questions earlier about ways in which you monitored the new employee training program to ensure that it was effective and to see if additional content needed to be added or content needed to be changed. Do you recall those questions?

A. Yes.

Q. During -- during your time as facility

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC NAND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 27 of 78
CHRISTOPHER BEAL
July 30, 2020

Page 101

training coordinator at Indiana State Prison, have you personally proposed any changes to the content or form of the on-the-job training that's provided to staff at -- to the staff at ISP?

A.  When we first went to this format, I was still just an officer assigned to training.  And so I kind of helped the then training coordinator come up with what we currently use.

Q.  So when the -- if I understood you correctly, when this four-phase format was developed in connection with that, there was sort of an overhaul of the on-the-job training, and you helped prepare the on-the-job training specific to Indiana State Prison; is that correct?

A.  Yeah.  He gave me -- basically, my boss then, Ivan Jones, gave me all of the tasks that they had previously had, and I kind of helped break them down into the different phases or the different sessions -- excuse me -- and made sure they were up-to-date and things of that nature.

Q.  Since that time -- since that overall, have you personally instigated, initiated, or proposed any changes to the content, format, or structure of the on-the-job training portion of the new employee training at ISP?

Page 102

A.  To the best of my knowledge, I have not. It's not to say you could go through the files and find something that I did in 2013 and I've just forgotten about it, but I honestly do not remember doing anything prior to when we originally got this set up.

Q.  To the best of your memory, then, as you sit here today, throughout all of your monitoring of the effectiveness of the program, there is not a single change that you personally have initiated or instigated to the on-the-job training program, correct?

MR. ELLIS: Objection to the form.

You can answer.

BY THE WITNESS:

A.  As far as the task sheets go, no, sir.

BY MR. HEPPELL:

Q.  And by "as far as the task sheets go," that's referring to the on-the-job training portion, correct?

A.  Yes, sir.  That's what I thought you were referring to this entire time.

Q.  Yes.

A.  So that's why I just wanted to state that.

Page 103

Q.  And I appreciate that clarification. Thank you.

Outside of the task sheet portion, are there portions that you would answer differently to, taking away that limitation?

A.  Yeah.  I mean, I think it was my -- I might have been the one that started getting going on the 12-hour shifts because I found out some other facilities were and things of that nature.

Q.  Got it.

A.  Other than that, I pretty much want the field training manager managing the OJT program.

Q.  We talked earlier about the different ways that you -- the different sources of information that you have for you to monitor the effectiveness or appropriateness or adequateness of the on-the-job training portion of the program.

Do you do anything to monitor or make yourself aware of incidents at the prison that take place to see if there are patterns and things that come up at the prison that would inform the contents of the on-the-job training provided to new employee at ISP?

A.  No, sir.

Q.  Okay.  And why is that?

Page 104

A.  If there's a change that needs to be implemented, that would come down from the deputy warden to me to make that happen or the custody supervisor.

Q.  And when you say that -- "the custody supervisor," who are you referring to specifically?

A.  Currently, the custody supervisor is Douglas Wardlow.

Q.  And do you know who held that position in 2017?

A.  In 2017, it would have either been Mr. Nowatske or Mr. Tittle.

Q.  Is that -- the major is the custody supervisor?

A.  Correct.

Q.  And the deputy warden you refer to -- are there two deputy wardens?

A.  We have one that's over re-entry, and then the one that I report to, which is over operations.  So deputy warden of operations.

Q.  And do you recall who that individual was in 2017?

A.  That should have been Mr. Gann.

MR. HEPPELL: Okay.  I'm just going to note for the record that my colleague Megan Pierce has

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC INND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 28 of 78

Page 105

joined the deposition. So you will both see her pop up on the Zoom, just so no one is surprised or confused about who that is.

(WHEREUPON, Ms. Pierce joined the deposition via videoconference.)

BY MR. HEPPELL:

Q. Just so -- if I understood the answer you just gave now, it's your testimony that your understanding is that it was the responsibility of the custody supervisor and the deputy warden to -- themselves be monitoring the prison for patterns and incidents that might require changes to the training program and to inform you of what those issues were for you then to make the changes to the training program?

A. Well, I would assume that they're monitoring those patterns given their positions, but the only thing I can verify is that if there was a change in something or the procedure with the training of the OJTs did, I would get that change mostly likely from them.

Q. Okay. So you actually don't know for sure one way or the other whether they're actively monitoring any such patterns with regard to any

Page 106

training changes that are needed, but just your assumption based on the nature of their position that --

A. To my exactly knowledge, sir, yes, I do not know that.

Q. To your knowledge, it's possible that no one is monitoring the patterns of incidents within the prison with a specific eye as to whether there are any changes that need to be made to the training program. Is that fair to say?

A. To my exact knowledge, no.

Q. Okay. Does that concern you that's it's possible that there are patterns that -- incidents emerging at the prison that are revealing deficiencies in the training, but no one may be monitoring those?

A. Well, somebody has to be monitoring them or else we wouldn't have curriculum changes every year. I just don't know who is doing it for sure.

Q. When you say "curriculum changes every year," are you referring to curriculum changes that are handed down from central DOC?

A. Yeah. Staff development and training. Like, this year, they added advanced criminal

Page 107

manipulation to annual in-service. So we have classes like "Calming the Storm" in our preservice academy, which is de-escalation techniques to teach staff to try to get -- lower the incidents of assaults. So, obviously, there is a lot of monitoring going on. I just can't tell you exactly who does the monitoring.

Q. Okay. And those are changes that may have come down as a result of monitoring -- department-wide -- those are development-wide curriculum changes. Is that fair to say?

A. Yes.

Q. Specific to monitoring patterns at Indiana State Prison during the time that you've served as training coordinator, has the chief of custody or the deputy warden ever come to you with any information about issues specific to ISP and informed you of changes that needed to be made to the training program?

A. No, sir.

Q. Okay. So during the time that you served as training coordinator, there have been no changes made to the on-the-job training program at Indiana State Prison, either as a result of your own monitoring of patterns of incidents at the facility

Page 108

or of someone else telling you about patterns that have been observed that require changes to the training program. Is that fair to say?

A. Correct.

MR. ELLIS: Objection. Compound.

BY MR. HEPPELL:

Q. I am going to pull up another document -- and just give me one moment here. It's going to be marked as Exhibit 3, which I think is accurate. It's the third document I'll be showing you. Let me pull it up on the screen here. And noting for the record, this is a three-page PDF. It is Bates stamped Devine Production 5826 through 5828.

And I'm going to leave it zoomed in on the top portion of the document, so you can hopefully see that.

(The document was thereupon marked for identification as Beal Exhibit No. 3, as of July 30, 2020.)

BY MR. HEPPELL:

Q. Mr. Beal, do you recognize this document?

MR. ELLIS: I'm just going to object that you cannot see the entire document, but you can answer as to the parts you can see.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

Page 109

BY THE WITNESS:

A. Actually, I don't recognize this document as -- when I applied for the job, online.

BY MR. HEPPELL:

Q. Okay.

A. Yeah. I may have filled this out with HR. I just don't remember.

Q. Let me -- let me pull it up to the full page. I don't know if you're able to -- are you able to read that, or is that now so far zoomed out you can't see any of it?

A. Yeah, I can't read it, sir.

Q. Okay. Well, let me direct you to the very top of the page. Top, bold heading says "job description," correct?

A. Yes.

Q. And then under "job title" -- well, strike that.

Under "agency," it lists "Indiana Department of Correction, Indiana State Prison," correct?

A. Uh-huh.

Q. And then job title, it states "Correctional Training Officer 3"; is that correct?

A. Yes.

Page 110

Q. And that's -- we talked earlier -- that's the -- that's the formal name for the position that's informally named training coordinator, correct?

A. Correct.

Q. And that's the position you currently hold?

A. Yes.

Q. And then going down from that header portion of the document, there is a section that says "purpose of position/summary," and then a section that says "essential duties/responsibilities" that carries on to the subsequent page as well. And then some additional sections going down from there. Do you see generally what I'm referring to?

A. Yes, sir.

Q. With that additional content that I've provided to you, are you able to recognize this document as a job description for your position as Correctional Training Officer 3?

A. It appears to be so.

Q. Okay. Is it -- is it your testimony that this is the first time seeing this document?

A. No, sir. As I stated earlier, I don't remember it. I very well may could have signed it. It has been seven years since I --

Page 111

Q. Okay.

A. -- applied for this.

Q. Fair to say, then, that if you've ever seen the job description for your position, it would have been when you first obtained the position back in 2013?

A. Correct.

Q. And have had no cause to refer back to your job description at any point in the years since you've obtained the position?

A. This document, correct.

Q. Okay. Is there -- and just to make sure that -- that we're not talking back to each other or misunderstanding each other, is there a different document that has substantially the same content in terms of laying out a description for purposes of a position and the essential duties of the position that you have reviewed more recently than this particular document?

A. There is one in our training plan that can change, you know, as new training plans come out. Sometimes they add to it and maybe they'll take a little bit away from. That would be what I was referring to.

Q. And that's a document that's -- can you

Page 112

explain a little more what you mean by "training plan"?

A. I'm sorry. I'm sorry, sir. I misspoke. The training policy. The one you had up earlier.

Q. Okay.

A. The job description for training coordinator.

Q. And so that's something that you would refer to -- that you've referred to more recently than the job description for your position here?

A. Well, I wouldn't say referred, but actually had access of going through the plan itself.

Q. Okay. So it's something that you've had access to but have not referred back to?

A. Correct.

Q. Okay. The policy itself? The description in the policy?

A. My job description of the policy, correct.

Q. Okay. And looking at the essential duties and responsibilities listed in your job description -- when you see that the second -- second item on that list is "analyze effectiveness of training"?

A. Yes.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD document 203-12 filed 03/29/21 page 30 of 78

Page 113

Q. And that -- that is what we were discussing earlier in terms of those different methods that you used to review whether the training was adequate and effective?

A. Correct.

Q. And then going down, it continues that one of the responsibilities for the position is to review, update, and compile training materials and to make recommendations for their use on an annual basis. Do you see what I'm looking at there?

A. Yes, sir. Yearly we have to turn in what they call a curriculum review -- an annual curriculum review. And so that document will be turned in with any suggestions, changes to the current curriculum that we have. We submit that to staff development and training.

Q. And I'm going to pull that document down. I may come back and refer to that later.

If I recall correctly, you had testified near the start of the deposition with regard to your ability to make changes to that training program, and I think you had offered some testimony along the lines of you did not have the ability to make changes to the training program, but that all came from downstate from central DOC.

Page 114

Do you recall the line of questioning or the question that I'm referring to earlier?

A. Yes, sir.

Q. Okay. And so I guess I want to drill down a little more on that. And you had just made reference to an annual process by -- that was describing your -- in your job description, you made reference to a process of compiling a report for suggestions for the training program. Did I understand you correctly?

A. Well, it's actually a review of current curriculum and possibly the effectiveness of it. Most likely, it's anything that we may have found wrong with it, including spelling, in the PowerPoint.

Q. Okay. So fair to say then, based on that description, that that annual review process runs the gamut from typos all of the way up to, you know, substantive ideas for improvements or additions to the program?

A. Actually, no additions. Just the current curriculum.

Q. Okay. I am going to pull up another exhibit. It is -- I think I marked it as Exhibit 4. Let me share the screen for you to show you that.

Page 115

(The document was thereupon marked for identification as Beal Exhibit No. 4, as of July 30, 2020.)

BY MR. HEPPELL:

Q. For the record, it is a four-page document. It is Bates stamped Devine 69643 through 69646. And going back to the first page, this is a four-page document that is listed as being to Nancy Riley, director of the staff development and training, from yourself, Chris Beal, facility training coordinator, Indiana State Prison. This particular document is dated February 27th, 2014.

And the subject listed on that top portion of the first page is "annual training needs assessment for the 2014-15 training year." Do you see what I'm referring to?

A. Yes, sir.

Q. And we're on the same page in terms of my description of the document?

A. Yes.

Q. Is this document -- well, strike that.

Does this document relate to the process you were just describing in terms of that annual process of sharing feedback with the central

Page 116

DOC training folks about curriculum?

A. No, sir. This is a different document that actually we don't even use anymore. This is actual training needs, and this is where you could go in and put suggestions for specific classes like drug identification or, you know, things of that nature.

So, yeah, this is a training -- basically, whatever you feel was a training need, this is where you could get those suggestions sent to staff development and training when they would sit down and make their curriculum. The curriculum review is actually going over the certain curriculum that we have and submitting any errors, any feedback that we have on the current curriculum only.

Q. And so can you describe for me specifically what the format and contents of that curriculum review document -- what that would look like and where -- well, strike that -- what that would look like?

A. It looks very much like this. They've changed the format over the years. But, basically, like I said, if you found errors in the PowerPoint -- if you were to go in there and list, you know, advanced criminal manipulation, PowerPoint Page 3 misspelling because, like I said, I cannot alter the

Page 117

curriculum. I cannot even go in and make a grammatical correction on a PowerPoint.

Q. And what portion of the training that's offered at the facility is -- are you referring to when you talk about that curriculum with the PowerPoints that you can't even change a typo on?

A. That would be our annual in-service training, along with any special -- specialized training, restrictive status housing unit training, you know, firearms, QRT. Anything that comes from staff development or emergency operations, we can make no changes to.

Q. Okay. And is that curriculum review document -- that is your one -- your one avenue for making those suggestions?

A. Right. Like, if I found a grammatical error or, say, there is a weapon that's listed that's been retired, you know, then I can put in there "Hey, you know, remove this from Power -- lesson plan. We don't use it anymore." That's the avenue we would use for the curriculum review.

Q. And so if I understood your testimony earlier, it was your testimony that you could not, through the curriculum review process, suggest additions to the topics that were covered? Just --

Page 118

is that correct?

A. Yes. Just the current curriculum.

Q. Okay.

A. Review of curriculum.

Q. So if you -- so we looked earlier at your job description, and one of the responsibilities that you have as training coordinator is analyzing the effectiveness of the training, correct? We looked at that?

A. Yes.

Q. And then also -- we also looked at a portion of the job description that described developing or compiling training materials, correct?

A. Say that again, sir.

Q. Maybe it will be helpful if I pull up the documents. I'm going to take down Exhibit 4 and go back to Exhibit 3, which was the job description document.

In sharing that with you, again, one of the responsibilities in addition to analyzing the effectiveness training -- well, it states here that you had duty and responsibility to research and develop training curricula to meet specific performance objectives. Do you see that?

A. Yes, sir.

Page 119

Q. Is that accurate? Is that accurate? That's a part of one of the duties -- one of your job duties or responsibilities?

A. That would be accurate when we were placed on focus group to help develop curricula. So as a training officer or training coordinator, either one, we are subject to being assigned to focus groups to help develop curricula. So, yes, that is correct.

Q. Well -- and just so I understand that answer, is it your testimony that outside of you being specifically assigned to a focus group by someone at central IDOC -- outside of that situation, you do not have the duty or responsibility to research and develop training curricula; is that correct?

A. Yes. Correct. It would go to the focus group and then it goes through another few stages that I've never been a part of, and then staff development will roll out the curricula.

Q. And then what about developed training aids and techniques. That's the next item listed under "job duties." Do you see what I'm referring to?

A. Yes.

Q. Do you agree or disagree that that's one

Page 120

of the job duties that you had as the training coordinator at ISP?

A. No. I would agree with that.

Q. Okay. And that's not limited to focus groups?

A. Well, developing training aids and techniques is -- can be like program delivery. It's as simple as rearranging the classroom and making the staff read the PowerPoint instead of you reading it for them. It's about how -- how the material is delivered.

Q. Understood. So you view that as nothing to the contents of -- of the training, just -- just the manner in which it is conveyed?

A. Right. The aids and techniques, yes, sir.

Q. Okay. And then the next point on the list is reviews, updates, and -- it says "complied," but I assume -- speaking of typos, that is a typo, and it should be compiled.

But in any event, "reviews, updates, and complies training materials and makes recommendations for their use on an annual basis." Do you see what I'm referring to?

A. Yes, sir. And that would be to the last

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND, case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 32 of 78
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

Page 121

document that showed the annual training needs.

Q. Okay. So let's go back to that document, then, because I think you -- I had asked you about that, but didn't fully get you to explain that.

Can you -- are we back on Exhibit 4? Can you see now the --

A. Yes, sir.

Q. Okay. And you testified that this -- this format of document is no longer used. Did I understand you correctly?

A. Correct. The training needs now are just a section of our annual training plans. So it is no longer an individual document.

Q. Understood. So what you had been testifying to earlier in terms of that -- the curriculum -- well, strike that.

You previously testified that there was that annual document that you prepared. Is it your testimony now that that document and that this document, the annual training needs, have been combined and it's all contained in one document?

A. Yes. The annual training needs -- the document you're currently looking at now -- has been done away with and just the training needs is now part of our annual training plan. It's been added to

Page 122

our annual training.

Q. Okay. So nothing in terms of the substance of the review process that you engage in has changed? It's just the format in which that is conveyed to the folks at central DOC?

A. Correct.

Q. And you participated in the preparation of this annual training needs assessment that's up in front of us for 2014/2015; is that correct?

A. Yes.

Q. And that you had -- if I understood your testimony, you have participated and conveyed similar information using a similar process in subsequent years just in a different format, correct?

A. Yes, sir.

Q. And looking at this document -- I'm going to zoom in a little bit so it's easier to read.

This states "Per Indiana Department of Correction, IDOC Policy 01-05-101, staff development and training, the Indiana State Prison, ISP, training committee is submitting the ISP annual training needs assessment for the division of staff development and training to review."

It goes on to state "Sources of information used in the needs assessment include, but

Page 123

are not limited to the following." And then it lists eight different -- a numbered list of eight different items that listed as sources of information used. Do you see what I'm referring to?

A. Correct.

Q. And it includes "No. 4. Review incident, slash, accident reports." Do you see that on the list?

A. Yes, sir.

Q. In what ways were incident and accident reports used by you in the preparation of the -- of this needs assessment document?

A. Any incident that may have occurred in the training department or any training-related accidents, reports would have went into that review.

Q. So is it your testimony then that when it states "review incident, slash, accident reports" on the list of items that were used as a source of information, that is limited to incident or accident reports that occurred in the training department or specifically in relation to a training activity?

A. That would have been -- yeah. Training department, training activity, or related to training.

Q. And can you explain what you mean by

Page 124

"related to training"?

A. Let's say that somebody is doing an escort improperly. They're not escorting the way they were trained to escort, and the offender falls. Of course, you know, a report's going to be made. And I'm just using this as a scenario. And then when they get asked why they weren't escorting properly, and they say, "This is how training showed me how to do it" --

Q. Okay.

A. -- then -- then I'm going to have to address that because -- I'm going to have to go get my documentation and show that that isn't how they were trained and then -- but let's say, you know, now you have 30 people that have done it. Well, we have to go and look at this. Now, did I have a trainer not training properly? So that's when it would show up in this incident/accident report.

Q. Okay.

A. Does that make sense?

Q. It does make sense. I have some follow-up questions I want to clarify with you. So the example that you gave -- and I think it is helpful to talk about -- you gave an example of an incident where an employee was escorting a prisoner,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 33 of 78

Page 125

and a prisoner slipped and fell and injured themselves and an incident report was created as a result of that.

And then the example that you gave, the employee, when asked about it, gave a statement along the lines of "Well, this is how I was trained to do it." I don't know if I got it exact, but, broadly speaking, that was the hypothetical example you gave. Is that fair to say?

A. Yes.

Q. Okay.

A. I'm sorry. I thought you were done.

Q. No. Go ahead.

A. I was just going to say that at that juncture then, I would prove to, you know, the acting authority, whether it was the major deputy warden, "Here's their training sheet. They're lying. They know they were trained correctly." And, you know, you move on because people like to say that all of the time.

You have an unintentional discharge with a firearm. What do they say? "Well, training told me to do that" because they don't want to get in trouble.

Q. Okay.

Page 126

A. But let's say you got 30 or 40 people that are all doing it wrong. Well, we need to look at this. Was -- was the training officer not doing their job because we have this many? When you have -- when you get something concrete like that, then it would go in here to No. 4.

Q. Okay. And so how would -- so in that -- so -- well, strike that.

So I understood from your prior testimony, but correct me if I'm wrong, you don't do anything proactively to review incident or accident reports at the prison; is that correct?

A. No. I do not have access to those.

Q. Okay. So you couldn't even review incident or accident reports if you wanted to. Is that -- is that your testimony?

A. I've never requested it.

Q. So you've never requested access to those?

A. Nor have I been given the duty to do so.

Q. Okay. Do you believe if you did request access that that would be denied?

MR. ELLIS: Objection. Calls for speculation.

You can answer if you're able to.

Page 127

BY THE WITNESS:

A. I really don't -- I really can't say.

BY MR. HEPPELL:

Q. Who would have authority to grant you access to an incident report?

MR. ELLIS: Objection. Calls for speculation.

But you can answer if you know.

BY THE WITNESS:

A. I would imagine it would be my deputy warden of operations.

BY MR. HEPPELL:

Q. And there's -- there's nothing -- there's been nothing stopping you, if you wanted to, going to the deputy warden and saying, "Hey, I want to take a look through incident reports that are being generated to see if there are any ongoing issues that I think we can make -- make changes to our training program to address those issues"? There's been nothing preventing you from having a conversation like that with your deputy warden?

MR. ELLIS: Objection to form.

But you can answer.

BY THE WITNESS:

A. Yeah. I mean, there's nothing preventing

Page 128

it. I don't think it's necessary, though.

BY MR. HEPPELL:

Q. Okay. When you say you don't think it's necessary, why do you say that?

A. Well, if it was, I think they would have already assigned me that job duty.

Q. Okay.

MR. ELLIS: Can we stop and take a lunch break when you're finished this document?

MR. HEPPELL: Sure. Yeah. I've got probably a few more questions about this specific document, but then we can go off and take a more extended break. That's fine.

BY MR. HEPPELL:

Q. So going back to that hypothetical scenario you gave about the incident report. How -- how would that type of incident report be brought to your attention where someone says, "Oh, training told me to do this this way"?

A. Nine times out of ten it's going to be a phone call. Sometimes after that, it may be a third party because, you know, this -- training gets blamed for everything. So somebody didn't do proper key control. "Training didn't tell me." So a lot of times they're like, "Just tell the truth."

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 34 of 78

Page 129

And they'll fess up and say, "Okay. I just didn't do it right." Usually, informally once in a blue moon, I might get an e-mail saying, "Hey, this OJT's claiming they weren't shown how to do this"; but usually in a very informal way. A phone call or just in passing by.

Q. Okay. If I understood your testimony, it's your perspective and perception that the majority of the time, those are incorrect statements, whether deliberately false claims or mistaken claims about understanding -- "I was trained to do it this way, but that's incorrect." Is that your assessment?

A. Yes, sir. And 17 years in the Department of Correction, when a staff person messes up and doesn't want to be honest, they try to blame training.

Q. Okay. And so those sort of false reports where someone messes up and tries to blame training, that doesn't result in any recommendation in the needs assessment in terms of changes to training. Is that fair to say?

A. No, I would not.

Q. You made reference earlier to the possibility that there might be something that keeps coming up. You say -- I think you said if I saw 30

Page 130

times that something happened and people said, "I wasn't trained properly," then you might look into that --

A. We actually --

Q. Go ahead.

A. Oh, sorry. We actually have a tracking system for that. We validate all our tests. And so when you see that a specific instructor -- say, maybe down at Miami Correctional Facility -- every time they teach a class, the majority of people are missing Question Nos. 3, 4, and 5. That sets a pattern that somebody is not doing their job.

Q. Okay. And in the example you just gave, that's, like, people in class missing questions on the evaluation. Is that what you were just describing?

A. You know, test validation for any type of test that we do, whether it be security skills, personal protection, use of force -- you know, whether it be a skill-based or knowledge-based training, there is a validation sheet. So that's how -- when I get the validation sheets, I can actually monitor how my trainers are doing.

If I see the same people missing the same questions, then I can go to my trainer and say,

Page 131

"Are you covering this when you're teaching the class?"

Q. Got it. And I thought what you were describing was a little different than that, but maybe I misunderstood you. I thought you had -- we were talking about incident reports and --

A. I was just throwing another scenario out, sir.

Q. Okay. So the scenario you were throwing out was related to test validation and not NCO reports?

A. Oh, no. I was throwing out just a scenario, but I'm telling you now that through the validation sheets is how we actually monitor that a trainer is not doing their job.

Q. Okay. So the scenario you described where you would have multiple incident reports where people are describing the same type of training failure, that was a hypothetical that has not happened. Am I understanding you correctly?

A. Correct. Hypothetical. Has not happened.

Q. Okay. If there was an incident where some -- some incident occurred and someone did not follow the correct policy and procedure, but they

Page 132

didn't -- the officer involved did not make a statement, "I did it how I was trained to do it," is that type of incident something that would come to your attention?

A. If -- like I said, it's very rare that I ever get anything in writing on that when they try to blame training, but as far as people not following what they're supposed to do -- I mean, you know, people get walked out all of the time for trafficking, and that's the first thing we tell them not to do is not to traffic. So it's kind of vague, sir.

Q. Sure. I guess I'm asking you a more specific example.

And, again, looking at Bullet Point 4 on the list, "Review incident, slash, accident reports," if there was a pattern of incidents that kept on coming up at the facility where people were doing things that were not following correct policies or procedures, but the officer involved was not making the affirmative claim in their report "I did it this way because that's how I was trained to do it," is it your understanding that you would have no way of learning that information?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 35 of 78

Page 133

MR. ELLIS: Objection to form.

But you can answer.

BY THE WITNESS:

A. You're dealing with a very broad spectrum there. I'm trying to think of something that may have happened once that -- you know, maybe a shift supervisor calls and says, "All my staff are not -- are doing this wrong. I want them re-trained." Something to that nature.

BY MR. HEPPELL:

Q. You don't do anything affirmative yourself to seek out information about whether those type of patterns exist at the facility. Is that fair to say?

A. No, sir. They would have to bring it to me.

MR. HEPPELL: Okay. Ben, I know you'd like -- want to take a longer break. I won't promise that I don't have more stuff on this document, but this is as good of a place as any to take a break.

MR. ELLIS: Sure. And before we go off the record, do you have any more questions? I just have a note to put on the record before we go off.

MR. HEPPELL: Sure. No. I was just going to talk about logistics of when you wanted to come back.

Page 134

MR. ELLIS: Is an hour fine? I actually --

MR. HEPPELL: What's that?

MR. ELLIS: Is an hour fine?

MR. HEPPELL: Yes. 1:05 Central, 2:05 Eastern, we'll come back.

MR. ELLIS: Yeah. That sounds good.

Is that good with you, Mr. Beal?

THE WITNESS: Yes, sir.

MR. ELLIS: Okay. I just want to note on the record that I'm going to renew my objection, but I think the questioning in this deposition is outside of the scope. I do think that if someone were to review the transcript, other than the very initial question, which we established that Mr. Beal did not have any personal involvement in the April 7 fire, I don't think anyone reading this transcript would be able to tell that it had any connection at all to the Devine lawsuit.

So, you know, I think we've been giving you some latitude in the questioning, but if we're going to continue hour after hour just asking general training questions about any connection to the fire, training related to fire safety, knowledge of any deficiencies, then I think we're going to have to call the Court.

Page 135

MR. HEPPELL: Okay. I don't have anything additional in response to that. So, you know, incorporate my reference -- my previous record statement on the topic.

MR. ELLIS: Okay.

MR. HEPPELL: We'll come back at 1:05 or a little after. Take an hour.

MR. ELLIS: Okay.

MR. HEPPELL: I'm going to just leave the Zoom link open. I think that's the best way to handle it.

MR. ELLIS: Okay. If you would, Mr. Beal -- sorry. Stop your video.

THE WITNESS: Sounds good.

MR. HEPPELL: Off the record.

(WHEREUPON, a short break was taken.)

(WHEREUPON, Ms. Pierce exited the deposition via videoconference.)

BY MR. HEPPELL:

Q. Mr. Beal, before we took our lunch break, I've been asking you some questions about the annual training assessment document we've been looking at. I do just have a couple more questions about -- to

Page 136

ask about that particular document. I'm going to put that back up on the screen here.

Do you recall this document that we were looking at before the break?

A. Yes, sir.

Q. Okay. We've been talking previously about Item No. 4 on the list, sources of information that were used in your needs assessment. I'm going to draw your attention to Item No. 6 on the list, which states "Review any pertinent information that has training implications." Do you see what I'm referring to?

A. Yes.

Q. And then underneath that in this particular document lists four items, A through D, "A, use of force reports; B, current litigation; C, current professional literature; and, D, changes to policy, procedure, and/or directives."

Can you explain to me how you came to review those categories of -- documents or categories of information through the course of your training needs assessment?

A. Yeah. So, once again, if there's something out of order -- say, you know, cell extraction took place, and, you know, there was

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 36 of 78

Page 137

excessive force in there, they would bring that to my attention. And so the use of force report would show that any -- anything that's listed there is -- A, B, C, or D has to be related to training. It's not for the entire facility. It is just training related.

Same thing like this current litigation. I'm not familiar with legal terms and things of that nature, but I'm assuming that this has not went to court yet, correct?

Q. Are you asking about this case?

A. Yes.

Q. That you are giving the deposition?

A. Yeah.

Q. Right. So this case hasn't gone to trial yet. It's still in the discovery phase, including the deposition we're taking of you today.

A. So then if it was actually gone to trial, then that would be brought up in the review of the current litigation since I'm actually named in it.

Q. Okay. Because you're -- because you're named in it as the training --

A. Yeah. Because training is actually being named in the litigation process. Other than that, litigation will not be discussed. It has to be training related.

Page 138

Q. Okay. So just to make sure I understand the points you just made, in terms of current litigation, you would only review cases that had actually gone to trial and only where there was some allegation made against the training coordinator or the training department in that lawsuit?

A. Yeah. Or training as a whole. So let's just say, you know, John Doe sues us because he claims training -- people weren't trained properly to escort, and he fell and broke his nose. And it goes to trial. Well, then litigation let's us know, and then I could do a review on that of, you know, we're being sued because allegedly we're not training people to escort correctly.

Q. And outside of a specific allegation in the lawsuit about failure to train properly, there was no -- you weren't systematically or proactively monitoring any litigation to see if there were patterns emerging in the allegations that might relate to training?

A. Correct. Legal would come to me if training was involved with it.

Q. When you say "legal," are you referring to central IDOC legal?

A. No.

Page 139

Q. Or legal at the facility?

A. No. We have our own legal team here at the facility. So my chief is the one that told me that I was involved in the Devine case.

Q. And looking at Item A on that list, "Use of force reports," am I correct in understanding that, again, you were not engaged in any systematic comprehensive review of use of force reports to see if there were any changes to training that needed to be made?

A. Correct. I have reviewed no use of force reports.

Q. When you say you've reviewed no use of force reports, do you mean ever?

A. To the best of my knowledge, as the training coordinator, I have not reviewed any use of force reports.

Q. So although this document reflects review any pertinent information that has training implications and lists use of force reports, this could reflect categories where you did not actually review any items that fit within the categories on this list; is that correct?

A. No, sir. It would have been up to the responsible party that reviewed the use of force

Page 140

reports -- that if it was a training-related issue, to then get it to me.

Q. Right. But we agree that this is a document that you created and sent to Nancy Riley, correct?

A. Correct.

Q. And you list on the first page of this document a number of different categories of sources of information used in the needs assessments?

A. Yes, sir.

Q. And I just want to understand your testimony. Your testimony is that certain items might be listed on this list as items -- as sources used in the needs assessment, but there would actually be zero items that you had personally reviewed that fit in some of those categories?

A. Correct. Like, use of force reports. Same thing with current litigation. And that would also be documented in our training committee meetings that, you know -- use of force reports, nothing pertaining to training, and then we move on. It's just there as a source, and if there is, we're going to use that. That's why it says "any pertinent information."

Q. Understood.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 37 of 78

Page 141

MR. HEPPELL: I'll just put on the record that my colleague Megan Pierce has joined us.

(WHEREUPON, Ms. Pierce joined the deposition via videoconference.)

BY MR. HEPPELL:

Q. When you say those would be brought up in those training committee meetings, were there minutes of those meetings taken?

