**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:18-cv-00995-JD-MGG |
| RON NEAL, et al. | ) ) | Hon. Jon E. DeGuilio, Judge |
| Defendants. | ) | Hon. Michael G. Gotsch, Sr., M.J. |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................3

I.      Legal standard. ......................................................................................................4

II.     A reasonable jury could find Defendants liable for deliberate indifference ........................4

        A.      Legal standard for deliberate indifference claims. .........................................4

        B.      Defendants have forfeited their argument at summary judgement that they were
                not deliberately indifferent. ...................................................................5

        C.      A reasonable jury could conclude that the Incident Defendants acted with
                deliberate indifference to Mr. Devine when they failed to take timely action steps
                to rescue him from his burning, locked cell. ...............................................6

                1.   Mr. Devine faced an objectively serious risk of harm when he was locked in
                     his burning prison cell. ..................................................................6

                2.   A reasonable jury could conclude that the Incident Defendants were aware of
                     the risk of harm faced by Mr. Devine ..................................................7

                3.   A reasonable jury could conclude that the Incident Defendants were
                     deliberately indifferent to the serious risk posed to Mr. Devine. ....................9

                4.   A reasonable jury could conclude that these failures caused Mr. Devine's
                     death. ......................................................................................17

        D.      A reasonable jury could conclude that the Supervisory Defendants knew of the
                risk that fires at ISP posed to Mr. Devine and other prisoners, but ignored that
                risk. ............................................................................................18

                1.   A reasonable jury could conclude that the Supervisory Defendants were aware
                     of the risk posed to Mr. Devine and other prisoners by fires in their locked
                     cells. ......................................................................................19

                2.   A reasonable jury could conclude that the Supervisory Defendants ignored the
                     serious risk posed to Mr. Devine and others. .........................................21

                3.   A jury could conclude that the Supervisory Defendants caused Mr. Devine's
                     terrible suffering and death. ...........................................................30

i

III.    Defendants are not entitled to qualified immunity ............................................................33

IV.    A jury must resolve Plaintiff's conspiracy claims ............................................................35

V.    A jury could conclude that Defendants failed to intervene in the violation of Mr. Devine's rights ........................................................................................................................38

VI.    Plaintiff's state law claims must be resolved by a jury......................................................39

CONCLUSION....................................................................................................................40

**ISSUE STATEMENT**

1.        Whether, construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the Incident Defendants were deliberately indifferent to the risk of harm that Joshua Devine faced from the fire in his cell on April 7, 2017?

2.        Whether, construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the Supervisory Defendants were deliberately indifferent to the risk of harm from fires posed to Mr. Devine and prisoners like him by certain conditions, practices, and training at Indiana State Prison?

3.        Whether a reasonable jury could conclude that Defendants participated in a conspiracy to violate the rights of Mr. Devine and/or prisoners like him?

4.        Whether a reasonable jury could conclude that Defendants are liable for failing to intervene to stop the violation of Mr. Devine's constitutional rights?

5.        Whether Defendants are entitled to qualified immunity from suit?

6.        Whether a reasonable jury could find in Plaintiff's favor on her claims under Indiana state law?

## TABLE OF AUTHORITIES

**CASES**                                                                                        **Page(s)**

*Alexander v. Scheid*, 726 N.E.2d 272 (Ind. 2000) ........................................................................17

*Am. Homeland Title Agency, Inc. v. Robertson*, 2016 WL 5661562 (S.D. Ind. Sept. 30, 2016)...33

*Amundsen v. Chicago Park Dist.*, 218 F.3d 712 (7th Cir. 2000)............................................. 36-37

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).....................................................................4

*Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996) .....................................................................19

*Backes v. Vill. of Peoria Heights*, 662 F.3d 866 (7th Cir. 2011) ....................................................18

*Balsewicz v. Pawlyk*, 963 F.3d 650 (7th Cir. 2020)........................................................................20

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984)..............................................................36

*Borello v. Allison*, 446 F.3d 742 (7th Cir. 2006) ..........................................................................13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................................4

*Childress v. Walker*, 787 F.3d 433 (7th Cir. 2015)........................................................................19

*Cooney v. Casady*, 735 F.3d 514 (7th Cir. 2013) ..........................................................................35

*Dale v. Poston*, 548 F.3d 563 (7th Cir. 2008)...............................................................................13

*Demouchette v. Dart*, 2015 WL 684805 (N.D. Ill. Feb. 17, 2015)................................................11

*Doe #8 v. Municipal Courts of Marion County*, 97 F.3d 902 (7th Cir. 1996)...............................18

*Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603 (7th Cir. 2002)...............................................19

*Duckworth v. Franzen*, 780 F.2d 645 (7th Cir. 1985)....................................................................34

*Eagen v. Dempsey*, 987 F.3d 667 (7th Cir. 2021)..........................................................................10

*Farmer v. Brennan*, 511 U.S. 825 (1994)..................................................................................4, 20

*French v. Owens*, 777 F.2d 1250 (7th Cir. 1985) ..........................................................................34

*Gentry v. Duckworth*, 65 F.3d 555 (7th Cir. 1995)..........................................................................18

*Gevas v. McLaughlin*, 798 F.3d 475 (7th Cir. 2015) ......................................................................10

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) .......................................................... 35-36, 38

*Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008)................................................................................4

*Haywood v. Hathaway*, 842 F.3d 1026 (7th Cir. 2016)..................................................................18

*Hood v. Smith*, 2017 WL 2404974 (N.D. Ill. June 1, 2017) ..........................................................33

*Hope v. Welty*, 2018 WL 7960378 (S.D. Ill. Nov. 15, 2018)..........................................................11

*Horshaw v. Casper*, 910 F.3d 1027 (7th Cir. 2018) ......................................................................18

*J.K.J. v. Polk County,* 960 F.3d 367 (7th Cir. 2020) (en banc) ........................................30, 30 n. 5

*Jeanine B. Blondis v. Thompson*, 877 F. Supp. 1268 (E.D. Wis. 1995).........................................19

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) .......................................................30 n.5

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) .................................................................35

*Kluppelberg v. Burge*, 2017 WL 3142757 (N.D. Ill. July 25, 2017) ..............................................6

*Lanahan v. County of Cook*, 2018 WL 1784139 (N.D. Ill. Apr. 13, 2018)...................................34

*Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467 (7th Cir. 1997)...........................................33, 39

*Lee v. Young*, 533 F.3d 505 (7th Cir. 2008)...................................................................................14

*McGill v. Duckworth*, 944 F.2d 344 (7th Cir. 1991).....................................................................10

*McGuire v. Dykstra*, 2020 WL 4735264 (N.D. Ind. Aug. 14, 2020)............................................34

*Miller v. Zaruba*, 2013 WL 5587288 (N.D. Ill. Oct. 10, 2013).....................................................38

*Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018) .....................................................17 n. 4

*Misher v. Barnett*, 2010 WL 2136659 (N.D. Ill. May 26, 2010) .....................................................6

*Outlaw v. Wilson,* 2012 WL 4097187 (N.D. Ind. Sept. 17, 2012).................................................11

*Perez v. Fenoglio*, 792 F.3d 768 (7th Cir. 2015) ...........................................................................18

*Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) ....................................................... *passim*

*Potts v. Manos*, 2013 WL 5968930 (N.D. Ill. Nov. 7, 2013).........................................................19

*Rabb Ra Chaka v. O'Leary*, 1989 WL 56874 (N.D. Ill. May 24, 1989) .......................................35

*Rasho v. Elyea*, 856 F.3d 469 (7th Cir. 2017)...............................................................................18

*Reed v. McBride*, 178 F.3d 849 (7th Cir. 1999)............................................................................14

*Rice ex rel. Rice v. Corr. Med. Services*, 675 F.3d 650 (7th Cir. 2012) .........................................11

*Richardson v. City of Indianapolis*, 658 F.2d 494 (7th Cir. 1981) ...............................................36

*Scherer v. Balkema*, 840 F.2d 437 (7th Cir. 1988) .......................................................................35

*Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618 (7th Cir. 2002) ................................30

*Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742 (7th Cir. 2006).......................................17, 31

*Shipley v. Chicago Board of Election Commissioners*, 947 F.3d 1056 (7th Cir. 2020) .................6

*Sinn v. Lemmon*, 911 F.3d 412 (7th Cir. 2018)..............................................................................19

*Smith v. Jones*, 2012 WL 5381222 (N.D. Ill. Oct. 31, 2012) ..........................................................7

*Spierer v. Rossman*, 798 F.3d 502 (7th Cir. 2015) ........................................................................4

*Steele v. Knight*, 2016 WL 7117155 (S.D. Ind. Dec. 7, 2016)......................................................40

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998) ..........................................................................19

*Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731 (7th Cir. 2006) ........................................ *passim*

*Thorncreek Apartments Ill., LLC v. Village of Park Forest*, 970 F. Supp. 2d 828 (N.D. Ill. 2013). ...................................................................................................................................................6

*Tully v. Del Re*, 2002 WL 31175983 (N.D. Ill. Oct. 1, 2002).......................................................36

*Velez v. Johnson*, 395 F.3d 732 (7th Cir. 2005) ...........................................................................11

*Walker v. Benjamin*, 293 F.3d 1030 (7th Cir. 2002).....................................................................34

*Walker v. Peters*, 233 F.3d 494 (7th Cir. 2000)..............................................................................7

*White v. Cooper*, 55 F. Supp. 2d 848 (N.D. Ill. 1999) .........................................................20, 35

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) ...............................................................30

*Woodward v. Corr. Med. Servs.*, 368 F.3d 917 (7th Cir. 2004) ...............................................17, 30

*Xie v. City of Chicago*, 2016 WL 6193981 (N.D. Ill. Oct. 24, 2016) ...........................................35

**STATUTES**

42 U.S.C. § 1983 ................................................................................................................................18

**INTRODUCTION**

During the evening of April 7, 2017, Mr. Devine burned to death in his locked cell in B Cell House ("BCH") at Indiana State Prison ("ISP"). He died because of Defendants' longstanding disregard of prisoner safety and the substantial and known risk that fires and electrical problems posed to Mr. Devine and other prisoners in their care.

