**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:18-cv-00995-JD-MGG |
| RON NEAL, et al. | ) ) | Hon. Jon E. DeGuilio, Judge |
| Defendants. | ) | Hon. Michael G. Gotsch, Sr., M.J. |

## PLAINTIFF'S STATEMENT OF GENUINE DISPUTED FACTS

**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES[1]**

I.      **The April 7, 2017 fire in BCH**

    A.      **Introduction**

    1.      Joshua Devine burned to death in his cell at Indiana State Prison ("ISP") on April 7, 2017. Devine and dozens of other prisoners in B Cell House ("BCH"), where Devine lived, yelled for help and banged on the bars for more than 10 minutes after the fire began to get the attention of correctional officers to help Devine. But Defendants Rodriguez, Abbassi and Blakely[2] ignored those cries for help while the fire grew larger and larger. Even once these Defendants belatedly responded, their actions were completely inadequate. *See generally* Plaintiff's Statement of Genuine Disputes ("PSGD") ¶¶25-83.

    2.      After the fire code was belatedly called over the radio, Defendants Dykstra, Watson, and Redden were alerted to the fire emergency in BCH, yet these officers similarly failed to take obvious and available steps that could have saved Devine's life. *See generally* PSGD ¶¶51-83.

---

[1] Pursuant to Local Rule 56-1(b)(2), Plaintiff submits this Statement of Genuine Disputes as an Appendix to her Response Brief in Opposition to Defendants' Motion for Summary Judgment. *See Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 595 (N.D. Ind. 2006) (noting that "a Rule 56.1 motion for summary judgment or response thereto is permitted to present the statement of material facts or statement of genuine issues, respectively, in a *separate* appendix, which itself is subject to no page limitation"); *Canen v. Chapman*, No. 3:14-CV-315, 2016 WL 695970, at *2 (N.D. Ind. Feb. 22, 2016) (denying motion to strike statement of facts filed as a separate appendix).

[2] Defendant Blakely uses male pronouns, and out of respect for his gender identity Plaintiff uses male pronouns, where necessary, to refer to him in this document. Ex. 3 at 6:8-12, 86:7-87:1. Since Blakely used female pronouns and was perceived as female by officers and staff at the time of the incident, and since Blakely's gender identity was unknown to counsel during the majority of the discovery period in this case, the discovery materials and depositions generally refer to Blakely using female pronouns and as a female officer.

**B.      Staffing at ISP on the night of the fire.**

3.      Rodriguez, Abbassi and Blakely were the three correctional officers on duty in BCH on the night shift on April 7, 2017, when the fire began. The night shift ran from 6pm to 6am. All three Defendants held the rank of correctional officer. Ex. 85 at 5; Ex. 3 at 127:25-128:4.

4.      Rodriguez was assigned to be the Officer in Charge ("OIC") in BCH on April 7, 2017. Rodriguez had worked at the prison for just over six months, and this was his first, or nearly his first, shift as OIC. Ex. 1; Ex. 2 at 29:6-12, 32:19-21. The OIC position was assigned based on seniority, and it was not usually assigned to Rodriguez except when the prison was low on staff. Ex. 2 at 32:17-33:7.

5.      Abbassi had been working at ISP for just over seven months. Ex. 73. Blakely had been working at ISP for three months and had finished his new officer training about two months prior. Ex. 3 at 90:18-91:11.

6.      Dykstra held the rank of captain and was the shift supervisor on the night of April 7, 2017. He was stationed in the shift supervisor's office, which is immediately adjacent to BCH in ISP's custody hall. Ex. 69; Ex. 63 at 167:23-168:3; Ex. 85 at 5.

7.      On April 7, 2017, Watson and Redden were lieutenants and on duty as the assistant shift supervisors at ISP, and they were assigned to the First Responder team. As assistant shift supervisors, they were able to step into the role of shift supervisor when needed, with the same responsibilities and job duties as the shift supervisor. The First Responders were supposed to rapidly mobilize and take charge of any emergency situation at the prison. Ex. 85 at 5; Ex. 63 at 110:15-111:14, 126:10-18; Ex. 64 at 121:24-123:4.

8.      Dykstra, as shift supervisor, and Watson and Redden, as assistant shift supervisors, shared responsibility for maintaining the staff roster, and therefore knew that BCH

2

was staffed by inexperienced correctional officers. Ex. 63 at 85:17-23, 98:7-15, 255:24-266:11. Dykstra had conversations "every day" with Major Nowatzke requesting that more senior officers be assigned to the night shift, and Watson and Redden were often part of these conversations also. Ex. 63 at 262:20-24, 263:13-19, 266:1-8.

**C.    B Cell House**

9.    BCH is a prisoner housing unit with 5 tiers of cells, running from the 100 level cells on the ground floor, up four flights of stairs to the 500 level cells at the top of the cell house. Ex. 63 at 276:11-16; Ex. 4. Each tier or "range" of cells has one row of even numbered cells on the North side of the cell house, and one row of odd numbered cells on the South side. Ex. 4; Ex. 64 at 132:20-133:5.

10.    The officer's station in BCH is on the southeast  side of the building, immediately adjacent to the main entrance/exit to the cell house, and the counselor's office is on the northeast side. Ex. 4. The counselor's office was kept locked, and officers ordinarily were not allowed to go into the office, but they could be let in by a lieutenant or captain in order to use the computer to complete their payroll paperwork. Ex. 2 at 95:25-96:25.

11.    There is a single key that unlocks all of the cells on a particular range. Prisoners' cells in BCH can be unlocked in one of two ways. The key for that range can be inserted directly into the cell door to manually unlock it. There is also a control panel on each range located near the front stairs, with an electric switch for each cell that can be pressed to remotely unlock any cell on the range. Ex. 30 at 47:8-49:5; Ex. 63 at 275:20-277:10, 280:22-284:10.

12.    Devine was living in cell 540 on April 7, 2017, on the North side of the 500 range. Ex. 9 at 1; Ex. 63 at 221:23-222:4.

**D.      Lead up to the fire**

13.      At the beginning of the night shift on April 7, Rodriguez assigned Blakely to cover the 400 and 500 ranges, Abbassi to cover the 200 and 300 ranges, and himself to cover the 100 range. Ex. 2 at 38:11-39:25; Ex. 65 at 127:14-25.

14.      There were two sets of keys for each range located in BCH. One was held by the officer assigned to that range, and the spare set was kept in the officer's station. Rodriguez, Abbassi, and Blakely all had access to the spare keys. Ex. 30 at 49:6-23; Ex. 63 at 277:21-279:6.

15.      As the officer assigned to the 500 range, Blakely was responsible for monitoring what was happening on that range. Ex. 2 at 85:25-86:8; Ex. 65 at 22:9-24:13.

16.      Correctional officers assigned to a housing unit had primary responsibility for emergency response and, when emergencies like a fire occurred, ISP policy required those officers to work together and to assist in timely responding to the situation. Ex. 5 at 75:10-14, 106:4-10, 137:16-24; Ex. 6 at 32:5-34:5.

17.      Officers in a housing unit were required to do rounds, or security checks, of every cell at least once every thirty minutes. Ex. 5 at 140:8-20, 143:4-10; Ex. 2 at 61:3-22; Ex. 7 at 2. During the security checks, officers were required to look in each cell and verify with a verbal response from each prisoner that they were okay. Ex. 65 at 25:20-26:12. The security checks on a particular range were typically completed by the officer assigned to that range, but any officer could do it. Ex. 2 at 79:7-19, 83:6-23.

18.      Officers were required to carry "wands" with them during their security checks and had to touch the wand to sensors placed throughout the housing unit, which would register the time contact was made, indicating that the identified officer had performed a security check in that area. The electronic system was called "Guard One" and ISP policy specifically required

4

each sensor of the Guard One system to be touched at least once every 30 minutes. Ex. 5 at 140:8-20, 143:4-10; Ex. 2 at 61:3-22; Ex. 7 at 2.

19.     Other than when they needed to let prisoners out of their cells for meals, medical issues, or work assignments, the main job duty of a correctional officer on the night shift was to complete the security checks and generally to make sure the prisoners were safe and secure. Night shift officers also had paperwork to complete. Ex. 2 at 77:16-79:3.

20.     On April 7, 2017, the last security check of the North side cells on the 500 range of BCH took place between 9:04 and 9:05pm. Ex. 8 at 4. If ISP policy had been followed, Rodriguez, Abbassi, or Blakely would have returned to the 500 range North side cells no later than 9:34pm. Ex. 7 at 2. Any officer who had gone to the 500 range around 9:34pm would have immediately seen the fire in Devine's cell.  Ex. 9 at 1.

21.     There was a prisoner count scheduled at ISP every night at 9pm, after which prisoners in the housing units were all locked in their cells for the night and needed the assistance of an officer to unlock the cell before they could leave the cell. Ex. 3 at 137:7-25. On April 7, 2017, the 9pm count was completed at approximately 9:06pm, with all prisoners accounted for and locked in their cells. Ex. 9 at 1 ("9:06 pm Officer Counts- no offenders are out").

22.     A couple of minutes after the 9pm count was complete, Watson came to BCH, unlocked the counselor's office, and told Abbassi and Blakely to complete their payroll paperwork inside the office. Ex. 2 at 115:3-10; 117:15-118:23.

23.     The counselor's office was directly adjacent to the cells on the North side of BCH, where Devine's cell was located. Ex. 4.

5

24.    After Abbassi and Blakely went into the counselor's office together, Rodriguez was by himself in the officer's station. Ex. 2 at 121:15-19. The officer's station has open mesh walls, with no closed doors or windows that would prevent the officer inside from hearing what is happening out on the ranges. Ex. 2 at 121:8-12; Ex. 91. Rodriguez was working on paperwork. Ex. 2 at 121:15-19.

### E.    A fire breaks out in Joshua Devine's cell

25.    At some point shortly after the 9pm count was completed and the prisoners in BCH were locked in their cells for the night, a fire broke out in Devine's cell. Ex. 10 at 7:1-18.

26.    Prisoners in nearby cells became aware of the fire when they smelled smoke. Devine told Lee Miller, a prisoner in a neighboring cell, that his television was on fire and he could not put the fire out. At that point, prisoners began yelling "Fire" to get assistance from the officers in the housing unit. Ex. 9 at 2; Ex. 11 at 5:16-6:11; Ex. 10 at 7:1-18.

27.    The exact time that the fire started is not known. A prisoner on the 100 range heard other prisoners yelling "Fire on 500" starting at approximately 9:15pm. Ex. 12 at 4:12-6:22. Surveillance video shows the fire was already underway at 9:34pm, when flashes of light appearing to be flames extruding from cell 540 became visible from the vantage of the video camera (which only partially depicts the inside of cell 540). Ex. 9 at 1, Ex. 33 ¶45. The surveillance cameras also do not capture audio, so they do not reveal when prisoners began yelling about the fire. Ex. 33, ¶45.

### F.    Defendants Abbassi and Blakely act with deliberate indifference to Joshua Devine.

28.    BCH was typically very quiet after the 9pm count—some residents described it as so quiet "you can hear pretty much . . . a cricket chirp." It had been calm and "real quiet" on April 7, 2017. A person could easily hear what was happening on the ranges from within BCH,

6

and it was quiet enough that you could hear practically any conversation of one prisoner talking to another. Ex. 2 at 101:18-102:10, 118:24-119:2; Ex. 19 at 6:3-8; Ex. 11 at 5:16-20, 8:11-18; Ex. 3 at 159:23-160:1.

29.     When prisoners began yelling about the fire, it was "very, very loud" in BCH. Although different people were yelling different things, it was audible that people were yelling that there was fire on the 500 range. Ex. 11 at 9:15-10:16; Ex. 10 at 10:1-11; Ex. 12 at 9:17-10:18; Ex. 20 at 128:6-18. In addition to the yelling, prisoners were banging on their cell bars trying to get the officers' attention. Ex. 12 at 7:18-22. The yelling was loud enough that it woke up a prisoner on the 400 range. Ex. 19 at 5:9-12. It was audible on the 100 level (where the counselor's office and officer's station are located) that prisoners were yelling "Fire on 500." Ex. 12 at 4:12-6:22, 10:19-23. More prisoners joined in and within a short period of time, BCH was full of the noise of around 100 grown men yelling "Fire" at the top of their lungs. Ex. 19 at 6:9-7:7. Some of the prisoners were also yelling "let out 126" and "let the fireman out" to alert guards to release prisoner firefighter Danny Means from Cell 126. Ex. 12 at 7:23-8:3. This high level of noise was highly unusual for the time of night (i.e., after lock-in). Ex. 2 at 101:18-102:10, 118:24-119:2; Ex. 19 at 6:3-8; Ex. 11 at 5:16-20, 8:11-18; Ex. 3 at 159:23-160:1.

30.     A few minutes after Abbassi and Blakely went into the counselor's office, Rodriguez began to hear prisoners yelling. He could hear they were yelling "fire on 500 range." Ex. 2 at 115:9-11; 121:20-22. Given the configuration of the officer's station, Rodriguez would have heard the shouts for help coming from the ranges immediately after they began. Ex. 2 at 75:4-15; Ex. 3 at 159:7-16, 160:6-10.

31.     There are screens in the officer's station that show live camera footage from each video camera within BCH. Rodriguez admitted that he was keeping an eye on the camera footage

every couple of minutes while he was in the officer's station, and thus would also have seen the commotion of prisoners banging on their bars and standing near their bars to shout for help. Ex. 2 at 76:7-17, 77:2-15.

