**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# EXHIBIT 5

## In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*JASON NOWATZKE*

*August 20, 2020*

*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*

*Gary * Merrillville * Valparaiso, Indiana*

*3893 East Lincoln Highway (Rt. 30)*

*Merrillville, Indiana  46410*

*(219) 769-9090*



Original File 08-20-20 NOWATZKE.txt

Min-U-Script® with Word Index

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 3 of 82

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the )
ESTATE OF JOSHUA DEVINE, )
)
Plaintiff, )
) Case No.
vs. ) 3:18-cv-00995-JD-MGG
)
RON NEAL, et al., )
)
Defendants. )

THIS DEPOSITION CONTAINS CONFIDENTIAL MATERIAL

The videoconference videotaped deposition of JASON NOWATZKE, called for examination pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before APRIL D. HARGETT, a notary public within and for the County of Lake, State of Indiana, Certified Shorthand Reporter, on August 20, 2020, at the hour of 9:05 o'clock a.m.

BOSS REPORTERS

& VIDEOCONFERENCING

GARY * MERRILLVILLE * VALPARAISO, INDIANA

(219) 769-9090

Page 2

PRESENT:

LOEVY & LOEVY,
(311 North Aberdeen Street, Suite 3,
Chicago, Illinois 60607), by:
MR. SAM HEPPELL
-and-
MS. MEGAN PIERCE,
(312) 243-5900
megan@loevy.com
Appeared by videoconference on behalf of the Plaintiff;

STATE OF INDIANA, OFFICE OF THE ATTORNEY GENERAL,
(302 West Washington Street, 5th Floor,
Indianapolis, Indiana 46204), by:
MR. MICHAEL BLINN,
(317) 232-2472
michael.blinn@atg.in.gov
Appeared by videoconference on behalf of the Defendants.

Page 3

I N D E X

Witness:                                    Page

JASON NOWATZKE

EXAMINATION BY MR. HEPPELL                  4
EXAMINATION BY MR. BLINN                    229


EXHIBITS

Nowatzke
Exhibit Nos.                                Page

1    B Cellhouse Specific Post              132
     Orders (CONFIDENTIAL)
2    General Post Orders (CONFIDENTIAL)     153
3    Internal Affairs File (CONFIDENTIAL)   178
4    Indiana Department of Correction       202
     Fire Evacuation Drills

Page 4

(WHEREUPON, the witness was duly sworn.)

THE WITNESS: I do.

THE REPORTER: Thank you.

MR. HEPPELL: Just before we get started, I just wanted to put on the record that, you know, plaintiff's counsel has been cooperating with defense counsel during these unusual times and agreeing by doing the depositions by Zoom. I just wanted to confirm on the record that he has no objection to proceeding with the deposition by Zoom or having the witness sworn in by the court reporter over the -- over the Zoom; is that correct?

MR. BLINN: Michael Blinn, counsel for the defendant, for the record. And we have no objection to conducting this deposition remotely.

MR. HEPPELL: Thank you for that.

JASON NOWATZKE, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. HEPPELL:

Q. Mr. Nowatzke, would you go ahead and state and spell your name for the record?

A. Jason Nowatzke, J-a-s-o-n,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 4 of 82

Page 5

N-o-w-a-t-z-k-e.

Q. Thank you.

Sir, just to introduce myself, my name is Sam Heppell. I am one of the attorneys for the plaintiff in this case, who right now is Denise Dwyer, who is a representative for the Estate of Joshua Devine. Also on the Zoom is my colleague Megan Pierce. She is one of the other attorneys for the plaintiff in this case.

Of course, we have the court reporter and your attorney as well.

Mr. Nowatzke, have you ever testified at a deposition before?

A. Yes.

Q. Okay. I want to go over some of the rules or how we're going to proceed today as a refresher for both of us just so we're on the same page before we jump in, okay?

A. Okay.

Q. It's important that you answer questions verbally using full words without relying on gestures or things like uh-huh or uh-uh. Does that make sense?

A. Makes sense.

Q. And even though, you know, I can see you

Page 6

on the video, there is also a written transcript being made by the court reporter. And that's just to make the court reporter's job easier, so she can take down a clear written record of my questions and your answers, okay?

A. Okay.

Q. And for the same reason, even though it's not a natural way of having a conversation, it's important for you to let me get my whole question out before you jump in with your answer, okay?

A. Okay.

Q. And, similarly, I'm going to let you finish your answer before I jump in with my next question. So that's a two-way street. Understood?

A. Okay.

Q. If your attorney makes an objection -- there may be some objections that are raised to questions that your attorney thinks I'm asking that are improper questions.

A. Okay.

Q. Because there's no judge here to rule on those objections, those objections are just being made for the record, and the attorneys can argue about those later, okay?

A. Okay.

Page 7

Q. And so unless there is an objection where your attorney instructs you not to answer the question -- it is important for you to wait to jump in with your answer until the objection is made for the record, but once that objection is made, you can go ahead and answer the question, okay?

A. Okay.

Q. If you don't understand a question that I ask -- it may be that I phrased something poorly or you can tell from my question that I've misunderstood a previous answer you've given me -- if there is anything off with any of my questions, please do let me know. I'm happy to clarify my questions or rephrase my question if they're confusing, okay?

A. Okay.

Q. If you go ahead and answer the question, I'm going to assume you were able to understand the question, okay?

A. Okay.

Q. If you need a break at any point, that's fine. You know, we are pretty informal here. We are not in court, and I'll probably be asking for some breaks, you know; your counsel may, and, certainly, if you need to take a break for any reason, that's no problem and just let us know, okay?

Page 8

A. All right.

Q. The only stipulation on that is if I've asked the question, I would ask you to give your full and complete answer to that question, and then we can go off the record and take a break before I ask another question, okay?

A. Understood.

Q. With all of that in mind in terms of what we're here to do today, do you have any conditions, or are you taking any medications or anything else like that that you can think that would affect your memory or might in any way affect your ability to give truthful testimony to the best of your recollection here today?

A. No.

Q. On April 7th, 2017, you were employed at Indiana State Prison as the major; is that correct?

A. That's correct.

Q. Okay. And is there additional titles or position names that you had at that time?

A. Yes. The major is the rank that I held, but the position is called the custody supervisor.

Q. Custody supervisor. Okay. And approximately how long had you held the rank of major in April of 2017?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 5 of 82

Page 9

A. Approximately a year.

Q. And is that the same for custody supervisor? Had you held that position for also approximately one year?

A. Yes.

Q. Okay. So did those -- the rank of major and the position of custody supervisor, did those go hand in hand? Like, you obtained the rank of major and then obtained the position of custody supervisor at the same time?

A. That's correct.

Q. Okay. Are you familiar with the title or phrase "chief custody officer"?

A. No, I am not.

Q. Okay. During -- and what position do you now hold?

A. I'm deputy warden of operations.

Q. When did you obtain that position?

A. In November of '19.

Q. November 2019?

A. November 19th, I think of '19 or November 3rd. It was in November of '19.

Q. November of 2019?

A. Correct.

Q. Is that correct?

Page 10

A. Yes.

Q. Okay. And you were the major and custody supervisor continuously up until the point that you were promoted to deputy warden; is that correct?

A. Correct.

Q. During your career at Indiana State Prison, at any point did you personally make any changes to the prison's policies or protocols regarding fire safety?

A. No.

Q. Is that a task that you assigned or delegated to somebody else?

A. I wouldn't have assigned or delegated it, no. Someone else would have.

Q. Okay. And who would have assigned or delegated that task to somebody else?

A. I would say probably the warden.

Q. When you say "probably the warden," why do you say that?

A. Because some of the policies come from central office, so he has no control over those either.

Q. What's your understanding of who the warden assigned or delegated that task to?

A. I wouldn't know. I wouldn't know that

Page 11

answer.

Q. You have no knowledge one way or the other to whom the warden assigned the task of changing the prison's policies regarding fire safety?

A. That is correct.

Q. You have no knowledge one way or the other if the warden did that. Is that fair to say?

A. Yes.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to the prison's policies and protocols about fire drills?

A. No.

Q. Okay. That's not a task that you assigned or delegated to anyone else. Is that fair to say?

A. Yes.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to the prison's policies and protocols on when and how officers in cellhouses should activate the prisoner firefighter squad?

A. No.

Q. Is that a task that you assigned or delegated to anyone?

Page 12

A. No.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to the prison's policies or protocols on when and how officers in cellhouses should release prisoner firefighters from their cells?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to the prisoner -- to the prison's policies or protocols on when and how officers in cellhouses should evacuate a prisoner from a locked cell in the event of an emergency?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to the prison's policies or protocols on the responsibilities that officers in cellhouses had to investigate the disturbance or commotion that they

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 6 of 82

Page 13

observed in a cellhouse?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to the prison's policies or protocols on how officers in cellhouses should respond when there's a fire at the prison?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. Nope.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to how the staff at the prison were trained on fire safety or fire emergency response?

A. No.

Q. And is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point, did you personally take any steps to supervise how staff of the prison were

Page 14

responding to fires or responding to emergency situations at the prison?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. During your career at Indiana State Prison, at any point, did you personally make any changes to the prison's fire safety or fire prevention systems?

A. No.

Q. Is that a task that you assigned or delegated to anyone else?

A. No.

Q. And you were not present at Indiana State Prison on April 7th, 2017, during the fire itself? The fire in B cellhouse that killed Joshua Devine; is that correct?

A. That's correct.

Q. Okay. You did arrive at the prison later that night; is that correct?

A. That's correct.

Q. And that was after the fire had already been extinguished, correct?

A. Yes.

Page 15

Q. Okay. Have you reviewed any reports, investigations, or other materials that describe what happened that night during the fire?

A. Yes.

Q. Okay. And what materials have you reviewed that have given you information about what happened at the prison during the fire that night?

A. Just the incident reports of the incident.

Q. When you say "the incident reports of the incident," can you describe a little more specifically what you're referring to?

A. Reports that are written by the staff who responded and the shift supervisor.

Q. So that would have been the reports written by the three officers who were on duty in B cellhouse that night; is that correct?

A. Correct.

Q. And in addition to that, reports of any of the emergency responders -- the first responders who responded to that fire; is that correct?

A. Yes.

Q. And then the report of the shift supervisor, Captain Dykstra; is that correct?

A. Yes.

Page 16

Q. Outside of incident reports written by those staff, any other reports or materials that you reviewed that gave you any information about what happened during the fire that night?

A. Not that I'm aware of, no.

Q. Did you ever review any audio or video that captured any of the events during the fire?

A. Yes. I did see a video.

Q. Okay. When did you see video of the fire?

A. I don't remember the exact date, but it had to be shortly after the incident.

Q. In what context or in what situation did you have the opportunity to see video related to the fire?

A. I'm not sure I understand what you mean in what context that I saw it. And I just watched it on the videos that we have at the facility.

Q. Okay. And I guess -- I appreciate you flagging you didn't fully understand my question.

I guess what I'm getting at is was this just something you took upon yourself to review that video, or was this part of a meeting in which multiple people reviewed the video?

MR. BLINN: And I will object and instruct

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 7 of 82

Page 17

the witness not to answer only to the extent that it refers to any review undertaken at the direction of counsel or after he became aware of this lawsuit.

But, otherwise, go ahead and answer witness.

BY THE WITNESS:

A. Could you repeat the question?

BY MR. HEPPELL:

Q. Sure. And if I understood the answer you gave previously, you had stated that you reviewed the video shortly after the incident; is that correct?

A. Correct.

Q. Understanding that you don't remember the exact number of days, when you say "shortly after the incident," are you talking about within days or at most weeks after the fire itself?

A. Days, I would say.

Q. Okay. And where -- do you recall where you were when you reviewed video of the incident?

A. My office.

Q. And where at the prison is your office?

A. It's in --

Q. Strike that. Sorry.

Just so my question is more clear, where in the prison was your office at the time that

Page 18

you reviewed the video?

A. At the time, it was in the SSB building, which is the support services building.

Q. Okay. And that was the major's office?

A. Correct.

Q. Were you alone, or did you review the video at that time with anybody else?

A. I was alone.

Q. Okay. And what was your purpose in viewing the video at that time?

A. To see what had happened. Normally, I would review video of incidents that happen on a regular basis.

Q. That was part of your job duties as a major at the prison at the time. Is that fair to say?

A. Yeah. Yes, I would say it's fair.

Q. Okay. Did anyone direct you at that time to review the video, or did you take that upon yourself given that you viewed that as part of your job responsibility?

A. I took it upon myself.

Q. Okay. What do you recall you were able to learn about the incident from viewing that video?

A. I don't necessarily know that I really

Page 19

learned a whole lot from watching the video. I mean, it was pretty much what was said in the incident reports is what I observed. So --

Q. And my understanding from having viewed it myself -- related to the fire and video from the prison's video systems is that there are -- there's a computerized system where there are a number of different camera angles positioned at different positions in a cellhouse and you can view over time from those videos; is that correct?

A. That's correct.

Q. Okay. And you were using that system that you -- to review the video that you're describing. Is that fair to say?

A. Yes.

Q. Approximately how long did you spend reviewing the video?

A. I don't -- I don't remember.

Q. Would it be fair to say it was less than half an hour?

A. Yes.

Q. Okay. Other than this one time you've just been describing, which, to the best of your memory, was within days after the incident, have you reviewed any video of the incident at any point since

Page 20

then?

A. No. Not -- of that incident?

Q. Correct. And thank you for that clarification.

No video related to the April 2017 fire in B cellhouse?

A. No.

Q. Fair to say you've reviewed lots of video of other incidents at the prison?

A. Absolutely.

Q. Okay. So we talked about reviewing incident reports written by the staff, and we talked about your review of the video.

Any other audio or video materials related to the fire that you've reviewed at any point since the fire by which you've learned information about what happened?

A. No.

Q. Any other written materials, other than those incident reports, that you reviewed that have given you any information about what happened during the fire that night?

A. Not that I can recall.

Q. Are you aware if there was an investigation that was conducted into the fire

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 8 of 82

Page 21

afterwards?

A. I would imagine that there was an investigation conducted.

Q. Okay. And why do you say that?

A. Normally, during incidents of that magnitude, there would be an investigation conducted.

Q. Okay. And when an investigation is conducted, is it your understanding that there's usually a report generated revealing the findings of that incident or -- strike that.

Is it your understanding that when there's an investigation conducted into an incident, that there's usually a report written revealing the findings of that investigation?

A. Yes.

Q. Have you reviewed any written report or any other materials related to an investigation that was conducted into the April 2017 fire in B cellhouse?

A. Not that I can recall.

Q. Okay. Is that part of your -- strike that.

During the time you served as major, was it part of your practice to review investigations -- reports of investigations that were conducted into

Page 22

incidents at the prison?

A. Yes. Some.

Q. What was the purpose of you reviewing reports of investigations that took place as major?

A. To gain knowledge of what happened or was discovered during the investigation.

Q. And was that purely to gain knowledge about what happened, or would there potentially be action items for you to take as major, based on what you learned during the course of reviewing the findings of an investigation?

A. There could be actions that needed to be taken care of during that course of investigating.

MR. BLINN: Are we talking about any specific investigation, or are we talking about in general? Because it's not clear to me.

BY MR. HEPPELL:

Q. Sure. And just so I'm clear then, you've testified that, to the best of your recollection, you have not reviewed the investigation specifically into the April 2017 fire; is that correct?

A. Correct.

Q. But, generally speaking, as major, it was your practice to, at times, review investigations, correct?

Page 23

A. Correct.

Q. And how would you determine which investigations you would review and which you would not?

A. That was determined by the warden.

Q. Okay. So -- during the time you served as major, whenever you reviewed an investigation, it was at the warden's direction, correct?

A. Correct.

Q. And it was not part of your job responsibilities to review investigations other than at the warden's direction?

A. Correct.

Q. Okay. So is it fair to say the reason you did not review the investigation into the Devine fire is because the warden didn't direct you to?

A. I guess that would be fair to say.

Q. Okay. You have not -- strike that.

Are you -- have you reviewed at any point video-recorded interviews with any correctional staff or any of the prisoners related to what happened during the April 2017 fire?

A. No.

Q. Have you reviewed any written reports or written statements of any prisoner firefighters or

Page 24

other prisoners related to what took place during the April 2017 fire?

A. No.

Q. Any other written materials or audio, video recordings that you've reviewed that describe or depicted what took place during the fire other than what you've already testified to?

A. Not that I can recall, no.

Q. Have you had any conversations with people who were present during the fire during which they relayed to you anything substantive about what happened during the fire?

A. During this fire or during any fire?

Q. During this fire, specifically referring to the April 2017 fire that killed Joshua Devine?

A. Yes. I've had conversations with staff.

Q. Who have you spoken with related to the April 2017 fire?

A. It would be the shift supervisor and the emergency responders.

Q. And so in this case, that would be -- Captain Dykstra was the shift supervisor; is that correct?

A. Correct.

Q. And then do you recall which of the

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 9 of 82

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

Page 25

emergency responders you've spoken with about the fire -- about this fire?

A. If I remember, there was Lieutenant Redden. There was a sergeant. I can't recall his name and another Lieutenant. I think Lieutenant Watson.

Q. And did you speak to each of those three individuals -- Redden, Watson, the two lieutenants, and then the sergeant as well -- about the fire?

A. Yes.

Q. And when did those conversations take place?

A. I'm going to say probably the night that the incident occurred.

Q. And what did you learn -- strike that.

What did those individuals tell you during those conversations?

A. I don't remember specifically what was said.

Q. Did -- did you take any notes during those conversations?

A. No.

Q. Okay. Did you create any reports or any other written recordings of the substance of those conversations or what you learned during those

Page 26

conversations?

A. No.

Q. What was your purpose in having those conversations?

A. To try to find out what actually happened or what actually occurred.

Q. Okay. And what -- and why were you trying to do that?

A. I guess to -- the incident had occurred, the cellhouse was evacuated, and there was a lot of things going on at the time. So I was trying to gain information on how to handle the situation at the time.

Q. As you sit here today, are you able to recall anything you learned during those conversations?

A. I mean, parts and pieces, I guess. Little -- little bits of it.

Q. And what are the parts and pieces that you are able to remember?

A. That there was a fire in the cellhouse. They evacuated the cellhouse. Staff members were assaulted. The offenders were taken out of the cellhouse and held in an area on the side of the cellhouse. The firefighters were there. That's

Page 27

probably about the gist of it, I think.

Q. Okay. Any specifics related to any of those points beyond what you just described?

A. The only specifics would be that the fire was in Devine's cell. I mean, that would be the specifics.

Q. Okay. No specifics around the timing of when the fire was first observed or the actions of the officers who were on duty in B cellhouse that night in responding that you can recall?

A. No.

Q. Did you convey the information you learned during those conversation with Dykstra, Redden, Watson, and the sergeants to anyone else?

A. The warden.

Q. That was Warden Neal?

A. Correct.

Q. Ron Neal?

A. Yes.

Q. When did you convey that information to Warden Neal?

A. I would say within a few minutes of the conversation.

Q. What was your purpose in speaking with Warden Neal?

Page 28

A. To keep him informed on what was going on.

Q. What do you recall about the substance of your conversation with Warden Neal?

A. The same as what I just said -- what I just testified to. That -- what had happened, they evacuated the cellhouse, the offenders were outside, the fire started in Devine's cell, and that was pretty much it at that time.

Q. Did you learn any information from Warden Neal about the fire, or were you just conveying information to him that you had learned?

A. I was just conveying information to him.

Q. Other than the conversations you just testified to, which I understand took place on the night of the fire, have you had any subsequent conversations with anyone who was present at the prison during the fire during what -- during what you discussed -- the substance of what happened during the fire?

A. There was a -- I guess, yes. There was a debriefing held after -- sometime after the fire.

Q. Okay. And when you say "a debriefing," can you explain what you mean by that?

A. Any time there's a critical incident at

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 10 of 82

Page 29

the facility, the facility holds a debriefing.

Q. Is that also known as an after action review?

A. Correct.

Q. And that's what you're referring to in this case is that there was an after action review?

A. Yes.

Q. Do you recall when that after action review took place?

A. No, I do not.

Q. In discovery in this case, I've seen a copy of a document titled "After Action Review" with various notes on it related to this fire, and the date on that document is April 24th, 2017. And the fire itself -- I can represent to you it took place on April 7th, 2017.

Does that sound approximately correct to you in terms of the timing of the debriefing that you can recall?

A. That's probably correct.

Q. What was your purpose in attending that debriefing?

A. I was part of the incident since I arrived at the facility after the fire had occurred, and so my part of it was to be at the facility as

Page 30

someone that was -- that had taken part in it to give my -- the information that I had, I guess, at the time.

Q. Have you -- was it part of your job as major to attend debriefings like that?

A. At the time -- only if I was involved.

Q. Okay. So -- and let me know if -- as I understand what you're describing, your role in attending the debriefing for the fire, and other debriefing you attended, was if you had been present for part of the incident and to be someone who could convey information to others about what had happened. Is that fair to say?

A. For this incident, yes.

Q. Okay. It was not part of your role or purpose in attending that you would learn information from others about what had taken place and take action items yourself based on learning that information. Is that fair to say?

A. Yes.

Q. Okay. And is that true for other debriefings as well?

A. No. Because there were others -- no.

Q. Can you explain what you mean by that?

A. Other debriefings that I may have been a

Page 31

part of would -- I might not have been part of the actual incident, but I was sitting in on the review board to review what had happened and to see if there were changes we could make or things we could do to make things better.

Q. I see. And can you explain the -- the structure behind the review board? How that works in connection with an after action review?

A. You would call in the people that were involved in the incident, get their sides of the story, review their reports, and just have a discussion with them.

Q. And so there were some incidents where you served on the review board and then you had a role in gathering information and evaluating whether changes needed to be made in those other incidents. Is that fair to say?

A. Yes.

Q. Who is -- during -- in an after action review, who determines -- who determined who would serve on the review board?

A. At that time, it was the deputy warden.

Q. Okay. And so the reason that you were not on the review board for the after action review for the Devine fire is that the deputy warden didn't

Page 32

select you to serve in that capacity. Is that fair to say?

A. That's fair to say.

Q. Do you recall who did serve on the review board for the after action review?

A. Well, it would --

Q. Specifically -- sorry. Just so my question is clear for the record, I meant specifically related to the Devine fire. So let me ask the question over again just to be clear.

Do you recall specifically who served on the review board for the after action review related to the Devine fire?

A. A Mr. Curry would be the only name that I could remember.

Q. And who's Mr. Curry?

A. He's the executive director of ERO.

Q. And what is ERO?

A. Emergency response operations.

Q. And is that a position at the Indiana State Prison, or is that a statewide position?

A. That's a statewide position.

Q. Other than Mr. Curry, do you recall -- do you recall any of the other specifics of who was on

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 11 of 82

Page 33

the review board for the after action review?

A. No, I do not.

Q. Okay. Do you recall what information -- what additional information about the fire that you learned through your participation in the after action review?

A. No.

Q. So beyond what you've already testified to, there aren't additional details that you can recall about the fire about what you -- about what transpired that night?

A. That's correct.

Q. Okay. Other than the conversations that you've already testified to on the night of the fire and other than your participation in the after action review, have you had any conversations with individuals who were present the night of the fire or that you discussed the substance of what happened that night other than those that you've already testified to?

A. I don't recall.

Q. Okay. So in terms of the sources of information that you have about what happened during the fire on April 7, 2017, those come from reviewing the incident reports written by the officers, from

Page 34

your personal review of the video, from your conversations with the officers the night of the fire, and from your participation in the after action review. Is that fair to say?

A. Yes.

Q. No other sources, either in person, reviewing written or reviewing other materials, through which you learned anything that happened that night. Is that fair to say?

A. Not that I can recall.

Q. Based on your understanding of what happened that night at the fire -- strike that.

Based on your understanding of what happened during the April 7, 2017, fire and -- from those sources, did you personally take any action to -- in response to that information in your capacity as major?

A. I'm not sure I really understand the question.

Q. Sure. Let me rephrase the question.

So based -- let me break it down a little bit.

Based on the information that you learned from those different sources that we've discussed about what happened during the

Page 35

April 7, 2017, fire, in your capacity as custody supervisor, did you make any changes to any written or unwritten policies or procedures at the prison based on the information?

A. No. No.

Q. Did you direct anyone else to make any changes to policies or procedures at the prison?

A. No.

Q. Did you make any suggestions to anyone else on changes to policies or procedures of the prison that could or should be made?

A. No.

Q. Did you make any changes related to equipment or infrastructure at the prison based on what you learned?

A. No.

Q. Did you direct anyone else to make any such changes?

A. No.

Q. And did you suggest to anyone else that any changes to equipment or infrastructure of the prison should be made?

A. No.

Q. Did you make any changes to training at the prison as a result of what you learned?

Page 36

A. No.

Q. Did you direct anyone else to make any changes to training at the prison?

A. No.

Q. Did you make any suggestions to anyone else about changes to training that could or should be made?

A. No.

Q. Based on your understanding of what happened the night of the fire, did any of the correctional staff on duty that night act in a way that was contrary to their training?

A. No.

Q. And based on your understanding of what happened on the night of the fire that killed Joshua Devine, from your review of the materials and information we've discussed, did any of the correctional staff at the prison that night act in a way that was contrary to any written policies and procedures at the prison?

A. No.

Q. And based upon your understanding of what happened that night, did any of the correctional staff act in a way that was contrary to any unwritten procedures or unwritten protocols of the prison?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 12 of 82

Page 37

A. No.

Q. Based on your understanding of what happened that night, every correctional staff member acted consistently with the policies and procedures of the prison?

A. Yes.

Q. Based on your understanding of what happened, is there anything that you believe any correctional officer who was on duty that night should have done differently?

A. No.

Q. I want to ask you some questions about the position of custody supervisor and how that fits into the chain of command at the prison. And so can you -- and just -- I know you testified to this -- but just to refresh my memory -- you testified you served as custody supervisor from approximately one year -- starting at approximately one year prior to the fire; is that correct?

A. Correct.

Q. So it would sometime in the early part of 2016?

A. Probably the middle of 2016.

Q. Okay. Sometime that summer. Is that to the best of your memory?

Page 38

A. Yes.

Q. 2016?

A. Yeah.

Q. And then you held that position through to November of 2019, correct?

A. Correct.

Q. During that time that you served as custody supervisor at the Indiana State Prison, did the chain of command change at all?

A. No.

Q. Throughout that time, you reported upwards to the same folks, and then folks below you reported upwards to you in the same positions, correct?

A. Yes.

Q. Okay. Who was your direct report -- direct supervisor during the time you were custody supervisor at the prison?

A. I can't -- it would have to either have been -- at that time, Deputy Warden Gann or Deputy Warden Payne. I don't remember which one, but it was one of the two.

Q. And just so I'm clear, those are different individuals that served in the same position?

Page 39

A. Correct.

Q. At different periods of time?

A. Correct.

Q. What was the title of the position to whom you reported?

A. Deputy warden of operations.

Q. Okay. Are there multiple deputy wardens at Indiana State Prison at the time?

A. Yes. There's two.

Q. Okay. And you report -- your direct report was the deputy warden of operations?

A. Yes.

Q. And if I understood your answer correctly, it was just -- you don't recall whether the deputy warden at the time of the fire was Gann or Payne, but it was one of them?

A. Yes. It was one of them. I just don't remember which one.

Q. And then above the deputy warden level, who was -- who was above you in the chain of command?

A. Above the deputy warden is the warden.

Q. Okay. And was the warden able to give you instructions or directions directly or did those all have to go through the deputy warden?

A. He could give instructions directly.

Page 40

Q. Okay. And if you had issues that you wanted to raise or concerns you had, were you able to raise those with the warden directly, or did those all go by the deputy warden?

A. I could go through the warden as well.

Q. Okay. What was your personal practice as custody supervisor in terms of you whether you would -- when and whether you would raise issues with the warden directly versus going to the deputy warden?

A. Most of the time it was through the deputy warden.

Q. In terms of going down the chain of command, who was directly below you as -- who were you the direct supervisor of?

A. The captains at the facility.

Q. And at the time of the Devine fire, who were the captains at the facility, if you recall?

A. Captain Dykstra, for sure. The other ones -- I don't know if I could recall all of them at that time.

Q. Do you recall how many captains you were responsible for supervising?

A. It would have been six.

Q. And what was the -- well, strike that.

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 13 of 82

Page 41

What were your job duties as custody supervisor at Indiana State Prison?

A. To supervise the custody staff at the facility.

Q. Any other job duties, or is that sort of a one-line description of --

A. The security of the facility would be another responsibility.

Q. Okay. Anything else other than supervising the custody staff and your responsibility for the security of the facility?

A. Not that I can recall.

Q. Okay. And can you explain what you mean by security of the facility?

A. So security -- as far as the physical security, the walls, the gates, movement of offenders, securing -- the security of the housing units as far as offenders being secured in their cells. Things of that nature.

Q. As I understand what you've just described, part of that entails, you know, ensuring that prisoners stay where they're supposed to be and don't -- aren't able to leave the areas of prison where they're supposed to be or aren't able to escape the prison. Is that part of security of the

Page 42

facility? Fair to say?

A. Yes.

Q. Okay. And I would assume, correct me if I'm wrong, that part of your job duties and responsibilities for security of the facility would be ensuring that, you know, contraband wasn't making its way into the facility and the contraband that was at the facility was being discovered. Is that fair to say?

A. Yes.

Q. As part of your responsibilities for security of the prison, did that also include safety issues, or was that not one of your responsibilities?

A. It would be -- well, I would say yes.

Q. Okay. And what were your job responsibility related to safety in the prison?

A. Like you said with contraband, to make sure offenders didn't have weapons or items that they weren't allowed to possess.

Q. Okay. And so one thing that could impact, you know, both staff safety and the safety of other prisoners at the facility would be weapons?

A. Yes.

Q. And what about -- what about something like fires? That's something that can impact the

Page 43

safety of both staff and prisoners at the prison. Fair to say?

A. Yes.

Q. Was that aspect of safety part of your job duties as custody supervisor?

A. The answer would probably be yes and no. Yes as it pertains to the property and the stuff that the offenders have, and no as there is a fire safety or hazmat manager at the facility.

Q. Okay. So can you explain what you mean by that and explain sort of the distinction you're drawing between the aspects of fire safety that you were responsible for versus the aspects that someone else was responsible for?

A. The fire safety hazmat manager is responsible to make sure that the equipment is maintained and fire detection systems are working and maintained and certified or whatnot.

My portion of it would be just to make sure that the offenders are in compliance with policies so that they don't have a lot of stuff built up in their cells -- a lot of trash, garbage, and things like that.

Q. What about making sure that staff are in compliance with policies or are familiar with

Page 44

policies and following policies correctly when it relates to fire safety or fire response at the prison? Was that one of your responsibilities?

A. No. That would be covered in training.

Q. Okay. So that would be a -- when you say "that would be covered in training," whose responsibility was that to ensure that staff were correctly trained related to fire response at the prison?

A. The training coordinator at the time.

Q. Okay. And do you recall if that individual at the time was Mr. Beal?

A. I believe -- yeah. I believe Mr. Beal was the training coordinator.

Q. Okay. And what's -- what's your understanding of the nature of his responsibilities when it comes to ensuring proper training for staff in relation to fire safety at the prison?

A. That he is to make sure that staff are aware of what to do during a fire.

Q. Was it your expectation as the custody supervisor -- well, strike that.

There was a certain mandatory period of training that every new correctional officer had to go through before they could work by themselves at

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020
USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 14 of 82

Page 45

Indiana State Prison; is that fair?

A. Yes.

Q. And after an officer went through that chunk of initial mandatory training, they could be -- they were authorized to, you know, staff at a cellhouse without someone directly, you know, looking over their shoulder and making sure they were doing it correctly. Fair to say?

A. Yes.

Q. And as custody supervisor, was it your expectation that an officer coming out of that new officer training program would have all of the training and information they needed to -- you know, from day one to be able to respond appropriately and according to policy to emergency situations such as fires?

A. Yes.

Q. And your understanding was that it was the training coordinator, Mr. Beal, who had the responsibility for making sure that the training program was adequate so that folks coming out of that program could, you know, go to a cellhouse and, you know, from day one were -- were able to respond appropriately to emergency situations?

A. Yes.

Page 46

Q. You had testified that one of your responsibilities was supervising the custody staff; is that correct?

A. Yes.

Q. And I understood from your description of the change of command, that you were sort of the direct report or direct supervisor for the captains; is that correct?

A. Correct.

Q. Fair to say that your role -- your responsibility for supervising the custody staff extended beyond just the captains, correct?

A. Yes.

Q. You sort of had an overall responsibility for supervising all of the custody staff at the prison, correct?

A. Yes.

Q. From captain all of the way down to line level and correctional officers in cellhouses, correct?

A. Yes.

Q. And even if they weren't your direct report, ultimately, you had that supervisory responsibility to make sure that the actions of correctional staff at the prison were following

Page 47

policies and acting appropriately, correct?

A. Yes.

Q. Now, obviously, you, as being one person and not, I assume, working at the prison 24/7, you couldn't be eyes and ears on every single member of the prison staff at every point in time, correct?

A. Correct.

Q. So what were the methods that you used as the custody supervisor to supervise the custody staff at the prison recognizing that you personally couldn't have eyes and ears on everyone 24/7?

A. So I relied on the captains, lieutenants, and sergeants -- my lower level supervisors -- to handle the supervision of those staff.

Q. Okay.

A. Plus, I also made rounds on different shifts at different times. I adjusted my schedule accordingly to be here, but you're right, I wasn't here 24 hours a day, 7 days a week.

Q. Okay. So just so I understand, you did have some aspect of, you know, personal "your eyes on the situation" supervision through rounds that you would do at the prison, correct?

A. Correct.

Q. And that would be one way that you could

Page 48

learn information about how custody staff were behaving or going about their jobs and that would inform --

A. Correct.

Q. And that could be one way that you would learn about problems or deficiencies in the -- in how things were operating at the prison that would inform changes that you needed to make. Is that fair to say?

A. Yes.

Q. And then you had also described learning information from lower level supervisors, and I think you described them as your sergeants, lieutenants, and captains. Is that fair to say?

A. Yes.

Q. And was it your expectation that at any time any one of those individuals -- well, strike that.

How would the lower level supervisors convey information to you that would then allow you to do your job?

A. They would communicate up the chain of command until it got to me.

Q. And when you say "they would communicate up the chain of command," sir, how did that work in

USDC_INND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 15 of 82

Page 49

practice?

A. It could either have been verbal or via e-mails or something like that.

Q. And what was your expectation of what -- of what the lower level supervisors -- what they would communicate up the chain of command to you? What types of information would they communicate up to you?

A. Violations in policies, incidents that may have occurred, things that they found during their rounds that might have been security breaches or security violations or security concerns. Things that nature.

Q. During your time serving as custody supervisor, how would you describe the nature of your relationship with the lower level supervisors?

A. Good.

Q. And, I guess, just to clarify, sir, by "lower level supervisors" -- well, strike that.

What I'm trying to get at is that everybody -- you know, everybody from sergeants, lieutenants, and all the way up to captains -- the folks who were your eyes and ears on the ground -- I guess as -- "lower level supervisors" might be confusing.

Page 50

Is there a good phrase for us to use that we're going to be on the same page? I'm referring to folks with supervisory responsibility that were then reporting up to you. Just supervisors generally?

A. Yeah, that'd be fine.

Q. Okay. I guess what was -- you know, during your time as custody supervisor, how would you describe your relationship with the supervisors who were -- worked on your unit?

A. I would say it was good.

Q. And it was your expectation that they would be diligent in reporting issues up to you -- any problems or concerns that they had or observed. Is that fair to say?

A. Yes.

Q. And was that also not just an expectation that you had, but was that a policy requirement as part of their job at the prison that they would report issues up to you?

A. I'm not sure it was a policy, but it was conveyed to them. They knew.

Q. Okay. And when you say you're not sure that it was a policy, just so I'm clear, are you just saying you're not sure it was, like, a written

Page 51

policy, or you're not sure one way or the other whether it was required that they do that?

A. I'm not sure it's a written policy.

Q. Okay. But whether written or unwritten, it is your understanding that that was a requirement that they had to do that, right?

A. Yes.

Q. It wasn't just, you know, above and beyond -- they were required to convey information up the chain of command, and if they didn't -- if they became aware of problems and weren't conveying those up, that would be a problem, correct?

