**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# EXHIBIT 10

## In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*LEE MILLER*
*September 22, 2020*
*Cause No. 3:18-CV-00995-JD-MGG*

*BOSS REPORTERS*
*Gary \* Merrillville \* Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-22-20 LEE MILLER.TXT
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-13   filed 05/25/21   page 3 of 16

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the       )
ESTATE OF JOSHUA DEVINE,    )
                            )
          Plaintiff,        )
                            )
     vs.                    ) No. 3:18-CV-00995-JD-MGG
                            )
RON NEAL, et al.            )
                            )
          Defendants.       )

The Zoom videoconference deposition of LEE MILLER, called by Plaintiff Denise Dwyer for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jessica M. Warner Phipps, Registered Professional Reporter and Notary Public, with the witness being located at Indiana State Prison, commencing at 10:55 a.m. on the 22nd day of September, A.D., 2020.

Page 2

APPEARANCES:

     LOEVY & LOEVY
     MS. SARAH GRADY (via Zoom)
     311 North Aberdeen Street
     Third Floor
     Chicago, Illinois 60607
     Telephone: (312) 243-5900
     E-mail: sarah@loevy.com

          On behalf of the Plaintiff;


     OFFICE OF THE INDIANA ATTORNEY GENERAL
     MR. ARCHER ROSE, JR. (via Zoom)
     IGCS 5th Floor
     Indianapolis, Indiana 46204
     Telephone (317) 232-6286
     E-mail: archer.rose@atg.in.gov

          On behalf of the Defendants.


ALSO PRESENT: Ms. Pamela James

* * * * * *

I N D E X

WITNESSES

All Witnesses:                              Page

Lee Miller
  Direct Examination by Ms. Grady        3:8
  Cross-Examination by Mr. Rose          18:24
  Redirect Examination by Ms. Grady      31:3
  Recross-Examination by Mr. Rose        32:24
  Further Examination by Ms. Grady       33:12

NO EXHIBITS MARKED

Page 3

(Witness sworn.)

WHEREUPON:

LEE MILLER,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GRADY:

Q. Mr. Miller, can you please state and spell your name for the record.

A. Lee Miller, L E E, M I L L E R.

Q. Thank you, Mr. Miller. I -- I introduced myself before the deposition, but I'll do so again. My name is Sarah Grady. I represent the plaintiff in this case, Denise Dwyer. And we are here to take your deposition as a witness, and I'm going to ask you some questions about what you recall seeing or hearing about the relevant events.

Before we get started, can I ask, have you ever sat for a deposition before?

A. No, I haven't.

Q. Okay. So I think I'd like to just make sure that there are a couple of things for us to go over. The first one, I can tell there's a lot of feedback in the room, so I'm going to try and talk very slowly so that our court reporter can hear me.

Page 4

MS. GRADY: And, Jessica, if there are any issues with hearing me as we go forward, please let me know.

THE COURT REPORTER: Sure.

BY MS. GRADY:

Q. Mr. Miller, if you would please do your best to wait until I'm completely done asking my question before you start your answer, otherwise, I think our audio is going to get really tripped up. Okay?

A. Yes.

Q. Perfect. You did it perfectly. Just give it a beat so that the echo can -- can subside. And then the -- the other thing is that I'd ask if you have -- if you have any confusion about any of my questions, please definitely let me know. I'm happy to rephrase them. I want to make sure that I'm communicating clearly. Okay?

A. Yes.

Q. Okay. I want to turn your attention to -- Strike that. Let me -- let me start at a different place.

Can you tell me where you currently are?

A. Indiana State Prison.

Q. How long have you been at Indiana State Prison?

A. Nine years.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-13    filed 05/25/21    page 4 of 16

Page 5

Q. And at some point in the last nine years did you reside in B Cell House at Indiana State Prison?

A. Yes.

Q. Can you tell me approximately what -- how long and what date you resided at B Cell House?

A. I got here in 2011. I'm still there.

Q. So the entire nine years you were in B Cell House; is that correct?

A. Yes.

Q. And during the time that you have been in B Cell House, did you ever come to -- to know a man named Joshua Devine?

A. Yes, I know him as Josh Devine now. At that time I did not know him.

Q. How did you know him back then?

A. As my neighbor.

Q. Okay. So you knew -- you knew the person, but you didn't necessarily know that his name was Joshua Devine; is that -- is that correct?

A. Yes.

Q. And where were you neighbors?

A. B Cell House. Excuse me. Repeat that again.

Q. Yeah. What -- Were you on the top level, were you on the bottom level of B Cell House? Where were you in B Cell House that you were neighbors with

Page 6

Mr. Devine?

A. 500 range, north side.

Q. Okay. That's at the very top of the cell house, right?

A. Very last -- Right, the top range.

Q. How long did you -- were you neighbors with Mr. Devine?

A. He was there a couple months.

Q. And can you describe your interactions with Mr. Devine during the few months that you were neighbors before his death?

A. I spoke with him. "How you doing?" Pretty much that's it.

Q. Can you describe his personality?

A. Quiet, didn't say much, do much around me, so -- Yeah, pretty much I could get along with him.

Q. He was a -- a guy who you got along with okay?

A. Yes, I did. He didn't -- he didn't -- He did not keep up too much noise, so I could sleep at night. So that was good for me.

Q. And you said that you had conversations with him from time to time?

A. Pretty much just a "How you doing today?" Pretty much that's it, you know, no serious conversations.

Page 7

Q. I want to turn your attention to the evening and night of April 7th, 2017, the night that Joshua Devine died. Do you remember that night?

A. Yes, I do.

Q. Can you tell me, what is the first thing that you remember happening that night?

A. I was laying in my bed, it was a little bit after count, and I heard Josh moving around and I smelled smoke. And that's when I got up and I asked him what was -- the eff was going on because I'm getting ready to go to bed. And he said, "I need some help. Can you get me some water?" I said, "Some water?" He said, "I got" -- "there's a fire and I'm trying to put it out." I told him everyone was locked in. So I like -- we're locked in -- we're locked in, so I -- I -- I said something to my neighbor, my other neighbor, which is Dunn, and he's like, "Well, we can't help him right now." So I started yelling out "Fire."

That's when everybody in the cell house started joining in yelling, "Fire, fire." We did it for a little while. Then finally we see Officer Rodriguez, he comes upstairs. 540 asked him to open his door for -- and Rodriguez looked at him. I said, "Well, why don't you open the man's door?" He turns and goes back down the range. I don't see him no more

Page 8

that night.

A little time passed after that and Josh starts screaming, screaming for help. I mean, I -- I never heard nothing like this. We -- You could see the orange flames coming down the bars coming to my cell. And -- excuse me. He -- he just screamed, then all of a sudden it just stopped. I got scared myself then. I got on the floor on the back of my cell and -- excuse me. And I -- I --

Q. Mr. Miller, you can feel free to take some time if you need to take some time.

A. Yeah, I never heard nothing scream like this before. And -- Okay. Josh was screaming, then it stopped, and a little while passed. Finally, a big, tall white officer came up and Redding came up. They had a fire extinguisher. They sprayed the fire extinguisher, the fire didn't go out. I asked Redding to open my door, and Redding said he had opened the door from the end. I pushed my door and it was still locked. So they asked for another fire extinguisher. Finally, the firemen that's the inmates got there. They sprayed the fire. The fire went out.

The -- My door was still locked. I couldn't get out. So I see this tall black lieutenant. He wears glasses. I don't know his name. I don't know if

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-13    filed 05/25/21    page 5 of 16

Page 9

he still works here or not. And I asked him to open my door and I -- I -- they opened my door. By the time I got, out the firemen was pulling something out of the cell. It looked like a body. And I just -- I'm sorry. And it -- it -- pretty much after that they -- they didn't put me back in the cell house. They took me to another cell house and I stayed there for three days and they brung me back to that same cell house again and put me back in the cell that -- next -- in 538, so -- excuse me. I never heard nothing -- I just hate thinking about it.

