**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# EXHIBIT 11

## In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

---

*MICHAEL JOHNFAUNO*
*September 22, 2020*
*Cause No. 3:18-CV-00995-JD-MGG*

---

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-22-20 MICHAEL JOHNFUANO.TXT
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

MICHAEL JOHNFAUNO
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-14    filed 05/25/21    page 3 of 14

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the     )
ESTATE OF JOSHUA DEVINE,   )
                          )
        Plaintiff,        )
                          )
        vs.               ) No. 3:18-CV-00995-JD-MGG
                          )
RON NEAL, et al.          )
                          )
        Defendants.       )

The Zoom videoconference deposition of MICHAEL JOHNFAUNO, called by Plaintiff Denise Dwyer for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jessica M. Warner Phipps, Registered Professional Reporter and Notary Public, with the witness being located at Indiana State Prison, commencing at 12:12 p.m. on the 22nd day of September, A.D., 2020.

Page 2

APPEARANCES:

LOEVY & LOEVY
MS. SARAH GRADY (via Zoom)
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Telephone: (312) 243-5900
E-mail: sarah@loevy.com

        On behalf of the Plaintiff;

OFFICE OF THE INDIANA ATTORNEY GENERAL
MR. MICHAEL BLINN (via Zoom)
IGCS 5th Floor
Indianapolis, Indiana 46204
Telephone (317) 232-6286
E-mail: Michaelblinn.rose@atg.in.gov

        On behalf of the Defendants.

ALSO PRESENT: Ms. Pamela James

* * * * * *

I N D E X

WITNESSES

All Witnesses:                              Page

Michael Johnfauno for
 Direct Examination by Ms. Grady        3:8
 Cross-Examination by Mr. Blinn        18:18

NO EXHIBITS MARKED

Page 3

(Witness sworn.)
WHEREUPON:
        MICHAEL JOHNFUANO,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
        DIRECT EXAMINATION
BY MS. GRADY:

Q. Okay. Mr. Johnfauno, can you state and spell your name for the record.

A. First name Michael, M I C H A E L, last name Johnfauno, J O H N F A U N O.

Q. And I -- My name is Sarah Grady. I represent the plaintiff in the case brought by Denise Dwyer. This is a case about the death of Joshua Devine.

And I just want to go over two rules briefly that I think will help us move expeditiously forward. The first is, as you can hear, there's a big echo. And I think probably what we're going to have to do is ask you to take a second, like take a beat after I finish asking my question before you answer, so that we can make sure that the record is actually clear. Okay?

A. I got you.

Q. The second is that if you have any confusion about my questions -- sometimes I have trouble getting my words out right -- you just let me know and I'm

Page 4

happy to rephrase. Okay?

A. Okay. Just to make sure, you guys can hear me just fine, correct?

MR. BLINN: Loud and clear.

BY MS. GRADY:

Q. That's correct.

A. Okay. I just want to make sure.

Q. Okay. Mr. Johnfauno, can you tell us how long you have resided at Indiana State Prison?

A. Since early 2003.

Q. And have you ever resided in B Cell House during that time?

A. Yes, ma'am.

Q. What dates approximately did you reside at B Cell House?

A. 2016 to maybe 2018. 2000- -- End of 2017, beginning of 2018. Somewhere in there.

Q. Okay.

A. No more than two years.

Q. And -- and where did you reside in B Cell House?

A. During the incident?

Q. Well, have you -- have you resided in multiple cells in B Cell House during the 2016 to 2018 time frame?

USDC IN/ND case 3:18-cv-00995-JD   document 212-14   filed 05/25/21   page 4 of 14

Page 5

A. Yes.

Q. Can you give me an idea of where you have lived in the cell house?

A. I stayed in two different cells: One was on the other side of the cell house, which would be the south side, and then the -- the one where I lived at during the incident, I stayed on the -- on the third tier on the -- right under him.

Q. Do you remember the -- your cell number?

A. Yes, I remember the one for the incident. Yes. It was 338.

Q. So I'll represent to you that Joshua Devine died on April 7th, 2017. Do you remember the day that Joshua Devine died?

A. Yes, I do.

Q. Can you tell me, what is the first thing that you remember?

A. It was after -- it was after evening count. They had -- It was real quiet, so it was definitely after 9:00 o'clock count sometime. And I heard his neighbor say something about him smelling smoke, and Mr. Devine spoke up and said that it was him. And some time passed and then I heard him talking about he couldn't put it out, like the fire was going and he couldn't put it out.

Page 6

At that point in time we -- we -- we started -- in the cell house you had this thing where you -- you holler for like a fire or a medical emergency and it kind of resonates around the cell house. One guy says it, the next guy says it, the next guy says it. So at that point people started hollering for help because this man is screaming in his cell for help. And so we're trying to get the officers up there because they're -- at that point in time at night they're the only ones that can help him, so we're trying to get them up there.

And they just -- they never came and it just -- it got so bad because where I live at and how the windows are in that cell house, you can duck down and look up. He stayed directly above me, so if there's a light in the room that's on, you can see everything that's going on in that room. So when I heard him say that there -- he couldn't put it out, at that point in time I ducked down and looked up and I seen a fire in his cell, and it just progressively got worse.

As we're screaming for help, I'm watching this man burn. And it looked like the whole area in his room and just everything was on fire and you could see his hair on fire. And the screams got worse, you know,

Page 7

where the man was just screaming and screaming for help and standing at the door and just this -- nobody came. And -- and it's just one of them things that -- that I don't like to remember it because I never seen nobody die like that. The last thing the man was screaming for help and he slumped down on the door and then it was just over with from there.

At that point we was still looked in our rooms. They had a fireman that was on the Flag on the first tier. He didn't get let out. Nobody came. Like the firemen didn't even come until after we was already let out. We was already let outside to go downstairs. We couldn't get outside in a -- in a timely fashion because they had the -- the gates were locked. So we was trying to run through the smoke-filled building trying to figure out how he was going to get out of there.

At that point we get outside and just, you know, we're -- we're stuck outside while they're dealing with this situation. I can't speak on anything that I wasn't there for, so -- I can speak on what I said, though, and whatever I had in my statement. When I wrote a statement -- I know you guys all have a copy of it -- that was about as fresh as the memory can get at that point in time when I wrote that statement to

Page 8

you guys. Now, as far as times and a lot of other little details I might have forgotten over time, but that's pretty much the gist of everything that happened.

