**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) | |
| | ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Judge Jon E. DeGuilio, Judge |
| | ) | |
| RON NEAL, et al. | ) | Hon. Michael G. Gotsch, Sr., M.J. |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

# <u>EXHIBIT 12</u>

**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*OSCAR HALL*
*September 22, 2020*
*Cause No. 3:18-CV-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-22-20 OSCAR HALL.TXT
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG
OSCAR HALL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-15   filed 05/25/21   page 3 of 11

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the     )
ESTATE OF JOSHUA DEVINE,  )
                          )
        Plaintiff,        )
                          )
        vs.               ) No. 3:18-CV-00995-JD-MGG
                          )
RON NEAL, et al.          )
                          )
        Defendants.       )

        The Zoom videoconference deposition of OSCAR

HALL, called by Plaintiff Denise Dwyer for examination,

taken pursuant to notice and pursuant to the Federal

Rules of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Jessica M. Warner Phipps, Registered

Professional Reporter and Notary Public, with the

witness being located at Indiana State Prison,

commencing at 11:45 a.m. on the 22nd day of September,

A.D., 2020.

Page 2

APPEARANCES:

    LOEVY & LOEVY
    MS. SARAH GRADY (via Zoom)
    311 North Aberdeen Street
    Third Floor
    Chicago, Illinois 60607
    Telephone: (312) 243-5900
    E-mail: sarah@loevy.com

            On behalf of the Plaintiff;


    OFFICE OF THE INDIANA ATTORNEY GENERAL
    MR. ARCHER ROSE, JR. (via Zoom)
    IGCS 5th Floor
    Indianapolis, Indiana 46204
    Telephone (317) 232-6286
    E-mail: archer.rose@atg.in.gov

            On behalf of the Defendants.


ALSO PRESENT: Ms. Pamela James

        *   *   *   *   *   *

            I N D E X

            WITNESSES

All Witnesses:                              Page

Oscar Hall for
  Direct Examination by Ms. Grady        3:8
  Cross-Examination by Mr. Rose         14:25
  Redirect Examination by Ms. Grady     18:13

        NO EXHIBITS MARKED

Page 3

(Witness sworn.)

WHEREUPON:

        OSCAR HALL,

called as a witness herein, having been first duly

sworn, was examined and testified as follows:

        DIRECT EXAMINATION

BY MS. GRADY:

    Q. Mr. Hall, could you please state and spell your name for the record, please.

    A. Oscar Hall, O S C A R, H A L L.

    Q. Thank you very much, Mr. Hall. I introduced myself before we got started, but I'm going to go ahead and do it again. My name is Sarah Grady. I represent the plaintiff in this case, Denise Dwyer. She is the administrator for the Estate of Joshua Devine.

        Before we begin, because we're on video, it's -- and there's a bit of feedback on our end, I just ask, if you could, wait a beat after I finish my question to begin your answer. That way the echo can sort of end and then we can hear your answer and the court reporter can get everything down. Okay?

    A. Yes.

    Q. Perfect. And the second thing is if your -- you have any confusion about any questions asked by anybody today, just go ahead and let us know.

Page 4

Sometimes I have trouble getting my thoughts out very clearly, so it's possible I'm going to ask you something in a confusing way, and I'm happy to rephrase to where we understand each other. Okay?

    A. Yes. That's fine.

    Q. Okay. Mr. Hall, can you tell me how long you've been at Indiana State Prison?

    A. Ten years.

    Q. And during that time have you ever been housed in B Cell House?

    A. Yes.

    Q. Can you tell us approximately when you have resided in B Cell House at Indiana State Prison?

    A. From 2015 until 2019.

    Q. And during that time where did you -- where did you reside?

    A. I stayed in -- I stayed in 138, which is the main -- they call it the Flag, which is the first floor.

    Q. Okay. And the -- is -- is that near a set of stairs near the front or the back of the cell house?

    A. Yes, near the back. It's right by the back of the cell house.

    Q. Do you recall, in April of 2017, a day when a prisoner at Indiana State Prison in B Cell House had a

USDC-INND case 3:18-cv-00995-JD     document 212-15     filed 05/25/21     page 4 of 11

Page 5

fire in their cell?

A. Yes.

Q. Can you tell me, what is the first thing that you remember happening on that night?

A. They was yelling that -- that there was a fire on 500.

Q. And can you give me an approximate time when you first heard people yelling that there was a fire on 500?

A. Yes, it was around 9:15, quarter after 9:00 p.m.

Q. It's my understanding that there is a count where staff come through and check that everybody's in their cells at approximately 9:00 p.m.; is that correct?

