**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# EXHIBIT 16

**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*ROBERT ENGRAM*
*September 30, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-30-20 ROBERT ENGRAM.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-19 filed 05/25/21 page 3 of 32

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE, )
                         )
          Plaintiff,     )
                         )
vs.                      )  Cause No.
                         )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
          Defendants.    )
_____)

The Videoconference Deposition of ROBERT ENGRAM

Date:    Wednesday, September 30, 2020

Time:    8:02 o'clock a.m.

Place:   Via Zoom

Called as a witness, by the Plaintiff, in accordance with the Federal Rules of Civil Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

Page 2

APPEARANCES:

SAM HEPPELL, ESQ.
        Loevy & Joevy
        311 North Aberdeen Street
        Chicago, Illinois  60607
        PHONE:  (312) 243-5900
        FAX:    (312) 243-5902
        sam@loevy.com

On Behalf of the Plaintiff;


ARCHER ROSE, JR., ESQ.
        Office of the Attorney General
        Deputy Attorney General
        Civil Litigation
        302 West Washington Street
        IGCS Fifth Floor
        Indianapolis, Indiana  46204
        PHONE:  (317) 232-6201
        FAX:    (317) 232-7979
        archer.rose@atg.in.gov

On Behalf of the Defendants.

Page 3

THE VIDEOCONFERENCE DEPOSITION OF ROBERT ENGRAM

DIRECT EXAMINATION
   By Mr. Heppell......................... Page  4
CROSS EXAMINATION
   By Mr. Rose............................ Page  47
REDIRECT EXAMINATION
   By Mr. Heppell......................... Page 67
RECROSS EXAMINATION
   By Mr. Rose............................ Page 72


            E  X  H  I  B  I  T  S

PLAINTIFF'S          MARKED       IDENTIFIED

Exhibit No. 1           37             37


                  *   *   *

Page 4

MR. HEPPELL: So before we get started, Mr. Engram, I just need to get a couple of items of housekeeping taken care of. So, first, I just want to put on the record, as we've done in these other Zoom depositions, that the parties are agreed to conduct the deposition by Zoom, with the court reporter swearing in the witness and transcribing things remotely by video. So stipulated on behalf of plaintiff. And Randy, is that stipulated on behalf of the defendants as well?

MR. ROSE: Yes, likewise.

MR. HEPPELL: Okay. Would you please swear in the witness.

ROBERT ENGRAM, called as a witness, by the Plaintiff, having first been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. HEPPELL:

Q    Good morning, Mr. Engram. Thank you for meeting with us today. How are you?

A    I'm doing fine. Thank you for asking.

USDC IN/ND case 3:18-cv-00995-JD document 212-19 filed 05/25/21 page 4 of 32

Page 5

Q    Good.  My name is Sam Heppell, and I'm one of the attorneys for the plaintiff in this lawsuit, which is Denise Dwyer on behalf of the estate of Joshua Devine.

(Brief pause, technical issues.)

BY MR. HEPPELL:

Q    Mr. Engram, could you please state and spell your full name for the record?

A    First name is Robert.  That spelling is R as in Romeo, O as in October, B as in bravo, E as in echo, R as in Romeo once again, and T as in tango; middle name is Lee as in Lima; last name is Engram.  The spelling is E as in echo, N as in November, G as in golf, R as in Romeo, A as in alpha, and M as in Mary, and I'm a junior.

Q    All right.  Thank you, Mr. Engram.  I want to go over some background on the procedure we're going to follow today to try and help things run smoothly during this deposition.  Okay?

A    Sure.

Q    This deposition is being conducted under oath.  You were sworn in by the court reporter just as if you were in a courtroom in front of a judge and jury.  Do you understand that?

Page 6

A    Yes.

Q    And so all we're asking for you today is for you to give your truthful testimony under oath to the best of your ability, to the best of your memory.  Okay?

A    Yes.

Q    Now, it's much less formal than being in a courtroom, but there still is a record being made.  We're doing a video recording of the Zoom and there's also a transcript being prepared by the court reporter, who you see on the video as well.  Okay?

A    Yes.

Q    And there's an attorney for the defendants who's on the line, who I think will be switching over to video shortly, and it's just the four of us.  Can you see all three of us on the video?

A    Not at the moment.  I just see yourself.

Q    Just me?  Okay.  So it will probably switch over when someone else talks, but rest assured they're here.  Because the court reporter is preparing a transcript of my questions and your answers, it's important that you use words and not gestures or sounds to give your

Page 7

testimony.  Does that make sense?

A    Yes, it does.

Q    So although I can understand you perfectly if you say things like uh-huh, huh-uh, or nod your head, that's not going to make a clear transcript.  Okay?

A    Understood.

Q    Similarly, it's kind of unnatural, because in normal human conversation we talk over each other all the time, but it's important for you to let me get all the way to the end of my question before you start in with your answer.  Okay?

A    Understood.

Q    And that's just so there's a clean transcript, and it will slow things down a little bit, but it will slow things down less than if we were talking over each other and have to repeat things for the court reporter.  Okay?

A    Understood.

Q    It's important that you understand the question that I'm asking before you answer it because it is your testimony under oath and, you know, I only get this one opportunity to take your deposition.  So if there's anything

Page 8

about my question that you don't understand, please ask me to clarify and I will gladly rephrase my question to make sure you understand it.  Okay?

A    Understood.

Q    And an added wrinkle is doing this over Zoom, so if there any technological issues, you're not able to hear me properly or any barriers at all, let us know and we'll work to resolve them because I want you to have a fair chance to understand the questions and to give your testimony.  Okay?

A    Understood.

Q    There may be some objections that get made to some of the questions that I ask.  Unlike in a courtroom, there's no judge here to rule on those objections, so those objections are just being made for the record.  Okay?

A    Understood.

Q    And what that means is, you want to take a pause to let the other lawyer make their objection, but once that objection has been stated, you can jump in and just give your answer to the question.  Okay?

A    Understood.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-19 filed 05/25/21 page 5 of 32

Page 9

Q    We can take a break if we need to -- it's not going to be a long deposition, but if you do need to take a break, just let me know and we can go off the record for a moment for you to take a break.  Okay?

A    Understood.

Q    The only thing I would ask is, if I've asked a question that you give your answer to the question before we take the break.  Okay?

A    Understood.

Q    With that background, do you have any questions or concerns about the deposition before we get started today?

A    None at the moment.

Q    Okay.  And can you think of any reason that you might have difficulty testifying truthfully and accurately to the best of your memory?

A    None.

Q    Okay.  Mr. Engram, do you have any military background?

A    Yes.

Q    Can you please describe what your military background is?

A    I have two honorable discharges from the

Page 10

United States Army.  I'm a chemical operations specialist by certification, United States Army, and I am an 11 Bravo, which is infantryman, with the Guard here in Indiana, which is a general discharge.

Q    And you stated, I believe, that you were a chemical specialist; is that correct?

A    Chem operations, yes, chemical operations, nuclear, biological warfare.

Q    Can you explain what was entailed in that position?

A    Oh, God, there's a lot.  Giving just the basics, it is anything dealing with military raid, chemicals, and for example, VX nerve agents, serum, radiation.  Any kind of nuclear, biological chemical component, it was my job to teach the unit how to do recon and deacon of those particular chemicals.

Q    Are you currently a member of the prisoner firefighter squad at Indiana State Prison?

A    I am.

Q    How long have you served as a member of the prisoner firefighter squad?

A    Oh, God.  Without looking at the record, I don't want to give you an inaccurate date, but

Page 11

I'm sure they have it on record somewhere. The date in question of why we're doing this deposition, that was my first official call. So whatever year that was, that was the year, I believe, that I actually got on.

Q    Okay.  And you're referring to the fire in B-cell house that killed Joshua Devine; is that correct?

A    I believe that's his name, yes.

Q    Okay.  And so if I were to represent to you, based on the records that we have in the case, that that fire took place on April 7, 2017, it would be sometime shortly before that date that you first became a member of the prisoner firefighter squad; is that correct?

A    '16 or '17, yes.  It should have been February at that time.

Q    And is there anything about your military background that influences how you approach your job as a firefighter at the prison?

A    Can you be more specific?

Q    Sure.  Are there any skills or particular ways of doing things that you learned or developed during your military experience that you use during your work as a prisoner firefighter?

Page 12

A    Oh, okay.  When I grew up -- my dad is retired military, so I grew up in a military household.  I follow rules.  I follow procedures.  I try to be professional.  You know, albeit that I'm in a prison setting, I think it's a unique opportunity that we have. So, to me, I'm a firefighter first that happens to be in prison.  So, I mean, I guess more accurately, I would approach it as though I was a firefighter out on the street as a professional.  You know, I have a job to do. I perform the duty to the best of my abilities and certifications.

Q    Is attention to detail an important skill that you need to have as a firefighter?

A    Without a doubt or contradiction.

Q    Okay.  And is that something -- is that a skill that you developed in the military as well?

A    Both in the military and as a firefighter.

Q    And what about accuracy in documenting events, is that something that is important as a firefighter?

A    Military and firefighting, but I think it was more -- it was told to us over and over again

USDC IN/ND case 3:18-cv-00995-JD   document 212-19   filed 05/25/21   page 6 of 32

Page 13

as a firefighter that, you know, we had to make sure we knew times and what we call situational awareness; when we moving, why we moving, what time we moving, what time we were there, who's there, where they are, how much air you have. I mean, because if you're not paying attention to detail, you could run out of air and then you got a problem.

Q Understood. And so is that something that you take seriously as a firefighter then, like level of attention to detail?

A I would say so, yes.

Q Mr. Engram, what role do prisoner firefighters have in running fire drills at Indiana State Prison?

A Okay. We have a hierarchy. So let me start by saying that. I like to call our hierarchy all of the officers, prison officers, our executives. So they may have more information than I do. I can only tell you what my duties were as a mandatory or Firefighter I when it came to running fire drills. That entailed we would go over and there were a set of questions. We would go in with a set of questions. We would ask do you know this, do

Page 14

you this, do you know this, what do you do in this situation, and so forth, and so forth. I believe it was probably about six questions, if my recall serves me correctly, and I could be wrong in that. But there were multiple questions, let me say that.

So some of the questions was what kind of extinguisher would you grab, you know, what do you do in the case of a 10-70 or 10-71. So I know those three questions are for sure there. Then there were times when we would do evacuation drills during the day. Only thing we do is we would go in, we would sound the alarm, each one of the firefighters would take a position on one of the ranges. Once the range was clear, we would check the range, make sure it was clear, and then we would relay the information downstairs, and then they would comment, and we would clear it, and then they would go back in.

Q Is there a difference in how the fire drills are run on the night shift versus the day shift?

A Until recently I can't say that we ever did a night drill.

Page 15

Q Okay. And just so I'm clear, when you say you never did a night drill, are you referring to there was no aspect of what you were just describing in terms of asking the questions or are you referring to just the evacuation didn't happen?

A For myself, both. Now, again, I didn't get on the fire team until 2016, or I think you said in '17, around February. I can't speak to what happened prior to that. For myself, from 2016 leading up to the incident, I never did a night drill when I did an evacuation nor have I did one where we did questions on a night shift.

Q Okay. So fair to say in your experience as a firefighter on the prisoner firefighter squad the fire drills have only been run during the day shift?

A Yes.

Q And we talked about the fire in B-cell house that is the subject of this deposition taking place in April of 2017; specifically, April 7th of 2017.

A Yes.

Q Did you have an occasion to do a fire drill at

Page 16

some point prior to the night of that fire?

A Myself, yes.

Q Okay. Do you remember the officers that were involved in that fire drill that you participated in?

A I can't call them by name with the exception of maybe one.

Q And what's the one name that you remember?

A I believe -- and I could be pronouncing it wrong, but I believe it's Abbassi.

Q And understanding that you don't -- you may not recall the name of the other officers, do you recall anything about the other officers who were part of the fire drill that you are recalling that took place prior to the April 2017 fire?

A They all failed.

Q And do you -- do you know anything about who the other officers were even if you don't remember their names specifically?

A I don't really fully understand. Can you be more specific in what you're asking?

Q Sure. Well, maybe I'll -- I'll ask it this way: In addition to this fire drill, which I'm going to come back to, you later were one

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 7 of 32

Page 17

of the firefighters that responded to the fire on April 7, 2017 in B-cell house; correct?

A  Yes.

Q  And do you recall the officers who were on duty in B-cell house that night during the Devine fire?

A  Yes.

Q  Okay.  And were any of those officers the same officers that were a part of the fire drill that you had conducted sometime previously?

A  I know at least two of them were, yes.

Q  Okay.  And who were the officers that you recall being the same officers on the fire drill as were later in the cell house during the fire?

A  I know Abbassi was one.  There was a gentleman, I don't know his name.  There's an actual reason why I remember her name, you know, because I had more interaction in terms of the fire drill and in terms of my actions thereafter at the actual call, you know, because I had interaction with her.  And the other guy, which I believe there was, I want to say, two guys, two or three more guys there.

Page 18

Q  Okay.  Understanding that you only remember one of the names, can you describe any details or features about the other officers whose names you don't remember?

A  I believe one of them is Latino, maybe kind of, you know, short and stocky, I would describe him, yeah.  The other ones I really don't want to give a description of because it's kind of vague.

Q  So you remember an officer named Abbassi and a male Latino officer; is that correct?

A  Right.

Q  And those were officers you recall as being on duty during the fire itself; is that correct?

A  She was definitely there.

Q  And are those officers you remember being part of this fire drill that you were describing?

A  Yes, those two.

Q  Both Abbassi and Rodriguez?

A  Rodriguez, that's his name, yes.

Q  And so that name is familiar to you now that I say that?

A  Yes.

Q  Okay.  And do you recall the name Promise Blakely?

Page 19

A  I don't want to say yes or no.  I don't recall it.  However, you know, I'm sure we have a copy of the fire drill that was given to them because they all have to print and sign their name.

Q  Okay.  And do you recall whether you remember seeing a younger female African-American officer --

A  Yes, yes, yes.  I don't know her name, but she was there, yes.

Q  Okay.  And are you recalling her from the fire drill, from the night of the fire, or both?

A  From the fire drill.

Q  Okay.

A  The night of the fire -- the night of the fire there was only really two people I had interaction with; Abbassi being the original person that I had interaction with.  I believe it was either Rodriguez and Abbassi at the same time I had interaction with because I needed to find an electrical outlet to hook up an exhaust fan so we can, you know, move smoke out of the building.  So that was the extent of my interactions with them that night.  Everything else is kind of vague because

Page 20

once -- once I finished dealing with them as much as I needed them, I went into evacuation mode.  So I didn't really need them for that after they opened the door.

Q  Okay.  Going back to the fire drill that you were describing earlier, where did that fire drill take place?

A  In B-cell house I believe they call it the officer's station.

Q  And going back to that fire drill -- I believe you testified to this, but just so that I'm clear, how did the officers perform during that fire drill?

A  To me, personally, they took it as a joke.  They failed.  Every one of them failed.  As a matter of fact, Abbassi made the statement that if there was a fire, she was going to run out the front door.  I recall saying to Abbassi, you know, jokingly back to her, you know, you can't do that, you can't just leave us.  I took my papers back to my chief, who was Milne at the time -- we called him Dano, and I said, Dano, they all failed.  What do you want me to do?  His instructions were, and I quote, take it back to them, give them the

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-19   filed 05/25/21   page 8 of 32

Page 21

answers, and then bring it back to me.

The following night I took it back to them, gave them the fire drill, gave them the answer, had them sign, took it back to Dano. That was the extent of that. After that I was -- I requested to be moved out of B-cell house, because at the time I was assigned to B-cell house.

Q   You were housed in B-cell house at that time.

A   Yes.

Q   And why did you ask to be moved out of B-cell house?

