**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# <u>EXHIBIT 22</u>

**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*DONALD MAHONE*
*September 30, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-30-20 DONALD MAHONE.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 3 of 25

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE, )
                         )
          Plaintiff,     )
                         )
vs.                      )  Cause No.
                         )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
          Defendants.    )
_____)

The Videoconference Deposition of DONALD MAHONE

          Date:    Wednesday, September 30, 2020

          Time:    10:02 o'clock a.m.

          Place:   Via Zoom

          Called as a witness, by the Plaintiff, in accordance with the Federal Rules of Civil Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

Page 2

APPEARANCES:

SAM HEPPELL, ESQ.
          Loevy & Joevy
          311 North Aberdeen Street
          Chicago, Illinois   60607
          PHONE:   (312) 243-5900
          FAX:     (312) 243-5902
          sam@loevy.com

On Behalf of the Plaintiff;


GUSTAVO JIMENEZ, ESQ.
          Office of the Attorney General
          Deputy Attorney General
          Civil Litigation
          302 West Washington Street
          IGCS Fifth Floor
          Indianapolis, Indiana  46204
          PHONE:   (317) 232-6201
          FAX:     (317) 232-7979
          gustavo.jimenez@atg.in.gov

On Behalf of the Defendants.

Page 3

THE VIDEOCONFERENCE DEPOSITION OF DONALD MAHONE

DIRECT EXAMINATION
   By Mr. Heppell......................... Page  5

CROSS EXAMINATION
   By Mr. Jimenez......................... Page 39

REDIRECT EXAMINATION
   By Mr. Heppell......................... Page 55

          E  X  H  I  B  I  T  S

PLAINTIFF'S          MARKED     IDENTIFIED

          (No exhibits were marekd.)

                    *   *   *

Page 4

MR. HEPPELL: Mr. Mahone, just a couple of housekeeping things we're going to do here before we get started with you, so please bear with us.

MR. MAHONE: No problem.

MR. HEPPELL: I put this on the record with Randy earlier, but just so it's clear for the start of this deposition, and I guess if it's going to be you also for the subsequent deposition, we can do it for both. But the stipulation that everyone has agreed to conduct the deposition by Zoom, with the witness in a separate location and the court reporter swearing the witness and then transcribing the testimony via the videoconferencing and via Zoom. So stipulated on behalf of plaintiff. And on behalf of defendants is that also stipulated?

MR. JIMENEZ: Yes.

MR. HEPPELL: Okay. Would you please go ahead and swear in the witness.

DONALD MAHONE, JR., called as a witness, by the Plaintiff, having first been duly sworn, was examined and testified as follows:

DENISE DWYER, et al. v.          Cause No. 3:18-cv-00995-JD-MGG          DONALD MAHONE
RON NEAL, et al.                                                                                        September 30, 2020
USDC IN/ND case 3:18-cv-00995-JD   document 212-25   filed 05/25/21   page 4 of 25

Page 5

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. HEPPELL:

Q   Mr. Mahone, thank you for being with us this morning and for participating in the deposition. Just to introduce myself, my name is Sam Heppell. I'm one of the attorneys for the plaintiff in this case, who is Denise Dwyer, and she is representing the estate of Joshua Devine, the plaintiff in the lawsuit. I think you can only see on your screen the person who's actively talking, but also on the line here is the court reporter and one of the attorneys from the Attorney General's office representing the defendants in the case. Okay?

A   Yes, sir.

Q   I'm going to go over some background rules or procedures for a deposition just so we're all clear and on the same page before we get started. Okay? You were just given an oath by the court reporter. That's the same oath as if you were in a courtroom testifying in front of a judge and jury. And so it's important for you and all we're asking you to

Page 6

do is give truthful and accurate testimony to the best of your memory and to the best of your ability. Is that okay?

A   Yes.

Q   Okay. Although we're not in a courtroom, there is a court reporter who's preparing a transcript which is going to be a written record of my questions and your answers. Does that make sense?

A   Yes.

Q   And that's in addition to doing a video recording over the videoconferencing. And because the court reporter is making a written record, it's important that both for my questions and for your answers that we're using words, rather than gestures or sounds like uh-huh or huh-uh. Does that make sense?

A   Yes.

Q   Because those are easy for us to understand talking to each other, but hard to make a clear written transcript. Okay?

A   Okay.

Q   And similarly, it's an unnatural way of having a conversation because humans talking to each other naturally talk over each other a bit,

Page 7

but for the deposition today it's important that you let me get all the way to the end of my question before you start in with your answer. Okay?

A   Yes.

Q   And same for me, I've got to let you finish your answer before I jump in with my next question. Okay?

A   Yes.

Q   And that's, again, just so the court reporter is able to make a clear record of your testimony. Okay?

A   Yes.

Q   We've got the added challenge that, unfortunately, I'm not able to be in that conference room with you. We're doing this over the video, and if there are any technical issues, if you can't hear me very well or there's an issue with the audio, anything like that, please do let us know. Okay?

A   Okay.

Q   We'll take whatever time we need to figure it out, but it's important that you're able to hear my questions clearly and you're able to give your testimony clearly. Okay?

Page 8

A   Okay.

Q   Similarly, if you don't understand a question that I've asked, it's probably my fault, not your fault. I might have phrased something poorly or just, you know, asked a bad question. That happens, and if it does, please let me know and I will happily rephrase the question. I want to make sure we're on the same page before you answer. Okay?

A   Okay.

Q   There might be some objections that get made to some of the questions. There's no judge here to rule on the objections, so those objections are just being made for the record. Okay?

A   Okay.

Q   So what that means is, you want to pause, don't jump in with your answer until the objection is finished, but once the objection is finished, you can go ahead and state your answer. Okay?

A   Okay.

Q   It should a relatively short deposition. I'm not going to go for hours and hours and hours, but if you need to take a break at anytime,

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-25   filed 05/25/21   page 5 of 25

Page 9

that's no problem, just let me know and we can go off the record and you can take a break, five minutes, or whatever you need. Okay?

A   Yes.

Q   And the attorneys may ask for a short break at some point as well. With all of that said and out of the way, do you have any questions for me about the plan or how we're going to go ahead with the deposition today?

A   No, I don't.

Q   Okay. Is there any reason you can think of that you would not be able to give truthful and accurate testimony to the best of your ability?

A   No.

Q   Okay, great. Mr. Mahone, I don't believe I asked you to do this already. Could you please state and spell your full name for the record?

A   My name is Donald Eugene Mahone, Jr., D-O-N-A-L-D, E-U-G-E-N-E, M-A-H-O-N-E, Junior, J-R, period.

Q   Thank you, Mr. Mahone. And Mr. Mahone, are you currently a member of the prisoner firefighter squad?

Page 10

A   Yes, I am.

Q   And what position do you hold on the prisoner firefighter squad?

A   Well, I recently stepped down as assistant chief. So I'm just a regular firefighter right now.

Q   Okay. Regular firefighter, but previously you were assistant chief; is that correct?

A   Yes.

Q   Okay. How long in total, approximately, have you served on the prisoner firefighter squad?

A   Since 1994.

Q   Okay. Is that continuously since 1994?

A   Off and on.

Q   Okay. What's the -- what's the most recent time that you rejoined the prisoner firefighter squad?

A   Since 2010. I've been on it ten years straight.

Q   Okay. And up until recently you were assistant chief; is that correct?

A   Yes.

Q   When did you become assistant chief?

A   I can't exactly remember the year. Off the top of my head I can't remember.

Page 11

Q   Okay. The topic that we're going to touch on the most during your deposition today relates to a fire that took place in B-cell house that resulted in the death of a prisoner named Joshua Devine. Are you familiar with the fire that I'm referring to?

A   Yes, I am.

Q   Okay. And I don't know if you remember the exact date of the fire. Do you?

A   The exact date, no, I don't.

Q   Okay. Well, I'm going to -- sorry, go ahead.

A   No, I have to look at my -- I wrote down the date of the incident, what happened, and all that, but I don't have no copy of it. So I really don't know the date.

Q   And that's fine. I just want to represent to you that the documents in the case show that the fire was on April 7, 2017. Does that sound approximately correct to you?

A   If you say that's what it was, yeah. I don't know for sure.

Q   And were you assistant chief of the prisoner firefighter squad at the time of that fire?

A   I think I was. If I wasn't, I was a captain. I was either the assistant chief or the

Page 12

captain at the time.

Q   So you held some leadership position on the firefighter squad at that time.

A   Yes, I did.

Q   And on the night of the fire do you remember what time it was when you first learned that there was a fire?

A   It was around about 9:30, 9:35, 9:36, somewhere around like that.

Q   And how are you able to know that that was the time that you first learned about the fire?

A   The officer came to my cell and I was laying down watching TV, and he said that there was a fire in the cell house, and he was trying to unlock my door, but he couldn't get my door unlocked. So he left to go get something else to try to help get my door opened, and I got up and put on my clothes. I had a clock sitting up on my TV and I glanced at the clock, and that's how.

Q   And what cell house were you -- well, strike that.
   Where were you housed at the time?

A   In C-cell house in Cell 215.

Q   And approximately how long did it take you to

Page 13

get to B-cell house after you were released from C-cell house?

A   I really don't know. When they opened my door, I ran straight to the fire department, got on my bunker gear, and ran straight to the B-cell house. I really don't know how long it took, to be honest. I can't remember. I might have wrote it down, but I can't remember off the top of my head, but it wasn't long.

Q   Fair to say that you were moving as quickly as possible to get over there?

A   Yes, sir.

Q   Okay. When you arrived at B-cell house, can you describe what you observed when you got there?

A   When I got to C-cell house (sic), I walked in the door and the chief was standing right there by the doorway. When I came in the door, he said -- he said, the fire's up on the top range. He said, go up there and check and see what's going on. So I said, okay, and I went up the stairs, went straight up there. When I got up to the top of the stairs, I think about 400 range, 500 range, there was so much smoke and screaming and yelling, you

Page 14

know, I didn't know what was going on.
So when I walked on the range, I got to a cell down -- I think it was on 400 or 500 range, I can't remember, guys were screaming and yelling help me, help me, help me, I can't breathe, I can't breathe. I seen a lot of smoke on the range, and that's when I ran back downstairs to tell the chief what was going on.

Q   When you -- and I think you might have said at the beginning of that answer you just gave when you arrived at C-cell house. You were referring to your arrival at B-cell house where the fire was; is that correct?

A   Right, B-cell house, yeah, B-cell house.

Q   When you first got into B-cell house, can you describe what you were able to hear?

A   There was a lot of yelling, like get me out, get me out, get me out, help, help, get me out, I can't breathe, I can't breathe. There was a lot of stuff going -- it was chaotic. There was a lot of stuff going on, but I was trying to listen to what the chief was saying, so, you know.

Q   And understanding that it was chaotic, but you

Page 15

were able to make out the words of what the prisoners were yelling in the cell house; is that correct?

A   Yeah, yes. Yeah, yeah.

Q   And you were -- where were you when you first entered the cell house?

A   On the flag coming out of the front door, coming out of the front door, yeah, right there.

Q   And that's on the 100 level; is that correct?

A   Yes.

Q   Okay. And was there smoke either visible or that you could perceive by smell or taste when you entered the cell house even right on the 100 level?

A   No. I really can't remember. I really can't. I thought I had my mask on when I came in because we try to put our mask on before we come in the building at times, you know. So I can't remember, but I know when I came downstairs, I took my mask off to say something to the chief about what was going on. That's when I started smelling the smoke and started coughing. That's why I stepped outside, yeah.

