**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# <u>EXHIBIT 28</u>

## In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*GREGORY LINTZ*
*September 24, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary \* Merrillville \* Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-24-20 Gregory Lintz.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-31   filed 05/25/21   page 3 of 33

Page 3

Page 3

              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF INDIANA
                      SOUTH BEND DIVISION


    DENISE DWYER, as Personal    )
    Representative of the        )
    ESTATE OF JOSHUA DEVINE,      )
                                  )
              Plaintiffs,         )  Case No.
                                  )  3:18-CV-0995-JD-MGG
         -v-                      )
                                  )
    RON NEAL, et al.,             )
                                  )
              Defendants.         )

          The subpoenaed deposition upon oral
examination of GREGORY LINTZ, a witness produced and
sworn before me, Kristen K. Stokes, CSR, Notary
Public in and for the County of Lake, State of
Indiana, taken on behalf of the Plaintiff via Zoom,
on September 24, 2020, at 8:19 a.m. CST, pursuant to
the Federal Rules of Civil Procedure.


                     BOSS REPORTERS
                   & VIDEOCONFERENCING
          GARY * MERRILLVILLE * VALPARAISO, INDIANA
                      (219) 769-9090

                          I N D E X

EXAMINATION                                          PAGE

  DIRECT EXAMINATION BY MR. HEPPELL...........    4

EXHIBITS (First marked or referred to)

  DEPOSITION EXHIBIT 1.......................   11

  DEPOSITION EXHIBIT 2.......................   71



                    *   *   *   *   *

Page 2

                         APPEARANCES

MS. SAM HEPPELL
LOEVY & LOEVY
311 North Aberdeen Street, Third Floor
Chicago, Illinois  60607
(312) 243-5900

        on behalf of the Plaintiff;


MR. ARCHER RIDDICK RANDALL ROSE, JR.
ATTORNEY GENERAL'S OFFICE
302 West Washington Street
IGCS, Fifth Floor
Indianapolis, Indiana  46204
(317) 232-6231

        on behalf of all the Defendants except
        Blakely;

MS. KELLY EARLS
ICE MILLER
One American Square, Suite 2900
Indianapolis, Indiana  46282
(317) 236-2271

        on behalf of the third-party Indiana
        Department of Correction;

                    *   *   *   *   *

Page 4

        MR. HEPPELL: And just before we jump in, we've done this in other depositions, but I'm putting on the record a stipulation for, you know, counsel for different parties, as well, to conduct the deposition by zoom and have the court reporter transcribe it remotely.

        Kelly, on behalf of the deponent, are we in agreement on that?

        MS. EARLS: We agree.

        MR. HEPPELL: And on behalf of defendants?

        MR. ROSE: Likewise, agree.

        MR. HEPPELL: Okay.  And so stipulated on behalf of plaintiff as well.

        GREGORY LINTZ, called as a witness, having been first duly sworn, was examined and testified as follows:

        DIRECT EXAMINATION
        BY MR. HEPPELL:

Q.  Mr. Lintz, thank you for being with us this morning and for bearing through those technical difficulties.  My name is Sam Heppell.  I'm one of the attorneys for the plaintiff in this lawsuit.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-31 filed 05/25/21 page 4 of 33

Page 5

Mr. Lintz, have you ever sat for a deposition before?

A. Yes, once many years back.

Q. Okay. Well, just so we're all on the same page, I'm going to briefly go through sort of an outline for some of the procedures that we're going to use today just to make sure things go as smoothly as possible. And we've already got one speed bump out of the way.

This is in some ways similar to testimony that you would give in court in front of a judge or jury in that your testimony is under oath, and so, you know, you understand your testimony is under oath today; correct?

A. Yeah.

MR. ROSE: I hate to interrupt, but can we go off the record for just a quick second?

MR. HEPPELL: Sure.

(DISCUSSION OFF THE RECORD.)

MR. HEPPELL: Okay. Yeah, we can hear you, Mr. Lintz. Can you hear us? We're okay to go back on the record now?

MR. ROSE: Yes, thank you. Now I see Greg has got us muted on this.

Page 6

MR. HEPPELL: Yeah, I muted his video because --

THE WITNESS: Hello.

MR. HEPPELL: Yeah, we can hear you. Can you hear us? Mr. Lintz, can you hear us?

THE WITNESS: I lost communications again.

MR. ROSE: Can you hear us, Greg?

MR. HEPPELL: Everyone else can hear me; right? It's just Mr. Lintz?

MR. ROSE: I can hear you, Sam.

THE WITNESS: I can't hear any communications from anyone.

(A BRIEF RECESS WAS TAKEN.)

MR. HEPPELL: All right. I'm going to resume the recording. We can go back on the record and get started here.

THE WITNESS: Okay.

MR. HEPPELL:

Q. Okay. Back on the record.

Mr. Lintz, I guess, you know, I'll start by saying, I say this in every deposition, but it's important, particularly in this deposition, for you to alert me if there's some issue with

Page 7

either understanding my question or even just hearing my question, whether it's because I phrased something poorly or technical difficulties. Does that make sense?

A. Yes, yeah.

Q. And that's, you know, obviously because your testimony is under oath, and it's important that my questions are clear and your answers are clear. Okay?

A. Yeah.

Q. And it's also important that we make a clear record with the court reporter and she's able to understand my questions and understand your answers. Okay?

A. Yes.

Q. And so in addition to any technical difficulties that may arise that you should, you know, alert me to, it's important for you to let me get all the way to the end of my question before you jump in with your answer. Okay?

A. Yes.

Q. And that's maybe at times a little bit unnatural and not how we might speak in everyday conversation, but that makes a clearer, cleaner record for the court reporter. Okay?

Page 8

A. Yes.

Q. And like I said, if you don't understand a question that I ask, I might have phrased something poorly or I might have misunderstood part of your prior testimony. If you can tell from my question that I've misunderstood you, please do jump in and let me know. Okay?

A. Yes.

Q. If you don't ask to clarify or correct the premise of my question, I'm going to assume that you were able to understand the question and give your answer accordingly. Okay?

A. Yes.

Q. Because we are not in a courtroom and not in front of a judge and jury, you know, it can be, you know, certainly less formal than it would be in a courtroom setting, and one of the things along those lines is if you need to take a break at any point in time, that's no problem. Just let me know. We can go off the record and take a break. Okay?

A. Okay.

Q. Similarly, I may ask to take a break to, you know, look over my notes, to look over some documents to try to speed things up, and I hope

USDC IN/ND case 3:18-cv-00995-JD document 212-31 filed 05/25/21 page 5 of 33

Page 9

you'll bear with me if and when we do that.

And the only stipulation around taking a break is I would ask that if I have asked the question and there's a question pending, that you give your full and complete answer to that question before we go off the record and take our break. Okay?

A. Yes.

Q. With -- there may be some questions that I ask that one or more of the lawyers on the line want to make an objection to. Because there's no judge here to rule on those objections, those objections are primarily being made just for the record. Okay?

A. Okay.

Q. And so unless your lawyer instructs you not to answer a question, you can just go ahead, take a moment before you jump in. Let the lawyer make the objection for the record, but then you can go ahead and begin your testimony and answer the question. Okay?

A. Okay.

Q. With all those things out of the way, are there any conditions that you have or any medications that you're taking that would affect your memory

Page 10

or affect your ability to give truthful and accurate testimony to the best of your ability here today?

A. No.

Q. Okay. Anything else you can think of that might affect your ability to testify here today?

A. No.

Q. Okay. Mr. Lintz, what is your current employment position?

A. I'm the Director of Risk Management for the Department of Corrections.

Q. That's the Indiana Department of Corrections; is that correct?

A. Yes.

Q. And Mr. Lintz, you understand that you are giving testimony here today not in your individual capacity but as a designated witness on behalf of the Indiana Department of Correction to give binding testimony on the topics that you've been designated as a witness today; is that correct?

A. Yes.

Q. I'm going to pull up the deposition notice and show you those topics.

MR. HEPPELL: Before I do so, Kelly, the

Page 11

version of the deposition notice that I have includes Mr. Lintz designated on Topics 1, 9 and 10, but I understood I think from when I took Warden Neal's deposition earlier in the week that there had been some subsequent conversations or discussions on your end, and it was Mr. Dudley, who's going this afternoon, who's going to be designated on Topic 1 and you're withdrawing the designations of other witnesses on Topic 1; is that correct?

MS. EARLS: That's correct.

MR. HEPPELL:

Q. So Mr. Neal (sic), I'm going to pull up a copy of that notice to show you, and we'll mark that as Exhibit 1 for this deposition.

MS. EARLS: I'm also going to raise an objection here as to the time span under the document. By stipulation of counsel, we limited the time span from 2015 to 2018 and not from what it says in this, designated as 2010 on.

MR. HEPPELL: That's correct. I appreciate you raising that, and I'm going to put that on the record as well when we go

Page 12

through the document. I think we just never created an updated or revised notice to reflect that stipulation, but that's correct, the designated agreed time periods for all of the topics are January 1, 2015, through December 31, 2017, so it's that three-year time span. So with that understanding noted and agreed, let me pull up that document.

Q. And Mr. Lintz, are you able to see this document on the shared-screen function on the video here?

A. Yeah.

Q. Okay. And are you familiar with this document? Have you seen this before?

A. Yes.

Q. And that lists your name on the front page designated on Topics 1 and 9 and 10, but I understand you've been withdrawn on Topic 1, and you're solely designated here today to testify on Topics 9 and 10. Is that correct, Mr. Lintz?

A. Yes.

Q. Turning to Topics 9 and 10 on the third page of the deposition notice and amending it from the as-written version to reflect the agreed time period, Topic No. 9 relates to the Indiana

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 6 of 33

Page 13

Department of Corrections policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison from January 1st, 2015, through December 31st, 2017, relating to reviewing or auditing the emergency response policies, systems, infrastructure, plans or programs, including the number and substance of reviews or audits, including any conclusions reached or corrective action plans imposed as a result. Are we on the same page about that topic?

A. Yes.

Q. Okay. And are you prepared to give binding testimony as to that topic on behalf of the Indiana Department of Correction this morning?

A. Yes.

Q. And then the same for Topic No. 10, which reflects -- or rather, Topic No. 10, which relates to the Indiana Department of Correction's policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison from April 2010 -- strike that. From January 1st, 2015, through December 31st, 2017, relating to reviewing or auditing fire safety policies, systems, infrastructure,

Page 14

plans or programs, including the number and substance of reviews or audits, including any conclusions reached or corrective action plans imposed as a result. Are we on the same page about that topic, Mr. Lintz?

A. Yes.

Q. And are you prepared to give binding testimony as to that topic on behalf of the Indiana Department of Correction this morning?

A. Yes.

Q. Okay. Thank you. I'm going to pull that document down. If you want to review it at any point, let me know. I can pull it back up.

Mr. Lintz, I'm going to preference the next few questions by saying that I don't want you to tell me anything about the contents of any conversation that you have had with one of your attorneys. Okay?

A. Okay.

Q. Mr. Lintz, have you met with anyone or spoken with anyone to prepare for your deposition today?

A. Yes.

Q. Okay. And who have you met with or spoken with to prepare for your deposition?

Page 15

A. Kelly Earls.

Q. Okay. And Kelly Earls is representing you as your attorney from the Indiana Attorney General's office; is that correct?

A. Yes.

Q. Without getting into any of the substance of what you told Ms. Earls or what Ms. Earls told you during that preparation, but on how many occasions did you speak with Ms. Earls to prepare for your deposition?

MS. EARLS: Objection insomuch as it calls for attorney-client privilege, but Mr. Lintz can answer.

You can answer, Greg, how many times we met.

THE WITNESS: Once.

MR. HEPPELL:

Q. And was that conversation by phone?

A. The internet.

Q. Okay.

A. On the --

Q. An internet meeting. Okay.

And approximately how long did you meet with or speak with Ms. Earls during that one meeting?

Page 16

A. Roughly 30 minutes.

Q. Other than your attorney, Kelly Earls, have you met with or spoken with anyone else in preparation for your deposition today?

A. No.

Q. Have you reviewed any documents to prepare for your deposition today?

A. Just weekly and monthly -- the monthly inspections and things from the facilities.

Q. So you reviewed some documents that you're describing as weekly and monthly inspections from the facility?

A. Yes.

Q. And do you have those documents in front of you?

A. No.

Q. Okay. But those were documents that you reviewed to prepare for your deposition; correct?

A. They were reviews from that facility, yes.

Q. Okay. Do you recall approximately how many weekly inspections you reviewed to prepare for your deposition?

A. No.

Q. Okay. Are you able to give an approximation, if it was 1 or 10 or 50?

DENISE DWYER, et al. v.
RON NEAL; et al.
USDC_NND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 7 of 33
Cause No. 3:18-cv-00995-JD-MGG
GREGORY LINTZ
September 24, 2020

Page 17

A. 10.

Q. Okay. Approximately 10 weekly reports, weekly inspections?

A. Well, they were mainly monthlies and not weeklies.

Q. Okay. So it was approximately 10 total inspection reports that you reviewed?

A. Yes.

Q. Okay. Other than those approximately 10 inspection reports, are there any other documents that you reviewed to prepare for your deposition today?

A. No.

Q. Okay. And you've testified that you currently serve as Director of Risk Management for the Department of Correction; is that correct, Mr. Lintz?

A. Yes.

Q. How long have you held that position?

A. Since 2008.

Q. Okay. And what are your job duties as a Director of Risk Management for the Department of Correction?

A. To complete inspections of the facilities, audits on an annual basis, and to -- and work

Page 18

with the safety managers of the facilities and then also conduct ACA reviews for the facilities.

Q. Any other job duties associated with that position?

A. Sometimes training on an annual basis with the facility managers at the New Castle training facility.

Q. That's providing training to facility safety managers?

A. Yes.

Q. Any other job duties other than what you've testified to?

A. No.

Q. And you understand the lawsuit in which you're giving testimony here today -- or for which you're giving testimony today relates to an incident that took place in April 2017 at Indiana State Prison; is that correct?

A. Yes.

Q. And in your capacity as a Director of Risk Management for the Indiana Department of Correction, you have responsibility not just for Indiana State Prison but for prisons across the state; is that correct?

Page 19

A. Yes.

Q. It's fair to say in the course of your responsibilities as Director of Risk Management for the Department of Correction, you've had occasion to visit Indiana State Prison and conduct some of your inspection or audit activities at that prison; is that correct?

MS. EARLS: Objection insomuch as it calls for factual witness testimony instead of the 30(b)(6) as it falls outside of the 30(b)(6) topics designated, but Mr. Lintz can answer to the best of his knowledge.

THE WITNESS: Yes.

MR. HEPPELL:

Q. And on approximately how many occasions have you personally visited Indiana State Prison to conduct any sort of audit or inspection or review?

A. Average, twice annually.

Q. And the two topics on which you've been designated here today, Mr. Lintz, relate specifically to the audits or reviews of the emergency response policies and systems and programs in place at Indiana State Prison and the fire safety policies, systems, and programs

Page 20

in place at Indiana State Prison; correct?

A. Yes.

Q. Is there any written policy at the Department of Correction or at Indiana State Prison that lays out the process for reviewing or auditing those emergency response or fire safety policies and systems at the prison?

A. Yes, there's an executive directive.

Q. Can you please describe what that executive directive is?

A. It is the directive that gives direction to the facilities regarding inspections, plan of corrections for both the Facility Safety Manager and then the central office inspection group that visits the facilities average twice a year.

Q. And so that executive directive, is that a statewide policy that applies throughout the Indiana Department of Correction?

A. Yes.

Q. Okay. What's the title or number of that executive directive?

A. 00-02-201.

Q. And what does that executive directive provide in terms of mandating a review or audit of the fire safety and emergency response systems at

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 8 of 33

Page 21

Indiana State Prison?

A. It discusses the requirements for the facility to conduct monthly inspections and then central office to do an annual inspection with a follow-up.

Q. So that written policy, the Executive Directive 00-02-201, requires that a facility -- that staff at the facility level complete monthly inspections and that there be an annual inspection and any necessary follow-up conducted by staff of central IDOC; is that correct?

A. Yes.

Q. Okay. Other than providing for those monthly inspections and the annual inspection, is there anything else in that executive directive that provides for a requirement for reviews or audits of the fire safety policies and systems or the emergency response policies or systems at the prison?

A. No. It's monthly and then the annual.

Q. And other than that specific executive directive which you just described, is there any other written policy of the Indiana Department of Correction that directs or provides for reviews or audits of the fire safety or emergency

Page 22

response policies and systems?

A. Yes, but I'm not a -- those are not within my responsibility.

Q. Okay. Can you --

A. They're handled by other divisions.

Q. Can you explain what you mean by that?

A. The other emergency-type situations that might go into the Department of Corrections, some are handled by our emergency response and operations regarding that. The 00-02-201 is what handles the fire and safety.

Q. Okay. So I just want to make sure I understand the testimony you just gave. So there are other policies that apply -- well, strike that.

