**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# <u>EXHIBIT 30</u>

**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*KENNETH OSBOURNE*
*October 05, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 10-05-20 OSBORNE.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 3 of 29

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as          )
Personal                  )
Representative of the     )
ESTATE OF JOSHUA          )
DEVINE,                   )   No. 3:18-cv-00995-JD-MGG
                          )
        Plaintiff,        )
                          )
vs.                       )
                          )
RON NEAL, et al,          )
                          )
        Defendants.       )

        The remote discovery deposition of
KENNETH OSBOURNE, taken before MARI BETH KAWULIA,
C.S.R., for the purpose of discovery commencing at
9 o'clock a.m. on the 5th day of October, 2020.

Page 2

PRESENT:

        LOEVY & LOEVY
        MS. SARAH GRADY
        311 North Aberdeen Street
        3rd Floor
        Chicago, Illinois  60607
        (312) 243-5900
        sarah@loevy.com
                Appeared on behalf of Plaintiff;

        OFFICE OF INDIANA ATTORNEY GENERAL
        MR. MICHAEL BLINN
            -and-
        MR. CHRISTOPHER ANDERSON
        302 West Washington Street
        5th Floor
        Indianapolis, Indiana  46204
        (317) 232-6201
                Appeared on behalf of Defendants.

REPORTED BY:  MARI BETH KAWULIA

LICENSE #:  No. 84-2873

Page 3

I N D E X

WITNESS:
KENNETH OSBORNE
 Examination by Ms. Grady.....................4

EXHIBIT   DESCRIPTION                 PAGE
No. 1    Rule 30 (b)(6) notice          7
No. 2    emails                        27
No. 3    photograph DSCS 6793          53
No. 4    memo T 66                     57

Page 4

        (Witness duly sworn.)
WHEREUPON:
        KENNETH OSBORNE,
called as a witness herein, having been first duly
sworn, was examined and testified as follows:
        EXAMINATION
BY MS. GRADY:
    Q.   Mr. Osborne, can you please state and
spell your name for the record?
    A.   Yeah.  Kenneth Osborne, O-s-b-o-r-n-e.
    Q.   Thank you, Mr. Osborne.
        You are currently employed by the
Indiana Department of Corrections, correct?
    A.   Correct.
    Q.   Can you tell me your current job title?
    A.   I am an officer assigned to the lock
shop.
    Q.   Your job title is correctional officer
and you are assigned to the lock shop?
    A.   Correct.
    Q.   And are you assigned to the lock shop at
Indiana State Prison or assigned to the lock shop
for the Indiana Department of Corrections
generally?
    A.   Just Indiana State Prison.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 4 of 29

Page 5

Q.   Okay.  Can you please give me an overview of your career with the Indiana Department of Corrections beginning with when you were first hired and providing the various job assignments and titles that you have held there?

A.   I was hired in 2007.  I began working in the warehouse as a truck driver and then I moved over to custody and then I was assigned to the lock shop.

Q.   And, I'm sorry, when were you hired by the Indiana Department of Corrections?

A.   2007.

Q.   Did you receive any training as part of your assignment to the lock shop at Indiana State Prison?

A.   It's all on-the-job training.

Q.   And when were you assigned to the job of the lock shop?

A.   October 2016.

Q.   Prior to October of 2016, did you have any responsibility over the locking mechanisms at Indiana State Prison?

A.   No.

Q.   Prior to October 2016, did you have any responsibilities regarding the radio system at

Page 6

Indiana State Prison?

A.   Yes.

Q.   Can you tell me about that experience?

A.   I was, you know, appointed as the radio manager probably about two years before that, and it was just keeping track of the radios, maintaining them, you know, and so forth.

Q.   And can you tell me when you first were assigned the job of radio manager?

A.   I can't give you an exact date, no.

Q.   Can you tell me approximately?

A.   I'm going to say probably around 2014, somewhere in that area.

Q.   And did you remain the radio manager up until you were assigned to the lock shop in October of 2016?

A.   Yes.

Q.   Did you stop working as the radio manager when you became assigned to the lock shop in October of 2016?

A.   No, I am currently the manager still.

Q.   Can you tell me what does the job of radio manager entail?

A.   Mainly just maintaining the radios, making sure they are functioning, you know, that

Page 7

the radios are assigned, you know, to people that actually have the radios they are assigned to, making sure that our repeaters are working, you know, our consoles are working and everything is functioning the way it's supposed to.

Q.   And can you tell me what is involved in your assignment at the lock shop at Indiana State Prison?  What are your job duties and responsibilities?

A.   I repair and maintain any and all locks that need repair.

Q.   Okay.  I'm going to show you the Rule 30(b)(6) deposition topics for which you have been designated on some of those topics, and I'm going to ask you some questions.

MS. GRADY: Before I do, I'm hoping that, Chris, can you remind me of the dates that we agreed to?  I know we modified them.  I didn't put them on my notes.

MR. ANDERSON: It was January 1st, 2015 until December 31st, 2017.

MS. GRADY: Okay.  Thank you.

BY MS. GRADY:

Q.   Well, I'm going to show you what we'll mark as Exhibit 1.  This is a Rule 30(b)(6) notice

Page 8

served by the plaintiffs on the Indiana Department of Corrections and it lays out a number of topics as you can see here.  Can you see that on your screen, sir?

A.   Yes.

Q.   Okay.  You have been designated on Topics 4 and 7.

A.   Right.

Q.   So I'm going to ask you to read Topic 4 to yourself and let me know once you've had a chance to review that.

A.   Okay.  I'm ready.

Q.   Let me first ask you:  Is this a document that you have seen before today?

A.   Yes, I have.

Q.   Okay.  And the topic has been modified slightly so I'm going to read it with the modifications as to the dates that we have agreed on with the IDOC.

You have been designated by the IDOC to provide binding testimony on its behalf regarding IDOC's radio communication system in effect at Indiana State Prison between January 1st, 2015 through December 31st, 2017 including tracking, technical problems with radios,

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 5 of 29

Page 9

maintaining the radios, repairing the radios, replacing the radios, systems in place that permitted communication between staff in the event that the radio communication system was ineffective for any reason, and any policies, practices, customs, rules, regulations and/or systems relating to the use of the radios by IDOC staff or employees.

You are aware that you have been designated by the IDOC to provide binding testimony on its behalf on that topic, correct?

A.    Correct.

Q.    And you agree to provide binding testimony on IDOC's behalf on that topic as I've just read it?

A.    Yes.

Q.    I also want to turn your attention to Topic No. 7 and I will ask you to similarly read that topic to yourself and let me know once you've finished.

A.    I'm ready.

Q.    Okay.  You have been designated by the IDOC to also provide binding testimony on its behalf regarding IDOC's policies, practices, customs, rules and/or regulations in effect at

Page 10

Indiana State Prison from January 1st, 2015 through December 31st, 2017 relating to electronic, automatic or semi-automatic systems used to unlock or open secured doors at ISP, including creation and location of such systems, individuals or assigned positions authorized to use such systems, repair of those systems, testing of those, and audits or reviews of those systems at Indiana State Prison, including the number and substance of reviews or audits and any conclusions reached or corrective action plans imposed as a result.

You are aware that IDOC has designated you to provide binding testimony on its behalf regarding the topic as I just read it?

A.    Yes.

Q.    And you agree to provide binding testimony on IDOC's behalf on that topic as I've just read it, correct?

A.    Correct.

Q.    Can you tell me what, if anything, you did to prepare to provide testimony on those two topics that we just went over?

A.    Basically just checking on the dates when the new radios were put in place at ISP.

Q.    And how did you go about checking on the

Page 11

dates?

A.    I went back to our old packing slips that had the serial numbers and the date that they were shipped to our warehouse and also checked to see when I was assigned to the lock shop because I was moved from a 12-hour to a 5:00 to 2:00 shift so I could be present, you know, every day when the new system was put in place.

Q.    And what did your investigation uncover with respect to when the new radio system was put in at ISP?

A.    It would have been the fall of 2016, either October or early November.

Q.    So can you explain to me precisely what happened with respect to the radio system in the fall of 2016?

A.    The old system was taken out of service. All the old radios were collected and, you know, new radios and a new repeater system was put in service at the same time.

Q.    And what was the reason that the new radio system was put into place in the fall of 2016?

A.    It was being put in to route all the Indiana -- all the Department of Corrections were

Page 12

getting an upgrade and that that was the date that, you know, ours was chosen.

Q.    Okay.  We'll return to that in a moment.

Did you review any other document -- Strike that.

You testified that you reviewed some packing slips and also looked at some documents reflecting when your job assignment changed from a 12-hour assignment to, what did you call it, a five and two?

A.    5:00 to 2:00.  It's a Monday through Friday.

Q.    And those were your hours, 5:00 a.m. to 2:00 p.m.?

A.    From 7:00 a.m. to 3:00 in the afternoon Monday through Friday.

Q.    I see.  Okay.  So other than packing slips and documents reflecting your change in assignment from a 12-hour shift to the 7:00 to 3:00 Monday through Friday, were there any other documents that you reviewed to prepare for today's deposition?

A.    No, that was it.

Q.    And did you speak with anyone other than your attorney Mr. Anderson to prepare yourself for

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-33   filed 05/25/21   page 6 of 29

Page 13

today's deposition?

A.  No, I haven't.

Q.  Okay.  Can you tell me prior to the fall of 2016 what were the -- tell me about the quality of the radio communications before the replacement in the fall of 2016.

A.  The quality was --

MR. ANDERSON: Just object to vagueness. You can go ahead.

BY MS. GRADY:

Q.  Can you give that answer, sir?  Your attorney wanted to object to vagueness.  You can go ahead.

A.  You know, the radio system at that time, you know, was functioning.  It did have its issues where it would overheat occasionally in the summertime and, you know, I'd have to keep the fans on it to keep it cooled down, but it was a good functioning radio.

Q.  So why was the system replaced?

A.  It was done throughout all of DOC.  I believe all of Indiana governmental agencies were going to a digital mode, and our system at the time was analog, and in order to upgrade to a digital, we had to have a whole, you know, system put in

Page 14

place.

Q.  So all of the radios were replaced in the fall of 2016, correct?

A.  Correct.

Q.  What was the brand of radio that was put in in the fall of 2016?

A.  Motorola.

Q.  Can you tell me what, if anything, was done at Indiana State Prison to ensure that there were a sufficient number of radios for staff?

A.  That would have been more higher up, you know, decisions.  I think it was based upon the current number of radios that were being used on the old system and, you know, they wanted to match the numbers, you know, so we would have the same number of radios.

Q.  So the IDOC just gave -- just replaced the radios one for one when they did the replacement in the fall of 2016, correct?

A.  That was pretty much it.

Q.  And when the replacement was done, what, if anything -- what, if any, action was taken to ensure that the radio system had been installed correctly?

A.  There was a punch list that was

Page 15

performed by Motorola and our communications director.  They went down the punch list to make sure everything was, you know, done in accordance to what the contract called for.

Q.  Who actually performed the installation?

A.  It was Motorola and a contractor, you know, that they chose to do, you know, the antenna work, the grounding work.

Q.  Was any testing performed to ensure that the radios were in working order?

A.  Would you repeat the question?

Q.  Were any tests performed to ensure that the radios were in working order immediately after they were installed?

A.  Oh, yes.  We did a series of tests.  We walked with, you know, portables throughout the whole institution.  We insured that, you know, everything was working fine before the radios were deployed.

Q.  And what, if any, action was taken to ensure that there was sufficient batteries to enable staff to have a -- to replace the battery if the radio they had collected had a low or dead battery?

A.  Every cellhouse has its own charger bank

Page 16

and they have, you know, extra batteries in the charger, you know, that they can change out.  We also keep extra batteries in the control room if somebody needs a battery that they can, you know, exchange when there or the captain's office has a couple battery chargers that they can, you know, swap batteries out there.

Q.  And is it fair to say that the IDOC's policies require ISP to have extra batteries in each cellhouse in the event that a radio has a low or dead battery?

A.  That is correct.

Q.  What, if any, policies govern what staff are required to do when they begin a shift with respect to their radio?

A.  I don't know if it's policy.  It's, you know, a common practice that, you know, they check their radios beforehand to see how much charge is on the battery, you know, check for any physical damage, you know, to the radio, you know, before they take it, you know, and go to work with it.

Q.  Is it fair to say that that's a requirement of staff to check that their radios are in working order and their battery has enough charge to be functioning throughout their shift?

USDC IN/ND case 3:18-cv-00995-JD   document 212-33   filed 05/25/21   page 7 of 29

Page 17

A.   Right, and it's also, you know, the obligation of the sergeant or the officer-in-charge to inventory all the radios to make sure that all the radios assigned to the location is currently present.

Q.   Tell me more about that, the requirement to inventory the radios.

A.   Each radio has its own personal six, you know, digit ID number when it, you know, transmits.  If there was an emergency and somebody needed help, the radios are equipped with an emergency button.

If the officer would press that button, it would show up on our, you know, console and in the control room, you know, what the radio was and where it was, you know, assigned to.

Q.   Okay.  So the officer-in-charge is required -- Strike that.

An officer-in-charge for each shift is required to complete paperwork that reflects that the radio is in the cellhouse and is in working order; is that correct?

A.   Yes, they are to check the serial number to make sure, you know, they have, you know, the correct radios in their cellhouse.

Page 18

Q.   Okay.  Is that a form that they complete?

A.   They put it on their daily log sheet that the inventory was performed.

Q.   I think I lost some of that answer there.  Let me see if I got it.

They're required to confirm the inventory on their daily log sheet that is completed each shift; is that correct?

A.   Right.  That's correct.

Q.   Does that daily log sheet include a portion that specifically requires them to mark -- to record the serial numbers of the radios in their area?

A.   I don't think so.  I couldn't tell you offhand.

Q.   Okay.  But the sheet calls for some marking that you've completed the inventory.  Is it a simple yes, I've done it or is there more detail?

A.   I believe they would just make a notation that all the radios were accounted for.

Q.   Then IDOC policy would require the officer-in-charge to inspect the radios to ensure there was no obvious signs of damage, correct?

