**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Jon E. DeGuilio, Judge |
| RON NEAL, et al. | ) ) | Hon. Michael G. Gotsch, Sr., M.J. |
| Defendants. | ) ) ) ) | |

# <u>EXHIBIT 32</u>

# In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*30(b)(6) Deposition of CHRISTOPHER BEAL*
*September 29, 2020*
*Cause No. 3:18-CV-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-29-20 CHRISTOPHER  BEAL.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-M(30)(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-35 filed 05/25/21 page 3 of 31

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the )
ESTATE OF JOSHUA DEVINE, )
)
Plaintiff, )
)
vs. ) Cause No.
) 3:18-cv-00995-JD-MGG
RON NEAL, ET. AL., )
)
Defendants. )
_____)

The (30)(b)(6) Videoconference Deposition of
CHRISTOPHER BEAL

Date: Tuesday, September 29, 2020

Time: 9:02 o'clock a.m.

Place: Via Zoom

Called as a witness, by the Plaintiff, in
accordance with the Federal Rules of Civil
Procedure, pursuant to Notice.

Before Beth A. Barnette, CSR,
Illinois License No. 084-004727
Notary Public, State of Indiana

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

**Page 2**

APPEARANCES:

SAM HEPPEL, ESQ.
Loevy & Joevy
311 North Aberdeen Street
Chicago, Illinois 60607
PHONE: (312) 243-5900
FAX: (312) 243-5902
sam@loevy.com

On Behalf of the Plaintiff;

GUSTAVO JIMENEZ, ESQ.
CHRISTOPHER ANDERSON, ESQ.
Office of the Attorney General
Deputy Attorneys General
Civil Litigation
302 West Washington Street
IGCS Fifth Floor
Indianapolis, Indiana 46204
PHONE: (317) 232-6201
FAX: (317) 232-7979
gustavo.jimenez@atg.in.gov
christopher.anderson@atg.in.gov

On Behalf of the Defendants.

**Page 3**

THE VIDEOCONFERENCE DEPOSITION OF CHRISTOPHER BEAL

DIRECT EXAMINATION
By Mr. Heppell......................... Page 5

E X H I B I T S

| PLAINTIFF'S | MARKED | IDENTIFIED |
|---|---|---|
| Exhibit No. 1 | 7 | 7 |
| Exhibit No. 2 | 12 | 12 |

NOTE: Plaintiff's Exhibit Nos. 1 and 2 were
retained by Attorney Heppell.

* * *

**Page 4**

MR. HEPPELL: Just before we swear in the witness, I just want to put on the record -- I know we've done this in other depositions in this case, just a stipulation agreement amongst the parties to the case, and I guess here also with counsel for IDOC, that in light of the public health situation, everyone has agreed to move forward with the deposition proceeding by Zoom, with the court reporter transcribing and swearing in the witness remotely over the videoconferencing.

So stipulated on behalf of plaintiff. And is that stipulated on behalf of the defendants as well?

MR. JIMENEZ: Yes.

MR. BEAL: Yes, that's good with me.

MR. HEPPELL: And on behalf of Third-Party IDOC as well; correct?

MR. ANDERSON: Yes.

MR. HEPPELL: With that formality out of the way, go ahead and swear the witness, please.

USDC IN/ND case 3:18-cv-00995-JD    document 212-35    filed 05/25/21    page 4 of 31

Page 5

CHRISTOPHER BEAL,
called as a witness, by the Plaintiff, having first
been duly sworn, was examined and testified as
follows:

DIRECT EXAMINATION

BY MR. HEPPELL:

Q    Mr. Beal, would you please go ahead and state
and spell your full name for the record?

A    Sure.  Christopher Beal,
C-H-R-I-S-T-O-P-H-E-R, B-E-A-L.

Q    Thank you, Mr. Beal.  And I know you have
given depositions previously, including one a
couple months back in this case, but just to
give everyone a refresher on how we're going
to do things today.  Because there is a
written transcript being made of your answers
and my questions, it's important that we do
our best to help the court reporter make a
clean record of the testimony here today.
Okay?

A    Understood.

Q    And that means it's important for you to give
your answers verbally, using words and not
relying on gestures or head nods, or things
like uh-huh and huh-uh.  Does that make sense?

Page 6

A    Yes.

Q    And similarly, it's important for you to let
me get my full question out and get all the
way to the question mark at the end of the
sentence before you jump in with your answer.
Okay?

A    Yes.

Q    Similarly, I'm going to let you give your full
answer before I jump in with my next question.
Okay?

A    Okay.

Q    There might be some objections that get made
to some of the questions that I have to ask
today.  Because there's no judge here to rule
on those objections, those are just being made
for the record.  Does that make sense?

A    Yes.

Q    So give a moment before jumping in with your
answer to let the attorney make the objection
for the record, but then after that you can go
ahead and jump in and give your answer unless
your attorney directly instructs you not to
answer the question.  Okay?

A    Understood.

Q    Okay.  If you need to take a break at anytime,

Page 7

that's no problem, just let me know.  The only
sort of stipulation around that is that I
would ask that you give your full and complete
answer to any question that's pending before
we go off the record and you can take a break.
Okay?

A    Understood.

(Plaintiff's Exhibit No. 1
remotely marked for identification by
Attorney Heppell.)

BY MR. HEPPELL:

Q    Mr. Beal, I'm going to put up on the screen a
copy of the (30)(b)(6) notice that has been
prepared in this case, and I'm going to
designate this as Exhibit 1.  It's a four-page
notice of rule (30)(b)(6) depositions, and on
the front page it's got a list of the
different designees.
Are you familiar with this document,
Mr. Beal?

A    Yes.

Q    And you see on the first page there your name
and you've been designated on Topic 13; is
that correct?

A    Correct.

Page 8

Q    I'm going to pull down to Topic 13, which is
at the bottom of page 3.  And recognizing that
subsequent to the preparation of this
deposition notice there was a further
agreement between counsel limiting the time
period, so the time period that's written on
the notice has been substituted with the time
period of January 1, 2015 through December 31,
2017.
So with that modification, Topic 13
reflects training provided by IDOC, the staff,
employees, agents, contractors and/or
prisoners at Indiana State Prison from
January 1, 2015 through December 31, 2017,
regarding topics numbered 1 through 12.
Are we on the same page about what
Topic No. 13 entails?

A    Yes.

Q    And I'm not going to read through every one of
the topics 1 through 12.  They're reflected on
the notice.  Have you reviewed those topics?

A    Yes.

Q    Okay.  And are you prepared to give binding
testimony on behalf of IDOC today regarding
the training as set forth in Topic No. 13 of

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-M30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-35   filed 05/25/21   page 5 of 31

Page 9

this notice?

A    Yes.

Q    Okay.  We can set that document aside for now, Mr. Beal.  I'm going to preface these next few questions by telling you that I don't want you to tell me anything about the contents of any conversation that you have had with one of your attorneys.  Okay?

A    Understood.

Q    Have you met with or spoken with anyone to prepare for your deposition today?

A    Yes.

Q    And who have you met with or spoken with to prepare for your deposition?

A    Mr. Gustavo and Mr. Anderson.

Q    And were those separate meetings or a meeting together?

A    Separate.

Q    Okay.  And approximately how long did you spend meeting with or speaking with Gustavo?

A    Maybe 20 minutes.

Q    Is that by phone or video link?

A    By phone.

Q    When did that --

        MR. JIMENEZ: I'm sorry, just to

Page 10

clarify.  So I have spoken with Mr. Christopher Beal, and just to clarify, we spoke about the interrogatories and the requests for production and requests for admissions.  So it was related to discovery requests, but not in preparation for this deposition.

        MR. HEPPELL: Okay.  Understood, and I appreciate that clarification.

BY MR. HEPPELL:

Q    Mr. Beal, in terms of the conversation with the other attorney, Chris Anderson, when did that conversation take place?

A    We spoke very briefly, about five minutes, yesterday on the phone.

Q    Okay.  And was that one conversation the only conversation you had with Mr. Anderson to prepare for this deposition?

A    Yes.

Q    Did you speak with anyone else other than your attorneys about the deposition today or to prepare for the deposition today?

A    No.

Q    Did you review any documents to prepare for the deposition today?

Page 11

A    Yes.

Q    What documents did you review?

A    Hold on and I'll tell you.  I just got to load up my laptop.

Q    No problem.

A    So I reviewed ISP 00-9, which is fire prevention regulation and practices, and I just reviewed the topic outline of our emergency plan manual.

Q    The topic outline of the emergency plan manual, can you explain what you mean by that?

A    It's just a list of what's covered in the emergency manual.

Q    Is that like the table of contents for the emergency manual?

A    Something of that nature, yes.

Q    Okay.  Any other documents that you reviewed other than those two documents that you just testified to?

A    No, sir.

Q    Okay.  And was there an effective date or revision date on the version of the ISP fire prevention policy that you had reviewed?

A    In all honesty, sir, I didn't look at the date.

Page 12

Q    Okay.  I'm going to mark this document as Exhibit 2.  And this is -- let me pull it up on the screen here so you can see it as I'm reading it.  I'm designating this as Exhibit 2, and it is a four-page document, Bates stamped Devine 33108 through 33111. It's titled Department of Correction Indiana State Prison Facility Directive, with an effective date of June 8, 2000 and a revision date of May 24, 2013, titled ISP 00-9 Fire Prevention Regulations and Practices.

        (Plaintiff's Exhibit No. 2 remotely marked for identification by Attorney Heppell.)

BY MR. HEPPELL:

Q    Are you able to see that document that I'm referring to?

A    Yes.

Q    Is this the document that you reviewed in preparation for your deposition today?

A    Yes, sir.

Q    Okay.  The other document you testified you reviewed was the table of contents for the Indiana State Prison Emergency Manual; is that correct?

USDC IN/ND case 3:18-cv-00995-JD document 212-35 filed 05/25/21 page 6 of 31

Page 13

A   Correct.

Q   Was there an effective date or a revision date on that document, do you recall?

A   I do not recall the date, sir.

Q   Give me one moment here. And just so I can clarify, you did not review any of the substantive pages of the emergency manual in preparation for your deposition; is that correct?

A   Correct. I just looked at that table of contents.

Q   Did that have a section number or some designation setting out that table of contents?

A   I cannot recall.

Q   All right. Mr. Beal, I know that you previously gave a deposition in this matter and had testified to a number of issues related to training at Indiana State Prison, and I'm going to do my best not to be duplicative. Although, I do want to recognize and I think we understand that your capacity in which you're testifying today is a little bit different, not in your individual capacity as a defendant, but giving binding testimony

Page 14

on behalf of the department of corrections. So I hope you'll bear me with me if there is some overlap.

One aspect of the training that is provided to employees at Indiana State Prison on the topics designated in the (30)(b)(6) deposition notice is through the new employee training; is that correct?

A   Correct.

Q   And in which sections of the new employee training from the 2015 through 2017 time period were new correctional officers at Indiana State Prison provided any training about fire prevention and fire emergency response practices?

A   That would have been during their first session also known as Session 1.

Q   And during Session 1, specifically what training was provided to new officers on fire emergency response?

A   There would have been three separate training modules; fire extinguisher identification, use of a fire extinguisher, and fire emergencies.

Q   And what was covered in the fire extinguisher identification section?

Page 15

A   I'd have to look at the task sheets here to tell you what it says.

Q   In terms of the contents, fair to say that that is sort of limited to fire response specifically related to different types of fire extinguishers?

A   Yeah. The module should break down the different types of fire extinguishers for different types of fires.

Q   And then the second module you testified was use of a fire extinguisher; is that correct?

A   Correct.

Q   And fair to say that that topic was limited to techniques or how to operate a fire extinguisher?

A   Correct.

Q   What was the title of the third module you just testified to?

A   It should be fire procedures or fire emergency plans, but there is one that references fire emergencies in that Session 1.

Q   What's covered in that section?

A   It's basically a simulation training task sheet for someone to go through, you know, what are the steps to, you know, do if there

Page 16

is a fire.

Q   And the section you just referenced, is this training specific to Indiana State Prison or is this generic general training that is working off of a set curriculum provided by the Indiana Department of Correction?

A   The IDOC does have Session 1. The topics themselves are generically set for Session 1. So everybody has the same topics at every facility for Session 1. Now the topics themselves can be broken down to be more facility-specific, as every facility operates differently.

Q   And so who at the Indiana State Prison had the ability to customize the contents of that fire procedures topic to determine what specifically it would cover?

A   That one is an original one that we formatted at the end of 2011 that followed over to 2012. At that time the training coordinator was Ivan Jones, and then I believe he had to approve it and I believe at that time the warden had to have the final approval on it. The process has changed since then.

Q   When you say the process has changed since

Page 17

then, can you explain what you mean by that?

THE WITNESS: I'm getting video freeze.  Can everybody still hear me?

MR. HEPPELL: I can hear you and I can see you okay.  Can you hear and see me?

THE WITNESS: Hello?

MR. HEPPELL: Now you have frozen.  Mr. Beal, can you hear or see us?  Let's go off the record.

(Brief pause; technical issue.)

MR. HEPPELL: Back on the record.

BY MR. HEPPELL:

Q    Mr. Beal, I think where we had left off you had been describing the process for creating the contents of the fire procedures and fire emergency plan section of the training module.  And I think you had been giving some history on that being created around 2011, 2012 by the previous training coordinator; is that correct?

A    Well, he was the training coordinator.  Who the actual creator was, it could have well been myself or someone else, but I know it had to have his approval and then at that time it needed the warden's approval.  Now it simply

Page 18

just needs the approval of the field training manager, the field training coordinator, which is myself, and at least one member of the training committee.  So it has changed a little bit since then.

Q    Okay.  Has the contents of that module changed at any point in time since it was first developed in the 2011, 2012 time period?

A    To my knowledge, it has not.

Q    Okay.  Are there any written materials associated with that aspect of the training?

A    Can you clarify?

Q    Sure.  Are there any -- for example, are there any handouts or PowerPoints or worksheets that are provided to officers who are going through that aspect of the training?

A    Not for those particular modules, no.

Q    And I know from your prior testimony in this case that there are different modes of training provided during the new employee training.  There is some classroom-based training, there's some skills-based training, and then some on-the-job training.  Is that fair to say?

A    Correct.

Page 19

Q    Which category of training does this fire response, fire procedure section fall into?

A    That would fall underneath the on-the-job training.

Q    And so in terms of how this training is delivered, it's not delivered in a group setting in a classroom; it's delivered by each individual new officer being out in the facility with their designated field training officer and going through the items covered on the check list; is that correct?

A    Correct.

Q    And in terms of what is -- I had asked you about written materials and you testified there weren't any written materials in the sense of handouts or PowerPoints, or anything like that; correct?

A    For those modules, no.

Q    Okay.  Fair to say that there is a written document that lays out the content of that aspect of training in terms of the specific aspects of fire response that are to be covered?

