**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) | |
| | ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Judge Jon E. DeGuilio, Judge |
| | ) | |
| RON NEAL, et al. | ) | Hon. Michael G. Gotsch, Sr., M.J. |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

# <u>EXHIBIT 35</u>

**In The Matter Of:**

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*CHARLES WAYNE DUDLEY*
*September 24, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-24-20 Charles Dudley.txt
**Min-U-Script® with Word Index**

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal )
Representative of the )
ESTATE OF JOSHUA DEVINE, )
)
Plaintiffs, ) Case No.
) 3:18-CV-0995-JD-MGG
-v- )
)
)
RON NEAL, et al., )
)
Defendants. )

The subpoenaed deposition upon oral examination of CHARLES WAYNE DUDLEY, a witness produced and sworn before me, Kristen K. Stokes, CSR, Notary Public in and for the County of Lake, State of Indiana, taken on behalf of the Plaintiff via Zoom video conference, on September 24, 2020, at 12:05 p.m. CST, pursuant to the Federal Rules of Civil Procedure.

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

---

Page 4

MR. HEPPELL: Before we swear in the witness, just to put on the record, as we've done in the other depositions, that the parties and also the counsel for the third-party witness for IDOC are in agreement and stipulate to conducting the deposition today via zoom with the court reporter present through the video connection in light of the public health situation that we're in. I so stipulate on behalf of plaintiff in the case.

Counsel for Defendants are in agreement?

MR. ROSE: Also in agreement.

MS. EARLS: Same agreement for IDOC.

MR. HEPPELL: Okay. Thank you. With that technicality out of the way, I think we're ready to swear in the witness.

THE REPORTER: Raise your right hand, Mr. Dudley.

CHARLES WAYNE DUDLEY, called as a witness, having been first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

---

Page 2

APPEARANCES

MS. SAM HEPPELL
LOEVY & LOEVY
311 North Aberdeen Street, Third Floor
Chicago, Illinois 60607
(312) 243-5900

on behalf of the Plaintiff;

MR. ARCHER RIDDICK RANDALL ROSE, JR.
ATTORNEY GENERAL'S OFFICE
302 West Washington Street
IGCS, Fifth Floor
Indianapolis, Indiana 46204
(317) 232-6231

on behalf of all the Defendants except Blakely;

MS. KELLY EARLS
ICE MILLER
One American Square, Suite 2900
Indianapolis, Indiana 46282
(317) 236-2271

on behalf of the third-party Indiana Department of Correction;

* * * * *

---

Page 3

I N D E X

EXAMINATION                                        PAGE

DIRECT EXAMINATION BY MR. HEPPELL...........   5

CROSS EXAMINATION BY MS. EARLS..............   73

REDIRECT EXAMINATION BY MR. HEPPELL.........   74

EXHIBITS (First marked or referred to)

DEPOSITION EXHIBIT 1........................   11

DEPOSITION EXHIBIT 2........................   45

* * * * *

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-38   filed 05/25/21   page 4 of 32

Page 5

DIRECT EXAMINATION
BY MR. HEPPELL:

Q. Good afternoon, Mr. Dudley. Thank you for being here today.

A. Good afternoon.

Q. My name is Sam Heppell. I'm one of the attorneys for the plaintiff in this case.

Would you go ahead and please state and spell your full name just for the record.

A. Charles Wayne Dudley, C-H-A-R-L-E-S, W-A-Y-N-E, D-U-D-L-E-Y.

Q. And Mr. Dudley, what employment position do you currently hold?

A. I am the Director of Fire Risk Management for the Department of Corrections.

Q. How long have you held that position?

A. Four years.

Q. Have you sat for a deposition before today, Mr. Dudley?

A. No.

Q. Okay. So I'm going to go over some background rules or procedures to kind of make sure we're on the same page about how we're going to proceed today.

As you know, because you were just sworn

Page 6

in by the court reporter, your testimony here today is under oath with, you know, the same standard for what that means if you were testifying in court in front of a judge and jury. Does that make sense?

A. Yes.

Q. Okay. Obviously, though, there is no judge and jury here. So things are a little less formal than they would be in a courtroom. With that said though, there is still a record being made of your testimony both via recording of the zoom video and also a written record being made by the court reporter. Do you understand that?

A. Yes.

Q. And because of the importance of making a clear record, there are a few unnatural ways of doing things that we need to adhere to today. So for example, it's important that you let me get all the way to the end of my question before jumping in with your answer. Does that make sense?

A. Yes.

Q. Okay. And similarly, it's not how we would ordinarily talk in conversation, but it's important to give your testimony using full words without relying on gestures, like head

Page 7

nods, head shakes, or things like uh-huh or uh-uh, because those are very easy for us all to understand on the call and very hard for the court reporter to make an intelligible transcript. Does that make sense?

A. Yes, it does.

Q. And we can all try to hold each other to that and jump in just to correct each other to make sure we're making a clean record. Okay.

A. Yes.

Q. Similarly, there are some added challenges around doing the deposition remotely by video connection as opposed to having everyone in a conference room all together. So if there are any technical glitches or issues with the audio where you can't hear me or I can't hear you, it's important we're all in communication to make sure that everyone can hear each other, including the court reporter, so that we're able to have, again, a clear, accurate record of your testimony today. Okay?

A. Yes.

Q. So I hope you'll bear with us if we're asking you to speak up or ask you to repeat your answers, just know that we're not trying to do

Page 8

it just for the sake of it but to make sure there's a clear record for everyone. Okay?

A. Yes.

Q. And related to that, whether it's a technical issue with the video-audio quality or maybe I just phrase a question poorly that you can't understand it or there's something about my question that you can tell I misunderstood part of your previous answer, please do go ahead and let me know if there's anything unclear or inaccurate about my question. Okay?

A. Okay.

Q. If you go ahead and answer the question, I'm going to assume that you were able to understand the question. Okay?

A. Yes.

Q. There may be some objections that are made by the other lawyers on the line. They may pose an objection to a question that I ask. I will do my best to ask perfect questions to which no objection could possibly be raised, but I'm only human, and I may not succeed in that goal.

Unlike in a courtroom where there's a judge to rule on the objection right away though, there's no judge here, so those

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 5 of 32

Page 9

objections are primarily being made just for the record. Okay?

A. Okay.

Q. So that means unless your attorney directly instructs you not to answer a question, unless that happens, you can pause for a moment, give an opportunity for your attorney to make the objection for the record, but then you can go ahead and answer the question. Okay?

A. Yes.

Q. This is, like I said, much less formal than in-court testimony, and that includes that we can take breaks throughout the deposition as needed. I may ask to take a break, and you should certainly feel free to ask to take a break at any point in time if you need to. Okay?

A. Yes.

Q. The only stipulation around that is that if I've asked a question, I would ask that you give your full and complete answer to that question before we go off the record, and then I can start fresh with a new line of questioning once we're back after the break. Okay?

A. Yes.

Page 10

Q. With all of that background in terms of what we're here to do today, can you think of any reason or do you have any condition that would affect your ability to give truthful and accurate testimony to the best of your memory?

A. No.

Q. And Mr. Dudley, you understand that you are giving testimony here today not solely on your own behalf, not in your individual capacity, but as a designated witness to give testimony that's binding on behalf of the Indiana Department of Correction as to the topic areas in which you've been designated?

A. Yes, I do.

Q. Okay. And I'm going to pull up for you a copy of that -- the deposition notice and go through it with you briefly. And before I do that, I want to just note for the -- I guess, for the record and get counsel's confirmation. Based on the deposition testimony earlier today of Mr. Lintz related to the limitations around his ability to testify as to Topics 9 and 10, to my understanding that there's an additional designation of Mr. Dudley to testify as to those topics in the areas related to fire safety that

Page 11

Mr. Lintz was unable to speak to; is that correct?

MS. EARLS: DOC agrees with the limitations with those specific questions that were directed towards Greg Lintz.

MR. HEPPELL:

Q. Okay. And additionally, there is a limitation that's been agreed that's not on the face of the document that the time frame has been limited by agreement of the parties from January 1st, 2015, to December 31st, 2017.

So I've marked as Exhibit 1 a copy of the Rule 30(b)(6) notice of depositions.

Mr. Dudley, are you able to see that document that I've pulled up on the screen?

A. Yes, I am.

Q. Okay. And have you seen this document before?

A. Yes.

Q. Okay. And then that reflects your name Chip Dudley as designated on Topics 1 and 5; correct?

A. Yes.

Q. And also, as we just discussed on the record, the additional designation related to some aspects of Topics 9 and 10. So I'm going to go through those with you now.

Page 12

So as to Topic 1, that relates to the Indiana Department of Correction's policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison between January 1st, 2015, and December 31st, 2017, relating to emergency preparedness and responses, including relating to fire safety prevention and management. Are we on the same page about that topic?

A. Yes.

Q. Are you prepared to give binding testimony on behalf of the Indiana Department of Correction today as to the subject matter of that topic?

A. Yes.

Q. And then for Topic No. 5, which you've been designated, that relates to the Indiana Department of Correction's Prisoner Firefighter Program and/or system in effect at Indiana State Prison between January 1st, 2015, and December 31st, 2017, including obtaining, maintaining, repairing and replacing equipment, designing prisoner firefighter training and/or certification, selecting and training the prisoner firefighters and any IDOC policies, practices, customs, rules, regulations and/or

USDC IN/ND case 3:18-cv-00995-JD   document 212-38   filed 05/25/21   page 6 of 32

Page 13

systems in effect during this time for activating the prisoner firefighters during an emergency, enabling them to physically respond, and obtaining reports or feedback from the prisoner firefighters following an emergency. Are we on the same page about that topic?

A. Yes.

Q. Are you prepared to give binding testimony today on behalf of the Indiana Department of Correction as to the subject matter of that topic?

A. Yes.

Q. Turning to Topic 9 -- and Topics 9 and 10, again, as I noted earlier, were topics that we had discussed earlier today with Mr. Lintz, and he indicated that there were aspects of these topics that you would be in a better position to speak to. So with the agreement that was noted earlier on the record as to supplementally designating you to speak to these topics, Topic 9 relates to the Indiana Department of Correction's policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison from January 1st, 2015, through the present relating to reviewing or

Page 14

auditing the emergency response policies, systems, infrastructure, plans or programs, including the number and substance of reviews or audits, including any conclusions reached or corrective action plans imposed as a result. Are we on the same page about that topic?

A. Yes.

MS. EARLS: I'll add an objection that the scope of the Topics 9 and 10 are limited to what Mr. Dudley could not -- or I'm sorry, Mr. Lintz could not answer in his capacity specifically related to items such as sprinkler systems, etc., but to which Mr. Dudley has knowledge, he can answer.

MR. HEPPELL:

Q. And then with that understanding from your counsel, are you prepared to give binding testimony on behalf of the Department of Correction as to that topic within the areas that are appropriately within your scope of expertise and knowledge?

A. Yes.

Q. And finally, again, taking that same representation from your counsel as to Topic No. 10, which relates to the Indiana Department

Page 15

of Correction's policies, practices, customs, rules, regulations and/or systems in effect at Indiana State Prison from April 2010 through the present relating to reviewing or auditing fire safety policies, systems, infrastructure, plans or programs, including the number and substance of reviews or audits, including any conclusions reached or corrective action plans imposed as a result. Are we on the same page regarding that topic?

MS. EARLS: One point of objection. One point of clarification. Counsel just said April 2010. Again, we've limited the scope to the three-year time span of January 1st, 2015, to December 31st, 2017. And the second objection holds the same as for 9 as it does for 10, that Mr. Dudley can testify to his knowledge over specific areas that Mr. Lintz did not have knowledge.

MR. HEPPELL: Thank you for correcting me as to the date range. It's a surprisingly difficult task to read a paragraph and remember to substitute specific sections, although you would think I would have gotten the hang of it by now.

Page 16

Q. So with that correction on the date range, Mr. Dudley, are you prepared to give binding testimony on behalf of the Department of Correction as to that topic within your area of authority and expertise?

A. Yes.

Q. Okay. I'm going to pull that document down for now, but if you want to refer back to it at any point, Mr. Dudley, let me know, and I can pull that back up.

A. Okay.

Q. Mr. Dudley, I'm going to premise these next few questions by letting you know that I don't want you to tell me anything about the contents of any communication that you may have had with your attorney. Okay?

A. Okay.

Q. Have you met with anyone or spoke with anyone to prepare for your deposition today?

A. Yes.

Q. Who have you spoken with on that list to prepare for your deposition?

A. Ms. Earls.

Q. Okay. Ms. Earls is the attorney from the A.G.'s office representing you; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.                    Cause No. 3:18-cv-00995-JD-MGG                    CHARLES WAYNE DUDLEY
                                                                                      September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-38   filed 05/25/21   page 7 of 32

Page 17

A. That's correct.

Q. Again, without touching on the substance of your communications with her, what was the -- what was the format of your communication with Ms. Earls? Was it in writing or in person or by video communication, anything like that?

MS. EARLS: Objection in so much as it calls for attorney-client privilege, but Mr. Dudley can answer to his knowledge.

THE WITNESS: Video.

MR. HEPPELL:

Q. Did you have multiple video communications or just one meeting?

A. Just one.

Q. And approximately, how long was that video communication?

A. 30 minutes.

Q. Aside from that approximately 30-minute video communication with your attorney, have you met with or spoken with anyone else to prepare for your deposition today?

A. No.

Q. Have you reviewed any documents to prepare for your deposition today?

A. Just training records of the firefighters.

Page 18

Q. Okay. And specifically, what firefighter training records did you review to prepare for your deposition today?

A. I went over what their certification was, their outlines for the training and what training they had completed.

Q. Other than those training records relating to the prisoner firefighters, were there any other documents that you reviewed in preparation for your deposition today?

A. No.

Q. What are the written policies that set out fire response procedures and practices that were in effect at Indiana State Prison between January 1st, 2015, and December 31st, 2017?

A. Specifically what are you talking about? Response?

Q. Well, yes, so let me clarify my question.
What are the written policies that provided direction to correctional officers in terms of how correctional officers were to respond in the event of a fire at Indiana State Prison?

A. That is policies that are set out by the facilities themselves. Each facility is

Page 19

different and unique depending on what they have. We do not dictate the policies of the facility on their response.

Q. So is it your testimony that there are no written policies prescribed by IDOC related to how -- related to how staff at a prison facility -- at ISP were required to respond in the event of a fire?

A. No. They have their own policies. Each facility has their own policies that are supposed to be followed by the staff, so there are policies.

Q. Okay. And are you -- are you prepared to give testimony as to the policies that were in effect at Indiana State Prison during the designated time period related to fire response and fire -- fire response by staff at the prison?

MS. EARLS: Objection insomuch as it calls for speculation. Mr. Dudley can answer to the best of his knowledge.

THE WITNESS: I don't review their policies for each facility on their response. That is followed by the Life Safety Handbook for DOC, but each facility does have their own policies.

Page 20

MR. HEPPELL: Okay. Can we go off the record for a second?

(OFF THE RECORD.)

MR. HEPPELL:

Q. We'll go back on the record.
Mr. Dudley, are you familiar with an Emergency Manual as a document that is promulgated by the Indiana Department of Correction?

A. What was the title of that?

Q. Emergency Manual.

A. I'm not familiar with that title.

Q. Okay.

A. There's an Emergency Response Manual.

Q. What is the Emergency Response Manual?

A. That is under -- that deals with the E-squads, CERT and other emergency units.

Q. Is there an aspect or appendage to that manual that deals with fire safety and fire response?

A. Not -- the fire departments don't fall under that.

Q. Well, when you say the fire departments don't fall under that, you're referring to the prisoner firefighters; is that correct?

A. No. The fire departments do not fall under the

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-38   filed 05/25/21   page 8 of 32

Page 21

Emergency Response Manual.

Q. Right. And just so I'm clear, when you say the fire departments, are you referring to the prisoner fire departments, or are you referring to something else?

A. All fire departments in DOC.

Q. Well, I'm specifically --

A. All fire departments of DOC. We have -- okay.

Q. Go ahead.

A. We have four fire departments. It deals with all four. All four of those do not fall under emergency response.

Q. Well, specifically as it relates to Indiana State Prison, what is the fire department that you're referring to in relation to Indiana State Prison?

