**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) | |
| | ) | No. 3:18-cv-00995-JD-MGG |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Judge Jon E. DeGuilio, Judge |
| | ) | |
| RON NEAL, et al. | ) | Hon. Michael G. Gotsch, Sr., M.J. |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

# EXHIBIT 40

## In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*RICHARD CURRY*
*September 23, 2020*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 09-23-20 Richard Curry.txt
**Min-U-Script® with Word Index**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-43   filed 05/25/21   page 3 of 44

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

BARBARA DEVINE, as Personal )
Representative of the        )
ESTATE OF JOSHUA DEVINE,     )
                             )
            Plaintiff,       )
                             )  Case No.
      vs.                    )  3:18-cv-00995-JD-MGG
                             )
RON NEAL, et al.,            )
                             )
            Defendants.      )

The videoconference deposition of RICHARD CURRY, called for examination pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before APRIL D. HARGETT, a notary public within and for the County of Lake, State of Indiana, Certified Shorthand Reporter, on September 23, 2020, at the hour of 1:00 o'clock p.m.

BOSS REPORTERS

& VIDEOCONFERENCING

GARY * MERRILLVILLE * VALPARAISO, INDIANA

(219) 769-9090

## Page 2

PRESENT:

    LOEVY & LOEVY,
    (311 North Aberdeen Street, 3rd Floor
    Chicago, Illinois 60607), by:
    MS. SARAH GRADY,
    (312) 243-5900
    sarah@loevy.com
        Appeared by videoconference on behalf
        of the Plaintiff;


    STATE OF INDIANA, OFFICE OF THE ATTORNEY GENERAL,
    (302 West Washington Street, 5th Floor
    Indianapolis, Indiana 46204), by:
    MR. CHRISTOPHER ANDERSON,
    (317) 232-2472
    christopher.anderson@atg.in.gov
        Appeared by videoconference on behalf
        of the Defendants.

## Page 3

I N D E X

Witness:                                              Page

RICHARD CURRY

EXAMINATION BY MS. GRADY                              4


EXHIBITS

Curry
Exhibit Nos.                                          Page


1     30(b)(6) Deposition Notice                      5
2     Incident Reporting, Monitoring,                 15
      and Mapping
3     Indiana State Prison Emergency                  23
      Manual
4     Emergency Response Operations                   27
5     After-Action Review                             40
6     Critical Incident Follow-up After               93
      Action Review 2017 to 2015

        (Exhibits retained by counsel.)

## Page 4

(WHEREUPON, the witness was duly sworn.)

THE WITNESS: I do.

THE REPORTER: Thank you.

RICHARD CURRY, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. GRADY:

Q.   Good afternoon, Mr. Curry.

Can you please state and spell your name for the record?

A.   Yes.  Richard Curry, R-i-c-h-a-r-d, C-u-r-r-y.

Q.   Thank you.

And we are here today because you have been designated by the Indiana Department of Correction as a witness to provide testimony on its behalf about a topic.  So I'm going to start by showing you our Rule 30(b)(6) deposition notice and give you an opportunity to review it.  And I'm going to ask you a couple of questions about it, okay?

A.   Sure.

MS. GRADY: So we'll mark this as Exhibit 1.  For the record, it is the June 25th, 2020, 30(b)(6)

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 4 of 44

Page 5

deposition notice that was served on counsel for defendants, as well as the Indiana Department of Correction.

(The document was thereupon marked for identification as Curry Exhibit No. 1, as of September 23, 2020.)

BY MS. GRADY:

Q. Is this a document that you have seen before today?

A. I haven't seen it, but it was -- they actually went over some of the stuff with me.

Q. Okay. You have been designated on just one topic. So this first page just gives some technical details, but I'm going to move down to the topic. And I'm going to try to highlight it for you.

Take a minute and read that topic to yourself, and let me know once you're finished, okay?

A. (Witness complying.) Okay.

Q. Okay. For the record, that's Topic 11 on Exhibit 1. You have been designated by the Indiana Department of Correction to provide testimony on its behalf about the IDOC's policies, practices, customs, rules, regulations, and/or systems in effect at Indiana State Prison from January 1st, 2015, to

Page 6

December 31st, 2017, relating to after-action reviews or any other review processes for assessing emergencies or other serious incidents at IDOC facilities.

You are aware that you have been designated by IDOC to provide binding testimony on its behalf on that topic?

A. I'm aware.

MR. ANDERSON: If I may interject real quick. Just for the record, can we mention the updated timeline in our agreement?

MS. GRADY: Sure. Sure. And it was captured in my statement, but not captured on Exhibit 1.

So Exhibit 1 in the text of Topic 11 actually seeks a designee to testify about the topic for the dates of April 2010 through the present, but after serving this deposition notice, counsel for the IDOC and plaintiff's counsel agreed to limit that time to the time frame of January 1st, 2015, through December 31st, 2017.

BY MS. GRADY:

Q. Is that consistent with your understanding, Mr. Curry, of the date ranges for which you've been designated?

A. Yes.

Page 7

Q. Okay. And do you agree to give testimony on Indiana Department of Correction's behalf on the topic as written here in Exhibit 1, Topic 11, with the date limitation that I just discussed?

A. I do.

Q. Okay. Can you tell me -- do you currently work for the Indiana Department of Correction?

A. I do.

Q. Can you tell me what is your current job title?

A. My current job title is executive director of the emergency response operations.

Q. And can you describe for me what it means to be the executive director of emergency response operations for IDOC?

A. That's correct. I am the subject matter expert in the department and to the Commissioner concerning all things emergencies, whether it be preparedness or response.

Q. And you serve that role for the entirety of the Department of Correction, correct?

A. That's correct.

Q. How many facilities do you oversee in your -- in that role on the topic of emergency

Page 8

response operations?

A. All of the -- all of the prisons. I can't give you an exact number. All of the prisons and parole officers within the State of Indiana.

Q. And can you give me an overview of what are your job duties and responsibilities in that role?

A. Sure. In the preparedness side, I have the responsibility of ensuring and drafting policy and -- to be approved by the Commissioner, but also preparing the teams, whether it be facility or regional teams. We train our own people. And also my job is to manage any type of responses that go on.

So if there is an emergency that occurs, it's my job to gather the resources and get them to a specific situation to help where any emergencies that may occur throughout the state in the Indiana Department of Correction.

Q. And when you say "any emergencies," does that include fires that may occur in IDOC prisons?

A. Yeah. Well, that's kind of different. I am not -- I don't manage the fire teams, per se. I do manage quick response teams. And I have oversight over them, but -- although, they are a facility team, if that makes sense.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-43   filed 05/25/21   page 5 of 44

Page 9

Q.  What's a quick response team?

A.  That is the -- a quick response team is a designated response team within a facility that is managed by on-duty staff to be able to respond to what we call Level 5 emergencies.  Level 5 emergencies are emergencies that do not call for staff to be called in while off duty.  And that can range from a medical.  It could range -- it could include a fire.  It could include a fight.  It could include a suicide.  And it's inclusive of day-to-day operations.

Q.  How long have you served as the executive director of the emergency response operations for IDOC?

A.  Since December 1st, 2008.

Q.  And how long have you worked for the Indiana Department of Correction?

A.  Since June 1992.  June 22nd.

Q.  And can you just give me an overview of your career as it began at IDOC?

A.  Sure.  I started June 22nd, 1992, at the Plainfield Correctional Facility.  It would have been the Indiana Youth Center at the time.  I started as a correctional officer and worked my way through the ranks.  I was a correctional major, which was the

Page 10

highest uniformed staff person at Plainfield in -- I believe in 1998.  From there, I was promoted to what would have been at that time assistant superintendent at Putnamville Correctional Facility.

From there -- I stayed there roughly to -- until December of 2005.  In between there, I was temporarily assigned to -- temporarily assigned to the Pendleton Juvenile Correctional Facility because they needed help with some emergency things that was going on there.  I left Pendleton in spring of 2005.  I took a job with the Marion County Juvenile Detention Center, which was under DOC -- DOC scrutiny.

I was there approximately until September of 2007.  I started January 2006.  And I came back to Indiana Department of Correction in September of '07.  That's where -- it may have been '08. I'm losing track.  And I moved -- at any rate, I came back.  I was over -- I came back to be the executive director of staff development and training.  And then actually in December, I took over as executive director of staff development and training and emergency response operations and the auditing.  So I was on the executive staff concerning -- representing all three of those entities.

Page 11

And then later on, I was just moved over to being the executive director of emergency response operations.  One last thing.  In 1994, I started my career in emergency response operations actually being on a team and then becoming an instructor.  So I got -- I've been dealing with emergency response operations since 1994 in some capacity.

Q.  And can you tell me -- other than your career as you've just testified about it, have you received any other training or education about responding to emergencies in a correctional setting?

A.  Not necessarily in a correctional setting, but so -- as far as leadership, I provided -- there was a lot of that.  My educational background is in leadership as well.  I have a master's degree in leadership from Indiana Wesleyan University, and I'm pursuing my doctoral degree in team leadership now.

Q.  Okay.  Thank you.

Can you tell me if there's anything you did to prepare to give testimony on IDOC's behalf on the topic we've discussed today?

A.  Yes.  I kind of looked over the policies concerning debriefing.

Page 12

Q.  Okay.  So one of the things you did is looked at certain documents?

A.  Yeah.

Q.  And those included written policies; is that correct?

A.  Yes.

Q.  Can you tell me what policies you reviewed?

A.  I believe I reviewed the incident monitoring.  I reviewed Section 12, I believe, from the quick response training, which is the department emergency manual.

Q.  Can you say that one more time for me, please?  Section 12 of?

A.  The department emergency manual, which deals with quick response teams.

Q.  Any other policies that you reviewed to prepare -- any other documents other than these policies that you reviewed to prepare to give testimony as a IDOC designee?

A.  Yeah.  I kind of reviewed some of the Indiana State Prison AARs and things of that nature that covered the time frame.  But, again, a lot of that is -- is not necessarily pertaining to me.  I looked at some of the -- the documents of their

USDC IN/ND case 3:18-cv-00995-JD   document 212-43   filed 05/25/21   page 6 of 44

Page 13

safety meetings and this and that. And, again, that's outside of my responsibility.

Q. Okay. And so I'm going to repeat back to you the universe of documents that I've gotten from your testimony, and I want you to tell me if there's anything else that you reviewed, to your recollection, to prepare to give testimony on IDOC's behalf, okay?

A. Sure.

Q. So the incident monitoring policy, Section 12 of the department emergency manual?

A. Yes.

Q. Some AARs specific to Indiana State Prison?

A. Yes.

Q. And some safety meetings.

Were there any other documents that you reviewed that are not in that list?

A. No.

Q. Okay. Did you have any conversations -- I'm just going to ask first whether or not you had conversations, but don't tell me the content of any conversations you've had yet.

Did you have any conversations with anyone to prepare yourself or in preparation for this

Page 14

deposition today?

A. I did. I talked to some representative from the Attorney General's Office.

Q. Okay. So did you talk to anyone in IDOC in preparation for your deposition here today?

A. No.

Q. So when you say that -- the incident monitoring policy that you reviewed, can you tell me what that is?

A. It's -- in a nutshell, it keeps track of all of the incidents that may occur in a facility. We do it on a daily basis. It's a way to kind of keep track where violence is occurring. You know, you can kind of look at some of the metrics, and you can determine -- you know, to make decisions concerning the facilities, whether it be trouble with problem inmates or gangs or a lot of the kind of security -- it really gives an insight to that facility's executive staff on a daily basis of what's going on in their facility. And pretty much they host these meetings Monday through Friday.

Q. When you say it gives executive staff insight, can you tell me -- are you referring to wardens or someone -- someone else?

A. Yes. Yes. The wardens. The deputy

Page 15

wardens and the custody supervisor or the major. And it could be their unit managers. Those people that manage those particular cell houses. And it's not necessarily a set group that -- it's not a prescribed group that sits in there. The warden kind of allows who they want. So it may be medical people in there. You know, some people -- maybe even food service. It depends.

Q. Okay. I'm going to show you what we'll mark as Exhibit 2.

(The document was thereupon marked for identification as Curry Exhibit No. 2, as of September 23, 2020.)

BY MS. GRADY:

Q. This is a document that was produced for us. And I sent it along --

MS. GRADY: Christopher, I don't think I sent it to you.

Would you like me to forward that e-mail so that you have that e-mail in your inbox and you can have the documents as well?

MR. ANDERSON: Sure. If you don't mind.

MS. GRADY: Okay. Then let's go off the record for one minute just so I can send that e-mail.

Page 16

It will just take me about five seconds.

(WHEREUPON, a short break was taken.)

MS. GRADY: We can go back on the record then.

BY MS. GRADY:

Q. All right. So I'm going to, again, show you what's been -- I'll mark as Exhibit 2. This is a document that was produced to us today. And it is a policy from the Indiana Department of Correction entitled "Incident Reporting, Monitoring, and Mapping."

Is this the policy that we've been discussing that you reviewed to prepare for today's deposition?

A. That's correct.

Q. The effective date of this policy is July 1st, 2019.

Is there an additional version of this policy that existed prior to July 1st, 2019.

A. There probably is. That's the updated version, yes.

Q. Do you play -- personally play a role in updating this policy?

A. No, ma'am. Not this specific policy, no.

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD document 212-43 filed 05/25/21 page 7 of 44

Page 17

Q. Okay. So do you know as you sit here today how similar or dissimilar prior versions of the policy that were effective prior to July 2019 were to Exhibit 2?

A. It's probably -- it's probably pretty similar.

Q. Okay. So you discussed that the purpose of this policy is to create a system whereby incidents that occur in the prison are reported to executive staff so that they can be made aware of what is happening in the prison that they are responsible to oversee, correct?

A. That's correct. And to make decisions of safety and security, yes.

Q. Okay. To make decisions to ensure the safety and security of both inmates and staff, right?

A. That is correct.

Q. Okay. And you -- strike that.

Does this policy speak specifically to the topic that you have been designated on about -- about -- give me a minute.

Does this policy seek specifically to the topic you've been designated on about review processes for assessing emergencies or other serious incidents at IDOC facilities?

Page 18

A. Somewhat, yes.

Q. And can you --

A. I believe there is a section that talks about -- and it is called debriefing. Not after-action reviews. It's called debriefing. I would have to get you the pages.

Q. All right. So I just -- on Exhibit 2, which we have on the computer screen because of the way we're doing this deposition -- I just "control F" and searched for the word "debrief." And we see -- we find it here in monitoring incidents, which is on Page 11. It's Section 7 of the policy. It's -- you can take a minute to review it if you need to to respond to my question.

Is this the section of the policy where -- you were referencing in your testimony?

A. Yes.

Q. Okay. Can you explain to me -- again, take the time you need if you'd like to review it again.

Can you explain to me how this policy sets out -- this written policy sets out IDOC's policy regarding reviews of emergencies or other serious incidents in IDOC?

A. Okay. This is just one portion of it,

Page 19

obviously. Basically, daily, as you can see on Page 11, they review the previous night's incident reports -- the deputy warden of operations -- the daily shift reports and any conduct report of anything that may be out of sorts. And they bring it to the meeting, and they review it as a group.

You can see each business day Monday through Friday of the group of people in Section B meet together, and they discuss things that may be going on. And they look at some of the things that happened and really kind of review some of the decisions that were made or what could we have done different or what can we do differently in the future to ensure that we don't have this occur again. It could be that we need to move an offender out of the that facility to another facility. It's kind of wide open.

Again, there is a -- and I forgot to mention earlier, but there is an incident monitoring board. It's kind of like a dry-erase board that has the actual footprint of the facility on it. And then they stick magnets on it to kind of populate what kind of incidents that have occurred in a specific area.

Q. Okay. So does this policy require

Page 20

executive staff, including those listed on Page 11 of Exhibit 2 under Section 7(b) -- does this policy require those members of the staff to discuss at all any fires that have occurred within the facility on that or the next business day?

A. Yes, they should have. A fire would be a point of -- we call them a critical incident, yeah.

Q. At Indiana -- this is a -- strike that.

This is a policy that's been promulgated by the Indiana Department of Correction department-wide, correct?

A. Yes.

Q. Indiana State Prison is required to follow this because it is one of the prisons within the Indiana Department of Correction, correct?

A. That is correct.

Q. IDOC and its staff do not have discretion to disregard this policy and decide not to follow it, correct?

A. That is correct.

Q. Can you tell me who is responsible for ensuring that ISP complies with this policy?

A. Each facility has a regional director, which is at the central office level, that oversees the wardens.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 8 of 44

Page 21

Q. Okay. So the regional director may have some responsibility to ensure that policies are being followed at ISP, correct?

A. That is correct.

Q. Does the warden have responsibility to ensure that this policy is being followed at ISP?

A. Most definitely.

Q. Would you agree with me that the warden -- strike that.

Okay. The other document -- we'll come back to this, but I'm going to set it aside for now.

I'm going to actually ask you if -- do you have any documents physically in front of you?

A. I don't.

Q. Okay. That's fine. I just wanted to make sure I knew what they were if there were documents that you had in front of you and/or were looking at.

Okay. The other policy that you testified you reviewed to prepare for today's deposition is Section 12 of the department emergency manual?

A. That's correct.

Page 22

Q. I'm going to share another document -- actually, a document that was produced to us today. It is a document entitled -- it is an IDOC administrative procedures document entitled "Emergency Response Operations."

Is this the document that you were referring to that you read Section 12 of, or were you referring to a different document?

A. No. That's not Section 12. That's the actual -- I'm sorry -- that's the actual emergency response operations policy. That's not the department emergency manual. That is the actual policy that I go to that kind of governs my division.

Q. Okay. So this is a policy that you interact with in your role as executive director of emergency response operations, correct?

A. That is correct.

Q. But that's not the document that you reviewed to prepare for today's deposition that you testified about of Section 12 of the department emergency manual?

A. Yes. That's not the department emergency manual.

Q. Okay. Okay. I'm going to share a different document with you. Let's go off the record

Page 23

for a second.

(WHEREUPON, a short break was taken.)

BY MS. GRADY:

Q. I'm going to show you what we will mark as Exhibit 3 and --

MS. GRADY: And so for the record, this is a document that has been Bates marked Devine Production 1840 through Devine Production 2484. It is a very long document, and so probably what I'd ask -- so that we don't have to have it printed and filed with the -- charged for this part of the transcript and everything is we'll reference it, but not attach it to the transcript. We can figure that out off the record.

(The document was thereupon marked for identification as Curry Exhibit No. 3, as of September 23, 2020.)

BY MS. GRADY:

Q. In any event, Mr. Curry, is this the document that you reviewed to help prepare for today's deposition?

A. No. That is -- what that is is the Indiana State Prison Emergency Manual, and I'll

Page 24

kind of explain --

Q. Okay.

A. -- how that goes.

Q. Sure.

A. I create a department emergency manual for the entire department, okay? And I send it out, and I get -- it talks about the training requirements. It talks about other things they should have. What this is -- this is an emergency manual that's germane to the Indiana State Prison.

Q. Okay.

A. Because each facility has -- each facility has their -- not their own way of doing things, but I would say, for instance, they have their own local fire departments and local emergency services that they use. This would be specific to Indiana State Prison, if that makes sense.

Q. And it does.

So do you have a copy of the emergency manual that you did review?

A. I have a copy of it, yes.

Q. And are you in your office now?

A. I am.

Q. Can you tell me what does Section 12 of that manual cover that you testified you reviewed to

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 9 of 44

Page 25

prepare for today's deposition?

A.   It covers quick response training, quick response teams, and, basically, those would have been the staff that would have immediately responded to the fire along with the fire team.

Q.   Okay.  And so how, if at all, does Section 12 bear on the topic for which you've been designated to provide testimony on IDOC's behalf to talk about review processes for assessing emergencies or other serious incidents at IDOC facilities?

A.   It doesn't necessarily talk about that. That other policy does, to a certain extent -- the emergency response operations, but it speaks to the review process.  I provided that policy because -- based off who would respond and who would be actually -- actually be in the room in -- in an AAR situation or debriefing.

Q.   Okay.  How does Section 12 talk about who would be in the room in an AAR situation?

A.   No.  It doesn't necessarily say that. What I'm saying is that it gives an overview of a quick response team -- who would be the people and the make-up of the quick response team.

Q.   Okay.  Does it -- does it -- Section 12

Page 26

or any other part of the emergency manual set forth requirements regarding a review or assessment of critical incidents that occurred previously?

A.   Say that again.  I'm sorry.  That occurred previously?  Like, what do you mean by that?

Q.   Well, there might be a policy that says when there is an emergency, here's what you do, and then there might be a policy that says after an emergency occurs, here's what you need to do in order to assess how well the response went to the emergency?

Do you understand the difference between those two things?

A.   Yes.  Yes.  It wouldn't be in Section 12, per se.  It would be in the emergency response operations and the incident monitoring.  There's two different -- two different roles that I play.  I wouldn't necessarily respond or be in a facility after-action review, but then I could.

Q.   Okay.  So let me just try to understand your testimony.  I'm going to go back to the emergency response operations policy, which we'll mark as Exhibit 4.

A.   Sure.

Page 27

(The document was thereupon marked for identification as Curry Exhibit No. 4, as of September 23, 2020.)

BY MS. GRADY:

Q.   Is it your testimony that this policy does speak to requirements to assess or review how the response to an emergency went?

A.   Yes.

Q.   Okay.  Let's turn your attention --

A.   Okay.

Q.   I want to turn your attention to the last page of this policy on Page 7.  It's Section 12, the post-event analysis.

A.   Yes.

Q.   Can you take a minute and review that portion of this policy and let me know once -- once you've finished?

A.   Sure.  (Witness complying.)  Yes.

Q.   Is this the section of the policy that deals with review of the quality of -- of response to an emergency within a prison?

A.   Yes.

Q.   Okay.  And this is also an IDOC department-wide policy, correct?

Page 28

A.   That is correct.

Q.   And it is binding on Indiana State Prison, correct?

A.   It is.

Q.   And the warden at Indiana State Prison is responsible for ensuring that this portion of the policy is followed at Indiana State Prison, correct?

A.   Not the warden's responsibility.  It falls on the Commissioner.

Q.   It falls on the Commissioner of the department?

A.   Yes.  Specifically for post-event analysis, yes.  He or she or their designee -- has to be ordered by them to do a post-event.

