# In The Matter Of:

*BARABARA DEVINE vs*
*RON NEAL, et al.*

---

*TIMOTHY REDDEN*
*October 25, 2019*
*Cause No. 3:18-cv-00995-JD-MGG*

---

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 10-25-19 Timothy Redden.txt
Min-U-Script® with Word Index

USDC IN/ND   case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 2 of 111

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BARBARA DEVINE, as Personal      )
Representative of the ESTATE OF  )
JOSHUA DEVINE,                   )
                                 )
                 Plaintiff,      )Case No.
                                 )3:18-cv-00995-JD-MGG
          vs                     )
                                 )
RON NEAL, et al.,                )
                                 )
                 Defendants.     )
---------------------------------)

The deposition of TIMOTHY REDDEN, called for examination pursuant to the Indiana Rules of Civil Procedure pertaining to the taking of depositions, taken before Angela J. Galipeau, a notary public within and for the County of Porter, State of Indiana, Registered Professional Reporter, at 5816 East 7th Avenue, Gary, Indiana 46403, October 25, 2019, at the hour of 9:24 a.m.

BOSS REPORTERS
& VIDEOCONFERENCING
GARY * MERRILLVILLE * VALPARAISO, INDIANA
(219) 769-9090

**Page 2**

PRESENT:

LOEVY & LOEVY
BY:   Mr. Sam Heppell, Esq.
      Ms. Sarah Grady, Esq. (VIA TELEPHONE)
311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
megan@loevy.com

        Appeared on behalf of the Plaintiff;

OFFICE OF THE ATTORNEY GENERAL
BY:   Daniel Rothenberg, Esq.
302 West Washington Street
IGCS 5th Floor
Indianapolis, Indiana 46204
(317) 232-0149
daniel.rothenberg@atg.in.gov

        Appeared on behalf of the Defendants.

                *       *       *

**Page 3**

                    I N D E X

WITNESS:

TIMOTHY REDDEN

Examination By Mr. Heppell...................... Page 4

Examination By Mr. Rothenberg................... Page 301

Examination By Mr. Heppell...................... Page 303
                *       *       *

              E X H I B I T S
NO.            DESCRIPTION                          PAGE
Exhibit 1    Agreed Protective Order                  5
Exhibit 2    E-mail, 11-23-15                        36
Exhibit 3    Summons, Timothy Redden                 83
Exhibit 4    Answer                                  87
Exhibit 5    Answer to Second Amended Complaint      88
Exhibit 6    Defendant Redden's Responses to
             Plaintiff's Interrogatories             91
Exhibit 7    B Cell House Fire Evacuation Plans     130
Exhibit 8    Memo to Captain Dykstra, 4-7-17        246
Exhibit 9    Photograph                             253
Exhibit 10   Cash Spot Bonus Request Form           292
Exhibit 11   Notification of Personnel Action       292
Exhibit 12   Notice of Pre-Deprivation Meeting      292
Exhibit 13   Shift Report of Incident               292
                *       *       *

**Page 4**

TIMOTHY REDDEN called as a witness by the Plaintiff, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HEPPELL:

Q.  Good morning, sir.  How are you?

A.  I'm all right.

Q.  Good.  I introduced myself to you before we got started.  But to do it formally on the record, my name is Sam Heppell, and I represent the Plaintiff, Barbara Devine, in her capacity as the personal representative of the Estate of Joshua Devine in this lawsuit.

MR. HEPPELL: Before we get started, there's a couple of things we want to put on the record.  First of all, I know there has been e-mail correspondence about this and written correspondence between plaintiff's counsel and defense counsel.  But just to put on the record, there's been a number of Rule 37 phone calls, on October 7 and 11, in which we discussed a number of supplemental responses, a number of additional documents that were going to be provided.

We set those discussions out in a confirmatory letter on October 15 and requested a number of materials to be provided by October 18 so that we

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 3 of 111

Page 5

would have those in advance of the deposition. Those materials include various supplemental discovery documents, ESI from personal accounts of the defendants, a number of other items that are set forth in that correspondence.

Because we have not received a response to our letter or those supplemental materials, I do want to put on the record that we reserve the right to reopen this deposition and any other deposition that we conduct prior to receiving those materials so that we can examine the witnesses regarding those materials.

Secondly, I want to put on the record that the deponent today has executed a copy of the addendum to our protective order in the case. It's at Docket 82. Pages 14 and 15 is the acknowledgment. And if we have those -- we can mark those and make them an exhibit to the deposition. We might as well make the whole document. We can mark that as Exhibit please.

(Exhibit 1 marked for identification.)

So we've marked as Exhibit 1 a copy of the protective order with Lieutenant Redden's signature on the acknowledgment.

BY MR. HEPPELL:

Q. And, Lieutenant Redden, you had the opportunity to review

Page 6

that document with your counsel prior to signing that; is that correct?

A. Correct.

MR. HEPPELL: And the last thing that I wanted to put on the record before we get started is just that prior to beginning the deposition today, the court reporter just let us know that -- I believe you said it was your husband is a DOC employee, specifically the warden at Westville.

THE REPORTER: Yes.

MR. HEPPELL: And Westville is not a facility that's a subject of the case here today. And the court reporter has obviously, as a professional, assured us it's not going to affect her performing her duties as a court reporter today; but we appreciate her raising that. I just want to put on the record that that's information that's been given to both counsel, both sets of counsel; and we're proceeding today with that understanding.

MR. ROTHENBERG: Right. My name is Daniel Rothenberg from the Attorney General's office. I represent the defendants here. I just wanted to go ahead and say that any sort of issues with conflict as far as Mr. -- as far as the court reporter goes, we waive any sort of these issues with conflict. We

Page 7

want to put that on the record.

MR. HEPPELL: Thanks. And same with plaintiff.

MR. ROTHENBERG: Great.

MR. HEPPELL: With all that out of the way, has the witness been sworn?

THE REPORTER: Yes.

BY MR. HEPPELL:

Q. Great. Would you, please, state and spell your full name for the record, sir?

A. Timothy Redden, T-i-m-o-t-h-y, R-e-d-d-e-n.

Q. And are you currently employed?

A. Yes.

Q. What's your current employment position?

A. Lieutenant.

Q. That's a lieutenant with the Indiana Department of Corrections?

A. Uh-huh.

Q. Is that at Indiana State Prison?

A. Yes.

Q. Do you prefer that I call you Lieutenant Redden today?

A. I don't care.

Q. Okay. Lieutenant Redden, have you ever testified at a deposition before?

A. No.

Q. Okay. So I want to go over some background rules or

Page 8

guidelines just to try and make things go smoothly today. Okay?

First of all, you have sworn to tell the truth, and you understand that that oath is the same oath that you would take if you were testifying in a courtroom in front of a judge and jury, correct?

A. Correct.

Q. We aren't in a courtroom. As you know, we're in a conference room with a court reporter. And so it's a little less formal than in a courtroom. We might take breaks. We're going to take breaks. If you need to take a break at any point in time, that's no problem. Just let me know. Okay?

A. Yes, sir.

Q. The only stipulation around that is if I've asked a question, I would ask for you to give your full and complete answer to that question, and then we can take a break, go off the record before I ask my next question. Okay?

A. Understood.

Q. Even though we're -- we can be fairly informal, it is important that you answer my questions verbally using words without relying on gestures, head nods, head shakes, things like "uh-huh," "huh-uh" because in the room, for us, those are very easy to understand. But for the

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 4 of 111

Page 9

written record and for the court reporter to take down, that's very difficult. Okay?

A. Yes, sir.

Q. Similarly, it's going to be not a natural way of having a conversation. But it's important for you to let me get all the way to the end of my question before you start jumping in with your answer. Okay?

A. Yes.

Q. And that's even if you can save us a lot of time by -- you see where I'm going, you can jump in. But it won't save us time because I'll have to start it over again just so there's a clean record. Okay?

A. Understood.

Q. Your counsel may have some objections to the questions that I ask today. Because there's no judge here to rule on those objections -- primarily, those objections are just being made for the record. And so unless your lawyer instructs you not to answer a question, if you just give a moment, let the lawyer get the objection out for the record, and then you can just go ahead and answer the question. Okay?

A. Understood.

Q. If you don't understand a question that I ask, maybe I phrased something poorly, or you can tell that by the way I ask the question I've misunderstood something you said

Page 10

previously, or maybe you just don't have any idea what the heck I'm talking about, please let me know. I will gladly rephrase my question and we can work out what the misunderstanding is. Okay?

A. Understood.

Q. If you go ahead and answer the question, I'm going to assume that you were able to understand the question. Okay?

A. Yes, sir.

Q. With all of that aside, sort of background, what we're here to do today, do you have any conditions that affect your ability to provide truthful and accurate testimony today or any conditions affecting your memory?

A. No.

Q. And are you taking any medications that might affect your ability to provide truthful and accurate testimony or medications that affect your memory?

A. No.

Q. Lieutenant Redden, you were present at Indiana State Prison on April 7, 2017, and that's the night that there was a fire in B cell house involving Joshua Devine. That's correct?

A. Yes, sir.

Q. And as you sit here today -- and I understand it was a couple of years ago now. As you sit here today, do you

Page 11

have a memory of the events that happened that night?

A. Certain incidents of that incident, yeah.

Q. Based on that memory that you have and reflecting back on what you remember about that tonight, did you see or hear any correctional officer act in a way that violated or was not consistent with the policies and procedures of Indiana State Prison or the Indiana Department of Correction?

A. No, sir.

Q. And reflecting back on the memories you have of that night, did you do anything that violated or was not consistent with the policies and procedures of Indiana State Prison or the Indiana Department of Correction?

A. No, sir.

Q. And since that night, is there anything that you've learned about the incident that reveals that any officer did anything that violated or was not consistent with the policies and procedures of Indiana State Prison or the Indiana Department of Corrections, to your understanding and knowledge?

A. No, not at all.

Q. Reflecting back on that night, is there anything that you would do differently --

A. No.

Q. -- knowing what you know now?

A. No.

Page 12

Q. And reflecting back on that night, is there anything that you wish anyone else had done differently?

A. Offender not set the fire. Other than that, no.

Q. When you say "offender not set the fire," can you explain what you mean by that?

A. From my understanding, he was working on his TV or something and rewired it, and that's what started the fire.

Q. You said he was doing what on his TV?

A. Working on his TV.

Q. And where did you get that information? Where did you get that understanding?

A. From our -- from the packet that I received as far as the fire marshal statement.

Q. So you're referring to -- is that a report that was issued by the fire marshal?

A. Right.

Q. Okay. And that's what you're referring to as the basis for your information --

A. Yes.

Q. -- that Mr. Devine was working on his television?

A. Uh-huh.

Q. Okay. Outside of seeing that reflected in that report, do you have any information or any basis to have an opinion about the cause of the fire?

USDC IN/ND   case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 5 of 111

Page 13

A. No, sir.

Q. Okay. And you stated that other than that aspect of things, there isn't anything that you wish anyone else had done differently that night?

A. No, sir.

Q. Would you agree with me that one of the responsibilities of a correctional officer is protecting the life and safety of every prisoner in the prison?

A. Yes, sir.

Q. Would it ever be appropriate for a correctional officer to learn that a prisoner was locked in a cell where there was a fire and for that officer not to immediately take steps to let that prisoner out of the cell?

A. As far as -- could you repeat that?

Q. Yes, absolutely. Would it ever be appropriate for a correctional officer to learn that a prisoner was locked in a cell where there was a fire and for that officer not to immediately take steps to let that prisoner out of the cell?

A. Not appropriate.

Q. There's no circumstances in which it would be appropriate for that to happen?

A. No, not at all.

Q. Is there any policy at Indiana State Prison that says if there is a fire in a locked cell, you must immediately let

Page 14

the prisoner out of the cell?

A. There's no policy regarding that, in that terminology, no.

Q. Okay. There was no policy on that back in April 2017 as well; is that correct?

A. There's a fire escape plan in the emergency manual, but it doesn't really cover exactly explicitly what you said.

Q. Okay. So if there's no policy that covers that, how -- did correctional officers know at the prison back in April 2017 that it was not appropriate for them not to immediately take steps --

A. In that situation --

THE REPORTER: You have to let him finish his question. Go ahead.

MR. ROTHENBERG: I'm sorry   I'm going to object That was just a little bit confusing. There were a lot of "nots" in there. Do you mind repeating that one more time so he understands it correctly?

BY MR. HEPPELL:

Q. Okay. Maybe I'll just re-ask the question. If there was no policy in April 2017 that stated that it was not appropriate for a correctional officer not to immediately take steps to let a prisoner out of his cell when a prisoner is locked in his cell that's caught fire, how did correctional officers back in April 2017 know that that was not appropriate to do?

Page 15

A. We have -- could you rephrase that? Because I don't understand how did they not know it was not appropriate to do or --

Q. Sure. If there was no policy that was in effect back in April of 2017, how did correctional officers know at Indiana State Prison whether or not it was appropriate to fail to take steps to let a prisoner out of a cell that was locked and on fire?

A. It's an assessment of the situation when you go up there. When you say "policy," there is a plan of action to follow. When you get up there, obviously depending on the situation, you'll take appropriate action.

Q. When you say there's a "plan of action to follow," is that a written plan?

A. Yes.

Q. And what written plan is that?

A. That is in the emergency manual.

Q. And does it state in the emergency manual what I stated, that if there's a prisoner locked in a cell where there's a fire, the correctional officer has to immediately take steps to let the prisoner out of the cell?

A. No. You just follow the assessment that you do right then and there. You just follow basically the laws of common sense.

Q. So it's following the correctional officer's common sense

Page 16

that let's them know that that's what they have to do?

A. It's an assessment of the situation.

Q. Is there any training provided to correctional officers -- or strike that.

Was there any training provided to correctional officers at Indiana State Prison prior to April 2017 that covered rescuing or releasing prisoners from locked cells that were on fire?

A. Yes, sir.

Q. What training was that?

A. We do monthly fire drills, and there's also -- talked about in our annual training.

Q. So any other training other than those two things you just mentioned that cover that?

A. Not that I can think of at this moment, no.

Q. If there are things that I ask you about that you later think about during the course of the deposition, please let me know; and then you can supplement your answers. Okay?

A. Yes, sir.

Q. Because I only get one chance at asking you questions at the deposition. So I would appreciate that.

So you mentioned monthly fire drills and also that it was talked about in your annual training, correct?

A. Yes, we're educated about it every annual.

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 6 of 111

Page 17

Q. Can you describe the monthly fire drills?

A. What type of description are you looking for?

Q. What do they consist of? How do they work?

A. We typically will -- the fire chief, safety hazmat manager will come in. He'll sound the alarm, set the alarm off in the cell house. Officers are then to go up and release the offenders from their cells.
    The offenders should, in an orderly fashion, exit the cell house through the exit routes that are posted in the cell house.

Q. Are the doors locked prior to beginning those monthly fire drills?

A. Yes.

Q. And then that's a drill involving the evacuation of everyone in the cell house; is that correct?

A. Uh-huh.

Q. So every offender has their cells -- every prisoner has their cells unlocked and are evacuated as part of the drill; is that correct?

A. Yes, sir.

Q. Is there any aspect of the monthly fire drills that involves not a cell house-wide evacuation, but a drill for rescuing a specific individual from a specific cell that, you know, is a simulated fire situation like that?

A. Not for staff. That would be a job for the offender fire

Page 18

brigade that does those drills, not for staff.

Q. So to your understanding, the prisoner fire brigade runs drills that would involve the scenario I described, but there's no drills that staff run that involve rescuing a specific individual from a specific cell; is that correct?

A. Correct.

Q. What is the source of your knowledge about the drills that the prisoner fire brigade run?

A. Not much. It's not my job to know. I can just tell you they typically do those drills on the weekend. But as far as me knowing what their curriculum is, no, it's not my job.

Q. So you have some general understanding of that --

A. I'm sorry.

Q. That's fine. I appreciate you catching yourself, and I'll try to do the same. We'll try to keep a clean record. You have some general understanding of the prisoner fire brigade and how they operate just from being at the prison, but it's not your specific area of expertise or knowledge. Fair to say?

A. Yes, sir.

Q. You also mentioned that in addition to the monthly fire drills, there was annual training that covered the topic of rescuing a prisoner from a locked cell that was on fire; is that correct?

Page 19

A. No. Basically how to operate fire extinguishers, which signal to call, giving precise radio instructions as to where it is, and the nature of the fire, the welfare of the individuals in the cell as far as the staff staying out in front of it, or whatever the case may be. Very bland as far as what are they to physically do with the offender, but just an overview as to what should be followed if that should come up.

Q. Okay. When you say "very bland," do you just mean not a lot of details in that area?

A. Instructional. It's more verbal than it is physical, more verbal than physical.

Q. Are there instructions given about specifically what to do with the prisoner in terms of releasing the prisoner from the cell?

A. There's instructions on what to do as far as fighting the fire with the staff. Basically, they're told if it's a very minor fire, then you're capable or able with that training to put it out. But for the most part, any and every fire that occurs will be handled by the fire brigade.

Q. And just so I'm clear, I think, if I understood what you just described, you were describing the firefighting that staff was to do with minor fires. They would be able to handle it themselves. With more significant fires, the

Page 20

prisoner fire brigade would be involved, correct?

A. Yeah. The example they gave is maybe, like, a fire in a trash can is something we could put out.

Q. In terms of the annual training and the specific aspect of when and whether and how to release a prisoner from a locked cell when there's a fire in that cell, was that specific topic covered in any of the annual training?

A. No. All the cell dorms operate the same. So releasing an offender, regardless of the situation, is always going to be the same.

Q. And was it discussed at any point during the annual training that when there's a fire in a cell, that it was required that prisoners be let out of the cell?

A. Of course. That goes along with the annual fire drills that they do monthly as well.

Q. Again, that's part of the general cell house-wide evacuation you were describing earlier?

A. I'm sorry. Yes, sir, cell house, dorms, all of it.

Q. What particular part of the annual training curriculum that you were just describing includes this content around fire safety, fire training?

A. Could you rephrase that?

Q. Yeah. So is there a particular module within the annual training or a particular subheading or subtopic that that would all be covered on?

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 7 of 111

Page 21

A. Yeah. They have a computer-based training module that we complete. They also have a PowerPoint that they put on for the class as well.

Q. Can you describe the computer-based training module?

A. No. I take it yearly. It's been a while.

Q. So as you sit here right now, you don't have a memory of what that computer-based training module consists of?

A. Just of what I'm supposed to do when it happens from doing it. Other than that, no, I couldn't sit here and tell you exactly what the CBT says.

Q. How does it work? Is it everyone sitting down at a computer all at the same time and going through it?

A. Whenever they get to the computer, you'll get there and do all your CBTs. It varies. I've done 40. Some people do 27. Because I'm a lieutenant, I might have to do more than them. But it's a general rule of thumb, CBTs take forever. You get to it when you get to it. We have to have them all completed by a certain date, and that's just really all there is to it. There's no certain set time that we do them.

Q. So with the CBT -- and that's computer-based training? Is that what that stands for?

A. Uh-huh.

Q. That was a yes?

A. Yes, sir. I'm sorry.

Page 22

Q. No. You're fine. So that's not, like, classroom training that everyone is taking together, correct?

A. Other than that, we have the PowerPoint. That is classroom training.

Q. Got it. So the CBT is just a deadline for everyone to complete whatever set of training modules they're required to complete; is that fair to say?

A. No. I mean, it still offers valuable information as far as your job. But, I mean, it's just as valuable sitting in the classroom. You still got to answer questions. You still got to pass it. And we all do, so...

Q. If I understood what you were saying earlier, depending on your position at the prison, what your assignment is, what your rank is, you might have a different set of CBT requirements; is that correct?

A. No, the quantity is different. But the baseline CBTs, we'll all do. And fire safety and all that is all a basic number of CBTs we all have to accomplish regardless of rank or job classification.

Q. So the fire safety part is something that everyone does, is your understanding?

A. Yes.

Q. And there might be additional things that you do as a lieutenant that a regular correctional officer wouldn't have to take as a part of the CBT?

Page 23

A. Yes.

Q. As you sit here today, do you recall the contents of the fire safety component of the CBT?

A. No, not word for word, not verbatim, the operation of a fire extinguisher and stuff like that.

Q. Other than those, sort of, details or general topics you just described, are there any other general topics you recall about the fire safety contents of the CBT?

A. Like I said earlier, it may cover what signal to call, the pronunciation over the radio, using a clear, calm voice, how to contact control, determining to the best of your ability what type of fire it is, which is realistically hard to do because you never really know if it's electrical or chemical. It covers stuff like that.
    But like I said, in our environment, it's hard to come to a determination as to what they're setting a fire with. So that's why there's a basic guideline to have the firemen come and make that determination.

Q. And you also mentioned there was a PowerPoint, a classroom component of the annual training, correct?

A. Uh-huh.

Q. And is fire safety one of the topics that's covered in the classroom PowerPoint component?

A. From my knowledge -- like I said, it's been over a year for me because this is yearly. It basically covers the

Page 24

operation of fire extinguishers, where, how many should be posted in a cell house, the PASS method about pull the pin, assess it, you know, and generalized information.

Q. Is there any aspect of that PowerPoint classroom side of the training for fire safety that covers rescuing an individual who is locked in a cell where there's a fire?

A. Rescuing, no. Like I said, that would be the job of the firemen, if it got to that point.

Q. So is it your understanding that it's -- under the policies and procedures of Indiana State Prison, it's not the job of correctional officers to rescue a prisoner who's locked in a cell with a fire? That's the job of the prisoner fire brigade?

A. Again, your assessment means a lot when you go to the cell. I'll give you an example. An officer has a uniform on. A fireman has a fireproof suit. So you don't want to be put in the position to where you cause more than one individual to be harmed if a situation arises.

Q. Can you explain what you mean by that?

A. One victim is bad; two is worse.

Q. Would it be appropriate then, based on the policies and procedures in place at Indiana State Prison in April of 2017, for a correctional officer to learn that an offender -- that a prisoner was locked in a cell where there was a fire and to say, "Well, I'm not going to go

BARBARA DEVINE vs                    Cause No. 3:18-cv-00995-JD-MGG                    TIMOTHY REDDEN
RON NEAL, et al.                                                                              October 25, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 8 of 111

Page 25

rescue him from the cell; I'm going to wait for the fire brigade to come"?

A. Would it be appropriate?

Q. Correct.

A. Given the situation, like I said, it's a determination considering of the fact of the fire, the nature of the fire, whether it's a rough fire. I'm not them. I can only tell you my assessment. It wouldn't have been the best decision that a person can make to run in what I saw.

Q. I'm sorry. Could you repeat what you just said?

A. I said I'm not them. But from what I saw, it wouldn't have been the best decision for any human to run in, from what I saw, unequipped.

Q. That's what you're referring to at the time you saw the fire in April 2017?

A. Yes.

Q. Can you explain why you have that view?

A. Because it was just a bad fire. I mean, you're obviously going to get burned. I mean, it was nothing that you're going to run into without the proper gear on, which we are not provided.

Q. You didn't see the fire -- you didn't see the fire start; is that fair to say?

A. Correct.

Q. And you didn't see the fire at any earlier stage prior to

Page 26

you arriving in the cell house?

A. No, sir. No, sir.

Q. Was there any policy at Indiana State Prison in April of 2017 that said if there is a fire in a locked cell, as a correctional officer, you are prohibited from letting the prisoner out of the cell or that you have to get permission from some more senior officer before you can let the prisoner out of the cell?

A. There is no policy. It's an assessment when you get up there, or wherever the case may be. You take the accurate measurement to prevent hurt, harm, or danger to everybody. But if areas -- let's say the cell house is not affected as bad as the others, then, of course, you might want to steer clear of involving them in a situation.

Q. If, for example, there's a prisoner in a cell where the fire is in that cell, a correctional officer wouldn't have to get anyone else's permission before opening that cell door to get that prisoner out of the cell; is that fair to say?

A. Correct.

Q. And I understood you earlier to be describing a situation where the fire was raging so significantly that the correctional officer couldn't safely get to the cell door, and that's why you were suggesting that would be a situation you'd need to wait for someone with specialized

Page 27

equipment. Did I understand what you were saying correctly?

A. Yes, sir.

Q. So setting aside that kind of scenario and going to a scenario where there's a fire that's ignited, but it's not at the point where a correctional officer can't safely approach the cell front, under that situation, would you say, following the policies and procedures of the Indiana State Prison, it would be required for that correctional officer to let that prisoner out of the cell regardless of whether the prisoner fire brigade was on site or not?

A. Correct.

Q. You understand that prisoners maintain certain constitutional rights while they are in prison, correct?

A. Correct.

Q. Would you agree with me that it would violate those rights for a correctional officer to know that a prisoner was in danger due to a fire in their cell and for that officer to do nothing in response?

A. Willfully, yes.

Q. Can you explain what you mean by "willfully"?

A. Purposely.

Q. Would you agree with me that it would just be wrong for a correctional officer to know that a prisoner was in danger due to a fire in their cell and for that officer to

Page 28

willfully do nothing in response?

A. Willfully, yes, to do nothing at all.

Q. Do you understand that in that kind of situation, the correctional officers are required to take some action to try to help the prisoner, correct?

A. Yes.

Q. And do you believe that all of your colleagues, all of the correctional officers at Indiana State Prison back in April of 2017, also understood that?

A. Yes.

Q. Why do you believe that to be the case?

A. Because we are there to protect the public and the offenders, as well as staff, from every harm while they're a ward of the state.

Q. Under the -- setting aside the issue of seeing a prisoner locked in a cell with a fire, just generally speaking, regarding fires, under the policies and procedures in place at Indiana State Prison in April of 2017, were correctional officers required to respond if they personally saw a fire at the prison?

A. They are to call a signal advising control if there's a fire. From that point, control calls the signal. First responders respond, along with the fire brigade. They report to the fire station. They gear up. Then they report to the area which the fire is at.

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 9 of 111

Page 29

Q. So there's some response required from the correctional officer under those circumstances, correct?

A. Yes.

Q. Under the policies and procedures in place at Indiana State Prison in April of 2017, were correctional officers required to respond if they personally saw smoke in the prison?

A. They should go check it out, yes.

Q. When you say they "should," that's not an optional thing for them; they would be required to investigate that?

A. If they see it, they smell it, yeah, they're to check it out.

Q. Under the policies and procedures in place at Indiana State Prison in April of 2017, were correctional officers required to respond if they heard a prisoner or prisoners yelling "fire"?

A. If they heard that, they should check it out, correct.

Q. When you say they should check it out, can you explain what you mean by that?

A. They are to check it out.

Q. It would be required that they take some action to investigate that situation?

A. They are to investigate it, yes, sir.

Q. What about if the correctional officers just heard a prisoner or prisoners yelling "help"?

Page 30

A. They are to check it out.

Q. And what about if the correctional officers heard a prisoner or prisoners yelling, but they couldn't understand what they were yelling about?

A. They are to check it out.

Q. That would be a requirement that they go take some action to investigate the situation?

A. Investigate the situation.

Q. What about if a correctional officer just hears some commotion. They don't know what the noise is. There's some commotion that they hear?

A. They are to investigate, check it out.

Q. There would be no excuse under any of the circumstances I just described for a correctional officer not to take some action to respond or investigate those situations; is that fair to say?

A. It's fair to say.

Q. Lieutenant Redden, where do you live?

A. Michigan City.

Q. What's your address?

THE WITNESS: Is that all right?

MR. ROTHENBERG: We'll object to this being privileged, but you still have to answer.

A. Okay. ███████████████ Michigan City.

Q. Can you spell that?

Page 31

A. ████████████████████

Q. Do you have any plans to move in the future?

A. Maybe. I don't know.

Q. No current plans like you found a new place, you're immediately moving?

A. I'm not looking, no.

Q. You might move?

A. I might, yeah.

Q. What's your telephone number?

A. █████████████

Q. Is that a cell phone?

A. Yes, sir.

Q. Is that a personal cell phone?

A. Uh-huh.

MR. ROTHENBERG: Again, we object to all the personal information for the record. That's privileged.

MR. HEPPELL: Understood.

BY MR. HEPPELL:

Q. Do you have a landline telephone as well or just a cell phone?

A. Cell phone.

Q. And do you have a work cell phone or just a personal cell phone?

A. Just a personal.

Page 32

Q. Do you have a personal e-mail address?

A. Yes.

Q. What's your personal e-mail address?

A. ██████████████████████████████

Q. Is that the only personal e-mail account that you currently use?

A. Yes, sir.

Q. Were you using that personal e-mail account back in April of 2017?

A. Probably, yes.

Q. Okay. Is there a different personal e-mail account that you've used in the past that might have overlapped with the April 2017 time period?

A. No. I think I had that one since I was a minor.

Q. And how old are you today?

A. 32.

Q. So it would have been a good long while back?

A. Yeah, yeah.

Q. I guess most people these days aren't setting up new Hotmail accounts.

A. No.

Q. Do you currently have an ISP e-mail account as well?

A. Yes, sir.

Q. What's the address on that e-mail account?

A. Tiredden.in -- I'm sorry -- @idoc.in.gov.

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 10 of 111

Page 33

Q. Is that the same e-mail account that you had back in April of 2017?
A. Yes, sir.
Q. Is that the only work e-mail account --
A. Yes, sir.
Q. -- you have? So between those two e-mail accounts, are those the only two e-mail accounts that you use?
A. Yes, sir.
Q. Do you use social media?
A. I have a fire brigade, yes.
Q. And did you have that same fire brigade account back in April of 2017?
A. Maybe. I'm not sure.
Q. Did you have a different fire brigade account, or it's, like, if you had any fire brigade account, it would have been this one?
A. Correct, second one.
Q. And do you use your real name on your fire brigade account?
A. █████
Q. Do you use fire brigade -- do you use the fire brigade Messenger function as well?
A. Yeah. Depending on who I'm talking to, yeah.
Q. So in addition to making public posts, you would also use it to communicate with people?

Page 34

A. Yeah.
Q. What about Twitter? Do you have a Twitter account?
A. No, sir.
Q. Any other social media accounts other than fire brigade?
A. No, sir.
Q. And do you use text messages on your personal cell phone?
A. Yes.
Q. What about text messages on your work cell phone?
A. I don't have a work cell phone.
Q. I'm sorry. Okay. So just the one cell phone. That's right. Do you text message with colleagues from the prison?
A. Back and forth, yeah.
Q. Have you had that same phone number since April 2017?
A. Yes, sir.
Q. What about the phone itself?
A. No. I'm sure not.
Q. Have you used the system -- strike that.
       Is it, like, an Android or iPhone?
A. Android.
Q. Have your old text messages, like, transferred with you when you changed phones?
A. No.
Q. Do you still have those old phones --
A. No.

Page 35

Q. -- that you had previously?
       What happened to the old phones?
A. Some broke. One got stolen, and that's why I got the new one that I got now.
Q. Do you live alone, or do you live with anyone?
A. I live with my mother.
Q. What's your mother's name?
       MR. ROTHENBERG: We're going to object I don't see how this is relevant.
A. Tina.
Q. Anyone else that lives in your household other than your mother?
A. No.
Q. Are you married?
A. No.
Q. Do you have any children?
A. Yes.
Q. How many children do you have?
A. Two.
Q. What are the ages of your children?
A. Nine and four.
Q. You stated earlier that you're currently employed as a correctional lieutenant at Indiana State Prison, correct?
A. Yes, sir.
Q. How long have you held that position?

Page 36

A. About four years, I believe.
Q. If I were to suggest to you there's a document in the case suggesting that you became a correctional lieutenant effective November 22, 2015, does that sound right to you?
A. I don't know. Yeah, it's been a while.
Q. Can we mark this as Exhibit 2, please?
       (Exhibit 2 marked for identification.)
Q. Showing you what's been marked as Exhibit 2, it is a document that has been produced in discovery in this case. It does not have a Bates stamp. I believe this is from -- a page from the personnel file that's been provided to us. And it's an e-mail from Donna White dated November 23, 2015, "To: DOC, All SPU Staff"; subject line: "Congratulations - Tim Redden." Are you familiar with this document, with this e-mail?
A. Uh-huh.
Q. This e-mail reflects that you were promoted to the position of correctional lieutenant effective November 22, 2015; is that correct?
A. Yes, sir.
Q. That's what's reflected on the document?
A. Uh-huh.
Q. Do you have any reason to disagree with that timeline?
A. No, sir.
Q. Sounds right to you?

Page 37

A. I don't honestly remember. But if that's what it says --

Q. If that's what it says, you have no reason to disagree with it?

A. Right.

Q. That document also states that you started your career with DOC in November 2007 as a correctional officer at Indiana State Prison. Do you see where it says that?

A. Uh-huh.

Q. Do you have a memory of that being the correct timeline as well?

A. Correct, November 13 of '07.

Q. That was your start date with the Department of Correction?

A. Yes, sir.

Q. And you've spent your entire time at Indiana State Prison?

A. Yes, sir.

Q. Okay. You started as a correctional officer, correct?

A. Yes, sir.

Q. And then were you promoted directly to lieutenant, or was there an intermediate promotion?

A. Go through the ranks as sergeant and then lieutenant.

Q. When did you attain the rank of sergeant?

A. I don't know.

Q. It would have been sometime before November of 2015, correct?

Page 38

A. Oh, yeah.

Q. Do you have an approximate estimate of --

A. I was a sergeant for about two or three years before I got promoted to lieutenant.

Q. So it would have been sometime 2012, 2013 that you became a sergeant?

A. Best of my knowledge, yes.

Q. As a correctional lieutenant at Indiana State Prison, what are your job duties?

A. Supervise staff, offenders, conduct security assessments; a lieutenant, the job varies. I'm the assistant shift supervisor; so I run a shift.

Q. So if I understood what you were saying, different correctional lieutenants will have different job duties depending on their specific position?

A. Correct.

Q. And your specific position is assistant shift supervisor?

A. It's been that since I started as lieutenant. Since, what is that, 2015.

Q. So going on four years now?

A. Yes, sir.

Q. And that was a position you'd had for, approximately, a year-and-a-half in April of 2017, correct?

A. Yes, sir.

Q. And you worked as an assistant shift supervisor that

Page 39

entire time?

A. Yes, sir.

Q. Same shift or different shifts?

A. Two different shifts.

Q. What are the different shifts you've worked?

A. I started on nights, which was J group; that's when the incident happened. And now I'm on H, which is day shift.

Q. Are those 12-hour shifts?

A. Yes, sir.

Q. So is it 6:00 p.m. to 6:00 a.m.?

A. No. At the time, it was 5:00 to 5:00, and now it's 4:00 to 4:00.

Q. So back in April of 2017, it was a 5:00 p m. to 5:00 a.m. shift?

A. If I remember correctly, yes.

Q. And is that different depending on your position?

A. As far as my hours?

Q. Yeah. So does everyone work a 5:00 p.m. to 5:00 a m. shift, or the lieutenants might work 5:00 to 5:00 and the officers work a different --

A. It's been changing. It's subject to change any time. Back then, I couldn't tell you. I'll give you an example right now. I work 4:00 to 4:00. The other lieutenants come in at 5:45. The officers come in at 6:00. So I really don't know at that time what they were working. I

Page 40

know what I was doing.

Q. You were working 5:00 to 5:00 at the time, back in April of 2017?

A. Correct.

Q. So what are the job duties of a correctional lieutenant working as assistant shift supervisor?

A. I would manage the roster, placement of staff. Then we didn't. That's why we worked 5:00 to 5:00. We had a dispatcher. Now the dispatchers are gone. So we work 4:00 to 4:00. That gives us time to do the roster, get our QRT teams together, quick response team together, do our inventory checks inside the workstation. Basically, just to prep the shift for our staff when they arrive.

Q. Once the staff arrive and the shift is underway, what does, sort of, a typical shift look like for you as a correctional lieutenant serving as assistant shift supervisor?

A. As in -- can you elaborate on that?

Q. Yeah. As in -- so you're on the night shift and you're in the middle of your shift. What are you doing? Do you have a specific physical location that you're required to be?

Well, let me ask you that. Is there a specific physical location that you're required to be as the assistant shift supervisor?

Page 41

A. I didn't want to cut you off. That's why I didn't answer.

Q. I appreciate that.

A. Yeah. We're stationed in the custody hall.

Q. What is the "custody hall"?

A. It's just the -- I guess you -- the shift supervisor's office is located in the custody hall. That's where we conduct the offender visits. We operate the gates to enter the facility in the custody hall.

Q. And is the custody hall immediately adjacent to B cell house?

A. Yes, sir.

Q. And there's a shift supervisor's office in the custody hall?

A. Yes, sir.

Q. And is that where both the shift supervisor and the assistant shift supervisors are, sort of, based out of during a shift?

A. Yes, sir.

Q. In fact, are there multiple assistant shift supervisors on a shift?

A. No. It's just two now. At the time, I believe it was three. It's been a while. We've downsized so much. It's just two now. But, yeah, I believe at the time it was three, one captain, two lieutenants.

Q. Okay. And just so I'm clear, when you say three, it was

Page 42

one shift supervisor and then two assistants; is that correct?

A. Yes, sir.

Q. And that's how it was on April 7, 2017?

A. Yes, sir.

Q. Today that's changed, and it's just one shift supervisor who's the captain and one assistant who's a lieutenant?

A. Yes. And on nights, they have a shelter lieutenant. He's not a shift supervisor. He just basically runs the shelters back and forth everywhere. Days don't have that. We just have the one captain, one lieutenant, and we have the lieutenants who are assigned to our shift assigned to their own shelters.

Q. So as things stand right now on the night shifts, there's a lieutenant who, if I heard you correctly, does rounds between the different cell houses?

A. Yes.

Q. That position was not in effect in April of 2017?

A. No, sir.

Q. So were both -- strike that.
On the night of April 7, 2017, the most senior officer physically present within the walls of the prison was the shift supervisor; is that correct?

A. I don't know about senior, but the highest ranking.

Q. Highest ranking. Thank you. So not necessarily longest

Page 43

years of service, but highest ranking officer?

A. Yes, sir. That would have been the captain.

Q. And that was Captain Dykstra that night.

A. Yes, sir.

Q. And then, additionally, there were two assistant shift supervisors?

A. Yes, sir.

Q. Both lieutenants?

A. Yes, sir.

Q. And that was yourself and Lieutenant Watson; is that correct?

A. Yes, sir.

Q. And all three of you, your, sort of, regular posting during the shift was to be in that shift supervisor's office in custody hall?

A. Outside of making our normal rounds dealing with whatever incident or disturbance happened in the facility, yes.

Q. So let me split that in two because if I understood you correctly, I heard two different things that could take you out of the shift supervisor's office. You talked about regular rounds. Did I understand you correctly?

A. Well, anything can take us out of the shift supervisor's office, anything that erupts anywhere in the facility can take you out.

Q. Sure. And that's what I understood the second thing to

Page 44

be. So there's some incident. I think you described it as incident or disturbance, something out of the ordinary?

A. Correct.

Q. Something that requires or is advisable for a senior officer to go check it out because maybe it'll be nothing requiring assistance, but maybe it will be something that a senior officer needs to be there for; is that fair to say?

A. For the most part, yes.

Q. Okay. And that's responsive. That's responsive to there being some report or you learn somehow that something has happened or something might have happened; is that fair to say?

A. Not all the time, no. It could be something -- like I say, we do our security walks, tower flashes. There's a lot of responsibilities at that time. It's been a minute since I've been on nights. We had key checks. There's a lot of different things we did.

Q. I guess what I'm trying to get at, and let me know if this distinction doesn't make sense to you. But what I was hearing from what you were saying earlier was that there would be things that you would respond to incidents that was, sort of, something's happened, you're going out to it. And then there would also be routine rounds, whether you're patrolling or doing, you know, a standard walkabout

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

**Page 45**

that you're doing regardless if you hear something's going on, or it's just a quiet night, you'd still be doing those routine checks?

A. For the most part. But as far as responding to an incident, you only do that if you're on the QRT team, quick response team, for that particular day. If you're the only one there, if the captain's not there, then you wouldn't leave the office. You would fill his role. If you're not on the QRT team, then you wouldn't really respond to any incidents.

Q. Were both the assistant shift supervisors -- strike that. Are assistant shift supervisors always on the QRT team?

A. Not always. It just depends on staff shortages, who's here, who's not, who's qualified, who's not. You always have a supervisor, but that could be a sergeant. Typically, me and Watson put ourselves on that because we felt that we made better decisions than the newer staff and can control situations a lot better. And so we typically did. But like I said, the night dictated that, the day dictated that, who was there dictated that.

Q. Can you explain what you mean by that, the night, the day dictated that?

A. Again, depends on who came to work and who didn't. If you had two people in a cell house, you can't pull one person

**Page 46**

out and put them on the team responding to emergencies because that leaves one person in the cell house. So, like I said, the night, who all is there and all that dictated who was placed on that team for that particular day.

Q. I see. And who made those staffing decisions?

A. It depends, again, who was there. We had a dispatcher at the time. But ultimately, the captain decided it. If the captain wasn't there, then we decided, me or Watson. Typically, it was my job to.

Q. And correct me if I'm wrong, but if I understand what you're saying, basically there would be the roster of who all was at the prison that night and what different cell houses or other positions they were assigned to. And then it was up to either the captain or one of the lieutenants to, from within those positions, designate who was going to be on the QRT for that night?

A. Yeah, the dispatcher give just an overview as to what he has, who's called off; and the captain will ultimately make the changes to that roster. And then once he approves it, he signs off on it. And that's what it was.

Q. What is the QRT?

A. Quick response team.

Q. And is that something that only certain members of the correctional staff have been trained and authorized to

**Page 47**

serve in those positions?

A. Yes, sir.

Q. And how many QRT members on a night shift back in April of 2017 are designated?

A. It's the same for every shift. At the time, you have four first responders, four weapon teams, and then there's five, I want to say, cell extraction team members.

Q. And those designations are separate from and in addition to what a person's regular assignment was during that shift; is that correct?

A. It's added, I would say an added responsibility.

Q. So you don't have a set -- for example, you don't have a set of four people who are just first responders and that's all they're designated as, correct?

A. No, that's a violation of our policy because offenders will learn who is on what if they see the same people leave all the time for the same -- for anything that's called over a radio. So to keep them from not knowing, there's a safety precaution. It is rotated between members.

Q. It always rotates, and you would, for example, have someone who is assigned to A cell house, and they were staffing a cell house as their regular shift, but they were also designated as a first responder, something like that?

**Page 48**

A. Correct.

Q. Or designated to be weapons team or another aspect of QRT?

A. Correct.

Q. And then it would only be if the QRT is activated or called for that then they would then leave their assigned position and activate with the QRT?

A. Yes, sir.

Q. On April 7, 2017, you had responsibilities at the prison both as an assistant shift supervisor and also as a member of the QRT; is that correct?

A. Correct.

Q. At the time, did you hold a leadership position within the QRT?

A. Honestly, I don't know who was the actual leader. Like I said, it rotates. So that particular night, at the time of the incident, I would have known. But right now, honestly, I don't know who it really was. Their number, I couldn't tell you right now, as we sit here in this room today, and tell you the exact number that everybody was on that night, no.

Q. So there's a rotating leadership structure?

A. Yes, sir.

Q. And that rotates every shift?

A. It's dictated, again, by the captain. But I could be leader one night. Watson could be leader one night.

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 14 of 111

Page 49

Typically, they try to put the two most experienced individuals. Like, on our shift, it would be either me or Watson as the leader because we would make the decisions on what to do in the situation. You want someone responsible and eligible, and it's staffing the offenders for making those decisions.

Q. There's no permanent designated leader of the QRT, like, managing the QRT training or determining, like, recruiting new members or testing to see, like, who can join the team; no one who serves as that position?

A. That's a training thing. They get certified from the training department. As far as recruitment go, we don't do none of that. It's not a third party, anything like that. It's all departmental.

If they show an interest, they can request it. And when the time comes, they can get trained in it. It don't mean they'll be even utilized for it. Like I said, the roster dictates that.

Q. So you can train and become QRT eligible just through the training department. And then it's the dictates of the roster that determines whether you're actually designated as part of the team on any given night?

A. (Nodding.)

Q. You're nodding. So both of those statements are correct?

A. Correct.

Page 50

Q. And then it would be, you know, potentially rotating leadership; although, they would generally try to have more senior or more experienced people filling a leadership role on any given night?

A. Correct.

Q. I believe you stated that you -- that you don't remember who was the QRT leader on April 7, 2017?

A. Not now, no, I don't remember.

Q. Would that information be recorded or documented somewhere?

A. If it was, it should be somewhere on the roster. We've gone through about eight or nine different formats of roster since then. They add in slots. They remove slots. But as it stands now, that's on the roster. I couldn't tell you as to what was it on then.

Q. But if you look at the roster, that might be something --

A. From that day, from that shift, yeah.

Q. Is there something -- so would the role or responsibilities of the leader, of the QRT leader that day, be different from someone else on the QRT?

A. Just, realistically, like, they respond to a number of situations. I'll give you an example. They carry -- put it very simple, they're not to get involved physically. If there's a fight going on, the regular members will deal with that. They're to stand back and provide coverage for

Page 51

the staff there and the other offenders standing around.

It depends on the situation and what you're responding to. They're responsible for calling the weapons team if it's a riot situation. Every situation is different, and there's different rules that apply to what he would be doing in that situation and whatever signal is called.

Q. If there's an incident that requires QRT response, is it always the team leader who is taking the lead on making the decisions about how the QRT is going to respond to the situation?

A. No, I wouldn't say that. If you have a QRT member in a cell house that requires them to respond, then, naturally, that individual on the team would know more about what's going on than the team leader who just got there. So it would be safer to, kind of, let him -- to back him up rather than to push him aside and be like, well, I'm the team leader, you'll talk to me, or whatever the case may be.

Q. So if someone has more knowledge of the situation because maybe they happened to be assigned to the cell house where the incident took place would sort of respect that -- the setup was that the QRT would respect that and be, like, you know the most; we're going to follow your lead on this. Is that what you're describing?

Page 52

A. His responsibilities will still be the same. As far as the only one allowed to request, like I said, the weapons team and whatnot. But if you get there and a situation is going on, you know -- they call the signal; they know what's going on. As long as there's not an immediate threat to anybody's safety and it's being handled, it's best to back up the individual who is there in order to make the assessment of the situation you're walking into.

Q. So if I understood what you were just describing, it would be the designated leader who would have the authority to call the weapons team, correct?

A. Yes.

Q. And that's like the second level of QRT sub-teams or subgroups; is that correct?

A. No. I wouldn't say they're levels. They're all teams. Like I said, you got the cell extraction, weapons, first responders. That consists of three different teams. The first, if you want to title it that, would be the first responders will get there. And if they can't handle the situation, then their backup would be weapons and whatnot from that.

Q. Depending on what the situation is, correct?

A. Depending on the situation.

Q. So, again, if I understand what you're saying, whatever the situation is, any time there's some incident that

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 15 of 111

Page 53

requires QRT to be activated, the first responders are going to be there first. They're the first responders?

A. Correct.

Q. Regardless of the type of incident?

A. Correct.

Q. And then, depending on the nature of the incident, some incidents will require the involvement of the weapons team or the cell extraction team or both?

A. Yes, sir.

Q. Then some might be a type of incident like a fire where the weapons team and the cell extraction team aren't immediately part of what the response is required of that situation?

A. Well, the weapons team will respond to the weapons when they're prepped, just in case. They'll stand by until they're called out. When the signal is clear, they'll go back to their job duties.

Q. So regardless of the type of signal, they will go to the weapons room and be ready to go, correct, get ready to go?

A. Again, the situation is different. They may not do that for a medical emergency. If someone falls out or faints, they won't respond to the weapons room for that. But anything with the potential to be dangerous for anybody around, they might require extra controlling of people, then they'll respond and prep and be ready.

Page 54

Q. Does a fire fit into that category of things where the weapons team would report to the weapons room and get prepped?

A. Yes.

Q. Is there a written document that sets out the different situations where the weapons team will always go and get ready in case they're needed versus, like you described, a medical emergency where they might not?

A. Yeah. It will be in the emergency manual under the QRT.

Q. Is there a decision that needs to be made with any particular incident whether or not to activate the QRT, or is it automatic depending on the nature of the code that's called?

A. Any incident that requires someone to call a signal or activation of a QRT team.

Q. And then an incident that requires calling a signal, that's just something that a correctional officer in whatever location they're in sees something that they're required to notify up to the shift supervisor that something's happened?

A. I wouldn't say notify shift supervisor. It's more so to protect any and everybody around them. Then they'll call a signal, and the first responders will come.

Q. What are the different type of signals that get called?

A. The signal 7, serious situations. You have 10-10,

Page 55

offender on offender; you have signal 10, which is I need assistance; you have 10-71 and 10-70. It varies.

Q. What are 10-71 and 10-70?

A. Those are fire codes. One is an alarm, and one is a fire.

Q. Which is which?

A. I believe the -- well, I come from a time where there was a signal 12, and that means that it was a confirmed fire. It was not an alarm at the time. I believe a 10-71 now is an alarm. It's new terminology to me. 10-70 is alarm, and 10-71 is a fire.

Q. Was there ever a time that you're aware of when there is a distinction made between a code call for someone who saw smoke versus someone who saw a fire?

A. It's all the same code.

Q. All the same code?

A. Yep. If you see smoke, there's a fire, you call the signal. If there's a fire alarm, that's the only difference between the two.

Q. So the fire alarm, like the ring of the -- is it like a bell that rings?

A. Yeah.

Q. Okay. And that, we all know from experience, sometimes that means there's actually a fire; but sometimes it means something else has happened to set the fire alarm off?

A. And they will always call a signal regardless.

Page 56

Q. Is the initial response from the QRT or from the other officers the same regardless of whether it said 10-70 or 10-71?

A. It's always going to be the same. All available staff will report to there, and they'll follow under QRT when it gets there.

Q. When you say "all available staff," can you explain what you mean by that?

A. Depends on who is around, nearby staff.

Q. So that would include non-QRT members?

A. Yes.

Q. So if you have someone who is not on the QRT, but there's a 10-70 called in B cell house or a 10-71 called in B cell house, if a staff member is available, they'll respond to that situation as well?

A. Depending on the situation. Some of them -- a lot of times, they push it to get the door key and make sure the doors are unlocked so staff can get in. You can't respond after calling a signal and leave the door locked, for example, to allow -- we can't get in, you know. So prior to that, it's still what we regard as assisting in the situation.

Q. And was that true, specifically, for a fire alarm or fire codes, that that's the type of code where people from -- available officers, even if they're not on the QRT, would

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 16 of 111

Page 57

respond to that scene?

A. Fires, yes, assaults, yes. It might not be so much true for medical emergencies because it's less likely that staff is going to encounter any resistance from offenders because you're trying to help them out.

Rather than a signal 7, you know, you could be dealing with multiple individuals with knives or whatever. So, obviously, more people will be coming to try to get that in order.

Q. You talked -- if I understood the terminology you were using, you talked about an officer being available.

A. Uh-huh.

Q. What determines whether or an officer is available or not?

A. I'll give you an example. If you are supervising an offender who is using class A tools, which could be edge weapons, painting knives, you don't want to leave them unsupervised, those type of tools, to go assist with a signal that might happen. So he's not available. He would not go, even if he's right there.

Q. Setting aside that kind of situation with a prisoner who is out with tools, for example, confining it to, broadly speaking, this situation where it's something that happens after 9:00 o'clock, after the prisoners are locked in their cells, what determines whether an officer is or is not available to respond to a signal that's called?

Page 58

A. If they're clear on the other side of the cell house conducting security rounds, dealing with an offender and their issues, like I said, the severity of the situation that they're encountering can justify them not responding to something, especially when they're not on the QRT team. Their presence is just a bonus. It's not required.

Q. So is it -- I don't want to put words in your mouth, but what I kind of hear you describing, is it, sort of, discretionary for an officer to use their own good judgment? Like, should I respond to the signal that's being called or should I stay in my current post where I am?

A. Discretion, and what's going on right then and there and the situation that you can possibly be in.

Q. And is part of that discretionary consideration, like, how far they are from where the signal has been called?

A. Correct.

Q. Okay. So, like, if I'm -- if I'm in a cell house that's way on the other side of the prison, even if nothing's really going on in my cell house, if there's a signal that's been called on the other side of the prison, I may decide not to respond to that, even if I'm technically available?

A. As I said earlier, nearby staff. So you're not going to leave something on the total other end of the prison to go

Page 59

to a cell house completely on the other side of the facility.

Q. Is there any written policy that sets out what we've just been talking about in terms of when officers are considered available or unavailable to respond to codes that are called and what factors they should use to determine whether or not they should respond?

A. Everything like that is covered in the emergency manual, the QRT. However, a lot of it just comes from good judgment, I mean, in using your own judgment. As I said, naturally, there's no policy that says that it's okay to leave an offender with an edge, possible edge weapon to go assist in a 3000. So you just know you should not do that. So you don't do that.

Q. And you referenced the emergency manual, and I think you referenced a section that refers to the QRT. Is there -- in the QRT section of the emergency manual, is that where it talks about non-QRT members responding to codes to assist?

A. If it's about QRT, then it's going to be a subject out of QRT. Outside staff not on a QRT is not going to be discussed in a QRT instructional manual.

Q. So is there any written document that discusses, at any level of detail, having non-QRT staff responding to assist with a code if they're available?

Page 60

A. Other than your training and you understanding that you're there for staff and offender safety, which correlates in the whole aspect, if you're close to helping, you help. That's all we got.

Q. So what part of the training is it that informs officers, hey, even if you're not on the QRT, if there's a signal called and you're nearby and you're available, you should also go to check that out?

A. As far as advising them, there's nothing that covers specific situations that says, hey, if this happens, then you're cool. If that happens, then you're not cool because it's too broad of a horizon to cover.

Q. Sure.

A. Like I said, it's all an assessment, a judgment call. Again, if someone is getting stabbed up downstairs, then you're going to go. If a guy falls and says, "Hey, I hurt my knee and I can't get up," and they call 3000 for them, you're not going to. So it's going to be a judgment call.

Q. If I understand what you're saying, you're saying there's no, like, comprehensive document or comprehensive training that goes through all the different specifics that this is a situation when you should respond; this is when you shouldn't. Is that fair to say?

A. (Nodding.)

Q. My question is a little different. Setting aside the

Page 61

specific scenarios, just the general concept, the idea that as an officer who's not on the QRT, there are situations in which I should respond to a signal that's called if I'm available, how is that general concept communicated to officers?

A. It's just communicated because you're there. I mean, you just know because, like I said, safety and security reasons. So if you're available and there's something that comes up that violates the safety of a facility, then it's your job to help deal with the situation if you're available to do so.

Q. So is it just the officers are, kind of, assumed to figure out that they're supposed to be at their posts, but they're allowed to leave their post if there's a signal called and they're available?

A. They're not going to leave their post. Like I said, if you're in the immediate area to assist.

Q. So when you say "immediate area," can you explain what you mean be that?

A. You have to understand the size of a cell house. It's as big as a football field. So if I'm on the total end of it, then you're probably not going to get there before the first responders. And it just doesn't make sense to. If I'm standing right under a situation, then, of course, you should go up there and assist. You're to go

Page 62

up there and assist because, again, you're responsible for staff safety and security and the general welfare of the public and all those working in there.

Q. Got it.

A. So that's why you're working there.

Q. So if I understand you correctly, and maybe, again, let's route this not in general, but specific. So let's say a signal 10-71 is being called in B cell house, the first responders are going to respond because they're on the QRT. That's their job, correct?

A. (Nodding.)

Q. And then in addition to that, officers who are nearby, provided they're available, could respond to that as well?

A. Correct.

Q. And then in the context of B cell house, is that only other officers in B cell house who would respond?

A. Yeah, immediately area.

Q. So "immediate area" is, like, within the same cell house?

A. Within the same cell house, yes.

Q. So if there's a cell house right next door -- you would know better than me what the, sort of, layout is. If they're right next door, they wouldn't respond. That's beyond the immediate area. Is that fair to say?

A. You cannot abandon your post. So correct.

Q. Got it. I understand. So you can respond to assist if

Page 63

you're available, but still within your post, whatever your assigned position is?

A. Correct.

Q. Got it. Going back to what we were talking about earlier in terms of the job duties of the assistant shift supervisor -- strike that.
I'm going to ask one more question first. Are there job duties that QRT members have during a shift outside of responding to signals that are called?

A. No.

Q. So you could go through an entire shift and you haven't done anything as part of your QRT work. There's not, like, regular responsibilities outside of responding to signals?

A. No, sir.

Q. Okay. Going back to the responsibilities of the assistant shift supervisor acting in their capacity as assistant shift supervisor and not as a QRT member, I believe you mentioned something along the lines of rounds or, sort of, regular check-ins. Can you explain a little bit what you mean by that?

A. You walk the cell house, see how the offenders are doing, see how staff is doing. We make a point to walk the segregation units, see how those guys are doing, if they need something. They tend to feel more comfortable

Page 64

telling us about it. More so, offering our presence there as an outlet to a lot of different people, whatever issues or problems they may be having, either with the cell or emotionally; or if the case may be, they may feel more comfortable talking to a lieutenant.
Sometimes they might feel more comfortable talking to a person of a certain race. So being there to do that is just part of your job.

Q. Part of the job is to just be physically present in the cell house and even right up at the cell fronts throughout the shift; fair to say?

A. Fair to say.

Q. And is that both the assistant shift supervisors that have that kind of doing-rounds responsibility?

A. Yes, sir.

Q. Do you do those rounds together or separately?

A. Separately. It is not any written rule that says that we can't do them together. But typically, we just do them separately at our own pace.

Q. Is that separately, like, you're both going out at the same time but just different patterns and pathways through the prison?

A. Depends on how we feel. Some days we might say, "Hey, I'm going to walk this side."
"Okay. Well, I'm going to walk this side."

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 18 of 111

Page 65

Q. You might split it up?

A. Yeah.

Q. Or you might just, kind of, follow where your instincts take you?

A. Correct.

Q. Would it be fair to say there's not, like, a set pattern that you follow each time of where you're rounding?

A. No. They teach you to be spontaneous. So we don't go to the same place at the same times. We don't go to the same -- one of us will not always go to the same place.

Q. Is that partially for your staff accountability as well?

A. Staff accountability and offenders, just overall watch.

Q. But good for, you know, people not to be able to predict when and where you're going to be?

A. Correct. But they do know that a supervisor will be through at some point.

Q. Is there going to be a supervisor gets through every location in the prison on any given shift?

A. We are required, per orders from the warden, because I don't believe it's actually written down, and the major, to conduct a walk in the seg units, which now there's only one, and two populated units. But at night, it's a lot calmer than it is in the day. We have more time. So we, typically, will go everywhere, even though it wasn't required.

Page 66

Q. Got it. Does the shift supervisor do those kinds of rounds or walks?

A. At that time, no. Now, yes.

Q. At that time, it was just full time in the office?

A. We were not to leave the office.

Q. Do you know why that's changed?

A. I do not know. At the time, new leadership, new rules. New warden said, "This is what I want." So that's what happened. The original content of him not doing it was if -- which has happened down state. If he's taken hostage, who's going to run the show. That happened in New Castle. That's why you have assistants now, somebody actually manually in the office. That's his logic. If that happens, you still got somebody.

Q. So the shift supervisor can leave, provided an assistant stays in the office?

A. Correct.

Q. So the office is never empty, but it doesn't have to be the supervisor who is still there?

A. Now. Then, no.

Q. Got it. Back in April 2017, on, sort of, a typical night shift, roughly what proportion of the time would you, as an assistant shift supervisor, be physically present in the shift supervisor's office versus the amount of time that you were out visiting different areas of the

Page 67

facility?

A. Like I said, it was all random. We never went out all the time at the same time at all. Another thing that dictates that is the level of incidents that we have to take care of on paper, write them up, send them out. It's never the same day twice as far as our movements go.

Q. So you might have a lot of incidents that are happening that are keeping you in the office to do the paperwork related to them?

A. Yeah, it could be, which would set me behind; or I could just sit there and possibly say to myself, well, I'm going to go out today at 3:00 a.m. and do my walk. It all depends on --

Q. Okay. Other than writing up incidents, what other job duties did the assistant shift supervisors have while they're in the shift supervisor's office?

A. Answering phone calls, putting in sick calls, contacting medical. Offenders, staff will call me or call medical. Just basically supervision, making sure everyone is doing what they're supposed to be doing in the correct way, following correct security measurements.

Q. We were talking earlier that you joined the Department of Corrections in November 2007; is that correct?

A. Yes, sir.

Q. Why did you decide to pursue a career as a correctional

Page 68

officer?

A. Well, at the time it was the best paying job around. I was young. I had a friend that was already doing it, and he got me and my brother jobs there. So we've been there ever since.

Q. What was the friend?

A. What was --

Q. Or who was your friend?

A. Ken Young, who was a sergeant at the time. He's no longer there.

Q. He was a sergeant at ISP?

A. Uh-huh.

Q. It was through your friendship with him that he encouraged you to apply?

A. Yes, sir.

Q. And you said your brother as well?

A. Yes.

Q. Is your brother still a correctional officer?

A. My brother just recently got promoted to lieutenant as well.

Q. Also at Indiana State Prison?

A. Yes.

Q. So you've both been at ISP the whole time?

A. Yes.

Q. Both started around November of '07?

BARABARA DEVINE vs.    Cause No. 3:18-cv-00995-JD-MGG    TIMOTHY REDDEN
RON NEAL, et al.     October 25, 2019

Page 69

A. My brother started about six months prior to me.

Q. Any other reasons outside of what you just described that you decided to pursue a career as a correctional officer?

A. No.

Q. What assignments did you have as just a line-level correctional officer during that period of time that you were working as a CO at ISP?

A. That's a rough one. You're asking me to list out almost 13 years of --

Q. Just a variety of different posts all around the prison?

A. I worked everywhere. I've done everything.

Q. And then when you got promoted to sergeant, did you have a particular assignment you worked on during that two- or three-year period?

A. You mean -- "assignment," spots, locations, house shelters, yeah. I ran C cell house as a sergeant; Check Point 4, street sergeant; Check Point 2, street sergeant. Then I went to -- at the time, it was IDW, our disciplinary -- I was a disciplinary sergeant for about a year, and then I got lieutenant from there.

Q. During those, both as a correctional officer and during your time as a sergeant, you had a specific assignment in terms of a housing unit or check point?

A. Yes, sir.

Q. And that's different from the work as a lieutenant as a

Page 70

shift supervisor?

A. As far as posts go, no. This is where you're assigned. This is what you do. As a lieutenant, you supervise that sergeant, but you might be the C cell house lieutenant and he's a C cell house sergeant. My responsibilities was different as a shift supervisor.

Q. I see. So you could also be a lieutenant posted out in a housing unit or check point?

A. No check point, but a housing unit, yes.

Q. Housing unit. Okay. But assistant shift supervisor, that's a different category of position?

A. I would say so because you -- essentially, it's running the facility for that shift.

Q. Are you familiar with the terminology of officer in charge?

A. Yes.

Q. Was that a position that existed back in April of 2017 as well?

A. Yes.

Q. What does the officer-in-charge designation or position entail?

A. Basically, you're responsible for ensuring that the jobs of the cell house get done. You only have an officer in charge when there's not a sergeant present. And at the time, at night, there was no shelter sergeants. So it

Page 71

came down to officers. They get the title OIC, which is officer in charge. And they're responsible, basically, for the same thing, but on a less chaotic scale. Because like you said earlier, the offenders go in at a certain point and they all stay asleep till a certain point. Whereas, on days, they're up and out all day.

Q. If I understood what you just said, as the setup existed back in April of 2017, there was a shelter sergeant assigned to each cell house for the day shift. But for the night shift, because things were generally a little quieter, it would be an officer who filled that role, and they were given the designation officer in charge?

A. Yeah, the ones that worked there, I want to say the longest, had the best knowledge of the offenders there. I guess you would quote it as the most reliable one that you could trust tasks to and know it would get done.

Q. Who made the determination of who would be assigned to be an officer in charge on any given night shift?

A. That would be the captain of the shift.

Q. And was there, sort of, a minimum requirement of, you know, you have to have at least a certain amount of experience before we're going to have you be an officer in charge?

A. I would say so.

Q. What's that minimum level of experience?

Page 72

A. It varies. Depends on how quick you are and how well you learned your job. If you're proficient, then you're going to be given more tasks to handle based on your level of proficiency.

Q. So there's no, like, minimum number of months or years that you have to have been a correctional officer in order to serve in that officer-in-charge position?

A. Nope. A long time ago, there used to be a term called correctional officer trainee that no longer exists no more in the state. They're all treated as such on paper. They're all officers.

Q. How long was the correctional officer trainee designation in effect for?

A. Back then, way before that, every six months.

Q. And at that time, a trainee would not have been able to fill an officer-in-charge position?

A. Like I said, yes, because it was a level of proficiency, but it was unlikely. But it was left on paper that says he can't.

Q. Okay. So you talked about it being an assessment of proficiency to determine if an officer has a level of proficiency that they should be entrusted with the officer-in-charge designation?

A. Yes, sir.

Q. And if I understood what you were saying, it's the captain

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 20 of 111

Page 73

who's responsible for making that determination?

A. Yes, sir.

Q. What are the -- if you know, what are the sources of information that the captain has available to him to make that assessment, that proficiency assessment and say, yes, this person is ready for an officer-in-charge designation?

A. That's something up to the captain as to what he saw in somebody. I couldn't answer that.

Q. There's no, like, standard, to your knowledge, like, I'm going to look at their most recent evaluation, I'm going to look at this? Is it, like, anything standardized like that, or just more subjective based on observation?

A. I couldn't tell you how he made his decisions. I couldn't tell you if he did it that way. I couldn't tell you if he did it by this person's work ethic. That's solely his decision, whatever went through his mind to make those decisions is all I can tell you.

Q. Based on your understanding of the system, it would be important for the captain to designate someone as officer in charge who had demonstrated proficiency and could be trusted to take on that additional level of responsibility?

A. Yes, sir.

Q. Because, in effect, the officer in charge is assuming a sergeant's level of responsibility, but not having

Page 74

attained the rank of sergeant; is that fair to say?

A. No, I wouldn't say that. Each is more capable of those around him to do it. What a sergeant does on day shift is completely different as far as responsibility than an OIC on nights would.

Q. In terms of a chain of command within a cell house on a day shift, it would be the sergeant giving direction to the officers working underneath him or her; is that fair to say?

A. Yes, sir.

Q. Is that same model in effect at night, that it would be the officer in charge giving directions to the other officers in the cell house?

A. Yes, sir.

Q. And is it standard for all cell houses that it's three officers, or does it depend on the cell house?

A. It varies. Sometimes as of right now, it's one officer sometimes. Like I said, we were talking about your question about QRT earlier. It depends on who's there. It depends on who's calling off. It depends on who's on vacation. It depends on the training department, who's up there. It can vary. It's some days it's very bad.

Q. By "very bad," you mean just in terms of there not being enough staff?

A. Yes, sir.

Page 75

THE REPORTER: You're starting to talk over each other a little bit.

MR. HEPPELL: I would much rather you let me know, even if you have to interrupt me a little than we get to the end and the transcript is less readable.

THE REPORTER: That's my goal.

MR. HEPPELL: I appreciate that.

BY MR. HEPPELL:

Q. Would it be fair to say that the -- well, strike that. On April 7, 2017, there were three officers in B cell house; is that correct?

A. I believe so.

Q. One officer in charge and then two just regular officers?

A. Yes, sir.

Q. And it would be the obligation of the two non-designated officers to follow the directions and instructions of the officer in charge; is that fair to say?

A. Yes, sir.

Q. Same way that they would be required to follow the directions of a sergeant if a sergeant was there?

A. No.

Q. How is it different?

A. Because a sergeant carries the ability to discipline an officer for disobeying his order, and an officer can't.

Page 76

If they want to challenge the decision he's made, they can do that. Whereas, you can't do that with a sergeant. So it's not the same.

Q. How would a regular officer go about challenging the decision or direction given by the officer in charge?

A. Through us.

Q. "Through us," you mean through the assistant shift supervisors?

A. Yes, sir.

Q. So that would not be inappropriate for an officer to do?

A. No, I wouldn't say so.

Q. So if an officer in charge says -- so if I understand what you're saying, if you're working a shift, day or night shift, but a shift where there's a sergeant, and the sergeant says do something, as an officer you have to do it, correct?

A. Or risk discipline -- or risk discipline, yes.

Q. But it would not be appropriate for, under those circumstances, that officer to call you up as the shift supervisor and say, "Hey, my sergeant told me this, but I think that's a bad idea"?

A. They can do that.

Q. They can do that?

A. Yes. However, it will be up to that sergeant after that, regardless of my determination, to write this person up

Page 77

for disobeying or conduct unbecoming. An officer cannot do that to another officer. That's where the difference comes in.

Q. So it's not inappropriate to do it under either circumstance, but you risk discipline if you do it to a supervisor?

A. Yes.

Q. Would it be fair to say that it's not appropriate -- strike that.
   Would it be fair to say that you, as an officer receiving direction from the officer in charge, you either have to obey it or run it by the shift supervisor?

A. Correct.

Q. You can't just choose to disobey it, choose not to do the thing, but also not run it by a superior?

A. You shouldn't, no.

Q. Okay. Is there any written policy that discusses that aspect of the chain of command and the officer-in-charge position?

A. Yeah. There's a policy governing chain of command, yes. Again, that changes so much because it goes way up the ladder. And as a state creates slots, they update it and they remove slots, you know. So it's always under construction.

Q. And that chain-of-command document includes the discussion

Page 78

of the officer-in-charge position?

A. No. The chain of command one will just be an officer. That's why I tell you there's a difference between an officer and a sergeant.

Q. Got it. And I appreciate that clarification. So let me ask this question: Is there any written document or written policy that sets out the officer-in-charge designation and the way that that interaction works with the officer in charge giving directions to the officers?

A. Yes. It will be in that specific unit's post orders.

Q. Got it.

A. Which are guidelines as to how the operation of the facility are run.

Q. When you say they're viewed as guidelines, what do you mean by that?

A. Example, you asked me about the quantity of staff. Post orders may state three. However, if you just ain't got three people, then you can run a unit with two. But ideally, this is what we want. So they're considered guidelines.

Q. So it's not, necessarily, inappropriate to do something different from how the post orders say to do it?

A. Sorry. Could you rephrase that?

Q. It's not, necessarily, inappropriate based on how the prison is set up to do something differently than how the

Page 79

post orders say you're supposed to do it?

A. Without valid justification.

Q. Does an officer need to -- I guess strike that.
   Can anyone, sort of, determine that they have valid justification for doing something differently than the post orders, or does that decision have to be made by someone more senior?

A. Like I said earlier, the situation dictates those decisions that are being made. Ultimately, you're going to be held responsible for anything that you might do. But once it's ran up the chain of command, like I say, justification as to why it was done, then it's accepted, rather than I could have done this, I just didn't with no justification behind it.

Q. But provided that the officer who deviated from the post orders can provide that justification, then that would be considered to be okay?

A. Reasonable justification for your act will be deemed as understandable.

Q. And who's responsible for making a determination as to whether a justification is reasonable or not?

A. It would come to the conclusion by the captain or major, whoever wants to look into the situation.

Q. Okay. Is there -- there's no -- strike that.
   Is there an obligation for someone who's going to

Page 80

deviate from the post orders to proactively report that to someone else and say the post orders say this, but I'm doing it differently for this reason?

A. If it's in the person's capability of doing it at that time in a moment's notice, you know, anything can happen. It might go a different direction. And so you're not able to, "Hold on a minute. Let me go downstairs and call the captain."

Q. So you don't, necessarily, have to ask permission in advance or before you do it, depending on the situation? Is that what I hear you saying?

A. As long as you can adequately justify your acts as to why you did something.

Q. Do you always have to report after the fact that you did it differently or only if someone calls you out on it or asks you about it later?

A. Always report it and always log it in your daily log this is what took place so the other shifts know when they come in.

Q. So if somebody does something different than what the post orders say, they have to document that?

A. Yes, sir.

Q. And you said that would be in the daily log?

A. They should document it in the daily log. It's just a timesheet as to what happened, when it happened, and in

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 22 of 111

Page 81

the order that it happened of.

Q. And that's a document for each cell house, and that's a handwritten log?

A. That the OIC is responsible for maintaining. On days, the sergeant is responsible for maintaining.

Q. So you would agree that it's important for the officer in charge to be proficient and well trained and knowledgeable about the operations of the prison; fair to say?

A. Yes, sir.

Q. Lieutenant Redden, I believe you testified you live in Michigan City. Did you grow up in the area?

A. Yes, sir.

Q. Have you lived in any other parts of the state or any other states?

A. No, sir.

Q. What's the highest level of education you've completed?

A. Just high school.

Q. Where did you go to high school?

A. I went to no -- I was home schooled for my high school years.

Q. Home schooled through high school and got your high school diploma through that?

A. Yes, sir.

Q. When did you get that diploma?

A. I don't recall.

Page 82

Q. Any education past high school?

A. No, sir, no college.

Q. Any professional certifications or licenses?

A. No, sir.

Q. Do you have any corrections work experience prior to the Indiana Department of Corrections?

A. No, sir.

Q. Any law enforcement experience prior?

A. No, sir.

Q. Any military experience?

A. No, sir.

Q. What other work experience have you had since graduating high school before working at IDOC?

A. When I started, I was 18-ish. So other than just a temporary job agency for a while, other than that, it wasn't much.

Q. So you started at DOC when you were 18?

A. Yes.

Q. So some temporary or low-level jobs before that, but basically --

A. It's been my whole career.

Q. Your entire adult life, entire career with the DOC?

A. Yes, sir.

MR. HEPPELL: Can we go off the record?
(Recess taken.)

Page 83

BY MR. HEPPELL:

Q. Lieutenant Redden, how did you first learn that a lawsuit had been filed against you regarding the 2017 fire and the death of Joshua Devine?

A. When I was contacted at my place of employment by the admin service. They advised me of it.

Q. And was that -- strike that.
Do you remember the name of the person who contacted you?

A. Ms. Pam James.

Q. Do you remember when that took place?

A. No.

Q. Did Ms. James give you any documents in connection with that communication?

A. I believe so. When she contacted me is when I first got anything physical.

Q. And that was also the first time that you learned about the lawsuit, correct?

A. Correct.

(Exhibit 3 marked for identification.)

Q. Handing you what's been marked as Exhibit 3 by the court reporter. It's a two-page document front and back, which is -- it's not Bates stamped, but it says "Summons" and "Proof of Service." And the first side of the page "Summons in a civil action." It lists you under the "to"

Page 84

field, Timothy Redden. Do you see what I'm referring to? On the front side there, "Summons in a Civil Action," and then it says, "To Timothy Redden, 1 Park Road, Michigan City"?

A. Yes, sir.

Q. And that's the address of the Indiana State Prison, correct?

A. Yes, sir.

Q. And then flipping to the back side, this is a section called "Proof of Service." And it states, "The summons for Timothy Redden was received by me on 12-21-18." And then it states, "I personally served the summons on the individual at Indiana State Prison on 12-28-18." And then that document at the bottom is signed by Pamela James. Do you see what I'm referring to?

A. Yes, sir.

Q. So based on this document, it appears to me that Ms. James gave you a copy of the summons on December 28, 2018. Does that generally line up with your recollection of the timing of things?

A. I don't have any recollection of it. I couldn't tell you when it happened, but I know she was the one that brought it to my attention.

Q. Any reason to disagree or dispute the timing that's reflected on this document?

BARBARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 23 of 111

Page 85

A. No, sir.

Q. I'm going to preface the questions that I'm going to ask next by telling you I don't want you to tell me anything about the content or substance of any conversation that you've had with Mr. Rothenberg or any other attorney that's representing you in connection with this matter. Okay?
   When did you -- strike that.
   When did you first have any communication with any attorney about this lawsuit?

A. I couldn't -- I don't know. I couldn't answer that question.

Q. Just you don't remember the timing of things?

A. Not at all.

Q. Do you remember, approximately, how long after you were served with the summons that you first spoke with an attorney in connection with this lawsuit?

A. No, sir.

Q. Do you remember whether it was days or weeks or months after?

A. I don't remember.

Q. Do you remember who the attorney was that you first spoke with in connection with this lawsuit?

A. No, sir.

Q. Do you remember if it was a man or a woman?

Page 86

A. Man.

Q. Does the name David Arthur sound familiar as the person who spoke with you first?

A. Not really. I don't remember.

Q. How did you -- by what form, in person, e-mail, telephone did you communicate with the attorney?

A. Telephone, I believe.

Q. Up to and including today, on how many different occasions have you communicated with your attorneys in connection with this lawsuit?

A. I believe it was once.

Q. Just the one time total that you've ever spoken with an attorney in regards to this lawsuit?

A. Correct.

Q. And when did that one time take place?

A. I don't know.

Q. Is that a significant amount of time in the past?

A. I don't know. It's been a while. I don't know. My memory is not the same as yours. I don't know what's "significant" to you. I know I spoke to somebody. I couldn't tell you when.

Q. Was it earlier than this week that you spoke with someone?

A. Oh, yeah.

Q. Earlier than this month?

A. Yeah. I believe it was when I was supposed to -- before a

Page 87

lot of cancellations started to happen, a little bit before the first cancellation happened when I was supposed to be here the first time.

Q. Sometime shortly before you were first scheduled to have a deposition in this case?

A. Correct.

Q. And to the best of your memory, that was the first and only time that you've spoken with an attorney representing you in this lawsuit?

A. Correct.

Q. And that's by telephone, I believe you stated, correct?

A. Yes, sir.

   (Exhibit 4 marked for identification.)

Q. Showing you what's been marked as Exhibit 4 by the court reporter. And this is a copy of the answer, the first answer that was filed in this case. And that's docket number 30. Do you recognize this document, Mr. Redden?

A. I believe so.

Q. Do you believe you've seen this document before?

A. Yes, sir.

Q. Do you know when you've seen this document before?

A. No, sir.

Q. You see your name on this document, along with some of the other defendants in the lawsuit, in that first paragraph there?

Page 88

A. Yes, sir.

Q. That you, along with those other attorneys, through your counsel, are answering the complaint and alleging and stating the things that follow. Do you see that?

A. I do, sir.

Q. And you see this document was filed on February 15, 2019, up at the top?

A. Yes, sir.

Q. Had you spoken with any attorneys representing you in this case at some point prior to February 15, 2019?

A. All I know is what I said earlier. I don't know when I talked to anybody. I couldn't tell you when the first meeting -- there was a couple meetings that were canceled. So I don't know.

Q. So you have no knowledge one way or the other whether you spoke with any attorneys prior to this document being filed?

A. I don't know if it was before this one or after. I just know I talked to someone a little bit before this was scheduled for the first time, and that was it.

   (Exhibit 5 marked for identification.)

Q. Handing you what's been marked as Exhibit 5 by the court reporter. And this is "Answer to Second Amended Complaint," and it's docket number 78 filed in this case. Lieutenant Redden, do you recognize this document?

Page 89

A. No.

Q. To your knowledge, you've never seen this document before; is that fair to say?

A. It's fair to say.

Q. Okay. Do you see your name on the document?

A. Yes, sir.

Q. Same kind of format as the previous document we were looking at in terms of you, along with a number of other defendants, through your lawyer, answering the second amended complaint now, and then alleging and stating the number of things that follow; fair to say?

A. Yes, sir.

Q. I want you to turn to the second-to-last page of the document, page 25. And you see there's a bold heading labeled "Affirmative Defenses"?

A. Yes.

Q. And the first paragraph listed under there, paragraph 76, starts out by saying, "Defendants are entitled to qualified immunity." And then it says, "...from damages under federal law with respect to the claim for damages by the Plaintiff based upon federal constitutional principles or federal law because their actions were objectively reasonable and did not violate clearly established principles of law." Do you see what I'm referring to there?

Page 90

A. Yes, sir.

Q. And you're familiar with the allegations that are being made against you in this lawsuit; is that fair to say?

A. Yes, sir.

Q. What facts are you relying on to support your claim set forth in this paragraph that your actions were "objectively reasonable and did not violate clearly established principles of law"?

A. Just to what my incident report stated. That is all I know.

Q. Okay. So outside of the facts that are set forth in your incident report, those are the facts that you're relying on in support of this affirmative defense; is that correct?

A. Yes, sir.

Q. Going back down, later on on that page, paragraph 80, it's listed under "Affirmative Defenses," the statement that, "Offender Devine caused the fire and, therefore, Plaintiff is barred from recovery." Do you see what I'm referring to?

A. Yes, sir.

Q. We discussed that a little bit earlier. Do you agree with that statement, Devine caused the fire?

A. I agree with it.

Q. And that's based on what you read in the fire marshal's

Page 91

report?

A. Uh-huh.

Q. There's no basis for that statement, to your knowledge, outside of what was in the fire marshal's report; is that fair to say?

A. Correct.

(Exhibit 6 marked for identification.)

Q. Showing you what has been marked as Exhibit 6, and this is a copy of a document titled "Defendant Redden's Responses to Plaintiff's First Set of Interrogatories." It is a ten-page document.

Are you familiar with this document?

A. It's my first time seeing it. Yes, I'm familiar with it.

Q. Sorry. Is it your first time seeing it, or are you familiar with this document?

A. I remember -- I believe I filled something out at work similar to this. I thought that's what this was.

Q. Okay. And I guess -- it's a ten-page document. So take as much time as you need, and not to read every word necessarily, but just to familiarize yourself with what this document is. And let me know when you've had a chance to look it over.

A. Yeah.

Q. You see -- turning to the second-to-last page of the document, page 9, is that your signature on the document?

Page 92

A. Yes, sir.

Q. Okay. And you signed the document under the penalty of perjury, correct?

A. Yes, sir.

Q. You understand what that means?

A. Correct.

Q. Did you read through the document before you signed it?

A. Yes.

Q. Did you read it carefully?

A. I read it, yes.

Q. Well, did you read it carefully, or did you not read it carefully?

A. I read it, and I put my responses down.

Q. Was there anything that you read in terms of your responses that did not seem accurate or correct to you?

A. What I put down was to the best of my knowledge to what I could answer.

Q. And, again, I'm not asking you what you talked about or whether you talked about this with your attorney, but did you have an opportunity to go over your answers to this with your attorney before signing them?

A. I believe so.

Q. Can I get you to turn to question number 6? And that's on page 4. Do you see what I'm referring to, question 6?

A. Yes.

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 25 of 111

Page 93

Q. And question 6 asks, "What was the cause of the 2017 fire and how was this cause determined?" And that includes some clarifying language on that. Do you see what I'm referring to?

A. Sorry.

Q. Question 6 says, "What was the cause of the 2017 fire and how was this cause determined?" Correct?

A. Correct.

Q. And your answer to that states, "The internal and investigative file contains the results of the fire investigation"; and then, "As far as I know, the fire was accidental."

A. Uh-huh.

Q. When you say, "As far as I know, the fire was accidental," what are you basing that statement on?

A. At the time, that's what I thought. Like I said, I answered these questions at the time to the best of my knowledge. It wasn't until after that that I got a chance to read the report from the fire marshal. And then I had more knowledge as to what went down.

Q. So it was after -- well, you signed this document on August 9, 2019, correct?

A. If that's the date, yes.

Q. Turning to page 9 of the document, that's the date next to your signature, correct?

Page 94

A. Yes, sir.

Q. Okay.

A. Date, 8-9-19.

Q. August 9, '19, correct?

A. (Nodding.)

Q. And that's your handwriting next to that signature as well?

A. Yes, sir.

Q. So it's your testimony at the time you signed this document, you had not reviewed the fire marshal's report?

A. Correct.

Q. And it was only after reviewing the fire marshal's report that you came to change your -- strike that.

It was only after reviewing the fire marshal's report that you developed a belief that Mr. Devine caused the fire?

A. It was after this incident report that was written that the fire marshal's report was provided to me by the facility in preparation of this.

Q. At the time you signed these interrogatory answers, what was the basis for your belief that the fire was accidental?

A. I don't know. It's not my job to. Like I said, I'm not internal affairs. So my job is very simple. Respond, do what I did, do my incident reports as to what happened,

Page 95

stick to the facts; and what they come up with is what they come up with. Typically, I would not even know the outcome of an investigation.

Q. I understand. But with respect, that's not my question because you didn't say "I don't know." You said, "As far as I know, the fire was accidental," correct?

A. Yes.

Q. That was your sworn testimony in these interrogatories?

A. As far as I know, correct, as far as I know.

Q. Well, so that means that you had some knowledge, correct?

A. As far as I know.

Q. And what was that knowledge based on?

A. Just what I saw. I mean, I was there. So as far as I know, it was a fire. As to how the fire happened, like I said, I'm not an investigator. So as far as I know, it was a fire. A guy perished in it. As far as I know, I'm not -- it's not really my job or place to come to a determination as to how it happened.

Q. I understand that it's not your job or place to reach that determination. But the question was what your knowledge of the cause was. And you stated in your interrogatory answer that you had -- the extent of your knowledge was that it was accidental.

A. Right.

Q. And my question is what was the basis of that knowledge?

Page 96

Why did you say, "As far as I know, it was accidental"? Why did you put that sworn testimony in your interrogatory response?

A. Because I assumed that he didn't set himself on fire on purpose. So I don't think he'd do that on purpose.

Q. Do you believe -- is that what you believe today, that he set himself on fire on purpose?

A. I couldn't tell you what I believe today. I'm just going by what I read. As far as what he was thinking, I can't answer that.

Q. So as you sit here today, you have no opinion one way or the other as to the cause of the fire?

A. I just know it happened, and I did what I did. What went through his mind, I couldn't tell you.

Q. But you agree that it was -- up until August 9, 2019, you had no basis to think one way or the other that -- strike that.

You agree with me that prior to August 9, 2019, you had no basis to say anything other than that the fire was accidental; is that fair to say?

A. I agree, yeah.

Q. And you took your responses to this seriously, correct?

A. Yeah, as serious as I could.

Q. Was there anything limiting your ability to take them seriously?

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 26 of 111

Page 97

A. Lack of knowledge, possibly, of the incident because, like I said, it was not really shared. All I could go by is what I report. As far as what he did, I couldn't tell you that.

Q. But are you saying the things you didn't have personal knowledge of you didn't take seriously?

A. I went by what I believe to be true, and that's what I put down.

Q. And you took them seriously regardless of whether or not you had knowledge of them; fair to say?

A. I took it all serious.

Q. When you say the internal investigative file contains the results of the fire investigation, what are you describing? The internal investigative file, what is that?

A. That would be what -- I had composites of their determination, and that would be outside agencies as to what input they had. It would be their input. I would believe it should have contained everyone's statements of the situation in the case.

Q. And have you ever seen that file?

A. No.

Q. Okay. And so you're basing your statement about what that file contained just based on your assumptions about what that file would contain?

Page 98

A. Basing it on my knowledge of 13 years of being there as to what one should have in it.

Q. Can you explain what you mean by that?

A. Exactly what I said, exactly what should be in it.

Q. What is the extent of your knowledge about what is contained within an internal investigative file?

A. Could you rephrase it?

Q. Sure. Well, let me ask you this way: You stated earlier you have not seen the internal investigative file related to this file, correct?

A. Correct.

Q. Have you seen any internal investigative files related to any other incident during your time at Indiana State Prison?

A. Uh-huh, yes, sir.

Q. How have you come to see other internal investigative files?

A. Being there 13 years, I've been involved in incidents that obviously was investigated to make sure any and all wrongdoing -- whatever came out of it, witnessing the different things. It's just part of the job. As you're getting interviewed, you're being questioned off of stuff that comes out of that packet.

Q. Can you explain what you mean by that?

A. Well, I mean, if you imagine a folder labeled what I just

Page 99

stated, and everything in there, that's what I'm referring to. I don't know about you. It's basically just a folder with everything containing that file. I mean, containing everything in that case in that file. So that's what I was referring to.

Q. And so there have been other incidents that you have had access to that file that's been compiled?

A. No. As I stated, being asked, interviewed about; access to, no. Obviously, it's confidential, and I can't go through it if I'm being interviewed about it.

Q. So fair to say that you have not ever seen the contents of any internal investigative file for any incident; is that correct?

A. The content -- yes and no. Knowing what the contents are in a folder or file and not seeing them is two different things. I mean, those are two different aspects of the whole question. I don't get where you're going with it.

Q. Well, so how do you know what's in the internal investigative file, either in this case or just as a general matter, if you've never seen one?

A. Because -- I didn't say I've never seen one. But because I know who's involved in a situation, I knew what the investigation consists of; and I knew they came to the determination of -- they had to have some type of determination of what happened and a deeper aspect of the

Page 100

situation, which I'm not privy to that because it is confidential. And I know it's going to be kept in that particular investigative folder with everybody else's input that was involved in it.

Q. So fair to say that you have a general understanding of some of the types of information that is contained within an internal investigative file?

A. Yes, sir.

Q. For example, witness interviews, including witness interviews that you personally have conducted?

A. No, not personally conducted. Interviews that I've been involved in in interview, or that I've been interviewed about.

Q. Thank you for that clarification. Not conducted as in taking the interview, but part of -- an internal affairs investigator has interviewed you?

A. Yes.

Q. And the responses that you gave during that interview were made part of the file?

A. Yes.

Q. And I assume, presumably in talking with other people at the prison in relation to this incident, other people outside of you were also interviewed; is that fair to say?

A. Well, I know -- can you elaborate as far as "other people" go?

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 27 of 111

Page 101

Q. You weren't the only person interviewed by internal affairs about the April 7, 2017, fire?

A. Correct.

Q. And is it your assumption and understanding that those witness interviews with people other than you are also in that file?

A. I would assume so, yes.

Q. And you know that, or assume that, not because you've seen the file, but that's generally how the process works?

A. Through past experiences, yes.

Q. Again, those past experiences are being on the side of getting the interview statement, not investigating an incident?

A. Correct.

Q. Because you've actually never seen the contents of that file, of any file?

A. Itemize -- like, no one's ever opened it up and say go through it as you will.

Q. There are parts of the content that you have seen; is that fair to say?

A. What they provided to me, for an example, allegations and whatnot. Do you know where I'm going with this? They come from the same case file, you know, and that's what I'm referring to.

Q. When you say "they come from the same case file," can you

Page 102

explain what you mean by that?

A. The same folder you're describing, which is what I wrote down.

Q. What comes from that same folder?

A. Just different statements from people. I mean, depends on the case scenario. I mean -- I mean, that's all I really got to say about it.

Q. Did you review any documents to prepare for your deposition today?

A. Just what was provided to me. Like, I believe I got one of these. But to prepare me for today, I reviewed those a couple months back when you guys set the original date. And I believe you guys canceled it twice before today. So as far as doing a recap, no.

Q. Okay. So just so I understand what you're saying, there were some documents that you've been provided prior to the date that your deposition was previously scheduled; is that correct?

A. Correct.

Q. And you read those at the time prior to those depositions being scheduled?

A. Prior to.

Q. You read those documents thinking the depositions were going to go on those dates that they were scheduled previously?

Page 103

A. Yeah. I call myself educating myself about the case because it was a long time ago. So I had read the incident report, what the allegations were. It didn't never happen. So that's basically it. So at this time, I didn't.

Q. So you didn't reread those documents --

A. I didn't reread it.

Q. -- for today?

A. Correct. I'm sorry for speaking over. No, I didn't reread nothing.

Q. You read them all before when you were thinking you were going to be testifying on a different day?

A. Yes, sir.

Q. Okay. Thank you. Was there anything that you reread or read for the first time prior to today, like in preparation for today specifically?

A. As far as anything new you mean?

Q. Anything new?

A. No.

Q. Going back to the stuff that you read previously, but that you haven't reread, you made reference to one document, the incident report. Was that your incident report, a written report --

A. Written report.

Q. -- that you created in reference to this incident?

Page 104

A. That incident.

Q. Any other reports that you read, either authored by yourself or authored by someone else, other than that one incident report?

A. Well, being the shift supervisor that was there, I had access to everybody's reports that they initially wrote at the time of the incident in B Boy. Other than that, and this, that was it, really.

Q. And just so we're clear, "B Boy," that's B cell house, correct?

A. I'm sorry, yes.

Q. So as the assistant shift supervisor, you had access to other people's reports that they'd written about that incident; is that correct?

A. I collected them, called them all in one by one, gave them my computer, showed them how to print it. I did everything for them but write it.

Q. And this was -- what you're describing right now, that took place the night of the incident?

A. After everything was over. We were there a long time after shift change.

Q. And so it was, perhaps, at that point, early morning hours of April 8, rather than April 7; is that fair to say?

A. Yes, sir.

Q. But still it was on April 8?

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 28 of 111

Page 105

A. The incident -- well, you know, we work nights. So it passes -- midnight passes over, but our same workday.

Q. Same workday. What you're just describing in terms of having people come in one by one, use the computer, showing them how to complete their reports --

A. Right.

Q. That, what you're describing, is something that happened --

A. Same shift.

Q. Same shift?

A. Yes, sir.

Q. And what you were just describing, in terms of you being able to read those incident reports -- did you read those reports?

A. Yeah, I have to. It's part of my job.

Q. As the supervisor?

A. Yes, sir.

Q. And reading those reports written by other people, that took place same shift as well?

A. Yes, because they have to be submitted to our supervisors the same shift. Down state has to get copies of them all. And, yeah, we sent them all out to those different people.

Q. Got it. Have you read any of those reports written by other people at any point since you read them in your capacity as supervisor so you could sign off on them and

Page 106

get them submitted?

A. I had the opportunity to, but I haven't.

Q. Okay. So you could -- I mean, for example, at any point during your next shift at the prison, going -- pull those up on the computer and review them; is that fair to say?

A. Yes, sir.

Q. There would be nothing improper about you doing that; is that correct?

A. That's correct.

Q. You're permitted to have access to them, and you're allowed to go back and review old reports?

A. Yes.

Q. But, in fact, you have not done that at any point since the shift ended?

A. Since my last -- my actual personal prep, like I said, of this case, when it was supposed to happen a while back ago, I have not done anything.

Q. Okay. So when you were personally preparing for the dates for your deposition that got postponed to today, as part of that prior preparation, did you go on and pull those old reports up on the computer?

A. Yes, and I read mine. Like I said, I didn't read no one else's. I read mine.

Q. So you used that process that you just described, going on the computer to pull up old reports, but the only report

Page 107

you read was yours?

A. Correct.

Q. At no point since your shift ended on April 8, 2019, and then after you approved and then submitted them, at no point since then did you look at anyone else's report about this incident?

A. No, sir, didn't need to.

Q. Other than your own accident report -- and I think you kept on gesturing to a document in front of you. Just so I'm clear --

A. The court order ones that I had to sign for that the job gave me, Ms. James gave me, was the same format.

Q. Was that a copy of the complaint?

A. It might have been.

Q. And your recollection is that's the document that you were first given when Ms. James gave you that summons?

A. Right.

Q. So other than what I believe to be, based on your description of when you got it, what I believe to be the complaint and your incident report that you pulled up on the computer as part of your own personal prep, are there any other documents you reviewed in preparation for the deposition today or in preparation for the prior depositions that got postponed?

A. Other than that particular fire marshal's report, that was

Page 108

it.

Q. So just those three documents?

A. Yes.

Q. The complaint, the fire marshal's report, and your report?

A. Yes.

Q. How did you come to view the fire marshal's report?

A. When I looked into it, it was made available -- I don't exactly remember where it was, but it was made available with that particular incident because, like I said, I had no clue as to what took place to cause it. I just know, like I said, what I saw. I haven't -- and honestly, if it weren't for the lawsuit, I would have never even looked and found that either. But it was in the shared files with the incident report, as far as that go. So other than that, no.

Q. When you say "shared files," is that the internal network at the prison where there's, like, a server and different computers you can access, like, a shared set of documents?

A. Correct.

Q. And is it fair to say that depending -- you have to be logged into the computer with your credentials to access those shared files?

A. Correct.

Q. Is it your understanding that depending on what your rank or position is at the prison, you might have access to

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 29 of 111

Page 109

more or less shared files?

A. It would be -- I would say more -- based on your classification is what it is. But in a very simple aspect of it, yeah.

Q. Okay. And so as a lieutenant and assistant shift supervisor, you might have access to documents that a regular CO would not have access to?

A. Correct.

Q. And if I understood what you were describing -- well, strike that.

Was this a document -- strike that.

The fire marshal's report, which you stated you read, was that a document that you sought out or that you came upon somehow and then just decided to read it?

A. Came upon when I was looking for the actual incident report to read.

Q. So this was at the same time that you were preparing for your deposition previously, looking for your incident report, you happened to see in that same shared file structure the fire marshal's report?

A. Yeah, I can't tell you exactly where. I mean, it's one of those that you type in at the top right corner the individual's name. I don't know exactly where the location is, but the file comes up.

Q. And you reviewed that report as well?

Page 110

A. Yeah. It's the fire marshal's report, yeah.

Q. Outside of the one written report, which you reviewed, any other reports written by you that you reviewed in preparation for the deposition?

A. No, I believe that was the one and only report that I had written.

Q. Did you -- and setting aside your deposition preparation, have you ever created any written document about what happened, whether typed up, handwritten, or anything like that, draft, final version, other than the one incident report that you had described?

A. I did. The one accident report regarding that incident was all you do for any of them. So in that aspect, it wasn't no different from anything else. So that's all it required. That's all I did.

Q. You didn't at any point make any handwritten notes either from your own memory or to help you write your own report?

A. No, not at all.

Q. And you didn't do, like, an initial handwritten statement for the internal affairs investigators before going out and writing your formal, typed-up report?

A. I know sometimes they ask you to write a statement after they interview you, but I don't recall doing that that particular time. And to be honest with you, now that you bring it up, they may have. There might be one. But I

Page 111

don't recall it sitting here. But I do know it is normal practice to ask that, but I don't recall if I had to or not.

Q. Is that something that would be -- you did an interview with internal affairs, correct?

A. Oh, yeah.

Q. And you're aware that those are videotaped interviews?

A. Yes.

Q. Is that something -- and if I understand what you're saying, it's your recollection, based on your understanding of their usual practices, that they will ask you to write a handwritten statement in connection with what they're interviewing you about?

A. Correct.

Q. Did the interview with internal affairs take place in this case before or after you had typed up your formal report?

A. It would be after.

Q. It would be after?

A. Yes. Sometimes they use the actual incident report, and sometimes they'll ask you to write a written statement. So I don't recall writing one, but I may have. It's been such a while. I don't really remember if that's how they did it or not.

Q. As you sit here right now, you don't remember writing anything other than that one report?

Page 112

A. I don't remember, no.

Q. And the only reason you have to think that there might have been a second is based on the general practice that usually they ask for a handwritten one?

A. Usually they do. I've been in a situation where they didn't. So that's why I'm like -- if they always did it, I could tell you. I don't know.

Q. If they asked you for one, would that be, sort of -- that would be captured as part of the interview?

A. I don't know how they operate.

Q. So it's possible they could have done the interview, walked out of the room with the cameras and said, "Oh, by the way, can you do a handwritten statement as well?" That's possible, asking for the handwritten statement would not be captured on the same video as the interview?

A. It's possible. Honestly, I don't recall when and how they ask. I just know that you are asked. I don't know what timeline that will come up on.

Q. Did you read those materials multiple times or just the one time through?

A. Just the one time through, really.

Q. Did you review any other materials, whether audio or video or anything else, outside of those three documents you've described?

A. After it happened, we had a big debriefing with down

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 30 of 111

BARABARA DEVINE vs. Cause No. 3:18-cv-00995-JD-MGG TIMOTHY REDDEN
RON NEAL, et al. October 25, 2019

Page 113

state. And to be honest with you, I think they discussed the cause of it as well at our debriefing with down state. And it came out then too that it was the -- that it was the TV. Way down the line, that's when they introduced the new system that they were training the firemen on to put fires out more proficiently and all that other stuff. But they did announce it then too, what the fire marshal had said, now that you bring it up.

Q. During that debriefing --

A. During that debriefing.

Q. -- that the fire was connected with the TV?

A. Yeah. And they showed the video from the cell house camera systems, and that's the only other time that I seen anything outside of my report and the time it took me to do them.

Q. During that debriefing, do you remember them talking about, specifically, that Mr. Devine was responsible for starting the fire or just that the fire started through the television in the cell?

A. Basically, the second one.

Q. The second one?

A. Yeah.

Q. So that was consistent with what you put in your interrogatory responses, right, that "as far as I know, the fire was accidental"?

Page 114

A. Right.

Q. Other than seeing that video that you just described as part of the debriefing that was held, including with folks from down state, do you recall ever seeing documents that were circulated in connection with that meeting, either things that were sent around in advance of the meeting, like an agenda, or reports or materials to review, things that were passed around at the meeting or any materials that were created as a result of the meeting and then -- that you ever had a chance to review?

A. No, sir.

Q. Just showing up in person, hearing what people had to say and then watching the video?

A. The debriefing, yeah.

Q. Other than what you just described in terms of reviewing documents on your own initiative, did you do anything else to prepare for your deposition?

A. No.

Q. Again, without getting into the contents of anything you talked about with your lawyer, did you meet with or speak with your lawyer to prepare for the deposition?

A. Yes.

Q. And when did that take place?

A. That's one of the questions you asked earlier. I don't remember.

Page 115

Q. Was that prior to it being previously scheduled?

A. Correct.

Q. Nothing in connection with today's date?

A. I believe they tried to reach out, but I wasn't able to reach back.

Q. Okay. When you spoke with an attorney previously in connection with the prior scheduling, who did you speak with?

A. I don't know.

Q. Was it a male or female?

A. It was a male, I believe.

Q. It was by phone?

A. Yes.

Q. Approximately, how long did you spend on that conversation?

A. I don't know. I was at work. So it couldn't have been very long.

Q. No more than ten minutes?

A. I would say so.

Q. Have you talked with anyone, other than attorneys, about your deposition today or the depositions that were previously scheduled for you in this case?

A. No, just Ms. James who sent us out the reminders. I had to get the address from her.

Q. Did you talk with Ms. James at all about the contents of

Page 116

what was going to come up at the deposition, what you expected to be asked or to testify to?

A. No.

Q. Just the scheduling issue?

A. Just the scheduling, where I was supposed to be.

Q. Have you talked to any of the other defendants in the case about whether they have depositions coming up as well?

A. No. I know they were scheduled because she sent them all to us. But some of the people aren't even employed there no more. So no.

Q. You talked with, is it Puetzer or Putsur?

A. Puetzer.

Q. It's Puetzer?

A. Uh-huh.

Q. Have you talked with Mr. Puetzer in relation to his deposition?

A. No. Puetzer is on family medical leave. So he's not even there.

Q. I see.

A. It's been that way for about, maybe, four or five months.

Q. Four or five months?

A. I would say so, yeah.

Q. It might explain why Mr. Puetzer didn't arrive for his deposition, scheduled on Wednesday this week.

A. Yeah. He's been sick.

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 31 of 111

Page 117

Q. Got it. I mean, without getting into the details, you know it's family medical leave for a personal medical issue, not a medical issue that a family member is having?

A. Personal.

Q. All right. You talked a little bit earlier about your responsibilities as a correctional lieutenant and specifically as an assistant shift supervisor. As I understood what you were describing earlier, you had, sort of, an ongoing, during that shift, supervision responsibility over other folks working in the prison?

A. Yes, sir.

Q. Both in terms of responding to people who had questions or actively sought out your help, but also in terms of those spot checks or patrolling the facility to make sure everything was running smoothly; fair to say?

A. Yes, sir.

Q. Did your supervision responsibilities have any other aspects beyond those two aspects that I just described?

A. Oh, yeah. Every day was different. There was always something going on. If anything -- we got a disciplinary unit. That's all the guys wanted to do was act up. All night is drama. Every day is drama. I'm on high blood pressure pills because of that place.

That's just a small overview. Every problem that runs inside that prison comes through that office, and it

Page 118

is a maximum security prison with 2,000 offenders. That phone is ringing off the hook all night and day. So I feel like half the time my job title should be problem solver because I'm answering issues all day, all night.

And, you know, the more serious ones require the incident reports. And, basically, you're just doing your best to keep it from turning into an incident that requires that type of attention, which is why you make your walks.

Q. Did you have any responsibilities relating to providing training to other officers?

A. No.

Q. Did you have responsibilities in terms of disciplining other officers?

A. Yes.

Q. Over the period of time in which you served as a correctional lieutenant working as an assistant shift supervisor, how often have you disciplined other officers?

A. It varied. Most of our discipline comes from unauthorized leave, people calling off without having time. It really wasn't nothing of great severity or nothing like that. That was 80 percent of our discipline that was always submitted.

Q. And so that's people who are not showing up when they're supposed to show up, basically?

Page 119

A. Yes, sir.

Q. Setting aside people who don't show up when they're supposed to, and sort of narrowing it down to discipline that's given for people who are there, based on things they did do that they shouldn't have or didn't do that they should have at the prison, what types of discipline have you given out in your capacity as a correctional lieutenant?

A. Maybe conduct unbecoming. I mean, as you make your rounds, you might see an officer conducting themselves in a way that I don't see fit. It varies. I mean, there's a broad horizon as to something that can go on, or has, that you address. And it's at your discretion as to how you want to discipline them because there's different forms of discipline and different levels of it before you automatically take them to the major, you know. And that is discussed between you and the captain that's up there.

Q. So you -- is it fair to say that you can't give out discipline without discussing it with the captain?

A. Correct.

Q. So is it, like, your recommendation that the captain approves or you are just, sort of, reporting an incident up to the captain and recommending and just -- then the captain makes an independent decision of how the discipline goes?

Page 120

A. If I discipline somebody, I really don't need the captain's permission to do it. An infraction is an infraction. And, realistically, the only person that technically needs to know about it is our major. I don't really have to inform him that I'm writing anybody up for a violation of policy. However, as a respect factor, I did discuss, "Hey, this is what I am doing." And that's where it went.

Q. Okay. Have you ever given out discipline to someone based on that officer's failure to respond appropriately to an emergency situation?

A. I don't recall it, no. I don't recall doing it.

Q. Have you ever heard of that happening to anyone at Indiana State Prison, that type of discipline?

A. No, not really.

Q. Have you ever given out discipline to an officer for that officer failing to protect or failing to keep a prisoner safe?

A. Not to my knowledge, no.

Q. Have you ever heard of that happening with any other officer, giving out or receiving that type of discipline?

A. No, sir. I've never heard of it happening.

MR. HEPPELL: Could we go off the record?
(Recess taken.)

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 32 of 111

Page 121

BY MR. HEPPELL:

Q. Lieutenant Redden, you testified earlier that the shift you were working back in April of 2017 was the J shift; is that correct?

A. Yes, sir.

Q. And I have a copy of the roster, and I didn't actually -- I thought I printed it, but I didn't or can't find it. But I know that you had mentioned that depending on the -- strike that.

I can describe it for you; and if you want, I can show it to you on my screen. But it's the page of the roster that's been provided for us on J bracket for April 7, 2017. It lists you and Lieutenant Watson, both, as assistant shift supervisors in the top left-hand corner of the roster. It also includes in the bottom left-hand corner of the roster a series of boxes, one labeled "quick response," one labeled "weapons," and one labeled "cell extraction." Are you familiar with the formatted document based on my description?

A. Yeah.

Q. And that refers to the different sub groupings within the quick response team, correct?

A. Yes, sir.

Q. And the ones labeled just the plain label "quick response," are those referring to the first responders?

Page 122

A. Yes, sir. Yeah. Not really. "Quick responders," that's the overall term for all three teams combined.

Q. Maybe it will be -- just for simplicity sake -- so I'm showing you what I'm looking at in the bottom left page of the document --

A. It should say "first responders."

Q. It should say "first responders" there?

MR. HEPPELL: And just so it's clear, Daniel, this is not a Bates stamped document. This was provided by David Arthur, and it's copy of the H, J rosters for April 2017, a PDF document that's been provided. It's page 5 of the PDF.

BY MR. HEPPELL:

Q. And so listed on there, there's four names under "quick response," which I understand would be more properly titled "first responders," correct?

A. Yes, sir.

Q. And that's Lieutenant Watson, yourself, Sergeant Puetzer, and R. Statham?

A. Yep, Ryan Statham.

Q. Ryan Statham. And I think you mentioned earlier there would potentially be a designation for who is in charge depending on the format of the rosters. Are you able to see here that Lieutenant Watson is designated the OIC under those first responders?

Page 123

A. Yes, sir.

Q. So would that reflect then that he was the lead -- in the lead position on the first responder team that day?

A. Yes, sir.

Q. Do you have, as you sit here today, an independent memory of Lieutenant Watson being in that lead position in relation to the other first responders on the night of the fire?

A. As far as? He was there. He assisted with everything that he should have and needed to.

Q. You remember that he was there. You remember that he, as you just described, assisted with things and did everything he needed to.

Do you have an independent memory of him playing a lead role, sort of, as being in charge of the first responders?

A. Yeah, I mean -- the question to ask is kind of bland as "lead." I mean, he did what he was supposed to do. It wasn't any less, looking back at the situation, that he should have done any different or didn't.

Q. Well, I guess, were there any -- as things played out, in fact, on April 7, 2017, based on your memory of the incident, in terms of who was making decisions around what the first responders would do, who was, you know, directing who should do what, do you have any recollection

Page 124

of Lieutenant Watson taking on a greater or different type of leadership role beyond just any of the members of the first responder team?

A. I would say greater. He put himself at the greater risk. He almost got burned up too. Because when we put the fire out, he was the one that tried to rush in real quick. And right before it roared back up and shot back out, Statham actually grabbed him by the coat and got him out of the way before he got engulfed. So I guess that aspect, yes. That's about all I can say. I mean, I wouldn't change anything he did.

Q. In terms of the decision making as a group, like, what was the group going to do and who was going to do what within the group, was Lieutenant Watson playing a lead role there; or was it just you decided collectively amongst yourselves?

A. I mean, he made the calls that he's supposed to make. I don't see what needs to be discussed about a guy that we need to get out of a cell. We all see it.

Q. So your recollection of the night is there wasn't a lot of discussion around what steps to take. It was just taking action in response to the situation?

A. We took action and responded. But, in all fairness, asking me to remember something that was verbally said in a situation like that, I'm not going to be able to answer

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 33 of 111

Page 125

that adequately at all.

Q. And why is that?

A. Because it was such a long time ago. I mean, no disrespect. None of you guys were there. There was a lot of stuff going on at the time. Everybody's heart was going. Everybody's adrenaline was flowing. After all that stops, I can't tell you what was verbally transversed [sic] between me and him or the next guy. I talked to a ton of offenders too. I can't tell you none of that conversation that took place. I just know it did.

Q. So fair to say that based, in part, on the passing of time, and it sounds like, in part, on how intense the experience was for you, there's significant parts of the details of what happened that, as you sit here today, you can't remember?

A. I would say in that aspect, verbally, no. I put so much aspect on what physically happened in my mind. You know what I mean? A lot of that is just not there.

Q. In terms of the communications that took place, what you said to other people and what other people said to you?

A. In my opinion, that situation, the small talk in between of what took place to get -- physically to get a guy out of a cell that was burning up, no, I can't tell you the small talk that we took.

I know firemen was called out. I know he told him

Page 126

to -- I know fire extinguishers was got. In my mind, all I remember -- I mean, this is God's honest truth -- is physically what was being done physically, I don't really remember, you know, the smaller details like that right sitting at this table here today, no.

Q. Got it. And I understand that. And I don't mean any disrespect to you when I'm asking the question. It's just my job to figure out what you know, what you don't know, what you remember, and what you don't.

A. You're fine.

Q. Just so I'm clear, when you say "small talk," I'm not just asking about, like, chitchat unrelated to the incident, which I would assume there probably wasn't much of during it; but in terms of the instructions that were being given verbally by you to other people or by other people to you or information that you were learning when people were telling you things, are those also the types of communications that, based on the passage of time and the nature of the incident, what was said and by whom is much harder for you to remember, as opposed to the physical stuff of what you did and what you saw?

A. Could you rephrase that?

Q. Sure. I was mostly just trying to clarify because you had described "small talk." And it sounds to me like it's not just, like, you don't remember, sort of, the

Page 127

inconsequential chitchat or pleasantries, if I understood what you're saying, you also don't remember, in large part, even conversations or communications about the incident itself; is that fair to say?

A. No. In the heat of the moment, I can tell you what I did. I can tell you what Statham did. I can tell you what Watson physically did. But as far as who said what, no. You know what I mean? I can't recall that.

Q. And that also includes communications that were important, like information you were learning about what had happened previously or communications to update other people about what was happening? It's not that those conversations weren't important, it's just that you don't remember them?

A. I don't remember what took place and what was said to us at that time. When we got there, in my personal opinion, everybody knew what they needed to do when you see that. Like he called -- you know, he kept hitting on the radio asking where was the firemen at, where was the firemen at. We couldn't see our hand right in front of us. He was the one that was constantly making physical contact with us to make sure we was there, as well as the leader; he did what he was supposed to do.

Q. Sure.

A. But, honestly, you couldn't hear anything standing next to that cell because of the roar of the fire. And so to ask

Page 128

me did he verbally say something, you're taking it out of the whole element of could you even hear him saying anything. You have 300 offenders. Can you hear over them? No, you're not going to be able to.

So to ask me a question like did he verbally say this and that, I can't tell you. I can tell you that the cell was exploding inside, you know, because it was loud. I mean, you're not going to talk over all that.

Q. Sure. And I'm going to walk you through what happened in detail and, kind of, get into all of that. I just wanted to up front, you know, get a sense of the extent of your memory. And I appreciate you clarifying for me the areas in which you have a strong ability to recall things and the areas in which you have less ability to recall the specifics of things. So I appreciate that.

We were talking about the OIC position earlier and the OIC and the B cell house. Is there a specific physical location within the cell house on the night shift back in April 2017 that the OIC is supposed to occupy that's different from the other officers?

A. No. They all use the officer's station, unless they are doing their payroll, which was a subject of that that was mentioned. The computer in the officer's station does not have Internet access for obvious reasons because they don't want the offenders to have access to the outside

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 34 of 111

Page 129

world like that. So, yeah, he uses the same office as the day shift would use, as far as officers go.

Q. Okay. So OIC -- and that's where the OIC is supposed to be physically located, unless there's some incident he or she is needing to respond to?

A. No. Unless there's just another aspect of his job that might require him to do paperwork and e-mail it out, and he can't do it in that office no more.

Q. And so anything that requires that Internet access, where would that have to take place?

A. That would have to take place in another office in the same unit; but that's the counselor, unit team's office. It's a different classification of individuals that work there. They're not custody. That's custody staff. Unit team isn't --

Q. So there's two different offices within the B cell house, the officer's station where offenders, prisoners are permitted to come in during the day --

A. No. I'm sorry. I didn't mean to cut you off.

Q. Okay. So it's not that prisoners are permitted to be there, but they would have easier access to that office. So there's no Internet provided at that position?

A. Correct.

Q. Out of an abundance of caution?

A. Correct.

Page 130

Q. The counselor's office is not something they would be able to access, and so there is Internet access provided there; is that correct?

A. Correct. And they view it as the officers -- and I agree, you really don't need Internet access in the officer's station, and the counselors might.

Q. Is the counselor's office locked when it's not in use?

A. Yes, sir.

Q. The officer's station is not locked because it's constantly in use; is that fair to say?

A. If the officer is not in there, it is locked. If an officer is in there, it's locked to keep offenders from storming in when they're mad about something.

Q. Okay.

A. Realistically, the only time the officer's station should be open is when you're exiting or entering.

Q. Got it.

(Exhibit 7 marked for identification.)

Q. Showing you what's been marked as Exhibit 7, and it's a set of four pages of documents. It's Bates stamped Devine production 6233 through 6236. Do you recognize these documents?

A. Yes, sir.

Q. What are these documents?

A. Fire evacuation plans.

Page 131

Q. Okay. And I believe you made some reference to these types of documents earlier as well; is that correct?

A. Yes, sir.

Q. And this just shows -- and there's, sort of, four different -- well, if I understand these four pages correctly -- but let me know if I'm wrong -- these all depict B cell house, just different orientations of the same cell house and different evacuation routes, primary and secondary, depending on the location you might be in within the cell house?

A. Yes, sir.

Q. And just looking, for simplicity sake, at the first page there, it's got a compass designation, west, south, north, east. There are two offices labeled toward the bottom of that first page: One officer station on the left, south side; counselor's office on the north, right side of the page. Are those the two offices you were just describing?

A. Yes, sir.

Q. With the officer's station being the one where the officer in charge would be located, and the other officers would be located, unless they needed Internet access for payroll or other reasons, in which case they'd be in the counselor's office?

A. Yes, sir.

Q. And those -- in terms of the diagram, to me it looks like

Page 132

those are, sort of, roughly equivalent positions just on either side of the cell house; is that correct?

A. Yes.

Q. In terms of -- and the cell house is, sort of, roughly symmetrical in that it's got, you know, running east/west galleries, you know, 100 through 500 level running up through both sides, staircases up both sides, south and north?

A. Well, the directions of each cell house are different. There's a north/south side on B Boy. There's an east/west in A. I mean, the structure is similar, but the way they run them out isn't.

Q. Got it. In terms of the layout of B cell house, though, it's roughly symmetrical along that west/east axis, right, with one office on either side and then galleries on the -- five galleries up on either side of the --

A. Five floors up.

Q. Five floors up?

A. Yes.

Q. Do you recall -- strike that. The fire in this incident took place in cell 540; is that correct?

A. I believe so.

Q. Okay. And do you recall which -- whether 540 is on the south side or the north side?

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 35 of 111

Page 133

A. I believe it was on the north side. Yes, it is because north is evens and south is odds.

Q. North is evens. Okay. And so that's the same side of the cell house as the counselor's office, correct?

A. Yes.

Q. Is there any difference -- strike that.

You know, I can obviously see the layout here, but it's a diagram, not, you know, like a 3D image of the inside of the cell house. Is there any difference in terms of ability to hear what's going on out on the ranges between you sitting in the officer's station versus you sitting in the counselor's office?

A. A major one.

Q. What do you mean by that?

A. The officer station is created out of fencing mesh, and the counselor's office is made out of, like, the same brick they would lay a foundation with. So you can peer through all the walls in the officer's station, and the counselor's office you can't. It's a room.

Q. When officers are in the counselor's office to use, you know, internet access for some purpose, are they supposed to keep the door open or closed?

A. There's not really anything in writing that says they can do either one, especially at night.

Q. Okay.

Page 134

A. Because the counselors keep it -- it depends on their mood, to be honest with you. But there's nothing in writing that says there's a formality to follow with that. So if they're supposed to, I don't --

Q. You're not aware?

A. It's their discretion, I guess.

Q. Is it permitted for all three officers to be in the counselor's office at once, or is one person required to be out, you know, monitoring the galleries or in the officer's station, or otherwise not shut up in the counselor's office?

A. It depends on the -- there's nothing on paper that says that all officers have to be accounted in one area in one given time. No, there's nothing -- not that I'm aware of that says different.

Q. I believe you stated that you had some specific understanding or specific memory related to officers doing their payroll and that being related to this incident; is that correct?

A. Correct.

Q. Can you tell me what your understanding is in relation to that?

A. It's just an understanding. My understanding is that two were in the office doing payroll because they were sticklers on that, and one was conducting security checks

Page 135

at the time.

Q. And, again, this is just your understanding based on what you heard after the incident because you weren't there at the time; is that fair to say?

A. Correct. And I don't look into anything. That's just what I heard.

Q. Because you didn't play any investigative role in regard to this?

A. That's internal affairs. I did just what I did.

Q. Got it. But based on what you heard, I guess at the time of the incident, you heard that two of the officers in the cell house were in the counselor's office doing their payroll, and another officer was, I think you described, conducting security checks?

A. Correct, from my understanding.

Q. Do you recall how you learned that or how you gained that understanding?

A. No, I don't recall, honestly. I do not recall. But I've known that, I think, from just -- it's been a long time -- from my thoughts. I'll put it like that. It's been my thoughts since day one with it. So I'm assuming I somehow heard that that same night.

Q. Either someone told you or you overheard other people talking about it?

A. Yeah.

Page 136

Q. Anything like that?

A. Yeah.

Q. And when you say "conducting security checks," what does that mean?

A. He's walking the ranges. They have the guard one, and he's basically checking on the offenders. He's checking for living and breathing bodies in every cell. If there's a curtain up, he's reaching in and yanking it down, making sure there's an inmate in the bed that's alive.

Q. And so that's out, like, physically walking the beat, walking the ranges and, you know, walking by all the cells?

A. Yes, sir.

Q. Okay. And do you --

(Telephone interruption.)

Q. Did you at any point learn which officer you understood was out doing security checks while the other two were in the office doing payroll?

A. I'm bad, just as bad with names as I am with -- I do believe Rodriguez was the OIC that night, Abbassi. And these people didn't stick around very much longer. So it's hard for me to recollect their names. It was another female officer, I think two females officers in the office, and he's the one that was out.

(Interruption.)

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 36 of 111

Page 137

BY MR. HEPPELL:

Q. And my understanding, based on the documents I've seen in the case, is it's Justin Rodriguez, Sarah Abbassi, and Promise Blakely were the three officers in the cell house that night. Now that you've heard those names, does that sound right to you?

A. Yes, sir.

Q. And also, my understanding, again, based on what I've seen so far in the case, is that Rodriguez was designated as the officer in charge.

A. Yes, sir.

Q. That also sounds right to you?

A. Yes.

Q. And based on all those understandings and your memory, again, recognizing that you weren't there, or what you heard or learned was that it was Rodriguez doing the security checks while the two female officers were doing payroll; is that correct?

A. Correct.

Q. Where were you physically located in the prison when you first learned about the fire in B cell house on April 7, 2017?

A. Shift supervisor's office.

Q. Okay. How did you first learn that there was a fire or first learn that there was some incident or something

Page 138

wrong in B cell house that night?

A. The transmission to control from Rodriguez calling a fire.

Q. And do you remember -- and so just so I understand how that works, that's, like, a radio transmission?

A. Yes, sir.

Q. And do all officers and sergeants and lieutenants have radios physically on their person --

A. Yes, sir.

Q. -- when they're on duty?

A. Yes, sir.

Q. And are those, like, shoulder clip or, like, a walkie-talkie style radio?

A. They're shoulder clips.

Q. Shoulder clips.

A. Yes. However you wear it, though, doesn't mean that you have it strapped to your shoulder. Some of the equipment, I mean, sometimes it's not the best. We go through a lot of abuse. Sometimes when you get a radio from control, it does not have a shoulder holster. So I'm not too sure of the condition of their radios, but it had varied.

Q. "Beat up" in terms of, like, the holster might be snapped or, you know, like, the physical wear and tear?

A. The wiring to the mike might be fraying because it's stretched up. I mean, you got real tall people that pull it up, and then you got short people. They're used by

Page 139

everybody throughout a long period of time. So they get a lot of abuse.

Q. So that's, kind of, a known issue throughout the prison that the radios, kind of, have seen a lot of wear and tear, and some of them have seen better days?

A. That and the battery life of those current radios. They've since upgraded. So that's not really so much of an issue no more. But at that particular time, our battery sometimes, you get about 30 minutes out of one battery. And some cell houses, that's all they had.

Q. To your knowledge, were there any efforts to try and improve that or change that at the prison prior to April of 2017?

A. Yeah, they were rotating new batteries in and out. But I just think with the radios being as old as they were, it was kind of hard to keep them to a certain standard, up until they just basically got rid of them all and got us an entirely new system now.

But prior to that, they did rotate the batteries in and out. But they still went -- I mean, you get about a good year out of those new batteries before they would start behaving like their predecessors.

Q. Because that's -- would you agree that's something that's pretty important for an officer to have during his shift is a working radio?

Page 140

A. Correct.

Q. For situations where they may need to report an incident, it's vital that they're able to communicate with other officers in the facility?

A. Correct.

Q. Do you know if the warden was aware of the issues that were going on with the radios?

A. I couldn't tell you anything that he's aware of. I just know all the units -- you know, they had old radios, old batteries. Some batteries was dead. Some batteries wasn't.

Q. It was common knowledge throughout the prison --

A. I would say so.

Q. Was there any policy or procedure in place at the prison in that time that required folks to, like, check their radio before they started a shift to make sure it was working?

A. Procedure, yes.

Q. Okay. And when you say "procedure," can you just explain what you mean by that?

A. There's nothing really written that you should check your battery. You should check it as you insert it. You should make sure that you're on control. But if you value your safety, then you're going to do those types of things, follow that type of procedure because -- not just

USDC INND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 37 of 111

Page 141

to report something like that, I mean, you can be attacked and hurt too. So it's important for your safety as well as everybody else that you do these things.

Q. When you say it wasn't, like, a written policy, there was nowhere that set down in writing that says as part of your, like, beginning of shift checklist, you should test your radio; is that your understanding?

A. We have an inventory sheet. As long as the physical radio is there and our count matches, that's all that mattered.

Q. In terms of the written policy?

A. Well, I can't tell you what the written policy says because, honestly, I don't know. But I can tell you, like I said, what our procedures were. And that was to count everything down before you let the other shift go. And if the numbers matched, you signed off. Normally, so much -- they did have a radio guy that came through and checked once in a while, but nothing really.

Q. Checked once in a while in terms of are they working?

A. Yeah. They had a radio guy for repairs and stuff.

Q. But as far as individual officer's, like, personal procedures, was it a part of those personal procedures to make sure the radio was working properly?

A. It should have been, but it wasn't -- like I say, it wasn't nothing you hold someone accountable for.

Q. Got it. But that wasn't just, like -- well, strike that.

Page 142

Is that something that, as a supervisor, you encouraged officers under your command to do as part of their personal procedures when starting a shift?

A. Correct. Radio checks should be done.

Q. So if I understand what you're saying, it's not like breaking a formal rule that you could write someone up for not doing it. But it's also not like the color of your tie that's just like totally personal preference. Like, it's a procedure that they're encouraged to follow. And that's good practices that supervisors encourage everyone to follow?

A. Correct.

Q. And that's because everyone knows that you could get in serious trouble if there's an incident and your radio is not working?

A. Even if you did check it -- this is why a lot of people didn't. A lot of people did. The majority of people did. Even if you did check it, if the battery went down when you needed it in a bad moment, it didn't matter that it worked when you first started shift, you know.

Q. Where were spare batteries located for radios, if you know?

A. Officer's station.

Q. And that's in every cell house?

A. Yes, sir.

Page 143

Q. So worst-case scenario, if you found yourself in that situation, you have to rush off to the officer's station and switch out the batteries?

A. Yes.

Q. Back in April of 2017, were the batteries, like, locked up in a cabinet somewhere?

A. No. There's a big old charger, couldn't fit in a cabinet.

Q. So they're pretty accessible once you get to the officer's station?

A. Yes.

Q. Is it a complicated procedure to swap out one battery for the other?

A. Two clips and just pull it down.

Q. Okay. If you've used a radio before, you could swap them out in a matter of seconds?

A. Pretty quick, yeah.

Q. And then going back to what you were describing when I asked you how you learned about the fire, you described a transmission to control from Rodriguez calling a fire; is that correct?

A. Yeah, I believe so.

Q. And do you recall anything about the contents, like, the words that he used on that transmission?

A. No. To be perfectly honest with you, all I heard -- I'll clarify what I said. All I heard was a fire being called.

Page 144

I just assumed that it was him that called it. He said -- he called the fire and standard procedure. He said what range it was on. And that was what I remember.

Q. Okay. And so do you recall it being a male voice rather than a female voice?

A. I really don't know. Those radios, it's not something that you can sometimes -- like, new ones you can. I mean, they were in the early '80s passed down from the State Police to the prison system. And a lot of them, you really -- you could get tones, but you really -- my brother works there, and I couldn't sometimes recognize him.

Q. Got it. So if I understand what you're saying, but correct me if I'm wrong, all you remember is hearing that there was a fire called in B cell house, and they specified the range. Probably, at the time, you might not even have been able to recognize the voice as Rodriguez. But based on something you've learned after, you since believe that it was Rodriguez that called it in?

A. I just assumed. That was a bad thing to say. I just assumed that it was him that called it. And, actually, all I heard was the numbers. Like, I've been there a while. All you hear is the numbers. You really don't think about who's calling it. You just hear emergency and where you need to go, and I went.

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 38 of 111

**Page 145**

Q. And when you say the numbers, are you referring to, like, the code that was called?

A. Uh-huh.

Q. Do you remember which code was called?

A. Sitting here now, no, I do not.

Q. You remember, in addition to the code that would specify what the emergency was, the person calling it in also would have specified the location of the incident, correct?

A. Yes, yes.

Q. And do you remember that or just that it's your assumption of what must have taken place?

A. I remember it. I remember going straight up to the range. That's all I remember. So I'm assuming that's how I knew. So I guess you could say it was assumption. But that's what I knew, so...

Q. You remember when you -- and I don't want to walk you far ahead because I'm going to go through this very slowly, and I appreciate your patience with me as I do that. But just to clarify what you said, it sounds like you think you may have heard the specific range on the radio because you remember once you got to the cell house --

A. I knew where to go.

Q. -- you knew where to go?

A. I'm sorry, yes.

**Page 146**

Q. It's possible that you might have, like, had someone yell at you when you first got to the cell house, "Hey, it's up on 500 range," and then --

A. I don't think so just because of the noise volume in the cell house. I wouldn't be able to make it out.

Q. Best you can remember piecing it together, based on what happened, you think you knew it was 500 range right after the call?

A. Right off the bat, yeah.

Q. And, obviously, would have specified B cell house?

A. B Boy.

Q. "B Boy" is what they would have said over the radio?

A. Yes.

Q. Because that's what everyone called it?

A. "B Boy" or "B Baker."

Q. Who was with you when you heard that call?

A. I don't recall who was with me. But I know when I went through the door, it was Statham and Watson.

Q. When you say "when I went through the door," you're referring to the door from the custody hall into B cell house?

A. Into B cell house. I don't remember who was with me prior to getting to B Boy.

Q. Okay. You said Statham and Watson, correct?

A. Yes.

**Page 147**

Q. When you went in, but you don't know if they were with you at the time --

A. Right.

Q. Do you remember Dykstra being there?

A. Dykstra was in the office with me. He wasn't one of the guys who obviously went with me, but he was in the office.

Q. But at the time, the requirement was he stay in the office?

A. Correct.

Q. What time was it when you received or heard that radio call from B cell house?

A. I don't know, not at all.

Q. Fair to say there's no recordings made, like, of the radio traffic that's ongoing?

A. No, sir.

Q. Is there any record that's made of the calls as they come in?

A. Other than the daily logs in the cell house, no. Every cell house will keep a daily log. Shift supervisors keep a daily log. And he will put down at this time a signal whatever was called in this location and break it down and what time it was ended.

Q. So Rodriguez, or whoever made that call, if they're following the policy, he would have made a notation in that log of the time that he placed that call?

**Page 148**

A. He should have. But there was a reason why he may not have. Other than that, it should be in the shift supervisor's log who maintains the log of the running of the shift for that night and day.

Q. You said a couple different things in there, and I want to make sure I don't miss anything. You said he should have, but there might be a reason that he didn't?

A. Yes.

Q. Can you explain what you mean by that?

A. Because -- and I know you're going to ask me questions later, but it's jumping ahead. I pulled them, all involved staff, out the cell house due to what was going on when we evacuated the offenders. I don't leave staff in the cell house where they could potentially get hurt. It was a small riot that occurred right after that, and I removed them out of the area. He had no time to go back into the office and do none of that.

Q. So he wouldn't have been able to -- I mean, he potentially could have gone back later, but there would have been a long gap in time between him --

A. If he had been left to do his job, as far as maintaining the records, then yes; but he was not.

Q. Okay. And I think I understand what you're saying. Other than the logbook specific to B cell house that is maintained by the officer in charge of B cell house, which

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 39 of 111

Page 149

ordinarily Rodriguez would have documented, but in this case may not have, given what you just described --

A. Correct.

Q. You were also, I think, describing something about a shift supervisor's log.

A. Yes.

Q. That is, like, a master log of stuff occurring across the prison, not just specific to one cell house?

A. Correct.

Q. And was that maintained by Captain Dykstra as a shift supervisor that night?

A. Correct.

Q. And is that the same kind of format in terms of time and then what happened?

A. It would be the same, but it would be digital. They maintain it on the computer. Officers, like I said, they don't have a computer. They maintain it on paper.

Q. And so Dykstra had a responsibility to maintain that on the computer?

A. Yes. It should have been -- if I recall right, he did. That's one of the things we have to check before we leave. He did maintain it accurately.

Q. And what would that look like?

A. It would look just like a digital -- it's an Excel file at the time. They've changed it multiple times. But at the

Page 150

time, it would look just like the paper version of it. But, basically, it will announce what time we got on shift. We have electrical fences; we conduct tests on them. If they're in operating order, that's logged. We do inventory checks, equipment checks, if everything is accounted for. At the time, we had a toolbox in there. We had to account for all the class As that were in there. That's logged.

We log what time we conduct roll call, what time count cleared, what time the offenders came out to collect laundry, what time they've announced to put them back up, what time count began again, what time it cleared. Any incidents in between all those times are inserted timewise.

And it's just an overall look on the incidents that happens at night because the cell house isn't going to have an incident -- it will have a brief period of an incident. Like B Boy might have a 10-71 called. C cell house will have in theirs 10-71 or 10-70 called in B Boy at this time. Ours will have the actual incident report attached inside that. And then under that will be -- it goes in a list, and it's a timeline.

Q. Got it. And that's called a shift supervisor's log?

A. Shift log.

Q. Shift log?

Page 151

A. Yeah.

Q. And it's maintained by the shift supervisor?

A. Correct.

Q. And you described it as, like, an Excel file. I just want to clarify. Like, it's not a literal Microsoft Excel file. Is it, like, a special program that just, like, has that kind of format to it?

A. It's an Excel file.

Q. It's an actual Microsoft Excel file. And it's, like, manually entered by the shift supervisor? Like, when something happens, it's his responsibility to, like, look at his watch and be like, okay, this time --

A. No. We go by what time control says something was called. So someone in B Boy called a fire, 10-70. She's going to announce, "Rodriguez said, 'Control B Boy, I have a 10-70.'" She said, "Control to all units, we have a 10-70." She logs the official time.

Q. So that's another log or document that would be created that would have the time in it?

A. She might throw hers away because she don't have to --

Q. Got it.

A. She informs us, and we do that.

Q. But what's supposed to happen -- again, this may be, like, very basic to you. I want to make sure I'm not missing it. I want to make sure we have all the right documents

Page 152

that we want to have access to. The person in the -- is it called the control room?

A. Yes.

Q. That's, like, the radio operator?

A. Yes.

Q. Who's, like, running the transmissions back and forth?

A. Uh-huh.

Q. That person is maintaining, like, a live log, like, writing down as radio transmissions are coming back and forth the time of the transmissions?

A. On a scrap piece of paper.

Q. Like on a scrap piece of paper. So that's not a -- that's not a formal document that's kept?

A. It's not a state -- yeah. No.

Q. But the purpose of that document is --

A. Is to inform us.

Q. To inform you. So, for example, one of the shift supervisors making the formal log, the shift log, he needs to know what time was that 10-71 called. The person in the control room can look at their scratch pad and say that was called at whatever the time was, and then that time goes in the Excel spreadsheet?

A. Correct.

Q. And so if we're looking for something today, this scrap paper is probably long gone, but the Excel spreadsheet is

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 40 of 111

Page 153

going to have the time on it. And we know the time is accurate because it was written down in real time by the person in the control room?

A. Correct.

Q. Got it. Thank you for bearing with me. Okay. And so it seems like it's fair to say you would have nothing to say about what specific time it was called just beyond what was in the shift log. That's the time that it was called?

A. Yeah. And the time I put down in my incident report would have been the same time that he put down it happened.

Q. Got it. So you wrote your incident report, and we're going to look at it later, but you wrote that, obviously, much closer to the time than it is now; fair to say?

A. What do you mean?

Q. Like, when you wrote your incident report, it was, like, right after the incident; and here we are a year-and-a-half later?

A. Yeah, it's been a long time.

Q. It's been a long time.

A. Yeah.

Q. But when you wrote that incident report, the time that you put in, even back then when you probably had a much clearer memory of things, you weren't going off of memory; is that fair to say?

A. I went off of what control said the signal was called and

Page 154

when the signal was clear.

Q. Got it.

A. And that's it. Because, yeah, when they call it, you don't look at the clock and write it down. You just go.

Q. And it's important with this stuff not to guess. It's important to be accurate.

A. Correct.

Q. So whatever's in your report should be the same number that's on the shift log that Captain Dykstra created. Should be the same number that's rumpled up in a trash can or a garbage dump somewhere that was the scratch pad the control room created. It's all coming from that same source?

A. Yes.

Q. Got it.

A. In our system, we use the terminology in every report as being "approximately." So even if you are going off your own watch, which the majority of us don't, we use that system. Then they give us a ten-minute window so all that -- it should always happen within a ten-minute time gap from what control has.

Q. Tell me -- I just didn't quite follow what you said about the ten-minute window. Can you explain what you mean by that?

A. So if a 3000 happens at 7 o'clock, and I'm not letting

Page 155

control keep time for me, and I look at my watch and it's 7:03 because my watch is fast, and you put down "approximately this time," DOC looks at it as a ten-minute timeline between that and this as in terminology of what they find acceptable for it all being associated with the same time.

Q. Is that, like, a policy that you are aware of, that ten-minute wiggle room?

A. No. That's just a rule of thumb.

Q. A rule of thumb?

A. Uh-huh.

Q. What you were just saying about some incident that you looked at your watch and your watch was fast and control was not involved in?

A. No. I said some people do go off their watches. That's why I wanted to make the correction. However, it's a whole lot easier and less work for you if you just call up later and say this is what happened.

Q. So if I understood what you were saying, you were saying there would have been nothing improper for someone to write a report and they happened to look at their watch at the time and to go off their own time, even if their watch was, like, three minutes fast?

A. Correct.

Q. That would be permissible for them to write the report

Page 156

that way, in which case you would see a difference between, say, the times in different reports. Some people might be going off control time. Some people might be going off their own watches?

A. Correct.

Q. Okay. Your personal practice, though, at the time, and I guess today, is always go off of control time; is that fair to say?

A. Yes.

Q. So if we're looking at your report, that should be control time?

A. That would be control time.

Q. Got it. And control time, if you know -- you may not know, like, are they working off of, like, a clock that's not just, like, a random wristwatch that could be fast, could be slow? Are they working off of a clock that's synchronized or set to, like, some standard time?

A. Standard time off of Windows, and so you -- and it's connected to the internet.

Q. So it's going to be a synced-up, internet-based time?

A. Right, accurate time.

Q. Okay. I was just out east for a trip, and I spent, like, a whole week with my watch an hour fast. So I know when it's human error on a watch, it can be different.

A. Correct.

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 41 of 111

Page 157

Q. Okay. What was the first thing that you did after you heard the call from the transmission to control from someone in B cell house about the fire?

A. I left the custody hall.

Q. And where did you go from -- where did you go from the custody hall?

A. Right to B Boy's front door.

Q. How far is it from where you were in the shift supervisor's office to the front door of B cell house?

A. About 45 steps.

Q. Okay. Why was that the first thing you did?

A. That's where the signal is. That's where the disturbance is. As a first responder, that's where I go.

Q. What was in your mind as you were going from the shift supervisor's office through the custody hall towards the door to B cell house?

A. Probably nothing. Probably nothing. I treat all the incidents the same. They're to be taken seriously. So even if it was nothing, I still get there at the same pace as I would for something that turns out to be big.

Q. At the time that you heard about it being a fire, what sense did you have of how serious the situation was?

A. I treat them all serious. I don't have levels of it. If it's something that a signal is called for, I get there.

Q. So you don't -- you weren't going -- you weren't

Page 158

responding in any way differently than you would any code like that, regardless of how serious you subjectively were thinking it was?

A. If it's an emergency and they call a signal, it's my job to get there as fast as I can; and that's what I do.

Q. When you say as fast as you can, like, what does that look like? What's the protocol for a first responder responding to an emergency signal?

A. To get there as fast as they can.

Q. Is that, like, run? Is that jog? Is that fast walk? Is that --

A. That depends on the condition of the officer. If you got bad knees, you probably won't run. So you do a brisk walk. If you're a young supervisor or a young officer, they may run. That varies how you respond to it. I don't know. Someone might twist an ankle one day. They might run to one and speed walk to the next.

Q. Sure. On April 7, 2017, in terms of your response getting from the shift supervisor's office to the door to B cell house, did you run? Did you jog? Did you walk?

A. I don't know. My biggest time restraint is getting through the gates. Literally, once I get through the gates, and that's based on an operator, I just take an immediate right and I'm there.

So that's what I said. I'm literally, like, 45

Page 159

steps. But the only time restraint is how fast the gates open and shut. They are sally ports. So I went through four sally ports from the back door, to the right, and I'm there.

Q. Can you explain what a sally port is?

A. It's just a system of doors that opens one at a time. Once one door is shut, the other one can open.

Q. So it's like an airlock kind of style of you're like one opens, you go in, it closes behind you, you're stuck between two doors, and then the next one opens?

A. Correct. And that was the biggest -- I mean, that was about the longest period that I had to wait was the doors shutting and opening.

Q. Just because those are, like, electronic control. They only go as fast as they're going to go?

A. Mechanical, correct.

Q. Mechanical. They don't go faster because it's an emergency and slower because it's a beautiful day. They just go?

A. Correct.

Q. And you described you had to go through four of those doors?

A. I believe it's four. One, two -- it's three, four doors, I believe, yes. If you count the first one, yes, four doors, I believe.

Page 160

Q. Four doors. And just so I'm clear, that's, like, four doors, like, two sets of two, like, two airlock style, like, two sally ports?

A. First door opens, you go in, it shuts, this door opens, you go in, it shuts, then -- so it would be three doors. That door opens, you go in, shut, and then the push door. And then you got to push that one open, and there's this big, old 50-pound door. You push that open and take an immediate right.

Q. And then you're in B cell house?

A. Yes.

Q. So four doors to go through. Three of them are the mechanical doors?

A. And one's manual.

Q. And one's manual. So that one is heavy to push, but you're going through. You're not waiting for it to roll or anything?

A. Correct.

Q. Did anyone go with you in the process you just described, going through those three mechanical doors and the one push door into B cell house?

A. I don't remember, honestly. I really don't remember who was with me. I know when I got to -- like I said, when I got to B boy's front door, I know Statham and Watson was with me. I don't know if they came from the custody hall

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 42 of 111

Page 161

with me or not. I really don't.

Q. Turning to Exhibit 7 in front of you, when you say the "front door," is that in the bottom left-hand corner, the southeast corner where it's marked "primary exit"?

A. Correct.

Q. So that is the -- that's the route, that's the connection where the B cell house connects on to the custody hall?

A. Well, the door I would come out will swing this way, and I would just come out and then make that turn.

Q. Do you mind drawing that on that exhibit for me, if I give you a pen?

A. Yeah. It's just simply the door I would come out would be this wall right here. And we push it open, and we would just come out straight in. The door swings back shut, and I would turn right into B Boy.

Q. Okay. So you've drawn in blue ink in the bottom left-hand corner of Exhibit 1 a couple of lines and then a diagonal line. And that diagonal line is that heavy, manual door?

A. Swinging door.

Q. Swinging door that you were just describing. And then the two doors that are marked on that diagram itself in the primary exit, are those -- can you describe those doors for me?

A. It would be used as a sally port function, same as the other; but they're all manual. So let's say the primary

Page 162

exit door fails, then the secondary one, you can lock it. It's more of a gate than it is a door. The door functions, padlock -- not a padlock, a Folger Adam key on hinges. You can reach through it, but it functions as, like, an emergency crash gate.

Q. As a matter of standard procedure after the prisoners are, you know, locked down for the night after the -- is it 9 o'clock when they're all tucked in for the night?

A. At that time, it was 9 o'clock.

Q. At that time. After that 9 o'clock -- so for the rest of the night shift, as a matter of standard procedure, that primary exit, which I think you described as the front door to B cell house, are those doors kept locked or unlocked?

A. They're always locked.

Q. Always locked?

A. Yes.

Q. So is that, like, you unlock it, let a person in, and then close it and relock it again?

A. Yes, sir.

Q. And that's 24 hours a day? That's the procedure that's followed?

A. Yes.

Q. Okay. And who has keys to that front door of B cell house?

Page 163

A. The OIC of the unit is the one who carries the keys, unless he goes up on the range. He'll hand them off to someone who is going to be downstairs, and they'll carry them just in case an emergency happens so they can unlock the door.

Q. So there's one set of keys for the front door that's kept within B cell house?

A. Correct.

Q. Are there extra sets of keys?

A. Yes.

Q. Where are the extra sets of keys kept?

A. Tower 11. They call it Check Point 3. It's the tower that monitors street traffic when the offenders are going back and forth. They have sets of cell house door keys. And the lock shop, if I needed to, will have another set.

Q. Is the lock shop open on the night shift?

A. No. So we'll probably use Check Point 3.

Q. Is it even possible to get in the lock shop on the night shift?

A. Possible. But in reality, wasn't nobody there with security clearance to pull those keys to get in the lock shop that particular night because the captain couldn't do it.

Q. So it takes, like, someone above the captain to get authorized to get the key to get into the lock shop to get

Page 164

the other key. So you're, realistically, going to Check Point 3?

A. The idea, yeah. But above the captain, no, because there's officers that work there that are flagged to pull those keys when the captain can't. But ideally, yes.

Q. In terms of responding to a situation, that's not a realistic option because of just the time it would take to go through those added steps?

A. You would use Tower 3 that's always manned.

Q. Tower 11, Check Point 3?

A. Check Point 3, I'm sorry, Tower 11 was always manned.

Q. Got it. How long did it take you to get from first hearing the radio call about the fire to getting up to that locked entrance to B cell house?

A. I believe when the signal was called, they opened the door for us. I don't think I waited. So they had already opened the door expecting our arrival. So I don't believe I waited at all.

Q. So to the best of your memory, there wasn't any period of waiting for that door to be unlocked. By the time you got there through the mechanical doors --

A. That I can remember, no.

Q. -- you were basically heading straight in?

A. Correct.

Q. Okay. So let me ask the question then a different way.

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 43 of 111

Page 165

How long did it take from you hearing the signal for you to be, I guess, setting foot through those doors and into B cell house?

A. I'd say about 20 seconds would be adequate.

Q. And that's, basically, just the time it took for those mechanical doors to roll back and forth, back and forth, back and forth, those three mechanical doors, push the mechanical door, and then you're there; and your memory is the front door is already open?

A. These, the gates, that would be 20, 25 seconds.

Q. About 20, 25 seconds?

A. Yeah.

Q. Did you radio in at any point to alert anyone that you had arrived?

A. When we get up to the cell, we will advise control that we're on site.

Q. When you get up to the cell, meaning, like, the cell front, in this case, cell 540?

A. In that case, probably just the front of the range because it was pretty bad. So you're not going to be able to -- if someone fell out, normally you will wait until you open the door and you check them. And your teammates are there. And then you say, "Hey, we're 10-23, whatever the case may be." And she says, "10-4." She knows we're all there. The captain knows we're all there. But in that

Page 166

situation, I believe we said we were there in front of the block.

Q. But up on 500 range?

A. Yes, looking down at the flames.

Q. So I think you just stated this. But just so I'm clear, to the best of your memory, the first time you made any radio communication or any other -- created any record of the timing of your arrival would be once you got up to the 500 range?

A. Yes.

Q. Did you have any conversation with Statham or Watson at any point prior to your arrival together inside B cell house?

A. No. I don't recall saying nothing to anybody prior to walking in B Boy.

Q. And, sorry, was I correct that it was Statham and Watson that you remembered meeting -- either they came with you or you met them at the door to B cell house?

A. Yeah.

Q. Puetzer was the third officer who was the first responder that day, correct?

A. Yes.

Q. But he was not -- he didn't meet you right at the entrance to B cell house?

A. No.

Page 167

Q. Did he arrive on the scene later?

A. He arrived on the scene. But now that you mention it, that's something I never thought about. He was never on the range. So I know where he was at when I went down, but I never really thought about that. But, yeah, he wasn't physically on the range with us.

Q. You have no recollection of Puetzer ever being up on the 500 level?

A. Yes.

Q. In B cell house?

A. Correct.

Q. Sorry. I want to go back to something, just as an aside, because I forgot to ask you, and I remember, and I want to ask you before I forget.

Before you had described the report approval process and described approving reports from other people that were getting completed and I think copies sent down state as part of creating the incident record for this incident.

From context, I understood that you were describing reports created by other correctional officers; is that correct?

A. Correct.

Q. Were you involved in or do you have any knowledge of any of the prisoner firefighters creating reports about the incident?

Page 168

A. No. I have no clue. I'm assuming they do, but I have no clue how they operate at all. That's not even a custody thing. That would be something that safety hazmat -- which would be who they answer to. But as far as my go with them, no.

Q. Got it. So there may be some process that they follow that they create reports and probably someone else has to approve those, but that has nothing to do with you as the shift supervisor?

A. Right. And if they did that, it would be through the safety hazmat. That would be a fact, but not through me.

Q. And you have no knowledge one way or the other about whether those should have been created or whether they were, in fact, created in relation to this incident?

A. No knowledge.

Q. Coming back to setting foot in B cell house for the first time with Watson and Statham, what do you remember about first setting foot in B cell house?

A. Just a lot of noise. That was basically my first interpretation of everything.

Q. Can you describe what the noise was?

A. Just offenders making noises. I mean, it's a lot of them. You never make out what one person is saying.

Q. But it's, like, noises of, like, people yelling, like vocal noises?

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 44 of 111

Page 169

A. That's every day. They do that all day, all night. So it's 300 guys. They're communicating all day and night. With the voices traveling over each other, I couldn't tell you what -- you know.

Q. So when you walked into B cell house, was it, like, the usual level of noise you would expect to hear in B cell house at, like, 9:30 at night; or was it an unusual level of noise?

A. It was just a little above what it normally is because they're all locked in. I know the guys in the bottom tiers wouldn't know what's going on at the top. So they wouldn't have a reason to make noise. So just the guys basically who saw what was going on was the only added voices to the commotion that goes on on a regular basis. You know, so that's the best way I can describe it as far as the enhancement of noise.

Q. Is that your memory that it was somewhat louder than normal?

A. Yes.

Q. And, again, just so I'm clear, you had no knowledge of what information had been passed up or down the ranges in terms of what was happening on 500, what yelling or communications had happened before you arrived in B cell house; fair to say?

A. Correct, but I didn't really need any. I knew there was a

Page 170

fire on 500 range. How it started or why it started, it doesn't make a difference at that point. I just know there was a fire.

Q. Sure.

A. And we have to go up there. So there was really no information I needed other than that.

Q. Just in terms of your comment about what the prisoners on the 100 range would have known versus the prisoners on the 300 versus the 500, just so I'm clear, that's not something that you have knowledge of directly as to what they knew. Is that just an inference about the ones closer to the 500 range would have known more about it?

A. The ones that can physically see it?

Q. Right.

A. Yes. They were the ones that were -- that would have been making the extra noise. Because it was on the 500, that's the top, smoke rises. The guys below, you know --

Q. Sure. Again, just so I'm clear, are you saying that because you remember walking into B cell house and being able to tell it's noisier than usual and also you can tell there's a lot of noise coming from 500 and some noise coming from 300 and less from 100, or is that just, kind of, your assessment or assumption where the added noise was coming from?

A. As you run up these steps from the front door, you can

Page 171

look down to one -- yeah, the one, the two, the three, the four, you zigzag all the way up to the five. There was no commotion on any another range that was more than usual. But the five, that's where you got all the mirrors out and the guys banging on doors. I know that because I walked past them. There was no commotion on the other ranges.

Q. When you say "no commotion," what you're describing is from your visual look down the range. As you went up those stairs, you didn't see anything that visually looked out of the ordinary?

A. No mirrors, nothing out of the ordinary.

Q. But you did perceive something out of the ordinary up on the 500 range visually?

A. Yeah. Besides the fire, yeah, everybody had their mirror out looking at it.

Q. Is that something you've seen before?

A. As far as?

Q. Sorry. A range with everyone having their mirrors out looking at stuff?

A. Yeah. When something happens, that's the only way they can look at it. They reflect it. That's how they know you're coming when they want to throw something on you. I mean, that's how they see who's walking down the range. That's a normal practice.

Q. And that's what you're describing as commotion that you

Page 172

saw on 500 --

A. Activity.

Q. Activity?

A. Yes.

Q. There were noises coming from one, two, three, and four, correct?

A. No, no more -- as I said, no more than usual. Normally, normal noise was coming from the range that the fire was on.

Q. Okay. And you described earlier -- I believe you described earlier that it was -- I think at some point that it was noisy and hard to hear what people were saying, correct?

A. Yes.

Q. And that's from the moment you walk --

A. No. That was from me telling you that I was standing right there. So at that point, I already had got down to the fire when I told you that I could hear --

Q. Got it.

A. So time had moved from this point. There was a little more smoke at this point. More people knew what was going on at this point, and then the activity rages.

Q. Just so I'm clear, the time that you were describing earlier that it was so noisy that it was hard to hear what people were communicating to you, that point in time was

Page 173

when you were up on the 500 range right at the cell front?

A. At its worst.

Q. At its worst --

A. Standing next to the fire. That was at its worst.

Q. So when you first walked onto the -- when you first walked into B cell house, what's the best description of the level of noise that you can give?

A. I mean, without you ever being in a cell house, I couldn't say, hey, this is normal and this is above. Like, it's always noise going on. Like I said, you got 240 some-odd guys in a cell house. Above average to me, who's worked there for 13 years, I can tell you if they're noisy or more so. I don't really have an example for you. I really can't put it into words. I mean, I don't know how am I to compare that to something.

Q. I mean --

A. Other than saying that it was louder than what it usually is. That's the only thing I can really say.

Q. And you were able to perceive that from the first moment you walked into B cell house, that it was loader than normal?

A. Yes. When you walk in, the steps is right there. Every cell house I walk in, especially to an emergency, I know where I'm going. I'm going to the fire. So I look straight up the block. I hear it. You know what I'm

Page 174

saying? I'm going. I'm moving up the steps, and it is louder. And that is normal when a signal is called because the radios are blaring. They hear it. They know people are coming. So it was louder than what it usually is.

Q. Did you hear anything other than voices when you first walked into B cell house?

A. Just men yelling is all I heard, which, like I said, is somewhat typical. But it was a little bit more than usual.

Q. And then did I understand you correctly that up on the 500 range, there were people also, like, banging on the bars?

A. Kicking their blue cabinets. Some was banging on the bars. And a lot of them were just watching.

Q. So some -- okay. Was that -- were you at any point able to, sort of, perceive those, like, banging noises separately from the voices, or was that just all part of the commotion?

A. No. I heard -- like I said, I seen it. I seen them banging on it. When I came in, I heard voices. I just heard the yelling.

Q. Right.

A. The noise volume between the men yelling is what I heard, and it was more than usual. When I got up there, I couldn't tell you if they just started doing that or if

Page 175

they were doing it the whole time. But I didn't know that when I first came in.

Q. Okay. Got it. If I recall, your best memory is it took you approximately 20 seconds to get from the shift supervisor's office into the doors of B cell house?

A. Actually, 20, 25. It shouldn't have been more than that.

Q. And then immediately upon your arrival, you went up to the 500 range?

A. Yes.

Q. And did you have any discussion with Statham or Watson about going up to the 500 range?

A. I don't remember. At some point, I told somebody to get a fire extinguisher -- I think before I even went up there -- in anticipation of something being on fire, but I don't remember anything that I verbally said at that point.

Q. Do you know if that was one of -- Statham or Watson, or if that was someone else you talked to about getting a fire extinguisher?

A. I think I told Statham to get a fire extinguisher.

Q. And was that before you went up to the 500 range?

A. I want to say so.

Q. Other than the noise which you described as more than usual upon entering the range, is there anything else that you observed that was in any way out of the ordinary,

Page 176

different from how it would have looked, felt, smelled, sounded, than any other time?

A. When I got to the five, at that point you could smell the smoke. When I got up to four, I could start smelling the smoke. At that point, it hadn't really started fogging up down there or nothing like that.

When I got to the five, then I could see that a fire was happening and it was smoky up there. But at that point, before I got, like I said, to 400, I couldn't see anything.

Q. So your best recollection is that you didn't perceive any smoke, either seeing smoke or smelling smoke, up until you got to the 400 level?

A. I reached the floor, correct. Then you could see that there was smoke.

Q. Did you see any other -- any of the officers, either the officers assigned to B cell house or any of the first responders or any of the officers at all when you arrived in B cell house?

A. I believe Rodriguez was already up there. I believe -- this is a long time ago. I believe Abbassi was one that was by the door. That led me to believe that she was the one that had the door key that opened it up for us, which was normal. It's what should have happened if you was going to be on the range.

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 46 of 111

Page 177

Other than that, I did see, after all that was done, I do know they were up on top of the blocks in front of the blocks just basically standing there waiting for orders to provide us what we asked for if we needed it. They were still running down the ranges trying to help offenders who were screaming and yelling. And this is, like, the fire's worst part. But they were on the ranges in front of the block then. I don't know at what point they went up.

Q. When you say "in front of the block," what does that mean?

A. This right here, the stairwell, in front of every stairwell is a plaque of stone that you cross over when you going in, and that's the block. So the stairwell is a symbol, I guess you could say, on the front of the block. And this is the block. It's a shape of a block. That's the front of the block.

Q. And it's actually, like, a raised pad that's slightly, like, raised above the --

A. Stone deck.

Q. Okay.

A. And, basically, the platform you step onto on each floor once you get off the steps.

Q. Got it. And there's one on the first floor as well. So your recollection is that later on, they were on that block down in the --

Page 178

A. Yeah. And like I said, Rodriguez was already up there. She had opened the door. And we had just shot up the steps.

Q. Got it. And "she" opened the door, it's your recollection it was Abbassi that did that?

A. I believe so, yes.

Q. Is it possible it was Promise?

A. It could have been. To be honest with you, I was just trying to get up there. Who opened the door wasn't really that important because I believe the door was already open. But I really wasn't focused on the officers or nothing there. We were just going up to the cell that was on fire.

Q. Sure.

A. And to be honest with you, at that time, I didn't know what cell was on fire. I was focused on the 500. Of course when you get to the range, it's just a straight shot. You can find out where that is. But that was my goal. I really wasn't too concerned with, you know, what officer was doing what at the time.

Q. Do you know if it was 500 -- or did you know at the time when you first entered B cell house if it was 500 North or 500 South?

A. That I don't recall. I'm assuming I knew because if you call a signal, you always put 500 North, 500 South. You

Page 179

call 500 -- honestly, I don't recall that small of a detail, but I'm assuming he said "5 North."

Q. You don't have any memory of having to struggle to figure out which side of the range you needed to go to?

A. No, sir, I don't have any memory of not knowing where I was going.

Q. And your memory is basically immediately, once you got into the cell house, heading up the stairs to get up to the 500 range?

A. Correct.

Q. With Statham and Watson with you?

A. At that point, yeah, they were with me.

Q. Do you remember who was in the lead of the stairs?

A. No. I don't remember the lineup or nothing like that. There's nothing stating that there's a pattern that we follow. It was just who gets there first gets there first.

Q. Did you run up the stairs?

A. Yeah, I'm sure I did. I don't necessarily remember, you know, putting an emphasis on a memory what form I used to get up the steps. But I'm assuming I ran.

Q. That's based on the fact that you knew it was an emergency?

A. Yeah.

Q. And a fire, and that would have been your standard

Page 180

practice to respond as rapidly --

A. It's an emergency; so you get there.

Q. Were you at this time following any written policy or procedure, or was this just based on your discretion and, like, how you thought the best way to respond to the situation was?

A. Well, there is no procedure or policy to responding. The officer followed the policy and procedure when he called the signal, and I was following when I responded. There's no policy on how to respond. I just got there as fast as I could.

Q. Do you remember which of the two sets of stairs you would have taken to get up to the 500 range?

A. No, I couldn't tell you.

Q. Could have been either one?

A. It could have been either one.

Q. And then you knew you were heading toward 500 North. Approximately, how long did it take you to get up from the entrance to B cell house up onto the 500 range?

A. Shouldn't have took very long. Timeline, I don't know. But it shouldn't have took very long from when we left Gate 4 and got into B. It shouldn't have been long at all as far as response time.

Q. Gate 4, is that the two doors that you believe were unlocked already when you --

Page 181

A. Gate 4 is right there.

Q. Got it. And you're looking at a printout of video footage that I'm going to show you in a little bit, that's Gate 4?

A. That's where the sally ports are located.

Q. Gate 4 is where the sally ports are located in custody hall that leads directly to B cell house?

A. It leads directly out behind the wall, which B Boy just happens to sit, be the first cell house.

Q. Got it. Sounds like you don't have a specific memory of that night, how long it took you to get up from the entrance of B cell house up to the 500 range. Is that fair to say?

A. Yeah.

Q. Based on your overall familiarity with the layout, how long it takes to get up and down those stairs and your best understanding of how swiftly you would have been moving given the emergency, what's your best estimate of how long it would have taken you to get up there?

A. I really don't know. I couldn't really give you an estimate. Honestly, I have no clue as to a timeline, as to how long it took me to get from there to there. I can sit there and say it was no more than -- no more than four minutes, tops.

Q. You think it could have taken up to four minutes to get from the entrance to B cell house up the stairs to the 500

Page 182

range?

A. All the way up, I would say something like that. I can't see it taking too much more than that.

Q. So that's, like, 60 seconds per flight of stairs, like one to two, two to three?

A. I'm giving myself some room. So you wanted an estimate. So that's the one I'm going with. Yeah, that's the best I can provide you with the question that you asked, so...

Q. No more than four minutes?

A. Yes.

Q. Could have been less than that?

A. It could have been more. I mean, I don't know. I'm just estimating. It was a long time ago. I don't know.

Q. Sure.

A. You know.

Q. I understand it was a long time ago. Go ahead.

A. I'm sorry.

Q. No. I was just going to say, to this day, you're very familiar with the layout, correct?

A. Yes.

Q. You are in B cell house, if not literally every day, most days of the week, correct?

A. Correct.

Q. And not uncommon for you to be going up and down those stairs?

Page 183

A. All correct, yes.

Q. And the best estimate, as you sit here today, at the time it would have taken you responding to an emergency from the entrance to B cell house up to the 500 range is no more than four minutes?

A. Correct.

Q. And if I understood you correctly, from your testimony earlier, you started to perceive the smoke once you hit the 400 range?

A. Yeah, I think about there, about the 400 range when you start seeing it and smelling it.

Q. Seeing it and smelling it, and then did it get thicker once you got up to the 500 range?

A. Yes, it got worse as you got up to the 500 range.

Q. Again, just so I'm clear on the testimony from earlier, you didn't observe any activity out of the ordinary in terms of what the prisoners were doing up until you got on the 500 range; is that correct?

A. Correct.

Q. And you saw several of them with mirrors out, and you saw or heard some banging on the bars, banging on items in the cell?

A. Right.

Q. And then as soon as you got up -- were you able to see the fire as soon as you got up onto that 500 level?

Page 184

A. Yes.

Q. Can you -- and I understand that shortly thereafter, you started to get closer to it. But can you describe what you were able to observe from first getting up that last flight of stairs and onto 500?

A. When I first looked down the range, it looked like a dragon had his mouth open on the other side of the bars and flames were just firing out. It was a lot of fire.

Q. Can you give an estimate -- so just so I'm clear, flames were actually coming out from inside the cell and going out through the bars out into the walkway area in front of the cell?

A. Yeah, and rolling over the roof outside of the actual mesh outside on the block. So, yeah, it was -- yeah, you couldn't stand in front of the cell at all.

Q. When you say "up over the roof and through the mesh," is that, like, an open top to the --

A. No. That's why they call it the block. It's like a rectangle. The cells are sitting in there, and you've got a roof. So the flame was coming up out of the cell onto the roof and out on top.

Q. Got it. So that's, like, the roof of the cell block themselves, but then there's an actual, like, roof of the building that's between the outside and the inside?

A. Yeah.

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 48 of 111

Page 185

Q. So it's like an internal roof that's capping the physical structure that has the cells?

A. Correct.

Q. And the flames were coming up out of Mr. Devine's cell and then going upwards and curling back over --

A. Yeah.

Q. -- that roof?

A. And then the remainder was just shooting outside of the front of the bars.

Q. Can you estimate in distance, like, how far out past the bars you saw the flames coming when you first got up to the 500 range?

A. About five feet from the cell. It was completely blocked off, the path to the cell.

Q. How wide is the walkway up there?

A. About five feet. That's what I mean. There's no way to get past --

Q. The flames were coming all the way out and fully occupying that walkway?

A. Yes.

Q. Based on what you observed when you got up to the 500 range, fair to say it didn't look like that was a fire that had just started?

A. I'm not a fireman or fire expert. I don't know anything about how fast the fire grows. All I know is that what I

Page 186

saw is exactly that. And that most definitely wasn't on my mind when I saw it.

Q. So fair to say you have no opinion or knowledge or information one way or the other about how long that fire had been going by the time you got up there?

A. I have no knowledge. I just went up there when it was made notice.

Q. You saw what you saw?

A. Yes.

Q. And do you recall if it was Statham and Watson that made it to 500 range right around the same time you were?

A. Yeah, it was.

Q. Did any of you have any fire suppression equipment or other emergency response equipment with you at that time?

A. I don't believe so, no.

Q. Okay. Because I think you mentioned earlier the possibility of asking Statham to get a fire extinguisher.

A. Right.

Q. But to the best of your recollection, he did not have a fire extinguisher with him when you first got to the 500 range?

A. No. At that time, I don't think he did have one.

Q. Okay. Can you describe the smoke -- you just described the fire. Can you describe the smoke situation up on the 500 range when you first got up there?

Page 187

A. I mean, it was bad. You couldn't -- on the five, you couldn't really -- at that time, you could see a short distance in front of you. But shortly after, you couldn't. It was pouring out real quick.

Q. When you say you could see a short distance in front of you, like, how short are you talking about?

A. Well, B Boy is pretty small. When we got up to the front of the block, like I said, you can look down the range and see the fire. You can see people's mirrors. I'd say five or so minutes -- that's probably not even true either. It felt like an eternity when it wasn't -- when you're actually there. It got to the point where I recall not being able to see my hand.

Q. Sticking out in front of you?

A. Yes.

Q. How far down on that diagram is cell 540, if you recall, from, like, where you came up those stairs?

A. Well, on the north side, they count by twos. So 540 would technically be just 20 cells down. Two, four, six, eight -- yeah, it wouldn't even be that. So it would be somewhat towards the back.

Q. So it's more than halfway down the range?

A. Yes.

Q. Because the stairs you came up, that's starting at, like, 500?

Page 188

A. That starts at 502, 4, 6, 8, 10, 12, all the way down to 540.

Q. Okay. Do you mind counting off for me on that diagram and just seeing where we get to with 540?

A. 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40.

Q. And, again, I'm recognizing you're just counting. So I'm assuming that diagram is accurate. But will you just mark in that diagram "540" with the one that you got to just based on your counting?

A. (Complying.)

Q. And so pretty close to being all the way down. It's like three cells past it; is that correct?

A. Four cells from the last cell. I'm sorry, three cells from the last cell.

Q. So there's, like, three blank cells and then 540 is the fourth one from the far end on the north side?

A. Uh-huh.

Q. And so at the time you got up there, you could see the flame, and was it, like, a clear view to the flame or you could see it through the smoke because of the --

A. A foggy view. A foggy view, yes.

Q. Foggy view. Because, obviously, that bright light, you're going to be able to see that even through a certain amount of smoke, is that fair to say, with that five-foot

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

Page 189

shooting fire?

A. Yes, I agree with that.

Q. Okay. Tell me what you did next.

A. We went down the range toward the fire, got in front of the cell. I remember asking Statham where was the extinguisher. It came up, I want to say, right after that. I think Rodriguez brought it. Don't quote me on it. I'm not so sure where it came from.

At this time the door had already been popped open, but it wouldn't open. It only opened up, I'd say about, maybe, six or seven inches. It wasn't nearly enough for a body to get through because, from my understanding, the hinges had expanded and the door wasn't able to open.

Q. I don't want to cut you off mid-sentence, but I'm going to because you said a lot; and I want to make sure I understand each piece of that. Okay?

A. Okay.

Q. So you talked about going down to 540. Do you remember whether you walked or jogged or ran down?

A. I don't remember, but I probably wouldn't have ran.

Q. What's your best estimate of how long it took you to get from the top of those stairs just entering onto 500 range to getting to the cell front?

A. I don't know. But I know I wouldn't have ran because safety is still a priority. You just don't run through.

Page 190

That's how other people get hurt. You could still be stabbed, hit with a broomstick, a spear, something like that, from the other offenders there. And you don't just run down the range because, more than that, a lot times that's going on. So you still got to watch where you're going. You still have to watch those around you.

So, like I said, if it's foggy up there, I'm not trying to run. I briskly probably walked there quickly, but I still have to maintain some type of level of security around me.

Q. So were you concerned about getting attacked on your way walking from the top of the stairs down to cell 540?

A. That's what happened to half the officers downstairs when they evacuated it; so yes.

Q. Was there a heightened reason for concern at that point that you were walking or just, like, your usual level of caution whenever you're inside?

A. Usual level of caution because it's an unwritten rule that the captains enforce about when responding to a signal. When there's groups of offenders, don't run because they'll try to clothesline an officer just to be funny. So no, you always watch what you're doing, you know.

Q. How close -- earlier you described the flames rushing out of the cell five feet out and all the way up and over the cell and up to the mesh roof. Was that, like, a constant,

Page 191

just like there's flame there, or was it, sort of, whooshing out and then back, whooshing out and then back?

A. The whooshing out and then back. I would say that the majority of it stayed there, but it was definitely --

Q. So it was pulsating, but still there was flame outside of the cell --

A. Definitely.

Q. -- constantly?

A. Definitely.

Q. So there was no point by the time you got there that the flame was, like, receding all the way back into the cell?

A. It did a little bit. But the heat was so intense, you couldn't -- it was burning, like, yeah. Unless you had clothing on -- like, my face was on fire. You couldn't really get close to it.

Q. How close did you get to cell 540? And, again, I'm just talking about your initial, first approach.

A. I stopped directly at 38, at an angle, where I could view in. That's as close as I could get.

Q. And, approximately -- you could view into the cell from that angle?

A. Yes.

Q. And could you see Mr. Devine?

A. Yes.

Q. Approximately, how far away from Mr. Devine would you say

Page 192

you were standing at that point?

A. About six feet.

Q. And your best recollection is that Watson and Statham were with you at that point?

A. Yeah.

Q. Were they -- like, did they, sort of, all come and stand right beside you, or were you in front of where they were?

A. I don't remember our exact lineup. I do remember Watson was closer than I was because I had told Watson to be careful because the bars was just radiating heat. Smoke was just rising off of them, and you couldn't touch them. It was just that hot.

And Statham stood on the side of me with the fire extinguisher, and that's how we was trying to put it out, hitting it from that angle because we couldn't get in front of it. So we hit it. It went down. We thought it was done, and Watson tried to rush in.

Like I said, the door was still halfway open. By the time it cracked back open again for a second round, that's when Statham grabbed Watson and pulled him back because he almost got hit with it. Yeah, that was just -- and that was the best we could do until the firemen got there.

Q. When you say "cracked back open for a second round," you mean, like, the flames coming back out of the cell?

A. Yeah. It came back like it did the first time, just like

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 50 of 111

Page 193

we never had done anything to it.

Q. And it sounds like, if I'm understanding your description, Watson was, like, a little closer to the cell than you were, and Statham was on the other side farthest away, but all three of you fairly close together?

A. Yeah, we were huddled up pretty good. The range is kind of small.

Q. Did you feel like the group of the three of you at that point was as close to the cell as you could get without the heat being overwhelming or the risk of being hit by the flames?

A. I know that I was close enough. I was closer than that because I was hurting the whole time. But that was the most I could do. That was the most I could endure at the time.

Q. When you stay "hurting the whole time," are you talking about, like, that feeling on your skin of the heat of being, like, too close to the fire?

A. I was burning, yeah.

Q. What was the smoke -- can you describe what the smoke was like at that point when you first arrived to your position, like, angled in front of 538 looking into 540?

A. At that point, that's when it had grew to the point where I could not see my hand anymore. I couldn't breathe.

Q. So by the time you got to the cell for the very first

Page 194

time, to the cell front, at that point, the smoke was so thick you couldn't see your hand in front of your face?

A. Yeah, I would say so because it didn't take long for that to happen. I just remember not being able to breathe well. I remember thinking if I could wave my hand, it would go away because then I could breathe. But, no, you couldn't breathe at that point either.

Q. I think I heard you say this earlier, but let me know if I'm wrong. It sounds like you're, maybe, not a hundred percent sure where that fire extinguisher came from or how it got up to the 500 range?

A. I know I told Statham to get the fire extinguisher. I know when we got up there, before we went down the range, it wasn't there. But as we got to the cell, Statham had it in his hand. And that's what I remember.

Q. Where in the cell house, in B cell house at that time, were the fire extinguishers kept?

A. They're all located then, and still are, in the officer's station.

Q. Okay. Like, inside the officer's station?

A. Yes.

Q. How many fire extinguishers?

A. It varies from time to time. But we keep no less than three in there. I want to say one chemical and two water-pressured ones.

Page 195

Q. Okay. And just to make sure I understand what you're saying, you have a recollection of looking for the fire extinguishers and they weren't there?

A. No. I was on the range at the time. I was never in the office.

Q. Okay.

A. I remember walking down the range; and the fire extinguisher, we hadn't got it yet.

Q. I see.

A. And by the time I got to the cell, about 30 seconds, Statham had one in his hand.

Q. But you remember asking Statham to get a fire extinguisher?

A. Yes.

Q. But you also remember him being up with you on the range with no fire extinguisher?

A. One of the officers ran it up.

Q. So Statham didn't go get the fire extinguisher himself?

A. Correct. I believe he told another officer to go get it so he could go up and help.

Q. That must have been an in-person conversation between Statham and the other officer. You just don't recall seeing that.

A. I don't recall it because I told him -- I shot up the steps. I don't know what conversation he had.

Page 196

Q. Got it. You remember at some point -- was it you that had the fire extinguisher in your hand?

A. Statham.

Q. Statham had the fire extinguisher in his hand?

A. Yes.

Q. And not totally clear on how it got there, but obviously somebody must have brought it to him?

A. Yes.

Q. Possibly Rodriguez?

A. Possibly. I don't know.

Q. It could have been someone else?

A. Correct.

Q. Just one fire extinguisher?

A. Just one at that time, I believe. I think multiple ones were used. But I remember, at that time, just the ABC chemical one is what we had.

Q. The chemical one is what you had?

A. Yeah, which was the best one we had.

Q. Better than the water-based?

A. Yes, especially when you find out it might have been an electrical one, so...

Q. Okay. And can you describe what you observed when you started to use the fire extinguisher?

A. The fire slowly died down, and we thought we were going to be able to get close enough to see if we could get the

Page 197

door open because, like I said, it wouldn't open.
I think I remember someone taking their foot and trying to, like, grip it with the little traction indents on a boot. And it wasn't opening because you still couldn't touch it. But before we could even do too much at all, I mean, literally seconds later, it just sprung back up.

Q. You described earlier being able to see Mr. Devine in the cell when you first took up that angled position in front of 538.

A. Yes.

Q. Can you describe, to the best of your memory, what he was doing or saying at that time?

A. Screaming, yeah.

Q. Could you perceive, like, was it screaming, like yelling words that you could perceive or just, like, literal screaming?

A. He was in pain, yeah. So he was screaming.

Q. Okay. No words you could hear what -- anything that he was saying?

A. No.

Q. Just screaming?

A. Just screaming.

Q. Could you see, like, what he looked like through the smoke and flames, or could you just see enough that you knew

Page 198

there was a human form there?

A. He was engulfed in the flames.

Q. So the flames surrounding his body?

A. Yes.

Q. Could you see, like, what his skin looked like, what his face looked like?

A. Other than just a human standing in fire, I couldn't even answer that question. That's all that I can --

Q. I apologize because I'm sure this was a traumatic experience to go through, and I'm sure it's not a pleasant experience to even -- after this much time --

A. Right.

Q. -- to think back on. I'm just trying to get a sense of whether you could perceive anything about what his situation was beyond what you just told me, which is you could hear him screaming. You could see, I guess, that he was there. You could see him engulfed in flames. But with the smoke and the fire, were you able to see any details around, like, his facial features, any details around the extent of what his injuries might have been at that point in time?

A. No. The fire was too much to focus on something like that. We stayed there, constantly getting advisements, where's the firemen at. Finally, the firemen made it up, and they used quite a few different extinguishers on the

Page 199

fire. It was about four of them, the offender firemen.
It took a lot from the extinguishers just to put it out, more than what we had at all. I went downstairs. The firemen -- it took all four firemen to open the door. That's all four of the guys pulling on it. And he said he felt it through the gloves that they had.

Q. When you got to the cell front, was the door already, like, partially opened?

A. When I got there, it looked like it was already open.

Q. Did you or anyone that was with you that you saw, either, I guess, either Statham or Watson, do anything to open the door?

A. To do --

Q. To cause what you -- like, to unlock the door, or was it already like that when you got there?

A. I know someone had said, before we walked down there, to unlock the door, make sure it was open. He said, "I did." So I don't know when he popped the gate.

Q. Okay. Just so I'm clear on what you just said, you're describing a conversation between two other people?

A. Yes.

Q. Do you know who those other people were?

A. I just know Watson said that to someone standing there. I think it was Rodriguez. And he said, "I did." And we proceeded down the range.

Page 200

Q. So you think it was Watson that asked whoever it was to make sure the door was open?

A. And he said, "I already did."

Q. So at no point did you have the keys to either unlock the cell itself or unlock the panels to roll the doors on 500 range?

A. No.

Q. To the best of your memory, it was Rodriguez who told Watson that he had already done that?

A. Yeah, I believe Rodriguez had went down and retrieved the keys and was already back up there with him by the time we got there.

Q. Was Rodriguez up on the 500 range before you got there?

A. I would like to say so, honestly. And I can't remember distinctly, but I remember him being there. I don't know if he -- if I met him going up and he continued to go up with us. But he was in front of the block, the range. When I went down range, he was back there, yeah.

Q. But not by the cell front, but back toward the stairs?

A. He wasn't down the range, no.

Q. Okay. Do you recall where -- so you just described a conversation which, to the best of your memory, was Watson asking someone else, possibly Rodriguez, about opening the cell door?

A. Yes.

USDC IN/ND   case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 52 of 111

BARABARA DEVINE vs.                Cause No. 3:18-cv-00995-JD-MGG                TIMOTHY REDDEN
RON NEAL, et al.                                                                October 25, 2019

Page 201

Q. And Rodriguez responded, "I already did"?

A. Right.

Q. That conversation, did that take place up on the 500 range or down below?

A. I believe it was on the 5 because I remember we were getting ready to turn the corner to come up the stairwell, which was a left, to go down the range.

Q. And that was -- okay. Got it. And I think you were describing earlier -- well, strike that.
     My understanding is there's two different ways of opening those doors in B cell house. You can go up -- an old-style key in the lock at the cell front, turn the key and that unlocks it?

A. Right.

Q. Or there's a button that unlocks the cell that you needed a different key or the same key to unlock a cover on the panel?

A. Yeah, you need a different key.

Q. Different key. All on the same, like, set of keys for the 500 range?

A. Correct.

Q. So is it each individual cell has its own unique key that's the manual lock, or is it, like, a master key?

A. It's a master key, and each door inside the box is a switch.

Page 202

Q. Is a switch. Okay. So one master key for the 500 range --

A. Right.

Q. -- cells, the manual locks, and then a separate key that unlocks the panel to do the switches?

A. Correct.

Q. And when you do a manual unlock, you twist -- can you, like, describe, physically, the physical mechanics of opening the door?

A. It's a fatter key and a fatter bolt, but you have to physically stand in front of the door to do it. And that wasn't a possibility. So they used the switch. Luckily the switch worked because right after that, the wires got all burnt and all the doors shut down. But it was enough time to get the door open. But like I said, it didn't come all the way open.

Q. Setting aside the situation with the fire, which I understand obviously made things a lot different than -- or somewhat different. Just ordinary operations, can you just describe the physical process of that manual unlocking, like, how it works to open a door with the key at the cell front?

A. Put the key in and you turn it.

Q. And then how do you actually get the door open?

A. The bolt comes back, like on any door, and you pull the

Page 203

door open.

Q. Is it like a door, like, that swings open, like the doors in this room or a door in your house; or does it roll, like, side to side?

A. No, sir. As you said, old school. It's just a door you pull open.

Q. Okay. So the door from the cells swing out into that catwalk or gangway area?

A. Exactly.

Q. Okay. And when you use the -- obviously when it's a manual system, you just turn the bolt and then pull it open?

A. Uh-huh.

Q. How heavy are the doors?

A. Not very heavy.

Q. When you use the mechanical system with the switches on the panel, does that just mechanically move the bolt; or does that somehow also -- like, the door is automated as well?

A. It mechanically pulls the bolt back, and the doors are designed to have, like, a roller pin, a little spring in it that puts a little pressure on the door, normal operating door; and it will, like, guide it open a little bit.

Q. Okay. So it's not like it would swing wide open like it

Page 204

was spring-loaded?

A. No.

Q. And it's not like it would mechanically with some mechanism, like a robot arm, move out. But there would be a little bit of a push to keep it from, like, sitting flush?

A. Right. Sometimes when you use the door, you have to pop it a couple times. So the guy has to, like, pull it toward him as you hit it so he can open it sometimes. So they open very soft.

Q. And if it's -- once that's -- with the switch, is it possible to push from inside the cell, ordinarily, to open it --

A. Yeah, that's how they would typically get out.

Q. -- or pull from outside the cell?

A. If they're in their cells and you pop it, they would just push the door open. And they're provided -- and they lock their doors back with padlocks, and they just stay open until you have to resecure them. And then we shut them back.

Q. Got it. So that's their own, like, personal padlock so other people can't be wondering into their cells?

A. Correct.

Q. But in terms of the locking/unlocking bolt mechanism, those are just left unlocked?

Page 205

A. Correct.

Q. The thing you were just describing in terms of sometimes having to, like, try the switch a couple times for someone to be able to get out, I don't understand that.

A. Not for someone to get out, nothing like that. Sometimes if you're standing there, like they are when it's time to secure, you hit the button. If they're busy talking to a neighbor while they got their hands on it waiting to go back in, the bolt can come out and then come back in. And then you got to tell them, "Hey, pull on your door." "Oh, I'm sorry." And the bolt comes out, and then they open it.

Q. I see. Because it's -- the switch just, like, pulls the bolt back, and then it returns to its position. If you don't, like -- is it like you have to hold the switch up to retract it?

A. Like a light switch.

Q. Like a light switch. You flip it down and that pulls the bolt back?

A. Yes.

Q. And you flip it up?

A. To reengage the bolt.

Q. To reengage the bolt.

A. And the bolt will still stay out. But then you just shut the door, and it locks.

Page 206

Q. I see. So you want the bolt out so that it's like the door isn't swinging back all the way in?

A. Well, I mean, if the door is engaged when you hit the switch, the bolt retracts, and they open it. But if it takes long to open it, the bolts pop back.

Q. Because someone's flipped the switch back or just because it automatically pops back?

A. Yes. It automatically comes back. It just doesn't stay open. So like I say, if guys are talking to their buddies and miss their opportunity to pull it open, then you got to do it again for them to --

MR. HEPPELL: I think I understand. Thank you. Let's take five minutes.

(Recess taken.)

BY MR. HEPPELL:

Q. Going back to what you were able to observe from Mr. Devine at the cell front, do you recall -- well, strike that.

It sounded to me like you were describing him being up at the cell front close by the bars of the cell; is that correct?

A. Yes, sir.

Q. Do you recall anything about -- or were you able to observe anything about his body positioning in terms of whether his hands were up or down or anything like that?

Page 207

A. He moved quite a bit. He was flailing.

Q. Okay. So kind of in motion?

A. Erratically.

Q. Erratically and screaming?

A. Yes, sir.

Q. Okay. You had described the process of Statham using the fire extinguisher and it initially seeming effective in terms of somewhat dampening the fire; is that fair to say?

A. Yes.

Q. Can you describe, as best you're able, sort of, how far back the flames died down?

A. They disappeared. Of course, like, I'm not really knowledgeable to that degree of fires. But, yeah, they disappeared, and then they just shot back up.

Q. And so when you say "disappeared," you mean not just like the fire and flames that were venting out of the cell and coming out into the gangway and up top, but, like, looking into the cell, the active flames had, sort of, been pushed back, and you didn't see any active flames?

A. They were gone. There was none left. And then they just erupted again from what looked like possibly legal work or whatnot that he had that the fire was still burning in. And when the ABC extinguisher was exhausted and we couldn't really put no more pressure back down on it, it just --

Page 208

Q. Okay. When you say "legal work," do you mean, like, legal papers?

A. Yes. They're allowed to keep the cases that they're working on in their cell. And depending on the case, there can be a lot of legal work that an offender possesses. In that situation, legally, there's nothing they can do. They can't prevent them from having their legal work. In that case, a lot of it fed the fire.

Q. Right. Got it. I am somewhat familiar with the idea of having a case that might generate a lot of paper that might be occupying a space physically in a location.

So as best as you can remember, that might have been where the, sort of, reigniting came from was what appeared to be, like, a legal box or box of papers?

A. It looked like it started back from that area of the cell.

Q. Okay. Can you -- and, again, just to make sure I understand what you're saying, the flames were able to be, sort of, pushed back and, in fact, disappeared with the stream, with the active stream from the fire extinguisher. But then as soon as that stream petered out and then eventually died with the extinguisher being exhausted, was it immediate at that point that it reignited flames?

A. No. It took -- I would say it was maybe about seven or eight seconds because we thought we could possibly find a way to get inside. And that's when Watson was physically

BARABARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019
USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 54 of 111

Page 209

in front of the door trying to find a way to get it open without touching it, like trying to kick it with his foot to, like, bend it back. And it just hit.

And that's when Statham pulled Watson back. And by the time it started shooting back out of the roof again, the firemen actually arrived on the scene at that point.

Q. Okay.

A. That's when they shot about four of them at once in there.

Q. So in terms of the prisoner fire brigade arriving on scene, your best recollection is that happened -- was that, like, they were arriving, coming down 500 range while this was happening with the re-ignition and Watson getting pulled out of the way?

A. I would say at that point, that's when they probably did enter, hit the range.

Q. Right around that time --

A. Yeah.

Q. -- because it was very shortly after Statham pulls Watson out of the way that then you recall the prisoner firefighters being on scene?

A. Right.

Q. Okay. What do you recall -- strike that.

You just described seeing what looked like that legal box, seeing that in the cell and thinking that's maybe where the re-ignition came from.

Page 210

What else do you remember in terms of being able to see inside the cell during that period when the flames had been temporarily suppressed?

A. Mostly focusing on him. At that point, he had already fell, hit the ground, and stopped moving.

Q. You're referring to Mr. Devine?

A. Yes. That's where my focus was. That's what Watson's focus was, Statham. That's when he was trying to get in there so hard. But it just wasn't happening like that.

Q. Was it -- if you recall seeing it, was it, like, the entire inside of the cell was charred and black, like, 360 degrees around; or there were areas that you could see were burnt versus others that weren't?

A. No. I think the whole cell was burned up. There was really nowhere you could stand inside that cell to escape any of that. So the whole cell was -- there was not one wall that was not touched by the flames, and that was including the floor.

Q. Yeah.

A. So --

Q. And did you see Mr. Devine fall?

A. Yes.

Q. Can you describe what it looked like?

A. Horrific. He was still on fire. Staff was still trying to hit him with the fire extinguisher to put him out while

Page 211

still trying to -- it hit the walls and whatnot. I mean, that's, essentially, how it looked. He collapsed. One arm fell out the cell, and I saw when he stopped moving.

Q. And was it -- let me know if what I'm describing doesn't make sense to you. I can picture, like, someone who's stiff, who's, like, stiffened up and falling and they, kind of, fall like a board versus someone like you or I would fall down and there's still, like, motion in the limbs as we're falling. Do you recall the manner in which he fell?

A. Just like he collapsed, like he had no strength in his legs; and he went straight down.

Q. Like you or I would collapse if we caught a rut in the road and just sort of went down?

A. No. His body had just collapsed. I mean, it wasn't -- was no more life in it.

Q. And so you talked about the arm coming out of the cell. Was that how his body splayed when he fell?

A. Yeah.

Q. And when you say when it stopped moving, was that just like the gravity motion stopped moving, as far as you could tell, or was it, like, moving arms and hands and fingers?

A. No. I mean, like, when his body dropped, that was it.

Q. Was there -- do you recall perceiving a time when he

Page 212

stopped screaming?

A. At that point.

Q. Okay. Was it like as he fell or like --

A. As he fell. I would say a split second before he fell.

Q. The screaming stopped?

A. Yeah. Didn't move again until the fire roared back up. And the only thing that I remember -- because I exited to start the evacuation of the cell house, the range. Only thing I remember at that point, when the firemen was running past with the chemicals, as they were approaching, because I saw the lights through the smoke, was the force of the fire shaking the arm because it was just that hard coming out.

Q. It was that rush of fire coming out?

A. Yes. Yeah, that was the only thing that was moving at that point.

Q. Recognizing that you're not a doctor or medical expert, do you have an opinion or a belief as to whether Mr. Devine was still alive at the point that he fell?

A. No, I don't believe he was. I don't believe he was.

Q. Do you know who activated the prisoner fire brigade?

A. They're automatically activated any time a fire is called.

Q. Is that -- that's a system that's in place today, correct?

A. It's been in place ever since I started. The firemen are the only offenders whose doors are not locked when we do

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 55 of 111

Page 213

count or when we secure for the night. They stay secure with their personal padlock to keep other offenders, when they run breakfast, from running in on them and trying to rob them.

But I would also say from an officer standpoint, they're some of the most -- more so behaved guys, mellow guys. So there, in my opinion, isn't a big risk compared to the other guys of having them out. And for a situation like that, when there's a fire, the staff will hit the ranges and say, hey -- like Charlie, I can tell you I've worked in the cell so long, he's 212.

Malone, he's assistant chief, "Hey, there's a fire." He'll wake up, "Okay. Thank you." And they get ready. They'll all shoot out to the staging area and will dress up. So we were waiting on them for them to eventually get there because we didn't have what they have to deal with that.

Q. So to your recollection, it's your testimony that the system for how the firefighters get activated hasn't changed the entirety of the time that you've been at Indiana State Prison?

A. Not to my knowledge.

Q. And your understanding of the system, as it exists today, and as it existed in April of 2017 and as it existed the entire time you've been employed there, is that they're

Page 214

automatically activated whenever someone calls a signal code for a fire?

A. Fact, yes.

Q. 10-71?

A. 10-71. If you're older, been there a long time, a signal 12 is what we used to always call it.

Q. Got it.

A. Or a 10-70. Even if it's a fire alarm, they still get activated.

Q. And your understanding of the setup is that they're actually not secured in their cells overnight using the bolt locking mechanism. It's just the personal padlock?

A. Yeah, they're not secured like everybody else is.

Q. And so what's your understanding of how a prisoner firefighter at his cell sleeping overnight, how does he become aware that there's a 10-70 or 10-71 been called?

A. Staff will run up to their cell. Whatever shelter they're housed in, if they're housed in C, the officer will run up and say, "There's a fire."

They'll get them up like they do everybody. That's normal operations. I mean, we all run on an hour clock. Everything's done by the hour, and they kick them out the cell houses. And they just run straight out and follow the same principle. The only aspect is dictated by how fast they can get ready and get out the door.

Page 215

Q. So the parts that a correctional officer has to be involved in is obviously someone needs to call the 10-71 or 10-70, wherever the fire is. And it's going to be the correctional officer in whatever cell house the firefighters are housed in who receives that on the radio and then needs to go communicate that to wake up or communicate that to the firefighters, correct?

A. Correct. That's the aspect of calling control. The control delivers all that information to the facility, so those individuals who need to know.

Q. Got it. So it's control that broadcasts that out over to everyone, all the cell houses?

A. All stations.

Q. And then, obviously, the firefighter has to get their clothes on, if they're asleep, to get their equipment on. And then your understanding is that they're not locked in a cell. They're able to use just their personal padlock and get out of the cell and get to the cell house door, which would be locked per policy; is that correct?

A. No. When something like that happens, officers running whatever range go get them. They'll come down. The OIC will be there in front of the door. That's where he has to be with the door open already, and he'll just leave.

Q. So the protocol, the, sort of, simultaneous with going to wake up the prisoner firefighters, there will be either

Page 216

that same officer or the officer in charge will be stationed at the door to the cell house to unlock the cell door when the firefighters are ready so they can respond to the fire hall to get their fire equipment?

A. Correct.

Q. How did the firefighters get in the fire hall?

A. They just simply go to the door, Check point 2. If they're locked, Check Point 2, which is the sergeant who was out there already, he waits for them. He'll sit in there until they get dressed. And, basically, he just -- as weird as it sounds, he'll just, kind of, follow their lead. He's there for supervision, make sure nothing happens; but they know what they're doing more so than he do in that aspect. So he'll just basically sit there and watch their base while they go do what they do.

Q. So is the fire hall locked up when it's not in use?

A. At night, it's locked up.

Q. So that would be somebody from Check Point 2?

A. Check Point 2. During the day, the offender fire chief carries the keys. So he don't lose them, he turns them in to Check Point 2. And Check Point 2 has a key on his ring as well.

So that particular night, before the firemen got there, he already had opened the door for them. So all they had to do was open the door.

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 56 of 111

Page 217

Q. Are you saying that because you personally observed that? Are you saying that because you heard that that happened that night, or are you saying that just because that's how the procedure worked?

A. That's how the procedure worked, but I know that particular night I was told by the sergeant that that's what took place. And the radio chatter from asking for status updates, the sergeant was there with the offenders giving us updates as to what they're doing, how far, how long is it going to be, where they're at. "We're en route. We're at the front door. We're coming up."

Q. As you sit here today, do you have an independent recollection of that radio chatter?

A. Yes, because I personally requested it on the radio.

Q. You personally requested what on the radio?

A. Status updates as far as the fire go. That was when we were attempting to actually put the fire out. And when I seen it wasn't working that well, I was, "Where they at?"

Q. That was while Statham was using the fire extinguisher?

A. Yeah.

Q. And you remember radioing over to ask where the prisoner fire brigade was?

A. To be honest with you, now that you mention it, that's why Puetzer wasn't up there because he was Check Point 2 with the firemen at the fire station.

Page 218

Q. So when you said you spoke to the sergeant and the sergeant conveyed to you that he had unlocked the fire station, fire hall door --

A. Yeah.

Q. That person was Puetzer?

A. That was Sergeant Puetzer.

Q. Okay.

A. That's why he wasn't up there because he was with the firemen while they were prepping because he was there to unlock the door. And he had to be that guy that I just explained, his job was to be there with them while they get ready. So that's why he wasn't up there.

Q. Did you have any difficulty hearing the information that you were getting back over the radio --

A. Yes.

Q. -- about the prisoner firefighters?

A. Sorry. Yes, very much so.

Q. What were you able to -- what were you able to make out?

A. Just key -- certain words, "status." He could hear me, of course, fine. But in there, I could hear like "4," but it was a "10-4." You know, 25 Check Point 2, I would hear -- they would call me a bunch of times. Control called me a couple times. When I finally answered, "Coming to the door." I could hear part of the conversation just to make out what was going on.

Page 219

Q. So you could hear, like, snippets of what was being conveyed to you?

A. There was a couple times that I had to step away and try to find a spot and cup my ear and be like "10-9," and then really go the extra mile trying to hear just tidbits of it and trying to process it in my head. It was just -- it wasn't hard, common sense, what he was saying.

Q. And that was because the noise of the fire made it difficult to hear?

A. At that point, the offenders too. That's when they had -- yeah.

Q. When things got even louder?

A. Everybody -- because the smoke had drifted on both sides and had accumulated to the point where it was going downstairs. So everyone was waking up at that point.

Q. Got it. Is there, to your knowledge, any written policy or written procedure that describes the prisoner firefighter activation protocol that you just were describing to me in the sense of they're automatically activated with the 10-71 call, that they're kept in their cells unlocked, that kind of stuff? What is that written policy?

A. It is kept in the emergency manual, as well with the QRT ones as well, along with about a thousand other ones. As far as, like, a policy number, I can't tell you that.

Page 220

Q. But your understanding is that's part of the emergency manual, describes that specific procedure related to the prisoner firefighters?

A. Yeah. Those practices are what we use because of that.

Q. And what section of the emergency manual would that be in?

A. You just got to look at it and look for it. I mean, it's sectioned off based on category. I don't -- I'm not a fire chief or the hazmat. So I don't need to know anything about their policies. I just know what we need to do to get them out to do their job. That's enough for me.

As far as their inventory go, their tool list go, their fitting for their mask, that's listed in there. I don't need to know any of that. That's just stuff that I don't need to -- my time could be spent better in learning other stuff that associates with my job more.

Q. Who has -- is access to the emergency manual restricted?

A. Yes and no. Anyone can go read it. However, it's kept in the warden's office. So realistically, if you -- you can only access it if you come in on your day off to read it because you just can't leave your post to go read it, you know, as much as you would like to.

If we have -- this is off topic. The sergeant interviews, a lot of the questions are pulled from the emergency manual with the special teams and all that. And

Page 221

it's hard to get staff out and relieved to go and read that.

I mean, it does contain the information, but getting to it is quite difficult. So yes and no. That's something that I've actually brought up before. But yes and no.

Q. When you say that's something you brought up before, what do you mean by that?

A. It's the difficulty in getting to it if you wanted to learn more about it. Like I say, you'd have to come in on your day off to read it.

Q. Who did you bring that up to?

A. Just my captains, you know. But it's above their payroll. It really is. That's something that the warden does.

Q. When did you bring that up with your captains?

A. Man, a couple months ago, possibly.

Q. Was that the first time you mentioned that issue to anyone?

A. Uh-huh.

Q. Have you heard other people complaining about that or talking about how it's, like, really difficult to get in and read the emergency manual?

A. No.

Q. What captains specifically did you communicate that to?

A. My particular one, the shift supervisor currently now,

Page 222

Captain Boots.

Q. Captain Boots, B-o-o-t-s?

A. Yes.

Q. What did Captain Boots say in response?

A. "I agree." But I'm not stupid, neither is he. There's nothing we can do about it. We do not have anything to do with where they keep those. That is most definitely something way above.

Q. Did you get the sense from him that that issue had, sort of, already been discussed and decided that there weren't going to be changes around making that more accessible to people?

A. Well, it's not going to be. It is a confidential -- let's say someone makes an illegal copy of it and now it's floating behind the wall, and the offenders have an idea of what happens when an emergency happens. So there's a reason why it's up there, but it makes it real hard for staff to see it when they want to.

Q. Have you read that emergency manual?

A. Yeah. It's impossible to read all of it, but I read what correlates with my job description as far as the ERO teams, QRT teams, riot controls, bomb threats. It covers -- there's a plan for everything you can think of.

Q. And the part that you were just describing in terms of laying out in written policy the prisoner firefighter

Page 223

activation procedure, is that part of the emergency manual that you've personally read?

A. Yes, it's in there briefly, but I didn't read through it. I was astonished about how much stuff was in there, and I just read briefly through it. But like I said, realistically, unless you come in on your day off, you're not going to be able to educate yourself on it like you need to be.

Q. Got it. You had described, if I recall your testimony correctly, that it was right around the time that Stathum's fire extinguisher petered out, seven or eight seconds later, the fires had reignited. Watson got pulled out of the way. It was around that time that the prisoner firefighters were first hitting the 500 range and coming down with their lights you could see shining through the smoke?

A. Lights and respirators, yeah.

Q. After they arrived at the cell front, what did you do next?

A. I exited the range, went downstairs, spoke with my captain and told them that it's time that we evacuate the cell house. Originally, he did not want to do it but for the four and five, which was affected pretty bad. But my opinion, all of us needed to go. But he's the captain. I said "10-4." I hit the radio -- and this is -- like, it

Page 224

goes back to how the radios -- you couldn't hear nothing. Called "B Boy." The guy that was working, Rodriguez, who was up there, who had the keys still, I said, "Evacuate the four and five." The girls downstairs started evac, and they let one, two, and three go as well.

Q. Did you -- so you physically exited B cell house and walked back into the custody hall to talk with Captain Dykstra?

A. Yes, because you couldn't hear anything.

Q. And when you say because you "couldn't hear anything," can you explain what you mean by that?

A. You couldn't hear nothing. People are making noises. I'm talking to you, and you can't hear nothing.

Q. Are you explaining why you didn't just radio over to him?

A. Yeah.

Q. Okay. Was there a change in the volume level between the time that you were radioing, getting the updates about the prisoner firefighters, and the time that you tried to radio over to Dykstra?

A. Time had past. But like I said, in getting the information from Check Point 2, it had been getting worse and worse. And at the time, I felt like that was something -- he needed to be told in person.

At the point they had put the fire out, they -- yeah, they were already up there. They had put the fire out

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 58 of 111

Page 225

because I remember seeing that. And I turned around. And I just told him face to face that it was bad. He had no clue that it was a person. He had no clue that he was dead at that point, that I believed he was dead. He didn't know who it was. I had filled him in on all that because you couldn't transmit no information to the man.

Q. Okay. Just so I'm clear, how long after the prisoner firefighters arrived at the cell front did you stay at the cell front?

A. I would say about 15 seconds because they immediately -- like I said, they had about four chemical fire extinguishers. And they all shot it in the cell. And when it went down, it didn't take that long to see that it was done. And then they proceeded to start pulling the door open. That's how come I knew how many guys it took to open the door. But I was already making my way -- I had turned around to start making my way downstairs.

Q. So you turned around after they had extinguished the fire and while they were starting to pull on the door?

A. Yeah.

Q. So can you describe what you were able to observe of them pulling on the door before you left?

A. Them getting in the position to pull, and one guy pulling and, "Hold up. Let us help you." They were getting in position. That's how I knew it took all four because four

Page 226

of them were there. And like I said, I left the range.

Q. Do you know which four individuals were pulling on the door?

A. No, not at all. You know how people look in respirators. I don't know who was behind the mask I was talking to.

Q. Got it. But you remember it being four of them there, and you remember all four of them pulling on the door?

A. Yeah.

Q. Did you stay to see them get the door open, or did you leave while they were pulling on the door?

A. I left while they were pulling on the door.

Q. Do you know whether they were able to get it open?

A. They got it open, yes.

Q. Because you saw that before you left?

A. No, because -- I know they got it open, and I was the one further down when they advised them they were pulling the body out to take him through the back door.

At that point, they had evacuated. And the guys out front started acting a fool. So it wasn't good for them to see a body of anybody coming through. So I told them go back around. I knew -- at that point, the fire was out. The cell house was being evacuated. The radio traffic was easier to understand, and we could communicate a little bit better after the evacuation had started.

Q. So you didn't see them pull the door open, but you later

Page 227

learned that they had got it open based on that subsequent conversation?

A. As much as I saw was the door starting to open as I exited.

Q. And you were exiting to go in person to report back to Captain Dykstra?

A. Uh-huh, because -- I'm sorry.

Q. Go ahead.

A. In B Boy, there's actually a door right here in the front that's not actually shown, but this bar in an emergency, you can open this door and run this -- have direct contact with B cell house, straight into the custody hall. And if you look at that picture, you'll see the door.

I went to that door originally, but it's barred off with a gate. I mean, you can force it open if you needed to, if you had the key. But you couldn't hear me because, again, I was telling them we need to evacuate and people were still up there.

Q. The door -- and just so the record is clear, you got Exhibit 7 in front of you, and you drew just, like, a very small rectangle at the very bottom center of the diagram on the exhibit. Will you just actually put a little asterisk by that? Just so the record is clear, there's a little star beside that that you drew, or a star inside that. And that's a doorway to get directly from B cell

Page 228

house into the custody hall, rather than having to go through the front door of the cell house, through those two doors, through that mechanical door, through all the sally ports. You cut through all that directly into the custody hall?

A. If you have the key, which is kept in the lock shop.

Q. Were you able to get through there, or you just get up to the bars to be able to talk through?

A. Two doors is what I was getting to. One is a wood door that you can open up, and then the actual security door is made out of steel and it's bars, and you can visually face to face talk to them.

You can't open the barred door unless you have the key, which we don't have. I was trying to communicate through them because he's in the office. He couldn't hear me because of the noise. That's when I had to walk around and go in.

Q. I see. So you tried to take that shortcut, not a physical shortcut to get your body through, but a verbal shortcut to get close enough to him to be able to communicate; but he just wasn't hearing. So you physically went around the same way you'd come in back through those mechanical sally port doors you were describing earlier?

A. Correct.

Q. Did you at any point try to radio him to have that

Page 229

conversation?

A. Yes.

Q. Okay. Where were you when you tried to radio him?

A. In front of the cell on that range.

Q. Was that before the prisoner firefighters got there or while they were up there doing their work?

A. That was literally as they were putting the fire out because I, at that point, knew it was going to be at least under control. But I still knew the offender looked like he was dead, and he needed to know.

Q. And what was the -- what were you able to hear back, if anything, from Captain Dykstra?

A. He attempted to answer when I was calling him, but I couldn't hear anything. Like, I knew that he was trying to communicate with me, but I just couldn't make out anything he was saying with all the yelling and whatnot going around. And I don't think he really had a good sense of what I was saying either when I was trying to talk in that environment at the time.

Q. To your knowledge, had there been any updates going out over the radio or otherwise that Captain Dykstra would have been able to hear or otherwise receive?

A. No. He couldn't even keep track on the camera the smoke was so thick. So he couldn't even look on the camera and see what was going on. He just knew it was a fire. He

Page 230

knew what area it was at. And that's why I needed to tell him what was going on. Like, it felt like a lot longer. All that happened in a short amount of time. But he needed to know. I mean, he had a lot of people to report back to. It was a big thing. And he had nothing to report at that time.

Q. So to your knowledge, I guess based on your understanding of what the radio traffic was and, I guess, your understanding of Captain Dykstra's reaction, to your knowledge, you were the first person to convey to him that there had been a person involved in the fire, that the severity of the fire -- that was you conveying that news that you learned for the first time?

A. Yes.

Q. Do you remember exactly what you said to him?

A. I said -- honestly, I don't remember everything, but I told him that -- I did advise him that I believe one was dead. And he asked me who was it. And I said the dude live in 540, and we proceeded to call match location, and they got the record of names, got his name and DOC number. We pulled his picture.

And that's when I asked for permission to evacuate the cell house. He denied it, evacuate the whole house, told me to take out the five and four. Again, to this day, it should have been the whole cell house. Called B

Page 231

Boy, and he answered to the best of his ability. I said evacuate four and five. They can't hear. So they hear "evacuate," which was good. And it turned out to be good. The warden even said that was a good thing that it happened.

The fire marshal said it was a good thing. The whole house needed to be evacuated with the smoke coming out. So we evacuated it. And as I was coming back around, that's when I stood in front of B Boy and push them all out into the field. And that's when they told me, "Hey, we're about to bring him out front." I said, "No, take him out back." That's because they were still coming out the front.

Q. Was that the firefighters that communicated that to you?

A. No. It was Watson. He was still up there because he was the number one -- him and Statham was still up there.

Q. Got it. So they radioed down --

A. And said, "We're about to bring him down."

Q. Got it. And that's when you said, "Don't do that. Bring him around the back"?

A. Yes. Which was also, if you look at the map, a quicker way out than taking him all the way to the front.

Q. Got it. So you had a conversation with Dykstra -- with Captain Dykstra about the identity of the prisoner in cell 540 and, I think you described, radioing over to some

Page 232

other office where they could pull that information for you?

A. No. I didn't have an identity. I had a cell location, and I knew whoever was in 540 was the one that possibly just burned alive. So we called match location, which is in charge of location records, if you will, for all the offenders. Say, "I got a guy in B Boy in 540. Who is that?" She looked it up by cell, got his name and DOC number. And from there, we could pull a picture from the DOC.

Q. Was that, like, radioed over there or was that a phone call?

A. Phone call.

Q. Is that based within the prison?

A. Yes, sir.

Q. Okay. And then it was after that you had done those various steps, then you had the conversation with Dykstra about evacuating the cell house?

A. Yes.

Q. Is there a reason you waited until after finding out Mr. Devine's identity to raise the issue of the evacuation?

A. No. I felt like advising him about the offender who just burned alive, he needed to know about that before I start requesting to evacuate the cell house because, as far as I

BARBARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 60 of 111

Page 233

knew, which I was right, there was nobody else injured. He was the only fatality, and that's what needed to be taken care of. Now, the secondary conversation, we need to get everybody else out.

Q. But you understood, or at least you believed, there was some urgent need to get people out of the cell house?

A. I was the one there. I understood every urgency that was partaken. You know, not to be mean or nothing, but I watched a guy burn alive. Nobody else will understand what urgency needed to be taken at that time.

So I did exactly what I needed to do. And as I stated earlier, I wouldn't change anything that I did. So what happened is exactly what happened.

Q. And you had described the conversation with Dykstra where you recommended evacuating the whole cell house, his decision just to do five and four. But then through some method of confusion or miscommunication, it ended up being what you had asked for in the first place, which ended up, from what you learned later, the fire marshal and warden saying, "We're glad that's what happened"?

A. Correct.

Q. Do you know for a fact -- strike that.
Did you learn from talking to other people that that -- the specific source of confusion was the two female officers just hearing the word "evacuate" and not

Page 234

being able to hear the 4 and 500 due to the noise; or is that just a theory or a guess as to how that might have played out?

A. Well, after it all happened, I talked with my staff, and that's what happened because that's what they told me. And I could see why they took it that way.

Q. When you say "your staff," are you referring to Officer Abbassi and Officer Blakely?

A. Yes.

Q. When did that conversation take place?

A. When I spoke to him, it was -- I mean, naturally, it just didn't end when the fire stopped. I'm going to check, "How are you? How are you doing mentally?" So, yes, it's not even a question. Yeah, I checked with everybody being involved with the incident, you know. And that's just part of being a supervisor.

So that's what they relate to me because that was a big thing because we ended up having a serious incident with letting everybody out. So the question was going to be asked, naturally, "Well, why did you pop" -- "Why did you guys open the other doors?"

"I thought that's what we heard." And I believe that might be in my original incident report. I'm not so sure. But I do know it was discussed.

Q. I want to split things up into, sort of, two periods of

Page 235

time, periods of time when you're in B cell house, sort of, actively responding to the incident and then all the way up to the point where you leave and go talk to Dykstra. That's one bucket of time.

And then I understand there was a subsequent bucket, sort of after the emergency was over and you're talking with people to figure out what happened, like you just described, doing what you need to be doing as a supervisor, figure out what happened, make sure people are okay. Do you understand the, sort of, two timeframes I'm referring to?

A. Yes.

Q. In terms of the first timeframe, and that's the one we've been, sort of, going through in fairly precise detail; and I appreciate that. I know you had described various interactions that you had had with Rodriguez.
Are there any conversations with or interactions with Officer Rodriguez that you can recall during that period of time while the emergency is, sort of, ongoing while you're in B cell house, anything that you can recall that you have not already testified about today?

A. No. Exactly what happened to us in the heat of the moment is exactly what happened. Like I said, my conversations with the other staff members came after the incident was over. I don't have time to talk to him like that while

Page 236

the emergency is happening. So, no, there was nothing else said.

Q. Same question. I believe you made reference to seeing one of the female officers potentially at the door. You think it might have been Abbassi?

A. Right.

Q. I don't believe you during -- again, during the narrative we just went through mentioned either Abbassi again or Officer Blakely at all in terms of any interactions that you had with them.
Do you have any memory of seeing them or interacting with them or communicating with them in any way beyond what you've already testified to during that first period of time while the emergency was still ongoing?

A. Like I said, I recall seeing some of them up and down in front of the blocks. I did mention that. And that was more so Abbassi. I really don't know what Blakely was doing. But I did visually see Abbassi and Rodriguez up and down the front of the blocks. What they were doing, I don't know; but they were there.

Q. When you say "up and down," what do you mean by that?

A. You got an up and down stairs.

Q. So they were going up and down the stairs?

A. Yeah, and I don't know what they were doing, but they were there.

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 61 of 111

BARABARA DEVINE vs.      Cause No. 3:18-cv-00995-JD-MGG      TIMOTHY REDDEN
RON NEAL, et al.      October 25, 2019

Page 237

Q. Beyond that, and beyond the other stuff you already testified to, that's the full extent of your memory with regard to Rodriguez, Abbassi, and Blakely during the ongoing emergency timeframe; is that fair to say?

A. Correct.

Q. You had just started describing a second period of time, still that same shift, I believe, is that correct, when you had subsequent conversations with the people involved?

A. Correct.

Q. Did that -- was that a group conversation, or was that, like, one-on-one conversations or, like, small groups of two or three, sort of, more informally than a full group, everyone conversation?

A. It had to be a one on one because, as I stated, I had pulled them out of the unit and placed them in different areas. And I went and I talked to them one by one. Part of the conversation was to let them know that, in my eyes, they did what they could; so don't think you did anything wrong as to why we pulled you out. I pulled you out just for safety reasons.

And that's when the other conversations came up. All of them were real shaken up. So it was important that they talk to somebody. So I made sure that I made my rounds with every staff member that goes through something like that, especially something that was as traumatic as

Page 238

that was because that was bad. And I really think that had something to do with why they didn't last too much longer after that. But I could see it in their face. They said they were fine, but their whole attitude, mentality screamed differently.

Q. Let me separate that out. Was it just the three officers that had been in B cell house that you had those conversations with, or were there additional officers, whether they're like Watson or Statham or Puetzer, that you went and sought out to have conversations with?

A. I sought out those three particular officers. Me, Watson and Statham was going to spend a lot of time together doing reports. But I made it a point to because I knew that was going to be -- man, we were about four or five hours over.

After they do their initial incident report, their job in the matter is done. So they were going to leave way before I do. So I made it a point to find them and speak to them before that happened.

Q. Got it.

A. Because they were going to leave way before me. I was going to be stuck with Watson and Statham all night, basically. I was going to talk to them regardless; but the other ones, you know.

Q. So in terms of these, like, actually you seeking out to

Page 239

have the separate conversation, that was just Rodriguez, Abbassi, and Blakely?

A. Those three, yes, that were in B Boy.

Q. And those were three separate conversations?

A. Three separate conversations.

Q. Do you remember the order in which you did them?

A. Not at all.

Q. Were those three officers in three different places?

A. Yes.

Q. Had they -- had you sent them out to, like, other cell houses?

A. Yes.

Q. And were they just, sort of, like an extra staff body in those cell houses at that point?

A. We traded them out. So whoever was there, the OIC had to pick somebody to take their spot.

Q. To pull out and switch over to B cell house?

A. Yes. And I didn't want them all in the same unit again together. I mean, that, in my mind, wasn't a good aspect. So they just switched out.

Q. Split them up and switch them out so there's a new set of people in B cell house?

A. Exactly.

Q. And what was the motivation behind swapping, getting them out of B cell house?

Page 240

A. Because after we evacuated the cell house, for no apparent reason other than them just being offenders, the officers who were coming to help, they started knocking them out on the walk as they came through, just assaulting them because they thought it was fun. It was a game. Wasn't mad. They just took an opportunity to set fire to the check points, which is why Dykstra was hesitant to let all of them out because it was going to happen with the mentality of those guys there.

But, ultimately, it was the correct decision because all that perishable items can be replaced, but life can't. I'm glad, again, that that's the way it played out. I felt a very strong need to split them up, as I said earlier, for safety concerns. Because if they were going to assault staff for nothing, I didn't want staff being assaulted for something that the offenders thought they were responsible for.

Q. So just so I'm clear, did Dykstra share with you his reasoning behind only wanting to evacuate four and five?

A. A fear of them doing what they did.

Q. And when did he express that to you?

A. When he told me, "Just do the four and five because I don't want all those guys out at once. And we don't have the people at night to control those types of numbers."

Q. And you stated -- you described some of the aftermath in

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 62 of 111

Page 241

terms of the disruption that was outside after the evacuation. What is the basis for your knowledge about the motivation behind that, why the prisoners were doing that?

A. They said they wanted to see something else burn. So they set fire to a check point.

Q. Who said that?

A. The offenders.

Q. Which offenders?

A. Groups of offenders.

Q. And you were present and you heard them express that to you?

A. They were screaming it, yes. I'm not saying anything that I didn't hear myself. That's how it is working at a prison. You got gangs. They follow the big guys. That's how it is. That's how it is.

Q. So you were standing -- in what part of the prison were you standing when that happened?

A. At that point, I was standing -- when they started assaulting staff, I have was coming around the -- I wasn't there to visually witness that. I heard the signal get called.

I ran back through. And they had locked the B Boy door. As I was coming through Gate 4, one of the officers opened up that door that I was telling you about and spoke

Page 242

to me through the gate. "Hey, don't go through, all the way through," because I was going to go through front door B because they're hitting us and fighting us.

They hit True out, Officer True. And Puetzer reached down to pick him up, and he started hitting him in the face, in the mouth. But he's such a big dude, when he stood back up -- he's about close to seven-foot tall. He couldn't reach him. But they're all mobbing him. And he drug him in. When he got in the door of the cell house, they unleashed a bunch chemical agent and pushed the guys back so they could lock the gate. And then they took one of the ABC fire extinguishers that was being used and shot the staff with it, opened the gates and shot it, used all of that, and started setting fires to the check point. That I was there to see.

Q. You saw them setting fire to the check point?

A. Yes.

Q. And you heard offenders -- I'm sorry. What did you hear the offenders saying?

A. "There's been one fire. We want to see something else burn."

Q. Was that one offender or multiple offenders?

A. They were chanting, "Burn, burn, burn." That was about 80 percent of them. The other 20 segregated themselves into a corner and verbally said, "We want no part of that," and

Page 243

wouldn't go over there.

Q. But your recollection, it was 80 percent of the prisoners were outside chanting, "Burn, burn, burn"?

A. Yeah. The actual firemen, who are offenders, were being hit with rocks and stuff because they were helping us trying to put it out, the check points out with the firehose. And they're supposed to be rioting with them because they're offenders, and they're not. So they were getting assaulted at the same time. That's what Dykstra was scared of happening, the reason why he didn't want the whole cell house out.

Q. When you say they weren't mad, they weren't angry, what is the basis for that understanding that you have?

A. My years of experience with the DOC. When a man's laughing and, you know, smiling and just doing something to do it without no reasoning behind it, then you can't be too upset about that outcome.

Q. Sorry. I didn't mean to cut you off. Did you finish your answer?

A. Yes, sir.

Q. How many of the prisoners did you observe laughing and smiling outside of the prison?

A. B Boy, I want to say, houses about 240. I would say out of that number, only about 30 of them refused to take part in what was going on.

Page 244

Q. Right. But then you had expressed that you had an understanding of what their motivation was, not just that they were taking part, but that they weren't doing it because they were angry. They were doing it just to have fun?

A. Yeah.

Q. And if I understood you, what you said when I asked you about that was because you saw them laughing and smiling.

A. Yes.

Q. How many of the group that you saw that you just described, this big group participating in this, how many individual offenders did you see who were laughing and smiling?

A. I didn't stand out there and take a count, if that's what you're asking. But I'm telling you the ones that took part in it only took part in it.

Q. Not exact numbers then, but, like, what proportion of them were you able to observe their facial demeanor that they were laughing or smiling?

A. Everybody that was enjoying it, like I started off saying. Like I said, B Boy has 240 some-odd people. So only about 30 or 40, at the most, backed into the corner closer to the officers that was outside the fence and stood there while the other ones continued to do what they were going to do.

Page 245

Q. And is it your recollection that everyone you saw participating in -- like actively participating in the destruction that was happening was doing it with, like, a laughing or smiling demeanor?

A. They were all having fun, definitely. It was so many people involved, of course they shipped those individuals out. I want to say they did emergency transfers for the ring leaders, those individuals, maybe the next day because it was clearly seen by prison officials that these were the guys that was leading it. The other guys followed these guys. So, yeah, it definitely took place. I was there to see every last little bit of it.

Q. And you were close enough to see their facial expressions?

A. Yeah, I got eyes. So I can see it.

Q. Well, I know you have eyes, but how far away from them were you at the time --

A. Close enough to see their facial expressions.

Q. Well, how close were you?

A. I didn't count my feet when I locked myself behind the gate to keep guys from rioting myself. You're asking me a question that I really can't answer adequately at all.

Q. What's your best estimate of how far away you were?

A. From those particular guys, about 15 feet. Like I say, it was a bunch of them.

MR. HEPPELL: Can we mark this?

Page 246

(Exhibit 8 marked for identification.)

BY MR. HEPPELL:

Q. I'm handing you what has been marked as Exhibit 8, and it is Bates stamped Devine production 1776. Do you recognize this document?

A. Yes.

Q. What is this document?

A. This is a memo used at the time as an incident report.

Q. And specifically, is this a memo used as an incident report written by you to Captain Dykstra about the fire on April 7, 2017?

A. Yes, sir.

Q. Earlier when I was asking you about the materials that you reviewed in preparation for your deposition, you described reviewing a report that you had written. Do you remember that?

A. Correct.

Q. Is this that report that you were describing then?

A. Yes, sir.

Q. This is the document you pulled up and looked at?

A. Yes.

Q. That's your signature in the bottom right-hand corner of the document?

A. Correct.

Q. And this document in the first sentence reflects, "On

Page 247

April 7, 2017, at approximately 9:45 p m., a 10-71 was called inside of BCH," referring to B cell house, correct?

A. Yes.

Q. And we were discussing earlier the timing and specifically how you had arrived at the time. Seeing this report in front of you, is it still your understanding that you would have gotten this time by getting the time from control that day -- recorded that call coming in?

A. Yes, sir.

Q. And I think when I asked you earlier, you didn't specifically recall what the code was that was called.

A. Okay.

Q. Seeing your report reflect there was a 10-71 call, is it fair to say that that would have been the code that was used that night?

A. Yes, sir.

Q. The report goes on to describe you and Watson and Statham responding to that call and then arriving to cell 540. Going back to the first sentence, it says, "A 10-71 was called inside of BCH." It doesn't specify in your report that there was any information specified about the location of the fire within the cell house.

Does the fact that that's not listed in your report suggest that you didn't receive that on the call, or is that just you may not have mentioned that in your report?

Page 248

A. Probably just didn't mention it.

Q. We discussed earlier the process of Officer Statham using the fire extinguisher and having the fire die down and then reignite.

In your report, it's reflected as Officer Statham attempted to put the fire out by using one of the units assigned ABC chemical fire extinguishers; but due to the size of the fire, it could not be done." Do you see what I'm referring to?

A. Yes.

Q. Is that -- does that change your recollection at all of exactly how that happened? Or is that, to you, as you read it, consistent with what you were describing, just that it was possible to subdue the fire, but it could not be done, the fire couldn't be totally extinguished because it reignited?

A. I think that is true to word. It couldn't be done. It was huge.

Q. But seeing that written in your report doesn't change your best recollection about what you described earlier in terms of seeing that fire get, sort of, beaten back to the point where you couldn't see any visible flames anymore, but then it reignited after about seven or eight seconds?

A. Right.

Q. The next sentence after that describes, "As ISP's firemen

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 64 of 111

Page 249

were prepping, two more water extinguishers were used in an attempt to put the fire out, but failed." Do you see what I'm referring to?

A. Yes.

Q. Do you have any recollection of that?

A. No. I don't remember at all. I just remember the ABC. I don't remember using the water.

Q. Fair to say then you don't have any -- strike that. The report doesn't state who used those fire extinguishers. It just says "were used," correct?

A. Correct.

Q. Fair to say you don't have any memory of who used those fire extinguishers or how those fire extinguishers got up to the cell front?

A. No recollection.

Q. Okay. Do you recall who called the signal 3000?

A. No. I don't recall it even being called. Sitting here today, I don't even remember it being called.

Q. What is a signal 3000?

A. Medical emergency.

Q. But as you sit here today, you have no memory of that taking place?

A. No.

Q. The report continues on describing you contacting Captain Dykstra by radio requesting to evacuate. And then at this

Page 250

point -- at the point in time of that attempted radio contact, the cell house was, according to the report, ".. filled with smoke that contaminated the area and air as far down as 100 range of BCH." Is that consistent with your independent memory about the extent of the smoke at that point in time?

A. Correct.

Q. That it had filled the whole cell house by that point?

A. At that point, that's why I was trying to get a hold of him.

Q. And then this states, "Due to the loud noise in the cell house and the sound of the fire, I could not hear any radio traffic." Do you see that?

A. Yes.

Q. So is it your best understanding and best memory, now that you've had a chance to see the report, that the fire was still ongoing at the time you first attempted to contact Captain Dykstra by radio?

A. I believe it was.

Q. Okay.

A. Yeah.

Q. Perhaps I'm misremembering. What I understood your prior testimony to be was that your attempts to contact Captain Dykstra were after the prisoner firefighters had arrived and extinguished the fire?

Page 251

A. Yes. That was after I started calling them while they're using the ABC extinguishers on the cell. And I actually left the scene when they started pulling the door open.

Q. Did you try -- so as I understand your report, and with that clarification, one of the reasons you weren't able to communicate with Captain Dykstra by radio was the noise of the fire, in addition to the noise within the cell house. Did you try recontacting him by radio after the fire was extinguished while you were still in the cell house?

A. I don't recall.

Q. And then the report continues that you left B cell house, went to the custody hall to report to Captain Dykstra what was going on, and to clarify if we could evacuate the unit. And then the report goes on to describe what Captain Dykstra told you, which was that if anyone needed to be evacuated, it only needed to be 500 and possibly 400 range of B cell house. Is that consistent with your memory?

A. Yes, sir.

Q. And then it goes on to state, "As I, Lieutenant Redden, left the custody hall, I found that the whole B cell house was being evacuated and placed behind Check Point 7. I, Lieutenant Redden, assisted in pushing the offenders back behind Check Point 7. At this point in time, the ISP firemen were inside of B cell house, where they assisted

Page 252

in opening the door to cell 540 and pulling the offender out." Did I read that accurately?

A. Yes.

Q. Does seeing that -- strike that. As I read the report, to me that suggests that the ISP firemen being inside B cell house and pulling open the door to cell 540, your report appears to describe that as taking place at the point in time while you're assisting pushing the offenders back behind Check Point 7, after they've been evacuated. Is that how you read the report as well?

A. Right now, yeah.

Q. And that's not quite the same as what you described earlier. Is that fair to say?

A. Correct.

Q. Do you -- seeing that report, does that refresh your memory at all about the timing of the prisoner firefighters getting that door open?

A. It was as I stated. Like I said, the report was done after a lot of work, and I was just doing it to the best of my ability to do at the time. But what I stated is what it was. I believe I meant -- and it probably should have been up earlier. But it says, "At this point in time, ISP firemen were inside of B Boy when they assisted in opening the door to cell 540 and pulling the offender

Page 253

out." They were already up there. Only thing I didn't see is them fully get the door open and pull the offender out.

Q. So just so -- I think I understand what you're saying. You have an independent memory of the timing that you testified to earlier?

A. Yes.

Q. And you believe that's correct, and your best explanation for the inconsistency between the report and what you described is just that you may not have been as precise in describing the timeline in the report when you were writing it?

A. Correct.

Q. Okay.

(Exhibit 9 marked for identification.)

Q. The court reporter has handed you what's been marked as Exhibit 9, and this is a printout of a still image from the security camera, the surveillance camera video from Gate 4. And it looks like the way it's been printed, it's actually cut off, the sides of it. I'm happy to show it to you on my computer screen. It's got a full timestamp in the corner of 9:45 and 38. And it's a little wider view and in color.

I'm happy to show you the video that would assist you. You can see people's movements. But I'm wondering

Page 254

if you're able to, based on what you're seeing there, identify -- and obviously understanding the context that this is taken at 9:45 and 38 seconds on April 7, 2017, if you're able to identify the four individuals that are captured in that still photograph?

A. Only people I see is myself and Statham.

Q. And will you label those? Just mark those in pen with, like, an arrow and writing in the names.

A. (Complying.)

Q. So Statham is the individual on the far right?

A. Far right.

Q. And then yourself is the individual next over, one to the left of Statham?

A. Going in the gate.

Q. Going directly in the gate?

A. Yeah.

Q. And then those other two individuals, you can't tell who they are?

A. I don't know who they are.

Q. Is it possible that that is Dykstra and Watson?

A. Definitely not Dykstra.

Q. Can you think of anyone else who would have been in the vicinity of the custody hall other than Dykstra and Watson?

A. Yes, you have a copy of the roster. You can see who was

Page 255

assigned to the custody hall, Gate 4, and all that there. There should at least be probably about four different individuals that could be roaming that area. You have batch locations, which I brung up, as a department is right next to the custody hall. They're only in there when count is being completed.

You have a dispatcher and you have the gate officer. That's three right there. And you have the information officer because information is connected to the custody hall. So that's a possibility of four people.

Q. I'm going to actually -- I'm going to pull up the video and play it for you just in case you can see from the locations the individuals and where they're coming from and that additional context. And I'm just going to read into the record the start and stop time on the video.

Again, this is the Gate 4 video that was provided to us in discovery. I'm going to start it playing just right around 9:44 and 49 seconds, and let it go from there.

(Video played.)

BY MR. HEPPELL:

Q. So I'm just going to pause it briefly at 9:45:33. And you just saw three individuals who have emerged from a room, sort of up close toward the gate at the top of the image on the left-hand side of the hall; is that correct?

A. Uh-huh.

Page 256

Q. What room are those individuals coming out of?

A. Shift supervisor's office.

Q. Those three individuals coming out of the shift supervisor's office, does that help narrow it down at all in terms of the identity of those individuals?

A. Not from this far back, no.

Q. Okay.

A. Like I said, the only ones I knew, I can identify in the still picture. But they don't even look as clear in the --

Q. Okay. I'm going to hit play again at 9:45:33.

A. Okay.

(Video played.)

Q. And then I'm going to pause again at 9:45:39. We just saw that individual come from the right from a separate room across the hall; is that correct?

A. Yes.

Q. What room is that?

A. That's the dispatch office.

Q. Okay. And that was the individual who, a few seconds further along, that you saw, but that was the individual you identified in the photo as being Statham coming out of the dispatch office?

A. Yes, sir.

Q. And then we'll play it again at 9:45:39.

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 66 of 111

Page 257

(Video played.)

Q. I'm going to pause again at 9:45:50. There were two individuals coming up from the bottom of the screen and into the camera footage, one wearing a gray shirt, the other one a dark blue or black shirt. Do you recognize either of those individuals?

A. Yes. That's Captain Dykstra. The other one wasn't him. I believe the other one was Roadwick, who is actually working the gate. The man at the gate right there is Keller. That's the physical dispatcher. The guy behind him is match location, the one I said will be in there too, that's Kevin Fahey.

Q. Thank you for that. Just so I'm clear, you just described Captain Dykstra as being the one who came in wearing the gray shirt?

A. Yes, sir.

Q. And then the individual behind him, that was the max --

A. Match location officer.

Q. Match location officer whose name is?

A. Kevin Fahey.

Q. Fahey. And then based on seeing the additional movements and what everyone was doing, you believed you could identify the other two individuals that were on the left of the still photo you couldn't identify previously?

A. That was -- it looked to be Roadwick, Tyler Roadwick, and

Page 258

his job, technically, is the Gate 4 officer. He should be operating the gate. But Keller is doing it, and that's the physical dispatcher.

Q. Okay. Got it. Thank you. I also want to play you the audio recording or the video recording of your interview with internal affairs. And the audio quality is a little tricky. So I'm going to try it just with my laptop speakers. I brought a couple of external speakers that might help if you're not able to hear it. And I am going to, again, enumerate the timestamps on the video just so the record is clear.

But I'm going to wind it all the way back and start from the beginning. This is a total of a 9-minute-and-27-second-long video that was provided to us as part of the discovery in the case. I'm not going to play it all the way to the end.

(Video played.)

Q. I'm just going to pause it there. I paused it at 1 minute and 25 seconds. Were you able to understand what you were saying?

A. (Shaking head.)

Q. You weren't able to understand any of it?

A. No.

Q. Let me rewind it back and try it with my regular computer speakers. Otherwise, I might have to try playing it on a

Page 259

different computer or something.

(Video played.)

Q. Were you able to hear it that time?

A. No, not really.

Q. To me, it's hard to hear. It sounded to me like you were describing having responded to some incident previously that you were discussing with Captain Dykstra whether or not to write up an incident report related to that incident, even though there hadn't been a signal called for it. Is that consistent with your memory?

A. I don't remember anything that took place before the signal was really called.

Q. Okay. Is that consistent with what you were able to hear in terms of the --

A. Yeah.

Q. -- interview quality?

A. Yeah.

Q. Okay. And then you described hearing a signal called in B Boy. Did you catch that on the interview?

A. Yes.

Q. And that was, again, referring to B cell house, correct?

A. (Nodding.)

Q. And then it also sounded to me like you were describing an assumption on your part that it would be -- that it was an understanding there was a fire; but likely, it sounded to

Page 260

me like you said, "Some sort of petty crap," like a smaller fire that you would encounter more frequently in the prison. Is that consistent with what you heard on the interview tape?

A. I heard the word "petty." I don't really know what else was being said. So I would assume so, yeah.

MR. HEPPELL: Can we go off the record for a second?

(Recess taken.)

(Video played.)

BY MR. HEPPELL:

Q. Were you able to hear that better this time than previously?

A. Yes.

Q. Was that, what you've stated then to the investigator, that, "I just figured it was some petty crap like how it typically is"?

A. Probably. If that's what it says, yeah.

Q. Do you know what you meant by that?

A. Not that long ago. But if I was to take a guess, I would assume something petty. That's what I said, so...

Q. Did that affect how you responded to the incident at all?

A. No. It doesn't look that way on the cameras.

Q. During the time period April 17 and prior to that, were there frequently fires at Indiana State Prison that you

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 67 of 111

Page 261

would have to respond to?

A. Honestly, none that rings a bell to me. Of course not many will ever stick out to me like that one will, but not that I can recollect.

Q. So you don't remember any other incident responding to a fire?

A. We respond to fire every day. Like I respond to them now. But nothing that I can sit there and definitely say, oh, yeah, today, that day, that day.

Q. Got it. So just so I understand, what I think you're saying, there were frequently fires that you would have to respond to and, potentially, as frequently as every day; is that fair to say?

A. I wouldn't say fair. Honestly, I don't have a head count as to how often they have it. I mean, throughout a month, you're going to have quite a few fires. I think we had one a couple days ago, as a matter of fact. I couldn't give you an exact head count on what we get a month. But now, it's not that often. I don't know how many we were having then, honestly, at all.

Q. But your point about not remembering any was not that you don't remember that they ever happened, but just none were significant enough to stick out in your mind as "I remember this particular incident"?

A. Correct.

Page 262

Q. Okay. I paused it at 1:25, and I'm going to back it up a few seconds to 1:21 and then hit play again.
        (Video played.)

Q. Were you able to hear that, what you were just describing to the interviewer?

A. Yes.

Q. Can you, like, just for the record, because I don't think the court reporter is able to make a clear record from the recording, what you were just describing to the investigator?

A. On the video, I said that the cell house was like it was covered in smoke.

Q. It sounded to me like you said, "When I got in the actual doorway," referring to the doorway of B cell house, "it was already filled with smoke." Do you remember -- as you sit here today, do you remember that happening, you entering B cell house and it already being smoky?

A. No. I remember exactly how I explained it. That video too was also taken moments after all that went down. Sitting back and looking at something, you see things different than right after a bunch of stuff go down. It was exactly how I explained it to you earlier. Like I said, I could see the smoke as I went higher.

Q. So it's your testimony that the statement you gave to the internal affairs investigator within hours after the

Page 263

incident is less accurate than the testimony you gave today over a year-and-a-half after the incident?

A. Yes, sir.

Q. Why do you believe that to be the case?

A. Because I had just witnessed a man burn alive in front of me. I just witnessed a bunch of officers being assaulted. I managed to be blessed to survive a riot. So there's a lot of reasons as to why my reactions were different than they are today being able to look back over a situation, easily being able to assess a situation after it's over, than literally, as you stated, two hours after it was over, something that was traumatic.

Q. You understood that the purpose of the interview you were conducting at this point in time was part of an internal affairs investigation to determine what happened; is that correct?

A. Correct.

Q. And you understood that it was important for you to tell the truth to the best of your ability; is that fair to say?

A. Yes.

Q. Because this had been a serious incident where a prisoner lost his life, correct?

A. And that was to the best of my knowledge of what happened.

Q. So you were doing your best; you just got it wrong at the

Page 264

time?

A. Yes.

Q. Did you at any point contact the investigator after you had time to reflect on it and let the investigator know that some of the things you described in the interview weren't exactly as they'd happened?

A. No.

Q. Why didn't you do that?

A. Because, honestly, after that interview, I didn't really pay attention to how things were different then than looking back on it today. This is obviously not something that you -- honestly, I don't really too much remember the interview. I don't remember what questions he asked. I was just giving him the answers to the best of my ability at the time. If I had known that re-looking at the situation, that it was different than what I said, then yeah. But not purposely knowing that something was more than what it was, then no, I didn't.

Q. How soon after the incident -- after this interview did you come to realize that when you told the interviewer that when you got in the actual doorway, the whole place was already filled with smoke? How soon after this interview did you come to realize that that was not, in fact, true?

A. Here. Here. Just remembering walking into the door, I

BARBARA DEVINE vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 68 of 111

Page 265

mean, I can vividly remember it. I remember what I see. I mean, after that, I don't know what was on my mind then. But looking back at the situation now, I know what I -- you know, I know what I see and I'm calm when I see it. So, yeah, definitely didn't even recall the two differences.

Q. How many times have you, between giving this interview and today, reflected back on the incident that happened on April 7, 2017, and called up those memories around what happened?

A. Quite a bit. Right down to new officers asking me about it when I don't want to talk about it. So quite a bit.

Q. How long after the interview was it that you were able to, for the first time, have a clear memory of the incident, as opposed to what you're describing here in terms of the false memory that's clouded by the trauma of what -- you'd just been there?

A. Honestly, I did not know, like I said, up until now that I had told them that. Because in my mind, it's always been what I'm envisioning now.

Q. So are you surprised to hear you state on the video to the investigators what you just stated?

A. Yes, I am.

Q. Have you ever had that experience before at any other point in your life that you can recall where there was

Page 266

something that you described shortly after the event, that you described in one way, that many years later you had a memory that you remembered it differently, and you believe the later, different memory to be the accurate version?

A. No. But I'm -- having time to reflect it, it's been two years rather than two hours. A lot of things is more clear than that. Yeah, most definitely. That's my first --

Maybe if I was in Iraq or something, I could give you an example. But that's the most traumatic thing I've seen. So that's about the only thing that I've experienced in any aspect of, I think, life that I truly experienced it one way and -- you know, it was even kind of hard to put in words.

Q. This is the only thing you can think of that your memory is better -- your memory of it is better two years after the incident than it was two hours after the incident?

A. Yeah, I would definitely say so.

Q. It's fair to say that's not ordinarily how memory works, right?

A. I wouldn't know. I'm not a doctor.

Q. You know from your experience that for most things, you remember them much more clearly two hours after than two years after; is that fair to say?

A. I don't know. I would assume if something is traumatic,

Page 267

it might be, with adrenaline going -- I would assume, me, that time will allow you to really assess it a little bit better than going off of something right after an adrenaline run for three, two hours. You know what I'm saying?

Q. Setting aside traumatic things and adrenaline runs -- because you already said you don't know how memory works like that already anyway. Just generally, you'd agree with me, as a matter of basic human experience, that your memory tends to be better two hours after it happened than two years after it happened?

A. I don't agree with you because I don't know. I can tell you about a prison. I can't tell you how the human brain works. No, I can't agree with something I have no education in.

Q. So you have no opinion one way or the other whether, as a matter of basic human experience, your memory of an incident tends to be better two hours after it takes place versus two years after it takes place?

MR. ROTHENBERG: I'm going to object at this point. I think it's been asked and answered.

BY MR. HEPPELL:

Q. You can go ahead.

MR. ROTHENBERG: You can still answer.

A. At this point, I would say two years later, it gave me

Page 268

time to really look at it differently. I've had time to look at what happened.

Q. Well, I appreciate that. But I want you to listen carefully to the question that I'm asking because I'm not asking you about this incident or this particular video clip or why you're remembering things differently related to this fire today than you did previously.

My question is a different one about just generally memory and your experience of living through things in life and then thinking back on them later at various points in the future. Okay?

A. Okay.

Q. As a general matter of human experience, is it your testimony that you have no opinion on whether it's true that, generally speaking, you remember something better two hours after it takes place than two years after it takes place?

MR. ROTHENBERG: Again, I'm just going to renew my objection.

A. I have no knowledge over how the human brain works and that function.

Q. I'm not asking you how the human brain works. I'm asking you, in your experience as a human being, experiencing things in life and having memories, is it your testimony that you have no opinion on whether, generally speaking,

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 69 of 111

Page 269

you remember things better two hours after they've taken place than two years after they've taken place?

MR. ROTHENBERG: Again, I'm going to object and add that this is completely irrelevant; but that's the objection. And you still can go ahead and answer.

A. In this case scenario, that's the way it went.

Q. All right. I'm going to rewind a little bit just so we don't cut it off. I'm going to keep playing the tape, starting at 1:30.

(Video played.)

Q. Were you able to hear that latest part? Did you hear the statement you gave about, "So at that time, I started calling the firemen to be released from the shelters"?

A. Uh-huh.

Q. Do you remember, now that you've heard that on the video, do you remember that happening back on April 7, 2017?

A. I remember making a statement that I called asking for status updates as in what process they were at in gearing up.

Q. So your memory is of calling and asking for status updates?

A. Yes.

Q. And that's different from calling and asking the firemen to be released from the shelters, correct?

Page 270

A. Well, no, because I called the shelters and asked if they're out. "Yes, they're out."

"All right. Is Z [sic] out?"

"Yeah, he's out."

Q. The process you're just describing, calling the shelters, those were calls you made over the radio?

A. I don't know. I just remember I did call the shelters and say, "Hey, doggies from 25, is your firemen out?"

Q. So you don't know how you made those calls. You just know --

A. That was on the radio, yes.

Q. Okay. And so it's your testimony that when, on the video, to the investigator, you say, "At that time, I started calling the firemen to be released from the shelters," you were calling for a status update about whether they had already been released?

A. Yeah, because I was wanting them to get there quick. So my next call was into Check Point 2 to see what was going on.

Q. And are you able to rule out categorically that it was, in fact, the procedure at that time that a specific call had to be made to release the prisoner firefighters and activate the prisoner fire crew, and that you were the one that made that call on April 7, 2017?

A. Negative. Like I stated before, any time there's a fire

Page 271

or a signal called, a signal fire, then they get released.

Q. And just so I'm clear, you're able to rule out categorically that did not happen, correct?

A. As far as?

Q. That as far as that on April 7, 2017, it was you who made a call, and that was the call that activated the prisoner fire brigade?

A. I didn't say that in the video.

Q. My question is a little different. My question is are you able to rule out categorically that that happened? As you sit here today, based on your memory, you can say that definitely did not happen?

A. That I called the fire crew out?

Q. Correct.

A. Correct.

Q. 100 percent certain of that?

A. Yes.

Q. Was there any training that officers received in the 2017 time period around how the prisoner fire department was activated?

A. It was all the same. So it would have been the same thing everybody else got. And the thing is -- this is the hard thing about it all as to why doing it that way, that you're getting to, does not work and would not work is because you'd have to have knowledge of where every

Page 272

firemen work, lived.

And there's no way that you would know the locations of 15 to 20 guys individually to call out if there was a fire. So that's why they all came out automatically in the cell houses when the signal was called. So no one in their right mind, at least I know I can't, say, well, 415, he's a firemen, let's get him out, 216 -- you can't do that. See what I mean? It wouldn't work that way.

So the cell houses has it marked on the wall who's a fireman. And when it happens, they don't all come from one shelter. They come from C, A, B, D. And that's basically because when if one's locked down, you still got some units out that can send out firemen, if that's the case. So they're coming from too many places to activate them any other way but that way. And that's if a fire code hits, they automatically go out.

Q. You could have a system where you don't automatically do it based on the fire code, but you do it automatically based on someone, like a shift supervisor or assistant shift supervisor, saying activate the prisoner fire brigade?

A. That's not how it's done. It's done based on a signal 12, or whatever the case may be, whenever it's called.

Q. Got it. All right. I'm going to back it up to 1:35 and play it again, or 1:34.

Page 273

(Video played.)

Q. Were you able to hear what you were just saying to the investigator?

A. Uh-huh.

Q. I heard you describing that yourself, Watson, and Statham went up to 540; is that correct?

A. Yes.

Q. And just to be clear, and this is consistent with your testimony earlier, it sounded like you initially said Puetzer and corrected yourself and clarified that it was Watson and Statham; is that fair to say?

A. Yes.

Q. And then you described getting up there and that you saw staff standing there. Did you hear that?

A. I did.

Q. Do you know what that was referring to?

A. No, not now. I know staff members are at the door. I'm assuming it was Rodriguez because I said that when we got there earlier, someone was up on the top of the block. That's when Watson said, "Open the door," and they said, "I did." So I'm assuming that's when that happened.

Q. Got it. Let me rewind it back to 1:45. We'll play it again.

(Video played.)

Q. Were you able to hear?

Page 274

A. Uh-huh.

Q. You stated to the investigator, "I saw B cell house staff. I saw Abbassi, and they were all panicking." Is that what you stated to the investigator?

A. Yes, sir.

Q. Were you able to hear what you said after that?

A. No.

Q. Can you describe what Abbassi and the other B cell house staff were doing that caused you to describe those panicking to the investigator?

A. See, I thought Abbassi was at the front door. Obviously she wasn't. I don't remember then. Because if she was up there panicking, I don't remember.

Q. Okay.

A. Yeah. So I guess it had to be Blakely that opened the front door. I don't remember exactly what they were doing to this day to make me feel they were panicking.

Q. Just so I'm clear, this isn't a situation like the previous situation where you have a clear memory today that's different from this? This is just a situation where you don't remember what it was that led you to say that?

A. I don't remember that at all. I don't remember it at all.

Q. You have no reason to dispute the accuracy of what you stated on that video with regard to them panicking; is

Page 275

that fair to say?

A. No, sir. Like I said, I did see, like I said earlier, Abbassi and them on the range, on the front of the blocks. But at that time, I didn't know -- looking back, I don't remember her being up there, but I'm assuming that's right.

Q. Got it. Back it up to 1:50 and hit play again.

(Video played.)

Q. I'm going to pause it there, paused at 2:36. Were you able to hear that?

A. Yes, sir.

Q. That was consistent with what you testified to earlier in terms of the flames shooting out of the cell?

A. Yeah.

Q. And Stathum's efforts to use the ABC fire extinguisher and then have it go down for a minute and then it started shooting out. I believe you actually used this word earlier in the deposition, but I didn't ask you about it. I wanted to ask about it now. You used the word "explosions" to describe what was happening.

A. Yeah.

Q. Can you describe in a little more detail what exactly you meant by that, what causes you to use that word to describe what was happening?

A. Yeah, it literally sounded like explosions. That's

Page 276

something that when we did our debriefing, the fire marshal said what we're hearing was something called a flash break or flash point.

He said that's when the gas reaches a certain temperature to where they become more flammable, and it causes a flash. And the result of that is an explosion. And that's what we were hearing.

But being someone that is not, you know, knowledgeable of something like that, yeah, it was -- I mean, that's novice, what you're hearing right there, trying to explain what he was hearing. It was definitely an explosion, a couple of them.

And I don't know, like, at the time -- and I still think about it to this day. I don't know what anyone could have in a cell to make it explode, but that's what was happening in there.

Q. And the conversation you were just referring to in terms of learning from the fire marshal, that, sort of, more technical phrasing for some of the science behind what was happening, when did that conversation take place?

A. In the debriefing that we had. It was our deputy commissioner came down from Indianapolis, our state DOC fire marshal. I don't know if that's what you call him, but he's the head of the safety hazmat departments. It was -- they just made us all come up there and

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 71 of 111

BARABARA DEVINE vs   Cause No. 3:18-cv-00995-JD-MGG   TIMOTHY REDDEN
RON NEAL, et al.   October 25, 2019

Page 277

listen to them, and that's what they were explaining to us. They had explained that from the size of the fire, they estimated it was, like, 2,000 degrees in there, or something like that. That's when they introduced us to the system that they were going to be using. It's like a foam that they were going to transfer to to where it will be easier for them to put out a fire so it won't happen again because it took way too much to put it out. That's when we were told all that.

Q. Is that, like, a new fire suppression tool? Is it like a fire extinguisher, the foam?

A. It comes out of a backpack. I have not seen it. They say they have them and it's in the warehouse, but I haven't seen no one use it. I haven't even seen them. They're talking about new exhaust fans designed to take smoke out. I haven't seen that, but they claim they have it. But that's -- either way, that's when they made all those statements. And I think every lieutenant and every captain had to go to the meeting. It was mandatory. So that's what happened.

Q. How long after the incident was that -- did that meeting take place?

A. Not very long. I couldn't give you the exact date, but not very long at all. That was, maybe, three weeks. I could be wrong, but maybe three weeks. The fire guy that

Page 278

came up there, now that you mention it, his name is Chip Dudley, he was there. Basinger was there, everybody from down state.

Q. I've seen a document referring to something called an "after-action review." Is that what you're referring to?

A. You can call it that. But, yeah -- but, typically, that happens just almost, like, in-house staff. But this particular time, because of the situation, a lot of upper echelon was involved in it. So it got set further back so they could find time to make it back. So in that sense, yeah, that's what it was, but just more important people.

Q. Have you ever seen any documentation coming out of that process, whether it's a report or minutes of that kind of meeting?

A. No.

Q. Have you been involved in reviews or debriefs like that before?

A. Yes.

Q. In your experience, do those result in, like, a report being generated or some paperwork being generated coming out of those conversations?

A. Yes.

Q. Have you seen those documents before?

A. I've had them e-mailed to other participants in the meeting.

Page 279

Q. Can you describe what format those documents typically take?

A. Typically, it's a Word file, and the secretary will basically write down what's being discussed, who participated in the meetings, the speakers at the meetings, the subject of the meetings; and she'll send it to the people who partook in the meeting.

Q. You said that's usually a Word document?

A. Yes.

Q. Is it something that looks sort of like someone's rough notes that they've typed up, or is it proofread and formatted nicely?

A. It's formatted nicely and proofread, not sloppy.

Q. Okay. Do you remember other aspects of that after-action review or the meeting that took place in this case with Chip Dudley and, you know, other things that were discussed beyond what you testified to?

A. There were actually two different meetings that took place after that one. There was an ERO one because -- Emergency Response Operation that occurred that we were all a part of that cadre and whatnot came down and talked to us about what we could do differently due to the riot after that took place.

They had to activate the E squad, emergency team, to help retain order because of how the offenders were

Page 280

behaving. They had that meeting. And then they had the secondary meeting, which is the one I just talked about.

Q. That first meeting, did that have anything to do with the fire response, or was that solely focused on after the evacuation of the cell house and then the disruption?

A. It was mostly focused on the disruption. It was mostly focused on that.

Q. And then that second one, which you described earlier where the fire marshal was there telling you about the gas heating and all that stuff, that one was focused primarily on the fire, or did that touch on both?

A. I'm sorry, yes.

Q. Primarily on the fire?

A. Yes.

Q. Okay. I'm going to rewind this a few seconds back to 2:28.

(Video played.)

Q. Were you able to hear what you were describing with the investigator there?

A. Uh-huh.

Q. You described, I think, that you went and got water extinguishers to try and put it out while waiting for firemen to get up there. Did you hear that?

A. I heard that. I think I said we used water extinguishers.

Page 281

Q. And we discussed that before, seeing that in your report, that it referred to additional water extinguishers. That doesn't do anything to jog additional memories about where those came from?

(Reporter interruption.)

BY MR. HEPPELL:

Q. And then continuing on, you said, "We had already popped the door on the way up." Is that accurate, what you heard?

A. That's what I heard, yes.

Q. Does that refresh your memory at all in terms of who caused the door to be opened to cell 540?

A. No. It just -- I think talking there, I was just talking. I was, even in the video, sound pretty frantic about it. It was exactly what I mean about being able to rest after an incident, rather than going right into an interview about it. When I say we popped the door on the way up was because the request was still made on the way up. He just had already done it.

Q. So it's your testimony that when in the video to the investigator you say, "We had already popped the door on the way up," what that means is you talked to Rodriguez on the way up, and he said he had popped the door?

A. Yes, it was open.

Q. Okay. Looking at the video, is it your interpretation

Page 282

that you didn't remember it correctly at that point, or that you just were not expressing yourself clearly?

A. I wasn't expressing myself clearly at all. I see even in the video, I'm pretty frantic when I'm talking to him.

Q. So this is different from what we were describing before where there was something that you remembered differently then that you remember better now; is that fair to say?

A. No. I would probably say it stems from the same family tree, that a lot was going on. I was going through a lot at the time.

Q. Then you also said something along the lines of, "I didn't know then, but I know now why the door wasn't coming out." Can you explain what you meant by that?

A. Because it was after that that the offender firemen had told me why it took -- I remember I made the statement about him telling me that he could feel the heat through the gloves. He had told me that it took four of them to open the door because the hinges had expanded.

Q. And you learned that during a conversation with the prisoner firefighters?

A. Yeah, one of the guys that went to pull the door open.

Q. When did that conversation take place?

A. I honestly don't remember. It would had to have happened after we resecured the cell house.

Q. That's all I want to show you off the video for right now.

Page 283

We had talked earlier about conversations that you had had with Rodriguez and Abbassi and Blakely after you sent them to separate cell houses. How long after the incident, approximately, did those conversations take place?

A. I know it was after we resecured the unit. We had excess staff that came in to help resecure the unit. I think everybody was back in their cells. We were in the process of picking up a lot of things they had drug out the check point and burned.

So from start to finish, man, it would be after the incident was completely said and done with is when I had talked to him because I want to say they were still on hand during the incident. I separated them before I ran all the offenders back --

Well, we ended up securing them three by three because we didn't want them all going to the cell house at once and doing what they did outside of the cell house. And so that took a while. So before we started doing that, I switched them out.

So it was a little bit after the cell house was secure and counted and medical had went through, and we had gave everybody medical who wanted to go that I looked for them and found where they were at.

Q. I think you testified earlier you don't remember the order

Page 284

in which you did the conversation. So I'm going to take one. It may not be the first one in time. Your conversation with Officer Rodriguez, what did you say to Officer Rodriguez and what did he say to you?

A. That particular time, I believe I walked up to him and just say, "Hey, how are you doing, brother?"

And he was appearing wanting to be strong. Eyes was red like he wanted to cry, but he wasn't talkative. He just, kind of, nodded "I'm all right."

"Are you sure?" He kept it very simple. I could tell he just didn't want to talk about it.

Q. So you didn't really have anything of substance in terms of your conversation with Rodriguez?

A. No, not so much. Him and Blakely was close to the same.

Q. Blakely was similarly --

A. Yes.

Q. What was -- you described Officer Rodriguez's demeanor and appearance. What was Officer Blakely's demeanor and appearance?

A. The same, definitely same. I want to say, I think she actually cried; whereas, he acted like he wanted to. I want to say she had. But they were typically the same. They didn't want to really verbally communicate too much. I can't think of her name.

Abbassi, she was more verbal with her feelings. And

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 73 of 111

Page 285

it wasn't long talks, but just enough to let them know somebody was asking about them. She was more verbal with how she was feeling, you know, along with it and talked more about it than they did. But, yeah.

Q. Do you remember any of the substance of what Abbassi said to you or what you said to Abbassi?

A. Yeah, she asked me did she do anything wrong. And I said, "No, I don't think so." I said, "But it's not my job to make that determination either." I said, "Just write your report when we call you up there truthfully, and you'll be good."

And she was definitely shaken up. She asked as to why we pulled them out the cell house. So I explained that to her too. As little as it sounds, it was still way more than the other two had questioned. I just felt like that's how they dealt with their grief, where she was more, kind of, outspoken about it, showed more, you know, in the way she did things.

And like I said, they didn't last too much longer after that. And it was just a steady falloff, started coming in late, if at all, up until that was the end of it.

Q. For all three of them?

A. Yeah. Abbassi left on good standings, but I don't think the other two did due to discipline with them just not

Page 286

coming to work. I think a lot of -- I know a lot of it stemmed from that whole situation.

Q. Just so I'm clear, so Abbassi asked you if -- did she say if I had done anything wrong or if we had done anything wrong?

A. As to why they were moved out of B Boy that night.

Q. The words that she used were asking you if we had done anything wrong, correct?

A. Yeah.

Q. And you -- fair to say that you don't have any firsthand knowledge of what actions they took or didn't take in the cell house prior to your arrival that night?

A. Right, right.

Q. And at no point had you undertaken to investigate or been charged with investigating what took place in the cell house prior to your arrival that night; is that fair to say?

A. No, sir. I just answered, basically, the questions he asked me, and that was all I knew.

Q. How would you describe the nature of your relationship at the time of the incident with Rodriguez and Abbassi and Blakely?

A. Just standard supervisor/officer relationship, not just officer, supervisor/employee relationship. I will go into the cell houses when I would do my checks. I would sit

Page 287

down and make it a point to talk with them for a while. If I went up and did my walks, it wasn't extravagant, but it wasn't nothing -- they didn't hate me. You know what I mean, or I didn't dislike them in any type of way.

Q. Were you friends outside of work at all?

A. No.

Q. What about Watson, Statham, or Puetzer?

A. Yes.

Q. How do you describe your relationship with those officers?

A. Very good.

Q. Was that very close with them at the time and continuing through to today?

A. Yes, sir.

Q. Are those officers that you would say you do have, like, a personal friendship beyond just working with them?

A. Yes, sir.

Q. With all three of them?

A. Yes.

Q. What about Dykstra?

A. Yes.

Q. Fits into the same category?

A. Yes.

Q. Do you -- did you know Joshua Devine at all?

A. I talked to him before. I've had dealings with him, yes.

Q. Do you remember specifically any -- like, the specifics of

Page 288

any conversations you ever had with Joshua Devine?

A. Nothing of any interest. It was more of mostly about business. Like every once in a while, you meet offenders. You make small talk with them. It was nothing like that.

Q. Nothing that sticks out as particularly noteworthy, either positive or negative?

A. Correct.

Q. Setting aside conversations, any interactions with him at all that stick out in your memory as noteworthy positive or noteworthy negative?

A. Other than I think I did an incident report on him, something that may have happened. And I couldn't tell you what. My file, I have literally 600 incident reports that I wrote in four years. I think I wrote one one time. But it wasn't nothing big. It was something I had to inform my supervisors about just because they needed to be informed. But I couldn't tell you what it was. It wasn't nothing serious.

Q. You have some general memory of being involved in an incident report on him. Nothing sticks out in particular?

A. Right. And the involvement was just writing the incident report, not physically or verbally talking to him or being there even at that time.

Q. Got it. Do you have any secondhand knowledge of other people's interactions with him, like they've talked to you

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 74 of 111

Page 289

after the fact that you've gained additional knowledge about, anything like that?

A. No.

Q. Do you have any knowledge about Joshua Devine's physical or mental health at the time that he died?

A. No. We have no knowledge of anybody back there. HIPAA laws that are in effect, I never would have known that anyway.

Q. Anything about his personalty, what his life was like on the outside, hobbies, friends, anything like that about his personal life?

A. No, sir. I really don't get involved with the offenders like that.

Q. Do you have any knowledge of Joshua Devine's family?

A. No.

Q. Have you ever spoken, to your knowledge, with Barbara Devine or any other family members?

A. No, sir.

Q. Have you spoken -- since learning that the lawsuit was filed against you, what conversations have you had about the lawsuit, other than conversations with your attorneys?

A. Other than with Ms. James, none. I let my captain know because I had a vacation day for last night, yesterday. Like that Thursday, I told them that I was going to do a vacation day because I don't want to work Wednesday,

Page 290

Thursday, and deal with this Friday and just have Saturday and Sunday, and then I'm back off here, you know. He agreed. But other than that, that's about as far as it goes.

Q. You testified earlier that you were friends outside of work with Watson, Statham, Puetzer, and Dykstra, correct?

A. Uh-huh.

Q. Have you talked with them at any point about the lawsuit since it's been filed?

A. No. Because when we all get the e-mails about our dates, all of our names are on them anyway. We all were there. We all know we got a day coming up. And it's not all that shocking that it's happening, so...

Q. Have you talked with any of the other defendants in this lawsuit since the fire, but talked back with them about what they remember about what happened back in April 2017?

A. No, sir. I don't even know where they're at.

Q. Have you ever been convicted of a crime?

A. No, sir.

Q. Have you ever been arrested or detained by law enforcement?

A. No, sir.

Q. Have you received discipline at work through IDOC?

A. Yes, sir.

Q. How many times have you received discipline?

Page 291

A. Twice.

Q. What is the discipline for that you received?

A. The first one was after, like -- I want to say it was in 2009, and it was for sitting in a comfortable position in medical while mental health was interviewing a guy because they said that I looked relaxed.

The second one was for having dual coverage insurance on my daughter because her mother had it too. They were written reprimands.

Q. The first incident you were describing, the written reprimands, were you written up because your superior officer said you looked relaxed, or were you written up because your superior officer said you were sleeping?

A. My superior officer never wrote me up. A nurse wrote a statement saying that I appeared to be in a position where if something happened, I could not get up fast enough to assist them.

Q. That's your recollection of what the accusation was against you, not that you had been sleeping on the job?

A. That's exactly what it says on the written reprimand. When you get a copy, it will say "sitting in a relaxed position."

Q. What's your degree of confidence about that?

A. Confidence?

Q. Like, how confident are you that if I look at the written

Page 292

document, it's going to say "sitting in a relaxed position" rather than "sleeping"?

A. Because that's what I got, the yellow form. Mine says "sitting in a relaxed position." Like I said, the other one was for dual coverage insurance.

MR. HEPPELL: Got it. Can we go off the record for a second?

(Exhibits 10 through 15 marked for identification.)

(Recess taken.)

BY MR. HEPPELL:

Q. Handing you what's been marked as Exhibit 10 document. On the front is a cash spot bonus request form, and then the back is a copy of a star award, cash spot bonus award. And this document reflects a $200 cash spot bonus that was awarded to you in connection with your actions on April 7, 2017, correct?

A. This says more than that, but it is mentioned. It's a number of things as to why they recommended it.

Q. Got it. There's a number of different aspects mentioned, one of which is your actions on 4-7-2017.

A. One of many, yeah.

Q. Got it. And the tangible result that's listed is "saving money and possible staff overtime." Do you know what that's referring to?

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 75 of 111

Page 293

A. I didn't write this. So I couldn't answer that question. I couldn't put myself in for a bonus.

Q. I understand. You don't know what, in the previous paragraph, which of those has been determined that that was saving money and possible staff overtime?

A. No. I mean, this says Captain Calloway submitted it. I can't speak for Captain Calloway as to what he meant.

Q. Setting that aside, I'm going to hand you two documents marked as Exhibit 11 and Exhibit 12. This one is 11, and this one is 12.

These are -- again, they're not Bates stamped. These are pages out of your personnel file, which has been produced in discovery. And one is -- Exhibit 12 is a notice of pre-deprivation meeting, and then Exhibit 11 is a notice of personnel action, correct?

A. Yes.

Q. And your signature appears on both these documents under "employee signature," correct?

A. Correct.

Q. And the notice of pre-deprivation meeting states, "It has been reported that on Friday, May 15, 2009, you were sitting outside Dr. Matias' office asleep. You were told by a staff person twice you have to stay awake." Do you see what I'm referring to there?

A. Yes.

Page 294

Q. And then the second document, the notification of personnel action states, "On Friday, May 15, 2009, you were observed sleeping on two occasions at MSU by staff while you were transporting an offender from DCH East," correct?

A. Correct.

Q. So these documents confirm that, in fact, the discipline you received was for sleeping on two occasions in May of 2009?

A. Negative.

Q. What do you mean "negative"?

A. These are for the same. These are for the same incident.

Q. Got it. Right. One is pre-deprivation, and one is the personnel action that was taken for the same incident Friday, May 15, '09, correct?

A. Correct.

Q. And the notification of personnel action states, "On Friday, May 15, 2009, you were observed sleeping on two occasions," correct?

A. Correct.

Q. And so that's what you received discipline for?

A. Yes and no, because the subject suspension, termination, written reprimand is not included in here. And in my written reprimands, it states "sitting in a relaxed position" because they never believed I was.

Page 295

Q. So it's your testimony there's another document that contradicts the fact that you were sleeping and just reflects that you were sitting in a relaxed position?

A. Yes, sir. None of these are written reprimands.

Q. So the document marked as Exhibit 11 states -- there's a "to" field to you; classification, correctional officer; department, custody; then subject states, "Written reprimand in lieu of one-day suspension." Do you see what I'm referring to?

A. Yes, I see what you're referring to.

Q. Then later down in the document, it says in all caps and bold font, "Written reprimand in lieu of one-day suspension."

A. Yes, but this is not a written reprimand. The written reprimand is what I received and what goes into my fact file. This is incomplete.

Q. Do you have any explanation for why the document you're describing about being observed sitting in a relaxed position does not appear in your personnel file?

A. I couldn't tell you why it's not there, but I believe I could probably give you a copy of that one.

Q. We'd like that to be produced in discovery.

A. Uh-huh.

Q. Do you contend that you were not, in fact, sleeping on two occasions on May 15, 2009?

Page 296

A. Two occasions? Yeah, I don't -- I wasn't at all.

Q. Okay. Do you have any explanation for why there was a written reprimand document created that states that you were observed sleeping on two occasions?

A. Uh-huh.

Q. What's your explanation?

A. The reason why I only got a written reprimand for it was because my brother works there, his wife and the nurse was having issues. And it was believed that -- she believed I was him because our initials are exactly the same. Our IDs at the time had last names on them.

Q. Did you appeal the discipline that you received?

A. No.

Q. Did you have the right to appeal it?

A. Yes.

Q. Why didn't you choose to appeal it?

A. Because the written reprimand isn't anything.

Q. Well, it's in your personnel file.

A. Yes, but it doesn't stop me from doing what's important to me.

Q. I see. So you didn't feel like it was worth appealing, even though there had been a statement that you were asleep on the job when, in fact, you weren't asleep twice on the job?

A. Correct. And I believe to this date, it probably was the

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 76 of 111

Page 297

best decision because I don't know anyone who's won an appeal.

Q. Handing you what's been marked as Exhibit 13, and I will give counsel a copy of that as well.

Exhibit 13, it's not Bates stamped, but is a copy of a shift report of an incident written by Captain Dykstra related to the incident on April 7, 2017. Are we looking at the same document; is that correct?

A. I'm sorry, yes.

Q. Looking at -- and this is the -- on the first page of that document, there's a box that contains Captain Dykstra's narrative statement of what happened on that day from his perspective; is that fair to say?

A. Uh-huh.

Q. And looking one, two, three, four, five lines down in that narrative box, the first full sentence starting on that line, it states, "Then Lieutenant Redden activated the ISP Fire Department." Do you see what I'm referring to?

A. Yes.

Q. That is not consistent with the testimony you gave earlier today; is that fair to say?

A. I would agree.

Q. And that's not consistent with what -- your description of the even -- way that the ISP Fire Department was activated in 2017 or, indeed, at any point that you've been at the

Page 298

facility; is that correct?

A. Yes.

Q. Do you have any explanation why Captain Dykstra, the shift supervisor, included in his report that statement which you contend to be false?

A. Because I did get on the radio, because of the situation that we were in, and announce that all shelters, be sure that your firemen are out because I needed them. However, activating them, no. That's, again, they automatically get activated when the signal is called.

Q. So it's your belief that Captain Dykstra's written report happened to make the exact same mistake that you made in your oral statement to the investigator in terms of describing it as you activating the fire department when, in fact, you were just checking in on the progress?

A. I believe so.

Q. Are you permitted to use your work e-mail account to send personal e-mail messages while you're on duty?

A. No.

Q. Have you ever engaged in that?

A. Yes.

Q. On how many occasions have you engaged in that?

A. I'm not sure. Honestly, I'm not sure.

Q. Is this a frequent practice?

A. It depends on what happens. For an example, if my son's

Page 299

mother can't get a hold of me, she has in the past e-mailed me asking if I can watch my son or if she needs me to get off early if something happens because he is sickly.

Q. What about back and forths with Defendant Puetzer, have you engaged in personal messages back and forth with Puetzer?

A. Probably.

Q. What kinds of things do you message back and forth with Mr. Puetzer while you are on duty?

A. I'm not sure.

Q. How often do you message back and forth with Mr. Puetzer while you're on duty about personal matters?

A. Again, that was probably about, if it happened, around a year-and-a-half ago. So I couldn't tell you how often that happened.

Q. Are there other individuals that you -- other IDOC employees that you message back and forth with about personal matters using your work e-mail in violation of ISP rules, other than Mr. Puetzer?

A. I would have to have some type of idea to say yes or no to who you're referring to because I just -- I don't know what you're talking about right now.

Q. I'm just asking the question. Are there individuals other than Mr. Puetzer who you have engaged with back and forth

Page 300

personal messages on your IDOC e-mail account in violation of IDOC rules?

A. Yeah, I've talked to staff before through e-mail, yes.

Q. About personal matters?

A. It depends on what you consider "personal."

Q. Well, you stated earlier that you understood that it was prohibited to use your IDOC e-mail account to communicate about personal matters while on duty.

A. It depends on your definition of "personal," which is why -- nothing's ringing a bell. But if I knew the subject, then maybe it was.

Q. But you do recall doing that with Mr. Puetzer?

A. It was probably about World of Warcraft, but yeah.

Q. And that would be undisputedly a personal matter, right?

A. Probably, yes.

Q. Probably or definitely?

A. Well, I don't know what you're talking about.

Q. Well, World of Warcraft would undisputedly be a personal matter.

A. I said "probably." I don't necessarily know that's what you're talking about.

Q. My question is if you message about World of Warcraft, that would definitely be personal, not professional?

A. Correct.

Q. I'm going to show you --

BARABARA DEVINE vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 77 of 111

Page 301

MR. ROTHENBERG: Are we at about 7?

(Discussion held off the record.)

MR. ROTHENBERG: So that would be 7:02 right now I'm just going to ask a couple questions here very quickly, just to kind of refocus everything.

EXAMINATION

BY MR. ROTHENBERG:

Q. Mr. Redden, at the time of the incident, the fire that we've been discussing today -- I know you've gone in depth about it all day, but I want to hit a couple main things. When did you realize that there was a significant risk to Mr. Devine's safety?

A. When I got on the range, on the 500 range.

Q. Would you think that it was a significant risk when you got the message that there was a fire?

A. Yes. At the time I didn't know the nature of the fire, where it was at, or who was affected by it.

Q. Sure. Once you realized there was a risk to his health and safety, what did you do? Very briefly, what did you do to address that risk?

A. We fought the fire the best we could with the tools that we had.

Q. When you say "we" --

A. Myself, Lieutenant Watson, and Sergeant Statham.

Q. But more than that, you saw other officers that were also

Page 302

aware of the safety risk for Mr. Devine, correct?

A. Yes.

MR. HEPPELL: Object to form. Go ahead.

BY MR. ROTHENBERG:

Q. You can answer.

A. Yes, sir.

Q. Those officers, in your mind -- I'm sorry. Let me restate that. In your view, do you think any of those officers exhibited a disregard for Mr. Devine's safety?

MR. HEPPELL: Object to form, foundation.

A. Not at all.

Q. Not at all?

A. Not at all.

Q. They all -- what do you mean by "not at all"?

A. They were in no way disrespectful or had any type of disregard for the man's safety.

Q. Did they do things to try and remedy the situation?

A. Yes. To the best of their abilities, they did.

Q. All of the ones -- all of the officers that you know knew about this incident?

A. All the ones involved, they sure did.

MR. ROTHENBERG: Okay That's all the questions I have for Mr. Redden.

MR. HEPPELL: Just one follow-up to that.

Page 303

EXAMINATION

BY MR. HEPPELL:

Q. You have no knowledge of what did or did not take place in B cell house prior to your entering B cell house; is that fair to say?

A. I knew there was a fire because of the signal that was called.

Q. Other than the fact that there was a fire and the signal that was called, you have no knowledge of how long the fire had been burning prior to your arrival or what the officers were or were not doing prior to your arrival; fair to say?

A. I guess so, yeah.

MR. HEPPELL: Okay. That's all.

MR. ROTHENBERG: Great. I think we're done.

(The deposition concluded and witness excused at 3:48 p.m.)

*    *    *

Page 304

CERTIFICATE

I, Angela J. Galipeau, a Notary Public, in and for the County of Porter and State Of Indiana, do hereby certify:

That TIMOTHY REDDEN appeared before me on Friday, October 25, 2019, and was duly sworn or affirmed to testify the truth, the whole truth, and nothing but the truth to questions propounded at the taking of the foregoing deposition in a cause now pending and undetermined in said court;

That I further certify that I then and there reported stenographically the proceedings at the said time and place; that the proceedings were then transcribed from my original shorthand notes; and that the foregoing typewritten transcript is a true and correct record thereof;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 20th day of January, 2020.

_____
Angela J. Galipeau, RPR, CSR
Notary Public, State of Indiana
Residence:  Porter County
Commission Expires:  4-23-25

BARABARA DEVINE vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 78 of 111
TIMOTHY REDDEN
October 25, 2019

**$**

**$200 (1)**
292:15

**@**

**@idocingov (1)**
32:25

**[**

**[sic] (2)**
125:8;270:3

**A**

**abandon (1)**
62:24
**Abbassi (22)**
136:20;137:3;
176:21;178:5;234:8;
236:5,8,17,18;237:3;
239:2;274:3,8,11;
275:3;283:2;284:25;
285:5,6,24;286:3,21
**ABC (7)**
196:15;207:23;
242:12;248:7;249:6;
251:2;275:15
**abilities (1)**
302:19
**ability (12)**
10:12,16;23:12;
75:24;96:24;128:13,
14;133:10;231:1;
252:21;263:19;264:14
**able (72)**
10:7;19:18,24;65:13;
72:15;80:6;105:13;
115:4;122:23;124:25;
128:4;130:1;140:3;
144:17;146:5;148:18;
165:20;170:20;173:19;
174:15;183:24;184:4;
187:13;188:24;189:13;
194:4;196:25;197:8;
198:18;205:4;206:16,
23;207:10;208:17;
210:1;215:17;218:18,
18;223:7;225:21;
226:12;228:7,8,20;
229:11,22;234:1;
244:18;251:5;254:1,4;
258:9,19,22;259:3,13;
260:12;262:4,8;263:9,
10;265:13;269:12;
270:20;271:2,10;
273:2,25;274:6;
275:10;280:18;281:15
**above (8)**
163:24;164:3;169:9;

173:9,11;177:18;
221:13;222:8
**absolutely (1)**
13:15
**abundance (1)**
129:24
**abuse (2)**
138:18;139:2
**acceptable (1)**
155:5
**accepted (1)**
79:12
**access (22)**
99:7,8;104:6,12;
106:10;108:18,21,25;
109:6,7;128:24,25;
129:9,21;130:2,2,5;
131:21;133:21;152:1;
220:17,20
**accessible (2)**
143:8;222:11
**accident (2)**
107:8;110:12
**accidental (8)**
93:12,14;94:22;95:6,
23;96:1,20;113:25
**accomplish (1)**
22:18
**according (1)**
250:2
**account (16)**
32:5,8,11,22,24;33:1,
4,11,14,15,19;34:2;
150:7;298:17;300:1,7
**accountability (2)**
65:11,12
**accountable (1)**
141:24
**accounted (2)**
134:13;150:6
**accounts (5)**
5:3;32:20;33:6,7;
34:4
**accumulated (1)**
219:14
**accuracy (1)**
274:24
**accurate (11)**
10:12,16;26:10;
92:15;153:2;154:6;
156:21;188:8;263:1;
266:4;281:8
**accurately (2)**
149:22;252:2
**accusation (1)**
291:18
**acknowledgment (2)**
5:15,23
**across (2)**
149:7;256:16
**act (3)**
11:5;79:18;117:21
**acted (1)**

284:21
**acting (2)**
63:17;226:19
**action (15)**
15:10,12,13;28:4;
29:21;30:6,15;83:25;
84:2;124:22,23;
293:15;294:2,14,17
**actions (5)**
89:22;90:6;286:11;
292:17,21
**activate (6)**
48:6;54:11;270:23;
272:14,20;279:24
**activated (13)**
48:4;53:1;212:21,22;
213:19;214:1,9;
219:20;271:6,20;
297:17,24;298:10
**activating (2)**
298:9,14
**activation (3)**
54:15;219:18;223:1
**active (3)**
207:18,19;208:19
**actively (3)**
117:13;235:2;245:2
**Activity (4)**
172:2,3,22;183:16
**acts (1)**
80:12
**actual (12)**
48:14;106:15;
109:15;111:19;150:20;
151:9;184:13,23;
228:10;243:4;262:13;
264:21
**actually (28)**
49:21;55:23;65:20;
66:13;101:15;121:6;
124:8;144:21;175:6;
177:17;184:10;187:12;
202:24;209:6;214:11;
217:17;221:5;227:9,
10,22;238:25;251:2;
253:20;255:11;257:8;
275:17;279:18;284:21
**Adam (1)**
162:3
**add (2)**
50:13;269:4
**added (5)**
47:11,11;164:8;
169:13;170:23
**addendum (1)**
5:13
**addition (6)**
18:22;33:24;47:8;
62:12;145:6;251:7
**additional (9)**
4:21;22:23;73:21;
238:8;255:14;257:21;
281:2,3;289:1

**additionally (1)**
43:5
**address (8)**
30:20;32:1,3,24;
84:6;115:24;119:13;
301:20
**adequate (1)**
165:4
**adequately (3)**
80:12;125:1;245:21
**adjacent (1)**
41:9
**admin (1)**
83:6
**adrenaline (4)**
125:6;267:1,4,6
**adult (1)**
82:22
**advance (3)**
5:1;80:10;114:6
**advisable (1)**
44:4
**advise (2)**
165:15;230:17
**advised (2)**
83:6;226:16
**advisements (1)**
198:23
**advising (3)**
28:21;60:9;232:23
**affairs (10)**
94:24;100:15;101:2;
110:20;111:5,15;
135:9;258:6;262:25;
263:15
**affect (5)**
6:14;10:11,15,17;
260:22
**affected (3)**
26:12;223:23;301:17
**affecting (1)**
10:13
**Affirmative (3)**
89:15;90:13,17
**after-action (2)**
278:5;279:14
**aftermath (1)**
240:25
**again (56)**
9:11;20:16;24:14;
31:15;45:24;46:7;
48:24;52:24;53:20;
60:15;62:1,6;77:21;
92:18;101:11;114:19;
135:2;137:8,15;
150:12;151:23;162:19;
169:20;170:18;183:15;
188:7;191:16;192:19;
206:11;207:21;208:16;
209:5;212:6;227:17;
230:24;236:7,8;
239:18;240:12;255:16;
256:11,14,25;257:2;

258:10;259:21;262:2;
268:18;269:3;272:25;
273:23;275:7;277:8;
293:11;298:9;299:14
**against (4)**
83:3;90:3;289:20;
291:19
**agencies (1)**
97:17
**agency (1)**
82:15
**agenda (1)**
114:7
**agent (1)**
242:10
**ages (1)**
35:20
**ago (12)**
10:25;72:8;103:2;
106:17;125:3;176:21;
182:13,16;221:16;
260:20;261:17;299:15
**agree (17)**
13:6;27:16,23;81:6;
90:22,24;96:15,18,21;
130:4;139:23;189:2;
222:5;267:8,12,14;
297:22
**agreed (1)**
290:3
**ahead (11)**
6:23;9:20;10:6;
14:13;145:18;148:11;
182:16;227:8;267:23;
269:5;302:3
**ain't (1)**
78:17
**air (1)**
250:3
**airlock (2)**
159:8;160:2
**alarm (11)**
17:5,5;55:4,8,9,9,17,
19,24;56:23;214:8
**alert (1)**
165:13
**alive (6)**
136:9;212:19;232:5,
24;233:9;263:5
**allegations (3)**
90:2;101:21;103:3
**alleging (2)**
88:3;89:10
**allow (2)**
56:20;267:2
**allowed (4)**
52:2;61:14;106:11;
208:3
**almost (4)**
69:8;124:5;192:21;
278:7
**alone (1)**
35:5

BARABARA DEVINE vs
RON NEAL; et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC INND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 79 of 111
TIMOTHY REDDEN
October 25, 2019

**along (11)**
20:14;28:23;63:19;
87:23;88:2;89:8;
132:14;219:24;256:21;
282:11;285:3
**although (1)**
50:2
**always (28)**
20:9;45:12,14,15;
47:21;51:9;54:6;55:25;
56:4;65:10;77:23;
80:14,17,17;112:6;
117:19;118:22;154:20;
156:7;162:15,16;
164:9,11;173:10;
178:25;190:22;214:6;
265:19
**Amended (2)**
88:23;89:10
**amongst (1)**
124:15
**amount (5)**
66:24;71:21;86:17;
188:24;230:3
**Android (2)**
34:19,20
**angle (3)**
191:18,21;192:15
**angled (2)**
193:22;197:9
**angry (2)**
243:12;244:4
**ankle (1)**
158:16
**announce (4)**
113:7;150:2;151:15;
298:7
**announced (1)**
150:11
**annual (11)**
16:12,24,25;18:23;
20:4,7,11,14,19,23;
23:20
**answered (5)**
93:17;218:23;231:1;
267:21;286:18
**anticipation (1)**
175:14
**anymore (2)**
193:24;248:22
**apologize (1)**
198:9
**apparent (1)**
240:1
**appeal (4)**
296:12,14,16;297:2
**appealing (1)**
296:21
**appear (1)**
295:19
**appearance (2)**
284:18,19
**appeared (2)**

208:13;291:15
**appearing (1)**
284:7
**appears (3)**
84:17;252:7;293:17
**apply (2)**
51:5;68:14
**appreciate (11)**
6:16;16:22;18:15;
41:2;75:8;78:5;128:12,
15;145:19;235:15;
268:3
**approach (2)**
27:7;191:17
**approaching (1)**
212:10
**appropriate (14)**
13:10,15,20,21;14:9,
21,25;15:2,6,12;24:21;
25:3;76:18;77:8
**appropriately (1)**
120:10
**approval (1)**
167:15
**approve (1)**
168:8
**approved (1)**
107:4
**approves (2)**
46:21;119:22
**approving (1)**
167:16
**approximate (1)**
38:2
**approximately (11)**
38:22;85:15;115:14;
154:17;155:3;175:4;
180:18;191:20,25;
247:1;283:4
**April (58)**
10:20;14:3,8,20,24;
15:5;16:6;24:22;25:15;
26:3;28:9,18;29:5,14;
32:8,13;33:1,12;34:14;
38:23;39:13;40:2;42:4,
18,21;47:3;48:8;50:7;
66:21;70:17;71:8;
75:11;101:2;104:23,
23,25;107:3;121:3,13;
122:11;123:22;128:19;
137:21;139:12;143:5;
158:18;213:24;246:11;
247:1;254:3;260:24;
265:9;269:17;270:24;
271:5;290:16;292:17;
297:7
**area (18)**
18:19;19:10;28:25;
61:17,18;62:17,18,23;
81:11;134:13;148:16;
184:11;203:8;208:15;
213:14;230:1;250:3;
255:3

**areas (6)**
26:12;66:25;128:12,
14;210:12;237:16
**arises (1)**
24:18
**arm (4)**
204:4;211:3,17;
212:12
**arms (1)**
211:22
**around (39)**
8:15;20:20;51:1;
53:24;54:22;56:9;68:2,
25;69:10;74:3;114:6,8;
123:23;124:21;136:21;
186:11;190:6,10;
198:19,20;209:16;
210:12;222:11;223:10,
13;225:1,17,18;
226:21;228:16,21;
229:17;231:8,20;
241:20;255:18;265:9;
271:19;299:14
**arrested (1)**
290:20
**arrival (8)**
164:17;166:8,12;
175:7;286:12,16;
303:10,11
**arrive (4)**
40:13,14;116:23;
167:1
**arrived (10)**
165:14;167:2;
169:23;176:18;193:21;
209:6;223:18;225:8;
247:5;250:24
**arriving (4)**
26:1;209:9,11;
247:18
**arrow (1)**
254:8
**Arthur (2)**
86:2;122:10
**aside (13)**
10:10;27:4;28:15;
51:17;57:20;60:25;
110:7;119:2;167:12;
202:17;267:6;288:8;
293:8
**asleep (5)**
71:5;215:15;293:22;
296:23,23
**aspect (19)**
13:2;17:21;20:4;
24:4;48:2;60:3;77:18;
99:25;109:3;110:13;
124:9;125:16,17;
129:6;214:24;215:8;
216:14;239:19;266:12
**aspects (5)**
99:16;117:18,18;
279:14;292:20

**assault (1)**
240:15
**assaulted (3)**
240:16;243:9;263:6
**assaulting (2)**
240:4;241:20
**assaults (1)**
57:2
**assess (3)**
24:3;263:10;267:2
**assessment (12)**
15:9,22;16:2;24:14;
25:8;26:9;52:8;60:14;
72:20;73:5,5;170:23
**assessments (1)**
38:10
**assigned (13)**
42:12,12;46:14;
47:22;48:5;51:21;63:2;
70:2;71:9,17;176:17;
248:7;255:1
**assignment (5)**
22:13;47:9;69:13,15,
22
**assignments (1)**
69:5
**assist (10)**
57:17;59:13,19,24;
61:17,25;62:1,25;
253:24;291:17
**assistance (2)**
44:6;55:2
**assistant (29)**
38:11,17,25;40:6,16,
25;41:16,19;42:7;43:5;
45:11,12;48:9;63:5,16,
17;64:13;66:15,23;
67:15;70:10;76:7;
104:12;109:5;117:7;
118:17;121:14;213:12;
272:19
**assistants (2)**
42:1;66:12
**assisted (5)**
123:9,12;251:23,25;
252:24
**assisting (2)**
56:21;252:8
**associated (1)**
155:5
**associates (1)**
220:16
**assume (9)**
10:7;100:21;101:7,8;
126:13;260:6,21;
266:25;267:1
**assumed (5)**
61:12;96:4;144:1,20,
21
**assuming (11)**
73:24;135:21;
145:14;168:1;178:24;
179:2,21;188:8;

273:18,21;275:5
**assumption (5)**
101:4;145:11,15;
170:23;259:24
**assumptions (1)**
97:24
**assured (1)**
6:14
**asterisk (1)**
227:23
**astonished (1)**
223:4
**attached (1)**
150:21
**attacked (2)**
141:1;190:11
**attain (1)**
37:22
**attained (1)**
74:1
**attempt (1)**
249:2
**attempted (4)**
229:13;248:6;250:1,
17
**attempting (1)**
217:17
**attempts (1)**
250:23
**attention (3)**
84:23;118:8;264:10
**attitude (1)**
238:4
**Attorney (11)**
6:21;85:5,10,17,22;
86:6,13;87:8;92:19,21;
115:6
**attorneys (6)**
86:9;88:2,9,16;
115:20;289:21
**audio (3)**
112:22;258:5,6
**August (4)**
93:22;94:4;96:15,18
**authored (2)**
104:2,3
**authority (1)**
52:10
**authorized (2)**
46:25;163:25
**automated (1)**
203:18
**automatic (1)**
54:12
**automatically (11)**
119:16;206:7,8;
212:22;214:1;219:19;
272:4,16,17,18;298:9
**available (21)**
56:4,7,14,25;57:11,
13,18,25;58:23;59:5,
25;60:7;61:4,8,11,15;
62:13;63:1;73:4;108:7,

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 80 of 111

8

**average (1)**
173:11
**awake (1)**
293:23
**award (2)**
292:14,15
**awarded (1)**
292:16
**aware (9)**
55:11;111:7;134:5,
14;140:6,8;155:7;
214:16;302:1
**away (7)**
151:20;191:25;
193:4;194:6;219:3;
245:15,22
**axis (1)**
132:14

## B

**back (148)**
11:3,9,21;12:1;14:3,
8,24;15:4;28:8;32:8,
17;33:1,11;34:13;
39:13,22;40:2;42:10;
47:3;50:25;51:16;52:7;
53:17;63:4,16;66:21;
70:17;71:8;72:14;
83:22;84:9;90:16;
102:12;103:20;106:11,
16;115:5;121:3;
123:19;124:7,7;
128:19;143:5,17;
148:16,19;150:11;
152:6,9;153:22;159:3;
161:14;163:14;165:6,
6,7;167:12;168:16;
185:5;187:21;191:2,2,
3,11;192:19,20,23,24,
25;197:7;198:13;
200:11,18,19;202:25;
203:20;204:18,20;
205:9,9,14,19;206:2,5,
6,7,8,16;207:11,14,19,
24;208:15,18;209:3,4,
5;212:6;218:14;224:1,
7;226:17,21;227:5;
228:22;229:11;230:5;
231:8,12,20;241:23;
242:7,11;247:19;
248:21;251:23;252:9;
256:6;258:12,24;
262:1,20;263:9;
264:11;265:3,8;
268:10;269:17;272:24;
273:22;275:4,7;278:9,
10;280:15;283:8,15;
289:6;290:2,15,16;
292:14;299:5,6,9,12,
18,25
**backed (1)**

244:22
**background (2)**
7:25;10:10
**backpack (1)**
277:12
**backup (1)**
52:20
**bad (16)**
24:20;25:18;26:13;
74:22,23;76:21;
136:19,19;142:19;
144:20;158:13;165:20;
187:1;223:23;225:2;
238:1
**Baker (1)**
146:15
**banging (7)**
171:5;174:12,13,16,
20;183:21,21
**bar (1)**
227:10
**Barbara (2)**
4:10;289:16
**barred (3)**
90:19;227:14;228:13
**bars (11)**
174:12,14;183:21;
184:7,11;185:9,11;
192:10;206:20;228:8,
11
**base (1)**
216:15
**Based (45)**
11:3;24:21;41:16;
72:3;73:12,18;78:24;
84:17;89:21;90:25;
95:12;97:24;107:18;
109:2;111:10;112:3;
119:4;120:9;121:19;
123:22;125:11;126:18;
135:2,10;137:2,8,14;
144:18;146:6;158:23;
179:22;180:4;181:14;
185:21;188:10;220:7;
227:1;230:7;232:14;
254:1;257:21;271:11;
272:18,19,22
**baseline (1)**
22:16
**basic (5)**
22:17;23:17;151:24;
267:9,17
**basically (32)**
15:23;19:1,17;23:25;
40:12;42:9;46:12;
67:19;70:22;71:2;
82:20;99:2;103:4;
113:20;118:6,25;
136:6;139:17;150:2;
164:23;165:5;168:19;
169:13;177:3,21;
179:7;216:10,14;
238:23;272:12;279:4;

286:18
**basing (3)**
93:15;97:23;98:1
**Basinger (1)**
278:2
**basis (10)**
12:18,24;91:3;94:21;
95:25;96:16,19;
169:14;241:2;243:13
**bat (1)**
146:9
**batch (1)**
255:4
**Bates (7)**
36:10;83:23;122:9;
130:20;246:4;293:11;
297:5
**batteries (9)**
139:14,19,21;
140:10,10,10;142:21;
143:3,5
**battery (6)**
139:6,9,10;140:22;
142:18;143:11
**BCH (3)**
247:2,20;250:4
**bearing (1)**
153:5
**beat (2)**
136:10;138:21
**beaten (1)**
248:21
**beautiful (1)**
159:18
**became (2)**
36:3;38:5
**become (3)**
49:19;214:16;276:5
**bed (1)**
136:9
**began (1)**
150:12
**beginning (4)**
6:6;17:11;141:6;
258:13
**behaved (1)**
213:6
**behaving (2)**
139:22;280:1
**behind (17)**
67:10;79:14;159:9;
181:7;222:15;226:5;
239:24;240:19;241:3;
243:16;245:19;251:22,
24;252:9;257:10,17;
276:19
**belief (4)**
94:15,21;212:18;
298:11
**bell (3)**
55:20;261:2;300:10
**below (2)**
170:17;201:4

**bend (1)**
209:3
**beside (2)**
192:7;227:24
**Besides (1)**
171:14
**best (49)**
23:11;25:9,12;38:7;
52:7;68:2;71:14;87:7;
92:16;93:17;118:7;
138:17;146:6;164:19;
166:6;169:15;173:6;
175:3;176:11;180:5;
181:16,17;182:7;
183:2;186:19;189:21;
192:3,22;196:18;
197:12;200:8,22;
207:10;208:12;209:10;
231:1;245:22;248:20;
250:15,15;252:20;
253:8;263:19,24,25;
264:14;297:1;301:21;
302:19
**better (16)**
45:18,19;62:21;
139:5;196:19;220:15;
226:24;260:12;266:16,
16;267:3,10,18;
268:15;269:1;282:7
**beyond (10)**
62:23;117:18;124:2;
153:7;198:15;236:12;
237:1,1;279:17;287:15
**big (12)**
61:21;112:25;143:7;
157:20;160:8;213:7;
230:5;234:18;241:15;
242:6;244:11;288:15
**biggest (2)**
158:21;159:11
**bit (20)**
14:15;63:20;75:2;
87:1;88:19;90:22;
117:5;174:9;181:3;
191:12;203:24;204:5;
207:1;226:24;245:12;
265:11,12;267:2;
269:8;283:21
**black (2)**
210:11;257:5
**Blakely (11)**
137:4;234:8;236:9,
17;237:3;239:2;
274:15;283:2;284:14,
15;286:22
**Blakely's (1)**
284:18
**bland (3)**
19:6,9;123:17
**blank (1)**
188:16
**blaring (1)**
174:3

**blessed (1)**
263:7
**block (16)**
166:2;173:25;177:8,
10,13,14,15,15,16,25;
184:14,18,22;187:8;
200:17;273:19
**blocked (1)**
185:13
**blocks (5)**
177:2,3;236:16,19;
275:3
**blood (1)**
117:22
**blue (3)**
161:16;174:13;257:5
**board (1)**
211:7
**bodies (1)**
136:7
**body (10)**
189:12;198:3;
206:24;211:15,18,24;
226:17,20;228:19;
239:13
**bold (2)**
89:14;295:12
**bolt (16)**
202:10,25;203:11,
17,20;204:24;205:9,11,
14,19,22,23,24;206:1,
4;214:12
**bolts (1)**
206:5
**bomb (1)**
222:22
**bonus (5)**
58:6;292:13,15,16;
293:2
**boot (1)**
197:4
**Boots (3)**
222:1,2,4
**B-o-o-t-s (1)**
222:2
**both (21)**
6:18,18;41:15;42:20;
43:8;45:11;48:9;49:24;
53:8;64:13,20;68:23,
25;69:21;117:12;
121:13;132:7,7;
219:13;280:11;293:17
**bottom (10)**
84:14;121:15;122:4;
131:14;161:3,16;
169:10;227:21;246:22;
257:3
**box (6)**
201:24;208:14,14;
209:24;297:11,16
**boxes (1)**
121:16
**Boy (27)**

BARABARA DEVINE vs
RON NEAL; et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 81 of 111

104:7,9;132:10;
146:11,12,15,23;
150:18,19;151:14,15;
161:15;166:15;181:7;
187:7;224:2;227:9;
231:1,9;232:7;239:3;
241:23;243:23;244:21;
252:24;259:19;286:6
**Boy's (2)**
157:7;160:24
**bracket (1)**
121:12
**brain (3)**
267:13;268:20,22
**break (4)**
8:12,18;147:21;
276:3
**breakfast (1)**
213:3
**breaking (1)**
142:6
**breaks (2)**
8:11,11
**breathe (4)**
193:24;194:4,6,7
**breathing (1)**
136:7
**brick (1)**
133:17
**brief (1)**
150:17
**briefly (4)**
223:3,5;255:21;
301:19
**brigade (23)**
18:1,2,8,18;19:21;
20:1;24:13;25:2;27:11;
28:23;33:10,11,14,15,
18,21,21;34:4;209:9;
212:21;217:22;271:7;
272:21
**bright (1)**
188:23
**bring (7)**
110:25;113:8;
221:12,15;231:11,18,
19
**brisk (1)**
158:13
**briskly (1)**
190:8
**broad (2)**
60:12;119:12
**broadcasts (1)**
215:11
**broadly (1)**
57:21
**broke (1)**
35:3
**broomstick (1)**
190:2
**brother (8)**
68:4,16,18,19;69:1;

144:11;284:6;296:8
**brought (6)**
84:22;189:7;196:7;
221:5,7;258:8
**brung (1)**
255:4
**bucket (2)**
235:4,5
**buddies (1)**
206:9
**building (1)**
184:24
**bunch (5)**
218:22;242:10;
245:24;262:21;263:6
**burn (10)**
233:9;241:5;242:21,
23,23,23;243:3,3,3;
263:5
**burned (6)**
25:19;124:5;210:14;
232:5,24;283:10
**burning (5)**
125:23;191:13;
193:19;207:22;303:10
**burnt (2)**
202:14;210:13
**business (1)**
288:3
**busy (1)**
205:7
**button (2)**
201:15;205:7

## C

**cabinet (2)**
143:6,7
**cabinets (1)**
174:13
**cadre (1)**
279:21
**call (55)**
7:20;19:2;23:9;
28:21;52:4,11;54:14,
22;55:12,16,25;60:14,
17,18;67:18,18;76:19;
80:7;103:1;146:8,16;
147:11,23,25;150:9;
154:3;155:17;157:2;
158:4;163:12;164:13;
178:25;179:1;184:18;
214:6;215:2;218:22;
219:20;230:19;232:12,
13;247:8,13,18,24;
270:7,18,21,24;271:6,
6;272:3;276:23;278:6;
285:10
**called (78)**
4:2;46:19;47:18;
48:5;51:7;53:16;54:13,
24;56:13,13;57:25;
58:11,16,21;59:6;60:7;

61:4,15;62:8;63:9;
72:8;84:10;104:15;
125:25;127:17;143:25;
144:1,2,15,19,21;
145:2,4;146:14;
147:21;150:18,19,23;
151:13,14;152:2,19,21;
153:7,8,25;157:24;
164:15;174:2;180:8;
212:22;214:16;218:22;
224:2;230:25;232:5;
241:22;247:2,11,20;
249:16,17,18;259:9,12,
18;265:9;269:18;
270:1;271:1,13;272:5,
23;276:2;278:4;
298:10;303:7,9
**calling (18)**
51:3;54:16;56:19;
74:20;118:20;138:2;
143:19;144:24;145:7;
215:8;229:13;251:1;
269:14,21,24;270:5,14,
15
**Calloway (2)**
293:6,7
**calls (10)**
4:19;28:22;67:17,17;
80:15;124:17;147:16;
214:1;270:6,9
**calm (2)**
23:10;265:4
**calmer (1)**
65:23
**came (32)**
45:24;71:1;94:13;
98:20;99:23;109:13,
15;113:3;141:16;
150:10;160:25;166:17;
174:20;175:2;187:17,
24;189:6,8;192:25;
194:10;208:13;209:25;
235:24;237:21;240:4;
257:14;272:4;276:22;
278:1;279:21;281:4;
283:7
**camera (6)**
113:13;229:23,24;
253:18,18;257:4
**cameras (2)**
112:12;260:23
**can (175)**
5:11,16,18;8:17,21;
9:9,10,20,24;10:3;
12:4;16:15,18;17:1;
18:9;20:3;21:4;24:19;
25:7,9,17;26:7;27:21;
29:18;30:25;36:6;
40:18;43:22,23;45:19,
22;49:9,15,16,19;56:7,
18;58:4,14;61:18;
62:25;63:20;66:15;
73:17;74:22;76:1,22,

23;78:18;79:4,16;80:5,
12;82:24;92:23;98:3,
24;100:24;101:25;
108:18;112:13;119:12;
121:10,10;124:10;
127:5,6,6;128:3,6;
133:7,17,23;134:21;
140:19;141:1,12;
144:7,7;146:6;148:9;
152:20;154:10,23;
156:24;158:5,6,9;
159:5,7;161:22;162:1,
4;163:4;164:22;
168:21;169:15;170:13,
20,25;171:21;173:7,12,
18;178:18;181:21;
182:8;184:2,3,9;
185:10;186:23,24;
187:8,9;193:20;
196:22;197:12;198:8;
201:11;202:7,19;
204:9;205:9;207:10;
208:5,7,12,16;210:23;
211:5;213:10;214:25;
216:3;220:18,19;
222:6,23;224:10;
225:21;227:11,15;
228:10,11;235:18,20;
240:11;245:14,25;
253:25;254:22,25;
255:12;256:8;260:7;
261:4,8;262:7;265:1,
25;266:15;267:12,23,
24;269:5;271:11;
272:13;274:8;275:22;
278:6;279:1;282:13;
292:6;299:2;302:5
**canceled (2)**
88:13;102:13
**cancellation (1)**
87:2
**cancellations (1)**
87:1
**capability (1)**
80:4
**capable (2)**
19:18;74:2
**capacity (4)**
4:11;63:17;105:25;
119:7
**capping (1)**
185:1
**caps (1)**
295:11
**captain (58)**
41:24;42:7,11;43:2,
3;46:8,9,15,19;48:24;
71:19;72:25;73:4,7,19;
79:22;80:8;119:17,19,
21,23,24;149:10;
154:9;163:22,24;
164:3,5;165:25;222:1,
2,4;223:20,24;224:7;

227:6;229:12,21;
230:9;231:24;246:10;
249:24;250:18,23;
251:6,12,15;257:7,14;
259:7;277:19;289:22;
293:6,7;297:6,11;
298:3,11
**captains (4)**
190:19;221:13,15,24
**captain's (2)**
45:7;120:2
**captured (3)**
112:9,15;254:5
**care (3)**
7:21;67:4;233:3
**career (5)**
37:5;67:25;69:3;
82:21,22
**careful (1)**
192:10
**carefully (4)**
92:9,11,12;268:4
**carries (3)**
75:24;163:1;216:20
**carry (2)**
50:22;163:3
**case (45)**
5:14;6:12;19:5;
26:10;28:11;36:2,9;
51:18;53:15;54:7;64:4;
87:5,16;88:10,24;
97:20;99:4,19;101:23,
25;102:6;103:1;
106:16;111:16;115:22;
116:6;131:22;137:3,9;
149:2;156:1;163:4;
165:18,19,24;208:4,8,
10;255:12;258:15;
263:4;269:7;272:14,
23;279:15
**cases (1)**
208:3
**cash (3)**
292:13,14,15
**Castle (1)**
66:12
**catch (1)**
259:19
**catching (1)**
18:15
**categorically (3)**
270:20;271:3,10
**category (4)**
54:1;70:11;220:7;
287:21
**catwalk (1)**
203:8
**caught (2)**
14:23;211:13
**cause (11)**
12:25;24:17;93:1,2,
6,7;95:21;96:12;
108:10;113:2;199:14

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 82 of 111

TIMOTHY REDDEN
October 25, 2019

**caused (5)**
90:18,23;94:15;
274:9;281:12
**causes (2)**
275:23;276:6
**caution (3)**
129:24;190:17,18
**CBT (7)**
21:10,21;22:5,14,25;
23:3,8
**CBTs (4)**
21:14,16;22:16,18
**cell (335)**
10:21;13:11,13,17,
19,25;14:1,22,23;15:7,
19,21;17:6,9,10,15,22,
23;18:5,24;19:4,15;
20:6,6,8,12,13,16,18;
24:2,6,12,15,24;25:1;
26:1,4,6,8,12,15,16,17,
18,23;27:7,10,18,25;
28:16;31:11,13,20,22,
23,23;34:6,8,9,10;41:9;
42:16;45:25;46:2,13;
47:7,22,23;51:13,21;
52:16;53:8,11;56:13,
13;58:1,18,20;59:1;
61:20;62:8,15,16,18,
19,20;63:22;64:3,10,
10;69:16;70:4,5,23;
71:9;74:6,13,15,16;
75:11;81:2;104:9;
113:12,19;121:17;
124:19;125:23;127:25;
128:6,17,18;129:16;
131:7,8,10;132:2,4,9,
13,21;133:4,9;135:12;
136:7;137:4,21;138:1;
139:10;142:24;144:15;
145:22;146:2,5,10,20,
22;147:11,18,19;
148:12,14,24,25;149:8;
150:16,18;157:3,9,16;
158:20;160:10,21;
161:7;162:13,24;
163:7,14;164:14;
165:3,15,17,17,18;
166:12,18,24;167:10;
168:16,18;169:5,6,23;
170:19;173:1,6,8,11,
20,23;174:7;175:5;
176:17,19;178:12,16,
22;179:8;180:19;
181:6,8,11,25;182:21;
183:4,22;184:10,12,15,
20,22;185:4,13,14;
187:16;188:14,15;
189:5,23;190:12,24,25;
191:6,11,16,20;192:24;
193:3,9,25;194:1,14,
16,16;195:10;197:9;
199:7;200:5,19,24;
201:11,12,15,22;

202:22;204:12,15;
206:17,20,20;207:16,
18;208:4,15;209:24;
210:2,11,14,15,16;
211:3,17;212:8;
213:11;214:15,17,23;
215:4,12,17,18,18;
216:2,2;223:18,21;
224:6;225:8,9,12;
226:22;227:12,25;
228:2;229:4;230:23,
25;231:24;232:3,8,18,
25;233:6,15;235:1,20;
238:7;239:10,14,17,22,
25;240:1;242:9;
243:11;247:2,18,22;
249:14;250:2,8,11;
251:2,7,9,11,18,21,25;
252:1,6,7,25;259:21;
262:11,14,17;272:5,9;
274:2,8;275:13;
276:15;280:5;281:12;
282:24;283:3,17,18,21;
285:13;286:12,15,25;
303:4,4
**cells (20)**
16:7;17:7,17,18;
57:24;136:12;184:19;
185:2;187:19;188:13,
14,14,16;202:4;203:7;
204:16,22;214:11;
219:21;283:8
**center (1)**
227:21
**Certain (14)**
11:2;21:18,19;27:13;
46:24;64:7;71:4,5,21;
139:16;188:24;218:19;
271:16;276:4
**certifications (1)**
82:3
**certified (1)**
49:11
**chain (5)**
74:6;77:18,20;78:2;
79:11
**chain-of-command (1)**
77:25
**challenge (1)**
76:1
**challenging (1)**
76:4
**chance (5)**
16:21;91:22;93:18;
114:10;250:16
**change (9)**
39:21;94:13;104:21;
124:10;139:12;224:16;
233:12;248:11,19
**changed (5)**
34:22;42:6;66:6;
149:25;213:20
**changes (3)**

46:20;77:21;222:11
**changing (1)**
39:21
**chanting (2)**
242:23;243:3
**chaotic (1)**
71:3
**charge (23)**
70:15,24;71:2,12,18,
23;73:20,24;74:12;
75:14,18;76:5,12;
77:11;78:9;81:7;
122:22;123:15;131:20;
137:10;148:25;216:1;
232:6
**charged (1)**
286:15
**charger (1)**
143:7
**Charlie (1)**
213:10
**charred (1)**
210:11
**chatter (2)**
217:7,13
**check (47)**
29:8,11,17,18,20;
30:1,5,12;44:5;60:8;
69:16,17,23;70:8,9;
140:15,21,22;142:16,
18;149:21;163:12,17;
164:1,10,11;165:22;
216:7,8,18,19,21,21;
217:24;218:21;224:21;
234:12;240:7;241:6;
242:14,16;243:6;
251:22,24;252:9;
270:18;283:9
**checked (3)**
141:16,18;234:14
**checking (3)**
136:6,6;298:15
**check-ins (1)**
63:20
**checklist (1)**
141:6
**checks (13)**
40:12;44:17;45:3;
117:14;134:25;135:14;
136:3,17;137:17;
142:4;150:5,5;286:25
**chemical (7)**
23:14;194:24;
196:16,17;225:11;
242:10;248:7
**chemicals (1)**
212:10
**chief (4)**
17:4;213:12;216:19;
220:8
**children (3)**
35:16,18,20
**Chip (2)**

278:1;279:16
**chitchat (2)**
126:12;127:1
**choose (3)**
77:14,14;296:16
**circulated (1)**
114:5
**circumstance (1)**
77:5
**circumstances (4)**
13:21;29:2;30:13;
76:19
**City (4)**
30:19,24;81:11;84:4
**civil (2)**
83:25;84:2
**claim (3)**
89:20;90:5;277:16
**clarification (3)**
78:5;100:14;251:5
**clarified (1)**
273:10
**clarify (5)**
126:23;143:25;
145:20;151:5;251:13
**clarifying (2)**
93:3;128:12
**class (3)**
21:3;57:15;150:7
**classification (4)**
22:19;109:3;129:13;
295:6
**classroom (6)**
22:1,4,10;23:19,23;
24:4
**clean (2)**
9:12;18:16
**clear (37)**
19:22;23:10;26:14;
41:25;53:16;58:1;
104:9;107:10;122:8;
126:11;154:1;160:1;
166:5;169:20;170:9,
18;172:23;183:15;
184:9;188:20;196:6;
199:19;225:7;227:19,
23;240:18;256:9;
257:13;258:11;262:8;
265:14;266:7;271:2;
273:8;274:18,19;286:3
**clearance (1)**
163:21
**cleared (2)**
150:10,12
**clearer (1)**
153:23
**clearly (6)**
89:23;90:7;245:9;
266:23;282:2,3
**clip (2)**
138:11;268:6
**clips (3)**
138:13,14;143:13

**clock (4)**
154:4;156:14,16;
214:21
**close (21)**
60:3;162:19;188:12;
190:23;191:15,16,19;
193:5,9,12,18;196:25;
206:20;228:20;242:7;
245:13,17,18;255:23;
284:14;287:11
**closed (1)**
133:22
**closer (7)**
153:13;170:12;
184:3;192:9;193:3,12;
244:22
**closes (1)**
159:9
**clothes (1)**
215:15
**clothesline (1)**
190:21
**clothing (1)**
191:14
**clouded (1)**
265:16
**clue (6)**
108:10;168:1,2;
181:20;225:3,3
**CO (2)**
69:7;109:7
**coat (1)**
124:8
**code (15)**
54:12;55:12,14,15;
56:24;59:25;145:2,4,6;
158:1;214:2;247:11,
14;272:16,18
**codes (4)**
55:4;56:24;59:5,18
**collapse (1)**
211:13
**collapsed (3)**
211:2,11,15
**colleagues (2)**
28:7;34:11
**collect (1)**
150:10
**collected (1)**
104:15
**collectively (1)**
124:15
**college (1)**
82:2
**color (2)**
142:7;253:23
**combined (1)**
122:2
**comfortable (4)**
63:25;64:5,6;291:4
**coming (46)**
57:8;116:7;152:9;
154:12;168:16;170:21,

22,24;171:22;172:5,8;
174:4;184:10,20;
185:4,11,18;192:24;
207:17;209:11;211:17;
212:13,14;217:11;
218:23;223:14;226:20;
231:7,8,12;240:3;
241:20,24;247:8;
255:13;256:1,3,22;
257:3;272:14;278:12,
20;282:12;285:21;
286:1;290:12
**command (6)**
74:6;77:18,20;78:2;
79:11;142:2
**comment (1)**
170:7
**commissioner (1)**
276:22
**common (4)**
15:23,25;140:12;
219:7
**commotion (8)**
30:10,11;169:14;
171:3,6,7,25;174:18
**communicate (13)**
33:25;86:6;140:3;
215:6,7;221:24;
226:23;228:14,20;
229:15;251:6;284:23;
300:7
**communicated (4)**
61:5,6;86:9;231:14
**communicating (3)**
169:2;172:25;236:12
**communication (3)**
83:14;85:9;166:7
**communications (6)**
125:19;126:18;
127:3,9,11;169:23
**compare (1)**
173:15
**compared (1)**
213:7
**compass (1)**
131:13
**compiled (1)**
99:7
**complaining (1)**
221:20
**complaint (6)**
88:3,24;89:10;
107:13,20;108:4
**complete (5)**
8:17;21:2;22:6,7;
105:5
**completed (4)**
21:18;81:16;167:17;
255:6
**completely (5)**
59:1;74:4;185:13;
269:4;283:12
**complicated (1)**

143:11
**Complying (2)**
188:11;254:9
**component (3)**
23:3,20,23
**composites (1)**
97:16
**comprehensive (2)**
60:20,20
**computer (16)**
21:12,13;104:16;
105:4;106:5,21,25;
107:21;108:21;128:23;
149:16,17,19;253:21;
258:24;259:1
**computer-based (4)**
21:1,4,7,21
**computers (1)**
108:18
**concept (2)**
61:1,4
**concern (1)**
190:15
**concerned (2)**
178:19;190:11
**concerns (1)**
240:14
**concluded (1)**
303:16
**conclusion (1)**
79:22
**condition (2)**
138:20;158:12
**conditions (2)**
10:11,13
**conduct (8)**
5:10;38:10;41:7;
65:21;77:1;119:9;
150:3,9
**conducted (3)**
100:10,11,14
**conducting (6)**
58:2;119:10;134:25;
135:14;136:3;263:14
**conference (1)**
8:9
**confidence (2)**
291:23,24
**confident (1)**
291:25
**confidential (3)**
99:9;100:2;222:13
**confining (1)**
57:21
**confirm (1)**
294:7
**confirmatory (1)**
4:23
**confirmed (1)**
55:7
**conflict (2)**
6:23,25
**confusing (1)**

14:15
**confusion (2)**
233:17,24
**Congratulations (1)**
36:14
**connected (3)**
113:11;156:19;255:9
**connection (11)**
83:13;85:6,17,23;
86:9;111:12;114:5;
115:3,7;161:6;292:16
**connects (1)**
161:7
**consider (1)**
300:5
**consideration (1)**
58:15
**considered (3)**
59:5;78:19;79:17
**considering (1)**
25:6
**consist (1)**
17:3
**consistent (14)**
11:6,11,16;113:23;
248:13;250:4;251:18;
259:10,13;260:3;
273:8;275:12;297:20,
23
**consists (3)**
21:7;52:17;99:23
**constant (1)**
190:25
**constantly (4)**
127:20;130:10;
191:8;198:23
**constitutional (2)**
27:14;89:21
**construction (1)**
77:24
**contact (7)**
23:11;127:20;
227:11;250:2,17,23;
264:3
**contacted (3)**
83:5,8,15
**contacting (2)**
67:17;249:24
**contain (2)**
97:25;221:3
**contained (4)**
97:19,24;98:6;100:6
**containing (2)**
99:3,3
**contains (3)**
93:10;97:12;297:11
**contaminated (1)**
250:3
**contend (2)**
295:24;298:5
**content (5)**
20:20;66:9;85:4;
99:14;101:19

**contents (8)**
23:2,8;99:11,14;
101:15;114:19;115:25;
143:22
**context (4)**
62:15;167:19;254:2;
255:14
**continued (2)**
200:16;244:24
**continues (2)**
249:24;251:11
**continuing (2)**
281:7;287:11
**contradicts (1)**
295:2
**control (34)**
23:11;28:21,22;
45:19;138:2,18;
140:23;143:19;151:13,
15,16;152:2,20;153:3,
25;154:12,21;155:1,
13;156:3,7,10,12,13;
157:2;159:14;165:15;
215:8,9,11;218:22;
229:9;240:24;247:8
**controlling (1)**
53:24
**controls (1)**
222:22
**conversation (29)**
9:5;85:4;115:15;
125:10;166:11;195:21,
25;199:20;200:22;
201:3;218:24;227:2;
229:1;231:23;232:17;
233:3,14;234:10;
237:10,13,17;239:1;
276:17,20;282:19,22;
284:1,3,13
**conversations (18)**
127:3,12;235:17,23;
237:8,11,21;238:8,10;
239:4,5;278:21;283:1,
4;288:1,8;289:20,21
**convey (1)**
230:10
**conveyed (2)**
218:2;219:2
**conveying (1)**
230:12
**convicted (1)**
290:18
**cool (2)**
60:11,11
**copies (2)**
105:21;167:17
**copy (15)**
5:13,21;84:18;87:15;
91:9;107:13;121:6;
122:10;222:14;254:25;
291:21;292:14;295:21;
297:4,5
**corner (11)**

109:22;121:14,16;
161:3,4,17;201:6;
242:25;244:22;246:22;
253:22
**corrected (1)**
273:10
**Correction (4)**
11:7,12;37:13;
155:16
**correctional (58)**
11:5;13:7,10,16;
14:8,21,24;15:5,20,25;
16:3,5;22:24;24:11,23;
26:5,16,23;27:6,9,17,
24;28:4,8,19;29:1,5,14,
24;30:2,9,14;35:23;
36:3,18;37:6,17;38:8,
14;40:5,16;46:25;
54:17;67:25;68:18;
69:3,6,21;72:6,9,12;
117:6;118:17;119:7;
167:20;215:1,4;295:6
**Corrections (5)**
7:16;11:18;67:23;
82:5,6
**correctly (12)**
14:17;27:2;39:15;
42:15;43:19,21;62:6;
131:6;174:11;183:7;
223:10;282:1
**correlates (2)**
60:2;222:21
**correspondence (3)**
4:15,16;5:5
**counsel (8)**
4:17,17;6:1,18,18;
9:14;88:3;297:4
**counselor (1)**
129:12
**counselors (2)**
130:6;134:1
**counselor's (12)**
130:1,7;131:16,23;
133:4,12,16,19,20;
134:8,11;135:12
**count (12)**
141:9,13;150:10,12;
159:24;187:18;213:1;
244:14;245:19;255:6;
261:14,18
**counted (1)**
283:22
**counting (3)**
188:3,7,10
**couple (16)**
4:14;10:25;88:13;
102:12;148:5;161:17;
204:8;205:3;218:23;
219:3;221:16;258:8;
261:17;276:12;301:4,
10
**course (9)**
16:17;20:14;26:13;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 84 of 111

TIMOTHY REDDEN
October 25, 2019

61:25;178:17;207:12;
218:20;245:6;261:2
**court (14)**
6:6,13,15,24;8:9;9:1;
30:24;31:1;83:21;
87:14;88:22;107:11;
253:16;262:8
**courtroom (3)**
8:5,8,10
**cover (5)**
14:6;16:14;23:9;
60:12;201:16
**coverage (3)**
50:25;291:7;292:5
**covered (7)**
16:7;18:23;20:7,25;
23:22;59:8;262:12
**covers (6)**
14:7;23:14,25;24:5;
60:9;222:23
**cracked (2)**
192:19,23
**crap (2)**
260:1,16
**crash (1)**
162:5
**create (1)**
168:7
**created (12)**
103:25;110:8;114:9;
133:15;151:18;154:9,
12;166:7;167:20;
168:13,14;296:3
**creates (1)**
77:22
**creating (2)**
167:18,24
**credentials (1)**
108:21
**crew (2)**
270:23;271:13
**cried (1)**
284:21
**crime (1)**
290:18
**cross (1)**
177:12
**cry (1)**
284:8
**cup (1)**
219:4
**curling (1)**
185:5
**current (4)**
7:13;31:4;58:11;
139:6
**currently (5)**
7:11;32:6,22;35:22;
221:25
**curriculum (2)**
18:11;20:19
**curtain (1)**
136:8

**custody (28)**
41:3,4,6,8,9,12;
43:15;129:14,14;
146:20;157:4,6,15;
160:25;161:7;168:2;
181:5;224:7;227:12;
228:1,5;251:12,21;
254:23;255:1,5,9;
295:7
**cut (7)**
41:1;129:19;189:14;
228:4;243:18;253:20;
269:9

**D**

**daily (6)**
80:17,23,24;147:18,
19,20
**damages (2)**
89:19,20
**dampening (1)**
207:8
**danger (3)**
26:11;27:18,24
**dangerous (1)**
53:23
**Daniel (2)**
6:20;122:8
**dark (1)**
257:5
**date (10)**
21:18;37:12;93:23,
24;94:3;102:12,17;
115:3;277:23;296:25
**dated (1)**
36:12
**dates (3)**
102:24;106:18;
290:10
**daughter (1)**
291:8
**David (2)**
86:2;122:10
**day (51)**
39:7;45:6,21,22;
46:5;50:17,20;65:23;
67:6;71:6,9;74:3,7;
76:13;103:12;117:19,
22;118:2,4;123:3;
129:2,18;135:21;
148:4;158:16;159:18;
162:21;166:21;169:1,
1,2;182:18,21;216:19;
220:20;221:11;223:6;
230:25;245:8;247:8;
261:7,9,9,12;274:17;
276:14;289:23,25;
290:12;297:12;301:10
**days (10)**
32:19;42:10;64:23;
71:6;74:22;81:4;85:19;
139:5;182:22;261:17

**DCH (1)**
294:4
**dead (5)**
140:10;225:4,4;
229:10;230:18
**deadline (1)**
22:5
**deal (4)**
50:24;61:10;213:16;
290:1
**dealing (3)**
43:16;57:7;58:2
**dealings (1)**
287:24
**dealt (1)**
285:16
**death (1)**
83:4
**debriefing (9)**
112:25;113:2,9,10,
16;114:3,14;276:1,21
**debriefs (1)**
278:16
**December (1)**
84:18
**decide (2)**
58:22;67:25
**decided (6)**
46:8,9;69:3;109:14;
124:15;222:10
**decision (12)**
25:9,12;54:10;73:16;
76:1,5;79:6;119:24;
124:12;233:16;240:10;
297:1
**decisions (9)**
45:18;46:6;49:3,6;
51:10;73:13,17;79:9;
123:23
**deck (1)**
177:19
**deemed (1)**
79:18
**deeper (1)**
99:25
**Defendant (2)**
91:9;299:5
**defendants (7)**
5:4;6:22;87:24;89:9,
18;116:6;290:14
**defense (2)**
4:17;90:13
**Defenses (2)**
89:15;90:17
**definitely (18)**
186:1;191:4,7,9;
222:7;245:5,11;
254:21;261:8;265:5;
266:7,18;271:12;
276:11;284:20;285:12;
300:16,23
**definition (1)**
300:9

**degree (2)**
207:13;291:23
**degrees (2)**
210:12;277:3
**delivers (1)**
215:9
**demeanor (4)**
244:18;245:4;
284:17,18
**demonstrated (1)**
73:20
**denied (1)**
230:23
**Department (16)**
7:15;11:7,12,18;
37:12;49:12,20;67:22;
74:21;82:6;255:4;
271:19;295:7;297:18,
24;298:14
**departmental (1)**
49:14
**departments (1)**
276:24
**depend (1)**
74:16
**depending (17)**
15:11;22:12;33:23;
38:15;39:16;52:22,23;
53:6;54:12;56:16;
80:10;108:20,24;
121:8;122:23;131:9;
208:4
**depends (19)**
45:14,24;46:7;51:2;
56:9;64:23;67:13;72:1;
74:19,20,20,21;102:5;
134:1,12;158:12;
298:25;300:5,9
**depict (1)**
131:7
**deponent (1)**
5:13
**deposition (25)**
5:1,9,9,17;6:6;7:23;
16:17,22;87:5;102:9,
17;106:19;107:23;
109:18;110:4,7;
114:17,21;115:21;
116:1,16,24;246:14;
275:18;303:16
**depositions (5)**
102:20,23;107:24;
115:21;116:7
**depth (1)**
301:9
**deputy (1)**
276:21
**describe (28)**
17:1;21:4;121:10;
161:22;168:21;169:15;
184:3;186:23,24;
193:20;196:22;197:12;
202:8,20;207:10;

210:23;225:21;247:17;
251:15;252:7;274:8,9;
275:20,22,24;279:1;
286:20;287:9
**described (53)**
18:3;19:23;23:7;
30:14;44:1;54:7;69:2;
106:24;110:11;112:24;
114:2,15;117:18;
123:12;126:24;135:13;
143:18;149:2;151:4;
159:21;160:19;162:12;
167:15,16;172:10,11;
175:23;186:23;190:23;
197:8;200:21;207:6;
209:23;223:9;231:25;
233:14;235:8,15;
240:25;244:11;246:14;
248:20;252:13;253:10;
257:13;259:18;264:5;
266:1,2;273:13;280:8,
21;284:17
**describes (3)**
219:17;220:2;248:25
**describing (48)**
19:23;20:17,20;
26:21;51:25;52:9;58:8;
97:14;102:2;104:18;
105:3,7,12;109:9;
117:8;131:17;143:17;
149:4;161:20;167:19;
171:7,25;172:23;
199:20;201:9;205:2;
206:19;211:4;219:19;
222:24;228:23;237:6;
246:18;248:13;249:24;
253:11;259:6,23;
262:4,9;265:15;270:5;
273:5;280:18;282:5;
291:10;295:18;298:14
**description (7)**
17:2;107:19;121:19;
173:6;193:2;222:21;
297:23
**designate (2)**
46:16;73:19
**designated (9)**
47:4,14,24;48:2;
49:7,21;52:10;122:24;
137:9
**designation (8)**
70:20;71:12;72:12,
23;73:6;78:8;122:22;
131:13
**designations (1)**
47:8
**designed (2)**
203:21;277:15
**destruction (1)**
245:3
**detail (5)**
59:24;128:10;179:2;
235:14;275:22

**BOSS REPORTERS
(219) 769-9090**

BARABARA DEVINE vs
RON NEAL; et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 85 of 111
TIMOTHY REDDEN
October 25, 2019

**details (7)**
19:10;23:6;117:1;
125:14;126:4;198:19,
19
**detained (1)**
290:20
**determination (13)**
23:16,18;25:5;71:17;
73:1;76:25;79:20;
95:18,20;97:17;99:24,
25;285:9
**determine (4)**
59:7;72:21;79:4;
263:15
**determined (3)**
93:2,7;293:4
**determines (3)**
49:21;57:13,24
**determining (2)**
23:11;49:8
**developed (1)**
94:15
**deviate (1)**
80:1
**deviated (1)**
79:15
**Devine (22)**
4:10,12;10:21;12:21;
83:4;90:18,23;94:15;
113:17;130:20;191:23,
25;197:8;206:17;
210:6,21;212:18;
246:4;287:23;288:1;
289:17;302:1
**Devine's (6)**
185:4;232:21;289:4,
14;301:12;302:10
**diagonal (2)**
161:17,18
**diagram (8)**
131:25;133:8;
161:21;187:16;188:3,
8,9;227:21
**dictated (7)**
45:20,21,21,23;46:4;
48:24;214:24
**dictates (4)**
49:18,20;67:3;79:8
**die (1)**
248:3
**died (4)**
196:24;207:11;
208:21;289:5
**difference (7)**
55:18;77:2;78:3;
133:6,9;156:1;170:2
**differences (1)**
265:6
**different (88)**
22:14,16;32:11;
33:14;38:13,14;39:3,4,
5,16,20;42:16;43:19;
44:18;46:13;50:12,20;

51:5,5;52:17;53:20;
54:5,24;60:21,25;64:2,
21;66:25;69:10,25;
70:6,11;74:4;75:23;
78:22;80:6,20;86:8;
98:21;99:15,16;102:5;
103:12;105:22;108:17;
110:14;117:19;119:14,
15;121:21;123:20;
124:1;128:20;129:13,
16;131:5,7,8;132:9;
134:15;148:5;156:2,
24;164:25;176:1;
198:25;201:10,16,18,
19;202:18,19;237:15;
239:8;255:2;259:1;
262:21;263:8;264:10,
16;266:4;268:8;
269:24;271:9;274:20;
279:18;282:5;292:20
**differently (14)**
11:22;12:2;13:4;
78:25;79:5;80:3,15;
158:1;238:5;266:3;
268:1,6;279:22;282:6
**difficult (4)**
9:2;219:9;221:4,21
**difficulty (2)**
218:13;221:9
**digital (2)**
149:15,24
**diploma (2)**
81:22,24
**direct (1)**
227:11
**directing (1)**
123:25
**direction (4)**
74:7;76:5;77:11;
80:6
**directions (5)**
74:12;75:17,21;78:9;
132:9
**directly (8)**
37:19;170:10;181:6,
7;191:18;227:25;
228:4;254:15
**disagree (3)**
36:23;37:2;84:24
**disappeared (4)**
207:12,14,15;208:18
**disciplinary (3)**
69:19,19;117:20
**discipline (24)**
75:24;76:17,17;77:5;
118:19,22;119:3,6,14,
15,19,25;120:1,9,14,
16,21;285:25;290:23,
25;291:2;294:7,21;
296:12
**disciplined (1)**
118:18
**disciplining (1)**

118:13
**discovery (6)**
5:2;36:9;255:17;
258:15;293:13;295:22
**Discretion (4)**
58:13;119:13;134:6;
180:4
**discretionary (2)**
58:9,15
**discuss (1)**
120:7
**discussed (13)**
4:20;20:11;59:22;
90:22;113:1;119:17;
124:18;222:10;234:24;
248:2;279:4,17;281:1
**discusses (2)**
59:23;77:17
**discussing (4)**
119:19;247:4;259:7;
301:9
**discussion (4)**
77:25;124:21;
175:10;301:2
**discussions (1)**
4:23
**dislike (1)**
287:4
**disobey (1)**
77:14
**disobeying (2)**
75:25;77:1
**dispatch (2)**
256:19,23
**dispatcher (6)**
40:9;46:7,18;255:7;
257:10;258:3
**dispatchers (1)**
40:9
**dispute (2)**
84:24;274:24
**disregard (2)**
302:10,17
**disrespect (2)**
125:4;126:7
**disrespectful (1)**
302:16
**disruption (3)**
241:1;280:5,6
**distance (3)**
185:10;187:3,5
**distinction (2)**
44:20;55:12
**distinctly (1)**
200:15
**disturbance (3)**
43:17;44:2;157:12
**DOC (11)**
6:8;36:13;37:6;
82:17,22;155:3;
230:20;232:8,10;
243:14;276:22
**Docket (3)**

5:14;87:16;88:24
**doctor (2)**
212:17;266:21
**document (74)**
5:18;6:1;36:2,9,15,
21;37:5;54:5;59:23;
60:20;77:25;78:6;
80:21,24;81:2;83:22;
84:14,17,25;87:17,19,
21,23;88:6,16,25;89:2,
5,7,14;91:9,11,12,15,
18,21,25,25;92:2,7;
93:21,24;94:10;
103:21;107:9,15;
109:11,13;110:8;
121:18;122:5,9,11;
151:18;152:13,15;
246:5,7,20,23,25;
278:4;279:8;292:1,13,
15,17;294:1;295:1,5,11,
17;296:3;297:8,11
**documentation (1)**
278:12
**documented (2)**
50:9;149:1
**documents (25)**
4:21;5:3;83:13;
102:8,16,23;103:6;
107:22;108:2,18;
109:6;112:23;114:4,
16;130:20,22,24;
131:2;137:2;151:25;
278:23;279:1;293:8,
17;294:7
**doggies (1)**
270:8
**doing-rounds (1)**
64:14
**done (35)**
12:2;13:4;21:14;
63:12;69:11;70:23;
71:16;79:12,13;
106:13,17;112:11;
123:20;126:3;142:4;
177:1;192:17;193:1;
200:9;214:22;225:14;
232:16;238:17;248:8,
15,17;252:19;272:22,
22;281:19;283:12;
286:4,4,7;303:15
**Donna (1)**
36:12
**door (144)**
26:18,23;56:17,19;
62:20,22;133:22;
146:18,19,20;157:7,9,
16;158:19;159:3,7;
160:4,4,6,6,8,21,24;
161:3,8,12,14,18,19,
20;162:1,2,2,13,24;
163:5,6,14;164:15,17,
20;165:8,9,22;166:18;
170:25;176:22,23;

178:2,4,9,10;189:9,13;
192:18;197:1;199:4,7,
12,14,17;200:2,24;
201:24;202:9,11,15,21,
24,25;203:1,2,3,5,7,18,
22,23;204:7,17;205:10,
25;206:2,3;209:1;
214:25;215:18,22,23;
216:2,3,7,24,25;
217:11;218:3,10,24;
225:15,16,19,22;226:3,
7,9,11,17,25;227:3,
9,11,13,14,19;228:2,3,
9,10,13;236:4;241:24,
25;242:2,9;251:3;
252:1,7,18,25;253:2;
264:25;273:17,20;
274:11,16;281:8,12,17,
21,23;282:12,18,21
**doors (36)**
17:11;56:18;159:6,
10,12,22,23,25;160:1,
2,5,12,13,20;161:21,
22;162:13;164:21;
165:2,6,7;171:5;175:5;
180:24;200:5;201:11;
202:14;203:2,14,20;
204:18;212:25;228:3,
9,23;234:21
**doorway (4)**
227:25;262:14,14;
264:21
**dorms (2)**
20:8,18
**down (104)**
9:1;21:11;65:20;
66:10;71:1;90:16;
92:13,16;93:20;97:8;
102:3;105:21;112:25;
113:2,4;114:4;119:3;
136:8;141:5,14;
142:18;143:13;144:8;
147:20,21;152:9;
153:2,9,10;154:4;
155:2;162:7;166:4;
167:4,17;169:21;
171:1,8,23;172:17;
176:6;177:5,25;
181:15;182:24;184:6;
187:8,16,19,22;188:1,
12;189:4,18,19;190:4,
12;192:16;194:13;
195:7;196:24;199:16,
25;200:10,18,20;201:4,
7;202:14;205:18;
206:25;207:11,24;
209:11;211:8,12,14;
215:21;223:15;225:13;
226:16;231:17,18;
236:15,19,21,22,23;
242:5;248:3;250:4;
256:4;262:19,21;
265:11;272:12;275:16;

**BARABARA DEVINE vs**
**RON NEAL, et al.**
Cause No. 3:18-cv-00995-JD-MGG
**TIMOTHY REDDEN**
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 86 of 111

276:22;278:3;279:4,
21;287:1;295:11;
297:15
**downsized (1)**
41:22
**downstairs (9)**
60:15;80:7;163:3;
190:13;199:3;219:15;
223:20;224:4;225:17
**Dr (1)**
293:22
**draft (1)**
110:10
**dragon (1)**
184:7
**drama (2)**
117:22,22
**drawing (1)**
161:10
**drawn (1)**
161:16
**dress (1)**
213:14
**dressed (1)**
216:10
**drew (2)**
227:20,24
**drifted (1)**
219:13
**drill (3)**
17:14,19,22
**drills (12)**
16:11,23;17:1,12,21;
18:1,3,4,7,10,23;20:14
**dropped (1)**
211:24
**drug (2)**
242:9;283:9
**dual (2)**
291:7;292:5
**dude (2)**
230:18;242:6
**Dudley (2)**
278:2;279:16
**due (8)**
27:18,25;148:12;
234:1;248:7;250:11;
279:22;285:25
**duly (1)**
4:3
**dump (1)**
154:11
**during (30)**
16:17;20:11;41:17;
43:14;47:9;63:8;69:6,
13,21,21;98:13;
100:18;106:4;113:9,
10,16;117:9;126:13;
129:18;139:24;210:2;
216:19;235:18;236:7,
7,13;237:3;260:24;
282:19;283:14
**duties (8)**

6:15;38:9,14;40:5;
53:17;63:5,8;67:15
**duty (5)**
138:9;298:18;
299:10,13;300:8
**Dykstra (36)**
43:3;147:4,5;149:10,
18;154:9;224:8,19;
227:6;229:12,21;
231:23,24;232:17;
233:14;235:3;240:7,
18;243:9;246:10;
249:25;250:18,24;
251:6,12,16;254:20,21,
23;257:7,14;259:7;
287:19;290:6;297:6;
298:3
**Dykstra's (3)**
230:9;297:11;298:11

## E

**ear (1)**
219:4
**earlier (58)**
20:17;22:12;23:9;
25:25;26:21;35:22;
44:21;58:24;63:4;
67:22;71:4;74:19;79:8;
86:22,24;88:11;90:22;
98:8;114:24;117:5,8;
121:2;122:21;128:16;
131:2;172:10,11,24;
183:8,15;186:16;
190:23;194:8;197:8;
201:9;228:23;233:12;
240:14;246:13;247:4,
10;248:2,20;252:14,
23;253:6;262:22;
273:9,19;275:2,12,18;
280:8;283:1,25;290:5;
297:20;300:6
**early (3)**
104:22;144:8;299:3
**easier (4)**
129:21;155:17;
226:23;277:7
**easily (1)**
263:10
**east (3)**
131:14;156:22;294:4
**east/west (2)**
132:5,10
**easy (1)**
8:25
**echelon (1)**
278:9
**edge (3)**
57:15;59:12,12
**educate (1)**
223:7
**educated (1)**
16:25

**educating (1)**
103:1
**education (3)**
81:16;82:1;267:15
**effect (6)**
15:4;42:18;72:13;
73:24;74:11;289:7
**effective (3)**
36:4,18;207:7
**efforts (2)**
139:11;275:15
**eight (5)**
50:12;187:20;
208:24;223:11;248:23
**either (32)**
46:15;49:2;64:3;
77:4,11;99:19;104:2;
108:13;110:16;114:5;
132:2,15,16;133:24;
135:23;166:17;176:12,
16;180:15,16;187:10;
194:7;199:10,11;
200:4;215:25;229:18;
236:8;257:6;277:17;
285:9;288:5
**elaborate (2)**
40:18;100:24
**electrical (3)**
23:14;150:3;196:21
**electronic (1)**
159:14
**element (1)**
128:2
**eligible (2)**
49:5,19
**else (27)**
12:2;13:3;35:11;
50:20;55:24;80:2;
104:3;110:14;112:23;
114:16;141:3;168:7;
175:18,24;196:11;
200:23;210:1;214:13;
233:1,4,9;236:2;241:5;
242:20;254:22;260:5;
271:22
**else's (4)**
26:17;100:3;106:23;
107:5
**e-mail (23)**
4:15;32:1,3,5,8,11,
22,24;33:1,4,6,7;36:12,
15,17;86:5;129:7;
298:17,18;299:19;
300:1,3,7
**e-mailed (2)**
278:24;299:2
**e-mails (1)**
290:10
**emerged (1)**
255:22
**emergencies (2)**
46:1;57:3
**emergency (42)**

14:5;15:17,18;53:21;
54:8,9;59:8,15,17;
120:11;144:24;145:7;
158:4,8;159:18;162:5;
163:4;173:23;179:23;
180:2;181:17;183:3;
186:14;219:23;220:1,
5,17,25;221:22;222:16,
19;223:1;227:10;
235:6,19;236:1,14;
237:4;245:7;249:20;
279:19,24
**emotionally (1)**
64:4
**emphasis (1)**
179:20
**employed (4)**
7:11;35:22;116:9;
213:25
**employee (2)**
6:8;293:18
**employees (1)**
299:18
**employment (2)**
7:13;83:5
**empty (1)**
66:18
**en (1)**
217:11
**encounter (2)**
57:4;260:2
**encountering (1)**
58:4
**encourage (1)**
142:10
**encouraged (3)**
68:13;142:2,9
**end (8)**
9:6;58:25;61:21;
75:5;188:17;234:12;
258:16;285:21
**ended (7)**
106:14;107:3;
147:22;233:17,18;
234:18;283:16
**endure (1)**
193:14
**enforce (1)**
190:19
**enforcement (2)**
82:8;290:21
**engaged (5)**
206:3;298:20,22;
299:6,25
**engulfed (3)**
124:9;198:2,17
**enhancement (1)**
169:16
**enjoying (1)**
244:20
**enough (13)**
74:24;189:11;
193:12;196:25;197:25;

202:14;220:10;228:20;
245:13,17;261:23;
285:1;291:16
**ensuring (1)**
70:22
**entail (1)**
70:21
**enter (2)**
41:8;209:15
**entered (2)**
151:10;178:22
**entering (5)**
130:16;175:24;
189:22;262:17;303:4
**entire (7)**
37:15;39:1;63:11;
82:22,22;210:11;
213:25
**entirely (1)**
139:18
**entirety (1)**
213:20
**entitled (1)**
89:18
**entrance (6)**
164:14;166:23;
180:19;181:11,25;
183:4
**entrusted (1)**
72:22
**enumerate (1)**
258:10
**environment (2)**
23:15;229:19
**envisioning (1)**
265:20
**equipment (7)**
27:1;138:16;150:5;
186:13,14;215:15;
216:4
**equivalent (1)**
132:1
**ERO (2)**
222:21;279:19
**Erratically (2)**
207:3,4
**error (1)**
156:24
**ers (1)**
280:25
**erupted (1)**
207:21
**erupts (1)**
43:23
**escape (2)**
14:5;210:15
**ESI (1)**
5:3
**especially (5)**
58:5;133:24;173:23;
196:20;237:25
**essentially (2)**
70:12;211:2

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 87 of 111

**established (2)**
89:23;90:8
**Estate (1)**
4:11
**estimate (9)**
38:2;181:17,20;
182:6;183:2;184:9;
185:10;189:21;245:22
**estimated (1)**
277:3
**estimating (1)**
182:13
**eternity (1)**
187:11
**ethic (1)**
73:15
**evac (1)**
224:5
**evacuate (12)**
223:21;224:4;
227:17;230:22,23;
231:2,3;232:25;
233:25;240:19;249:25;
251:13
**evacuated (11)**
17:18;148:13;
190:14;226:18,22;
231:7,8;240:1;251:17,
22;252:10
**evacuating (2)**
232:18;233:15
**evacuation (10)**
17:14,22;20:17;
130:25;131:8;212:8;
226:24;232:22;241:2;
280:5
**evaluation (1)**
73:10
**Even (52)**
8:21;9:9;49:17;
56:25;57:19;58:19,22;
60:6;64:10;65:24;75:4;
95:2;108:12;116:9,17;
127:3;128:2;142:16,
18;144:17;153:22;
154:17;155:22;157:19;
163:18;168:2;175:13;
187:10,20;188:24;
197:5;198:7,11;214:8;
219:12;229:23,24;
231:4;234:14;249:17,
18;256:9;259:9;265:5;
266:13;277:14;281:14;
282:3;288:23;290:17;
296:22;297:24
**evens (2)**
133:2,3
**event (1)**
266:1
**events (1)**
11:1
**eventually (2)**
208:21;213:15

**everybody (19)**
26:11;48:19;54:22;
100:3;127:16;139:1;
141:3;171:14;214:13,
20;219:13;233:4;
234:14,19;244:20;
271:22;278:2;283:8,23
**everybody's (3)**
104:6;125:5,6
**everyone (16)**
17:15;21:11;22:2,5,
20;39:18;67:19;
142:10,13;146:14;
171:18;215:12;219:15;
237:13;245:1;257:22
**everyone's (1)**
97:19
**Everything's (1)**
214:22
**everywhere (3)**
42:10;65:24;69:11
**exact (6)**
48:19;192:8;244:17;
261:18;277:23;298:12
**exactly (24)**
14:6;21:10;98:4,4;
108:8;109:21,23;
186:1;203:9;230:15;
233:11,13;235:22,23;
239:23;248:12;262:18,
22;264:6;274:16;
275:22;281:15;291:20;
296:10
**EXAMINATION (3)**
4:4;301:6;303:1
**examine (1)**
5:11
**examined (1)**
4:3
**example (18)**
20:2;24:15;26:15;
39:22;47:12,21;50:22;
56:20;57:14,21;78:16;
100:9;101:21;106:3;
152:17;173:13;266:10;
298:25
**Excel (7)**
149:24;151:4,5,8,9;
152:22,25
**excess (1)**
283:6
**excuse (1)**
30:13
**excused (1)**
303:16
**executed (1)**
5:13
**exhaust (1)**
277:15
**exhausted (2)**
207:23;208:21
**exhibit (34)**
5:17,18,20,21;36:6,7,

8;83:20,21;87:13,14;
88:21,22;91:7,8;
130:18,19;161:2,10,17;
227:20,22;246:1,3;
253:15,17;292:12;
293:9,9,13,14;295:5;
297:3,5
**exhibited (1)**
302:10
**Exhibits (1)**
292:8
**existed (4)**
70:17;71:7;213:24,
24
**exists (2)**
72:9;213:23
**exit (6)**
17:8,9;161:4,22;
162:1,12
**exited (4)**
212:7;223:20;224:6;
227:4
**exiting (2)**
130:16;227:5
**expanded (2)**
189:13;282:18
**expect (1)**
169:6
**expected (1)**
116:2
**expecting (1)**
164:17
**experience (19)**
55:22;71:22,25;82:5,
8,10,12;125:13;198:10,
11;243:14;265:24;
266:22;267:9,17;
268:9,13,23;278:19
**experienced (4)**
49:1;50:3;266:12,13
**experiences (2)**
101:10,11
**experiencing (1)**
268:23
**expert (2)**
185:24;212:17
**expertise (1)**
18:19
**explain (20)**
12:4;24:19;25:17;
27:21;29:18;45:22;
56:7;61:18;63:20;98:3,
24;102:1;116:23;
140:19;148:9;154:23;
159:5;224:11;276:11;
282:13
**explained (5)**
218:11;262:18,22;
277:2;285:13
**explaining (2)**
224:14;277:1
**explanation (5)**
253:8;295:17;296:2,

6;298:3
**explicitly (1)**
14:6
**explode (1)**
276:15
**exploding (1)**
128:7
**explosion (2)**
276:6,12
**explosions (2)**
275:20,25
**express (2)**
240:21;241:11
**expressed (1)**
244:1
**expressing (2)**
282:2,3
**expressions (2)**
245:13,17
**extent (6)**
95:22;98:5;128:11;
198:20;237:2;250:5
**external (1)**
258:8
**extinguish (1)**
280:24
**extinguished (4)**
225:18;248:15;
250:25;251:9
**extinguisher (28)**
23:5;175:13,19,20;
186:17,20;189:6;
192:14;194:10,12;
195:8,13,16,18;196:2,
4,13,23;207:7,23;
208:19,21;210:25;
217:19;223:11;248:3;
275:15;277:11
**extinguishers (18)**
19:1;24:1;126:1;
194:17,22;195:3;
198:25;199:2;225:12;
242:12;248:7;249:1,
10,13,13;251:2;
280:22;281:2
**extra (6)**
53:24;163:9,11;
170:16;219:5;239:13
**extraction (5)**
47:7;52:16;53:8,11;
121:18
**extravagant (1)**
287:2
**eyes (4)**
237:17;245:14,15;
284:7

**F**

**face (9)**
191:14;194:2;198:6;
225:2,2;228:11,12;
238:3;242:6

**facial (4)**
198:19;244:18;
245:13,17
**facility (14)**
6:11;41:8;43:17,23;
59:2;61:9;67:1;70:13;
78:13;94:19;117:14;
140:4;215:9;298:1
**fact (23)**
25:6;41:19;80:14;
106:13;123:22;168:11,
14;179:22;208:18;
214:3;233:22;247:23;
261:17;264:24;270:21;
289:1;294:7;295:2,15,
24;296:23;298:15;
303:8
**factor (1)**
120:6
**factors (1)**
59:6
**facts (4)**
90:5,11,12;95:1
**Fahey (3)**
257:12,20,21
**fail (1)**
15:7
**failed (1)**
249:2
**failing (2)**
120:17,17
**fails (1)**
162:1
**failure (1)**
120:10
**faints (1)**
53:21
**Fair (70)**
18:20;22:7;25:23;
26:18;30:16,17;44:7,
12;60:23;62:23;64:11,
12;65:6;74:1,8;75:10,
18;77:8,10;81:8;89:3,
4,11;90:3;91:5;96:20;
97:10;99:11;100:5,23;
101:20;104:23;106:5;
108:20;117:15;119:18;
125:11;127:4;130:10;
135:4;147:13;153:6,
13,24;156:8;169:24;
181:12;185:22;186:3;
188:25;207:8;237:4;
247:14;249:8,12;
252:14;261:13,14;
263:19;266:19,24;
273:11;275:1;282:7;
286:10,16;297:13,21;
303:5,12
**fairly (3)**
8:21;193:5;235:14
**fairness (1)**
124:23
**fall (3)**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 88 of 111

210:21;211:7,8
**falling (2)**
211:6,9
**falloff (1)**
285:20
**falls (2)**
53:21;60:16
**false (2)**
265:16;298:5
**familiar (10)**
36:14;70:14;86:2;
90:2;91:12,13,15;
121:18;182:19;208:9
**familiarity (1)**
181:14
**familiarize (1)**
91:20
**family (6)**
116:17;117:2,3;
282:8;289:14,17
**fans (1)**
277:15
**far (68)**
6:24,24;12:13;13:14;
18:10;19:4,6,16;22:8;
39:17;45:4;49:12;52:1;
58:16;60:9;67:6;70:2;
74:4;93:11,14;95:5,9,9,
11,13,15,16;96:1,9;
97:3;100:24;102:14;
103:17;108:14;113:24;
123:9;127:7;129:2;
137:9;141:20;145:17;
148:21;157:8;168:4;
169:15;171:17;180:23;
185:10;187:16;188:17;
191:25;207:10;211:21;
217:9,16;219:25;
220:12;222:21;232:25;
245:15,22;250:4;
254:10,11;256:6;
271:4,5;290:3
**farthest (1)**
193:4
**fashion (1)**
17:8
**fast (15)**
155:2,13,23;156:15,
23;158:5,6,9,10;159:1,
15;180:10;185:25;
214:25;291:16
**faster (1)**
159:17
**fatality (1)**
233:2
**fatter (2)**
202:10,10
**fear (1)**
240:20
**features (1)**
198:19
**February (2)**
88:6,10

**fed (1)**
208:8
**federal (3)**
89:20,21,22
**feel (9)**
63:25;64:4,6,23;
118:3;193:8;274:17;
282:16;296:21
**feeling (2)**
193:17;285:3
**feelings (1)**
284:25
**feet (6)**
185:13,16;190:24;
192:2;245:19,23
**fell (9)**
165:21;210:5;211:3,
10,18;212:3,4,4,19
**felt (9)**
45:18;176:1;187:11;
199:6;224:22;230:2;
232:23;240:13;285:15
**female (6)**
115:10;136:23;
137:17;144:5;233:25;
236:4
**females (1)**
136:23
**fence (1)**
244:23
**fences (1)**
150:3
**fencing (1)**
133:15
**few (5)**
198:25;256:20;
261:16;262:2;280:15
**field (4)**
61:21;84:1;231:10;
295:6
**fight (1)**
50:24
**fighting (2)**
19:16;242:3
**figure (5)**
61:12;126:8;179:3;
235:7,9
**figured (1)**
260:16
**file (37)**
36:11;93:10;97:12,
14,21,24,25;98:6,9,10;
99:3,4,7,12,15,19;
100:7,19;101:6,9,16,
16,23,25;109:19,24;
149:24;151:4,6,8,9;
279:3;288:13;293:12;
295:16,19;296:18
**filed (7)**
83:3;87:16;88:6,17,
24;289:20;290:9
**files (6)**
98:12,17;108:13,16,

22;109:1
**fill (2)**
45:8;72:16
**filled (7)**
71:11;91:16;225:5;
250:3,8;262:15;264:22
**filling (1)**
50:3
**final (1)**
110:10
**Finally (2)**
198:24;218:23
**find (9)**
121:7;155:5;178:18;
196:20;208:24;209:1;
219:4;238:18;278:10
**finding (1)**
232:20
**fine (5)**
18:15;22:1;126:10;
218:20;238:4
**fingers (1)**
211:23
**finish (3)**
14:12;243:18;283:11
**fire (316)**
10:21;12:3,4,8,14,16,
25;13:12,17,25;14:5,
23;15:8,20;16:8,11,23;
17:1,4,11,21,24,25;
18:2,8,17,22,25;19:1,3,
17,18,20,20;20:1,2,6,
12,14,21,21;22:17,20;
23:3,5,8,12,16,22;24:1,
5,6,12,13,25;25:1,6,7,7,
15,18,22,22,25;26:4,
16,22;27:5,11,18,25;
28:16,20,22,23,24,25;
29:16;33:10,11,14,15,
18,21,21;34:4;53:10;
54:1;55:4,4,7,10,13,16,
17,19,23,24;56:23,23;
83:3;90:18,23,25;91:4;
93:1,6,10,11,14,19;
94:10,12,14,16,18,21;
95:6,14,14,16;96:4,7,
12,19;97:13;101:2;
107:25;108:4,6;
109:12,20;110:1;
113:7,11,18,18,25;
123:8;124:5;126:1;
127:25;130:25;132:21;
137:21,24;138:2;
143:18,19,25;144:2,15;
151:14;157:3,21;
164:13;170:1,3;
171:14;172:8,18;
173:4,24;175:13,14,18,
20;176:7;178:13,16;
179:25;183:25;184:8;
185:22,24,25;186:4,13,
17,20,24;187:9;189:1,
4;191:14;192:13;

193:18;194:10,12,17,
22;195:2,7,12,16,18;
196:2,4,13,23,24;
198:7,18,22;199:1;
202:17;207:7,8,16,22;
208:8,19;209:9;
210:24,25;212:6,12,14,
21,22;213:9,12;214:2,
8,19;215:3;216:4,4,6,
16,19;217:16,17,19,22,
25;218:2,3;219:8;
220:8;223:11;224:24,
25;225:11,18;226:21;
229:7,25;230:11,12;
231:6;233:19;234:12;
240:6;241:6;242:12,
16,20;246:10;247:22;
248:3,3,6,7,8,14,15,21;
249:2,9,13,13;250:12,
16,25;251:7,8;259:25;
260:2;261:6,7;268:7;
270:23,25;271:1,7,13,
19;272:4,15,18,20;
275:15;276:1,18,23;
277:2,7,10,11,25;
280:4,9,11,13;290:15;
297:18,24;298:14;
301:8,15,16,21;303:6,
8,10
**firefighter (4)**
214:15;215:14;
219:18;222:25
**firefighters (19)**
167:24;209:20;
213:19;215:5,7,25;
216:3,6;218:16;220:3;
223:14;224:18;225:8;
229:5;231:14;250:24;
252:18;270:22;282:20
**firefighting (1)**
19:23
**firehose (1)**
243:7
**fireman (3)**
24:16;185:24;272:10
**firemen (33)**
23:18;24:8;113:5;
125:25;127:18,18;
192:22;198:24,24;
199:1,4,4;209:6;212:9,
24;216:23;217:25;
218:9;243:4;248:25;
251:25;252:6,24;
269:14,24;270:8,14;
272:1,7,13;280:23;
282:14;298:8
**fireproof (1)**
24:16
**fires (11)**
19:24,25;28:17;57:2;
113:6;207:13;223:12;
242:14;260:25;261:11,
16

**fire's (1)**
177:7
**firing (1)**
184:8
**first (107)**
4:2,14;8:3;28:22;
47:6,13,24;52:16,18,
18;53:1,2,2;54:23;
61:23;62:8;63:7;83:2,
15,17,24;85:9,16,22;
86:3;87:2,3,4,7,15,24;
88:12,20;89:17;91:10,
13,14;103:15;107:16;
121:25;122:6,7,16,25;
123:3,7,15,24;124:3;
131:12,15;137:21,24,
25;142:20;146:2;
157:1,11,13;158:7;
159:24;160:4;164:12;
166:6,20;168:16,18,19;
173:5,5,19;174:6;
175:2;176:17;177:23;
178:22;179:16,17;
181:8;184:4,6;185:11;
186:20,25;191:17;
192:25;193:21,25;
197:9;221:17;223:14;
230:10,13;233:18;
235:13;236:13;246:25;
247:19;250:17;265:14;
266:8;280:3;284:2;
291:3,10;297:10,16
**firsthand (1)**
286:10
**fit (3)**
54:1;119:11;143:7
**Fits (1)**
287:21
**fitting (1)**
220:13
**five (25)**
47:7;116:20,21;
132:16,17,18;171:2,4;
176:3,7;185:13,16;
187:1,9;190:24;
206:13;223:23;224:4;
230:24;231:2;233:16;
238:14;240:19,22;
297:15
**five-foot (1)**
188:25
**flagged (1)**
164:4
**flailing (1)**
207:1
**flame (6)**
184:20;188:20,20;
191:1,5,11
**flames (23)**
166:4;184:8,9;185:4,
11,18;190:23;192:24;
193:11;197:25;198:2,
3,17;207:11,16,18,19;

208:17,22;210:2,17;
248:22;275:13
**flammable (1)**
276:5
**flash (3)**
276:3,3,6
**flashes (1)**
44:15
**flight (2)**
182:4;184:5
**flip (2)**
205:18,21
**flipped (1)**
206:6
**flipping (1)**
84:9
**floating (1)**
222:15
**floor (4)**
176:14;177:21,23;
210:18
**floors (2)**
132:17,18
**flowing (1)**
125:6
**flush (1)**
204:6
**foam (2)**
277:6,11
**focus (3)**
198:22;210:7,8
**focused (6)**
178:11,16;280:4,6,7,
10
**focusing (1)**
210:4
**fogging (1)**
176:5
**foggy (4)**
188:22,22,23;190:7
**folder (6)**
98:25;99:2,15;100:3;
102:2,4
**Folger (1)**
162:3
**folks (3)**
114:3;117:10;140:15
**follow (22)**
15:11,13,22,23;
51:24;56:5;65:3,7;
75:17,20;88:4;89:11;
134:3;140:25;142:9,
11;154:22;168:6;
179:16;214:23;216:11;
241:15
**followed (4)**
19:8;162:22;180:8;
245:11
**following (6)**
15:25;27:8;67:21;
147:24;180:3,9
**follows (1)**
4:3

**follow-up (1)**
302:25
**font (1)**
295:12
**fool (1)**
226:19
**foot (5)**
165:2;168:16,18;
197:2;209:2
**footage (2)**
181:2;257:4
**football (1)**
61:21
**force (2)**
212:11;227:15
**forever (1)**
21:17
**forget (1)**
167:14
**forgot (1)**
167:13
**form (7)**
86:5;179:20;198:1;
292:3,13;302:3,11
**formal (6)**
8:10;110:21;111:16;
142:6;152:13,18
**formality (1)**
134:3
**formally (1)**
4:9
**format (6)**
89:7;107:12;122:23;
149:13;151:7;279:1
**formats (1)**
50:12
**formatted (3)**
121:18;279:12,13
**forms (1)**
119:14
**forth (16)**
5:5;34:13;42:10;
90:6,11;152:6,10;
163:14;165:6,6,7;
299:6,9,12,18,25
**forths (1)**
299:5
**fought (1)**
301:21
**found (5)**
31:4;108:13;143:1;
251:21;283:24
**foundation (2)**
133:17;302:11
**four (53)**
35:21;36:1;38:20;
47:5,6,13;116:20,21;
122:14;130:20;131:4,
5;159:3,21,23,23,24;
160:1,1,12;171:2;
172:5;176:4;181:22,
24;182:9;183:5;
187:19;188:14;199:1,

4,5;209:8;223:23;
224:4;225:11,25,25;
226:2,6,7;230:24;
231:2;233:16;238:14;
240:19,22;254:4;
255:2,10;282:17;
288:14;297:15
**fourth (1)**
188:17
**frantic (2)**
281:14;282:4
**fraying (1)**
138:23
**frequent (1)**
298:24
**frequently (4)**
260:2,25;261:11,12
**Friday (5)**
290:1;293:21;294:2,
15,18
**friend (3)**
68:3,6,8
**friends (3)**
287:5;289:10;290:5
**friendship (2)**
68:13;287:15
**front (76)**
8:5;19:5;27:7;83:22;
84:2;107:9;127:19;
128:11;157:7,9;
160:24;161:2,3;
162:12,24;163:6;
165:9,18,19;166:1;
170:25;173:1;177:2,8,
10,11,14,16;184:11,15;
185:9;187:3,5,7,14;
189:4,23;192:7,16;
193:22;194:1,2;197:9;
199:7;200:17,19;
201:12;202:11,22;
206:17,20;209:1;
215:22;217:11;223:18;
225:8,9;226:19;227:9,
20;228:2;229:4;231:9,
11,13,22;236:16,19;
242:2;247:6;249:14;
263:5;274:11,16;
275:3;292:13
**fronts (1)**
64:10
**full (7)**
7:8;8:16;66:4;237:2,
12;253:21;297:16
**fully (2)**
185:18;253:2
**fun (3)**
240:5;244:5;245:5
**function (3)**
33:22;161:24;268:21
**functions (2)**
162:3,4
**funny (1)**
190:21

**further (3)**
226:16;256:21;278:9
**future (2)**
31:2;268:11

## G

**gained (2)**
135:16;289:1
**galleries (4)**
132:6,15,16;134:9
**game (1)**
240:5
**gangs (1)**
241:15
**gangway (2)**
203:8;207:17
**gap (2)**
148:20;154:21
**garbage (1)**
154:11
**gas (2)**
276:4;280:9
**gate (24)**
162:2,5;180:22,24;
181:1,3,5;199:18;
227:15;241:24;242:1,
11;245:20;253:19;
254:14,15;255:1,7,16,
23;257:9,9;258:1,2
**gates (6)**
41:7;158:22,23;
159:1;165:10;242:13
**gave (13)**
20:2;84:18;100:18;
104:15;107:12,12,16;
262:24;263:1;267:25;
269:13;283:23;297:20
**gear (2)**
25:20;28:24
**gearing (1)**
269:19
**general (15)**
18:13,17;20:16;
21:16;23:6,7;61:1,4;
62:2,7;99:20;100:5;
112:3;268:13;288:19
**generalized (1)**
24:3
**generally (9)**
28:16;50:2;71:10;
84:19;101:9;267:8;
268:8,15,25
**General's (1)**
6:21
**generate (1)**
208:10
**generated (2)**
278:20,20
**gestures (1)**
8:23
**gesturing (1)**
107:9

**gets (4)**
56:6;65:17;179:16,
16
**girls (1)**
224:4
**given (19)**
6:17;19:13;25:5;
49:22;50:4;65:18;
71:12,18;72:3;76:5;
107:16;119:4,7;120:9,
16;126:14;134:14;
149:2;181:17
**gives (1)**
40:10
**giving (9)**
19:2;74:7,12;78:9;
120:21;182:6;217:9;
264:14;265:7
**glad (2)**
233:20;240:12
**gladly (1)**
10:2
**gloves (2)**
199:6;282:17
**goal (2)**
75:7;178:19
**God's (1)**
126:2
**goes (16)**
6:24;20:14;60:21;
77:21;119:25;150:22;
152:22;163:2;169:14;
224:1;237:24;247:17;
251:15,20;290:4;
295:15
**Good (19)**
4:6,8;32:17;58:9;
59:9;65:13;139:21;
142:10;193:6;226:19;
229:17;231:3,3,4,6;
239:19;285:11,24;
287:10
**governing (1)**
77:20
**grabbed (2)**
124:8;192:20
**graduating (1)**
82:12
**gravity (1)**
211:21
**gray (2)**
257:4,15
**Great (4)**
7:3,8;118:21;303:15
**greater (3)**
124:1,4,4
**grew (1)**
193:23
**grief (1)**
285:16
**grip (1)**
197:3
**ground (1)**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 90 of 111

210:5
**group (9)**
39:6;124:12,13,14;
193:8;237:10,12;
244:10,11
**groupings (1)**
121:21
**groups (3)**
190:20;237:11;
241:10
**grow (1)**
81:11
**grows (1)**
185:25
**guard (1)**
136:5
**guess (23)**
32:19;41:5;44:19;
71:15;79:3;91:18;
123:21;124:9;134:6;
135:10;145:15;154:5;
156:7;165:2;177:14;
198:16;199:11;230:7,
8;234:2;260:20;
274:15;303:13
**guide (1)**
203:23
**guideline (1)**
23:17
**guidelines (4)**
8:1;78:12,14,20
**guy (16)**
60:16;95:16;124:18;
125:8,22;141:16,19;
204:8;218:10;224:2;
225:23;232:7;233:9;
257:10;277:25;291:5
**guys (31)**
63:24;102:12,13;
117:21;125:4;147:6;
169:2,10,12;170:17;
171:5;173:11;199:5;
206:9;213:6,7,8;
225:15;226:18;234:21;
240:9,23;241:15;
242:10;245:10,10,11,
20,23;272:3;282:21

**H**

**half (2)**
118:3;190:13
**halfway (2)**
187:22;192:18
**hall (30)**
41:3,4,6,8,9,13;
43:15;146:20;157:4,6,
15;160:25;161:7;
181:6;216:4,6,16;
218:3;224:7;227:12;
228:1,5;251:12,21;
254:23;255:1,5,10,24;
256:16

**hand (12)**
127:19;163:2;
187:13;193:24;194:2,
5,15;195:11;196:2,4;
283:14;293:8
**handed (1)**
253:16
**Handing (5)**
83:21;88:22;246:3;
292:12;297:3
**handle (3)**
19:25;52:19;72:3
**handled (2)**
19:20;52:6
**hands (3)**
205:8;206:25;211:22
**handwriting (1)**
94:6
**handwritten (8)**
81:3;110:9,16,19;
111:12;112:4,13,14
**happen (13)**
13:22;57:18;80:5;
87:1;103:4;106:16;
151:23;154:20;194:4;
240:8;271:3,12;277:7
**happened (75)**
11:1;35:2;39:7;
43:17;44:12,12,23;
51:21;54:20;55:24;
66:9,10,11;80:25,25;
81:1;84:22;87:2;94:25;
95:14,18;96:13;99:25;
105:8;109:19;110:9;
112:25;125:14,17;
127:10;128:9;146:7;
149:14;153:10;155:18,
21;169:23;176:24;
190:13;209:10;217:2;
230:3;231:5;233:13,
13,20;234:4,5;235:7,9,
22,23;238:19;241:18;
248:12;261:22;263:15,
24;264:6;265:8,10;
267:10,11;268:2;
271:10;273:21;277:20;
282:23;288:12;290:16;
291:16;297:12;298:12;
299:14,16
**happening (19)**
67:7;120:13,20,22;
127:12;169:22;176:8;
209:12;210:9;236:1;
243:10;245:3;262:16;
269:17;275:20,24;
276:16,20;290:13
**happens (19)**
21:8;57:22;60:10,11;
66:14;150:16;151:11;
154:25;163:4;171:20;
181:8;215:20;216:13;
222:16,16;272:10;
278:7;298:25;299:3

**happy (2)**
253:20,24
**hard (14)**
23:13,15;136:22;
139:16;172:12,24;
210:9;212:12;219:7;
221:1;222:17;259:5;
266:14;271:22
**harder (1)**
126:20
**harm (2)**
26:11;28:13
**harmed (1)**
24:18
**hate (1)**
287:3
**hazmat (5)**
17:4;168:3,11;220:8;
276:24
**head (7)**
8:23,23;219:6;
258:21;261:14,18;
276:24
**heading (4)**
89:14;164:23;179:8;
180:17
**health (3)**
289:5;291:5;301:18
**hear (59)**
11:4;30:11;45:1;
58:8;80:11;127:24;
128:2,3;133:10;
144:23,24;169:6;
172:12,18,24;173:25;
174:3,6;197:19;
198:16;218:19,20,21,
24;219:1,5,9;224:1,9,
10,12,13;227:16;
228:15;229:11,14,22;
231:2,2;234:1;241:14;
242:18;250:12;258:9;
259:3,5,13;260:12;
262:4;265:21;269:12,
12;273:2,14,25;274:6;
275:10;280:18,23
**heard (44)**
29:15,17,24;30:2;
42:15;43:19;120:13,
20,22;135:3,6,10,11,
22;137:5,16;143:24,
25;144:22;145:21;
146:16;147:10;157:2,
21;174:8,19,20,21,23;
183:21;194:8;217:2;
221:20;234:22;241:11,
21;242:18;260:3,5;
269:16;273:5;280:24;
281:9,10
**hearing (13)**
44:21;114:12;
144:14;164:13;165:1;
218:13;228:21;233:25;
259:18;276:2,7,10,11

**hears (1)**
30:9
**heart (1)**
125:5
**heat (7)**
127:5;191:12;
192:10;193:10,17;
235:22;282:16
**heating (1)**
280:10
**heavy (4)**
160:15;161:18;
203:14,15
**heck (1)**
10:2
**heightened (1)**
190:15
**held (4)**
35:25;79:10;114:3;
301:2
**help (15)**
28:5;29:25;57:5;
60:3;61:10;110:17;
117:13;177:5;195:20;
225:24;240:3;256:4;
258:9;279:25;283:7
**helping (2)**
60:3;243:5
**HEPPELL (38)**
4:5,10,13;5:24;6:4,
11;7:2,4,7;14:18;
31:18,19;75:3,8,9;
82:24;83:1;120:23;
121:1;122:8,13;137:1;
206:12,15;245:25;
246:2;255:20;260:7,
11;267:22;281:6;
292:6,11;302:3,11,25;
303:2,14
**hesitant (1)**
240:7
**hey (16)**
60:6,10,16;64:23;
76:20;120:7;146:2;
165:23;173:9;205:10;
213:10,12;231:10;
242:1;270:8;284:6
**high (8)**
81:17,18,19,21,21;
82:1,13;117:22
**higher (1)**
262:23
**highest (4)**
42:24,25;43:1;81:16
**himself (4)**
96:4,7;124:4;195:18
**hinges (3)**
162:4;189:13;282:18
**HIPAA (1)**
289:6
**hit (21)**
183:8;190:2;192:16,
21;193:10;204:9;

205:7;206:3;209:3,15;
210:5,25;211:1;213:9;
223:25;242:4;243:5;
256:11;262:2;275:7;
301:10
**hits (1)**
272:16
**hitting (5)**
127:17;192:15;
223:14;242:3,5
**hobbies (1)**
289:10
**hold (7)**
48:12;80:7;141:24;
205:15;225:24;250:9;
299:1
**holster (2)**
138:19,21
**home (2)**
81:19,21
**honest (8)**
110:24;113:1;126:2;
134:2;143:24;178:8,
15;217:23
**honestly (21)**
37:1;48:14,17;
108:11;112:16;127:24;
135:18;141:12;160:22;
179:1;181:20;200:14;
230:16;261:2,14,20;
264:9,12;265:18;
282:23;298:23
**hook (1)**
118:2
**horizon (2)**
60:12;119:12
**Horrific (1)**
210:24
**hostage (1)**
66:11
**hot (1)**
192:12
**Hotmail (1)**
32:20
**hour (3)**
156:23;214:21,22
**hours (14)**
39:17;104:22;
162:21;238:15;262:25;
263:11;266:6,17,23;
267:4,10,18;268:16;
269:1
**house (178)**
10:21;17:6,9,10,15;
20:18;24:2;26:1,12;
41:10;45:25;46:2;
47:22,23;51:13,21;
56:13,14;58:1,18,20;
59:1;61:20;62:8,15,16,
18,19,20;63:22;64:10;
69:15,16;70:4,5,23;
71:9;74:6,13,16;75:12;
81:2;104:9;113:12;

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 91 of 111

128:17,18;129:16;
131:7,8,10;132:2,4,9,
13;133:4,9;135:12;
137:4,21;138:1;
142:24;144:15;145:22;
146:2,5,10,21,22;
147:11,18,19;148:12,
14,24,25;149:8;150:16,
19;157:3,9,16;158:20;
160:10,21;161:7;
162:13,25;163:7,14;
164:14;165:3;166:13,
18,24;167:10;168:16,
18;169:5,7,24;170:19;
173:6,8,11,20,23;
174:7;175:5;176:17,
19;178:22;179:8;
180:19;181:6,8,11,25;
182:21;183:4;194:16,
16;201:11;203:3;
212:8;215:4,18;216:2;
223:22;224:6;226:22;
227:12;228:1,2;
230:23,23,25;231:7;
232:18,25;233:6,15;
235:1,20;238:7;
239:17,22,25;240:1;
242:9;243:11;247:2,
22;250:2,8,12;251:7,9,
11,18,21,25;252:6;
259:21;262:11,14,17;
274:2,8;280:5;282:24;
283:17,18,21;285:13;
286:12,16;303:4,4
**housed (3)**
214:18,18;215:5
**household (1)**
35:11
**houses (13)**
42:16;46:14;74:15;
139:10;214:23;215:12;
239:11,14;243:23;
272:5,9;283:3;286:25
**house-wide (2)**
17:22;20:16
**housing (4)**
69:23;70:8,9,10
**huddled (1)**
193:6
**huge (1)**
248:18
**huh-uh (1)**
8:24
**human (11)**
25:12;156:24;198:1,
7;267:9,13,17;268:13,
20,22,23
**hundred (1)**
194:9
**hurt (5)**
26:11;60:16;141:2;
148:14;190:1
**hurting (2)**

193:13,16
**husband (1)**
6:8

**I**

**idea (7)**
10:1;61:1;76:21;
164:3;208:9;222:15;
299:21
**ideally (2)**
78:19;164:5
**identification (10)**
5:20;36:7;83:20;
87:13;88:21;91:7;
130:18;246:1;253:15;
292:9
**identified (1)**
256:22
**identify (5)**
254:2,4;256:8;
257:23,24
**identity (4)**
231:24;232:3,21;
256:5
**IDOC (6)**
82:13;290:23;
299:17;300:1,2,7
**IDs (1)**
296:11
**IDW (1)**
69:18
**ignited (1)**
27:5
**illegal (1)**
222:14
**image (3)**
133:8;253:17;255:23
**imagine (1)**
98:25
**immediate (8)**
52:5;61:17,18;62:18,
23;158:24;160:9;
208:22
**immediately (13)**
13:12,18,25;14:10,
21;15:20;31:5;41:9;
53:12;62:17;175:7;
179:7;225:10
**immunity (1)**
89:19
**important (15)**
8:22;9:5;73:19;81:6;
127:9,13;139:24;
141:2;154:5,6;178:10;
237:22;263:18;278:11;
296:19
**impossible (1)**
222:20
**improper (2)**
106:7;155:20
**improve (1)**
139:12

**inappropriate (4)**
76:10;77:4;78:21,24
**inches (1)**
189:11
**incident (116)**
11:2,15;39:7;43:17;
44:1,2;45:5;48:16;
51:8,22;52:25;53:4,6,
10;54:11,14,16;90:9,
12;94:17,25;97:1;
98:13;99:12;100:22;
101:13;103:3,22,22,25;
104:1,4,7,14,19;105:1,
13;107:6,20;108:9,14;
109:15,18;110:10,12;
111:19;118:6,7;
119:22;123:23;126:12,
19;127:4;129:4;
132:21;134:18;135:3,
11;137:25;140:2;
142:14;145:8;150:17,
18,20;153:9,11,15,16,
21;155:12;167:18,18,
25;168:14;234:15,18,
23;235:2,24;238:16;
246:8,9;259:6,8,9;
260:22;261:5,24;
263:1,2,22;264:19;
265:8,14;266:17,17;
267:18;268:5;277:21;
281:16;283:4,12,14;
286:21;288:11,13,20,
21;291:10;294:12,14;
297:6,7;301:8;302:21
**incidents (12)**
11:2;44:22;45:10;
53:7;67:4,7,14;98:18;
99:6;150:13,15;157:18
**include (2)**
5:2;56:10
**included (2)**
294:23;298:4
**includes (5)**
20:20;77:25;93:2;
121:15;127:9
**including (4)**
86:8;100:9;114:3;
210:18
**incomplete (1)**
295:16
**inconsequential (1)**
127:1
**inconsistency (1)**
253:9
**indeed (1)**
297:25
**indents (1)**
197:3
**independent (6)**
119:24;123:5,14;
217:12;250:5;253:5
**Indiana (32)**
7:15,18;10:19;11:6,

7,11,12,17,18;13:24;
15:6;16:6;24:10,22;
26:3;27:8;28:8,18;
29:4,13;35:23;37:7,15;
38:8;68:21;82:6;84:6,
13;98:13;120:13;
213:21;260:25
**Indianapolis (1)**
276:22
**individual (16)**
17:23;18:5;24:6,18;
51:14;52:7;84:13;
141:20;201:22;244:12;
254:10,12;256:15,20,
21;257:17
**individually (1)**
272:3
**individuals (21)**
19:4;49:2;57:7;
129:13;215:10;226:2;
245:6,8;254:4,17;
255:3,13,22;256:1,3,5;
257:3,6,23;299:17,24
**individual's (1)**
109:23
**inference (1)**
170:11
**inform (4)**
120:5;152:16,17;
288:15
**informal (1)**
8:21
**informally (1)**
237:12
**information (24)**
6:17;12:11,19,24;
22:8;24:3;31:16;50:9;
73:4;100:6;126:16;
127:10;169:21;170:6;
186:4;215:9;218:13;
221:3;224:21;225:6;
232:1;247:21;255:8,9
**informed (1)**
288:17
**informs (2)**
60:5;151:22
**infraction (2)**
120:2,3
**in-house (1)**
278:7
**initial (4)**
56:1;110:19;191:17;
238:16
**initially (3)**
104:6;207:7;273:9
**initials (1)**
296:10
**initiative (1)**
114:16
**injured (1)**
233:1
**injuries (1)**
198:20

**ink (1)**
161:16
**inmate (1)**
136:9
**in-person (1)**
195:21
**input (3)**
97:18,18;100:4
**insert (1)**
140:22
**inserted (1)**
150:13
**inside (22)**
40:12;117:25;128:7;
133:9;150:21;166:12;
184:10,24;190:17;
194:20;201:24;204:12;
208:25;210:2,11,15;
227:24;247:2,20;
251:25;252:6,24
**instincts (1)**
65:3
**Instructional (2)**
19:11;59:22
**instructions (5)**
19:2,13,16;75:17;
126:14
**instructs (1)**
9:18
**insurance (2)**
291:7;292:5
**intense (2)**
125:12;191:12
**interacting (1)**
236:11
**interaction (1)**
78:8
**interactions (5)**
235:16,17;236:9;
288:8,25
**interest (2)**
49:15;288:2
**intermediate (1)**
37:20
**internal (22)**
93:9;94:24;97:12,14;
98:6,9,12,16;99:12,18;
100:7,15;101:1;
108:16;110:20;111:5,
15;135:9;185:1;258:6;
262:25;263:14
**Internet (8)**
128:24;129:9,22;
130:2,5;131:21;
133:21;156:19
**internet-based (1)**
156:20
**interpretation (2)**
168:20;281:25
**Interrogatories (2)**
91:10;95:8
**interrogatory (4)**
94:20;95:21;96:2;

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 92 of 111

113:24
**interrupt (1)**
    75:4
**interruption (3)**
    136:15,25;281:5
**interview (23)**
    100:12,15,18;
    101:12;110:23;111:4,
    15;112:9,11,15;258:5;
    259:16,19;260:4;
    263:13;264:5,9,13,19,
    23;265:7,13;281:16
**interviewed (7)**
    98:22;99:8,10;
    100:12,16,23;101:1
**interviewer (2)**
    262:5;264:20
**interviewing (2)**
    111:13;291:5
**interviews (6)**
    100:9,10,11;101:5;
    111:7;220:24
**into (51)**
    25:20;52:8;54:1;
    79:23;108:7,21;
    114:19;117:1;118:7;
    128:10;135:5;146:20,
    22;148:17;160:21;
    161:15;163:25;165:2;
    169:5;170:19;173:6,
    14,20;174:7;175:5;
    179:8;180:22;184:11;
    191:11,20;193:22;
    203:7;204:22;207:17,
    18;224:7;227:12;
    228:1,4;231:10;
    234:25;242:24;244:22;
    255:15;257:4;264:25;
    270:18;281:16;286:24;
    287:21;295:15
**introduced (3)**
    4:8;113:4;277:4
**inventory (4)**
    40:12;141:8;150:5;
    220:12
**investigate (8)**
    29:10,22,23;30:7,8,
    12,15;286:14
**investigated (1)**
    98:19
**investigating (2)**
    101:12;286:15
**investigation (5)**
    93:11;95:3;97:13;
    99:23;263:15
**investigative (12)**
    93:10;97:12,14;98:6,
    9,12,16;99:12,19;
    100:3,7;135:7
**investigator (15)**
    95:15;100:16;
    260:15;262:10,25;
    264:3,4;270:13;273:3;

274:2,4,10;280:19;
    281:21;298:13
**investigators (2)**
    110:20;265:22
**involve (2)**
    18:3,4
**involved (19)**
    20:1;50:23;98:18;
    99:22;100:4,12;
    148:12;155:14;167:23;
    215:2;230:11;234:15;
    237:8;245:6;278:9,16;
    288:19;289:12;302:22
**involvement (2)**
    53:7;288:21
**involves (1)**
    17:22
**involving (3)**
    10:21;17:14;26:14
**iPhone (1)**
    34:19
**Iraq (1)**
    266:9
**irrelevant (1)**
    269:4
**ISP (10)**
    32:22;68:11,23;69:7;
    251:24;252:6,24;
    297:17,24;299:20
**ISP's (1)**
    248:25
**issue (9)**
    28:15;116:4;117:3,3;
    139:3,8;221:17;222:9;
    232:21
**issued (1)**
    12:15
**issues (7)**
    6:23,25;58:3;64:2;
    118:4;140:6;296:9
**Itemize (1)**
    101:17
**items (3)**
    5:4;183:21;240:11

### J

**James (9)**
    83:10,13;84:14,17;
    107:12,16;115:23,25;
    289:22
**job (46)**
    17:25;18:9,12;22:9,
    19;24:7,11,12;38:9,11,
    14;40:5;46:10;53:17;
    61:10;62:10;63:5,8;
    64:8,9;67:14;68:2;
    72:2;82:15;94:23,24;
    95:17,19;98:21;
    105:15;107:11;118:3;
    126:8;129:6;148:21;
    158:4;218:11;220:10,
    16;222:21;238:17;

258:1;285:8;291:19;
    296:23,24
**jobs (3)**
    68:4;70:22;82:19
**jog (3)**
    158:10,20;281:3
**jogged (1)**
    189:19
**join (1)**
    49:9
**joined (1)**
    67:22
**Joshua (7)**
    4:12;10:21;83:4;
    287:23;288:1;289:4,14
**judge (2)**
    8:6;9:15
**judgment (5)**
    58:10;59:10,10;
    60:14,18
**jump (1)**
    9:10
**jumping (2)**
    9:7;148:11
**jury (1)**
    8:6
**justification (7)**
    79:2,5,12,14,16,18,
    21
**justify (2)**
    58:4;80:12
**Justin (1)**
    137:3

### K

**keep (19)**
    18:16;47:18;118:7;
    120:17;130:12;133:22;
    134:1;139:16;147:19,
    19;155:1;194:23;
    204:5;208:3;213:2;
    222:7;229:23;245:20;
    269:9
**keeping (1)**
    67:8
**Keller (2)**
    257:10;258:2
**Ken (1)**
    68:9
**kept (13)**
    100:2;107:9;127:17;
    152:13;162:13;163:6,
    11;194:17;219:20,23;
    220:18;228:6;284:10
**Kevin (2)**
    257:12,20
**key (25)**
    44:17;56:17;162:3;
    163:25;164:1;176:23;
    201:12,12,16,16,18,19,
    22,23,24;202:1,4,10,
    21,23;216:21;218:19;

227:16;228:6,14
**keys (13)**
    162:24;163:1,6,9,11,
    14,21;164:5;200:4,11;
    201:19;216:20;224:3
**kick (2)**
    209:2;214:22
**Kicking (1)**
    174:13
**kind (28)**
    27:4;28:3;51:16;
    57:20;58:8;61:12;
    64:14;65:3;89:7;
    123:17;128:10;139:3,
    4,16;149:13;151:7;
    159:8;170:22;193:6;
    207:2;211:7;216:11;
    219:21;266:13;278:13;
    284:9;285:17;301:5
**kinds (2)**
    66:1;299:9
**knee (1)**
    60:17
**knees (1)**
    158:13
**knew (31)**
    99:22,23;127:16;
    145:14,16,23,24;146:7;
    169:25;170:11;172:21;
    178:24;179:22;180:17;
    197:25;225:15,25;
    226:21;229:8,9,14,25;
    230:1;232:4;233:1;
    238:13;256:8;286:19;
    300:10;302:20;303:6
**knives (2)**
    57:7,16
**knocking (1)**
    240:3
**knowing (6)**
    11:24;18:11;47:18;
    99:14;179:5;264:17
**knowledge (52)**
    11:19;18:7,20;23:24;
    38:7;51:20;71:14;73:9;
    88:15;89:2;91:3;92:16;
    93:18,20;95:10,12,20,
    22,25;97:1,6,10;98:1,5;
    120:19;139:11;140:12;
    167:23;168:12,15;
    169:20;170:10;186:3,
    6;213:22;219:16;
    229:20;230:7,10;
    241:2;263:24;268:20;
    271:25;286:11;288:24;
    289:1,4,6,14,16;303:3,
    9
**knowledgeable (3)**
    81:7;207:13;276:9
**known (7)**
    48:16;135:19;139:3;
    170:8,12;264:15;289:7
**knows (3)**

142:13;165:24,25

### L

**label (2)**
    121:24;254:7
**labeled (7)**
    89:15;98:25;121:16,
    17,17,24;131:14
**Lack (1)**
    97:1
**ladder (1)**
    77:22
**landline (1)**
    31:20
**language (1)**
    93:3
**laptop (1)**
    258:7
**large (1)**
    127:2
**last (10)**
    6:4;106:15;184:4;
    188:14,15;238:2;
    245:12;285:19;289:23;
    296:11
**late (1)**
    285:21
**later (19)**
    16:16;80:16;90:16;
    148:11,19;153:12,17;
    155:18;167:1;177:24;
    197:6;223:12;226:25;
    233:19;266:2,4;
    267:25;268:10;295:11
**latest (1)**
    269:12
**laughing (6)**
    243:15,21;244:8,12,
    19;245:4
**laundry (1)**
    150:11
**law (6)**
    82:8;89:20,22,24;
    90:8;290:20
**laws (2)**
    15:23;289:7
**lawsuit (16)**
    4:12;83:2,18;85:10,
    17,23;86:10,13;87:9,
    24;90:3;108:12;
    289:19,21;290:8,15
**lawyer (5)**
    9:17,19;89:9;114:20,
    21
**lay (1)**
    133:17
**laying (1)**
    222:25
**layout (5)**
    62:21;132:13;133:7;
    181:14;182:19
**lead (10)**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 93 of 111

51:9,24;123:2,3,6,15,
18;124:14;179:13;
216:12
**leader (13)**
48:14,25,25;49:3,7;
50:7,19,19;51:9,15,18;
52:10;127:21
**leaders (1)**
245:8
**leadership (6)**
48:12,21;50:2,4;
66:7;124:2
**leading (1)**
245:10
**leads (2)**
181:6,7
**learn (11)**
13:11,16;24:23;
44:11;47:16;83:2;
136:16;137:24,25;
221:10;233:23
**learned (12)**
11:15;72:2;83:17;
135:16;137:16,21;
143:18;144:18;227:1;
230:13;233:19;282:19
**learning (5)**
126:16;127:10;
220:15;276:18;289:19
**least (5)**
71:21;229:8;233:5;
255:2;272:6
**leave (22)**
45:8;47:17;48:5;
56:19;57:16;58:25;
59:12;61:14,16;66:5,
15;116:17;117:2;
118:20;148:13;149:21;
215:23;220:21;226:10;
235:3;238:17,21
**leaves (1)**
46:2
**led (2)**
176:22;274:21
**left (19)**
72:18;122:4;131:15;
148:21;157:4;180:21;
201:7;204:25;207:20;
225:22;226:1,11,14;
251:3,11,21;254:13;
257:23;285:24
**left-hand (5)**
121:14,15;161:3,16;
255:24
**legal (7)**
207:21;208:1,1,5,8,
14;209:23
**legally (1)**
208:6
**legs (1)**
211:12
**less (12)**
8:10;57:3;71:3;75:5;

109:1;123:19;128:14;
155:17;170:22;182:11;
194:23;263:1
**letter (2)**
4:24;5:7
**letting (3)**
26:5;154:25;234:19
**level (21)**
52:13;59:24;67:4;
71:25;72:3,17,21;
73:21,25;81:16;132:6;
167:8;169:6,7;173:7;
176:13;183:25;190:9,
16,18;224:16
**levels (3)**
52:15;119:15;157:23
**licenses (1)**
82:3
**lieu (2)**
295:8,12
**Lieutenant (52)**
5:22,25;7:14,15,20,
22;10:19;21:15;22:24;
30:18;35:23;36:3,18;
37:19,21;38:4,8,11,18;
40:5,16;42:7,8,11,15;
43:10;64:5;68:19;
69:20,25;70:3,4,7;
81:10;83:2;88:25;
109:5;117:6;118:17;
119:8;121:2,13;
122:18,24;123:6;
124:1,14;251:20,23;
277:18;297:17;301:24
**lieutenants (8)**
38:14;39:19,23;
41:24;42:12;43:8;
46:15;138:6
**life (12)**
13:7;82:22;139:6;
211:16;240:11;263:23;
265:25;266:12;268:10,
24;289:9,11
**light (3)**
188:23;205:17,18
**lights (3)**
212:11;223:15,17
**likely (2)**
57:3;259:25
**limbs (1)**
211:9
**limiting (1)**
96:24
**line (6)**
36:13;84:19;113:4;
161:18,18;297:17
**line-level (1)**
69:5
**lines (4)**
63:19;161:17;
282:11;297:15
**lineup (2)**
179:14;192:8

**lion (1)**
32:4
**list (3)**
69:8;150:22;220:12
**listed (6)**
89:17;90:17;122:14;
220:13;247:23;292:23
**listen (2)**
268:3;277:1
**lists (2)**
83:25;121:13
**literal (2)**
151:5;197:16
**Literally (8)**
158:22,25;182:21;
197:6;229:7;263:11;
275:25;288:13
**little (34)**
8:10;14:15;60:25;
63:20;71:10;75:2,4;
87:1;88:19;90:22;
117:5;169:9;172:20;
174:9;181:3;191:12;
193:3;197:3;203:21,
22,23;204:5;226:24;
227:22,24;245:12;
253:22;258:6;267:2;
269:8;271:9;275:22;
283:21;285:14
**live (7)**
30:18;35:5,5,6;
81:10;152:8;230:19
**lived (2)**
81:13;272:1
**lives (1)**
35:11
**living (2)**
136:7;268:9
**loader (1)**
173:20
**located (9)**
41:6;129:4;131:20,
21;137:20;142:21;
181:4,5;194:18
**location (18)**
40:21,24;54:18;
65:18;109:24;128:18;
131:9;145:8;147:21;
208:11;230:19;232:3,
5,6;247:22;257:11,18,
19
**locations (4)**
69:15;255:4,13;
272:2
**lock (11)**
162:1;163:15,16,18,
21,25;201:12,23;
204:17;228:6;242:11
**locked (37)**
13:11,16,25;14:23;
15:8,19;16:7;17:11;
18:24;20:6;24:6,12,24;
26:4;28:16;56:19;

57:23;130:7,9,11,12;
143:5;162:7,13,15,16;
164:14;169:10;212:25;
215:16,19;216:8,16,17;
241:23;245:19;272:12
**locking (1)**
214:12
**locking/unlocking (1)**
204:24
**locks (2)**
202:4;205:25
**log (22)**
80:17,17,23,24;81:3;
147:19,20,25;148:3,3;
149:5,7;150:9,23,24,
25;151:18;152:8,18,
18;153:8;154:9
**logbook (1)**
148:24
**logged (3)**
108:21;150:4,8
**logic (1)**
66:13
**logs (2)**
147:18;151:17
**long (49)**
32:17;35:25;52:5;
72:8,12;80:12;85:15;
103:2;104:20;115:14,
17;125:3;135:19;
139:1;141:8;148:20;
152:25;153:18,19;
164:12;165:1;176:21;
180:18,20,21,22;
181:10,15,18,21;
182:13,16;186:4;
189:21;194:3;206:5;
213:11;214:5;217:10;
225:7,13;260:20;
265:13;277:21,23,24;
283:3;285:1;303:9
**longer (6)**
68:9;72:9;136:21;
230:2;238:3;285:19
**longest (3)**
42:25;71:14;159:12
**look (37)**
40:15;50:16;73:10,
11;79:23;91:22;107:5;
135:5;149:23,24;
150:1,15;151:11;
152:20;153:12;154:4;
155:1,21;158:6;171:1,
8,21;173:24;185:22;
187:8;220:6,6;226:4;
227:13;229:24;231:21;
256:9;260:23;263:9;
268:1,2;291:25
**looked (23)**
108:7,12;155:13;
171:9;176:1;184:6,6;
197:24;198:5,6;199:9;
207:21;208:15;209:23;

210:23;211:2;229:9;
232:8;246:20;257:25;
283:23;291:6,12
**looking (25)**
17:2;31:6;89:8;
109:15,18;122:4;
123:19;131:12;152:24;
156:10;166:4;171:15,
19;181:2;193:22;
195:2;207:17;262:20;
264:11;265:3;275:4;
281:25;297:7,10,15
**looks (4)**
131:25;155:3;
253:19;279:10
**lose (1)**
216:20
**lost (1)**
263:23
**lot (48)**
9:9;14:16;19:10;
24:14;44:16,18;45:19;
56:16;59:9;64:2;65:22;
67:7;87:1;124:20;
125:4,18;138:17;
139:2,4;142:16,17;
144:9;155:17;168:19,
22;170:21;174:14;
184:8;189:15;190:4;
199:2;202:18;208:5,8,
10;220:24;230:2,4;
238:12;252:20;263:8;
266:6;278:8;282:9,9;
283:9;286:1,1
**loud (2)**
128:7;250:11
**louder (5)**
169:17;173:17;
174:2,4;219:12
**low-level (1)**
82:19
**Luckily (1)**
202:12

## M

**mad (3)**
130:13;240:6;243:12
**main (1)**
301:10
**maintain (6)**
27:13;149:16,17,18,
22;190:9
**maintained (3)**
148:25;149:10;151:2
**maintaining (4)**
81:4,5;148:21;152:8
**maintains (1)**
148:3
**major (5)**
65:20;79:22;119:16;
120:4;133:13
**majority (3)**

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 94 of 111

142:17;154:18;191:4
**makes (3)**
119:24;222:14,17
**making (19)**
33:24;43:16;49:6;
51:9;67:19;73:1;79:20;
123:23;124:12;127:20;
136:8;152:18;168:22;
170:16;222:11;224:12;
225:16,17;269:18
**male (3)**
115:10,11;144:4
**Malone (1)**
213:12
**man (8)**
85:25;86:1;221:16;
225:6;238:14;257:9;
263:5;283:11
**manage (1)**
40:7
**managed (1)**
263:7
**manager (1)**
17:4
**managing (1)**
49:8
**mandatory (1)**
277:19
**manned (2)**
164:9,11
**manner (1)**
211:9
**man's (2)**
243:14;302:17
**manual (25)**
14:5;15:17,18;54:9;
59:8,15,17,22;160:14,
15;161:18,25;201:23;
202:4,7,20;203:11;
219:23;220:2,5,17,25;
221:22;222:19;223:1
**manually (2)**
66:13;151:10
**many (18)**
24:1;35:18;47:3;
86:8;194:22;225:15;
243:21;244:10,11;
245:5;261:3,19;265:7;
266:2;272:14;290:25;
292:22;298:22
**map (1)**
231:21
**mark (6)**
5:16,18;36:6;188:8;
245:25;254:7
**marked (26)**
5:20,21;36:7,8;
83:20,21;87:13,14;
88:21,22;91:7,8;
130:18,19;161:4,21;
246:1,3;253:15,16;
272:9;292:8,12;293:9;
295:5;297:3

**married (1)**
35:14
**marshal (10)**
12:14,16;93:19;
113:7;231:6;233:19;
276:2,18,23;280:9
**marshal's (12)**
90:25;91:4;94:10,12,
14,18;107:25;108:4,6;
109:12,20;110:1
**mask (2)**
220:13;226:5
**master (4)**
149:7;201:23,24;
202:1
**match (5)**
230:19;232:5;
257:11,18,19
**matched (1)**
141:15
**matches (1)**
141:9
**materials (10)**
4:25;5:2,7,10,11;
112:19,22;114:7,8;
246:13
**Matias' (1)**
293:22
**matter (13)**
85:6;99:20;142:19;
143:15;162:6,11;
238:17;261:17;267:9,
17;268:13;300:14,19
**mattered (1)**
141:9
**matters (4)**
299:13,19;300:4,8
**max (1)**
257:17
**maximum (1)**
118:1
**may (33)**
9:14;19:5;23:9;
26:10;51:18;53:20;
58:21;64:3,4,4;78:17;
110:25;111:21;140:2;
145:21;148:1;149:2;
151:23;156:13;158:15;
165:24;168:6;247:25;
253:10;272:23;284:2;
288:12;293:21;294:2,
8,15,18;295:25
**maybe (22)**
9:23;10:1;14:19;
20:2;31:3;33:13;44:5,
6;51:21;62:6;116:20;
119:9;122:3;189:11;
194:9;208:23;209:24;
245:8;266:9;277:24,
25;300:11
**mean (101)**
12:5;19:9;22:8,9;
24:19;25:18,19;27:21;

29:19;45:22;49:17;
56:8;59:10;61:6,19;
63:21;69:15;74:23;
76:7;78:15;95:13;98:3,
24,25;99:3,16;102:1,5,
6,6;103:17;106:3;
109:21;117:1;119:9,
11;123:17,18;124:10,
17;125:3,18;126:2,6;
127:8;128:8;129:19;
132:11;133:14;136:4;
138:15,17,24;139:20;
140:20;141:1;144:7;
148:9,18;153:14;
154:23;159:11;168:22;
171:23;173:8,14,16;
177:10;182:12;185:16;
187:1;192:24;197:6;
206:3;207:15;208:1;
211:1,15,24;214:21;
220:6;221:3,8;224:11;
227:15;230:4;233:8;
234:11;236:21;239:19;
243:18;261:15;265:1,
2;272:8;276:10;
281:15;287:4;293:6;
294:11;302:15
**meaning (1)**
165:17
**means (7)**
24:14;55:7,23,23;
92:5;95:10;281:22
**meant (5)**
252:22;260:19;
275:23;282:13;293:7
**measurement (1)**
26:11
**measurements (1)**
67:21
**Mechanical (11)**
159:16,17;160:13,
20;164:21;165:6,7,8;
203:16;228:3,22
**mechanically (3)**
203:17,20;204:3
**mechanics (1)**
202:8
**mechanism (3)**
204:4,24;214:12
**media (2)**
33:9;34:4
**medical (14)**
53:21;54:8;57:3;
67:18,18;116:17;
117:2,2,3;212:17;
249:20;283:22,23;
291:5
**medications (2)**
10:15,17
**meet (3)**
114:20;166:23;288:3
**meeting (17)**
88:13;114:5,6,8,9;

166:17;277:19,21;
278:14,25;279:7,15;
280:1,2,3;293:14,20
**meetings (5)**
88:13;279:5,6,6,18
**mellow (1)**
213:6
**member (6)**
48:9;51:12;56:14;
63:18;117:3;237:24
**members (13)**
46:24;47:3,7,20;
49:9;50:24;56:10;
59:18;63:8;124:2;
235:24;273:17;289:17
**memo (2)**
246:8,9
**memories (4)**
11:9;265:9;268:24;
281:3
**memory (57)**
10:13,17;11:1,3;
21:6;37:9;86:19;87:7;
110:17;123:5,14,22;
128:12;134:17;137:14;
153:23,23;164:19;
165:8;166:6;169:17;
175:3;179:3,5,7,20;
181:9;197:12;200:8,
22;236:11;237:2;
249:12,21;250:5,15;
251:18;252:17;253:5;
259:10;265:14,16;
266:3,4,15,16,19;
267:7,10,17;268:9;
269:21;271:11;274:19;
281:11;288:9,19
**men (2)**
174:8,23
**mental (2)**
289:5;291:5
**mentality (2)**
238:5;240:9
**mentally (1)**
234:13
**mention (5)**
167:2;217:23;
236:16;248:1;278:1
**mentioned (14)**
16:14,23;18:22;
23:19;63:19;121:8;
122:21;128:23;186:16;
221:17;236:8;247:25;
292:18,20
**mesh (4)**
133:15;184:13,16;
190:25
**message (6)**
34:11;299:9,12,18;
300:22;301:15
**messages (6)**
34:6,8,21;298:18;
299:6;300:1

**Messenger (1)**
33:22
**met (2)**
166:18;200:16
**method (2)**
24:2;233:17
**Michigan (4)**
30:19,24;81:11;84:3
**Microsoft (2)**
151:5,9
**middle (1)**
40:20
**midnight (1)**
105:2
**mid-sentence (1)**
189:14
**might (58)**
5:17;8:10;10:15;
21:15;22:14,23;26:13;
31:7,8;32:12;39:19;
44:12;50:16;53:10,24;
54:8;57:2,18;64:6,23;
65:1,3;67:7;70:4;
79:10;80:6;107:14;
108:25;109:6;110:25;
112:2;116:23;119:10;
129:7;130:6;131:9;
138:21,23;144:16;
146:1;148:7;150:18;
151:20;156:3,3;
158:16,16;196:20;
198:20;208:10,11,12;
234:2,23;236:5;258:9,
25;267:1
**mike (1)**
138:23
**mile (1)**
219:5
**military (1)**
82:10
**mind (15)**
14:16;73:16;96:14;
125:17;126:1;157:14;
161:10;186:2;188:3;
239:19;261:23;265:2,
19;272:6;302:7
**mine (3)**
106:22,23;292:3
**minimum (3)**
71:20,25;72:5
**minor (3)**
19:18,24;32:14
**minute (4)**
44:16;80:7;258:18;
275:16
**minutes (10)**
115:18;139:9;
155:23;181:23,24;
182:9;183:5;187:10;
206:13;278:13
**mirror (1)**
171:14
**mirrors (5)**

BOSS REPORTERS
(219) 769-9090

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 95 of 111

171:4,11,18;183:20;
187:9
**miscommunication (1)**
233:17
**misremembering (1)**
250:22
**miss (2)**
148:6;206:10
**missing (1)**
151:24
**mistake (1)**
298:12
**misunderstanding (1)**
10:4
**misunderstood (1)**
9:25
**mobbing (1)**
242:8
**model (1)**
74:11
**module (4)**
20:23;21:1,4,7
**modules (1)**
22:6
**moment (7)**
9:19;16:15;127:5;
142:19;172:15;173:19;
235:22
**moments (1)**
262:19
**moment's (1)**
80:5
**money (2)**
292:24;293:5
**monitoring (1)**
134:9
**monitors (1)**
163:13
**month (3)**
86:24;261:15,18
**monthly (7)**
16:11,23;17:1,11,21;
18:22;20:15
**months (8)**
69:1;72:5,14;85:19;
102:12;116:20,21;
221:16
**mood (1)**
134:2
**more (82)**
14:17;19:11,11,25;
21:15;24:17;26:7;50:3,
3;51:14,20;54:21;57:8;
63:7,25;64:1,4,6;
65:23;72:3,9;73:12;
74:2;79:7;93:20;109:1,
2;113:6;115:18;
116:10;118:5;122:15;
129:8;139:8;162:2;
170:12;171:3;172:7,7,
21,21;173:13;174:9,
24;175:6,23;181:22,
22;182:3,9,12;183:5;

187:22;190:4;199:3;
207:24;211:16;213:6;
216:13;220:16;221:10;
222:11;236:17;237:12;
249:1;260:2;264:17;
266:6,23;275:22;
276:5,18;278:11;
284:25;285:2,4,15,17,
17;288:2;292:18;
301:25
**morning (2)**
4:6;104:22
**most (20)**
19:19;32:19;42:21;
44:9;45:4;49:1;51:24;
71:15;73:10;118:19;
182:21;186:1;193:14,
14;213:6;222:7;
244:22;266:7,10,22
**mostly (5)**
126:23;210:4;280:6,
6;288:2
**mother (4)**
35:6,12;291:8;299:1
**mother's (1)**
35:7
**motion (3)**
207:2;211:8,21
**motivation (3)**
239:24;241:3;244:2
**mouth (3)**
58:7;184:7;242:6
**move (5)**
31:2,7;203:17;204:4;
212:6
**moved (3)**
172:20;207:1;286:6
**movements (3)**
67:6;253:25;257:21
**moving (9)**
31:5;174:1;181:17;
210:5;211:3,20,21,22;
212:15
**MSU (1)**
294:3
**much (30)**
18:9;41:22;57:2;
75:3;77:21;82:16;
91:19;125:16;126:13,
19;136:21;139:7;
141:15;153:13,22;
182:3;197:5;198:11,
22;218:17;220:22;
223:4;227:3;238:2;
264:12;266:23;277:8;
284:14,23;285:19
**multiple (6)**
41:19;57:7;112:19;
149:25;196:14;242:22
**must (4)**
13:25;145:12;
195:21;196:7
**myself (12)**

4:8;67:11;103:1,1;
182:6;241:14;245:19,
20;254:6;282:3;293:2;
301:24

**N**

**name (15)**
4:9;6:20;7:8;33:18;
35:7;83:8;86:2;87:23;
89:5;109:23;230:20;
232:8;257:19;278:1;
284:24
**names (8)**
122:14;136:19,22;
137:5;230:20;254:8;
290:11;296:11
**narrative (3)**
236:7;297:12,16
**narrow (1)**
256:4
**narrowing (1)**
119:3
**natural (1)**
9:4
**naturally (4)**
51:13;59:11;234:11,
20
**nature (7)**
19:3;25:6;53:6;
54:12;126:19;286:20;
301:16
**nearby (4)**
56:9;58:24;60:7;
62:12
**nearly (1)**
189:11
**necessarily (7)**
42:25;78:21,24;80:9;
91:20;179:19;300:20
**need (25)**
8:11;26:25;55:1;
63:25;79:3;91:19;
107:7;120:1;124:19;
130:5;140:2;144:25;
169:25;201:18;215:10;
220:8,9,14,15;223:8;
227:17;233:3,6;235:8;
240:13
**needed (26)**
54:7;123:10,13;
127:16;131:21;142:19;
163:15;170:6;177:4;
179:4;201:15;223:24;
224:23;227:15;229:10;
230:1,4;231:7;232:24;
233:2,10,11;251:16,17;
288:16;298:8
**needing (1)**
129:5
**needs (8)**
44:7;54:10;120:4;
124:18;152:18;215:2,

6;299:2
**Negative (5)**
270:25;288:6,10;
294:10,11
**neighbor (1)**
205:8
**neither (1)**
222:5
**network (1)**
108:16
**new (20)**
31:4;32:19;35:3;
49:9;55:9;66:7,7,8,12;
103:17,18;113:5;
139:14,18,21;144:7;
239:21;265:11;277:10,
15
**newer (1)**
45:18
**news (1)**
230:12
**next (19)**
8:18;62:20,22;85:3;
93:24;94:6;106:4;
125:8;127:24;158:17;
159:10;173:4;189:3;
223:19;245:8;248:25;
254:12;255:5;270:18
**nicely (2)**
279:12,13
**night (68)**
10:20;11:1,10,14,21;
12:1;13:4;40:19;42:14,
21;43:3;45:2,20,22;
46:3,13,17;47:3;48:15,
20,25,25;49:22;50:4;
65:22;66:21;70:25;
71:10,18;74:11;76:13;
104:19;117:22;118:2,
4;123:7;124:20;
128:18;133:24;135:22;
136:20;137:5;138:1;
148:4;149:11;150:16;
162:7,8,11;163:16,18,
22;169:1,2,7;181:10;
213:1;216:17,23;
217:3,6;238:22;
240:24;247:15;286:6,
12,16;289:23
**nights (5)**
39:6;42:8;44:17;
74:5;105:1
**Nine (2)**
35:21;50:12
**nobody (3)**
163:20;233:1,9
**nodded (1)**
284:9
**Nodding (6)**
49:23,24;60:24;
62:11;94:5;259:22
**nods (1)**
8:23

**noise (23)**
30:10;146:4;168:19,
21;169:6,8,12,16;
170:16,21,21,23;172:8;
173:7,10;174:23;
175:23;219:8;228:16;
234:1;250:11;251:6,7
**noises (6)**
168:22,24,25;172:5;
174:16;224:12
**noisier (1)**
170:20
**noisy (3)**
172:12,24;173:12
**non-designated (1)**
75:16
**none (9)**
49:13;125:4,9;
148:17;207:20;261:2,
22;289:22;295:4
**non-QRT (3)**
56:10;59:18,24
**Nope (1)**
72:8
**normal (11)**
43:16;111:1;169:18;
171:24;172:8;173:9,
21;174:2;176:24;
203:22;214:21
**Normally (4)**
141:15;165:21;
169:9;172:7
**north (13)**
131:13,16;132:8,25;
133:1,2,3;178:22,25;
179:2;180:17;187:18;
188:17
**north/south (1)**
132:10
**notation (1)**
147:24
**notes (2)**
110:16;279:11
**noteworthy (3)**
288:5,9,10
**nothing's (2)**
58:19;300:10
**notice (5)**
80:5;186:7;293:14,
15,20
**notification (2)**
294:1,17
**notify (2)**
54:19,21
**nots (1)**
14:16
**November (8)**
36:4,12,18;37:6,11,
24;67:23;68:25
**novice (1)**
276:10
**nowhere (2)**
141:5;210:15

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 96 of 111

**number (26)**
4:18,20,21,24;5:4;
22:18;31:9;34:14;
48:17,19;50:21;72:5;
87:17;88:24;89:8,11;
92:23;154:8,10;
219:25;230:20;231:16;
232:9;243:24;292:19,
20
**numbers (6)**
141:15;144:22,23;
145:1;240:24;244:17
**nurse (2)**
291:14;296:8

## O

**oath (2)**
8:4,4
**obey (1)**
77:12
**object (8)**
14:14;30:22;31:15;
35:8;267:20;269:3;
302:3,11
**objection (3)**
9:19;268:19;269:5
**objections (3)**
9:14,16,16
**objectively (2)**
89:22;90:7
**obligation (2)**
75:16;79:25
**observation (1)**
73:12
**observe (7)**
183:16;184:4;
206:16,24;225:21;
243:21;244:18
**observed (8)**
175:25;185:21;
196:22;217:1;294:3,
18;295:18;296:4
**obvious (1)**
128:24
**obviously (19)**
6:13;15:11;25:18;
57:8;98:19;99:9;133:7;
146:10;147:6;153:12;
188:23;196:6;202:18;
203:10;215:2,14;
254:2;264:11;274:11
**occasions (8)**
86:8;294:3,8,19;
295:25;296:1,4;298:22
**occupy (1)**
128:19
**occupying (2)**
185:18;208:11
**occurred (2)**
148:15;279:20
**occurring (1)**
149:7

**occurs (1)**
19:20
**o'clock (5)**
57:23;154:25;162:8,
9,10
**October (3)**
4:19,24,25
**odds (1)**
133:2
**off (51)**
8:18;17:5;41:1;
46:19,21;55:24;74:20;
82:24;98:22;105:25;
118:2,20;120:23;
129:19;141:15;143:2;
146:9;153:23,25;
154:17;155:15,22;
156:3,4,7,14,16,18;
163:2;177:22;185:14;
188:3;189:14;192:11;
220:7,20,23;221:11;
223:6;227:14;243:18;
244:20;253:20;260:7;
267:3;269:9;282:25;
290:2;292:6;299:3;
301:2
**Offender (26)**
12:3,4;17:17,25;
19:7;20:9;24:24;41:7;
55:1,1;57:15;58:2;
59:12;60:2;90:18;
199:1;208:5;216:19;
229:9;232:23;242:22;
252:1,25;253:2;
282:14;294:4
**offenders (50)**
17:7,8;28:13;38:10;
47:15;49:5;51:1;57:4;
63:22;65:12;67:18;
71:4,14;118:1;125:9;
128:3,25;129:17;
130:12;136:6;148:13;
150:10;163:13;168:22;
177:6;190:3,20;
212:25;213:2;217:8;
219:10;222:15;232:7;
240:2,16;241:8,9,10;
242:18,19,22;243:4,8;
244:12;251:23;252:9;
279:25;283:15;288:3;
289:12
**offering (1)**
64:1
**offers (1)**
22:8
**office (55)**
6:21;41:6,12;43:15,
20,23;45:8;66:4,5,13,
16,18,24;67:8,16;
117:25;129:1,8,11,12,
21;130:1,7;131:16,23;
132:15;133:4,12,16,19,
20;134:8,11,24;

135:12;136:18,24;
137:23;147:5,6,8;
148:17;157:9,15;
158:19;175:5;195:5;
220:19;228:15;232:1;
256:2,4,19,23;293:22
**officer (127)**
11:5,15;13:7,10,12,
16,17;14:21;15:20;
22:24;24:15,23;26:5,7,
16,23;27:6,10,17,18,
24,25;29:2;30:9,14;
37:6,17;42:22;43:1;
44:5,7;54:17;57:11,13,
24;58:9;61:2;68:1,18;
69:3,6,21;70:14,23;
71:2,11,12,18,22;72:6,
9,12,21;73:19,24;
74:12,17;75:14,18,25,
25;76:4,5,10,12,15,19;
77:1,2,10,11;78:2,4,9;
79:3,15;81:6;119:10;
120:16,17,21;130:11,
12;131:15,19;133:15;
135:13;136:16,23;
137:10;139:24;148:25;
158:12,14;166:20;
178:20;180:8;190:21;
195:19,22;213:5;
214:18;215:1,4;216:1,
1;234:7,8;235:18;
236:9;242:4;248:2,5;
255:7,9;257:18,19;
258:1;284:3,4,17,18;
286:24;291:12,13,14;
295:6
**officer-in-charge (8)**
70:20;72:7,16,23;
73:6;77:18;78:1,7
**officers (80)**
14:8,24;15:5;16:3,6;
17:6;24:11;28:4,8,19;
29:5,14,24;30:2;39:20,
24;56:2,25;59:4;60:5;
61:5,12;62:12,16;71:1;
72:11;74:8,13,16;
75:11,14,17;78:9;
118:11,14,18;128:20;
129:2;130:4;131:20;
133:20;134:7,13,17;
135:11;136:23;137:4,
17;138:6;140:4;142:2;
149:16;164:4;167:20;
176:16,17,18;178:11;
190:13;195:17;215:20;
233:25;236:4;238:6,8,
11;239:8;240:2;
241:24;244:23;263:6;
265:11;271:18;287:9,
14;301:25;302:7,9,20;
303:11
**officer's (18)**
15:25;120:10;

128:21,23;129:17;
130:5,9,15;131:19;
133:11,18;134:10;
141:20;142:23;143:2,
8;194:18,20
**offices (3)**
129:16;131:14,17
**official (1)**
151:17
**officials (1)**
245:9
**often (5)**
118:18;261:15,19;
299:12,15
**OIC (13)**
71:1;74:4;81:4;
122:24;128:16,17,19;
129:3,3;136:20;163:1;
215:21;239:15
**old (13)**
32:15;34:21,24;35:2;
106:11,21,25;139:15;
140:9,9;143:7;160:8;
203:5
**older (1)**
214:5
**old-style (1)**
201:12
**Once (22)**
40:14;46:20;79:11;
86:11;134:8;141:17,
18;143:8;145:22;
158:22;159:7;166:8;
177:22;179:7;183:8,
13;204:11;209:8;
240:23;283:18;288:3;
301:18
**one (198)**
13:6;14:17;16:21;
23:22;24:17,20;32:14;
33:16,17;34:10;35:3,4;
41:24;42:1,6,7,11,11;
45:7,25;46:2,15;48:25,
25;49:10;52:2;55:4,4;
63:7;65:10,22;69:8;
71:15;74:17;75:14;
78:2;84:22;86:12,15;
88:15,18;96:11,16;
98:2;99:20,21;102:10;
103:21;104:3,15,15;
105:4,4;106:22;
109:21;110:2,5,10,12,
25;111:21,25;112:4,8,
20,21;113:20,21;
114:24;121:16,17,17;
124:6;127:20;131:15,
19;132:15;133:13,24;
134:8,13,13,25;135:21;
136:5,24;139:9;
143:11;147:5;149:8,
21;152:17;158:16,17;
159:6,7,7,8,10,23,24;
160:7,15,20;162:1;

163:1,6;168:12,23;
171:1,1;172:5;175:17;
176:21,23;177:23;
180:15,16;182:4,7;
186:4,22;188:9,17;
194:24;195:11,17;
196:13,14,16,17,18,21;
202:1;210:16;211:2;
221:25;224:5;225:23;
226:15;228:9;230:17;
231:16;232:4;233:7;
235:4,13;236:3;
237:14,14,16,16;
241:24;242:11,20,22;
248:6;251:5;254:12;
257:4,5,7,8,11,14;
261:3,17;266:2,13;
267:16;268:8;270:23;
272:5,11;277:14;
279:19,19;280:2,8,10;
282:21;284:2,2;
288:14,14;291:3,7;
292:5,21,22;293:9,10,
13;294:13,13;295:21;
297:15;302:25
**one-day (2)**
295:8,12
**one-on-one (1)**
237:11
**ones (18)**
71:13;107:11;118:5;
121:24;144:7;170:11,
13,15;194:25;196:14;
219:24,24;238:24;
244:15,24;256:8;
302:20,22
**one's (4)**
101:17;160:14,15;
272:12
**ongoing (6)**
117:9;147:14;
235:19;236:14;237:4;
250:17
**only (51)**
8:15;16:21;25:8;
32:5;33:4,7;45:5,7;
46:24;48:4;52:2;55:17;
62:15;65:21;70:23;
80:15;87:8;94:12,14;
101:1;106:25;110:5;
112:2;113:13;120:3;
130:15;159:1,15;
169:13;171:20;173:18;
189:10;212:7,8,15,25;
214:24;220:20;233:2;
240:19;243:24;244:16,
21;251:17;253:1;
254:6;255:5;256:8;
266:11,15;296:7
**onto (7)**
173:5;177:21;
180:19;183:25;184:5,
20;189:22

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 97 of 111

**open (71)**
130:16;133:22;
159:2,7;160:7,8;
161:13;163:16;165:9,
21;178:11;184:7,17;
189:9,10,13;192:18,19,
23;197:1,1;199:4,9,11,
17;200:2;202:15,16,21,
24;203:1,2,6,12,23,25;
204:9,10,12,17,18;
205:12;206:4,5,9,10;
209:1;215:23;216:25;
225:15,16;226:9,12,13,
15,25;227:1,3,11,15;
228:10,13;234:21;
251:3;252:6,18;253:2;
273:20;281:24;282:18,
21
**opened (14)**
101:17;164:15,17;
176:23;178:2,4,9;
189:10;199:8;216:24;
241:25;242:13;274:15;
281:12
**opening (8)**
26:17;159:13;197:4;
200:23;201:11;202:9;
252:1,25
**opens (6)**
159:6,9,10;160:4,4,6
**operate (6)**
18:18;19:1;20:8;
41:7;112:10;168:2
**operating (3)**
150:4;203:23;258:2
**operation (4)**
23:4;24:1;78:12;
279:20
**operations (3)**
81:8;202:19;214:21
**operator (2)**
152:4;158:23
**opinion (11)**
12:24;96:11;125:21;
127:15;186:3;212:18;
213:7;223:24;267:16;
268:14,25
**opportunity (5)**
5:25;92:20;106:2;
206:10;240:6
**opposed (2)**
126:20;265:15
**option (1)**
164:7
**optional (1)**
29:9
**oral (1)**
298:13
**order (12)**
5:14,22;52:7;57:9;
72:6;75:25;81:1;
107:11;150:4;239:6;
279:25;283:25

**orderly (1)**
17:8
**orders (11)**
65:19;78:10,17,22;
79:1,6,16;80:1,2,21;
177:4
**ordinarily (3)**
149:1;204:12;266:19
**ordinary (7)**
44:2;171:10,11,12;
175:25;183:16;202:19
**orientations (1)**
131:7
**original (3)**
66:9;102:12;234:23
**Originally (2)**
223:22;227:14
**ot44@hotmailcom (1)**
32:4
**others (2)**
26:13;210:13
**otherwise (4)**
134:10;229:21,22;
258:25
**Ours (1)**
150:20
**ourselves (1)**
45:17
**out (269)**
4:23;7:4;9:19;10:3;
13:13,18;14:1,22;15:7,
21;19:5,19;20:3,13;
26:6,8,18;27:10;29:8,
12,17,18,20;30:1,5,12;
41:16;43:20,22,24;
44:2,5,23;46:1;53:16,
21;54:5;57:5,21;59:3,
20;60:8;61:13;64:20;
66:25;67:2,5,12;69:8;
70:7;71:6;78:7;80:15;
89:18;91:16;98:20,23;
105:22;109:13;110:20;
112:12;113:3,6;115:4,
23;117:13;119:7,18;
120:9,16,21;123:21;
124:6,7,8,19;125:22,
25;126:8;128:1;129:7,
24;132:12;133:10,15,
16;134:9;136:10,17,
24;139:9,14,20,21;
143:3,11,15;146:5;
148:12,16;150:10;
156:22;157:20;161:8,
9,12,14;165:21;
168:23;171:4,10,11,12,
15,18;175:25;178:18;
179:4;181:7;183:16,
20;184:8,10,11,11,20,
21;185:4,10,18;187:4,
14;190:23,24;191:2,2,
3;192:14,24;196:20;
199:3;203:7;204:4,14;
205:4,5,9,11,24;206:1;

207:16,17;208:20;
209:5,13,19;210:25;
211:3,17;212:13,14;
213:8,14;214:22,23,25;
215:11,18;216:9;
217:17;218:18,25;
220:10;221:1;222:25;
223:11,13;224:24,25;
226:17,18,22;228:11;
229:7,15,20;230:24;
231:3,7,10,11,12,12,
22;232:20;233:4,6;
234:3,19;235:7,9;
237:15,19,19;238:6,10,
11,25;239:10,15,17,20,
21,25;240:3,8,12,23;
242:4;243:6,6,11,23;
244:14;245:7;248:6;
249:2;252:2;253:1,3;
256:1,3,22;261:3,23;
270:2,2,3,4,8,20;271:2,
10,13;272:3,4,7,13,13,
16;275:13,17;277:7,8,
12,15;278:12,21;
280:22;282:12;283:9,
20;285:13;286:6;
288:5,9,20;293:12;
298:8
**outcome (2)**
95:3;243:17
**outlet (1)**
64:2
**Outside (29)**
12:23;43:16;59:21;
63:8,13;69:2;90:11;
91:4;97:17;100:23;
110:2;112:23;113:14;
128:25;184:13,14,24;
185:8;191:5;204:15;
241:1;243:3,22;
244:23;283:18;287:5;
289:10;290:5;293:22
**outspoken (1)**
285:17
**over (42)**
7:25;9:11;23:10,24;
47:18;75:1;91:22;
92:20;103:9;104:20;
105:2;117:10;118:16;
128:3,8;146:12;169:3;
177:12;184:13,16;
185:5;190:24;215:11;
217:21;218:14;224:14,
19;229:21;231:25;
232:11;235:6,25;
238:15;239:17;243:1;
254:12;263:2,9,10,12;
268:20;270:6
**overall (4)**
65:12;122:2;150:15;
181:14
**overheard (1)**
135:23

**overlapped (1)**
32:12
**overnight (2)**
214:11,15
**overtime (2)**
292:24;293:5
**overview (3)**
19:7;46:18;117:24
**overwhelming (1)**
193:10
**own (14)**
42:13;58:9;59:10;
64:19;107:8,21;
110:17,17;114:16;
154:18;155:22;156:4;
201:22;204:21

**P**

**pace (2)**
64:19;157:19
**packet (2)**
12:13;98:23
**pad (3)**
152:20;154:11;
177:17
**padlock (6)**
162:3,3;204:21;
213:2;214:12;215:17
**padlocks (1)**
204:18
**page (16)**
36:11;83:24;89:13,
14;90:16;91:24,25;
92:24;93:24;121:11;
122:4,12;131:12,15,17;
297:10
**Pages (4)**
5:15;130:20;131:5;
293:12
**pain (1)**
197:18
**painting (1)**
57:16
**Pam (1)**
83:10
**Pamela (1)**
84:14
**panel (3)**
201:17;202:5;203:17
**panels (1)**
200:5
**panicking (5)**
274:3,10,13,17,25
**paper (10)**
67:5;72:10,18;
134:12;149:17;150:1;
152:11,12,25;208:10
**papers (2)**
208:2,14
**paperwork (3)**
67:8;129:7;278:20
**paragraph (6)**

87:24;89:17,17;90:6,
16;293:4
**Park (1)**
84:3
**part (49)**
17:18;19:19;20:16,
19;22:20,25;44:9;45:4;
49:22;53:12;58:15;
60:5;63:12;64:8,9;
98:21;100:15,19;
105:15;106:19;107:21;
112:9;114:3;125:11,
12;127:3;141:5,21;
142:2;167:18;174:17;
177:7;218:24;220:1;
222:24;223:1;234:16;
237:16;241:17;242:25;
243:24;244:3,16,16;
258:15;259:24;263:14;
269:12;279:20
**partaken (1)**
233:8
**partially (2)**
65:11;199:8
**participants (1)**
278:24
**participated (1)**
279:5
**participating (3)**
244:11;245:2,2
**particular (24)**
20:19,23,24;45:6;
46:4;48:15;54:11;
69:13;100:3;107:25;
108:9;110:24;139:8;
163:22;216:23;217:6;
221:25;238:11;245:23;
261:24;268:5;278:8;
284:5;288:20
**particularly (1)**
288:5
**partook (1)**
279:7
**parts (4)**
81:13;101:19;
125:13;215:1
**party (1)**
49:13
**pass (2)**
22:11;24:2
**passage (1)**
126:18
**passed (3)**
114:8;144:8;169:21
**passes (2)**
105:2,2
**passing (1)**
125:11
**past (12)**
32:12;82:1;86:17;
101:10,11;171:6;
185:10,17;188:13;
212:10;224:20;299:1

**BOSS REPORTERS**
**(219) 769-9090**

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 98 of 111

**path (1)**
185:14
**pathways (1)**
64:21
**patience (1)**
145:19
**patrolling (2)**
44:25;117:14
**pattern (2)**
65:6;179:15
**patterns (1)**
64:21
**pause (5)**
255:21;256:14;
257:2;258:18;275:9
**paused (3)**
258:18;262:1;275:9
**pay (1)**
264:10
**paying (1)**
68:2
**payroll (8)**
128:22;131:21;
134:18,24;135:13;
136:18;137:18;221:13
**PDF (2)**
122:11,12
**peer (1)**
133:17
**pen (2)**
161:11;254:7
**penalty (1)**
92:2
**people (75)**
21:14;32:19;33:25;
45:25;47:13,16;50:3;
53:24;56:24;57:8;64:2;
65:13;78:18;100:21,
22,24;101:5;102:5;
105:4,18,22,24;114:12;
116:9;117:12;118:20,
24;119:2,4;125:20,20;
126:15,15,16;127:11;
135:23;136:21;138:24,
25;142:16,17,17;
155:15;156:2,3;
167:16;168:24;172:12,
21,25;174:4,12;190:1;
199:20,22;204:22;
221:20;222:12;224:12;
226:4;227:17;230:4;
233:6,23;235:7,9;
237:8;239:22;240:24;
244:21;245:6;254:6;
255:10;278:11;279:7
**people's (4)**
104:13;187:9;
253:25;288:25
**per (3)**
65:19;182:4;215:19
**perceive (8)**
171:12;173:19;
174:16;176:11;183:8;

197:15,16;198:14
**perceiving (1)**
211:25
**percent (5)**
118:22;194:10;
242:24;243:2;271:16
**perfectly (1)**
143:24
**performing (1)**
6:14
**perhaps (2)**
104:22;250:22
**period (14)**
32:13;69:6,14;
118:16;139:1;150:17;
159:12;164:19;210:2;
235:18;236:13;237:6;
260:24;271:19
**periods (2)**
234:25;235:1
**perishable (1)**
240:11
**perished (1)**
95:16
**perjury (1)**
92:3
**permanent (1)**
49:7
**permissible (1)**
155:25
**permission (5)**
26:7,17;80:9;120:2;
230:22
**permitted (5)**
106:10;129:18,20;
134:7;298:17
**person (28)**
25:9;45:25;46:2;
64:7;73:6;76:25;83:8;
86:2,5;101:1;114:12;
120:3;134:8;138:7;
145:7;152:1,8,19;
153:3;162:18;168:23;
218:5;224:23;225:3;
227:5;230:10,11;
293:23
**personal (41)**
4:11;5:3;31:13,16,
23,25;32:1,3,5,8,11;
34:6;97:5;106:15;
107:21;117:2,4;
127:15;141:20,21;
142:3,8;156:6;204:21;
213:2;214:12;215:17;
287:15;289:11;298:18;
299:6,13,19;300:1,4,5,
8,9,14,18,23
**personally (10)**
28:20;29:6;84:12;
100:10,11;106:18;
217:1,14,15;223:2
**personalty (1)**
289:9

**personnel (8)**
36:11;293:12,15;
294:2,14,17;295:19;
296:18
**person's (3)**
47:9;73:15;80:4
**perspective (1)**
297:13
**petered (2)**
208:20;223:11
**petty (4)**
260:1,5,16,21
**phone (18)**
4:19;31:11,13,21,22,
23,24;34:6,8,9,10,14,
16;67:17;115:12;
118:2;232:11,13
**phones (3)**
34:22,24;35:2
**photo (2)**
256:22;257:24
**photograph (1)**
254:5
**phrased (1)**
9:24
**phrasing (1)**
276:19
**physical (17)**
19:11,12;40:21,24;
83:16;126:20;127:20;
128:18;138:22;141:8;
185:1;202:8,20;
228:18;257:10;258:3;
289:4
**physically (23)**
19:6;42:22;50:23;
64:9;66:23;125:17,22;
126:3,3;127:7;129:4;
136:10;137:20;138:7;
167:6;170:13;202:8,
11;208:11,25;224:6;
228:21;288:22
**pick (2)**
239:16;242:5
**picking (1)**
283:9
**picture (5)**
211:5;227:13;
230:21;232:9;256:9
**piece (3)**
152:11,12;189:16
**piecing (1)**
146:6
**pills (1)**
117:23
**pin (2)**
24:3;203:21
**place (55)**
24:22;28:18;29:4,13;
31:4;51:22;65:9,10;
80:18;83:5,11;86:15;
95:17,19;104:19;
105:19;108:10;111:15;

114:23;117:23;125:10,
19,22;127:14;129:10,
11;132:21;140:14;
145:12;201:3;212:23,
24;217:7;233:18;
234:10;245:11;249:22;
252:8;259:11;264:21;
267:18,19;268:16,17;
269:2,2;276:20;
277:22;279:15,18,23;
282:22;283:5;286:15;
303:3
**placed (4)**
46:4;147:25;237:15;
251:22
**placement (1)**
40:7
**places (2)**
239:8;272:14
**plain (1)**
121:24
**Plaintiff (5)**
4:2,10;7:2;89:21;
90:18
**plaintiff's (2)**
4:17;91:10
**plan (6)**
14:5;15:10,13,14,16;
222:23
**plans (3)**
31:2,4;130:25
**plaque (1)**
177:12
**platform (1)**
177:21
**play (10)**
135:7;255:12;
256:11,25;258:4,16;
262:2;272:25;273:22;
275:7
**played (15)**
123:21;234:3;
240:12;255:19;256:13;
257:1;258:17;259:2;
260:10;262:3;269:11;
273:1,24;275:8;280:17
**playing (5)**
123:14;124:14;
255:17;258:25;269:9
**pleasant (1)**
198:10
**pleasantries (1)**
127:1
**please (5)**
5:19;7:8;10:2;16:17;
36:6
**pm (5)**
39:10,13,18;247:1;
303:17
**point (119)**
8:12;20:11;24:8;
27:6;28:22;63:23;
65:16;69:17,17,23;

70:8,9;71:5,5;88:10;
104:22;105:24;106:3,
13;107:3,5;110:16;
136:16;163:12,17;
164:2,10,11;165:13;
166:12;170:2;172:11,
17,20,21,22,25;174:15;
175:12,16;176:3,5,9;
177:8;179:12;187:12;
190:15;191:10;192:1,
4;193:9,21,23,23;
194:1,7;196:1;198:21;
200:4;208:22;209:6,
14;210:4;212:2,9,16,
19;216:7,8,18,19,21,
21;217:24;218:21;
219:10,14,15;224:21,
24;225:4;226:18,21;
228:25;229:8;235:3;
238:13,18;239:14;
241:6,19;242:14,16;
248:22;250:1,1,6,8,9;
251:22,24,24;252:8,9,
23;261:21;263:14;
264:3;265:25;267:21,
25;270:18;276:3;
282:1;283:10;286:14;
287:1;290:8;297:25
**points (3)**
240:7;243:6;268:11
**Police (1)**
144:9
**policies (10)**
11:6,11,17;24:10,21;
27:8;28:17;29:4,13;
220:9
**policy (31)**
13:24;14:2,3,7,20;
15:4,10;26:3,9;47:15;
59:3,11;77:17,20;78:7;
120:6;140:14;141:4,
10,11;147:24;155:7;
180:3,7,8,10;215:19;
219:16,22,25;222:25
**poorly (1)**
9:24
**pop (4)**
204:7,16;206:5;
234:20
**popped (6)**
189:9;199:18;281:7,
17,21,23
**pops (1)**
206:7
**populated (1)**
65:22
**port (3)**
159:5;161:24;228:23
**ports (6)**
159:2,3;160:3;181:4,
5;228:4
**position (39)**
7:13;22:13;24:17;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD document 212-67 filed 05/25/21 page 99 of 111

35:25;36:18;38:15,17,
22;39:16;42:18;48:6,
12;49:10;63:2;70:11,
17,20;72:7,16;77:19;
78:1;108:25;123:3,6;
128:16;129:22;193:22;
197:9;205:14;225:23,
25;291:4,15,22;292:2,
4;294:25;295:3,19
**positioning (1)**
206:24
**positions (4)**
46:14,16;47:1;132:1
**positive (2)**
288:6,9
**possesses (1)**
208:6
**possibility (3)**
186:17;202:12;
255:10
**possible (13)**
59:12;112:11,14,16;
146:1;163:18,20;
178:7;204:12;248:14;
254:20;292:24;293:5
**possibly (11)**
58:14;67:11;97:1;
196:9,10;200:23;
207:21;208:24;221:16;
232:4;251:17
**post (15)**
58:11;61:14,16;
62:24;63:1;78:10,16,
22;79:1,6,15;80:1,2,20;
220:21
**posted (3)**
17:9;24:2;70:7
**posting (1)**
43:13
**postponed (2)**
106:19;107:24
**posts (4)**
33:24;61:13;69:10;
70:2
**potential (1)**
53:23
**potentially (6)**
50:1;122:22;148:14,
18;236:4;261:12
**pouring (1)**
187:4
**PowerPoint (5)**
21:2;22:3;23:19,23;
24:4
**practice (6)**
111:2;112:3;156:6;
171:24;180:1;298:24
**practices (3)**
111:11;142:10;220:4
**precaution (1)**
47:19
**precise (3)**
19:2;235:14;253:10

**predecessors (1)**
139:22
**pre-deprivation (3)**
293:14,20;294:13
**predict (1)**
65:13
**preface (1)**
85:2
**prefer (1)**
7:20
**preference (1)**
142:8
**prep (4)**
40:13;53:25;106:15;
107:21
**preparation (8)**
94:19;103:16;
106:20;107:22,23;
110:4,7;246:14
**prepare (4)**
102:8,11;114:17,21
**preparing (2)**
106:18;109:17
**prepped (2)**
53:15;54:3
**prepping (2)**
218:9;249:1
**presence (2)**
58:6;64:1
**present (6)**
10:19;42:22;64:9;
66:23;70:24;241:11
**pressure (3)**
117:23;203:22;
207:24
**presumably (1)**
100:21
**pretty (10)**
139:24;143:8,16;
165:20;187:7;188:12;
193:6;223:23;281:14;
282:4
**prevent (2)**
26:11;208:7
**previous (3)**
89:7;274:19;293:3
**previously (14)**
10:1;35:1;102:17,25;
103:20;109:18;115:1,
6,22;127:11;257:24;
259:6;260:13;268:7
**primarily (3)**
9:16;280:10,13
**primary (5)**
131:8;161:4,22,25;
162:12
**principle (1)**
214:24
**principles (3)**
89:21,24;90:8
**print (1)**
104:16
**printed (2)**

121:7;253:19
**printout (2)**
181:2;253:17
**prior (33)**
5:10;6:1,6;16:6;
17:11;25:25;56:20;
69:1;82:5,8;88:10,16;
96:18;102:16,20,22;
103:15;106:20;107:23;
115:1,7;139:12,19;
146:22;166:12,14;
250:22;260:24;286:12,
16;303:4,10,11
**priority (1)**
189:25
**Prison (68)**
7:18;10:20;11:7,12,
17;13:8,24;14:8;15:6;
16:6;18:19;22:13;
24:10,22;26:3;27:9,14;
28:8,18,20;29:5,7,14;
34:12;35:23;37:7,15;
38:8;42:22;46:13;48:8;
58:19,21,25;64:22;
65:18;68:21;69:10;
78:25;81:8;84:6,13;
98:14;100:22;106:4;
108:17,25;117:10,25;
118:1;119:6;120:14;
137:20;139:3,12;
140:12,14;144:9;
149:8;213:21;232:14;
241:15,17;243:22;
245:9;260:3,25;267:13
**prisoner (63)**
13:8,11,13,16,18;
14:1,22,23;15:7,19,21;
17:17;18:2,8,17,24;
19:14,14;20:1,5;24:11,
13,24;26:6,8,15,18;
27:10,11,17,24;28:5,
15;29:15,25;30:3;
57:20;120:17;167:24;
209:9,19;212:21;
214:14;215:25;217:21;
218:16;219:17;220:3;
222:25;223:13;224:18;
225:7;229:5;231:24;
250:24;252:17;263:22;
270:22,23;271:6,19;
272:20;282:20
**prisoners (16)**
16:7;20:13;27:13;
29:15,25;30:3;57:23;
129:17,20;162:6;
170:7,8;183:17;241:3;
243:2,21
**privileged (2)**
30:23;31:17
**privy (1)**
100:1
**proactively (1)**
80:1

**Probably (29)**
32:10;61:22;126:13;
144:16;152:25;153:22;
157:17,17;158:13;
163:17;165:19;168:7;
187:10;189:20;190:8;
209:14;248:1;252:22;
255:2;260:18;282:8;
295:21;296:25;299:8,
14;300:13,15,16,20
**problem (3)**
8:12;117:24;118:3
**problems (1)**
64:3
**procedure (19)**
140:14,18,19,25;
142:9;143:11;144:2;
162:6,11,21;180:4,7,8;
217:4,5;219:17;220:2;
223:1;270:21
**procedures (13)**
11:6,11,17;24:10,22;
27:8;28:17;29:4,13;
141:13,21,21;142:3
**proceeded (3)**
199:25;225:14;
230:19
**proceeding (1)**
6:19
**process (13)**
101:9;106:24;
160:19;167:15;168:6;
202:20;207:6;219:6;
248:2;269:19;270:5;
278:13;283:8
**produced (3)**
36:9;293:13;295:22
**production (2)**
130:21;246:4
**professional (3)**
6:13;82:3;300:23
**proficiency (6)**
72:4,17,21,22;73:5,
20
**proficient (2)**
72:2;81:7
**proficiently (1)**
113:6
**program (1)**
151:6
**progress (1)**
298:15
**prohibited (2)**
26:5;300:7
**Promise (2)**
137:4;178:7
**promoted (5)**
36:17;37:19;38:4;
68:19;69:12
**promotion (1)**
37:20
**pronunciation (1)**
23:10

**Proof (2)**
83:24;84:10
**proofread (2)**
279:11,13
**proper (1)**
25:20
**properly (2)**
122:15;141:22
**proportion (2)**
66:22;244:17
**protect (3)**
28:12;54:22;120:17
**protecting (1)**
13:7
**protective (2)**
5:14,22
**protocol (3)**
158:7;215:24;219:18
**provide (6)**
10:12,16;50:25;
79:16;177:4;182:8
**provided (21)**
4:22,25;16:3,5;
25:21;36:11;62:13;
66:15;79:15;94:18;
101:21;102:10,16;
121:12;122:10,12;
129:22;130:2;204:17;
255:16;258:14
**providing (1)**
118:10
**public (3)**
28:12;33:24;62:3
**Puetzer (24)**
116:11,12,13,15,17,
23;122:18;166:20;
167:7;217:24;218:5,6;
238:9;242:4;273:10;
287:7;290:6;299:5,7,
10,12,20,25;300:12
**pull (25)**
24:2;45:25;106:4,20,
25;138:24;143:13;
163:21;164:4;202:25;
203:6,11;204:8,15;
205:10;206:10;225:19,
23;226:25;232:1,9;
239:17;253:2;255:11;
282:21
**pulled (13)**
107:20;148:11;
192:20;209:4,13;
220:24;223:12;230:21;
237:15,19,19;246:20;
285:13
**pulling (13)**
199:5;225:14,22,23;
226:2,7,10,11,16;
251:3;252:1,6,25
**pulls (4)**
203:20;205:13,18;
209:18
**pulsating (1)**

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 100 of 111

191:5

**purpose (6)**
96:5,5,7;133:21;
152:15;263:13
**Purposely (2)**
27:22;264:17
**pursue (2)**
67:25;69:3
**push (13)**
51:17;56:17;160:6,7,
8,15,21;161:13;165:7;
204:5,12,17;231:9
**pushed (3)**
207:18;208:18;
242:10
**pushing (2)**
251:23;252:9
**put (51)**
4:14,18;5:8,12;6:5,
16;7:1;19:19;20:3;
21:2;24:17;45:17;46:1;
49:1;50:22;58:7;92:13,
16;96:2;97:7;113:6,23;
124:4,5;125:16;
135:20;147:20;150:11;
153:9,10,22;155:2;
173:14;178:25;192:14;
199:2;202:23;207:24;
210:25;217:17;224:24,
25;227:22;243:6;
248:6;249:2;266:14;
277:7,8;280:22;293:2
**puts (1)**
203:22
**Putsur (1)**
116:11
**putting (3)**
67:17;179:20;229:7

## Q

**QRT (48)**
40:11;45:5,9,12;
46:17,22;47:3;48:2,4,6,
10,13;49:7,8,19;50:7,
19,20;51:8,10,12,23;
52:13;53:1;54:9,11,15;
56:1,5,12,25;58:5;59:9,
16,17,20,21,21,22;
60:6;61:2;62:10;63:8,
12,18;74:19;219:23;
222:22
**qualified (2)**
45:15;89:19
**quality (2)**
258:6;259:16
**quantity (2)**
22:16;78:16
**quick (13)**
40:11;45:6;46:23;
72:1;121:16,22,24;
122:1,14;124:6;
143:16;187:4;270:17

**quicker (1)**
231:21
**quickly (2)**
190:8;301:5
**quiet (1)**
45:2
**quieter (1)**
71:11
**quite (8)**
154:22;198:25;
207:1;221:4;252:13;
261:16;265:11,12
**quote (2)**
71:15;189:7

## R

**race (1)**
64:7
**radiating (1)**
192:10
**radio (49)**
19:2;23:10;47:18;
127:17;138:4,12,18;
139:25;140:16;141:7,
8,16,19,22;142:4,14;
143:14;145:21;146:12;
147:10,13;152:4,9;
164:13;165:13;166:7;
215:5;217:7,13,14,15;
218:14;223:25;224:14,
19;226:22;228:25;
229:3,21;230:8;
249:25;250:1,13,18;
251:6,8;270:6,11;
298:6
**radioed (2)**
231:17;232:11
**radioing (3)**
217:21;224:17;
231:25
**radios (11)**
138:7,20;139:4,6,15;
140:7,9;142:21;144:6;
174:3;224:1
**rages (1)**
172:22
**raging (1)**
26:22
**raise (1)**
232:21
**raised (2)**
177:17,18
**raising (1)**
6:16
**ran (9)**
69:16;79:11;179:21;
189:19,20,24;195:17;
241:23;283:14
**random (2)**
67:2;156:15
**range (81)**
144:3,16;145:13,21;

146:3,7;163:2;165:19;
166:3,9;167:4,6;170:1,
8,12;171:3,8,13,18,23;
172:8;173:1;174:12;
175:8,11,21,24;176:25;
178:17;179:4,9;
180:13,19;181:11;
182:1;183:4,9,10,13,
14,18;184:6;185:12,
22;186:11,21,25;187:8,
22;189:4,22;190:4;
193:6;194:11,13;
195:4,7,15;199:25;
200:6,13,17,18,20;
201:3,7,20;202:2;
209:11,15;212:8;
215:21;223:14,20;
226:1;229:4;250:4;
251:17;275:3;301:13,
13
**ranges (8)**
133:10;136:5,11;
169:21;171:6;177:5,7;
213:10
**rank (5)**
22:14,19;37:22;74:1;
108:24
**ranking (3)**
42:24,25;43:1
**ranks (1)**
37:21
**rapidly (1)**
180:1
**rather (10)**
51:17;57:6;75:3;
79:13;104:23;144:4;
228:1;266:6;281:16;
292:2
**reach (5)**
95:19;115:4,5;162:4;
242:8
**reached (2)**
176:14;242:4
**reaches (1)**
276:4
**reaching (1)**
136:8
**reaction (1)**
230:9
**reactions (1)**
263:8
**read (47)**
90:25;91:19;92:7,9,
10,11,11,13,14;93:19;
96:9;102:20,23;103:2,
11,15,20;104:2;105:13,
13,23,24;106:22,22,23;
107:1;109:12,14,16;
112:19;220:18,20,21;
221:1,11,22;222:19,20,
20;223:2,3,5;248:13;
252:2,5,10;255:14
**readable (1)**

75:6
**reading (1)**
105:18
**ready (10)**
53:19,19,25;54:7;
73:6;201:6;213:13;
214:25;216:3;218:12
**real (7)**
33:18;124:6;138:24;
153:2;187:4;222:17;
237:22
**realistic (1)**
164:7
**realistically (7)**
23:12;50:21;120:3;
130:15;164:1;220:19;
223:6
**reality (1)**
163:20
**realize (3)**
264:20,23;301:11
**realized (1)**
301:18
**really (65)**
14:6;21:19;23:13;
39:25;45:9;48:17;
58:20;86:4;95:17;97:2;
102:6;104:8;111:22;
112:21;118:20;120:1,
5,15;122:1;126:3;
130:5;133:23;139:7;
140:21;141:17;144:6,
10,10,23;160:22;
161:1;167:5;169:25;
170:5;173:13,14,18;
176:5;178:9,11,19;
181:19,19;187:2;
191:15;207:12,24;
210:15;219:5;221:14,
21;229:17;236:17;
238:1;245:21;259:4,
12;260:5;264:9,12;
267:2;268:1;284:12,
23;289:12
**re-ask (1)**
14:19
**reason (15)**
36:23;37:2;80:3;
84:24;112:2;148:1,7;
169:12;190:15;222:17;
232:20;240:2;243:10;
274:24;296:7
**Reasonable (4)**
79:18,21;89:23;90:7
**reasoning (2)**
240:19;243:16
**reasons (7)**
61:8;69:2;128:24;
131:22;237:20;251:5;
263:8
**recall (51)**
23:2,8;81:25;110:23;
111:1,2,21;112:16;

114:4;120:12,12;
127:8;128:13,14;
132:20,24;135:16,18,
18;143:22;144:4;
146:17;149:20;166:14;
175:3;178:24;179:1;
186:10;187:12,16;
195:22,24;200:21;
206:17,23;209:19,22;
210:10;211:9,25;
223:9;235:18,20;
236:15;247:11;249:16,
17;251:10;265:5,25;
300:12
**recap (1)**
102:14
**receding (1)**
191:11
**receive (2)**
229:22;247:24
**received (12)**
5:6;12:13;84:11;
147:10;271:18;290:23,
25;291:2;294:8,21;
295:15;296:12
**receives (1)**
215:5
**receiving (3)**
5:10;77:11;120:21
**recent (1)**
73:10
**recently (1)**
68:19
**Recess (5)**
82:25;120:24;
206:14;260:9;292:10
**recognize (7)**
87:17;88:25;130:21;
144:11,17;246:4;257:5
**recognizing (3)**
137:15;188:7;212:17
**recollect (2)**
136:22;261:4
**recollection (23)**
84:19,21;107:15;
111:10;123:25;124:20;
167:7;176:11;177:24;
178:4;186:19;192:3;
195:2;209:10;213:18;
217:13;243:2;245:1;
248:11,20;249:5,15;
291:18
**recommendation (1)**
119:21
**recommended (2)**
233:15;292:19
**recommending (1)**
119:23
**recontacting (1)**
251:8
**record (31)**
4:9,14,18;5:8,12;6:5,
17;7:1,9;8:18;9:1,12,

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 101 of
111

17,20;18:16;31:16;
82:24;120:23;147:16;
166:7;167:18;227:19,
23;230:20;255:15;
258:11;260:7;262:7,8;
292:6;301:2
**recorded (2)**
50:9;247:8
**recording (3)**
258:5,5;262:9
**recordings (1)**
147:13
**records (2)**
148:22;232:6
**recovery (1)**
90:19
**recruiting (1)**
49:8
**recruitment (1)**
49:12
**rectangle (2)**
184:19;227:21
**red (1)**
284:8
**REDDEN (21)**
4:1;5:25;7:10,20,22;
10:19;30:18;36:14;
81:10;83:2;84:1,3,11;
87:17;88:25;121:2;
251:20,23;297:17;
301:8;302:24
**R-e-d-d-e-n (1)**
7:10
**Redden's (2)**
5:22;91:9
**reengage (2)**
205:22,23
**reference (4)**
103:21,25;131:1;
236:3
**referenced (2)**
59:15,16
**referred (1)**
281:2
**referring (33)**
12:15,18;25:14;84:1,
15;89:24;90:19;92:24;
93:4;99:1,5;101:24;
121:25;145:1;146:20;
210:6;234:7;235:11;
247:2;248:9;249:3;
259:21;262:14;273:16;
276:17;278:4,5;
292:25;293:24;295:9,
10;297:18;299:22
**refers (2)**
59:16;121:21
**reflect (5)**
123:2;171:21;
247:13;264:4;266:5
**reflected (5)**
12:23;36:21;84:25;
248:5;265:8

**reflecting (4)**
11:3,9,21;12:1
**reflects (4)**
36:17;246:25;
292:15;295:3
**refocus (1)**
301:5
**refresh (2)**
252:16;281:11
**refused (1)**
243:24
**regard (4)**
56:21;135:7;237:3;
274:25
**regarding (5)**
5:11;14:2;28:17;
83:3;110:12
**regardless (12)**
20:9;22:18;27:10;
45:1;53:4,18;55:25;
56:2;76:25;97:9;158:2;
238:23
**regards (1)**
86:13
**regular (13)**
22:24;43:13,21;47:9,
23;50:24;63:13,20;
75:14;76:4;109:7;
169:14;258:24
**reignite (1)**
248:4
**reignited (4)**
208:22;223:12;
248:16,23
**reigniting (1)**
208:13
**re-ignition (2)**
209:12,25
**relate (1)**
234:17
**related (9)**
67:9;98:9,12;134:17,
18;220:2;259:8;268:6;
297:7
**relating (1)**
118:10
**relation (5)**
100:22;116:15;
123:7;134:21;168:14
**relationship (4)**
286:20,23,24;287:9
**relaxed (8)**
291:6,12,21;292:1,4;
294:24;295:3,18
**release (3)**
17:6;20:5;270:22
**released (5)**
269:14,25;270:14,
16;271:1
**releasing (3)**
16:7;19:14;20:8
**relevant (1)**
35:9

**reliable (1)**
71:15
**relieved (1)**
221:1
**relock (1)**
162:19
**re-looking (1)**
264:15
**relying (3)**
8:23;90:5,12
**remainder (1)**
185:8
**remedy (1)**
302:18
**remember (126)**
11:4;37:1;39:15;
50:6,8;83:8,11;85:13,
15,19,21,22,25;86:4;
91:16;108:8;111:22,
24;112:1;113:16;
114:25;123:11,11;
124:24;125:15;126:2,
4,9,20,25;127:2,13,14;
138:3;144:3,14;145:4,
6,11,13,13,14,17,22;
146:6,22;147:4;
160:22,22;164:22;
167:13;168:17;170:19;
175:12,15;179:13,14,
19;180:12;189:5,18,
20;192:8,8;194:4,5,15;
195:7,12,15;196:1,15;
197:2;200:14,15;
201:5;208:12;210:1;
212:7,9;217:21;225:1;
226:6,7;230:15,16;
239:6;246:15;249:6,6,
7,18;259:11;261:5,22,
24;262:15,16,18;
264:12,13;265:1,1;
266:23;268:15;269:1,
16,17,18;270:7;274:12,
13,16,21,23,23;275:5;
279:14;282:1,7,15,23;
283:25;285:5;287:25;
290:16
**remembered (3)**
166:17;266:3;282:6
**remembering (3)**
261:21;264:25;268:6
**reminders (1)**
115:23
**remove (2)**
50:13;77:23
**removed (1)**
148:16
**renew (1)**
268:18
**reopen (1)**
5:8
**repairs (1)**
141:19
**repeat (2)**

13:14;25:10
**repeating (1)**
14:16
**rephrase (6)**
10:3;15:1;20:22;
78:23;98:7;126:22
**replaced (1)**
240:11
**report (108)**
12:15,23;28:24,25;
44:11;54:2;56:5;80:1,
14,17;90:9,12;91:1,4;
93:19;94:10,12,14,17,
18;97:3;103:3,22,22,
23,24;104:4;106:25;
107:5,8,20,25;108:4,4,
6,14;109:12,16,19,20,
25;110:1,2,5,11,12,17,
21;111:16,19,25;
113:14;140:2;141:1;
150:20;153:9,11,15,21;
154:8,16;155:21,25;
156:10;167:15;227:5;
230:4,6;234:23;
238:16;246:8,10,15,18;
247:5,13,17,20,23,25;
248:5,19;249:9,24;
250:2,16;251:4,11,12,
15;252:5,7,10,16,19;
253:9,11;259:8;
278:13,19;281:1;
285:10;288:11,20,22;
297:6;298:4,11
**reported (1)**
293:21
**reporter (17)**
6:7,10,13,15,24;7:6;
8:9;9:1;14:12;75:1,7;
83:22;87:15;88:23;
253:16;262:8;281:5
**reporting (1)**
119:22
**reports (22)**
94:25;104:2,6,13;
105:5,13,14,18,23;
106:11,21,25;110:3;
114:7;118:6;156:2;
167:16,20,24;168:7;
238:13;288:13
**represent (2)**
4:10;6:22
**representative (1)**
4:11
**representing (3)**
85:6;87:8;88:9
**reprimand (9)**
291:20;294:23;
295:8,12,14,15;296:3,
7,17
**reprimands (4)**
291:9,11;294:24;
295:4
**request (4)**

49:15;52:2;281:18;
292:13
**requested (3)**
4:24;217:14,15
**requesting (2)**
232:25;249:25
**require (4)**
53:7,24;118:5;129:7
**required (21)**
20:13;22:6;27:9;
28:4,19;29:1,6,10,15,
21;40:21,24;53:12;
54:19;58:6;65:19,25;
75:20;110:15;134:8;
140:15
**requirement (3)**
30:6;71:20;147:7
**requirements (1)**
22:15
**requires (8)**
44:4;51:8,13;53:1;
54:14,16;118:8;129:9
**requiring (1)**
44:6
**reread (5)**
103:6,7,10,14,21
**rescue (2)**
24:11;25:1
**rescuing (6)**
16:7;17:23;18:4,24;
24:5,7
**resecure (2)**
204:19;283:7
**resecured (2)**
282:24;283:6
**reserve (1)**
5:8
**resistance (1)**
57:4
**respect (5)**
51:22,23;89:20;95:4;
120:6
**respirators (2)**
223:17;226:4
**respond (40)**
28:19,23;29:6,15;
30:15;44:22;45:10;
50:21;51:10,13;53:14,
22,25;56:14,18;57:1,
25;58:10,22;59:5,7;
60:22;61:3;62:9,13,16,
22,25;94:24;120:10;
129:5;158:15;180:1,5,
10;216:3;261:1,7,7,12
**responded (5)**
124:23;180:9;201:1;
259:6;260:22
**responder (6)**
47:24;123:3;124:3;
157:13;158:7;166:20
**responders (20)**
28:23;47:6,13;52:17,
19;53:1,2;54:23;61:23;

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 102 of
111

62:9;121:25;122:1,6,7,
16,25;123:7,16,24;
176:18
**responding (18)**
45:4;46:1;51:3;58:4;
59:18,24;63:9,13;
117:12;158:1,8;164:6;
180:7;183:3;190:19;
235:2;247:18;261:5
**response (22)**
5:6;27:19;28:1;29:1;
40:11;45:6;46:23;51:8;
53:12;56:1;96:3;
121:17,22,25;122:15;
124:22;158:18;180:23;
186:14;222:4;279:20;
280:4
**responses (7)**
4:20;91:9;92:13,15;
96:22;100:18;113:24
**responsibilities (12)**
13:6;44:16;48:8;
50:19;52:1;63:13,16;
70:5;117:6,17;118:10,
13
**responsibility (8)**
47:11;64:14;73:22,
25;74:4;117:10;
149:18;151:11
**responsible (12)**
49:5;51:3;62:1;
70:22;71:2;73:1;79:10,
20;81:4,5;113:17;
240:17
**responsive (2)**
44:10,10
**rest (2)**
162:10;281:15
**restate (1)**
302:7
**restraint (2)**
158:21;159:1
**restricted (1)**
220:17
**result (4)**
114:9;276:6;278:19;
292:23
**results (2)**
93:10;97:13
**retain (1)**
279:25
**retract (1)**
205:16
**retracts (1)**
206:4
**retrieved (1)**
200:10
**returns (1)**
205:14
**reveals (1)**
11:15
**review (9)**
5:25;102:8;106:5,11;

112:22;114:7,10;
278:5;279:15
**reviewed (7)**
94:10;102:11;
107:22;109:25;110:2,
3;246:14
**reviewing (4)**
94:12,14;114:15;
246:15
**reviews (1)**
278:16
**rewind (4)**
258:24;269:8;
273:22;280:15
**rewired (1)**
12:7
**rid (1)**
139:17
**right (110)**
4:7;5:8;6:20;12:17;
15:22;21:6;30:21;
34:11;36:4,25;37:4;
39:23;42:14;48:16,18;
57:19;58:13;61:24;
62:20,22;64:10;74:17;
95:24;104:18;105:6;
107:17;109:22;111:24;
113:24;114:1;117:5;
124:7;126:4;127:19;
131:16;132:14;137:6,
12;146:7,9;147:3;
148:15;149:20;151:25;
153:16;156:21;157:7;
158:24;159:3;160:9;
161:13,15;166:23;
168:10;170:14;172:17;
173:1,22;174:22;
177:11;181:1;183:23;
186:11,18;189:6;
192:7;198:12;201:2,
14;202:3,13;204:7;
208:9;209:16,21;
223:10;227:9;233:1;
236:6;244:1;248:24;
252:12;254:10,11;
255:5,8,17;256:15;
257:9;262:21;265:11;
266:20;267:3;269:8;
270:3;272:6,24;275:6;
276:10;281:16;282:25;
284:9;286:13,13;
288:21;294:13;296:14;
299:23;300:14;301:3
**right-hand (1)**
246:22
**rights (2)**
27:14,16
**ring (3)**
55:19;216:21;245:8
**ringing (2)**
118:2;300:10
**rings (2)**
55:20;261:2

**riot (5)**
51:4;148:15;222:22;
263:7;279:22
**rioting (2)**
243:7;245:20
**rises (1)**
170:17
**rising (1)**
192:11
**risk (11)**
76:17,17;77:5;124:4;
193:10;213:7;301:12,
14,18,20;302:1
**Road (2)**
84:3;211:14
**Roadwick (3)**
257:8,25,25
**roaming (1)**
255:3
**roar (1)**
127:25
**roared (2)**
124:7;212:6
**rob (1)**
213:4
**robot (1)**
204:4
**rocks (1)**
243:5
**Rodriguez (34)**
136:20;137:3,9,16;
138:2;143:19;144:17,
19;147:23;149:1;
151:15;176:20;178:1;
189:7;196:9;199:24;
200:8,10,13,23;201:1;
224:2;235:16,18;
236:18;237:3;239:1;
273:18;281:22;283:2;
284:3,4,13;286:21
**Rodriguez's (1)**
284:17
**role (8)**
45:8;50:4,18;71:11;
123:15;124:2,14;135:7
**roll (5)**
150:9;160:16;165:6;
200:5;203:3
**roller (1)**
203:21
**rolling (1)**
184:13
**roof (10)**
184:13,16,20,21,22,
23;185:1,7;190:25;
209:5
**room (19)**
8:9,24;48:18;53:19,
22;54:2;112:12;
133:19;152:2,20;
153:3;154:12;155:8;
182:6;203:3;255:22;
256:1,15,18

**roster (15)**
40:7,10;46:12,20;
49:18,21;50:11,13,14,
16;121:6,12,15,16;
254:25
**rosters (2)**
122:11,23
**rotate (1)**
139:19
**rotated (1)**
47:19
**rotates (3)**
47:21;48:15,23
**rotating (3)**
48:21;50:1;139:14
**ROTHENBERG (18)**
6:20,21;7:3;14:14;
30:22;31:15;35:8;85:5;
267:20,24;268:18;
269:3;301:1,3,7;302:4,
23;303:15
**rough (3)**
25:7;69:8;279:10
**roughly (4)**
66:22;132:1,4,14
**round (2)**
192:19,23
**rounding (1)**
65:7
**rounds (10)**
42:15;43:16,21;
44:24;58:2;63:19;
64:16;66:2;119:10;
237:24
**route (3)**
62:7;161:6;217:11
**routes (2)**
17:9;131:8
**routine (2)**
44:24;45:3
**Rule (11)**
4:18;9:15;21:16;
64:17;142:6;155:9,10;
190:18;270:20;271:2,
10
**rules (5)**
7:25;51:5;66:7;
299:20;300:2
**rumpled (1)**
154:10
**run (30)**
18:4,8;25:9,12,20;
38:12;66:11;77:12,15;
78:13,18;132:12;
158:10,13,15,17,20;
170:25;179:18;189:25;
190:4,8,20;213:3;
214:17,18,21,23;
227:11;267:4
**running (10)**
70:12;117:15;132:5,
6;148:3;152:6;177:5;
212:10;213:3;215:20

**runs (4)**
18:2;42:9;117:25;
267:6
**rush (4)**
124:6;143:2;192:17;
212:14
**rushing (1)**
190:23
**rut (1)**
211:13
**Ryan (2)**
122:20,21

---

### S

**safe (1)**
120:18
**safely (2)**
26:23;27:6
**safer (1)**
51:16
**safety (28)**
13:8;17:4;20:21;
22:17,20;23:3,8,22;
24:5;47:19;52:6;60:2;
61:7,9;62:2;140:24;
141:2;168:3,11;
189:25;237:20;240:14;
276:24;301:12,19;
302:1,10,17
**sake (2)**
122:3;131:12
**sally (9)**
159:2,3,5;160:3;
161:24;181:4,5;228:4,
22
**Sam (1)**
4:9
**same (88)**
7:2;8:4;18:16;20:8,
10;21:12;33:1,11;
34:14;39:3;47:5,16,17;
52:1;55:14,15;56:2,4;
62:18,19;64:21;65:9,9,
10,10;67:3,6;71:3;
74:11;75:20;76:3;
86:19;89:7;101:23,25;
102:2,4;105:2,3,9,10,
19,21;107:12;109:17,
19;112:15;129:1,12;
131:8;133:3,16;
135:22;149:13,15;
153:10;154:8,10,12;
155:6;157:18,19;
161:24;186:11;201:16,
19;214:24;216:1;
228:22;236:3;237:7;
239:18;243:9;252:13;
271:21,21;282:8;
284:14,20,20,22;
287:21;294:12,12,14;
296:10;297:8;298:12
**Sarah (1)**

137:3
**Saturday (1)**
290:1
**save (2)**
9:9,10
**saving (2)**
292:23;293:5
**saw (37)**
25:9,11,13,14;28:20;
29:6;55:12,13;73:7;
95:13;108:11;126:21;
169:13;172:1;183:20,
20;185:11;186:1,2,8,8;
199:10;211:3;212:11;
226:14;227:3;242:16;
244:8,10;245:1;
255:22;256:14,21;
273:13;274:2,3;301:25
**saying (50)**
22:12;27:1;38:13;
44:21;46:12;52:24;
60:19,19;72:25;76:13;
80:11;89:18;97:5;
102:15;111:10;127:2;
128:2;142:5;144:13;
148:23;155:12,19,19;
166:14;168:23;170:18;
172:13;173:17;174:1;
195:2;197:13,20;
208:17;217:1,2,3;
219:7;229:16,18;
233:20;241:13;242:19;
244:20;253:4;258:20;
261:11;267:5;272:20;
273:2;291:15
**scale (1)**
71:3
**scared (1)**
243:10
**scenario (6)**
18:3;27:4,5;102:6;
143:1;269:7
**scenarios (1)**
61:1
**scene (7)**
57:1;167:1,2;209:6,
10,20;251:3
**scheduled (9)**
87:4;88:20;102:17,
21,24;115:1,22;116:8,
24
**scheduling (3)**
115:7;116:4,5
**school (8)**
81:17,18,19,21,21;
82:1,13;203:5
**schooled (2)**
81:19,21
**science (1)**
276:19
**scrap (3)**
152:11,12,24
**scratch (2)**

152:20;154:11
**screamed (1)**
238:5
**screaming (12)**
177:6;197:14,15,17,
18,22,23;198:16;
207:4;212:1,5;241:13
**screen (3)**
121:11;253:21;257:3
**second (17)**
33:17;43:25;52:13;
88:23;89:9;112:3;
113:20,21;192:19,23;
212:4;237:6;260:8;
280:8;291:7;292:7;
294:1
**secondary (4)**
131:9;162:1;233:3;
280:2
**secondhand (1)**
288:24
**Secondly (1)**
5:12
**seconds (18)**
143:15;165:4,10,11;
175:4;182:4;195:10;
197:6;208:24;223:12;
225:10;248:23;254:3;
255:18;256:20;258:19;
262:2;280:15
**second-to-last (2)**
89:13;91:24
**secretary (1)**
279:3
**section (4)**
59:16,17;84:9;220:5
**sectioned (1)**
220:7
**secure (4)**
205:7;213:1,1;
283:22
**secured (2)**
214:11,13
**securing (1)**
283:16
**security (16)**
38:10;44:15;58:2;
61:7;62:2;67:21;118:1;
134:25;135:14;136:3,
17;137:17;163:21;
190:10;228:10;253:18
**seeing (28)**
12:23;28:15;91:13,
14;99:15;114:2,4;
176:12;183:11,12;
188:4;195:23;209:23,
24;210:10;225:1;
236:3,11,15;247:5,13;
248:19,21;252:4,16;
254:1;257:21;281:1
**seeking (1)**
238:25
**seem (1)**

92:15
**seeming (1)**
207:7
**seems (1)**
153:6
**sees (1)**
54:18
**seg (1)**
65:21
**segregated (1)**
242:24
**segregation (1)**
63:24
**send (4)**
67:5;272:13;279:6;
298:17
**senior (7)**
26:7;42:21,24;44:4,
7;50:3;79:7
**sense (13)**
15:24,25;44:20;
61:23;128:11;157:22;
198:13;211:5;219:7,
19;222:9;229:18;
278:10
**sent (7)**
105:22;114:6;
115:23;116:8;167:17;
239:10;283:3
**sentence (4)**
246:25;247:19;
248:25;297:16
**separate (8)**
47:8;202:4;238:6;
239:1,4,5;256:15;
283:3
**separated (1)**
283:14
**separately (5)**
64:16,17,19,20;
174:17
**sergeant (39)**
37:21,22;38:3,6;
45:16;68:9,11;69:12,
16,17,17,19,22;70:4,5,
24;71:8;74:1,3,7;
75:21,21,24;76:2,14,
15,20,24;78:4;81:5;
122:18;216:8;217:6,8;
218:1,2,6;220:23;
301:24
**sergeants (2)**
70:25;138:6
**sergeant's (1)**
73:25
**series (1)**
121:16
**serious (11)**
54:25;96:23;97:11;
118:5;142:14;157:22,
23;158:2;234:18;
263:22;288:18
**seriously (5)**

96:22,25;97:6,9;
157:18
**serve (2)**
47:1;72:7
**served (3)**
84:12;85:16;118:16
**server (1)**
108:17
**serves (1)**
49:10
**service (4)**
43:1;83:6,24;84:10
**serving (1)**
40:16
**set (31)**
4:23;5:4;12:3,4;
17:5;21:19;22:6,14;
47:12,13;55:24;65:6;
67:10;78:25;90:5,11;
91:10;96:4,7;102:12;
108:18;130:20;141:5;
156:17;163:6,15;
201:19;239:21;240:6;
241:6;278:9
**sets (9)**
6:18;54:5;59:3;78:7;
160:2;163:9,11,14;
180:12
**setting (17)**
23:16;27:4;28:15;
32:19;57:20;60:25;
110:7;119:2;165:2;
168:16,18;202:17;
242:14,16;267:6;
288:8;293:8
**setup (3)**
51:23;71:7;214:10
**seven (4)**
189:11;208:23;
223:11;248:23
**seven-foot (1)**
242:7
**several (1)**
183:20
**severity (3)**
58:3;118:21;230:12
**shaken (2)**
237:22;285:12
**shakes (1)**
8:23
**shaking (2)**
212:12;258:21
**shape (1)**
177:15
**share (1)**
240:18
**shared (7)**
97:2;108:13,16,18,
22;109:1,19
**sheet (1)**
141:8
**shelter (5)**
42:8;70:25;71:8;

214:17;272:11
**shelters (10)**
42:10,13;69:16;
269:14,25;270:1,5,7,
14;298:7
**shift (133)**
38:11,12,17,25;39:3,
7,14,19;40:6,13,14,15,
16,19,20,25;41:5,12,
15,16,17,19,20;42:1,6,
9,12,23;43:5,14,14,20,
22;45:11,12;47:3,5,10,
23;48:9,23;49:2;50:17;
54:19,21;63:5,8,11,17,
18;64:11,13;65:18;
66:1,15,22,23,24;
67:15,16;70:1,6,10,13;
71:9,10,18,19;74:3,7;
76:7,13,14,14,19;
77:12;104:5,12,21;
105:9,10,19,21;106:4,
14;107:3;109:5;117:7,
9;118:17;121:2,3,14;
128:18;129:2;137:23;
139:24;140:16;141:6,
14;142:3,20;147:19;
148:2,4;149:4,10;
150:3,23,24,25;151:2,
10;152:17,18;153:8;
154:9;157:8,14;
158:19;162:11;163:16,
19;168:9;175:4;
221:25;237:7;256:2,3;
272:19,20;297:6;298:3
**shifts (6)**
39:3,4,5,8;42:14;
80:18
**shining (1)**
223:15
**shipped (1)**
245:6
**shirt (3)**
257:4,5,15
**shocking (1)**
290:13
**shoot (1)**
213:14
**shooting (5)**
185:8;189:1;209:5;
275:13,17
**shop (6)**
163:15,16,18,22,25;
228:6
**short (5)**
138:25;187:2,5,6;
230:3
**shortages (1)**
45:14
**shortcut (3)**
228:18,19,19
**shortly (5)**
87:4;184:2;187:3;
209:18;266:1

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 104 of
111

**shot (9)**
124:7;178:2,18;
195:24;207:14;209:8;
225:12;242:12,13
**shoulder (5)**
138:11,13,14,16,19
**show (10)**
49:15;66:11;118:25;
119:2;121:11;181:3;
253:20,24;282:25;
300:25
**showed (3)**
104:16;113:12;
285:17
**Showing (8)**
36:8;87:14;91:8;
105:5;114:12;118:24;
122:4;130:19
**shown (1)**
227:10
**shows (1)**
131:4
**shut (8)**
134:10;159:2,7;
160:6;161:14;202:14;
204:19;205:24
**shuts (2)**
160:4,5
**shutting (1)**
159:13
**sick (2)**
67:17;116:25
**sickly (1)**
299:4
**side (30)**
24:4;58:1,19,21;
59:1;64:24,25;83:24;
84:2,9;101:11;131:16,
16;132:2,10,15,16,25,
25;133:1,3;179:4;
184:7;187:18;188:17;
192:13;193:4;203:4,4;
255:24
**sides (4)**
132:7,7;219:13;
253:20
**sign (2)**
105:25;107:11
**signal (55)**
19:2;23:9;28:21,22;
51:6;52:4;53:16,18;
54:14,16,23,25;55:1,7,
17,25;56:19;57:6,18,
25;58:10,16,20;60:6;
61:3,14;62:8;147:20;
153:25;154:1;157:12,
24;158:4,8;164:15;
165:1;174:2;178:25;
180:9;190:19;214:1,5;
241:21;249:16,19;
259:9,12,18;271:1,1;
272:5,22;298:10;
303:6,8

**signals (3)**
54:24;63:9,14
**signature (7)**
5:22;91:25;93:25;
94:6;246:22;293:17,18
**signed (7)**
84:14;92:2,7;93:21;
94:9,20;141:15
**significant (7)**
19:25;86:17,20;
125:13;261:23;301:11,
14
**significantly (1)**
26:22
**signing (2)**
6:1;92:21
**signs (1)**
46:21
**similar (2)**
91:17;132:11
**Similarly (2)**
9:4;284:15
**simple (4)**
50:23;94:24;109:3;
284:10
**simplicity (2)**
122:3;131:12
**simply (2)**
161:12;216:7
**simulated (1)**
17:24
**simultaneous (1)**
215:24
**sit (22)**
10:24,25;21:6,9;
23:2;48:18;67:11;
96:11;111:24;123:5;
125:14;181:8,22;
183:2;216:9,14;
217:12;249:21;261:8;
262:16;271:11;286:25
**site (2)**
27:11;165:16
**sitting (19)**
21:11;22:9;111:1;
126:5;133:11,12;
145:5;184:19;204:5;
249:17;262:20;291:4,
21;292:1,4;293:22;
294:24;295:3,18
**situation (74)**
14:11;15:9,12;16:2;
17:24;20:9;24:18;25:5;
26:14,21,25;27:7;28:3;
29:22;30:7,8;49:4;
51:2,4,4,6,11,20;52:3,
8,20,22,23,25;53:13,
20;56:15,16,22;57:20,
22;58:3,14;60:22;
61:10,24;79:8,23;
80:10;97:20;99:22;
100:1;112:5;120:11;
123:19;124:22,25;

125:21;143:2;157:22;
164:6;166:1;180:6;
186:24;198:15;202:17;
208:6;213:8;263:9,10;
264:16;265:3;274:18,
19,20;278:8;286:2;
298:6;302:18
**situations (8)**
30:15;45:19;50:22;
54:6,25;60:10;61:3;
140:2
**six (5)**
69:1;72:14;187:19;
189:11;192:2
**size (3)**
61:20;248:8;277:2
**skin (2)**
193:17;198:5
**sleeping (10)**
214:15;291:13,19;
292:2;294:3,8,18;
295:2,24;296:4
**slightly (1)**
177:17
**sloppy (1)**
279:13
**slots (4)**
50:13,13;77:22,23
**slow (1)**
156:16
**slower (1)**
159:18
**slowly (2)**
145:18;196:24
**small (12)**
117:24;125:21,24;
126:11,24;148:15;
179:1;187:7;193:7;
227:21;237:11;288:4
**smaller (2)**
126:4;260:2
**smell (2)**
29:11;176:3
**smelled (1)**
176:1
**smelling (4)**
176:4,12;183:11,12
**smiling (6)**
243:15,22;244:8,13,
19;245:4
**smoke (34)**
29:6;55:13,16;
170:17;172:21;176:4,
5,12,12,12,15;183:8;
186:23,24;188:21,25;
192:10;193:20,20;
194:1;197:24;198:18;
212:11;219:13;223:16;
229:23;231:7;250:3,5;
262:12,15,23;264:22;
277:15
**smoky (2)**
176:8;262:17

**smoothly (2)**
8:1;117:15
**snapped (1)**
138:21
**snippets (1)**
219:1
**social (2)**
33:9;34:4
**soft (1)**
204:10
**solely (2)**
73:15;280:4
**solver (1)**
118:4
**somebody (12)**
66:12,14;73:8;80:20;
86:20;120:1;175:12;
196:7;216:18;237:23;
239:16;285:2
**somehow (4)**
44:11;109:14;
135:21;203:18
**some-odd (2)**
173:10;244:21
**someone (48)**
26:25;47:22;49:4;
50:20;51:20;53:21;
54:14;55:12,13;56:12;
60:15;73:19;79:7,25;
80:2,15;86:22;88:19;
104:3;120:9;135:23;
141:24;142:6;146:1;
151:14;155:20;157:3;
158:16;163:3,24;
165:21;168:7;175:18;
196:11;197:2;199:16,
23;200:23;205:3,5;
211:5,7;214:1;215:2;
222:14;272:19;273:19;
276:8
**someone's (2)**
206:6;279:10
**something's (3)**
44:23;45:1;54:20
**sometime (3)**
37:24;38:5;87:4
**sometimes (17)**
55:22,23;64:6;74:17,
18;110:22;111:19,20;
138:17,18;139:9;
144:7,11;204:7,9;
205:2,5
**somewhat (6)**
169:17;174:9;
187:21;202:19;207:8;
208:9
**somewhere (4)**
50:10,11;143:6;
154:11
**son (1)**
299:2
**son's (1)**
298:25

**soon (5)**
183:24,25;208:20;
264:19,22
**sorry (28)**
14:14;18:14;20:18;
21:25;25:10;32:25;
34:10;78:23;91:14;
93:5;103:9;104:11;
129:19;145:25;164:11;
166:16;167:12;171:18;
182:17;188:14;205:11;
218:17;227:7;242:18;
243:18;280:12;297:9;
302:7
**sort (47)**
6:23,25;10:10;23:6;
40:15;41:16;43:13;
44:23;51:22;58:8;
62:21;63:19;66:21;
71:20;79:4;112:8;
117:8;119:3,22;
123:15;126:25;131:4;
132:1,4;174:16;191:1;
192:6;207:10,18;
208:13,18;211:14;
215:24;222:9;234:25;
235:1,6,10,14,19;
237:12;239:13;248:21;
255:23;260:1;276:18;
279:10
**sought (4)**
109:13;117:13;
238:10,11
**sound (6)**
17:5;36:4;86:2;
137:6;250:12;281:14
**sounded (8)**
176:2;206:19;259:5,
23,25;262:13;273:9;
275:25
**Sounds (10)**
36:25;125:12;
126:24;137:12;145:20;
181:9;193:2;194:9;
216:11;285:14
**source (3)**
18:7;154:13;233:24
**sources (1)**
73:3
**south (7)**
131:13,15;132:7,25;
133:2;178:23,25
**southeast (1)**
161:4
**space (1)**
208:11
**spare (1)**
142:21
**speak (4)**
114:20;115:7;
238:19;293:7
**speakers (4)**
258:8,8,25;279:5

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 105 of 111

**speaking (5)**
28:16;57:22;103:9;
268:15,25
**spear (1)**
190:2
**special (2)**
151:6;220:25
**specialized (1)**
26:25
**specific (27)**
17:23,23;18:5,5,19;
20:4,7;38:15,17;40:21,
23;60:10;61:1;62:7;
69:22;78:10;128:17;
134:16,17;145:21;
148:24;149:8;153:7;
181:9;220:2;233:24;
270:21
**specifically (11)**
6:8;19:13;56:23;
103:16;113:17;117:7;
221:24;246:9;247:4,
11;287:25
**specifics (3)**
60:21;128:15;287:25
**specified (4)**
144:16;145:8;
146:10;247:21
**specify (2)**
145:6;247:20
**speed (1)**
158:17
**spell (2)**
7:8;30:25
**spend (2)**
115:14;238:12
**spent (3)**
37:15;156:22;220:15
**splayed (1)**
211:18
**split (6)**
43:18;65:1;212:4;
234:25;239:21;240:13
**spoke (11)**
85:16,22;86:3,20,22;
88:16;115:6;218:1;
223:20;234:11;241:25
**spoken (5)**
86:12;87:8;88:9;
289:16,19
**spontaneous (1)**
65:8
**spot (6)**
117:14;219:4;
239:16;292:13,14,15
**spots (1)**
69:15
**spreadsheet (2)**
152:22,25
**spring (1)**
203:21
**spring-loaded (1)**
204:1

**sprung (1)**
197:6
**SPU (1)**
36:13
**squad (1)**
279:24
**stabbed (2)**
60:15;190:2
**staff (61)**
17:25;18:1,4;19:4,
17,24;28:13;36:13;
38:10;40:7,13,14;
45:14,18;46:25;51:1;
56:4,7,9,14,18;57:4;
58:24;59:21,24;60:2;
62:2;63:23;65:11,12;
67:18;74:24;78:16;
129:14;148:12,13;
210:24;213:9;214:17;
221:1;222:18;234:4,7;
235:24;237:24;239:13;
240:15,15;241:20;
242:13;273:14,17;
274:2,9;278:7;283:7;
292:24;293:5,23;
294:3;300:3
**staffing (3)**
46:6;47:23;49:5
**stage (1)**
25:25
**staging (1)**
213:14
**staircases (1)**
132:7
**stairs (17)**
171:9;179:8,13,18;
180:12;181:15,25;
182:4,25;184:5;
187:17,24;189:22;
190:12;200:19;236:22,
23
**stairwell (4)**
177:11,12,13;201:6
**stamp (1)**
36:10
**stamped (6)**
83:23;122:9;130:20;
246:4;293:11;297:5
**stand (8)**
42:14;50:25;53:15;
184:15;192:6;202:11;
210:15;244:14
**standard (11)**
44:25;73:9;74:15;
139:16;144:2;156:17,
18;162:6,11;179:25;
286:23
**standardized (1)**
73:11
**standing (14)**
51:1;61:24;127:24;
172:16;173:4;177:3;
192:1;198:7;199:23;

205:6;241:17,18,19;
273:14
**standings (1)**
285:24
**standpoint (1)**
213:5
**stands (2)**
21:22;50:14
**star (3)**
227:24,24;292:14
**start (15)**
9:6,11;25:22;37:12;
139:22;176:4;183:11;
212:8;225:14,17;
232:24;255:15,17;
258:12;283:11
**started (43)**
4:8,13;6:5;12:7;37:5,
17;38:18;39:6;68:25;
69:1;82:14,17;87:1;
113:18;140:16;142:20;
170:1,1;174:25;176:5;
183:8;184:3;185:23;
196:23;208:15;209:5;
212:24;224:5;226:19,
24;237:6;240:3;
241:19;242:5,14;
244:20;251:1,3;
269:13;270:13;275:16;
283:19;285:20
**starting (8)**
75:1;113:18;142:3;
187:24;225:19;227:3;
269:10;297:16
**starts (2)**
89:18;188:1
**state (47)**
7:8,18;10:19;11:7,
12,17;13:24;15:6,18;
16:6;24:10,22;26:3;
27:9;28:8,14,18;29:5,
14;35:23;37:7,15;38:8;
66:10;68:21;72:10;
77:22;78:17;81:13;
84:6,13;98:13;105:21;
113:1,2;114:4;120:14;
144:8;152:14;167:17;
213:21;249:9;251:20;
260:25;265:21;276:22;
278:3
**stated (27)**
13:2;14:20;15:18;
35:22;50:6;87:11;90:9;
95:21;98:8;99:1,8;
109:12;134:16;166:5;
233:12;237:14;240:25;
252:19,21;260:15;
263:11;265:22;270:25;
274:2,4,25;300:6
**statement (22)**
12:14;90:17,23;91:3;
93:15;97:23;101:12;
110:19,22;111:12,20;

112:13,14;262:24;
269:13,18;282:15;
291:15;296:22;297:12;
298:4,13
**statements (4)**
49:24;97:19;102:5;
277:18
**states (14)**
37:5;81:14;84:10,12;
93:9;250:11;293:20;
294:2,17,24;295:5,7;
296:3;297:17
**Statham (52)**
122:19,20,21;124:7;
127:6;146:18,24;
160:24;166:11,16;
168:17;175:10,17,20;
179:11;186:10,17;
189:5;192:3,13,20;
193:4;194:12,14;
195:11,12,18,22;196:3,
4;199:11;207:6;209:4,
18;210:8;217:19;
231:16;238:9,12,22;
247:17;248:2,5;254:6,
10,13;256:22;273:5,
11;287:7;290:6;301:24
**Stathum's (2)**
223:11;275:15
**stating (3)**
88:4;89:10;179:15
**station (20)**
28:24;128:21,23;
129:17;130:6,9,15;
131:15,19;133:11,15,
18;134:10;142:23;
143:2,9;194:19,20;
217:25;218:3
**stationed (2)**
41:3;216:2
**stations (1)**
215:13
**status (6)**
217:8,16;218:19;
269:19,21;270:15
**stay (11)**
58:11;71:5;147:7;
193:16;204:18;205:24;
206:8;213:1;225:8;
226:9;293:23
**stayed (2)**
191:4;198:23
**staying (1)**
19:4
**stays (1)**
66:16
**steady (1)**
285:20
**steel (1)**
228:11
**steer (1)**
26:14
**stemmed (1)**

286:2
**stems (1)**
282:8
**step (2)**
177:21;219:3
**steps (18)**
13:12,18;14:10,22;
15:7,21;124:21;
157:10;159:1;164:8;
170:25;173:22;174:1;
177:22;178:3;179:21;
195:25;232:17
**stick (5)**
95:1;136:21;261:3,
23;288:9
**Sticking (1)**
187:14
**sticklers (1)**
134:25
**sticks (2)**
288:5,20
**stiff (1)**
211:6
**stiffened (1)**
211:6
**still (55)**
22:8,10,11;30:23;
34:24;45:2;52:1;56:21;
63:1;66:14,19;68:18;
104:25;139:20;157:19;
177:5;189:25;190:1,5,
6,9;191:5;192:18;
194:18;197:4;205:24;
207:22;210:24,24;
211:1,8;212:19;214:8;
224:3;227:18;229:9;
231:12,15,16;236:14;
237:7;247:6;250:17;
251:9;253:17;254:5;
256:9;257:24;267:24;
269:5;272:12;276:13;
281:18;283:13;285:14
**stipulation (1)**
8:15
**stolen (1)**
35:3
**stone (2)**
177:12,19
**stood (4)**
192:13;231:9;242:7;
244:23
**stop (2)**
255:15;296:19
**stopped (8)**
191:18;210:5;211:3,
20,21;212:1,5;234:12
**stops (1)**
125:7
**storming (1)**
130:13
**straight (8)**
145:13;161:14;
164:23;173:25;178:17;

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 106 of
111

211:12;214:23;227:12
**strapped (1)**
138:16
**stream (3)**
208:19,19,20
**street (3)**
69:17,17;163:13
**strength (1)**
211:11
**stretched (1)**
138:24
**strike (25)**
16:4;34:18;42:20;
45:11;63:6;75:10;77:9;
79:3,24;83:7;85:8;
94:13;96:16;109:10,
11;121:9;132:20;
133:6;141:25;201:9;
206:18;209:22;233:22;
249:8;252:4
**strong (3)**
128:13;240:13;284:7
**structure (4)**
48:21;109:20;
132:11;185:2
**struggle (1)**
179:3
**stuck (2)**
159:9;238:22
**stuff (19)**
23:5,14;98:22;
103:20;113:6;125:5;
126:21;141:19;149:7;
154:5;171:19;219:21;
220:14,16;223:4;
237:1;243:5;262:21;
280:10
**stupid (1)**
222:5
**style (3)**
138:12;159:8;160:2
**sub (1)**
121:21
**subdue (1)**
248:14
**subgroups (1)**
52:14
**subheading (1)**
20:24
**subject (9)**
6:12;36:13;39:21;
59:20;128:22;279:6;
294:22;295:7;300:10
**subjective (1)**
73:12
**subjectively (1)**
158:2
**submitted (5)**
105:20;106:1;107:4;
118:23;293:6
**subsequent (3)**
227:1;235:5;237:8
**substance (3)**

85:4;284:12;285:5
**sub-teams (1)**
52:13
**subtopic (1)**
20:24
**suggest (2)**
36:2;247:24
**suggesting (2)**
26:24;36:3
**suggests (1)**
252:5
**suit (1)**
24:16
**Summons (8)**
83:23,25;84:2,10,12,
18;85:16;107:16
**Sunday (1)**
290:2
**superior (4)**
77:15;291:11,13,14
**Supervise (2)**
38:10;70:3
**supervising (1)**
57:14
**supervision (4)**
67:19;117:9,17;
216:12
**supervisor (49)**
38:12,17,25;40:6,17,
25;41:15;42:1,6,9,23;
45:16;48:9;54:19,21;
63:6,17,18;65:15,17;
66:1,15,19,23;70:1,6,
10;76:20;77:6,12;
104:5,12;105:16,25;
109:6;117:7;118:18;
142:1;149:11;151:2,
10;158:14;168:9;
221:25;234:16;235:9;
272:19,20;298:4
**supervisor/employee (1)**
286:24
**supervisor/officer (1)**
286:23
**supervisors (14)**
41:16,19;43:6;45:11,
12;64:13;67:15;76:8;
105:20;121:14;142:10;
147:19;152:18;288:16
**supervisor's (17)**
41:5,12;43:14,20,22;
66:24;67:16;137:23;
148:3;149:5;150:23;
157:9,15;158:19;
175:5;256:2,4
**supplement (1)**
16:18
**supplemental (3)**
4:20;5:2,7
**support (2)**
90:5,13
**supposed (19)**
21:8;61:13;67:20;

79:1;86:25;87:2;
106:16;116:5;118:25;
119:3;123:18;124:17;
127:22;128:19;129:3;
133:21;134:4;151:23;
243:7
**suppressed (1)**
210:3
**suppression (2)**
186:13;277:10
**Sure (48)**
15:4;33:13;34:17;
43:25;56:17;60:13;
67:19;98:8,19;117:14;
126:23;127:21,23;
128:9;136:9;138:19;
140:16,23;141:22;
148:6;151:24,25;
158:18;170:4,18;
178:14;179:19;182:14;
189:8,15;194:10;
195:1;198:9,10;
199:17;200:2;208:16;
216:12;234:23;235:9;
237:23;284:10;298:7,
23,23;299:11;301:18;
302:22
**surprised (1)**
265:21
**surrounding (1)**
198:3
**surveillance (1)**
253:18
**survive (1)**
263:7
**suspension (3)**
294:22;295:8,13
**swap (2)**
143:11,14
**swapping (1)**
239:24
**swiftly (1)**
181:16
**swing (3)**
161:8;203:7,25
**Swinging (3)**
161:19,20;206:2
**swings (2)**
161:14;203:2
**switch (15)**
143:3;201:25;202:1,
12,13;204:11;205:3,13,
15,17,18;206:4,6;
239:17,21
**switched (2)**
239:20;283:20
**switches (2)**
202:5;203:16
**sworn (5)**
4:3;7:5;8:3;95:8;
96:2
**symbol (1)**
177:14

**symmetrical (2)**
132:5,14
**synced-up (1)**
156:20
**synchronized (1)**
156:17
**system (15)**
34:18;73:18;113:5;
139:18;144:9;154:16,
19;159:6;203:11,16;
212:23;213:19,23;
272:17;277:5
**systems (1)**
113:13

## T

**table (1)**
126:5
**talk (20)**
51:18;75:1;115:25;
125:21,24;126:11,24;
128:8;224:7;228:8,12;
229:19;235:3,25;
237:23;238:23;265:12;
284:11;287:1;288:4
**talkative (1)**
284:8
**talked (34)**
16:11,24;43:20;
57:10,11;72:20;88:12,
19;92:18,19;114:20;
115:20;116:6,11,15;
117:5;125:8;175:18;
189:18;211:17;234:4;
237:16;279:21;280:2;
281:22;283:1,13;
285:3;287:24;288:25;
290:8,14,15;300:3
**talking (30)**
10:2;33:23;59:4;
63:4;64:5,6;67:22;
74:18;100:21;113:16;
128:16;135:24;187:6;
191:17;193:16;205:7;
206:9;221:21;224:13;
226:5;233:23;235:6;
277:15;281:13,13;
282:4;288:22;299:23;
300:17,21
**talks (2)**
59:18;285:1
**Tall (3)**
30:24;138:24;242:7
**T-a-l-l (1)**
31:1
**tangible (1)**
292:23
**tape (2)**
260:4;269:9
**tasks (2)**
71:16;72:3
**teach (1)**

65:8
**team (33)**
40:11;45:5,6,9,13;
46:1,4,23;47:7;48:2;
49:10,22;51:4,9,14,15,
18;52:3,11;53:7,8,11,
11,14;54:2,6,15;58:5;
121:22;123:3;124:3;
129:15;279:24
**teammates (1)**
165:22
**teams (8)**
40:11;47:6;52:15,17;
122:2;220:25;222:22,
22
**team's (1)**
129:12
**tear (2)**
138:22;139:5
**technical (1)**
276:19
**technically (4)**
58:22;120:4;187:19;
258:1
**telephone (6)**
31:9,20;86:5,7;
87:11;136:15
**television (2)**
12:21;113:19
**telling (9)**
64:1;85:3;126:17;
172:16;227:17;241:25;
244:15;280:9;282:16
**temperature (1)**
276:5
**temporarily (1)**
210:3
**temporary (2)**
82:15,19
**ten (1)**
115:18
**tend (1)**
63:25
**tends (2)**
267:10,18
**ten-minute (5)**
154:19,20,23;155:3,
8
**ten-page (2)**
91:11,18
**term (2)**
72:8;122:2
**termination (1)**
294:22
**terminology (6)**
14:2;55:9;57:10;
70:14;154:16;155:4
**terms (52)**
19:14;20:4;59:4;
63:5;69:23;74:6,23;
89:8;92:14;105:3,12;
114:15;117:12,13;
118:13;123:23;124:12;

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 107 of
111

125:19;126:14;131:25;
132:4,13;133:10;
138:21;141:10,18;
149:13;158:18;164:6;
169:22;170:7;183:17;
204:24;205:2;206:24;
207:8;209:9;210:1;
222:24;235:13;236:9;
238:25;241:1;248:21;
256:5;259:14;265:15;
275:13;276:17;281:11;
284:12;298:13

**test (1)**
141:6
**testified (12)**
4:3;7:22;81:10;
121:2;235:21;236:13;
237:2;253:6;275:12;
279:17;283:25;290:5
**testify (1)**
116:2
**testifying (2)**
8:5;103:12
**testimony (19)**
10:12,16;94:9;95:8;
96:2;183:7,15;213:18;
223:9;250:23;262:24;
263:1;268:14,24;
270:12;273:9;281:20;
295:1;297:20
**testing (1)**
49:9
**tests (1)**
150:3
**Thanks (1)**
7:2
**theirs (1)**
150:19
**theory (1)**
234:2
**thereafter (1)**
184:2
**therefore (1)**
90:18
**thick (2)**
194:2;229:24
**thicker (1)**
183:12
**thinking (7)**
96:9;102:23;103:11;
158:3;194:5;209:24;
268:10
**third (2)**
49:13;166:20
**though (7)**
8:21;65:24;132:13;
138:15;156:6;259:9;
296:22
**thought (13)**
91:17;93:16;121:7;
167:3,5;180:5;192:16;
196:24;208:24;234:22;
240:5,16;274:11

**thoughts (2)**
135:20,21
**thousand (1)**
219:24
**threat (1)**
52:6
**threats (1)**
222:22
**three (50)**
38:3;41:22,24,25;
43:13;52:17;74:15;
75:11;78:17,18;108:2;
112:23;122:2;134:7;
137:4;155:23;159:23;
160:5,12,20;165:7;
171:1;172:5;182:5;
188:13,14,16;193:5,8;
194:24;224:5;237:12;
238:6,11;239:3,4,5,8,8;
255:8,22;256:3;267:4;
277:24,25;283:16,16;
285:23;287:17;297:15
**three-year (1)**
69:14
**throughout (5)**
64:10;139:1,3;
140:12;261:15
**throw (2)**
151:20;171:22
**thumb (3)**
21:16;155:9,10
**Thursday (2)**
289:24;290:1
**tidbits (1)**
219:5
**tie (1)**
142:8
**tiers (1)**
169:11
**till (1)**
71:5
**Tim (1)**
36:14
**Timber (1)**
30:24
**T-i-m-b-e-r (1)**
31:1
**timeframe (2)**
235:13;237:4
**timeframes (1)**
235:10
**timeline (8)**
36:23;37:9;112:18;
150:22;155:4;180:20;
181:20;253:11
**times (14)**
56:17;65:9;112:19;
149:25;150:13;156:2;
190:4;204:8;205:3;
218:22,23;219:3;
265:7;290:25
**timesheet (1)**
80:25

**timestamp (1)**
253:21
**timestamps (1)**
258:10
**timewise (1)**
150:14
**timing (7)**
84:20,24;85:13;
166:8;247:4;252:17;
253:5
**TIMOTHY (5)**
4:1;7:10;84:1,3,11
**T-i-m-o-t-h-y (1)**
7:10
**Tina (1)**
35:10
**Tireddenin (1)**
32:25
**title (3)**
52:18;71:1;118:3
**titled (2)**
91:9;122:16
**today (54)**
5:13;6:6,12,15,19;
7:20;8:1;9:15;10:11,
13,24,25;23:2;32:15;
42:6;48:19;67:12;86:8;
96:6,8,11;102:9,11,13;
103:8,15,16;106:19;
107:23;115:21;123:5;
125:14;126:5;152:24;
156:7;183:2;212:23;
213:23;217:12;235:21;
249:18,21;261:9;
262:16;263:2,9;
264:11;265:8;268:7;
271:11;274:19;287:12;
297:21;301:9
**today's (1)**
115:3
**together (10)**
22:2;40:11,11;64:16,
18;146:6;166:12;
193:5;238:12;239:19
**told (31)**
19:17;76:20;125:25;
135:23;172:18;175:12,
20;192:9;194:12;
195:19,24;198:15;
200:8;217:6;223:21;
224:23;225:2;226:20;
230:17,24;231:10;
234:5;240:22;251:16;
264:20;265:19;277:9;
282:15,17;289:24;
293:22
**ton (1)**
125:9
**tones (1)**
144:10
**tonight (1)**
11:4
**took (47)**

51:22;80:18;83:11;
96:22;97:9,11;104:19;
105:19;108:10;113:14;
124:23;125:10,19,22,
24;127:14;132:21;
165:5;175:3;180:20,
21;181:10,21;189:21;
197:9;199:2,4;208:23;
217:7;225:15,25;
234:6;240:6;242:11;
244:15,16;245:11;
259:11;277:8;279:15,
18,23;282:15,17;
283:19;286:11,15
**tool (2)**
220:12;277:10
**toolbox (1)**
150:6
**tools (4)**
57:15,17,21;301:21
**top (13)**
88:7;109:22;121:14;
169:11;170:17;177:2;
184:17,21;189:22;
190:12;207:17;255:23;
273:19
**topic (3)**
18:23;20:7;220:23
**topics (3)**
23:6,7,22
**tops (1)**
181:23
**total (4)**
58:25;61:21;86:12;
258:13
**totally (3)**
142:8;196:6;248:15
**touch (3)**
192:11;197:5;280:11
**touched (1)**
210:17
**touching (1)**
209:2
**toward (6)**
131:14;180:17;
189:4;200:19;204:9;
255:23
**towards (2)**
157:15;187:21
**tower (6)**
44:15;163:12,12;
164:9,10,11
**track (1)**
229:23
**traction (1)**
197:3
**traded (1)**
239:15
**traffic (5)**
147:14;163:13;
226:23;230:8;250:13
**train (1)**
49:19

**trained (3)**
46:25;49:16;81:7
**trainee (3)**
72:9,12,15
**training (34)**
16:3,5,10,12,13,24;
18:23;19:19;20:4,7,12,
19,21,24;21:1,4,7,21;
22:1,4,6;23:20;24:5;
49:8,11,12,20;60:1,5,
20;74:21;113:5;
118:11;271:18
**transcript (1)**
75:5
**transfer (1)**
277:6
**transferred (1)**
34:21
**transfers (1)**
245:7
**transmission (5)**
138:2,4;143:19,23;
157:2
**transmissions (3)**
152:6,9,10
**transmit (1)**
225:6
**transporting (1)**
294:4
**transversed (1)**
125:7
**trash (2)**
20:3;154:10
**trauma (1)**
265:16
**traumatic (6)**
198:9;237:25;
263:12;266:10,25;
267:6
**traveling (1)**
169:3
**treat (2)**
157:17,23
**treated (1)**
72:10
**tree (1)**
282:9
**tricky (1)**
258:7
**tried (6)**
115:4;124:6;192:17;
224:18;228:18;229:3
**trip (1)**
156:22
**trouble (1)**
142:14
**true (9)**
56:23;57:2;97:7;
187:10;242:4,4;
248:17;264:24;268:14
**truly (1)**
266:12
**trust (1)**

BARABARA DEVINE vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

TIMOTHY REDDEN
October 25, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 108 of 111

71:16
**trusted (1)**
  73:21
**truth (3)**
  8:3;126:2;263:19
**truthful (2)**
  10:12,16
**truthfully (1)**
  285:10
**try (19)**
  8:1;18:16,16;28:5;
  49:1;50:2;57:8;139:11;
  190:21;205:3;219:3;
  228:25;251:4,8;258:7,
  24,25;280:22;302:18
**trying (23)**
  44:19;57:5;126:23;
  177:5;178:9;190:8;
  192:14;197:3;198:13;
  209:1,2;210:8,24;
  211:1;213:3;219:5,6;
  228:14;229:14,18;
  243:6;250:9;276:11
**tucked (1)**
  162:8
**turn (8)**
  89:13;92:23;161:9,
  15;201:6,12;202:23;
  203:11
**turned (4)**
  225:1,17,18;231:3
**turning (4)**
  91:24;93:24;118:7;
  161:2
**turns (2)**
  157:20;216:20
**TV (5)**
  12:6,9,10;113:4,11
**twice (5)**
  67:6;102:13;291:1;
  293:23;296:23
**twist (2)**
  158:16;202:7
**Twitter (2)**
  34:2,2
**two (90)**
  16:13;24:20;33:6,7;
  35:19;38:3;39:4;41:21,
  23,24;42:1;43:5,18,19;
  45:25;49:1;55:18;
  65:22;75:14,16;78:18;
  99:15,16;117:18;
  129:16;131:14,17;
  134:23;135:11;136:17,
  23;137:17;143:13;
  159:10,23;160:2,2,2,3;
  161:21;171:1;172:5;
  180:12,24;182:5,5;
  187:19;194:24;199:20;
  201:10;224:5;228:3,9;
  233:24;234:25;235:10;
  237:12;249:1;254:17;
  257:2,23;263:11;

265:5;266:5,6,16,17,
23,23;267:4,10,11,18,
19,25;268:16,16;269:1,
2;279:18;285:15,25;
293:8;294:3,8,18;
295:24;296:1,4;297:15
**two- (1)**
  69:13
**two-page (2)**
  83:22;292:12
**twos (1)**
  187:18
**Tyler (1)**
  257:25
**type (19)**
  17:2;23:12;53:4,10,
  18;54:24;56:24;57:17;
  99:24;109:22;118:8;
  120:14,21;124:1;
  140:25;190:9;287:4;
  299:21;302:16
**typed (3)**
  110:9;111:16;279:11
**typed-up (1)**
  110:21
**types (6)**
  100:6;119:6;126:17;
  131:2;140:24;240:24
**typical (3)**
  40:15;66:21;174:9
**typically (15)**
  17:4;18:10;45:17,20;
  46:10;49:1;64:18;
  65:24;95:2;204:14;
  260:17;278:6;279:1,3;
  284:22

**U**

**ultimately (4)**
  46:8,19;79:9;240:10
**unauthorized (1)**
  118:19
**unavailable (1)**
  59:5
**unbecoming (2)**
  77:1;119:9
**uncommon (1)**
  182:24
**under (25)**
  24:9;27:7;28:15,17;
  29:2,4,13;30:13;54:9;
  56:5;61:24;76:18;77:4,
  23;83:25;89:17,20;
  90:17;92:2;122:14,25;
  142:2;150:21;229:9;
  293:17
**underneath (1)**
  74:8
**understandable (1)**
  79:19
**understandings (1)**
  137:14

**understands (1)**
  14:17
**Understood (30)**
  8:20;9:13,22;10:5;
  19:22;22:12;26:21;
  28:9;31:18;38:13;
  43:18,25;52:9;57:10;
  71:7;72:25;109:9;
  117:8;127:1;136:16;
  155:19;167:19;183:7;
  233:5,7;244:7;250:22;
  263:13,18;300:6
**undertaken (1)**
  286:14
**underway (1)**
  40:14
**undisputedly (2)**
  300:14,18
**unequipped (1)**
  25:13
**uniform (1)**
  24:15
**unique (1)**
  201:22
**unit (15)**
  69:23;70:8,9,10;
  78:18;117:21;129:12,
  12,14;163:1;237:15;
  239:18;251:14;283:6,7
**units (7)**
  63:24;65:21,22;
  140:9;151:16;248:6;
  272:13
**unit's (1)**
  78:10
**unleashed (1)**
  242:10
**unless (9)**
  9:17;128:21;129:4,6;
  131:21;163:2;191:13;
  223:6;228:13
**unlikely (1)**
  72:18
**unlock (10)**
  162:18;163:4;
  199:14,17;200:4,5;
  201:16;202:7;216:2;
  218:10
**unlocked (8)**
  17:18;56:18;162:14;
  164:20;180:25;204:25;
  218:2;219:21
**unlocking (1)**
  202:21
**unlocks (3)**
  201:13,15;202:5
**unrelated (1)**
  126:12
**unsupervised (1)**
  57:17
**unusual (1)**
  169:7
**unwritten (1)**

190:18
**up (267)**
  15:9,11;17:6;19:8;
  26:9;28:24;32:19;
  46:15;51:16;52:7;
  54:19;60:15,17;61:9,
  25;62:1;64:10;65:1;
  67:5,14;71:6;73:7;
  74:21;76:19,24,25;
  77:21;78:25;79:11;
  81:11;84:19;86:8;88:7;
  95:1,2;96:15;101:17;
  106:5,21,25;107:20;
  109:24;110:9,25;
  111:16;112:18;113:8;
  114:12;116:1,7;
  117:21;118:24,25;
  119:2,17,23;120:5;
  124:5,7;125:23;
  128:11;132:6,7,16,17,
  18;134:10;136:8;
  138:21,24,25;139:16;
  142:6;143:5;145:13;
  146:2;150:11;154:10;
  155:17;163:2;164:13;
  165:15,17;166:3,8;
  167:7;169:21;170:5,
  25;171:2,8,12;173:1,
  25;174:1,11,24;175:7,
  11,13,21;176:4,5,8,12,
  20,23;177:2,9;178:1,2,
  9,12;179:8,8,18,21;
  180:13,18,19;181:10,
  11,15,18,24,25;182:2,
  24;183:4,13,14,17,24,
  25;184:4,16,20;185:4,
  11,15,21;186:5,6,24,
  25;187:7,17,24;
  188:19;189:6,10;
  190:7,24,25;193:6;
  194:11,13;195:15,17,
  20,24;197:7,9;198:24;
  200:11,13,16,16;201:3,
  6,11;205:15,21;206:20,
  25;207:14,17;210:14;
  211:6;212:6;213:13,
  15;214:17,18,20;215:6,
  25;216:16,17;217:11,
  24;218:8,12;219:15;
  221:5,7,12,15;222:17;
  224:3,25;225:24;
  227:18;228:7,10;
  229:6;231:15,16;
  232:8;233:17,18;
  234:18,25;235:3;
  236:15,18,21,22,23;
  237:21,22;239:21;
  240:13;241:25;242:5,
  7;246:20;249:13;
  252:23;253:1;255:4,
  11,23;257:3;259:8;
  262:1;265:9,18;
  269:20;272:24;273:6,

13,19;274:12;275:5,7;
276:25;278:1;279:11;
280:23;281:8,17,18,22,
23;283:9,16;284:5;
285:10,12,21;287:2;
290:12;291:11,12,14,
16
**update (3)**
  77:22;127:11;270:15
**updates (7)**
  217:8,9,16;224:17;
  229:20;269:19,22
**upgraded (1)**
  139:7
**upon (5)**
  89:21;109:14,15;
  175:7,24
**upper (1)**
  278:8
**upset (1)**
  243:17
**upwards (1)**
  185:5
**urgency (2)**
  233:7,10
**urgent (1)**
  233:6
**use (33)**
  32:6;33:7,9,18,21,21,
  24;34:6;58:9;59:6;
  105:4;111:19;128:21;
  129:2;130:7,10;
  133:20;154:16,18;
  163:17;164:9;196:23;
  203:10,16;204:7;
  215:17;216:16;220:4;
  275:15,23;277:14;
  298:17;300:7
**used (26)**
  32:12;34:18;72:8;
  106:24;138:25;143:14,
  23;161:24;179:20;
  196:15;198:25;202:12;
  214:6;242:12,13;
  246:8,9;247:15;249:1,
  9,10,12;275:17,19;
  280:24;286:7
**uses (1)**
  129:1
**using (15)**
  8:22;23:10;32:8;
  57:11,15;59:10;207:6;
  214:11;217:19;248:2,
  6;249:7;251:2;277:5;
  299:19
**usual (10)**
  111:11;169:6;
  170:20;171:3;172:7;
  174:10,24;175:24;
  190:16,18
**usually (5)**
  112:4,5;173:17;
  174:4;279:8

USDC IN/ND case 3:18-cv-00995-JD   document 212-67   filed 05/25/21   page 109 of 111

**utilized (1)**
49:17

## V

**vacation (3)**
74:21;289:23,25
**valid (2)**
79:2,4
**valuable (2)**
22:8,9
**value (1)**
140:23
**varied (2)**
118:19;138:20
**varies (8)**
21:14;38:11;55:2;
72:1;74:17;119:11;
158:15;194:23
**variety (1)**
69:10
**various (4)**
5:2;232:17;235:15;
268:10
**vary (1)**
74:22
**venting (1)**
207:16
**verbal (5)**
19:11,12;228:19;
284:25;285:2
**verbally (11)**
8:22;124:24;125:7,
16;126:15;128:1,5;
175:15;242:25;284:23;
288:22
**verbatim (1)**
23:4
**version (3)**
110:10;150:1;266:4
**versus (9)**
54:7;55:13;66:24;
133:11;170:8,9;
210:13;211:7;267:19
**vicinity (1)**
254:23
**victim (1)**
24:20
**video (39)**
112:15,22;113:12;
114:2,13;181:2;
253:18,24;255:11,15,
16,19;256:13;257:1;
258:5,10,14,17;259:2;
260:10;262:3,11,18;
265:21;268:5;269:11,
16;270:12;271:8;
273:1,24;274:25;
275:8;280:17;281:14,
20,25;282:4,25
**videotaped (1)**
111:7
**view (11)**

25:17;108:6;130:4;
188:20,22,22,23;
191:18,20;253:23;
302:9
**viewed (1)**
78:14
**violate (3)**
27:16;89:23;90:7
**violated (3)**
11:5,10,16
**violates (1)**
61:9
**violation (4)**
47:15;120:6;299:19;
300:1
**visible (1)**
248:22
**visiting (1)**
66:25
**visits (1)**
41:7
**visual (1)**
171:8
**visually (5)**
171:9,13;228:11;
236:18;241:21
**vital (1)**
140:3
**vividly (1)**
265:1
**vocal (1)**
168:25
**voice (4)**
23:10;144:4,5,17
**voices (5)**
169:3,14;174:6,17,
20
**volume (3)**
146:4;174:23;224:16

## W

**wait (4)**
25:1;26:25;159:12;
165:21
**waited (3)**
164:16,18;232:20
**waiting (6)**
160:16;164:20;
177:3;205:8;213:15;
280:22
**waits (1)**
216:9
**waive (1)**
6:25
**wake (3)**
213:13;215:6,25
**waking (1)**
219:15
**walk (17)**
63:22,23;64:24,25;
65:21;67:12;128:9;
145:17;158:10,14,17,

20;172:15;173:22,23;
228:16;240:4
**walkabout (1)**
44:25
**walked (12)**
112:12;169:5;171:5;
173:5,5,20;174:7;
189:19;190:8;199:16;
224:7;284:5
**walkie-talkie (1)**
138:12
**walking (12)**
52:8;136:5,10,11,11;
166:15;170:19;171:23;
190:12,16;195:7;
264:25
**walks (4)**
44:15;66:2;118:9;
287:2
**walkway (3)**
184:11;185:15,19
**wall (5)**
161:13;181:7;
210:17;222:15;272:9
**walls (3)**
42:22;133:18;211:1
**wants (1)**
79:23
**Warcraft (3)**
300:13,18,22
**ward (1)**
28:14
**warden (7)**
6:9;65:19;66:8;
140:6;221:14;231:4;
233:19
**warden's (1)**
220:19
**warehouse (1)**
277:13
**watch (16)**
65:12;151:12;
154:18;155:1,2,13,13,
21,22;156:23,24;190:5,
6,22;216:15;299:2
**watched (1)**
233:9
**watches (2)**
155:15;156:4
**watching (2)**
114:13;174:14
**water (5)**
249:1,7;280:21,24;
281:2
**water-based (1)**
196:19
**water-pressured (1)**
194:25
**Watson (51)**
43:10;45:17;46:9;
48:25;49:3;121:13;
122:18,24;123:6;
124:1,14;127:7;

146:18,24;160:24;
166:11,16;168:17;
175:10,17;179:11;
186:10;192:3,8,9,17,
20;193:3;199:11,23;
200:1,9,22;208:25;
209:4,12,18;223:12;
231:15;238:9,11,22;
247:17;254:20,24;
273:5,11,20;287:7;
290:6;301:24
**Watson's (1)**
210:7
**wave (1)**
194:5
**way (86)**
7:4;9:4,6,24;11:5;
58:19;67:20;72:14;
73:14;75:20;77:21;
78:8;88:15;96:11,16;
98:8;112:13;113:4;
116:20;119:11;124:9;
132:11;156:1;158:1;
161:8;164:25;168:12;
169:15;171:2,20;
175:25;180:5;182:2;
185:16,18;186:4;
188:1,12;190:11,24;
191:11;202:16;206:2;
208:25;209:1,13,19;
222:8;223:13;225:16,
17;228:22;231:22,22;
234:6;235:2;236:12;
238:18,21;240:12;
242:2;253:19;258:12,
16;260:23;266:2,13;
267:16;269:7;271:23;
272:2,8,15,15;277:8,
17;281:8,17,18,22,23;
285:14,18;287:4;
297:24;302:16
**ways (1)**
201:10
**weapon (2)**
47:6;59:12
**weapons (17)**
48:2;51:4;52:2,11,
16,20;53:7,11,14,14,
19,22;54:2,2,6;57:16;
121:17
**wear (3)**
138:15,22;139:4
**wearing (2)**
257:4,14
**Wednesday (2)**
116:24;289:25
**week (4)**
86:22;116:24;
156:23;182:22
**weekend (1)**
18:10
**weeks (3)**
85:19;277:24,25

**weird (1)**
216:11
**welfare (2)**
19:3;62:2
**weren't (18)**
101:1;108:12;
127:13;135:3;137:15;
153:23;157:25,25;
195:3;210:13;222:10;
243:12,12;244:3;
251:5;258:22;264:6;
296:23
**west (1)**
131:13
**west/east (1)**
132:14
**Westville (2)**
6:9,11
**whatever's (1)**
154:8
**whatnot (7)**
52:3,20;101:22;
207:22;211:1;229:16;
279:21
**What's (35)**
7:13;30:20;31:9;
32:3,24;35:7;36:8,21;
51:14;52:5;58:13;
71:25;81:16;83:21;
86:19;87:14;88:22;
99:18;130:19;133:10;
151:23;158:7;169:11;
173:6;181:17;189:21;
214:14;245:22;253:16;
279:4;291:23;292:12;
296:6,19;297:3
**Whenever (4)**
21:13;190:17;214:1;
272:23
**Whereas (3)**
71:6;76:2;284:21
**where's (1)**
198:24
**wherever (2)**
26:10;215:3
**White (1)**
36:12
**whole (23)**
5:18;60:3;68:23;
82:21;99:17;128:2;
155:17;156:23;175:1;
193:13,16;210:14,16;
230:23,25;231:6;
233:15;238:4;243:11;
250:8;251:21;264:21;
286:2
**whooshing (3)**
191:2,2,3
**who's (26)**
24:12;42:7,7;45:14,
15,15,15;46:19;61:2;
66:11;73:1;74:19,20,
20,21;79:20,25;99:22;

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 110 of
111

144:24;152:6;171:23;
173:11;211:5,6;272:9;
297:1
**whose (2)**
212:25;257:19
**wide (2)**
185:15;203:25
**wider (1)**
253:22
**wife (1)**
296:8
**wiggle (1)**
155:8
**Willfully (4)**
27:20,21;28:1,2
**wind (1)**
258:12
**window (2)**
154:19,23
**Windows (1)**
156:18
**wires (1)**
202:13
**wiring (1)**
138:23
**wish (2)**
12:2;13:3
**within (21)**
20:23;42:22;46:16;
48:12;62:18,19;63:1;
74:6;98:6;100:6;
121:21;124:13;128:18;
129:16;131:10;154:20;
163:7;232:14;247:22;
251:7;262:25
**without (11)**
8:23;25:20;79:2;
114:19;117:1;118:20;
119:19;173:8;193:9;
209:2;243:16
**witness (8)**
4:2;7:5;30:21;100:9,
9;101:5;241:21;303:16
**witnessed (2)**
263:5,6
**witnesses (1)**
5:11
**witnessing (1)**
98:20
**woman (1)**
85:25
**won (1)**
297:1
**wondering (2)**
204:22;253:25
**wood (1)**
228:9
**word (11)**
23:4,4;91:19;233:25;
248:17;260:5;275:17,
19,23;279:3,8
**words (9)**
8:23;58:7;143:23;

173:14;197:16,19;
218:19;266:14;286:7
**work (41)**
10:3;17:3;21:11;
31:23;33:4;34:8,9;
39:18,19,20,23;40:9;
45:24;63:12;69:25;
73:15;82:5,12;91:16;
105:1;115:16;129:13;
155:17;164:4;207:21;
208:1,5,8;229:6;
252:20;271:24,24;
272:1,8;286:1;287:5;
289:25;290:6,23;
298:17;299:19
**workday (2)**
105:2,3
**worked (12)**
38:25;39:5;40:8;
69:11,13;71:13;
142:20;173:11;202:13;
213:11;217:4,5
**working (28)**
12:6,10,21;39:25;
40:2,6;62:3,5;69:7;
74:8;76:13;82:13;
117:10;118:17;121:3;
139:25;140:17;141:18,
22;142:15;156:14,16;
208:4;217:18;224:2;
241:14;257:9;287:15
**works (11)**
78:8;101:9;138:4;
144:11;202:21;266:19;
267:7,14;268:20,22;
296:8
**workstation (1)**
40:12
**world (4)**
129:1;300:13,18,22
**worse (4)**
24:20;183:14;
224:21,22
**worst (4)**
173:2,3,4;177:7
**worst-case (1)**
143:1
**worth (1)**
296:21
**wristwatch (1)**
156:15
**write (15)**
67:5;76:25;104:17;
110:17,22;111:12,20;
142:6;154:4;155:21,
25;259:8;279:4;285:9;
293:1
**writing (12)**
67:14;110:21;
111:21,24;120:5;
133:23;134:3;141:5;
152:9;253:12;254:8;
288:21

**written (54)**
4:16;9:1;15:14,16;
54:5;59:3,23;64:17;
65:20;77:17;78:6,7;
94:17;103:23,24;
104:13;105:18,23;
110:2,3,6,8;111:20;
140:21;141:4,10,11;
153:2;180:3;219:16,
17,21;222:25;246:10,
15;248:19;291:9,10,11,
12,20,25;294:23,24;
295:4,7,12,14,14;
296:3,7,17;297:6;
298:11
**wrong (13)**
27:23;46:11;131:6;
138:1;144:14;194:9;
237:19;263:25;277:25;
285:7;286:4,5,8
**wrongdoing (1)**
98:20
**wrote (10)**
102:2;104:6;153:11,
12,15,21;288:14,14;
291:14,14

## Y

**yanking (1)**
136:8
**year (3)**
23:24;69:20;139:21
**year-and-a-half (4)**
38:23;153:17;263:2;
299:15
**yearly (2)**
21:5;23:25
**years (22)**
10:25;36:1;38:3,20;
43:1;69:9;72:5;81:20;
98:1,18;173:12;
243:14;266:2,6,16,24;
267:11,19,25;268:16;
269:2;288:14
**yell (1)**
146:1
**yelling (12)**
29:16,25;30:3,4;
168:24;169:22;174:8,
21,23;177:6;197:15;
229:16
**yellow (1)**
292:3
**Yep (2)**
55:16;122:20
**yesterday (1)**
289:23
**young (4)**
68:3,9;158:14,14

## Z

**zebra (1)**
32:4
**zigzag (1)**
171:2

## 0

**07 (2)**
37:11;68:25
**09 (1)**
294:15

## 1

**1 (6)**
5:18,20,21;84:3;
161:17;258:18
**1:21 (1)**
262:2
**1:25 (1)**
262:1
**1:30 (1)**
269:10
**1:34 (1)**
272:25
**1:35 (1)**
272:24
**1:45 (1)**
273:22
**1:50 (1)**
275:7
**10 (5)**
55:1;188:1,5;292:8,
12
**100 (5)**
132:6;170:8,22;
250:4;271:16
**10-10 (1)**
54:25
**10-23 (1)**
165:23
**10-4 (3)**
165:24;218:21;
223:25
**10-70 (11)**
55:2,3,9;56:2,13;
150:19;151:14,17;
214:8,16;215:3
**10-70' (1)**
151:16
**10-71 (18)**
55:2,3,8,10;56:3,13;
62:8;150:18,19;
152:19;214:4,5,16;
215:2;219:20;247:1,
13,19
**10-9 (1)**
219:4
**11 (8)**
4:19;163:12;164:10,
11;293:9,9,14;295:5
**115 (1)**
30:24

**12 (8)**
55:7;188:1,5;214:6;
272:22;293:9,10,13
**12-21-18 (1)**
84:11
**12-28-18 (1)**
84:13
**12-hour (1)**
39:8
**13 (7)**
37:11;69:9;98:1,18;
173:12;297:3,5
**14 (2)**
5:15;188:5
**15 (13)**
4:24;5:15;88:6,10;
225:10;245:23;272:3;
292:8;293:21;294:2,
15,18;295:25
**16 (1)**
188:5
**17 (1)**
260:24
**1776 (1)**
246:4
**18 (3)**
4:25;82:17;188:5
**18-ish (1)**
82:14
**19 (1)**
94:4

## 2

**2 (15)**
36:6,7,8;69:17;
188:5;216:7,8,18,19,
21,21;217:24;218:21;
224:21;270:18
**2,000 (2)**
118:1;277:3
**2:28 (1)**
280:16
**2:36 (1)**
275:9
**20 (9)**
165:4,10,11;175:4,6;
187:19;188:5;242:24;
272:3
**2007 (2)**
37:6;67:23
**2009 (6)**
291:4;293:21;294:2,
9,18;295:25
**2012 (1)**
38:5
**2013 (1)**
38:5
**2015 (5)**
36:4,13,19;37:24;
38:19
**2017 (58)**
10:20;14:3,9,20,24;

USDC IN/ND case 3:18-cv-00995-JD    document 212-67    filed 05/25/21    page 1 of 111

15:5;16:6;24:23;25:15;
26:4;28:9,18;29:5,14;
32:9,13;33:2,12;34:14;
38:23;39:13;40:3;42:4,
18,21;47:4;48:8;50:7;
66:21;70:17;71:8;
75:11;83:3;93:1,6;
101:2;121:3,13;
122:11;123:22;128:19;
137:22;139:13;143:5;
158:18;213:24;246:11;
247:1;254:3;265:9;
269:17;270:24;271:5,
18;290:16;292:17;
297:7,25
**2018 (1)**
84:18
**2019 (6)**
88:6,10;93:22;96:15,
18;107:3
**210-2275 (1)**
31:10
**212 (1)**
213:11
**216 (1)**
272:7
**219 (1)**
31:10
**22 (3)**
36:4,18;188:5
**23 (1)**
36:12
**24 (2)**
162:21;188:5
**240 (3)**
173:10;243:23;
244:21
**25 (7)**
89:14;165:10,11;
175:6;218:21;258:19;
270:8
**26 (1)**
188:5
**27 (1)**
21:15
**28 (2)**
84:18;188:5

### 3

**3 (8)**
83:20,21;163:12,17;
164:2,9,10,11
**3:00 (1)**
67:12
**3:48 (1)**
303:17
**30 (6)**
87:17;139:9;188:5;
195:10;243:24;244:22
**300 (4)**
128:3;169:2;170:9,
22

**3000 (5)**
59:13;60:17;154:25;
249:16,19
**32 (2)**
32:16;188:6
**34 (1)**
188:6
**36 (1)**
188:6
**360 (1)**
210:11
**37 (1)**
4:18
**38 (4)**
188:6;191:18;
253:22;254:3
**3D (1)**
133:8

### 4

**4 (18)**
69:17;87:13,14;
92:24;180:22,24;
181:1,3,5;188:1,5;
218:20;234:1;241:24;
253:19;255:1,16;258:1
**4:00 (6)**
39:11,12,23,23;
40:10,10
**40 (3)**
21:14;188:6;244:22
**400 (5)**
176:9,13;183:9,10;
251:17
**415 (1)**
272:6
**45 (2)**
157:10;158:25
**4-7-2017 (1)**
292:21
**49 (1)**
255:18

### 5

**5 (5)**
88:21,22;122:12;
179:2;201:5
**5:00 (12)**
39:11,11,13,13,18,
18,19,19;40:2,2,8,8
**5:45 (1)**
39:24
**500 (56)**
132:6;146:3,7;166:3,
9;167:8;169:22;170:1,
9,12,16,21;171:13;
172:1;173:1;174:11;
175:8,11,21;178:16,21,
22,23,25,25;179:1,9;
180:13,17,19;181:11,
25;183:4,13,14,18,25;

184:5;185:12,21;
186:11,20,25;187:25;
189:22;194:11;200:5,
13;201:3,20;202:1;
209:11;223:14;234:1;
251:17;301:13
**502 (1)**
188:1
**50-pound (1)**
160:8
**538 (2)**
193:22;197:10
**540 (23)**
132:21,24;165:18;
187:16,18;188:2,4,9,
16;189:18;190:12;
191:16;193:22;230:19;
231:25;232:4,7;
247:18;252:1,7,25;
273:6;281:12

### 6

**6 (8)**
91:7,8;92:23,24;
93:1,6;188:1,5
**6:00 (3)**
39:10,10,24
**60 (1)**
182:4
**600 (1)**
288:13
**6233 (1)**
130:21
**6236 (1)**
130:21

### 7

**7 (33)**
4:19;10:20;42:4,21;
48:8;50:7;54:25;57:6;
75:11;101:2;104:23;
121:13;123:22;130:18,
19;137:21;154:25;
158:18;161:2;227:20;
246:11;247:1;251:22,
24;252:9;254:3;265:9;
269:17;270:24;271:5;
292:17;297:7;301:1
**7:02 (1)**
301:3
**7:03 (1)**
155:2
**76 (1)**
89:17
**78 (1)**
88:24

### 8

**8 (7)**
104:23,25;107:3;

188:1,5;246:1,3
**80 (4)**
90:16;118:22;
242:23;243:2
**80s (1)**
144:8
**82 (1)**
5:14
**8-9-19 (1)**
94:3

### 9

**9 (11)**
91:25;93:22,24;94:4;
96:15,18;162:8,9,10;
253:15,17
**9:00 (1)**
57:23
**9:30 (1)**
169:7
**9:44 (1)**
255:18
**9:45 (3)**
247:1;253:22;254:3
**9:45:33 (2)**
255:21;256:11
**9:45:39 (2)**
256:14,25
**9:45:50 (1)**
257:2
**9-minute-and-27-second-long (1)**
258:14