# In The Matter Of:

*BARBARA DEVINE, et al. vs*
*RON NEAL, et al.*

*SARAH ABBASSI*
*October 29, 2019*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary * Merrillville * Valparaiso, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 10-29-19 SARAH ABBASSI.txt
Min-U-Script® with Word Index

BARBARA DEVINE, et al. vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD document 212-68 filed 05/25/21 page 2 of 76

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

BARBARA DEVINE, as Personal)
Representative of the      )
ESTATE OF JOSHUA DEVINE,   )
                           )
        Plaintiff,         )
                           )  Case No.
   vs.                     )  3:18-cv-00995-JD-MGG
                           )
RON NEAL, et al.,          )
                           )
        Defendants.        )

The deposition of SARAH ABBASSI, called for examination pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before APRIL D. HARGETT, a notary public within and for the County of Lake, State of Indiana, Certified Shorthand Reporter at 5816 East 7th Avenue, Gary, Indiana, on October 29, 2019, at the hour of 9:21 o'clock a.m.

BOSS REPORTERS

& VIDEOCONFERENCING

GARY * MERRILLVILLE * VALPARAISO, INDIANA

(219) 769-9090

Page 2

PRESENT:

LOEVY & LOEVY,
(311 North Aberdeen Street, 3rd Floor
Chicago, Illinois 60607), by:
MS. MEGAN PIERCE
     -and-
MS. SARAH GRADY,
(312) 243-5900
megan@loevy.com
        Appeared on behalf of the Plaintiff;

STATE OF INDIANA, OFFICE OF THE ATTORNEY GENERAL,
(302 West Washington Street, 5th Floor
Indianapolis, Indiana 46204), by:
MR. DANIEL ROTHENBERG,
(317) 232-2472
daniel.rothenberg@atg.in.gov
        Appeared on behalf of the Defendants.

Page 3

I N D E X

Witness:                                        Page

SARAH ABBASSI

EXAMINATION BY MS. PIERCE                         4

EXHIBITS

Abbassi
Exhibit Nos.                                    Page

1    Learning Plan Transcript               36
2    Report of Investigation                37
3    Indiana State Prison Emergency         41
     Manual
4    B Cell House Fire Evacuation Plans     56
5    Indiana State Prison Map               86
6    After Action Review                   134
7    Shift Report of Incident              166
8    Indiana State Prison 24-Hour          171
     Report
9    Post Orders                           186
10   Patrol Report                         188
11   Responses to Interrogatories          190

Page 4

(WHEREUPON, the witness was duly sworn.)

THE WITNESS: Yes.

THE REPORTER: Thank you.

SARAH ABBASSI, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. PIERCE:

Q. So my name is Megan Pierce, and I represent the plaintiff, Barbara Devine, in her capacity as the personal representative of the Estate of Joshua Devine in this case.

MS. PIERCE: Just -- before we begin, I'm going to just read a quick statement into the record.

On October 7th and 11th during Rule 37 telephone calls with opposing counsel, we requested and agreed upon supplemental responses and documents to be turned over by October 18th. We raised this, again, in a letter on October 15th. Many of these documents are still outstanding, so we reserve the right to re-open this deposition should documents require -- additional documents require that we do so.

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019
USDC IN/ND case 3:18-cv-00995-JD document 212-68 filed 05/25/21 page 3 of 76

Page 5

BY MS. PIERCE:

Q.  Ms. Abbassi, can you state and spell your name for the record?

A.  Sarah Abbassi, S-a-r-a-h, Abbassi, A-b-b-a-s-s-i.

Q.  Have you ever been a witness in a deposition before?

A.  No.

Q.  Have you ever given testimony in court before?

A.  No.

Q.  Have you ever been sued before?

A.  No.

Q.  Have you ever been a party in a lawsuit at any time?

A.  Can you repeat that?

Q.  Have you ever been a party in a lawsuit at any time?

A.  No.

Q.  Okay.  So I'm just going to go over some of the rules of the deposition.

If you need me to repeat anything, just say so.

A.  Okay.

Q.  So you understand that you're under oath?

Page 6

A.  Yes.

Q.  Okay.  You understand that telling a lie at a deposition is a crime?

A.  Yes.

Q.  So the court reporter is going to be taking down everything we say.  So it's really important for you to give verbal responses.  So instead of nodding or saying uh-huh, it is important to say yes or no so that the court reporter can get everything down.

A.  Okay.

Q.  Along the same lines, it's important to let me finish my question before you give an answer just so the court reporter can get a clear record; is that fair?

A.  Yes.

Q.  So I'm going to try to ask questions that are clear and make sense.  Sometimes they might be confusing.  If you don't understand a question, just let me know, and I'll rephrase it.

A.  Okay.

Q.  If you don't say that you don't understand or if you don't ask for clarification, I'll assume that you've understood the question.

A.  Okay.

Page 7

Q.  And then if you need to take a break at any time, that's fine.  I just ask that you don't take a break while a question is pending.

A.  Okay.

Q.  So are you currently under any medical care that would impact your ability to testify honestly and truthfully here today?

A.  No, sir.

Q.  Are you currently taking any medication that would impair your ability to testify truthfully here today?

A.  No, sir.

Q.  Do you have any medical conditions that would impact your ability to testify truthfully today?

A.  No.

Q.  Do you have any sort of condition that affects your memory?

A.  No.

Q.  Have you had any medical conditions in the past that affect your memory?

A.  No.

Q.  Did you meet with -- without going into the substance of any conversations you had, did you meet with counsel to prepare for your deposition

Page 8

today?

A.  A meeting, no.  In person, no.

Q.  Did you speak with counsel over the phone?

A.  Yes.

Q.  When did you speak with counsel?

A.  A couple times throughout the month.

Q.  And for about how long did you speak with counsel?

A.  Maybe a couple months.

Q.  I mean, the duration of the telephone calls?

A.  What do you mean by that?  Like --

Q.  Like about -- did you talk with counsel for ten minutes?  Three hours?

A.  Oh, not too long.  Just any questions I had.

Q.  Did you do anything else to prepare for your deposition today?

A.  I looked over the interrogatories and the IA file.

Q.  Okay.  Did you look at any other documents?

A.  No.

Q.  Did you speak with anybody else besides

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 4 of 76

Page 9

your attorney?

A. No.

Q. Did you speak to anybody -- any current or former IDOC employees?

A. No.

Q. So what city are you living in?

A. Schererville, Indiana.

Q. Do you have any plans to move in the near future?

A. No.

Q. Do you have a telephone number?

A. Right now my -- I don't really have a "cell phone, cell phone" until I get one; but my house number is ▮▮▮▮▮▮▮

MR. ROTHENBERG: I'm going to object to the personal information as being privileged, but you're still going to have to answer.

THE WITNESS: Yes.

BY MS. PIERCE:

Q. Have you had a cell phone in the past?

A. Yes.

Q. Have you had a work phone in the past?

A. No.

Q. Do you have an e-mail address?

A. Yes.

Page 10

Q. What's your personal e-mail address?

A. It's ▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q. Did you have an e-mail address with ISP?

A. I believe so.

Q. Do you remember that e-mail address?

A. No.

Q. Do you have any social media?

A. Yes.

Q. Do you have a Facebook?

A. Yes.

Q. Do you have a Twitter?

A. No.

Q. Do you have an Instagram?

A. Yes.

Q. Do you have any other social medias that I didn't mention?

A. No.

Q. So can you tell me what is your -- let's go through your education.

When did you graduate from high school?

A. 2012.

Q. What high school did you attend?

A. Lake Central.

Q. And did you go on to additional

Page 11

education?

A. Yes. I went to Purdue University Calumet.

Q. And how long were you there?

A. Four years.

Q. Did you graduate?

A. Yes.

Q. What was your degree?

A. Sociology with a focus in criminal justice.

Q. And so you graduated in 2016?

A. Yes.

Q. And what did you do after you graduated?

A. I started working at the prison.

Q. What was the process for getting employed at the prison?

A. I don't remember very much, but for as much as I remember -- I remember applying on-line, getting a call for the interviews and the drug test. And then after we pass everything, we go through the training.

Q. Okay. Was -- how did you learn about employment opportunities at the prison?

A. We did a tour with one of my classes at Purdue.

Page 12

Q. And that made you interested in seeking employment at the prison?

A. Yes.

Q. So you did an on-line application?

A. Yes.

Q. And then you had interviews with how many people?

A. It was a room full of maybe two or three people, if I remember.

Q. And did you have to do any additional steps?

A. Not -- I don't remember any other steps.

Q. And who made an offer of employment?

A. I can't remember the name.

Q. What was your first position at IDOC?

A. A correctional officer.

Q. Okay. What date did you start?

A. I don't know an exact date, but I believe it was maybe August 29th, 2017.

Q. August 29th?

A. I think so. I'm not quite sure.

Q. And what was your -- what shift were you assigned to?

A. The first couple of months I was on day shift, and then I ended up switching to night shift.

Page 13

Q. So on the day shift, what hours did you work?

A. 6:00 -- I believe it was 6:00 a.m. to 6:00 p.m.

Q. What days?

A. It rotated.

Q. And did you always work with the same people, or did you work with different people every time?

A. It depends where they put us that day.

Q. So when you were -- so it was the first three months, you said, you were on the day shift?

A. I can't remember how long I was on day shift, but it was in the beginning -- when I started, I mostly did days.

Q. Okay. And did you have a specific assignment? Like were you assigned to a certain cell house?

A. I didn't have a permanent spot, so whatever I got that day -- wherever they told me to go, I went.

Q. Okay. So how did the assignments work at ISP?

A. Not quite sure.

Q. So who would give you your assignments?

Page 14

A. I believe it was the dispatcher.

Q. Do you remember their name?

A. No.

Q. And when would you find out what your assignment was for that day?

A. Right after roll call or before roll call. I can't remember. One of those two.

Q. So why don't you go through for me a day -- like a typical day at the prison. So you would arrive at ISP?

A. And go through security check. After that, we'd get ready for roll call.

Q. And where is roll call?

A. As soon as you get through security check and through the gates, it's in a room to the right.

Q. And who does roll call?

A. Usually, the captain and the lieutenants.

Q. And what happens during roll call?

A. They just tell us what's been going on, check our uniforms, and just get ready for the day.

Q. How long does that usually last?

A. About 15 minutes.

Q. And what kind of stuff would they normally tell you? You said stuff that's going on?

A. Uh-huh.

Page 15

Q. But can you give some examples?

A. They tell us what happened during the shift before and just mentally prepare us for the day.

Q. And is roll call when you would get your assignments?

A. I believe it was right before roll call or right after.

Q. Okay.

A. We'd check in with the dispatcher, and they tell us where to go.

Q. Okay. And where did you normally work? Was there a place that was typical for you to be assigned?

A. I worked everywhere -- wherever they assigned me that day, I went.

Q. Okay.

A. So I never had like an actual permanent spot.

Q. Okay. Did you have any direct supervisor?

A. Like the captain. We had a captain on every shift.

Q. Okay. And so would you report to the captain?

Page 16

A. Well, we are assigned at the time -- there is usually a lieutenant or a sergeant or an officer in charge.

Q. Okay. So after you went to the dispatcher and got your assignment, then what would you do next?

A. We would head toward that way.

Q. And when you were on assignment, would you get breaks throughout the day?

A. I don't remember. I don't remember.

Q. Would you get a lunch break or a dinner break?

A. We just kind of ate whenever we can.

Q. So no official breaks that you remember?

A. I don't remember.

Q. Were there any regular meetings that you attended?

A. Well, like our actual meetings? It would just be really local.

Q. Okay.

A. And then our quick, like, meeting before the shift started when we're actually in the assigned spot.

Q. And who would be in that meeting?

A. It's not really a meeting, but we, you

USDC IN/ND case 3:18-cv-00995-JD document 212-68 filed 05/25/21 page 6 of 76

BARBARA DEVINE, et al. vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

Page 17

know, gather everything together for the day. So it would either be the lieutenant, sergeant, officer in charge, and then the other officers that will be working that day.

Q. And what things would you talk about?

A. Who's assigned to which ranges. That's basically -- I don't remember anything else, but I remember that.

Q. Okay. And then -- so you would eat at some point, you said, when you had time.

Would somebody take over your position or take over your responsibilities while you ate?

A. I don't remember.

Q. Do you ever remember taking over a position or responsibilities while someone else ate?

A. No.

Q. Do you remember at what point you switched to the night shift?

A. Maybe four -- maybe five months into working there. I can't remember.

Q. How long were you at ISP?

A. I would say about ten months.

Q. Do you remember when you left?

A. In June.

Page 18

Q. Did you work at any other --

A. Just ISP.

Q. What was your reason for leaving?

A. I found a better job opportunity.

Q. What job opportunity was that?

A. It was closer to home at a bank.

Q. What bank?

A. First Merchants.

Q. And what was your position there?

A. I was a teller.

Q. Are you still working there?

A. No.

Q. Where do you work now?

A. I do DoorDash on my own time.

Q. What was your reason for leaving First Merchants?

A. I got let go from there.

Q. Okay.

A. Yeah.

Q. What was the reason you got let go?

A. It was -- it was a reason -- like basically being on time and stuff like that.

Q. So the reason you got let go was for not showing up on time?

A. Yeah.

Page 19

Q. Was there any other reason?

A. No.

Q. And do you remember when you were let go?

A. I was there for about almost a year.

Q. Have you had any other employment besides ISP, First Merchants, and DoorDash?

A. Uh-uh.

Q. Did you do any part-time jobs in high school?

A. No.

Q. Okay. So you were working on -- in B cell house on April 7th, 2017?

A. Yes.

Q. Did you work in B house -- B cell house frequently?

A. I didn't work there all of the time, but I've worked there before multiple times.

Q. Can you walk me through a typical day of working in the B cell house?

A. I'm going to try my best to remember because it's been a while.

Every officer was assigned to a range, so you were in charge of that range.

Q. Okay.

Page 20

A. So that means you have the keys to those ranges.

Q. So just backing up.

So this was at the initial meeting when you would get into B cell house and talk --

A. Uh-huh.

Q. Who would make the assignments to the ranges?

A. The officer that would make it -- it would be either the lieutenant, the sergeant, or the officer in charge working that cell house.

Q. Okay. And when you say, "the lieutenant, sergeant, or officer in charge working that cell house," do you mean the lieutenant or the sergeant would be working in the cell house or they would come from outside?

A. Usually -- usually, in the office -- in there usually a sergeant or an officer in charge would be there or both.

Q. Okay. So the officer in charge could be a sergeant?

A. Yes.

Q. So whoever was in charge of the cell house?

A. Yes.

BARBARA DEVINE, et al. vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

Page 21

Q.   And how many people were there normally in a cell house?

A.   It really depends.  It could be between three and six.

Q.   And what factors would impact how many people were in the cell house?

A.   I'm not really sure.

Q.   Were there ever six people in the B cell house when you worked there?

A.   I can't remember.

Q.   Were there more people on the day shift versus the night shift in a cell house?

A.   I do not remember.

Q.   Were you ever an officer in charge in a cell house?

A.   No.

Q.   Was there a requirement of how much experience you had to have to be an officer in charge?

A.   I don't know that part.

Q.   Okay.  So when you got your assignment, what would happen then?

A.   We would do our security rounds, and we would get people ready for like breakfast, lunch, or dinner.  Let them out for classes and rec and

Page 22

multiple things like that.

Q.   So stepping back when -- a little bit before, would you get keys or anything like at -- what point would you get gear when you came into the cell house?

A.   As soon as we walk in -- when the officer who is in charge that night assigns every officer to each range.

Q.   Can you walk me through the process of getting the gear?

A.   When they find out who gets assigned to what range, the officer gives us the assigned keys and -- yeah.

Q.   Okay.

A.   To those ranges.

Q.   And so you get the keys for only the range that you're assigned to?

A.   Yes.

Q.   What other keys do you have?

A.   That was the only keys we had.

Q.   So just for your range?

A.   Yes.

Q.   And is there -- so you have a key for each individual door?

A.   No.  One key works for the whole range.

Page 23

Q.   Okay.  So you just had one key?

A.   Yes.  For each range.  Each range had its own set of keys.

Q.   And do you have any keys to -- the door of the cell house?

A.   The front door?

Q.   Yes.

A.   Usually, the officer in charge has that.

Q.   Okay.  So only the officer in charge has --

A.   Yes.  It's whoever stays on the first -- assigned to the first floor has those keys.

Q.   Okay.  So you would have -- if you were on the 500 and the 400 range, you would have just two keys on you?

A.   You should.

Q.   And you wouldn't have any other keys to any other part of the facility?

A.   They shouldn't unless they were told to stay, like, on the first floor with the front door key.  Whoever is on the first floor stays with the front door key.

Q.   Does anybody have any keys to either of the offices in the B cell house?

A.   The officer in charge --

Page 24

Q.   The officer in charge?

A.   -- usually has that.

Q.   To both offices?

A.   I believe they can only open the officer's station.

Q.   And what's the other office in the B cell house?

A.   It's usually where the counselors are at.

Q.   Okay.  And what's that office called?

A.   I don't remember.

Q.   So you would get your keys for your ranges?

A.   Yes.

Q.   What other equipment would you get?

A.   A radio.

Q.   Okay.

A.   Yeah.

Q.   And when you got the radio, would you be required to do anything with the radio?

A.   No.  Unless we needed it.

Q.   Would you test the radio at all?

A.   Yes, we did.

Q.   At the start of each shift?

A.   Uh-huh.

Q.   And would you get any other equipment?

Page 25

A. No.

Q. Was there any other equipment in the officer's station?

A. I don't remember right now.

Q. Any emergency equipment?

A. Oh, yes. I believe there was a first aid kit, I believe, and I believe -- there is a fire extinguisher.

Q. Anything else that you can remember?

A. No.

Q. And would you get any other equipment?

A. No.

Q. Was there equipment that you used for the security check?

A. Yes. It was called a pipe.

Q. And what's the pipe?

A. They have little checkpoints within the range, and you have to scan it so it shows that you checked each cell.

Q. And what are you supposed to do on the security check?

A. You check in each cell to make sure everybody is good.

Q. And how do you do that?

A. You look in each cell with a flashlight,

Page 26

and you walk to each offender making sure they're okay.

Q. And you're supposed to talk to each offender?

A. To get a response to make sure they're okay.

Q. And how often do you do that?

A. I can't remember. I remember doing it every 30 minutes.

Q. And so at night you also talk to the offender every 30 minutes?

A. Yes.

Q. Okay. So you would -- let's go through what we went through again.

You would come in, get your assignment, get your gear, and then you would do your security checks?

A. Yes.

Q. You also said that you would -- you would take people out for their jobs or activities.

How would you know who to take out and when?

A. The officer in charge let's us know everything and we write it down.

Q. Is there any paperwork that he gets that

Page 27

tells him who to let out?

A. I'm not really sure how that works.

Q. Okay. But you write it down yourself?

A. Yeah. Or they usually -- they write it down for us.

Q. And then you go and you take that person out?

A. Yes.

Q. Do you escort them to wherever they're going?

A. No.

Q. You just let them out and they go?

A. Whenever we're told to let them out -- it's clear to let everybody out for their assignments, then we do.

Q. And when you let somebody out, do you use the lock on their door?

A. Yes.

Q. Do you ever use the electronic lock at the front of the range?

A. Both, yeah.

Q. What would make you use one instead of the other?

A. It's the way they set it up. We have to go through each one anyway, so we would use both.

Page 28

Q. Okay. Was there anything else that you would do during your shift?

A. No. Basically, just safety and security throughout the day.

Q. Okay. And if you had to go use the restroom or something like that, who would take over your responsibilities?

A. You would hand over your keys to usually the officer in charge to use the restroom real quick and come back and take them back.

Q. And between security checks, where would you -- where would you be?

A. I would be in the office or I would usually be walking around making sure everything was okay.

Q. Okay. In the office -- is the office closed?

A. No.

Q. So it's open at all times?

A. Yes.

Q. So you can hear anything that's going on?

A. Yes. The only one that's not open is the counselor's office, and that's where we would do the -- I forgot what it's called for the -- our time sheets.

BARBARA DEVINE, et al. vs
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 9 of 76

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

Page 29

Q. Okay. And how often would you do your time sheets?

A. Every two weeks.

Q. Okay. And you would always do them in the counselor's office?

A. If we were told to do it.

Q. And why would you be told to do it in the counselor's office?

A. If they needed to be turned in at a certain time or anything -- they tell us to do it, and we go ahead and do it.

Q. Would you always do your time sheets at work?

A. No.

Q. You would never do them at home?

A. No.

Q. If you didn't do them at the counselor's station, where would you do your time sheets?

A. In the front where we usually -- there is an office by where roll call is, and there's computers in there to do it.

Q. So while you were at ISP, were you ever promoted?

A. No.

Q. So you were a correctional officer the

Page 30

entire time?

A. Yes.

Q. Did you ever have any complaints made against you by any of the prisoners while you were at ISP?

A. Not that I know of.

Q. Did you ever make any complaints or grievances while you were at ISP?

A. I don't remember.

Q. Were any complaints ever made about you by your supervisors?

A. No.

Q. Were you ever disciplined for any reason?

A. No.

Q. So let's go through the training you received when you started at IDOC.

Did you have to do any training before you could actually start work?

A. Yes.

Q. What was that?

A. There was a training class we did. That's where we learned everything -- how to use like the equipment. We took multiple tests learning about everything, yeah.

Q. So was this like a -- how long was this

Page 31

training?

A. It lasted weeks. I can't remember how long.

Q. And where did you do it?

A. We did it at ISP, and then we did, I believe, a week at Westville.

Q. And who led the training?

A. I can't remember his name, but usually we had different -- usually, different topics would be different people. There was one trainer, but I can't remember his name.

Q. Would you do classroom training?

A. Yes.

Q. And what would you do in the classroom training?

A. We learned how to use the equipment. We took multiple tests that we have to pass. We did like basically -- like self-defense things or things that keep us safe, and then we had classes that would teach us about the prison and how to do things.

Q. What equipment were you instructed on how to use?

A. Handcuffs, the pepper spray.

Q. Were you instructed on how to use any emergency equipment?

Page 32

A. I do not remember.

Q. You don't remember being instructed on any emergency equipment?

A. I don't remember the full training process. It's been a while.

Q. Okay. But to your knowledge, you don't recall any training on how to use emergency equipment?

A. I honestly do not remember if we did or not.

Q. Okay. But just to -- so for my question, it's a yes or no answer.

Do you recall any training about how to use fire safety equipment?

A. We probably did, but I just don't remember.

Q. You don't recall any? So yes or no to that?

A. No, not that I remember.

Q. Okay. And you don't recall any training on emergency equipment generally?

A. We went over multiple topics, so we probably did. I just really don't remember.

Q. Okay. So for these questions, I just need a yes or no.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 10 of 76

Page 33

So do you recall any training on how to use emergency equipment?

A. No.

Q. Okay. And what were the -- do you remember what any of the tests were about?

A. No.

Q. Were they written tests or, you know, sort of acting tests where you would have to act out a scenario?

A. Both.

Q. Okay. Do you remember any of the topics of any of the scenario tests?

A. No.

Q. During the training, did you have any interactions with prisoners at Indiana State Prison?

A. No. The only time we did is if -- when we went as a group with our class into the prison, and then we would shadow officers in there.

Q. And how frequently did you do that?

A. It was maybe the last couple of weeks of training.

Q. Okay. Do you remember which officers you shadowed?

A. No. They were different ones every time.

Q. Okay. And did you do any training that

Page 34

was not at ISP?

A. Just that week that we went to Westville.

Q. Okay. And so after -- did you get a -- did you have like a final test that you had to take to complete training?

A. I do not remember.

Q. Did everybody pass training?

A. I believe so.

Q. Okay. Did you get some sort of certificate saying that you had completed the training?

A. No, I don't believe so.

Q. Okay. Were you told that you had to successfully complete the training before you could begin the position?

A. Yes.

Q. And was there a probationary period when you began?

A. Yes. I can't remember how long it lasted though.

Q. And what did -- were there any restrictions on your employment or the tests that you were doing while you were on probationary status?

A. I don't remember.

Q. Okay. Were you able to do all of the

Page 35

tasks that anyone else employed at ISP could do?

A. In the beginning, I think we still had to shadow officers and be with them for a while.

Q. Okay.

A. Before we were on our own.

Q. Did you do any continuing -- continuing training after you started working at ISP?

A. I can't remember.

Q. Do you remember while you were shadowing doing any sort of emergency response training or drills?

A. I remember doing emergency drills like during count.

Q. Just during count?

A. Yes.

Q. And what type of drills would those be?

A. I can't remember exactly what the drills were, but I remember having drills and being instructed by lieutenants, sergeants, and officers in charge on what to do.

Q. Okay. Do you remember how frequently those drills happened?

A. It happened maybe like -- I don't remember how many times, but it happened multiple times while I was working there.

Page 36

Q. Okay. Would you say less than five? More than five?

A. I'm not sure the exact number, but around that.

Q. Around five?

A. Yes.

MS. PIERCE: Okay. I'm going to pull out two exhibits.

(The document was thereupon marked for identification as Abbassi Exhibit No. 1, as of October 29, 2019.)

BY MS. PIERCE:

Q. So do you recognize this sheet?

A. I think these are the trainings we did on-line.

Q. And did you do these before you started your employment or after?

A. I can't remember if it was before or after, but I do remember doing these.

Q. Just briefly -- let's walk through each one.

What was this first one? "Adult Phase"?

A. I don't remember what each one was about,

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 11 of 76

Page 37

but I remember doing them.

Q. Looking through these briefly, do you remember if any of these deal with any type of emergency response?

A. Yes.

Q. Which one does?

A. I see the first one.

Q. The first one, "Adult Phase"?

A. The fourth one down.

Q. Can you read that one for me, please?

A. "Cardiopulmonary Resuscitation/First Aid." I can't remember what the other ones stand for though.

Q. But the fourth one was the only one you remember being about emergency response?

A. I believe so with the first aid.

MS. PIERCE: Okay. I have a second exhibit.

(The document was thereupon marked for identification as Abbassi Exhibit No. 2, as of October 29, 2019.)

BY MS. PIERCE:

Q. Okay. Can you turn to -- have you ever seen this document before?

A. Is this the IA file?

Page 38

Q. I'm asking you if you know what the document is?

A. I don't think so, but it looks kind of familiar.

Q. It looks familiar, but you're not sure you've seen it before?

A. Yes.

Q. Can you turn to Page 8?

A. (Witness complying.)

Q. The second paragraph from the bottom, do you see it starts with the word "copies"?

A. Yes.

Q. I'll just read those first two sentences. "Copies of all fire drills for the past year and a half were reviewed. Can see no fire drills where any of the staff from BCH participated."

Do you have any reason to dispute that statement?

A. What do they mean by that?

Q. I believe it means that -- so this is a review of what happened regarding the April 7th, 2017, fire.

And so the review says that no one who was in B cell house that night participated in a fire drill over the last year.

Page 39

Do you have any reason to dispute that?

A. I mean, I can't remember a fire drill.

Q. Okay.

A. To be part of --

Q. Do you remember any fire drills happening at ISP while you were there?

A. I do not remember.

Q. Okay. I think we're done with Exhibit 2 for now, but I would hold on to it in case we turn back to it.

Okay. Do you remember any other instruction on fire safety while you were at Indiana State Prison?

A. I just remember where the fire extinguishers were.

Q. And who showed you where the fire extinguishers were?

A. They're in the office hanging.

Q. Okay. What other types of ongoing training or instruction would you get while you were at ISP?

A. Any other training? I do not remember.

Q. Do you remember receiving post orders?

A. Yes.

Page 40

Q. And how would you get the post orders?

A. They're in the office, and we have to read through them before every shift and sign off on them.

Q. Before every shift?

A. Well, I can't remember if it was every shift or once a month, but we had to read through the whole packet and sign it.

Q. And would they change?

A. No.

Q. And so every month you would read through the post orders?

A. Yes. I can't remember how often we read through it, but we had to sign it.

Q. So people would sign off.

Did people ever sign off that they had read through it when they didn't read through it?

A. Not that I know of. I remember watching everybody read it.

Q. Okay. And so you were told before you started at ISP that you had to read the post orders and sign them?

A. Yes.

Q. Okay. Were there any other policies that you were asked to read while you were at ISP?

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 12 of 76

Page 41

A.  Not that I remember.

Q.  Were you ever shown any sort of emergency manual?

A.  I can't remember.

(The document was thereupon marked for identification as Abbassi Exhibit No. 3, as of October 29, 2019.)

BY MS. PIERCE:

Q.  Have you ever seen this document before?

A.  Honestly, I cannot remember.

Q.  Does it look familiar to you?

A.  It looks kind of familiar, but I do not remember.

Q.  Okay.  So you don't recall ever being asked to review this document?

A.  It does look -- it does look familiar. It looks familiar, but I can't really remember.

Q.  What do you remember about being shown documents either similar to this or this document at ISP?

A.  I think we had a fire department there, and I remember we had to read over paperwork that was given by one of the firefighters there.  And we had to sign off on it.

Page 42

Q.  Did that happen one time or multiple times?

A.  I can't remember how many times.

Q.  But you remember it happening one time?

A.  I remember it happening, yes.

Q.  Okay.

A.  So, yeah, I remember that.

Q.  And who -- so you said the fire department.  Is that the prisoner fire department?

A.  Yes.

Q.  So one of the prisoners gave you a document about fire safety?

A.  Yes.

Q.  Do you remember any of the content of that document?

A.  I do not remember, but I remember reading it.

Q.  Do you remember getting any kind of instruction from the fire department?

A.  I remember the -- all of the emergency exits, where the extinguishers were, and we had to memorize -- that's all I remember.

Q.  So you say you remember fire -- you remember emergency exits?

A.  Uh-huh.

Page 43

Q.  Did somebody show you emergency exits?

A.  They were -- we had exits, I believe, in the back of the building.

Q.  And how did you learn about those?

A.  I remember them telling us, the fire department, and we were told in the beginning where all of the exits were.

Q.  By -- during your training?

A.  I believe so.  I don't remember, but I remember learning about that.

Q.  Okay.  Were the emergency exits locked?

A.  Yes.

Q.  So who would have the keys to the emergency exits?

A.  Whoever has the keys on the first floor --

Q.  Okay.

A.  -- usually would have those keys, I believe.  I'm not really sure.

Q.  So just one person has the emergency exit keys?

A.  Yes, I believe so.  I'm not really sure. I've never really been in charge.

Q.  And if the person has the -- during an emergency, does the person with the emergency exit

Page 44

keys have to hold the door open, or can they open the door and then it stays open?

A.  I'm not sure.

Q.  Did you ever get any instruction about what to do with the emergency exit doors during an emergency?

A.  Not that I remember.

Q.  Did you ever get any instruction about what to do with the fire extinguishers?

A.  Yes.

Q.  What was that?

A.  You just knew how to use them and use them when it's needed.

Q.  Okay.  And where were the fire extinguishers?

A.  In the office.

Q.  And when would you need to use a fire extinguisher?

A.  If you see fire.

Q.  Any fire?

A.  Yes.

Q.  Okay.  It doesn't matter how big or how small?

A.  Not that I remember.

Q.  What else would you do when you -- when

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 13 of 76

Page 45

you realized there was a fire?

A.  Call it on the radio immediately for help.

Q.  And who would receive that call on the radio?

A.  The dispatcher and the fire department, I believe.

Q.  Okay.  So you would call on the radio and that would let the dispatchers and the fire department know?

A.  It would let everybody know in the facility.

Q.  And then what would happen once you called it?

A.  The first responders get there really fast.

Q.  Okay.  And then the first responders --

A.  Yes.

Q.  -- what do they do?

A.  They came in to assist where the help was needed.  We had to call them on a radio -- when you call for help, you have to locate where the help was needed.

Q.  Okay.  And what -- what are you supposed to do until the first responders arrive?

Page 46

A.  Try your best to handle the situation before they get there, but they're usually pretty fast.

Q.  Okay.  So what would you do -- what were you trained to do if you noticed a fire while you were waiting for the emergency responders to come or the first responders?

A.  To use the extinguishers.

Q.  Use the extinguishers.
        Anything else?

A.  To make sure everybody is safe.

Q.  And how would you make sure everybody is safe?

A.  I don't remember.

Q.  You don't remember what you were taught?

A.  No.

Q.  So you don't remember any training about how to make sure that people are safe?

A.  No.  Just -- no.  Usually, I would take -- we would take instructions from whoever was like in charge or higher up.

Q.  And were you allowed to act without instruction from somebody higher up?

A.  Yes.  If it was, like, an emergency.

Q.  So if there was an emergency, would you,

Page 47

without instruction, be allowed to let somebody out of their cell?

A.  I don't remember.

Q.  Was it your understanding that you were allowed to let somebody out of their cell during an emergency without instruction?

A.  Yes.

Q.  Okay.  And what was that understanding based on?

A.  I mean, if it's an emergency, you would do everything you can to fix -- to help the situation.

Q.  Okay.  So that includes letting somebody out of their cell?

A.  Yes.

Q.  Was there anything else that you would do in an emergency to keep people safe?

A.  I would just do another security check.

Q.  During an emergency?

A.  I would just -- I would call it on the radio.

Q.  Okay.  So you would call it on the radio.
        Is there anything else that you would do?

A.  Whatever is needed at the situation -- at

Page 48

the moment, I would do.

Q.  Were there any examples where you had an emergency situation besides the April 7th fire where you had to act?

A.  Not that I remember.

Q.  And so once the first responders were called to an emergency, did that relieve you from any obligation to help out to address the emergency?

A.  They usually took over; and then if they instructed us to do anything, we would do it.

Q.  And while you were waiting for them, would you still have an obligation to address an emergency?

A.  What do you mean?

Q.  Would part of your duties require you to address an emergency while you were waiting for the first responders?

A.  Like would we do anything while we were waiting?

Q.  Yes.

A.  Whatever is necessary at the moment.

Q.  Okay.  While you were working at ISP, you said you had a work e-mail?

A.  Yes.  I think everybody was assigned one.

Q.  What did you use that work e-mail for?

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 14 of 76

Page 49

A. I never really used it like that, so probably just if you have any questions about anything.

Q. How often would you check it?

A. I checked it often.

Q. While you were at work?

A. Yes. Only at work.

Q. And where would you check it at work?

A. In the office or on the computer.

Q. So while you were checking your e-mail, who would be taking over your --

A. Oh, no. We don't check it while we're actually working. Like it would be before your shift or after your shift.

Q. Okay. So you would never check your e-mail?

A. During work?

Q. Yes.

A. No.

Q. Were you told that you were not allowed to check your e-mail during work?

A. We didn't have, like, access to computers like that to be able to check them.

Q. So you weren't ever supposed to be going into the counselor's office unless instructed?

Page 50

A. Unless instructed.

Q. And what reasons would you be instructed to go into the counselor's office?

A. To do like our time sheets.

Q. Any other reasons?

A. Not that I remember.

Q. Do you remember going in the counselor's office at any other time other than to do your time sheets?

A. No, just time sheets.

Q. And there was no computer in the officer's station?

A. The only one was -- the camera was on it.

Q. And could you use that computer for anything else?

A. No.

Q. Were the cameras always showing on that computer?

A. I believe so. I'm not really sure how they controlled the cameras.

Q. Did you ever look at the videos on that computer?

A. Yeah. Whenever we're in the office, we would be checking the cameras.

Q. How frequently?

Page 51

A. We would always be looking at them.

Q. Okay. All three of you?

A. Whoever is sitting at the desk, yes.

Q. Okay.

A. And usually that's -- usually whoever is sitting at that desk is the officer in charge or the sergeant.

Q. Okay. And so someone is supposed to be monitoring those if you're in the office?

A. Yes. They're always monitored.

Q. Okay. Did the videos cover all areas of the cell house?

A. Yes. It covers every range.

Q. So you could see every cell on the videos?

A. The camera points down the ranges.

Q. Okay. Did you have a cell phone at work?

A. No.

Q. Were you allowed to bring a cell phone in?

A. No.

Q. What phone -- would you use any phones while you were at work?

A. The only one that we're allowed to use is the one in the office.

Page 52

Q. Which office?

A. In every officer's station, there is a phone.

Q. Okay. And what would you use that phone for?

A. If you need to contact the front desk, the dispatcher, a captain, or anything like that.

Q. Okay. And when would you use a phone versus the radio?

A. When you're turning in count.

Q. I'm sorry?

A. For count time.

Q. You would use the phone for count time?

A. Yeah. When you turn in the counts at the end of every count.

Q. What do you mean by that?

A. After you finish doing count, you just call -- I forgot what station you call -- and you tell them the count for every range.

