UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER,

    Plaintiff,

    v.                                              Case No. 3:18-CV-995 JD

RON NEAL, et al.,

    Defendants.

## OPINION AND ORDER

This action arises out of a tragic fire which occurred at the Indiana State Prison (ISP) on

April 7, 2017. In that fire, Joshua Devine burned to death in his cell. The personal representative

of Devine's estate filed suit against certain correctional officers who responded to the fire (the

"Incident Defendants").[1] The personal representative of Devine's estate also brought suit against

certain supervisors at ISP (the "Supervisory Defendants").[2] Now before the Court is a motion for

summary judgment brought by certain defendants on all of Plaintiff's claims.[3] (DE 201.)

The Court will grant the motion in part. As to the claims brought against Defendants

Lessner, Puetzer, and Statham, the Plaintiff does not contest dismissal. Plaintiff also does not

contest dismissal of Count VI for all defendants, except for Justin Rodriguez, who did not join

the motion for summary judgment. Accordingly, the Court grants the motion for summary

judgment on the claims brought against Lessner, Puetzer, and Statham, as well as summary

---

[1] The Incident Defendants are Sarah Abbassi, Justin Rodriguez, Promise Blakely, Anthony Watson, Timothy Redden, and Jeremy Dykstra.

[2] The Supervisory Defendants are Ron Neal, Kenneth Gann, Jason Nowatzke, Steven Griffin, and Christopher Beal.

[3] One Incident Defendant, Justin Rodriguez, is proceeding pro se, and did not move for summary judgment. All other Defendants joined the motion for summary judgment.

judgment on Count VI. The Court will also grant summary judgment on the claims brought under Count II against all defendants except for Rodriguez, finding that evidence does not support a claim of conspiracy under § 1983. However, for the remaining claims, the Court denies the motion for summary judgment.

## A.      Factual Background

The facts, viewed in the light most favorable to Plaintiff, as the non-moving party, are as follows. On April 7, 2017, Joshua Devine, a 30-year-old prisoner housed at the Indiana State Prison (ISP), was living in the B Cell House. The B Cell House is a prisoner housing unit at ISP with 5 tiers of cells, going from 100 level cells, which are on the ground floor of the cell house, up to the 500 level cells, which are on the top floor of the cell house. (DE 212-66 at 276:5–17; DE 212-67 at 132:4–19.) B Cell House's ranges have even numbered rows of cells on the north side, and odd numbered rows on the south side. (DE 212-67 at 132:13–133:5.) Devine lived in cell 540, on the north side of the 500 range. (DE 211-4 at 1; DE 212-66 at 221:23–222:4.)

### (1) Defendants Rodriguez, Abbassi, and Blakely

On the night of April 7, 2017, Officers Rodriguez, Abbassi, and Blakely were the three correctional officers on duty in the B Cell House when the fire began. The officers were working the night shift, which ran from 6 p.m. to 6 a.m. (DE 211-21 at 6; DE 6 at 127:25–128:4.) Rodriguez had been assigned as the Officer in Charge of B Cell House that night. This was the first time, or one of the first times, he was Officer in Charge. (DE 212-4; DE 212-5 at 29:6–12, 32:17–24.) The other officers on duty in B Cell House that night were also relatively new to the job: Abbassi had been with the prison for a little over seven months (DE 212-76), while Blakely had been working at ISP for approximately three months. (DE 212-6 at 91:18–25.) Rodriguez, as the Officer in Charge, assigned Blakely to cover the 400 and 500 ranges and assigned Abbassi to

cover the 200 and 300 ranges, while he covered the 100 ranges. (DE 212-5 at 38:11–39:25; DE 212-68 at 127:14–25.)

Every night, around 9:00 p.m., there was a prisoner count scheduled at ISP. (DE 212-6 at 137:7–25, 140:23–141:12.) During the count, prisoners are all locked in their cells, so the only way for them to get the guards' attention about an issue was to yell and make noise. (*Id.* at 137:20–25.) On the night of April 7, 2017, the Count was completed at 9:06 p.m., with no offenders remaining out of their cells. (DE 211-4 at 2.) Abbassi and Blakely then went into the counselor's office to complete some paperwork (DE 212-5 at 114:24–115:14), and Rodriguez stayed inside the officer's station. (*Id.* at 121:15–17.)

Shortly after 9:00 p.m., the television in Devine's cell caught on fire. (DE 211-4 at 3–4.) Devine started telling other prisoners that he couldn't put it out. (DE 212-14 at 5:16–25.) Prisoners began to scream for help at 9:15 p.m., trying to get the attention of the officers. (*Id.* at 6:1–25, 9:15–25; DE 212-15 at 4:12–6:22) As the prisoners screamed, smoke began to fill B Cell House. (DE 212-13 at 10:13–16; DE 212-5 at 123:16-17.)

Blakely, Abbassi, and Rodriguez heard and understood the yelling immediately after it began. (DE 212-7; DE 212-6 at 169:5–11; DE 211-13; DE 212-5 at 115:15–19, 121:3–12; DE 211-24.) Despite being able to hear prisoners screaming about a fire, it took at least 15 minutes before any of the three took action. (DE 212-16 ¶ 9; DE 212-17 ¶ 5; DE 212-18 ¶ 7; DE 212-19 at 68:3–10.) Rodriguez did eventually go upstairs towards Devine (DE 212-5 at 115:9–15), but he did not bring any equipment to fight the fire, such as a fire extinguisher (DE 212-5 at 115:3–116:15), did not call a fire code (*Id.*), did not release the prisoner firefighter in B Cell House (DE 212-89), and he did not bring the spare set of keys for the 500 range in case he had to evacuate the prisoners. (DE 212-33 at 49:6–23; DE 212-66 at 277:21–279:6; DE 212-13 at 11:1–25.)

When he got to Devine's cell, Devine asked Rodriguez to let him out. (DE 212-13 at 11:18–21.) Other prisoners also asked Rodriguez to let Devine out of his cell. (*Id.*) However, Rodriguez, without uttering a word to the prisoners, turned around, and walked away. (*Id.* at 11:18–25.)

Rodriguez's radio wasn't working (DE 212-5 at 115:9–18), so he began yelling for Abbassi and Blakely's help. (*Id;* DE 211-13; DE 211-18.) When they stepped out of the counselor's office, Abbassi and Blakely could see that the fire was on the 500 range. (DE 212-6 at 174:2–23.) It appeared to Blakely that the fire was coming from a prisoner's cell and that all the other prisoners in that vicinity were in danger. (*Id.* at 178:12–21.) Even though Blakely had been assigned to cover the 500 range, knew she was responsible for the safety of the prisoners in that range, and had a set of keys to release prisoners on the 500 range, Blakely never went up to the 500 range between the time the fire began and the fire was extinguished. (*Id.* at 175:22–176:23; 179:19–180:1, 184:15–19; 201:6–13; DE 60 ¶ 1.) She did not release the prisoner firefighter, get a fire extinguisher, bring keys to Rodriguez, or call a fire code in response to seeing a dangerous fire raging in a prisoner's cell. (DE 212-6 at 185:4–12; 190:16–18, 194:18–21, 195:12–16, 207:10–17) In fact, it appears that Blakely took no action to aid in the fire response after learning there was a fire on the 500 range. (*Id.* at 175:23–176:23; 179:19–180:1, 184:15–19; 185:23–186:2; 201:6–13; DE 60 ¶ 1.)

Abbassi did eventually go up to meet with Rodriguez, but did not take any keys and did not bring a fire extinguisher. (DE 212-5 at 115:16–116:15; DE 212-68 at 125:9–126:12; DE 211-13.) Additionally, even though Abbassi had a radio, she did not call in the fire code until 9:45, 30 minutes after the prisoners began to yell. (DE 212-5 at 115:19–21, 127:7–22; DE 211-13; DE 211-14; DE 211-15.) When Abbassi did eventually meet with Rodriguez on the 300 range, Rodriguez told Abbassi that Blakely had the keys. (DE 212-5 at 127:2–128:14.) Rodriguez then

went up to the 500 Range, where he waited silently for either Abbassi or Blakely to bring him keys. (*Id.*) However, neither Abbassi nor Blakely brought him the keys for the 500 range.

Instead, it was Lieutenants Watson and Redden, who were not assigned to the B Cell House, who finally brought the keys to the 500 range. (*Id.* at 129:15–19.) By this point, Devine was pressed against the front of the cell, not saying anything. According to Rodriguez, "[h]e was just screaming." (*Id.* at 132:9–19.)

### *(2) Dykstra, Redden, and Watson*

When a fire occurs at ISP, a team of prisoner firefighters are supposed to be released to help fight the fire. (DE 212-19 at 41:6–20; DE 212-26 at 33:2–7.) As the shift supervisor that night, Captain Dykstra had the responsibility to ensure that the prison firefighters were released during a fire and to ensure that staff was instructed on when to release prisoner firefighters. (DE 212-28 at 131:2–13.) Watson and Redden served as assistant shift supervisors that night. (DE 211-21 at 6.) Meaning, they had the same duties and abilities as the shift supervisor, even though they were outranked by Dykstra. (DE 212-66 at 110:15–111:14.) Watson and Redden were also part of the first responder team, which was supposed to act quickly and take control of emergency situations. (*Id.* at 122:3–16; 126:10–18; 299:14–20; DE 211-21 at 6.)

At 9:45 p.m., almost half an hour after the prisoners started screaming about the fire, a fire signal was called in B Cell House. (DE 211-14.) Rather than take action immediately at 9:45 p.m., when the fire signal was called and he learned of the fire, Dykstra was passive, simply watching the fire progress on the live video feed and listening to radio traffic. (*Id.*) He took no affirmative steps to direct the fire response or to release Devine from his cell until Redden called at 9:58 to request an evacuation. (DE 212-66 at 204:15–207:16; DE 211-14.) Redden and Watson responded to the fire signal by going to B Cell House, but they failed to grab fire

extinguishers before going up to the 500 range. (DE 212-5 at 133:10–15.) There was also a delayed response with activating the prisoner firefighters: neither Dykstra, Watson, nor Redden activated the prisoner firefighters until 9:58 p.m. (DE 211-14 at 2.)

During this time, prisoner firefighters were standing idly by, waiting to be allowed to fight the fire. For example, the prisoner firefighters, who were housed in I Cell House, were released from their cells when the fire call came in around 9:45. (DE 212-26 at 10:18–12:7.) However, rather than allow them to go and fight the fire in B Cell House, the prisoner firefighters in I Cell House were held up at the front door of I Cell House by the Officer in Charge of that unit, who refused to let them out. (*Id.)* This caused a delay of between 5 and 10 minutes in having them released from I Cell House. (*Id.* at 15:13–24; DE 211-7.) By the time the firefighters from I Cell House arrived at B Cell House, the fire had grown so large that it was shooting out of the eaves. (DE 212-26 at 20:10–16.)

When the prisoner firefighters were eventually released and went to the fire station to pick up their equipment to help them fight the fire, they were again delayed. (DE 212-19 at 25:17–18.) Prior to getting their equipment, the firefighters had to get keys from a correctional officer at a checkpoint. But, that night, there was no officer at the checkpoint and, when an officer finally got to the checkpoint, he did not know how to locate the keys. (DE 212-19 at 25:17–18, 26:3–27:11.)

