**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DENISE DWYER, as Personal Representative of the ESTATE OF JOSHUA DEVINE, | ) ) ) ) | No. 3:18-cv-00995-JD |
| Plaintiff, | ) ) ) | Chief Judge Jon E. DeGuilio |
| v. | ) ) | |
| RON NEAL, et al. | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S MOTION TO BAR PROPOSED DEFENSE EXPERT JOHN REES**

Plaintiff moves pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) to bar the opinion testimony of Defendants' proposed expert John D. Rees.

**INTRODUCTION**

Defendants have disclosed Mr. Rees as their expert witness in the area (presumably) of corrections and prison administration. Mr. Rees's Rule 26(a)(2) Report appends a CV listing years of experience as a prison administrator and prison warden in Kentucky, Oklahoma, and for the private corrections firm Corrections Corporation of America. *See* Rees Report with attachments (Ex. A at 10-14).

Mr. Rees no doubt possesses specialized knowledge in prison administration. But his report does not apply his specialized knowledge to this case in any way that would be helpful to the jury's understanding of the evidence or determination of the facts. Instead, Mr. Rees uncritically and inaccurately endorses Defendants' version of how the officers responded to the fire in Joshua Devine's cell and concludes that their response was "immediate" and

"appropriate." *Id.* at 2-3. Then, based on nothing but the fact that the Indiana State Prison ("ISP") is accredited by the American Correctional Association ("ACA") and was a 2009 recipient of the ACA's Golden Eagle Award, Mr. Rees opines that the ISP "has strived to achieve the highest level of operation and has succeeded in this goal." *Id.* at 3-4.

These opinions do not pass muster under Rule 702 and *Daubert*, 509 U.S. at 589. A threshold requirement is that admissible expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702(a). Yet it is evident from Mr. Rees's written report, and confirmed in his deposition testimony, that Mr. Rees did nothing in his analysis that the jury at trial is not equally capable of doing without the need for his opinions. The Federal Rules forbid Mr. Rees from co-opting the jury's role as the arbiter of disputed facts which are within the ken of the average layperson to sift and weigh. To the extent that his report evinces the application of any professional expertise whatsoever, Mr. Rees opines about the purported rigors of the ACA accreditation process. But the issue at trial is Defendants' compliance with the U.S. Constitution, not ISP's compliance with ACA standards. And to the extent there are disputed facts about the conditions at ISP, and about prison officials' attention (or lack thereof) to remedying fire safety concerns, it is for the jury to assess those facts, without the need for Mr. Rees' *ipse dixit* about ISP's "highest level of operation." Ex. A, at Report, p. 3-4.

Mr. Rees's opinions are at best unhelpful to the jury, and at worst a misleading distraction. Mr. Rees should be barred from testifying.

### BACKGROUND: MR. REES'S OPINIONS IN CONTEXT

Mr. Rees's report—the preview of his planned direct examination at trial—describes in these terms his view of the correctional officers' response to the fire:

2

> [T]wo of the officers assigned to B cellhouse that evening were in the Counselors [sic] office in the unit completing payroll documents. The third, SGT Rodriquez [sic], was in the officers' station when he heard cries of fire on the walk. He immediately responded determined the location of the fire and called to the other officers for assistance and to radio a call for a fire code to initiate a facility wide response of additional personnel and the inmate fire crew. … [T]he security camera footage indicates that Officer Rodriquez [sic] was observed running up the stairs at the exact same time as the fire and smoke were seen coming out of the cell. At the same time Officer Rodriquez [sic] is calling for his other two officers and has them radio call a Fire code. He is also calling for the keys to the fifth floor[.]

Ex. A, at Report, p. 2. Mr. Rees baldly claims that it is "simply not true" that "officers failed to respond to the cries for help from the inmate population." *Id.* at p. 3.