A. Yes.

Q. What's your understanding of where -- who keeps track of those minutes or where those minutes are located?

A. Those minutes are actually printed out and kept in my trainer's manual and -- for the fiscal year. And they're kept electronically.

Q. Okay. So you had access --

A. And --

Q. Sorry. Go ahead.

A. That's part of our ACA requirement that I show documentation that training minutes were taken.

Q. And you had -- you have access to those documents?

A. Yes.

Q. Including going back a number of years;

Page 142

is that correct?

A. Yes.

Q. So those are electronic. So those would be indefinitely; is that correct?

A. Yes.

Q. Looking through the subsequent page of this document, it lists a few different categories; types of training, new employee orientation in-service, and lists any suggestions that you have underneath that.

Without going into the details, is that a fair representation of the format that this document is in?

A. Correct.

Q. And if I understood your earlier testimony, this particular format is no longer used, but the contents in terms of making these kind of suggestions is ongoing in a different formatted document going forward?

A. The needs assessment has been added to the annual training.

Q. At any point since you became the training coordinator at Indiana State Prison, during any of these annual communications of training needs or training reports, have you made any

Page 143

recommendations related to improvements in training related to fire safety or fire prevention or fire emergency response?

A. Not to my knowledge.

Q. And if you had made any of those, those would be reflected in this document or documents like it for subsequent years, correct?

A. Correct.

Q. We had talked earlier about the different phases the emergency -- strike that.

We had talked earlier about the different phases of on-the-job training that were given as part of the new employee training program.

Do you recall that topic of testimony that we were discussing earlier?

A. Yes.

Q. During which, if any, aspects of that training would new employees be given training on fire safety and emergency response procedures and policies in the event of a fire?

A. That would be during Session 1, the one that is standardized throughout the state.

Q. And in Session 1, what specifically is the training that is provided to new employees about safety and emergency response?

Page 144

A. Off the top of my head, I know that there is identification of fire extinguisher. There is one for use of a fire extinguisher, and then there should be just one for fire emergency plans. So there should be -- if memory serves correct, there's three separate tasks on fire in Session 1.

Q. Do you have a rough approximation of how many different tasks in total are covered in Session 1?

A. Off of the top of my head, I believe it was 30 -- between 31 and 33 mandatory Session 1 tasks.

Q. How much time total is devoted to Session 1?

A. Session 1 would -- excuse me. My asthma is acting up.

So you figure 60 hours is going to be Session 1 and Session 2. So just put a dividing line in there if you would on that.

Q. And is it your understanding that that's roughly 50/50 between the two of them?

A. Roughly, yeah. Session 1 is more knowledge-based tasks, and then there's virtually no hands-on tasks in there. If there is a hands-on task -- say, there's a bomb threat, there will be a

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC NND, case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 38 of 78

Page 145

sheet, you know, that you're supposed to fill out if you receive a bomb threat. Other than that, it's pretty much knowledge-based training.

Q. I think you might have testified to this -- well, strike that.

Outside of the three modules in Session 1 that you just described -- identification of the fire extinguisher, use of the fire extinguisher, and fire emergency plans -- are there any other aspects of the four phases of new employee training that relate to fire response or fire prevention and fire safety?

A. Not to my knowledge.

Q. So a new employee coming out of that new employee training and being back at the facility -- being able to work a shift on their own without supervision, they would be coming out with those three tasks during Session 1 training being the sum total of their fire safety training, to the best of your knowledge?

A. To the best of my knowledge, yes.

Q. You, I believe, may have testified to this earlier. I apologize if I'm repeating this.

My recollection is that you had testified that the Session 1 training was set

Page 146

statewide and that you -- that it was not facility specific as opposed to the Session 2, 3, and 4, which was facility specific. Am I recalling that correctly?

A. The topics for Session 1 are standardized. The way the topics fluctuate -- how the topics are written are going to be facility specific. Kind of like entrance procedures, and I used that as an example earlier.

Q. Understood.

A. But the tasks -- all -- the mandatory tasks will be standardized in Session 1 throughout the entire department.

Q. And thank you for that clarification.

So it was set by central DOC that there would be a Session 1 task regarding fire emergency plans, but the facility itself in this case, Indiana State Prison, has the ability to come up with specific contents of how that training is constructed. Is that fair to say?

A. Correct. The task would have to be written to match the layout of the facility. Obviously, dormitory and a cellhouse are going to have to be written up differently, just based off their physical makeup.

Page 147

Q. In the Session 1 task that you relate to fire emergency plans as it has been -- well, strike that.

To your knowledge, has the Session 1 new employee training related to fire emergency plans, has that changed at all during the period of time you have been the training coordinator at ISP?

A. Not that to my knowledge.

Q. You certainly have not proposed or suggested any changes to that Session 1 task; is that correct?

A. No, sir.

Q. What -- what are new employees trained on in that fire emergency plan task in Session 1?

A. I don't have it in front of me. Obviously, it's been a long time since I've read over that. It would consist of knowing where your fire extinguishers are at on the unit, knowing fire evacuation routes for your unit, which would all be found in the post orders of the unit. Proper radio calls to either call 10-70 or 10-71. 10-70 being fire. 10-71 would be actual nature of fire.

There should be something about notifying -- because we actually have a fire department -- offender fire department on grounds --

Page 148

notifying the offender fire department. Things of that nature. Just basic fire precautions -- not precautions, but fire plans for an emergency if there was to be a fire.

Q. And was there anything covered in the Session 1 fire emergency plan task training topic about evacuating a prisoner from his locked cell in the event of a fire in that cell?

A. Once again, if memory serves me correct, it would be the -- it wouldn't specifically say that the offender was locked in the cell as much as it was evacuating the offenders from the housing area, getting them in a secure location, and taking physical count. So whether he's locked in his cell or he's deaf and can't hear that there's a fire alarm going off -- it's the main concept of getting the offenders evacuated from the area into a designated area.

Q. Okay.

A. But I'd really have to go over and read that for sure to be 100 percent. Right now, I'm just trying to go off memory.

Q. Okay. And just if I could -- to make sure I understand the distinction that I think you were drawing -- what I understand you to be

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NNND case 3:18-cv-00995-JD
Cause No. 3:18-cv-00995-JD-MGG
document 203-12    filed 03/29/21
CHRISTOPHER BEAL
July 30, 2020
page 39 of 78

Page 149

describing was, like, an evacuation plan for getting -- for evacuating an entire unit or portion of a unit and following that kind of mass evacuation plan as opposed to a specific training targeted towards rescuing a particular offender in a particular location.  Is that fair to say?

A.  Correct.  It's very generic in its term because, once again, it's going to go back to the post orders and the fire procedures for that particular post that are going to give them much more in-depth information than the training is.  The training is just a base cover of acknowledging the fact of your main responsibilities and duties in the -- in the case of a fire.  And then your post orders are probably going to go into more detail on the evacuation routes, procedures.

You know, if you work a high risk security unit, like I did at the women's prison, you just didn't unlock the doors and let the offenders out.  They had to be handcuffed before they could be brought out even in a fire.

Q.  So there was -- if I understood that last part -- and correct me if I'm wrong -- there was not any general training offered in the Session 1 fire emergency plan training about the circumstances in

Page 150

which it was appropriate to release a prisoner from his cell in the event of an emergency?

A.  Yeah.  It wouldn't cover anything that specific.  It covers the basic points.  And then, like I said, once again, they have to go back, and they're going to have to follow the post orders for whatever that housing unit is and what the post orders actually designate to do during a fire emergency.

Q.  Okay.  And outside of what's listed in the post orders and what the topics are covered in the Session 1 fire emergency plan, is that the extent of the information that a brand new employee would have available to them to guide them in terms of what to do in the event of a fire?

A.  To my knowledge, yes.

Q.  So if there wasn't any additional specifics in the post order in terms of directing them about when and how to release a prisoner from their cell in the event of a fire, there wouldn't be any particular direction given to an employee on that topic.  Is that fair to say?

A.  To my knowledge, no.

Q.  Is it your understanding that -- well, strike that.

Page 151

To your knowledge, is there a policy or procedure at Indiana State Prison, whether it's a written policy or an unwritten policy, that's required to be followed that tells employees at the prison -- custody employees under what circumstances they are required or permitted to release an offender prisoner from his cell in the event of a fire in that cell?

A.  Not to my knowledge.  Once again, sir, I would have to relate to the post order.

Q.  Again, so outside of the post order, no policy one way or the other on that?

A.  Correct.

Q.  You made reference to the prison firefighter program.  I understand that Indiana State Prison is unusual in having that program.  Is that your understanding?

A.  Yes, sir.  We're the only one in the United States.

Q.  Have you ever had any responsibility over the prisoner firefighter program?

A.  No, sir.

Q.  Or any cause to interact with any members of the prisoner firefighter program?

A.  No more interaction than I would with

Page 152

anybody else in the general population.

Q.  You may have interacted with them because you're in the prison every day and they're in the prison and you may have run into them, but no specific interactions with them related to their duties as firefighters?

A.  Oh, no, sir.

Q.  What is your understanding of the -- well, strike that.

Has the policies and procedures at Indiana State Prison around when to activate the prisoner firefighters -- has that changed at all during the course of your time at Indiana State Prison, to your knowledge?

A.  I'm not very familiar with the policy as I'm here in administration.  To my knowledge, I can't say.

Q.  Okay.  What are new employees trained on in the fire emergency plan Session 1 task related to the prisoner firefighter program?

A.  I honestly can't say other than if it is mentioned in fire emergencies, then there may be something in there saying that the offender firefighters are to be called and/or notified that there is a fire.  I do know that when I last worked

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 40 of 78
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

Page 153

behind a wall, which was quite a long time, just because somebody called a 10-70, which is a fire over the radio, you just didn't let the offender firefighters off the unit.

99 percent of our fires are offenders starting fires outside of their cells. So they called the 10-70 or 10-71, and staff is running up there with a fire extinguisher to put it out.

Q. And recognizing that your experience on the custody side of things was some time ago, but based on -- just so I understand what you just said, your recollection of the last time you were working in a custody capacity at ISP, the procedure was that the prisoner firefighters were not activated in response to every fire; is that correct?

A. Well, just -- you could just -- did send them off your unit. You just didn't open the door and say run to the fire department. The shift supervisor had the responsibility of saying, "Get the fire department." And you're also talking a long time ago.

Q. And I think you anticipated, perhaps, the next -- or strike that.

Any content of the Session 1 training related to the prisoner firefighter program

Page 154

would be reflected on that written task list that you were describing earlier; is that correct?

A. Correct. If it's mentioned, it would be mentioned in the emergency procedures for fire.

Q. Okay. And if it's not mentioned, then that's something that would not be covered in that topic, correct?

A. Correct. And then that would be something that they would get in the post orders.

Q. Would it concern you if you would have learned that there were inconsistencies in how staff in housing units were understanding when and whether they were permitted to make and release prisoner firefighters in response to a 10-70 or 10-71 call?

MR. ELLIS: Objection. Calls for speculation.

But you can answer if you're able.

BY THE WITNESS:

A. Yeah. It's kind of short -- cut and dry, sir. I mean, it's -- it would bother me more to know that they're just opening doors and letting the offender firefighters out without authorization from the shift supervisor because that creates a danger to safety and security.

Page 155

BY MR. HEPPELL:

Q. Okay.

A. More so than that they weren't letting them out.

Q. Okay. So you would be more concerned -- strike that.

You would agree with me that if the policy was the offender firefighters should be immediately let out from their units and allowed to respond to the fire upon the 10-71 called being made -- if that was the policy and the staff in the cellhouses are not following that policy consistently, that would be a concern. Is that fair to say?

A. Yes.

MR. ELLIS: Objection.

BY MR. HEPPELL:

Q. You can go ahead.

A. That would be up to the shift supervisors to discipline their staff and make sure the procedure is being followed properly.

Q. In your view as the training coordinator, do you have any role to play in ensuring that that kind of policy is consistently followed?

A. No, sir. That would be up to the shift

Page 156

supervisors.

Q. And so is it fair to say that you've, during your time as master training coordinator, taken those steps to ensure that prison staff, custody staff, and housing units are consistently following the policy around when and how to activate the offender firefighters?

MR. ELLIS: Objection. Misstates his prior testimony.

But you can answer.

BY THE WITNESS:

A. Once again, that falls on the shift supervisor's responsibility.

BY MR. HEPPELL:

Q. Yes? Correct? You agree with me?

MR. ELLIS: Objection. Asked and answered.

BY MR. HEPPELL:

Q. Just to get a clear answer on the record, you agreed with me? You said correct? Yes?

A. What was the question again, sir?

MR. HEPPELL: Could you read back that prior question, please?

(WHEREUPON, the record was read as requested.)

MR. ELLIS: And I'll object that that

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 41 of 78
CHRISTOPHER BEAL
July 30, 2020

Page 157

misstates his prior testimony, and he answered. So I object now that it's been asked and answered.

But you can answer again.

BY THE WITNESS:

A. And, correct, that would fall on the shift supervisor.

BY MR. HEPPELL:

Q. Is there anything in the new employee training that discusses fire drills at the prison?

A. Yeah. Once again, if it is, it's in that Session 1. And, again, the fire drills are going to be stated in the post orders, which there is actually a task for them in the Session 1 that they're supposed to read and know the post orders on your unit.

Q. In your capacity as facility training coordinator, have you -- strike that.

In your capacity as facility training coordinator, do you review reports that are made of the fire drills to review whether custody officers are correctly following the evacuation procedures on which they've been trained through the training programs you oversee?

A. No, sir.

Page 158

Q. Okay. And why is that?

A. I believe the fire -- fire drills are conducted and maintained by the safety manager.

Q. Okay. Is it your expectation that if there were concerns about how the officers were conducting the fire drills, that those would be brought to your attention so that you could look at whether the training needed to be updated or altered with regard to fire hazard?

MR. ELLIS: Objection. Calls for speculation.

But you can answer.

BY THE WITNESS:

A. My expectation would be that they would go to their shift supervisors.

BY MR. HEPPELL:

Q. When you say "they," who are you referring?

A. I'm sorry. I meant the safety manager. The people that are monitoring the drills.

Q. Okay. So that's -- that's not something that in your view, you, as the facility training coordinator, have any role in improving the training programs to address issues like that. Is that fair

Page 159

to say?

A. Correct.

Q. I want to bring up a copy of one of the sets of training records for one of the officers that was involved in this incident in the Devine fire. I'm going to mark it as Exhibit 5.

MR. ELLIS: Sam, your mic is kind of going in and out. I'm not sure if it's because you're not close to it or what. I just want to make sure we're audio recorded here.

MR. HEPPELL: Thank you. I appreciate that. I will try to speak a little clearly.

MR. ELLIS: You're good.

MR. HEPPELL: Is that better?

MR. ELLIS: Yes.

MR. HEPPELL: Okay. Thanks, Ben. Please do let me know if -- if anyone can't hear me because -- well, Ben has already questioned the value of my lines of questioning -- any value they might have is going to be diminished significantly if no one can hear me.

I am marking as Exhibit 5 a set of training records that were produced in discovery. It's a two-page document. Let me share that on the screen here.

Page 160

(The document was thereupon marked for identification as Beal Exhibit No. 5, as of July 30, 2020.)

BY MR. HEPPELL:

Q. Those are training records for Justin Rodriguez. It is a two-page document. It's Bates stamped 4704 and 4705. That's in the bottom, left corner because I've rotated the document sideways. It's a two-page document. Although, the second page, it's very little content on there.

Mr. Beal, are you able to see the document that I'm sharing?

A. Yes, sir.

Q. Okay. Are you familiar with this format of document?

A. Yes.

Q. Can you explain -- can you explain this format of document?

A. Yeah. This is the electronic learning management. We call it the ELM for short. And this is the transcript. Once a staff member has completed whatever training it is, we would go in -- electronically go in and enroll him. If they pass and completed the course, we will pass and complete

DENISE DWYER, et al. v.
RON NEAL, et al.                     Cause No. 3:18-cv-00995-JD-MGG                     CHRISTOPHER BEAL
USDC NND case 3:18-cv-00995-JD     document 203-12     filed 03/29/21     page 42 of 78   July 30, 2020

Page 161

and close it out, and then it goes to their individual learner transcript. And so it would just show a listing of everything that they received, depending on when you run the dates through. You can see this one looks like it was from 7/1/16 to 6/26/17.

Q. And is that intended to be an exhaustive repository of all of the training that a particular officer has received in connection with their employment with the Department of Correction?

A. Yeah.

MR. ELLIS: Objection. Calls for speculation.

But you can answer if you're able.

BY THE WITNESS:

A. Yeah. This is the -- this is, like, the main go-to document that we use to record and track their training.

BY MR. HEPPELL:

Q. Okay. And the discussion we were having earlier about the -- well, strike that.

Looking at this -- the training that's reflected on this training record for Officer Rodriguez, Justin Rodriguez, reflects a total of 340 hours that's listed at the bottom over on

Page 162

Page 2 there, and it has the different topics and the course name listed throughout.

Is this -- does this training record reflect basically that this person has gone through and completed the new employee training program?

A. Let's see. Yes. That would be somebody who's completed everything that they needed and some additional training that we offered them prior to starting working unsupervised.

Q. And can you identify the additional training on here that's outside of the scope of the standard employee training?

A. Yeah. You have an hour for ethics, an hour for information resource use agreement. Those are both computer-based training modules. There is five hours for traumatic brain injury, which is now offered in the academy. You've got an hour for sexual harassment refresher. Two hours for criminal agent. Five hours for restrictive status housing unit. That's a CDT. And then another 16 hours for the classroom-based status housing unit, and three hours down at the bottom for electronic orientation. So those are all additional trainings.

Q. Okay. And then this is based upon your knowledge of how these records are kept, and these

Page 163

records are intended to reflect -- this should be a complete recitation of all the training that this officer had received? At least up to the date of June 26, '17, where -- at the top of the document, it listed the time period, correct?

A. Correct. For this one, yes. You may have some people who hire and quit before we can get them into the system and give them their training documentation, but then we wouldn't be here because, you know, they would have still been in on-the-job training.

Q. Then in terms of the discussion we were having earlier, the fire emergency plan portion of the training, that would be reflected on this transcript under the DOC, underscore, net, underscore, Phase 1 portion?

A. Phase 2.

Q. Phase 2. Session 1 of Phase 2?

A. Correct.

Q. Thank you for correcting me anyway, though.

I'm going to pull up another document that is a record of a fire drill that was conducted. I'm going to name this one Exhibit 6.

Page 164

(The document was thereupon marked for identification as Beal Exhibit No. 6, as of July 30, 2020.)

BY MR. HEPPELL:

Q. Are you seeing this new document, Exhibit 6? And I'll just state for the record, it's a two-page document Bates stamped Devine 133032 through 33. It's a two-page document. The first page is listed at the top "Indiana Department of Correction Fire Evacuation Drills," and the second page is called "Fire Drill Questions."

Are we on the same page looking at the same kind of two-page document, Mr. Beal?

A. Yes, sir.

Q. Okay. Are you familiar with this format of document?

A. I've seen it, but it was a long time ago.

Q. Okay. Have you ever reviewed documents of this format at all in relation to your duties as the training coordinator?

A. No, sir.

Q. Okay. And what's your understanding of what this document is, based on the familiarity you have with it?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD document 203-12 filed 03/29/21 page 43 of 78

Page 165

A. Well, it's a -- they run a fire drill. They have to document who was involved with the drill. I believe on the front side there may be something up there that shows the time. Maybe not -- yeah, there it is. Yeah. 6:35. And then they have to answer some questions on the back. And I believe -- so -- it's look like they did it on night group.

Q. And, again, so based on your understanding of the document and what you're seeing on the face of the document here, this would appear to be a record of a fire evacuation drill that was conducted on April 27, 2017, at 6:35 p.m.?

A. 4/27/17? Correct. That's what it appears to be.

Q. And in D cellhouse; is that correct?

A. Yes. DCH.

Q. And turning to the back page, you can see it lists opposite of Rodriguez and the signature of Justin Rodriguez. Do you know an Officer Justin Rodriguez?

A. Well, I obviously did. He came through training, but I see so many faces that, if they don't stick around, I can't recall them.

Q. Sure. You don't have any specific memory

Page 166

of him one way or the other?

A. No.

Q. Okay. And the assessment listed at the bottom of this report states "Score: Poor." And it's written in there "Officer Rodriguez doesn't know anything." Do you see what I'm referring to?

A. Yes, sir.

Q. That's something -- well, strike that.

You would agree with me that that's concerning if an officer as a fire drill conductor -- then the assessment is "they don't know anything" -- if that assessment is given at the end of the fire drill?

MR. ELLIS: Objection. Calls for speculation.

But you can answer if --

BY THE WITNESS:

A. I'm actually more concerned about the person who wrote that.

BY MR. HEPPELL:

Q. Can you explain what you mean by that?

A. That's extremely vague and unprofessional. So, I mean, I don't even know why somebody would write this. If I was conducting a fire drill and Mr. Rodriguez did poorly, I would at

Page 167

least list out where his weaknesses were, so he could focus on strengthening those. Insulting him saying he doesn't know anything -- yeah.

Q. So looking at this document -- the two-page document I'm showing you -- the thing that causes you greatest concern with this document is the way in which Officer Rodriguez's performance has been documented by whoever completed this form?

A. Well, yes. Let's start --

MR. ELLIS: I lost half of that question. I don't know if you were able to hear, Mr. Beal.

It sometimes seems like you're very clear, and then it phases out a bit. So, usually, I can hear it still, but that time I couldn't hear what you were asking.

MR. HEPPELL: And I'm going to try to hold up my microphone up like this. I've noticed that -- I'm not sure if that's an issue with the Zoom because there was a period earlier when Mr. Beal's questions -- Mr. Beal's answer got very quiet, and then it faded in and out. Hopefully, if I do this, it will be clearer.

I can just re-ask the question, so it is clear for everyone.

Page 168

BY MR. HEPPELL:

Q. Mr. Beal, is it fair to say then that the thing that causes you most concern about this particular document we're reviewing is the way in which Officer Rodriguez's performance has been documented by whoever completed this document?

A. Yes. If this was actually being submitted to me as saying this man needs training, this tells me absolutely nothing of -- because I refuse to believe somebody doesn't know anything. So, to me, it's just somebody was having a bad night because they had to come in and do a fire drill or they didn't like this kid or, you know, whatever it is. That tells me absolutely nothing. It is so vague and insulting. I couldn't do anything with it.

Q. So looking at this document -- strike that.

I understand that it was not your practice and is not your practice to review fire drill documentation like this in your capacity as training coordinator; is that correct?

A. Correct.

Q. If that was your practice and you were to review a document like this, is it -- am I understanding correctly that seeing something like

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 44 of 78

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

Page 169

this would not cause you to make changes to the training program in relation to fire response?

A.   To the program?  I mean, you know, this sounds like an individual that may not have even cared to try to do it correctly.

Q.   There is nothing in here, from your perspective, that demonstrates a need for better or different training for officers in regard to fire response for evacuation procedures?

A.   Not -- like I said, the very vague insulting information I'm seeing -- I either see somebody that just didn't like that person, or this person just didn't care about trying to do the job right.

Q.   Okay.  Are you familiar with a document at the facility at Indiana State Prison called emergency manual?

A.   Yes.

Q.   What's your understanding of what that document is?

A.   That has several different policies and procedures concerning different emergency situations.  It's a classified and restricted document that has to be kept in specific areas.  It's just not out in the open.

Page 170

Q.   And fair to say, then, that line level correctional officers working housing units don't have ready access to review the emergency manual?

A.   The vast majority of the staff don't have ready access to examine that manual.  The post orders would come based off that manual.

Q.   Okay.  And so fair to say there is no aspect of that emergency manual that are used during the employee training?

A.   If anything comes from that emergency manual, it would be Session 1 because there is several different emergency procedures that are covered in Session 1.

Q.   Okay.

A.   And that would have been derived from the emergency manual.

Q.   Thank you for that clarification.

So, again, those would be reflected on task sheets that we used for that on-the-job training?

A.   I don't know if it would make a reference to the emergency manual, but the content would be derived from the emergency manual.

Q.   And I appreciate that clarification.

So there may be content derived from

Page 171

the emergency manual.  It may reflected on the training sheets, and it may not reference the emergency manual.

But if I want -- if I want to understand the contents of any training given to new employees, I'd have to look at the emergency manual because it's either on the task list or they're not trained on it, correct?

A.   Correct.  There are certain things in there, like, you know, what to do if there's an employee work stoppage.  Well, you don't put that in Session 1 of your training manual.

Q.   Sorry.  I didn't mean to cut you off.

Specifically with regard to fire response or fire evacuation procedures, to the extent there is any discussion of that in the emergency manual, if that's not contained in the task list for Session 1, then that's not something that new employees would be trained on through their employee training.  Is that fair to say?

A.   Not through the task sheet, but, once again, I'll still reflect back to the post orders.

Q.   Got it.  Outside of the task sheet and the post orders, there wouldn't be any other way that emergency manual instructions would be made available

Page 172

to new employees?

A.   Not in their work environment.  That would be something they could go to the deputy warden's office and ask to see.  I forget some of the other areas where it is secured.  They do have access.  They just have to get permission to get the access.

Q.   Okay.  Is it an expectation conveyed to new employees that they are to seek out that emergency manual and familiarize themselves with sections of the emergency manual related to, for example, fire emergency response?

A.   As a manual --

MR. ELLIS: Objection.  Calls for speculation.

But you can answer.

BY THE WITNESS:

A.   As an expectation, no.

BY MR. HEPPELL:

Q.   Okay.  Is that conveyed to them that that's an option?  Something they can do if they want to?

A.   They are --

MR. ELLIS: Objection.  Calls for speculation.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 45 of 78

Page 173

But you can answer.

BY THE WITNESS:

A. They are made aware of the -- where the emergency manual is, and they also have access to the policy and procedure manual up in the training department.

BY MR. HEPPELL:

Q. And the policy and procedure manual is not a restricted document; is that correct?

A. Correct. To my knowledge, there is no restricted documents in the policy manual. That would be something you would have to go to your policy manager and review.

Q. And so that's something that employees would not need permission to review? They could just go and review that?

A. Yes. Our training department is open. If they are up during training, if they want to stop in on their day off or when they get off shift, they have direct access to go to that training -- training policy.

Q. Is there anything during your new employee training that there is an expectation conveyed to the employees that they are expected to go up and review that policy manual?

Page 174

A. An expectation, no.

Q. What's your understanding, Mr. Beal, of how frequently there are fires at Indiana State Prison?

A. My understanding? If I read the morning minutes and it's in the morning minutes that a fire had been started on D cellhouse or if I'm near somebody who has a radio and I hear 10-70 or 71, that would be the extent of it.

Q. Okay. When you say "morning minutes," can you explain what you mean by that?

A. They have a department meeting that they can't always do in the morning. Sometimes the department heads will get together in the morning and discuss the events maybe over the weekend. They have a specific name for it. I can't remember off the top of my head, but -- yeah. And, like I said, it may get mentioned, and it may not. They start fires an awful lot at D cellhouse.

Q. So you do have an understanding, just based on your presence at the facility, that fires are frequent specifically in B cellhouse. Did I understand you correctly?

A. D cellhouse.

Q. D cellhouse?

Page 175

A. Yeah. Our restrictive status housing unit.

Q. And is it fair to say that fires are more common -- most common in D cellhouse, but not uncommon in the other cellhouses? Is that your impression?

A. I would say very common on D and very uncommon anywhere else off of my knowledge.

Q. Do you make it your practice to review the morning minutes?

A. If they -- when they get posted, if I have time, I'll read over them. If it's been two or three days, it's kind of pointless because it covered incidents that happened the night before.

Q. So it sounds like you frequently, but not always, review the morning minutes. Would that be accurate?

A. Correct. Just don't tell my boss.

Q. Understood. You may be pleased to hear that it would be a violation of my ethical rules if I were to communicate anything directly to your boss. So you'll have to ask for Ben's commitment on that.

So I don't think I covered this earlier. As the training coordinator, who is your -- who is your direct report? Who is directly above

Page 176

you?

A. I report directly to Jason Nowatzke.

Q. So he has supervisory responsibility over you?

A. Correct.

Q. And previously it was Mr. Gann who held that position; is that correct?

A. Correct. No. No. Sorry. Mr. Payne. George Payne.

Q. Payne?

A. And then it was Mr. Gann before him.

Q. Gann and then Payne and now Mr. Nowatzke?

A. Yes.

Q. And those are three different people who have been above you in the chain of command during the course of your time as facility training instructor -- facility training coordinator?

A. Actually, it goes all of the way back to Mr. Neal. Mr. Neal was the deputy warden of operations. So I've served under four different deputy wardens now.

Q. So you have outlasted many of your bosses?

A. Well, they went on to promote. I'm still stuck. So --

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020
USDC INND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 46 of 78

Page 177

Q. I guess depending on how you want to look at it.

A. Yeah.

MR. HEPPELL: Could we take a five-minute break? I've kind of reached a natural pause point. I'm going to reorganize my thoughts; and, hopefully, the five minutes will streamline going forward.

MR. ELLIS: Okay. Bathroom break.

MR. HEPPELL: Bathroom break. We'll go off the record and come back in five to ten minutes or so.

Thanks, everyone.

(WHEREUPON, a short break was taken.)

MR. HEPPELL: Back on the record. I think I'm nearing the finish line here. I have a few more topics to touch on, I think, fairly briefly.

THE REPORTER: I'm having a hard time hearing you again.

(WHEREUPON, a discussion was had off the record.)

BY MR. HEPPELL:

Q. Mr. Beal, would you agree with me that there was no rule or policy at Indiana State Prison that prevented you from proposing changes to the --

Page 178

to the new employee training program or at least changes to the on-the-job training portions of that program?

A. That would be a fair assessment.

Q. And would you agree with me that the purpose of that new employee training was to ensure that any correctional officer going through that training was ready on day one to -- to handle any situation that might arise at the prison. Is that fair to say?

A. No. Actually, that wouldn't. That would prepare them to do the basic skills of the job. There's other trainings down the road that they're not even qualified for yet to do for any situation.

Q. Well, let me ask it this way: Fair to say that the purpose of new employee training was to provide new correctional officers with a basic set of skills that would be sufficient for them to safely deal with any situation they might encounter -- strike that. That's a bad question. Let me try and ask it --

Let me ask it this way: Are -- fair to say that you're aware that after completing the new employee training, new correctional officers hired at the Indiana State Prison are permitted to

Page 179

serve as correctional officers unsupervised?

A. Correct.

Q. And it would not be a violation of Indiana State Prison's policies and procedures to, for example, have three relatively newly-trained officers, for example, with less one year experience to be by themselves in the cellhouse overnight?

A. Correct.

Q. Okay. And so you would agree with me that it's important for the new employee training to provide new correctional officers at least with the skills needed to safely operate a cellhouse by themselves as the only line officers at the cellhouse. Is that fair to say?

A. It prepares them with the basic skill set to work unsupervised. As far as running the cellhouse, yeah, you know, we have sergeants and veteran officers that are called officers in charge that would actually be running it. It's not like you complete OJT and then you're in charge of C cellhouse.

Q. So is it your understanding that the -- completing the basic -- strike that.

As the training coordinator at Indiana State Prison, is it your opinion that merely

Page 180

completing the new employee training without additional training would not be sufficient to equip an officer to serve in an officer-in-charge position?

A. The training itself wouldn't designate the officer in charge as much as just experience. You know, no training program that you put together will ever prepare somebody 100 percent. You have to have, you know, that experience. You won't get that true experience until you're working unsupervised. We prepare them enough with the skill set and the mindset to go in and work, you know -- work a range, work inside the dorm. You know, work various posts unsupervised, and that's where they can gain that -- gain that experience to where when the sergeant does call off, "Hey, this is the go-to person. You know, they know how to run the cellhouse."

Q. With that -- in your opinion, what's a minimum amount of experience that's necessary for someone to discharge the responsibilities of officer in charge?

A. Honestly, sir, it varies on the person. You could have somebody that could do it right off OJT, and I could have somebody that's been here for five years and they're not going to do a good job at it just based off the person.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 47 of 78

Page 181

Q. If someone were to have, say, less than one year of experience and is going to be placed in that officer-in-charge position, would you expect that that person would be carefully selected as someone who stands out based on their experience and abilities?