BCH was staffed by three junior correctional officers on the evening of the fire—each had been working at the prison for less than one year. After locking the prisoners in their cells for the night, Defendants Sarah Abbassi and Promise Blakely went into the counselor's officer to complete their payroll paperwork, and Defendant Justin Rodriguez stayed inside the officer's station. All three remained close to the prisoner cells and could easily hear what was happening in the quiet cellhouse.

A short time later, the prisoners in BCH began yelling that there was a fire on 500 range. The yelling was clearly heard and understood by Blakely, Abbassi, and Rodriguez. Despite hearing the prolonged and desperate cries for help permeate the normally quiet cell house and knowing that the prisoners were locked in their cells, none of the three officers took any action for ten to fifteen minutes. When Rodriguez finally took action, he responded to what he knew was a fire on the 500 range without a fire extinguisher, the keys to the range, or a working radio.

Blakely and Abbassi finally began to act when Rodriguez called their names. Immediately upon exiting the counselor's office, they could see the fire in Devine's cell. Despite this, the officers did not immediately call a fire signal over the radio as required. Blakely was assigned to the 500 range and had the 500 keys in his possession, but never went to the 500 range, provided his keys to his fellow officers, or retrieved a fire extinguisher. Abbassi went up to the 500 range, but did not bring a fire extinguisher or the 500 range keys. When additional

1

officers arrived, both Abbassi and Blakely were standing idly on the ground floor, next to the officer's station where all of the fire extinguishers were still locked inside.

ISP has a prisoner firefighter program to help address fires at the facility. Firefighters are required to be released from their cells immediately whenever a fire occurs so they can promptly respond to the emergency. Defendant Jeremy Dykstra as shift supervisor—and his two assistant supervisors, Defendants Anthony Watson and Timothy Redden—were responsible for ensuring the prisoner firefighters were timely released. But after seeing the fire and heavy smoke in BCH, Dykstra, Watson and Redden took no steps to initiate the release of the firefighters. The firefighters were significantly delayed as a result, arriving much too late to save Mr. Devine's life. And none of the Defendants did anything to release the firefighter who lived in BCH from his cell, despite being required to do so.

This failure to take any meaningful steps to protect Mr. Devine from the fire raging in his cell was part of a larger and prolonged disregard for the safety of prisoners at ISP and the substantial and well-known risk that fires in particular posed to that safety. Defendants Ron Neal, Kenneth Gann, Jason Nowatzke, Steven Griffin, and Christopher Beal, as supervisors at ISP, had knowledge of the widespread fires at ISP, the widespread electrical problems that caused many of these fires, and the fact that prisoners who were locked in their cells depended on timely staff response to help them during an emergency. Despite this, these Defendants failed to provide proper instruction and training to explain when and how officers should respond to prisoners in distress, how to respond to fire in cell houses, how and when to release the prisoner firefighters, and how and when to release prisoners from their cells during an emergency. Similarly, these Defendants failed to carry out fire drills on the night shift, ignored evidence that staff did not know the basics of fire safety and were not releasing the prisoner firefighters when fires

occurred, and failed to take any meaningful steps to address widespread problems of radio failure and the frequently sparking electrical outlets in prisoners' cells. In short, these Defendants knew that fires posed a substantial risk of harm to prisoners at ISP, yet failed to implement even the most basic safeguards to address this risk.

Defendants' total failure to protect Mr. Devine from a fire that raged in his cell violated his clearly established right to be free from cruel and unusual punishment while incarcerated. Their failures are amply supported by the factual record when properly construed in Plaintiff's favor. Defendants' conclusory and undeveloped arguments fail to engage with the evidence Plaintiff has gathered to support her claims. Summary judgment should be denied.

## ARGUMENT

Plaintiff has brought this lawsuit alleging that Defendants violated Mr. Devine's rights under the Eighth Amendment and Indiana law by failing to protect him from a fire in his cell at ISP, and by conspiring to violate his constitutional rights and failing to intervene to prevent the violation of those rights. ECF No. 43. Plaintiff brings claims against Defendants Abbassi, Rodriguez, Blakely, Watson, Redden, and Dykstra—the "Incident Defendants" who were on duty on April 7, 2017 and responsible for physically protecting Plaintiff from the fire. Plaintiff also brings claims against Defendants Neal, Gann, Nowatzke, Griffin, and Beal—the "Supervisory Defendants" who were responsible for ensuring that prisoners at ISP were protected from the substantial risk of harm posed by fires at the facility. For the reasons set forth below, this Court should deny Defendants' motion for summary judgment.[1]

---

[1] Defendant Rodriguez has not joined in the motion for summary judgment. ECF Nos. 201-202. Plaintiff will discuss his role insofar as it is relevant to the actions by other Defendants, but will not otherwise discuss the claims against him. Plaintiff does not contest dismissal of her claims against Defendants Lessner, Puetzer, and Statham.

## I.      Legal standard

On summary judgment, the moving party bears the initial burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]ith the court drawing all inferences in the light most favorable to the non-moving party, the moving party must discharge its burden of showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). Credibility determinations are for the jury, and all reasonable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II.     A reasonable jury could find Defendants liable for deliberate indifference.

### A. Legal standard for deliberate indifference claims

To prevail on her deliberate indifference claims against Defendants for their failure to protect Joshua Devine, ultimately causing his death, Plaintiff must show that Joshua Devine faced an objectively serious risk of harm and that Defendants were deliberately indifferent to that risk—that they actually knew of and disregarded it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Plaintiff need not prove that Defendants intended for the harm to occur or even believed that the harm would result, but must instead establish Defendants knew of a substantial risk of harm, and acted or failed to act in a way that a jury could conclude evinced disregard for that risk. *Petties*, 836 F.3d at 728; *see also Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). The substantial risk of harm of which Defendants must be aware may be one that was personal to Mr. Devine or one that he faced because all prisoners in his situation faced such a risk. *Farmer*, 511 U.S. at 843.

4

**B. Defendants have forfeited their argument at summary judgment that they were not deliberately indifferent.**

Defendants make a conclusory, one paragraph argument that while their response to the risk posed to Mr. Devine was arguably inadequate, "there is no evidence that they intended for Mr. Devine to be harmed, or otherwise held the level of culpability required to establish deliberate indifference." ECF No. 202 at 17. Defendants do not argue that they were not aware of a substantial risk of serious harm to Mr. Devine, but simply that their response to that risk did not rise to the level of deliberate indifference. Yet in doing so they neither cite nor discuss a single fact in support of their position, which is entirely conclusory.

The sum total of legal and factual argument in support of the Incident Defendants' claimed entitlement to summary judgment is that "[i]t is undisputed that all Defendants who were involved in responding to the fire reacted promptly and tried to rescue Mr. Devine before it was too late." *Id.* They do not cite or specifically refer to any evidence from the record to support this bare conclusion. It stretches credulity to suggest this is "undisputed," but without any discussion of what they mean by "reacted promptly" or what they claim they did to "tr[y] to rescue Mr. Devine," it is entirely unclear what facts they suggest demonstrate their lack of deliberate indifference as a matter of law.

The Supervisory Defendants' argument on deliberate indifference is even thinner. They state only that "[i]t is undisputed that procedures were in place at all levels of the facility to ensure safety." *Id.* They neither cite nor specifically refer to any evidence from the record to support these conclusions. *Id.* And even in their statement of facts, the description of these purportedly undisputed "procedures to ensure safety" is almost entirely lacking. At most, Defendants offer the vague conclusory claim that "custody staff were informed how to respond in the event of a live fire emergency." *Id.* at 13, ¶ 67.

Because Defendants make no argument that they were unaware of the substantial risk posted to Mr. Devine by fires at ISP, that argument has been forfeited. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *see also Thorncreek Apartments Ill., LLC v. Village of Park Forest*, 970 F. Supp. 2d 828, 842-43 (N.D. Ill. 2013) (enforcing forfeiture and collecting cases). Defendants' argument that their response was not deliberately indifferent is so undeveloped and conclusory that the Court should similarly conclude it has been forfeited. *See Kluppelberg v. Burge*, 2017 WL 3142757, at *5 (N.D. Ill. July 25, 2017) (rejecting defendants' arguments at summary judgment because they were cursory and undeveloped); *Shipley v. Chicago Board of Election Commissioners*, 947 F.3d 1056, 1062-63 (7th Cir. 2020); *Misher v. Barnett*, 2010 WL 2136659, at *2 (N.D. Ill. May 26, 2010). Regardless and as discussed below, these arguments are without merit.

C. **A reasonable jury could conclude that the Incident Defendants acted with deliberate indifference to Mr. Devine when they failed to take timely action to rescue him from his burning, locked cell.**

        1.    <u>Mr. Devine faced an objectively serious risk of harm when he was locked in his burning prison cell.</u>

Other than a general discussion of the legal standard, Defendants provide no legal or factual argument that Mr. Devine did not face a substantial risk of serious harm, Dkt. 202 at 14-17, which as noted above forfeits the point. Regardless, in the context of his failure to protect claim against the Incident Defendants, it would be frivolous to suggest otherwise. Mr. Devine was locked inside his prison cell, with no means of escape other than relying on prison staff to release him. PSGD ¶ 21. A fire broke out in his cell, which Mr. Devine was not able to extinguish on his own, and which began to spread. PSGD ¶¶ 25-26. Mr. Devine ultimately died

from thermal burns as a result of the fire. PSGD ¶ 82. It cannot be reasonably disputed that, locked in a burning cell, Mr. Devine faced a substantial risk of (and ultimately suffered) serious harm. *See Smith v. Jones*, 2012 WL 5381222, at *5 (N.D. Ill. Oct. 31, 2012) (finding that a fire in a prisoner's cell poses a substantial risk of serious harm, even where the fire does not ultimately cause death).