32.     Rodriguez knew that prisoners yelled in order to get an officer's attention, and knew that if a prisoner was yelling or banging on the bars of their cell, he was required to go and investigate. Ex. 2 at 103:25-106:21.

33.     Abbassi and Blakely in the counselor's office would also have heard the prisoners yelling on the ranges and banging on their bars. Ex. 3 at 168:2-169:11, 172:4-10. Blakely heard the prisoners yelling "Fire on 500" even while Blakely was inside of the office, and he could smell smoke right away as he was passing through the office doorway out towards the ranges. Ex. 3 at 170:17-171:21; 198:16-199:2. Abbassi was also able to hear yelling coming from the ranges from inside the counselor's office. Ex. 75. Despite hearing the prolonged attempts by prisoners to get help, neither Abbassi nor Blakely left the counselor's office. Ex. 2 at 151:2-17.

34.     ISP policy required officers in a cell house to investigate any disturbance or commotion that they heard. Ex. 5 at 207:11-208:13.

35.     Devine and dozens of other prisoners were yelling for help for at least 10-15 minutes before Defendants Rodriguez, Abbassi, and Blakely took any action whatsoever in response. Ex. 13 ¶ 9 ("After everyone started yelling, 10 to 15 minutes passed before an officer went up the range to Joshua's cell); Ex. 14 ¶ 5 ("The prisoners in the cell house were yelling for about 15 minutes before any officer came up to the 500 range."); Ex. 15 ¶ 7 ("From the time I woke up to the screaming in the cell house, 20 to 30 minutes passed before I was released along with the prisoners in the cell house."); Ex. 16 at 65:8-12, 67:17-70:16; Ex. 17 at 2 (consensus among the prisoners that there was at least 10 minutes of yelling before any officer responded);

8

Ex. 18 at 1; Ex. 19 at 7:8-13 (at least 15 minutes passed while prisoners were yelling "Fire" before any officer responded); Ex. 20 at 181:15-18, 183:10-15 (Officer Statham talked to 20-30 prisoners after the fire, every one of them said fire was burning at least 20 minutes before officers came to help); Ex. 21 at 40:1-41:10; Ex. 90 at 2 (BCH prisoners reported that fire started around 9:11pm, Devine was continuously yelling for help yet officers failed to respond).

36.    When Rodriguez finally did respond, all he did was go up the stairs towards the 500 range without any equipment or other materials to help him respond to the known fire. He did not call in a fire code. He did not attempt to call for back-up or other help. He did not release Danny Means, the certified firefighter prisoner housed on the 100 level (for whose cell Rodriguez had the keys) to help fight the fire. He did not get a fire extinguisher. He did not even bother to get the set of 500 range keys from Blakely, or the spare set of 500 range keys from the officer's station. Ex. 2 at 115:9-14; Ex. 86; Ex. 30 at 49:6-23; Ex. 63 at 277:21-279:6; Ex. 10 at 7:20-8:1, 10:23-11:7, 11:18-25, 22:3-13..

37.    Rodriguez knew that in the event of a fire in the housing unit, he was required to immediately call for help by signaling the fire code over the radio, release the firefighter prisoners from their cells, and retrieve a fire extinguisher to help fight the fire. Ex. 2 at 45:11-47:1, 47:19-48:16. Rodriguez knew that Danny Means was the prisoner firefighter in BCH on April 7, 2017, and Rodriguez knew that he was housed on the 100 level, where Rodriguez was responsible for releasing him in the event of a fire. Ex. 2 at 52:5-24; Ex. 86.

38.    On a previous occasion, Rodriguez had encountered a prisoner who needed emergency assistance but was locked in a cell for which Rodriguez did not have the key—he had been doing a security check on the 400 range in C Cell House, he and had encountered a prisoner passed out in his cell who appeared to have overdosed. Rodriguez was unable to render aid

because he did not have the keys for that range, and his emergency response was delayed while he radioed to another officer to get the keys. This put Rodriguez on notice of the need to bring keys for the range where an emergency was taking place. Ex. 2 at 88:4-90:3.

39.    Abbassi and Blakely eventually emerged from the counselor's office in response to Rodriguez yelling. Ex. 75; Ex. 82. As soon as they stepped out of the counselor's office into the open area adjacent to the ranges, Abbassi and Blakely could see that the fire was on the 500 range just by looking up the cell house. The fire appeared to be coming from inside a cell, and it was obvious that all of the prisoners in the vicinity were in danger. Ex. 3 at 174:2-175:3; 178:7-179:3.

40.    Blakely heard Rodriguez yelling at him multiple times that Rodriguez needed the keys to the 500 range and needed Blakely's assistance. Ex. 81 at 06m04s-06m22s; Ex. 2 at 115:15-18, 126:3-10; 149:23-150:11; Ex. 78. Blakely knew there was no ISP policy that forbade him from going up to the 500 range, knew that Rodriguez could not unlock the cells, knew that he was the only person who could let the prisoners out, and knew that he was responsible for their safety. Ex. 3 at 177:23-178:21, 179:19-180:1, 181:2-8, 184:20-185:3. Blakely has no explanation for why he did not go up to the 500 range and does not recall doing anything immediately after seeing there was a fire there. Ex. 3 at 175:23-176:23; 179:19-180:1, 184:15-19; 201:6-13.

41.    Blakely knew that he had an obligation to protect the lives of prisoners, that releasing a prisoner from a locked call was an important part of responding to a fire, and that he was responsible for unlocking the cell if there was a fire on his assigned range. Ex. 3 at 97:9-15, 133:14-20, 134:13-18.

42.     Blakely also knew that, after prisoners were locked in for the night, the only way that prisoners had to get officers' attention in the event of an emergency was by yelling. Ex. 3 at 136:25-137:25.

43.     Rodriguez's radio was not working, so he could not radio in a fire code and had to shout down to Abbassi or Blakely to ask for their help. Ex. 2 at 115:9-18. Both Abbassi and Blakely had radios, but neither of them called a fire code or made any calls for emergency assistance when they heard Rodriguez's shouts, nor when they came out of the counselor's office and saw the fire for themselves. Abbassi Dep. 24:18-24; Ex. 3 at 185:4-6, 10-12; 190:16-18.

44.     In fact, Blakely took no action whatsoever in response to learning that there was a fire on the 500 range on April 7. Ex. 3 at 186:4-11, 193:2-5; 194:19-21, 195:12-16.

45.     Blakely did not go up to the 500 range at any point after the fire started. Ex. 3 at 190:25-191:3, 192:12-15; Ex. 81 at 6m40s-6m50s; Ex. 57 ¶1; Ex. 65 at 143:15-144:5.

46.     If there was an emergency on a specific range, the officer with the keys was required by policy to respond to that range or give his keys to another officer to respond. Ex. 5 at 209:3-24.

47.     Abbassi went up towards the 500 range, but did not bring the keys to the 500 range with her, took no action to get the keys from Blakely despite being right next to Blakely when they both saw the fire on the 500 range upon exiting the counselor's office, and did not retrieve a fire extinguisher to bring with her. Ex. 2 at 115:16-21; Ex. 65 at 125:9-12; Ex. 75. Rodriguez knew that Blakely had the keys to the 500 range, but he took no action to try to get the keys from Blakely. Ex. 2 at 126:15-127:6.

48.     Rodriguez did not take any steps to get a fire extinguisher until he was later told to do so by Watson or Redden. Ex. 2 at 132:20-25.

11

49.     At no point did Rodriguez, Blakely or Abbassi bring the keys for the 500 range up to the 500 range. The keys were not brought up until Watson brought them up and handed them to Rodriguez, several minutes later. Ex. 2 at 129:15-19, 130:10-131:6.

50.     Rodriguez took no action to try to unlock Joshua Devine's cell until he was later given the keys by Watson and Redden several minutes later. Ex. 2 at 147:17-22.

51.     Finally, at 9:45pm—approximately 30 minutes after the fire started and prisoners in BCH began yelling for help—Abbassi called in the fire code "10-71" over her radio from the 300 range. Ex. 2 at 115:19-21, 127:7-22; Ex. 76; Ex. 77; Ex. 12 at 4:12-6:22.

52.     Officer Statham first learned about the fire when he heard the fire alarm outside of BCH going off. Ex. 20 at 72:6-10. At the time he heard the fire alarm, the fire code had not yet been called. Ex. 20 at 72:6-10. Statham explained that there has to be a significant amount of fire and smoke to cause the fire alarm *outside* the housing unit to go off. Ex. 20 at 155:10-20, 156:1-6, 156:19-157:16.

53.     It would take a correctional officer between 10 and 45 seconds to get from the first floor up to the 500 range if they were running. Ex. 2 at 109:11-14 (40 to 45 seconds); Ex. 63 at 309:16-311:13 (10 to 20 seconds).

**G.     Defendants' continuing deliberate indifference as the fire spreads in Joshua Devine's cell.**

54.     After calling in the fire code, Abbassi came downstairs to give Blakely the key to the front gate of BCH. Ex. 2 at 142:4-19. Blakely still had the keys to the 500 range, but he did not give the keys to Abbassi, and Abbassi did not ask for them, or retrieve the spare 500 range key from the officer's station. Meanwhile, Rodriguez went back up to the 500 level, also without taking any action to get the keys. Ex. 2 at 115:19-116:3, 128:1-17, 142:4-19; Ex. 30 at 49:6-23; Ex. 63 at 277:21-279:6.

12

55.     Once he got to the 500 range, Rodriguez simply stood silently near Devine's cell, taking no action to save Devine's life. Instead, he simply waited for someone else to arrive. Ex. 2 at 115:19-116:3, 128:1-17, 142:4-19.

56.     Dykstra, Watson and Redden were in the shift supervisor's office and learned about the fire in BCH when Abbassi called in the fire code. Dykstra looked at the live feed from video cameras in BCH and saw the fire on the 500 range, with so much smoke that he could not tell which cell was on fire. Ex. 63 at 167:9-168:3; Ex. 76.

57.     As First Responders, Watson and Redden were required to respond quickly to BCH and take control of the clear emergency situation there. Ex. 63 at 126:10-18.

58.     As high-ranking correctional staff and/or members of the First Responder team, Dykstra, Watson and Redden all knew that fires posed a serious danger to prisoners, particularly at night when they were locked in their cells. Ex. 66 at 50:3-23 (any situation involving smoke or fire in the prison is inherently a dangerous situation); Ex. 64 at 26:3-20 (correctional staff are required to make an assessment in fire situations and act "to prevent hurt, harm, or danger to everybody").

59.     During an emergency incident like a fire, Dykstra as the on-duty shift supervisor is required to be "directing traffic" and "delegating duties to everyone else." This responsibility is mostly done via radio communication, managing people and telling them where to go and what to do. Dykstra Dep. 112:21-113:2, 119:5-24.

60.     After being notified of the fire in BCH, Watson and Redden did not take any steps to ensure the prisoner firefighters were properly activated, did not take any steps to release the firefighter housed in BCH from his cell, and did not retrieve fire extinguishers from the officer's

13

station before they went up to the 500 range. Ex. 2 at 133:6-15; Ex. 66 at 189:7-24, 194:17-195:11; Ex. 76.

61.     Watson and Redden saw the fire extruding from cell 540 as soon as they arrived in BCH, and the unit was already filled with smoke. It was obvious to them that this was a serious fire, and that the prisoner firefighter squad was required to combat it. Ex. 89 ¶ 5; Ex. 90 ¶ 5.

62.     Once Watson and Redden arrived at BCH and began going up to the 500 range, Abbassi just stood around on the ground level of BCH, waiting for someone to tell her what to do. Ex. 2 at 134:8-135:1.

63.     Officer Statham, another one of the First Responder team, walked "casually" to BCH after hearing the fire alarm. When he arrived, Abbassi and Blakely were standing by the officer's station not doing anything. The officer's station was locked, and the fire extinguishers had not yet been retrieved from the officer's station. Ex. 20 at 155:7-17, 158:14-18, 158:24-159:18, 160:4-18, 161:19-162:10. Abbassi told Statham the fire was on the 400 range, although it was actually on the 500 range. Ex. 20 at 158:16-160:2.

64.     Joshua Devine was still alive when Watson and Redden arrived on the 500 level with the keys to Mr. Devine's cell. Ex. 2 at 132:9-133:19.

65.     At this point, the prisoner firefighter in BCH still had not been released, and no fire extinguishers had been brought up to the 500 range by any correctional staff. Ex. 2 at 134:5-135:6.

**H.     Defendants cause serious delays in activating the prisoner firefighters.**

66.     At ISP, there is a team of firefighter prisoners who are affirmatively tasked with responding to fires within the prison. Ex. 16 at 41:6-42:20. ISP policy requires that any firefighters residing in a housing unit where there is a fire must be released promptly by the

14

correctional officers in the housing unit, so that the firefighter can immediately respond to the fire. Ex. 23 at 33:2-7.

67.     As the shift supervisor, Dykstra was responsible for making sure that the prisoner firefighters were properly and timely released during a fire, and for instructing correctional staff to ensure that the firefighters were able to respond immediately. Ex. 25 at 131:2-13.

68.     Neither Dykstra, Watson, nor Redden acted with any urgency to ensure that the prisoner firefighters were activated to help combat the fire. Ex. 66 at 157:14-16.

69.     Watson did not radio to ensure prisoner firefighters were activated until after arriving in BCH, going to the 500 range, attempting to unlock the cell, and attempting to put the fire out himself. Ex. 66 at 157:14-16. Prison policy required correctional staff to activate the prisoner firefighters and did not provide for staff to first attempt to put fires out on their own. Ex. 63 at 30:10-15.