A. Correct.

Q. That would be a violation of the prison's protocols for them not to do that. Is that fair to say?

A. Yes.

Q. At any point during your time as custody supervisor, did you come -- become aware of any problems with how that information conveying up from the supervisors was happening? Like, did you come to learn of issues where there were things happening in the prison that weren't properly getting conveyed up to you through the supervisors?

A. Not that I'm aware of, no.

Page 52

Q. Okay. And based on the nature of your relationship with the supervisors and your sort of professional assessment of their abilities, you don't have any reason to think that there were issues going on at the prison that weren't being conveyed up to you. Is that fair to say?

A. Yes.

Q. And, in fact, if you had -- if you had had concerns about whether one of the supervisors working underneath you at the prison was -- was appropriately conveying issues up to you, that's something that would have been your responsibility to address. Is that fair to say?

A. Yes.

Q. So, for example, if you had any reason to think that one of the sergeants wasn't doing a good job of keeping you informed of things that the sergeant was observing during his or her work, it would be your responsibility to make sure that the sergeant got in line and had those communications with the chain of command working above them, correct?

A. Correct.

Q. Okay. Would it be fair to say that, based on your understanding of those policy

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 16 of 82

Page 53

requirements, that your -- that your -- you know, your working relationship with those supervisors -- you didn't have any reason to think that during your time as custody supervisor that there were issues happening in the prison that you were not aware of. Is that fair to say?

A. Yes.

Q. So in terms of how you did your job as custody supervisor related to the supervision of custody staff -- excuse me -- you talked about the rounds that you would do -- sort of your personal eyes and ears to see things that would happen at the prison, and we've talked about you receiving information from supervisors.

Were there other ways in which you would either learn or which you sought out information about the custody staff at the prison and -- to achieve your job responsibility as supervisor of the custody staff?

A. I mean, not just the supervisors, but the officers could also communicate things that they've seen.

Q. So it would be -- it would not be a violation of prison procedures, written or unwritten, for a line level officer to come directly to you and

Page 54

convey something that they saw or heard or they otherwise thought needed to be communicated?

A. No.

Q. Okay. Was it a requirement that they come to you, or was the requirement just that they would report that information?

A. It's a requirement, I guess, that they report it, but it wasn't a requirement that they necessarily had to come to me.

Q. Okay. So if a line level officer during the course of their duties sees something that isn't going smoothly or a violation of policy, is it fair to say that it's a requirement that they -- that that officer do something with that information, correct?

A. Yes.

Q. And what are -- what are the options an officer has in that kind of situation?

A. They could report it to their immediate supervisor, they could report it to their shift supervisor, or they could come to me and report it.

Q. And either way, under any of those scenarios, it's your expectation that, one way or the other, that information is coming up to you, right? Either directly to you or a little -- you know, coming up through the chain of command to you?

Page 55

A. Yes.

Q. Did you -- other than your personal, you know, rounds when you would be physically present at different parts of the facility directly observing things, was there anything proactive that you would do to supervise the custody staff at the prison?

A. I mean, at the time, I required the shift supervisors and their assistants to also conduct rounds on their shifts.

Q. So that was part of the information gathering that then they would convey what they learned up to you. Is that fair to say?

A. Yes.

Q. And what about reviewing written materials or written reports? Is that something that you would do proactively as the custody supervisor?

A. Yes.

Q. Okay. And can you explain how you would proactively review those types of materials and how that fit in with your job responsibilities to supervise custody staff at the prison?

A. Just an example would be a use of force document that would come through my office, and I would make sure that that document was correctly filled out and all of the boxes were filled in before

Page 56

it got submitted.

Q. Okay. And the type of review that you just described -- correct me if I'm wrong, that sounded like you were reviewing it for -- the reporting was done correctly?

A. Right.

Q. That they filled out the forms and had the necessary categories of information and that kind of stuff, correct?

A. Yes.

Q. Would you also review those types of documents for information about the underlying event that was being reported on and to see if things were being done correctly in that regard?

A. Yes.

Q. Okay. How would you go about doing that?

A. Same example. Use of force document to see how they handled the situation and made sure they followed use of force properly.

Q. And the example you gave for use of force, would those -- is there a separate category recording a use of force incident, or is that just reported on an incident report?

A. There is a separate form for that.

Q. Okay. As custody supervisor, did you

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 17 of 82

Page 57

review every use of force incident or -- strike that.

As custody supervisor, did you review every use of force report, or was it more of a spot check that you would go in and review some and look at some?

A. It was almost all -- I would say all use of force incidents came through my office.

Q. Okay. And that's because the -- sort of paper flow for those reports is that every -- every use of force report that's generated is going to land on your desk at some point in the paper process, correct?

A. Yes.

Q. What about nonuse of force incidents? And I guess, you know, there's -- it's not just use of force that would result in an officer writing a report.

If there's a nonuse of force incident, that could also be written up by an officer, correct?

A. Correct.

Q. And, in fact, it's a requirement that officers create a report when there's an incident at the prison; is that correct?

A. Yes.

Page 58

MR. BLINN: I'm just going to object to form. I think the question was a little vague, but go ahead.

MR. HEPPELL: Okay.

BY MR. HEPPELL:

Q. And maybe I can provide a little more clarity.

One -- one type of incident that could occur at the prison that would require an incident report is a fire. Is that fair to say?

A. Yes.

Q. And that would be -- obviously, the fire on April 7th, 2017, was a major event and resulted in a loss of life. It was a serious fire. Is that fair to say?

A. Yes.

Q. And that would obviously result in incident reports being created related to that incident. Is that fair to say?

A. Yes.

Q. There could also be fires that were less serious. Those would also result in incident reports; is that correct?

A. Yes.

Q. Is it your understanding that the

Page 59

prison's policies and procedures, whether written or unwritten, required any fire to be documented on an incident report?

A. Yes.

Q. Okay. As custody supervisor, how -- how did incident reports for fires fit into your job responsibilities as supervisor of the custody staff?

A. All those reports would funnel through my office.

Q. Okay. Same for use -- same as for use of force reports? Your understanding is that every single one of those would land on your desk?

A. Correct.

Q. Was it your practice as custody supervisor to review every one of those reports?

A. Yes.

Q. And what was your purpose in reviewing those types of incident reports?

A. To make sure that procedures and policies were being followed.

Q. And, again, that wasn't just a review to make sure that the form was filled out correctly, but it was a review to make sure that the underlying incident had been handled correctly. Is that fair to say?

Page 60

A. Yes.

Q. And other than reviewing what was on the written reports, was there anything else that you did to keep yourself informed of how custody staff were responding to fires?

A. No, not that I'm aware of.

Q. Did you -- did you personally -- during your personal rounds when you were -- had eyes and ears on different parts of the prison at different times, did you have occasion to personally observe the emergency response to a fire situation?

A. Yes.

Q. Okay. Approximately how many times would you say you personally observed the fire response?

A. I probably couldn't give you an exact number, but a few times, yes.

Q. So you -- you were relying on your -- you were relying primarily on reviewing those written incident reports of fires to fulfill your duty of ensuring that custody staff were acting appropriately in response to fires?

A. Yes.

Q. Would it be fair to say that you reviewed those fire incident reports carefully?

A. Yes.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 18 of 82

Page 61

Q. Okay. Would you agree with me that in a prison setting, fires can be dangerous? They can pose a danger to prisoner health and well-being, as well as staff health and well-being?

A. Yes.

Q. So that's something that's important to take seriously?

A. Absolutely.

Q. And fair to say that it's important to look seriously at whether the response was appropriate to a minor fire even -- well, strike that.

Would you agree with me that it's important to review the appropriateness of staff responses to minor fires just as it is important to review their responses to major or more serious fires?

MR. BLINN: Object to form. I don't think minor and major are really very well defined here.

Go ahead and answer.

BY THE WITNESS:

A. Yes.

BY MR. HEPPELL:

Q. Okay. And, again, without getting into, you know, specific classification, but you would

Page 62

agree with me that there were fires at the prison that were -- that you would describe as minor or less serious. Is that fair to say?

A. I mean, all fires are serious, but some -- yes, smaller than others.

Q. Okay. And I guess my question is would you agree with me that one of the reasons it's important to review staff response, even to a less serious fire, is that that could reveal issues or problems with how fire safety or safety response was happening, but then it could be solved before they revealed themselves in a major fire. Is that fair to say?

A. Yes.

Q. And that was one of your goals in reviewing those incident reports. Is that fair to say?

A. Yes.

Q. And so you would review those incident reports -- well, strike that.

When reviewing an incident report, was it important for you as a custody supervisor to look at not just the information that was contained in the document, but information that might be missing that you would expect to see there. Is that

Page 63

fair to say?

A. Yes.

Q. If information is missing from an incident report, then a supervisor relying on the written report to supervise, you can't -- you can't evaluate how -- whether the response was appropriate if certain categories of information are missing from an incident report. Is that fair to say?

A. Yes.

Q. And as a supervisor, was one of your responsibilities ensuring that you had the adequate information on the face of those reports to evaluate the staff response to the incident?

A. Yes.

Q. And if there was information you would have liked to have seen that was missing from an incident report, did you have the ability to -- to ask for additional information or to ask for that information to be added to the report?

A. Yes.

Q. Okay. Did you also have the ability to, you know, go directly to the people involved in that incident and to -- you know, first-hand information gathering to talk with them about what happened -- to gather information directly?

Page 64

A. I could, yes.

Q. Is that something that you ever did in relation to fire response or fire safety at the prison?

A. Not that I can recall.

Q. Okay. How would you -- strike that.

How many fires -- strike that. Let me ask it a different way.

How frequent were fires at Indiana State Prison during the period of time that you served as custody supervisor?

A. I wouldn't say they were frequent. I couldn't give an answer. I mean, it wasn't an everyday occurrence.

Q. But you would receive a copy of an incident any time there was a fire at the prison is your understanding, correct?

A. Yes.

Q. Based on your recollection as to how often you would receive incident reports related to fires, what's your best approximation of how frequent fires were?

A. I don't even know if I could give a -- maybe one or two a month.

Q. In terms of supervising custody staff at

Page 65

the prison, one of your responsibilities was ensuring that custody staff were following the written policies and procedures of the prison. Is that fair to say?

A. Yes.

Q. Did you also have the responsibility for ensuring that custody staff were following unwritten protocols or things that might not be laid out exactly in a written policy, but they were, nonetheless, you know, requirements of how they go about doing their job?

A. Yes.

Q. Okay. Was it also your responsibility as custody supervisor for identifying areas where there were issues or problems with lack of clarity in the policy or where -- where the way the policy was -- was constructed was causing problems, such that it was a -- a policy change needed to happen?

A. Could you repeat that again?

Q. Sure. And I guess -- maybe I'll zoom out a little bit.

There might be an issue at the prison where something goes wrong or something unsafe happens because an officer violated a policy, correct?

Page 66

A. Okay. Yes.

Q. And that could happen with an intentional violation of a policy. Is that fair to say?

A. Yes.

Q. So just to give an example, you know, an officer could bring -- you know, deliberately bring contraband into the prison. That would be an intentional violation of a policy that would hold a risk to prison safety. Is that fair to say?

A. Yes.

Q. Or if an officer, to give an example, who didn't -- didn't want to do fire drills and, you know, deliberately violated the prison policy about fire drills. That would be a deliberate violation of a policy that -- that would pose an impact on prison safety. Fair to say?

A. Yes.

Q. And those -- you know, those type of deliberate policy violations would be, you know, something that as the custody supervisor you would have responsibilities for supervising and ensuring, you know, they didn't happen, and if they did happen, ensuring that was remedied. Fair to say?

A. Yes.

Q. And you could also have unintentional

Page 67

policy violations -- fair to say -- where a correctional officer does something in a way that is contrary to policy and that's -- because they don't know -- they didn't know to follow the policy correctly. That could also happen, correct?

A. Yes.

Q. And fair to say in those situations -- that could be sort of an individual performance failure on the officer's part. Is that fair to say?

A. Yes.

Q. Would you agree with me that that could also reveal a problem with training if officers aren't following the policies correctly?

A. I would say if it was more than one, yes. If it was just one individual, probably not.

Q. Right. And that would be part of your job as custody supervisor to look for patterns like that in issues that arise, and if you see a pattern that arises repeatedly with different officers, that would be the sort of thing that would reveal some sort of systemic issue and not just an individual performance problem. Is that fair to say?

A. Yes.

Q. As custody supervisor, what responsibilities did you have for monitoring for

Page 68

those type of systemic problems leading to systemic policy violations in terms of work performance issues like that?

A. I mean, obviously, if I would have seen multiple incident reports where someone was violating a certain policy over and over again -- multiple people -- that would bring my attention to maybe we need to look at how the staff were trained or what the reason was for that violation.

Q. And how -- what steps would you take as custody supervisor to remedy those type of systemic problems?

A. I guess it would depend on what -- what the problem was. If it was a training issue, obviously, I would confirm with Mr. Beal in the training department to make sure he was presenting the information properly, review the procedures for training to make sure it was done, and everything was being covered.

Q. During the period of time that you were custody supervisor, is that what you would do? If there were issues encountered where officers were doing -- different officers seemed to be doing the same thing wrong, you would bring that to Mr. Beal's attention; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 20 of 82

Page 69

A. If it was a training issue, then, yes.

Q. When you say "if it was a training issue," can you explain what you mean by that?

A. Maybe it wasn't a training -- didn't have anything to do with training. Maybe it was a communication issue of relaying information on one shift to another. It could have been something like that. Not always would I went to Beal. I could have went to my captains to address issues as well.

Q. Fair to say that it was your -- you had the responsibility of ensuring that some step was taken to resolve issues that arose like that?

A. Yes.

Q. And was -- fair to say it was responsibility as custody supervisor to do the information gathering that would give -- give you a basis to determine is this a training issue, is this a communication issue, so you could figure out what the appropriate way of addressing that is. Fair to say?

A. Yes.

Q. And then there could also be situations where there were problems that arose in how officers were responding to situations or doing their jobs because the policies were -- were not clear or didn't

Page 70

give them direction on what to do in that particular situation. Is that fair to say?

A. Yes.

Q. Okay. And in a situation like that, as custody supervisor, what were your responsibilities if you learned about situations like that?

A. To make sure that staff did understand what the policy was and what their expectation was.

Q. Okay. So would it be fair to say that you could -- well, strike that.

We've talked earlier in the deposition about written policies, but also that there might be unwritten policies or unwritten protocols that staff were required to follow. Is that fair to say?

A. I mean, I'm not -- I guess I'm not really sure what unwritten is. Most things are written for staff to -- any changes or any, I guess, direction needed -- that would be written.

Q. Okay. And what are the ways in which written direction could be given to custody staff in the prison?

A. E-mails, handouts. It could be post orders.

Q. Okay. So post orders are one example of

Page 71

a written policy. Is that fair to say?

A. Yes.

Q. And who -- who's responsible for the contents of post orders?

A. Custody supervisor.

Q. Okay. So it was your supervisor for the post orders?

A. Yes.

Q. And how would you -- well, strike that.

When you first became custody supervisor, I would assume, but correct me if I'm wrong, that you didn't have to create a whole bunch of post orders from scratch?

A. That's correct.

Q. Okay. So you sort of inherited an existing set of post orders when you obtained the position of custody supervisor?

A. Yes.

Q. What were your practices as custody supervisor to -- on an ongoing basis ensure that the post orders were adequate to convey to officers how they should be going about doing their jobs?

A. To review them yearly.

Q. And was that a personal practice that you adopted, or was that a requirement of your job that

Page 72

you conduct yearly review of the post orders?

A. Requirement.

Q. Was that set by the warden or by someone above you in the chain of command as a requirement of you?

A. Yes.

Q. And did you follow that requirement?

A. Yes.

Q. And can you describe what that yearly review entailed?

A. Read the post orders, make sure that everything in there is up-to-date, adequate, and nothing has changed or needs to be changed or omitted from those post orders.

Q. And fair to say that it's not possible to include in the post orders direction on literally everything a correctional officer is required to do or directions for every situation that they might encounter?

A. That's fair to say.

Q. And so as custody supervisor, would it be fair to say that one of your responsibilities was in making sure that those post orders were properly tailored to focus on the types of incidents that a correctional officer would face frequently or

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 21 of 82

Page 73

regularly?

A. I don't necessarily think it was tailored to incidents, but just the overall daily operation of that area where they worked.

Q. Okay. Was it a -- well, strike that.

So the post orders -- if I understand your last answer, but correct me if I'm wrong, the primary focus that you had in creating and reviewing and revising those post orders was to set out the different pieces of information that an officer would need and the different requirements that an officer was required to follow in doing the routine aspects of their job on a daily basis. Is that fair to say?

A. That's fair to say.

Q. Was there also an aspect of the post orders content in the post orders that gave the officers direction on what policies they were required to follow to respond to unusual situations or emergencies?

A. Yes.

Q. Okay. And how would you, as custody supervisor, determine what kind of information to put in the post orders to direct the officers on the types of emergencies they might face and the steps

Page 74

they should take in response to emergencies?

A. It would be written in the post orders. I mean, just an example, if you observed -- I don't know -- let's say, a fight, for example, or some kind of medical emergency or something on your unit, you would call a signal on the radio. You could call this number to inform somebody that you had an emergency and that -- then responders would come. So --

Q. And that would be the -- that would be just one example that you gave.

How would you as the person responsible for writing or editing the post orders decide what type of information to put in about emergency response and the specific instructions that should be given to officers?

A. I guess I would have to say it's a general guideline, so it's not spelled out in the post orders as to every step to take. It's just general, like, this is what you do in medical emergencies, this is what you do if there's a -- another type of incident, but nothing, like, in detail.

Q. Okay. So how -- how would an officer have the detailed information on how to respond to an

Page 75

emergency if it was not set out in the post order?

A. Through training. And I guess it would depend on what emergency and what type of person is responding.

Q. And can you explain what you mean by that?

A. So a first responder would get more training in responding to incidences than a regular line officer.

Q. Fair to say that the -- that the staff in a cellhouse -- line level officers in a cellhouse would have some responsibilities for emergency response. Is that fair to say?

A. Yes.

Q. For an officer -- line level officer in a cellhouse, what post orders are they responsible for being familiar with?

A. Multiple post orders. Any post that they work, they're required to sign them every 30 days.

Q. Okay. And maybe we omitted some background on post orders.

Can you explain what post orders are?

A. Post orders are general guidelines on the daily operation of a post of a certain area.

Page 76

Q. And so can you explain what you mean by a post?

A. An assignment. A post is an assignment for an officer.

Q. And so fair to say that every -- every person working at a prison on a particular day has a post and they would have post orders associated with that position?

A. Yes.

Q. And it was those post orders that they were responsible for being familiar with. Is that fair to say?

A. Yes.

Q. And so to give an example, an officer working as a custody officer assigned to B cellhouse, there would be a set of post orders specific to B cellhouse that that officer was responsible for being familiar with; is that fair?

A. Correct.

Q. And I think you testified earlier that they had an ongoing responsibility to review those post orders at least once every 30 days; is that correct?

A. Yes.

Q. And then there would be records

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 22 of 82

Page 77

reflecting those periodic reviews?

A. Yes.

Q. And when an officer was newly assigned to a cellhouse, did they have a responsibility to familiarize themselves with the post orders?

A. Yes.

Q. And then once every 30 days thereafter while they still had that same assignment?

A. That's correct.

Q. And you -- would it be fair to say that the -- there were different sets of post orders for each cellhouse?

A. Yes.

Q. Fair to say that the large parts of those post orders would be the same across the different cellhouses, and then there would be certain aspects that were tailored based on the specific setup or function of those cellhouses?

A. Yes.

Q. Other than the post orders for a -- for the specific posts that an officer was working at, were there other -- any other written policy documents that officers were required to be familiar with on a day-to-day basis?

A. No.

Page 78

Q. Okay. And so in terms of written policies for a custody officer to follow while working a cellhouse, if it's not in the post orders, they're not given any written direction that they are reviewing on a day-to-day basis for how to go about doing their job; is that correct?

A. Like I said, the post orders are their guidelines. So they don't include everything, but if there was something in there that they needed more information about, they could get that done.

Q. Okay. And can you explain what that -- how that would go or what that would entail?

A. They could talk to their supervisor to get more information. They could review policies online. They could contact the training department and get information from them or clarification about things they had. They could contact myself. So --

Q. Did you have to -- when you were creating the post orders, did you have to get sign off from anybody further above you in the chain of command before you could make changes to post orders?

A. Yes. They would have be approved by the warden.

Q. Okay. But the warden gave discretion to you in terms of being the person to generate those

Page 79

proposals and ideas for changes that would be sent up to him for his signature. Is that fair to say?

A. Yes.

Q. And is it your understanding that the warden was relying on you to make changes as necessary to ensure that those post orders were adequate to -- to provide all of the correctional officers the information they needed to fulfill their job duties?

A. Yes.

Q. What were your sources and -- well, strike that.

Outside of the annual review process, could you make changes to a post order if you, you know, learned information that there was something that, you know, should be added to a post order or changed to a post order?

A. No.

Q. You didn't have to wait for the yearly review to come around?

A. No.

Q. Is that something you could do at any time if you thought it necessary to add instruction or add directions to officers at a particular post?

Page 80

A. Yes.

Q. What steps did you take as custody supervisor to gather information about whether existing post orders were sufficient or whether there should be changes made to the post orders?

A. I guess, like I said earlier, I would read them and see if everything was still up-to-date or any policy changes or any changes to the unit -- and when I say "changes to the unit," I mean something dramatically changed in that unit -- being a general population to a restricted housing unit or the purpose of the unit was something different other than what it was.

Q. If there was something -- a type of situation that an officer would face frequently, is it fair to say that that would be something important to give that officer clearer instructions on how to handle that type of situation?

A. Yes.

Q. Okay. One of your responsibilities of custody supervisor would be, you know, keeping apprised of situations that might arise frequently, so you can ensure that the post orders for line level correctional officers were giving them the direction they needed to -- to respond to those types of

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 23 of 82

Page 81

situations. Fair to say?

A. Yes.

Q. And was it part of your practice to consult with others in evaluating whether the information in a post order was sufficient or adequate?

A. Yes.

Q. Who would you consult with?

A. The captains or the lieutenants that were in charge of the units.

Q. Is that something that you would do in connection with the annual review process on sort of an ongoing ad hoc basis or both?

A. I would say both.

Q. Okay. And how -- how would those consultations take place?

A. They could either be verbal or submitted in writing or sent through e-mail.

Q. And specifically with regard to the post orders for cellhouses related to fire emergency response, did you, during your time as custody supervisor, consult with anyone else related to those post orders -- items within post orders?

A. No.

Q. Okay. Why not?

Page 82

A. There was nothing to be changed with them. Everything was within, I guess, policy.

Q. Okay. And how -- when you say "everything was within policy," can you explain what you mean by that?

A. So as far as the post orders go with the fire, it gives the officers information on who to call if there is a fire, what to do right off the bat if there's a fire, which firefighters to let out of their cells with the evacuation plans, and things like that.

Q. Okay. And it's your testimony that that information would be contained within the post orders specific for the cellhouse?

A. Yes.

Q. Okay. Is there something called a general post order?

A. Yes.

Q. What's a general post order?

A. A general post order is just general orders for custody staff in the facility. So things like medical emergency would be kind of in a general post order because a medical emergency could happen anywhere.

Q. Okay. How are custody staff kept

Page 83

informed of what information is in a general post order?

A. Those post orders are put in with the specific post orders for the units.

Q. Okay. So if I'm -- if I want to know the universe of written policy information that a member of the custody staff in a particular cellhouse is -- has at their disposal and is responsible for reviewing and familiarizing themselves with, that looks like a copy of the general post orders and a copy of the cellhouse-specific post orders. Is that fair to say?

A. Yes.

Q. Any other written information that gives line level correctional officers in a cellhouse direction?

A. Yes. There could be memos or amendments to the post orders put in that same binder.

Q. Okay. Did you say memos or amendments?

A. Yes.

Q. Well, let's go through each of those in turn.

What kind of memo would be included in there?

A. I guess a memo on the operation of the

Page 84

unit -- let's say, I guess, something changed with the way they go to chow. Instead of running the whole cell to chow, we would run half and then the other half. They could put a memo in there just informing staff that we no longer run them altogether and they go half and half.

Q. Okay. Who had responsibility for issuing those kinds of memos?

A. Those could be the unit lieutenant, captain could put those memos out.

Q. Could you, as custody supervisor, put a memo out?

A. Yes.

Q. Okay. How -- is that something you did do, in fact, during your period of time as custody supervisor?

A. Yes.

Q. How did you determine whether something would go in a memo versus something that needed to go in the post orders themselves?

A. I guess that depended on the information that was being put out and how important that information was. I'm trying to think of an example. It could just be a memo from me reminding staff that offenders are not allowed to have curtains up hanging

Page 85

in their cellblock in the view of the cell. Make sure we're having inmates or offenders take their curtains down or rise them up. That could be just a simple memo.

Q. Okay. And that example that you just gave, is that something that's also contained when the post order?

A. I'm not sure if it's in there or not.

Q. Okay. If it's not in the post order, how would custody staff know in the first instance that that's something that's not permitted?

A. That would be in the disciplinary policy. So there's a process where offenders are written up. There's actually policies for assaulting staff, you know, giving and receiving. They would have that information.

Q. So you gave an example of something that might be in a memo.

Was there any sort of guidelines that you followed, written or unwritten, or principles that you applied to determine whether you would put something in a memo versus whether you update the post orders themselves?

A. If it was something that needed to be in the post orders because it was a dramatic, big

Page 86

change, then that would be added as an amendment to the post orders until it could be signed off by the warden and actually be put in the post order.

Q. Okay. And just to help me understand that a little bit -- earlier you talked about memos and amendments. I think there's things -- are you referring now to an amendment as a different category of things?

A. Correct.

Q. And so is an amendment -- is that something that's going to be incorporated into the post orders when the warden signs off, but in the meantime, you're conveying that to people that they should start doing it right away?

A. Yes. If it's something -- a change that needs to be made right away that the warden will eventually sign off on in the future.

Q. Okay. Okay. Based on your experience working with the warden on updating the post orders, what was sort of the lag time in getting his follow-up on actual formal updates to the post orders?

A. I really couldn't give an exact time. If I guessed, a couple of weeks.

Q. Okay. And in the meantime until the post

Page 87

orders themselves were updated, there'd be sort of a written document that would be what the amendment was?

A. Correct.

Q. Okay. If direction to -- how correctional officers in the cellhouse were to handle emergency situations, is that the type of thing that would ever be in a memo, or is that something that would always be in the post orders themselves?

A. That's something that's in the post orders itself.

Q. Okay. So that's not something that would be appropriate to give guidance -- additional guidance through a memo? That would have to be in the post orders themselves?

A. Yes. But, obviously, there could be a memo put in there to give additional information on something like that.

Q. Okay. What's your understanding of where memos are stored or archived in terms of, like -- well, strike that.

If I wanted to find out what, if any, memos had been made available to officers in a particular cellhouse at a particular, you know, point in time, how would I go about learning that

Page 88

information?

A. If they weren't put in the post orders, I don't think you would -- the memo would be posted somewhere in the cellhouse if it was pertinent to that time, but -- like, to find one that was archived -- I don't know that you could.

Q. When you -- when you wrote a memo in your position of custody supervisor, is that something that you would save somewhere, like, electronically in addition to causing it to be posted in the pertinent area?

A. Yeah. Normally, yes, I would save it.

Q. Okay. And would you save that, like, just on your own personal share drive, or was there, like, a central location where memos were saved?

A. Shared personal drive.

Q. You're not aware of an area where, like, if you wrote a memo that got posted in the cellhouses and lieutenants, you know, also wrote memos for that particular cellhouse, that those would be saved in the same place?

A. No.

Q. How long would a memo -- well, strike that.

My understanding from the

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 25 of 82

Page 89

description you gave was that at each post and specifically with regard to, you know, cellhouses -- at each cellhouse there will be a physical location in that cellhouse where a paper copy of the general orders, a paper copy of the post orders, and a paper copy of memos and amendments would be stored?

A. Yes.

Q. How long would memos be kept as part of -- you know, in that physical location?

A. They would be kept in the post orders until they were reviewed or a change needed to be made where they would be taken out or added physically to the post orders.

Q. Okay. And whose job was that to keep tabs on --

A. The custody supervisor.

Q. Okay. So it was your job to sort of keep tabs on the number of memos that were, you know, floating around in each of those posts and to make sure the important information that needed to be conveyed on an ongoing basis was added to the post orders themselves. Is that fair to say?

A. Yes.

Q. Okay. And were correctional officers required to review the memos in addition to the post

Page 90

orders on a 30-day basis, or is it just the post orders?

A. Yes. If they were in the post orders -- if they were with the post orders, then, yes, they reviewed them all.

Q. And was that part of the sign off that they had to do every 30 days?

A. Yes.

Q. And did that -- so that sign off reflected not just that they were saying, yes, I've read the post orders, but I've read everything in this bundle of documents?

A. Yes.

Q. Including the memos?

A. Yes.

Q. How -- at any given time at a cellhouse, how many memos are typically floating around in addition to the post orders?

A. In the -- actually in the post orders, not many. Maybe one or two.

Q. Okay. And is that because a memo is either something that's sort of transitory that you, as custody supervisor, take out after a while, or it's something that's important enough that it needs to be, you know, in the post orders itself?

Page 91

A. A memo in general is kind of -- I guess I would say informal. So a lieutenant could post a memo, for example, in his cellhouse saying that offenders get ice at 1:00 o'clock instead of getting it at 2:00 o'clock or they only get one scoop of ice instead of multiple scoops. That's just a general memo that wouldn't really necessarily need to be in the post orders.

Q. Okay.

A. So that's -- I guess that's kind of why there wouldn't be a whole lot of memos in the post orders.

Q. And for those types of informal memos, that's not something that's part of the requirement that a correctional officer familiarizes themselves with every 30 days and signs off that they reviewed them?

A. No. But it's something they need to know if they're working in that cellhouse.

Q. Where are those memos posted or located?

A. They would be in the officer's station.

Q. Okay. Is that, like, a bulletin board or --

A. Yeah. Some officer stations have a bulletin board or board that they have.

Page 92

Q. And that's for the informal memos?

A. Right.

Q. And then what's the physical location of the post orders at the cellhouses?

A. They're also in the officer's station under a locked cabinet.

Q. So it's a locked cabinet for the post orders?

A. Yes.

Q. Okay. Who has the keys for that cabinet?

A. The officer in charge or the supervisor of the cellhouse.

Q. Okay. So that's not something that an officer can -- has the ability to sort of quickly access in the event of an emergency to look at the post orders to figure out what am I supposed to do in this situation. Is that fair to say?

A. I mean, they could -- it's right there with them, so they could get it.

Q. But it's -- I mean, it's under lock and key, right?

A. Right.

Q. And fair -- but fair to say one of the purposes of making sure that officers review the post orders is so they have the information, you know, in

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 26 of 82

Page 93

their heads about what to do in response to an emergency situation and aren't having to, you know, go into a locked cabinet to read a policy to know what to do. Is that fair to say?

MR. BLINN: Sam, I'm having a little trouble hearing you. Can you speak up just a little bit?

MR. HEPPELL: I certainly can. For everyone on the line, please do let me know if you're having -- having trouble hearing me. I want the witness to understand my questions, and obviously counsel as well, and a clear record from our court reporter. Let me know if my voice wavers.

Actually, let's take a five-minute break. Let's go off the record and take five to ten minutes, if that works for everyone.

MR. BLINN: Yes. Let's take ten.

(WHEREUPON, a short break was taken.)

MR. HEPPELL: Back on the record then.

BY MR. HEPPELL:

Q. Mr. Nowatzke, before we took our break there, I asked some questions about the post orders and your role in creating and revising them.

And if I recall your testimony correctly, one of the primary ways that you would

Page 94

update the post orders was you would review the documents, and based on your personal knowledge of the applicable prison policies, you would ensure that the post orders accurately covered what needed to be covered for that particular posted situation. Is that fair to say?

A. Yes.

Q. And was that the primary method that you used to develop, update, and amend the post orders?

A. Yes.

Q. So fair to say then it was important for you, as custody supervisor, to be familiar yourself with prison policies and procedures?

A. Yes.

Q. Okay. Including the prison policies and procedures that needed to be followed by line level correctional staff working in the cellhouses even though that wasn't your primary posting?

A. Yes.

Q. Because you were responsible for supervising them, but also you're responsible for developing the written policies that were guiding them through those post orders?

A. Correct.

Q. Is that fair to say?

Page 95

A. Yes.

Q. Okay. And specifically with regard to the post orders as they related to how officers in cellhouses handled emergency response and handled response to fires in the cellhouses, how did you go about developing or updating post orders on those topics?

A. I don't believe there was any updating that I did to any of the post orders concerning fire.

Q. Okay. To the best of your knowledge during the entirety of your time as custody supervisor, you didn't make any exchanges to the post orders with regard to fires or emergency response to fires?

A. Not that I can recall, no.

Q. Okay. What steps, if any, did you take to determine whether the post orders on those topics were adequate or sufficient to guide correctional staff in the cellhouses?

A. I guess, like I said before, just review them and read them to make sure that everything was still up-to-date as far as who they should call and things like that.

Q. Okay. And that was part of the annual review process that you described earlier; is that

Page 96

correct?

A. Yes.

Q. So in terms of aspects of the post orders related to fire safety and fire response, to the best of your recollection, the process that you went through for those was just reading them as part of the annual review and assessing them against your memory, your understanding of what was required. Fair to say?

A. Yes.

Q. No other steps with regard to post orders on those topics that you took at any point during your time as custody supervisor?

A. No, not that I can recall.

Q. Did you consult at any point with the safety hazmat person related to the contents of post orders regarding fire safety?

A. No, not that I remember.

Q. Did you speak with any members of the prisoner firefighter squad regarding contents of the post orders?

A. Absolutely not.

Q. Okay. And just maybe -- so my question is clear -- and you gave a pretty good answer there.

Fair to say that the contents of

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 27 of 82

Page 97

post orders is confidential and something that is not to be shared with prisoners. Is that fair to say?

A. Yes.

Q. Would it be fair to say that it would be appropriate for you to gather information from prisoners about what was happening in the prison that could inform your understanding of the post orders that needed to be developed?

A. Not -- no. I would have to say no.

Q. Okay. And why would that not be appropriate?

A. Kind of like you said -- post orders are confidential. So I don't think I would use anything from an offender to come up with a post order to give to my staff to operate things that are -- a specific thing.

Q. So even -- and just so I'm clear -- because the -- because the post orders themselves are confidential, you would not use information from a prisoner that would lead you to develop a post order that would then be conveyed to correctional staff on how to do their job?

A. I don't recall a case where I would have done that, no.

Q. Okay. And I guess setting aside that you

Page 98

don't recall ever specifically doing that, is that something you could have done?

A. I would say no.

Q. And why is that not something you could have done?

A. I mean, I guess I could have, but I don't -- I don't think I would have ever done that, no.

Q. Okay. That's just something that strikes you as not something that you would do with information gathered from prisoners?

A. Right.

Q. Okay. And so then that's certainly not something that you ever did during your period of time as custody supervisor was talk directly to any members of the prisoner firefighter squad to learn information about their experiences responding to fires that would -- that you used that information then to evaluate the post orders related to fire response?

A. Yeah. Exactly.

Q. Okay. And I guess is that fair to say that you didn't -- you didn't seek out that information directly or indirectly? And maybe I'll break that down.

Page 99

So you didn't personally speak with any members of the prisoner firefighter squad to gather information from them about fire response that -- that you used to -- for your post orders --

MR. HEPPELL: You're breaking up again, Sam.

BY MR. HEPPELL:

Q. I'm sorry. Let me repeat that question because it didn't come through clearly.

So, first of all, directly you, yourself, didn't have any conversations with any members of the prisoner firefighter squad directly that you used to evaluate the post orders related to fire safety. Is that fair to say?

A. Yes.

Q. Nor did you seek out information from the prisoner firefighter squad by speaking to anyone else? For example, other members of the correctional staff who worked with or supervised the firefighter squad. Is that also correct?

A. Yes, that's correct.

Q. And you didn't seek out information from the hazmat person in order to inform your review of the post orders related to fire response. Is that fair to say?