Q. And, Mr. Miller, if -- if you want to -- Do you need a break or are you okay to keep going?

A. I'm -- I'm -- I'm fine.

Q. Okay.

A. I'm fine.

Q. No problem at all.

So I just want to ask you a few details, if that's okay, about some of the things that you just testified about. Okay?

A. Yes, ma'am.

Q. You said that all of this started a little bit after count. Can you tell me what time count typically occurs?

A. 9:00 o'clock count at night. 9:00 p.m.

Page 10

Q. Okay. And you said that you began yelling "Fire" and then you heard other people joining in with you. Can you describe how loudly, from your perspective, the shouts were from you and the other inmates yelling "Fire"?

A. Very, very loud. It was -- it was pretty much everyone joined in. Because we yelled so long and it just -- like a chorus started. Everybody joined in saying, "540 fire." So it was very, very loud.

Q. And were you yelling loudly?

A. I yelled so long I -- I started to get hoarse.

Q. When -- when you first began yelling you hadn't yet seen the flames coming out of the cell, correct?

A. No, I didn't. I smelled a little smoke, but no flames.

Q. And can you give me a time, to the best of your recollection, between when you began yelling "Fire" and when you first saw any member of the ISP staff?

A. If I have to give a time it was 10, 15 minutes.

Q. And you said the first person you saw was Officer Rodriguez?

A. Yes. Yeah.

Page 11

Q. And can you tell me what -- what you saw him doing when he got up to Mr. Devine's cell?

A. Well, he stopped in front of my cell and he -- he looked at Josh and Josh asked him to open the cell. Then I asked him, then he -- then he just turned and went back. He didn't say a word. He just turned and went back.

Q. And approximately how -- how much longer until you saw anybody else come back up to the cell?

A. It was a few minutes. About five, maybe less. I -- but it seemed like forever. I -- I can't put a time because he was standing there at the bars so -- no, Josh wasn't -- he wasn't screaming yet. So the fire didn't -- got blazed and got bigger. It took that -- that few minutes when every -- that's the time the blaze got bigger. That's when I started seeing the fire again, so --

Q. Okay. And you said when Officer Rodriguez came up, Mr. Devine asked him to let him out?

A. Yes, he did. And I also asked him to let him out.

Q. And you said he didn't respond?

A. He didn't. He turned and went back. I don't know why, I don't know if he didn't have the keys or not. I don't know why, but he turned and went back.

Page 12

Q. And you said at some point you laid on the floor in the back of your cell?

A. Yes. The back of my cell next to the vent, yes.

Q. And can you tell me why you did that?

A. The flame was coming out of Joshua's cell into my cell.

Q. So you were worried for yourself?

A. I was very afraid.

Q. I want to ask you, during the time that you've been in B Cell House, have you ever experienced any issues with the electrical system there?

A. Yes. Wires -- When I first moved into the cell house we had exposed wires in my cell. They had to come in -- I mean, there was no socket there. Then the cell I was in on 400 range, when we -- when it came back there were wires hanging out the light fixture. Because all light fixtures are against the wall and they had wires where -- pretty much just wires hanging out of it, so -- In fact, last week they came in and fixed a lot of them in the cell house last week, the whole 500 range. Because they moved all of us off of 500 onto 400. And, in fact, 500 south, it was a lot of lights they fixed up there.

Q. And they did that last week, you said?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
LEE MILLER
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-13 filed 05/25/21 page 6 of 16

Page 13

A. Yes, they did. Last week.

Q. Did anyone tell you that they -- that the reason they were doing that -- Strike that.

Did anyone tell you the reason they were doing that?

A. No, they didn't tell us the reason they was doing it.

Q. And was that the only time you've ever seen anyone making repairs to the electrical system on the 500 range?

A. No. This is an old prison, so pretty much you got wires hanging everywhere. So pretty much that's a -- that's a daily thing around here.

Q. Okay. So it's very common on the 500 range in B Cell House to see wires hanging in an -- in a way that is not -- they're not supposed to be, right?

MR. ROSE: Objection to the form of the question.

MS. GRADY: Yeah. And that's a fair objection. Let me re-ask it.

BY MS. GRADY:

Q. So is it common in your experience to see wires hanging on the 500 range in B Cell House?

A. It's common for me to see wires hanging in every range in B Cell House.

Q. And what about the electrical outlets? In

Page 14

your experience living in B Cell House for the past nine years, have you experienced problems with the electrical outlets?

A. Well, some guys -- me, myself, never had a problem, but I know -- I know this because a guy bought a flat screen TV and got a surge and they -- It wasn't my TV, but it was a person I know that got a surge through his TV and it messed it up.

Q. And you said when you first came into your cell in B Cell House there was an issue with the socket? I'm sorry. Can you just explain again what the issue was?

A. Okay. So the plug, the whole plug was out. The wires was just hanging and it was -- stayed like that for about a week before I -- I stayed in the cell a week before they actually put a plug in there.

Q. Okay. And then you said last week they did a large repair, a large-scale repair to the 500 range of B Cell House?

A. Yes, they did. They -- the light fixtures, the light fixtures and plugs they -- they worked on. They -- they moved everybody off of 500 south down off -- last week.

Q. And have you ever, in the nine years you've lived in B Cell House, seen or experienced an entire

Page 15

range being moved to perform electrical repairs?

A. I have seen a whole range moved, not specifically for electrical repair -- repairs.

Q. So this is the first time since you've been at ISP that an entire range has been relocated in order to perform electrical repairs; is that correct?

A. No, that's not correct. I said they -- I said they moved us and they repaired up there. I'm being -- I'm being truthful here.

Q. Yeah.

A. They repaired up there. Did they move us for that reason? I do not know. But they -- they did not -- they did a lot of repairs on electrical up there because I helped clean up up there too.

Q. You said you helped clean up up there?

A. Yeah, because the cells are nasty, dirty. So we had to clean the cells out when they move someone.

Q. So you have to clean the cells when prisoners are moved in and out of the cells?

A. Yeah. That's one of my jobs I do. Yes, I do.

Q. And did you work to clean the cells when all of the men were taken off the 500 range at B Cell House?

A. I did some cleaning, yes. Me and some other guys, yes.

Page 16

Q. Did anyone tell you that there was an inspection of the prison scheduled for this week?

A. No, they did not.

Q. And did you clean every cell?

A. Clean and -- and painted.

Q. Is that the first time you've ever painted a cell?

A. No, that's not the first time I ever painted a cell. No.

Q. Is that something you do commonly?

A. No, they asked me -- No, I just was helping out doing that.

Q. Sure. And I'm just -- I'm just trying to understand the sort of purview of this project in light of our upcoming inspection.

So did -- did you paint every cell on the 500 or were all 500 range cells painted?

A. No, no, no.

Q. Okay.

A. No.

Q. What about Joshua Devine's cell? Do you know whether that one was painted?

A. Well, that's -- it's -- you got north and south sides of the cell house. I'm on the south side now. They done moved me from the north side to the

USDC IN/ND case 3:18-cv-00995-JD   document 212-13   filed 05/25/21   page 7 of 16

Page 17

south side.  Where Josh's cell was is on the north side.  That's a whole new set of people over there.  That's like the drug side of the prison, B Cell House.  So that side of the range, that side of B Cell House I do not have access to that side anymore.

Q.  I got you.  Okay.  So when we're talking about you seeing everybody move from the 500 range, you were talking about the south side?

A.  South.  South side.  Yes.

Q.  Excellent.  Okay.  And did you -- Strike that.

Do you know whether or not men who were living on the 500 north side range were moved in -- were moved as part of this electrical repair program?

A.  No, I do not know.  From my understanding, everyone is still in their cell on 500 range on the north side.

Q.  I got you.  Okay.  Okay.  And during the nine years that you've lived in B Cell House, were you on both north side and south side?

A.  Yeah, they moved me from the north side last year in September to the south side, to 500.

Q.  Was that the first time you'd lived on the south side of the B Cell House?

A.  Yes, it was.

Q.  And -- and the -- How long did you live on the

Page 18

500 range on the north side?

A.  Since 2000 -- 2011 of November, until September of last year.

MS. GRADY: Okay.  All right.  If you would just give me one minute to look over my notes.