Q. Can I start by asking you, you said that you lived in the cell underneath Joshua Devine; is that correct?

A. Yes, he stayed in 5- -- 538. I stayed in 338.

Q. Okay.

A. So there was one tier between us two.

Q. Okay. And you said that it was -- it was quiet that evening?

A. Yes, it's a -- at night in that cell house -- it's really small. There's not a lot of hollering and carrying on after 9:00, 10:00 o'clock at night. It's real quiet. So you can hear pretty much a -- you know, a cricket chirp, you know. I mean, it's that quiet in there.

Q. And the -- You heard then the neighbor asked about there being a fire; is that correct?

A. The neighbor said he smelled smoke, and that's when Mr. Devine spoke up and said that that was him. Whatever was going on, was going on in his room, in other words.

Q. And then shortly after that the yells that the

USDC INND case 3:18-cv-00995-JD   document 212-14   filed 05/25/21   page 5 of 14

Page 9

fire started?

A. I have no idea how the fire started. He didn't say how it started. He just said that he couldn't put it out. Whatever it was he couldn't put it out. It was out of control at that point in time when he started hollering for help.

Q. Yeah. No. I'm sorry. My question was unclear. Shortly after you heard the -- Mr. Devine's neighbor ask about smoke, the -- the yells started reporting a fire and asking for help, right?

A. No, the -- the -- the report for the fire didn't start until after he said that he couldn't put it out. That's when the initials -- like, hey, I need help started.

Q. Okay. And were you able to hear the words that were being yelled?

A. Yeah, there was -- they was screaming over the range about that there's a fire up on the fifth range, there's a man burning up in his cell. Just a whole bunch of different things. You've got to think, there was 20, 30, 40 people hollering, you know. So everybody's hollering different things, but they was -- At the end of the day, they was trying to let the police know that there was a fire up there and that they needed to get up there and put it out.

Page 10

Q. And did the -- Did you also join in the yelling?

A. Yes, ma'am.

Q. What -- How would you describe in terms of the volume of the cell house?

A. It was loud. It was loud. When you're screaming for help like that in them cell houses, a lot of people holler. There's no way -- That's the only way to get the attention of the officers from that type of distance is for everybody to yell. Hey, look, you know, blah-blah-blah, they need this, this, and this or whatever it might be, medical attention, a fire, anything. It can be clearly heard at that time of night when somebody is screaming for help, especially a blood-curdling scream when a man is on fire. You can clearly hear that.

Q. And did you -- did you see anyone from Indiana State Prison respond at any point to the yells?

A. I can't say that I seen anything because I didn't live on that range, but you could judge based on how the inmates were responding to the officers, that when they did come up there, you heard them talking about, like, "How come you didn't let this man out? How come" -- "Where's the fire extinguisher at?" You know, their -- their first initial trip up there they

Page 11

didn't bring a fire extinguisher. And them doors are electronic doors, so they really didn't even need to run all the way down the range to do anything. They could have hit that door on the front and let that man out of his cell. So they had several different ways that they could have responded to that.

Q. And how long did the yells go on? Can you give me an approximate number of minutes that prisoners in B Cell House were yelling?

A. See, in -- in an instance like that I can't -- I can't -- I can't remember. I know I screamed and screamed and screamed and -- and I want to say -- instances where -- where -- where things are just moving and -- and something needs to happen really fast, I don't know how you would describe the incident. But time -- time seems different, you know, and time would seem different to where I know it was several minutes. I can say that. I can't say exactly how long because I don't remember. I know that's in my statement that I wrote. I think I described it as best as I could as far as the time goes, but as far -- it's been three years for me in here. I don't remember the exact time. But it was definitely several minutes.

Q. Okay. You said that you saw the fire starting to build as time went on, correct?

Page 12

A. Yes.

Q. Can you tell me how many minutes approximately between when you first heard Mr. Devine say that he couldn't put it out and when you saw him just collapse, which indicated to you that he had -- he had died?

A. At that point when the -- when the -- when the -- when the screaming got to that point, okay, because he said that he couldn't put it out. So at that point the fire was already too big for him to put out. That when I -- that's when I looked up and seen what was going on. So that couldn't have been more than a few minutes, if that. You know, that -- that's one of them situations that a fire catches everything in your cell on fire really fast. We all know that. So this couldn't have been more than a couple minutes type stuff. That's what I'm saying. The whole situation between the fire was out of control to the time that he was dead was not very long.

In that small space it gets really hot and the fire builds really quick. There's no -- there's no way around that. Paint falls off the walls and the door gets hot enough to where you can't open it. I mean, the fire gets hot in there.

Q. Okay. And I think what -- Strike that.

You said that you're not able to put an

USDC IN/ND case 3:18-cv-00995-JD document 212-14 filed 05/25/21 page 6 of 14

Page 13

approximate number of minutes on it?

A. I -- I can't remember. I can't remember. That's one of them situations, like I said, things are moving. Like I -- This is not fresh in my mind, so any types of time frames I can't verbally tell you. But I can tell you to refer back to my statement that I wrote where I did -- I know I talked about times in there. I haven't seen my statement since I gave it to whoever I gave it to, but I know I talked about that stuff in there. I know that that would be the -- If you're looking for time frames, that would be the best place to get the times from because it was more fresh in my mind at that point.

Q. Okay. I want to talk to you about the fire drills. Have you ever done a fire drill during the 6:00 p.m. to 6:00 a.m. shift at Indiana State Prison? Have you ever participated in a fire drill during that shift?

A. Absolutely not. Their thing -- Their policy is at night they want to keep as many people in their cells as possible. Even at night they don't like to let like laundry workers and stuff like that out, so they're definitely not going to let 400 people in the cell house out at night for a fire drill.

Q. You -- We heard earlier today that there was a

Page 14

fire drill that was done late last week. Did you participate in that fire drill?

A. No. I heard about that probably just a few minutes ago, actually. Prior to coming in here I had heard about that because we talked about this on the phone with me and you about fire drills in the evening time, and just conveniently that night they had a fire drill in the -- in the Honor Cell House in I Cell House. So prior to that day, no, never.

Q. You -- you aren't in I Cell House now, right?

A. No, I'm in C.

Q. Okay. And can you tell me in -- in the time that you've spent at Indiana State Prison, have you seen other fires occur in cells before?

A. Absolutely. Absolutely. And just recently within -- well, recently to me is within the last year. They had one in -- in C Cell House where I'm at now. It was on the 300 -- on the 300 west side. This guy, this man was in his room and he was trying to actually kill himself with a fire and the fire was like really, really big, cell house full of smoke, and they got people out of their cells.