A. That's correct.

Q. So was it shortly after that 9:00 p.m. count?

A. Yes, absolutely.

Q. And were you -- at that time after the 9:00 p.m. count, were -- were you locked into your cells for the night?

A. Yes.

Q. Okay. And what were you doing when you heard people starting to yell?

A. I was watching the television. I believe I

Page 6

was watching the game or something. Yeah.

Q. Okay. So then you -- you heard people starting to yell, "Fire on 500." Can you tell me what -- what happened next?

A. Well, yeah, they was yelling, "Fire on 500," and I'm just thinking it's a hot pot because it's common for hot pots to catch on fire. So they continued yelling. So I'm like, oh, wait a minute. This is something serious. So I got up to look out my cell and I could see smoke. So, you know, then I was like, oh. So I started yelling, too, at that point, you know. The whole cell house is yelling at that point.

Q. And can you tell me, was it -- Strike that.

How long after you heard people yelling, "Fire" on 500 range until you got out of -- out -- when you -- I'm sorry. Let me try that one last time.

How long after you heard people yelling, "Fire" on 500 range until you went to your bars to see what was going on?

A. Maybe -- maybe two to three minutes.

Q. And how long after you heard people yelling "Fire" on 500 range before you saw any member of Indiana State Prison staff?

A. I didn't until I got outside. The firemen

Page 7

came, which are inmates, and they came and let me out. I didn't see no staff until I got outside, which that was around, I don't know, maybe almost 10:00 o'clock when they released us.

Q. Did -- Even if the staff didn't come to your cell, did you ever see any member of the staff either on the stairs or around the -- the cell that you saw where there was smoke?

A. No, no. Not at all.

Q. You said that when you looked out you could -- out of your bars you could see smoke. Was that in the reflection of the glass across the way from you?

A. No. Actually, the smoke was visibly there and it -- it had started getting more and more and more, then it started getting black. So what I did, I grabbed my fans and I turned my fans towards the bars and I wetted a towel because I was starting to choke, and I wet a towel and wrapped it around my face. And we still yelling and I'm banging, and, you know, everybody just banging. I'm shaking the bars and doing everything to try to get the officers' attention that there's a fire on 500, you know.

So then I started yelling, "Let out 126," which is Danny Means. He's a fireman. So I'm like, "Let the firemen out, let the firemen out," you know,

Page 8

because they're trained, they know what to do. And I don't know where the officers was at but no one ever came.

Q. Did you ever see the fire coming out of the cell?

A. Yes, absolutely. I could see -- I could see Devine up there. He was yelling. He's standing in his bars because it's a -- it's a glass, you know, and at night you can see a reflection. So I can see him and he's yelling, he's yelling, I'm yelling, and, you know -- Oh, man, it was crazy. So then all of a sudden it was just a big flash, boom, like, you know, red and -- and, you know, fire. And he was like, "Ah, ah, ah," and he's yelling and, "Ah" -- He's standing there holding the bars. And then the fire went out and it just became all black. It was just black. And then he stopped yelling, so I knew it was over. I was -- Man.

Q. When you say you knew it was over, can you tell me what you mean?

A. I think he was dead. I knew he was dead at that point.

Q. When you said you were -- I just want to make sure the record's clear.

When you look out of the bars of your cell, there is glass across the way from you, correct?

USDC IN/ND case 3:18-cv-00995-JD   document 212-15   filed 05/25/21   page 5 of 11

Page 9

A. Correct. There's a glass that goes all the way up to the top, very top of the cell house. And you can see reflections of people in the -- in the glass through different ranges. If they're standing in their bars, you can see them. Like if you're looking at a --

Q. I'm sorry. Go ahead.

A. Like, say, for instance, you're looking at a -- a -- a glass and you can see a person's reflection. Like, say, for instance, a vending machine. I was just sitting out there and I can look at the vending machine and I can see the officers sitting in their cell. I mean, in their office through the vending machine through the reflection in the glass. So it's just like that. You can see the reflection off the glass and see another person sitting.

Q. And when you -- when you heard the yelling about fire on the 500 range, can you describe, was it loud or quiet or can you describe the -- the volume that you heard?

A. It was -- it was -- it was very, very loud. I mean, I don't know if you ever seen a cell house in a ruckus, but trust me, you could hear it from a long way. Not only in the cell house, outside the cell house. So, yeah, you -- you definitely hear. Because

Page 10

we all was banging and, you know -- It wasn't just a few people, it was everybody. Because the smoke was so intense and so thick that you could literally after a while -- and I'm on the Flag. I'm on the first floor, so I can imagine being up there and you can barely even see five foot in front of you. Dude, that's how thick the black smoke was and it was black smoke.

Q. And so just for the record, the Flag is on the first floor --

A. Correct.

Q. -- of B Cell House, right?

A. Correct. Yes.

Q. And when you say that, you know, the cell house was in a ruckus, would it be fair to say that it was louder than its normal volume on a given night?