A   You know, as a prisoner you tend to kind of see things and I'm very perceptive of what I see. I didn't like what I was seeing. So I'm like -- you know, everybody was moving. I'm trying to figure out why is everybody trying to make this mass exit, and it could be just a coincidence. So, you know, I decided I wanted to move. So I requested to go to E. It had nothing to do with this fire, or anything, you know.

Q   Right. This was before the fire; correct?

A   Absolutely.

Q   After the fire drill, but before the fire is

Page 22

when you asked to be moved.

A   Yes.

Q   And you were describing the conversation that you had with the fire chief --

A   Yes.

Q   -- after the officers had performed poorly on the fire drill, and that -- you stated that his name was Dano; is that correct?

A   His actual -- we call him Dano, and his actual last name, I believe, is Maline (sic) or something like that. I might be pronouncing it wrong.

Q   The name I have is Daniel Milne, M-I-L-N-E.

A   That's it.

Q   Does that sound right?

A   Yes. Yes.

Q   And he was the fire chief at the time to whom you reported about the fire drill; correct?

A   Yes.

Q   And what's your understanding of how -- well, strike that.

Are you aware of if Chief Milne was in contact with any members of the prison staff in terms of bringing issues to their attention about fire safety at the prison?

Page 23

A   All I can -- the only way I can answer is, if I had an issue, I'd take it to Dano and Dano does whatever he does with it. If he takes it to higher ups, that's what he does. I try to -- as we say in the military, that's above my pay grade. Once I give it to Dano, I'm done with it.

Q   Okay. But it was your understanding that the procedure that was to be followed was that if individual members of the firefighter squad ran into issues in terms of fire safety or fire preparedness within the prison, the process was to bring those to the fire chief's attention; is that correct?

A   Yes.

Q   I want to ask you questions about the night of the fire. I understand that you don't remember the specific date, but again, take my representation, based on the records in the case, that the fire took place on April 7th of 2017. Does that sound approximately correct to you?

A   Yes.

Q   Where were you when you first learned that there was a fire that night?

Page 24

A   I was housed in what's known as E-dorm, as in echo, on the east side of E-dorm, as in echo. I was in my bunk asleep. Apparently, the signal came across. I didn't actually hear the signal. One of the other firefighters came past, kind of kicked my bunk. Because I was new, I was kind of gung-ho, you know, like I'm ready for this. So I recall putting my shoes on, but the first thing I did, I guess, like simultaneously, I turned my television to the time station, which would be Channel 2, and that's just something we do because we have to write reports. You know, we have to know exactly what time we got the call, what time we got go there, and so forth. My recollection was 9:30 p.m.

He said to me, he's like we got to go, we got a call. He left. I left second, but prior to leaving I looked back to make sure the third guy, which was Serwatka, if he was coming. All three of us exited out of the front door of E-dorm. Ty exited first. I exited behind Ty. We then made a right turn out of E and we went down to what's called Main Street. We made another right turn,

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 9 of 32

Page 25

which is going towards the fire station. Once we got a little bit -- I guess, maybe 30 yards after we made the right on to Main Street, you could actually see B-cell house and you could actually see the fire. The cell was fully engulfed.

When I say fully engulfed, you couldn't see. In fact, Ty had made the comment -- because we kind of for a nanosecond or a quick second, however you want to phrase it, we all stopped. We were kind of -- we were stunned, you know, because we hadn't never seen anything like that. And he was like, man, if somebody's in there, they're going to be dead. So we took off to the fire station. We all kicked into our training. We went to the fire station. We started at Checkpoint 2 trying to get keys. We had problems getting the keys. Once we got the key, we got into the fire station. We opened the bay door. We cleared out the truck and the response cart and started getting dressed.

Q   Mr. Engram, I don't mean to cut you off, but I just want to ask some clarifying questions and sort of guide you with some questions rather

Page 26

than having you give the entire narrative.

A   Yes.

Q   You just mentioned that you had some problems getting the keys. Did I understand you correctly?

A   Yes.

Q   Can you explain with a little more detail what you mean by that and what exactly happened?

A   Well, what ends up happening is, when we get a call in the p.m., because the fire station is locked -- of course, it's a Level 4 facility and we have Class A tools in the fire station, so it has to be secured. The procedure is, we get the call. We go to Checkpoint 2. They have a set of keys for us. They either open the door for us or they give the chief the keys and he'll open the door. However, this particular night, for whatever reason, they couldn't get the key or there wasn't nobody at the checkpoint when we first got there, because we respond kind of quick.

So once the guy got there, he couldn't get into the box or he didn't know what box to go into. So we had to -- Ty had to actually go over and show him how to get into the box

Page 27

to get the key. Once he got the key, we then had to figure out which key it was to open the door to get into the fire station. All of this is happening quick. So when I say we was having issues, those were the issues that we were having.

Q   Okay. So there was some delay in being able to get into the fire station itself as a result of the issue with the key; is that correct?

A   Yes.

Q   And then eventually you made your way over to B-cell house; is that correct?

A   Yes.

Q   Approximately, how long would you say it took you from the moment you were first informed that there was a fire when you were in E-dorm to you arriving at B-cell house?

A   Probably five minutes.

Q   Okay.

A   If that.

Q   And is that a fairly standard response time in terms of firefighters being activated from their housing unit to arriving at the scene of a fire?

Page 28

A   From anywhere in the prison here on the grounds we have a response time of, from call to scene, some firefighter being on scene, between five to seven or eight minutes.

Q   And is B-cell house located pretty close to the fire station?

A   Yes. If we looking at a baseball field, it would probably be between, if B-cell house was first base -- the corner of B-cell house on Main Street, if that was first base, we'd probably be between second and third, or maybe second, you know, and I'm guessing. I'm just trying to give you a visual. I don't know if you can see a map of the prison. It's not far.

Q   Okay.

A   50 feet. We can stretch a 50-foot hose from our fire station to B-cell house. So about 50 feet.

Q   Do you recall whether there was an issue with other members of the firefighter squad coming from other housing units being delayed in terms of their responding to the fire?

A   Yes. Particularly -- I mean, it was interesting to me because I think Danny Means

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC NND case 3:18-cv-00995-JD     document 212-19     filed 05/25/21     page 10 of 32

Page 29

was the active firefighter in B, but for some reason they wouldn't let him out. So once we got there and we started the evacuation, he was still on Level 1. So, that was it. They just never let him out.

Q   Just so I understand what your testimony was just now, Danny Means was a member of the prisoner firefighter squad who was personally housed in B-cell house?

A   Yes.

Q   But when you arrived at B-cell house, Mr. Means was still locked in his cell; is that correct?

A   Yes.

Q   Did you hear him saying anything or yelling anything when you were in B-cell house?

A   To be honest, he may have been yelling. Once I went into B-cell house -- and I entered in from the B side of B-cell house, once I went in I wasn't really concerned with anything else other than getting people out.

Q   You testified that you and a couple of the other firefighters were coming from E-dorm; is that correct?

A   Yes.

Page 30

Q   Were there other prisoner firefighters who were housed in different housing units?

A   Yes.

Q   Where were they housed?

A   Myself, Ty, and Serwatka was housed in E. Danny Means was housed in B. The rest of the fire squad was housed either I or I-north.

Q   Do you remember --

A   Correction, correction. I apologize. I-north was not fully up and running, so they were housed in I-cell house.

Q   Do you recall if there was any issue or delay with the firefighters who were in I-cell house arriving at the scene of the fire that night?

A   I can't say for sure, so I'm going to not answer that because I don't want to say yes and then I'm wrong.

Q   Okay. When you arrived at B-cell house, did you -- well, strike that.
    When you first arrived at B-cell house, can you describe what you were able to hear inside the cell house?

A   It was quite chaotic. Everybody was screaming, get us out. I'd like to believe that I heard him yelling. By him I mean -- I

Page 31

can't remember the guy's name, the one that's deceased, but I can't say for accurate. Maybe that was just wishful thinking or hoping on my part. But it was chaotic. It was just a bunch of confusion.

Q   And I understand you're not able to say for sure, but is it fair to say that to the best of your memory there was someone's voice or screams that stood out to you as different from the others?

A   Yes.

Q   And without, I guess, you know, without getting into too graphic details, but fair to say, based on your understanding of what happened inside the cell house that night, there was -- there were a bunch of people who were locked in their cells, but there was one person who was locked in a cell whose cell was actually on fire; correct?

A   Yes.

Q   Okay. And to the best of your memory, you believe you heard that person screaming when you entered the cell house; is that correct?

A   Yes.

        MR. ROSE: Objection. It calls

Page 32

for speculation. The witness has testified that it may have just been wishful thinking.

BY MR. HEPPELL:

Q   Okay. And did you -- were you able to observe any of the correctional officers who were on duty in B-cell house that night when you arrived at B-cell house?

A   Yes.

Q   And who did you first observe? What officer did you first see?

A   The first officer I encountered was Abbassi.

Q   And can you describe your interaction with Officer Abbassi?

A   Sure. As I was saying, in the fire department when we look at a structure, we have an A side, B side, C, and D; A being the front entrance of the building. I entered on the B side of the building, going clockwise. Once I went in I would be on what's known as Range 1. I went down Range 1, turned to the right going towards the officer station. I met Abbassi by the structure where they would open up to unlock the ranges, so it's kind of on the corner of the cell house. She was kind of shocked to see me, but happy at the same time,

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC NND case 3:18-cv-00995-JD     document 212-19     filed 05/25/21     page 11 of 32

Page 33

but her interactions was she threw the keys and ran towards the door.

And I'm like, Abbassi, you got to come -- I can't pick the keys up off the floor. Even though we are firefighters, that's a no-no picking those keys up. So I had to have her come back. Once she, you know, I guess, gained her composure, she came back, picked up the keys, and she opened Range 1. Thereafter, I start evacuating Range 1.

Q   Okay. Just so I understand your testimony, when you first encountered Officer Abbassi, can you describe her demeanor?

A   Panic.

Q   And you testified that she threw her keys towards you and started running out of the cell house; is that correct?

A   Yes, she was heading for the door.

Q   And do you recall either the exact words or a paraphrase of what you said to her?

A   Not exactly, but it was, paraphrasing, I need you to come back and get these keys. I can't pick these keys up.

Q   And then she did come back into the cell house after you spoke to her; is that correct?

Page 34

A   Yes.

Q   And when you describe her demeanor as panicked, can you explain specifically what you were able to see or observe in terms of her behavior or what she looked like?

A   I think it was, like I said, panic and fear. There was -- she didn't know what to do. She was young. She's an officer. She was new. I mean, I don't know how else to describe it. She did exactly what she said in the fire drill. You know, in the military we had this thing, we train the way we do things. She said that's what she would do when it happened. That's what she did.

Q   And you referred to one of her statements during that fire drill that you had run previously with her when she had said that she would, you know, throw the keys and run; is that correct?

A   She didn't say throw the keys. She said she was going -- if there was a fire, she was going out the front door.

Q   Okay. When you arrived in B-cell house, what was the extent of smoke within the cell house?

A   Range 5, 4, and 3, even with our masks without

Page 35

with our tanks on, we had issues getting up the range. Of course, we could do it. But, for example, the nurses had came in, and I recall one nurse, I think she made it to the second range and I had to take her bag from her and take it up to the range because she could no longer go up there. She just couldn't. It was a lot of smoke.

Q   And even on the 100 level when you first entered in the cell house was there smoke that was noticeable and obvious on the 100 level either visually or by its smell?

A   Visually, putting your hand in front of you, you probably -- if you stretched it out, you wouldn't be able to see your hand.

Q   And that's even on the 100 level when you first entered?

A   Yes.

Q   Did you see any of the other officers or interact with any of the other officers while you were in B-cell house on the night of the fire?

A   Other than to get a receptacle to hook up the exhaust fans.

Q   And which officer did you interact with to do

Page 36

that?

A   I want to say it's Rodriguez because he was the male and he was the Latino-looking guy. He was there with Abbassi. By that time we had all the doors open on both sides of the building, which would be the A side of the building and the B side of the building, and we had the chief, which would be Dano, he was in there giving instructions as well. So there was a lot of interactions going on at that time. I was instructed to get a receptacle and set up the exhaust fans so we could start blowing smoke out of the building.

Q   And what were Rodriguez and Abbassi doing when you saw them at this time?

A   By this time they had pretty much, you know, gained their composure and they were kind of taking as much instructions from us as safely as possible, I guess. You know, this is a Level 4 facility. You know, we couldn't just say, hey, let everybody out, even though that's what we were saying, let everybody out. But I guess they have custody procedures, and I'm speculating. I don't know what custody's procedures are, but that night had they not

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 12 of 32

Page 37

let everybody out, we would have had more dead bodies.

Q    Okay.  What was the demeanor of Rodriguez when you saw him?

A    I can't recall.

Q    All right.

A    I can't recall.

Q    Did you write a report --

A    Yes.

Q    At the time you wrote the report did you do your best to record everything as accurately as possible?

A    I most certainly did.

Q    Okay.  And I'm going to pull up a copy of your report on the screen.  I'm hoping you'll be able to see it.  I'm going to mark this as Exhibit 1.

A    Okay.

        MR. HEPPELL: And for the record, it is a two-page document, Bates stamped Devine 133738 and 1133739.

        THE WITNESS: Okay.

        MR. HEPPELL: And let me just share that on the screen here.

        (Plaintiff's Exhibit No. 1

Page 38

remotely marked for identification by Attorney Heppell.)

BY MR. HEPPELL:

Q    Are you able to see that, Mr. Engram?

A    That is the report, yes.

Q    Okay.  And that's your name on the From line on that first page of the report?  And I can zoom that in.

A    Yes, it is.  There we go.  Now I can see it better.  That's it.

Q    And then turning to the end, is that your signature at the bottom of the second page?

A    Yes, it is.

Q    And looking to the first line of the report, it says:  At approximately 21:27 hours on April 7, 2017.  Do you see that?

A    Yes.

Q    And I know you had testified earlier to your memory of the time.  Does this refresh your memory about the exact time that you were activated on that night?

A    Absolutely.

Q    Okay.  The time on the report, is that the time you were testifying to that you were able to get from turning on your television?

Page 39

A    Yes.

Q    Okay.  Turning to about halfway down the front page -- I'm marking it here in your report, where it says:  Lieutenant Dowdell instructed me to head to I-cell house to see why the chief and the remainder of the squadron had not been released yet.

A    Absolutely, yes.

Q    I executed the lieutenant's instructions and headed to I-cell house.  I was met by the chief at the midpoint between I-cell house and Main Street.

A    And Main Street, yes.

Q    Do you see that in your report that I'm referring to?

A    Yes.

Q    Does this refresh your memory about any issues with the firefighters from I-cell house being released?

A    Absolutely.

Q    Okay.  Are you able to remember any additional details about that delay beyond what's in your report or is it just what's in your report is what you remember?

A    I think it's best for me to defer to what I

Page 40

wrote in the report.  Of course, that report was written, I think, that night -- no, the next day we wrote that report.  So, of course, that's more accurate, considering that's 2017 and here we are at 2020, three years later.

Q    Understood.  I'm going to pull that down for now.  At that time, you know, back in 2017, were fires a frequent occurrence at Indiana State Prison?

A    What do you mean by frequent?

Q    How often would there be fires at the prison around that time?

A    We never had like major fires.  We have what's known as protest fires, I need attention fire, come see me fire.  They were small, I guess you could call them, pocket fires, brush fires, whatever.  What they would do is, they would take papers, and so forth, and pile them up or collect and then set it on fire.  We come, spread out, normally with a water extinguisher, and that was the extent of them.