Page 16

Q   Were you able to observe the officers who were on duty in the cell house that night at any point in time?

A   Yeah, I seen one officer when I was talking to the chief. When I looked back, he was standing in the officer cage. It was a heavy-set guy, looked like he was Hispanic, or something. I don't mean to say it that kind of way, but it looked like he was Hispanic and he was just standing there. That's what I seen.

Q   And was this one of the officers who was on duty that night in B-cell house or was this someone -- a sergeant or a lieutenant who had arrived after the fact?

A   Later on I found out that he was the officer in the cell house, but it didn't register to me then that he was the officer. Where he came from I really wasn't paying attention to that because I was focusing in on what the chief was asking me to do. So I really wasn't focusing in on that.

Q   But you later learned that that individual was one of the officers in the cell house that night; is that correct?

USDC IN/ND case 3:18-cv-00995-JD   document 212-25   filed 05/25/21   page 7 of 25

Page 17

A   Yes.  Yes.

Q   And does the name Justin Rodriguez sound familiar to you?

A   No, I really don't know their names like that.

Q   Okay.  But the officer that you saw that you were just describing was a male officer who you believe may have been Hispanic; is that correct?

A   Yes.  Yes, yes.

Q   And can you describe his demeanor at the time you saw him?

A   He was just standing in the office staring at us.  That's all.

Q   Okay.  Was he doing anything at the time that you were able to observe?

A   No, he wasn't doing nothing that I seen him doing.  I don't know what he ended up doing.  He was just standing there.  If he was doing something, I don't know, but I didn't see him physically doing anything.

Q   And was that when you first arrived at the cell house you observed that?

A   Yes.  Yes.

Q   Did you see any of the other officers who were on duty in the cell house that night at any

Page 18

point?

A   Yes, I later found out that two females I seen standing outside by the back door that they was working.  I found that out later on, because what made me notice them when I came out the back door -- because I had been in there and I had got real hot, so I came out the back door because it was open and I came out to get some air to take my mask off, and stuff, you know, to cool down, and I noticed that they was standing up under the tower by the back door and they was standing there crying.  It was a black lady.  She was real small, and it was a woman that looked like she was from Arab, or something, you know.  She was standing there and they hugging each other crying.

Q   Okay.  And do you know the names Promise Blakely or Sarah Abbassi?

A   I don't know neither one of their names.

Q   Okay.  But you later learned that those were also the officers who were on duty in the cell house that night?

A   Yeah.  Yes, I learned later, later on that night, yep, that they was the officers over

Page 19

there.

Q   Okay.  Do you remember anything else about their demeanor beyond what you just testified to?

A   No, I don't.

Q   Okay.  At the time of the fire around April 2017, what was your impression of the relationship between the prisoner firefighter squad and correctional officers at the prison?

A   You mean what kind of relation we had with the staff?

Q   Correct.

A   I guess we -- you know, I mean, some like us, some don't.  That goes with the territory, you know.

Q   Were there issues that you experienced as a member of the prisoner firefighter squad in terms of not being able to do your job because of actions that correctional staff were or were not taking?

A   Oh, man.  I -- I don't want to answer that question.  I don't want to answer that.

Q   What's your hesitation in answering that question, Mr. Mahone?

A   Because I got to be in this prison and I don't

Page 20

want to get moved or get in no trouble, or nothing, you know.  I just want to, you know, if we can, just stick to what happened that night, you know.

Q   And I --

A   I understand you got a job.  I understand you got a job you got to do.  I understand it, but I ain't trying to get in no -- I don't want to do nothing.

Q   Sure, and I appreciate that and I'm not trying to cause problems for you here and I'm sure no one else on this video recording here today is going to be trying to cause any problems for you.  And we understand here that, you know, you've been -- you're not here trying to spread rumors or gossip about anyone.  You're just here to answer questions truthfully to the best of your memory and ability.  Is that fair to say?

A   Yes, sir.

Q   And I'm not asking you to try to get any particular person in trouble or even necessarily give me any names of people or specific correctional officers.  Okay?  I don't need you to give me specific names, or

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 8 of 25

Page 21

anything like that. But I do -- like you said, I'm just doing my job, and so I do have to ask you some questions about how the system was working at the time and if there were issues.

So maybe let me ask it this way: Was there a member of the correctional staff that firefighters could report issues to? If there were problems that they observed with fire safety or fire preparedness at the prison, was there a contact person on staff that you had as assistant chief of the firefighter squad?

A  Yes, our boss.

Q  Okay. And who was that individual?

A  Steve Griffin.

Q  Okay. And so he was the point of contact between members of the firefighter squad and the correctional staff; is that correct?

A  Yes.

Q  Okay. And as assistant chief, did you have communications with Mr. Griffin, including in the months and years prior to this fire, where you had the opportunity to report to Mr. Griffin what was going on with fire safety at the prison?

Page 22

A  Yes.

Q  Okay. And how frequently would you have conversations with Mr. Griffin?

A  Pretty much when he came -- he came back here pretty much on a daily basis. If we encountered any problems at a fire scene, or anything, we would always refer to him and tell him what went wrong or what happened, and we tried to, you know, not have no confrontation with staff and we just did our job. We didn't cause issues. We still try to do our job the best way we can without getting in no trouble.

Q  Understood. And so if I understood the testimony you just gave, you and the other members of the firefighter squad would always do your best whatever the situation you were put in. Is that fair to say?

A  Right. Yes, sir.

Q  And if there were concerns that you had, those were things that you would bring up with Mr. Griffin; is that correct?

A  Yes, sir.

Q  And that was a pretty open line of communication that you had with Mr. Griffin.

Page 23

Is that fair to say?

A  Yes, sir.

Q  Okay. And were there other members of the prisoner firefighter squad besides yourself who were -- had that same kind of open communication with Mr. Griffin?

A  Yes, sir.

Q  Okay. Could any member of the prisoner firefighter squad bring issues to Mr. Griffin's attention?

A  Yes, sir.

Q  And what would Mr. Griffin say when you would bring issues to his attention?

A  Well, it depends on what the issue was, you know. It's various answers for a solution. But the main thing was that if we had any encounters with staff members concerning how to do our job or getting out of our cells or being called, he would tell us he would handle it. You know, he'd always tell us don't get in an argument with no staff member. You know, if they tell you to do something, do it, you know, and I'll deal with it later on. He'll deal with it later on.

Q  Okay. You made reference in your answer just

Page 24

then to, I think, some of the specific issues that you brought to Mr. Griffin's attention. And again, without getting into the names of specific officers, what were some of the kinds of problems that you would bring to Mr. Griffin's attention?

A  Well, when they have fires -- oftentimes at nighttime he's not here, so when they have fires, all of us want to be let out to fight the fire. There might be of a few of us let out, and then sometimes we get to the fire and we can't -- you know, we assess the situation. We might want to fight the fire a certain kind of way and then we can't because, you know, staff say no or, you know, it's similar stuff like that, you know, just stuff like that. You know, we don't -- sometimes we can't fight the fire the way we want to because maybe security reasons, or whatever, that come up.

Q  Okay. And just so I understand the testimony you're giving, was there an issue you're describing where there would be a fire, but correctional staff would not let all the prisoner firefighters out of their cell to respond to a fire?

USDC IN/ND case 3:18-cv-00995-JD   document 212-25   filed 05/25/21   page 9 of 25

Page 25

A   Yes.  All of us don't stay in the same areas. You have firefighters in different units that stay in C, A, the dorm, I-cell house.  So in each one of them cell houses the staff got to let you out, and whoever work in that cell house might not let the guy out.  So when we get to the fire station, what we do is that we assess how many people are there so when we go fight the fire, we know how many people going to be there to help fight the fire.  Now, we don't know what the fire looks like before we get there.

So we always thinking ahead and trying to think ahead of time the manpower that we're going to have to fight a fire.  So when we run to the fire station, the first thing we deal with is who here, you know.  And if I'm there, I will always ask about how many tank guys I got, because everybody is not in the tank. Everybody have a role they play on the fire department.  And then when I go to the scene, I let the chief know, you know, what I know and then we fight the fire, you know. Sometimes we have to have the staff call the cell houses to try to get the other

Page 26

firefighters out.

Q   Does that delay the response to the fire if all the firefighters aren't let out in a timely fashion?

A   Yes.  That's how we -- that's how it's done at the fire station, yes.  If we don't all get out on a timely manner, we always assess, you know, our manpower and how we going to fight the fire.  If it's a big fire or a small fire, whatever, it's all taken into account, but we also be trying to get the other firefighters out of they cells.  We'll say something to whoever officer to call C-cell house or call whatever cell house that we know where somebody ain't been let out at.

Q   And that was an issue that you and other firefighters brought to Mr. Griffin's attention; is that correct?

A   Yes, yes, we always brought that to his attention.  That happens on a regular basis.

Q   Okay.

A   But it don't happen no more because all of us stay in one unit now.

Q   Previously, and at the time of the April 2017 fire and prior to that, that had been an

Page 27

issue.  Is that fair to say?

A   Yeah, that was an issue, yeah.

Q   And did the -- did you as assistant chief, as one of the firefighters, play a role in fire drills at the prison?

A   Yes, sir.

Q   And were there sometimes issues with fire drills?

A   Like -- I don't know what you mean by issues.

Q   Sure.  Let me put it this way:  How seriously did staff at the prison take the fire drills?

MR. JIMENEZ: I'll object to that.

A   Some of them took it serious.

MR. JIMENEZ: I'm going to object to the question.  It calls for speculation.

BY MR. HEPPELL:

Q   You can go ahead.

A   I can answer?

Q   You can answer.

A   I don't know about all of the staff, but some of took it serious.  Some them didn't know their answers to some of the questions we asked them.  You know, some of them, you know, thought it was a joke, you know.  It varied, you know.

Page 28

Q   And when you say some of them thought it was a joke, are you basing this on your observations of their behavior while you were doing the fire drill?

A   Yeah, before the fire.  Before this fire -- before the fires, I mean, you know, they didn't take us -- they didn't believe we were real firefighters.  You know, some them made comments about that, you know, don't bother me.  I know what I am, you know.

Q   If I understand your testimony correctly, in addition to those issues, there were also issues with some correctional officers not knowing the answers during the fire drills?

A   Yes.

MR. HEPPELL: Go ahead with your objection.

MR. JIMENEZ: Objection, calls for speculation.

BY MR. HEPPELL:

Q   You can go ahead with your answer, Mr. Mahone.

A   When we do fire drills, we ask them a list of questions that they should know.  You know, that's what they finna supposed to know, and we ask them about if they smell smoke, what do

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

USDC NND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 10 of 25

Page 29

they call; if they see an actual fire, what do they call; what do they take with them in case of a fire, and things of that nature right there. You know, we ask them to describe the extinguishers, you know, what the red one is for, what the silver one is for, you know, stuff like that. Some of them didn't know the answers. You know, then we would question them about it and we would give them the answers. We would tell them.

And then after we interview them, or whatever, they finna sign a paper with their name, and stuff, saying that they know what's going on and we gave them this test, or whatever. It's really just a quiz. In case they didn't know, now you should know, you know. And we did this quarterly, you know, to make sure that, you know, in case something ever happened, they should at least know the basics of what to do, you know. But some of it they didn't know. It really wasn't no big issue for us because we going to explain to them what to do if they didn't know, so.

Q So if I understood the testimony you just gave, if there were situations where you were

Page 30

running a fire drill and the officers didn't know the answers to the questions, the firefighters would give them the answers to those questions then; is that correct?

A Yes, sir. We wouldn't leave them without knowing what to do. We always told them what to do if they didn't know.