You just testified in response to my question about whether there were any other policies that would apply here, that, yes, they -- yes, there were, but those weren't within your purview or your set of responsibilities. Did I understand you correctly?

A. Correct.

Q. Is it your understanding that those other policies also touch on or relate to the subject of reviews or audits of emergency response

Page 23

policies, systems, programs or plans or fire safety policies, systems, infrastructure or plans at Indiana State Prison?

MS. EARLS: Objection. Compound. But he may answer to the best of his ability.

THE WITNESS: The 00-02-201 is specific for fire and safety. The other emergency operations policies and procedures I am not responsible for or have a lot of knowledge of.

MR. HEPPELL:

Q. Okay. And so if I understand your testimony, you are not in a position here today to offer binding testimony on behalf of the Indiana Department of Correction as to any policies relating to reviewing or auditing the policies or plans in place at Indiana State Prison as it relates to those other areas of emergency operations or emergency response?

A. Correct.

MR. HEPPELL: Can we go off the record for a second?

(OFF THE RECORD.)

MR. HEPPELL:

Q. Okay. Back on the record.

Page 24

Mr. Lintz, you testified there were other policies in place that you were not responsible for that we were just discussing. Are you aware of what those policy numbers are or, if you don't know the exact numbers, what those policy topic areas cover?

A. Those policies are more of the emergency response instead of the fire and safety.

Q. Okay.

A. Unfortunately, I don't know what those policy numbers are by memory.

Q. Who would be responsible for the emergency response side of the policies?

A. That would be Mr. Curry.

Q. Okay. And what is Mr. Curry's job title?

A. The Director of Emergency Response.

Q. And that's Mr. Richard Curry?

A. Yes.

Q. Okay. And so you and the testimony you just gave, you drew a distinction between emergency response and between fire and safety in your understanding. Can you explain that distinction in terms of what area -- you know, what does fall within your competency to testify to and what does not?

USDC IN/ND case 3:18-cv-00995-JD   document 212-31   filed 05/25/21   page 9 of 33

Page 25

A. My responsibilities deal with inspections, also the documentation completing the annual training for the facilities statewide and then their review of the life, health, safety manual, which is the 00-02-201.

Q. So the 00-02-201 is the life, health and safety manual, or that's the policy that describes your role in reviewing it?

A. That is the life, health, safety policy.

Q. Okay. And what are the areas covered by emergency response that you're not in a position to testify to?

A. That deals with Mr. Curry and the emergency responses dealing with like the disturbances and things of that nature.

Q. Okay. So in terms of reviewing the Indiana State Prison's policies or procedures for responding to an emergency situation where that emergency situation is a fire, is that something that falls within your responsibilities or Mr. Curry's responsibilities?

A. That falls more with Mr. Dudley, the Director of Fire and Risk Management.

Q. Okay. And can you explain a little more what you mean by that?

Page 26

A. He is the director that reviews the fire policies/procedures of the 00-02-201 and also assists with conducting the training, and he also is the one that does the annual visits to the facility.

Q. In the context of fire response; is that correct?

A. Yes.

Q. Okay. And I don't want to put words in your mouth, Mr. Lintz, but from what I'm gathering from the testimony you've just given, I think I'm gaining an understanding of where your responsibilities and ability to testify and where others may pick up, and so I'm going to articulate what I've gathered and ask you to, you know, tell me in what ways I'm right and what ways I'm wrong, just so we can help -- you know, help me to understand exactly what you're able to testify to today. Okay?

A. Okay.

Q. So from the testimony you've given, it appears to me that your role and responsibility would include the reviews and audits of the physical infrastructure related to fire safety at the prison but not the systems or programs or

Page 27

policies that were in place in terms of emergency response to fires. Do I have that generally correct, or can you clarify for me or correct me on that?

A. Yes, you're correct.

Q. Okay. And so in terms of Topics 9 and 10, which we had looked at earlier, would it be fair to say that your ability to give binding testimony on behalf of the Indiana Department of Correction this morning is limited to the reviews and audits of the physical infrastructure at Indiana State Prison as it relates to fire safety and emergency response and not these policies that touch on those areas and not those that are programatic aspects of those topics; is that fair to say?

A. Yes.

MR. HEPPELL: Okay. Kelly, I know we have Mr. Dudley slated for this afternoon. And I know Mr. Curry, unfortunately, I think his deposition was already taken solely as to Topic 11, which is the topic he was designated on. If Mr. Dudley is the person for whom it makes sense to designate sort of the aspects of Topics 9 or 10 that Mr. Lintz

Page 28

isn't able to testify to this morning and he's able to get designated on those topics this afternoon, I'm happy to go forward with that. I'm not sure if you need additional time to work with him on that.

MS. EARLS: Are we on the record still?

MR. HEPPELL: We are. We can go off the record. Do you want to go off the record?

MS. EARLS: Well, I would say that -- we can stay on the record.

I would say that Mr. Lintz probably has more background on policies and practices than -- but I'm happy to also agree to a designation of Mr. Dudley as to 9 and 10, but I think, you know, in asking specific questions that you have concerns about to which Mr. Lintz doesn't know the answer, you can readdress to Mr. Dudley later, but I think he actually probably does know enough about policies and practices that he could provide testimony to such.

MR. HEPPELL: Okay.

MS. EARLS: Even though he's not directly involved, I'm sure he can answer some of the policy questions.

USDC IN/ND case 3:18-cv-00995-JD   document 212-31   filed 05/25/21   page 10 of 33

Page 29

MR. HEPPELL: Okay. And I appreciate your willingness to designate Mr. Dudley on those as needed, and we can go forward and see what gaps arise in the course of the deposition.

Q. Mr. Lintz, the monthly inspection and the annual inspection that you described earlier as being directed in that Executive Directive 00-02-201 -- well, starting first with the monthly inspection, can you please describe what the monthly inspection provided for and that directive entails or covers?

A. The monthly inspections that are completed by the Safety Hazard Manager at the facility level is the full facility-wide inspection for fire, health and safety issues according to code, dealing with electrical irregularities, excessive fire loads, etc., just dealing with the codes, also food codes, and that is done at the facility level. And then they send the -- they complete the monthly inspection to the warden.

Q. Okay. And does the written policy direct who is responsible for conducting that inspection?

A. Yes, it's the Safety Hazard Manager.

Page 30

Q. And during the time period at issue in this case, that would have been Mr. Griffin at Indiana State Prison; is that correct?

A. Yes, I believe so.

Q. And when the policy directs the Safety Hazard Manager to conduct that monthly inspection, is it the expectation that that specific individual will themselves personally, you know, complete that physical tour of the prison and that they personally will note any issues and document those in the report?

A. Yes.

Q. Okay. That's not a responsibility that they have the authority to delegate to someone else?

A. No.

Q. And then in terms of reporting, I believe you indicated that that report is provided to the warden; is that correct?

A. Yes.

Q. Okay. And is there any -- strike that.
I asked you earlier about written policies that applied at Indiana State Prison related to these topics. Were there any unwritten policies or informal policies or practices on these topics that applied outside

Page 31

of the written policy that you've testified to?

A. No.

Q. Okay.

A. We have that specific policy to follow.

Q. Okay. Does the written policy provide a direction to the Safety Hazard Manager in terms of how comprehensive that physical inspection needs to be?

A. They are -- during the training, they are taught to make sure that they are very specific when they put the description of what they have found, and that is because of the individuals that are going to make the repairs or fixing know exactly where to go and what to do to make the repairs if there is something wrong noted on the deficiency page.

Q. Okay. And in terms of areas of the prison that are covered by that inspection, is it -- does the policy require that, you know, literally every square foot of the prison be covered by the inspection, or is there some direction that's given in terms of, you know, how the physical geographic scope of that inspection takes place?

A. In the policy it's described as "all areas of

Page 32

the facility."

Q. And does that include the interior of prisoners' cells?

A. Yes, it -- they do a walk-through of the cell houses and walk the ranges to look at things as that as well, yes.

Q. And is it the expectation -- is it the requirement of that policy that the Safety Hazard Manager -- well, strike that.
The description you just gave, if I understood you, it sounds, sir, like a visual inspection of the interiors of the cells, but completed by walking, you know, as you described, walking the ranges and looking into the interiors of prisoner cells; is that correct?

A. Yes.

Q. Now, fair to say that there could be safety issues that would not be immediately apparent from a -- the level of visual inspection that you would give walking past the cell looking into the interior of it as you're walking past on the range; is that fair to say?

A. Yes.

Q. Okay. And what direction is given to the Safety

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 11 of 33

Page 33

Hazard Manager to ensure that they are gathering information about safety hazards or other issues that may exist that would not be -- that would not be or may not be caught through that sort of -- you know, through that level of visual inspection?

A. I don't understand the question.

Q. Sure. Well, so you described the process of inspecting the interior of prisoner cells being a visual inspection conducted by walking along the ranges, walking through the cell houses; correct?

A. Yes, it's a visual inspection.

Q. And that visual inspection in terms of a systematic inspection doesn't even involve going inside of prisoner cells; is that correct?

A. Right, yes.

Q. Okay. Does the policy provide any direction to Safety Hazard Manager in terms of additional methods of gathering information about potential safety hazards that might be missed by that visual inspection conducted from outside of the cells?

A. No. It is specified in the policy how to do the inspection -- or basically during the training

Page 34

of how to do the inspections.

Q. Okay. Well, let me ask it this way: Is it the expectation of the Indiana Department of Correction whether through written policy or unwritten policies or practices that the Safety Manager also try to affirmatively gather information from correctional staff and prisoners about safety hazards that may exist but that might be missed on the level of inspection -- the level of visual inspection that you've described?

MS. EARLS: Objection as to compound, but Mr. Lintz can answer.

THE WITNESS: If the Safety Hazard Manager has been notified that there's possibly an issue, they would do a follow-up inspection of that area.

MR. HEPPELL:

Q. Is it the expectation that the Safety Hazard Manager do anything proactive to seek out or solicit any information about potential issues, or is it solely if one is brought to his attention that he act on it?

A. No. The Safety Hazard Manager receives weekly and monthly inspections throughout the facility

Page 35

through -- by the custody staff, custody supervision and things that they review that lets them know if there's something in the area. And when they are in the area doing their inspection, they can do a follow-up.

Q. As to the monthly inspection conducted by the Safety Hazard Manager, is it your testimony that there's no requirement either written in the policy or sort of an unwritten expectation outside of the written policy that the Safety Hazard Manager do anything proactive to learn information about safety hazards at the prison beyond the visual inspection?

A. The safety managers at the facilities are throughout the facilities throughout the month. Always constantly we try to get them to, during our training sessions, to be proactive when they have staff or see an issue to where they can inform the staff if there is like excessive -- like anything that deals with any kind of hazards. Education of the staff there is an ongoing thing to -- because the more training and information that you give the staff, the safer everything is going to be.

Q. And fair to say that, at least in terms of

Page 36

safety hazards that exist within a prisoner's cell, the prisoners themselves would be important sources of information about such potential hazards; is that fair to say?

A. Yes.

Q. Okay. And is it the expectation as part of the review or inspection policies of the Indiana Department of Correction that the Safety Hazard Manager is ensuring that he or she is gathering information from prisoners about potential safety hazards?

A. I don't understand the question.

Q. Sure. Well, let me rephrase the question then. Is it a requirement or expectation of the Indiana Department of Correction that Safety Hazard Managers are taking steps to gather information from prisoners about potential safety hazards that may exist at the facility including in prisoners cells?

A. The safety managers, when they walk through the housing units and things like that, they do bring it to the offender's attention and the staff attention on excessive -- just anything -- any kind of safety features or safety issues or anything like that and address that at that

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 12 of 33

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

Page 37

time.

Q. And the situation you just described, it sounded to me like it was a situation where there was a safety issue that the Safety Hazard Manager observed and they wanted to bring it to the attention of staff or to the attention of prisoners. Is that what you were describing?

A. Yeah. They are taught to be proactive on things. If they see, as an example, trash cans blocking a fire extinguisher, they explain to the staff and the offenders about you can't have anything in front of like a fire extinguisher because that is not giving the fire extinguisher accessibility without something blocking it and being an obstruction. So they teach them while they're there and then move like the said trash can, but it's training like that and just more information like that.

Q. What about information, going the other way, the Safety Hazard Manager seeking out information from prisoners about potential safety issues or hazards that they may have perceived or observed?

A. I believe that they do something along that line with like a meeting that the wardens do with the

Page 38

offender -- there's a -- the offender groups. They meet with them to discuss issues in their housing units, but that is done through the warden's office.

Q. Okay. But that is another way in which safety issues at the prison would be brought to correctional staff's attention would be through those meetings between prisoner representatives and the warden; is that correct?

A. Yes.

Q. Okay. Is there anything in the Indiana Department of Correction policies that restricts or prevents the warden from imposing additional requirements on the Facility Hazard Manager or Safety Hazard Manager or additional requirements as to how those monthly inspections should be conducted?

A. I guess I'm not understanding your question.

Q. Sure. Let me try and rephrase it.

A. Okay.

Q. You had testified to -- you had testified that the policy set forth certain requirements for how the Safety Hazard Manager was to conduct those monthly inspections; correct?

A. Yes.

Page 39

Q. Is there anything in IDOC's policies that restricts or limits the warden from imposing additional requirements or asking for more stringent levels of inspection from the Safety Hazard Manager?

A. No.

Q. So for example, I believe it was your testimony that the policy -- IDOC policy did not require the Safety Hazard Manager to sort of proactively engage in conversations with the prisoners to seek out information about hazards that might exist in their cells; is that fair to say?

A. There's nothing in our -- in the 00-02-201 that requires anything dealing with the offender and safety hazard communications.

Q. Okay.

A. It's just the actual inspection itself.

Q. Okay. There's nothing in IDOC's policies that would prohibit or restrict either the warden from requiring that or the facility -- the Safety Hazard Manager from engaging in that on their own; is that fair to say?

A. Yes.

Q. And in fact, is it fair to say that if either the warden or the facility -- the Safety Hazard

Page 40

Manager believed that was necessary to ensure safety at the prison, they would be required to implement that kind of step; is that fair to say?

A. Yes.

Q. Are there conversations or information gathering required with anyone -- strike that.
In describing the monthly inspection conducted by the Safety Hazard Manager, you've described it as sort of, you know, physical visual inspection of the prison; is that fair to say?

A. Yes.

Q. Is there any requirement within that policy of any conversation or information gathering with anyone outside of that physical visual inspection?

A. Not in policy, no.

Q. Okay. Those kinds of information-gathering mechanisms are left to the warden and the Safety Hazard Manager to implement as needed; is that correct?

A. Yes, according to what they -- that would be according to what they -- what their findings are in the monthly inspection. If they find an

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
GREGORY LINTZ
September 24, 2020

Page 41

issue in an area that needs extra attention, the warden with the Safety Manager would probably impose more inspections in that area or just having less -- you know, if there's like the example with the extinguishers and things, relocating items and things like that.

Q. Fair to say it would not be appropriate under IDOC's policies for a Safety Hazard Manager or a warden to ignore issues that were raised with them by prisoners or by prison staff just because those weren't issues that arose during the formal monthly inspection?

A. All of our monthly inspections are deficiencies. They are attached with a certain code either from the International Fire Code, International Building Code, OSHA code, so they actually have a code attached to them, so they have to be addressed.

Q. Setting aside issues that arise during the formal monthly inspection, is it -- would you agree with me that it's not permitted under IDOC's policies for a warden or a Safety Hazard Manager to ignore or to fail to take steps to address a safety issue that's brought to their attention just because it didn't arise during

Page 42

the course of the, you know, monthly physical visual inspection of the facility?

A. Those are the meetings that I discussed a little bit ago dealing with the warden and the area representatives from the offenders. That is all done during those meetings. And then it's up to the warden to assign the individuals to look into those procedures, but that's separate from the monthly inspection by my safety manager.

Q. Okay. But would you agree with me that IDOC policy requires either the warden or the Safety Hazard Manager to take steps to address and investigate those kinds of issues even if those issues arise outside of the monthly inspection?

A. Yes.

Q. You had described an annual inspection in addition to the monthly inspection requirement; is that correct?

A. Yes.

Q. And can you describe or explain how the requirement for the annual inspection is different from the monthly inspection?

A. The annual inspection is done by staff that are not directly reports to the warden. They are the direct reports to the commissioner and the

Page 43

Director of Construction Services. When we come in to do the annual inspection, we look at the full facility and then also look at the -- review the documentation dealing with the different safety systems.

Q. So if I understood what you just described, there were two aspects to that annual inspection. There's sort of a full facility physical inspection and then also reviewing documentation. Did I understand that correctly?

A. Yes.

Q. Okay. And in terms of the full facility inspection, is that something that is -- takes the same form of inspection as the monthly inspection that's conducted by the Safety Hazard Manager?

A. Yes.

Q. Okay. And so in terms of the inspection of the interior of prisoner cells, that just takes the form of a visual inspection conducted from outside of the cells as the person conducting the inspection walks down the range?