Page 19

A.   I don't know if they would do that, you know, but being that he would have to, you know, look at the serial number, I hope he would, but I don't think it's a policy that he would have to check for damage.

Q.   Is the officer-in-charge required to test the radio to ensure it's in working order as part of the job to inventory the radios?

A.   No.  Generally the officer who picked up the radio would, you know, test the radio and see if it would, you know, key up.

Q.   I apologize.  I have a bit of a cold today.

A.   That's okay.

Q.   I'm going to be muting myself to spare you my sniffles.

So each officer is required to test his or her radio at the beginning of the shift to ensure it's in working order and the battery has a sufficient charge, correct?

A.   Yes.

Q.   And can you tell me -- You agree that's an important part of an officer's job, right?

A.   I would say so, yes.

Q.   And can you tell me why?

Page 20

A.   The radio is their life line if they need help.

Q.   Was there any other large scale replacement of the radios performed after the fall of 2016?

A.   No.

Q.   Are radios replaced on an individual basis?

A.   As needed for repair.

Q.   Can you tell me on a typical month how many radios are replaced?

A.   Zero to one.

Q.   Can you tell me in a typical year how many radios are replaced?

A.   Being they are fairly new, I haven't had to send too many out so it's a real low number.

Q.   What is IDOC's policy regarding how staff should communicate in the event that the radio doesn't work for any reason?

A.   That I couldn't tell you offhand.

Q.   As we sit here today, you're not aware of any policy governing how staff should communicate in the event that their radio is not functioning for any reason, correct?

A.   Yeah, I couldn't tell you.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-33   filed 05/25/21   page 8 of 29

Page 21

Q.    And no training is provided to officers regarding how to communicate if a radio is not functioning for any reason, correct?

A.    I believe our training department, you know, does, you know, train new employees on the use of the radio, you know, so that might be covered in, you know, their orientation.

Q.    Well, the reason I'm asking, sir, is because this is one of the topics on which you've been designated, the IDOC's policy regarding systems in place that permit a communication between staff in the event that the radio communication system was ineffective for any reason.

So my question to you is:  What training, if any, are you aware of that's provided to officers about how to communicate in the event a radio is not functioning for any reason?

A.    What would happen if the system would go down, you know, all the radios would begin to, you know, beep out a tone, you know, saying, you know, I can't talk to anybody.

Every radio has what is referred to as a talk around channel which is a radio-to-radio channel so as soon as everybody hears that tone on

Page 22

their radio, everybody goes to that, you know, talk around channel so we have, you know, communication between, you know, employees.

Q.    Okay.  As someone who's not very familiar with this technology, can you explain what a talk around channel is?

A.    It's basically just talking radio to radio without the use of the repeater.  So if you and me were within a couple hundred feet, we would be able to talk to each other without the use of the repeater.

Q.    Okay.  So it turns the radio into sort of direct walkie-talkie?

A.    That's a simple analogy, yes.

Q.    And you have to be within a few hundred feet of the radio that you are trying to communicate with?

A.    Pretty much so, you know, and what we do if our system is down, we have what I refer to as a relay point in our towers who is able to hear more because they're higher up and they can relay transmissions that others may not hear.

Q.    Okay.  And when you do the talk around, that just broadcasts to everybody who's within a few hundred feet; is that correct?

Page 23

A.    That is correct.  So no matter where you're at in a prison, somebody would be able to hear you and if, you know -- and then they could always relay the information to someone else or pick up a telephone or whatever, you know, but, you know, there's always somebody that would be able to hear you.

Q.    And officers are trained when they get their initial training with IDOC or ISP particularly about this function of the radios, correct?

A.    That is correct, and also when we do preventive, you know, maintenance, Motorola has to take the system down, we, you know, do a broadcast in advance that it's going down, everybody has to go to this channel, the talk around.  It gets our towers practice relaying the information so it's actually a good, you know, exercise for us to do.

Q.    And how often does Motorola do preventive maintenance such that you're using the talk around as your primary means of communication?

A.    They do it once a year.

Q.    Do you know when the first time after the installation was performed that Motorola did preventive maintenance?

Page 24

A.    It would have probably been the summer after.

Q.    And are officers trained on the importance of ensuring their radios are in working order at the beginning of their shift?

A.    I would hope so, yes.

Q.    Officers are told that the radio needs to be in working order because it becomes a critically important tool in the event of an emergency in the cellhouse, right?

A.    That is correct.

Q.    What is the system in place at Indiana State Prison for tracking radios that have been reported to have any issue?

A.    I have a sheet that I keep track of all the radios.  You know, all the radios are marked. You know, if I had to put it in the shop then I change yellow to good, yes, I know that they've been looked at.

Q.    Okay.  Is there a formal form or something else for officers to communicate with you as the radio manager that a radio needs repair?

A.    No.  They would notify their officer-in-charge and they would, in turn, notify, you know, the captain or, you know, the watch

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-33   filed 05/25/21   page 9 of 29

Page 25

commander that they have an issue or they may just turn the radio into the control room, you know, saying this radio needs to be checked and looked at, and then I get it from there.

Q. How often does that happen that radios are submitted to you through whatever mechanism for inspection or repair?

A. Maybe about one a month.

Q. Was that the same in the fall of 2016?

A. Yeah. We didn't have any radios going in the shop because we had nothing going down so it was a quiet period of time.

Q. Can you tell me what, if any, policies are in place to track technical problems with the radios? So we talked about how often radios get submitted to you for repairs. Is there any policies or systems in place to track whether a particular radio has been submitted multiple times for repair or not?

A. No, we don't have that.

Q. And are you the point person to handle all radios that have been submitted for repairs?

A. The point man would be, you know, Mark Hahn with the DOC. He's our director, and I can't send anything in without him being notified and his

Page 26

approval.

Q. Can you spell his last name for me?

A. H-a-h-n.

Q. Okay. I understand that you can't send anything without his approval, but my question is more one of a functional point person. Are you the person who handles when a radio gets submitted, repaired or sent out for replacement even though you may need further authorization to send a radio to someone else? Are you the person who handles it?

A. I am the person, yes.

Q. And you've been that person since approximately 2014 when you took on the role of radio manager?

A. That would be correct.

Q. Can you explain to me what is the difference between analog radios and digital radios?

A. That's a loaded question. Analog radio is just, you know, where the modulation, you know, is, you know, just sent out over, you know, the airwaves.

A digital is, you know, your voice or the modulation, you know, it's changed into, you

Page 27

know, one zero one zero bits, and that is transmitted over the airways and then it's decoded at the other end. That's about as simple as I can explain it.

Q. I appreciate that. All right. I'm going to show you what I'm going to mark as Exhibit 2. This is emails that were introduced to us by the IDOC, and Exhibit 2's Bates stamp numbers are 13 -- Sorry. Let me just go down all the way to get the numbers and then we'll start at the beginning. 13 to 33.

Okay. Let's start with the first page. This is an email from you to a number of different people sent on January 11th, 2017. Is this a document that you have reviewed recently before today?

A. No.

Q. Would you take a minute and review this email and then let me know once you've had a chance to review it?

A. Okay. I read it.

Q. Do you remember a time in January of 2019 when the ISP radios went down?

A. I don't recall the incident, but, you know, I'm seeing the email.

Page 28

Q. Okay. On January 11th, 2017 you sent an email to Mark Hahn?

A. Right.

Q. Jason Nowatzke, Kenneth Gann, Michael Moon, James Meehan and Tien Wallace, correct?

A. Correct.

Q. And you told me who Mark Hahn was. We know who Mr. Nowatzke and Mr. Gann are. Can you tell me who Michael Moon is?

A. Michael Moon is currently a lieutenant here at Indiana Prison. He is, you know, a big help to me on the radios, so I keep him informed on what I do and what is going on, you know, in the event that I'm not around, you know, there's somebody else here.

James Meehan, he is retired. And Tien Wallace, he is no longer with us either.

Q. And back in January of 2017, what was Mr. Meehan and Mr. Wallace's positions at ISP -- at IDOC?

A. Meehan was a lieutenant, and, you know, Wallace was a sergeant assigned to the lock shop.

Q. Okay. In your email you state that around 3:30 p.m. yesterday ISP radios went down and when you checked the system ISO (Channel 2) was

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-33   filed 05/25/21   page 10 of 29

Page 29

functioning normally.

Can you explain what that means, ISO (Channel 2) was functioning normally?

A. We are on a trunked radio system which means we have four repeaters that are all tied, you know, together and they are managed by one of the repeaters which is referred to as a controller which, you know, handles all the communications going to, you know, this repeater, that repeater, whatever so everything works normally. I don't know if that helps you any.

Q. I'm not just sure I follow. So the controller is the central system and the channels -- maybe if you try to explaining it --

A. Let me do another analogy. On a trunking system, if you imagine you're going to a restaurant and you're keying up your radio, you're asking the controller can I talk. Well, if you were going to a restaurant and you asked the maitre d, you know, is there a table I can sit at.

Well, the comptroller will check and say yes, I have an open repeater, go ahead and talk, you know, or the maitre d would say yes, I have a table available, go ahead and sit down.

If there wasn't one available, you

Page 30

know, and you asked the controller, you know, can I talk, it would beep and say no, I'm occupied, you have to wait a minute, and the same as a maitre d, sorry, I don't have a table available, you have to wait until one opens up. And that's how the controller operates.

Q. So according to your email then one of the channels appeared to be functioning normally and that was as you were checking the controller, correct?

A. Right. I used my radio and I could access, you know, the ISO channel on No. 2, but, you know, for some reason I couldn't access, you know, Channel 1. So anybody could have went to Channel 2, Channel 3, Channel 4 and just changed the channels and they would have gotten through fine.

Q. So I think maybe what I have confusion is about the first sentence of your email seems to indicate that the ISP radios went down generally.

The second sentence seems to indicate that there is a channel that was functioning normally, and the third sentence indicates there was a channel not functioning normally.

Page 31

My question is: At around 3:30 p.m. on January 10th, 2017, the radios were totally not functioning in ISP or that they were functioning but one of the channels was not functional?

A. The way I'm reading that email it was just that one channel was not working for some reason.

Q. You would agree that the first sentence suggests that the radios went down completely though, right?

A. Right. Which, you know, I think that was probably my way of saying hey, I had an issue, you know, this is what happened, this is what I did, all is fine.

Q. Okay. What does ISO stand for and what does ISP stand for with respect to Channel 1 and Channel 2?

A. Channel 1, you know, is primarily used for custody at ISP. ISO, it's another unit, it's a minimum, you know, security unit which is on grounds and, you know, they are on Channel 2, you know, so that's the difference between the two. I couldn't tell you what ISO means.

Q. Okay. So then ISP radios might -- went down because they primarily used Channel 1 which

Page 32

according to your email had no communications away from the admin building, right?

A. They had none on that channel. You know, they could have went to any of the other channels or, you know, go to the talk around, you know, and they would have had, you know, communication.

Q. How many channels are there on radios that are in use at ISP?

A. I'm counting. At least six.

Q. Okay. Do they each have a different use like Channel 1 and Channel 2?

A. Yeah. You know, some of the channels are assigned to, you know, different talk grids.

Q. Okay. So can you tell me what -- of the six that you have testified there are at least, Channel 1 is for custody staff in the maximum portions of the Indiana State Prison, correct?

A. Correct.

Q. Channel 2 is for the staff in the minimum security unit of the prison, correct?

A. Correct.

Q. Okay. What other channels and what are their purposes?

A. Channel 3 is used by, you know, the

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 11 of 29

Page 33

officers in D cellhouse.

Q. Okay.

A. Channel 4 is used by maintenance.

Q. Okay.

A. 5 is an open channel that anybody can talk to -- you know, to talk on if you need to talk more than a couple, you know, words, you know, on your channel, you can go to that channel and you'll go, you know, talk in more detail without interfering with anybody else, and the same for 6 too, it's also a general use channel.

Q. Is there any policy in Indiana State Prison about what to do if one of the channels is nonfunctional?

A. Not to my knowledge.

Q. There's no policy directing ISP staff if Channel 1 is nonfunctional to go to one of the different channels to communicate during the period of time that Channel 1 remained nonfunctional, correct?

A. I would have to say that would have been during their orientation, but that's the best I can answer that.

Q. My first question is just what is the policy. I mean, is there a policy that says if

Page 34

Channel 1 is not working, you should go to this channel or check this channel to see if your radio can communicate on this channel instead?

A. I don't believe there is a policy per se.

Q. And is there a practice?

A. As referring to what?

Q. Well, you said there's no policy. Is there a practice about what staff would do if one of the channels isn't working?

A. Well, it would be the same as if, you know, all of them went down. You could go to your talk around channel, your walkie-talkie channel, or just turn your knob and, you know, go to another channel.

Q. Okay. I understand that's like an available thing, but presumably some of these channels are reserved for different functions to minimize traffic that's not applicable to various groups at ISP, right?

A. Correct.

Q. If all the channels were functioning, you wouldn't want custody staff to be communicating on Channel 4 that's supposed to be reserved for maintenance staff, right?

Page 35

A. That's the general practice, yes.

Q. In terms of the general practice, is there any general practice with respect to when one of the channels is not working what people who primarily use that channel do in order to access a different channel to communicate on?

A. Well, in the event like, you know, like email, Channel 1 was probably emitting a tone, you know, saying I'm busy, you know, don't bother me and that would have alerted everybody, you know, to go to a different channel, you know, either to Channel 2 or to the talk around channel.

Q. Okay. But there's no policy about that, right?

A. I don't believe so.

Q. And is there a practice that when Channel 1 is down people typically go to Channel 2 or is there no practice?

A. They would generally go to Channel 2. You know, that's the next custody channel.

Q. You see in the second paragraph you know that you performed a shutdown and a hard reset of the controller, correct?

A. Right.

Q. Where is the controller located at

Page 36

Indiana State Prison?