A    Well, yeah, the task sheet itself will have the individual steps concerning that task.

Page 20

Q    And those steps have not changed, the steps that are covered in the task sheet have not changed at any point since it was first developed in 2011 or 2012; is that correct?

A    To my knowledge, no.

Q    Okay.  Approximately, how many minutes of training time are covered by that one task sheet?  And just to be clear, I'm referring to the third of the three task sheets that you described.  So not either the fire extinguisher task sheets, but the fire procedures, fire emergency plan task sheet.

A    There's not a specific designation of time.  Each session is given out.  So they'll receive 68 hours during the first two sessions and 96 hours for the last two sessions, so a total of four sessions for on-the-job training per custody staff.

Q    So if I understood your testimony, there's no designated amount of time that sort of each individual task sheet covers.  Is that fair to say?

A    Yes.  Now, you used to.  It used to be you literally had to sit down and show that we spent ten minutes on this, five minutes on

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-35   filed 05/25/21   page 8 of 31

Page 21

that.  That process has been done away with for quite a while, I believe.

Q   Okay.  So fair to say that there could be some amount of variation in terms of how long each officer spends on a particular task sheet?

A   Yeah.  Like you may be able to find something from 2005 and see where they were actually getting individual minutes per sheet.  That's been a long time ago.

Q   So understanding that there's not a designated amount of time, fair to say that the length of the task sheet in terms of the number of topics and the nature of those topics is going to dictate, to some extent, how much time is spent on a particular task sheet?  Is that fair to say?

A   Yes.

Q   Okay.  Given the nature of what's covered in that fire procedures, fire emergency plan task sheet, are you able to give an approximation or a range of the amount of time that, you know, an average officer would spend on that particular item of the training?

A   I really can't give you per se an actual official time.  I can tell you, given the

Page 22

information on there and how simplistic it actually is, an average person shouldn't need more than maybe ten minutes covering that material.  I mean, it's pretty cut and dry.

Q   Okay.  And what is the material that's covered on that specific task sheet?

A   From memory, I know it's about, you know, actually acknowledging that the fire has been called, you know, proper radio signals, evacuating the area depending on what area you're on, doing a count once the area has been evacuated, calling in your count, things of that nature.  Just your basic fire evacuation material.

Q   Okay.  Fair to say that that would be a simulation rather than actually going through response to an actual emergency?

A   I believe it is set up to kind of quiz the person as if it was a simulation.  Remember, it's a generic topic covering, you know, just basic information.

Q   And I guess I should have been more precise in my question.  There are some aspects -- some of the topics covered in that on-the-job training where a trainee actually does a real

Page 23

task in the same manner that they would do it during the course of their regular duties at the prison, just, you know, supervised by the field training officer.  Is that fair to say?

A   Correct.  So taking count is something that they can physically do.  You know, a fire emergency, unless you're actually experiencing one, is not one that we can actually physically do.  That would be something they would be given at some point in time during a fire drill or during an emergency as it is actually transpiring.

Q   Sure.  And as you know, fire emergency is usually something that you have to simulate in some fashion unless you've going to go to the extreme of actually setting a fire.  So some degree of simulation is required for that.  Fair to say?

A   Well, theoretically, simulation you can have a verbal -- do it just verbally.

Q   Right.  And I think you're sort of anticipating what I'm trying to get at, because there can be different levels of simulation.  So, for example, you can do a simulation where you would, even though

Page 24

there's not an active fire, you would sort of walk through the steps, get out the radio and, you know, demonstrate, you know, radioing in and, you know, walking down a range of a cell house to evacuate a prisoner from a cell in the manner that you would, for example, during a fire drill, even though there's no actual fire burning.  That would be one type of simulation that could be accomplished.  Fair to say?

A   That could be accomplished, yes.

Q   Okay.  And then a different level of simulation would be there's no physicality involved at all, no walking to different areas within the prison, no unlocking of cell doors or removing individuals; it's just done verbally.  That would be a different type of simulation.  Fair to say?

A   That could be done as well.

Q   More like a quiz to see if you know the right answer without actually practicing going through the tasks; correct?

A   Yes.  I could like walk you through it now via Zoom and then, you know, if you ever came here you could actually try and -- you know, that

Page 25

way you can just physically see what exactly it is that needs to be done.

Q   In terms of the training module that we've been describing, the task list, the check list for the fire procedures, on-the-job training, is that accomplished through that sort of verbal quiz simulation as opposed to any sort of physical simulation?

A   Well, they're actually in the field.  So, you know, I got to go back a long time ago when I was still in uniform, you know.  So when you walk with a trainee, you show them where the fire exits are.  You point out where the fire extinguishers are.  You know, they learn how to use keys.  They get a radio card.  So, you know, it's a hands-on, but it can be a verbal, slash, hands-on.  It can be a knowledge-based task because you're going to be with them for eight hours going up and down those ranges in the cell house, and, you know, a lot of times they get an opportunity to put out fires because offenders love to start fires and throw them out on the range.

Q   So there might be an opportunity during the field training for a trainee to actually deal

Page 26

with a real fire situation depending on what was happening at the prison.  Fair to say?

A   Yes.

Q   But that's not a required part of the training.

A   No, no.  We actually don't have the offenders start fires so they can put them out.

Q   And similarly, if I understood your testimony, you know, during the course of walking the range and working with the radio, there may be certain aspects of the tasks that the trainee accomplishes in terms of actually, you know, moving about the prison, operating their radio.  Fair to say?

A   Correct.

Q   But in terms of completing this task sheet on fire procedures, all that is required is the verbal quizzing around the procedures.  Is that fair to say?

A   No, I would not say that that's all that's required, no.

Q   Okay.  So it would not be possible for a trainee to complete this module without their field training officer having physically walking them down the range pointing out

Page 27

certain physical aspects; is that correct?

A   It would just be a combination, sir.  It's knowledge-based, slash, physical skills.  I mean, you have to know the layout.  Like I said, I can tell you how to do a fire escape on C-cell house, but you'd need to -- you know, I don't know if you've ever been to this prison, but you'd actually need to go over and see B and C-cell house to fully comprehend.  Basically, how our training goes is, I hear, I see, I do.  So we want people to hear the information, we want them to see us doing it, and we want them to be able to physically do it and verbally explain it to us.

Q   Is there any simulation of cell evacuation in terms of actually having a correctional officer go to a cell, unlock the cell, and, you know, remove a prisoner from the cell?  Is there any aspect of that simulation in the context of the fire procedure manual employee training?

A   Not to my knowledge.

Q   Okay.  Is that something that would be -- well, strike that.
     There's no IDOC policy or rule that says

Page 28

you couldn't institute that as part of the training.  Is that fair to say?

A   I wouldn't say that I know of any that would prevent it, no.

Q   What are the specific aspects of fire procedures and fire response that are covered in that one module that we've been talking about?

A   Well, as I said, from memory, it's about notifying, control of the fire emergency, and then evacuation and count procedures, would be from what I can remember of that specific task.  Very basic training, sir.  I think I had mentioned this quite a bit in our last one.  It's the individual post orders that are going to give that defined information per that post, as all our posts are somewhat different.

Q   All right.  Is reviewing the post order part of the training that the officers receive?

A   That is in Session 2.  There is a specific task sheet relegated to them understanding the importance of reading post orders and staying up to date on post orders.  So even if you work this same post day in and day out, at a

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG 30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC NND case 3:18-cv-00995-JD    document 212-35    filed 05/25/21    page 10 of 31

Page 29

minimum once every 30 days you need to refresh yourself on the post orders. So, yes, that is -- and that's, you know, that's very important that they understand that. So, yes, there is a specific task just about reading post orders.

Q And just so I'm clear, that task doesn't involve them reading the specific post order for their anticipated specific post; it just emphasizes to them that once they're assigned a post after they've completed their training, it emphasizes the importance of reviewing post orders; is that correct?

A No, sir. It emphasizes to read the post orders anytime they go to a new post, whether they're in training or not. But if they are assigned to a post and you worked C-cell house for the last three years, you should still at a minimum be refreshing those post orders once every 30 days.

Q Understood. But in terms of a new employee -- well, strike that.
The section of training you were just referring to about post orders, was that part of the new employee training?

Page 30

A Yes, sir, that's in Session 2.

Q Okay. And in that Session 2 training on post orders for new employees, are the new employees actually trained on the specific post orders to their specific post or is that just emphasizing what post orders are and that when they arrive at their post, they need to review them?

A Correct. The post order -- basically, your post order is your guide for that generalized area. So the training is teaching them the importance of reading those post orders and/or keeping up to date on post orders, as they are all different.

Q Not going through the specific post orders themselves. Fair to say?

A No, sir, I do not have tasks on each individual post order from the facility.

Q And in addition to specific post orders for a specific post, there are also general post orders that apply facility-wide; is that correct?

A Correct.

Q And are those covered specifically as part of the training or is that one of the aspects

Page 31

they're just told they need to read those and be familiar with them as part of being familiar with the post orders?

A Well, most of the general post orders are going to point towards a specific post, you know, as far as maybe we have something that goes on a certain procedure, and then our curriculum pretty much is broken down to incorporate that into the actual training itself. Like the reason there is a fire task sheet is because somewhere there is a directive on fire emergencies. Does that make sense?

Q Yes, I think I understood you. But just to make sure I'm clear with you, you previously said that the post order section of the new employee training didn't involve reviewing specific post orders; it involved emphasizing what the purpose of post orders were and emphasizing the importance of post orders. Is that fair to say?

A Yes, and their importance of reading, knowing, and refreshing on said post orders.

Q And just so I'm clear, in terms of your testimony that specific post orders are not

Page 32

reviewed and covered as part of the training, that includes the specific post orders and that includes the general post orders that apply facility-wide, neither of those documents themselves are reviewed as part of the training; correct?

A A part of the new employee training, no.

Q Going back to the module you've been describing, the check list related to fire procedures, you described one aspect of it relating to evacuation.
Is that sort of a cell house wide evacuation or is that evacuation tailored to, you know, rescuing a specific prisoner from an area that is on fire?

A No, sir. Like I said, it's a very generic task sheet, and so it emphasizes the evacuation and -- you guys are freezing up on me, by the way. I may be ready to lose you again.
It's very generic, and so as far as it doesn't say in the task sheet whether it's an individual evacuation or a entire cell house. It points more towards evacuating the entire cell house, as it is requiring a count

Page 33

afterwards. And then, you know, if I was -- let's say you're over on C-cell house and I'm training you. If I'm covering that task, guess what I'm going to do, I'm going to already have you reading those post orders and I'm going to ask you what's our evacuation procedure for this cell house, because C-cell house is going to have different evacuation procedures than death row would.

Q   And just to make sure that I understood the testimony you just gave, the overall focus of the evacuation aspect of that training is on like a cell house wide type of evacuation. Am I understand that correctly?

A   Correct.

Q   There's no aspect of that training that specifically goes through with a new officer a scenario or a simulation of an evacuation of an individual prisoner from an individual cell; is that correct?

A   Well, I mean, if we're evacuating the entire cell, then it would be every individual coming out of their cell, as there's only one person to a cell.

Q   Understood, and maybe I phrased the question

Page 34

poorly. I guess, let me back up a little bit.
    So fair to say that there's sort of a different scenario involved if there's a fire in a cell and an evacuation procedure is undergone to remove that individual prisoner from the cell where there's an active fire? That's a different -- that's different from evacuating an entire cell house in terms of a fire. Fair to say?

A   No, sir, not really, because whether it's one cell on fire, it's an entire block on fire, you're going to go through the same procedure to get it evacuated based on how that cell house operates.

Q   Fair to say that the urgency or level of prioritization would be different if there's an active fire in one specific prisoner's cell and the purpose of the evacuation is to remove that prisoner from immediate danger versus the procedure to evacuate an entire cell house?

A   You know, that's speculative, sir, because, you know, for one thing, you have to understand our physical layout. If there's smoke and there's fire, I don't actually know that the actual nature is that it's only one

Page 35

cell. Remember, if I have to evacuate one offender or an entire range, you know, depending on what time of the day it is, you're going to have to roll the bar and you're going to have to go through and physically unlock the cell board. So, you know, it's really not going to change if it's the entire cell house or just one cell. It would be the same procedure.

Q   Okay. So there's no aspect of the training procedure, the check list that you just described as part of the new employee training, that does anything to distinguish between the general evacuation procedures for evacuating an entire cell house versus the procedures for identifying the specific location of a fire, determining if a specific prisoner needs to be urgently evacuated from a specific cell before moving on to a broader cell house wide evacuation.

A   That's a broad question, and I think I see what you're trying to ask. But, you know, given the scenario or given the actual reality of what it is, it's going to be the same procedure. If they're double locked in their

Page 36

cell, whether it's one specific offender or everybody, you're going to have to go through the exact same procedure. So the emergency fire procedure for evacuation is going to be the same, whether it's electronically unlocking or it has to be manually unlocked.

Q   If I understand what you're saying, in terms of procedure you're referring to like the method of physically opening the doors and getting prisoners out of their cell is going to be the same whether you're evacuating every prisoner or one specific prisoner. Is that fair to say?

A   Correct. The double locking system, if that's in place, would have to be taken off first. So if I'm standing -- let's say you're in your cell and your cell is on fire and I'm standing right outside your cell when it catches on fire. Okay? If I can call the signal, I'm going to have to run all the way down to the end of the range and unsecure the secondary locking system in order to run back and let you out of your cell. So it wouldn't matter if you're in there by yourself or the whole range is on fire, I'm going to have the same

Page 37

procedure.

Q   Well, in the situation that you've just described, an officer could also unlock the cell at the cell front using the mechanical lock rather than the electronic lock; is that correct?

A   No.  You can do the unlock, but if the secondary lock is on, you're going to still be in there until I can get that secondary lock unlocked, which takes us back to the same procedure of whether or not it's an entire cell block or just one cell.  So the procedure is not going to change, sir.

Q   Okay.  Is there any aspect of the training that you just described that provides direction or guidance to new employees around how to investigate a fire or to, you know, determine what steps to follow to determine whether an evacuation is necessary?

A   As far as investigations go, the most a new employee would be trained on that is just to leave the area as undisturbed as possible, just like a crime scene.  You know, as far as the evacuation goes, that's what we have the -- you have the sergeant over the cell

Page 38

house, communication through the shift supervisor.  That wouldn't prevent an employee, you know, from making the decision, but we do have a chain of command as well, depending on the nature of the fire.  I mean, if the guy set his toilet paper on fire and threw it out of his cell, you know, do I need to evacuate the housing unit.

Q   And so just so I understand the testimony you just gave, am I correct in understanding that that sort of decision making, like is this fire serious enough that I need to immediately evacuate versus this is minor and I don't need to evacuate, those types of decision making scenarios are not covered in this training that we've been discussing?

A   That level of training for a new employee, no.