A. Indiana State Prison Fire Department. It is the prisoner-based fire department.

Q. Okay. And so when you use the phrase "fire department" as it relates to Indiana State Prison, you're referring to that prisoner fire department?

A. Yes.

Q. Okay. And it's your testimony that the prisoner firefighters at Indiana State Prison do not fall

Page 22

under the scope of the Emergency Manual -- the Emergency Response Manual?

A. They don't.

Q. But in terms of correctional staff at the facility, correctional staff are required to follow the procedures set forth in the Emergency Response Manual; is that correct?

A. Yes.

Q. And that includes the procedures that are set forth in that Emergency Response Manual in terms of fire safety and fire response; is that correct?

A. The manual -- the Emergency Response Manual does not deal with fire. It just deals with the response of E-squads, canine, that type of stuff of operations. The fire department falls under -- the response for fire is under their post orders and their policies and procedures for the facility itself.

Q. Turning to the Prisoner Firefighter Program at Indiana State Prison, can you describe what the purpose of that department is or the purpose of that program?

A. To provide fire protection -- initial fire protection for inside the walls of Michigan City

Page 23

Prison, Indiana State Prison.

Q. And are there written policies that govern how that prisoner fire department is to be managed and utilized?

A. It is managed and utilized under their post orders. When there's called a fire, then they're supposed to be released to fight the fire.

Q. And at the facility level, who is responsible for supervising and managing the prisoner firefighters in the Prisoner Firefighter Program?

A. They fall under the Safety Hazard Manager.

Q. And you testified that when there is a fire, they are supposed to be released to fight the fire. Is that policy in effect any time there is a fire that is observed at the prison?

A. I don't know. They supposed to be -- they don't release them if there's just a small trash can fire and they put it out, no.

Q. What is the source of that policy? Is that a written policy or unwritten policy that dictates the scope of under what circumstances the prisoner firefighters are released?

A. That would -- I believe it's under one of their

Page 24

post orders.

Q. Okay. As the Director of Fire Risk Management for DOC, you're responsible for providing the training to the prisoner firefighters; is that correct?

A. Yes.

Q. Can you describe the training and certification that the prisoner firefighters receive?

A. The prisoner firefighters are -- have received all of the certifications, national and state certifications required to be structural firefighters in the State of Indiana. NFPA 101, National Fire Protection Association Standard 101 and Firefighter 1 and 2. NFPA 472, 473 for hazardous material response. That's awareness and operations level. And NFPA 1006, technical rescue awareness. This is the same training standards that the outside firefighters receive in Indiana, paid and volunteers.

Q. So if I understood the testimony that you just gave, someone who's gone through the training to become a member of the Prisoner Firefighters Squad at ISP has the same level of certification that a firefighter would have out in the community; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 9 of 32

Page 25

A. That is correct.

Q. Okay. How are -- well, strike that.
How many hours of initial training are there that a member of the Prisoner Firefighters Squad has to go through before they are able to serve in that capacity?

A. They go through an apprentice program at the facility to get on the fire department before they're allowed to do the tryouts for the fire department to see if they can make it. But the first training is about 80 hours, the mandatory two-week program, and that receives the mandatory firefighting skills to start building on their Firefighter 1 and 2 certifications.

Q. Okay. So that first training that you just described, that's 80 hours of mandatory training. And after they receive that training, are they eligible to serve as a prisoner firefighter at the facility?

A. Yes.

Q. And is there -- in addition to that initial mandatory training, is there ongoing annual or other periodic training required for them to stay certified as an active member of the fire department?

Page 26

A. They do weekly trainings at the facility along with our ongoing training for the firefighters to bring them up to their Firefighter 1 and 2 certs, the ones that don't have it, as they come on.

Q. Okay. How were the members of the Prisoner Firefighters Squad selected?

A. They are to fill out an application, and the Safety Hazard Manager, I believe the lead Captain and Major go over them, along with classifications, to select people for the position. And then they have to go through an agility test in order to do the physical agility test.

Q. And what are the criteria that are used to determine whether someone is a suitable candidate to be able to join the Prisoner Firefighters Squad?

A. That is up to the facility.

Q. As the -- strike that.
So there are no DOC policies around certain criteria that prisoner firefighters have to meet in order to be eligible to join the squad?

A. I don't know what the local -- at the facility

Page 27

level, if there's a policy or not for that.

Q. Is it fair to say that in order to serve as a firefighter, that's a position of significant trust and responsibility?

A. Yes.

Q. And in your capacity training the prisoner firefighters, you would only move forward with maintaining someone on the Prisoner Firefighter Squad who was able to discharge the job with, you know, accepting that significant role of trust and responsibility?

A. Could you repeat that.

Q. Sure. Well, let me ask it a different way.
If you had any concerns about any individual firefighter's ability to discharge the responsibilities of a firefighter with the level of trust and responsibility required to do so, would you have the ability to have that person removed from the squad or have those concerns addressed?

A. I could have those concerns addressed at the facility level.

Q. Did you have any concerns regarding the abilities of any members of the Prisoner Firefighters Squad that were in place at Indiana

Page 28

State Prison from 2015 to 2017? Any concerns with their abilities to discharge their job duties in a way that was commensurate with the trust and responsibility placed in them?

MS. EARLS: Objection insomuch as it calls for a factual conclusion. Mr. Dudley is here testifying in a 30(b)(6) capacity on behalf of DOC, but he may answer to the best of his knowledge.

THE WITNESS: I didn't start in the position until July of 2016. So from then on, I have not had any problems with any of the buildings -- with any firefighters that I've had in training at the facility.

MR. HEPPELL:

Q. When you testified to the weekly trainings that were conducted by the Prisoner Firefighters Squad, what did those weekly trainings consist of?

A. There are sign-up sheets. They do their ongoing SCVAs, firehose, fire streams, water supply, ventilation, all skills. They just do a different skill each week.

Q. And is that pursuant to state or federal certification requirements to maintain their

DENISE DWYER, et al. v.
RON NEAL, et al.                     Cause No. 3:18-cv-00995-JD-MGG                     CHARLES WAYNE DUDLEY
September 24, 2020

Page 29

certification, or is that over and above the minimum requirements to maintain their certification?

A. That is over and above. The State of Indiana does not require any ongoing training once they receive their certifications.

Q. So according to the State of Indiana, they could be certified to act as a firefighter indefinitely once they complete that mandatory 80-hour initial training; is that correct?

A. That's true, but you have to be a Firefighter 1 and 2 to move on.

Q. Okay. And can you explain what you mean by that?

A. Firefighter 1 and 2 or --

Q. Yeah.

A. To be able to be a -- to move up to do additional training, they have to receive their Firefighter 1 and then their Firefighter 2 to get any training above that level.

Q. Okay.

A. But that is the level that a firefighter in Indiana -- the top level is a Firefighter 2.

Q. Is every active member of the Indiana State Prison Prisoner Firefighter Squad certified at

Page 30

the Firefighter 1 and Firefighter 2 level?

A. Not at this time. The new ones have not been.

Q. Okay. So the new members of the squad, is that -- well, strike that.
    Is that what you referred to earlier as the apprenticeship portion of their training?

A. The apprenticeship starts them off, and then once they get on there, it's like on the outside firefighter department you have people retiring or moving on, so you don't have the same people. So you have to do ongoing training to bring them -- to keep those people up -- get those up to the certifications.

Q. Is a prisoner firefighter who's -- well, so strike that.
    So if I understood what you just testified to, but correct me if I misunderstood, a prisoner can be working towards that Firefighter 1 and Firefighter 2 certification. They may not yet have obtained it, but they're working towards it, and they would still be considered a member of that Prisoner Firefighters Squad?

A. Yes.

Q. Okay. Are those individuals who are in that

Page 31

circumstance, working towards their certification, are they authorized to respond to a fire emergency at the prison?

A. They're -- once they have their mandatory, they can respond to do inside, but until they have got their mandatory, they can only do outside operations.

Q. And can you --

A. Which consists of dragging hoses and hooking to the hydrant and that kind of stuff, changing air packs.

Q. So when you say mandatory, what do you mean by that?

A. That was the first 40 hours they have once they get out of the apprenticeship.

Q. Okay. So it's a total of 80 hours, and that first 40 hours is required to be considered completing their apprenticeship?

A. No. I'm sorry. It's 80 hours mandatory. The apprenticeship is before that.

Q. Okay. So until they've completed that 80 hours, they can assist outside of a physical structure, as you were suggesting. They can help drag hoses or provide assistance to other members of the squad, but they can't go into a building and

Page 32

actually fight a fire themselves?

A. That's true.

Q. Okay. Is there additional certifications or training that is available to members of the prisoner firefighter crew beyond that mandatory Firefighter 1 and Firefighter 2 certification?

A. Yes, the hazardous materials awareness and operations and also the technical rescue awareness. That is all part of the state to receive their 1 and 2. They have to have the two haz-mats and the technical rescue to get their Firefighter 1 and 2.

Q. Okay. So that's part of the mandatory training that is required by the state?

A. The mandatory -- there's different -- mandatory is just to allow them to get to be able to respond to a fire. That is the first step of building onto their certifications.

Q. Okay. And I'm sorry if I'm missing you, but I just want to make sure I understand it. So you had made reference to Firefighter 1 and Firefighter 2 certifications; correct?

A. Yes.

Q. And those are levels of certification set by the State of Indiana; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 11 of 32

Page 33

A. Yes.

Q. And are those different from and/or sort of more advanced than the mandatory certification that you had been testifying to?

A. Yes.

Q. Okay.

A. Mandatory is the stepping stone to start with.

Q. Okay. So someone can -- and does the mandatory have a title, or is it just the mandatory certification?

A. Mandatory firefighter, yes.

Q. Okay. So mandatory firefighter would be sort of the lowest level you could meet in order to be permitted to respond to a fire?

A. Yes.

Q. And if you were working towards that level but had not reached that mandatory level, you could assist with dragging hoses and equipment but couldn't actually fight the fire; correct?

A. Yes.

Q. And then once you had completed the mandatory level, Firefighter 1 and Firefighter 2 are levels of training and certification beyond that; correct?

A. Yes, 1 and 2 is beyond that.

Page 34

Q. So how many hours of training is required to hit the mandatory level?

A. Mandatory was 80 hours.

Q. Okay. And so then how many hours for Firefighter 1 on top -- in addition to the 80 hours to hit mandatory?

A. That's around 100 to 120 hours.

Q. And then Firefighter 2 is additional, on top of that?

A. Yes.

Q. Okay. And approximately how many hours on top of Firefighter 1 does it take to reach Firefighter 2?

A. 80 to 100 hours.

Q. Okay. So you're talking ballpark somewhere in the range of 300 hours of training to hit that Firefighter 2 level when you're combining mandatory Firefighter 1 and Firefighter 2?

A. And you still have to add in the hazardous material classes, which is another 40 hours, and the technical rescue is another 16.

Q. Those are additional hours of training outside of what you were just describing that are required to get up to that Firefighter 2 level?

A. Yes.

Page 35

Q. Okay. So somewhere in excess of 350 hours of training for someone to hit that Firefighter 2?

A. In that area, yes.

Q. Okay. And is it the -- is it a requirement that all of the prisoners on the firefighter squad work towards and eventually obtain that Firefighter 2 training or certification?

A. Yes. That's the way it is on all fire departments, yes.

Q. Okay. So you can start fighting fires once you hit the mandatory, but you need to be taking the training and working towards the certification up to the level of Firefighter 2?

A. Yes.

Q. Is it fair to say that's a significant number of hours of training that the firefighter squad has that's in excess of what a line level correctional officer is required to have in terms of hours of fire training?

A. Yes.

Q. The Prisoner Firefighter Squad has a designated Fire Chief and an Assistant Chief; is that correct?

A. That is correct.

Q. And those are leadership positions that

Page 36

prisoners hold within that squad; correct?

A. Yes.

Q. Do -- are there other leadership positions other than Fire Chief and Assistant Fire Chief?

A. Yes.

Q. What are those positions?

A. Captain and lieutenant.

Q. Approximately how many captains are there on the firefighter squad?

A. One or two captains, and I think a few lieutenants.

Q. And then the Chief and Assistant Chief positions are above those positions?

A. Yes. The captains are below. It's Chief, Assistant Chief, captain, lieutenant and then firefighters.

Q. In terms of the leadership structure, chain of command?

A. Yes.

Q. Are there additional mandatory certifications that are required for a prisoner firefighter at Indiana State Prison to attain one of those leadership positions?

A. No.

Q. How are the leadership -- how are the

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020

USDC NNND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 12 of 32

Page 37

firefighters selected for those leadership positions?

A. That is at the facility level again, from their ability to do the job and their leadership and their ability to perform the job and task there at hand.

Q. Are there additional certifications that members of the Prisoners Firefighters Squad can obtain beyond the Firefighter 2 certification? And I think the additional couple of topic areas you testified to that were required as part of that. I believe you said hazardous materials and another topic area. But are there additional certifications that members of the Prisoner Firefighters Squad can attain beyond that mandatory -- beyond those required levels?

A. There can be after we get -- there are more advanced classes.

Q. Is it fair to say that it's not a requirement for members of the Prisoner Firefighter Squad to take those advanced classes and obtain certification in them?

A. No, because it's not required outside, in outside fire departments.

Q. Is it fair to say that there are a number of

Page 38

prisoner firefighters at any one time at Indiana State Prison who have attained those additional advanced certifications?

A. I don't -- just the Firefighter 1 and 2 and the hazardous material and the technical rescue are the highest ones that they have.

Q. Okay. So there are not additional certifications -- additional advanced certifications that any members of the Prisoner Firefighter Squad have obtained beyond those?

A. No.

MS. EARLS: Objection insomuch as it calls for speculation, but Mr. Dudley can answer.

THE WITNESS: The only one, some of them do have the National Incident Management System, NIMS. I believe they have -- a few of them have 700 and 800, which is a FEMA or Homeland Security class.

MR. HEPPELL:

Q. And there's a number of individuals on the squad who have that additional advanced training?

A. Yes.

Q. And what does that additional training consist of?

Page 39

A. It deals with the incident command system.

Q. Approximately how many hours is that additional advanced training?

A. Well, they probably have 10 to 15 hours in it, maybe 20 on -- for both classes.

Q. Prior to you obtaining the role of Director of Fire Risk Management, I think you testified, in 2016, what position did you hold prior to that?

A. I was a Senior Code Enforcement with the Deputy State Fire Marshal with the Indiana Department of Homeland Security.

Q. In your capacity as the -- well, strike that. What review processes are in place to ensure that the fire response policies and fire response procedures at Indiana State Prison are sufficient -- or were sufficient during the designated time period?

A. I don't understand. Could you repeat that again. I didn't quite understand that.

Q. Sure. What policies were in place to review the sufficiency of the fire response policies and practices at Indiana State Prison during the designated time period?

A. I don't know. That is at the facility level.

Q. Okay. So is that something that is left to the

Page 40

warden to determine to ensure that the fire response policies at the prison are adequate and sufficient?

A. That is throughout DOC. All DOC are expected to respond and do their duties and review the policies that they are responsible for. I don't know who -- I don't know who is responsible for it at that facility.

Q. So your testimony just now is relating to every officer within the Indiana Department of Correction from a line level officer all the way up to leadership has that ongoing responsibility to ensure fire safety in the prison. Is that what you're referring to?

A. Yes. It's part of their -- everybody's job is safety, and they do the fire extinguishers and participate in fire drills.

Q. In terms of reviewing the procedures that are in place at the prison, is there any review process to ensure that the fire drills at the prison are being conducted appropriately?

A. Yes.

Q. And who -- can you describe that review process?

A. We do an annual audit of each facility, and their paperwork is part of it, and we go through

USDC NND, case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 13 of 32

Page 41

their fire drills to make sure the fire drills are completed when they're supposed to be and are up to date.

Q. And does that review consist of a substantive review of how effective or how successful the staff were at conducting the fire drill, or is that limited to just verifying that drills were held on the -- you know, within the duration required by the code?