Q.   Okay.  So the division of emergency response operations, is that your department?

A.   That is correct.

Q.   And I see you were tasked under this policy with conducting a post-event analysis?

A.   If directed by the Commissioner, yes, or their designee, yes.

Q.   Okay.  And who typically, in your experience, does -- orders it?  Is it the Commissioner him or herself, or is there a particular designee that typically makes those decisions?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 10 of 44

Page 29

A. Well, I'm not privy to those conversations, but I work for the deputy commissioner of operations. And, normally, it's -- the word is passed down through that person to tell me what to do.

Q. Understood. How often do you -- in the -- in the course of your time serving as an executive director of the emergency response operations for IDOC, on a given month or a year, depending on the frequency -- how often are you conducting a post-event analysis?

A. Well, it's -- everything is based off an emergency. You know, we don't manufacture them. They come up on their own. So, basically, maybe -- if I go out on a limb, maybe once or twice a year at the least.

Q. Okay. So you've been doing this particular job since 2008, right?

A. That is correct.

Q. So in the past 12 years, you would average that you've done one to two per year?

A. Yeah, that would be right.

Q. Okay.

A. Some more.

Q. Okay.

Page 30

A. Depending on what emergencies have occurred.

Q. Right. I understand. What can you -- you explained a little bit about Level 5 emergencies. Can you explain to me the difference of Level 4 and above emergencies?

A. Yes. Level 5, according to the National Incident Monitoring System or NIMS, which we are -- we are designated to be -- not only by the governor, but by the President of the United States. We ought to go by their system. It's kind of inverted. We used to be Level 1 through Level 5, but now it's inverted.

Level 5 emergencies, as I said before, talk about emergencies that involve quick response, which is our on-duty staff that we don't have to call anybody in. A Level 4 emergency is when we have to call in other resources. Level 4 -- for example, a Level 4 situation may be where we called in off-duty team members. We activate a team to come in to actually cover the emergency. So that's the difference between a Level 5.

Q. Okay.

A. On-duty staff manage the Level 5.

Q. Okay. And so are the levels that are

Page 31

available for categorizing emergencies one through five?

A. Actually, it would be five through one. That would be the right way.

Q. So one would be the highest level --

A. That is correct.

Q. -- of severity?

A. That is correct.

Q. Just out of curiosity, like, what qualifies as a Level 1 emergency?

A. Level 1 -- kind of what we're going through now. The pandemic where we have to use FEMA and the National Guard and other mutual aid situations. We're kind in a perpetual Level 1 emergency right now, ironically.

Q. Interesting. Okay. So this policy is relevant to the topic that you've been designated to testify about because it provides mechanism for the Commissioner to order you and your staff to conduct a post-event analysis, correct?

A. That is correct.

Q. Fair to say that this policy does not set out a mandatory or optional mechanism for Indiana State Prison itself to conduct assessment of an emergency that has happened onsite?

Page 32

A. Could you repeat that question? I'm sorry.

Q. Sure. I think -- what I'm trying to say -- let me try to say it in a slightly different way. This policy talks about a very high level review from an external department, right?

A. No, ma'am. Not from an external. No.

Q. External to ISP is what I'm getting at.

A. Yes. Yes.

Q. Okay.

A. My division would come in.

Q. And this policy doesn't speak to how ISP might review its own response -- might self-review its own response to an emergency situation, right?

A. No. Because this is -- this is more germane from the central office response.

Q. Understood. Have you ever in the course of your career conducted a post-event analysis for a fire anywhere in Indiana Department of Correction?

A. No. No, I haven't.

Q. And you didn't conduct a post-event analysis for the Devine case, right?

A. No.

Q. Now, you haven't been designated to

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 11 of 44
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

Page 33

testify about the Devine case. But just so that we're on the same page here, you're aware of the case that we are all here talking about involves the death of a prisoner Joshua Devine in his cell on April 7th, 2017, at Indiana State Prison? You're aware of those basic facts?

A. Yes.

Q. Okay. So can you tell me what is the policy with respect to what, if any, responsibility Indiana State Prison and its leadership has for conducting one or more review processes for assessing emergencies or serious incidents?

A. You need to look at the -- I would think the incident monitoring --

Q. Okay. So that's the written policy that lays out what is required for Indiana State Prison and its leadership in terms of assessing emergencies and other serious incidents?

A. That is correct.

Q. You've testified a couple of times by referring to something that you called an AAR.

A. Yes.

Q. Can you tell me what that is?

A. In -- in industry standards, it's called an after-action review. And you may not find that

Page 34

necessarily -- we use that terminology, but you may not find it in policy. Most of the time in policy we call it a debriefing.

Q. And is an after-action review the meeting that is -- strike that.

Does an after-action review refer to a -- the staff's response to an emergency or other serious incident?

A. Yes. The debriefing and AAR is one of them.

Q. Okay. Can you tell me what should be reviewed as a part of an after-action review or debriefing by --

A. Yes.

Q. -- IDOC policy?

A. Basically, you take all of the incident reports, and you take -- you ask the people -- the staff that were involved to be there, the shift supervisors and any effected stakeholders to be in the room. Oftentimes, it may be a video of watching the actual incident, and then -- so that they could pause and say, hey, listen, this is what happened here, and they kind of go over that.

Everybody kind of talks through what went on in that situation, and they talk about what

Page 35

could we have done differently and what -- what else happened in this incident that kind of added to it.

Q. Anything else that's required to be included as part of an after-action review or debriefing by IDOC policy?

A. What I shared with you and the documents and things of that nature.

Q. Okay. We can -- I can -- let me just re-ask the question.

Is there anything else that's required to be included as part of an after-action review or debriefing by IDOC policy?

A. Basically, what's covered in the -- in this policy here would tell you all of the things that you would need. Just thinking right outside the cuff, it would be the incident report, the actual staff that were involved, perhaps video, and -- and what they do is they kind of go back and recreate the scene and they talk about what could have been done differently or what could have been done better and what can we do to make sure this doesn't happen again.

Q. And in your answer, you said "this policy."

Is this Exhibit 2, the incident

Page 36

reporting, monitoring, and mapping, what you were referring to when you said "this policy"?

A. That's correct.

Q. Okay. And I want to just make sure I get your testimony about where in this policy the requirements for after-action reviews or debriefing or monitoring -- where that is laid out in the policy.

I know that we discussed that it is laid out in Section 7. I would like to be able to allow you to review this policy in its entirety and tell me if there's anywhere else in this policy that deals with the requirements for assessing staff response to an emergency or serious incident --

A. I think that pretty much -- you know, I can read the policy again, but this is pretty much talking about -- in Section 7 -- I -- Section B -- that -- about the debriefing, yeah. That would be the actual -- those are the debriefings that would happen with -- with the individuals that was going on.

Q. And who is responsible for ensuring that an after-action review or debriefing, in fact, was completed correctly with the necessary components that you testified about?

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 12 of 44
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

Page 37

A. The warden -- for ISP, the warden would be the -- his sole responsibility, which in turn could be monitored by the regional director after they reviewed the report.

Q. Who in -- who in your experience typically convenes these after-action reviews or debriefing?

A. Could you repeat that? I'm sorry.

Q. Yes.

Who, by position, typically convenes these after-action reviews or debriefing?

A. Actually, the way the policy reads is the deputy warden of operations shall review the incident reports and report a critical incident and things of that nature.

Q. So if you look at Section A, it talks about the deputy warden is tasked with reviewing incident reports and other reports to determine if any type of violence occurred?

A. Sure.

Q. And then on Section B -- I don't see any reference to the deputy warden for convening the meeting. It looks to me -- and correct my misunderstanding if there is one -- each business day if an incident or critical incident occurs, an

Page 38

operational meeting shall be held to debrief, slash, discuss all incidents within the facility.

Do you agree with me that the policy is technically silent on whose responsibility it is to convene that meeting?

A. Well, I wouldn't say -- it doesn't say specifically, but if you look at B, it starts out with the warden. So that would be the person that would be ultimately responsible for anything that goes on at the prison.

Q. So they'd also have the responsibility for convening the meeting or ensuring that it's convened, right?

A. So if you read it -- the way I understand the way its read is the deputy warden of operations reviews the reports, which, in turn, kind of tells the warden what's going on.

Q. Okay.

A. And the warden is ultimately responsible for hosting that meeting and being a part of that review process.

Q. Okay. Did you review the after-action review document that discussed Joshua Devine's fire?

A. Briefly.

Q. And that's not something you would

Page 39

normally review in the normal course of your job, right?

A. No.

Q. Does anybody above the warden have responsibility for reviewing documentation of after-action reviews or debriefings?

A. I would say that in situations where -- it's not necessarily a responsibility, but the regional directors have direct oversight of the wardens of the prisons. So it'd kind of go like this -- if there was an incident of a fire, they would -- they would set it up. And if there were some questions or some concerns, which, in turn -- they would fire those questions back if something didn't seem to fit.

Q. Okay. And do you agree that IDOC policy requires that the warden reflect that the after-action review or incident or -- strike that. Debriefing -- that's the word I was looking for. Let me start my question again.

Do you agree that IDOC policy requires the warden to ensure that documentation reflecting the fact that an AAR or debriefing has occurred is created?

A. That's correct.

Page 40

(The document was thereupon marked for identification as Curry Exhibit No. 5, as of September 23, 2020.)

BY MS. GRADY:

Q. I'm going to share with you what we've marked as Exhibit 5. This is the after-action review of Joshua Devine.

This is a document that you reviewed briefly prior to today's deposition, correct?

A. That is correct.

Q. And can you tell me -- and feel free to review this document again if you'd like -- whether the documentation of this after-action review indicates that it was compliant with IDOC's policies regarding after-action reviews?

A. Yes.

Q. Okay. Tell me how.

A. Well, it talks about the incident. It tells about who was there. And this is in -- this is actually an addendum to the -- it should be to the debriefing, but this was another day, which I actually came up -- it was a situation that was serious enough that I was asked to come up and sit in this after-action review. And there are times when

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 212-43   filed 05/25/21   page 13 of 44
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

Page 41

that's -- again, that's at the Commissioner's -- all of the Deputy Commissioners' discretion. I was up there. Normally, I would not be in a normal after-action review.

Q. So you were in this after-action review?

A. I was there, yeah.

Q. And does the documentation indicate that it was conducted in compliance with IDOC policy?

A. Yes. All of these were the minutes, yes.

Q. Okay. And how does Exhibit 5 here that is on your screen -- how does that indicate that it was compliant with IDOC -- it was conducted in compliance with IDOC policy?

A. So, basically, we had everyone who was in the room that was participating in the situation, whether directly or indirectly, and what we did -- as I said, in a debriefing, you go and you talk about what was going on. We showed the video, okay? And then we kind of went from there.

And I said, "Well, tell me what happened here. Tell me what happened." And you could see in the situation -- by the way, my name's not Robert Curry. It's Richard Curry.

So, basically, what I did is I tried to get an understanding -- my role in that particular

Page 42

meeting was to try to challenge them and say, well, could you have did this? Could you have did that?"

Q. Okay.

A. Based on what I saw.

Q. Did you -- do you recall this after-action review on April 24th, 2017?

A. Somewhat. It's been a while, but --

Q. Okay.

A. Yes.

Q. And it was unusual for you to attend one of these, right?

A. Well, I'm not going to say it's unusual. I mean, there are times when, you know -- when central office inserts their oversight and sends me to oversee these things and to ensure quality and to ensure -- and, again, once you say -- once they receive -- I told you before -- once central office receives the reports, okay, they may say, hey, listen, I want you to go a little further with this. I want you to look into this.

Q. Do you -- what reason were you given, if any, for why you were being asked to attend this particular after-action review on April 24th, 2017?

A. They don't necessarily give me a reason. They say, "Get up there and conduct an AAR." Again,

Page 43

I'm not privy to a lot of conversations that happen with the Commissioner and his -- his inner circle.

Q. Sure. I understand sometimes you might just be assigned.

But my question is: In this particular instance, were you given a reason, and, if so, what was it?

A. No. No, I wasn't. Other than it was a fire that occurred with a death. That is a serious incident. We kind of go up there and look and see and ensure we did what was right.

Q. Okay. And can you tell me what -- what conversations, if any, you had with Warden Neal about the fire either before or after this after-action review on April 24, 2017?

A. None.

Q. Okay. So you didn't talk with him before this meeting about --

A. No.

Q. -- concerns that you may have had about staff response or maybe the opposite or anything about the fire before you participated in this meeting?

A. No. And -- excuse me -- I don't do that because I -- what I don't want to do is -- is cause

Page 44

people to try to form their answers based off conversation that I may have had with them. So let me explain that. If there was something that I felt the warden or someone in his staff did wrong, I would not say that to the warden because oftentimes it could create a situation where they may become defensive and craft the story of their own. I mean -- not to say that they would.

I don't talk about it. I just -- I just tell them when I'm coming up, which is customary, and I tell them to assemble the people.

Q. What records, if any, did you review prior to sitting in this meeting on April 24th, 2017?

A. Excuse me?

Q. What materials or documents were you given, if any, prior to sitting down in this meeting on April 24th, 2017?

A. I was not given any documents. And the way that is is that I would have -- be privy to them if I wanted to because they're on a shared point -- the critical incidents are on a shared point. I did not review any of the incident. The only thing that I saw beforehand was the actual video.

Q. And where were you when you reviewed the video?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 14 of 44

Page 45

A. I was at central office at the time.

Q. Who did you review the video with?

A. I believe I may have watched it with the Deputy Commissioner.

Q. And what were the circumstances that you and the Deputy Commissioner were together watching the video?

A. He called me and said, "I need you to go up there and review the incident." And he says, "Have you seen the incident?"

And I said, "No."

Q. And what, if anything, was said while you watched the video together with the Deputy Commissioner?

A. Well, basically -- I mean, we -- it was a tragic event. I mean, it wasn't a situation where either of us had any definite comments. I just wanted to make sure that we did the best we could do to ensure the safety and security of that offender. And that's --

Q. Sorry. Go ahead.

A. Sorry. And that's always implied. I mean -- and, again, they don't necessarily tell me, you know, to be looking for certain things. They trust me to go in there and ask the right questions.

Page 46

Q. Understood. But it's -- you know, the video quality is not the best, but it's an upsetting video, right?

A. Oh, yeah. It's tragic. I agree with you.

Q. As you were watching this video for the first time -- strike that.

Did you know whether the Deputy Commissioner was also seeing the video for the first time or whether he had already reviewed it?

A. I would assume he had already reviewed it because he pulled it up for me on his -- and in order to pull it up, you would have to go back to the exact time. So I'm assuming he saw it.

Q. Okay.

A. That's my assumption.

Q. So you watched this upsetting video together.

And my question is: You know, what, if anything, did you say as you were watching it together? Did -- well, that's my question. You can go ahead and answer.

A. I don't think I really said anything other than that's horrible. Terrible. And, you know, I don't really believe I said anything, you

Page 47

know, that profound or anything that was -- other then, "Hey, I'll go up there and check it out."

Q. Did either you or the Deputy Commissioner make any comments about any of the staff members that were seen on the video?

A. Yes. I think we talked about the two officers that may have been first on the scene and how one officer stayed on the range to actually try to open the cell and had smoke inhalation and that. I think we talked briefly about that. That was a brave act for that officer to do that because they didn't have any type of protection. They were just the officers assigned to that cell house that had the key.

Q. No other comments?

A. Not that I can remember.

Q. Do you recall discussing with the Deputy Commissioner any concern about the first officer who went to the cell not having the key?

A. No. We didn't talk about that, no.

Q. Were you made aware before you came -- before you attended the meeting on April 24, 2017, the identities of the three officers that were staffed in the cell house on that day?

A. No.

Page 48

Q. Okay. So I'll represent to you that those three officers were Officer Rodriguez, Officer Abbassi, and Officer Blakely.

You see that Officer Abbassi is noted in this review as being in attendance, correct?

A. That's correct.

Q. You see -- I think this is a typo -- but given the documentary and the benefit of the doubt, I think this a reflection that Officer Blakely was also in attendance, right?

A. That is correct.

Q. But Officer Rodriguez is not in attendance.

Did you or anyone else during this meeting raise any concerns about the fact that the first officer who responded to the cell and is one of the three officers on the scene when the fire broke out did not attend the after-action review?

A. No. It never --

Q. I'm sorry. Go ahead.

A. It never came up.

Q. You agree that IDOC policy requires that an officer -- as a centrally-involved officer to be included in the after-action review, right?

A. Well, I'm -- that's not how the policy

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC NN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 15 of 44

Page 49

reads. It really reads that -- anyone that the warden deems. I believe that's what it reads. Any other person -- other than the staff -- executive staff and the leaders -- I believe the policy says anyone else that the warden -- that the warden deems necessary to appear.

Q. Okay. I'll show you -- I'll go back to show you Exhibit 2 -- Exhibit 2.

You were talking about the list of people in Section 7 and the catchall is just "other staff designated by the warden or deputy warden," right?

A. Yes.

Q. Okay. So it's your testimony that it was not a violation of policy to conduct an after-action review --

A. There are times when they -- when the actual person that's involved may not necessarily be there. It may be sickness. It could be an emergency. It could be -- you know, they called in sick that day. It could be anything. I just didn't catch that was the case.

Q. So just to be clear, it was not a violation of policy for the after-action review to go forward without Mr. Rodriguez in attendance, correct?

Page 50

A. I don't believe so, no.

Q. You agree it would have been a good idea to have him in attendance to get more information and use it as a tool to help improve emergency responses afterwards?

A. Well, yes and no. And I -- in a perfect scenario, yes; but, I mean, obviously there's other mechanisms such as internal affairs who would actually do a report of their own. It could be a situation where, you know, based off the incident reports and whatever the case may be, you know -- once I saw the film and once I saw what was going on, you know, I didn't necessarily need to hear from Rodriguez. I don't even remember him not being there, to be honest with you.

Q. Okay. So the first thing that happens in that meeting, to your recollection, is that the video was shown again?

A. That is correct.

Q. And according to this document, you asked whether anyone saw any smoke at that time.

Do you know whether that's referring to when the flash of light occurred?

A. Yes. If I read it properly, yes. When they say they could see a little smoke, and I asked

Page 51

did anybody see the smoke.

Q. Okay. Is that something that you're relying on the document to testify about, or is that something you recall that as you were watching it and you saw smoke on the video you recall audibly asking whether anyone in the cell house saw smoke?

A. I don't remember specifically. Again, it's been a while, but I can't even remember what range it was necessarily on. If you note the schematics of a cell house, it's huge.

And so the officer's station oftentimes is on the first range. There are five ranges. So I can't remember exactly what range that Offender Devine was on. So when I say that -- when I made the comment, they would have -- someone would have had to really look up and actually see if they saw smoke if they're not on that range specifically.

Q. Okay. And he was -- I can represent to you he was on the 500 range.

A. Which is higher up, yeah.

Q. But, you know, you didn't conduct any interviews with any of the people in the cell house about whether or not smoke was visible from the 100 range?

A. No. That would not be the -- that would

Page 52

not be the venue to do that. If I was going to conduct an investigation to recall something different, then I would do that in a post-event analysis situation where I could actually interview that individual person.

Q. Okay. What did you understand to be your role in this after-action review?

A. My role was to look at the actual response as far as safety and security of not only that -- that -- that particular cell house, but what was going on in the rest of the prison. You know, did you lock the rest of the prison down? What did the shift supervisor do? You know, was the weapons team deployed?

Q. And did you understand your role to be offering opinions about whether the response to the fire itself was appropriate and/or consistent with IDOC policy?

A. Well, I mean, again, the fire department is not in my oversight. And so I couldn't tell you if they responded the right way with the fire. I can tell you that the officers -- the quick response team did -- did what they were supposed to do other -- I mean, I just -- if you read the minutes, I offered some other suggestions, okay? But, again, the quick

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 16 of 44

Page 53

response team is not a situation where they have to do this, this, this, this, and this, okay? It's all a judgment call.

Q. Okay. So -- and, again, I'm just trying to understand, like, what -- what was your purpose of being there. So I can imagine one purpose would be not reaching any conclusions about whether or not certain staff members responded appropriately or not and I'm offering suggestions about how to improve because you can always improve, or another, you know, purpose might be I was there to determine whether the response was sufficient and to tell the administration or whomever, yes, this was a sufficient response or, no, it was not and here's why. And I'm sure there are other options, but those are the two that come to my mind.

A. Yeah.

Q. When you testified, you kind of suggested both of those things.

Did you understand your purpose to be offering an opinion about the propriety of the response by staff members, or did you understand your purpose to be offering suggestions about without reaching an opinion?

A. Well, again, most of them do apply, okay?

Page 54

And the reason why I say that is that I could say did you do this or why didn't you do this? But, again, you know, what we call in that business -- that's a Monday morning quarterback. So what -- I basically listen to what they have to say, and I said, "Well, how come you didn't do this?"

Well, then they say, "Well, I do this." So it's really -- yes. It is an opinion, but the main goal is to make sure they didn't violate policy, if that makes sense. So, yeah, it is an opinion because each person has to make a -- the best way I could explain that -- it would be if a policeman was on the street and they fired their weapon. They made a judgment call. My job would be in that -- if I was looking at that to ensure did they follow policy -- but I can't sit there and say, "Well, why did you fire?" And I think that's what I'm trying to say?

Q. Okay. So did you -- and when you were talking about reaching an opinion as to whether or not staff followed policy, did that apply only to the quick review team, or did that also apply to the correctional staff who were in the cell house at the time the fire broke out?

A. It's overall.

Page 55

Q. Okay. And did you reach an opinion about whether policy was complied with in response to the fire in Joshua Devine's cell?

A. For the most part, yes. I mean, I -- there were some things I may have done differently, but, again, I've got 30 years of experience.

Q. So just to be clear, at the time that you did the after-action review or immediately following that review, it's your testimony that you did reach an opinion regarding the staff's compliance with IDOC policy in response to the fire, correct?

A. Well, I don't know -- I mean, again, I'm kind of leery of the word "opinion," but -- maybe I said that, but what I do is I look at their actions according to policy.

Q. Okay. But what -- all I'm trying to understand is whether you, in fact, reached a determination about whether staff acted in compliance or in violation of IDOC policy in responding to the fire?

A. Yes. Again, other than a couple of decisions that, you know -- that I would have made that maybe someone that has less experience -- I didn't see anything out of policy concerning them responding as correctional officers and as QRT

Page 56

members to that fire.

Q. And what were the things that you would have done differently?

A. As you could see in the fourth bullet point that I -- I would have activated the weapons team.

Q. Okay. Anything else?

A. Again, that's about it concerning that. I mean, they had to evacuate the offenders from the cell house. And some of the offenders, as you can see in the minutes, began to assault some of the staff members. And when I asked them -- I said, "Where was the weapons team?" And they said that they had them on standby, but they didn't deploy them.