Q. Okay. And by that, you mean the number of people on the range?

A. Yes.

Q. Would you use the phone for anything else?

A. No. Unless it was, like, work related.

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 15 of 76
SARAH ABBASSI
October 29, 2019

Page 53

Q. Okay. When would you use the radio?

A. If officers are trying to contact each other while they're on different ranges, for an emergency, any signals, yeah.

Q. So you might be on the 500 range and you could radio down to somebody on the 300 range?

A. Yes.

Q. And what would you tell them?

A. Whatever you needed to tell them. Like meet me at this point or anything like that.

Q. Okay. What reason would you need them to meet you somewhere?

A. It could be anything. It could be if they're doing a shakedown in a cell or anything like that.

Q. So you would do a shakedown together?

A. Yes.

Q. Was there a chip system to get the keys?

A. Yes.

Q. Can you explain that to me?

A. When you -- there's a box where the keys are, and we have to give the officer our chips, I think they called it, to set them on each one where -- when you take the key out, you put the chips on there to let them know which officer has which set

Page 54

of keys. It has our name on it.

Q. And do you need to turn that back in to leave?

A. At the end of the shift when we turn the keys back in, they give us our chips back.

Q. Okay. And do you have to turn the chip in to somebody when you leave?

A. I don't remember that.

Q. Okay. When you were working in the cell house, would there be frequent talk on the radios?

A. We could hear everything going on in the whole facility on the radio.

Q. On your radio. Okay.

A. But it wasn't often. It was just when needed.

Q. So how often do you think in an hour would you hear talk on the radio?

A. I would just hear like clear signals for, like, checkpoints or, okay, it's ready for rec for this cell house. Stuff like that.

Q. Okay. Would you ever go a whole hour without hearing anything on the radio?

A. Not at all, no.

Q. So it was fairly frequent?

A. Yes.

Page 55

Q. Did you have to fill out any logs in the cell houses while you were working a shift?

A. The logs were filled out by the officer in charge.

Q. Okay. So would you fill out any paperwork while you were working on the -- in the cell house?

A. No. The officer in charge did the log.

Q. Okay. And is there any other type of paperwork that you were responsible for filling out?

A. No.

Q. Did you ever fill out an incident report?

A. We have incident reports, yes.

Q. How frequently did you fill out incident reports?

A. It wasn't often.

Q. Okay. Would you say once a month?

A. Probably.

Q. Okay. Did you fill out any other types of reports like that?

A. Besides the incident report, no.

Q. Okay. So there was no other paperwork that you would be responsible for?

A. No.

Q. Did you feel like the training you got at

Page 56

ISP was effective?

A. Yes.

Q. Do you feel like you knew how to do your job?

A. Yes.

Q. Were there any areas that you felt like you didn't know how to do your job?

A. No.

MS. PIERCE: Would you like to take five minutes?

(WHEREUPON, a short break was taken.)

MS. PIERCE: Back on the record. I think this is Exhibit 4.

(The document was thereupon marked for identification as Abbassi Exhibit No. 4, as of October 29, 2019.)

BY MS. PIERCE:

Q. Okay. Do you recognize this map?

A. Are these the ranges?

Q. You tell me what you recognize this as?

A. It looks like the cell house.

Q. Okay. So this is B cell house?

A. Yeah.

BARBARA DEVINE, et al vs                    Cause No. 3:18-cv-00995-JD-MGG                    SARAH ABBASSI
RON NEAL, et al.                                                                                                    October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 16 of 76

Page 57

Q. So can you -- can you identify for me where the front entrance -- where you would come in to the cell house?

A. Where it says, "primary exit."

Q. Okay.

A. That's where you enter.

Q. Okay. And so who has a key to that -- can you go ahead and circle that?

A. (Witness complying.)

Q. Oh, you did?

A. Yeah.

Q. Perfect.
Who would have the key?

A. Whoever was in charge would have that key.

Q. Would anybody else?

A. No one unless instructed to.

Q. Okay. So were there any back-up keys to that door?

A. Like anybody else in the cell house or in the prison?

Q. In the prison.

A. I'm not sure who else has it. I just know in the cell house, whoever was in charge had it, unless somebody else was instructed to have it.

Page 58

Q. Would the first responders have a key to that door?

A. I'm not sure.

Q. Were you ever instructed about how to let the first responders in in the case of an emergency?

A. Yes. Whoever has the key should open the door.

Q. For the first responders?

A. Yes.

Q. Okay.

A. Make sure the door is open.

Q. Okay.

A. Yeah. So that once they arrive there, they could get in really fast.

Q. And can you open the door and then go and address the emergency, or do you have to wait at the door?

A. Somebody has to be on the first floor by the door.

Q. Waiting by the door.
And why is that?

A. Just in case nobody leaves the facility for any reason.

Q. Okay. So making sure that everybody stays?

Page 59

A. All of the offenders are in.

Q. But you could leave the door open, and you could --

A. Leave the door open, but somebody should stay on the first floor. They need to stay there.

Q. And when were you instructed about that?

A. How were we instructed?

Q. Sure. How or when?

A. We were told -- that's what we were told to do.

Q. By who?

A. That's just how the rule went, and the officer in charge would tell us to like stay by the door.

Q. So that was something that you were instructed to do in the moment, or was it something that you were trained to do before you started?

A. I believe trained.

Q. You believe you were trained to do that?

A. I believe.

Q. Do you remember the training when you were told to do that?

A. I don't remember, but I know somebody just had to be by that door by the entrance.

Q. Okay. Specifically during an emergency?

Page 60

A. Whenever the door was open, somebody always had to be there.

Q. Okay.

A. Emergency or not.

Q. Okay. Was there any training on who that person should be who stays by the door?

A. Whoever has the front door key.

Q. And that would be the person on the 100 range?

A. Yes. It should be unless instructed to give it to somebody else.

Q. Okay.

A. For any reason.

Q. Okay. And so where is the -- what other exits are in the B cell house?

A. Where it says, "secondary exit" (indicating.)

Q. And who has a key to that door?

A. It should be the officer in charge.

Q. Okay. So he would have both the keys?

A. I believe so. I'm not really sure.

Q. And you say, "the officer in charge." So it's the officer in charge has that key and not the person who has the 100-level keys?

A. Well, usually whoever was in charge had

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 17 of 76

Page 61

the first 100 level.

Q. And why is that?

A. That's just how it worked because they were right there next to the office.

Q. Okay. And so the officer in charge would be responsible for doing something in the office?

A. Usually, the officer in charge had to be in that area on the first floor if they have the keys to that floor.

Q. Sorry. So I think I'm a little confused. Maybe you can clarify.

So does the officer in charge have the 100 keys because he needs to be on the first floor for a certain reason?

A. Yes. Usually, the officer in charge has the keys for that floor, and then the other officers are assigned to the other ranges.

Q. And do you know the reason for that?

A. I'm not really sure.

Q. So you don't why the officer in charge has the 100-level keys?

A. Not exactly. I've never been in charge.

Q. Because you said before that the officer in charge needed to be near the office.

Is there a reason that the officer

Page 62

in charge needs to be near the office?

A. Because they ran all of the paperwork and stuff and everything --

Q. Okay.

A. -- that needed to be done.

Q. Okay. So sort of to facilitate them being able to do paperwork?

A. Everything. They were in charge of the cell house that night.

Q. So what else would that entail? You said doing paperwork?

A. Doing paperwork and making sure all of the work is needed to be done by other officers.

Q. Okay. Did they have any other responsibilities?

A. Not that I know of because I've never been in charge.

Q. Tell me your understanding of it based on being in the cell house generally. I mean, you see what the officer in charge does, right?

A. Yes.

Q. In what way do they make sure the other officers do their job?

A. They made sure we knew who to let out that day for what -- for classes or anything in that

Page 63

area and made sure all of the paperwork was done. That's all I remember.

Q. Have you ever had an officer in charge tell you that you're doing something incorrectly?

A. No, not that I remember.

Q. Had you ever had an officer in charge tell you to do one of his tasks to get it done?

A. Their tasks? No.

Q. Have you ever had an officer in charge tell you to do anything besides letting a prisoner out to go to class or their job?

A. Not that I remember.

Q. Okay.

A. We just made sure all of our security rounds were done, too.

Q. Were you ever told to wait by the first door to let people in the cell house?

A. If I was instructed to do so, yes.

Q. Were you ever instructed to do so?

A. I was once in a while.

Q. Who would tell you to do that?

A. The officer in charge that day. If they needed to stay in the office to do something, they would hand the front door key and say to just watch the front door.

Page 64

Q. Okay. So if the officer in charge had to do something, they would ask you to watch the front door?

A. Yes.

Q. And why would they ask you to watch the front door?

A. For any reason. If people are coming back from rec, from chow, or anything. Somebody always had to be there at the front door.

Q. At the front door?

A. Yes.

Q. Okay. So someone was always waiting by the front door?

A. Yes.

Q. At all times?

A. Any time the door was open, yes.

Q. Okay.

A. Okay. Not always -- not throughout the day when it was locked; but if it was open, yes.

Q. And so at what points would it be open?

A. During chow, during rec, when people are coming back from their classes, or anything like that.

Q. Okay.

A. Their jobs.

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 18 of 76

Page 65

Q. Okay.

A. Letting first responders in -- we'd open the door.

Q. Okay.

A. Yeah.

Q. So who gave you instructions on when and in what circumstances the front door could be opened?

A. Usually, it's whoever's on the radio telling us to let everybody out for rec or chow. It's clear to let that cell house out, and that's when we open the door.

Q. And were you ever in charge of opening the door?

A. If I was told to do so.

Q. Okay. Did you ever have any trainings specifically about when door -- the front door could be opened or closed in a cell house?

A. Only when instructed to do so.

Q. So you did have a training covering when the front door could be opened or closed?

A. Yes. We can't ever open it unless we're told to do so on the radio. And they specifically say the cell house -- which cell house it was okay to open the door and let everybody out.

Q. And when did you get that training?

Page 66

A. During on-the-job training.

Q. During --

A. Like during the job training, you just learn everything.

Q. That was before you started your job or while you were shadowing?

A. That was while shadowing and actually learning the job.

Q. Okay. So while you were shadowing, someone instructed you to only open the door when you were instructed to?

A. Yes.

Q. And at that same time, did -- when were you told that you had to stay by the door at all times?

A. Well, whenever the door was open, somebody always had to be right there.

Q. And how did you know that that was the case? When were you told that?

A. We were told that during -- like during work. We can't ever just -- that was the rule. If it was open, you had to be right there.

Q. And do you remember who told you that?

A. No. I don't remember exactly who told me that. That's just what we did.

Page 67

Q. And was that an official policy?

A. Not really sure.

Q. Not sure. Did everybody follow that rule?

A. Yes.

Q. Okay. Did they explain to you why that was the rule?

A. Just for safety and security reasons.

Q. Okay. Just to control --

A. Yes.

Q. I think you said before to control who could come in and out?

A. Yes.

Q. Okay. Okay. Looking back at Exhibit -- Exhibit 4. So those are the only two entrance and exits to B cell house?

A. That I remember, yes.

Q. Okay. And so do you know which side of the cell house would be Cell 540?

A. It would be on this side by the back -- more towards the middle. Maybe right here (indicating.)

Q. Can you mark 540 about where you think it would be?

A. Probably around like right there

Page 68

(indicating.)

Q. Okay.

A. I'm not really sure exactly.

Q. Okay. So how long would it take you to get from the front door to Cell 540?

A. It was a long walk. You have to go through five flights of stairs, and then it was always towards the back.

Q. So about how long do you think it would take you?

A. A couple minutes maybe.

Q. A couple minutes?

A. Or --

Q. Less than three?

A. Maybe longer than three. It was -- it was a walk.

Q. Do you think -- if you were running and getting there as fast as you could, how long do you think it would take you to get to Cell 540?

A. Maybe -- maybe like five minutes.

Q. Five minutes to run to 540?

A. Yeah. You have to go through five flights of stairs.

Q. Okay. And so can you point out -- can you circle the officer's station for me?

BARBARA DEVINE, et al. vs
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 19 of 76
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

Page 69

A.  Right here (indicating.)
Q.  And so that door is always open?
A.  If somebody is in there, yes, it's open.
Q.  Are there windows that are open?
A.  There was windows -- there's windows throughout the cell house, but they're high up.
Q.  Okay.  Are there windows in the officer's station?
A.  No.  It was like a cage.
Q.  Okay.
A.  So it wasn't really like windows in there.  It was a cage.
Q.  So it was open air?
A.  Yeah.
Q.  So it was just bars?
A.  Yeah, basically.
Q.  So you could hear?
A.  Not exactly like bars, but it was like a cage thing.  So, yes, it's open.
Q.  Okay.  Could you hear everything that was going on in the cell house from there?
A.  You could hear things, but honestly it's really hard to hear things on the highest level.  It's really, really, really hard to hear up there.
Q.  So how are prisoners told they can get

Page 70

your attention if you were -- while they were in their cells?
A.  Usually, they say something while we're doing our security rounds.
Q.  And how are they told to get your attention during an emergency?
A.  Usually, they'll yell.
Q.  And can you hear them if they're yelling?
A.  It depends where they're at.
Q.  So there could be an emergency, and you might not be able to hear it?
A.  Like, for instance, it's easier to hear on the second level than from the fifth.
Q.  Are there areas that you cannot hear somebody yelling from there?
A.  It's just -- I mean, the cell house -- I mean, if you can hear --
Q.  Is there any part of the cell house that you know that you can't hear somebody yelling from there?
A.  You should be able to hear them, but it gets harder to hear the higher up you go.
Q.  But you can hear somebody from any part of the cell house?
A.  Yeah, you should.

Page 71

Q.  Have you heard people yelling from other parts of the cell house?
A.  Like that night or in general?
Q.  Just in general.
A.  It's usually really loud in there.
Q.  Loud in what way?
A.  Everybody is usually talking to each other in there.
Q.  Even at night?
A.  Yeah.  You could hear people talking.
Q.  So there is always people talking.
Do you ever hear people yelling to get your attention?
A.  It was very rare.  Usually, if anything is happening, they let us know during our security rounds.
Q.  Okay.  Have you ever had a prisoner yell to get your attention while you were not doing a security round?
A.  Not that I remember.
Q.  Were you instructed about how prisoners would get your attention during an emergency?
A.  Yeah.  They just let us know.
Q.  But were you -- during your training, were you told how a prisoner was supposed to get your

Page 72

attention if there was an emergency?
A.  Well, if we hear anything from them or were asked for any kind of help from them, we would have to give them the attention immediately.
Q.  And where did you learn that?
A.  During training.
Q.  Okay.  So you were told to respond to any requests for help?
A.  Yes.
Q.  So any time a prisoner was yelling or trying to get your attention --
A.  Help, yes.
Q.  -- you should go?
A.  Yes.
Q.  Okay.  So any sort of commotion or call for your attention, you were required to go and check it out?
A.  Yes.
Q.  Okay.
A.  Yes.  Whoever is on that range needs to go check that.
Q.  Okay.
A.  Whoever is in charge of that range.
Q.  And were you instructed during training about specifically how prisoners were supposed to get

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 20 of 76

Page 73

your attention?

A. Specifically? Well, usually -- whenever -- whenever they -- inmates -- the inmates let us know they need any type of help or anything -- they always just tell us.

Q. So if a prisoner asked you, "How do I get your attention if I feel really sick," what would you tell them?

A. Well, usually we were walking around doing our security check very often and just yell.

Q. Okay.

A. And, hopefully, we can hear it.

Q. And you would tell a prisoner to yell, and you would listen for it?

A. Yeah. If you could hear it.

Q. Okay.

A. But usually that rarely happens. Usually, they tell us during the security rounds.

Q. Right.

A. That's why we do it so often.

Q. But is there any sort of policy for an emergency?

A. Not that I remember. I just know whenever help is needed, we know we need to assist them immediately.

Page 74

Q. So you were trained -- nothing more specific that you remember then -- when there's a -- someone asks for help, we must go and help them?

A. Yes.

Q. That's the level of specificity that you remember?

A. Yes.

Q. Okay. And so you said you should be able to hear yelling from any part of the cell house?

A. Should be. But it's really -- it depends on where you're at in the cell house. It's really hard to hear the higher up you go from the lower station.

Q. Have you ever heard of anybody yelling and somebody not hearing them yell?

A. Not that I know because it rarely happens.

Q. Was there ever any issue about or any discussion about people not being able to hear prisoners ask for help?

A. No. I believe that's why we do the security rounds so often.

Q. Do you remember any concerns being expressed that you couldn't -- that officers couldn't hear certain parts of the cell house?

Page 75

A. No.

Q. Would you -- would it be your responsibility to go check out if you heard a prisoner banging on the cell bars?

A. Yes. If you could hear it. Whoever is in charge in that cell should go check out to see what was going on.

Q. If you heard any sort of disturbance or commotion, would you go and check it out?

A. Yes.

Q. If you heard a person crying, would you go and check it out?

A. Yes.

Q. Is there any point at which you would hear a prisoner calling someone that you would not go and check it out?

A. Oh, no.

Q. On the night of April 7th, do you know how many times previously you had worked in B cell house?

A. Not often, but I've worked there multiple times.

Q. Would you say less than ten?

A. No. Maybe around that or more.

Q. Around 10 -- between 10 and 15?

Page 76

A. Probably. I've worked everywhere in there mostly.

Q. Okay.

A. I never had a permanent spot, so whenever -- I find out where I'm going right before I get there. So --

Q. Is there a reason that they move people around?

A. Wherever help is needed that night, that's where they put the officers.

Q. Okay. Do they move people around for a specific reason, or do they just move them around to cover all of the positions?

A. I'm not really sure how that worked.

Q. Okay. So you didn't know any details about how positions were assigned?

A. No.

Q. Looking back at Exhibit 4, which stairs would you use to go to -- go up the range?

A. The front two by the officer's station.

Q. Would you ever use these back stairs (indicating)?

A. Those stairs were rarely used.

Q. Were those stairs locked?

A. Yes. They were kept locked.

BARBARA DEVINE, et al. vs
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 21 of 76

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

Page 77

Q. Were they locked on each level, or were they locked just at the top and bottom?

A. On each level.

Q. Do you know why they were locked?

A. Not quite sure.

Q. Do you know when they would be unlocked?

A. If we're walking through doing a security round, we would unlock it.

Q. And why would you unlock those for a security round?

A. Just to get through the back stairs to the next floor.

Q. Okay. Were you ever given any instruction about using those stairs?

A. No. I just know we kept them locked at all times when nobody was there.

Q. Were you ever given any instruction about how those stairs should be used in an emergency?

A. Not that I remember.

Q. Were you ever given any instruction about what to do in an emergency in B cell house?

A. Well, if there was an emergency that was, like, needed back there and we were instructed by the responders when they come in to open it, we would open it.

Page 78

Q. And were you told that that was the policy or -- that that specifically was the policy?

A. I'm not sure.

Q. So you were told -- what were your instructions -- what were you told about the first responders?

A. What was I told about the first responders?

Q. Yes. What training did you receive about working with the first responders?

A. They're people that come when we need them -- when we have an emergency and you call for help. They get there within, like, seconds.

Q. Did you ever go through any training with the first responders?

A. Not that I remember.

Q. Were you ever told specifically to call the first responders?

A. Whatever emergency's called on the radio, they just automatically send the help we need.

Q. Did you ever have a situation like the April 7th fire when the first responders came?

A. Not that I remember.

Q. You don't recall ever having the first responders come to a situation that you were involved

Page 79

in?

A. I don't remember.

Q. Okay. So you don't recall any situation in which you worked with the first responders in an emergency?

A. I don't remember.

Q. Okay. So on those -- when I ask if you recall it, just state a yes or no answer.

A. What do you mean by, like, do I recall it?

Q. So if you have any --

A. Like during training?

Q. Thanks for asking that question. That's helpful.

What I'm -- I'm just trying to figure out if you have any memories as you sit here today of these events happening. So if I say, "do you recall," if you have a memory of that happening, then you would say yes. If you have no memory of that ever happening, then you can just say no.

A. Okay. Like the times I do remember the first responders -- if there was any help needed for an inmate --

Q. So you -- do you recall the first responders ever coming to a situation where you had

Page 80

called a signal on the radio?

A. I don't remember calling any other signals.

Q. Okay. Do you remember the first responders ever coming to a station that you were working at?

A. Not that I remember.

Q. Okay. So your -- so your understanding that you're supposed to listen to instructions from the first responders comes from training that you were told to listen to the first responders?

A. Well, if anything was called on the radio, usually they're the first people to get there.

Q. And you were instructed to take instruction from them on what to do?

A. When they come in, they usually take control of the situation.

Q. Okay. So you have control until the first responders come?

A. Yes.

Q. And then when they come, you take instruction from them?

A. Yes. Take instruction from the officer in charge, and then after that, the first responders usually take over the situation.

USDC IN/ND case 3.18-cv-00995-JD     document 212-68     filed 05/25/21     page 22 of 76

Page 81

Q. Okay. And you were told that?

A. Yes.

Q. When were you told that?

A. I don't remember. I just know that's how it worked in there.

Q. So you learned that either through shadowing or during your training before you started work?

A. Not during training. During shadowing.

Q. So you learned during shadowing about the first responders?

A. Yes.

Q. And they instructed you what to do when the first responders took over?

A. They usually just took over. They took over the situation to get as much help as they need.

Q. So I guess what I'm just trying to understand is how you knew that the first responders will come and take over a situation.

What did you -- how did you come to that understanding?

A. Because that was their job during an emergency, and they were called to be there. That's what they're needed there for was extra, additional help.

Page 82

Q. Okay. And so how did you know that was their job?

A. We were just told basically to let them do all of the help -- they -- they're trained to do that. All of the first responders and stuff like that. They're trained to do all of the classes for that team, so we would just let them take control because that's what they do.

Q. Okay. And so I think -- just to clarify a little bit -- so it's -- I'm asking you these questions not to just keep asking the similar question, but I actually want to separate out, you know, the things that you know about what first responders were supposed to do and then how you knew that that's what they were supposed to do to sort of breakdown what you know and the ways in which you were informed.

A. I'm not really sure how we knew. I'm not really sure.

Q. So you just -- that was just the understanding that you had?

A. Yeah. We call an emergency on the radio. They're the first people to get there to help.

Q. Did you see them -- did you see other examples of them responding in the prison?

Page 83

A. Any time help was needed by an officer getting control of a situation, they were there. Any time somebody needed medical help, they were there.

Q. And so did that happen while you were working at ISP?

A. Yeah. It happened while I was working there.

Q. Did it happen frequently?

A. Yeah.

Q. Do you think --

A. Not like all of the time, but it happened.

Q. If you could give like an estimate of how often in a week the first responders were called?

A. I'm not really sure how the other shifts -- how that worked on their shift. So I'm not really sure how many counts on their shifts, but I would say a couple of times throughout the week on our shifts.

Q. So every week you would hear or see the first responders being called to a situation?

A. Yes.

Q. Several times?

A. Uh-huh.

Q. Okay. So did that affect your

Page 84

understanding of what you were supposed to do when the first responders showed up?

A. What do you mean?

Q. Did you learn what was supposed to happen when the first responders arrived based on what happened when they arrived in other situations?

A. Yes.

Q. Okay. Did you talk to other officers about what happened when the first responders arrived?

A. In general or that night?

Q. In general.

A. What do we do in that situation?

Q. Did you ever talk to other officers at any time about the first responders coming to help them with a situation?

A. Well, if anything happens and the first responders were needed, the officers on those ranges try to do their best to control the situation or handle the situation until they get there.

Q. Okay. So similar thing with that point.

How did you know that officers were supposed to do their best until the first responders arrived?

A. Well, the job was to make sure everything

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 23 of 76

Page 85

was safe and in control in the cell house. So we tried our best to make sure everything was in control and safe.

Q. So were you ever given specific instructions about what to do?

A. Well, every situation is different.

Q. Okay. So you weren't -- you don't recall ever being given specific instructions on what to do while you wait for the first responders?

A. No. We just try to control the situation the best we can.

Q. And you knew you should do that just because of your general responsibility to ensure the safety of the prisoners?

A. Yes.

Q. So no special instruction that you should respond to an emergency until the first responders arrive?

A. No.

Q. Okay. I'm going to give you another exhibit.

A. Okay.

Page 86

(The document was thereupon marked for identification as Abbassi Exhibit No. 5, as of October 29, 2019.)

BY MS. PIERCE:

Q. It's a full map of the Indiana State Prison.

Have you ever seen this map before?

A. I've never seen the map. No. I've never seen this map. Not that I remember.

Q. Do you recognize this as Indiana State Prison?

A. Yes.

Q. Can you tell me where B cell house would be?

A. Right here where it says, "12" (indicating.)

Q. Okay. And which -- so what is marked as "24," can you tell me what that is?

A. The custody hall.

Q. And what's in the custody hall?

A. It's -- that's where dispatch is. That's where our master location is. There is some holding cells in there. That's where visitation happened, protective -- PC, protective custody was upstairs in

Page 87

that unit.

Q. Is that where whoever was in charge of that shift would be?

A. Yes.

Q. Which side of that -- where is the shift supervisor's office?

A. I feel like on the left.

Q. Okay. And so would you have to go through the custody hall to get to B cell house?

A. Yes. To get through the -- all of the cell houses, yeah, you have to go through there.

Q. And how many doors are there in the custody hall and B cell house?

A. It's a gate we have to go through on the left or right -- no -- on the left through like another gate. They have to close that one, get through another gate. So it is really one gate, but one of them closes and it opens. And then B cell house is right there next to the door.

Q. Okay.

A. So it's the one right there next to the custody hall (indicating.)

Q. So there is two gates and then the door to B cell house?

A. It's one big gate, but there's -- okay.

Page 88

Maybe it's one gate. I can't remember, but it's one big gate. And then you have to go through that, and then the cell house is right there.

Q. Okay. So to the best of your recollection, there's a gate and then the B cell house door?

A. Yes.

Q. So how long would that take you to get from the custody hall to B cell house?

A. Like 30 seconds.

Q. Okay. And the door that you would go in, looking back at Exhibit 4, is this primary exit door?

A. Yeah.

Q. And that's where you would come in?

A. Yeah. And custody hall is right here (indicating.)

Q. And where does this -- the back door -- where would that let you out?

A. That goes to like Main Street to where the checkpoints are at.

Q. Okay. Is that outside?

A. Yes.

Q. And Main Street, is that like part of the yard? Is that something prisoners have access to?

A. It's just how you get to each cell house.

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 24 of 76

SARAH ABBASSI
October 29, 2019

Page 89

It's outside.

Q. Okay. So would people normally go through that second exit for any reason?

A. No, that's always locked.

Q. So people would normally only use this primary exit?

A. Yes.

Q. What's this building that says, "slab" off to the left of 24?

A. That's what I was trying to figure out. I'm not sure what "slab" means.

Q. Okay. So we talked a little bit about the key -- who has the keys in the cell house.

A. Yes.

Q. What instruction were you given during your training about who has what keys?

A. Well, whoever was in charge assigned us the key. We never got to pick our own ranges.

Q. Do you know what keys the captain would have?

A. I'm not really sure.

Q. Do you know if there is anybody at the facility who has a key to all of the doors at any time?

A. No, I'm not sure.

Page 90

Q. Do you know if there are any emergency back-up keys?

A. I'm not sure.

Q. Were you ever given any instruction about what to do if you needed a back-up set of keys?

A. No.

Q. Okay.

A. Not that I remember.

Q. So you don't remember anyone ever telling you what to do if you needed a back-up set of keys?

A. No, I don't remember.

Q. And you were told if the first responders come, that you need to open the door for them?

A. Yes.

Q. And who told you that?

A. We just -- we open the door before they get here.

Q. And --

A. So when they get there, they go straight in.

Q. And where did you learn that?

A. During, like, the training process.

Q. Okay.

A. We were taught to open the doors for them.

Page 91

Q. So during the shadowing process?

A. Yeah.

Q. Okay. Did that ever happen during the shadowing that you were asked to open the doors for the first responders?

A. No. We never -- I don't remember having keys while shadowing.

Q. Okay. Were there any other emergency groups besides the first responders?

A. I do not remember.

Q. Okay. What types of emergencies were the first responders responsible for responding to?

A. Any situation that an officer needed some help, they would be there.

Q. Okay. Have you ever heard of the E squad?

A. Yes.

Q. And what is the E squad?

A. I don't remember exactly what they did.

Q. Okay.

A. I can't remember.

Q. Do you remember how you learned about the E squad?

A. Yeah. We learned about all of the squads during training. I just -- that was years ago. I

Page 92

don't remember specifically what each did now. I remembered then. I don't remember now.

Q. Do you -- were you ever asked if you wanted to train to be part of any of the emergency squads?

A. No. You just asked. If you wanted to join the team, you could ask.

Q. Did you ever ask about joining the team?

A. No.

Q. Do you remember in what form you were told about the emergency squads? Was it in classroom learning?

A. Yeah. In the classroom, we learned about everything.

Q. Did you ever -- do you ever remember doing any drills with any of the emergency squads?

A. I do not remember -- I remember learning about it in the training, but I don't remember much of the training right now.

Q. Okay.

A. Because that was a while ago.

Q. And that's okay.
Why don't you tell me what you do remember about the training?

A. Well, I just remember learning about what

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 25 of 76

Page 93

each team did.

Q. Okay. Do you remember anything about what the E squad did?

A. I honestly do not remember right now.

Q. Okay. Do you remember anything specific about what the first responders did?

A. They -- well, whenever an officer needed help, they came to help with that situation.

Q. And do you remember any distinctions between the E squad and the first -- first responders?

A. I do not remember.

Q. When you looked at the post orders once a month, I believe you said --

A. I don't know how often it was, but I know for sure we looked at it every month.

Q. Do you remember what type of topics the post orders covered?

A. Right now, honestly, I can't remember.

Q. You don't remember any of the topics that the post orders covered?

A. No, that was years ago. I don't remember.

Q. Okay. Do you -- do you remember about how many post orders you saw?

Page 94

A. There was one in every station.

Q. Were there any post orders specifically about your cell house?

A. Yes. There is -- there is post orders in every station in the prison.

Q. And so they cover specifically what is supposed to happen in that cell house?

A. Yeah. Every station had their own. So you had to look over every single one every time you worked -- every time you worked at a new place, you have to look over the post orders for that section.

Q. And so would each section typically have different post orders?

A. I don't remember if they were different or not. I just know they were at every station.

Q. And I know it was a little while ago, but this is my only chance to talk to you. And this is a serious case, and go ahead and take your time and try to think about your answers and see what you can remember.

A. Okay.

Q. So do you remember in the post orders there being any instructions about the radio?

A. I just know we always had to make sure our radios were working.

Page 95

Q. At the beginning of each shift?

A. Yes. And I always checked it throughout the shift.

Q. Okay. And were you told to check it throughout the shift?

A. Yes. I think -- I think once it starts -- the battery goes low, it starts beeping. I don't really remember, but I believe it starts to beep.

Q. Okay. And were you instructed during your training that you should check your radio at the beginning and throughout the shift?

A. Yes.

Q. Okay. Was that part of the post orders?

A. I'm not really sure. I believe so.

Q. Did other officers check their radios at the beginning and throughout the shift?

A. Yes. We always had to check it in the beginning and in the shift throughout the day.

Q. And how would you check it?

A. Well, I believe when you start hitting it, it starts making a beeping noise.

Q. Okay.

A. But you have to check it because only the beeping happens when you actually try to use it.

Page 96

Q. Okay. So you would try to use it and see if it beeps and that's how you would check it?

A. Yep.

Q. And it would beep if it was working?

A. Yeah. It makes like a noise if it's dead.

Q. Do you remember other than on April 7th -- do you recall any other time when an officer's radio was not working?

A. Do you -- can you repeat that? I'm sorry.

Q. Other than the night of April 7th -- putting that night aside -- do you ever recall any incident when an officer's radio was not working?

A. Not that I remember because -- I didn't have control over someone else's radio. I just made sure mine was always charged.

Q. Did you ever hear about an officer's radio not working?

A. No.

Q. Okay. And how would you charge your radio?

A. In the station, there's different batteries. You can switch them out.

Q. Are there extra radios?

BARBARA DEVINE, et al vs.    Cause No. 3:18-cv-00995-JD-MGG    SARAH ABBASSI
RON NEAL, et al.    October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 26 of 76

Page 97

A.  I don't think so.  Not that I remember.

Q.  How frequently would you change the battery in your radio?

A.  A couple times throughout the shift maybe.

Q.  Okay.  So about how long would the battery last?

A.  I'm not sure how long.  I just made sure to always check mine.

Q.  Okay.  Would you say a few hours?

A.  Longer than a few hours.

Q.  Okay.  So you would change it two to three times during a shift?

A.  Maybe like one, maybe two.

Q.  Okay.  Do you know how many radios were in the officer's station?

A.  I'm not sure exactly specifically.  I don't think there was a specific amount, but we made sure every officer had to have one.

Q.  Okay.  And is everybody on the same channel throughout the whole prison?

A.  That I know of, yes.

Q.  Were you taught that the radio was an important piece of equipment to have?

A.  Yes.

Page 98

Q.  And why was that?

A.  In case of an emergency, we need to call out.  In case we needed help for any reason, that was our safety thing --

Q.  Okay.

A.  -- to carry around.

Q.  So the radio was --

A.  It was really important, yeah.

Q.  So it was for use in an emergency?

A.  Emergencies.  If you needed help, assistance on the range.  You can't get to somebody for help -- that radio is needed for everything.

Q.  Was it ever appropriate for an officer to do anything while on duty without their radio?

A.  No.  They should always have their equipment on them.  They're supposed to.

Q.  If you went to the bathroom, would you take your radio?

A.  Yes.

Q.  Do you ever remember doing anything at the prison without your radio?

A.  No.

Q.  But if you went to go to the bathroom, for example, you said you would leave the keys?

A.  The keys, yes; but the radio stayed on

Page 99

you.

Q.  And is there any other type of equipment you had on you besides your key and your radio?

A.  Handcuffs and pepper spray.  That was it.

Q.  And then the -- was it the baton?

A.  No.  We don't have those.

Q.  What was the thing you used to do the security checks?

A.  Oh, the pipe.

Q.  The pipe?

A.  That one stayed -- that one usually stayed with the person on the ranges.

Q.  Okay.

A.  Unless -- that usually stayed -- I think we had a couple for every station.

Q.  Okay.  So that would stay with you throughout the shift as well?

A.  Yeah.  When you're doing a security round, it has to be with you.

Q.  And if you went to the bathroom, would you take your pipe with you?

A.  It depends.  It really depends.  I think usually they stay on us.

Q.  Do you have any reason --

A.  If I remember.

Page 100

Q.  I'm sorry.

A.  If I remember, I think it stayed on us.

Q.  Do you remember any time when you did not have your pipe on you in a cell house?

A.  Not that I remember.

Q.  Okay.  Do you know of any circumstances when you would not have your pipe on you in a cell house?

A.  No.  I think it usually stayed on us to make sure we get the security checks done.

Q.  Is there any way that you would, you know, register that you were using that specific pipe or mark that you were using that specific pipe?

A.  No.

Q.  Okay.  So when you did the checks, how would it reflect who had used the pipe?

A.  I'm not really sure how that system worked.  I just know we had to use it while doing the security rounds.

Q.  Okay.  And when were you taught to use that during security rounds?

A.  That was part of the policy is to use the pipe during the security checks.

Q.  Okay.  Did you learn that during your training before you started your job or --

BARBARA DEVINE, et al. vs
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 27 of 76
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

Page 101

A. Yes.

Q. Okay. Did you practice using that during your shadowing?

A. Yes.

Q. Okay. Do you know what would happen in the control room?

A. No. No. I don't really know what goes on in the control room.

Q. Do you ever remember getting any instruction about the control room?

A. No. An officer usually worked that. So that would be their job.

Q. Is the control room the same as the dispatch?

A. I can't remember if they called that the control room or if it was a different room.

Q. Where was the dispatcher?

A. In the custody hall.

Q. And what was the -- was that their title? Just dispatcher?

A. That I know of, yes. Dispatch.

Q. And there was just one person working each shift as --

A. Dispatch, yes.

Q. And they were just responsible for giving

Page 102

you your assignments?

A. Yes.

Q. Was there anything else that they were responsible for?

A. Well, they just assigned us to where we needed to work that night.

Q. Okay. And there was nothing else that they were responsible for?

A. Not that I know of.

Q. So who was responsible when you called on the radio? Who was responsible for acting on that call?

A. I'm not really sure who controls that. I just know if anything was needed, to call it on the radio.

Q. So you don't --

A. I believe it probably was dispatch. I'm not sure though.

Q. Okay. So you don't recall getting any instruction about what would happen after you called on the radio?

A. It was either dispatch or control. I think control was a different room. So it was either dispatch or control that we called out to, but I can't remember exactly which one.