There was also a severe delay in releasing the only prisoner firefighter in B Cell House, Danny Means. (DE 212-19 at 28:20–29:14.) Prisoners in B Cell House were yelling to Defendants Rodriguez, Abbassi, or Blakely to "let the fireman out." (DE 212-16 ¶ 17.) Means himself was yelling "I'm a fireman, let me out." (*Id.*)  Despite these yells, Means was not released until B Cell House was evacuated. (*Id;* DE 212-15 at 4:15–19, 6:22–8:3, 16:12–25.)

As the Shift Supervisors and Assistant Shift Supervisors, Dykstra, Watson, and Redden were responsible for ensuring the release of firefighters in the event of a fire. (DE 212-28 at 131:2–13; DE 211-21 at 6; DE 212-66 at 110:15–111:14.) Despite this responsibility, the prisoner firefighters were not activated until 9:58 p.m., the volunteer firefighters in I Cell House experienced 5 to 10-minute delays in getting out of the cell house, further delays in getting their equipment, and the only firefighter in B Cell House, Means, was never released until the whole cell house was evacuated.

When the prisoner firefighters finally arrived at B Cell House, the firefighters could hear Devine screaming—his voice standing out amongst the other prisoners' screams. (DE 212-19 at 31:6–24.) Devine was eventually recovered from his cell, but, by this point, he had 2nd and 3rd degree burns over the majority of his body. (DE 211-8 at 19.) CPR was attempted, but was unsuccessful. (*Id.*) Devine was then declared dead. (DE 212-29.)

### (3) Defendants Neal, Gann, Nowatzke, Griffin, and Beal

Defendants Neal, Gann, Nowatzke, Griffin, and Beal, each had supervisory roles at ISP on April 7, 2017. Each one of them was aware of an abundant number of safety hazards at ISP. One particularly glaring safety hazard was the widespread, persistent issues with fires and electrical outlets sparking. (DE 212-19 at 40:6–10, 40:22–41:5, 42:21–44:5; DE 212-19 at 40:6–10, 40:22–41:5; DE 212-32 at 174:20–24; DE 212-23 at 67:6–14; DE 212-22 at 11:8–10, 16:12–24.) There could be as many as five to six fires every week or two. (DE 212-19 at 40:6–10, 40:22–41:5.) Prisoners considered plugging devices into outlets to be risky, due to them frequently catching fire. (DE 212-19 at 42:21–44:5.) And, just a few months prior to the fire on April 7, 2017, a large electrical fire on the 400 range of the B Cell House was reported. (DE 212-45 at 2.) It appears that a similar electrical issue may have started Devine's fire: the State Fire

7

Marshal determined that the fire in Devine's cell was accidental, that Devine tried to unplug the cord of the television to stop the fire, and that there was a "reasonable probability of an electrical event" having caused the fire. (DE 212-30 at 18–21.)

In addition to the numerous prior fires, there were persistent issues with the prisoner firefighter program, where firefighters would either not be called or staff would cause substantial delays in their release. (DE 212-19 at 41:6–20; DE 212-25 at 23:25–26:20.) The prisoner firefighter chief filed reports describing how, in response to fires, guards on many occasions would say "we can't let you out" and wasted valuable time giving keys to random people. (DE 212-26 at 40:12–41:5; DE 211-6.)

Numerous other safety hazards and deficient safety protocols also existed: radios consistently malfunctioned, excessive property was stored in cells, inspections were performed perfunctorily, new officer training on emergency fire response was "basic" and "simplistic," post-orders were written with no instructions regarding the prisoner firefighters, there were no sprinklers in B Cell House, and there was a complete absence of fire drills for the night shift. *See infra* pp. 28–33.

Each of the Supervisory Defendants knew of these serious, ongoing problems. Despite this knowledge, the Supervisory Defendants took no actions to correct any of these persistent issues at ISP prior to Devine's death. *See infra* pp. 33–44.

### *(4) Procedural History*

On December 10, 2018, Devine's mother, Barbara Devine, filed this suit as personal representative of Devine's estate against various officers and supervisors at ISP. (DE 1.) Plaintiff then amended her complaint, asserting the following claims:

**Count I** – 42 U.S.C § 1983 – Failure to Protect (DE 43 ¶¶ 36–44);

8

      **Count II** – 42 U.S.C § 1983 – Conspiracy (*Id.* ¶¶ 45–50);

      **Count III** – 42 U.S.C § 1983 – Failure to Intervene (*Id.* ¶¶ 51–54)

      **Count IV** – Negligent or Willful and Wanton Conduct (*Id.* ¶¶ 55–60);

      **Count V** – Intentional Infliction of Emotional Distress (*Id.* ¶¶ 61–65);

      **Count VI** – Negligent Infliction of Emotional Distress (*Id.* ¶¶ 66–69);

      **Count VII** – Wrongful Death (*Id.* ¶¶ 70–75).

(DE 43.) After filing the amended complaint, Ms. Devine passed away, and Denise Dwyer was substituted in her place as plaintiff. (DE 143.) Certain defendants then moved for summary judgment on all claims.[4] (DE 201.) The Court now considers that motion for summary judgment.

**B.**    **Standard of Review**

      On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

      "The moving party has the burden of either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel*

---

[4] Defendant Rodriguez is the only defendant who did not join the motion for summary judgment.

*v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 116 (7th Cir. 2016). If a party chooses to argue that there is an absence of evidence supporting an essential element, the burden is not "onerous" and "may be discharged by 'showing' —that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 325).[5]

Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be *material*, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## C.    Discussion

Defendants argue that each of Plaintiff's claims must be dismissed.[6] However, resolving whether Plaintiff has raised a genuine dispute of material fact on her failure to protect claim

---

[5] Plaintiff argues multiple times that various arguments in Defendants Motion for Summary Judgment should be forfeited because they are conclusory and fail to cite facts in support of their position. (DE 212-1 at 13, 33, 44.) However, when the moving party is arguing that there is a lack of evidence supporting a given claim, they must simply "point out" how the opposing party lacks evidence. Here, the Court finds that the Defendants satisfied this burden by pointing out the areas where they believed the Plaintiff lacked evidence.

[6] First, Defendants argue that summary judgment should be granted as to Plaintiff's claims alleging failure to protect and failure to intervene because they have no evidence upon which a reasonable jury could find that any defendant was deliberately indifferent. Furthermore, Defendants assert that even if these were actionable constitutional violations, Defendants would be entitled to qualified immunity. Defendants also argue that the state law claims must fail because they have no evidence upon which a reasonable jury could find that any defendant was "willful and wanton." Lastly, Defendants argue that summary judgment must be granted as to Plaintiff's claims alleging

resolves most of Defendants' other arguments. Accordingly, the Court initially considers Plaintiff's failure to protect claim.

### (1) Count I: Failure to Protect Claim Against Incident Defendants

A failure to protect claim stems from the Eighth Amendment's Cruel and Unusual Punishment Clause, which requires prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27, (1984)). "Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001) (citation omitted). To state a failure to protect claim, a plaintiff must show (1) that the deprivation alleged was "objectively, sufficiently serious" and (2) that "the mental state of the prison official" was "one of deliberate indifference to inmate health or safety." *Est. of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (quotation marks and citations omitted). The first component is an objective component, while the latter is subjective. *See Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020).

The Defendants do not appear to contest the objective prong, at least as to the Incident Defendants.[7] This makes sense, as Devine clearly experienced a serious harm when he burned to death while locked in his cell.

---

conspiracy because there is no evidence from which a reasonable jury could conclude there is a conspiracy. (DE 202.)

[7] In one brief line in their reply, without any citations, the Defendants argue that the fact that the prisoners were "locked in their cells after 9pm does nothing to show a 'risk of harm.'" (DE 227 at 5.) To the extent this is an argument Devine did not face a substantial risk, it is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We have repeatedly made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). Even if the argument wasn't waived, it lacks merit. The Seventh Circuit has found that placing a detainee in a cell in which there is a known cobra or at least a high probability of a cobra constitutes a substantial risk. *Brown v. Budz*,

The Defendants primarily argue that the Plaintiff has not shown "deliberate indifference" because "there is no evidence" that the incident defendants "held the level of culpability required to establish deliberate indifference." (DE 202 at 17.) Deliberate indifference requires that the prison official "must have known of and disregarded an excessive risk to the inmate's health or safety." *Balsewicz*, 963 F.3d at 654. Meaning, a Plaintiff must show that the defendants: (1) subjectively knew the prisoner was at substantial risk of harm and (2) intentionally disregarded the risk. *See Lisle v. Welborn*, 933 F.3d 705, 717 (7th Cir. 2019).

As to the first component of deliberate indifference, "[t]he prison official must have actual, not merely constructive, knowledge of the risk to be liable." *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020). The Plaintiff does not need to "prove that the prison officials intended, hoped for, or desired the harm that transpired." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). Rather, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Gevas v. McLaughlin*, 798 F.3d 475, 479 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). Actual knowledge can be shown "in the usual ways" that facts are demonstrated, "including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

Furthermore, in order to show knowledge of the risk, it is not necessary to know which particular inmate is at risk. *See Farmer*, 511 U.S. at 842 ("[W]hether a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk."); *see also Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005) ("[D]eliberate indifference can be predicated upon knowledge of a victim's particular vulnerability (though the

---

398 F.3d 904, 911 (7th Cir. 2005) (citing *Billman v. Indiana Department of Corrections*, 56 F.3d 785, 788 (7th Cir. 1995). The Court sees no reason why being locked in a cell with a raging fire does not similarly show a "substantial risk of harm."

identity of the ultimate assailant [need] not [be] known in advance of attack), or, in the alternative, an assailant's predatory nature (though the identity of the ultimate victim not known in advance of attack).").

*(a) Knowledge of substantial risk*

The Court finds that the Plaintiff has demonstrated there is a genuine dispute over whether Blakely and Abbassi knew of the substantial risk the fire posed while they were in the counselor's office doing their paperwork.

Plaintiff provided the court with multiple affidavits and depositions from both prisoners and prison officials indicating the cell house was " pretty quiet" after 9:00 pm. (DE 212-5 at 101:18–102:10; DE 212-6 at 159:23–160:1; DE 212-14 at 8:11–18.) Despite it typically being quiet, prisoners testified that it became "very, very" loud in B Cell House shortly after the fire in Devine's cell began. (DE 212-15 at 4:12–6:22, 9:17–10:7; DE 212-13 at 10:1–18.) Screams could be heard on the 100 range as early as 9:15 p.m. (DE 212-15 at 4:15–5:11) "Pretty much everyone joined in," saying, "540 fire." (DE 212-13 at 10:1–18.) B Cell House inmates were "screaming over the range . . . that there's a fire up on the fifth range, there's a man burning up in his cell." (DE 212-14 at 9:15–10:16.) Officer Statham, a correctional officer at ISP, testified that when the prisoners were yelling in harmony, he could almost always tell what they were yelling about. (DE 212-23 at 128:15–18.)

Plaintiff also provided evidence indicating the layout of the counselor's office would have allowed Abbassi and Blakely to immediately hear what was going on in B Cell House: the counselor's office was located on the 100-range — the very same range as a prisoner who testified he heard other prisoners yelling "[f]ire on 500" at 9:15 p.m. (DE 212-15 at 4:12–6:22; DE 212-7; DE 212-5 at 203:5–204:14.) Furthermore, Blakely testified that, while he was in the

office, he was able to hear what people were yelling on the ranges, with the door open or closed (DE 212-6 at 168:2–169:11), that the first time he heard someone say fire he was in the counselor's office (*Id.* at 170:12–171:7), and that the words he heard may "have been fire on 500." (*Id.* at 198:16–199:2.) Abbassi also gave a statement indicating that she was able to hear Rodriguez calling her name while in the counselor's office. (DE 211-13 at 2.)