These opinions flow directly from Mr. Rees's assumptions about when the fire started, and when prisoners began yelling about the fire. As Mr. Rees explained during his deposition, based on his review of the B Cellhouse video, along with a review of a handful of statements by prisoners contained in the prison's investigative report, he determined that the fire started at 9:34 p.m., but that the prisoners' cries for help didn't begin until 9:43 p.m. Ex. B (Rees Dep. Tr.) at 131:11-134:10.

This account is incomplete in a many respects. It omits, for example, discussion of the officers' initial failure to bring a fire extinguisher to the blaze, or of the inexplicable conduct of Officer Promise Blakely, who was the only officer in the building with keys to the fifth range yet who never left the bottom floor of the cellhouse. Notably, Mr. Reese acknowledged in his deposition that he had not been given and had not reviewed any of the deposition transcripts of prisoners housed in B Cellhouse, Ex. B at 98:10-99:1, 100:11-15, which this Court has already found (along with other evidence) suffice to create genuine factual disputes about when the fire started and how quickly officers responded to the prisoners' cries for help, Dkt 234 at 3-4, 13-19.

Moving to the administrative level, Mr. Rees offers effusive praise for ISP's fire safety

preparedness. Though he conducted no interviews, Mr. Rees somehow divines that "the staff and leadership of the Indiana State Prison" took fire safety "seriously." Ex. A at Report, p. 2. He opines that the ISP is "committed to operating at the highest level of institutional administration" and that it "has strived to achieve the highest level of operation and has succeeded in this goal." *Id.* at Report, pp. 2-3. Mr. Rees bases these views solely on the fact that the ISP has been accredited by the American Correctional Association (the accreditation review includes a fire safety component) annually since 2006 and the fact that the ISP received the ACA's Golden Eagle Award in 2009. Mr. Rees has no opinions about the actual fire safety training in the ISP, the responses ISP staff in fact made to other fires, the on-the-ground operation of the ISP prisoner firefighter program, or about any of the specific policies and procedures in place at the time of the fatal fire relating to fire safety and fire response. Ex. B at 143:13-144:3, 144:21-145:1, 146:6-24.

ACA accreditation is hardly a mark of distinction. According to the most recent Bureau of Justice Statistics Census of State and Federal Correctional Facilities there were just under 1700 adult correctional facilities in the United States.[1] The ACA does not make publicly available a list of the correctional facilities it has certified, but the ACA website boasts that, through its Commission on Accreditation, the ACA accredits "more than 1300 facilities across the U.S. and the world.[2] In short, ISP's accreditation proves only that the ISP is among the overwhelming majority of correctional facilities around the country with ACA approval. Yet Mr. Rees—having admitted that he holds no views on the actual fire safety measures that ISP took

---

[1] *See* Ex. C (Census of State and Federal Adult Correctional Facilities, 2019 – Statistical Tables, U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics) at 1.
[2] *See* Ex. D (ACA Commission on Accreditation website) at 1, *available at* https://www.aca.org/ACA_Member/ACA/ACA_Member/Standards_and_Accreditation/SAC_Commission.aspx (last accessed Mar. 19, 2023).

4

(and did not take)—has no basis other than the ACA accreditation for his opinions about the ISP's "high level" of fire safety administration and its supposed "success" in this area.

## ARGUMENT

The admissibility of expert testimony is governed by Federal Rule of Evidence ("Rule") 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the Court to ensure that expert evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The reliability requirement serves to distinguish a well-grounded expert opinion, which is admissible, from "subjective belief," which is not. *Id.* at 590. The purpose of this gatekeeping is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 152, 137 (1999). "[N]othing . . . requires a district court to admit opinion evidence" that rests solely on "the *ipse dixit* of the expert." *Id.* at 157.