A. If I was a shift supervisor, that's what I would do.

Q. Okay. And based on your experience as a correctional officer and specifically with regard to training new correctional officers, it wouldn't be appropriate to have someone relatively new to put in an officer-in-charge position without making an assessment of "Is this the type of person that's well equipped to handle that responsibility this early?" Is that fair to say?

A. Yes and no, sir. That's kind of a broad question. You have to remember that we're a prison that operates 24/7, and staff shortages -- you know, I've been there myself. You know, 17 years ago, and we had a staff shortage, and there I am two weeks, a week out of the academy, and I'm the officer in charge of the main dormitory at the women's prison. They receive enough training to where they can function in that position. It really boils down to

Page 182

the person's ability to do it.

Q. We talked a little bit earlier about the new employee training and how staff were trained on the different policies and procedures that apply to their work at the prison.

I just want to is it clarify. We talked about the written task lists that were used throughout the Phase 2 and 4 training; is that correct?

A. Yeah. Sessions 3 and 4 during Phase 4.

Q. And then you also made reference to the post orders, and one of the tasks that would be required in the on-the-job training would be to review the post orders of whatever particular post an officer was assigned to; is that correct?

A. Yes. Correct. In Session 1, post orders -- the task sheet -- and that way the -- of course, we're going to tell them anyway, but that way they're -- right off the bat their first day going to the field they understand the importance and the necessity of being familiar and reading those post orders as those post orders can change.

So I may have went over to C cellhouse and worked there for a month, and then I was somewhere else for six months. I come back to

Page 183

C cellhouse. The first thing I need to do is read those post orders again because they may have changed and/or to refresh.

Q. And is there -- strike that.

Are the written policies themselves -- like the actual either department-wide policies or the facility directives -- are those used during the new employee training at all, or are they only used to the extent that their content is incorporated in the post orders or is incorporated into the written task lists?

A. They'll be -- they'll be used in, like I said, content because all of our training does come from policy and procedure. And, like I said, they do have access to the policy manual. And then some of the knowledge-based training, the policies will be covered based on what specific topic. You know, the prison rape elimination act. There is going to be a lot of Indiana codes that are mentioned referring to the prison rape elimination act, the use of force policy, when we do use of force, and things of that nature.

Q. I'm going to show you a document briefly. I've marked it as Exhibit 7. It is a four-page PDF. It is Bates ranges Devine 68541 through 68544.

Page 184

(The document was thereupon marked for identification as Beal Exhibit No. 7, as of July 30, 2020.)

BY MR. HEPPELL:

Q. I don't want to get into the content specifically of this incident. But just looking at that first page, this is an e-mail from Jeremy Dykstra to a number of individuals who are the recipients of this e-mail; is that correct?

A. That's what it appears to be.

Q. And you are listed as one of the recipients of that e-mail, correct?

A. I see my name up there.

Q. Okay. And there is an attachment, which is described as an incident report. Do you see that listed?

A. Yes.

Q. And then without getting into the details of what happened, this is a -- Lieutenant -- I guess then Lieutenant Dykstra's describing an incident involving a Signal 3000 that was called related to a prisoner; is that correct?

A. That's what it appears to be.

Q. And Signal 3000 is a medical emergency,

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020
USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 48 of 78

Page 185

correct?

A. Correct.

Q. And I think you had testified earlier about your being made aware of incidents at the prison.

Does it surprise you to see your name on the recipient list for the incident report?

A. Yeah. I don't recall this. And Lieutenant Dykstra may have put in a thing for department heads. I mean, I'm seeing all kinds of names in here of -- that incident report shouldn't have went to them. I mean, I've got a secretary there. They've got the re-entry coordinator there. Yeah. So it could have been a typo on his part.

Q. Okay. Would it surprise you if there were a number of similar incidents where your name appeared on the list by e-mail in a similar format as this one that were in your e-mail account?

A. Yeah. Because I don't recall those.

Q. Okay. It's your testimony that you were not routinely and, in fact, you don't generally recall ever receiving incident reports sent to you by e-mail; is that correct?

A. Yes.

Q. I want to show you another exhibit. I've

Page 186

marked it as Exhibit 8. It is a 28-page document. Let me pull it up on the screen here. Its Bates ranges are Devine 68426 through 68453.

(The document was thereupon marked for identification as Beal Exhibit No. 8, as of July 30, 2020.)

MR. HEPPELL: Just in the interest of time, I just want to put on the record that the version of the document I'm showing has some highlighting on it. That's highlighting that I just added to guide me, so we can move through it quickly. That's not highlighting that is on the document itself. I'm just hoping to jump to a few things, hopefully, without taking up too much time.

BY MR. HEPPELL:

Q. Are you able to read that front page of the document? The first page? Or do you need me to zoom in?

A. No, I can see it. It says "Please find attachment results in the needs assessment survey for your facility. If you have any questions, please let me know. Matt."

Q. And that's an e-mail that was sent to you from an individual identified as Matthew Andrick,

Page 187

curriculum development manager?

A. Correct.

Q. Is this -- and then it looks like the results of a survey -- both numerical results and some descriptive or comment-based results of the survey in the following page of that document. Is that fair to say? Fair assessment of the format of this document?

A. Yes, sir.

Q. Is this document the type of document you were referring to earlier as one of the ways that you would evaluate the quality of the training that was being performed?

A. Yes, sir. That's the surveys that go to -- for our needs assessment, so we would get those surveys back and compile a needs assessment.

Q. Okay. And zooming in a little bit and then moving on to some of the substantive pages, there are both quantitative measures like people identifying their classification. It can be broken down into statistics, and then there is also qualitative descriptions as to folks being given the opportunity to offer feedback on the quality of the training programs, correct?

A. Correct.

Page 188

Q. And there are -- is it your practice to review these assessments carefully when you receive them?

A. When I receive these, I actually scroll down further to hit the needs assessment, and there's going to be a list of responses from the staff themselves on what they want to see an improvement on training. Things of that nature. And then we go from there.

Q. Okay. Do you -- is it your practice to review the question and the -- specifically the responses that are given to the question, "Do you feel topics covered during in-service are helpful in your daily work duties?"

A. Yeah. That graph right there that you're looking at, that's my main review part.

Q. Okay. Do you -- so looking at the graph, it reflects that 70 percent answered the question yes -- 71 answered yes and 28.9 answered no.

Do you go on to review beyond that top line statistic and actually review the comments that folks have left?

A. I think the only time I review the comments is when -- when the negative outweighs the positive or a certain percentage of positive is not

Page 189

reached. So 71 percent yes and 28 percent no. So that one should have been reviewed. I think it is anything under 80 or 70 percent that we're going to review the responses to try to find out why they felt that way.

Q. Okay. Is that a written policy or written guideline that you should review the comments if it is under 80 percent, or is that just a personal practice that you've decided to follow?

A. I think I -- one of the other training coordinators said that's what they did. Obviously, you're going to have some people that are just going to put negative stuff to begin with. So if you're showing a vast majority of positive in your -- in that question or that field, we want to focus on the ones that are showing a much less positive or a higher negative to see where we've got to try to make some corrections.

Q. And so if I understood you correctly, this sort of percentage -- while, obviously, the majority positive -- falls into the range of something that you would in your practice look at the specific comments?

A. Yeah. I can't remember if I have 70 or 80. What I set it at. It might have been 80.

Page 190

Q. Okay. Looking at some of the specific comments here, response No. 2 reflects "I believe staff brush off yearly training as in it doesn't do anything for them. It is very repetitive from year to year." Do you see that comment?

A. Yeah. Actually, we'll get a lot of that. And, unfortunately, due to ACA standards, the majority of our in-service training has to take place. So there's not a lot of room to implement. Like, you're always going to have suicide prevention. You're always going to have use of force, personal protection, security skills. Those just -- those can't leave. And that's the bulk of your training. So that's why I'll focus on other training that they can try to get in and change it up, but there is literally nothing we can do about the majority of the annual in-service training as it is an ACA requirement.

Q. Okay. So understanding and recognizing that there are ACA requirements that prevent in terms of being able to avoid repetitiveness, does it concern you to see a comment suggesting that this person -- at least from their perspective, that the staff was brushing off their yearly training?

A. It's concerning, but after 17 years,

Page 191

unfortunately, some veteran staff that -- that's -- they don't -- that's just going to be their opinion. It doesn't mean that they're not grasping the material. It's like, "Okay. It's training. Let's hurry up and get it over with." And I'm not the most popular department here at the prison.

Q. But, hopefully, not the least popular?

A. I don't know. I'm pretty low down there.

Q. Fair enough. Again, looking at Comment 6, the portion I've highlighted, "It's like pulling teeth to get the staff to participate in the training." Does comments like that concern you?

A. No. I mean, like I said, you know, you've got a bunch of grown adults, most of which have ceased -- they're not adult learners. They just want to come, do the job, and go home. And so to try to get them to participate -- by "participate," they're talking about getting them to answer questions. Getting them involved like that -- it's dealing with adult learners. It's just what we deal with.

We make -- we do the best that we can and make sure that they're still getting material, whether they want to be there or not.

Q. Okay. And so I don't need to go through

Page 192

everything here. But fair to say there aren't changes you made to either the contents or the format or method of conveying the training information in response to comments like these?

A. Methodology, we can change up, but, obviously, the curriculum and content, I cannot. It depends on who your training officer is. Like I said, the training officer is going to do the bulk of the training. Right now I have a very energetic, very knowledgeable training officer. So it seems like veteran staff are kind of a little more into it.

If you get somebody boring up there like myself, they may sit there and look at you like, "Oh, my God, I'm watching paint dry." You know, you try to get people involved. You know, I don't know if you've ever had to instruct or anything of that nature, but you try to ask questions. You try to get their input. Focus on their veteran experiences and try to bring them in that way. That's the best you can do.

Q. Fair to say that you personally haven't implemented any changes to the method of instruction in response to seeing comments like those on the surveys for the training?

A. Well, no. Like I say, we will go around

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 50 of 78

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

Page 193

and try to change things up. We'll move the tables around and have the tables facing a different way. You know, one time we may have one of those squeezy stress balls. And so, you know, you throw it at the person, and the person that catches it has to answer the question. So we do try the methodology to get people as involved as we can.

Q. And, you know, I do just want to note for the record that whatever -- whatever assessments other people have given you, I found you to be quite interesting during your testimony today.

A. I appreciate that.

Q. I'm not sure that you would feel the same about my questions, but we don't need to get into that.

Mr. Beal, did you review any documents to prepare for your deposition today?

A. No, sir.

Q. And I don't want you to tell me anything about the contents of any conversation you might have had with your attorney, but did you meet with your attorney or speak with your attorney to prepare for your deposition today?

A. I spoke with Mr. Ellis.

Q. And did you speak with Mr. Ellis by phone

Page 194

or meet with him in person?

A. By telephone.

Q. Okay. And on how many occasions did you speak with Mr. Ellis by telephone in connection with this deposition?

A. Once.

Q. When was that?

A. I think it was yesterday.

Q. And, again, without getting into the contents of what you discussed, approximately how long did you speak with Mr. Ellis by phone to prepare for your deposition?

A. Like, five or ten minutes.

Q. Other than Mr. Ellis or any other attorneys representing you, have you spoken with anyone else in connection with your deposition today?

A. The people that are -- work for me, Mr. Wilson and Ms. Miller, they know I'm in here doing this because I had to commandeer her office because my air-conditioner is too loud. So they know I'm in a deposition, but that's it.

Q. Any conversations with them about the substance of the subject matter that you anticipated testifying about or substance of the lawsuit?

A. No.

Page 195

Q. Okay. And you can convey my apologies to your staff whose office you commandeered when we're done. I appreciate you making yourself available in a room that we can hear and speak.

Mr. Beal, you testified earlier that you were not present at the prison on the night of the fire April 7, 2017, correct?

A. Correct.

Q. Did you play any role in any of the investigations into -- into the fire?

A. No, sir.

Q. Do you -- did you know Joshua Devine?

A. No, sir.

Q. Okay. And fair to say that, you know, given the amount of time you spend in the prison and the amount of time he would have spent in the prison, it's certainly possible and, perhaps, even likely that you would have crossed paths with him at some point during the course of your career?

A. Yes. I stand on the chow lines a lot, so it's very possible that we passed crossed -- tongue tied. Our paths crossed.

Q. Would it be fair to say that you have no recollection of anything about him as you sit here today?

Page 196

A. Correct.

Q. You couldn't describe for me what he looks like?

A. I have no idea what Mr. Devine even looks like.

Q. You're not in a position to give any information about what he was like as a person or what his habits were as a prisoner or anything like that. Is that fair to say?

A. Yes. I know nothing about the man.

Q. And you don't have any secondhand information to that effect that other people have told you about him. Is that fair so say?

A. No, sir, I do not.

Q. What about any members of Mr. Devine's family? Any --

A. I don't.

Q. -- knowledge from his family?

A. No, sir.

Q. Nothing you could say about any family members of Mr. Devine, either from personal knowledge or secondhand information?

A. Correct.

Q. Okay. And same for -- other than the fact that obviously you know he is currently

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD     document 203-12     filed 03/29/21     page 51 of 78

Page 197

deceased -- but prior to his death, you have no knowledge of anything to do with Mr. Devine's mental or physical health or anything like that. Is that fair to say?

A. Correct.

Q. You have no -- strike that.

Do you have any knowledge of how the fire in Mr. Devine's cell started?

A. No, sir.

Q. Okay. Not from personal knowledge or secondhand knowledge?

A. Correct.

Q. Mr. Beal, have you ever been sued prior to this lawsuit?

A. No, sir.

Q. Have you ever brought a lawsuit against anyone else?

A. No, sir.

Q. Have you ever testified under oath prior to the deposition today?

A. No, sir.

Q. Have you ever been convicted of a crime?

A. No, sir.

Q. Have you ever been arrested?

A. No, sir.

Page 198

Q. Have you ever been disciplined in any job in your life?

A. Yes.

Q. In what contexts have you received discipline in connection with a job?

A. A long time ago -- I may have been 20 or 21 -- I worked as an overnight stocker. And one of the meat case's refrigeration unit went out, and, you know, they had to throw away thousands and thousands of dollars' worth of meat. And since I was in charge that night, I got wrote up for it.

Q. Nothing -- no connection with your employment with the Department of Correction?

A. As of today, no.

Q. Have -- what's the highest level of education you've completed?

A. I have a masters of theology.

Q. When did you complete that?

A. In early 2011.

Q. And where did you get your masters of theology?

A. Southern Indiana Baptist College.

Q. And do you also have a bachelor's degree?

A. Yes.

Q. When and where did you complete your

Page 199

bachelor's degree?

A. Southern Indiana Baptist as well, and the date I can't remember offhand.

Q. Was that prior to you beginning your employment with the DOC?

A. No. It was all after.

Q. All after. Okay. What was the course of study in your bachelor's degree?

A. Theology.

Q. And where did you grow up? Where did go to high school?

A. Perry Meridian High School.

Q. Whereabouts is that?

A. Indianapolis south side.

Q. Did you grow up in Indianapolis?

A. Yes.

Q. Have you been living in the Michigan City area ever since you transferred up to ISP?

A. Yes.

Q. How did you first come to learn that you had been named as a defendant in this lawsuit in connection with the fire at ISP on April 7th, 2017?

A. It would have been Pam James. I can't remember if it was verbal or an e-mail.

Q. You're aware that there's a number of

Page 200

other individuals named as defendants in that lawsuit, including a number of officers who were on staff at the facility that night, Warden Neal, and then a number of other department heads or supervisory-level folks at the facility?

A. Yes.

Q. Okay. Have you talked with any of the other defendants in the lawsuit about -- about the lawsuit or about the -- events of the fire that night?

A. No, sir.

Q. Okay. How would -- how do you describe the nature of your relationship with Warden Neal?

A. I think we have a good working relationship. I've worked for him now for many years. Promoted twice up underneath him, so I think we have a good working relationship.

Q. Would you describe yourself as friends with Warden Neal?

A. No.

Q. How would you describe your relationship with Kenneth Gann?

A. Same way. He was the major custody supervisor when I first transferred here, and then he went on to be deputy warden. So I worked for him for

Page 201

several years, so we had a good working relationship as well.

Q. Okay. Would you describe him as a friend?

A. No.

Q. Same question for William Lessner?

A. Mr. Lessner? We have a working relationship. We don't really interact that much unless I'm having -- obviously, he's over investigations. Usually, if I'm having an issue with one of the staff members -- new staff members -- something questionable, I'll get ahold of usually somebody else in his department. So just a -- your standard working relationship with Mr. Lessner.

Q. How would you describe your relationship with Steven Griffin?

A. Mr. Griffin? We actually -- I knew him when he still worked at the boot camp. We -- he was the trainer there at the boot camp. So we traveled together down to New Castle on several occasions for some training, and then he came here as the safety manager. He was a nice guy. We had no problems.

Q. Would you describe him as a friend?

A. No, sir.

Q. What about Jason Nowatzke?

Page 202

A. Oh, same. He was actually a lieutenant when I transferred here. And he was the K-9 commander. I was on E squad. So good working relationship.

Q. Would you describe him as a friend?

A. No, sir.

Q. And what about Anthony Watson? Do you know Anthony Watson?

A. Yes. Yes. He was lieutenant for a period of time. We were E squad members together. He was a nice guy.

Q. Would you describe him as a friend?

A. No.

Q. What about Timothy Redden? How would you describe your relationship with Timothy Redden?

A. Tim Redden? I watched him go from an officer up to lieutenant. I believe he's now with parole. A stand-up guy. I like him.

Q. Would you describe Mr. Redden as a friend?

A. Yeah, I would. We're not, like, hangout friends, but friendly, yeah.

Q. What about Christopher Puetzer?

A. Puetzer? I know Puetzer. He works night shift, so I'm not -- not a lot contact with him.

Page 203

Q. Would you describe him as a friend?

A. No, sir.

Q. What about Ryan Statham?

A. Mr. Statham. Yeah. He's a -- I hated to see him leave. He was a really good -- really good officer and sergeant and FTO, and he went on to parole. Very good guy.

Q. And would you describe him as a friend?

A. No, sir.

Q. Do you know -- I think I asked you earlier. We were looking at his training records. I understand that you don't know Officer Justin Rodriguez; is that correct?

A. Offhand, no, sir. Like I said, obviously, I did because, you know, I would have been supervising when he trained, but I can't recall him.

Q. Okay. What about Sarah Abbassi?

A. Not ringing a bell.

Q. Okay.

A. You have to understand my -- you know, with the influx of new staff I have, plus the new staff I see down when I go to assist at the academy, and for all these years here, there's hundreds upon hundreds of people.

Q. Sure. And so with my, you know,

Page 204

representation to you that Sarah Abbassi was one of the three officers on duty in B cellhouse the night of the fire, to the best your knowledge, you don't recall any attraction to that person?

A. No.

Q. Okay. And what about Promise Blakely?

A. Promise Blakely. She was here not too long. Her mother worked here longer than she did. I remember -- I might be able to point her out, but that would be it.

Q. No specific memory with any interactions with Promise?

A. No.

Q. Have you spoken with anyone other than your attorneys about this lawsuit?

A. No, sir.

Q. Have you spoken with anyone other than your attorneys about the April 2017 fire?

A. No, sir.

MR. HEPPELL: Your attorney might have some questions for you or he might not. And if he does, I might have some follow-up, but I don't have any more questions for you at this time.

MR. ELLIS: As usual, I'm going to give him a call.

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 53 of 78
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

Page 205

Do you want to put your objection on the record?

MR. HEPPELL: I will just briefly note our objection for the record to communication between counsel and the witness on the subject matter of the deposition while the deposition is in progress.

MR. ELLIS: Before I give you a call. Mr. Beal, would you -- mute -- mute your mic and stop your video.

THE WITNESS: Yes.

MR. HEPPELL: And we'll go off the record. I'm stopping the recording now.

And just flip your video back on, Ben, when you're ready.

MR. ELLIS: Will do.

(WHEREUPON, a short break was taken.)

EXAMINATION

BY MR. ELLIS:

Q.   Mr. Beal, I just have one question for you.

Have you discussed any of the -- discussed this lawsuit or any of the events underlying it, such as the fire that occurred at ISP on April 7th, using your personal cell phone or

Page 206

personal e-mail or social media account?

A.   No, sir.

MR. ELLIS: Okay.  That's all.

MR. HEPPELL: No follow-up based on that.

Mr. Beal, thank you very much for your time today.  I appreciate it.

THE WITNESS: You're welcome.  Thank you.

MR. ELLIS: We're going to read and sign.

(Signature reserved.)

(WHEREUPON, at 3:01 p.m., the deposition was concluded.)

Page 207

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, APRIL D. HARGETT, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 84-4735, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 16th day of September, 2020.

April Hargett

April D. Hargett, CSR
License No. 084-004735

Page 208

STATE OF ILLINOIS )

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as            )
Personal Representative     )
of the ESTATE OF            )
JOSHUA DEVINE,              )
                            )
          Plaintiff,        )   Case No.
                            )   3:18-cv-00995-JD-MGG
     vs.                    )
                            )
RON NEAL, et al.,           )
                            )
          Defendants.       )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of Pages 1 to 207, inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid, and includes changes, if any, so made by me.

_____
CHRISTOPHER BEAL

Subscribed and sworn to
Before me this
Day of            , 2020

_____
     Notary Public

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC NND, case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 54 of 78

Page 209

ERRATA SHEET
CHANGES IN TESTIMONY

DEVINE v. NEAL, ET AL.
CHRISTOPHER BEAL
July 30, 2020

PAGE    LINE    FROM                    TO

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 55 of 78

CHRISTOPHER BEAL
July 30, 2020

## A

**Abbassi (2)**
203:17;204:1
**abilities (2)**
45:18;181:6
**ability (8)**
10:6;16:17;81:12;
99:21;113:21,24;
146:18;182:1
**able (18)**
8:21;9:4;40:2,10;
65:22;109:9,9;110:17;
126:25;134:17;145:16;
154:18;160:12;161:14;
167:12;186:17;190:21;
204:9
**above (5)**
29:12;83:21;87:15;
175:25;176:15
**absentee (1)**
34:1
**absolute (1)**
67:4
**Absolutely (4)**
72:14,14;168:9,14
**ACA (4)**
141:20;190:7,17,20
**academy (13)**
38:11;39:6;41:13;
43:22;50:10;62:23;
71:17;80:15;91:23;
107:3;162:17;181:22;
203:22
**access (22)**
81:3,13,18;82:3;
83:6;99:18,22;112:12,
14;126:13,18,22;
127:5;141:17,22;
170:3,5;172:6,7;173:4,
20;183:15
**accident (7)**
123:7,10,17,19;
126:11,15;132:17
**accidents (1)**
123:15
**account (4)**
20:18;21:9;185:18;
206:1
**accountant (1)**
71:3
**accounts (3)**
20:21;21:1,11
**accurate (6)**
10:6;108:9;119:1,1,
4;175:17
**achieve (1)**
67:11
**acknowledge (1)**
55:5
**acknowledging (1)**
149:12

**acknowledgment (1)**
82:17
**across (3)**
36:24;63:17;81:7
**act (3)**
82:17;183:18,20
**acted (2)**
15:1,7
**acting (8)**
29:23;32:18;33:14,
17;34:6,17;125:15;
144:16
**activate (3)**
11:14;152:11;156:6
**activated (1)**
153:14
**active (1)**
75:10
**actively (1)**
105:24
**activities (3)**
55:9,10;57:16
**activity (2)**
123:21,23
**actual (9)**
4:10;69:20;75:15;
82:18;83:16;99:8;
116:4;147:22;183:6
**actually (61)**
16:24;20:6;21:5;
24:21;25:20;46:13;
47:4;50:8;51:3;62:24;
65:16;66:9,22;68:23;
72:20;75:17;78:6;
80:25;90:17;92:4;94:2,
4,6;95:1,4,21;96:24;
97:18;99:4;105:23;
109:2;112:12;114:12,
21;116:3,12;130:4,6,
23;131:14;134:1;
137:17,19,22;138:4;
139:21;140:15;141:14;
147:24;150:8;157:13;
166:18;168:7;176:18;
178:11;179:19;188:4,
21;190:6;201:17;202:1
**add (9)**
61:1;85:8,20;87:2;
91:2;97:13;98:9,15;
111:22
**added (10)**
57:19,24;61:8;85:23;
97:24;100:21;106:25;
121:25;142:20;186:11
**adding (1)**
96:16
**addition (8)**
6:11;21:19;37:14;
62:5;87:3,9;98:12;
118:20
**additional (18)**
38:24;48:22;60:5;
71:14,18;78:11;97:13,

23;98:15;100:21;
110:13,16;135:2;
150:17;162:8,10,23;
180:2
**additions (5)**
90:15;92:24;114:19,
21;117:25
**address (9)**
17:22;18:1,2,5;
76:13;92:25;124:12;
127:19;158:25
**addressed (1)**
36:22
**adequate (5)**
75:13;76:13;91:14;
92:15;113:4
**adequately (2)**
46:5;74:20
**adequateness (1)**
103:16
**adjunct (15)**
27:10,23;28:1,3,9,13,
19;29:13;30:5;31:13,
19,21,25;32:3,9
**administer (1)**
16:8
**administration (1)**
152:16
**administrative (1)**
87:22
**Adult (3)**
40:15;191:15,20
**adults (1)**
191:14
**advance (1)**
39:15
**advanced (2)**
106:25;116:24
**adventures (1)**
20:11
**affect (1)**
10:4
**affirmative (2)**
132:21;133:11
**again (32)**
19:7;35:20;41:2;
47:25;48:16;54:9;
63:13;89:19;98:17,24;
118:14,19;132:15;
136:23;139:7;148:9;
149:8;150:5;151:9,11;
156:12,20;157:3,11,12;
165:9;170:18;171:22;
177:19;183:2;191:9;
194:9
**against (5)**
62:2;74:2;76:8;
138:5;197:16
**agency (1)**
109:19
**agenda (3)**
86:18,21,25
**agent (1)**

162:19
**ago (6)**
50:12;153:10,21;
164:18;181:20;198:6
**agree (10)**
92:20;119:25;120:3;
140:3;155:7;156:15;
166:9;177:23;178:5;
179:9
**agreed (1)**
156:19
**agreement (3)**
4:4,13;162:14
**ahead (9)**
4:16;5:15;7:16;9:3;
89:16;125:13;130:5;
141:19;155:18
**ahold (1)**
201:12
**aid (7)**
41:11;42:15;46:2;
47:19;58:10;60:6;
62:14
**aid/CPR (2)**
38:4;41:24
**aids (3)**
119:21;120:6,15
**air-conditioner (1)**
194:20
**alarm (1)**
148:15
**alcohol (1)**
69:20
**alias (1)**
20:22
**aliases (2)**
20:24,25
**align (1)**
40:22
**allegation (5)**
75:11,12,14;138:5,
15
**allegations (4)**
74:19,25;77:2;
138:19
**allegedly (1)**
138:13
**alleging (2)**
74:16;76:11
**allowed (1)**
155:9
**alone (2)**
24:8,10
**along (6)**
55:25;60:25;61:13;
113:23;117:8;125:6
**alongside (1)**
69:10
**alter (2)**
85:20;116:25
**altered (1)**
158:9
**Although (5)**

5:13;32:11;73:21;
139:18;160:10
**always (10)**
33:23;45:17;56:17;
67:11;77:11,16;
174:13;175:16;190:10,
11
**amended (1)**
75:10
**Amendment (2)**
76:3,6
**Among (1)**
81:16
**amount (4)**
73:4;180:18;195:15,
16
**analyze (1)**
112:23
**analyzing (2)**
118:7,20
**and/or (7)**
28:15;70:2;90:18,25;
136:18;152:24;183:3
**Andrick (1)**
186:25
**Angelica (3)**
23:25;64:18;84:1
**annual (26)**
16:23;28:25;29:2,8;
107:1;113:9,12;114:7,
17;115:15,25;117:7;
120:23;121:1,12,18,20,
22,25;122:1,8,21;
135:23;142:21,24;
190:17
**answered (6)**
156:16;157:1,2;
188:18,19,19
**Anthony (2)**
202:7,8
**anticipated (2)**
153:22;194:23
**anymore (3)**
73:2;116:3;117:20
**apologies (2)**
88:22;195:1
**apologize (2)**
49:1;145:23
**appear (1)**
165:11
**appearances (1)**
96:22
**appeared (1)**
185:17
**appears (5)**
41:15;110:20;
165:15;184:11,24
**applied (2)**
109:3;111:2
**applies (1)**
89:22
**apply (1)**
182:4

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 56 of 78

**appointments (1)**
89:1
**appraisal (3)**
37:7;52:23,25
**appraisals (3)**
33:25;36:5;52:22
**appreciate (12)**
18:24;74:9;75:7;
77:16;82:21;96:16;
103:1;159:11;170:24;
193:12;195:3;206:6
**approached (1)**
31:11
**appropriate (7)**
74:15;76:18;77:3,4,
10;150:1;181:12
**appropriately (1)**
46:4
**appropriateness (1)**
103:16
**approve (1)**
25:7
**approved (3)**
17:3;85:24;90:6
**approximately (9)**
10:14;27:12,17;
28:20;39:11;50:15;
58:23;78:20;194:10
**approximating (1)**
61:20
**approximation (1)**
144:7
**April (16)**
10:9;13:17;15:23;
29:20,22;32:17;34:9;
35:6;39:15;88:13;
134:15;165:13;195:7;
199:22;204:18;205:25
**archived (4)**
82:7,10,19,23
**archives (1)**
82:2
**area (4)**
148:12,17,18;199:18
**areas (5)**
31:3;67:16;77:14;
169:24;172:5
**arise (2)**
91:16;178:9
**around (11)**
9:17;12:24;31:10;
41:4;47:16;74:19;
152:11;156:6;165:24;
192:25;193:2
**arrested (1)**
197:24
**aside (5)**
58:10;62:12;91:9;
95:9;100:4
**aspect (7)**
65:7;66:3;94:14;
95:18;98:20;100:17;
170:8

**aspects (9)**
44:17;47:11;48:3,17;
49:5;76:23;96:5;
143:17;145:10
**assaults (1)**
107:5
**assess (1)**
95:5
**assessment (23)**
74:6;115:16;122:8,
22,25;123:12;129:12,
20;135:24;136:8,22;
140:14;142:20;166:3,
11,12;178:4;181:14;
186:21;187:7,15,16;
188:5
**assessments (3)**
140:9;188:2;193:9
**assigned (36)**
10:25;11:8,17;12:2,
11,24;13:4,13;17:15;
23:8;27:10,19,25;28:6,
10,23;29:7;30:4;31:22,
25;32:10;34:13,18;
38:17;52:10;53:19;
64:19;68:13;83:25;
86:17;100:15;101:6;
119:7,11;128:6;182:15
**assigns (1)**
65:3
**assist (1)**
203:22
**associated (8)**
17:22;25:25;33:3;
49:10,25;58:16;61:6;
100:12
**assume (3)**
9:3;105:17;120:19
**assuming (1)**
137:8
**assumption (1)**
106:2
**asthma (1)**
144:15
**attached (2)**
52:24;60:20
**attachment (3)**
60:19;184:15;186:21
**attendance (1)**
54:14
**attention (6)**
88:16;128:18;132:4;
136:9;137:2;158:8
**attorney (8)**
7:10,15,17,23;
193:21,22,22;204:20
**attorneys (4)**
5:8;194:15;204:15,
18
**attraction (1)**
204:4
**audio (1)**
159:10

**audit (4)**
94:2,6,17;96:6
**August (2)**
50:12;88:11
**authority (5)**
16:25;84:2;85:19;
125:16;127:4
**authorization (1)**
154:23
**available (4)**
99:24;150:14;
171:25;195:3
**avenue (2)**
117:14,20
**avoid (1)**
190:21
**aware (6)**
26:17;103:19;173:3;
178:23;185:4;199:25
**away (6)**
7:13;85:9;103:5;
111:23;121:24;198:9
**awful (1)**
174:19