2.      A reasonable jury could conclude that the Incident Defendants were aware of the risk of harm faced by Mr. Devine.

As with the objective seriousness of the risk, Defendants likewise offer nothing to dispute that the Incident Defendants were subjectively aware that Mr. Devine faced a substantial risk of serious harm, and it too is forfeited. Dkt. 202 at 14-17; *see also Sublett*, 463 F.3d at 736. Regardless, there is ample evidence from which a jury could conclude that the Incident Defendants were aware of the substantial risk of serious harm that Mr. Devine faced.

Courts do not require plaintiffs to produce direct evidence in the form of an admission of such awareness by defendants, since "except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge." *Petties*, 836 F.3d at 728. Instead, "[m]ost cases turn on circumstantial evidence," *id.*, and "whether a prison official had the requisite knowledge of a substantial risk is a fact question that could be demonstrated by drawing an inference from [that] circumstantial evidence," including the permissible conclusion "that the official was aware of the substantial risk from the very fact that the risk was obvious," *Walker v. Peters*, 233 F.3d 494, 498-99 (7th Cir. 2000).

There are important facts about the situation at ISP even before the fire started which provide relevant context to the Incident Defendants' knowledge of the risk of harm. They knew that, once the 9pm count was complete, prisoners were locked in their cells and entirely reliant on prison staff to come to their aid in case of an emergency. PSGD ¶ 21. They also knew that

7

prison policy required correctional officers in the housing units to complete security checks of every cell at least once every 30 minutes, for the purpose of verifying the welfare of every prisoner in every cell, and that the main responsibility of correctional officers on the night shift was to complete those checks and generally monitor and ensure the safety of the prisoners on their unit. PSGD ¶¶ 17-19. They also knew that fires were common at ISP. PSGD ¶¶ 86.

*Abbassi and Blakely*

A reasonable jury could conclude that Defendants Abbassi and Blakely became aware of the fire in Mr. Devine's cell shortly after the fire began. BCH was typically very quiet after the 9pm count and had been quiet on April 7, 2017 until the fire broke out. PSGD ¶ 28.  It was quiet enough that staff could hear what was happening on the ranges and make out conversations between prisoners. PSGD ¶ 28. Mr. Devine and prisoners in the neighboring cells began yelling for assistance and banging on their cell bars shortly after the fire began. PSGD ¶¶ 26-27, 29. The prisoners were loudly yelling "Fire on 500 range" or similar phrases to convey that information, and although the yelling was not in perfect unison, prisoners throughout the cell house testified that they could hear what the prisoners were yelling, and a jury could easily infer that staff could hear the contents of the cries as well. PSGD ¶¶ 29. A prisoner on the 100 range, the same level as Rodriguez, Abbassi, and Blakely, testified that he could hear that the prisoners were yelling "Fire on 500." PSGD ¶ 29. At the time the fire broke out, Rodriguez was in the officer's station, an area from which he would have been able to hear yelling on the ranges, and he would have seen the commotion and banging on bars on the cell house cameras. PSGD ¶ 24, 30-31. Abbassi and Blakely were in the counselor's office—on the North side of BCH, the same part of the housing unit where Mr. Devine lived and thus they also would have heard that prisoners were yelling about a fire on the 500 range. PSGD ¶ 22-24, 30.

8

In addition to all of this circumstantial evidence, Abbassi and Blakely admit that they heard the prisoners yelling "Fire on 500" from inside the counselor's office. PSGD ¶ 30, 33. And Defendants could smell smoke on the 100 level. PSGD ¶ 33. Additionally, once these officers eventually stepped outside the counselor's office, they saw that there was a fire on the 500 range, which appeared to be coming from inside a prisoner's cell. PSGD ¶ 39.

*Dykstra, Redden and Watson*

Dykstra, Redden and Watson learned about the fire in Mr. Devine's cell when Abbassi called the fire code over the radio while they were together in the shift supervisor's office. PSGD ¶ 56. It was immediately apparent that the fire was serious. Dykstra could tell from looking at the BCH cameras that the fire was coming from the ranges, and that the fire was so serious that the smoke was obscuring which particular cell the fire was coming from. PSGD ¶ 56. Dykstra, Redden and Watson knew that any fire in the prison posed a danger, particularly at night when prisoners were locked in their cells. PSGD ¶¶ 19, 21, 58. They also knew that BCH was staffed with new and inexperienced officers. PSGD ¶¶ 4-5, 8, . As soon as Watson and Redden arrived in BCH they immediately perceived the extent of the fire, as the fire was visible from the entrance to the cell house and the smell and sight of smoke was clear even from the 100 range. PSGD ¶¶ 33, 39, 61.

       3.     <u>A reasonable jury could conclude that the Incident Defendants were deliberately indifferent to the serious risk posed to Mr. Devine.</u>

As noted above, Defendants have forfeited this argument, but any such argument would also fail on the merits because a reasonable jury could conclude that the Incident Defendants acted with deliberate indifference to the serious risk of harm faced by Mr. Devine.

Having established the Incident Defendants' knowledge of the risk of harm Mr. Devine faced, Plaintiff need only point to evidence from which a jury could conclude that the Incident

Defendants "disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. In their discussion of the applicable legal standard, Defendants attempt to raise the bar as to what Plaintiff must prove, but in doing so they misstate the law. They quote *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991), for the proposition that "[t]otal disregard for a prisoner's safety is the 'functional equivalent of wanting harm to come to the prisoner,'" and go on to argue that Plaintiff's claims must fail because "there is no evidence that they intended for Mr. Devine to be harmed." Dkt. 202 at 16-17. But as noted above, the Seventh Circuit has directly rejected any such requirement: "[f]or a prison official's acts or omissions to constitute deliberate indifference, a plaintiff does *not* need to show that the official intended harm or believed that harm would occur." *Petties*, 836 F.3d at 728 (emphasis added); *see also Eagen v. Dempsey*, 987 F.3d 667, 695 (7th Cir. 2021) (same). To the extent that *McGill*, which predates the Supreme Court's decision in *Farmer*, holds anything to the contrary, it is no longer good law. *See Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (noting that *McGill* has been overruled by *Farmer*).

*Abbassi and Blakely disregarded the risk of harm to Mr. Devine*

Taking first the officers who were on duty in BCH the night of the fire, there is ample evidence from which a jury could conclude that Abbassi and Blakely acted with deliberate indifference. First, after learning that there was a fire on the 500 range, there was a period of at least 10-15 minutes when these officers did absolutely nothing to respond to the emergency, instead remaining in the counselor's office completing paperwork. PSGD ¶¶ 33, 35. These officers knew that after prisoners were locked in for the night, the only way they could get an officer's attention was to yell, and knew that in the event of a fire they were required to respond quickly by calling a fire code to summon assistance, to get a fire extinguisher to combat the fire, to release any available prisoner firefighters to aid them, and to evacuate any prisoners, including Mr. Devine, from their locked cells who were placed in danger by the blaze. PSGD ¶¶ 32, 37, 41,

10

42. Instead, these officers did precisely nothing to assist Mr. Devine for several minutes after being alerted that there was a fire.

As *Petties* found in the context of a medical need for assistance, the "first, and most obvious" method of proving deliberate indifference is "a prison official's decision to ignore a request for . . . assistance," which is precisely what Abbassi and Blakely did in response to the loud requests by dozens of prisoners for help in the face of a growing fire. In *Rice ex rel. Rice v. Corr. Med. Services*, 675 F.3d 650, 680-81 (7th Cir. 2012),[2] the Seventh Circuit found evidence that prison guards ignored prisoners who were shouting and kicking their doors was "particularly disturbing," even if the shouting did not "expressly signal" there was an emergency, since it was designed to "alert the guards that something was amiss and convince them to come into the unit so that they could be told just what that was." *See also Velez v. Johnson*, 395 F.3d 732, 735-36 (7th Cir. 2005) (jury could find defendant deliberately indifferent for failing to take action in response to notice of an emergency, despite policy requiring him to respond); *Demouchette v. Dart*, 2015 WL 684805, at *5 (N.D. Ill. Feb. 17, 2015) (denying summary judgment because jury could infer deliberate indifference where prisoners "began kicking and banging on doors and waiving at the security cameras for help," and a factual dispute existed regarding how long it took officers to respond); *Hope v. Welty*, 2018 WL 7960378, at *4 (S.D. Ill. Nov. 15, 2018); *Outlaw v. Wilson,* 2012 WL 4097187, at *3 (N.D. Ind. Sept. 17, 2012) (jury could infer deliberate indifference from guard's failure to investigate why prisoners were "yelling, banging, and kicking to get her attention").

Defendants assert that "it is undisputed that all Defendants who were involved in responding to the fire reacted promptly," Dkt. 202 at 17, but this is simply not the case. There are

---

[2] The plaintiff's claim failed in *Rice* on the basis of the lack of evidence to support any inference that the guards actually *heard* the commotion, *id.* at 681, which as noted above is not the case here.

11

numerous disputed facts on this point, including when Mr. Devine and the other prisoners began yelling for help, what they were yelling, how loud the cellhouse was (before and after the yelling started), which of the officers heard the yelling, what they heard, and when. *See generally* PSGD ¶¶ 25-53. A jury will need to resolve these disputes and assess Defendants' conduct and inaction in light of the version of the facts they credit, but at this stage it is Plaintiff's version which must be credited, and Plaintiff's evidence reveals a lengthy delay during which the Abbassi and Blakely heard prisoners yelling "Fire on 500" but did absolutely nothing to respond. Indeed, as the cases cited above make clear, Plaintiff's deliberate indifference claims would survive summary judgment even if the record revealed that Defendants' did not specifically hear the prisoners yelling "Fire", but had only heard incomprehensible yelling and banging coming from the ranges. Plaintiff's case at summary judgment is thus stronger than the evidence found sufficient in those cases to require a trial, since construed in her favor, the factual record supports the conclusion that the "Fire on 500" (or words to that effect) were specifically heard by Abbassi and Blakely. PSGD ¶¶ 28-30, 33. Moreover, these Defendants' deliberate indifference to Mr. Devine's risk of harm is even more evident considering that, no matter how ambiguous or incomprehensible the prisoners' cries for help, one or more of these Defendants were indisputably required to return to the 500 range no later than 9:34pm—11 minutes before the fire code was eventually called—as part of their mandatory security checks designed to ensure the wellbeing of prisoners in their care. PSGD ¶¶ 20. Defendants heard several cries for help, knew they were overdue to check on the prisoners on the ranges, and yet still did absolutely nothing to investigate while remaining in the cell house offices completing paperwork. PSGD ¶¶ 20, 33, 35. This is quintessential deliberate indifference.