70.     As a result of the inaction by Dykstra, Watson, and Redden, there was a significant delay in the prisoner firefighters being released from their cells and housing units on the night of the April 7, 2017 fire. This, in turn, significantly delayed the prisoner firefighters' arrival to BCH to fight the fire in Devine's cell. Ex. 21 at 31:16-32:29; Ex. 76..

71.     Danny Means was the prisoner firefighter stationed in BCH on the night of the fire. None of the officers released him from his cell. When the prisoner firefighters from other housing units arrived in BCH, Danny Means was still locked in his cell. Ex. 16 at 28:20-29:14; Ex. 22 at 33:18-23.

72.     Rodriguez did not release Danny Means, the BCH prisoner firefighter, from his cell on the 100 range until after officers had begun to evacuate BCH, and after the fire in Joshua Devine's cell was totally out of control. Ex. 2 at 139:16-22.

15

73.     Prisoners in BCH repeatedly begged for Defendants Rodriguez, Abbassi, or Blakely to release Danny Means so he could fight the fire in Devine's cell. Danny Means himself was yelling "I'm fireman, let me out." But Danny Means was not released from his cell until the whole of BCH was being evacuated. Ex. 13 ¶17; Ex. 12 at 4:15-19, 6:22-8:3, 16:12-16.

74.     If Danny Means had been let out of his cell sooner, he would have been able to help with the firefighting efforts. Ex. 23 at 33:8-18; Ex. 86.

75.     The firefighter team at ISP is able to get from their housing units to the firehouse in less than one minute when they are timely released from their cells (as required by ISP policy). The team is able to don their necessary gear at the prison's firefighter station within 1-2 minutes. Ex. 23 at 16:24-17:20. BCH is very close to the fire station, approximately 50 feet. Ex. 16 at 28:5-19; Ex. 69.

76.     On April 7, 2017, however, there was a long delay in releasing the prisoner firefighters, due to Dykstra, Watson and Redden's failure to timely activate the firefighter squad. Ex. 16 at 39:2-40:5; Ex. 17 at 1. For example, the firefighters in I Cell House—where most of the firefighters were housed—were released from their cells when the fire call came over the intercom, but they were held up at the front door by the OIC in that cell house, who refused to let the firefighters out until he figured out whether the firefighters were supposed to be released. Ex. 23 at 10:18-12:7. This caused a delay of between 5 and 10 minutes in having the firefighters released from I Cell House. Ex. 23 at 15:13-24; Ex. 24. By the time the firefighters from I Cell House met up with the rest of the fire crew, the other firefighters had been at the fire house for 8 minutes already, and flames were already shooting out the eaves of BCH. Ex. 23 at 20:10-16; Ex. 18 at 1.

77.     When the prisoner firefighters were eventually able to get to the fire station, they were delayed once again by problems getting the fire station unlocked. The officers at Checkpoint 2 are supposed to either unlock the fire station or have the keys available, but on the night of the fire, there was no officer at Checkpoint 2, and when that officer arrived, he did not know how to locate the keys. As shift supervisor, Dykstra was responsible for ensuring that the firefighters were activated effectively. Dykstra's failure to do so caused a delay in getting access to the fire station. Ex. 16 at 25:17-18, 26:3-27:11; Ex. 17 at 1.

78.     Dykstra's incident report reflects no action on his part between 9:45pm, when he learned of the fire, and 9:58pm, when the prisoner firefighters were finally activated by Redden. Ex. 76. Dykstra took an entirely passive approach during this time, watching the fire progress on the live video feed and listening to the radio traffic without taking action at any point to direct the fire response, ensure reasonable steps were being taken to combat the fire and release Devine from his cell, or to activate the prisoner firefighters. Ex. 63 at 204:15-207:16.

79.     Joshua Devine was still alive when the first prisoner firefighters finally arrived in BCH. The firefighters could hear him screaming, and his voice sounded different from the voices of the other prisoners. Ex. 16 at 31:6-24.

80.     When prisoner firefighters arrived in BCH, the smoke on the 100 range was already so thick that they could not see their hands stretched out in front of them. There was a lot of smoke, and it got thicker the closer to the 500 range they got. Ex. 16 at 34:23-35:18.

81.     When firefighter Robert Engram arrived in BCH, Abbassi threw her keys at him and ran towards the door of BCH. She only came back when Engram told her he needed her to come back because he was not allowed to pick up the keys. Ex. 16 at 32:21-34:22.

17

I.      **Joshua Devine burns to death in his locked cell after his cries for help go unanswered by prison staff.**

82.     Joshua Devine died on April 7, 2017 due to thermal burns he received from the fire in his cell. Ex. 26. Mr. Devine had 2nd and 3rd degree burns over the majority of his body. Ex. 27 at 18.

83.     There were many ways in which the actions of Defendants Rodriguez, Abbassi, Blakely, Dykstra, Watson and Redden violated the ISP policies specifically in place to address fires at the prison. Fire Chief Milne testified that based on his observations and the information he gathered about the fire, the inadequate response on April 7, 2017 reflected a failure to take the fire seriously. Chief Milne indicated that these failures, including the failure to release the prisoner firefighters on time, was one of the causes of Devine's death. Ex. 23 at 38:20-40:11; Ex. 18 at 2. The State Fire Marshal's investigation determined that the cause of the fire was accidental, and the fire originated from an area in Mr. Devine's cell that centered around his television. The State Fire Marshal determined a "reasonable probability" that the fire had an electrical origin. The physical evidence of the television cord was consistent with Mr. Devine having attempted to unplug the television after the fire started. Ex. 9 at 2; Ex. 27 at 18-21.

84.     Joshua Devine had been on the 500 range for about a week before the night of the fire. The prisoner who had lived in cell 540 before Devine had complained about electrical outlets in the cell sparking. Ex. 13 ¶¶22-23.

II.     **Longstanding dangerous conditions at ISP caused Joshua Devine's tragic death.**

85.     In addition to the many failures of correctional staff on duty on the night of the fire, Defendants Neal, Griffin, Beal, Nowatzke and Gann were all senior officials who had knowledge of dangerous conditions relating to fire safety at ISP prior to April 2017, and yet took

18

no meaningful action to remedy those known issues. *See generally* Plaintiff's Statement of Genuine Disputes ("PSGD") ¶¶ 86-176.

**A.    Defendants were on notice that conditions at ISP were high risk for fires.**

86.    Fires were very common at ISP. Ex. 29 at 174:20-24; Ex. 20 at 67:6-14; Ex. 16 at 40:6-10, 40:22-41:5 (frequent fires at ISP, ranging from five or six per week to two or three in a single day); Ex. 19 at 11:8-10; 16:12-24 (frequent fires at ISP, at least once per day); Ex. 63 at 183:14-16 (in his time at ISP Dykstra has "dealt with hundreds and hundreds of fires" both inside and outside of cells). Statham himself responded to over 100 fires between the fall 2014 and November 2019. Ex. 20 at 13:18-22, 14:19-20, 185:3-4.

87.    Every day, Warden Ron Neal, Deputy Warden Kenneth Gann, Major and Custody Supervisor Jason Nowatzke, Shift Supervisor Jeremy Dykstra, and most department heads, including ISP training Coordinator Christopher Beal and Safety Hazard Manager Steven Griffin, would attend a meeting where they would discuss the incidents from the previous day, including fires. Incident reports were required to be created for every fire at ISP, no matter how minor. Ex. 21 at 123:19-124:6, 201:20-202:16, 202:19-203:1; Ex. 5 at 58:25-59:4. During these meetings, they would review incidents critically regarding what went well and what did not, as well as what policy required and what actually happened. Ex. 21 at 35:10-13, 36:15-37:9, 201:12-202:14.

88.    In addition to these daily meetings, Gann would receive all incident reports at ISP and was required to review them, and he would also be notified of every incident. Ex. 40 at 37:10-20; Ex. 25 at 25:2-7, 53:3-7, 52:2-7, 53:3-7. All issues, including violations of policy, would be reported up the chain of command to Nowatzke, who would also receive all incident reports at the facility. Ex. 5 at 51:4-53:7, 59:5-20. Nowatzke was further responsible for identifying systematic issues or patterns of violations at ISP, and he would inform Beal

19

whenever a problem was related to training. Ex. 5 at 67:16-23, 68:10-19. Beal would also be informed whenever staff had a concern that additional or different training was needed, and whenever a new officer was found not to have the training needed to carry out their responsibilities. Ex. 32 at 56:9-59:5; Ex. 29 at 128:15-129:16, 136:19-137:5; Ex. 32 at 58:7-59:5.

**B.      Correctional officers received deficient training on fire emergency response.**

89.      Defendant Christopher Beal, as the head of ISP's training department in April 2017, and Defendants Ron Neal and Kenneth Gann, as Warden and Deputy Warden respectively, were responsible for ensuring that correctional staff at ISP were adequately trained. Ex. 29 at 1 at 10:9-19, 25:1-8, 26:22-27:1, 92:11-17; Ex. 5 at 43:24-20, 45:18-25; Ex. 29 at 45:3-8, 92:11-17; Ex. 56; Ex. 59; Ex. 62.

90.      But the training that new correctional staff at ISP received on responding to emergencies, and responding to fires specifically, was woefully inadequate—it was "simplistic," very "generic" and just "cover[ed] the basic points." Ex. 32 at 21:18-22:4; Ex. 29 at 145:6-21, 149:7-16, 150:3-4; Ex. 25 at 43:20-23, 44:23-45:3. There were no written materials provided as part of this training. Ex. 32 at 18:13-17. Beal took no action to change the training in any way; in fact, the training has not changed since 2011, let alone since Beal became training coordinator in 2013. Ex. 29 at 147:4-12; Ex. 29 at 1 at 10:9-19, 25:1-8, 26:22-27:1; Ex. 32 at 18:6-9.

91.      Among other things, there was no information in the new officer training about (1) the prisoner firefighter program, (2) transferring or exchanging keys in the event of an emergency, (3) investigating a commotion or disturbance in a cell block, including when and how to do so, (4) what do if a prisoner is in distress in his cell, or (5) how to assess the seriousness of a fire to determine whether an evacuation is necessary. Ex. 32 at 38:9-21, 46:14-47:2, 49:1-50:2; Ex. 25 at 59:4-6; Ex. 2 at 46:18-23. The training did not cover anything about the circumstances in which it was appropriate to release a prisoner from his cell in the event of

20

an emergency. Ex. 29 at 149:22-150:9; Ex. 32 at 41:16-43:14. Nor did it include any instruction on how to evacuate prisoners from a housing unit in case of an emergency. Ex. 2 at 54:14-55:1. New employee training did not include any physical simulation of fire response, cell evacuation or any fire drills. Ex. 32 at 22:5-23:12, 27:15-28:4, 39:7-12; Ex. 25 at 43:20-23, 44:23-45:3. In fact, Statham testified that he did not receive any training regarding how to respond to emergencies at ISP whatsoever until he took the First Responder Team training. Ex. 20 at 17:25-19:8.

92.     Training focused on calling for help during an emergency situation, not how correctional officers in a cell house should carry out their responsibility to attend to the emergency before (and after) help arrived. Ex. 2 at 49:10-51:3; Ex. 6 at 32:5-34:5, 88:3-21; Ex. 33 ¶69. For example, the only training Gann remembers receiving regarding emergency response was to make sure the scene was safe, call the alarm on the radio, and make sure that multiple other staff members were en route to the scene. Ex. 25 at 42:17-43:16.

93.     The only training that Rodriguez, Blakely and Abbassi received prior to the April 7, 2017 fire was the basic, minimum new employee training. Ex. 2 at 91:19-92:5. And the only information new correctional staff like Rodriguez, Blakely, and Abbassi would have received about what to do in the event of a fire is what they had learned in their new employee training and what was included in the "post orders," or written instructions developed for each job assignment at the prison. Ex. 29 at 150:10-23.

94.     After prisoners were locked in for the night, yelling for help was the only way they could get an officer's attention. Ex. 21 at 194:8-13; Ex. 25 at 65:20-66:1; Ex. 40 at 59:17-60:11; Ex. 20 at 124:5-21. But Beal, Neal, and Gann provided no training whatsoever on what

21

action correctional staff were required to take in response to prisoners yelling. Ex. 2 at 106:10-18.

### C.    Fire drills at ISP were deficient or did not take place at all

95.    ISP policy required staff to participate in periodic fire drills. During these fire drills, prisoner firefighters were required to go into the housing unit during the day, ask the officers several questions about what to do in the event of a fire, and then perform an evacuation drill of certain areas within the housing unit. Ex. 16 at 13:20-14:20. The Safety Hazard Manager, Steven Griffin, was required to accompany the prisoner firefighters on the drills. Ex. 23 at 33:19-25.

96.    Griffin was responsible for ensuring that fire drills were carried out as required and in a way that ensured staff were prepared to respond to an actual fire. Ex. 28 at 69:3-22; Ex. 25 at 44:15-18, 78:7-22; Ex. 25 at 46:9-15. Griffin was required to inform Nowatzke before conducting each fire drill, and Nowatzke had a parallel responsibly to ensure that fire drills were being carried out. Ex. 5 at 199:9-20; Ex. 25 at 46:9-20.