A. Yes.

Page 100

Q. Okay. Was there anyone you sought information from related to fire safety or how officers were to respond to fires on the unit that you used to guide or review the post orders?

A. No.

Q. So the -- what was your understanding of the policy that an officer in a cellhouse was supposed to follow that was in effect at Indiana State Prison in April 2017 when they became aware of a fire on the unit -- fire in a cellhouse?

A. That once they became aware of a fire, they are to notify, I guess, other staff or first responders, either via radio or telephone, at the control center that there is a fire on the unit, to take the necessary steps to obtain a fire extinguisher or whatnot to see if they could eliminate the fire or extinguish the fire.

Q. Any other steps that a line level officer in the cellhouse was supposed to take in response to a fire on the unit other than the two steps you just described?

A. After -- once those -- and then the next thing the staff would do is let out the offender firefighters if they had them in their unit.

Q. Okay. So if there were one or more

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

Page 101

members of the prisoner firefighter squad who were housed in the cellhouse where the fire was, the policy was that the cellhouse staff was supposed to let that individual out of their cell; is that correct?

A. I would have to say yes and no. Only because if the staff members were actually dealing with the fire at the time of the incident, I would rather see them dealing with that than going to get somebody out of their cell who's going to have to leave to go get their equipment to come back. I guess if they're already dealing with the incident -- so I would expect them to try to handle the fire and extinguish that before they went to get them out because it's actually happening on their unit.

Q. Okay. So you're -- and that was then -- you conveyed that as if that was your expectation.

And as custody supervisor, then that was the policy that you were responsible for enforcing and educating prison staff at Indiana State Prison during the period of time you served as custody supervisor, correct?

A. Yes.

Q. Okay. And that policy then was that correctional staff should first try to put out the

Page 102

fire themselves, and then only if they determined they were unable to put the fire out, they should then let the prisoner firefighter out of his cell in the unit?

A. Or once the first responders had arrived and took over the scene, then they could go then and let the offender firefighter out, yes.

Q. Okay. But it would have been a violation of a policy that you set and a violation of the expectations that you had if someone -- if the staff on the unit were to immediately release the prisoner firefighter outside of his cell; is that correct?

A. I don't necessarily think it would have been a violation. It just -- I mean, it depends on the situation. If the fire was on -- the cellhouse is five stories high. I don't know if you know that. If the fire was on the -- on the 100 range and the firefighter lived on the 500 range, it's easier for the staff to go take care of the fire than it would be for him to run up to the 500 range to get this guy out and come back down. So I guess it would depend on the situation on how close the offender firefighter lived to where the actual fire was.

Q. And so how were those different, you know, options communicated to -- to prison staff?

Page 103

A. Via the post orders. So, I guess, first and foremost, you're to try to address it yourself.

Q. Okay. So the post -- and so I guess if I understood what you were saying, it wouldn't necessarily be deemed by you to be a policy violation if they were to let the prisoner firefighter out first if -- depending on the situation, but the instructions they were given was to fight the fire themselves first?

A. Right.

Q. Okay. Now, are there multiple -- strike that.

How -- how did you determine that that was the appropriate policy to have with regard to the steps that may -- strike that.

How did you determine that those were the appropriate steps -- the appropriate directions to guide correctional officers in terms of responding to a fire?

A. I guess I'd have to say -- in the emergency response operations, if an incident occurs on your unit or in the area that you're involved in and -- just as an example, if I was a first responder and I was required to respond somewhere to take care of a situation, if it happened on my unit,

Page 104

I can't -- I'm not going to leave my unit to go somewhere else to come back to my unit. I'm just going to stay there and deal with, and someone else would end up taking my spot based on what the shift supervisor would have -- have had someone cover for me to go to that.

So it kind of carried over, I guess, into the firefighting area. If I'm on that unit, I have to deal with it at that time until somebody else gets there. That's kind of the determination. I can't leave to go do something else. I know it's kind of confusing.

Q. There -- no, I appreciate that. And I just want to make sure I understand what you're -- what you're getting at.

If I understand your testimony, you were sort of drawing an analogy between, you know, a -- someone who's on a different unit that's being asked to respond to a situation somewhere else with, you know -- with the custody staff -- the correctional officers in the units wanting to, you know, respond to the issue first -- respond to the fire first before they go somewhere else to let the prisoner firefighter out of his cell to let him respond. Is that fair to say?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 29 of 82

Page 105

MR. BLINN: Object to form. I don't think that's an accurate characterization, but go ahead and answer.

BY THE WITNESS:

A. Yes. I would rather the -- I guess I would rather the officer respond to try to deal with it before he went to get somebody else. Time is kind of an essence, I guess.

BY MR. HEPPELL:

Q. Sure. And in terms of -- is it fair to say that in any given cellhouse, there's always multiple officers on duty at any given time?

A. Yes.

Q. What's -- in B cellhouse, is that -- is it your understanding that, at the time of the Devine fire, it was staffed with a minimum of three officers on duty?

A. You know, I don't remember exactly how many were there that day.

Q. More than one officer. Fair to say?

A. More than one, yes.

Q. And that's true of every cellhouse? There are always multiple officers on duty at a given time?

A. Not always.

Page 106

Q. Okay. Some cellhouses only have one officer?

A. Correct.

Q. If there are multiple -- if there are multiple officers on duty in a cellhouse at a given time and there is an emergency like a fire, is it the expectation, the policy that all of those officers are going to make themselves available to respond as appropriate to that emergency?

A. Yes.

Q. And, for example, with the topic we were just discussing with -- whether to release the prisoner firefighter from his cell first or whether to go to the -- fight the fire first, it would be possible for -- if there were multiple correctional staff on the unit, for one or more of the staff to go, you know, take fire extinguishers to the fire itself and another officer to go release the prisoner firefighter from his cell; is that correct?

A. Yeah, that's possible.

Q. Okay. That wouldn't be a violation of the policy if they were to do that. Is that fair to say?

A. That's fair to say.

Q. And, in fact, that would be the -- that

Page 107

would kind of be the best of both worlds, right? Someone's fighting the fire right way, but someone is also letting the prisoner firefighter out of his cell in case the fire can't be contained. Is that fair to say?

A. I guess, yes and no. Because someone still has the keys. So if there's those two -- someone still has the key to the front door. So someone is going to have to let the first responders in and the responding firefighters. You have to keep that in mind as well.

Q. Okay. Are there directions in the post orders in terms of how the correctional staff are supposed to prioritize these competing considerations? Fighting the fire themselves versus releasing the prisoner firefighters versus letting the first responders in to the locked door of the cellhouse?

A. I'm not sure if it's -- I would -- as far as prioritizing them, I'm going to say no.

Q. And if it's not in the post orders, what information would correctional staff be given about how to, you know, evaluate those different competing priorities during a fire emergency?

A. I do believe it's in the post orders

Page 108

about -- I mean, they all know they have the keys to the cellhouses. So the key is supposed to be left downstairs preferable close to the door in case of an emergency, so they can respond and open the door. So I guess that would probably be covered in the post orders as far as letting somebody in or out.

Q. And you had talked about releasing the prisoner firefighters -- if I understood your testimony, that was in the context of if there was a firefighter housed in that cellhouse, you know, when and whether to release that individual or individuals from his or their cells; is that correct?

A. Correct.

Q. What about the determination of -- of when and how to activate prisoner firefighters housed in other cellhouses and having them released from their cells and respond to the fire?

A. So immediately after an officer calls -- reports a fire and it's announced over the radio system that there's a fire in the cellhouse, all cellhouses that have firefighters are to release them to the fire station at that time.

Q. Okay. And so that's something that an officer in a cellhouse would also need to know; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 30 of 82

Page 109

A. Yes.

Q. So -- because you could be an officer in the cellhouse where the fire is located, but you could also be an officer in a different cellhouse and your responsibility then is related to the release of prisoner firefighters so they can go and respond to that other fire; is that correct?

A. Yes.

Q. And it's your understanding of the policy that was in effect at Indiana State Prison at the time in April 2017, that immediately upon the radio signal going out that there was a fire, prisoner firefighters in other cellhouses should be released from their cells and released from the cellhouse so they can respond to the fire; is that correct?

A. Yes.

Q. What's your understanding of where that policy -- the policy you just described -- where that is written down or how that is communicated to officers?

A. The cellhouses have a bed board with a list of all of the offenders on it. The offender firefighters are marked. There is also a memo put out that staff are aware that these are your firefighters in the cellhouse. In the event of a

Page 110

fire, these men are to be released to go to the fire station. Also, there's a post on -- I guess a post on Checkpoint 2, which is responsible for receiving those firefighters once they're released. So once a fire is called, he also calls and makes sure that those firefighters are released and sent to the fire station.

Q. And just to make sure I understand that last part -- so Checkpoint 2 -- that's a post that would be staffed by correctional officers or a correctional officer?

A. A correctional officer and correctional sergeant, yes.

Q. Okay. And did I understand you correctly just now -- and you testified that that individual that -- the individual staff at Checkpoint 2 had some additional responsibility for ensuring that prisoner firefighters get released from their cells?

A. Not necessarily him releasing them from their cells, but -- yes. He is responsible to, I guess, supervise those offenders once they get to the fire station.

Q. Following the policy, they should be released automatically by the officers in the cellhouses once that fire signal is called, but then

Page 111

it's the Checkpoint 2 officer who's responsible for supervising those firefighters as they're arriving at the firehouse from their cellhouses. Is that fair to say?

A. Yes.

Q. Okay. And you've been describing -- I had asked you about how officers in the cellhouses would know to release -- well, strike that.

How would an officer in a cellhouse know that they were supposed to release the prisoner firefighters in their cellhouse when they heard the fire radio call?

A. Because normally after the fire radio call goes out, they instruct staff to release offender firefighters.

Q. Okay. And so I guess help me understand that because what I had -- what I had understood you to be saying earlier -- that that is something they should be doing automatically as soon as there's -- as possible as they hear that someone in another cellhouse has called a fire signal, officers should be -- should be doing that without any further instruction or direction; is that correct?

A. That's correct.

Q. And that was the policy in effect at the

Page 112

time of this fire in April 2017, correct?

A. Correct.

Q. But then they could also be -- there could be also an additional notification go out over the radio ensuring that they're doing that? Giving them instructions to ensure that they're being released. Is that fair to say?

A. Yes.

Q. But they -- the policy wasn't that they needed to wait for that radio call? They should be doing that automatically as soon as they hear the fire code call; is that correct?

A. That's correct.

Q. And how would they -- how would they know that they should -- if you hear a fire code call and it's not in your cellhouse, your job as a correctional officer is to let the prisoner firefighters out who are in your cellhouse.

How would -- how would those officers know that that's something they're supposed to do?

A. That was -- if there was a fire, that was what was required of them. They have -- there is a memo in the cellhouse that would tell them or instruct them to let those offender firefighters out.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 31 of 82

Page 113

The bed board -- it's something that -- I don't necessarily know or remember if it's in the post orders, but it's something they have to be aware of when they report to their post on where the firefighters are supposed to do.

Q. And I appreciate you being clear, and I'm not trying to belabor the point. I just want to make sure I'm understanding you correctly because there's -- there was the instruction about where the prisoner firefighters are located in the cellhouse sort of like which -- which cells have firefighters versus the majority of them that don't.

That's one thing that's important for prisoner staff to be aware of, correct?

A. Correct.

Q. So that they can act quickly to release the correct prisoners? They're not releasing non-firefighters? They are releasing firefighters, correct?

A. Correct.

Q. It's important that they be able to do that swiftly because a fire is an emergency situation, correct?

A. Yes.

Q. And so what I understood you to be

Page 114

describing was that there was markings on the bed board or some visual posting in the -- in each cellhouse that would sort of show them which cells have firefighters in them; is that correct?

A. Correct.

Q. And then my next question is a little different. It's not about how they would know which cells have firefighters in. It's how they would know that their job is to automatically release the firefighters. They don't need to wait on any instruction or authorization. As soon as they hear that fire radio call, they should release them.

How was this -- an officer in a cellhouse informed of that policy or that instruction?

A. So that would be given to them during training -- the same as the fire training that they would receive on how to call a fire, proper procedure and the steps to take. So that would be a training thing where the training officer would tell them after -- when the fire is called, you release your firefighters.

Q. Okay. That's not something that's part of the written post orders; is that correct?

A. I don't think so. I don't remember.

Page 115

Q. So officers are going off of their memory from their training on what to do on those situations?

A. Correct.

Q. And -- so that would be -- fair to say that would be an important point to emphasize during the training. Is that fair to say?

A. Yes.

Q. Both because it's an emergency situation, but also -- and also because it's not conveyed in written post orders that they're reviewing at an ongoing basis. Is that fair to say?

A. Yes.

Q. And just so I'm clear, when you're referring to -- when you referred to training just now -- that it would be during the training that they would be instructed on that -- how do you know that is something that was covered in the training?

A. Well, because it's in the lesson plan of training. I mean, that's -- there are guidelines training has to follow on things they have to follow. They put out lesson plans. So I could go review a lesson plan to see what they're actually covering in the training.

Q. Okay. Just so I'm clear, are -- do you

Page 116

have a specific memory of a -- of seeing a lesson plan that covered this topic, or is it your expectation that that would be covered in training, but you don't have specific -- you don't have a specific knowledge of whether it is or isn't?

A. Yeah, I can't remember. So I would have to say I don't remember.

Q. Okay. And when you're talking about training, are you -- what type of training are you referring to?

A. New -- any new employee training or 40-hour in-service training.

Q. Okay. And the 40-hour in-service training, that's the annual training, correct?

A. Correct.

Q. And a correctional officer might work at a prison for up to a year before they got that annual 40-hour training, correct?

A. Correct.

Q. The new officer training, that's the only training that every officer working every shift is going to -- has gone through, correct?

A. Yes.

Q. And is it your understanding that the training that you were just describing related to --

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 32 of 82

Page 117

relaying to correctional staff that they had to let prisoner firefighters out of their cells automatically upon hearing a fire call -- is it your testimony that that's contained in the new officer training? In the 40-hour training? Both? Or you're not sure one way or the other?

A. I would say I'm not sure one way or the other.

Q. Okay. Is it possible that that's not contained in either the new officer training or the 40-hour training?

A. Again, I'm not sure.

Q. Okay. And you were talking about written lesson plans.

Can you give a little more detail around what exactly the type of document is that you're describing?

A. It's just a plan or instruction guidelines on how to conduct training.

Q. And is that something that is, like, materials that are given to the trainees, or is that materials that are used by the trainer only to guide their training?

A. Yes. Used by trainers to guide their training.

Page 118

Q. And in what context have you -- well, strike that.

Are you -- do you serve as a trainer, or have you served as a correctional trainer?

A. I have in the past, yes.

Q. Okay. And so -- is it based on your past experience as a correctional trainer that you're describing -- that you're recalling and describing these lesson plans?

A. Yes.

Q. Okay. Have you specifically -- well, strike that.

Did you provide fire training or training on other topics?

A. Other topics.

Q. Okay. So you -- have you personally seen at any point during your career at Indiana State Prison the lesson plans related to fire training?

A. No.

Q. Have you spoken with Mr. Beal or any of the other trainers at the prisoner with regard to the lesson plans for fire training?

A. No.

Page 119

Q. To your knowledge, have you ever spoken with any trainer at Indiana State Prison about the contents of the training regarding fire safety or fire response in the prison?

A. No.

Q. Is that -- is that the sort of formal title of the document? Lesson plan?

A. I would assume, yes. That's what we call a lesson plan.

Q. Okay. And so if I were looking for the document that you were describing, that's something that would be electronically stored at the prison and it would be called a lesson plan related to -- related to fire safety; is that correct?

A. I would say yes.

Q. Okay. And my understanding of that new officer training, at least, is that there are some components that are classroom based and then there's sort of a component that's an on-the-job type of training with a field training officer.

Are you familiar with that distinction that I'm drawing?

A. Yes.

Q. And the lesson plans -- and, broadly speaking, the classroom is sort of what it sounds

Page 120

like? The trainees are in a classroom-type setting, and they're being -- you know, having information conveyed to them and using that mode of learning, correct?

A. Correct.

Q. And then there's also a component of that new officer training where they're actually out in the prison sort of doing the tasks as they come along and -- you know, under the supervision of a field training officer, and they're going through scenarios and they're, you know, going through tasks in that way. Is that a fair description of that aspect of the training?

A. Yes.

Q. The fire training that you were, you know, describing your belief or understanding about how officers would learn about releasing prisoner firefighters, was that a classroom-type training that you were describing based on your belief, or was that the on-the-job training supervised by field training officers or you're not sure?

A. I'm not sure. If I had to guess, I would say it would be classroom.

Q. Okay. And that's just sort of an assumption you're making or an educated guess, but

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 33 of 82

Page 121

you don't have any concrete information one way or the other on that. Is that fair to say?

A. Yes.

Q. Okay. I want to go -- and so there was no written policy that or written directive that officers had access to after their training that instructed them on releasing prisoner firefighters to go respond to fires in other cellhouses; is that correct?

A. Like I said, there would have been a memo probably posted in the cellhouse to advise staff to release the offender firefighters to take care of the fire. That's the only thing that I'm aware of.

Q. Okay. And are you recalling a specific memo, or is it just an assumption that that's the type of thing that would be conveyed in a memo?

A. I don't recall one specifically, no.

Q. Okay. Did you ever convey that information in a memo?

A. No.

Q. Okay. And are you aware of anyone else who ever conveyed that information in a memo?

A. Not off the top of my head, no.

Q. So it's possible that that -- that that memo doesn't exist. Fair to say?

Page 122

A. I guess it's fair to say, yes.

Q. Okay. And the memo that you sort of described that may or may not exist -- we talked earlier about memos -- I guess, two types. Some that would be posted, but that were not required to be signed off on that 30-day process, and then a different type that's bundled into the post orders that officers sign off that they're familiarizing themselves with every 30 days.

The memo that you were describing potentially letting officers know about releasing offender firefighters -- prisoner firefighters -- is that a memo that's bundled into the post orders or that is not bundled into the post orders?

A. I'm not sure.

Q. Okay. You have no information one way or the other on that?

A. No.

Q. Okay. If it was something that was bundled into the post orders, you would have reviewed that as part of your ongoing process of reviewing the documents that are -- that are bundled in the post orders as part of your review process to update the post orders; is that correct?

A. Yes.

Page 123

Q. Do you have any memory of seeing that kind of memo bundled into the post orders?

A. No.

Q. There is nothing preventing you from adding that instruction into the written post orders if you wanted to do that. Is that fair to say?

A. Yes.

Q. Okay. Why isn't that something that you added to the written post orders?

A. Why isn't it something?

Q. Correct. Why did you not do that?

A. I'm not sure why. Like I said, I'm not sure. It might already be in there. I'm -- I don't recall.

Q. Okay. So you can't say -- well, strike that.

If there were -- if there were issues with how officers were -- well, strike that.

In releasing a prisoner firefighter from a cell -- from a cellhouse to go respond to a fire in a different cellhouse, the prisoner -- the prisoner firefighter would both have to be released from his individual cell and then also released from the cellhouse? Those two steps would have to be followed. Is that fair to say?

Page 124

A. Yes.

Q. And what's your understanding of the policy that was in place in April 2017 in terms of those two different steps? Are -- were both those steps, steps that should be taken automatically without any additional authorization over the radio or additional instruction to be given?

A. So my understanding would be that once they released them from the cell, they would contact the street sergeant or Checkpoint 2 and advise them that, for example, A cellhouse just released their two or three firefighters.

Q. And just so I'm clear on that, they would advise the Checkpoint 2 after they had released them from the cellhouse? Like, "They're on their way -- they're out of the cellhouse on their way to you," or was that a requesting authorization to release them?

A. It would be just to inform him that they are on their way.

Q. Okay. So without -- without authorization upon hearing the fire alert code or the fire code to be called over the radio, officers in cellhouses should be both releasing firefighters from their individual cells if they're locked in their cell and releasing them out of the cellhouse to go --

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IND/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 34 of 82
JASON NOWATZKE
August 20, 2020

Page 125

to go to the firehouse, and then after they're released, they should be informing the checkpoint that they're on their way?

A. Yes.

Q. Got it. And that sort of second step I just described -- letting them out of their cellhouse and not just their individual cells -- that's all part of the same process, and it would -- you know, your answers would be the same in terms of whether or when that was covered by training and whether or when that was covered in written instructions as to the testimony you have just given, correct?

A. Yes.

Q. As -- that's a process that -- it's important that that process goes smoothly if there is a fire. Is that fair to say?

A. Yes.

Q. Because in a fire situation, fair to say if it's a serious fire, you know, every moment potentially counts in terms of being able to contain the fire and reduce the chance of injury, reduce the chance of damage to the prison buildings or equipment. Is that fair to say?

A. Yes.

Q. Was it your responsibility as custody

Page 126

supervisor ultimately to be ensuring that processes like that are running smoothly at the prison?

A. Yes.

Q. Do you recall any specific steps that you take during -- that you took during your time as custody supervisor to ensure that that specific process of releasing prisoner firefighters from cellhouses was running smoothly?

A. I don't recall. I'm -- I'm sure I probably put out a memo or two about staff making them aware because I'm sure there were some issues in the past. Off the top of my head, I don't really recall.

Q. When you say you're sure there were some issues with that in the past, can you explain what you mean by that?

A. There may have been an instance or two where a firefighter wasn't -- I guess in a timely manner -- but I don't really recall specific incidents. So --

Q. Okay. And so I understand you to be saying you don't recall specific incidents, like, on this date at this time in this cellhouse there was an issue. Is that fair to say?

A. Yes.

Page 127

Q. Do you recall -- do you have a recollection that there were incidents like that that happened? I can't remember when it was or where it was, but I remember there being some problems with --

A. I remember -- yes.

Q. Go ahead.

A. I remember there was a problem at one time, and I believe I probably put a memo out.

Q. Okay.

A. But I'm not 100 percent sure.

Q. Okay. So it's possible that you didn't put a memo out, but you believe you did?

A. Right.

Q. If you did put a memo out, where would that memo be located?

A. At this point, I would not know. I mean, I may have a copy of it -- but if I don't have a copy, then I wouldn't know.

Q. Okay. So it's possible that you put a memo out, but sitting here today, you wouldn't be able to go back and verify that. Is that fair to say?

A. Yeah. Honestly, it may not have been a memo. It may have been, like, conveyed in a meeting --

Page 128

Q. Okay.

A. -- with supervisors.

Q. Okay. So it's possible you sent a memo out? It's possible that you just conveyed it to supervisors?

A. Right. It may have been conveyed verbally. Like, I don't recall.

Q. And would that be a formal meeting that there would be minutes? Like, some written record that you talked with supervisors and told them, "Hey, this is an issue. We need you to take care of that"?

A. It could or could not have been.

Q. Okay. As you sit here today, do you have any specific memory of writing a particular memo or of having -- taking any particular concrete action in relation to the problems you were made aware of relating to releasing prisoner firefighters?

A. No.

Q. Is there anything that you would be able to do to refresh your recollection to -- to determine specifically what steps you took, if any, in response to that?

A. Not that I know of.

Q. And, again, if I understood you correctly, you were saying you might have sent a memo

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 35 of 82

Page 129

and that memo doesn't exist anymore or you might not have sent a memo -- strike that. That was a bad question -- not a question.

I -- understanding that you don't know for sure exactly what you did in response to learning that information, is there a reason you didn't include that in an update to the post orders?

A. Like I said, I don't -- it might already be in there. I'm not sure.

MR. BLINN: I'll object to form.

But you can answer.

BY MR. HEPPELL:

Q. There was -- no policy prevented you from updating the post orders to include that information if there was a belief --

MR. BLINN: I'm going to object to form again. I'm not sure what information are you referring to that may or may not have been included in the post orders. I don't understand the question.

MR. HEPPELL: Sure. Let me rephrase.

BY MR. HEPPELL:

Q. In terms of the specific directions to be given to officers in cellhouses about the circumstances in which they were supposed to release prisoner firefighters from their cells, that type of

Page 130

direction -- there was nothing preventing you from putting information about those requirements in post orders if you had wanted to. Is that fair to say?

A. Yes.

Q. I would like to show you a couple of the documents specifically. And I -- I think we -- the post orders -- I want to show you a post order for B cellhouse and a post order for the general -- the general post orders.

MR. HEPPELL: And those are both documents that are marked as confidential. So I think we should designate this portion of the transcript going forward -- have a portion of the deposition transcript that's designated as confidential and -- and these two exhibits will also be designated as confidential.

Is there anything else you want me to put on the record regarding that before we -- before we jump in?

MR. BLINN: I think that works. Remind me how we're handling the exhibits. Does the court reporter have them, or are they going to get e-mailed to me?

MR. HEPPELL: I have just been doing share screen and pulling them. I have them, you know, on

Page 131

my computer right now. I'm happy to e-mail --

MR. BLINN: They'll be included with the transcript, though, right, also?

MR. HEPPELL: Yes. After the deposition as well, I will --

MR. BLINN: Yeah. Why don't you go ahead and e-mail to me -- the ones -- either as you're using them or however you want to do it just so that I have a copy of exactly what you're using.

MR. HEPPELL: Yeah. That's fine. I'm happy to do that.

MR. BLINN: Okay.

MR. HEPPELL: And then I will also -- as a practice, I will identify them by Bates range on the record as well.

MR. BLINN: That way I don't have to go through the whole production to refer to the document.

MR. HEPPELL: Sure. But it -- there should be no issues in terms of what we're referring to. So just give me -- just give me one second here and let me pull up the two documents I'm going to use. And then I will e-mail those to you as well.

(WHEREUPON, a discussion was had off the record.)

Page 132

(WHEREUPON, the following portion of the transcript is marked as confidential.)
(The document was thereupon marked for identification as Nowatzke Exhibit No. 1, as of August 20, 2020.)

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 36 of 82

Page 133



Page 135

Page 134

Page 136

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 37 of 82



Page 137

Page 138

Page 139

Page 140

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 38 of 82

Page 141



Page 143

Page 142

Page 144

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 39 of 82

Page 145



Page 146

Page 147

Page 148

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 40 of 82



USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 41 of 82



Page 153

Page 154

Page 155

Page 156

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 42 of 82

Page 157



Page 158

Page 159

Page 160

Page 161

Page 163

Page 162

Page 164



USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 44 of 82

Page 165

Page 167

Page 166

Page 168



USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 45 of 82

Page 169

Page 171

Page 170

Page 172



USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 46 of 82

Page 173



Page 174

Page 175

Page 176

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 47 of 82

Page 177



Page 179

Page 178

Page 180

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 48 of 82



DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 49 of 82

Page 185

Page 187

Page 186

Page 188



DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 50 of 82

Page 189



Page 191

(WHEREUPON, the following portion of the transcript is marked as nonconfidential.)

BY MR. HEPPELL:

Q. Mr. Nowatzke, you testified earlier that directly above you in your chain of command was the deputy warden of operations; is that correct?

A. That's correct.

Q. And I think you stated earlier that you couldn't recall if at the time of the fire it was Deputy Warden Gann or Deputy Warden Payne, but you worked with both of those individuals during your time as custody supervisor; is that correct?

A. That's correct.

Q. How was your relationship with Deputy Wardens Gann and Payne?

A. It was good.

Q. Would you -- did you have a close working relationship with them?

Page 190

Page 192

A. I would say yes.

Q. Okay. How would you and what were the different ways that you would report up to them so they could be apprised of what you learned about, you know, how the prison was operating?

A. A number of ways. Either verbally, e-mail, memo.

Q. You used all of those forms of communication on a regular basis with both of those deputy wardens at the time they were above you in the chain of command, correct?

A. Yes.

Q. Would it be fair to say any time there were issues of significance that you learned about that were going on at the prison, you would apprise them of those issues? Would that be fair to say?

A. Yes.

Q. And would that include both issues that you had taken steps to resolve and also issues that you needed additional assistance or guidance in how to resolve?

A. Yes.

Q. So if there was something that you -- you had identified an issue, but you're like, "I can take care of this," you would tell them, "Hey, this issue

DENISE DWYER, et al. v.                    Cause No. 3:18-cv-00995-JD-MGG                    JASON NOWATZKE
RON NEAL, et al.                                                                            August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 51 of 82

Page 193

came up, but here's how's I'm handling it." Fair to say?

A. I guess not always. Some issues they didn't need to be aware of, but --

Q. Okay. If it was something significant, even if you thought that you had a handle on how to resolve it, you would have to convey it up to them. Is that fair to say?

A. Yeah. If I handled it, then necessarily they wouldn't know.

Q. Okay.

A. If it was important enough that -- if I couldn't handle it or it was a big enough issue, then I would include them in it.

Q. Okay. Certainly, if there was something you felt you had not been able to resolve or needed assistance resolving, that is something that you would ensure they were made aware of. Is that fair to say?

A. Yes.

Q. Okay. Did you ever have any difficulties with getting their attention or getting them to be made aware of issues that you were running into at the prison?

A. No.

Page 194

Q. Are you familiar with documents called reports of weekly inspections and reports of monthly inspections?

A. Yes.

Q. Can you explain what those documents are?

A. Each week areas of the facility are inspected by staff, and then they're also done monthly. Security and safety inspections.

Q. And those are inspections of -- so the physical -- physical infrastructure of the prison; is that correct?

A. Yes.

Q. So those -- and who is responsible for conducting those inspections?

A. Staff assigned to those areas will conduct those inspections.

Q. And as custody supervisor, was one of your responsibilities supervising the custody staff to make sure that those inspections were actually taking place?

A. Yes and no. Those inspections go to the safety hazmat manager, so it's their responsibility to keep records of those.

Q. Okay.

A. At times, if they weren't getting done,

Page 195

then I would be notified and have to make sure staff was completing those.

Q. Okay. So in terms -- if I understood your answer correctly, in terms of the substance of issues identified in those reports, those would go to the safety and hazmat person?

A. Yes.

Q. So it would be that individual and not yourself who was responsible for actually addressing any issues with safety that was revealed in those inspections?

A. Yes.

Q. But in terms of if there were issues with staff complying with completing the inspections at all, that's -- that would fall on your plate as the custody supervisor; is that correct?

A. Yes.

Q. Okay. What's your understanding of the purpose of those inspections?

A. For safety, sanitation, security.

Q. Okay.

A. All those reasons to find out where there were deficiencies.

Q. Would you say that that's an important thing to ensure is taking place on a regular basis?

Page 196

A. Yes.

Q. During your time at Indiana State Prison, have you participated in any meetings or conversations about the prisoner firefighter program?

MR. BLINN: I'm just going to object to form.

Just real quickly for clarification, are you asking about during the time in question when the witness was the custody supervisor, or are you talking about the whole entire time the witness has been employed at ISP up through the present.

MR. HEPPELL: Sure. Well, let me -- I appreciate that clarification. Let me -- I'm going to ask it both ways.

BY MR. HEPPELL:

Q. But let me start by -- during the period of time, Mr. Nowatzke, that you served as custody supervisor at Indiana State Prison -- during that time in that capacity, did you participate in any meetings or conversations with anyone at the prison about the prisoner firefighter program?

A. I would have to say yes.

Q. And can you describe or explain in what context those meetings or conversations took place?

A. Probably just conversations with their trainers or instructors during the time of their

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 52 of 82

Page 197

training.

Q. Okay. And who were the trainers or instructors of the prisoner firefighter program?

A. I can't think of their names right off the top of my head. Yeah. I can't think of the names right off the top of my head.

Q. Those trainers were on staff at the prison or outside?

A. Not necessarily employed by the prison, but by the department.

Q. Okay. But they would come in from the outside? Those aren't folks that were sort of day-to-day working in the prison?

A. Not at this facility, no.

Q. And other than -- how would you come to have conversations with those individuals when they would come in to train the firefighters?

A. Just doing rounds, observing their training, just asking questions about different things that were going on and what they were doing.

Q. Okay. Did you make any policy changes or propose any policy changes about fire response to the prison as a result of anything you learned during those conversations?

A. No.

Page 198

Q. Okay. Did you -- so setting aside that sort of -- you personally observing the trainers coming in and training the firefighters -- any other situations which -- during the period of time as custody supervisor, you had conversations or meetings where the prisoner firefighter program was a topic of discussion?

A. No, not that I can recall.

Q. Okay. What about more broadly? Outside of the period of time that you were custody supervisor -- either prior to that or since you've obtained the deputy warden position -- have you've been in meetings or had other conversations with anyone where the topic of the prisoner firefighter program was a substantive topic of conversation?

A. Not that I can recall, no.

Q. What's your understanding of who at a supervisory level in the prison administration is responsible for ensuring that the prisoner firefighter program is operating effectively and efficiently?

A. The safety hazmat manager.

Q. And was that Mr. Griffin at the time of this incident, to your knowledge?

A. Yes, I believe so.

Page 199

Q. Okay. To your knowledge, you've never had any conversations -- well, strike that.

You don't believe you have had any conversations with Mr. Griffin about the prisoner firefighter program during the period of time that you served as custody supervisor?

A. No. There were conversations between me and Mr. Griffin.

Q. Okay. What conversations did you have with Mr. Griffin about the prisoner firefighter program while you were custody supervisor?

A. Griffin would have to come to me to get permission to run fire drills or conduct his fire drills. So he would come to me and ask if it was okay to run fire drills at certain times of the day.

Q. Okay. And other than asking about permission to run fire drills, any other conversations you had with Mr. Griffin about the prisoner firefighter program?

A. Not that I can recall.

Q. If Mr. Griffin had raised concerns with you about how correctional staff were interacting with the firefighters or issues with correctional staff not knowing the correct policies or protocols to follow with regard to the firefighter program, is

Page 200

that something that you would have addressed?

A. I would like to say I would have, yes.

Q. Okay. You don't recall ever having those types of conversations with Mr. Griffin?

A. Not that I can recall, no.

Q. Would it be your expectation that Mr. Griffin would pass that information along to you if he learned of something from the firefighters, say, that there were issues?

A. Yes. I would hope that he would come to me for that.

Q. And, in fact, if Mr. Griffin felt that he didn't have the ability to address those issues, the prison's policies require him to bring those to someone's attention who had the ability to address those?

A. Yes.

Q. Do you -- what's your understanding of when fire drills were conducted at the prison in the period of time you were the custody supervisor?

A. They were conducted whenever Griffin wanted to do them. I want to say they were done monthly, but sometimes they were done during the day. Sometimes they were done early morning and sometimes late evening. It was whenever he wanted to do it.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 53 of 82

Page 201

Q. Do you recall anything about fire drills being run specifically during chow time?

A. Yeah. There were fire drills done during that time.

Q. Okay. And was that a decision made by Mr. Griffin in terms of when to run the fire drills?

A. Yes.

Q. Okay. Were there fire drills conducted on the night shift at the prison?

A. Yes.

Q. Okay. Again, was it Mr. Griffin's responsibility for ensuring the night shift staff were adequately trained on fire procedures?

A. That's correct.

Q. Okay. Did you ever review records made during fire drills? Reports during fire drills?

A. Not that I can recall, no.

Q. Is it your understanding that there would be evaluations made by the prisoner firefighters of how the fire drills were -- were handled by staff during the -- during the fire drill?

A. No, I did not know that.

Page 202

MR. HEPPELL: Okay. I'm going -- Mike, I'm going to e-mail you this exhibit. It's going to be Exhibit 4.

(WHEREUPON, a discussion was had off the record.)

(The document was thereupon marked for identification as Nowatzke Exhibit No. 4, as of August 20, 2020.)

BY MR. HEPPELL:

Q. Let me pull that document up on the share screen as well. There it is. So showing you what I've designated as Exhibit 4. It's a two-page document. It's Bates stamped Devine 133032 to 133033.

I've just -- to represent to you, for the record, I've just extracted this out as one example of a package of similar-formatted documents that were produced to us in discovery. This is a two-page document.

The first page has -- says at the top "Indiana Department of Correction Fire Evacuation Drills." And then on the back side, there's a -- labeled "Fire Drill Questions?"

Are you able to see the document

Page 203

that I've pulled up on the screen here?

A. Yes.

Q. Are you familiar with this type of document?

A. Some of it, yes.

Q. Okay. Can you explain what you mean by that?

A. Not the page that you're showing me now.

Q. Okay.

A. But the other page I've seen before.

Q. Just so the record's clear, the page I'm showing now is Devine 133032. That's Page 1 where it says, "Fire Evacuation Drills" at the top; is that correct?