THE WITNESS: Okay.

(A short break was had.)

BY MS. GRADY:

Q.  Just the -- the only other questions I have is can you tell me what cell you lived in when you were neighbors with Mr. Devine?

A.  My cell number was 538.

Q.  And do you recall what Joshua Devine's cell number was?

A.  540.

MS. GRADY: Okay.  I don't have anything else.  Thank you very much for your time, Mr. Miller.

THE WITNESS: All right.

MS. GRADY: I think we're going to wait to hear if the attorneys for the defendants have any questions though.

CROSS-EXAMINATION

BY MR. ROSE:

Q.  Mr. Miller, my name is Randy Rose.  I'm here on behalf of a number of defendants in this case.

Page 19

Did you need to take a break?  Although, I'll tell you, I don't expect to be very long.

A.  No, no.  Go right ahead.

Q.  Yes, sir.  Just let me know if you need to take a break at any point, in case I do run long, but I don't expect so.

I want to clarify a few things.  I heard you talk about the range number of times.  What is a range?

A.  It's a -- where they have the cells, it's a long row of cells stacked on top of each other and you have like a space you walk down through and we call -- yeah, the first floor, second floor, third floor, fourth floor, fifth floor.  And you back through like a gangway and you have a -- cells to the sides of -- that -- that's a range.

Q.  Okay.  I understand.  And if -- if I'm correct, and you correct me if I'm wrong, but the B Cell House, the ranges you're talking about with the cells around the -- the inside and so you can walk around the outside of the cells, are they back to back of one another?  Am I right on that?

A.  They back to back.

Q.  Okay.

A.  Okay.  You have to -- the cells are in -- in this box here and the range is on the outside.  So

Page 20

pretty much you in like a cage within a cage.

Q.  Got you.  So when -- Go ahead, Mr. Miller.

A.  No, I was done.

Q.  Okay.  So when we're talking about north and south, we're talking about which side we're talking about of the cell house?

A.  Yes, it is.

Q.  Okay.  And then I heard you said count at 9:00 p.m.  What is count?

A.  That's when they make sure that everybody is locked in their cells and they do a headcount to make sure everybody's where they're supposed to be.

Q.  And when you say "they," are you talking about the custody staff there at the Indiana State Prison?

A.  Yes, yes.  The -- the COs, they come through and you have basically three COs that run B Cell House, so -- so pretty much they does -- they have several counts a day.  They make sure everybody is in the place they're supposed to be in.

Q.  Okay.  And when you say "COs," are you talking about a correctional officer?

A.  Yes, sir.

Q.  Yes, sir.  And then I heard you use the term "ISP" earlier.  When you use "ISP" you were referring to the Indiana State Prison, right?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC-INND case 3:18-cv-00995-JD   document 212-13   filed 05/25/21   page 8 of 16

Page 21

A. Yes, sir.

Q. Got you. And then I heard you talk about "we was locked down" when you had -- Josh first said something to you about needing water?

A. Right.

Q. Now, when I said "locked down," actually, I think you actually said "locked in." What does locked in mean?

A. I was locked in my cell. I mean, that's during count time where -- no movement. Only place you're supposed to be is in your cell.

Q. Okay. And then Josh Devine was your neighbor in 540 cell, right?

A. Yes.

Q. And you were in 538. And when I'm talking about timing, we're talking about April of 2017, right?

A. Right.

Q. Okay. And then I heard you talk about your other neighbor, Dunn. Is that Dwayne Dunn?

A. Yes.

Q. Okay. And he was held in 536?

A. Yes, he was.

Q. Got you. And then I heard you talk about Rodriguez, and he was a correctional officer; is that right?

Page 22

A. At that time, yes, sir. I don't know whether he is now. I haven't seen him in a while.

Q. Sure. And when he came to your cell and Josh's cell, you described him as turned and went back, right?

A. Yes, he -- Josh asked him to open the door, I asked him to open his door, and he turned back and went the other way.

Q. Now, how did he go? Did he run, did he walk?

A. It was like a brisk walk.

Q. A brisk walk?

A. Yeah, it wasn't running. I couldn't say running.

Q. Okay. Do you remember talking to an investigator from the Office of Intelligence Investigations or Internal Affairs after this fire?

A. Yes, I do. Yes.

Q. Okay. And that would've been Investigator Chris Dustin; do you remember that man?

A. Yeah, Dustin. I remember Dustin. Yes.

Q. Okay. And you remember talking to him, and that was just in the days after this event? I mean, we're talking three and a half ago right now, right?

A. I -- I talked -- We talked to him like 3:00 o'clock that morning. They had us sitting outside in

Page 23

the cold for like three hours and they pulled us to -- into IA and talked to us then. We didn't --

Q. Okay.

A. Yeah.

Q. I got you. So we're talking about roughly six hours after the fire?

A. Pretty much. Something like that, yes.

Q. Sure. Now, I would wager that six hours after the fire your recollection was clearer then than it is now, three and a half years later, right?

A. I remember being cold. Yeah, because it was freezing outside.

Q. Sure.

A. We stayed outside for hours, yes. Yeah, for six hours.

Q. Sure. But you'd agree with me that your memory was fresher then than it is now, correct?

A. Yeah. Yeah, I guess. It probably was.

Q. Fair. And do you remember telling Investigator Dustin that Officer Rodriguez left running?

A. Yeah, I know he turned -- he turned and went back, I can remember.

Q. Okay. And then would it refresh your recollection if I read here, it says, "He ran back down

Page 24

the range"? Does that refresh your recollection about what you told Investigator Dustin?

MS. GRADY: Objection; foundation.

You can answer.

BY THE WITNESS:

A. I -- I just -- He turned and went back down the way. So if I said he ran, he probably ran then.

Q. Okay.

A. It was a brisk walk or --

Q. Sure. All right. And then Josh or Joshua Devine asked you for water, right?

A. Right.

Q. And told you there was a fire and he was trying to put it out?

A. Yes.

Q. Did he tell you what was on fire?

A. No. All he said was something on fire. I didn't hear that. I didn't hear that.

Q. Okay. All right. So going back to your interview with Investigator Dustin.

A. Uh-huh.

Q. Do you recall -- and I'll ask you whether or not this refreshes your recollection -- that you told Investigator Dustin, "asked him for some water and he told Devine everyone locked in." He continued that,

Page 25

"Devine stated he can't put it out," and that later you told him, "Devine never" -- he asked you, "Did Devine ever say what was on fire?"  And you told Investigator Dustin, "His TV."  Do you remember telling him his TV?

A.  Yeah, I remember he said something was on fire.  That's why I said -- that's why -- I remember he said something was on fire.

Q.  Okay.  And we established earlier you agree with me that your recollection was fresher then than now, right?

A.  Uh-huh.  Yes, probably was.  Yes.

Q.  Okay.  Having heard that, does that refresh your recollection about what he told you was on fire?

A.  On -- I remember he said something was on fire.  So, yeah, it could have been a TV.

Q.  Okay.  You don't have any reason to doubt what was recorded then?

A.  No, I can't -- No, I can't doubt what I said.

Q.  Yes, sir.

A.  Because I -- I just remember I -- I remember he said something was on fire.

Q.  Sure.

A.  So --

Q.  Now, I heard you talk about when you were initially put into your first cell at the B Cell House

Page 26

that there was a problem with the outlet; was that right?

A.  Yes.

Q.  All right.  But the custody staff or maintenance people came and fixed it?

A.  Yeah.  Yes.  About a week later, yes.

Q.  Okay.  I imagine you pointed out the problem and that's when it got fixed a week later?

A.  Yeah, just the same day I got to the cell.  Actually, I -- I -- at first I refused to move in that cell, but they said that that's the only cell they had, so --

Q.  Okay.  Now, other than Investigator Dustin and to myself and Miss Grady today, have you talked to anybody else about what you experienced that evening, what you saw and what you heard?  I understand that it was an emotional story to have to tell.  Have you had to share that story with anybody else?