And like my neighbor, he's been down 40 plus years, and what they did with that is they came in and they locked us all in our cells. They didn't want

Page 15

nobody to go outside. And then they came through and ended up taking him to medical and stuff like that because he couldn't breathe. But prior to that date, their -- their main thing was to lock us all in our rooms. We was not allowed to go outside.

I was threatened with lockup time in which I -- when they locked me in my room, if I didn't go in my room I was going to go to lockup. And I was telling them I couldn't breathe. Then I took -- and I went in my room and I wrote the ombudsman. Because we have our tablets. I wrote the ombudsman immediately telling them that they was trying to kill us in this -- in this cell house because they was locking us in during the point where the cell house was full of smoke and people couldn't breathe. And I never got anything back from that, but I did immediately report that to the ombudsman.

Q. And what about before April of 2017? Were fires common back then as well?

A. There was one incident that I can think of where a man died in his room. I don't know all the details of it, but it was years and years ago where a man died in his room inside D Cell House. That was prior to it being the whole lockup unit. Inside segregation they start fires all the time, so -- but, I

Page 16

mean, their -- they -- they try to put those out at quickly as possible. But there's always fires in the segregation units. As far as population goes it's, you know, you get a hot pot catches on fire every now and then. And, I mean, it's nothing serious. As far as the severity of type of stuff, I've only known of two incidents where somebody's died in a fire that I can -- that I can think of, you know, in --

Q. Sure. So there are, you know, fires that have caused the death of people and then there are other fires that erupt in the cell house. But putting -- putting all of those fires into one category as fires, is -- in your experience, is it fair to say that there are -- that fires in the cell house -- in the cells are not infrequent?

A. Absolutely not. They don't -- No, there's not fires like that. No. There's not that many in the cells, no. Not like that. They -- in -- in the lockup units they'll start them on the range, but they're, no, not in the cells.

Q. Okay. On the night of April 7th, 2017, can you tell me, do you know whether the back stairs were open or locked?

A. During the incident?

Q. Yes.

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD document 212-14 filed 05/25/21 page 7 of 14
Cause No. 3:18-CV-00995-JD-MGG
MICHAEL JOHNFAUNO
September 22, 2020

Page 17

A. Okay. During the incident they have -- at night they -- The officers that tend to work the ranges, they'll lock the back gate of the range that they're working on. So like the officer that's working the second and the third tier, he can just walk his ranges without having to keep stopping and unlock gates. So when they did unlock the doors, I went down the second tier, and then went down to the first tier, at which point I couldn't get through that gate because that gate was locked.

So I had to go -- actually go back up to the second tier and then run back down from the back of the range to the front of the range to go down the front steps in order to get out the front door. That was my progression of having to get out of the cell house. Because they teach you, you know -- you know, growing up, when there's a fire, they try to tell you to get to the lowest parts of the -- you know, the building that's on fire. So you try to immediately go down, and we wasn't able to go down that route.

Q. And is it common for the back stairs to be open at night in B Cell House?

A. They changed up how they do stuff in that cell house, but during that time, during that time frame, let's say, during the daytime they always had the back

Page 18

stairs locked during that time frame and then you would have -- everybody had to go down one section of the stairs, which was the front stairs. Now, I'm not in B Cell House right now because they done changed it all over. But the cell house I'm in now they changed it to where you don't go down the front stairs no more. You got to go down the back stairs. You don't have a choice. You either do gown whatever one they open up. And outside that they keep us away from the front now. They want us to all come down the back. So it's one or the other. It's never both.

MS. GRANT: Okay. I don't have anything else, Mr. Johnfauno. I think my opposing counsel will have some questions for you.

MR. BLINN: I will.

CROSS-EXAMINATION

BY MR. BLINN:

Q. Thank you, sir. My name is Michael Blinn. I represent the defendants in this case. I'm going to go through my notes here for just a second.

A. No problem. Take your time.

Q. Do you -- Let me see here.

When you lived in the B House, did you have a clock in your cell?

A. Yes.

Page 19

Q. Okay. Did you have a clock in your cell the night of the incident, the night of the fire with Mr. Devine?

A. Of course. I -- We all have these little alarm clocks, yeah.

Q. Okay. You referred a few times to a statement that you sent Miss Grady. When did you send that statement?

A. I didn't send it. I gave it to an individual here that turned them in to -- they turned in all the statements and stuff to wherever they went. I don't know. They contacted me. I didn't contact them.

Q. Who contacted you?

A. Miss -- The people representing Mr. Devine.

Q. Okay. And when was that?

A. I don't know exactly when. It's been -- I'd have to go get all the paperwork and stuff. They -- What, within the least year or so. I don't -- I don't know. I'm just saying I don't know.

Q. Okay.

A. I've contacted them -- one time they came up here and they seen us and they all talked to us, and then the next time, which was just a while back -- matter of fact, last week that we had -- we had a phone call and then this. That was the only contact.

Page 20

Q. Okay. So -- so a total of three times?

A. No. This is the third time.

Q. Okay. Okay. So do you -- do you remember who you gave your written statement to?

A. The -- the man you talked to right before me. He was the one that collected all the written statements. The -- the man that was just here. I know him by his Muslim name, so I don't know his last name.

Q. Oh, okay. You gave them to the prior witness who got deposed?

A. Yes. He was the one that had all -- everybody's statement, that sent them wherever they needed to go.

Q. Okay. Do you still have a copy of that statement?

A. No, I do not.

THE WITNESS: Sarah, you guys don't have one?

BY MR. BLINN:

Q. And I'll talk to Sarah about that. I mean, I think that's probably responsive to our outstanding discovery, but we can talk about that later.

A. Okay. I'm pretty sure she's got it.

Q. Yeah, I would expect that too. We can talk about that. You gave it to the last witness who was deposed and that was the last you saw it?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

MICHAEL JOHNFAUNO
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-14   filed 05/25/21   page 8 of 14

Page 21

A. Yes. But I know that they have it. I know that they have it because when I talked to Megan the first time -- I talked to Megan, she told me that that's how she got my information was from that statement, so I know that they have it.

Q. Okay.

MS. GRADY: Mike, if it's helpful, we do have it and we are planning to produce those in response to your discovery requests, if that clears thing up.

MR. BLINN: Great. That's helpful. Thank you.

BY MR. BLINN:

Q. You said you spoke to Megan; was that shortly after the fire?

A. So, some time passed. Some time passed after that. It didn't just happen right away, but she was the first one to reach out and contact everybody that sent in those statements.