A. Oh, yeah. Absolutely.

Q. Was it much louder?

A. Yes, yes. Very loud.

Q. And you were able to hear particularly that the yells were of a fire on the 500 range, right?

A. Yes. They was yelling, "Fire on 500, 540. Fire on 500 range, 540." And this was before I even started yelling, you know. I heard them yelling it, but I was just thinking like -- Like I said, I was just thinking it was a hot pot because it's common. You

Page 11

know, hot pots catch fire. You know, somebody fell asleep, left the hot pot burning, you know, and they put it out themselves. But this was serious. This wasn't the case.

Q. The -- I want to talk to you about fire drills at Indiana State Prison. And you've -- you've been at Indiana State Prison for approximately ten years you said?

A. Correct.

Q. Have you ever participated in a fire drill on the night to morning shift, which I understand I think is the 6:00 p.m. to 6:00 a.m. shift?

A. You know what's funny? When we just had a conversation, when I called you and we spoke about that, three days later they had a fire drill at night. So that's how I know they be listening to attorney-client privileged calls because not once ever did they have a fire drill at night until, when was that, last Tuesday, I believe? After I talked to you on Friday, that Tuesday they had one. So I was like, wow, what a coincidence. But, yeah, they just had one, when was it, this -- No, it was last Tuesday. Last Tuesday. After I talked to you that Friday, that Tuesday they had one at night.

Q. So let me just break -- let me break that down

Page 12

a couple steps.

You and I talked last Friday?

A. Yes.

Q. And I asked you during that phone call if you'd ever participated in a fire drill during the 6:00 p.m. to 6:00 a.m. shift, right?

A. Correct.

Q. And at the time you told me that you had never done that, right?

A. Ever. Ever.

Q. And at that time that was true, right?

A. Right. Absolutely.

Q. So let me ask it this way, and then I'll ask you about the second half of -- of what you just told me.

As of April 2017, have you ever participated in a fire drill during the 6:00 p.m. to 6:00 a.m. shift?

A. No.

Q. Okay. You did participate in a fire drill during the 6:00 p.m. to 6:00 a.m. shift very recently; is that right?

A. Yes.

Q. And when was that?

A. This was last Tuesday. A few days after we

USDC IN/ND case 3:18-cv-00995-JD document 212-15 filed 05/25/21 page 6 of 11

Page 13

had that conversation over the phone, they had that fire drill at -- at that time.

Q. And what time was the fire drill?

A. It -- they -- it was around 6:30, 7:00. It was the evening. And I was like, wow, out of all these years.

Q. Did you tell -- did you tell any of the staff that or ask any of the staff if it was as a result of this lawsuit or the conversations you had about this lawsuit?

A. No, I -- you know, I -- I didn't because you -- I mean, it's obvious. You know, out of all the years I've been there, you know, just a coincidence after we talk about this they had the fire drill at night a few days later. So it's -- there's no reason to ask. They're not going to tell me yeah anyway, so -- but I did mention it to the fire chiefs that runs the fire drills and he was like -- he said, "Wow." Yeah, he said because -- he said, "It was strange that they came and asked us, they wanted to start running fire drills at night," and he said he was wondering where did this come about all of a sudden. So, you know, I put two and two together. It's -- it's -- Yeah.

Q. I want to ask you a couple questions about

Page 14

Joshua Devine.

Did you know him before you saw him on the night that he died?

A. Yes.

Q. And can you tell me your impression of him and his personality?

A. Joshua, he was -- he was like -- He stayed to his self a lot, but he had friends. I mean, we didn't hang out, but we spoke. I used to see him on the telephone a lot talking to his family. He used to always stay on the phone talking to his family, so -- but just in passing, you know, we'll speak and, you know, I just know him from being around. But as far as us hanging out, you know, it's -- things like that, we didn't hang out, but I knew of him and, you know, spoke with him, you know.

Q. Okay. So you weren't friends, but he was a likable enough guy that had friends in the -- in the cell house, right?

A. Yes.

MS. GRADY: And just give me a minute. No. Okay. I don't have anything else.

CROSS-EXAMINATION

BY MR. ROSE:

Q. Mr. Hall, I know I introduced myself briefly

Page 15

off the record, but my name is Randy Rose, and I'm an attorney with the Attorney General's office in Indianapolis. I do have a few follow-up questions for you. Okay?

A. Okay.

Q. Sure. Now, you said in April of 2017 you were housed in B Cell House, Cell 138; is that right?

A. That's correct.

Q. Okay. Now, 138, the way I envision this, and you tell me if I'm wrong, would correspond right above you to 238, 338, and so forth; am I right on that?