        But we had them -- I guess there was a transition going on in the prison.  So we were having them quite frequently.  By frequently, there were maybe one week or two weeks at a

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC NND case 3:18-cv-00995-JD   document 212-19   filed 05/25/21   page 13 of 32

Page 41

time where we might get five or six calls in that week and there were times where we might get two or three calls in a day. You know, so we had different times when we're getting, you know --

Q   Is it your understanding of the procedures at that time that the firefighter squad was supposed to be called out whenever there was a fire at the prison?

A   Yes. Once the 10-70 or 71 is called, we were all procedurally supposed to be released. For whatever reason, we kind of got away -- when I say we -- how do I say this. I guess, for whatever reason, they didn't let all of us out. They wouldn't let us out. There were times where, you know, I would get up the next day and, you know, like, hey, why are all these extinguishers here, no one called us. So there would be fires and we didn't get called.

Q   When you say "they" wouldn't let you out, who are you referring to?

A   I would have to say custody because, you know -- let's just say custody.

Q   You're referring to correctional officers at

Page 42

the prison?

A   Yes.

Q   And so you would become aware that there had been a fire, but that you, as one of the members of the firefighter squad, had not been activated and called out to respond to the fire.

A   Yes.

Q   Was that a frequent issue at the prison around that time?

A   It was infrequent when I first got on the department, but it became frequent as, you know, I did time on the department, yes.

Q   And to your knowledge was that an experience that other members of the prisoner firefighter squad had too, that they were not getting activated --

A   Yes.

Q   -- when there was a fire?

A   Yes.

Q   Mr. Engram, have you ever observed or experienced electrical problems at the prison, issues in your cell, for example?

A   Well, there are times when, you know, you might look in a cell and, you know, you plug

Page 43

something up, but you're doing it at your own risk. I mean, the prison is old, you know. People destroy things here.

Q   And when you say when you plug something in, you're doing it at your own risk, can you explain what you mean by that?

A   I didn't want to, but okay. I guess in order to light a fire, it's quite dangerous, but they will take the lead out of a pencil, a Number 2 pencil, or whatever, and shove it into the electrical socket and then they would take another, let's say, object to create a spark, and then light the paper, or whatever wick they're using to sustain the fire. The issue was that sometimes the lead is stuck in the electrical socket and we can't get it out. So the next person may come along and shove something in there and get electrocuted or pop the socket or blow out all the electrical wiring. It's crazy. It's very unique.

Q   And so if I understand what you're describing, there could be an issue with damage to the socket that the next person coming along to use the cell, they wouldn't -- they would just being trying to use it normally, but it would

Page 44

cause problems. Is that fair to say?

A   Yes.

Q   And based on your experience was that a widespread problem at the prison?

A   Yes.

Q   Did you ever have other problems or issues that you personally experienced, other than that outlet issue, related to the electrical system or other fire hazards in your cell?

A   In my cell?

Q   In your cell.

A   I can't say that I have. I can't say that I have.

Q   Did you have an issue with water leaking into your cell that was --

A   Well, that's now. I thought you was talking about back then. Now I got -- I had to have them take the light out because above the light there's water leaking into the light. I mean, I don't know where the water was coming from. I'm not a plumber, but it's actual water leaking into the light. So I had them -- I put in several work orders. They would come, they would look at it, two or three of them, take a picture of it, and

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 14 of 32

Page 45

leave, and nothing would ever get done.
Me being a firefighter, I just felt
uncomfortable. Look, man, just take the light
out. You know, it's above my head. So,
sitting right now, the light is still out. I
just had them take the whole electrical wiring
and whole panel, just take it all out.
Anything that could be electrical, just take
it out. I felt safer that way.

Q   And the situation you just described with sort
of putting in a work order and it taking a
while to actually get someone to come and do
something about a problem, is that a common
experience in your experience at the prison?

A   Correction, if I may. Something you just
said. It doesn't take them a while. They
come. They just -- sometimes they look at it
and there's probably nothing they can do. I'm
not really sure why they just look at it and
then leave, you know. I'm a firefighter, not
an electrician.

Q   Sure. But in terms of that experience of not
having issues resolved and having to put in
multiple work orders to get an issue resolved,
is that a common experience at the prison, to

Page 46

your knowledge?
MR. ROSE: Objection, asked and
answered.
THE WITNESS: I'm not sure if I
should answer that question. He just said
something.
MR. HEPPELL: No, he just made an
objection for the record, but you can go ahead
and answer the question.
MR. ROSE: Let me repeat it just
in case Mr. Engram didn't hear it. I just
said that I object that the question has been
asked and that you had answered it.
THE WITNESS: Okay.

A   Well, yes. The answer to the question is yes,
affirmative.
MR. HEPPELL: Okay. Mr. Engram,
those are the questions that I have for you
for now. Mr. Rose may have some questions
that he wants to ask of you, so I'm going to
turn it over to him.
MR. ROSE: Thank you. Mr. Engram,
my name is Randy Rose. I'm with the Attorney
General's office. I do have just a couple
questions, but I would ask for an indulgence

Page 47

of a five-minute break and then I will ask my
questions and we'll conclude our business
today after Mr. Heppell may have some
follow-up for you. Okay?
THE WITNESS: Yes, sir. Thank
you.
MR. HEPPELL: Okay. So we'll just
go off the record for five minutes. So we'll
come back at about ten after 9:00 Central,
ten after 10:00 Eastern time. I'm going to
pause the recording here, we'll go off the
record, and come back in a moment. Okay,
Mr. Engram?
THE WITNESS: Yes, sir.
(Brief recess.)
CROSS EXAMINATION
BY MR. ROSE:

Q   Now that we are back on the record,
Mr. Engram, again, I know I introduced myself
before we took the break. My name is Randy
Rose. I'm here on behalf of the defendants,
to the exclusion of Promise Blakely. I did
have a few follow-up questions based upon your
testimony earlier this morning.
I heard you talk about a Level 4

Page 48

facility.

A   May I interject?

Q   Yes, sir, go ahead.

A   I'm having an issue hearing you. Can you
speak up a little, please?

Q   Sure, absolutely. Let me see if my volume can
be increased. How about now? Is that better?

A   Yes, it's a little better. Thank you.

Q   Okay. Thank you for stopping me, and let me
go ahead and increase the volume while I'm at
it. Okay. Mr. Engram, is that any better?

A   Yes.

Q   All right. You can hear me clearly now?

A   Yes, thank you.

Q   Perfect. Yes, sir, thank you for that. I
heard you say several times Level 4 facility.
What is a Level 4 facility?

A   I don't know what the technical would be, but
for myself on the offender side, it is, I
believe, the next highest to a super max. So
a lot of the offenders here are violent
offenders and we have a substantial amount of
time.

Q   Okay. And then Checkpoint 2, what's
Checkpoint 2?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
ROBERT ENGRAM
September 30, 2020

USDC NND case 3:18-cv-00995-JD     document 212-19     filed 05/25/21     page 15 of 32

Page 49

A    Checkpoint 2 is exactly what -- it's a checkpoint within the facility. I'm assuming for custody reasons on the security side they have them there to randomly check for contraband, or whatever, or to maintain safety and security of the facility. I'm guessing on that.

Q    That's quite all right. Where is it?

A    When you say where is it, you're talking about?

Q    The Checkpoint 2, where is it located at the Indiana State Prison?

A    Oh. Checkpoint 2 would be located pretty much like in the center of the facility, of the Level 4 facility, on what we call Main Street. So it's like right in the center of the facility between all the housing units.

Q    I understand. And one of the housing units would be the B-cell house that we talked about?

A    Yes, that would be one of them, and let me make a correction. It's on Main Street, but there's only two housing units, specifically A-cell house and B-cell house, that are actually in close contact with Checkpoint 2,

Page 50

and then you would have A-dorm, which would be kind of north of Checkpoint 2.

Q    Sure. And then I heard you refer to a Signal 10-71. What is a Signal 10-71?

A    10-71, I believe -- I'm not sure if that is exclusive to the fire department, so I'm not going to say that, but for the fire department, a 10-71 simply means that there's an actual fire going on at a location.

Q    Okay. And the call in of a 10-71, am I correct that that's how you are activated as a firefighter in the event of a fire?

A    70 or 71, yes. 70 is we are smelling smoke and they're going to investigate and a 71 is there's an actual fire.

Q    Okay. And then on this particular occasion, April the 7th, 2017, it would appear that this was a 10-71; is that correct?

A    Yes, sir.

Q    Okay. And then I heard you talk about turning to Channel 2. What is Channel 2?

A    Channel 2 is, I guess, like a TV guide on the cable subscription that we have in the facility. What it does is, it keeps -- well, I've been locked up for a long time, but at

Page 51

the top there's different time blocks, but then there's also a running time in the first, I guess, column.

Q    Yes, sir. Now, am I gathering correctly then this is how you approximated the time that you received the call to be the 21:27 hours; is that right?

A    Yes, 21:27, yes.

Q    And that was by turning to Channel 2 or am I misunderstanding that?

A    No, I specifically do that. Again, my Channel 2 may be different from, say, the time that the cameras here have, give or take five or six minutes. I don't know, because, again, that's a custody issue. The only thing I do is turn to that channel because that's my way of telling time.

Q    Got you. So for your purposes that's how you were to gather what time that you got the call; is that right?

A    Right. Yes, sir.

Q    All right. And then I heard you talk about major fires versus -- you described them as several different things, a protest or come see me fires.

Page 52

A    Right.

Q    Do I gather correctly that the fire on April the 7th, 2017 in the B-cell house was the first what you would call a major fire in your experience on the firefighter crew there at the Indiana State Prison?

A    Yes, it would be described as a fully-engulfed cell house, and if we was on the street, it would be a fully-engulfed structure, but here it would be called a cell house.

Q    Got you. Now when we say fully engulfed, am I correct in my understanding that the cell on the 500 range was engulfed in flame and then the cell house in smoke? Is that how you're characterizing the fully engulfed?

A    Yes.

Q    Okay. Now I understand better. Did you on the evening of April the 7th, 2017 ever go into the 500 range where the fire was located?

A    You said prior to or that particular day?

Q    That evening did you go to the 500 range?

A    No.

Q    Okay. As I gather from your statement that you gave several days after the event and then your testimony today was that you remained on

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-19   filed 05/25/21   page 16 of 32

Page 53

the 100 level; is that right?

A   The furthest I got up on the range -- and I don't know if I wrote that in my report.  Me, if I didn't, I didn't deem it necessary to be in the report.  However, that particular night I met the nurse on 100 range.  Most of my duties were on 100 range.  However, I did try to help her get upstairs by taking her medical bag, I guess you want to call it, and taking it up to -- the furthest I got was 300 range, and I put the bag down because I was running out of air and I had to get out of the building.

Q   Okay.  I understand.  And then do you recall who the nurse was that you helped?

A   No, I don't.  I think -- if I had to guess, it was Shirley, the head nurse over there.  I don't want to name a person because, no, I can't recall.  I can't recall.

Q   That's quite all right.  I'm not asking you to guess or speculate at her name.  Do you recall the race and/or approximate age of this person?

A   I'm sorry, can you repeat that, please?

Q   Yes, I'm so sorry.  The nurse that you helped,

Page 54

do you recall, if not her name, the race and age approximately of this person that you helped?

A   White female -- you're going to get me in trouble with this age thing.

Q   We all have to deal with that age guessing thing.  And I'll tell you, if you can't remember her age, that's perfectly fine.

A   Okay.  Let's go with that one then.

Q   Okay.  But what you do remember is white female nurse?

A   She was a mature lady, let's say that.

Q   Okay.  Now you talked about things that you deemed or did not deem to be put into your statement.  Now the statement we're talking about is what was shown to you earlier by Mr. Heppell, the statement dated April 11, 2017; right?

A   Yes, sir.

Q   Okay.  Now you talked about you didn't put that in the report about your contact with the nurse; is that right?

A   Okay.  Can you repeat that again, please?

Q   Sure.  Did I understand you correctly that you didn't put in or may not have put in your

Page 55

interactions with that nurse into your statement?

A   I may not.  But, however, I'm deferring to my statement to be accurate and true of what happened that night.  So if I did, then there was some interaction with her.  However, at this time I can't recall it.

Q   Sure.  And I would gather that when you're saying you're deferring to the accuracy of your statement, this was done four days after the fire; correct?

A   Yes.  I believe so, yes.

Q   And today you would obviously agree with me that your recollection of the events of that evening were fresher four days afterwards, rather than now; correct?

A   Absolutely, with the exception of, again, it was traumatizing.  So there are specific things that I'm just never going to forget.

Q   Yeah.  Those things you would have put into your report, though, the traumatizing things that you'll never forget; right?

        MR. HEPPELL: Object to form.
        THE WITNESS: What was --
        MR. HEPPELL: It was just a form

Page 56

objection.  You can go ahead.

        COURT REPORTER: I didn't get his answer.
        THE WITNESS: I answered affirmative.
        COURT REPORTER: Thank you.
        MR. ROSE: Now, let's take a look at your statement.  I believe, Sam, you just shared it on the screen earlier; is that right?
        MR. HEPPELL: Do you need me to pull it up?
        MR. ROSE: If you will, please.
Did you identify this as Exhibit 1 or Exhibit A?  How did you identify it?
        MR. HEPPELL: I identified it as Exhibit 1 and also I put the Bates ranges on the record.
        MR. ROSE: I remember that now.
So, Mr. Engram, Mr. Heppell is helping us out by pulling up the exhibit, since he's got the sharing the screen function on his end, and we'll take a look at it together.
        THE WITNESS: Yes, sir.
        MR. ROSE: I just want to give you

USDC IN/ND   case 3:18-cv-00995-JD   document 212-19   filed 05/25/21   page 17 of 32

Page 57

an opportunity to look it back over and I have a couple questions about what was testified to today.

MR. HEPPELL: Are you able to see that on the screen?

THE WITNESS: Yes.

MR. ROSE: And then, if you will, Sam, just scroll down. Thank you.

BY MR. ROSE:

Q   Mr. Engram, did you have an opportunity to take a look at it?

A   I'm looking at it now, yes.

Q   Okay. Tell me when you've had an opportunity to take a look at this portion of it. Okay?

A   Which specific -- do you want me to look at a specific portion?

Q   The entirety of your statement.

A   (Witness complies.) Can he scroll up so I can continue reading?

MR. ROSE: Sam, would you mind, please?

MR. HEPPELL: Okay.

A   (Witness complies.) I'm okay now.

MR. ROSE: Okay. And then, Sam, would you mind scrolling down towards the

Page 58

bottom of the page? That's good.

BY MR. ROSE:

Q   I believe that would show you the remainder of page 1, Mr. Engram. Just let me know when you've had a chance to look it over.

A   (Witness complies.) Okay. I've just completed: The building at this time was full of dark, thick, black smoke. After clearing. Can I get the rest of it, please?

Q   Certainly. And Mr. Heppell has scrolled to page 2 at the top. Just let us know when you're ready to move on from where we're at now.

A   (Witness complies.) Okay. You can go ahead. There we go.

Q   Just for the record, I see Mr. Heppell scrolled down to the remainder of page 2. Just let us know when you've finished reading that, Mr. Engram.

A   Yes, sir. (Witness complies.) Okay.

Q   All right. And then do you see the last line of your statement is that there is no more to report; is that correct?

A   Yes, sir.

Q   Did you author this yourself? Did you type it

Page 59

out yourself?

A   Yes, I did.

Q   Okay. And you did that on April the 11th, on the date that I see listed at the top of page 1?

A   Yes, sir.

Q   Okay. And did you have any help in authoring your statement?

A   No, sir, with the exception I believe I asked Dano the officer's name, because, again, if I didn't have too much interaction, I didn't really know their name. So I believe I asked Dano their names too because I saw I wrote a name of an officer in there.

MR. ROSE: Sam, would you mind scrolling back up to the top of page 2, please.

BY MR. ROSE:

Q   And I see there that you put Rodriguez?