Q If there were issues -- the issues you just described that would come out during fire drills with sometimes not taking it seriously or sometimes not knowing the answers, were those issues that you would bring up with Mr. Griffin also?

A Yeah, we would let him know. If we go to a unit and a group of officers didn't know something, we would let him know, hey, they didn't really know nothing, but we told them. Yeah, we always told him that, yeah. We gave him assessment on what was going on so he can encourage whoever the training officer was to make sure they know. We thought that was important. You know what I mean? We felt it was important.

Q During the fire drills were there actual evacuations conducted or was it just the quiz

Page 31

questions?

A During the daytime we actually do fire drills, empty the cell houses, but at nighttime we just do the questions.

Q Okay. At any point in time at Indiana State Prison since you've been part of the prisoner firefighter squad have there been actual evacuations conducted on the night shift fire drills?

A Yes, we just did one about two weeks ago.

Q Okay. And that was during the night shift?

A Yes.

Q Okay. So that's something that's changed recently?

A That was my first one I ever did.

Q Okay. So just a couple weeks ago was the first time that there was ever an actual evacuation conducted on a night shift fire drill.

A That I can remember. I don't remember doing none.

Q Okay. Your memory of the night shift fire drills going back to around the time of the B-cell house fire, and in the years before that, was with the night shift it was always

Page 32

just quiz questions; is that correct?

A Yes. Yes, sir.

Q And is that something that Mr. Griffin knew about, that it was just the questions and not the actual evacuation for the night shift?

A Yes.

Q Do you know who made that decision or was that just how it was done, to your knowledge?

A I don't know who made the decision. I just thought that's how it was done.

Q During the fire drills do you recall if there was any discussion with officers about bringing keys with them for unlocking cells?

A That's one of the things that if -- one of the questions that we ask them about is what do they take with them. The keys and all -- the keys is part of that, taking the log with them and the keys and -- yeah, yes, that's discussed with them, yeah.

Q So that was something that was emphasized to officers during the fire drills as part of the questions?

A Yes, yes, make sure they take that, yep.

Q On the night of the fire in B-cell house on April 7, 2017, was there a prisoner

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 11 of 25

Page 33

firefighter who was actually housed in B-cell house?

A   There was two of them over there. One was an ex-firefighter. He was a firefighter, and there was one that stayed on the flag around there. Yeah, yeah, both of them was in there. There was two of them in there. One of them was actually on the fire department that was living in there.

Q   But at the time one of them was active on the fire department, the other had previously been on the fire department, but wasn't active at the time; is that correct?

A   Yes, sir.

Q   Okay. And when you say on the flag, is that referring to the 100 level?

A   Yes.

Q   Okay. When you arrived at B-cell house on April 7, 2017, had the firefighter housed in B-cell house been released from his cell?

A   No. I know later on -- they didn't get him out until later on, if they got him out at all. But, no, he wasn't out when I got there.

Q   Okay. Mr. Mahone, during your time at Indiana State Prison have you experienced there being

Page 34

electrical issues at the prison that posed a fire hazard or fire risk?

A   Can you be more -- yeah, yeah, yeah. Yes, yes.

Q   And what kind of electrical issues have you experienced or observed at the prison?

A   Receptacle where you plug your TV or radio, or whatever, in, I seen them spark flash out of them. I got -- I got, you know, a reason why, but I don't want to -- you know, I'm not no electrician, so I don't -- you know, but I've just experienced it and went on calls where we had to fight a fire where the flame jumped out of where you plug the TV or radio at or hot pot in at.

Q   So you've -- would you describe that as a frequent issue that came up at the prison?

A   It has started -- it has started being more. We had started going to more runs than we normally did, but I don't know why, you know. But they would call us and we had to go to a cell and seen that the flames is jumping out of the receptacle, and stuff, and when we get there we seen it all burned up, and stuff like that. And I happened to be in a guy's cell

Page 35

one day when it happened. When I was standing in C-cell house on 200 range, I was talking to a guy in his cell and all of a sudden I seen flames pop out of there like an explosion. And I'm like, man, what the -- you know, I said, man, what the hell, you know, and I ran down and grabbed a fire extinguisher and came back and it was out.

And I made Griffin aware of it when I went to work the next day, or it was over the weekend, or sometime, but I made him aware of that, that I seen it with my own eyes and that something up with that. I don't know what caused it, but I seen it and I let him know about it. Then when we had a couple other fires where we had to go and the staff said that flames jumped up out of there, and so we went there and looked at a couple of them, and stuff, like I said, yeah.

Q   Just to make sure that I understand your testimony, there was one occasion where you had actually personally seen that happen --

A   Yeah, yeah.

Q   -- sort of in process; is that correct?

A   Yes, sir.

Page 36

Q   And then a number of occasions where you responded to fire calls or later learned that that's what had happened that had caused the fire?

A   Yes.

Q   And were those all brought to Mr. Griffin's attention?

A   I brought it to his attention when it happened with me. Every time we have a fire he knows. We always give him assessment of what the fires was. We always did that.

Q   Okay. During your period of time on the fire department have there been multiple serious or significant fires that you've either personally responded to or been made aware of at Indiana State Prison?

A   Yeah, yeah. Yes.

Q   Have there been other fires that led to fatalities in addition to the fire that killed Mr. Devine?

A   There was a fire happened in D-cell house. A guy got burned up in his cell, and I was on the fire department, but they didn't call us. The chief went over there and they didn't call the rest of us. The chief was over there with

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
DONALD MAHONE
September 30, 2020

USDC NND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 12 of 25

Page 37

a staff member trying to get in the guy's cell to get him out, but it was too late. He still died, you know. I guess when they did finally get him out, he went to the hospital and he died there, I guess.

You know, but, yeah, I remember that one, you know, because I was on the fire department. I was kind of upset about that one because I felt they should have called us, you know, at least the chief should have made them call us, but they didn't call us. So, you know, I was kind of upset about that one because I knew the guy real well.

Q Do you recall approximately when that fire was?

A It was -- oh, man, it was like, like it was before -- it was around like anywhere from 2000 or 2006, around that time up in that area.

Q Okay.

A Matter of fact, it was after -- it was like 2004, 2006, somewhere up in there, because I was staying in the dorm at the time. He moved out of the dorm and moved to the cell house and that's when it happened.

Page 38

Q Have you ever -- are there any other fires that caused death or serious injury that you can recall at this time?

A I mean, since that incident there?

Q Correct.

A Yeah, we went on one about a year ago when a guy set -- lit himself on fire, and the staff was there to help save him, but he got burned up pretty bad. There was a guy try to kill himself in a fire last year, a Mexican guy. He ended up dying later on from something else. They was doing a lot of fires around here with guys trying to harm themself, and we get there and we going to try to save them, yeah. There's a few fires, yeah. They do a lot of protest fires around here. So we try to stay on our tiptoes by getting to them quickly, and stuff like that, you know. Yeah, fires real active now and then.

MR. HEPPELL: All right. Those are the questions that I have for you at this time, Mr. Mahone, but Mr. Jimenez may have some questions that he wants to ask you as well.

Page 39

CROSS EXAMINATION
BY MR. JIMENEZ:

Q Good morning, Mr. Mahone. My name is Gustavo Jimenez. Can you hear me okay?

A Yes, sir.

Q I'm a deputy attorney general with the Indiana Attorney General's office, and I represent the individual defendants in this case, including Warden Ron, Kenneth Gann, William Lessner, Christopher Beal, Steven Griffin, Jason Nowatske, Jeremy Dykstra, Anthony Watson, Timothy Redden, Christopher Putser, Ryan Statham, Justin Rodriguez, and Sarah Abbassi.

So there are just a few questions I want to go over with you, as well as just a clarification question regarding some of the testimony that you just gave.

A Yes.

Q So you mentioned that on the night of the fire you saw two female officers who were standing together crying. Do you recall that testimony?

A Yes, sir.

Q And you stated that you didn't know who they were; correct?

Page 40

A I didn't know their name, yeah.

Q And then you also -- when Mr. Heppell asked you if you knew who Sarah Abbassi was, you said no; correct?

A I never heard that name before, yeah. I don't know who that is, no.

Q And you don't know who Promise Blakely is either?

A Thomas Blakely?

Q Promise Blakely.

A No.

Q So just to clarify, so the two officers who you saw standing together crying, you don't know who their names were.

A No, I didn't, I didn't know their names.

Q Okay. Mr. Mahone, are you familiar with the Indiana State Prison policies regarding any type of response to any emergency?

A For who, us or the staff?

Q For the staff.

A Do I know their -- no, no.

Q Are you aware of the training that the correctional staff goes through when they start working at the Indiana State Prison?

A I can tell you what I was told, but I don't

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC NND case 3:18-cv-00995-JD document 212-25 filed 05/25/21 page 13 of 25
DONALD MAHONE
September 30, 2020

Page 41

know exactly -- I was never inside the training, but I was told some of the stuff that they do.

Q But you don't know exactly the training that they go through prior -- when they initially start working at the Indiana State Prison.

A I don't -- not the staff, no.

Q Mr. Mahone, you testified that there are a lot of prisoners who try to harm themselves; correct?

A Yes.

Q Is it common for prisoners to start fires in cells?

A Recently we've been going on a lot of them fire runs where they start fires in their cell house outside their cells, mainly outside their cells.

Q And do you go on fire runs for every single one of those fires?

A If they call.

Q Are the types of fire -- do the types of fires that get started by offenders vary in size?

A Yes. Yeah, yeah.

Q Can you describe just some of the types of fires that offenders start?

Page 42

A They might throw a lot of clothes out front of their cell, light a match on it, start it up, and it get going real good. They might throw a mattress out -- you got older-type mattresses and sometime they might throw that out there, some of the stuff from inside there, light it on fire, trash, paper, books, all kind of things like that.

Q Fair to say that the extent of the fire varies depending on what they're lighting on fire?

A Yes, sir. Yeah.

Q And as a member of the firefighter crew are you always told the type of fire when you're called?

A I'm not always the first one there. The chief usually be the first one there. So when I get there, he tells me what to do. And so I usually -- you know, wherever you tell me to go, go upstairs and look or -- I know from him. I don't really know. All we get is they got a signal that's called, a 10-70 or a 10-71. 10-70 means that somebody smells smoke. 10-71 is that an officer actually see a fire. So when they call a 10-71, first thing coming out my mind is an actual fire

Page 43

going on. What kind and how big, we don't know until we actually get there.

Q So just to clarify, so you don't know the extent of a fire until you physically get there and see it.

A Right, right. The chief usually be there when we get there. Always when we get to a fire, our chief -- when they call a 10-70, 10-71, he goes straight to the fire. We go straight to the fire department, get our gear, bunker, and stuff like that, and then we go to the fire. But the chief always go straight to the fire so he can get an assessment on what's going on so when we get there, he can tell us.

Q Mr. Mahone, do you know if correctional officers receive any type of training regarding fire drills?

A We talk to them a lot, and we was told that they get the basics in training up front, but I don't know that. You know, this was told to us through -- Steve Griffin told us that. They get the basics about the fire extinguishers and how to use them, and stuff like that.

Q Do you know the specifics, though, of the

Page 44

training that they receive?

A No, I don't. No, I don't.

Q Now you also testified that there were -- that there was a nighttime evacuation drill that you completed or that you did a few weeks ago; is that correct?

A Yes, sir.

Q And you said that was the first one that you did?

A That's the only one I can remember doing. I can't -- you know, that's the only one I remember doing. As far as assembling everybody out of the building, besides that fire that happened that night when they emptied everybody out, that was the other time, but I don't remember no other time.