A. Yes.

Q. Is there any aspect of that full facility inspection during the annual inspection that

Page 44

involves sort of proactively gathering information from either prison staff or prisoners themselves beyond the visual inspection of the physical conditions of the facility?

A. If during our inspection we have some of the offender population come up and mention that they have an issue in a specific area, we try to review that and address that to see if the actual information is factual. If it is a part of the physical plant that needs to be addressed and it is a code violation, then by all means we list it on our report.

Q. Okay. Other than if -- so if a prisoner comes up to you during the inspection, is there any sort of proactively seeking out information either from prisoners themselves or from prison staff during the annual inspection?

A. I don't understand the question.

Q. So the scenario you just described would be, you know, if during the physical walk-about for the annual inspection, you know, one of the prisoners came up to you or came up to the person conducting the inspection and at their initiative raised an issue with you. Is that

USDC NND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 14 of 33

Page 45

the scenario you just described?

A. Yes. Like if an offender would come up and say we're having issues, if it's a dormitory-style setting and they're having issues in the restroom area with three or four toilets not working, then we would go to that area to confirm, and that would be something that we would put on our report.

Q. So my --

A. Same thing --

Q. Go ahead.

A. The same thing dealing with like if there is like electrical issues or things like that, we would look into those as well.

Q. Okay. And so my question is outside of, you know, responding to issues that are brought to your attention, is there any part of the annual inspection that involves sort of seeking out or canvassing for information about issues from either prison staff or prisoners themselves?

A. I mean, unless they come up to talk to us when we do the inspections, I -- no.

Q. Okay. So that was a no at the end of your answer? Just the audio glitched out for a second. Is that correct? Unless they come up

Page 46

to you, it was a no?

A. Yes, if they come up to us and tell us of an issue or if one of the staff come up and tell us about an issue, we can address it.

Q. Outside of that, no sort of proactive reaching out to prisoners or staff to ask them about issues that may exist; fair to say?

A. Yes.

Q. And then the -- you also described that that annual inspection involves reviewing documentation dealing with safety systems. Can you describe what you mean by that or explain that?

A. When we do the documentation review, we look at the fire drill reports that are conducted, the monthly inspections that are conducted by the safety managers. We look to verify that the fire alarm systems, sprinkler systems and hood systems are up to date on their inspections and compliant. We also review if we've been -- if the facility has been audited by the Department of Health. We also review those. And we also review if they've been audited by the Fire Marshal's office. We also review that documentation as well, along with physical plant

Page 47

dealing with looking at the documentation for like HVAC filter changes and lift inspections during the documentation review.

Q. Okay. And how are the results of the annual report or the annual inspection documented?

A. Excuse me?

Q. How are the results of the annual inspection documented?

A. They are put on a deficiency report, and that is sent to the warden for a plan of correction. And then once the plan of correction has been completed, it is forwarded back to central office. And then once items are -- have been corrected, then a follow-up inspection has been done or they provide photos of the corrective action, and then the report is deemed compliant.

Q. Is there any IDOC policy which was in place at Indiana State Prison during the designated time period that required any sort of systematic or comprehensive inspection of electrical systems or electrical fixtures within a prisoner's cell beyond the visual inspection from outside of the cell walking the ranges that you've described earlier?

A. Not that I'm aware of, no.

Page 48

Q. And you know, just to clarify, you -- that's -- is that an area that does fall within your responsibilities that you're prepared to give binding testimony on behalf of the Department of Correction on that subject matter?

A. Yes. When we do our inspections, we do a full walk-through and just a visual inside the cells.

Q. Okay. And so no requirement at any point that there be any physical inspection whether visual or involving testing of any of the electrical fixtures or systems within a cell beyond that visual inspection from outside of the cell?

A. Not that I'm aware of.

Q. Okay. And again, just -- you know, just so I'm clear and so you're aware, you know, unless -- your testimony today is not just to the extent of your personal knowledge but is binding on behalf of the department. So is there someone else that we should talk to that would be able to give a more definitive answer to that question, or is a binding answer on behalf of the department that there is no such policy?

A. I -- the only other person that might would be the Director of Construction Services.

Q. Okay. But your answer included in your

Page 49

designated capacity deposition today is that there is no such policy; is that correct?

A. Not that I'm aware of, no.

Q. Well, I guess I'm struggling, and I'm not trying to belabor the point, Mr. Lintz, only because your testimony today is intended to be binding on behalf of the department. So if you're not able to give a binding answer on that topic, then I would need to know that so I can follow up with counsel for the department in terms of whether there is some additional policy that would require those types of inspections.

So are you able to -- are you able to give that binding testimony on that topic, or is that something that someone else would need to speak to?

A. What I can testify on is regarding the inspections that we complete and the documentation that we review.

Q. And as part of those inspections, no requirement to do any physical inspection or whether visual or involving testing of any of the electrical systems within a prisoner's cell; is that correct?

A. Yes.

Page 50

Q. Fair to say that there's no IDOC policy that would prevent or restrict the warden at Indiana State Prison from requiring such inspections to take place at his or her own initiative?

A. Correct.

Q. And no policy of IDOC that would restrict the Safety Hazard Manager from, at his own initiative, engaging in those kinds of inspections if he wished to; is that fair to say?

A. Correct. If the safety manager during his or her walk-through of the facility sees like a light fixture or an outlet or something like that that has been altered or removed or destroyed, they can do a more in-depth review of that area and call over like the facility electrician and things like that, but that would all be made note of in their monthly report.

Q. So if those aren't noted in the monthly report, then fair to say that those kinds of inspections are not happening?

A. I don't understand what you're -- what --

Q. So if those types of inspections that you just described were happening, those would be documented in the monthly reports; is that

Page 51

correct?

A. Yes, yes.

Q. So if it's not in the monthly reports, then safe to say that that didn't happen; correct?

A. Correct. If they did not see the cover is missing or the light fixture altered or damaged, then chances are it was in good working order at the time when they were by it.

Q. And would you agree with me that the -- that the policies of the Indiana Department of Correction would require the warden or the Safety Hazard Manager to take additional inspection steps beyond the minimums required in that policy if the situation at the prison was such that additional inspection was required to insure safety of the prison?

MS. EARLS: Objection as to compound, but he may answer if he knows.

THE WITNESS: If -- as -- if during the inspection the safety manager finds an issue with an area, then they should be -- then they would go back and do follow-ups to see that those were corrected.

MR. HEPPELL:

Q. And if there were information that the warden or

Page 52

the Safety Hazard Manager were aware of that suggested there was some sort of, you know, widespread systematic issues with a certain system, for example, widespread issues with the electrical outlets in prisoners' cells, would you agree with me that they would be required to take steps to address that, including inspections or audits that went beyond the minimum requirements of the monthly or annual inspection, if that was necessary, to insure facility safety?

A. Yes, if it is noted on the safety inspection by the Safety Hazard Manager, those documents, not only do they go to the warden, but they are sent to the physical plant director of the facility who has the electricians, the plumbers, the carpenters to address any and all issues that arise with the plumbing of the cells, the electric of the cells and of the facility itself.

Q. So --

A. So if there is an issue, it would be addressed.

Q. And you referenced something that would be documented on the report, but even if something is not documented on -- in writing, if they

USDC NND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 16 of 33

Page 53

learned information either from prisoners or prison staff about a widespread issue at the prison, they would be required to take additional steps to inspect or investigate beyond the requirements of the monthly inspection; is that fair to say?

A. Yes.

Q. Okay. That could include a requirement to take a closer look at electrical installations or electrical outlets within prisoner cells if they were made aware that there were widespread problems with those types of systems?

A. Yes. And a lot of times those are corrected or initiated through the staff with the work order system that would notify the electrician -- the physical plant, so they could notify the electricians or plumbers, whatever the issue is, whether it was electricity or plumbing.

Q. And so you just described that there would be work orders. If there was a particular issue that was noted and addressed, that would be documented in writing; is that fair to say?

A. They've got a work order system, yes.

Q. If there had been any efforts to conduct inspections or reviews of any physical

Page 54

conditions at the prison, including, for example, electrical systems within prisoner cells that took place outside of the context of the monthly inspection, would those also be documented in writing?

A. Through work orders, I would imagine.

Q. When you say through work orders, work orders would reflect if there was an issue found or repairs that were required to be made; correct?

A. Yes.

Q. But a work order wouldn't document an inspection unless the inspection found a deficiency that needed to be repaired; is that fair to say?

A. Yes, because the areas are inspected on a weekly and then the monthly and then the annual.

Q. Right. And you couldn't tell from looking at the face of a work order whether that issue was detected during a systematic inspection or if it was detected just because someone brought the issue to a person's attention, for example, a prisoner saying, hey, there's, you know, a problem with the electrical outlet in my cell, something like that?

A. Correct. It would be just an issued work order for an electrical issue or a plumbing issue or a

Page 55

carpenter issue.

Q. And so my question is about the documentation that would exist that would show if there were any inspections being conducted through systematic inspections inside of prisoner cells beyond the requirements -- the minimum requirements of the monthly inspection, which does not require someone to go inside of a prisoner's cell. Would the IDOC policies require that those kinds of, you know, inspections be documented somewhere?

A. If the inspection -- when the Safety Manager walked the range and seen that there was, like I said earlier, an open electric box, an open light fixture, then that would require for the electrician to go back in to do an in-depth inspection to find out what would it take to do the repairs or make the repairs into that area from the inspection, but if a staff member of that area turns in a work order that they seen it before or after while they were doing their inspection or their cell walk or their range walk, they also generate work orders during their walks as well.

Q. And I appreciate that, Mr. Lintz. My question

Page 56

is just a little different, and so maybe let me ask it with an illustration.

If -- you had agreed with me earlier, I think, that there was no IDOC policy that would have prevented the warden at Indiana State Prison from saying, hey, we've had a lot of concerns raised with problems with electrical outlets in prisoners' cells. I want you, Safety Hazard Manager, to go through and conduct an up-close inspection of electrical outlets inside prisoners' cells. No policy would restrict the warden's ability to do that if he felt it was necessary for prisoner safety; fair to say?

A. Fair to say. No, there wouldn't be any restrictions.

Q. If that kind of inspection of -- you know, of electrical outlets within prisoners' cells were conducted by the Safety Hazard Manager whether at his or her own initiative or at the direction of the warden, would it be the expectation pursuant to IDOC policies that the Safety Hazard Manager would create some documentation reflecting that that inspection took place?

A. Yes.

Q. And not --

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 17 of 33
Cause No. 3:18-cv-00995-JD-MGG
GREGORY LINTZ
September 24, 2020

Page 57

A. Yes. We teach our safety managers any time that they do an inspection, it must be documented because anything that is documented we have to put the codes with it to verify that it is against a certain code violation.

Q. And it's important to document inspections not solely to see the issues that were -- that were found, any deficiencies found, but also to document that the inspection was done and that areas were reviewed; is that fair to say?

A. Correct.

Q. And so Safety Hazard Managers are aware and IDOC requires them to document not just deficiencies but also to document areas that they inspect even if no deficiencies are found; is that fair to say?

A. Correct.

Q. At any point at Indiana State Prison during the designated time period of 2015 through 2017 was there any systematic testing review or inspection of electrical systems inside of prisoner cells beyond the visual inspection conducted from walking the range outside of the cell that you described earlier?

A. Not that I'm aware of, no.

Page 58

Q. The review that you -- the reviews that you've described focused on reviews of the facility itself, the physical review of the facility itself and reviewing documentation created during those kinds of physical inspections.
    Is there any review process for fire safety or emergency response that looks at whether the policies of the prison itself are adequate?

A. There is a review done by our Program Review Division over policies and procedures.

Q. And can you explain what you mean by that?

A. When -- like with the -- they are done on an annual -- some are annual. Some are longer distance now. But they are reviewed by the Program Review to see if there needs to be any upgrades or -- like with our policy, if there's changes in the buildings or changes within code, we make changes accordingly and pass that along to Program Review to update our policies. If there's like state codes that have changed or federal codes that have changed dealing with inspections --

Q. Okay.

A. -- we update those to meet the codes.

Page 59

Q. And so the type of review that you just described sounded to me like that was insuring that the actual code requirements were being updated and whatever policies were in place at the prison; is that fair to say?

A. Yes.

Q. Was there any review process at the Indiana Department of Correction level that reviewed the policies in place at Indiana State Prison in terms of fire safety and emergency response outside of those -- of the building code requirements?

A. Not that I'm aware of, no.

    MR. HEPPELL: Okay. Can we take a 10-minute break off the record and then come back at, I guess, 10:00 Central, 11:00 Eastern?

    THE WITNESS: Sure.

    MR. HEPPELL: I'll pause the recording here, and we'll come back at the top of the hour if that works for everyone.

    MS. EARLS: Sounds good.

    (A BRIEF RECESS WAS HAD.)

    MR. HEPPELL:

Q. So resuming the recording and back on the

Page 60

record.
    Mr. Lintz, if I understood your testimony earlier regarding the monthly and annual inspections required by IDOC policy, those focused on insuring that the different areas of the prison that were inspected met with the different requirements of code; is that fair to say?

A. Yes.

Q. Is there -- was there any review process in place at Indiana State Prison to determine whether changes or improvements to the fire safety infrastructure at the prison were necessary or advisable outside of just insuring that the prison met the requirements of code?

A. Not to my knowledge, no.

Q. Is that something that would have been a separate requirement for the warden to investigate in the context of his or her overall responsibilities for the facility management even if not directly required by a written IDOC policy?

A. When it comes to the policy that deals with the fire and safety inspection, all wardens would have input. Any type of -- if they have had

Page 61

issues or we needed to address them throughout the state, we would do reviews. But strictly our policy deals with following the guidelines on the codes.

Q. Okay. So for example, there's nothing that would prevent a warden of a facility from reviewing the -- from reviewing the fire safety infrastructure at the prison and saying, you know, the code minimum is that we have X number of fire extinguishers on the unit, but to make things safer, I think we should increase the number of fire extinguishers or place them in additional locations throughout the cell house?

MR. ROSE: Objection to the extent the question is compound.

MR. HEPPELL:

Q. You can go ahead, Mr. Lintz.

A. Okay. Yes, the code -- if the warden would like to have more fire protection or more protection, they have that ability to add to the minimum requirement.

Q. And so that's not part -- those kinds of conversations or decision-making processes is not part of the monthly or annual review process that you've described; is that fair to say?

Page 62

A. Yes, correct.

Q. Okay. But it would be -- fair to say that it would be an expectation of the warden as part of their overall responsibilities for insuring safety at the prison that they are proactively reviewing all prison policies and prison infrastructure to make sure not just that it's meeting minimum code requirements but that it is meeting the needs of the facility in terms of providing adequate safety?

MS. EARLS: Objection as to compound. Objection as to vague. But Mr. Lintz can answer.

THE WITNESS: Yes.

MR. HEPPELL:

Q. During the time period of January 1st, 2015, through December 31st, 2017, was there any system in place whereby -- at Indiana State Prison by which the warden or his designee was engaged in that kind of systematic review of considering improvements to the fire safety systems at the prison beyond insuring that they met the minimum levels of the code?

A. Not that I'm aware of.

Q. Are sprinkler systems required by the code?

Page 63

A. In areas -- the way -- and Mr. Dudley will need to be addressing this because of his expertise in the fire side, but depending on the building and the code for the time the building was designed and built would determine whether the building needed sprinkler systems or not.

Q. So that's not something that you are able to testify to in detail?

A. No, sir. That would be Mr. Dudley.

Q. Okay. Is there any IDOC policy that restricts or limits the warden's ability to consider or explore improvements of physical infrastructure, like sprinkler systems, beyond the minimal requirements of that code?

A. When it comes to the sprinkler systems, they stick -- they stay within policy. And that is through the International Fire Codes and certain codes designated by Homeland Security.

Q. When you say they stay within policy, is it your testimony then that a warden would be prohibited from exploring the possibility of putting sprinkler systems in if it were the case that the minimum requirements of code did not mandate the sprinkler system be implemented?

A. That question would need to be answered by

Page 64

Mr. Dudley regarding the fire suppression system.

Q. Okay. You understand that the fire at issue in this case occurred in B cell house; correct?

A. Yes.

Q. Was there -- at any point in the designated time period was there any discussion or review either before or after the fire as to putting in sprinkler systems in B cell house?

MS. EARLS: Objection insomuch as it goes outside the scope of the 30(b)(6). He's not here to testify on his own actual behalf, but Mr. Lintz can answer if he knows.

THE WITNESS: I'm not aware of any, no.

MR. HEPPELL: And just, you know, to your objection, you know, it would be our position that reviews of the -- as set forth in the 30(b)(6) notice, reviews of fire safety infrastructure would cover sprinkler systems and the designation or the topics set forth in the notice, which specifically includes any conclusions reached or corrective action plans imposed as a result related to the systems in effect at Indiana

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC INND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 19 of 33

Page 65

State Prison during the stipulated time frame. So I disagree that that falls outside the scope of the 30(b)(6) deposition.