A. It would be in the radio room.

Q. You say that the system came back up but it did seem to take longer than normal, do you see that?

A. Yes.

Q. How long does it normally take to come up?

A. Just maybe 30 seconds.

Q. And do you have any idea how much longer it took to come up this time?

A. I couldn't tell you.

Q. Can you tell me what, if anything, was done to address the outage on January 10th, 2017?

A. I notified, you know, Mark Hahn who is in charge of all the DOC radios.

Q. Okay. Anything else?

A. Yeah, that would have been it, just, you know, send out the email.

Q. Okay. I want to turn your attention to the next page of this document. If you take a minute and review this document and then let me know once you've finished.

A. Okay. I reviewed it.

Q. Okay. This is a document from Mr. Moon

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020

USDC NND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 12 of 29

Page 37

to a variety of people, many of the same people from the first email, but there's also a Michael Calloway.

A.   He would have been the shift supervisor. He's a captain.

Q.   Okay.  Do you recall receiving this email on approximately May 6th, 2017?

A.   I do now, yeah.

Q.   Okay.  This is Mr. Moon notifying you and others that the ISP radio system was not functioning, correct?

A.   That is correct.

Q.   That even after a full reset there was still problems with C cellhouse not being able to use the radios?

A.   That's what he's saying, yeah.

Q.   Do you recall him contacting you before this email was sent about this problem?

A.   No, that would have been -- that was on a Saturday.  I was off.

Q.   Okay.  I understand, but you're cc'd here.  Do you know whether or not he did notify you before sending this email on May 6th of 2017?

A.   I don't recall.

Q.   What does it mean that -- What are the

Page 38

repeaters?

A.   That is what relays our -- you know, it repeats, you know, the radio transmission from one radio to another.

Q.   So the repeaters are how -- are the mechanism that allows the person who's providing the communications to have that communication heard by someone else in a different area, right?

A.   Correct.

Q.   Can you tell me what, if anything, you determined was the source of the issues regarding the facility's radio system not functioning properly?

A.   That I couldn't tell you.  I wasn't present at the time.

Q.   Did you diagnose what happened that rendered the facility's radio system nonfunctional for the period of time described in this email?

A.   No, it doesn't have a diagnostic on it.

Q.   As you sit here today, you don't recall any diagnosis that was made regarding the problem, correct?

A.   That's correct.

Q.   How many repeaters are there as part of the radio system?

Page 39

A.   Four.

Q.   Are they all used at any given time?

A.   They can be.

Q.   But in a typical -- if there are no issues with the facility and everything is working fine, are the repeaters all being used?

A.   Well, they are all in operation. Whether they are all used at the same time, I couldn't tell you.

Q.   Okay.  So does whether a particular repeater is being used depend on how many people are trying to communicate at any given time on a radio?

A.   That's correct.

Q.   I want to turn, briefly turn your attention to Page 3.  This is an email from you to a variety of individuals on March 8th, 2016.  Can you tell me was this before the radio system was replaced at Indiana State Prison?

A.   Yes, that was before it was replaced.

Q.   Okay.  Then we'll go to Page 4 which for the record is Bates No. 16.  This is a series of emails on approximately April 11th, 2016.  That's also before the radio system was replaced?

A.   Yes, that was before it was replaced.

Page 40

Q.   Okay.  Same with this email in May of 2016, that was before the radio system was replaced?

A.   Yeah.  I do recall that one, yes.  That was before it was replaced.

Q.   Can you tell me who is Minor?

A.   Minor is a radio contractor.  Their full name is Minor Communications Company.

Q.   So are they still your contractor today?

A.   No.  We go through Motorola.

Q.   Did that change when you replaced the radio system in the fall of 2016?

A.   Yes.

Q.   Okay.  I'm going to move down to this email which for the record is Bates No. 24, Page 12 of this exhibit.  Can you take a minute to review this email and let me know once you've had a change to do that?

A.   Okay.  I reviewed it.

Q.   Okay.  Can you tell me whether or not this email references the system before or after the replacement?

A.   Oh, that was before this.

Q.   Okay.  How long did you know that the radios were going to be replaced, how far in

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 13 of 29

Page 41

advance?

A. We knew about it for I would say maybe a year. The exact date, you know, was, you know, to be determined.

Q. Okay. I'm going to move us down again to Bates No. 27. It's Page 15 of this exhibit. If you would take a minute to review this email and let me know once you've finished.

A. Okay. I'm finished.

Q. Okay. So this is the new radio system, is that your testimony?

A. By the way the emails are reading, I'm going to have to say this was the old system.

Q. Okay. Let's come back to this email. This is Page 16 of this exhibit. It's Bates No. 28. If you would please review this email and let me know once you've had a chance to review it.

A. Okay. That would have been the email that I sent out, you know, to all the employees that we were going to be, you know, changing over to the new system.

Q. So previously you had testified that the switch occurred in the fall of 2016 but this email is May of 2017, correct?

A. Yes. So the actual date would have

Page 42

been, you know, in May of 2017. I was going by, you know, the invoice on the packing slips, you know, and that was the date on the packing slips when we received the actual radios.

Q. Okay. So you received the radios in the fall of 2016, correct?

A. Correct.

Q. But they weren't -- they weren't put into use until May of 2017?

A. Yeah. That would have been the correct date.

Q. Why the delay?

A. Getting the contractor and building, everything that needed to be put in place would be before anything could be turned on.

Q. Okay. Any other reasons?

A. No. It took the contractors about two or, you know, three months, you know, to do all the work or the prep work, you know, to have everything ready to go.

Q. So prior to this day, people were still communicating via analog radios, correct?

A. That would be correct, yes.

Q. All right. And you testified that one of the problems with the analog radios was that the

Page 43

central unit would overheat, correct?

A. That would be correct, yes.

Q. What other problems were there with the functioning of the analog radios?

A. That was the main, you know, problem was an overheating issue.

Q. And what, if any, steps did ISP take to protect against the radio's central units from overheating?

A. We had three air conditioners in that room. We added a fourth, you know, air cooler and we also put fans on the units to circulate the air.

Q. Okay. You see in this email you say that the goal is to have a radio for everyone who needs a radio, that we will not have the number of radios that we have now, do you see that?

A. That is correct, yes.

Q. Can you tell me what you mean by that?

A. We went from I believe 350 down to 330 radios so we actually went down about 20 radios that we actually used on a daily basis.

Q. And did you ever receive more radios?

A. No. Well, yes, we have but not for a general release.

Q. Okay. So the analog radios, we talked a

Page 44

little bit generally about the difference between a radio that uses analog versus digital. Do the analog radios have a talk around?

A. Yes, they did.

Q. Did the analog radios have an emergency button?

A. Yes, they did.

Q. But the analog radios also had issues, more issues with systemic malfunctions, right?

A. Because of their age, you know, yeah, they were more susceptible, you know, to breaking down.

Q. When you say because of their age, how old were they?

A. Couldn't tell you offhand. It was way before my time.

Q. But you were familiar with the radio system at Indiana State Prison, right?

A. Yes.

Q. And when you say it's way before your time, you started there in 2007?

A. Yes.

Q. So it was -- they were at least ten years old?

A. At least, yes.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC NND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 14 of 29

Page 45

Q. Okay. So then let's go back up to this email on January 4th of 2017. You reviewed this previously, right?

A. Yes.

Q. So this is another instance when the radio system went down?

A. Right.

Q. And multiple radios were unable to transmit, correct?

A. Correct.

Q. And this email reflects that you reset the controller and the repeater and that the system then worked, correct?

A. That would have been correct.

Q. So you have to be onsite to reset the system, right?

A. That is correct, yes.

Q. And during this time you were working 7:00 a.m. to 3:00 p.m.?

A. Correct.

Q. So what, if anything, was done to ensure that any malfunction of the radios could be addressed during the period of time that you weren't at the facility?

A. I am on call 24/7. I only live about

Page 46

ten minutes away, so if there's an issue, you know, I can get here in a reasonable amount of time.

Q. And during the year before the radios were replaced, how often were you called when you weren't physically at the facility to come and do some form of radio repair?

A. Maybe just a couple times. It wasn't that many.

Q. Now, how, if at all, are staff notified that they should contact you if when you are not present at the facility they have a radio issue?

A. You know, the captain on duty would have called me because, you know, he would have known to call me.

Q. Okay. When were you made aware that on April -- in April of 2017 there was a fire in B cellhouse that caused the death of one of the people in custody there?

A. Yeah, I'm aware of it.

Q. And were you aware that one of the officers reported that his radio was not functioning when he responded and first saw that the fire was occurring?

A. No, I was not.

Q. You were never made aware of that fact?

Page 47

A. No.

Q. Okay. I want to talk to you a little bit about the door locks. Can you tell me what is the system in place at Indiana State Prison that governs the electronic or semi-electronic door locks?

A. Could you repeat the question for me?

Q. Sure. Let me set us up in a little cleaner way. Each cell at Indiana State Prison, and we can talk maybe just about the maximum security portion of the prison, each cell has a physical lock that can be unlocked with a key, correct?

A. That's correct, yes.

Q. Okay. Is there another way to unlock one or multiple cells without physically inserting a key into the door and physically unlocking it?

A. There's some that can be done electronically.

Q. And when you say there are some that can be done electronically, does that depend on which cellhouse you're in?

A. Correct.

Q. Okay. Which cellhouses have some form of electronic door lock?

Page 48

A. A cellhouse has some electric. B cellhouse has some electric. Your lock-up units, your PCU, I North, X row, you know, those are all electric.

Q. One of the areas is B cellhouse, correct?

A. Yes.

Q. And can you tell me how that system works?

A. Well, you could, you know, go to a cell, insert the key, you know, turn the key and the door opens or you could go to the main panel at the end of the range, open the door, you know, flip the switch and it engages a motor inside which unlocks the door.

Q. And that's accessible by a control panel at the end of the range, correct?

A. That's correct.

Q. And can you just -- I assume that not everybody has access to that, there must be a key to unlock --

A. The officer who works the range has access to that.

Q. The officer who works the range has access or carries the keys to each cell on that

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 15 of 29

Page 49

range as well as the key to the control panel at the end of the range; is that correct?

A. Right. Because, you know, the way it's set up is one key would open all the doors on that range.

Q. Okay. And what about the officer-in-charge, does the officer-in-charge also have a key to the control panel at the end of the ranges?

A. If he wanted to, yeah, there was an extra set, you know, that he can use if he wanted to.

Q. Was there any policy with respect to ensuring the officer-in-charge has a key at least to the control panel at the end of each range?

A. Not to my knowledge.

Q. What is the practice?

A. You know, generally not. It's, you know, the officer working that range has access to it. If he needed to, he could, you know, pull the other key from the box, you know, in the office, you know, but generally the officer on that range has control.

Q. Okay. What, if any, system is in place to ensure that that control panel is in working

Page 50

order?

A. If it's not in working order, the officer on that range would notify his officer-in-charge or the sergeant who would then, you know, go up, you know, check it or call us and we would come in and check the locks or see what the problem is.

Q. Sure. Well, one way is that someone notes it's not working and then reports it. Is there any system in effect to regularly inspect that control panel for each gallery in a given cellhouse where those control panels exist to ensure affirmatively that they are in working order?

A. We do, you know, maintenance as required on them, but that would be about it for our shop, you know.

Q. Okay. Just so I'm understanding you, there's no system in place to perform checks or other measures to ensure affirmatively that a control panel is working, correct?

A. Well, each panel has, you know, lights, you know, for each door, red or green. If it's red, you know, it's indicating it has a problem. If it's green, it's showing everything is in check

Page 51

and everything is in order. If there's an order to green, different things all have to be in alignment for it to go green.

Q. Right, but I think my question is much simpler. So, you know, often there will be certain parts of a prison that you inspect on a daily basis to make sure like the radios, that they're present, that they're in working order, et cetera without relying on someone reporting a problem to assess them.

My question is whether there's any similar system for the control panels to affirmatively go to each control panel to inspect that it is, in fact, in working order absent or apart from addressing issues as they are reported. Do you understand my question?

A. Well, I know what you're saying. All the panels are used several times a day by different shifts, so if all the panels were working, you know, on one shift, you know, there wouldn't be any issue, you know, to report it to the next shift.

If they had a problem with, you know, a cell or whatever, you know, the officers would have reported it, you know, and if it was an

Page 52

urgency, you know, then we would be called, you know, even in the middle of the night to come to address the issue.

Q. Okay. But again I understand, and we'll get into exactly what it means that people are constantly using it, but again there is no system in place to affirmatively check that the control panels are in working order absent or apart from when people report a problem, correct?

A. I don't believe so.

Q. Okay. So you said they are used several times per day. In the cellhouses that have those electronic systems, those are the primary way that staff lets prisoners out of their cells or secure their cells when it's time to secure them, correct?

A. That is the primary way, yes.

Q. Okay. They can access each individual cell with the use of a physical key though, right?

A. That is correct.

Q. And you said that the same key unlocks all the doors on a range; is that right?

A. That is correct, yes.

Q. So if the control panels -- Strike that.

I'm going to show you -- for the record, I believe Chris has uploaded some of the

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 16 of 29

Page 53

photos, maybe all of the photos from our inspection on to hytel (phonetic). Is that right, Chris?

MR. ANDERSON: Yes.

BY MS. GRADY:

Q. So I haven't downloaded them yet so what I'm going to be showing you is a photograph of a control panel that was taken recently, just one or two weeks ago during an inspection of Indiana State Prison. It has a marker on it, but it's not -- and I will download it to the send to the court reporter so we'll have an exhibit. For now I'm showing it to you in a web browser because I haven't downloaded it.

Can you see this picture in my browser which is the picture we'll make Exhibit 3 and it's entitled DSCS 6793?

A. I see it.

Q. Do you see that?

A. Yes.

Q. Okay. That's a picture of the control panel that we have been discussing, correct?

A. Right. That's a typical control panel, yes.

Q. So you see on this control panel, and I will represent to you that this is the control

Page 54

panel on the bottom range on the north side of the cellhouse, and you can see that here from the North 100, you can see that it's the north side in the bottom range, correct?