Q   Is there other training that goes to that level of training them to make those kind of determinations?

A   Not to my knowledge.  It would be, basically, just your job knowledge as you progress.  You know, new people have to get familiarized with the job and the way that things operate compared to, you know, a veteran staff member,

Page 39

slash, the sergeant who's in charge of that.  Possibly during a fire drill maybe the fire safety hazards manager is giving tips or ideas, things of that nature.  It's been a long time since I've been involved in a fire drill, you know, with offenders.

Q   There's no requirement as part of the new employee training that the new employee goes through a fire drill; is that correct?

A   I do not have a requirement in the training modules for them to actually go through a fire drill, no.

Q   Okay.  Is that something you could have if it was determined that that was an important procedure to train folks on?

A   If it was requested of me by my supervisors to implement that, then, absolutely, that could be put in.

Q   And when you say requested by your supervisors, are you referring to the warden?

A   It could be the deputy warden, it could be the custody supervisor, it could be the lead captain, it could even be the safety hazards manager.

Q   Okay.  None of those individuals at any point

Page 40

have requested that fire drills be made part of the training?

A   Actually part of on-the-job training, no.

Q   So going back to the on-the-job training that we've been discussing, fair to say that there's no aspect of that training that emphasizes or directs the trainees on in terms of anytime there's a fire in a cell that prisoner in that cell has to be immediately removed from that cell?

A   Well, sir, the generic training that they receive, you know, teaches them about evacuations, and so the field training officer would actually show them how to do the evacuation, which I kind of explained some of the locking system as to one of our cell houses, as we have several different cell houses that operate differently in that area, and then it would be up to the post orders and what the actual post orders say.

        THE WITNESS: And before you ask your next question, can we take a break?  The coffee is hitting me.

        MR. HEPPELL: Absolutely.  I'm going to pause the recording here and we'll go

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND, case 3:18-cv-00995-JD   document 212-35   filed 05/25/21   page 13 of 31
Cause No. 3:18-CV-00995-JD-MGG(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

Page 41

off the record and take a break and come back. Do you want to take five minutes, ten minutes?

THE WITNESS: Five minutes is fine with me.

MR. HEPPELL: Okay. We'll come back at five after the hour then, if that works for everyone?

THE WITNESS: Thank you.

(Brief recess.)

MR. HEPPELL: Back on the record.

BY MR. HEPPELL:

Q    Mr. Beal, before we took our break, we've been talking, again, about the evacuation aspect of the fire procedure topic covered in the new employee training.

I just want to maybe try and get some clarity by phrasing it this way: Is it fair to say that aspect of training provides some direction around how to evacuate prisoners from cells, but not around the question of when or whether to evacuate prisoners from their cells?

A    From what I remember of the task sheet, it's pretty generic when it says fire. So I think it's in the -- the module is more of when an

Page 42

evacuation has been declared, the procedural steps.

Q    Okay. So you would agree with me then what it covers is those procedural steps on how to do it and not any of the factors around decision making of when to order an evacuation or when to make that kind of decision. Fair to say?

A    Yeah, as far as, you know, when we're speaking of evacuation, we're not talking about being brought out of a cell now. We're talking about being brought out of a cell house. So, yes, just your general line staff is not going to make the call to emptying a cell house. It would take something as quick as the captain to look at the camera and say get them out. But your line staff, that wouldn't prevent him from, you know, getting somebody out of the cell, or whatever, but as far as evacuating and taking Level 4 offenders out onto the streets unannounced, no, that would take a higher decision.

Q    Understood, and I appreciate you making that clarification and that's helpful actually. In terms of an evacuation as you've been using that term during the deposition today in

Page 43

referring to the training, you've been referring to the process of taking prisoners out of a cell house and sort of bringing them outside of the cell house; is that correct?

A    Yeah. When we're talking about actual evacuation, it was believing whatever area they're in, whether it can be the rec building, kitchen, cell house, a dorm, the evacuation is actually when the offenders will leave their assigned area, which is why there is a count that needs to be taken afterwards, which ensures two things; that no offender was left behind and/or that, you know, we haven't had an escape on our hands.

Q    Understood. And in terms of the different procedure or sort of a more narrow situation where you would, rather than evacuating a group of people from inside a building to the outside of the building, but removing a specific individual from a cell to the, you know, to the outside of the cell, for example, could be within the cell house, that's not something that's covered by that aspect of training that we've been talking about.

A    In writing it is referencing the moving of

Page 44

offenders from inside a building to outside. Now, once again, though, this is very generic, and so if you were running the scenario where an offender did need out of his cell, you can still evacuate him from the cell without evacuating them off the unit in the same manner that you're going to evacuate them from the unit, just minus opening the main door. It's still going to be the same steps.

You're going to have to take off the -- most likely the secondary locking system will be engaged and then you would have to manually unlock the cell doors, unless you're obviously in an electronic, the few units where we have electronic, and then they have different procedures to unlock them.

Q    But in terms of that being specifically covered in the training, that's not something that's covered. Is that fair to say?

A    That's kind of speculative, because in order to get them out of the building I got to let them out of their cell. So they're going to get that training on how to get them out of the cell.

Q    Understood. And not wanting to belabor the

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MJD 30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-35   filed 05/25/21   page 14 of 31

Page 45

point, but making sure I'm getting clarity, they're going to be given the instruction on the how, the mechanics of unlocking the cell, but not any sort of decision making on when or whether to do that removal, whether that's the full cell house evacuation or a decision around removing a specific individual from a specific cell, that's not covered.

A    The task sheet is not that in-depth, no. That's when the FTO is going to have to reference the post orders and let the trainee read those and get a full understanding of the actual procedure for that unit.

Q    And that's not something that the field training officer is prompted to do in this module in the specific contents of fire procedures. Is that fair to say?

A    No, they're prompted in that in Session 2 on post orders.

Q    And that's just --

A    I'm sorry. I didn't mean to cut you off. As a former field training manager that's always the first one, and I see it all the time when people get new trainees. They have them reading post orders before they ever get to

Page 46

that task sheet.

Q    And again, that's covering the post orders as a whole and not specific emphasis or specifically limited to any related fire procedures. Fair to say?

A    Well, it just depends on what post you're at. Obviously, if you're on a cell house, it should have fire procedures in that general post order for that cell house. You may be working the information desk up front and, obviously, we don't house offenders up there, so the fire procedures would probably be a lot smaller and much less detailed.

Q    Understood. Does any aspect of the fire procedures, on-the-job training module that we've been talking about, give any instruction or information to trainee correctional officers around prisoner fire department?

A    You know, I'm not even sure if the prisoner fire department is mentioned in there because that's -- the post orders should designate to the officer in charge or sergeant that when there is a fire that then they need to make that announcement for the offender firefighters that are housed on units to be

Page 47

notified. So I don't even believe that's in the module.

Q    Is it part of your job as the training coordinator to review the post orders in combination with the trainee check list to make sure sort of between the two whatever needs to be covered is covered?

A    Actually, the field, which would be my field training managers, will usually bring something -- or excuse me, field training officers, the FTOs, will then usually, if there's been a change in post orders that's not matching up with the task sheet, they will usually notify whoever the field training manager is to try and get that updated.

Q    Okay. And that's if there's a disconnect between something that the post order says to do something one way versus the training that diverges from that? Is that what you're referring to?

A    Right. Let's just say that, you know, at 10:00 we're going to take count and count time has been moved to 11:00. Well, that needs to be corrected in the task sheet.

Q    In terms of sort of an evaluation to make sure

Page 48

that between the contents of the training check list and the contents of the post orders that correctional officers have the information they need, whose responsibility is that?

A    Can you repeat that, sir?

Q    Sure. In terms of -- well, strike that. I'll withdraw the question.
     So if I understood your earlier testimony, there's no -- the discussion of the prisoner firefighter department and how to use and interact with those individuals, that's something that would be covered only through the post orders, not through any of the specific training. Is that fair to say?

A    Correct.

Q    Is there any aspect of the fire response training that we've been discussing that provides direction or instruction to correctional officers around transferring keys between officers in a cell house if that's needed to accomplish a rescue or an evacuation?

A    I'm sorry, sir, you were breaking up. What was that question again?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-M30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC NN/ND, case 3:18-cv-00995-JD    document 212-35    filed 05/25/21    page 15 of 31

Page 49

Q    Sure.  Is there any aspect of the fire
procedure, fire response training that we've
been discussing that provides any direction or
information to trainee officers around
exchanging keys between officers working in a
cell house if that's needed to conduct a
rescue or needed in response to an emergency
situation?

A    I do not have anything specific in those
training modules on that topic, sir.

Q    Okay.  Is there any aspect of any of the
training modules that discusses officers'
obligation to investigate unusual situations
or to investigate some disturbance or
commotion if they're not sure what the
situation is?

A    I honestly don't know if there's anything in
writing on that, sir.  That's just kind of one
of those -- that's an odd question.
Sometimes, you know, you get a lot of noise on
them cell houses and they're making noise just
to make noise.  So I think that would just
pretty much come down to, you know, there
could be something in the post orders that
specifically relates to that.  I don't have

Page 50

anything in my training modules that say that
that I'm aware of.

Q    Okay.  Is there any aspect of the training
that provides direction or instruction to
correctional officers around checking
electrical systems within prisoners' cells to
make sure there aren't defects or potential
hazards or dangers in those electrical
systems?

A    On my level, no.  I believe that would be done
by the safety hazard manager as far as that.
I mean, the last thing I need is a new staff
member going in there and electrocuting
themselves.  I mean, I wouldn't want to do
that.  So I believe that would take the safety
hazard manager's responsibility.

Q    Okay.  And just so I'm clear what you mean by
your answer that's the safety hazard manager's
responsibility, you mean it's the safety
hazard manager's responsibility to do that
kind of checking, not that it's the
responsibility by officers on that point.

A    Yeah, I mean, like when we move an offender
out, if there's an offender that's leaving the
housing unit, there's supposed to be a cell

Page 51

inspection done.  But as far as, you know,
getting in there and checking internal
circuitry, and stuff like that, that's not
going to be -- I mean, they can look at the
outlet to see if it's all burnt up, or
something, but as far as, you know, actually,
you know, testing it to see if it is
functioning properly, I don't think that's in
their realm.  That probably should be the
safety HAZMAT or, you know, if there's an
issue with it, the offender can let a staff
member know and a work order can get put in on
it, or something of that nature.

Q    And just to make sure I understand you,
because you have sort of laid out many
different potential levels of inspection or
review there, so I understand from your
testimony that there's no aspect of the
training -- of the training provided to
officers that directs them to go through any
sort of internal circuitry testing of the
electrical systems in prisoners' cells.  Is
that fair?

A    Internal circuitry, absolutely not.

Q    Is there any aspect of the training that's

Page 52

provided to correctional officers at Indiana
State Prison regarding levels of monitoring or
inspection that they should be doing as line
level correctional officers to see if there
are any signs of dangerous electrical
conditions in a cell?

A    Specifically dangerous electrical conditions,
you know, they are trained, you know, when
they do their rounds that they're to be
checking on the welfare of the offenders.  So,
obviously, if I looked in a cell and saw wires
hanging out and sparking, then we have an
issue.  But, you know, specifically designed
towards that aspect of it, not that I'm aware
of.

Q    Okay.  So there's the general direction that
as part of their rounds there's sort of a
general obligation to be checking on the
welfare of the prisoners; correct?

A    Correct.

Q    But nothing more specific than that in terms
of here's -- you know, here are things
specifically to look for on an electrical
system or here are signs that there might be a
damaged or a defective outlet, nothing like

Page 53

that.

A   Actually, the most of what we run into is where the offenders have made their own homemade extension cords, you know, because they've rummaged through trash and work sites. I've actually seen one time they used a piece of cork board, that real hard cardboard, in a three-prong outlet working out of that. So they are trained when they see that fire hazard to remove those fire hazards from the offender cells because almost all of them do it.

I've got a huge collection up here when we've done shakedowns to collect these illegal outlets because they're fire hazards. So I don't have it officially written down on a task sheet of going by and collecting these. It's just part of the training they receive or on-the-job training experience.

Q   And so just to make sure I understand what you're just saying, that's not covered anywhere on an official written task sheet. Fair to say?

A   Not covered on a task sheet, no.

Q   So during what aspect of the training or

Page 54

portion of the training are prison staff given the instructions that you were just describing?

A   I actually usually bring out my bucket during their first week of training before they've even had a chance to go to the field to show them some of the stuff that we've confiscated, with those illegal outlets being part of that, and explaining why we take these, because it's a potential for fire because they're running electricity into cardboard with probably some paper clips and they're running two or three or four outlets in their cell on that.

Q   And so that consists of you showing them like this is what some of these illegal outlets look like and this is why you need to remove those from the cell. Is that sort of what you cover?

A   Yes, because it is a fire hazard that is easily seen, and like I said, most of these -- as soon as you take it, they're making another one. So, I mean, it's loaded in there.

Q   Other than those specific illegal outlets, like a separate, you know, piece of equipment that's been created by the prisoner, other

Page 55

than showing them those, is there any content, either formal or informal, that sort of goes through potential electrical hazards in a cell or, you know, this is signs to look for on an outlet itself that there might be a problem, or anything like that?

A   No. If memory serves me correct, and I believe you have it, either in Session 1, 2, 3, or 4, there should be something about cell inspections, and I believe inspecting the outlet for damage is part of that.

Q   Okay. And that's a cell inspection that is conducted when a prisoner is moved out of the cell, the cell is vacant before a new prisoner is moved in; is that correct?

A   Right, a cell inspection should be completed before the new one moves in.

Q   Nothing with that level of instruction in terms of ongoing monitoring or ongoing of what to look for while a cell is housing someone. Is that fair to say?

A   Correct.

Q   Are cell inspections conducted by line level officers?

A   As far as the one I was just -- we were just

Page 56

speaking of?

Q   Correct, in terms of a prisoner is moved out of a cell and before a new prisoner is moved in.

A   Yeah, that cell inspection, because there's an actual cell inspection sheet that goes with it, so, yeah, just your line staff would be able to complete the cell inspection.

Q   Okay. Is there any sort of ongoing or periodic review process, whether formal or informal, to look at the contents of the specific on-the-job training around fire response or more generally to look at whether it needs to be updated or expanded at all?

A   It's an informal process. You know, at some point if somebody comes to us and says, hey, we think there needs to be training in this area. Like I said, a field training officer gets ahold of it and says, hey, this has been updated, this isn't like that anymore. So, yeah, because, you know, you never -- you never want to settle on your training, so you're always ready to implement change. So it's more of an informal process, though. That's how it formally gets done in an

USDC IN/ND case 3:18-cv-00995-JD document 212-35 filed 05/25/21 page 17 of 31

DENISE DWYER, et al. v.                    Cause No. 3:18-CV-00995-JD-MGG
RON NEAL, et al.                           30(b)(6) Deposition of CHRISTOPHER BEAL
                                           September 29, 2020

Page 57

informal way. I don't have specific dates and things of that scheduled to do this. It's kind of done in an informal way.