A. We look at the drills, the notes. They have times for evacuations. We check their times. We check to see if there's any problems that was noted by the person doing the fire drills.

Q. And what were the results of those reviews of fire drills at Indiana State Prison during the designated time period?

A. The ones that I was involved in, there was no notable problems with it.

Q. Can you describe what documentation specifically was reviewed by -- as part of that review process?

A. For the fire drills?

Q. Correct.

A. Okay. The fire drill paperwork is who was doing it, what -- the date, time, weather, shift,

Page 42

number of staff, number of offenders, you know, the time it took to evacuate the building, and if there were any problems, if there were any problems that needed to be taken care of through the facility.

Q. And if there were issues noted during that review process, whose responsibility -- well, strike that.

If there were issues noted during that review process, what would -- what does IDOC policy require to happen?

A. We just write -- we would write a violation and go back and try to help them solve the problem whether -- you know, if it was a -- just a misunderstanding or a policy.

Q. When you say, "write a violation," can you explain what you mean by that?

A. We do violations if they fail on a fire code, or OSHA or Board of Health would do an encompassing annual inspection.

Q. And is that part of this overall annual inspection that includes physical infrastructure of the prison, all that? That's part of that annual inspection report?

A. Yes.

Page 43

Q. And whose responsibility is it during those annual reviews to provide copies of the fire drill documentation for the IDOC inspectors to review?

A. It falls under the Safety Hazard Manager.

Q. And you rely on the Safety Hazard Manager to provide you with the relevant documentation and to, you know, provide you with candid accurate information about how the fire drills are going at the prison; is that fair to say?

A. Yes.

Q. And in conducting that outside review, that annual review, your ability to conduct that review in terms of fire drills is limited to what information you're provided; is that fair to say?

A. Yes.

Q. And is that -- just so I understand, is it -- during that review, is it every single piece of documentation related to a fire drill that would be reviewed during the course of that annual review?

A. Yes.

Q. Okay. And any issues noted in any of those fire drills would be reflected in the -- in that

Page 44

annual review statement of deficiencies and plan of correction; is that fair to say?

A. Yes.

MR. HEPPELL: Can we take a 10-minute break, go off the record and come back at quarter after the hour?

MR. ROSE: Yes, sounds good.

MR. HEPPELL: Okay. I'm going to pause the recording, and we'll come back at 1:15 Central, 2:15 Eastern.

(A BRIEF RECESS WAS HAD.)

MR. HEPPELL:

Q. Okay. And I'm actually going to email a number of exhibits, as I did earlier, to the two of you, and then I'll share-screen those with the witness. I may not make all of these exhibits formally in the deposition, but I may refer to them. So let me send this by email now, which I now realize I could and should have done before I went back on the record to avoid this awkward silence, but so it goes.

I'll start off by sending these first two, and then I can send additional ones as well.

Mr. Dudley, before we took our break

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC NNND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 14 of 32

Page 45

earlier, you had offered some testimony around the review process for reviewing the fire drills conducted at Indiana State Prison, and you talked about the records that would be reviewed and the format of the document that would be generated as part of that annual review process. Do you recall discussing those topics earlier?

A. Yes.

Q. Okay. I'm going to pull up an exhibit, if my computer would cooperate, which is hopefully on its way by email to counsel as well. We'll mark it as Exhibit 2. And bear with me just one moment here while I pull up that exhibit.

I'm showing you a document that is a two-page document, Bates-stamped DEVINE 13302 to 13303, and it's a two-page document. First page titled, "Indiana Department of Correction Fire Evacuation Drills." It's a form that's filled out. And then the second page is titled, "Fire Drill Questions."

Are you able to see the document that I have pulled up on the screen?

A. Yes.

Q. Okay. And is this the type of document that you were referring to earlier in terms of the

Page 46

documentation of fire drills that would be reviewed as part of the annual review process?

A. Yes.

Q. And looking at the second page of the document towards the bottom, I can zoom in if that will be helpful for you to review, but this reflects -- this appears to reflect a fire drill conducted in D cell house; is that correct?

A. Yes.

Q. And the date of the fire drill reflects April 27th, 2017; is that correct?

A. It looks like '17, yes.

Q. Okay. And the score reflected was poor, and then there's a handwritten notation that says, "Officer Rodriguez doesn't know anything." You see what I'm referring to?

A. I see that.

Q. In terms of the annual review process, is this something that should be noted in the review of the fire drills conducted at the prison?

A. They should review what they didn't know --

Q. Okay.

A. -- on the questions.

Q. Sorry. Can you explain what you mean by that?

A. They should list individual questions, what they

Page 47

didn't know, not just generalize that they didn't know anything.

Q. So you're identifying what you see as an issue with how this fire drill has been documented; is that fair to say?

A. Yes, this is a mock fire drill.

Q. Okay. And when you say that this is a mock fire drill, can you explain what you mean by that?

A. This is one where they do not evacuate the cell house. And it's done per the officers.

Q. And is there a requirement that's in effect at Indiana State Prison during the designated time period that there actually be real evacuation drills as opposed to mock fire drills?

A. If they're during a lockdown, when the facility is locked down, they do mock drills. If this is a secured housing unit, they do mock drills. They do not release the prisoners in the secured housing units.

Q. Then during a prison lockdown or for a secured housing unit, are there any other circumstances in which it would be appropriate to conduct a mock drill or simulated drill as opposed to an actual evacuation?

A. Well, this year we've decided COVID has come up

Page 48

in some facilities.

Q. Sure. Fair to say that it would not be appropriate to consistently fail to hold full evacuation drills as opposed to mock drills on a nonsecured housing unit for a particular shift outside of prison lockdowns or other unusual extenuating circumstances such as Covid?

A. Yes, they should -- they can do those.

Q. When you say they can do those, they are supposed to do those; correct? They are supposed to do actual evacuation drills?

A. Yes.

Q. And there's a limited number of circumstances that you had identified in which it was appropriate and permissible to forego the evacuation drills?

A. There's also security concerns that can be brought up by the facility itself, warden, major, or the deputy wardens.

Q. And what -- were there any such concerns in effect during the designated time period at Indiana State Prison that were limiting the ways in which fire drills were being operated?

A. I would -- I'm not -- I don't have any information on that.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 15 of 32

Page 49

Q. Okay.

A. I was not there.

Q. And in addition to not being there, you haven't prepared yourself today to be able to testify as to that aspect of the prison policies related to fire safety, fire response at Indiana State Prison; is that correct?

        MS. EARLS: Objection. That's a mischaracterization of what Mr. Dudley said. Mr. Dudley is here to testify on the Department of Correction procedures and policies, not to his specific knowledge as a factual witness, but he may answer to the best of his ability.

        MR. HEPPELL:

Q. You can go ahead.

A. Well, now, I -- could you repeat that.

Q. I'll withdraw the question. And you know, I do want to make -- I do want to get through, you know, substantive topics with Mr. Dudley. I think we do have a disagreement around what the appropriate scope of the 30(b)(6) notice is, and I'm going to put that on the record and have some questions related to that later, but I do want to keep going on the substantive topics

Page 50

now, and I can get to that issue, and we can put on the record whatever we want to put on the record, me too, and then also address it between counsel offline as well. But I will keep going now on the substantive matters.

        Mr. Dudley, the record that I'm showing you, Exhibit 2, Bates-stamped DEVINE 133033, if I understood your testimony, you had testified that there was a -- that this reflected a deficiency in the recordkeeping, specifically that it's not possible to tell from the face of this record of the fire drill what the issues were with Officer Rodriguez's lack of knowledge; is that fair to say?

A. Yes.

Q. Okay. In addition to that recordkeeping deficiency, would you agree with me that this also reveals some level of substantive deficiency in terms of correctional officers should have the knowledge they need to successfully complete the fire drill; is that fair to say?

A. Yes.

Q. Okay. But because of the recordkeeping deficiency, it's not possible to tell more

Page 51

details around what exactly the issue was with Officer Rodriguez; fair to say?

A. That's fair to say, yes.

Q. Okay. In terms of the fire -- strike that.
        In terms of the ongoing review at Indiana State Prison to ensure that the prison's fire response policies and procedures and the staff's ability to follow those policies and procedures is adequate, something should have been done in response to this fire drill; is that fair to say?

        MR. ROSE: Objection to the question. Calls for a legal conclusion as compound and vague.

        MS. EARLS: And nonparty counsel joins that same objection, but Mr. Dudley can answer to the best of his knowledge.

        THE WITNESS: Could you repeat that again.

        MR. HEPPELL: Sure. Madam court reporter, to the extent you have a good record of my question, would you be able to read my question back?

        (RECORD READ BACK AS REQUESTED.)

        THE WITNESS: Yes, there should have

Page 52

been some training done with the officers.

        MR. HEPPELL:

Q. With Officer Rodriguez; correct?

A. Yes.

Q. And it would not be appropriate to take no action in response to seeing a record like this; is that fair to say?

A. I'm sorry. I didn't understand that. Could you repeat that.

Q. It would be not be appropriate for staff at the prison -- well, strike that.
        Who at Indiana State Prison had the responsibility for reviewing on an ongoing basis fire drill records and ensuring that appropriate actions were taken in response?

A. That would have been the Safety Hazard Manager.

Q. And it would not have been appropriate for the Safety Hazard Manager to take no remedial steps in response to a record like this; is that fair?

        MS. EARLS: Objection --

        MR. ROSE: Go ahead, Kelly.

        MS. EARLS: Objection insomuch as it calls for speculation and a legal conclusion.

        MR. ROSE: Join in that objection.

Page 53

MR. HEPPELL:

Q. You can go ahead, Mr. Dudley.

A. Could you repeat that again.

Q. Sure. It would've been inappropriate for the Safety Hazard Manager to take no steps in response to a fire drill as documented with the deficiencies documented in the record in Exhibit 2; is that correct?

A. I would say correct. Training of the officer should have been done.

Q. I understood your testimony earlier, as part of the annual review process, this record would have been reviewed; is that correct?

A. Yes.

Q. And is this type of deficiency -- well, strike that.

What -- according to the IDOC policy during the annual review process, what conversation or action should have been taken in response to a record like this one?

A. Just a recommendation that there should be more ongoing training with the staff.

Q. And is that something that would be reflected in the annual report?

A. Not necessarily.

Page 54

Q. Is that -- why do you say that?

A. A lot of times that can be done with the Safety Hazard Manager or their designee when they're doing their training. We would make note that there should be some training done on the fire drills.

Q. And --

A. It's not a test. It's a learning document. If they don't understand or don't know what they're supposed to do, training along with coaching them to help them understand what it is.

Q. Okay. And so if that -- would that be documented anywhere in connection with the annual review process that there were deficiencies like this identified?

A. Not like this one.

Q. So fair to say that looking at the annual review documents, it's not possible to tell whether a fire drill record like this was reviewed as part of that annual review and addressed with the Safety Hazard Manager or whether the topic was not discussed at all; is that fair to say?

MS. EARLS: Objection insomuch as it calls for speculation, but Mr. Dudley may answer.

Page 55

THE WITNESS: I don't really understand that question. Could you repeat it again.

MR. HEPPELL:

Q. Sure. Let me back up a little bit and make sure I understood your earlier testimony correctly.

If I understand your earlier testimony, you testified that as part of that annual review process, records of the fire drills would be reviewed in addition to the physical inspection of the prison and other aspects of that annual review; is that correct?

A. Yes.

Q. And I also had understood your earlier testimony to be that any deficiencies that were revealed during the annual review process would be noted in the report that was generated as a result of the annual review; is that correct?

A. Yes. Most of that is done from Page 1 of this document, not Page 2.

Q. Okay. So turning to Page 1 of this document, it's your testimony that the annual review process would not consider the fact that Officer Rodriguez in this example or another officer in another hypothetical example was deemed to have performed poorly and not to have known anything,

Page 56

that's not something that would be covered by the annual review?

A. That is more of a local, the facilities. Ours is to make sure they're doing the fire drill, they're being done in a timely manner, their evacuation times are there, you know, make sure that all the documentation for this part of the document, this is what is required by the State of Indiana and the Fire Marshal's office. This is the documentation we look at and can write the violation on.

The verbal testing of it falls under the facility to make sure that their staff is trained more than it is for us to write a violation for Officer Rodriguez. It would be the Safety Hazard Manager's responsibility to look at them and help them, you know, get through the fire drill to understand what their jobs are.

Q. We're having issues.

A. Yeah, you're very garbled. I can't understand you.

Q. Can you hear me okay now?

A. Yes. Go ahead.

Q. Okay. If there were systemic issues revealed,

USDC NND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 17 of 32

Page 57

not just with one officer but with the pattern of officers who have had similar results as documented in this example, is that also something that would not be covered in the annual review but would be the responsibility of the Safety Hazard officer at the prison to address?

A. Yes.

Q. And so in terms of the annual review process, it's your testimony just that that first side of the document would be considered?

A. Yes.

Q. First page. Okay.
And you testified that this was a simulated or mock drill and that there was no actual evacuation completed; is that fair to say?

A. Yes.

Q. So in terms of the annual review process, there's nothing really to evaluate with this other than that they asked all the questions or they held that verbal drill; correct?

A. The verbal drill, yes. If it was a regular drill, we would like at the time evacuated also.

Q. But given that there is no time evacuated here

Page 58

and the substance of this, you know, successful ability to answer the questions is not evaluated, other than the piece of paper was generated, there's not a lot that's actually evaluated during the annual review; fair to say?

A. Yes.

Q. And I'll take that document down for now.
Other than reviewing the fire drill records, did the annual review -- strike that.
Other than the fire drill records, in terms of the annual review of fire safety at the prison, what else did that consist of?

A. The documentation are you talking about, or are you talking about the whole --

Q. Yeah, the actual review. In terms of fire safety at the prison, what does that review consist of?

A. We do a total walk-through of the facility looking at fire safety, evacuation, exiting, storage, and then we look at all the fire alarm records, sprinkler records, hood systems. Then the physical plant group looks through the water softener, the gen -- or the emergency generator, maintenance log, filters, that type of stuff, anything to deal with the physical plant. And

Page 59

then they also deal with the Board of Health part of it. They look at the Board of Health, the OSHA documentation.

Q. Is there any part of the annual review process that --

A. You're -- I can't understand you.

Q. Is there any part of the annual review process that involves soliciting information from line level correctional staff or from the prisoner population about issues related to fire safety?

A. There -- we can ask -- a lot of times they'll ask the officer questions about the fire safety or fire evacuation or something related to fire safety to see if they know what -- know the answers.

Q. Is that documented anywhere in the annual review documentation?

A. That is. If we ask a question and they seem to not have a clue what's going on, then we document that there needs to be more training on fire evacuation and fire drill plans.

Q. Is that a standard aspect of every review, or is that left to the discretion of the individual conducting the annual review?

A. That's the discretion of each individual

Page 60

inspector as you're there.

Q. Would that be documented in any way if it was successfully done, like if the -- if officers were quizzed and were able to answer the questions appropriately?

A. No.

Q. Okay. So from looking at the face of the written documentation, it's not possible to tell whether the questions were asked and answered appropriately or whether the questions were not asked at all; is that fair to say?

A. Yes.

Q. Okay. Is there any -- in terms of the annual review process, is it fair to say that that focuses on determining whether the fire equipment and fire infrastructure at the facility requires with the requirements of the code?

A. Yes.

Q. Is there any review process that evaluates whether improvements are advisable or necessary to improve fire safety at the prison beyond the minimum requirements of the code?

A. No.

Q. Is that something that is the warden's

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 18 of 32

Page 61

responsibility to be determining whether those sorts of additional systems or policies are necessary or advisable to improve fire safety at the prison over and above the minimum code requirements?

MS. EARLS: Objection to --

MR. ROSE: Go ahead, Kelly.

MS. EARLS: Objection insomuch as it calls for a legal speculation or a legal conclusion, but Mr. Dudley may answer.

MR. ROSE: I would join in the objection but also add to the extent that the question is compound.

THE WITNESS: Yeah, we only deal with the code. We can't enforce anything above the code. The code is the minimum requirements.