One of the options that we teach is even though you have an emergency in one place, you still have to secure the rest of the prison. They probably would not have been assaulted if the weapons team was out. So that was pretty much my own -- it was very separate from the fire itself, but it had to do with taking the inmates from the B cell house and moving them to a safe situation.

Q. And --

A. When --

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 17 of 44

Page 57

Q. I'm sorry. Go ahead.

A. Excuse me. When they were moving them, some of the offenders began to fight the staff. That's when I asked, "Well, was the weapons team involved?" And their answer to me was that they thought -- they implied that had the weapons team been there, that may have caused more problems. And I disagreed with that.

Q. Okay.

A. But, again, that was a -- it had nothing to do with the fire or their response to the fire.

Q. Other than reviewing the video and listening to Lieutenant Watson's and the other accounts from the people who attended the meeting, what, if any, documents did you review in order to reach your conclusion that -- with the potential exception of activating the weapons team -- the response to the fire was performed in compliance with IDOC policy?

A. Okay. Again, in the after-action review, we -- I was not privy to their actual incident report. This was in the after-action review. We talked about in this case -- I just talked about word of mouth, okay? I said, "Well, listen" -- when they tell me stuff, I'd stop and I was asking them

Page 58

questions.

Q. Okay. So other than hearing the people who are noted --

A. Sure.

Q. -- and the first responders and then watching the video, you did not review any other documents to reach your opinion that -- again, except for the potential not activating the weapons team -- in all other respects, IDOC staff complied with IDOC policies in responding to the fire?

A. Yeah. As it relates to the quick response team and the officers' response, there was nothing out of the ordinary.

Q. But there were no other documents that you reviewed, right?

A. No.

Q. And can -- strike that.

And you didn't talk to anybody other than the people who spoke at this meeting, right?

A. That's correct.

Q. You agree that there is no indication in this document that either Officer Abbassi or Officer Blakely spoke at this meeting, right?

A. I don't recall, no.

Q. And you don't recall speaking at this

Page 59

meeting, right?

A. No.

Q. Did you talk to anyone about how long Mr. Devine and other prisoners in B cell house were screaming for help before an officer came to -- came into the area where the cells were at and went up to the range to investigate?

A. No.

Q. And you agree that the video does not have audio, correct?

A. That's correct.

Q. So would it be consistent with IDOC policy if prisoners in the -- strike that.

Do you have any familiarity with the layout of what's in a cell in Indiana State Prison?

A. Yes.

Q. You know that there are no mechanisms in the cell to get the attention of an officer that -- like, a button or anything that would call the officer, right?

A. That is correct.

Q. And when prisoners are locked in their cells for the night, the only way they can get an officer's attention is to, you know, yell or, you know, try to get the attention from their cell

Page 60

verbally, right?

A. That's one way, yeah.

Q. Is there another way?

A. No. What I'm saying is oftentimes the officer may be on the range, you know, and they could see them in the cells.

Q. Right. But if they're not on the range, the only way would be to, you know, speak loudly enough that they could be heard by the officer, right?

A. That's correct.

Q. So would it be compliant with IDOC policy for an officer to wait until 15 minutes after yelling by many of the prisoners in B cell house to respond to -- to yells for attention? Would that be consistent with IDOC policy?

A. I would say this: Cell houses are loud. There is 300 offenders in there. And if you've ever been in one, that's all they do is yell. That's how they communicate. So I can't say for sure if I was there or -- I think that's why we asked about the noise and we asked about the smoke, but, again, cell houses are loud.

People communicate from -- unfortunately, communicate from the 500 to the 300 by

USDC NND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 18 of 44

Page 61

calling each other's name. It's very loud. So I couldn't tell you exactly what was going on in there. I do know day to day that a cell house is very loud.

Q. Okay. So you weren't at B cell house on April 7th, 2017, correct?

A. No, ma'am.

Q. And I've been in lots of cell houses, too. There's a difference between the level of noise that occurs on a typical night after count when everybody is locked back and the level of noise when every prisoner in the cell house is yelling at the top of their lungs for help. Would you agree with that as a general proposition?

A. Say that again for me, please.

Q. Would you agree that there would be a difference in the level of sound between a typical evening in a cell house where there's no emergency occurring and the level of noise that would occur when every single prisoner in B cell house was yelling at the top of their lungs for help?

A. I'll say it like this: There's nothing typical to a cell house. All of the offenders could be mad. I don't know. I mean, it could -- you know, what we teach our officers is try to be aware of what is going on.

Page 62

Q. So just to be clear -- and your testimony is that you cannot agree with the statement that every prisoner in B cell house yelling at the top of their lungs would be an out-of-the-ordinarily loud amount of noise in a cell house? Is that your testimony, sir?

A. Well, what I'm saying is I don't know if every offender in there was raising their voice. I don't know.

Q. Right. But I'm asking -- so just to be clear -- if you can just answer my question instead of a different question.

Would you agree with me that it would be louder to have a cell house full of every single prisoner yelling at the top of their lungs for help than a cell house where every single prisoner is not yelling at the top of their lungs for help?

A. Well, I would assume that, yeah.

Q. Okay. And you took no steps to investigate the level of noise that was occurring during the number of minutes that elapsed between when prisoners told internal affairs and also testified under oath as part of this case that every single prisoner in B cell house was yelling at the top of their lungs -- how many minutes that was --

Page 63

and what could be heard outside -- you took no steps to investigate that, right?

A. That's not my job.

Q. Well -- but you said that your job was to determine whether the officers complied with IDOC policies in their response to the fire, right?

A. That is correct.

Q. You would agree that ignoring an audible cry for help for 15 minutes from prisoners yelling who were yelling that there was a fire in a cell and doing nothing, that would be a violation of IDOC policies, right, sir?

MR. ANDERSON: Objection. Argumentative.

BY MS. GRADY:

Q. You can answer.

A. I would say that if it would have came up in the AAR, yeah, but, again, I wasn't privy to that.

Q. Right. But I'm just asking you to tell me whether or not you agree that hearing but ignoring cries for help and cries that there was a fire in the cell for 15 minutes, that that is a violation of IDOC policy?

A. I would say that would be negligent, yeah.

Page 64

Q. That would be a violation of IDOC policy, correct?

A. Yes. Providing they heard it. Again, that's a broad question.

Q. Okay.

A. That's a broad question.

Q. Okay. I'm going to go back to -- can you see the after-action review document again?

A. Yeah.

Q. So after you asked if anyone saw any smoke, Lieutenant Watson explains his account of what happened, and then there's a note about what the video shows.

A. Uh-huh.

Q. And you asked why did he not have the key?

A. I did.

Q. And then there appears to be an answer written in response to your question.

A. Yes.

Q. Can you tell me what prompted you to ask that question?

A. Why did he not have a key? Because I -- when they explained to me -- I believe when the officer showed up, he showed up and he did not have

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 19 of 44

Page 65

the key with him. And he had to go back down the range to get the key.

Q. And it concerned you that an officer was walking up the stairs to a range that he did not have a key for?

A. No, not necessarily. And I had to look at their key control, but -- obviously, if they're walking up on the 500 range and someone takes -- you know, takes them hostage or whatever the case may be, then the offenders have a key. And I can't tell you why they -- he necessarily didn't have a key. It wouldn't have been a time at that time -- at the time, it wouldn't be time to let anybody out.

Q. But you're not testifying that it's inappropriate for officers to ever have keys because a hostage situation could occur at any time, right? Then why ever give any officers keys to open any of the cells for any reason at any point?

A. Well, I think it's pretty, you know -- I think it's pretty -- you know, that's a point in question to ask me to answer why they wouldn't have the key. The key -- the answer to that would be in their key control policy or what would be their normal operation. Each physical plant is different.

Q. And you didn't know their key control

Page 66

policy when you attended the after-action review, correct?

A. No. No.

Q. So you were --

A. I was --

Q. I'm sorry. Go ahead.

A. I'm sorry. I was asking why he didn't have the key. I believe they responded the other person had the key. Somebody else had the key. That was my question.

Q. Uh-huh. And you didn't make any determination about whether or not staff complied with a key control policy in going up to the 500 range without a key, correct?

A. No, I didn't.

Q. Okay. So you weren't assessing whether staff complied with IDOC policy and/or ISP policy in its entirety, correct?

A. No, that's not true. I mean, again, I looked at the quick response team, okay? There's nothing in the quick response team -- whatever it says -- if they respond, they have to have a key in their hand, okay? That is a judgment call. And so the thing is we're supposed to respond to emergencies. So there's -- you'll find nothing

Page 67

written that says when you respond to an emergency you have to have a key.

In fact, we kind of sometimes talk against that because there was a case -- a case study in North Carolina where the inmates were screaming and hollering for an officer to come -- and I use this as a case study all of the time -- where they lured her in based on saying there was a fire and they killed her. They took her --

Q. Sir --

A. They took her in and killed her.

Q. -- when have you ever provided training on that case study?

A. What do you mean? I do training all of the time. I have oversight over all of the custody supervisors, and I have regular phone calls with them. I have leaders call me, and those were some of the things that we talk about. When there is something that happens nationwide, I always try to bring it to our attention. And I'll say, "Look, this is what happened. Be careful."

And it's taught from the time you're a correctional officer to be aware of your surroundings, so you don't get -- you don't get sucked into an incident. And around that time it was

Page 68

a fire that went on in North Carolina --

Q. And when did that fire occur?

A. I can't tell you. It would have happened around the same time.

Q. But you just testified that you do training on it all of the time. It's your testimony that despite doing training on it all the time you cannot identify the timeline of that fire?

A. Well, I could say this: That when the case laws or case studies would come along -- I would tell you when things come up, we discuss them because in the correctional field you don't want to be the second person that that happens to. So if there's a hostage situation tomorrow, I gather the people and we try to talk about what went on to make sure. And that's the thing that we do -- that's what all correctional facilities do.

Q. Just to be clear, the answer to my question is you cannot provide a time for when that North Carolina fire occurred; is that correct?

A. It's happened the same year.

Q. In 2017?

A. I believe so.

Q. Did it happen before or after the Devine fire?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 20 of 44

Page 69

A.   I don't know.

Q.   When is the first time you provided training to any individual on that fire?

A.   I can't tell you exactly.

Q.   Did it happen before or after the Devine fire?

A.   I think it happened after.

Q.   Okay.  You agree -- you've testified a lot about all of the dangers that prisoners can pose to staff, but you agree that one of the responsibilities that you and other staff have is to keep prisoners safe, right?

A.   That is correct.

Q.   And you recognize that you not only have a responsibility under IDOC policy, but under the United States Constitution to provide that -- that action, correct?

A.   That is correct.

Q.   So one of the things that can occur is that an emergency, in fact, happened, right, sir?

A.   That is correct.

Q.   And you agree that it would be bad policy to have a prison system that refuses to provide any staff members any ability to take a prisoner out of their cell when they are suffering?  For example, a

Page 70

heart attack, another type of medical emergency where the difference in response could mean the matter of life or death, right?

MR. ANDERSON: Objection to form.

BY MS. GRADY:

Q.   You can answer.

A.   That is not what happened.

Q.   Well, you saw the video.  You would agree with me that had Mr. -- had Officer Rodriguez had a key to Joshua Devine's cell that day, he may well be alive, right?

A.   I can't say that.

Q.   But you can't say that that's not true either, can you, sir?

A.   Well, I will say when they did respond, the fire was so hot that they could not turn the lock.

Q.   Well, I'm not going to show you the video because I think it will take a lot of bandwidth, but you saw that when Officer Rodriguez first went up to the cell, the fire had not yet expanded beyond the cell itself, right?

A.   Yes.

Q.   And do you have any reason to believe that Mr. -- Officer Rodriguez -- had he had the keys

Page 71

would not have been able to open the door?

A.   I can't tell you that.  And, again, because -- again, when they went up with the keys, the fire was hot, and there was an officer that stayed there and dealt with smoke inhalation trying to get that guy out.  That I know.

Q.   By the time the keys finally got to the door, the fire had gotten so bad that Mr. Devine died, right?

A.   That is true.  But I will say this:  You know -- that Offender Devine had a responsibility to not have anything in the cell.

Q.   Well, what, if any, steps have you taken to uncover the cause of the fire, sir?

A.   I -- that's not -- outside of my agency.

Q.   So when you're saying that Mr. Devine had a responsibility, you don't have any knowledge, information, or expertise on whether or not he, in fact, had anything inappropriate his cell, correct?

A.   Well, I will say there was an accelerant.

Q.   Tell me the basis for that testimony.

A.   We had to -- actually, unfortunately -- we had to continue to look at it and was at -- we got briefed by construction services at a warden's retreat.  That means I had to look at that -- this

Page 72

terrible site, like, five different times.

Q.   All right.  So it's your testimony that you spoke about the Devine fire during a warden's retreat?

A.   No.  I didn't speak about it.  It was presented to me.

Q.   When was that?

A.   Probably the fall of that year.  Later on.

Q.   And who attended that retreat?

A.   It would have been all of the wardens, all of the division directors, the commissioner, and his executives.

Q.   And you participated in a meeting where the Devine fire was discussed; is that correct?

A.   Yeah, I believe it was.  It was kind of like a case study.

Q.   Who led the meeting?

A.   The executive director of construction services.

Q.   The executive director of construction services?

A.   Yes.

Q.   Who was that person?

A.   Director Orme.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC NNND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 21 of 44

Page 73

Q.  Can you spell the last name for me, please?

A.  O-r-m-e.

Q.  And why was he leading the meeting, if you know?

A.  Because he's over the fire chiefs, and he would be -- he's over risk management.  He's over -- he's over -- that would be his responsibility.

Q.  How long was the meeting?

A.  Maybe an hour.

Q.  And did Mr. Orme lead it the whole time?

A.  Yeah.  I believe at that time they may have already had the actual fire marshal report of the state police.

Q.  Did the commissioner attend this meeting?

A.  Yeah.

Q.  Who else other than Mr. Orme spoke at the meeting?

A.  It's been a while, but I think it was just him.

Q.  Were any -- was any documentation maintained at the meeting?

A.  No.

Q.  Would --

A.  What do you mean by "documentation"?

Page 74

Like, who was there?

Q.  Well, any documentation requesting that the meeting occurred, reflecting what occurred as part of the meeting, or reflecting any comments that were made during the meeting?

A.  Well, you could probably find the actual agenda for that meeting.  It was very informal.

Q.  Were you provided any documents as part of that discussion?  For example, I think you testified about the fire marshal report.

A.  No.  We were not provided anything.

Q.  Were you shown any materials like a PowerPoint or any other sort of thing?

A.  We actually just watched the video again.

Q.  Okay.  And what was the purpose of that meeting, to your knowledge?

A.  Well, the purpose of that meeting -- again, like we do with any anything -- to look and make sure that we're being aware that these things happened.  We've got a couple of facilities that have failed, and they're kind of an older physical plant.  So we just talked about, you know, those things that can happen.

Q.  Okay.  Tell me about the presentation -- the contents of the presentation, to the best of your

Page 75

recollection.

A.  We assemble in a room, okay?  We looked at the video, and we just talked about things that could happen.  Things we should watch out for.

Q.  When you say "we talked," you're -- it suggests to me that multiple people, in fact, did speak.

So who other than Mr. Orme did speak --

A.  What I mean by that is people may have asked questions.  I mean, it's been a long time.  I mean, I couldn't tell you who actually asked questions.

Q.  Did the Commissioner make any comments or ask any questions?

A.  I don't remember.

Q.  Did you ask any questions or make any comments?

A.  No.

Q.  Was Warden Neal in attendance at the meeting?

A.  He would have been.  I assume he was, yes.

Q.  Did he make any comments or ask any questions?

Page 76

A.  No.

Q.  And you mentioned something -- strike that.

When you say "we talked about it," what I'm asking you is to tell me to the best of your recollection what it was that was said.

A.  Well, all we did was review the situation, okay?  In my guesstimating, it was maybe implied that Offender Devine may have had something in his cell he shouldn't have.  I don't know.  That was my assumption based off of sitting there.

Q.  And what was said that caused you to think that that might be the case?

A.  Well, because we don't issue anything to offenders that would cause a fire in a cell.  We don't issue anything, okay?  If you look at the landscape -- of course, I'm not -- I'm not an expert fire person, but there are things that -- you know, that they do and -- oftentimes offenders use tricks and stuff to be able to ignite -- because we don't sell lighters and things inside of the prison.  They use sometimes the electricity in there to jump and light the cigarettes or other contraband.  That's not uncommon.

Q.  Were you ever provided any information

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC NN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 22 of 44

Page 77

that Mr. Devine had any cigarettes in his cell?

A. No.

Q. Were you ever provided any information that caused you to believe that Mr. Devine intentionally created a spark of any sort?

A. No.

Q. So you talked about -- you were led to believe that Mr. Devine had items in his that weren't. You testified just now that one of the reasons you came to that conclusion was because of your belief that prisoners are not provided with anything that could at any point catch fire for any reason.

Can you tell me any other reason that lead you to the conclusion that the reason for the fire in Mr. Devine's cell is because he had items in his cell that he shouldn't have had?

A. That was my assumption based off what we -- we do not give anything to offenders that would start a fire.

Q. Okay. Is there any other basis for that assumption --

A. Not in concrete, no. I haven't seen the fire report. No, I haven't.

Q. Is there anything else that occurred as

Page 78

part of the fall meeting that you recall as you sit here today regarding the Devine fire and the discussion that resulted?

A. No.

Q. What were the things to look out for that were discussed in -- as part of that meeting?

A. Well, like any meeting, awareness, you know, to ensure that we -- you know, if we see anything when we're doing routine checks that may be of the way -- things that we talk about daily -- being aware because at prisons like that or any prison, for that matter, life and death can happen at any time.

Q. Well, you mentioned specifically older prisons. Why was the topic of older prisons brought up?

A. Older prisons have different systems. I mean, if you live in an older house, things are made differently. So, you know, we have older prisons.

Q. Okay. So how did that play into the discussion that occurred regarding the Devine fire and recommendations that were made following it?

A. Well, the point is that when you have older prisons, there is different situations that -- if you look at the state prisons cell construction,

Page 79

it is different than Miami that was built in -- past 2000. I mean, that's obvious.

Q. Okay. I understand that that's -- different cells built at different decades have different materials. I'm asking you what, if any, recommendations were made --

A. There were no recommendations made. Just being aware. Being aware of your surroundings. That's the things we talked about.

Q. So it's your testimony that there was nothing more specific that was discussed other than to be aware of your surroundings?

A. And -- in a nutshell, yes. They didn't talk about anything else.

Q. Well -- but just to be clear, it's your testimony that there were no more specific recollections than to be aware of your surrounding?

A. Yes. And ensure that we -- we -- you know, we're doing our daily checks and doing the things that are necessary.

MS. GRADY: All right. It's 2:50. Let's take a short break, and then we can jump back in five or ten minutes. Whatever you guys think.

(WHEREUPON, a short break was taken.)

Page 80

BY MS. GRADY:

Q. So, Mr. Curry, before the break, we had talked about the after-action review, which is Exhibit 5 for Mr. Devine. I just want to go back to that.

This is Exhibit 5. Do you see the after-action review on your screen?

A. I do.

Q. Okay. There is some discussion -- we talked through the first two bullet points, right, earlier in the deposition?

A. Sure.

Q. And then the next bullet point talks about the first responders response, including what they did with respect to other prisoners in the cell house?

A. That is correct.

Q. In the third bullet point -- do you see that?

A. Yes.

Q. And then you asked the question was the weapons team deployed or something to that effect?

A. That's correct.

Q. And, again, do you recall asking -- do you have, like, a memory in your mind of asking that

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 23 of 44
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

Page 81

question, or are you relying on this document to indicate that you did, in fact, ask that question?

A. No. I know I asked the question.

Q. Okay. So then it appears that there was a response that they were on stand -- and I think it's maybe saying -- it was supposed to say by, but not deployed, right?

A. That's correct.

Q. Do you recall receiving that answer in response to your question?

A. Yes.

Q. And then the next sentence says "Policy states any time an emergency call is made, should be call and set up when any moves are made."

Do you see that on Exhibit 5 here?

A. Yes.

Q. Was that something that was reflecting your statement or someone else's statement, if you recall?

A. I think that may be their interpretation. What happens is when the -- there's two or three elements that is involved in response. There is the first responders, which is a group of three to four or five people that actually report to the scene, okay? The -- the weapons team reports to a

Page 82

designated area, and that's where I basically get the weapons -- and the weapons, by the way, are less lethal weapons. And they go. And then the team supervisor is responsible for assessing the situation, and then it's their call alone to ask for the weapons team.

Now, what had happened is that there was some time that had elapsed between the time of them starting the evacuation. My recommendation to them was that had they had the weapons team deployed versus standing by, it would have eliminated those officers from were being assaulted by other offenders in that cell house.

Q. Okay. I understand. And I think what I'm just trying to understand for this document is whether -- you know, the indication on the fourth bullet point -- that you asked the question was the weapons team deployed, and then there is a statement afterwards. And then there is several more sentences. "Policy states any time an emergency call is made, should be call and set up when any moves are made. The system" -- I think that should say is made for QRT to help. "The team supervisor has to make the calls of what's to do in emergency situation."

A. Yes.

Page 83

Q. Are those summaries of statements that you made, or are those summaries of something else?

A. Actually, those -- I don't remember quite saying the policy states any time an emergency call would be made and set up when moves are made. I don't think I quite said it like that. I -- it probably was stated to me that whenever the QRT is called, the weapons team should be stood up and they should be in in the situation where they are deployed, okay? I don't know exactly what -- that may have been a typo or maybe whoever took the minutes didn't actually quote me in the right way.

Q. Okay. But you understand this to be generally -- whether perfectly accurate or not -- an indication of statements that you made to the group as part of the after-action review, right?

A. That is correct. That is correct.

Q. And you recall making the statements that you just testified to?

A. Yes. Yes.

Q. Okay. On the next page, there are a number of other questions here.

A. Sure.

Q. Was the MC fire department notified? That's at the top of Page 2. Who cleared the scene

Page 84

and gave the okay for the offenders to return to their cells?

A. Yes.

Q. Was that -- I think that's supposed to say triage --

A. Yes.

Q. -- area setup? Was there a debriefing? Was CISM called in?

A. Yes.

Q. Do you know -- were those questions that you asked or -- strike that.

Do -- as you sit here today, do you recall whether those were questions that you asked or whether they were questions that somebody else asked?