Page 103

Q. Okay.

A. At the time I remembered, but now I don't remember.

Q. Okay. So -- but do you recall what you were told generally about what would happen after you made a call on the radio?

A. Well, help would be -- do you mean like in the situation where help is needed?

Q. Yes.

A. Yeah. They would get us the help we needed right away.

Q. Who would do that?

A. Honestly, I can't remember if it was dispatch or the control room.

Q. Okay.

A. I can't remember which one.

Q. And do you know how they would contact people to come and help?

A. I'm not sure on their part.

Q. Okay. So you don't know how the first responders were activated?

A. No.

Q. Do you know how the firemen were activated?

A. I don't know how it was activated, no.

Page 104

Q. Were you ever told any instruction about how to get the first responders or the firemen?

A. Well, it depends on which code you use on the radio for what -- for what help is needed. Whoever was in control of sending the help out would know what the help was needed for depending on which code we used.

Q. Okay. So would everybody hear you calling over the radio? Would that activate them?

A. I'm not sure how the activation worked, but I just know like -- as a correctional officer, you just called out the code that you needed help for. And whatever -- whoever controls that gets the help they needed.

Q. Okay.

A. Gets us the help we need.

Q. Were you on the same radio frequency? Everybody at ISP?

A. I believe so.

Q. Okay.

A. I don't know.

Q. So you were all on ISP. So everybody in the -- at ISP would hear you call it out over the radio?

A. If we called an emergency, yes, everybody

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 28 of 76

Page 105

would hear it.

Q. Okay. So everybody would hear you call an emergency, but then you said somebody controls --

A. I'm not sure who activates the actual help that we need. Somebody is in control of that part.

Q. But --

A. I'm not really sure who.

Q. But there is somebody -- you know there is somebody in charge of getting the help that you need once you call a signal?

A. Yes.

Q. But you don't remember who that is?

A. No.

Q. Do you -- were you ever instructed about who that was?

A. Yes. I just can't remember exactly who it was right now.

Q. Okay. Do you --

A. It was either control or dispatch.

Q. So it wasn't like the shift supervisor?

A. It might have been. I honestly don't know on their end. We just called out what we needed.

Q. Okay.

Page 106

A. And after that, we get the help we need. I don't know who is in control of that.

Q. Okay. So you said that with the firemen, you remember meeting with them and getting some instructions?

A. Uh-huh.

Q. Do you remember -- can you remind me what those instructions were?

A. I remember them showing us where -- just reminding us where the extinguishers were, where all of the exits were, what the code is to call it out for the fire. That's all I can remember right now.

Q. Okay. So did they show you the exits as part of showing you how to evacuate the prisoners or the exits you would use in case of an emergency?

A. The exits we use in case of an emergency.

Q. Okay. So did they go through with you how you would evacuate the prisoners in the case of an emergency?

A. Not that I remember.

Q. Okay. So they showed you where the fire extinguishers were and where the emergency exits were?

A. Yes.

Q. Did they give you any other information?

Page 107

A. Not that I remember. That's all I remember right now.

Q. Okay. Did you ever do any sorts of like practices with them? Practice drills?

A. Not that I remember for that.

Q. How many times do you think you talked to the firemen?

A. Maybe once or twice.

Q. Over that whole period that you were at ISP?

A. Yes.

Q. Were there any firemen in B cell house?

A. I cannot remember the inmates right now at the time.

Q. Were the firemen spread out throughout the prison?

A. I believe so. Everybody lived in different places.

Q. Okay.

A. So, yeah.

Q. Did you ever go to the fire station?

A. Not that I remember.

Q. Do you know where the fire station was?

A. Yes.

Q. Can you mark where it was on Exhibit 5?

Page 108

A. Right here (indicating.) 25.

Q. About how long would it take for you to get from the fire station to B cell house?

A. Like two minutes.

Q. Two minutes?

A. Uh-huh.

Q. If you were running or walking?

A. Probably running. Fast walking. It's really close to it.

Q. Okay. So you could get there in maybe under two minutes?

A. No. Like two minutes.

Q. Okay.

A. Yeah.

Q. Do you know how the fire station was unlocked?

A. No.

Q. Did you ever receive any instruction about unlocking the fire station?

A. No. We're not in control of that. We don't have the keys to that.

Q. Do you know who does?

A. No.

Q. Are there fire alarms in every cell house?

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 29 of 76

Page 109

A. Yes, I think so.

Q. Do you ever remember hearing the fire alarms go off?

A. That night?

Q. Any time while you were at ISP.

A. No.

Q. You don't ever remember hearing the fire alarms going off?

A. Not that I remember, no.

Q. Do you remember hearing them go off on the night of April 7th?

A. I cannot remember.

Q. So you don't remember them going off?

A. I don't remember.

Q. Do you know if all of the fire alarms -- like if the fire alarm goes off in B cell house, do you know if you can hear it in A cell house?

A. I'm not sure because I don't remember it.

Q. Were you ever told about what to do if you heard the fire alarm go off?

A. Well, if we heard it going off? I think the help would be there already, and we would know where all of the exits were.

Q. So my question was a little bit different.

Page 110

Were you ever told what to do if --

A. No. We were just instructed -- we just listened to what they told us to do.

Q. I'm sorry.

A. We just listened to what they tell us to do in any situation.

Q. Who?

A. All -- whoever is in charge that night.

Q. Are you talking about the shift supervisor?

A. Well, whoever is like higher up than the correctional officers or the officer in charge or the sergeant, lieutenant.

Q. Okay.

A. You would listen to their instructions.

Q. So if the fire alarm is going off, you would wait to get instructions from whoever was in charge?

A. Yes, I believe so.

Q. Okay. So you wouldn't start to do any sort of evacuation or --

A. Well, I don't remember any of that.

Q. As your memory is now -- what was your understanding of what you would do if the fire alarm went off?

Page 111

A. Call for help.

Q. You would call for help?

A. And try to control the situation as best as we can.

Q. What do you mean by "control the situation"?

A. Whatever we need to do to control the situation.

Q. So what would you need to do to control the situation if the fire alarm went off?

A. Well, to get the fire extinguisher, locate where it's at, get the officer on that range to pass the keys.

Q. Okay.

A. All that.

Q. Okay.

A. The basic stuff.

Q. Okay. So you would -- if the fire alarm went off, you would try to locate the fire?

A. Yes.

Q. You would get the fire extinguishers, and then you would try to get the keys for wherever the fire was?

A. Everything, yes.

Q. Is there anything else that you would do?

Page 112

A. Well, if we do evacuate, we would have to wait for instruction from somebody higher up to tell us because we can't just let the whole cell house out without instruction.

Q. Okay. So you couldn't start an evacuation without instruction?

A. Yes.

Q. In any circumstances?

A. I believe so.

Q. Would you be able to let a single prisoner out of his cell, or would you have to wait for instructions to do that?

A. I think you could let them out, yeah.

Q. What makes you think that?

A. Well, if it's much needed for the safety of the offender, I would let them out.

Q. Okay. So you could let a single offender out, but you couldn't let multiple offenders out?

A. Unless it's like a really, really emergency, yes.

Q. Okay. So when you say, "a really, really emergency," what do you mean?

A. Well, to evacuate the whole building -- we have to get that cleared from somebody to evacuate a whole building because then they would need extra

BARBARA DEVINE, et al. vs
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 30 of 76
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

Page 113

officers there to help.

Q. Okay. So there's no circumstances you would evacuate the building without instruction?

A. Not that I know of.

Q. Okay. Would you ever evacuate an entire range without instruction?

A. I would ask first.

Q. You would always ask first before you would evacuate a range?

A. Yes. To get the extra help.

Q. Okay. So you would never evacuate a range without instruction?

A. I would ask somebody higher up than me first.

Q. Okay. And what --

A. To get the extra help that I need.

Q. What happened if somebody higher up said, no, you couldn't evacuate?

A. Then I would have to listen.

Q. So you wouldn't go against the orders of somebody higher up?

A. No.

Q. So what was your understanding about when you evacuate -- when you could evacuate a range? Where did you -- sorry. Scratch that.

Page 114

So where did you understand that you had to get instruction before you could evacuate somebody on a range or the entire cell house?

A. Well, I always asked the officer in charge before I did anything.

Q. Okay. Did you ever receive any specific training about when you could evacuate a cell house or part of a cell house?

A. No, not that I remember.

Q. Okay. So all of your understanding about asking somebody higher up is just your general understanding that you should get things cleared?

A. Yes.

Q. Okay. Were there any -- were there any tasks that you could do without getting instruction from someone higher up?

A. No.

Q. Okay. Could you do your security rounds without getting --

A. Well, security rounds, yes. I do it by myself.

Q. Is there anything else that you could do without instruction?

A. Well, when you let them out for like rec and chow or everything, but usually the officer in

Page 115

charge knows who is getting let out for classes and stuff.

Q. So the only things that you could do without instruction are letting people out for scheduled activities and security checks?

A. Yes.

Q. Okay. Would you ever go and respond to an officer -- to a prisoner who was trying to get your attention without asking a higher up?

A. Yes. If we hear anything going on on the range, we would go.

Q. Okay. Were you ever instructed about what to do if a prisoner asked to be let out for not a scheduled activity?

A. We would always have to ask first.

Q. And who would you ask?

A. The officer in charge.

Q. Okay. And were you ever given any instruction about letting prisoners out during an emergency?

A. Not that I remember.

Q. Okay. Were you ever given any instructions about what your responsibilities were during an emergency?

A. To keep everything under control and try

Page 116

to keep everything safe.

Q. And were you ever given any more specific instruction than to keep everybody safe and to keep everybody in control?

A. No. We had to wait for the help to get there.

Q. So they told you you had to wait for the help to get there?

A. From what I remember, yes. Unless it's -- yes. You always have someone else with you, too.

Q. Okay.

A. During an emergency.

Q. What do you mean you always need somebody else with you?

A. Like if there was an emergency going on, you would always ask another officer to come with you to be there because you don't want to be there by yourself.

Q. Was that -- were you instructed to always bring somebody with you in an emergency?

A. Yeah. You always called for somebody to be there.

Q. Were you taught that during your training?

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 31 of 76

Page 117

A. Yeah.

Q. And -- does that include if a prisoner is trying to get your attention, do you need to go with someone else, or could you go yourself?

A. You could go by yourself; but if it is something to do with actually opening the cell for any reason, you would want somebody else with you.

Q. And you were taught that during your training?

A. Yes. If they need to get out when they're not supposed to be out, you need to have somebody else with you to do that. And wait for responders as well.

Q. Okay. If it is an emergency, you would wait for the responders?

A. Well, every situation is different, honestly.

Q. And what instructions were you given about how to address different situations?

A. Every situation was different, but you always needed another officer there with you.

Q. And what instructions were you given about -- you say, "every situation is different."

Were you given instructions to do different things in different situations?

Page 118

A. Not really, no.

Q. You weren't given any instructions about what to do in any emergency situation or other situation where a prisoner needed to be let out of his cell?

A. No. You just -- I always take -- I always let the officer in charge know, and usually they make the decision.

Q. Okay.

A. And wait for the help to get there. Usually, the officer in charge makes the decision.

Q. Okay. So you were told to always go to somebody above you?

A. Yeah.

Q. In any situation?

A. Yes.

Q. Okay. So any situation that wasn't a routine --

A. Yes.

Q. -- scheduled thing, you were always told to go to somebody in charge?

A. Yes.

Q. Were you told that you couldn't act until you went to somebody in charge?

A. Not that I remember. I just know that if

Page 119

everybody -- well, I just know if you're letting somebody out when they're not supposed to be out, you need somebody else there. And usually that's the officer in charge there telling -- letting you know, okay, it's okay to do this and that.

Q. Okay.

A. But when you -- at the same time, the responders are already on the way.

Q. Okay. And when were you told that?

A. I don't remember when. We're just not supposed to let people out that are not supposed to be out unless we're told to do so.

Q. So is there any situation where you would let somebody out of their cell without checking with the supervisor?

A. I would let the officer in charge know -- I would let the officer in charge know and let him make that decision.

Q. Okay. But you would never in any situation let somebody out of the cell without checking with someone above you?

A. No. Because somebody would have to be there with you.

Q. Okay. So you would never ever let somebody out of the cell if there was nobody there

Page 120

with you?

A. When they're not supposed to be out, no.

Q. Okay. And you understood that from your training?

A. Yes.

Q. Okay. Did they ever tell you that there were any exceptions to that rule?

A. Not that I remember.

Q. You don't recall them telling you there were any exceptions to that rule?

A. No. I just always went to the officer in charge for anything.

Q. Were fires pretty common at ISP?

A. No. It wasn't that common.

Q. How frequently do you think there were fires?

A. Rarely.

Q. Can you give me a guess about how many in a month maybe?

A. Sometimes -- like none. It was rare.

Q. So you think maybe one every three months?

A. Maybe even longer than that.

Q. One every six months?

A. Probably.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 32 of 76

Page 121

Q.  Okay.  Did you usually hear about it if there was a fire?

A.  Not that I remember because there was like four different shifts.

Q.  Okay.  So you don't remember hearing about any fire besides the fire on April 7th?

A.  Not that I remember.

Q.  Do you ever remember being told about what might cause a fire at the -- at the prison?

A.  No.

Q.  So you don't remember ever getting any kind of instruction of what things to look for that might be a fire hazard?

A.  Well, if you see anything electrical -- not that I remember.

Q.  Okay.  What do you mean by "if you see anything electrical"?

A.  If there is any contraband that's not supposed to be there.

Q.  Like what?

A.  I don't know.  They usually make up -- make things themselves with contraband.  So if you find anything that's not supposed to be there, you're supposed to take it away.

Q.  So if you see any contraband that the

Page 122

prisoners have, you're supposed to take it away?

A.  You're supposed to take it away and write it up, yes.

Q.  Okay.  But they're allowed to have some electrical equipment, correct?

A.  I believe so.  I think they have TVs and stuff in there.

Q.  Okay.

A.  Yeah.

Q.  So they have TVs.

Do they have other things like fans?

A.  I think so.

Q.  So what sort of things would you be on the lookout for that they weren't allowed to have?

A.  Any type of contraband like cell phone chargers or anything like that that's not supposed to be there.

Q.  Okay.  Were there any sorts of things specifically related to fire or fire hazards that you were supposed to keep an eye out for?

A.  Not that I remember.

Q.  So you were never given any instruction that you recall to look out for items that might be a fire hazard?

A.  No.

Page 123

Q.  Okay.  Do you recall any incidents where there were fires while you were at ISP?

A.  Not while I was working that I know of.

Q.  You don't remember any fires happening while you were there?

A.  No.

Q.  Do you remember there being any -- scratch that.

Were there any maintenance issues at ISP?

A.  Not that I know of.

Q.  You didn't hear about any maintenance requests?

A.  What do you mean by that?

Q.  Do you remember in your -- in any of the areas where you were working any maintenance requests being made by you or any of the other officers?

A.  Not that I know of.

Q.  If a prisoner had a maintenance request that they needed taken care of, what would they do?

A.  There was a lot of paperwork that we had at the station that we could give to each offender to put requests in.

Q.  Okay.

A.  So I can't remember if that was one --

Page 124

one of the requests.

Q.  Okay.  But the request for a maintenance problem wouldn't go through you?

A.  No.

Q.  Okay.  Do you remember there being any electrical problems at ISP?

A.  No.

MS. PIERCE: Do you guys want to take a break?

THE WITNESS: Sure.

(WHEREUPON, a short break was taken.)

BY MS. PIERCE:

Q.  Do you have any independent memory as you sit here today of the April 7th, 2017, fire?

A.  I'll try my best to remember what I can.

Q.  So do you have any recollection as you sit here today?

A.  Yeah.  I have some memories here and there.

Q.  Okay.  So why don't you tell me what you remember starting at the beginning right before the fire?

A.  Okay.  So I remember sitting in the office and -- in the counselor's office doing the

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 33 of 76

Page 125

time sheet -- I think they called it the A4 -- with Officer Blakely.

MR. ROTHENBERG: Speak up a little bit.

BY THE WITNESS:

A. So I remember sitting in the counselor's office doing the A4 with Officer Blakely.

BY MS. PIERCE:

Q. Okay.

A. We're in there for not that long. Maybe five minutes. And that's when we started hearing Officer Rodriguez yelling our names from -- I'm not sure where he was at. Somewhere up there on the range. Somewhere. I'm not sure where. Yelling our names. So I ran up there looking for him.

So I got maybe like half way up the flights of stairs, maybe more. I was still looking for him, but I heard a call 10-71 on the radio. I believe that was the code for it for the fire. So I called it on the radio, but I continued to look for Officer Rodriguez because I couldn't locate him.

And then when I finally located him, he was on the 500 floor. So I proceeded to -- to walk down the range a little bit, and then I realized what was going on. And that's when I started running back towards the front of the range trying to get

Page 126

the -- yelling for Officer Blakely for the keys because she was assigned to that range. So she was the only one with those keys.

So I started -- like while I was running down -- back to go grab the keys or to get her because she had the keys, responders were already up the stairs. And I guess -- I guess she said she handed the keys to one of the lieutenants. So they already had the key. So as I was yelling for the keys, the responders were already up the stairs with the keys and everything -- fire extinguishers and everything.

So when I realized what was happening, I was running back down the range yelling for the keys. And I was running to go grab the fire extinguisher.

Q. Okay.

A. But as I was running down the stairs to -- to get everything, the responders were already running up the stairs. So it happened really fast. That's what I could remember.

Q. What else do you remember after?

A. All of the first responders were already there. The fire department was there. Everything happened super fast.

Page 127

Q. And what --

A. From what I remember.

Q. What else do you remember after the first responders and the fire department came?

A. Then we waited for somebody to tell us when to evacuate the building.

Q. Okay. And what else do you remember?

A. I remember there was multiple officers in there helping us evacuate and letting all of the offenders out, I believe, from both sides of the exits, from what I could remember.

Q. Do you remember anything else?

A. No. It happened so fast.

Q. Do you remember anything about what you did after the first responders came up?

A. I proceeded to evacuate the building with the other officers. So I was in control of -- that night I was -- I had the second and the third range. I was assigned -- Rodriguez was assigned to the first range. The flag, they called it. I was assigned to the second and third range, and Officer Blakely was assigned to the fourth and fifth range.

So I proceeded to evacuate the people on the second and the third range, from what I remember.

Page 128

Q. And by "evacuate," what do you mean? What did you do?

A. Letting everybody out because I had the keys to those ranges. I waited until I was told to do so.

Q. What else do you remember from the 500 range that night?

A. That's all I remember. When I was looking for Rodriguez and realized what was going on, I ran back down the range to go -- yelling for the keys and to grab the fire extinguisher, but help was already up -- I couldn't even get -- not barely down the stairs when help -- like I was running down the stairs and help was going up the stairs. And the keys were already going up the stairs, too, with them. The lieutenant is who I believe she said she gave it to.

Q. Do you remember anything else that you experienced that night?

A. No. Because first responders and the fire department were already there doing their job.

Q. Do you remember anything else about what they did? What you saw in the 500 range?

A. I wasn't on the 500 range that long. Only when I realized what was happening and was

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 34 of 76

Page 129

running to grab Officer Blakely because that was her range and she had the keys to that range. So I was barely on the range.

I ran back to -- yelling for the keys and to go downstairs -- I was trying to go downstairs to grab a fire extinguisher, but everybody was already up the stairs with all of the fire extinguishers. That's all I remember.

Q. Do you remember ever seeing Joshua in his cell?

A. No.

Q. Do you ever remember seeing the fire?

A. I just -- when I walked down the range and realized what was happening is when I saw some flashes of like fire, and I think Rodriguez was over there. That's when I ran back to go grab the officer in charge of that range and to go grab a fire extinguisher, but help was there so fast.

Q. Okay. So you never saw Joshua that night?

A. No, I didn't.

Q. Did you ever see the fire itself?

A. I didn't see the actual, like -- like I seen flames; but when I seen it, it wasn't that big. Like I seen -- like some flames, that's when I

Page 130

realized what was going on. And I couldn't even get down there -- all of the way down there, and I realized what was going on. I hurried up quickly and turned around to go grab the officer and to go down to get the fire extinguisher, but help was already there on the way up.

Q. What happened after you evacuated the cells?

A. We let all of the offenders out of the cell house. We let everybody out into like the checkpoint areas.

Q. And then what happened?

A. Well, I remember they broke one of the checkpoints out there.

Q. Did you talk with anybody after?

A. No. The only person I talked to is when IA came.

Q. And who did you talk to from IA?

A. I believe his name was Dustin.

Q. Did you talk to any of the other officers?

A. Not that I remember. Like having conversations after? Is that what you mean?

Q. Yes. Like did you have any conversations after the fire was put out with any of the other

Page 131

officers?

A. I remember we had -- I think we had one meeting and that was it after with everybody.

Q. When was the meeting?

A. I don't remember when the meeting was, but I remember we had a meeting and we talked about what happened.

Q. Was it like the same day, or was it several days later?

A. No. It was way after. I can't remember when.

Q. So like weeks after?

A. Probably.

Q. And where was the meeting?

A. At ISP.

Q. And who was in the meeting?

A. Captains, lieutenants, sergeants.

Q. Okay.

A. Yeah.

Q. Did you talk at the meeting?

A. No.

Q. Did anybody ask you any questions at the meeting?

A. No.

Q. Who talked at the meeting?

Page 132

A. I can't remember his name.

Q. Somebody from ISP?

A. Yes.

Q. Somebody higher up?

A. Yes.

Q. Is it the warden?

A. I can't remember who.

Q. Was it somebody that you knew?

A. I don't think so.

Q. And what happened at the meeting?

A. They just talked about everything.

Q. They talked --

A. They didn't ask anybody questions. They just sat and like was -- like a meeting thing.

Q. It was about --

A. And I was there.

Q. I'm sorry. That was my fault.

You -- so you were there, and they were talking about what happened the night of the fire?

A. I can't remember exactly what he was talking about during the meeting.

Q. Why don't you tell me everything you remember about the meeting?

A. Basically, they just went over everything

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 35 of 76
SARAH ABBASSI
October 29, 2019

Page 133

that happened, I think.

Q. Can you tell me what specifically they went over?

A. I don't exactly remember everything we talked over. I don't remember.

Q. Do you remember anything?

A. No.

Q. Do you know what the purpose of the meeting was?

A. No.

Q. Do you know what was decided -- was anything decided at the meeting?

A. No.

Q. Did you go over a timeline of what happened at the meeting?

A. Not really.

Q. So in what ways did you talk about what happened the night of the fire?

A. I really don't even remember what was talked about in the meeting, honestly.

Q. So it didn't have any impression on you, the meeting, to talk about the fire?

A. No. I wasn't asked any questions or anything.

Q. Was -- was Officer Blakely at the

Page 134

meeting?

A. I don't remember if she was there or not.

Q. Was Officer Rodriguez at the meeting?

A. I'm not sure who was there.

Q. So you don't remember anybody who was there?

A. Specific names? No, I don't remember.

Q. Okay. And you don't remember -- so only one person talked at the meeting?

A. From what I remember.

Q. And you don't remember who that person was?

A. No.

MS. PIERCE: I think we're on Exhibit 6.

THE REPORTER: Yes.

(The document was thereupon marked for identification as Abbassi Exhibit No. 6, as of October 29, 2019.)

BY MS. PIERCE:

Q. Have you ever seen this paper before?

A. No.

Q. Do you know what this is?

A. No.

Q. What does the title say?

Page 135

A. "After Action Review."

Q. What's the date?

A. April 24, 2017.

Q. Were you in attendance?

A. Yes. Oh, is this the meeting?

Q. Is this -- that's what I was wondering.

A. Can I look over it?

Q. Yes, take your time.

A. (Witness complying.) Yes. I remember this is the meeting, I think.

Q. Okay. So what -- do you have any recollection -- excuse me. Scratch that.

Does that refresh your recollection about what happened at the meeting?

A. Yeah, a little bit.

Q. So what do you remember happened at the meeting?

A. I do remember the video now.

Q. So what video did they show?

A. Of the fire.

Q. Was it like surveillance video or --

A. I think it was like the cameras that were pointed, like, on that range that day.

Q. Was there --

A. That was recording.

Page 136

Q. Was there any sound on the video?

A. No, I don't think so. I don't remember sound.

Q. Were you able to see yourself or Officer Blakely or Officer Rodriguez in the video?

A. Honestly, from what I remember, the video was really hard to see.

Q. Do you remember -- so you don't remember?

A. I don't remember seeing much. It was just hard to see anything on that camera.

Q. Do you recall being able to see the fire?

A. I don't remember seeing like the whole fire. Just like how it shows a flash of light.

Q. Okay. And do you remember seeing any of the officers -- yourself or any of the other officers on the video?

A. Not that I remember.

Q. Do you remember Lieutenant Watson speaking at the meeting?

A. I remember he was there, but I honestly don't remember who was speaking or any of that.

Q. Do you know who Mr. Curry is?

A. No, I don't remember who that is.

Q. Do you remember any of the other first responders discussing what they did?

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 36 of 76

Page 137

A. I honestly don't remember much from that meeting that day. I remember seeing the video, and I remember somebody speaking.

Q. Okay.

A. But I don't remember -- I don't remember everything that was discussed. That's why I'm reading through it. I think they just pretty much talked about that night.

Q. But you were not asked to say anything about what happened?

A. No.

Q. It says at the bottom that Mr. Curry asked what we can learn from this, and somebody apparently says better communication is key to any emergency. Do you know who said that or why?

A. I have no idea.

Q. Do you remember that being said?

A. No. I don't really recall what was said because that happened two years ago.

Q. Do you recall it being said that they need to make sure you know who's in charge of first responders?

A. No, I don't remember that.

Q. Do you remember anyone saying they needed to work on fire drills and plan of action for staff?

Page 138

A. No, I don't recall. I really don't remember who said what or what was said at the meeting.

Q. Did this meeting strike you as an important event?

A. Yes. It was an important event.

Q. Why?

A. Because it was -- because of the situation that happened was a tragic one.

Q. And so do you think attention needed to be paid to what happened?

A. What do you mean?

Q. Do you think it was important to have a meeting afterwards to discuss what happened?

A. Yeah.

Q. Do you think it was important to participate in that meeting about what happened?

A. I honestly -- participation? No. I wasn't asked anything at the meeting. So --

Q. Did the meeting have an impact on you?

A. Well, I think the meeting was needed after a situation like that.

Q. And did -- aside from that, did the meeting have an impact on you?

A. Yes.

Page 139

Q. In what way?

A. At the time, it just helped to talk about -- you know, just to hear about everything.

Q. Helped in what way?

A. Like at the time, what we learned from this and the -- just the discussions from everybody helped at the time after something tragic like that happened.

Q. Helped --

A. Even though we didn't -- like I didn't say anything or anything, but having a group meeting with everybody was helpful.

Q. Helpful in what way?

A. I don't know.

Q. Okay.

A. Because we never had a meeting really besides this.

Q. About --

A. Discussing anything, you know.

Q. You mean about the fire or specifically?

A. Like just the situation in general.

Q. About this situation with the fire, you didn't have any other meetings about it?

A. Not that I remember. Besides when I got interviewed.

Page 140

Q. By Dustin?

A. Yes.

Q. So why was it important to have a meeting with everybody about what happened?

A. I feel like everybody was affected by that situation.

Q. Okay. So to deal with the effect that it had on staff members, it was important?

A. Yes.

Q. Was it important for any other reason?

A. Well, yeah. It's important to like know -- to learn from everything -- to discuss everything. I don't remember the things being said, but it was helpful at the time.

Q. So it was helpful in what way?

A. Like what we learned from this part. That's helpful.

Q. Helpful how?

A. Just in future situations.

Q. It's helpful --

A. Just to learn.

Q. And what do you --

A. About the situation.

Q. What do you do with what you learned from the situation?

BARBARA DEVINE, et al. vs
RON NEAL, et al.
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 37 of 76
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

Page 141

A. Just to use it in the future.

Q. So it's helpful to learn from the situation, but you don't remember anything that was learned from the situation?

A. No. I'm just reading over what was discussed here, and it was helpful at the time.

Q. It was helpful at the time?

A. Uh-huh.

Q. In what way?

A. Well, it would be helpful at the time because it would help with future -- if anything happens in the future, you know exactly what to do.

Q. So what was learned from this event that could be used to change things in the future?

A. Like I'm reading over -- it says, "better communication, plan of action for staff" -- things like that.

Q. So you don't remember anything beyond reading what's here? You don't have any recollection of what was learned from this event that could be helpful going forward?

A. No. I don't remember because it happened over two years ago.

Q. Okay. But you said it's helpful and important to learn --

Page 142

A. Now that I'm looking over it, yes.

Q. Okay. Make sure you wait until I finish my question.

A. Okay.

Q. I'll try to do the same.

A. Sorry.

Q. No, it's okay.

Just to go over this again. You said it is helpful and important to learn from the event, but you don't have any recollection of what was learned from this event?

A. No. Just reading over it, it brings some things back here and there. But, no, I don't really remember.

Q. Okay. So do you know what they're talking about when they say that better communication is key to any emergency?

A. It's always better -- it's always good to have good communication; but, honestly, I feel like all of the officers did the best they can that night.

Q. So if you could go back now, is there anything that you would do differently that night?

A. There's nothing I would do differently. I did the best I can. As soon as I seen what was happening, I ran to go get the keys -- well, get the

Page 143

officer with the keys to get -- you know, help was -- we were, like, on the same time. It happened so fast, but -- I don't think I would do anything different. I did the best I can.

Q. So you wouldn't change anything that you did that night?

A. No. I honestly did the best I can.

Q. Would you change anything that anybody else did that night?

A. No. I feel like everybody did the best they can.

Q. So you wouldn't change anything that Officer Rodriguez did?

A. I feel like he did the best he can.

Q. Would you change anything about what Officer Blakely did?

A. Probably be on the range with the keys.

Q. You would have her be on the range with the keys?

A. (Witness nods.)

Q. Why?

A. Because she had control of the keys. Nobody else did.

Q. So you would have had her go up to the range immediately?

Page 144

A. Yes. That's why I was running to go get her.

Q. And why -- why didn't she come up to the range with you?

A. I'm not sure why.

Q. Did you ever --

A. She said she gave her keys to one of the lieutenants. That's why the lieutenant and all of the responders were already going up the stairs.

Q. Do you know why she didn't go up immediately upon Officer Rodriguez calling for you guys?

A. No.

Q. Did you ever talk with her about that afterwards?

A. No.

Q. Did anybody ever ask you that afterwards?

A. Not that I remember.

Q. So the only thing you would do differently -- you would have somebody else do differently is you would have Officer Blakely go directly to the 500 range when Officer Rodriguez called?

A. Yes. But nobody knew where the situation happened until we found where Officer Rodriguez was.

BARBARA DEVINE, et al. vs                Cause No. 3:18-cv-00995-JD-MGG                SARAH ABBASSI
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 38 of 76
RON NEAL, et al.                                                                                October 29, 2019

Page 145

Q. So do you still think -- are you saying she should have gone regardless?

A. Well, I don't think she would have known it was on her range until we found Rodriguez on that range.

Q. So what should happen if you don't know where a problem is? Should everybody go?

A. Well, my first reaction was to go find the officer to see what was going on and to see why he's yelling for help from me and her.

Q. And why was that your first reaction? Was that taught to you, or was that --

A. If an officer was yelling for -- our names, I immediately think he is in danger or something, so I go to help him.

Q. Were you ever taught during any training what to do if there's an emergency system where you're being called and you don't know where the problem is?

A. Well, you're supposed to ask on the radio where you're at -- where help is, but I don't remember that being called. So I went looking for him myself.

Q. Is there anything about the policies or practices that you would change at ISP if you could

Page 146

go back?

A. A policy I would change?

Q. Yes.

A. Maybe having extinguishers everywhere than just in the office.

Q. Anything else?

A. That's all I can think of right now.

Q. And why would you have fire extinguishers everywhere?

A. In case something like that happens, it's right there instead of having to run five flights of stairs to grab one.

Q. Is there anything else you would change about the key policies?

A. Yes, that, too. Every officer should have a key for every range in case -- just in case.

Q. Did you ever make that suggestion?

A. No.

Q. Did that ever get brought up as a suggestion?

A. Not that I know of.

Q. Did that get discussed in the after incident review?

A. Not that I remember.

Q. Do you know what was meant by "make sure

Page 147

you know who is in charge of first responders"?

A. No. No. That's probably something the first responders would discuss among them.

Q. Was this discussed at the meeting if it's on here?

A. Well, if it's on here, yes; but I don't remember it.

Q. Do you remember it being discussed that there should be more fire drills and plan of action?

A. I mean, yeah, it was discussed; but I don't remember.

Q. You don't have any recollection of that discussion?

A. No. I don't recall much of that meeting because it happened so long ago.

Q. Do you think that on the night of April 7th all of the officers and first responders who came to B cell house acted in compliance with all of the policies and practices at ISP?

A. Yes.

Q. Do you think any policies were violated?

A. No.

Q. Do you think -- would you change anything that the first responders did that night?

A. No. I feel like everybody really did

Page 148

their best.

Q. Do you know if there was any other documentation that was made of the after action review?

A. No.

Q. And you said you've never seen this document before?

A. No, I don't recall it.

Q. Okay. So on that night of the fire, you said you were doing -- I think you said A4 paperwork?

A. A4, yeah.

Q. And why were you doing your A4 paperwork?

A. Because we were instructed by the lieutenant to turn it in.

Q. And why was he instructing you to turn it in?

A. Because it needed to be turned in.

Q. Was it overdue?

A. I don't believe it was overdue. I believe it was just due at the time.

Q. Okay. So -- so how -- how were you instructed to do your A4 paperwork?

A. He told us to go in there and do it.

Q. Who did?

A. The lieutenant.

USDC IN/ND case 3:18-cv-00995-JD     document 212-68     filed 05/25/21     page 39 of 76

Page 149

Q. Which lieutenant?

A. I believe it was Watson.

Q. Okay. And when did you talk to him?

A. Right before we did the A4s.

Q. Did he come to the B cell house? Did he call you?

A. I can't remember if he called or if he came. I can't remember, but I know we were instructed to finish it.

Q. Okay. And so when he instructed you to finish it, did he tell you where to go finish it?

A. Yes. The counselor's office.

Q. So did you go straight to the counselor's office to finish it?

A. Yes.

Q. What did you do when you went into the counselor's office?

A. Turned on the computer and got on the A4 to do it.

Q. And you were with Promise Blakely?

A. Yes.

Q. You both did at the same time?

A. I believe so. We should have done it at the same time. We were in the office at the same time.

Page 150

Q. Are there multiple computers in the office?

A. Yes.

Q. So did you have to log-on?

A. Yeah.

Q. You logged on. And then about how long did it take you to do your paperwork?

A. Not long. Like five minutes.

Q. Was there any concern raised about leaving Officer Rodriguez to watch the whole cell house why you both did your paperwork?

A. Well, no. Because the counselor's office -- he was in the office -- he was in the officer's office. We were in the counselor's office, but our door was open. So if something happened, we were right there.

Q. Your door --

A. The door was left over.

Q. The door of the counselor's office was left open?

A. Yes. So it's wide open.

Q. Okay.

A. Yes.

Q. So you could hear anything that's happening outside?

Page 151

A. Uh-huh.

Q. So there was no concern raised about doing your paperwork at the same time?

A. No. We were instructed to do it, so we did it.

Q. Okay. So your understanding is you were supposed to do it at the same time?

A. Yes.

Q. And so did you finish your A4 before you heard Officer Rodriguez calling your name?

A. I believe I just finished it when I started hearing the name, and I ran out of the office.

Q. Okay. You had just finished it?

A. I believe so.

Q. Okay. Did Officer Blakely run out of the officer with you?

A. I think, yeah.

Q. Okay. So Officer Rodriguez was calling both of your names?

A. Yeah. But he was up somewhere where we couldn't see him.

Q. Okay.

A. So I ran to go find him.

Q. Did you hear any of the prisoners in the

Page 152

B cell house yelling at that time?

A. No.

Q. There was no yelling when you left the --

A. I didn't hear any. I heard just Rodriguez yelling.

Q. Okay. All you heard --

A. From the bottom floor, yeah.

Q. Okay.

A. I just heard Rodriguez.

Q. Did you at some point hear the prisoners start yelling?

A. When I got on that range, yeah.

Q. Which range?

A. The 500 when I finally located Rodriguez.

Q. So you didn't hear any yelling until you got to the 500 range?

A. No.

Q. Did you see -- see or smell any smoke when you left the counselor's office?

A. No. You can't smell or see anything from there.

Q. At some point, did the prisoners start yelling loudly?

A. Yeah.

Q. About how long after you ran out of the

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 40 of 76

Page 153

counselor's office did they start yelling loudly?