Based on this record, a reasonable juror could find that Abbassi and Blakely knew that there was a fire shortly after the prisoners started screaming and that this fire presented a substantial risk to the prisoners' safety.[8] If Abbassi and Blakely could hear Rodriguez calling for their help as they sat in the counselor's office, and could typically understand yells from the range while in the counselor's office (with the door open or closed), then a reasonable inference is that they could hear and understand the numerous prisoners screaming that there was a fire on the 500 range shortly after the screaming started. Evidence that the screaming was exceptionally loud, that the range was normally quiet, and that prisoners on the same floor as them could hear and understand the screaming, similarly supports the inference that Blakely and Abbassi knew there was a fire immediately after the screaming began. The next inference, that they knew this fire presented a substantial risk to the prisoners locked in their cells, is also reasonable. *See Haley*, 86 F.3d at 641 ("[A]ctual knowledge of a substantial risk of serious harm can be *inferred* by the trier of fact from the obviousness of the risk.").

---

[8] In the Defendants' Motion for Leave to File Additional Authority and Argument, they argue that it is unsupported speculation that "Abbassi and Blakely in the counselor's office *would also have heard* the prisoners yelling on the ranges and banging on their bars." (DE 233-1 at 4) (quoting Plaintiff's Statement of Genuinely Disputed Facts, DE 212-2 ¶ 33). The Court would like to direct the Defendants to the numerous paragraphs surrounding that line, which Defendants plucked out of context, where Plaintiff specifically points out the portions of the record supporting the inference that Abbassi and Blakely could hear the prisoners yelling and banging on their bars. (DE 212-2 ¶¶ 22–24, 26–31, 33, 35, 40.)

14

In their reply, the Defendants dispute the truth of some of the facts asserted above. For example, the Defendants assert that Plaintiff "cannot claim, as she does, that 'BCH was typically very quiet after 9 pm count.'" (DE 227 at 6.) They also assert that the noise "was not more than usual" and that neither Blakely nor Abbassi were aware of the fire when they were in the counselor's office. (*Id.*) In support of these assertions, the Defendants cite deposition testimony from Abbassi, Blakely and Redden. (*Id.*) However, it appears that the Defendants want the Court to make credibility determinations, weighing portions of the record against other portions of the record and deciding which version is correct. But, at the summary judgment stage, this is not the role of the Court. Instead, the Court is supposed to examine "the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Construing the record in the light most favorable to the nonmovant, the Court finds there is a genuine dispute as to whether Abbassi and Blakely knew about the fire, and the substantial risk it posed, while they were in the counselor's office.

A reasonable jury could also infer that Dykstra, Watson, and Redden knew that there was a fire in B Cell House and knew that it posed a substantial risk to the prisoner's health and safety. When the fire signal was called, Dykstra, Watson, and Redden, were all in the shift supervisor's office. (DE 212-67 at 42:21–43:15, 137:20–23; DE 212-69 at 155:20–24.) Watson provided testimony indicating that they had been in the supervisor's office waiting for count to clear prior to the signal being called. (DE 212-69 at 155:20–24, 159:14–25.) Shortly after the signal was called, Dykstra began looking at the camera feed showing B Cell House and could see a fire coming from a cell, but he could not tell which cell it was coming from due to all of the smoke. (DE 211-14 at 2.) Because Dykstra heard the fire signal and had a video feed showing that the

fire was coming from a cell, it is reasonable to infer he knew that the fire presented a substantial risk of harm.

While Dykstra was watching the video feed, Watson and Redden responded to the signal by going to B Cell House. (DE 212-69 at 155:20–25.) However, the Defendants argue that "neither knew there was a fire since it was not until Watson and Redden arrived on the 500 range, having to go up several flights of stairs, that they saw the flames coming out of the cell." (DE 227 at 8.) This argument is absurd considering that Defendants admit in their statement of undisputed facts that "Redden and Watson were in the shift supervisor's office when they first learned of the fire" and that they then "immediately responded" and "were inside B Cell House in less than 30 seconds." (DE 202 ¶¶ 17, 19.)

Defendants go on to argue that upon "arriving inside B Cell House, neither Watson nor Redden could see any smoke nor could they see a fire." (DE 227 at 8.) However, there is evidence supporting that they could see just that. For example, Blakely testified that, prior to Watson and Redden entering B Cell House, she could see the fire from the 100 range and understood the danger it posed, without even going up to the 500 range. (DE 212-6 at 174:2–175:3; 178:7–179:3.) Furthermore, there is evidence indicating that the fire alarm went off inside B Cell House, as well as a fire alarm outside B Cell House. (DE 212-23 at 72:6–10, 155:10–20; 156:1–157:16.) According to Officer Statham, there has to be a "good amount" of smoke coming out of the cell house for it to set off the outside alarm. (*Id.* at 157:10–13.)

Accordingly, because both men heard the fire signal, and because there is evidence supporting that they understood the severity of the fire upon entering B Cell House, a reasonable juror could find that Watson and Redden knew about the substantial risk posed by the fire when they entered B Cell House.

*(b) Disregarding the substantial risk*

Next, the Court considers the second aspect of deliberate indifference: disregarding the substantial risk to an inmate's health or safety. "[P]rison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (citation omitted). A reasonable response in this context "requires a showing of more than mere or gross negligence." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quotation marks and citations omitted). However, even though the deliberate indifference standard requires more than a finding of negligence, it requires less than a showing of intentional harm. *See Gil v. Reed*, 381 F.3d 649, 664 (7th Cir. 2004). The Seventh Circuit has emphasized that deliberate indifference comes close to a complete lack of concern for the prisoner's welfare in the face of serious risks. *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006). Meaning, that the standard is equivalent to recklessness. *See Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003) (defendant's "action must be reckless before § 1983 liability can be found").

The Court finds that there is a genuine question whether Defendants Abbassi and Blakely acted with deliberate indifference in response to the substantial risk posed by the fire in Devine's cell.

First, a reasonable juror could conclude that it took at least 15 minutes after the screams began for Rodriguez, Abbassi, or Blakely to respond to the fire by going up to the 500 range. The Plaintiff submitted affidavits and depositions where multiple prisoners gave statements to this effect. (DE 212-16 ¶ 9; DE 212-17 ¶ 5; DE 212-22 at 7:8–13.) Officer Statham, a correctional officer at ISP, interviewed around 30 prisoners after the fire occurred, none of whom

indicated that the officers responded in less than 20 minutes. (DE 212-23 at 181:15–18, 183:10–15.)

The Defendants argue that these citations do not support the inference that Defendants Abbassi and Blakely ignored "cries for help." (DE 227 at 6.) They assert that the conclusion that Abbassi and Blakely ignored cries of help is grounded on "flights of fancy, speculations, hunches, intuitions, or rumors." (*Id.*) Defendants go on to write that: "contrary to Plaintiff's assertions, there was no delay in actions taken by Abbassi or Blakely. After Rodriguez yelled that he needed keys and to call signal, Abbassi ran up the stairs and called signal before she located Rodriguez and was able to determine what was going on." (*Id.*) However, this argument does not address the evidence provided supporting that numerous prisoners were screaming for 15 minutes *before* Rodriguez responded. It also ignores how a reasonable juror could infer, based on the evidence presented, that Abbassi and Blakely could hear the screams and understand the screams immediately after they began. Therefore, a jury could also conclude that Rodriguez, Abbassi, and Blakely, knowing there was a fire in B Cell House, waited at least 15 minutes before performing any actions in response to the fire.

The Court believes that this delay alone is sufficient to allow a jury to find that Abbassi and Blakely were deliberately indifferent. However, Plaintiff provided additional evidence supporting that Blakely and Redden acted unreasonably *after* they responded to Rodriguez. As previously explained, it was initially Rodriguez, and only Rodriguez, who went up to the 500 range. Rodriguez then began to yell down to Blakely and Abbassi for assistance.

As to Blakely, the Plaintiff submitted evidence supporting the finding that he took no meaningful action after Rodriguez started yelling for help. First, there is evidence indicating that Blakely heard and understood Rodriguez yelling about the fire, even though he may have been

on the 100 range. *See supra* pp. 13–14. Rodriguez gave a statement saying that he yelled multiple times for Blakely to bring the keys to the 500 range. (DE 211-16.) There were only two sets of keys that could open cells in a given range, one in the officer's station, and the other with the officer responsible for a given range. (DE 212-33 at 49:6–23; DE 212-66 at 277:21–279:6) Blakely had been assigned to cover the 500 range, so a reasonable inference is that he had one of the only sets of keys. Blakely also testified that if there was a fire on the range an officer was responsible for "[o]f course" it was that officer's responsibility to unlock the cell. (DE 212-6 at 134:6–135:16.) According to Dykstra, it would have taken Blakely "15 to 20" seconds to go from the 100 range up to the 500 range. (DE 212-66 at 309:16–311:10.) However, despite his admitted responsibility over the 500 range, and despite the short distance to the 500 range, Blakely never brought the keys up to the 500 range. (DE 211-16.)

The Defendants argue that Blakely responded reasonably because he was "running around making sure other prisoners were okay." (DE 227 at 7.) It is true that Blakely testified that he was running around "doing the steps of whatever we needed to do." (DE 212-6 at 175:23–176:9, 186:4–25.) However, it's unclear from the record what these steps were. In fact, Blakely testified that he could not remember any specific steps he took after he learned there was a fire on the 500 range. (DE 212-6 at 185:23–186:11.) He also testified he had no memory of getting a fire extinguisher (*Id.* at 194:19–21), no memory of letting out any prisoner firefighters (*Id.* at 195:12–16), and no memory of making any calls for emergency assistance. (*Id.* at 185:10–12.) Furthermore, Defendants admitted that Blakely did not go up to the 500 range at any point on April 7, 2017, between the time that the fire began and the time that the fire was extinguished. (DE 212-60 ¶ 1.) While a jury could believe that Blakely was, in fact, running around doing all he could, another reasonable inference from Defendants admitting that Blakely did not go up to

the 500 range, and Blakely's testimony that he had no memory of taking any specific actions after learning about the fire, is that Blakely, in fact, took no meaningful actions to aid with the fire response after Rodriguez began yelling for assistance.

There is ample evidentiary support for the conclusion that Blakely not only failed to take action for 15 minutes after the screaming began, but also failed to take meaningful action after Rodriguez yelled for assistance. Accordingly, the Court finds that a reasonable jury could conclude that Blakely's actions that night were deliberately indifferent to the substantial risk posed by the fire in Devine's cell.

As to Abbassi, Plaintiff admits that Abbassi went up to meet Rodriguez after Rodriguez started yelling for help. But there is evidence indicating that, even though she knew there was a fire coming from a prisoner's cell, she did not grab either the keys in Blakely's possession or the spare set of keys from the officer's station. (DE 212-5 at 115:16–116:15; DE 212-68 at 125:9–126:16; DE 211-13.) She also did not grab a fire extinguisher to bring up to help fight the fire. (*Id.*)

Defendants argue that no reasonable juror could find that Abbassi was deliberately indifferent because "after Rodriguez yelled that he needed keys and to call signal, Abbassi ran up the stairs and called signal before she located Rodriguez and was able to determine what was going on." (DE 227 at 6.) However, as the Court previously discussed, a reasonable juror could find that Abbassi heard and understood the screams about the fire immediately after the screams began, at 9:15. Defendants admit in their reply that the fire code was called at 9:45. (*Id.* at 19.) Therefore, a reasonable inference is that Abbassi waited 30 minutes after she knew there was a fire to actually call in the fire code, even though she had a radio. (DE 212-68 at 24:14–24.)