The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Courts consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In addition to being reliable, expert testimony must "assist the trier of fact to

understand the evidence or determine a fact at issue." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Furthermore, "Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.,* 765 F.3d 765, 772 (7th Cir. 2014). The burden of establishing that the requirements of Rule 702 and *Daubert* have been satisfied rests with the proponent of the expert testimony. *Id.*

> **A.    Mr. Rees's Opinions as to the Propriety or Swiftness of the Correctional Officer Defendants' Response to the Fire in Joshua Devine's Cell Are Inadmissible Because They Would Not Be Helpful to the Jury.**

One central issue in this case is whether the correctional officer defendants ignored the cries of "fire" and for help from the men locked in their cells on the north side of B cellhouse. Determining that fact will require the jury to sort through conflicting evidence to reach a conclusion. They will hear the testimony of prisoners describing many minutes of anguished cries for help as the fire in Mr. Devine's cell burned out of control. They will see video of the events. On the other hand, they will hear the claims of the correctional officers that they responded with alacrity. Applying their life experiences and their common sense to the conflicting evidence, the jury will decide whether the correctional officers' response was appropriate. That is their exclusive province.

For Mr. Rees's opinions to be admissible, they must "help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702(a). But Mr. Rees's Report makes clear that his testimony would amount to nothing more than informing the jury of his own view of the evidence: the response was "immediate;" Officer Rodriguez was mounting the stairs just as the fire broke out; "the response to the fire was appropriate;" etc. *See* Ex. A, Report at 2-3.

Indeed, it is evident from Mr. Rees's apparent "methodology" that he offers nothing of value to enhance the jury's understanding of the evidence. Mr. Rees watched the surveillance video from B Cellhouse and read the Defendants' deposition testimony, and then reached

conclusions about the propriety of their response to the fire. In doing so, he merely anticipated the work the jury will be called on to do at trial—the jury is perfectly capable of reviewing the video, listening to the testimony of the Defendants (and other important witnesses Mr. Rees ignored), and reaching its own conclusions. The Federal Rules forbid Mr. Rees from co-opting the jury's role as the arbiter of disputed facts which are within the ken of the average layperson to sift and weigh. *See United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert."); *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury . . . .").

It will not aid the jury "to understand the evidence or to determine a fact in issue" for Mr. Rees to weigh in with his personal resolution of conflicting evidence. Experts may not place themselves in the jury box and offer opinions that merely replicate the jury's role. *See United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017) ("[A]n expert's role is to 'help the trier of fact to understand the evidence,' Fed. R. Evid. 702(a), not to draw conclusions *for* the fact finder when no help is needed[,]" and the Federal Rules "prohibit expert opinions that would "merely tell the jury what result to reach."); *Thomas v. Landrum*, No. 11 C 09275, 2014 WL 11370447, at *1 (N.D. Ill. Mar. 18, 2014) ("Although expert opinions are not objectionable 'just because' they 'embrace[] an ultimate issue,' very often that type of opinion will not help the trier of fact understand evidence or determine a fact in issue, which is the basic precondition for permitting expert testimony.").

It might be different if Mr. Rees's report revealed how the specialized knowledge he possesses would assist the jury in deciding whether the correctional officers were indifferent to cries for help, but it does not. All Mr. Rees plans to tell the jury is how they should decide the case. That he may not do. *See Garrit v. City of Chicago,* No. 16-CV-7319, 2022 WL 124554, at *9 (N.D. Ill. Jan. 13, 2022) ("[E]xpert witnesses are not allowed to sort out possible conflicting testimony or to argue the implication of those consistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears.").

Mr. Rees offers only an unhelpful and superfluous duplication of the jurors' task—employing common experience to sift through conflicting evidence. His opinions should be barred.

> **B.     Mr. Rees's Opinions are Unreliable Because He Cherry-Picked Data to Support His Conclusions, Ignoring Highly Relevant Testimony from Eyewitnesses to the Fire.**