## B

**bachelor's (3)**
198:23;199:1,8
**back (44)**
9:21;38:12;39:7;
41:13;48:1;55:1,21;
58:25;62:23;65:25;
71:16;73:7,16;80:15;
90:3;97:12;111:5,8,13;
112:14;113:18;115:8;
118:17;121:2,5;
128:15;133:25;134:5;
135:6;136:2;141:25;
145:15;149:8;150:5;
156:21;165:6,18;
171:22;176:18;177:10,
15;182:25;187:16;
205:13
**background (2)**
5:23;9:23
**bad (2)**
168:11;178:20
**balls (1)**
193:4
**Baptist (2)**
198:22;199:2
**base (2)**
66:4;149:12
**based (18)**
42:8;44:9;84:14;
94:3;106:2;114:16;
146:24;153:11;162:24;
164:24;165:9;170:6;
174:21;180:25;181:5,
9;183:17;206:4
**basic (9)**
49:5;64:7,16;148:2;

150:4;178:12,17;
179:15,23
**basically (6)**
62:18;65:23;101:15;
116:8,21;162:4
**basis (10)**
18:8,8,9;34:19;63:1;
64:25;74:12;92:22;
113:10;120:23
**bat (2)**
34:23;182:19
**Bates (9)**
39:25;40:4;88:7;
108:12;115:7;160:8;
164:8;183:25;186:2
**Bathroom (2)**
177:8,9
**BEAL (41)**
4:23;5:3,15,19;10:9;
17:14;19:24;21:6;24:8;
40:7;74:17;76:9;77:21;
88:4;97:19;98:5,20;
108:19,22;115:3,11;
134:7,14;135:12,22;
160:3,12;164:3,14;
167:12;168:2;174:2;
177:23;184:3;186:6;
193:16;195:5;197:13;
205:8,20;206:5
**B-e-a-l (1)**
5:18
**Beal's (3)**
75:2;167:20,21
**bear (4)**
7:9;8:2;19:5;59:21
**became (5)**
28:25;30:4;32:18;
33:14;142:22
**become (3)**
31:13;34:20,21
**begin (1)**
189:13
**beginning (2)**
73:23;199:4
**behind (1)**
153:1
**bell (1)**
203:18
**Ben (5)**
73:17;133:17;
159:16,18;205:14
**Bend (1)**
84:21
**Ben's (1)**
175:22
**best (22)**
7:21;8:19;10:7;
39:17,20;41:3,10;
42:11;45:18;61:18;
67:4;77:11;98:9;102:1,
7;135:10;139:15;
145:19,21;191:22;
192:19;204:3

**better (2)**
159:14;169:7
**beyond (4)**
19:4;48:22;74:14;
188:20
**Bible (1)**
20:11
**big (2)**
67:7,9
**bit (9)**
25:16;43:15;59:2;
65:8;111:23;122:17;
167:14;182:2;187:17
**Blakely (2)**
204:6,7
**blame (3)**
129:15,18;132:7
**blamed (1)**
128:22
**blank (1)**
83:2
**blue (1)**
129:3
**board (1)**
63:17
**boils (1)**
181:25
**bold (1)**
109:14
**bomb (2)**
144:25;145:2
**book (2)**
68:10;80:12
**booklet (1)**
65:13
**boot (2)**
201:18,19
**boring (1)**
192:12
**boss (3)**
101:15;175:18,21
**bosses (1)**
176:23
**both (11)**
45:4;47:16;66:15;
73:5;75:1;93:16;94:22;
105:1;162:15;187:4,19
**bother (1)**
154:21
**bottom (5)**
40:1;160:8;161:25;
162:22;166:4
**boxes (1)**
67:17
**brain (2)**
87:18;162:16
**brand (1)**
150:13
**break (24)**
8:24;9:10,14,15,21;
31:2;72:13;73:7,14;
77:25;78:15;101:17;
128:9,13;133:18,20;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 57 of 78

135:16,22;136:4;
177:5,8,9,13;205:16
**breakdown (2)**
40:22;44:25
**breaks (3)**
9:7,9,12
**briefly (3)**
177:17;183:23;205:3
**bring (6)**
21:7;48:10;133:15;
137:1;159:3;192:19
**bringing (1)**
78:16
**broad (2)**
133:4;181:17
**Broadly (4)**
44:9;85:2;92:10;
125:8
**broke (1)**
138:10
**broken (5)**
39:4;43:21;49:5;
63:15;187:20
**B-R-O-K-J-V (1)**
21:7
**Brother (1)**
21:8
**brought (7)**
41:4;128:17;137:18;
141:7;149:21;158:8;
197:16
**brush (1)**
190:3
**brushing (1)**
190:24
**build (1)**
66:4
**built (2)**
31:15;65:24
**bulk (3)**
73:24;190:13;192:8
**Bullet (1)**
132:16
**bunch (1)**
191:14

### C

**call (21)**
5:25;25:17;38:1,5,
10;39:23;46:14;47:8;
63:15;77:9;82:1;
113:12;128:21;129:6;
134:25;147:21;154:15;
160:21;180:15;204:25;
205:7
**called (13)**
4:24;20:17;38:10;
57:2;92:1;152:24;
153:2,7;155:10;
164:12;169:16;179:18;
184:22
**calling (1)**

55:6
**Calls (11)**
91:17;126:23;127:6;
133:7;147:21;154:16;
158:11;161:12;166:14;
172:14,24
**Calming (1)**
107:2
**came (11)**
27:22;31:16;41:12;
60:19;62:6;63:13,14;
113:25;136:19;165:22;
201:21
**camp (2)**
201:18,19
**camping (1)**
20:10
**can (114)**
7:12,16;8:15,23;9:9,
15,20;12:20;16:21;
18:25;19:23;35:21;
36:10;37:20;42:7,10,
16,17;44:16;46:17,21;
51:5,20,25;52:17,22;
56:2,5;58:14,15;60:16;
61:23,24;62:3,11;
69:13;72:7,12;74:7;
85:8;86:10;87:18;
90:17,20,24;91:19;
92:3;93:3,8,13,21;97:8,
15,21;99:25;102:14;
105:19;108:15,24,25;
111:21,25;116:15;
117:11,18;120:7;
121:5,6;123:25;
126:25;127:8,18,23;
128:8,12;130:22,25;
133:2;136:19;154:18;
155:18;156:10;157:3;
158:13;159:20;160:18,
18;161:4,14;162:10;
163:7;165:18;166:16,
21;167:15,24;172:16,
21;173:1;174:11;
180:13;181:24;182:22;
186:12,20;187:20;
190:15,16;191:23;
192:5,20;193:7;195:1,
4
**capacity (6)**
33:20;44:1;153:13;
157:17,19;168:20
**captain (3)**
87:15,15;90:20
**captain's (1)**
53:22
**card (1)**
68:13
**cards (1)**
64:9
**care (2)**
14:10;169:13
**cared (1)**

169:5
**career (11)**
10:20;11:3,11,20;
12:5,14,21;13:7;31:7;
35:1;195:19
**carefully (2)**
181:4;188:2
**carries (1)**
110:12
**carving (1)**
62:16
**case (9)**
4:3;5:9;72:6;85:12;
137:10,14;139:4;
146:18;149:14
**cases (1)**
138:3
**case's (1)**
198:8
**Castle (3)**
16:9,12;201:20
**catch (1)**
8:3
**catches (1)**
193:5
**categories (7)**
136:20,21;139:21,
22;140:8,16;142:7
**caught (1)**
55:4
**causal (1)**
74:21
**cause (3)**
111:8;151:23;169:1
**caused (1)**
31:7
**causes (2)**
167:6;168:3
**causing (1)**
8:23
**CBT (2)**
61:11,19
**CDT (1)**
162:20
**ceased (1)**
191:15
**cell (23)**
12:9;17:14,18;22:17,
19,21;23:9,10,14,16,
16,17;136:24;148:7,8,
11,14;150:2,20;151:7,
8;197:8;205:25
**cellhouse (22)**
12:19;13:2,18;69:5,
10;146:23;165:16;
174:7,19,22,24,25;
175:4;179:7,12,14,17,
21;180:16;182:24;
183:1;204:2
**cellhouses (9)**
11:14,23;12:8,17,25;
13:10;53:20;155:12;
175:5

**cells (2)**
11:25;153:6
**central (15)**
16:11,11,13;43:23;
83:22;86:23;89:13;
106:23;113:25;115:25;
119:12;122:5;134:4;
138:24;146:15
**centralized (1)**
85:2
**centrally (1)**
85:15
**certain (5)**
51:6;116:12;140:12;
171:9;188:25
**Certainly (4)**
36:2;74:15;147:9;
195:17
**certificates (1)**
82:17
**certification (2)**
31:13;82:18
**certified (3)**
38:7,14;80:3
**chain (2)**
29:12;176:15
**chance (1)**
98:10
**change (26)**
16:2,7;28:18;39:12,
18;41:18,22;42:2,4,9;
78:19,21;83:14,14;
84:8,12;102:10;104:1;
105:20,21;111:21;
117:6;182:22;190:15;
192:5;193:1
**changed (13)**
39:10;42:15;59:3;
73:3;83:10;84:5,10;
100:22;116:21;122:4;
147:6;152:12;183:2
**changes (49)**
10:22;11:5,12,22;
12:7,16,23;13:9;15:17;
16:5,25;17:1,9;42:7,
12;53:5;83:15;84:3;
90:5,15;92:25;101:2,
23;105:13,15;106:1,9,
18,21,22;107:8,11,18,
23;108:2;113:14,21,
24;117:12;127:18;
129:20;136:17;139:9;
147:10;169:1;177:25;
178:2;192:2,22
**channel (1)**
20:6
**charge (6)**
179:19,20;180:5,20;
181:23;198:10
**Charles (2)**
24:1;26:8
**charts (1)**
60:21

**check (1)**
21:3
**checklists (1)**
83:9
**checks (1)**
65:1
**chief (2)**
107:15;139:3
**chow (1)**
195:20
**Chris (1)**
115:11
**CHRISTOPHER (4)**
4:23;5:17;21:6;
202:23
**C-h-r-i-s-t-o-p-h-e-r (1)**
5:17
**church (1)**
20:12
**circumstances (2)**
149:25;151:5
**city (4)**
24:11,13;31:5;
199:17
**claim (9)**
74:1,17,25;75:14,15,
17;76:3,8;132:21
**claiming (1)**
129:4
**claims (9)**
73:22;74:2,16;75:21,
25;76:20;129:10,10;
138:9
**clarification (5)**
75:9;103:1;146:14;
170:17,24
**clarifications (1)**
97:22
**clarify (3)**
91:3;124:22;182:6
**class (8)**
51:4,23;62:7;67:7,9;
130:10,14;131:2
**classes (3)**
51:5;107:2;116:5
**classification (6)**
53:6,16,17;70:2;
71:2;187:20
**classifications (3)**
70:21,22,25
**classified (2)**
28:3;169:23
**classroom (13)**
33:21,22,24;36:8;
44:18;45:25;47:16;
49:19,20;60:3;67:21,
24;120:8
**classroom-based (8)**
38:11;44:12,19,20,
22;45:4;62:15;162:21
**clean (4)**
6:18;7:1;31:2;35:19
**cleanly (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 58 of 78

35:20
**clear (10)**
8:6;15:22;19:2;
36:23;48:17;60:2;
83:18;156:18;167:14,
25
**clearer (1)**
167:23
**clearly (2)**
34:4;159:12
**close (2)**
159:9;161:1
**code (1)**
40:1
**codes (1)**
183:19
**colleague (2)**
104:25;141:2
**colleagues (1)**
5:11
**College (1)**
198:22
**combination (1)**
20:10
**combined (1)**
121:21
**comfortable (2)**
94:11,23
**coming (11)**
37:22;51:22;62:25;
67:18;68:17;69:3;
92:15;129:25;132:18;
145:14,17
**command (2)**
29:12;176:15
**commandeer (1)**
194:19
**commandeered (1)**
195:2
**commander (1)**
202:3
**comment (3)**
190:5,22;191:10
**comment-based (1)**
187:5
**comments (8)**
188:21,24;189:7,23;
190:2;191:12;192:4,23
**commitment (1)**
175:22
**committee (18)**
86:1,5,11,12,14;87:6,
8;88:25;89:2,4,14,19,
23,24;90:8;122:21;
140:19;141:8
**common (4)**
66:18;175:4,4,7
**commotion (2)**
12:18;13:1
**communicate (8)**
18:5,15;19:13,21;
21:11;23:6,20;175:21
**communicated (1)**

18:10
**communicating (1)**
6:22
**communication (1)**
205:4
**communications (2)**
23:13;142:24
**compared (1)**
47:2
**compile (2)**
113:8;187:16
**compiled (1)**
120:20
**compiling (2)**
114:9;118:13
**complaint (7)**
74:25;75:10,10;76:1,
6,21,23
**complete (10)**
9:19;55:20;62:1,9;
71:17;160:25;163:2;
179:20;198:18,25
**completed (12)**
52:6;56:15,19;61:21;
97:3;160:22,25;162:5,
7;167:8;168:6;198:16
**completes (1)**
80:18
**completing (3)**
178:23;179:23;180:1
**completion (1)**
43:11
**complied (1)**
120:18
**complies (1)**
120:22
**component (4)**
44:12,13;49:13;78:2
**components (3)**
45:5,25;47:12
**Compound (2)**
93:20;108:5
**comprehensive (1)**
139:8
**computer (2)**
56:5;62:1
**computer-based (5)**
61:1,5,24;62:8;
162:15
**concept (1)**
148:16
**conceptional (1)**
65:7
**concern (7)**
106:12;154:10;
155:13;167:6;168:3;
190:22;191:12
**concerned (2)**
155:5;166:18
**concerning (3)**
166:10;169:22;
190:25
**concerns (2)**

9:25;158:6
**concluded (1)**
206:12
**conclusively (1)**
75:24
**concrete (1)**
126:5
**conditions (1)**
10:3
**conduct (1)**
69:18
**conducted (3)**
158:3;163:24;165:13
**conducting (3)**
4:5;158:7;166:24
**conductor (1)**
166:10
**confirm (1)**
48:1
**confiscated (1)**
69:15
**confused (1)**
105:3
**confusion (1)**
35:11
**connected (1)**
4:6
**connection (10)**
17:15;101:11;
134:17,22;161:9;
194:4,16;198:5,12;
199:22
**connects (1)**
74:8
**conservative (1)**
20:20
**considered (1)**
24:22
**consist (3)**
58:18;89:4;147:17
**consistent (4)**
15:11,25;58:22;
63:17
**consistently (3)**
155:13,24;156:5
**constantly (1)**
35:2
**constructed (1)**
146:20
**contact (2)**
22:8;202:25
**contained (3)**
64:2;121:21;171:17
**content (20)**
20:3,7;42:3;63:12;
65:7;69:9;100:21,22;
101:2,23;110:16;
111:15;153:24;160:11;
170:22,25;183:9,13;
184:6;192:6
**contents (17)**
65:11;68:17,19;69:6;
79:11;90:5;92:13;

93:11;103:22;116:16;
120:13;142:17;146:19;
171:5;192:2;193:20;
194:10
**contexts (2)**
78:1;198:4
**continuation (1)**
62:18
**continue (1)**
134:21
**continues (2)**
89:1;113:6
**continuing (1)**
89:17
**contradict (1)**
98:4
**contradictory (1)**
98:12
**contrary (2)**
15:1,7
**control (2)**
80:7;128:24
**conversation (2)**
127:20;193:20
**conversations (3)**
6:22;13:25;194:22
**convey (1)**
195:1
**conveyed (7)**
65:11;120:14;122:5,
12;172:8,20;173:24
**conveying (1)**
192:3
**convicted (1)**
197:22
**coordinate (1)**
50:9
**coordinated (1)**
72:25
**coordinating (1)**
36:6
**coordinator (55)**
17:8,12;24:23,24;
25:18;29:11,23;32:18;
33:18;34:7,13,14;
35:14,25;36:3;37:6;
44:2,2;45:3,24;74:19;
81:12;83:7;89:6;90:11;
91:11;92:11;93:9,14;
96:9;101:1,7;107:15,
22;110:3;112:7;
115:12;118:7;119:6;
120:2;138:5;139:16;
142:23;147:7;155:22;
156:3;157:18,20;
158:24;164:21;168:21;
175:24;176:17;179:24;
185:13
**coordinators (1)**
189:11
**copy (5)**
52:24;82:3;87:20;
99:18;159:3

**corner (3)**
40:2,17;160:9
**corrected (2)**
36:20;52:1
**correcting (1)**
163:20
**correction (15)**
15:6;18:7;21:12;
22:1,25;25:14;30:1;
81:9;109:20;117:2;
122:19;129:14;161:10;
164:11;198:13
**correctional (32)**
14:25;24:22;25:2,11;
26:6,14,14,20;27:8,14;
28:4;30:7,10,12;31:9;
32:2,15;36:2;37:8;
63:21;64:1;109:24;
110:19;130:9;170:2;
178:7,17,24;179:1,11;
181:10,11
**Corrections (4)**
19:14,21;95:6;
189:18
**correctly (25)**
38:22;41:21;47:20;
48:2;66:12,21;67:1;
78:24;81:5;86:6;94:16,
20;101:10;113:19;
114:11;121:10;125:18;
131:20;138:14;146:4;
157:22;168:25;169:5;
174:23;189:19
**correspond (1)**
18:19
**counsel (4)**
36:17;74:4;98:5;
205:5
**counseled (1)**
36:19
**count (6)**
66:17,21,21,24;68:9;
148:14
**counts (3)**
65:20,21,22
**couple (2)**
59:3;135:25
**course (17)**
9:8;47:17;48:13;
55:10;57:25;67:10;
86:22;87:1;124:5;
136:21;152:13;160:25;
162:2;176:16;182:18;
195:19;199:7
**court (7)**
4:6;6:10,18;7:1,12;
134:25;137:9
**courtroom (1)**
6:6
**cover (5)**
67:25;85:3;87:1;
149:12;150:3
**covered (22)**

DENISE DWYER, et al, v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 59 of 78

48:4,12;69:24;70:6;
72:19;78:12;79:12;
85:13;90:13;93:17,18;
99:11;117:25;144:8;
148:5;150:11;154:6;
170:13;175:13,23;
183:17;188:13
**covering (1)**
131:1
**covers (1)**
150:4
**CPR (11)**
41:11;42:9,14;44:21;
46:2;47:15,18,19;
58:10;60:6;62:13
**create (4)**
55:15,18;56:6;91:1
**created (4)**
20:5;57:7;125:2;
140:4
**creates (1)**
154:24
**credit (2)**
42:21;64:9
**crime (1)**
197:22
**criminal (3)**
106:25;116:24;
162:18
**crossed (3)**
195:18,21,22
**CTI (1)**
26:19
**CTO3 (2)**
35:14;36:1
**CTO4 (3)**
29:7;35:13,24
**current (19)**
19:21;21:13,16,21;
61:14;83:17;84:7,13;
113:14;114:12,21;
116:14;118:2;136:16,
17;137:6,19;138:2;
140:18
**currently (15)**
10:18;36:1;39:10;
41:1;47:19;58:18;60:4,
10;64:18;84:1;101:8;
104:7;110:5;121:23;
196:25
**curricula (6)**
15:18;118:23;119:5,
8,14,19
**curriculum (42)**
16:8,14,17;17:1,3,
10;39:10;46:9,16;
62:20;63:11;67:20;
69:23;85:1;91:14;
92:14;93:11;106:18,
21,22;107:11;113:12,
12,14;114:13,22;116:1,
11,11,12,14,17;117:1,
5,13,21,24;118:2,4;

121:16;187:1;192:6
**custody (36)**
28:4,5;32:12;37:8;
45:21;53:19,23;63:24;
69:4,11,19;70:7;71:6,7,
14,18,21;72:4;78:3;
79:8;85:11,14;98:24;
100:7;104:3,5,7,13;
105:11;107:16;151:5;
153:10,13;156:5;
157:21;200:23
**Custody-wise (1)**
87:14
**cut (3)**
73:3;154:20;171:13
**cycle (1)**
37:21

### D

**daily (7)**
64:25;94:8,19,21;
95:12;96:6;188:14
**Dan (1)**
76:8
**danger (1)**
154:24
**date (6)**
56:15,16;72:19;
88:11;163:3;199:3
**dated (1)**
115:13
**dates (1)**
161:4
**day (5)**
69:14;152:3;173:19;
178:8;182:19
**days (3)**
22:5;62:7;175:13
**day-to-day (2)**
28:7;69:11
**DCH (1)**
165:17
**deaf (1)**
148:15
**deal (3)**
98:14;178:19;191:20
**dealing (2)**
133:4;191:20
**death (2)**
74:21;197:1
**debriefing (3)**
94:9,19,21
**debriefs (3)**
64:25;95:12;96:6
**deceased (1)**
197:1
**decided (1)**
189:9
**deems (1)**
84:25
**de-escalation (1)**
107:3

**defendant (3)**
74:18;75:3;199:21
**defendants (4)**
74:3;76:8;200:1,8
**defensive (3)**
46:15;47:10;48:5
**deficiencies (5)**
92:25;94:7;95:7;
106:15;134:24
**deficient (1)**
90:22
**degree (3)**
198:23;199:1,8
**delegated (7)**
11:1,9,18;12:3,12;
13:5,14
**deliberate (1)**
76:4
**deliberately (2)**
66:7;129:10
**delivered (2)**
68:19;120:11
**delivery (1)**
120:7
**demonstrates (1)**
169:7
**denied (1)**
126:22
**Denise (1)**
5:9
**department (66)**
10:11;11:15;18:6;
19:14,15,21;21:12;
22:1,25;23:7;24:3,17;
25:3,6,14;26:24;27:6,
15,20,25;28:6,10,11,
23;30:1;31:22;32:1,6,
10;34:24;36:4;37:1,16,
22;39:2;53:15,16;
57:10;64:22;70:9;
80:24;81:8;109:20;
122:18;123:14,20,23;
129:13;138:6;146:13;
147:25,25;148:1;
153:18,20;161:10;
164:10;173:6,17;
174:12,14;185:10;
191:6;198:13;200:4;
201:13
**department-wide (3)**
83:23;107:10;183:6
**depend (1)**
100:11
**depending (4)**
9:10;70:21;161:4;
177:1
**depends (2)**
28:12;192:7
**deposition (37)**
4:5;5:12,20;6:5,25;
8:13,20;9:8,11,24;
10:1;18:25;73:20,24;
75:24;76:24;97:10,20,

22;105:1,5;113:20;
134:11;135:19;137:12,
16;141:4;193:17,23;
194:5,12,16,21;197:20;
205:6,6;206:11
**depositions (2)**
4:2;34:1
**depth (1)**
93:17
**deputy (14)**
104:2,16,17,20;
105:11;107:16;125:16;
127:10,15,21;172:3;
176:19,21;200:25
**derived (3)**
170:15,23,25
**describe (21)**
13:22;35:22;62:11;
64:2;72:7;93:8,13;
116:15;196:2;200:12,
18,21;201:3,15,23;
202:5,12,15,19;203:1,8
**described (21)**
40:23;47:9,14;58:9;
64:16;65:8;66:6;67:19;
71:9,11;78:5,14;89:12;
90:5;94:17,19;95:10;
118:12;131:16;145:7;
184:16
**describes (3)**
25:20;76:7;89:18
**describing (12)**
35:12,15;77:25;
83:19;114:8;115:24;
130:16;131:4,18;
149:1;154:2;184:21
**description (20)**
25:4;44:7;78:13;
84:14;109:15;110:18;
111:4,9,16;112:6,10,
17,18,22;114:8,17;
115:20;118:6,12,17
**descriptions (1)**
187:22
**descriptive (3)**
25:17,18;187:5
**designate (2)**
150:8;180:4
**designated (2)**
27:20;148:17
**designation (3)**
25:3;26:15;57:2
**designations (2)**
25:23;26:17
**desired (1)**
67:12
**detail (3)**
89:20;97:13;149:15
**details (3)**
78:11;142:11;184:19
**determine (2)**
15:5;93:1
**determined (1)**

63:12
**develop (4)**
118:23;119:5,8,14
**developed (4)**
17:1;52:5;101:10;
119:20
**developing (2)**
118:13;120:6
**development (23)**
16:9;17:2,4;35:3;
39:9;46:7,17;63:14;
82:8;85:7;87:21;88:18;
94:1;95:4;106:24;
113:15;115:10;116:10;
117:11;119:19;122:20,
23;187:1
**development's (1)**
81:1
**development-wide (1)**
107:10
**Devine (20)**
5:10;13:18;24:15;
40:4;74:22;88:7,9,24;
89:17;108:12;115:7;
134:18;139:4;159:5;
164:8;183:25;186:3;
195:12;196:4,21
**Devine's (3)**
196:15;197:2,8
**devoted (1)**
144:13
**dictate (1)**
50:18
**differ (1)**
32:1
**difference (6)**
27:24;33:15;34:16;
41:19;62:22;63:7
**differences (4)**
28:8;35:12,23;40:25
**different (63)**
25:22;30:5,14;33:25;
43:21;46:24;52:13;
53:3,8,12;58:16;59:2;
62:19,20;63:24;69:21,
23,24;70:10,11,14,20,
22,25;71:11;78:1,8,11;
79:3,12;80:10;81:8;
82:13;84:23;86:3;
100:6,8;101:18,18;
103:13,14;111:14;
113:2;116:2;122:14;
123:2,2;131:4;140:8;
142:7,18;143:9,12;
144:8;162:1;169:8,21,
22;170:12;176:14,20;
182:4;193:2
**differently (2)**
103:4;146:24
**difficult (2)**
6:18;93:23
**diminished (2)**
33:22;159:20

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 60 of 78

**direct (5)**
21:25;76:5;109:13;
173:20;175:25
**directing (1)**
150:18
**direction (1)**
150:21
**directives (2)**
136:18;183:7
**directly (11)**
7:15;14:13;24:6;
43:7;44:3;81:2;95:25;
96:1;175:21,25;176:2
**director (2)**
22:3;115:10
**disagree (2)**
77:15;119:25
**disagreement (1)**
74:23
**disagreements (1)**
74:24
**discharge (2)**
125:21;180:19
**discipline (2)**
155:20;198:5
**disciplined (1)**
198:1
**discover (1)**
75:1
**discovery (2)**
137:15;159:23
**discuss (5)**
76:17;86:19,22;
97:21;174:15
**discussed (5)**
23:5;137:24;194:10;
205:22,23
**discusses (1)**
157:9
**discussing (2)**
113:2;143:15
**discussion (4)**
161:20;163:12;
171:16;177:20
**distinction (1)**
148:24
**distinguish (1)**
46:23
**disturbance (2)**
12:18;13:1
**dividing (1)**
144:18
**division (1)**
122:22
**DOC (10)**
85:2;86:23;100:10;
106:23;113:25;116:1;
122:5;146:15;163:15;
199:5
**Docket (1)**
76:6
**document (120)**
39:24;40:3,5,11,14,

21;41:7,16;42:8,17,20,
23;47:21;56:22;57:15;
59:1;60:16;71:23;
87:21,24;88:2,14,23;
89:9;90:2;108:7,10,15,
17,22,24;109:2;110:9,
18,22;111:11,15,19,25;
113:13,17;115:1,7,9,
13,20,22,23;116:2,17;
117:14;118:18;121:1,
2,9,13,18,19,20,21,23;
122:16;123:12;128:9,
11;133:19;135:24;
136:1,3,15;139:18;
140:4,8;142:7,13,19;
143:6;159:24;160:1,7,
9,10,13,16,19;161:17;
163:4,23;164:1,6,8,9,
14,17,24;165:2,10,11;
167:4,5,7;168:4,6,16,
24;169:15,20,23;
173:9;183:23;184:1;
186:1,4,10,13,18;
187:6,8,10,10
**documentation (7)**
29:3;55:19;82:1;
124:13;141:21;163:9;
168:20
**documented (3)**
140:19;167:8;168:6
**documenting (1)**
56:19
**documents (17)**
44:10;53:6;56:6;
69:22;72:8;77:25;78:5;
79:1;82:9;83:3;118:16;
136:20;141:23;143:6;
164:19;173:11;193:17
**Doe (1)**
138:8
**dollars' (1)**
198:10
**done (20)**
4:2,3;7:24;31:18;
37:13;62:8;64:21;65:2,
3;66:15;67:21;72:1;
73:2;79:22;80:12;
90:21;121:24;124:15;
125:12;195:3
**door (1)**
153:17
**doors (2)**
149:19;154:22
**dorm (1)**
180:12
**dormitory (2)**
146:23;181:23
**Douglas (1)**
104:8
**down (39)**
26:19;36:16;39:4;
40:1;43:14,21;49:5;
53:16;55:3,8;60:17;

63:15,19;68:9;73:3;
88:21;90:3;94:24;95:4;
101:18;104:2;106:23;
107:9;110:8,13;113:6,
17;114:6;116:11;
118:16;130:9;162:22;
178:13;181:25;187:21;
188:5;191:8;201:20;
203:22
**downstate (1)**
113:25
**downtime (1)**
68:10
**draw (2)**
88:15;136:9
**drawing (1)**
148:25
**drill (12)**
43:14;114:5;163:23;
164:12;165:1,3,12;
166:10,13,25;168:12,
20
**drills (8)**
11:6;157:9,12,21;
158:2,7,21;164:11
**drive (5)**
81:2,4,6,6;82:8
**drug (1)**
116:5
**dry (2)**
154:20;192:14
**due (2)**
22:5;190:7
**duly (2)**
4:20,24
**duration (1)**
44:25
**during (46)**
6:5,24;10:20;11:3,
11,20;12:5,14,21;13:7,
17;14:23;17:11;29:12;
41:22;45:23;51:24;
69:2;72:9;85:3;86:19,
22;91:23;97:10;99:5;
100:25,25;107:14,21;
142:23;143:17,21;
145:18;147:6;150:8;
152:13;156:3;170:8;
173:18,22;176:15;
182:10;183:8;188:13;
193:11;195:19
**duties (23)**
28:7,8,18;31:24;
32:14,20;33:3,16;
34:17;35:17,23;57:25;
63:3;111:17;112:21;
119:2,3,22;120:1;
149:13;152:6;164:20;
188:14
**duties/responsibilities (1)**
110:11
**duty (8)**
15:1,6;75:4;118:22;

119:13;126:20;128:6;
204:2
**Dwyer (1)**
5:9
**Dykstra (2)**
184:9;185:9
**Dykstra's (1)**
184:21

**E**

**earlier (41)**
19:7;22:14,16;24:14;
26:9;27:2;43:14;51:13;
58:9,15;65:15;69:8;
78:4;90:5;100:18;
103:13;110:1,23;
112:4;113:2;114:3;
117:23;118:5;121:15;
129:23;142:15;143:9,
11,15;145:23;146:9;
154:2;161:21;163:13;
167:20;175:24;182:2;
185:3;187:11;195:5;
203:11
**early (3)**
81:25;181:15;198:19
**earn (1)**
22:5
**earthquake (4)**
68:4,5,12;69:8
**easier (1)**
122:17
**Eastern (1)**
134:5
**easy (2)**
6:16;7:20
**educate (1)**
99:25
**educated (1)**
99:25
**education (1)**
198:16
**effect (2)**
88:12;196:12
**effective (3)**
88:10;100:20;113:4
**effectiveness (10)**
92:23;93:10;95:14;
96:9;102:9;103:15;
112:23;114:13;118:8,
21
**eight (3)**
60:12;123:2,2
**Eighth (1)**
76:3
**either (10)**
14:22;104:11;
107:24;119:6;147:21;
169:11;171:7;183:6;
192:2;196:21
**electronic (6)**
56:4;70:8;82:25;

142:3;160:20;162:22
**electronically (10)**
56:2;58:3,4;70:4;
80:1,22,23;83:5;
141:16;160:24
**elimination (3)**
82:16;183:18,20
**ELLIS (54)**
4:14;16:20;73:19;
75:8,19;77:1,18;91:17;
92:18;93:2,20;97:18;
102:13;108:5,23;
126:23;127:6,22;
128:8;133:1,21;134:1,
3,6,9;135:5,8,12;
154:16;155:16;156:8,
16,25;158:11;159:7,13,
15;161:12;166:14;
167:11;172:14,24;
177:8;193:24,25;
194:4,11,14;204:24;
205:7,15,19;206:3,8
**ELM (1)**
160:21
**else (19)**
11:1,9,18;12:3,12;
13:5,14;14:22;16:5;
63:22;96:17;106:18;
108:1;152:1;175:8;
182:25;194:16;197:17;
201:13
**else's (1)**
77:19
**e-mail (21)**
17:22,25;18:2,4,11,
12,15;19:12,20;60:19,
20;129:3;184:8,10,13;
185:17,18,23;186:24;
199:24;206:1
**e-mailed (1)**
18:17
**emergencies (1)**
152:22
**emergency (43)**
11:25;49:15;64:8;
76:12;117:11;143:3,
10,19,25;144:4;145:9;
146:17;147:2,5,14;
148:3,6;149:25;150:2,
9,12;152:19;154:4;
163:13;169:17,22;
170:3,8,10,12,16,22,
23;171:1,3,6,16,25;
172:10,11,12;173:4;
184:25
**emerging (2)**
106:14;138:19
**employed (1)**
10:10
**employee (69)**
18:18;19:14;32:25;
37:22;40:15,23;41:23;
42:13;45:1,16;50:14,