Even once Defendants Abbassi and Blakely finally left the counselor's office, there is

12

ample evidence from which a jury could conclude that their deliberate indifference continued. For Blakely, the analysis is the same, since he continued to take absolutely no action to respond to the fire, despite being the officer assigned to (and in possession of the keys to) the 500 range. Blakely heard Rodriguez yelling at him multiple times that he needed Blakely to assist, and needed the keys to the 500 range. PSGD ¶ 40. Blakely knew that Rodriguez could not unlock the cells on the 500 range without the key, that Blakely himself was the only person who could let the prisoners on that range out of their cells, and that he was responsible for doing so in the event of a fire. PSGD ¶¶ 40-41. Blakely never went up to the 500 range at any point after the fire started and has no explanation for why he did not. PSGD ¶¶ 40, 44-45. In fact, Blakely took no action whatsoever in response to the fire to either rescue prisoners on the 500 range or otherwise respond to the situation—he had a working radio but did not call for backup, he did not get a fire extinguisher, and he did not take action to release the prisoner firefighters. PSGD ¶¶ 43-45. Blakely simply stood by the door to the cell house, holding the key to Mr. Devine's cell in his hand, doing nothing. PSGD ¶ 63.

Abbassi's response was also so deficient that a jury could readily conclude it constituted deliberate indifference. Although the deliberate indifference standard is often discussed in terms of a 'failure to act' despite knowledge of a serious risk of harm, the Seventh Circuit has made clear that "a prison official is not entitled to" summary judgment "simply because he or she takes *any* action in response to a risk of harm to an inmate—that response must be reasonable." *Borello v. Allison*, 446 F.3d 742, 749 (7th Cir. 2006) (emphasis in original); *see also Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). To be clear, Plaintiff acknowledges that the deliberate indifference standard is far more exacting than negligence, and she does not suggest she can prevail merely by showing a 'reasonable officer' would have acted differently. But, having

13

established a triable issue for the jury as to their subjective knowledge of the risk of harm to Mr. Devine, neither can Defendants prevail simply by establishing they did *something*. "[A]n inmate is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference." *Petties*, 836 F.3d at 729. Prison officials "are not required to act flawlessly," but "they are expected to act responsibly under the circumstances that confront them." *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008), and deliberate indifference will be found where defendants have "acted with reckless disregard toward [a prisoner's] serious need by inaction or *woefully inadequate action*." *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999) (emphasis added).

A reasonable jury could readily conclude that Abbassi's later actions in response to the fire were so far from reasonable as to be woefully inadequate and rise to the level of deliberate indifference. Construed in Plaintiff's favor, the record shows that Abbassi knew that there was a fire on the 500 range, likely emanating from one of the cells in which the prisoners were locked in for the night (indeed, there is nothing on the 500 range but cells and a hallway connecting them), and that the fire was of sufficient severity to be visible from the front of BCH and to have nearly the entire housing unit clamoring for someone to help. PSGD ¶¶ 14, 29-30, 33, 35, 39. Yet Abbassi took no action to release Mr. Devine from his locked cell, despite the keys being a mere stone's throw away in Blakely's possession by the cell house door and a spare set of keys available to her in the officer's station. PSGD ¶¶ 14, 36, 47, 49, 54. Moreover, Abbassi knew that there was a member of the prisoner firefighter squad on the 100 range, that other prisoner firefighters and a staff first responder team were only a radio call away, and that fire extinguishers were available in the officer's station. PSGD ¶¶ 36-37, 40-41, 43-45. But she failed to pursue these available actions to respond to the fire for an extended period of time. PSGD ¶¶ 36, 43-44, 51. Instead, after Rodriguez went up towards the 500 range with neither the key nor a

14

fire extinguisher (ensuring that he could do absolutely nothing to address the obvious emergency), PSGD ¶¶ 36, Abbassi inexplicably followed up after him, again with no key, no fire extinguisher, and still without radioing for help. ¶¶ 47, 51, 65. A jury could readily conclude that while Abbassi no longer "literally ignored" Mr. Devine's obvious need for help, *Petties*, 836 F.3d at 729, her actions did nothing to advance the prospects of releasing Mr. Devine from his cell, combating the fire, or summoning additional help, and were therefore woefully inadequate as a response to the known and obvious risk of harm.

*Dykstra, Watson and Redden disregarded the risk of harm to Mr. Devine*

Dykstra, Watson and Redden's actions in response to the fire were likewise deliberately indifferent to Mr. Devine's risk of harm. As the three most senior prison officials at ISP that night and the prison officials affirmatively tasked with overseeing the response to emergencies during the shift, these Defendants were required to take charge during an emergency and coordinate the response by staff—a task which they knew was all the more important in light of the inexperienced staff assigned to BCH. PSGD ¶¶ 6-8, 57-59. As shift supervisor, Dykstra's role was to coordinate the response by staff throughout the prison, while Watson and Redden as members of the first responder team were required to take charge of the situation on the ground. PSGD ¶¶ 6-7, 57-59. Dykstra was specifically responsible for ensuring that the prisoner firefighter squad was promptly activated[3] in response to a fire emergency. PSGD ¶¶ 67.

As discussed above, immediately after the fire code was called at 9:45pm, Dykstra, Watson and Redden became aware that there was a significant fire in BCH emanating from one of the cells where prisoners were locked in. The need for swift and urgent action was obvious.

---

[3] Plaintiff uses "activated," in the context of the prisoner firefighter squad, as shorthand to refer to the steps necessary for the prisoner firefighters to deploy to the scene of a fire—that is, both releasing them from their cells and cell houses throughout ISP, and ensuring they are given access to the firehouse to gear up.

15

Yet the response of these three Defendants was woefully inadequate. Dykstra, for example, took virtually no action to ensure that the staff's response to the fire was appropriate and complied with ISP policy. Instead, he simply listened to the radio traffic from his office and watched the fire engulf Mr. Devine's cell from the video feed. PSGD ¶ 78. He gave no direction over the radio to Watson, Redden, or any of the three officers in BCH. PSGD ¶ 78. And despite having the responsibility for activating the prisoner firefighters, Dykstra took no action to ensure they were released from their cells and given access to their equipment to ensure a timely response to fight the fire in BCH. PSGD ¶¶ 68, 78. Dykstra's incident report, which documents his activities on the night of the fire, reveals no action between 9:45pm, when the fire code was called, and 9:58pm. PSGD ¶ 78. In fact, Dykstra took absolutely no action whatsoever to activate the prisoner firefighter department. PSGD ¶¶ 68, 78.

As for Watson and Redden, upon entering BCH it was immediately obvious that the fire was serious and that the BCH officers did not have the situation under control. PSGD ¶ 61. Yet neither Watson nor Redden took even the basic step of retrieving the fire extinguisher. PSGD ¶ 60. Nor did they take any action to activate the prisoner firefighter squad, despite knowing that the prisoner firefighters had more specialized fire response training and equipment and that ISP policy required them to do so. PSGD ¶ 60, 68-70. The prisoner firefighters were not activated until after 9:58pm when Redden belatedly did so, 13 minutes after the fire code was called over the radio. PSGD ¶ 78.

Dykstra, Watson and Redden were not required to act perfectly but they were responsible for taking action once they learned of the fire. Dykstra fully abdicated his responsibility to direct staff's response to the fire and activate the prisoner firefighters, and instead did nothing but listen and watch. Watson and Redden similarly failed to activate the firefighters until nearly a quarter

16

hour after first responding to the fire, and failed to take any other steps to combat the fire that was now raging within Mr. Devine's cell. A reasonable jury could conclude these Defendants' response evinced deliberate indifference to Mr. Devine's safety and wellbeing.

4.    <u>A reasonable jury could conclude that these failures caused Mr. Devine's death.</u>

A jury could easily conclude that the abject failures and stark inaction described above was the cause of the harm suffered by Mr. Devine—excruciating pain, followed by his death. Causation is typically reserved for the jury, which is particularly necessary here given the array of disputed facts and interlocking aspects of the fire response (or non-response). *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 748 (7th Cir. 2006). As noted in discussing the Incident Defendants' deliberate indifference, there was a long menu of available actions that were tragically not taken, any one of which, alone or in combination with others, a jury could find would have saved Mr. Devine's life.[4] *See Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004) (causation requirement satisfied where the harm was a "highly predictable consequence of the deliberate indifference). Without the long period during which Rodriguez, Abbassi and Blakely ignored the banging and cries for help coming from the ranges, it would have been possible to release him from his locked cell before he succumbed to the flames, and also to extinguish the fire before it raged out of control. PSGD ¶¶ 35, 64. Even accepting that long delay, once the officers emerged, had they taken any steps to get the right keys to the 500 range, they still could have released Mr. Devine or extinguished the fire. PSGD ¶ 64. Notably, it would have taken any of the Defendants somewhere in the range of 10 to 40 seconds to run up

---

[4] Notably, Plaintiff need not prove that Mr. Devine's life *would* have been saved had Defendants not acted with deliberate indifference. It is instead enough to show that Mr. Devine's life *might* have been saved. *See Miranda v. County of Lake*, 900 F.3d 335, 347 (7th Cir. 2018); *Alexander v. Scheid*, 726 N.E.2d 272, 279 (Ind. 2000) (recognizing loss of chance of survival as a compensable injury).

from the 100 level, where the keys and fire extinguishers were, to the 500 level, where they were desperately needed to save Mr. Devine's life. PSGD ¶¶ 53. And even accepting that failure too, if Dykstra, Watson or Redden had timely activated the prisoner firefighters, speeding up their response, a jury could conclude Mr. Devine would still be alive. PSGD ¶¶ 60, 64.