97.    However, fire drills were not carried out as required. No fire drills were carried out on the night shift for an extended period leading up to the April 7, 2017 fire. Ex. 16 at 14:21-15:19. Ex. 19 at 11:1-7 (Never participated in a fire drill that took place anytime from 6pm to 6am). Ex. 12 at 4:6-8, 11:10-13:22 (During 10 years at ISP, never participated in a 6pm to 6am fire drill, until a few days before his deposition); Ex. 22 at 31:5-21 (Testified at deposition that recent night shift fire drill was the first one he ever remembers doing); Ex. 11 at 4:8-10, 13:14-24 (Has been at ISP since 2003 and has never done a fire drill on the night shift). At ISP, staff typically worked *only* on the night shift or day shift for years at a time. Ex. 20 at 24:2-11. As such, officers who worked on night shift would not have been expected to observe or participate

in training or drills that took place only during the day shift. Ex. 20 at 140:2-141:10. Both Gann and Nowatzke knew this but did not address the problem. Ex. 5 at 199:9-20; Ex. 25 at 46:9-20.

98.     Gann did not participate in a single fire drill for the two years that he was deputy warden at ISP. Ex. 25 at 44:9-14. Statham never participated in a fire drill while working on the night shift. Ex. 20 at 139:7-9. During his entire time working at ISP, Rodriguez never participated in a fire drill. Ex. 2 at 59:12-24.

99.     In fact, the only instruction that staff on the night shift received regarding fire response was to be asked a few questions that addressed only the basics of fire safety. Ex. 23 at 34:1-6; Ex. 22 at 30:24-31:4; Ex. 3 at 128:25-129:6. Statham admitted that it creates confusion and increases risks and dangers if the night shift officers have never done a live fire drill, because they would have to rely on paper to know what to do. Ex. 20 at 140:8-141:10. Griffin was on notice of these safety concerns and knew the importance of conducting live fire drills. Ex. 21 at 160:19-24, 161:7-162:6

100.     And even when staff failed to provide correct responses to the written questions, no additional training was provided. Instead, when officers failed the quiz, the protocol under Griffin's direction was just to go back, give them the correct answers, and have them complete the paperwork documenting that they had successfully completed the exercise. Ex. 16 at 20:21-21:5; Ex. 23 at 33:19-25, 36:1-11.

101.     Blakely, Rodriguez, and Abbassi were given one of these quizzes on basic fire safety shortly before the April 7, 2017 fire. During this questioning, all three officers treated the entire exercise as a joke, and "every one of them failed." Abbassi told one of the prisoner firefighters conducting the questioning that if there was a fire, she would run away rather than try to save any prisoners who were in danger. Ex. 16 at 11:2-17, 15:20-16:17, 17:4-18:23, 19:6-13,

20:5-21:8. This information was provided to Griffin, but Griffin provided no additional training or instruction to these Defendants in response to their concerning answers. Ex. 16 at 20:21-21:5; Ex. 23 at 36:1-11. Blakely, Abbassi, and Rodriguez never participated in a live fire drill before the April 7, 2017 fire. Ex. 9 at 8.

102.    Correctional officers across ISP routinely failed fire drills, demonstrating their lack of knowledge, lack of training, and lack of care. The knowledge of correct fire safety procedures demonstrated by correctional officers during fire drills was "luck of the draw" and "inconsistent," and some officers did so poorly it was obvious to the firefighters running the drill that the officers "had no idea what we were talking about." Ex. 23 at 33:19-35:19. Some officers treated fire drills like a joke. Ex. 22 at 27:3-30:7. Serious problems were documented—issues like the fact that "cells were not open[ed] on time," "officers were not engaged," "ranges were not check[ed]," an obvious "need to be train[ed] for signals," officer "[does]n't know anything." Ex. 37; Ex. 38; Ex. 39 at 2. Griffin and Beal were made aware of all of these issues. Ex. 22 at 21:20-23:11, 30:8-23; Ex. 23 at 14:2-6, 36:1-37:11, 41:16-20; Ex. 18 at 2.

103.    The abjectly poor performance and ignorance about fire response was particularly present with newer correctional staff, demonstrating that the training (and particularly the new officer training) was wholly insufficient to teach officers how to respond to fires. Ex. 23 at 33:19-35:19. Again, Griffin and Beal were made aware of this issue. Ex. 22 at 30:8-23; Ex. 23 at 14:2-6.

104.    Many officers at ISP had a bad attitude towards the fire drills, and towards the prisoner firefighters who were trying to run them. Ex. 23 at 36:12-37:8. Some officers "still act like [the prisoner firefighters] are a bother when we ask the questions." Ex. 40 at 2. Griffin and Beal were aware of this problem. Ex. 23 at 36:12-37:11; Ex. 22 at 30:8-23.

24

105.    The fire safety questioning was not designed to actually improve the knowledge of correctional officers. Ex. 22 at 27:3-30:7; Ex. 23 at 33:19-25, 36:1-11.

**D.    There were serious problems with the operation of the prisoner firefighter program at ISP.**

106.    The only written instruction that Neal and Nowatzke provided to staff assigned to BCH regarding fire safety and response was contained in the BCH post orders and General post orders. Ex. 25 at 124:19-125:3; Ex. 72 ¶12. Despite the fact that the prisoner firefighters were the primary response created by ISP to address fires at the prison, there was no guidance in the post orders about how and when to activate and release the prisoner firefighters, leading to widespread delay and confusion. Ex. 33 ¶67. Neal and Nowatzke knew there were repeated problems related to  prisoner firefighters not being timely released (if at all) during fires, but they failed to act despite this knowledge. Ex. 5 at 11:9-14:14, 78:24-79:10, 125:14-24, 126:14-128:7, 128:13-18; Ex. 21 at 35:10-13, 36:15-37:9, 201:12-202:14

107.    In addition to their poor performance on fire drills or fire safety questioning, there were serious inconsistencies with how prison staff at ISP responded to actual fire situations. Ex. 23 at 41:6-15. Neal, Gann, Nowatzke, Beal, and Griffin knew about these inconsistencies. Ex. 21 at 35:10-13, 36:15-37:9, 201:12-202:14; Ex. 23 at 36:12-37:11.

108.    Every time there is a fire at ISP, regardless of its severity, ISP policy required staff to activate the prisoner firefighter squad. In fact, ISP policy required the firefighters to be activated not only for a 10-71 code (an actual fire) but also for a 10-70 code (a report of smoke). Ex. 5 at 109:9-16, 114:6-115:13; Ex. 16 at 41:6-42:20, 50:10-15; Ex. 22 at 23:25-26:20; Ex. 23 at 36:12-37:8, 40:12-41:12; Ex. 18 at 2. This policy was in place because ISP relied on firefighters to be specially and thoroughly trained to know how to handle, and actually handle, all fires. Ex. 25 at 50:25-51:14. However, that policy was frequently violated or ignored.

Sometimes, prison staff would release some, but not all, of the prisoner firefighters from their cells so they could respond to the fire, which would delay the squad's ability to respond, as they had to re-assign roles on the fly and spend time trying to get the other squad members released. Other times, the prisoner firefighter squad would not be activated at all, and the firefighter squad would only find out about a fire the next day. Fire Chief Milne heard from prison staff "on many occasions" that they could handle a situation themselves and did not want to release the prisoner firefighters. Ex. 16 at 41:6-42:20, 50:10-15; Ex. 22 at 23:25-26:20; Ex. 23 at 36:12-37:8, 40:12-41:12; Ex. 18 at 2. Again, Neal, Gann, Nowatzke, Beal, and Griffin were aware of this problem. Ex. 21 at 35:10-13, 36:15-37:9, 201:12-202:14; Ex. 23 at 36:12-37:11; Ex. 5 at 126:14-128:7.

109.    This was a longstanding problem at ISP that was simply never remedied. Sometime in the mid-2000s, there was a serious fire in one of the cellhouses at ISP, but only the Fire Chief (and not the rest of the firefighter squad) was released. The prisoner died as a result. Ex. 22 at 36:18-37:25.

110.    Even when the firefighters were activated to respond to an emergency, there were frequently delays in releasing them from their cells or cellhouses due to confusion among prison staff about whether or not they needed to get authorization from a supervisor to let firefighters out of their housing unit so they could run to the fire house. "It was the luck of the draw" whether or not this would happen on any given fire call. More experienced officers knew what to do, but newer officers "always have to check on that because they weren't sure" what to do. Ex. 23 at 12:8-13:10; 36:12-37:8; 41:6-16.  Again, Neal, Gann, Nowatzke, Beal, and Griffin were aware of this problem, and that the prisoner firefighters were the primary tool to address fires at the prison, but they did nothing in response. Ex. 21 at 35:10-13, 36:15-37:9, 201:12-202:14; Ex. 23 at 36:12-37:11; Ex. 5 at 126:14-128:7, 128:13-18; Ex. 23 at 45:9-13; Ex. 68 ¶13. Ex. 84 at 14.

26

**E.     Other Conditions at ISP Exacerbated the Risk Posed by Frequent Fires**

111.    There was a problem at ISP with staff not doing their security checks on time. Ex. 20 at 113:6-13. The fact that officers were not doing their security checks frequently enough was commonly brought up during the staff meetings before the start of the night shift. Ex. 2 at 34:23-35:1.

112.    That correctional officers were not doing enough to walk the ranges to check on the prisoners and make sure they were safe was also a frequent topic during daily meetings. Ex. 2 at 34:10-15.

113.    In BCH on April 7, 2017, the only fire extinguishers were in the officer's station. Ex. 2 at 55:12-16, 135:14-22. There were no fire sprinklers in B Cell house. Ex. 79 ¶8.

114.    Electrical problems, especially related to outlets in prisoner cells were common; outlets frequently sparked or caught fire. Ex. 25 at 25:6-14; Ex. 20 at 94:1-8, 95:20-96:20; Ex. 6 at 94:2-8; Ex. 15 ¶¶10-11; Ex. 16 at 42:21-44:5 (plugging devices into electrical outlets at ISP is "at your own risk" due to "widespread problem" of damaged outlets that posed a fire hazard); Ex. 19 at 10:8-25 (electrical problem in one cell often caused outlet in adjacent cells to spark); Ex. 22 at 34:5-35:8 (electrical outlets would often spark, and fires would often have electrical outlets as their point of origin); Ex. 10 at 5:4-9, 12:10-13:24, 14:9-16 (exposed wires in outlets and light fixtures were a daily problem on every range in BCH); *see e.g.*, Ex. 41; Ex. 67; Ex. 71. In fact, just a few months before Mr. Devine's death, large flames came from an electrical socket in a cell on the 400 range of BCH. Ex. 42, and Neal, Gann, Nowatzke, Beal, and Griffin were aware of this incident. Ex. 21 at 35:10-13, 36:15-37:9, 201:12-202:14. Griffin was made aware by the prisoner firefighter squad whenever there were fires related to defects in ISP's electrical system. Ex. 22 at 35:9-36:1. The majority of the electrical outlets at ISP are faulty. Prison staff do not take steps to inspect for or keep up with problems at the prison, instead making changes

27

only right before they know an inspection is going to happen. Ex. 15 ¶¶9-13. Specifically, Neal and Griffin failed to implement any systematic inspection of electrical outlets or ensure that they were examined during weekly and monthly inspections. Ex. 28 at 57:18-25; Ex. 44.

115.    Before the April 7, 2017 fire it was well known, including by Neal, that prisoners had excess property in their cells, that staff tolerated such excess property, and that the excess property increased the risk of a fire in a prisoner's cell. Ex. 21 at 217:15-221:1. Despite this, Neal took no steps to address the hazard until after the April 7, 2017 fire. Ex. 21 at 217:15-221:1.

116.    Nowatzke, Gann, and Griffin failed to ensure that the weekly and monthly inspections were carried out in any meaningful way, and every item and  area to be inspected was almost always given a rating of "4" on a 1-5 scale without comment. Exs. 44-54. Oftentimes, elements that were not present were also rated a "4", like the nonexistent sprinkler system in BCH. *Compare* Ex. 44 *with* Ex. 51; *see also* Ex. 28 at 64:6-15; Ex. 79 ¶8. Moreover, the electrical system and electrical outlets were not covered in the inspections. *See e.g.*, Ex. 44, Ex. 52

117.    Because of the abject failure of Neal, Nowatzke, Gann, and Beal to provide staff with training or instruction on how and when to release prisoner from their cells in an emergency and how to activate the prisoner firefighters, staff testified about widely disparate policies they believed to be in place. *See* Ex. 20 at 230:24-231:1, 232:1-13. For example:

    a.  There was no uniform understanding regarding when staff should release a prisoner from a cell that is on fire. *Compare* Ex. 20 at 85:2-22, 86:6-20, 100:21-101:5 (if there was a fire in a locked cell and an officer called for help but did nothing else to assist the prisoner inside, that would not be a violation of policy, and there are situations where staff should not let prisoners out of a cell that was

on fire), *with* Ex. 6 at 31:3-32:16 (officer must release a prisoner if there is a fire in his cell, without exception), *and* Ex. 32 at 14:21 (officer is permitted to release a prisoner in case of emergency), *and* Ex. 2 at 90:4-91:11 (it was a widely-known ISP policy that officers could not open a cell door without another officer present with them, no exceptions).

    b.    Nor was there a uniform understanding of how firefighters are activated. *Compare* Ex. 29 at 153:9-154:25 (prisoner firefighters were not to be released in the event of a fire unless the shift supervisor specifically called for their release), *with* Ex. 20 at 68:11-17 (firefighters would automatically stage when a 10-70 or 10-71 was called, but the yard sergeant would not release them from the firehouse until a specific request was made for their release), *and* Ex. 63 at 343:14-344:12; *see also* Ex. 25 at 130:22-131:1 (Gann did not know whether firefighters were to be released when a 10-70 or 10-71 was called or only if there as a specific order to release them.); Ex. 2 at 109:21-110:16 (firefighters should be released automatically when Control announces there is a fire, but not just based on an officer calling in a fire code).