A. Correct.

Q. And that's the one you say you're not familiar with?

A. Yeah. I don't recall seeing that one.

Q. And then the one I'm showing you now -- Devine 133033 that says "Fire Drill Questions," Page 2 of the document, you are familiar with this; is that correct?

A. Yes.

Q. How are you familiar with this fire drill questions part of the document?

Page 204

A. I am aware that the fire department or the firefighters ask questions of the staff members in the housing units when they conduct fire drills to make sure that they know what to do in case of a fire.

Q. Okay. And as custody supervisor, have you -- is it part of your practice to review the results of those fire drills or to review those questions in any way?

A. No.

Q. Okay. Taking this particular page as an example -- and it's -- based on the notations on the bottom of the page where there's sections for unit, date, score -- you see the portion of the page that I'm referring to?

A. Yes.

Q. Would you agree with me this appears to document a fire drill that was conducted in B cellhouse on April 27th, 2017?

MR. BLINN: Object to form.

BY MR. HEPPELL:

Q. You can go ahead.

A. Yes.

Q. The notation on the face of this record states "Officer Rodriguez doesn't know anything," and

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 54 of 82

Page 205

then it reflects a score of "poor" in the bottom, left-hand corner. Do you see what I'm referring to?

A. Yes.

MR. BLINN: Object to form.

BY MR. HEPPELL:

Q. Is this the type of information that you would expect to be conveyed to you as custody supervisor?

A. Yes. I would like to know that.

Q. Okay. Whose responsibility was it to ensure that you were made aware of poor performance by officers on fire drills?

A. I would say the safety hazmat manager.

Q. Okay. So it would be Mr. Griffin's responsibility to bring to your attention issues with performance of correctional officers during fire drills?

A. I would say yes.

Q. And if Mr. Griffin had brought that to your attention, there are steps you could have taken to correct -- correct the issue. Is that fair to say?

A. Yes.

Q. You could have talked to folks in the training department to beef up the training related

Page 206

to fire drills? That would have been one option. Fair to say?

A. Yes.

Q. And you could have looked to see if there were specific officers that seem to be consistently poor and address the issues with those specific officers? That could have been an option for you. Fair to say?

A. Yes.

Q. And if it appeared to be a more systemic problem that was not limited to specific officers, you could have provided additional guidance in the post orders to provide that direction to the officers on how they were supposed to go about the fire drills. Is that fair to say?

A. Yes.

Q. Those aren't any steps that you actually took. Is that fair to say?

A. No. Not to my knowledge, no.

Q. You have no recollection of taking any action on those lines?

A. No.

Q. Or any other action to address issues with custody staff performing poorly on fire drills?

A. That's correct.

Page 207

MR. BLINN: Object to form.

BY MR. HEPPELL:

Q. Did you have access to reports of fire drills if you wanted to review them?

A. I would say yes.

Q. Okay. But you didn't at any point take any steps affirmatively to review fire drill reports. Is that fair to say?

A. Yes.

Q. I'm done with that document.

Mr. Nowatzke, is it your understanding of the policies and procedures, whether written or unwritten, that were in place at Indiana State Prison in April of 2017 -- is it your understanding that those were policies or procedures that correctional staff in a cellhouse were required to take steps to investigate or ascertain the source of any commotion or disturbance on the housing unit?

A. Yes.

Q. Okay. And so, for example, if correctional staff were, say, in the office submitting their payroll and they heard prisoners yelling, but they couldn't hear what they were yelling or couldn't determine what the issue was, you would agree with me that those officers would be

Page 208

required to take steps to investigate that situation?

A. Yes.

Q. It would not be appropriate for those correctional officers to say, "Well, I can't hear what they're yelling. I don't know what the issue is, so I'm not going to take any steps. I'm going to keep doing what I'm doing"? That would be inappropriate, correct?

A. I agree.

Q. It would be a violation of policy and against their training if they were to do that, correct?

A. Yes.

Q. You had mentioned earlier that -- and I don't know if you were referring specifically to B cellhouse or just giving cellhouses as an example, but -- well, strike that.

It's your understanding that B cellhouse had five different tiers -- you know, 100 range, 200 range, and all of the way up to the 500 range; is that correct?

A. Yes.

Q. And the different officers had different sets of keys so that only one of the three officers in the cellhouse would have the keys to the 500

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 55 of 82

Page 209

range; is that correct?

A. Correct.

Q. What -- if there was an issue in the 500 range, say, that -- an emergency that required a prisoner to be released from his cell in the 500 range, did the policies and procedures in place at Indiana State Prison require the officer with the keys to the 500 range to respond personally up to that 500 range to address the issue?

A. Yes.

Q. Okay. Was there anything in the policies or procedures that prohibited that officer from giving their 500 range keys to a different officer to go up and respond instead?

A. No.

Q. So that -- that would have been also a permissible option under the policies and procedures -- either address the issue directly or pass off your keys and have another officer go up and address the issue, correct?

A. Correct.

Q. One of those two things would be required. Is that fair to say?

A. Yes.

Q. Okay. Mr. Nowatzke, did you know

Page 210

Joshua Devine?

A. No.

Q. Okay. Fair to say that you can't rule out the possibility that you seen him or interacted with him at some point during your time at the prison?

A. That's a possibility.

Q. But you have -- as you sit here today, you have no independent recollection of anything with regard to Mr. Devine?

A. No, not that I can recall.

Q. Do you have any firsthand knowledge or secondhand knowledge from any source -- from anyone who's told you anything about Mr. Devine's physical or mental health at the time that he died?

MR. BLINN: Object to form.

BY THE WITNESS:

A. No.

BY MR. HEPPELL:

Q. Any knowledge, whether from firsthand or secondhand sources, about Mr. Devine's personal habits?

MR. BLINN: Just to speed things up, I'll put in a continuing objection to questions to the extent that they ask for information not based on firsthand

Page 211

knowledge.

Go ahead and answer.

And that will be a continuing objection. Are you okay with that?

MR. HEPPELL: That's fine. Yeah. Thank you. I appreciate that.

BY THE WITNESS:

A. Can you repeat the question?

BY MR. HEPPELL:

Q. Sure. Whether you have any information, either based on personal knowledge you learned or secondhand from anyone telling you, about anything with regard to Mr. Devine's personal habits?

A. No.

Q. Any information, whether you learned it firsthand or secondhand from someone else, about the nature of Mr. Devine's behavior as a prisoner?

A. No.

Q. Okay. Do you have any recollection as you sit here today of any time you've ever had a conversation with Mr. Devine?

A. No.

MR. BLINN: Object to form.

BY MR. HEPPELL:

Q. And do you know Mr. Devine's family?

Page 212

A. No.

Q. To your knowledge, have you ever met or interacted in any way with any member of Mr. Devine's family?

A. Not to my knowledge, no.

Q. Fair to say you would not be in a position to offer any opinion or information about what Mr. Devine was like as a person or anything about his habits or behaviors?

A. That's correct.

Q. And, Mr. Nowatzke, when did you first become a correctional officer?

A. July 3rd, 1995.

Q. And what position did you first obtain as a correctional officer?

A. Correctional officer.

Q. Where did you first obtain employment as a correctional officer?

A. At the Indiana State Prison.

Q. Was that position the first position in the field of corrections that you obtained?

A. Yes.

MR. BLINN: I want to jump in between questions. Just -- I want to clarify April is going to go for another hour and 15 minutes -- April is

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 56 of 82

Page 213

good to go until 5:00 Eastern Time and 4:00 o'clock Central Time; is that right?

THE REPORTER: Yes, that's correct.

MR. BLINN: Okay. So we're not under an hour yet? Okay.

THE REPORTER: No. 4:00 o'clock Central Time. So we have an hour and 13 minutes.

MR. BLINN: Got you.

THE REPORTER: Okay. Thank you.

MR. HEPPELL: All right. Thank you. And I hate to make promises or predictions, because I'm often proven to be a liar, but I think I'm sort of within the closing phase of --

MR. BLINN: If not, we'll talk about it in a minute.

MR. HEPPELL: Okay.

MR. BLINN: But go ahead.

BY MR. HEPPELL:

Q. Mr. Nowatzke, what made you pursue a career in corrections?

A. I needed a job.

Q. Was there anything in particular outside of just looking generally for employment that made the correctional field attractive to you?

A. Nope.

Page 214

Q. And then you obviously had risen through the ranks from a correctional officer all of the way up to major and now up to deputy warden.

Would you mind walking me through briefly just the periods of time that you obtained those promotions, to the best of your recollection?

A. I mean, I don't -- off the top of my head, I don't know the exact dates, but obviously I was a correctional officer for quite some time. And then I moved up to correctional sergeant. From there, I moved to lieutenant, to captain, to major, and then the deputy warden.

Q. Has the entirety of your career in the Indiana Department of Correction been served at Indiana State Prison?

A. Yes.

Q. Okay. Did you have any law enforcement or military experience prior to becoming a correctional officer in 1995?

A. No.

Q. What's the highest level of education that you've completed?

A. Associate's degree.

Q. Okay. And when and where did you obtain that degree?

Page 215

A. I obtained that degree in '95 from Vincennes University in law enforcement.

Q. As a law enforcement major or a law enforcement focus to that degree?

A. Yes.

Q. And what employment did you have since completing high school, but prior to obtaining your role as a correctional officer?

A. Probably -- I had a factory job maybe and -- I'd say that's probably it.

Q. Have you ever been charged or convicted with a crime?

A. No.

Q. Have you ever been arrested?

A. No.

Q. Have you ever received discipline in connection with your job at Indiana State Prison?

A. No.

Q. Never been written up?

A. No.

Q. Okay. Ever been disciplined in connection with any other job you've held other than at ISP?

A. No.

Q. Have you ever been sued prior to this

Page 216

lawsuit?

A. Yes.

Q. Okay. How many other lawsuits in addition to this one have you been named as a defendant in, to the best of your knowledge?

A. Any answer I would give would probably be a guess. Maybe somewhere between five and ten.

Q. Okay. What's your knowledge of how those other five or ten lawsuits were resolved?

A. Not sure on hardly any of them. I don't really know the outcome.

Q. Okay. Have you ever -- so you testified earlier that you have given deposition testimony before; is that correct?

A. Correct.

Q. Was that deposition testimony -- well, strike that.

On how many occasions other than today have you sat for a deposition?

A. I'd say -- what I can remember is at least two.

Q. To your knowledge, were those depositions in connection with criminal cases in which you were a witness or civil cases?

A. I would say civil cases.

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 57 of 82

Page 217

Q. Okay. So would those depositions be in cases in which you were named as a defendant, to the best of your knowledge?

A. One of them for sure, yes, I would say.

Q. Okay. What's your understanding of the allegations against you in that case that you gave a deposition where you were named as a defendant?

A. I'm not really sure.

Q. Okay. You have no knowledge of what the plaintiff in that lawsuit is claiming you did wrong?

A. The case is at issue where I put out a memo or -- the case is still ongoing. So it hasn't been to trial yet, but it is a case where I put in a memo to have officers or direct officers to do something and they did, and he doesn't like the fact that it was done. So I'm thinking that I violated some right or something.

Q. Okay. And do you recall the name of the individual that brought that lawsuit against you?

A. Yes, sir.

Q. What's his name?

A. Comer.

Q. Comer? That's his last name?

A. Yes.

Q. You had described your understanding of

Page 218

the allegations as that Mr. Comer was saying you put out a memo directing others to do something and he didn't like what they did.

What specifically -- do you recall the memo that's at issue in the lawsuit?

A. Yes.

Q. Can you describe the substance of the memo -- the subject matter of the events that it relates to?

A. It's about searching offenders.

Q. Okay. Other than that -- other than that lawsuit related to that memo about searches, what else do you recall about the allegations or subject matter of the other lawsuits that have been brought against you?

A. There was one where I was the screening officer and the offender was asking for witnesses and evidence, and he claims that I didn't offer him or didn't write down what his -- evidence that he requested for his disciplinary case or --

Q. Any of the other cases that you recall anything about the factual matter of the allegations?

A. No.

Q. I want to preface these next couple of questions by -- by telling you that I don't want you

Page 219

to tell me anything about the substance of conversations that you had with your attorney or the substance of any communications you had with your attorney, okay?

A. Okay.

Q. But did you speak with your attorney to -- in preparation for your deposition today?

A. Yes.

Q. Okay. On how many occasions did you speak with your attorney to prepare for your deposition?

A. Once.

Q. Was that by phone or in person?

A. By phone.

Q. Approximately how long was that conversation?

MR. BLINN: I'm going to object and instruct him not to answer that question. I think that's getting -- well, you know what? I'll withdraw that instruction, but I'm not sure where we're going here.

So go ahead. You can answer that.

BY THE WITNESS:

A. I don't really know. 15, 20 minutes.

BY MR. HEPPELL:

Q. Okay. Did you review any documents or

Page 220

other materials to prepare for your deposition today?

A. No.

Q. Okay. Are you aware -- well, strike that.

When did you -- when did you first find out that you were being sued in relation to the fire that took place at the prison on April 7th, 2017?

A. I don't know the exact date, but -- yeah. I don't recall the date it was.

Q. Other than your attorneys, who else have you spoken with about the lawsuit?

A. No one.

Q. Okay. You're aware that there are a number of other individuals who have also been named as defendants in the lawsuit?

A. Yes.

Q. One of those individuals is Warden Ron Neal.

Have you ever -- have you ever spoken with Warden Neal about the lawsuit?

MR. BLINN: I'm going to instruct the witness not to testify concerning the substantive communications with other codefendants. That's privileged.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 58 of 82

Page 221

MR. HEPPELL: Are you -- just so I understand the nature of your objection, are you asserting --

MR. BLINN: I'm asserting codefendant privilege.

Go ahead and ask your next question.

MR. HEPPELL: Okay. Well, I disagree that there's any codefendant privilege in civil cases --

MR. BLINN: Fair enough. Ask your next question.

MR. HEPPELL: Can you name me any rule or case related to an assertion of codefendant --

MR. BLINN: Are you asking for his communications with other defendants, or are you just asking if he has talked to them about the case?

MR. HEPPELL: Well, my first question is whether he's talked with them about the case, but -- and just so I'm clear, I would not dispute at all that there would be a privilege if Mr. Nowatzke had had conversations with other codefendants present that were also conversations where there was -- there was an attorney-client conversation amongst multiple codefendants.

I understand your privilege assertion to be different, and you are asserting that there is a privilege for any communication between

Page 222

individual codefendants, regardless of the presence of a lawyer. I --

MR. BLINN: No. You can ask him were there any such conversations and -- because it might be a moot point. Otherwise, we've made our record, but -- so he can answer whether he's even had conversations about this case with other defendants since finding out about the lawsuit. If you want to ask him that question first.

MR. HEPPELL: Well, I will ask that question --

MR. BLINN: Okay.

MR. HEPPELL: -- but I want to understand the basis for your privilege objection because I've -- honestly, I've never heard this privilege assertion before --

MR. BLINN: Okay.

MR. HEPPELL: Are you able to --

MR. BLINN: But why don't you ask the first question, and then we'll see if there's anything for me to make instruction on.

MR. HEPPELL: Well, I appreciate your guidance on how you think I should handle the deposition, but you've -- you've made an objection for the record. You've asserted a privilege that

Page 223

I've -- I'm not posturing here. I've never heard it invoked before.

I'm asking you to provide me any guidance on where I could find that privilege located in a rule or procedure or a statute or case law, and I understand you to be declining my request for you to identify any basis of that privilege--

MR. BLINN: I've --

MR. HEPPELL: -- is that correct?

MR. BLINN: I've made an instruction -- at this point, I don't even know if I've instructed him not to answer a question that's actually pending. So why don't we get there first before --

MR. HEPPELL: Okay.

MR. BLINN: I'm not sure there's even an instruction right now. So why don't we get there first?

MR. HEPPELL: That's fine. But just so I'm clear, you are not -- you're declining my request to cite any basis for the privilege you've described?

MR. BLINN: I think right now -- let's find out -- let's find out if we've got anything to talk about.

BY MR. HEPPELL:

Q. Mr. Nowatzke, have you had any

Page 224

conversations with Warden Neal about this -- about this lawsuit?

A. I would say no.

Q. Okay. Have you had any conversations with Warden Neal about the fire that took place on April 7th, 2017?

A. Yes.

Q. Okay. And I believe you testified to one of those conversations earlier in the deposition in terms of a conversation that you had on the night of the fire when you had learned some information from the first responders and from Captain Dykstra and then you conveyed that to Mr. Neal; is that correct?

A. That's correct.

Q. And aside from that one conversation, which you already testified to, have you had any other conversations with -- with Warden Neal about the fire on April 7th, 2017?

A. Not that I can recall.

Q. If you had had conversations with Warden Neal about the fire, would you expect those conversations to be documented in any way?

A. Probably -- I would say no.

Q. And you -- have you ever had any conversations with Kenneth Gann about this lawsuit?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 59 of 82

Page 225

A. No.

Q. Have you ever had any conversations with Kenneth Gann about the April 7th, 2017, fire?

A. Not that I can recall, no.

Q. Okay. Have you had any conversations with William Lessner about this lawsuit?

A. No.

Q. Have you had any conversations with William Lessner about the fire that killed Joshua Devine?

A. No, not that I can recall.

Q. Okay. Have you had any conversations with Christopher Beal about this lawsuit?

A. No.

Q. Have you had any conversations with Christopher Beal about the fire that killed Joshua Devine?

A. No.

Q. Have you had any conversations with Steven Griffin about this lawsuit?

A. No.

Q. Have you had any conversations with Mr. Griffin about the fire that killed Joshua Devine?

A. No.

Q. Have you had any conversations with

Page 226

Anthony Watson about this lawsuit?

A. No.

Q. Have you had any conversations with Anthony Watson about the fire that -- well, strike that.

You had testified earlier that Lieutenant Watson was one of the individuals who you spoke to the night of the fire, correct?

A. Correct.

Q. Outside of that one conversation, have you ever talked with Anthony Watson about the fire that killed Joshua Devine?

A. No, not that I can recall.

Q. Same question for Timothy Redden.

Again, I understand he was one of the individuals you spoke to on the night of the fire.

Outside of that one conversation, have you ever spoken with Mr. Redden about the fire?

A. Not that I can recall, no.

Q. Have you ever spoken with Timothy Redden about this lawsuit?

A. No.

Q. Have you ever spoken with

Page 227

Christopher Puetzer about this lawsuit?

A. No.

Q. Have you ever spoken with Christopher Puetzer about the fire that killed Joshua Devine?

A. The day of the incident, yes.

Q. Okay. Outside of that one occasion?

A. No, not that I can recall.

Q. And the day of the incident, are you referring to the conversation that you've already testified to?

A. Yes.

Q. Okay. And there are no additional details that you recall about your conversation with Christopher Puetzer beyond what you've already testified to?

A. Correct.

Q. Have you ever talked with Ryan Statham about this lawsuit?

A. No.

Q. Have you ever spoken with him about the fire that killed Joshua Devine?

A. Not outside the immediate incident.

Q. Okay. So, again, to your knowledge, he

Page 228

was one of the individuals you spoke with the night of the fire?

A. Yes.

Q. Outside of that, never?

A. No.

Q. Okay. Have you ever spoken with Justin Rodriguez about this lawsuit?

A. No.

Q. Have you every spoken with Justin Rodriguez about the night of the fire?

A. No.

Q. Have you ever talked with Sarah Abbassi about this lawsuit?

A. No.

Q. Have you ever talked with Sarah Abbassi about what happened the night of the fire?

A. No.

Q. Have you ever talked with Promise Blakely about this lawsuit?

A. No.

Q. Have you ever talked with Promise Blakely about what happened the night of the fire?

A. Not that I can recall, no.

MR. HEPPELL: I think I'm close to the end of my questions. I would like to take a five-minute

Page 229

break just to look over my notes, and then I can clean up anything remaining.  And then I can turn it over to you, Mike, if you have questions.

MR. BLINN: Yeah.  I am going to have a few.  If we're done in five or ten minutes, I think we'll be good on time.

MR. HEPPELL: Okay.  Let's just take five.  We'll come back at ten after the hour.

MR. BLINN: All right.  See you then.

(WHEREUPON, a short break was taken.)

MR. HEPPELL: Back on the record.  I do not have any further questions at this time.

EXAMINATION

BY MR. BLINN:

Q.  Mr. Nowatzke, as custody supervisor, you don't know every single thing that happens in the prison, do you?

A.  No.

Q.  You don't expect to know everything that happens in the prison, do you?

A.  No.

Q.  You rely on lower level reports to handle a lot of routine and day-to-day issues?

A.  Yes.

Page 230

Q.  And that's consistent with the policy?

A.  Yes.

Q.  We talked about fires earlier, and you remember there was some discussion about fire policies and how they're documented and how they're handled.

And you -- and do you remember testifying about major fires and minor fires and kind of the policy for handling fires?  Do you remember that?

A.  Yes.

Q.  Do offenders sometimes create, what I'll call, nuisance fires where, for example, they might set a piece of paper on fire and throw it out of the cell or they might light a cigarette or something like that?

MR. HEPPELL: Object to form.

BY MR. BLINN:

Q.  Go ahead and answer.

A.  Yes.

Q.  Okay.  And so, you know, again, that's what I'm referring to when I say "a nuisance fire."

And do some of those fires go out on their own?

Page 231

A.  Yes.

Q.  And that happens fairly commonly out on the range?

A.  That's pretty common, yes.

Q.  Does every single one of those get documented?

MR. HEPPELL: Can I make a -- sorry.  Just to make things easier, I'd like to make a standing objection to form.  Just the leading nature of the questions.  If that's okay for a standing objection --

BY MR. BLINN:

Q.  You can answer.

A.  Yes.

Q.  Okay.

A.  I guess not all of them get documented.

Q.  Not all of them get documented.

Okay.  Okay.  And do all of them require a staff response?

A.  No, not always.

Q.  Okay.  And that's also consistent with policy?

A.  Yes.

MR. BLINN: That's all I've got.

Page 232

MR. HEPPELL: I don't have any follow-up based on that.

MR. BLINN: Okay.  We will sign, and we will take an electronic transcript, please.

(WHEREUPON, at 3:12 p.m., the deposition was concluded.)

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 61 of 82

Page 233

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, APRIL D. HARGETT, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 84-4735, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 2nd day of November, 2020.

*April Hargett*
_____
April D. Hargett, CSR
License No. 084-004735

Page 234

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the )
ESTATE OF JOSHUA DEVINE, )
)
Plaintiff, )
) Case No.
vs. )  3:18-cv-00995-JD-MGG
)
RON NEAL, et al., )
)
Defendants. )

I hereby certify that I have read the foregoing

transcript of my deposition given at the time and

place aforesaid, consisting of Pages 1 to 232,

inclusive, and I do again subscribe and make oath

that the same is a true, correct, and complete

transcript of my deposition so given as aforesaid,

and includes changes, if any, so made by me.

_____
JASON NOWATZKE

Subscribed and sworn to
Before me this
Day of              , 2020

Notary Public

Page 235

ERRATA SHEET
CHANGES IN TESTIMONY

DWYER v. NEAL, ET AL.
JASON NOWATZKE
August 20, 2020

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
| | | | |

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 62 of 82

## A

**Abbassi (2)**
228:12,15
**abilities (1)**
52:3
**ability (8)**
8:12;63:17,21;92:14;
188:14;190:9;200:13,
15
**able (31)**
7:17;18:23;26:14,20;
39:22;40:2;41:23,24;
45:14,23;113:21;
125:20;127:21;128:19;
132:16;133:2,13,14;
138:11,23;142:20;
153:22;158:7;162:3;
172:8;173:3,4;187:21;
193:16;202:25;222:18
**above (9)**
39:19,20,21;51:8;
52:21;72:4;78:20;
191:12;192:10
**absolute (1)**
140:15
**Absolutely (3)**
20:10;61:8;96:22
**access (6)**
92:15;121:6;158:11;
159:7;162:3;207:3
**accessible (1)**
186:21
**accommodations (1)**
132:20
**according (4)**
45:15;140:8;156:24;
166:7
**accordingly (1)**
47:18
**accountability (1)**
139:23
**accurate (1)**
105:2
**accurately (2)**
94:4;182:2
**achieve (2)**
53:18;165:6
**across (2)**
77:15;132:22
**act (4)**
36:11,18,24;113:16
**acted (1)**
37:4
**acting (3)**
47:1;60:20;166:6
**action (22)**
22:9;29:2,6,8,12;
30:18;31:8,19,24;32:5,
12;33:1,6,15;34:3,15;
128:15;137:10,17;
164:16;206:21,23

**actions (3)**
22:12;27:8;46:24
**activate (2)**
11:21;108:15
**activating (1)**
163:18
**actual (4)**
31:2;86:21;102:23;
146:22
**actually (17)**
26:5,6;85:14;86:3;
90:19;93:13;101:7,15;
115:23;120:7;139:24;
145:12;157:3;194:19;
195:9;206:17;223:12
**ad (1)**
81:13
**add (2)**
79:23,24
**added (6)**
63:19;79:16;86:1;
89:12,21;123:9
**adding (1)**
123:5
**addition (5)**
15:19;88:10;89:25;
90:18;216:4
**additional (14)**
8:19;33:4,9;63:18;
87:13,17;110:17;
112:4;124:6,7;135:16;
192:20;206:12;227:14
**address (12)**
52:13;69:9;103:2;
137:11;161:17;200:13,
15;206:6,23;209:9,18,
20
**addressed (1)**
200:1
**addressing (3)**
69:19;148:23;195:9
**adequate (7)**
45:21;63:11;71:21;
72:12;79:7;81:6;95:18
**adequately (1)**
201:14
**adjusted (1)**
47:17
**administration (1)**
198:18
**adopted (1)**
71:25
**advisable (1)**
190:13
**advise (3)**
121:11;124:10,14
**affairs (1)**
149:12
**affect (2)**
8:11,12
**affirmatively (1)**
207:7
**afterwards (1)**

21:1
**again (21)**
32:10;59:21;61:24;
65:19;68:6;99:5;
117:12;128:24;129:17;
142:2;152:10;154:16;
155:7,12;157:12;
171:4;178:5;201:12;
226:15;227:25;230:21
**against (7)**
96:7;140:5,5;208:11;
217:6,19;218:15
**agree (15)**
61:1,13;62:1,7;
67:11;137:8;158:9;
159:2,19;169:16,18;
176:24;204:17;207:25;
208:9
**agreeing (1)**
4:8
**ahead (20)**
4:23;7:6,16;17:4;
58:3;61:20;105:2;
127:6;131:6;158:20;
172:10;177:20;182:4,
7;204:22;211:2;
213:17;219:21;221:5;
230:19
**alarms (1)**
181:14
**alert (1)**
124:21
**allegations (4)**
217:6;218:1,13,22
**allow (2)**
48:21;141:24
**allowed (3)**
42:19;84:25;157:5
**almost (2)**
57:6;167:21
**alone (2)**
18:6,8
**along (4)**
120:8;189:25;190:3;
200:7
**altogether (1)**
84:5
**always (8)**
69:8;87:9;105:11,23,
25;181:15;193:3;
231:21
**amend (1)**
94:9
**amendment (4)**
86:1,7,10;87:2
**amendments (4)**
83:17,19;86:6;89:6
**amongst (2)**
164:20;221:21
**amount (1)**
180:25
**analogy (1)**
104:17

**angles (1)**
19:8
**announced (1)**
108:19
**annoys (1)**
145:15
**annual (6)**
79:13;81:12;95:24;
96:7;116:14,17
**Anthony (3)**
226:1,4,11
**anymore (2)**
129:1;150:4
**apologize (1)**
143:3
**appear (1)**
172:18
**appeared (1)**
206:10
**appears (2)**
179:4;204:17
**applicable (2)**
94:3;154:4
**applied (1)**
85:21
**applies (3)**
163:1;169:1;170:8
**apply (5)**
137:3,5;155:25;
160:16;161:25
**appreciate (8)**
16:19;104:13;113:6;
177:10,23;196:12;
211:6;222:22
**apprise (1)**
192:15
**apprised (2)**
80:22;192:4
**appropriate (13)**
61:11;63:6;69:19;
87:13;97:5,11;103:14,
17,17;106:9;144:16;
165:3;208:3
**appropriately (5)**
45:14,24;47:1;52:11;
60:20
**appropriateness (1)**
61:14
**approved (2)**
78:22;188:9
**approximately (9)**
8:24;9:1,4;19:16;
29:17;37:17,18;60:13;
219:15
**approximation (1)**
64:21
**April (39)**
8:16,25;14:16;20:5;
21:18;22:21;23:22;
24:2,15,18;29:14,16;
33:24;34:14;35:1;
58:13;100:9;109:11;
112:1;124:3;134:3,20,

24;135:4;140:9,10;
154:22;163:5;178:24;
179:11;180:12;204:19;
207:14;212:24,25;
220:8;224:6,18;225:3
**archived (2)**
87:20;88:5
**area (18)**
26:24;73:4;75:25;
88:11,17;103:22;
104:8;142:9;160:8;
164:25;166:11,24,25;
167:17,23;168:6,25;
169:1
**areas (8)**
41:23;65:14;139:25;
141:1;143:7;186:17;
194:6,15
**argue (1)**
6:23
**arise (3)**
67:18;80:22;141:10
**arises (1)**
67:19
**arose (2)**
69:12,23
**around (5)**
27:7;79:20;89:19;
90:17;117:16
**arrested (1)**
215:14
**arrive (1)**
14:20
**arrived (2)**
29:24;102:5
**arriving (1)**
111:2
**ascertain (1)**
207:17
**aside (4)**
97:25;168:1;198:1;
224:15
**aspect (5)**
43:4;47:21;73:16;
120:12;139:14
**aspects (5)**
43:12,13;73:13;
77:16;96:3
**ass (1)**
181:9
**assaulted (1)**
26:23
**assaulting (1)**
85:14
**asserted (1)**
222:25
**asserting (3)**
221:2,3,24
**assertion (3)**
221:11,24;222:15
**assess (1)**
163:11
**assessing (1)**

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 63 of 82

96:7
**assessment (1)**
52:3
**assigned (17)**
10:11,13,15,24;11:3,
15,24;12:8,18;13:3,12,
20;14:4,12;76:15;77:3;
194:15
**assignment (3)**
76:3,3;77:8
**assist (7)**
137:13,14,19;
141:19;165:2;169:15;
180:24
**assistance (2)**
192:20;193:17
**assistants (1)**
55:8
**assisting (1)**
136:24
**associated (1)**
76:7
**Associate's (1)**
214:23
**assume (5)**
7:17;42:3;47:4;
71:11;119:8
**assumption (2)**
120:25;121:15
**attend (1)**
30:5
**attended (1)**
30:10
**attending (3)**
29:21;30:9,16
**attention (13)**
68:7,25;133:11;
135:10,23;151:2;
155:3;180:9,13;
193:22;200:15;205:15,
20
**attitude (3)**
183:11,23;184:21
**attitudes (1)**
185:20
**attorney (8)**
5:11;6:16,18;7:2;
219:2,4,6,10
**attorney-client (1)**
221:21
**attorneys (4)**
5:4,9;6:23;220:11
**attractive (1)**
213:24
**audible (1)**
145:12
**audio (3)**
16:6;20:14;24:4
**August (4)**
132:7;153:15;178:4;
202:9
**authority (6)**
188:1,7,16;190:12,

19,21
**authorization (4)**
114:11;124:6,17,21
**authorized (1)**
45:5
**automatically (6)**
110:24;111:19;
112:11;114:9;117:3;
124:5
**available (7)**
87:23;106:8;148:25;
154:8;157:17;159:6;
168:16
**average (2)**
179:22;184:18
**aware (31)**
16:5;17:3;20:24;
44:20;51:11,19,25;
53:5;60:6;88:17;
100:10,11;109:24;
113:3,14;121:13,21;
126:11;128:16;144:4,
8,10;145:3;150:14;
193:4,18,23;204:1;
205:11;220:3,14
**away (2)**
86:14,16

## B

**Back (11)**
93:19;101:11;
102:21;104:2;127:21;
142:11;151:8;171:10;
202:23;229:8,12
**background (1)**
75:21
**bad (3)**
129:2;181:12,12
**based (32)**
22:9;30:18;34:11,13,
21,23;35:4,14;36:9,14,
22;37:2,7;52:1,25;
64:19;77:17;86:18;
94:2;104:4;118:7;
119:18;120:19;134:16,
21;154:17;158:7;
178:12;204:12;210:25;
211:11;232:2
**basic (1)**
159:10
**basing (1)**
185:20
**basis (15)**
18:13;69:17;71:20;
73:13;77:24;78:5;
81:13;89:21;90:1;
115:12;192:9;195:25;
222:14;223:7,20
**bat (1)**
82:8
**Bates (6)**
131:14;132:12;

153:20;178:22;186:6;
202:14
**BCH (1)**
180:22
**Beal (8)**
44:12,13;45:19;
68:15;69:8;118:22;
225:13,16
**Beal's (1)**
68:24
**bear (2)**
133:1,4
**bearing (1)**
177:8
**beat (2)**
145:13,15
**became (5)**
17:3;51:11;71:10;
100:9,11
**become (2)**
51:19;212:12
**becoming (2)**
141:12;214:18
**bed (3)**
109:21;113:1;114:1
**beef (1)**
205:25
**beep (1)**
145:17
**beginning (3)**
140:9;148:3;180:13
**behaving (1)**
48:2
**behavior (1)**
211:17
**behaviors (1)**
212:9
**behind (1)**
31:7
**belabor (1)**
113:7
**belief (3)**
120:16,19;129:15
**bells (1)**
183:2
**belongings (1)**
162:9
**below (2)**
38:12;40:14
**benefit (1)**
184:16
**best (13)**
8:13;19:23;22:19;
37:25;64:21;95:10;
96:4;107:1;181:18;
182:15;214:6;216:5;
217:3
**better (2)**
31:5;181:11
**beyond (5)**
27:3;33:8;46:12;
51:9;227:16
**big (3)**

85:25;164:7;193:13
**binder (1)**
83:18
**bit (8)**
34:22;65:21;86:5;
93:6;149:6;177:17;
181:9;184:17
**bits (1)**
26:18
**Blakely (2)**
228:18,21
**Blinn (61)**
4:14,14;16:25;22:14;
58:1;61:18;93:5,16;
105:1;129:10,16;
130:20;131:2,6,12,16;
133:6;135:18,20;
142:1,10,21;158:19;
170:17;171:4;177:19;
182:3,7;183:14;196:5;
204:20;205:4;207:1;
210:16,23;211:23;
212:23;213:4,8,14,17;
219:17;220:22;221:3,
8,12;222:3,12,17,19;
223:8,10,15,21;229:4,
9,15;230:18;231:12,
25;232:3
**board (15)**
31:3,7,14,21,24;32:5,
12;33:1;91:22,25,25;
109:21;113:1;114:2;
188:10
**bolt (5)**
161:10,12,14;
162:25;164:24
**both (17)**
5:17;42:21;43:1;
81:13,14;107:1;115:9;
117:5;123:22;124:4,
23;130:10;143:5;
191:18;192:9,18;
196:13
**bottom (7)**
132:13;138:16,20;
160:20;180:14;204:13;
205:1
**bound (1)**
181:7
**boxes (1)**
55:25
**breaches (1)**
49:11
**break (12)**
7:20,24;8:5;34:21;
93:14,17,21;98:25;
142:24;171:8;229:1,10
**breaking (2)**
99:5;142:1
**breaks (1)**
7:23
**briefly (1)**
214:5

**bring (6)**
66:6,6;68:7,24;
200:14;205:15
**broad (2)**
160:15;168:24
**broadly (2)**
119:24;198:9
**broke (1)**
170:17
**brought (4)**
151:2;205:19;
217:19;218:14
**bud (1)**
141:11
**building (2)**
18:2,3
**buildings (1)**
125:22
**built (1)**
43:21
**Bullet (5)**
163:7,11;171:23;
186:18;187:1
**bulletin (2)**
91:22,25
**bunch (1)**
71:12
**bundle (1)**
90:12
**bundled (6)**
122:7,13,14,20,22;
123:2
**busted (1)**
146:12
**busy (1)**
143:12
**button (1)**
136:23
**buttons (1)**
145:16