A.  Well, other than, you know, a guy from another cell house asked us what went on that night.  And, you know, pretty much we talked to each other, tried to comfort each other from what happened, but, you know, I only -- so far as details, a lot of details, no.  I just told them what I -- you know, how it felt to me emotionally.  They tried to comfort me.  That's it.

Page 27

Q.  Sure.  So you would've talked to another inmate from another cell house when they asked you what happened?

A.  Yeah, we had said, "Well, we had a fire over in B Cell House, man, and it was bad."  That's all we pretty much --

Q.  Do you recall who it was that you spoke to from that other cell house?

A.  Let me see.  It's a guy with -- he's the one in here.  He went home.  He's one of the guys I talked to.  Let me see.

Q.  Do you remember his name, Mr. Miller?

A.  Rob.  I don't know his last name, but his first name was Rob.

Q.  Rob, R O B?

A.  Yeah, E R T.  Yeah.  Robert.  I think they called him Robert, Rob.

Q.  Okay.  Do you know a man by the name of Oscar Hall?

A.  No.

Q.  What about a Michael Johnfauno, F A U N O?

A.  No.  Actually, we know each other -- a lot of people are their nicknames, so if you tell me their real names, pretty much it's -- it would be hard for me to --

Page 28

Q.  I understand.  I understand.  But you know that name?

A.  No, I don't anybody with those names.  No.

Q.  Okay.  Let me keep going.  I've got several.  I'm sorry.  I don't have the nicknames.

LeeTravis Griffin?

A.  No.

Q.  Go ahead.  I'm sorry.

A.  No.  I'm trying to think.  No, I don't think so.  I don't -- because --

Q.  All right.

A.  Because I -- I know a guy named Lee, but I -- I don't know if his last name is Griffin or not.

Q.  Okay.  Was he in B Cell House on the 500 range back in April 2017?

A.  No, I don't think he had got -- he just got here.  The guy named Lee I know, he just got here like two years ago, so --

Q.  Got you.

A.  Yeah.

Q.  What about a Richard Engram?

A.  No, I don't -- Engram, the last name sounds familiar, but I don't -- I don't deal with -- because, you know, like you hear names, but people you don't deal with.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
LEE MILLER
September 22, 2020
USDC NND case 3:18-cv-00995-JD    document 212-13    filed 05/25/21    page 10 of 16

Page 29

Q. Got you. What about Horatio Lopez? Do you recognize that name?

A. No.

Q. And last one, a Donald Mahone?

A. Donald who?

Q. Mahone?

A. No, no, I don't know anybody.

MR. ROSE: Hold on one second. Sarah, are you there? We're going to go off record just a moment.

(A short break was had.)

MR. ROSE: All right. Back on the record.

BY MR. ROSE:

Q. Bear with me just one moment.

A. Go right ahead. I'm still trying to think of some of these names.

Q. I appreciate it.

A. Probably the only one is that Griffin name. Probably maybe that Griffin name. That's -- that's the only one I can think of.

Q. Well, I tell you what. Do you know who -- Well, let me ask this. Was there a cell on the opposite side of Joshua Devine's cell, 540, in April 2017?

A. 542. Yes, I know who exactly was in that cell.

Page 30

Q. Who was in 542?

A. Ochoa.

Q. Say that again, please.

A. Ochoa.

Q. Ochoa. Can you spell it?

A. O M A C H A, I think. Ochoa. It's a -- I -- Yes. O C S -- O C --

Q. Sure. Sure. Sure. Did you know him by any other name or just what you testified to?

A. That's -- that's his last name.

Q. Got you.

A. We called him -- that's his last name. I remember, that's his last name.

Q. Yes. Yes, sir. And then what about 544, do you recall that?

A. Now, I don't know his name, but they called him P A T.

Q. P A T?

A. Yes.

Q. Got you.

MR. ROSE: All right. Mr. Miller, I don't believe I have any more questions. Miss Grady may have some redirect.

THE WITNESS: All right.

Page 31

REDIRECT EXAMINATION

BY MS. GRADY:

Q. I just have a couple questions for you, Mr. Miller.

You were asked a question about whether you'd met or talked with anyone about the fire before today, and I just want to make sure that question's clear.

You and I had a phone call where we talked about your recollection of the fire, correct?

A. Okay. Yes. I thought you was talking about the ones from the prison, from the prison.

Q. Yeah. No problem. That's exactly why I asked the question. I wanted to make sure that it was clear. And I think you talked to someone else in my office one other time when we came to visit, correct?

A. I talked -- Yes. In fact, I talked to you all twice, I think.

Q. Okay. So other than those two times and the times that you talked about talking with other guys in the cell house about what had happened, any other conversations that you recall about the fire?

A. No. No.

Q. Okay. And then there was some questions about you asking for the outlet in your cell to be repaired and -- and a repair occurring a week later. You also

Page 32

testified about wires hanging throughout B Cell House, right?

A. Right.

Q. Was it common, in your experience, for those wires to be hanging for quite a long time?

MR. ROSE: Objection to the form of the question.
But go ahead, Mr. Miller.

BY THE WITNESS:

A. Pretty much you can walk through the cell house now and you can see wires hanging from the lights.

Q. So would it be fair to say that those wires would be hanging for weeks or months without repair?

MR. ROSE: Same objection.

BY THE WITNESS:

A. They -- Pretty much until the work order get in and repair it. So it could take a week, could take a month. It depends on how fast the repairmen can get out there. So it -- it could take some time.

MS. GRADY: Okay. I don't have anything else.

RECROSS-EXAMINATION

BY MR. ROSE:

Q. Just one last question on that point. You were asked about the wires, and I gather that based upon your answer, problems were being fixed by staff

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC NNND case 3:18-cv-00995-JD    document 212-13    filed 05/25/21    page 11 of 16

Page 33

there at the Indiana State Prison, correct?

MS. GRADY: Objection to form and foundation.

You can answer.

BY THE WITNESS:

A. Whenever -- When they get around to it, when they get the time they do fix it. Yes.

MR. ROSE: Yes. No further questions. Thank you for your time, Mr. Miller.

FURTHER EXAMINATION

BY MS. GRADY:

Q. Sorry. I do have one final question.

When you say "when they get around to it," can you give me a general estimate of how long it takes for staff at ISP to get around to fixing the problem?

A. Some longer than others.

MR. ROSE: One moment, Mr. Miller. I need to state one objection, then you may certainly answer.

Objection. The question calls for speculation.

Go ahead, Mr. Miller.

BY THE WITNESS:

A. Some longer than others because, like I said before, depends on what's needed at the time, so --

Q. Can you give -- can you give me a range of time that, in your experience, you've seen repairs

Page 34

made?

A. Be -- By the time a work order go in, normally a week.

Q. Okay. And that's if a work order has been submitted?

A. That's right.

Q. But if that's the case, then why were there always wires hanging throughout B Cell House, to your knowledge?

MR. ROSE: Objection to the form of the question.

THE WITNESS: Answer it?

MR. ROSE: Yes, sir, Mr. Miller. You go right ahead, sir.

BY THE WITNESS:

A. Okay. Well, the -- because you have people moving in and out of the cells, and once the lights get messed up or whatever and nobody reports it and it just stays hanging.

MS. GRADY: Okay. I don't have anything else. Thank you very much.

THE WITNESS: All right.

MR. ROSE: I have nothing else.

THE COURT REPORTER: Signature?

MS. GRADY: So, Mr. Miller, you have the option to waive your signature or to review for signature. If

Page 35

you review for signature, the idea is just to review for typos in the transcript.

THE WITNESS: Uh-huh.

MS. GRADY: You can waive and trust that your testimony has been taken down accurately, or you can review, although, I'm not exactly sure how review would work in this instance where you're not represented. But it's your choice. You can either waive your signature and trust everything was taken down correctly or you can reserve your signature until you've reviewed the transcript and correct any typos.

THE WITNESS: I'm trusting, so I believe you all did the right thing today and I feel comfortable with what I said, so --

MS. GRADY: Okay.

THE WITNESS: -- on signature.

MS. GRADY: So waive the signature? Okay.

THE WITNESS: Yes.

MS. GRADY: Well, thank you very much for your time, Mr. Miller. We appreciate it. And thanks for hanging tight with us as we had a lot of tech problems. We really appreciate it.