Q. Okay.

A. She contacted us.

Q. Okay.

A. I don't know how much passed on that but --

Q. Okay. Did you talk about anything other than what was in your written statement?

A. No. The first contact was to make sure, just to kind of hit up on what we talked about, you know, as

Page 22

far as they had questions pertaining to the statement to make sure that everything was what it was.

Q. Okay. All right. And then you said -- I think you said you spoke with Sarah like within the last week or so?

A. Yes, sir.

Q. What did you talk about then?

A. The same thing that we just talked about now with the fire drills. She wanted to know if it was okay that they put me under deposition, under oath. Outside that she asked me if I knew Mr. Devine, I told her I don't. I didn't know him prior at all, in any form or fashion. The fire drills at night. Yeah, that's pretty much it. I mean, it was a short phone call. It -- it wasn't anything drastic. That's -- that's the gist of it.

Q. Okay. So you said you did not know Mr. Devine really at all before the fire?

A. Absolutely -- absolutely not. I didn't know nothing about it. I did not know him.

Q. Okay. Did -- did Miss Grady ask you any questions during the phone call that she didn't ask you today?

A. Not that I can think of. That's why I'm glad she -- she touched up on the fire drill thing. We

Page 23

talked about the -- now, I brought up the -- the coming down the stairs and how they -- how they ran us out the cell house. That was something I talked about that she hit on just a minute ago. No, not that I can remember. We talked about -- all the questions she asked me definitely was along the lines of what we -- what questions she asked me on the phone.

Q. All right. All right. So you talked to Megan and then you've talked to Miss Grady and then we had our deposition today.

Did you have any other contacts with anyone from Miss Grady's firm or Megan's firm?

A. Absolutely not.

Q. All right. You talked a little bit about fires coming out on the range and you kind of talked about how some fires were serious and some fires weren't.

How commonly do offenders in general population, in your observation, start small fires? And by small fire I might mean, for example, lighting a piece of paper on fire and throwing it out on the range.

A. That happens more -- That's more of a lockup-type mentality. That's a protest in the lockup units. They'll start a fire on the range because the

Page 24

officers ain't doing something that they need to do. So that's very common in the lockup units, but in population that does not happen.

Q. Okay. Okay. Have you ever been in lockup?

A. Yes.

Q. Okay. How long ago?

A. Two -- I did two -- I did two bits. In 2015 -- Matter of fact, this might help you out too. In 2015 I went over there. They had a big fire over there, like a whole bunch of fires over there and the building was really smoky like B Cell House was that day that Mr. Devine died. And then in 2000- -- it's either 2017, 2018. Whenever I left B Cell House, that's where I went was lockup. I don't remember the exact time on that because, you know, I've been -- just every day with me, the days just kind of just go by. So counting the days just doesn't -- it's not -- I've been here 19 years. You know, the days -- I don't even own a calendar, so I don't know. It's definitely within the last couple years. I had just came out of lockup, and that's where I ended up in C right now.

Q. All right.

A. So two lockup bits. One time was four months, one time was nine months.

Q. All right. You mentioned that you -- Go

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

MICHAEL JOHNFAUNO
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-14    filed 05/25/21    page 9 of 14

Page 25

ahead. I'm sorry.

A. I didn't say nothing. I was waiting on you.

Q. Okay. Okay. You mentioned that you wrote the ombudsman after the fire; is that right?

A. The one that was in C Cell House that happened within the last year.

Q. Oh, the recent one?

A. Yes, yes.

Q. All right.

A. Back when I was in B Cell House they didn't have the tablets and stuff like that, so we couldn't just reach out to the -- to the ombudsman. Like now we have tablets or we can get on the phone and stuff in our rooms and so it was easier to do that then. And at that time we didn't have that system set up.

Q. All right. So you physically filed an ombudsman report?

A. Yes.

Q. But it was about a different fire than the one that involved Mr. Devine?

A. Yes.

MR. BLINN: Okay. Okay. I don't have any other questions. Thank you, sir.

MS. GRADY: I don't have any -- anything else based on that. So we can go off the record.

Page 26

(A short break was had.)

THE WITNESS: I think you guys have every -- between the two of you guys and -- the three of you, I think you have everything that you need. I don't -- I think you guys are good. If you had any more you would ask. If there was something unclear, I'm pretty sure you would've touched on it.

MS. GRADY: Okay. So you're going waive your signature?

THE WITNESS: Yes.

(Signature waived.)

(Witness excused at 12:40 p.m.)

Page 27

STATE OF INDIANA        )
                        )  SS.
COUNTY OF PORTER        )

        I, Jessica M. Warner Phipps, Registered Professional Reporter and Notary Public, do hereby certify that on the 22nd day of September, A.D., 2020, the deposition of the witness, MICHAEL JOHNFAUNO, called by the Plaintiff, was taken before me, reported stenographically, and was thereafter reduced to typewriting under my direction.

        The said deposition was taken via Zoom videoconference from the Indiana State Prison, and there were present counsel as previously set forth.

        The said witness, MICHAEL JOHNFAUNO, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

        I further certify that the foregoing is a true, accurate, and complete record of the questions asked of and answers made by the said witness, MICHAEL JOHNFAUNO, at the time and place hereinabove referred to.

        The signature of the witness, MICHAEL JOHNFAUNO, was waived by agreement of counsel.

        The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

        Witness my official signature on this 28th day of October, 2020, A.D.


        JESSICA M. WARNER PHIPPS, RPR
        5816 East 7th Avenue
        Gary, Indiana 46403
        Phone:  (219) 769-9090

CSR No.    084-004485

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD    document 212-14    filed 05/25/21    page 10 of 14
MICHAEL JOHNFAUNO
September 22, 2020

## A

**able (3)**
9:15;12:25;17:20
**above (1)**
6:15
**Absolutely (7)**
13:19;14:15,15;
16:16;22:19,19;23:13
**actually (4)**
3:21;14:4,19;17:11
**ago (4)**
14:4;15:22;23:4;
24:6
**ahead (1)**
25:1
**ain't (1)**
24:1
**alarm (1)**
19:5
**allowed (1)**
15:5
**along (1)**
23:6
**always (2)**
16:2;17:25
**approximate (2)**
11:8;13:1
**approximately (2)**
4:14;12:2
**April (3)**
5:13;15:18;16:21
**area (1)**
6:23
**around (2)**
6:4;12:21
**attention (2)**
10:9,12
**away (2)**
18:9;21:15