A. Well, it -- it -- it shifts off a little. You know, like, say, for instance, like I'm in 138 and as you continue to go up, I don't know why that it is, but the cells kind of like move -- the numbers move.

Q. Okay.

A. So just because I'm in 138, yeah, you would think the next cell up would be 138 or 138 and 138 and so forth. But it -- I don't know why, but it -- it shifts off. I believe that's because it may be a little shorter up there. It might not have as many cells on the Flag as it does up there.

Q. Okay.

A. So the numbers are kind of off.

Q. Okay. And then I heard you talk about "they"

Page 16

was yelling. Who were you talking about "they"?

A. I'm sorry?

Q. When you were talking about the fire you said you heard "they" was yelling. Who is "they"?

A. They -- All of us. Those -- The guys in the cell house.

Q. When you're saying "guys in the cell house," you're talking about other inmates?

A. Yes.

Q. Okay.

A. Yes.

Q. And then you mentioned a Danny Means in cell 126 and that he was a firefighter; is that right?

A. Yes, that's correct.

Q. Did you see that that cell ever opened?

A. No, it didn't. It didn't.

Q. At one point were the -- the cell house evacuated and cells opened to get people out?

A. You say at what point?

Q. Yes, at some point that evening did everybody get out of the cell house?

A. Correct, yes.

Q. Okay. And I'm asking at that point, including Mr. Means, right?

A. Correct.

DENISE DWYER, et al. v.
RON NEAL; et al.

Cause No. 3:18-CV-00995-JD-MGG

OSCAR HALL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-15   filed 05/25/21   page 7 of 11

Page 17

Q. Now, of course, I heard you talking about your conversation with Miss Grady on the phone about the fire drills. What else did you all talk about?

A. Basically what we talking about today.

Q. Okay.

A. What -- what I witnessed, what I heard, you know, things of that nature.

Q. Okay. Did you all talk about anything that you haven't testified to today?

A. No.

Q. Other than Miss Grady and myself through your testimony today, have you talked to anybody else about the events of that evening in April 2017?

A. No. No, not that I can recall.

Q. Let me break it down. Did you -- a little bit more specifics.

Have you talked to any investigators from Internal Affairs with Indiana Department of Corrections about the events that evening?

A. No.

Q. Any law enforcement officer otherwise?

A. No.

Q. Any other attorney that was not your own counsel?

A. No.

Page 18

Q. Okay. Any other offenders held there at the Indiana State Prison other than just simply, hey, that's crazy that happened, or something to that effect, about the details of what happened?

A. No, I mean, we all just talk about what -- you know, what took place but not about, you know -- nothing else.

MR. ROSE: Okay. All right. Mr. Hall, I don't believe I have any other questions. Thank you, sir. Miss Grady may have some follow-up for you.

REDIRECT EXAMINATION

BY MS. GRADY:

Q. I just have one follow-up.

We talked on the phone, but I think someone from my office met with you at some point, right, Mr. Hall?

A. I'm sorry. Can you repeat that.

Q. Yes. Do you remember meeting with someone from my office? I don't believe it was me, but there was someone who came to visit you from my office. Do you recall having a meeting like that?

A. Yes, but I thought it was you. It probably was someone else.

Q. I don't think it was me. But, in any event, let me just ask you this. You -- you were asked

Page 19

questions, sort of similar today, about what you recall happening on April 7th, 2017?

A. Yes.

Q. And no one during that meeting, whether it was me or someone else, suggested that you do anything but be truthful in any testimony about your recollection; is that fair to say?

A. Correct.

MS. GRADY: Okay. I don't have anything else.

MR. ROSE: Nothing further, Mr. Hall. I appreciate your time, sir.

MS. GRADY: Mr. Hall, you have the opportunity, now that the deposition is complete -- I think we can go off the record.

(A short break was had.)

THE WITNESS: I'll waive it. I don't need it.

MS. GRADY: Okay. Most people waive.

(Signature waived.)

(Witness excused at 12:08 p.m.)

Page 20

STATE OF INDIANA      )
                      )  ss.
COUNTY OF PORTER      )

I, Jessica M. Warner Phipps, Registered Professional Reporter and Notary Public, do hereby certify that on the 22nd day of September, A.D., 2020, the deposition of the witness, OSCAR HALL, called by the Plaintiff, was taken before me, reported stenographically, and was thereafter reduced to typewriting under my direction.

The said deposition was taken via Zoom videoconference from the Indiana State Prison, and there were present counsel as previously set forth.

The said witness, OSCAR HALL, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate, and complete record of the questions asked of and answers made by the said witness, OSCAR HALL, at the time and place hereinabove referred to.

The signature of the witness, OSCAR HALL, was waived by agreement of counsel.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature on this 28th day of October, 2020, A.D.