A   Yes, sir.

Q   And is that who you're talking about now that Dano gave you the name of?

A   Yes, sir.

Q   And now Dano is Chief Milne; is that right?

A   Yes, sir.

Page 60

Q   Okay. And that's who I see here it's referencing in the statement as Chief Milne, M-I-L-N-E; is that right?

A   Yes, sir.

Q   I heard you talk about -- Mr. Heppell was asking about Rodriguez. Is that who you were referring to as Rodrigos (sic), is that Rodriguez?

A   Are you asking me or --

Q   I'm asking you, Mr. Engram.

A   Yes, sir.

Q   Okay. So that's one and the same, the correctional officer?

A   Yes, sir.

Q   All right. Good deal. Now I heard you testify about your interactions that evening with a Defendant Abbassi, who was a correctional officer; is that right?

A   Yes, sir.

Q   Okay. And then now you've had a chance to look at your statement, and you would agree with me that you did not put anything about your interactions with Abbassi on the evening of April the 7th, 2017?

A   Absolutely not.

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD
Cause No. 3:18-cv-00995-JD-MGG
document 212-19   filed 05/25/21
ROBERT ENGRAM
page 18 of 32
September 30, 2020

Page 61

Q    Okay.  You do not agree with me?
A    No, no, no, I'm agreeing with you that I didn't put anything in regards to herself and that interaction in that report whatsoever.
Q    Okay.  Help me understand why you did not.
A    Honestly speaking, I didn't want to get her in trouble.
Q    Okay.  Why was that your thought process?
A    Pardon?
Q    Why did you not want to get her in trouble?
A    I mean, I got to live here, I guess.  I mean, this is a very unique situation as I was -- I kind of felt conflicted, you know.  She threw the keys at me and left.  I was conflicted when I had to tell Dano that they all failed, you know.  I was new that night, just as they were new.  It's -- I just didn't want to get her in trouble, so I didn't put anything in that report in that regard because I knew people would see this report.
Q    Sure.  Who did you give what you've now referred to as the report or the statement we're looking at identified as Exhibit A?
MR. ROSE: Is that right, Sam, A?
MR. HEPPELL: Exhibit 1.

Page 62

BY MR. ROSE:
Q    Exhibit 1, who did you give it to?
A    Specifically, the chief, which would be Dano.
Q    Dano, and that being Milne?
A    Yes.
Q    Okay.  And you described that they were new and you were new; is that right?
A    Yeah, I was fairly new to the station.
Q    Okay.
A    To the squad.
Q    Same for the C/Os that you're referring to, Abbassi and Rodriguez?
A    They were fairly new to the facility.
Q    Okay.  Now since the fire have you had on occasion to talk to an inmate by the name of Lee Miller about the fire?
A    Say that again?
Q    Do you know who Lee Miller is, another inmate there at Indiana State Prison?
A    No, never.
Q    I'm going to add a little context for you, and you may not know this person, or you may.  I would submit to you that he was housed on the 500 range in April of 2017.  Does that help you identify that person as to whether or not

Page 63

you know him?
A    No.
Q    Okay.
A    Black or white?
Q    A black male.
A    Okay.  Miller, black male.  If I may interject.  If I had a conversation with him that night, it had to have been after he evacuated the building.  I never made it up to four, five, or past 300 range.
Q    Sure, sure.  And I'm referring to afterwards.
A    Oh, okay.
Q    Do you recall having a conversation with that person?
A    Not without knowing the nature of the conversation.  I may have.  I don't -- no, I can't recall that.
Q    That's quite all right.  Did you talk with any other offenders -- or excuse me, inmates there at the Indiana State Prison after the fire about what they saw or heard that evening?
A    I'm sure I did not only afterwards, but that evening we had conversations about what they saw.
Q    Did you talk to anybody that was on the 500

Page 64

range at the time of the fire?
A    I could have, but not knowing they was on the 500 range.  That particular night when I was talking to people, that was after we did the evacuation.  And as my report stated, I was in between trying to secure Class A tools that we had out; for example, hydrant wrenches and pipe wrenches.  We had all kind of fire tools out that in this unique situation we had to make sure we kept control of that for the safety of ourselves and the staff and the other offenders who might, you know -- so there was a lot of stuff going on.  I couldn't tell you who I talked to and what range they was on, but I spoke to some people, yes.
Q    Okay.  I understand.  Did you talk to anybody that you recall now that as we're talking at this moment who had spoken to Mr. Devine at the time of the fire?
A    Pardon?
Q    Did you talk to anybody -- and I believe you may have testified earlier that you did not know who was in that cell on the night of the fire.
Did you talk to anybody that spoke to

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 19 of 32

Page 65

the person who was in the cell that the fire occurred?

MR. HEPPELL: Object to form, foundation. You can go ahead.

THE WITNESS: Am I answering?

MR. HEPPELL: You can go ahead, yes.

A   Okay. Yeah, they were just -- you know, people were just kind of saying they heard him yelling. The guards wouldn't let him out. He was yelling for about ten minutes and they should have let him out. It was just people being riled up. I really didn't try to pay attention to too much of that because I know from experience, being in the military, being a military police, and now being a firefighter, that when you have chaoticness like that a lot of times, although you pay attention to what's going on, people are just shouting stuff. So you have to be kind of able to decipher who is actually being accurate and who's just trying to create more chaos, for whatever reason.

BY MR. ROSE:

Q   Okay. And do you recall anybody relaying to

Page 66

you what the person in the cell that the fire occurred in had to say about the cause of the fire?

A   Okay. I'm trying to hear you. Can you repeat that again?

Q   I'm so sorry. Do you recall anybody telling you what the man in the cell house where the fire occurred on April the 7th, 2017 had to say about how the fire started?

A   No, not right offhand, but I'm sure people speculated and gave me -- you know, some people probably thought -- I do recall some people saying that he was trying to do something to his television and then some people were saying that the police had went up there and there was a fire going. They put it out and then went back downstairs. Everybody had their speculations.

Q   Sure. Do you recall who was saying it was involving the TV or the television?

A   Not specifically because I took it with a grain of salt.

Q   Okay. And you don't know how it started; correct?

A   I don't. I was not there.

Page 67

MR. ROSE: Mr. Engram, thank you for your time. I don't have any further questions for you at this moment. Mr. Heppell may have some redirect, and if he does, I may have a follow-up question or two. We shall see.

THE WITNESS: Yes, sir. Thank you.

REDIRECT EXAMINATION

BY MR. HEPPELL:

Q   Just one or two brief questions, Mr. Engram, and I appreciate your patience and cooperation with us.

Do you see the report we have pulled up on the screen here?

A   I'm still looking at it, yes.

Q   Okay, great. So page 2 that is pulled up here of Exhibit 1 of your report, you were asked some questions just now by Mr. Rose related to what people were telling you, people who had been inside B-cell house during the fire, information they were giving you. Do you recall being asked questions about that?

A   By Mr. Rose just now, yes.

Q   Okay. And you included information to that

Page 68

effect in your report. Is that fair to say?

A   Right.

Q   And specifically, your report reads: While guarding the equipment people began to divulge to me what they witnessed. The consensus was the guards on duty did not heed the cry for help for at least ten minutes. Do you see what I'm referring to?

A   Yes, and I defer to that statement, yes, as being accurate.

Q   Okay. And your -- during your testimony just now you had described some pieces of information that might have been conflicting or diverging between the information that you were given. Is that fair to say?

A   I'm sorry, can you say it again?

Q   Sure. In your testimony just now in answer to Mr. Rose's questions, if I understood you correctly, there were some details that you were hearing from people that may be different, people were saying different things. Is that fair to say?

A   Yes, yes.

Q   All right. In terms of what you chose to include in your report, though, you describe

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC NND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 20 of 32

Page 69

that in your report as a consensus; is that correct?

A    Right.

Q    Okay.

A    May I interject?

Q    Sure, go ahead.

A    In relation to the question you're asking, the reason I said the consensus was, as I wrote it in the report was, just for clarification purposes, what I mean is that if I heard 15 guys say, well, he was crying for at least 10 minutes and no one heeded his call or nobody answered his call, to me, that was consensus that all of these guys witnessed the same thing. Now, could they have all stood somewhere and came up with this idea? Sure.

They were all evacuated to the same point, you know. Did I see them congregating and come up with this? No. I just as a firefighter, to the best of my ability, they all said ten minutes and that was the only accuracy in everybody's statement was the time ten minutes. Some people said he was yelling. Some people said he was yelling when we came in, but everybody says ten minutes. So the

Page 70

consensus was ten minutes no one heeded his call.

Q    So just so I understand what you just testified to right now, the piece of information that we've been looking at that you included in your report, you included that because that was information that was consistent between what different people were telling you; is that correct?

A    Yes.

Q    Okay. And again, just so I'm clear, you have no specific reason to believe that consistent piece of information was -- that they came up with a plan to make that up; right? You have no reason to believe that that's the case.

A    I have no reason to believe that, no.

Q    Okay. You were just -- you were just speculating about that. Is that fair to say?

A    I mean, this is prison. It's plausible that they did it, but I have no reason to say they did that.

Q    Okay.

A    I didn't actually see them doing it. I wasn't looking for them to do it. Does it happen around here? Of course. This is prison.

Page 71

Q    You were also asked some questions by Mr. Rose about pieces of information that you testified to today that you chose not to include in your report. Do you remember those questions?

A    Yes.

Q    Okay. Fair to say that everything you've testified to today is based on your memory and you've testified to it truthfully and accurately to the best of your memory?

A    Yes.

Q    And that includes details that you testified to today, but weren't in your report; is that correct?

A    Yes, and I stand firmly on the reason I didn't put it in the report.

Q    Understood, and I'm not questioning those reasons. I just want to make clear, your testimony today for the things that aren't in your report, those are based on a memory that you have that you were able to recall sitting here today; correct?

A    Yes.

MR. HEPPELL: Okay. I have no further questions.

Page 72

RECROSS EXAMINATION

BY MR. ROSE:

Q    Okay. Mr. Engram, just a couple follow-up. We've talked now about Exhibit 1 here, the statement that we've been going over. Did you give any other written statements regarding the fire?

A    At this time I doubt I did. I don't think I wrote any other written statements anywhere.

Q    Okay. We talked about you talking to other inmates there at the Indiana State Prison -- and when I said the fire, just to be clear, we're talking about April the 7th, 2017 there at B-cell house.

A    Okay.

Q    You're telling me, no, I haven't given any other written statements; is that correct?

A    I believe so. Yeah, let's say that's correct. I can't recall. I can't recall. I doubt that I did. This is my -- the statement that I gave and gave to my chief is the statement that I stand firmly on. I don't think I had a reason to write another statement.

Q    Okay. No worries. Have you spoken regarding the fire that I've now identified for purposes

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC NND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 21 of 32

Page 73

of this conversation with anybody other than in your statement here or on the record today that was not your attorney?

A   That wasn't my -- can you repeat?

Q   I'm sorry. Have you talked to anybody from Loevy & Loevy about the fire prior to today?

A   I believe I did. Somebody called me -- well, I had to have a call with somebody on the phone about this upcoming deposition, or something.

Q   Sure. Do you remember who it was that you talked to?

A   I can't say that. I know it was -- I believe it was a female. I know it was a female.

Q   Okay. How long ago was that?

A   Oh, God. More than two weeks ago.

Q   Okay. And as we sit here today, do you recall anything that was discussed during that conversation regarding the fire that we had not discussed today and that you had testified to today?

A   I can't say that I do. When I talked to that individual female that we're referring to, I like to believe that she was asking me questions and I was responding to the

Page 74

questions.

Q   Sure. Do you remember any questions or answers that you gave to her that you have not testified to today?

A   No, I don't.

MR. ROSE: Okay, good deal. I don't believe I have any further questions for you, Mr. Engram.

THE WITNESS: Yes, sir.

MR. HEPPELL: Nothing further for me based on that. Thank you very much for your testimony, for your time today, Mr. Engram. We appreciate it.

THE WITNESS: Yes, sir. Thank you.

MR. ROSE: Mr. Engram?

THE WITNESS: Yes, sir.

MR. ROSE: Thank you for your service, sir.

THE WITNESS: Yes, sir. Thank you.

MR. ROSE: Oh, Sam, signature?

MR. HEPPELL: Sure, yeah. Mr. Engram, as I mentioned at the start of the deposition, the court reporter has been, you

Page 75

know, making a written record. At some point one of the parties may order that a transcript actually be created, for her to write that up. At that point you have two options. You can ask for the opportunity to review the transcript and make any changes. You can't make changes to the substance of your testimony like, oh, I should have said this or add details, change your answers, but you can review it to make sure that the court reporter has made an accurate record of what you've testified to today.

So you have that opportunity, or you can waive signature, which means that you're waiving your right to look at the transcript and just having the court reporter prepare the transcript based on her efforts transcribing it and that the transcript is going to be what it's going to be. So that's your choice whether you want to waive signature or reserve the right to review it and sign off on it at a later date.

THE WITNESS: Question, if I may.

MR. HEPPELL: Sure.

THE WITNESS: This is all new to

Page 76

me, this technology. So I'm not sure -- and I'm asking this question for my purposes. If for some reason she can't or the recording didn't pick up something that I said clearly and it's just put in there -- like when I did my criminal deposition, it may say not discernible, or something to that effect. So my question is, should I review it to make sure that all my stuff has been heard through this technology? I don't know what to do.

MR. HEPPELL: So I can't advise you what to do. It's really up to you. I can tell you that the court reporter is making her written transcript and we also have a recording of the video as well. So we have it preserved at least a couple different ways, but it is your right if you want to review it and it's your right if you want to waive it.

I don't want to put the court reporter on the spot, but have there been any audio issues that you've perceived through the deposition today or have you been able to pretty much make everything out?

MR. ROSE: I guess you put her on the spot.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

Page 77

MR. HEPPELL: I guess I did put her on the spot with that.

COURT REPORTER: Oh, you're asking me?  I did my best to interrupt every time I had a problem.  I'm not going to be offended one way or another.  I'm totally impartial here.

THE WITNESS: All right.  I guess with that being said, I can, you know, waive and what's said is said.

MR. HEPPELL: Okay.  So you're waiving signature.  Understood.  And that's absolutely your decision.  No problems with that.

THE WITNESS: Yes, sir.

MR. HEPPELL: So with that being said, again, thank you for taking the time and for participating in the deposition.

THE WITNESS: Yes, sir.

MR. HEPPELL: Let's go off the record.

(Signature waived.)

(Proceedings concluded at 9:46 a.m.)

* * *

Page 78

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE, )
                         )
        Plaintiff,       )
                         )
vs.                      )   Cause No.
                         )   3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
        Defendants.      )
_____)

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of seventy-seven (77) typewritten pages, is a true and correct transcript of my said stenographic notes.

Signed this 27th day of October, 2020.