Q But for the one that you did a few weeks ago, who else did -- or who else was involved in that fire drill nighttime evacuation?

A The one we did just a couple weeks ago?

Q Yes.

A Our supervisor, Ms. Brown, and they had a few other staff members. I don't know all their names, but they was taking pictures and videos of it. It was several staff members involved

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 14 of 25

Page 45

in it.

Q   Were other firefighter crew members involved?

A   Yeah, everybody on the department was there.

Q   Okay.  So it did involve both staff members and prisoner firefighter crew members.

A   Yes, sir.  Yes.

Q   Do you have any knowledge as to whether any of the correctional officers or department -- or any Indiana State Prison staff ever conducted a fire drill evacuation that didn't involve prisoners?

A   Not that I know of.  I mean, no, no.

Q   All right.  So the only one that you were involved with a couple weeks ago involved both prisoners and staff members.

A   Yes.  Now, we've done staff before, though, in the daytime.

Q   But you don't know or you don't have any knowledge -- or let me rephrase.
    Do you have any knowledge as to whether staff members did any fire drill evacuation on their own without any of the prisoner firefighter crew members?

A   Oh, no, I don't know nothing about that, no.  No, sir.

Page 46

Q   Now I want to talk to you about the electrical issues and that line of questioning that Mr. Heppell asked.  Do you recall that testimony?

A   Yes.

Q   So you said that on one occasion you personally saw a spark flash; is that correct?

A   Yes, out of the receptacle, yes.

Q   And do you recall exactly the circumstances regarding that particular fire?

A   When it flashed out of there, there were flames coming out of it.  I was talking to the guy.  He jumped out of the way.  I jumped out of the way and looked.  It was still smoking.  I ran downstairs and grabbed the fire extinguisher from the officer's cage and ran back upstairs with the fire extinguisher and I sprayed it in there.  There wasn't no more flames coming out of it, but it was burned.  So I figured that it might still be heated up in there, so I sprayed it one time with the ADC.

Q   And that fire was ultimately put out?

A   Yes, yes.

Q   And then for the other number of occasions

Page 47

that you didn't physically see, but that you responded to as you testified --

A   Yes.

Q   -- did you ever learn the cause of those exact fires?

A   I could tell you what we was told how they was, but I don't know if that's what you want.  What caused, I can tell you that.  I don't -- I'm not no electrician, you know.  I'm just a firefighter.  That's all.  I just fight fires.

Q   Were those fires ultimately put out?

A   Yes, sir.

Q   Did those fires injure any offender?

A   No, not that I know of.  Some of they clothes got burnt, stuff like that, but --

Q   But no physical injuries to any --

A   No, not that I know of.

Q   Mr. Mahone, prior to today's deposition did you have any communication with any of plaintiff's attorneys?

A   Prior to today?

Q   Yes.

A   Yeah, I talked to -- they came to see me, some attorney.  I talked to one a week ago, and two ladies -- a lady came to see me about a month

Page 48

or two ago, something like that, three months ago, something like that, talked to me about this.

Q   Do you remember their names?

A   No, I don't really remember their name.

Q   Have you -- does the name Sarah Grady ring a bell?

A   I don't remember.

Q   Does the name Megan Pierce ring a bell?

A   I'm good at faces.  I'm bad at names.  I'm being honest.

Q   No problem.  Have you talked to -- have you previously had any communications with the attorney here at the deposition, Sam Heppell?

A   Sam Heppell.  Oh, the guy right here?  I don't remember hearing that voice.  I talked to a lady on the phone the other day.  No, I ain't never seen him or talked to him, I don't think.

Q   In any of the previous conversations that you've had with plaintiff's attorneys have they asked you any questions that weren't asked of you here today?

A   Let me see.  Trying to think all of what we talked about.  Pretty much they asked me the

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC NND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 15 of 25
DONALD MAHONE
September 30, 2020

Page 49

same kind of questions, same kind of questions.

Q   On the night of the fire on April 7th of 2017, did you interact with Mr. Devine in any way?

A   Yes, yes, I was one of the ones help carry him from down off the range from his cell. Then we brought him all the way -- brought him halfway down and then I had to go back downstairs. I was one of the guys that when I first seen his body -- I didn't know he was in there, first of all. They never told us that somebody was in the cell. I didn't know nothing about that until later on when I went back up there. But then when I seen his body, I seen a lot of foam coming out his nose and mouth, and I ran downstairs and let them know that I don't know if he's still alive, but I don't think he is.

Because the nurses was down there and officers were down there, and when I told them that, the nurses and officers was coming up the stairs with me. So when we got halfway up there, there was so much smoke the officer couldn't hardly breathe, so he go back downstairs. So I told the nurse I'd help her

Page 50

carry the stuff upstairs, and when we got all the way upstairs to the top of the range where we finna go on the range with the stretchers and stuff, she couldn't hardly breathe. And I seen she was struggling and she couldn't hardly see, and I told her go back downstairs and I'd take the stretcher down there to him and we'll bring him down this way, and she said okay. That's what I did.

And when we went down there, we struggled getting him out because we realized that he was dead because his body was like -- he was laying on his back, his arms was up in the air, his legs was up a little bit like he was struck like that, you know, and he was naked. He didn't have no clothes on. Like all his clothes, I think they burned off of him. It was -- it bothered a few of the firefighters the sight of what they seen, you know.

So we were struggling trying to get him off the range. And we got him to the front of the bars and we had to stop because he was real heavy. And I went back downstairs and a few other firefighters were bringing him

Page 51

downstairs, and then they started taking him back the other way once they got to the range. So me and Officer Watson, I think, went up there to help them and we brought him down the rest of the way.

Q   And prior to you helping, you know, given the circumstances you just described, did you have -- did you hear anything from Mr. Devine himself?

A   No. Like I say, when I seen him, I didn't hear nothing. But when I looked at his face and I seen all the bubbles coming out his nose and mouth, I thought he was still alive. That's when I ran downstairs to let them know. I didn't -- you know, I didn't know if he was still alive or not, but I figured if you got bubbles coming out of your nose or mouth, something going on, you know. That was me. I'm not no doctor, but that's what I thought.

Q   And Mr. Mahone, when you arrived at the scene of the fire on April 7th of 2017, did you -- were there already other Indiana State Prison staff members there responding to the fire?

A   I did not see nothing but one officer standing in that cage when I got there, and I went

Page 52

straight upstairs. And then when I came back down, I seen some staff members was in there then that came in then. That's when I confronted the chief and told him we got to get these guys out of here because I said there's so much smoke up there. They can't breathe. We got to get them out. I was yelling at him, and he turned and was talking to whoever that was right there, whether it was a sergeant or lieutenant, he was standing right there with them talking to them.

And I went back outside because I started coughing because I had took my mask off and I was coughing because the smoke was kind of getting to me, and I went out and then other firefighters was coming in the door. I guess the chief told them where to go at, go upstairs, and stuff, but I stood outside and put my mask back on and try to catch my breath.

Q   So fair to say that at the time you as well as other members of the firefighter crew and Indiana State Prison staff were responding to the emergency going on at the time, the fire?

A   Yeah, I mean, they came in there. After I

DENISE DWYER, et al. v.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    DONALD MAHONE
                                                                                    September 30, 2020

Page 53

came downstairs, yeah, I seen them all in there, yeah. I seen a lot of them in there, yeah. B-cell house is next to the guard house, so it shouldn't -- I mean, all they have to do is open the door and they right there.

Q   And Mr. Mahone, did you speak with any other prisoners who were located in B-cell house during the fire?

A   There was some guys on the range -- when I walked down the range, there was some guys in their cell. When I walked by, they had their curtain up and they was screaming and yelling I can't breathe, I can't breathe, and I was walking. The farther I was walking down the range, the more I couldn't see in front of me, and I seen it was a bad situation. There was a lot of yelling and screaming going on, and I realized that oftentimes the smoke will kill you before the fire will, you know. So that's when I ran back downstairs to let the chief know what was going on. We got to get these guys out of here because there's so much smoke. Now, I didn't know where the smoke was coming from, but I knew it was a lot of smoke

Page 54

up there.

Q   Besides hearing them, as you stated, yelling, did you personally talk to them after the fire was ultimately put out?

A   Yes. When we went out, when we was standing outside, they wanted to know what was going on inside, you know, because it had became chaotic, because I guess when they was bringing all the guys out of the cell house, it became a riot with the staff and offenders. An officer said something to one of the offenders when we were standing outside, and as I was going in the door, as I stepped in the door, an officer ran in the door and slammed it, slammed the door and said they hit me, they hit me, and they was trying to bust the door down and get back in. And I stood there and I was like, wow.

Now, my concern was other firefighters standing out there, you know, are they going to be all right. And then I guess the staff started mobilizing right then to figure out what was going on, and later on I fund out, you know, what had happened, and stuff, from other firefighters telling me what happened

Page 55

outside, but that was -- that's what happened.

Q   And then, Mr. Mahone, you also testified earlier that you saw a male officer who you stated looked Hispanic who was standing there; correct?

A   He was standing in the officer's cage.

Q   He was standing in the officer's cage. But you don't know the exact identity of this officer?

A   I didn't know his name, but I found out later on he was the OIC over there.

MR. JIMENEZ: Thank you, Mr. Mahone. I have no further questions for you.

REDIRECT EXAMINATION

BY MR. HEPPELL:

Q   Just very briefly following up on the question that you were just asked. You said OIC, can you clarify what that refers to?

A   The officer in charge.

MR. HEPPELL: Okay. Thank you. I don't have anything further. Thank you very much for your time today, Mr. Mahone, and for providing your testimony. Gustavo, do you have any follow-up based on that?

Page 56

MR. JIMENEZ: No.

MR. HEPPELL: Okay. There's one additional thing I need to explain for you before we wrap up today. As I mentioned at the start of the deposition, the court reporter has been making a record of your testimony. At some point one of the attorneys may order that the transcript be formally prepared, written up, and you have two options.

You can reserve signature, which means that if someone eventually orders the transcript, it gets sent to you. You have the opportunity to review it and sign off on it and note any changes on the transcript. You can't change the substance of your testimony. You can't add to your answers or change your answers, but if there was an issue with something that got taken down incorrectly, those kind of errors in preparing the transcript, you have the opportunity to review the transcript to see if you want to note any of those kinds of changes.

You also have the opportunity to waive signature, which means you say I'm

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 17 of 25

Page 57

waiving my right to review it. The court reporter will prepare the transcript based on, you know, based on her best abilities from following the deposition today and her many years of training and experience, and then that transcript is going to be what it's going to be and you would waive your right to review it and notate changes on the transcript. So that's entirely your choice which option you want to do. Do you want to waive or do you --

THE WITNESS: I waive my whatever. I waive it, my signature.

MR. HEPPELL: Okay. Waive signature. Thank you.

THE WITNESS: Yes, sir.

MR. HEPPELL: All right. Well, again, thank you for your time and cooperation today, Mr. Mahone. We appreciate it.

THE WITNESS: Okay. No problem.

MR. HEPPELL: We can go off the record here.

(Signature waived.)

(Proceedings concluded at 11:10 a.m.)

Page 58

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE, )
                         )
        Plaintiff,       )
                         )
vs.                      )  Cause No.
                         )  3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,       )
                         )
        Defendants.      )
_____)

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of fifty-seven (57) typewritten pages, is a true and correct transcript of my said stenographic notes.

Signed this 27th day of October, 2020.