Q. But I do understand, Mr. Lintz, you to be saying as to sprinkler systems, that's a topic better addressed with Mr. Dudley; is that fair to say?

A. Yes.

Q. During the designated time period, was there any review or discussion either before the April 2017 fire or after as to the effect on fire safety that limitations to the water flow or availability of water through the restrictions on flushing toilets in prisoner cells in B cell house would have on fire safety?

A. Not that I'm aware of, no.

Q. And is that something that would fit within your area of responsibility, or would that be a question to be addressed to Mr. Dudley as well?

A. Mr. Dudley as well.

Q. Okay. Was there any review of the fire safety or emergency response policies, systems, infrastructure, plans, or programs that took place as a result of the April 2017 fire that killed Mr. Devine?

Page 66

A. Not to my knowledge, but that would be addressed by Mr. Curry who done the -- would possibly have done the after action, along with the warden.

Q. Okay. And so you referenced the After Action Review. Is that the review mechanism during which issues related to fire safety or emergency response policies as they were implicated by the fire, is that the mechanism by which those would be addressed?

A. The After Action Review is a step by step on what the incident was and the actions that were taken.

Q. And what about a review of whether the systems or policies or infrastructure in place at the prison played a role in the events that took place? Is that covered by the After Action Review, or is that a separate review policy?

A. That would have been addressed as well.

Q. In the After Action Review?

A. It should have, yes.

Q. Okay. And outside of the After Action Review -- well, strike that.

The After Action Review is convened and conducted by staff from central IDOC as opposed to staff at the facility; is that correct?

Page 67

A. The After Action is assisted by the central office, but it is conducted at the facility itself.

Q. Okay. There's nothing preventing or restricting the warden from conducting a review of fire response or fire safety policies or systems or procedures beyond them in the requirements of the IDOC policy; is that fair to say?

A. Yes.

Q. And in fact, would you agree that IDOC policy imposes on the warden an independent obligation to insure that those policies and systems in place at the prison are adequate and sufficient to protect the health and safety of both prisoners and prison staff?

A. I don't understand the question.

Q. Would you agree with me that in addition to the minimum requirements of different review processes that we've talked about and you've testified to today, that the warden has some overarching obligation to ensure that the systems and policies and procedures in place at the prison are adequate to protect the life, health and safety of prisoners and prison staff; fair to say?

Page 68

MR. ROSE: Objection. Compound as vague.

MS. EARLS: And I'm going to object that it calls for legal speculation and legal conclusion, but Mr. Lintz can answer to the best of his ability.

THE WITNESS: I lost some of the vocal on that. I apologize.

MR. HEPPELL: No problem. Madam court reporter, did you catch that question? Are you able to read that back?

(RECORD READ BACK AS REQUESTED.)

THE WITNESS: Yes.

MR. HEPPELL:

Q. I think I know the answer to these questions, and I think your answer is going to be that I need to talk to Mr. Dudley, but just so I make sure I'm not failing to address a topic that I need to address with you, Mr. Lintz, if you wouldn't mind bearing with me.

A. Okay.

Q. The person who can best give a binding answer on behalf of the Department of Correction in terms of reviewing the fire drill procedures in place at Indiana State Prison, would that be you or

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 20 of 33

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

Page 69

Mr. Dudley?

A.  Mr. Dudley.

Q.  Okay.  In terms of the review of the procedures and policies in place giving direction to correctional staff for how to respond in the event of a fire, would that be best directed to you or to Mr. Dudley?

A.  That could be done with both of us because we follow the fire drill procedures according to fire code, which is once per building, per shift, per -- once per building, per shift, per quarter when we talk about the fire drills.

Q.  Okay.  Once per building -- go ahead.

A.  But you can ask Mr. Dudley as well.

Q.  The requirement to conduct a fire drill once per building, per shift, per quarter, what IDOC policy is that requirement set forth in?

A.  That is actually a fire code.

Q.  And is that -- is that set forth also in that 00-02-201 policy, that that's incorporated in that policy as well?

A.  Yes.

Q.  Okay.  I have a copy of that policy effective as of September 1st, 2019.  I believe we have requested but not yet received a copy of that

Page 70

policy that was in place as of the designated time period.  Are you aware of substantial or any substantive changes in that policy between the version that was in place from January 1st, 2015, through December 31st, 2017, versus the version that became effective as of September 1st, 2019?

A.  No.

Q.  So that while there may have been formatting or other changes, in terms of the substance that policy sets forth, that should be the same in substance as the previous version of the policy?

A.  There were some minor changes, but I don't have those in front of me.

Q.  The policy describes an individual as a Fire Chief or designates an individual as a Fire Chief.  Are you familiar with that aspect of the policy?

A.  Yes.

Q.  And is that a different individual from the Safety Hazard Manager?

A.  Yes.  At four of the facilities they actually have IDOC fire departments.

Q.  Okay.  And so the Fire Chief referred to in this policy is referring to the prisoner Fire Chief?

Page 71

A.  No.  That is -- that section there dealing with the Fire Chief is for the IDOC Fire Chiefs, and the state prison does not have a staff fire department that is designated for the department Fire Chiefs.

Q.  Okay.  Maybe this is going to be easier if I pull up that policy, and you can help me walk through it in particular.  So we can mark this then as Exhibit 2.

MS. EARLS: Sam, as you're marking and when you pull it up, can you drop it in the chat as well?  That's how I've been doing it in depositions is to drop the actual document.

MR. HEPPELL: Oh, sure.  That's no problem.  I will be happy to do that.  So I can do that both for Exhibit 1 and Exhibit 2.  Let me see.

I'm not seeing an option to drag and drop that file in the chat.  I feel like I've done that before, so I'm not sure why I'm struggling with that.

Can we go off the record for just one second?

(OFF THE RECORD.)

Page 72

MR. HEPPELL:

Q.  So going back on the record.

So Mr. Lintz, I'm going to pull up what's been marked as Exhibit 2, and this is a copy of Policy No. 000-201, which is titled, "Compliance With Federal and State Fire, Health, and Safety Regulations."  Are you able to see that pulled up on my screen here?

A.  Yes.

Q.  Okay.  And it's a 14-page policy.  And this version with an effective date of 9/1/2019, is this the policy you had referred to earlier in terms of the written policy governing some of the topics that we had discussed earlier in the deposition?

A.  Yes.

Q.  Okay.  And just to note for the record, this Exhibit 2, it's Bates-stamped SUP, S-U-P, 5548 through 5561.  And the Section 9 of that policy refers to a -- on Page 6 and going on to Page 7 refers to a Fire Chief.

A.  Yes.

Q.  And can you explain how that section of the policy applies at Indiana State Prison where they do have a prisoner fire department?

DENISE DWYER, et al. v.  Cause No. 3:18-cv-00995-JD-MGG  GREGORY LINTZ
RON NEAL, et al.  September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 21 of 33

Page 73

A. This -- the explanation on this policy that deals with the Fire Chief is for a state employee Fire Chief. The only places that we have state IDOC Fire Chiefs are -- there is not one at the state prison.

The state prison has only an offender fire department and Fire Chief, and that is a different policy that Mr. Dudley would have to address because he's over the aspect of the fire department.

Q. Okay. So in terms of the duties set forth in that section of the policy regarding reviews and inspections of fire safety, reviewing the -- reviewing and inspecting the fire safety equipment, are those duties that would be assigned at Indiana State Prison to the Safety Hazard Manager?

A. Yes.

Q. Okay. And in terms of the specific details of that review, in terms of fire drill procedures -- well, strike that.

You had testified to a sort of joint area of responsibility between you and Mr. Dudley in terms of the fact that fire drills are a requirement of the code?

Page 74

A. Yes.

Q. Outside of the requirement of fire drills per code, are there any other areas of fire safety response that would fall within your competency to testify to as opposed to Mr. Dudley?

A. During the annual inspections, when we go through to do the full facility inspection.

Q. And you've already testified to that.

Outside of those areas, anything else that I would need to ask you about as opposed to Mr. Dudley?

A. No.

Q. Okay. In terms of the required fire drills, what review process is in place to ensure that those fire drills are conducted and that they are conducted effectively?

A. That is during the annual inspection review of the documentation.

Q. And what -- when you say annual inspection review of the documentation, what documentation specifically regarding fire drills are you describing?

A. There's a fire drill -- it's -- there's a fire drill form that is filled out by the safety manager or whoever -- or whoever conducts the

Page 75

drill that talks about the time when it was taken, what building it was taken, and how many were evacuated and so forth.

Q. And I believe you had testified that the requirements were quarterly drills on once per shift; is that correct?

A. Per building, correct.

Q. Once per building, per shift, per quarter?

A. Yes.

Q. And what are the minimum requirements that the fire drill entail?

A. That would be a question for Mr. Dudley.

Q. Okay. So in terms of your -- of the review of the fire drill in the context of the annual inspection, that's just looking at those documents to see there was some sort of fire drill conducted on this date, at this time, at this building; is that fair to say?

A. Yes.

Q. And in terms of reviewing the substance of that documentation, like, did the staff perform well? Did the staff perform poorly? Was it a proper evacuation, or was it just a -- sort of a verbal or simulated drill? Are those topics that would be covered as part of the annual review?

Page 76

A. Yes, those would be items that would be listed on the individual sheets that the Safety Manager would fill out that we would review annually.

Q. And what is the review process related to fire drills to ensure that staff are performing well on fire drills?

A. The only thing would be the documentation, how long it takes. If we look at the documentation, if it took an overextended time to be able to evacuate a certain building, we would be looking at why it took so long to evacuate the building. Was it obstructions at the doorways, or was it just noncooperative personnel or offenders? Things like that, that would cause issues with the drill. If there was something like that, then the review would be -- and that would be where we could do more drills to educate or find out what the core problem was and address it.

Q. Is that ultimately the responsibility of the Safety Hazard Manager at the facility to ensure that the fire drills are going smoothly and if they're not to take remedial steps to improve the conduct of those drills?

A. Yes.

Q. And is that an ongoing obligation that the

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 22 of 33

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

Page 77
Page 79

Safety Hazard Manager has outside of the annual review process?

A. Yes, because they are the ones that conduct the drills on a quarterly basis.

Q. Understood.

THE REPORTER: I'm sorry. Can we take a real quick break. I have an emergency happening.

MR. HEPPELL: No problem. We'll go off the record and take a break for a few minutes until we're able to get our court reporter back.

(A BRIEF RECESS WAS HAD.)

MR. HEPPELL:

Q. Back on the record.

Mr. Lintz, is it a requirement pursuant to IDOC policy that the fire drills that are conducted on each shift include an actual evacuation of the cell house?

A. It depends on the cell house. That is up to the warden because of security reasons. Any of the areas that are -- have the ability to evacuate can evacuate, but if it is endangerment to the facility or staff or other offenders, then what is conducted is a mock drill or an educational

the understanding that there's some of the topics that were designated that I'll need to address with Mr. Dudley this afternoon.

If we could take 5 minutes, or so, maybe 8 minutes, through to 10 to the hour for me to look over my notes and the remaining documents to make sure there aren't additional questions, and we'll come back on the record at 10 to the hour. If that works for everyone?

MS. EARLS: Sounds good.

MR. ROSE: No problem.

(A BRIEF RECESS WAS HAD.)

MR. HEPPELL: Okay. We're resuming the recording.

Mr. Lintz, thank you for being with us today. Aside from the issues related to areas covered by the designation that has been identified by Mr. Lintz that need to be covered with Mr. Dudley or other witnesses, but aside from those areas, I don't have any further questions at this time.

I don't know if any of the other attorneys on the call have questions.

MS. EARLS: Mr. Rose, do you have any

Page 78
Page 80

drill in the same aspect of the quarterly, per shift, per building. And it's an educational training session at that time.

Q. So the warden is given some discretion in that regard as to how those drills are conducted?

A. Yes.

Q. Fair to say if they're going to -- either way, whether it's an actual evacuation or a simulated evacuation just through questions and answers as you just described, the expectation is that the drill will be conducted in a way that is effective and sufficient to ensure that staff on the unit are well prepared to respond to an actual emergency; is that fair to say?

MR. ROSE: Objection as to compound.

THE WITNESS: Yes.

MR. HEPPELL:

Q. And ultimately, it is the warden and the Safety Hazard Manager who have the responsibilities for ensuring that that is, in fact, happening during the fire drill at the facility?

A. Yes.

MR. HEPPELL: I think I'm getting close to the end of what I would anticipate wishing to cover with Mr. Lintz today with

questions?

MR. ROSE: No questions from the defendants.

MS. EARLS: Yeah, no redirect either.

MR. HEPPELL: Okay. Thank you very much for making the time this morning, Mr. Lintz. We appreciate it. And thank you to the court reporter and to counsel for their cooperation as well. So with that, I think we're done here.

MR. ROSE: Sam, what about signature?

MS. EARLS: I was going to say, Kristen, we would reserve the signature, please.

THE REPORTER: Okay. And are you going to order this to be transcribed?

MR. HEPPELL: We are not ordering a copy at this time.

MS. EARLS: Non-party is not requesting a copy either.

MR. ROSE: Same for the defendants.

MR. HEPPELL: Okay. Thanks, everyone.

(PROCEEDINGS CONCLUDED AT 10:55 AM.)

**DENISE DWYER, et al. v.**
**RON NEAL, et al.:**
Cause No. 3:18-cv-00995-JD-MGG
**GREGORY LINTZ**
September 24, 2020

USDC NN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 23 of 33

Page 81

C E R T I F I C A T E

I, KRISTEN K. STOKES, CSR, and Notary Public within and for the County of Lake, State of Indiana, do hereby certify that there appeared before me the deponent, GREGORY LINTZ, via a zoom teleconference meeting, on 24th day of September, 2020, who was thereupon first duly sworn by me to testify the truth and nothing but the truth in response to questions propounded to said deponent at the taking of the foregoing deposition relating to the above-captioned cause now pending and undetermined in said court.

I further certify that I then and there reported in machine shorthand the testimony so given at said time and place and that the testimony was then transcribed from my original shorthand notes, and the foregoing transcript is a true and accurate record of said testimony given by said deponent at said time and place.

I further certify that I am not related by blood or marriage to any of the parties to said suit, nor am I an employee of any of the parties or of their attorneys or agents, nor am I interested in any way, financially or otherwise, in the outcome of said litigation.

I further certify the reading and signing of the foregoing deposition was not waived by the parties on the record.

Dated at Lake County, Indiana, this 13th day of May, 2021.

KRISTEN K. STOKES
CSR# 084-003723

My Commission Expires:  8/27/23
County of Residence:  Lake

Page 82

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal        )
Representative of the            )
ESTATE OF JOSHUA DEVINE,         )
                                 )
        Plaintiffs,              ) Case No.
-v-                              ) 3:18-CV-0995-JD-MGG
                                 )
RON NEAL, et al.,                )
                                 )
        Defendants.              )

DEPONENT'S CERTIFICATE

I, GREGORY LINTZ, deponent herein, do hereby certify that I have read the above and foregoing deposition and find the same to be a true, correct and complete transcript of said deposition, and includes changes, if any, so made by me, given on the 24th day of September, 2020.  I further agreed to read and sign the same.
WITNESS MY HAND this _____ day of _____, 2021.