A. Yeah, I see the 100 mark, yes.

Q. Okay. So I want to zoom in on the part that has the buttons. You see that there is a red light here which is labeled B and also here which is labeled 108 and also here which is labeled 136 and also here which is labeled BCH worker. Do you see that the red button appears to illuminated for those --

A. Yes.

Q. -- for those cells?

A. Yes.

Q. So I have a question about these two in particular. It looks like both lights are illuminated under 108 and 136. Are you familiar with that phenomenon, both lights are lighted, illuminated?

A. No, I'm not.

Q. Okay. Clearly on B this first top left one, it's just the red light that's illuminated though, right?

A. Correct.

Page 55

Q. So that means that -- Can you tell me what that means?

A. If I'm the officer on that range, it would tell me either the door is open and unlocked or it didn't, you know, secure all the way.

Q. Okay. So a red light might mean that the door is not secure; is that right?

A. Correct.

Q. And it might also mean that the door is unable to -- that this button is unable to secure or not secure the door, correct?

A. Right. It could be open partially and that's why it didn't go green.

Q. Well, in this case it actually looks like there is no button for B, that the button is missing. Do you see that?

A. Yeah, I see that.

Q. Do you know what this is, the B button and why it's missing?

A. That is a button that's not used -- A and B aren't used for anything, so those, you know, aren't going to any cell whatsoever.

Q. Okay. And what about BCH worker?

A. That is just a note they put on there that he's a range worker. He can be generally left

Page 56

out of his cell most of the day to clean the ranges so that's why it's just showing it's unlocked.

Q. Okay. So a red light doesn't necessarily mean that this button is not functioning, correct?

A. Right. Because, yeah, there isn't anything there.

Q. Well, it could also designate -- I mean, for BCH worker, the way you testified as I understand it --

A. It's showing his door is unlocked.

Q. Right. So red light could mean that everything is functioning correctly, it's just that that door is not secured, correct?

A. Right. If it was red, it's showing it isn't secure. It could be that it is locked, but, you know, it could be an issue with a relay, other things, you know, that are minor, but it shows that, you know, something that has to be addressed.

Q. And does this -- Is there anything that specifically designates to an officer that a button is not functional on this control panel?

A. No, there isn't.

Q. How would an officer come to learn that a button is not functional and needs to be reported

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020
USDC NND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 17 of 29

Page 57

to maintenance?

A. Well, if you look to the left-hand side, you see the tabs that say lock and unlock.

Q. Yes.

A. Yeah, that right there, you know, if he moves the switch to the unlock and the light doesn't turn green, you know, then there's an issue with that lock and you would have to go and open it manually.

Q. Wait. If he chooses to unlock, wouldn't it turn red?

A. Yes. You're correct. I'm sorry.

Q. So this would only know that if they pushed one the buttons and the door -- the light either didn't turn red or the door didn't respond, correct?

A. Right.

Q. I want to show you what we'll mark as Exhibit 4 and then take us back to talking about the radios. Sorry. I just shopped sharing.

Exhibit 4 for the record is Bates marked T 66 and it is a memo sent from Officer Rodriguez concerning the fire in B cellhouse on April 7, 2017. If you would take a minute and review this document.

Page 58

Let me first ask whether you have seen this document before just now.

A. I have not seen it.

Q. If you would take a minute and review this document and let me know once you've had a chance to read it.

A. Okay.

Q. Do you see that Officer Rodriguez according to this memo that he authored reported that when he went to the ranges in B cellhouse he had radio failure, correct?

A. That's what he's saying, yes.

Q. That's what the text of this memo is saying?

A. Right.

Q. And it's your testimony that this was never brought to your attention, correct?

A. That is correct.

Q. And ISP never did an investigation of the issues with Mr. Rodriguez' radio and what might have caused him to have radio failure on that day, correct?

A. That is correct. When I came in the next day, it was working fine.

Q. Tell me what you mean by that.

Page 59

A. Well, if there was a radio failure, it wouldn't just heal itself I would think, you know.

Q. So the reason that you know -- Go ahead.

A. There wasn't anything that we did or I did, you know, to fix a radio issue.

Q. And if there was something that you would have done, there would have been a report of that?

A. Documentation of it, yes. I would have had it documented.

Q. Okay. And where would I go to look for whether such a document exists?

A. Again it would have been emailed to Mark Hahn and, you know, you would have had all that information so, you know, I don't believe there was ever an email sent out.

Q. Let me just make sure I've got this broken down. You don't have any recollection of performing any maintenance or taking any steps to assess a radio that had been reported to have failed on April 7, 2017, correct?

A. That is correct.

Q. Did you learn about the fire shortly after it happened?

A. Not until the next day.

Page 60

Q. But do you recall learning of it the next day?

A. Everybody was talking about it, yes.

Q. So you have a memory of the day that followed the fire, right?

A. Vaguely, yes.

Q. You don't remember taking any steps to investigate or perform maintenance on a radio in B cellhouse, correct?

A. There was nothing brought to my attention.

Q. Did you play any role in the investigation or actions taken after the fire?

A. Not as far as investigating the fire, no.

Q. Well, did you play -- when you say not as far as investigating the fire. Did you play a role in other aspects following the fire on April 7th, 2017?

A. After everybody was all done investigating, I went and, you know, checked the lock itself.

Q. Okay. So you checked the lock to the cell?

A. Yes.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 18 of 29

Page 61

Q. And was that before it was removed? My understanding was that many of the parts of the cell were removed afterwards.

A. The lock itself was not removed.

Q. What, if anything, did you determine about the lock upon your inspection after the fire on April 7th, 2017?

A. To be honest, I was really impressed with the lock and how it was manufactured because it worked normally, you know. I opened it up, just found a little bit of carbon on the inside, but the locked worked, you know, mechanically and electrically, and I couldn't find any issues with the lock, and it's in operation today.

Q. Did you take any other steps to inspect or assess any portion of the cell or any portion of any other part of the prison that either was or was unable to be used during the fire on April 7th, 2017?

A. No, I didn't. There was no need to. Everything was functioning normally to the best of my knowledge.

Q. How often does the control panel require maintenance?

A. Very rarely.

Page 62

Q. Can you tell me what that means to you?

A. Maybe a switch on the panel might get broken and would have to be replaced.

Q. How often?

A. Maybe once a year on the high side.

Q. You mean one time per year you --

A. For the whole institution, yes.

Q. One time per year per button or one time per year for any button?

A. For any button. You know, we rarely have any problems.

Q. And if you -- if a button needs repair and gets reported, that's something that comes to you, correct?

A. That would come to me, yes.

Q. And do you take -- Are you in charge of actually performing the maintenance or does that go to somebody else?

A. No, I would do the maintenance.

Q. When was the last time that the -- Strike that.

When did those control panels get put in?

A. I couldn't give you a date. I don't know. It was before I was in the shop.

Page 63

Q. You went in the shop in October of 2016; is that right?

A. Yes.

Q. Okay. Have they ever had systemic either replacement or systematic maintenance like having all of the buttons replaced or, you know, removing the wiring and replacing the wiring, things that are a larger skill than just replacing a button? Has that ever happened during your tenure?

A. No.

MS. GRADY: Okay. Let's go off the record. I just want to review my notes and see what else I have.

Mr. Osborne, if you need a break to go to the bathroom or anything like that, it will just take me a few minutes to review my notes.

(Whereupon, a short break in the proceedings was taken.)

BY MS. GRADY:

Q. Okay. I just have a couple more questions.

Can you tell me, Warden Neal was responsible for ensuring that the radios were in working order, correct?

Page 64

A. He's ultimately in charge, yes.

Q. And he was ultimately responsible for ensuring that the control panels that govern the door locks are in working order, correct?

A. As his job, yes.

Q. Can you tell me did you inspect the control panel after the fire on April 7th, 2017?

A. I did, you know, check the panel itself. I looked at it.

Q. And did you see whether it was in working order?

A. It was in working order, yes.

Q. Well, isn't the only way to determine whether it's actually in working order to see if when you push the lock or unlock that it does the -- it actually locks the door or unlocks it?

A. Well, for the panel, yes.

Q. And did you do that?

A. Yes.

Q. For all the cells or just Mr. Devine's cell?

A. Just that cell and it worked.

Q. Now, there was testimony in this case that the cell was not able to be opened by the control panel. Were you made aware of that fact?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 19 of 29

Page 65

A. No, I wasn't.

Q. There was also testimony -- there's also been testimony in this case that even the physical key was difficult -- it was very difficult to open the door with the physical key. Were you made aware of any facts like that?

A. No, I wasn't.

Q. And there was testimony about the warping of the metal of the bars. Did you see any bars -- did you see any warping of the metal of the bars in Joshua Devine's cell?

A. No, I didn't. That might have been repaired by the time I actually got to it.

Q. And how long after the fire did you actually go to inspect the lock?

A. I'd say it was probably about a week.

Q. And was that something that you were asked to do by somebody else or something you decided to do on your own?

A. No, that was something I did on my own, you know, because they were going to get it ready for another offender, so I had to ensure that everything was operational.

Q. Okay. And how did you get the key?

A. I would have either had the officer on

Page 66

the range with me or I would have borrowed it from her, but chances are whoever the officer that was working at that time was with me.

Q. And just I'm clear, the purpose of your going to test the locks was not to assess whether the lock had malfunctioned in any way during the fire but instead to ensure that as it was when you inspected it, it was in working order such that another prisoner could be secured in that cell, correct?

A. Well, that is correct, you know, assuming that if there was a malfunction during the fire, the same malfunction would be present.

Q. Well, except that I think what you testified to is that you have no knowledge about whether or not repairs were performed to the cell door or the bars, correct?

A. The door, I would have no knowledge of that, if anything was repaired on the door. The lock itself is not in the door.

Q. Okay. But you would have had -- you have no knowledge of whether the -- what, if any, repairs were performed to the door of the cell where there was a fire on April 7th, 2017, correct?

A. That is correct.

Page 67

MS. GRADY: All right. I don't think I have anything further.

THE COURT REPORTER: What do you want to do about signature?

MS. GRADY: Mike, do you have any questions?

MR. BLINN: I have no questions for this witness.

MR. ANDERSON: I have nothing.

THE COURT REPORTER: What do you what do do with the signature?

MR. ANDERSON: Mr. Osborne, would you like the opportunity to review the transcript and make sure everything is accurate as to what you said?

THE WITNESS: Sure. Why not?

MR. ANDERSON: Okay.

THE COURT REPORTER: Ms. Grady, do you want to order the transcript?

MS. GRADY: I think we'll wait to order for now but we'll let you know.

THE COURT REPORTER: Okay. Thank you.

MR. BLINN: Mari Beth, in the event the plaintiffs do order a transcript and have this deposition transcribed, just get in touch with my

Page 68

office. We'll probably take an electronic transcript, but we're not going to order one if the plaintiff doesn't have it transcribed in the first place.

THE COURT REPORTER: No problem. Thank you.

(The deposition ended at 10:46 a.m.)
(Signature reserved.)

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 20 of 29

Page 69

REPORTER CERTIFICATE

I, MARI BETH KAWULIA, a Certified Shorthand Reporter within and for the County of Cook and State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this May 12, 2021.

_____
MARI BETH KAWULIA, CSR
C.S.R. No. 84-2873

Page 70

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as        )
Personal                )
Representative of the   )
ESTATE OF JOSHUA        )
DEVINE,                 )  No. 3:18-cv-00995-JD-MGG
                        )
    Plaintiff,          )
                        )
vs.                     )
                        )
RON NEAL, et al,        )
                        )
    Defendants.         )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given as aforesaid, and includes changes, if any, so made by me.

_____
KENNETH OSBOURNE

SUBSCRIBED AND SWORN TO
before me this _____ day
of_____, A.D. 2020.

_____
Notary Public

Page 71

E R R A T A   S H E E T

I hereby make the following changes to my deposition:

PAGE:        LINE:        CHANGE AND REASON

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

**                         DATE

Correction Sheet Pages _____ of _____

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 21 of 29

## A

**able (6)**
22:10,20;23:2,6;
37:14;64:24
**absent (2)**
51:14;52:8
**access (8)**
30:12,13;35:5;48:20,
23,25;49:19;52:17
**accessible (1)**
48:16
**accordance (1)**
15:3
**according (3)**
30:7;32:1;58:9
**accounted (1)**
18:22
**accurate (1)**
67:14
**action (3)**
10:11;14:22;15:20
**actions (1)**
60:13
**actual (2)**
41:25;42:4
**actually (11)**
7:2;15:5;23:18;
43:20,21;55:14;62:17;
64:14,16;65:13,15
**added (1)**
43:11
**address (2)**
36:14;52:3
**addressed (2)**
45:23;56:19
**addressing (1)**
51:15
**admin (1)**
32:2
**advance (2)**
23:15;41:1
**affirmatively (4)**
50:13,20;51:13;52:7
**afternoon (1)**
12:15
**afterwards (1)**
61:3
**again (4)**
41:5;52:4,6;59:13
**against (1)**
43:8
**age (2)**
44:10,13
**agencies (1)**
13:22
**ago (1)**
53:8
**agree (4)**
9:13;10:16;19:22;
31:8
**agreed (2)**

7:18;8:18
**ahead (5)**
13:9,13;29:22,24;
59:3
**air (3)**
43:10,11,12
**airwaves (1)**
26:23
**airways (1)**
27:2
**alerted (1)**
35:10
**alignment (1)**
51:2
**allows (1)**
38:6
**always (2)**
23:4,6
**amount (1)**
46:2
**analog (11)**
13:24;26:18,20;
42:22,25;43:4,25;44:2,
3,5,8
**analogy (2)**
22:14;29:15
**and/or (2)**
9:6,25
**ANDERSON (7)**
7:20;12:25;13:8;
53:3;67:9,12,17
**antenna (1)**
15:7
**apart (2)**
51:15;52:8
**apologize (1)**
19:12
**appeared (1)**
30:8
**appears (1)**
54:11
**applicable (1)**
34:19
**appointed (1)**
6:4
**appreciate (1)**
27:5
**approval (2)**
26:1,5
**approximately (4)**
6:11;26:14;37:7;
39:23
**April (10)**
39:23;46:16,16;
57:24;59:21;60:19;
61:7,18;64:7;66:24
**area (3)**
6:13;18:14;38:8
**areas (1)**
48:5
**around (14)**
6:12;21:24;22:2,6,
23;23:16,21;28:14,24;