Q    And is that sort of solely a process where you're relying on information being brought to your attention by the field training officer or is this a proactive let's, you know, try and seek out what situations are coming up frequently in the prison and if there are anywhere, correctional staff are seeming to need additional guidance and we're going to try to seek out information on what those areas might be so we can add or alter the training accordingly?

A    Well, that's actually where the FTOs would convey that information to us and say, you know, we feel it's lacking here. Maybe one of my supervisors contacts me and says, you know, staff's not doing this right. So it's not so much us trying to see where the change is needed. We let the field let us know because I don't work in the field. So who am I to go to the field and say this isn't working right. The field needs to let me know because they're the ones actually doing it.

Page 58

Q    But is the expectation that folks out in the field in terms of those field training officers are bringing issues to your attention? Is that fair to say?

A    The FTO can bring it our attention. The new employees can bring it to our attention.

Q    Or a supervisor, you know, even when someone has completed their field training, if there's issues in prison operations, that would be brought to your attention, if newer employees were coming out of the training and found not to know how to handle certain situations?

A    Yeah. I mean, there has been occasions where, you know, I've had to have a meeting with the major or the deputy warden and we've decided to give an employee an additional two weeks or more of on-the-job training just because they didn't feel they were adequately prepared to work unsupervised.

Q    Okay. And that would be sort of specific -- the situation you just described was sort of specific to a particular employee?

A    Yes.

Q    Okay. But it could also -- that same type of conversation could be had and could result in

Page 59

a decision to change the focus of the training that's provided overall or to add additional emphasis to aspects of the overall training program. Is that fair to say?

A    Yeah, yeah, it can go any way.

Q    Okay. Outside of what you've testified to in terms of the three modules of on-the-job training that related to fires and then the review of the post orders, which would include a review of whatever fire response provisions were contained in that post order, any other aspect of the new employee training that covers fire and fire response beyond what we've already testified to?

A    To my knowledge, no.

Q    Okay. And then in terms of periodic training after an employee has gone through the new employee training, they are subject to periodic annual in-service training; is that correct?

A    Correct.

Q    Are there aspects of the annual in-service training that cover fire response?

A    Yes, there are a few scenarios that work hand in hand with our emergency procedures during

Page 60

annual in-service training.

Q    Are those different from the scenarios or the fire response procedures that we've been discussing in the context of the new employee training?

A    Yeah, the scenarios are actually scenarios that have actually happened in the facility at some point in time, and I believe one of them is a fire in the kitchen and I can't remember what the other one is. And it's just, basically, you do it in a group setting during annual in-service and you get people's feedback, okay, what do we do. You know, you get through the steps and see that they're giving appropriate responses as far as, you know, how to handle that certain scenario. There's like 25 or 30 different scenarios, and then an emergency plan PowerPoint, and there's a few of them that do focus on fire.

Q    Do you know approximately how many of those focus on fires?

A    At least two.

Q    Is that a prison-specific PowerPoint specific to procedures at Indiana State Prison?

A    The PowerPoint is statewide, and then, of

Page 61

course, the answers would be facility-specific because any of our facilities could have a fire in the kitchen or on a housing unit, and then, of course, based on your facility makeup how are we going to handle that scenario.

Q    So that sort of level of discussion that takes place in that classroom in that in-service training is going to be specific to the procedures at Indiana State Prison.

A    Correct.

Q    Sorry, did you have something to add to that answer?

A    No, sir.

Q    Okay. Is there a discussion during that annual in-service training regarding the use of the prisoner firefighter department?

A    Yes. Well, as somebody mentions it, and obviously, you know, I'm more of a facilitator during these scenarios. It's not my job to tell them what to say. It's to see what they're -- if they're thinking correctly and efficiently.

Q    Understood. But fair to say as a trainer, you know, if they're not touching on important areas in that discussion, it's your job or

Page 62

whoever is facilitating that session to make sure they're covering what needs to be covered.

A    Right. I guess, you know -- and fortunately, I've never had it happen because, you know, veteran staff pretty much know how to do their jobs, but, you know, if for some reason we went through these two fire scenarios and nobody has mentioned the offender fire department, then you kind of throw it up there, well, could you do this. But to my knowledge -- you know, I don't instruct annual in-service every week, but I've never had to mention that. They're pretty squared away on the emergency plans.

Q    Is there any aspect of the new employee training -- and I apologize for jumping around. I want to jump backwards for a second to the new employee training.
     Is there any aspect of that training that's directed to officers around releasing members of the prisoner fire department from housing units when they are needed to go respond to a fire?

A    Well, you know, if you're going to go with

Page 63

scenarios, then during the fire procedures scenario that they have two of those going over the OJT with, you know, that could obviously be brought up. As far as that is, as far as being written down in that task sheet, to my knowledge, it is not. You know, that's going to be one of those ones that, you know, like I said, always revert back to the post orders. It's going to be in the post orders on getting those offenders notified and released.

Q    Okay. And so if I understood your testimony, there's nothing that prevents a field training officer from providing sort of additional detail or additional color on a particular scenario as they're going through a situation. Fair to say?

A    Well, yeah, I mean, that's what we expect from the field training officers, having been one myself. I mean, training, I can only provide, you know, certain basic material and then it's up to the next level. It's kind of like going through your college classes and then finally getting your internship. So, yeah, obviously, you know, pump their head with as much

Page 64

information as you have. You know, that's kind of what that one-on-one hands-on basis is for is to give them that real life training because they're now no longer in a classroom. They are in the field.

Q    But in terms of releasing the prisoner firefighters, that's not something that is covered in the task list which then means that there's no -- that's not something that's systematically covered with every single new trainee. Fair to say?

A    No, because that would be systematically covered when they read the post orders, which they're told to do.

Q    Okay. And if some aspect of the procedures for releasing prisoner firefighters was not covered in the post orders, then that just wouldn't be covered. Is that fair to say? If it's not in the new employee training, if it's not in the post orders, those would be the sources of the information; correct?

A    It also would be in the written sources of information, but then they're going to have their verbal sources of information when they are working and there is a fire and their OIC

Page 65

or sergeant is a telling them to go let firefighters out. I mean, they actually have little signs outside their cells that says firefighter. And so, yeah, there's going to be verbal information handed down either during the training or once they're actually on shift.

Q   And for that to be a source of information, that relies on the OIC being someone who knows what needs to happen and has knowledge him or herself; correct?

A   Yeah, because it's either going to be a sergeant, that's their post, and/or the officer in charge, which is somebody that's capable of running that unit in place of the sergeant.

Q   Is there any additional training that is provided to someone who's going to be designated an officer in charge if that individual is not a sergeant and -- well, strike that. Let me just ask the question more simply.
        Is there any additional training that's provided to someone before they're designated an officer in charge?

Page 66

A   Oh, additional training, no, there's no specific training to be an OIC. It's just based off your experience.

Q   Okay. And, in fact, it's possible at Indiana State Prison for someone to be designated an officer in charge without being a sergeant; correct?

A   Correct.

Q   Okay. And someone could be designated as an officer in charge without even having completed a full year of service; correct?

A   Correct.

Q   And so someone who's designated an OIC without being a sergeant and without having completed a full year of service, the only training they would have received would be the same new employee training that every other new officer in the prison has gone through; is that correct?

A   Correct.

Q   Okay. An officer would only complete annual in-service training after they had been working at the facility for a full year; is that correct?

A   Actually, it would go with their completion

Page 67

date of their hire time compared to the fiscal year. So let's say you hired in in January of 2020, you would have completed your training before July 1st, so that would put you on the rotation to go through your annual in-service training sometime between July 1, 2020 and June 30, 2021.

Q   Okay. And so in that scenario you just described, someone who comes in and goes through new employee training in January of 2020, is that the scenario you were just describing?

A   I was just explaining how our cutoff date with the fiscal year and the new hire training would have worked.

Q   And so someone who goes through that new hire training in January of 2020, when specifically would they be receiving their annual in-service training?

A   By policy, just as long as they get it by the end of June 30, 2021.

Q   And as a practical matter at the facility, when does that generally take place or get completed?

A   I never practically try to go that late. I

Page 68

think I'm scheduled to have all my annual in-service training done by the end of February of this year. So it just depends on the size of your facility and the ability to get people through training. That's just the ACA policy is going to give us that leeway of the fiscal year.

Q   Okay. But certainly no -- well, strike that.
        Someone is going to have to be working at the facility for potentially a year and a half, but certainly some extended period of time there's going to be a gap between the new employee training and when they first hit their annual training; correct?

A   There will be a gap, yes.

Q   Okay. It could be as long as a year and a half; correct?

A   Well, no, I mean, if they hire in January and by the time they get all their training done, you're talking about not being completed until sometime in March. So even if we bring it to the last week of June, it would be a full year.

        MR. HEPPELL: Okay. I think I'm close to being done with the questions I have.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG 30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020
USDC IN/ND case 3:18-cv-00995-JD document 212-35 filed 05/25/21 page 20 of 31

Page 69

Could we take another five-minute break?  I need to go back over my notes and see if there's anything else I want to cover.  So we'll come back at, say, 10:47 Central, 11:47 Eastern?

THE WITNESS: Sounds good.

MR. HEPPELL: Okay.  Pausing the recording and going off the record.

(Brief pause.)

MR. HEPPELL: Thank you for your time today, Mr. Beal.  I don't have any additional questions for you at this time.  I don't know if either of the other attorneys have questions for you.

MR. ANDERSON: No questions from me.

MR. JIMENEZ: No questions from me either.

MR. HEPPELL: Okay.  Thank you for your time and cooperation.  We appreciate it, Mr. Beal.

THE WITNESS: Thank you, Mr. Heppell.  It was a lot easier on me this second time around, so.

MR. ANDERSON: Would you like the

Page 70

opportunity to review this, Mr. Beal?

THE WITNESS: Yes, I mean, if it's part of the standard process.

MR. ANDERSON: Okay.  We'll reserve.

(Signature reserved.)

(Proceedings concluded at 12:23 p.m.)

* * *

Page 71

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE,  )
                          )
        Plaintiff,        )
                          )
vs.                       )    Cause No.
                          )    3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,        )
                          )
        Defendants.       )
_____)

REPORTER'S CERTIFICATE

I, Beth A. Barnette, CSR, and Notary Public, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of seventy (70) typewritten pages, is a true and correct transcript of my said stenographic notes.
Signed this 2nd day of November, 2020.

*Beth Barnette*
_____
BETH A. BARNETTE, CSR
Notary Public
My Commission Expires:  6/13/22

Page 72

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal)
Representative of the    )
ESTATE OF JOSHUA DEVINE,  )
                          )
        Plaintiff,        )
                          )
vs.                       )    Cause No.
                          )    3:18-cv-00995-JD-MGG
RON NEAL, ET. AL.,        )
                          )
        Defendants.       )
_____)

CHRISTOPHER BEAL

I hereby acknowledge that I have read the foregoing deposition transcript regarding the above-mentioned matter, taken Tuesday, September 29, 2020, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the additions or changes, if any, as noted on the attached errata sheet.

_____
CHRISTOPHER BEAL

Subscribed and sworn to me this

_____ day of _____,
2020, A.D.

_____
Notary Public
State of_____
County of_____
My Commission Expires:_____

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC NND, case 3:18-cv-00995-JD

Cause No. 3:18-CV-00995-JD-MGG

30(b)(6) Deposition of CHRISTOPHER BEAL

document 212-35    filed 05/25/21    page 21 of 31

September 29, 2020

Page 73

                    DEPOSITION ERRATA SHEET

Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____
Page No._____ Line No._____Change to:_____
Reason for change:_____

SIGNATURE:_____DATE:_____
         CHRISTOPHER BEAL
         Date of Deposition:  September 29, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-35   filed 05/25/21   page 22 of 31

## A

**ability (2)**
16:15;68:4
**able (5)**
12:16;21:6,20;27:13;
56:8
**absolutely (3)**
39:17;40:24;51:24
**ACA (1)**
68:6
**accomplish (1)**
48:22
**accomplished (3)**
24:9,11;25:6
**accomplishes (1)**
26:12
**accordingly (1)**
57:14
**acknowledging (1)**
22:8
**active (3)**
24:1;34:6,17
**actual (11)**
17:22;21:24;22:17;
24:7;31:9;34:25;35:23;
40:20;43:5;45:13;56:6
**actually (36)**
21:7;22:2,8,16,25;
23:7,8,12,16;24:21,25;
25:9,25;26:6,12;27:8,
16;30:4;34:24;39:11;
40:3,14;42:23;43:9;
47:8;51:6;53:2,6;54:4;
57:15,25;60:6,7;65:2,
6;66:25
**add (3)**
57:13;59:2;61:11
**addition (1)**
30:19
**additional (9)**
57:11;58:16;59:2;
63:14,15;65:17,23;
66:1;69:12
**adequately (1)**
58:18
**admissions (1)**
10:5
**afterwards (2)**
33:1;43:11
**again (5)**
32:20;41:13;44:2;
46:2;48:25
**agents (1)**
8:12
**ago (2)**
21:9;25:10
**agree (1)**
42:3
**agreed (1)**
4:8
**agreement (2)**

4:5;8:5
**ahead (3)**
4:22;5:7;6:21
**ahold (1)**
56:19
**almost (1)**
53:11
**alter (1)**
57:13
**Although (1)**
13:21
**always (3)**
45:22;56:23;63:8
**amongst (1)**
4:5
**amount (4)**
20:20;21:4,11,21
**and/or (4)**
8:12;30:12;43:13;
65:13
**ANDERSON (7)**
4:20;9:15;10:12,17;
69:15,25;70:4
**announcement (1)**
46:24
**annual (11)**
59:19,22;60:1,12;
61:15;62:12;66:21;
67:5,18;68:1,14
**anticipated (1)**
29:9
**anticipating (1)**
23:22
**anymore (1)**
56:20
**apologize (1)**
62:17
**apply (2)**
30:21;32:4
**appreciate (3)**
10:9;42:22;69:20
**appropriate (1)**
60:15
**approval (4)**
16:23;17:24,25;18:1
**approve (1)**
16:21
**approximately (3)**
9:19;20:6;60:20
**approximation (1)**
21:20
**area (10)**
22:10,10,11;30:11;
32:15;37:22;40:18;
43:6,10;56:18
**areas (3)**
24:14;57:13;61:25
**around (16)**
7:2;17:18;26:18;
37:16;41:19,20;42:5;
45:7;46:18;48:20;49:4;
50:5;56:12;62:18,21;
69:24