MR. HEPPELL:

Q. There's nothing -- there's no IDOC rule or policy that prevents a warden from instituting procedures or infrastructure that exceeds the minimum requirements of the code; is that fair to say?

A. I couldn't answer that. I don't think -- not to my knowledge there is.

Page 62

Q. Are sprinklers required at Indiana State Prison as part of the minimum code requirements?

A. Not in -- it depends on when the building was built.

Q. Is there any IDOC rule or policy that dictates that sprinklers can't be installed in buildings where they're not required to based on the code?

A. If they're not required, we can't make -- it's not -- if it's not required by the code.

Q. Sir, can you repeat that answer, please, Mr. Dudley.

A. I said, we're -- as -- if it's not required by the code, you know, there's nothing I can -- or we can do about it, you know, because it meets the minimum standards.

Q. Well, is there any IDOC rule or policy that prevents sprinklers from being installed where they are not required by the code but in a manner that would exceed the code requirements?

A. No.

Q. Okay. You testified earlier in the deposition regarding your lack of knowledge as to certain fire response policies at -- that were in effect at Indiana State Prison, and I think there's a disagreement amongst counsel as to the

Page 63

appropriate scope of the deposition notice, but I do just want to ask a number of questions.

Mr. Dudley, in preparation for your deposition today to serve as a Rule 30(b)(6) designated witness, you did not review any of the post orders related to fire safety or fire response at the prison; is that fair to say?

A. Yes.

Q. And you did not review the emergency manual and specifically Appendix C of the emergency manual which sets forth a fire plan in effect at Indiana State Prison; is that correct?

A. Yeah, that's correct.

Q. And you did not review a Department of Correction facility directive in effect at Indiana State Prison related to fire prevention regulations and practices; is that fair to say?

A. No.

Q. And just -- I probably phrased that question poorly. Your answer is, no, you did not review such a document; correct?

A. No, I did not.

Q. As you sit here right now, you are not prepared to give binding testimony as to the contents and implementation of those various policies or

Page 64

other policies in effect at Indiana State Prison as it relates to fire response procedures; is that correct?

MS. EARLS: I'm going to object as that mischaracterizes what Mr. Dudley says. Mr. Dudley just said he didn't review them in preparation. He didn't say he couldn't answer questions based on that.

MR. HEPPELL:

Q. Mr. Dudley, are you in a position as you sit here today to answer questions about the fire response policies that were in effect at Indiana State Prison during the designated time period?

A. No.

MR. HEPPELL: Okay. And so I want to note, you know, for the record that it's our position that that is within the scope of the 30(b)(6) designation and that we -- to the extent that Mr. Dudley is obviously not able to testify both because he hasn't reviewed and brought himself up to speed on the relevant documents and does not otherwise have knowledge without having reviewed those policies, that we believe that an additional designation needs to be

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 19 of 32

Page 65

made of someone to answer questions within Topic 1 and Topic 5 as it relates to those aspects that Mr. Dudley has not been able to answer.

MS. EARLS: You may so certify, but I would again state Mr. Dudley has stated he can't testify as to ISP policies and procedures for a specific facility. That would fall inside a hearsay. Mr. Dudley can testify as to IDOC's review if such are mandated, but he can't testify as to ISP's policies of a specific facility. That's a hearsay question. You need to ask ISP of their policies and procedures.

MR. HEPPELL: Well, we disagree, I think, as to any applicability of the hearsay issue in the context of policies, but I can ask a few more foundational questions.

Q. Mr. Dudley, you would agree with me that Indiana State Prison is a subsidiary entity of the Indiana Department of Corrections; correct?

A. Yes.

Q. Okay. And the policies in effect at Indiana State Prison are attributable to Indiana

Page 66

Department of Corrections; is that correct?

A. Yes.

Q. And the -- I'm not going to make these exhibits. I can reference them by Bates-stamp. I'm not going to get into the substance of them. I just want to show them to Mr. Dudley.

So for the record, pulling up a document that's Bates-stamped DEVINE 32879 through 32886. Mr. Dudley, you testified earlier regarding post orders. The document that I've shared on the screen with you, is this an example of the post orders that you were referring to earlier?

A. Yes.

Q. Okay. And at the top of this document it reads Indiana Department of Correction Post Orders at the very top page of that document?

A. Yes.

Q. And then under Post-It, it lists BCH specific; correct?

A. Correct.

Q. And you're not in a position today to offer testimony as to fire response procedures contained within this document, the Indiana Department of Correction Post Orders specific to B cell house; is that correct?

Page 67

A. That's correct.

Q. And I'm going to pull that down and show you another document. Again, I'm not going to make it an exhibit because I'm not going to get into the substance of it, but it is Bates-stamped DEVINE 32761 through DEVINE 32777. Sharing that document with you, this is another set of post orders; correct, Mr. Dudley?

A. Yes.

Q. And again, at the top of the document it reads Indiana Department of Correction Post Orders, and then the post is listed as General Post Orders; correct?

A. Yes.

Q. And again, without getting into the details or the substance, but there's -- looking at Page 7 of the document, there are a number of procedures listed, including Section N, emergency situation; Section P, fire; Section Q, evacuation procedures. Do you see generally the sections of those post orders that I'm referring to?

A. Yes.

Q. And it's your testimony today that you're not in a position to offer testimony as to the contents

Page 68

of these post orders as it relates to fire response or any of the other subject matters that we discussed at the outset of your deposition; is that fair to say?

A. Yes.

Q. And again, not making it as an exhibit but just to briefly put it on the record, and I don't believe this document is Bates-stamped or at least the -- oh, no, that's incorrect.

So I have a document Bates-stamped DEVINE production 6011 through 6021, and pulling that up on the screen. And this is -- are you familiar with this type of document, Mr. Dudley?

A. Again, not this one.

Q. Okay. This has the Indiana Department of Correction logo at the top of this document; correct?

A. Yes.

Q. And then it lists Randall Koester, Acting Commissioner, on the top of the document; correct?

A. Yes.

Q. And that's the Acting Commissioner of the Indiana Department of Correction as of 2016; is that correct?

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 20 of 32
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020

Page 69

A. I don't remember when the Commissioner stepped down or retired. It was after '16.

Q. But Koester did serve for a period of time as Acting Commissioner of Indiana Department of Corrections; is that fair to say?

A. Yes.

Q. Again, looking at the title of this document, it reflects, "Emergency Manual, Appendix C, Fire Plan." Do you see what I'm referring to there?

A. Yes.

Q. You're not in a position to offer testimony as to any of the policies or procedures related to fire response contained in this document; is that correct?

A. That's correct.

Q. I'm going to pull that down, and one additional document I want to pull up, which I will do as soon as my computer cooperates, which may be easier said than done.

MR. HEPPELL: I'm sorry. Let's go off the record and take a 3-minute break. Let's go off the record, and I'll come back in a second. Sorry about that.

(OFF THE RECORD.)

Page 70

MR. HEPPELL:

Q. Okay. Sorry about that. Go back on the record.

Showing you one additional document, Bates-stamped 33108 through 33111. Again, not getting into the substance of this document, but this document has -- that's the Indiana Department of Correction logo at the top of the document; correct, Mr. Dudley?

A. Yes.

Q. And then the Bruce Lemon, Commissioner, name reflected on the document. That's at the time the Commissioner of the Indiana Department of correction; is that correct?

A. Yes.

Q. And then the header on the document states, "Department of Correction, Indiana State Prison Facility Directive," is that correct?

A. Yes.

Q. And then, specifically, the document is ISP 000-9 fire prevention regulations and practices?

A. Yes.

Q. And am I correct in my understanding that you're not prepared to offer testimony today in relation to fire response practices or

Page 71

procedures contained within this document?

A. Not to that document. That was before I was hired.

Q. Okay. But my understanding is that this document remained in effect through the time period designated in the deposition. So although the document was revised May 2013, this -- it was this version of the document that was in effect at Indiana State Prison through the 2015 through 2017 time period. Understanding that to be the case or accepting my representation as to that --

A. I'm sorry. Yeah, I'm not familiar with this one, no.

Q. Okay. Not familiar with it and not able to offer testimony as to its contents today; correct?

A. That's correct.

Q. Okay. In terms of setting policies at Indiana State Prison related to fire response, those policies are set by the warden; is that correct?

A. I don't know if it's -- he has the final say.

Q. Are there other individuals who you believe might have the final say of those policies?

A. No, it would be the warden.

Page 72

MR. ROSE: Objection.

MR. HEPPELL:

Q. It would be the warden who had the final say over those policies?

A. Yes.

MR. HEPPELL: Subject to -- hold on one second.

Subject to the objections that, you know, I put on the record relating to Mr. Dudley's inability to answer questions that we contend are within the area of -- that are covered by Topics 1 and 5 as it relates to fire response policies at the prison -- and I understand that we're going to have to have those conversations offline and resolve them ourselves, if we can, or seek court intervention, if necessary. But subject to that and given the limits of Mr. Dudley's knowledge in preparation and ability to testify today, those would be the questions that I have for this witness at this time.

And I appreciate your testimony and cooperation today. I don't know if either of the other counsel have questions for you.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 21 of 32

Page 73

MR. ROSE: No questions from the defense.

MS. EARLS: I have one redirect question.

CROSS EXAMINATION
BY MS. EARLS:

Q. Mr. Dudley, do you remember when Mr. Heppell was discussing with you Indiana State Prison's policies and procedures?

A. Yes.

Q. Are you employed by Indiana State Prison?

A. No.

Q. Are you, in fact, employed by the Indiana Department of Correction?

A. Yes.

Q. Would you be prepared to testify as to IDOC's policies and not ISP's policies?

A. DOC's, not ISP's.

Q. Yeah. Would you be prepared to talk about IDOC's policies?

A. Yes.

MS. EARLS: Okay. That's all that I have.

MR. HEPPELL: Okay. And just brief follow-up on that.

Page 74

REDIRECT EXAMINATION
BY MR. HEPPELL:

Q. Mr. Dudley, you testified that you are employed by the Indiana Department of Correction; is that correct?

A. Yes.

Q. The warden of Indiana State Prison is also employed by the Indiana Department of Correction; is that correct?

A. Yes.

Q. And all of the line level correctional officers at Indiana State Prison are employed by the Indiana Department of Correction; is that correct?

A. Yes.

Q. And the supervisory staff that -- sergeants, lieutenants, captains, majors at Indiana State Prison, they are also employed by the Indiana Department of Correction; is that correct?

A. Yes.

MR. HEPPELL: Okay. I have nothing further.

MR. ROSE: No questions from the defense as to the questions that have just been raised.

Page 75

MS. EARLS: Nothing further either.

MR. HEPPELL: Thank you for your time, Mr. Dudley, and your participation. Your counsel may want to advise you on signature.

MS. EARLS: We're going to reserve his signature, Kristen.

THE REPORTER: Okay.

MR. HEPPELL: Okay. I'm not going to order a copy of the transcript at this time.

THE REPORTER: Okay.

MR. ROSE: And likewise.

MS. EARLS: Yeah, nonparty will not order at this time either.

THE REPORTER: Okay.

MR. HEPPELL: Thank you, Mr. Dudley, and thank you, everyone else. And I think that concludes what we have to cover today.

(PROCEEDINGS WERE CONCLUDED AT 2:20 PM.)

Page 76

C E R T I F I C A T E.

I, KRISTEN K. STOKES, CSR, and Notary Public within and for the County of Lake, State of Indiana, do hereby certify that there appeared before me the deponent, CHARLES WAYNE DUDLEY, via a zoom teleconference meeting, on 24th day of September, 2020, who was thereupon first duly sworn by me to testify the truth and nothing but the truth in response to questions propounded to said deponent at the taking of the foregoing deposition relating to the above-captioned cause now pending and undetermined in said court.

I further certify that I then and there reported in machine shorthand the testimony so given at said time and place and that the testimony was then transcribed from my original shorthand notes, and the foregoing transcript is a true and accurate record of said testimony given by said deponent at said time and place.

I further certify that I am not related by blood or marriage to any of the parties to said suit, nor am I an employee of any of the parties or of their attorneys or agents, nor am I interested in any way, financially or otherwise, in the outcome of said litigation.

I further certify the reading and signing of the foregoing deposition was not waived by the parties on the record.

Dated at Lake County, Indiana, this 12th day of May, 2021.

KRISTEN K. STOKES
CSR# 084-003723

My Commission Expires:  8/27/23
County of Residence:  Lake

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 22 of 32

Page 77

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER, as Personal      )
Representative of the          )
ESTATE OF JOSHUA DEVINE,       )
                               )
         Plaintiffs,           ) Case No.
  -v-                          ) 3:18-CV-0995-JD-MGG
                               )
RON NEAL, et al.,              )
                               )
         Defendants.           )

DEPONENT'S CERTIFICATE

I, CHARLES WAYNE DUDLEY, deponent herein, do hereby certify that I have read the above and foregoing deposition and find the same to be a true, correct and complete transcript of said deposition, and includes changes, if any, so made by me, given on the 24th day of September, 2020.  I further agreed to read and sign the same.
     WITNESS MY HAND this _____ day of _____, 2021.

                    _____
                    CHARLES WAYNE DUDLEY, Deponent

STATE OF _____    )
                           ) SS:
COUNTY OF_____    )

Before me, the undersigned, a Notary Public for _____ County, State of _____, appeared and acknowledged the execution of the foregoing instrument on this _____ day of _____, 2021.
         (SEAL)

                    _____
                    NOTARY PUBLIC
                    My Commission Expires:

Page 78

E R R A T A   S H E E T

PAGE   LINE        CORRECTION      REASON

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

____ ____      _____

                    _____
                    CHARLES WAYNE DUDLEY

Date of Deposition:  9/24/2020

STATE OF _____    )
                           ) SS:
COUNTY OF_____    )

Before me, the undersigned, a Notary Public for _____ County, State of _____, appeared and acknowledged the execution of the foregoing instrument on this _____ day of _____, 2021.
         (SEAL)

                    _____
                    NOTARY PUBLIC
                    My Commission Expires:

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 23 of 32

## A

**abilities (2)**
27:24;28:2
**ability (11)**
10:4,22;27:15,18;
37:4,5;43:13;49:14;
51:8;58:2;72:20
**able (15)**
7:19;8:14;11:14;
25:5;26:17;27:9;29:17;
32:16;45:21;49:4;
51:22;60:4;64:20;65:3;
71:15
**above (6)**
29:1,4,20;36:13;
61:4,15
**accepting (2)**
27:10;71:11
**according (2)**
29:7;53:17
**accurate (3)**
7:20;10:5;43:8
**act (1)**
29:8
**Acting (3)**
68:19,23;69:4
**action (4)**
14:5;15:8;52:6;
53:19
**actions (1)**
52:15
**activating (1)**
13:2
**active (2)**
25:24;29:24
**actual (4)**
47:24;48:11;57:16;
58:15
**actually (5)**
32:1;33:19;44:13;
47:13;58:4
**add (3)**
14:8;34:19;61:12
**added (1)**
7:11
**addition (5)**
25:21;34:5;49:3;
50:16;55:9
**additional (21)**
10:23;11:23;29:18;
32:3;34:8,22;36:20;
37:7,10,13;38:2,7,8,22,
24;39:2;44:23;61:2;
64:25;69:16;70:3
**additionally (1)**
11:7
**address (2)**
50:3;57:7
**addressed (3)**
27:20,21;54:20
**adequate (2)**