A. I believe I may have asked those questions.

Q. Okay. Do you recall asking those questions as you sit here today?

A. I can't remember specifically, but I am assuming, since it's underneath my name, I probably did.

Q. Okay. Well, it's not actually specifically underneath your name for any of the questions that I just read to you on Page 2, right?

A. Well, I'm thinking -- if you go back --

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 24 of 44

Page 85

okay. Maybe not. I understand what you're saying, but those were things that were discussed.

Q. Okay. But as you sit here today, you don't recall whether those were questions that you asked?

A. No.

Q. Or somebody else asked?

A. No.

Q. Okay.

A. No. I don't remember asking those specific questions.

Q. Do you recall specifically the discussion about a debriefing?

A. I don't know if it was me that asked about it, but I -- it sounds like something I would have asked, yes.

Q. But do you recall -- as you sit here today, do you have a memory of that discussion about whether or not there was a debriefing during the after-action review on April 24, 2017?

A. And, again, I don't recall specifically. You know, that probably would have been something I would have asked. And the rationale behind that is whenever we activate an officer or staff or -- you know, there's trauma or they're involved in that

Page 86

situation -- they would go hand in hand with the next question was CISM called.

Q. What is CISM?

A. Critical incident stress management.

Q. And what is that?

A. It's a regional team that's called in to trauma that officers -- so, for instance, there is an incident where an officer -- this is a hypothetical -- where an officer saw another offender get stabbed or an officer was stabbed and that other officer saw it -- what we do is we offer kind of like a psychological first aid to ensure -- and we do it before the staff person goes home. It's strictly voluntary in this case, but we offer them services so they don't take the trauma home.

Q. Okay. So just -- just to be clear about my earlier question when asking if you had a memory -- was -- whether reading that question about the -- whether there was a debriefing had been asked and that the answer was that there had been and then details about what time.

You can see in this document that -- according to the person that created this document -- that that conversation occurred.

My question is just do you recall in

Page 87

your mind a memory about discussing the debriefing and whether or not it occurred as part of the after-action review on April 24th, 2017?

A. I don't remember it specifically, no.

Q. Okay. And then after these bullet points, it says "Some suggestions were made in what we need to aid in being prepared for similar incidents were discussed."

Can you tell me all of the suggestions that were made about being prepared for similar instances that were discussed as part of the after-action review on April 24th, 2017?

A. No. I think -- if I'm not mistaken, I think that should go underneath what we learned.

Q. Okay. As you sit here today, you don't recall whether there were any suggestions that were made other than what appears on Page 2 of this document or --

A. No. No. Not specifically, no.

Q. And do you recall specifically having a discussion about what was learned from the fire?

A. No.

Q. So you do have a memory of that in your mind?

A. I do.

Page 88

Q. Do you recall discussing about better communication?

A. Yes.

Q. And what do you think about the incident provided an opportunity to improve communication in an emergency?

A. I recall them talking about it was hard to hear over the radio, okay, because of the noise that was going on in the cell house. And I think I made mention of, you know, them -- and they need to utilize some type of runner to relay the information because there was a -- I believe there was a disconnect, you know, with getting the offenders out to the -- the evacuation point because those were -- in the 100 range couldn't necessarily hear those that were up on the other ranges.

Q. Okay. Anything else that you recall discussing with regard to better communication and what about the response gave the opportunity to improve communication?

A. No. What we talked about is, you know -- again, that was pretty much the gist of it.

Q. We talked about the weapons team, so we won't go back over that.

The next statement is "Make sure you

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 25 of 44

Page 89

know who is in charge of first responders." Do you see that?

A. Yes.

Q. What about the response to the Devine fire gave the opportunity to improve by making sure to know who's in charge of first responders?

A. Because -- and I said that -- I remember saying that -- in our policy -- in any QRT situation, when they're activated and they take over the -- they take over the responsibility of being in charge of the emergency, okay? So in this case, there may have been a -- another person of, say -- open their housing area, but the way it is set up -- in an emergency, they're not over the emergency, okay?

And my point is that -- the point I was making is with all of the noise that's going on, they need to hear from a clear person who is in charge. Not other people that may be spouting out because it could cause confusion. But that's what I'm saying. It needs to be identified and -- and, you know, when the first responder gets there, that that is the team supervisor. And they should be talking on the radio. They should -- you know, they have to send a runner down to get something. That's what I meant by that.

Page 90

Q. The last statement under that section is "Work on fire drills and plan of action for staff." Do you see that?

A. Yes.

Q. Do you recall that part of the discussion about what was learned from the fire?

A. Not necessarily what was learned. Well, what -- any time I do some type of AAR, after-action reviews -- what we do is that we have monthly drills. We have -- what we call QRT drills. Every shift has to do at least two of them per month, okay? So what I try to do is, you know, use that particular incident as a QRT tool. And then what it means by "plan of action for staff" -- it simply means you need to involve those staff that are not necessarily on the QRT teams.

It's okay, you know, that the QRT knows, but there's other things that are going on that the actual line officers that have to work that cell house -- they need to know. And even though it's covered in their post orders and things of that nature, it doesn't always flush out as, you know, we just evacuate. It is not, like, a school where all of the kids are going to plow out. And, obviously, in this state prison situation, it did occur. When

Page 91

they were evacuating those offenders, those offenders started fighting. So they have to be ready -- and that's what I mean by that -- a plan of action to make sure they know their role in an evacuation.

Q. So you said that's not something -- you wouldn't characterize that as something that was learned from the Devine fire?

A. Yeah, I think so. I mean, again, that's -- I would say that's something we learned, but my point is that that's not everything that could happen.

Q. Right. But it's listed here in this document as what we have learned from this, right?

A. Yes.

Q. Okay. And so is it your testimony that you do recall the discussion about having staff work on fire drills and having a plan of action for staff?

A. Yes.

Q. And --

A. And not necessarily because they made a mistake. That's not what I was saying. I was saying that, you know, you need to work on fire drills because that's something that we don't necessarily do all of the time. I mean, it's not -- not -- not in that context. We do fire drills. You have to do

Page 92

them monthly, but what happens is that -- you know, those things are situations where the offenders know -- it's kind of like at school. You know, you hear -- you hear it, and they go outside and they stand.

What I said was work on -- work on fire drills in less than favorable conditions. We came up with -- because, you know, it was something different that maybe some of the staff that were on board had never seen.

Q. You said the meeting was dismissed and the tour was given.

What does that refer to, if you know?

A. We actually went to the cell and the range.

Q. Okay.

A. Because a lot of times when you're talking about stuff in a meeting place, it's hard to get the schematics of what's going on. So then we go -- we went over and got the tour, and then I could ask some questions. Where were you staged? What happened here? So we walked to every different area concerning the prison that would have been, you know, affected.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC NND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 26 of 44

Page 93

Q. All right. And what, if anything, do you recall from the visit to Joshua Devine's cell?

A. Nothing. I mean, we didn't -- you looked -- I think it was still roped off or something. Nobody had moved in there. Nothing that I saw was -- you know, other than it being burned up.

Q. And you didn't inspect any of the materials in the cell, right?

A. No. That wouldn't be my job.

Q. And you didn't talk to any of the prisoners who were in the cells around Mr. Devine's cell, right?

A. No. Not me personally, no.

Q. I'm going to mark the next exhibit here. You said you reviewed -- to prepare for today's deposition were some other AARs from ISP, correct?

A. Yeah. I looked at them, yes.

(The document was thereupon marked for identification as Curry Exhibit No. 6, as of September 23, 2020.)

BY MS. GRADY:

Q. All right. I'm going to show you a document that I'll mark as Exhibit 6. This is a document that was produced to us today. It is -- the

Page 94

document itself is entitled "Critical Incident Follow-Up After Action Review 2017 to 2015."

Is this the document that you reviewed -- it's approximately 32 pages. Is this the document you reviewed to prepare for today's deposition?

A. Yes. Some of it, yes.

Q. When you say "some of it," are there more pages that you reviewed?

A. No. No. What I'm saying is I didn't -- I reviewed -- I reviewed the -- I reviewed the document that was sent there. What I'm saying is I didn't -- if you read enough of them, you see the same thing over and over. This is more than -- as I understand, that's more than one incident.

Q. Yes. I believe that's -- that's so -- just so I understand, you looked at some of these, but you did not thoroughly study all 32 pages of this document; is that right?

A. No.

Q. I'm going to start at the bottom of this document because it's in reverse -- it's organized in reverse chronological order, I believe.

A. Okay.

Q. So I'm going to take your -- draw your

Page 95

attention to what I believe is -- and I have not had an opportunity to exhaustively review this document either since we just got it, but I'm going to turn your attention to Page 29, which I think is the earliest review that was produced to us.

A. Okay.

Q. The first page of that review -- this review runs from Pages 29 to 32. I just wanted to first ask you is this a type of form that you are familiar with in your work as an IDOC employee?

A. That is correct.

Q. Okay. What is this form?

A. Critical incident report.

Q. And what's it used for?

A. It's used to -- a type of way to report a critical incident -- to report -- keep record of how they responded -- not how they responded, but the fourth box -- who it was reported to and the warden reported it to and then --

Q. Okay. And is there another type of form that is an incident report that doesn't necessarily --

A. Yeah.

Q. That's not --

A. Yeah.

Page 96

Q. Okay. So there is an incident report and then a critical incident report?

A. That's true.

Q. And they're used for different things, right?

A. Yes.

Q. What -- what makes a difference, in your knowledge of an IDOC employee, between --

A. I'm sorry.

Q. Sorry. Let me just get my question out. When -- when should a critical incident report be completed as opposed to an incident report?

A. If you look in the policy -- if you look in the policy that you brought up before with incident monitoring, it spells out the different instances you would use the critical incident report. And the layman's term would be when life or limb or when an offender has been moved out of their cell to a hospital -- you could see some of the things -- a serious significant or highly sensitive event.

Q. Okay. And so would I be correct in saying that an incident report should be completed whenever a member of the staff encounters a circumstance that is out of the ordinary?

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC NN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 27 of 44

Page 97

A. A regular incident report?

Q. Yes.

A. Yes.

Q. And a critical incident report should be completed when it fits the category laid out in Exhibit 2 on Page 3, Section -- Section L?

A. Well, actually, you could probably go up because K is -- those are the definitions. If you scroll up --

Q. Yes. I think you're right.

A. Those are the definitions, okay? So then you will go down to K, M -- if you go up a little further --

Q. So, actually, I do just want to draw your attention to Section 4, which, I think -- I think defines what -- what qualifies as a critical incident.

A. Yeah.

Q. And is this consistent with your understanding as an IDOC employee?

A. Yes.

Q. Okay. So then let's go back to Exhibit 6.

A. Okay.

Q. So this is the form for the critical

Page 98

incident report, and this one is completed for an incident that occurred on April 2nd, 2015.

Can you tell me -- do you receive these as part of your work as executive director of the emergency --

A. Response operations.

Q. -- response operations?

A. I don't receive them. They're actually on a portal.

Q. Okay. And what is the expectation with respect to the completion of this form? Is it IDOC policy -- if you know because you haven't been designated to talk on this topic, but just to help orient us -- does IDOC require that this form be completed in any sort of timeline after a critical incident occurs?

A. Yeah. For the most part, if you could look at it, it is reported at 9:55 by the captain -- reported -- so, basically, if something goes on -- it's either reported to the warden or it's reported to -- if it's after hours, what we call the duty officer, okay? And they rotate with them. You know -- you know, each leader takes their turn as duty officer, okay?

The duty officer has a

Page 99

responsibility to report it to the regional director. You can see at 10:15. It's not much of a -- of a time lapse between what goes on. And then it's reported to the executive director either by phone or by e-mail. And then we also -- we -- what we call RDC operations.

And, basically, it's reported -- it's a place -- RDC is reception diagnostics. They have staff there who gather the information. Every morning I receive a report of critical incidents in some type of form -- abbreviated form that happened throughout the state, okay? And so -- and so, say, if I looked at that and I saw on the RDC report -- I can always go back into the shared point and look further, if that makes sense.

Q. Sure. You have access to it, but it's not, like, e-mailed to you or otherwise affirmatively put in front of you on a regular basis?

A. No. And the rationale behind that is -- I'm not over the warden, okay? The regional directors are. So the regional director reads it. And if says, "Hey, Mr. Curry, I think we need to look further into it. You know, we're going to talk to the Deputy Commissioner. I think this needs to be reviewed."

Page 100

Q. Okay.

A. Or whatever.

Q. Okay.

A. And that's kind of how it happens.

Q. I got you. Okay. So this reflects a -- well, it looks like the description of the incident is incomplete.

When you -- I mean, you -- even though these aren't affirmatively put in front of you on a routine basis, you've had occasion to access them in the course of your career as executive director for emergency response operations, right?

A. Yes.

Q. Can you tell me -- is this an interaction form that occurs? I'm just wondering if this maybe is a problem with our production as opposed to a reflection that that's all that was written about this prisoner's death is that the facility was notified by St. Anthony's.

A. I couldn't tell you. I mean, again, I do know that the form is a drop-down box format.

Q. Okay.

A. And not necessarily -- but even with the description of the incident -- it may have been something that happened.

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 28 of 44

Page 101

Q. Okay. Well, let's just work our way through this form then.

So the date refers to the date that the critical incident occurred, correct?

A. Correct.

Q. The location refers to the facility and then also the particular location where the critical incident occurred, correct?

A. Right.

Q. The type -- is that a drop-down box under nature? This would be an offender death non-homicide. Is that, like, a drop-down box?

A. If you can see over to the right, there is a space for the drop box.

Q. Understood. And then disturbance level, what does that refer to?

A. We talked about that. The Level 1, Level 5 -- Level 1 through Level 5.

Q. So was this done when Level 1 used to be the lowest level?

A. No. That would -- that would be a Level 1 because it happened outside at St. Anthony's. It was an outside agency that was involved.

Q. Okay. We have the incident date and time. You have the reported by and that would refer

Page 102

to the first person who reported the critical incident had occurred, correct?

A. Normally, it would be what we call the shift supervisor. It's probably a captain or lieutenant. In this case, it was the captain.

Q. And why would the shift supervisor be the first person to report it?

A. Well, at that time, it's 9:55 p.m. So no administrative staff are normally on duty at that time. Everything -- so, basically, the rule of thumb is that the shift supervisor is actually acting as a warden in his actions while he's off duty.

Q. Okay. Let me just clarify what my question is because I think we're talking past each other.

The first person to have been notified that whoever the prisoner is died, is unlikely to have been Captain Nowatski, right?

A. No. I mean, I don't understand what you mean.

Q. Well, it appears -- although, I think -- I do think this document is missing some of its description.

But it appears that St. Anthony called the prison to tell them that this prisoner had

Page 103

died?

A. Uh-huh.

Q. Right?

A. Yes.

Q. So can we -- can you tell from this form that the first person to have learned -- the first person at ISP to have learned that this prisoner died was Captain Nowatski?

A. Well, that's what I can assume.

Q. Okay. So can anybody complete a critical incident report regardless of the level of their seniority?

A. No, not necessarily. Because there's really only one critical incident report that's done.

Q. Tell me what that means.

A. It means that the shift supervisor has the responsibility of putting this form together based off the information that he or she has been given.

Q. Okay. And that is what I was getting at. So that's -- that helps clarifies things.

So even if the first person to actually witness a critical incident is a member -- a correctional officer who is a member of the line staff, they might not be the person that authors the

Page 104

form, correct?

A. Well, if you look down -- right. If you look down, it says "click here for additional reporting." There may be other -- other incident reports attached to it. There may be pictures.

So, basically, the shift supervisor is the person in the warden's absence that would gather all that information and forward it up. And we do that to ensure -- you know, obviously to make sure we have it in a complete format.

Q. Sure. I understand. I really am just -- honestly just trying to get the mechanics of how this form is completed.

A. That's fine.

Q. So the -- does anybody have access to the form? Did -- would Officer Rodriguez have had access to the form from any computer terminal at ISP?

A. No, not necessarily. No.

Q. Okay. So am I --

A. Not that form, no.

Q. So this is a form that should be completed by the -- that should be completed by the shift supervisor for every critical incident that happens during the shift they're supervising, right?

A. Yes. I would say that, yes.

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 29 of 44
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

Page 105

Q. And so this reflects that the shift supervisor on the night of April 2nd, 2015, was Captain Nowatski who reported to Warden Neal or -- I think then they referred to them at superintendents --

A. At the time, yes.

Q. Who in turn reported to the executive director William Wilson on that same day, correct?

A. Correct.

Q. And when -- strike that.

Who is Executive Director William Wilson? Is that the former commissioner?

A. No. He would have been the regional director of that.

Q. Understood. Thank you.

When it says "click here for additional reporting," that is something that appears on the form to permit people to show that they reported to additional individuals, correct?

A. No.

Q. Okay.

A. The way that I -- the way that reads is that you can click here -- I think there is some attachments -- maybe I'm wrong, but I believe that to

Page 106

be some -- some other reports of some other things.

Q. Okay. Do you agree with me that this -- this particular form indicated that no one submitted attachments, correct? Here --

A. I guess -- maybe not, no. Maybe not.

Q. Okay. In your review of forms like this, you would see the attachment up here on the face of this report had an attachment been uploaded, right?

A. Yes.

Q. Okay. And then staff involved indicates who was involved as part of this critical incident?

A. Well, who may have been notified or whatever the case may be, yes.

Q. Okay. Then there is a -- part of the form for injuries to staff, which here is blank because it was -- involved a death that didn't involve staff assault, right?

A. Right.

Q. There is a portion of the form to identify the prisoners involved and injuries to the prisoners?

A. Yes.

Q. And you can see that, on this particular

Page 107

form, there is nothing attached to any of those boxes, right?

A. I see. That's correct.

Q. Okay. There is a portion of the form that can be completed if a weapon was involved, right?

A. Yes.

Q. And ERO involvement, can you tell me what that refers to?

A. That if the first responders were activated -- QRT, E squad -- E squad would be a riot squad. K9 is obviously dogs. SITCOM is hostage negotiators, and CISM is crisis intervention stress management.

Q. Okay. And then we have a description of incident, which we may or may not have the complete description for here.

A. Sure.

Q. That would be the narrative portion of the form that details what exactly the critical incident was, correct?

A. That is correct.

Q. Okay. And then there is a portion of the form for follow-up, right?

A. Yes.

Page 108

Q. Level 1, does that refer to the -- as we discussed before, the emergency?

A. Yes.

Q. And the "Completed by: Ron Neal. Title: Assistant superintendent." Do you see that?

A. He may have been the assistant at the time. I don't know. It may be a typo.

Q. Okay.

A. Or he may have been the acting superintendent.

Q. Okay. And you see that there is no follow-up date or time, right?

A. Right.

Q. Then on the last page of the form, there is a blank page at the end, but on the last page containing material on the form --

A. Uh-huh.

Q. -- there are Sections A through K?

A. Okay.

Q. They include a brief description of the incident, review of staff, and offender's action, factors that may have contributed to the incident, a list of all injuries or death, a list of all staff directly involved, a review of incident's impact on staff and offenders, an inventory of damaged or

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 30 of 44

Page 109

destroyed state property, a critique of decisions male --

A. It should be made.

Q. Made. Okay. Factors or conditions which still exist and which could result in a similar -- I think that might say incident?

A. Yes.

Q. Any referrals to law enforcement and/or prosecutor's office and recommendations for plans of improvement.

Do you see those --

A. Yes.

Q. And those appear as a pre -- on each part -- strike that. Sorry.

Those appear on the template of each critical incident report, correct?

A. Yes.

Q. Those are intended to prompt the discussion for the follow-up, right?

A. Yes.

Q. And then there is also a part of the form that says "follow-up notes." Do you see that?

A. Yes.

Q. Do you know whether that form -- in its interactive form -- allows for a narrative response

Page 110

there?

A. I believe it does.

Q. And then you see that there is "click here to insert" three times. You will agree with me that on this particular form nothing was inserted there?

A. It appears so, yes.

Q. And then same with file attachments? That the fact that -- what appears is "click here to attach a file" and not the name of an attached file -- that indicates there was no attachment in this particular form, right?

A. That is how it appears, yes.

Q. Okay. Do you agree with me that the documentation of this particular critical incident report does not document any follow up was conducted?

A. Yes. That is what it appears.

Q. Okay. And is there any other form that would reflect follow up of a critical incident?

A. Possibly the debriefing. And, obviously, it would be a -- it would be a priority if they used -- it would be a part -- if they scrolled down and used the follow up -- those would have prompted -- and those would have been part of the

Page 111

review --

Q. I'm not sure I follow.

So is there a different form that's used for a debriefing?

A. No.

Q. Okay. So there is no other documents that you're aware of that's commonly used?

A. Not for this incident, no.

Q. Okay.

A. Or any incident.

Q. Okay. Just give me a few minutes to go over and see if there's anything else that I have.

A. Sure.

MS. GRADY: I don't think I have anything else.

MR. ANDERSON: Okay. Could we have maybe another ten-minute break?

MS. GRADY: Sure.

MR. ANDERSON: Okay.

(WHEREUPON, a short break was taken.)

MS. GRADY: So I don't have anything else. Sorry. I wanted to put that on the record just in case.

MR. ANDERSON: We don't have any

Page 112

questions.

MR. JIMENEZ: I don't have any questions either.

THE REPORTER: Are you reserving signature?

MR. ANDERSON: Yes, we are.

(WHEREUPON, at 3:53 p.m., the deposition was concluded.)

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD   document 212-43   filed 05/25/21   page 31 of 44
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

Page 113

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, APRIL D. HARGETT, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 84-4735, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 18th day of May, 2021.

*April Hargett*

April D. Hargett, CSR
License No. 084-004735

Page 114

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

BARBARA DEVINE, as Personal)
Representative of the        )
ESTATE OF JOSHUA DEVINE,     )
                             )
        Plaintiff,           )
                             )  Case No.
   vs.                       )  3:18-cv-00995-JD-MGG
                             )
RON NEAL, et al.,            )
                             )
        Defendants.          )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of Pages 1 to 113, inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid, and includes changes, if any, so made by me.