A. When I located Rodriguez is when I started hearing everybody on that floor.

Q. Okay. But did you hear the whole cell house start yelling at any point?

A. Eventually. Not in that moment.

Q. About how much later was it that the whole cell house started yelling?

A. Not long after.

Q. So if the officer -- if the prisoners weren't yelling at that time, how did Officer Rodriguez know --

A. I didn't hear -- sorry. I didn't hear any yelling or anything. Usually, the cell house is always loud.

Q. Even at night? In the evening?

A. Yeah. It will still be loud. You'll hear people yelling all of the time back and forth. So that was normal. But I didn't really hear the yelling, commotion until I went up there myself and seen what was going on. That's when I ran to get Blakely because she was in charge of that range and went to go grab the fire extinguishers.

Q. Okay.

A. But the first responders and everybody

Page 154

were already going up the stairs as I was running down the stairs. So that's how fast it was.

Q. So I know earlier you had said that you should go -- any time you hear an offender or a prisoner yelling for help you should go and see?

A. For help, yes.

Q. So how do you differentiate between when somebody is yelling for help or when they're just yelling?

A. Well, you hear all types of noises in there. People singing, talking back and forth to each other. So that's how you -- if you hear someone yelling help --

Q. If you hear -- sorry.

A. If you hear somebody yelling, like, help and stuff like that, that's different.

Q. So if you just hear somebody yelling and you can't tell for what reason they're yelling, do you go to check on them?

A. If they're yelling, yes.

Q. Okay. If they're just talking, you don't go to help them?

A. People always talk amongst each other there.

Q. Okay.

Page 155

A. It's really loud.

Q. But there's a difference between yelling and talking?

A. Yes.

Q. Okay. And you didn't hear anybody yelling until you got to the 500 range?

A. Yes. Until I started running up the stairs and I started -- when I located Rodriguez and seen everything was going on.

Q. Okay. Did you call the 10-71 before you got to the 500 range?

A. Yeah, I did. That's why the responders got there so fast, but I still hadn't seen Rodriguez. So I just heard -- while I was running up the stairs -- I couldn't locate where he was -- but I heard 10-71. So I called it right away before I even seen anything.

Q. Okay. So you immediately called 10-71 on hearing that?

A. Yes. As soon as I heard that code, I called it in.

Q. Did you hear anything that the prisoners were yelling?

A. Like specific things?

Q. Yes.

Page 156

A. No.

Q. So you cant --

A. Specific, no. Just yelling.

Q. Okay. Did you hear any of the prisoners banging on the bars of their cells?

A. I don't believe banging.

Q. Okay. So you called the 10-71. You ran up to the 500 range.

A. I called the 10-71. I still didn't know where it was, so I was looking for Officer Rodriguez.

Q. Okay.

A. And that's where I found him.

Q. Okay. So tell me about what you did. You started running up. Did you run around each cell, or did you run straight up until you could hear him?

A. I was looking down every range until I found where he was at.

Q. Okay. Were you yelling his name while you did that?

A. I don't remember. I don't remember.

Q. Did you have --

A. Sorry. I just remember running looking for him.

Q. So you would run up, look on the range,

BARBARA DEVINE, et al. vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 41 of 76

Page 157

and then keep going up?

A. Uh-huh. On every floor. There was five.

Q. Did he yell at all about what range he was on?

A. No. I couldn't hear a range.

Q. Was he saying things generally, or did he only yell 10-71?

A. All I heard was 10-71 and our names.

Q. Okay. So you didn't hear him yelling anything else?

A. Uh-uh. No.

Q. When you got up to the 500 range, you saw him on that range?

A. Uh-huh. Yes.

Q. And what was he doing?

A. I seen him standing over there. I walked down a little because I didn't realize what was going on. So I was going towards him to see, but then I seen the flashing light. And that's when I realized he was already up there. So I thought everything was like -- I thought he knew what was going on already, but I don't think he even realized -- I don't know.

I don't know what he was doing, but I just remember he was standing there. When I realized what I was seeing, that's when I was looking

Page 158

for Blakely and ran for the fire extinguisher.

Q. So he was just standing there when you saw him on the 500 range?

A. When I seen him? Yeah. I just seen him -- seen a flash of light, and I ran for Blakely right away and the fire extinguisher. I didn't stand there for too long.

Q. Did he run downstairs at all?

A. I'm not really sure. I just remember me running.

Q. Okay. And so you saw the flash of light, and you ran to go get the fire extinguishers and Blakely?

A. Blakely.

Q. Where was Blakely?

A. I'm not sure where she was at. While I was running down the stairs to get everything, the responders were already running up the stairs. And they said they had the keys already from her.

Q. At what point did you pass them?

A. Maybe I ran down one or two flights of stairs, and they were already going up the stairs. Like we ran into each other in the middle.

Q. Around like 2- or 300?

A. Yeah. Like I was running down, and they

Page 159

were running up. So we ran into each other in the middle, and they said they already had the keys.

Q. And did you keep running downstairs, or did you run back up with them?

A. I listened to their instructions. I can't remember what I was told to do.

Q. So they gave you instructions?

A. Yes. Because we eventually had to evacuate the building.

Q. And do you remember -- you don't remember what their instructions were?

A. I remember while I was down the stairs there was responders going up -- no, I don't remember.

Q. Okay. So just to clarify. You pass them on the stairs. You were going down?

A. Yeah.

Q. They stopped and gave you instructions?

A. I don't think they stopped. I think they just -- I really don't remember what they told us.

Q. Did you follow them back up?

A. No. I don't think so because I don't remember seeing anything that happened on that floor.

Q. Okay.

A. After running down.

Page 160

Q. So you don't remember going back up with them?

A. No, I didn't. After that, I stayed on two and three to evacuate.

Q. Did they tell you to evacuate at that time?

A. Not right away.

Q. Okay. Do you remember who told you to evacuate?

A. No.

Q. Okay. And you evacuated all of the cells on 2- and 300?

A. Yes. There were other officers there helping with the evacuation, too, from other buildings. They called other officers.

Q. So did see Promise again after the first responders arrived?

A. Yeah. We all seen each other again.

Q. Where?

A. While we were in the cell house until everything was safe; and then after that, we all had to go to the custody hall after everything was situated.

Q. Did you talk to Promise at all after you heard Rodriguez yelling your name before you went

USDC IN/ND case 3:18-cv-00995-JD document 212-68 filed 05/25/21 page 42 of 76

Page 161

upstairs?

A. Not that I remember. I remember just him yelling our name and to go see if he's okay.

Q. Did you think she was running upstairs with you?

A. Yes, I did.

Q. So you were surprised that she wasn't running upstairs with you?

A. Yes.

Q. So did you have your keys when you were running upstairs?

A. Yes.

Q. And did you think that Promise was bringing her keys?

A. Yeah.

Q. And why did you think that?

A. Because the keys stayed on us.

Q. Okay. And why did you think she was running upstairs?

A. Because we both ran out of the counselor's office when we heard him screaming our names. So I just booked it up the stairs, and I thought she was running behind me.

Q. Do you know who let the first responders in?

Page 162

A. No, I don't.

Q. But Officer Rodriguez would have had the key to open the cell house door, right?

A. Yeah.

Q. Okay. So if Officer Rodriguez had the key, do you know how the door was unlocked?

A. No.

Q. Did you ever talk to Promise about why she didn't come up with you?

A. I just know she passed the keys to one of the lieutenants.

Q. The 400 and 500 range keys?

A. Yes.

Q. Do you know which lieutenants came?

A. I remember -- I think Watson. I remember -- there were a lot of people there. I think Redden. Maybe Fritter. I can't remember everybody, but those are the faces I kind of remember.

Q. Okay. Did the -- when did the firemen arrive? After the first responders?

A. I don't remember if they came in at the same time or if somebody came first. I don't remember. I just know the responders were -- as I was coming down to get help, they were already going

Page 163

up the stairs. After that everything was just -- the fire department was there. Everybody was there.

Q. Okay. So did you see anybody else running up to the 500 level?

A. The responders and the fire department.

Q. Okay.

A. That was it.

Q. Do you know where Officer Rodriguez was?

A. No.

Q. Do you know where Promise was?

A. No, I can't remember.

Q. Can you look back at the report of investigation. I think it's Exhibit 2.

A. (Witness complying.)

Q. So if you -- at the first line of the narrative there, it says that a 10-71 was called at approximately 9:45; is that right?

A. Right here (indicating)?

Q. Yes.

A. Yeah.

Q. And you called that 10-71?

A. Yes.

Q. Did anybody else call a 10-71?

A. Not that I know of.

Page 164

Q. Okay. So it says -- if you go down, there is a timeline that's pulled from the video. Do you see where I'm talking about?

A. Right here (indicating)?

Q. Yes.

A. Yes.

Q. Okay. So it says there was a large flash of light in the cell at 9:34?

A. Okay.

Q. And then a flash of light that appears to be a flame at 9:35?

A. Okay.

Q. So it looks like then that the fire started at least at the very latest by 9:34?

A. What was that?

Q. So it looks like the fire started at the very latest by 9:34?

A. I'm not sure when, but that's what it says. So, yes.

Q. So you didn't hear any yelling in the almost 11 minutes from when the -- when you called the 10-71?

A. I don't recall yelling until I got up closer up there.

Q. Okay. So you don't recall any yelling

BARBARA DEVINE, et al. vs
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 43 of 76

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

Page 165

until you got to the 500 level after you had already called the 10-71?

A. I don't recall yelling.

Q. The first yelling you remember is after the 10-71?

A. Well, I called the 10-71 and kept looking for Officer Rodriguez. And as I got up higher and higher, I started to hear yelling.

Q. Okay. So you didn't hear any yelling until you got up to the 500 level?

A. Until I got higher up, yeah. I couldn't hear nothing from the first or second floor or nothing like that.

Q. Okay. So you didn't hear any yelling until you reached that after --

A. Until I got up higher. That's when I started hearing everything going on.

Q. Okay. And it says that the first responders arrived at 9:46. Do you have any reason to dispute that?

A. No.

Q. Okay. And it looks like the firefighters arrived sometime around 9:57. Do you have any reason to dispute that?

A. No. Because I'm not really sure of the

Page 166

time on everything.

Q. Okay. I'm going to get another exhibit.

A. Okay.

(The document was thereupon marked for identification as Abbassi Exhibit No. 7, as of October 29, 2019.)

BY MS. PIERCE:

Q. Have you ever seen this document before?

A. No. No.

Q. Do you recognize what this -- what type of document this is?

A. Is it the incident report?

Q. And can you tell who made this incident report?

A. No.

Q. At the top, it says the reporting employee is Captain Jeremy Dykstra.

Does that mean he's the one that wrote the report?

A. I'm guessing. I'm not sure because I didn't write this.

Q. So go ahead and read through the incident report.

A. Okay.

Page 167

Q. So you can just start with the first one -- if you read the first one.

A. (Witness complying.) Okay.

Q. It says, again, at 9:45 you called a 10-71?

A. Yeah.

Q. And it says that Captain Dykstra looked at the camera and could see fire coming from a cell in the 500 range.

Is that consistent with your experience? That you could see fire at that point?

A. Like when I got up there?

Q. Yes.

A. I seen like a flash of light.

Q. It says here that -- on the fourth line down, that Lieutenant Redden activated the ISP fire department. Do you believe that that's correct?

A. I'm not sure who activated them, and I'm not sure exactly what time it was at.

Q. Go ahead and turn to your statement, which, I think, is on the eighth page.

A. (Witness complying.)

Q. Do you see your statement there?

A. Yeah. Yeah.

Q. Is that consistent with what you

Page 168

remember?

A. Yes. But -- where it says I called the signal and ran up the stairs -- when I say -- remember? I ran up of the stairs and I heard the 10-71, and that's when I called it and continued to look for him.

Q. So you were already running up the stairs when you called the 10-71?

A. Yes.

Q. Otherwise, this is accurate to the best of your memory?

A. Yes.

Q. When you ran back downstairs, did you ever get a fire extinguisher?

A. I ran down the stairs to go grab it, but I remember -- I don't remember who passed me one, and I passed it to one of the first responders --

Q. So you --

A. -- as they were running up the stairs. I don't know who passed it to me though.

Q. Okay. All right. So you said as you were down, someone gave you a fire extinguish or --

A. As they were running up -- no. I remember somebody just passing it to me to give it to a first responder.

BARBARA DEVINE, et al, vs     Cause No. 3:18-cv-00995-JD-MGG                    SARAH ABBASSI
RON NEAL, et al.                                                              October 29, 2019
USDC IN/ND case 3.18-cv-00995-JD   document 212-68   filed 05/25/21   page 44 of 76

Page 169

Q. And when was that?

A. As we were going down and up.

Q. So you were going down and the first responders were coming up?

A. Uh-huh.

Q. And one of the first responders passed you --

A. I'm not sure who passed it to me to pass it to them.

Q. Okay.

A. Because that was my whole point of running down the stairs was to grab it, but somebody -- everybody was already running up the stairs. So somebody passed me one to pass it to one of the first responders as they were running up.

Q. Okay. So did you run back up with the fire extinguisher?

A. No. I passed it to the first responder.

Q. Okay. So who else was running up the stairs besides the first responders?

A. I'm not sure. It was a bunch of people running up the stairs at that point.

Q. And you don't recall who any of them were?

A. No. Lieutenants. I don't remember. It

Page 170

was just like the first responder team, and I don't remember who else. It was a bunch of people at that point.

Q. Okay. Because if we look back at defendant's -- Captain Dykstra's report, it says that Lieutenant Redden was there. Does it say that anybody else was there?

A. On the first page?

Q. Yes.

A. It doesn't say, but there was a bunch of people in there.

Q. Okay.

A. Because the first responders is not just one person. It is like a team of them.

Q. Do you know how many first responders there are?

A. I don't remember how many. I just remember there was a whole bunch of people in that building running up to get help.

Q. Okay. If I represent to you there were four first responders, would that sound right?

A. It seemed like there was more people, but I don't remember.

Page 171

(The document was thereupon marked for identification as Abbassi Exhibit No. 8, as of October 29, 2019.)

BY MS. PIERCE:

Q. Do you remember what this is?

A. No.

Q. Does this look like a scheduling sheet?

A. Yes. But I don't think I've ever seen this before.

Q. If you turn to Page 5, the date on the top says, "April 7th, 2017," correct?

A. The last page?

Q. Page 5. Second to last page.

A. Okay.

Q. Do you see where I'm reading the date there at the top, right-hand corner?

A. Yes.

Q. So it says, "April 7, 2017," correct?

A. Yes.

Q. And then if you go down maybe about in the middle of the page on the left-hand side, it says who is in the B cell house?

A. Yes.

Q. And that's listed as Rodriguez, you, and

Page 172

Blakely, correct?

A. Yes.

Q. So this is probably the roster sheet for the night of the fire, correct?

A. Yeah.

Q. So if you go down to the bottom, left-hand corner, do you see where it says, "quick response"?

A. Yeah.

Q. Is that the first responder team?

A. I believe so.

Q. So are you familiar with Lieutenant Watson?

A. Yes.

Q. Are you familiar with Lieutenant Redden?

A. Yes.

Q. Are you familiar with Lieutenant Puetzer?

A. Yes.

Q. Are you familiar with -- was Statham an officer, or was he a sergeant at the time?

A. I can't remember.

Q. Were you familiar with Officer Statham?

A. Yes.

Q. So those four were the first responders that night?

A. Okay.

BARBARA DEVINE, et al. vs
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 45 of 76

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

Page 173

Q. Is that correct?

A. Oh, I believe so, yeah.

Q. Do you remember seeing any of them the night of the fire?

A. I remember Redden -- yeah, they were all there.

Q. Did any of them hand you the fire extinguisher?

A. I honestly can't remember who because someone took it from me. One of the responders took it from me.

Q. Okay.

A. I don't remember.

Q. So an unknown person handed you a fire extinguisher --

A. I really don't remember who passed it to me, and then somebody else took it from me.

Q. Okay. So you never went back up to 500 level?

A. No. The responders were there.

Q. And was the fire extinguisher that you were passed, was that one of the ones from the B cell house or was that from another location?

A. I'm not sure where it came from.

Q. Did you ever go down to see if there were

Page 174

more fire extinguishers downstairs?

A. They were all used.

Q. You know that they were all used?

A. I didn't see any more.

Q. Did you go down to look if there were more?

A. When I went down there, I didn't see if there was any more.

Q. When did you go down?

A. Eventually we all went down.

Q. After the fire was put out or before?

A. When we ran down the stairs.

Q. When you ran down the stairs when?

A. After I started running down to get help.

Q. So -- so this is after you ran up to the 500 level, saw Rodriguez, and you ran all of the way back down to the first floor?

A. Well, in the middle is when I ran in to everybody, and that's when somebody passed me one and I passed it -- somebody grabbed it from me.

Q. Okay. Did you -- so my question is a little bit different.

Did you ever go all the way back down to the first level after --

A. Eventually. But I don't remember when I

Page 175

did.

Q. But was that while the fire was still going on, or was it after the fire?

A. I don't remember because eventually we had to evacuate our range. My range was the second and the third.

Q. Did you go back down to the first level before you evacuated the ranges?

A. I don't remember.

Q. You don't remember what happened after you saw the first responders?

A. No, I don't remember.

Q. Is there a reason that your report here that we looked at doesn't say anything about what happened after you saw the first responders?

A. Which one?

Q. So the report -- I think it's Exhibit 7, Page 8.

A. Like my statement?

Q. Yes.

A. I just wrote everything at the time what happened.

Q. So if you wrote everything at the time that happened, does that mean you didn't do anything after the first responders arrived?

Page 176

A. No. They took over the situation on Blakely's range. After that I waited for them to let us know when to evacuate the building.

Q. So you don't recall doing anything except waiting after the first responders arrived?

A. Yes. Because they took over the situation, and the fire department got there.

Q. So you waited either on the 200, 300 level or on the 100 level?

A. Yeah. I don't remember where I waited.

Q. Okay. And you don't -- you did not go and look for additional fire extinguishers then?

A. Well, I passed them the one.

Q. The one?

A. Yeah.

Q. And you didn't go downstairs to look for any additional fire extinguishers?

A. Well, they were all gone. There was two in the office. They were gone.

Q. And you knew they were gone?

A. Yes. Because when I seen it, it was gone, and I know that's the one they used. And then I know the fire department came, too.

Q. When did you see that they were gone?

A. Whenever I got back to the first floor

BARBARA DEVINE, et al. vs    Cause No. 3:18-cv-00995-JD-MGG    SARAH ABBASSI
RON NEAL, et al.                                                October 29, 2019
USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 46 of 76

Page 177

and I seen they were gone.

Q. Okay. But you never went to go look to see if they were there?

A. No. Because I already passed them the fire extinguisher.

Q. Okay. But those fire extinguishers could have been from another area, correct?

A. They could have been, but I believe they were the cell house ones because those ones were used already.

Q. And how do you know they were used already?

A. Because they were gone.

Q. Later when you went down there, you realized they were gone?

A. Yeah. Because I passed one up.

Q. But, like you said, that could have been a fire extinguisher from another department?

A. It could have been because I ran down to go grab one, but they were already up the stairs with fire -- the fire extinguishers and help was already on the way.

Q. Okay. So you let the help take over, and you didn't do any -- take any additional action after the first responders arrived?

Page 178

A. When the first responders arrived, they take over.

Q. Okay. And you didn't get any instructions from them to help in any other way?

A. No. They take over completely.

Q. And you didn't take any of your own action to do anything else to address the emergency?

A. I did the best I can. I didn't have the keys to the range, and I already passed them a fire extinguisher.

Q. Okay. That's not exactly what my question was.

I'm just wondering if you did anything additional to assist with the emergency?

A. No. I was just being told by the higher-ups to -- to wait.

Q. Okay. Let's look at Promise's statement. She's the next one after yours.

A. (Witness complying.)

Q. Go ahead and read that one.

A. (Witness complying.)

Q. Okay. It says that Promise ran to go open the gate for the first responders.

Do you agree with that? Is that what happened?

Page 179

A. I have no idea because I was already up the stairs looking for Rodriguez.

Q. But it's your understanding that Rodriguez would have had the keys to open the front gate, correct?

A. Yes.

Q. Okay. So is there any reason that Promise would have went to open the front gate if she didn't have the keys?

A. I have no idea.

Q. Look at Officer Rodriguez's statement. It's the page just before yours.

A. (Witness complying.)

Q. Go ahead and take a minute to read that statement.

A. (Witness complying.)

Q. Okay. Does it surprise you that his radio was not working?

A. Yes.

Q. Why does it surprise you?

A. Because they should be working at all times.

Q. Should he have checked to make sure his radio was working?

A. Yes.

Page 180

Q. Should he have known his radio wasn't working?

A. If he checked it, yes.

Q. Do you know if there was ever any inquiry as to why his radio wasn't working?

A. I'm not really sure.

Q. Do you know if there was ever any finding about what happened with his radio?

A. No.

Q. Do you know for a fact that he had his radio with him?

A. No, I don't know.

Q. If you had been Officer Rodriguez, would you have grabbed the keys before you ran up?

A. Yes.

Q. From everybody?

A. I probably wouldn't grab the keys from everybody. I probably would actually --

MR. ROTHENBERG: I'm going to object. It's kind of speculation.

BY MS. PIERCE:

Q. You can answer.

THE WITNESS: Do I have to answer that?

MR. ROTHENBERG: Yes, you have to.

BY THE WITNESS:

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 47 of 76

Page 181

A. Well, if I was Rodriguez -- I don't know. I probably would either -- I probably would bring all of the officers with me instead of taking everybody's keys.

BY MS. PIERCE:

Q. So you would have made sure the officers --

A. Everybody was with me. We all go look for the situation together.

Q. Okay. And why would you have done that?

A. Because if you're not -- if you don't know where it's coming from, it's better to have everybody there, and plus you always have to have a back-up person with you. So if you don't know where anything is coming from, bring everybody.

Q. Okay. Do you know if anyone ever unlocked Joshua Devine's cell?

A. I'm not sure. Whoever had the keys.

Q. Okay. So you think somebody tried to unlock it, but you don't know?

A. Well, whoever had the keys had to have unlocked it.

Q. But you don't know? You never heard one way or another whether someone tried to unlock his cell?

Page 182

A. They eventually unlocked it once the first responders -- because when they ran up the stairs with the keys, they went to unlock it.

Q. Okay. But you didn't see anybody unlock the cell?

A. No. After that -- after the responders came, I didn't go back to the fifth floor.

Q. Okay. At any point during this, did you hear the fire alarm going off?

A. I honestly don't remember.

Q. Was it -- did it ever at any point become very loud in the cell house?

A. Yes.

Q. About when was that that it became very loud?

A. When the first responders came.

Q. And in what way was it loud?

A. Yelling, shouting from everywhere. There was a lot of people -- there is a lot of people in that cell house.

Q. When you were doing the evacuation, was there a lot of smoke?

A. Yeah. There was smoke.

Q. Did you have any trouble breathing?

A. No.

Page 183

Q. Did you have any trouble breathing after the event?

A. No.

Q. Did you help remove Joshua Devine from the cell house?

A. No.

Q. Do you know who did?

A. No. I don't know who did that part.

Q. Okay.

A. Because after the first responders came, they took the -- control of the whole situation.

Q. Okay. Do you feel like your training was adequate for you to respond to that situation?

A. What do you mean?

Q. Do you feel like the training that you were given at ISP was sufficient to allow you to respond appropriately to the situation? To the emergency situation?

A. Yeah.

Q. Do you feel like there were any addition -- any additional things that you should have been trained on that would have helped you better respond to the emergency?

A. No. I feel like we did try our best with everything.

Page 184

Q. That's a little bit of a different answer than what I was asking. So it's not about the efforts that you guys made.

Do you feel like there was additional training you needed to help you respond effectively to the emergency like the fire on April 7th?

A. Maybe more fire drills.

Q. More fire drills.

Anything else?

A. Not that I can think of.

Q. Now, were there any additional trainings that were done regarding fires or emergencies generally after the April 7th fire?

A. Not that I remember.

Q. Were there any statements that were put out by the warden or anybody else at ISP after the fire?

A. Like what kind of statement?

Q. Any statements to the prisoners about what happened? Any statements made to staff about what happened?

A. Not that I remember.

Q. Do you remember whether there was any investigation that was undertaken into the night of

BARBARA DEVINE, et al. vs                    Cause No. 3:18-cv-00995-JD-MGG                              SARAH ABBASSI
RON NEAL, et al.                                                                                                              October 29, 2019

USDC IN/ND case 3.18-cv-00995-JD    document 212-68    filed 05/25/21    page 48 of 76

Page 185

the fire?

A. Any investigation by who?

Q. By anyone.

A. I'm not really sure about investigations because we had no part in that.

Q. Were you interviewed as part of any investigation?

A. Yeah. We were interviewed. But that's all I remember is the interviews.

Q. You don't remember any other aspects of the investigation?

A. No. The only thing I remember is the interview by Dustin.

Q. And, again, there was no additional training or instruction that was given to you about fires or fire policy after the April 7th fire?

A. There probably was. I just really don't remember right now.

Q. Do you recall any extra instruction that was given about fire response or emergency response after the April 7th fire? It's just a yes or no.

A. No.

Q. Do you recall any additional training or instruction about key control after the April 7th event?

Page 186

A. Not that I remember.

(The document was thereupon marked for identification as Abbassi Exhibit No. 9, as of October 29, 2019.)

BY MS. PIERCE:

Q. Have you ever seen this document before?

A. Post orders.

Q. Which post orders specifically?

A. It says, "B cell house."

Q. And what's the date on those post orders?

A. It says, "April 1st, 2015."

Q. So were these the post orders that were in effect on April 7th, 2017?

A. I'm not really sure if it's this specific one.

Q. Okay. But you don't have any reason to think these were different from the ones that were in effect?

A. I don't have a reason to not.

Q. Can you turn to Page 2?

A. (Witness complying.)

Q. We're looking at Section 5(a.) So what is this section about?

A. It's basically the security checks that

Page 187

were supposed to be made.

Q. And if you look at the second paragraph in Section A, there's a Guard One Wand System installed in the housing units.

Is that system the --

A. The pipe I was talking about.

Q. Okay. The next sentence says, "There are several sensors in each unit, and each sensor must be touched with a wand at least every 30 minutes."

A. Yes.

Q. So does that mean you need to do a security check every 30 minutes?

A. That's the security check I was talking about every 30 minutes and -- with the wand. We have to hit them. It's throughout the whole range going down.

Q. So what happens if they go -- if you go more than 30 minutes without any security check?

A. I'm not really sure what happens. We just always make sure to do them.

Q. Do you know if anyone gets disciplined if they don't do a security check every 30 minutes?

A. I don't know. I never got disciplined for that.

Q. But you said before it's important to do

Page 188

them every 30 minutes in case there is a problem, right?

A. Yes.

(The document was thereupon marked for identification as Abbassi Exhibit No. 10, as of October 29, 2019.)

BY MS. PIERCE:

Q. Have you ever seen this report before?

A. No.

Q. So this is the report we were given that shows the wand -- the pipe checks?

A. Okay.

Q. So if you look at Page 10.

A. Okay.

Q. It looks like -- sorry. Let's go to Page 11.

A. (Witness complying.)

Q. So it looks like there were -- the pipes were touched on the 500 middle at 8:45; is that right?

A. Yeah. That's what it says.

Q. And the 500 rear at 8:46?

A. Okay.

Q. The 500 front at 9:04.

BARBARA DEVINE, et al. vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD document 212-68 filed 05/25/21 page 49 of 76

Page 189

A. Okay.

Q. And then the 500 rear at 9:05; is that right?

A. Yeah.

Q. So when should the next -- do you see any 500 checks that were done that day after that?

A. After?

Q. Yes.

A. No. Because that's when the whole thing happened.

Q. Okay.

A. And we evacuated everybody. So, no, there was none.

Q. But at the --

A. Sorry. The officers that were in there eventually ended up going to custody hall, so we ended up not even finishing work in that cell house that day.

Q. Okay. So if they were supposed to happen at least every 30 minutes, shouldn't the next check have started around 9:30, 9:35?

A. Well, they have to be finished within the 30-minute period.

Q. Okay.

A. Like from 9:00 to 9:30, one should be

Page 190

done. From 9:30 to 10:00, one should be done.

Q. Okay. So you could do one at 9:00 and then not again until 9:45?

A. Yeah.

Q. Okay. So it's just in that 30-minute period they have to be done?

A. Yes.

Q. Okay. So it's not every 30 minutes?

A. Yeah. It's within that. It's from 9:00 to 9:300 and from 9:30 to 10:00.

(The document was thereupon marked for identification as Abbassi Exhibit No. 11, as of October 29, 2019.)

BY MS. PIERCE:

Q. Do you recognize this document?

A. Yes.

Q. What is this document?

A. The interrogatories.

Q. Go ahead and take a look through your interrogatories.

A. (Witness complying.) Okay.

Q. Without going into any conversation you had with counsel, did someone help you prepare these interrogatories?

Page 191

A. No.

Q. No one helped you prepare them?

A. Besides the person who -- what do you mean by someone helped me?

Q. Did you talk with counsel about preparing them, or did you have anybody else at IDOC help you answer them?

A. No. I just answered the questions.

Q. So did counsel give you any instructions about how to answer the interrogatories?

A. Not that I remember.

Q. So how did you get the interrogatories?

A. I was sent the questions, and I was told to answer them.

Q. And then you just sent them back to counsel?

A. Yes.

Q. After having looked through these, is there anything that you would like to correct or anything that you think has been left out in your interrogatories?

A. For No. 7 -- No. 7, that's when the first responders took over the situation.

Q. Oh, what is --

A. For No. 7.

Page 192

Q. So you were prevented from doing anything further because the first responders took over the situation?

A. Yeah.

Q. Okay. So by training or by policy, you were not supposed to do anything after the first responders took over?

A. There was nothing else I could do on my part because I was not in charge of the range. I didn't have the keys. The fire extinguishers were already given to them, and they took over the situation. So other than that, I did the best I can.

Q. Was there anything -- did policy say that when the first responders arrived, you were not allowed to do anything else except what they instructed you to do?

A. I'm not sure that's what it says in the policy, but that's how it happened.

Q. Is that what you learned in training?

A. Yeah.

Q. Okay. In training, you were told not -- when the first responders arrived, not to do anything unless instructed to do so?

A. Yes, from what I remember.

Q. Is that something you were told in

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 50 of 76

Page 193

training, or is that something that you thought was the right thing to do?

A. I believe that's what we were taught.

Q. In training?

A. I believe so.

Q. No. 8 -- No. 3, you have no felony convictions.

Have you had any misdemeanor convictions?

A. No.

Q. Okay. And on this last page here, the second copy, I guess Page 8, is that your signature?

A. Where at? Oh, yeah, that's my signature.

Q. Okay. Do you recall officer -- Prisoner Joshua Devine?

A. Do I recall -- sorry. Can you repeat that?

Q. Do you recall Joshua Devine? Did you know him?

A. No.

Q. Had you ever spoken with him before?

A. No.

Q. Had you ever heard anybody refer to him as Spider?

A. No.

Page 194

Q. Is it common for you not to know the prisoners on the ranges in the cell house you're assigned to?

A. Well, you don't know everybody, but the more you work there, you start to know them. And usually if I worked there, I was on either the second or third floor.

Q. Okay.

A. I don't know everybody.

Q. Did you ever talk to any of the prisoners about the fire after the fire happened?

A. No.

Q. Did any of them ever discuss it with you after the fire happened?

A. No.

Q. Were you ever assigned to B cell house again?

A. No. I don't remember being assigned there after.

Q. Okay. You don't recall at any time that you were in B cell house after the fire?

A. After? I don't remember after.

Q. Do you know what was -- if any work was done to the Cell 540 after the fire?

A. I have no idea.

Page 195

Q. Can you turn to Exhibit 2?

A. (Witness complying.)

Q. Not Exhibit 2. Can you turn to Page 6?

A. This page (indicating)?

Q. Yes. Do you recognize the person there?

A. No.

Q. Do you ever recall seeing him before at the prison?

A. Before? No, I don't recognize --

Q. But this is Joshua Devine?

A. Yes. From the pictures I've seen after.

Q. Have you heard anything at the prison about what type of person Joshua Devine was?

A. No.

Q. Have you heard any of the other prisoners talk about him?

A. No.

Q. Have you heard any of the other staff talk about him?

A. No.

Q. Do you have any knowledge of any disciplinary actions he might have received?

A. No.

Q. Do you have any personal knowledge about any of his -- about his time at ISP?

Page 196

A. No.

Q. Have you ever met Barbara Devine?

A. No.

Q. Do you know who Barbara Devine is?

A. No.

Q. Have you ever met Crystal Devine?

A. No.

Q. Do you know who Crystal Devine is?

A. No.

Q. Do you know Ron Neal?

A. No.

Q. Do you know who the warden is at ISP?

A. What was the one before that?

Q. Ron Neal.

A. Oh, Ron Neal, yes.

Q. Who is Ron Neal?

A. Was he the warden? I think -- superintendent?

Q. Yes. He's the warden.

A. Yeah.

Q. Did you ever interact with him?

A. No.

Q. Did you know Kenneth Gann?

A. What was the name?

Q. Kenneth Gann.

USDC IN/ND  case 3:18-cv-00995-JD  document 212-68  filed 05/25/21  page 51 of 76

Page 197

A. I don't remember.
Q. What about William Wesner?
A. The last name sounds familiar.
Q. Christopher Beal?
A. Yeah.
Q. Who is Christopher Beal?
A. I forgot his title there.
Q. But he works at ISP?
A. Yes.
Q. Do you know what he does there?
A. No, I don't remember.
Q. In what way do you know him?
A. From ISP.
Q. And what interactions have you had with him at ISP?
A. I don't remember interactions.
Q. You just seen him around and know his name?
A. Yes.
Q. Do you know Steven Griffin?
A. The name sounds familiar, but I don't recall their titles or where they worked or anything.
Q. Do you know Jason Nowatzke?
A. No.
Q. Do you stay in contact with anybody from

Page 198

ISP?
A. No.
Q. When is the last time you talked to anybody from ISP?
A. I believe that year. I had no contact with nobody.
Q. Have you been back to ISP since you stopped working there?
A. Yes. I've been there.
Q. For what purpose?
A. To talk to Pam James.
Q. Who is Pam James?
A. I believe she controlled all of the things that had to do with lawsuits and stuff like that over there with paperwork.
Q. Okay. So besides your attorney, have you talked about this lawsuit with anybody else?
A. No. Besides the people who are involved asked me questions and stuff like that, no.
Q. By "the people involved," do you mean --
A. Like the attorneys and --
Q. Okay.
A. When I was served and stuff like that.
Q. Have you talked to any family about the lawsuit?

Page 199

A. No.
Q. Talked to any friends about the lawsuit?
A. No.
Q. How well did you know Officer Rodriguez?
A. How well did I know him?
Q. Yes.
A. I didn't know him personally or anything like that. It was just when I was at work.
Q. Did you work with him frequently?
A. I've worked with him before.
Q. Okay. Did you ever have any issues working with him?
A. No.
Q. Did you ever socialize with him outside of work?
A. No.
Q. Have you talked to him at all since leaving ISP?
A. No.
Q. Did you ever talk to him about the fire after the fire happened?
A. No.
Q. How close were you with Promise Blakely?
A. Just at work.
Q. Never socialized with her outside of

Page 200

work?
A. No.
Q. Did you work with her frequently at ISP?
A. Not frequently, but sometimes.
Q. Did you ever have any issues working with her?
A. No.
Q. Did you ever work with her mother, who I think also worked with ISP?
A. I'm not sure who her mother is.
Q. Have you talked to her at all since leaving ISP?
A. No.
Q. Did you ever talk to her about the fire after it happened?
A. No.
Q. Did you ever talk to anybody at ISP about the fire besides Dustin after it happened?
A. No.
Q. Did anybody talk with you after the after review meeting?
A. After which meeting?
Q. The after review meeting that we discussed. Exhibit --
A. Oh, no.

BARBARA DEVINE, et al. vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 52 of 76

Page 201

Q. No one ever talked to you after the meeting?

A. No.

Q. No one ever asked you for your opinion about the meeting or for feedback from the meeting?

A. Not that I remember, no.

Q. Did internal affairs ever talk to you beyond the interview that you had with Dustin?

A. That was the only time I remember talking to them.

Q. Okay. You don't recall any other time when they came to speak with you?

A. Not that I remember.

Q. Did Warden Neal ever speak to you about what happened?

A. No, I don't remember.

Q. Did any other staff member, supervisor ever ask you about what happened?

A. No.

MS. PIERCE: I think we want to show the video, so we might -- we need a few minutes to get that ready.