An officer is not relieved of liability "simply because he or she takes *any* action in response to a risk of harm to an inmate." *Borello v. Allison*, 446 F.3d 742, 749 (7th Cir. 2006). Rather, an officer may be liable if they behaved recklessly in the face of a known risk. Even though Abbassi eventually went up in response to Rodriguez's yells, there is evidence supporting a finding that Abbassi understood the screams by the prisoners at 9:15, then ignored those screams for at least 15 minutes. There is also evidence supporting that, after Rodriguez yelled, Abbassi failed to grab a key, fire extinguisher, or call in a fire code until 9:45. Based on this evidence, a reasonable jury could find that Abbassi was deliberately indifferent to the substantial risk posed by the fire in Devine's cell.

Next, the Court considers whether a reasonable jury could conclude that Dykstra's actions were reckless. Dykstra testified that during "an incident," as the on-duty supervisor, he was "supposed to be directing traffic and delegating duties to everybody else." (DE 212-66 at 112:21–113:2.) Meaning, he was supposed to be "managing people" and telling them "where to go" and "what to do." (*Id.* at 119:10–24.) Furthermore, it was the shift officer's responsibility to make sure that prisoner firefighters were released properly. (DE 212-28 at 130:22–131:8.) However, it's reasonable to infer that, between 9:45 p.m., when he first learned of the fire, and 9:58, when the cell house was evacuated, Dykstra took no actions to direct the fire response beyond watching the fire progress on a live video feed and listening to the radio. The incident report Dykstra wrote after the incident indicates that between 9:45 and 9:58 he looked at the cameras and could see a fire, but shows no other response in that time period. (DE 211-14.) Additionally, Dykstra's testimony indicates that while he remembered watching the camera and listening to radio traffic, he could not recall taking other additional steps until Redden called to ask Dykstra to evacuate the B Cell House. (DE 212-66 at 207:2–25.)

Defendants argue that it would be unreasonable for a jury to infer that Dykstra took no action because, during this time period, "Dykstra was the 'eyes' of the response as he quickly reviewed the cameras to see where the fire and smoke were." (DE 227 at 8.) They also assert that, during this time period, "Dykstra knew that the first responders had already been activated and was on the radio trying to determine what was happening." (*Id.*)

As to the Defendants first argument, the Court believes that a jury could find that Dykstra was reckless precisely because he acted only as the "eyes" of the response. Dykstra testified that he was supposed to direct traffic and delegate in response to an emergency, which a juror could certainly find entailed more than watching cameras and listening to the radio. The Defendants second argument is also unconvincing. It is true that a portion of Dykstra's testimony indicates that the first responders, meaning, Dykstra and Redden, were activated prior to him getting on the camera. (DE 212-66 at 167:14–19 ("They called for a fire, and the First Responders were activated. So I got on the camera.")) However, it was also Dykstra's responsibility to ensure the release of the prisoner firefighters in the event of a fire. (DE 212-28 at 131:2–13; DE 212-88 at 6.) Dykstra's incident report, which he wrote the night of the fire, indicates that it was only after 9:58 p.m. that the prison fire department was activated. (DE 211-14.) There was also evidence presented indicating that prisoner firefighters experienced multiple delays once they were released. (DE 212-26 at 15:13–24; DE 211–7; DE 212-15 at 4:15–19, 6:22-8:3, 16:12–16.) At this stage, we look at the record in the light most favorable to the Plaintiff, who is the non-moving party. Accordingly, a reasonable jury could find that Dykstra acted with deliberate indifference in light of his inaction between 9:45 p.m. and 9:58 p.m.

Finally, the Court considers whether Watson and Redden behaved recklessly. As the Court previously mentioned, it is reasonable to conclude that they knew about the fire prior to

22

entering the B Cell House, and that they would have known that the fire was coming from the 500 range once they entered.

Defendants contend that "Watson and Redden took courageous steps to address the fire." (DE 227 at 8.) They assert that "Ryan Statham was right behind both lieutenants and he grabbed fire extinguishers from the officer's station and quickly made his way up to the 500 range." (*Id.* at 9.) However, even if Watson and Redden *eventually* used fire extinguishers to try to put out the fire, there is still evidence indicating that they didn't initially grab fire extinguishers, despite knowing about the fire and how serious it was. Blakely gave testimony that he could see the fire from the 100 range, and understood how dangerous it was, supporting the inference that Watson and Redden would have known immediately how much of a danger this fire was upon entering B Cell House. However, despite knowing about this danger, neither Watson or Redden grabbed fire extinguishers when they initially went up to the 500 range (DE 212-5 at 133:10–15), and neither activated the prisoner firefighters until sometime after 9:58 p.m., 13 minutes after the fire code was called. (DE 211-14.)

Because there is evidence indicating Watson and Redden were aware how dangerous the fire was, failed to bring fire extinguishers initially, and failed to activate prison firefighters for 13 minutes after the fire signal was called, a reasonable jury could find they were deliberately indifferent.[9]

---

[9] On February 9, 2022, the Defendants filed a motion for leave to file additional authority and argument in support of their motion for summary judgment. (DE 233.) This motion is based on a recent case, *Miles v. Dorre,* No. 3:19-CV-456 DRL, 2022 WL 59540, at *1 (N.D. Ind. Jan. 6, 2022). Defendants assert that *Miles* was granted summary judgment motion on facts "similar" to the instant case. (DE 233 at 1.) However, the evidence provided by the plaintiff in *Miles* supported very different facts. To name a few, in *Miles*: (1) the prisoner did not die nor suffer second and third degree burns over the majority of their body; (2) the prisoners were not screaming for 15 minutes, begging for assistance; (3) the correctional officers did not ignore screams of help for at least 15 minutes; (4) the prisoner was able to put out the fire within a minute or two; (5) officers came up to the cell within only a few minutes of the time that Miles had put out the fire; (6) the fire, since it was out, would not have been visibly dangerous to the responding officers; (7) there were no facts indicating that the officers, in light of a serious, dangerous live fire, failed to activate prisoner firefighters who were specifically trained to help fight fires for an

### *(2) Count I: Failure to Protect Claim Against Supervisory Defendants*

Defendants' primary argument is that the Plaintiff has "no evidence that [the Supervisory Defendants] intended for Mr. Devine to be harmed, or otherwise held the level of culpability required to establish deliberate indifference." (DE 202 at 17.) However, in their reply, the Defendants offer several arguments which are based on misunderstandings of the law concerning failure to protect claims and the theory of Plaintiff's case. (DE 227.) Because of this confusion, the Court will first address the arguments Defendants raise in their reply and clarify the standards applicable to the claim for failure to protect brought against the Supervisory Defendants.

First, Defendants argue that the Supervisory Defendants cannot be liable for deliberate indifference because Plaintiff has not provided evidence that they consented to the actions of the Incident Defendants on April 7, 2017. According to the Defendants, "in order to hold the Supervisory Officials liable for deliberate indifference, the plaintiff must prove that the Supervisory Officials personally must have ignored the allegedly unconstitutional *conduct* (i.e. Incident Defendants' responses to the fire) complained of." (DE 227 at 13.) The Defendants argue they cannot be deliberately indifferent because they did not know or condone the response by Abbassi, Blakely, and the other correctional officers who responded that night. This is wrong and misinterprets Plaintiff's theory underlying her failure to protect claim against the Supervisory Defendants.

Plaintiff is not claiming that the Supervisory Defendants are liable because they approved, condoned, or turned a blind eye to the actions taken by the Incident Defendants on

---

extended period of time; (8) there were no facts indicating that the officers, in light of a serious, dangerous live fire, failed to radio a fire signal for half an hour; and (9) the defendants were only the officers responding to the incident, not supervisors. While *Miles* may be "similar" in the sense that it involved a fire and a prisoner, there are obvious factual distinctions that make it unhelpful to deciding the case at hand.

April 7, 2017. Rather, in her Amended Complaint, Plaintiff sets forth a separate, independent theory of deliberate indifference as to the Supervisory Defendants. Plaintiff alleges that the Supervisory Defendants were aware of dangerous conditions in the jail, the substantial risk these conditions posed in an event of a fire, but that they failed to take reasonable action in response to this risk. (DE 43 ¶ 40.) Meaning, Plaintiff is alleging that there was separate unconstitutional conduct that resulted in Devine's death, apart from the response of the Incident Defendants. *See, e.g., Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004) (describing a failure to protect claim which is based on the *conditions* of the prison).

For a claim such as this one, "involving the conditions of confinement in a prison, two elements are required to establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment: first, an objective showing that the conditions are sufficiently serious—*i.e.*, that they deny the inmate 'the minimal civilized measures of decency and life's necessities . . . creating an excessive risk to the inmate's health and safety, and second, a subjective showing of a defendant's culpable state of mind." *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017). The first "element is satisfied if a plaintiff shows that he was incarcerated under conditions posing a substantial risk of serious harm." *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016). The subjective element requires deliberate indifference to that risk, meaning that the official must know of and disregard "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A plaintiff does not need to prove that the substantial risk was "literally ignored," but must show that "defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded [the substantial risk]." *Haywood*, 842

F.3d at 1031. No part of this standard requires that the Supervisory Defendants condone the alleged unconstitutional actions of the Incident Defendants, as the Defendants incorrectly assert in their reply.

The Court also wishes to address another point of confusion on the part of the Defendants. In their reply, the Defendants assert that Plaintiffs are trying to raise a "systemic liability claim." (DE 227 at 14.) This is incorrect, as a condition being "systemic" is relevant to demonstrating an Eighth Amendment claim for failure to protect, but is not itself a separate claim. *See Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018) (describing how allegations of systemic issues, as opposed to isolated conditions, is one way to show that supervisors violated the Eighth Amendment).

A systemic issue is relevant to two aspects of the Eighth Amendment inquiry for failure to protect. First, a pervasive lapse of enforcing a safety policy or recurrent unsafe conditions can show that there was an objective, substantial risk to prisoners. For example, in *Antonelli v. Sheahan*, the Seventh Circuit determined that a pest infestation of cockroaches posed a substantial risk of harm, partly because it was a "prolonged deprivation seriously impacting on his health." 81 F.3d 1422, 1431 (7th Cir. 1996); *see also Smith v. Sangamon Cty. Sherriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013) ("A risk of serious harm may be shown . . . by evidence of a series of bad acts that the policymaking level of government was bound to have noticed, like a pervasive pattern of assaults or the existence of an identifiable group of prisoners at particular risk of assault." (quotation marks and citations omitted)).