Even if Mr. Rees's approach did not simply co-opt the role of the jury, his opinions would be independently inadmissible because his one-sided review of the evidence renders them unreliable. In preparing his report, Mr. Rees reviewed deposition testimony from all Defendants who were present at ISP during the fire, *see* Ex. A, Documents Reviewed, pp. 5-6, ¶¶8, 12-16, 21, as well as testimony from most of the other Defendants, *id.* ¶¶18-20, 22, and contemporaneous statements by the B Cellhouse officers and other prison staff, *id.* ¶¶3-4. However, the only testimony from prisoners which he reviewed was from the prisoner firefighters, *id.* ¶¶9-11, who he acknowledges did not enter B Cellhouse until after the fire was already being responded to, Ex. B at 100:16-101:1, and who therefore would have no personal knowledge of the critical disputed period after the fire first ignited but before officers responded. Mr. Rees was aware of deposition transcripts and sworn statements from other prisoners, who had been inside B Cellhouse during this critical period, and simply chose not to review them. *Id.*

at 100:6-15, 101:2-104:12.

"Ignoring relevant data is not a scientifically valid method . . . [and] an expert is not permitted to simply ignore evidence that is contrary to her opinion . . .." *Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at \*15 (N.D. Ill. May 9, 2017). The Seventh Circuit has expressly held that an expert should be barred where he "did not adequately explain why he ignored certain facts and data, while accepting others," and "he merely accepted some of the testimony and . . . data that suited his theory and ignored other portions of it that did not." *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001). Where an expert "cherry-picked the facts he considered to render an expert opinion," courts should "bar[] his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert,* and it thus fails to 'assist the trier of fact.'" *Id; see also Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889-91 (E.D. Wis. 2010) (barring testimony of expert who "all but 'cherry picked' the data he wanted to use" and who "uniformly treated all evidence that undermined his underlying conclusion [with] unwarranted dismissal . . . or outright blindness," finding that this selective use of facts, "without any explanation provided by [the expert] on why he chose the data he did," rendered his methodology unreliable).

In essence, Mr. Rees chose not to review or not to discuss any record evidence that conflicted with the defense theory of the case. This egregiously slanted approach to the discovery record taints his methodology, rendering it unreliable and his opinions inadmissible.

### C.       Mr. Rees's Opinions that the Indiana State Prison "Achieved the Highest Level of Operation" Are Inadmissible Because They Are Mere *Ipse Dixit* of a Purported Expert.

Mr. Rees believes that the Indiana State Prison must be well run because it has been accredited annually by the American Correctional Association. But Mr. Rees has no opinion to offer on the ISP policies and practices that bear on this case. He freely admitted in his deposition

that he has no opinions about the actual fire safety training that the ISP provides to correctional staff. He does not hold opinions about the operation of ISP's prisoner fire fighter program. He has no opinions about how ISP staff responded to fires that occurred prior to Mr. Devine's death. And he has no opinions about any of the specific policies and procedures in place at the time of the fatal fire relating to fire safety and fire response. Ex. B at 143:13-144:3, 144:21-145:1, 146:6-24.

Mr. Rees's Report asserts that ACA accreditation is not easily achieved. But the Report is silent as to any specific way in which that accreditation bears on the issues in this case. Mr. Rees does not discuss whether or how accreditation might ensure or support the effective communication to staff of their responsibilities in the event of a fire. He does not address how accreditation connects to the conduct of meaningful fire drills or the provision of training on fire safety and fire response. Mr. Rees does not mention how accreditation might be squared with the failure to properly maintain and equip the ISP's aging physical structures.

Mr. Rees's opinion that ISP has "achieved the highest level of operation" as to fire safety because it is ACA-accredited is thus no more than pure *ipse dixit*: it is so because Mr. Rees says it is so. This is both unhelpful and misleading. Such opinions must be barred. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connecting to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997). "The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003); *See also Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,* 395 F.3d 416, 419 (7th Cir. 2005) ("As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'").

10

Mr. Rees offers no elaboration on how ISP's ACA accreditation relates to the fire safety conditions at the prison. His opinions regarding ACA accreditation and the significance of that accreditation as to ISP's operations and its fire safety should be barred because they are unhelpful and unsupported.

### D.    Mr. Rees's Opinions Based on the ISP's ACA Accreditation Should Be Barred Because They Are Confusing and Unduly Prejudicial.