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 61 of 78

16,23;51:4,17;53:25;
54:23;57:21;59:11,17,
18;60:22;61:16;64:22;
69:3;78:25;79:18,19;
80:3,7,19;81:22;82:5;
83:10;84:16;85:4;
92:14;93:16;95:14,17;
100:7,19;101:25;
103:23;124:25;125:5;
142:8;143:13;145:10,
14,15;147:5;150:13,
21;157:9;162:5,12;
170:9;171:11,19;
173:23;178:1,6,16,24;
179:10;180:1;182:3;
183:8
**employees (34)**
19:22,22;22:1,8;
23:21;36:25;37:10,11,
12,17;50:6;51:14;
61:22;68:20;74:20;
91:14;92:15;93:19;
98:23,24,25;100:5;
143:18,24;147:13;
151:4,5;152:18;171:6,
19;172:1,9;173:14,24
**employee's (2)**
52:4;53:3
**employment (5)**
18:18;95:17;161:10;
198:13;199:5
**empty (1)**
55:14
**encounter (1)**
178:19
**encourage (1)**
74:4
**end (8)**
7:3;52:21;94:25;
95:1,3,11;97:21;
166:12
**end-of-training (1)**
94:4
**energetic (1)**
192:9
**engage (1)**
122:3
**engaged (1)**
139:7
**enough (3)**
180:10;181:24;191:9
**enroll (1)**
160:24
**ensure (8)**
46:4;91:12;92:13;
93:16,24;100:20;
156:4;178:6
**ensuring (1)**
155:23
**enters (1)**
48:14
**entire (6)**
54:25;102:22;

108:24;137:5;146:13;
149:2
**entirely (3)**
48:3;49:20;53:8
**entirety (1)**
88:14
**entitled (2)**
75:1;77:9
**entrance (7)**
84:19,20,23,24,25;
99:6;146:8
**envelope (1)**
55:23
**environment (2)**
69:13;172:2
**epidemic (1)**
67:10
**equip (3)**
91:14;92:15;180:2
**equipped (1)**
181:15
**error (1)**
117:17
**errors (2)**
116:13,22
**escort (4)**
124:3,4;138:10,14
**escorting (3)**
124:3,7,25
**essential (3)**
110:11;111:17;
112:20
**essentially (2)**
32:11;71:25
**established (1)**
134:14
**Estate (1)**
5:10
**estimate (1)**
78:23
**ethical (1)**
175:20
**ethics (1)**
162:13
**etiquette (1)**
64:8
**evacuate (1)**
12:9
**evacuated (1)**
148:17
**evacuating (3)**
148:7,12;149:2
**evacuation (9)**
147:19;149:1,3,16;
157:22;164:11;165:12;
169:9;171:15
**evaluate (5)**
92:22;93:10,15;
94:18;187:12
**evaluation (1)**
130:15
**even (15)**
14:19;18:19;29:6;

68:15;69:4;116:3;
117:1,6;126:14;
149:21;166:23;169:4;
178:14;195:17;196:4
**event (9)**
11:25;61:13;120:21;
143:20;148:8;150:2,
15,20;151:7
**events (3)**
174:15;200:9;205:23
**everybody (3)**
33:11;45:20;63:22
**everyone (10)**
8:5;48:14;64:16;
67:20;68:17;70:15,18;
87:5;167:25;177:12
**exact (2)**
106:11;125:7
**exactly (4)**
76:19;87:5;106:4;
107:6
**EXAMINATION (2)**
5:1;205:18
**examine (1)**
170:5
**examined (1)**
4:25
**example (16)**
19:12,16;26:4;66:18;
69:2;70:5;124:23,24;
125:4,8;130:13;
132:14;146:9;172:12;
179:5,6
**Except (1)**
45:10
**excessive (1)**
137:1
**excuse (5)**
65:4;71:10;91:25;
101:19;144:15
**exhaustive (1)**
161:7
**exhibit (24)**
39:21,23;40:7;87:24;
88:4;108:9,19;114:24,
24;115:3;118:16,17;
121:5;159:6,22;160:3;
163:25;164:3,7;
183:24;184:3;185:25;
186:1,6
**exist (3)**
26:18;69:22;133:13
**existed (1)**
78:1
**exists (1)**
78:9
**Exit (5)**
95:15,16,22;96:3,7
**exited (1)**
135:19
**expect (1)**
181:3
**expectation (6)**

158:5,15;172:8,18;
173:23;174:1
**expected (1)**
173:24
**experience (10)**
153:9;179:6;180:5,8,
9,14,18;181:2,5,9
**experiences (1)**
192:18
**explain (14)**
36:10;46:21;52:17;
66:20;74:12;86:10;
112:1;121:4;123:25;
136:19;160:18,18;
166:21;174:11
**explaining (1)**
68:1
**explore (2)**
19:9;75:1
**exploring (1)**
73:24
**extended (1)**
128:12
**extent (6)**
19:3,9;150:12;
171:15;174:9;183:9
**extinguisher (5)**
144:2,3;145:8,9;
153:8
**extinguishers (1)**
147:18
**extra (1)**
62:4
**extraction (1)**
136:25
**extremely (2)**
51:23;166:22
**eye (1)**
106:8

## F

**face (3)**
92:3,6;165:11
**Facebook (11)**
20:2,13,21;21:5,13,
14,15,19,25,25;22:11
**Facebook's (1)**
21:18
**faces (1)**
165:23
**facilities (5)**
26:18;30:14;63:18;
81:8;103:9
**facility (73)**
16:6;26:16;28:17,17;
32:21;36:25;38:23,24;
40:15;43:6,17,24;44:1;
48:14;50:6;53:12;
60:22;62:4;66:9,11;
70:9;71:13;74:20;
76:10;80:20;81:4,10,
11;82:7;83:21;84:18,

19,25;85:8,17,20;89:2,
3,5,19,23,24;91:10;
93:9;94:2;99:15;
100:25;107:25;115:11;
117:4;130:9;132:18;
133:13;137:5;139:1,3;
145:15;146:1,3,7,17,
22;157:17,19;158:23;
169:16;174:21;176:16,
17;183:7;186:22;
200:3,5
**facing (1)**
193:2
**fact (33)**
34:1;36:5,9,15,18;
37:17,23;51:12,16,22,
25;52:4,20,23,24;
53:17,20,25;54:6,12,
16,19,21;55:6;56:12,
23,24;57:4,12;78:16;
149:13;185:21;196:25
**factor (1)**
7:19
**factors (1)**
74:21
**facts (4)**
14:2;36:12,21;73:22
**factual (4)**
55:9;75:11,12,14
**faded (1)**
167:22
**failure (13)**
73:25;74:19;75:17,
18,19,20,20;76:3,7,14,
14;131:19;138:16
**fair (59)**
4:12,14;14:11,20;
15:12,14;19:17;23:11;
25:5;26:25;32:12;35:7;
39:15;42:2,18;44:14;
48:6;54:17;68:21;
78:13;91:7;99:15;
100:2;106:10;107:11;
108:3;111:3;114:16;
125:9;129:21;133:13;
142:12;146:20;149:6;
150:22;155:13;156:2;
158:25;168:2;170:1,7;
171:20;175:3;178:4,
10,15,22;179:14;
181:16;187:7,7;191:9;
192:1,21;195:14,23;
196:9,13;197:4
**fairly (1)**
177:17
**fall (6)**
27:13,18;28:21,21;
32:16;157:5
**falls (3)**
124:4;156:12;189:21
**false (2)**
129:10,17
**familiar (7)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 62 of 78

94:5;137:7;152:15;
160:15;164:16;169:15;
182:21
**familiarity (1)**
164:24
**familiarize (1)**
172:10
**family (5)**
24:9;30:24;196:16,
18,20
**far (14)**
16:2;35:17;49:16;
51:2;70:2;79:21;96:20;
99:3;100:13;102:16,
18;109:10;132:7;
179:16
**far-field (1)**
74:14
**farther (1)**
88:21
**feature (1)**
21:19
**February (5)**
27:22;28:20;30:3,10;
115:13
**federal (1)**
4:10
**feedback (7)**
95:18,19;96:1,7;
115:25;116:13;187:23
**feel (6)**
87:2;91:12;95:22;
116:8;188:13;193:13
**feeling (1)**
94:11
**feet (1)**
99:17
**fell (2)**
125:1;138:10
**felt (1)**
189:4
**fess (1)**
129:1
**few (8)**
20:23;40:24;86:3;
119:17;128:11;142:7;
177:16;186:14
**fewer (1)**
50:24
**field (45)**
23:24;38:6,7,14,14,
19;43:7;44:23;63:5;
64:20,23;65:3,4,5,15,
19;66:24;67:3,22,25;
68:8,25;69:7,14,15;
72:9;80:3,9;81:17;
83:20,24;85:24;87:13;
89:6;90:7,18,25;91:13;
93:25;94:19;96:13,19;
103:12;182:20;189:15
**figure (2)**
8:24;144:17
**file (44)**

36:10,12,15,18,20;
37:23;51:12,16,22,25;
52:4,13,14,15,18,21,23,
24;53:3,25;54:12,16,
19,21;55:6,13,22;
56:12,18,23,24;57:5,
12,13,19,23,24;80:22;
81:10;82:2,11,15,19,19
**files (16)**
34:1;36:6,23;37:8,
17;53:17,20;54:6;70:8;
81:24;82:10,12,14,23;
83:6;102:2
**fill (3)**
64:10;94:5;145:1
**filled (1)**
109:6
**filling (1)**
69:9
**final (1)**
95:3
**find (6)**
34:22;82:9;94:7;
102:3;186:20;189:4
**fine (5)**
5:6;77:5;128:13;
134:1,3
**finish (3)**
6:23;7:6;177:16
**finished (1)**
128:9
**finishes (1)**
53:10
**fire (104)**
10:23;11:6,15;13:11,
18;14:23;15:23;16:19,
19;24:15;39:15;49:14;
75:5;76:10,12;88:12;
134:15,23,23;143:2,2,
2,19,20;144:2,3,4,6;
145:8,8,9,11,11,12,19;
146:16;147:2,5,14,17,
18,22,22,24,25;148:1,
2,3,4,6,8,15;149:9,14,
21,24;150:8,12,15,20;
151:7;152:19,22,25;
153:2,8,15,18,20;
154:4;155:10;157:9,
12,21;158:2,2,7,10;
159:5;163:13,23;
164:11,12;165:1,12;
166:10,12,25;168:12,
19;169:2,8;171:14,15;
172:12;174:6;195:7,
10;197:8;199:22;
200:9;204:3,18;205:24
**firearm (1)**
125:22
**firearms (1)**
117:10
**firefighter (5)**
151:15,21,24;
152:20;153:25

**firefighters (10)**
11:24;152:6,12,24;
153:4,14;154:14,23;
155:8;156:7
**fires (7)**
49:15;153:5,6;174:3,
18,21;175:3
**first (31)**
4:24;6:4;29:25;38:4;
41:11,24;42:14;46:2;
47:19;54:20;55:16;
58:10;60:3,6;62:14;
69:14;88:16;101:5;
110:22;111:5;115:8,
15;132:10;140:7;
164:9;182:19;183:1;
184:8;186:18;199:20;
200:24
**Fiscal (2)**
40:16;141:15
**fit (2)**
139:22;140:16
**five (9)**
73:7;89:3;99:17;
162:16,19;177:7,10;
180:24;194:13
**five-minute (1)**
177:4
**flag (1)**
37:22
**fleet (1)**
64:9
**flip (1)**
205:13
**floats (1)**
47:15
**fluctuate (1)**
146:6
**focus (11)**
72:4;85:12;119:5,7,
11,16;120:4;167:2;
189:15;190:14;192:18
**focused (1)**
77:12
**folder (4)**
55:13,22;56:4;82:7
**folks (12)**
5:25;22:10;37:14;
43:23;46:4;54:4,4;
116:1;122:5;187:22;
188:22;200:5
**follow (8)**
46:8,16;66:25;86:3;
99:2;131:25;150:6;
189:9
**followed (3)**
151:4;155:21,24
**following (11)**
38:3;46:9;60:21;
123:1;132:7,20;149:3;
155:12;156:6;157:22;
187:6
**follows (1)**

4:25
**follow-up (3)**
124:22;204:22;206:4
**force (18)**
49:2;99:6;130:19;
136:16;137:1,2;139:6,
8,11,14,17,20,25;
140:17,20;183:20,21;
190:11
**forever (1)**
83:1
**forget (1)**
172:4
**forgotten (1)**
102:4
**form (16)**
16:20;55:8;56:21,25;
57:2,12,15;82:17;
92:18;93:2;94:22;
101:3;102:13;127:22;
133:1;167:9
**formal (8)**
24:18,19,23;26:1,5;
28:22;57:2;110:2
**formally (4)**
27:20;28:22;33:19;
34:18
**format (19)**
65:10;73:3;101:5,10,
23;116:16,21;121:9;
122:4,14;142:12,16;
160:15,19;164:16,20;
185:17;187:7;192:2
**formatted (1)**
142:18
**former (6)**
18:18;19:13;21:14,
16,21;22:7
**forms (1)**
69:9
**forth (1)**
41:7
**Forty (1)**
50:1
**forward (4)**
57:16;77:21;142:19;
177:7
**found (6)**
103:8;114:14;
116:22;117:16;147:20;
193:10
**four (19)**
31:14;38:22;40:19;
43:2;44:16,17;51:15;
52:6;55:25;56:9;63:15,
16;71:8,11,24;98:22;
136:15;145:10;176:20
**four-page (3)**
115:6,9;183:24
**four-phase (7)**
38:25;41:4;42:13;
45:1;46:1;58:24;
101:10

**fourth (2)**
58:8,11
**frame (3)**
28:21;37:21;59:2
**free (1)**
87:2
**frequent (1)**
174:22
**frequently (2)**
174:3;175:15
**friend (7)**
201:4,23;202:5,12,
20;203:1,8
**friendly (1)**
202:22
**friends (4)**
21:15;22:1;200:18;
202:22
**frisk (2)**
46:13;49:6
**front (8)**
42:8;47:21;94:8,23;
122:9;147:15;165:3;
186:17
**FTM (2)**
83:13,19
**FTO (1)**
203:6
**full (7)**
5:16;9:18;19:9;
27:18;50:2;99:13;
109:8
**full-time (1)**
32:11
**fully (2)**
31:17;121:4
**function (2)**
39:22;181:25
**further (1)**
188:5
**future (2)**
14:10;98:11

## G

**gain (2)**
180:13,14
**gamut (1)**
114:18
**Gann (5)**
104:23;176:6,11,12;
200:22
**gas (1)**
68:13
**gave (14)**
19:16;35:10;84:15;
86:4;101:15,16;105:9;
124:23,24;125:4,5,9;
128:16;130:13
**geared (4)**
28:14;71:2,5,6
**general (4)**
77:6;134:22;149:24;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 63 of 78

CHRISTOPHER BEAL
July 30, 2020

152:1
**generally (6)**
  57:8;68:21;75:6;
  78:13;110:14;185:21
**generate (1)**
  54:16
**generated (3)**
  52:5;95:10;127:17
**generic (7)**
  55:8;56:14;64:16;
  69:7;83:3,25;149:7
**geographically (1)**
  31:2
**George (1)**
  176:9
**gestures (1)**
  6:15
**gets (1)**
  128:22
**given (26)**
  15:14;32:23,24;35:6;
  46:7,8,16;65:13;80:13;
  98:5,7,8;99:4,10,13;
  105:18;126:20;143:13,
  18;150:21;166:12;
  171:5;187:22;188:12;
  193:10;195:15
**gives (1)**
  94:24
**giving (3)**
  100:4;134:20;137:12
**goal (1)**
  45:17
**goals (1)**
  45:14
**God (1)**
  192:14
**goes (15)**
  52:8,15;57:20;70:2;
  80:19;82:1,18;88:9;
  95:4;97:9;119:17;
  122:24;138:10;161:1;
  176:18
**Good (19)**
  5:3,7;36:13;55:3;
  95:7;96:4;133:20;
  134:6,7;135:14;
  159:13;180:24;200:14,
  17;201:1;202:3;203:5,
  5,7
**go-to (2)**
  161:17;180:15
**graduate (1)**
  56:3
**graduating (1)**
  54:5
**grammatical (2)**
  117:2,16
**grant (1)**
  127:4
**graph (2)**
  188:15,17
**grasping (1)**

191:3
**greatest (1)**
  167:6
**Griffen (1)**
  76:9
**Griffin (2)**
  201:16,17
**grounds (1)**
  147:25
**group (5)**
  94:10;119:5,11,17;
  165:8
**groups (2)**
  119:7;120:5
**grow (2)**
  199:10,15
**growing (1)**
  35:2
**grown (1)**
  191:14
**guess (17)**
  14:18;21:22;32:17;
  33:13;46:1,22;54:22;
  65:8;68:15;76:19;
  79:23;88:16;97:10;
  114:5;132:13;177:1;
  184:20
**guide (2)**
  150:14;186:11
**guideline (1)**
  189:7
**guy (4)**
  201:22;202:11,18;
  203:7

## H

**H00zier (1)**
  21:9
**habits (1)**
  196:8
**half (1)**
  167:11
**hall (1)**
  69:19
**hand (2)**
  66:13,13
**handcuffed (1)**
  149:20
**handed (1)**
  106:23
**handle (3)**
  135:11;178:8;181:15
**handling (1)**
  36:4
**hands (1)**
  47:2
**hands-on (5)**
  46:12;47:17;49:8;
  144:24,24
**handwritten (2)**
  78:6,10
**hangout (1)**

202:21
**happen (3)**
  14:16;69:13;104:3
**happened (9)**
  13:23;14:2,7;130:1;
  131:20,22;133:6;
  175:14;184:20
**happens (5)**
  8:14;50:7;52:4;
  53:24;80:17
**happy (2)**
  8:14;76:17
**harassment (1)**
  162:18
**hard (2)**
  7:20;177:18
**hated (1)**
  203:4
**hazard (2)**
  89:7;158:10
**hazmat (1)**
  87:17
**head (8)**
  10:10;24:16;53:15,
  17;64:5;144:1,10;
  174:17
**headed (1)**
  74:7
**header (1)**
  110:8
**heading (1)**
  109:14
**heads (3)**
  174:14;185:10;200:4
**health (1)**
  197:3
**hear (13)**
  8:22;9:2,4;86:5;
  148:15;159:17,21;
  167:12,15,15;174:8;
  175:19;195:4
**hearing (1)**
  177:18
**held (6)**
  10:13;27:3;30:6;
  32:16;104:9;176:6
**help (4)**
  63:25;95:5;119:5,8
**helped (3)**
  101:7,12,17
**helpful (3)**
  118:15;124:24;
  188:13
**HEPPELL (74)**
  4:1,15;5:2,7;17:5;
  40:9;73:6,10,13,16;
  74:10;75:18,22;77:9,
  20;88:6;92:7,19;93:7;
  94:13;98:3;102:17;
  104:24;105:7;108:6,
  21;109:4;115:5;127:3,
  12;128:2,10,14;133:10,
  17,24;134:2,4;135:1,6,

9,15,21;141:1,6;155:1,
  17;156:14,17,21;
  157:7;158:17;159:11,
  14,16;160:5;161:19;
  164:5;166:20;167:17;
  168:1;172:19;173:7;
  177:4,9,15,22;184:5;
  186:8,16;204:20;
  205:3,11;206:4
**herein (1)**
  4:24
**Here's (1)**
  125:17
**Hey (8)**
  22:8;68:11;90:20,23;
  117:18;127:15;129:3;
  180:15
**high (3)**
  149:17;199:11,12
**higher (2)**
  67:14;189:17
**highest (1)**
  198:15
**highlighted (1)**
  191:10
**highlighting (3)**
  186:10,11,13
**hire (3)**
  55:19;99:5;163:7
**hired (4)**
  50:7,19;63:19;
  178:25
**hiring (2)**
  22:9;50:18
**history (1)**
  36:21
**hit (3)**
  22:7;61:11;188:5
**hold (7)**
  10:18;21:3;27:5;
  36:1;62:9;110:6;
  167:17
**holds (1)**
  28:1
**home (4)**
  45:22;61:25;94:8;
  191:16
**honest (2)**
  18:20;129:15
**honestly (4)**
  18:23;102:4;152:21;
  180:21
**hope (1)**
  19:5
**hopefully (6)**
  35:2;108:16;167:22;
  177:6;186:14;191:7
**hoping (1)**
  186:14
**hour (9)**
  77:5;134:1,3,21,21;
  135:7;162:13,14,17
**hours (40)**

38:1,5,13;39:7;
  42:21;43:1,4,10;49:24,
  25;58:19,20;59:1,6,10,
  12,16;60:3,4,5,12,14;
  61:2,3,11,16,20;62:2,4,
  8;71:18,24;88:15;
  144:17;161:25;162:16,
  18,19,20,22
**housing (11)**
  37:9;57:20;117:9;
  148:12;150:7;154:12;
  156:5;162:19,21;
  170:2;175:1
**HR (5)**
  25:6;95:15,16;96:8;
  109:7
**hub (1)**
  16:13
**human (4)**
  6:22;25:4;45:20;
  53:4
**hundreds (2)**
  203:23,24
**hurry (1)**
  191:5
**hypothetical (4)**
  125:8;128:15;
  131:19,21

## I

**idea (2)**
  58:1;196:4
**ideas (1)**
  114:19
**identification (11)**
  40:6;88:3;108:18;
  115:2;116:6;144:2;
  145:7;160:2;164:2;
  184:2;186:5
**identified (1)**
  186:25
**identify (1)**
  162:10
**identifying (1)**
  187:20
**IDOC (6)**
  30:6;87:22;89:13;
  119:12;122:19;138:24
**IDOC-wide (1)**
  16:11
**imagine (1)**
  127:10
**immediately (1)**
  155:9
**impact (1)**
  10:5
**implement (2)**
  17:2;190:9
**implemented (4)**
  15:3,8;104:2;192:22
**implementing (1)**
  16:2

**implications (2)**
136:11;139:20
**importance (1)**
182:20
**important (4)**
6:14;7:2;8:5;179:10
**impossible (1)**
6:25
**impression (1)**
175:6
**improperly (1)**
124:3
**improved (1)**
91:6
**improvement (1)**
188:7
**improvements (2)**
114:19;143:1
**improving (1)**
158:24
**incident (30)**
15:16,19,22;64:10;
123:6,10,13,17,19;
124:25;125:2;126:11,
15;127:5,16;128:16,
17;131:6,17,23,24;
132:3,16;159:5;184:7,
16,21;185:7,11,22
**incident/accident (1)**
124:18
**incidents (12)**
14:13,15;103:19;
105:13;106:7,13;
107:4,25;132:18;
175:14;185:4,16
**include (2)**
95:19;122:25
**includes (2)**
81:6;123:6
**including (10)**
4:5;21:21;43:11;
61:24;65:17;76:14;
114:15;137:15;141:25;
200:2
**inconsistencies (1)**
154:11
**incorporate (1)**
135:3
**incorporated (2)**
183:10,10
**incorrect (2)**
129:9,12
**increased (1)**
59:9
**indefinitely (1)**
142:4
**in-depth (1)**
149:11
**Indiana (62)**
10:10,21;11:3,11,20;
12:5,14,22;13:7,17;
15:3,9,19;16:18;17:8,
10,16,19;18:6;19:22;

21:12;22:25;23:21;
24:16;26:22;28:19;
29:18;30:1,16,17;
31:12;44:3;84:17,22;
92:12;99:1;100:8;
101:1,14;107:14,24;
109:19,20;115:12;
122:18,20;142:23;
146:18;151:2,15;
152:11,13;164:10;
169:16;174:3;177:24;
178:25;179:4,25;
183:19;198:22;199:2
**Indianapolis (3)**
30:16;199:14,15
**indifference (1)**
76:4
**individual (8)**
65:14;70:3;78:25;
104:21;121:13;161:2;
169:4;186:25
**individually (2)**
94:9;97:2
**individuals (6)**
23:14,19;24:2,5;
184:9;200:1
**individual's (1)**
52:13
**influence (1)**
16:17
**influx (1)**
203:21
**inform (2)**
103:21;105:14
**informal (4)**
24:21,23;26:11;
129:5
**informally (2)**
110:3;129:2
**information (29)**
51:13;53:25;97:23,
25;98:12,16;99:22;
103:14;107:17;122:13,
25;123:3,19;132:25;
133:12;136:7,10,21;
139:19;140:9,24;
149:11;150:13;162:14;
169:11;192:3;196:7,
12,22
**informed (1)**
107:18
**initial (1)**
134:13
**initialled (1)**
78:18
**initials (2)**
72:17,19
**initiated (2)**
101:22;102:10
**injured (1)**
125:1
**injury (1)**
162:16

**input (3)**
91:10,12;192:18
**inquiries (1)**
22:12
**inquiry (1)**
77:3
**in-service (15)**
29:1,2,8;32:20,22,
24;33:2,12;82:16;
107:1;117:7;142:9;
188:13;190:8,17
**inside (1)**
180:12
**instead (4)**
8:20;62:25;84:11;
120:9
**instigated (2)**
101:22;102:11
**Institute (1)**
26:20
**instituted (1)**
58:24
**instruct (3)**
65:24;76:14;192:16
**instructing (1)**
33:8
**instruction (1)**
192:22
**instructional (1)**
66:7
**instructions (2)**
98:4;171:25
**instructor (19)**
27:10,23;28:1,3,9,
19;29:13;30:5;31:13,
19,21,25;32:4,9;33:5;
51:8;82:18;130:8;
176:17
**instructors (1)**
28:14
**instructs (1)**
7:15
**Insulting (3)**
167:2;168:15;169:11
**intended (3)**
8:25;161:7;163:1
**interact (2)**
151:23;201:8
**interacted (1)**
152:2
**interaction (1)**
151:25
**interactions (2)**
152:5;204:11
**interest (1)**
186:8
**interesting (1)**
193:11
**interviews (1)**
96:7
**in-the-field (1)**
62:10
**into (38)**

26:21;37:22;38:6;
39:4;43:21;49:5;52:15,
23;56:23;62:6;63:15;
65:18;76:25;77:3;
80:21;82:1,18,19;
84:11;96:13;101:18;
123:15;130:2;142:11;
148:17;149:15;152:4;
163:8;183:11;184:6,
19;187:21;189:21;
192:11;193:14;194:9;
195:10,10
**intoxicant (1)**
69:19
**intoxicants (1)**
69:16
**investigate (2)**
12:18,25
**investigation (2)**
14:9,14
**investigations (3)**
13:22;195:10;201:10
**involved (10)**
28:15;132:1,21;
138:22;139:4;159:5;
165:2;191:19;192:15;
193:7
**involvement (1)**
134:15
**involving (1)**
184:22
**ISP (24)**
21:16,22;27:6,15;
30:20;39:3;45:24;
73:25;81:12,13;85:20;
100:2;101:4,25;
103:23;107:17;120:2;
122:21,21;147:7;
153:13;199:18,22;
205:24
**issue (6)**
30:24;55:16;72:5;
140:1;167:19;201:10
**issues (7)**
54:13;77:12;105:14;
107:17;127:17,19;
158:25
**item (5)**
112:23;119:21;
136:7,9;139:5
**items (7)**
123:3,18;136:15;
139:22;140:12,13,15
**itinerary (1)**
82:16
**Ivan (2)**
29:17;101:16

**J**

**James (2)**
21:8;199:23
**Jason (2)**

176:2;201:25
**Jeremy (1)**
184:9
**job (58)**
17:2,15;25:4;26:1,5,
11;28:7,8,18;31:24;
32:14;33:3,15,16;
34:16;35:1,23;36:13;
53:5;55:3;57:25;68:21,
23;71:5;81:22;92:16;
94:11;95:18,23;99:7;
109:3,14,17,23;110:18;
111:4,9;112:6,10,18,
21;114:8;118:6,12,17;
119:2,22;120:1;126:4;
128:6;130:12;131:15;
169:13;178:12;180:24;
191:16;198:1,5
**jobs (1)**
69:11
**John (1)**
138:8
**join (1)**
29:25
**joined (4)**
105:1,5;141:2,4
**joining (1)**
5:11
**Jones (3)**
29:17,18;101:16
**Joshua (3)**
5:10;13:18;195:12
**judge (3)**
7:12;77:7,10
**July (8)**
40:8;88:5;108:20;
115:4;160:4;164:4;
184:4;186:7
**jump (4)**
6:23;7:3,7;186:14
**juncture (1)**
125:15
**June (1)**
163:4
**Justin (5)**
160:7;161:24;
165:20,21;203:12
**juvenile (2)**
38:24;60:22

**K**

**K-9 (1)**
202:2
**keep (5)**
19:15;51:13;55:9;
67:4;77:11
**keeps (3)**
80:7;129:24;141:12
**Kenneth (1)**
200:22
**kept (6)**
18:17;132:18;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 65 of 78

141:15,16;162:25;
169:24
**key (1)**
128:23
**kid (1)**
168:13
**killed (1)**
13:18
**kind (24)**
6:24;20:8;31:14;
33:10;37:20;47:15;
55:23;63:8;69:22;
93:23;101:7,17;
132:11;142:17;146:8;
149:3;154:20;155:24;
159:7;164:14;175:13;
177:5;181:17;192:11
**kinds (2)**
22:12;185:10
**King (1)**
21:8
**knew (2)**
76:11;201:17
**knowing (2)**
147:17,18
**knowledge (37)**
14:24;23:17;44:24;
53:7,18;61:18;66:4;
67:15;77:4;102:1;
106:4,6,11;134:23;
139:15;143:4;145:13,
20,21;147:4,8;150:16,
23;151:1,9;152:14,16;
162:25;173:10;175:8;
196:18,21;197:2,7,10,
11;204:3
**knowledgeable (1)**
192:10
**knowledge-based (12)**
47:3;48:8,17;49:10,
18;68:3;91:24;92:4;
130:20;144:23;145:3;
183:16
**known (1)**
57:9

## L

**lab (1)**
62:1
**large (4)**
41:8;51:5;54:3,13
**last (6)**
59:3;78:22;120:25;
149:22;152:25;153:12
**late (2)**
36:17;51:24
**later (2)**
5:11;113:18
**latitude (1)**
134:20
**lawsuit (18)**
73:22,23;74:1,8;

75:11,15;134:18;
138:6,16;194:24;
197:14,16;199:21;
200:2,8,9;204:15;
205:23
**lay (1)**
78:1
**laying (1)**
111:16
**layout (2)**
89:22;146:22
**leadership (1)**
37:16
**leading (1)**
74:21
**leads (2)**
64:12,15
**learn (4)**
14:2,6;45:19;199:20
**learned (2)**
66:1;154:11
**learner (2)**
82:15;161:2
**learners (2)**
191:15,20
**learning (3)**
69:17;132:24;160:20
**least (13)**
5:4;25:23;39:14;
85:25;87:15;89:3;90:7;
163:3;167:1;178:1;
179:11;190:23;191:7
**leave (6)**
29:18;54:4;108:14;
135:9;190:13;203:5
**leaves (4)**
53:25;81:22;82:24;
95:17
**leaving (1)**
54:4
**lecture (1)**
47:4
**left (6)**
18:18;19:15;82:6,20;
160:9;188:22
**legal (8)**
49:5;76:21;137:7;
138:21,23,24;139:1,2
**lengths (1)**
58:22
**less (4)**
32:24;179:6;181:1;
189:16
**Lessner (3)**
201:6,7,14
**lesson (2)**
48:11;117:19
**Lester (1)**
76:9
**letting (2)**
154:22;155:3
**level (12)**
25:25;29:6;31:8;