**D. A reasonable jury could conclude that the Supervisory Defendants knew of the risk that fires at ISP posed to Mr. Devine and other prisoners, but ignored that risk.**

Under 42 U.S.C. § 1983, state actors are liable for their personal involvement in causing a constitutional violation. *See Rasho v. Elyea*, 856 F.3d 469, 479 (7th Cir. 2017). A supervisor is not liable simply because someone below her in the chain of command violated a constitutional right, but she is liable where her own indifference was a cause of the violation at issue. *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018); *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

"The law recognizes . . . that a defendant need not participate directly in the deprivation for liability to follow under § 1983." *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870-71 (7th Cir. 2011) (internal quotation marks omitted)). For decades, the Seventh Circuit has held that an official is personally involved in, and thereby personally responsible for, unconstitutional conduct where he "know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye" to it. *Gentry*, 65 F.3d at 561; *see also Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015); *Doe #8 v. Municipal Courts of Marion County*, 97 F.3d 902, 909 (7th Cir. 1996). In *Haywood v. Hathaway*, 842 F.3d 1026, 1031-33 (7th Cir. 2016), for example, the Seventh Circuit found that a prison warden could be held liable under § 1983 when he was aware of unconstitutional conditions at the prison and was in a position to remedy them, but responded in a "plainly inappropriate" way. Whether a state actor is in a position to remedy unconstitutional conditions or conduct is a question of fact. *Horshaw*, 910 F.3d at 1030.

18

Supervisory prison officials may thus be held liable for their deliberate indifference toward systemic conditions that exist over which they have responsibility. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1428-29 (7th Cir. 1996); *see also Potts v. Manos*, 2013 WL 5968930, at *4-5 (N.D. Ill. Nov. 7, 2013); *Jeanine B. Blondis v. Thompson*, 877 F. Supp. 1268, 1279 (E.D. Wis. 1995). And liability may also attach when a prison administrator is aware of a systemic failure to comply with established policies and procedures designed to protect prisoners' safety and fails to take meaningful steps to remedy the problem. *See Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998). The central questions in such cases are the defendants' awareness of the conditions that pose a serious risk of harm and their failure to take meaningful action in response.

It is beyond dispute in this Circuit that individual prison officials may be held liable for their part in the creation or maintenance of policies or practices that pose a serious risk of harm to prisoners in their care. *E.g., Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015); *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002). And in similar fashion, "[i]ndividual defendants . . . who are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." *Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018) (citing *Steidl*, 151 F.3d at 741) (internal quotation marks omitted).

> 1.  <u>A reasonable jury could conclude that the Supervisory Defendants were aware of the risk posted to Mr. Devine and other prisoners by fires in their locked cells.</u>

There can be no doubt that Mr. Devine was exposed to and suffered serious harm when a fire started in his locked cell, as discussed above. *See supra* pp. 6-7. And the Supervisory Defendants have forfeited any argument that they were not aware of the substantial risk of harm Mr. Devine faced while in their custody at ISP. *See supra* pp. 5-6. But even on the merits, there

19

is substantial evidence in the record from which a jury could conclude that the Supervisory Defendants knew that Mr. Devine and other prisoners at ISP faced a substantial risk of injury from fires in their cells.

First, a jury may conclude these Defendants were aware of the risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842; *Balsewicz v. Pawlyk*, 963 F.3d 650, 655 (7th Cir. 2020). A jury could easily conclude that the risks posed by fires in the correctional setting, where prisoners are locked in their cells or otherwise have their movement restricted, was obvious and well-known by the Supervisory Defendants. *See, e.g.*, *White v. Cooper*, 55 F. Supp. 2d 848, 858 (N.D. Ill. 1999) ("The absence of fire safety and prevention devices, which are necessary in a correctional facility to notify staff that a fire started and to aid in the evacuation of smoke, is an obvious risk of serious harm.").

And second, the Supervisory Defendants were aware of a large number of fires at ISP. PSGD ¶ 86-88. Dykstra testified that during his tenure at ISP he has "dealt with hundreds and hundreds of fires there," and estimated that over a five-year period there were "a few hundred" fires. PSGD ¶ 86. The Supervisory Defendants were aware of these fires because policy required that an incident report be written for every fire. PSGD ¶ 87-88. These incident reports would include detailed factual information about the fire, and how prison staff responded. *Id.* And every day, Neal, Gann, Nowatzke, Griffin, and Beal (among others) would attend a meeting where they would discuss the incidents from the previous day. *Id*. Fires were discussed at these meetings, along with staff response and how ISP's policies were and were not followed. PSGD ¶¶ 87.

The Supervisory Defendants were further aware that a significant number of these fires occurred from electrical problems at ISP, especially the electrical outlets in prisoners' cells. PSGD ¶¶ 114, 168. In fact, it was common for the outlets at ISP, especially the outlets in

prisoner cells, to spark. *Id.* This was well known to the Supervisory Defendants. Indeed, in the months before Mr. Devine's death, large flames erupted from an electrical socket in a cell on the 400 range of BCH. PSGD ¶¶ 86-88, 114. Moreover, Mr. Devine was moved into his cell about a week before the fire, and the previous resident of the cell had complained of electrical problems in that very cell. PSGD ¶ 84. A jury could conclude from these facts and the other evidence in the record that the Supervisory Defendants were aware that ISP prisoners like Mr. Devine faced a serious risk of harm from fire, especially when locked in their cells.

> 2.    A reasonable jury could conclude that the Supervisory Defendants ignored the serious risk posed to Mr. Devine and others.

*Defendant Griffin – Safety Hazard Manager*

Griffin was Safety Hazard Manager at ISP in April 2017 and had been in that position for over a year. PSGD ¶ 124. He was responsible for establishing and monitoring a safety program at ISP to set health and safety standards for prisoners and staff, and to ensure that ISP complied with federal and state fire rules and regulations, among other things. PSGD ¶¶ 124.

Griffin had several key responsibilities related to fire safety. First, he was required to make sure that fire drills were conducted at least once per quarter for each shift in each building, and to ensure that they were conducted in a way that was sufficient to prepare staff to respond to an actual fire emergency and understand the fire response procedures. PSGD ¶ 126. Griffin knew that fire drills were a vital part of a prison's fire safety. *Id.* And he knew that live fire drills with evacuations, rather than simple verbal quizzes about the fire protocols, were required to address the known risk of fire at the prison. *Id.*

Despite this, Griffin took no action whatsoever to carry out fire drills on the night shift. *Id.* Instead, the sole exposure that staff on the night shift had to the fire protocols was through six verbal questions asked by prisoner firefighters without any meaningful drill or other simulation.

21

PSGD ¶¶ 99, 100, 105. And those questions addressed only the very basics of fire safety. PSGD ¶¶ 99. These verbal quizzes were not even intended to provide meaningful training to staff: when staff failed to provide correct responses to the written questions, the prisoner firefighters, following Griffin's direction, would give them the correct answers and complete the paperwork documenting that the quiz had been successfully completed, regardless of whether staff could provide even a single correct answer, and no additional training was provided. PSGD ¶¶ 100, 105. In short, Griffin knew he had an important responsibility to make sure that staff had practiced emergency fire response and understood the fire safety policies, and he also knew that some staff were performing poorly on the quizzes and did not know basic fire safety. PSGD ¶¶ 96, 100. Despite this, Griffin abdicated his responsibility by taking no action to address the problem and ensure proper training. PSGD ¶¶ 97-105, 126, 129-137.

Griffin also knew about the widespread issues with the electrical system at ISP and the risk of fire posed as a result. PSGD ¶¶ 86-88, 114, 127. It was Griffin's responsibility to investigate and address safety issues and to specifically address and correct systematic electrical problems. PSGD ¶¶ 125, 127. But Griffin disregarded this responsibility, and he took no steps to modify, or even inspect, the electrical system at ISP before Mr. Devine's death, leaving prisoners like Mr. Devine vulnerable to electrical fires. PSGD ¶¶ 116, 127. He similarly took no action to ensure that prisoners were not housed in cells where a faulty electrical outlet had been identified, as was the case with Mr. Devine's cell before he was housed there approximately one week before the fire. PSGD ¶¶ 84, 116, 127.

Relatedly, Griffin was required to conduct monthly facility inspections for fire and safety issues, and ensure that weekly inspections were also conducted. PSGD ¶¶ 125. Griffin would receive copies of all such inspection reports, and as safety hazard manager, was required to

22

address issues raised in those reports. *Id*. Griffin knew from the reports themselves that the weekly and monthly inspections were being conducted in a perfunctory manner that made clear that no real inspection was being done: reports frequently rated all inspected areas exactly the same in each report; the reports contained few, if any, notes; and the reports frequently reported that staff had performed inspections of infrastructure—like fire sprinklers—that did not even exist. PSGD ¶¶ 113, 116. Despite this, he took no action to ensure that the facility was being meaningfully inspected to identify fire and safety risks to prisoners like Mr. Devine. PSGD ¶ 116.

Finally, Griffin had supervisory responsibility over the prisoner firefighter program. Any issues or problems experienced by the firefighters were brought to his attention. PSGD ¶¶ 128-136. For example, Griffin knew from the firefighters' direct reports that poorly trained staff were causing delays in the release of prisoner firefighters, and that this was causing a substantial delay in their ability to respond to fires. PSGD ¶¶ 130, 132. Griffin knew that the prisoner firefighters were the primary mechanism at ISP to address fires at the prison, especially serious fires, PSGD ¶¶ 106, 110, but took no action in response to learning that staff were hampering their ability to do the job that ISP policy required of them to prevent and fight fires. PSGD ¶ 136.