118.    There were significant problems with the radios that were used at ISP at the time of the April 7, 2017 fire. The radios would frequently malfunction in a way that staff could hear radio traffic but could not use the radio to make an outgoing communication. Ex. 2 at 65:23-66:9. This was a common problem, widely known at the prison—it was "a big thing." Ex. 2 at 65:10-67:2, 67:18-69:11. It was hit or miss whether they were working, and even if an officer checked it and it was working, it might not be working the next time the officer went to use it on

29

their shift. This would usually happen more than once a day. Ex. 20 at 75:23-77:25, 79:1-17; Ex. 2 at 65:10-67:2, 67:18-69:11, 72:13-73:6.

119.    There were also problems with the radio batteries, which sometimes would not charge properly, and which staff would have to replace to get their radio to work. There were not backup batteries kept in each cellhouse, so staff would have to go and hunt for a spare if their radio had a defective battery. Ex. 2 at 69:18-70:21.

120.    Additionally, once or twice a month the whole radio system would go down. Ex. 20 at 78:17-25.

121.    The problems with the radios were reported to supervisors at the prison, including to Dykstra, and were well-known by senior prison officials like Gann, Nowatzke, and Neal. Ex. 20 at 79:18-80:6; Ex. 2 at 65:10-67:2, 67:18-69:11. *see, e.g.*, Ex. 43.

122.    Despite all of the problems with the radios, Neal, Gann, Nowatzke, and Dykstra failed to instruct officers (or direct someone else to instruct officers) to test their radios before beginning their shift. Ex. 2 at 73:19-21.

123.    ISP had new radios available for use by the fall of 2016, but Neal and Nowatzke did not make them available to staff until May 2017—after Devine had already died. Ex. 30 at 42:5-9.

**F.    Defendant Griffin was deliberately indifferent to the risk that fires posed to Joshua Devine and other prisoners at ISP.**

124.    As Safety Hazard Manager at ISP in April 2017, Griffin was responsible for establishing and monitoring a safety program at ISP that encompassed all life, health, and safety standards and ensured compliance with federal and state fire rules and regulations, among other things. Ex. 58. Griffin had been the Safety Hazard Manager for over a year on April 7, 2017. Ex. 88.

125.    Griffin was also responsible for ensuring that weekly facility inspections were done, for reviewing those inspections, and for carrying out monthly facility-wide inspection for fire, health, and safety issues (including electrical irregularities). Ex. 5 at 194:1-24, 195:8-12; Ex. 28 at 29:13-30:15, 31:17-32:6; Ex. 58; Ex. 21 at 87:6-88:2, 90:24-91:19. Ex. 28 at 73:11-18. He was further responsible for addressing issues identified in the weekly and monthly inspection reports. Ex. 5 at 194:1-24, 195:8-12; Ex. 21 at 87:6-88:2, 90:24-91:19.

126.    Griffin was required to make sure that fire drills were conducted at least once per building, per shift, per quarter, and that they were conducted in a way that was effective and sufficient to ensure that staff on each unit were well-prepared to respond to an actual emergency. Ex. 28 at 69:3-22; Ex. 25 at 44:15-18, 78:7-22; Ex. 25 at 46:9-15. Griffin had discretion to conduct fire drills more frequently if he had wanted to. Ex. 5 at 200:18-25. Griffin knew that live drills with evacuations, rather than questioning on basic fire safety, needed to be conducted. Ex. 21 at 160:19-24, 161:7-162:6; Ex. 33 ¶ 62. Despite this, Griffin failed to carry out fire drills on the night shift. Ex. 16 at 14:21-15:19. Ex. 19 at 11:1-7; Ex. 12 at 4:6-8, 11:10-13:22; Ex. 11 at 4:8-10, 13:14-24; Ex. 22 at 31:22-32:6.

127.    The Warden and the Safety Hazard Manager are required to take steps to address and investigate safety issues at the prison that are brought to their attention, such as the well-known electrical problems at ISP. Ex. 28 at 42:10-15; Ex. 22 at 35:9-36:17. Griffin was required to make sure electrical outlets and systems were checked for potential hazards or dangers and to address widespread or systematic issues with electrical outlets in prisoners' cells using, among other things, additional inspections and audits. Ex. 28 at 49:20-50:18, 56:3-15, 51:25-53:13; Ex. 32 at 50:3-51:13. But between 2015 and 2017, there was no systematic testing, review, or inspection of the electrical system inside prisoners' cells. Ex. 28 at 57:18-25.

31

128.    As safety manager, Griffin had supervisory responsibility over the prisoner firefighter squad. He was the point of contact for the fire chief and was the person to whom the fire chief could report issues or problems, as well as being the point of contact for other members of the firefighter squad. The fire chief would have frequent conversations with Griffin, around once a week, and they would debrief after Griffin reviewed the chief's report about responding to a fire to discuss what had happened. The fire chief had an open line of communication with Griffin, and the chief would also report issues that he had learned about from other members of the fire squad. Ex. 23 at 13:11-20, 14:7-15:12; Ex. 22 at 21:6-19. Griffin was also made aware of the cause/circumstances of every fire at ISP, including those related to issues with the electrical system. Ex. 22 at 35:9-36:17.

129.    Griffin would be informed by the prisoner firefighters regarding all issues that arose during fire drills, fire safety questioning, and responses to real fires, including the delayed or refused release of prisoner firefighters and poor performance during drills. Ex. 22 at 21:20-23:11; Ex. 23 at 14:2-6, 36:1-37:11, 41:16-20; Ex. 18 at 2.

130.    Whenever there was an issue at the prison, the fire chief would write a report to Griffin to document what the issue was. The fire chief would also notify Griffin of problems orally. Ex. 23 at 36:7-11, 55:6-21.

131.    The assistant fire chief also had regular conversations with Griffin, with an open line of communications, and any member of the firefighter squad could bring issues directly to Griffin. Any time any firefighter encountered a problem in responding to a fire, they would report the issue to Griffin. Ex. 22 at 21:20-23:11.

132. The fire chief had brought to Griffin's attention the issue about newer, poorly trained officers causing delays in releasing the prisoner firefighters from housing units. Ex. 23 at 14:2-6.

133. The fire chief had brought to Griffin's attention the issues with newer officers not performing well during fire drills and fire safety questioning. Ex. 23 at 36:1-6.

134. The fire chief had informed Griffin that some officers had a bad attitude towards the prisoner firefighters, which led to problems releasing the prisoner firefighters on time or releasing only a few of them. Ex. 23 at 36:12-37:11.

135. All of the systemic problems and issues documented in the fire chief's report about the fire response on April 7, 2017 were issues he had previously raised with Griffin. Ex. 23 at 41:16-20; Ex. 18 at 2.

136. When the fire chief raised concerns with Griffin, he did not hear back from Griffin on how Griffin or other ISP officials had resolved the issues. Ex. 23 at 46:9-23. Based on the fire chief's ongoing experience responding to fires at ISP, it was clear that nothing had been done by Griffin in response to the concerns he had raised. Ex. 23 at 45:9-13.

137. Similarly, it was Griffin's responsibility to ensure that staff understood the fire response procedures and that fire drills ran smoothly, and, if they did not, to notify Nowatzke and take remedial steps to address the issues. Ex. 28 at 76:19-77:4; Ex. 5 at 201:12-16, 204:24-205:18. Despite this and Griffin's knowledge of frequent problems with fire drills and fire response, Nowatzke claims that Griffin never raised any issues to Nowatzke about the firefighter program and related policies or protocols. Ex. 5 at 199:21-5.

**G.    Defendant Beal was deliberately indifferent to the risk that fires posed to Joshua Devine and other prisoners at ISP.**

138.    Beal was the head of ISP's training department in April 2017 and had held that position since October 2013. Ex. 29 at 1 at 10:9-19, 25:1-8, 26:22-27:1.

139.    Beal was responsible for making sure that staff were properly trained regarding ISP's policies related to fire safety and response, that staff were following these policies, and that staff knew what to do during a fire. Ex. 5 at 43:24-20; Ex. 59. This included making sure that individuals coming out of the new officer training program were able to respond to emergency situations from day one. Ex. 5 at 45:18-25; Ex. 29 at 45:3-8, 92:11-17. This responsibility required Beal to evaluate the effectiveness and sufficiency of the on-the-job training on an ongoing basis and to make additions and changes as needed to address any deficiencies. Ex. 29 at 92:20-93:5.

140.    Beal was also responsible for coordinating or conducting trainings, developing facility-specific curricula and materials, reviewing and updating training materials; and gathering data and assessing training sufficiency, and collaborating with other departments and staff to improve employee performance. Ex. 59.

141.    Although he cannot remove topics that IDOC requires to be included in training, Beal is permitted to add additional topics to staff training. Ex. 29 at 84:14-85:9. Beal is permitted to add, remove, or change any facility-specific training subjects and lesson plans given to ISP staff. Ex. 29 at 85:10-86:1.

142.    Specifically, Beal had the authority to include additional training on emergency response and fire safety procedures as part of the new employee training given to new correctional officers. Ex. 57 ¶30.

34

143.    Despite the requirement to collect data and analyze the adequacy of training, Beal did not take any steps to seek out information about whether employee conduct indicated a need for additional training; he relied on others to identify and report training issues to him. Ex. 29 at 133:11-16. Beal received incident reports, but he did not review them to see if there were patterns that would inform the contents of the on-the-job or other training provided to new employees. Ex. 29 at 103:18-104:4, 126:9-17, 127:13-128:1; Ex. 60.

144.    Field training officers, new employees, and supervisors would raise concerns to Beal about staff needing additional or different training to effectively and correctly carry out their job duties. Ex. 32 at 56:9-59:5; Ex. 29 at 128:15-129:16, 136:19-137:5. Beal would specifically be made aware if newer employees coming out of training were found not to know how to handle certain situations. Ex. 32 at 58:7-59:5. Prison firefighters would tell Griffin when officers performed poorly on a fire drill or fire safety questioning so that Griffin would pass that information on to Beal to ensure officers were being properly trained on the information they needed for responding to fires at the prison. Ex. 22 at 30:8-23.

145.    When staff did raise issues suggesting training was inadequate, Beal was dismissive. Beal knew that staff sometimes reported that the reason they failed to follow policy was because of inadequate training, but Beal dismissed these complaints as staff falsely blaming training so they would not get in trouble for doing something wrong. *See, e.g.*, Ex. 29 at 125:14-24, 128:15-129:16.

146.    Beal has not made any changes to any of the training programs or training procedures and curriculum at ISP on any topic during the time that he has been training coordinator. Ex. 29 at 17:6-13. Specifically, during his career, Beal has never made any changes or recommendations for any changes to the prison's training programs and protocols regarding

35

fire safety, fire response, fire drills, evacuating a prisoner from a cell, and/or investigation a commotion in a cellhouse, nor had he assigned or delegated any of those tasks to anyone else. Ex. 29 at 1 at 10:20-13:15; Ex. 29 at 142:22-143:4. Nor had Beal initiated or proposed any changes, to the content, format, or structure of the on-the-job training program. Ex. 29 at 101:21-102:23. There were no rules or policies that prevented Beal from proposing changes to the on-the-job training program. Ex. 29 at 177:23-178:4.

147.    Beal knew about common electrical hazards at ISP. Ex. 32 at 53:2-15, 54:4-22. But besides showing new employees what homemade extension cords looked like, there was no training regarding monitoring for potential electrical hazards in a cell or the signs to look for indicating that an outlet may pose a fire risk or other problem. Ex. 32 at 54:23-55:23.

148.    In short, Beal did not take any steps to improve fire safety at ISP. Ex. 68 ¶13.

**H.     Defendant Nowatzke was deliberately indifferent to the risk that fires posed to Joshua Devine and other prisoners at ISP.**

149.    Nowatzke became a major and custody supervisor at ISP in the summer of 2016, and he remained in this position at the time of the fire. Ex. 5 at 8:19-9:5, 37:24-38:6.

150.    As custody supervisor, Nowatzke was responsible for taking proactive action to learn how things were operating at the prison, identifying problematic patterns that arise in officer conduct to determine if the issue is systematic, and addressing those issues. Ex. 5 at 67:16-23, 68:20-70:8, 190:15-24. Relatedly, Nowatzke was responsible for supervising all custody staff and ensuring that they were both familiar with and complying with ISP policies and procedures, including those related to fire safety and response. Ex. 5 at 43:24-4, 46:10-47:2; Ex. 25 at 72:25-73:4; Ex. 61.

151.    Lower-level supervisors were required to report issues, including violations of policy, up the chain of command to Nowatzke. Ex. 5 at 51:4-53:7. Moreover, all incident reports,

36

including related to fires, would go to Nowatzke's office and he would review them to make sure policies and procedures were being followed. Ex. 5 at 59:5-20; Ex. 25 at 52:5-7

152. Nowatzke was responsible for reviewing (at least annually) all post orders to ensure they adequately provided direction to staff about how to carry out their responsibilities, and he was responsible for proposing changes to the post orders to the Warden to address inadequacies. Ex. 5 at 71:19-72:2, 78:24-79:10, 96:3-14; Ex. 61.

153. Nowatzke knew that fires are dangerous in a prison setting and that it is important to take fire safety seriously, even in the context of a small fire. Ex. 5 at 61:1-22. He further knew that inadequate policies would create a serious risk in the event of a fire. Ex. 33 ¶67. He also understood that one of the purposes of post orders is to give staff easy access to key points that they would be required to follow in the event of an emergency, and nothing prevented him from including more detailed information about emergency plans, fire safety, or fire response in the post orders. Ex. 5 at 158:9-15, 160:1-5.