## C

**cabinet (4)**
92:6,7,10;93:3
**call (17)**
31:9;74:6,6;82:8;
95:22;111:12,14;
112:10,12,15;114:12,
18;117:3;119:8;
169:21;177:12;230:13
**called (11)**
4:19;8:22;82:16;
110:5,25;111:21;
114:21;119:13;124:22;
156:13;194:1
**calling (2)**
156:3,9
**calls (2)**
108:18;110:5
**came (4)**
57:7;150:23;188:21;
193:1

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 64 of 82

**camera (1)**
19:8
**can (112)**
5:25;6:3,23;7:5,10;
8:4,11;15:11;19:9;
20:23;21:20;24:8;
27:10;28:24;29:15,19;
30:24;31:6;33:9;34:10;
37:14;41:12,13;42:25;
43:10;55:18;58:6;61:2,
2;64:5;69:3;72:9;75:5,
22;76:1;78:11;80:23;
82:4;92:14;93:6,7;
95:15;96:14;108:4;
109:6,15;113:16;
117:15;126:15;129:11;
133:3,17;138:9,16,23;
139:1;141:10;142:14,
21,23,24;144:6,7;
145:8;152:10;154:1;
156:21;159:7;161:16,
22;168:2,8;169:15;
171:7;173:2;178:16;
179:16;180:7,18;
181:4;186:4;189:15;
191:2;192:24;194:5;
196:22;198:8,16;
199:20;200:5;201:20;
203:6;204:22;210:11;
211:8;216:20;218:7;
219:21;221:10;222:3,
6;224:19;225:4,11;
226:13,21;227:9;
228:23;229:1,2;231:7,
13
**capacity (5)**
32:1;34:17;35:1;
179:17;196:18
**Captain (8)**
15:24;24:22;40:19;
46:18;84:10;150:6;
214:11;224:12
**captains (11)**
40:16,18,22;46:7,12;
47:12;48:14;49:22;
69:9;81:9;147:23
**captured (1)**
16:7
**care (7)**
22:13;102:19;
103:25;121:12;128:11;
150:7;192:25
**career (13)**
10:6;11:9,18;12:2,
11,21;13:6,15,23;14:7;
118:18;213:20;214:13
**carefully (1)**
60:24
**carried (1)**
104:7
**carries (1)**
139:20
**case (25)**

5:5,9;24:21;29:6,11;
97:23;107:4;108:3;
132:11;136:21;156:22;
161:9;162:7;165:22;
204:4;217:6,11,12,13;
218:20;221:11,14,16;
222:7;223:5
**cases (6)**
216:23,24,25;217:2;
218:21;221:7
**categories (2)**
56:8;63:7
**category (2)**
56:21;86:7
**causes (1)**
145:17
**causing (2)**
65:17;88:10
**cell (43)**
12:15;27:5;28:8;
84:3;85:1;101:4,10;
102:3,12;104:24;
106:13,19;107:3;
123:20,23;124:9,25;
161:9,13,20,22,22;
162:3,3,8,12,15,21,25;
163:2,2;166:15,16;
167:6,12;168:11,15,17;
169:22;180:21;186:19;
209:5;230:15
**cellblock (1)**
85:1
**cellhouse (110)**
13:1;14:17;15:17;
19:9;20:6;21:19;26:10,
21,22,24,25;27:9;28:7;
45:6,22;75:11,11,16;
76:15,17;77:4,12;78:3;
82:14;83:7,15;87:6,24;
88:4,20;89:3,4;90:16;
91:3,19;92:12;100:7,
10,19;101:2,3;102:15;
105:11,14,22;106:5;
107:18;108:10,20,24;
109:3,4,14,25;111:9,
11,21;112:16,18,24;
113:10;114:3,14;
121:11;123:20,21,24;
124:11,15,16,25;125:6;
126:23;130:8;133:19,
20,22;134:19;135:2;
138:2,4;140:17;143:6;
144:24;147:11,13;
153:2,4;154:8,10;
157:18;162:16;163:6,
8,17,20;164:9,11,12,
14;166:6;169:14,20;
170:11;186:22;204:19;
207:16;208:16,19,25
**cellhouses (40)**
11:21;12:5,14,24;
13:9;46:19;77:16,18;
81:20;88:18;89:2;92:4;

94:17;95:4,5,19;106:1;
108:2,16,21;109:13,21;
110:25;111:3,7;121:8;
124:23;126:8;129:23;
141:10;155:25;156:2;
159:6;163:25;172:21;
173:12;174:21;177:1;
186:20;208:16
**cellhouse-specific (1)**
83:11
**cells (16)**
12:6;41:19;43:22;
82:10;108:12,17;
109:14;110:18,20;
113:11;114:3,8;117:2;
124:24;125:7;129:25
**center (1)**
100:14
**central (4)**
10:21;88:15;213:2,6
**certain (6)**
44:23;63:7;68:6;
75:25;77:16;199:15
**certainly (4)**
7:23;93:7;98:13;
193:15
**certified (1)**
43:18
**chain (17)**
37:14;38:9;39:20;
40:13;48:22,25;49:6;
51:10;52:21;54:25;
72:4;78:20;162:4,22;
190:22;191:12;192:11
**chains (2)**
161:11,19
**chance (20)**
125:21,22;138:15;
151:16;152:6,23;
173:9,16,21;174:1,6,
11;175:8,13,18,23;
176:3,8,13,18
**change (8)**
38:9;46:6;65:18;
86:1,15;89:11;149:25;
190:7
**changed (8)**
72:13,13;79:17;
80:10;82:1;84:1;150:2,
3
**changes (47)**
10:8;11:11,20;12:4,
13,23;13:8,17;14:9;
31:4,16;35:2,7,10,13,
18,21,24;36:3,6;48:8;
70:18;78:21;79:1,5,14;
80:5,8,8,9;149:20;
187:13,14,23;188:2,8,
15,21;189:4,9,23;
190:1,10,18,20;197:21,
22
**changing (1)**
11:4

**characterization (2)**
105:2;183:11
**charge (10)**
81:10;92:11;163:25;
164:3,8;165:13,19,23;
166:4,5
**charged (1)**
215:11
**check (5)**
57:4;144:7;149:16,
21,23
**checking (2)**
141:14;143:7
**Checkpoint (7)**
110:3,9,16;111:1;
124:10,14;125:2
**checks (8)**
139:14;143:25;
144:17,24;147:21;
150:9,15,18
**chest (1)**
181:14
**chief (8)**
9:13;179:6,11,13,22;
180:1,3;181:25
**chow (3)**
84:2,3;201:2
**Christopher (5)**
225:13,16;227:1,4,
16
**chunk (2)**
45:4;138:9
**cigarette (1)**
230:15
**circumstances (3)**
129:24;150:21;163:5
**cite (1)**
223:20
**civil (3)**
216:24,25;221:7
**claiming (1)**
217:10
**claims (1)**
218:18
**clarification (4)**
20:4;78:16;196:6,12
**clarify (3)**
7:13;49:18;212:24
**clarity (2)**
58:7;65:15
**classification (1)**
61:25
**classroom (3)**
119:18,25;120:23
**classroom-type (2)**
120:1,18
**clean (1)**
229:2
**cleanly (1)**
149:6
**clear (22)**
6:4;17:24;22:16,18;
32:8,10;38:23;50:24;

69:25;93:11;96:24;
97:17;113:6;115:14,
25;124:13;158:24;
172:3;185:5;203:11;
221:17;223:19
**clearer (1)**
80:17
**clearly (1)**
99:8
**close (5)**
102:22;108:3;
142:17;191:24;228:24
**closing (1)**
213:13
**code (6)**
112:12,15;124:21,
22;154:14;161:8
**codefendant (3)**
221:3,7,11
**codefendants (4)**
220:24;221:19,22;
222:1
**colleague (1)**
5:8
**combination (1)**
154:9
**Comer (3)**
217:22,23;218:1
**coming (5)**
45:11,21;54:23,25;
198:3
**command (16)**
37:14;38:9;39:20;
40:14;46:6;48:23,25;
49:6;51:10;52:21;
54:25;72:4;78:20;
190:22;191:12;192:11
**common (2)**
136:7;231:4
**commonly (1)**
231:2
**commotion (2)**
12:25;207:18
**communicate (6)**
48:22,24;49:6,7;
53:21;155:21
**communicated (3)**
54:2;102:25;109:19
**communication (4)**
69:6,18;192:9;
221:25
**communications (8)**
52:20;147:23;
155:15,20;174:17;
219:3;220:24;221:13
**competing (2)**
107:14,23
**complete (1)**
8:4
**completed (1)**
214:22
**completing (5)**
139:24;147:21;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 65 of 82
JASON NOWATZKE
August 20, 2020

195:2,14;215:7
**compliance (2)**
43:20,25
**complying (26)**
138:18,21;139:3;
151:18;152:2,7,13,18,
24;173:10,17,22;174:2,
7,12,24;175:6,9,14,19,
24;176:4,9,14,20;
195:14
**component (2)**
119:19;120:6
**components (1)**
119:18
**computer (1)**
131:1
**computer-generated (1)**
144:21
**computerized (1)**
19:7
**concern (1)**
183:12
**concerned (1)**
183:18
**concerning (2)**
95:9;220:23
**concerns (6)**
40:2;49:12;50:14;
52:9;184:5;199:21
**concluded (1)**
232:7
**concludes (1)**
191:1
**conclusion (1)**
185:20
**concrete (2)**
121:1;128:15
**conditions (1)**
8:9
**conduct (6)**
55:8;72:1;117:19;
194:16;199:13;204:3
**conducted (12)**
20:25;21:3,6,8,12,18,
25;147:25;200:19,21;
201:9;204:18
**conducting (2)**
4:16;194:14
**conference (1)**
132:22
**confidential (15)**
97:1,13,19;130:11,
14,16;132:3;153:18;
157:4;171:13,16;
177:13,15;191:2,4
**confirm (2)**
4:10;68:15
**confusing (3)**
7:14;49:25;104:12
**connection (5)**
31:8;81:12;215:17,
22;216:23
**consecutively (2)**

153:21;178:8
**consider (1)**
159:20
**considerations (1)**
107:15
**consistent (3)**
137:16;230:1;231:22
**consistently (4)**
37:4;146:9;148:9;
206:5
**constructed (1)**
65:17
**consult (4)**
81:4,8,22;96:15
**consultations (1)**
81:16
**contact (3)**
78:15,17;124:9
**contacting (1)**
153:4
**contain (1)**
125:20
**contained (13)**
62:23;82:13;85:6;
107:4;117:4,10;
136:12;151:12;153:4;
161:1;170:2,14;172:8
**contains (1)**
160:11
**content (2)**
73:17;135:16
**contents (8)**
71:4;96:16,20,25;
119:3;183:1,5,6
**context (6)**
16:13,17;108:9;
118:1;179:16;196:23
**continuing (2)**
210:24;211:3
**continuously (1)**
10:3
**contraband (4)**
42:6,7,17;66:7
**contrary (4)**
36:12,19,24;67:3
**contrasted (1)**
133:24
**control (5)**
10:21;100:14;
136:22;141:12;186:24
**conversation (14)**
6:8;27:13,23;28:4;
198:15;211:21;219:16;
221:21;224:10,15;
226:10,18;227:11,15
**conversations (50)**
24:9,16;25:11,17,21,
25;26:1,4,16;28:14,17;
33:13,16;34:2;99:10;
196:4,19,23,24;197:16,
24;198:5,13;199:2,4,7,
9,18;200:4;219:2;
221:19,20;222:4,6;

224:1,4,9,17,20,22,25;
225:2,5,8,12,15,19,22,
25;226:3
**convey (12)**
27:12,20;30:12;
48:20;51:9;54:1;55:11;
71:21;121:18;147:20;
169:6;193:7
**conveyed (17)**
50:22;51:23;52:5;
89:21;97:21;101:17;
115:10;120:3;121:16,
22;127:24;128:4,6;
144:2;190:22;205:7;
224:13
**conveying (6)**
28:12,13;51:11,20;
52:11;86:13
**convicted (1)**
215:11
**cooperating (1)**
4:7
**coordinator (3)**
44:10,14;45:19
**copies (2)**
134:17;157:4
**copy (11)**
29:12;64:15;83:10,
11;89:4,5,6;127:17,18;
131:9;177:15
**corner (2)**
132:14;205:2
**corrected (1)**
144:12
**Correction (2)**
202:22;214:14
**correctional (70)**
23:20;36:11,18,23;
37:3,9;44:24;46:19,25;
67:2;72:17,25;79:7;
80:24;83:15;87:6;
89:24;91:15;94:17;
95:18;97:21;99:17;
101:25;103:18;104:21;
106:15;107:13,22;
110:10,11,12,12;
112:17;116:16;117:1;
118:4,8;135:12;
137:10;139:20,23;
140:25;142:7;144:3;
157:17;159:5;161:2;
166:2,6;172:21;
173:12;174:21;177:1;
185:13;199:22,23;
205:16;207:16,21;
208:4;212:12,15,16,18;
213:24;214:2,9,10,19;
215:8
**corrections (2)**
212:21;213:20
**correctly (22)**
39:14;44:1,8;45:8;
55:24;56:5,14;59:22,

24;67:5,13;93:25;
110:14;113:8;128:25;
136:25;145:6,23;
146:16;149:4;161:14;
195:4
**counsel (6)**
4:7,8,14;7:23;17:3;
93:11
**count (3)**
162:14;163:7;181:5
**countless (1)**
181:13
**counts (1)**
125:20
**couple (5)**
86:24;130:5;139:5;
171:6;218:24
**course (6)**
5:10;22:10,13;54:11;
167:12;188:12
**court (8)**
4:12;5:10;6:2,3;
7:22;93:11;130:21;
142:13
**cover (2)**
104:5;178:12
**covered (13)**
44:4,6;68:19;94:4,5;
108:5;115:18;116:2,3;
125:10,11;138:1;143:8
**covering (1)**
115:23
**create (4)**
25:23;57:23;71:12;
230:12
**created (1)**
58:18
**creating (3)**
73:8;78:18;93:23
**crime (1)**
215:12
**criminal (1)**
216:23
**critical (1)**
28:25
**current (3)**
148:7;150:5,6
**Curry (3)**
32:14,16,24
**curtains (2)**
84:25;85:3
**custody (118)**
8:22,23;9:2,7,9,13;
10:2;35:1;37:13,17;
38:8,17;40:7;41:1,3,
10;43:5;44:21;45:10;
46:2,11,15;47:9,9;
48:1;49:14;50:8;51:18;
53:4,9,10,17,19;55:6,
16,21;56:25;57:2;59:5,
7,14;60:4,20;62:22;
64:11,25;65:2,7,14;
66:20;67:17,24;68:11,

21;69:15;70:5,21;71:5,
10,17,19;72:21;73:22;
76:15;78:2;80:2,21;
81:21;82:21,25;83:7;
84:11,15;85:10;88:8;
89:16;90:23;94:12;
95:11;96:13;98:15;
101:18,22;104:20;
125:25;126:6;134:9;
138:3;144:10;145:3;
146:14;147:13,19,20;
148:11;150:13,22;
158:16;159:3;184:10;
188:3,14;190:16;
191:19;194:17,18;
195:16;196:8,16;
198:5,10;199:6,11;
200:20;204:6;205:7;
206:24;229:16
**cutters (5)**
161:10,12,14;163:1;
164:24
**cutting (1)**
142:15

**D**

**daily (3)**
73:3,13;75:25
**damage (2)**
125:22;145:16
**damaged (1)**
145:21
**damages (1)**
145:25
**danger (2)**
61:3;169:2
**dangerous (1)**
61:2
**Daniel (3)**
179:4,8;181:25
**date (8)**
16:11;29:14;126:23;
134:2;154:21;204:14;
220:9,10
**dated (2)**
154:18;178:24
**dates (2)**
148:13;214:8
**day (11)**
45:14,23;47:19;76:6;
105:19;144:23;149:22;
199:15;200:23;227:6,
10
**days (11)**
17:14,15,17;19:24;
47:19;75:19;76:22;
77:7;90:7;91:16;122:9
**day-to-day (4)**
77:24;78:5;197:13;
229:24
**deal (4)**
104:3,9;105:6;

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 66 of 82

156:23
**dealing (5)**
101:7,9,12;143:18,
20
**death (1)**
181:3
**debriefing (7)**
28:22,23;29:1,19,22;
30:9,10
**debriefings (3)**
30:5,22,25
**decide (1)**
74:14
**decision (1)**
201:5
**declining (2)**
223:6,19
**deemed (1)**
103:5
**defendant (4)**
4:15;216:5;217:2,7
**defendants (3)**
220:16;221:13;222:7
**defense (1)**
4:7
**deficiencies (2)**
48:6;195:23
**defined (1)**
61:19
**definitely (1)**
147:22
**definition (1)**
167:21
**degree (4)**
214:23,25;215:1,4
**delegated (13)**
10:12,13,16,24;
11:15,25;12:9,19;13:4,
13,21;14:5,13
**deliberate (2)**
66:14,19
**deliberately (2)**
66:6,13
**Denise (1)**
5:6
**department (7)**
68:16;78:15;197:10;
202:22;204:1;205:25;
214:14
**depend (3)**
68:13;75:3;102:21
**depended (1)**
84:21
**depending (1)**
103:7
**depends (3)**
102:14;143:17;167:4
**depicted (1)**
24:6
**deposition (19)**
4:11,16;5:13;70:12;
130:13;131:4;153:11;
171:14;177:14;216:13,

16,19;217:7;219:7,11;
220:1;222:24;224:9;
232:6
**depositions (3)**
4:9;216:22;217:1
**deputy (24)**
9:17;10:4;31:22,25;
38:20,21;39:6,7,11,15,
19,21,24;40:4,9,12;
191:13,17,17,22;
192:10;198:12;214:3,
12
**describe (11)**
15:2,11;24:5;49:15;
50:9;62:2;72:9;145:8;
179:16;196:22;218:7
**described (12)**
27:3;41:21;48:11,13;
56:3;95:25;100:21;
109:18;122:3;125:6;
217:25;223:20
**describing (14)**
19:14,23;30:8;111:6;
114:1;116:25;117:17;
118:9,9;119:11;
120:16,19;122:10;
167:10
**description (5)**
41:6;46:5;89:1;
120:12;162:6
**designate (2)**
130:12;191:3
**designated (5)**
130:14,15;166:3;
178:5;202:13
**designating (1)**
136:4
**designation (4)**
133:21;155:13;
169:5;179:5
**designed (2)**
161:17,18
**desk (2)**
57:11;59:12
**detail (3)**
74:23;117:15;172:14
**detailed (3)**
74:25;159:21;160:2
**details (2)**
33:9;227:15
**detection (1)**
43:17
**determination (2)**
104:10;108:14
**determine (11)**
23:2;69:17;73:23;
84:18;85:21;95:17;
103:13,16;128:20;
164:18;207:24
**determined (3)**
23:5;31:20;102:1
**determines (1)**
31:20

**develop (2)**
94:9;97:20
**developed (1)**
97:8
**developing (2)**
94:22;95:6
**device (1)**
139:20
**Devine (31)**
5:7;14:17;23:15;
24:15;31:25;32:9,13;
36:16;40:17;105:15;
132:14;136:17;153:20;
155:14;178:8,9;
182:12;186:6;202:14;
203:12,20;210:1,10;
211:21;212:8;225:10,
17,23;226:12;227:5,23
**Devine's (8)**
27:5;28:8;210:14,21;
211:13,17,25;212:3
**died (1)**
210:15
**difference (1)**
164:8
**different (51)**
19:8,8;34:24;38:24;
39:2;47:16,17;55:4;
60:9,9;64:8;67:19;
68:23;73:10,11;77:11,
15;80:12;86:7;102:24;
104:18;107:23;109:4;
114:7;122:7;123:21;
124:4;135:3;136:3,4,4;
139:25;141:1,8,9,15;
147:2;150:10;155:5,
13;158:3;163:22;
164:21;169:20;192:3;
197:19;208:19,23,23;
209:13;221:24
**differently (2)**
37:10;154:25
**difficulties (1)**
193:21
**diligent (1)**
50:13
**direct (16)**
18:18;23:16;35:6,17;
36:2;38:16,17;39:10;
40:15;46:7,7,22;73:24;
165:20;169:19;217:14
**directed (3)**
137:13;156:2;168:5
**directing (3)**
138:3;165:14;218:2
**direction (26)**
17:2;23:8,12;70:1,
18,21;72:16;73:18;
78:4;80:24;83:16;87:5;
111:23;130:1;137:9;
153:3;161:1;162:1,24;
163:1;169:13;172:20;
173:12;174:21;177:1;

206:13
**directions (6)**
39:23;72:18;79:24;
103:18;107:12;129:22
**directive (1)**
121:5
**directly (18)**
39:23,25;40:3,9,14;
45:6;53:25;54:24;55:4;
63:22,25;98:15,24;
99:9,11;157:18;
191:12;209:18
**director (1)**
32:17
**directs (2)**
155:20;163:17
**disagree (1)**
221:6
**disciplinary (2)**
85:12;218:20
**discipline (2)**
151:6;215:16
**disciplined (2)**
150:24;215:21
**discovered (2)**
22:6;42:8
**discovery (4)**
29:11;132:11;
134:18;202:19
**discretion (1)**
78:24
**discussed (4)**
28:19;33:18;34:25;
36:17
**discussing (3)**
106:12;133:25;154:4
**discussion (6)**
31:12;131:24;133:8;
198:7;202:4;230:4
**dispatched (1)**
161:12
**disposal (1)**
83:8
**dispute (1)**
221:17
**distill (1)**
141:8
**distinction (2)**
43:11;119:22
**disturbance (2)**
12:25;207:18
**divide (1)**
164:19
**document (83)**
29:12,14;55:23,24;
56:17;62:24;87:2;
117:16;119:7,11;
131:18;132:4,10,16;
133:2,12,14,15,18;
134:2,5,12,12;135:7,
11;136:16;138:1;
144:20,24;151:9,22;
153:9,12,18,23,24;

154:1,9,10,11,18;
155:3,6,10,24;156:25;
157:1,4,9,14,17;158:3,
6,18;159:10;170:1,2;
172:23;176:18,25;
177:5;178:1,7,12,13,
17,24;179:1;182:16;
183:10;186:6;187:8;
188:3;202:6,11,14,20,
25;203:4,21,25;
204:18;207:10
**documented (8)**
59:2;190:4,6;224:22;
230:5;231:6,17,18
**documents (14)**
56:12;77:23;90:12;
94:2;122:22;130:6,10;
131:22;182:11;191:2;
194:1,5;202:18;219:25
**done (22)**
37:10;56:5,14;68:18;
78:10;97:24;98:2,5,7;
139:1;147:16;180:24;
181:1;194:7,25;
200:22,23,24;201:3;
207:10;217:16;229:5
**door (9)**
107:8,17;108:3,4;
161:20;162:21,23;
165:1,1
**doors (2)**
161:20;186:19
**down (11)**
6:4;34:21;40:13;
46:18;85:3;98:25;
102:21;109:19;133:3;
150:23;218:19
**download (2)**
149:14,16
**downloaded (1)**
149:22
**downloading (1)**
150:7
**downstairs (1)**
108:3
**dramatic (1)**
85:25
**dramatically (1)**
80:10
**draw (3)**
135:10;155:2;180:13
**drawing (6)**
43:12;104:17;
119:22;133:11;135:22;
180:9
**drill (7)**
186:22;201:24;
202:24;203:20,24;
204:18;207:7
**drills (25)**
11:12;66:12,14;
199:13,14,15,17;
200:19;201:1,3,7,9,18,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 67 of 82

19,23;202:23;203:13;
204:3,8;205:12,17;
206:1,15,24;207:4
**drive (2)**
88:14,16
**duly (2)**
4:2,19
**during (97)**
4:8;9:15;10:6;11:9,
18;12:2,11,21;13:6,15,
23;14:7,16;15:3,7;
16:4,7;20:21;21:5,23;
22:6,10,13;23:6,22;
24:1,6,10,10,12,13,13,
14;25:17,20,25;26:15;
27:13;28:18,18,18,19;
31:19;33:23;34:14,25;
38:7,17;44:20;49:10,
14;50:8;51:18;52:18;
53:3;54:10;60:7;64:10;
68:20;81:21;84:15;
95:11;96:12;98:14;
101:21;107:24;114:16;
115:6,16;118:18;
126:5,5;144:9;145:2,2;
146:14;147:24;184:9;
188:11;191:18;196:2,
7,15,17,25;197:23;
198:4;199:5;200:23;
201:2,3,18,18,24,24;
205:16;210:5
**duties (8)**
18:14;41:1,5;42:4;
43:5;54:11;79:9;180:4
**duty (9)**
15:16;27:9;36:11;
37:9;60:19;105:12,17,
23;106:5
**Dwyer (1)**
5:6
**Dykstra (5)**
15:24;24:22;27:13;
40:19;224:12

**E**

**earlier (20)**
70:11;76:20;80:6;
86:5;95:25;111:18;
122:4;133:25;151:23;
153:11;154:4;177:3;
182:10;191:11,15;
208:14;216:13;224:9;
226:6;230:3
**early (2)**
37:21;200:24
**ears (6)**
47:5,11;49:23;53:12;
60:9;141:14
**easier (3)**
6:3;102:18;231:8
**easily (1)**
186:20

**Eastern (1)**
213:1
**edit (1)**
134:12
**editing (1)**
74:13
**educated (1)**
120:25
**educating (1)**
101:20
**education (1)**
214:21
**effect (7)**
100:8;109:10;
111:25;134:24;135:4;
140:9;154:22
**effective (1)**
165:7
**effectively (1)**
198:20
**efficient (1)**
165:7
**efficiently (1)**
198:21
**ego (1)**
181:8
**eight-page (2)**
132:11;135:6
**either (18)**
10:22;34:6;38:19;
49:2;53:16;54:21,24;
81:17;90:22;100:13;
117:10;131:7;152:25;
161:3;192:6;198:11;
209:18;211:11
**elapse (1)**
141:24
**electronic (1)**
232:4
**electronically (2)**
88:9;119:12
**eliminate (1)**
100:17
**else (41)**
8:10;10:12,14,16;
11:15;12:9,19;13:4,13,
21;14:5,13;18:7;27:14;
35:6,10,17,20;36:2,6;
41:9;43:14;60:3;81:22;
99:17;104:2,3,9,11,19,
23;105:7;121:21;
130:17;138:1;143:21;
152:1;156:10;211:16;
218:13;220:11
**elsewhere (1)**
170:2
**e-mail (8)**
81:18;131:1,7,23;
133:7;177:11;192:7;
202:2
**e-mailed (1)**
130:22
**e-mailing (1)**

177:18
**e-mails (2)**
49:3;70:23
**emergencies (4)**
73:20,25;74:1,21
**emergency (75)**
12:16;13:18;14:1;
15:20;24:20;25:1;
32:19;45:15,24;60:11;
74:5,8,15;75:1,3,12;
81:20;82:22,23;87:7;
92:15;93:2;95:4,13;
103:21;106:6,9;
107:24;108:4;113:22;
115:9;136:21,23,24;
137:11,18;143:17;
151:11;155:15,19,22;
156:3,5,9,10,11,14,18,
21,22,25;157:3,9,10,
19,25;158:13,14;159:4,
13,21,22;160:3,12,16;
163:19;164:4,17;
172:18;174:17,20;
177:2;181:15;186:24;
209:4
**emphasize (1)**
115:6
**emphasizing (1)**
148:24
**employed (3)**
8:16;196:10;197:9
**employee (1)**
116:11
**employment (3)**
212:17;213:23;215:6
**encounter (2)**
72:19;155:22
**encountered (1)**
68:22
**end (8)**
104:4;142:12,15;
167:15;170:17,20;
181:6;228:24
**enforced (1)**
141:18
**enforcement (4)**
214:17;215:2,3,4
**enforcing (1)**
101:20
**enough (8)**
90:24;138:9;151:4,5;
172:8;193:12,13;221:8
**ensure (14)**
44:7;71:20;79:6;
80:23;94:3;112:6;
126:6;139:23;162:2;
163:21;166:5;193:18;
195:25;205:11
**ensuring (15)**
41:21;42:6;44:17;
60:20;63:11;65:1,7;
66:21,23;69:11;
110:17;112:5;126:1;

198:19;201:13
**entail (1)**
78:12
**entailed (1)**
72:10
**entails (1)**
41:21
**entered (1)**
146:17
**entire (4)**
147:9,10,11;196:9
**entirety (2)**
95:11;214:13
**equal (1)**
180:25
**equally (1)**
163:1
**equipment (6)**
35:14,21;43:16;
101:11;125:23;185:2
**ERO (2)**
32:17,18
**escape (1)**
41:24
**escapes (1)**
141:6
**essence (1)**
105:8
**Estate (1)**
5:7
**evacuate (2)**
12:15;170:10
**evacuated (3)**
26:10,22;28:7
**evacuation (10)**
82:10;170:4,15;
171:3;172:4,9,14;
175:2;202:22;203:13
**evacuations (1)**
186:23
**evaluate (5)**
63:6,12;98:19;99:12;
107:23
**evaluating (2)**
31:15;81:4
**evaluations (1)**
201:22
**even (14)**
5:25;6:7;46:22;
61:11;62:8;64:23;
94:17;97:17;157:5;
165:22;193:6;222:6;
223:11,15
**evening (1)**
200:25
**evenings (1)**
162:14
**event (24)**
12:16;56:12;58:13;
92:15;109:25;135:13;
136:11;137:5,9;157:9,
19;158:12;162:25;
163:20;164:4,5;

168:11;169:7;170:24;
171:2;172:7,22;
173:13;177:2
**events (2)**
16:7;218:8
**eventually (1)**
86:17
**everybody (2)**
49:21,21
**everyday (1)**
64:14
**everyone (5)**
47:11;93:7,15;154:5;
162:14
**evidence (2)**
218:18,19
**exact (8)**
16:11;17:14;60:15;
86:23;148:13;158:1;
214:8;220:9
**exactly (6)**
65:9;98:21;105:18;
117:16;129:5;131:9
**EXAMINATION (2)**
4:21;229:14
**examined (1)**
4:20
**example (29)**
52:15;55:22;56:17,
20;66:5,11;70:25;74:3,
4,11;76:14;84:23;85:5,
17;91:3;99:17;103:23;
106:11;124:11;146:7;
162:13;166:14;167:5;
185:12;202:18;204:12;
207:20;208:16;230:13
**exception (2)**
143:19,24
**exceptions (4)**
143:11,16;166:18;
168:4
**exchanges (1)**
95:12
**excuse (2)**
53:10;143:24
**executive (1)**
32:17
**Exhaust (1)**
186:19
**Exhibit (15)**
132:6;153:11,14,18,
20;171:14;177:12,13,
15;178:3,6;202:2,3,8,
13
**exhibits (2)**
130:15,21
**exist (3)**
121:25;122:3;129:1
**existing (2)**
71:16;80:4
**expect (6)**
62:25;101:13;
164:23;205:7;224:21;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 68 of 82

229:20

**expectation (15)**
44:21;45:11;48:16;
49:4;50:12,17;54:22;
70:8;101:17;106:7;
116:3;164:17;165:10;
170:24;200:6

**expectations (1)**
102:10

**expected (3)**
165:15,19;166:4

**experience (4)**
86:18;118:8;189:17;
214:18

**experiences (1)**
98:17

**explain (22)**
28:24;30:24;31:6;
41:13;43:10,11;55:18;
69:3;75:5,22;76:1;
78:11;82:4;126:15;
133:17;154:1;156:21;
161:16;178:16;194:5;
196:22;203:6

**express (1)**
147:24

**expressed (1)**
183:25

**extended (1)**
46:12

**extent (2)**
17:1;210:24

**extinguish (3)**
100:17;101:14;
168:20

**extinguished (3)**
14:24;167:7;168:2

**extinguisher (3)**
100:16;167:14,23

**extinguishers (3)**
106:17;164:24;
168:21

**extracted (1)**
202:17

**eyes (8)**
47:5,11,21;49:23;
53:12;60:8;141:14;
181:23

**F**

**face (5)**
63:12;72:25;73:25;
80:15;204:24

**facility (29)**
16:18;29:1,1,24,25;
40:16,18;41:4,7,11,14;
42:1,5,7,8,22;43:9;
55:4;82:21;141:5;
154:5;156:18;157:6;
179:18;184:16,19;
185:4;194:6;197:14

**fact (8)**

52:8;57:22;84:15;
106:25;185:1;190:15;
200:12;217:15

**factory (1)**
215:9

**factual (1)**
218:22

**failure (2)**
67:9;150:17

**fair (164)**
11:7,15;18:15,17;
19:14,19;20:8;23:14,
17;30:13,19;31:17;
32:1,3;34:4,9;42:1,8;
43:2;45:1,8;46:10;
48:8,14;50:15;51:15;
52:6,13,24;53:6;54:12;
55:12;58:10,14,19;
59:24;60:23;61:9;62:3,
12,16;63:1,8;65:3;
66:3,9,16,23;67:1,7,9,
22;69:10,14,19;70:2,9,
15;71:1;72:15,20,22;
73:14,15;75:10,13;
76:5,12,18;77:10,14;
79:2;80:16;81:1;83:12;
89:22;92:17,23,23;
93:4;94:6,11,25;96:9,
25;97:2,4;98:22;99:13,
24;104:25;105:10,20;
106:22,24;107:4;
111:3;112:7;115:5,7,
12;120:12;121:2,25;
122:1;123:6,25;
125:16,18,23;126:24;
127:21;130:3;134:13;
136:5;137:4,5;141:15,
16,20;144:13;146:12,
13;148:25;156:6;
157:1,8,23;158:2;
159:15;160:13;163:3,
19,22;165:8;166:7,16,
20,25;167:18;168:17;
169:2;179:19;183:7;
185:9;188:11;189:16;
190:15,23;192:13,16;
193:1,8,18;205:21;
206:2,8,15,18;207:8;
209:23;210:3;212:6;
221:8

**fairly (1)**
231:2

**fall (1)**
195:15

**familiar (23)**
9:12;43:25;75:17;
76:11,18;77:23;94:12;
119:21;178:13;182:20,
25;183:6;187:9,10,15,
17,20,24;194:1;203:3,
17,21,24

**familiarize (1)**
77:5

**familiarizes (1)**
91:15

**familiarizing (2)**
83:9;122:8

**family (2)**
211:25;212:4

**fans (1)**
186:19

**far (8)**
41:15,18;82:6;95:22;
107:19;108:6;138:9,10

**fellow (1)**
136:24

**felt (2)**
193:16;200:12

**few (4)**
27:22;60:16;155:5;
229:4

**field (5)**
119:20;120:9,20;
212:21;213:24

**fight (3)**
74:4;103:8;106:14

**fighting (3)**
107:2,15;169:15

**figure (4)**
69:18;92:16;147:3;
165:16

**file (2)**
134:23;177:15

**filled (4)**
55:25,25;56:7;59:22

**find (9)**
26:5;87:22;88:5;
181:16;195:22;220:6;
223:4,21,22

**finding (1)**
222:7

**findings (3)**
21:9,14;22:11

**fine (5)**
7:21;50:6;131:10;
211:5;223:18

**finish (2)**
6:13;158:21

**fire (317)**
10:9;11:4,12;13:10,
18,18;14:9,9,16,17,23;
15:3,7,21;16:4,7,10,15;
17:16;19:5;20:6,15,16,
22,25;21:18;22:21;
23:16,22;24:2,6,10,12,
13,13,14,15,18;25:2,2,
9;26:21;27:4,8;28:8,
11,16,18,20,22;29:13,
15,24;30:9;31:25;32:9,
13;33:4,10,14,17,24;
34:3,12,14;35:1;36:10,
15;37:19;39:15;40:17;
43:8,12,15,17;44:2,2,8,
18,20;58:10,12,14;
59:2;60:11,14,24;
61:11;62:9,10,12;64:3,