THE WITNESS: Very entertaining today.

(Signature waived.)

(Witness excused at 11:40 a.m.)

Page 36

STATE OF INDIANA      )
                      )  SS.
COUNTY OF PORTER      )

        I, Jessica M. Warner Phipps, Registered
Professional Reporter and Notary Public, do hereby
certify that on the 22nd day of September, A.D., 2020,
the deposition of the witness, LEE MILLER, called by
the Plaintiff, was taken before me, reported
stenographically, and was thereafter reduced to
typewriting under my direction.

        The said deposition was taken via Zoom
videoconference from the Indiana State Prison, and
there were present counsel as previously set forth.

        The said witness, LEE MILLER, was first duly
sworn to tell the truth, the whole truth, and nothing
but the truth, and was then examined upon oral
interrogatories.

        I further certify that the foregoing is a true,
accurate, and complete record of the questions asked of
and answers made by the said witness, LEE MILLER, at
the time and place hereinabove referred to.

        The signature of the witness, LEE MILLER, was
waived by agreement of counsel.

        The undersigned is not interested in the within
case, nor of kin or counsel to any of the parties.

        Witness my official signature on this 28th day
of October, 2020, A.D.

_Jessica M. Warner Phipps, RPR_

JESSICA M. WARNER PHIPPS, RPR
5816 East 7th Avenue
Gary, Indiana 46403
Phone:  (219) 769-9090

CSR No.   084-004485

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-13    filed 05/25/21    page 12 of 16

**A**

**access (1)**
17:5
**accurately (1)**
35:5
**actually (5)**
14:16;21:6,7;26:10;
27:22
**Affairs (1)**
22:16
**afraid (1)**
12:9
**again (6)**
3:12;5:22;9:8;11:17;
14:11;30:3
**against (1)**
12:18
**ago (2)**
22:23;28:18
**agree (2)**
23:16;25:8
**ahead (7)**
19:3;20:2;28:8;
29:14;32:7;33:20;
34:13
**along (2)**
6:16,17
**Although (2)**
19:1;35:6
**always (1)**
34:8
**anymore (1)**
17:5
**appreciate (3)**
29:16;35:20,22
**approximately (2)**
5:4;11:8
**April (4)**
7:2;21:16;28:15;
29:23
**around (8)**
6:15;7:8;13:13;
19:19,20;33:5,12,14
**attention (2)**
4:18;7:1
**attorneys (1)**
18:20
**audio (1)**
4:8

**B**

**back (27)**
5:15;7:25;8:8;9:6,8,
9;11:6,7,9,23,25;12:2,
3,17;19:13,20,20,22,
22;22:4,7;23:23,25;
24:6,19;28:15;29:11
**bad (1)**
27:5
**bars (2)**

8:5;11:12
**based (1)**
32:24
**basically (1)**
20:16
**Bear (1)**
29:13
**beat (1)**
4:11
**bed (2)**
7:7,11
**began (3)**
10:1,12,18
**behalf (1)**
18:25
**best (2)**
4:5;10:17
**big (1)**
8:14
**bigger (2)**
11:14,16
**bit (2)**
7:7;9:22
**black (1)**
8:24
**blaze (1)**
11:16
**blazed (1)**
11:14
**body (1)**
9:4
**both (1)**
17:19
**bottom (1)**
5:24
**bought (1)**
14:5
**box (1)**
19:25
**break (5)**
9:13;18:7;19:1,5;
29:10
**brisk (3)**
22:10,11;24:9
**brung (1)**
9:8

**C**

**cage (2)**
20:1,1
**call (2)**
19:11;31:8
**called (4)**
3:4;27:17;30:12,16
**calls (1)**
33:18
**came (9)**
8:15,15;11:19;12:16,
20;14:9;22:3;26:5;
31:15
**can (36)**
3:8,18,23,25;4:11,11,

21;5:4;6:9,14;7:5,12;
8:10;9:23;10:3,17;
11:1;12:5;14:11;18:10;
19:19;23:23;24:4;
29:19;30:5;32:9,10,18;
33:3,12,24,24;35:4,5,8,
10
**case (4)**
3:14;18:25;19:5;
34:7
**Cell (81)**
5:2,5,7,11,22,24,25;
6:3;7:19;8:5,8;9:4,6,7,
8,9;10:13;11:2,3,4,9;
12:2,3,6,7,11,14,14,16,
21;13:15,22,24;14:1,
10,10,15,19,25;15:22;
16:4,7,9,16,21,24;17:1,
3,4,15,18,23;18:10,12,
13;19:18;20:6,16;21:9,
11,13;22:3,4;25:25,25;
26:9,11,11,20;27:2,5,8;
28:14;29:21,22,25;
31:20,24;32:1,9;34:8
**cells (14)**
15:16,17,18,19,21;
16:17;19:9,10,14,19,
20,24;20:11;34:16
**certainly (1)**
33:17
**choice (1)**
35:8
**chorus (1)**
10:8
**Chris (1)**
22:19
**clarify (1)**
19:7
**clean (7)**
15:14,15,17,18,21;
16:4,5
**cleaning (1)**
15:24
**clear (2)**
31:7,13
**clearer (1)**
23:9
**clearly (1)**
4:16
**cold (2)**
23:1,11
**comfort (2)**
26:22,25
**comfortable (1)**
35:13
**coming (4)**
8:5,5;10:13;12:6
**common (4)**
13:14,21,23;32:4
**commonly (1)**
16:10
**communicating (1)**
4:15

**completely (1)**
4:6
**confusion (1)**
4:13
**continued (1)**
24:25
**conversations (3)**
6:21,25;31:21
**correctional (2)**
20:21;21:24
**correctly (1)**
35:9
**COs (3)**
20:15,16,20
**count (7)**
7:8;9:23,23,25;20:8,
9;21:10
**counts (1)**
20:18
**couple (3)**
3:22;6:8;31:3
**court (3)**
3:25;4:3;34:23
**CROSS-EXAMINATION (1)**
18:22
**currently (1)**
4:21
**custody (2)**
20:14;26:4

**D**

**daily (1)**
13:13
**date (1)**
5:5
**day (2)**
20:18;26:9
**days (2)**
9:7;22:22
**deal (2)**
28:23,25
**death (1)**
6:11
**defendants (2)**
18:20,25
**definitely (1)**
4:14
**Denise (1)**
3:14
**depends (2)**
32:18;33:23
**deposition (3)**
3:12,15,19
**describe (3)**
6:9,14;10:3
**described (1)**
22:4
**details (3)**
9:18;26:23,23
**Devine (15)**
5:12,13,19;6:1,7,10;
7:3;11:19;18:11;21:12;

24:11,25;25:1,2,2
**Devine's (4)**
11:2;16:21;18:13;
29:22
**died (1)**
7:3
**different (1)**
4:19
**DIRECT (1)**
3:6
**dirty (1)**
15:16
**Donald (2)**
29:4,5
**done (3)**
4:6;16:25;20:3
**door (10)**
7:23,24;8:18,19,19,
23;9:2,2;22:6,7
**doubt (2)**
25:16,18
**down (10)**
7:25;8:5;14:22;
19:11;21:3,6;23:25;
24:6;35:5,9
**drug (1)**
17:3
**duly (1)**
3:4
**Dunn (3)**
7:17;21:19,19
**during (5)**
5:10;6:10;12:10;
17:17;21:10
**Dustin (9)**
22:19,20,20;23:20;
24:2,20,24;25:4;26:13
**Dwayne (1)**
21:19
**Dwyer (1)**
3:14

**E**

**earlier (2)**
20:24;25:8
**echo (1)**
4:11
**eff (1)**
7:10
**either (1)**
35:8
**electrical (9)**
12:12;13:9,25;14:3;
15:1,3,6,13;17:13
**else (8)**
11:9;18:16;26:15,18;
31:14;32:20;34:19,22
**emotional (1)**
26:17
**emotionally (1)**
26:25
**end (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-13    filed 05/25/21    page 13 of 16