## B

**back (14)**
13:6;15:15,19;16:22;
17:3,11,12,12,21,25;
18:7,10;19:23;25:10
**bad (1)**
6:13
**based (2)**
10:20;25:25
**beat (1)**
3:19
**beginning (1)**
4:17
**best (2)**
11:20;13:11
**big (4)**
3:17;12:9;14:21;
24:9
**bit (1)**
23:14

**bits (2)**
24:7,23
**blah-blah-blah (1)**
10:11
**BLINN (8)**
4:4;18:15,17,18;
20:18;21:10,11;25:22
**blood-curdling (1)**
10:15
**both (1)**
18:11
**break (1)**
26:1
**breathe (3)**
15:3,9,15
**briefly (1)**
3:15
**bring (1)**
11:1
**brought (2)**
3:13;23:1
**build (1)**
11:25
**building (3)**
7:15;17:18;24:11
**builds (1)**
12:20
**bunch (2)**
9:20;24:10
**burn (1)**
6:23
**burning (1)**
9:19

## C

**calendar (1)**
24:19
**call (3)**
19:25;22:15,22
**called (1)**
3:4
**came (7)**
6:12;7:2,10;14:24;
15:1;19:21;24:20
**can (32)**
3:8,17,20;4:2,8;5:2,
16;6:10,14,16;7:21,24;
8:5,16;10:13,15;11:7,
18;12:2;13:6;14:12;
15:20;16:7,8,21;17:5;
20:21,23;22:24;23:4;
25:13,25
**carrying (1)**
8:15
**case (3)**
3:13,14;18:19
**catches (2)**
12:13;16:4
**category (1)**
16:12
**caused (1)**
16:10

**Cell (43)**
4:11,15,20,24;5:3,5,
9;6:2,4,7,14,20;8:6,13;
9:19;10:5,7;11:5,9;
12:14;13:24;14:8,8,10,
17,21;15:13,14,23;
16:11,14;17:15,22,23;
18:4,5,24;19:1;23:3;
24:11,13;25:5,10
**cells (9)**
4:24;5:4;13:21;
14:14,22,25;16:14,18,
20
**changed (3)**
17:23;18:4,5
**chirp (1)**
8:17
**choice (1)**
18:8
**clear (2)**
3:21;4:4
**clearly (2)**
10:13,16
**clears (1)**
21:9
**clock (2)**
18:24;19:1
**clocks (1)**
19:5
**collapse (1)**
12:4
**collected (1)**
20:6
**coming (3)**
14:4;23:1,15
**common (3)**
15:19;17:21;24:2
**commonly (1)**
23:18
**confusion (1)**
3:23
**contact (4)**
19:12,25;21:16,24
**contacted (4)**
19:12,13,21;21:19
**contacts (1)**
23:11
**control (2)**
9:5;12:17
**conveniently (1)**
14:7
**copy (2)**
7:23;20:14
**counsel (1)**
18:13
**count (2)**
5:18,20
**counting (1)**
24:17
**couple (2)**
12:15;24:20
**course (1)**
19:4

**cricket (1)**
8:17
**CROSS-EXAMINATION (1)**
18:16

## D

**date (1)**
15:3
**dates (1)**
4:14
**day (5)**
5:13;9:23;14:9;
24:12,16
**days (3)**
24:16,17,18
**daytime (1)**
17:25
**dead (1)**
12:18
**dealing (1)**
7:20
**death (2)**
3:14;16:10
**defendants (1)**
18:19
**definitely (5)**
5:19;11:23;13:23;
23:6;24:19
**Denise (1)**
3:13
**deposed (2)**
20:10,25
**deposition (2)**
22:10;23:10
**describe (2)**
10:4;11:15
**described (1)**
11:20
**details (2)**
8:2;15:22
**Devine (13)**
3:14;5:12,14,22;8:6,
22;12:3;19:3,14;22:11,
17;24:12;25:20
**Devine's (1)**
9:8
**die (1)**
7:5
**died (7)**
5:13,14;12:5;15:21,
23;16:7;24:12
**different (7)**
5:4;9:20,22;11:5,16,
17;25:19
**DIRECT (1)**
3:6
**directly (1)**
6:15
**discovery (2)**
20:21;21:9
**distance (1)**
10:10

**done (3)**
13:15;14:1;18:4
**door (5)**
7:2,6;11:4;12:21;
17:14
**doors (3)**
11:1,2;17:7
**down (16)**
6:14,19;7:6;11:3;
14:23;17:7,8,12,13,19,
20;18:2,6,7,10;23:2
**downstairs (1)**
7:12
**drastic (1)**
22:15
**drill (7)**
13:15,17,24;14:1,2,
8;22:25
**drills (4)**
13:15;14:6;22:9,13
**duck (1)**
6:14
**ducked (1)**
6:19
**duly (1)**
3:4
**during (14)**
4:12,22,24;5:7;
13:15,17;15:13;16:24;
17:1,24,24,25;18:1;
22:22
**Dwyer (1)**
3:13

## E

**earlier (1)**
13:25
**early (1)**
4:10
**easier (1)**
25:14
**echo (1)**
3:17
**either (2)**
18:8;24:13
**electronic (1)**
11:2
**else (2)**
18:12;25:24
**emergency (1)**
6:4
**End (2)**
4:16;9:23
**ended (2)**
15:2;24:21
**enough (1)**
12:22
**erupt (1)**
16:11
**especially (1)**
10:14
**even (4)**

**BOSS REPORTERS**
**(219) 769-9090**

USDC IN/ND case 3:18-cv-00995-JD   document 212-14   filed 05/25/21   page 11 of 14

7:11;11:2;13:21;
24:18
**evening (3)**
5:18;8:12;14:6
**everybody (3)**
10:10;18:2;21:16
**everybody's (2)**
9:22;20:12
**exact (2)**
11:23;24:15
**exactly (2)**
11:18;19:16
**EXAMINATION (1)**
3:6
**examined (1)**
3:5
**example (1)**
23:20
**excused (1)**
26:12
**expect (1)**
20:23
**expeditiously (1)**
3:16
**experience (1)**
16:13
**extinguisher (2)**
10:24;11:1