*Jessica M. Warner Phipps, RPR*

JESSICA M. WARNER PHIPPS, RPR
5816 East 7th Avenue
Gary, Indiana 46403
Phone: (219) 769-9090

CSR No.   084-004485

DENISE DWYER, et al., v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

OSCAR HALL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-15   filed 05/25/21   page 8 of 11

## A

**able (1)**
10:19
**above (1)**
15:10
**absolutely (4)**
5:18;8:6;10:16;
12:12
**across (2)**
7:12;8:25
**Actually (1)**
7:13
**administrator (1)**
3:15
**Affairs (1)**
17:18
**again (1)**
3:13
**ah (4)**
8:13,13,14,14
**ahead (3)**
3:12,25;9:6
**almost (1)**
7:3
**always (1)**
14:11
**appreciate (1)**
19:11
**approximate (1)**
5:7
**approximately (3)**
4:12;5:14;11:7
**April (5)**
4:24;12:16;15:6;
17:13;19:2
**around (6)**
5:10;7:3,7,18;13:4;
14:13
**asleep (1)**
11:2
**attention (1)**
7:21
**Attorney (3)**
15:2,2;17:23
**attorney-client (1)**
11:17

## B

**back (3)**
4:21,22,22
**banging (3)**
7:19,20;10:1
**barely (1)**
10:5
**bars (8)**
6:19;7:11,16,20;8:8,
15,24;9:5
**Basically (1)**
17:4
**beat (1)**

3:18
**became (1)**
8:16
**begin (2)**
3:16,19
**big (1)**
8:12
**bit (2)**
3:17;17:15
**black (5)**
7:15;8:16,16;10:7,7
**boom (1)**
8:12
**break (4)**
11:25,25;17:15;
19:15
**briefly (1)**
14:25
**burning (1)**
11:2

## C

**call (2)**
4:18;12:4
**called (2)**
3:4;11:14
**calls (1)**
11:17
**came (5)**
7:1,1;8:3;13:20;
18:20
**can (26)**
3:19,20,21;4:6,12;
5:3,7;6:3,14;8:9,9,18;
9:3,5,8,10,11,14,18,19;
10:5,5;14:5;17:14;
18:17;19:13
**case (2)**
3:14;11:4
**catch (2)**
6:7;11:1
**Cell (29)**
4:10,13,21,23,25;
5:1;6:10,12;7:6,7;8:5,
24;9:2,12,22,24,24;
10:11,13;14:19;15:7,7,
18;16:6,7,12,15,17,21
**cells (5)**
5:14,20;15:15,22;
16:18
**check (1)**
5:13
**chiefs (1)**
13:17
**choke (1)**
7:17
**clear (1)**
8:23
**clearly (1)**
4:2
**coincidence (2)**
11:21;13:13

**coming (1)**
8:4
**common (2)**
6:7;10:25
**complete (1)**
19:13
**confusing (1)**
4:3
**confusion (1)**
3:24
**continue (1)**
15:14
**continued (1)**
6:8
**conversation (3)**
11:14;13:1;17:2
**conversations (1)**
13:9
**Corrections (1)**
17:18
**correspond (1)**
15:10
**counsel (1)**
17:24
**count (3)**
5:12,17,20
**couple (2)**
12:1;13:25
**course (1)**
17:1
**court (1)**
3:21
**crazy (2)**
8:11;18:3
**CROSS-EXAMINATION (1)**
14:23

## D

**Danny (2)**
7:24;16:12
**day (1)**
4:24
**days (3)**
11:15;12:25;13:15
**dead (2)**
8:20,20
**definitely (1)**
9:25
**Denise (1)**
3:14
**Department (1)**
17:18
**deposition (1)**
19:13
**describe (2)**
9:18,19
**details (1)**
18:4
**Devine (3)**
3:15;8:7;14:1
**died (1)**
14:3

**different (1)**
9:4
**DIRECT (1)**
3:6
**done (1)**
12:9
**down (3)**
3:21;11:25;17:15
**drill (9)**
11:10,15,18;12:5,17,
20;13:2,3,14
**drills (4)**
11:5;13:18,21;17:3
**Dude (1)**
10:6
**duly (1)**
3:4
**during (7)**
4:9,15;12:4,5,17,21;
19:4
**Dwyer (1)**
3:14

## E

**echo (1)**
3:19
**effect (1)**
18:4
**either (1)**
7:6
**else (7)**
14:22;17:3,12;18:7,
23;19:5,9
**end (2)**
3:17,20
**enforcement (1)**
17:21
**enough (1)**
14:18
**envision (1)**
15:9
**Estate (1)**
3:15
**evacuated (1)**
16:18
**Even (3)**
7:5;10:5,22
**evening (4)**
13:5;16:20;17:13,19
**event (1)**
18:24
**events (2)**
17:13,19
**everybody (3)**
7:20;10:2;16:20
**everybody's (1)**
5:13
**EXAMINATION (2)**
3:6;18:11
**examined (1)**
3:5
**excused (1)**