Beth Barnette
_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires:  6/13/22

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 23 of 32

## A

**Abbassi (18)**
16:10;17:16;18:10,
19;19:17,19;20:16,19;
32:11,13,21;33:3,12;
36:4,14;60:17,23;
62:12
**abilities (1)**
12:12
**ability (2)**
6:4;69:20
**able (15)**
8:8;27:7;30:21;31:6;
32:4;34:4;35:15;37:16;
38:4,24;39:21;57:4;
65:21;71:20;76:22
**above (3)**
23:5;44:18;45:4
**Absolutely (8)**
21:24;38:22;39:8,20;
48:6;55:17;60:25;
77:13
**accuracy (3)**
12:21;55:9;69:22
**accurate (6)**
31:2;40:4;55:4;
65:22;68:10;75:11
**accurately (4)**
9:17;12:9;37:11;
71:9
**A-cell (1)**
49:24
**across (1)**
24:4
**actions (1)**
17:20
**activated (5)**
27:23;38:21;42:6,17;
50:11
**active (1)**
29:1
**actual (7)**
17:18,21;22:9,9;
44:21;50:9,15
**actually (11)**
11:5;24:4;25:4,5;
26:24;31:19;45:12;
49:25;65:21;70:23;
75:3
**add (2)**
62:21;75:9
**added (1)**
8:6
**addition (1)**
16:24
**additional (1)**
39:21
**A-dorm (1)**
50:1
**advise (1)**
76:11

**affirmative (2)**
46:16;56:5
**African-American (1)**
19:7
**afterwards (3)**
55:15;63:11,22
**again (15)**
5:11;12:25;15:7;
23:18;47:19;51:11,14;
54:23;55:17;59:10;
62:17;66:5;68:16;
70:11;77:17
**age (5)**
53:22;54:2,5,6,8
**agents (1)**
10:15
**ago (2)**
73:15,16
**agree (3)**
55:13;60:21;61:1
**agreed (1)**
4:6
**agreeing (1)**
61:2
**ahead (8)**
46:8;48:3,10;56:1;
58:14;65:4,6;69:6
**air (3)**
13:6,8;53:12
**alarm (1)**
14:14
**albeit (1)**
12:5
**along (2)**
43:17,23
**alpha (1)**
5:15
**although (2)**
7:3;65:18
**amount (1)**
48:22
**and/or (1)**
53:22
**answered (4)**
46:3,13;56:4;69:13
**apologize (1)**
30:9
**Apparently (1)**
24:3
**appear (1)**
50:17
**appreciate (2)**
67:12;74:13
**approach (2)**
11:19;12:9
**approximate (1)**
53:22
**approximated (1)**
51:5
**approximately (4)**
23:21;27:15;38:15;
54:2
**April (16)**

11:12;15:22,23;
16:15;17:2;23:20;
38:16;50:17;52:3,18;
54:17;59:3;60:24;
62:24;66:8;72:13
**Army (2)**
10:1,3
**around (4)**
15:9;40:12;42:9;
70:25
**arrived (5)**
29:11;30:18,20;32:7;
34:23
**arriving (3)**
27:18,24;30:14
**asleep (1)**
24:3
**aspect (1)**
15:3
**assigned (1)**
21:7
**assuming (1)**
49:2
**assured (1)**
6:21
**attention (8)**
12:14;13:7,11;22:24;
23:14;40:14;65:14,19
**attorney (4)**
6:14;38:2;46:23;
73:3
**attorneys (1)**
5:2
**audio (1)**
76:21
**author (1)**
58:25
**authoring (1)**
59:7
**aware (2)**
22:22;42:3
**awareness (1)**
13:3
**away (1)**
41:12

## B

**back (23)**
14:20;16:25;20:5,10,
19,21,25;21:1,2,4;
24:19;33:7,9,22,24;
40:7;44:17;47:9,12,18;
57:1;59:16;66:17
**background (5)**
5:18;9:11,21,24;
11:19
**bag (3)**
35:5;53:9,11
**barriers (1)**
8:8
**base (2)**
28:9,10

**baseball (1)**
28:7
**based (9)**
11:11;23:19;31:14;
44:3;47:23;71:7,19;
74:11;75:17
**basics (1)**
10:13
**Bates (2)**
37:20;56:17
**bay (1)**
25:20
**B-cell (32)**
11:7;15:20;17:2,5;
20:8;21:6,8,9,11;25:4;
27:13,18;28:5,8,9,18;
29:9,11,16,18,19;
30:18,20;32:6,7;34:23;
35:21;49:19,24;52:3;
67:21;72:14
**became (2)**
11:14;42:12
**become (1)**
42:3
**began (1)**
68:4
**behalf (4)**
4:10,11;5:3;47:21
**behavior (1)**
34:5
**behind (1)**
24:23
**best (11)**
6:4,4;9:17;12:12;
31:7,21;37:11;39:25;
69:20;71:9;77:4
**better (5)**
38:10;48:7,8,11;
52:17
**beyond (1)**
39:22
**biological (2)**
10:9,16
**bit (2)**
7:16;25:2
**black (4)**
58:8;63:4,5,6
**Blakely (2)**
18:25;47:22
**blocks (1)**
51:1
**blow (1)**
43:19
**blowing (1)**
36:13
**bodies (1)**
37:2
**Both (5)**
12:20;15:7;18:19;
19:12;36:5
**bottom (2)**
38:12;58:1
**box (3)**

26:23,23,25
**bravo (2)**
5:10;10:3
**break (6)**
9:1,3,5,9;47:1,20
**Brief (3)**
5:5;47:15;67:11
**bring (2)**
21:1;23:13
**bringing (1)**
22:24
**brush (1)**
40:16
**building (10)**
19:23;32:17,18;36:6,
7,7,13;53:13;58:7;63:9
**bunch (2)**
31:5,16
**bunk (2)**
24:3,6
**business (1)**
47:2

## C

**C/Os (1)**
62:11
**cable (1)**
50:23
**call (23)**
11:3;13:2,17;16:6;
17:21;20:8;22:9;24:14,
18;26:10,14;28:2;
40:16;49:15;50:10;
51:6,20;52:4;53:9;
69:12,13;70:2;73:8
**called (10)**
4:17;20:22;24:24;
41:8,10,18,20;42:6;
52:10;73:7
**calls (3)**
31:25;41:1,3
**came (8)**
13:22;24:4,6;33:8;
35:3;69:16,24;70:13
**cameras (1)**
51:13
**Can (47)**
6:17;7:3;8:23;9:1,4,
15,23;10:10;11:21;
13:20;16:21;18:2;
19:22;23:1,1;26:7;
28:14,17;30:21;32:12;
33:13;34:3;38:7,9;
43:5;45:18;46:8;48:4,
6,13;53:24;54:23;56:1;
57:18,18;58:9,14;65:4,
6;66:4;68:16;73:4;
75:4,9,14;76:12;77:9
**care (1)**
4:3
**cart (1)**
25:21

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 24 of 32

**case (5)**
11:11;14:9;23:20;
46:11;70:15
**cause (2)**
44:1;66:2
**cell (28)**
17:14;25:5;29:12;
30:22;31:15,18,18,23;
32:24;33:17,24;34:24;
35:10;42:23,25;43:24;
44:9,10,11,15;52:8,10,
12,14;64:23;65:1;66:1,
7
**cells (1)**
31:17
**center (2)**
49:14,16
**Central (1)**
47:9
**certainly (2)**
37:13;58:10
**certification (1)**
10:2
**certifications (1)**
12:13
**chance (3)**
8:10;58:5;60:20
**change (1)**
75:9
**changes (2)**
75:6,7
**Channel (7)**
24:11;50:21,21,22;
51:9,12,16
**chaos (1)**
65:23
**chaotic (2)**
30:23;31:4
**chaoticness (1)**
65:17
**characterizing (1)**
52:15
**check (2)**
14:16;49:4
**Checkpoint (11)**
25:17;26:14,20;
48:24,25;49:1,2,11,13,
25;50:2
**Chem (1)**
10:8
**chemical (4)**
10:1,7,8,16
**chemicals (2)**
10:14,18
**chief (12)**
20:21;22:4,17,22;
26:16;36:8;39:6,11;
59:24;60:2;62:3;72:21
**chief's (1)**
23:13
**choice (1)**
75:20
**chose (2)**

68:24;71:3
**clarification (1)**
69:9
**clarify (1)**
8:2
**clarifying (1)**
25:24
**Class (2)**
26:12;64:6
**clean (1)**
7:15
**clear (9)**
7:5;14:16,17,19;
15:1;20:12;70:11;
71:17;72:12
**cleared (1)**
25:20
**clearing (1)**
58:8
**clearly (2)**
48:13;76:4
**clockwise (1)**
32:18
**close (2)**
28:5;49:25
**coincidence (1)**
21:19
**collect (1)**
40:19
**column (1)**
51:3
**coming (5)**
24:21;28:21;29:23;
43:23;44:20
**comment (2)**
14:19;25:8
**common (2)**
45:13,25
**completed (1)**
58:7
**complies (5)**
57:18,23;58:6,14,20
**component (1)**
10:16
**composure (2)**
33:8;36:17
**concerned (1)**
29:20
**concerns (1)**
9:12
**conclude (1)**
47:2
**concluded (1)**
77:23
**conduct (1)**
4:6
**conducted (2)**
5:22;17:10
**conflicted (2)**
61:13,14
**conflicting (1)**
68:13
**confusion (1)**

31:5
**congregating (1)**
69:18
**consensus (5)**
68:5;69:1,8,13;70:1
**considering (1)**
40:4
**consistent (2)**
70:8,12
**contact (3)**
22:23;49:25;54:21
**context (1)**
62:21
**continue (1)**
57:19
**contraband (1)**
49:5
**contradiction (1)**
12:16
**control (1)**
64:10
**conversation (7)**
7:9;22:3;63:7,13,16;
73:1,19
**conversations (1)**
63:23
**cooperation (1)**
67:12
**copy (2)**
19:3;37:14
**corner (2)**
28:9;32:24
**correction (4)**
30:9,9;45:15;49:22
**correctional (4)**
32:5;41:25;60:13,18
**correctly (6)**
14:4;26:5;51:4;52:2;
54:24;68:19
**couple (6)**
4:3;29:22;46:24;
57:2;72:3;76:16
**course (5)**
26:11;35:2;40:1,3;
70:25
**court (13)**
4:7;5:23;6:11,22;
7:19;56:2,6;74:25;
75:10,16;76:13,19;
77:3
**courtroom (3)**
5:24;6:8;8:16
**crazy (1)**
43:20
**create (2)**
43:12;65:22
**created (1)**
75:3
**crew (1)**
52:5
**criminal (1)**
76:6
**CROSS (1)**

47:16
**cry (1)**
68:6
**crying (1)**
69:11
**currently (1)**
10:19
**custody (5)**
36:23;41:23,24;49:3;
51:15
**custody's (1)**
36:24
**cut (1)**
25:23

**D**

**dad (1)**
12:1
**damage (1)**
43:22
**dangerous (1)**
43:8
**Daniel (1)**
22:13
**Danny (3)**
28:25;29:7;30:6
**Dano (16)**
20:22,23;21:4;22:8,
9;23:2,2,6;36:8;59:10,
13,22,24;61:15;62:3,4
**dark (1)**
58:8
**date (6)**
10:25;11:2,13;23:18;
59:4;75:22
**dated (1)**
54:17
**day (7)**
14:12,22;15:18;40:3;
41:3,17;52:20
**days (3)**
52:24;55:10,15
**deacon (1)**
10:18
**dead (2)**
25:14;37:1
**deal (3)**
54:6;60:15;74:6
**dealing (2)**
10:13;20:1
**deceased (1)**
31:2
**decided (1)**
21:19
**decipher (1)**
65:21
**decision (1)**
77:13
**deem (2)**
53:4;54:14
**deemed (1)**
54:14

**Defendant (1)**
60:17
**defendants (3)**
4:11;6:14;47:21
**defer (2)**
39:25;68:9
**deferring (2)**
55:3,9
**definitely (1)**
18:15
**delay (3)**
27:7;30:12;39:22
**delayed (1)**
28:22
**demeanor (3)**
33:13;34:2;37:3
**Denise (1)**
5:3
**department (5)**
32:14;42:12,13;50:6,
8
**deposition (13)**
4:7;5:20,22;7:25;9:2,
12;11:3;15:21;73:9;
74:25;76:6,22;77:18
**depositions (1)**
4:5
**describe (9)**
9:23;18:2,7;30:21;
32:12;33:13;34:2,9;
68:25
**described (5)**
45:10;51:23;52:7;
62:6;68:12
**describing (5)**
15:4;18:17;20:6;
22:3;43:21
**description (1)**
18:8
**destroy (1)**
43:3
**detail (4)**
12:14;13:7,11;26:7
**details (6)**
18:2;31:13;39:22;
68:19;71:11;75:9
**developed (2)**
11:23;12:18
**Devine (5)**
5:4;11:7;17:6;37:21;
64:18
**difference (1)**
14:21
**different (10)**
30:2;31:9;41:4;51:1,
12,24;68:21,21;70:8;
76:16
**difficulty (1)**
9:16
**DIRECT (1)**
4:21
**discernible (1)**
76:7

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 25 of 32

**discharge (1)**
10:5
**discharges (1)**
9:25
**discussed (2)**
73:18,20
**diverging (1)**
68:14
**divulge (1)**
68:4
**document (1)**
37:20
**documenting (1)**
12:21
**done (4)**
4:5;23:7;45:1;55:10
**door (10)**
20:4,18;24:22;25:20;
26:16,17;27:3;33:2,18;
34:22
**doors (1)**
36:5
**doubt (3)**
12:16;72:8,19
**Dowdell (1)**
39:4
**down (10)**
7:16,17;24:24;32:20;
39:2;40:6;53:11;57:8,
25;58:17
**downstairs (2)**
14:18;66:17
**dressed (1)**
25:22
**drill (24)**
14:25;15:2,12,25;
16:4,14,24;17:9,14,20;
18:17;19:3,12,13;20:5,
7,10,13;21:3,25;22:7,
18;34:11,16
**drills (5)**
13:14,22;14:12,21;
15:17
**duly (1)**
4:18
**during (13)**
5:20;11:24,25;14:12;
15:17;17:5,14;18:14;
20:12;34:16;67:21;
68:11;73:18
**duties (2)**
13:20;53:7
**duty (5)**
12:12;17:5;18:14;
32:6;68:6
**Dwyer (1)**
5:3

**E**

**earlier (6)**
20:6;38:18;47:24;
54:16;56:9;64:22

**east (1)**
24:2
**Eastern (1)**
47:10
**echo (4)**
5:11,13;24:2,2
**E-dorm (5)**
24:1,2,22;27:17;
29:23
**effect (2)**
68:1;76:7
**efforts (1)**
75:17
**eight (1)**
28:4
**either (5)**
19:19;26:15;30:7;
33:19;35:12
**electrical (8)**
19:21;42:22;43:11,
16,19;44:8;45:6,8
**electrician (1)**
45:21
**electrocuted (1)**
43:18
**else (4)**
6:21;19:25;29:21;
34:9
**encountered (2)**
32:11;33:12
**end (3)**
7:11;38:11;56:22
**ends (1)**
26:9
**Engram (29)**
4:2,16,23;5:7,13,17;
9:20;13:13;25:23;38:4;
42:21;46:11,17,22;
47:13,19;48:11;56:20;
57:10;58:4,19;60:10;
67:1,11;72:3;74:8,13,
16,24
**engulfed (5)**
25:6,7;52:11,13,15
**entailed (2)**
10:10;13:22
**entered (5)**
29:18;31:23;32:17;
35:10,17
**entire (1)**
26:1
**entirety (1)**
57:17
**entrance (1)**
32:17
**equipment (1)**
68:4
**estate (1)**
5:4
**evacuated (2)**
63:9;69:17
**evacuating (1)**
33:10

**evacuation (6)**
14:12;15:5,12;20:2;
29:3;64:5
**even (6)**
16:19;33:5;34:25;
35:9,16;36:21
**evening (7)**
52:18,21;55:15;
60:16,23;63:21,23
**event (2)**
50:12;52:24
**events (2)**
12:21;55:14
**eventually (1)**
27:12
**everybody (8)**
21:16,17;30:23;
36:21,22;37:1;66:17;
69:25
**everybody's (1)**
69:22
**exact (2)**
33:19;38:20
**exactly (5)**
24:14;26:8;33:21;
34:10;49:1
**EXAMINATION (4)**
4:21;47:16;67:9;
72:1
**examined (1)**
4:18
**example (4)**
10:14;35:3;42:23;
64:7
**exception (3)**
16:6;55:17;59:9
**exclusion (1)**
47:22
**exclusive (1)**
50:6
**excuse (1)**
63:19
**executed (1)**
39:9
**executives (1)**
13:19
**exhaust (3)**
19:22;35:24;36:12
**Exhibit (11)**
37:17,25;56:14,15,
17,21;61:23,25;62:2;
67:18;72:4
**exit (1)**
21:18
**exited (3)**
24:21,22,23
**experience (10)**
11:24;15:15;42:14;
44:3;45:14,14,22,25;
52:5;65:15
**experienced (2)**
42:22;44:7
**explain (4)**