_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires:  6/13/22

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 18 of 25

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

## A

**Abbassi (3)**
18:19;39:13;40:3
**abilities (1)**
57:3
**ability (3)**
6:3;9:14;20:18
**able (11)**
7:11,15,23,24;9:12;
12:10;14:17;15:1;16:1;
17:15;19:18
**account (1)**
26:10
**accurate (2)**
6:1;9:13
**actions (1)**
19:19
**active (3)**
33:10,12;38:19
**actively (1)**
5:12
**actual (6)**
29:1;30:24;31:7,17;
32:5;42:25
**actually (6)**
31:2;33:1,8;35:22;
42:23;43:2
**ADC (1)**
46:22
**add (1)**
56:17
**added (1)**
7:14
**addition (3)**
6:11;28:12;36:19
**additional (1)**
56:3
**again (3)**
7:10;24:3;57:17
**ago (10)**
31:10,16;38:6;44:5,
17,20;45:14;47:24;
48:1,2
**agreed (1)**
4:11
**ahead (9)**
4:21;8:20;9:9;11:11;
25:13,14;27:17;28:16,
21
**ain't (3)**
20:8;26:15;48:17
**air (2)**
18:9;50:14
**alive (3)**
49:17;51:13,16
**Although (1)**
6:5
**always (16)**
22:7,16;23:20;25:13,
18;26:7,19;30:6,18;
31:25;36:10,11;42:13,

15;43:7,12
**Anthony (1)**
39:11
**appreciate (2)**
20:10;57:18
**approximately (4)**
10:10;11:19;12:25;
37:14
**April (7)**
11:18;19:6;26:24;
32:25;33:19;49:3;
51:21
**Arab (1)**
18:15
**area (1)**
37:19
**areas (1)**
25:1
**argument (1)**
23:21
**arms (1)**
50:13
**around (9)**
12:8,9;19:6;31:23;
33:5;37:17,18;38:12,
16
**arrival (1)**
14:13
**arrived (6)**
13:13;14:12;16:15;
17:21;33:18;51:20
**assembling (1)**
44:12
**assess (3)**
24:12;25:8;26:7
**assessment (3)**
30:19;36:10;43:13
**assistant (9)**
10:4,8,21,23;11:22,
25;21:12,20;27:3
**attention (9)**
16:19;23:10,13;24:2,
6;26:18,20;36:7,8
**Attorney (5)**
5:14;39:6,7;47:24;
48:14
**attorneys (6)**
5:7,14;9:5;47:20;
48:21;56:7
**audio (1)**
7:19
**aware (4)**
35:9,11;36:15;40:22

## B

**back (22)**
14:7;16:5;18:3,6,8,
12;22:4;31:23;35:8;
46:17;49:8,14,24;50:6,
13,24;51:2;52:1,12,19;
53:21;54:17
**background (1)**

5:18
**bad (4)**
8:5;38:9;48:10;
53:17
**bars (1)**
50:23
**based (3)**
55:25;57:2,3
**basics (3)**
29:20;43:19,22
**basing (1)**
28:2
**basis (2)**
22:5;26:20
**B-cell (16)**
11:3;13:1,6,13;
14:13,15,15,16;16:13;
31:24;32:24;33:1,18,
20;53:3,8
**Beal (1)**
39:10
**bear (1)**
4:4
**became (2)**
54:7,10
**become (1)**
10:23
**beginning (1)**
14:11
**behalf (2)**
4:17,17
**behavior (1)**
28:3
**bell (2)**
48:7,9
**besides (3)**
23:4;44:13;54:2
**best (7)**
6:2,2;9:13;20:18;
22:12,17;57:3
**beyond (1)**
19:3
**big (3)**
26:9;29:21;43:1
**bit (2)**
6:25;50:14
**black (1)**
18:13
**Blakely (4)**
18:19;40:7,9,10
**body (3)**
49:10,14;50:12
**books (1)**
42:7
**boss (1)**
21:13
**both (5)**
4:10;6:14;33:6;45:4,
14
**bother (1)**
28:9
**bothered (1)**
50:18

**break (3)**
8:25;9:2,5
**breath (1)**
52:20
**breathe (9)**
14:6,6,20,20;49:24;
50:4;52:7;53:14,14
**briefly (1)**
55:17
**bring (6)**
22:21;23:9,13;24:5;
30:12;50:8
**bringing (3)**
32:13;50:25;54:9
**brought (8)**
24:2;26:17,19;36:6,
8;49:7,7;51:4
**Brown (1)**
44:22
**bubbles (2)**
51:12,17
**building (2)**
15:19;44:13
**bunker (2)**
13:5;43:10
**burned (5)**
34:24;36:22;38:8;
46:19;50:17
**burnt (1)**
47:15
**bust (1)**
54:16

## C

**cage (5)**
16:6;46:16;51:25;
55:6,7
**call (13)**
25:24;26:13,13;29:1,
2;34:21;36:23,24;
37:11,11;41:20;42:24;
43:8
**called (5)**
4:23;23:19;37:9;
42:14,21
**calls (4)**
27:15;28:18;34:12;
36:2
**came (18)**
12:12;13:18;15:17,
20;16:19;18:5,7,8;
22:4,4;34:17;35:7;
47:23,25;52:1,3,25;
53:1
**can (29)**
4:10;5:11;8:20;9:1,2,
11;13:13;14:16;17:10;
20:3;22:12;27:17,18,
19;28:21;30:19;31:20;
34:3;38:3;39:4;40:25;
41:24;43:13,14;44:10;
47:8;55:18;56:11;

57:20
**captain (2)**
11:24;12:1
**carry (2)**
49:5;50:1
**case (7)**
5:8,15;11:17;29:2,
15,18;39:8
**catch (1)**
52:19
**cause (4)**
20:11,13;22:11;47:4
**caused (4)**
35:14;36:3;38:2;
47:8
**C-cell (6)**
12:24;13:2,16;14:12;
26:13;35:2
**cell (33)**
12:12,14,21,24;14:3;
15:2,6,14;16:2,17,24;
17:22,25;18:22;24:24;
25:4,5,25;26:14;31:3;
33:20;34:22,25;35:3;
36:22;37:1,24;41:15;
42:2;49:6,12;53:12;
54:9
**cells (6)**
23:18;26:12;32:13;
41:13,16,17
**certain (1)**
24:13
**challenge (1)**
7:14
**change (2)**
56:16,17
**changed (1)**
31:13
**changes (3)**
56:15,23;57:8
**chaotic (3)**
14:21,25;54:8
**charge (1)**
55:20
**check (1)**
13:20
**chief (26)**
10:5,8,21,23;11:22,
25;13:17;14:8,23;
15:22;16:5,21;21:12,
20;25:22;27:3;36:24,
25;37:10;42:15;43:6,8,
12;52:4,17;53:21
**choice (1)**
57:9
**Christopher (2)**
39:10,12
**circumstances (2)**
46:9;51:7
**clarification (1)**
39:16
**clarify (3)**
40:12;43:3;55:19

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 19 of 25

**clear (4)**
4:8;5:20;6:21;7:11
**clearly (2)**
7:24,25
**clock (2)**
12:18,20
**clothes (5)**
12:18;42:1;47:14;
50:16,17
**coming (11)**
15:7,8;42:25;46:12,
19;49:15,21;51:12,17;
52:16;53:25
**comments (1)**
28:9
**common (1)**
41:12
**communication (3)**
22:25;23:6;47:19
**communications (2)**
21:21;48:13
**completed (1)**
44:5
**concern (1)**
54:19
**concerning (1)**
23:17
**concerns (1)**
22:20
**concluded (1)**
57:23
**conduct (1)**
4:12
**conducted (4)**
30:25;31:8,18;45:9
**conference (1)**
7:16
**confrontation (1)**
22:10
**confronted (1)**
52:4
**contact (2)**
21:11,16
**continuously (1)**
10:13
**conversation (1)**
6:24
**conversations (2)**
22:3;48:20
**cool (1)**
18:10
**cooperation (1)**
57:17
**copy (1)**
11:14
**correctional (10)**
19:9,19;20:24;21:7,
18;24:23;28:13;40:23;
43:15;45:8
**correctly (1)**
28:11
**coughing (3)**
15:24;52:13,14

**couple (6)**
4:2;31:16;35:15,18;
44:20;45:14
**court (8)**
4:13;5:13,22;6:6,13;
7:10;56:5;57:1
**courtroom (2)**
5:23;6:5
**crew (5)**
42:12;45:2,5,23;
52:22
**CROSS (1)**
39:1
**crying (4)**
18:13,17;39:21;
40:13
**currently (1)**
9:24
**curtain (1)**
53:13

**D**

**daily (1)**
22:5
**date (4)**
11:9,10,13,15
**day (3)**
35:1,10;48:17
**daytime (2)**
31:2;45:17
**D-cell (1)**
36:21
**dead (1)**
50:12
**deal (3)**
23:23,24;25:16
**death (2)**
11:4;38:2
**decision (2)**
32:7,9
**defendants (3)**
4:18;5:15;39:8
**delay (1)**
26:2
**demeanor (2)**
17:10;19:3
**Denise (1)**
5:8
**department (11)**
13:4;25:21;33:8,11,
12;36:13,23;37:8;
43:10;45:3,8
**depending (1)**
42:10
**depends (1)**
23:14
**deposition (13)**
4:8,10,12;5:6,19;7:1;
8:23;9:9;11:2;47:18;
48:14;56:5;57:4
**deputy (1)**
39:6

**describe (6)**
13:14;14:17;17:10;
29:4;34:16;41:24
**described (2)**
30:9;51:7
**describing (2)**
17:6;24:22
**Devine (5)**
5:10;11:5;36:20;
49:4;51:8
**died (2)**
37:3,5
**different (1)**
25:2
**DIRECT (1)**
5:2
**discussed (1)**
32:19
**discussion (1)**
32:12
**doctor (1)**
51:19
**documents (1)**
11:17
**DONALD (2)**
4:22;9:20
**D-O-N-A-L-D (1)**
9:21
**done (4)**
26:5;32:8,10;45:16
**door (19)**
12:15,15,17;13:4,17,
19;15:7,8;18:3,6,8,12;
52:16;53:5;54:13,14,
14,15,17
**doorway (1)**
13:18
**dorm (3)**
25:3;37:23,24
**down (20)**
10:4;11:12;12:13;
13:8;14:3;18:10;35:7;
49:6,8,19,20;50:7,8,10;
51:4;52:2;53:11,15;
54:17;56:19
**downstairs (12)**
14:8;15:21;46:15;
49:9,16,25;50:6,24;
51:1,14;53:1,21
**drill (7)**
28:4;30:1;31:19;
44:4,19;45:10,21
**drills (13)**
27:5,8,11;28:14,22;
30:10,24;31:2,9,23;
32:11,21;43:17
**duly (1)**
4:24
**during (11)**
11:2;28:14;30:9,24;
31:2,11;32:11,21;
33:24;36:12;53:9
**duty (4)**

16:2,13;17:25;18:22
**Dwyer (1)**
5:9
**dying (1)**
38:11
**Dykstra (1)**
39:11

**E**

**earlier (2)**
4:7;55:3
**easy (1)**
6:19
**either (4)**
11:25;15:12;36:14;
40:8
**electrical (3)**
34:1,5;46:1
**electrician (2)**
34:11;47:9
**else (6)**
12:16;19:2;20:12;
38:12;44:18,18
**emergency (2)**
40:18;52:24
**emphasized (1)**
32:20
**emptied (1)**
44:15
**empty (1)**
31:3
**encountered (1)**
22:6
**encounters (1)**
23:17
**encourage (1)**
30:20
**end (1)**
7:2
**ended (2)**
17:17;38:11
**entered (2)**
15:6,14
**entirely (1)**
57:9
**errors (1)**
56:20
**estate (1)**
5:9
**Eugene (1)**
9:20
**E-U-G-E-N-E (1)**
9:21
**evacuation (6)**
31:18;32:5;44:4,19;
45:10,21
**evacuations (2)**
30:25;31:8
**even (2)**
15:14;20:22
**eventually (1)**
56:12