_____
GREGORY LINTZ, Deponent

STATE OF _____     )
                            ) SS:
COUNTY OF_____     )

Before me, the undersigned, a Notary Public for _____ County, State of _____, appeared and acknowledged the execution of the foregoing instrument on this _____ day of _____, 2021.
     (SEAL)

_____
        NOTARY PUBLIC
        My Commission Expires:

Page 83

E R R A T A   S H E E T

PAGE    LINE        CORRECTION        REASON

____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____
____ ____    _____

_____
        GREGORY LINTZ

Date of Deposition:  9/24/2020

STATE OF _____     )
                            ) SS:
COUNTY OF_____     )

Before me, the undersigned, a Notary Public for _____ County, State of _____, appeared and acknowledged the execution of the foregoing instrument on this _____ day of _____, 2021.
     (SEAL)

_____
        NOTARY PUBLIC
        My Commission Expires:

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 24 of 33

## A

**ability (11)**
10:1,2,6;23:5;26:13;
27:8;56:12;61:20;
63:11;68:6;77:22
**able (16)**
7:12;8:11;12:10;
16:24;26:19;28:1,2;
48:19;49:8,13,13;63:7;
68:11;72:7;76:9;77:11
**ACA (1)**
18:2
**accessibility (1)**
37:14
**according (4)**
29:16;40:23,24;69:9
**accordingly (2)**
8:12;58:19
**accurate (1)**
10:2
**across (1)**
18:24
**act (1)**
34:23
**action (12)**
13:9;14:3;47:16;
64:24;66:3,4,10,16,19,
21,23;67:1
**actions (1)**
66:11
**activities (1)**
19:7
**actual (8)**
39:17;44:10;59:3;
64:12;71:13;77:18;
78:8,14
**actually (4)**
28:19;41:16;69:18;
70:22
**add (1)**
61:20
**addition (3)**
7:16;42:17;67:17
**additional (11)**
28:4;33:19;38:13,15;
39:3;49:11;51:12,15;
53:4;61:13;79:8
**address (13)**
36:25;41:24;42:12;
44:9;46:4;52:7,17;
61:1;68:18,19;73:9;
76:18;79:3
**addressed (9)**
41:18;44:11;52:22;
53:21;65:7,19;66:1,9,
18
**addressing (1)**
63:2
**adequate (4)**
58:9;62:10;67:13,23
**advisable (1)**

60:14
**affect (3)**
9:25;10:1,6
**affirmatively (1)**
34:6
**afternoon (4)**
11:8;27:19;28:3;
79:3
**again (2)**
6:8;48:14
**against (1)**
57:5
**ago (1)**
42:4
**agree (9)**
4:10,13;28:13;41:21;
42:10;51:9;52:6;67:10,
17
**agreed (4)**
12:4,8,24;56:3
**agreement (1)**
4:9
**ahead (5)**
9:17,20;45:11;61:17;
69:13
**alarm (1)**
46:18
**alert (2)**
6:25;7:17
**along (6)**
8:18;33:10;37:24;
46:25;58:19;66:3
**altered (2)**
50:14;51:6
**Always (1)**
35:16
**amending (1)**
12:23
**and/or (2)**
13:2,21
**annual (34)**
17:25;18:6;21:4,9,
14,20;25:2;26:4;29:6;
42:16,21,23;43:2,7,25;
44:18,22;45:17;46:10;
47:4,5,7;52:9;54:15;
58:14,14;60:4;61:24;
74:6,17,19;75:14,25;
77:1
**annually (2)**
19:19;76:3
**answered (1)**
63:25
**anticipate (1)**
78:24
**apologize (1)**
68:8
**apparent (1)**
32:19
**appears (1)**
26:21
**applied (2)**
30:22,25

**applies (2)**
20:17;72:24
**apply (2)**
22:14,17
**appreciate (4)**
11:24;29:1;55:25;
80:7
**appropriate (1)**
41:7
**approximately (6)**
15:23;16:20;17:2,6,
9;19:15
**approximation (1)**
16:24
**April (4)**
13:22;18:18;65:11,
24
**area (17)**
24:23;34:17;35:3,4;
41:1,3;42:4;44:8;45:5,
6;48:2;50:16;51:21;
55:18,20;65:18;73:23
**areas (16)**
23:18;24:6;25:10;
27:14;31:17,25;54:14;
57:10,14;60:6;63:1;
74:3,9;77:22;79:18,21
**arise (6)**
7:17;29:4;41:19,25;
42:14;52:18
**arose (1)**
41:11
**around (1)**
9:2
**articulate (1)**
26:15
**aside (3)**
41:19;79:17,21
**aspect (4)**
43:24;70:17;73:9;
78:1
**aspects (3)**
27:15,25;43:7
**assign (1)**
42:7
**assigned (1)**
73:16
**assisted (1)**
67:1
**assists (1)**
26:3
**associated (1)**
18:4
**assume (1)**
8:10
**as-written (1)**
12:24
**attached (2)**
41:14,17
**attention (10)**
34:23;36:22,23;37:6,
6;38:7;41:1,25;45:17;
54:20

**Attorney (3)**
15:3,3;16:2
**attorney-client (1)**
15:12
**attorneys (3)**
4:24;14:18;79:24
**audio (1)**
45:24
**audit (3)**
19:6,17;20:24
**audited (2)**
46:21,23
**auditing (4)**
13:5,24;20:5;23:16
**audits (10)**
13:8;14:2;17:25;
19:22;21:16,25;22:25;
26:23;27:11;52:8
**authority (1)**
30:14
**availability (1)**
65:13
**Average (2)**
19:19;20:15
**aware (14)**
24:4;47:25;48:13,15;
49:3;52:1;53:11;57:12,
25;59:13;62:24;64:15;
65:16;70:2

## B

**back (18)**
5:3,23;6:17,21;
14:13;23:25;47:12;
51:22;55:16;59:16,20,
25;68:11,12;72:2;
77:12,15;79:8
**background (1)**
28:12
**basically (1)**
33:25
**basis (3)**
17:25;18:6;77:4
**Bates-stamped (1)**
72:18
**bear (1)**
9:1
**bearing (2)**
4:22;68:20
**became (1)**
70:6
**begin (1)**
9:20
**behalf (14)**
4:8,11,15;10:18;
13:14;14:8;23:14;27:9;
48:4,18,21;49:7;64:13;
68:23
**belabor (1)**
49:5
**best (6)**
10:2;19:12;23:5;

68:6,22;69:6
**better (1)**
65:6
**beyond (12)**
35:13;44:3;47:22;
48:11;51:13;52:8;53:5;
55:6;57:22;62:22;
63:13;67:7
**binding (12)**
10:19;13:13;14:7;
23:14;27:8;48:4,17,21;
49:6,8,14;68:22
**bit (2)**
7:22;42:4
**blocking (2)**
37:10,14
**both (4)**
20:13;67:14;69:8;
71:17
**box (1)**
55:14
**break (8)**
8:18,21,23;9:3,7;
59:15;77:7,10
**BRIEF (4)**
6:15;59:23;77:13;
79:13
**briefly (1)**
5:5
**bring (2)**
36:22;37:5
**brought (5)**
34:22;38:6;41:24;
45:16;54:19
**Building (16)**
41:16;59:11;63:3,4,
6;69:10,11,13,16;75:2,
7,8,18;76:10,11;78:2
**buildings (1)**
58:18
**built (1)**
63:5
**bump (1)**
5:9

## C

**call (2)**
50:16;79:24
**called (1)**
4:17
**calls (3)**
15:12;19:9;68:4
**came (2)**
44:23,23
**can (60)**
5:16,21,22;6:4,5,5,9,
10,12,17;8:5,15,20;
9:17,19;10:5;14:13;
15:13,14;19:12;20:9;
22:4,6;23:21;24:22;
25:24;26:17;27:3;28:7,
10,18,24;29:3,10;

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 25 of 33

34:13;35:5,18;37:17;
42:20;46:4,11;49:9,17;
50:15;58:12;59:14;
61:17;62:12;64:13;
68:5,22;69:14;71:7,8,
11,17,23;72:23;77:6,23
**cans (1)**
37:9
**canvassing (1)**
45:19
**capacity (3)**
10:17;18:21;49:1
**carpenter (1)**
55:1
**carpenters (1)**
52:17
**case (3)**
30:2;63:22;64:4
**Castle (1)**
18:7
**catch (1)**
68:10
**caught (1)**
33:4
**cause (1)**
76:14
**cell (19)**
32:4,21;33:11;36:2;
47:21,23;48:11,12;
49:23;54:22;55:9,22;
57:24;61:13;64:4,9;
65:15;77:19,20
**cells (22)**
32:3,12,15;33:9,16,
23;36:19;39:12;43:19,
21;48:7;52:5,18,19;
53:10;54:3;55:5;56:8,
11,17;57:22;65:15
**central (7)**
20:14;21:3,11;47:12;
59:16;66:24;67:1
**certain (6)**
38:22;41:14;52:3;
57:5;63:17;76:10
**certainly (1)**
8:16
**chances (1)**
51:7
**changed (2)**
58:21,22
**changes (8)**
47:2;58:18,18,19;
60:12;70:3,10,13
**chat (2)**
71:12,20
**Chief (9)**
70:16,17,24,25;71:2;
72:21;73:2,3,7
**Chiefs (3)**
71:2,5;73:4
**clarify (3)**
8:9;27:3;48:1
**cleaner (1)**

7:24
**clear (4)**
7:8,9,11;48:15
**clearer (1)**
7:24
**close (1)**
78:23
**closer (1)**
53:9
**code (25)**
29:16;41:14,15,16,
16,17;44:12;57:5;
58:18;59:3,11;60:7,15;
61:9,18;62:8,23,25;
63:4,14,23;69:10,18;
73:25;74:3
**codes (9)**
29:19,19;57:4;58:21,
22,25;61:4;63:17,18
**commissioner (1)**
42:25
**communications (3)**
6:7,14;39:15
**competency (2)**
24:24;74:4
**complete (6)**
9:5;17:24;21:8;
29:21;30:8;49:18
**completed (3)**
29:13;32:13;47:12
**completing (1)**
25:2
**Compliance (1)**
72:6
**compliant (2)**
46:20;47:16
**Compound (7)**
23:4;34:12;51:17;
61:15;62:11;68:1;
78:15
**comprehensive (2)**
31:7;47:20
**concerns (2)**
28:16;56:7
**CONCLUDED (1)**
80:23
**conclusion (1)**
68:5
**conclusions (3)**
13:8;14:3;64:23
**conditions (3)**
9:24;44:4;54:1
**conduct (12)**
4:5;18:2;19:6,17;
21:3;30:6;38:23;53:24;
56:9;69:15;76:23;77:3
**conducted (22)**
21:10;33:10,22;35:6;
38:17;40:9;43:15,20;
46:15,16;55:4;56:18;
57:23;66:24;67:2;
74:15,16;75:17;77:18,
25;78:5,11

**conducting (5)**
26:3;29:24;43:21;
44:24;67:5
**conducts (1)**
74:25
**confirm (1)**
45:7
**consider (1)**
63:11
**considering (1)**
62:21
**constantly (1)**
35:16
**Construction (2)**
43:1;48:24
**contents (1)**
14:16
**context (4)**
26:6;54:3;60:19;
75:14
**convened (1)**
66:23
**conversation (4)**
7:24;14:17;15:18;
40:15
**conversations (4)**
11:6;39:10;40:6;
61:23
**cooperation (1)**
80:9
**copy (6)**
11:14;69:23,25;72:5;
80:16,19
**core (1)**
76:18
**corrected (3)**
47:14;51:23;53:13
**Correction (22)**
10:19;13:15;14:9;
17:16,23;18:23;19:4;
20:4,18;21:24;23:15;
27:10;34:4;36:8,15;
38:12;47:10,11;48:5;
51:10;59:8;68:23
**correctional (3)**
34:7;38:7;69:5
**Corrections (5)**
10:11,12;13:1;20:13;
22:8
**Correction's (1)**
13:20
**corrective (4)**
13:9;14:3;47:15;
64:24
**correctly (2)**
22:21;43:10
**counsel (4)**
4:4;11:19;49:10;
80:8
**course (3)**
19:2;29:4;42:1
**court (7)**
4:6;5:11;7:12,25;

68:10;77:11;80:8
**courtroom (2)**
8:14,17
**cover (4)**
24:6;51:5;64:20;
78:25
**covered (7)**
25:10;31:18,20;
66:16;75:25;79:18,20
**covers (1)**
29:12
**create (1)**
56:22
**created (2)**
12:2;58:4
**current (1)**
10:8
**currently (1)**
17:14
**Curry (5)**
24:14,17;25:13;
27:20;66:2
**Curry's (2)**
24:15;25:21
**custody (2)**
35:1,1
**customs (2)**
13:2,20

## D

**damaged (1)**
51:6
**date (3)**
46:19;72:11;75:17
**deal (1)**
25:1
**dealing (11)**
25:14;29:17,18;
39:14;42:4;43:4;45:12;
46:11;47:1;58:22;71:1
**deals (5)**
25:13;35:20;60:23;
61:3;73:2
**December (5)**
12:6;13:4,23;62:17;
70:5
**decision-making (1)**
61:23
**deemed (1)**
47:16
**defendants (3)**
4:12;80:3,20
**deficiencies (4)**
41:13;57:8,13,15
**deficiency (3)**
31:16;47:9;54:12
**definitive (1)**
48:20
**delegate (1)**
30:14
**Department (35)**
10:11,12,18;13:1,15,

19;14:9;17:16,22;
18:22;19:4;20:3,18;
21:23;22:8;23:15;27:9;
34:3;36:8,15;38:12;
46:21;48:4,18,22;49:7,
10;51:10;59:8;68:23;
71:4,4;72:25;73:7,10
**departments (1)**
70:23
**depending (1)**
63:3
**depends (1)**
77:20
**deponent (1)**
4:8
**deposition (22)**
4:5;5:2;6:23,24;
10:23;11:1,4,16;12:23;
14:21,25;15:10;16:4,7,
17,22;17:12;27:21;
29:5;49:1;65:4;72:15
**depositions (2)**
4:2;71:13
**describe (4)**
20:9;29:10;42:20;
46:12
**described (21)**
21:22;29:7;31:25;
32:14;33:8;34:11;37:2;
40:10;42:16;43:6;
44:20;45:1;46:9;47:23;
50:24;53:19;57:24;
58:2;59:2;61:25;78:10
**describes (2)**
25:7;70:15
**describing (4)**
16:11;37:7;40:8;
74:22
**description (2)**
31:11;32:10
**designate (2)**
27:24;29:2
**designated (21)**
10:17,20;11:2,8,21;
12:4,17,19;19:11,21;
27:23;28:2;47:18;49:1;
57:19;63:18;64:6;65:9;
70:1;71:4;79:2
**designates (1)**
70:16
**designation (3)**
28:14;64:21;79:18
**designations (1)**
11:10
**designed (1)**
63:5
**designee (1)**
62:19
**destroyed (1)**
50:15
**detail (1)**
63:8
**details (1)**

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 26 of 33

73:19
**detected (2)**
54:18,19
**determine (2)**
60:11;63:5
**Devine (1)**
65:25
**different (9)**
4:4;42:22;43:5;56:1;
60:5,7;67:18;70:20;
73:8
**difficulties (3)**
4:23;7:4,16
**DIRECT (3)**
4:19;29:23;42:25
**directed (2)**
29:8;69:6
**direction (7)**
20:11;31:6,21;32:25;
33:18;56:19;69:4
**directive (11)**
20:8,10,11,16,21,23;
21:6,15,21;29:8,12
**directly (3)**
28:24;42:24;60:21
**Director (11)**
10:10;17:15,22;
18:21;19:3;24:16;
25:22;26:1;43:1;48:24;
52:15
**directs (2)**
21:24;30:5
**disagree (1)**
65:2
**discretion (1)**
78:4
**discuss (1)**
38:2
**discussed (2)**
42:3;72:14
**discusses (1)**
21:2
**discussing (1)**
24:3
**DISCUSSION (3)**
5:20;64:7;65:10
**discussions (1)**
11:6
**distance (1)**
58:15
**distinction (2)**
24:20,22
**disturbances (1)**
25:14
**Division (1)**
58:11
**divisions (1)**
22:5
**document (13)**
11:19;12:1,9,10,13;
14:12;30:10;54:11;
57:6,9,13,14;71:14
**documentation (18)**

25:2;43:4,10;46:11,
14,25;47:1,3;49:19;
55:2;56:22;58:4;74:18,
20,20;75:21;76:7,8
**documented (10)**
47:5,8;50:25;52:24,
25;53:22;54:5;55:11;
57:2,3
**documents (9)**
8:25;16:6,10,14,16;
17:11;52:13;75:16;
79:7
**done (14)**
4:2;29:19;38:3;42:6,
23;47:15;57:9;58:10,
13;66:2,3;69:8;71:21;
80:10
**doorways (1)**
76:12
**dormitory-style (1)**
45:3
**down (2)**
14:12;43:22
**drag (1)**
71:19
**drew (1)**
24:20
**drill (17)**
46:15;68:24;69:9,15;
73:20;74:23,24;75:1,
11,14,17,24;76:15;
77:25;78:1,11,21
**drills (15)**
69:12;73:25;74:2,13,
15,21;75:5;76:5,6,17,
21,23;77:4,17;78:5
**drop (3)**
71:11,13,20
**Dudley (25)**
11:7;25:22;27:19,23;
28:14,18;29:2;63:1,9;
64:1;65:7,19,20;68:17;
69:1,2,7,14;73:8,24;
74:5,11;75:12;79:3,20
**duly (1)**
4:17
**during (30)**
15:8,24;30:1;31:9;
33:25;35:16;41:11,19,
25;42:6;43:25;44:6,15,
18,21;47:3,18;50:11;
51:19;54:18;55:23;
57:18;58:5;62:16;65:1,
9;66:5;74:6,17;78:20
**duties (5)**
17:21;18:4,12;73:11,
15