31:1;32:5;34:13;35:12;
44:3
**aspects (1)**
60:18
**assess (4)**
51:9;59:20;61:16;
66:5
**assigned (17)**
4:16,19,21,22;5:8,
17;6:9,15,19;7:1,2;
10:6;11:5;17:4,16;
28:22;32:14
**assignment (5)**
5:14;7:7;12:8,9,19
**assignments (1)**
5:4
**assume (1)**
48:19
**assuming (1)**
66:12
**attention (5)**
9:17;36:20;39:16;
58:17;60:11
**attorney (2)**
12:25;13:12
**audits (2)**
10:8,10
**authored (1)**
58:9
**authorization (1)**
26:9
**authorized (1)**
10:6
**automatic (1)**
10:3
**available (4)**
29:24,25;30:4;34:17
**aware (10)**
9:9;10:12;20:21;
21:16;46:15,19,20,25;
64:25;65:6
**away (2)**
32:1;46:1

## B

**b6 (1)**
3:8
**back (6)**
11:2;28:18;36:3;
41:14;45:1;57:19
**bank (1)**
15:25
**bars (4)**
65:9,10,11;66:17
**based (1)**
14:12
**Basically (2)**
10:23;22:7
**basis (3)**
20:8;43:21;51:6
**Bates (6)**
27:8;39:22;40:15;

41:6,15;57:21
**bathroom (1)**
63:16
**batteries (5)**
15:21;16:1,3,7,9
**battery (8)**
15:22,24;16:4,6,11,
19,24;19:19
**BCH (3)**
54:10;55:23;56:9
**became (1)**
6:19
**becomes (1)**
24:8
**beep (2)**
21:21;30:2
**beforehand (1)**
16:18
**began (1)**
5:6
**begin (2)**
16:14;21:20
**beginning (4)**
5:3;19:18;24:5;
27:11
**behalf (6)**
8:21;9:11,14,24;
10:14,17
**best (2)**
33:22;61:21
**Beth (1)**
67:23
**big (1)**
28:11
**binding (6)**
8:21;9:10,13,23;
10:13,16
**bit (4)**
19:12;44:1;47:3;
61:11
**bits (1)**
27:1
**BLINN (2)**
67:7,23
**borrowed (1)**
66:1
**both (2)**
54:17,19
**bother (1)**
35:9
**bottom (2)**
54:1,4
**box (1)**
49:21
**brand (1)**
14:5
**break (2)**
63:15,18
**breaking (1)**
44:11
**briefly (1)**
39:15
**broadcast (1)**

23:14
**broadcasts (1)**
22:24
**broken (2)**
59:18;62:3
**brought (2)**
58:17;60:10
**browser (2)**
53:12,15
**building (2)**
32:2;42:13
**busy (1)**
35:9
**button (17)**
17:12,14;44:6;54:11;
55:10,15,15,18,20;
56:4,21,25;62:8,9,10,
12;63:9
**buttons (3)**
54:7;57:14;63:6

## C

**call (4)**
12:9;45:25;46:14;
50:5
**called (5)**
4:4;15:4;46:4,13;
52:1
**Calloway (1)**
37:3
**calls (1)**
18:17
**came (2)**
36:3;58:23
**can (67)**
4:8;15:5:1;6:3,8,11,
22;7:6,17;8:3,3;10:20;
11:14;13:3,9,11,12;
14:8;16:2,4,6;19:22,
25;20:10,13;22:5,21;
25:13;26:2,17;27:3;
28:8;29:2,18,20;30:1;
32:15;33:5,8,22;34:3;
36:13;38:10;39:3,17;
40:6,16,20;43:18;46:2;
47:3,10,12,18,20;48:8,
19;49:11;52:17;53:14;
54:2,3;55:1,25;62:1;
63:23;64:6
**captain (3)**
24:25;37:5;46:12
**captain's (1)**
16:5
**carbon (1)**
61:11
**career (1)**
5:2
**carries (1)**
48:25
**case (3)**
55:14;64:23;65:3
**caused (2)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 22 of 29

46:17;58:21
**cc'd (1)**
37:21
**cell (18)**
47:9,11;48:10,25;
51:24;52:18;55:22;
56:1;60:24;61:3,16;
64:21,22,24;65:11;
66:9,16,23
**cellhouse (17)**
15:25;16:10;17:21,
25;24:10;33:1;37:14;
46:17;47:22;48:1,2,5;
50:12;54:2;57:23;
58:10;60:9
**cellhouses (2)**
47:24;52:12
**cells (5)**
47:16;52:14,15;
54:14;64:20
**central (3)**
29:13;43:1,8
**certain (1)**
51:5
**cetera (1)**
51:8
**chance (4)**
8:11;27:19;41:17;
58:6
**chances (1)**
66:2
**change (5)**
12:18;16:2;24:18;
40:11,17
**changed (3)**
12:8;26:25;30:15
**changing (1)**
41:20
**channel (51)**
21:24,25;22:2,6;
23:16;28:25;29:3;
30:12,14,15,15,15,22,
24;31:6,16,17,18,21,
25;32:3,12,12,17,20,
25;33:3,5,8,8,11,17,19;
34:1,2,2,3,13,13,15,24;
35:5,6,8,11,12,12,17,
17,19,20
**channels (14)**
29:14;30:8,16;31:4;
32:5,8,13,23;33:13,18;
34:10,18,22;35:4
**charge (6)**
16:18,25;19:20;
36:16;62:16;64:1
**charger (2)**
15:25;16:2
**chargers (1)**
16:6
**check (12)**
16:17,19,23;17:23;
19:5;29:21;34:2;50:5,
6,25;52:7;64:8

**checked (5)**
11:4;25:3;28:25;
60:21,23
**checking (3)**
10:23,25;30:9
**checks (1)**
50:19
**chooses (1)**
57:10
**chose (1)**
15:7
**chosen (1)**
12:2
**Chris (3)**
7:17;52:25;53:2
**circulate (1)**
43:12
**clean (1)**
56:1
**cleaner (1)**
47:9
**clear (1)**
66:4
**Clearly (1)**
54:22
**cold (1)**
19:12
**collected (2)**
11:18;15:23
**commander (1)**
25:1
**common (1)**
16:17
**communicate (10)**
20:18,23;21:2,17;
22:17;24:21;33:18;
34:3;35:6;39:12
**communicating (2)**
34:23;42:22
**communication (9)**
8:22;9:3,4;21:11,13;
22:2;23:21;32:7;38:7
**communications (6)**
13:5;15:1;29:8;32:1;
38:7;40:8
**Company (1)**
40:8
**complete (2)**
17:20;18:2
**completed (2)**
18:9,18
**completely (1)**
31:9
**comptroller (1)**
29:21
**concerning (1)**
57:23
**conclusions (1)**
10:10
**conditioners (1)**
43:10
**confirm (1)**
18:7

**confusion (1)**
30:18
**console (1)**
17:14
**consoles (1)**
7:4
**constantly (1)**
52:6
**contact (1)**
46:10
**contacting (1)**
37:17
**contract (1)**
15:4
**contractor (4)**
15:6;40:7,9;42:13
**contractors (1)**
42:17
**control (27)**
16:3;17:15;25:2;
48:16;49:1,8,15,23,25;
50:11,12,21;51:12,13;
52:7,23;53:7,20,22,24,
25;56:22;61:23;62:22;
64:3,7,25
**controller (9)**
29:7,13,18;30:1,6,9;
35:23,25;45:12
**cooled (1)**
13:18
**cooler (1)**
43:11
**correctional (1)**
4:18
**Corrections (6)**
4:13,23;5:3,11;8:2;
11:25
**corrective (1)**
10:11
**correctly (2)**
14:24;56:13
**counting (1)**
32:10
**couple (5)**
16:6;22:9;33:7;46:7;
63:21
**court (6)**
53:10;67:3,10,18,22;
68:5
**covered (1)**
21:7
**creation (1)**
10:4
**critically (1)**
24:9
**current (2)**
4:15;14:13
**currently (4)**
4:12;6:21;17:4;
28:10
**custody (6)**
5:8;31:19;32:17;
34:23;35:20;46:18

**customs (2)**
9:6,25

---

### D

**daily (5)**
18:3,8,11;43:21;51:6
**damage (3)**
16:20;18:25;19:5
**date (8)**
6:10;11:3;12:1;41:3,
25;42:3,11;62:24
**dates (4)**
7:17;8:18;10:23;
11:1
**day (10)**
11:7;42:21;51:18;
52:12;56:1;58:21,24;
59:25;60:2,4
**dead (2)**
15:23;16:11
**death (1)**
46:17
**December (3)**
7:21;8:24;10:2
**decided (1)**
65:19
**decisions (1)**
14:12
**decoded (1)**
27:2
**delay (1)**
42:12
**Department (7)**
4:13,23;5:2,11;8:1;
11:25;21:4
**depend (2)**
39:11;47:21
**deployed (1)**
15:19
**deposition (5)**
7:13;12:22;13:1;
67:25;68:7
**described (1)**
38:18
**DESCRIPTION (1)**
3:7
**designate (1)**
56:8
**designated (7)**
7:14;8:6,20;9:10,22;
10:13;21:10
**designates (1)**
56:21
**detail (2)**
18:20;33:9
**determine (2)**
61:5;64:13
**determined (2)**
38:11;41:4
**Devine's (2)**
64:20;65:11
**diagnose (1)**

38:16
**diagnosis (1)**
38:21
**diagnostic (1)**
38:19
**difference (3)**
26:18;31:22;44:1
**different (10)**
27:14;32:11,14;
33:18;34:18;35:6,11;
38:8;51:2,19
**difficult (2)**
65:4,4
**digit (1)**
17:9
**digital (5)**
13:23,24;26:18,24;
44:2
**direct (1)**
22:13
**directing (1)**
33:16
**director (2)**
15:2;25:24
**discussing (1)**
53:21
**DOC (3)**
13:21;25:24;36:16
**document (10)**
8:14;12:4;27:15;
36:21,22,25;57:25;
58:2,5;59:12
**Documentation (1)**
59:9
**documented (1)**
59:10
**documents (3)**
12:7,18,21
**done (11)**
13:21;14:9,21;15:3;
18:19;36:14;45:21;
47:18,21;59:7;60:20
**door (24)**
47:3,5,17,25;48:11,
13,15;50:23;55:4,7,9,
11;56:11,14;57:14,15;
64:4,16;65:5;66:17,18,
19,20,23
**doors (3)**
10:4;49:4;52:21
**down (23)**
13:18;15:2;21:20;
22:19;23:14,15;25:11;
27:9,23;28:24;29:24;
30:20;31:9,25;34:12;
35:17;40:14;41:5;
43:19,20;44:12;45:6;
59:18
**download (1)**
53:10
**downloaded (2)**
53:5,13
**driver (1)**

**BOSS REPORTERS**
**(219) 769-9090**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 23 of 29

5:7
**DSCS (2)**
3:10;53:16
**duly (2)**
4:1,4
**during (10)**
33:18,22;45:18,23;
46:3;53:8;61:18;63:9;
66:6,12
**duties (1)**
7:8
**duty (1)**
46:12

## E

**early (1)**
11:13
**effect (3)**
8:23;9:25;50:10
**either (8)**
11:13;28:17;35:11;
55:4;57:15;61:17;63:5;
65:25
**electric (3)**
48:1,2,4
**electrically (1)**
61:13
**electronic (5)**
10:2;47:5,25;52:13;
68:1
**electronically (2)**
47:19,21
**else (10)**
23:4;24:21;26:10;
28:15;33:10;36:17;
38:8;62:18;63:14;
65:18
**email (30)**
27:13,19,25;28:2,23;
30:7,19;31:5;32:1;
35:8;36:19;37:2,7,18,
23;38:18;39:16;40:1,
15,17,21;41:7,14,16,
18,23;43:13;45:2,11;
59:16
**emailed (1)**
59:13
**emails (4)**
3:9;27:7;39:23;
41:12
**emergency (4)**
17:10,12;24:10;44:5
**emitting (1)**
35:8
**employed (1)**
4:12
**employees (4)**
9:8;21:5;22:3;41:19
**enable (1)**
15:22
**end (6)**
27:3;48:12,17;49:2,

8,15
**ended (1)**
68:7
**engages (1)**
48:14
**enough (1)**
16:24
**ensure (14)**
14:9,23;15:9,12,21;
18:24;19:7,19;45:21;
49:25;50:13,20;65:22;
66:7
**ensuring (4)**
24:4;49:14;63:24;
64:3
**entail (1)**
6:23
**entitled (1)**
53:16
**equipped (1)**
17:11
**et (1)**
51:8
**even (4)**
26:8;37:13;52:2;
65:3
**event (10)**
9:3;16:10;20:18,23;
21:12,17;24:9;28:14;
35:7;67:23
**everybody (8)**
21:25;22:1,24;23:15;
35:10;48:20;60:3,20
**everyone (1)**
43:14
**exact (2)**
6:10;41:3
**exactly (1)**
52:5
**Examination (2)**
3:5;4:6
**examined (1)**
4:5
**except (1)**
66:14
**exchange (1)**
16:5
**exercise (1)**
23:18
**EXHIBIT (11)**
3:7;7:25;27:7,8;
40:16;41:6,15;53:11,
15;57:19,21
**exist (1)**
50:12
**exists (1)**
59:12
**experience (1)**
6:3
**explain (5)**
11:14;22:5;26:17;
27:4;29:2
**explaining (1)**