**arrive (1)**
30:7
**aside (1)**
9:3
**aspect (26)**
18:11,16;19:21;
27:19;32:10;33:12,16;
35:10;37:14;40:6;
41:13,18;43:23;46:14;
48:17;49:1,11;50:3;
51:18,25;52:14;53:25;
59:12;62:16,20;64:15
**aspects (8)**
19:22;22:23;26:11;
27:1;28:5;30:25;59:3,
22
**assigned (3)**
29:10,17;43:10
**associated (1)**
18:11
**attention (5)**
57:6;58:4,5,6,10
**attorney (5)**
6:19,22;7:10;10:12;
12:14
**attorneys (3)**
9:8;10:21;69:13
**average (2)**
21:22;22:2
**aware (2)**
50:2;52:14
**away (2)**
21:1;62:14

## B

**back (14)**
5:13;17:11;25:10;
32:8;34:1;36:22;37:10;
40:4;41:1,6,10;63:8;
69:2,4
**backwards (1)**
62:18
**bar (1)**
35:4
**based (3)**
34:13;61:4;66:3
**basic (4)**
22:13,21;28:13;
63:21
**basically (5)**
15:23;27:10;30:9;
38:21;60:11
**basis (1)**
64:2
**Bates (1)**
12:6
**BEAL (17)**
4:16;5:1,7,9,11;7:12,
20;9:4;10:2,11;13:16;
17:8,13;41:12;69:11,
21;70:1
**B-E-A-L (1)**

5:10
**behalf (4)**
4:12,13,18;8:24
**behind (1)**
43:13
**belabor (1)**
44:25
**believing (1)**
43:6
**best (2)**
5:18;13:20
**beyond (1)**
59:13
**binding (2)**
8:23;13:25
**bit (4)**
13:24;18:5;28:14;
34:1
**block (2)**
34:11;37:12
**board (2)**
35:6;53:7
**bottom (1)**
8:2
**break (7)**
6:25;7:5;15:7;40:22;
41:1,12;69:1
**breaking (1)**
48:24
**Brief (3)**
17:10;41:9;69:9
**briefly (1)**
10:14
**bring (5)**
47:9;54:4;58:5,6;
68:21
**bringing (2)**
43:3;58:3
**broad (1)**
35:21
**broader (1)**
35:19
**broken (2)**
16:11;31:8
**brought (5)**
42:10,11;57:5;58:10;
63:4
**bucket (1)**
54:4
**building (5)**
43:8,18,19;44:1,21
**burning (1)**
24:8
**burnt (1)**
51:5

## C

**call (2)**
36:19;42:13
**called (2)**
5:2;22:9
**calling (1)**

22:12
**came (1)**
24:24
**camera (1)**
42:15
**can (41)**
6:20;7:5;9:3;11:11;
12:3;13:5;16:11;17:1,
3,4,5,5,8;18:12;21:25;
23:6,8,19,23,24;25:1,
16,17;26:7;27:5;28:12;
36:19;37:7,9;40:22;
43:7;44:4;48:6;51:4,
11,12;57:13;58:5,6;
59:5;63:20
**capable (1)**
65:15
**capacity (2)**
13:22,24
**captain (2)**
39:23;42:14
**card (1)**
25:15
**cardboard (2)**
53:7;54:11
**case (5)**
4:4,5;5:13;7:14;
18:19
**catches (1)**
36:18
**category (1)**
19:1
**C-cell (5)**
27:6,9;29:17;33:2,7
**cell (88)**
24:4,5,15;25:20;
27:15,17,17,18;32:12,
23,25;33:7,13,20,22,
23,24;34:4,6,8,11,13,
17,20;35:1,6,8,8,15,19,
20;36:1,10,17,17,18,
23;37:4,4,12,12,25;
38:7;40:8,9,10,16,17;
42:10,11,13,18;43:3,4,
8,20,21,22;44:4,5,13,
22,24;45:3,6,8;46:7,9;
48:21;49:6,21;50:25;
52:6,11;54:13,17;55:3,
9,12,14,14,16,20,23;
56:3,5,6,8
**cells (6)**
41:20,22;50:6;51:22;
53:11;65:3
**Central (1)**
69:4
**certain (6)**
26:11;27:1;31:7;
58:12;60:16;63:21
**certainly (2)**
68:8,11
**chain (1)**
38:4
**chance (1)**

**BOSS REPORTERS**
**(219) 769-9090**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG 30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-35 filed 05/25/21 page 23 of 31

change (6)
35:7;37:13;47:12;
56:23;57:20;59:1
changed (6)
16:24,25;18:4,6;
20:1,3
charge (7)
39:1;46:22;65:14,19,
25;66:6,10
check (6)
19:11;25:4;32:9;
35:11;47:5;48:2
checking (5)
50:5,21;51:2;52:10,
18
Chris (1)
10:12
CHRISTOPHER (3)
5:1,9;10:2
C-H-R-I-S-T-O-P-H-E-R (1)
5:10
circuitry (3)
51:3,21,24
clarification (2)
10:9;42:23
clarify (4)
10:1,2;13:6;18:12
clarity (2)
41:17;45:1
classes (1)
63:23
classroom (3)
19:7;61:7;64:4
classroom-based (1)
18:21
clean (1)
5:19
clear (5)
20:8;29:7;31:15,24;
50:17
clips (1)
54:12
close (1)
68:25
coffee (1)
40:23
collect (1)
53:14
collecting (1)
53:17
collection (1)
53:13
college (1)
63:23
color (1)
63:15
combination (2)
27:2;47:5
coming (3)
33:22;57:8;58:11
command (1)
38:4

committee (1)
18:4
commotion (1)
49:15
communication (1)
38:1
compared (2)
38:25;67:1
complete (4)
7:3;26:23;56:8;
66:21
completed (8)
29:11;55:16;58:8;
66:11,14;67:3,24;
68:20
completing (1)
26:16
completion (1)
66:25
comprehend (1)
27:9
concerning (1)
19:25
concluded (1)
70:7
conditions (2)
52:6,7
conduct (1)
49:6
conducted (2)
55:13,23
confiscated (1)
54:7
consists (1)
54:14
contacts (1)
57:18
contained (1)
59:11
content (2)
19:20;55:1
contents (13)
9:6;11:14;12:23;
13:11,14;15:3;16:15;
17:15;18:6;45:16;48:1,
2;56:11
context (2)
27:20;60:4
contractors (1)
8:12
control (1)
28:10
conversation (6)
9:7;10:11,13,16,17;
58:25
convey (1)
57:16
cooperation (1)
69:20
coordinator (5)
16:20;17:19,21;18:2;
47:4
copy (1)

7:13
cords (1)
53:4
cork (1)
53:7
corrected (1)
47:24
Correction (2)
12:7;16:6
correctional (8)
27:16;46:17;48:3,20;
50:5;52:1,4;57:10
correctly (2)
33:14;61:21
counsel (2)
4:6;8:5
count (8)
22:11,12;23:5;28:11;
32:25;43:11;47:22,22
couple (1)
5:13
course (4)
23:2;26:9;61:1,4
court (2)
4:9;5:18
cover (4)
16:17;54:18;59:23;
69:3
covered (29)
11:12;15:22;19:10,
23;20:2,7;21:18;22:5,
24;28:6;30:24;32:1;
38:15;41:14;43:23;
44:18,19;45:8;47:7,7;
48:13;53:21,24;62:3;
64:8,10,13,17,18
covering (5)
22:3,20;33:3;46:2;
62:2
covers (3)
20:21;42:4;59:13
created (2)
17:18;54:25
creating (1)
17:14
creator (1)
17:22
crime (1)
37:23
curriculum (2)
16:5;31:8
custody (2)
20:18;39:22
customize (1)
16:15
cut (2)
22:4;45:21
cutoff (1)
67:13

**D**

damage (1)

55:11
damaged (1)
52:25
danger (1)
34:19
dangerous (2)
52:5,7
dangers (1)
50:8
date (12)
11:21,22,25;12:9,10;
13:2,2,4;28:24;30:13;
67:1,13
dates (1)
57:1
day (3)
28:25,25;35:3
days (2)
29:1,20
deal (1)
25:25
death (1)
33:9
December (2)
8:8,14
decided (1)
58:15
decision (9)
38:3,11,14;42:5,7,
21;45:4,6;59:1
declared (1)
42:1
defective (1)
52:25
defects (1)
50:7
defendant (1)
13:25
defendants (1)
4:14
defined (1)
28:16
degree (1)
23:17
delivered (3)
19:6,6,7
demonstrate (1)
24:3
Department (8)
12:7;16:6;46:18,20;
48:11;61:16;62:10,22
depending (4)
22:10;26:1;35:3;
38:5
depends (2)
46:6;68:3
deposition (13)
4:9;8:4;9:11,14;10:7,
18,21,22,25;12:20;
13:8,17;42:25
depositions (3)
4:4;5:12;7:16
deputy (2)

39:21;58:15
described (7)
20:10;32:10;35:12;
37:3,15;58:21;67:9
describing (5)
17:14;25:4;32:9;
54:3;67:12
designate (2)
7:15;46:21
designated (9)
7:23;19:9;20:20;
21:10;65:19,24;66:5,9,
13
designating (1)
12:4
designation (2)
13:13;20:13
designed (1)
52:13
designees (1)
7:18
desk (1)
46:10
detail (1)
63:15
detailed (1)
46:13
determinations (1)
38:20
determine (3)
16:16;37:18,18
determined (1)
39:14
determining (1)
35:17
developed (2)
18:8;20:4
Devine (1)
12:6
dictate (1)
21:14
different (23)
7:18;13:24;15:5,8,9;
18:19;23:23;24:12,14,
17;28:18;30:14;33:8;
34:3,7,7,16;40:17;
43:15;44:15;51:16;
60:2,17
differently (2)
16:13;40:18
DIRECT (1)
5:5
directed (1)
62:21
direction (6)
37:16;41:19;48:19;
49:3;50:4;52:16
Directive (2)
12:8;31:12
directly (1)
6:22
directs (2)
40:7;51:20

USDC IN/ND case 3:18-cv-00995-JD document 212-35 filed 05/25/21 page 24 of 31

**disconnect (1)**
47:16
**discovery (1)**
10:5
**discusses (1)**
49:12
**discussing (5)**
38:16;40:5;48:18;
49:3;60:4
**discussion (4)**
48:10;61:6,14,25
**distinguish (1)**
35:13
**disturbance (1)**
49:14
**diverges (1)**
47:19
**document (9)**
7:19;9:3;12:1,5,16,
19,22;13:3;19:20
**documents (5)**
10:24;11:2,17,18;
32:5
**done (13)**
4:3;21:1;24:16,19;
25:2;50:10;51:1;53:14;
56:25;57:3;68:2,19,25
**door (1)**
44:8
**doors (3)**
24:15;36:9;44:13
**dorm (1)**
43:8
**double (2)**
35:25;36:14
**down (13)**
8:1;15:7;16:11;
20:24;24:4;25:19;
26:25;31:8;36:20;
49:23;53:16;63:5;65:5
**drill (6)**
23:11;24:7;39:2,6,9,
12
**drills (1)**
40:1
**dry (1)**
22:4
**duly (1)**
5:3
**duplicative (1)**
13:21
**during (18)**
18:20;20:15;23:2,10,
11;24:6;25:24;26:9;
39:2;42:25;53:25;54:4;
59:25;60:11;61:14,19;
63:1;65:6
**duties (1)**
23:2

**E**

**earlier (1)**

48:9
**easier (1)**
69:23
**easily (1)**
54:20
**Eastern (1)**
69:5
**effective (3)**
11:21;12:9;13:2
**efficiently (1)**
61:22
**eight (1)**
25:19
**either (7)**
20:10;55:2,8;65:5,
12;69:13,18
**electrical (7)**
50:6,8;51:22;52:5,7,
23;55:3
**electricity (1)**
54:11
**electrocuting (1)**
50:13
**electronic (3)**
37:5;44:14,15
**electronically (1)**
36:5
**else (3)**
10:20;17:23;69:3
**emergencies (2)**
15:21;31:12
**emergency (20)**
11:9,10,13,15;12:24;
13:7;15:19;17:16;
20:12;21:19;22:17;
23:7,11,13;28:10;36:3;
49:7;59:25;60:18;
62:15
**emphasis (2)**
46:3;59:3
**emphasizes (5)**
29:10,12,14;32:17;
40:7
**emphasizing (3)**
30:6;31:18,20
**employee (25)**
18:20;27:20;29:21,
25;31:17;32:7;35:12;
37:21;38:3,17;39:8,8;
41:15;58:16,22;59:12,
17,18;60:4;62:16,19;
64:19;66:17;67:10;
68:13
**employees (6)**
8:12;30:3,4;37:16;
58:6,10
**emptying (1)**
42:13
**end (5)**
6:4;16:19;36:21;
67:21;68:2
**engaged (1)**
44:12

**enough (1)**
38:12
**ensures (1)**
43:12
**entails (1)**
8:17
**entire (10)**
32:23,24;33:21;34:8,
11,20;35:2,8,15;37:11
**equipment (1)**
54:24
**escape (2)**
27:5;43:14
**evacuate (10)**
24:5;34:20;35:1;
38:8,13,14;41:19,21;
44:5,7
**evacuated (3)**
22:12;34:13;35:18
**evacuating (9)**
22:10;32:24;33:21;
34:8;35:15;36:11;
42:18;43:17;44:6
**evacuation (30)**
22:14;27:15;28:11;
32:11,13,13,18,23;
33:6,8,12,13,18;34:4,
18;35:14,20;36:4;
37:19,24;40:15;41:13;
42:1,6,9,24;43:6,9;
45:6;48:23
**evacuations (1)**
40:13
**evaluation (1)**
47:25
**even (10)**
23:25;24:7;28:24;
39:23;46:19;47:1;54:6;
58:7;66:10;68:21
**everybody (3)**
16:9;17:3;36:2
**everyone (3)**
4:8;5:14;41:7
**exact (1)**
36:3
**exactly (1)**
25:1
**EXAMINATION (1)**
5:5
**examined (1)**
5:3
**example (4)**
18:13;23:24;24:6;
43:21
**exchanging (1)**
49:5
**excuse (1)**
47:10
**Exhibit (5)**
7:8,15;12:2,5,12
**exits (1)**
25:13
**expanded (1)**

56:14
**expect (1)**
63:18
**expectation (1)**
58:1
**experience (2)**
53:19;66:3
**experiencing (1)**
23:7
**explain (3)**
11:11;17:1;27:14
**explained (1)**
40:15
**explaining (2)**
54:9;67:13
**extended (1)**
68:11
**extension (1)**
53:4
**extent (1)**
21:14
**extinguisher (3)**
15:11,15;20:11
**extinguishers (3)**
15:6,8;25:14
**extreme (1)**
23:16