40:2;51:9
**adhere (1)**
6:17
**advanced (7)**
33:3;37:18,21;38:3,
8,22;39:3
**advisable (2)**
60:21;61:3
**advise (1)**
75:4
**affect (1)**
10:4
**afternoon (2)**
5:3,5
**again (18)**
7:20;13:14;14:23;
15:13;17:2;37:3;39:19;
51:19;53:3;55:2;65:6;
67:3,10,15;68:6,14;
69:7;70:4
**agility (2)**
26:13,13
**agree (2)**
50:17;65:20
**agreed (1)**
11:8
**agreement (6)**
4:6,12,13,14;11:10;
13:18
**agrees (1)**
11:3
**AG's (1)**
16:24
**ahead (10)**
5:8;8:9,13;9:9;21:9;
49:16;52:21;53:2;
56:24;61:7
**air (1)**
31:10
**alarm (1)**
58:20
**allow (1)**
32:16
**allowed (1)**
25:9
**along (3)**
26:1,10;54:10
**although (2)**
15:24;71:7
**amongst (1)**
62:25
**and/or (7)**
12:3,18,22,25;13:23;
15:2;33:2
**annual (35)**
25:22;40:24;42:20,
21,24;43:2,13,21;44:1;
45:6;46:2,18;53:12,18,
24;54:14,17,20;55:7,
10,15,17,21;56:2;57:5,
9,19;58:5,9,11;59:4,7,
16,24;60:13
**answered (1)**

60:9
**appears (1)**
46:7
**appendage (1)**
20:18
**Appendix (2)**
63:10;69:8
**applicability (1)**
65:16
**application (1)**
26:8
**appreciate (1)**
72:23
**apprentice (1)**
25:7
**apprenticeship (5)**
30:6,7;31:15,18,20
**appropriate (9)**
47:22;48:3,15;49:22;
52:5,10,14,17;63:1
**appropriately (4)**
14:20;40:21;60:5,10
**approximately (5)**
17:15,18;34:11;36:8;
39:2
**April (3)**
15:3,13;46:11
**area (4)**
16:4;35:3;37:13;
72:11
**areas (5)**
10:12,25;14:19;
15:18;37:10
**around (8)**
7:12;9:19;10:21;
26:21;34:7;45:1;49:21;
51:1
**Aside (1)**
17:18
**aspect (3)**
20:18;49:5;59:22
**aspects (4)**
11:24;13:16;55:10;
65:3
**assist (2)**
31:22;33:18
**assistance (1)**
31:24
**Assistant (4)**
35:22;36:4,12,15
**Association (1)**
24:13
**assume (1)**
8:14
**attain (2)**
36:22;37:15
**attained (1)**
38:2
**attorney (5)**
9:4,7;16:16,24;17:19
**attorney-client (1)**
17:8
**attorneys (1)**

5:7
**attributable (1)**
65:25
**audio (1)**
7:15
**audit (1)**
40:24
**auditing (2)**
14:1;15:4
**audits (2)**
14:4;15:7
**authority (1)**
16:5
**authorized (1)**
31:2
**available (1)**
32:4
**avoid (1)**
44:20
**awareness (4)**
24:15,17;32:7,9
**away (1)**
8:24
**awkward (1)**
44:20

## B

**back (13)**
9:23;16:8,10;20:5;
42:13;44:5,9,20;51:23,
24;55:4;69:22;70:2
**background (2)**
5:21;10:1
**ballpark (1)**
34:15
**Based (3)**
10:19;62:7;64:8
**basis (1)**
52:13
**Bates-stamp (1)**
66:4
**Bates-stamped (7)**
45:15;50:7;66:8;
67:5;68:8,10;70:4
**BCH (1)**
66:18
**bear (2)**
7:23;45:12
**become (1)**
24:22
**behalf (8)**
4:11;10:9,11;12:12;
13:9;14:18;16:3;28:8
**below (1)**
36:14
**best (6)**
8:20;10:5;19:20;
28:8;49:14;51:17
**better (1)**
13:17
**beyond (8)**
32:5;33:23,25;37:9,

15,16;38:10;60:22
**binding (6)**
10:11;12:11;13:8;
14:17;16:2;63:24
**bit (1)**
55:4
**Board (3)**
42:19;59:1,2
**both (3)**
6:11;39:5;64:20
**bottom (1)**
46:5
**break (6)**
9:14,16,24;44:5,25;
69:21
**breaks (1)**
9:13
**BRIEF (2)**
44:11;73:24
**briefly (2)**
10:17;68:7
**bring (2)**
26:3;30:11
**brought (2)**
48:18;64:21
**Bruce (1)**
70:10
**building (5)**
25:13;31:25;32:18;
42:2;62:3
**buildings (2)**
28:13;62:6
**built (1)**
62:4

## C

**call (1)**
7:3
**called (2)**
4:21;23:6
**calls (8)**
17:8;19:19;28:6;
38:13;51:13;52:23;
54:24;61:9
**can (58)**
7:7,18;8:8;9:6,8,13,
22;10:2;14:14;15:17;
16:9;17:9;19:19;20:1;
22:21;23:19;24:7;
25:10;29:13;30:18;
31:5,6,8,22,23;33:8;
35:10;37:8,15,17;
38:13;40:23;41:19;
42:16;44:4,23;46:5,24;
47:8;48:8,9,17;49:16;
50:1,1;51:16;53:2;
54:2;56:10,23;59:11;
62:10,13,14;65:9,18;
66:4;72:16
**candid (1)**
43:8
**candidate (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 24 of 32

26:17
canine (1)
    22:15
capacity (6)
    10:9;14:12;25:6;
    27:6;28:7;39:12
Captain (3)
    26:10;36:7,15
captains (4)
    36:8,10,14;74:17
care (1)
    42:4
case (3)
    4:11;5:7;71:11
cell (3)
    46:8;47:9;66:25
Central (1)
    44:10
CERT (1)
    20:17
certain (2)
    26:22;62:22
certainly (1)
    9:15
certification (18)
    12:23;18:4;24:7,23;
    28:25;29:1,3;30:19;
    31:2;32:6,24;33:3,10,
    23;35:7,12;37:9,22
certifications (14)
    24:10,11;25:14;29:6;
    30:13;32:3,18,22;
    36:20;37:7,14;38:3,8,9
certified (3)
    25:24;29:8,25
certify (1)
    65:5
certs (1)
    26:4
chain (1)
    36:17
challenges (1)
    7:11
changing (1)
    31:10
CHARLES (2)
    4:20;5:10
C-H-A-R-L-E-S (1)
    5:10
check (2)
    41:11,12
Chief (8)
    35:22,22;36:4,4,12,
    12,14,15
Chip (1)
    11:19
circumstance (1)
    31:1
circumstances (4)
    23:23;47:21;48:7,13
City (1)
    22:25
clarification (1)

15:12
clarify (1)
    18:18
class (1)
    38:19
classes (4)
    34:20;37:18,21;39:5
classifications (1)
    26:11
clean (1)
    7:9
clear (4)
    6:15;7:20;8:2;21:2
clue (1)
    59:19
coaching (1)
    54:10
Code (16)
    39:9;41:9;42:18;
    60:18,23;61:4,15,16,
    16,22;62:2,7,9,13,18,
    19
combining (1)
    34:17
command (2)
    36:18;39:1
commensurate (1)
    28:3
Commissioner (6)
    68:20,23;69:1,4;
    70:10,12
communication (6)
    7:17;16:15;17:4,6,
    16,19
communications (2)
    17:3,12
community (1)
    24:25
complete (3)
    9:21;29:9;50:21
completed (5)
    18:6;31:21;33:21;
    41:2;57:16
completing (1)
    31:18
compound (2)
    51:13;61:13
computer (2)
    45:10;69:18
concerns (7)
    27:14,20,21,23;28:1;
    48:17,20
CONCLUDED (1)
    75:19
concludes (1)
    75:17
conclusion (4)
    28:6;51:13;52:24;
    61:10
conclusions (2)
    14:4;15:7
condition (1)
    10:3

conduct (2)
    43:13;47:22
conducted (5)
    28:17;40:21;45:3;
    46:8,20
conducting (4)
    4:6;41:6;43:12;
    59:24
conference (1)
    7:14
confirmation (1)
    10:19
connection (3)
    4:9;7:13;54:13
consider (1)
    55:22
considered (3)
    30:22;31:17;57:11
consist (5)
    28:18;38:24;41:4;
    58:12,17
consistently (1)
    48:3
consists (1)
    31:9
contained (3)
    66:23;69:13;71:1
contend (1)
    72:11
contents (4)
    16:14;63:24;67:25;
    71:16
context (1)
    65:17
conversation (2)
    6:23;53:19
conversations (1)
    72:15
cooperate (1)
    45:10
cooperates (1)
    69:18
cooperation (1)
    72:24
copies (1)
    43:2
copy (3)
    10:15;11:12;75:9
correcting (1)
    15:20
Correction (25)
    10:12;12:12;13:10;
    14:19;16:1,4;20:9;
    40:11;44:2;45:17;
    49:11;63:15;66:15,24;
    67:11;68:16,24;70:7,
    13,16;73:14;74:4,9,13,
    19
correctional (8)
    18:20,21;22:4,5;
    35:18;50:19;59:9;
    74:11
Corrections (4)

5:15;65:22;66:1;
    69:5
Correction's (4)
    12:2,17;13:22;15:1
corrective (2)
    14:5;15:8
correctly (1)
    55:5
counsel (11)
    4:4,12;14:17,24;
    15:12;45:11;50:4;
    51:15;62:25;72:25;
    75:4
counsel's (1)
    10:19
couple (1)
    37:10
course (1)
    43:21
court (8)
    4:7;6:1,4,13;7:4,19;
    51:20;72:17
courtroom (2)
    6:9;8:23
cover (1)
    75:17
covered (3)
    56:1;57:4;72:12
COVID (2)
    47:25;48:7
crew (1)
    32:5
criteria (2)
    26:15,22
CROSS (1)
    73:5
currently (1)
    5:13
customs (4)
    12:3,25;13:22;15:1

**D**

date (5)
    15:21;16:1;41:3,25;
    46:10
deal (4)
    22:14;58:25;59:1;
    61:14
deals (5)
    20:16,19;21:10;
    22:14;39:1
December (5)
    11:11;12:5,20;15:15;
    18:15
decided (1)
    47:25
deemed (1)
    55:24
Defendants (1)
    4:12
defense (2)
    73:2;74:23

deficiencies (4)
    44:1;53:7;54:15;
    55:14
deficiency (5)
    50:10,17,19,25;
    53:15
Department (44)
    5:15;10:11;12:2,12,
    17;13:9,21;14:18,25;
    16:3;20:8;21:14,17,18,
    20,22;22:16,22;23:3;
    25:8,10,25;30:9;39:10;
    40:10;45:17;49:11;
    63:14;65:22;66:1,15,
    24;67:11;68:15,24;
    69:4;70:7,12,16;73:14;
    74:4,8,13,19
departments (10)
    20:20,22,25;21:3,4,6,
    8,10;35:9;37:24
depending (1)
    19:1
depends (1)
    62:3
deposition (18)
    4:7;5:18;7:12;9:13;
    10:16,20;16:19,22;
    17:21,24;18:3,10;
    44:17;62:21;63:1,4;
    68:4;71:6
depositions (2)
    4:3;11:13
Deputy (2)
    39:9;48:19
describe (4)
    22:21;24:7;40:23;
    41:19
described (1)
    25:16
describing (1)
    34:23
designated (14)
    10:10,13;11:20;
    12:16,19;15:21;35:21;
    39:17,23;41:16;47:12;
    48:21;63:5;64:13;71:6
designating (1)
    13:20
designation (4)
    10:24;11:23;64:18,
    25
designee (1)
    54:3
designing (1)
    12:22
details (2)
    51:1;67:15
determine (2)
    26:16;40:1
determining (2)
    60:15;61:1
DEVINE (6)
    45:15;50:7;66:8;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 25 of 32

67:6,6;68:11
**dictate (1)**
19:2
**dictates (2)**
23:22;62:5
**different (5)**
19:1;27:13;28:23;
32:15;33:2
**difficult (1)**
15:22
**DIRECT (1)**
5:1
**directed (1)**
11:5
**direction (1)**
18:20
**directive (2)**
63:15;70:17
**directly (1)**
9:4
**Director (3)**
5:14;24:2;39:6
**disagree (1)**
65:15
**disagreement (2)**
49:21;62:25
**discharge (3)**
27:9,15;28:2
**discretion (2)**
59:23,25
**discussed (4)**
11:22;13:15;54:22;
68:3
**discussing (2)**
45:7;73:8
**DOC (9)**
11:3;19:24;21:6,8;
24:3;26:21;28:8;40:4,4
**DOC's (1)**
73:18
**document (49)**
11:9,15,17;16:7;
20:7;45:5,14,15,16,21,
24;46:4;54:8;55:19,20;
56:8;57:11;58:7;59:20;
63:21;66:7,10,14,16,
23;67:3,7,10,17;68:8,
10,13,16,20;69:7,13,
17;70:3,5,6,8,11,15,19;
71:1,2,5,7,8
**documentation (11)**
41:19;43:3,7,20;
46:1;56:7,10;58:13;
59:3,17;60:8
**documented (7)**
47:4;53:6,7;54:13;
57:3;59:16;60:2
**documents (4)**
17:23;18:9;54:18;
64:22
**done (12)**
4:3;44:19;47:10;
51:10;52:1;53:10;54:2,

5;55:18;56:5;60:3;
69:19
**down (6)**
16:7;47:16;58:7;
67:2;69:2,16
**drag (1)**
31:23
**dragging (2)**
31:9;33:18
**drill (27)**
41:6,24;43:3,20;
45:20;46:7,10;47:4,6,8,
23,23;50:12,21;51:10;
52:14;53:6;54:19;56:4,
18;57:15,22,23,24;
58:8,10;59:21
**drills (27)**
40:17,20;41:1,1,7,10,
13,15,22;43:9,14,25;
45:2,18;46:1,20;47:14,
14,16,17;48:4,4,11,16,
23;54:6;55:8
**Dudley (49)**
4:19,20;5:3,10,12,
19;10:7,24;11:14,20;
14:10,14;15:17;16:2,9,
12;17:9;19:19;20:6;
28:6;38:13;44:25;49:9,
10,20;50:6;51:16;53:2;
54:24;61:10;62:11;
63:3;64:5,6,10,19;65:3,
6,9,20;66:6,9;67:8;
68:13;70:8;73:7;74:3;
75:3,15
**D-U-D-L-E-Y (1)**
5:11
**Dudley's (2)**
72:10,19
**duly (1)**
4:21
**duration (1)**
41:8
**during (19)**
13:1,2;19:15;39:16,
22;41:15;42:6,9;43:1,
19,21;47:12,15,20;
48:21;53:18;55:15;
58:5;64:13
**duties (2)**
28:3;40:5

### E

**earlier (16)**
10:20;13:14,15,19;
30:5;44:14;45:1,7,25;
53:11;55:5,6,13;62:21;
66:9,12
**EARLS (26)**
4:14;11:3;14:8;
15:11;16:23,24;17:5,7;
19:18;28:5;38:12;49:8;
51:15;52:20,22;54:23;

61:6,8;64:4;65:5;73:3,
6,22;75:1,5,12
**easier (1)**
69:19
**Eastern (1)**
44:10
**easy (1)**
7:2
**effect (18)**
12:4,18;13:1,23;
15:2;18:14;19:14;
23:16;47:11;48:21;
62:23;63:11,15;64:1,
12;65:24;71:5,9
**effective (1)**
41:5
**either (3)**
72:24;75:1,13
**eligible (2)**
25:18;26:23
**else (4)**
17:20;21:5;58:12;
75:16
**email (3)**
44:13,18;45:11
**emergency (22)**
12:6;13:3,5;14:1;
20:7,11,14,15,17;21:1,
12;22:1,2,6,10,13;31:3;
58:23;63:9,10;67:19;
69:8
**employed (6)**
73:11,13;74:3,8,12,
18
**employment (1)**
5:12
**enabling (1)**
13:3
**encompassing (1)**
42:19
**end (1)**
6:19
**enforce (1)**
61:15
**Enforcement (1)**
39:9
**ensure (5)**
39:14;40:1,13,20;
51:6
**ensuring (1)**
52:14
**entity (1)**
65:21
**equipment (3)**
12:21;33:18;60:16
**E-squads (2)**
20:16;22:15
**etc (1)**
14:13
**evacuate (2)**
42:2;47:9
**evacuated (2)**
57:24,25