_____
             RICHARD CURRY

Subscribed and sworn to
Before me this
Day of            , 2021

     Notary Public

Page 115

ERRATA SHEET
CHANGES IN TESTIMONY

DEVINE v. NEAL, ET AL.
RICHARD CURRY
September 23, 2020

| PAGE | LINE | FROM | TO |
|------|------|------|-----|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 32 of 44

## A

**AAR (8)**
25:17,20;33:21;34:9;
39:23;42:25;63:18;
90:8
**AARs (3)**
12:22;13:13;93:16
**Abbassi (3)**
48:3,4;58:22
**abbreviated (1)**
99:11
**ability (1)**
69:24
**able (4)**
9:4;36:10;71:1;
76:20
**above (2)**
30:6;39:4
**absence (1)**
104:7
**accelerant (1)**
71:20
**access (4)**
99:16;100:10;
104:15,16
**according (4)**
30:7;50:20;55:15;
86:23
**account (1)**
64:11
**accounts (1)**
57:14
**accurate (1)**
83:14
**act (1)**
47:11
**acted (1)**
55:18
**acting (2)**
102:11;108:9
**action (7)**
69:17;90:2,14;91:3,
17;94:2;108:21
**actions (2)**
55:14;102:12
**activate (2)**
30:20;85:24
**activated (3)**
56:5;89:9;107:11
**activating (2)**
57:17;58:8
**actual (14)**
19:21;22:10,10,12;
34:21;35:16;36:19;
44:23;49:18;52:8;
57:21;73:13;74:6;
90:19
**actually (30)**
5:12;6:15;10:21;
11:5;21:13;22:2;25:17,
17;30:21;31:3;37:12;

40:21,23;47:8;50:9;
51:16;52:4;71:22;
74:14;75:12;81:24;
83:3,12;84:22;92:15;
97:7,14;98:8;102:11;
103:23
**added (1)**
35:2
**addendum (1)**
40:21
**additional (4)**
16:19;104:3;105:18,
20
**administration (1)**
53:13
**administrative (2)**
22:4;102:9
**affairs (2)**
50:8;62:22
**affected (1)**
92:25
**affirmatively (2)**
99:17;100:9
**after-action (42)**
6:1;18:5;26:20;
33:25;34:4,6,12;35:4,
11;36:6,23;37:6,11;
38:22;39:6,18;40:7,14,
16,25;41:4,5;42:6,23;
43:14;48:18,24;49:15,
24;52:7;55:8;57:20,22;
64:8;66:1;80:3,7;
83:16;85:20;87:3,12;
90:9
**afternoon (1)**
4:10
**afterwards (2)**
50:5;82:19
**again (45)**
12:23;13:1;16:7;
18:18,20;19:14,18;
26:4;35:22;36:16;
39:20;40:13;41:1;
42:16,25;45:23;50:18;
51:7;52:19,25;53:4,25;
54:2;55:6,12,21;56:8;
57:10,20;58:7;60:22;
61:14;63:18;64:3,8;
66:19;71:2,3;74:14,18;
80:24;85:21;88:22;
91:8;100:20
**against (1)**
67:4
**agency (2)**
71:15;101:23
**agenda (1)**
74:7
**agree (23)**
7:1;21:8;38:3;39:16,
21;46:4;48:22;50:2;
58:21;59:9;61:12,15;
62:2,13;63:9,20;69:8,
10,22;70:8;106:2;

110:4,14
**agreed (1)**
6:18
**agreement (1)**
6:11
**ahead (5)**
45:21;46:22;48:20;
57:1;66:6
**aid (3)**
31:13;86:12;87:7
**alive (1)**
70:11
**allow (1)**
36:11
**allows (2)**
15:5;109:25
**alone (1)**
82:5
**along (3)**
15:17;25:5;68:10
**although (2)**
8:24;102:21
**always (5)**
45:22;53:10;67:19;
90:22;99:14
**amount (1)**
62:5
**analysis (8)**
27:14;28:13,19;
29:11;31:20;32:19,23;
52:4
**and/or (5)**
5:24;21:19;52:17;
66:17;109:8
**ANDERSON (8)**
6:9;15:23;63:14;
70:4;111:16,19,25;
112:6
**Anthony (1)**
102:24
**Anthony's (2)**
100:19;101:22
**appear (3)**
49:6;109:13,15
**appears (10)**
64:18;81:4;87:17;
102:21,24;105:18;
110:7,9,13,18
**apply (3)**
53:25;54:21,22
**appropriate (1)**
52:17
**appropriately (1)**
53:8
**approved (1)**
8:10
**approximately (2)**
10:14;94:4
**April (14)**
6:16;33:5;42:6,23;
43:15;44:13,17;47:22;
61:5;85:20;87:3,12;
98:2;105:2

**area (6)**
19:24;59:6;82:1;
84:7;89:13;92:23
**Argumentative (1)**
63:14
**around (3)**
67:25;68:4;93:11
**aside (1)**
21:11
**assault (2)**
56:11;106:19
**assaulted (2)**
56:19;82:12
**assemble (2)**
44:11;75:2
**assess (2)**
26:11;27:7
**assessing (8)**
6:2;17:24;25:9;
33:11,17;36:13;66:16;
82:4
**assessment (2)**
26:2;31:24
**assigned (4)**
10:7,7;43:4;47:13
**assistant (3)**
10:3;108:5,6
**assume (4)**
46:11;62:18;75:22;
103:9
**assuming (2)**
46:14;84:20
**assumption (4)**
46:16;76:11;77:18,
22
**attach (2)**
23:14;110:10
**attached (3)**
104:5;107:1;110:10
**attachment (3)**
106:7,8;110:11
**attachments (3)**
105:25;106:4;110:8
**attack (1)**
70:1
**attend (4)**
42:10,22;48:18;
73:15
**attendance (6)**
48:5,10,13;49:25;
50:3;75:20
**attended (4)**
47:22;57:14;66:1;
72:10
**attention (10)**
27:10,12;59:18,24,
25;60:15;67:20;95:1,4;
97:15
**Attorney (1)**
14:3
**audible (1)**
63:9
**audibly (1)**

51:5
**audio (1)**
59:10
**auditing (1)**
10:23
**authors (1)**
103:25
**available (1)**
31:1
**average (1)**
29:21
**aware (15)**
6:5,8;17:10;33:2,6;
47:21;61:24;67:23;
74:19;78:11;79:8,8,12,
17;111:7
**awareness (1)**
78:7

## B

**back (20)**
10:16,19,19;13:3;
16:4;21:11;26:22;
35:18;39:14;46:13;
49:7;61:10;64:7;65:1;
79:22;80:4;84:25;
88:24;97:22;99:14
**background (1)**
11:16
**bad (2)**
69:22;71:8
**bandwidth (1)**
70:19
**based (9)**
25:16;29:12;42:4;
44:1;50:10;67:8;76:11;
77:18;103:18
**basic (1)**
33:6
**Basically (14)**
19:1;25:3;29:14;
34:16;35:13;41:14,24;
45:15;54:4;82:1;98:19;
99:7;102:10;104:6
**basis (6)**
14:12,19;71:21;
77:21;99:18;100:10
**Bates (1)**
23:8
**bear (1)**
25:7
**become (1)**
44:6
**becoming (1)**
11:5
**beforehand (1)**
44:23
**began (3)**
9:20;56:11;57:3
**behalf (7)**
4:19;5:23;6:7;7:2;
11:22;13:8;25:9

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 33 of 44

**behind (2)**
85:23;99:19
**belief (1)**
77:11
**benefit (1)**
48:8
**best (5)**
45:18;46:2;54:11;
74:25;76:5
**better (3)**
35:20;88:1,18
**beyond (1)**
70:21
**binding (2)**
6:6;28:2
**bit (1)**
30:4
**Blakely (3)**
48:3,9;58:23
**blank (2)**
106:17;108:15
**board (3)**
19:20,20;92:10
**both (2)**
17:16;53:19
**bottom (1)**
94:21
**box (5)**
95:18;100:21;
101:10,12,14
**boxes (1)**
107:2
**brave (1)**
47:11
**break (7)**
16:2;23:2;79:22,24;
80:2;111:17,20
**brief (1)**
108:20
**briefed (1)**
71:24
**Briefly (3)**
38:24;40:10;47:10
**bring (2)**
19:5;67:20
**broad (2)**
64:4,6
**broke (2)**
48:17;54:24
**brought (2)**
78:15;96:15
**built (2)**
79:1,4
**bullet (6)**
56:4;80:10,13,18;
82:17;87:5
**burned (1)**
93:6
**business (4)**
19:7;20:5;37:24;
54:3
**button (1)**
59:19

**C**

**call (22)**
9:5,6;20:7;30:17,18;
34:3;53:3;54:3,14;
59:19;66:23;67:17;
81:13,14;82:5,20,21;
83:4;90:10;98:21;99:5;
102:3
**called (14)**
4:6;9:7;18:4,5;
30:19;33:21,24;45:8;
49:20;83:8;84:8;86:2,
6;102:25
**calling (1)**
61:1
**calls (2)**
67:16;82:24
**came (11)**
10:16,19,19;40:23;
47:21;48:21;59:5,5;
63:17;77:10;92:8
**Can (79)**
4:11;6:10;7:6,10,14;
8:5;9:7,19;11:9,21;
12:7,13;14:8,14,15,23;
15:22,25;16:4;17:10;
18:2,13,18,21;19:1,7,
13;20:21;23:14;24:24;
27:16;30:3,5;33:8,23;
34:11;35:8,8,21;36:16;
40:12;43:12;46:21;
47:16;51:18;52:21;
53:6,10;56:10;58:17;
59:23;62:11;63:16;
64:7,21;69:9,19;70:6,
14;73:1;74:23;77:14;
78:12;79:22;86:22;
87:9;98:3;99:2,14;
100:14;101:13;103:5,
5,9,10;105:24;106:25;
107:5,8
**capacity (1)**
11:8
**captain (6)**
98:18;102:4,5,18;
103:8;105:3
**captured (2)**
6:12,13
**career (5)**
9:20;11:4,10;32:19;
100:11
**careful (1)**
67:21
**Carolina (3)**
67:5;68:1,20
**case (21)**
32:23;33:1,2;49:22;
50:11;57:23;62:23;
65:9;67:4,4,7,13;68:10,
10;72:17;76:13;86:14;
89:11;102:5;106:15;

111:24
**catch (2)**
49:22;77:12
**catchall (1)**
49:10
**categorizing (1)**
31:1
**category (1)**
97:5
**cause (4)**
43:25;71:14;76:15;
89:19
**caused (3)**
57:7;76:12;77:4
**cell (57)**
15:3;33:4;47:9,13,
19,24;48:16;51:6,10,
22;52:10;54:23;55:3;
56:10,22;59:4,15,18,
25;60:14,17,22;61:3,4,
7,11,17,19,22;62:3,5,
14,16,24;63:11,22;
69:25;70:10,21,22;
71:12,19;76:10,15;
77:1,16,17;78:25;
80:15;82:13;88:9;
90:20;92:15;93:2,8,12;
96:19
**cells (7)**
59:6,23;60:6;65:18;
79:4;84:2;93:11
**Center (2)**
9:23;10:12
**central (5)**
20:24;32:17;42:14,
17;45:1
**centrally-involved (1)**
48:23
**certain (4)**
12:2;25:13;45:24;
53:8
**challenge (1)**
42:1
**characterize (1)**
91:6
**charge (4)**
89:1,6,10,18
**charged (1)**
23:12
**check (1)**
47:2
**checks (2)**
78:9;79:19
**chiefs (1)**
73:6
**Christopher (1)**
15:18
**chronological (1)**
94:23
**cigarettes (2)**
76:23;77:1
**circle (1)**
43:2

**circumstance (1)**
96:25
**circumstances (1)**
45:5
**CISM (4)**
84:8;86:2,3;107:13
**clarifies (1)**
103:21
**clarify (1)**
102:13
**clear (8)**
49:23;55:7;62:1,11;
68:18;79:15;86:16;
89:17
**cleared (1)**
83:25
**click (5)**
104:3;105:17,24;
110:3,9
**coming (1)**
44:10
**comment (1)**
51:15
**comments (7)**
45:17;47:4,15;74:4;
75:14,18,24
**Commissioner (20)**
7:18;8:10;28:9,10,
20,24;29:2;31:19;43:2;
45:4,6,14;46:9;47:3,
18;72:12;73:15;75:14;
99:24;105:13
**Commissioners' (1)**
41:2
**Commissioner's (1)**
41:1
**commonly (1)**
111:7
**communicate (3)**
60:20,24,25
**communication (4)**
88:2,5,18,20
**complete (3)**
103:10;104:10;
107:16
**completed (11)**
36:24;96:12,23;97:5;
98:1,15;104:13,22,22;
107:5;108:4
**completion (1)**
98:11
**compliance (5)**
41:8,13;55:10,18;
57:18
**compliant (3)**
40:15;41:12;60:12
**complied (5)**
55:2;58:9;63:5;
66:12,17
**complies (1)**
20:22
**complying (2)**
5:19;27:19

**components (1)**
36:24
**computer (2)**
18:8;104:17
**concern (1)**
47:18
**concerned (1)**
65:3
**concerning (7)**
7:19;10:24;11:25;
14:16;55:24;56:8;
92:24
**concerns (3)**
39:13;43:20;48:15
**concluded (1)**
112:9
**conclusion (3)**
57:16;77:10,15
**conclusions (1)**
53:7
**concrete (1)**
77:23
**conditions (2)**
92:7;109:4
**conduct (8)**
19:4;31:19,24;32:22;
42:25;49:15;51:21;
52:2
**conducted (4)**
32:19;41:8,12;
110:17
**conducting (3)**
28:19;29:11;33:11
**confusion (1)**
89:19
**consistent (5)**
6:22;52:17;59:12;
60:16;97:19
**Constitution (1)**
69:16
**construction (4)**
71:24;72:19,21;
78:25
**containing (1)**
108:16
**content (1)**
13:22
**contents (1)**
74:25
**context (1)**
91:25
**continue (1)**
71:23
**contraband (1)**
76:23
**contributed (1)**
108:22
**control (5)**
18:9;65:7,23,25;
66:13
**convene (1)**
38:5
**convened (1)**

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 34 of 44

38:13
**convenes (2)**
37:6,10
**convening (2)**
37:22;38:12
**conversation (2)**
44:2;86:24
**conversations (7)**
13:20,22,23,24;29:2;
43:1,13
**copy (2)**
24:19,21
**Correction (12)**
4:18;5:3,22;7:8,22;
8:18;9:17;10:16;16:10;
20:10,15;32:20
**Correctional (13)**
9:22,24,25;10:4,8;
11:12,13;54:23;55:25;
67:23;68:12,17;103:24
**Correction's (1)**
7:2
**correctly (1)**
36:24
**counsel (3)**
5:1;6:17,18
**count (1)**
61:9
**County (1)**
10:11
**couple (4)**
4:22;33:20;55:21;
74:20
**course (5)**
29:7;32:18;39:1;
76:17;100:11
**cover (2)**
24:25;30:21
**covered (3)**
12:23;35:13;90:21
**covers (1)**
25:2
**craft (1)**
44:7
**create (3)**
17:8;24:5;44:6
**created (3)**
39:24;77:5;86:23
**cries (2)**
63:21,21
**crisis (1)**
107:13
**critical (29)**
20:7;26:3;37:14,25;
44:21;86:4;94:1;95:13,
16;96:2,11,17;97:4,16,
25;98:15;99:10;101:4,
7;102:1;103:10,14,23;
104:23;106:12;107:20;
109:16;110:15,20
**critique (1)**
109:1
**cry (1)**

63:10
**cuff (1)**
35:16
**curiosity (1)**
31:9
**current (2)**
7:10,12
**currently (1)**
7:7
**CURRY (15)**
4:5,10,13;5:6;6:23;
15:13;23:18,21;27:3;
40:3;41:23,23;80:2;
93:20;99:22
**C-u-r-r-y (1)**
4:14
**custody (2)**
15:1;67:15
**customary (1)**
44:11
**customs (1)**
5:24

**D**

**daily (6)**
14:12,19;19:1,4;
78:10;79:19
**damaged (1)**
108:25
**dangers (1)**
69:9
**date (7)**
6:23;7:4;16:17;
101:3,3,24;108:12
**dates (1)**
6:16
**day (10)**
19:7;20:5;37:25;
40:22;47:24;49:21;
61:3,3;70:10;105:8
**day-to-day (1)**
9:10
**dealing (1)**
11:6
**deals (3)**
12:16;27:21;36:13
**dealt (1)**
71:5
**death (8)**
33:4;43:9;70:3;
78:12;100:18;101:11;
106:18;108:23
**debrief (2)**
18:10;38:1
**debriefing (25)**
11:25;18:4,5;25:18;
34:3,9,13;35:5,12;36:6,
18,23;37:7,11;39:19,
23;40:22;41:17;84:7;
85:13,19;86:19;87:1;
110:21;111:4
**debriefings (2)**

36:19;39:6
**decades (1)**
79:4
**December (5)**
6:1,20;9:15;10:6,21
**decide (1)**
20:18
**decisions (7)**
14:15;17:13,15;
19:12;28:25;55:22;
109:1
**deems (2)**
49:2,5
**defendants (1)**
5:2
**defensive (1)**
44:7
**defines (1)**
97:16
**definite (1)**
45:17
**definitely (1)**
21:7
**definitions (2)**
97:8,11
**degree (2)**
11:17,19
**Department (28)**
4:17;5:2,22;7:2,7,18,
22;8:18;9:17;10:16;
12:11,15;13:11;16:10;
20:10,15;21:23;22:12,
20,22;24:5,6;28:11,16;
32:7,20;52:19;83:24
**departments (1)**
24:15
**department-wide (2)**
20:11;27:25
**depending (2)**
29:10;30:1
**depends (1)**
15:8
**deploy (1)**
56:14
**deployed (6)**
52:14;80:22;81:7;
82:10,18;83:10
**deposition (16)**
4:20;5:1;6:17;14:1,
5;16:15;18:9;21:23;
22:19;23:23;25:1;
40:10;80:11;93:16;
94:6;112:8
**deputy (16)**
14:25;19:3;29:2;
37:13,17,22;38:15;
41:2;45:4,6,14;46:9;
47:3,18;49:11;99:24
**describe (1)**
7:14
**description (6)**
100:6,24;102:23;
107:15,17;108:20

**designated (15)**
4:17;5:13,21;6:6,24;
9:3;17:20,23;25:8;
30:9;31:17;32:25;
49:11;82:1;98:13
**designee (5)**
6:15;12:20;28:13,21,
25
**despite (1)**
68:7
**destroyed (1)**
109:1
**details (3)**
5:15;86:21;107:20
**Detention (1)**
10:12
**determination (2)**
55:18;66:12
**determine (4)**
14:15;37:18;53:11;
63:5
**development (2)**
10:20,22
**Devine (24)**
23:9,9;32:23;33:1,4;
40:8;51:14;59:4;68:24;
69:5;71:8,11,16;72:3,
15;76:9;77:1,4,8;78:2,
21;80:4;89:4;91:7
**Devine's (6)**
38:23;55:3;70:10;
77:16;93:2,11
**diagnostics (1)**
99:8
**died (4)**
71:9;102:17;103:1,7
**difference (7)**
26:13;30:5,22;61:8,
16;70:2;96:7
**different (22)**
8:21;19:13;22:8,25;
26:18,18;32:4;52:3;
62:12;65:24;72:1;
78:17,24;79:1,4,4,5;
92:9,23;96:4,16;111:3
**differently (6)**
19:13;35:1,20;55:5;
56:3;78:19
**direct (1)**
39:9
**directed (1)**
28:20
**directly (2)**
41:16;108:24
**director (22)**
7:13,15;9:13;10:20,
22;11:2;20:23;21:1;
22:15;29:8;37:3;72:19,
21,25;98:4;99:1,4,21;
100:12;105:8,12,15
**directors (3)**
39:9;72:12;99:21
**disagreed (1)**

57:8
**disconnect (1)**
88:13
**discretion (2)**
20:17;41:2
**discuss (4)**
19:9;20:3;38:2;
68:11
**discussed (12)**
7:4;11:23;17:7;36:9;
38:23;72:15;78:6;
79:11;85:2;87:8,11;
108:2
**discussing (5)**
16:14;47:17;87:1;
88:1,18
**discussion (10)**
74:9;78:3,21;80:9;
85:12,18;87:21;90:5;
91:16;109:19
**dismissed (1)**
92:11
**disregard (1)**
20:18
**dissimilar (1)**
17:2
**disturbance (1)**
101:15
**division (4)**
22:13;28:15;32:12;
72:12
**DOC (2)**
10:12,13
**doctoral (1)**
11:19
**document (45)**
5:4,9;15:11,16;16:9;
21:10;22:1,2,3,4,6,8,
18,25;23:8,10,16,22;
27:1;38:23;40:1,9,13;
50:20;51:3;58:22;64:8;
81:1;82:15;86:22,23;
87:18;91:13;93:18,24,
25;94:1,3,5,12,19,22;
95:2;102:22;110:16
**documentary (1)**
48:8
**documentation (8)**
39:5,22;40:14;41:7;
73:21,25;74:2;110:15
**documents (16)**
12:2,18,25;13:4,17;
15:22;21:14,19;35:6;
44:15,18;57:15;58:7,
14;74:8;111:6
**dogs (1)**
107:12
**done (9)**
19:12;29:21;35:1,19,
20;55:5;56:3;101:19;
103:14
**door (2)**
71:1,8

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 35 of 44

**doubt (1)**
48:8
**down (10)**
5:15;29:4;44:16;
52:12;65:1;89:24;
97:12;104:2,3;110:23
**drafting (1)**
8:9
**draw (2)**
94:25;97:14
**drills (7)**
90:2,10,10;91:17,22,
25;92:7
**drop (1)**
101:14
**drop-down (3)**
100:21;101:10,12
**dry-erase (1)**
19:20
**duly (2)**
4:2,6
**during (6)**
48:14;62:21;72:3;
74:5;85:19;104:24
**duties (1)**
8:6
**duty (6)**
9:7;98:21,24,25;
102:9,12

**E**

**earlier (3)**
19:19;80:11;86:17
**earliest (1)**
95:5
**education (1)**
11:11
**educational (1)**
11:16
**effect (2)**
5:24;80:22
**effected (1)**
34:19
**effective (2)**
16:17;17:3
**either (9)**
43:14;45:17;47:3;
58:22;70:14;95:3;
98:20;99:4;112:3
**elapsed (2)**
62:21;82:8
**electricity (1)**
76:22
**elements (1)**
81:22
**eliminated (1)**
82:11
**else (20)**
13:6;14:24;35:1,3,
10;36:12;48:14;49:5;
56:7;66:9;73:17;77:25;
79:14;83:2;84:14;85:7;