Let's take a break.

(WHEREUPON, a short break was taken.)

Page 202

BY MS. PIERCE:

Q. So you said you had seen the surveillance video from the fire before, correct?

A. Yes.

Q. So do you -- can you see okay from where you're at?

A. Well --

Q. Do you want to come sit here?

A. Yes, I'll come closer.

Q. So this is the video from the 500 north.

A. Yes.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. Do you see any -- do you know what you're seeing there?

A. The flash of light.

Q. Okay. And what time is that at?

A. 9:46:37.

Q. So is this looking down the range to 540?

A. Yes.

Q. So does that look pretty bright to you?

A. Yes. The ranges are dark.

Q. Let's go back a little ways.

Let's go to 9:45. So this is

Page 203

9:43:12.

Can you see the fire at this point?

A. No.

MS. GRADY: Let's go off the record for a second.

(WHEREUPON, a short break was taken.)

BY MS. PIERCE:

Q. So do you recognize this video?

A. The camera?

Q. Yes.

A. Yes.

Q. What is it depicting? What part of the cell house?

A. It looks like the opposite side of the office.

Q. Okay. We'll go ahead and start watching it at 9:43:45.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. Did you see who was running there?

A. That looked like Rodriguez.

Q. And that was just around 9:43:50 -- 55, 53, or right around there?

Page 204

A. Yeah.

Q. So he was running by in the back of the cell house, correct? On the opposite side?

A. On the opposite side.

Q. Of the officer's station?

A. Yes. But that's the front stairs, I believe.

Q. So is that closest to the main exit?

A. Yes.

Q. Do we have the exhibit with the map on it?

A. I don't know which side this is on. I think that's the front door actually. I think that's the front door.

Q. Okay.

THE REPORTER: Please keep your voice up.

BY MS. PIERCE:

Q. So you think it's -- this side here closest to the officer's station (indicating)?

A. I feel like that's recording this part (indicating.)

Q. Okay. That would make sense because of the way the stairs are there?

A. Yeah.

Q. The same as this (indicating)?

BARBARA DEVINE, et al. vs                Cause No. 3:18-cv-00995-JD-MGG                SARAH ABBASSI
RON NEAL, et al.                                                                      October 29, 2019
USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 53 of 76

Page 205

A. Yes.

Q. Okay. Let's watch this.

A. Okay.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So does that seem like it's Officer Rodriguez coming from the officer's station?

A. Yes.

Q. So he's just running up to the range around -- just before 9:44?

A. Yes.

Q. Is that him there running by? So I think we can see him there. Let me know if you see him. Is that him?

A. I'm not sure.

Q. You can see someone else there. Do you know who that is?

A. Yeah. That's me and Promise.

Q. So what are you guys doing there?

A. That's --

Q. And this is at 9:44?

A. That's when I start running up the stairs. I'm not sure.

Page 206

Q. Okay. So at 9:44:27 we're starting it. I see someone there.

A. Yes.

Q. Do you know who that is there?

A. Rodriguez.

Q. Okay. That's Officer Rodriguez?

A. Yes.

Q. On around the -- let's see -- that's got to be the 200 range or 300 range?

A. That looks like three.

Q. 300 at 9:44. And he's going up or down?

A. Up.

Q. Okay. And then you two are down here. It looks like you're handing something to Officer Blakely. Is that you running by there?

A. Yeah. I'm running up the stairs.

Q. Is that you running up there?

A. I believe so. I'm looking for him.

Q. Is that you again there?

A. Yes. I'm still running.

Q. So you got up to the 500 by 9:45:47; is that right?

A. Yes.

Q. And you were downstairs -- let's see how

Page 207

long it took you. So it took you from the bottom here -- 9:44:55. So it took you under a minute to go up the stairs there. Do you know who that is there (indicating)?

A. I believe that's Blakely.

Q. Okay. Do you know what she's doing?

A. Opening the front door, and that's the responders (indicating.)

Q. Okay. And how many do you see there?

A. I believe four.

Q. And they're running up now to the 540 area?

A. Yes.

Q. Is that the fire that you can see there?

A. Probably.

Q. Do you know who is down there at that point? It's around 9:47:20. It looks like there's somebody by the front door.

A. Blakely.

Q. Blakely. So she stays down, it looks like, the whole time?

A. I can't recall where she was at.

Q. But at any point in here, have you seen

Page 208

her go upstairs?

A. No.

Q. Have you seen the fire -- the firemen come in at any point?

A. Not yet.

MS. PIERCE: I think we can switch to one of the other videos.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. So this is on the 500 range?

MS. GRADY: Just for the record, this is the video camera BCH 500 North.

BY MS. PIERCE:

Q. So at this point you can see the fire, correct?

A. Yes.

Q. 9:46?

A. Yes.

Q. Do you see a person go in front of the camera there at about 9:46:45?

A. Yes.

Q. Do you know who that is?

A. I can't really see it.

Q. Do you know who that person is there

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 54 of 76

Page 209

(indicating)?

A. I believe that's me.

Q. Just before 9:47. Do you know who that is there (indicating)?

A. No. It looks like the first responders, and that's the front of the range.

Q. But you don't know which responders those are?

A. I can't tell you, honestly.

Q. But by now at 9:47:28, they're heading down towards the fire?

A. Yes.

Q. And then we're going to look at the BCH North U4 camera.

A. Okay.

THE REPORTER: Can you repeat the last part?

MS. PIERCE: BCH North U4.

THE REPORTER: U4. Thank you.

(WHEREUPON, the video recording was played.)

BY MS. PIERCE:

Q. Okay. We're starting at 9:35:35.

And what is this a view of here?

A. The side of the ranges.

Q. We're starting at 9:35:32. I think 540

Page 210

is right here (indicating.)

Do you see anything there in that cell?

A. No.

Q. Do you see a flash there?

A. I didn't see it.

Q. Okay. So what happens there at 9:37:53? The light goes on in the cell next door?

A. Yeah. It looks like the offender turned their lights on in their cell.

Q. Can you start to see some smoke up there?

A. Yes.

Q. This is around 9:40?

A. Yes.

Q. It looks like a lot of smoke?

A. Yeah, there's smoke.

Q. Do you see smoke in some of the other cells?

A. Right here (indicating.)

Q. Can you see some movement in Cell 540?

A. Yes.

Q. It's continuing to fill up with smoke?

A. Yes.

Q. It's around 9:42:30.

Have you seen any officers come up

Page 211

yet at this point?

A. It's really hard to see in the camera.

Q. But you haven't seen any officers come up?

A. I've seen movement here, but I can't really tell what it is.

Q. And that's Joshua's cell, right? Cell 540?

A. I believe so.

Q. It's getting pretty smokey at this point, I think. You can barely see the cell, right?

A. Yes.

Q. Can you see the fire at that point?

A. Right here (indicating.)

Q. This is around 9:44:20 to 30?

A. Yes.

Q. Now, you can see the flames coming out of the cell?

A. Yes.

Q. It's around 9:46:20?

A. Yes.

Q. Okay. We can stop it.

A. Okay.

MS. PIERCE: And just for the record, the first video we watched was camera BCH North.

Page 212

BY MS. PIERCE:

Q. So I just want to touchback on a few more things.

So just, again, a yes or no answer.

You don't recall at any point hearing a fire alarm go off in the B cell house on the night of April 7th?

A. No.

Q. Okay. Can you go over -- so you said earlier that you were required to go up the chain of command for instructions.

Can you go over who was in each step of the chain of command on the night of April 7th?

A. There's a captain, a lieutenant, a sergeant.

Q. Okay. Going up from you, who is directly above you in the chain of command?

A. In the building I was working at was the officer in charge.

Q. So that would have been Rodriguez?

A. Yes.

Q. And who was just above him?

A. He was in charge of B cell house that night. There was only three of us there.

Q. And so who would he go to if he needed

BARBARA DEVINE, et al. vs.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 55 of 76

Page 213

permission to do something?

A. Either a sergeant, a lieutenant, or captain.

Q. And do you know -- it wasn't any specific person? It was any sergeant or any lieutenant?

A. Yes.

Q. Okay. Is there a lieutenant or a sergeant who was in charge of the B cell house area or an area that included the B cell house?

A. That night I don't think there was.

Q. Okay.

A. I don't remember that night. There was only three of us in there.

Q. If you look at the roster, again, that I gave you.

A. Okay.

Q. Do you know the exhibit number?

A. Eight.

Q. So go to the second to last page.

A. Okay.

Q. So next above Rodriguez would have been sergeants.

Can you see how many sergeants were on duty that night?

A. On which part?

Page 214

Q. Just from this roster, can you tell how many sergeants were on duty that night? Actually, turn to the next page.

A. (Witness complying.)

Q. In that box at the top where it says, "J bracket."

A. Yes.

Q. So it says there is four sergeants on duty that night?

A. Yeah.

Q. Two lieutenants?

A. Yes.

Q. And one captain?

A. Yes.

Q. So the captain was the highest ranking person that night?

A. Yes.

Q. Do you know who the captain was on duty?

A. Dykstra.

Q. And then assistant shift supervisors were -- those were Lieutenant Redden and Watson.

So they were the two lieutenants?

A. Yes.

Q. And then the sergeants -- can you tell who the four sergeants were? It looks like maybe the

Page 215

control sergeant was Sergeant K. Hill.

A. Oh, I see it. Yes.

Q. And then there was Sergeant Puetzer?

A. Yes.

Q. Do you see who else was on?

A. Another sergeant?

Q. Yes.

A. Taylor.

Q. And it sounds like there was one more.

A. Smith.

Q. Okay. So those would be the people -- so after the officer in charge, the next person would be the sergeants?

A. Yes.

Q. And then the lieutenants?

A. Yes.

Q. And then the captain?

A. Yes.

Q. Is there anybody else in the line of the chain of command?

A. For the shift, no.

Q. Okay. So you said when you would let somebody out of their cell, you would use both an electronic unlock and the key on the door itself?

A. Yes.

Page 216

Q. Can you explain that a little bit more?

A. Well, you would go to the cell and open it yourself if needed. But when you set up for like chow hall and rec and stuff, you do it on the box because you do multiple ones at once.

Q. Okay.

A. All of them.

Q. So any time you're letting out multiple people, you would use the box?

A. Yes.

Q. And any time you're letting just one person, you would usually go to their cell?

A. Yes.

Q. Can you explain to me how the box works?

A. It's just electronic. It switches, like, up and down. I forgot which way it goes. When they're down, it means the cells are unlocked -- I forgot which way it goes. But either way -- it's either up is either locked or unlocked and the bottom is locked or unlocked.

Q. So you would open it and then you would either turn them up or down?

A. Switch them.

Q. And you would do that for everybody who was being released?

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 56 of 76

SARAH ABBASSI
October 29, 2019

Page 217

A. Yes.

Q. Okay. And you had to unlock that box with your key?

A. Yes.

Q. And the only person who has that key is the person that has the keys for the range?

A. Yes.

Q. With regard to the number of people on duty that night, was it normal to have three people in a cell house that night?

A. Yes.

Q. That was typical?

A. It could range between like three and six.

Q. Would it ever be lower than three?

A. Usually, no.

Q. If there were more than three, would -- would each person just have one range if there were five people?

A. Yes.

Q. Do you think that three people is enough to have in a cell house in one night?

A. No.

Q. How many do you think there should be?

A. A person to every range.

Page 218

Q. So five?

A. Yes.

Q. And why is that?

A. Because there's a lot of people in a cell house.

Q. Okay. And why is it important to have five people if there is a lot of people in the cell house?

A. For safety reasons.

Q. Can you elaborate a little bit?

A. Control. It's safer to have more people.

Q. In what way?

A. If anything happens, an emergency needed or riot or anything going on, it's just better to have more people.

Q. And why?

A. To have better control of the situation.

Q. Okay. Is it better for checking as well to have more people on staff?

A. Yeah. It's better overall.

Q. Were there staffing issues at ISP?

A. Not that I know of.

Q. So they had enough people to staff each shift?

A. I believe so.

Page 219

Q. Okay.

A. I'm not really sure how the assignments and staffing went.

Q. But you didn't hear about any issues with staffing?

A. Not that I know of.

Q. Did you -- so was it typical to have four sergeants on in one night?

A. I never counted how many sergeants.

Q. Does that seem like enough to have in one night?

A. I believe so.

Q. Did it seem sufficient to have two lieutenants?

A. Do you mean like should there be more?

Q. Yes. Did it seem like it was sufficient to efficiently and adequately run the prison to have two lieutenants on a night shift?

A. I feel like they did their job real good, but I feel like the more help the better.

Q. So what would you think would be an ideal number of lieutenants to have on the shift?

A. Maybe one for every station.

Q. Okay. By "every station," you mean cell house?

Page 220

A. Yes.

Q. Was there more staff in the -- during the day shift than the night shift?

A. It seemed like it. I'm not really sure.

Q. What were the -- were the responsibilities of the sergeants and lieutenants? Let's start with the sergeants.

A. They made sure everything was in control and if we ever needed help to go to them.

Q. Were they staffed to specific areas?

A. I'm not sure how the staffing went.

Q. Okay. Like, for example, Sergeant Puetzer was on the Main Street Checkpoint 2. So was he assigned to work there at the Main Street?

A. That's when the dispatch assigned everybody.

Q. So they assigned him there?

A. I believe so. I'm not sure how it works, but everybody got assigned to a spot.

Q. So even the sergeants and lieutenants are assigned to a spot?

A. I believe so.

Q. Okay.

A. I'm not sure.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 57 of 76

Page 221

Q. How would you know which sergeant or lieutenant to go to?

A. Usually -- if there is one in the cell house -- most of the time there's one in the cell house.

Q. Were you ever instructed who to go to if there wasn't one in the cell house?

A. Just call up front.

Q. Call up front?

A. Where the captain would be and stuff.

Q. So you call the captain -- -- what's the captain's office called?

A. They call it the captain --

Q. Okay.

A. Like the office. You just call up there, or for a lieutenant, you know to call them for help.

Q. Okay. So if you needed a sergeant or a lieutenant or the captain, you would call either to the captain's office or call that lieutenant directly?

A. Or you could call them directly on the radio.

Q. On the radio?

A. Yeah.

Q. So you could use the radio for

Page 222

non-emergency purposes?

A. If you really needed them for something, yes, you could call them.

Q. Okay.

A. Yes, you could call them.

Q. Otherwise --

A. If it's work related, yes.

Q. Otherwise, you would call them on the phone?

A. Yes.

Q. Okay. And did everybody have a line that you could reach them on?

A. Yes. Every station had a line.

Q. And you had that number accessible to you?

A. Yes.

Q. So you said it's difficult to hear people yelling from the high ranges?

A. Yes.

Q. Were you ever given any instruction during training about, you know, how to address that issue? Were you told to stay higher on -- stay longer on those ranges or --

A. No. We just had to do our security checks.

Page 223

Q. Okay. So you -- the only instructions you were given were to do your security checks?

A. Yes. Yeah, per the policy.

Q. Were you ever given any instruction to pay additional attention to the high ranges?

A. No.

Q. Were you ever given any instruction about how to tell prisoners to get your attention if they needed you?

A. No.

Q. Were you ever given any instruction or training about responding to prisoner's requests?

A. Yes. If they asked for anything, try your best to help them.

Q. And that was it? Just if they asked for something, try your best to help?

A. Yeah. We had different forms for anything that we would give them.

Q. So you were instructed on the forms to give them?

A. Yes.

Q. And what types of forms were those?

A. Grievances. There's the medical forms. I can't remember the rest, but there's forms for everything.

Page 224

Q. And so that was the extent of your training on helping prisoners who asked for help?

A. Yes. But they need to be seen immediately, then we would call the hospital there and tell them that we're going to let them be seen.

Q. Okay. And so then you would take them out of the cell to see them?

A. Yes.

Q. To the hospital?

A. Yes.

Q. Would you get permission before you could take them out of their cell?

A. Yes.

Q. Who would you get permission from?

A. Whoever's in charge in the cell house.

Q. Do you think it would be a good idea to spend additional time on the higher ranges if you can't hear what's happening up there?

A. Yes, it would help.

Q. Do you think it would be a good idea to come up with a better system for allowing prisoners to communicate with staff when they needed assistance?

A. Yes.

Q. Do you have any ideas about what would be

BARBARA DEVINE, et al. vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD document 212-68 filed 05/25/21 page 58 of 76

Page 225

a better system for having prisoners communicate with staff when they need assistance?

A. Maybe if they had something in their cell where they could click on and we would immediately know which range or cell to go to.

Q. Okay. So, again, you said the after review meeting was important.

Tell me, again, why you thought the after -- after review meeting was important.

A. I just feel like it was just helpful to like -- just like be there because after a situation like that, nobody -- nobody really -- you know, you don't really talk to anybody about it or anything like that. So it's like even though you're not talking, it just helped being there.

Q. Okay. So it helped people work through what happened?

A. I feel like it did in a way.

Q. So you think other people were upset after the event?

A. Yeah. It was a tragedy. It was -- I feel like it affected everybody.

Q. So what makes you think it affected everyone? Did you talk with anyone about it?

A. No. But you could just tell.

Page 226

Q. In what ways could you tell?

A. It was just a sad situation. Like it would affect anybody.

Q. So you just assumed that other people were affected because it was a sad situation?

A. Yeah. There was a riot that happened and stuff. I know some officers probably got hurt. It was -- it was a bad experience. So I'm sure it affected a lot of people that were there that night.

Q. But you didn't see anybody appear to be affected?

A. You could just tell like -- I didn't talk to anybody about it, but you could just tell it affected people.

Q. In what ways could you tell?

A. It was a traumatizing experience, and I know officers got hurt. So you could tell they probably were traumatized by the experience.

Q. Was anybody acting in a way that you could tell they were upset?

A. No. But it was just a sad experience in general at the facility.

Q. So your -- just to clarify, you think people were upset because you understand it to be a sad situation. So -- because of that you think other

Page 227

people were upset?

A. That's how it felt.

Q. Okay. But you didn't see or hear anyone tell you that they were upset after the incident?

A. No. I didn't talk to anybody about it.

Q. Okay. So a couple of questions I asked you, you said you don't remember or you -- you don't remember a lot things that happened during your tenure at ISP.

Is there anything that you can think of that would refresh your recollection about your time at ISP?

A. What do you mean?

Q. Is there, you know, any documents you could review that might refresh your recollection about your responsibilities, your training?

A. Do you mean like the policies?

Q. Yes.

A. No. I feel like everything I said is really what I remember.

Q. Okay. So you don't think if you saw, for example, training documents that would help you remember anything about your training?

A. It might refresh something if I see it.

Q. Are there any other documents that, you

Page 228

think, if you saw them, they would refresh your recollection?

A. It's honestly so hard to remember that long ago. So I would say maybe anything I look at maybe could help. I'm not sure though.

Q. Okay. But as we sit here today, you don't have any recollection about, you know, your duties or your training beyond what we discussed here?

A. No. Everything that I said is what I really remember.

Q. Did you keep any documentation related to your employment at ISP?

A. No.

Q. You didn't keep any employee handbook?

A. No.

Q. Any sort of training materials?

A. No.

Q. Any discharge papers?

A. No.

Q. Did you keep anything related to the fire on April 7th, 2017?

A. No.

Q. So let's turn back really quickly to your interrogatory answers.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 59 of 76

Page 229

So back to Interrogatory No. 7. So your response when you submitted this and signed that it was true and accurate is that nobody prevented you from doing anything, but you wanted to add now that you were prevented from doing things because the first responders arrived?

A. I mean, nothing prevented me; but there is nothing I could have done different. If I don't have the keys to that range, and the fire extinguishers were already on the range -- I don't have the keys to open the range or to the cell. So I don't know.

Q. So is there anything you would have done differently if the first responders had not arrived?

A. If they hadn't arrived yet?

Q. If they hadn't arrived yet?

A. Well, yeah. We ran into each other going like this -- going, like, up and down the stairs. If they didn't arrive yet, I would have got -- I would have been able to probably -- but they arrived so fast. I would have got the fire extinguisher myself and went up there myself with it.

Q. Okay.

A. But we ran into each other, and everybody already had everything they needed for the fire.

Page 230

Q. And because they arrived, you didn't take any more action?

A. No. I passed somebody a fire extinguisher going up, and that was it. After that, the first responders took over the situation and put -- tried to take the fire out.

Q. Okay.

A. And another thing is I would have had Blakely up there with her keys, but somebody already had the keys going up the stairs with them.

Q. Okay. So I guess is it your position that because you -- you were prevented from taking any further action because the first responders arrived that you would have taken?

A. What do you mean?

Q. So did the first responders -- the arrival of the first responders, did that prevent you from doing anything else to help with the emergency situation?

A. There was nothing else I can do at that point.

Q. Okay. So you're not saying that the first responders prevented you from doing anything?

A. Nobody prevented -- nobody prevented anything, but there was nothing on my part that I

Page 231

could have done different if I was running for -- yelling for the keys for the 500 and running down the stairs.

Q. Okay.

A. But while I was running down, everybody was already going up with everything.

Q. So my question, I guess, is that before you said you -- your training instructed you not to take any action when the first responders arrived except what they told you to take.

A. Yeah. Once they got there, they took over.

Q. Okay. But were you -- were you prevented from doing anything unless the first responders told you to do it?

A. That's when you go back to the officer in charge and you ask them what should be done.

Q. Okay. So you're not quite answering my question.

My question is: Are you -- are you prohibited from taking any action unless you're instructed to take action by the first responders?

A. Can you repeat that one more time? Sorry.

Q. Are you prohibited from taking any action

Page 232

unless that action -- unless you were instructed to take that action by the first responders?

A. Yes. Because you always have to go to an officer in charge before you make a decision.

Q. Even during an emergency?

A. Yes. You still ask the officer in charge.

Q. So where is that from? Were you trained to do that?

A. Yes.

Q. When were you trained to do that?

A. During training, we were told any -- before we make any decisions to ask the officer in charge first.

Q. Okay. But your -- -- but you said that you wouldn't have done anything -- there was nothing additional that you would have done once the first responders arrived?

A. There was nothing else I can do at that point.

Q. Did you ever voice any concerns to anybody about the number of staff in the B cell house or at ISP generally?

A. No.

Q. Were you concerned about only having

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND  case 3:18-cv-00995-JD  document 212-68  filed 05/25/21  page 60 of 76

Page 233

three people on -- in B cell house?

A. No. But it would have been nice to have more people. It would have made the job way easier.

MS. PIERCE: I think we're almost done, but do you mind if we go off the record for two minutes to concur?

MR. ROTHENBERG: Yes.

(WHEREUPON, a short break was taken.)

MS. PIERCE: So just to put on the record, this is Megan speaking. We have agreed that we will not ask punitive questions relating to net worth and punitive damages at this point. And defendants have agreed to reproduce the defendants for depositions after summary judgment is decided to re-depose the defendants on those issues.

MR. ROTHENBERG: Should punitive damages still be an issue.

MS. PIERCE: Yes.

MR. ROTHENBERG: And, again -- I'm sorry. I didn't introduce myself in the beginning.

My name is Daniel Rothenberg, and I'm counsel for the defendants. And I represent -- I'm from the Attorney General's Office.

MS. PIERCE: I think with that, we have no

Page 234

additional questions unless you have some.

MR. ROTHENBERG: I don't have any questions.

THE REPORTER: Signature?

(WHEREUPON, a discussion was had off the record.)

THE WITNESS: Waive.

(WHEREUPON, at 3:07 p.m., the deposition was concluded.)

Page 235

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, APRIL D. HARGETT, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 84-4735, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 21st day of January, 2020.

April Hargett

April D. Hargett, CSR
License No. 084-004735

BARBARA DEVINE, et al. vs.      Cause No. 3:18-cv-00995-JD-MGG      SARAH ABBASSI
RON NEAL, et al.      October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 61 of 76

## A

**A4 (8)**
125:1,6;148:10,11,
12,22;149:18;151:9
**A4s (1)**
149:4
**ABBASSI (15)**
4:5;5:2,4,4;36:11;
37:20;41:7;56:17;86:3;
134:18;166:6;171:3;
186:4;188:6;190:13
**A-b-b-a-s-s-i (1)**
5:5
**ability (3)**
7:6,10,14
**able (11)**
34:25;49:23;62:7;
70:11,21;74:8,19;
112:10;136:4,11;
229:20
**above (5)**
118:13;119:21;
212:17,22;213:21
**access (2)**
49:22;88:24
**accessible (1)**
222:14
**accurate (2)**
168:10;229:3
**act (4)**
33:8;46:22;48:4;
118:23
**acted (1)**
147:18
**acting (3)**
33:8;102:11;226:19
**Action (15)**
135:1;137:25;
141:16;147:9;148:3;
177:24;178:7;230:2,
13;231:9,21,22,25;
232:1,2
**actions (1)**
195:22
**activate (1)**
104:9
**activated (5)**
103:21,24,25;
167:16,18
**activates (1)**
105:4
**activation (1)**
104:10
**activities (2)**
26:20;115:5
**activity (1)**
115:14
**actual (4)**
15:18;16:18;105:4;
129:23
**actually (10)**

16:22;30:18;49:13;
66:7;82:12;95:25;
117:6;180:18;204:13;
214:2
**add (1)**
229:4
**addition (1)**
183:21
**additional (17)**
4:24;10:25;12:10;
81:24;176:12,17;
177:24;178:14;183:21;
184:5,12;185:14,23;
223:5;224:17;232:17;
234:1
**address (11)**
9:24;10:1,3,5;48:8,
12,16;58:16;117:19;
178:7;222:21
**adequate (1)**
183:13
**adequately (1)**
219:17
**Adult (2)**
36:23;37:8
**affairs (1)**
201:7
**affect (3)**
7:21;83:25;226:3
**affected (7)**
140:5;225:22,23;
226:5,9,11,14
**affects (1)**
7:18
**afterwards (3)**
138:14;144:15,17
**again (15)**
4:21;26:14;142:8;
160:16,18;167:4;
185:14;190:3;194:17;
206:20;212:4;213:14;
225:6,8;233:20
**against (2)**
30:4;113:20
**ago (8)**
91:25;92:21;93:22;
94:16;137:19;141:23;
147:15;228:4
**agree (1)**
178:24
**agreed (3)**
4:19;233:11,14
**ahead (9)**
29:11;57:8;94:18;
166:23;167:20;178:20;
179:14;190:20;203:17
**aid (3)**
25:6;37:12,16
**air (1)**
69:13
**alarm (8)**
109:16,20;110:16,
24;111:10,18;182:9;

212:6
**alarms (4)**
108:24;109:3,8,15
**allow (1)**
183:16
**allowed (9)**
46:22;47:1,5;49:20;
51:19,24;122:4,14;
192:15
**allowing (1)**
224:21
**almost (3)**
19:5;164:21;233:4
**Along (1)**
6:12
**always (43)**
13:7;29:4,12;50:17;
51:1,10;60:2;64:9,12,
18;66:17;68:8;69:2;
71:11;73:5;89:4;94:24;
95:2,18;96:17;97:9;
98:15;113:8;114:4;
115:15;116:10,14,17,
20,22;117:21;118:6,7,
12,20;120:11;142:18,
18;153:15;154:23;
181:13;187:20;232:3
**among (1)**
147:3
**amongst (1)**
154:23
**amount (1)**
97:18
**answered (1)**
191:8
**apparently (1)**
137:14
**appear (1)**
226:10
**appears (1)**
164:10
**application (1)**
12:4
**applying (1)**
11:18
**appropriate (1)**
98:13
**appropriately (1)**
183:17
**approximately (1)**
163:18
**April (24)**
19:13;38:21;48:3;
75:18;78:22;96:8,12;
109:11;121:6;124:15;
135:3;147:16;171:12,
19;184:7,14;185:16,21,
24;186:12,14;212:7,
13;228:22
**area (6)**
61:8;63:1;177:7;
207:14;213:8,9
**areas (6)**

51:11;56:6;70:14;
123:16;130:11;220:10
**around (26)**
28:14;36:3,5;67:25;
73:9;75:24,25;76:8,11,
12;98:6;130:4;156:14;
158:24;165:23;189:21;
197:17;203:24,25;
205:12;206:8;207:19;
210:13,24;211:15,20
**arrival (1)**
230:17
**arrive (6)**
14:10;45:25;58:13;
85:18;162:21;229:19
**arrived (22)**
84:5,6,10,24;160:17;
165:19,23;175:25;
176:5;177:25;178:1;
192:14,22;229:6,14,15,
16,20;230:1,14;231:9;
232:18
**aside (2)**
96:13;138:23
**aspects (1)**
185:10
**assigned (30)**
12:23;13:17;15:14,
16;16:1,22;17:6;19:23;
22:11,12,17;23:12;
48:24;61:17;76:16;
89:17;102:5;126:2;
127:19,19,20,22;194:3,
16,18;220:14,16,18,20,
22
**assignment (6)**
13:17;14:5;16:5,8;
21:21;26:16
**assignments (7)**
13:22,25;15:6;20:7;
27:15;102:1;219:2
**assigns (1)**
22:7
**assist (3)**
45:20;73:24;178:14
**assistance (3)**
98:11;224:23;225:2
**assistant (1)**
214:20
**assume (1)**
6:24
**assumed (1)**
226:4
**ate (3)**
16:13;17:13,16
**attend (1)**
10:23
**attendance (1)**
135:4
**attended (1)**
16:17
**attention (16)**
70:1,6;71:13,18,22;

72:1,4,11,16;73:1,7;
115:9;117:3;138:10;
223:5,8
**attorney (3)**
9:1;198:16;233:24
**attorneys (1)**
198:21
**August (2)**
12:19,20
**automatically (1)**
78:20
**away (7)**
103:11;121:24;
122:1,2;155:16;158:6;
160:7

## B

**back (51)**
22:2;28:10,10;39:11;
43:3;54:2,5,5;56:13;
64:8,22;67:14,20;68:8;
76:18,21;77:11,23;
88:12,17;125:25;
126:5,14;128:10;
129:4,16;142:13,21;
146:1;153:18;154:11;
159:4,21;160:1;
163:13;168:13;169:16;
170:4;173:18;174:17,
23;175:7;176:25;
182:7;191:15;198:7;
202:24;204:2;228:24;
229:1;231:16
**backing (1)**
20:3
**back-up (5)**
57:18;90:2,5,10;
181:14
**bad (1)**
226:8
**banging (3)**
75:4;156:5,6
**bank (2)**
18:6,7
**Barbara (3)**
4:11;196:2,4
**barely (3)**
128:12;129:3;211:11
**bars (4)**
69:15,18;75:4;156:5
**based (3)**
47:9;62:18;84:5
**basic (1)**
111:17
**basically (8)**
17:7;18:22;28:3;
31:18;69:16;82:3;
132:25;186:25
**bathroom (3)**
98:17,23;99:20
**baton (1)**
99:5

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 62 of 76

**batteries (1)**
96:24
**battery (3)**
95:7;97:3,7
**BCH (5)**
38:16;208:13;
209:14,17;211:25
**Beal (2)**
197:4,6
**became (1)**
182:14
**become (1)**
182:11
**beep (2)**
95:9;96:4
**beeping (3)**
95:7,22,25
**beeps (1)**
96:2
**began (1)**
34:18
**begin (2)**
4:14;34:15
**beginning (9)**
13:14;35:2;43:6;
95:1,12,17,19;124:22;
233:21
**behind (1)**
161:23
**besides (15)**
8:25;19:6;48:3;
55:21;63:10;91:9;99:3;
121:6;139:17,24;
169:20;191:3;198:16,
18;200:18
**best (22)**
19:21;46:1;84:19,23;
85:2,11;88:4;111:3;
124:16;142:20,24;
143:4,7,10,14;148:1;
168:10;178:8;183:24;
192:12;223:14,16
**better (14)**
18:4;137:14;141:15;
142:16,18;181:12;
183:23;218:14,17,18,
20;219:20;224:21;
225:1
**beyond (3)**
141:18;201:8;228:8
**big (4)**
44:22;87:25;88:2;
129:24
**bit (11)**
22:2;82:10;89:12;
109:24;125:3,23;
135:15;174:22;184:1;
216:1;218:10
**Blakely (24)**
125:2,6;126:1;
127:21;129:1;133:25;
136:5;143:16;144:21;
149:20;151:16;153:22;

158:1,5,13,14,15;
172:1;199:23;206:16;
207:7,21,22;230:9
**Blakely's (1)**
176:2
**booked (1)**
161:22
**both (12)**
20:19;24:3;27:21,25;
33:10;60:20;127:10;
149:22;150:11;151:20;
161:20;215:23
**bottom (7)**
38:10;77:2;137:12;
152:7;172:6;207:2;
216:19
**box (6)**
53:21;214:5;216:4,9,
14;217:2
**bracket (1)**
214:6
**break (11)**
7:1,3;16:11,12;
56:11;124:9,11;
201:23,24;203:6;233:8
**breakdown (1)**
82:16
**breakfast (1)**
21:24
**breaks (2)**
16:9,14
**breathing (2)**
182:24;183:1
**briefly (2)**
36:21;37:2
**bright (1)**
202:22
**bring (4)**
51:19;116:21;181:2,
15
**bringing (1)**
161:14
**brings (1)**
142:12
**broke (1)**
130:13
**brought (1)**
146:19
**building (11)**
43:3;89:8;112:23,25;
113:3;127:6,16;159:9;
170:19;176:3;212:18
**buildings (1)**
160:15
**bunch (4)**
169:21;170:2,10,18

## C

**cage (3)**
69:9,12,19
**call (50)**
11:19;14:6,7,12,13,

16,18;15:5,7;29:20;
45:2,4,8,21,22;47:20,
22;52:18,18;72:15;
78:12,17;82:22;98:2;
102:12,14;103:6;
104:23;105:2,11;
106:11;111:1,2;
125:17;149:6;155:10;
163:24;221:8,9,11,13,
15,16,18,19,21;222:3,
5,8;224:4
**called (44)**
4:6;24:9;25:15;
28:24;45:14;48:7;
53:23;78:19;80:1,12;
81:23;83:14,21;
101:15;102:10,20,24;
104:12,25;105:23;
116:22;125:1,19;
127:20;144:23;145:18,
22;149:7;155:16,18,
21;156:7,9;160:15;
163:17,22;164:21;
165:2,6;167:4;168:2,5,
8;221:12
**calling (6)**
75:15;80:2;104:9;
144:11;151:10,19
**calls (2)**
4:18;8:12
**Calumet (1)**
11:3
**came (18)**
22:4;45:20;78:22;
93:8;127:4,15;130:17;
147:17;149:8;162:14,
22,23;173:24;176:23;
182:7,16;183:10;
201:12
**camera (10)**
50:13;51:16;136:10;
167:8;203:10;208:13,
21;209:14;211:2,25
**cameras (4)**
50:17,20,24;135:22
**can (93)**
5:2,16;6:9,14;10:18;
15:1;16:13;19:19;22:9;
24:4;25:9;28:21;37:10,
23;38:8,15;44:1;47:11;
53:20;57:1,1,8;58:15;
61:11;67:23;68:24,24;
69:25;70:8,17,23;
73:12;79:20;85:11;
86:14,19;94:19;96:10,
24;106:7,12;107:25;
109:17;111:4;120:18;
124:16;133:2;135:7;
137:13;142:20,24;
143:4,7,11,14;146:7;
163:13;166:14;167:1;
178:8;180:22;184:11;
186:21;192:12;193:16;

195:1,3;202:5;203:2;
205:15,18;207:16;
208:6,15;209:16;
210:11,20;211:11,13,
17,22;212:9,12;
213:23;214:1,24;
216:1,14;218:10;
227:10;230:20;231:23;
232:19
**cant (1)**
156:2
**capacity (1)**
4:12
**captain (19)**
14:17;15:22,22,25;
52:7;89:19;166:18;
167:7;170:5;212:14;
213:3;214:13,15,18;
215:17;221:10,11,13,
18
**Captains (1)**
131:17
**captain's (2)**
221:12,19
**Cardiopulmonary (1)**
37:11
**care (2)**
7:6;123:20
**carry (1)**
98:6
**case (15)**
4:13;39:10;58:5,22;
66:19;94:18;98:2,3;
106:15,16,18;146:10,
16,16;188:1
**cause (1)**
121:9
**cell (162)**
9:13,13,20;13:17;
19:13,15,20;20:5,11,
13,15,23;21:2,6,9,12,
15;22:5;23:5,24;24:6;
25:19,22,25;38:24;
47:2,5,14;51:12,14,17,
19;53:14;54:9,20;55:2,
7;56:23,24;57:3,20,24;
60:15;62:9,19;63:17;
65:10,17,23,23;67:16,
19,19;68:5,19;69:6,21;
70:16,18,24;71:2;74:9,
11,25;75:4,6,20;77:21;
85:1;86:14;87:9,11,13,
18,24;88:3,5,9,25;
89:13;94:3,7;100:4,7;
107:12;108:3,24;
109:16,17;112:3,11;
114:3,7,8;117:6;118:5;
119:14,20,25;122:15;
129:10;130:10;147:18;
149:5;150:10;152:1;
153:4,8,14;156:15;
160:20;162:3;164:8;
167:8;171:23;173:22;