However, it is also relevant in another way. If a condition becomes so pervasive that the policymakers are "bound to have noticed," then it becomes reasonable to infer that they knew of that condition. *Smith*, 715 F.3d at 192; *see also Potts v. Manos*, No. 11 C 3952, 2013 WL

5968930, at *5 (N.D. Ill. Nov. 7, 2013) ("[A] plaintiff can show deliberate indifference of high-level officials by demonstrating that he fell victim to a general, obvious risk to inmate safety posed by the problem whose pervasiveness would lead to the inference that Defendants had actual knowledge of [its] substantial risk." (citations omitted)). This is because there are multiple ways actual knowledge can be inferred. One way actual knowledge can be found is if there is evidence that a defendant directly knew of a dangerous condition. For example, in *Potts v. Manos*, the Northern District of Illinois held the allegation that the Defendant notified the Sheriff of the conditions, and that they "participated in high-level meetings" in which the dangerous condition was discussed, was sufficient to make out a plausible claim the sheriff knew of the dangerous condition. No. 11 C 3952, 2013 WL 5968930, at *5. However, another way to demonstrate actual knowledge is by relying on the inference that common problems in an institution are commonly known by the personnel of that institution. *See Byron v. Dart,* 825 F. Supp. 2d 958, 963–64 (N.D. Ill. 2011) (holding that the plaintiff had adequately alleged that jail officials were liable under a failure to protect claim after the plaintiff had been attacked in his jail cell because the plaintiff alleged the defendants "knew there was a widespread problem of faulty cell doors."). Accordingly, the Court considers the pervasiveness of the dangerous conditions in analyzing the Eighth Amendment claims brought against the Supervisory Defendants, both in determining whether the conditions presented a substantial risk of harm, and in determining whether the Supervisory Defendants knew of that risk.

The Court first finds that there is a genuine dispute as to whether there was a substantial risk of serious harm posed by the conditions at ISP. Plaintiff argues that this case is similar to *White v. Cooper*, where the Northern District of Illinois concluded that "[t]he absence of fire safety and prevention devices, which are necessary in a correctional facility to notify staff that a

fire has started and to aid in the evacuation of smoke, is an obvious risk of serious harm." *White v. Cooper*, 55 F. Supp. 2d 848, 858 (N.D. Ill. 1999). The Court agrees that this case is similar to *White* because Plaintiff has directed the Court to numerous pieces of evidence indicating that fires were frequent at ISP, and also that fire safety at ISP was severely deficient in multiple areas.

First, Plaintiff has put forth evidence indicating that there were frequent fires at ISP. (DE 212-19 at 40:6–10, 40:22–41:5; DE 212-32 at 174:20–24; DE 212-23 at 67:6–14; DE 212-22 at 11:8–10, 16:12–24.) For example, one prisoner firefighter testified that they had to respond to fires "quite frequently," meaning "five or six calls" in a week or sometimes "two or three calls in a day." (DE 212-19 at 40:6–10, 40:22–41:5.) Similarly, Officer Statham testified that between fall of 2014 and November 2019, he had "easily" responded to "over a hundred" fires. (DE 212-23 at 13:18–22, 14:19–20, 185:3–4.)

There is also evidence showing that at least some of these fires were related to electrical problems. Multiple inmates and officers at ISP, including Gann, Neal, and Officer Statham, provided deposition testimony indicating that there were widespread electrical problems often associated with outlets which would spark. (DE 212-19 at 42:21–44:5; DE 212-25 at 34:5–35:8; DE 212-28 at 25:6–14; DE 212-9 at 94:2–8; DE 212-23 at 95:17–96:11.) One inmate testified that when he arrived in his cell there were "exposed wires" coming from the walls because there was "no socket," and that exposed wires in B Cell House were common on "every range." (DE 212-13 at 12:10–13:24.) Another incident report from July 21, 2016, indicates that a prisoner began calling for help after "large flames accompanied by smoke" began shooting out of "the electrical outlet." (DE 212-45.) This prisoner's cell was located on the 400 range of B Cell House—the very same cell house as Devine. (*Id.*)

28

Defendants argue that "there was no obvious risk of harm because fire safety policies were in place at ISP, ISP trained its employees in fire safety, and made available fire safety and prevention devices." (DE 227 at 12.) They assert that this case is different than *White v. Cooper* because ISP does have fire safety and prevention devices, such as "some training with live fire drills," fire extinguishers, fire alarms, and a trained team of prisoner firefighters. (DE 227 at 11.)

The Defendants correctly point out that training with live fire drills, fire extinguishers, alarms, and prisoner firefighters existed in some form at ISP. However, the mere existence of training does not mean that the training was not deficient. Similarly, just because there were prisoner firefighters does not mean that they were consistently activated, released, or employed. The Plaintiff has provided evidence supporting a finding that exactly those deficiencies existed at ISP, as well as others. These types of systemic lapses in policy and procedure can help establish a serious risk of harm. *See Sinn*, 911 F.3d at 423 ("Individual defendants . . . who are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." (citation omitted)). Additionally, even if policies are complied with, a policy that is substantively deficient may establish a substantial risk of harm. *See Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015) ("In the case of those responsible for setting policy, liability will result from the institution of a 'policy that, when enforced, causes a constitutional deprivation.").

A reasonable inference, looking at the record in the light most favorable to plaintiff, is that there were both dangerous policies at ISP, as well as dangerous lapses in enforcing policy. To begin with, Plaintiff has provided evidence which could support a finding that volunteer prison firefighters were consistently delayed in their release. When a fire signal was called, the prisoner firefighters were supposed to be immediately released by the staff so they could respond

to the fire. (DE 212-8 at 109:9–16, 114:6–115:13; DE 212-19 at 41:6–42:20; DE 212-28 at 50:12–19.) This was because, as firefighters, they had particular expertise helpful for fighting fires. (DE 212-28 at 50:25–51:14.) However, on many occasions, when a fire signal was called, firefighters reported that they would not get activated by the staff. (DE 212-19 at 41:6–20; DE 212-25 at 23:25–26:20.) The chief prisoner firefighter heard staff say on many occasions "we can handle it" or "we can't let you out." (DE 212-26 at 40:12–41:12; DE 211-6 at 3.) Even when the firefighters were activated, poorly trained staff would occasionally cause substantial delays in releasing them from their cells or cellhouses. (*Id.* at 12:7–13:10, 36:12–37:8, 41:6–15.)

Plaintiff also presented sufficient evidence to support a finding that training for new officers on responding to emergencies at ISP was deficient. The only training new employees received during new employee training prior to being able to work shifts related to fire response were modules on "identification of the fire extinguisher, use of the fire extinguisher, and fire emergency plans." (DE 212-32 at 145:6–21.) A new officer would typically be trained by going through a check list with a field officer. (DE 212-35 at 19:5–12.) The average person would only need 10 minutes on the fire emergency procedures check list, because it was "simplistic" and "basic." (*Id.* at 22:1–5; DE 212-32 at 149:22–150:9.) No part of the training covered: (1) when it was appropriate to release a prisoner from his cell in the event of an emergency (DE 212-32 at 149:22–150:9); (2) when to exchange keys if that was needed in a rescue (DE 212-35 at 49:1–10); (3) when to investigate unusual situations or disturbances (*Id.* at 49:11–25); and (4) when to go and let prison firefighters out of their cells. (DE 212-5 at 46:11–23.)

In addition to the training failing to cover fire safety and response in any real depth, there is also evidence sufficient to support a finding that there were no written instructions advising staff on how and when to release prisoner firefighters. The only written instructions officers had

on how to respond to a fire were their General Post Orders and B Cell House Post Orders. (DE 212-75 ¶ 12.) And yet, these post orders provided no guidance on the use of prisoner firefighters. (DE 211-13.) According to an affidavit from the Chief of Operations of the Illinois Department of Corrections (who oversaw 27 Adult Institutions and 48,000 inmates in Illinois for approximately four years, is serving as an expert for plaintiff, and reviewed the deposition transcripts of numerous officers in this case), this lack of guidance created "widespread delay and confusion" in activating the inmate fire department. (DE 212-36 ¶¶ 14, 67.)

Furthermore, Plaintiff provided evidence sufficient to allow a jury to find that fire drills at ISP were not being performed in compliance with the fire code or fire policy. Fire drills were to be done "once per building, per shift, per quarter" according to the fire code and fire policy. (DE 212-31 at 69:3–22.) Live fire drills (meaning, fire drills which actually evacuate the prisoners and physically simulate a fire) were needed. (DE 212-24 at 160:19–24, 161:6–162:6; DE 212-36 ¶ 62.) The night shift and day shift were separate units, and officers working the night shift typically worked only that shift for years at a time. (DE 212-23 at 20:22–21:2; 24:2–11.) However, multiple prisoners, some of whom had been at ISP for more than a decade, testified that they had never participated in a live fire drill from the hours of 6:00 p.m. and 6:00 a.m. (DE 212-19 at 14:21–15:19. DE 212-22 at 11:1–7; DE 212-15 at 4:6–8, 11:10–13:22; DE 212-25 at 31:5–21; DE 212-14 at 4:8–10, 13:14–24.) Rather than complete live fire drills, the night shift was simply given written questions in the form of a quiz regarding fire safety. (DE 212-25 at 30:24–31:4; DE 212-6 at 128:25–129:6.) The prisoner firefighters would help administer this quiz to the officers. (DE 212-26 at 33:19–34:25.) However, the officers "took it as a joke." (DE 212-19 at 20:10–21:5.) According to one prisoner, in fact, "Abbassi made the statement that if there was a fire, she was going to run out the front door." (*Id.*) Another prisoner

firefighter testified that "[s]ome people had no idea what we were talking about." (DE 212-26 at 34:14–25.) And, when the officers failed their quizzes, they were instructed to "take it back to them" and "[g]ive them the answers." (DE 212-19 at 20:21–21:5.)

The problems don't end there. Plaintiff presented sufficient evidence to support a finding by the jury that inspections of the facility, which involved inspecting fire safety equipment, were not being performed in any meaningful manner. (DE 212-47–DE 212-57.) The inspections were required to be very specific and give ratings of every item and area inspected on a 1–5 scale. (*Id.*; DE 212-31 at 31:17–32:6.) However, the inspections almost always circled "4" for every single item, gave no description of their findings, and would even give ratings for items that didn't exist. (DE 212-47; DE 212-54; DE 212-31 at 64:6–15; DE 212-82 ¶ 8. )

Additionally, there were multiple depositions from officers indicating that a problem at ISP was radios malfunctioning, where the radios wouldn't register an officer trying to speak. (DE 212-5 at 65:23–66:9.) This was a common problem and, according to Officer Statham, "it was hit or miss as to whether or not those radios worked." (*Id*; DE 212-23 at 75:23–76:2; DE 212-33 at 20:21–25.) The radios failing to work would happen "more than once a day" (DE 212-23 at 79:1–7), and the Supervisors' radios would also fail. (DE 212-5 at 67:21–68:1.) Despite these failures, there is evidence indicating that it was only after Devine burned to death that ISP got new radios. (DE 212-23 at 76:3–12.)

Plaintiffs also presented evidence sufficient to support findings that an assortment of other problems with fire safety existed at ISP. There was excessive property being stored in cells prior to Devine's death, which was a "fire hazard," according to Warden Neal. (DE 212-24 at 217:15–219:16.) Security checks on the prisoners were not being performed on time. (DE 212-5

at 34:23–35:1; DE 212-23 at 113:6–13.) Lastly, there were no fire sprinklers in B Cell House. (DE 212-82 ¶ 8.)

The plaintiff has presented evidence creating a genuine dispute of material fact as to each of the above safety deficiencies at ISP. These deficiencies are as severe as those alleged in *White v. Cooper.* There, the fire alarm and smoke alarm systems were alleged to have not been operational, and the Northern District of Illinois, on a motion to dismiss, found this was sufficient to support an "obvious risk of harm." *White*, 55 F. Supp. 2d at 858. Here, a reasonable jury could find that there was a substantial risk of harm to the prisoners at ISP due to the evidence supporting that that there were numerous fires, as well as a multitude of other fire safety deficiencies, at ISP.