One of the fundamental issues in this case is whether the administrative staff of the ISP, through deliberate indifference, failed to take protective measures to reduce the risk of death or injury by fire despite having knowledge of a substantial risk that Mr. Devine would be seriously injured or killed in a fire—a question to be decided under the Eighth Amendment. *See generally* Dkt. 234 at 24-27 (summary judgment opinion discussing legal framework applicable to Plaintiff's claims against Supervisory Defendants).

Whether the ISP was or was not accredited by the American Correctional Association has little to no bearing on that question. Whether an agency has complied with a standard or a guideline has no bearing on whether that agency has committed a constitutional violation. *Thompson v. City of Chicago,* 472 F.3d 444, 454 (7th Cir. 2006) (a police department's use of force policy does not dictate the constitutional standard for the use of force); *see also Nash v. DeTella,* No. 00 C 2784, 2000 WL 1372864 (N.D. Ill. Sept. 22, 2000) (dismissing the ACA from a suit claiming the ACA was complicit in a constitutional violation relating to the provision of clean water in a prison; the ACA can accredit, but it cannot demand compliance with the constitution); *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004) (rejecting department of corrections' argument that ACA accreditation "is proof that the conditions in question don't violate the Eighth Amendment," and concluding that "it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA");

11

*Ruiz v. Johnson*, 37 F. Supp. 2d 855, 924 (S.D. Tex. 1999) (describing "the limitations of ACA accreditation," including that "ACA accreditation is . . . not a constitutional standard," and "the ACA does not carry out . . . a performance-based review in the accreditation process," and noting "a number of examples where a prison system was accredited by the ACA, but was, nevertheless, held by a court to be operating in an unconstitutional fashion") (rev'd and remanded on other grounds sub nom. *Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001)).

On the other hand, evidence concerning the ACA's accreditation of the ISP could mislead the jury into believing that the prison staff had satisfied the requirements of the constitution. Indeed, it would be easy for the jury to mistakenly infer compliance with the constitution from Mr. Rees's proposed testimony that the ACA accreditation reflects that ISP had achieved "the highest level of operation." Ex. A, Report at 4. The minimal (or non-existent) probative value of the ACA accreditation is greatly outweighed by the risk of misleading the jury and unfairly prejudicing Plaintiff. Perhaps if Mr. Rees had offered any analysis of *how* the ACA accreditation shed light on the disputed issues of fire safety at ISP, the opinion might be of marginal assistance to the jury—but in the total absence of any such explanation, his bare opinion about ACA compliance is plainly inadmissible under Rule 403 balancing. *Cf. Grenning v. Miller-Stout*, 739 F.3d 1235, 1241 (9th Cir. 2014) (reversing summary judgment order and remanding for further consideration of plaintiff's conditions of confinement Eighth Amendment claim relating to the use of continuous lighting in his cell, and rejecting defendants' reliance on fact of ACA accreditation since the court was "unable to determine" from the record evidence "the significance of the 'accreditation' by the ACA"—the defendants failed to offer evidence "of the standards of the ACA," or "about the thoroughness of the testing performed"). Therefore, Mr. Rees's proposed testimony regarding the ACA accreditation and the supposed significance of the

12

accreditation should be barred under Rule 403 of the Federal Rules of Evidence.

## CONCLUSION

For the foregoing reasons, this Court should enter an order barring any testimony from

proposed defense expert John D. Rees.

Respectfully submitted,

**DENISE DWYER, as Personal Representative
of the Estate of Joshua Devine**

By: /s/ Locke Bowman
One of Plaintiff's Attorneys

Arthur Loevy
Jon Loevy
Locke E. Bowman
Sam Heppell
Megan Pierce
Maria Makar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
locke@loevy.com

## CERTIFICATE OF SERVICE

I, Locke Bowman, hereby certify that on March 20, 2023, I caused the foregoing
document to be filed using the Court's CM/ECF system, which effected service on all counsel of
record.

/s/ Locke Bowman
One of Plaintiff's Attorneys