35:25;36:1;53:12;
83:22;84:21,22;85:20;
170:1;198:15
**liability (1)**
75:2
**lieutenant (7)**
90:20;184:20,21;
185:9;202:1,9,17
**life (2)**
37:21;198:2
**likely (4)**
96:4;105:22;114:14;
195:17
**limitation (1)**
103:5
**limited (4)**
54:10;120:4;123:1,
19
**limiting (1)**
85:11
**line (10)**
31:8;77:8,12;90:19;
114:1;144:19;170:1;
177:16;179:13;188:21
**lines (6)**
61:14;76:24;113:23;
125:6;159:19;195:20
**link (1)**
135:10
**list (23)**
14:17;69:23;96:15;
112:23;116:23;120:18;
123:2,8,18;132:16;
136:7,9;139:5,23;
140:7,13;154:1;167:1;
171:7,17;185:7,17;
188:6
**listed (20)**
40:16;42:20;47:22;
48:23;112:21;115:9,
14;117:17;119:21;
123:3;137:3;140:13;
150:10;161:25;162:2;
163:5;164:10;166:3;
184:12,17
**listen (1)**
47:3
**listing (1)**
161:3
**lists (10)**
79:11;109:19;123:1;
136:15;139:20;142:7,
9;165:19;182:7;183:11
**literally (1)**
190:16
**literature (1)**
136:17
**litigation (9)**
136:16;137:7,19,23,
24;138:3,11,18;140:18
**little (18)**
35:10;40:1;43:14;
59:2;65:8;75:8;92:10;

111:23;112:1;114:6;
122:17;131:4;135:7;
159:12;160:11;182:2;
187:17;192:11
**live (5)**
24:8,10,11,12;82:19
**living (1)**
199:17
**loan (2)**
28:5,9
**located (1)**
141:13
**location (2)**
148:13;149:6
**locked (5)**
12:9;71:25;148:7,11,
14
**logistics (1)**
133:25
**logs (1)**
65:1
**long (11)**
9:11;77:2;82:23;
99:17;147:16;153:1,
20;164:18;194:11;
198:6;204:8
**longer (10)**
9:9;34:21;38:17;
78:18;97:4;121:9,13;
133:18;142:16;204:8
**look (18)**
55:24;58:25;59:4;
72:8;82:9;96:1;116:17,
19;124:16;126:2;
127:16;130:2;158:8;
165:7;171:6;177:1;
189:22;192:13
**looked (6)**
26:21;64:6;75:9;
118:5,8,11
**looking (22)**
16:24;40:14;88:23;
112:20;113:10;121:23;
122:16;132:15;135:24;
136:4;139:5;142:6;
161:22;164:13;167:4;
168:16;184:7;188:16,
17;190:1;191:9;203:11
**looks (6)**
59:25;116:20;161:5;
187:3;196:3,4
**Lori (1)**
23:24
**lost (2)**
88:22;167:11
**lot (12)**
21:13;22:6;36:5;
68:2;107:5;128:24;
174:19;183:19;190:6,
9;195:20;202:25
**loud (1)**
194:20
**low (2)**

67:15;191:8
**lower (1)**
107:4
**lunch (3)**
9:10;128:8;135:22
**lying (1)**
125:17

## M

**magistrate (1)**
77:7
**mailing (1)**
14:17
**mailroom (1)**
71:4
**main (5)**
148:16;149:13;
161:17;181:23;188:16
**maintain (9)**
36:12;37:12,17;
45:21;52:16,19;54:21,
24;56:1
**maintained (20)**
53:4,10,11,21;55:13,
24;58:3,4,6;70:1,3;
80:1,22,23;81:3,19,21;
82:23;83:5;158:3
**maintaining (6)**
29:3;33:9;36:24;
37:7;79:20,21
**maintains (2)**
52:18;53:17
**maintenance (1)**
63:20
**major (5)**
87:16,16;104:13;
125:16;200:23
**majority (13)**
23:4;33:7;54:25;
91:24;96:2;100:14;
129:9;130:10;170:4;
189:14,21;190:8,16
**makes (3)**
6:25;59:22;120:22
**makeup (1)**
146:25
**making (9)**
33:11;46:7;90:12;
117:15;120:8;132:21;
142:17;181:13;195:3
**man (3)**
63:20;168:8;196:10
**management (1)**
160:21
**manager (27)**
23:25;28:25;29:8;
32:20;33:2;64:20;65:4,
16;67:25;81:17;83:20,
24;85:25;87:11,12,14,
17;89:7;90:7;94:1;
96:19;103:12;158:4,
20;173:13;187:1;

201:22
**manager/designee (1)**
89:5
**managing (3)**
34:23;36:4;103:12
**mandated (4)**
85:6,14,16;86:13
**mandatory (4)**
64:5;85:7;144:11;
146:11
**manipulation (2)**
107:1;116:24
**manner (1)**
120:14
**manual (30)**
68:24;87:22;99:14,
18;100:5;141:15;
169:17;170:3,5,6,8,11,
16,22,23;171:1,3,6,12,
17,25;172:10,11,13;
173:4,5,8,11,25;183:15
**many (14)**
49:24,25;50:15;
59:14;70:20,22;88:15;
93:24;126:4;144:8;
165:23;176:22;194:3;
200:15
**March (3)**
30:2,3,9
**mark (2)**
61:12;159:6
**marked (12)**
40:6;88:3;108:9,18;
114:24;115:2;160:2;
164:2;183:24;184:2;
186:1,5
**marking (1)**
159:22
**married (1)**
30:25
**mass (1)**
149:3
**master (1)**
156:3
**masters (2)**
198:17,20
**match (1)**
146:22
**material (4)**
68:1;120:10;191:4,
24
**materials (11)**
13:22;14:2,6,15,21,
22;15:15;72:8;113:8;
118:13;120:22
**math (1)**
61:12
**mathematician (1)**
59:21
**mathematics (1)**
60:1
**Matt (1)**
186:23

**matter (2)**
194:23;205:5
**matters (1)**
23:3
**Matthew (1)**
186:25
**maximum (3)**
50:22;51:9;84:22
**may (46)**
5:12;7:10;18:17;
19:3;22:8;26:19,19;
34:3;40:2,2;51:25;
55:2,6;69:14;77:7,13;
90:3;91:16;106:15;
107:8;109:6;110:24;
113:18;114:14;123:13;
128:21;133:5;145:22;
152:2,4,22;163:6;
165:3;169:4;170:25;
171:1,2;174:17,18;
175:19;182:23;183:2;
185:9;192:13;193:3;
198:6
**Maybe (15)**
18:17;25:9;35:10,18;
61:9;67:16;68:9;92:8;
111:22;118:15;130:8;
131:5;133:6;165:4;
174:15
**mean (28)**
34:20;36:10;43:10;
46:21;52:18;68:3,4;
74:10;75:18,19;83:19;
99:5;103:6;112:1;
123:25;127:25;132:8;
139:14;154:21;166:21,
23;169:3;171:13;
174:11;185:10,12;
191:3,13
**meant (1)**
158:20
**measures (2)**
16:19;187:19
**meat (2)**
198:8,10
**media (6)**
19:24;20:1,15;21:1,
10;206:1
**medical (1)**
184:25
**medications (1)**
10:4
**meet (6)**
43:9;86:18;93:18;
118:23;193:21;194:1
**meeting (3)**
38:19;89:25;174:12
**meetings (5)**
86:20,22;140:19;
141:8,9
**meets (1)**
84:19
**Megan (3)**

5:11;104:25;141:2
**member (7)**
55:2;86:1;89:7,7,23;
90:8;160:22
**members (10)**
21:14,16;84:10;89:3;
151:23;196:15,21;
201:11,11;202:10
**memory (11)**
10:4;19:3;39:8;
58:15;98:9;102:7;
144:5;148:9,22;
165:25;204:11
**mental (2)**
49:3;197:2
**mentioned (10)**
58:11,15;65:15;
68:17;152:22;154:3,4,
5;174:18;183:19
**merely (1)**
179:25
**Meridian (1)**
199:12
**merits (1)**
74:24
**message (3)**
22:24;23:3,20
**messages (2)**
23:10,15
**messaging (2)**
21:18;22:22
**messenger (1)**
21:25
**messes (2)**
129:14,18
**method (2)**
192:3,22
**Methodology (2)**
192:5;193:6
**methods (2)**
97:6;113:3
**Miami (1)**
130:9
**mic (2)**
159:7;205:8
**Michigan (3)**
24:13;31:5;199:17
**microphone (1)**
167:18
**middle (1)**
42:22
**might (34)**
4:9;8:10;10:5;12:19;
19:13;23:9,13,15;
54:12;56:18;58:14;
61:7;83:13,15,15;
95:17;100:12;103:7;
105:13;129:3,24;
130:2;138:19;140:13;
145:4;159:19;178:9,
19;189:25;193:20;
204:9,20,21,22
**Miller (4)**

23:25;64:19;84:1;
194:18
**mind (1)**
7:9
**mindset (1)**
180:11
**minimum (7)**
43:4,10;50:17,22;
51:2,9;180:18
**minus (1)**
44:21
**minute (1)**
39:23
**minutes (14)**
73:8;141:8,12,12,14,
21;174:6,6,10;175:10,
16;177:7,10;194:13
**miscommunication (1)**
8:16
**missing (3)**
130:11,14,24
**misspelling (1)**
116:25
**misspoke (1)**
112:3
**Misstates (2)**
156:8;157:1
**mistaken (4)**
74:6;75:16,21;
129:10
**misunderstanding (1)**
111:14
**misunderstood (2)**
8:12;131:5
**mixed (1)**
48:8
**modules (4)**
61:1,5;145:6;162:15
**moment (2)**
6:17;108:8
**Monday (1)**
37:25
**Monday-through-Friday (1)**
63:1
**monitor (8)**
93:9,15;95:13;96:9;
103:15,18;130:23;
131:14
**monitored (1)**
100:19
**monitoring (14)**
102:8;105:12,18,25;
106:7,16,17;107:6,7,9,
13,25;138:18;158:21
**month (1)**
182:24
**months (2)**
29:24;182:25
**moon (1)**
129:3
**more (43)**
25:20,25;28:14;
33:24;34:22;36:3;50:7,

25;59:12;60:16;67:21;
68:21;69:7;71:19;
76:18,18;77:19,22;
92:1,10;96:20;111:18;
112:1,9;114:6;128:11,
12;132:13;133:19,22;
135:25;144:22;149:10,
15;151:25;154:21;
155:3,5;166:18;175:3;
177:16;192:11;204:22
**morning (10)**
5:3,4,14;174:5,6,10,
13,14;175:10,16
**most (11)**
26:23;28:13;40:25;
91:21;96:4;99:12;
114:14;168:3;175:4;
191:5,14
**mostly (2)**
92:5;105:22
**mother (1)**
204:8
**mouthful (1)**
25:16
**move (6)**
31:3;46:18;125:19;
140:21;186:12;193:1
**moved (1)**
41:13
**moving (2)**
41:23;187:18
**much (13)**
81:25;91:21;103:11;
116:20;144:13;145:3;
148:11;149:10;180:5;
186:15;189:16;201:8;
206:5
**multiple (1)**
131:17
**must (1)**
43:5
**mute (2)**
205:8,8
**myself (6)**
32:21;85:25;87:10;
93:25;181:20;192:13

## N

**name (12)**
5:7,16;20:22,23;
57:2;110:2;162:2;
163:24;174:16;184:14;
185:7,16
**named (6)**
110:3;137:19,21,23;
199:21;200:1
**names (4)**
18:20;19:17;86:15;
185:11
**Nancy (2)**
115:9;140:4
**natural (1)**

177:5
**nature (35)**
  22:9;23:7;29:4;
  33:10;34:2;36:7;47:7;
  48:13;51:9;64:11;65:9;
  67:11;68:7,14;69:21;
  75:25;76:7,20;82:13;
  94:12;95:8,24;97:1;
  101:20;103:9;106:2;
  116:6;133:9;137:8;
  147:22;148:2;183:22;
  188:8;192:17;200:13
**NCO (1)**
  131:10
**Neal (6)**
  76:8;176:19,19;
  200:3,13,19
**near (2)**
  113:20;174:7
**nearing (1)**
  177:16
**necessary (4)**
  51:19;128:1,4;
  180:18
**necessity (1)**
  182:21
**need (32)**
  8:24;9:10,13;32:6;
  36:20;51:10;55:17;
  62:9;65:2,21;66:14,15,
  20;72:13;75:8;77:7;
  84:6;90:6,20,23;91:15;
  95:6;99:24;106:9;
  116:8;126:2;169:7;
  173:15;183:1;186:18;
  191:25;193:14
**needed (16)**
  31:4,18;54:15;55:20;
  72:23;78:17;90:16;
  92:25;100:21,22;
  106:1;107:18;139:9;
  158:9;162:7;179:12
**needing (1)**
  99:22
**needs (27)**
  67:7;85:23;93:18;
  104:1;115:15;116:4;
  121:1,11,20,22,24;
  122:8,22,25;123:12;
  129:20;136:8,22;
  140:9,14;142:20,24;
  168:8;186:21;187:15,
  16;188:5
**negative (7)**
  51:20;56:13,22;
  57:22;188:24;189:13,
  17
**neither (1)**
  98:17
**net (1)**
  163:15
**New (91)**
  16:9,12;37:12,17,21;

39:5,5;40:15,23;41:3,
22;42:13;45:1,15;50:5,
7,13,16,23;51:4,14,17;
52:4;54:22;59:17,17;
60:22;61:16,21;65:12;
67:3;69:3;70:6;78:25;
79:19;80:18;82:4,5;
83:4,10;85:4;90:14;
91:14;92:14;93:16;
95:14;98:23,25;100:6,
7,7,19;101:25;103:22;
111:21;142:8;143:13,
18,24;145:10,14,14;
147:5,13;150:13;
152:18;157:8;162:5;
164:6;171:5,18;172:1,
9;173:22;178:1,6,16,
17,24,24;179:10,11;
180:1;181:11,12;
182:3;183:8;201:11,
20;203:21,21
**newer (1)**
  22:6
**newly-trained (1)**
  179:5
**next (14)**
  6:25;7:7;9:20;31:14;
  46:19;50:19;59:19;
  60:23;66:23;89:1,18;
  119:21;120:17;153:23
**nice (2)**
  201:22;202:11
**night (17)**
  13:23;14:3,7,23;
  15:1,7;75:4;76:10;
  165:7;168:11;175:14;
  195:6;198:11;200:3,
  10;202:24;204:2
**Nine (1)**
  128:20
**non-acting (2)**
  33:20;34:13
**non-custody (4)**
  53:15;71:15,16;72:1
**none (1)**
  42:18
**non-trainee (1)**
  66:10
**nor (5)**
  14:9;38:18;76:9;
  98:18;126:20
**normal (1)**
  32:3
**Nos (1)**
  130:11
**nose (1)**
  138:10
**note (8)**
  54:15;55:15,17;
  104:24;133:23;134:9;
  193:8;205:3
**notes (1)**
  57:22

**noteworthy (1)**
  56:12
**noticed (1)**
  167:18
**notified (1)**
  152:24
**notifying (2)**
  147:24;148:1
**noting (2)**
  98:14;108:11
**November (1)**
  30:18
**Nowatske (1)**
  104:12
**Nowatzke (3)**
  176:2,12;201:25
**number (17)**
  21:16;25:24;43:1,4,
  10;50:23;59:10,16;
  61:15;70:24;140:8;
  141:25;184:9;185:16;
  199:25;200:2,4
**numbered (1)**
  123:2
**numbers (1)**
  61:3
**Numeral (1)**
  88:25
**numerical (1)**
  187:4
**nutshell (1)**
  75:6

## O

**oath (3)**
  6:5;98:13;197:19
**object (6)**
  73:19;93:2;97:18;
  108:23;156:25;157:2
**objection (28)**
  4:4,8;7:17,23;16:20;
  75:7,23;91:17;92:18;
  93:20;102:13;108:5;
  126:23;127:6,22;
  133:1;134:10;154:16;
  155:16;156:8,16;
  158:11;161:12;166:14;
  172:14,24;205:1,4
**objections (4)**
  4:9;7:10,13,13
**objectives (1)**
  118:24
**obligation (3)**
  74:11;92:24;97:24
**obligations (1)**
  35:5
**observed (1)**
  108:2
**obtained (3)**
  33:19;111:5,10
**obviously (21)**
  33:6;34:25;50:18;

72:5;74:11;76:1,9;
84:6,20;86:16;96:20;
107:5;146:23;147:16;
165:22;189:11,20;
192:6;196:25;201:9;
203:15
**occasions (2)**
  194:3;201:20
**occurred (6)**
  78:19,21;123:13,20;
  131:24;205:24
**October (7)**
  10:16,17;27:3;29:22;
  33:19;34:9,12
**off (46)**
  9:15,19;31:12;34:23;
  50:8;52:22;55:6;56:3;
  57:13;58:5;64:5;71:25;
  73:6,11;79:4;80:4,9,
  19;87:18;94:3;128:12;
  133:21,23;135:15;
  144:1,10;146:24;
  148:16,22;153:4,17;
  170:6;171:13;173:19,
  19;174:16;175:8;
  177:9,21;180:15,22,25;
  182:19;190:3,24;
  205:11
**offender (13)**
  67:15;69:16;124:4;
  147:25;148:1,11;
  149:5;151:6;152:23;
  153:3;154:23;155:8;
  156:7
**offenders (5)**
  48:15;148:12,17;
  149:19;153:6
**offer (5)**
  50:16;97:19,25;
  98:12;187:23
**offered (7)**
  50:5;61:25;113:22;
  117:4;149:24;162:8,17
**offhand (5)**
  57:4;70:25;86:14;
  199:3;203:14
**office (4)**
  53:23;172:4;194:19;
  195:2
**officer (94)**
  23:25;24:22;25:2,12;
  26:6,12,14,15;27:8,8,9,
  14,21,25;28:2,4,4,11,
  23,24;29:7,14;30:8,11,
  12;31:9;32:2,15,16,22;
  33:23;35:13,24;36:3,8;
  38:7,14,19;43:1,5,8;
  57:20;63:5,21;64:1,19,
  23;65:5;66:10,24;67:3,
  22;68:8,25;69:7,11,15;
  70:7;80:4,9;81:17;
  82:5,6;83:25;89:6;
  90:19;101:6;109:24;

110:19;119:6;126:3;
132:1,21;161:9,24;
163:3;165:21;166:5,
10;167:7;168:5;178:7;
180:3,5,19;181:10,22;
182:15;192:7,8,10;
202:17;203:6,12
**officer-in-charge (3)**
  180:3;181:3,13
**officers (29)**
  11:14,23;12:8,17,24;
  13:10;37:8;53:19;72:9;
  75:4;90:14,25;94:20;
  157:22;158:6;159:4;
  169:8;170:2;178:17,
  24;179:1,6,11,13,18,
  18;181:11;200:2;204:2
**official (4)**
  18:8;25:3,12;34:19
**officially (1)**
  34:21
**offset (1)**
  99:15
**OJT (8)**
  59:5;62:24;65:24;
  82:14;95:5;103:12;
  179:20;180:23
**OJTs (3)**
  64:25;94:9;105:21
**OJT's (1)**
  129:4
**older (1)**
  40:24
**once (23)**
  8:5;25:7;34:20;
  53:10;55:20;57:19;
  63:13;80:11,17,18;
  82:19;129:2;133:6;
  136:23;148:9;149:8;
  150:5;151:9;156:12;
  157:11;160:22;171:21;
  194:6
**one (81)**
  5:8,10;7:23;9:10;
  14:24;19:7;20:17;
  27:12,17;32:22;40:24;
  41:18,21;50:7,11,12;
  51:1,24;55:15;64:6;
  66:18;72:20;74:21;
  78:5;84:11;85:25;
  86:16;87:17;90:8,11;
  95:3;98:10;99:25;
  103:7;104:18,19;
  105:2,24;106:7,15;
  108:8;111:20;112:4;
  113:7;117:14,14;
  118:6,19;119:2,2,7,25;
  121:21;139:3;143:21;
  144:2,4;151:12,18;
  159:3,4,20;161:5;
  163:6,24;166:1;178:8;
  179:6;181:2;182:12;
  184:12;185:18;187:11;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 68 of 78

189:2,10;193:3,3;
198:7;201:11;204:1;
205:20
**one-on-one (3)**
67:12,13,22
**one-on-two (1)**
67:14
**one-page (1)**
39:24
**ones (5)**
21:4;37:2;48:23;
52:19;189:16
**one-to-one (2)**
67:2,5
**one-to-two (1)**
67:8
**ongoing (3)**
92:22;127:17;142:18
**online (1)**
109:3
**only (25)**
8:4;9:17;16:7;23:17;
30:7;32:22;36:25;50:4;
54:13;59:5;60:18;
62:22;71:21;78:19;
81:3;93:25;98:10;
105:19;116:14;138:3,
4;151:18;179:13;
183:9;188:23
**on-the-job (61)**
28:16;38:5,13;39:8;
44:13,18,23;45:5;
58:12,19,20;59:6;60:5;
62:2,5,17,20;63:4,12;
65:9;69:25;70:7,12,20,
22;78:2;79:3;84:3,15;
85:4,14,21;90:6,13,16;
91:6,13;92:13,23;
93:10,15;94:3,18;
95:19;96:10;98:23;
99:8;101:3,12,13,24;
102:11,19;103:16,22;
107:23;143:12;163:10;
170:19;178:2;182:13
**onward (1)**
34:12
**open (6)**
31:17;91:5;135:10;
153:17;169:25;173:17
**opening (1)**
154:22
**operate (1)**
179:12
**operates (1)**
181:19
**operations (6)**
89:8;104:20,20;
117:11;127:11;176:20
**opinion (4)**
14:24;179:25;
180:17;191:2
**opportunity (4)**
94:24;98:15;100:4;

187:23
**opposed (5)**
31:8;32:9;46:23;
146:2;149:4
**opposite (1)**
165:19
**option (1)**
172:21
**order (6)**
42:4;46:18;136:24;
150:18;151:10,11
**orders (20)**
100:15;147:20;
149:9,15;150:6,8,11;
154:9;157:13,15;
170:5;171:22,24;
182:12,14,17,22,22;
183:2,10
**ordinary (1)**
4:9
**orient (1)**
5:23
**orientation (5)**
9:23;39:5,5;142:8;
162:22
**originally (1)**
102:5
**others (1)**
94:23
**other's (1)**
6:24
**otherwise (1)**
10:5
**ought (1)**
97:23
**out (64)**
7:23;8:15,24;22:2,
10;33:6;34:22;36:14;
38:6;46:18;60:18;
62:16;64:10;65:18;
66:8,10;68:10,20;69:5,
9,23;78:1;79:11;87:22;
92:15;94:5;96:13,21;
99:17;103:8;109:6,10;
111:16,21;119:19;
128:20;131:7,10,12;
132:9;133:12;136:24;
141:14;145:1,14,17;
149:20,21;153:8;
154:23;155:4,9;159:8;
161:1;167:1,14,22;
169:24;172:9;181:5,
22;189:4;198:8;204:9
**outlasted (1)**
176:22
**Outside (11)**
103:3;119:10,12;
134:11;138:15;145:6;
150:10;151:11;153:6;
162:11;171:23
**outweighs (1)**
188:24
**over (30)**

5:22;6:23;7:21;8:3;
21:24;26:24;30:15;
32:20;37:20;45:4;61:8;
62:9;65:16;68:5;73:3;
104:18,19;116:12,21;
147:16;148:20;151:20;
153:2;161:25;174:15;
175:12;176:3;182:23;
191:5;201:9
**overall (2)**
42:3;101:21
**overhaul (1)**
101:12
**overly (1)**
92:9
**overnight (2)**
179:7;198:7
**oversaw (2)**
15:2,8
**oversee (2)**
33:10;157:24
**overseeing (1)**
44:3
**oversees (1)**
64:24
**own (15)**
18:2;20:6,22;23:6;
25:6;47:16;61:22;
79:14;80:19;81:10;
91:1;97:5;107:24;
139:2;145:16

## P

**page (29)**
40:14;60:17,18,23;
76:6;88:16,22,23;89:1,
18;109:9,14;110:12;
115:8,15,19;116:24;
140:7;142:6;160:11;
162:1;164:10,12,13;
165:18;184:8;186:17,
18;187:6
**pages (2)**
60:21;187:18
**paint (1)**
192:14
**Pam (1)**
199:23
**paper (5)**
79:25;80:2,8,18;82:4
**paperwork (4)**
16:23;33:9;36:5;
78:14
**paragraph (5)**
75:12,12;76:5,12,16
**parameters (1)**
51:6
**Parler (3)**
20:18,19;21:6
**parole (2)**
202:18;203:7
**part (17)**

14:8,14;19:1,1;
40:25;76:22;92:21;
99:12,19;119:2,18;
121:25;141:20;143:13;
149:23;185:14;188:16
**participants (3)**
50:23;51:8,17
**participate (3)**
191:11,17,17
**participated (2)**
122:7,12
**particular (15)**
56:7;57:1;67:7;
111:19;115:13;136:1,
15;142:16;149:5,6,10;
150:21;161:8;168:4;
182:14
**parties (1)**
4:4
**parts (1)**
108:25
**party (2)**
128:22;139:25
**pass (5)**
46:13;54:6;57:13;
160:24,25
**passed (3)**
55:25;57:21;195:21
**passing (2)**
38:20;129:6
**past (4)**
18:17;37:25;61:15;
69:16
**pat (2)**
46:13;49:6
**paths (2)**
195:18,22
**pattern (2)**
130:12;132:17
**patterns (11)**
103:20;105:12,18,
25;106:7,13;107:13,
25;108:1;133:13;
138:19
**pause (1)**
177:5
**pay (1)**
22:4
**Payne (4)**
176:8,9,10,12
**payroll (3)**
25:3;34:1;36:6
**payrolls (1)**
25:7
**PDF (3)**
87:25;108:12;183:24
**pending (2)**
74:2;98:1
**people (44)**
14:6;20:4;22:2;
23:23;25:17;45:18,19;
50:5,7,19;51:4;53:1;
56:10;57:7;61:23;

86:13,17;90:20;94:22;
97:2;124:15;125:19;
126:1;130:1,10,14,24;
131:18;132:7,9,19;
138:9,14;158:21;
163:7;176:14;187:19;
189:12;192:15;193:7,
10;194:17;196:12;
203:24
**people's (1)**
25:7
**per (2)**
51:8;122:18
**perceive (1)**
41:19
**percent (9)**
23:22;148:21;153:5;
180:7;188:18;189:1,1,
3,8
**percentage (2)**
188:25;189:20
**perception (1)**
129:8
**perfectly (1)**
77:5
**performance (10)**
33:25;36:5;37:6;
52:21,23,25;54:14;
118:24;167:8;168:5
**performed (1)**
187:13
**Perhaps (4)**
35:19;74:24;153:22;
195:17
**period (14)**
29:13,22;30:15;
33:16,18;34:5,17;
37:23;39:1;58:23;
147:6;163:5;167:20;
202:10
**periodically (1)**
50:5
**permanently (2)**
28:10;34:13
**permission (2)**
172:6;173:15
**permitted (4)**
43:6;151:6;154:13;
178:25
**Perry (1)**
199:12
**person (27)**
8:20;26:23;29:16;
37:24;55:14;56:7;
65:18,25;71:16;79:2;
87:17;129:14;162:4;
166:19;169:12,13;
180:15,21,25;181:4,14;
190:23;193:5,5;194:1;
196:7;204:4
**personal (27)**
17:25;18:2,4,8,12,
15;19:12,20;22:19;

DENISE DWYER, et al, v.
RON NEAL, et al:

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD     document 203-12     filed 03/29/21     page 69 of 78

23:10,14,17;46:15,15;
47:6,11;48:6;49:3;
82:11;130:19;134:15;
189:8;190:11;196:21;
197:10;205:25;206:1
**personally (13)**
10:22;11:4,21;12:6,
15,22;13:8;15:16;
101:2,22;102:10;
140:15;192:21
**personnel (3)**
21:22;52:13;53:3
**persons (1)**
89:3
**person's (1)**
182:1
**perspective (4)**
45:14;129:8;169:7;
190:23
**pertaining (1)**
140:21
**pertinent (3)**
136:10;139:19;
140:23
**Phase (87)**
38:2,10,22,24;40:19,
22;41:11,14,22,23;
43:16,20,22;44:4,4,4,
19,20,21,21;45:10;
46:1,11,19;47:11,13,
19,22,23;48:1,2,4;
49:14,17,20,25;51:18;
54:10,11,22,22;58:18,
19;59:14;60:4,9,11,14;
61:6;62:13,13,17,17;
63:5,6;64:13;65:11;
66:6,7;68:16;69:4;
70:15,17,19;71:9,12,
21,25;72:2,10,10;78:2,
2;91:23,25;92:1,14;
99:5,10,11;137:15;
163:16,17,18,18;182:8,
10
**phased (1)**
25:10
**phases (25)**
43:2,11,17;44:17,17;
51:15;52:6;55:25;56:9;
58:8,12,17,22;61:4;
63:15;69:25;70:11;
71:25;98:22;100:6;
101:18;143:10,12;
145:10;167:14
**phone (16)**
17:14,18;21:3;22:17,
19,21;23:6,9,10,16,16;
128:21;129:5;193:25;
194:11;205:25
**phones (2)**
23:15,18
**phrase (2)**
36:9;46:22
**phrased (2)**

8:10;92:8
**phrasing (1)**
34:3
**physical (7)**
79:23;80:7,17;96:22;
146:25;148:14;197:3
**physically (10)**
47:4,5,6;53:21;
55:12,23;58:7;65:22;
66:2;72:21
**Pierce (6)**
5:11;104:25;105:4;
135:18;141:2,3
**place (14)**
28:13;39:12,19;
41:22,24;43:17;72:17,
18;93:24;100:2;
103:20;133:20;136:25;
190:9
**placed (2)**
119:5;181:2
**plaintiff (1)**
5:8
**plan (13)**
111:20;112:2,12;
117:19;121:25;147:14;
148:6;149:1,4,25;
150:12;152:19;163:13
**planning (1)**
9:24
**plans (9)**
48:11;111:21;
121:12;144:4;145:9;
146:17;147:2,6;148:3
**platforms (1)**
20:16
**play (2)**
155:23;195:9
**plead (1)**
76:21
**please (9)**
4:17;8:14;19:3;
93:13;97:14;156:22;
159:16;186:20,22
**pleased (1)**
175:19
**plethora (1)**
92:2
**plus (4)**
60:5,8;61:10;203:21
**pm (2)**
165:13;206:10
**PO (1)**
72:18
**point (25)**
8:21;9:13;10:21;
11:4,12,21;12:6,15,22;
13:8;31:5,20;38:15;
58:6;77:10;98:11,22,
25;111:9;120:17;
132:16;142:22;177:5;
195:19;204:9
**pointless (1)**

175:13
**points (2)**
138:2;150:4
**policies (16)**
98:25;99:3,4,9;
100:1,8,10;132:20;
143:20;152:10;169:21;
179:4;182:4;183:5,7,
16
**policy (53)**
83:14,17;84:5,7,9,
13;86:13,17,23;87:1,
10,21,23;88:10,17;
89:9,11,13,21;99:6,14,
14,18;100:5,13;112:4,
16,17,18;122:19;
131:25;136:18;151:1,
3,3,12;152:15;155:8,
11,12,24;156:6;173:5,
8,11,13,21,25;177:24;
183:14,15,21;189:6
**Poor (1)**
166:4
**poorly (4)**
8:10;25:10;92:9;
166:25
**pop (2)**
5:12;105:1
**popular (2)**
191:6,7
**populated (1)**
67:16
**population (1)**
152:1
**portion (24)**
49:19;62:12,20;66:6,
8;68:16;72:10;84:16;
85:5,21;93:15;101:24;
102:19;103:3,17;
108:15;110:9;115:15;
117:3;118:12;149:2;
163:13,16;191:10
**portions (2)**
103:4;178:2
**position (42)**
10:13,18;24:20;
25:13,19,25;26:1;27:3,
6;28:2;31:16;32:15,16;
33:19;34:14,19;35:13,
14,15,24,25;68:18;
74:15;83:22;104:9;
106:2;110:2,5,18;
111:4,5,10,17,17;
112:10;113:7;176:7;
180:3;181:3,13,25;
196:6
**position/summary (1)**
110:10
**positions (4)**
25:24;30:5;35:3;
105:18
**positive (12)**
36:15;51:21,22;