*Defendant Beal – Training Coordinator*

As of April 7, 2017, Beal had been the head of ISP's training department for almost four years. PSGD ¶ 138. As such, he was responsible for making sure that staff were properly trained on ISP's fire safety policies, that staff were following those policies, and that staff knew what to do during a fire as soon as they began correctional duties. PSGD ¶ 139.

Specifically, Beal was required to review information from incident reports and other sources on an ongoing basis to evaluate the effectiveness and sufficiency of the new employee training, especially the on-the-job training, and to make or propose changes as needed to address

all deficiencies. PSGD ¶¶ 139. In other words, Beal had the authority and responsibility to add training modules and activities to the training program and create training materials to ensure that, among other things, staff knew how to adequately respond to a fire. PSGD ¶¶ 139-142.

Despite these responsibilities, Beal took no action to review incident reports and other documents provided to him to identify conduct that indicated a dire need for additional training. PSGD ¶ 143. Beal instead relied on staff members to tell him if and when additional training was needed. PSGD ¶¶ 143-44. Worse still, when staff did raise issues about training inadequacies, Beal refused to act, instead dismissing these issues as staff trying to avoid getting in trouble. PSGD ¶ 144. Beal made *no* changes to the training related to fire safety and response (or any other topic) during his tenure, and the on-the-job training related to fire safety and response remained unchanged between 2011 and April 2017. PSGD ¶ 146.

Beal's inaction is especially egregious in light of the fact that ISP's new officer training on fire safety and response was plainly and woefully inadequate. The only training that new officers like Rodriguez, Abbassi, and Blakely received was a "generic" and "simplistic" less-than-ten minute quiz that omitted information crucial to proper fire response, including information about the prisoner firefighter program; information about transferring or exchanging keys during an emergency and investigating a commotion or disturbance; information about responding to a prisoner who was in distress in his cell; and information about assessing the seriousness of a fire and the need to evacuate one or more prisoners. PSGD ¶¶ 90-91. Nor did the new employee training provide any simulation of a cell evacuation or response to a fire. PSGD ¶ 91. The training directed staff to call for assistance when a fire occurred but did not provide critical instruction about how to respond to a fire or take life-saving measures before others might arrive. PSGD ¶¶ 91-92.

24

In short, Beal knew that new officer training was woefully insufficient to prepare new officers to respond to fires, a fact borne out when Rodriguez, Blakely, and Abbassi failed to properly respond to the fire in Mr. Devine's cell, and a jury could find Beal's inaction was deliberately indifferent to the known and obvious risk that the inadequate training posed to prisoners like Mr. Devine.

*Defendant Nowatzke – Major and Custody Supervisor*

Defendant Nowatzke was a major and the custody supervisor at ISP starting in 2016. PSGD ¶ 149. Nowatzke was responsible for identifying and correcting problematic patterns of officer conduct at ISP. PSGD ¶ 150. Nowatzke was made aware of all incidents and custody issues that occurred at ISP, which were reported to him through incident reports and the chain of command. PSGD ¶¶ 8, 86-88, 151. He knew that the prevalence of fires and electrical problems at ISP was a problem and posed a substantial risk of harm to prisoners like Mr. Devine. PSGD ¶¶ 86-88, 114, 168. Yet in the face of this knowledge, he failed to carry out his own responsibilities to address that risk.

Nowatzke was specifically responsible for reviewing post orders to ensure they adequately provided direction to staff about how to perform their duties, and proposing changes to the warden wherever deficiencies arose. PSGD ¶ 152. He was also responsible for ensuring that prisoner firefighters were being timely released in the event of a fire. PSGD ¶ 155. Nowatzke knew the danger that fires presented and how important it was to have proper systems and policies in place to address the risk. PSGD ¶¶ 153, 155. Despite this, Nowatzke never consulted with anyone about the adequacy of post orders related to fire emergency response. PSGD ¶ 154.

Critically, the post orders—the *only* written policies regarding fire response available to cell house officers like Blakey, Abbassi, and Rodriguez—provided no guidance whatsoever

25

about when and how to release prisoner firefighters. PSGD ¶ 106. Nowatzke knew that this lack of information was causing problems with prisoner firefighters not being timely released when a fire occurred, and knew that this problem was substantial, as every second counts in fire response. PSGD ¶ 155. Despite that knowledge, he failed to make or initiate any changes to the post orders to provide written instruction to staff about releasing prisoner firefighters in the event of a fire. PSGD ¶ 154. Nothing prevented Nowatzke from making or proposing such changes. PSGD ¶ 155.

Nowatzke was also responsible for ensuring that fire drills occurred as required by ISP policy. PSGD ¶ 156. Nowatzke was notified by Griffin before every fire drill that occurred at the facility, and accordingly knew that such fire drills were not occurring during the night shift. PSGD ¶¶ 97, 156. Despite this, Nowatzke did not take any steps to ensure that fire drills were being carried out on the night shift, correct staff's systemically poor performance during fire drills, or make any changes to ISP policies or procedures relating to fire drills. PSGD ¶ 156.

As custody supervisor, Nowatzke, like Griffin, was responsible for ensuring that staff were conducting the required weekly and monthly inspections at ISP and was required to review all resulting inspection reports. PSGD ¶ 158. Nowatzke knew that regular inspections were important to protect the safety and security of prisoners and staff at ISP, and knew from the reports themselves (as described above) that the inspections were not being done in any meaningful way. PSGD ¶¶ 116, 158. Yet there is no evidence that Nowatzke took action to ensure that inspections were actually conducted or adequately assessed fire safety and emergency infrastructure. PSGD ¶¶ 158. Nowatzke was also responsible for ensuring that radios were in working order and ordering new radios when necessary. PSGD ¶ 157. However, there is no

26

evidence that Nowatzke took any steps to address the widespread and well-known radio problems, including frequent battery failures, that occurred at ISP. *Id.*

In sum, Nowatzke knew of a serious risk of harm to prisoners like Mr. Devine posed by fires at ISP, yet he failed to take any steps—including required steps—to reduce this risk. A jury could conclude this was deliberate indifference.

*Defendant Neal – Warden*

Defendant Neal started working at ISP in 2007, and he was promoted to warden in 2014. PSGD ¶ 160. As Warden, Neal was chief executive of ISP and responsible for managing facility operations, including all security and custody operations. PSGD ¶ 161.

Neal was chiefly responsible for ISP policies and procedures, including those related to fire safety and response, and he was affirmatively required to review ISP policies and procedures to ensure they were adequate to protect the health and safety of prisoners and staff. PSGD ¶¶ 161-62. He was also required to inspect facility infrastructure. *Id*. Neal was aware of the prevalence of fires at ISP, PSGD ¶¶ 86-88, and he knew that fires and electrical problems at ISP were a serious problem that posed a substantial risk to prisoners like Mr. Devine. PSGD ¶¶ 114, 168. Despite this awareness, Neal failed to take any action to modify or even review the fire safety systems at the prison at any point prior to Mr. Devine's death. PSGD ¶ 162. He similarly failed to conduct any inspection or evaluation of the electrical system or electrical outlets, or make any modifications to address the obvious danger of electrical fires posed by the electrical system in place at ISP. PSGD ¶ 168. Finally, Neal was aware of a widespread problem of radio failure at ISP, and despite admitting that communication via radio was essential to protecting the safety of prisoners and staff alike, failed to take any action to address the problem of radio failure at any point prior to Mr. Devine's death. PSGD ¶ 166.

27

Moreover, Neal failed to create or implement critical policies and procedures to address the risks that fires posed to prisoners like Mr. Devine. For example, Neal neither created nor directed the creation of any policies regarding when and how to release a prisoner during an emergency. PSGD ¶ 165. Neal further failed to ensure that staff were properly trained and instructed about fire response policies and procedures. PSGD ¶¶ 91, 106. For example, there was widespread confusion among staff about when and even *if* prisoner firefighters were required to be released in the event of a fire. PSGD ¶ 117. Neal knew about these issues from his daily incident review meetings but failed to take action to address them. PSGD ¶¶ 87-88. Similarly, Neal knew that carrying out live fire drills was necessary to ensure fire safety at ISP, but took no action to ensure that they occurred, even after he was notified that they were not happening at the facility. PSGD ¶¶ 167.

A jury could conclude from this evidence that Neal knew that ISP's policies and practices were inadequate to address the known and obvious risk of fires at the facility but responded to that knowledge with inaction and deliberate indifference.

*Defendant Gann – Deputy Warden*

Gann began working as the Deputy Warden at ISP in 2015, and continued in that position until after the April 7, 2017 fire. PSGD ¶ 169. As Deputy Warden, Gann was responsible for the safety and security of prisoners at ISP, and he would be notified of each incident that occurred at the facility and would review incident reports for most incidents. *Id.* Gann was responsible for developing and implementing ISP policies and procedures, supervising and evaluating custody staff, and ensuring that inspections were conducted and any issues addressed. PSGD ¶¶ 170.

Gann was similarly responsible for evaluating staff and ensuring that they were properly trained. PSGD ¶ 173. Gann knew that fire response training was important, and that he and others were not receiving adequate training about addressing fires at the prison. *Id.* Gann was

28

further aware that fire drills were not occurring at ISP as required by policy, and he knew that these drills were important to ensure staff understood what to do in response to a fire. *Id.* But Gann ignored these problems and his own responsibilities, taking no action to ensure that staff were properly trained on fire response, including critically important fire drills. PSGD ¶ 173.