154. Despite this, Nowatzke never consulted with anyone (including the Safety Hazard Manager, prison firefighters, or staff who worked with the prison firefighters) regarding the adequacy of the post orders related to fire emergency response, and never made any changes or updates to the post orders or other ISP policies or protocols on this topic. Ex. 5 at 11:9-14:14, 81:19-24, 95:2-9, 96:15-18, 98:13-21, 99:9-25, 100:1-5, 159:20-25.

155. As custody supervisor, Nowatzke was responsible for ensuring that firefighters were being timely released in the event of a fire. Ex. 25 at 123:9-11. Nowatzke knew there were problems at ISP with prisoner firefighters not being timely released in the event of a fire and knew that every moment counts with regard to fire response and that it is important that the releasing of firefighters goes smoothly, yet he failed to take any action to address that problem.

Ex. 5 at 125:14-24, 126:14-128:7, 128:13-18; Ex. 21 at 35:10-13, 36:15-37:9, 201:12-202:14. Notably, Nowatzke did not know of any written instruction provided to staff regarding releasing firefighters in the event of a fire. There was nothing stopping him from providing such written instruction, but he did not. Ex. 5 at 121:4-123:7.

156.    Nowatzke was responsible for ensuring that fire drills occurred as required and Nowatzke signed off on Griffin's plans for scheduling a fire drill. Ex. 25 at 46:9-20; Ex. 5 at 199:9-20. Despite this, Nowatzke never reviewed any reports or records regarding fire drills, nor did he take any steps to correct poor performance during fire drills or change ISP policies or procedures relating to fire drills. Ex. 5 at 11:9-17, 205:19-206:25.

157.    As custody supervisor, Nowatzke was responsible for ensuring that radios were in working order and ordering new radios when necessary. Ex. 21 at 91:20-92:17, 97:7-98:24. Despite this, there is no evidence that Nowatzke took any action to address the well-known and common issue of radio failure. Ex. 30 at 20:21-25, 42:5-9; Ex. 2 at 65:10-67:2, 67:18-69:11; Ex. 2 at 65:10-67:2, 67:18-69:11, 72:13-73:6.

158.    Nowatzke was responsible for ensuring that staff were carrying out weekly and monthly inspections at ISP and reviewing all inspection reports. Ex. 5 at 185:11-168:4; Ex. 61; Ex. 25 at 86:22-24, 99:23-100:5. Nowatzke knew that the inspections were being carried out in a perfunctory manner, but there is no indication he took any steps to address this. Exs. 44-54. *Compare* Ex. 44 *with* Ex. 51; *see also* Ex. 28 at 64:6-15.

159.    In short, Nowatzke took no steps to improve fire safety at ISP. Ex. 72 ¶13.

I.    **Defendant Neal was deliberately indifferent to the risk that fires posed to Joshua Devine and other prisoners at ISP.**

160.    Neal first started working at ISP in 2007, and he was promoted to Warden in 2014. Ex. 21 at 78:25-79:7; Ex. 55.

38

161.    Neal was the chief executive of the facility and is responsible for directing and managing the facility. He has the ultimate authority for all facility policies, which he is charged with implementing and monitoring for compliance. Ex. 56.

162.    Neal was required by IDOC policy to proactively review and sign off on all ISP policies and procedures, including all post orders, to ensure that they are adequate to protect the life, health, and safety of prisoners and staff. Ex. 5 at 78:24-79:10; Ex. 6 at 79:18-23. The warden has the final say about fire response policies at ISP. Ex. 35 at 71:19-25; Ex. 28 at 62:2-14, 67:17-68:13. The warden was also responsible for reviewing all changes or suggestions to the post orders. Ex. 5 at 78:24-79:10. He was further responsible for proactively reviewing prison infrastructure to ensure safety at the facility. Ex. 28 at 62:2-14.

163.    Despite this, Neal did not carry out any such systematic review considering improvements to the fire safety systems at the prison between 2015 and 2017. Ex. 28 at 62:16-24

164.    Neal knew it was critical to have policies at ISP that ensured that a person can be removed from his cell immediately in an emergency, if necessary, and there was nothing preventing him from making or directing policy changes. Ex. 21 at 185:6-12; Ex. 6 at 78:25-79:17; Ex. 33 ¶67.

165.    Despite this, Neal failed to create and implement policies directing staff about how to respond when a prisoner is yelling or in distress in his cell; whether or not staff should bring the keys to a prisoner's cell if that prisoner is in distress; when a prisoner should be released from his cell in an emergency; or how prisoners should get staff attention in an emergency.  Ex. 21 at 187:19-25, 188:22-189:2; Ex. 25 at 59:4-6, 68:14-17; Ex. 20 at 85:2-22, 86:6-20, 128:6-18, 122:5-123:8; Ex. 30 at 49:13-18.

166.    Neal was responsible for making sure the radios were in working order. Ex. 30 at 63:23-64:1 He knew that radios were a critical piece of equipment for ensuring the safety and security of prisoners and staff at ISP, and that inoperable radios would put the safety of prisoners and staff at risk. Ex. 21 at 94:1-18. Despite this, there is no evidence that Neal took any action to address the well-known and common issue of radio failure. Ex. 30 at 20:21-25, 42:5-9; Ex. 21 at 138:19-139:6; Ex. 2 at 65:10-67:2, 67:18-69:11; Ex. 2 at 65:10-67:2, 67:18-69:11, 72:13-73:6.

167.    Neal was responsible for ensuring that fire drills are conducted sufficiently to train staff on how to respond in the event of a real fire, and he knew live fire drills were necessary to do this. Neal also knew that live fire drills were not occurring as required. Ex. 21 at 154:14-23, 155:25, 156:18-157:12, 161:7-24. Despite this knowledge, Neal took no action to address the problem and just "assume[d] staff would know their jobs and what their responsibility is during a fire. Ex. 21 at 157:3-24.

168.    Neal was aware that outlets in prisoner cells sparked and posed a risk of fire, and he understood that it was important to investigate every fire to determine if there was a faulty outlet or electrical device. Ex. 21 at 124:7-23. Ex. 6 at 94:2-8. Neal was responsible for supervising Griffin as Safety Hazard Manager, and the two men together were responsible for looking into the electrical problems at the facility. Ex. 25 at 44:21-22; Ex. 28 at 42:10-15. Despite this, Neal failed to carry out or direct anyone to carry out any systematic inspection or testing of the electrical system inside prisoner's cells. Ex. 28 at 57:18-25.

**J.    Defendant Gann was deliberately indifferent to the risk that fires posed to Joshua Devine and other prisoners at ISP.**

169.    Gann became the deputy warden at ISP in 2015 and remained in that position at the time of the April 7, 2017 fire. Ex. 25 at 10:11-24, 16:9-24. In this position, he was responsible for the maintenance and custody departments at the prison and for assuring the safety

40

and security at the institution. Ex. 25 at 17:16-20. The deputy warden of operations is responsible for reviewing incident and other reports to determine if any policy violations occurred. Ex. 40 at 37:10-20. Gann reviewed the majority of the incident reports at ISP, and he was called and notified of every incident. Ex. 25 at 52:2-7, 53:3-7.

170.    As deputy warden, Gann was responsible for developing and implementing institutional policies, procedures, and objectives; supervising, and evaluating custody staff in accordance with IDOC and ISP policy; and managing the facility in the absence of the warden, among other things. Ex. 62.

171.    With regard to maintenance, Gann was responsible for supervising the physical plant director, who was responsible for keeping track of recurring maintenance problems and finding systematic ways to address them. Ex. 25 at 28:21-29:16. Despite this, Gann never spoke with the physical plant director about recurring maintenance problems or ways to address recurring maintenance problems. Ex. 25 at 29:2-11. Gann was also responsible for reviewing the monthly inspection reports and making sure that concerns were addressed and work orders were carried out. Ex. 21 at 89:3-21; Ex. 25 at 20:15-21. Gann knew that inspections were being carried out in a perfunctory manner, but he did not take any steps to address this. Exs. 44-54. *Compare* Ex. 44 *with* Ex. 51; *see also* Ex. 28 at 64:6-15.

172.    Gann was responsible for the general safety of prisoners at ISP. Ex. 25 at 66:18-22. Gann knew that the only way a prisoner locked in his cell could get staff attention was by yelling, but he did not take steps to learn if staff could hear a prisoner yelling in BCH or to ensure that there was a policy regarding what staff should do if a prisoner were yelling or in distress. Ex. 25 at 67:2-13; Ex. 20 at 85:2-22, 86:6-20, 128:6-18, 122:5-123:8.

173.    Gann was responsible for evaluating staff and ensuring that they were properly trained. Ex. 62. Gann believed that specific fire response training and fire drills are important. Ex. 25 at 127:6-25. He also knew that he and other staff were not receiving fire-specific training. Ex. 25 at 43:20-23, 44:9-14, 44:23-45:3, 124:19-125:3, 126:11-15. Despite this, Gann took no steps to ensure that staff receive proper training related to fire safety. Ex. 70 ¶13; Ex. 25 at 47:17-24. Nor did he take any steps to ensure that prisoner firefighters were timely released in the event of a fire. Ex. 25 at 122:20-123:8

174.    Gann was aware of the well-known issue of batteries not charging properly for the ISP officer radios, and he knew there were incidents where officers would try to call on the radios but could not because the batteries were dead. Ex. 25 at 33:16-34:137:20-38:17, 37:20-38:1. He knew that it was important to ensure that radio batteries were working. Ex. 25 at 37:13-38:10, 39:11-14. Despite this, Gann did not take any steps to make sure that staff knew how to ensure their radio batteries were charging properly. Ex. 25 at 37:1-3.

175.    Gann did not raise any concerns he had about issues at ISP that he believed fell outside of his job responsibility. Ex. 25 at 47:17-24.

176.    Besides talking to prisoners in D Cell house about setting fires, Gann took no action to try to minimize the risk of fires at ISP. Ex. 25 at 56:24-57:6; Ex. 70 ¶13.

**RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      At the time of the fire in which Joshua Devine died, Jason Nowatzke was the Correctional Major and he was not on duty during the events of April 7, 2017. [Watson Dep. at 147: 12-17.]

**Response:** Undisputed.

2.      The only individuals who were on duty on the night of April 7, 2017 were Justin Rodriguez, Promise Blakely, Sarah Abbassi, Ryan Statham, Christopher Puetzer, Timothy Redden, Anthony Watson, and Jeremy Dykstra.

**Response:** Undisputed to the extent "individuals" is intended to mean "Defendants" and "on duty on the night of April 7, 2017" means "on duty at the time of the fire." There were other non-Defendant individuals working at ISP on the night of the fire, and some of the Defendants not listed here came to ISP on April 7, 2017 after the fire had been extinguished, including for example Defendant Neal. Ex. 85; Ex. 21 at 10:10-11:4.

3.      Justin Rodriguez, Sarah Abbassi, and Promise Blakely were the three Correctional Officers in B cell house on the night of April 7, 2017 with Rodriguez being the officer in charge. [Redden Dep. at 137:2-13; *see generally* Rodriguez, Abbassi, and Blakeley Deps. *seriatim*].

**Response:** Undisputed.

4.      At the time, Ryan Statham was a Correctional Officer at the Indiana State Prison at who was on duty that night, but not assigned to B-Cell House. [Statham Dep. at 220:6-7, 151:9.]

**Response:** Undisputed.

5.      Christopher Puetzer is and was a Correctional Sergeant at the Indiana State Prison who was on duty that night, but not in B-Cell House. [Statham Dep. 154:17.]

43

**Response:** Undisputed.

6.      At the time, Timothy Redden was a Correctional Lieutenant at the Indiana State Prison. [Redden Dep. at 7:13-19]. A lieutenant's duties included supervising staff, offenders, conducting security assessments and was the assistant shift supervisor. [*Id*. at 37: 10-12.]

**Response:** Undisputed.

7.      At the time, Anthony Watson was a Correctional Lieutenant at the Indiana State Prison. [Watson Dep. at 29:10-11.]

**Response:** Undisputed.

8.      On April 7, 2017, the highest ranking officer on duty was Captain Jeremy Dykstra and the two assistant shift Supervisors on duty were Timothy Watson and Timothy. [Redden Dep. at 43:2-12]. Dykstra was the shift supervisor that night. [*Id.* at 11:17-24, 40:14-16, 167:25.] Dykstra was never involved in the any of the policy-making or policy amending process. [Dykstra 72:1-5.]

**Response:** Undisputed to the extent "April 7, 2017" is limited to the night shift on April 7, 2017, and to the extent "Timothy Watson and Timothy" is meant to refer to "Anthony Watson and Timothy Redden." Ex. 85.

9.      When there is a fire, a signal is called advising Control. First responders will then respond along with the offender fire fighters, who will report to the fire station to gear up. [Redden Dep. at 28:21-25]; [Watson Dep 154:11-13]; [Statham Dep at 54:4-11.].

**Response:** Undisputed that this is ISP's policy, but disputed to the extent that this was not carried out in practice. *See* PSGD ¶¶ 108-110.

44

10.    That night, Rodriguez was doing security checks and Abbassi and Blakely were completing payroll forms in the counselor's office. [Redden Dep. at 137:13-19; Rodriguez Dep. 114:24-115:14; Blakely Dep. 149:4-8; Abbassi Dep. 124:21-125:2]

**Response:** Disputed because "[t]hat night" is vague and there were various things that Rodriguez, Abbassi, and Blakely did during the night shift on April 7, 2017. The last round of security checks on the night of April 7, 2017 ended at 9:16pm. Ex. 8 at 19. When Rodriguez heard the prisoners yelling about the fire on the night of April 7, 2017, he was in the officer's station. PSGD ¶¶ 24, 30; Plaintiff does not dispute that at that time, Abbassi and Blakely were completing payroll forms in the counselor's office.