3,16;66:12,14;81:20;
82:7,8,9;95:9;96:4,4,
17;98:19;99:3,13,23;
100:2,10,10,11,14,15,
17,17,20;101:2,8,13;
102:1,2,15,17,19,23;
103:8,19;104:23;
105:16;106:6,14,17,17;
107:2,4,15,24;108:17,
19,20,22;109:3,7,12,
15;110:1,1,5,6,22,25;
111:12,13,21;112:1,12,
15,22;113:22;114:12,
17,18,21;117:3;118:14,
20,24;119:3,4,14;
120:15;121:13;123:21;
124:21,22;125:16,18,
19,21;135:13;136:11;
137:5,9,18;138:5;
139:7;141:20;153:5;
154:20;155:4,4;
159:21;160:3,4,19,24;
161:7,8,9,13;162:2,25;
163:6,12,20;164:5,12,
22,24;165:8;166:12,14,
23,24;167:4,6,11,14,
17,22,24;168:2,7,11,
15,20,25;169:2,15,21,
23;170:25;171:2,22;
172:7,7,20,20,22;
173:13;174:20;175:1,
2;177:2;179:6,11,12,
13,22,25,25;180:3,12;
181:1,19,25;182:12;
186:21;189:18,18;
191:16;197:22;199:13,
13,15,17;200:19;201:1,
3,6,9,14,18,18,23,24;
202:22,24;203:13,20,
24;204:1,3,5,8,18;
205:12,16;206:1,14,24;
207:3,7;220:7;224:5,
11,18,21;225:3,9,16,
23;226:4,8,11,17,20;
227:4,23;228:2,10,16,
22;230:4,14,23

**firefighter (36)**
11:22;96:20;98:16;
99:2,11,16,18;101:1;
102:3,7,12,18,23;
103:6;104:24;106:13,
19;107:3;108:10;
123:19,22;126:18;
183:12;184:4;186:11,
23;196:4,20;197:3;
198:6,14,20;199:5,10,
19,25

**firefighters (64)**
12:6;23:25;26:25;
82:9;100:24;107:10,
16;108:8,15,21;109:6,
13,23,25;110:4,6,18;
111:2,11,15;112:18,25;

113:5,10,11,18;114:4,
8,10,22;117:2;120:18;
121:7,12;122:12,12;
124:12,23;126:7;
128:17;129:25;169:14,
15,22;183:24;184:4,6,
13,15,17,22;185:7,14,
15,23;186:3;187:14;
189:17;197:17;198:3;
199:23;200:8;201:22;
204:2

**firefighters' (2)**
184:12;186:18

**firefighting (1)**
104:8

**firehouse (2)**
111:3;125:1

**firemen (1)**
180:23

**fires (31)**
14:1;42:25;45:16;
58:21;59:6;60:5,19,21;
61:2,15,17;62:1,4;64:7,
9,21,22;95:5,13,14;
98:18;100:3;121:8;
137:4;151:12;230:3,8,
8,9,13,24

**fire's (1)**
167:24

**first (42)**
4:19;15:20;27:8;
71:10;75:7;85:10;99:9;
100:12;101:25;102:5;
103:1,7,9,23;104:22,
23;106:13,14;107:9,
17;133:12;155:10;
161:1;170:13;171:2;
180:15;182:17;184:2;
186:25;187:7;202:21;
212:11,14,17,20;220:6;
221:15;222:9,19;
223:13,17;224:12

**firsthand (4)**
210:12,20,25;211:16

**first-hand (1)**
63:23

**fit (2)**
55:20;59:6

**fits (1)**
37:13

**five (7)**
93:14;102:16;
208:19;216:7,9;229:5,
7

**five-minute (2)**
93:13;228:25

**flagging (1)**
16:20

**flip (2)**
132:24;160:20

**floating (2)**
89:19;90:17

**flow (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 69 of 82
JASON NOWATZKE
August 20, 2020

57:9
**focus (3)**
72:24;73:8;215:4
**folks (7)**
38:12,12;45:21;
49:23;50:3;197:12;
205:24
**follow (13)**
67:4;70:14;72:7;
73:12,19;78:2;100:8;
115:21,21;158:12;
170:16;172:10;199:25
**followed (8)**
56:19;59:20;85:20;
94:16;123:25;163:9;
171:1;172:6
**following (11)**
44:1;46:25;65:2,7;
67:13;110:23;132:1;
137:8;163:16;165:4;
191:6
**follows (2)**
4:20;160:11
**follow-up (2)**
86:21;232:1
**force (13)**
55:22;56:17,19,21,
22;57:1,3,7,10,14,16,
18;59:11
**foremost (1)**
103:2
**form (21)**
56:24;58:1;59:22;
61:18;105:1;129:10,
16;158:11,19;159:7;
182:3;183:14;184:25;
196:5;204:20;205:4;
207:1;210:16;211:23;
230:17;231:9
**formal (3)**
86:21;119:6;128:8
**format (1)**
155:12
**formatting (1)**
136:7
**formed (1)**
140:21
**forms (2)**
56:7;192:8
**forward (1)**
130:13
**found (1)**
49:10
**four (2)**
186:17;187:1
**frequent (3)**
64:9,12,21
**frequently (3)**
72:25;80:15,22
**front (1)**
107:8
**fulfill (2)**
60:19;79:8

**full (2)**
5:21;8:3
**fully (1)**
16:20
**function (1)**
77:18
**funnel (1)**
59:8
**further (3)**
78:20;111:22;229:13
**future (1)**
86:17

**G**

**gain (3)**
22:5,7;26:11
**Gann (6)**
38:20;39:15;191:17,
22;224:25;225:3
**garbage (1)**
43:22
**gates (1)**
41:16
**gather (4)**
63:25;80:3;97:5;
99:3
**gathered (1)**
98:11
**gathering (4)**
31:15;55:11;63:24;
69:16
**gave (14)**
16:3;17:10;56:20;
73:17;74:11;78:24;
85:6,17;89:1;96:24;
134:17;141:8;184:17;
217:6
**general (34)**
22:15;74:18,20;
75:24;80:11;82:17,19,
20,20,22;83:1,10;89:4;
91:1,6;130:8,9;133:25;
141:9;154:2,19;
156:24;159:10;160:6,
7,11,15,23;169:1;
171:15,21;172:17;
173:8;176:25
**generally (4)**
22:23;50:5;160:12;
213:23
**generate (1)**
78:25
**generated (2)**
21:9;57:10
**gestures (1)**
5:21
**gets (3)**
104:10;181:11,12
**gist (1)**
27:1
**given (25)**
7:11;15:6;18:20;

20:21;70:21;74:16;
78:4;90:16;103:8;
105:11,12,23;106:5;
107:22;114:16;117:21;
124:7;125:12;129:23;
144:23,24;148:7;
154:18;157:13;216:13
**gives (2)**
82:7;83:14
**giving (5)**
80:24;85:15;112:5;
208:16;209:13
**goals (1)**
62:15
**goes (4)**
65:23;111:14;
125:15;167:13
**Good (10)**
49:17;50:1,11;52:16;
96:24;141:11;173:1;
191:23;213:1;229:6
**grab (1)**
164:24
**Great (2)**
135:19;184:16
**Griffin (15)**
198:23;199:4,8,10,
12,18,21;200:4,7,12,
21;201:6;205:19;
225:20,23
**Griffin's (2)**
201:12;205:14
**ground (1)**
49:23
**group (1)**
164:19
**Guard (6)**
139:16;141:18;
145:11;149:3,8;151:10
**guess (63)**
16:19,21;23:17;26:9,
17;28:21;30:2;49:18,
24;50:7;54:7;57:15;
62:6;65:20;68:13;
70:16,18;74:17;75:2;
80:6;82:2;83:25;84:1,
21;91:1,10;95:20;
97:25;98:6,22;100:12;
101:12;102:21;103:1,
3,20;104:7;105:5,8;
107:6;108:5;110:2,21;
111:16;120:22,25;
122:1,4;126:18;
135:10;138:8,14;
142:13;167:2,20;
174:18;183:3,16,18;
185:2;193:3;216:7;
231:16
**guessed (1)**
86:24
**guidance (8)**
87:13,14;161:18;
165:20;192:20;206:12;

222:23;223:4
**guide (7)**
95:18;100:4;103:18;
117:22,24;157:10,19
**guideline (3)**
74:18;136:18;137:3
**guidelines (11)**
75:24;78:8;85:19;
115:20;117:19;135:24;
136:13;139:12;155:8;
159:11,14
**guiding (1)**
94:22
**guy (1)**
102:20
**guys (1)**
180:22

**H**

**habit (1)**
162:19
**habits (3)**
210:22;211:13;212:9
**half (5)**
19:20;84:3,4,6,6
**halfway (1)**
180:20
**hand (3)**
9:8,8;132:23
**handle (11)**
26:12;47:14;80:18;
87:6;101:13;181:4;
185:2;193:6,13;
222:23;229:23
**handled (8)**
56:18;59:24;95:4,4;
186:25;193:9;201:23;
230:6
**handling (3)**
130:21;193:1;230:9
**handouts (1)**
70:23
**hanging (1)**
84:25
**happen (10)**
18:12;53:12;65:18;
66:2,22,22;67:5;82:23;
146:21;181:7
**happened (34)**
15:3,7;16:4;18:11;
20:17,21;22:5,8;23:22;
24:12;26:5;28:6,19;
30:12;31:3;33:18,23;
34:8,12,14,25;36:10,
15,23;37:3,8;63:24;
103:25;127:3;147:15;
148:5;180:11;228:16,
22
**happening (7)**
51:21,22;53:5;62:11;
97:6;101:15;149:5
**happens (5)**

65:24;142:10;
229:17,21;231:2
**happy (3)**
7:13;131:1,10
**hardly (1)**
216:10
**hate (2)**
181:22;213:11
**hazmat (8)**
43:9,15;96:16;99:22;
194:22;195:6;198:22;
205:13
**head (6)**
121:23;126:12;
187:6;197:5,6;214:8
**headed (1)**
186:16
**header (2)**
153:23;186:9
**heading (2)**
135:23;160:19
**headphone (1)**
142:17
**headphones (2)**
142:24;171:7
**heads (1)**
93:1
**health (3)**
61:3,4;210:15
**hear (10)**
111:20;112:11,15;
114:11;142:20,21;
169:20;170:20;207:23;
208:4
**heard (8)**
54:1;111:11;181:4;
183:25;187:20;207:22;
222:15;223:1
**hearing (4)**
93:6,9;117:3;124:21
**held (9)**
8:21,24;9:3;26:24;
28:22;38:4;148:9;
158:18;215:22
**help (5)**
86:4;111:16;157:19;
180:21,22
**helpful (1)**
177:9
**HEPPELL (84)**
4:5,17,22;5:4;17:8;
22:17;58:4,5;61:23;
93:7,19,20;99:5,6;
105:9;129:12,20,21;
130:10,24;131:4,10,13,
19;132:8,12,15;
133:10;135:19,21;
142:3,5,16,22;143:1;
153:10,16;158:22;
159:1;170:21;171:5,
10,18;177:11,23;178:5,
10;182:8;183:20;
190:25;191:10;196:11,

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 70 of 82

14;202:1,10;204:21;
205:5;207:2;210:19;
211:5,9,24;213:10,16,
18;219:24;221:1,6,10,
15;222:10,13,18,22;
223:9,14,18,24;228:24;
229:7,12;230:17;
231:7;232:1
**herein (1)**
4:19
**here's (1)**
193:1
**Hey (4)**
128:10;146:11;
189:3;192:25
**high (2)**
102:16;215:7
**higher (2)**
165:23;166:3
**highest (1)**
214:21
**highly-confidential (2)**
157:1,14
**hits (1)**
145:12
**hoc (1)**
81:13
**hold (6)**
9:16;66:8;142:17;
165:23;166:2;185:8
**holds (1)**
29:1
**Honestly (2)**
127:23;222:15
**hope (1)**
200:10
**hour (5)**
19:20;212:25;213:4,
7;229:8
**hours (1)**
47:19
**housed (3)**
101:2;108:10,15
**housing (8)**
41:17;80:11;140:18;
141:1;142:8;143:8;
204:3;207:18
**how's (1)**
193:1
**hypothetical (1)**
167:10

**I**

**I&I (2)**
149:12;150:4
**IA (2)**
177:15;182:11
**ice (2)**
91:4,5
**ideas (2)**
79:1;189:25
**identification (4)**

132:5;153:13;178:2;
202:7
**identified (2)**
192:24;195:5
**identify (2)**
131:14;223:7
**identifying (1)**
65:14
**imagine (1)**
21:2
**immediate (8)**
54:18;166:11,24,25;
167:23;168:6,25;
227:24
**immediately (7)**
102:11;108:18;
109:11;160:11;161:13;
162:25;168:2
**impact (3)**
42:21,25;66:15
**implement (3)**
188:18;189:4,22
**importance (2)**
147:21;185:14
**important (24)**
5:20;6:9;7:3;61:6,9,
14,15;62:8,22;80:16;
84:22;89:20;90:24;
94:11;113:13,21;
115:6;125:15;140:22,
23;147:25;159:5;
193:12;195:24
**improper (1)**
6:19
**Improvement (1)**
186:17
**inability (1)**
181:1
**inappropriate (2)**
168:13;208:8
**incidences (3)**
75:8;146:23;147:12
**incident (63)**
15:8,9,10,11;16:1,
12;17:11,15,19;18:24;
19:2,24,25;20:2,12,20;
21:10,12;25:14;26:9;
28:25;29:23;30:11,14;
31:2,10;33:25;56:22,
23;57:1,19,23;58:8,10,
18,19,22;59:3,6,18,24;
60:19,24;62:16,19,21;
63:4,8,13,17,23;64:16,
20;68:5;74:22;101:8,
12;103:21;186:9;
198:24;227:6,10,24
**incidents (15)**
18:12;20:9;21:5;
22:1;31:13,16;49:9;
57:7,14;72:24;73:3;
126:20,22;127:2;
141:10
**include (12)**

42:12;72:16;78:8;
129:7,14;156:8;
158:10;159:12;160:2;
166:15;192:18;193:14
**included (4)**
83:23;129:18;131:2;
159:11
**includes (2)**
141:3;156:5
**Including (4)**
90:14;94:15;159:20;
186:18
**incorporated (1)**
86:11
**independent (1)**
210:9
**Indiana (35)**
8:17;10:6;11:9,18;
12:2,11,21;13:6,15,23;
14:7,15;32:21;38:8;
39:8;41:2;45:1;64:10;
100:9;101:20;109:10;
118:19;119:2;148:10;
179:20;184:9;196:2,
17;202:22;207:14;
209:7;212:19;214:14,
15;215:17
**indication (1)**
146:11
**indirectly (1)**
98:24
**individual (16)**
44:12;67:8,15,21;
101:4;108:11;110:15,
16;123:23;124:24;
125:7;146:4,5;195:8;
217:19;222:1
**individuals (13)**
25:8,16;33:17;38:24;
48:17;108:11;191:18;
197:16;220:15,18;
226:7,16;228:1
**indulge (1)**
172:22
**inform (7)**
48:3,7;74:7;97:7;
99:22;124:18;186:1
**informal (5)**
7:21;91:2,13;92:1;
151:5
**information (118)**
15:6;16:3;20:16,21;
26:12;27:12,20;28:10,
12,13;30:2,12,16,19;
31:15;33:3,4,23;34:16,
23;35:4;36:17;45:13;
48:1,12,20;49:7;51:9,
20;53:14,17;54:6,14,
23;55:10;56:8,12;
62:23,24;63:3,7,12,15,
18,19,23,25;68:17;
69:6,16;73:10,23;
74:14,25;78:10,14,16;

79:8,15;80:3;81:5;
82:7,13;83:1,6,14;
84:21,23;85:16;87:17;
88:1;89:20;92:25;97:5,
19;98:11,17,18,24;
99:3,15,21;100:2;
107:22;120:2;121:1,
19,22;122:16;129:6,14,
17;130:2;134:22;
136:10,12;144:11;
148:5,6;156:4;159:5,
21;160:3;183:9,21;
184:3,24;185:19;
187:22;188:12;190:17;
200:7;205:6;210:25;
211:10,15;212:7;
224:11
**informed (5)**
28:1;52:17;60:4;
83:1;114:14
**informing (2)**
84:5;125:2
**infrastructure (3)**
35:14,21;194:10
**inherited (1)**
71:15
**initial (1)**
45:4
**injury (1)**
125:21
**inmates (2)**
85:2;181:9
**in-service (2)**
116:12,13
**inside (2)**
157:5;185:3
**inspected (1)**
194:7
**inspections (11)**
194:2,3,8,9,14,16,19,
21;195:11,14,19
**instance (2)**
85:10;126:17
**Instead (4)**
84:2;91:4,6;209:14
**instruct (5)**
16:25;111:14;
112:25;219:17;220:22
**instructed (3)**
115:17;121:7;223:11
**instruction (12)**
79:24;111:23;113:9;
114:11,15;117:18;
123:5;124:7;219:20;
222:21;223:10,16
**instructions (10)**
39:23,25;74:15;
80:17;103:8;112:6;
125:11;135:12;160:12,
16
**instructors (2)**
196:25;197:3
**instructs (1)**

7:2
**intelligence (1)**
149:13
**intended (1)**
169:6
**intentional (2)**
66:2,8
**interacted (2)**
210:4;212:3
**interacting (2)**
184:6;199:22
**interactions (1)**
183:24
**internal (1)**
149:12
**interviews (1)**
23:20
**into (22)**
20:25;21:12,18,25;
22:20;23:15;37:14;
42:7;59:6;61:24;66:7;
86:11;93:3;104:8;
122:7,13,14,20;123:2,
5;182:11;193:23
**introduce (1)**
5:3
**investigate (3)**
12:25;207:17;208:1
**investigating (1)**
22:13
**investigation (15)**
20:25;21:3,6,7,12,14,
17;22:6,11,15,20;23:7,
15;149:13;182:11
**investigations (7)**
15:2;21:24,25;22:4,
24;23:3,11
**Investigative (1)**
178:18
**invoked (1)**
223:2
**involved (5)**
30:6;31:10;63:22;
103:22;156:10
**ISP (4)**
179:6;181:25;
196:10;215:23
**issue (29)**
65:22;67:21;68:14;
69:1,3,6,17,18;104:22;
126:24;128:11;142:18,
23;145:20;147:7;
161:17;162:7;192:24,
25;193:13;205:21;
207:24;208:5;209:3,9,
18,20;217:11;218:5
**issues (40)**
40:1,8;42:13;50:13,
20;51:22;52:4,11;53:4;
62:9;65:15;67:18;68:2,
22;69:9,12;123:18;
126:11,15;131:20;
141:19;143:3;148:23;

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 71 of 82

180:6;192:14,16,18,19;
193:3,23;195:5,10,13;
199:23;200:9,13;
205:15;206:6,23;
229:24
**issuing (1)**
84:7
**it' (1)**
181:5
**Item (3)**
161:9;166:10;168:23
**items (5)**
22:9;30:18;42:18;
81:23;161:23
**IV (1)**
155:8

## J

**JASON (2)**
4:18,25
**J-a-s-o-n (1)**
4:25
**job (35)**
6:3;18:14,21;23:10;
30:4;41:1,5;42:4,15;
43:5;48:21;50:19;
52:17;53:8,18;55:20;
59:6;65:11;67:17;
71:25;73:13;78:6;79:9;
89:14,17;97:22;
112:16;114:9;158:16;
181:22;188:12;213:21;
215:9,17,22
**jobs (7)**
48:2;69:24;71:22;
159:3;184:12,14;
185:16
**Joshua (11)**
5:7;14:17;24:15;
36:16;210:1;225:10,
17,23;226:12;227:5,23
**judge (1)**
6:21
**July (1)**
212:13
**jump (6)**
5:18;6:10,13;7:3;
130:19;212:23
**jumped (1)**
158:21
**Justin (2)**
228:7,10

## K

**keep (10)**
28:1;60:4;89:14,17;
107:10;142:15,18;
171:12;194:23;208:7
**keeping (2)**
52:17;80:21
**Kenneth (2)**

224:25;225:3
**kept (3)**
82:25;89:8,10
**key (5)**
92:21;107:8;108:2;
158:11;159:4
**keys (11)**
92:10;107:7;108:1;
164:8;181:13,15;
208:24,25;209:8,13,19
**killed (9)**
14:17;24:15;36:15;
225:9,16,23;226:12;
227:4,23
**kind (23)**
54:17;56:8;73:23;
74:4;82:22;83:23;91:1,
10;97:12;104:7,10,12;
105:7;107:1;123:2;
145:15;158:6;159:10,
13;182:20;184:17;
185:17;230:8
**kinds (1)**
84:8
**knew (3)**
50:22;179:15,17
**knowing (1)**
199:24
**knowledge (27)**
11:2,6;22:5,7;94:2;
95:10;116:5;119:1;
135:1;154:24;187:8;
198:24;199:1;206:19;
210:12,13,20;211:1,11;
212:2,5;216:5,8,22;
217:3,9;227:25
**known (1)**
29:2

## L

**labeled (2)**
170:4;202:24
**laborious (1)**
177:9
**lack (1)**
65:15
**lag (1)**
86:20
**laid (1)**
65:8
**land (2)**
57:10;59:12
**large (3)**
77:14;159:10;179:19
**last (7)**
73:7;110:9;152:21;
176:17;180:14,20;
217:23
**late (1)**
200:25
**later (3)**
6:24;14:20;144:20

**law (5)**
214:17;215:2,3,3;
223:5
**lawsuit (22)**
17:3;216:1;217:10,
19;218:5,12;220:12,16,
21;222:8;224:2,25;
225:6,13,20;226:1,23;
227:1,20;228:7,13,19
**lawsuits (3)**
216:3,9;218:14
**lawyer (1)**
222:2
**lead (1)**
97:20
**leadership (2)**
165:14,20
**leading (2)**
68:1;231:9
**leaning (1)**
142:11
**learn (13)**
18:24;25:15;28:10;
30:16;48:1,6;51:22;
53:16;98:16;120:17;
188:12,22;190:17
**learned (23)**
19:1;20:16;22:10;
25:25;26:15;27:13;
28:12;33:5;34:8,24;
35:15,25;55:12;70:6;
79:15;187:22;192:4,
14;197:23;200:8;
211:11,15;224:11
**learning (6)**
30:18;48:11;87:25;
120:3;129:6;184:3
**least (10)**
76:22;119:17;
140:12;157:22;165:1;
177:17,24;178:20;
184:4;216:21
**leave (5)**
41:23;101:11;104:1,
11;161:21
**leaving (1)**
181:16
**left (3)**
108:2;171:12,19
**left-hand (1)**
205:2
**less (6)**
19:19;58:21;62:2,8;
140:24;179:24
**Lessner (2)**
225:6,9
**lesson (12)**
115:19,22,23;116:1;
117:14;118:10,19,24;
119:7,9,13,24
**letter (4)**
136:3;155:12;
180:19;182:2

**letters (1)**
136:3
**letting (5)**
107:3,16;108:6;
122:11;125:6
**level (24)**
39:19;46:19;47:13;
48:12,19;49:5,16,19,
24;53:25;54:10;75:11,
15;80:23;83:15;94:16;
100:18;166:1;173:1,5;
185:12;198:18;214:21;
229:23
**liar (1)**
213:12
**Lieutenant (7)**
25:4,5,6;84:9;91:2;
214:11;226:7
**lieutenants (6)**
25:8;47:12;48:13;
49:22;81:9;88:19
**life (1)**
58:14
**light (1)**
230:15
**liked (1)**
63:16
**limitations (1)**
166:19
**limited (1)**
206:11
**line (18)**
46:18;52:20;53:25;
54:10;75:9,11,15;
80:23;83:15;93:8;
94:16;100:18;151:14;
166:1;180:15,20;
185:12;186:10
**lines (1)**
206:21
**list (4)**
109:22;160:22;
166:10;168:19
**listed (3)**
166:19;186:18;189:4
**listing (1)**
179:5
**lit (1)**
167:5
**literally (1)**
72:16
**little (23)**
15:11;26:18,18;
34:22;54:24;58:2,6;
65:21;86:5;93:5,6;
114:6;117:15;132:13;
149:5;177:9,17;
181:22;183:3,3,17;
184:17;185:1
**lived (2)**
102:18,23
**located (7)**
91:20;109:3;113:10;

127:15;141:2;161:10;
223:4
**location (6)**
88:15;89:3,9;92:3;
140:18;146:5
**locations (1)**
144:23
**lock (1)**
92:20
**locked (8)**
12:15;92:6,7;93:3;
107:17;124:24;162:4,9
**locking (1)**
162:20
**logs (1)**
146:17
**long (6)**
8:24;19:16;88:23;
89:8;157:25;219:15
**longer (4)**
84:5;148:20,25;
167:23
**look (14)**
57:5;61:10;62:23;
67:17;68:8;92:15;
138:9;152:6;155:5;
170:1;173:16;175:8;
177:17;229:1
**looked (9)**
151:22,23;153:6;
154:10;163:17;174:15,
19;177:3;206:4
**looking (8)**
45:6;119:10;153:23;
171:14,20;178:23;
182:17;213:23
**looks (4)**
83:10;139:19;
182:20;186:7
**loss (1)**
58:14
**lost (2)**
142:11;171:4
**lot (9)**
19:1;26:10;43:21,22;
91:11;145:15;149:20;
180:24;229:24
**lots (1)**
20:8
**lower (8)**
47:13;48:12,19;49:5,
16,19,24;229:23

## M

**machine (1)**
147:1
**magnitude (1)**
21:6
**maintained (2)**
43:17,18
**major (22)**
8:17,21,24;9:6,8;

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 72 of 82

10:2;18:15;21:23;22:4,
9,23;23:7;30:5;34:17;
58:13;61:16,19;62:12;
214:3,11;215:3;230:8
**majority (1)**
113:12
**major's (1)**
18:4
**Makes (3)**
5:24;6:16;110:5
**making (10)**
42:6;43:24;45:7,20;
72:23;92:24;120:25;
126:10;133:2;159:16
**man (1)**
180:21
**manager (5)**
43:9,15;194:22;
198:22;205:13
**mandatory (2)**
44:23;45:4
**manipulate (1)**
132:24
**manner (3)**
126:19;165:7;181:2
**man's (1)**
181:3
**manual (1)**
159:13
**many (10)**
40:22;60:13;64:7;
90:17,20;105:19;
181:4;216:3,18;219:9
**March (1)**
154:18
**marked (12)**
109:23;130:11;
132:3,5;153:11,13,17,
20;171:15;178:2;
191:8;202:7
**markings (1)**
114:1
**materials (14)**
15:2,5;16:2;20:14,
19;21:17;24:4;34:7;
36:16;55:15,19;
117:21,22;220:1
**matter (4)**
162:19;218:8,14,22
**maximum (2)**
140:15;185:3
**may (17)**
6:17;7:9,23;30:25;
49:10;103:15;122:3,3;
126:17;127:17,23,24;
128:6;129:18,18;
144:19;178:19
**maybe (12)**
58:6;64:24;65:20;
68:7;69:4,5;75:20;
90:20;96:23;98:24;
215:9;216:7
**mean (34)**

16:16;19:1;26:17;
27:5;28:24;30:24;
41:13;43:10;53:20;
55:7;62:4;64:13;68:4;
69:3;70:16;74:3;75:5;
76:1;80:9;82:5;92:18,
20;98:6;102:14;108:1;
115:20;126:16;127:16;
140:14;164:23;183:16,
17;203:6;214:7
**meant (1)**
32:8
**meantime (2)**
86:13,25
**mechanism (2)**
162:4,20
**medical (4)**
74:5,20;82:22,23
**medications (1)**
8:10
**meeting (4)**
16:23;127:25;128:8;
147:22
**meetings (5)**
196:3,19,23;198:5,
13
**Megan (1)**
5:8
**member (4)**
37:3;47:5;83:6;
212:3
**members (9)**
26:22;96:19;98:16;
99:2,11,17;101:1,7;
204:2
**memo (51)**
83:23,25;84:4,12,19,
24;85:4,18,22;87:8,14,
17;88:3,7,18,23;90:21;
91:1,3,7;109:23;
112:24;121:10,15,16,
19,22,25;122:2,10,13;
123:2;126:10;127:8,
12,14,15,20,24;128:3,
14,25;129:1,2;192:7;
217:12,14;218:2,5,8,12
**memorize (1)**
158:7
**memory (11)**
8:12;19:24;37:16,25;
96:8;115:1;116:1;
123:1;128:14;154:23;
181:19
**memos (21)**
83:17,19;84:8,10;
86:5;87:20,23;88:15,
19;89:6,8,18,25;90:14,
17;91:11,13,20;92:1;
122:4;190:9
**men (2)**
110:1;181:19
**mental (1)**
210:15

**mentioned (1)**
208:14
**met (1)**
212:2
**method (1)**
94:8
**methods (1)**
47:8
**Michael (1)**
4:14
**microphone (2)**
142:16;172:1
**middle (1)**
37:23
**might (24)**
8:12;31:1;49:11,24;
62:24;65:8,22;70:13;
72:18;73:25;80:22;
85:18;116:16;123:13;
128:25;129:1,8;
142:18;146:2,7,11;
222:4;230:13,15
**Mike (3)**
177:12;202:1;229:3
**military (1)**
214:18
**Miller (7)**
186:10,16;187:5,5;
188:2;189:5;190:1
**Milne (10)**
179:4,8,8,15,17,21;
180:3,7,11;181:25
**Milne's (4)**
180:19;182:2;
183:10,22
**mind (4)**
8:8;107:11;159:18;
214:4
**minimal (1)**
168:2
**minimum (1)**
105:16
**minor (5)**
61:11,15,19;62:2;
230:8
**minute (1)**
213:15
**minutes (17)**
27:22;93:15;128:9;
140:12,24;141:24;
142:8;143:7;144:5;
146:10;148:1;149:17;
171:6;212:25;213:7;
219:23;229:5
**miss (2)**
144:16;150:25
**missed (4)**
138:19;149:23;
150:14,14
**missing (8)**
62:25;63:3,7,16;
135:15,16;138:7;
172:24

**misunderstood (1)**
7:10
**mode (1)**
120:3
**moment (1)**
125:19
**monitor (2)**
149:8;185:25
**monitoring (3)**
67:25;141:19;149:2
**month (2)**
64:24;159:18
**monthly (3)**
194:2,8;200:23
**moot (1)**
222:5
**more (36)**
15:11;17:24;57:3;
58:6;61:16;67:14;75:7;
78:9,14;100:25;
105:20,21;106:16;
117:15;141:12,24;
142:8,22;143:6;
147:10;149:6;159:21;
160:2;168:24;170:22;
179:22,24;181:8,22;
184:18;185:1;186:21,
24;189:17;198:9;
206:10
**morning (1)**
200:24
**most (5)**
17:16;40:11;70:17;
134:19;154:19
**mounted (1)**
145:11
**move (2)**
139:2,4
**moved (2)**
214:10,11
**movement (1)**
41:16
**moving (1)**
166:15
**much (4)**
19:2;28:9;152:22;
156:3
**multiple (15)**
16:24;39:7;68:5,6;
75:18;91:6;103:11;
105:12,23;106:4,5,15;
146:2;164:11;221:21
**myself (4)**
5:3;18:22;19:5;
78:17

**N**

**name (8)**
4:24;5:4;25:5;32:14;
217:18,21,23;221:10
**named (4)**
216:4;217:2,7;

220:15
**names (3)**
8:20;197:4,6
**narrative (1)**
180:10
**natural (1)**
6:8
**nature (9)**
41:19;44:16;49:13,
15;52:1;156:5;211:17;
221:2;231:9
**Neal (13)**
27:16,18,21,25;28:4,
11;220:19,21;224:1,5,
13,17,21
**necessarily (11)**
18:25;54:9;73:2;
91:7;102:13;103:5;
110:19;113:2;151:2;
193:9;197:9
**necessary (4)**
56:8;79:6,23;100:15
**need (19)**
7:20,24;68:8;73:11;
91:7,18;108:24;
114:10;128:11;143:13;
147:16;167:8,16;
181:14;185:3;186:20,
21,23;193:4
**needed (26)**
22:12;31:16;45:13;
48:8;54:2;65:18;70:19;
78:9;79:8;80:25;84:19;
85:24;89:11,20;94:4,
16;97:8;112:10;
159:17;161:14;165:2;
170:15;184:13;192:20;
193:16;213:21
**needing (1)**
170:10
**needs (4)**
72:13;86:16;90:24;
148:7
**new (10)**
44:24;45:11;116:11,
11,20;117:4,10;
119:16;120:7;148:6
**newly (1)**
77:3
**next (13)**
6:13;100:22;114:6;
138:17;139:2;151:21;
152:5;166:10;170:3;
180:15;218:24;221:5,8
**night (35)**
14:21;15:3,7,17;
16:4;20:22;25:13;
27:10;28:16;33:11,14,
17,19;34:2,9,12;36:10,
11,15,18,23;37:3,9;
164:12,14;180:12;
201:10,13;224:10;
226:8,16;228:1,10,16,

USDC IN/ND case 3:18-cv-00995-JD document 212-8 filed 05/25/21 page 73 of 82

22

**nipping (1)**
141:11
**nonconfidential (1)**
191:9
**nonetheless (1)**
65:10
**non-firefighters (1)**
113:18
**nonuse (2)**
57:14,18
**Nope (2)**
13:14;213:25
**Nor (1)**
99:15
**Normally (5)**
18:11;21:5;88:12;
111:13;150:23
**notation (1)**
204:24
**notations (1)**
204:12
**note (3)**
151:19;171:11;
190:25
**notes (3)**
25:20;29:13;229:1
**notification (1)**
112:4
**notified (3)**
150:19;151:6;195:1
**notify (2)**
100:12;136:22
**November (7)**
9:19,20,21,22,22,23;
38:5
**NOWATZKE (29)**
4:18,23,25;5:12;
93:21;132:6,9;133:13;
143:2;153:14,22;
171:19;177:7;178:3,
14;179:1;182:2,9;
186:13;191:11;196:16;
202:8;207:11;209:25;
212:11;213:19;221:18;
223:25;229:16
**N-o-w-a-t-z-k-e (1)**
5:1
**nuisance (2)**
230:13,22
**number (14)**
17:14;19:7;60:16;
74:7;89:18;132:13;
141:3,6;158:1,3;179:5,
19;192:6;220:15
**Numeral (2)**
136:2;155:8

## O

**object (16)**
16:25;58:1;61:18;
105:1;129:10,16;

182:3;183:14;196:5;
204:20;205:4;207:1;
210:16;211:23;219:17;
230:17
**objection (14)**
4:10,15;6:16;7:1,4,5;
158:19;210:24;211:4;
221:2;222:14,24;
231:9,11
**objections (3)**
6:17,22,22
**observations (1)**
185:25
**observe (1)**
60:10
**observed (6)**
13:1;19:3;27:8;
50:14;60:14;74:3
**observing (5)**
52:18;55:4;185:22;
197:18;198:2
**obtain (5)**
9:18;100:15;212:14,
17;214:24
**obtained (7)**
9:8,9;71:16;198:12;
212:21;214:5;215:1
**obtaining (1)**
215:7
**obvious (1)**
186:21
**obviously (15)**
47:3;58:12,17;68:4,
15;87:16;93:10;
143:19;145:14;159:12;
164:7,25;165:18;
214:1,8
**occasion (2)**
60:10;227:8
**occasions (3)**
181:4;216:18;219:9
**occur (1)**
58:9
**occurred (5)**
25:14;26:6,9;29:24;
49:10
**occurrence (1)**
64:14
**occurs (1)**
103:21
**o'clock (4)**
91:4,5;213:1,6
**off (32)**
7:12;8:5;78:19;82:8;
86:2,12,17;90:6,9;
91:16;93:14;115:1;
121:23;122:6,8;
126:12;131:25;133:9;
142:15;154:21;157:15,
15;171:6,12,20;
181:14;187:6;197:4,6;
202:5;209:19;214:7
**offender (18)**