8:19
**Engram (2)**
28:21,22
**entertaining (1)**
35:23
**entire (3)**
5:7;14:25;15:5
**established (1)**
25:8
**estimate (1)**
33:13
**evening (2)**
7:1;26:15
**event (1)**
22:22
**events (1)**
3:17
**everybody (6)**
7:19;10:8;14:22;
17:7;20:10,18
**everybody's (1)**
20:12
**everyone (4)**
7:14;10:7;17:15;
24:25
**everywhere (1)**
13:12
**exactly (3)**
29:24;31:12;35:6
**EXAMINATION (3)**
3:6;31:1;33:9
**examined (1)**
3:5
**Excellent (1)**
17:10
**Excuse (4)**
5:22;8:6,8;9:10
**excused (1)**
35:25
**expect (2)**
19:2,6
**experience (4)**
13:21;14:1;32:4;
33:25
**experienced (4)**
12:11;14:2,25;26:15
**explain (1)**
14:11
**exposed (1)**
12:14
**extinguisher (3)**
8:16,17,20

**F**

**fact (3)**
12:20,23;31:16
**fair (3)**
13:18;23:19;32:12
**familiar (1)**
28:23
**far (1)**
26:23

**fast (1)**
32:18
**feedback (1)**
3:23
**feel (2)**
8:10;35:13
**felt (1)**
26:24
**few (5)**
6:10;9:18;11:10,15;
19:7
**fifth (1)**
19:13
**final (1)**
33:11
**finally (3)**
7:21;8:14,21
**fine (2)**
9:14,16
**fire (32)**
7:13,18,20,20;8:16,
16,17,20,22,22;10:2,5,
9,19;11:14,17;22:16;
23:6,9;24:13,16,17;
25:3,6,7,13,15,21;27:4;
31:6,9,21
**firemen (2)**
8:21;9:3
**first (17)**
3:4,23;7:5;10:12,19,
23;12:13;14:9;15:4;
16:6,8;17:22;19:12;
21:3;25:25;26:10;
27:14
**five (1)**
11:10
**fix (1)**
33:6
**fixed (5)**
12:21,24;26:5,8;
32:25
**fixing (1)**
33:14
**fixture (1)**
12:17
**fixtures (3)**
12:18;14:20,21
**flame (1)**
12:6
**flames (3)**
8:5;10:13,16
**flat (1)**
14:6
**floor (7)**
8:8;12:2;19:12,12,
12,13,13
**follows (1)**
3:5
**forever (1)**
11:11
**form (4)**
13:17;32:6;33:2;
34:10

**forward (1)**
4:2
**foundation (2)**
24:3;33:2
**fourth (1)**
19:13
**free (1)**
8:10
**freezing (1)**
23:12
**fresher (2)**
23:17;25:9
**front (1)**
11:3
**further (2)**
33:7,9

**G**

**gangway (1)**
19:14
**gather (1)**
32:24
**general (1)**
33:13
**glasses (1)**
8:25
**goes (1)**
7:25
**good (1)**
6:20
**GRADY (23)**
3:7,13;4:1,4;13:18,
20;18:4,8,16,19;24:3;
26:14;30:22;31:2;
32:20;33:2,10;34:19,
24;35:4,15,17,19
**Griffin (4)**
28:6,13;29:17,18
**guess (1)**
23:18
**guy (6)**
6:17;14:5;26:19;
27:9;28:12,17
**guys (4)**
14:4;15:25;27:10;
31:19

**H**

**half (2)**
22:23;23:10
**Hall (1)**
27:19
**hanging (14)**
12:17,19;13:12,15,
22,23;14:14;32:1,5,10,
13;34:8,18;35:21
**happened (3)**
26:22;27:3;31:20
**happening (1)**
7:6
**happy (1)**

**4:14**
**hard (1)**
27:24
**hate (1)**
9:10
**headcount (1)**
20:11
**hear (5)**
3:25;18:19;24:18,18;
28:24
**heard (14)**
7:8;8:4,12;9:10;
10:2;19:7;20:8,23;
21:2,18,23;25:12,24;
26:16
**hearing (2)**
3:16;4:2
**held (1)**
21:21
**help (3)**
7:12,18;8:3
**helped (2)**
15:14,15
**helping (1)**
16:11
**herein (1)**
3:4
**hoarse (1)**
10:11
**Hold (1)**
29:8
**home (1)**
27:10
**Horatio (1)**
29:1
**hours (5)**
23:1,6,8,14,15
**House (41)**
5:2,5,8,11,22,24,25;
6:4;7:19;9:6,7,8;12:11,
14,21;13:15,22,24;
14:1,10,19,25;15:23;
16:24;17:3,4,18,23;
19:18;20:6,16;25:25;
26:20;27:2,5,8;28:14;
31:20;32:1,10;34:8

**I**

**IA (1)**
23:2
**idea (1)**
35:1
**imagine (1)**
26:7
**Indiana (6)**
4:22,23;5:2;20:14,
25;33:1
**initially (1)**
25:25
**inmate (1)**
27:2
**inmates (2)**

8:21;10:5
**inside (1)**
19:19
**inspection (2)**
16:2,15
**instance (1)**
35:7
**Intelligence (1)**
22:15
**interactions (1)**
6:9
**Internal (1)**
22:16
**interview (1)**
24:20
**into (5)**
12:6,13;14:9;23:2;
25:25
**introduced (1)**
3:11
**Investigations (1)**
22:16
**investigator (8)**
22:15,18;23:20;24:2,
20,24;25:3;26:13
**ISP (5)**
10:19;15:5;20:24,24;
33:14
**issue (2)**
14:10,12
**issues (2)**
4:1;12:12

**J**

**Jessica (1)**
4:1
**jobs (1)**
15:20
**Johnfauno (1)**
27:21
**joined (2)**
10:7,8
**joining (2)**
7:20;10:2
**Josh (11)**
5:13;7:8;8:2,13;11:4,
4,13;21:3,12;22:6;
24:10
**Josh's (2)**
17:1;22:4
**Joshua (7)**
5:12,18;7:2;16:21;
18:13;24:10;29:22
**Joshua's (1)**
12:6

**K**

**keep (3)**
6:19;9:13;28:4
**keys (1)**
11:24

USDC IN/ND case 3:18-cv-00995-JD   document 212-13   filed 05/25/21   page 14 of 16

**knew (2)**
5:17,17
**knowledge (1)**
34:9

### L

**laid (1)**
12:1
**large (1)**
14:18
**large-scale (1)**
14:18
**last (18)**
5:1;6:5;12:20,21,25;
13:1;14:17,23;17:20;
18:3;27:13;28:13,22;
29:4;30:10,12,13;
32:23
**later (5)**
23:10;25:1;26:6,8;
31:25
**laying (1)**
7:7
**LEE (4)**
3:3,10;28:12,17
**LeeTravis (1)**
28:6
**left (1)**
23:20
**less (1)**
11:10
**level (2)**
5:23,24
**lieutenant (1)**
8:24
**light (5)**
12:17,18;14:20,21;
16:14
**lights (3)**
12:24;32:11;34:16
**little (6)**
7:7,21;8:2,14;9:22;
10:15
**live (1)**
17:25
**lived (4)**
14:25;17:18,22;
18:10
**living (2)**
14:1;17:11
**locked (12)**
7:14,15,15;8:20,23;
20:11;21:3,6,7,7,9;
24:25
**long (11)**
4:23;5:4;6:6;10:7,
11;17:25;19:2,5,10;
32:5;33:13
**longer (3)**
11:8;33:15,22
**look (1)**
18:5

**looked (3)**
7:23;9:4;11:4
**Lopez (1)**
29:1
**lot (7)**
3:23;12:21,23;15:13;
26:23;27:22;35:21
**loud (2)**
10:6,9
**loudly (2)**
10:3,10