**F**

**fact (2)**
19:24;24:8
**fair (1)**
16:13
**falls (1)**
12:21
**far (6)**
8:1;11:21,21;16:3,5;
22:1
**fashion (2)**
7:13;22:13
**fast (2)**
11:15;12:14
**few (3)**
12:12;14:3;19:6
**fifth (1)**
9:18
**figure (1)**
7:16
**filed (1)**
25:16
**fine (1)**
4:3
**finish (1)**
3:19
**fire (49)**
5:24;6:3,20,24,25;
8:20;9:1,2,10,11,18,24;
10:12,15,24;11:1,24;
12:9,13,14,17,20,23;
13:14,15,17,24;14:1,2,
6,7,20,20;16:4,7;17:17,

19;19:2;21:13;22:9,13,
18,25;23:20,21,25;
24:9;25:4,19
**fireman (1)**
7:9
**firemen (1)**
7:11
**fires (15)**
14:14;15:19,25;16:2,
9,11,12,12,14,17;
23:15,16,16,19;24:10
**firm (2)**
23:12,12
**first (11)**
3:4,10,17;5:16;7:10;
10:25;12:3;17:8;21:3,
16,24
**Flag (1)**
7:9
**follows (1)**
3:5
**forgotten (1)**
8:2
**form (1)**
22:13
**forward (1)**
3:16
**four (1)**
24:23
**frame (3)**
4:25;17:24;18:1
**frames (2)**
13:5,11
**fresh (3)**
7:24;13:4,12
**front (7)**
11:4;17:13,13,14;
18:3,6,9
**full (2)**
14:21;15:14

**G**

**gate (3)**
17:3,9,10
**gates (2)**
7:14;17:7
**gave (6)**
13:8,9;19:9;20:4,9,
24
**general (1)**
23:18
**gets (3)**
12:19,22,23
**gist (2)**
8:3;22:16
**glad (1)**
22:24
**goes (2)**
11:21;16:3
**good (1)**
26:5
**gown (1)**

18:8
**GRADY (9)**
3:7,12;4:5;19:7;
21:7;22:21;23:9;25:24;
26:8
**Grady's (1)**
23:12
**GRANT (1)**
18:12
**Great (1)**
21:10
**growing (1)**
17:16
**guy (4)**
6:5,5,6;14:18
**guys (7)**
4:2;7:23;8:1;20:17;
26:2,3,5

**H**

**hair (1)**
6:25
**happen (3)**
11:14;21:15;24:3
**happened (2)**
8:4;25:5
**happens (1)**
23:23
**happy (1)**
4:1
**hear (5)**
3:17;4:2;8:16;9:15;
10:16
**heard (11)**
5:20,23;6:18;8:19;
9:8;10:13,22;12:3;
13:25;14:3,5
**help (13)**
3:16;6:7,8,10,22;7:1,
6;9:6,10,14;10:7,14;
24:8
**helpful (2)**
21:7,10
**herein (1)**
3:4
**hey (2)**
9:13;10:10
**himself (1)**
14:20
**hit (3)**
11:4;21:25;23:4
**holler (2)**
6:3;10:8
**hollering (5)**
6:6;8:14;9:6,21,22
**Honor (1)**
14:8
**hot (4)**
12:19,22,23;16:4
**House (34)**
4:11,15,21,24;5:3,5;
6:2,5,14;8:13;10:5;

11:9;13:24;14:8,9,10,
17,21;15:13,14,23;
16:11,14;17:15,22,24;
18:4,5,23;23:3;24:11,
13;25:5,10
**houses (1)**
10:7

**I**

**idea (2)**
5:2;9:2
**immediately (3)**
15:11,16;17:19
**incident (8)**
4:22;5:7,10;11:15;
15:20;16:24;17:1;19:2
**incidents (1)**
16:7
**Indiana (4)**
4:9;10:17;13:16;
14:13
**indicated (1)**
12:5
**individual (1)**
19:9
**information (1)**
21:4
**infrequent (1)**
16:15
**initial (1)**
10:25
**initials (1)**
9:13
**inmates (1)**
10:21
**inside (2)**
15:23,24
**instance (1)**
11:10
**instances (1)**
11:13
**into (1)**
16:12
**involved (1)**
25:20

**J**

**Johnfauno (4)**
3:8,11;4:8;18:13
**JOHNFUANO (1)**
3:3
**join (1)**
10:1
**Joshua (4)**
3:14;5:12,14;8:6
**judge (1)**
10:20

**K**

**keep (3)**

13:20;17:6;18:9
**kill (2)**
14:20;15:12
**kind (4)**
6:4;21:25;23:15;
24:16
**knew (1)**
22:11
**known (1)**
16:6

**L**

**last (11)**
3:10;7:5;14:1,16;
19:24;20:8,24,25;22:5;
24:20;25:6
**late (1)**
14:1
**later (1)**
20:21
**laundry (1)**
13:22
**least (1)**
19:18
**left (1)**
24:13
**light (1)**
6:16
**lighting (1)**
23:20
**lines (1)**
23:6
**little (3)**
8:2;19:4;23:14
**live (2)**
6:13;10:20
**lived (4)**
5:3,6;8:6;18:23
**lock (2)**
15:4;17:3
**locked (6)**
7:14;14:25;15:7;
16:23;17:10;18:1
**locking (1)**
15:13
**lockup (10)**
15:6,8,24;16:18;
23:24;24:2,4,14,21,23
**lockup-type (1)**
23:24
**long (5)**
4:8;11:7,18;12:18;
24:6
**look (2)**
6:15;10:10
**looked (4)**
6:19,23;7:8;12:10
**looking (1)**
13:11
**lot (3)**
8:1,14;10:7
**Loud (3)**

USDC IN/ND case 3:18-cv-00995-JD     document 212-14     filed 05/25/21     page 12 of 14

4:4;10:6,6
**lowest (1)**
17:18

## M

**ma'am (2)**
4:13;10:3
**main (1)**
15:4
**man (13)**
6:7,23;7:1,5;9:19;
10:15,23;11:4;14:19;
15:21,23;20:5,7
**many (3)**
12:2;13:20;16:17
**matter (2)**
19:24;24:8
**maybe (1)**
4:16
**mean (7)**
8:17;12:22;16:1,5;
20:19;22:14;23:20
**medical (3)**
6:3;10:12;15:2
**Megan (4)**
21:2,3,12;23:8
**Megan's (1)**
23:12
**memory (1)**
7:24
**mentality (1)**
23:24
**mentioned (2)**
24:25;25:3
**MICHAEL (3)**
3:3,10;18:18
**might (4)**
8:2;10:12;23:20;
24:8
**Mike (1)**
21:7
**mind (2)**
13:4,13
**minute (1)**
23:4
**minutes (8)**
11:8,18,23;12:2,12,
15;13:1;14:4
**Miss (5)**
19:7,14;22:21;23:9,
12
**months (2)**
24:23,24
**more (8)**
4:19;12:11,15;13:12;
18:6;23:23,23;26:5
**move (1)**
3:16
**moving (2)**
11:14;13:4
**much (4)**
8:3,16;21:21;22:14