19:19

## F

**face (1)**
7:18
**fair (2)**
10:14;19:7
**family (2)**
14:10,11
**fans (2)**
7:16,16
**far (1)**
14:13
**feedback (1)**
3:17
**fell (1)**
11:1
**few (4)**
10:2;12:25;13:15;
15:3
**fine (1)**
4:5
**finish (1)**
3:18
**fire (33)**
5:1,5,8;6:3,5,7,16,19,
23;7:22;8:4,13,15;
9:18;10:20,21,22;11:1,
5,10,15,18;12:5,17,20;
13:2,3,14,17,18,21;
16:3;17:3
**firefighter (1)**
16:13
**fireman (1)**
7:24
**firemen (3)**
6:25;7:25,25
**first (6)**
3:4;4:18;5:3,8;10:4,9
**five (1)**
10:6
**Flag (4)**
4:18;10:4,8;15:22
**flash (1)**
8:12
**floor (3)**
4:19;10:4,9
**follows (1)**
3:5
**follow-up (3)**
15:3;18:10,13
**foot (1)**
10:6
**forth (2)**
15:11,19
**Friday (3)**
11:20,23;12:2
**friends (3)**
14:8,17,18
**front (2)**
4:21;10:6
**funny (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-CV-00995-JD-MGG

OSCAR HALL
September 22, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-15   filed 05/25/21   page 9 of 11

11:13
**further (1)**
19:10

**G**

**game (1)**
6:1
**General's (1)**
15:2
**given (1)**
10:15
**glass (8)**
7:12;8:8,25;9:1,3,8,
14,15
**goes (1)**
9:1
**grabbed (1)**
7:16
**GRADY (10)**
3:7,13;14:21;17:2,
11;18:10,12;19:9,12,17
**guy (1)**
14:18
**guys (2)**
16:5,7

**H**

**half (1)**
12:14
**HALL (10)**
3:3,8,10,11;4:6;
14:25;18:8,16;19:10,
12
**hang (2)**
14:9,15
**hanging (1)**
14:14
**happened (3)**
6:4;18:3,4
**happening (2)**
5:4;19:2
**happy (1)**
4:3
**hear (4)**
3:20;9:23,25;10:19
**heard (13)**
5:8,23;6:2,15,18,22;
9:17,20;10:23;15:25;
16:4;17:1,6
**held (1)**
18:1
**herein (1)**
3:4
**hey (1)**
18:2
**holding (1)**
8:15
**hot (5)**
6:6,7;10:25;11:1,2
**House (18)**
4:10,13,21,23,25;

6:12;9:2,22,24,25;
10:11,14;14:19;15:7;
16:6,7,17,21
**housed (2)**
4:9;15:7

**I**

**imagine (1)**
10:5
**impression (1)**
14:5
**including (1)**
16:23
**Indiana (8)**
4:7,13,25;6:24;11:6,
7;17:18;18:2
**Indianapolis (1)**
15:3
**inmates (2)**
7:1;16:8
**instance (3)**
9:7,9;15:13
**intense (1)**
10:3
**Internal (1)**
17:18
**into (1)**
5:20
**introduced (2)**
3:11;14:25
**investigators (1)**
17:17

**J**

**Joshua (3)**
3:15;14:1,7

**K**

**kind (2)**
15:15,24
**knew (4)**
8:17,18,20;14:15

**L**

**last (6)**
6:17;11:19,22,22;
12:2,25
**later (2)**
11:15;13:15
**law (1)**
17:21
**lawsuit (2)**
13:9,10
**left (1)**
11:2
**likable (1)**
14:18
**listening (1)**
11:16

**literally (1)**
10:3
**little (3)**
15:12,21;17:15
**locked (1)**
5:20
**long (5)**
4:6;6:15,18,22;9:23
**look (3)**
6:9;8:24;9:10
**looked (1)**
7:10
**looking (2)**
9:5,7
**lot (2)**
14:8,10
**loud (3)**
9:19,21;10:18
**louder (2)**
10:15,17

**M**

**machine (3)**
9:10,11,13
**main (1)**
4:18
**man (2)**
8:11,17
**many (1)**
15:21
**may (2)**
15:20;18:10
**Maybe (3)**
6:21,21;7:3
**mean (6)**
8:19;9:12,22;13:12;
14:8;18:5
**Means (3)**
7:24;16:12,24
**meeting (3)**
18:18,21;19:4
**member (2)**
6:23;7:6
**mention (1)**
13:17
**mentioned (1)**
16:12
**met (1)**
18:15
**might (1)**
15:21
**minute (2)**
6:8;14:21
**minutes (1)**
6:21
**Miss (3)**
17:2,11;18:10
**more (4)**
7:14,14,14;17:16
**morning (1)**
11:11
**Most (1)**