10:10;26:7;34:3;
43:6
**extent (4)**
19:23;21:5;34:24;
40:21
**extinguisher (2)**
14:8;40:21
**extinguishers (1)**
41:18

**F**

**facility (12)**
26:11;36:20;48:1,16,
17;49:2,6,14,15,17;
50:24;62:13
**fact (2)**
20:16;25:8
**failed (5)**
16:17;20:15,15,23;
61:15
**fair (10)**
8:10;15:15;31:7,13;
44:1;68:1,15,22;70:18;
71:6
**fairly (3)**
27:22;62:8,13
**familiar (1)**
18:21
**fan (1)**
19:22
**fans (2)**
35:24;36:12
**far (1)**
28:15
**fear (1)**
34:6
**features (1)**
18:3
**February (2)**
11:16;15:9
**feet (2)**
28:17,19
**felt (3)**
45:2,9;61:13
**female (6)**
19:7;54:4,11;73:14,
14,23
**few (1)**
47:23
**field (1)**
28:7
**figure (2)**
21:17;27:2
**find (1)**
19:21
**fine (2)**
4:25;54:8
**finished (2)**
20:1;58:18
**fire (109)**
11:6,12;13:14,22;
14:21;15:8,17,20,25;

16:1,4,14,16,24;17:1,6,
9,13,15,20;18:14,17;
19:3,11,12,13,15,15;
20:5,6,10,13,17;21:3,
21,23,25,25;22:4,7,17,
18,25;23:11,12,13,17,
20,25;25:1,5,15,16,19;
26:10,12;27:3,8,17,25;
28:6,18,23;30:7,14;
31:19;32:14;34:10,16,
21;35:22;40:14,15,19;
41:9;42:4,7,19;43:8,
14;44:9;50:6,7,9,12,15;
52:2,4,19;55:11;62:14,
16;63:20;64:1,8,19,24;
65:1;66:1,3,8,9,16;
67:21;72:7,12,25;73:6,
19
**firefighter (29)**
10:20,23;11:15,20,
25;12:7,10,15,20,23;
13:1,10,21;15:16,16;
23:10;28:3,21;29:1,8;
41:7;42:5,15;45:2,20;
50:12;52:5;65:17;
69:20
**firefighters (10)**
13:13;14:14;17:1;
24:5;27:23;29:23;30:1,
13;33:5;39:18
**firefighting (1)**
12:24
**fires (9)**
40:8,11,13,14,16,17;
41:19;51:23,25
**firmly (2)**
71:14;72:22
**first (25)**
4:4,17;5:9;11:3,14;
12:7;23:24;24:9,22;
26:20;27:16;28:9,10;
30:20;32:9,10,11;
33:12;35:9,17;38:7,14;
42:11;51:2;52:4
**five (6)**
27:19;28:4;41:1;
47:8;51:13;63:10
**five-minute (1)**
47:1
**flame (1)**
52:13
**floor (1)**
33:5
**follow (3)**
5:19;12:3,3
**followed (1)**
23:9
**following (1)**
21:2
**follows (1)**
4:19
**follow-up (4)**
47:4,23;67:5;72:3

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 26 of 32

**forget (2)**
55:19,22
**form (3)**
55:23,25;65:3
**formal (1)**
6:7
**forth (4)**
14:2,2;24:15;40:18
**foundation (1)**
65:4
**four (4)**
6:17;55:10,15;63:10
**frequent (4)**
40:8,10;42:9,12
**frequently (2)**
40:24,24
**fresher (1)**
55:15
**front (7)**
5:24;20:18;24:22;
32:16;34:22;35:13;
39:2
**full (2)**
5:8;58:7
**fully (6)**
16:21;25:5,7;30:10;
52:11,15
**fully-engulfed (2)**
52:7,9
**function (1)**
56:22
**further (4)**
67:2;71:24;74:7,10
**furthest (2)**
53:2,10

**G**

**gained (2)**
33:8;36:17
**gather (4)**
51:19;52:2,23;55:8
**gathering (1)**
51:4
**gave (8)**
21:3,3;52:24;59:22;
66:11;72:21,21;74:3
**general (1)**
10:5
**General's (1)**
46:24
**gentleman (1)**
17:17
**gestures (1)**
6:25
**given (3)**
19:3;68:15;72:16
**Giving (3)**
10:12;36:9;67:22
**gladly (1)**
8:2
**God (3)**
10:12,24;73:16

**golf (1)**
5:14
**Good (5)**
4:23;5:1;58:1;60:15;
74:6
**grab (1)**
14:8
**grade (1)**
23:6
**grain (1)**
66:22
**graphic (1)**
31:13
**great (1)**
67:17
**grew (2)**
12:1,2
**grounds (1)**
28:2
**Guard (1)**
10:4
**guarding (1)**
68:4
**guards (2)**
65:10;68:6
**guess (20)**
12:8;24:9;25:2;
31:12;33:8;36:19,23;
40:15,22;41:13;43:7;
50:22;51:3;53:9,16,21;
61:11;76:24;77:1,8
**guessing (3)**
28:12;49:6;54:6
**guide (2)**
25:25;50:22
**gung-ho (1)**
24:7
**guy (4)**
17:23;24:20;26:22;
36:3
**guys (4)**
17:24,24;69:11,14
**guy's (1)**
31:1

**H**

**halfway (1)**
39:2
**hand (2)**
35:13,15
**happen (2)**
15:6;70:24
**happened (5)**
15:10;26:8;31:15;
34:14;55:5
**happening (2)**
26:9;27:4
**happens (1)**
12:8
**happy (1)**
32:25
**hazards (1)**

44:9
**head (4)**
7:5;39:5;45:4;53:17
**headed (1)**
39:10
**heading (1)**
33:18
**hear (7)**
8:8;24:4;29:15;
30:21;46:11;48:13;
66:4
**heard (13)**
30:25;31:22;47:25;
48:16;50:3,20;51:22;
60:5,15;63:21;65:9;
69:10;76:9
**hearing (2)**
48:4;68:20
**heed (1)**
68:6
**heeded (2)**
69:12;70:1
**help (6)**
5:19;53:8;59:7;61:5;
62:24;68:7
**helped (3)**
53:15,25;54:3
**helping (1)**
56:20
**HEPPELL (39)**
4:1,14,22;5:1,6;32:3;
37:19,23;38:2,3;46:7,
17;47:3,7;54:17;55:23,
25;56:11,16,20;57:4,
22;58:10,16;60:5;
61:25;65:3,6;67:3,10;
71:23;74:10,23;75:24;
76:11;77:1,11,16,20
**herself (1)**
61:3
**hey (2)**
36:21;41:17
**hierarchy (2)**
13:16,17
**higher (1)**
23:4
**highest (1)**
48:20
**honest (1)**
29:17
**Honestly (1)**
61:6
**honorable (1)**
9:25
**hook (2)**
19:21;35:23
**hoping (2)**
31:3;37:15
**hose (1)**
28:17
**hours (2)**
38:15;51:6
**house (52)**

11:7;15:20;17:2,5,
14;20:8;21:7,8,9,12;
25:4;27:13,18;28:5,8,9,
18;29:9,11,16,18,19;
30:11,13,18,20,22;
31:15,23;32:6,7,24;
33:17,24;34:23,24;
35:10,21;39:5,10,11,
18;49:19,24,24;52:3,8,
10,14;66:7;67:21;
72:14
**housed (10)**
21:9;24:1;29:9;30:2,
4,5,6,7,11;62:23
**household (1)**
12:3
**housekeeping (1)**
4:3
**housing (6)**
27:24;28:22;30:2;
49:17,18,23
**huh-uh (1)**
7:4
**human (1)**
7:9
**hydrant (1)**
64:7

**I**

**I-cell (6)**
30:11,13;39:5,10,11,
18
**idea (1)**
69:16
**identification (1)**
38:1
**identified (3)**
56:16;61:23;72:25
**identify (3)**
56:14,15;62:25
**impartial (1)**
77:6
**important (5)**
6:24;7:10,21;12:14,
22
**inaccurate (1)**
10:25
**incident (1)**
15:11
**include (2)**
68:25;71:3
**included (3)**
67:25;70:6,6
**includes (1)**
71:11
**increase (1)**
48:10
**increased (1)**
48:7
**Indiana (9)**
10:4,20;13:14;40:8;
49:12;52:6;62:19;

63:20;72:11
**individual (2)**
23:10;73:23
**indulgence (1)**
46:25
**infantryman (1)**
10:4
**influences (1)**
11:19
**information (10)**
13:19;14:18;67:22,
25;68:13,14;70:5,7,13;
71:2
**informed (1)**
27:16
**infrequent (1)**
42:11
**inmate (2)**
62:15,18
**inmates (2)**
63:19;72:11
**I-north (2)**
30:7,9
**inside (3)**
30:22;31:15;67:21
**instructed (2)**
36:11;39:4
**instructions (4)**
20:24;36:9,18;39:9
**interact (2)**
35:20,25
**interaction (9)**
17:19,22;19:17,18,
20;32:12;55:6;59:11;
61:4
**interactions (6)**
19:24;33:1;36:10;
55:1;60:16,23
**interesting (1)**
28:25
**interject (3)**
48:2;63:7;69:5
**interrupt (1)**
77:4
**into (20)**
20:2;23:11;25:16,19;
26:23,24,25;27:3,8;
29:18;31:13;33:24;
43:11;44:14,19,22;
52:19;54:14;55:1,20
**introduced (1)**
47:19
**investigate (1)**
50:14
**involved (1)**
16:4
**involving (1)**
66:20
**issue (12)**
23:2;27:9;28:20;
30:12;42:9;43:15,22;
44:8,14;45:24;48:4;
51:15

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 27 of 32

**issues (12)**
    5:5;8:7;22:24;23:11;
    27:5,5;35:1;39:17;
    42:23;44:6;45:23;
    76:21
**items (1)**
    4:3

## J

**job (3)**
    10:17;11:20;12:11
**joke (1)**
    20:14
**jokingly (1)**
    20:19
**Joshua (2)**
    5:4;11:7
**judge (2)**
    5:25;8:16
**jump (1)**
    8:23
**junior (1)**
    5:16
**jury (1)**
    5:25

## K

**keeps (1)**
    50:24
**kept (1)**
    64:10
**key (6)**
    25:19;26:19;27:1,1,
    2,9
**keys (15)**
    25:18,18;26:4,15,17;
    33:1,4,6,9,15,22,23;
    34:18,20;61:14
**kicked (2)**
    24:6;25:16
**killed (1)**
    11:7
**kind (21)**
    7:8;10:15;14:7;18:5,
    9;19:25;21:13;24:6,7;
    25:9,11;26:21;32:23,
    24;36:17;41:12;50:2;
    61:13;64:8;65:9,20
**knew (2)**
    13:2;61:19
**knowing (2)**
    63:15;64:2
**knowledge (2)**
    42:14;46:1
**known (3)**
    24:1;32:19;40:14

## L

**lady (1)**
    54:12

**last (3)**
    5:12;22:10;58:21
**later (4)**
    16:25;17:14;40:5;
    75:22
**Latino (2)**
    18:5,11
**Latino-looking (1)**
    36:3
**lawsuit (1)**
    5:3
**lawyer (1)**
    8:21
**lead (2)**
    43:9,15
**leading (1)**
    15:11
**leaking (3)**
    44:14,19,22
**learned (2)**
    11:23;23:24
**least (4)**
    17:11;68:7;69:11;
    76:16
**leave (3)**
    20:20;45:1,20
**leaving (1)**
    24:19
**Lee (3)**
    5:12;62:16,18
**left (3)**
    24:18,18;61:14
**less (2)**
    6:7;7:17
**level (12)**
    13:11;26:11;29:4;
    35:9,11,16;36:20;
    47:25;48:16,17;49:15;
    53:1
**Lieutenant (1)**
    39:4
**lieutenant's (1)**
    39:9
**light (8)**
    43:8,13;44:18,19,19,
    22;45:3,5
**likewise (1)**
    4:13
**Lima (1)**
    5:12
**line (4)**
    6:15;38:6,14;58:21
**listed (1)**
    59:4
**little (6)**
    7:16;25:2;26:7;48:5,
    8;62:21
**live (1)**
    61:11
**located (4)**
    28:5;49:11,13;52:19
**location (1)**
    50:9

**locked (5)**
    26:11;29:12;31:17,
    18;50:25
**Loevy (2)**
    73:6,6
**long (5)**
    9:2;10:22;27:15;
    50:25;73:15
**longer (1)**
    35:7
**look (15)**
    32:15;42:25;44:24;
    45:3,17,19;56:7,23;
    57:1,11,14,15;58:5;
    60:21;75:15
**looked (2)**
    24:19;34:5
**looking (8)**
    10:24;28:7;38:14;
    57:12;61:23;67:16;
    70:5,24
**lot (6)**
    10:12;35:8;36:10;
    48:21;64:13;65:18

## M

**Main (7)**
    24:25;25:3;28:10;
    39:12,13;49:15,22
**maintain (1)**
    49:5
**major (3)**
    40:13;51:23;52:4
**making (2)**
    75:1;76:13
**male (4)**
    18:11;36:3;63:5,6
**Maline (1)**
    22:10
**man (3)**
    25:13;45:3;66:7
**mandatory (1)**
    13:21
**map (1)**
    28:14
**mark (1)**
    37:16
**marked (1)**
    38:1
**marking (1)**
    39:3
**Mary (1)**
    5:15
**masks (1)**
    34:25
**mass (1)**
    21:18
**matter (1)**
    20:16
**mature (1)**
    54:12
**max (1)**

**48:20
**may (25)**
    8:14;13:19;16:11;
    29:17;32:2;43:17;
    45:15;46:19;47:3;48:2;
    51:12;54:25;55:3;
    62:22,22;63:6,16;
    64:22;67:4,4;68:20;
    69:5;75:2,23;76:6
**maybe (7)**
    16:7,23;18:5;25:2;
    28:11;31:2;40:25
**mean (15)**
    12:8;13:6;25:23;
    26:8;28:24;30:25;34:9;
    40:10;43:2,6;44:20;
    61:11,11;69:10;70:19
**means (7)**
    8:20;28:25;29:7,12;
    30:6;50:8;75:14
**medical (1)**
    53:8
**meeting (1)**
    4:24
**member (4)**
    10:19,22;11:14;29:7
**members (5)**
    22:23;23:10;28:21;
    42:5,15
**memory (10)**
    6:5;9:18;31:8,21;
    38:19,20;39:17;71:7,9,
    19
**mentioned (2)**
    26:3;74:24
**met (3)**
    32:21;39:10;53:6
**middle (1)**
    5:12
**midpoint (1)**
    39:11
**might (7)**
    9:16;22:11;41:1,2;
    42:25;64:12;68:13
**military (14)**
    9:20,23;10:13;11:18,
    24;12:2,2,18,20,24;
    23:5;34:11;65:15,16
**Miller (3)**
    62:16,18;63:6
**Milne (6)**
    20:22;22:13,22;
    59:24;60:2;62:4
**M-I-L-N-E (2)**
    22:13;60:3
**mind (3)**
    57:20,25;59:15
**minutes (11)**
    27:19;28:4;47:8;
    51:14;65:11;68:7;
    69:12,21,23,25;70:1
**misunderstanding (1)**
    51:10