**everybody (5)**
25:19,20;44:13,15;
45:3
**everyone (1)**
4:11
**exact (4)**
11:9,10;47:4;55:8
**exactly (4)**
10:24;41:1,4;46:9
**EXAMINATION (3)**
5:2;39:1;55:15
**examined (1)**
4:24
**ex-firefighter (1)**
33:4
**experience (1)**
57:5
**experienced (4)**
19:16;33:25;34:6,12
**explain (2)**
29:22;56:3
**explosion (1)**
35:4
**extent (2)**
42:9;43:4
**extinguisher (3)**
35:7;46:16,17
**extinguishers (2)**
29:5;43:23
**eyes (1)**
35:12

**F**

**face (1)**
51:11
**faces (1)**
48:10
**fact (2)**
16:15;37:21
**Fair (7)**
13:10;20:19;22:18;
23:1;27:1;42:9;52:21
**familiar (3)**
11:5;17:3;40:16
**far (1)**
44:12
**farther (1)**
53:15
**fashion (1)**
26:4
**fatalities (1)**
36:19
**fault (2)**
8:3,4
**felt (2)**
30:22;37:9
**female (1)**
39:20
**females (1)**
18:2
**few (8)**
24:10;38:15;39:14;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 20 of 25

44:5,17,22;50:18,25
**fight (10)**
24:9,13,17;25:9,10,
15,23;26:8;34:13;
47:10
**figure (2)**
7:22;54:22
**figured (2)**
46:20;51:16
**finally (1)**
37:3
**fine (1)**
11:16
**finish (1)**
7:6
**finished (2)**
8:19,20
**finna (3)**
28:24;29:12;50:3
**fire (109)**
11:3,5,9,18,23;12:5,
7,11,14;13:4;14:14;
19:6;21:9,10,22,24;
22:6;24:10,11,13,18,
22,25;25:7,9,10,11,15,
16,20,23;26:2,6,9,9,9,
25;27:4,7,11;28:4,5,5,
14,22;29:1,3;30:1,9,24;
31:2,8,18,22,24;32:11,
21,24;33:8,11,12;34:2,
2,13;35:7;36:2,4,9,12,
19,21,23;37:7,14;38:7,
10;39:19;41:15,18,21;
42:7,9,10,13,24,25;
43:4,7,9,10,11,12,17,
22;44:14,19;45:10,21;
46:10,15,17,23;49:3;
51:21,23;52:24;53:9,
20;54:3
**firefighter (25)**
9:25;10:3,5,7,11,17;
11:23;12:3;19:8,17;
21:12,17;22:16;23:4,9;
31:7;33:1,4,19;42:12;
45:2,5,23;47:10;52:22
**firefighters (15)**
21:8;24:24;25:2;
26:1,3,11,17;27:4;
28:8;30:3;50:19,25;
52:16;54:19,25
**fires (21)**
24:7,9;28:6;35:16;
36:11,14,18;38:1,12,
15,16,19;41:12,15,19,
21,25;47:5,10,11,13
**fire's (1)**
13:19
**first (15)**
4:23;12:6,11;14:16;
15:5;17:21;25:16;
31:15,17;42:15,16,24;
44:8;49:10,11
**five (1)**

9:3
**flag (3)**
15:7;33:5,15
**flame (1)**
34:13
**flames (5)**
34:22;35:4,17;46:12,
19
**flash (2)**
34:8;46:7
**flashed (1)**
46:11
**foam (1)**
49:15
**focusing (2)**
16:20,22
**following (2)**
55:17;57:4
**follows (1)**
4:25
**follow-up (1)**
55:25
**formally (1)**
56:8
**found (4)**
16:16;18:2,4;55:10
**frequent (1)**
34:17
**frequently (1)**
22:2
**front (7)**
5:24;15:7,8;42:1;
43:19;50:22;53:16
**full (1)**
9:18
**fund (1)**
54:23
**further (2)**
55:13,22

**G**

**Gann (1)**
39:9
**gave (6)**
14:11;22:15;29:14,
25;30:18;39:17
**gear (2)**
13:5;43:10
**general (1)**
39:6
**General's (2)**
5:14;39:7
**gestures (1)**
6:16
**gets (1)**
56:13
**given (2)**
5:21;51:6
**giving (1)**
24:21
**glanced (1)**
12:19

**goes (3)**
19:14;40:23;43:9
**Good (3)**
39:3;42:3;48:10
**gossip (1)**
20:16
**grabbed (2)**
35:7;46:15
**Grady (1)**
48:6
**great (1)**
9:16
**Griffin (13)**
21:15,21,24;22:3,22,
25;23:6,12;30:13;32:3;
35:9;39:10;43:21
**Griffin's (5)**
23:10;24:2,6;26:17;
36:6
**group (1)**
30:15
**guard (1)**
53:3
**guess (7)**
4:9;19:13;37:3,5;
52:17;54:8,21
**Gustavo (2)**
39:3;55:24
**guy (10)**
16:7;25:6;35:3;
36:22;37:13;38:7,9,10;
46:13;48:15
**guys (9)**
14:4;25:18;38:13;
49:9;52:5;53:10,11,23;
54:9
**guy's (2)**
34:25;37:1

**H**

**halfway (2)**
49:8,22
**handle (1)**
23:19
**happen (2)**
26:22;35:22
**happened (14)**
11:13;20:3;22:8;
29:19;34:25;35:1;36:3,
8,21;37:25;44:14;
54:24,25;55:1
**happens (2)**
8:6;26:20
**happily (1)**
8:7
**hard (1)**
6:20
**hardly (3)**
49:24;50:4,6
**harm (2)**
38:13;41:9
**hazard (1)**

34:2
**head (2)**
10:25;13:9
**hear (6)**
7:18,24;14:17;39:4;
51:8,11
**heard (1)**
40:5
**hearing (2)**
48:16;54:2
**heated (1)**
46:20
**heavy (1)**
50:24
**heavy-set (1)**
16:7
**held (1)**
12:2
**hell (1)**
35:6
**help (11)**
12:17;14:5,5,5,19,
19;25:10;38:8;49:5,25;
51:4
**helping (1)**
51:6
**HEPPELL (19)**
4:1,6,20;5:3,7;27:16;
28:16,20;38:20;40:2;
46:3;48:14,15;55:16,
21;56:2;57:13,16,20
**hesitation (1)**
19:23
**hey (1)**
30:16
**himself (3)**
38:7,10;51:9
**Hispanic (4)**
16:7,9;17:7;55:4
**hit (2)**
54:15,16
**hold (1)**
10:2
**honest (2)**
13:7;48:11
**hospital (1)**
37:4
**hot (2)**
18:7;34:14
**hours (3)**
8:24,24,24
**house (41)**
11:3;12:14,21,24;
13:1,2,6,13,16;14:12,
13,15,15,16;15:2,6,14;
16:2,13,17,24;17:22,
25;18:23;25:3,6;26:13,
14;31:24;32:24;33:2,
18,20;35:2;36:21;
37:24;41:16;53:3,4,8;
54:9
**housed (3)**
12:23;33:1,19

**housekeeping (1)**
4:2
**houses (3)**
25:4,25;31:3
**hugging (1)**
18:16
**huh-uh (1)**
6:17
**humans (1)**
6:24

**I**

**I-cell (1)**
25:3
**identity (1)**
55:8
**important (6)**
5:25;6:14;7:1,23;
30:22,23
**impression (1)**
19:7
**incident (2)**
11:13;38:4
**including (2)**
21:21;39:8
**incorrectly (1)**
56:19
**Indiana (10)**
31:5;33:24;36:16;
39:6;40:17,24;41:6;
45:9;51:22;52:23
**individual (3)**
16:23;21:14;39:8
**initially (1)**
41:5
**injure (1)**
47:13
**injuries (1)**
47:16
**injury (1)**
38:2
**inside (3)**
41:1;42:6;54:7
**interact (1)**
49:4
**interview (1)**
29:11
**into (3)**
14:16;24:3;26:10
**introduce (1)**
5:6
**involve (2)**
45:4,10
**involved (5)**
44:18,25;45:2,14,14
**issue (9)**
7:19;23:14;24:21;
26:16;27:1,2;29:22;
34:17;56:18
**issues (18)**
7:18;19:16;21:5,8;
22:11;23:9,13;24:1;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 21 of 25

27:7,9;28:12,13;30:8,8,
12;34:1,5;46:2

**J**

**Jason (1)**
39:10
**Jeremy (1)**
39:11
**JIMENEZ (9)**
4:19;27:12,14;28:18;
38:22;39:2,4;55:12;
56:1
**job (7)**
19:18;20:6,7;21:2;
22:11,12;23:18
**joke (2)**
27:24;28:2
**Joshua (2)**
5:10;11:5
**JR (2)**
4:22;9:20
**J-R (1)**
9:22
**judge (2)**
5:24;8:12
**jump (2)**
7:7;8:18
**jumped (4)**
34:13;35:17;46:13,
13
**jumping (1)**
34:22
**Junior (1)**
9:21
**jury (1)**
5:24
**Justin (2)**
17:2;39:13

**K**

**Kenneth (1)**
39:9
**keys (4)**
32:13,16,17,18
**kill (2)**
38:9;53:19
**killed (1)**
36:19
**kind (13)**
16:8;19:10;23:5;
24:13;34:5;37:8,12;
42:8;43:1;49:1,1;
52:15;56:20
**kinds (2)**
24:4;56:23
**knew (4)**
32:3;37:13;40:3;
53:25
**knowing (3)**
28:14;30:6,11
**knowledge (4)**

32:8;45:7,19,20
**knows (1)**
36:9

**L**

**ladies (1)**
47:25
**lady (3)**
18:13;47:25;48:17
**last (1)**
38:10
**late (1)**
37:2
**Later (16)**
16:16,23;18:2,4,21,
24,24;23:23,24;33:21,
22;36:2;38:11;49:13;
54:23;55:10
**lawsuit (1)**
5:10
**laying (2)**
12:12;50:13
**leadership (1)**
12:2
**learn (1)**
47:4
**learned (6)**
12:6,11;16:23;18:21,
24;36:2
**least (2)**
29:19;37:10
**leave (1)**
30:5
**led (1)**
36:18
**left (1)**
12:16
**legs (1)**
50:14
**Lessner (1)**
39:9
**level (3)**
15:10,15;33:16
**lieutenant (2)**
16:14;52:10
**light (2)**
42:2,7
**lighting (1)**
42:10
**line (3)**
5:13;22:24;46:2
**list (1)**
28:22
**listen (1)**
14:23
**lit (1)**
38:7
**little (1)**
50:14
**living (1)**
33:9
**located (1)**

53:8
**location (1)**
4:13
**log (1)**
32:17
**long (4)**
10:10;12:25;13:6,9
**look (2)**
11:12;42:19
**looked (8)**
16:5,7,9;18:14;
35:18;46:14;51:11;
55:4
**looks (1)**
25:11
**lot (14)**
14:6,18,21,22;38:12,
16;41:8,14;42:1;43:18;
49:15;53:2,18,25