**E**

**earlier (11)**
11:4;27:7;29:7;
30:21;47:24;55:14;

56:3;57:24;60:3;72:12,
14
**EARLS (28)**
4:10;11:12,17;15:1,
2,7,7,9,11,24;16:2;
19:8;23:4;28:6,9,23;
34:12;51:17;59:22;
62:11;64:10;68:3;
71:10;79:11,25;80:4,
12,18
**easier (1)**
71:6
**Eastern (1)**
59:17
**educate (1)**
76:17
**Education (1)**
35:21
**educational (2)**
77:25;78:2
**effect (4)**
13:3,21;64:25;65:11
**effective (4)**
69:23;70:6;72:11;
78:12
**effectively (1)**
74:16
**efforts (1)**
53:24
**either (15)**
7:1;35:8;39:19,24;
41:14;42:11;44:2,17;
45:20;53:1;64:7;65:10;
78:7;80:4,19
**electric (2)**
52:19;55:14
**electrical (16)**
29:17;45:13;47:20,
21;48:10;49:22;52:5;
53:9,10;54:2,22,25;
56:7,10,17;57:21
**electrician (3)**
50:17;53:15;55:16
**electricians (2)**
52:16;53:17
**electricity (1)**
53:18
**else (8)**
6:10;10:5;16:3;
21:15;30:14;48:19;
49:15;74:9
**emergency (27)**
13:5;19:23;20:6,25;
21:18,25;22:9,25;23:7,
18,19;24:7,12,16,20;
25:11,13,18,19;27:2,
13;58:7;59:10;65:22;
66:6;77:7;78:14
**emergency-type (1)**
22:7
**employee (1)**
73:3
**employment (1)**

10:9
**end (4)**
7:19;11:6;45:23;
78:24
**endangerment (1)**
77:23
**engage (1)**
39:10
**engaged (1)**
62:20
**engaging (2)**
39:21;50:8
**enough (1)**
28:19
**ensure (7)**
33:1;40:1;67:21;
74:14;76:5,20;78:12
**ensuring (2)**
36:9;78:20
**entail (1)**
75:11
**entails (1)**
29:12
**equipment (1)**
73:15
**etc (1)**
29:18
**evacuate (4)**
76:10,11;77:22,23
**evacuated (1)**
75:3
**evacuation (4)**
75:23;77:19;78:8,9
**even (7)**
7:1;28:23;33:15;
42:13;52:24;57:15;
60:21
**event (1)**
69:6
**events (1)**
66:15
**everyday (1)**
7:23
**Everyone (4)**
6:10;59:21;79:10;
80:21
**exact (1)**
24:5
**exactly (2)**
26:18;31:14
**EXAMINATION (1)**
4:19
**examined (1)**
4:18
**example (7)**
37:9;39:7;41:5;52:4;
54:2,20;61:5
**excessive (3)**
29:18;35:19;36:23
**Excuse (1)**
47:6
**executive (9)**
20:8,9,16,21,23;21:6,

15,21;29:8
**Exhibit (6)**
11:16;71:9,17,18;
72:4,18
**exist (7)**
33:3;34:8;36:1,18;
39:12;46:7;55:3
**expectation (10)**
30:7;32:7;34:3,19;
35:9;36:6,14;56:20;
62:3;78:10
**expertise (1)**
63:2
**explain (8)**
22:6;24:22;25:24;
37:10;42:20;46:12;
58:12;72:23
**explanation (1)**
73:1
**explore (1)**
63:12
**exploring (1)**
63:21
**extent (2)**
48:16;61:14
**extinguisher (3)**
37:10,12,13
**extinguishers (3)**
41:5;61:10,12
**extra (1)**
41:1

**F**

**face (1)**
54:17
**facilities (10)**
16:9;17:24;18:1,3;
20:12,15;25:3;35:14,
15;70:22
**facility (41)**
16:12,19;18:7,8,9;
20:13;21:2,7,8;26:5;
29:14,20;32:1;34:25;
36:18;38:14;39:20,25;
42:2;43:3,8,12,24;
44:5;46:21;50:12,16;
52:11,15,19;58:2,3;
60:20;61:6;62:9;66:25;
67:2;74:7;76:20;77:24;
78:21
**facility-wide (1)**
29:15
**fact (4)**
39:24;67:10;73:24;
78:20
**factual (2)**
19:9;44:10
**fail (1)**
41:23
**failing (1)**
68:18
**fair (34)**

BOSS REPORTERS
(219) 769-9090

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 27 of 33

19:2;27:7,16;32:18,
23;35:25;36:4;39:12,
22,24;40:3,11;41:7;
46:7;50:1,9,20;53:6,
22;54:13;56:13,14;
57:10,15;59:5;60:7;
61:25;62:2;65:7;67:8,
25;75:18;78:7,14
**fall (3)**
24:24;48:2;74:4
**falls (4)**
19:10;25:20,22;65:2
**familiar (2)**
12:13;70:17
**features (1)**
36:24
**federal (2)**
58:22;72:6
**feel (1)**
71:20
**felt (1)**
56:12
**few (2)**
14:15;77:10
**file (1)**
71:20
**fill (1)**
76:3
**filled (1)**
74:24
**filter (1)**
47:2
**find (3)**
40:25;55:17;76:17
**findings (1)**
40:24
**finds (1)**
51:20
**fire (94)**
13:25;19:25;20:6,25;
21:17,25;22:11;23:1,7;
24:8,21;25:19,23;26:1,
6,24;27:13;29:15,18;
37:10,12,13;41:15;
46:15,18,23;58:6;
59:10;60:12,24;61:7,
10,12,19;62:21;63:3,
17;64:1,3,8,19;65:11,
12,15,21,24;66:6,8;
67:5,6;68:24;69:6,9,10,
12,15,18;70:15,16,23,
24,25;71:2,2,3,5;72:6,
21,25;73:2,3,4,7,7,9,13,
14,20,24;74:2,3,13,15,
21,23,23;75:11,14,16;
76:4,6,21;77:17;78:21
**fires (1)**
27:2
**first (2)**
4:17;29:9
**fit (1)**
65:17
**fixing (1)**

31:13
**fixture (3)**
50:13;51:6;55:15
**fixtures (2)**
47:21;48:11
**flow (1)**
65:12
**flushing (1)**
65:14
**focused (2)**
58:2;60:5
**follow (3)**
31:4;49:9;69:9
**following (1)**
61:3
**follows (1)**
4:18
**follow-up (5)**
21:5,10;34:16;35:5;
47:14
**follow-ups (1)**
51:22
**food (1)**
29:19
**foot (1)**
31:20
**form (3)**
43:14,20;74:24
**formal (3)**
8:16;41:12,20
**formatting (1)**
70:9
**forth (8)**
38:22;64:18,22;
69:17,19;70:11;73:11;
75:3
**forward (2)**
28:3;29:3
**forwarded (1)**
47:12
**found (6)**
31:12;54:8,12;57:8,
8,15
**four (2)**
45:5;70:22
**frame (1)**
65:2
**front (6)**
5:11;8:15;12:16;
16:14;37:12;70:14
**full (8)**
9:5;29:15;43:3,8,12,
24;48:6;74:7
**function (1)**
12:11
**further (1)**
79:22

**G**

**gaining (1)**
26:12
**gaps (1)**

29:4
**gather (2)**
34:6;36:16
**gathered (1)**
26:15
**gathering (7)**
26:10;33:1,20;36:9;
40:6,15;44:1
**gave (3)**
22:13;24:20;32:10
**generally (1)**
27:3
**General's (1)**
15:4
**generate (1)**
55:23
**geographic (1)**
31:23
**given (5)**
26:11,21;31:22;
32:25;78:4
**gives (1)**
20:11
**giving (5)**
10:16;18:16,17;
37:13;69:4
**glitched (1)**
45:24
**goes (1)**
64:11
**good (3)**
51:7;59:22;79:11
**governing (1)**
72:13
**Greg (3)**
5:25;6:9;15:14
**GREGORY (1)**
4:16
**Griffin (1)**
30:2
**group (1)**
20:14
**groups (1)**
38:1
**guess (4)**
6:22;38:18;49:4;
59:16
**guidelines (1)**
61:3

**H**

**handled (2)**
22:5,9
**handles (1)**
22:10
**happen (1)**
51:4
**happening (4)**
50:21,24;77:8;78:20
**happy (3)**
28:3,13;71:16
**hate (1)**

5:16
**Hazard (43)**
29:14,25;30:5;31:6;
32:9;33:1,19;34:14,19,
24;35:7,11;36:8,16;
37:4,20;38:14,15,23;
39:5,9,15,21,25;40:9,
21;41:8,22;42:12;
43:15;50:7;51:11;52:1,
13;56:9,18,21;57:12;
70:21;73:17;76:20;
77:1;78:19
**hazards (11)**
33:2,21;34:8;35:12,
21;36:1,4,11,18;37:22;
39:11
**health (8)**
25:4,6,9;29:16;
46:22;67:14,24;72:6
**hear (9)**
5:21,22;6:4,5,5,9,10,
12,13
**hearing (1)**
7:2
**held (1)**
17:19
**Hello (1)**
6:3
**help (3)**
26:17,18;71:7
**HEPPELL (44)**
4:1,11,14,20,23;5:19,
21;6:1,4,10,16,20;
10:25;11:13,23;15:17;
19:14;23:11,21,24;
27:18;28:7,22;29:1;
34:18;51:24;59:14,19,
24;61:16;62:15;64:16;
68:9,14;71:15;72:1;
77:9,14;78:17,23;
79:14;80:5,16,21
**hey (2)**
54:21;56:6
**Homeland (1)**
63:18
**hood (1)**
46:18
**hope (1)**
8:25
**hour (3)**
59:21;79:5,9
**house (6)**
61:13;64:4,9;65:15;
77:19,20
**houses (2)**
32:5;33:11
**housing (2)**
36:21;38:3
**HVAC (1)**
47:2

**I**

**identified (1)**
79:19
**IDOC (21)**
21:11;39:8;42:10;
47:17;50:1,6;55:9;
56:4,21;57:12;60:4,21;
63:10;66:24;67:8,10;
69:16;70:23;71:2;73:4;
77:17
**IDOC's (4)**
39:1,18;41:8,22
**ignore (2)**
41:9,23
**illustration (1)**
56:2
**imagine (1)**
54:6
**immediately (1)**
32:19
**implement (2)**
40:3,21
**implemented (1)**
63:24
**implicated (1)**
66:7
**important (6)**
6:24;7:7,11,18;36:3;
57:6
**impose (1)**
41:3
**imposed (3)**
13:9;14:4;64:24
**imposes (1)**
67:11
**imposing (2)**
38:13;39:2
**improve (1)**
76:22
**improvements (3)**
60:12;62:21;63:12
**incident (2)**
18:18;66:11
**include (4)**
26:23;32:2;53:8;
77:18
**included (1)**
48:25
**includes (2)**
11:2;64:23
**including (7)**
13:7,8;14:1,2;36:19;
52:7;54:1
**incorporated (1)**
69:20
**increase (1)**
61:11
**independent (1)**
67:11
**in-depth (2)**
50:15;55:16
**Indiana (45)**
10:12,18;12:25;13:3,
15,19,22;14:8;15:3;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 28 of 33

18:19,22,24;19:5,16,
24;20:1,4,18;21:1,23;
23:3,14,17;25:16;27:9,
12;30:3,22;34:3;36:7,
15;38:11;47:18;50:2;
51:10;56:5;57:18;59:7,
9;60:11;62:18;64:25;
68:25;72:24;73:16
**indicated (1)**
30:17
**individual (6)**
10:17;30:7;70:15,16,
20;76:2
**individuals (2)**
31:12;42:7
**inform (1)**
35:19
**informal (1)**
30:24
**information (21)**
33:2,20;34:7,21;
35:12,23;36:3,10,17;
37:18,19,20;39:11;
40:6,15;44:2,10,16;
45:19;51:25;53:1
**information-gathering (1)**
40:19
**infrastructure (12)**
13:6,25;23:2;26:24;
27:12;60:13;61:8;62:7;
63:12;64:20;65:23;
66:14
**initiated (1)**
53:14
**initiative (4)**
44:25;50:4,8;56:19
**input (1)**
60:25
**inside (6)**
33:16;48:7;55:5,8;
56:10;57:21
**insomuch (3)**
15:11;19:8;64:10
**inspect (2)**
53:4;57:14
**inspected (2)**
54:14;60:6
**inspecting (2)**
33:9;73:14
**inspection (106)**
17:7,10;19:6,17;
20:14;21:4,10,14;29:6,
7,10,11,15,21,24;30:6;
31:7,18,21,23;32:12,
20;33:6,10,13,14,15,
22,25;34:10,10,17;
35:5,6,13;36:7;39:4,
17;40:8,11,17,25;
41:12,20;42:2,9,14,16,
17,21,22,23;43:2,8,9,
13,14,15,18,20,22,25,
25;44:4,6,15,18,22,24;
45:18;46:10;47:5,7,14,

20,22;48:9,12;49:21;
51:12,15,20;52:10,12;
53:6;54:4,11,12,18;
55:7,12,17,19,22;
56:10,16,23;57:2,9,21,
22;60:24;74:7,17,19;
75:15
**inspections (40)**
16:9,11,21;17:3,24;
20:12;21:3,9,14;25:1;
29:13;34:1,25;38:16,
24;41:3,13;45:22;
46:16,19;47:2;48:6;
49:12,18,20;50:3,9,20,
23;52:8;53:25;55:4,5,
11;57:6;58:5,23;60:4;
73:13;74:6
**installations (1)**
53:9
**instead (2)**
19:9;24:8
**instructs (1)**
9:16
**insure (3)**
51:15;52:10;67:12
**insuring (5)**
59:2;60:5,14;62:4,22
**intended (1)**
49:6
**interior (4)**
32:2,22;33:9;43:19
**interiors (2)**
32:12,15
**International (3)**
41:15,15;63:17
**internet (2)**
15:19,22
**interrupt (1)**
5:16
**into (7)**
15:6;22:8;32:14,22;
42:8;45:14;55:18
**investigate (3)**
42:13;53:4;60:19
**involve (1)**
33:15
**involved (1)**
28:24
**involves (3)**
44:1;45:18;46:10
**involving (2)**
48:10;49:22
**irregularities (1)**
29:17
**issue (23)**
6:25;30:1;34:16;
35:18;37:4;41:1,24;
44:8,25;46:3,4;51:20;
52:22;53:2,17,20;54:8,
17,20,25,25;55:1;64:3
**issued (1)**
54:24
**issues (28)**

29:16;30:10;32:19;
33:2;34:21;36:24;
37:21;38:2,6;41:9,11,
19;42:13,14;45:3,4,13,
16,19;46:7;52:3,4,17;
57:7;61:1;66:6;76:14;
79:17
**items (3)**
41:6;47:13;76:1

## J

**January (5)**
12:5;13:3,23;62:16;
70:4
**job (4)**
17:21;18:4,12;24:15
**joint (1)**
73:22
**judge (3)**
5:12;8:15;9:12
**jump (4)**
4:1;7:20;8:7;9:18
**jury (2)**
5:12;8:15

## K

**Kelly (6)**
4:8;10:25;15:1,2;
16:2;27:18
**killed (1)**
65:25
**kind (5)**
35:20;36:24;40:3;
56:16;62:20
**kinds (7)**
40:19;42:13;50:8,20;
55:10;58:5;61:22
**knowledge (5)**
19:12;23:9;48:17;
60:16;66:1
**knows (2)**
51:18;64:14
**Kristen (1)**
80:12

## L

**later (1)**
28:18
**lawsuit (2)**
4:25;18:15
**lawyer (2)**
9:16,18
**lawyers (1)**
9:10
**lays (1)**
20:4
**learn (1)**
35:11
**learned (1)**
53:1

**least (1)**
35:25
**left (1)**
40:20
**legal (2)**
68:4,4
**less (2)**
8:16;41:4
**lets (1)**
35:3
**level (8)**
21:8;29:14,20;32:20;
33:5;34:9,10;59:8
**levels (2)**
39:4;62:23
**life (4)**
25:4,6,9;67:23
**lift (1)**
47:2
**light (3)**
50:13;51:6;55:15
**Likewise (1)**
4:13
**limitations (1)**
65:12
**limited (2)**
11:20;27:10
**limits (2)**
39:2;63:11
**line (2)**
9:10;37:24
**lines (1)**
8:18
**LINTZ (41)**
4:16,21;5:1,22;6:5,
11,22;10:8,15;11:2;
12:10,20;14:5,14,20;
15:13;17:17;19:11,21;
24:1;26:10;27:25;
28:11,17;29:6;34:13;
49:5;55:25;60:2;61:17;
62:12;64:13;65:5;68:5,
19;72:3;77:16;78:25;
79:16,19;80:6
**list (1)**
44:13
**listed (1)**
76:1
**lists (1)**
12:16
**literally (1)**
31:19
**little (4)**
7:22;25:24;42:3;
56:1
**loads (1)**
29:18
**locations (1)**
61:13
**long (4)**
15:23;17:19;76:8,11
**longer (1)**
58:14

**look (12)**
8:24,24;32:5;42:7;
43:2,3;45:14;46:14,17;
53:9;76:8;79:6
**looked (1)**
27:7
**looking (6)**
32:14,21;47:1;54:16;
75:15;76:10
**looks (1)**
58:7
**lost (2)**
6:7;68:7
**lot (3)**
23:9;53:13;56:6