29:14
**extra (4)**
16:1,3,9;49:11

## F

**facility (4)**
39:5;45:24;46:5,11
**facility's (2)**
38:12,17
**fact (3)**
46:25;51:14;64:25
**facts (1)**
65:6
**failed (1)**
59:21
**failure (3)**
58:11,21;59:1
**fair (2)**
16:8,22
**fairly (1)**
20:15
**fall (13)**
11:12,16,22;13:3,6;
14:3,6,19;20:4;25:9;
40:12;41:23;42:6
**familiar (3)**
22:5;44:17;54:18
**fans (2)**
13:17;43:12
**far (3)**
40:25;60:14,17
**feet (3)**
22:9,16,25
**few (3)**
22:15,25;63:17
**find (1)**
61:13
**fine (5)**
15:18;30:17;31:14;
39:6;58:24
**finished (4)**
9:20;36:23;41:8,9
**fire (16)**
46:16,23;57:23;
59:23;60:5,13,14,17,
18;61:6,18;64:7;65:14;
66:7,13,24
**first (14)**
4:4;5:3;6:8;8:13;
23:23;27:12;30:19;
31:8;33:24;37:2;46:22;
54:22;58:1;68:3
**five (1)**
12:9
**fix (1)**
59:5
**flip (1)**
48:13
**follow (1)**
29:12
**followed (1)**
60:5

**following (1)**
60:18
**follows (1)**
4:5
**form (4)**
18:1;24:20;46:6;
47:24
**formal (1)**
24:20
**forth (1)**
6:7
**found (1)**
61:11
**four (2)**
29:5;39:1
**fourth (1)**
43:11
**Friday (3)**
12:12,16,20
**full (2)**
37:13;40:7
**function (1)**
23:10
**functional (4)**
26:6;31:4;56:22,25
**functioning (23)**
6:25;7:5;13:15,19;
16:25;20:24;21:3,18;
29:1,3;30:8,23,24;31:3,
3;34:22;37:11;38:12;
43:4;46:22;56:5,13;
61:21
**functions (1)**
34:18
**further (2)**
26:9;67:2

## G

**gallery (1)**
50:11
**Gann (2)**
28:4,8
**gave (1)**
14:17
**general (5)**
33:11;35:1,2,3;43:24
**generally (8)**
4:24;19:9;30:20;
35:19;44:1;49:18,22;
55:25
**gets (3)**
23:16;26:7;62:13
**given (3)**
39:2,12;50:11
**goal (1)**
43:14
**goes (1)**
22:1
**good (3)**
13:18;23:18;24:18
**govern (2)**
16:13;64:3

**governing (1)**
20:22
**governmental (1)**
13:22
**governs (1)**
47:5
**GRADY (12)**
4:7;7:16,22,23;
13:10;53:4;63:12,20;
67:1,5,18,20
**Grady4 (1)**
3:5
**green (6)**
50:23,25;51:2,3;
55:13;57:7
**grids (1)**
32:14
**grounding (1)**
15:8
**grounds (1)**
31:21
**groups (1)**
34:20

## H

**Hahn (5)**
25:24;28:2,7;36:15;
59:14
**H-a-h-n (1)**
26:3
**handle (1)**
25:21
**handles (3)**
26:7,10;29:8
**happen (2)**
21:19;25:5
**happened (5)**
11:15;31:13;38:16;
59:24;63:9
**hard (1)**
35:22
**heal (1)**
59:2
**hear (4)**
22:20,22;23:3,7
**heard (1)**
38:7
**hears (1)**
21:25
**held (1)**
5:5
**help (3)**
17:11;20:2;28:12
**helps (1)**
29:11
**herein (1)**
4:4
**hey (1)**
31:12
**high (1)**
62:5
**higher (2)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 24 of 29
KENNETH OSBOURNE
October 05, 2020

14:11;22:21
**hired (3)**
  5:4,6,10
**honest (1)**
  61:8
**hope (2)**
  19:3;24:6
**hoping (1)**
  7:16
**hours (1)**
  12:13
**hundred (3)**
  22:9,15,25
**hytel (1)**
  53:2

## I

**ID (1)**
  17:9
**idea (1)**
  36:10
**IDOC (11)**
  8:19,20;9:7,10,23;
  10:12;14:17;18:23;
  23:9;27:8;28:20
**IDOC's (7)**
  8:22;9:14,24;10:17;
  16:8;20:17;21:10
**illuminated (4)**
  54:11,18,20,23
**imagine (1)**
  29:16
**immediately (1)**
  15:13
**importance (1)**
  24:4
**important (2)**
  19:23;24:9
**imposed (1)**
  10:11
**impressed (1)**
  61:8
**incident (1)**
  27:24
**include (1)**
  18:11
**including (3)**
  8:24;10:4,9
**Indiana (27)**
  4:13,22,23,25;5:2,11,
  14,22;6:1;7:7;8:1,23;
  10:1,8;11:25;13:22;
  14:9;24:12;28:11;
  32:18;33:12;36:1;
  39:19;44:18;47:4,9;
  53:8
**indicate (2)**
  30:20,22
**indicates (1)**
  30:24
**indicating (1)**
  50:24

**individual (2)**
  20:7;52:17
**individuals (2)**
  10:5;39:17
**ineffective (2)**
  9:4;21:13
**information (3)**
  23:4,17;59:15
**informed (1)**
  28:12
**initial (1)**
  23:9
**insert (1)**
  48:11
**inserting (1)**
  47:16
**inside (2)**
  48:14;61:11
**inspect (7)**
  18:24;50:10;51:6,13;
  61:15;64:6;65:15
**inspected (1)**
  66:8
**inspection (4)**
  25:7;53:1,8;61:6
**installation (2)**
  15:5;23:24
**installed (2)**
  14:23;15:14
**instance (1)**
  45:5
**instead (2)**
  34:3;66:7
**institution (2)**
  15:17;62:7
**insured (1)**
  15:17
**interfering (1)**
  33:10
**into (7)**
  11:22;22:12;25:2;
  26:25;42:9;47:17;52:5
**introduced (1)**
  27:7
**inventory (6)**
  17:3,7;18:4,8,18;
  19:8
**investigate (1)**
  60:8
**investigating (3)**
  60:14,17,21
**investigation (3)**
  11:9;58:19;60:13
**invoice (1)**
  42:2
**involved (1)**
  7:6
**ISO (6)**
  28:25;29:2;30:12;
  31:15,19,23
**ISP (19)**
  10:4,24;11:11;16:9;
  23:9;27:23;28:19,24;

30:20;31:3,16,19,24;
32:9;33:16;34:20;
37:10;43:7;58:19
**issue (11)**
  24:14;25:1;31:12;
  43:6;46:1,11;51:21;
  52:3;56:17;57:7;59:5
**issues (8)**
  13:15;38:11;39:5;
  44:8,9;51:15;58:20;
  61:13

## J

**James (2)**
  28:5,16
**January (10)**
  7:20;8:23;10:1;
  27:14,22;28:1,18;31:2;
  36:14;45:2
**Jason (1)**
  28:4
**job (11)**
  4:15,18;5:4,17;6:9,
  22;7:8;12:8;19:8,23;
  64:5
**Joshua (1)**
  65:11

## K

**keep (5)**
  13:17,18;16:3;24:15;
  28:12
**keeping (1)**
  6:6
**KENNETH (4)**
  3:4;4:3,10;28:4
**key (16)**
  19:11;47:12,17;
  48:11,11,20;49:1,4,8,
  14,21;52:18,20;65:4,5,
  24
**keying (1)**
  29:17
**keys (1)**
  48:25
**knew (1)**
  41:2
**knob (1)**
  34:14
**knowledge (6)**
  33:15;49:16;61:22;
  66:15,18,22
**known (1)**
  46:13

## L

**labeled (4)**
  54:8,9,9,10
**large (1)**
  20:3

**larger (1)**
  63:8
**last (2)**
  26:2;62:20
**lays (1)**
  8:2
**learn (2)**
  56:24;59:23
**learning (1)**
  60:1
**least (5)**
  32:10,16;44:23,25;
  49:14
**left (2)**
  54:22;55:25
**left-hand (1)**
  57:2
**lets (1)**
  52:14
**lieutenant (2)**
  28:10,21
**life (1)**
  20:1
**light (7)**
  54:8,23;55:6;56:3,
  12;57:6,14
**lighted (1)**
  54:19
**lights (3)**
  50:22;54:17,19
**line (1)**
  20:1
**list (2)**
  14:25;15:2
**little (4)**
  44:1;47:2,8;61:11
**live (1)**
  45:25
**loaded (1)**
  26:20
**located (1)**
  35:25
**location (2)**
  10:5;17:4
**lock (26)**
  4:16,19,21,22;5:8,14,
  18;6:15,19;7:7;11:5;
  28:22;47:12,25;57:3,8;
  60:22,23;61:4,6,9,14;
  64:15;65:15;66:6,20
**locked (2)**
  56:16;61:12
**locking (1)**
  5:21
**locks (7)**
  7:10;47:3,6;50:6;
  64:4,16;66:5
**lock-up (1)**
  48:2
**log (3)**
  18:3,8,11
**long (3)**
  36:7;40:24;65:14

**longer (3)**
  28:17;36:4,10
**look (3)**
  19:3;57:2;59:11
**looked (4)**
  12:7;24:19;25:3;
  64:9
**looks (2)**
  54:17;55:14
**lost (1)**
  18:5
**low (3)**
  15:23;16:10;20:16

## M

**main (2)**
  43:5;48:12
**Mainly (1)**
  6:24
**maintain (1)**
  7:10
**maintaining (3)**
  6:7,24;9:1
**maintenance (13)**
  23:13,20,25;33:3;
  34:25;50:15;57:1;
  59:19;60:8;61:24;
  62:17,19;63:5
**maitre (3)**
  29:20,23;30:3
**making (2)**
  6:25;7:3
**malfunction (3)**
  45:22;66:12,13
**malfunctioned (1)**
  66:6
**malfunctions (1)**
  44:9
**man (1)**
  25:23
**managed (1)**
  29:6
**manager (8)**
  6:5,9,14,19,21,23;
  24:22;26:15
**manually (1)**
  57:9
**manufactured (1)**
  61:9
**many (9)**
  20:11,14,16;32:8;
  37:1;38:24;39:11;46:8;
  61:2
**March (1)**
  39:17
**Mari (1)**
  67:23
**mark (10)**
  7:25;18:12;25:23;
  27:6;28:2,7;36:15;
  54:5;57:18;59:13
**marked (2)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 25 of 29

24:16;57:22
**marker (1)**
    53:9
**marking (1)**
    18:18
**match (1)**
    14:14
**matter (1)**
    23:1
**maximum (2)**
    32:17;47:10
**may (9)**
    22:22;25:1;26:9;
    37:7,23;40:1;41:24;
    42:1,9
**Maybe (10)**
    25:8;29:14;30:18;
    36:9;41:2;46:7;47:10;
    53:1;62:2,5
**mean (10)**
    33:25;37:25;43:18;
    55:6,9;56:4,8,12;
    58:25;62:6
**means (8)**
    23:21;29:2,5;31:23;
    52:5;55:1,2;62:1
**measures (1)**
    50:20
**mechanically (1)**
    61:12
**mechanism (2)**
    25:6;38:6
**mechanisms (1)**
    5:21
**Meehan (4)**
    28:5,16,19,21
**memo (4)**
    3:11;57:22;58:9,13
**memory (1)**
    60:4
**metal (2)**
    65:9,10
**Michael (4)**
    28:4,9,10;37:2
**middle (1)**
    52:2
**might (7)**
    21:6;31:24;55:6,9;
    58:20;62:2;65:12
**Mike (1)**
    67:5
**minimize (1)**
    34:19
**minimum (2)**
    31:20;32:21
**Minor (4)**
    40:6,7,8;56:18
**minute (7)**
    27:18;30:3;36:22;
    40:16;41:7;57:24;58:4
**minutes (2)**
    46:1;63:17
**missing (2)**

55:16,19
**mode (1)**
    13:23
**modifications (1)**
    8:18
**modified (2)**
    7:18;8:16
**modulation (2)**
    26:21,25
**moment (1)**
    12:3
**Monday (3)**
    12:11,16,20
**month (2)**
    20:10;25:8
**months (1)**
    42:18
**Moon (5)**
    28:5,9,10;36:25;37:9
**more (11)**
    14:11;17:6;18:19;
    22:20;26:6;33:7,9;
    43:22;44:9,11;63:21
**most (1)**
    56:1
**motor (1)**
    48:14
**Motorola (7)**
    14:7;15:1,6;23:13,
    19,24;40:10
**move (2)**
    40:14;41:5
**moved (2)**
    5:7;11:6
**moves (1)**
    57:6
**much (5)**
    14:20;16:18;22:18;
    36:10;51:4
**multiple (3)**
    25:18;45:8;47:16
**must (1)**
    48:20
**muting (1)**
    19:15
**myself (1)**
    19:15

## N

**name (3)**
    4:9;26:2;40:8
**Neal (1)**
    63:23
**necessarily (1)**
    56:4
**need (6)**
    7:11;20:2;26:9;33:6;
    61:20;63:15
**needed (4)**
    17:11;20:9;42:14;
    49:20
**needs (7)**

16:4;24:7,22;25:3;
    43:15;56:25;62:12
**new (10)**
    10:24;11:8,10,19,19,
    21;20:15;21:5;41:10,
    21
**next (6)**
    35:20;36:21;51:22;
    58:24;59:25;60:2
**night (1)**
    52:2
**none (1)**
    32:3
**nonfunctional (4)**
    33:14,17,19;38:17
**normal (1)**
    36:4
**normally (9)**
    29:1,3,10;30:8,23,
    25;36:7;61:10,21
**North (4)**
    48:3;54:1,3,3
**notation (1)**
    18:22
**note (1)**
    55:24
**notes (4)**
    7:19;50:9;63:13,17
**notice (2)**
    3:8;7:25
**notified (3)**
    25:25;36:15;46:9
**notify (4)**
    24:23,24;37:22;50:3
**notifying (1)**
    37:9
**November (1)**
    11:13
**Nowatzke (2)**
    28:4,8
**number (11)**
    8:2;10:9;14:10,13,
    16;17:9,23;19:3;20:16;
    27:13;43:15
**numbers (5)**
    11:3;14:15;18:13;
    27:8,10

## O

**object (2)**
    13:8,12
**obligation (1)**
    17:2
**obvious (1)**
    18:25
**occasionally (1)**
    13:16
**occupied (1)**
    30:2
**occurred (1)**
    41:23
**occurring (1)**