**F**

**facilitating (1)**
62:1
**facilitator (1)**
61:18
**facilities (1)**
61:2
**Facility (11)**
12:8;16:10,12;19:9;
30:18;60:7;61:4;66:23;
67:22;68:4,10
**facility-specific (2)**
16:12;61:1
**facility-wide (2)**
30:21;32:4
**fact (1)**
66:4
**factors (1)**
42:5
**fair (39)**
15:3,13;18:24;19:19;
20:21;21:3,11,16;
22:15;23:4,18;24:9,18;
26:2,14,19;28:2;30:16;
31:21;34:2,9,15;36:13;
40:5;41:17;42:7;44:19;
45:17;46:5;48:15;
51:23;53:23;55:21;
58:4;59:4;61:23;63:17;
64:11,18
**fall (2)**
19:2,3
**familiar (3)**
7:19;31:2,3

**familiarized (1)**
38:23
**far (13)**
31:6;32:21;37:20,23;
42:8,18;50:11;51:1,6;
55:25;60:15;63:4,5
**fashion (1)**
23:15
**February (1)**
68:3
**feedback (1)**
60:13
**feel (2)**
57:17;58:18
**few (4)**
9:4;44:14;59:24;
60:19
**field (27)**
18:1,2;19:9;23:4;
25:9,25;26:24;40:13;
45:14,22;47:8,8,10,14;
54:6;56:18;57:6,21,22,
23,24;58:2,2,8;63:13,
19;64:5
**final (1)**
16:23
**finally (1)**
63:23
**find (1)**
21:6
**fine (1)**
41:3
**fire (102)**
11:6,22;12:10;15:4,
6,8,11,14,19,19,20;
16:1,15;17:15,15;19:1,
2,22;20:10,11,12;
21:19,19;22:8,13;23:6,
11,13,16;24:1,7,8;25:5,
13,13;26:1,17;27:5,20;
28:5,6,10;31:10,12;
32:9,15;34:3,6,9,11,11,
17,24;35:17;36:4,17,
19,25;37:17;38:5,6,12;
39:2,2,5,9,11;40:1,8;
41:14,24;45:16;46:4,8,
12,14,18,20,23;48:17;
49:1,2;53:9,10,15;
54:10,19;56:12;59:10,
13,13,23;60:3,9,19;
61:3;62:8,9,22,24;
63:1;64:25
**firefighter (3)**
48:11;61:16;65:4
**firefighters (4)**
46:25;64:7,16;65:2
**fires (6)**
15:9;25:21,22;26:7;
59:8;60:21
**first (9)**
5:2;7:22;18:7;20:3,
15;36:15;45:23;54:5;
68:13

DENISE DWYER, et al. v.
RON NEAL, et al:
Cause No. 3:18-CV-00995-JD-MGG 30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-35    filed 05/25/21    page 25 of 31

**fiscal (3)**
67:1,14;68:7
**five (5)**
10:14;20:25;41:2,3,6
**five-minute (1)**
69:1
**focus (4)**
33:11;59:1;60:19,21
**folks (2)**
39:15;58:1
**follow (1)**
37:18
**followed (1)**
16:19
**follows (1)**
5:4
**formal (2)**
55:2;56:10
**formality (1)**
4:21
**formally (1)**
56:25
**formatted (1)**
16:18
**former (1)**
45:22
**forth (1)**
8:25
**fortunately (1)**
62:4
**forward (1)**
4:8
**found (1)**
58:11
**four (2)**
20:17;54:13
**four-page (2)**
7:15;12:5
**freeze (1)**
17:3
**freezing (1)**
32:18
**frequently (1)**
57:9
**front (3)**
7:17;37:4;46:10
**frozen (1)**
17:7
**FTO (2)**
45:10;58:5
**FTOs (2)**
47:11;57:15
**full (10)**
5:8;6:3,8;7:3;45:6,
12;66:11,15,23;68:22
**fully (1)**
27:9
**functioning (1)**
51:8
**further (1)**
8:4

## G

**gap (2)**
68:12,15
**gave (3)**
13:17;33:11;38:10
**general (9)**
16:4;30:20;31:4;
32:3;35:14;42:12;46:8;
52:16,18
**generalized (1)**
30:10
**generally (2)**
56:13;67:23
**generic (7)**
16:4;22:20;32:16,21;
40:11;41:24;44:2
**generically (1)**
16:8
**gestures (1)**
5:24
**gets (2)**
56:19,25
**given (9)**
5:12;20:14;21:18,25;
23:10;35:23,23;45:2;
54:1
**giving (4)**
13:25;17:17;39:3;
60:15
**goes (10)**
27:10;31:7;33:17;
37:24;38:18;39:8;55:2;
56:6;67:9,16
**good (2)**
4:16;69:6
**group (3)**
19:6;43:18;60:11
**guess (5)**
4:6;22:22;33:4;34:1;
62:4
**guidance (2)**
37:16;57:11
**guide (1)**
30:10
**Gustavo (2)**
9:15,20
**guy (1)**
38:6
**guys (1)**
32:18

## H

**half (2)**
68:11,17
**hand (2)**
59:24,25
**handed (1)**
65:5
**handle (3)**
58:12;60:16;61:5

**handouts (2)**
18:14;19:16
**hands (1)**
43:14
**hands-on (3)**
25:16,17;64:2
**hanging (1)**
52:12
**happen (2)**
62:5;65:10
**happened (1)**
60:7
**happening (1)**
26:2
**hard (1)**
53:7
**hazard (6)**
50:11,16,18,20;
53:10;54:19
**hazards (6)**
39:3,23;50:8;53:10,
15;55:3
**HAZMAT (1)**
51:10
**head (2)**
5:24;63:25
**health (1)**
4:7
**hear (6)**
17:3,4,5,8;27:10,11
**Hello (1)**
17:6
**help (1)**
5:18
**helpful (1)**
42:23
**HEPPELL (23)**
4:1,18,21;5:6;7:10,
11;10:8,10;12:14,15;
17:4,7,11,12;40:24;
41:5,10,11;68:24;69:7,
10,19,23
**here's (1)**
52:22
**herself (1)**
65:11
**hey (2)**
56:16,19
**higher (1)**
42:21
**hire (4)**
67:1,14,16;68:18
**hired (1)**
67:2
**history (1)**
17:17
**hit (1)**
68:13
**hitting (1)**
40:23
**Hold (1)**
11:3
**homemade (1)**

53:4
**honestly (1)**
49:17
**honesty (1)**
11:24
**hour (1)**
41:6
**hours (3)**
20:15,16;25:19
**house (31)**
24:5;25:20;27:6,9;
29:17;32:12,23,25;
33:2,7,8,13;34:8,14,20;
35:8,15,20;38:1;42:11,
13;43:3,4,8,22;45:6;
46:7,9,11;48:21;49:6
**housed (1)**
46:25
**houses (3)**
40:17,18;49:21
**housing (5)**
38:8;50:25;55:20;
61:3;62:23
**huge (1)**
53:13
**huh-uh (1)**
5:25

## I

**ideas (1)**
39:4
**identification (2)**
7:9;12:13
**identifying (1)**
35:16
**IDOC (6)**
4:6,19;8:11,24;16:7;
27:25
**illegal (4)**
53:14;54:8,15,23
**immediate (1)**
34:19
**immediately (2)**
38:12;40:9
**implement (2)**
39:17;56:23
**importance (5)**
28:23;29:12;30:12;
31:20,22
**important (6)**
5:17,22;6:2;29:4;
39:14;61:24
**include (1)**
59:9
**includes (2)**
32:2,3
**including (1)**
5:12
**incorporate (1)**
31:9
**in-depth (1)**
45:9

**Indiana (11)**
8:13;12:7,24;13:19;
16:3,6,14;52:1;60:24;
61:9;66:4
**individual (15)**
13:24;19:8,25;20:21;
21:8;28:15;30:18;
32:23;33:19,19,22;
34:5;43:20;45:7;65:20
**individuals (3)**
24:16;39:25;48:12
**informal (6)**
55:2;56:11,15,24;
57:1,3
**information (17)**
22:1,21;27:12;28:16;
46:10,17;48:4;49:4;
57:5,12,16;64:1,21,23,
24;65:5,8
**in-service (11)**
59:19,22;60:1,12;
61:7,15;62:13;66:22;
67:5,19;68:2
**inside (2)**
43:18;44:1
**inspecting (1)**
55:10
**inspection (8)**
51:1,16;52:3;55:12,
16;56:5,6,8
**inspections (2)**
55:10,23
**institute (1)**
28:1
**instruct (1)**
62:12
**instruction (5)**
45:2;46:16;48:19;
50:4;55:18
**instructions (1)**
54:2
**instructs (1)**
6:22
**interact (1)**
48:12
**internal (3)**
51:2,21,24
**internship (1)**
63:24
**interrogatories (1)**
10:3
**into (4)**
19:2;31:9;53:2;
54:11
**investigate (3)**
37:17;49:13,14
**investigations (1)**
37:20
**involve (2)**
29:8;31:17
**involved (4)**
24:14;31:18;34:3;
39:5

BOSS REPORTERS
(219) 769-9090

**ISP (3)**
11:6,22;12:10
**issue (3)**
17:10;51:11;52:13
**issues (3)**
13:18;58:3,9
**item (1)**
21:23
**items (1)**
19:10
**Ivan (1)**
16:20

## J

**January (6)**
8:8,14;67:2,10,17;
68:18
**JIMENEZ (3)**
4:15;9:25;69:17
**job (5)**
38:22,24;47:3;61:19,
25
**jobs (1)**
62:7
**Jones (1)**
16:21
**judge (1)**
6:14
**July (2)**
67:4,6
**jump (4)**
6:5,9,21;62:18
**jumping (2)**
6:18;62:17
**June (4)**
12:9;67:7,21;68:22

## K

**keeping (1)**
30:13
**keys (3)**
25:15;48:20;49:5
**kind (11)**
22:18;38:19;40:15;
42:7;44:20;49:18;
50:21;57:3;62:10;
63:22;64:2
**kitchen (3)**
43:8;60:9;61:3
**knowing (1)**
31:22
**knowledge (9)**
18:9;20:5;27:22;
38:21,22;59:15;62:12;
63:6;65:10
**knowledge-based (2)**
25:17;27:3
**knows (1)**
65:9

## L

**lacking (1)**
57:17
**laid (1)**
51:15
**laptop (1)**
11:4
**last (5)**
20:16;28:14;29:18;
50:12;68:22
**late (1)**
67:25
**layout (2)**
27:4;34:23
**lays (1)**
19:20
**lead (1)**
39:22
**learn (1)**
25:14
**least (2)**
18:3;60:22
**leave (2)**
37:22;43:10
**leaving (1)**
50:24
**leeway (1)**
68:6
**left (2)**
17:13;43:13
**length (1)**
21:11
**less (1)**
46:13
**level (11)**
24:12;34:15;38:17,
19;42:19;50:10;52:4;
55:18,23;61:6;63:22
**levels (3)**
23:23;51:16;52:2
**life (1)**
64:3
**light (1)**
4:7
**likely (1)**
44:11
**limited (3)**
15:4,13;46:4
**limiting (1)**
8:5
**line (5)**
42:12,16;52:3;55:23;
56:7
**link (1)**
9:22
**list (10)**
7:17;11:12;19:11;
25:4,4;32:9;35:11;
47:5;48:2;64:8
**literally (1)**
20:24

**little (4)**
13:23;18:5;34:1;
65:3
**load (1)**
11:3
**loaded (1)**
54:22
**location (1)**
35:17
**lock (4)**
37:5,5,8,9
**locked (1)**
35:25
**locking (4)**
36:14,22;40:16;
44:11
**long (7)**
9:19;21:4,9;25:10;
39:5;67:20;68:16
**longer (1)**
64:4
**look (10)**
11:24;15:1;42:15;
51:4;52:23;54:16;55:4,
20;56:11,13
**looked (2)**
13:10;52:11
**lose (1)**
32:19
**lot (4)**
25:20;46:12;49:20;
69:23
**love (1)**
25:22

## M

**main (1)**
44:8
**major (1)**
58:15
**makeup (1)**
61:4
**making (9)**
38:3,11,14;42:6,22;
45:1,4;49:21;54:21
**manager (6)**
18:2;39:3,24;45:22;
47:15;50:11
**managers (1)**
47:9
**manager's (3)**
50:16,18,20
**manner (3)**
23:1;24:6;44:7
**manual (7)**
11:9,11,13,15;12:24;
13:7;27:20
**manually (2)**
36:6;44:12
**many (3)**
20:6;51:15;60:20
**March (1)**

68:21
**mark (2)**
6:4;12:1
**marked (2)**
7:9;12:13
**matching (1)**
47:13
**material (4)**
22:4,5,14;63:21
**materials (3)**
18:10;19:14,15
**matter (3)**
13:17;36:23;67:22
**May (5)**
12:10;21:6;26:10;
32:19;46:9
**Maybe (7)**
9:21;22:3;31:6;
33:25;39:2;41:16;
57:17
**mean (20)**
11:11;17:1;22:4;
27:4;33:21;38:5;45:21;
50:12,14,17,19,23;
51:4;54:22;58:13;
63:18,20;65:2;68:18;
70:2
**means (2)**
5:22;64:8
**mechanical (1)**
37:4
**mechanics (1)**
45:3
**meeting (3)**
9:16,20;58:14
**meetings (1)**
9:16
**member (4)**
18:3;38:25;50:13;
51:12
**members (1)**
62:22
**memory (3)**
22:7;28:9;55:7
**mention (1)**
62:14
**mentioned (3)**
28:14;46:20;62:9
**mentions (1)**
61:17
**met (2)**
9:10,13
**method (1)**
36:9
**might (5)**
6:12;25:24;52:24;
55:5;57:13
**minimum (2)**
29:1,19
**minor (1)**
38:13
**minus (1)**
44:8

**minutes (10)**
9:21;10:14;20:6,25,
25;21:8;22:3;41:2,2,3
**modes (1)**
18:19
**modification (1)**
8:10
**module (13)**
15:7,10,17;17:16;
18:6;25:3;26:23;28:7;
32:8;41:25;45:16;
46:15;47:2
**modules (7)**
18:17;19:18;39:11;
49:10,12;50:1;59:7
**moment (2)**
6:18;13:5
**monitoring (2)**
52:2;55:19
**months (1)**
5:13
**more (13)**
16:11;22:3,22;24:20;
32:24;41:25;43:16;
52:21;56:13,24;58:17;
61:18;65:22
**most (5)**
31:4;37:20;44:11;
53:2;54:20
**move (2)**
4:8;50:23
**moved (5)**
47:23;55:13,15;56:2,
3
**moves (1)**
55:17
**moving (3)**
26:13;35:19;43:25
**much (7)**
21:14;31:8;46:13;
49:23;57:20;62:6;
63:25
**myself (3)**
17:23;18:3;63:20

## N

**name (2)**
5:8;7:22
**narrow (1)**
43:16
**nature (8)**
11:16;21:13,18;
22:13;34:25;38:5;39:4;
51:13
**necessary (1)**
37:19
**need (17)**
6:25;22:2;27:6,8;
29:1;30:7;31:1;38:7,
12,13;44:4;46:23;48:4;
50:12;54:16;57:11;
69:2