**Evacuation (12)**
45:18;47:13,24;48:4,
11,16;56:6;57:16;
58:19;59:13,21;67:20
**evacuations (1)**
41:11
**evaluate (1)**
57:20
**evaluated (2)**
58:3,5
**evaluates (1)**
60:20
**event (2)**
18:22;19:8
**eventually (1)**
35:6
**everybody's (1)**
40:15
**everyone (4)**
7:13,18;8:2;75:16
**exactly (1)**
51:1
**EXAMINATION (3)**
5:1;73:5;74:1
**examined (1)**
4:22
**example (5)**
6:18;55:23,24;57:3;
66:11
**exceed (1)**
62:19
**exceeds (1)**
61:21
**excess (2)**
35:1,17
**Exhibit (8)**
11:12;45:9,12,13;
50:7;53:8;67:4;68:6
**exhibits (3)**
44:14,16;66:3
**exiting (1)**
58:19
**expected (1)**
40:4
**expertise (2)**
14:21;16:5
**explain (4)**
29:13;42:17;46:24;
47:8
**extent (3)**
51:21;61:12;64:19
**extenuating (1)**
48:7
**extinguishers (1)**
40:16

### F

**face (3)**
11:8;50:11;60:7
**facilities (3)**
18:25;48:1;56:3
**facility (30)**

18:25;19:3,7,10,22,
24;22:5,19;23:9;25:8,
19;26:1,19,25;27:22;
28:14;37:3;39:24;40:8,
24;42:5;47:15;48:18;
56:13;58:18;60:17;
63:15;65:8,12;70:17
**fact (2)**
55:22;73:13
**factual (2)**
28:6;49:13
**fail (2)**
42:18;48:3
**fair (27)**
27:2;35:15;37:19,25;
43:10,15;44:2;47:5;
48:2;50:14,22;51:2,3,
11;52:7,19;54:17,22;
57:16;58:5;60:11,14;
61:22;63:7,17;68:4;
69:5
**fall (7)**
20:20,23,25;21:11,
25;23:13;65:9
**falls (3)**
22:16;43:5;56:12
**familiar (5)**
20:6,12;68:13;71:13,
15
**federal (1)**
28:24
**feedback (1)**
13:4
**feel (1)**
9:15
**FEMA (1)**
38:18
**few (5)**
6:16;16:12;36:10;
38:17;65:18
**fight (4)**
23:7,15;32:1;33:19
**fighting (1)**
35:10
**fill (1)**
26:8
**filled (1)**
45:18
**filters (1)**
58:24
**final (3)**
71:22,24;72:3
**finally (1)**
14:23
**Fire (138)**
5:14;10:25;12:7;
15:4;18:12,22;19:8,16,
16,17;20:19,19,20,22,
25;21:3,4,6,8,10,14,17,
18,19,21;22:11,11,14,
16,17,24,24;23:3,6,8,
14,16,17,20;24:2,13;
25:8,9,24;28:21;31:3;

32:1,17;33:14,19;35:8,
19,22;36:4,4;37:24;
39:7,10,14,14,21;40:1,
13,16,17,20;41:1,1,6,
13,15,22,24;42:18;
43:2,9,14,20,24;45:2,
17,19;46:1,7,10,20;
47:4,6,7,14;48:23;49:6,
6;50:12,21;51:4,7,10;
52:14;53:6;54:5,19;
55:8;56:4,9,18;58:8,10,
11,15,19,20;59:10,12,
13,13,21,21;60:15,16,
22;61:3;62:23;63:6,6,
11,16;64:2,11;66:22;
67:19;68:1;69:8,13;
70:20,25;71:20;72:13
**Firefighter (57)**
12:17,22;18:1;22:20;
23:11;24:14,24;25:14,
19;26:3;27:3,8,16;
29:8,11,15,19,19,22,23,
25;30:1,1,9,14,19,19;
32:5,6,6,12,21,22;
33:11,12,22,22;34:5,8,
12,13,17,18,18,24;
35:2,5,7,13,16,21;36:9,
21;37:9,20;38:4,10
**firefighters (30)**
12:24;13:2,5;17:25;
18:8;20:24;21:25;
23:11,24;24:4,8,9,12,
18,22;25:4;26:2,7,18,
22;27:7,25;28:13,17;
30:23;36:16;37:1,8,15;
38:1
**firefighter's (1)**
27:15
**firefighting (1)**
25:13
**firehose (1)**
28:21
**fires (1)**
35:10
**first (10)**
4:21;25:11,15;31:14,
17;32:17;44:22;45:16;
57:10,13
**focuses (1)**
60:15
**follow (2)**
22:6;51:8
**followed (2)**
19:11,23
**following (1)**
13:5
**follows (1)**
4:22
**follow-up (1)**
73:25
**forego (1)**
48:15
**form (1)**

45:18
**formal (2)**
6:8;9:11
**formally (1)**
44:17
**format (2)**
17:4;45:5
**forth (3)**
22:6,10;63:11
**forward (1)**
27:7
**foundational (1)**
65:18
**Four (4)**
5:17;21:10,11,11
**frame (1)**
11:9
**free (1)**
9:15
**fresh (1)**
9:22
**front (1)**
6:4
**full (4)**
5:9;6:24;9:21;48:3
**further (2)**
74:22;75:1

## G

**garbled (1)**
56:21
**gave (1)**
24:21
**gen (1)**
58:23
**General (1)**
67:12
**generalize (1)**
47:1
**generally (1)**
67:20
**generated (3)**
45:6;55:16;58:4
**generator (1)**
58:23
**gestures (1)**
6:25
**given (2)**
57:25;72:18
**giving (1)**
10:8
**glitches (1)**
7:15
**goal (1)**
8:22
**goes (1)**
44:21
**Good (4)**
5:3,5;44:7;51:21
**govern (1)**
23:2
**Greg (1)**

11:5
**group (1)**
58:22
**guess (1)**
10:18

## H

**hand (2)**
4:18;37:6
**Handbook (1)**
19:24
**handwritten (1)**
46:14
**hang (1)**
15:25
**happen (1)**
42:11
**happens (1)**
9:6
**hard (1)**
7:3
**Hazard (11)**
23:13;26:9;43:5,6;
52:16,18;53:5;54:3,21;
56:16;57:6
**hazardous (5)**
24:15;32:7;34:19;
37:12;38:5
**haz-mats (1)**
32:11
**head (2)**
6:25;7:1
**header (1)**
70:15
**health (4)**
4:9;42:19;59:1,2
**hear (4)**
7:16,16,18;56:23
**hearsay (3)**
65:9,13,17
**held (3)**
5:16;41:8;57:22
**help (4)**
31:23;42:13;54:11;
56:17
**helpful (1)**
46:6
**HEPPELL (35)**
4:1,15;5:2,6;11:6;
14:15;15:20;17:11;
20:1,4;28:15;38:20;
44:4,8,12;49:15;51:20;
52:2;53:1;55:3;61:18;
64:9,15;65:15;69:20;
70:1;72:2,6;73:7,24;
74:2,21;75:2,8,15
**highest (1)**
38:6
**himself (1)**
64:21
**hired (1)**
71:3

**hit (5)**
34:1,6,16;35:2,11
**hold (6)**
5:13;7:7;36:1;39:8;
48:3;72:6
**holds (1)**
15:16
**Homeland (2)**
38:19;39:11
**hood (1)**
58:21
**hooking (1)**
31:9
**hope (1)**
7:23
**hopefully (1)**
45:10
**hoses (3)**
31:9,24;33:18
**hour (1)**
44:6
**hours (23)**
25:3,11,16;31:14,16,
17,19,21;34:1,3,4,6,7,
11,14,16,20,22;35:1,
16,19;39:2,4
**house (3)**
46:8;47:10;66:25
**housing (4)**
47:17,19,21;48:5
**human (1)**
8:22
**hydrant (1)**
31:10
**hypothetical (1)**
55:24

## I

**identified (2)**
48:14;54:15
**identifying (1)**
47:3
**IDOC (10)**
4:5,14;12:24;19:5;
42:10;43:3;53:17;
61:19;62:5,16
**IDOC's (3)**
65:10;73:16,20
**implementation (1)**
63:25
**importance (1)**
6:15
**important (3)**
6:18,24;7:17
**imposed (2)**
14:5;15:8
**improve (2)**
60:22;61:3
**improvements (1)**
60:21
**inability (1)**
72:10

**inaccurate (1)**
8:11
**inappropriate (1)**
53:4
**Incident (2)**
38:16;39:1
**includes (3)**
9:12;22:9;42:22
**including (8)**
7:19;12:7,20;14:3,4;
15:6,7;67:18
**incorrect (1)**
68:9
**in-court (1)**
9:12
**indefinitely (1)**
29:9
**Indiana (76)**
10:11;12:2,4,12,16,
18;13:9,21,24;14:25;
15:3;18:14,22;19:15;
20:8;21:13,15,17,20,
25;22:21;23:1;24:12,
19;27:25;29:4,7,23,24;
32:25;36:22;38:1;
39:10,15,22;40:10;
41:15;45:3,17;47:12;
48:22;49:6;51:6;52:12;
56:9;62:1,24;63:12,16;
64:1,12;65:20,22,24,
25;66:15,23;67:11;
68:15,24;69:4;70:6,12,
16;71:9,19;73:8,11,13;
74:4,7,8,12,13,17,18
**indicated (1)**
13:16
**individual (5)**
10:9;27:15;46:25;
59:23,25
**individuals (3)**
30:25;38:21;71:23
**information (4)**
43:9,15;48:25;59:8
**infrastructure (5)**
14:2;15:5;42:22;
60:16;61:21
**initial (4)**
22:24;25:3,21;29:10
**inside (3)**
22:25;31:5;65:9
**insomuch (6)**
19:18;28:5;38:12;
52:22;54:23;61:8
**inspection (4)**
42:20,22,24;55:9
**inspector (1)**
60:1
**inspectors (1)**
43:3
**installed (2)**
62:6,17
**instituting (1)**
61:20

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 27 of 32

| | | | | |
|---|---|---|---|---|
| **instructs (1)** | 17:9;19:20;28:9;49:12; | **limiting (1)** | **Management (5)** | 24:22;25:4,24;29:24; |
| 9:5 | 50:13,20;51:17;61:25; | 48:22 | 5:14;12:8;24:2; | 30:22 |
| **intelligible (1)** | 62:22;64:23;72:19 | **limits (1)** | 38:16;39:7 | **members (9)** |
| 7:4 | **known (1)** | 72:18 | **Manager (9)** | 26:6;27:24;30:3; |
| **intervention (1)** | 55:25 | **line (6)** | 23:13;26:9;43:5,6; | 31:24;32:4;37:7,14,20; |
| 72:17 | **Koester (2)** | 8:18;9:23;35:17; | 52:16,18;53:5;54:3,21 | 38:9 |
| **into (5)** | 68:19;69:3 | 40:11;59:8;74:11 | **Manager's (1)** | **memory (1)** |
| 31:25;66:5;67:4,15; | **Kristen (1)** | **Lintz (6)** | 56:16 | 10:5 |
| 70:5 | 75:6 | 10:21;11:1,5;13:15; | **managing (1)** | **met (2)** |
| **involved (1)** | | 14:11;15:19 | 23:10 | 16:18;17:19 |
| 41:17 | **L** | **list (2)** | **mandated (1)** | **Michigan (1)** |
| **involves (1)** | | 16:21;46:25 | 65:11 | 22:25 |
| 59:8 | **lack (2)** | **listed (2)** | **mandatory (28)** | **might (1)** |
| **ISP (5)** | 50:13;62:22 | 67:12,18 | 25:11,13,16,22;29:9; | 71:24 |
| 19:7;24:23;65:7,13; | **later (1)** | **lists (2)** | 31:4,6,12,19;32:5,13, | **minimum (7)** |
| 70:20 | 49:24 | 66:18;68:19 | 15,15;33:3,7,8,9,11,12, | 29:2;60:23;61:4,16, |
| **ISP's (3)** | **lawyers (1)** | **little (2)** | 17,21;34:2,3,6,18; | 22;62:2,15 |
| 65:11;73:17,18 | 8:18 | 6:8;55:4 | 35:11;36:20;37:16 | **minutes (1)** |
| **issue (5)** | **lead (1)** | **local (2)** | **manner (2)** | 17:17 |
| 8:5;47:3;50:1;51:1; | 26:9 | 26:25;56:3 | 56:5;62:19 | **mischaracterization (1)** |
| 65:17 | **leadership (8)** | **lockdown (2)** | **Manual (15)** | 49:9 |
| **issues (8)** | 35:25;36:3,17,23,25; | 47:15,20 | 20:7,11,14,15,18; | **mischaracterizes (1)** |
| 7:15;42:6,9;43:24; | 37:1,4;40:12 | **lockdowns (1)** | 21:1;22:1,2,7,10,13,13; | 64:5 |
| 50:12;56:20,25;59:10 | **learning (1)** | 48:6 | 63:9,10;69:8 | **missing (1)** |
| **items (1)** | 54:8 | **locked (1)** | **many (6)** | 32:19 |
| 14:12 | **least (1)** | 47:16 | 25:3;34:1,4,11;36:8; | **misunderstanding (1)** |
| | 68:9 | **log (1)** | 39:2 | 42:15 |
| **J** | **left (2)** | 58:24 | **mark (1)** | **misunderstood (2)** |
| | 39:25;59:23 | **logo (2)** | 45:11 | 8:8;30:17 |
| **January (6)** | **legal (4)** | 68:16;70:7 | **marked (1)** | **mock (8)** |
| 11:10;12:5,19;13:24; | 51:13;52:23;61:9,9 | **long (2)** | 11:12 | 47:6,7,14,16,17,23; |
| 15:14;18:15 | **Lemon (1)** | 5:16;17:15 | **Marshal (1)** | 48:4;57:15 |
| **job (5)** | 70:10 | **look (5)** | 39:10 | **moment (2)** |
| 27:9;28:2;37:4,5; | **less (2)** | 41:10;56:10,17; | **Marshal's (1)** | 9:6;45:13 |
| 40:15 | 6:8;9:11 | 58:20;59:2 | 56:9 | **more (8)** |
| **jobs (1)** | **letting (1)** | **looking (6)** | **material (3)** | 33:2;37:17;50:25; |
| 56:19 | 16:13 | 46:4;54:17;58:19; | 24:15;34:20;38:5 | 53:21;56:3,14;59:20; |
| **join (4)** | **level (25)** | 60:7;67:16;69:7 | **materials (2)** | 65:18 |
| 26:17,23;52:25; | 23:9;24:16,23;27:1, | **looks (2)** | 32:7;37:12 | **Most (1)** |
| 61:11 | 17,22;29:20,22,23; | 46:12;58:22 | **matter (2)** | 55:18 |
| **joins (1)** | 30:1;33:13,16,17,22; | **lot (3)** | 12:13;13:10 | **move (3)** |
| 51:15 | 34:2,17,24;35:13,17; | 54:2;58:4;59:11 | **matters (2)** | 27:7;29:12,17 |
| **judge (4)** | 37:3;39:24;40:11; | **lowest (1)** | 50:5;68:2 | **moving (1)** |
| 6:4,7;8:24,25 | 50:18;59:9;74:11 | 33:13 | **may (16)** | 30:10 |
| **July (1)** | **levels (3)** | | 8:17,18,22;9:14; | **much (2)** |
| 28:11 | 32:24;33:23;37:16 | **M** | 16:15;28:8;30:20; | 9:11;17:7 |
| **jump (1)** | **lieutenant (2)** | | 44:16,17;49:13;54:24; | **multiple (1)** |
| 7:8 | 36:7,15 | **Madam (1)** | 61:10;65:5;69:18;71:7; | 17:12 |
| **jumping (1)** | **lieutenants (2)** | 51:20 | 75:4 | |
| 6:19 | 36:11;74:17 | **maintain (2)** | **maybe (2)** | **N** |
| **jury (2)** | **Life (1)** | 28:25;29:2 | 8:5;39:5 | |
| 6:5,8 | 19:23 | **maintaining (2)** | **mean (5)** | **name (4)** |
| | **light (1)** | 12:21;27:8 | 29:13;31:12;42:17; | 5:6,9;11:19;70:10 |
| **K** | 4:9 | **maintenance (1)** | 46:24;47:8 | **national (3)** |
| | **likewise (1)** | 58:24 | **means (2)** | 24:10,13;38:16 |
| **keep (3)** | 75:11 | **Major (2)** | 6:3;9:4 | **necessarily (1)** |
| 30:12;49:25;50:4 | **limitation (1)** | 26:10;48:19 | **meet (2)** | 53:25 |
| **Kelly (2)** | 11:7 | **majors (1)** | 26:23;33:13 | **necessary (3)** |
| 52:21;61:7 | **limitations (2)** | 74:17 | **meeting (1)** | 60:21;61:3;72:17 |
| **kind (2)** | 10:21;11:4 | **making (3)** | 17:13 | **need (5)** |
| 5:22;31:10 | **limited (6)** | 6:15;7:9;68:6 | **meets (1)** | 6:17;9:16;35:11; |
| **knowledge (15)** | 11:9;14:9;15:13; | **managed (2)** | 62:14 | 50:20;65:13 |
| 14:14,21;15:18,19; | 41:7;43:14;48:13 | 23:3,5 | **member (5)** | **needed (2)** |