88:17;111:12,15,22
**else's (1)**
81:18
**e-mail (4)**
15:21,21,25;99:5
**e-mailed (1)**
99:17
**emergencies (20)**
6:3;7:19;8:17,19;9:5,
6,6;11:12;17:24;18:23;
25:10;30:1,4,6,14,15;
31:1;33:12,17;66:25
**emergency (63)**
7:13,15,25;8:14;
9:13;10:9,23;11:2,4,7;
12:12,15;13:11;21:23;
22:5,10,12,16,21,22;
23:25;24:5,9,15,20;
25:14;26:1,8,10,12,16,
23;27:8,22;28:15;29:8,
13;30:17,21;31:10,15,
25;32:15;34:7;36:14;
49:20;50:4;56:17;
61:17;67:1;69:20;70:1;
81:13;82:20,24;83:4;
88:6;89:11,14,14;98:5;
100:12;108:2
**employee (3)**
95:10;96:8;97:20
**encounters (1)**
96:24
**end (1)**
108:15
**enforcement (1)**
109:8
**enough (3)**
40:24;60:9;94:13
**ensure (14)**
17:15;19:14;21:2,6;
39:22;42:15,16;43:11;
45:19;54:15;78:8;
79:18;86:12;104:9
**ensuring (5)**
8:9;20:22;28:6;
36:22;38:12
**entire (1)**
24:6
**entirety (3)**
7:21;36:11;66:18
**entities (1)**
10:25
**entitled (4)**
16:11;22:3,4;94:1
**ERO (1)**
107:8
**evacuate (2)**
56:9;90:23
**evacuating (1)**
91:1
**evacuation (3)**
82:9;88:14;91:4
**even (8)**
15:7;50:14;51:8;

56:17;90:20;100:8,23;
103:22
**evening (1)**
61:17
**event (3)**
23:21;45:16;96:21
**Everybody (2)**
34:24;61:10
**everyone (1)**
41:14
**exact (2)**
8:3;46:13
**exactly (5)**
51:13;61:2;69:4;
83:10;107:20
**EXAMINATION (1)**
4:8
**examined (1)**
4:7
**example (3)**
30:19;69:25;74:9
**except (1)**
58:7
**exception (1)**
57:17
**excuse (3)**
43:24;44:14;57:2
**executive (21)**
7:12,15;9:12;10:20,
22,24;11:2;14:19,22;
17:10;20:1;22:15;29:8;
49:3;72:19,21;98:4;
99:4;100:11;105:7,12
**executives (1)**
72:13
**exhaustively (1)**
95:2
**Exhibit (30)**
4:24;5:6,21;6:13,14;
7:3;15:10,13;16:8;
17:4;18:7;20:2;23:6,
18;26:24;27:3;35:25;
40:3,7;41:10;49:8,8;
80:4,6;81:15;93:14,20,
24;97:6,23
**exist (1)**
109:5
**existed (1)**
16:20
**expanded (1)**
70:21
**expectation (1)**
98:10
**experience (4)**
28:23;37:5;55:6,23
**expert (2)**
7:18;76:17
**expertise (1)**
71:18
**explain (6)**
18:18,21;24:1;30:5;
44:3;54:12
**explained (2)**

30:4;64:24
**explains (1)**
64:11
**extent (1)**
25:13
**external (3)**
32:7,8,9

**F**

**face (1)**
106:8
**facilities (7)**
6:4;7:24;14:16;
17:25;25:11;68:17;
74:20
**facility (19)**
8:11,24;9:3,22;10:4,
8;14:11,20;19:16,16,
21;20:4,23;24:12,13;
26:19;38:2;100:18;
101:6
**facility's (1)**
14:19
**fact (10)**
36:23;39:23;48:15;
55:17;67:3;69:20;
71:19;75:6;81:2;110:9
**factors (2)**
108:22;109:4
**facts (1)**
33:6
**failed (1)**
74:21
**Fair (1)**
31:22
**fall (2)**
72:8;78:1
**falls (2)**
28:9,10
**familiar (1)**
95:10
**familiarity (1)**
59:14
**far (2)**
11:14;52:9
**favorable (1)**
92:7
**feel (1)**
40:12
**felt (1)**
44:3
**FEMA (1)**
31:12
**few (1)**
111:11
**field (1)**
68:12
**fight (2)**
9:9;57:3
**fighting (1)**
91:2
**figure (1)**

23:15
**file (3)**
110:8,10,11
**filed (1)**
23:12
**film (1)**
50:12
**finally (1)**
71:7
**find (5)**
18:11;33:25;34:2;
66:25;74:6
**fine (2)**
21:17;104:14
**finished (2)**
5:18;27:18
**fire (67)**
8:22;9:9;20:6;24:15;
25:5,5;32:20;38:23;
39:11,14;43:9,14,22;
48:17;52:17,19,21;
54:17,24;55:3,11,20;
56:1,21;57:11,11,18;
58:10;63:6,11,21;67:8;
68:1,2,8,20,25;69:3,6;
70:16,21;71:4,8,14;
72:3,15;73:6,13;74:10;
76:15,18;77:12,16,20,
24;78:2,21;83:24;
87:21;89:5;90:2,6;
91:7,17,22,25;92:7
**fired (1)**
54:13
**fires (2)**
8:20;20:4
**first (29)**
4:6;5:14;13:21;46:7,
10;47:7,18;48:16;
50:16;51:12;58:5;69:2;
70:20;80:10,14;81:23;
86:12;89:1,6,21;95:7,
9;102:1,7,16;103:6,6,
22;107:10
**fit (1)**
39:15
**fits (1)**
97:5
**five (7)**
16:1;31:2,3;51:12;
72:1;79:22;81:24
**flash (1)**
50:23
**flush (1)**
90:22
**follow (7)**
20:14,18;54:16;
110:16,20,24;111:2
**followed (4)**
21:3,6;28:7;54:21
**following (2)**
55:8;78:22
**follows (1)**
4:7

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 36 of 44

**Follow-Up (5)**
94:2;107:24;108:12;
109:19,22
**food (1)**
15:7
**footprint (1)**
19:21
**forgot (1)**
19:18
**form (38)**
44:1;70:4;95:9,12,
20;97:25;98:11,14;
99:11,11;100:15,21;
101:2;103:5,17;104:1,
13,16,17,20,21;105:19;
106:3,17,21;107:1,4,
20,24;108:14,16;
109:21,24,25;110:5,12,
19;111:3
**format (2)**
100:21;104:10
**former (1)**
105:13
**forms (1)**
106:6
**forth (1)**
26:1
**forward (3)**
15:20;49:25;104:8
**four (1)**
81:23
**fourth (3)**
56:4;82:16;95:18
**frame (2)**
6:19;12:23
**free (1)**
40:12
**frequency (1)**
29:10
**Friday (2)**
14:21;19:8
**front (4)**
21:14,19;99:18;
100:9
**full (1)**
62:14
**further (4)**
42:19;97:13;99:15,
23
**future (1)**
19:13

**G**

**gangs (1)**
14:17
**gather (4)**
8:15;68:14;99:9;
104:8
**gave (3)**
84:1;88:19;89:5
**general (1)**
61:13

**generally (1)**
83:14
**General's (1)**
14:3
**germane (2)**
24:10;32:17
**gets (1)**
89:21
**gist (1)**
88:22
**given (8)**
29:9;42:21;43:6;
44:16,18;48:8;92:12;
103:19
**gives (4)**
5:14;14:18,22;25:22
**goal (1)**
54:9
**goes (5)**
24:3;38:10;86:13;
98:19;99:3
**Good (2)**
4:10;50:2
**governor (1)**
30:10
**governs (1)**
22:13
**GRADY (23)**
4:9,24;5:8;6:12,21;
15:15,18,24;16:4,6;
23:4,7,20;27:5;40:5;
63:15;70:5;79:21;80:1;
93:22;111:14,18,22
**group (6)**
15:4,5;19:6,8;81:23;
83:15
**Guard (1)**
31:13
**guess (1)**
106:5
**guesstimating (1)**
76:8
**guy (1)**
71:6
**guys (1)**
79:23

**H**

**hand (3)**
66:23;86:1,1
**happen (9)**
35:21;36:20;43:1;
68:24;69:5;74:23;75:4;
78:12;91:11
**happened (19)**
19:11;31:25;34:22;
35:2;41:21,21;64:12;
67:21;68:3,21;69:7,20;
70:7;74:20;82:7;92:23;
99:11;100:25;101:22
**happening (1)**
17:11

**happens (7)**
50:16;67:19;68:13;
81:21;92:1;100:4;
104:24
**hard (2)**
88:7;92:19
**hear (6)**
50:13;88:8,15;89:17;
92:4,4
**heard (3)**
60:9;63:1;64:3
**hearing (2)**
58:2;63:20
**heart (1)**
70:1
**held (1)**
38:1
**help (13)**
8:16;10:9;23:22;
50:4;59:5;61:12,20;
62:16,17;63:10,21;
82:23;98:13
**helps (1)**
103:21
**herein (1)**
4:6
**here's (3)**
26:8,10;53:14
**herself (1)**
28:24
**hey (4)**
34:22;42:18;47:2;
99:22
**high (1)**
32:6
**higher (1)**
51:20
**highest (2)**
10:1;31:5
**highlight (1)**
5:16
**highly (1)**
96:21
**hollering (1)**
67:6
**home (2)**
86:13,15
**honest (1)**
50:15
**honestly (1)**
104:12
**horrible (1)**
46:24
**hospital (1)**
96:20
**host (1)**
14:21
**hostage (4)**
65:9,16;68:14;
107:12
**hosting (1)**
38:20
**hot (2)**

70:16;71:4
**hour (1)**
73:10
**hours (1)**
98:21
**house (27)**
47:13,24;51:6,10,22;
52:10;54:23;56:10,22;
59:4;60:14;61:3,4,11,
17,19,22;62:3,5,14,16,
24;78:18;80:16;82:13;
88:9;90:20
**houses (4)**
15:3;60:17,23;61:7
**housing (1)**
89:13
**huge (1)**
51:10
**hypothetical (1)**
86:9

**I**

**idea (1)**
50:2
**identification (6)**
5:5;15:12;23:17;
27:2;40:2;93:19
**identified (1)**
89:20
**identify (2)**
68:8;106:22
**identities (1)**
47:23
**IDOC (45)**
6:4,6,18;7:16;8:20;
9:14,20;12:20;14:4;
17:25;18:24;20:17;
22:3;25:10;27:24;29:9;
34:15;35:5,12;39:16,
21;41:8,12,13;48:22;
52:18;55:10,19;57:19;
58:9,9;59:12;60:12,16;
63:6,12,22;64:1;66:17;
69:15;95:10;96:8;
97:20;98:11,14
**IDOC's (6)**
5:23;11:22;13:7;
18:23;25:8;40:15
**ignite (1)**
76:20
**ignoring (2)**
63:9,20
**imagine (1)**
53:6
**immediately (2)**
25:4;55:8
**impact (1)**
108:24
**implied (3)**
45:22;57:6;76:9
**improve (6)**
50:4;53:9,10;88:5,

20;89:5
**improvement (1)**
109:10
**inappropriate (2)**
65:15;71:19
**inbox (1)**
15:21
**incident (76)**
12:9;13:10;14:7;
16:11;19:2,19;20:7;
26:17;30:8;33:14;34:8,
16,21;35:2,16,25;
36:14;37:13,14,18,25,
25;39:11,18;40:19;
43:10;44:22;45:9,10;
50:10;57:21;67:25;
86:4,8;88:4;90:13;
94:1,15;95:13,16,21;
96:1,2,12,13,16,17,23;
97:1,4,17;98:1,2,16;
100:6,24;101:4,8,24;
102:2;103:11,14,23;
104:4,23;106:13;
107:16,21;108:21,22;
109:6,16;110:15,20;
111:8,10
**incidents (15)**
6:3;14:11;17:9,25;
18:11,24;19:23;25:10;
26:3;33:12,18;38:2;
44:21;87:8;99:10
**incident's (1)**
108:24
**include (5)**
8:20;9:9,9,10;108:20
**included (4)**
12:4;35:4,11;48:24
**including (2)**
20:1;80:14
**inclusive (1)**
9:10
**incomplete (1)**
100:7
**Indiana (31)**
4:17;5:2,22,25;7:2,7;
8:4,18;9:17,23;10:16;
11:18;12:22;13:13;
16:10;20:8,10,13,15;
23:25;24:10,17;28:2,5,
7;31:24;32:20;33:5,10,
16;59:15
**indicate (3)**
41:7,11;81:2
**indicated (1)**
106:3
**indicates (3)**
40:15;106:12;110:11
**indication (3)**
58:21;82:16;83:15
**indirectly (1)**
41:16
**individual (2)**
52:5;69:3

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 37 of 44

**individuals (2)**
36:20;105:20
**industry (1)**
33:24
**informal (1)**
74:7
**information (8)**
50:3;71:18;76:25;
77:3;88:11;99:9;
103:18;104:8
**inhalation (2)**
47:9;71:5
**injuries (3)**
106:17,22;108:23
**inmates (4)**
14:17;17:16;56:22;
67:5
**inner (1)**
43:2
**insert (1)**
110:4
**inserted (1)**
110:5
**inserts (1)**
42:14
**inside (1)**
76:21
**insight (2)**
14:18,23
**inspect (1)**
93:7
**instance (3)**
24:14;43:6;86:7
**instances (2)**
87:11;96:17
**instead (1)**
62:11
**instructor (1)**
11:6
**intended (1)**
109:18
**intentionally (1)**
77:5
**interact (1)**
22:15
**interaction (1)**
100:14
**interactive (1)**
109:25
**Interesting (1)**
31:16
**interject (1)**
6:9
**internal (2)**
50:8;62:22
**interpretation (1)**
81:20
**intervention (1)**
107:13
**interview (1)**
52:4
**interviews (1)**
51:22

**into (6)**
42:20;59:6;67:25;
78:20;99:14,23
**inventory (1)**
108:25
**inverted (2)**
30:12,13
**investigate (3)**
59:7;62:20;63:2
**investigation (1)**
52:2
**involve (3)**
30:15;90:15;106:19
**involved (13)**
34:18;35:17;49:18;
57:5;81:22;85:25;
101:23;106:11,12,18,
22;107:5;108:24
**involvement (1)**
107:8
**involves (1)**
33:3
**ironically (1)**
31:15
**ISP (10)**
20:22;21:3,6;32:9,
13;37:1;66:17;93:16;
103:7;104:17
**issue (2)**
76:14,16
**items (2)**
77:8,16

## J

**January (3)**
5:25;6:19;10:15
**JIMENEZ (1)**
112:2
**job (12)**
7:10,12;8:6,13,15;
10:11;29:18;39:1;
54:14;63:3,4;93:9
**Joshua (6)**
33:4;38:23;40:8;
55:3;70:10;93:2
**judgment (3)**
53:3;54:14;66:23
**July (3)**
16:18,20;17:3
**jump (2)**
76:22;79:22
**June (4)**
4:25;9:18,18,21
**Juvenile (2)**
10:8,12

## K

**K9 (1)**
107:12
**keep (3)**
14:13;69:12;95:16

**keeps (1)**
14:10
**key (22)**
47:14,19;64:16,23;
65:1,2,5,7,10,11,22,22,
23,25;66:8,9,9,13,14,
22;67:2;70:10
**keys (5)**
65:15,17;70:25;71:3,
7
**kids (1)**
90:24
**killed (2)**
67:9,11
**kind (33)**
8:21;11:24;12:21;
14:12,14,17;15:5;
19:11,16,20,22,23;
22:13;24:1;30:11;
31:11,14;34:23,24;
35:2,18;38:16;39:10;
41:19;43:10;53:18;
55:13;67:3;72:16;
74:21;86:11;92:3;
100:4
**knew (1)**
21:18
**knowledge (3)**
71:17;74:16;96:8
**knows (1)**
90:18

## L

**laid (3)**
36:7,10;97:5
**landscape (1)**
76:17
**lapse (1)**
99:3
**last (6)**
11:3;27:12;73:1;
90:1;108:14,15
**later (2)**
11:1;72:8
**law (1)**
109:8
**laws (1)**
68:10
**layman's (1)**
96:18
**layout (1)**
59:15
**lays (1)**
33:16
**lead (2)**
73:11;77:15
**leader (1)**
98:23
**leaders (2)**
49:4;67:17
**leadership (6)**
11:14,16,17,19;

33:10,17
**leading (1)**
73:4
**learned (9)**
87:14,21;90:6,7;
91:7,9,13;103:6,7
**least (2)**
29:16;90:11
**led (2)**
72:18;77:7
**leery (1)**
55:13
**left (1)**
10:10
**less (3)**
55:23;82:2;92:7
**lethal (1)**
82:3
**Level (34)**
9:5,5;20:24;30:4,6,7,
12,12,14,17,18,19,22,
24;31:5,10,11,14;32:7;
61:8,10,16,18;62:20;
101:15,17,18,18,18,19,
20,22;103:11;108:1
**levels (1)**
30:25
**Lieutenant (3)**
57:13;64:11;102:5
**life (3)**
70:3;78:12;96:18
**light (2)**
50:23;76:23
**lighters (1)**
76:21
**limb (2)**
29:15;96:18
**limit (1)**
6:18
**limitation (1)**
7:4
**line (2)**
90:19;103:24
**list (4)**
13:18;49:9;108:23,
23
**listed (2)**
20:1;91:12
**listen (4)**
34:22;42:19;54:5;
57:24
**listening (1)**
57:13
**little (4)**
30:4;42:19;50:25;
97:12
**live (1)**
78:18
**local (2)**
24:15,15
**location (2)**
101:6,7
**lock (2)**

52:12;70:17
**locked (2)**
59:22;61:10
**long (6)**
9:12,16;23:10;59:3;
73:9;75:11
**look (25)**
14:14,19;10:10;33:13;
37:16;38:7;42:20;
43:10;51:16;52:8;
55:14;65:6;67:20;
71:23,25;74:18;76:16;
78:5,25;96:14,14;
98:18;99:14,22;104:2,
3
**looked (9)**
11:24;12:2,25;66:20;
75:2;93:4,17;94:17;
99:13
**looking (4)**
21:20;39:19;45:24;
54:15
**looks (2)**
37:23;100:6
**losing (1)**
10:18
**lot (7)**
11:15;12:23;14:17;
43:1;69:9;70:19;92:18
**lots (1)**
61:7
**loud (5)**
60:17,23;61:1,3;62:4
**louder (1)**
62:14
**loudly (1)**
60:8
**lowest (1)**
101:20
**lungs (6)**
61:12,20;62:4,15,17,
25
**lured (1)**
67:8

## M

**ma'am (3)**
16:25;32:8;61:6
**mad (1)**
61:23
**magnets (1)**
19:22
**main (1)**
54:9
**maintained (1)**
73:22
**major (2)**
9:25;15:1
**makes (6)**
8:25;24:17;28:25;
54:10;96:7;99:15
**make-up (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 38 of 44

25:24
**making (3)**
    83:18;89:5,16
**male (1)**
    109:2
**manage (5)**
    8:13,22,23;15:3;
    30:24
**managed (1)**
    9:4
**management (3)**
    73:7;86:4;107:14
**managers (1)**
    15:2
**mandatory (1)**
    31:23
**manual (13)**
    12:12,15;13:11;
    21:24;22:12,21,23;
    23:25;24:5,10,20,25;
    26:1
**manufacture (1)**
    29:13
**many (3)**
    7:24;60:14;62:25
**Mapping (2)**
    16:12;36:1
**Marion (1)**
    10:11
**mark (7)**
    4:24;15:10;16:8;
    23:5;26:24;93:14,24
**marked (8)**
    5:5;15:12;23:8,17;
    27:2;40:2,7;93:19
**marshal (2)**
    73:13;74:10
**master's (1)**
    11:17
**material (1)**
    108:16
**materials (4)**
    44:15;74:12;79:5;
    93:8
**matter (3)**
    7:17;70:2;78:12
**may (47)**
    6:9;8:17,20;10:17;
    14:11;15:6;19:5,9;
    21:1;30:19;33:25;34:1,
    20;42:18;43:20;44:2,6;
    45:3;47:7;49:18,19;
    50:11;55:5;57:7;60:5;
    65:9;70:10;73:12;
    75:10;76:9;78:9;81:20;
    83:11;84:15;89:11,18;
    100:24;104:4,5;
    106:14,15;107:16,16;
    108:6,7,9,22
**maybe (17)**
    15:7;29:14,15;43:21;
    55:13,23;73:10;76:8;
    81:6;83:11;85:1;92:9;

100:15;105:25;106:5,
    5;111:16
**MC (1)**
    83:24
**mean (30)**
    26:5;42:13;44:8;
    45:15,16,23;50:7;
    52:19,24;55:4,12;56:9;
    61:23;66:19;67:14;
    70:2;73:25;75:10,11,
    12;78:18;79:2;91:3,8,
    24;93:3;100:8,20;
    102:19,20
**means (6)**
    7:14;71:25;90:14,15;
    103:15,16
**meant (1)**
    89:25
**mechanics (1)**
    104:12
**mechanism (2)**
    31:18,23
**mechanisms (2)**
    50:8;59:17
**medical (3)**
    9:8;15:6;70:1
**meet (1)**
    19:9
**meeting (38)**
    19:6;34:4;37:23;
    38:1,5,12,20;42:1;
    43:18,23;44:13,16;
    47:22;48:15;50:17;
    57:14;58:19,23;59:1;
    72:14,18;73:4,9,15,18,
    22;74:3,4,5,7,16,17;
    75:21;78:1,6,7;92:11,
    19
**meetings (3)**
    13:1,16;14:21
**member (3)**
    96:24;103:23,24
**members (8)**
    20:3;30:20;47:4;
    53:8,22;56:1,12;69:24
**memory (5)**
    80:25;85:18;86:18;
    87:1,23
**mention (3)**
    6:10;19:19;88:10
**mentioned (2)**
    76:2;78:14
**metrics (1)**
    14:14
**Miami (1)**
    79:1
**might (9)**
    26:7,9;32:14,14;
    43:3;53:11;76:13;
    103:25;109:6
**mind (5)**
    15:23;53:16;80:25;
    87:1,24