177:9;181:17,25;
182:5,12,20;183:5;
186:10;189:17;194:2,
16,21,24;203:14;
204:3;210:3,8,10,20;
211:7,7,11,18;212:6,
23;213:8,9;215:23;
216:2,12;217:10,22;
218:4,7;219:24;221:3,
4,7;224:7,12,15;225:3,
5;229:11;232:22;233:1
**cells (7)**
70:2;86:24;130:8;
156:5;160:11;210:18;
216:17
**Central (1)**
10:24
**certain (4)**
13:17;29:10;61:14;
74:25
**certificate (1)**
34:10
**chain (4)**
212:10,13,17;215:20
**chance (1)**
94:17
**change (12)**
40:9;97:2,12;141:14;
143:5,8,12,15;145:25;
146:2,13;147:23
**channel (1)**
97:21
**charge (82)**
16:3;17:3;19:24;
20:11,13,18,20,23;
21:14,19;22:7;23:8,9,
25;24:1;26:23;28:9;
35:20;43:23;46:21;
51:6;55:4,8;57:14,24;
59:13;60:19,22,23,25;
61:5,7,12,15,20,22,24;
62:1,8,17,20;63:3,6,9,
22;64:1;65:12;72:23;
75:6;80:24;87:2;89:17;
96:21;105:10;110:8,
12,18;114:5;115:1,17;
118:7,11,21,24;119:4,
16,17;120:12;129:17;
137:21;147:1;153:22;
192:9;212:19,23;
213:8;215:12;224:15;
231:17;232:4,7,14
**charged (1)**
96:17
**chargers (1)**
122:16
**check (36)**
14:11,14,20;15:10;
25:14,21,22;47:18;
49:4,8,12,15,21,23;
72:16,21;73:10;75:3,6,
9,12,16;95:4,11,16,18,
20,24;96:2;97:9;

BARBARA DEVINE, et al. vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 63 of 76

154:19;187:12,13,18,
22;189:20
**checked (5)**
25:19;49:5;95:2;
179:23;180:3
**checking (5)**
49:10;50:24;119:14,
21;218:18
**checkpoint (2)**
130:11;220:13
**checkpoints (4)**
25:17;54:19;88:20;
130:14
**checks (12)**
26:17;28:11;99:8;
100:10,15,23;115:5;
186:25;188:12;189:6;
222:25;223:2
**chip (2)**
53:18;54:6
**chips (3)**
53:22,24;54:5
**chow (5)**
64:8,21;65:9;114:25;
216:4
**Christopher (2)**
197:4,6
**circle (2)**
57:8;68:25
**circumstances (4)**
65:7;100:6;112:8;
113:2
**city (1)**
9:6
**clarification (1)**
6:23
**clarify (4)**
61:11;82:9;159:15;
226:23
**class (3)**
30:21;33:17;63:11
**classes (7)**
11:24;21:25;31:19;
62:25;64:22;82:6;
115:1
**classroom (4)**
31:12,14;92:11,13
**clear (5)**
6:14,18;27:14;54:18;
65:10
**cleared (2)**
112:24;114:12
**click (1)**
225:4
**close (3)**
87:16;108:9;199:23
**closed (3)**
28:17;65:17,20
**closer (3)**
18:6;164:24;202:9
**closes (1)**
87:18
**closest (2)**

204:8,19
**code (6)**
104:3,7,12;106:11;
125:18;155:20
**coming (12)**
64:7,22;79:25;80:5;
84:15;162:25;167:8;
169:4;181:12,15;
205:8;211:17
**command (4)**
212:11,13,17;215:20
**common (3)**
120:13,14;194:1
**commotion (3)**
72:15;75:9;153:20
**communicate (2)**
224:22;225:1
**communication (4)**
137:14;141:16;
142:16,19
**complaints (3)**
30:3,7,10
**complete (2)**
34:5,14
**completed (1)**
34:10
**completely (1)**
178:5
**compliance (1)**
147:18
**complying (15)**
38:9;57:9;135:9;
163:15;167:3,22;
178:19,21;179:13,16;
186:22;188:18;190:22;
195:2;214:4
**computer (6)**
49:9;50:11,14,18,22;
149:18
**computers (3)**
29:21;49:22;150:1
**concern (2)**
150:9;151:2
**concerned (1)**
232:25
**concerns (2)**
74:23;232:21
**concluded (1)**
234:9
**concur (1)**
233:6
**condition (1)**
7:17
**conditions (2)**
7:13,20
**confused (1)**
61:10
**confusing (1)**
6:19
**consistent (2)**
167:10,25
**contact (5)**
52:6;53:2;103:17;

197:25;198:5
**content (1)**
42:14
**continued (2)**
125:19;168:5
**continuing (3)**
35:6,6;210:22
**contraband (4)**
121:18,22,25;122:15
**control (39)**
67:9,11;80:17,18;
82:7;83:2;84:19;85:1,
2,10;96:16;101:6,8,10,
13,16;102:22,23,24;
103:14;104:5;105:5,
20;106:2;108:20;
111:3,5,7,9;115:25;
116:4;127:17;143:22;
183:11;185:24;215:1;
218:11,17;220:8
**controlled (2)**
50:20;198:13
**controls (3)**
102:13;104:13;105:3
**conversation (1)**
190:23
**conversations (3)**
7:24;130:23,24
**convictions (2)**
193:7,9
**copies (2)**
38:11,14
**copy (1)**
193:12
**corner (2)**
171:17;172:7
**correctional (4)**
12:16;29:25;104:11;
110:12
**counsel (11)**
4:18;7:25;8:3,6,9,14;
190:24;191:5,9,16;
233:23
**counselors (1)**
24:8
**counselor's (18)**
28:23;29:5,8,17;
49:25;50:3,7;124:25;
125:5;149:12,13,17;
150:12,14,19;152:19;
153:1;161:21
**count (8)**
35:13,14;52:10,12,
13,15,17,19
**counted (1)**
219:9
**counts (2)**
52:14;83:17
**couple (10)**
8:7,10;12:24;33:20;
68:11,12;83:18;97:4;
99:15;227:6
**court (4)**

5:9;6:5,9,14
**cover (3)**
51:11;76:13;94:6
**covered (2)**
93:18,21
**covering (1)**
65:19
**covers (1)**
51:13
**crime (1)**
6:3
**criminal (1)**
11:9
**crying (1)**
75:11
**Crystal (2)**
196:6,8
**current (1)**
9:3
**currently (2)**
7:5,9
**Curry (2)**
136:22;137:12
**custody (11)**
86:20,21,25;87:9,13,
22;88:9,15;101:18;
160:22;189:16

## D

**damages (2)**
233:13,17
**danger (1)**
145:14
**Daniel (1)**
233:22
**dark (1)**
202:23
**date (6)**
12:17,18;135:2;
171:11,16;186:11
**day (28)**
12:24;13:1,10,12,13,
20;14:5,9,9,20;15:4,16;
16:9;17:1,4;19:19;
21:11;28:4;62:25;
63:22;64:19;95:19;
131:8;135:23;137:2;
189:6,18;220:3
**days (3)**
13:5,15;131:9
**dead (1)**
96:6
**deal (2)**
37:3;140:7
**decided (3)**
133:11,12;233:15
**decision (4)**
118:8,11;119:18;
232:4
**decisions (1)**
232:13
**defendants (4)**

233:13,14,16,23
**defendant's (1)**
170:5
**degree (1)**
11:8
**department (16)**
41:22;42:9,9,19;
43:6;45:6,10;126:24;
127:4;128:21;163:2,6;
167:17;176:7,23;
177:18
**depending (1)**
104:6
**depends (7)**
13:10;21:3;70:9;
74:10;99:22,22;104:3
**depicting (1)**
203:13
**deposition (7)**
4:23;5:7,21;6:3;
7:25;8:19;234:8
**depositions (1)**
233:14
**desk (3)**
51:3,6;52:6
**details (1)**
76:15
**Devine (11)**
4:11,13;183:4;
193:15,18;195:10,13;
196:2,4,6,8
**Devine's (1)**
181:17
**difference (1)**
155:2
**different (29)**
13:8;31:9,9,10;
33:24;53:3;85:6;94:13,
14;96:23;101:16;
102:23;107:18;109:25;
117:16,19,20,23,25,25;
121:4;143:4;154:16;
174:22;184:1;186:18;
223:17;229:8;231:1
**differentiate (1)**
154:7
**differently (5)**
142:22,23;144:20,
21;229:14
**difficult (1)**
222:17
**dinner (2)**
16:11;21:25
**direct (1)**
15:20
**directly (4)**
144:22;212:16;
221:20,21
**discharge (1)**
228:19
**disciplinary (1)**
195:22
**disciplined (3)**

BOSS REPORTERS
(219) 769-9090

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD   document 212-68   filed 05/25/21   page 64 of 76

30:13;187:21,23
**discuss (4)**
138:14;140:12;
147:3;194:13
**discussed (8)**
137:6;141:6;146:22;
147:4,8,10;200:24;
228:8
**discussing (2)**
136:25;139:19
**discussion (3)**
74:19;147:13;234:4
**discussions (1)**
139:6
**dispatch (10)**
86:22;101:14,21,24;
102:17,22,24;103:14;
105:20;220:16
**dispatcher (7)**
14:1;15:10;16:5;
45:6;52:7;101:17,20
**dispatchers (1)**
45:9
**dispute (4)**
38:17;39:1;165:20,
24
**distinctions (1)**
93:9
**disturbance (1)**
75:8
**document (24)**
36:9;37:18,24;38:2;
41:5,10,16,20;42:12,
15;56:15;86:1;134:16;
148:7;166:4,9,12;
171:1;186:2,7;188:4;
190:11,16,18
**documentation (2)**
148:3;228:12
**documents (9)**
4:20,22,24,24;8:23;
41:20;227:14,22,25
**done (22)**
39:9;62:5,13;63:1,7,
15;100:10;149:23;
181:10;184:13;189:6;
190:1,1,6;194:24;
229:8,13;231:1,17;
232:16,17;233:4
**door (66)**
22:24;23:4,6,20,22;
27:17;44:1,2;57:19;
58:2,7,11,15,17,19,20;
59:2,4,14,24;60:1,6,7,
18;63:17,24,25;64:3,6,
9,10,13,16;65:3,7,11,
13,16,16,20,24;66:10,
14,16,16;68:5;69:2;87:19,
23;88:6,11,12,17;
90:13,16;150:15,17,18,
19;162:3,6;204:13,14;
207:9,20;210:8;215:24
**DoorDash (2)**

18:14;19:7
**doors (5)**
44:5;87:12;89:23;
90:24;91:4
**down (64)**
6:6,10;26:24;27:3,5;
37:9;51:16;53:6;
125:23;126:5,14,18;
128:10,12,13;129:13;
130:2,2,4;154:2;
156:17;157:17;158:17,
21,25;159:12,16,25;
162:25;164:1;167:16;
168:15,22;169:2,3,12;
171:21;172:6;173:25;
174:5,7,9,10,12,13,14,
17,24;175:7;177:14,
19;187:16;202:20;
206:12,14;207:18,22;
209:11;216:16,17,22;
229:18;231:2,5
**downstairs (8)**
129:5,6;158:8;159:3;
168:13;174:1;176:16;
206:25
**drill (2)**
38:25;39:3
**drills (15)**
35:11,12,16,17,18,
22;38:14,15;39:6;
92:16;107:4;137:25;
147:9;184:8,9
**drug (1)**
11:19
**due (1)**
148:20
**duly (2)**
4:2,6
**duration (1)**
8:11
**during (59)**
4:17;14:18;15:2;
28:2;33:14;35:13,14;
43:8,24;44:5;47:5,19;
49:17,21;59:25;64:21,
21;66:1,2,3,20,20;70:6;
71:15,22,24;72:6,24;
73:18;79:12;81:7,9,9,
10,22;89:15;90:22;
91:1,3,25;95:10;97:13;
100:21,23,24;101:2;
115:19,24;116:13,24;
117:8;132:22;145:16;
182:8;220:2;222:21;
227:8;232:5,12
**Dustin (5)**
130:19;140:1;
185:13;200:18;201:8
**duties (2)**
48:15;228:8
**duty (6)**
98:14;213:24;214:2,
9,18;217:9

**Dykstra (3)**
166:18;167:7;214:19
**Dykstra's (1)**
170:5

### E

**earlier (2)**
154:3;212:10
**easier (2)**
70:12;233:3
**eat (1)**
17:9
**education (2)**
10:19;11:1
**effect (3)**
140:7;186:14,19
**effective (1)**
56:1
**effectively (1)**
184:6
**efficiently (1)**
219:17
**efforts (1)**
184:3
**Eight (1)**
213:18
**eighth (1)**
167:21
**either (17)**
17:2;20:10;23:23;
41:20;81:6;102:22,23;
105:20;176:8;181:2;
194:6;213:2;216:18,
19,19,22;221:18
**elaborate (1)**
218:10
**electrical (4)**
121:14,17;122:5;
124:6
**electronic (3)**
27:19;215:24;216:15
**else (61)**
8:18,25;17:7,16;
25:9;28:1;35:1;44:25;
46:10;47:16,23;50:15;
52:24;57:16,20,23,25;
60:11;62:10;102:3,7;
111:25;114:22;116:10,
15;117:4,7,12;119:3;
126:22;127:3,7,12;
128:6,18,22;143:9,23;
144:20;146:6,13;
157:10;163:4,24;
169:19;170:2,7;
173:17;178:7;184:10,
17;191:6;192:8,15;
198:17;205:18;215:5,
19,19;230:18,20;232:19
**else's (1)**
96:16
**e-mail (9)**
9:24;10:1,3,5;48:23,

25;49:10,16,21
**emergencies (3)**
91:11;98:10;184:13
**emergency (85)**
25:5;31:25;32:3,7,
21;33:2;35:10,12;37:4,
15;41:2;42:20,24;43:1,
11,14,20,25,25;44:5,6;
46:6,24,25;47:6,10,17,
19;48:3,7,8,13,16;53:4;
58:5,16;59:25;60:4;
70:6,10;71:22;72:1;
73:22;77:18,21,22;
78:12;79:5;81:23;
82:22;85:17;90:1;91:8;
92:4,11,16;98:2,9;
104:25;105:3;106:15,
16,19,22;112:20,22;
115:20,24;116:13,16,
21;117:14;118:3;
137:15;142:17;145:17;
178:7,14;183:18,23;
184:6;185:20;218:13;
230:18;232:5
**emergency's (1)**
78:19
**employed (2)**
11:15;35:1
**employee (2)**
166:18;228:15
**employees (1)**
9:4
**employment (7)**
11:23;12:2,13;19:6;
34:22;36:18;228:13
**end (3)**
52:15;54:4;105:23
**ended (3)**
12:25;189:16,17
**enough (3)**
217:21;218:23;
219:10
**ensure (1)**
85:13
**entail (1)**
62:10
**enter (1)**
57:6
**entire (3)**
30:1;113:5;114:3
**entrance (3)**
57:2;59:24;67:15
**equipment (19)**
24:14,25;25:2,5,11,
13;30:23;31:16,21,25;
32:3,8,14,21;33:2;
97:24;98:16;99:2;
122:5
**escort (1)**
27:9
**Estate (1)**
4:13
**estimate (1)**

83:13
**evacuate (25)**
106:14,18;112:1,23,
24;113:3,5,9,11,18,24,
24;114:2,7;127:6,9,16,
23;128:1;159:9;160:4,
5,9;175:5;176:3
**evacuated (4)**
130:7;160:11;175:8;
189:12
**evacuation (4)**
110:21;112:6;
160:14;182:21
**Even (13)**
71:9;120:23;128:12;
130:1;133:19;139:10;
153:16;155:16;157:22;
189:17;220:21;225:14;
232:5
**evening (1)**
153:16
**event (9)**
138:5,6;141:13,20;
142:10,11;183:2;
185:25;225:20
**events (1)**
79:17
**Eventually (7)**
153:6;159:8;174:10,
25;175:4;182:1;189:16
**everybody (55)**
25:23;27:14;34:7;
40:19;45:11;46:11,12;
48:24;58:24;65:9,24;
67:3;71:7;97:20;104:8,
18,22,25;105:2;
107:17;116:3,4;119:1;
128:3;129:6;130:10;
131:3;139:6,12;140:4,
5;143:10;145:7;
147:25;153:3,25;
162:18;163:2;169:13;
174:19;180:16,18;
181:8,13,15;189:12;
194:4,9;216:24;
220:17,20;222:11;
225:22;229:24;231:5
**everybody's (1)**
181:3
**everyone (1)**
225:24
**everywhere (5)**
15:15;76:1;146:4,9;
182:18
**exact (2)**
12:18;36:3
**exactly (14)**
35:17;61:22;66:24;
68:3;69:18;91:19;
97:17;102:25;105:17;
132:21;133:4;141:12;
167:19;178:11
**EXAMINATION (1)**

BARBARA DEVINE, et al. vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

4:8
**examined (1)**
4:7
**example (3)**
98:24;220:12;227:22
**examples (3)**
15:1;48:2;82:25
**except (3)**
176:4;192:15;231:10
**exceptions (2)**
120:7,10
**excuse (1)**
135:12
**Exhibit (29)**
36:11;37:17,20;39:9;
41:7;56:14,17;67:14,
15;76:18;85:21;86:3;
88:12;107:25;134:14,
18;163:14;166:2,6;
171:3;175:17;186:4;
188:6;190:13;195:1,3;
200:24;204:10;213:17
**exhibits (1)**
36:8
**exit (9)**
43:20,25;44:5;57:4;
60:16;88:12;89:3,6;
204:8
**exits (16)**
42:21,24;43:1,2,7,11,
14;60:15;67:16;
106:11,13,15,16,22;
109:23;127:11
**experience (6)**
21:18;167:11;226:8,
16,18,21
**experienced (1)**
128:19
**explain (4)**
53:20;67:6;216:1,14
**expressed (1)**
74:24
**extent (1)**
224:1
**extinguish (1)**
168:22
**extinguisher (20)**
25:8;44:18;111:11;
126:16;128:11;129:6,
18;130:5;158:1,6;
168:14;169:17;173:8,
15,21;177:5,18;
178:10;229:21;230:4
**extinguishers (23)**
39:16,18;42:21;44:9,
15;46:8,9;106:10,22;
111:21;126:11;129:8;
146:4,8;153:23;
158:12;174:1;176:12,
17;177:6,21;192:10;
229:10
**extra (6)**
81:24;96:25;112:25;

113:10,16;185:19
**eye (1)**
122:20

**F**

**Facebook (1)**
10:9
**faces (1)**
162:18
**facilitate (1)**
62:6
**facility (6)**
23:18;45:12;54:12;
58:22;89:23;226:22
**fact (1)**
180:10
**factors (1)**
21:5
**fair (1)**
6:15
**fairly (1)**
54:24
**familiar (13)**
38:4,5;41:12,13,17,
18;172:12,14,16,18,21;
197:3,21
**family (1)**
198:24
**fans (1)**
122:11
**fast (13)**
45:16;46:3;58:14;
68:18;108:8;126:20,
25;127:13;129:18;
143:3;154:2;155:13;
229:21
**fault (1)**
132:17
**feedback (1)**
201:5
**feel (21)**
55:25;56:3;73:7;
87:7;140:5;142:19;
143:10,14;147:25;
183:12,15,20,24;184:4;
204:20;219:19,20;
225:10,18,22;227:19
**felony (1)**
193:6
**felt (2)**
56:6;227:2
**few (4)**
97:10,11;201:21;
212:2
**fifth (3)**
70:13;127:22;182:7
**figure (2)**
79:16;89:10
**file (2)**
8:21;37:25
**fill (6)**
55:1,5,12,14,19;

210:22
**filled (1)**
55:3
**filling (1)**
55:10
**final (1)**
34:4
**finally (2)**
125:21;152:14
**find (6)**
14:4;22:11;76:5;
121:23;145:8;151:24
**finding (1)**
180:7
**fine (1)**
7:2
**finish (8)**
6:13;52:17;142:2;
149:9,11,11,14;151:9
**finished (3)**
151:11,14;189:22
**finishing (1)**
189:17
**fire (155)**
25:7;32:14;38:14,15,
22,25;39:3,6,13,15,17;
41:22;42:8,9,12,19,23;
43:5;44:9,14,17,19,20;
45:1,6,9;46:5;48:3;
78:22;106:12,21;
107:21,23;108:3,15,19,
24;109:2,7,15,16,20;
110:16,24;111:10,11,
18,19,21,23;121:2,6,6,
9,13;122:19,19,24;
124:15,23;125:18;
126:11,15,24;127:4;
128:11,21;129:6,7,12,
15,17,22;130:5,25;
132:20;133:18,22;
135:20;136:11,13;
137:25;139:20,22;
146:8;147:9;148:9;
153:23;158:1,6,12;
163:2,6;164:13,16;
167:8,11,16;168:14,22;
169:17;172:4;173:4,7,
14,21;174:1,11;175:2,
3;176:7,12,17,23;
177:5,6,18,21,21;
178:9;182:9;184:6,8,9,
14,18;185:1,16,16,20,
21;192:10;194:11,11,
14,21,24;199:20,21;
200:14,18;202:3;
203:2;207:16;208:3,
15;209:11;211:13;
212:6;228:21;229:9,
21,25;230:3,6
**firefighters (2)**
41:24;165:22
**firemen (8)**
103:23;104:2;106:3;

107:7,12,15;162:20;
208:3
**fires (6)**
120:13,16;123:2,4;
184:13;185:16
**first (151)**
4:6;12:15,24;13:11;
18:8,16;19:7;23:11,12,
20,21;25:6;36:23;37:7,
8,16;38:13;43:15;
45:15,17,25;46:7;48:6,
17;58:1,5,8,18;59:5;
61:1,8,13;63:16;65:2;
78:5,7,10,15,18,22,24;
79:4,22,24;80:4,10,11,
13,19,24;81:11,14,18;
82:5,13,23;83:14,21;
84:2,5,9,15,17,23;85:9,
17;90:12;91:5,9,12;
93:6,10,10;103:20;
104:2;113:7,8,14;
115:15;126:23;127:3,
15,19;128:20;136:24;
137:21;145:8,11;
147:1,3,17,24;153:25;
160:16;161:24;162:21,
23;163:16;165:4,12,
18;167:1,2;168:17,25;
169:3,6,15,18,20;
170:1,8,13,15,21;
172:10,23;174:17,24;
175:7,11,15,25;176:5,
25;177:25;178:1,23;
182:2,16;183:10;
191:22;192:2,6,14,22;
209:5;211:25;229:6,
14;230:5,13,16,17,23;
231:9,14,22;232:2,14,
17
**five (16)**
17:20;36:1,2,5;56:9;
68:7,20,21,22;125:10;
146:11;150:8;157:2;
217:19;218:1,7
**fix (1)**
47:11
**flag (1)**
127:20
**flame (1)**
164:11
**flames (3)**
129:24,25;211:17
**flash (8)**
136:13;158:5,11;
164:7,10;167:14;
202:17;210:5
**flashes (1)**
129:15
**flashing (1)**
157:19
**flashlight (1)**
25:25
**flights (5)**

68:7,23;125:16;
146:11;158:21
**floor (21)**
23:12,20,21;43:16;
58:18;59:5;61:8,9,14,
16;77:12;125:22;
152:7;153:3;157:2;
159:23;165:12;174:17;
176:25;182:7;194:7
**focus (1)**
11:9
**follow (2)**
67:3;159:21
**follows (1)**
4:7
**forgot (5)**
28:24;52:18;197:7;
216:16,18
**form (1)**
92:10
**former (1)**
9:4
**forms (5)**
223:17,19,22,23,24
**forth (2)**
153:18;154:11
**forward (1)**
141:21
**found (5)**
18:4;144:25;145:4;
156:12,18
**Four (9)**
11:5;17:20;121:4;
170:21;172:23;207:12;
214:8,25;219:7
**fourth (4)**
37:9,14;127:22;
167:15
**frequency (1)**
104:17
**frequent (2)**
54:10,24
**frequently (11)**
19:16;33:19;35:21;
50:25;55:14;83:8;97:2;
120:15;199:9;200:3,4
**friends (1)**
199:2
**Fritter (1)**
162:17
**front (33)**
23:6,20,22;27:20;
29:19;52:6;57:2;60:7;
63:24,25;64:2,6,9,10,
13;65:7,16,20;68:5;
76:20;125:25;179:4,8;
188:25;204:6,13,14;
207:9,20;208:20;
209:6;221:8,9
**full (3)**
12:8;32:4;86:6
**further (2)**
192:2;230:13

**BOSS REPORTERS**
**(219) 769-9090**    (5) examined - further

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 66 of 76

**future (6)**
9:9;140:19;141:1,11, 12,14

# G

**Gann (2)**
196:23,25
**gate (11)**
87:14,16,17,17,25; 88:1,2,5;178:23;179:5, 8
**gates (2)**
14:15;87:23
**gather (1)**
17:1
**gave (8)**
42:11;65:6;128:17; 144:7;159:7,18; 168:22;213:15
**gear (3)**
22:4,10;26:16
**general (8)**
71:3,4;84:11,12; 85:13;114:11;139:21; 226:22
**generally (6)**
32:21;62:19;103:5; 157:6;184:14;232:23
**General's (1)**
233:24
**gets (6)**
22:11;26:25;70:22; 104:13,16;187:21
**given (27)**
5:9;41:24;77:13,17, 20;85:4,8;89:15;90:4; 115:18,22;116:2; 117:18,22,24;118:2; 122:22;183:16;185:15, 20;188:11;192:11; 222:20;223:2,4,7,11
**gives (1)**
22:12
**giving (1)**
101:25
**goes (7)**
88:19;95:7;101:7; 109:16;210:8;216:16, 18
**good (6)**
25:23;142:18,19; 219:19;224:16,20
**grab (14)**
126:5,15;128:11; 129:1,6,16,17;130:4; 146:12;153:23;168:15; 169:12;177:20;180:17
**grabbed (2)**
174:20;180:14
**graduate (2)**
10:20;11:6
**graduated (2)**

11:11,13
**GRADY (2)**
203:4;208:12
**grievances (2)**
30:8;223:23
**Griffin (1)**
197:20
**group (2)**
33:17;139:11
**groups (1)**
91:9
**Guard (1)**
187:3
**guess (7)**
81:17;120:18;126:7, 7;193:12;230:11;231:7
**guessing (1)**
166:21
**guys (4)**
124:8;144:12;184:3; 205:21

# H

**half (2)**
38:15;125:15
**hall (11)**
86:20,21;87:9,13,22; 88:9,15;101:18; 160:22;189:16;216:4
**hand (3)**
28:8;63:24;173:7
**handbook (1)**
228:15
**Handcuffs (2)**
31:23;99:4
**handed (2)**
126:8;173:14
**handing (1)**
206:15
**handle (2)**
46:1;84:20
**hanging (1)**
39:19
**happen (13)**
21:22;42:1;45:13; 83:4,8;84:4;91:3;94:7; 101:5;102:20;103:5; 145:6;189:19
**happened (58)**
15:2;35:22,23,24; 38:21;83:6,12;84:6,9; 86:24;113:17;126:20, 25;127:13;130:7,12; 131:7;132:10,19; 133:1,15,18;135:14,16; 137:10,19;138:9,11,14, 17;139:8;140:4; 141:22;143:2;144:25; 147:15;150:15;159:23; 175:10,15,22,24; 178:25;180:8;184:21, 22;189:10;192:18;

194:11,14;199:21; 200:15,18;201:15,18; 225:17;226:6;227:8
**happening (14)**
39:6;42:4,5;71:15; 79:17,18,20;123:4; 126:14;128:25;129:14; 142:25;150:25;224:18
**happens (11)**
14:18;73:17;74:17; 84:17;95:25;141:12; 146:10;187:17,19; 210:7;218:13
**hard (7)**
69:23,24;74:12; 136:7,10;211:2;228:3
**harder (1)**
70:22
**hazard (2)**
121:13;122:24
**hazards (1)**
122:19
**head (1)**
16:7
**heading (1)**
209:10
**hear (72)**
28:21;54:11,17,18; 69:17,20,22,23,24; 70:8,11,12,14,17,19,21, 22,23;71:10,12;72:2; 73:12,15;74:9,12,19, 25;75:5,15;83:20; 96:18;104:8,23;105:1, 2;109:17;115:10; 121:1;123:12;139:3; 150:24;151:25;152:4, 10,15;153:4,13,13,18, 19;154:4,10,12,14,15, 17;155:5,22;156:4,15; 157:5,9;164:20;165:8, 9,12,14;182:9;219:4; 222:17;224:18;227:3
**heard (25)**
71:1;74:14;75:3,8, 11;91:15;109:20,21; 125:17;151:10;152:4, 6,9;155:14,16,20; 157:8;160:25;161:21; 168:4;181:23;193:23; 195:12,15,18
**hearing (12)**
54:22;74:15;109:2,7, 10;121:5;125:10; 151:12;153:3;155:19; 165:17;212:6
**help (89)**
45:3,20,22,22;47:11; 48:8;72:3,8,12;73:4, 24;74:3,3,20;76:9; 78:13,20;79:22;81:16, 25;82:4,23;83:1,3; 84:15;91:14;93:8,8;

98:3,10,12;103:7,8,10, 18;104:4,5,6,12,14,16; 105:5,10;106:1; 109:22;111:1,2;113:1, 10,16;116:5,8;118:10; 128:11,13,14;129:18; 130:5;141:11;143:1; 145:10,15,21;154:5,6, 8,13,15,22;162:25; 170:19;174:14;177:21, 23;178:4;183:4;184:5; 190:24;191:6;219:20; 220:9;221:16;223:14, 16;224:2,19;227:22; 228:5;230:18
**helped (9)**
139:2,4,7,9;183:22; 191:2,4;225:15,16
**helpful (16)**
79:14;139:12,13; 140:14,15,17,18,20; 141:2,6,7,10,21,24; 142:9;225:10
**helping (3)**
127:9;160:14;224:2
**herein (1)**
4:6
**high (6)**
10:20,23;19:10;69:6; 222:18;223:5
**higher (19)**
46:21,23;70:22; 74:12;110:11;112:2; 113:13,17,21;114:11, 16;115:9;132:4;165:7, 8,11,16;222:22;224:17
**higher-ups (1)**
178:16
**highest (2)**
69:23;214:15
**Hill (1)**
215:1
**hit (1)**
187:15
**hitting (1)**
95:21
**hold (2)**
39:10;44:1
**holding (1)**
86:23
**home (2)**
18:6;29:15
**honestly (20)**
7:7;32:9;41:11; 69:22;93:4,19;103:13; 105:22;117:17;133:20; 136:6,20;137:1; 138:18;142:19;143:7; 173:9;182:10;209:9; 228:3
**hopefully (1)**
73:12
**hospital (2)**

224:4,9
**hour (2)**
54:16,21
**hours (4)**
8:15;13:1;97:10,11
**house (113)**
9:14;13:18;19:13,15, 15,20;20:5,11,14,15, 24;21:2,6,9,12,15;22:5; 23:5,24;24:7;38:24; 51:12;54:10,20;55:7; 56:23,24;57:3,20,24; 60:15;62:9,19;63:17; 65:10,17,23,23;67:16, 19;69:6,21;70:16,18, 24;71:2;74:9,11,25; 75:20;77:21;85:1; 86:14;87:9,13,19,24; 88:3,6,9,25;89:13;94:3, 7;100:4,8;107:12; 108:3,25;109:16,17; 112:3;114:3,7,8; 130:10;147:18;149:5; 150:11;152:1;153:5,8, 14;160:20;162:3; 171:23;173:23;177:9; 182:12,20;183:5; 186:10;189:17;194:2, 16,21;203:14;204:3; 212:6,23;213:8,9; 217:10,22;218:5,8; 219:25;221:4,5,7; 224:15;232:22;233:1
**houses (2)**
55:2;87:11
**housing (1)**
187:4
**hurried (1)**
130:3
**hurt (2)**
226:7,17

# I

**IA (4)**
8:21;37:25;130:17, 18
**idea (6)**
137:16;179:1,10; 194:25;224:16,20
**ideal (1)**
219:21
**ideas (1)**
224:25
**identification (11)**
36:10;37:19;41:6; 56:16;86:2;134:17; 166:5;171:2;186:3; 188:5;190:12
**identify (1)**
57:1
**IDOC (4)**
9:4;12:15;30:16;

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 67 of 76

191:6
**immediately (9)**
45:2;72:4;73:25;
143:25;144:11;145:14;
155:18;224:4;225:4
**impact (5)**
7:6,14;21:5;138:20,
24
**impair (1)**
7:10
**important (19)**
6:7,8,12;97:24;98:8;
138:5,6,13,16;140:3,8,
10,11;141:25;142:9;
187:25;218:6;225:7,9
**impression (1)**
133:21
**incident (10)**
55:12,13,14,21;
96:14;146:23;166:13,
14,23;227:4
**incidents (1)**
123:1
**include (1)**
117:2
**included (1)**
213:9
**includes (1)**
47:13
**incorrectly (1)**
63:4
**independent (1)**
124:14
**Indiana (5)**
9:7;33:15;39:13;
86:6,11
**indicating (22)**
60:17;67:22;68:1;
69:1;76:22;86:17;
87:22;88:16;108:1;
163:19;164:4;195:4;
204:19,21,25;207:6,10;
209:1,4;210:1,19;
211:14
**individual (1)**
22:24
**information (2)**
9:16;106:25
**informed (1)**
82:17
**initial (1)**
20:4
**inmate (1)**
79:23
**inmates (3)**
73:3,3;107:13
**inquiry (1)**
180:4
**Instagram (1)**
10:13
**installed (1)**
187:4
**instance (1)**

70:12
**instead (4)**
6:8;27:22;146:11;
181:3
**instructed (42)**
31:21,24;32:2;35:19;
48:10;49:25;50:1,2;
57:17,25;58:4;59:6,7,
16;60:10;63:18,19;
65:18;66:10,11;71:21;
72:24;77:23;80:14;
81:13;95:10;105:15;
110:2;115:12;116:20;
148:13,22;149:9,10;
151:4;192:16,23;
221:6;223:19;231:8,
22;232:1
**instructing (1)**
148:15
**instruction (42)**
39:13,21;42:19;44:4,
8;46:23;47:1,6;77:14,
17,20;80:15,22,23;
85:16;89:15;90:4;
101:10;102:20;104:1;
108:18;112:2,4,6;
113:3,6,12;114:2,15,
23;115:4,19;116:3;
121:12;122:22;185:15,
19,24;222:20;223:4,7,
11
**instructions (25)**
46:20;65:6;78:5;
80:9;85:5,8;94:23;
106:5,8;110:15,17;
112:12;115:23;117:18,
22,24;118:2;159:5,7,
11,18;178:4;191:9;
212:11;223:1
**interact (1)**
196:21
**interactions (3)**
33:15;197:14,16
**interested (1)**
12:1
**internal (1)**
201:7
**interrogatories (7)**
8:20;190:19,21,25;
191:10,12,21
**interrogatory (2)**
228:25;229:1
**interview (2)**
185:13;201:8
**interviewed (3)**
139:25;185:6,8
**interviews (3)**
11:19;12:6;185:9
**into (16)**
4:15;7:23;17:20;
20:5;22:4;33:17;49:25;
50:3;130:10;149:16;
158:23;159:1;184:25;

190:23;229:17,24
**introduce (1)**
233:21
**investigation (5)**
163:14;184:25;
185:2,7,11
**investigations (1)**
185:4
**involved (3)**
78:25;198:18,20
**ISP (55)**
10:3;13:23;14:10;
17:22;18:2;19:7;29:22;
30:5,8;31:5;34:1;35:1,
7;39:7,22;40:21,25;
41:21;48:22;56:1;83:5;
104:18,22,23;107:10;
109:5;120:13;123:2,
10;124:6;131:15;
132:2;145:25;147:19;
167:16;183:16;184:17;
195:25;196:12;197:8,
13,15;198:1,4,7;
199:18;200:3,9,12,17;
218:21;227:9,12;
228:13;232:23
**issue (3)**
74:18;222:22;233:18
**issues (6)**
123:9;199:11;200:5;
218:21;219:4;233:16
**items (1)**
122:23