Next, the Court considers whether a reasonable jury could conclude that the Supervisory Defendants knew about the substantial risk of harm and whether they behaved recklessly in the face of this risk. The Defendants asserts that because "safety policies were in place at ISP," it is not "reasonable to conclude that the Supervisory Defendants would have been aware of an obvious risk of death by fire." (DE 227 at 12.) The Court disagrees and finds that the Plaintiff has established that a reasonable jury could find the Supervisory Defendants knew that the safety protocols were deficient and posed a substantial risk. The Court also finds that a reasonable jury could find the Supervisory Defendants acted recklessly in the face of those risks.

First, the Court will consider evidence relevant to the knowledge of all Supervisory Defendants.[10] Plaintiff provided evidence creating a genuine dispute about whether each of the

---

[10] Plaintiff provided the Court with evidence that can be thought of as relevant to whether *all* Supervisory Defendant's knew of the substantial risk. However, they also provided more particularized evidence, relevant to whether each specific Supervisory Defendant knew about each specific risk. The Court considers the evidence relevant to all Supervisory Defendants before moving on to the more particularized evidence of knowledge.

Supervisory Defendants knew about the frequency of the fires and the electrical issues. According to Warden Neal's testimony, ISP policy requires that each fire be documented, wherever it occurred, even if it was able to be controlled. (DE 212-24 at 123:19–124:6.) Even less serious fires required documentation with an "incident report." (*Id*; DE 212-8 at 58:25–59:4.) Additionally, at least some incidents concerning electrical outlets sparking were included in incident reports. (DE 212-45.) Warden Neal also testified that "at 8:00 every morning," Monday through Friday, "we always" have a meeting to "review the previous day's incidents." (DE 212-24 at 201:20–202:16.) Meaning, fires, which were required by policy to be documented in incident reports, would have been reviewed at those meetings. (*Id.* at 202:19–21.) Neal also testified as to who went to the meeting, indicating that Deputy Warden Gann, Major Nowatzke, Dykstra, and most department heads would go to the meeting. (*Id.* at 201:20–202:6.) Beal was the head of the training department from 2013–2017 (DE 212-32 at 10:9–19), while Griffin was the Safety Hazard Manager. (DE 212-91.) Because there is evidence supporting that each of the Supervisory Defendants attended the daily meeting, and that fires and electrical issues were discussed in the meeting, it would be reasonable for a jury to find that each of the Defendants knew about the frequency of fires and electrical issues at ISP.

It is also reasonable to conclude that the Supervisory Defendants knew about many of the deficient safety conditions due to their pervasiveness. There was evidence submitted indicating that there were common and widespread issues with safety and safety protocols at ISP, including: fires, electrical hazards, radio malfunctions, excessive property being kept in cells, security checks not being performed on time, perfunctory inspections, a complete absence of fire drills for the night shift, and delays in letting out prisoner firefighters. As explained previously, these common, dangerous conditions and policy lapses help demonstrate that each of the

Supervisory Defendants knew about the dangerous conditions. *See Potts v. Manos*, No. 11 C 3952, 2013 WL 5968930, at *5 (N.D. Ill. Nov. 7, 2013) ("[A] plaintiff can show deliberate indifference of high-level officials by demonstrating that he fell victim to a general, obvious risk to inmate safety posed by the problem whose pervasiveness would lead to the inference that Defendants had actual knowledge of [its] substantial risk." (citations omitted)). Knowledge of these myriad issues would make the inference of knowledge of a substantial risk reasonable. *See Haley*, 86 F.3d at 641 ("[A]ctual knowledge of a substantial risk of serious harm can be *inferred* by the trier of fact from the obviousness of the risk.").

Even though the pervasiveness of these problems supports the inference that all of the Supervisory Defendants knew about the substantial risk to prisoners posed by the conditions at ISP, Plaintiff also provided evidence specifically tailored to how each Supervisory Defendant would have known about the deficient safety protocols given their position at ISP and their specific responsibilities. They also identify evidence showing that there is a genuine dispute concerning whether each Supervisor acted recklessly in the face of this knowledge.

Determining if each Supervisor acted recklessly depends on the actions (or lack of actions) of each particular defendant. Accordingly, the Court will individually examine the evidence of knowledge and reckless conduct as to each of the Supervisory Defendants.

*(a) Griffin*

Griffin, as Safety Hazard Manager, was responsible for conducting routine inspections (DE 212-61), addressing and correcting problems found in those inspections (DE 212-8 at 195: 3–12), supervising the prisoner firefighter program (DE 212-26 at 13:11–20), and ensuring that fire drills were done properly. (DE 212-28 at 44:15–18.) As discussed above, sufficient evidence

was presented to support a finding that there were deficiencies in each of these areas. *Supra* pp. 28–33.

It's reasonable to infer, based on the record, that Griffin would have known about each of these issues. First, the daily meetings he attended reviewing incident reports and the pervasiveness of the issues makes it reasonable to infer he knew about the conditions at ISP. *Supra* pp. 34–35. However, there was also evidence indicating that Prisoners reported the results of fire drills to Griffin (DE 212-26 at 36:1–11; DE 212-25 at 21:20–23:11), that they reported problems with outlets causing fires to Griffin (DE 212-25 at 34:5–36:1), and that they reported issues with delays activating and releasing prisoner firefighters to Griffin. (DE 212-26 at 14:2–6.) Griffin also would have known about the deficiencies in inspections because he personally completed several inspection reports which circled "4" on a 1–5 scale for every item and area to be inspected, without providing any comments. (DE 212-24 at 87:6–88:2; DE 212-47; DE 212-48; DE 212-50.)

Despite knowing about each of these deficiencies, evidence was submitted showing that Griffin did not make any alterations to require live fire drills during the night shift (DE 212-6 at 128:25–129:6; DE 212-25 at 31:22–32:6), did not change how inspections were performed (DE 212-47–DE 212-57), and did not conduct any systematic testing, review, or inspection of the electrical system inside prisoner's cells while he served as Safety Hazard Manager between 2015 and 2017. (DE 212-31 at 57:18–25.) Furthermore, Griffin did nothing after learning about the delays with the prisoner firefighters to help rectify the problem. (DE 212-26 at 45:9–13, 46:9–23.)

Systemic failure to enforce fire safety policies or ensure adequate policies, especially in an environment known to have numerous fires, can constitute deliberate indifference. *See Sinn*,

36

911 F.3d at 423 ("Individual defendants . . . who are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy.") Because of the evidence indicating Griffin had knowledge of the frequency of the fires, as well as numerous deficiencies in safety protocol and policy, and yet took no action to correct those deficiencies in the areas over which he was responsible, a reasonable jury could find that Griffin actions were reckless and that he was deliberately indifferent.

   *(b) Beal*

   On April 7, 2017, Beal was head of ISP's training department. (DE 212-32 at 10:9–19, 25:1–8, 26:22–27:1.) He had been in that role for almost four years. (*Id.*) Plaintiff provided the Court with evidence describing Beal's job responsibilities. In his role, Beal was responsible for coordinating training functions and supervising the training department. (DE 212-62.) He also had the responsibility of ensuring staff were correctly trained related to fire response and was the most senior person in charge of fire training. (DE 212-8 at 43:24–44:20; DE 212-32 at 26:22–27:1.) This responsibility required Beal to evaluate on an ongoing basis the effectiveness and sufficiency of the on-the-job training and an obligation to make additions and changes as needed. (DE 212-32 at 92:20–93:5.) Beal had the authority to include additional training on emergency response and fire safety procedures and policies as part of the new employee training given to new correctional officers. (DE 212-60 ¶ 30.) However, despite these responsibilities, there was also evidence supporting a finding that the training around fire response was deficient in multiple areas. *See supra* pp. 30–32 (describing how the training consisted of only a short ten-minute quiz, which was "simplistic," failed to cover multiple important areas of fire response, and did not require any live fire drills).

A jury could find that Beal knew about these issues with training and the serious risk it posed. First, like all the other Supervisory Defendants, the daily meetings he attended and the pervasiveness support that he knew about the conditions at ISP. Additionally, Beal was in charge of training and knew that the training on fire response consisted of only a ten-minute quiz, which was "simplistic" and "basic" and did not address numerous areas of fire response nor require any live fire simulations. (DE 212-35 at 19:5–12, 21:18–22:4, 39:7–12; DE 212-32 at 149:22–150:9.) This deficient training, in an environment known to experience numerous fires, was an obvious risk. *See Haley*, 86 F.3d at 641 ("[A]ctual knowledge of a substantial risk of serious harm can be *inferred* by the trier of fact from the obviousness of the risk.").

Furthermore, field training officers, new employees, and supervisors raised concerns about training with Beal. (DE 212-35 at 56:9–59:5.) Beal testified that, if newer employees were coming out of training and found to not know how to handle a situation, then this would be brought to his attention. (DE 212-35 at 58:7–23.) Because prisoner firefighters would tell Griffin that officers were performing poorly on fire drills or fire safety, it's reasonable to infer that Griffin, at some point, passed this information on to Beal. (DE 212-25 at 30:8–23.) Additionally, Beal testified that officers at ISP would commonly criticize training. However, rather than looking into these criticisms, Beal testified that he thought the majority of people who criticized training were lying and blaming training in order to deflect blame from themselves. (DE 212-32 at 124:2–125:9, 128:15–129:16.)

Given the obviousness of the risk of having deficient training surrounding fire safety, coupled with the frequent fires and electrical issues at ISP, it is reasonable to believe Beal knew that the prisoners at ISP faced a substantial risk of harm. Despite this substantial risk, Beal testified that he did not make any changes to any training program, procedure, or curriculum

during his time as training coordinator. (DE 212-32 at 17:6–13.) Due to this inaction over his four-year tenure as training coordinator, a jury could reasonably find that Beal's failure to act and alter training at ISP was reckless and that he was deliberately indifferent to the substantial risk posed by the numerous fires at ISP coupled with deficient training protocol. *See Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015) ("In the case of those responsible for setting policy, liability will result from the institution of a 'policy that, when enforced, causes a constitutional deprivation.").

### (c) Nowatzke

On April 7, 2017, Nowatzke was a major and custody supervisor at ISP. He had been in that position for almost a year. (DE 212-8 at 8:19–9:5.) As custody supervisor, Nowatzke was responsible for supervising all staff (DE 212-28 at 46:9–20), for ensuring that radios were in working order (DE 212-24 at 91:20–92:17), for the "maintenance of post orders" (DE 212-64 at 2; DE 212-8 at 71:19–72:2), for ensuring that staff completed inspections (DE 212-8 at 194:1–195:12; DE 212-28 at 86:22–24, 99:23–100:5), and for reviewing all inspection reports (*Id.*).