54:19;56:12,22;57:22;
188:25,25;189:14,16,
21
**possibility (1)**
129:24
**possible (7)**
18:23;54:11;83:12;
106:6,13;195:17,21
**possibly (2)**
91:2;114:13
**post (31)**
20:3,7,8;32:5,7;
100:15,15;147:20;
149:9,10,14;150:6,7,
11,18;151:10,11;
154:9;157:13,15;
170:5;171:22,24;
182:12,14,14,16,21,22;
183:2,10
**posted (1)**
175:11
**post-procedures (1)**
14:9
**posts (2)**
21:19;180:12
**potential (1)**
75:2
**Power (1)**
117:19
**PowerPoint (5)**
114:15;116:22,24;
117:2;120:9
**PowerPoints (2)**
48:11;117:6
**practice (9)**
14:12;168:19,19,23;
175:9;188:1,10;189:9,
22
**practices (3)**
15:12;16:1;50:18
**practicum (1)**
47:18
**Preacher (1)**
21:2
**precautions (2)**
148:2,3
**predominantly (2)**
36:8;48:9
**predominately (1)**
56:1
**preparation (3)**
49:3;122:7;123:11
**prepare (9)**
63:1,25;101:13;
178:12;180:7,10;
193:17,22;194:11
**prepared (4)**
6:13;75:22,24;
121:18
**preparedness (1)**
69:8
**prepares (2)**
92:4;179:15

**presence (1)**
174:21
**present (8)**
13:16,20;14:1,23;
15:16;76:10;84:10;
195:6
**presently (1)**
24:16
**preservice (3)**
38:10;50:10;107:2
**pretty (4)**
40:3;103:11;145:3;
191:8
**prevent (1)**
190:20
**prevented (1)**
177:25
**preventing (2)**
127:20,25
**prevention (3)**
143:2;145:12;190:10
**previous (2)**
97:12;135:3
**previously (9)**
8:13;32:19;35:10,16;
54:11;101:17;121:17;
136:6;176:6
**primarily (4)**
5:13;49:9;58:3;60:3
**primary (2)**
32:19;33:5
**principles (1)**
49:6
**print (2)**
56:2;58:5
**printed (1)**
141:14
**prior (17)**
4:2;27:5,7,9,18;30:7;
39:16;102:5;126:9;
156:8,21;157:1;162:8;
197:1,13,19;199:4
**Prison (99)**
10:10,21;11:4,12,21;
12:6,15,22;13:8,17;
14:3,7,13,16;15:3,9,19;
16:18;17:8,11,16,19,
23;18:6,14;19:22;
21:12;22:8,25;23:9,11,
21;24:17;26:13,22;
28:20;29:19;30:16,17;
31:12,16,20,23;44:3;
53:21;54:1;57:3,8;
68:20;69:12;82:16;
84:17,22;91:16;92:12;
99:1;100:8;101:1,14;
103:19,21;105:12;
106:8,14;107:14,24;
109:20;115:12;122:20;
126:12;142:23;146:18;
149:18;151:2,5,14,16;
152:3,4,11,14;156:4;
157:10;169:16;174:4;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 70 of 78

177:24;178:9,25;
179:25;181:18,23;
182:5;183:18,20;
185:5;191:6;195:6,15,
16
**prisoner (18)**
11:15,24;12:9;
124:25;125:1;148:7;
150:1,19;151:7,21,24;
152:12,20;153:14,25;
154:14;184:23;196:8
**prisoners (1)**
48:5
**prison's (10)**
10:11,22;11:5,13,22;
12:7,16,23;13:9;179:4
**proactively (2)**
126:11;138:17
**probably (7)**
9:7,11;58:6;77:14;
91:23;128:10;149:15
**problem (2)**
8:23;9:14
**problems (2)**
14:10;201:22
**procedure (13)**
83:14;84:5;87:22;
99:14;105:20;131:25;
136:18;151:2;153:13;
155:20;173:5,8;183:14
**procedures (32)**
17:10;64:8,9;68:4;
84:20,20,23,24;87:23;
99:1,3,4,6,9;100:1,9,
13,14;132:20;143:19;
146:8;149:9,16;
152:10;154:4;157:23;
169:9,22;170:12;
171:15;179:4;182:4
**proceed (3)**
5:24;7:25;77:18
**proceeding (3)**
6:6;8:19;9:25
**process (43)**
28:16;38:22,25;
40:15,20;41:4,8,23;
42:13;43:2;45:1,16;
51:15;52:5,7;54:25;
56:19;57:23;58:9,24;
59:11,18,19;60:23;
61:15;62:13,19;69:18;
89:25;92:16;94:3,18;
95:11;96:6;114:7,9,17;
115:24,25;117:24;
122:3,13;137:23
**produced (1)**
159:23
**Production (1)**
108:13
**professional (2)**
35:3;136:17
**proficiency (1)**
47:18

**proficient (1)**
46:18
**program (44)**
28:25;29:8;32:20;
33:2;51:17;53:11;
55:20;65:24;80:21;
82:12,15;95:5,14;
96:10;100:20;102:9,
11;103:12,17;105:14,
16;106:10;107:19,23;
108:3;113:22,24;
114:10,20;120:7;
127:19;143:13;151:15,
16,21,24;152:20;
153:25;162:5;169:2,3;
178:1,3;180:6
**programs (16)**
10:23;11:5,13,22;
12:7,16,23;13:9;15:2,8,
18;16:6;17:9;157:24;
158:25;187:24
**progress (1)**
205:6
**promise (4)**
133:18;204:6,7,12
**promote (1)**
176:24
**promoted (2)**
28:24;200:16
**proof (1)**
72:21
**proper (3)**
81:1;128:23;147:20
**properly (6)**
124:7,17;130:2;
138:9,16;155:21
**propose (1)**
90:15
**proposed (3)**
101:2,23;147:9
**proposing (1)**
177:25
**protect (4)**
75:17,20;76:3,8
**protection (8)**
46:15,16;47:6,11;
48:6;49:4;130:19;
190:12
**protocols (9)**
10:23;11:6,13,23;
12:8,17,24;13:10;
15:18
**prove (1)**
125:15
**provide (3)**
90:14;178:17;179:11
**provided (4)**
101:3;103:22;
110:17;143:24
**provides (1)**
78:11
**public (1)**
21:19

**Puetzer (3)**
202:23,24,24
**pull (13)**
68:10;70:5,10;82:12;
87:20;108:7,10;109:8;
113:17;114:23;118:15;
163:22;186:2
**pulled (3)**
32:7;40:11;60:18
**pulling (1)**
191:11
**purpose (3)**
110:10;178:6,16
**purposes (2)**
25:4;111:16
**pursue (1)**
31:7
**pursued (2)**
30:19,22
**put (24)**
4:1;36:18;51:20;
54:16;55:19;73:17;
88:8;90:2;96:15;97:15;
116:5;117:18;133:23;
136:1;141:1;144:18;
153:8;171:11;180:6;
181:12;185:9;186:9;
189:13;205:1
**puts (1)**
59:24
**putting (2)**
48:10;77:16

## Q

**QRT (1)**
117:10
**qualified (3)**
31:17;80:4;178:14
**qualitative (1)**
187:22
**quality (3)**
93:24;187:12,23
**quantitative (1)**
187:19
**quarterly (3)**
86:18,19;89:25
**questionable (1)**
201:12
**question-by-question (1)**
74:12
**quick (1)**
72:13
**quickly (1)**
186:12
**quiet (1)**
167:21
**quit (2)**
81:25;163:7
**quite (5)**
39:9;54:11;83:12;
153:1;193:10
**Quits (2)**

81:22,23

## R

**radio (4)**
64:8;147:20;153:3;
174:8
**range (4)**
61:9;88:7;180:11;
189:21
**ranges (2)**
183:25;186:3
**rape (3)**
82:16;183:18,20
**rare (4)**
51:21,23;54:18;
132:5
**rate (1)**
46:18
**reach (2)**
22:2,10
**reached (2)**
177:5;189:1
**read (18)**
88:13;89:8,20;
100:16;109:10,12;
120:9;122:17;147:16;
148:20;156:21,24;
157:15;174:5;175:12;
183:1;186:17;206:8
**reading (3)**
120:9;134:16;182:21
**ready (5)**
77:21;170:3,5;178:8;
205:14
**really (12)**
36:13;54:2;55:3,8;
98:17;127:2,2;148:20;
181:25;201:8;203:5,5
**rearranging (1)**
120:8
**re-ask (1)**
167:24
**reason (2)**
7:2;30:22
**reassigned (1)**
30:20
**reassure (1)**
74:13
**recall (22)**
18:16;19:17,23;
39:11;42:8,18;51:5;
87:5,7;97:14;100:22;
104:21;113:19;114:1;
136:3;143:14;165:24;
185:8,19,22;203:16;
204:4
**recalling (1)**
146:3
**receive (7)**
14:19;38:4;91:23;
145:2;181:24;188:2,4
**received (7)**

38:1;42:4,5;161:3,9;
163:3;198:4
**receives (3)**
33:11;43:1;59:17
**receiving (1)**
185:22
**recently (3)**
20:17;111:18;112:9
**recipient (1)**
185:7
**recipients (2)**
184:10,13
**recitation (2)**
4:12;163:2
**recognize (4)**
77:13;108:22;109:2;
110:17
**recognizing (4)**
34:25;98:10;153:9;
190:19
**recollection (12)**
10:7;39:18,20;41:3,
7,10;42:11;60:20,23;
145:24;153:12;195:24
**recommend (1)**
90:15
**recommendation (1)**
129:19
**recommendations (3)**
113:9;120:23;143:1
**record (46)**
4:2;5:16;6:10,19;
7:14;8:6;9:15,20;
35:19,21;40:13;73:6,
11,16,18;77:17;88:9;
97:15,24;98:6,8;
104:25;108:11;115:6;
133:22,23;134:10;
135:3,15;141:1;
156:18,23;161:17,23;
162:3;163:23;164:7;
165:12;177:10,15,21;
186:9;193:9;205:2,4,
11
**recorded (1)**
159:10
**recording (3)**
6:12;73:11;205:12
**records (8)**
81:7,13;159:4,23;
160:6;162:25;163:1;
203:11
**recruitment (1)**
87:11
**Redden (4)**
202:14,15,16,19
**re-entry (3)**
89:6;104:18;185:13
**refer (5)**
99:24;104:16;111:8;
112:9;113:18
**reference (10)**
51:12;100:5;114:7,9;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 71 of 78
CHRISTOPHER BEAL
July 30, 2020

129:23;135:3;151:14;
170:21;171:2;182:11
**referenced (4)**
26:8;61:20;76:15;
86:5
**referencing (2)**
48:18;98:24
**referred (3)**
112:9,11,14
**referring (23)**
15:23;16:10;40:1;
88:19;89:12;102:19,
22;104:6;106:22;
110:14;111:24;114:2;
115:17;117:4;119:22;
120:24;123:4;136:12;
138:23;158:19;166:6;
183:19;187:11
**reflect (5)**
42:25;139:21;162:4;
163:1;171:22
**reflected (6)**
143:6;154:1;161:23;
163:14;170:18;171:1
**reflects (4)**
139:18;161:24;
188:18;190:2
**refresh (2)**
58:15;183:3
**refresher (2)**
5:24;162:18
**refrigeration (1)**
198:8
**refuse (1)**
168:10
**regard (9)**
16:18;25:23;89:24;
105:25;113:21;158:10;
169:8;171:14;181:10
**regarding (4)**
10:23;11:6;14:15;
146:16
**regardless (1)**
68:18
**regards (1)**
14:12
**regimen (2)**
73:25;78:9
**regimens (1)**
77:6
**regional (4)**
38:8;87:12,13;89:4
**regular (6)**
32:1,4,5;37:15;
57:25;63:8
**relate (7)**
48:19;99:10;115:23;
138:20;145:11;147:1;
151:10
**related (20)**
18:3;73:22;78:3,3;
95:25;123:23;124:1;
131:10;134:23;137:4,

5,25;143:1,2;147:5;
152:5,19;153:25;
172:11;184:22
**relates (3)**
49:14;74:17;97:12
**relating (1)**
74:18
**relation (3)**
123:21;164:20;169:2
**relationship (11)**
67:2;200:13,15,17,
21;201:1,8,14,15;
202:4,15
**relatively (2)**
179:5;181:12
**release (6)**
11:24;84:21;150:1,
19;151:6;154:13
**relevancy (1)**
74:12
**relevant (7)**
73:23;74:1,5;76:23,
24;77:3,12
**relying (1)**
6:15
**remaining (1)**
31:8
**remember (14)**
18:20;19:2,5;41:12;
86:15;102:4;109:7;
110:24;174:16;181:18;
189:24;199:3,24;204:9
**remind (1)**
49:23
**remotely (2)**
4:6;8:20
**remove (2)**
85:20;117:19
**renew (1)**
134:10
**reorganize (1)**
177:6
**repeating (1)**
145:23
**repetitive (1)**
190:4
**repetitiveness (1)**
190:21
**rephrase (2)**
8:15;12:20
**replaced (1)**
29:21
**report (22)**
24:6;38:8,12,16;
64:10;69:18;95:2;
104:19;114:9;124:18;
125:2;127:5;128:16,
17;132:22;137:2;
166:4;175:25;176:2;
184:16;185:7,11
**reporter (6)**
4:6,22;6:10,18;7:1;
177:18

**reporting (1)**
62:25
**reports (29)**
13:21;14:19;34:1;
123:7,11,15,17,20;
126:12,15;127:16;
129:17;131:6,11,17;
132:17;136:16;139:6,
8,12,14,17,20;140:1,
17,20;142:25;157:20;
185:22
**report's (1)**
124:5
**repository (1)**
161:8
**representation (2)**
142:12;204:1
**representative (1)**
5:9
**representing (2)**
5:8;194:15
**represents (1)**
14:12
**request (1)**
126:21
**requested (3)**
126:17,18;156:24
**require (3)**
78:10;105:13;108:2
**required (4)**
76:21;151:4,6;
182:13
**requirement (3)**
89:13;141:20;190:18
**requirements (2)**
38:20;190:20
**requires (2)**
51:8;84:10
**rescuing (1)**
149:5
**research (2)**
118:22;119:14
**reserved (1)**
206:9
**resource (1)**
162:14
**resources (2)**
25:4;53:4
**respond (3)**
13:11;91:15;155:10
**response (18)**
16:19;49:15;75:7;
97:20;135:2;143:3,19,
25;145:11;153:15;
154:14;169:2,9;
171:15;172:12;190:2;
192:4,23
**responses (3)**
188:6,12;189:4
**responsibilities (18)**
26:23;33:16,25;
34:17;35:5,23;37:7;
63:3;89:18,22;90:12;

112:21;113:7;118:6,
20;119:3;149:13;
180:19
**responsibility (16)**
16:5;33:4;45:15;
91:11;92:12,21,22;
93:5;105:10;118:22;
119:13;151:20;153:19;
156:13;176:3;181:15
**responsible (3)**
33:8;79:19;139:25
**responsive (1)**
97:25
**restraints (6)**
46:14;47:5,9;48:4,
10;49:7
**restrict (1)**
74:5
**restricted (3)**
169:23;173:9,11
**restrictive (3)**
117:9;162:19;175:1
**restroom (1)**
72:13
**result (6)**
15:19;67:12;107:9,
24;125:3;129:19
**results (4)**
186:21;187:4,4,5
**resume (1)**
31:15
**retention (1)**
87:11
**retired (1)**
117:18
**re-trained (1)**
133:8
**revealing (1)**
106:14
**review (54)**
14:15;44:10;91:2;
95:22;113:3,8,12,13;
114:12,17;116:12,17;
117:13,21,24;118:4;
122:3,23;123:6,15,17;
126:11,14;132:16;
134:13;136:10,20;
137:18;138:3,12;
139:8,18,22;157:20,21;
168:19,24;170:3;
173:13,15,16,25;175:9,
16;182:14;188:2,11,16,
20,21,23;189:4,7;
193:16
**reviewed (14)**
13:21;14:1,5,21,22;
15:15;111:18;139:11,
13,16,25;140:16;
164:19;189:2
**reviewing (1)**
168:4
**reviews (5)**
95:15,16;96:3;

120:18,21
**right (23)**
7:13;24:19;34:23;
50:17;51:7;61:11;62:6;
64:18;72:15;87:8,18;
90:21;117:16;120:15;
129:2;137:14;140:3;
148:21;169:14;180:22;
182:19;188:15;192:9
**right-hand (2)**
40:2,16
**Riley (2)**
115:10;140:4
**ringing (1)**
203:18
**risk (2)**
76:14;149:17
**risks (1)**
76:11
**road (1)**
178:13
**Rodriguez (9)**
160:7;161:24,24;
165:19,20,21;166:5,25;
203:13
**Rodriguez's (2)**
167:7;168:5
**role (5)**
17:7;74:18;155:23;
158:24;195:9
**roll (1)**
119:19
**Roman (1)**
88:24
**rona (1)**
67:10
**room (3)**
7:12;190:9;195:4
**rotated (1)**
160:9
**rough (1)**
144:7
**roughly (2)**
144:21,22
**round (1)**
66:23
**routes (2)**
147:19;149:16
**routinely (1)**
185:21
**rule (4)**
7:12;9:17;73:21;
177:24
**rules (4)**
4:10;5:23;6:2;
175:20
**run (15)**
50:8,13,20,20,24;
51:3,4,10,10,11;152:4;
153:18;161:4;165:1;
180:16
**running (4)**
23:6;153:7;179:16,

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 72 of 78

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

19
**runs (1)**
    114:17
**Ryan (1)**
    203:3

**S**

**safe (1)**
    45:19
**safely (2)**
    178:18;179:12
**safety (16)**
    10:23;16:19;45:21;
    49:14;87:17;89:7;
    134:23;143:2,19,25;
    145:12,19;154:25;
    158:3,20;201:21
**Sam (2)**
    5:7;159:7
**same (35)**
    8:4;22:7;35:6;39:1;
    40:14;44:25;48:19;
    54:21;57:12,19,23;
    62:18,19;63:5,22;
    64:17;66:9;67:20;
    68:17;70:15,18;
    111:15;115:19;130:24,
    25;131:18;137:6;
    140:18;164:13,14;
    193:13;196:24;200:23;
    201:6;202:1
**Sarah (2)**
    203:17;204:1
**save (3)**
    56:6,6,6
**saw (1)**
    129:25
**saying (7)**
    69:8;127:15;129:3;
    152:23;153:19;167:2;
    168:8
**scanned (2)**
    80:21;82:4
**scenario (7)**
    86:2;124:6;128:16;
    131:7,9,13,16
**schedule (10)**
    28:17;41:16;46:6,8,
    10;50:9,13;63:8,9,14
**scheduled (2)**
    51:3;62:23
**schedules (1)**
    50:9
**scheduling (2)**
    36:6;63:6
**school (2)**
    199:11,12
**scope (6)**
    19:4;42:3;73:20;
    93:17;134:12;162:11
**Score (1)**
    166:4

**screen (8)**
    39:22;40:11;47:24;
    108:11;114:25;136:2;
    159:25;186:2
**scroll (3)**
    60:17;88:8;188:4
**scrolling (1)**
    88:21
**search (6)**
    46:13;47:4;48:14;
    49:6;67:17;84:9
**searches (3)**
    46:14;47:10;49:7
**searching (1)**
    48:5
**search's (1)**
    84:9
**second (10)**
    58:8,11;60:17;75:10;
    76:5;87:24;112:22,22;
    160:11;164:11
**secondary (2)**
    72:24;78:8
**secondhand (3)**
    196:11,22;197:11
**secretary (3)**
    23:24;81:16;185:12
**Section (7)**
    88:24;89:17,21,21;
    110:9,10;121:12
**sections (2)**
    110:13;172:11
**secure (1)**
    148:13
**secured (2)**
    53:22;172:5
**security (9)**
    45:21;49:4,6,8;
    84:23;130:18;149:18;
    154:25;190:12
**seeing (7)**
    110:22;164:6;
    165:10;168:25;169:11;
    185:10;192:23
**seek (2)**
    133:12;172:9
**seems (3)**
    75:13;167:13;192:10
**selected (1)**
    181:4
**send (3)**
    56:2;58:5;153:16
**sending (1)**
    23:15
**senior (3)**
    25:25;26:23;32:25
**sense (5)**
    6:19;7:4;8:16;
    124:20,21
**sent (6)**
    31:12;37:13;116:9;
    140:4;185:22;186:24
**sentences (1)**

6:24
**separate (2)**
    62:14;144:6
**September (1)**
    10:14
**sergeant (3)**
    90:19;180:14;203:6
**sergeants (1)**
    179:17
**serious (1)**
    76:11
**sermons (1)**
    20:11
**serve (3)**
    24:16;179:1;180:3
**served (8)**
    27:13;28:22;30:10;
    31:19;34:6;107:15,22;
    176:20
**serves (3)**
    39:8;144:5;148:9
**service (2)**
    54:1;81:22
**services (1)**
    32:7
**serving (1)**
    33:17
**Session (67)**
    63:17,18,22,23;64:3,
    4,6,13,16;65:11;67:19;
    68:2,16;69:2,4,17;
    70:15,17,19;71:1,4,13,
    14;79:7,7,9,9;80:11,12,
    13,16,16;85:6;143:21,
    23;144:6,9,11,14,15,
    18,18,22;145:7,18,25;
    146:2,5,12,16;147:1,4,
    10,14;148:6;149:24;
    150:12;152:19;153:24;
    157:12,14;163:18;
    170:11,13;171:12,18;
    182:16
**sessions (17)**
    63:16,16;70:1,11;
    71:6,8,11,19,20;79:13;
    85:10,17,22;91:25;
    92:1;101:19;182:10
**set (15)**
    41:7;50:10;51:6;
    79:1;85:1,1;86:23;
    102:6;145:25;146:15;
    159:22;178:17;179:15;
    180:10;189:25
**sets (2)**
    130:11;159:4
**setting (4)**
    62:12;67:21;76:18;
    91:9
**seven (1)**
    110:25
**several (5)**
    48:11;169:21;
    170:12;201:1,20

**sexual (1)**
    162:18
**shadow (1)**
    99:7
**shadowing (2)**
    68:21,23
**shaking (1)**
    55:3
**shall (2)**
    89:2,4
**share (4)**
    39:22;47:24;114:25;
    159:24
**sharing (3)**
    115:25;118:19;
    160:13
**sharp (1)**
    74:24
**sheet (19)**
    43:21;65:21;72:16,
    20;73:1;78:6,8,17;
    79:7,15;84:12;91:1;
    103:3;125:17;130:21;
    145:1;171:21,23;
    182:17
**sheets (25)**
    65:14;70:3,10;72:25;
    73:2;78:19;79:9,10,20,
    20,25;80:2,8,18;82:4,
    14;83:9;84:4,15;
    102:16,18;130:22;
    131:14;170:19;171:2
**shift (25)**
    31:23;32:5;37:13;
    38:17;43:6;52:8,25;
    53:14;55:2,21;56:3;
    57:14;62:24;133:6;
    145:16;153:18;154:24;
    155:19,25;156:12;
    157:6;158:16;173:19;
    181:7;202:25
**shifting (1)**
    42:14
**shifts (3)**
    62:25;63:2;103:8
**short (8)**
    9:9;21:8;73:14;
    135:16;154:20;160:21;
    177:13;205:16
**shortage (1)**
    181:21
**shortages (2)**
    67:10;181:19
**shortly (1)**
    5:13
**shot (1)**
    19:7
**show (16)**
    36:21;39:21;47:18;
    65:20,25;66:2,15,22;
    114:25;124:13,17;
    137:2;141:21;161:3;
    183:23;185:25

**showed (4)**
    59:1;71:23;121:1;
    124:8
**showing (6)**
    59:13;108:10;167:5;
    186:10;189:14,16
**shown (2)**
    87:25;129:4
**shows (3)**
    72:16;88:16;165:4
**sick (2)**
    33:6;55:6
**side (6)**
    32:12;38:9;53:19;
    153:10;165:3;199:14
**sideways (1)**
    160:10
**sign (2)**
    80:4;206:8
**Signal (2)**
    184:22,25
**signature (2)**
    165:20;206:9
**signatures (1)**
    72:22
**signed (1)**
    110:24
**significantly (1)**
    159:20
**signing (2)**
    79:4;80:9
**sign-off (7)**
    72:16;73:1;78:6,7,
    10;79:7,9
**sign-up (1)**
    79:20
**similar (5)**
    60:21;122:12,13;
    185:16,17
**Similarly (3)**
    6:21;7:6;8:18
**simple (3)**
    56:18,20;120:8
**simply (2)**
    28:5;45:20
**simulate (1)**
    68:5
**single (2)**
    55:14;102:10
**sit (9)**
    36:16;47:3;59:15;
    68:9;87:7;102:8;
    116:10;192:13;195:24
**sitting (2)**
    51:25;97:12
**situation (4)**
    119:12;178:9,14,19
**situational (1)**
    91:22
**situations (5)**
    91:16,21;92:3,5;
    169:22
**six (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 73 of 78

182:25
**skill (3)**
66:4;179:15;180:10
**skill-based (10)**
28:15;38:2;46:11,22;
47:13;48:9;49:16,18;
60:4;130:20
**skilled-based (3)**
47:8;51:6;92:2
**skills (10)**
47:18;49:5,8;60:1;
91:15;130:18;178:12,
18;179:12;190:12
**skills-based (2)**
48:3;49:9
**skipping (1)**
89:16
**slash (3)**
123:7,17;132:16
**slipped (1)**
125:1
**Smales (1)**
23:24
**small (1)**
40:3
**smaller (2)**
25:24;32:21
**social (6)**
19:24;20:1,15;21:1,
10;206:1
**somebody (21)**
18:17;36:17;47:5;
55:4;81:24;106:17;
124:2;128:23;130:12;
153:2;162:6;166:24;
168:10,11;169:12;
174:8;180:7,22,23;
192:12;201:13
**somebody's (1)**
55:9
**someone (26)**
14:14;16:5;28:1,10;
29:21;53:10;54:12,20;
55:16;59:10;80:18;
81:23;82:8,24;83:4,21;
108:1;119:12;128:18;
129:18;131:24;134:12;
180:19;181:1,5,12
**Sometime (1)**
39:14
**sometimes (7)**
21:24;22:6;77:13;
111:22;128:21;167:13;
174:13
**somewhere (8)**
27:13,18;41:4;56:5;
61:9,20;83:5;182:25
**Sorry (13)**
37:4;49:1;71:13;
73:6;112:3,3;125:12;
130:6;135:13;141:19;
158:20;171:13;176:8
**sort (13)**

37:15;40:21;43:22;
65:6;68:21;69:23;
76:22;79:11;80:7;91:4;
101:11;129:17;189:20
**sounds (7)**
36:11;41:18;66:5;
134:6;135:14;169:4;
175:15
**source (2)**
123:18;140:22
**sources (6)**
103:14;122:24;
123:3;136:7;140:8,13
**South (2)**
84:21;199:14
**Southern (2)**
198:22;199:2
**speak (8)**
75:23,24;159:12;
193:22,25;194:4,11;
195:4
**speaking (5)**
44:9;85:3;94:23;
120:19;125:8
**speaks (1)**
76:1
**special (1)**
117:8
**specialist (1)**
87:13
**specialized (1)**
117:8
**specific (38)**
19:17;71:5,14;79:2;
81:12;84:17,18;85:18;
86:13,18,21,25;91:11;
95:21;101:13;106:8;
107:13,17;116:5;
118:23;128:11;130:8;
132:14;138:15;146:2,
3,8,19;149:4;150:4;
152:5;165:25;169:24;
174:16;183:17;189:23;
190:1;204:11
**specifically (21)**
48:1;71:2,7;76:15;
78:3;92:9;93:11;95:24;
98:24;99:10;104:6;
116:16;119:11;123:21;
143:23;148:10;171:14;
174:22;181:10;184:7;
188:11
**specifics (1)**
150:18
**spectrum (1)**
133:4
**speculation (9)**
91:18;126:24;127:7;
154:17;158:12;161:13;
166:15;172:15,25
**spell (1)**
5:16
**spelling (1)**

114:15
**spend (2)**
77:5;195:15
**spent (2)**
73:24;195:16
**spoke (2)**
42:15;193:24
**spoken (4)**
15:15;194:15;
204:14,17
**squad (2)**
202:3,10
**squeezy (1)**
193:3
**staff (97)**
14:25;15:6;16:8,11,
17;17:2,3;18:5,10,14;
21:14,16;22:6;28:5;
29:2;31:11;36:12,13,
24;37:8,15;39:9;46:7,
17;48:12;53:23;55:2;
61:24;63:14,24;67:10;
69:4;71:14,16,18,21;
72:1,4;78:3;79:8;
80:25;81:7,13;82:7;
84:6,10,24;85:6,11,14;
87:21;88:17;89:6,7;
90:19;94:1;95:4;99:25;
100:7,7;101:4,4;
106:24;107:4;113:15;
115:10;116:10;117:11;
119:18;120:9;122:19,
22;129:14;133:7;
153:7;154:12;155:11,
20;156:4,5;160:22;
170:4;181:19,21;
182:3;188:6;190:3,24;
191:1,11;192:11;
195:2;200:3;201:11,
11;203:21,22
**staffing (1)**
67:7
**staff's (1)**
71:6
**stage (1)**
79:4
**stages (1)**
119:17
**stamped (6)**
39:25;40:4;108:12;
115:7;160:8;164:8
**stand (1)**
195:20
**standard (7)**
50:8,13;56:21,24;
57:12;162:12;201:14
**standardized (5)**
72:15,20;143:22;
146:6,12
**standards (1)**
190:7
**stands (1)**
181:5

**stand-up (1)**
202:18
**start (7)**
34:23;48:10;59:20;
86:4;113:20;167:10;
174:18
**started (6)**
20:17;37:25;56:15;
103:7;174:7;197:8
**starting (8)**
35:6;41:9;54:20;
59:18;89:17;92:16;
153:6;162:9
**starts (2)**
88:7;99:7
**state (60)**
5:16;10:10,21;11:3,
11,20;12:5,14,22;13:7,
17;15:3,9,19;16:18;
17:8,10,16,19;18:6;
19:22;21:12;22:25;
23:21;24:17;26:22;
28:19;29:18;30:17;
31:16;44:3;63:18;
84:17,22;92:12;99:1;
100:8;101:1,14;
102:24;107:14,24;
109:20;115:12;122:20,
24;142:23;143:22;
146:18;151:2,15;
152:11,13;164:7;
169:16;174:3;177:24;
178:25;179:4,25
**stated (4)**
7:17;32:19;110:23;
157:13
**statement (3)**
125:5;132:2;135:4
**statements (1)**
129:9
**states (8)**
95:22;109:23;
118:21;122:18;123:17;
136:10;151:19;166:4
**statewide (1)**
146:1
**Statham (2)**
203:3,4
**statistic (1)**
188:21
**statistics (1)**
187:21
**status (4)**
117:9;162:19,21;
175:1
**staying (1)**
83:17
**stepkids (1)**
31:5
**steps (7)**
15:5;65:17;76:13;
84:8;93:8,14;156:4
**Steven (1)**

201:16
**stick (1)**
165:24
**still (16)**
10:18;28:3;31:22;
33:22;67:22;68:19,20;
84:24;101:6;137:15;
163:10;167:15;171:22;
176:24;191:23;201:18
**stocker (1)**
198:7
**stop (6)**
47:24;73:10;128:8;
135:13;173:18;205:8
**stoppage (1)**
171:11
**stopping (2)**
127:14;205:12
**Storm (1)**
107:2
**straight (5)**
30:9;39:6;55:1;
60:11;95:4
**straining (1)**
73:20
**stream (1)**
77:2
**streamline (1)**
177:7
**streams (1)**
70:20
**street (1)**
7:8
**strengthening (1)**
167:2
**stress (1)**
193:4
**Strictly (1)**
30:12
**strike (37)**
20:14;22:15;33:14;
40:20;41:19;44:8;
45:12;46:20;52:2;
62:11;79:17,23;81:20;
93:12;94:15;98:20;
100:17;109:18;115:22;
116:18;121:16;126:8;
143:10;145:5;147:2;
150:25;152:9;153:23;
155:6;157:18;161:21;
166:8;168:16;178:20;
179:23;183:4;197:6
**strip (3)**
49:7;84:9,9
**structure (2)**
62:19;101:24
**struggling (1)**
65:8
**stub (1)**
22:4
**stuck (1)**
176:25
**studies (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 74 of 78