With regard to maintenance, Gann was responsible for supervising the physical plant director, who was responsible for identifying and addressing systemic and recurrent maintenance problems. PSGD ¶ 171. Gann knew that sparking outlets was a dangerous problem at ISP and that dangerous electrical fires were occurring at the prison. PSGD ¶ 114. Despite this, Gann never spoke with the physical plant director about addressing the systemically faulty electrical grid at ISP. PSGD ¶ 171. Gann, like Griffin, was responsible for reviewing the monthly inspection reports and making sure that concerns were addressed and fixed. *Id*. Gann knew that both weekly and monthly inspection reports were being carried out in a perfunctory manner that made clear that no real inspection was being done, as explained above, but took no action to ensure that the facility was being meaningfully inspected to identify fire, safety, and health risks to prisoners like Mr. Devine. PSGD ¶¶ 116, 171, 176.

Gann was also aware of the systemic problem of faulty officer radios, and knew that officers would repeatedly be left incommunicado on their post as a result. PSGD ¶ 174. He knew that it was important to the safety and security of both prisoners and staff that the radios in use at ISP were in good working order. *Id*. Despite this, Gann took no action to ensure that staff had working radios. *Id*. Instead, he allowed the problem to continue to inhibit emergency communication and pose a danger to prisoners like Mr. Devine. A jury could reasonably conclude from this evidence that Gann's abject disregard of his responsibilities, particularly in

light of the acknowledged dangers faced by prisoners like Mr. Devine, constituted deliberate indifference.

> 3. A jury could conclude that the Supervisory Defendants caused Mr. Devine's terrible suffering and death

Like with other aspects of Plaintiff's claims, the Supervisory Defendants have forfeited any argument regarding causation by failing to raise it in their brief. *See supra* pp. 5-6. In fact, they offer no argument or discussion about causation whatsoever, and cannot now raise it in reply. *See generally* ECF No. 202.

Regardless, any such argument would be without merit. As discussed in detail above, the Supervisory Defendants exhibited deliberate indifference toward the substantial risk that prisoners like Mr. Devine would be seriously harmed by fires in their locked cells.[5] A jury could readily find that this deliberate indifference was one of the causes of Mr. Devine's injuries. In discussing the causation requirement of § 1983, the Seventh Circuit has repeatedly noted that injuries resulting from constitutional violations can—and frequently do—have multiple sufficient causes. *Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012); *see also Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002). Causation is a quintessential fact question that requires a jury to examine the relationship between the misconduct and the harm suffered by the plaintiff. *See, e.g., Woodward*, 368 F.3d at 929; *J.K.J. v. Polk County*, 960 F.3d 367, 384-85 (7th Cir. 2020) (en banc) (causation requires jury to view

---

[5] Plaintiff does not seek to hold the Supervisory Defendants liable purely based on rule or policy violations. But IDOC and ISP policies, along with other rules and regulations, are relevant because they show that the Supervisory Defendants were aware of available tools and actions they could (or, in some cases, must) use to address the risk, and knew of the consequences if they failed to take available or required action. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013) (Evidence regarding "relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights."); *see also Petties*, 836 F.3d at 729; *J.K.J.*, 960 F.3d at 384.

evidence holistically); *Shepard*, 463 F.3d at 748 ("[I]n the normal course, the issue of causation is one for the jury").

Here, a jury could conclude that each of the failures of each of the Supervisory Defendants discussed above led directly to Mr. Devine's suffering and death. First, Neal, Nowatzke, Gann, and Griffin failed to address the common electrical problems, especially stemming from the electrical outlets, at ISP. PSGD ¶ 114. Before his death, Mr. Devine told nearby prisoners that his television was on fire, and the State Fire Marshall determined that the fire was accidental and that there was a "reasonable probability" that the fire had an electrical origin. PSGD ¶¶ 26, 83. A reasonable jury could determine that, had these Defendants taken action in response to this known problem, an electrical fire would not have started in Mr. Devine's cell on April 7, 2017. PSGD ¶ 83. In fact, Mr. Devine had only been in his cell on the 500 range for about a week at the time of his death, and the prisoner who had lived in Cell 540 before him had complained about the electrical outlet sparking. PSGD ¶ 84.

There is also ample evidence in the record to conclude that the Supervisory Defendants' failure to adequately train and instruct custody staff, including through fire drills, led directly to a delayed and confused response to the fire that erupted in Mr. Devine's cell. For example, because Griffin and the other Supervisory Defendants failed to ensure that fire drills were carried out during the night shift, none of the officers in BCH on the night of the fire had ever participated in a live fire drill. PSGD ¶ 101. As Statham observed, this fact led directly to confusion and increased danger. PSGD ¶ 99.

Because Abbassi, Blakely, and Rodriguez had not been provided adequate training and instruction about what to do when prisoner was yelling and in distress and how to actually respond to a fire, their response was largely absent. Blakely took no action after learning of the

fires—she did not even leave the 100 range. PSGD ¶¶ 44-45, 63. The three officers failed to bring the keys to the 500 range to release Mr. Devine from his cell. PSGD ¶¶ 49. A radio signal was not called until well after the fire started; when the first responders arrived, Abbassi and Blakely were standing idly by the officer's station on the 100 range, with the fire extinguishers still locked in the office; no one released the firefighter living in BCH from his cell. PSGD ¶¶ 43, 51, 63.

The Supervisory Defendants further condoned and perpetuated a general disregard for fire safety among correctional staff by, among other things, failing to take fire drills seriously. PSGD ¶¶ 95-105, 136. They failed to carry out fire drills during the night shift and took no action when new staff performed poorly during the verbal quizzes. *Id.* In fact, Blakely, Abbassi, and Rodriguez participated in a mock drill shortly before the April 7, 2017 fire where they treated the exercise as a joke and "every one of them failed" the questions. PSGD ¶¶ 101. Abbassi even told one of the prisoner firefighters conducting the mock drill that if there was a fire, she would run away rather than try to save any prisoners who were in danger. PSGD ¶¶ 81. This was a grim predictor of the three officer's ajbect failure to respond to the fire that killed Mr. Devine.

Similarly, the Supervisory Defendants failed to take any corrective action to address the problem of staff refusing to release or delaying the release of prisoner firefighters when a fire occurred at ISP. PSGD ¶¶ 106-110. Predictably, there were significant delays in releasing the prisoner firefighters on the night of April 7, 2017, preventing those best equipped to save Mr. Devine from doing so, and causing his terrible suffering and death. PSGD ¶¶ 66-81.

Finally, the failure of Neal, Gann, and Nowatzke to address the problem of inoperable radios and failing radio batteries directly contributed to Mr. Devine's death. Rodriguez reported

32

that when he finally responded to the yelling in BCH, his radio was not working and he could not call a signal or call for help. PSGD ¶¶ 43. This again caused unnecessary delay in an emergency situation where every second mattered. PSGD ¶¶ 51, 155. Had Neal, Gann, and Nowatzke addressed the known radio problem, a jury could conclude Mr. Devine would have received the help he so desperately needed. In short, a jury has ample evidence from which to conclude that the Supervisory Defendants' deliberate indifference caused Mr. Devine's death.

## III.    Defendants are not entitled to qualified immunity.

Defendants argue in just three short paragraphs that they are entitled to qualified immunity. ECF No. 202 at 19-20. But their brief fails to explain their basis for asserting qualified immunity at all. Other than asserting that the doctrine of qualified immunity exists and reciting its elements, Defendants offer no explanation as to why they are entitled to qualified immunity or even what constitutional violations were not clearly established at the time that they occurred in this case. Instead, they simply assert—wrongly—that they are entitled to the affirmative defense because there is no evidence that Defendants "subjectively knew" their actions violated Mr. Devine's constitutional rights. *Id.* at 20; *see also Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 471-72 (7th Cir. 1997) ("the determination of whether public officials are entitled to qualified immunity is an objective one").

Defendants' failure to develop their qualified immunity argument in any manner is a clear forfeiture of the defense. While it is ultimately a plaintiff's burden to overcome a qualified immunity defense, "[i]t is [the defendant's] initial burden to properly put the defense before the Court." *Hood v. Smith*, 2017 WL 2404974, at *3 (N.D. Ill. June 1, 2017) (citation omitted). It is not enough for a defendant simply to invoke the qualified immunity standard, as Defendants do here. *See id.*; *see also Am. Homeland Title Agency, Inc. v. Robertson*, 2016 WL 5661562, at *10-11 (S.D. Ind. Sept. 30, 2016) (declining to address cursory and undeveloped arguments on

33

qualified immunity). As the district court explained in *Lanahan v. County of Cook*, 2018 WL 1784139, at *11 (N.D. Ill. Apr. 13, 2018), "the defendants bear the initial burden to properly put the defense of qualified immunity before the Court," and they "fail to do so" where they "do little more than recite the requirements for qualified immunity and insist that the defense applies." Like the district courts cited above, this Court should find that Defendants forfeited their qualified immunity defense for purposes of summary judgment.

Even if the defense had not been forfeited, the rights at issue here were clearly established at the time the events in this case occurred. Plaintiff asserts that the Incident Defendants were deliberately indifferent in failing to act after being notified of the fire in Mr. Devine's cell on April 7, and that Defendant Supervisors were similarly deliberately indifferent to the known and substantial risk of harm from fires posed to prisoners like Mr. Devine. The Seventh Circuit, in *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002), held that in cases involving claims of deliberate indifference, where "there are genuine issues of fact concerning [the deliberate indifference] elements, a defendant may not avoid trial on the grounds of qualified immunity." *See also McGuire v. Dykstra*, 2020 WL 4735264, at *4 (N.D. Ind. Aug. 14, 2020) (citing *Walker* and denying qualified immunity for prisoner who was denied medical care after the fire in Mr. Devine's cell).

Additionally, the Seventh Circuit has recognized a prisoner's right to be free from deliberate indifference to the risk of fires in a prison setting since at least 1985. *See, e.g., French v. Owens*, 777 F.2d 1250, 1257-58 (7th Cir. 1985) ("There is no question that fire and occupational safety are legitimate concerns under the eighth amendment."); *Duckworth v. Franzen*, 780 F.2d 645, 655-56 (7th Cir. 1985). Accordingly, district courts in this Circuit have uniformly rejected invocations of qualified immunity when the violation at issue involved

34

deliberate indifference to the risk of harm posed by fires in prison. *See, e.g., White*, 55 F. Supp.