11.    Custody staff are permitted to complete timesheets during shifts in the unit team or counselor's office, as even in the office, events on the unit are still audible. [Gann Depo. at 101:01-102:07; Neal Depo. at 188:16-23.] Cell houses are loud and quite common to hear offenders yelling – even late in the evening. [Neal Depo. at 186:1-10.]

**Response:** Disputed that BCH was loud late in the evening. BCH was typically very quiet after the 9pm count, and was very quiet on the night of April 7, 2017 before the fire broke out. PSGD ¶ 28.

12.    In B cell house, the keys kept by on-duty custody staff operate a key box with electronic door controls on each range. [Neal Depo. at 182:12-184:11.] Cell doors are opened-and-closed using the electronic door controls on the corresponding range or with a key specific to the range. [*Id.*; IDOC 30(b)(6) Beal Depo. at 37:02-13, IDOC 30(b)(6) Neal Depo. at 44:08-53:23, 56:05-57:13.]

**Response:** Undisputed.

13.     While Abbassi and Blakely were doing their payroll paperwork in the counselor's office, Rodriguez saw a fire on the 500 range. His radio malfunctioned, so he immediately yelled for Blakely and Abbassi to assist. In the confusion, Rodriguez directed Blakely to stand by the gate and await responders, so he then had to send Abbassi to retrieve the 500 range keys from Blakely. When Lieutenants Watson and Redden returned with those keys, Rodriguez attempted to open the cell, but was unable to do so. [Rodriguez Dep. 114:24-116:15].

**Response:** Disputed. These events which Defendants have compressed into a single paragraph are the subject of numerous factual disputes, including as to the sequence of events, the timeline, and the duration of various periods of delay and inaction which this paragraph elides. Plaintiff sets forth her full series of genuine disputed facts covering this series of events at PSGD ¶¶ 25-65. Among these disputed facts: Prisoners in BCH were yelling that there was a fire on the 500 range and banging on their cells for at least 10-15 minutes, which Rodriguez heard from the officer's station and saw on the surveillance video in the officer's station. PSGD ¶¶ 30-31, 35. Abbassi and Blakely also heard the yelling from the counselor's office. PSGD ¶ 33. Despite hearing the yelling, Abbassi, Blakely and Rodriguez did not respond for at least 10-15 minutes. PSGD ¶¶ 35. Rodriguez eventually went to the 500 range but took nothing with him and did not call a code. PSGD ¶ 36. Rodriguez knew he did not have keys for the 500 range. PSGD ¶¶, 36, 38. Blakely and Abbassi saw the fire on the 500 range upon leaving the counselor's office. PSGD ¶ 39. Blakely heard Rodriguez yelling at him multiple times to bring the keys to the 500 range and that he needed his  assistance, but he did not go up to the 500 range or take any other action to protect Mr. Devine or the other prisoners. PSGD ¶¶ 40, 44-45. Abbassi went up to the 500 range but took no action to get the keys from Blakely. PSGD ¶¶ 47, 49.

14.    Abbassi and Blakely responded as soon as they heard Rodriguez yelling for them. [Abbassi Dep. 124:21-126:12; Blakely Dep. 149:4-18].

Response: Disputed. This statement is vague as to what is meant by "responded," but Plaintiff disputes that either Abbassi or Blakely took any meaningful action to respond appropriately. Blakely heard Rodriguez yelling at him multiple times that he needed the keys to the 500 range and his assistance, yet he never went to the 500 range or took any other action to protect the prisoners or otherwise respond to the fire. PSGD ¶¶ 40, 44-45. Abbassi went up to the 500 range but did not take any action to bring the 500 range keys. PSGD ¶¶ 47, 49. Both Abbassi and Blakely heard the prisoners in BCH yelling for 10-15 minutes before any staff responded, yet neither Abbassi nor Blakely called the fire signal upon hearing prisoners yelling that there was a fire on the 500 range. PSGD ¶¶ 35, 43. When the first responders arrived, both Abbassi and Blakely were on the 100 range in front of the locked officer's station, where the fire extinguishers remained untouched. PSGD ¶ 63.

15.    On April 7, 2017, at approximately 9:45 pm, a fire signal was called inside B-Call House. [Redden Dep. at 246:25- 247:2.]

Response: Undisputed to the extent this is intended to mean B Cell House.

16.    The first responder team on April 7, 2017 included Timothy Redden, Anthony Watson, Ryan Statham and Christopher Puetzer. [Redden Dep. 122:14-20]; [Statham Dep. at 31:1-2.] When the fire was called, the first responders were activated. [Dykstra Dep. 167:16-17.]

Response: Undisputed.

17.    Redden and Watson were in the shift supervisor's office when they first learned of the fire. [Redden Dep. at 137: 20-23]; [Watson Dep. at 155:22-24].

Response: Undisputed.

47

18.     Statham and Puetzer were checking the gates on Main Street when they heard the alarm from outside of B Cell House. [Statham Dep. at 147:9-11.]

**Response:** Undisputed.

19.     Redden and Watson immediately responded and were inside B Cell House in less than 30 seconds. [Redden Dep 146:22-25]; [Watson Dep. at 155:22-24].

**Response:** Disputed. Watson and Redden did not move with any sense of urgency to respond to the fire. Ex. 33 ¶ 52.

20.     Statham saw them make their way to B Cell House and he made his way there too while Puetzer went over to open the firehouse. [Statham Dep. at 147:13-17, 20-21.]

**Response:** Undisputed.

21.     Dykstra stayed in the office as was required for the Correctional Captain on duty. [Redden Dep. at 147:7-9]; [Dykstra Dep. 299:5-9].

**Response:** Undisputed that Dykstra's primary post was the shift supervisor's office, but otherwise disputed because Dykstra was able to leave the office provided that someone else was assigned to remain in the office and cover that post, which permitted Dykstra to leave the shift supervisor's office during a shift and visit the housing units. Ex. 63 at 105:20-106:13.

22.     Meanwhile in B-Cell House, upon arriving inside B-Cell House, neither Watson nor Redden could see any smoke nor could they see a fire. [Redden Dep. at 176:7-10]; [Watson Dep. at 161:7-8].

**Response:** Disputed. There was significant smoke that Watson and Redden would have seen and smelled. PSGD ¶¶ 33, 52, 56, 61. They also would have been able to see the fire. PSGD ¶ 39, 61.

48

23.    The noise inside B Cell House was not more than usual for a cell house full of inmates. [Redden Dep. at 168:19-22, 171:2-3, 172:5-7]

**Response:** Disputed. This statement is vague as it does not specify the time period it refers to. Undisputed that the cell house was quiet, as usual, before the fire began. PSGD ¶ 28. After the fire began, the cell house was extremely loud—prisoners were yelling and banging on their cells. PSGD ¶ 29.

24.    Watson got the keys to the 500 range from Officer Blakely and he and Redden quickly made their way to the 500 range. [Watson Dep. at 163:19-22, 176:8-25;] [Redden Dep. at 175: 5-10].

**Response:** Disputed. Watson and Redden did not move quickly, but rather walked with no sense of urgency and it took them more than 30 seconds to arrive at BCH. Ex. 33 ¶ 52; Ex. 2 at 130:9-12.

25.    Statham was just behind them. [Watson Dep. at 163:15-19.]

**Response:** Undisputed.

26.    It took Statham less than a minute to arrive in B-cell house from the time he heard the alarm. [Statham Dep. at 158:6-8.] When Statham arrived inside BCell H-house, he could not see any smoke or fire either. [Statham Dep. at 237:15-16.]

**Response:** Disputed. There was significant smoke that Statham would have seen and smelled. PSGD ¶¶ 33, 52, 56, 61. He also would have been able to see the fire. PSGD ¶ 39, 61.

27.    When Statham arrived, he learned that the lieutenants had already gone up so he grabbed fire extinguishers from the officer's station and quickly made his way up to the 500 range too. [Statham Dep. 159:12-18, 160:5-15, 163:2-3.]

49

**Response:** Disputed that Statham moved quickly. He moved with no sense of urgency. Ex. 33 ¶ 52.

28.     When Redden and Watson first got to the 500 range, they saw flames coming out of the cell. [Redden Dep at 184:6-8]; [Watson Dep. at 166:19-22.] Flames were rolling over the roof of the cell itself so it was not possible to stand in front of the cell. [Redden Dep at 184:13-15.] The fire was about five feet out and occupying the walkway on the range. [Redden 185: 13-20.]

**Response:** Undisputed.

29.     The men tried to pop the door open from the front of the range since there was a key box at the front of the range. [Watson Dep. 156:14-16.] The door had been unlocked, but the door would not open. [*Id.* at 168:3]; [Statham Dep. 168:1-6, 12]. Their goal was to pop the door open as soon as possible. [Watson Dep 167:14-16.]

**Response:** This statement is confusing and vague as to the people involved ("the men") and the timeline of events. Undisputed that one or more of Watson, Redden and Statham used the panel with the electronic mechanism for unlocking cell doors to attempt to unlock the cell door. Disputed to the extent that "[t]he door had been unlocked" is intended to mean that there had been any efforts to unlock or open the door to Joshua Devine's cell prior to this attempt to use the electronic panel, and disputed that Watson, Redden and Statham acted "as soon as possible." PSGD ¶¶ 50, 55-65.

30.     By the time, they got up to the 500 range, it was foggy due to the smoke making it difficult to see [Redden Dep. at 188:19-22] [Statham Dep. 167:4-9.]

**Response:** Undisputed that there was smoke on the 500 range and that it was difficult to see. Disputed to the extent that the word "foggy" is intended to diminish the extent of the smoke,

and to the extent "[b]y the time, they got up to the 500 range" is intended to mean that the ranges in BCH lower than the 500 range were not smoky. There was thick smoke throughout BCH that made it difficult to see and breathe. PSGD ¶¶ 33, 52, 56, 61.

31.    At some point while the three men where upstairs, Statham handed Watson a fire extinguisher. [Watson Dep. at 169:13]; [Statham, Dep. at 148:3-6, 169:13.]

**Response:** Undisputed.

32.    Statham could not see into the cell but attempted to put out the fire and was able to get down significantly. [Redden Dep at 207:12-21]; [Watson Dep. at 157:9-10]; [Statham Dep. at 148:6-10, 169:13-15.]

**Response:** Undisputed.

33.    A signal was made to call in/activate the firefighters. [Watson Dep. at 170:2-5]; [Statham Dep. 186:13-17].

**Response:** Undisputed that this occurred, but this vague statement does not specify when the firefighters were activated/called and who activated/called them, which is disputed. *See* PSGD ¶¶ 66-81.

34.    There were a few seconds where the men thought they could get inside. [Redden Dep. at 208:23-25.]

**Response:** Undisputed.

35.    When the fire was down, Watson tried to grab and door and open it. [Watson Dep. at 157:9-11, 173:10-16]. "[Watson] put himself at the greater risk. He almost got burned up too. Because when we put the fire out, he was the one that tried to rush in real quick. And right before it roared back up and got back out, Statham actually grabbed him by the coat and got him out of the way before he got engulfed." [Redden Dep. at 124:4-11, 192:13-22] [Watson Dep. at 189:4-

10 ("That's when I just tried to op the door. I tried to grab it, but my partner pulled me back so I wouldn't burn my hands. I didn't really think about my hands being burnt. I was trying to get the door open.")]; [Statham Dep. at 148:14-17, 169:16-18.]

**Response:** Undisputed that Watson made a motion towards grabbing the cell door at a moment when the flames of the fire had ebbed, although the phrase "the fire was down" is vague and ambiguous. Undisputed that one of the other first responders prevented him from touching the bars and that sometime thereafter the flames of the fire grew bigger again. Disputed to the extent that the quoted deposition testimony is vague, hyperbolic, and inconsistent with these undisputed facts: Watson "put himself at the greater risk" is vague (greater than whom?); there is simply no evidence that anyone had "put the fire out" at this time; and there is no evidence that Watson "almost got burned up" or almost "got engulfed." Disputed that Watson did anything "real quick" in response to the fire in BCH. PSGD ¶¶ 60-65, 68; Ex. 33 ¶ 52.

36.     Watson was as physically close to front of the door trying to find a way to get it to open without touching it including like trying to kick it with his foot." [Redden Dep at 208:25 – 209:3]

**Response:** Undisputed.

37.     Statham was also trying to get the door open since it was already unlocked, but when he went to grab the door, it burned though his glove to the point where he couldn't open it. [Statham Dep. at 149:9-17.]

**Response:** Undisputed.

38.     While the three men on the 500 range where trying to put out the fire, Redden was communicating with Puetzer through the radios asking about where the offender fire fighters were. [Redden Dep. at 217:14-16.]

**Response:** Undisputed that at some point while on the 500 range in BCH, Redden communicated over the radio about the whereabouts of the prisoner firefighters. The time frame "[w]hile the three men on the 500 range [were] trying to put out the fire" is vague and ambiguous, and this statement is disputed to the extent it is meant to imply that either Watson or Redden took timely or effective efforts to coordinate the activation of the prisoner firefighters. The release of the prisoner firefighters on April 7, 2017 was significantly delayed. PSGD ¶¶ 66-81.

39.     Puetzer was at the fire station with the firefighters providing updates to the other three first responders on the 500 range as to what the fire fighters were doing, how far they were, how long it was going to be, and where they were at each point. [Redden Dep. at 217:7-11.]