97:14;100:23;102:7,
22;109:22;111:15;
112:25;121:12;122:12;
167:5,8,17;179:13,18,
25;184:19;185:23;
218:17
**offenders (23)**
26:23;28:7;41:17,18;
42:18;43:8,20;84:25;
85:2,13;91:4;109:22;
110:21;141:5;145:13;
161:12,19,21;162:11;
166:11;168:6;218:10;
230:12
**offer (2)**
212:7;218:18
**office (9)**
10:21;17:20,21,25;
18:4;55:23;57:7;59:9;
207:21
**officer (93)**
9:13;37:9;44:24;
45:3,11,12;53:25;
54:10,14,17;57:16,20;
65:24;66:6,11;67:2;
72:17,25;73:11,12;
74:24;75:9,15,15;76:4,
14,15,17;77:3,21;78:2;
80:15,17;91:15,24;
92:11,14;100:7,18;
105:6,20;106:2,18;
108:18,24;109:2,4;
110:11,12;111:1,9;
112:17;114:13,20;
116:16,20,21;117:4,10;
119:17,20;120:7,10;
137:17;139:20;163:18;
164:3,6,7,8;165:13,19,
23;166:2,4;167:13;
168:14,15;169:20;
204:25;209:7,12,13,19;
212:12,15,16,18;214:2,
9,19;215:8;218:17
**officers (99)**
11:21;12:5,14,24;
13:9;15:16;27:9;33:25;
34:2;46:19;53:21;
57:23;67:12,19;68:22,
23;69:23;71:21;73:18,
24;74:16;75:11;77:23;
79:8,24;80:24;82:7;
83:15;87:6,23;89:24;
92:24;95:3;100:3;
103:18;104:21;105:12,
16,23;106:5,7;109:20;
110:10,24;111:7,21;
112:20;115:1;120:17,
21;121:6;122:8,11;
123:18;124:22;129:23;
135:12;136:11;137:18;
139:23;140:17,25;
141:13;143:6;145:4;
159:17;162:2;163:8,

20,25;164:11,13,16,18;
165:5,15,21,24;168:5,
10;169:13;172:10,21;
173:12;174:21;177:1;
185:13;205:12,16;
206:5,7,11,13;207:25;
208:4,23,24;217:14,14
**officer's (4)**
67:9;91:21;92:5;
161:10
**offsite (1)**
158:18
**often (2)**
64:20;213:12
**oftentimes (1)**
145:18
**omits (1)**
145:12
**omitted (2)**
72:13;75:20
**once (20)**
7:5;76:22;77:7;
100:11,22;102:5;
110:4,4,21,25;124:8;
140:12,24;147:11;
151:1;157:22;158:7;
167:21,21;219:12
**one (112)**
5:4,8;9:4;11:2,6;
19:22;37:17,18;38:21,
22;39:16,17,18;42:13,
20;44:3;45:14,23;46:1;
47:3,25;48:5,17;51:1;
52:9,16;54:22;58:8,8;
59:12,15;62:7,15;
63:10;64:24;65:1;
67:14,15;69:6;70:25;
72:22;74:11;80:20;
88:5;90:20;91:5;92:23;
93:25;100:25;105:20,
21;106:1,16;113:13;
117:6,7;121:1,17;
122:16;127:7;131:21;
132:19,19;135:3;
137:17;139:14;140:16,
24;141:17;142:22;
146:8,10;149:21;
150:9;158:9,16;159:2;
164:7,23,25;169:5;
170:14,22;171:1;
177:12;178:19;187:13;
188:24;189:1;190:16;
194:17;202:17;203:16,
18,19;206:1;208:24;
209:22;216:4;217:4;
218:16;220:13,18;
224:8,15;226:7,10,15,
18;227:7;228:1;231:5
**one-line (1)**
41:6
**ones (4)**
40:20;131:7;149:23;
189:4

**one-sentence (1)**
136:18
**ongoing (9)**
71:20;76:21;81:13;
89:21;115:12;122:21;
142:23;149:2;217:12
**online (1)**
78:15
**only (18)**
8:2;17:1;27:4;30:6;
32:14;91:5;101:6;
102:1;106:1;116:20;
117:22;121:13;137:3;
153:3;161:24;162:7;
176:24;208:24
**on-the-job (2)**
119:19;120:20
**open (5)**
108:4;165:1;181:14,
23;186:19
**operate (1)**
97:15
**operating (4)**
48:7;190:18;192:5;
198:20
**operation (3)**
73:3;75:25;83:25
**operational (1)**
186:20
**operations (7)**
9:17;32:19;39:6,11;
103:21;190:11;191:13
**opinion (13)**
144:1;180:2;183:17,
19,22;184:8,15,20,25;
185:7,8,18;212:7
**opinions (1)**
183:25
**opportunity (5)**
16:14;134:11;138:5;
148:23;169:25
**option (3)**
206:1,7;209:17
**options (2)**
54:16;102:25
**orally (1)**
144:3
**order (29)**
75:1;79:14,17,17;
81:5;82:17,19,20,23;
83:2;85:7,9;86:3;
97:14,20;99:22;130:7,
8;133:19;137:3;
139:15;140:8;141:23;
142:6;156:25;163:16;
169:6;173:8;190:7
**orders (166)**
70:24,25;71:4,7,13,
16,21;72:1,11,14,16,
23;73:6,9,17,17,24;
74:2,13,19;75:16,18,
21,22,24;76:7,10,16,
22;77:5,11,15,20;78:3,

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 74 of 82

7,19,21;79:6;80:4,5,23;
81:20,23,23;82:6,13,
21;83:3,4,10,11,18;
84:20;85:23,25;86:2,
12,19,22;87:1,9,11,15;
88:2;89:5,5,10,13,22;
90:1,2,3,4,11,18,19,25;
91:8,12;92:4,8,16,25;
93:22;94:1,4,9,23;95:3,
6,9,13,17;96:3,11,17,
21;97:1,7,12,18;98:19;
99:4,12,23;100:4;
103:1;107:13,21,25;
108:6;113:3;114:24;
115:11;122:7,13,14,20,
23,24;123:2,5,9;129:7,
14,19;130:3,7,9;
133:22,25;134:13,20;
135:2;136:8;137:17;
138:2;139:8;143:5;
153:3;154:2,3,7,20,24;
158:10;159:8,11,16,22;
160:4,6,8,23;161:2,17;
166:19;169:12,19;
171:15,21;172:5,17;
175:1;176:25;206:13
**ordinarily (1)**
132:21
**originating (2)**
187:13;190:1
**others (6)**
30:12,17,23;62:5;
81:4;218:2
**otherwise (4)**
17:4;54:2;158:13;
222:5
**out (96)**
6:9;26:5,23;45:11,
21;53:16;55:25;56:7;
59:22;65:8,20;69:18;
73:10;74:18;75:1;82:9;
84:10,12,22;87:22;
89:12;90:23;92:16;
98:23;99:15,21;
100:23;101:4,10,14,25;
102:2,3,7,21;103:6;
104:24;107:3;108:6;
109:12,24;111:14;
112:4,18,25;115:22;
117:2;120:7;124:16,
25;125:6;126:10;
127:8,12,14,20;128:4;
138:8,12;141:12;
142:24;144:22;147:4,
11;159:3,3;165:16;
166:16,25;167:6,15,17,
24;170:10;171:7;
172:1;180:23,24;
181:2,6,10,12;182:23;
191:4;195:22;202:17;
210:4;217:11;218:2;
220:6;222:8;223:22,
22;230:14,24;231:2

**outcome (1)**
216:11
**Outside (17)**
16:1;28:7;79:13;
102:12;151:25;162:8;
163:2;167:12;197:8,
12;198:9;213:22;
226:10,18;227:7,24;
228:4
**over (21)**
4:12,13;5:15;10:21;
19:9;32:10;45:7;68:6,
6;102:6;104:7;108:19;
112:4;124:6,22;146:9;
160:21;174:15;186:24;
229:1,3
**overall (2)**
46:14;73:3
**own (3)**
88:14;169:14;230:25

### P

**package (1)**
202:18
**padlocks (1)**
161:21
**page (95)**
5:18;50:2;133:12;
135:7,25;136:16;
138:14,16,17,20,22,25;
139:2;151:9,12,14,19,
21,21;152:3,5,10,11,
14,16,19,21,21,25;
155:6,10,14;160:20,21;
173:2,8,11,15,18,20,23,
25;174:3,5,8,10,13,15,
16,19,23,25;175:4,5,7,
10,12,15,17,20,22,25;
176:2,5,7,10,12,15,17,
17,21;177:4,16;178:11,
12,20,21;179:3;180:14,
15,16;186:5,7,8,9,15;
202:21;203:8,10,11,12,
21;204:11,13,14
**pages (3)**
158:1;178:21;186:8
**paper (10)**
57:9,11;89:4,5,5;
167:5,11,15,22;230:14
**papers (1)**
132:23
**part (40)**
16:23;18:14,20;
21:21,24;23:10;29:23,
25;30:1,4,11,15;31:1,1;
37:21;41:21,25;42:4,
11;43:4;50:19;55:10;
67:9,16;81:3;89:8;
90:6;91:14;95:24;96:6;
110:9;114:23;122:21,
23;125:8;133:14;
135:10;174:16;203:25;

204:7
**partially (1)**
181:3
**participate (1)**
196:18
**participated (1)**
196:3
**participation (3)**
33:5,15;34:3
**particular (13)**
70:1;76:6;79:25;
83:7;87:24,24;88:20;
94:5;128:14,15;
133:21;204:11;213:22
**parts (9)**
26:17,19;55:4;60:9;
77:14;139:21;141:15;
172:24;182:25
**pass (3)**
140:16;200:7;209:19
**passed (2)**
189:25;190:3
**past (4)**
118:6,7;126:12,15
**patrolling (1)**
140:25
**pattern (1)**
67:18
**patterns (1)**
67:17
**pay (1)**
148:17
**Payne (4)**
38:21;39:16;191:17,
22
**payroll (3)**
143:23;144:6;207:22
**PDF (4)**
132:10,11;153:19;
178:22
**pending (1)**
223:12
**people (7)**
16:24;24:10;31:9;
63:22;68:7;86:13;
181:8
**percent (2)**
127:10;148:18
**performance (6)**
67:8,22;68:2;180:3;
205:11,16
**performing (1)**
206:24
**period (13)**
44:23;64:10;68:20;
84:15;98:14;101:21;
144:9;184:10;196:15;
198:4,10;199:5;200:20
**periodic (1)**
77:1
**periods (2)**
39:2;214:5
**permissible (1)**

209:17
**permission (2)**
199:13,17
**permitted (3)**
85:11;148:20;161:11
**person (15)**
34:6;47:3;74:12;
75:3;76:6;78:25;96:16;
99:22;139:25;150:10,
24;181:16;195:6;
212:8;219:13
**personal (14)**
34:1;40:6;47:21;
53:11;55:2;60:8;71:24;
88:14,16;94:2;185:24;
210:21;211:11,13
**personally (20)**
10:7;11:10,19;12:3,
12,22;13:7,16,24;14:8;
34:15;47:10;60:7,10,
14;99:1;118:17;
137:25;198:2;209:8
**personnel (1)**
186:23
**pertains (1)**
43:7
**pertinent (3)**
88:4,11;148:6
**phase (1)**
213:13
**phone (2)**
219:13,14
**phrase (2)**
9:13;50:1
**phrased (1)**
7:9
**physical (8)**
41:15;89:3,9;92:3;
139:20;194:10,10;
210:14
**physically (5)**
55:3;89:13;139:24;
140:4,18
**picking (1)**
142:14
**piece (4)**
167:5,11,14;230:14
**pieces (4)**
26:17,19;73:10;
156:8
**Pierce (1)**
5:8
**pipe (2)**
145:11;147:25
**pipes (4)**
149:14,16,22;150:7
**place (20)**
22:4;24:1,6;25:12;
28:15;29:9,15;30:17;
81:16;88:21;124:3;
149:7;170:9;194:20;
195:25;196:23;207:13;
209:6;220:7;224:5

**placed (1)**
139:21
**plaintiff (3)**
5:5,9;217:10
**plaintiff's (1)**
4:7
**plan (11)**
115:19,23;116:2;
117:18;119:7,9,13;
156:19;157:10;158:14;
159:4
**plans (15)**
82:10;115:22;
117:14;118:10,19,24;
119:24;156:21,22,25;
157:4,22,25;159:22;
160:3
**plate (1)**
195:15
**play (3)**
164:4;165:14;181:16
**please (3)**
7:12;93:8;232:4
**Plus (1)**
47:16
**pm (3)**
162:14;163:7;232:5
**point (38)**
7:20;10:3,7;11:10,
19;12:3,12,22;13:7,16,
24;14:8;19:25;20:15;
23:20;47:6;51:18;
57:11;87:24;96:12,15;
113:7;115:6;118:18;
127:16;148:12,19;
149:21;150:1,3;
158:16;159:20;163:7,
11;207:6;210:5;222:5;
223:11
**points (5)**
27:3;158:11;171:23;
186:18;187:1
**policies (46)**
10:8,20;11:4,11,20;
12:4,13,23;13:8;35:3,7,
10;36:19;37:4;43:21,
25;44:1,1;47:1;49:9;
59:1,19;65:3;67:13;
69:25;70:12,13;73:18;
78:2,14;85:14;94:3,13,
15,22;134:17;160:2;
165:4;199:24;200:14;
207:12,15;209:6,11,17;
230:5
**policy (71)**
45:15;50:18,21,24;
51:1,3;52:25;54:12;
65:9,16,16,18,24;66:3,
8,13,15,19,24;67:1,3,4;
68:2,6;70:8;71:1;
77:22;80:8;82:2,4;
83:6;85:12;93:3;100:7;
101:3,19,24;102:9;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 75 of 82

103:5,14;106:7,22;
109:9,18,18;110:23;
111:25;112:9;114:14;
121:5;124:3;129:13;
140:9,21;141:17,23;
142:7;143:6,12;
165:11;166:7,23;
168:5,14;187:23;
190:11;197:21,22;
208:10;230:1,9;231:23
**poor (4)**
180:21;205:1,11;
206:6
**poorly (2)**
7:9;206:24
**population (1)**
80:11
**portion (18)**
43:19;130:12,13;
132:2;133:12;136:19;
139:7;157:5,16;
171:13;177:14;180:13,
18;182:1;191:3,4,7;
204:14
**portions (3)**
171:20;176:24;177:3
**pose (2)**
61:3;66:15
**posing (1)**
167:7
**position (25)**
8:20,22;9:3,7,9,15,
18;32:20,22,23;37:13;
38:4,25;39:4;71:17;
76:8;88:8;134:9,13;
179:22;198:12;212:7,
14,20,20
**positioned (1)**
19:8
**positions (2)**
19:9;38:13
**possess (1)**
42:19
**possibility (2)**
210:4,7
**possible (17)**
72:15;106:15,20;
111:20;117:9;121:24;
127:11,19;128:3,4;
156:4;162:18;168:20;
182:21,22,24;189:2
**Possibly (1)**
190:5
**post (205)**
70:23,25;71:4,7,13,
16,21;72:1,11,14,16,
23;73:6,9,16,17,24;
74:2,13,19;75:1,16,18,
18,21,22,24,25;76:2,3,
7,7,10,16,22;77:5,11,
15,20;78:3,7,19,21;
79:6,14,16,17,25;80:4,
5,23;81:5,19,23,23;

82:6,13,17,19,20,23;
83:1,3,4,10,11,18;
84:20;85:7,9,23,25;
86:2,3,12,19,21,25;
87:9,10,15;88:2;89:1,5,
10,13,21,25;90:1,3,4,
11,18,19,25;91:2,8,11;
92:4,7,16,24;93:22;
94:1,4,9,23;95:3,6,9,
12,17;96:3,11,16,21;
97:1,7,12,14,18,20;
98:19;99:4,12,23;
100:4;103:1,3;107:12,
21,25;108:5;110:2,2,9;
113:2,4;114:24;
115:11;122:7,13,14,20,
22,24;123:2,5,9;129:7,
14,19;130:2,7,7,8,9;
133:19,21,25;134:13,
19;135:2;136:8;137:3,
17;138:2;139:7,15;
140:8;141:22;142:6;
143:5;153:3;154:2,3,7,
20,24;156:24;158:10;
159:7,11,16,22;160:4,
6,8,23;161:2,17;
166:19;169:6,12,19;
171:15,21;172:5,17,17;
173:8;175:1;176:25;
190:7;206:13
**posted (7)**
88:3,10,18;91:20;
94:5;121:11;122:5
**posting (2)**
94:18;114:2
**posts (2)**
77:21;89:19
**posturing (1)**
223:1
**potentially (3)**
22:8;122:11;125:20
**practice (10)**
21:24;22:24;40:6;
49:1;59:14;71:24;81:3;
131:14;186:22;204:7
**practices (1)**
71:19
**predate (1)**
154:20
**predated (1)**
134:8
**predictions (1)**
213:11
**preface (1)**
218:24
**preferable (1)**
108:3
**premises (1)**
157:15
**preparation (1)**
219:7
**prepare (2)**
219:10;220:1

**presence (1)**
222:1
**present (10)**
14:15;24:10;28:17;
30:10;33:17;55:3;
140:18;168:10;196:10;
221:19
**presenting (1)**
68:16
**pretty (7)**
7:21;19:2;28:9;
96:24;158:2;160:15;
231:4
**prevent (1)**
141:5
**prevented (1)**
129:13
**preventing (4)**
123:4;130:1;141:11;
160:1
**prevention (2)**
14:10;141:4
**previous (3)**
7:11;148:6;170:9
**previously (2)**
17:10;182:12
**primarily (1)**
60:18
**primary (4)**
73:8;93:25;94:8,18
**principles (1)**
85:21
**printout (2)**
144:22;146:7
**prior (8)**
37:18;134:20;154:9;
174:18;198:11;214:18;
215:7,25
**priorities (1)**
107:24
**prioritize (1)**
107:14
**prioritizing (1)**
107:20
**priority (1)**
169:7
**Prison (147)**
8:17;10:7;11:10,19;
12:3,12,22;13:7,10,16,
17,24,25;14:2,8,16,20;
15:7;17:21,25;18:15;
20:9;22:1;28:18;32:21;
35:3,7,11,14,22,25;
36:3,18,20,25;37:5,14;
38:8,18;39:8;41:2,23,
25;42:12,16;43:1;44:3,
9,18;45:1;46:16,25;
47:4,6,10,23;48:7;
50:19;51:23;52:5,10;
53:5,13,17,24;55:6,21;
57:24;58:9;60:9;61:2;
62:1;64:4,10,16;65:1,3,
23;66:7,9,13,15;70:22;

76:6;94:3,13,15;97:6;
100:9;101:20,21;
102:25;109:10;116:17;
118:19;119:2,4,12;
120:8;125:22;126:2;
142:7,9;143:5;144:4;
147:20;148:10;155:21;
157:15,16;166:23;
179:20;183:11;184:5,
9,11;185:8,12;186:2;
187:15;188:7;190:10,
11,18;192:5,15;
193:24;194:10;196:2,
17,19;197:8,9,13,23;
198:18;200:19;201:10;
207:14;209:7;210:6;
212:19;214:15;215:17;
220:7;229:18,21
**prisoner (79)**
11:22;12:6,13,15;
23:25;61:3;96:20;
97:20;98:16;99:2,11,
16;101:1;102:3,11;
103:6;104:24;106:13,
18;107:3,16;108:8,15;
109:6,12;110:17;
111:10;112:17;113:10,
14;117:2;118:23;
120:17;121:7;122:12;
123:19,21,22;126:7;
128:17;129:25;162:8,
15,18;163:2;166:15,
24;168:10,16;169:13,
22;179:5,23;180:7;
183:12,23;184:3,4,6,
13,21;185:7,13,15;
186:2;187:13;189:16;
196:4,20;197:3;198:6,
14,19;199:4,10,19;
201:22;209:5;211:17
**prisoners (13)**
23:21;24:1;41:22;
42:22;43:1;97:2,6;
98:11;113:17;168:25;
169:1;179:20;207:22
**prison's (14)**
10:8;11:4,11,20;
12:4,13,23;13:8;14:9;
19:6;51:14;59:1;
141:23;200:14
**privilege (10)**
221:4,7,18,23,25;
222:14,15,25;223:4,20
**privilege- (1)**
223:7
**privileged (1)**
220:25
**proactive (1)**
55:5
**proactively (2)**
55:16,19
**probably (20)**
7:22;10:17,18;25:13;

27:1;29:20;37:23;43:6;
60:15;67:15;108:5;
121:11;126:10;127:8;
167:8;196:24;215:9,
10;216:6;224:23
**problem (7)**
7:25;51:12;67:12,22;
68:14;127:7;206:11
**problems (15)**
48:6;50:14;51:11,20;
62:10;65:15,17;68:1,
12;69:23;127:4;
128:16;145:3,9;146:15
**procedure (3)**
114:18;172:5;223:5
**procedures (26)**
35:3,7,10;36:20,25;
37:4;53:24;59:1,19;
65:3;68:17;94:13,16;
135:24;136:13;139:12;
155:9;170:4;172:14;
175:2;201:15;207:12,
15;209:6,12,18
**proceed (2)**
5:16;136:23
**proceeding (1)**
4:11
**process (13)**
57:11;79:14;81:12;
85:13;95:25;96:5;
122:6,21,23;125:8,14,
15;126:7
**processes (1)**
126:1
**produced (2)**
132:10;202:19
**production (1)**
131:17
**professional (1)**
52:3
**professionally (1)**
181:21
**professionals (1)**
165:16
**program (15)**
45:12,21,22;149:14;
187:14;196:4,20;
197:3;198:6,15,20;
199:5,11,19,25
**prohibited (1)**
209:12
**Promise (2)**
228:18,21
**promises (1)**
213:11
**promoted (1)**
10:4
**promotions (1)**
214:6
**proper (2)**
44:17;114:18
**properly (4)**
51:23;56:19;68:17;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 76 of 82

72:23
**property (1)**
43:7
**proposals (1)**
79:1
**propose (4)**
188:17;189:3,14;
197:22
**proposed (2)**
188:2;189:9
**protocols (12)**
10:8;11:11,20;12:4,
14,23;13:8;36:25;
51:15;65:8;70:14;
199:24
**proven (1)**
213:12
**provide (10)**
58:6;79:7;118:14;
156:3;161:18;173:11;
174:20;176:25;206:13;
223:3
**provided (2)**
160:23;206:12
**provides (1)**
169:12
**providing (1)**
172:20
**provision (1)**
137:23
**provisions (1)**
170:2
**Puetzer (3)**
227:1,4,16
**pull (4)**
131:22;153:8;
177:24;202:11
**pulled (3)**
132:17,25;203:1
**pulling (2)**
130:25;132:9
**purely (1)**
22:7
**purpose (11)**
18:9;22:3;26:3;
27:24;29:21;30:16;
59:17;80:12;159:15;
162:1;195:19
**purposely (1)**
145:16
**purposes (2)**
92:24;158:10
**pursue (1)**
213:19
**put (29)**
4:6;73:23;74:14;
83:3,18;84:4,10,11,22;
85:22;86:3;87:17;88:2;
101:25;102:2;109:23;
115:22;126:10;127:8,
12,14,19;130:18;
167:14;178:7;210:23;
217:11,13;218:1

**putting (2)**
130:2;141:14

## Q

**quickly (3)**
92:14;113:16;196:6
**quiet (1)**
142:11
**quite (1)**
214:9
**quote (3)**
181:4,5,6

## R

**radio (14)**
74:6;100:13;108:19;
109:11;111:12,13;
112:5,10;114:12;
124:6,22;136:22;
161:3,8
**raise (3)**
40:2,3,8
**raised (2)**
6:17;199:21
**random (1)**
181:16
**Randy (2)**
186:10;187:5
**range (16)**
102:17,18,20;
131:14;146:24;147:10;
208:20,20,21;209:1,4,
6,8,9,13;231:3
**ranges (2)**
132:12;147:9
**rank (6)**
8:21,24;9:6,8;
165:23;166:2
**ranks (1)**
214:2
**rather (4)**
101:9;105:5,6;
186:22
**Read (15)**
72:11;80:7;90:11,11;
93:3;95:21;136:25;
138:10,11,23;161:14;
173:3,4;180:17;182:1
**readily (1)**
159:7
**reading (4)**
96:6;165:4;183:1;
186:25
**ready (1)**
181:11
**real (1)**
196:6
**really (12)**
18:25;34:18;61:19;
70:16;86:23;91:7;
126:12,19;182:19;

216:11;217:8;219:23
**re-ask (1)**
172:2
**reason (14)**
6:7;7:24;23:14;
31:23;52:4,15;53:3;
68:9;129:6;145:19;
147:2;162:19;189:12,
13
**reasons (4)**
62:7;141:3,6;195:22
**recall (70)**
17:18;18:23;20:23;
21:20;24:8,25;25:5;
26:15;27:10;28:3;29:8,
19;32:4,11,24,25;33:3,
10,21;34:10;39:14;
40:18,20,22;41:12;
44:11;64:5;93:24;
95:15;96:14;97:23;
98:1;121:17;123:14;
126:4,9,13,19,22;
127:1;128:7;180:7;
186:4;188:20,23,24;
189:1;191:16;198:8,
16;199:20;200:3,5;
201:1,20;203:18;
210:11;217:18;218:4,
13,21;220:10;224:19;
225:4,11;226:13,21;
227:9,15;228:23
**recalling (2)**
118:9;121:14
**receive (3)**
64:15,20;114:18
**received (1)**
215:16
**receiving (3)**
53:13;85:15;110:3
**recognize (1)**
133:14
**recognizing (2)**
47:10;164:15
**recollection (12)**
8:14;22:19;64:19;
96:5;127:2;128:20;
135:1;182:15;206:20;
210:9;211:19;214:6
**record (34)**
4:6,10,15,24;6:4,23;
7:5;8:5;32:8;93:11,14,
19;128:9;130:18;
131:15,25;132:13;
133:9;153:10,19;
171:6,10,11;172:3;
178:7;180:18;191:1,3;
202:5,17;204:24;
222:5,25;229:12
**recording (1)**
56:22
**recordings (2)**
24:5;25:24
**records (4)**

76:25;154:17;
194:23;201:17
**record's (2)**
158:24;203:11
**Redden (6)**
25:4,8;27:14;226:14,
19,22
**reduce (2)**
125:21,21
**refer (2)**
131:17;157:18
**referred (1)**
115:15
**referring (23)**
15:12;24:14;29:5;
50:3;86:7;115:15;
116:10;129:18;131:20;
136:19;155:17;156:16;
157:10;163:13;166:12;
180:19;186:12;187:2;
204:15;205:2;208:15;
227:11;230:22
**refers (2)**
17:2;156:18
**reflected (1)**
90:10
**reflecting (2)**
77:1;146:8
**reflects (1)**
205:1
**refresh (2)**
37:16;128:20
**refreshed (1)**
159:18
**refresher (1)**
5:17
**regard (12)**
56:14;81:19;89:2;
95:2,13;96:11;103:14;
118:23;180:4;199:25;
210:10;211:13
**regarding (6)**
10:9;11:4;96:17,20;
119:3;130:18
**regardless (1)**
222:1
**register (3)**
145:17;146:25;
147:14
**registered (1)**
149:18
**registering (2)**
145:6;146:19
**registers (1)**
140:6
**regular (4)**
18:13;75:8;192:9;
195:25
**regularly (2)**
73:1;141:13
**rejected (1)**
189:22
**relate (2)**

139:6;172:18
**related (47)**
16:14;19:5;20:5,15;
21:17;23:21;24:1,17;
27:2;29:13;32:9,13;
35:13;42:16;44:8;53:9;
58:18;64:20;81:20,22;
95:3;96:4,16;98:19;
99:12,23;100:2;109:5;
116:25;118:19;119:13,
14;135:12;138:2;
141:20;151:11;155:4,
14;160:23;172:1,7;
180:4;182:11;183:10;
205:25;218:12;221:11
**relates (3)**
44:2;135:11;218:9
**relating (3)**
128:17;174:19;
180:11
**relation (5)**
44:18;64:3;128:16;
185:8;220:6
**relationship (7)**
49:16;50:9;52:2;
53:2;186:1;191:21,25
**relay (1)**
148:5
**relayed (3)**
24:11;183:9,22
**relaying (2)**
69:6;117:1
**release (19)**
12:5;102:11;106:12,
18;108:11,21;109:5;
111:8,10,14;113:16;
114:9,12,21;121:12;
124:17;129:24;168:16;
180:23
**released (16)**
108:16;109:13,14;
110:1,4,6,18,24;112:7;
123:22,23;124:9,11,14;
125:2;209:5
**releasing (15)**
107:16;108:7;
110:19;113:17,18;
120:17;121:7;122:11;
123:19;124:23,25;
126:7;128:17;169:13,
22
**relied (1)**
47:12
**rely (1)**
229:23
**relying (5)**
5:21;60:17,18;63:4;
79:5
**remaining (1)**
229:2
**remedied (1)**
66:23
**remedy (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JASON NOWATZKE
August 20, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 77 of 82

68:11

**remember (29)**
16:11;17:13;19:18;
25:3,18;26:20;32:15;
38:21;39:18;96:18;
105:18;113:2;114:25;
116:6,7;127:3,4,5,7;
149:19;171:23;181:18;
182:13;187:19;189:10;
216:20;230:4,7,9

**Remind (1)**
130:20

**reminding (1)**
84:24

**remotely (1)**
4:16

**Remove (4)**
166:10;167:8,17;
168:6

**removing (1)**
168:10

**repeat (6)**
17:7;65:19;99:7;
142:4;157:12;211:8

**repeatedly (1)**
67:19

**rephrase (3)**
7:14;34:20;129:20

**replaced (3)**
145:18,23;147:1

**report (38)**
15:23;21:9,13,16;
38:16;39:10,11;46:7,
23;50:20;54:6,8,18,19,
20;56:23;57:3,10,17,
23;58:10;59:3;62:21;
63:4,5,8,17,19;113:4;
149:24;161:3;178:18;
183:5;186:5,7,9,16;
192:3

**reported (5)**
38:11,13;39:5;56:13,
23

**REPORTER (10)**
4:4,12;5:11;6:2;
93:12;130:22;142:13;
213:3,6,9

**reporter's (1)**
6:3

**reporting (3)**
50:4,13;56:5

**reports (42)**
15:1,8,10,13,15,19;
16:1,2;19:3;20:12,20;
21:25;22:4;23:24;
25:23;31:11;33:25;
55:15;57:9;58:18,23;
59:6,8,11,15,18;60:3,
19,24;62:16,20;63:12;
64:20;68:5;108:19;
194:2,2;195:5;201:18;
207:3,7;229:23

**represent (5)**

29:15;134:16;
154:16;164:13;202:16

**representative (1)**
5:6

**request (3)**
190:7;223:6,19

**requested (1)**
218:20

**requesting (1)**
124:17

**require (5)**
58:9;172:9;200:14;
209:7;231:20

**required (26)**
51:2,9;55:7;59:2;
70:14;72:17;73:12,19;
75:19;77:23;89:25;
96:8;103:24;112:23;
122:5;137:10;140:1;
158:12;164:21;165:5,
11;170:16;207:16;
208:1;209:4,23

**requirement (18)**
50:18;51:5;54:4,5,7,
8,13;57:22;71:25;72:2,
4,7;91:14;140:11;
157:21;164:15;166:22;
168:9

**requirements (4)**
53:1;65:10;73:11;
130:2

**requires (1)**
171:2

**re-share (1)**
171:16

**resolve (5)**
69:12;192:19,21;
193:7,16

**resolved (1)**
216:9

**resolving (1)**
193:17

**respect (1)**
184:18

**respectfully (2)**
181:21,24

**respond (28)**
13:9;45:14,23;73:19;
74:25;80:25;100:3;
103:24;104:19,22,22,
25;105:6;106:8;108:4,
17;109:6,15;121:8;
123:20;136:11;137:19;
153:5;157:11;164:20;
169:23;209:8,14

**responded (2)**
15:14,21

**responder (2)**
75:7;103:24

**responders (11)**
15:20,20;24:20;25:1;
74:8;100:13;102:5;
107:9,17;165:1;224:12

**responding (15)**
14:1,1;27:10;60:5;
69:24;75:4,8;98:17;
103:19;107:10;138:3;
162:2;164:21;165:7;
167:12

**response (50)**
13:18;32:19;34:16;
44:2,8;60:11,14,21;
61:10;62:8,10;63:6,13;
64:3;74:1,15;75:13;
81:21;93:1;95:4,5,13;
96:4;98:20;99:3,23;
100:19;103:21;119:4;
128:21;129:5;137:14,
18;138:4;139:7;
151:12;155:4;157:19;
159:22;160:4;163:18;
164:16;172:18,20;
174:20,20;177:2;
189:18;197:22;231:20

**responses (2)**
61:15,16

**responsibilities (19)**
12:24;23:11;42:5,11,
13;44:3,16;46:2;55:20;
59:7;63:11;65:1;66:21;
67:25;70:5;72:22;
75:12;80:20;194:18

**responsibility (29)**
18:21;41:8,10;42:16;
44:7;45:20;46:11,14,
24;50:3;52:12,19;
53:18;65:6,13;69:11,
15;76:21;77:4;84:7;
109:5;110:17;125:25;
160:7;188:5;194:22;
201:13;205:10,15

**responsible (22)**
40:23;43:13,14,16;
71:3;74:13;75:16;
76:11,17;83:8;94:20,
21;101:19;110:3,20;
111:1;149:13;169:21;
181:3;194:13;195:9;
198:19

**restricted (1)**
80:11

**result (6)**
35:25;57:16;58:17,
22;179:21;197:23

**resulted (1)**
58:13

**results (1)**
204:8

**reveal (3)**
62:9;67:12,20

**revealed (2)**
62:12;195:10

**revealing (2)**
21:9,13

**reveals (1)**
186:10

**review (86)**
16:6,22;17:2;18:6,
12,19;19:13;20:13;
21:24;22:24;23:3,11,
15;29:3,6,9,12;31:2,3,
7,8,11,14,20,21,24,24;
32:4,5,12,13;33:1,1,6,
16;34:1,4;36:16;55:19;
56:2,11;57:1,3,4;59:15,
21,23;61:14,16;62:8,
19;68:17;71:23;72:1,
10;76:21;78:14;79:13,
20;81:12;89:25;92:24;
94:1;95:20,25;96:7;
99:22;100:4;115:22;
122:23;133:2;134:12,
17,21;137:25;138:6;
152:23;154:17;157:22;
158:7;201:17;204:7,8;
207:4,7;219:25

**reviewed (27)**
15:1,6;16:3,24;
17:10,19;18:1;19:25;
20:8,15,20;21:16;
22:20;23:7,19,24;24:5;
60:23;89:11;90:5;
91:16;122:20;139:8;
151:9;182:10,22;183:4

**reviewing (19)**
19:17;20:11;22:3,10;
33:24;34:7,7;55:14;
56:4;59:17;60:2,18;
62:16,21;73:9;78:5;
83:9;115:11;122:21

**reviews (1)**
77:1

**revised (2)**
134:2,6

**revising (2)**
73:9;93:23

**right (39)**
5:5;8:1;47:18;51:6;
54:23;56:6;67:16;82:8;
86:14,16;92:2,18,21,
22;98:12;103:10;
107:1,2;127:13;128:6;
131:1,3;142:22;
150:12;170:22;171:5;
175:17;176:20;177:19,
23;180:25;197:4,6;
213:2,10;217:17;
223:16,21;229:9

**right-hand (1)**
132:14

**ring (1)**
183:2

**rise (1)**
85:3

**risen (1)**
214:1

**risk (2)**
66:9;167:7

**Rodriguez (3)**

204:25;228:7,10

**role (9)**
30:8,15;31:15;46:10;
93:23;164:3,6;165:14;
215:8

**roles (1)**
190:16

**roll-call (3)**
148:3,4,14

**roll-calls (4)**
147:24;148:2,9,20

**Roman (2)**
136:2;155:8

**Ron (2)**
27:18;220:19

**room (2)**
132:22;136:22

**rounds (17)**
47:16,22;49:11;
53:11;55:3,9;60:8;
139:9,15,24;141:18;
143:20;147:25;149:4,
9,24;197:18

**routine (2)**
73:13;229:24

**rule (6)**
6:21;143:14;182:23;
210:3;221:10;223:5

**rules (1)**
5:16

**run (8)**
84:3,5;102:20;
199:13,15,17;201:2,6

**running (4)**
84:2;126:2,8;193:23

**Ryan (1)**
227:19

## S

**safety (39)**
10:9;11:4;13:18;
14:9;42:12,16,21,21;
43:1,4,8,12,15;44:2,18;
62:10,10;64:3;66:9,16;
96:4,16,17;99:13;
100:2;119:3,14;141:4,
20;155:4;160:4;
189:18;194:8,22;
195:6,10,20;198:22;
205:13

**Sam (6)**
5:4;93:5;99:5;133:6;
142:1;170:18

**same (25)**
5:17;6:7;9:2,10;
28:5;38:12,13,24;50:2;
56:17;59:10,10;68:24;
77:8,15;83:18;88:21;
114:17;125:8,9;150:8;
155:12;164:6;185:18;
226:14