### M

**ma'am (1)**
9:21
**Mahone (2)**
29:4,6
**maintenance (1)**
26:5
**making (1)**
13:9
**man (4)**
5:11;22:19;27:5,18
**man's (1)**
7:24
**may (2)**
30:22;33:17
**maybe (2)**
11:10;29:18
**mean (5)**
8:3;12:15;21:8,9;
22:22
**member (1)**
10:19
**memory (1)**
23:17
**men (2)**
15:22;17:11
**messed (2)**
14:8;34:17
**met (1)**
31:6
**Michael (1)**
27:21
**MILLER (20)**
3:3,8,10,11;4:5;8:10;
9:12;18:17,24;20:2;
27:12;30:21;31:4;32:7;
33:8,16,20;34:12,24;
35:20
**minute (1)**
18:5
**minutes (3)**
10:22;11:10,15
**Miss (2)**
26:14;30:22
**moment (3)**
29:9,13;33:16
**month (1)**
32:18
**months (3)**
6:8,10;32:13

**more (2)**
7:25;30:22
**morning (1)**
22:25
**move (4)**
15:11,17;17:7;26:10
**moved (11)**
12:13,22;14:22;15:1,
2,8,19;16:25;17:12,12,
20
**movement (1)**
21:10
**moving (2)**
7:8;34:16
**much (24)**
6:13,15,15,16,19,23,
24;9:5;10:6;11:8;
12:19;13:11,12;18:17;
20:1,17;23:7;26:21;
27:6,24;32:9,16;34:20;
35:19
**myself (4)**
3:12;8:7;14:4;26:14

### N

**name (20)**
3:9,13;5:18;8:25;
18:24;27:12,13,14,18;
28:2,13,22;29:2,17,18;
30:9,10,12,13,16
**named (3)**
5:11;28:12,17
**names (4)**
27:24;28:3,24;29:15
**nasty (1)**
15:16
**necessarily (1)**
5:18
**need (6)**
7:11;8:11;9:13;19:1,
4;33:16
**needed (1)**
33:23
**needing (1)**
21:4
**neighbor (5)**
5:16;7:16,17;21:12,
19
**neighbors (5)**
5:21,25;6:6,11;18:11
**new (1)**
17:2
**next (2)**
9:9;12:3
**nicknames (2)**
27:23;28:5
**night (8)**
6:19;7:2,2,3,6;8:1;
9:25;26:20
**Nine (6)**
4:25;5:1,7;14:2,24;
17:17

**nobody (1)**
34:17
**noise (1)**
6:19
**normally (1)**
34:2
**north (10)**
6:2;16:23,25;17:1,
12,16,19,20;18:1;20:4
**notes (1)**
18:5
**November (1)**
18:2
**number (4)**
18:12,14,25;19:8

### O

**Objection (9)**
13:17,18;24:3;32:6,
14;33:2,17,18;34:10
**occurring (1)**
31:25
**occurs (1)**
9:24
**Ochoa (4)**
30:2,4,5,6
**o'clock (2)**
9:25;22:25
**off (5)**
12:22;14:22,23;
15:22;29:9
**Office (2)**
22:15;31:14
**Officer (7)**
7:21;8:15;10:24;
11:18;20:21;21:24;
23:20
**old (1)**
13:11
**once (1)**
34:16
**one (17)**
3:23;15:20;16:22;
18:5;19:21;27:9,10;
29:4,8,13,17,19;31:14;
32:23;33:11,16,17
**ones (1)**
31:11
**only (7)**
13:8;18:9;21:10;
26:11,23;29:17,19
**onto (1)**
12:23
**open (7)**
7:22,24;8:18;9:1;
11:4;22:6,7
**opened (2)**
8:18;9:2
**opposite (1)**
29:22
**option (1)**
34:24

**orange (1)**
8:5
**order (4)**
15:5;32:16;34:2,4
**Oscar (1)**
27:18
**others (2)**
33:15,22
**otherwise (1)**
4:7
**out (22)**
7:14,18;8:17,22,24;
9:3,3;10:13;11:19,21;
12:6,17,20;14:13;
15:17,19;16:12;24:14;
25:1;26:7;32:19;34:16
**outlet (2)**
26:1;31:24
**outlets (2)**
13:25;14:3
**outside (5)**
19:20,25;22:25;
23:12,14
**over (4)**
3:22;17:2;18:5;27:4

### P

**paint (1)**
16:16
**painted (5)**
16:5,6,8,17,22
**part (1)**
17:13
**passed (2)**
8:2,14
**past (1)**
14:1
**people (6)**
10:2;17:2;26:5;
27:23;28:24;34:15
**Perfect (1)**
4:10
**perfectly (1)**
4:10
**perform (2)**
15:1,6
**person (3)**
5:17;10:23;14:7
**personality (1)**
6:14
**perspective (1)**
10:4
**phone (1)**
31:8
**place (3)**
4:20;20:18;21:10
**plaintiff (1)**
3:13
**please (5)**
3:8;4:2,5,14;30:3
**plug (3)**
14:13,13,16

DENISE DWYER, et al, v.
RON NEAL, et al:

Cause No. 3:18-CV-00995-JD-MGG

LEE MILLER
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-13   filed 05/25/21   page 15 of 16

plugs (1)
  14:21
pm (2)
  9:25;20:9
point (4)
  5:1;12:1;19:5;32:23
pointed (1)
  26:7
Pretty (17)
  6:12,16,23,24;9:5;
  10:6;12:19;13:11,12;
  20:1,17;23:7;26:21;
  27:6,24;32:9,16
Prison (11)
  4:22,24;5:2;13:11;
  16:2;17:3;20:14,25;
  31:11,11;33:1
prisoners (1)
  15:18
probably (5)
  23:18;24:7;25:11;
  29:17,18
problem (6)
  9:17;14:5;26:1,7;
  31:12;33:14
problems (3)
  14:2;32:25;35:21
program (1)
  17:13
project (1)
  16:14
pulled (1)
  23:1
pulling (1)
  9:3
purview (1)
  16:14
pushed (1)
  8:19
put (8)
  7:14;9:6,9;11:11;
  14:16;24:14;25:1,25

## Q

question's (1)
  31:7
Quiet (1)
  6:15
quite (1)
  32:5

## R

ran (3)
  23:25;24:7,7
Randy (1)
  18:24
range (27)
  6:2,5;7:25;12:16,22;
  13:10,14,22,24;14:18;
  15:1,2,5,22;16:17;17:4,
  7,12,15;18:1;19:8,8,15,

25;24:1;28:14;33:24
ranges (1)
  19:18
read (1)
  23:25
ready (1)
  7:11
real (1)
  27:24
really (2)
  4:8;35:22
re-ask (1)
  13:19
reason (5)
  13:3,4,6;15:12;25:16
recall (6)
  3:16;18:13;24:22;
  27:7;30:15;31:21
recognize (1)
  29:2
recollection (8)
  10:18;23:9,25;24:1,
  23;25:9,13;31:9
record (3)
  3:9;29:9,11
recorded (1)
  25:17
RECROSS-EXAMINATION (1)
  32:21
Redding (3)
  8:15,17,18
redirect (2)
  30:23;31:1
referring (1)
  20:24
refresh (3)
  23:24;24:1;25:12
refreshes (1)
  24:23
refused (1)
  26:10
relevant (1)
  3:17
relocated (1)
  15:5
remember (17)
  7:3,6;22:14,19,20,
  21;23:11,19,23;25:4,5,
  6,14,20,20;27:12;30:13
repair (7)
  14:18,18;15:3;17:13;
  31:25;32:13,17
repaired (3)
  15:8,11;31:24
repairmen (1)
  32:18
repairs (6)
  13:9;15:1,3,6,13;
  33:25
Repeat (1)
  5:22
rephrase (1)
  4:14

reporter (3)
  3:25;4:3;34:23
reports (1)
  34:17
represent (1)
  3:13
represented (1)
  35:7
reserve (1)
  35:10
reside (1)
  5:2
resided (1)
  5:5
respond (1)
  11:22
review (5)
  34:25;35:1,1,6,6
reviewed (1)
  35:10
Richard (1)
  28:21
right (36)
  6:4,5;7:18;13:16;
  18:4,18;19:3,21;20:25;
  21:5,13,16,17,25;22:5,
  23,23;23:10;24:10,11,
  12,19;25:10;26:2,4;
  28:11;29:11,14;30:21,
  24;32:2,3;34:6,12,21;
  35:13
Rob (4)
  27:13,14,15,17
Robert (2)
  27:16,17
Rodriguez (6)
  7:22,23;10:24;11:18;
  21:24;23:20
room (1)
  3:24
ROSE (15)
  13:17;18:23,24;29:8,
  11,12;30:21;32:6,14,
  22;33:7,16;34:10,12,22
roughly (1)
  23:5
row (1)
  19:10
run (3)
  19:5;20:16;22:9
running (3)
  22:12,13;23:21