**multiple (1)**
4:23
**Muslim (1)**
20:8

## N

**name (7)**
3:9,10,10,12;18:18;
20:8,8
**need (5)**
9:13;10:11;11:2;
24:1;26:4
**needed (2)**
9:25;20:13
**needs (1)**
11:14
**neighbor (5)**
5:21;8:19,21;9:9;
14:23
**next (3)**
6:5,5;19:23
**night (14)**
6:9;8:13,15;10:14;
13:20,21,24;14:7;
16:21;17:2,22;19:2,2;
22:13
**nine (1)**
24:24
**nobody (4)**
7:2,4,10;15:1
**notes (1)**
18:20
**number (3)**
5:9;11:8;13:1

## O

**oath (1)**
22:10
**observation (1)**
23:19
**occur (1)**
14:14
**o'clock (2)**
5:20;8:15
**off (2)**
12:21;25:25
**offenders (1)**
23:18
**officer (1)**
17:4
**officers (5)**
6:8;10:9,21;17:2;
24:1
**ombudsman (6)**
15:10,11,17;25:4,12,
17
**One (24)**
5:4,6,10;6:5;7:3;
8:10;12:13;13:3;14:17;
15:20;16:12;18:2,8,10;
19:21;20:6,11,17;

21:16;24:23,24;25:5,7,
19
**ones (1)**
6:10
**only (4)**
6:10;10:8;16:6;
19:25
**open (4)**
12:22;16:23;17:22;
18:8
**opposing (1)**
18:13
**order (1)**
17:14
**out (32)**
3:25;5:24,25;6:18;
7:10,12,16,16;9:4,5,5,
13,25;10:23;11:5;12:4,
8,10,17;13:22,24;
14:22;16:1;17:14,15;
21:16;23:2,15,21;24:8,
20;25:12
**outside (8)**
7:12,13,18,19;15:1,
5;18:9;22:11
**outstanding (1)**
20:20
**over (8)**
3:15;7:7;8:2;9:17;
18:5;24:9,9,10
**own (1)**
24:19

## P

**Paint (1)**
12:21
**paper (1)**
23:21
**paperwork (1)**
19:17
**participate (1)**
14:2
**participated (1)**
13:17
**parts (1)**
17:18
**passed (4)**
5:23;21:14,14,21
**people (9)**
6:6;9:21;10:8;13:20,
23;14:22;15:14;16:10;
19:14
**pertaining (1)**
22:1
**phone (6)**
14:6;19:24;22:14,22;
23:7;25:13
**physically (1)**
25:16
**piece (1)**
23:21
**place (1)**

13:11
**plaintiff (1)**
3:13
**planning (1)**
21:8
**plus (1)**
14:23
**pm (2)**
13:16;26:12
**point (15)**
6:1,6,9,19;7:8,18,25;
9:5;10:18;12:6,7,9;
13:13;15:14;17:9
**police (1)**
9:24
**policy (1)**
13:19
**population (3)**
16:3;23:19;24:3
**possible (2)**
13:21;16:2
**pot (1)**
16:4
**pretty (5)**
8:3,16;20:22;22:14;
26:6
**Prior (6)**
14:4,9;15:3,24;20:9;
22:12
**Prison (4)**
4:9;10:18;13:16;
14:13
**prisoners (1)**
11:8
**probably (3)**
3:18;14:3;20:20
**problem (1)**
18:21
**produce (1)**
21:8
**progression (1)**
17:15
**progressively (1)**
6:20
**protest (1)**
23:24
**put (13)**
5:24,25;6:18;9:4,4,
12,25;12:4,8,9,25;16:1;
22:10
**putting (2)**
16:11,12

## Q

**quick (1)**
12:20
**quickly (1)**
16:2
**quiet (4)**
5:19;8:12,16,17

## R

**ran (1)**
23:2
**range (11)**
9:18,18;10:20;11:3;
16:19;17:3,13,13;
23:15,22,25
**ranges (2)**
17:3,6
**reach (2)**
21:16;25:12
**real (2)**
5:19;8:16
**really (10)**
8:14;11:2,14;12:14,
19,20;14:20,21;22:18;
24:11
**recent (1)**
25:7
**recently (2)**
14:15,16
**record (3)**
3:9,21;25:25
**refer (1)**
13:6
**referred (1)**
19:6
**remember (13)**
5:9,10,13,17;7:4;
11:11,19,22;13:2,2;
20:3;23:4;24:14
**rephrase (1)**
4:1
**report (3)**
9:11;15:16;25:17
**reporting (1)**
9:10
**represent (3)**
3:12;5:12;18:19
**representing (1)**
19:14
**requests (1)**
21:9
**reside (2)**
4:14,20
**resided (3)**
4:9,11,23
**resonates (1)**
6:4
**respond (1)**
10:18
**responded (1)**
11:6
**responding (1)**
10:21
**response (1)**
21:8
**responsive (1)**
20:20
**right (17)**
3:25;5:8;9:10;14:10;

DENISE DWYER, et al, v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

MICHAEL JOHNFAUNO
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-14    filed 05/25/21    page 13 of 14

18:4;20:5;21:15;22:3;
23:8,8,14;24:21,22,25;
25:4,9,16
**room (10)**
6:16,17,24;8:23;
14:19;15:7,8,10,21,23
**rooms (3)**
7:9;15:5;25:14
**route (1)**
17:20
**rules (1)**
3:15
**run (3)**
7:15;11:3;17:12

## S

**same (1)**
22:8
**Sarah (4)**
3:12;20:17,19;22:4
**saw (3)**
11:24;12:4;20:25
**saying (2)**
12:16;19:19
**scream (1)**
10:15
**screamed (3)**
11:11,12,12
**screaming (9)**
6:7,22;7:1,1,5;9:17;
10:7,14;12:7
**screams (1)**
6:25
**second (6)**
3:19,23;17:5,8,12;
18:20
**section (1)**
18:2
**seem (1)**
11:17
**seems (1)**
11:16
**segregation (2)**
15:25;16:3
**send (2)**
19:7,9
**sent (3)**
19:7;20:12;21:17
**serious (2)**
16:5;23:16
**set (1)**
25:15
**several (3)**
11:5,17,23
**severity (1)**
16:6
**shift (2)**
13:16,18
**short (2)**
22:14;26:1
**shortly (3)**
8:25;9:8;21:12