19:17
**move (2)**
15:15,15
**much (2)**
3:11;10:17
**myself (3)**
3:12;14:25;17:11

**N**

**name (3)**
3:9,13;15:1
**nature (1)**
17:7
**near (3)**
4:20,21,22
**need (1)**
19:16
**next (2)**
6:4;15:18
**night (11)**
5:4,21;8:9;10:15;
11:11,15,18,24;13:15,
21;14:3
**normal (1)**
10:15
**numbers (2)**
15:15,24

**O**

**obvious (1)**
13:12
**o'clock (1)**
7:3
**off (6)**
9:15;15:1,12,20,24;
19:14
**offenders (1)**
18:1
**office (5)**
9:12;15:2;18:15,19,
20
**officer (1)**
17:21
**officers (2)**
8:2;9:11
**officers' (1)**
7:21
**once (1)**
11:17
**one (8)**
6:17;8:2;11:20,21,
24;16:17;18:13;19:4
**only (1)**
9:24
**opened (2)**
16:15,18
**opportunity (1)**
19:12
**OSCAR (2)**
3:3,10
**otherwise (1)**

17:21
**out (22)**
4:1;6:9,16,16;7:1,10,
11,23,25,25;8:4,15,24;
9:10;11:3;13:5,12;
14:9,14,15;16:18,21
**outside (3)**
6:25;7:2;9:24
**over (3)**
8:17,18;13:1
**own (1)**
17:23

**P**

**participate (1)**
12:20
**participated (3)**
11:10;12:5,16
**particularly (1)**
10:19
**passing (1)**
14:12
**people (10)**
5:8,24;6:2,15,18,22;
9:3;10:2;16:18;19:17
**Perfect (1)**
3:23
**person (1)**
9:15
**personality (1)**
14:6
**person's (1)**
9:8
**phone (5)**
12:4;13:1;14:11;
17:2;18:14
**place (1)**
18:6
**plaintiff (1)**
3:14
**please (2)**
3:8,9
**pm (9)**
5:11,14,17,20;11:12;
12:6,17,21;19:19
**point (8)**
6:11,13;8:21;16:17,
19,20,23;18:15
**possible (1)**
4:2
**pot (3)**
6:6;10:25;11:2
**pots (2)**
6:7;11:1
**Prison (7)**
4:7,13,25;6:24;11:6,
7;18:2
**prisoner (1)**
4:25
**privileged (1)**
11:17
**probably (1)**

USDC IN/ND case 3:18-cv-00995-JD   document 212-15   filed 05/25/21   page 10 of 11

18:22
**put (2)**
11:3;13:23

## Q

**quarter (1)**
5:10
**quiet (1)**
9:19

## R

**Randy (1)**
15:1
**range (6)**
6:16,19,23;9:18;
10:20,22
**ranges (1)**
9:4
**reason (1)**
13:15
**recall (4)**
4:24;17:14;18:21;
19:1
**recently (1)**
12:21
**recollection (1)**
19:6
**record (4)**
3:9;10:8;15:1;19:14
**record's (1)**
8:23
**red (1)**
8:12
**REDIRECT (1)**
18:11
**reflection (5)**
7:12;8:9;9:9,13,15
**reflections (1)**
9:3
**released (1)**
7:4
**remember (2)**
5:4;18:18
**repeat (1)**
18:17
**rephrase (1)**
4:3
**reporter (1)**
3:21
**represent (1)**
3:13
**reside (1)**
4:16
**resided (1)**
4:13
**result (1)**
13:8
**right (16)**
4:22;10:11,20;12:6,
9,11,12,22;14:19;15:7,
10,11;16:13,24;18:8,15

**ROSE (4)**
14:24;15:1;18:8;
19:10
**ruckus (2)**
9:23;10:14
**running (1)**
13:20
**runs (1)**
13:17

## S

**Sarah (1)**
3:13
**saw (3)**
6:23;7:7;14:2
**saying (1)**
16:7
**second (2)**
3:23;12:14
**self (1)**
14:8
**serious (2)**
6:9;11:3
**set (1)**
4:20
**shaking (1)**
7:20
**shift (5)**
11:11,12;12:6,18,21
**shifts (2)**
15:12,20
**short (1)**
19:15
**shorter (1)**
15:21
**shortly (1)**
5:17
**Signature (1)**
19:18
**similar (1)**
19:1
**simply (1)**
18:2
**sitting (3)**
9:10,12,16
**smoke (7)**
6:10;7:8,11,13;10:2,
7,7
**somebody (1)**
11:1
**someone (5)**
18:14,18,20,23;19:5
**Sometimes (1)**
4:1
**sorry (4)**
6:17;9:6;16:2;18:17
**sort (2)**
3:20;19:1
**speak (1)**
14:12
**specifics (1)**
17:16