**mode (1)**
    20:3
**moment (7)**
    6:19;9:4,14;27:16;
    47:12;64:18;67:3
**more (13)**
    11:21;12:9,25;13:19;
    16:22;17:19,24;26:7;
    37:1;40:4;58:22;65:22;
    73:16
**morning (2)**
    4:23;47:24
**most (2)**
    37:13;53:6
**move (3)**
    19:22;21:20;58:12
**moved (3)**
    21:6,11;22:1
**moving (4)**
    13:3,4,4;21:16
**much (10)**
    6:7;13:5;20:2;36:16,
    18;49:13;59:11;65:14;
    74:11;76:23
**multiple (2)**
    14:5;45:24
**myself (6)**
    15:7,10;16:2;30:5;
    47:19;48:19

## N

**name (31)**
    5:1,8,9,12,13;11:9;
    16:6,8,12;17:17,18;
    18:20,21,24;19:5,9;
    22:8,10,13;31:1;38:6;
    46:23;47:20;53:18,21;
    54:1;59:10,12,14,22;
    62:15
**named (1)**
    18:10
**names (4)**
    16:20;18:2,4;59:13
**nanosecond (1)**
    25:9
**narrative (1)**
    26:1
**nature (1)**
    63:15
**necessary (1)**
    53:4
**need (8)**
    4:2;9:1,3;12:15;
    20:3;33:21;40:14;
    56:11
**needed (2)**
    19:21;20:2
**nerve (1)**
    10:14
**new (9)**
    24:7;34:8;61:16,17;
    62:6,7,8,13;75:25

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 28 of 32

**next (5)**
40:3;41:16;43:17,23;
48:20
**night (28)**
14:22,25;15:2,12,13;
16:1;17:5;19:12,15,15,
24;21:2;23:16,25;
26:18;30:14;31:15;
32:6;35:21;36:25;
38:21;40:2;53:5;55:5;
61:16;63:8;64:3,23
**nobody (2)**
26:19;69:12
**nod (1)**
7:4
**None (2)**
9:14,19
**no-no (1)**
33:6
**nor (1)**
15:12
**normal (1)**
7:9
**normally (2)**
40:20;43:25
**north (1)**
50:2
**noticeable (1)**
35:11
**November (1)**
5:14
**nuclear (2)**
10:9,16
**Number (1)**
43:10
**nurse (8)**
35:4;53:6,15,17,25;
54:11,22;55:1
**nurses (1)**
35:3

**O**

**oath (3)**
5:22;6:3;7:23
**object (4)**
43:12;46:12;55:23;
65:3
**objection (6)**
8:22,22;31:25;46:2,
8;56:1
**objections (3)**
8:14,17,17
**observe (3)**
32:4,9;34:4
**observed (1)**
42:21
**obvious (1)**
35:11
**obviously (1)**
55:13
**occasion (3)**
15:25;50:16;62:15

**occurred (3)**
65:2;66:2,8
**occurrence (1)**
40:8
**October (1)**
5:10
**off (8)**
9:4;25:15,23;33:4;
47:8,11;75:22;77:20
**offended (1)**
77:5
**offender (1)**
48:19
**offenders (4)**
48:21,22;63:19;
64:12
**offhand (1)**
66:10
**office (1)**
46:24
**officer (13)**
18:10,11;19:8;32:9,
11,13,21;33:12;34:8;
35:25;59:14;60:13,18
**officers (20)**
13:18,18;16:3,12,13,
19;17:4,8,9,12,13;18:3,
13,16;20:12;22:6;32:5;
35:19,20;41:25
**officer's (2)**
20:9;59:10
**official (1)**
11:3
**often (1)**
40:11
**old (1)**
43:2
**once (16)**
5:11;8:22;14:15;
20:1,1;23:6;25:1,19;
26:22;27:1;29:2,17,19;
32:18;33:7;41:10
**one (29)**
5:1;7:24;14:14,15;
15:13;16:7,8,25;17:16;
18:2,5;20:15;24:5;
31:1,17;34:15;35:4;
40:25;41:18;42:4;
49:18,21;54:9;60:12;
67:11;69:12;70:1;75:2;
77:6
**ones (1)**
18:7
**only (12)**
7:24;9:7;13:20;
14:12;15:17;18:1;
19:16;23:1;49:23;
51:15;63:22;69:21
**open (5)**
26:15,17;27:2;32:22;
36:5
**opened (3)**
20:4;25:20;33:9

**operations (3)**
10:1,8,8
**opportunity (7)**
7:24;12:6;57:1,10,
13;75:5,13
**options (1)**
75:4
**order (3)**
43:7;45:11;75:2
**orders (2)**
44:23;45:24
**original (1)**
19:17
**others (1)**
31:10
**ourselves (1)**
64:11
**out (47)**
12:10;13:7;19:23;
20:18;21:6,11,17;
24:21,24;25:21;27:2;
29:2,5,21;30:24;31:9;
33:16;34:22;35:14;
36:13,21,22;37:1;
40:20;41:8,15,15,21;
42:6;43:9,16,19;44:18;
45:4,5,7,9;53:12,12;
56:20;59:1;64:7,9;
65:10,12;66:17;76:23
**outlet (2)**
19:21;44:8
**over (16)**
5:18;6:16,21;7:9,18;
8:6;12:25,25;13:23;
26:25;27:12;46:21;
53:17;57:1;58:5;72:5
**own (2)**
43:1,5

**P**

**page (10)**
38:7,12;39:3;58:1,4,
11,17;59:5,16;67:17
**panel (1)**
45:7
**Panic (2)**
33:14;34:6
**panicked (1)**
34:3
**paper (1)**
43:13
**papers (2)**
20:21;40:18
**paraphrase (1)**
33:20
**paraphrasing (1)**
33:21
**Pardon (2)**
61:9;64:20
**part (4)**
16:14;17:9;18:16;
31:4

**participated (1)**
16:5
**participating (1)**
77:18
**particular (7)**
10:18;11:22;26:18;
50:16;52:20;53:5;64:3
**Particularly (1)**
28:24
**parties (2)**
4:6;75:2
**past (2)**
24:6;63:10
**patience (1)**
67:12
**pause (3)**
5:5;8:21;47:11
**pay (3)**
23:6;65:13,18
**paying (1)**
13:7
**pencil (2)**
43:9,10
**people (22)**
19:16;29:21;31:16;
43:3;61:20;64:4,15;
65:9,12,19;66:10,12,
13,15;67:20,20;68:4,
20,21;69:23,24;70:8
**perceived (1)**
76:21
**perceptive (1)**
21:14
**Perfect (1)**
48:15
**perfectly (2)**
7:3;54:8
**perform (2)**
12:12;20:12
**performed (1)**
22:6
**person (13)**
19:18;31:18,22;
43:17,23;53:18,23;
54:2;62:22,25;63:14;
65:1;66:1
**personally (3)**
20:14;29:8;44:7
**phone (1)**
73:9
**phrase (1)**
25:10
**pick (3)**
33:4,23;76:4
**picked (1)**
33:9
**picking (1)**
33:6
**picture (1)**
44:25
**piece (2)**
70:4,13
**pieces (2)**

**68:12;71:2**
**pile (1)**
40:18
**pipe (1)**
64:8
**place (5)**
11:12;15:22;16:15;
20:7;23:20
**plaintiff (3)**
4:10,17;5:2
**Plaintiff's (1)**
37:25
**plan (1)**
70:14
**plausible (1)**
70:19
**please (11)**
4:15;5:7;8:2;9:23;
48:5;53:24;54:23;
56:13;57:21;58:9;
59:17
**plug (2)**
42:25;43:4
**plumber (1)**
44:21
**pm (2)**
24:16;26:10
**pocket (1)**
40:16
**point (4)**
16:1;69:18;75:1,4
**police (2)**
65:16;66:15
**poorly (1)**
22:6
**pop (1)**
43:18
**portion (2)**
57:14,16
**position (2)**
10:11;14:15
**possible (2)**
36:19;37:12
**prepare (1)**
75:17
**prepared (1)**
6:11
**preparedness (1)**
23:12
**preparing (1)**
6:23
**preserved (1)**
76:16
**pretty (4)**
28:5;36:16;49:13;
76:23
**previously (2)**
17:10;34:17
**print (1)**
19:4
**prior (6)**
15:10;16:1,15;24:19;
52:20;73:6

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 29 of 32

**Prison (29)**
10:20;11:20;12:5,8;
13:15,18;22:23,25;
23:12;28:1,14;40:9,11,
23;41:9;42:1,9,22;
43:2;44:4;45:14,25;
49:12;52:6;62:19;
63:20;70:19,25;72:11
**prisoner (10)**
10:19,23;11:14,25;
13:13;15:16;21:13;
29:8;30:1;42:15
**probably (8)**
6:20;14:3;27:19;
28:8,11;35:14;45:18;
66:12
**problem (4)**
13:8;44:4;45:13;
77:5
**problems (6)**
25:18;26:3;42:22;
44:1,6;77:13
**procedurally (1)**
41:11
**procedure (3)**
5:18;23:9;26:13
**procedures (4)**
12:4;36:23,25;41:6
**Proceedings (1)**
77:23
**process (2)**
23:13;61:8
**professional (2)**
12:4,11
**Promise (2)**
18:24;47:22
**pronouncing (2)**
16:9;22:11
**properly (1)**
8:8
**protest (2)**
40:14;51:24
**pull (3)**
37:14;40:6;56:12
**pulled (2)**
67:14,17
**pulling (1)**
56:21
**purposes (4)**
51:18;69:10;72:25;
76:2
**put (20)**
4:4;44:23;45:23;
53:11;54:14,20,25,25;
55:20;56:17;59:19;
60:22;61:3,18;66:16;
71:15;76:5,19,24;77:1
**putting (3)**
24:8;35:13;45:11

**Q**

**quick (3)**

25:9;26:21;27:4
**quite (6)**
30:23;40:24;43:8;
49:8;53:20;63:18
**quote (1)**
20:25

**R**

**race (2)**
53:22;54:1
**radiation (1)**
10:15
**raid (1)**
10:14
**ran (2)**
23:11;33:2
**randomly (1)**
49:4
**Randy (3)**
4:10;46:23;47:20
**range (22)**
14:16,16;32:19,20;
33:9,10;34:25;35:2,5,
6;52:13,19,21;53:2,6,7,
10;62:24;63:10;64:1,3,
14
**ranges (3)**
14:15;32:23;56:17
**rather (2)**
25:25;55:16
**reading (2)**
57:19;58:18
**reads (1)**
68:3
**ready (2)**
24:8;58:12
**really (9)**
16:21;18:7;19:16;
20:3;29:20;45:19;
59:12;65:13;76:12
**reason (15)**
9:15;17:18;26:18;
29:2;41:12,14;65:23;
69:8;70:12,15,16,20;
71:14;72:23;76:3
**reasons (2)**
49:3;71:17
**recall (35)**
14:4;16:12,13;17:4,
13;18:13,24;19:1,6;
20:18;24:8;28:20;
30:12;33:19;35:4;37:5,
7;53:14,19,19,21;54:1;
55:7;63:13,17;64:17;
65:25;66:6,12,19;
67:23;71:20;72:19,19;
73:17
**recalling (2)**
16:15;19:11
**received (1)**
51:6
**recently (1)**

14:24
**receptacle (2)**
35:23;36:12
**recess (1)**
47:15
**recollection (2)**
24:16;55:14
**recon (1)**
10:17
**record (19)**
4:4;5:8;6:8;8:18;9:4;
10:24;11:1;37:11,19;
46:8;47:8,12,18;56:18;
58:16;73:2;75:1,11;
77:21
**recording (4)**
6:9;47:11;76:3,15
**records (2)**
11:11;23:19
**RECROSS (1)**
72:1
**redirect (2)**
67:4,9
**refer (1)**
50:3
**referencing (1)**
60:2
**referred (2)**
34:15;61:22
**referring (11)**
11:6;15:2,5;39:15;
41:22,25;60:7;62:11;
63:11;68:8;73:23
**refresh (2)**
38:19;39:17
**regard (1)**
61:19
**regarding (3)**
72:6,24;73:19
**regards (1)**
61:3
**related (2)**
44:8;67:19
**relation (1)**
69:7
**relay (1)**
14:18
**relaying (1)**
65:25
**released (3)**
39:7,19;41:11
**remainder (3)**
39:6;58:3,17
**remained (1)**
52:25
**remember (20)**
16:3,8,20;17:18;
18:1,4,10,16;19:6;
23:18;30:8;31:1;39:21,
24;54:8,10;56:19;71:4;
73:11;74:2
**remotely (2)**
4:9;38:1

**repeat (6)**
7:18;46:10;53:24;
54:23;66:4;73:4
**rephrase (1)**
8:3
**report (36)**
37:8,10,15;38:5,7,14,
23;39:3,14,23,23;40:1,
1,3;53:3,5;54:21;
55:21;58:23;61:4,19,
20,22;64:5;67:14,18;
68:1,3,25;69:1,9;70:6;
71:4,12,15,19
**reported (1)**
22:18
**reporter (13)**
4:7;5:23;6:11,22;
7:19;56:2,6;74:25;
75:10,16;76:13,20;
77:3
**reports (1)**
24:13
**represent (1)**
11:10
**representation (1)**
23:19
**requested (2)**
21:6,20
**reserve (1)**
75:21
**resolve (1)**
8:9
**resolved (2)**
45:23,24
**respond (2)**
26:21;42:6
**responded (1)**
17:1
**responding (2)**
28:23;73:25
**response (3)**
25:21;27:22;28:2
**rest (3)**
6:21;30:6;58:9
**result (1)**
27:9
**retired (1)**
12:1
**review (5)**
75:5,10,21;76:8,17
**right (43)**
5:17;18:12;21:23;
22:15;24:23,25;25:3;
32:20;37:6;45:5;48:13;
49:8,16;51:7,20,21,22;
52:1;53:1,20;54:18,22;
55:22;56:10;58:21;
59:24;60:3,15,18;
61:24;62:7;63:18;
66:10;68:2,24;69:3;
70:4,14;75:15,21;
76:17,18;77:8
**riled (1)**

65:13
**risk (2)**
43:2,5
**ROBERT (2)**
4:16;5:9
**Rodrigos (1)**
60:7
**Rodriguez (10)**
18:19,20;19:19;36:2,
14;37:3;59:19;60:6,8;
62:12
**role (1)**
13:13
**Romeo (3)**
5:10,11,14
**ROSE (33)**
4:13;31:25;46:2,10,
19,22,23;47:17,21;
56:7,13,19,25;57:7,9,
20,24;58:2;59:15,18;
61:24;62:1;65:24;67:1,
19,24;71:1;72:2;74:6,
16,18,22;76:24
**Rose's (1)**
68:18
**rule (1)**
8:16
**rules (1)**
12:3
**run (7)**
5:20;13:7;14:22;
15:17;20:17;34:16,18
**running (6)**
13:14,22;30:10;
33:16;51:2;53:11

**S**

**safely (1)**
36:18
**safer (1)**
45:9
**safety (4)**
22:25;23:11;49:5;
64:11
**salt (1)**
66:22
**Sam (8)**
5:1;56:8;57:8,20,24;
59:15;61:24;74:22
**same (8)**
17:8,13;19:20;32:25;
60:12;62:11;69:14,17
**saw (5)**
36:15;37:4;59:13;
63:21,24
**saying (11)**
13:17;20:18;29:15;
32:14;36:22;55:9;65:9;
66:13,15,19;68:21
**scene (4)**
27:24;28:3,3;30:14
**screaming (2)**