**M**

**Mahone (23)**
4:1,5,22;5:4;9:16,20,
23,23;19:24;28:21;
33:24;38:22;39:3;
40:16;41:8;43:15;
47:18;51:20;53:7;55:2,
13,23;57:18
**M-A-H-O-N-E (1)**
9:21
**main (1)**
23:16
**mainly (1)**
41:16
**making (2)**
6:13;56:6
**male (2)**
17:6;55:3
**man (4)**
19:21;35:5,6;37:16
**manner (1)**
26:7
**manpower (2)**
25:14;26:8
**many (4)**
25:8,9,18;57:4
**mask (6)**
15:17,18,21;18:9;
52:13,19
**match (1)**
42:2
**Matter (1)**
37:21
**mattress (1)**
42:4
**mattresses (1)**
42:5
**may (4)**
9:5;17:7;38:22;56:8
**maybe (2)**
21:6;24:18
**mean (10)**

16:8;19:10,13;27:9;
28:6;30:22;38:4;45:12;
52:25;53:4
**means (4)**
8:17;42:22;56:12,25
**Megan (1)**
48:9
**member (7)**
9:24;19:17;21:7;
23:8,21;37:1;42:12
**members (15)**
21:17;22:16;23:3,17;
44:23,25;45:2,4,5,15,
21,23;51:23;52:2,22
**memory (3)**
6:2;20:18;31:22
**mentioned (2)**
39:19;56:4
**Mexican (1)**
38:10
**might (11)**
8:4,11;13:8;14:10;
24:10,13;25:6;42:1,3,
5;46:20
**mind (1)**
42:25
**minutes (1)**
9:3
**mobilizing (1)**
54:22
**month (1)**
47:25
**months (2)**
21:22;48:1
**more (6)**
26:22;34:3,18,19;
46:18;53:16
**morning (2)**
5:5;39:3
**most (2)**
10:15;11:2
**mouth (3)**
49:16;51:13,17
**moved (3)**
20:1;37:23,24
**moving (1)**
13:10
**much (8)**
13:25;22:4,5;48:25;
49:23;52:6;53:23;
55:23
**multiple (1)**
36:13
**myself (1)**
5:6

**N**

**naked (1)**
50:16
**name (12)**
5:6;9:18,20;17:2;
29:13;39:3;40:1,5;

48:5,6,9;55:10
**named (1)**
11:4
**names (11)**
17:4;18:18,20;20:23,
25;24:3;40:14,15;
44:24;48:4,10
**naturally (1)**
6:25
**nature (1)**
29:3
**necessarily (1)**
20:23
**need (5)**
7:22;8:25;9:3;20:25;
56:3
**neither (1)**
18:20
**next (3)**
7:7;35:10;53:3
**night (18)**
12:5;16:2,13,25;
17:25;18:23,25;20:4;
31:8,11,18,22,25;32:5,
24;39:19;44:14;49:3
**nighttime (4)**
24:8;31:3;44:4,19
**none (1)**
31:21
**normally (1)**
34:20
**nose (3)**
49:15;51:12,17
**notate (1)**
57:8
**note (2)**
56:15,22
**notice (1)**
18:5
**noticed (1)**
18:10
**Nowatske (1)**
39:11
**number (2)**
36:1;46:25
**nurse (1)**
49:25
**nurses (2)**
49:19,21

**O**

**oath (2)**
5:21,22
**object (2)**
27:12,14
**objection (4)**
8:19,19;28:17,18
**objections (3)**
8:11,13,14
**observations (1)**
28:2
**observe (2)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 22 of 25

16:1;17:15
**observed (4)**
13:14;17:22;21:9;
34:6
**occasion (2)**
35:21;46:6
**occasions (2)**
36:1;46:25
**off (12)**
9:2;10:14,24;13:9;
15:21;18:9;49:6;50:17,
22;52:14;56:14;57:20
**offender (1)**
47:13
**offenders (4)**
41:22,25;54:10,12
**office (3)**
5:14;17:12;39:7
**officer (18)**
12:12;16:4,6,16,18;
17:5,6;26:13;30:20;
42:23;49:23;51:3,24;
54:11,14;55:3,9,20
**officers (20)**
16:1,12,24;17:24;
18:22,25;19:9;20:24;
24:4;28:13;30:1,15;
32:12,21;39:20;40:12;
43:16;45:8;49:20,21
**officer's (3)**
46:16;55:6,7
**oftentimes (2)**
24:7;53:19
**OIC (2)**
55:11,18
**older-type (1)**
42:4
**once (2)**
8:19;51:2
**one (44)**
5:7,13;16:4,12,24;
18:20;20:12;25:4;
26:23;27:4;29:5,6;
31:10,15;32:14,14;
33:3,5,7,10;35:1,21;
37:7,9,12;38:6;41:19;
42:15,16;44:8,10,11,
17,20;45:13;46:6,21;
47:24;49:5,9;51:24;
54:11;56:2,7
**ones (1)**
49:5
**only (4)**
5:11;44:10,11;45:13
**open (4)**
18:8;22:24;23:5;
53:5
**opened (2)**
12:17;13:3
**opportunity (4)**
21:23;56:14,21,24
**option (1)**
57:9

**options (1)**
56:10
**order (1)**
56:8
**orders (1)**
56:12
**out (68)**
7:23;9:7;14:18,19,
19,20;15:1,7,8;16:16;
18:2,4,6,7,9;23:18;
24:9,11,24;25:5,6;26:1,
3,7,12,15;30:9;33:22,
22,23;34:8,13,22;35:4,
8,17;37:2,4,24;42:1,4,
6,25;44:13,15;46:8,11,
12,13,13,19,23;47:11;
49:15;50:11;51:12,17;
52:5,7,15;53:23;54:4,5,
9,20,22,23;55:10
**outside (9)**
15:25;18:3;41:16,16;
52:12,18;54:6,12;55:1
**over (12)**
5:18;6:12,25;7:17;
13:11;18:25;33:3;
35:10;36:24,25;39:15;
55:11
**own (2)**
35:12;45:22

**P**

**page (2)**
5:20;8:9
**paper (2)**
29:12;42:7
**part (3)**
31:6;32:17,21
**participating (1)**
5:5
**particular (2)**
20:22;46:10
**pause (1)**
8:17
**paying (1)**
16:19
**people (3)**
20:23;25:8,9
**perceive (1)**
15:13
**period (2)**
9:22;36:12
**person (3)**
5:12;20:22;21:11
**personally (4)**
35:22;36:15;46:7;
54:3
**phone (1)**
48:17
**phrased (1)**
8:4
**physical (1)**
47:16

**physically (3)**
17:20;43:4;47:1
**pictures (1)**
44:24
**Pierce (1)**
48:9
**place (1)**
11:3
**plaintiff (4)**
4:17,23;5:8,10
**plaintiff's (2)**
47:20;48:21
**plan (1)**
9:8
**play (2)**
25:20;27:4
**please (5)**
4:4,21;7:20;8:7;9:18
**plug (2)**
34:7,14
**point (6)**
9:6;16:3;18:1;21:16;
31:5;56:7
**policies (1)**
40:17
**poorly (1)**
8:5
**pop (1)**
35:4
**posed (1)**
34:1
**position (2)**
10:2;12:2
**possible (1)**
13:11
**pot (1)**
34:15
**prepare (1)**
57:2
**prepared (1)**
56:9
**preparedness (1)**
21:10
**preparing (2)**
6:6;56:20
**Pretty (5)**
22:4,5,24;38:9;48:25
**previous (1)**
48:20
**previously (4)**
10:7;26:24;33:11;
48:13
**prior (6)**
21:22;26:25;41:5;
47:18,21;51:6
**prison (18)**
19:9,25;21:10,25;
27:5,11;31:6;33:25;
34:1,6,17;36:16;40:17,
24;41:6;45:9;51:22;
52:23
**prisoner (15)**
9:24;10:2,11,16;

11:4,22;19:8,17;23:4,
8;24:24;31:6;32:25;
45:5,22
**prisoners (6)**
15:2;41:9,12;45:11,
15;53:8
**probably (1)**
8:3
**problem (4)**
4:5;9:1;48:12;57:19
**problems (5)**
20:11,13;21:9;22:6;
24:5
**procedures (1)**
5:19
**Proceedings (1)**
57:23
**process (1)**
35:24
**Promise (3)**
18:18;40:7,10
**protest (1)**
38:16
**providing (1)**
55:24
**put (9)**
4:6;12:18;15:18;
22:18;27:10;46:23;
47:11;52:19;54:4
**Putser (1)**
39:12

**Q**

**quarterly (1)**
29:17
**quickly (2)**
13:10;38:18
**quiz (3)**
29:15;30:25;32:1

**R**

**radio (2)**
34:7,14
**ran (10)**
13:4,5;14:7;35:6;
46:15,16;49:16;51:14;
53:21;54:14
**Randy (1)**
4:7
**range (15)**
13:20,24,24;14:2,4,
7;35:2;49:6;50:2,3,22;
51:2;53:10,11,16
**rather (1)**
6:16
**real (7)**
18:7,13;28:8;37:13;
38:19;42:3;50:24
**realized (2)**
50:11;53:19
**really (13)**

11:15;13:3,6;15:16,
16;16:19,21;17:4;
29:15,21;30:17;42:20;
48:5
**reason (2)**
9:11;34:9
**reasons (1)**
24:19
**recall (6)**
32:11;37:14;38:3;
39:21;46:3,9
**receive (2)**
43:16;44:1
**recent (1)**
10:15
**recently (4)**
10:4,20;31:14;41:14
**Receptacle (3)**
34:7,23;46:8
**record (9)**
4:7;6:8,14;7:11;
8:14;9:2,19;56:6;57:21
**recording (2)**
6:12;20:12
**red (1)**
29:5
**Redden (1)**
39:12
**REDIRECT (1)**
55:15
**refer (1)**
22:7
**reference (1)**
23:25
**referring (3)**
11:6;14:13;33:16
**refers (1)**
55:19
**regarding (4)**
39:16;40:17;43:17;
46:10
**register (1)**
16:17
**regular (3)**
10:5,7;26:20
**rejoined (1)**
10:16
**relates (1)**
11:2
**relation (1)**
19:10
**relationship (1)**
19:8
**relatively (1)**
8:23
**released (2)**
13:1;33:20
**remember (20)**
10:24,25;11:8;12:5;
13:7,8;14:4;15:16,20;
19:2;31:20,20;37:6;
44:10,12,16;48:4,5,8,
16

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 23 of 25
Cause No. 3:18-cv-00995-JD-MGG
DONALD MAHONE
September 30, 2020

**rephrase (2)**
8:7;45:19
**report (2)**
21:8,23
**reporter (8)**
4:14;5:13,22;6:6,13;
7:10;56:6;57:2
**represent (2)**
11:16;39:7
**representing (2)**
5:9,15
**reserve (1)**
56:11
**respond (1)**
24:25
**responded (3)**
36:2,15;47:2
**responding (2)**
51:23;52:23
**response (2)**
26:2;40:18
**rest (2)**
36:25;51:5
**resulted (1)**
11:4
**review (4)**
56:14,21;57:1,7
**right (20)**
10:6;13:17;14:15;
15:8,14;22:19;29:3;
38:20;43:6,6;45:13;
48:15;52:9,11;53:5;
54:21,22;57:1,7,16
**ring (2)**
48:6,9
**riot (1)**
54:10
**risk (1)**
34:2
**Rodriguez (2)**
17:2;39:13
**role (2)**
25:20;27:4
**Ron (1)**
39:9
**room (1)**
7:16
**rule (1)**
8:13
**rules (1)**
5:18
**rumors (1)**
20:16
**run (1)**
25:15
**running (1)**
30:1
**runs (3)**
34:19;41:15,18
**Ryan (1)**
39:12