## M

**Madam (1)**
68:10
**mainly (1)**
17:4
**makes (2)**
7:24;27:24
**making (1)**
80:6
**Management (7)**
10:10;17:15,22;
18:22;19:3;25:23;
60:20
**Manager (49)**
20:13;29:14,25;30:6;
31:6;32:9;33:1,19;
34:6,15,20,24;35:7,11;
36:9;37:4,20;38:14,15,
23;39:5,9,21;40:1,9,21;
41:2,8,23;42:9,12;
43:16;50:7,11;51:12,
20;52:1,13;55:12;56:9,
18,22;70:21;73:17;
74:25;76:2,20;77:1;
78:19
**managers (9)**
18:1,7,10;35:14;
36:16,20;46:17;57:1,
12
**mandate (1)**
63:23
**mandating (1)**
20:24
**manual (2)**
25:4,7
**many (6)**
5:3;15:8,14;16:20;
19:15;75:2
**mark (2)**
11:15;71:8
**marked (1)**
72:4
**marking (1)**
71:10
**Marshal's (1)**
46:24

USDC IN/ND case 3:18-cv-00995-JD   document 212-31   filed 05/25/21   page 29 of 33

**matter (1)**
48:5
**may (13)**
7:17;8:23;9:9;23:5;
26:14;33:3,4;34:8;
36:18;37:22;46:7;
51:18;70:9
**maybe (4)**
7:22;56:1;71:6;79:4
**mean (5)**
22:6;25:25;45:21;
46:12;58:12
**means (1)**
44:12
**mechanism (2)**
66:5,8
**mechanisms (1)**
40:20
**medications (1)**
9:24
**meet (3)**
15:23;38:2;58:25
**meeting (5)**
15:22,25;37:25;62:8,
9
**meetings (3)**
38:8;42:3,6
**member (1)**
55:19
**memory (2)**
9:25;24:11
**mention (1)**
44:7
**met (7)**
14:20,24;15:15;16:3;
60:6,15;62:23
**methods (1)**
33:20
**might (9)**
7:23;8:3,4;10:5;
22:7;33:21;34:9;39:11;
48:23
**mind (1)**
68:20
**minimal (1)**
63:13
**minimum (9)**
52:9;55:6;61:9,20;
62:8,23;63:23;67:18;
75:10
**minimums (1)**
51:13
**minor (1)**
70:13
**minutes (4)**
16:1;77:11;79:4,5
**missed (2)**
33:21;34:9
**missing (1)**
51:6
**misunderstood (2)**
8:4,6
**mock (1)**

77:25
**moment (1)**
9:18
**month (1)**
35:15
**monthlies (1)**
17:4
**monthly (40)**
16:8,8,11;21:3,8,13,
20;29:6,9,11,13,21;
30:6;34:25;35:6;38:16,
24;40:8,25;41:12,13,
20;42:1,9,14,17,22;
43:14;46:16;50:18,19,
25;51:3;52:9;53:5;
54:4,15;55:7;60:3;
61:24
**more (14)**
9:10;24:7;25:22,24;
28:12;35:22;37:17;
39:3;41:3;48:20;50:15;
61:19,19;76:17
**morning (6)**
4:22;13:15;14:9;
27:10;28:1;80:6
**mouth (1)**
26:10
**move (1)**
37:16
**much (1)**
80:5
**must (1)**
57:2
**muted (2)**
5:25;6:1

**N**

**name (2)**
4:23;12:16
**nature (1)**
25:15
**Neal (1)**
11:14
**Neal's (1)**
11:4
**necessary (5)**
21:10;40:1;52:10;
56:13;60:14
**need (11)**
8:18;28:4;49:9,15;
63:1,25;68:17,19;
74:10;79:2,19
**needed (5)**
29:3;40:21;54:13;
61:1;63:6
**needs (5)**
31:8;41:1;44:11;
58:16;62:9
**New (1)**
18:7
**next (1)**
14:15

**noncooperative (1)**
76:13
**Non-party (1)**
80:18
**note (3)**
30:10;50:18;72:17
**noted (5)**
12:8;31:15;50:19;
52:12;53:21
**notes (2)**
8:24;79:6
**notice (7)**
10:23;11:1,15;12:2,
23;64:19,22
**notified (1)**
34:15
**notify (2)**
53:15,16
**number (5)**
13:7;14:1;20:20;
61:9,12
**numbers (3)**
24:4,5,11

**O**

**oath (3)**
5:13,14;7:7
**object (1)**
68:3
**objection (15)**
9:11,19;11:18;15:11;
19:8;23:4;34:12;51:17;
61:14;62:11,12;64:10,
17;68:1;78:15
**objections (2)**
9:12,13
**obligation (3)**
67:11,21;76:25
**observed (2)**
37:5,23
**obstruction (1)**
37:15
**obstructions (1)**
76:12
**obviously (1)**
7:6
**occasion (1)**
19:5
**occasions (2)**
15:9;19:15
**occurred (1)**
64:4
**off (12)**
5:17,20;8:20;9:6;
23:21,23;28:7,8;59:15;
71:23,25;77:9
**offender (6)**
38:1,1;39:14;44:7;
45:2;73:6
**offenders (4)**
37:11;42:5;76:13;
77:24

**offender's (1)**
36:22
**offer (1)**
23:13
**office (7)**
15:4;20:14;21:4;
38:4;46:24;47:13;67:2
**once (10)**
5:3;15:16;47:11,13;
69:10,11,13,15;75:5,8
**one (12)**
4:23;5:9;8:17;9:10;
14:17;15:24;26:4;
34:22;44:22;46:3;
71:23;73:5
**ones (1)**
77:3
**ongoing (2)**
35:22;76:25
**only (7)**
9:2;48:23;49:5;
52:14;73:3,6;76:7
**open (2)**
55:14,14
**operations (3)**
22:9;23:8,19
**opposed (3)**
66:24;74:5,10
**option (1)**
71:19
**order (8)**
51:7;53:14,23;54:11,
17,24;55:20;80:15
**ordering (1)**
80:16
**orders (5)**
53:20;54:6,7,7;55:23
**OSHA (1)**
41:16
**others (1)**
26:14
**out (14)**
5:9;9:23;20:5;34:20;
37:20;39:11;44:16;
45:18,24;46:6;55:17;
74:24;76:3,18
**outlet (2)**
50:13;54:22
**outlets (5)**
52:5;53:10;56:8,10,
17
**outline (1)**
5:6
**outside (21)**
19:10;30:25;33:22;
35:10;40:16;42:14;
43:21;45:15;46:5;
47:22;48:12;54:3;
57:23;59:11;60:14;
64:11;65:3;66:21;74:2,
9;77:1
**over (6)**
8:24,24;50:16;58:11;

73:9;79:6
**overall (2)**
60:19;62:4
**overarching (1)**
67:21
**overextended (1)**
76:9
**own (5)**
39:22;50:4,7;56:19;
64:12

**P**

**page (8)**
5:4;12:16,22;13:10;
14:4;31:16;72:20,20
**part (9)**
8:5;36:6;44:10;
45:17;49:20;61:22,24;
62:3;75:25
**particular (2)**
53:20;71:8
**particularly (1)**
6:24
**parties (1)**
4:5
**pass (1)**
58:19
**past (2)**
32:21,22
**pause (1)**
59:19
**pending (1)**
9:4
**per (18)**
69:10,10,11,11,11,
11,13,15,16,16;74:2;
75:5,7,8,8,8;78:1,2
**perceived (1)**
37:22
**perform (2)**
75:21,22
**performing (1)**
76:5
**period (8)**
12:25;30:1;47:19;
57:19;62:16;64:7;65:9;
70:2
**periods (1)**
12:4
**permitted (1)**
41:21
**person (5)**
27:23;43:21;44:24;
48:23;68:22
**personal (1)**
48:17
**personally (3)**
19:16;30:8,10
**personnel (1)**
76:13
**person's (1)**
54:20

BOSS REPORTERS
(219) 769-9090

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 30 of 33

**phone (1)**
15:18
**photos (1)**
47:15
**phrased (2)**
7:3;8:3
**physical (21)**
26:23;27:11;30:9;
31:7,23;40:10,16;42:1;
43:9;44:4,11,21;46:25;
48:9;49:21;52:15;
53:16,25;58:3,5;63:12
**pick (1)**
26:14
**place (26)**
18:18;19:24;20:1;
23:17;24:2;27:1;31:24;
47:17;50:4;54:3;56:23;
59:4,9;60:11;61:12;
62:18;65:24;66:14,16;
67:13,22;68:24;69:4;
70:1,4;74:14
**places (1)**
73:3
**plaintiff (2)**
4:15,24
**plan (3)**
20:12;47:10,11
**plans (9)**
13:6,9;14:1,3;23:1,3,
17;64:24;65:23
**plant (4)**
44:11;46:25;52:15;
53:16
**played (1)**
66:15
**please (4)**
8:7;20:9;29:10;
80:13
**plumbers (2)**
52:16;53:17
**plumbing (3)**
52:18;53:18;54:25
**point (6)**
8:19;14:13;48:8;
49:5;57:18;64:6
**policies (52)**
13:1,6,20,25;19:23,
25;20:6;21:17,18;22:1,
14,17,24;23:1,2,8,15,
16;24:2,7,13;25:17;
27:1,14;28:12,20;
30:22,24,24;34:5;36:7;
38:12;39:1,18;41:8,22;
51:10;55:9;56:21;58:8,
11,20;59:4,9;62:6;
65:22;66:7,14;67:6,12,
22;69:4
**policies/procedures (1)**
26:2
**policy (71)**
20:3,17;21:6,23;
24:4,6,10;25:7,9;

28:25;29:23;30:5;31:1,
4,5,19,25;32:8;33:18,
24;34:4;35:9,10;38:22;
39:8,8;40:14,18;42:11;
47:17;48:22;49:2,11;
50:1,6;51:13;56:4,11;
58:17;60:4,22,23;61:3;
63:10,16,19;66:17;
67:8,10;69:17,20,21,
23;70:1,3,11,12,15,18,
25;71:7;72:5,10,12,13,
19,24;73:1,8,12;77:17
**poorly (3)**
7:3;8:4;75:22
**population (1)**
44:7
**position (6)**
10:9;17:19;18:5;
23:13;25:11;64:18
**possibility (1)**
63:21
**possible (1)**
5:8
**possibly (2)**
34:16;66:2
**potential (6)**
33:20;34:21;36:4,10,
17;37:21
**practices (6)**
13:1,20;28:12,20;
30:25;34:5
**preference (1)**
14:14
**premise (1)**
8:10
**preparation (2)**
15:8;16:4
**prepare (7)**
14:21,25;15:10;16:6,
17,21;17:11
**prepared (4)**
13:13;14:7;48:3;
78:13
**prevent (2)**
50:2;61:6
**prevented (1)**
56:5
**preventing (1)**
67:4
**prevents (1)**
38:13
**previous (1)**
70:12
**primarily (1)**
9:13
**prior (1)**
8:5
**Prison (64)**
13:3,22;18:19,24;
19:5,7,16,24;20:1,4,7;
21:1,19;23:3,17;26:25;
27:12;30:3,9,22;31:17,
20;35:12;38:6;40:2,11;

41:10;44:2,17;45:20;
47:18;50:3;51:14,16;
53:2,3;54:1;56:6;
57:18;58:8;59:5,9;
60:6,11,13,15;61:8;
62:5,6,6,19,22;65:1;
66:15;67:13,15,23,24;
68:25;71:3;72:24;73:5,
6,16
**prisoner (15)**
32:15;33:9,16;38:8;
43:19;44:14;53:10;
54:2,21;55:5;56:13;
57:22;65:14;70:25;
72:25
**prisoners (17)**
34:8;36:2,10,17,19;
37:7,21;39:10;41:10;
44:3,17,23;45:20;46:6;
53:1;67:15,24
**prisoners' (5)**
32:2;52:5;56:8,11,17
**prisoner's (4)**
36:1;47:21;49:23;
55:9
**prisons (1)**
18:24
**Prison's (1)**
25:17
**privilege (1)**
15:12
**proactive (5)**
34:20;35:11,17;37:8;
46:5
**proactively (4)**
39:9;44:1,16;62:5
**probably (3)**
28:11,19;41:2
**problem (7)**
8:19;54:22;68:9;
71:16;76:18;77:9;
79:12
**problems (2)**
53:12;56:7
**procedures (11)**
5:6;23:8;25:17;42:8;
58:11;67:7,22;68:24;
69:3,9;73:20
**PROCEEDINGS (1)**
80:23
**process (9)**
20:5;33:8;58:6;59:7;
60:10;61:24;74:14;
76:4;77:2
**processes (2)**
61:23;67:19
**Program (3)**
58:10,16,20
**programatic (1)**
27:15
**programs (7)**
13:7;14:1;19:24,25;
23:1;26:25;65:23

**prohibit (1)**
39:19
**prohibited (1)**
63:20
**proper (1)**
75:22
**protect (2)**
67:14,23
**protection (2)**
61:19,19
**provide (5)**
20:23;28:21;31:5;
33:18;47:15
**provided (2)**
29:11;30:17
**provides (2)**
21:16,24
**providing (3)**
18:9;21:13;62:10
**pull (8)**
10:23;11:14;12:8;
14:11,13;71:7,11;72:3
**pulled (1)**
72:8
**pursuant (2)**
56:21;77:16
**purview (1)**
22:19
**put (6)**
11:25;26:9;31:11;
45:8;47:9;57:4
**putting (3)**
4:3;63:21;64:8

**Q**

**quarter (3)**
69:12,16;75:8
**quarterly (3)**
75:5;77:4;78:1
**quick (2)**
5:17;77:7

**R**

**raise (1)**
11:17
**raised (3)**
41:9;44:25;56:7
**raising (1)**
11:24
**range (5)**
32:23;43:22;55:13,
22;57:23
**ranges (4)**
32:5,14;33:11;47:23
**rather (1)**
13:18
**reached (3)**
13:9;14:3;64:23
**reaching (1)**
46:5
**read (2)**

68:11,12
**readdress (1)**
28:18
**real (1)**
77:7
**reasons (1)**
77:21
**recall (1)**
16:20
**received (1)**
69:25
**receives (1)**
34:24
**RECESS (4)**
6:15;59:23;77:13;
79:13
**record (30)**
4:3;5:17,20,23;6:18,
21;7:12,25;8:20;9:6,
14,19;11:25;23:21,23,
25;28:6,8,8,10;59:15;
60:1;68:12;71:23,25;
72:2,17;77:10,15;79:9
**recording (4)**
6:17;59:19,25;79:15
**redirect (1)**
80:4
**referenced (2)**
52:23;66:4
**referred (2)**
70:24;72:12
**referring (1)**
70:25
**refers (2)**
72:20,21
**reflect (3)**
12:3,24;54:8
**reflecting (1)**
56:23
**reflects (1)**
13:18
**regard (1)**
78:5
**regarding (7)**
20:12;22:10;49:17;
60:3;64:1;73:12;74:21
**regulations (3)**
13:2,21;72:7
**relate (2)**
19:21;22:24
**related (6)**
26:24;30:23;64:25;
66:6;76:4;79:17
**relates (5)**
12:25;13:19;18:17;
23:18;27:13
**relating (3)**
13:4,24;23:16
**relocating (1)**
41:6
**remaining (1)**
79:6
**remedial (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    GREGORY LINTZ
September 24, 2020

76:22
**remotely (1)**
    4:7
**removed (1)**
    50:14
**repaired (1)**
    54:13
**repairs (5)**
    31:13,15;54:9;55:18,
    18
**rephrase (2)**
    36:13;38:19
**report (10)**
    30:11,17;44:13;45:8;
    47:5,9,16;50:18,19;
    52:24
**reporter (8)**
    4:6;7:12,25;68:10;
    77:6,12;80:8,14
**reporting (1)**
    30:16
**reports (8)**
    17:2,7,10;42:24,25;
    46:15;50:25;51:3
**representatives (2)**
    38:8;42:5
**representing (1)**
    15:2
**REQUESTED (2)**
    68:12;69:25
**requesting (1)**
    80:18
**require (7)**
    31:19;39:8;49:12;
    51:11;55:8,10,15
**required (12)**
    40:2,7;47:19;51:13,
    15;52:6;53:3;54:9;
    60:4,21;62:25;74:13
**requirement (17)**
    21:16;32:8;35:8;
    36:14;40:14;42:17,21;
    48:8;49:20;53:8;60:18;
    61:21;69:15,17;73:25;
    74:2;77:16
**requirements (20)**
    21:2;38:14,15,22;
    39:3;52:9;53:5;55:6,7;
    59:3,12;60:7,15;62:8;
    63:14,23;67:7,18;75:5,
    10
**requires (4)**
    21:7;39:14;42:11;
    57:13
**requiring (2)**
    39:20;50:3
**reserve (1)**
    80:13
**respond (2)**
    69:5;78:13
**responding (2)**
    25:18;45:16
**response (24)**