46:23
**October (7)**
    5:19,20,24;6:15,20;
    11:13;63:1
**off (2)**
    37:20;63:12
**offender (1)**
    65:22
**offhand (3)**
    18:16;20:20;44:15
**office (3)**
    16:5;49:21;68:1
**officer (17)**
    4:16,18;17:13;19:9,
    17;48:22,24;49:19,22;
    50:3;55:3;56:21,24;
    57:22;58:8;65:25;66:2
**officer-in-charge (10)**
    17:2,17,19;18:24;
    19:6;24:24;49:7,7,14;
    50:4
**officers (9)**
    21:1,17;23:8;24:3,7,
    21;33:1;46:21;51:24
**officer's (1)**
    19:23
**often (7)**
    23:19;25:5,15;46:4;
    51:5;61:23;62:4
**old (7)**
    11:2,17,18;14:14;
    41:13;44:14,24
**once (10)**
    8:10;9:19;23:22;
    27:19;36:23;40:17;
    41:8,17;58:5;62:5
**one (35)**
    14:18,18;20:12;21:9;
    25:8;26:6;27:1,1;29:6,
    25;30:5,7;31:4,6;
    33:13,17;34:9;35:3;
    38:3;40:4;42:24;46:17,
    20;47:16;48:5;49:4;
    50:8;51:20;53:7;54:23;
    57:14;62:6,8,8;68:2
**only (3)**
    45:25;57:13;64:13
**onsite (1)**
    45:15
**on-the-job (1)**
    5:16
**open (9)**
    10:4;29:22;33:5;
    48:13;49:4;55:4,12;
    57:8;65:4
**opened (2)**
    61:10;64:24
**opens (2)**
    30:5;48:12
**operates (1)**
    30:6
**operation (2)**
    39:7;61:14

**operational (1)**
    65:23
**opportunity (1)**
    67:13
**order (28)**
    13:24;15:10,13;
    16:24;17:22;19:7,19;
    24:5,8;35:5;50:1,2,14;
    51:1,1,8,14;52:8;
    63:25;64:4,11,12,14;
    66:8;67:19,20,24;68:2
**orientation (2)**
    21:7;33:22
**OSBORNE (7)**
    3:4;4:3,8,10,11;
    63:15;67:12
**O-s-b-o-r-n-e (1)**
    4:10
**others (2)**
    22:22;37:10
**ours (1)**
    12:2
**out (13)**
    8:2;11:17;16:2,7;
    20:16;21:21;26:8,22;
    36:19;41:19;52:14;
    56:1;59:16
**outage (1)**
    36:14
**over (6)**
    5:8,21;10:22;26:22;
    27:2;41:20
**overheat (2)**
    13:16;43:1
**overheating (2)**
    43:6,9
**overview (1)**
    5:2
**own (4)**
    15:25;17:8;65:19,20

## P

**packing (5)**
    11:2;12:7,17;42:2,3
**PAGE (8)**
    3:7;27:13;36:21;
    39:16,21;40:15;41:6,
    15
**panel (22)**
    48:12,16;49:1,8,15,
    25;50:11,21,22;51:13;
    53:7,21,22,24;54:1;
    56:22;61:23;62:2;64:7,
    8,17,25
**panels (8)**
    50:12;51:12,18,19;
    52:8,23;62:22;64:3
**paperwork (1)**
    17:20
**paragraph (1)**
    35:21
**part (6)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020

5:13;19:8,23;38:24;
54:6;61:17
**partially (1)**
55:12
**particular (3)**
25:18;39:10;54:17
**particularly (1)**
23:10
**parts (2)**
51:6;61:2
**PCU (1)**
48:3
**people (11)**
7:1;27:14;35:4,17;
37:1,1;39:11;42:21;
46:18;52:5,9
**per (6)**
34:4;52:12;62:6,8,8,
9
**perform (2)**
50:19;60:8
**performed (10)**
15:1,5,9,12;18:4;
20:4;23:24;35:22;
66:16,23
**performing (2)**
59:19;62:17
**period (4)**
25:12;33:18;38:18;
45:23
**permit (1)**
21:11
**permitted (1)**
9:3
**person (7)**
25:21;26:6,7,10,12,
13;38:6
**personal (1)**
17:8
**phenomenon (1)**
54:19
**phonetic (1)**
53:2
**photograph (2)**
3:10;53:6
**photos (2)**
53:1,1
**physical (5)**
16:19;47:12;52:18;
65:3,5
**physically (3)**
46:5;47:16,17
**pick (1)**
23:5
**picked (1)**
19:9
**picture (3)**
53:14,15,20
**place (15)**
9:2;10:24;11:8,22;
14:1;21:11;24:12;
25:14,17;42:14;47:4;
49:24;50:19;52:7;68:4

**plaintiff (1)**
68:3
**plaintiffs (2)**
8:1;67:24
**plans (1)**
10:11
**play (3)**
60:12,16,17
**please (3)**
4:8;5:1;41:16
**pm (4)**
12:14;28:24;31:1;
45:19
**point (4)**
22:20;25:21,23;26:6
**policies (6)**
9:5,24;16:9,13;
25:13,17
**policy (14)**
16:16;18:23;19:4;
20:17,22;21:10;33:12,
16,25;34:4,8;35:13;
49:13
**portables (1)**
15:16
**portion (4)**
18:12;47:11;61:16,
16
**portions (1)**
32:18
**positions (2)**
10:6;28:19
**practice (10)**
16:17;23:17;34:6,9;
35:1,2,3,16,18;49:17
**practices (2)**
9:5,24
**precisely (1)**
11:14
**prep (1)**
42:19
**prepare (3)**
10:21;12:21,25
**present (6)**
11:7;17:5;38:15;
46:11;51:7;66:13
**press (1)**
17:13
**presumably (1)**
34:17
**pretty (2)**
14:20;22:18
**preventive (3)**
23:13,20,25
**previously (2)**
41:22;45:3
**primarily (3)**
31:18,25;35:5
**primary (3)**
23:21;52:13,16
**Prior (4)**
5:20,24;13:3;42:21
**Prison (25)**

4:22,25;5:15,22;6:1;
7:8;8:23;10:1,9;14:9;
23:2;24:13;28:11;
32:18,21;33:13;36:1;
39:19;44:18;47:4,9,11;
51:6;53:9;61:17
**prisoner (1)**
66:9
**prisoners (1)**
52:14
**probably (7)**
6:5,12;24:1;31:12;
35:8;65:16;68:1
**problem (9)**
37:18;38:21;43:5;
50:7,24;51:9,23;52:9;
68:5
**problems (6)**
8:25;25:14;37:14;
42:25;43:3;62:11
**proceedings (1)**
63:19
**properly (1)**
38:13
**protect (1)**
43:8
**provide (7)**
8:21;9:10,13,23;
10:13,16,21
**provided (2)**
21:1,16
**providing (2)**
5:4;38:6
**pull (1)**
49:20
**punch (2)**
14:25;15:2
**purpose (1)**
66:4
**purposes (1)**
32:24
**push (1)**
64:15
**pushed (1)**
57:14
**put (16)**
7:18;10:24;11:8,10,
19,22,24;13:25;14:5;
18:3;24:17;42:8,14;
43:12;55:24;62:23

**Q**

**quality (2)**
13:4,7
**quiet (1)**
25:12

**R**

**radio (83)**
5:25;6:4,9,14,18,23;
8:22;9:4;11:10,15,22;

13:5,14,19;14:5,23;
15:23;16:10,15,20;
17:8,15,21;19:7,10,10,
18;20:1,19,23;21:2,6,
12,18,23;22:1,7,8,12,
16;24:7,22,22;25:2,3,
18;26:7,9,15,20;29:4,
17;30:11;34:2;36:2;
37:10;38:3,4,12,17,25;
39:13,18,24;40:2,7,12;
41:10;43:14,15;44:2,
17;45:6;46:6,11,21;
58:11,20,21;59:1,5,20;
60:8
**radios (78)**
6:6,24;7:1,2;8:25;
9:1,1,2,7;10:24;11:18,
19;14:2,10,13,16,18;
15:10,13,18;16:18,23;
17:3,4,7,11,25;18:13,
22,24;19:8;20:4,7,11,
14;21:20;23:10;24:4,
13,16,16;25:5,10,15,
15,22;26:18,19;27:23;
28:12,24;30:20;31:2,9,
24;32:8;36:16;37:15;
40:25;42:4,5,22,25;
43:4,16,20,20,22,25;
44:3,5,8;45:8,22;46:3;
51:7;57:20;63:24
**radio's (1)**
43:8
**radio-to-radio (1)**
21:24
**range (17)**
48:13,17,22,24;49:1,
2,5,15,19,22;50:3;
52:21;54:1,4;55:3,25;
66:1
**ranges (3)**
49:9;56:1;58:10
**rarely (2)**
61:25;62:10
**reached (1)**
10:10
**read (8)**
8:9,17;9:15,18;
10:14,18;27:21;58:6
**reading (2)**
31:5;41:12
**ready (4)**
8:12;9:21;42:20;
65:21
**real (1)**
20:16
**really (1)**
61:8
**reason (11)**
9:5;11:21;20:19,24;
21:3,8,14,18;30:13;
31:7;59:3
**reasonable (1)**
46:2

**reasons (1)**
42:16
**recall (7)**
27:24;37:6,17,24;
38:20;40:4;60:1
**receive (2)**
5:13;43:22
**received (2)**
42:4,5
**receiving (1)**
37:6
**recently (2)**
27:15;53:7
**recollection (1)**
59:18
**record (7)**
4:9;18:13;39:22;
40:15;52:25;57:21;
63:13
**red (11)**
50:23,24;54:7,11,23;
55:6;56:3,12,15;57:11,
15
**refer (1)**
22:19
**references (1)**
40:21
**referred (2)**
21:23;29:7
**referring (1)**
34:7
**reflecting (2)**
12:8,18
**reflects (2)**
17:20;45:11
**regarding (9)**
5:25;8:22;9:24;
10:14;20:17;21:2,10;
38:11,21
**regularly (1)**
50:10
**regulations (2)**
9:6,25
**relating (2)**
9:6;10:2
**relay (4)**
22:20,21;23:4;56:17
**relaying (1)**
23:17
**relays (1)**
38:2
**release (1)**
43:24
**relying (1)**
51:9
**remain (1)**
6:14
**remained (1)**
33:19
**remember (2)**
27:22;60:7
**remind (1)**
7:17

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-33    filed 05/25/21    page 27 of 29

**removed (3)**
61:1,3,4
**removing (1)**
63:7
**rendered (1)**
38:17
**repair (9)**
7:10,11;10:7;20:9;
24:22;25:7,19;46:6;
62:12
**repaired (3)**
26:8;65:13;66:19
**repairing (1)**
9:1
**repairs (4)**
25:16,22;66:16,23
**repeat (2)**
15:11;47:7
**repeater (8)**
11:19;22:8,11;29:9,
9,22;39:11;45:12
**repeaters (7)**
7:3;29:5,7;38:1,5,24;
39:6
**repeats (1)**
38:3
**replace (1)**
15:22
**replaced (17)**
13:20;14:2,17;20:7,
11,14;39:19,20,24,25;
40:3,5,11,25;46:4;
62:3;63:6
**replacement (7)**
13:5;14:19,21;20:4;
26:8;40:22;63:5
**replacing (3)**
9:2;63:7,8
**report (3)**
51:21;52:9;59:7
**reported (8)**
24:14;46:21;51:15,
25;56:25;58:9;59:20;
62:13
**reporter (6)**
53:11;67:3,10,18,22;
68:5
**reporting (1)**
51:9
**reports (1)**
50:9
**represent (1)**
53:25
**require (3)**
16:9;18:23;61:23
**required (7)**
16:14;17:18,20;18:7;
19:6,17;50:15
**requirement (2)**
16:23;17:6
**requires (1)**
18:12
**reserved (3)**

34:18,24;68:9
**reset (4)**
35:22;37:13;45:11,
15
**respect (6)**
11:10,15;16:15;
31:16;35:3;49:13
**respond (1)**
57:15
**responded (1)**
46:22
**responsibilities (2)**
5:25;7:9
**responsibility (1)**
5:21
**responsible (2)**
63:24;64:2
**restaurant (2)**
29:17,19
**result (1)**
10:11
**retired (1)**
28:16
**return (1)**
12:3
**review (14)**
8:11;12:4;27:18,20;
36:22;40:16;41:7,16,
17;57:25;58:4;63:13,
17;67:13
**reviewed (6)**
12:6,21;27:15;36:24;
40:19;45:2
**reviews (2)**
10:8,10
**Right (40)**
8:8;17:1;18:10;
19:23;24:10;27:5;28:3;
30:11;31:10,11;32:2;
34:20,25;35:14,24;
38:8;42:24;44:9,18;
45:3,7,16;49:3;51:4;
52:18,21;53:2,22;
54:24;55:7,12;56:6,12,
15;57:5,17;58:15;60:5;
63:2;67:1
**Rodriguez (2)**
57:23;58:8
**Rodriguez' (1)**
58:20
**role (3)**
26:14;60:12,18
**room (5)**
16:3;17:15;25:2;
36:2;43:11
**route (1)**
11:24
**row (1)**
48:3
**Rule (3)**
3:8;7:13,25
**rules (2)**
9:6,25

**S**

**same (11)**
11:20;14:15;25:9;
30:3;33:10;34:11;37:1;
39:8;40:1;52:20;66:13
**Saturday (1)**
37:20
**saw (1)**
46:22
**saying (8)**
21:21;25:3;31:12;
35:9;37:16;51:17;
58:12,14
**scale (1)**
20:3
**screen (1)**
8:4
**se (1)**
34:5
**second (2)**
30:21;35:21
**seconds (1)**
36:9
**secure (7)**
52:14,15;55:5,7,10,
11;56:16
**secured (3)**
10:4;56:14;66:9
**security (3)**
31:20;32:21;47:11
**seeing (1)**
27:25
**seem (1)**
36:4
**seems (2)**
30:19,21
**semi-automatic (1)**
10:3
**semi-electronic (1)**
47:5
**send (6)**
20:16;25:25;26:4,9;
36:19;53:10
**sending (1)**
37:23
**sent (8)**
26:8,22;27:14;28:1;
37:18;41:19;57:22;
59:16
**sentence (4)**
30:19,21,23;31:8
**sergeant (3)**
17:2;28:22;50:4
**serial (4)**
11:3;17:23;18:13;
19:3
**series (2)**
15:15;39:22
**served (1)**
8:1
**service (2)**