USDC IN/ND case 3:18-cv-00995-JD    document 212-35    filed 05/25/21    page 27 of 31

**needed (6)**
17:25;48:22;49:6,7;
57:21;62:23
**needs (11)**
18:1;25:2;35:18;
43:11;47:7,23;56:14,
17;57:24;62:2;65:10
**neither (1)**
32:4
**new (37)**
18:20;19:8;29:15,21,
25;30:3,3;31:16;32:7;
33:17;35:12;37:16,20;
38:17,23;39:7,8;41:14;
45:24;50:12;55:14,17;
56:3;58:5;59:12,17;
60:4;62:16,19;64:10,
19;66:16,17;67:10,14,
16;68:12
**newer (1)**
58:10
**next (4)**
6:9;9:4;40:22;63:22
**nobody (1)**
62:9
**nods (1)**
5:24
**noise (3)**
49:20,21,22
**None (1)**
39:25
**notes (1)**
69:2
**notice (6)**
7:13,16;8:4,7,21;9:1
**notified (2)**
47:1;63:10
**notify (1)**
47:14
**notifying (1)**
28:10
**number (3)**
13:12,18;21:12
**numbered (1)**
8:15

## O

**objection (1)**
6:19
**objections (2)**
6:12,15
**obligation (2)**
49:13;52:18
**obviously (7)**
44:13;46:7,11;52:11;
61:18;63:4,24
**occasions (1)**
58:13
**odd (1)**
49:19
**off (11)**
7:5;16:5;17:9,13;

36:15;41:1;44:6,10;
45:21;66:3;69:8
**offender (10)**
35:2;36:1;43:12;
44:4;46:24;50:23,24;
51:11;53:11;62:9
**offenders (10)**
25:22;26:6;39:6;
42:19;43:9;44:1;46:11;
52:10;53:3;63:10
**officer (22)**
19:8,10;21:5,22;
23:4;26:24;27:17;
33:17;37:3;40:13;
45:15;46:22;56:18;
57:6;63:14;65:14,19,
25;66:6,10,17,21
**officers (18)**
18:15;28:20;46:18;
47:11;48:3,20,21;49:4,
5;50:5,22;51:20;52:1,
4;55:24;58:3;62:21;
63:19
**officers' (1)**
49:12
**official (2)**
21:25;53:22
**officially (1)**
53:16
**OIC (4)**
64:25;65:9;66:2,13
**OJT (1)**
63:3
**once (6)**
22:11;29:1,10,19;
44:2;65:6
**one (40)**
5:12;8:19;9:7;10:16;
13:5;15:20;16:18,18;
18:3;20:7;23:8,8;24:8;
28:7,15;30:25;32:10;
33:23;34:10,17,22,25;
35:1,8;36:1,12;37:12;
40:16;45:23;47:18;
49:18;53:6;54:22;
55:17,25;57:17;60:8,
10;63:7,19
**one-on-one (1)**
64:2
**ones (2)**
57:25;63:7
**ongoing (3)**
55:19,19;56:9
**only (8)**
7:1;10:16;33:23;
34:25;48:13;63:20;
66:15,21
**on-the-job (12)**
18:23;19:3;20:17;
22:24;25:5;40:3,4;
46:15;53:19;56:12;
58:17;59:7
**onto (1)**

42:19
**opening (2)**
36:9;44:8
**operate (3)**
15:14;38:24;40:18
**operates (2)**
16:12;34:14
**operating (1)**
26:13
**operations (1)**
58:9
**opportunity (3)**
25:21,24;70:1
**opposed (1)**
25:7
**order (13)**
28:19;29:8;30:9,10,
18;31:16;36:22;42:6;
44:20;46:9;47:17;
51:12;59:11
**orders (45)**
28:15,23,24;29:2,6,
13,15,19,24;30:3,5,6,
12,13,15,19,21;31:3,4,
18,19,20,23,25;32:2,3;
33:5;40:19,20;45:11,
19,25;46:2,21;47:4,12;
48:2,14;49:24;59:9;
63:9,10;64:13,17,20
**original (1)**
16:18
**out (39)**
4:22;6:3;13:13;19:8,
20;20:14;24:2;25:13,
21,23;26:7,25;28:25;
33:23;36:10,23;38:7;
42:10,11,15,17,19;
43:3;44:4,21,22,23;
50:24;51:15;52:12;
53:8;54:4;55:13;56:2;
57:8,12;58:1,11;65:2
**outlet (5)**
51:5;52:25;53:8;
55:5,11
**outlets (5)**
53:15;54:8,13,15,23
**outline (2)**
11:8,10
**outside (7)**
36:18;43:4,19,21;
44:1;59:6;65:3
**over (7)**
4:11;16:19;27:8;
33:2;37:25;63:3;69:2
**overall (3)**
33:11;59:2,3
**own (1)**
53:3

## P

**page (4)**
7:17,22;8:2,16

**pages (1)**
13:7
**paper (2)**
38:6;54:12
**part (19)**
26:4;28:1,19;29:24;
30:24;31:2;32:1,5,7;
35:12;39:7;40:1,3;
47:3;52:17;53:18;54:8;
55:11;70:3
**particular (6)**
18:17;21:5,15,23;
58:22;63:15
**parties (1)**
4:5
**pause (3)**
17:10;40:25;69:9
**Pausing (1)**
69:7
**pending (1)**
7:4
**people (5)**
27:11;38:23;43:18;
45:24;68:5
**people's (1)**
60:12
**per (4)**
20:17;21:8,24;28:16
**period (5)**
8:6,6,8;18:8;68:11
**periodic (3)**
56:10;59:16,19
**person (3)**
22:2,19;33:23
**phone (3)**
9:22,23;10:15
**phrased (1)**
33:25
**phrasing (1)**
41:17
**physical (4)**
25:8;27:1,3;34:23
**physicality (1)**
24:13
**physically (7)**
23:6,9;25:1;26:24;
27:13;35:6;36:9
**piece (2)**
53:6;54:24
**place (5)**
10:13;36:15;61:7;
65:15;67:23
**plaintiff (2)**
4:13;5:2
**Plaintiff's (2)**
7:8;12:12
**plan (6)**
11:9,10;17:16;20:12;
21:19;60:18
**plans (2)**
15:20;62:15
**please (2)**
4:23;5:7

**pm (1)**
70:8
**point (10)**
18:7;20:3;23:10;
25:13;31:5;39:25;45:1;
50:22;56:16;60:8
**pointing (1)**
26:25
**points (1)**
32:24
**policy (4)**
11:23;27:25;67:20;
68:6
**poorly (1)**
34:1
**portion (1)**
54:1
**possible (3)**
26:22;37:22;66:4
**Possibly (1)**
39:2
**post (66)**
28:15,17,19,23,24,
25;29:2,6,8,9,11,12,14,
15,17,19,24;30:2,5,5,6,
7,9,10,12,13,15,18,19,
20,20;31:3,4,5,16,18,
19,20,23,25;32:2,3;
33:5;40:19,20;45:11,
19,25;46:2,6,9,21;47:4,
12,17;48:2,14;49:24;
59:9,11;63:9,9;64:13,
17,20;65:13
**posts (1)**
28:17
**potential (4)**
50:7;51:16;54:10;
55:3
**potentially (1)**
68:10
**PowerPoint (3)**
60:18,23,25
**PowerPoints (2)**
18:14;19:16
**practical (1)**
67:22
**practically (1)**
67:25
**practices (2)**
11:7;12:11
**practicing (1)**
24:21
**precise (1)**
22:22
**preface (1)**
9:4
**preparation (4)**
8:3;10:6;12:20;13:8
**prepare (5)**
9:11,14;10:18,22,24
**prepared (3)**
7:14;8:23;58:18
**pretty (6)**

22:4;31:8;41:24;
49:23;62:6,14
**prevent (3)**
28:4;38:2;42:16
**prevention (3)**
11:7,23;12:11
**prevents (1)**
63:13
**previous (1)**
17:19
**previously (3)**
5:12;13:17;31:15
**prior (1)**
18:18
**prioritization (1)**
34:16
**Prison (19)**
8:13;12:8,24;13:19;
16:3,14;23:3;24:15;
26:2,13;27:8;52:2;
54:1;57:9;58:9;60:24;
61:9;66:5,18
**prisoner (22)**
24:5;27:18;32:14;
33:19;34:5,19;35:18;
36:12,12;40:9;46:18,
19;48:11;54:25;55:13,
14;56:2,3;61:16;62:22;
64:6,16
**prisoners (6)**
8:13;36:10;41:19,21;
43:2;52:19
**prisoners' (2)**
50:6;51:22
**prisoner's (1)**
34:17
**prison-specific (1)**
60:23
**proactive (1)**
57:7
**probably (3)**
46:12;51:9;54:11
**problem (3)**
7:1;11:5;55:5
**procedural (2)**
42:1,4
**procedure (21)**
19:2;27:20;31:7;
33:7;34:4,12,20;35:9,
11,25;36:3,4,8;37:1,11,
12;39:15;41:14;43:16;
45:13;49:2
**procedures (26)**
15:19;16:16;17:15;
20:12;21:19;25:5;
26:17,18;28:6,11;
32:10;33:9;35:14,16;
44:16;45:17;46:5,8,12,
15;59:25;60:3,24;61:9;
63:1;64:15
**proceeding (1)**
4:9
**Proceedings (1)**

70:7
**process (10)**
16:23,25;17:14;21:1;
43:2;56:10,15,24;57:4;
70:3
**production (1)**
10:4
**program (1)**
59:4
**progress (1)**
38:22
**prompted (2)**
45:15,18
**proper (1)**
22:9
**properly (1)**
51:8
**provide (1)**
63:20
**provided (9)**
8:11;16:5;18:15,20;
51:19;52:1;59:2;65:18,
24
**provides (5)**
37:15;41:18;48:19;
49:3;50:4
**providing (1)**
63:14
**provisions (1)**
59:10
**public (1)**
4:7
**pull (2)**
8:1;12:2
**pump (1)**
63:25
**purpose (2)**
31:19;34:18
**put (7)**
4:2;7:12;25:21;26:7;
39:18;51:12;67:4

### Q

**quick (1)**
42:14
**quite (2)**
21:2;28:14
**quiz (3)**
22:18;24:20;25:7
**quizzing (1)**
26:18

### R

**radio (5)**
22:9;24:2;25:15;
26:10,14
**radioing (1)**
24:3
**range (8)**
21:21;24:4;25:23;
26:10,25;35:2;36:21,

25
**ranges (1)**
25:19
**rather (3)**
22:16;37:5;43:17
**read (5)**
8:19;29:14;31:1;
45:12;64:13
**reading (8)**
12:4;28:23;29:5,8;
30:12;31:22;33:5;
45:25
**ready (2)**
32:19;56:23
**real (4)**
22:25;26:1;53:7;
64:3
**reality (1)**
35:23
**really (3)**
21:24;34:10;35:7
**realm (1)**
51:9
**reason (2)**
31:10;62:7
**rec (1)**
43:7
**recall (3)**
13:3,4,15
**receive (4)**
20:14;28:20;40:12;
53:18
**received (1)**
66:16
**receiving (1)**
67:18
**recess (1)**
41:9
**recognize (1)**
13:21
**recognizing (1)**
8:2
**record (11)**
4:3;5:8,19;6:16,20;
7:5;17:9,11;41:1,10;
69:8
**recording (2)**
40:25;69:8
**reference (1)**
45:11
**referenced (1)**
16:2
**references (1)**
15:20
**referencing (1)**
43:25
**referring (8)**
12:17;20:8;29:24;
36:8;39:20;43:1,2;
47:20
**reflected (1)**
8:20
**reflects (1)**

8:11
**refresh (1)**
29:1
**refresher (1)**
5:14
**refreshing (2)**
29:19;31:23
**regarding (4)**
8:15,24;52:2;61:15
**regular (1)**
23:2
**regulation (1)**
11:7
**Regulations (1)**
12:11
**related (6)**
10:5;13:19;15:5;
32:9;46:4;59:8
**relates (1)**
49:25
**relating (1)**
32:11
**released (1)**
63:11
**releasing (3)**
62:21;64:6,16
**relegated (1)**
28:22
**relies (1)**
65:9
**relying (2)**
5:24;57:5
**Remember (5)**
22:19;28:12;35:1;
41:23;60:9
**remotely (3)**
4:11;7:9;12:13
**removal (1)**
45:5
**remove (5)**
27:18;34:5,18;53:10;
54:16
**removed (1)**
40:10
**removing (3)**
24:16;43:19;45:7
**repeat (1)**
48:6
**reporter (2)**
4:10;5:18
**requested (3)**
39:16,19;40:1
**requests (3)**
10:4,4,6
**required (4)**
23:17;26:4,17,21
**requirement (2)**
39:7,10
**requiring (1)**
32:25
**rescue (2)**
48:22;49:7
**rescuing (1)**

32:14
**reserve (1)**
70:5
**reserved (1)**
70:6
**respond (1)**
62:24
**response (13)**
15:4;19:2,22;22:17;
28:6;48:17;49:2,7;
56:13;59:10,13,23;
60:3
**responses (1)**
60:15
**responsibility (5)**
48:4;50:16,19,20,22
**result (1)**
58:25
**revert (1)**
63:8
**review (10)**
10:24;11:2;13:6;
30:8;47:4;51:17;56:10;
59:9,10;70:1
**reviewed (9)**
8:21;11:6,8,17,23;
12:19,23;32:1,5
**reviewing (3)**
28:19;29:12;31:17
**revision (3)**
11:22;12:9;13:2
**right (10)**
13:16;23:21;24:20;
28:19;36:18;47:21;
55:16;57:19,23;62:4
**roll (1)**
35:4
**rotation (1)**
67:5
**rounds (2)**
52:9,17
**row (1)**
33:9
**rule (3)**
6:14;7:16;27:25
**rummaged (1)**
53:5
**run (3)**
36:20,22;53:2
**running (4)**
44:3;54:10,12;65:15

### S

**safety (7)**
39:3,23;50:11,15,18,
19;51:10
**same (16)**
8:16;16:9;23:1;
28:25;34:12;35:9,24;
36:3,5,11,25;37:10;
44:6,9;58:24;66:16
**saw (1)**