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 28 of 32

9:14;42:4
**needs (2)**
59:20;64:25
**new (3)**
9:23;30:2,3
**next (1)**
16:12
**NFPA (3)**
24:12,14,16
**NIMS (1)**
38:17
**nods (1)**
7:1
**nonparty (2)**
51:15;75:12
**nonsecured (1)**
48:5
**notable (1)**
41:18
**notation (1)**
46:14
**note (3)**
10:18;54:4;64:16
**noted (8)**
13:14,18;41:13;42:6,
9;43:24;46:19;55:15
**notes (1)**
41:10
**notice (4)**
10:16;11:13;49:22;
63:1
**number (11)**
14:3;15:6;35:15;
37:25;38:21;42:1,1;
44:13;48:13;63:2;
67:17

## O

**oath (1)**
6:2
**object (1)**
64:4
**objection (22)**
8:19,21,24;9:8;14:8;
15:11,16;17:7;19:18;
28:5;38:12;49:8;51:12,
16;52:20,22,25;54:23;
61:6,8,11;72:1
**objections (3)**
8:17;9:1;72:8
**observed (1)**
23:17
**obtain (3)**
35:6;37:8,21
**obtained (2)**
30:20;38:10
**obtaining (3)**
12:20;13:4;39:6
**Obviously (2)**
6:7;64:19
**off (9)**
9:22;20:1,3;30:7;

44:5,22;69:20,22,24
**offenders (1)**
42:1
**offer (5)**
66:21;67:25;69:11;
70:24;71:16
**offered (1)**
45:1
**office (2)**
16:25;56:9
**officer (14)**
35:18;40:10,11;
46:15;50:13;51:2;52:3;
53:9;55:22,23;56:15;
57:1,6;59:12
**officers (8)**
18:20,21;47:10;
50:19;52:1;57:2;60:3;
74:11
**offline (2)**
50:4;72:15
**once (8)**
9:23;29:5,9;30:8;
31:4,14;33:21;35:10
**one (21)**
5:6;15:11,11;17:13,
14;23:25;36:10,22;
38:1,15;45:12;47:9;
53:20;54:16;57:1;
68:14;69:16;70:3;
71:14;72:6;73:3
**ones (5)**
26:4;30:2;38:6;
41:17;44:23
**ongoing (9)**
25:22;26:2;28:20;
29:5;30:11;40:12;51:5;
52:13;53:22
**only (6)**
8:21;9:19;27:7;31:6;
38:15;61:14
**onto (1)**
32:18
**operated (1)**
48:23
**operations (4)**
22:16;24:16;31:7;
32:8
**opportunity (1)**
9:7
**opposed (4)**
7:13;47:14,23;48:4
**order (6)**
26:13,23;27:2;33:13;
75:9,13
**orders (13)**
22:18;23:6;24:1;
63:6;66:10,12,15,24;
67:8,11,13,21;68:1
**ordinarily (1)**
6:23
**OSHA (2)**
42:19;59:3

**otherwise (1)**
64:23
**Ours (1)**
56:3
**ourselves (1)**
72:16
**out (8)**
4:16;18:12,24;23:20;
24:24;26:8;31:15;
45:19
**outlines (1)**
18:5
**outset (1)**
68:3
**outside (9)**
24:18;30:8;31:6,22;
34:22;37:23,24;43:12;
48:6
**over (8)**
5:21;15:18;18:4;
26:10;29:1,4;61:4;72:4
**overall (1)**
42:21
**own (4)**
10:9;19:9,10,25

## P

**packs (1)**
31:11
**page (14)**
5:23;12:9;13:6;14:6;
15:9;45:16,19;46:4;
55:18,19,20;57:13;
66:16;67:16
**paid (1)**
24:19
**paper (1)**
58:3
**paperwork (2)**
40:25;41:24
**paragraph (1)**
15:23
**part (19)**
8:8;32:9,13;37:11;
40:15,25;41:20;42:21,
23;45:6;46:2;53:11;
54:19;55:7;56:7;59:2,
4,7;62:2
**participate (1)**
40:17
**participation (1)**
75:3
**particular (1)**
48:5
**parties (2)**
4:4;11:10
**pattern (1)**
57:1
**pause (2)**
9:6;44:8
**people (4)**
26:11;30:9,10,12

**per (1)**
47:10
**perfect (1)**
8:20
**perform (1)**
37:5
**performed (1)**
55:25
**period (10)**
19:16;39:17,23;
41:16;47:13;48:21;
64:13;69:3;71:6,10
**periodic (1)**
25:23
**permissible (1)**
48:15
**permitted (1)**
33:14
**person (3)**
17:5;27:19;41:13
**phrase (2)**
8:6;21:19
**phrased (1)**
63:19
**physical (6)**
26:13;31:22;42:22;
55:9;58:22,25
**physically (1)**
13:3
**piece (2)**
43:19;58:3
**place (4)**
27:25;39:13,20;
40:19
**placed (1)**
28:4
**plaintiff (2)**
4:11;5:7
**plan (3)**
44:1;63:11;69:9
**plans (5)**
14:2,5;15:5,8;59:21
**plant (2)**
58:22,25
**please (3)**
5:8;8:9;62:10
**PM (1)**
75:19
**point (4)**
9:16;15:11,12;16:9
**policies (50)**
12:2,24;13:22;14:1;
15:1,5;18:12,19,24;
19:2,5,9,10,12,14,22,
25;22:18;23:2;26:21;
39:14,20,21;40:2,6;
49:5,12;51:7,8;61:2;
62:23;63:25;64:1,12,
24;65:7,12,14,17,24;
69:12;71:19,21,24;
72:4,13;73:9,17,17,20
**policy (11)**
23:16,21,22,22;27:1;

42:11,15;53:17;61:20;
62:5,16
**poor (1)**
46:13
**poorly (3)**
8:6;55:25;63:20
**population (1)**
59:10
**portion (1)**
30:6
**pose (1)**
8:18
**position (12)**
5:12,16;13:17;26:12;
27:3;28:11;39:8;64:10,
17;66:21;67:25;69:11
**positions (7)**
35:25;36:3,6,12,13,
23;37:2
**possible (4)**
50:11,25;54:18;60:8
**possibly (1)**
8:21
**post (14)**
22:18;23:5;24:1;
63:6;66:9,11,15,24;
67:7,11,12,12,21;68:1
**Post-It (1)**
66:18
**practices (9)**
12:3,25;13:22;15:1;
18:13;39:22;63:17;
70:21,25
**premise (1)**
16:12
**preparation (4)**
18:9;63:3;64:7;
72:19
**prepare (5)**
16:19,21;17:20,23;
18:2
**prepared (10)**
12:11;13:8;14:17;
16:2;19:13;49:4;63:23;
70:24;73:16,19
**preparedness (1)**
12:6
**prescribed (1)**
19:5
**present (3)**
4:8;13:25;15:4
**prevention (3)**
12:8;63:16;70:20
**prevents (2)**
61:20;62:17
**previous (1)**
8:9
**primarily (1)**
9:1
**Prior (2)**
39:6,8
**Prison (66)**
12:4,19;13:24;15:3;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD     document 212-38     filed 05/25/21     page 29 of 32

18:14,23;19:6,15,17;
21:14,16,17,21,25;
22:21;23:1,1,17;28:1;
29:25;31:3;36:22;38:2;
39:15,22;40:2,13,19,
20;41:15;42:23;43:10;
45:3;46:20;47:12,20;
48:6,22;49:5,7;51:6;
52:11,12;55:10;57:6;
58:12,16;60:22;61:4;
62:1,24;63:7,12,16;
64:1,13;65:21,25;
70:16;71:9,20;72:14;
73:11;74:7,12,18
**Prisoner (40)**
12:17,22,24;13:2,5;
18:8;20:24;21:4,21,24;
22:20;23:3,10,11,24;
24:4,8,9,22;25:4,18;
26:6,17,22;27:6,8,24;
28:17;29:25;30:14,18,
22;32:5;35:21;36:21;
37:14,20;38:1,9;59:9
**prisoner-based (1)**
21:18
**prisoners (4)**
35:5;36:1;37:8;
47:18
**prison's (2)**
51:6;73:8
**privilege (1)**
17:8
**probably (2)**
39:4;63:19
**problem (1)**
42:13
**problems (5)**
28:12;41:12,18;42:3,
4
**procedures (20)**
5:22;18:13;22:6,9,
18;39:15;40:18;49:11;
51:7,9;61:21;64:2;
65:8,14;66:22;67:18,
20;69:12;71:1;73:9
**proceed (1)**
5:24
**PROCEEDINGS (1)**
75:19
**process (21)**
40:19,23;41:21;42:7,
10;45:2,6;46:2,18;
53:12,18;54:14;55:8,
15,22;57:9,19;59:4,7;
60:14,20
**processes (1)**
39:13
**production (1)**
68:11
**Program (6)**
12:18;22:20,23;
23:12;25:7,12
**programs (2)**

14:2;15:6
**promulgated (1)**
20:8
**protection (3)**
22:24,25;24:13
**provide (5)**
22:24;31:24;43:2,7,8
**provided (2)**
18:20;43:15
**providing (1)**
24:3
**public (1)**
4:9
**pull (8)**
10:15;16:7,9;45:9,
13;67:2;69:16,17
**pulled (2)**
11:15;45:22
**pulling (2)**
66:7;68:11
**purpose (2)**
22:22,22
**pursuant (1)**
28:24
**put (7)**
4:2;23:20;49:23;
50:1,2;68:7;72:9

## Q

**quality (1)**
8:5
**quarter (1)**
44:6
**quite (1)**
39:19
**quizzed (1)**
60:4

## R

**Raise (1)**
4:18
**raised (2)**
8:21;74:25
**Randall (1)**
68:19
**range (3)**
15:21;16:1;34:16
**reach (1)**
34:12
**reached (3)**
14:4;15:8;33:17
**read (3)**
15:22;51:23,24
**reads (2)**
66:14;67:10
**ready (1)**
4:17
**real (1)**
47:13
**realize (1)**
44:19

**really (2)**
55:1;57:20
**reason (1)**
10:3
**recall (1)**
45:7
**receive (6)**
24:8,18;25:17;29:6,
18;32:10
**received (1)**
24:9
**receives (1)**
25:12
**RECESS (1)**
44:11
**recommendation (1)**
53:21
**record (40)**
4:2;5:9;6:10,12,16;
7:9,20;8:2;9:2,8,22;
10:19;11:22;13:19,
20:2,3,5;44:5,20;
49:23;50:2,3,6,12;
51:22,24;52:6,19;53:7,
12,20;54:19;64:16;
66:7;68:7;69:21,22,24;
70:2;72:9
**recording (2)**
6:11;44:9
**recordkeeping (3)**
50:10,16,24
**records (10)**
17:25;18:2,7;45:4;
52:14;55:8;58:9,10,21,
21
**redirect (2)**
73:3;74:1
**refer (2)**
16:8;44:17
**reference (2)**
32:21;66:4
**referred (1)**
30:5
**referring (11)**
20:23;21:3,4,15,21;
40:14;45:25;46:16;
66:12;67:21;69:9
**reflect (1)**
46:7
**reflected (5)**
43:25;46:13;50:9;
53:23;70:11
**reflects (4)**
11:19;46:7,10;69:8
**regarding (4)**
15:9;27:23;62:22;
66:9
**regular (1)**
57:23
**regulations (6)**
12:3,25;13:23;15:2;
63:17;70:20
**related (17)**

8:4;10:21,25;11:23;
14:12;19:5,6,16;43:20;
49:5,24;59:10,13;63:6,
16;69:12;71:20
**relates (10)**
12:1,16;13:21;14:25;
21:13,20;64:2;65:2;
68:1;72:13
**relating (7)**
12:6,7;13:25;15:4;
18:7;40:9;72:9
**relation (2)**
21:15;70:25
**release (2)**
23:19;47:18
**released (3)**
23:7,15,24
**relevant (2)**
43:7;64:22
**rely (1)**
43:6
**relying (1)**
6:25
**remained (1)**
71:5
**remedial (1)**
52:18
**remember (3)**
15:23;69:1;73:7
**remotely (1)**
7:12
**removed (1)**
27:19
**repairing (1)**
12:21
**repeat (9)**
7:24;27:12;39:18;
49:17;51:18;52:9;53:3;
55:2;62:10
**replacing (1)**
12:21
**report (3)**
42:24;53:24;55:16
**reporter (10)**
4:8,18;6:1,13;7:4,19;
51:21;75:7,10,14
**reports (1)**
13:4
**representation (2)**
14:24;71:12
**representing (1)**
16:25
**REQUESTED (1)**
51:24
**require (2)**
29:5;42:11
**required (22)**
19:7;22:5;24:11;
25:23;27:17;31:17;
32:14;34:1,24;35:18;
36:21;37:11,16,23;
41:9;56:8;62:1,7,8,9,
12,18

**requirement (3)**
35:4;37:19;47:11
**requirements (9)**
28:25;29:2;60:17,23;
61:5,17,22;62:2,19
**requires (1)**
60:17
**rescue (5)**
24:17;32:8,11;34:21;
38:5
**reserve (1)**
75:5
**resolve (1)**
72:16
**respond (8)**
13:3;18:22;19:7;
31:2,5;32:17;33:14;
40:5
**response (42)**
14:1;18:13,17;19:3,
16,17,23;20:14,15,19;
21:1,12;22:2,7,10,11,
13,15,17;24:15;39:14,
15,21;40:2;49:6;51:7,
10;52:6,15,19;53:6,20;
62:23;63:7;64:2,12;
66:22;68:2;69:13;
70:25;71:20;72:13
**responses (1)**
12:7
**responsibilities (1)**
27:16
**responsibility (11)**
27:4,11,17;28:4;
40:12;42:7;43:1;52:13;
56:16;57:5;61:1
**responsible (4)**
23:9;24:3;40:6,7
**result (3)**
14:5;15:9;55:16
**results (2)**
41:14;57:2
**retired (1)**
69:2
**retiring (1)**
30:9
**revealed (2)**
55:14;56:25
**reveals (1)**
50:18
**review (59)**
18:2;19:21;39:13,20;
40:5,19,23;41:4,5,20;
42:7,10;43:4,12,13,14,
19,22;44:1;45:2,6;
46:2,6,18,19,21;51:5;
53:12,18;54:14,17,20;
55:7,11,15,17,21;56:2;
57:5,9,19;58:5,9,11,15,
16;59:4,7,16,22,24;
60:14,20;63:5,9,14,20;
64:6;65:10
**reviewed (11)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020
USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 30 of 32

17:23;18:9;41:20;
43:21;45:4;46:2;53:13;
54:19;55:9;64:21,24
**reviewing (6)**
13:25;15:4;40:18;
45:2;52:13;58:8
**reviews (4)**
14:3;15:7;41:14;
43:2
**revised (1)**
71:7
**right (4)**
4:18;8:24;21:2;
63:23
**Risk (3)**
5:14;24:2;39:7
**Rodriguez (5)**
46:15;51:2;52:3;
55:23;56:15
**Rodriguez's (1)**
50:13
**role (2)**
27:10;39:6
**room (1)**
7:14
**ROSE (11)**
4:13;44:7;51:12;
52:21,25;61:7,11;72:1;
73:1;74:23;75:11
**rule (6)**
8:24;11:13;61:19;
62:5,16;63:4
**rules (5)**
5:22;12:3,25;13:23;
15:2