**minute (5)**
    5:17;15:25;17:21;
    18:13;27:16
**minutes (11)**
    41:9;52:24;56:11;
    60:13;62:21,25;63:10,
    22;79:23;83:12;111:11
**missing (1)**
    102:22
**mistake (1)**
    91:21
**mistaken (1)**
    87:13
**misunderstanding (1)**
    37:24
**Monday (3)**
    14:21;19:7;54:4
**monitored (1)**
    37:3
**monitoring (12)**
    12:10;13:10;14:8;
    16:11;18:11;19:19;
    26:17;30:8;33:14;36:1,
    7;96:16
**month (2)**
    29:9;90:11
**monthly (2)**
    90:10;92:1
**more (12)**
    12:13;29:24;32:16;
    33:11;50:3;57:7;79:11,
    16;82:19;94:8,14,15
**morning (2)**
    54:4;99:10
**Most (5)**
    21:7;34:2;53:25;
    55:4;98:17
**mouth (1)**
    57:24
**move (2)**
    5:15;19:15
**moved (4)**
    10:18;11:1;93:5;
    96:19
**moves (3)**
    81:14;82:21;83:5
**moving (2)**
    56:23;57:2
**much (6)**
    14:20;36:15,16;
    56:20;88:22;99:2
**multiple (1)**
    75:6
**mutual (1)**
    31:13

## N

**name (6)**
    4:12;61:1;73:1;
    84:20,23;110:10
**name's (1)**
    41:22

**narrative (2)**
    107:19;109:25
**National (2)**
    30:8;31:13
**nationwide (1)**
    67:19
**nature (5)**
    12:22;35:7;37:15;
    90:22;101:11
**Neal (4)**
    43:13;75:20;105:3;
    108:4
**necessarily (24)**
    11:13;12:24;15:4;
    25:12,21;26:19;34:1;
    39:8;42:24;45:23;
    49:18;50:13;51:9;65:6,
    11;88:15;90:7,16;
    91:20,23;95:22;
    100:23;103:13;104:18
**necessary (3)**
    36:24;49:6;79:20
**need (15)**
    18:13,19;19:15;
    26:10;33:13;35:15;
    45:8;50:13;87:7;88:10;
    89:17;90:15,20;91:22;
    99:22
**needed (1)**
    10:9
**needs (2)**
    89:20;99:24
**negligent (1)**
    63:24
**negotiators (1)**
    107:13
**next (7)**
    20:5;80:13;81:12;
    83:21;86:1;88:25;
    93:14
**night (3)**
    59:23;61:9;105:2
**night's (1)**
    19:2
**NIMS (1)**
    30:8
**Nobody (1)**
    93:5
**noise (8)**
    60:22;61:8,10,18;
    62:5,20;88:8;89:16
**None (1)**
    43:16
**non-homicide (1)**
    101:12
**normal (3)**
    39:1;41:3;65:24
**normally (5)**
    29:3;39:1;41:3;
    102:3,9
**North (3)**
    67:5;68:1,20
**note (2)**

51:9;64:12
**noted (2)**
    48:5;58:3
**notes (1)**
    109:22
**notice (3)**
    4:20;5:1;6:17
**notified (4)**
    83:24;100:19;
    102:17;106:14
**Nowatski (3)**
    102:18;103:8;105:3
**number (3)**
    8:3;62:21;83:22
**nutshell (2)**
    14:10;79:13

## O

**oath (1)**
    62:23
**Objection (2)**
    63:14;70:4
**obvious (1)**
    79:2
**obviously (7)**
    19:1;50:7;65:7;
    90:24;104:9;107:12;
    110:21
**occasion (1)**
    100:10
**occur (10)**
    8:17,20;14:11;17:9;
    19:14;61:18;65:16;
    68:2;69:19;90:25
**occurred (20)**
    19:23;20:4;26:3,5;
    30:2;37:19;39:24;43:9;
    50:23;68:20;74:3,3;
    77:25;78:21;86:24;
    87:2;98:2;101:4,8;
    102:2
**occurring (3)**
    14:13;61:18;62:20
**occurs (6)**
    8:15;26:10;37:25;
    61:9;98:16;100:15
**off (13)**
    9:7;15:24;22:25;
    23:15,25;16;29:12;
    44:1;50:10;76:11;
    77:18;93:4;102:12;
    103:18
**off-duty (1)**
    30:20
**offender (9)**
    19:15;45:19;51:14;
    62:8;71:11;76:9;86:9;
    96:19;101:11
**offenders (16)**
    56:9,10;57:3;60:18;
    61:22;65:10;76:15,19;
    77:19;82:12;84:1;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 39 of 44

88:13;91:1,1;92:2;
108:25
**offender's (1)**
108:21
**offer (2)**
86:11,14
**offered (1)**
52:24
**offering (4)**
52:16;53:9,21,23
**Office (8)**
14:3;20:24;24:22;
32:17;42:14,17;45:1;
109:9
**officer (39)**
9:24;47:8,11,19;
48:2,3,3,4,9,12,16,23,
23;58:22,23;59:5,18,
20;60:5,9,13;64:25;
65:3;67:6,23;70:9,20,
25;71:4;85:24;86:8,9,
10,11;98:22,24,25;
103:24;104:16
**officers (15)**
8:4;47:7,13,23;48:2,
17;52:22;55:25;61:24;
63:5;65:15,17;82:12;
86:7;90:19
**officers' (1)**
58:12
**officer's (2)**
51:11;59:24
**often (2)**
29:6,10
**Oftentimes (5)**
34:20;44:5;51:12;
60:4;76:19
**older (7)**
74:21;78:14,15,17,
18,19,24
**once (9)**
5:18;27:17,17;29:15;
42:16,16,17;50:12,12
**on-duty (3)**
9:4;30:16,24
**one (29)**
5:14;11:3;12:1,13;
15:25;18:25;20:14;
29:21;31:1,3,5;33:11;
34:9;37:24;42:10;47:8;
48:16;53:6;56:16,17;
60:2,19;69:10,19;77:9;
94:15;98:1;103:14;
106:3
**only (8)**
30:9;44:22;52:9;
54:21;59:23;60:8;
69:14;103:14
**onsite (1)**
31:25
**open (5)**
19:17;47:9;65:17;
71:1;89:12

**operation (1)**
65:24
**operational (1)**
38:1
**operations (25)**
7:13,16;8:1;9:11,13;
10:23;11:3,4,7;19:3;
22:5,11,16;25:14;
26:17,23;28:16;29:3,9;
37:13;38:15;98:6,7;
99:6;100:12
**opinion (9)**
53:21,24;54:8,11,20;
55:1,10,13;58:7
**opinions (1)**
52:16
**opportunity (5)**
4:21;88:5,19;89:5;
95:2
**opposed (2)**
96:12;100:16
**opposite (1)**
43:21
**optional (1)**
31:23
**options (2)**
53:15;56:16
**order (5)**
26:10;31:19;46:12;
57:15;94:23
**ordered (1)**
28:14
**orders (2)**
28:23;90:21
**ordinary (2)**
58:13;96:25
**organized (1)**
94:22
**orient (1)**
98:14
**Orme (4)**
72:25;73:11,17;75:8
**O-r-m-e (1)**
73:3
**other's (1)**
61:1
**otherwise (1)**
99:17
**ought (1)**
30:11
**out (33)**
18:22,22;19:5,15;
23:15;24:6;29:15;31:9,
23;33:16;36:7,10;38:7;
47:2;48:18;54:24;
55:24;56:20;58:13;
65:13;69:24;71:6;75:4;
78:5;88:13;89:18;
90:22,24;96:10,16,19,
25;97:5
**out-of-the-ordinarily (1)**
62:4
**outside (7)**

13:2;35:15;63:1;
71:15;92:4;101:22,23
**over (23)**
5:12;8:24;10:19,21;
11:2,24;34:23;67:15;
73:6,7,7,8;88:8,24;
89:9,10,14;92:21;
94:14,14;99:20;
101:13;111:12
**overall (1)**
54:25
**oversee (3)**
7:24;17:12;42:15
**oversees (1)**
20:24
**oversight (5)**
8:23;39:9;42:14;
52:20;67:15
**overview (3)**
8:5;9:19;25:22
**own (9)**
8:12;24:13,15;29:14;
32:14,15;44:7;50:9;
56:20

**P**

**page (17)**
5:14;18:12;19:2;
20:1;27:13,13;33:2;
83:21,25;84:24;87:17;
95:4,7;97:6;108:14,15,
15
**pages (5)**
18:6;94:4,9,18;95:8
**pandemic (1)**
31:12
**parole (1)**
8:4
**part (24)**
23:12;26:1;34:12;
35:4,11;38:20;55:4;
62:23;74:4,8;78:1,6;
83:16;87:2,11;90:5;
98:4,17;106:12,16;
109:14,21;110:23,25
**participated (2)**
43:22;72:14
**participating (1)**
41:15
**particular (14)**
15:3;28:24;29:18;
41:25;42:23;43:6;
52:10;90:13;101:7;
106:3,25;110:5,12,15
**passed (1)**
29:4
**past (3)**
29:20;79:1;102:14
**pause (1)**
34:22
**Pendleton (2)**
10:8,10

**people (21)**
8:12;15:2,6,7;19:8;
25:23;34:17;44:1,11;
49:10;51:22;57:14;
58:2,19;60:24;68:14;
75:6,10;81:24;89:18;
105:19
**per (4)**
8:22;26:16;29:21;
90:11
**perfect (1)**
50:6
**perfectly (1)**
83:14
**performed (1)**
57:18
**perhaps (1)**
35:17
**permit (1)**
105:19
**perpetual (1)**
31:14
**person (23)**
10:1;29:4;38:8;49:3,
18;52:5;54:11;66:9;
68:13;72:24;76:18;
86:13,23;89:12,17;
102:1,7,16;103:6,7,22,
25;104:7
**personally (2)**
16:23;93:13
**pertaining (1)**
12:24
**phone (2)**
67:16;99:4
**physical (2)**
65:24;74:21
**physically (1)**
21:14
**pictures (1)**
104:5
**place (3)**
56:17;92:19;99:8
**Plainfield (2)**
9:22;10:1
**plaintiff's (1)**
6:18
**plan (4)**
90:2,14;91:3,17
**plans (1)**
109:9
**plant (2)**
65:24;74:21
**play (4)**
16:23,23;26:18;
78:20
**please (4)**
4:11;12:14;61:14;
73:2
**plow (1)**
90:24
**pm (2)**
102:8;112:7

**point (16)**
20:7;44:20,21;56:5;
65:18,20;77:12;78:23;
80:13,18;82:17;88:14;
89:15,15;91:10;99:14
**points (2)**
80:10;87:6
**police (1)**
73:14
**policeman (1)**
54:13
**policies (11)**
5:23;11:24;12:4,7,
17,19;21:2;40:15;
58:10;63:6,13
**policy (99)**
8:9;13:10;14:8;
16:10,13,17,20,24,25;
17:3,8,19,22;18:12,15,
22,22,23;19:25;20:2,9,
18,22;21:6,21;22:11,
13,14;25:13,15;26:7,9,
23;27:6,13,17,20,25;
28:7,19;31:16,22;32:6,
13;33:9,15;34:2,2,15;
35:5,12,14,24;36:2,5,8,
11,12,16;37:12;38:3;
39:16,21;41:8,13;
48:22,25;49:4,15,24;
52:18;54:10,16,21;
55:2,11,15,19,24;
57:19;59:13;60:12,16;
63:23;64:1;65:23;66:1,
13,17,17;69:15,22;
81:12;82:20;83:4;89:8;
96:14,15;98:12
**populate (1)**
19:22
**portal (1)**
98:9
**portion (7)**
18:25;27:17;28:6;
106:21;107:4,19,23
**pose (1)**
69:9
**position (1)**
37:10
**Possibly (1)**
110:21
**post (1)**
90:21
**post-event (9)**
27:14;28:12,14,19;
29:11;31:20;32:19,22;
52:3
**potential (2)**
57:16;58:8
**PowerPoint (1)**
74:13
**practices (1)**
5:23
**pre (1)**
109:13

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 40 of 44

**preparation (2)**
13:25;14:5
**prepare (12)**
11:22;12:18,19;13:7,
25;16:14;21:22;22:19;
23:22;25:1;93:15;94:5
**prepared (2)**
87:7,10
**preparedness (2)**
7:20;8:8
**preparing (1)**
8:11
**prescribed (1)**
15:4
**present (1)**
6:16
**presentation (2)**
74:24,25
**presented (1)**
72:6
**President (1)**
30:10
**pretty (8)**
14:20;17:5;36:15,16;
56:20;65:19,20;88:22
**previous (1)**
19:2
**previously (2)**
26:3,5
**printed (1)**
23:12
**prior (6)**
16:20;17:2,3;40:10;
44:13,16
**priority (1)**
110:22
**Prison (28)**
5:25;12:22;13:14;
17:9,11;20:13;23:25;
24:10,17;27:22;28:3,5,
7;31:24;33:5,10,16;
38:10;52:11,12;56:18;
59:15;69:23;76:21;
78:12;90:25;92:24;
102:25
**prisoner (11)**
33:4;61:11,19;62:3,
15,16,24;69:24;102:17,
25;103:7
**prisoners (13)**
59:4,13,22;60:14;
62:22;63:10;69:9,12;
77:11;80:15;93:11;
106:22,23
**prisoner's (1)**
100:18
**prisons (12)**
8:2,3,20;20:14;
39:10;78:11,15,15,17,
19,24,25
**privy (5)**
29:1;43:1;44:19;
57:21;63:18

**probably (12)**
16:21;17:5,5;23:10;
56:19;72:8;74:6;83:7;
84:20;85:22;97:7;
102:4
**problem (2)**
14:17;100:16
**problems (1)**
57:7
**procedures (1)**
22:4
**process (2)**
25:15;38:21
**processes (4)**
6:2;17:24;25:9;
33:11
**produced (5)**
15:16;16:9;22:2;
93:25;95:5
**Production (3)**
23:9,9;100:16
**profound (1)**
47:1
**promoted (1)**
10:2
**prompt (1)**
109:18
**prompted (2)**
64:21;110:25
**promulgated (1)**
20:10
**properly (1)**
50:24
**property (1)**
109:1
**proposition (1)**
61:13
**propriety (1)**
53:21
**prosecutor's (1)**
109:9
**protection (1)**
47:12
**provide (7)**
4:18;5:22;6:6;25:8;
68:19;69:16,23
**provided (10)**
11:15;25:15;67:12;
69:2;74:8,11;76:25;
77:3,11;88:5
**provides (1)**
31:18
**Providing (1)**
64:3
**psychological (1)**
86:12
**pull (1)**
46:13
**pulled (1)**
46:12
**purpose (8)**
17:7;53:5,6,11,20,
23;74:15,17

**pursuing (1)**
11:18
**put (3)**
99:18;100:9;111:23
**Putnamville (1)**
10:4
**putting (1)**
103:17

**Q**

**QRT (9)**
55:25;82:23;83:7;
89:8;90:10,13,16,17;
107:11
**qualifies (2)**
31:10;97:16
**quality (3)**
27:21;42:15;46:2
**quarterback (1)**
54:4
**quick (17)**
6:9;8:23;9:1,2;12:11,
16;25:2,2,23,24;30:15;
52:22,25;54:22;58:11;
66:20,21
**quite (2)**
83:3,6
**quote (1)**
83:12

**R**

**radio (2)**
88:8;89:23
**raise (1)**
48:15
**raising (1)**
62:8
**range (18)**
9:8,8;47:8;51:9,12,
13,17,19,24;59:7;60:5,
7;65:2,4,8;66:14;
88:15;92:16
**ranges (3)**
6:23;51:13;88:16
**ranks (1)**
9:25
**rate (1)**
10:18
**rationale (2)**
85:23;99:19
**RDC (3)**
99:6,8,13
**reach (4)**
55:1,9;57:16;58:7
**reached (1)**
55:17
**reaching (3)**
53:7,24;54:20
**read (9)**
5:17;22:7;36:16;
38:14,15;50:24;52:24;

84:24;94:13
**reading (1)**
86:18
**reads (6)**
37:12;49:1,1,2;
99:21;105:23
**ready (1)**
91:2
**real (1)**
6:9
**really (9)**
14:18;19:11;46:23,
25;49:1;51:16;54:8;
103:14;104:11
**re-ask (1)**
35:9
**reason (9)**
42:21,24;43:6;54:1;
65:18;70:24;77:13,14,
15
**reasons (1)**
77:10
**recall (27)**
42:5;47:17;51:4,5;
52:2;58:24,25;78:1;
80:24;81:9,19;83:18;
84:13,17;85:4,12,17,
21;86:25;87:16,20;
88:1,7,17;90:5;91:16;
93:2
**receive (4)**
42:17;98:3,8;99:10
**received (1)**
11:11
**receives (1)**
42:18
**receiving (1)**
81:9
**reception (1)**
99:8
**recognize (1)**
69:14
**recollection (4)**
13:7;50:17;75:1;
76:6
**recollections (1)**
79:17
**recommendation (1)**
82:9
**recommendations (4)**
78:22;79:6,7;109:9
**record (11)**
4:12,25;5:20;6:10;
15:25;16:4;22:25;23:7,
15;95:16;111:23
**records (1)**
44:12
**recreate (1)**
35:18
**refer (5)**
34:6;92:13;101:16,
25;108:1
**reference (2)**

23:13;37:22
**referencing (1)**
18:16
**referrals (1)**
109:8
**referred (1)**
105:4
**referring (6)**
14:23;22:7,8;33:21;
36:2;50:22
**refers (3)**
101:3,6;107:9
**reflect (2)**
39:17;110:20
**reflecting (4)**
39:23;74:3,4;81:17
**reflection (2)**
48:9;100:17
**reflects (2)**
100:5;105:1
**refuses (1)**
69:23
**regard (1)**
88:18
**regarding (6)**
18:23;26:2;40:16;
55:10;78:2,21
**regardless (1)**
103:11
**regional (10)**
8:12;20:23;21:1;
37:3;39:9;86:6;99:1,
20,21;105:14
**regular (3)**
67:16;97:1;99:18
**regulations (1)**
5:24
**relates (1)**
58:11
**relating (1)**
6:1
**relay (1)**
88:11
**relevant (1)**
31:17
**relying (2)**
51:3;81:1
**remember (11)**
47:16;50:14;51:7,8,
13;75:16;83:3;84:19;
85:10;87:4;89:7
**repeat (3)**
13:3;32:1;37:8
**report (32)**
19:4;35:16;37:4,14;
50:9;57:22;73:13;
74:10;77:24;81:24;
95:13,15,16,21;96:1,2,
12,13,17,23;97:1,4;
98:1;99:1,10,13;102:7;
103:11,14;106:8;
109:16;110:16
**reported (14)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 41 of 44

17:9;95:18,19;98:18,
19,20,20;99:4,7;
101:25;102:1;105:3,7,
20
**REPORTER (2)**
4:4;112:4
**Reporting (4)**
16:11;36:1;104:4;
105:18
**reports (12)**
19:3,4;34:17;37:14,
18,18;38:16;42:18;
50:11;81:25;104:5;
106:1
**represent (2)**
48:1;51:18
**representative (1)**
14:2
**representing (1)**
10:25
**requesting (1)**
74:2
**require (3)**
19:25;20:3;98:14
**required (4)**
20:13;33:16;35:3,11
**requirements (5)**
24:8;26:2;27:7;36:6,
13
**requires (3)**
39:17,22;48:22
**reserving (1)**
112:4
**resources (2)**
8:15;30:18
**respect (3)**
33:9;80:15;98:11
**respects (1)**
58:9
**respond (9)**
9:4;18:14;25:16;
26:19;60:14;66:22,24;
67:1;70:15
**responded (7)**
25:4;48:16;52:21;
53:8;66:8;95:17,17
**responder (1)**
89:21
**responders (6)**
58:5;80:14;81:23;
89:1,6;107:10
**responding (4)**
11:12;55:19,25;
58:10
**response (65)**
7:13,15,20;8:1,23;
9:1,2,3,13;10:23;11:3,
4,7;12:11,16;22:5,11,
16;25:2,3,14,23,24;
26:11,16,23;27:8,21;
28:16;29:8;30:16;
32:14,15,17;34:7;
36:14;43:21;52:9,16,

22;53:1,12,14,22;55:2,
11;57:11,18;58:12,12;
63:6;64:19;66:20,21;
70:2;80:14;81:5,10,22;
88:19;89:4;98:6,7;
100:12;109:25
**responses (2)**
8:13;50:4
**responsibilities (2)**
8:6;69:11
**responsibility (18)**
8:9;13:2;21:2,5;
28:8;33:9;37:2;38:4,
11;39:5,8;69:15;71:11,
17;73:8;89:10;99:1;
103:17
**responsible (7)**
17:12;20:21;28:6;
36:22;38:9,19;82:4
**rest (3)**
52:11,12;56:18
**result (1)**
109:5
**resulted (1)**
78:3
**retreat (3)**
71:25;72:4,10
**return (1)**
84:1
**reverse (2)**
94:22,23
**review (77)**
4:21;6:2;17:23;
18:13,19;19:2,6,11;
24:20;25:9,15;26:2,20;
27:7,16,21;32:7,14;
33:11,25;34:4,6,12;
35:4,12;36:11,23;
37:13;38:21,22,23;
39:1,18;40:7,13,14,25;
41:4,5;42:6,23;43:15;
44:12,22;45:2,9;48:5,
18,24;49:16,24;52:7;
54:22;55:8,9;57:15,20,
22;58:6;64:8;66:1;
76:7;80:3,7;83:16;
85:20;87:3,12;94:2;
95:2,5,7,8;106:6;
108:21,24;111:1
**reviewed (29)**
12:8,9,10,17,19,21;
13:6,18;14:8;16:14;
21:22;22:19;23:22;
24:25;34:12;37:4;40:9;
44:24;46:10,11;58:15;
93:15;94:4,5,9,11,11,
11;99:25
**reviewing (3)**
37:17;39:5;57:12
**reviews (10)**
6:1;18:5,23;36:6;
37:6,11;38:16;39:6;
40:16;90:9