### J

**James (2)**
198:11,12
**Jason (1)**
197:23
**Jeremy (1)**
166:18
**job (17)**
18:4,5;56:4,7;62:23;
63:11;66:3,5,8;81:22;
82:2;84:25;100:25;
101:12;128:21;219:19;
233:3
**jobs (3)**
19:9;26:20;64:25
**join (1)**
92:7
**joining (1)**
92:8
**Joshua (9)**
4:13;129:9,19;
181:17;183:4;193:15,
18;195:10,13
**Joshua's (1)**
211:7
**judgment (1)**
233:15
**June (1)**

17:25
**justice (1)**
11:10

### K

**keep (14)**
31:19;47:17;82:11;
115:25;116:1,3,3;
122:20;157:1;159:3;
204:16;228:12,15,21
**Kenneth (2)**
196:23,25
**kept (3)**
76:25;77:15;165:6
**key (30)**
22:23,25;23:1,21,22;
53:24;57:7,13,15;58:1,
6;60:7,18,23;63:24;
89:13,18,23;99:3;
126:9;137:14;142:17;
146:14,16;162:3,6;
185:24;215:24;217:3,5
**keys (84)**
20:1;22:3,12,16,19,
20;23:3,4,12,15,17,23;
24:11;28:8;43:13,15,
18,21;44:1;53:18,21;
54:1,5;57:18;60:20,24;
61:8,13,16,21;89:13,
16,19;90:2,5,10;91:7;
98:24,25;108:21;
111:13,22;126:1,3,5,6,
8,10,11,15;128:4,11,
15;129:2,5;142:25;
143:1,17,19,22;144:7;
158:19;159:2;161:10,
14,17;162:10,12;
178:9;179:4,9;180:14,
17;181:4,18,21;182:3;
192:10;217:6;229:9,
11;230:9,10;231:2
**kind (10)**
14:23;16:13;38:3;
41:13;42:18;72:3;
121:12;162:18;180:20;
184:19
**kit (1)**
25:7
**knew (11)**
44:12;56:3;62:24;
81:18;82:14,18;85:12;
132:8;144:24;157:21;
176:20
**knowledge (3)**
32:6;195:21,24
**known (2)**
145:3;180:1
**knows (1)**
115:1

### L

**Lake (1)**
10:24
**large (1)**
164:7
**last (11)**
14:21;33:20;38:25;
97:7;171:13,14;
193:11;197:3;198:3;
209:16;213:19
**lasted (2)**
31:2;34:19
**later (3)**
131:9;153:7;177:14
**latest (2)**
164:14,17
**lawsuit (5)**
5:14,17;198:17,25;
199:2
**lawsuits (1)**
198:14
**learn (13)**
11:22;43:4;66:4;
72:5;84:4;90:21;
100:24;137:13;140:12,
21;141:2,25;142:9
**learned (15)**
30:22;31:16;81:6,10;
91:22,24;92:13;139:5;
140:16,24;141:4,13,20;
142:11;192:19
**learning (6)**
30:23;43:10;66:8;
92:12,17,25
**least (3)**
164:14;187:9;189:20
**leave (5)**
54:3,7;59:2,4;98:24
**leaves (1)**
58:22
**leaving (5)**
18:3,15;150:10;
199:18;200:12
**led (1)**
31:7
**left (10)**
17:24;87:7,15,15;
89:9;150:18,20;152:3,
19;191:20
**left-hand (2)**
171:22;172:7
**less (3)**
36:1;68:14;75:23
**letter (1)**
4:21
**letting (11)**
47:13;63:10;65:2;
115:4,19;119:1,4;
127:9;128:3;216:8,11
**level (15)**
61:1;69:23;70:13;
74:5;77:1,3;163:5;
165:1,10;173:19;
174:16,24;175:7;

BARBARA DEVINE, et al. vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 68 of 76

176:9,9
**lie (1)**
    6:2
**lieutenant (26)**
    16:2;17:2;20:10,12,
    14;110:13;128:16;
    136:18;144:8;148:14,
    25;149:1;167:16;
    170:6;172:12,14,16;
    212:14;213:2,5,7;
    214:21;221:2,16,18,19
**lieutenants (16)**
    14:17;35:19;126:8;
    131:17;144:8;162:11,
    14;169:25;214:11,22;
    215:15;219:14,18,22;
    220:6,21
**light (9)**
    136:13;157:19;
    158:5,11;164:8,10;
    167:14;202:17;210:8
**lights (1)**
    210:10
**line (5)**
    163:16;167:15;
    215:19;222:11,13
**lines (1)**
    6:12
**listed (1)**
    171:25
**listen (5)**
    73:14;80:9,11;
    110:15;113:19
**listened (3)**
    110:3,5;159:5
**little (16)**
    22:2;25:17;61:10;
    82:10;89:12;94:16;
    109:24;125:3,23;
    135:15;157:17;174:22;
    184:1;202:24;216:1;
    218:10
**lived (1)**
    107:17
**living (1)**
    9:6
**local (1)**
    16:19
**locate (5)**
    45:22;111:12,19;
    125:20;155:15
**located (4)**
    125:21;152:14;
    153:2;155:8
**location (2)**
    86:23;173:23
**lock (2)**
    27:17,19
**locked (11)**
    43:11;64:19;76:24,
    25;77:1,2,4,15;89:4;
    216:19,20
**log (1)**

55:8
**logged (1)**
    150:6
**log-on (1)**
    150:4
**logs (2)**
    55:1,3
**long (27)**
    8:8,16;11:4;13:13;
    14:21;17:22;30:25;
    31:3;34:19;68:4,6,9,
    18;88:8;97:6,8;108:2;
    125:9;128:24;147:15;
    150:6,8;152:25;153:9;
    158:7;207:1;228:4
**longer (4)**
    68:15;97:11;120:23;
    222:23
**look (31)**
    8:22;25:25;41:12,17,
    17;50:21;94:9,11;
    121:12;122:23;125:19;
    135:7;156:25;163:13;
    168:6;170:4;171:8;
    174:5;176:12,16;
    177:2;178:17;179:11;
    181:8;187:2;188:14;
    190:20;202:22;209:13;
    213:14;228:4
**looked (7)**
    8:20;93:13,16;167:7;
    175:14;191:18;203:23
**Looking (19)**
    37:2;51:1;67:14;
    76:18;88:12;125:14,
    16;128:9;142:1;
    145:22;156:10,17,23;
    157:25;165:6;179:2;
    186:23;202:20;206:19
**lookout (1)**
    122:14
**looks (19)**
    38:3,5;41:13,18;
    56:23;164:13,16;
    165:22;188:16,19;
    203:15;206:10,15;
    207:19,22;209:5;
    210:9,15;214:25
**lot (10)**
    123:21;162:16;
    182:19,19,22;210:15;
    218:4,7;226:9;227:8
**loud (8)**
    71:5,6;153:15,17;
    155:1;182:12,15,17
**loudly (2)**
    152:23;153:1
**low (1)**
    95:7
**lower (2)**
    74:12;217:15
**lunch (2)**
    16:11;21:24

## M

**Main (5)**
    88:19,23;204:8;
    220:13,15
**maintenance (5)**
    123:9,12,16,19;
    124:2
**makes (4)**
    96:5;112:14;118:11;
    225:23
**making (5)**
    26:1;28:14;58:24;
    62:12;95:22
**manual (1)**
    41:3
**Many (20)**
    4:22;12:6;21:1,5;
    35:24;42:3;75:19;
    83:17;87:12;93:25;
    97:15;107:6;120:18;
    170:15,17;207:11;
    213:23;214:2;217:24;
    219:9
**map (6)**
    56:20;86:6,8,9,10;
    204:10
**mark (3)**
    67:23;100:13;107:25
**marked (12)**
    36:10;37:19;41:6;
    56:16;86:2,18;134:17;
    166:5;171:2;186:3;
    188:5;190:12
**master (1)**
    86:23
**materials (1)**
    228:17
**matter (1)**
    44:22
**Maybe (36)**
    8:10;12:8,19;17:20,
    20;33:20;35:23;61:11;
    67:21;68:11,15,20,20;
    75:24;88:1;97:5,14,14;
    107:8;108:10;120:19,
    21,23;125:9,15,16;
    146:4;158:21;162:17;
    171:21;184:8;214:25;
    219:23;225:3;228:4,5
**mean (37)**
    8:11,13;20:14;38:19;
    39:3;47:10;48:14;
    52:16,20;62:19;70:16,
    17;79:9;84:3;103:7;
    111:5;112:22;116:14;
    121:16;123:14;128:1;
    130:23;138:12;139:20;
    147:10;166:19;175:24;
    183:14;187:11;191:4;
    198:20;219:15,24;
    227:13,17;229:7;

230:15
**means (4)**
    20:1;38:20;89:11;
    216:17
**meant (1)**
    146:25
**media (1)**
    10:7
**medias (1)**
    10:15
**medical (5)**
    7:5,13,20;83:3;
    223:23
**medication (1)**
    7:9
**meet (4)**
    7:23,25;53:10,12
**meeting (54)**
    8:2;16:21,24,25;
    20:4;106:4;131:3,4,5,6,
    14,16,20,23,25;132:10,
    14,22,24;133:9,12,15,
    20,22;134:1,3,9;135:5,
    10,14,17;136:19;
    137:2;138:3,4,14,17,
    19,20,21,24;139:11,16;
    140:3;147:4,14;
    200:21,22,23;201:2,5,
    5;225:7,9
**meetings (3)**
    16:16,18;139:23
**Megan (2)**
    4:10;233:11
**member (1)**
    201:17
**members (1)**
    140:8
**memories (2)**
    79:16;124:19
**memorize (1)**
    42:22
**memory (7)**
    7:18,21;79:18,19;
    110:23;124:14;168:11
**mentally (1)**
    15:3
**mention (1)**
    10:16
**Merchants (3)**
    18:8,16;19:7
**met (2)**
    196:2,6
**middle (6)**
    67:21;158:23;159:2;
    171:22;174:18;188:20
**might (11)**
    6:18;53:5;70:11;
    105:22;121:9,13;
    122:23;195:22;201:21;
    227:15,24
**mind (1)**
    233:5
**mine (2)**

96:17;97:9
**minute (2)**
    179:14;207:3
**minutes (26)**
    8:15;14:22;26:9,11;
    56:10;68:11,12,20,21;
    108:4,5,11,12;125:10;
    150:8;164:21;187:9,
    12,14,18,22;188:1;
    189:20;190:8;201:21;
    233:5
**misdemeanor (1)**
    193:8
**moment (4)**
    48:1,21;59:16;153:6
**monitored (1)**
    51:10
**monitoring (1)**
    51:9
**month (7)**
    8:7;40:7,11;55:17;
    93:14,16;120:19
**months (7)**
    8:10;12:24;13:12;
    17:20,23;120:22,24
**more (30)**
    21:11;36:2;67:21;
    74:1;75:24;116:2;
    125:16;147:9;170:22;
    174:1,4,6,8;184:8,9;
    187:18;194:5;212:2;
    215:9;216:1;217:17;
    218:11,15,19;219:15,
    20;220:2;230:2;
    231:23;233:3
**most (1)**
    221:4
**mostly (2)**
    13:15;76:2
**mother (2)**
    200:8,10
**move (4)**
    9:8;76:7,11,12
**movement (2)**
    210:20;211:5
**much (11)**
    11:17,18;21:17;
    81:16;92:18;112:15;
    136:9;137:1,7;147:14;
    153:7
**multiple (13)**
    19:18;22:1;30:23;
    31:17;32:22;35:24;
    42:1;75:21;112:18;
    127:8;150:1;216:5,8
**must (2)**
    74:3;187:8
**myself (6)**
    114:21;145:23;
    153:20;229:21,22;
    233:21

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 69 of 76

## N

**name (19)**
4:10;5:3;12:14;14:2;
31:8,11;54:1;130:19;
132:1;151:10,12;
156:19;160:25;161:3;
196:24;197:3,18,21;
233:22
**names (7)**
125:11,14;134:7;
145:14;151:20;157:8;
161:22
**narrative (1)**
163:17
**Neal (5)**
196:10,14,15,16;
201:14
**near (3)**
9:8;61:24;62:1
**necessary (1)**
48:21
**need (33)**
5:22;7:1;32:25;
44:17;52:6;53:11;54:2;
59:5;73:4,24;78:11,20;
81:16;90:13;98:2;
104:16;105:5,11;
106:1;111:7,9;112:25;
113:16;116:14;117:3,
10,11;119:3;137:21;
187:11;201:21;224:3;
225:2
**needed (54)**
24:20;29:9;44:13;
45:21,23;47:25;53:9;
54:15;61:24;62:5,13;
63:23;73:24;76:9;
77:23;79:22;81:24;
83:1,3;84:18;90:5,10;
91:13;93:7;98:3,10,12;
102:6,14;103:8,11;
104:4,6,12,14;105:24;
112:15;117:21;118:4;
123:20;137:24;138:10,
21;148:17;184:5;
212:25;216:3;218:13;
220:9;221:17;222:2;
223:9;224:22;229:25
**needs (3)**
61:13;62:1;72:20
**net (1)**
233:12
**new (1)**
94:10
**next (13)**
16:6;61:4;77:12;
87:19,21;178:18;
187:7;189:5,20;210:8;
213:21;214:3;215:12
**nice (1)**
233:2

**night (54)**
12:25;17:19;21:12;
22:7;26:10;38:24;62:9;
71:3,9;75:18;76:9;
84:11;96:12,13;102:6;
109:4,11;110:8;
127:18;128:7,19;
129:20;132:19;133:18;
137:8;142:20,22;
143:6,9;147:16,24;
148:9;153:16;172:4,
24;173:4;184:25;
212:7,13,24;213:10,12,
24;214:2,9,16;217:9,
10,22;219:8,11,18;
220:3;226:9
**nobody (11)**
58:22;77:16;119:25;
143:23;144:24;198:6;
225:12,12;229:3;
230:24,24
**nodding (1)**
6:8
**nods (1)**
143:20
**noise (2)**
95:22;96:5
**noises (1)**
154:10
**none (2)**
120:20;189:13
**non-emergency (1)**
222:1
**normal (2)**
153:19;217:9
**normally (5)**
14:24;15:12;21:1;
89:2,5
**north (5)**
202:10;208:13;
209:14,17;211:25
**noticed (1)**
46:5
**Nowatzke (1)**
197:23
**number (9)**
9:11,14;36:3;52:20;
213:17;217:8;219:22;
222:14;232:22

## O

**oath (1)**
5:25
**object (2)**
9:15;180:19
**obligation (2)**
48:8,12
**October (14)**
4:17,20,21;36:12;
37:21;41:8;56:18;86:4;
134:19;166:7;171:4;
186:5;188:7;190:14

**off (21)**
40:3,15,16;41:25;
89:9;109:3,8,10,13,16,
20,21;110:16,25;
111:10,19;182:9;
203:4;212:6;233:5;
234:5
**offender (8)**
26:1,4,11;112:16,17;
123:22;154:4;210:9
**offenders (4)**
59:1;112:18;127:10;
130:9
**offer (1)**
12:13
**office (51)**
20:17;24:6,9;28:13,
16,16,23;29:5,8,20;
39:19;40:2;44:16;49:9,
25;50:3,8,23;51:9,25;
52:1;61:4,6,24;62:1;
63:23;87:6;124:25,25;
125:6;146:5;149:12,
14,17,24;150:2,13,13,
14,14,19;151:13;
152:19;153:1;161:21;
176:19;203:16;221:12,
15,19;233:24
**officer (115)**
12:16;16:3;17:2;
19:23;20:9,11,13,18,
20;21:14,18;22:6,7,12;
23:8,9,25;24:1;26:23;
28:9;29:25;51:6;53:22,
25;55:3,8;59:13;60:19,
22,23,25;62:20;63:3,6,9,
22;64:1;80:23;83:1;
91:13;93:7;97:19;
98:13;101:11;104:11;
110:12;111:12;114:4,
25;115:8,17;116:17;
117:21;118:7,11;
119:4,16,17;120:11;
125:2,6,11,20;126:1;
127:21;129:1,16;
130:4;133:25;134:3;
136:5,5;143:1,13,16;
144:11,21,22,25;145:9,
13;146:15;150:10;
151:10,16,17,19;
153:10,12;156:10;
162:2,5;163:9;165:7;
172:19,21;179:11;
180:13;193:14;199:4;
205:8;206:6,16;
212:19;215:12;231:16;
232:4,6,13
**officers (36)**
17:3;33:18,22;35:3,
19;53:2;61:16;62:13,
23;74:24;76:10;84:8,
14,18,22;95:16;

110:12;113:1;123:17;
127:8,17;130:21;
131:1;136:15,15;
142:20;147:17;160:13,
15;181:3,7;189:15;
210:25;211:3;226:7,17
**officer's (15)**
24:5;25:3;50:12;
52:2;68:25;69:7;76:20;
96:9,14,18;97:16;
150:14;204:5,19;205:8
**offices (2)**
23:24;24:3
**official (2)**
16:14;67:1
**often (14)**
26:7;29:1;40:13;
49:4,5;54:14,16;55:16;
73:10,20;74:22;75:21;
83:14;93:15
**once (14)**
40:7;45:13;48:6;
55:17;58:13;63:20;
93:13;95:6;105:11;
107:8;182:1;216:5;
231:11;232:17
**one (105)**
9:13;11:24;14:7;
22:25;23:1;27:22,25;
28:22;31:10;36:22,23,
25;37:6,7,8,9,10,14,14;
38:23;41:24;42:1,4,11;
43:20;48:24;50:13;
51:24,25;53:23;57:17;
63:7;87:16,17,18,21,
25;88:1,1;94:1,9;
97:14,19;99:11,11;
101:22;102:25;103:16;
120:21,24;123:25;
124:1;126:3,8;130:13;
131:2;134:9;138:9;
144:7;146:12;158:21;
162:10;166:19;167:2,
2;168:16,17;169:6,14,
14;170:14;173:10,22;
174:19;175:16;176:13,
14,22;177:16,20;
178:18,20;181:23;
186:16;187:3;189:25;
190:1,2;191:2;196:13;
201:1,4;208:6;214:13;
215:9;216:11;217:18,
22;219:8,10,23;221:3,
4,7;231:23
**ones (7)**
33:24;37:12;173:22;
177:9,9;186:18;216:5
**ongoing (1)**
39:20
**on-line (3)**
11:18;12:4;36:16
**only (30)**
22:16,20;23:9;24:4;

28:22;33:16;37:14;
49:7;50:13;51:24;
65:18;66:10;67:15;
89:5;94:17;95:24;
115:3;126:3;128:25;
130:16;134:8;144:19;
157:7;185:12;201:9;
212:24;213:13;217:5;
223:1;232:25
**on-the-job (1)**
66:1
**open (43)**
24:4;28:19,22;44:1,
1,2;58:6,11,15;59:2,4;
60:1;64:16,19,20;65:2,
11,21,24;66:10,16,22;
69:2,3,4,13,19;77:24,
25;90:13,16,24;91:4;
150:15,20,21;162:3;
178:23;179:4,8;216:2,
21;229:11
**opened (3)**
65:7,17,20
**opening (3)**
65:12;117:6;207:9
**opens (1)**
87:18
**opinion (1)**
201:4
**opportunities (1)**
11:23
**opportunity (2)**
18:4,5
**opposing (1)**
4:18
**opposite (3)**
203:15;204:3,4
**orders (19)**
39:24;40:1,12,21;
93:13,18,21,25;94:2,4,
11,13,22;95:14;
113:20;186:8,9,11,13
**Otherwise (3)**
168:10;222:6,8
**out (95)**
14:4;21:25;22:11;
26:20,21;27:1,7,12,13,
14,16;33:8;36:7;47:1,
5,14;48:8;53:24;55:1,
3,5,10,12,14,19;62:24;
63:11;65:9,10,24;
67:12;68:24;72:17;
75:3,6,9,12,16;76:5;
79:16;82:12;88:18;
89:10;96:24;98:3;
102:24;104:5,12,23;
105:23;106:11;107:15;
112:3,11,13,16,18,18;
114:24;115:1,4,13,19;
117:10,11;118:4;
119:2,2,11,12,14,20,
25;120:2;122:20,23;
127:10;128:3;130:9,

BARBARA DEVINE, et al. vs
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 70 of 76

10,14,25;151:12,16;
152:25;161:20;174:11;
184:17;191:20;211:17;
215:23;216:8;224:7,
12;230:6
**outside (6)**
20:16;88:21;89:1;
150:25;199:14,25
**outstanding (1)**
4:22
**over (53)**
4:20;5:20;8:3,20;
17:11,12,15;28:6,8;
32:22;38:25;41:23;
48:9;49:11;80:25;
81:14,15,16,19;94:9,
11;96:16;104:9,23;
107:9;129:15;132:25;
133:3,5,14;135:7;
141:5,15,23;142:1,8,
12;150:18;157:16;
176:1,6;177:23;178:2,
5;191:23;192:2,7,11;
198:15;212:9,12;
230:5;231:12
**overall (1)**
218:20
**overdue (2)**
148:18,19
**own (6)**
18:14;23:3;35:5;
89:18;94:8;178:6

**P**

**packet (1)**
40:8
**Page (19)**
38:8;167:21;170:8;
171:11,13,14,14,22;
175:18;179:12;186:21;
188:14,17;193:11,12;
195:3,4;213:19;214:3
**paid (1)**
138:11
**Pam (2)**
198:11,12
**paper (1)**
134:21
**papers (1)**
228:19
**paperwork (18)**
26:25;41:23;55:6,10,
22;62:2,7,11,12;63:1;
123:21;148:10,12,22;
150:7,11;151:3;198:15
**paragraph (2)**
38:10;187:2
**part (25)**
21:20;23:18;39:5;
48:15;70:18,23;74:9;
88:23;92:4;95:14;
100:22;103:19;105:6;

106:14;114:8;140:16;
183:8;185:5,6;192:9;
203:13;204:20;209:16;
213:25;230:25
**participate (1)**
138:17
**participated (2)**
38:16,24
**participation (1)**
138:18
**parts (2)**
71:2;74:25
**part-time (1)**
19:9
**party (2)**
5:14,17
**pass (8)**
11:20;31:17;34:7;
111:13;158:20;159:15;
169:8,14
**passed (17)**
162:10;168:16,17,
20;169:6,8,14,18;
173:16,22;174:19,20;
176:13;177:4,16;
178:9;230:3
**passing (1)**
168:24
**past (4)**
7:21;9:20,22;38:14
**pay (1)**
223:5
**PC (1)**
86:25
**pending (1)**
7:3
**people (71)**
12:7,9;13:8,8;21:1,6,
8,11,24;26:20;31:10;
40:15,16;46:18;47:17;
52:21;63:17;64:7,21;
71:1,10,11,12;74:19;
76:7,11;78:11;80:13;
82:23;89:2,5;103:18;
115:4;119:11;127:24;
153:18;154:11,23;
162:16;169:21;170:2,
11,18,22;182:19,19;
198:18,20;215:11;
216:9;217:8,9,19,21;
218:4,7,7,11,15,19,23;
222:17;225:16,19;
226:4,9,14,24;227:1;
233:1,3
**pepper (2)**
31:23;99:4
**per (1)**
223:3
**Perfect (1)**
57:12
**period (4)**
34:17;107:9;189:23;
190:6

**permanent (3)**
13:19;15:18;76:4
**permission (3)**
213:1;224:11,14
**person (30)**
8:2;27:6;43:20,24,
25;60:6,8,24;75:11;
99:12;101:22;130:16;
134:9,11;170:14;
173:14;181:14;191:3;
195:5,13;208:20,25;
213:5;214:16;215:12;
216:12;217:5,6,18,25
**personal (4)**
4:12;9:16;10:1;
195:24
**personally (1)**
199:7
**Phase (2)**
36:24;37:8
**phone (15)**
8:4;9:13,13,20,22;
51:17,19,22;52:3,4,8,
13,23;122:15;222:9
**phones (1)**
51:22
**pick (1)**
89:18
**pictures (1)**
195:11
**piece (1)**
97:24
**PIERCE (44)**
4:9,10,14;5:1;9:19;
36:7,13;37:17,22;41:9;
56:9,13,19;86:5;124:8,
13;125:7;134:14,20;
166:8;171:5;180:21;
181:5;186:6;188:8;
190:15;201:20;202:1,
14;203:8,21;204:17;
205:6;208:6,10,14;
209:17,21;211:24;
212:1;233:4,10,19,25
**pipe (13)**
25:15,16;99:9,10,21;
100:4,7,12,13,16,23;
187:6;188:12
**pipes (1)**
188:19
**place (2)**
15:13;94:10
**places (1)**
107:18
**plaintiff (1)**
4:11
**plan (3)**
137:25;141:16;147:9
**plans (1)**
9:8
**played (5)**
202:13;203:20;
205:5;208:9;209:20

**please (2)**
37:10;204:16
**plus (1)**
181:13
**pm (2)**
13:4;234:7
**point (29)**
17:10,18;22:4;53:10;
68:24;75:14;84:21;
152:10,22;153:5;
158:20;167:11;169:11,
22;170:3;182:8,11;
203:2;207:19,25;
208:4,15;211:1,10,13;
212:5;230:21;232:20;
233:13
**pointed (1)**
135:23
**points (2)**
51:16;64:20
**policies (6)**
40:24;145:24;
146:14;147:19,21;
227:17
**policy (11)**
67:1;73:21;78:2,2;
100:22;146:2;185:16;
192:5,13,18;223:3
**position (6)**
12:15;17:12,16;18:9;
34:15;230:11
**positions (2)**
76:13,16
**post (18)**
39:24;40:1,12,21;
93:13,18,21,25;94:2,4,
11,13,22;95:14;186:8,
9,11,13
**practice (2)**
101:2;107:4
**practices (3)**
107:4;145:25;147:19
**prepare (5)**
7:25;8:18;15:3;
190:24;191:2
**preparing (1)**
191:5
**pretty (5)**
46:2;120:13;137:7;
202:22;211:10
**prevent (1)**
230:17
**prevented (9)**
192:1;229:3,5,7;
230:12,23,24,24;
231:13
**previously (1)**
75:19
**primary (3)**
57:4;88:12;89:6
**prison (22)**
11:14,16,23;12:2;
14:9;31:20;33:15,17;

39:14;57:21,22;82:25;
86:7,12;94:5;97:21;
98:21;107:16;121:9;
195:8,12;219:17
**prisoner (17)**
42:9;63:10;71:17,25;
72:10;73:6,13;75:4,15;
112:11;115:8,13;
117:2;118:4;123:19;
154:5;193:15
**prisoners (27)**
30:4;33:15;42:11;
69:25;71:21;72:25;
74:20;85:14;88:24;
106:14,18;115:19;
122:1;151:25;152:10,
22;153:11;155:22;
156:4;184:20;194:2,
10;195:15;223:8;
224:2,21;225:1
**prisoner's (1)**
223:12
**privileged (1)**
9:16
**probably (22)**
32:15,23;49:2;55:18;
67:25;76:1;102:17;
108:8;120:25;131:13;
143:17;147:2;172:3;
180:17,18;181:2,2;
185:17;207:17;226:7,
18;229:20
**probationary (2)**
34:17,23
**problem (4)**
124:3;145:7,19;
188:1
**problems (1)**
124:6
**proceeded (3)**
125:22;127:16,23
**process (5)**
11:15;22:9;32:5;
90:22;91:1
**prohibited (2)**
231:21,25
**Promise (10)**
149:20;160:16,24;
161:13;162:8;163:11;
178:22;179:8;199:23;
205:20
**Promise's (1)**
178:17
**promoted (1)**
29:23
**protective (2)**
86:25,25
**Puetzer (3)**
172:16;215:3;220:13
**pull (1)**
36:7
**pulled (1)**
164:2

**punitive (3)**
233:12,13,17
**Purdue (2)**
11:2,25
**purpose (2)**
133:8;198:10
**purposes (1)**
222:1
**put (9)**
13:10;53:24;76:10;
123:23;130:25;174:11;
184:16;230:6;233:10
**putting (1)**
96:13

# Q

**quick (4)**
4:15;16:21;28:9;
172:7
**quickly (2)**
130:3;228:24
**quite (4)**
12:21;13:24;77:5;
231:18

# R

**radio (59)**
24:15,18,19,21;45:2,
5,8,21;47:21,22;52:9;
53:1,6;54:12,13,17,22;
65:8,22;78:19;80:1,13;
82:22;94:23;95:11;
96:9,14,16,19,22;97:3,
23;98:7,12,14,18,21,
25;99:3;102:11,15,21;
103:6;104:4,9,17,24;
125:17,19;145:21;
179:18,24;180:1,5,8,
11;221:22,23,25
**radios (5)**
54:10;94:25;95:16;
96:25;97:15
**raised (3)**
4:21;150:9;151:2
**ran (33)**
62:2;125:14;128:10;
129:4,16;142:25;
151:12,24;152:25;
153:21;156:7;158:1,5,
12,21,23;159:1;
161:20;168:3,4,13,15;
174:12,13,15,16,18;
177:19;178:22;180:14;
182:2;229:17,24
**range (93)**
19:24,24;22:8,12,17,
21,25;23:2,2,14;25:18;
27:20;51:13;52:19,21;
53:5,6;60:9;72:20,23;
76:19;98:11;111:12;
113:6,9,12,24;114:3;

115:11;125:13,23,25;
126:2,14;127:18,20,21,
22,24;128:7,10,23,24;
129:2,2,3,13,17;
135:23;143:17,18,25;
144:4,22;145:4,5;
146:16;152:12,13,16;
153:22;155:6,11;
156:8,17,25;157:3,5,
12,13;158:3;162:12;
167:9;175:5,5;176:2;
178:9;187:15;192:9;
202:20;205:11;206:9,
9;208:11;209:6;217:6,
13,18,25;225:5;229:9,
10,11
**ranges (21)**
17:6;20:2,8;22:15;
24:12;51:16;53:3;
56:21;61:17;84:18;
89:18;99:12;128:4;
175:8;194:2;202:23;
209:24;222:18,23;
223:5;224:17
**ranking (1)**
214:15
**rare (2)**
71:14;120:20
**rarely (4)**
73:17;74:16;76:23;
120:17
**reach (1)**
222:12
**reached (1)**
165:15
**reaction (2)**
145:8,11
**read (17)**
4:15;37:10;38:13;
40:3,7,11,13,17,17,19,
21,25;41:23;166:23;
167:2;178:20;179:14
**reading (7)**
42:16;137:7;141:5,
15,19;142:12;171:16
**ready (5)**
14:12,20;21:24;
54:19;201:22
**real (2)**
28:9;219:19
**realize (1)**
157:17
**realized (12)**
45:1;125:23;126:13;
128:9,25;129:14;
130:1,3;157:19,22,25;
177:15
**really (81)**
6:6;9:12;16:19,25;
21:3,7;27:2;32:23;
41:18;43:19,22,23;
45:15;49:1;50:19;
58:14;60:21;61:19;

67:2;68:3;69:11,23,24,
24,24;71:5;73:7;74:10,
11;76:14;82:18,19;
83:15,17;87:17;89:21;
95:8,15;98:8;99:22;
100:17;101:7;102:13;
105:8;108:9;112:19,
19,21,21;118:1;
126:20;133:16,19;
136:7;137:18;138:1;
139:16;142:13;147:25;
153:19;155:1;158:9;
159:20;165:25;173:16;
180:6;185:4,17;
186:15;187:19;208:24;
211:2,6;219:2;220:4;
222:2;225:12,13;
227:20;228:11,24
**rear (2)**
188:23;189:2
**reason (30)**
18:3,15,20,21,23;
19:1;30:13;38:17;39:1;
53:11;58:23;60:13;
61:14,18,25;64:7;76:7,
12;89:3;98:3;99:24;
117:7;140:10;154:18;
165:19,23;175:13;
179:7;186:17,20
**reasons (4)**
50:2,5;67:8;218:9
**rec (7)**
21:25;54:19;64:8,21;
65:9;114:24;216:4
**recall (42)**
32:7,13,17,20;33:1;
41:15;78:24;79:3,8,9,
18,24;85:7;96:8,13;
102:19;103:4;120:9;
122:23;123:1;136:11;
137:18,20;138:1;
147:14;148:8;164:23,
25;165:3;169:23;
176:4;185:19,23;
193:14,16,18;194:20;
195:7;197:22;201:11;
207:24;212:5
**receive (4)**
45:4;78:9;108:18;
114:6
**received (2)**
30:16;195:22
**receiving (1)**
39:24
**recognize (9)**
36:14;56:20,22;
86:11;166:11;190:16;
195:5,9;203:9
**recollection (11)**
88:5;124:17;135:12,
13;141:19;142:10;
147:12;227:11,15;
228:2,7

**record (10)**
4:16;5:3;6:14;56:13;
203:4;208:12;211:24;
233:5,10;234:5
**recording (7)**
135:25;202:13;
203:20;204:20;205:5;
208:9;209:20
**Redden (6)**
162:17;167:16;
170:6;172:14;173:5;
214:21
**re-depose (1)**
233:15
**refer (1)**
193:23
**reflect (1)**
100:16
**refresh (5)**
135:13;227:11,15,
24;228:1
**regard (1)**
217:8
**regarding (2)**
38:21;184:13
**regardless (1)**
145:2
**register (1)**
100:12
**regular (1)**
16:16
**related (5)**
52:25;122:19;222:7;
228:12,21
**relating (1)**
233:12
**released (1)**
216:25
**relieve (1)**
48:7
**remember (367)**
10:5;11:17,18,18;
12:9,12,14;13:13;14:2,
7;16:10,10,14,15;17:7,
8,14,15,18,21,24;19:3,
21;21:10,13;24:10;
25:4,9;26:8,8;30:9;
31:2,8,11;32:1,2,4,9,
16,19,23;33:5,11,22;
34:6,19,24;35:8,9,12,
17,18,21,24;36:19,20,
25;37:1,3,12,15;39:3,6,
8,12,15,23,24;40:6,13,
18;41:1,4,11,14,18,19,
23;42:3,4,5,7,14,16,16,
18,20,22,23,24;43:5,9,
10;44:7,24;46:14,15,
17;47:3;48:5;50:6,7;
54:8;59:21,23;63:2,5,
12;66:23,24;67:17;
71:20;73:23;74:2,6,23;
77:19;78:16,23;79:2,6,
21;80:2,4,7;81:4;

86:10;88:1;90:8,9,11;
91:6,10,19,21,22;92:1,
2,10,15,17,17,18,24,25;
93:2,4,5,9,12,17,19,20,
23,24;94:14,20,22;
95:8;96:7,15;97:1;
98:20;99:25;100:2,3,5;
101:9,15;102:25;
103:3,13,16;105:13,17;
106:4,7,9,12,20;107:1,
2,5,13,22;109:2,7,9,10,
12,13,14,18;110:22;
114:9;115:21;116:9;
118:25;119:10;120:8;
121:3,5,7,8,11,15;
122:21;123:4,7,15,25;
124:5,16,22,24;125:5;
126:21,22;127:2,3,7,8,
11,12,14,25;128:6,8,
18,22;129:8,9,12;
130:13,22;131:2,5,6,
10;132:1,7,21,24;
133:4,5,6,19;134:2,5,7,
8,10,11;135:9,16,18;
136:2,6,8,8,9,12,14,17,
18,20,21,23,24;137:1,
2,3,5,5,17,23,24;138:2;
139:24;140:13;141:3,
18,22;142:14;144:18;
145:22;146:24;147:7,
8,11;149:7,8;156:21,
21,23;157:24;158:9;
159:6,10,10,12,14,20,
23;160:1,8;161:2,2;
162:15,16,17,19,22,24;
163:12;165:4;168:1,4,
16,16,24;169:25;170:2,
17,18,23;171:6;
172:20;173:3,5,9,13,
16;174:25;175:4,9,10,
12;176:10;182:10;
184:15,23,24;185:9,10,
12,18;186:1;191:11;
192:24;194:18,22;
197:1,11,16;201:6,9,
13,16;213:12;223:24;
227:7,8,20,23;228:3,11
**remembered (2)**
92:2;103:2
**remind (1)**
106:7
**reminding (1)**
106:10
**remove (1)**
183:4
**re-open (1)**
4:23
**repeat (6)**
5:16,22;96:10;
193:16;209:16;231:23
**rephrase (1)**
6:20
**report (13)**

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 72 of 76
SARAH ABBASSI
October 29, 2019