The Court believes that there is a genuine dispute as to whether Nowatzke knew about a substantial risk of harm to the prisoners. First, the evidence of the daily meetings concerning incident reports, as well as the pervasiveness of the conditions, helps to show Nowatzke's knowledge of the frequent fires and the deficient fire safety protocols at ISP, including that radios were not operating properly. However, there was also evidence presented indicating that Nowatzke's position as major and custody supervisor would have made him directly aware of various deficiencies. For example, there is evidence supporting a finding that Nowatzke would have known that live fire drills were not being performed on the night shift. (DE 212-28 at 199:9–15.) There is also evidence that he knew that one of the purposes of the post orders was to

provide staff with key points on what to do in the event of an emergency and the importance of releasing firefighters smoothly and without delays, but that the post orders had no directions in this regard. (DE 212-8 at 124:20–125:17; DE 211-1 at 158:9–15; 211-3, 211-9) Furthermore, there is evidence that he would have known that inspections were being performed perfunctorily and without specificity given that his position required him to review inspection reports. (DE 212-47–DE 212-57.)

From the above, as well as the meetings he attended and the pervasive issues at ISP, it's reasonable to infer that Nowatzke knew that the deficient post orders, inspections, radios, and lack of fire drills, coupled with the frequent fires, posed a substantial risk to prisoners. However, despite knowing about the above issues and having responsibility over radios, post orders, and inspections, Nowatzke appears to have taken no steps to address them. Nowatzke did not replace the radios on any widescale basis. (DE 212-33 at 20:21–25, 42:5–9.) Nowatzke never consulted with anyone regarding the adequacy of the post orders and did not update the post orders concerning handling emergency responses or fire response. (DE 212-8 at 81:19–24, 95:2–9.) And Nowatzke took no steps to address the persistent deficient inspections. (DE 212-47–DE 212-57.)

A jury could find that this inaction was reckless and that Nowatzke was deliberately indifferent to the substantial risk posed by the numerous fires and deficient safety protocols at ISP. *See Sinn*, 911 F.3d at 423.

### (d) Neal

On April 7, 2017, Neal had been serving as Warden at ISP for approximately three years. (DE 212-24 at 78:25-79:7; Ex. 55.) As Warden, Neal carried a variety of responsibilities. He was responsible for proactively reviewing prison infrastructure to ensure safety (DE 212-31 at 62:2–

14), for approving proposals to change post orders (DE 212-8 at 78:24–79:10), for developing the facility's mission (DE 212-59), for ensuring policies were implemented consistently (*Id.*), and providing oversight to all facility operations. (*Id.*) He was also ultimately responsible for ensuring the radios were in working order (DE 212-33 at 63:23–64:1), for ensuring that fire drills were conducted properly (DE 212-24 at 154:14–23), and for ensuring that inspections were addressed and investigated properly (DE 212-31 at 42:10–15; DE 212-28 at 44:21–22).

The Court believes that there is a genuine dispute as to whether Neal knew about a substantial risk of harm to the prisoners. Again, evidence of the daily meetings concerning incident reports, as well as the pervasiveness of the conditions, helps to show Neal's knowledge of the fires and the deficient protocols. However, there was also evidence submitted that Neal was made specifically aware of multiple issues at ISP. For example, he testified that he knew that the fire drills being conducted did not involve offenders actually being brought out of their cells ("live fire drills") and that he knew that outlets would spark at the prison (DE 212-24 at 156:18–157:12, 122:12–125:16). Neal also testified that he knew it was critical to ensure there were policies in place so that a person could be removed from a cell immediately in the event of an emergency (*Id.* 185:3–12).

However, despite his responsibilities to ensure policies were implemented consistently and the importance of removing prisoners from their cells, there is evidence indicating that Neal failed to implement policies directing staff on how to respond to prisoners in distress or yelling (DE 212-28 at 59:4–7, 68:14–17), when to bring keys to a prisoner in distress (DE 212-24 at 187:13–25, 188:16–189:2), when a prisoner should be released (DE 212-23 at 85:23–86:9), or how prisoners could get attention of the staff (*Id.* at 122:5–123:8.) Even though he was ultimately responsible for ensuring live fire drills were properly conducted, and knew that they

41

were not conducting live fire drills for the night shift, Neal did not address the problem with the night shift fire drills and simply "assumed staff would know their jobs and what their responsibility is during a fire." (DE 212-24 at 157:3–24.) Even though he had ultimate responsibility over ensuring radios were working properly, and even though the radio problems were ubiquitous, affecting supervisors too, he did nothing to replace the radios on a widespread basis until *after* Devine burned to death. (DE 212-23 at 76:3–12.) Lastly, even though Neal had responsibility alongside Griffin over electrical problems and knew of the widespread issue with electrical outlets, he did not carry out or direct any systematic testing of the electrical systems inside prisoner cells. (DE 212-31 at 57:18–25.)

A reasonable jury could find that this inaction, in the face of widespread fires at ISP, as well as the numerous known deficiencies in fire safety protocol, was reckless and that Neal was deliberately indifferent. *See Sinn*, 911 F.3d at 423

*(e)  Gann*

Gann was the deputy warden at ISP on April 7, 2017, and had been in that role for approximately two years. (DE 212-28 at 10:11–24, 16:9–24.) As deputy warden, Gann was responsible for developing, establishing, and implementing institutional policies, procedures, and objectives, supervising the facility when the Warden was absent, training staff and evaluating their performance, reviewing the monthly inspection reports, reviewing incident reports, and ensuring the general safety of the facility. (DE 212-24 at 88:25–89:17; DE 212-43 at 37:10–20; DE 212-65; DE 212-28 at 66:18–22.) Gann was also responsible for supervising the physical plant director, who was in charge of keeping track of recurring maintenance problems and finding ways to fix them on a system wide basis. (DE 212-28 at 28:21–29:19.)

The Court believes that there is a genuine dispute as to whether Gann knew about a substantial risk of harm to the prisoners. As with the other Supervisory Defendants, evidence of the daily meetings concerning incident reports, as well as the pervasiveness of the conditions, helps to show Gann's knowledge of the fires and the deficient protocols. However, there is also evidence that Gann was made aware of multiple issues at ISP by virtue of his position. Because Gann had the responsibility to review inspection reports monthly, it is reasonable to infer that he knew the inspections were being carried out in a perfunctory manner, since most inspection reports contained no detail, circled four for every single item, and even rated items that didn't exist. (DE 212-47–DE 212-57.) Evidence also supports that Gann knew that staff were not receiving fire specific training and that fire drills were not occurring. (DE 212-28 at 43:20–23, 44:2–14, 44:23–45:3, 123:19–125:3, 126:11–14.) Furthermore, Gann provided testimony indicating he knew that the only way prisoners could get attention was to yell. (DE 212-28 at 67:2–13.) Gann was also aware of a problem with staff failing to change batteries in radios and that it was important to ensure batteries were working. (*Id.* at 33:16–37:9.)

However, despite being responsible for reviewing inspection reports, and knowing that they were being done perfunctorily, there is evidence indicating that Gann failed to take any action to correct the deficient inspection reports. (DE 212-47–212-57.) Despite having responsibilities over training staff, and knowing that staff were not receiving fire specific training or going through fire drills, there is evidence indicating that Gann did not take any steps to ensure proper training. (DE 212-73 ¶ 13; DE 212-28 at 47:17–24.) Even though Gann had a responsibility to ensure general safety at the facilities, and knew that it was important to ensure that radio batteries were working, evidence supports that Gann took no steps to ensure that staff knew how to correctly charge their batteries. (DE 212-28 at 36:20–37:3.) Furthermore, Gann had

43

a supervisory responsibility over the physical plant director, whose job entailed keeping track of maintenance problems and finding ways to address them, but Gann never spoke to him about recurring maintenance problems or ways to address maintenance problems. (DE 212-28 at 28:21–29:16.) And, despite having responsibility over creating policies and general safety, and knowing that the only way a prisoner in an emergency situation could get attention was by screaming, Gann took no steps to ensure there was a policy regarding what staff should do if a prisoner was yelling in distress. (DE 212-28 at 67:2–13.)

A jury could find that this inaction, in the face of knowing about the numerous fires at ISP, as well as numerous deficient safety protocols, was reckless and constituted deliberate indifference. *See Sinn*, 911 F.3d at 423

### (3) Other Claims and Defenses

With the finding that it is reasonable to infer, based on the record, that Incident Defendants and Supervisory Defendants were both deliberately indifferent, resolving the rest of the arguments made by the Defendants in their summary judgment motion becomes easier. The Court now considers Defendants' remaining arguments.

#### (a) Qualified Immunity

First, Defendants argue that the claims against them are barred under the doctrine of qualified immunity. "Qualified immunity protects government officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (internal quotation marks and citation omitted). To overcome a qualified immunity defense, a plaintiff must show the deprivation of a constitutional

right and must also "show that the right was clearly established at the time of the violation." *Id.*
"A right is clearly established when existing precedent has 'placed the statutory or constitutional
question beyond debate.'" *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (quoting *Reichle v.*
*Howards*, 566 U.S. 658, 664 (2012))

In *Walker v. Benjamin*, the Seventh Circuit held that "[i]f there are genuine issues of fact
concerning the elements of [an eighth amendment violation for failure to protect], defendant may
not avoid trial on the grounds of qualified immunity." 293 F.3d 1030, 1037 (7th Cir. 2002); *see*
*also McGuire v. Dykstra*, 2020 WL 4735265, at *4 (N.D. Ind. Aug. 14. 2020) (denying qualified
immunity for three officers at ISP, Dykstra, Abbassi, and Rodriguez, who were alleged to have
been deliberately indifferent to a prisoner's medical care after he inhaled smoke from the fire in
Devine's cell). The Defendants' argument in their reply does not dispute that *Walker* is good
law. Rather, it simply rehashes their arguments concerning the failure to protect claims, which
were already ruled on in the previous section. The Court found a genuine dispute about whether
there was a substantial risk of harm, whether the defendants had knowledge of the substantial
risk of harm, and whether the Defendants disregarded that risk of harm. Additionally, a
reasonable person would know that they could face liability for being deliberately indifferent to a
substantial risk of harm posed by fire hazards and deficient fire safety protocol and policies. *See,*
*e.g., Rabb Ra Chaka v. O'Leary*, No. 88 C 3753, 1989 WL 56874, at *4 (N.D. Ill. May 24, 1989)
("[I]t has long been established that dangerous conditions of confinement violate the eighth
amendment; more important, the Seventh Circuit, following several other circuits, has
recognized that fire hazards in particular may violate prisoners' rights."); *see also White*, 55 F.
Supp. 2d at 858 ("In fact, it is reasonable to conclude state defendants knew that consciously
disregarding a non-operational fire safety and prevention system in a state prison and failing to

free a man from his burning cell would violate an inmate's most basic and established constitutional rights.") Accordingly, the Court finds that the Defendants cannot avoid trial on the ground of qualified immunity.

### (b) Count III: Failure to intervene claim against Incident Defendants

Defendants argue that the failure to intervene claim must be dismissed for three reasons. First, they suggest that a failure to intervene claim is not a separate claim from the failure to protect claims. Second, they again assert that the Defendants did not act with deliberate indifference. Third, they argue that no defendant "had an opportunity to set forward and prevent [a deliberately indifferent] action." (DE 202 at 18–19.) These arguments all fail.

First, a failure to intervene claim is a separate claim from a failure to protect claim. An officer may be liable under § 1983 for a failure to intervene if "any constitutional violation has been committed by a law enforcement official[,] *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quotation marks and citations omitted). In *Miller v. Zaruba*, the Northern District of Illinois found that failure to protect and failure to intervene were separate claims and that both could proceed to trial, writing:

> If the jury were to find a constitutional violation, either by Ushman or Cantwell, the jury could also conclude that the other officer could have stopped it. For example, the jury could find that Cantwell was deliberately indifferent by failing to recognize that Rothberg had an orange wristband and escorting him into the gym where other inmates could be. The jury could then find that Ushman's position in the control booth gave him a realistic opportunity to prevent this from happening.