20:11
**study (1)**
199:8
**stuff (6)**
6:24;20:8;57:24;
76:15;133:19;189:13
**subject (5)**
4:8;115:14;119:7;
194:23;205:5
**submit (3)**
16:23;91:1;113:15
**submitted (3)**
25:8;85:24;168:8
**submitting (2)**
116:13;122:21
**subsequent (4)**
110:12;122:13;
142:6;143:7
**subsequently (1)**
82:6
**substance (3)**
122:3;194:23,24
**substantially (1)**
111:15
**substantive (2)**
114:19;187:18
**succeed (1)**
77:14
**succeeding (1)**
77:15
**such-and-such (2)**
56:15,16
**sued (2)**
138:13;197:13
**sues (1)**
138:8
**sufficiency (1)**
92:23
**sufficient (4)**
90:13;93:18;178:18;
180:2
**sufficiently (1)**
95:23
**suggest (2)**
90:24;117:24
**suggested (1)**
147:10
**suggesting (1)**
190:22
**suggestion (1)**
90:18
**suggestions (8)**
91:5;113:14;114:10;
116:5,9;117:15;142:9,
18
**suicide (1)**
190:10
**sum (1)**
145:18
**supervise (3)**
45:7;46:3;53:1
**supervised (2)**
43:7;45:11

**supervising (2)**
45:25;203:16
**supervision (4)**
37:15;38:18;45:4;
145:17
**supervisor (19)**
45:15;52:8,16,18;
53:14;55:2,21;57:14;
104:4,6,7,14;105:11;
133:7;153:19;154:24;
157:6;181:7;200:24
**supervisors (6)**
52:25;53:12;56:3;
155:19;156:1;158:16
**supervisor's (1)**
156:13
**supervisory (1)**
176:3
**supervisory-level (1)**
200:5
**supposed (3)**
132:8;145:1;157:15
**sure (47)**
8:24;12:21;19:8;
24:19;26:20;29:5;
33:11;36:11,14;37:25;
43:15;45:17;46:8,17;
54:2,9;55:5;61:4;65:1;
66:25;68:15;72:11;
74:10;75:8;83:16;84:6,
12;90:12;101:19;
105:24;106:20;111:12;
128:10;132:13;133:21,
24;138:1;148:21,24;
155:20;159:8,9;
165:25;167:19;191:23;
193:13;203:25
**surprise (2)**
185:6,15
**surprised (1)**
105:2
**survey (3)**
186:21;187:4,6
**SurveyMonkey (3)**
94:4,5,17
**surveys (4)**
95:10;187:14,16;
192:24
**suspect (2)**
69:15,19
**swear (2)**
4:7,16
**sworn (3)**
4:20,25;6:6
**system (2)**
130:7;163:8
**systematic (1)**
139:7
**systematically (1)**
138:17

**T**

**tables (2)**
193:1,2
**tactics (3)**
46:15;47:10;48:5
**tactile (2)**
46:25;66:4
**talk (9)**
6:23;21:24;23:2;
65:25;68:12;94:9;
117:5;124:24;133:25
**talked (10)**
14:6,21;86:9;103:13;
110:1;143:9,11;182:2,
7;200:7
**talking (10)**
5:14;7:21;8:3;97:1,
2;111:13;131:6;136:6;
153:20;191:18
**talks (1)**
88:25
**tardiness (2)**
52:1;54:14
**tardy (1)**
36:19
**targeted (1)**
149:4
**task (50)**
10:25;11:8,17;12:2,
11;13:4,13;65:14,20;
66:11;70:3,10;72:19,
25;73:2;78:17,18;
79:10,15,20;83:9,16;
84:3,8,11,15;91:1;
100:12,12;102:16,18;
103:3;144:25;146:16,
21;147:1,10,14;148:6;
152:19;154:1;157:14;
170:19;171:7,17,21,23;
182:7,17;183:11
**tasks (16)**
29:1;31:17;63:24;
65:14;78:12;90:16;
101:16;144:6,8,12,23,
24;145:18;146:11,12;
182:12
**taught (2)**
90:25;99:19
**teach (2)**
107:3;130:10
**teaching (1)**
131:1
**team (2)**
87:17;139:2
**techniques (6)**
47:7;95:9;107:3;
119:21;120:7,15
**technology (1)**
8:22
**teeth (1)**
191:11
**telephone (3)**
64:8;194:2,4
**telling (2)**

108:1;131:13
**tells (3)**
151:4;168:9,14
**ten (4)**
73:8;128:20;177:10;
194:13
**term (4)**
24:19;57:7;81:1;
149:7
**terms (26)**
25:3;26:1,22;28:7;
35:4;47:25;61:16;75:2,
3;85:2;86:23;98:18;
111:16;113:2;115:19,
24;121:15;122:2;
129:20;137:7;138:2;
142:17;150:14,18;
163:12;190:20
**test (8)**
38:16,20;43:11;
46:13,17;130:17,18;
131:10
**tested (1)**
69:20
**testified (21)**
4:25;5:19;19:11;
22:14,16;24:14;27:2;
41:3;87:4;96:18;97:7;
98:13;113:20;121:8,
17;145:4,22,25;185:3;
195:5;197:19
**testifying (2)**
121:15;194:24
**testimony (34)**
4:7,10;6:5;8:6;10:6;
16:16;17:6,7;44:11;
48:2;54:10;78:4;91:4;
97:19;105:9;110:21;
113:23;117:22,23;
119:10;121:19;122:12;
123:16;126:10,16;
129:7;140:12,12;
142:16;143:15;156:9;
157:1;185:20;193:11
**tests (3)**
82:12,14;130:7
**Thanks (2)**
159:16;177:12
**theology (3)**
198:17,21;199:9
**theories (1)**
76:21
**therefore (1)**
36:20
**There'll (2)**
72:15;78:6
**thereupon (8)**
40:5;88:2;108:17;
115:1;160:1;164:1;
184:1;186:4
**third (2)**
108:10;128:21
**though (2)**

128:1;163:21
**thought (4)**
102:21;125:12;
131:3,5
**thoughts (1)**
177:6
**thousands (2)**
198:9,9
**threat (2)**
144:25;145:2
**three (17)**
7:21;23:23;24:2,5;
37:10,11;51:24;78:22;
96:5;144:5;145:6,18;
162:21;175:13;176:14;
179:5;204:2
**three-page (1)**
108:12
**throughout (12)**
9:8;18:24;39:1;
44:25;52:20;63:18,25;
102:8;143:22;146:12;
162:2;182:8
**throw (2)**
193:4;198:9
**throwing (3)**
131:7,9,12
**tied (1)**
195:22
**Tim (1)**
202:16
**times (8)**
8:19;19:4;50:15;
51:24;67:6;128:20,25;
130:1
**timing (1)**
58:16
**Timothy (2)**
202:14,15
**title (12)**
24:20,23;25:12,18;
26:1,5,11;64:20;83:25;
88:17;109:17,23
**titled (1)**
40:15
**titles (1)**
86:15
**Tittle (1)**
104:12
**today (21)**
5:24;6:12;7:11;9:8;
10:1;24:16;35:7;59:11,
15;76:25;98:14;102:8;
137:16;193:11,17,23;
194:16;195:25;197:20;
198:14;206:6
**together (4)**
174:14;180:6;
201:20;202:10
**told (5)**
30:4;125:23;128:18;
139:3;196:13
**tongue (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 75 of 78

195:21
**took (6)**
39:12,18;62:7;77:24;
135:22;136:25
**tools (1)**
91:15
**top (12)**
40:16;87:18;108:15;
109:14,14;115:14;
144:1,10;163:4;
164:10;174:16;188:21
**topic (13)**
17:11;65:16;72:16;
79:14;85:23;90:24,24;
135:4;143:14;148:6;
150:22;154:7;183:17
**topics (36)**
48:3,19,22;49:11;
63:24;64:5;65:15,19;
69:24;70:6;74:5;78:8,
12;79:3,12;80:10;85:3,
7,8,9,13,16,21;87:2;
90:12,16;93:17;99:11;
117:25;146:5,6,7;
150:11;162:1;177:17;
188:13
**total (11)**
42:3,25;49:24;59:10,
16;61:16;70:24;144:8,
13;145:19;161:24
**totaled (1)**
71:24
**touch (3)**
19:16;22:11;177:17
**toward (1)**
28:14
**towards (2)**
71:2;149:5
**track (5)**
18:17;55:9;96:4;
141:12;161:17
**tracking (1)**
130:6
**traffic (2)**
55:4;132:11
**trafficking (1)**
132:10
**train (11)**
32:8;63:25;72:9;
73:25;74:20;75:18,19,
20;76:14;90:23;138:16
**trained (34)**
11:13,23;12:8,17;
13:10;16:18;45:18;
46:4,12;48:13;67:17;
84:7,13,24;90:21;
95:23;98:25;100:8;
124:4,14;125:6,18;
129:11;130:2;132:2,
23;138:9;147:13;
152:18;157:23;171:8,
19;182:3;203:16
**trainee (8)**

63:4,7;67:3,23;78:7;
79:1;80:6;97:4
**trainees (2)**
51:14;65:12
**trainee's (1)**
72:17
**trainer (5)**
72:18;124:16;
130:25;131:15;201:19
**trainers (2)**
95:12;130:23
**trainer's (1)**
141:15
**training (589)**
10:11,22,23;11:5,5,
13,22;12:7,7,16,23,24,
24;13:9,9;15:2,8,17,18;
16:6,9,11,13;17:4,8,9,
10,12;22:3;23:24,25;
24:3,17,22,23,24;25:2,
12,18;26:6,12,14,15,
20,24;27:6,8,8,10,14,
15,21,25;28:2,9,11,11,
12,15,16,23,24;29:1,3,
7,8,11,14,23;31:8,11,
22;32:1,6,10,11,15,16,
22;33:3,12,17,23;34:6,
13,14;35:13,14,24,25;
36:2,3,8;37:1,6,12,16;
38:2,3,4,5,7,11,13,14,
19;39:2,8;40:15,19,23;
41:23,24;42:3,5,13,15,
21;43:1,5,7,23;44:2,2,
4,12,13,18,20,21,22,23;
45:1,3,5,6,16,24;46:1,
2,12,22,23,24,25;47:3,
13;48:4,18;49:14,16,
25;50:2,14,16,20,23;
51:1,4,7,17;52:5,7;
53:11;54:5,23;56:10,
11,19;57:21,23;58:10,
12,19,20;59:6,11,17,
18;60:4,5,6,12,22;61:1,
2,5,11,17,19,25;62:1,2,
5,8,10,10,17,21;63:4,5,
12,14;64:7,15,17,19,
20,22,23;65:1,4,4,9,16;
66:3,7,24;67:3,22,24,
25;68:3,8,25;69:7,15,
25;70:7,9,12,20,23;
71:17;72:2,9,21;73:25;
74:18;75:3,13;77:4,6;
78:2,9;79:4,19;80:3,9,
19,24;81:2,4,6,7,11,16,
17;82:5,8;83:4,6,11,20,
23,24;84:3,16,16;85:4,
4,14,21,25;86:1,5,10,
12,13,14;87:5,8,12,13,
14,21;88:18,25;89:2,4,
5,5,6,14,19,23,24;90:6,
7,8,11,13,14,16,18,25;
91:2,6,10,13,13,22,24;
92:2,4,11,13,15,16,24;

93:9,11,14,15,16,25,
25;94:1,3,18,20;95:1,3,
5,11,14,19,25;96:9,10,
19,24;97:1,3;98:23;
99:8,19;100:7,20;
101:1,3,6,7,12,13,24,
25;102:11,19;103:12,
17,22;105:13,15,21;
106:1,9,15,24;107:15,
19,22,23;108:3;
109:24;110:3,19;
111:20,21;112:1,4,6,
24;113:3,8,16,22,24;
114:10;115:11,12,15,
16;116:1,4,7,8,10;
117:3,8,9,9;118:7,8,13,
21,23;119:6,6,14,20;
120:1,6,13,22;121:1,
11,12,20,22,24,25;
122:1,8,20,21,22,23;
123:14,20,21,22,23,24;
124:1,8,17;125:17,22;
126:3;127:18;128:18,
22,24;129:16,18,20;
130:21;131:18;132:7;
134:22,23;135:24;
136:11,22;137:4,5,21,
22,25;138:5,6,7,9,13,
20,22;139:9,16,19;
140:19,21;141:8,21;
142:8,21,23,24,25;
143:1,12,13,18,18,24;
145:3,11,15,18,19,25;
146:19;147:5,7;148:6;
149:4,11,12,24,25;
153:25;155:22;156:3;
157:9,17,20,24;158:9,
23,24;159:4,23;160:6,
23;161:8,18,22,23;
162:3,5,8,11,12,15;
163:2,8,11,14;164:21;
165:23;168:8,21;
169:2,8;170:9,20;
171:2,5,12,20;173:5,
17,18,20,20,23;175:24;
176:16,17;178:1,2,6,8,
16,24;179:10,24;180:1,
2,4,6;181:11,24;182:3,
8,13;183:8,13,16;
187:12,24;188:8;
189:10;190:3,8,13,14,
17,24;191:4,12;192:3,
7,8,9,10,24;201:21;
203:11
**training-related (2)**
123:14;140:1
**trainings (2)**
162:23;178:13
**training's (1)**
94:10
**transcript (10)**
6:9,13;7:1;35:19;
82:15;134:13,16;

160:22;161:2;163:15
**transfer (2)**
30:19,23
**transferred (6)**
30:17;31:16;63:20;
199:18;200:24;202:2
**transition (1)**
63:7
**traumatic (1)**
162:16
**traveled (1)**
201:19
**treat (1)**
45:20
**trial (5)**
4:11;137:14,17;
138:4,11
**tries (1)**
129:18
**trouble (2)**
35:20;125:24
**true (1)**
180:9
**truth (1)**
128:25
**truthful (1)**
10:6
**try (23)**
7:9;22:2;50:9;52:1;
92:10;96:21;107:4;
129:15;132:6;159:12;
167:17;169:5;178:20;
189:4,17;190:15;
191:16;192:15,17,17,
19;193:1,6
**trying (7)**
21:7;36:19;55:4;
66:3;133:5;148:22;
169:13
**turn (2)**
80:12;113:11
**turned (1)**
113:13
**turning (1)**
165:18
**twice (1)**
200:16
**Twitter (3)**
20:18,20;21:9
**two (22)**
38:9;39:14;43:21;
50:11;51:3,5,24;59:5;
60:11;61:4;62:7;71:19;
78:5,22;82:13;84:10;
95:9;104:17;144:21;
162:18;175:12;181:21
**two-page (7)**
159:24;160:7,10;
164:8,9,14;167:5
**two-way (1)**
7:8
**type (15)**
14:9;43:22;46:23;

52:14;57:12;82:13,15,
17;128:17;130:17;
131:18;132:3;133:13;
181:14;187:10
**types (4)**
46:24;53:6;78:5;
142:8
**typo (3)**
117:6;120:19;185:14
**typos (2)**
114:18;120:19

---

**U**

**uh-huhs (1)**
6:16
**uh-uhs (1)**
6:16
**Ultimately (2)**
45:7;93:5
**uncommon (2)**
175:5,8
**under (22)**
4:9;6:5;20:21;24:3;
26:5;37:1,2,10,15;
38:18;62:13;74:11;
98:13;109:17,19;
119:22;151:5;163:15;
176:20;189:3,8;197:19
**underlying (1)**
205:24
**underneath (3)**
136:14;142:10;
200:16
**underscore (2)**
163:15,16
**Understood (35)**
6:20;7:5,18;8:8,17;
9:1,6,16,22;41:21;
44:7;47:20;48:2;54:9;
58:8;61:7;78:4,24;
90:4;91:3;94:16;101:9;
105:8;117:22;120:12;
121:14;122:11;126:9;
129:7;140:25;142:15;
146:10;149:22;175:19;
189:19
**unfortunately (2)**
190:7;191:1
**unintentional (1)**
125:21
**unit (17)**
57:20;87:17;117:9;
147:18,19,20;149:2,3,
18;150:7;153:4,17;
157:16;162:20,21;
175:2;198:8
**United (1)**
151:19
**units (5)**
37:9;154:12;155:9;
156:5;170:2
**unless (9)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 76 of 78
CHRISTOPHER BEAL
July 30, 2020

7:14;14:13;33:6;
75:15;97:20,25;98:9,9;
201:9
**Unlike (1)**
7:11
**unlock (1)**
149:19
**unnatural (1)**
6:21
**unofficial (1)**
64:20
**unprofessional (1)**
166:23
**unrelated (1)**
75:14
**unsupervised (7)**
43:12;69:1;162:9;
179:1,16;180:9,13
**unusual (3)**
8:19;57:6;151:16
**unwritten (1)**
151:3
**up (85)**
5:12;21:7;27:22;
30:3;31:5,15,16;40:11;
50:10;51:6;56:2,13;
57:25;61:8,8;62:25;
63:20;65:20;69:19;
70:6,10;77:19;78:16;
82:12;83:25;86:3;
87:20;90:17,23;93:6;
97:25;98:19;99:19,21;
101:7;102:6;103:21;
105:2;108:7,11;109:8;
112:4;114:18,23;
118:15;122:8;124:18;
129:1,14,18,25;132:18;
136:2;137:18;139:24;
141:7;144:16;146:19,
24;153:8;155:19,25;
159:3;163:3,22;165:4;
167:17,18;173:5,18,25;
184:14;186:2,15;
190:15;191:5;192:5,
12;193:1;198:11;
199:10,15,18;200:16;
202:17
**update (1)**
113:8
**updated (1)**
158:9
**updates (2)**
120:18,21
**upon (3)**
155:10;162:24;
203:23
**up-to-date (1)**
101:20
**use (52)**
18:4;19:24;20:1,4,
16,22,25;21:10,18;
22:21;23:6;32:6;41:1;
46:14;47:2,5,9;48:4;

49:2,6;56:21;64:9;
70:21;72:13;99:5,20;
101:8;113:9;116:3;
117:20,21;120:23;
130:19;136:16;137:2;
139:5,8,11,13,16,20,
25;140:17,20,23;
144:3;145:8;161:17;
162:14;183:20,21;
190:11
**used (34)**
4:10;19:12,20;25:13;
36:9;38:10;39:4;41:9;
46:22;52:22;57:13,15;
72:9,21;73:2;78:17;
91:25;113:3;121:9;
122:25;123:3,11,18;
136:8;140:9,14;
142:16;146:9;170:8,
19;182:7;183:7,9,12
**using (11)**
4:5;6:15;23:9;24:19;
39:22;41:16;66:17;
95:10;122:13;124:6;
205:25
**usual (4)**
14:12;15:11,25;
204:24
**usually (7)**
32:21;87:16;129:2,5;
167:14;201:10,12

**V**

**vacation (1)**
33:7
**vague (4)**
132:11;166:22;
168:15;169:10
**vaguely (1)**
41:12
**validate (1)**
130:7
**validation (5)**
130:17,21,22;
131:10,14
**Valley (1)**
63:19
**value (2)**
159:18,19
**varied (1)**
63:25
**varies (2)**
28:16;180:21
**various (8)**
22:3,6;29:1;31:17;
65:19;75:4;87:2;
180:12
**vast (2)**
170:4;189:14
**verbal (1)**
199:24
**verbally (4)**

65:24,25;68:6;94:22
**verify (1)**
105:19
**Version (3)**
21:8;88:12;186:9
**versions (2)**
83:3,4
**versus (8)**
28:1,10,21;33:18;
34:18;35:14,25;44:18
**veteran (6)**
29:2;61:24;179:18;
191:1;192:11,18
**vi (2)**
88:24,25
**via (4)**
18:11;105:5;135:19;
141:4
**video (3)**
135:13;205:9,13
**videoconference (3)**
105:6;135:20;141:5
**videos (1)**
20:4
**view (4)**
20:4;120:12;155:22;
158:23
**views (1)**
77:16
**violation (2)**
175:20;179:3
**virtually (2)**
5:4;144:23
**visually (1)**
96:13
**voluntary (1)**
30:21

**W**

**Wabash (1)**
63:19
**wait (2)**
7:24;50:19
**walk (2)**
37:20;44:16
**walked (2)**
43:13;132:9
**wall (1)**
153:1
**warden (14)**
104:3,16,20;105:11;
107:16;125:16;127:11,
15,21;176:19;200:3,13,
19,25
**wardens (2)**
104:17;176:21
**warden's (1)**
172:4
**Wardlow (1)**
104:8
**warehouse (1)**
67:16

**watched (1)**
202:16
**watching (1)**
192:14
**Watson (2)**
202:7,8
**way (41)**
6:21;7:3;10:5,5;
14:24;15:1,7;16:7;
22:11;36:14;66:9;
69:16;74:8;84:12;96:3;
99:7,25;105:24;
114:18;124:3;128:19;
129:5,12;132:22,24;
135:10;146:6;151:12;
166:1;167:7;168:4;
171:24;176:18;178:15,
22;182:17,18;189:5;
192:19;193:2;200:23
**ways (6)**
95:13;96:8;100:19;
103:14;123:10;187:11
**weaknesses (1)**
167:1
**weapon (1)**
117:17
**week (11)**
38:3;50:2,19,21;
51:23,24;54:20;59:19;
60:3;95:2;181:22
**weekend (1)**
174:15
**weekly (1)**
95:2
**weeks (6)**
38:9;43:21;50:11;
59:5;60:11;181:21
**welcome (2)**
91:9;206:7
**welcoming (1)**
91:5
**weren't (6)**
37:7;124:7;129:4;
138:9,17;155:3
**Westville (5)**
38:9;45:11;50:11;
63:21;71:17
**what's (18)**
16:24;41:7;52:3;
53:24;59:15;60:23;
72:5;74:14;79:16;
82:22;134:2;141:11;
150:10;164:23;169:19;
174:2;180:17;198:15
**whenever (1)**
50:6
**Whereabouts (2)**
24:11;199:13
**WHEREUPON (11)**
4:19;73:14;105:4;
135:16,18;141:3;
156:23;177:13,20;
205:16;206:10

**wherever (2)**
54:6;57:13
**whoever's (2)**
45:11;53:14
**whole (1)**
138:7
**who's (3)**
31:25;32:10;162:7
**whose (2)**
26:23;195:2
**wide (1)**
57:10
**wife (1)**
31:4
**Wilderness (1)**
21:2
**William (1)**
201:6
**Wilson (4)**
24:1;26:7,8;194:18
**wise (1)**
65:7
**within (15)**
25:13;27:14;28:23;
30:6;37:16;64:22;
70:11;71:9,12;78:22;
80:24;81:8;82:7;106:7;
139:22
**without (10)**
6:15;43:7;142:11;
145:16;154:23;180:1;
181:13;184:19;186:15;
194:9
**witness (31)**
4:7,16,19,21,24;
16:22;73:9,12;91:20;
93:4,22;98:2;102:15;
109:1;127:1,9,24;
133:3;134:8;135:14;
154:19;156:11;157:4;
158:14;161:15;166:17;
172:17;173:2;205:5,
10;206:7
**Women's (6)**
30:16;31:12,20,23;
149:18;181:23
**word (2)**
16:24;70:21
**words (1)**
6:15
**work (41)**
8:15;17:14,18,21,22;
18:3;21:24;22:17;23:4,
5,8,15,16,23;24:3;
30:14;32:4,11;37:2;
38:6,18;43:12;49:10;
64:1;65:5,19;69:1;
80:19;84:21;145:16;
149:17;171:11;172:2;
179:16;180:11,11,12,
12;182:5;188:14;
194:17
**worked (9)**

BOSS REPORTERS
(219) 769-9090

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHRISTOPHER BEAL
July 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 203-12    filed 03/29/21    page 77 of 78

29:12;31:23;152:25;
182:24;198:7;200:15,
25;201:18;204:8
**working (22)**
8:25;26:4;37:1,10;
39:2;63:2;68:24,25;
69:6,10;71:4;83:22;
153:12;162:9;170:2;
180:9;200:14,17;
201:1,7,14;202:3
**work-related (2)**
23:2,10
**works (1)**
202:24
**worth (1)**
198:10
**wrap-up (1)**
95:2
**write (5)**
55:7;72:21;90:18;
94:24;166:24
**writing (4)**
52:23;73:1,4;132:6
**written (18)**
6:9,10,13;38:16;
57:24;58:7;94:22;
146:7,22,24;151:3;
154:1;166:5;182:7;
183:5,11;189:6,7
**wrong (6)**
75:16;114:15;126:2,
10;133:8;149:23
**wrote (2)**
166:19;198:11

## Y

**year (19)**
27:7,9,12,18;39:14;
41:17;50:15;52:20,21;
55:10;106:19,22,25;
115:16;141:16;179:6;
181:2;190:4,5
**Yearly (3)**
113:11;190:3,24
**years (18)**
31:15;59:4;61:16;
73:3;78:22;110:25;
111:9;116:21;122:14;
129:13;141:25;143:7;
180:24;181:20;190:25;
200:16;201:1;203:23
**yesterday (1)**
194:8
**YouTube (5)**
20:2,3,9,13;21:2

## Z

**zero (3)**
21:9,9;140:15
**z-i-e-r (1)**
21:9

**Zoom (11)**
4:5,6;5:12;6:12;
8:19;39:22;105:2;
122:17;135:10;167:19;
186:19
**zoomed (2)**
108:14;109:10
**zooming (1)**
187:17

## 0

**01-05-101 (1)**
122:19
**068373 (1)**
40:4

## 1

**1 (82)**
26:15;38:2;39:23;
40:7,22;43:16;44:4,19;
46:1,11;47:11,13;48:1,
2,4;49:14,17,20,25;
51:8,18;54:10,11;61:6;
63:17,18,22;64:3,4,13,
16;65:11;67:19;68:2,
16;69:2,4,17;70:15,17,
19;79:7;80:11,12;
84:21;85:6;99:5,10,11;
143:21,23;144:6,9,11,
14,15,18,22;145:7,18,
25;146:5,12,16;147:1,
4,10,14;148:6;149:24;
150:12;152:19;153:24;
157:12,14;163:16,18;
170:11,13;171:12,18;
182:16
**1:05 (2)**
134:4;135:6
**10 (2)**
76:6;88:23
**100 (2)**
148:21;180:7
**1-05-101 (1)**
88:17
**10-70 (6)**
147:21,21;153:2,7;
154:14;174:8
**10-71 (5)**
147:21,22;153:7;
154:14;155:10
**10th (2)**
50:12,20
**11 (1)**
61:10
**12 (5)**
50:18;59:22;60:5,8;
75:12
**120 (1)**
59:23
**12-hour (3)**
62:25;63:2;103:8

**12-hour-shift-based (1)**
63:9
**13 (1)**
28:22
**133032 (1)**
164:8
**15 (3)**
51:8;61:10,11
**15th (1)**
88:11
**16 (2)**
62:8;162:20
**17 (6)**
61:3,20;129:13;
163:4;181:20;190:25
**1s (1)**
64:6

## 2

**2 (51)**
26:14;40:22;41:14;
43:16;44:4,21;47:19,
23;54:22;58:18;59:14;
60:4,9,11;62:13,17;
63:5,23;64:13;65:11;
66:6;68:16;69:4;70:15,
17,19;71:1,4,6,9,12,13;
72:10;78:2;79:7;80:13;
85:10,17,22;87:24;
88:4;92:1,14;144:18;
146:2;162:1;163:17,
18,18;182:8;190:2
**2:05 (1)**
134:4
**20 (1)**
198:6
**200 (1)**
59:24
**2003 (3)**
30:2,3,10
**2006 (1)**
31:10
**2010 (1)**
30:18
**2011 (6)**
27:19,22;28:20;30:4,
10;198:19
**2012 (5)**
27:13,19;28:21,21;
32:17
**2013 (14)**
10:14,16,17;27:3,13;
29:20;32:17;33:13,19;
34:10,12;35:6;102:3;
111:6
**2014 (1)**
115:13
**2014/2015 (1)**
122:9
**2014-15 (1)**
115:16
**2015 (6)**

39:13,18;41:5,9;
42:13;58:23
**2016 (3)**
82:6;83:10;88:11
**2017 (13)**
10:9;13:17;15:23;
39:15;83:10;88:13;
104:10,11,22;165:13;
195:7;199:22;204:18
**2017/2018 (1)**
40:16
**2020 (8)**
40:8;88:5;108:20;
115:4;160:4;164:4;
184:4;186:7
**21 (1)**
198:7
**24/7 (1)**
181:19
**26 (1)**
163:4
**26b (1)**
73:21
**27 (1)**
165:13
**27th (1)**
115:13
**28 (1)**
189:1
**28.9 (1)**
188:19
**28-page (1)**
186:1
**296 (2)**
59:25;61:8

## 3

**3 (31)**
24:22;25:2,12;36:3;
38:10;40:22;43:20,22;
44:20;45:10;63:23;
71:6,14,20;72:2;79:9;
80:16;85:10,17,22;
91:23;92:1;108:9,19;
109:24;110:19;116:24;
118:17;130:11;146:2;
182:10
**3:01 (1)**
206:10
**30 (13)**
40:8;50:19;88:5;
108:20;115:4;124:15;
126:1;129:25;144:11;
160:4;164:4;184:4;
186:7
**300 (1)**
61:9
**3000 (2)**
184:22,25
**31 (1)**
144:11
**311 (6)**

42:21;49:24;59:12;
61:9,12;71:24
**33 (2)**
144:11;164:9
**33791 (1)**
88:8
**33800 (1)**
88:24
**33803 (1)**
89:17
**33850 (1)**
88:9
**340 (1)**
161:25

## 4

**4 (49)**
26:6;27:8,14;33:23;
36:8;40:22;41:11,22;
43:16;44:4,21;47:22;
54:22;58:19;60:14;
61:10;62:13,17;63:6,
23;66:7;71:6,15,20,21,
25;72:10;78:2;79:9;
80:16;84:22;85:10,17,
22;92:1,14;114:24;
115:3;118:16;121:5;
123:6;126:6;130:11;
132:16;136:7;146:2;
182:8,10,10
**4/27/17 (1)**
165:14
**40 (6)**
38:1;59:13,22,23;
60:3;126:1
**42 (1)**
76:5
**43 (3)**
76:6,12,16
**4704 (1)**
160:8
**4705 (1)**
160:8

## 5

**5 (4)**
130:11;159:6,22;
160:3
**5:00 (1)**
63:8
**50/50 (1)**
144:21
**5826 (1)**
108:13
**5828 (1)**
108:13

## 6

**6 (6)**
88:24;136:9;163:25;

USDC IN/ND case 3:18-cv-00995-JD   document 203-12   filed 03/29/21   page 78 of 78

164:3,7;191:10
**6/26/17 (1)**
  161:6
**6:35 (2)**
  165:5,13
**60 (1)**
  144:17
**60-page (1)**
  87:25
**68 (5)**
  38:5;58:19;59:22;
  60:4,8
**68426 (1)**
  186:3
**68453 (1)**
  186:3
**68541 (1)**
  183:25
**68544 (1)**
  183:25
**69643 (1)**
  115:7
**69646 (1)**
  115:8

### 7

**7 (4)**
  134:15;183:24;
  184:3;195:7
**7/1/16 (1)**
  161:5
**70 (3)**
  188:18;189:3,24
**71 (3)**
  174:8;188:19;189:1
**7th (4)**
  10:9;13:17;199:22;
  205:25

### 8

**8 (3)**
  89:17;186:1,6
**80 (9)**
  39:7;59:5,23,23,24;
  189:3,8,25,25

### 9

**9:00 (1)**
  63:8
**96 (6)**
  38:13;58:20;59:8,25;
  60:14;71:18
**99 (1)**
  153:5
**99.9 (1)**
  23:22