2d at 858; *Rabb Ra Chaka v. O'Leary*, No. 88 C 3753, 1989 WL 56874, at \*4 (N.D. Ill. May 24,

1989) ("[I]t has long been established that dangerous conditions of confinement violate the

eighth amendment; more important, the Seventh Circuit, following several other circuits, has

recognized that fire hazards in particular may violate prisoners' rights."). As the district court in

*White* explained: "In fact, it is reasonable to conclude state defendants knew that consciously

disregarding a non-operational fire safety and prevention system in a state prison and failing to

free a man from his burning cell would violate an inmate[']s most basic and established

constitutional rights." 55 F. Supp. 2d at 858. Accordingly, even if this Court addresses the claim

of qualified immunity on its merits, which it should not, the defense should be rejected.

## IV.     A jury must resolve Plaintiff's conspiracy claims.

To prove a § 1983 conspiracy, Plaintiff must point to evidence from which a jury could

infer an agreement among two or more people acting in concert to commit an unlawful act, or a

lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*

*on other grounds*, 446 U.S. 754 (1980). The Seventh Circuit has explained:

> To be liable as a conspirator you must be a voluntary participant in a common venture,
> although you need not have agreed on the details of the conspiratorial scheme or even
> know who the other conspirators are. It is enough if you understand the general
> objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do
> your part to further them.

*Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988).

"[A]n express agreement among the conspirators is not necessary; the participants must

simply share the same general conspiratorial objective." *Xie v. City of Chicago*, 2016 WL

6193981, at \*10 (N.D. Ill. Oct. 24, 2016) (citing *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir.

2013)); *accord. Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). "[I]f the agreement is

not overt, the alleged acts must be sufficient to raise the inference of mutual understanding (i.e.,

35

the acts performed by the members of a conspiracy 'are unlikely to have been undertaken without an agreement')." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (internal quotation marks omitted). This is because the "law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein," but requires only "that there be a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981) (cleaned up).

Because conspiracies are by their nature carried out in secret, direct proof of agreement is rare. *Tully v. Del Re*, 2002 WL 31175983, at *7 (N.D. Ill. Oct. 1, 2002). Thus, as Defendants concede, "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984). At summary judgment, when inferences are taken in the non-movant's favor, "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds." *Hampton*, 600 F.2d at 621.

Again, as discussed above, Defendants have forfeited the argument that the record is insufficient for a jury to hold them liable for conspiracy. Their argument consists of four sentences—two briefly setting out the legal standard for conspiracy and two very briefly concluding that "there is no evidence of culpable intent to harm Mr. Devine" or "of a conspiracy among the Defendants," so Count II "fails as a matter of law." ECF No. 202 at 17-18. This argument is so conclusory and devoid of any discussion of the facts or meaningful discussion of the law that it should be deemed forfeited by the Court. *See supra* pp. 5-6.

Regardless, there is ample evidence in the record from which a jury could conclude that Defendants conspired to expose prisoners like Mr. Devine to a substantial risk of injury by fire at ISP. In other words, Defendants agreed not to implement critical policies and training related to fire safety and response, as well as to address safety risks posed by facility infrastructure, or take any other action to address the known risk of fires at ISP. Construing the record in Plaintiff's favor and affording her all reasonable inferences, as required at this stage, the collective refusal to take fire safety seriously and respond to the frequent occurrence of fires, including electrical fires, by implementing available safeguards reveals a coordinated effort among Defendants to abdicate their responsibility to protect prisoners like Mr. Devine from a substantial risk of serious harm posed by fires at ISP.

Specifically, a jury can rely on Defendants failure to provide meaningful training to staff about fire response; the failure to provide training, instruction, or policy about when and how to activate the prisoner firefighters; the failure to address widespread electrical problems and radio failures, that posed a risk of fire and hampered emergency response; the failure to conduct fire drills on the night shift or otherwise take fire safety seriously during quizzes; the significant delay of Blakely, Abbassi, and Rodriguez to respond to the prolonged cries for help in BCH on the night of the fire; the total inaction of Blakley in response to the fire; and the failure of Dykstra, Watson, and Redden to ensure that firefights were timely release after the fire started in BCH, among others. Because a reasonable jury could conclude that these actions and omissions are unlikely to occur absent an agreement, a reasonable jury could also find the existence of a conspiracy. *See Amundsen.*, 218 F.3d at 718.

Defendants argue that there is "no evidence of culpable intent to harm Mr. Devine." ECF No. 202 at 18. Defendants identify no authority that requires Plaintiff to show a "culpable intent

37

to harm Mr. Devine," nor could they; this statement misunderstands and misrepresents Plaintiff's burden. Plaintiff must simply show that Defendants share a common purpose "to commit an unlawful act, or a lawful act by unlawful means." *Hampton*, 600 F.2d at 620. As discussed above, there is ample evidence to show that Defendants agreed and each acted to fail to protect Mr. Devine and other prisoners at ISP, exposing them to a substantial risk of serious harm by fire. A jury must decide this claim.

**V.    <u>A jury could conclude that Defendants failed to intervene to prevent the violation of Mr. Devine's rights.</u>**

For the same reasons as discussed for other claims, Defendants have forfeited their summary judgment argument on failure to intervene. Aside from citing the general legal standard, and two sentences of interstitial text, Defendants offer a single, conclusory sentence—without any citation to the record—with a bare assertion that there is no evidence of their deliberate indifference or that any Defendant had an opportunity to intervene. Dkt. 202 at 18-19. This is insufficient to avoid forfeiture. *Sublett*, 463 F.3d at 736.

Even on the merits, there are disputed facts a jury must resolve to adjudicate Plaintiff's failure to intervene claims. Defendants half-heartedly suggest that failure to intervene is not a distinct claim, Dkt. 202 at 18, but they are wrong. While the facts may largely overlap, Plaintiff's failure to protect claim (Count I) asserts liability against each Defendant for their deliberate indifference to Mr. Devine's serious risk of harm, while Plaintiff's failure to intervene claim (Count III) seeks liability separately for Defendants' failure to intervene to prevent the deliberate indifference of other Defendants. *See, e.g.*, *Miller v. Zaruba*, 2013 WL 5587288, at *8 (N.D. Ill. Oct. 10, 2013) (discussing separate viability of failure to intervene claim in failure to protect deliberate indifference case). Furthermore, "[w]hether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the

trier of fact." *Lanigan,* 110 F.3d at 478. That is certainly true here. Plaintiff alleges deliberate indifference by the Incident Defendants arising from their myriad failures on the night of the fire, *see generally* PSGD ¶¶ 28-83, and by the Supervisory Defendants for their failure to remedy widespread and serious dangerous conditions at ISP, *see* PSGD ¶¶ 83-176. There are numerous periods where the evidence shows multiple Defendants in close proximity or coordination with one another, without taking action to remedy the deliberate indifference of their colleagues (perhaps unsurprising given their own deliberately indifferent course of conduct). For example, Abbassi and Blakely did nothing to intervene to stop the other's deliberate indifference while they were in the counselor's office ignoring the prisoners' cries for help, PSGD ¶¶ 28-35, and Dykstra, Watson and Redden did nothing while each failed to discharge his responsibility to activate the prisoner firefighters in face of the fire which was obviously burning out of control, PSGD ¶¶ 56-76. Similarly, the Supervisory Defendants failed to do *anything* during frequent meetings about incidents and policy violations at the prison to press each other into action to remedy the numerous dangerous conditions at ISP. PSGD ¶¶ 86-176. Plaintiff's failure to intervene claims must accordingly be submitted to a jury.

## VI.    Plaintiff's state law claims[6] must be resolved by a jury.

Defendants appear to claim some immunity applicable to Plaintiff's state law claims, but they do so in just one half-sentence, asserting without any legal or factual support that "Defendants are immune under Indiana law to all state-law claims." Dkt. 202 at 22. Any immunity argument is forfeited. *Sublett*, 463 F.3d at 736. So too for Defendants' non-immunity argument, which follows the same pattern as their forfeited arguments discussed above. Dkt. 202

---

[6] Plaintiff does not contest dismissal of Count VI (Negligent Infliction of Emotional Distress).

at 21-22. This is insufficient and any argument for summary judgment on Plaintiff's state-law claims has been forfeited. *Sublett*, 463 F.3d at 736.

Even if not forfeited, since Defendants offer substantively the same argument as they do in seeking summary judgment on Plaintiff's § 1983 claims, Dkt. 202 at 21-22, their argument on the state law claims should be rejected for the reasons discussed above. *See Steele v. Knight*, 2016 WL 7117155, at *13 (S.D. Ind. Dec. 7, 2016) (noting that "the willful and wanton standard [under Indiana state law] is similar to the deliberate indifference standard analyzed in the context of [plaintiff's] § 1983 claim," and denying summary judgment based on prior finding of material disputes on the constitutional claims). Defendants argue, as they did in seeking summary judgment on Plaintiff's § 1983 claims, that it is "undisputed" that "they reacted quickly and attempted to rescue Mr. Devine," and that there is no evidence of "purpose or design" in Defendants' failure to address dangerous conditions at the prison. Dkt. 202 at 21-22. As shown above, however, there are many factual disputes on these issues requiring a jury to resolve. As such, summary judgment in Defendants' favor on Plaintiff's state-law claims is inappropriate.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion for summary judgment.

Respectfully Submitted,

/s/ Megan Pierce
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Sarah Grady
Sam Heppell
Megan Pierce
LOEVY & LOEVY
311 North Aberdeen St.
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
megan@loevy.com

## CERTIFICATE OF SERVICE

I, Megan Pierce, an attorney, hereby certify that I served the foregoing Plaintiff's

Response in Opposition to Defendants' Motion for Summary Judgment on May 25, 2021 via the

Court's CM/ECF filing system, effecting service on all counsel of record.

/s/ Megan Pierce
One of Plaintiff's Attorneys

41