**Response:** Undisputed that Puetzer was at the fire station communicating over the radio about the prisoner firefighters. Disputed to the extent that this is meant to imply that the activation of the prisoner firefighters on April 7, 2017 was well-coordinated, effective, or rapid. To the contrary, the evidence shows that the release of the prisoner firefighters on April 7, 2017 was ineffective and delayed. PSGD ¶¶ 66-81.

40.     Though communication was difficult given the noise and circumstances of the fire, the communication between Redden and Puetzer continued. [Redden Dep. at 218:18-219:7.]

**Response:** Undisputed that the circumstances of the fire and conditions in BCH posed added challenges to communications over radio, particularly given the old and unreliable radio equipment, and undisputed that Puetzer and Redden communicated by radio. Disputed to the extent that this is meant to imply that these communications were part of an activation of the prisoner firefighters on April 7, 2017 that was well-coordinated, effectively, or rapid. To the contrary, the evidence shows that the release of the prisoner firefighters on April 7, 2017 was

ineffective and delayed. PSGD ¶¶ 66-81. Plaintiff also notes that this statement is inconsistent with Defendants' prior statement in paragraph 23 (which is disputed) that the level of noise inside B Cell House was not unusual.

41.    During this time, Mr. Devine was still calling out for help and Statham started telling him that they were doing the best they could to get him out of the cell. [See Statham Dep. 169:22-170:21.]

**Response:** Undisputed that Mr. Devine was still alive at this time, and that Statham made reassuring statements to him. Disputed to the extent that this is meant to imply that Defendants had in fact "done the best they could" in response to the fire. *See generally* PSGD ¶¶ 25-81.

42.    The smoke has growing and building up making it even more difficult hard to see and difficult to breathe. [Redden Dep. at 193:23-24]; [Watson Dep. at 157:17-18, 185:14-20]; [Statham Dep. at 218:19-21].

**Response:** Undisputed.

43.    Meanwhile, because the smoke grew thicker, Dykstra was not able to see anything or see who was on the range [Dykstra Dep. 204:22-205:1.]

**Response:** Undisputed that the smoke grew thicker and made it harder for Dykstra to see what was happening on the camera but disputed that "Dykstra was not able to see anything." Dykstra testified that he could not identify which staff were on the ranges ("who was who"), but he described in detail seeing the fire fluctuate in size and severity. Ex. 63 at 204:18-205:10.

44.    Dykstra then opened a door to B-Cell House, put some fans blocking in fresh air into the cell house given the large amount of smoke coming from B-Cell House at that point. [Dykstra Dep. at 205:11-16.]

**Response:** Disputed. Dykstra testified that it was the Guard Hall staff, not himself, who opened the door and set up fans. Ex. 63 at 214:12-15.

45.    Dykstra was still on the radio trying to determine what was happening. [Dykstra Dep. 207:15-16.]

**Response:** Disputed to the extent that this is intended to describe any action on Dykstra's part to take control of the situation, or coordinate or direct the actions of any other person. Dykstra testified that he did not get on the radio, although he was passively monitoring what other people were saying on the radio. Ex. 63 at 207:11-16.

46.    The three first responders on the 500 range stayed on the range waiting for the offender fire-fighters to get there because they did not have the equipment at that point to deal with the fire. [Redden Dep. at 198:22-24, 213:15-17]; [Watson Dep. at 171:15-19 ("They have the oxygen tanks and things like that. I didn't have an oxygen tank. I didn't have a mask. I was just up there fighting the fire trying to save someone's life."). Redden himself was getting burnt. [Redden Dep. at 193:19.]

**Response:** Undisputed that the prisoner firefighters have additional firefighting equipment that the first responders did not have available to them that would have assisted in fighting the fire, but disputed given the vague timeframe ("at that point") and to the extent the statement is intended to imply that Defendants could take no action at any point in time to contain or quell the fire in Mr. Devine's cell with the fire equipment available in BCH. *See* PSGD ¶ 63.

47.    Redden tried to radio Dykstra while he was still by Devine's cell on the 500 range as the freighters were arriving there. [Redden Dep 229:3-9.] Dykstra attempted to answer but

Redden could not hear anything because communication was difficult given the circumstances. [Redden Dep at 229:13-19]; [Statham Dep. at 189:2-3.]

**Response:** Disputed that this conversation took place as the firefighters were arriving. Redden testified this took place as the prisoner firefighters had already virtually completed putting the fire out. Ex. 64 at 229:5-10.

48.    Four firefighters made it up and used quite a few extinguishers to put out the fire. [Redden Dep. at 198:24 – 199:1]; [Watson Dep. 185:12-13, 201:17-19.]

**Response:** Undisputed that four prisoner firefighters went to the 500 range and eventually succeeded in extinguishing the fire using multiple extinguishers. Disputed to the extent the statement is vague about where the firefighters went ("made it up") and to the extent it is intended to imply this was the extent of the prisoner firefighters' activities.

49.    Once the firefighters arrived with their lights and respirators, Redden began making his way down the range to inform Captain Dykstra about the situation and to evacuate the cell house. [Redden Dep. 223:20-22]; [Statham Dep. at 150:3-5]; [Dykstra Dep. at 207:21-25.]

**Response:** Disputed. The first responders did not willingly evacuate BCH and had to be persuaded by members of the prisoner firefighter squad. Ex. 80; Ex. 23 at 29:23-31:1.

50.    Dykstra had wanted to start the evacuation process with the 500 range because that was where the fire was, where the offender firefighters were, where the offenders closest to the incident were, and where the staff were who did have not any protective gear and breathing in the smoke. [Dykstra Dep. 209:7-201:7.]

**Response:** Undisputed.

56

51.     Throughout the incident, Dykstra was "worried about the offender firemen getting to unit, [] worried about the First Responders getting to the unit . . . 'cause you're thinking: I don't want staff to get hurt. I don't want offenders to get hurt." [*Id*. at 195:15-20.

**Response:** Disputed. Dykstra's actions "[t]hroughout the incident," and particularly his lack of any actions to coordinate the release of the prisoner firefighters in other housing units or to coordinate with the staff on scene in BCH, are inconsistent with this claimed concern and a jury could thus conclude otherwise. PSGD ¶¶ 56, 58-59, 67-68, 70, 76.

52.     The staff began evacuating the entire B-cell house. [Statham Dep. at 209:6-10]; [Dykstra Dep. at 209:1-5].

**Response:** Undisputed.

53.     Redden said not to go down the front stairs with the gurney carrying Mr., Devine because they were still in the mix of evacuating [Watson Dep. at 158:24-159:1]; [Statham Dep. at 150:18-19.]

**Response:** Undisputed.

54.     Instead, Mr. Devine was taken down the back staircase and medical was stationed and ready to help them once they came down. [Watson Dep 158:1-4.] Mr. Devine was taken to the custody hall where the nurses performed CPR on him [Watson Dep. 158:5-6.]

**Response:** Undisputed that this occurred, although Mr. Devine was already dead at this point. Ex. 20 at 173:17-174:3.

55.     Watson left the nurses and went back to the cell house to finish helping with the evacuation of the cell house. [Watson Dep. 158:6-10.]

**Response:** Undisputed.

57

56.     After the cell-house evacuation, offenders started assaulting officers. [Redden Dep at 240:1-5]; [Statham Dep. at 151:4-6.]; [Dykstra Dep. at 298:4-7]. Offenders started rioting and were hitting officers, which included Mr. Puetzer and the offenders even started setting fires at various check points. [Redden Dep. at 242:4-15.] Approximately 200 of the offenders who were evacuated offenders were chanting "burn, burn, burn." [Redden Dep at 242:23-25]. Even the offenders firefighters were being hit with rocks and other things because they were helping the staff put out the fires at check points [Redden Dep 243:4-8.]

**Response:** Undisputed that there was a disturbance after the BCH evacuation had been completed and Mr. Devine had died, but disputed that this is any way material to the claims in this lawsuit, and disputed that these actions could be fairly described as a "riot," that multiple checkpoints were burned or that 200 prisoners were chanting.

57.     According to Redden as a lieutenant, he did not see or hear any of the staff act in a way that violated or was not consistent with the policies and procedures of ISP or IDOC. [Redden Dep. at 11:3-13.]

**Response:** Disputed. Redden heard and saw Blakely, Abbassi, Rodriguez, Watson, and Dykstra act inconsistently with ISP and IDOC policies and procedures. *See* PSGD ¶¶ 41, 46, 48-50, 55, 62-81.

58.     According to Watson as a lieutenant, he did not see or hear any of the staff act in a way that violated or was not consistent with the policies and procedures of ISP or IDOC. [Watson Dep. at 11:3-13.]

**Response:** Disputed. Watson heard and saw Blakely, Abbassi, Rodriguez, Redden, and Dykstra act inconsistently with ISP and IDOC policies and procedures. *See* PSGD ¶¶ 41, 46, 48-50, 55, 62-81.

58

59.     Statham had no knowledge of what happened in B Cell house before he got there either. [Statham Dep. at 181:23-25.]

**Response:** Undisputed.

60.     According to Dykstra, he did not see or hear any correctional officer act in any way that violated or was inconsistent with the policies and procedures. [Dykstra Dep. at 11:25-12:4.]

**Response:** Disputed. Dykstra heard and saw Blakely, Abbassi, Rodriguez, Watson, and Redden act inconsistently with ISP and IDOC policies and procedures. *See* PSGD ¶¶ 41, 46, 48-50, 55, 62-81.

61.     During the events of that night, Dykstra contacted those individuals in his chain of command who had not been present – Jason Nowatzke, Kenneth Gann, and Warden Ron Neal. [Dykstra Dep. at 304:16-21.]

**Response:** Undisputed.

62.     Mr. Devine died from the burns sustained by the fire.

**Response:** Undisputed.

63.     Christopher Beal is a correctional training officer at the ISP. [Beal Depo. at 10:09-12:04, 24:14-25.] He does not have the authority to alter the training he provides – as that is a role reserved for IDOC Central Office. [*Id.* at 16:04-25.] He was not present at the time of the incident fire nor was he involved in the subsequent investigation. [*Id*. at 13:16-20; 195:05-11.]

**Response:** Undisputed that Beal was not present at the time of the fire or involved in its investigation. The remainder is disputed. At the time of the fire, Beal was the head of ISP's training department, and he had the authority to add training topics and alter facility-specific

training that was provided during on-the-job training. PSGD ¶ 141. Beal had the authority and responsibility to include additional training to new employees on emergency response and fire safety procedures. PSGD ¶ 142.

64.     Ron Neal is the Warden of ISP and so employed since 2016. [Neal Depo. at 77:02-13; IDOC 30(b)(6) Neal Depo. at 8:11-19.] On the night of the incident fire, Mr. Neal was on-site – as his residence is located on the grounds of ISP. [*Id*. at 8:02-15:11.] That evening, he received a call from Mr. Dykstra informing him of the fire. [*Id*. at 17:09-20.] In accordance with policy and procedure, Mr. Neal responded to his office, where he remained until the situation was brought under control. *[Id.* at 21:09-13.]

**Response:** Disputed as to the length of Neal's tenure as Warden. Neal first became Warden/Superintendent of ISP in 2014. PSGD ¶ 160.

65.     After the incident fire, a number of considerations were undertaken, including improvements to the offender firefighter program and making fire extinguishers more readily accessible – while weighing those considerations in light of safety and security concerns. [*Id.* at 27:02-31:20, 146:14-149:15.]

**Response:** Disputed to the extent this statement is vague as to whether these purported changes were implemented or merely considered ("a number of considerations were undertaken"), and to the extent it is implied that these were the only two aspects of the fire response on April 7, 2017 that needed to be improved, when in fact the events that night revealed a litany of failures of staff conduct, policy and practices, and training. *See* PSGD ¶¶ 28-84, 86-123. Also disputed to the extent that it is intended to imply that a thorough consideration was undertaken of the changes needed to prevent future fires like the one that killed Mr. Devine. *See* Ex. 21 at 38:12-58:5, 138:19-139:6; Ex. 20 at 198:7-200:7; Ex. 29 at 14:20-15:0; Ex. 30 at

60

46:20-24, 59:17-60:11, 58:8-24. Finally, disputed to the extent that it is meant to imply that consideration of changes taken *after* Mr. Devine's death exculpates Defendants from liability in any way.

66.    Kenneth Gann is a former Deputy Warden at ISP and was employed in that role from 2015 to 2017. [Gann Depo. at 16:09-21.] On the night of the fire, Mr. Gann was not present and did not respond to the fire. [*Id.* at 10:11-27.]

**Response:** Undisputed.

67.    At the time of the incident fire, Mr. Griffin was the safety hazard supervisor at ISP responsible for fire drills and monthly inspections at ISP. [Gann Depo. at 44:01-22, 93:09-16; Neal Depo. at 87:19-88:08.] Training with live fire drills was preferable but not always done. [Neal Depo. at 158:17-168:07; IDOC 30(b)(6) Beal Depo. at 39:07-40:20.] Nevertheless, custody staff were informed how to respond in the event of a live fire emergency. [*Id.*; IDOC 30(b)(6) Beal Depo. at 14:10-16:01, 28:05-31:23, 39:07-40:20, 46:02-47:02; IDOC 30(b)(6) Neal Depo. at 25:04-.27:16, 31:03-34:05]

**Response:** Disputed that custody staff were informed about how to respond in the event of a live fire emergency. They were not. *See* PSGD ¶¶ 89-105. Also disputed to the extent this is intended to be a complete recitation of Griffin's responsibilities and authorities. PSGD ¶¶ 124-129, 137.