**sanitation (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 78 of 82

195:20
**Sarah (2)**
  228:12,15
**sat (2)**
  180:21;216:19
**save (3)**
  88:9,12,13
**saved (2)**
  88:15,20
**saw (2)**
  16:17;54:1
**saying (8)**
  50:25;90:10;91:3;
  103:4;111:18;126:22;
  128:25;218:1
**scenario (1)**
  167:10
**scenarios (3)**
  54:22;120:10;141:8
**scene (2)**
  102:6;163:12
**schedule (1)**
  47:17
**school (1)**
  215:7
**scoop (1)**
  91:5
**scoops (1)**
  91:6
**score (2)**
  204:14;205:1
**scratch (1)**
  71:13
**screaming (2)**
  180:21,22
**screen (8)**
  130:25;132:10,17;
  133:1;171:16;177:25;
  202:12;203:1
**screening (1)**
  218:16
**scroll (1)**
  133:3
**searches (1)**
  218:12
**searching (1)**
  218:10
**second (7)**
  125:5;131:21;153:8;
  173:18;179:3;180:14,
  20
**secondhand (4)**
  210:13,21;211:12,16
**secret (1)**
  158:18
**section (32)**
  139:5;151:22,25;
  155:3,14,16,19;156:13,
  15;160:10,10,11,18,19;
  161:16;169:12,19;
  170:3,4,9,14;171:1,22,
  22;172:2,5,6,11,15;
  174:16,18;175:1

**sections (7)**
  136:4;155:5,13;
  158:4;172:17;177:4;
  204:13
**secure (3)**
  161:22;162:9,12
**secured (3)**
  41:18;157:5,15
**securing (1)**
  41:17
**security (20)**
  41:7,11,14,15,16,17,
  25;42:5,12;49:11,12,
  12;139:9,9,14,15;
  141:5;185:3;194:8;
  195:20
**seeing (5)**
  116:1;123:1;182:17;
  187:8;203:18
**seek (3)**
  98:23;99:15,21
**seem (2)**
  182:25;206:5
**seemed (1)**
  68:23
**seems (1)**
  187:20
**sees (1)**
  54:11
**select (2)**
  32:1;159:4
**send (2)**
  190:9,9
**sense (3)**
  5:23,24;169:7
**sensor (10)**
  140:5,11;146:1,8,10,
  12,19,24;147:8,8
**sensor-by-sensor (1)**
  147:7
**sensors (14)**
  139:21;141:2;143:8;
  144:23;145:5,5,10,12,
  21;146:2,15;147:1,9;
  149:3
**sent (7)**
  79:1;81:18;110:6;
  128:3,25;129:2;177:24
**sentence (1)**
  187:1
**separate (2)**
  56:21,24
**sergeant (7)**
  25:4,9;52:18,20;
  110:13;124:10;214:10
**sergeants (5)**
  27:14;47:13;48:13;
  49:21;52:16
**serious (9)**
  58:14,22;61:16;62:3,
  4,9;125:19;141:13;
  181:2
**seriously (5)**

61:7,10;181:22;
  184:12;185:14
**serve (4)**
  31:21;32:1,4;118:3
**served (14)**
  21:23;23:6;31:14;
  32:12;37:17;38:7,24;
  64:11;101:21;118:4;
  184:10;196:16;199:6;
  214:14
**serves (1)**
  181:19
**services (1)**
  18:3
**serving (1)**
  49:14
**set (9)**
  71:16;72:3;73:9;
  75:1;76:16;102:9;
  133:21;136:7;230:14
**sets (2)**
  77:11;208:24
**setting (5)**
  61:2;97:25;120:1;
  168:1;198:1
**setup (1)**
  77:17
**severity (1)**
  151:5
**share (6)**
  88:14;130:24;
  132:10;177:25;178:6;
  202:11
**Shared (2)**
  88:16;97:2
**shelter (1)**
  161:11
**shift (16)**
  15:14,23;24:19,22;
  54:19;55:7;69:7;104:4;
  116:21;148:4,6,8;
  149:17;181:13;201:10,
  13
**shifts (2)**
  47:17;55:9
**short (3)**
  93:17;171:8;229:10
**shortly (3)**
  16:12;17:11,14
**shoulder (1)**
  45:7
**show (7)**
  114:3;130:5,7;
  144:19;153:17;175:17;
  178:21
**showing (10)**
  173:7;175:22;176:2,
  7,12;178:11;202:12;
  203:8,12,19
**shut (1)**
  181:14
**side (2)**
  26:24;202:23

**sides (1)**
  31:10
**sign (7)**
  75:19;78:19;86:17;
  90:6,9;122:8;232:3
**signal (4)**
  74:6;109:12;110:25;
  111:21
**signature (2)**
  79:2;186:10
**signed (4)**
  86:2;122:6;179:4;
  181:24
**significance (1)**
  192:14
**significant (2)**
  172:8;193:5
**signs (2)**
  86:12;91:16
**similar-formatted (1)**
  202:18
**similarly (1)**
  6:12
**simple (1)**
  85:4
**single (4)**
  47:5;59:12;229:17;
  231:5
**sit (4)**
  26:14;128:13;210:8;
  211:20
**sitting (3)**
  31:2;127:20;132:22
**situation (35)**
  16:13;26:12;47:22;
  54:17;56:18;60:11;
  70:2,4;72:18;80:15,18;
  92:17;93:2;94:5;
  102:15,22;103:7,25;
  104:19;113:23;115:9;
  125:18;156:23;164:10;
  166:5;167:13,18,20;
  168:1;169:8;170:10,
  15;181:11,15;208:1
**situations (17)**
  14:2;45:15,24;67:7;
  69:22,24;70:6;73:19;
  80:22;81:1;87:7;115:3;
  156:14;160:12;168:3;
  186:24;198:4
**six (6)**
  40:24;160:22;169:5;
  170:14;171:1,22
**six-item (1)**
  160:22
**skip (2)**
  144:7,7
**sleeping (1)**
  145:14
**slip (1)**
  150:25
**smaller (1)**
  62:5

**smoothly (4)**
  54:12;125:15;126:2,
  8
**solved (1)**
  62:11
**somebody (8)**
  10:12,16;74:7;
  101:10;104:9;105:7;
  108:6;180:22
**somehow (1)**
  187:20
**Someone (24)**
  10:14;30:1,11;43:13;
  45:6;68:5;72:3;102:10;
  104:3,5,18;107:2,6,8,9;
  111:20;141:24;144:11;
  146:18;150:14,18,25;
  151:4;211:16
**Someone's (2)**
  107:2;200:15
**sometime (3)**
  28:22;37:21,24
**Sometimes (8)**
  145:10;147:1,8,9;
  200:23,24,24;230:12
**somewhat (1)**
  183:6
**somewhere (7)**
  88:4,9;103:24;104:2,
  19,23;216:7
**soon (3)**
  111:19;112:11;
  114:11
**Sorry (6)**
  17:23;32:7;99:7;
  142:3;158:20;231:7
**sort (43)**
  41:5;43:11;46:6,14;
  52:2;53:11;57:8;67:8,
  20,21;71:15;81:12;
  85:19;86:20;87:1;
  89:17;90:22;92:14;
  104:17;113:11;114:3;
  119:6,19,25;120:8,24;
  122:2;125:5;135:14;
  140:25;141:7,18;
  144:22;146:4;149:16;
  157:14;159:4;167:15,
  21;170:8;197:12;
  198:2;213:12
**sought (2)**
  53:16;100:1
**sound (4)**
  29:17;187:15,17,23
**sounded (1)**
  56:4
**sounds (2)**
  119:25;187:9
**source (3)**
  190:2;207:17;210:13
**sources (6)**
  33:22;34:6,15,24;
  79:11;210:21

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 79 of 82
JASON NOWATZKE
August 20, 2020

speak (6)
    25:7;93:6;96:19;
    99:1;219:6,10
speaking (4)
    22:23;27:24;99:16;
    119:25
specific (35)
    22:14;61:25;74:15;
    76:16;77:17,21;82:14;
    83:4;97:15;116:1,4,5;
    121:14;126:4,6,19,22;
    128:14;129:22;133:19,
    20;135:23;146:1,22;
    153:3;154:10;155:3;
    160:8,18;163:16,17;
    183:5;206:5,6,11
specifically (22)
    15:12;22:20;24:14;
    25:18;32:7,9,11;81:19;
    89:2;95:2;98:1;118:12;
    121:17;128:21;130:6;
    139:6;164:4,11;
    183:10;201:2;208:15;
    218:4
specifics (5)
    27:2,4,6,7;32:25
speed (1)
    210:23
spell (1)
    4:24
spelled (1)
    74:18
spend (1)
    19:16
spit (1)
    144:22
spoke (3)
    226:8,16;228:1
spoken (13)
    24:17;25:1;118:22;
    119:1;220:12,21;
    226:19,22,25;227:3,22;
    228:6,9
spot (4)
    57:4;104:4;146:5,5
sprayed (1)
    167:22
spreading (1)
    144:11
squad (8)
    11:22;96:20;98:16;
    99:2,11,16,19;101:1
SSB (1)
    18:2
stack (1)
    132:23
staff (139)
    13:17,25;15:13;16:2;
    20:12;23:21;24:16;
    26:22;36:11,18,24;
    37:3;41:3,10;42:21;
    43:1,24;44:7,17,19;
    45:5;46:2,11,15,25;

47:6,9,14;48:1;53:10,
    17,19;55:6,21;59:7;
    60:4,20;61:4,14;62:8;
    63:13;64:25;65:2,7;
    68:8;70:7,14,18,21;
    75:10;82:21,25;83:7;
    84:5,24;85:10,14;
    94:17;95:19;97:15,21;
    99:18;100:12,23;
    101:3,7,20,25;102:10,
    19,25;104:20;106:16,
    16;107:13,22;109:24;
    110:16;111:14;113:14;
    117:1;121:11;126:10;
    136:22,24;137:10,14;
    138:3;142:8;144:3;
    146:23;147:5,20,24;
    148:4,5,24,24;149:9;
    150:23;153:4;155:20,
    25;156:2;157:9,18,22;
    158:11;159:5;161:2;
    165:21;166:6;181:22;
    183:11,23;184:5,9,11,
    17,21;185:12,21,22;
    186:2;194:7,15,18;
    195:1,14;197:7;
    199:22,24;201:14,23;
    204:2;206:24;207:16,
    21;231:20
staffed (2)
    105:16;110:10
staff's (1)
    181:1
stages (1)
    135:17
stamped (3)
    153:20;186:6;202:14
stamps (1)
    178:22
standing (2)
    231:8,10
start (4)
    86:14;135:22;
    177:25;196:15
started (2)
    4:5;28:8
starting (4)
    37:18;155:9;174:16;
    180:20
starts (3)
    135:25;178:8;186:8
state (34)
    4:24;8:17;10:6;11:9,
    18;12:2,11,21;13:6,15,
    23;14:7,15;32:21;38:8;
    39:8;41:2;45:1;64:10;
    100:9;101:20;109:10;
    118:19;119:2;148:10;
    179:20;184:9;196:2,
    17;207:14;209:7;
    212:19;214:15;215:17
stated (3)
    17:10;179:15;191:15

statement (1)
    168:4
statements (1)
    23:25
states (5)
    135:24;136:21;
    161:9;168:19;204:25
statewide (2)
    32:21,23
Statham (1)
    227:19
stating (1)
    155:8
station (10)
    91:21;92:5;108:22;
    110:2,7,22;161:10;
    181:19;186:9,11
stations (1)
    91:24
statute (1)
    223:5
stay (4)
    41:22;104:3;164:25;
    177:13
step (3)
    69:11;74:19;125:5
stepped (1)
    144:12
steps (40)
    13:25;68:10;73:25;
    80:2;95:16;96:11;
    100:15,18,20;103:15,
    17;114:19;123:24;
    124:4,5,5;126:4;
    128:21;138:4;147:19;
    163:22;167:16;168:16;
    169:8;170:8,13,16,25;
    172:6,10;184:13,25;
    185:25;192:19;205:20;
    206:17;207:7,17;
    208:1,6
Steven (1)
    225:20
still (11)
    77:8;80:7;95:22;
    107:7,8;133:6;146:18;
    147:3;171:13;183:18;
    217:12
stipulation (1)
    8:2
stolen (1)
    161:23
stopped (1)
    148:13
stored (4)
    87:20;89:6;119:12;
    157:15
stories (1)
    102:16
story (2)
    31:11;167:16
street (2)
    6:14;124:10
supervise (7)

Strike (39)
    17:23;21:10,21;
    23:18;25:15;34:12;
    40:25;44:22;48:17;
    49:19;57:1;61:11;
    62:20;64:6,7;70:10;
    71:9;73:5;79:12;87:21;
    88:23;103:11,15;
    111:8;118:2,13;
    123:15,18;129:2;
    149:5;161:25;188:6,
    13;189:12;199:2;
    208:17;216:17;220:3;
    226:4
strikes (1)
    98:9
structure (2)
    31:7;170:8
struggling (1)
    171:25
stuff (5)
    43:7,21;56:9;159:16;
    185:3
subheading (4)
    136:13,17,18;139:12
subject (2)
    218:8,13
submitted (2)
    56:1;81:17
submitting (3)
    143:22,23;207:22
Subsection (1)
    153:6
subsequent (2)
    28:16;172:6
substance (18)
    25:24;28:3,19;33:18;
    151:15;152:11;155:20;
    160:22;173:2,7;175:1;
    183:6;187:11;190:2;
    195:4;218:7;219:1,3
substantial (1)
    158:3
substantive (4)
    24:11;138:25;
    198:15;220:23
sudden (1)
    146:18
sued (2)
    215:25;220:6
sufficient (3)
    80:4;81:5;95:18
suggest (3)
    35:20;188:15,17
Suggested (4)
    186:17;187:12,23;
    188:20
suggestions (4)
    35:9;36:5;187:12;
    189:5
summer (1)
    37:24

13:25;41:3;47:9;
    55:6,21;63:5;110:21
supervised (2)
    99:18;120:20
supervising (10)
    40:23;41:10;46:2,11,
    15;64:25;66:21;94:21;
    111:2;194:18
supervision (4)
    47:14,22;53:9;120:9
supervisor (103)
    8:22,23;9:3,7,9;10:3;
    15:14,24;24:19,22;
    35:2;37:13,17;38:8,17,
    18;40:7,15;41:2;43:5;
    44:22;45:10;46:7;47:9;
    49:15;50:8;51:19;53:4,
    9,19;54:19,20;55:16;
    56:25;57:2;59:5,7,15;
    62:22;63:4,10;64:11;
    65:14;66:20;67:17,24;
    68:11,21;69:15;70:5;
    71:5,6,11,17,20;72:21;
    73:23;78:13;80:3,21;
    81:22;84:11,16;88:8;
    89:16;90:23;92:11;
    94:12;95:12;96:13;
    98:15;101:18,22;
    104:5;126:1,6;134:9;
    144:10;145:3;146:14;
    147:13,20;148:11;
    150:13,22;158:17;
    159:3;184:11;188:3,
    15;191:19;194:17;
    195:16;196:8,17;
    198:5,11;199:6,11;
    200:20;204:6;205:8;
    229:16
supervisors (22)
    47:13;48:12,20;49:5,
    16,19,24;50:4,9;51:21,
    24;52:2,9;53:2,14,20;
    55:8;128:2,5,10;
    147:22;190:17
supervisory (3)
    46:23;50:3;198:18
support (1)
    18:3
supposed (14)
    41:22,24;92:16;
    100:8,19;101:3;
    107:14;108:2;111:10;
    112:20;113:5;129:24;
    144:5;206:14
sure (81)
    16:16;17:9;22:18;
    34:18,20;40:19;42:18;
    43:16,20,24;44:19;
    45:7,20;46:24;50:21,
    23,25;51:1,3;52:19;
    55:24;56:18;59:19,22,
    23;65:20;68:16,18;
    70:7,17;72:11,23;85:2,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-8    filed 05/25/21    page 80 of 82

8;89:20;92:24;95:21;
104:14;105:10;107:19;
110:5,8;113:8;117:6,7,
12;120:21,22;122:15;
123:12,13;126:9,11,14;
127:10;129:5,9,17,20;
131:19;133:2;143:22;
148:18;149:2,8,17;
150:1;159:16;172:2;
182:20;190:21;194:19;
195:1;196:11;204:4;
211:10;216:10;217:4,
8;219:20;223:15
**swap (1)**
171:7
**swapping (1)**
142:24
**swiftly (1)**
113:22
**sworn (3)**
4:2,12,20
**system (17)**
19:7,12;108:20;
139:16,18,22;141:19;
144:21;149:3,7,8,11,
20,25;150:5,6,8
**systematic (2)**
149:15;150:9
**systemic (5)**
67:21;68:1,1,11;
206:10
**systems (4)**
14:10;19:6;43:17;
145:4

**T**

**table (1)**
132:22
**tabs (2)**
89:15,18
**tailored (3)**
72:24;73:2;77:17
**talk (5)**
63:24;78:13;98:15;
213:14;223:22
**talked (20)**
20:11,12;53:10,13;
70:11;86:5;108:7;
122:3;128:10;175:3;
205:24;221:14,16;
226:11;227:19;228:12,
15,18,21;230:3
**talking (7)**
17:15;22:14,15;
116:8;117:13;145:10;
196:9
**talks (1)**
139:8
**tapped (3)**
146:9,10,24
**tapping (2)**
145:5;146:18

**task (15)**
10:11,16,24;11:3,14,
24;12:8,18;13:3,12,20;
14:4,12;143:13;144:16
**tasks (5)**
120:8,11;164:20,21;
165:6
**tech (2)**
142:18;143:3
**telephone (3)**
100:13;136:23;161:3
**telling (3)**
147:23;211:12;
218:25
**tells (1)**
154:24
**ten (6)**
93:15,16;216:7,9;
229:5,8
**terms (34)**
8:8;29:18;33:22;
40:7,13;53:8;64:25;
68:2;78:1,25;87:20;
96:3;103:18;105:10;
107:13;124:3;125:9,
20;129:22;131:20;
136:10;153:2;154:7;
164:17;165:14;172:20;
177:2;183:22;187:11;
195:3,4,13;201:6;
224:10
**testified (22)**
4:20;5:13;22:19;
24:7;28:6,15;33:8,14,
20;37:15,16;46:1;
76:20;110:15;182:9;
191:11;216:12;224:8,
16;226:6;227:12,17
**testify (1)**
220:23
**testifying (1)**
230:8
**testimony (9)**
8:13;82:12;93:24;
104:16;108:9;117:4;
125:12;216:13,16
**that'd (1)**
50:6
**thereafter (1)**
77:7
**there'd (1)**
87:1
**thereupon (4)**
132:4;153:12;178:1;
202:6
**thinking (1)**
217:16
**third (3)**
186:7,9,15
**though (6)**
5:25;6:7;94:18;
131:3;150:8;152:6
**thought (5)**

54:2;79:23;190:12,
20;193:6
**three (14)**
15:16;25:7;105:16;
124:12;147:2;156:8;
164:12,13,16,18,20;
165:16;186:8;208:24
**threw (1)**
167:6
**Throughout (3)**
38:11;148:10;154:5
**throw (1)**
230:14
**tiers (1)**
208:19
**timely (2)**
126:18;181:2
**times (17)**
4:8;22:24;47:17;
60:10,13,16;132:21;
136:24;141:25;144:22;
145:15;147:2;151:4;
181:13;186:19;194:25;
199:15
**timing (3)**
27:7;29:18;169:7
**Timothy (2)**
226:14,22
**title (3)**
9:12;39:4;119:7
**titled (2)**
29:12;160:19
**titles (1)**
8:19
**today (11)**
5:16;8:9,14;26:14;
127:20;128:13;210:8;
211:20;216:19;219:7;
220:1
**together (4)**
163:21;164:19;
165:5;174:18
**toilet (4)**
167:5,11,14,22
**told (2)**
128:10;210:14
**took (23)**
16:22;18:22;22:4;
24:1,6;28:15;29:9,15;
93:21;96:12;102:6;
126:5;128:21;181:22,
23;184:11,12;185:13,
25;196:23;206:18;
220:7;224:5
**tool (1)**
181:14
**top (12)**
121:23;126:12;
133:11;158:18;159:17;
178:25;187:6;197:5,6;
202:22;203:13;214:7
**topic (5)**
106:11;116:2;198:6,

14,15
**topics (8)**
95:7,17;96:12;
118:15,16;187:15,17,
23
**touch (1)**
140:4
**touched (1)**
140:12
**towards (3)**
183:12,23;184:21
**tracking (2)**
139:22;144:21
**train (1)**
197:17
**trained (4)**
13:17;44:8;68:8;
201:14
**trainees (2)**
117:21;120:1
**trainer (5)**
117:22;118:4,5,8;
119:2
**trainers (6)**
117:24;118:23;
196:25;197:2,7;198:2
**training (81)**
35:24;36:3,6,12;
44:4,6,10,14,17,24;
45:4,12,13,19,20;
67:12;68:14,16,18;
69:1,2,4,5,17;75:2,8;
78:15;114:17,17,19,20;
115:2,7,15,16,18,20,21,
24;116:3,9,9,11,12,14,
14,18,20,21,25;117:5,
5,10,11,19,23,25;
118:14,15,20,24;119:3,
17,20,20;120:7,10,13,
15,18,20,20;121:6;
125:10;189:17;197:1,
19;198:3;205:25,25;
208:11
**transcript (9)**
6:1;130:12,14;131:3;
132:2;171:14;191:5,8;
232:4
**transitory (1)**
90:22
**transpired (1)**
33:11
**trash (1)**
43:22
**trial (1)**
217:13
**trouble (2)**
93:5,9
**troubles (1)**
172:1
**true (2)**
30:21;105:22
**trustworthy (1)**
185:2

**truthful (1)**
8:13
**try (12)**
26:5;101:13,25;
103:2;105:6;142:18,
22,24,25;145:16;
170:22;173:1
**trying (7)**
26:8,11;49:20;84:23;
113:7;141:7;142:17
**turn (4)**
83:22;174:10;179:3;
229:2
**turning (6)**
151:14;173:15;
174:23;175:4,7;186:5
**two (21)**
25:8;38:22;39:9;
64:24;90:20;100:20;
107:7;122:4;123:24;
124:4,12;126:10,17;
130:15;131:22;135:17;
147:1;154:13;168:10;
209:22;216:21
**two-page (2)**
202:13,20
**two-way (1)**
6:14
**type (25)**
56:2;58:8;66:18;
68:1,11;74:14,22;75:3;
80:14,18;87:7;116:9;
117:16;119:19;121:16;
122:7;129:25;144:15;
157:16;165:13;167:18;
178:13,17;203:3;205:6
**types (12)**
49:7;55:19;56:11;
59:18;72:24;73:25;
80:25;91:13;122:4;
141:10;168:3;200:4
**typically (1)**
90:17

**U**

**uh-uh (1)**
5:22
**ultimately (2)**
46:23;126:1
**unable (1)**
102:2
**under (15)**
54:21;92:6,20;120:9;
135:23;136:12,16,18;
139:11,11;141:9;
150:21;155:7;209:17;
213:4
**underlying (2)**
56:12;59:23
**underneath (2)**
52:10;136:2
**Understood (16)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 81 of 82
JASON NOWATZKE
August 20, 2020

6:14;8:7;17:9;39:13;
46:5;103:4;108:8;
111:17;113:25;128:24;
145:23;162:6;167:9;
185:14,17;195:3
**undertaken (1)**
17:2
**unintentional (1)**
66:25
**unit (37)**
50:10;74:5;80:8,9,
10,11,12;84:1,9;100:3,
10,14,20,24;101:15;
102:4,11;103:22,25;
104:1,2,8,18;106:16;
137:9,19;139:22;
140:11,19;141:15;
143:8,18;147:17;
153:5;170:25;204:13;
207:18
**units (8)**
41:18;81:10;83:4;
104:21;140:1;141:1;
142:8;204:3
**universal (1)**
154:14
**universe (1)**
83:6
**University (1)**
215:2
**unless (1)**
7:1
**unsafe (1)**
65:23
**unusual (3)**
4:8;73:19;132:21
**unwritten (15)**
35:3;36:24,25;51:4;
53:24;59:2;65:7;70:13,
13,17;85:20;143:11,
16;168:4;207:13
**up (65)**
10:3;43:22;48:22,25;
49:6,7,22;50:4,13,20;
51:9,12,20,23;52:5,11;
54:23,25;55:12;57:19;
79:1;84:25;85:3,13;
93:6;97:14;99:5;
102:20;104:4;116:17;
131:22;132:9,17,25;
142:1,14,17,19;145:22;
150:25;151:15;153:8;
162:9;167:13;170:17;
176:24;177:25;190:22;
192:3;193:1,7;196:10;
202:11;203:1;205:25;
208:20;209:8,14,19;
210:23;214:3,3,10;
215:19;229:2
**update (5)**
85:23;94:1,9;122:23;
129:7
**updated (2)**

87:1;134:19
**updates (2)**
86:21;135:2
**updating (4)**
86:19;95:6,8;129:14
**upon (8)**
16:22;18:19,22;
36:22;109:11;117:3;
124:21;134:13
**up-to-date (5)**
72:12;80:7;95:22;
134:23;154:19
**upwards (2)**
38:12,13
**use (18)**
50:1;55:22;56:17,19,
20,22;57:1,3,6,10,15;
59:10,10;97:13,19;
131:22;139:15;161:11
**used (11)**
47:8;94:9;98:18;
99:4,12;100:4;117:22,
24;149:4;156:22;192:8
**using (5)**
5:21;19:12;120:3;
131:7,9
**usually (2)**
21:9,13
**utility (1)**
150:6

**V**

**vague (1)**
58:2
**valid (1)**
143:24
**valuable (1)**
181:17
**various (2)**
29:13;139:21
**verbal (2)**
49:2;81:17
**verbally (3)**
5:21;128:7;192:6
**verified (3)**
146:24;150:10;
151:11
**verify (5)**
127:21;135:15;
147:4,16;151:17
**verifying (1)**
172:23
**version (6)**
134:19,23;135:3;
137:4;154:19,21
**versus (7)**
40:9;43:13;84:19;
85:22;107:15,16;
113:12
**via (3)**
49:2;100:13;103:1
**video (30)**

6:1;16:6,8,9,14,23,
24;17:11,19;18:1,7,10,
12,19,24;19:1,5,6,13,
17,25;20:5,8,13,14;
24:5;34:1;146:25;
147:5,16
**video-recorded (1)**
23:20
**videos (2)**
16:18;19:10
**view (3)**
19:9;85:1;144:15
**viewed (2)**
18:20;19:4
**viewing (2)**
18:10,24
**Vincennes (1)**
215:2
**violated (3)**
65:24;66:13;217:16
**violating (1)**
68:5
**violation (19)**
51:14;53:24;54:12;
66:3,8,14;68:9;102:8,9,
14;103:5;106:21;
137:22;141:22,23;
142:6;143:5;168:14;
208:10
**Violations (5)**
49:9,12;66:19;67:1;
68:2
**visiting (1)**
142:9
**visual (1)**
114:2
**voice (2)**
93:12;142:18
**voluminous (1)**
158:17

**W**

**wait (6)**
7:3;79:19;112:10;
114:10;161:13;177:20
**Waldo (1)**
181:16
**walked (1)**
174:17
**walking (1)**
214:4
**wall (1)**
145:11
**walls (1)**
41:16
**Wand (6)**
139:16;140:5;
141:18;143:8;149:3,8
**wands (2)**
146:18;151:10
**warden (62)**
9:17;10:4,17,18,24;

11:3,7;23:5,16;27:15,
16,21,25;28:4,11;
31:22,25;38:20,21;
39:6,11,15,19,21,21,22,
24;40:3,4,5,9,10,12;
72:3;78:23,24;79:5;
86:3,12,16,19;188:17,
21;189:3,9,14,22;
190:3,10,22;191:13,17,
17;198:12;214:3,12;
220:19,21;224:1,5,17,
21
**wardens (3)**
39:7;191:22;192:10
**warden's (2)**
23:8,12
**warranted (1)**
151:5
**wasting (1)**
181:17
**watched (1)**
16:17
**watching (1)**
19:1
**Watson (7)**
25:6,8;27:14;226:1,
4,7,11
**wavers (1)**
93:12
**way (40)**
6:8;8:12;11:2,6;
36:11,19,24;42:7;
46:18;47:25;48:5;
49:22;51:1;54:21,22;
64:8;65:16;67:2;69:19;
84:2;107:2;117:6,7;
120:12;121:1;122:16;
124:15,16,19;125:3;
131:16;141:11;188:24;
189:1;190:4;204:9;
208:20;212:3;214:2;
224:22
**ways (6)**
53:15;70:20;93:25;
192:3,6;196:13
**weapons (2)**
42:18,22
**week (2)**
47:19;194:6
**weekly (1)**
194:2
**weeks (2)**
17:16;86:24
**welded (2)**
161:20;162:22
**well-being (3)**
61:3,4;141:4
**weren't (8)**
42:19;46:22;51:11,
23;52:5;88:2;145:5;
194:25
**whatnot (2)**
43:18;100:16

**What's (19)**
10:23;44:15,15;
64:21;82:19;87:19;
92:3;105:14;109:17;
124:2;150:5;185:11;
195:18;198:17;200:18;
214:21;216:8;217:5,21
**whenever (3)**
23:7;200:21,25
**WHEREUPON (10)**
4:1;93:17;131:24;
132:1;133:8;171:8;
191:6;202:4;229:10;
232:5
**whole (8)**
6:9;19:1;71:12;84:3;
91:11;131:17;147:13;
196:9
**who's (6)**
32:16;71:3;101:10;
104:18;111:1;210:14
**whose (4)**
44:6;89:14;156:9;
205:10
**William (2)**
225:6,9
**window (1)**
140:15
**wish (1)**
181:21
**withdraw (1)**
219:19
**within (9)**
17:15;19:24;27:22;
81:23;82:2,4,13;
190:19;213:13
**without (10)**
5:21;45:6;61:24;
111:22;124:6,20,20;
142:9;143:7;178:11
**witness (46)**
4:1,3,12,19;17:1,5,6;
61:21;93:10;105:4;
138:18,21;139:3;
142:14;151:18;152:2,
7,13,18,24;170:19;
173:10,17,22;174:2,7,
12,24;175:6,9,14,19,
24;176:4,9,14,20;
182:5;183:15;196:8,9;
210:17;211:7;216:24;
219:22;220:22
**witnesses (1)**
218:17
**wording (1)**
160:21
**words (2)**
5:21;168:5
**work (8)**
44:25;48:25;52:18;
68:2;75:19;116:16;
164:19;165:5
**worked (6)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JASON NOWATZKE
August 20, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-8   filed 05/25/21   page 82 of 82

50:10;73:4;99:18;
148:10;185:22;191:18
**working (20)**
43:17;47:4;52:10,21;
53:2;76:6,15;77:21;
78:3;86:19;91:19;
94:17;116:21;146:16;
147:3;163:21;185:15;
186:1;191:24;197:13
**works (3)**
31:7;93:15;130:20
**worlds (1)**
107:1
**worries (1)**
158:22
**worry (1)**
143:13
**wrap (1)**
176:23
**write (1)**
218:19
**writing (6)**
57:16;74:13;81:18;
128:14;144:3;160:7
**written (60)**
6:1,4;15:13,16;16:1;
20:12,19;21:13,16;
23:24,25;24:4;25:24;
33:25;34:7;35:2;36:19;
50:25;51:3,4;53:24;
55:14,15;57:19;59:1;
60:3,18;63:5;65:2,9;
70:12,17,19,21;71:1;
74:2;77:22;78:1,4;
83:6,14;85:13,20;87:2;
94:22;109:19;114:24;
115:11;117:13;121:5,
5;123:5,9;125:11;
128:9;153:3;158:11;
186:16;207:13;215:19
**wrong (9)**
42:4;56:3;65:23;
68:24;71:12;73:8;
139:19;181:1;217:10
**wrote (3)**
88:7,18,19

## Y

**year (7)**
9:1,4;37:18,18;
116:17;157:22;158:7
**yearly (4)**
71:23;72:1,9;79:19
**yelling (3)**
207:23,24;208:5

## Z

**Zoom (8)**
4:9,11,13;5:7;65:20;
133:3;173:1,5
**zoomed (2)**

138:8,12

## 1

**1 (11)**
132:6;135:7;138:14;
139:16;141:18;145:11;
149:3,8;153:11;173:8;
203:12
**1:00 (1)**
91:4
**10 (2)**
175:7,10
**100 (4)**
102:17;127:10;
148:18;208:19
**10-70 (3)**
161:3,6;181:10
**10-71 (1)**
181:10
**10th (1)**
178:24
**11 (2)**
175:12,15
**12 (2)**
175:17,20
**13 (3)**
175:22,25;213:7
**133032 (2)**
202:14;203:12
**133033 (2)**
202:15;203:20
**133712 (1)**
178:8
**133740 (1)**
178:22
**133741 (1)**
178:22
**133757 (1)**
186:8
**133759 (1)**
186:6
**133808 (1)**
178:9
**14 (2)**
176:2,5
**15 (4)**
176:7,10;212:25;
219:23
**15-minute (1)**
148:4
**16 (2)**
176:12,15
**17 (2)**
176:17,21
**17-page (1)**
153:19
**19 (3)**
9:19,21,22
**1995 (2)**
212:13;214:19
**19th (1)**
9:21

## 2

**2 (17)**
110:3,9,16;111:1;
124:10,14;135:25;
138:22;151:9;153:14,
18,20;161:9;163:8;
171:14;173:15;203:21
**2:00 (1)**
91:5
**20 (5)**
132:7;153:15;178:4;
202:9;219:23
**200 (1)**
208:20
**2014 (1)**
154:19
**2015 (2)**
134:3;140:9
**2016 (3)**
37:22,23;38:2
**2017 (35)**
8:16,25;14:16;20:5;
21:18;22:21;23:22;
24:2,15,18;29:14,16;
33:24;34:14;35:1;
58:13;100:9;109:11;
112:1;124:3;134:20,
24;135:4;140:10;
154:22;163:6;178:24;
179:11;180:12;204:19;
207:14;220:8;224:6,
18;225:3
**2019 (3)**
9:20,23;38:5
**2020 (4)**
132:7;153:15;178:4;
202:9
**24 (1)**
47:19
**24/7 (2)**
47:4,11
**24th (1)**
29:14
**27th (1)**
204:19
**29 (1)**
178:21

## 3

**3 (7)**
151:14;163:11;
173:20,23;177:13;
178:3,6
**3:12 (1)**
232:5
**30 (16)**
75:19;76:22;77:7;
90:7;91:16;122:9;

140:12,24;141:24;
142:8;143:7;144:5;
146:10;148:1;149:17;
178:21
**30-day (2)**
90:1;122:6
**30-minute (11)**
140:15;143:14,25;
144:16;146:17;147:21;
149:4,24;150:9,15,18
**31st (1)**
154:18
**32761 (1)**
153:20
**32767 (1)**
155:14
**32777 (1)**
153:21
**32879 (1)**
132:14
**32886 (1)**
132:14
**33882 (1)**
136:17
**3rd (2)**
9:22;212:13

## 4

**4 (9)**
136:16;151:21;
168:24,24;173:25;
174:3;202:3,8,13
**4:00 (2)**
213:1,6
**40-hour (5)**
116:12,13,18;117:5,
11
**48 (1)**
186:5

## 5

**5 (4)**
135:24;168:19;
174:5,8
**5:00 (1)**
213:1
**500 (9)**
102:18,20;208:20,
25;209:3,5,8,9,13
**57 (3)**
181:19;186:9,11

## 6

**6 (4)**
152:10;169:1;
174:10,13

## 7

**7 (11)**

33:24;34:14;35:1;
47:19;152:16;155:6,
14;160:20;174:15;
177:4,4
**7th (13)**
8:16;14:16;29:16;
58:13;134:20,24;
154:22;163:5;180:12;
220:8;224:6,18;225:3

## 8

**8 (6)**
135:7;152:21;
160:21;174:23,25;
177:4

## 9

**9 (2)**
175:4,5
**9:00 (2)**
162:14;163:7
**95 (1)**
215:1
**97-page (1)**
178:7