## S

same (3)
  9:8;26:9;32:14
Sarah (2)
  3:13;29:8
sat (1)
  3:19
saw (5)
  10:19,23;11:1,9;

26:16
saying (1)
  10:9
scared (1)
  8:7
scheduled (1)
  16:2
scream (1)
  8:12
screamed (1)
  8:6
screaming (4)
  8:3,3,13;11:13
screen (1)
  14:6
second (2)
  19:12;29:8
seeing (3)
  3:16;11:16;17:7
seemed (1)
  11:11
September (2)
  17:21;18:3
serious (1)
  6:24
set (1)
  17:2
several (2)
  20:17;28:4
share (1)
  26:18
short (2)
  18:7;29:10
shouts (1)
  10:4
side (21)
  6:2;16:24,25;17:1,2,
  3,4,4,5,8,9,12,16,19,19,
  20,21,23;18:1;20:5;
  29:22
sides (2)
  16:24;19:14
Signature (9)
  34:23,25,25;35:1,9,
  10,16,17,24
sitting (1)
  22:25
six (3)
  23:5,8,15
sleep (1)
  6:19
slowly (1)
  3:24
smelled (2)
  7:9;10:15
smoke (2)
  7:9;10:15
socket (2)
  12:15;14:11
someone (2)
  15:17;31:14
sorry (5)
  9:4;14:11;28:5,8;

33:11
sort (1)
  16:14
sounds (1)
  28:22
south (12)
  12:23;14:22;16:24,
  24;17:1,8,9,9,19,21,23;
  20:5
space (1)
  19:11
specifically (1)
  15:3
speculation (1)
  33:19
spell (2)
  3:8;30:5
spoke (2)
  6:12;27:7
sprayed (2)
  8:16,22
stacked (1)
  19:10
staff (5)
  10:20;20:14;26:4;
  32:25;33:14
standing (1)
  11:12
start (2)
  4:7,19
started (7)
  3:18;7:18,20;9:22;
  10:8,11;11:16
starts (1)
  8:3
state (8)
  3:8;4:22,23;5:2;
  20:14,25;33:1,17
stated (1)
  25:1
stayed (4)
  9:7;14:14,15;23:14
stays (1)
  34:18
still (6)
  5:6;8:19,23;9:1;
  17:15;29:14
stopped (3)
  8:7,14;11:3
story (2)
  26:17,18
Strike (3)
  4:19;13:3;17:10
submitted (1)
  34:5
subside (1)
  4:11
sudden (1)
  8:7
supposed (4)
  13:16;20:12,19;
  21:11
sure (20)

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
LEE MILLER
September 22, 2020
USDC IN/ND case 3:18-cv-00995-JD   document 212-13   filed 05/25/21   page 16 of 16

3:21;4:3,15;16:13;
20:10,12,18;22:3;23:8,
13,16;24:10;25:22;
27:1;30:8,8,8;31:7,13;
35:6
**surge (2)**
14:6,7
**sworn (2)**
3:1,5
**system (2)**
12:12;13:9

## T

**talk (6)**
3:24;19:8;21:2,18,
23;25:24
**talked (13)**
22:24,24;23:2;26:14,
21;27:1,10;31:6,8,14,
16,16,19
**talking (16)**
17:6,8;19:18;20:4,5,
5,13,20;21:15,16;
22:14,21,23;23:5;
31:10,19
**tall (2)**
8:15,24
**tech (1)**
35:21
**telling (2)**
23:19;25:4
**term (1)**
20:23
**testified (4)**
3:5;9:20;30:9;32:1
**testimony (1)**
35:5
**thanks (1)**
35:20
**thinking (1)**
9:11
**third (1)**
19:12
**though (1)**
18:21
**thought (1)**
31:10
**three (5)**
9:7;20:16;22:23;
23:1,10
**throughout (2)**
32:1;34:8
**tight (1)**
35:21
**times (3)**
19:8;31:18,19
**timing (1)**
21:16
**today (5)**
6:23;26:14;31:6;
35:13,23
**told (9)**

7:14;24:2,13,23,25;
25:2,3,13;26:24
**took (2)**
9:6;11:14
**top (4)**
5:23;6:3,5;19:10
**transcript (2)**
35:2,11
**tried (2)**
26:21,25
**tripped (1)**
4:8
**trust (2)**
35:4,9
**trusting (1)**
35:12
**truthful (1)**
15:9
**try (1)**
3:24
**trying (5)**
7:14;16:13;24:14;
28:9;29:14
**turn (2)**
4:18;7:1
**turned (9)**
11:5,6,23,25;22:4,7;
23:22,22;24:6
**turns (1)**
7:24
**TV (6)**
14:6,7,8;25:4,4,15
**twice (1)**
31:17
**two (2)**
28:18;31:18
**typically (1)**
9:23
**typos (2)**
35:2,11

## U

**up (18)**
4:8;6:19;7:9;8:15,
15;11:2,9,19;12:24;
14:8;15:8,11,13,14,14,
15,15;34:17
**upcoming (1)**
16:15
**upon (1)**
32:25
**upstairs (1)**
7:22
**use (2)**
20:23,24

## V

**vent (1)**
12:3
**visit (1)**
31:15

## W

**wager (1)**
23:8
**wait (2)**
4:6;18:19
**waive (4)**
34:25;35:4,8,17
**waived (1)**
35:24
**walk (7)**
19:11,19;22:9,10,11;
24:9;32:9
**wall (1)**
12:18
**water (5)**
7:12,13;21:4;24:11,
24
**way (3)**
13:15;22:8;24:7
**wears (1)**
8:25
**week (14)**
12:20,21,25;13:1;
14:15,16,17,23;16:2;
26:6,8;31:25;32:17;
34:3
**weeks (1)**
32:13
**what's (1)**
33:23
**Whenever (1)**
33:5
**WHEREUPON (1)**
3:2
**white (1)**
8:15
**whole (4)**
12:22;14:13;15:2;
17:2
**Wires (16)**
12:13,14,17,19,19;
13:12,15,22,23;14:14;
32:1,5,10,12,24;34:8
**within (1)**
20:1
**without (1)**
32:13
**Witness (20)**
3:1,4,15;18:6,18;
24:5;30:24;32:8,15;
33:4,21;34:11,14,21;
35:3,12,16,18,23,25
**word (1)**
11:6
**work (5)**
15:21;32:16;34:2,4;
35:7
**worked (1)**
14:21
**works (1)**
9:1

**worried (1)**
12:8
**wrong (1)**
19:17

## Y

**year (2)**
17:21;18:3
**years (8)**
4:25;5:1,7;14:2,24;
17:18;23:10;28:18
**yelled (2)**
10:7,11
**yelling (7)**
7:18,20;10:1,5,10,12,
18

## 1

**10 (1)**
10:21
**11:40 (1)**
35:25
**15 (1)**
10:21

## 2

**2000 (1)**
18:2
**2011 (2)**
5:6;18:2
**2017 (4)**
7:2;21:16;28:15;
29:23

## 3

**3:00 (1)**
22:24

## 4

**400 (2)**
12:16,23

## 5

**500 (18)**
6:2;12:22,23,23;
13:10,14,22;14:18,22;
15:22;16:16,17;17:7,
12,15,21;18:1;28:14
**536 (1)**
21:21
**538 (3)**
9:9;18:12;21:15
**540 (5)**
7:22;10:9;18:15;
21:13;29:22
**542 (2)**
29:24;30:1

**544 (1)**
30:14

## 7

**7th (1)**
7:2

## 9

**9:00 (3)**
9:25,25;20:8