**side (3)**
5:5,6;14:18
**signature (2)**
26:9,11
**situation (2)**
7:20;12:17
**situations (2)**
12:13;13:3
**slumped (1)**
7:6
**small (4)**
8:14;12:19;23:19,20
**smelled (1)**
8:21
**smelling (1)**
5:21
**smoke (5)**
5:21;8:21;9:9;14:21;
15:14
**smoke-filled (1)**
7:15
**smoky (1)**
24:11
**somebody (1)**
10:14
**somebody's (1)**
16:7
**sometime (1)**
5:20
**sometimes (1)**
3:24
**Somewhere (1)**
4:17
**sorry (2)**
9:7;25:1
**south (1)**
5:6
**space (1)**
12:19
**speak (2)**
7:20,21
**spell (1)**
3:8
**spent (1)**
14:13
**spoke (4)**
5:22;8:22;21:12;
22:4
**stairs (8)**
16:22;17:21;18:1,3,
3,6,7;23:2
**standing (1)**
7:2
**start (6)**
8:5;9:12;15:25;
16:19;23:19,25
**started (8)**
6:2,6;9:1,2,3,6,9,14
**starting (1)**
11:24
**state (5)**
3:8;4:9;10:18;13:16;
14:13

**statement (14)**
7:22,23,25;11:20;
13:6,8;19:6,8;20:4,12,
15;21:5,23;22:1
**statements (3)**
19:11;20:7;21:17
**stayed (5)**
5:4,7;6:15;8:8,8
**steps (1)**
17:14
**still (2)**
7:8;20:14
**stopping (1)**
17:6
**Strike (1)**
12:24
**stuck (1)**
7:19
**stuff (10)**
12:16;13:9,22;15:2;
16:6;17:23;19:11,17;
25:11,13
**sure (8)**
3:21;4:2,7;16:9;
20:22;21:24;22:2;26:6
**sworn (2)**
3:1,5
**system (1)**
25:15

## T

**tablets (3)**
15:11;25:11,13
**talk (6)**
13:14;20:19,21,23;
21:22;22:7
**talked (16)**
13:7,9;14:5;19:22;
20:5;21:2,3,25;22:8;
23:1,3,5,8,9,14,15
**talking (2)**
5:23;10:22
**teach (1)**
17:16
**telling (2)**
15:8,11
**tend (1)**
17:2
**terms (1)**
10:4
**testified (1)**
3:5
**third (3)**
5:7;17:5;20:2
**though (1)**
7:22
**threatened (1)**
15:6
**three (3)**
11:22;20:1;26:3
**throwing (1)**
23:21

**tier (7)**
5:8;7:10;8:10;17:5,8,
8,12
**timely (1)**
7:13
**times (5)**
8:1;13:7,12;19:6;
20:1
**today (3)**
13:25;22:23;23:10
**told (2)**
21:3;22:11
**took (1)**
15:9
**total (1)**
20:1
**touched (2)**
22:25;26:7
**trip (1)**
10:25
**trouble (1)**
3:24
**try (3)**
16:1;17:17,19
**trying (7)**
6:8,11;7:15,16;9:23;
14:19;15:12
**turned (2)**
19:10,10
**two (10)**
3:15;4:19;5:4;8:10;
16:6;24:7,7,7,23;26:3
**type (3)**
10:9;12:16;16:6
**types (1)**
13:5

## U

**unclear (2)**
9:8;26:6
**under (3)**
5:8;22:10,10
**underneath (1)**
8:6
**unit (1)**
15:24
**units (4)**
16:3,19;23:25;24:2
**unlock (2)**
17:6,7
**up (25)**
5:22;6:8,11,15,19;
8:22;9:18,19,24,25;
10:22,25;12:10;15:2;
17:11,17,23;18:8;
19:21;21:9,25;22:25;
23:1;24:21;25:15

## V

**verbally (1)**
13:5

**volume (1)**
10:5

## W

**waiting (1)**
25:2
**waive (1)**
26:8
**waived (1)**
26:11
**walk (1)**
17:5
**walls (1)**
12:21
**watching (1)**
6:22
**way (4)**
10:8,9;11:3;12:20
**ways (1)**
11:5
**week (3)**
14:1;19:24;22:5
**weren't (1)**
23:17
**west (1)**
14:18
**Whenever (1)**
24:13
**Where's (1)**
10:24
**WHEREUPON (1)**
3:2
**wherever (2)**
19:11;20:12
**whole (5)**
6:23;9:19;12:16;
15:24;24:10
**windows (1)**
6:14
**within (6)**
14:16,16;19:18;22:4;
24:20;25:6
**without (1)**
17:6
**Witness (8)**
3:1,4;20:9,17,24;
26:2,10,12
**words (3)**
3:25;8:24;9:15
**work (1)**
17:2
**workers (1)**
13:22
**working (2)**
17:4,4
**worse (2)**
6:21,25
**written (3)**
20:4,6;21:23
**wrote (7)**
7:23,25;11:20;13:6;
15:10,11;25:3

USDC IN/ND case 3:18-cv-00995-JD   document 212-14   filed 05/25/21   page 14 of 14

**Y**

**year (3)**
14:16;19:18;25:6
**years (7)**
4:19;11:22;14:24;
15:22,22;24:18,20
**yell (1)**
10:10
**yelled (1)**
9:16
**yelling (2)**
10:2;11:9
**yells (4)**
8:25;9:9;10:18;11:7

**1**

**10:00 (1)**
8:15
**12:40 (1)**
26:12
**19 (1)**
24:18

**2**

**20 (1)**
9:21
**2000- (2)**
4:16;24:12
**2003 (1)**
4:10
**2015 (2)**
24:8,9
**2016 (2)**
4:16,24
**2017 (5)**
4:16;5:13;15:18;
16:21;24:13
**2018 (4)**
4:16,17,24;24:13

**3**

**30 (1)**
9:21
**300 (2)**
14:18,18
**338 (2)**
5:11;8:8

**4**

**40 (2)**
9:21;14:23
**400 (1)**
13:23

**5**

**5- (1)**

8:8
**538 (1)**
8:8

**6**

**6:00 (2)**
13:16,16

**7**

**7th (2)**
5:13;16:21

**9**

**9:00 (2)**
5:20;8:15