**spell (1)**
3:8
**spoke (3)**
11:14;14:9,15
**staff (7)**
5:13;6:24;7:2,5,6;
13:7,8
**stairs (2)**
4:21;7:7
**standing (3)**
8:7,14;9:4
**start (1)**
13:20
**started (6)**
3:12;6:11;7:14,15,
23;10:23
**starting (3)**
5:24;6:3;7:17
**state (8)**
3:8;4:7,13,25;6:24;
11:6,7;18:2
**stay (1)**
14:11
**stayed (3)**
4:17,17;14:7
**steps (1)**
12:1
**still (1)**
7:19
**stopped (1)**
8:17
**strange (1)**
13:19
**Strike (1)**
6:14
**sudden (2)**
8:11;13:22
**suggested (1)**
19:5
**sure (2)**
8:23;15:6
**sworn (2)**
3:1,5

## T

**talk (6)**
11:5;13:14;15:25;
17:3,8;18:5
**talked (6)**
11:19,23;12:2;17:12,
17;18:14
**talking (7)**
14:10,11;16:1,3,8;
17:1,4
**telephone (1)**
14:10
**television (1)**
5:25
**Ten (2)**
4:8;11:7
**testified (2)**
3:5;17:9

**testimony (2)**
17:12;19:6
**thick (2)**
10:3,6
**thinking (3)**
6:6;10:24,25
**thought (1)**
18:22
**thoughts (1)**
4:1
**three (2)**
6:21;11:15
**today (5)**
3:25;17:4,9,12;19:1
**together (1)**
13:23
**told (2)**
12:8,14
**took (1)**
18:6
**top (2)**
9:2,2
**towards (1)**
7:16
**towel (2)**
7:17,18
**trained (1)**
8:1
**trouble (1)**
4:1
**true (1)**
12:11
**trust (1)**
9:23
**truthful (1)**
19:6
**try (2)**
6:17;7:21
**Tuesday (6)**
11:19,20,22,23,24;
12:25
**turned (1)**
7:16
**two (3)**
6:21;13:23,23

## U

**up (8)**
6:9;8:7;9:2;10:5;
15:14,18,21,22
**used (2)**
14:9,10

## V

**vending (3)**
9:9,11,13
**video (1)**
3:16
**visibly (1)**
7:13
**visit (1)**

18:20
**volume (2)**
9:19;10:15

## W

**wait (2)**
3:18;6:8
**waive (2)**
19:16,17
**waived (1)**
19:18
**watching (2)**
5:25;6:1
**way (8)**
3:19;4:3;7:12;8:25;
9:2,24;12:13;15:9
**weren't (1)**
14:17
**wet (1)**
7:18
**wetted (1)**
7:17
**what's (1)**
11:13
**WHEREUPON (1)**
3:2
**whole (1)**
6:12
**Witness (4)**
3:1,4;19:16,19
**witnessed (1)**
17:6
**wondering (1)**
13:21
**wow (3)**
11:21;13:5,18
**wrapped (1)**
7:18
**wrong (1)**
15:10

## Y

**years (4)**
4:8;11:7;13:6,13
**yell (2)**
5:24;6:3
**yelling (23)**
5:5,8;6:5,8,11,12,15,
18,22;7:19,23;8:7,10,
10,10,14,17;9:17;
10:21,23,23;16:1,4
**yells (1)**
10:20

## 1

**10:00 (1)**
7:3
**12:08 (1)**
19:19
**126 (2)**

USDC IN/ND case 3:18-cv-00995-JD    document 212-15    filed 05/25/21    page 11 of 11

7:23;16:13
**138 (8)**
   4:17;15:7,9,13,17,18,
   18,18

**2**

**2015 (1)**
   4:14
**2017 (5)**
   4:24;12:16;15:6;
   17:13;19:2
**2019 (1)**
   4:14
**238 (1)**
   15:11

**3**

**338 (1)**
   15:11

**5**

**500 (12)**
   5:6,9;6:3,5,16,19,23;
   7:22;9:18;10:20,21,22
**540 (2)**
   10:21,22

**6**

**6:00 (8)**
   11:12,12;12:5,6,17,
   17,21,21
**6:30 (1)**
   13:4

**7**

**7:00 (1)**
   13:4
**7th (1)**
   19:2

**9**

**9:00 (4)**
   5:10,14,17,19
**9:15 (1)**
   5:10