30:24;31:22
**screams (1)**
    31:9
**screen (6)**
    37:15,24;56:9,22;
    57:5;67:15
**scroll (2)**
    57:8,18
**scrolled (2)**
    58:10,17
**scrolling (2)**
    57:25;59:16
**second (6)**
    24:18;25:10;28:11,
    12;35:5;38:12
**secure (1)**
    64:6
**secured (1)**
    26:13
**security (2)**
    49:3,6
**seeing (2)**
    19:7;21:15
**sense (1)**
    7:1
**seriously (1)**
    13:10
**serum (1)**
    10:15
**served (1)**
    10:22
**serves (1)**
    14:4
**service (1)**
    74:19
**Serwatka (2)**
    24:20;30:5
**set (5)**
    13:23,24;26:15;
    36:12;40:19
**setting (1)**
    12:5
**seven (1)**
    28:4
**several (4)**
    44:23;48:16;51:24;
    52:24
**shall (1)**
    67:5
**share (1)**
    37:24
**shared (1)**
    56:9
**sharing (1)**
    56:22
**shift (4)**
    14:22,23;15:14,18
**Shirley (1)**
    53:17
**shocked (1)**
    32:25
**shoes (1)**
    24:9

**short (1)**
    18:6
**shortly (2)**
    6:16;11:13
**shouting (1)**
    65:20
**shove (2)**
    43:10,17
**show (2)**
    26:25;58:3
**shown (1)**
    54:16
**sic (2)**
    22:10;60:7
**side (9)**
    24:2;29:19;32:16,16,
    18;36:6,7;48:19;49:3
**sides (1)**
    36:5
**sign (3)**
    19:4;21:4;75:22
**signal (4)**
    24:4,5;50:3,4
**signature (6)**
    38:12;74:22;75:14,
    21;77:12,22
**Similarly (1)**
    7:8
**simply (1)**
    50:8
**simultaneously (1)**
    24:10
**sit (1)**
    73:17
**sitting (2)**
    45:5;71:20
**situation (4)**
    14:2;45:10;61:12;
    64:9
**situational (1)**
    13:3
**six (3)**
    14:3;41:1;51:14
**skill (2)**
    12:14,18
**skills (1)**
    11:22
**slow (2)**
    7:16,17
**small (1)**
    40:15
**smell (1)**
    35:12
**smelling (1)**
    50:13
**smoke (8)**
    19:22;34:24;35:8,10;
    36:13;50:13;52:14;
    58:8
**smoothly (1)**
    5:20
**socket (4)**
    43:11,16,19,23

**Somebody (2)**
    73:7,8
**somebody's (1)**
    25:14
**someone (2)**
    6:21;45:12
**someone's (1)**
    31:8
**sometime (2)**
    11:13;17:10
**sometimes (2)**
    43:15;45:17
**somewhere (2)**
    11:1;69:16
**sorry (5)**
    53:24,25;66:6;68:16;
    73:5
**sort (2)**
    25:25;45:10
**sound (3)**
    14:13;22:15;23:21
**sounds (1)**
    6:25
**spark (1)**
    43:13
**speak (2)**
    15:9;48:5
**speaking (1)**
    61:6
**specialist (2)**
    10:2,7
**specific (7)**
    11:21;16:22;23:18;
    55:18;57:15,16;70:12
**specifically (8)**
    15:22;16:20;34:3;
    49:23;51:11;62:3;
    66:21;68:3
**speculate (1)**
    53:21
**speculated (1)**
    66:11
**speculating (2)**
    36:24;70:18
**speculation (1)**
    32:1
**speculations (1)**
    66:18
**spell (1)**
    5:7
**spelling (2)**
    5:9,13
**spoke (3)**
    33:25;64:15,25
**spoken (2)**
    64:18;72:24
**spot (3)**
    76:20,25;77:2
**spread (1)**
    40:20
**squad (12)**
    10:20,23;11:15;
    15:16;23:10;28:21;

29:8;30:7;41:7;42:5,
    16;62:10
**squadron (1)**
    39:6
**staff (2)**
    22:23;64:11
**stamped (1)**
    37:20
**stand (2)**
    71:14;72:22
**standard (1)**
    27:22
**start (5)**
    7:12;13:16;33:10;
    36:13;74:24
**started (8)**
    4:2;9:13;25:17,22;
    29:3;33:16;66:9,23
**state (9)**
    5:7;10:20;13:14;
    40:9;49:12;52:6;62:19;
    63:20;72:11
**stated (4)**
    8:23;10:6;22:7;64:5
**statement (22)**
    20:16;52:23;54:15,
    15,17;55:2,4,10;56:8;
    57:17;58:22;59:8;60:2,
    21;61:22;68:9;69:22;
    72:5,20,21,23;73:2
**statements (4)**
    34:15;72:6,9,17
**States (2)**
    10:1,2
**station (14)**
    20:9;24:11;25:1,15,
    17,20;26:10,12;27:3,8;
    28:6,18;32:21;62:8
**still (5)**
    6:8;29:4,12;45:5;
    67:16
**stipulated (2)**
    4:9,11
**stocky (1)**
    18:6
**stood (2)**
    31:9;69:15
**stopped (1)**
    25:11
**stopping (1)**
    48:9
**street (9)**
    12:10;24:25;25:3;
    28:10;39:12,13;49:15,
    22;52:8
**stretch (1)**
    28:17
**stretched (1)**
    35:14
**strike (2)**
    22:21;30:19
**structure (3)**
    32:15,22;52:9

**stuck (1)**
    43:15
**stuff (3)**
    64:13;65:20;76:9
**stunned (1)**
    25:11
**subject (1)**
    15:21
**submit (1)**
    62:23
**subscription (1)**
    50:23
**substance (1)**
    75:7
**substantial (1)**
    48:22
**super (1)**
    48:20
**supposed (2)**
    41:8,11
**Sure (38)**
    5:21;8:3;11:1,22;
    13:2;14:10,17;16:23;
    19:2;24:19;30:15;31:7;
    32:14;45:19,22;46:4;
    48:6;50:3,5;54:24;
    55:8;61:21;63:11,11,
    22;64:10;66:10,19;
    68:17;69:6,16;73:11;
    74:2,23;75:10,24;76:1,
    9
**sustain (1)**
    43:14
**swear (1)**
    4:15
**swearing (1)**
    4:8
**switch (1)**
    6:20
**switching (1)**
    6:16
**sworn (2)**
    4:18;5:23
**system (1)**
    44:9

**T**

**talk (11)**
    7:9;47:25;50:20;
    51:22;60:5;62:15;
    63:18,25;64:16,21,25
**talked (10)**
    15:20;49:19;54:13,
    20;64:14;72:4,10;73:5,
    12,22
**talking (9)**
    7:18;44:16;49:9;
    54:15;59:21;64:4,17;
    72:10,13
**talks (1)**
    6:21
**tango (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 31 of 32

5:12
**tanks (1)**
    35:1
**teach (1)**
    10:17
**team (1)**
    15:8
**technical (2)**
    5:5;48:18
**technological (1)**
    8:7
**technology (2)**
    76:1,10
**television (4)**
    24:10;38:25;66:14,
    20
**telling (5)**
    51:17;66:6;67:20;
    70:9;72:16
**ten (8)**
    47:9,10;65:11;68:7;
    69:21,23,25;70:1
**tend (1)**
    21:13
**terms (10)**
    15:4;17:19,20;22:24;
    23:11;27:23;28:23;
    34:4;45:22;68:24
**testified (16)**
    4:18;20:11;29:22;
    32:1;33:15;38:18;57:2;
    64:22;70:4;71:2,7,8,
    11;73:20;74:4;75:12
**testify (1)**
    60:16
**testifying (2)**
    9:16;38:24
**testimony (13)**
    6:3;7:1,23;8:12;
    29:6;33:11;47:24;
    52:25;68:11,17;71:18;
    74:12;75:8
**thereafter (2)**
    17:21;33:10
**thick (1)**
    58:8
**thinking (2)**
    31:3;32:2
**third (2)**
    24:20;28:11
**though (5)**
    12:9;33:5;36:21;
    55:21;68:25
**thought (3)**
    44:16;61:8;66:12
**three (7)**
    6:17;14:10;17:24;
    24:21;40:5;41:3;44:25
**threw (3)**
    33:1,15;61:13
**throw (2)**
    34:18,20
**times (8)**

13:2;14:11;41:2,4,
16;42:24;48:16;65:18
**today (22)**
    4:24;5:19;6:2;9:13;
    47:3;52:25;55:13;57:3;
    71:3,7,12,18,21;73:2,6,
    17,20,21;74:4,12;
    75:12;76:22
**together (1)**
    56:23
**told (1)**
    12:25
**took (11)**
    11:12;16:15;20:14,
    21;21:2,4;23:20;25:15;
    27:15;47:20;66:21
**tools (3)**
    26:12;64:6,8
**top (4)**
    51:1;58:11;59:4,16
**totally (1)**
    77:6
**towards (5)**
    25:1;32:21;33:2,16;
    57:25
**train (1)**
    34:12
**training (1)**
    25:16
**transcribing (2)**
    4:8;75:18
**transcript (10)**
    6:10,23;7:6,15;75:2,
    6,16,17,18;76:14
**transition (1)**
    40:23
**traumatizing (2)**
    55:18,21
**trouble (4)**
    54:5;61:7,10,18
**truck (1)**
    25:21
**true (1)**
    55:4
**truthful (1)**
    6:3
**truthfully (2)**
    9:17;71:8
**try (5)**
    5:19;12:4;23:4;53:7;
    65:13
**trying (9)**
    21:17,17;25:17;
    28:13;43:25;64:6;
    65:22;66:4,13
**turn (4)**
    24:23,25;46:21;
    51:16
**turned (2)**
    24:10;32:20
**turning (5)**
    38:11,25;39:2;50:20;
    51:9

**TV (2)**
    50:22;66:20
**two (14)**
    9:25;17:11,24,24;
    18:18;19:16;40:25;
    41:3;44:24;49:23;67:5,
    11;73:16;75:4
**two-page (1)**
    37:20
**Ty (5)**
    24:22,23;25:8;26:24;
    30:5
**type (1)**
    58:25

## U

**uncomfortable (1)**
    45:3
**under (3)**
    5:22;6:3;7:23
**Understood (14)**
    7:7,14,20;8:5,13,19,
    25;9:6,10;13:9;40:6;
    68:18;71:16;77:12
**unique (4)**
    12:6;43:20;61:12;
    64:9
**unit (2)**
    10:17;27:24
**United (2)**
    10:1,2
**units (5)**
    28:22;30:2;49:17,18,
    23
**Unlike (1)**
    8:15
**unlock (1)**
    32:23
**unnatural (1)**
    7:8
**up (40)**
    12:1,2;15:11;19:21;
    26:9;30:10;32:22;33:4,
    6,9,23;35:1,6,7,23;
    36:12;37:14;40:19;
    41:16;43:1;48:5;50:25;
    53:2,10;56:12,21;
    57:18;59:16;63:9;
    65:13;66:15;67:14,17;
    69:16,19;70:13,14;
    75:3;76:4,12
**upcoming (1)**
    73:9
**upon (1)**
    47:23
**ups (1)**
    23:4
**upstairs (1)**
    53:8
**use (4)**
    6:24;11:24;43:24,25
**using (1)**

43:14

## V

**vague (2)**
    18:9;19:25
**versus (2)**
    14:22;51:23
**video (6)**
    4:9;6:9,12,16,18;
    76:15
**violent (1)**
    48:21
**visual (1)**
    28:13
**visually (2)**
    35:12,13
**voice (1)**
    31:8
**volume (2)**
    48:6,10
**VX (1)**
    10:14

## W

**waive (4)**
    75:14,20;76:18;77:9
**waived (1)**
    77:22
**waiving (2)**
    75:15;77:12
**wants (1)**
    46:20
**warfare (1)**
    10:9
**water (5)**
    40:20;44:14,19,20,
    22
**way (8)**
    7:11;16:24;23:1;
    27:12;34:12;45:9;
    51:16;77:6
**ways (2)**
    11:22;76:16
**week (2)**
    40:25;41:2
**weeks (2)**
    40:25;73:16
**weren't (1)**
    71:12
**what's (11)**
    16:8;22:20;24:1,24;
    32:19;39:22,23;40:13;
    48:24;65:19;77:10
**whatsoever (1)**
    61:4
**whenever (1)**
    41:8
**White (3)**
    54:4,10;63:4
**whole (2)**
    45:6,7

**who's (3)**
    6:15;13:5;65:22
**whose (2)**
    18:3;31:18
**wick (1)**
    43:14
**widespread (1)**
    44:4
**wiring (2)**
    43:20;45:6
**wishful (2)**
    31:3;32:2
**within (3)**
    23:12;34:24;49:2
**Without (6)**
    10:24;12:16;31:12,
    12;34:25;63:15
**witness (30)**
    4:8,15,17,20;32:1;
    37:22;46:4,14;47:5,14;
    55:24;56:4,24;57:6,18,
    23;58:6,14,20;65:5;
    67:7;74:9,14,17,20;
    75:23,25;77:8,15,19
**witnessed (2)**
    68:5;69:14
**words (2)**
    6:25;33:19
**work (5)**
    8:9;11:25;44:23;
    45:11,24
**worries (1)**
    72:24
**wrenches (2)**
    64:7,8
**wrinkle (1)**
    8:6
**write (4)**
    24:13;37:8;72:23;
    75:3
**written (6)**
    40:2;72:6,9,17;75:1;
    76:14
**wrong (4)**
    14:5;16:10;22:12;
    30:17
**wrote (7)**
    37:10;40:1,3;53:3;
    59:13;69:8;72:9

## Y

**yards (1)**
    25:2
**year (2)**
    11:4,4
**years (1)**
    40:5
**yelling (7)**
    29:15,17;30:25;
    65:10,11;69:23,24
**young (1)**
    34:8

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

ROBERT ENGRAM
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-19    filed 05/25/21    page 32 of 32

**younger (1)**
19:7

**Z**

**Zoom (5)**
4:5,7;6:10;8:6;38:8

**1**

**1 (15)**
29:4;32:19,20;33:10,
10;37:17,25;56:14,17;
58:4;59:5;61:25;62:2;
67:18;72:4
**10 (1)**
69:11
**10:00 (1)**
47:10
**100 (6)**
35:9,11,16;53:1,6,7
**10-70 (2)**
14:9;41:10
**10-71 (7)**
14:9;50:4,4,5,8,10,18
**11 (2)**
10:3;54:17
**1133739 (1)**
37:21
**11th (1)**
59:3
**133738 (1)**
37:21
**15 (1)**
69:10
**16 (1)**
11:16
**17 (2)**
11:16;15:9

**2**

**2 (20)**
24:11;25:17;26:14;
43:10;48:24,25;49:1,
11,13,25;50:2,21,21,
22;51:9,12;58:11,17;
59:16;67:17
**2016 (2)**
15:8,11
**2017 (17)**
11:12;15:22,23;
16:16;17:2;23:21;
38:16;40:4,7;50:17;
52:3,18;54:18;60:24;
62:24;66:8;72:13
**2020 (1)**
40:5
**21:27 (3)**
38:15;51:6,8

**3**

**3 (1)**
34:25
**30 (1)**
25:2
**300 (2)**
53:10;63:10

**4**

**4 (7)**
26:11;34:25;36:20;
47:25;48:16,17;49:15

**5**

**5 (1)**
34:25
**50 (2)**
28:17,19
**500 (6)**
52:13,19,21;62:24;
63:25;64:3
**50-foot (1)**
28:17

**7**

**7 (3)**
11:12;17:2;38:16
**70 (2)**
50:13,13
**71 (3)**
41:10;50:13,14
**7th (8)**
15:23;23:20;50:17;
52:3,18;60:24;66:8;
72:13

**9**

**9:00 (1)**
47:9
**9:30 (1)**
24:16
**9:46 (1)**
77:24