## S

**safety (2)**
21:10,24
**Sam (3)**
5:7;48:14,15
**same (8)**
5:20,22;7:6;8:9;
23:5;25:1;49:1,1
**Sarah (4)**
18:19;39:13;40:3;
48:6
**save (2)**
38:8,14
**saw (6)**
17:5,11;39:20;40:13;
46:7;55:3
**saying (2)**
14:23;29:13
**scene (3)**
22:6;25:21;51:20
**screaming (4)**
13:25;14:4;53:13,18
**screen (1)**
5:11
**security (1)**
24:19
**sense (2)**
6:9,17
**sent (1)**
56:13
**separate (1)**
4:13
**sergeant (2)**
16:14;52:10
**serious (4)**
27:13,21;36:13;38:2
**seriously (2)**
27:10;30:10
**served (1)**
10:11
**set (1)**
38:7
**several (1)**
44:25
**shift (6)**
31:8,11,18,22,25;
32:5
**short (2)**
8:23;9:5
**show (1)**
11:17
**sic (1)**
13:16
**sight (1)**
50:19
**sign (2)**
29:12;56:14
**signal (1)**
42:21
**signature (5)**
56:11,25;57:12,14,

22
**significant (1)**
36:14
**silver (1)**
29:6
**similar (1)**
24:15
**similarly (2)**
6:23;8:2
**single (1)**
41:18
**sitting (1)**
12:19
**situation (3)**
22:17;24:12;53:17
**situations (1)**
29:25
**size (1)**
41:22
**slammed (2)**
54:15,15
**small (2)**
18:14;26:9
**smell (2)**
15:13;28:25
**smelling (1)**
15:23
**smells (1)**
42:22
**smoke (13)**
13:25;14:7;15:12,23;
28:25;42:23;49:23;
52:6,14;53:19,24,24,25
**smoking (1)**
46:14
**solution (1)**
23:15
**somebody (3)**
26:15;42:22;49:12
**someone (2)**
16:14;56:12
**sometime (2)**
35:11;42:5
**sometimes (6)**
24:11,17;25:24;27:7;
30:10,11
**somewhere (2)**
12:9;37:22
**sorry (1)**
11:11
**sort (1)**
35:24
**sound (2)**
11:19;17:2
**sounds (1)**
6:16
**spark (2)**
34:8;46:7
**speak (1)**
53:7
**specific (4)**
20:24,25;24:1,4
**specifics (1)**

43:25
**speculation (2)**
27:15;28:19
**spell (1)**
9:18
**sprayed (2)**
46:18,21
**spread (1)**
20:16
**squad (14)**
9:25;10:3,11,17;
11:23;12:3;19:9,17;
21:12,17;22:16;23:4,9;
31:7
**staff (33)**
19:11,19;21:7,11,18;
22:10;23:17,21;24:15,
23;25:4,24;27:11,20;
35:16;37:1;38:7;40:19,
20,23;41:7;44:23,25;
45:4,9,15,16,21;51:23;
52:2,23;54:10,21
**stairs (3)**
13:22,23;49:22
**standing (20)**
13:17;16:6,10;17:12,
18;18:3,11,12,16;35:1;
39:20;40:13;51:24;
52:10;54:5,12,20;55:4,
6,7
**staring (1)**
17:12
**start (9)**
4:8;7:3;40:24;41:6,
12,15,25;42:2;56:5
**started (11)**
4:3;5:21;15:23,24;
34:18,18,19;41:22;
51:1;52:13;54:22
**state (11)**
8:20;9:18;31:5;
33:25;36:16;40:17,24;
41:6;45:9;51:22;52:23
**stated (3)**
39:24;54:2;55:4
**Statham (1)**
39:13
**station (3)**
25:7,16;26:6
**stay (4)**
25:1,3;26:23;38:17
**stayed (1)**
33:5
**staying (1)**
37:23
**stepped (3)**
10:4;15:24;54:13
**Steve (2)**
21:15;43:21
**Steven (1)**
39:10
**stick (1)**
20:3

**still (7)**
22:11;37:2;46:14,20;
49:17;51:13,16
**stipulated (2)**
4:16,18
**stipulation (1)**
4:11
**stood (2)**
52:18;54:17
**stop (1)**
50:23
**straight (8)**
10:19;13:4,5,22;
43:9,9,12;52:1
**stretcher (1)**
50:7
**stretchers (1)**
50:3
**strike (1)**
12:21
**struck (1)**
50:15
**struggled (1)**
50:11
**struggling (2)**
50:5,21
**stuff (20)**
14:21,22;18:10;
24:15,16;29:7,13;
34:23,24;35:19;38:18;
41:2;42:6;43:11,23;
47:15;50:1,4;52:18;
54:24
**subsequent (1)**
4:10
**substance (1)**
56:16
**sudden (1)**
35:3
**supervisor (1)**
44:22
**supposed (1)**
28:24
**sure (9)**
8:8;11:21;20:10,11;
27:10;29:18;30:21;
32:23;35:20
**swear (1)**
4:21
**swearing (1)**
4:14
**sworn (1)**
4:24
**system (1)**
21:3

## T

**talk (4)**
6:25;43:18;46:1;
54:3
**talked (7)**
47:23,24;48:2,12,16,

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
DONALD MAHONE
September 30, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-25    filed 05/25/21    page 24 of 25

18,25
**talking (8)**
5:12;6:20,24;16:4;
35:2;46:12;52:8,11
**tank (2)**
25:18,19
**taste (1)**
15:13
**technical (1)**
7:17
**telling (1)**
54:25
**tells (1)**
42:17
**ten (1)**
10:18
**terms (1)**
19:18
**territory (1)**
19:14
**test (1)**
29:14
**testified (6)**
4:24;19:3;41:8;44:3;
47:2;55:2
**testifying (1)**
5:23
**testimony (16)**
4:15;6:1;7:12,25;
9:13;22:15;24:20;
28:11;29:24;35:21;
39:17,22;46:4;55:24;
56:7,16
**thinking (1)**
25:13
**Thomas (1)**
40:9
**though (2)**
43:25;45:16
**thought (7)**
15:17;27:24;28:1;
30:21;32:10;51:13,19
**three (1)**
48:1
**throw (3)**
42:1,3,5
**timely (2)**
26:4,7
**times (1)**
15:19
**Timothy (1)**
39:12
**tiptoes (1)**
38:17
**today (10)**
7:1;9:9;11:2;20:12;
47:21;48:23;55:23;
56:4;57:4,18
**today's (1)**
47:18
**together (2)**
39:21;40:13
**told (16)**

30:6,17,18;40:25;
41:2;42:13;43:18,20,
21;47:6;49:11,20,25;
50:6;52:4,17
**took (6)**
11:3;13:7;15:21;
27:13,21;52:13
**top (5)**
10:25;13:9,20,23;
50:2
**topic (1)**
11:1
**total (1)**
10:10
**touch (1)**
11:1
**tower (1)**
18:11
**training (8)**
30:20;40:22;41:2,4;
43:16,19;44:1;57:5
**transcribing (1)**
4:15
**transcript (10)**
6:7,21;56:8,13,15,21,
22;57:2,6,8
**trash (1)**
42:7
**tried (1)**
22:9
**trouble (3)**
20:1,22;22:13
**truthful (2)**
6:1;9:12
**truthfully (1)**
20:17
**try (10)**
12:17;15:18;20:21;
22:11;25:25;38:9,14,
16;41:9;52:19
**trying (13)**
12:14;14:23;20:8,10,
13,15;25:13;26:11;
37:1;38:13;48:24;
50:21;54:16
**turned (1)**
52:8
**TV (4)**
12:13,19;34:7,14
**two (9)**
18:2;31:10;33:3,7;
39:20;40:12;47:24;
48:1;56:9
**type (3)**
40:18;42:13;43:16
**types (3)**
41:21,21,24

**U**

**ultimately (3)**
46:23;47:11;54:4
**under (1)**

18:11
**understood (3)**
22:14,14;29:24
**unfortunately (1)**
7:15
**unit (2)**
26:23;30:15
**units (1)**
25:2
**unlock (1)**
12:15
**unlocked (1)**
12:16
**unlocking (1)**
32:13
**unnatural (1)**
6:23
**up (37)**
10:20;12:18,19;
13:19,20,22,22,23;
17:17;18:11;22:21;
24:19;30:12;34:17,24;
35:13,17;36:22;37:18,
22;38:9,11;42:2;43:19;
46:20;49:14,21,22;
50:13,14;51:3;52:6;
53:13;54:1;55:17;56:4,
9
**upset (2)**
37:8,12
**upstairs (6)**
42:19;46:17;50:1,2;
52:1,18
**use (1)**
43:23
**using (1)**
6:16
**usually (3)**
42:16,18;43:6

**V**

**varied (1)**
27:24
**varies (1)**
42:9
**various (1)**
23:15
**vary (1)**
41:22
**via (2)**
4:15,16
**video (3)**
6:11;7:17;20:12
**videoconferencing (2)**
4:16;6:12
**videos (1)**
44:24
**visible (1)**
15:12
**voice (1)**
48:16

**W**

**waive (6)**
56:25;57:7,10,11,12,
13
**waived (1)**
57:22
**waiving (1)**
57:1
**walked (4)**
13:16;14:2;53:11,12
**walking (2)**
53:15,15
**wants (1)**
38:23
**Warden (1)**
39:9
**watching (1)**
12:13
**Watson (2)**
39:11;51:3
**way (17)**
6:23;7:2;9:7;16:9;
21:6;22:12;24:14,18;
27:10;46:13,14;49:4,7;
50:2,8;51:2,5
**week (1)**
47:24
**weekend (1)**
35:11
**weeks (6)**
31:10,16;44:5,17,20;
45:14
**weren't (1)**
48:22
**what's (6)**
10:15,15;13:21;
19:23;29:13;43:13
**wherever (1)**
42:18
**who's (2)**
5:12;6:6
**William (1)**
39:9
**without (4)**
22:12;24:3;30:5;
45:22
**witness (8)**
4:13,14,21,23;5:1;
57:11,15,19
**woman (1)**
18:14
**words (2)**
6:16;15:1
**work (2)**
25:5;35:10
**working (4)**
18:4;21:4;40:24;
41:6
**wow (1)**
54:18
**wrap (1)**

56:4
**written (4)**
6:7,13,21;56:9
**wrong (1)**
22:8
**wrote (2)**
11:12;13:8

**Y**

**year (3)**
10:24;38:6,10
**years (4)**
10:18;21:22;31:24;
57:5
**yelling (8)**
13:25;14:5,18;15:2;
52:8;53:13,18;54:2
**yep (2)**
18:25;32:23

**Z**

**Zoom (2)**
4:12,16

**1**

**100 (3)**
15:10,15;33:16
**10-70 (3)**
42:21,22;43:8
**10-71 (4)**
42:22,23,24;43:8
**11:10 (1)**
57:24
**1994 (2)**
10:12,13

**2**

**200 (1)**
35:2
**2000 (1)**
37:18
**2004 (1)**
37:22
**2006 (2)**
37:18,22
**2010 (1)**
10:18
**2017 (7)**
11:18;19:7;26:24;
32:25;33:19;49:3;
51:21
**215 (1)**
12:24

**4**

**400 (2)**
13:24;14:3

**5**

**500 (2)**
    13:24;14:3

**7**

**7 (3)**
    11:18;32:25;33:19
**7th (2)**
    49:3;51:21

**9**

**9:30 (1)**
    12:8
**9:35 (1)**
    12:8
**9:36 (1)**
    12:8