13:5;19:23;20:6,25;
    21:18;22:1,9,15,25;
    23:19;24:8,13,16,21;
    25:11;26:6;27:2,13;
    58:7;59:10;65:22;66:7;
    67:6;74:4
**responses (1)**
    25:14
**responsibilities (10)**
    19:3;22:20;25:1,20,
    21;26:13;48:3;60:20;
    62:4;78:19
**responsibility (7)**
    18:23;22:3;26:22;
    30:13;65:18;73:23;
    76:19
**responsible (4)**
    23:9;24:3,12;29:24
**restrict (4)**
    39:19;50:2,6;56:11
**restricting (1)**
    67:4
**restrictions (2)**
    56:15;65:14
**restricts (3)**
    38:12;39:2;63:10
**restroom (1)**
    45:5
**result (4)**
    13:10;14:4;64:24;
    65:24
**results (2)**
    47:4,7
**resume (1)**
    6:17
**resuming (2)**
    59:25;79:14
**review (54)**
    14:12;19:18;20:24;
    25:4;35:2;36:7;43:4;
    44:9;46:14,20,22,23,
    24;47:3;49:19;50:15;
    57:20;58:1,3,6,10,10,
    16,20;59:1,7;60:10;
    61:24;62:20;64:7;
    65:10,21;66:5,5,10,13,
    17,17,19,21,23;67:5,
    18;69:3;73:20;74:14,
    17,20;75:13,25;76:3,4,
    16;77:2
**reviewed (9)**
    16:6,10,17,21;17:7,
    11;57:10;58:15;59:8
**reviewing (16)**
    13:5,24;20:5;23:16;
    25:8,16;43:9;46:10;
    58:4;61:7,7;62:6;
    68:24;73:13,14;75:20
**reviews (18)**
    13:8;14:2;16:19;
    18:2;19:22;21:16,24;
    22:25;26:1,23;27:11;
    53:25;58:1,2;61:2;

64:18,19;73:12
**revised (1)**
    12:2
**Richard (1)**
    24:17
**right (5)**
    6:11,16;26:16;33:17;
    54:16
**Risk (6)**
    10:10;17:15,22;
    18:21;19:3;25:23
**role (3)**
    25:8;26:22;66:15
**ROSE (13)**
    4:13;5:16,24;6:9,12;
    61:14;68:1;78:15;
    79:12,25;80:2,11,20
**Roughly (1)**
    16:1
**rule (1)**
    9:12
**rules (2)**
    13:2,21

## S

**safe (1)**
    51:3
**safer (2)**
    35:24;61:11
**safety (115)**
    13:25;18:1,9;19:25;
    20:6,13,25;21:17,25;
    22:11;23:2,7;24:8,21;
    25:4,6,9;26:24;27:13;
    29:14,16,25;30:5;31:6;
    32:8,18,25;33:2,19,21;
    34:5,8,14,19,24;35:7,
    10,12,14;36:1,8,11,15,
    18,20,24,24;37:4,4,20,
    21;38:5,15,23;39:4,9,
    15,21,25;40:2,9,20;
    41:2,8,22,24;42:9,11;
    43:5,15;46:11,17;50:7,
    11;51:11,16,20;52:1,
    11,12,13;55:12;56:8,
    13,18,21;57:1,12;58:7;
    59:10;60:13,24;61:7;
    62:5,10,21;64:20;
    65:12,15,21;66:6;67:6,
    14,24;70:21;72:7;
    73:13,14,16;74:3,24;
    76:2,20;77:1;78:18
**Sam (4)**
    4:23;6:12;71:10;
    80:11
**same (10)**
    5:4;13:10,17;14:4;
    43:14;45:10,12;70:11;
    78:1;80:20
**sat (1)**
    5:1
**saying (6)**

6:23;14:15;54:21;
    56:6;61:8;65:5
**scenario (2)**
    44:20;45:1
**scope (3)**
    31:23;64:11;65:3
**screen (1)**
    72:8
**second (4)**
    5:18;23:22;45:25;
    71:24
**section (4)**
    71:1;72:19,23;73:12
**Security (2)**
    63:18;77:21
**seeing (1)**
    71:19
**seek (2)**
    34:20;39:11
**seeking (3)**
    37:20;44:16;45:18
**sees (1)**
    50:12
**send (1)**
    29:20
**sense (2)**
    7:4;27:24
**sent (2)**
    47:10;52:14
**separate (3)**
    42:8;60:18;66:17
**September (2)**
    69:24;70:7
**serve (1)**
    17:15
**Services (2)**
    43:1;48:24
**session (1)**
    78:3
**sessions (1)**
    35:17
**set (7)**
    22:19;38:22;64:18,
    22;69:17,19;73:11
**sets (1)**
    70:11
**setting (3)**
    8:17;41:19;45:4
**shared-screen (1)**
    12:11
**sheets (1)**
    76:2
**shift (7)**
    69:11,11,16;75:6,8;
    77:18;78:2
**show (3)**
    10:24;11:15;55:3
**sic (1)**
    11:14
**side (2)**
    24:13;63:3
**signature (2)**
    80:11,13

**similar (1)**
    5:10
**Similarly (1)**
    8:23
**simulated (2)**
    75:24;78:8
**situation (5)**
    25:18,19;37:2,3;
    51:14
**situations (1)**
    22:7
**slated (1)**
    27:19
**smoothly (2)**
    5:8;76:21
**solely (4)**
    12:19;27:21;34:22;
    57:7
**solicit (1)**
    34:21
**someone (5)**
    30:14;48:18;49:15;
    54:19;55:8
**Sometimes (1)**
    18:6
**somewhere (1)**
    55:11
**sorry (1)**
    77:6
**sort (17)**
    5:5;19:17;27:24;
    33:4;35:9;39:9;40:10;
    43:8;44:1,16;45:18;
    46:5;47:19;52:2;73:22;
    75:16,23
**sounded (2)**
    37:2;59:2
**sounds (3)**
    32:11;59:22;79:11
**sources (1)**
    36:3
**span (3)**
    11:18,20;12:7
**speak (4)**
    7:23;15:9,24;49:16
**specific (8)**
    21:21;23:6;28:15;
    30:7;31:4,10;44:8;
    73:19
**specifically (3)**
    19:22;64:22;74:21
**specified (1)**
    33:24
**speculation (1)**
    68:4
**speed (2)**
    5:9;8:25
**spoken (3)**
    14:20,24;16:3
**sprinkler (10)**
    46:18;62:25;63:6,13,
    15,22,24;64:9,20;65:6
**square (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 32 of 33

31:20
**staff (32)**
21:8,11;34:7;35:1,
18,19,21,23;36:23;
37:6,11;41:10;42:23;
44:2,18;45:20;46:3,6;
53:2,14;55:19;66:24,
25;67:15,24;69:5;71:3;
75:21,22;76:5;77:24;
78:12
**staff's (1)**
38:7
**start (1)**
6:22
**started (1)**
6:18
**starting (1)**
29:9
**State (36)**
13:3,22;18:19,24,25;
19:5,16,24;20:1,4;
21:1;23:3,17;25:17;
27:12;30:3,22;47:18;
50:3;56:5;57:18;58:21;
59:9;60:11;61:2;62:18;
65:1;68:25;71:3;72:6,
24;73:2,4,5,6,16
**statewide (2)**
20:17;25:3
**stay (3)**
28:10;63:16,19
**step (3)**
40:3;66:10,10
**steps (7)**
36:16;41:23;42:12;
51:12;52:7;53:4;76:22
**stick (1)**
63:16
**still (1)**
28:6
**stipulated (2)**
4:14;65:1
**stipulation (4)**
4:3;9:2;11:19;12:3
**strictly (1)**
61:2
**strike (7)**
13:22;22:14;30:20;
32:9;40:7;66:22;73:21
**stringent (1)**
39:4
**struggling (2)**
49:4;71:22
**subject (2)**
22:24;48:5
**subsequent (1)**
11:5
**substance (6)**
13:7;14:2;15:6;
70:10,12;75:20
**substantial (1)**
70:2
**substantive (1)**

70:3
**sufficient (2)**
67:13;78:12
**suggested (1)**
52:2
**SUP (1)**
72:18
**S-U-P (1)**
72:18
**supervision (1)**
35:2
**suppression (1)**
64:1
**sure (15)**
5:7,19;22:12;28:4,
24;31:10;33:8;36:13;
38:19;59:18;62:7;
68:18;71:15,21;79:7
**sworn (1)**
4:18
**system (6)**
52:4;53:15,23;62:18;
63:24;64:2
**systematic (7)**
33:15;47:19;52:3;
54:18;55:5;57:20;
62:20
**systems (40)**
13:2,6,21,25;19:23,
25;20:7,25;21:17,18;
22:1;23:1,2;26:25;
43:5;46:11,18,18,19;
47:20;48:11;49:23;
53:12;54:2;57:21;
62:22,25;63:6,13,15,
22;64:9,21,25;65:6,22;
66:13;67:6,12,22

**T**

**talk (4)**
45:21;48:19;68:17;
69:12
**talked (1)**
67:19
**talks (1)**
75:1
**taught (2)**
31:9;37:8
**teach (2)**
37:15;57:1
**technical (3)**
4:22;7:3,16
**terms (28)**
20:24;24:23;25:16;
27:1,6;30:16;31:6,17,
22;33:14,19;35:25;
43:12,18;49:10;59:10;
62:9;68:23;69:3;70:10;
72:13;73:11,19,20,24;
74:13;75:13,20
**testified (12)**
4:18;17:14;18:13;

22:15;24:1;31:1;38:21,
21;67:20;73:22;74:8;
75:4
**testify (11)**
10:6;12:19;24:24;
25:12;26:13,19;28:1;
49:17;63:8;64:12;74:5
**testimony (30)**
5:11,12,14;7:7;8:5;
9:20;10:2,16,19;13:14;
14:7;18:16,17;19:9;
22:13;23:12,14;24:19;
26:11,21;27:8;28:21;
35:7;39:7;48:4,16;
49:6,14;60:3;63:20
**testing (3)**
48:10;49:22;57:20
**Thanks (1)**
80:21
**third (1)**
12:22
**though (1)**
28:23
**three (1)**
45:5
**three-year (1)**
12:7
**throughout (6)**
20:17;34:25;35:15,
15;61:1,13
**times (3)**
7:22;15:14;53:13
**title (2)**
20:20;24:15
**titled (1)**
72:5
**today (22)**
5:7,14;10:3,6,16,21;
12:19;14:22;16:4,7;
17:12;18:16,17;19:21;
23:13;26:19;48:16;
49:1,6;67:20;78:25;
79:17
**toilets (2)**
45:5;65:14
**told (2)**
15:7,7
**took (8)**
11:4;18:18;54:3;
56:23;65:23;66:15;
76:9,11
**top (1)**
59:20
**Topic (17)**
11:9,10;12:18,25;
13:11,14,17,18;14:5,8;
24:6;27:22,22;49:8,14;
65:6;68:18
**topics (19)**
10:20,24;11:2;12:5,
17,20,22;19:11,20;
27:6,16,25;28:2;30:23,
25;64:21;72:14;75:24;

79:2
**total (1)**
17:6
**touch (2)**
22:24;27:14
**tour (1)**
30:9
**training (11)**
18:6,7,9;25:2;26:3;
31:9;33:25;35:17,22;
37:17;78:3
**transcribe (1)**
4:7
**transcribed (1)**
80:15
**trash (2)**
37:9,16
**truthful (1)**
10:1
**try (5)**
8:25;34:6;35:16;
38:19;44:8
**trying (1)**
49:4
**Turning (1)**
12:22
**turns (1)**
55:20
**twice (2)**
19:19;20:15
**two (2)**
19:20;43:7
**type (2)**
59:1;60:25
**types (3)**
49:12;50:23;53:12

**U**

**ultimately (2)**
76:19;78:18
**under (6)**
5:13,14;7:7;11:18;
41:7,21
**understood (5)**
11:3;32:11;43:6;
60:2;77:5
**Unfortunately (2)**
24:10;27:20
**unit (2)**
61:10;78:13
**units (2)**
36:21;38:3
**unless (5)**
9:16;45:21,25;48:15;
54:12
**unnatural (1)**
7:22
**unwritten (3)**
30:24;34:5;35:9
**up (23)**
8:25;10:23;11:14;
12:9;14:13;26:14;42:6;

44:7,15,23,23;45:2,21,
25;46:2,3,19;49:10;
71:7,11;72:3,8;77:20
**up-close (1)**
56:10
**update (2)**
58:20,25
**updated (2)**
12:2;59:4
**upgrades (1)**
58:17
**use (1)**
5:7

**V**

**vague (2)**
62:12;68:2
**verbal (1)**
75:23
**verify (2)**
46:17;57:4
**version (6)**
11:1;12:24;70:4,6,
12;72:11
**versus (1)**
70:5
**video (2)**
6:1;12:11
**violation (2)**
44:12;57:5
**visit (1)**
19:5
**visited (1)**
19:16
**visits (2)**
20:15;26:4
**visual (20)**
32:11,20;33:5,10,13,
14,22;34:10;35:13;
40:11,16;42:2;43:20;
44:3;47:22;48:7,9,12;
49:21;57:22
**vocal (1)**
68:7

**W**

**walk (5)**
32:5;36:20;55:22,23;
71:7
**walk-about (1)**
44:21
**walked (1)**
55:13
**walking (8)**
32:13,14,21,22;
33:10,11;47:23;57:23
**walks (2)**
43:22;55:24
**walk-through (3)**
32:4;48:7;50:12
**Warden (36)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

GREGORY LINTZ
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-31    filed 05/25/21    page 33 of 33

11:4;29:22;30:18;
38:9,13;39:2,19,25;
40:20;41:2,9,22;42:4,7,
11,24;47:10;50:2;
51:11,25;52:14;56:5,
20;60:18;61:6,18;62:3,
19;63:20;66:3;67:5,11,
20;77:21;78:4,18
**wardens (2)**
37:25;60:24
**warden's (3)**
38:4;56:12;63:11
**water (2)**
65:12,13
**way (9)**
5:9;7:19;9:23;34:2;
37:19;38:5;63:1;78:7,
11
**ways (3)**
5:10;26:16,17
**week (1)**
11:5
**weeklies (1)**
17:5
**weekly (7)**
16:8,11,21;17:2,2;
34:24;54:14
**weren't (2)**
22:18;41:11
**What's (2)**
20:20;72:4
**whereby (1)**
62:18
**who's (2)**
11:7,8
**widespread (4)**
52:3,4;53:2,11
**willingness (1)**
29:2
**wished (1)**
50:9
**wishing (1)**
78:25
**withdrawing (1)**
11:9
**withdrawn (1)**
12:18
**within (18)**
22:2,19;24:24;25:20;
36:1;40:14;47:21;48:2,
11;49:23;53:10;54:2;
56:17;58:18;63:16,19;
65:17;74:4
**Without (2)**
15:6;37:14
**witness (19)**
4:17;6:3,7,13,19;
10:17,20;15:16;19:9,
13;23:6;34:14;51:19;
59:18;62:14;64:15;
68:7,13;78:16
**witnesses (2)**
11:10;79:20

**words (1)**
26:9
**work (13)**
17:25;28:5;53:14,20,
23;54:6,7,7,11,17,24;
55:20,23
**working (2)**
45:6;51:7
**works (2)**
59:21;79:9
**writing (3)**
52:25;53:22;54:5
**written (12)**
20:3;21:6,23;29:23;
30:21;31:1,5;34:4;
35:8,10;60:21;72:13
**wrong (2)**
26:17;31:15

**Y**

**year (1)**
20:15
**years (1)**
5:3

**Z**

**zoom (1)**
4:6

**0**

**000-201 (1)**
72:5
**00-02-201 (10)**
20:22;21:7;22:10;
23:6;25:5,6;26:2;29:8;
39:13;69:20

**1**

**1 (9)**
11:2,9,10,16;12:5,17,
18;16:25;71:17
**10 (16)**
11:3;12:17,20,22;
13:17,18;16:25;17:1,2,
6,9;27:6,25;28:14;
79:5,9
**10:00 (1)**
59:16
**10:55 (1)**
80:23
**10-minute (1)**
59:15
**11 (1)**
27:22
**11:00 (1)**
59:16
**14-page (1)**
72:10
**1st (6)**

13:3,23;62:16;69:24;
70:4,7

**2**

**2 (4)**
71:9,18;72:4,18
**2008 (1)**
17:20
**2010 (2)**
11:22;13:22
**2015 (7)**
11:20;12:5;13:4,23;
57:19;62:16;70:5
**2017 (9)**
12:6;13:4,24;18:18;
57:19;62:17;65:11,24;
70:5
**2018 (1)**
11:20
**2019 (2)**
69:24;70:7

**3**

**30 (1)**
16:1
**30b6 (5)**
19:10,11;64:11,19;
65:3
**31 (1)**
12:6
**31st (4)**
13:4,24;62:17;70:5

**5**

**5 (1)**
79:4
**50 (1)**
16:25
**5548 (1)**
72:18
**5561 (1)**
72:19

**6**

**6 (1)**
72:20

**7**

**7 (1)**
72:20

**8**

**8 (1)**
79:5

**9**

**9 (9)**
11:2;12:17,20,22,25;
27:6,25;28:14;72:19
**9/1/2019 (1)**
72:11