11:17,20
**set (3)**
47:8;49:4,11
**several (2)**
51:18;52:11
**sharing (1)**
57:20
**sheet (5)**
18:3,8,11,17;24:15
**shift (11)**
11:6;12:19;16:14,25;
17:19;18:9;19:18;24:5;
37:4;51:20,22
**shifts (1)**
51:19
**shipped (1)**
11:4
**shop (17)**
4:17,19,21,22;5:9,14,
18;6:15,19;7:7;11:5;
24:17;25:11;28:22;
50:16;62:25;63:1
**shopped (1)**
57:20
**short (1)**
63:18
**shortly (1)**
59:23
**show (6)**
7:12,24;17:14;27:6;
52:24;57:18
**showing (6)**
50:25;53:6,12;56:2,
11,15
**shows (1)**
56:18
**shutdown (1)**
35:22
**side (4)**
54:1,3;57:2;62:5
**signature (3)**
67:4,11;68:9
**signs (1)**
18:25
**similar (1)**
51:12
**similarly (1)**
9:18
**simple (3)**
18:19;22:14;27:3
**simpler (1)**
51:5
**sit (4)**
20:21;29:20,24;
38:20
**six (3)**
17:8;32:10,16
**skill (1)**
63:8
**slightly (1)**
8:17
**slips (5)**
11:2;12:7,18;42:2,3

**sniffles (1)**
19:16
**somebody (7)**
16:4;17:10;23:2,6;
28:15;62:18;65:18
**someone (6)**
22:4;23:4;26:10;
38:8;50:8;51:9
**somewhere (1)**
6:13
**soon (1)**
21:25
**sorry (5)**
5:10;27:9;30:4;
57:12,20
**sort (1)**
22:12
**source (1)**
38:11
**spare (1)**
19:15
**speak (1)**
12:24
**specifically (2)**
18:12;56:21
**spell (2)**
4:9;26:2
**staff (17)**
9:3,7;14:10;15:22;
16:13,23;20:18,22;
21:12;32:17,20;33:16;
34:9,23,25;46:9;52:14
**stamp (1)**
27:8
**stand (2)**
31:15,16
**start (2)**
27:10,12
**started (1)**
44:21
**state (21)**
4:8,22,25;5:14,22;
6:1;7:7;8:23;10:1,8;
14:9;24:13;28:23;
32:18;33:12;36:1;
39:19;44:18;47:4,9;
53:8
**steps (4)**
43:7;59:19;60:7;
61:15
**still (4)**
6:21;37:14;40:9;
42:21
**stop (1)**
6:18
**Strike (4)**
12:5;17:18;52:23;
62:21
**submitted (5)**
25:6,16,18,22;26:7
**substance (1)**
10:9
**sufficient (3)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

KENNETH OSBOURNE
October 05, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-33   filed 05/25/21   page 28 of 29

14:10;15:21;19:20
**suggests (1)**
  31:9
**summer (1)**
  24:1
**summertime (1)**
  13:17
**supervisor (1)**
  37:4
**supposed (2)**
  7:5;34:24
**sure (12)**
  6:25;7:3;15:3;17:3,
  24;29:12;47:8;50:8;
  51:7;59:17;67:14,16
**susceptible (1)**
  44:11
**swap (1)**
  16:7
**switch (4)**
  41:23;48:14;57:6;
  62:2
**sworn (2)**
  4:1,5
**system (48)**
  5:25;8:22;9:4;11:8,
  10,15,17,19,22;13:14,
  20,23,25;14:14,23;
  21:13,19;22:19;23:14;
  24:12;28:25;29:4,13,
  16;36:3;37:10;38:12,
  17,25;39:18,24;40:2,
  12,21;41:10,13,21;
  44:18;45:6,12,16;47:4;
  48:8;49:24;50:10,19;
  51:12;52:6
**systematic (1)**
  63:5
**systemic (2)**
  44:9;63:4
**systems (10)**
  9:2,6;10:3,5,6,7,8;
  21:11;25:17;52:13

**T**

**table (3)**
  29:20,24;30:4
**tabs (1)**
  57:3
**talk (22)**
  21:22,24;22:1,6,10,
  23;23:16,21;29:18,23;
  30:2;32:5,14;33:6,6,6,
  9;34:13;35:12;44:3;
  47:2,10
**talked (2)**
  25:15;43:25
**talking (3)**
  22:7;57:19;60:3
**technical (2)**
  8:25;25:14
**technology (1)**

22:5
**telephone (1)**
  23:5
**ten (2)**
  44:23;46:1
**tenure (1)**
  63:10
**terms (1)**
  35:2
**test (4)**
  19:7,10,17;66:5
**testified (7)**
  4:5;12:6;32:16;
  41:22;42:24;56:9;
  66:15
**testimony (13)**
  8:21;9:10,14,23;
  10:13,17,21;41:11;
  58:16;64:23;65:2,3,8
**testing (2)**
  10:7;15:9
**tests (2)**
  15:12,15
**third (1)**
  30:23
**though (4)**
  26:8;31:10;52:18;
  54:24
**three (2)**
  42:18;43:10
**throughout (3)**
  13:21;15:16;16:25
**tied (1)**
  29:5
**Tien (2)**
  28:5,17
**times (4)**
  25:18;46:7;51:18;
  52:12
**title (2)**
  4:15,18
**titles (1)**
  5:5
**today (7)**
  8:14;19:13;20:21;
  27:16;38:20;40:9;
  61:14
**today's (2)**
  12:21;13:1
**together (1)**
  29:6
**told (2)**
  24:7;28:7
**tone (3)**
  21:21,25;35:8
**took (3)**
  26:14;36:11;42:17
**tool (1)**
  24:9
**top (1)**
  54:22
**Topic (8)**
  8:9,16;9:11,14,18,

19;10:14,17
**topics (6)**
  7:13,14;8:2,7;10:22;
  21:9
**totally (1)**
  31:2
**touch (1)**
  67:25
**towers (2)**
  22:20;23:17
**track (4)**
  6:6;24:15;25:14,17
**tracking (2)**
  8:25;24:13
**traffic (1)**
  34:19
**train (1)**
  21:5
**trained (2)**
  23:8;24:3
**training (6)**
  5:13,16;21:1,4,16;
  23:9
**transcribed (2)**
  67:25;68:3
**transcript (4)**
  67:13,19,24;68:2
**transmission (1)**
  38:3
**transmissions (1)**
  22:22
**transmit (1)**
  45:9
**transmits (1)**
  17:10
**transmitted (1)**
  27:2
**truck (1)**
  5:7
**trunked (1)**
  29:4
**trunking (1)**
  29:16
**try (1)**
  29:14
**trying (2)**
  22:16;39:12
**turn (11)**
  9:17;24:24;25:2;
  34:14;36:20;39:15,15;
  48:11;57:7,11,15
**turned (1)**
  42:15
**turns (1)**
  22:12
**two (7)**
  6:5;10:21;12:10;
  31:22;42:17;53:8;
  54:16
**typical (4)**
  20:10,13;39:4;53:22
**typically (1)**
  35:17

**U**

**ultimately (2)**
  64:1,2
**unable (4)**
  45:8;55:10,10;61:18
**uncover (1)**
  11:9
**under (1)**
  54:18
**unit (4)**
  31:19,20;32:21;43:1
**units (3)**
  43:8,12;48:2
**unlock (7)**
  10:3;47:15;48:21;
  57:3,6,10;64:15
**unlocked (4)**
  47:12;55:4;56:2,11
**unlocking (1)**
  47:17
**unlocks (3)**
  48:14;52:20;64:16
**up (17)**
  6:14;14:11;17:14;
  19:9,11;22:21;23:5;
  29:17;30:5;36:3,8,11;
  45:1;47:8;49:4;50:5;
  61:10
**upgrade (2)**
  12:1;13:24
**uploaded (1)**
  52:25
**upon (2)**
  14:12;61:6
**urgency (1)**
  52:1
**use (13)**
  9:7;10:6;21:6;22:8,
  10;32:9,11;33:11;35:5;
  37:15;42:9;49:11;
  52:18
**used (17)**
  10:3;14:13;30:11;
  31:18,25;32:25;33:3;
  39:2,6,8,11;43:21;
  51:18;52:11;55:20,21;
  61:18
**uses (1)**
  44:2
**using (2)**
  23:20;52:6

**V**

**Vaguely (1)**
  60:6
**vagueness (2)**
  13:8,12
**variety (2)**
  37:1;39:17
**various (2)**

5:4;34:19
**versus (1)**
  44:2
**via (1)**
  42:22
**voice (1)**
  26:24

**W**

**wait (4)**
  30:3,5;57:10;67:20
**walked (1)**
  15:16
**walkie-talkie (2)**
  22:13;34:13
**Wallace (3)**
  28:5,17,22
**Wallace's (1)**
  28:19
**Warden (1)**
  63:23
**warehouse (2)**
  5:7;11:4
**warping (2)**
  65:9,10
**watch (1)**
  24:25
**way (17)**
  7:5;27:9;31:5,12;
  41:12;44:15,20;47:9,
  15;49:3;50:8;52:13,16;
  55:5;56:9;64:13;66:6
**web (1)**
  53:12
**week (1)**
  65:16
**weeks (1)**
  53:8
**weren't (4)**
  42:8,8;45:24;46:5
**whatsoever (1)**
  55:22
**WHEREUPON (2)**
  4:2;63:18
**whole (3)**
  13:25;15:17;62:7
**who's (3)**
  22:4,24;38:6
**wiring (2)**
  63:7,7
**within (3)**
  22:9,15,24
**without (7)**
  22:8,10;25:25;26:5;
  33:9;47:16;51:8
**WITNESS (5)**
  3:3;4:1,4;67:8,16
**words (1)**
  33:7
**work (6)**
  15:8,8;16:21;20:19;
  42:19,19

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
KENNETH OSBOURNE
October 05, 2020
USDC IN/ND case 3:18-cv-00995-JD   document 212-33   filed 05/25/21   page 29 of 29

**worked (4)**
  45:13;61:10,12;
  64:22
**worker (4)**
  54:10;55:23,25;56:9
**working (37)**
  5:6;6:18;7:3,4;15:10,
  13,18;16:24;17:22;
  19:7,19;24:4,8;31:6;
  34:1,10;35:4;39:5;
  45:18;49:19,25;50:2,9,
  13,21;51:8,14,20;52:8;
  58:24;63:25;64:4,11,
  12,14;66:3,8
**works (4)**
  29:10;48:9,22,24

## Y

**year (8)**
  20:13;23:22;41:3;
  46:3;62:5,6,8,9
**years (2)**
  6:5;44:24
**yellow (1)**
  24:18
**yesterday (1)**
  28:24

## Z

**Zero (3)**
  20:12;27:1,1
**zoom (1)**
  54:6

## 1

**1 (13)**
  3:8;7:25;30:14;
  31:16,18,25;32:12,17;
  33:17,19;34:1;35:8,17
**10:46 (1)**
  68:7
**100 (2)**
  54:3,5
**108 (2)**
  54:9,18
**10th (2)**
  31:2;36:14
**11th (3)**
  27:14;28:1;39:23
**12 (1)**
  40:15
**12-hour (3)**
  11:6;12:9,19
**13 (2)**
  27:9,11
**136 (2)**
  54:9,18
**15 (1)**
  41:6
**16 (2)**

  39:22;41:15
**1st (3)**
  7:20;8:23;10:1

## 2

**2 (13)**
  3:9;27:7;28:25;29:3;
  30:12,15;31:17,21;
  32:12,20;35:12,17,19
**2:00 (3)**
  11:6;12:11,14
**20 (1)**
  43:20
**2007 (3)**
  5:6,12;44:21
**2014 (2)**
  6:12;26:14
**2015 (3)**
  7:20;8:24;10:1
**2016 (22)**
  5:19,20,24;6:16,20;
  11:12,16,23;13:4,6;
  14:3,6,19;20:5;25:9;
  39:17,23;40:2,12;
  41:23;42:6;63:1
**2017 (22)**
  7:21;8:24;10:2;
  27:14;28:1,18;31:2;
  36:14;37:7,23;41:24;
  42:1,9;45:2;46:16;
  57:24;59:21;60:19;
  61:7,19;64:7;66:24
**2019 (1)**
  27:23
**24 (1)**
  40:15
**24/7 (1)**
  45:25
**27 (2)**
  3:9;41:6
**28 (1)**
  41:16
**2's (1)**
  27:8

## 3

**3 (5)**
  3:10;30:15;32:25;
  39:16;53:15
**3:00 (3)**
  12:15,19;45:19
**3:30 (2)**
  28:24;31:1
**30 (2)**
  3:8;36:9
**30b (2)**
  7:13,25
**31st (3)**
  7:21;8:24;10:2
**33 (1)**
  27:11

**330 (1)**
  43:19
**350 (1)**
  43:19

## 4

**4 (9)**
  3:11;8:7,9;30:15;
  33:3;34:24;39:21;
  57:19,21
**4th (1)**
  45:2

## 5

**5 (1)**
  33:5
**5:00 (3)**
  11:6;12:11,13
**53 (1)**
  3:10
**57 (1)**
  3:11

## 6

**6 (1)**
  33:10
**66 (2)**
  3:11;57:22
**6793 (2)**
  3:10;53:16
**6th (2)**
  37:7,23

## 7

**7 (5)**
  3:8;8:7,9;18;57:24;
  59:21
**7:00 (3)**
  12:15,19;45:19
**7th (5)**
  60:19;61:7,18;64:7;
  66:24

## 8

**8th (1)**
  39:17