52:11
**saying (2)**
36:7;53:21
**scenario (10)**
33:18;34:3;35:23;
44:3;60:16;61:5;63:2,
16;67:8,11
**scenarios (9)**
38:15;59:24;60:2,6,
6,17;61:19;62:8;63:1
**scene (1)**
37:23
**scheduled (2)**
57:2;68:1
**screen (2)**
7:12;12:3
**se (1)**
21:24
**second (3)**
15:10;62:18;69:24
**secondary (4)**
36:21;37:8,9;44:11
**section (7)**
13:12;15:22;16:2;
17:16;19:2;29:23;
31:16
**seek (2)**
57:8,12
**seeming (1)**
57:10
**sense (4)**
5:25;6:16;19:16;
31:13
**sentence (1)**
6:5
**separate (3)**
9:16,18;54:24
**sergeant (9)**
37:25;39:1;46:22;
65:1,13,16,20;66:6,14
**serious (1)**
38:12
**serves (1)**
55:7
**service (2)**
66:11,15
**Session (11)**
15:21;16:7,8,10;
20:14;28:21;30:1,2;
45:18;55:8;62:1
**sessions (3)**
20:15,16,17
**set (6)**
8:25;9:3;16:5,8;
22:18;38:6
**setting (4)**
13:13;19:7;23:16;
60:11
**settle (1)**
56:22
**several (1)**
40:17
**shakedowns (1)**

53:14
**sheet (27)**
15:24;19:24;20:2,8,
12,21;21:5,8,12,15,20;
22:6;26:16;28:22;
31:11;32:17,22;41:23;
45:9;46:1;47:13,24;
53:17,22,24;56:6;63:6
**sheets (3)**
15:1;20:9,11
**shift (2)**
38:1;65:7
**show (4)**
20:24;25:12;40:14;
54:6
**showing (2)**
54:14;55:1
**signal (1)**
36:19
**signals (1)**
22:9
**Signature (1)**
70:6
**signs (4)**
52:5,24;55:4;65:3
**similarly (3)**
6:2,8;26:8
**simplistic (1)**
22:1
**simply (2)**
17:25;65:22
**simulate (1)**
23:14
**simulation (15)**
15:23;22:16,19;
23:17,19,24,25;24:9,
13,18;25:7,8;27:15,19;
33:18
**single (1)**
64:10
**sit (1)**
20:24
**sites (1)**
53:5
**situation (8)**
4:7;26:1;37:2;43:16;
49:8,16;58:21;63:16
**situations (3)**
49:13;57:8;58:12
**size (1)**
68:4
**skills (1)**
27:3
**skills-based (1)**
18:22
**slash (3)**
25:17;27:3;39:1
**smaller (1)**
46:13
**smoke (1)**
34:24
**solely (1)**
57:4

**somebody (4)**
42:17;56:16;61:17;
65:14
**someone (13)**
15:24;17:23;55:20;
58:7;65:9,18,24;66:5,9,
13;67:9,16;68:9
**sometime (2)**
67:6;68:21
**Sometimes (1)**
49:20
**somewhat (1)**
28:17
**somewhere (1)**
31:11
**soon (1)**
54:21
**sorry (4)**
9:25;45:21;48:24;
61:11
**sort (26)**
7:2;15:4;20:20;
23:21;24:1;25:6,7;
32:12;34:2;38:11;43:3,
16;45:4;47:6,25;51:15,
21;52:17;54:17;55:2;
56:9;57:4;58:20,21;
61:6;63:14
**Sounds (1)**
69:6
**source (1)**
65:8
**sources (3)**
64:21,22,24
**sparking (1)**
52:12
**speak (1)**
10:20
**speaking (3)**
9:20;42:8;56:1
**specific (42)**
16:3;19:21;20:13;
22:6;28:5,12,21;29:5,8,
9;30:4,5,15,19,20;31:5,
18,25;32:2,14;34:17;
35:16,17,19;36:1,12;
43:20;45:7,8,16;46:3;
48:15;49:9;52:21;
54:23;56:12;57:1;
58:20,22;60:23;61:8;
66:2
**specifically (11)**
15:5;16:17;30:24;
33:17;44:17;46:4;
49:25;52:7,13,23;
67:17
**speculative (2)**
34:21;44:20
**spell (1)**
5:8
**spend (2)**
9:20;21:22
**spends (1)**

21:5
**spent (2)**
20:25;21:15
**spoke (2)**
10:3,14
**spoken (3)**
9:10,13;10:1
**squared (1)**
62:14
**staff (11)**
8:11;20:18;38:25;
42:12,16;50:12;51:11;
54:1;56:7;57:10;62:6
**staff's (1)**
57:19
**stamped (1)**
12:6
**standard (1)**
70:3
**standing (2)**
36:16,17
**start (2)**
25:22;26:7
**state (11)**
5:7;8:13;12:8,24;
13:19;16:3,14;52:2;
60:24;61:9;66:5
**statewide (1)**
60:25
**staying (1)**
28:23
**steps (10)**
15:25;19:25;20:1,1;
24:2;37:18;42:2,4;
44:9;60:14
**still (6)**
17:3;25:11;29:18;
37:8;44:5,9
**stipulated (2)**
4:12,13
**stipulation (2)**
4:4;7:2
**streets (1)**
42:20
**strike (5)**
27:24;29:22;48:7;
65:21;68:8
**stuff (2)**
51:3;54:7
**subject (1)**
59:18
**subsequent (1)**
8:3
**substantive (1)**
13:7
**substituted (1)**
8:7
**supervised (1)**
23:3
**supervisor (3)**
38:2;39:22;58:7
**supervisors (3)**
39:16,20;57:18

**supposed (1)**
50:25
**Sure (16)**
5:9;18:13;23:13;
31:15;33:10;45:1;
46:19;47:6,25;48:7;
49:1,15;50:7;51:14;
53:20;62:2
**swear (2)**
4:1,22
**swearing (1)**
4:10
**sworn (1)**
5:3
**system (5)**
36:14,22;40:16;
44:11;52:24
**systematically (2)**
64:10,12
**systems (3)**
50:6,9;51:22

**T**

**table (4)**
11:14;12:23;13:10,
13
**tailored (1)**
32:13
**talking (8)**
28:7;41:13;42:9,10;
43:5,24;46:16;68:20
**task (37)**
15:1,23;19:24,25;
20:2,7,9,11,12,21;21:5,
12,15,19;22:6;23:1;
25:4,18;26:16;28:13,
22;29:5,7;31:10;32:17,
22;33:3;41:23;45:9;
46:1;47:13,24;53:17,
22,24;63:5;64:8
**tasks (3)**
24:22;26:11;30:17
**teaches (1)**
40:12
**teaching (1)**
30:11
**technical (1)**
17:10
**techniques (1)**
15:14
**telling (2)**
9:5;65:1
**ten (3)**
20:25;22:3;41:2
**term (1)**
42:25
**terms (28)**
10:11;15:3;19:5,13,
21;21:4,12;25:3;26:12,
16;27:16;29:21;31:24;
34:8;36:7;40:7;42:24;
43:15;44:17;47:25;

48:7;52:21;55:19;56:2;
58:2;59:7,16;64:6
**testified (9)**
5:3;11:19;12:22;
13:18;15:10,18;19:14;
59:6,14
**testifying (1)**
13:23
**testimony (12)**
5:19;8:24;13:25;
18:18;20:19;26:8;
31:25;33:11;38:9;
48:10;51:18;63:12
**testing (2)**
51:7,21
**theoretically (1)**
23:19
**thinking (1)**
61:21
**third (2)**
15:17;20:9
**Third-Party (1)**
4:19
**though (4)**
23:25;24:7;44:2;
56:24
**three (4)**
20:9;29:18;54:12;
59:7
**three-prong (1)**
53:8
**threw (1)**
38:7
**throw (2)**
25:23;62:10
**times (1)**
25:20
**tips (1)**
39:3
**title (1)**
15:17
**titled (2)**
12:7,10
**today (12)**
5:15,19;6:14;8:24;
9:11;10:21,22,25;
12:20;13:23;42:25;
69:11
**together (1)**
9:17
**toilet (1)**
38:6
**told (2)**
31:1;64:14
**took (1)**
41:12
**Topic (12)**
7:23;8:1,10,17,25;
11:8,10;15:13;16:16;
22:20;41:14;49:10
**topics (9)**
8:15,20,21;16:7,9,
10;21:13,13;22:24

**total (1)**
20:16
**touching (1)**
61:24
**towards (3)**
31:5;32:24;52:14
**train (1)**
39:15
**trained (4)**
30:4;37:21;52:8;
53:9
**trainee (10)**
22:25;25:12,25;
26:11,23;45:11;46:17;
47:5;49:4;64:11
**trainees (2)**
40:7;45:24
**trainer (1)**
61:23
**training (149)**
8:11,25;13:19;15:23;
16:3,4,20;17:16,19,21;
18:1,2,4,11,16,20,21,
22,22,23;19:1,4,5,9,21;
20:7,17;21:23;22:25;
23:4;25:3,5,25;26:5,
24;27:10,21;28:2,13,
20;29:11,16,23,25;
30:2,11,25;31:9,17;
32:1,6,7;33:3,12,16;
35:10,13;37:14;38:15,
17,18,19;39:8,10;40:2,
3,4,6,11,13;41:15,18;
43:1,24;44:18,23;
45:15,22;46:15;47:3,9,
10,14,18;48:1,15,18;
49:2,10,12;50:1,3;
51:19,19,25;53:18,19,
25;54:1,5;56:12,17,18,
22;57:6,14;58:2,8,11,
17;59:1,3,8,12,16,18,
19,23;60:1,5;61:8,15;
62:17,19,20;63:13,19,
20;64:3,19;65:6,17,23;
66:1,2,15,17,22;67:3,6,
10,14,17,19;68:2,5,13,
14,19
**transcribing (1)**
4:10
**transcript (1)**
5:16
**transferring (1)**
48:20
**transpiring (1)**
23:12
**trash (1)**
53:5
**try (6)**
24:25;41:16;47:15;
57:7,12;67:25
**trying (3)**
23:22;35:22;57:20
**two (10)**

11:18;20:15,16;
43:12;47:6;54:12;
58:16;60:22;62:8;63:2
**type (4)**
24:8,17;33:13;58:24
**types (4)**
15:5,8,9;38:14

## U

**unannounced (1)**
42:20
**undergone (1)**
34:5
**underneath (1)**
19:3
**Understood (18)**
5:21;6:24;7:7;9:9;
10:8;20:19;26:8;29:21;
31:14;33:10,25;42:22;
43:15;44:25;46:14;
48:9;61:23;63:12
**undisturbed (1)**
37:22
**uniform (1)**
25:11
**unit (7)**
38:8;44:6,8;45:13;
50:25;61:3;65:15
**units (3)**
44:14;46:25;62:23
**unless (4)**
6:21;23:7,15;44:13
**unlock (6)**
27:17;35:6;37:3,7;
44:13,16
**unlocked (2)**
36:6;37:10
**unlocking (3)**
24:15;36:6;45:3
**unsecure (1)**
36:21
**unsupervised (1)**
58:19
**unusual (1)**
49:13
**up (20)**
7:12;11:4;12:2;
22:18;25:19;28:24;
30:13;32:18;34:1;
40:19;46:10,11;47:13;
48:24;51:5;53:13;57:8;
62:10;63:4,22
**updated (3)**
47:15;56:14,20
**urgency (1)**
34:15
**urgently (1)**
35:18
**use (4)**
15:11;25:15;48:11;
61:15
**used (3)**

20:23,23;53:6
**using (3)**
5:23;37:4;42:24
**usually (5)**
23:14;47:9,11,14;
54:4

## V

**vacant (1)**
55:14
**variation (1)**
21:4
**verbal (6)**
23:20;25:7,16;26:18;
64:24;65:5
**verbally (4)**
5:23;23:20;24:17;
27:14
**version (1)**
11:22
**versus (4)**
34:19;35:15;38:13;
47:18
**veteran (2)**
38:25;62:6
**via (1)**
24:23
**video (2)**
9:22;17:2
**videoconferencing (1)**
4:11

## W

**walk (3)**
24:2,23;25:12
**walking (4)**
24:4,14;26:9,25
**warden (4)**
16:22;39:20,21;
58:15
**warden's (1)**
17:25
**way (11)**
4:22;6:4;25:1;32:19;
36:20;38:24;41:17;
47:18;57:1,3;59:5
**week (3)**
54:5;62:13;68:22
**weeks (1)**
58:16
**welfare (2)**
52:10,19
**weren't (1)**
19:15
**what's (4)**
11:12;15:22;21:18;
33:6
**whole (2)**
36:24;46:3
**who's (3)**
39:1;65:18;66:13

**whose (1)**
48:4
**wide (3)**
32:12;33:13;35:20
**wires (1)**
52:11
**withdraw (1)**
48:8
**within (3)**
24:15;43:22;50:6
**without (7)**
24:21;26:23;44:5;
66:6,10,13,14
**witness (12)**
4:2,11,23;5:2;17:2,6;
40:21;41:3,8;69:6,22;
70:2
**words (1)**
5:23
**work (6)**
28:25;51:12;53:5;
57:22;58:19;59:24
**worked (2)**
29:17;67:15
**working (9)**
16:5;26:10;46:10;
49:5;53:8;57:23;64:25;
66:23;68:9
**works (1)**
41:7
**worksheets (1)**
18:14
**writing (2)**
43:25;49:18
**written (10)**
5:16;8:6;18:10;
19:14,15,19;53:16,22;
63:5;64:22

## Y

**year (10)**
66:11,15,23;67:2,14;
68:3,7,10,16,23
**years (1)**
29:18
**yesterday (1)**
10:15

## Z

**Zoom (2)**
4:9;24:24

## 0

**00-9 (2)**
11:6;12:10

## 1

**1 (12)**
7:8,15;8:8,14,15,20;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-CV-00995-JD-MGG 30(b)(6) Deposition of CHRISTOPHER BEAL
September 29, 2020

15:21;16:7,8,10;55:8;
67:6
**10:00 (1)**
47:22
**10:47 (1)**
69:4
**11:00 (1)**
47:23
**11:47 (1)**
69:5
**12 (2)**
8:15,20
**12:23 (1)**
70:8
**13 (5)**
7:23;8:1,10,17,25
**1st (1)**
67:4

**2**

**2 (8)**
12:2,5,12;28:21;
30:1,2;45:18;55:8
**20 (1)**
9:21
**2000 (1)**
12:9
**2005 (1)**
21:7
**2011 (4)**
16:19;17:18;18:8;
20:4
**2012 (4)**
16:19;17:18;18:8;
20:4
**2013 (1)**
12:10
**2015 (2)**
8:8,14
**2017 (2)**
8:9,14
**2020 (4)**
67:3,6,11,17
**2021 (2)**
67:7,21
**24 (1)**
12:10
**25 (1)**
60:17

**3**

**3 (2)**
8:2;55:9
**30 (5)**
29:1,20;60:17;67:7,
21
**30b6 (2)**
7:13,16
**31 (2)**
8:8,14
**33108 (1)**

12:6
**33111 (1)**
12:6

**4**

**4 (2)**
42:19;55:9

**6**

**68 (1)**
20:15

**8**

**8 (1)**
12:9

**9**

**96 (1)**
20:16