**S**

**safety (29)**
10:25;12:7;15:5;
19:24;20:19;22:11;
23:13;26:9;40:13,16;
43:5,6;49:6;52:16,18;
53:5;54:2,21;56:16;
57:6;58:11,16,19;
59:10,12,14;60:22;
61:3;63:6
**sake (1)**
8:1
**Sam (1)**
5:6
**Same (13)**
4:14;5:23;6:2;12:8;
13:6;14:6,23;15:9,16;
24:17,23;30:10;51:16
**sat (1)**
5:18
**scope (8)**
14:9,20;15:13;22:1;
23:23;49:22;63:1;
64:17
**score (1)**
46:13

**screen (4)**
11:15;45:22;66:11;
68:12
**SCVAs (1)**
28:21
**second (6)**
15:16;20:2;45:19;
46:4;69:23;72:7
**Section (3)**
67:18,19,19
**sections (2)**
15:24;67:21
**secured (3)**
47:17,18,20
**Security (3)**
38:19;39:11;48:17
**seeing (1)**
52:6
**seek (1)**
72:17
**seem (1)**
59:18
**select (1)**
26:11
**selected (2)**
26:7;37:1
**selecting (1)**
12:23
**send (2)**
44:18,23
**sending (1)**
44:22
**Senior (1)**
39:9
**sense (3)**
6:5,20;7:5
**sergeants (1)**
74:16
**serve (5)**
25:6,18;27:2;63:4;
69:3
**set (7)**
18:12,24;22:6,9;
32:24;67:7;71:21
**sets (1)**
63:11
**setting (1)**
71:19
**shakes (1)**
7:1
**shared (1)**
66:10
**share-screen (1)**
44:15
**Sharing (1)**
67:6
**sheets (1)**
28:20
**shift (2)**
41:25;48:5
**show (2)**
66:6;67:2
**showing (3)**

45:14;50:6;70:3
**side (1)**
57:10
**signature (2)**
75:4,6
**significant (3)**
27:3,10;35:15
**sign-up (1)**
28:20
**silence (1)**
44:21
**similar (1)**
57:2
**similarly (2)**
6:22;7:11
**simulated (2)**
47:23;57:15
**single (1)**
43:19
**sit (2)**
63:23;64:10
**situation (2)**
4:10;67:19
**skill (1)**
28:23
**skills (2)**
25:13;28:22
**small (1)**
23:19
**softener (1)**
58:23
**solely (1)**
10:8
**soliciting (1)**
59:8
**solve (1)**
42:13
**someone (6)**
24:21;26:16;27:8;
33:8;35:2;65:1
**somewhere (2)**
34:15;35:1
**soon (1)**
69:18
**sorry (9)**
14:11;31:19;32:19;
46:24;52:8;69:20,23;
70:2;71:13
**sort (2)**
33:2,12
**sorts (1)**
61:2
**sounds (1)**
44:7
**source (1)**
23:21
**span (1)**
15:14
**speak (4)**
7:24;11:1;13:18,20
**specific (8)**
11:4;15:18,24;49:12;
65:8,12;66:18,24

**specifically (9)**
14:12;18:1,16;21:7,
13;41:19;50:10;63:10;
70:19
**speculation (5)**
19:19;38:13;52:23;
54:24;61:9
**speed (1)**
64:21
**spell (1)**
5:9
**spoke (1)**
16:18
**spoken (2)**
16:21;17:20
**sprinkler (2)**
14:13;58:21
**sprinklers (3)**
62:1,6,17
**Squad (23)**
24:23;25:5;26:7,18,
24;27:9,19,25;28:18;
29:25;30:3,23;31:25;
35:5,16,21;36:1,9;37:8,
15,20;38:10,21
**staff (12)**
19:6,11,17;22:4,5;
41:6;42:1;52:10;53:22;
56:13;59:9;74:16
**staff's (1)**
51:8
**standard (3)**
6:3;24:13;59:22
**standards (2)**
24:18;62:15
**start (6)**
9:22;25:13;28:10;
33:7;35:10;44:22
**starts (1)**
30:7
**state (55)**
5:8;12:4,18;13:24;
15:3;18:14,22;19:15;
21:14,15,17,20,25;
22:21;23:1;24:10,12;
28:1,24;29:4,7,24;32:9,
14,25;36:22;38:2;
39:10,15,22;41:15;
45:3;47:12;48:22;49:6;
51:6;52:12;56:8;62:1,
24;63:12,16;64:1,13;
65:6,21,25;70:16;71:9,
20;73:8,11;74:7,12,17
**stated (1)**
65:6
**statement (1)**
44:1
**states (1)**
70:15
**stay (1)**
25:24
**step (1)**
32:17

**stepped (1)**
69:1
**stepping (1)**
33:7
**steps (2)**
52:18;53:5
**still (3)**
6:10;30:21;34:19
**stipulate (2)**
4:6,10
**stipulation (1)**
9:19
**stone (1)**
33:7
**storage (1)**
58:20
**streams (1)**
28:21
**strike (10)**
25:2;26:20;30:4,15;
39:12;42:8;51:4;52:11;
53:15;58:9
**structural (1)**
24:11
**structure (2)**
31:22;36:17
**stuff (3)**
22:16;31:10;58:24
**subject (6)**
12:13;13:10;68:2;
72:6,8,18
**subsidiary (1)**
65:21
**substance (8)**
14:3;15:6;17:2;58:1;
66:5;67:5,16;70:5
**substantive (5)**
41:4;49:20,25;50:5,
18
**substitute (1)**
15:23
**succeed (1)**
8:22
**successful (2)**
41:5;58:1
**successfully (2)**
50:21;60:3
**sufficiency (1)**
39:21
**sufficient (3)**
39:16,16;40:3
**suggesting (1)**
31:23
**suitable (1)**
26:16
**supervising (1)**
23:10
**supervisory (1)**
74:16
**supplementally (1)**
13:19
**supply (1)**
28:21

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
CHARLES WAYNE DUDLEY
September 24, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-38   filed 05/25/21   page 31 of 32

**supposed (8)**
19:11;23:7,15,18;
41:2;48:10,11;54:10
**sure (16)**
5:22;7:9,18;8:1;
27:13;32:20;39:20;
41:1;48:2;51:20;53:4;
55:4,4;56:4,6,13
**surprisingly (1)**
15:22
**swear (2)**
4:1,17
**sworn (2)**
4:21;5:25
**system (3)**
12:18;38:17;39:1
**systemic (1)**
56:25
**systems (9)**
12:4;13:1,23;14:2,
13;15:2,5;58:21;61:2

**T**

**talk (2)**
6:23;73:19
**talked (1)**
45:4
**talking (4)**
18:16;34:15;58:13,
14
**task (2)**
15:22;37:5
**technical (7)**
7:15;8:4;24:16;32:8,
11;34:21;38:5
**technicality (1)**
4:16
**terms (19)**
10:1;18:21;22:4,10;
35:19;36:17;40:18;
43:14;45:25;46:18;
50:19;51:4,5;57:9,19;
58:11,15;60:13;71:19
**test (3)**
26:13,14;54:8
**testified (12)**
4:22;23:14;28:16;
30:17;37:11;39:7;50:8;
55:7;57:14;62:21;66:9;
74:3
**testify (11)**
10:22,24;15:17;49:4,
10;64:20;65:7,10,11;
72:20;73:16
**testifying (3)**
6:4;28:7;33:4
**testimony (34)**
6:1,11,24;7:21;9:12;
10:5,8,10,20;12:11;
13:8;14:18;16:3;19:4,
14;21:24;24:20;40:9;
45:1;50:8;53:11;55:5,

6,13,21;57:10;63:24;
66:22;67:24,25;69:11;
70:24;71:16;72:23
**testing (1)**
56:12
**third-party (1)**
4:5
**though (3)**
6:7,10;8:25
**three-year (1)**
15:14
**throughout (2)**
9:13;40:4
**timely (1)**
56:5
**times (5)**
41:11,11;54:2;56:6;
59:11
**title (4)**
20:10,12;33:9;69:7
**titled (2)**
45:17,19
**today (28)**
4:7;5:4,18,24;6:2,17;
7:21;10:2,8,20;12:13;
13:8,15;16:19;17:21,
24;18:3,10;49:4;63:4;
64:11;66:21;67:24;
70:24;71:16;72:20,24;
75:17
**together (1)**
7:14
**took (2)**
42:2;44:25
**top (10)**
29:23;34:5,8,11;
66:14,16;67:10;68:16,
20;70:7
**topic (19)**
10:12;12:1,9,13,15;
13:6,11,13,20;14:6,19,
24;15:10;16:4;37:10,
13;54:21;65:2,2
**Topics (13)**
10:22,25;11:20,24;
13:13,14,17,20;14:9;
45:7;49:20,25;72:12
**total (2)**
31:16;58:18
**touching (1)**
17:2
**towards (8)**
11:5;30:18,21;31:1;
33:16;35:6,12;46:5
**trained (1)**
56:14
**training (48)**
12:22,23;17:25;18:2,
5,5,7;24:4,7,17,21;
25:3,11,15,17,17,22,
23;26:2;27:6;28:14;
29:5,10,18,20;30:6,11;
32:4,13;33:23;34:1,16,

22;35:2,7,12,16,19;
38:22,24;39:3;52:1;
53:9,22;54:4,5,10;
59:20
**trainings (3)**
26:1;28:16,18
**transcript (2)**
7:5;75:9
**trash (1)**
23:19
**true (2)**
29:11;32:2
**trust (4)**
27:4,11,17;28:4
**truthful (1)**
10:4
**try (2)**
7:7;42:13
**trying (1)**
7:25
**tryouts (1)**
25:9
**Turning (3)**
13:13;22:20;55:20
**two (4)**
32:11;36:10;44:14,
23
**two-page (2)**
45:15,16
**two-week (1)**
25:12
**type (5)**
22:15;45:24;53:15;
58:24;68:13

**U**

**uh-uh (1)**
7:2
**unable (1)**
11:1
**unclear (1)**
8:10
**under (16)**
6:2;20:16,20,23,25;
21:11;22:1,17,17;23:5,
13,23,25;43:5;56:12;
66:18
**understood (6)**
24:20;30:16;50:8;
53:11;55:5,13
**unique (1)**
19:1
**unit (3)**
47:17,21;48:5
**units (2)**
20:17;47:19
**unless (2)**
9:4,5
**Unlike (1)**
8:23
**unnatural (1)**
6:16

**unusual (1)**
48:6
**unwritten (1)**
23:22
**up (23)**
7:24;10:15;11:15;
16:10;26:3,19;29:17;
30:12,12;34:24;35:13;
40:12;41:3;45:9,13,22;
47:25;48:18;55:4;
64:21;66:7;68:12;
69:17
**use (1)**
21:19
**used (1)**
26:15
**using (1)**
6:24
**utilized (2)**
23:4,5

**V**

**vague (1)**
51:14
**various (1)**
63:25
**ventilation (1)**
28:22
**verbal (3)**
56:12;57:22,23
**verifying (1)**
41:7
**version (1)**
71:8
**via (2)**
4:7;6:11
**video (8)**
4:8;6:12;7:12;17:6,
10,12,15,18
**video-audio (1)**
8:5
**violation (4)**
42:12,16;56:11,15
**violations (1)**
42:18
**volunteers (1)**
24:19

**W**

**walk-through (1)**
58:18
**walls (1)**
22:25
**warden (7)**
40:1;48:18;61:20;
71:21,25;72:3;74:7
**wardens (1)**
48:19
**warden's (1)**
60:25
**water (2)**

28:21;58:22
**way (8)**
4:16;6:19;27:13;
28:3;35:8;40:11;45:11;
60:2
**WAYNE (2)**
4:20;5:10
**W-A-Y-N-E (1)**
5:10
**ways (2)**
6:16;48:22
**weather (1)**
41:25
**week (1)**
28:23
**weekly (3)**
26:1;28:16,18
**what's (1)**
59:19
**whole (1)**
58:14
**who's (2)**
24:21;30:14
**whose (2)**
42:7;43:1
**withdraw (1)**
49:18
**within (11)**
14:19,20;16:4;36:1;
40:10;41:8;64:17;65:1;
66:23;71:1;72:11
**without (4)**
6:25;17:2;64:23;
67:15
**witness (18)**
4:2,5,17,21,23;
10:10;17:10;19:21;
28:10;38:15;44:16;
49:13;51:18,25;55:1;
61:14;63:5;72:21
**words (1)**
6:25
**work (1)**
35:6
**working (5)**
30:18,21;31:1;33:16;
35:12
**write (5)**
42:12,12,16;56:10,
14
**writing (1)**
17:5
**written (7)**
6:12;18:12,19;19:5;
23:2,22;60:8

**Y**

**year (1)**
47:25
**years (1)**
5:17

USDC IN/ND case 3:18-cv-00995-JD    document 212-38    filed 05/25/21    page 32 of 32

**Z**

**zoom (3)**
    4:7;6:11;46:5

**0**

**000-9 (1)**
    70:20

**1**

**1 (25)**
    11:12,20;12:1;24:14;
    25:14;26:3;29:11,15,
    19;30:1,19;32:6,10,12,
    21;33:22,25;34:5,12,
    18;38:4;55:18,20;65:2;
    72:12
**1:15 (1)**
    44:9
**10 (7)**
    10:22;11:24;13:13;
    14:9,25;15:17;39:4
**100 (2)**
    34:7,14
**1006 (1)**
    24:16
**101 (2)**
    24:12,14
**10-minute (1)**
    44:4
**120 (1)**
    34:7
**13302 (1)**
    45:15
**13303 (1)**
    45:16
**133033 (1)**
    50:7
**15 (1)**
    39:4
**16 (2)**
    34:21;69:2
**17 (1)**
    46:12
**1st (6)**
    11:10;12:5,19;13:24;
    15:14;18:15

**2**

**2 (29)**
    24:14;25:14;26:3;
    29:12,15,19,23;30:1,
    19;32:6,10,12,22;
    33:22,25;34:8,13,17,
    18,24;35:2,7,13;37:9;
    38:4;45:12;50:7;53:8;
    55:19
**2:15 (1)**
    44:10

**2:20 (1)**
    75:19
**20 (1)**
    39:5
**2010 (2)**
    15:3,13
**2013 (1)**
    71:7
**2015 (8)**
    11:10;12:5,19;13:24;
    15:15;18:15;28:1;
    71:10
**2016 (3)**
    28:11;39:8;68:24
**2017 (8)**
    11:11;12:6,20;15:15;
    18:15;28:1;46:11;
    71:10
**27th (1)**
    46:11

**3**

**30 (1)**
    17:17
**300 (1)**
    34:16
**30b6 (5)**
    11:13;28:7;49:22;
    63:4;64:18
**30-minute (1)**
    17:18
**31st (5)**
    11:11;12:5,20;15:15;
    18:15
**32761 (1)**
    67:6
**32777 (1)**
    67:6
**32879 (1)**
    66:8
**32886 (1)**
    66:8
**33108 (1)**
    70:4
**33111 (1)**
    70:4
**350 (1)**
    35:1
**3-minute (1)**
    69:21

**4**

**40 (3)**
    31:14,17;34:20
**472 (1)**
    24:14
**473 (1)**
    24:14

**5**

**5 (4)**
    11:20;12:15;65:2;
    72:12

**6**

**6011 (1)**
    68:11
**6021 (1)**
    68:11

**7**

**7 (1)**
    67:16
**700 (1)**
    38:18

**8**

**80 (8)**
    25:11,16;31:16,19,
    21;34:3,6,14
**800 (1)**
    38:18
**80-hour (1)**
    29:10

**9**

**9 (7)**
    10:22;11:24;13:13,
    13,21;14:9;15:16