**RICHARD (3)**
4:5,13;41:23
**R-i-c-h-a-r-d (1)**
4:13
**right (75)**
16:7;17:16;18:7;
29:18,22;30:3;31:4,15;
32:7,15,23;35:15;
38:13;39:2;42:11;
43:11;45:25;46:3;
48:10,24;49:12;52:21;
58:15,19,23;59:1,20;
60:1,7,10;62:10;63:2,7,
13,19;65:16;69:12,20;
70:3,11,22;71:9;72:2;
79:21;80:10;81:7;
83:12,16;84:24;91:12,
13;93:1,8,12,23;94:19;
96:5;97:10;100:12;
101:9,13;102:18;
103:3;104:2,24;106:9,
19,20;107:2,6,24;
108:12,13;109:19;
110:12
**riot (1)**
107:11
**risk (1)**
73:7
**Robert (1)**
41:23
**Rodriguez (8)**
48:2,12;49:25;50:14;
70:9,20,25;104:16
**role (10)**
7:21,25;8:7;16:23;
22:15;41:25;52:7,8,15;
91:4
**roles (1)**
26:18
**Ron (1)**
108:4
**room (5)**
25:17,20;34:20;
41:15;75:2
**roped (1)**
93:4
**rotate (1)**
98:22
**roughly (1)**
10:5
**routine (2)**
78:9;100:10
**Rule (2)**
4:20;102:10
**rules (1)**
5:24
**runner (2)**
88:11;89:24
**runs (1)**
95:8

**S**

**safe (2)**
56:23;69:12
**safety (6)**
13:1,16;17:14,16;
45:19;52:9
**same (6)**
33:2;68:4,21;94:14;
105:8;110:8
**saw (16)**
42:4;44:23;46:14;
50:12,12,21;51:5,6,17;
64:10;70:8,20;86:9,11;
93:6;99:13
**saying (15)**
25:22;60:4;62:7;
67:8;71:16;81:6;83:4;
85:1;89:8,20;91:21,21;
94:10,12;96:23
**scenario (1)**
50:7
**scene (5)**
35:19;47:7;48:17;
81:24;83:25
**schematics (2)**
51:10;92:20
**school (2)**
90:23;92:3
**screaming (2)**
59:5;67:5
**screen (3)**
18:8;41:11;80:7
**scroll (1)**
97:9
**scrolled (1)**
110:23
**scrutiny (1)**
10:13
**se (2)**
8:22;26:16
**searched (1)**
18:10
**second (2)**
23:1;68:13
**seconds (1)**
16:1
**Section (29)**
12:10,14;13:11;18:3,
12,15;19:8;20:2;21:23;
22:7,9,20;24:24;25:7,
19,25;26:15;27:13,20;
36:10,17,17;37:16,21;
49:10;90:1;97:6,6,15
**Sections (1)**
108:18
**secure (1)**
56:18
**security (5)**
14:18;17:14,16;
45:19;52:9
**seeing (1)**
46:9
**seek (1)**
17:22

**seeks (1)**
6:15
**seem (1)**
39:15
**self-review (1)**
32:14
**sell (1)**
76:21
**send (3)**
15:25;24:6;89:24
**sends (1)**
42:14
**seniority (1)**
103:12
**sense (4)**
8:25;24:17;54:10;
99:15
**sensitive (1)**
96:21
**sent (3)**
15:17,18;94:12
**sentence (1)**
81:12
**sentences (1)**
82:20
**separate (1)**
56:21
**September (8)**
5:7;10:15,17;15:14;
23:19;27:4;40:4;93:21
**serious (11)**
6:3;17:24;18:24;
25:10;33:12,18;34:8;
36:14;40:24;43:9;
96:21
**serve (1)**
7:21
**served (2)**
5:1;9:12
**service (1)**
15:7
**services (5)**
24:16;71:24;72:20,
22;86:14
**serving (2)**
6:17;29:7
**set (9)**
15:4;21:11;26:1;
31:23;39:12;81:14;
82:21;83:5;89:13
**sets (2)**
18:22,22
**setting (2)**
11:12,14
**setup (1)**
84:7
**several (1)**
82:19
**severity (1)**
31:7
**shall (2)**
37:13;38:1
**share (3)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 42 of 44

22:1,24;40:6
**shared (4)**
  35:6;44:20,21;99:14
**shift (12)**
  19:4;34:18;52:13;
  90:11;102:4,6,11;
  103:16;104:6,23,24;
  105:1
**short (5)**
  16:2;23:2;79:22,24;
  111:20
**show (8)**
  15:9;16:7;23:5;49:7,
  8;70:18;93:23;105:19
**showed (3)**
  41:18;64:25,25
**showing (1)**
  4:20
**shown (2)**
  50:18;74:12
**shows (1)**
  64:13
**sick (1)**
  49:21
**sickness (1)**
  49:19
**side (1)**
  8:8
**signature (1)**
  112:5
**significant (1)**
  96:21
**silent (1)**
  38:4
**similar (5)**
  17:2,6;87:7,11;109:5
**simply (1)**
  90:14
**single (4)**
  61:19;62:15,16,24
**sit (9)**
  17:1;40:24;54:16;
  78:1;84:12,18;85:3,17;
  87:15
**SITCOM (1)**
  107:12
**site (1)**
  72:1
**sits (1)**
  15:5
**sitting (3)**
  44:13,16;76:11
**situation (24)**
  8:16;25:18,20;30:19;
  32:15;34:25;40:23;
  41:15,22;44:6;45:16;
  50:10;52:4;53:1;56:23;
  65:16;68:14;76:8;82:5,
  24;83:9;86:1;89:8;
  90:25
**situations (4)**
  31:14;39:7;78:24;
  92:2

**slash (1)**
  38:1
**slightly (1)**
  32:4
**smoke (11)**
  47:9;50:21,25;51:1,
  5,6,17,23;60:22;64:11;
  71:5
**sole (1)**
  37:2
**Somebody (3)**
  66:9;84:14;85:7
**someone (7)**
  14:24,24;44:4;51:15;
  55:23;65:8;81:18
**sometimes (3)**
  43:3;67:3;76:22
**Somewhat (2)**
  18:1;42:7
**sorry (14)**
  22:10;26:4;32:2;
  37:8;45:21,22;48:20;
  57:1;66:6,7;96:9,10;
  109:14;111:23
**sort (3)**
  74:13;77:5;98:15
**sorts (1)**
  19:5
**sound (1)**
  61:16
**sounds (1)**
  85:15
**space (1)**
  101:14
**spark (1)**
  77:5
**speak (7)**
  17:19;27:7;32:13;
  60:8;72:5;75:7,9
**speaking (1)**
  58:25
**speaks (1)**
  25:14
**specific (8)**
  8:16;13:13;16:25;
  19:23;24:16;79:11,16;
  85:11
**specifically (14)**
  17:19,22;28:12;38:7;
  51:7,17;78:14;84:19,
  23;85:12,21;87:4,19,20
**spell (2)**
  4:11;73:1
**spells (1)**
  96:16
**spoke (4)**
  58:19,23;72:3;73:17
**spouting (1)**
  89:18
**spring (1)**
  10:10
**squad (3)**
  107:11,11,12

**St (3)**
  100:19;101:22;
  102:24
**stabbed (2)**
  86:10,10
**staff (57)**
  9:4,7;10:1,20,22,24;
  14:19,22;17:10,16;
  20:1,3,17;25:4;30:16,
  24;31:19;34:18;35:17;
  36:13;43:21;44:4;47:4;
  49:3,4,11;53:8,22;
  54:21,23;55:18;56:12;
  57:3;58:9;66:12,17;
  69:10,11,24;85:24;
  86:13;90:2,14,15;
  91:16,17;92:9;96:24;
  99:9;102:9;103:25;
  106:11,17,19;108:21,
  23,25
**staffed (1)**
  47:24
**staff's (2)**
  34:7;55:10
**staged (1)**
  92:22
**stairs (1)**
  65:4
**stakeholders (1)**
  34:19
**stand (2)**
  81:5;92:5
**standards (1)**
  33:24
**standby (1)**
  56:14
**standing (1)**
  82:11
**start (4)**
  4:19;39:20;77:20;
  94:21
**started (5)**
  9:21,23;10:15;11:4;
  91:2
**starting (1)**
  82:9
**starts (1)**
  38:7
**state (23)**
  4:11;5:25;8:4,17;
  12:22;13:13;20:13;
  23:25;24:10,17;28:2,5,
  7;31:24;33:5,10,16;
  59:15;73:14;78:25;
  90:25;99:12;109:1
**stated (1)**
  83:7
**statement (7)**
  6:13;62:2;81:18,18;
  82:18;88:25;90:1
**statements (3)**
  83:1,15,18
**States (5)**

30:10;69:16;81:13;
  82:20;83:4
**station (1)**
  51:11
**stayed (3)**
  10:5;47:8;71:5
**steps (3)**
  62:19;63:1;71:13
**stick (1)**
  19:22
**still (3)**
  56:18;93:4;109:5
**stood (1)**
  83:8
**stop (1)**
  57:25
**story (1)**
  44:7
**street (1)**
  54:13
**stress (2)**
  86:4;107:13
**strictly (1)**
  86:13
**strike (12)**
  17:18;20:8;21:9;
  34:5;39:18;46:7;58:17;
  59:13;76:2;84:11;
  105:11;109:14
**studies (1)**
  68:10
**study (5)**
  67:4,7,13;72:17;
  94:18
**stuff (4)**
  5:12;57:25;76:20;
  92:19
**subject (1)**
  7:17
**submitted (1)**
  106:3
**sucked (1)**
  67:25
**suffering (1)**
  69:25
**sufficient (2)**
  53:12,14
**suggested (1)**
  53:18
**suggestions (6)**
  52:25;53:9,23;87:6,
  10,16
**suggests (1)**
  75:6
**suicide (1)**
  9:10
**summaries (2)**
  83:1,2
**superintendent (3)**
  10:3;108:5,10
**superintendents (1)**
  105:5
**supervising (1)**

104:24
**supervisor (12)**
  15:1;52:13;82:4,23;
  89:22;102:4,6,11;
  103:16;104:6,23;105:2
**supervisors (2)**
  34:19;67:16
**supposed (4)**
  52:23;66:24;81:6;
  84:4
**Sure (35)**
  4:23;6:12,12;8:8;
  9:21;13:9;15:23;21:18;
  24:4;26:25;27:19;32:3;
  35:21;36:4;37:20;43:3;
  45:18;53:15;54:9;58:4;
  60:20;68:15;74:19;
  80:12;83:23;88:25;
  89:5;91:4;99:16;
  104:10,11;107:18;
  111:2,13,18
**surrounding (1)**
  79:17
**surroundings (3)**
  67:24;79:8,12
**sworn (2)**
  4:2,7
**system (5)**
  17:8;30:8,11;69:23;
  82:22
**systems (2)**
  5:24;78:17

---

**T**

**talk (21)**
  14:4;25:9,12,19;
  30:15;34:25;35:19;
  41:17;43:17;44:9;
  47:20;58:18;59:3;67:3,
  18;68:15;78:10;79:14;
  93:10;98:13;99:23
**talked (16)**
  14:2;47:6,10;57:23,
  23;74:22;75:3,5;76:4;
  77:7;79:9;80:3,10;
  88:21,23;101:17
**talking (8)**
  33:3;36:17;49:9;
  54:20;88:7;89:23;
  92:19;102:14
**talks (8)**
  18:3;24:7,8;32:6;
  34:24;37:16;40:19;
  80:13
**tasked (2)**
  28:18;37:17
**taught (1)**
  67:22
**teach (2)**
  56:16;61:24
**team (36)**
  8:24;9:1,2,3;11:5,19;

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

RICHARD CURRY
September 23, 2020

USDC IN/ND case 3:18-cv-00995-JD   document 212-43   filed 05/25/21   page 43 of 44

25:5,23,24;30:20,20;
52:14,22;53:1;54:22;
56:6,13,20;57:4,6,17;
58:8,12;66:20,21;
80:22;81:25;82:3,6,10,
18,23;83:8;86:6;88:23;
89:22
**teams (7)**
8:11,12,22,23;12:16;
25:3;90:16
**technical (1)**
5:15
**technically (1)**
38:4
**tells (2)**
38:16;40:20
**template (1)**
109:15
**temporarily (2)**
10:7,7
**ten (1)**
79:23
**ten-minute (1)**
111:17
**term (1)**
96:18
**terminal (1)**
104:17
**terminology (1)**
34:1
**terms (1)**
33:17
**Terrible (2)**
46:24;72:1
**testified (14)**
4:7;11:10;21:22;
22:20;24:25;33:20;
36:25;53:18;62:23;
68:5;69:8;74:10;77:9;
83:19
**testify (4)**
6:15;31:18;33:1;
51:3
**testifying (1)**
65:14
**testimony (23)**
4:18;5:22;6:6;7:1;
11:22;12:20;13:5,7;
18:16;25:8;26:22;27:6;
36:5;49:14;55:9;62:1,
6;68:6;71:21;72:2;
79:10,16;91:15
**thereupon (6)**
5:4;15:11;23:16;
27:1;40:1;93:18
**thinking (2)**
35:15;84:25
**third (1)**
80:18
**thoroughly (1)**
94:18
**though (3)**
56:17;90:20;100:9

**thought (1)**
57:6
**three (7)**
10:25;47:23;48:2,17;
81:21,23;110:4
**throughout (2)**
8:17;99:12
**thumb (1)**
102:10
**timeline (3)**
6:11;68:8;98:15
**times (7)**
33:20;40:25;42:13;
49:17;72:1;92:18;
110:4
**title (3)**
7:11,12;108:4
**today (15)**
4:16;5:10;11:23;
14:1,5;16:9;17:2;22:2;
78:2;84:12,18;85:3,18;
87:15;93:25
**today's (8)**
16:14;21:22;22:19;
23:23;25:1;40:10;
93:15;94:5
**together (6)**
19:9;45:6,13;46:18,
21;103:17
**told (2)**
42:17;62:22
**tomorrow (1)**
68:14
**took (7)**
10:11,21;62:19;63:1;
67:9,11;83:11
**tool (2)**
50:4;90:13
**top (7)**
61:12,20;62:3,15,17,
25;83:25
**topic (18)**
4:19;5:14,16,17,20;
6:7,14,15;7:3,3,25;
11:23;17:20,23;25:7;
31:17;78:15;98:13
**tour (2)**
92:12,21
**track (3)**
10:18;14:10,13
**tragic (2)**
45:16;46:4
**train (1)**
8:12
**training (11)**
10:20,22;11:11;
12:11;24:7;25:2;67:12,
14;68:6,7;69:3
**transcript (2)**
23:13,14
**trauma (3)**
85:25;86:7,15
**triage (1)**

84:5
**tricks (1)**
76:19
**tried (1)**
41:24
**trouble (1)**
14:16
**true (4)**
66:19;70:13;71:10;
96:3
**trust (1)**
45:25
**try (11)**
5:16;26:21;32:4;
42:1;44:1;47:8;59:25;
61:24;67:19;68:15;
90:12
**trying (7)**
32:3;53:4;54:18;
55:16;71:5;82:15;
104:12
**turn (9)**
27:10,12;37:2;38:16;
39:13;70:16;95:3;
98:23;105:7
**twice (1)**
29:15
**two (9)**
26:14,17,18;29:21;
47:6;53:16;80:10;
81:21;90:11
**type (11)**
8:13;37:19;47:12;
70:1;88:11;90:8;95:9,
15,20;99:11;101:10
**typical (3)**
61:9,16,22
**typically (4)**
28:22,25;37:6,10
**typo (3)**
48:7;83:11;108:7

**U**

**ultimately (2)**
38:9,19
**uncommon (1)**
76:24
**uncover (1)**
71:14
**under (8)**
10:12;20:2;28:18;
62:23;69:15,15;90:1;
101:10
**underneath (3)**
84:20,23;87:14
**Understood (5)**
29:6;32:18;46:1;
101:15;105:16
**unfortunately (2)**
60:25;71:22
**uniformed (1)**
10:1

**unit (1)**
15:2
**United (2)**
30:10;69:16
**universe (1)**
13:4
**University (1)**
11:18
**unlikely (1)**
102:18
**unusual (2)**
42:10,12
**up (43)**
29:14;39:12;40:23,
24;41:2;42:25;43:10;
44:10;45:9;46:12,13;
47:2;48:21;51:16,20;
59:6;63:17;64:25,25;
65:4,8;66:13;68:11;
70:20;71:3;78:16;
81:14;82:21;83:5,8;
88:16;89:13;92:8;93:6;
96:15;97:7,9,12;104:8;
106:7;110:16,20,24
**updated (2)**
6:10;16:21
**updating (1)**
16:24
**uploaded (1)**
106:8
**upsetting (2)**
46:2,17
**use (9)**
24:16;31:12;34:1;
50:4;67:6;76:19,22;
90:12;96:17
**used (9)**
30:12;95:14,15;96:4;
101:19;110:23,24;
111:4,7
**utilize (1)**
88:11

**V**

**venue (1)**
52:1
**verbally (1)**
60:1
**version (2)**
16:19,22
**versions (1)**
17:2
**versus (1)**
82:11
**video (24)**
34:20;35:17;41:18;
44:23,25;45:2,7,13;
46:2,3,6,9,17;47:5;
50:17;51:5;57:12;58:6;
59:9;64:13;70:8,18;
74:14;75:3
**violate (1)**

54:9
**violation (6)**
49:15,24;55:19;
63:12,22;64:1
**violence (2)**
14:13;37:19
**visible (1)**
51:23
**visit (1)**
93:2
**voice (1)**
62:8
**voluntary (1)**
86:14

**W**

**wait (1)**
60:13
**walked (1)**
92:23
**walking (2)**
65:4,8
**warden (31)**
15:5;19:3;21:5,9;
28:5;37:1,1,13,17,22;
38:8,15,17,19;39:4,17,
22;43:13;44:4,5;49:2,
5,5,11,11;75:20;95:18;
98:20;99:20;102:12;
105:3
**wardens (6)**
14:24,25;15:1;20:25;
39:10;72:11
**warden's (4)**
28:8;71:24;72:3;
104:7
**watch (1)**
75:4
**watched (4)**
45:3,13;46:17;74:14
**watching (6)**
34:20;45:6;46:6,20;
51:4;58:6
**Watson (1)**
64:11
**Watson's (1)**
57:13
**way (25)**
9:24;14:12;18:9;
24:13;31:4;32:5;37:12;
38:14,15;41:22;44:19;
52:21;54:12;59:23;
60:2,3,8;78:10;82:2;
83:12;89:13;95:15;
101:1;105:23,23
**weapon (2)**
54:14;107:5
**weapons (18)**
52:13;56:5,13,19;
57:4,6,17;58:8;80:22;
81:25;82:2,2,3,6,10,18;
83:8;88:23

USDC IN/ND case 3:18-cv-00995-JD    document 212-43    filed 05/25/21    page 44 of 44

**weren't (3)**
61:4;66:16;77:9
**Wesleyan (1)**
11:18
**What's (9)**
9:1;14:19;16:8;
35:13;38:17;59:15;
82:24;92:20;95:14
**whenever (3)**
83:7;85:24;96:24
**whereby (1)**
17:8
**WHEREUPON (6)**
4:1;16:2;23:2;79:24;
111:20;112:7
**whole (1)**
73:11
**whomever (1)**
53:13
**who's (1)**
89:6
**whose (1)**
38:4
**wide (1)**
19:16
**William (2)**
105:8,12
**Wilson (2)**
105:8,13
**within (6)**
8:4;9:3;20:4,14;
27:22;38:2
**without (3)**
49:25;53:23;66:14
**witness (7)**
4:1,3,6,18;5:19;
27:19;103:23
**wondering (1)**
100:15
**word (5)**
18:10;29:3;39:19;
55:13;57:23
**work (11)**
7:7;29:2;90:2,19;
91:16,22;92:6,6;95:10;
98:4;101:1
**worked (2)**
9:16,24
**written (7)**
7:3;12:4;18:22;
33:15;64:19;67:1;
100:17
**wrong (2)**
44:4;105:25

### Y

**year (5)**
29:9,15,21;68:21;
72:8
**years (2)**
29:20;55:6
**yell (2)**

59:24;60:19
**yelling (9)**
60:13;61:11,20;62:3,
15,17,24;63:10,11
**yells (1)**
60:15
**Youth (1)**
9:23

### 0

**07 (1)**
10:17
**08 (1)**
10:18

### 1

**1 (15)**
4:24;5:6,21;6:13,14;
7:3;30:12;31:10,11,14;
101:17,18,19,22;108:1
**10:15 (1)**
99:2
**100 (2)**
51:23;88:15
**11 (6)**
5:20;6:14;7:3;18:12;
19:2;20:1
**12 (14)**
12:10,14;13:11;
21:23;22:7,9,20;24:24;
25:7,19,25;26:15;
27:13;29:20
**15 (3)**
60:13;63:10,22
**1840 (1)**
23:9
**1992 (2)**
9:18,21
**1994 (2)**
11:3,7
**1998 (1)**
10:2
**1st (5)**
5:25;6:19;9:15;
16:18,20

### 2

**2 (13)**
15:10,13;16:8;17:4;
18:7;20:2;35:25;49:8,
8;83:25;84:24;87:17;
97:6
**2:50 (1)**
79:21
**2000 (1)**
79:2
**2005 (2)**
10:6,11
**2006 (1)**
10:15

**2007 (1)**
10:15
**2008 (2)**
9:15;29:18
**2010 (1)**
6:16
**2015 (5)**
5:25;6:19;94:2;98:2;
105:2
**2017 (15)**
6:1,20;33:5;42:6,23;
43:15;44:13,17;47:22;
61:5;68:22;85:20;87:3,
12;94:2
**2019 (3)**
16:18,20;17:3
**2020 (7)**
4:25;5:7;15:14;
23:19;27:4;40:4;93:21
**22nd (2)**
9:18,21
**23 (6)**
5:7;15:14;23:19;
27:4;40:4;93:21
**24 (3)**
43:15;47:22;85:20
**2484 (1)**
23:10
**24th (6)**
42:6,23;44:13,17;
87:3,12
**25th (1)**
4:25
**29 (2)**
95:4,8
**2nd (2)**
98:2;105:2

### 3

**3 (3)**
23:6,18;97:6
**3:53 (1)**
112:7
**30 (1)**
55:6
**300 (2)**
60:18,25
**30b6 (2)**
4:20,25
**31st (2)**
6:1,20
**32 (3)**
94:4,18;95:8

### 4

**4 (7)**
26:24;27:3;30:6,17,
18,19;97:15

### 5

**5 (16)**
9:5,5;30:4,7,12,14,
22,24;40:3,7;41:10;
80:4,6;81:15;101:18,
18
**500 (4)**
51:19;60:25;65:8;
66:13

### 6

**6 (3)**
93:20,24;97:23

### 7

**7 (5)**
18:12;27:13;36:10,
17;49:10
**7b (1)**
20:2
**7th (2)**
33:5;61:5

### 9

**9:55 (2)**
98:18;102:8