15:24;55:12,21;
163:13;166:13,15,20,
24;170:5;175:13,17;
188:9,11
**REPORTER (9)**
4:4;6:5,9,14;134:15;
204:16;209:16,18;
234:3
**reporting (1)**
166:17
**reports (3)**
55:13,15,20
**represent (3)**
4:11;170:20;233:23
**representative (1)**
4:12
**reproduce (1)**
233:14
**request (2)**
123:19;124:2
**requested (1)**
4:19
**requests (6)**
72:8;123:13,16,23;
124:1;223:12
**require (3)**
4:24,24;48:15
**required (3)**
24:19;72:16;212:10
**requirement (1)**
21:17
**reserve (1)**
4:23
**respond (7)**
72:7;85:17;115:7;
183:13,17,23;184:5
**responder (4)**
168:25;169:18;
170:1;172:10
**responders (119)**
45:15,17,25;46:6,7;
48:6,17;58:1,5,8;65:2;
77:24;78:6,8,10,15,18,
22,25;79:4,22,25;80:5,
10,11,19,24;81:11,14,
18;82:5,14;83:14,21;
84:2,5,9,15,18,23;85:9,
17;90:12;91:5,9,12;
93:6,11;103:21;104:2;
117:13,15;119:8;
126:6,10,19,23;127:4,
15;128:20;136:25;
137:22;144:9;147:1,3,
17,24;153:25;155:12;
158:18;159:13;160:17;
161:24;162:21,24;
163:6;165:19;168:17;
169:4,6,15,20;170:13,
15,21;172:23;173:10,
20;175:11,15,25;
176:5;177:25;178:1,
23;182:2,6,16;183:10;
191:23;192:2,7,14,22;

207:10;209:5,7;229:6,
14;230:5,13,16,17,23;
231:9,14,22;232:2,18
**responding (3)**
82:25;91:12;223:12
**response (8)**
26:5;35:10;37:4,15;
172:8;185:20,20;229:2
**responses (2)**
4:19;6:7
**responsibilities (7)**
17:12,16;28:7;62:15;
115:23;220:6;227:16
**responsibility (2)**
75:3;85:13
**responsible (9)**
55:10,23;61:6;91:12;
101:25;102:4,8,10,11
**rest (1)**
223:24
**restrictions (1)**
34:22
**restroom (2)**
28:6,9
**Resuscitation/First (1)**
37:11
**review (11)**
38:21,23;41:16;
135:1;146:23;148:4;
200:21,23;225:7,9;
227:15
**reviewed (1)**
38:15
**right (57)**
4:23;9:12;14:6,15;
15:7,8;25:4;61:4;
62:20;66:17,22;67:21,
25;69:1;73:19;76:5;
86:16;87:15,19,21;
88:3,15;92:19;93:4,19;
103:11;105:18;106:12;
107:2,13;108:1;
124:22;146:7,11;
149:4;150:16;155:16;
158:6;160:7;162:3;
163:18,19;164:4;
168:21;170:21;185:18;
188:2,21;189:3;193:2;
203:25;206:23;210:1,
19;211:7,11,14
**right-hand (1)**
171:17
**riot (2)**
218:14;226:6
**Rodriguez (41)**
125:11,20;127:19;
128:9;129:15;134:3;
136:5;143:13;144:11,
22,25;145:4;150:10;
151:10,19;152:5,9,14;
153:2,12;155:8,13;
156:10;160:25;162:2,
5;163:9;165:7;171:25;

174:16;179:2,4;
180:13;181:1;199:4;
203:23;205:8;206:5,6;
212:20;213:21
**Rodriguez's (1)**
179:11
**roll (9)**
14:6,6,12,13,16,18;
15:5,7;29:20
**Ron (4)**
196:10,14,15,16
**room (10)**
12:8;14:15;101:6,8,
10,13,16,16;102:23;
103:14
**roster (3)**
172:3;213:14;214:1
**rotated (1)**
13:6
**ROTHENBERG (9)**
9:15;125:3;180:19,
24;233:7,17,20,22;
234:2
**round (4)**
71:19;77:8,10;99:19
**rounds (10)**
21:23;63:15;70:4;
71:16;73:18;74:22;
100:19,21;114:18,20
**routine (1)**
118:18
**Rule (7)**
4:18;59:12;66:21;
67:4,7;120:7,10
**rules (1)**
5:21
**run (10)**
68:21;146:11;
151:16;156:14,15,25;
158:8;159:4;169:16;
219:17
**running (53)**
68:17;108:7,8;
125:24;126:5,14,15,18,
20;128:13;129:1;
144:1;154:1;155:7,14;
156:14,23;158:10,17,
18,25;159:1,3,25;
161:4,8,11,19,23;
163:5;168:7,19,23;
169:12,13,15,19,22;
170:19;174:14;203:22;
204:2;205:11,14,24;
206:16,17,18,21;
207:13;231:1,2,5

### S

**sad (4)**
226:2,5,21,25
**safe (10)**
31:19;46:11,13,18;
47:17;85:1,3;116:1,3;

160:21
**safer (1)**
218:11
**safety (9)**
28:3;32:14;39:13;
42:12;67:8;85:14;98:4;
112:15;218:9
**same (17)**
6:12;13:7;66:13;
97:20;101:13;104:17;
119:7;131:8;142:5;
143:2;149:22,24,24;
151:3,7;162:23;204:25
**SARAH (2)**
4:5;5:4
**S-a-r-a-h (1)**
5:4
**sarahabbassi105@gmailcom (1)**
10:2
**sat (1)**
132:14
**saw (12)**
93:25;128:23;
129:14,19;157:12;
158:3,11;174:16;
175:11,15;227:21;
228:1
**saying (6)**
6:8;34:10;137:24;
145:1;157:6;230:22
**scan (1)**
25:18
**scenario (2)**
33:9,12
**scheduled (3)**
115:5,14;118:20
**scheduling (1)**
171:8
**Schererville (1)**
9:7
**school (3)**
10:21,23;19:10
**Scratch (3)**
113:25;123:8;135:12
**screaming (1)**
161:21
**second (15)**
37:17;38:10;70:13;
89:3;127:18,21,24;
165:12;171:14;175:5;
187:2;193:12;194:6;
203:5;213:19
**secondary (1)**
60:16
**seconds (2)**
78:13;88:10
**section (5)**
94:11,12;186:23,24;
187:3
**security (35)**
14:11,14;21:23;
25:14,21;26:17;28:3,
11;47:18;63:14;67:8;

70:4;71:15,19;73:10,
18;74:22;77:7,10;99:8,
18;100:10,19,21,23;
114:18,20;115:5;
186:25;187:12,13,18,
22;222:24;223:2
**seeing (11)**
129:9,12;136:9,12,
14;137:2;157:25;
159:23;173:3;195:7;
202:16
**seeking (1)**
12:1
**seem (4)**
205:7;219:10,13,16
**seemed (2)**
170:22;220:4
**self-defense (1)**
31:18
**send (1)**
78:20
**sending (1)**
104:5
**sense (2)**
6:18;204:22
**sensor (1)**
187:8
**sensors (1)**
187:8
**sent (2)**
191:13,15
**sentence (1)**
187:7
**sentences (1)**
38:13
**separate (1)**
82:12
**sergeant (21)**
16:2;17:2;20:10,13,
14,18,21;51:7;110:13;
172:19;212:15;213:2,
5,8;215:1,1,3,6;220:13;
221:1,17
**sergeants (14)**
35:19;131:17;
213:22,23;214:2,8,24,
25;215:13;219:8,9;
220:6,7,21
**serious (1)**
94:18
**served (1)**
198:23
**set (7)**
23:3;27:24;53:23,25;
90:5,10;216:3
**Several (3)**
83:23;131:9;187:8
**shadow (2)**
33:18;35:3
**shadowed (1)**
33:23
**shadowing (11)**
35:9;66:6,7,9;81:7,9,

BARBARA DEVINE, et al. vs.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 73 of 76

10;91:1,4,7;101:3
**shakedown (2)**
53:14,16
**sheet (4)**
36:14;125:1;171:8;
172:3
**sheets (7)**
28:25;29:2,12,18;
50:4,9,10
**shift (43)**
12:22,25,25;13:1,12,
14;15:3,23;16:22;
17:19;21:11,12;24:23;
28:2;40:3,5,7;49:13,
14;54:4;55:2;83:16;
87:3,5;95:1,3,5,12,17,
19;97:4,13;99:17;
101:23;105:21;110:9;
214:20;215:21;218:24;
219:18,22;220:3,3
**shifts (4)**
83:16,17,19;121:4
**short (5)**
56:11;124:11;
201:24;203:6;233:8
**shouting (1)**
182:18
**show (4)**
43:1;106:13;135:19;
201:20
**showed (3)**
39:17;84:2;106:21
**showing (4)**
18:24;50:17;106:9,
14
**shown (2)**
41:2,19
**shows (3)**
25:18;136:13;188:12
**sick (1)**
73:7
**side (10)**
67:18,20;87:5;
171:22;203:15;204:3,
4,12,18;209:24
**sides (1)**
127:10
**sign (7)**
40:3,8,14,15,16,22;
41:25
**signal (3)**
80:1;105:11;168:3
**signals (3)**
53:4;54:18;80:3
**signature (3)**
193:12,13;234:3
**signed (1)**
229:2
**similar (3)**
41:20;82:11;84:21
**singing (1)**
154:11
**single (3)**

94:9;112:10,17
**sit (5)**
79:16;124:15,18;
202:8;228:6
**sitting (4)**
51:3,6;124:24;125:5
**situated (1)**
160:23
**situation (64)**
46:1;47:12,25;48:3;
78:21,25;79:3,25;
80:17,25;81:16,19;
83:2,21;84:13,16,19,
20;85:6,10;91:13;93:8;
103:8;110:6;111:3,6,8,
10;117:16,20,23;118:3,
4,15,17;119:13,20;
138:9,22;139:21,22;
140:6,23,25;141:3,4;
144:24;176:1,7;181:9;
183:11,13,17,18;
191:23;192:3,12;
218:17;225:11;226:2,
5,25;230:5,19
**situations (4)**
84:6;117:19,25;
140:19
**six (4)**
21:4,8;120:24;
217:14
**slab (2)**
89:8,11
**small (1)**
44:23
**smell (2)**
152:18,20
**Smith (1)**
215:10
**smoke (8)**
152:18;182:22,23;
210:11,15,16,17,22
**smokey (1)**
211:10
**social (2)**
10:7,15
**socialize (1)**
199:14
**socialized (1)**
199:25
**Sociology (1)**
11:9
**somebody (71)**
17:11;27:16;43:1;
46:23;47:1,5,13;53:6;
54:7;57:25;58:18;59:4,
23;60:1,11;64:8;66:17;
69:3;70:15,19,23;
74:15;83:3;98:11;
105:3,5,9,10;112:2,24;
113:13,17,21;114:3,11;
116:14,21,22;117:7,12;
118:13,21,24;119:2,3,
14,20,22,25;127:5;

132:2,4,8;137:3,13;
144:20;154:8,15,17;
162:23;168:24;169:13,
14;173:17;174:19,20;
181:19;207:20;215:23;
230:3,9
**someone (19)**
17:16;51:8;64:12;
66:10;74:3;75:15;
96:16;114:16;116:10;
117:4;119:21;154:12;
168:22;173:10;181:24;
190:24;191:4;205:18;
206:2
**sometime (1)**
165:23
**Sometimes (3)**
6:18;120:20;200:4
**somewhere (4)**
53:12;125:12,13;
151:21
**soon (4)**
14:14;22:6;142:24;
155:20
**sorry (16)**
52:11;61:10;96:11;
100:1;110:4;113:25;
132:17;142:6;153:13;
154:14;156:23;188:16;
189:15;193:16;231:24;
233:20
**sort (13)**
7:17;33:8;34:9;
35:10;41:2;62:6;72:15;
73:21;75:8;82:15;
110:21;122:13;228:17
**sorts (2)**
107:3;122:18
**sound (3)**
136:1,3;170:21
**sounds (3)**
197:3,21;215:9
**speak (8)**
8:3,6,8,25;9:3;125:3;
201:12,14
**speaking (4)**
136:19,21;137:3;
233:11
**special (1)**
85:16
**specific (17)**
13:16;74:2;76:12;
85:4,8;93:5;97:18;
100:12,13;114:6;
116:2;134:7;155:24;
156:3;186:15;213:4;
220:10
**Specifically (15)**
59:25;65:16,22;
72:25;73:2;78:2,17;
92:1;94:2,6;97:17;
122:19;133:2;139:20;
186:9

**specificity (1)**
74:5
**speculation (1)**
180:20
**spell (1)**
5:2
**spend (1)**
224:17
**Spider (1)**
193:24
**spoken (1)**
193:21
**spot (6)**
13:19;15:19;16:23;
76:4;220:20,22
**spray (2)**
31:23;99:4
**spread (1)**
107:15
**squad (5)**
91:16,18,23;93:3,10
**squads (4)**
91:24;92:5,11,16
**staff (13)**
38:16;137:25;140:8;
141:16;184:21;195:18;
201:17;218:19,23;
220:2;224:22;225:2;
232:22
**staffed (1)**
220:10
**staffing (4)**
218:21;219:3,5;
220:11
**stairs (55)**
68:7,23;76:18,21,23,
24;77:11,14,18;
125:16;126:7,10,18,20;
128:13,14,14,15;129:7;
144:9;146:12;154:1,2;
155:8,15;158:17,18,22,
22;159:12,16;161:22;
163:1;168:3,4,7,15,19;
169:12,14,20,22;
174:12,13;177:20;
179:2;182:3;204:6,23;
205:25;206:17;207:4;
229:18;230:10;231:3
**stand (2)**
37:12;158:6
**standing (3)**
157:16,24;158:2
**start (16)**
12:17;24:23;30:18;
95:21;110:20;112:5;
152:11,22;153:1,5;
167:1;194:5;203:17;
205:24;210:11;220:7
**started (26)**
11:14;13:14;16:22;
30:16;35:7;36:17;
40:21;59:17;66:5;81:7;
100:25;125:10,24;

126:4;151:12;153:3,8;
155:7,8;156:14;
164:14,16;165:8,17;
174:14;189:21
**starting (4)**
124:22;206:1;
209:22,25
**starts (5)**
38:11;95:7,7,8,22
**state (6)**
5:2;33:15;39:14;
79:8;86:6,11
**statement (9)**
4:15;38:18;167:20,
23;175:19;178:17;
179:11,15;184:19
**statements (3)**
184:16,20,21
**Statham (2)**
172:18,21
**station (30)**
24:5;25:3;29:18;
50:12;52:2,18;68:25;
69:8;74:13;76:20;80:5;
94:1,5,8,15;96:23;
97:16;99:15;107:21,
23;108:3,15,19;
123:22;204:5,19;
205:9;219:23,24;
222:13
**status (1)**
34:23
**stay (11)**
23:20;59:5,5,13;
63:23;66:14;99:16,23;
197:25;222:22,22
**stayed (8)**
98:25;99:11,12,14;
100:2,9;160:3;161:17
**stays (6)**
23:11,21;44:2;58:25;
60:6;207:22
**step (1)**
212:12
**stepping (1)**
22:2
**steps (2)**
12:11,12
**Steven (1)**
197:20
**still (14)**
4:22;9:17;18:11;
35:2;48:12;125:16;
145:1;153:17;155:13;
156:9;175:2;206:21;
232:6;233:18
**stop (1)**
211:22
**stopped (3)**
159:18,19;198:8
**straight (3)**
90:19;149:13;156:15
**Street (4)**

BARBARA DEVINE, et al. vs
RON NEAL, et al.

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 74 of 76

Cause No. 3:18-cv-00995-JD-MGG

SARAH ABBASSI
October 29, 2019

88:19,23;220:13,15
**strike (1)**
138:4
**stuff (16)**
14:23,24;18:22;
54:20;62:3;82:5;
111:17;115:2;122:7;
154:16;198:14,19,23;
216:4;221:10;226:7
**submitted (1)**
229:2
**substance (1)**
7:24
**successfully (1)**
34:14
**sued (1)**
5:12
**sufficient (3)**
183:16;219:13,16
**suggestion (2)**
146:17,20
**summary (1)**
233:15
**super (1)**
126:25
**superintendent (1)**
196:18
**supervisor (5)**
15:21;105:21;
110:10;119:15;201:17
**supervisors (2)**
30:11;214:20
**supervisor's (1)**
87:6
**supplemental (1)**
4:19
**supposed (32)**
25:20;26:3;45:24;
49:24;51:8;71:25;
72:25;80:9;82:14,15;
84:1,4,23;94:7;98:16;
117:11;119:2,11,11;
120:2;121:19,23,24;
122:1,2,16,20;145:20;
151:7;187:1;189:19;
192:6
**sure (100)**
12:21;13:24;21:7;
25:22;26:1,5;27:2;
28:14;36:3;38:5;43:19,
22;44:3;46:11,12,18;
50:19;57:23;58:3,11,
24;59:8;60:21;61:19;
62:12,22,24;63:1,14;
67:2,3;68:3;76:14;
77:5;78:3;82:18,19;
83:15,17;84:25;85:2;
89:11,21,25;90:3;
93:16;94:24;95:15;
96:17;97:8,8,17,19;
100:10,17;102:13,18;
103:19;104:10;105:4,
8;109:18;124:10;

125:12,13;134:4;
137:21;142:2;144:5;
146:25;158:9,16;
164:18;165:25;166:21;
167:18,19;169:8,21;
173:24;179:23;180:6;
181:6,18;185:4;
186:15;187:19,20;
192:17;200:10;205:17,
25;219:2;220:4,8,11,
19,25;226:8;228:5
**surprise (2)**
179:17,20
**surprised (1)**
161:7
**surveillance (2)**
135:21;202:2
**switch (3)**
96:24;208:6;216:23
**switched (1)**
17:19
**switches (1)**
216:15
**switching (1)**
12:25
**sworn (2)**
4:2,7
**system (7)**
53:18;100:17;
145:17;187:3,5;
224:21;225:1

**T**

**talk (36)**
8:14;17:5;20:5;26:3,
10;54:10,17;84:8,14;
94:17;130:15,18,20;
131:20;133:17,22;
139:2;144:14;149:3;
154:23;160:24;162:8;
191:5;194:10;195:16,
19;198:11;199:20;
200:14,17,20;201:7;
225:13,24;226:12;
227:5
**talked (18)**
89:12;107:6;130:16;
131:6,25;132:11,12;
133:5,20;134:9;137:8;
198:3,17,24;199:2,17;
200:11;201:1
**talking (15)**
71:7,10,11;110:9;
132:19,22;142:16;
154:11,21;155:3;
164:3;187:6,13;201:9;
225:15
**tasks (4)**
35:1;63:7,8;114:15
**taught (9)**
46:15;90:24;97:23;
100:20;116:24;117:8;

145:12,16;193:3
**Taylor (1)**
215:8
**teach (1)**
31:20
**team (7)**
82:7;92:7,8;93:1;
170:1,14;172:10
**telephone (3)**
4:18;8:11;9:11
**teller (1)**
18:10
**telling (6)**
6:2;43:5;65:9;90:9;
119:4;120:9
**tells (1)**
27:1
**ten (3)**
8:15;17:23;75:23
**tenure (1)**
227:9
**test (3)**
11:19;24:21;34:4
**testified (1)**
4:7
**testify (3)**
7:6,10,14
**testimony (1)**
5:9
**tests (7)**
30:23;31:17;33:5,7,
8,12;34:22
**Thanks (1)**
79:13
**thereupon (11)**
36:9;37:18;41:5;
56:15;86:1;134:16;
166:4;171:1;186:2;
188:4;190:11
**third (5)**
127:18,21,24;175:6;
194:7
**though (7)**
34:20;37:13;102:18;
139:10;168:20;225:14;
228:5
**thought (5)**
157:20,21;161:23;
193:1;225:8
**Three (19)**
8:15;12:8;13:12;
21:4;51:2;68:14,15;
97:13;120:21;160:4;
206:10;212:24;213:13;
217:9,13,15,17,21;
233:1
**throughout (16)**
8:7;16:9;28:4;64:18;
69:6;83:18;95:2,5,12,
17,19;97:4,21;99:17;
107:15;187:15
**timeline (2)**
133:14;164:2

**times (19)**
8:7;19:18;28:19;
35:24,25;42:2,3;64:15;
66:15;75:19,22;77:16;
79:21;83:18,23;97:4,
13;107:6;179:22
**title (3)**
101:19;134:25;197:7
**titles (1)**
197:22
**today (9)**
7:7,11,15;8:1,19;
79:17;124:15,18;228:6
**together (3)**
17:1;53:16;181:9
**told (62)**
13:20;23:19;27:13;
29:6,7;34:13;40:20;
43:6;49:20;59:9,9,22;
63:16;65:14,22;66:14,
19,20,23,24;69:25;
70:5;71:25;72:7;78:1,
4,5,7,17;80:11;81:1,3;
82:3;90:12,15;92:11;
95:4;103:5;104:1;
109:19;110:1,3;116:7;
118:12,20,23;119:9,12;
121:8;128:4;148:23;
159:6,20;160:8;
178:15;191:13;192:21,
25;222:22;231:10,14;
232:12
**took (21)**
30:23;31:17;48:9;
81:14,15,15;173:10,10,
17;176:1,6;183:11;
191:23;192:2,7,11;
207:1,2,3;230:5;
231:11
**top (5)**
77:2;166:17;171:12,
17;214:5
**topics (5)**
31:9;32:22;33:11;
93:17,20
**touchback (1)**
212:2
**touched (2)**
187:9;188:20
**tour (1)**
11:24
**toward (1)**
16:7
**towards (5)**
67:21;68:8;125:25;
157:18;209:11
**tragedy (1)**
225:21
**tragic (2)**
138:9;139:7
**train (1)**
92:4
**trained (10)**

46:5;59:17,18,19;
74:1;82:4,6;183:22;
232:8,11
**trainer (1)**
31:10
**training (75)**
11:21;30:15,17,21;
31:1,7,12,15;32:4,7,13,
20;33:1,14,21,25;34:5,
7,11,14;35:7,10;39:21,
23;43:8;46:17;55:25;
59:21;60:5;65:19,25;
66:1,3;71:24;72:6,24;
78:9,14;79:12;80:10;
81:7,9;89:16;90:22;
91:25;92:18,19,24;
95:11;100:25;114:7;
116:25;117:9;120:4;
145:16;183:12,15;
184:5;185:15,23;
192:5,19,21;193:1,4;
222:21;223:12;224:2;
227:16,22,23;228:8,17;
231:8;232:12
**trainings (3)**
36:15;65:15;184:12
**traumatized (1)**
226:18
**traumatizing (1)**
226:16
**tried (4)**
85:2;181:19,24;
230:6
**trouble (2)**
182:24;183:1
**true (1)**
229:3
**truthfully (3)**
7:7,10,14
**try (17)**
6:17;19:21;46:1;
84:19;85:10;94:18;
95:25;96:1;111:3,19,
22;115:25;124:16;
142:5;183:24;223:13,
16
**trying (9)**
53:2;72:11;79:15;
81:17;89:10;115:8;
117:3;125:25;129:5
**turn (17)**
37:23;38:8;39:10;
52:14;54:2,4,6;148:14,
15;167:20;171:11;
186:21;195:1,3;214:3;
216:22;228:24
**turned (6)**
4:20;29:9;130:4;
148:17;149:18;210:9
**turning (1)**
52:10
**TVs (2)**
122:6,10

BARBARA DEVINE, et al. vs
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
SARAH ABBASSI
October 29, 2019

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 75 of 76

**twice (1)**
107:8
**Twitter (1)**
10:11
**two (26)**
12:8;14:7;23:14;
29:3;36:7;38:13;67:15;
76:20;87:23;97:12,14;
108:4,5,11,12;137:19;
141:23;158:21;160:4;
176:18;206:14;214:11,
22;219:13,18;233:5
**type (9)**
35:16;37:3;55:9;
73:4;93:17;99:2;
122:15;166:11;195:13
**types (5)**
39:20;55:19;91:11;
154:10;223:22
**typical (5)**
14:9;15:13;19:19;
217:12;219:7
**typically (1)**
94:12

## U

**U4 (3)**
209:14,17,18
**Uh-uh (2)**
19:8;157:11
**under (5)**
5:25;7:5;108:11;
115:25;207:3
**understood (2)**
6:24;120:3
**undertaken (1)**
184:25
**uniforms (1)**
14:20
**unit (2)**
87:1;187:8
**units (1)**
187:4
**University (1)**
11:2
**unknown (1)**
173:14
**unless (19)**
23:19;24:20;49:25;
50:1;52:25;57:17,25;
60:10;65:21;99:14;
112:19;116:9;119:12;
192:23;231:14,21;
232:1,1;234:1
**unlock (8)**
77:8,9;181:20,24;
182:3,4;215:24;217:2
**unlocked (9)**
77:6;108:16;162:6;
181:17,22;182:1;
216:17,19,20
**unlocking (1)**

108:19
**up (125)**
12:25;18:24;20:3;
27:24;46:21,23;69:6,
24;70:22;74:12;76:19;
84:2;110:11;112:2;
113:13,17,21;114:11,
16;115:9;121:21;
122:3;125:3,12,14,15;
126:7,10,20;127:15;
128:12,14,15;129:7;
130:3,6;132:4;143:24;
144:3,9,10;146:19;
151:21;153:20;154:1;
155:7,14;156:8,14,15,
25;157:1,12,20;158:18,
22;159:1,4,13,21;
160:1;161:22;162:9;
163:1,5;164:23,24;
165:7,10,11,16;167:12;
168:3,4,7,19,23;169:2,
4,13,15,16,19,22;
170:19;173:18;174:15;
177:16,20;179:1;
180:14;182:2;189:16,
17;204:16;205:11,24;
206:12,13,17,18,22;
207:4,13;210:11,22,25;
211:4;212:10,16;
216:3,16,19,22;221:8,
9,15;224:18,21;229:18,
22;230:4,9,10;231:6
**upon (2)**
4:19;144:11
**upset (5)**
225:19;226:20,24;
227:1,4
**upstairs (7)**
86:25;161:1,4,8,11,
19;208:1
**use (43)**
27:16,19,22,25;28:5,
9;30:22;31:16,22,24;
32:7,14;33:2;44:12,12,
17;46:8,9;48:25;50:14;
51:22,24;52:4,8,13,23;
53:1;76:19,21;89:5;
95:25;96:1;98:9;
100:18,20,22;104:3;
106:15,16;141:1;
215:23;216:9;221:25
**used (13)**
25:13;49:1;76:23;
77:18;99:7;100:16;
104:7;141:14;174:2,3;
176:22;177:9,11
**using (4)**
77:14;100:12,13;
101:2
**Usually (54)**
14:17,21;16:2;20:17,
17,18;23:8;24:2,8;
27:4;28:8,14;29:19;

31:8,9;43:18;46:2,19;
48:9;51:5,5;60:25;
61:7,15;65:8;70:3,7;
71:5,7,14;73:2,9,17,18;
80:13,16,25;81:15;
99:11,14,23;100:9;
101:11;114:25;118:7,
11,119:3;121:1,21;
153:14;194:6;216:12;
217:16;221:3

## V

**verbal (1)**
6:7
**versus (2)**
21:12;52:9
**video (20)**
135:18,19,21;136:1,
5,6,16;137:2;164:2;
201:21;202:3,10,12;
203:9,19;205:4;208:8,
13;209:19;211:25
**videos (4)**
50:21;51:11,15;
208:7
**view (1)**
209:23
**violated (1)**
147:21
**visitation (1)**
86:24
**voice (2)**
204:16;232:21

## W

**wait (13)**
58:16;63:16;85:9;
110:17;112:2,11;
116:5,7;117:12,15;
118:10;142:2;178:16
**waited (5)**
127:5;128:4;176:2,8,
10
**waiting (7)**
46:6;48:11,16,19;
58:20;64:12;176:5
**Waive (1)**
234:6
**walk (8)**
19:19;22:6,9;26:1;
36:21;68:6,16;125:23
**walked (2)**
129:13;157:16
**walking (5)**
28:14;73:9;77:7;
108:7,8
**Wand (4)**
187:3,9,14;188:12
**warden (6)**
132:6;184:17;
196:12,17,19;201:14

**watch (5)**
63:24;64:2,5;150:10;
205:2
**watched (1)**
211:25
**watching (2)**
40:18;203:17
**Watson (5)**
136:18;149:2;
162:15;172:12;214:21
**way (30)**
16:7;27:24;62:22;
71:6;100:11;119:8;
125:15;130:2,6;
131:10;139:1,4,13;
140:15;141:9;174:16,
23;177:22;178:4;
181:24;182:17;197:12;
204:23;216:16,18,18;
218:12;225:18;226:19;
233:3
**ways (5)**
82:16;133:17;
202:24;226:1,15
**week (5)**
31:6;34:2;83:14,18,
20
**weeks (4)**
29:3;31:2;33:20;
131:12
**weren't (5)**
49:24;85:7;118:2;
122:14;153:11
**Wesner (1)**
197:2
**Westville (2)**
31:6;34:2
**What's (12)**
10:1;14:19;24:6,9;
25:16;86:21;89:8;
135:2;141:19;186:11;
221:11;224:18
**whenever (11)**
16:13;27:13;50:23;
60:1;66:16;73:3,3,24;
76:5;93:7;176:25
**WHEREUPON (13)**
4:1;56:11;124:11;
201:24;202:12;203:6,
19;205:4;208:8;
209:19;233:8;234:4,7
**wherever (5)**
13:20;15:15;27:9;
76:9;111:22
**whoever's (2)**
65:8;224:15
**whole (19)**
22:25;40:8;54:12,21;
97:21;107:9;112:3,23,
25;136:12;150:10;
153:4,8;169:11;
170:18;183:11;187:15;
189:9;207:23

**Who's (2)**
17:6;137:21
**wide (1)**
150:21
**William (1)**
197:2
**windows (5)**
69:4,5,5,7,11
**within (4)**
25:17;78:13;189:22;
190:9
**without (21)**
7:23;46:22;47:1,6;
54:22;98:14,21;112:4,
6;113:3,6,12;114:15,
19,23;115:4,9;119:14,
20;187:18;190:23
**witness (26)**
4:1,3,6;5:6;9:18;
38:9;57:9;124:10;
125:4;135:9;143:20;
163:15;167:3,22;
178:19,21;179:13,16;
180:23,25;186:22;
188:18;190:22;195:2;
214:4;234:6
**wondering (2)**
135:6;178:13
**word (1)**
38:11
**work (40)**
9:22;13:2,7,8,22;
15:12;18:1,13;19:15,
17;29:13;30:18;48:23,
25;49:6,7,8,17,21;
51:17,23;52:25;62:13;
66:21;81:8;102:6;
137:25;189:17;194:5,
23;199:8,9,15,24;
200:1,3,8;220:14;
222:7;225:16
**worked (20)**
15:15;19:18;21:9;
61:3;75:19,21;76:1,14;
79:4;81:5;83:16;94:10,
10;100:18;101:11;
104:10;194:6;197:22;
199:10;200:9
**working (37)**
11:14;17:4,21;18:11;
19:12,20;20:11,13,15;
35:7,25;48:22;49:13;
54:9;55:2,6;78:10;
80:6;83:5,6;94:25;
96:4,9,14,19;101:22;
123:3,16;179:18,21,24;
180:2,5;198:8;199:12;
200:5;212:18
**works (5)**
22:25;27:2;197:8;
216:14;220:19
**worth (1)**
233:12

USDC IN/ND case 3:18-cv-00995-JD    document 212-68    filed 05/25/21    page 76 of 76

**write (5)**
26:24;27:3,4;122:2;
166:22
**written (1)**
33:7
**wrote (3)**
166:20;175:21,23

## Y

**yard (1)**
88:24
**year (4)**
19:5;38:14,25;198:5
**years (5)**
11:5;91:25;93:22;
137:19;141:23
**yell (7)**
70:7;71:17;73:10,13;
74:15;157:3,7
**yelling (57)**
70:8,15,19;71:1,12;
72:10;74:9,14;125:11,
13;126:1,9,14;128:10;
129:4;145:10,13;
152:1,3,5,11,15,23;
153:1,5,8,11,14,18,20;
154:5,8,9,13,15,17,18,
20;155:2,6,23;156:3,
19;157:9;160:25;
161:3;164:20,23,25;
165:3,4,8,9,14;182:18;
222:18;231:2
**Yep (1)**
96:3

## 1

**1 (1)**
36:11
**10 (4)**
75:25,25;188:6,14
**10:00 (2)**
190:1,10
**100 (4)**
60:9;61:1,13;176:9
**100-level (2)**
60:24;61:21
**10-71 (18)**
125:17;155:10,16,
18;156:7,9;157:7,8;
163:17,22,24;164:22;
165:2,5,6;167:5;168:5,
8
**11 (3)**
164:21;188:17;
190:13
**11th (1)**
4:17
**12 (1)**
86:16
**15 (2)**
14:22;75:25

**15th (1)**
4:21
**18th (1)**
4:20
**1st (1)**
186:12

## 2

**2 (7)**
37:20;39:9;163:14;
186:21;195:1,3;220:13
**2- (2)**
158:24;160:12
**200 (2)**
176:8;206:9
**2012 (1)**
10:22
**2015 (1)**
186:12
**2016 (1)**
11:11
**2017 (9)**
12:19;19:13;38:22;
124:15;135:3;171:12,
19;186:14;228:22
**2019 (11)**
36:12;37:21;41:8;
56:18;86:4;134:19;
166:7;171:4;186:5;
188:7;190:14
**219-796-0096 (1)**
9:14
**24 (3)**
86:19;89:9;135:3
**25 (1)**
108:1
**29 (11)**
36:12;37:21;41:8;
56:18;86:4;134:19;
166:7;171:4;186:5;
188:7;190:14
**29th (2)**
12:19,20

## 3

**3 (2)**
41:7;193:6
**3:07 (1)**
234:7
**30 (12)**
26:9,11;88:10;187:9,
12,14,18,22;188:1;
189:20;190:8;211:15
**300 (6)**
53:6;158:24;160:12;
176:8;206:9,11
**30-minute (2)**
189:23;190:5
**37 (1)**
4:18

## 4

**4 (5)**
56:14,17;67:15;
76:18;88:12
**400 (2)**
23:14;162:12

## 5

**5 (4)**
86:3;107:25;171:11,
14
**500 (31)**
23:14;53:5;125:22;
128:6,23,24;144:22;
152:14,16;155:6,11;
156:8;157:12;158:3;
162:12;163:5;165:1,
10;167:9;173:18;
174:16;188:20,23,25;
189:2,6;202:10;
206:22;208:11,13;
231:2
**53 (1)**
203:25
**540 (11)**
67:19,23;68:5,19,21;
194:24;202:20;207:13;
209:25;210:20;211:8
**55 (1)**
203:24
**5a (1)**
186:23

## 6

**6 (3)**
134:14,18;195:3
**6:00 (3)**
13:3,3,4

## 7

**7 (7)**
166:6;171:19;
175:17;191:22,22,25;
229:1
**7th (22)**
4:17;19:13;38:21;
48:3;75:18;78:22;96:8,
12;109:11;121:6;
124:15;147:17;171:12;
184:7,14;185:16,21,24;
186:14;212:7,13;
228:22

## 8

**8 (5)**
38:8;171:3;175:18;
193:6,12

**8:45 (1)**
188:20
**8:46 (1)**
188:23

## 9

**9 (1)**
186:4
**9:00 (3)**
189:25;190:2,9
**9:04 (1)**
188:25
**9:05 (1)**
189:2
**9:30 (4)**
189:21,25;190:1,10
**9:300 (1)**
190:10
**9:34 (3)**
164:8,14,17
**9:35 (2)**
164:11;189:21
**9:35:32 (1)**
209:25
**9:35:35 (1)**
209:22
**9:37:53 (1)**
210:7
**9:40 (1)**
210:13
**9:42:30 (1)**
210:24
**9:43:12 (1)**
203:1
**9:43:45 (1)**
203:18
**9:43:50 (1)**
203:24
**9:44 (3)**
205:12,23;206:11
**9:44:20 (1)**
211:15
**9:44:27 (1)**
206:1
**9:44:55 (1)**
207:3
**9:45 (4)**
163:18;167:4;190:3;
202:25
**9:45:47 (1)**
206:22
**9:46 (2)**
165:19;208:18
**9:46:20 (1)**
211:20
**9:46:37 (1)**
202:19
**9:46:45 (1)**
208:21
**9:47 (1)**
209:3
**9:47:20 (1)**

207:19
**9:47:28 (1)**
209:10
**9:57 (1)**
165:23