No. 10 C 6533, 2013 WL 5587288, at *8 (N.D. Ill. Oct. 10, 2013). The Seventh Circuit has similarly found that failure to intervene claims can proceed alongside excessive force claims brought under the Fourth Amendment. *See, e.g. Sanchez v. City of Chicago*, 700 F.3d 919, 925–26 (7th Cir. 2012) ("First, in a section 1983 action alleging that police violated the plaintiff's

Fourth Amendment rights by subjecting him to excessive force, a defendant police officer may be held to account both for his own use of excessive force on the plaintiff . . . as well as his failure to take reasonable steps to attempt to stop the use of excessive force used by his fellow officers." (citations and quotation marks omitted)). Accordingly, the Court finds that failure to intervene and failure to protect are separate, distinct claims.

The Court has already rejected Defendants' argument that there is no genuine dispute of material fact as to deliberate indifference. In support of their third argument, the Defendants assert that Dykstra, Watson, and Redden had no opportunity to intervene because Dykstra, who was listening to all radio communication, "knew the firefighters were being dispatched" and, therefore, Redden, Watson, and Dykstra did not take duplicating efforts to activate the fire team." (DE 227 at 16.) In support of this, Defendants cite to two pieces of deposition testimony, which only indicate that Dykstra was "listening to [the] radio traffic, trying to gather what was going on" and that he believed his responsibility was to stay in the shift supervisor office. (DE 203-4 at 207:15–16, 299:5–9.) Neither piece of deposition testimony cited supports the inference that he knew firefighters were being dispatched. On the other hand, Plaintiff provided Dykstra's incident report from the night of April 7, 2017, which specifically indicates that Redden activated the fire department after 9:58 p.m., a full thirteen minutes after the fire signal. (DE 211-14 at 2.) Again, it is not the job of the Court to resolve these factual disputes. Instead, the Court finds that there is sufficient evidence in the record for a reasonable juror to conclude that Dykstra, Redden, or Watson each understood that another officer was committing a constitutional violation and had a reasonable opportunity to intervene by activating the prisoner firefighters prior to 9:58 p.m.

As to Abbassi and Blakely, Defendants do not provide any other argument for why a failure to intervene claim should not continue except for noting that there is "no evidence that any of the Defendants acted with deliberate or reckless disregard." (DE 202 at 18–19.) There is evidence in the record supporting that both Abbassi and Blakely could have left the counselor's office far sooner than they did, brought keys up to the 500 range, grabbed a fire extinguisher, or activated the prisoner firefighters. *Supra* pp. 17–21. A jury could find that either Abbassi or Blakely committed a constitutional violation, and that the other had a reasonable opportunity to prevent the harm from that constitutional violation from occurring.

Accordingly, the failure to intervene claims proceed against the Incident defendants.[11]

### (c)  State Law Claims

Defendants argue that they are entitled to summary judgment on the Indiana state law claims alleged in Count IV (Negligent or Willful and Wanton Conduct), Count V (Intentional Infliction of Emotional Distress), Count VI (Negligent Infliction of Emotional Distress), and Count VII (Wrongful Death). Under Indiana Code 34-13-3-5 (c), "[a] lawsuit filed against an [Indiana State] employee personally must allege that an act or omission of the employee that causes a loss is: (1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally." First, Defendants argue in their motion for summary judgment that Count VI must be dismissed because it does not allege that the Defendants engaged in "willful or wanton conduct." Second,

---

[11] Defendants also argue that the failure to intervene claim should be dismissed as to Defendants Neal, Gann, Nowatzke, Beal, and Griffin, because they were not present at the scene of the fire and thus had no realistic opportunity to intervene. (DE 227 at 16.) This would be a very logical argument if Plaintiff had actually brought a claim against Defendants Neal, Gann, Nowatzke, Beal, and Griffin for failure to intervene. However, no such claim is alleged in Plaintiff's Amended Complaint. (DE 43.) Plaintiff only brought a failure to intervene claim against Dykstra, Watson, Redden, Rodriguez, Blakely, Abbassi, Puetzer, and Statham, who the Amended Complaint refers to as "Defendant Officers." (DE 43 at 5, 12.)

they argue that Counts IV, V, and VII must be dismissed because no reasonable juror could find that the Defendants conduct was "willful or wanton." (DE 202 at 21–22.)

As to Count VI, Plaintiff does not contest dismissal, as she failed to allege in her Amended Complaint that the Defendants engaged in "willful or wanton" conduct. Defendants also argue in their reply, for the first time, that Plaintiff failed to properly allege "willful and wanton" conduct in Count V alleging Intentional Infliction of Emotional Distress. (DE 227 at 21.) Because this argument was raised for the first time in the reply, the Court will not consider it, as doing so would leave no chance for the Plaintiff to respond. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived); *see also White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in White's reply brief are waived because they leave no chance to respond."). Accordingly, the Court will only consider whether Plaintiff provided sufficient evidence to support a claim for IIED against each Defendant, not whether it was sufficiently pled in the Amended Complaint.

Counts IV, V and VII all turn on the issue of whether the evidence provided is sufficient to support a finding that there was "willful or wanton conduct." The elements of "willful or wanton" misconduct are: "(1) the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury; and (2) the actor's conduct must have exhibited an indifference to the consequences of his conduct." *Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1205 (Ind. Ct. App. 2011) (internal quotation marks and citation omitted). However, District Courts in Indiana have recognized that "the willful and wanton standard is similar to the deliberate indifference standard analyzed in the context of [a] § 1983 claim." *Young v. Hyatte*, No. 3:20-CV-940 DRL-MGG, 2021 WL 3726058, at *3 (N.D.

Ind. Aug. 23, 2021) (citing *Steele v. Knight*, 2016 U.S. Dist. LEXIS 169016, 38, 2016 WL 7117155 (S.D. Ind. Dec. 7, 2016)).

Defendants raise no new arguments except reiterating that the "Incident Defendants . . . responded as quickly as they could" and that the Supervisory Defendants "implemented fire safety policies and procedures, provided an operational and accredited fire safety system, appropriate equipment was available, and emergency responders were available to response." (DE 227 at 22-23). However, the Court considered these arguments previously, and still found that a reasonable jury could find that the Defendants were deliberately indifferent.

Accordingly, Counts IV, V, and VII continue against all Defendants, except for Lessner, Puetzer, and Statham.

### (d)  Count II: Section 1983 Conspiracy

Lastly, Defendants argue that summary judgment should be granted as to Plaintiff's Section 1983 conspiracy claim. They assert in their Motion for Summary Judgment that "just as there is no evidence of culpable intent to harm Mr. Devine, there is likewise no evidence of a conspiracy among the Defendants (or any subset of them)." (DE 202 at 18.) Defendants also argue in their reply brief that Plaintiff did not adequately allege conspiracy in her Amended Complaint. (DE 227 at 16–17.) However, this argument concerning the allegations in the complaint was not raised in their Motion for Summary Judgment. Because this argument was raised for the first time in the reply, the Court will not consider it, as doing so would leave no chance for the Plaintiff to respond. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived); *see also White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in White's reply brief are waived because they leave no chance to respond."). Accordingly, the Court will

only consider whether Plaintiff provided sufficient evidence to make out a claim of conspiracy against each Defendant.

At the summary judgment stage, for a § 1983 civil conspiracy claim, a plaintiff needs to show evidence from which a jury could reasonably infer there was "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 880 (N.D. Ill. 2019) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)); *Owens v. Evans*, 878 F.3d 559, 565 (7th Cir. 2017). "[T]he alleged acts must be sufficient to raise the inference of mutual understanding (*i.e.*, the acts performed by the members of a conspiracy are unlikely to have been undertaken without an agreement)." *Amundsen v. Chicago Park Dist*., 218 F.3d 712, 718 (7th Cir. 2000) (quotation marks and citation omitted). However, while a conspirator "must be a voluntary participant in a common venture," the conspirator "need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). Rather, it is "enough if [the conspirator] understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [their] part to further them." *Id.*[12]

Because there will rarely be direct evidence of an express agreement among conspirators, existence of a conspiracy may be inferred by relying on circumstantial evidence and common sense. *See Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979); *Patrick v. City of Chicago*,

---

[12] Defendants, in their reply, argue that *Jones* is not relevant case law. They assert that *Jones* is "law to hold someone liable as a conspirator rather than what is required for a conspiracy claim."(DE 227 at 16.) This argument is nonsensical because a "conspirator" is simply a "[p]erson[] partaking in conspiracy." Definition of Conspirator, Black's Law Dictionary (6th ed. 1990). Additionally, *Jones* involved a plaintiff who brought a tort claim under § 1983 for "conspiracy to commit [various constitutional wrongs]," just like this case. *Jones*, 856 F.2d at 988.

USDC IN/ND case 3:18-cv-00995-JD   document 234   filed 02/15/22   page 52 of 53

213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016). The Court may infer agreement "[w]hen the acts performed by the alleged members of the conspiracy are unlikely to have been done alone[.]" *Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017).

In her Amended Complaint, Plaintiff alleges two different agreements: (1) Plaintiff alleges that the Incident Defendants "reached an agreement among themselves to leave Mr. Devine locked in his cell despite knowing that the fire posed a serious risk to Mr. Devine's health, safety, and life, thus depriving him of his constitutional rights, as described in the various paragraphs;" (2) Plaintiff alleges that all of the Defendants "reached an agreement among themselves to expose Mr. Devine and the other prisoners to dangerous conditions and thereby a risk of serious harm." (DE 43 at 11–12.)

The Court finds that Plaintiff has not provided evidence sufficient to support a claim of conspiracy against any defendant. There are many alternative reasons, other than an agreement, that could explain the actions of each defendant. For example, with Abbassi, Blakely, Redden, Dykstra, and Watson, their failure to act reasonably could have been the result of improper training, poor communication, laziness, or apathy to the prisoners. The inaction of the Supervisory Defendants can also be explained by other reasons, such as improper training, lack of understanding their job responsibilities, laziness, and apathy to the prisoners. Due to those other explanations, the Court does not believe this is the circumstance where the acts performed are unlikely to have been done without an agreement. *Compare Domanus*, 847 F.3d at 482 (finding that because there was an "easy explanation" for their actions (i.e. self-interest), this was not enough to indicate a RICO conspiracy), *with Geinosky v. City of Chicago*, 675 F.3d 743 7th Cir. 2012 (finding that a § 1983 claim alleging a conspiracy where several officers of the same police unit issued numerous "bogus parking tickets," some of which alleged traffic violations at

52

the same time, over the span of months was sufficient to make out a plausible claim of conspiracy).

Accordingly, the Court Grants the motion for summary judgment on Count II for all defendants, except for Rodriguez.

**D.    Conclusion**

Based on the foregoing, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment. (DE 201.) The Court also GRANTS Defendants motion to for leave to file additional authority and argument. (DE 233.) To summarize:

1. No claims remain against Lessner, Puetzer, and Statham. Accordingly, those three parties are DISMISSED.

2. Count II proceeds only against Rodriguez.

3. Count I, Count III, Count IV, Count V, and Count VII proceed as to all Defendants except for Lessner, Puetzer, and Statham.

4. Count VI proceeds only against Rodriguez.

SO ORDERED.

ENTERED: February 15, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court