# In The Matter Of:

*DENISE DWYER, et al. v.*
*RON NEAL, et al.*

*JOHN D. REES*
*May 26, 2021*
*Cause No. 3:18-cv-00995-JD-MGG*

*BOSS REPORTERS*
*Gary & Merrillville, Indiana*
*3893 East Lincoln Highway (Rt. 30)*
*Merrillville, Indiana  46410*
*(219) 769-9090*



Original File 05-26-21 JOHN D. REES.txt
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DENISE DWYER, as Personal        )
Representative of the            )
ESTATE OF JOSHUA DEVINE,         )Case No.
                                 )3:18-cv-00995-JD-MGG
          Plaintiff,             )Judge Jon E. DeGuilio
                                 )Magistrate Judge
vs.                              )Michael G. Gotsch, Sr.
                                 )
RON NEAL, et al.,                )
                                 )
          Defendants.            )

     The Deposition of JOHN D. REES, taken at the instance of the Plaintiff, taken via Zoom videoconference pursuant to notice and agreement as to the time and place and pursuant to the Federal Rules of Civil Procedure, before Pamela S. Owen, CSR, RPR, Illinois License No. 084-002294, a Notary Public and a competent and qualified court reporter, on the 26th day of May, 2021, and commencing at the hour of 10:00 o'clock a.m.

BOSS REPORTERS
& VIDEOCONFERENCING
GARY & MERRILLVILLE,, INDIANA
(219) 769-9090

APPEARANCES

MEGAN PIERCE, ESQ.
& SAM HEPPELL, ESQ.
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, Illinois  60607
312.243.5900
Megan@loevy.com

    appeared on behalf of the Plaintiff,

and

MICHAEL BLINN, ESQ.
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION
302 West Washington Street
IGCS Fifth Floor
Indianapolis, Indiana  46204
317.232.6201
Gustavo.jimenez@atg.in.gov

    appeared on behalf of the Defendants.


INDEX

| ITEM | DESCRIPTION | PAGE | LINE |
|---|---|---|---|
| Direct Exam | By Mr. Pierce | 3 | 5 |
| Cross Exam | By Mr. Blinn | 168 | 8 |

EXHIBITS:

| Exhibit 1 | Deft. Expert Disclosures, etc. | 30 | 12 |
| Exhibit 2 | 05-24-21 Email | 77 | 15 |
| Exhibit 3 | Confidential Documents | 87 | 4 |
| Exhibit 4 | 03-01-21 Email | 96 | 11 |
| Exhibit 5 | Subpoena | 156 | 3 |

JOHN D. REES                          3
Cause No. 3:18-cv-00995-JD-MGG

JOHN D. REES,

called as a witness on behalf of the Plaintiff, was

first duly sworn and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MS. PIERCE:

Q    Okay.  Mr. Rees, can you please state and
spell your name for the record?

A    John Rees.  J-O-H-N, R-E-E-S.

Q    Okay.  Thank you.  And where are you
currently staying at while --

A    I'm in Pawleys Island, South Carolina.

Q    Is anyone in the room with you?

A    No.

Q    Mr. Rees, have you ever been deposed
before?

A    Yes, I have.

Q    How many times?

A    Ma'am, I have no idea.  Several.

Q    "Several."  Would you say more than ten,
less than ten?

A    I'd say more than fifty.

Q    Okay.  I'm just going to go through -- I'm
sure you're familiar with this -- go through the
basic ground rules of the deposition to make sure

JOHN D. REES                                                    4
Cause No. 3:18-cv-00995-JD-MGG

we're all on the same page.  Okay?

A    Okay.

Q    I'm going to ask you questions.  I ask that you listen carefully to the question that I've asked and answer the question that I've asked.  If I ask a question that's confusing, please ask me for clarification.  If you don't ask for clarification, I'll assume that you understood my question.  Is that fair?

A    Fair.

Q    So -- and you understand that the answers that you'll be giving are under oath; correct?

A    Yes.

(Attorney Sam Heppell joined the videoconference.)

MS. PIERCE:  I'm sorry.  I'll pause for the record just to say that my Co-counsel, Sam Heppell, just joined the meeting.

BY MS. PIERCE:

Q    And then in order for the court reporter to get down a clear record, I just ask that you let me finish my question before you start answering, and I'll try to let you finish your answer before I start asking another question.  Okay?

A    Okay.

Q    And then please make sure that all of your answers are verbal.  So instead of nodding your head or shaking your head, say yes or no so the court reporter can get that down.

A    Yes.

Q    And then I'm happy to take a break at any point.  That's completely fine.  Just I ask that if there's a question pending, you answer that question before we take a break.  Okay?

A    Fair enough.

Q    Do you have any medical conditions that would affect your ability to testify here today?

A    No.

Q    Are you taking any medication that would affect your ability to testify here today?

A    No.

Q    How did you first learn about this case?

A    I received an email from Mr. Blinn asking me if I would -- to send him information about me, about my career.

Q    Do you know -- I'm sorry.

A    I'm sorry?

Q    I'm sorry.  Did you finish your answer?

A    Yes.  I got an email from Michael Blinn.

Q    Okay.  Do you know how the defendants

JOHN D. REES                                    6
Cause No. 3:18-cv-00995-JD-MGG

found you as a possible expert for this case?

A    I believe they asked the Department of Corrections.  I think there was some interaction between the Department of Corrections and Mr. Blinn.

Q    When you say, "the Department of Corrections," you mean the Indiana Department of Corrections?

A    Yes.

Q    And what capacity have you worked with the Indiana Department of Corrections before?

A    I have consulted with the department on a couple different projects.

Q    What are those projects?

A    Security review.  I did an administrative study of personnel in Central Office.  And then I did some work with them on the death penalty.

Q    Okay.  Let's go through those one by one.

So the first one you said was a security review.  What did that entail?

A    I was with George Camp in working for the Criminal Justice Institute out of Connecticut, and we did a security analysis of Michigan City.

Q    Of Michigan City or of the prison in Michigan City?

A    The prison in Michigan City.  I'm sorry.

**JOHN D. REES**                                7
**Cause No. 3:18-cv-00995-JD-MGG**

Q    Okay.  And what did the security analysis entail?

A    We looked at all of their procedures, the physical plant, staffing, those types of things, and prepared a report.  It's probably -- that probably took place over ten years ago.

Q    Okay.  So probably around 2010; is that fair?

A    Or later.  Earlier maybe.  You know, but that's fair.  That's fair.

Q    Okay.  And what was the second thing you said?  The administrative review of staffing; is that correct?

A    Yeah.  Central Office staffing and organization.  That was for the Commissioner's Office, and that was probably about the same time, maybe a little bit earlier.  I'm not sure on the date.  It was after I -- after I left being commissioner in Kentucky.

Q    What did that administrative --

A    Just a review of the positions and how they interacted.  Was there a better way to suggest that they might do it?

Q    And that was just for the administrative staff?

A    That's correct.

Q    Okay.  So you didn't look at the facilities --

A    No, I did not.

Q    And, Mr. Rees, I just ask, again, that you make sure I finish my question just so the court reporter can get everything down clearly.

And then the third -- the third item that you identified was looking at the death penalty.  Can you explain that further?

A    I did some research for them on the attainment of chemicals that we use during the execution process.

Q    What research did you do?

A    I discussed with other state Department of Corrections, their -- the chemicals they use and the procurement of the chemicals.

Q    Okay.  So it would be fair to say --

(Video feed dropped.  Contact was re-established, and the proceedings resumed as follows:)

MS. PIERCE:  I'm just -- I forgot to do this at the beginning.  I'm going to start recording, and we'll send you the recording again at the end of the deposition.  Hold on

JOHN D. REES                                        9
Cause No. 3:18-cv-00995-JD-MGG

one second.  Looks like I can't record.  Right.

Okay.  Go ahead, Pam.  Do you want to read back the last question that you --

MR. BLINN:  Can I jump in?  Megan, did you say that you're recording it?

MS. PIERCE:  I am not recording it.  I think it's because it's not our zoom link, I believe.

MR. BLINN:  Okay.  That's fine.  I know some of the depositions were recorded and some weren't.  I just want to make sure if you are, that we get a copy, but that's fine.

MS. PIERCE:  Yeah.  That's what I was saying, that I would send you one.  Hold on.  We might be able -- give me one second.

MR. BLINN:  I'm indifferent.  If you are recording it, obviously, please send us a copy.  If you're not, you know, that's fine.  I'm totally indifferent, just as long as I get it if you are.

MS. PIERCE:  Of course, of course.  One second.  We can be off the record.

(A brief recess was taken while Zoom recording was established.)

JOHN D. REES                                    10
Cause No. 3:18-cv-00995-JD-MGG

BY MS. PIERCE:

Q    So I'll restate my question.

So would it be fair to say, Mr. Rees, that you were researching how and where to get chemicals for carrying out the death penalty?

A    Yes.

Q    And then, Mr. Rees, have you ever worked as an expert in any litigation involving the Indiana Department of Correction or its employees before?

A    No.

Q    Mr. Rees, what facts were you -- did you learn about the case before you agreed to be an expert for this matter?

A    I don't know, other than just the general discussion of what took place, the fact that there had been an inmate death as a result of a fire.  As I said, I had received an email from Mr. Blinn, and then we had a subsequent phone conversation.

Q    Okay.  And beyond that --

MS. PIERCE:  Looks like we've now lost Mike.  Having some trouble this morning.  We can go off the record, Pam, until he comes back.

(A brief recess was held while Mr. Blinn rejoins the

JOHN D. REES                                    11
Cause No. 3:18-cv-00995-JD-MGG

videoconference.)

BY MS. PIERCE:

Q    Okay.  So I just want to make sure that I understand your testimony, Mr. Rees.

So you said that you knew that someone had died in a fire at Indiana State Prison before you agreed to be an expert in this case.

Were there any other details or any other information about what happened that you learned before you agreed to be an expert?

A    Not really.  Just general conversation between Mr. Blinn and myself.

Q    What facts about the case or information about the case did Mr. Blinn provide you in that --

A    I don't remember the exact details.  He discussed what the case was about and asked me to send him some information about me.  And I agreed and I began working on the case.

Q    Okay.  And I understand you don't remember the exact details of the conversation, but is there any facts or assumptions about the case that you were provided that you recall as you sit here today?

A    Not really.

Q    You say, "not really."  Do you mean no or there are some that you recall?

JOHN D. REES                                12
Cause No. 3:18-cv-00995-JD-MGG

A    It was a general conversation regarding the case.

Q    Sure.  And so I just want to understand what you recall about the conversation that you were told about the case.

A    That an inmate had died in a fire at the penitentiary in Michigan City, and that there was litigation over this, and general things of that sort.

Q    Anything else that you recall that's part of "general things of that sort"?

A    No, I do not.

Q    Okay.  How many times have you served as an expert in litigation?

A    I don't have an exact number of times that I've served as an expert.  I served as an expert throughout my career at different times, both when I was working and then subsequently when I was consulting as -- on a case that I wasn't involved in.

Q    Okay.  So you served as a retained expert during the time that you were working?

A    No, not during the time that I was working.  But there were times when I was working that I was established as an expert in the

JOHN D. REES                    13
Cause No. 3:18-cv-00995-JD-MGG

particular litigation that I was involved in.

Q    Can you clarify what you mean by that?

A    Well, I've been involved in federal litigation in multiple locations at multiple times during my career, and an attorney who was either representing me or I was working with put forth me as an expert before a judge, and a judge said, yes, he's acting as an expert.

Q    Were you retained or paid or compensated to be an expert in those cases?

A    No, I was not.  One clarification or correction, I guess, I should say:  There were times -- there have been several times, not many, during my career when I've worked for a federal agency in regard to a specific piece of litigation and was paid, but not as -- not as -- you know, just a standard consultant to the Department of Justice or the National Institute of Corrections.

Q    And you said you consulted with the -- with federal agencies like the DOJ or the National Institute of Corrections --

A    That's correct.

Q    -- as an expert for litigation.  What would you do as a consultant or as an expert in the litigation?

JOHN D. REES                          14
Cause No. 3:18-cv-00995-JD-MGG

A    I was dealing with inmate classification. This is thirty years ago.

Q    What do you mean by that?

A    What --

Q    "Inmate classification"?

A    Yes, inmate classification.  It's the process by which you classify an inmate and determine what security classification, what treatment needs may be there, total analysis of the individual and what the department or institution needs to do to address his situation.

Q    And what did you do as a consultant on that issue?

A    Looked at what they were doing, analyzed it, and gave my opinion as to whether or not it was a good way to do it or whether they should do something different.

Q    This was related to litigation; correct?

A    Yes.

Q    What was the litigation about?

A    It was a total -- total conditions and confinement litigation.

Q    What were the allegations about the litigation?

A    I have no -- I can't remember that, ma'am.

JOHN D. REES                          15
Cause No. 3:18-cv-00995-JD-MGG

It was in Georgia thirty years ago, Reidsville.

Q    Okay.  So let's go back before.

How many times have you worked as a retained expert in litigation?

A    I don't know.  Thirty, forty times.  I don't have an exact count.  I don't count it up. I've submitted to you a list of cases that I've worked on in the last three or four years, I think.

Q    Do you keep records of the cases which you were a retained expert?

A    Not -- not totally, no.

Q    What records do you keep on the cases that you work --

A    Records that I submitted to you along with my report.

Q    What records are those things?

A    Listing of cases that I've testified in, written a report, or given a deposition.

Q    Okay.  So my question's a little different.

Do you keep any other records besides a list of the cases in which you provided routine expert services?

A    No.

Q    Do you keep a list of all cases of which

you provided retained expert services?

    A    No.

    Q    Do you keep the reports that you've written?

    A    Some I have, yes.

    Q    Do you keep all of the reports that you've written?

    A    No, ma'am.

    Q    Do you keep billing information related to the cases in which you've worked as a retained expert?

    A    Some I have, some I haven't.

    Q    And how do you determine whether or not to keep the records related to billing for cases where you're a retained expert?

    A    Well, I keep them on my computer, and so information that was in paper files didn't get kept. I purge stuff periodically.

          I recently moved to -- over the -- after living in the same location for over twenty years and threw tons and tons of stuff away.  I keep that which my accountant and lawyer say I need to keep.  Other than that, it's not relatively new, I destroy it.

    Q    How often do you purge documents related

JOHN D. REES                17
Cause No. 3:18-cv-00995-JD-MGG

to your work as a retained expert?

A    I don't have a routine schedule of purge.

Q    When was the last time that you purged documents related to your work as a retained expert?

A    Probably the biggest purge was probably in November, December '19, 2019.

Q    Okay.

A    That's when I sold my house.

Q    I'm sorry?

A    That's when I sold my house.

Q    And you understand that the Federal Rules require you to provide a list of all cases that you've provided expert testimony in the past four years; correct?

A    That's correct.

Q    So do you have a list of all of the --

A    I -- I submitted that list with my report.

Q    Mr. Rees, I'm going to ask that you wait until I finish my question before you answer so that the court reporter can get it down clearly.  Okay?

A    Yes.

Q    Have you provided a -- do you maintain a copy of all of the cases in which you've provided expert testimony in the last four years?

A    A copy of what, ma'am?  I'm not -- I don't

JOHN D. REES                                          18
Cause No. 3:18-cv-00995-JD-MGG

understand the question.

Q    Sure.  I'll ask it again.

Do you maintain a copy of a list of cases in which you have worked -- strike that.  Let me ask it again.

Do you the maintain a copy of all of the cases in which you've worked as a retained expert over the past four years?

A    I -- yes, I have a list of those cases which I submitted to you.

Q    Okay.  Do you maintain the reports for all litigation in which you've worked as a retained expert over the past four years?

A    I probably have some of them.  I don't know that I have all of the them.  I don't go back and look at them once they're finished.

Q    When was the first time that you worked as a retained expert?

A    I would imagine probably 1998, maybe '98 or '99.

Q    Okay.  And how many ongoing cases are you currently working as a retained expert?

A    Three.

Q    Does that include this matter?

A    Yes.

JOHN D. REES                                      19
Cause No. 3:18-cv-00995-JD-MGG

Q    What are the other two matters?

A    There's a case where an individual died in a jail in Eastern Kentucky; and there's a case in a jail in Paducah, Kentucky, where an offender died.

Q    And how did the deaths occur?  What were the causes of death in both of those case?

A    In the one case it was a heart attack.

In the other case it was -- I don't have the case information in front of me, so I don't have the autopsy; but as I recall, it was a drug overdose and delirium tremens.

Q    Were you retained by the plaintiff or the defendants in those cases?

A    The defendants.

Q    In both cases?

A    Yes.

Q    Have you ever been retained by a plaintiff in any litigation dealing with the corrections setting?

A    Yes.

Q    How many times?

A    Two or three.

Q    Okay.  And so the remainder of the thirty to forty times that you've worked as an expert -- as a retained expert, you were working for the

defendants; correct?

A    That's correct.

Q    And what were the two or three cases that you were working for the plaintiff as a retained expert?

A    One was a staff member being charged with felony assault, and I worked for the lawyer that was representing him.

And the other case that I remember, that was a -- a couple of cases in Texas dealing with the two different nurses that were assaulted by inmates that they were treating in Lubbock, Texas, I believe.  But that was a long -- that was 10 or 11 years ago.

Q    Okay.  So I just want to make sure I understand.

So you worked -- the three cases that you're referencing, one involved a staff member was charged with felony assault, and he was the plaintiff in the matter?

A    He was the defendant.

Q    Okay.  And who was the plaintiff --

A    It was a criminal case.  It was not a -- it was not a civil case.

Q    Okay.  Thank you for clarifying that.

JOHN D. REES                    21
Cause No. 3:18-cv-00995-JD-MGG

So were you retained by the prosecution in that matter?

A    No.  I was retained by the defense attorney.

Q    Okay.  Okay.  So you were -- okay.  Understood.

And then the second two cases involved nurses being assaulted by prisoners; is that correct?

A    That is correct.

Q    Okay.  And the nurses were the plaintiffs in that matter?

A    That is correct.

Q    Okay.  And so you were retained by the counsel for the nurses?

A    That is correct.

Q    And so beyond that case, those two cases where you were retained by the nurses or the plaintiffs, have you ever been retained by plaintiff's counsel in litigation involving corrections?

A    Just when I was used by the Department of Justice to assist in either -- either conditions of confinement or the classification case that I talked about earlier, the Georgia case.

JOHN D. REES                    22
Cause No. 3:18-cv-00995-JD-MGG

Q   What's the -- is it just one DOJ case resolving-- involving --

A   No.  I actually think I was involved in two or three, but that's almost -- that's what? Thirty years ago and early in my career, and the specifics of it I don't recall.

Q   Okay.  And again, Mr. Rees, I know it's not natural, but I just want to make sure that Pam is able to get down all of my questions, so please just wait till I --

A   All right.

Q   I'm sure it's easy to anticipate sometimes what I'm going to say.

A   Okay.

Q   But if we can just get it on the record, that will make it clear.

So all of the cases in which you were involved in general conditions of confinement with the Department of Justice were early in your career; correct?

A   That is correct.

Q   So can you give me a ballpark of when that would have been?

A   I'm going to say in the late '70s, early '80s, mid '80s.

JOHN D. REES                                        23
Cause No. 3:18-cv-00995-JD-MGG

Q    Okay.

A    It was during the period of a large number of cases dealing with conditions of confinement, and I had worked in three states that were under consent decrees, and I -- in Oklahoma and in Kentucky, I was directly and deeply involved with the federal courts, and so I became -- I think I developed a relationship with the judge in Oklahoma and subsequently in Kentucky that was positive because they, I think, respected my opinion and thoughts and my name got out.  So I guess then the Justice Department had me look at two or three different things.

But I had been involved in three conditions of confinement court cases in Oklahoma, Kentucky, and then a little bit later, Louisiana. And so at least two out of the three of those judges and I had a very good relationship.  The one in Louisiana, maybe not as good.

Q    Thank you for clarifying that.  I appreciate that.

So what -- I just want to make sure that I understand.  So what was your role when working with the Department of Justice related to those consent decrees?

A    Just being a corrections adviser.  I think a general corrections adviser would probably be with a specialization on population and classification.

Q    Okay.  So would it be -- I just want to -- so for example, were you helping to formulate the consent decree, to implement the consent decree, or identify deficiencies in the conditions at those facilities?

A    Identify deficiencies and giving an assessment of the situation.

Q    And was that related to, you know, determining liability in the litigation or just to formulate the consent decree?

A    I don't know that we got much into liability.  We got -- we were involved in the total conditions of confinement and how you can make the place a better place for staff and inmates.

Q    Okay.  Is it fair to say that you've never been retained to offer an opinion on behalf of a prisoner litigant in a case before?

A    I'm trying -- trying to remember.  You know, when I'd be working with the Justice Department, you know, you're talking about improving the general conditions of confinement for an individual prisoner.  Have I ever been hired by a

JOHN D. REES                           25
Cause No. 3:18-cv-00995-JD-MGG

particular inmate or an attorney for a particular

inmate?  I don't recall that, no.

Q    Okay.  So you've -- just to make sure I

understand, you've never been retained to provide an

opinion on behalf of a prisoner or group of

prisoners who are bringing a lawsuit?

A    No, I've never -- I've never -- never been

retained.  I've talked to several lawyers -- oh, I

take that back.  Wait a minute.

I just remem-- there was a case in

Oldham County, Kentucky.  And I don't remember

whether this was before I was commissioner or after

I was commissioner.  There was a period of time when

I was consulting, from about 1998 to 2003.  And I

don't remember the exact time, but I was retained by

an attorney in Oldham County, Kentucky, and he asked

me to review the case.  I gave him a report.  He

didn't like what I had to say, and he sent me a

check and never used me.

Q    Okay.  And is that the only time that

you've ever been retained --

A    That's --

Q    Let me finish the question.

A    Okay.

Q    Is that the only time that you've ever

JOHN D. REES                    26
Cause No. 3:18-cv-00995-JD-MGG

been retained to offer an opinion on behalf of a prisoner litigant in a lawsuit before?

A    That's the only one I can remember at this time.

Q    Okay.  And what were the -- what was that case about?

A    It was a case over a disagreement between him and another inmate, and I think he got hit upside the head.  It was an assault case, a fight case.

Q    And who was he suing in that case?

A    The jailer in Shelbyville, Kentucky.

Q    Okay.  So every other case besides that one you've been retained -- when you've been retained to offer an opinion on behalf of a litigant has been on behalf of a correctional officer or staff member; correct?

A    Or the department.

Q    Okay.  Do you know why that other attorney in the case where you were retained to offer an opinion on behalf of the prisoner litigant did not like your opinions or your report?

A    I guess he didn't like what I had to say.

Q    Do you know what about what you said that he didn't like?

JOHN D. REES                    27
Cause No. 3:18-cv-00995-JD-MGG

A    I didn't think he had a case.

Q    And why didn't you think he had a case?

A    I don't remember the specific facts, but I remember the fact that I didn't think it was a case that was going to be successful.  As I recall the -- his person that he was defending actually started the altercation with the other offender.

Q    Okay.  Have you -- have you ever reviewed a case as a retained expert where you concluded that a prisoner, plaintiff, had a good case against the Department of Corrections or staff at the Department of Corrections?

A    Yes.

Q    About how many times?

A    Oh, that happens -- it doesn't happen frequently, but it happens regularly.

Q    Okay.  And these are cases in which you've been retained by the defendant?

A    If you say, "retained by the defendant" and they're more -- they're cases where an attorney calls, we discuss the case, and I'll say to the attorney, you don't -- you know, I -- I don't need to work in this particular case because --

MS. PIERCE:  Sorry to interrupt you, Mr. Rees, but it looks like we lost Mike again.

JOHN D. REES                28
Cause No. 3:18-cv-00995-JD-MGG

So I'm just going to cut you off there, and we can continue when he comes back had in.

(The proceedings resume as follows after Mr. Blinn reconnects.)

MS. PIERCE:  Okay.  I think I cut it off as soon as you started to disappear, so I think we're all right.

MR. BLINN:  Okay.

MS. PIERCE:  Okay?

MR. BLINN:  What's that?

MS. PIERCE:  I think we can just pick back up.  Is that okay?

MR. BLINN:  Yeah.  Works for me.  Thank you.

BY MS. PIERCE:

Q    I'm just going to ask a question now, Mr. Rees.

So have you ever testified in court or at a deposition on behalf of a prisoner?

A    I'm sure I have.  Whether during my career as the employee or in my career as a consultant, but I'm not sure I ever testified on behalf -- in a case where I've been retained.

Q    Okay.  Yeah, so to clarify -- thank you

JOHN D. REES                29
Cause No. 3:18-cv-00995-JD-MGG

for pointing that out.

So I'm just talking about cases where you've been retained as an expert.

A     No.  I guess I've -- I represent -- the majority of the cases that I have done I represent the defendants in those cases.

Q     Okay.  And fair to say that as a retained consultant -- or a retained expert, you've never provided any deposition or trial testimony on behalf of a prisoner; correct?

A     No.

Q     That's -- you mean, yes, that's correct?

A     That's correct.

Q     Okay.  Have you ever been retained as an expert in any litigation involving fires in a correctional center?

A     I don't recall any.

Q     Has a court ever found that you were not qualified to serve as an expert in litigation?

A     I don't think so.

Q     Has a court ever excluded any of your opinions or narrowed the scope of your testimony based on your qualifications as an expert?

A     Not that I'm aware of.

Q     Has a court ever found that any of your

opinions do not meet the requirements to be presented to a jury?

A    Not that I'm aware of.

MS. PIERCE:  I am going to pull up for us to all look at the -- your report that was provided to us with the attachments by your attorney.  Can everyone see this okay?

THE REPORTER:  Yes.

MR. BLINN:  I see it.

MR. HEPPEL:  I see it.

THE WITNESS:  I see it.

(Exhibit 1 identified for the record.)

BY MS. PIERCE:

Q    The page that's pulled up currently, it's your resume; correct, Mr. Rees?

A    That is correct.

Q    I'm just going to go up here.  This is one of the captions of your report that reads, "Recent cases that I've testified in, provided a report, or given a deposition."  Is that correct?

A    That's correct.

Q    So when you say, "recent," that doesn't say exactly the time frame that this encompasses, but it's your testimony here today that this

encompasses the last four years?  Is that correct?

A    It's -- yes, I'm going to say that that's within -- it may go beyond four years.

Q    Okay.  So every lawsuit in which you've provided a report or given a deposition over the past four years is identified here in this list?

A    Yes.

Q    Okay.  When was the last time you reviewed this list?

A    I'm sorry?

Q    When was the last time you reviewed this list?

A    When I prepared it for Mr. Blinn.

Q    Okay.  And fair to say that none of these cases that are here involve any litigation related to fire in a prison or jail setting?

A    That's correct.

Q    In all of these cases you were retained by either the Department of Corrections or individuals working for the Department of Corrections; is that correct?

A    That is correct.

Q    And you prepared this list of cases for the attorneys for defendants in this lawsuit?

A    Yes.  I updated it for the attorneys in

JOHN D. REES                    32
Cause No. 3:18-cv-00995-JD-MGG

this lawsuit.

Q    Okay.  And how did you go about preparing this list or updating this list?

A    I added the most recent case that I submitted a report on.

Q    Okay.  What did you look at to find the names of the cases that you used -- or I'm sorry.  Strike that.

What did you look at or what information did you use to identify the cases in which you worked as a retained expert?

A    I looked at the most recent work with regard to a case.

Q    And I believe you testified earlier that at times you don't save documents related to cases or you purge them.  So how did you ensure that this list is complete?

A    I don't purge cases as soon as I finish them.

Q    Okay.  You said the last purge that you had done was in 2019; correct?

A    That's correct.

Q    So how did you ensure that this contained cases going back to 2017?

A    I have no idea, ma'am.

Q    You don't know how you ensured that this list was complete?

A    I've been maintaining this list for numerous years, and it contains the cases that I have been employed, retained.

Q    Okay.  And so do you add a list -- do you add cases to the list as you are retained on them, or how do you go about adding cases to the list?

A    I add cases to the lsit once I submit a report or provide testimony for a deposition.

Q    Okay.  And how far back in time does this list go?

A    Ma'am, I don't have the exact date.  I'd have -- that would -- I'd have to go back and see, but it's -- it's three, four, five years.

Q    Okay.

A    Maybe longer than that.

Q    Okay.  Is it possible that this contains cases only going back three years?

A    No, ma'am.  No, ma'am.

Q    Okay.

A    No, ma'am.

Q    So you're -- as you sit here today, you're confident that this contains all of the cases in which you provided expert testimony or reports in

the past four years?

A    Yes.

Q    Actually, I'm going to share that document again.  Okay.  I am going to go now to Page 15 of the report that you provided that has your name at the top.  This is a copy of your CV; correct?

A    Yes.

Q    When was the last time that you updated your CV?

A    Probably sometime in the last year or so. I think I added an article -- I remember adding something to it in the last year or so.

Q    Okay.  And when was the last time that you reviewed this and made sure that it was accurate and up to date?

A    I'm sorry?

Q    When was the last time that you reviewed this CV to make sure that it was accurate and up to date?

A    Probably sometime in early 2020 after I changed my address and moved from Madison, Indiana, to Kentucky.

Q    So are there any updates to your CV that need to be made today as we're discussing your qualifications?

JOHN D. REES                35
Cause No. 3:18-cv-00995-JD-MGG

A    No, I don't think so.

Q    So since 2008, you've been working as a consultant for Rees & Associates Consulting; is that correct?

A    That is correct.

Q    How many people work at Rees & Associates Consulting?

A    Myself and my people that I hire on specific jobs.  It varies.

Q    So you don't have any other permanent staff?

A    No.  Just me.  My wife.

Q    Okay.  What does your wife do for --

A    She helps with the books.

Q    So it says here on your resume that you provide "consultant services to companies and government agencies providing correctional services as well as advising, maintaining the development, policy, and procedures for agencies dealing with adult and juvenile offenders.  Expert witness and guidance to the legal community regarding the correctional industry."  Is that correct?

A    Yes.

Q    Anything else that you do as a consultant for Rees & Associates Consulting?

A    No.

Q    About how much of your time as a consultant is spent working as an expert in litigation?

A    10 percent, 15 percent.

Q    Okay.  So the other 90 to -- 85 to 90 percent is spent engaging the other types of work listed here on your CV?

A    Yeah.  You know, maybe it's 20 percent. You know, I'm semiretired.  The amount of time that I've been -- you know, that I've put in has gone down over the years.  I'm -- now I'd say I'm working 50, 60 percent of the time.  And I'd say court cases are 15 to 20 percent of my time.  No more than that.

Q    Okay.  And I just want to clarify.

So you spend -- when you say you spend 50 to 60 percent of your time working as a consultant, is that, you know, compared to a normal 40-hour workweek, or what's the --

A    Yeah.  Yes.

Q    Okay.  And so then when you say that you spend 10 to 15 percent of your time working on court cases, do you mean 10 to 15 percent of the total time that you're working or of the typical 40-hour workweek?

JOHN D. REES                37
Cause No. 3:18-cv-00995-JD-MGG

A    The total time I'm working.

Q    Okay.  About what percentage of your income currently comes from working as a retained expert in litigation?

A    10, 15 percent.  Maybe 20.

Q    Okay.  And on average, how much do you generate a year from working as a retained expert in litigation?

A    I -- between 20 and 30,000.

Q    Do you have any additional income that you receive as a consultant that you're not including in that 20 to 30,000?

A    Yes.

Q    What is that?

A    I work for not-for-profits.  I work for private companies.  I work for state departments of correction.  I work for private architectural and planning organizations.  There's all kinds of consultant income.

Q    What types of things do you do in that -- in the non-litigation work that you do as a consultant?

A    Well, I consult with a company that is involved in managed access, cell phone interdiction.  I work for two not-for-profits; one in substance

JOHN D. REES                              38
Cause No. 3:18-cv-00995-JD-MGG

abuse treatment and recovery housing, and the other in providing community correctional services to Department of Corrections in Kentucky and the Federal Bureau of Prisons. And then deal with other projects; staffing analysis, security analysis from time to time with other organizations. And currently, I'm working on a project in Wyoming on utilization of their resources, their physical plant resources, at their locations.

Q    Okay. I want to make sure that I understand your testimony.

So you say that you're currently working on a project with the utilization of resources in Wyoming; correct?

A    That is correct.

Q    What do you do specifically when you look at the utilization of resources and what consulting services are you providing?

A    Well, we're doing an analysis of their needs and their current physical plant locations and the capacities of those locations and is there a way they could better utilize them more efficiently and still meet the needs of the various inmate populations.

Q    Okay. You mentioned earlier that you are

JOHN D. REES                        39
Cause No. 3:18-cv-00995-JD-MGG

working -- or you worked on managed access with cell phone interdiction; is that correct?

A    That is correct.

Q    What do you mean by that?

A    I'm not sure I understand.  Do you understand what managed access is and contraband cell phone interdiction is?

Q    No.  I'm asking you to explain that.

A    Well, there's a problem within prisons with contraband cell phones.  Inmates are not allowed to have personal cell phones, and they present a considerable problem.  And there are various organizations that are trying to stop and come up with a system to either control or provide a mechanism of interdiction to dealing with the contraband cell phones.

The company that I work with has a system which basically sets up a cell phone tower within a prison, captures all the illegal cell phones, controls their signals, submits them to courts, whether they be state court -- they're all state courts where they're submitted.  And then they get a court order to kill that phone.  I mean, it's a lot more complicated than that, but that's a basic analysis of the service they're providing.

JOHN D. REES                                    40
Cause No. 3:18-cv-00995-JD-MGG

Q    And what do you do in relation to your work with that company?

A    I'm a correctional consultant to the president of the company.

Q    So what type of consulting services or information do you provide?

A    What's the best way to do it, go about it; how to explain it to other potential customers; how to improve it.  All kinds of professional consultation.

Q    Okay.  So what would you estimate as the total amount of that you make off of your consulting services in a given year?

A    Are you asking for my total income?

Q    From consulting services, correct.

A    I think it's between -- it -- don't hold -- I don't have my tax return in front of me, but I believe it's between 100 and 150,000 over the last three or four years.

Q    Okay.  150,000, so for each year over the past three or four years?

A    Yes.  I believe that's a fair estimate.

Q    Okay.  And I think -- sorry.  I forgot to mark the copy of the report as Exhibit 1, so I will go ahead and do that now.

JOHN D. REES                                    41
Cause No. 3:18-cv-00995-JD-MGG

So it starts with here, the letter from Tiffany Orner.  There's no Bates stamp, but the letter from Tiffany Orner, dated March 5, 2021, enclosing Defendants' Expert Disclosures and supporting documents, a 19-page document that ends with the last page here -- with the last page of your CV.

Okay.  Is there any other work that you do -- let me get back to your CV here.

Is there any other work that you do as a consultant for Rees & Associates Consulting that we haven't discussed here today?

A    I don't think so.

Q    Okay.

A    You haven't discussed the not-for-profits, but --

Q    Sure.  What type of work do you do with that, not-for-profit?

A    Well, as I said, I work with the Fletcher Group, which is a not-for-profit developing recovery and drug treatment housing and programs across the country.

I work with Dismas Charities of Louisville, Kentucky, which is the largest provider of community correction services to the Federal

JOHN D. REES                          42
Cause No. 3:18-cv-00995-JD-MGG

Bureau of Prisons.  I believe that they're either number one or number two.  They're in 13 states and in the state of Kentucky, and I provide correctional consultation with them.  They rely on my experience within the corrections community or industry.

Q    And what are you referring to when you refer to community corrections services?

A    Provide them advice and consultation on furthering of their program.

Q    Sorry.  So my question is slightly different.

I'm asking what is entailed in community correction services?

A    What is entailed?  Everything from job placement for offenders; drug treatment; and health services; medical services; transitional housing; basically, the full continuum of services to the offender transitioning from prison to the community.

Q    Okay.  Let's turn to your job as commissioner for the Kentucky Department of Corrections.  You served in that position from 2004 to 2008; correct?

A    That is correct.

Q    What were your responsibilities as the commissioner for the Kentucky Department of

JOHN D. REES                                        43
Cause No. 3:18-cv-00995-JD-MGG

Corrections?

A   I was responsible for the overall operation and budget of the various correctional facilities, for the probation and parole services for all jail standards and inspections, management of healthcare services to the offender population, overall management of security professional services dealing with staff and inmates, providing a safe workplace.  The full range of operations of correctional services within a state.

Q   As the commissioner, did you have any responsibilities specifically related to fire safety and fire response in the Kentucky Department of Corrections?

A   Yes.

Q   What were those?

A   We -- we're a credited facility, so all of our facilities were accredited.  And fire safety standards and policies and practices are a very integral part of the accreditation process.

Q   That's slightly different from what my question was.

My question was asking what your specific job duties and responsibilities were related to the fire safety and fire response in the

JOHN D. REES                                      44
Cause No. 3:18-cv-00995-JD-MGG

Kentucky Department of Corrections?

A    I don't understand your question then, I guess.

Q    So what steps did you specifically take, related to how the Kentucky Department of Corrections dealt with fire safety and fire response, as the commissioner?

A    Well, you develop a management style and a culture of commitment to professional correctional practices, and I provide a safe and secure environment for both staff and offenders.  And an integral part of that process is ensuring that fire safety issues are addressed and are practiced.  And the practices that address fire safety, for example, fire drills, periodic fire drills; checking of equipment, checking of extinguishers; ensuring training's taking place.  There's a full range of stuff that a commissioner of corrections is responsible for ensuring that it takes place.

Q    Okay.  And so I want to know specifically what you did as commissioner.  So what steps did you take as commissioner to ensure that the Kentucky Department of Corrections was properly dealing with fire safety and fire response?

A    Well, I made sure that we had the

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                    45
Cause No. 3:18-cv-00995-JD-MGG

appropriate training staff available and that they were doing their job.

I ensured that financially fire safety equipment and practice expenses were an integral part of the budget process.

I ensured that accreditation standards were kept at the highest level of importance and on everybody's radar and that we successfully maintained accreditation with regard to jails.

I ensured that the standards that were set for jails were followed with regard -- you know, addressed fire safety, the standards that we were responsible for developing and ensured that my jail inspection staff were aware and trained in ensuring that the jails that they inspected on a twice-annual basis were in compliance with fire safety regulations and standards.

Q    Okay.  So you said that you made sure that staff were doing their job.  How do you go about doing that?

A    Would you repeat that, please?

Q    Sure.  You said that you -- one of the things that you did was make sure that training staff were doing their job.  How did you go about

JOHN D. REES                        46
Cause No. 3:18-cv-00995-JD-MGG

doing that?

A    Well, you go visit the training academy. You get reports.  You review reports.  You talk to wardens.  You talk to deputy wardens.  You talk to fire safety staff at your facilities, and you learn what's going on.  And you talk with the training people, and you make sure that they have what they need to do their job.

Q    Okay.  And I just want to clarify because you've been using the word "you."

Are you talking about things that you specifically did or things that people should be doing?

A    I -- what I just described are things that I did as I managed the Corrections Department.

Q    Okay.  When you were commissioner for the Kentucky Department of Corrections, what types of training on fire safety did you ensure was provided?

A    The standard, latest curriculums that were provided by various organizations.  Our Training Department utilized Eastern Kentucky University which had a specific fire training program within its curriculum.  And we relied heavily on them for advice, as well as the state fire marshal, local fire departments, the full rage

of resources that are available.

Q    Okay.  And did you review the fire safety training that was provided to all staff?

A    Did I review the curriculum item by item?  No.  Did I review the results and -- from a management perspective and make sure that it was going as it was supposed to be going?  Yes.

Q    You said you reviewed the results.  What do you mean by that?

A    Yes.

Q    I'm sorry.  When you say you reviewed the results, what do you mean by that?  What were the results that you rereviewed?

A    The training records, the number of people that have gone through the training, the annual retraining, new recruit training, specific fire safety staff and training.  A whole range of activities.

Q    Okay.  As the commissioner for the Kentucky Department of Corrections, were you involved in creating or amending any policies or standards relating to fire safety?

A    I'm sure I was.  Do I remember what the specific things were?  No.  But as a part of the accreditation process, you do annual reviews of

JOHN D. REES                48
Cause No. 3:18-cv-00995-JD-MGG

policies and procedures, and they're modified and developed as needed and as situations change, and they're part of a process.  Do I specifically remember that on February the 13th of 2006 I did X, Y, or Z?  No.

Q    Do you recall what types of things ensured were part of the policies and standards related to fire safety?

A    No.

Q    Let's go to your next job.  So from 1998 to 2004, you worked as a consultant again for Rees & Associates, but this time it says you worked on corrections and criminal justice administration.

What specifically did you do between 1998 and 2004?

A    Basically, the same type of stuff that I was doing -- that I'm doing today.  I worked with companies.  I worked with individual state systems. I worked with the private sector.  Same general correctional consulting activities.

Q    Do you also work as a retained expert in litigation --

THE REPORTER:  I'm sorry.  The question again, please?  You're trailing off a little bit.

JOHN D. REES                                           49
Cause No. 3:18-cv-00995-JD-MGG

BY MS. PIERCE:

Q    Yeah.  So during this period from 1998 to 2004, did you also work as a retained expert in litigation?

A    Yes.

Q    And then from 1994 to 1998, you were the vice president for business development in the Corrections Corporation of America.  What were your job responsibilities and duties in that role?

A    I was responsible for working with governments across the country to provide correctional programming to state and local -- federal, state, and local jurisdictions.

Q    Corrections Corporation of America is a private company; correct?

A    Yes.

Q    Okay.  I'm going to go down to the next page, Page 2 of your CV.  It says -- starts with Professional Experience.

So you worked as the warden for the Corrections Corporation of America from 1989 to 1994; correct?

A    Yes.

Q    And again, that's a private prison company; right?

JOHN D. REES 50
Cause No. 3:18-cv-00995-JD-MGG

A    That is correct.

Q    And what were your job responsibilities and duties as warden?

A    The same as being a warden at the Kentucky State Reformatory in LaGrange.  You run the facility.  You're the mayor, if you will, of a metro system, a facility that offers 24-hour security services, 365-day food services, medical services.  In many jurisdictions, you also run your own sewer plant and your own water system.  So you run -- you're the chief executive, running a large institution, which primary mission is to provide a safe, secure environment for staff and inmates and, at the same time, protecting the public.

Q    As warden, did you have specific job responsibilities related to fire safety and response at the facility?

A    Yes, I did.

Q    What were those?

A    To ensure that the standards were being complied with, with regard to training, with regard to practice, with regard to procedure, and ensure that staff were doing everything to maintain a safe environment.

Q    Okay.  When you refer to "standards," what

JOHN D. REES                                51
Cause No. 3:18-cv-00995-JD-MGG

standards are you referring to?

A    The American Correctional Association standards.

Q    Okay.  What specifically did you do to ensure that policy, procedures, and training complied with the ACA standards?

A    Well, we put forth the mechanism and an effort to achieve accreditation by the American Correctional Association.  You start with the review of your policies and procedures, and you're rewriting and adding to them to meet the minimum level of compliance.

You develop practices that follow those procedures.  And then when you are -- think you're ready for an audit, you request one from the American Correctional Association.  They come, spend three or four days at your facility, depending on the size, and determine your compliance with those standards and come to a judgment of whether or not you should be accredited, a recommendation for accreditation.

And then you go before the Standards Commission, and they ultimately decide whether or not to accredit your particular facility or not.

JOHN D. REES                    52
Cause No. 3:18-cv-00995-JD-MGG

Q    Did you ever have your facility not accredited?

A    No.  I've been involved -- well, I -- let me preface that.  I've been involved in the accreditation process specifically and directly since a time in Oklahoma, and I've been a strong believer in the process and in the -- in the development of the standards.  You have to get your facility accredited.  So when you start out, it's not accredited.  But I'm very proud of the fact that I've been involved in the successful accreditation of numerous facilities over my career.

Q    When you say that you were involved in the "accreditation of numerous facilities," how were you involved?  Were you consulting with the facility or you were working at the facility?

A    Working at the facility or overseeing accreditation.  When I was in Oklahoma, I was deputy commissioner, and one of my responsibilities was the accreditation of facilities in that system.  During my particular time there, we were able to get, I believe it was, six or seven facilities accredited in a period of three to four years.

Q    Okay.  In that same period of three to four years, did you ever review a facility and find

JOHN D. REES                53
Cause No. 3:18-cv-00995-JD-MGG

that it did not meet the standards to be accredited and, therefore, give a report that it was not accredited?

A    You mean where I served as an auditor for the American --

Q    Yes.

A    Yes.  Yes, there are facilities that have failed accreditation audits or failed to meet the standards.  And if you fail to meet mandatory standards, you have to fix that before you can be accredited.  It's a process.

Q    Okay.  And are they -- I just want to make sure that I understand the process.

So if facilities are found to have failed or not to have met the standards, are they given an opportunity at that time to correct the issues and then thereby become accredited?

A    They're given an opportunity to correct or change a practice; but during the audit, no. There's a finding and then there's a presentation before the hearing later.  And then the commission will direct them to, you know -- we'll review you again in six months or we'll review you again in a year.

Q    Okay.  Understood.

JOHN D. REES                                                 54
Cause No. 3:18-cv-00995-JD-MGG

Is there any facility that -- I'm sorry.

The facility that you worked in as warden, was that just one facility or is that multiple facilities?  I can't quite tell.

A    I worked in multiple facilities --

Q    Okay.

A    -- as a warden.  Yes, I was a warden in the Kentucky State Reformatory.  I was a warden in South Central; Venus, Texas.  Facility administrator in Santa Fe, New Mexico; but that's just another word for a warden, a smaller facility.  And Louisiana.

Q    Okay.

A    All of those facilities were accredited.

Q    Did any of those facilities ever fail at the accreditation process?

A    Not -- not while I was there.

Q    Okay.

A    No.  I mean, the reformatory, the reformatory in Kentucky took a while.  It took about 18 months to get it accredited; but it was under a federal court order when I became the warden, and that was one of my -- one of the directions of both the federal judge and the governor at the time, is

JOHN D. REES                    55
Cause No. 3:18-cv-00995-JD-MGG

to get the facility accredited.

     Q    You say it took 18 months.  What do you mean by that?  What happened during that 18-month period?

     A    You have to develop the procedures, the policies, get staff to get the facility to a level that could be reviewed and be accredited.

          You have to -- it's not a total paper process.  You have to -- it's -- how can I say this? It is an organizational commitment and process for things working in all different areas in accordance to the standards.  So it took some time.

     Q    Okay.  Would it be fair to say that the facility was found to not meet the standards for accreditation, and so then you worked at the facility over a period of months to achieve accreditation?

     A    Would you repeat that?  Because you're breaking -- you're crackling up.

     Q    Sure.  So would it be fair to say that the facility had been found not to meet the standards for accreditation, and then you worked over a period of months to make sure that the facility became compliant with the standards?

     A    It hadn't been found to be in

JOHN D. REES                              56
Cause No. 3:18-cv-00995-JD-MGG

noncompliance with the standards; it just had never

participated in the program.

Q    Okay.  So while you were a warden --

strike that.

What types of fire safety policies

and procedures did you have in place at the

facilities that you worked at as warden to ensure

that the risk of fire was properly addressed?

A    We did get inspected periodically by the

state fire marshal's office.

You get inspected by your

departmental fire safety person, a person in charge.

You have a local -- at the

reformatory in LaGrange, at Winn Parish, and at

Venus, I had individuals that were responsible for

fire safety.  It's one -- fire safety was one of the

components of their particular responsibility.

And you make sure policies were

written in accordance with the standards.  You made

sure the training was in accordance with the

standards.  You managed that operationally.

Q    Okay.  So what types of policies did you

have in place at those facilities to address fire

safety?

A    I'm sorry.  That -- you have a fire safety

policy.  That's a policy that addresses everything from inspection of the cells for combustible -- or housing areas for combustible stuff that -- you had too much stuff around.  Do you have periodic fire drills?  Do you check your fire extinguishers?  Do you check your fire supression equipment, whether you have trucks or -- you know, whatever you have, your breathing equipment?

It's an overall management system of com-- that you use for fire safety.  You have -- if it's a sprinkled system, then you have a -- you have to have your sprinklers checked periodically by an outside contractor.  Repaired if the sprinklers get broke.

It's a wide range of situations, depending on the particular institution, the age of the institution, and the design of the institution.

Q   Okay.  Would you agree that it's important for prisons to have policies in place regarding what staff should do in the event of a fire?

A   Yes.

Q   Do you agree that it's important that prisons should have a --

A   I'm sorry?  I'm sorry?

MS. PIERCE:  Can everyone hear me okay?

THE REPORTER:  You're fading out a little bit.  If you could stay close to your mic, please.

MR. BLINN:  I can hear you okay, but yeah.

MS. PIERCE:  Thank you for letting me know.  I'm going to put in my headphones, and let's just see if that helps.

Is that better?  Can everyone hear me better?

THE REPORTER:  Yes, thank you.

MR. BLINN:  Yes.

MS. PIERCE:  Great.  If I get quiet again, please let me know, and I will make sure that I'm speaking loudly.

BY MS. PIERCE:

Q    Is it important -- would you agree that it's important for prisons to have in place training of all staff about what to do in the event of a fire at a facility?

A    Yes.

Q    Is it important for a facility to have regular fire drills?

A    Yes.

Q    Is it important for facilities to have fire drills that are carried out -- strike that.

JOHN D. REES                                59
Cause No. 3:18-cv-00995-JD-MGG

Let me --

What should normally occur during fire drills at prison facilities?

A    Depends on the facility.

Q    What do you mean by that?

A    Well, if it's an old dormitory facility in a minimum-security institution, the procedures will be different than it is in a maximum security where you have to empty a cellhouse.

Q    If you -- would you agree that it's important to have regular inspections of -- strike that.

You said that you made sure that inspections were being carried out at the facility. What types of inspections did you ensure were carried out?

A    By staff that were responsible for fire safety.

Q    You said, looking at your resume, that facility administrator is essentially a warden of that facility; correct?

A    That's correct.

Q    And then a department director from Program Services, is that also like a warden?

A    No.  That's a Central Office position.  A

**JOHN D. REES**                    60
**Cause No. 3:18-cv-00995-JD-MGG**

direct report to the director of corrections,

responsible -- responsible for a broad range of

activities; from medical services, inmate

classification and place-- and offender placement;

the accreditation process; prison industries; and

the farms and records, I believe.

Q    Okay.  And then your assistant deputy

director of institutions at the Oaklahoma Department

of Corrections, what were your responsibilities

there?

A    I was responsible -- well, directly

responsible for offender classification and

served -- assists the director in dealing with the

federal court order, planning and, you know

preparation, budget preparation for the division

institutions and the accreditation process.

Q    Okay.  Fair to say you didn't have any

responsibility for fire safety in that position?

A    Not really.  Not really.  Other than being

over accreditation, and accreditation -- a key

component of accreditation was fire safety.

Q    And then you were executive assistant or

commissioner at the Kentucky Bureau of Corrections.

What were your responsibilities there?

A    I was responsible for overseeing special

JOHN D. REES                                    61
Cause No. 3:18-cv-00995-JD-MGG

institutions, which were minimum-custody institutions; but I worked in all areas that the commissioner wanted me to within the system.

I -- I interacted with the governor's office and legislature during legislative sessions and, I guess, basically, that was the general overseeing of issues that the commissioner felt were his top concerns and programs that he wanted pushed, if you will.

Q    Okay.  And then what were your responsibilities as the director -- or division of --

A    Development --

Q    Director/Division of --

A    Development --

Q    I'm sorry.

A    Development of institutions.  This -- the department was -- that was a period of time when the department was growing and developing minimum-custody facilities to move individuals from secure institutions into more therapeutic treatment-oriented facilities that were smaller and minimum custody.

Q    And I -- again, I just want to -- I know I'm a little slow at getting questions out, but just

make sure I get the question out for the record.

So this was -- the position that you were just discussing was the Director/Division of Special Institutions; correct?

A    Yes, that's correct.

Q    At any point in your career did you work as a correctional officer at a corrections institution?

A    I was a lieutenant at the reformatory.  I started off as a caseworker and got promoted from there to -- or -- wasn't really a promotion.  It was a change of responsibility.  I became training officer.  And we were putting in additional training and starting things up, and so I was classified as a lieutenant within the correctional status.

I worked as a -- no, I didn't "work as."  When I worked for the Bureau of Prisons in my assistantship between my junior and senior year at University of Kentucky, I went through the correctional officer training with the bureau, but I served as a classification and treatment officer.

Q    So it would be fair to say that you never worked as a custody officer, you know, whether as a higher ranking --

A    No, I never worked as a Level 1 custody

officer specifically, no.

Q   Okay.  And you never worked in -- in custody itself; correct?

A   No, no.  When you're -- you know, everybody that works in a prison is involved in custody at some point in time.  I mean, you all have security responsibilities.  All positions do. The -- you know, and there's supervisory personnel over all custody staff.  Obviously, I'm involved in the custody operations.

Q   Okay.  Understood.

At any point while you -- at any point in your career, have you ever actually responded to a fire that occurred in a correctional facility?

A   Yes.  Numerous times.

Q   When was that?

A   The reformatory, at various times during my career there.

In Oklahoma, responded to -- as a supervisory administrator, to a fire after it had taken place, but I had to prepare a report on it.

And as a warden, you respond to fires at different times when they happen.

Q   Were you ever involved in putting out a

JOHN D. REES                      64
Cause No. 3:18-cv-00995-JD-MGG

fire at a correctional facility?

A    I think I've used a fire extinguisher on occasion.  And I can remember one massive fire that was caused by the training staff at the firing range, and I was involved in that, putting that out.  There have been occasions.  Do I remember every one?  No, I don't.

Q    Okay.  And here you have a list of your publications; is that correct?

A    Yes.

Q    On Page 3 -- Page 4 of your resume.

A    Yes, ma'am.

Q    Is this list of publications up to date?

A    I think so.

Q    Okay.

A    Can you go down to Page 4?

Q    Sure.

A    What's the last one there?

Q    "Getting Smart on Crime Means" --

A    Yeah, I think that is.  There may be one -- something new that isn't in there, but I don't think so.  I've got a couple of things that are -- that I'm working on now; but no, that's up to date.

Q    Do any of these publications deal with

JOHN D. REES                    65
Cause No. 3:18-cv-00995-JD-MGG

fire safety or fire response in the Correctional setting?

A    Not that I -- not specifically.  I think there was a couple -- no, not really fire safety.  Accreditation process, yes.  Controlling chemicals, yes.  But that's more of a safe -- that was more of a safety than a fire situation.  But, you know, you have to control -- one of the main standards is controlling toxic and flammable materials.  That one article -- but that dealt with controlling cleaning chemicals, which needs to be done.

Q    Okay.  Which one of these publications or -- which of these publications deal with the accreditation process?  I'll start with just Page 3 up there.

A    Well, jail -- where is it --

Q    I can move to Page 4 when you're ready.

A    Yeah.  Can you move down?

Q    Sure.

A    No.  I saw there was one -- there was one -- go back up a page.

Q    (Counsel complying).

A    Slow.  "Juvenile and Adult Jail Standards, a Hybrid Approach" was specifically about accreditation standards.

JOHN D. REES                                66
Cause No. 3:18-cv-00995-JD-MGG

Q    Any other of your publications that dealt with accreditations standards or the accreditation process?

A    No, not that I -- not -- possibly the "Problems in Classification as Related to Court Ordered Population Reductions."

Q    And then here, your Professional Memberships, you note that you were the certified corrections executive for the Clean and Green Committee.  Is that correct?

A    No.  I'm a certified correctional executive with the American Correctional Association, and I'm a member of the Institutions Commission and the Clean and Green Committee.

Q    Gotcha.  Okay.  Thank you for clarifying.

So what is the process for being certified as a corrections executive?

A    Well, you have to read and study a list of documents, and then you take a test.  And if you pass that, plus your years of experience and your, you know, education, then they'll certify you.

Q    When were you first certified as a corrections executive?

A    I think -- I think in probably 2000, 2001, sometime around there.

JOHN D. REES                    67
Cause No. 3:18-cv-00995-JD-MGG

Q    And once you're certified, do you remain certified, or is there something you have to do to keep it up?

A    It depends.  I only had to take a test twice, I believe, every three or four years; and then I got, you know, retirement certification.

Q    Okay.

A    So I'm --

Q    So if you're not retired, you have to take the test every few years?

A    Yeah.  If you're actively working in the field, I think it's every three or four years you're tested.  But there's also a process that you start at one level and move up different levels.  This is the highest level.  When they -- and they were just bringing this out around 2000, and I started off at the high level.

Q    About when was the last time that you took the test?

A    In 2003, I think, or 2004, somewhere around there.

Q    Okay.  And with retired status, is there anything that you have to do to keep up?  Any, you know, continued education that's required or anything like that?

A    Not really, no.

Q    And then on Page 4 and -- no, just Page 4, you have a list the of specialized training.  Is this a complete list of the specialized training that you received?

A    Probably no, it's not; but it's the most significant specialized training.

Q    What training have you received since 2009?

A    Other than attendance at the Associations of State Corrections administrator training, trainings on an annual basis in that organization; attendance at professional conferences; and participation in those -- in those conferences would be the training that I received.

Q    Is there any training that's not listed in this report that you relied on to form your opinions in this case?

A    Not really, no.

Q    Did any of these training here deal with fire safety and fire response?

A    Well, the American Correctional Association auditor training, both the initial training and then the annual training that took place after that, specific-- would have addressed

JOHN D. REES                  69
Cause No. 3:18-cv-00995-JD-MGG

fire safety issues.  Other than that -- well, the ICE training for inspections dealt with both their standards and ACA standards dealing -- and fire safety is a component of that, also.

Q    What must -- you said the auditor training had annual -- was an annual thing.  How many times did you take that annual training?

A    I'm almost -- I guess I attended -- I've attended American Correctional Association, probably 95 percent of their annual meetings, and they have two a year.  So I'm -- I quit doing audits probably in about the late '90s.  Probably quit going to annual training, auditor training, in probably right around -- around '98, '99.  I was getting -- you know, then the 2009 training, I went back and did that to do the ICE --

THE REPORTER:  "To do the?"  I'm sorry. You went back "to do the?"

THE WITNESS:  ICE training, the specialized immigration and -- they have a specialized training program you have to complete to be able to inspect their facilities.

THE REPORTER:  Thank you.

JOHN D. REES                                    70
Cause No. 3:18-cv-00995-JD-MGG

BY MS. PIERCE:

Q    You also mentioned ACA meetings.  When was the last time you an attended ACA meeting?

A    The last one that was held in person was in January of 2020 in San Diego.  I was there.  They held a couple of virtual meetings since then.  I'm planning on attending in person in August, early August, in Nashville.

Q    What occurs at these ACA meetings?

A    Training, social interaction between professionals, workshops, certifications, testing, keynote speakers.

Q    How long do these ACA meetings last?

A    Generally, they start on Thursday or Friday and end on Monday or Tuesday.  Well, I shouldn't say -- the correctional leaders -- the Commissioners Association starts on Thursday and ends on Sunday.  And that coincides with the ACA meetings that start on Friday and end on Tuesday.  But that was pre-pandemic.  I think this one's a little shorter than that.  Ends on Sunday.

Q    Okay.  So the next page, Page 5 of your CV, identifies teaching and consulting assignments.  When was the last time that you -- strike that.

Some of these are things that we

BOSS REPORTERS
(219) 769-9090

already discussed earlier in relation to your work as a consultant; correct?

A    That's correct.

Q    When was the last time that you engaged in any teaching assignments?

A    Just as being invited by professors to attend a class or lead a class in the last, probably, ten years, two or three times.  I've not taught full or part time since probably the late '80s.

Q    Okay.  So since the late '80s, you've just taught a class here or there when a professor requested it?

A    Yeah.

MS. PIERCE:  Okay.  I think we've been going for about two hours, so I think now would be a good time to take a break.  Let's take a ten-minute break and come back around 12:05.

MR. BLINN:  Works for me.

THE WITNESS:  See you in ten minutes.

(A brief recess was taken from 11:56 to 12:05.)

MS. PIERCE:  Looks like the recording was just restarted after the break.

JOHN D. REES                    72
Cause No. 3:18-cv-00995-JD-MGG

BY MS. PIERCE:

Q    Okay.  Mr. Rees, before the break, we were talking about your previous work experience.

Have you ever worked at a facility with a prisoner fire department before?  Have you ever worked at a facility that had a prisoner fire department before?

MR. BLINN:  John, I think you're on mute still.

THE WITNESS:  Sorry about that.  Yes, I have.  Yes, I have worked.

BY MS. PIERCE:

Q    What facilities?

A    The Kentucky State Reformatory.

Q    Okay.  And that had its own prisoner-run fire department?

A    That is correct.

Q    Okay.  Any other facility?

A    I'm trying -- I think we had one at Winn. We didn't have one in -- at Tennessee.  Santa Fe, no.  For sure the reformatory's was the biggest.  I think Winn Parish also had one.

Q    Okay.  I'm going to pull back Exhibit 1, and I'll start on Page 6 of the pdf, which is your expert report.

JOHN D. REES                73
Cause No. 3:18-cv-00995-JD-MGG

A    All right.

Q    Do you recognize this document?

A    I do.

Q    What is this document?

A    It is my report in regard to this case.

Q    Okay.  What was your methodology for writing this report?

A    I don't know that I have a mythology of writing a report.  I read the documents, become familiar with the case, write a report which describes the case or the main items of concern, and then I render an opinion.

Q    Okay.  And how did you determine which documents to review?

A    The -- Mr. Blinn sent them to me or his -- Tiffany probably sent some.

Q    Okay.  And how did you reach the conclusions that you reached?

A    Well, I have a long history and career in correctional administration, and I've been successful in that career.  And I looked at the situation as described in the various reports and came up with my opinion.

Q    Did you speak with anyone other than Mr. Blinn to gather any information to prepare your

JOHN D. REES                        74
Cause No. 3:18-cv-00995-JD-MGG

report?

A    Yes.

Q    Who did you speak with?

A    The Central Office accreditation manager for the Department of Corrections, Indiana Department of Corrections.

Q    And who was that?

A    I don't have the gentleman's name.  I can look it up.

Q    Did you speak with anyone else besides the Central Office accreditation manager?

A    No.  I texted the deputy commissioner and asked who it was, and he had that individual give me a call.

Q    You mean the deputy commissioner at the Indiana Department of Corrections?

A    That is correct.

Q    Did you have any other conversations with the deputy commissioner about this case beyond asking for the identification of the Central Office accreditation manager?

A    No.

Q    What conversations did you have with the Central Office accreditation manager?

A    I just wanted the -- any information he

had on the information of accreditation at the Indiana State Penitentiary in Michigan City and any issues over fire safety standards and then just the basic accreditation history of that facility.

Q   How did you speak with him?  Did you speak with him over the phone, via email?

A   I talked with him over the phone initially.

Q   Did you have his personal cell phone number?

A   I have no idea, ma'am.

Q   Who did you get his phone number from?

A   He called me, as I recall.  He got my number from the deputy commissioner.

Q   And how did you get the deputy commissioner's phone number?

A   I've had it for a long time.

Q   So how do you know the deputy commissioner?

A   We worked in different state departments of corrections at different times.  I've worked, as I've previously told you, within the Department of Corrections consulting, and I know many of the executive staff within the Indiana Department of Corrections.

JOHN D. REES                                76
Cause No. 3:18-cv-00995-JD-MGG

Q    Do you consider the deputy commissioner a friend?

A    Yes.  Yes, I consider all -- I consider people I know professionally as friends.

Q    Do you spend time with the deputy commissioner socially?

A    I have spent time with him socially at meetings and training sessions within the correctional community.

Q    Have you spent time with him outside of work settings?

A    No.

Q    How often do you communicate with the deputy commissioner?

A    When there's a need.  I don't -- I don't communicate with him regularly or on a specific -- we don't have a close, involved friendship.  We're professional friends who know each other.

Q    How many conversations did you have with the Central Office accreditation manager?

A    One.

Q    How long was that conversation?

A    I have no remembrance of how long it was.

Q    Say more than an hour?  Less than an hour?

A    Way less than an hour.  I asked him for

JOHN D. REES                77
Cause No. 3:18-cv-00995-JD-MGG

some information.  He said he would get it to me, and he did.

Q    Did he provide any information to you orally over the phone, or did he only provide you information in writing?

A    I'm sure we talked about what he was going to send me in the email, but -- and I'm sure it was regarding the information I was requesting; but do I remember the specifics of it?  No, I don't.

Sorry about that.  (Witness shutting a door).

Q    One second.  I'm going to pull up a document.  Okay.  I'm going to share with you what I'll mark as Exhibit 2.

(Exhibit No. 2 marked for identification.)

BY MS. PIERCE:

Q    So this is a Bates stamped, for the record, Expert Subpoena 688.  It's a one-page pdf. It's sent from you to Tiffany.  Take a second to review this email.

A    (Witness complying).  Yes.

Q    Is this the communication that you were referring to?

A    Yes.

JOHN D. REES                78
Cause No. 3:18-cv-00995-JD-MGG

Q    Okay.  So Andy Dunigan is the Central Office accreditation manager that you mentioned?

A    Yes.

Q    Is there any other conversations that you had with Mr. Dunigan besides this email?

A    We had one phone conversation.

Q    Any other emails?

A    No.

Q    Anything else that you recall from that phone conversation that we haven't discussed?

A    No.

Q    Did you ask him for any other information besides the accreditation documents?

A    No.

Q    You mentioned previously that you had asked him about issues over fire safety standards?

A    I'm sorry?

Q    I think you mentioned earlier that you'd asked him about issues over fire safety standards?

A    No, ma'am.  I asked him about the accreditation history of Michigan State Penitentiary at -- the state penitentiary in Michigan City, and I asked him had there ever been any issues with regard to accreditation where -- with fire safety.  And he

said no, there weren't.

Q    Okay.  And then did you ask for any documentation related to that information?

A    And that's what this response is.

Q    Okay.  And what did Mr. Dunigan send you?

A    There was an attachment, some information -- the history of their accreditation, some information about when the Indiana Department of Corrections received acknowledgment of all of their facilities being accredited within the department.

Q    So it says that, "Attached is the information you requested."  Can you describe the attachment that was provided?

A    No, I -- not without being able to open up the attachment.  You have the attachment, do you not?

Q    Do you recall all of the information that was included in the attachment?

A    No, ma'am.

Q    Do you recall any of the information that was included in the attachment?

A    Yes ma'am.  Yes, ma'am.

Q    Okay.  And it was just one single document that was attached?

JOHN D. REES                    80
Cause No. 3:18-cv-00995-JD-MGG

A    I believe so.  Yes, ma'am.

MR. BLINN:  Object to form.

BY MS. PIERCE:

Q    You didn't receive anything else from Mr. Dunigan?

A    Ma'am, I don't remember what I received from him.  I received the email.  I know there was a -- there was a document that talked about them receiving accreditation of all of their facilities.  And I believe there was discussion that there had been no fire safety issues on any of the current or previous Michigan City audits from the ACA auditors.  But do I remember all the details of that particular document?  No, ma'am, I don't.

Q    I just want to make sure I understand.

You're saying there was a discussion about whether or not there had been fire safety issues and the --

A    I believe --

Q    Please wait till I finish my question, Mr. Rees.

You said there was a discussion about whether or not there had been issues related to the fire and safety standards during the accreditation process.  Was that written in documents that you

JOHN D. REES                                     81
Cause No. 3:18-cv-00995-JD-MGG

received, or was this an oral discussion that you had?

A    I don't recall whether it was oral or written.  It may have been both.

Q    Okay.  And was this written information provided by Andy Dunigan that he himself wrote, or was it reports or document that he sent to you?

A    I do not recall.

Q    Are there any other emails that you received from Mr. Dunigan beyond this one here?

A    I do not believe so.

Q    Did you look for other emails provided by Mr. Dunigan in your email?

A    I did.

Q    All right.  And this is the only one that you provided to your attorneys?

A    Yes.

Q    I'll represent to you that from our review of the subpoena response, it appears that there are five ACA reports and one additional two-page document discussing the Eagle award.  Do you have any reason to dispute that that's the information that you received?

A    No.

Q    Do you recall receiving any other

documents besides those?

A    No.

Q    I'm going to return to Exhibit 1.

So this is, again, your expert report and attachments that were provided.  I'm going to go to Page 10 of the pdf document that's titled, "Documents Reviewed for the Following Case," and it lists the case name of this case.  Is that correct?

A    Yes.

Q    What is this list here that is up on the screen?

A    What is it?

Q    Yes.

A    It is the documents that I looked at in preparation of putting together the report.

Q    Did you prepare this list?

A    I did.

Q    Okay.

A    I copied some of it, but then I prepared some of it.

Q    When you say you copied some of it, what did you copy it from?

A    Oh, a memo or an email from Tiffany, I believe, saying what she sent me.

Q    Okay.

JOHN D. REES                    83
Cause No. 3:18-cv-00995-JD-MGG

A    But I typed it.

Q    Okay.  So let's -- did you review this list to ensure that it was a complete recitation of all of the documents that you reviewed?

A    I believe so.

Q    Okay.  No. 1 is the Internal Affairs investigation of the fire in Mr. Devine's cell. This refers to the Internal Affairs report; correct?

A    Yes.

Q    Does it encompass anything else beyond the Internal Affairs report?

A    Ma'am, I don't recall.  I mean, I looked at the Internal Affairs investigation report of the fire.

Q    Okay.  And I'm just asking, this refers -- this No. 1 refers to the report itself; correct?

A    That is correct.

Q    Okay.  Then Item 3 here, "Various statements of officers assigned to B cellhouse on the evening of April 7, 2017, as well as the video recordings of the interview by the Internal Affairs staff."

Which officers did you review written statements for?

A    I believe I reviewed everything -- all

three officers' statements, plus there were other officers that responded to the event. So the three officers that were assigned to the cellhouse and then the various officers -- I think there were four our five, maybe less than that -- that were directly involved in the response.

Q    Okay. So that -- the three officers in the cellhouse would have been Blakely, Abbassi, and Rodriguez; correct?

A    That's correct.

Q    And who were the other officers that responded, that you reviewed their report?

A    There were -- lieutenant and then the two officers -- there were a couple of lieutenants, I believe. And then there was another officer who responded to the fire that was directly involved in that response. I don't recall his name.

Q    Okay. Did you look at a statement from Lieutenant Watson?

A    Does it say that I looked at a statement from Lieutenant Watson on the list?

Q    It says, "Various statements."

A    Probably, yes. I know I read his deposition. It's listed down as Item No. 15.

Q    And I appreciate that clarification. I'm

JOHN D. REES                                    85
Cause No. 3:18-cv-00995-JD-MGG

just asking about the statement right now.

A    If it -- I didn't list every single individual statement.  I reviewed numerous statements of officers and supervisors that were a part of the materials that were sent to me.

Q    Okay.  When you said you looked at video recordings of the interviews, which video recordings did you look at?

A    The various people who were doing the investigate-- the -- primarily, I think, there was one investigator -- there may have been two, but they interviewed different staff and inmates, and they were video-recorded.  And I listened to them, watched them.

Q    Did you watch the individual recording of the interviews of staff and prisoners?

A    Yes.

Q    Did you read any written statements from any prisoners?

A    Yes.

Q    From which prisoners?

A    I don't recall.  The ones who were involved.  The firemen -- they were primarily the firearm.  I believe that there were statements from one or two inmates that were in-- adjacent or nearby

**JOHN D. REES**                86
**Cause No. 3:18-cv-00995-JD-MGG**

cells of the deceased.

Q    Okay.  So I just want to make sure I understand.

So you reviewed written statements from prisoners who were in nearby cells?

A    I said I believe it was one or two inmates from nearby cells.  Then there were also statements prepared by the inmate fireman.

Q    Okay.  And you reviewed written statements prepared by prisoner firemen?

A    Yes.

Q    Okay.  About how many video interviews did you review?

A    How many minutes of video?

Q    How many video interviews total did you review?

A    I don't remember the exact number.

Q    Less than ten?  More than ten?

A    Around ten maybe.  Ten's probably a good number; 10 or 12, 15.

Q    When did you review the -- this information that was sent to you?

A    When it was sent.  It was sent -- as I recall, Mr. Blinn contacted me early this year, and I did it -- reviewed the material January, February,

March of this year.

MS. PIERCE:  Okay.  I'm going to pull up a different document that I'll mark as Exhibit 3.

(Exhibit No. 3 marked for identification.)

MS. PIERCE:  Okay.  This document has been marked as "Confidential."  I'm just going to -- whoops.  Let me do that it again.  Sorry.  I'm just going to note that for the record.

So this here is a 97-page document, Bates labeled, "Devine 133."

MR. BLINN:  Can I just jump in and ask the court reporter to just label these pages confidential, please?

THE REPORTER:  Certainly.

BY MS. PIERCE:

Q    And then Devine -- I think it's the last page, 133808.

So I'm just going to kind of move a little bit slowly through this document, Mr. Rees, if you could just kind of skim over it.

Does this appear familiar, as a document that you were provided with and you reviewed as part of this litigation?

A    I believe so.

JOHN D. REES                       88
Cause No. 3:18-cv-00995-JD-MGG

Q    This 97-page document?

A    I believe so.

Q    How were materials provided to you for review in this case?

A    Some were emailed, some were sent in a jump drive, some were sent on CD.

Q    Okay.  And all of those came from the attorneys for the Defendants in this case; correct?

A    Yes.

Q    Okay.  I'm going to go back to Exhibit 1 which is the list of documents you reviewed.  So I just want to go back to No. 1 again because it's -- it's important that we understand.  I only have one period to question you about your reports, so it's important I understand what your report is based on.  You understand?

A    Yes.

Q    I want to go back to No. 1, the internal affairs investigation of the fire.  Is there anything else that this refers to other than the 97-page report that I just showed you?

A    I don't believe so, ma'am.

Q    Okay.  And the various statements of officers and the video recordings of the interviews, did that refer to anything besides the statements

JOHN D. REES                          89
Cause No. 3:18-cv-00995-JD-MGG

that were contained in that 97 report -- page report
and the videos of the interviews by investigators?

A    I don't believe there -- I believe that
they're all -- they may be the same or they may be
duplicate copies of what was in that report.

Q    So the written statements that you
received were short, one-page or one-paragraph
statements from the various officers and supervisors
who responded to the fire; correct?

A    Yes.

Q    Anything else that you're referring to
there?

A    No.

Q    Okay.  So the video recordings, again,
you're only referring to the interviews done by
Internal Affairs staff of prisoners and staff
members who were present during the fire; is that
correct?

A    At that -- that's what that particular
statement refers to, yes, No. 3.

Q    Okay.  Is there anything else that you
reviewed that's encompassed in Item 3 here that we
haven't discussed?

A    No.

Q    No. 4 is various statements of supervisory

JOHN D. REES                 90
Cause No. 3:18-cv-00995-JD-MGG

staff and others who responded to the emergency in B

cellhouse on the evening of April 7, 2017.  So again

that statement is from individuals who responded or

were present at the fire; correct?

     A    Yes.

     Q    Okay.  Again, that refers to a short

paragraph or one-page statements about what happened

and the response to the fire; correct?

     A    Yes.

     Q    Does this No. 4 encompass anything other

than that?

     A    No.

     Q    Okay.  And then No. 5, Various reports

concerning the American Correction Association

accreditation of the Indiana State Prison.  That

refers to the five pages -- five reports and six

documents that we just discussed that was vent to

you by Mr. Dunigan correct?

     A    That and there may have been other reports

that were sent to me initially on accreditation.

     Q    By whom?

     A    By Miss Tiffany.  What's Tiffany's last

name?

     Q    I don't know.

               How many reports on accreditation did

you review?

A    I don't know.  That's why I -- that's why there -- there were several.

Q    More than five.  Less than five?

A    Ma'am, I don't know.  I didn't count them.

Q    Did you take any notes on your reviews of the accreditation reports?

A    Not really.  In my head, maybe.

Q    Did you take any written notes relating to any documents that you reviewed?

A    Yes.

Q    How long did you spend reviewing the ACA accreditation reports?

A    Ma'am, I don't recall.  They were a part of a review of multiple documents.

Q    About how much time did you spend reviewing documents for your report?

A    Numerous hours.

Q    Have you billed defendants for your hours in this case?

A    Not yet.

Q    Do you keep track of the hours that you've billed?

A    Yes.

Q    Would you say you've spent more than 50

**JOHN D. REES**                                92
**Cause No. 3:18-cv-00995-JD-MGG**

hours or less than 50 hours reviewing documents in this case?

    A   I never thought you'd ask about hours. Hold on a minute.

          About forty hours.  I believe

    Q   Forty hours reviewing documents or forty hours working on this case in total?

    A   Forty hours -- I believe it's forty -- I -- it's forty hours working on the case in total. I don't know document review hours.

    Q   Okay.  So as you sit here today, is there anything that you're relying on to support your opinions in this case encompassed by Item No. 5 here other than the documents that were sent in the email by Mr. Dunigan?

    A   No.

    Q   Okay.  No. 6, Various policies and procedures from the Indiana State Prison.  What is encompassed by this number?

    A   They sent me various policies relating to fire safety and inspections, I believe.  There were -- in the packet of information, there were policies and procedures.

    Q   Okay.  So these were written policies of both Indiana State Prison and Indiana Department of

Corrections or just --

A     Yes, I believe they were stuff from both, headquarters and the facility.

Q     And these were formal policies with policy numbers and titles up at the top?

A     Yes.

Q     Anything else besides those formal policy documents that you're referring to here?

A     No.

Q     About how many policies did you review?

A     I don't recall.

Q     So in report you list several depositions, the specific depositions that you reviewed.  Did you review any other depositions beyond the ones identified here?

A     No, ma'am.

Q     Okay.  And I just want to touch back on Item 6, the policies and procedures.  I just want to understand what you reviewed.

            What do you recall about the policies and procedures that you reviewed beyond what we already discussed?

A     Nothing other than that they were official policies and procedures of the Indiana State Penitentiary at Michigan City or the

Department of Corrections in Indianapolis.  I didn't pick which ones got sent to me, but they were all relevant to the emergency or to the fire safety issue.  They were relevant to the event.

Q    Okay.  What were some of the topics or titles of the policies and --

A    I don't recall the topics.  They were relevant to the event.

Q    How do you know they were relevant to the event if you don't recall the topics?

A    Well, when I reviewed the documents, I reviewed them in relation to the event that they were sent -- they dealt with fire safety.  I don't recall specifics of what they -- what they were about, but they -- I didn't see anything in the policies and procedures that were sent that were not relevant to the event.

Q    Okay.  So let's see.  So 8 through 16 is the depositions that you reviewed and that's a complete list of the depositions you reviewed; correct?

A    I believe.

Q    Okay.  And then Item 17, the security camera video of April 7, 2017.  That's the video from inside the cellhouse showing the fire and their

JOHN D. REES                95
Cause No. 3:18-cv-00995-JD-MGG

response; correct?

A    That is correct.

Q    And there's no sound on that video; correct?

A    There's no sound on that video, correct.

Q    And then, sorry, earlier I said that 8 through 16 were the number of depositions you reviewed, but it's also 18, 19, 20, 21, and 22; correct?

A    That is correct.

Q    Okay.  And any other documents that you recall reviewing that are not included here?

A    No, ma'am.

Q    You understand that this list of documents you reviewed and relied on is important; correct?

A    Yes.

Q    And you created the list?

A    Yes.

Q    You were careful when you created the list?

A    Yes.

Q    Do you have any reason to believe that this list is not complete?

A    No.

Q    Okay.  When you reviewed depositions, did

you read the depositions in their entirety?

A   Yes, I -- I would say I did.  Did I read them word for word or did I scan -- did I read them fast in some cases?  Yes.  But I read them page for page.

Q   Okay.  All right.  I am going to stop sharing that document and share what I'll mark with you -- I'm sorry, what I'll mark as Exhibit 49 -- I'm sorry.  What I will mark as Exhibit 4, which is Expert Subpoena 49.

(Exhibit No. 4 marked for identification.)

BY MS. PIERCE:

Q   Okay.  So this is -- Exhibit 4, Expert Subpoena 49 to Expert Subpoena 50.  And this is an email from Tiffany Orner on March 1st, 2021; correct?

A   Yes.

Q   Okay.  Was she saying that she's sending you a final deposition that you requested; correct?

A   Yes.  I don't know that I requested it, but that's okay.  Yeah.

Q   Okay.  So she sent you some depositions; correct?

A   Yes.  Yes, she did send them.

JOHN D. REES                97
Cause No. 3:18-cv-00995-JD-MGG

Q    I'm going to go down -- that was a response to, looks like, an email from you on February 26 that identify depositions that were on the expert's list.  And there's nine depositions there.  And you reviewed these first five, the deposition of Mr. Neal, Mr. Redden, Mr. Gann, Mr. Nowatzke, and Mr. Beal; correct?

A    Yes.

Q    Is there a reason that you did not review the -- wait, one second.  I'm just going to -- I'm sorry.

You did not review the deposition of Mr. Nowatzke; correct?

A    I don't believe I did, but I -- I'd have to look at his deposition.

Q    Well, this deposition was not included on your list of documents you reviewed; correct?

A    Okay.  Yeah, the list I submitted were the ones that I know that I reviewed.

Q    Okay.  So you reviewed then just Neal, Redden, Gann, and Beal, according to your list.

A    I believe so, yes.

Q    Okay.  And you saw that plaintiff's expert, Mr. Farr (phonetic), reviewed all of these depositions here; correct?

JOHN D. REES                98
Cause No. 3:18-cv-00995-JD-MGG

A    I don't know what he reviewed.  I remember reading what he reviewed, but I don't recall specifically.

Q    Okay.  Well, your email here says the depositions that were on the expert's list are all these, so you understood that these documents were the documents that he relied on -- some of the documents --

A    Yes, yes.  Okay.  Yes.

Q    So these last four here; 6, 7, 8 and 9, did you know that these last four depositions are sworn testimony from prisoners who were in B cellhouse at the time of the fire?

A    I may have remembered their names, but no, I -- I didn't.  I don't.  You know.

Q    Okay.  So you wrote down here, "I don't think I need them," referring to these depositions, "unless you think there is something critical in these depositions that I need to be aware of."

How did you determine that you didn't need to review them?

A    Well, I'd already reviewed other inmate depositions.  I reviewed staff depositions.  I reviewed the film from the security camera video. And I felt I had a pretty comprehensive view of the

JOHN D. REES                            99
Cause No. 3:18-cv-00995-JD-MGG

particular incident.

Q    Okay.  Did you review deposition testimony, sworn deposition testimony, from any prisoners who were not prisoner firefighters?

A    I'm not sure.  I know I reviewed statements from a couple of offenders, and I reviewed video interviews with them.  Depositions, I'm not sure of.  The depositions that were listed -- that are listed on my page that are offenders, were they all firemen?

Q    I'll pull that back up.

So here, looking at --

A    Yeah, they're firemen.

Q    -- Exhibit 1, these are lists -- depositions are listed of inmate firemen, and there are four that are listed here.  There are no other depositions identified of any other prisoners; is that correct?

A    Yes.

Q    Okay.  Let's take a quick two-minute break.

(A brief recess was taken from 12:51 to 12:55.)

MR. BLINN:  Okay.

MS. PIERCE:  Back on at 12:55.

JOHN D. REES                                    100
Cause No. 3:18-cv-00995-JD-MGG

BY MS. PIERCE:

Q    Thank you.  I'm ready to go back on the record.  So let's go to Exhibit No. 4, the email that you sent on February 26.  So I just want to -- I just want to make sure that I understand.

So on February 26th when you sent this email, you had not received any of these nine depositions; correct?  Or you had not reviewed any of those nine depositions; correct?

A    I believe that is correct, yes.

Q    And you did not know at the time that these individuals; Mr. Miller, Mr. Griffin, Mr. Johnfauno, and Mr. Hall, were prisoners in B cellhouse for the duration of the fire; correct?

A    I don't believe I did.  I may have.

Q    Okay.  And by their own testimony, the prisoner firefighters arrived at the fire well after the fire had started; correct?

A    I wouldn't say, "well after."  They respond-- the fire was being responded to by the time they got there, yes.

Q    Okay.  So there had already been numerous things that had occurred in B cellhouse related to the fire before the prisoner firefighters arrived; correct?

JOHN D. REES                             101
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    Okay.  And these four individuals here, I'll represent to you, were prisoners in B cellhouse that were there for the duration of the fire.

How did you determine -- you determined that you did not need to review their sworn testimony; correct?

A    Well, you see what my response was.  "I don't think I need them unless you think there's something critical in these depositions that I need to be aware of."

Obviously, that indicates that Tiffany and I had a conversation, telephone conversation, regarding these -- this email.

Q    And I'm --

MR. BLINN:  I'm going to jump in.  Can you scroll up?  Because I think I was copied on that email.

THE WITNESS:  Okay.

MR. BLINN:  Oh, no, the email was to me. So just for the record, I think it probably wasn't Tiffany.

THE WITNESS:  Okay.  All right.  It was to you.  I apologize.

MS. PIERCE:  I'll just ask you, Mr. Blinn,

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                        102
Cause No. 3:18-cv-00995-JD-MGG

not to testify.

MR. BLINN:  No.  I understand.  I just wanted the record to be clear because I think that the document was not visible to the witness, and he was speaking -- I'm not -- carry on.  I think the witness was misunderstanding a document that he couldn't see all of.  That's all.

BY MS. PIERCE:

Q    Okay.  So Mr. Rees, so what about this -- do you recall having any conversations either with Tiffany or Mr. Blinn about whether or not you needed to review these documents?

A    I don't recall, but I was relying -- as the email says, I was relying on Mr. Blinn's advice regarding what he felt I needed to see.

Q    You also said, "I don't think I need to review them."  What is that decision that you personally did not need to review them based on?

A    I felt that I had a complete understanding of the event.

Q    Okay.

A    And certainly, enough information to make my opinion, develop an opinion, reach an opinion.

Q    So I just want to make sure I understand.

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                    103
Cause No. 3:18-cv-00995-JD-MGG

So was it -- so was it your decision not to review the sworn testimony from the prisoners who were in B cellhouse for the duration of the fire, or was it counsel for the defendants decision?

A    I believe it was -- if you look at my question and the fact that I didn't get them, I believe it was his decision.

Q    Okay.  Does it concern you that you didn't review the sworn testimony from any prisoner firefighters who were in B cellhouse for the duration of the fire?

A    No, it doesn't.

Q    Why not?

A    I believe I -- in the -- in plaintiff's expert's report, he talks about statements and/or -- it may have been depositions of these individuals, and what their testimony was.  I did not think that they would have anything in their deposition that would change my report.

Q    Did you consider the statements that were referred to in plaintiff's expert report by these prisoners who were in B cellhouse?

A    I don't know whether I considered specifically, but I do know -- I did read his report, and in it he refers to statements by

JOHN D. REES                                    104
Cause No. 3:18-cv-00995-JD-MGG

offenders.

Q    Okay.  I just want to understand why did you believe that there was no information in their testimony that would call for the opinions in your report?

A    I just didn't believe it.

Q    I'd like to understand why.

A    Because I felt I had a comprehensive view of what had happened that night and didn't think that they would have had information that wouldn't have been presented that would have changed anything about my opinion.

Q    Is understanding the testimony of prisoners who were in B cellhouse on the night of the fire for the duration of the fire important to getting a comprehensive view of what happened during the fire?

A    I believe I had that information already from your expert's report.

Q    Okay.  So you believe that you received and considered information from these prisoners from the plaintiff's expert report?

A    Yes.

Q    Okay.  I'm closing Exhibit 4.

When was the last time that you

JOHN D. REES                                          105
Cause No. 3:18-cv-00995-JD-MGG

reviewed the report you wrote for this case?

A    About five minutes ago.

Q    Did you read it in its entirety?

A    No.

Q    When was the last time that you read your report in its entirety?

A    Yesterday.

Q    Okay.  Okay.  I'm going to pull up your report in Exhibit 1 again, and we'll go to Page -- so Page 6 of the pdf on, from Page 6 to Page 9; is that correct?

A    Ma'am, I -- I don't know what you were sent, but -- or how it was sent, but I don't -- you have put your questions on your share screen.  Are you aware of that?

Q    Oh, let me close that.  Thank you.

     Now, just the report?

A    Yep.

Q    Okay.  Thank you.

     Okay.  So this report now, it's a four-page report that you wrote; correct?

A    Yes.

Q    Okay.  So I understand that your report contains several opinions and then supporting statements for those opinions; correct?

JOHN D. REES                106
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    Okay.  So I want to go through the report page by page.  We'll start on Page 1.  Do you have a copy of the report in front of you?

A    I do now, yes.

Q    Okay.  Just take your time and review Page 1 of the report, and then I'd like you to identify for me each opinion that you reached on Page 1 of your report.  Actually, from my review, Page 1 looks like an introduction, so I don't believe there are any opinions, but please review it and let me know if I'm correct.

A    Okay.  I reviewed it.

Q    Are there any opinions that you have to identify for me on Page 1?

A    No.

Q    Let's go to Page 2.  So again, I understand that there are opinions and then statements providing support for your opinions.

Can you please identify for me all opinions that you've written on Page 2 of your report?

A    I believe my opinions, or at least my analysis, began on the final paragraph of that page where I talk about "Plaintiff's expert is extremely

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                                107
Cause No. 3:18-cv-00995-JD-MGG

critical of the officers in B cellhouse."  And he
says that Devine -- "Mr. Devine, was on fire for 15
minutes before there was a response by staff."

It's just not accurate.

Q    Okay.  So I want to make sure -- I
understand there's analysis, there's supporting
statements, and there's inspection of the facts; but
I'm looking for just your opinion, your expert
opinion, about the response to the fire.  So if you
could identify for me where in this section here --
I guess, you're saying there's no opinions before
"Plaintiff's expert."  Where in this section is your
opinion, your opinion written about the fact --

A    Well, it's my opinion that plaintiff's
expert's analysis is inaccurate.

Q    And --

MR. BLINN:  I'm just going to jump in
with -- I'm going to object to the form of the
question.  I'm going to put in just a
continuing objection to the form of the
question so I don't have to keep jumping in.  I
think the document speaks for itself, the
opinions are disclosed in the document, and
make that a continuing objection.  You can go
on, ma'am.

JOHN D. REES                    108
Cause No. 3:18-cv-00995-JD-MGG

BY MS. PIERCE:

Q    And I'm not asking you now to provide your -- an opinion that's not in the report.  I'm asking you to just look at the report and identify statements that you are representing as your opinions about the response to the fire on April 7th, 2017.

MR. BLINN:  And I'll make the same objection.  If you're okay with me having a continuing objection, I can stop now.

MS. PIERCE:  Yeah.  Continuing objection is fine.

THE WITNESS:  It's my opinion that the plaintiff's expert was wrong in suggesting that it took too long for Officer Rodriguez to respond.  That's an opinion.

BY MS. PIERCE:

Q    Can you identify the written -- the specific written language in your report?

A    "That is simply not accurate, as the security camera footage indicates Officer Rodriguez was observed running up the stairs at the exact same time as the fire and smoke were seen coming out of the cell."

Q    Okay.  That is an opinion that you reached

JOHN D. REES                    109
Cause No. 3:18-cv-00995-JD-MGG

in this case.  Can you identify any other opinions that you reached in that paragraph?

     A    "Was the response to the incident perfect?  No."  That's an opinion.

     Q    Okay.  So just for clarity, I'm going to say -- I'll refer back to your opinions now.  So I'm going to say, your first opinion in this report is that -- where you say, "This is simply not accurate, as the security camera footage indicates that Officer Rodriguez was observed running up the stairs at the exact same time as the fire and smoke was seen coming out of the cell."

               Your second opinion is --

     A    Well, my opinion continues, as it goes further describing what took place as the incident unfolded.  The incident started at 9:34.43.  That's when the incident started.

     Q    Okay.

     A    It was -- the incident continues, and it's a continuing incident.  It's not a individual act here and an individual act there.  It's an incident.  And it's completed when the deceased is declared dead, that he had died.

               It's a tragedy.  It's not a good thing, but it is a continual event that's taking

JOHN D. REES                    110
Cause No. 3:18-cv-00995-JD-MGG

place, and I have rendered opinions on that entire event.

Q    Okay.  I just want to make sure that I understand your opinion, so I appreciate that clarification.

So would it be fair to characterize your first opinion is that the officers in B cellhouse responded promptly to the fire in Mr. Devine's cell?

A    The officers responded appropriate-- as fast as they could.  Did they do it exactly as they should have?  No.

The -- your expert, the plaintiff's expert, makes a major deal out of the fact that the two officers were filling out paperwork just after they had completed their rounds.  There's nothing -- that's normal behavior.  Once Officer Rodriguez heard the call from an inmate or inmates that there was fire on the range, he began to respond.

Q    Okay.

A    Simultaneously, as he's running up, he's calling for the other two officers to call for help, sounding alarm, acknowledge that a fire's taking place.

Q    Mr. Rees, I just want to stop you for a

second because my question is a little different than I think what you're understanding is and that's probably my fault for asking it poorly.

So I just want to understand, you know, not all of the individual facts that you were relying on.  I just want to look at your report right here in this paragraph and have you identify for me what is the opinion that you are expressing in that paragraph.

So I think, if I'm correct, that your opinion is that the officers in B cellhouse responded appropriately and immediately when they learned that there was a fire.  Is that correct?

A    That's fair.

Q    Okay.

A    Were they perfect?  No.  But did they do an appropriate response?  Yes.

Q    Okay.  So they responded appropriately and immediately to the fire but not perfectly.  Is that a fair recitation of your opinion?

A    I think that's fair.

Q    Okay.  Is there any other opinions that you see expressed in this paragraph beyond that one?

A    No.  I -- I -- it's all incorporated into one opinion, so...

JOHN D. REES                    112
Cause No. 3:18-cv-00995-JD-MGG

Q    Sure.  Like I said, I understand there's supporting discussion of the facts and things like that, but I just want to understand the opinion that you're reaching in this paragraph.

Do I understand the opinion that you've reached correctly?

A    Yes.

Q    Any other opinion that you've reached here?

A    Yes.  It says, "Was the response to the incident perfect?  No."

Q    Okay.

A    "Emergency responses rarely are.  It's an emergency situation.  It's confusing.  It's chaotic.  Very fast moving.  But the response to the fire was appropriate and completed in 22 minutes from the time the first flash of light was seen and 14 minutes from the time you can see flames and smoke" coming out of the cell.  That response time is appropriate, reasonable.

Q    Okay.  So, again, I think that fits in with what we've stated; the response was appropriate in that -- the media -- or timeline, but not perfect.  Correct?

A    Correct.  Mr. Devine -- you know,

JOHN D. REES 113
Cause No. 3:18-cv-00995-JD-MGG

Mr. Devine died, and I'm sorry about that. That is a tragedy. It's a horrible result of a fire, an accidental fire.

Now, do I know how it started? No. The fire marshal says it was an accident, and they point to the radio or television, rather, I believe.

Q Okay.

A There are other rumors as to how it started.

Q Again, Mr. Rees, I want you to listen to my question and answer the questions that I've asked.

So I understand there's other facts that you've reviewed and facts that you're discussing here. Again, I'm just trying to have you -- I want to understand your report, so I'm just trying to understand the actual opinions that you reached about the facts.

A Well --

Q There's factual -- factual -- evidence and facts that you relied on in your report. And here, I just want you to identify for me the opinions you reached. We don't need to discuss the facts or the information that was provided; okay?

A Well, my opinion is -- that entire

JOHN D. REES                    114
Cause No. 3:18-cv-00995-JD-MGG

paragraph is an opinion.

Q    Okay.  You have no opinion in this report -- this goes in support about how the fire started, beyond noting that the fire marshal determined that the fire was an accident; correct?

A    That is correct.

Q    Okay.  Let's move on to the next paragraph.  So take minute to review this paragraph, starting with Plaintiff's Expert Claims.

A    Okay.

Q    Okay.  So what is your conclusion or opinion reached in this paragraph?

A    That the plaintiff's expert claims that the fire was not responded to, with cries coming from the entire inmate population.  It's just not true.  It was inaccurate.  The inmates -- neighboring inmates asked Mr. Devine if he was all right.  And he said, "Yes.  I'm handling it."

"When Mr. Rodriguez heard the cries, he responded, called for assistance from the fellow officers who were in the Counselor's Office and initiated an institutional fire alarm Code 71."

Q    Okay.  So would it be fair to say that your opinion here is that when Mr. Rodriguez heard the cries, they responded and called for assistance?

A    Yes, that's an opinion.  I believe what the record is.

Q    Move on to -- I just want to -- I want to clarify one thing before I move on to the next paragraph.

So, Mr. Rees, you understand that it's the jury's responsibility to come to a conclusion on the facts in the case; correct?

A    Yes.

Q    And you understand that the role of an expert is to provide opinions about the facts that are in the record; correct?

A    Yes.

Q    Okay.  So you understand the difference between the opinions and facts that are in the record; correct?

A    Yes.

Q    Okay.  So -- and you understand -- I mean, you've been serving as a retained expert for some time; correct?

A    Yes.

Q    So you understand that it's important to clearly layout your opinions in your report; correct?

A    Yes.

JOHN D. REES                           116
Cause No. 3:18-cv-00995-JD-MGG

Q    So I just want to make sure that as I'm going through, I clearly understand your opinions. Okay?

A    Okay.

Q    Okay.  So I want to make sure that I'm not -- when I'm asking for your opinion, I'm not necessarily asking for your discussion of the supporting facts -- for the conclusion that you reached upon reviewing the facts does.  Does that make sense?

A    But when you ask me a question, I'm going to answer it the best way I can, that I know how.

Q    Sure.  And what I'm asking is I'm asking you to look at the report and identify the specific opinions that are there; okay?  Because one of the things that I'm trying to understand is the opinions that you've reached in this matter.  So I would like you, as you go through, to look and identify the opinions that you reached.  Okay?

A    All right.

Q    Okay.  So let's look at this paragraph here, Plaintiff's expert mentions other instances of fire emergencies.  Take a moment to review this.

A    (Witness complying).  Okay.

Q    Okay.  Are there any opinions that you've

reached here that you can point me to?

A    "Fires in prisons, especially maximum-security prisons, are major concerns, as inmates often use electrical appliances for purposes for which they were not intended."

Q    Okay.

A    "This results in electrical fires. Additionally, offenders oftentimes start small paper fires to gain attention and create turmoil. Finally, fires are sometimes used as the method of suicide."

Q    And so that's -- any other opinion that you reached there in that paragraph?

A    No.

Q    Okay.  Let's move on to the next one that starts with, "This is why fire safety and prevention."  Take a moment to review that.

A    Yeah.  (Witness complying).  Okay.

Q    Okay.  What opinions did you reach that you can point me to in this specific paragraph?

A    That fire safety and prevention are important to correctional management, correctional training, and overall operational activities.

Q    Okay.  Anything else?

A    That the fact that the Indiana State

JOHN D. REES                                    118
Cause No. 3:18-cv-00995-JD-MGG

Penitentiary, State Prison at Michigan City, was accredited not once but multiple times and never found to be in noncompliance with fire safety standards.  Reaching that, achieving that by any prison is a difficult task or extremely more difficult than an old, maximum-security institution like Indiana State Prison.  You can't achieve that without the commitment of staff from the top down.

Q    Okay.

A    Plaintiff's expert basically says that staff and leadership of the prison did not take fire safety seriously.  That's absurd.  It could not achieve accreditation status without having a specific concern, operational concern, and responsibility with regard to the -- to fire safety.  They had to be interested in fire safety.  He makes that statement, but he has nothing to base it on.

Q    Okay.  Any other opinions that you reached in this paragraph?

A    No.

Q    Let's look at the last paragraph, which -- oh, there's a few more.  This next paragraph that starts with, "The fact that," and it covers two pages.  Can you take a moment to review that?

A    (Witness complying).  Yes.

JOHN D. REES                              119
Cause No. 3:18-cv-00995-JD-MGG

Q    Okay.  Any opinions that you've reached in that paragraph that you can identify for me?

A    That the Indiana Department of Corrections and at the Indiana State Prison tried to achieve and maintain accreditation status and that's the highest level of operational analysis in the field.

Q    Okay.  Any other opinions?

A    Just that it was a tragic occurrence.  It was an accident, as determined by the state fire marshal.

Q    Okay.  And just a point of clarification.  The fire marshal's determination that the fire was an accident means that it was not arson or that it was not intentionally set; is that correct?

A    That would be -- that would be, I think, a fair analysis, yes.  But we don't know -- we don't know what started the fire.  We assume --

Q    So that's not my question, Mr. Rees.  I just want to make sure that you listen to my question.

So the fire marshal -- the only opinion that you provide in your report about how the fire was set was that the fire marshal determined it was accidental; correct?

A    That is correct.

JOHN D. REES                                120
Cause No. 3:18-cv-00995-JD-MGG

Q    And by that, he means that the fire was not arson and was not intentionally set; correct?

A    I -- I just say he said it was accidental. I don't know how he reached his opinion, if he has specific standards or specific requirements.

Q    So I want to understand what you understand him to mean by the fact that the fire was accidental.

A    That it was an accident.  That Mr. Devine didn't start it.

Q    Okay.  Great.  So you understand, by him saying that the fire was accidental, he means that Mr. Devine did not start the fire; correct?

A    Did not intentionally start the fire.  He may have started the fire.  He may have exacerbated the conditions of the fire by his behavior, but we don't know that.

Q    There's no opinion in your report at all about -- that Mr. Devine started the fire; correct?

A    No.

Q    Okay.  So, again, the next paragraph, I think you included that, sort of, in what you just said, that the fire was a track tragic accident; correct?

A    Yes, it was.

BOSS REPORTERS
(219) 769-9090

Q    And if you just take a moment to review your conclusion.

A    (Witness complying).  Okay.

Q    I think that's your ultimate opinion; correct?

A    Yes.

Q    I just want to now go through with you specific points.  I want to touch back on your conclusion section one more time.  This conclusion section, is this a summary of the opinions that you provided, or is this a separate and new opinion that you're providing?

A    My conclusions.

Q    Okay.  So that's not quite my question.

Is this a summary of what you've already said earlier in the report, or is this a separate and additional conclusion that you've reached?

A    It's a separate, additional conclusion that I reached as a result of all the other analysis, information, and facts that -- that took place during this incident.

Q    Okay.  And so your opinion -- your additional opinion is that there's nothing to suggest that Warden Ron Neal or any of the staff at

JOHN D. REES                       122
Cause No. 3:18-cv-00995-JD-MGG

ISP, including all named defendants, did anything that led to the death of Mr. Josh Devine.

A   That is correct.

Q   Okay.

A   They responded to the fire appropriately. Unfortunately, tragically, they were not able to save Mr. Devine's life.

Q   Okay.  Let's now go up and -- a little further up.  I want to go here -- so this is on Page -- it's the second page of your report, the very top of the page.

A   I think you have the top of the third page.

Q   I'm sorry.  You're right.  The top of the third page.  Thank you.

Okay.  So that first line is, "Was the response to the incident perfect?  No."

So your conclusion is the response to the incident was not perfect; correct?

A   Yes.

Q   What in your opinion should have been done differently to respond to the fire?

A   I think represent-- or I think Officer Rodriguez could have directed -- and I'm forgetting exactly which of the other officer --

JOHN D. REES                    123
Cause No. 3:18-cv-00995-JD-MGG

that she came up with the keys, the one that had the keys, that took a little extra time than it should have.  But 22 minutes is -- in response to an incident of this type in a maximum-security prison is a reasonable time.

Could they have done it faster, quicker, better?  Could he have gotten the lock open?  Could they have got Mr. Devine out of the cell quicker?  Where there's -- where there's a stumble with the firemen reporting getting through the gate, there -- incidents of this type, emergency incidents, are chaotic, and they're confusing and --

Q    Mr. Rees, I want you to listen carefully to my question and answer the question that I've asked.  Okay?

A    I am answering, ma'am.  I --

MR. BLINN:  Yeah.  I'm going to object.  I mean, this is responsive to the question.

BY MS. PIERCE:

Q    Okay.  So I want you to listen to the question that I'm asking, and I just want you to tell me the things that the officers in the cellhouse should have done differently in your opinion.

MR. BLINN:  Objection.  Asked and

answered.

THE WITNESS:  Yeah.  I don't know that I can tell you.  If it was a perfect situation, they would have gotten him, Mr. Devine, out; the fire would have been put out.  The fire maybe not have ever started.  We don't know.  It was not a perfect situation.  It was not a perfect response.  It didn't successfully save Mr. Devine's life.  That makes it imperfect.

BY MS. PIERCE:

Q    Okay.  I want to --

A    The officers --

Q    I want to make sure that I understand your opinion here.

So is the basis for your statement that the response was not perfect the fact that Mr. Devine died?

A    That's part of it, certainly, because your goal is to keep people safe and secure, and the department -- the State Prison in Michigan [sic] had a accidental fire death.  That's not something you want to have happen.  That's not something that you want to happen.  You want to try and prevent that.  In this case, unfortunately, they were unable to prevent that.

JOHN D. REES                                      125
Cause No. 3:18-cv-00995-JD-MGG

It was investigated by the state fire marshal, and the state fire marshal indicates that it was an accidental death.  Fires can be -- as you previously said, can be, you know, started by people or -- or they can be accidents.

Q    I want to clarify -- I want to clarify one point.

The fire marshal concluded that it was an accidental fire; correct?  Not an accidental death?

A    The coroner said that Mr. Devine died from the fire which was determined as an accident.

Q    Sure.

A    He was healthy -- he was healthy and he died as a result of an accident.  That's an accidental death.

Q    Okay.

A    Nobody killed him.  It was an accident.

Q    So that's -- that's not quite my question.  Again, I want you to listen to my question.

So the conclusion of the fire marshal was strictly about how the fire started; correct?

A    Yes.

Q    Okay.  There was no other conclusion that the fire marshal reached when he said that the fire

was accidental; correct?

A    That's his job.

Q    His job is to determine whether the fire was started accidentally or purposefully; correct?

A    That is correct.

Q    And he determined that the fire was accidental; correct?

A    Yes.

Q    So you mentioned that one of the things that could have been done differently is that they could have gotten the keys more quickly to the 500 range; correct?

A    Yes.

Q    What should the officers in B cellhouse have done to get the keys to the range more quickly?

A    It's the total response.  The total response was imperfect because it did not result in saving Mr. Devine's life.

Q    Okay.  So I want to just make sure I understand.

        The sole basis that you have for concluding that the response was not perfect was that it did not result in saving his life, or are there specific aspects of the fire response that you determined during your review were not perfect?

JOHN D. REES 127
Cause No. 3:18-cv-00995-JD-MGG

A It was not perfect because it didn't re-- it did not reach a successful ending. Mr. Devine passed away. He died as a result of an accidental fire. That's not good. All right? It's tragic --

Q Okay. Again --

A -- accident.

Q The question I'm asking is, the basis for your statement that the response to the fire was not perfect is simply that Mr. Devine died; correct?

A No, ma'am. No, ma'am. That's a significant portion of it. That's a significant portion of it.

Q Okay.

A But that the confusion over the keys was a part of it. That slowed it down. Did it slow -- you know, the time -- response time, 22 minutes from the first flash of light and 14 minutes from the time that you can see the fire, that response is a reasonable response time.

Q Okay.

A Could they have reduced it -- could they have reduced it to 12 minutes? Maybe. Could they have reduced it to 11, 9? I don't know.

Q Mr. Rees, I'm trying to -- I'd like you to listen to my question. I understand that you're

JOHN D. REES                                          128
Cause No. 3:18-cv-00995-JD-MGG

getting frustrated.  I want to understand the basis

for your opinion that things were not done perfectly

in response to the fire.

So you mentioned that the keys were

not retrieved as quickly as they could have been.

What other aspects of the response to the fire were

not perfect?

A    That they were unsuccessful in saving

Mr. Devine's life.

Q    What other things could the officers have

done to reduce the response time to 11 minutes?

MR. BLINN:  Object to form.

THE WITNESS:  Are you waiting on an

answer?

MR. BLINN:  Yeah, and I guess I'll

clarify.  Object to form.  I think it

mischaracterizes the witness's testimony.  I

don't believe the witness testified that they

could have done things differently to respond

in 11 minutes.  He said, "maybe."  It was --

but I'm objecting to the form of the question.

Go ahead and answer.

MS. PIERCE:  I'll ask you not to make

speaking objections, Mr. Blinn.  Just object to

form.

JOHN D. REES                    129
Cause No. 3:18-cv-00995-JD-MGG

THE WITNESS:  (No immediate response).

MR. BLINN:  You can go ahead and answer.

THE WITNESS:  Repeat the question, please.

BY MS. PIERCE:

Q    You mentioned that they possibly could have reduced the response time to 11 minutes; correct?

A    Yes, but they -- and the 11 minutes is a figure of speech.

Q    I understand.  You were saying that they could have reduced the time.

A    Right.

Q    What could they have done to reduce the --

A    They could have --

Q    -- response time to the fire?

A    -- been faster.  They could have been faster.  They could have been better coordinated. They could have not been filling out the paperwork. That was situational.  There's a lot of things they can do, but they were -- they were functioning as officers within a housing unit, and it isn't -- it is a collective, operational situation.  So --

Q    So -- and my --

A    -- was it a perfect response?  No, it wasn't.

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                           130
Cause No. 3:18-cv-00995-JD-MGG

Q    Right.  And my question --

A    I don't know that there is a perfect response.

Q    Mr. Rees -- Mr. Rees, I'm able to ask the questions in this case and control the questions; okay?  And so I'm asking you to respond just to the questions that I've asked; okay?  And I want to understand all of the things that you believe they could have done differently to reduce the response time in this case.  I don't want any other explanation about the fire.  I just want you to explain what steps they could have done or things they could have done differently to reduce the response time to the fire.

A    I think I already have answered it.

MR. BLINN:  Yeah.  Object to form.

BY MS. PIERCE:

Q    Anything else beyond the things that you mentioned?

A    No.

Q    Okay.  So I want to look at this first paragraph here.  The last sentence, at 9:46 -- no. Hold on.

Okay.  So you say here that -- the second to the last sentence in the first paragraph

it starts with "eight minutes."  You see where I'm referring here?

A    Yes.

Q    So eight minutes later, at 9:43, light and smoke are seen coming from the cell, and Officer Rodriguez is seen running up the stairs.

At 9:46 the first responders arrive.

So I just want to look at this sentence here that starts, "Eight minutes later." Actually, let's keep going.  Move on.

Let's move to Paragraph 4.  So here the second sentence starts with, "The third, Sergeant Rodriguez, was in the officers' station when he heard cries of fire on the walk.  He immediately responded, determined the location of the fire, and called to the other officers for assistance and to radio a call for a fire code to initiate a facility-wide response of additional personnel and the inmate fire crew."

Is this opinion based on the assumption that the prisoners did not begin to cry for help until 9:43?

A    That's when he saw the fire.  Correct -- the fire -- that's determined from the film, the time stamp on the film.

JOHN D. REES                        132
Cause No. 3:18-cv-00995-JD-MGG

Q    Well, so you write here that,
"Sergeant Rodriguez was in the officers' station
when he heard cries of fire on the walk."

A    That's correct.

Q    Okay.  So there's no noise on the film;
correct?

A    No.

Q    Okay.  So is -- your assumption here that
he immediately responded when he heard cries, was
that based on an assumption that the yelling or the
cries for help started at 9:43?

A    Yes.

Q    Okay.

A    And it makes sense because it coincides
with when the --

Q    Again, Mr. Rees, I'm just asking you to
answer the question that I've asked.  Okay?

A    (No immediate response).

        MR. BLINN:  He is answering the question.

        MS. PIERCE:  I asked a question; he
    answered it.

BY MS. PIERCE:

Q    Okay.  So you said that you watched the
video to determine that he immediately responded to
the fire.

JOHN D. REES                            133
Cause No. 3:18-cv-00995-JD-MGG

Are there any other facts or evidence that you relied on to make this determination that he immediately responded upon hearing the cries for help?

A    No.

Q    Okay.  So that was based on reviewing the video?

A    Yeah [sic].

Q    What was that based on then?

A    Based on reviewing the video.

Q    Oh, okay.  Great.  I think I did not speak clearly.  Okay.

Are your opinions based on the assumption that the fire started at approximately 9:43?

A    Yes.

Q    Okay.

A    I believe that's when the initial -- 9:34, rather.  9:34.43.  That's when there was an initial flash of light.

Q    Okay.  So your opinions are assuming that the fire started at approximately 9:34; is that correct?

A    Yes.

Q    Okay.  And your opinions are based on the

assumption, again, that the yelling started at
approximately 9:43; correct?

A    Yes.  That's substantiated, also, by
inmate reports that when the -- they saw the first
flash at 9:34, they asked him if he was all right,
if there was anything he needed.  And he said, "No.
I'll take care of it myself."

Q    Anything else that you're basing that
opinion on?

A    No.

Q    Okay.  I just want to look -- so in your
report in Paragraph 2, you noted that the inmate
fireman arrives at 9:57.  Is that right?

A    Yes.

Q    So I'm going to go back here to this
paragraph that starts with, "Plaintiff's expert" at
the bottom of the page.  Do you see that?

A    Yes.

Q    And then I'm going to go to the middle of
the paragraph.  I'll start a little bit ahead of
where I'm looking, but -- so it says, "At the same
time Officer Rodriguez is calling for his two -- his
other two officers and has them radio and call the
fire code, he is also calling for the keys to the
fifth floor so Officer Blakely was the officer

possessing -- as Officer Blakely was the officer possessing the keys. By the time he gets the main lock opened, first responders began to arrive with fire extinguishers and began putting out the fire."

Did I read that correctly?

A    Yes.

Q    Okay. So is it your opinion that Rodriguez got the main lock opened around 9:57?

A    I don't think I have a time in there.

Q    Well, you said by the time he gets the main lock opened, first responders began to arrive. Did you mean by that, that the two things happened around the same time?

A    (No immediate response).

Q    I'm sorry. That's the first responders, not the first -- the prisoner firefighters. I read that incorrectly.

A    That's right. They're the lieutenant and some other officer. He may have been a lieutenant. It may have been two lieutenants. But there was -- the inmate firefighters did not get there until, I believe -- it's in the report. Was it 57 maybe?

Q    What report are you referring to?

A    My report.

MS. PIERCE: Okay. Let's take a

JOHN D. REES                                136
Cause No. 3:18-cv-00995-JD-MGG

five-minute break and come back at 2:00 p.m.

     MR. BLINN:  That works here.  Just ballpark -- I mean, I don't expect this to get done any time soon, but do you have a rough idea just for planning purpose?

     MS. PIERCE:  I'm sorry, I don't.  It's going to be --

     MR. BLINN:  I mean, like in terms of how many hours.  I'm not expecting you to be almost done yet.  I'm just trying to figure out where we are.

     MS. PIERCE:  Plan for at least three.  I can't be sure.

     THE WITNESS:  I'm sorry?

     MS. PIERCE:  Probably around at least three more.  I can't be certain how long it will take.  So let's take a break and come back at 2:00 p.m. Central.  So we can go off the record and come back in about five minutes.

     (A brief recess was taken from 1:54 to 2:07.)

     MS. PIERCE:  Okay.  I'm ready to get started.

BY MS. PIERCE:

    Q   Okay.  So, Mr. Rees, is it fair to say

JOHN D. REES                           137
Cause No. 3:18-cv-00995-JD-MGG

that your report has, sort of, two sections; one where you talk about the response on the night of the fire itself, and then one where you focus a little bit more broadly on the conditions at Indiana State Prison?  Is that fair to say?

A    I don't know how you can separate them.

Q    Okay.  Well, there's two --

A    Michigan State -- I mean, Indiana State Prison at Michigan City, Indiana, is a prison.  It's an entity.  It had an incident.  I don't know -- I don't understand how I can separate how I look at that.

Q    Okay.  Let me ask the question a little bit differently then.

You discussed the actual response that the defendant prison had at the fire; correct?

A    Correct.

Q    Okay.  And then you also discuss in your report general things related to fire safety and ensuring fire safety at the prison; correct?

A    Correct.

Q    Okay.  And those are sort of -- I understand they're linked, they're tied; but there's a distinction between actual response to the fire and then efforts to achieve fire safety at the

JOHN D. REES                    138
Cause No. 3:18-cv-00995-JD-MGG

prison; correct?

A    Not in relation to this incident because plaintiff's expert report talks about it specifically, about the fact that the warden and the deputy wardens and the lieutenants didn't take fire safety serious.  That may be close to his words.  And they did take it serious.  They couldn't have maintained their accreditation status if they hadn't taken it serious.  So they did believe in the need for fire safety, and they did everything possible to have a facility that could respond to the fire emergency.

Q    Okay.  So, again, I think we're in agreement here.  I think we're just talking past each other, but I want to -- so there's things that the individuals -- you discuss in your report things that the individual officers and staff members at the prison did when the fire occurred to try to address the fire, and then you also address things regarding Mr. Neal and other supervisors, that they did to take the fire seriously; correct?

A    Correct.

Q    Okay.  I think we're on the same page.

So with regard to the second part, I stopped sharing this document.  Let me share it with

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                  139
Cause No. 3:18-cv-00995-JD-MGG

you.

Okay.  Can you see the expert report; correct?

A    Yes.

Q    Okay.  So it looks like around Page 3 of the report here, you start with, "Plaintiff's expert mentions other instances of fire."

So this is where you start to talk about the actions and the response of Neal and other supervisors and fire safety; correct?

A    That's correct.

Q    Okay.

A    Plaintiff's expert mentions the fire where somebody died, but no specifics, no reviews.

Q    So, again, Mr. Rees, I haven't asked a question.  I just asked if this is where you start discussing that.  You answered the question.  I ask that you wait to till I ask another question before you start responding; okay?

A    (No immediate response).

Q    Okay.  So you note in your report that ISP was accredited by the ACA; correct?

A    Yes.

Q    Okay.  And then you note here in this bottom paragraph on Page 3, you see where I've

highlighted?

A    All right.  Yes.

Q    Okay.  You state that "All of the staff at Indiana State Prison, including each of the named defendants, were committed to American Correctional Association standards which places a significant emphasis on fire prevention and fire safety.  This clearly refutes plaintiff's expert's allegation that the staff and leadership of the Indiana State Prison did not take fire safety seriously."

So the basis that you recognize in your report for your opinion that the staff and leadership took fire safety seriously is that they passed the ACA accreditation; correct?

A    Yes.

Q    Are there any other bases that you identify in your report to show that Mr. Neal and the other supervisors took fire safety seriously?

A    Their testimony and their deposition.

Q    I'm asking you to -- what you identified in your report.  So can you point me to anywhere else in your report where you identify other bases for your opinion that Mr. Neal and the other firefighters took fire safety seriously?  And you can take a minute to review your report if you'd

like.

A    No.  It's -- the only other place I saw it was in their depositions.

Q    So, again, I'm asking where in your report you show the other information that you relied on.

A    My report indicates that I read the depositions.

Q    Okay.  Can you show me where in your report you rely on other facts or what other facts that you rely on to show that Mr. Neal and other supervisors took fire safety seriously?  And, again, I'm asking you to look at your report and identify other facts or evidence -- excuse me, identify other facts or assumptions that you relied on to reach the conclusion that Mr. Neal and the other supervisors took fire safety seriously.

MR. BLINN:  Object to form.  Asked and answered.

THE WITNESS:  The fact that the facility was accredited and maintained its accreditation multiple times and had never been found in noncompliance with the fire safety standard, plus their own testimony.  And I know you don't want me saying that 'cause it's not in the report, but it is in the report when it looks

JOHN D. REES                                142
Cause No. 3:18-cv-00995-JD-MGG

at -- when it says that I reviewed their depositions.

BY MS. PIERCE:

Q    Okay.  Is there anywhere in your report where your mention any of the things that the supervisor defendants testified to?

A    No.

Q    Okay.  And is there anything else besides the depositions and the fact of the accreditation that you relied on in reaching that conclusion -- that you relied on in your report to reach the conclusion --

A    No.

Q    -- that the supervisors took fire safety seriously?

A    No.

Q    So, again, I'm going to ask a few questions.  I ask that you listen to my question and answer just the question; okay?

A    Okay.

Q    Is there anywhere in your report where you give an opinion specifically about the sufficiency of training on fire safety and response at ISP?

A    Paragraph -- this page starts off, "This is why fire safety and prevention are such important

JOHN D. REES                143
Cause No. 3:18-cv-00995-JD-MGG

part of correctional training and operational procedures." Because fires -- the proceeding paragraph says, why? Because fires are a problem in prisons, especially maximum-security prisons, especially older maximum-security prisons.

Q    Let me --

A    I'm sorry that you can't understand the continuity of the report, but the report is the report.

Q    Okay. I think maybe I worded that question poorly. So let me ask it a little differently.

Is there anywhere in your report where you give an opinion about the specific training provided at the Indiana State Prison --

A    No.

Q    -- related to fire safety and fire response?

A    No.

Q    Okay. Is there anywhere in your report where you give an opinion about the specific -- about the sufficiency of the specific policies and procedures in place at Indiana State Prison in April 2017 related to fire safety and fire response?

A    Other than the accreditation that had been

JOHN D. REES                          144
Cause No. 3:18-cv-00995-JD-MGG

maintained by the facility.

Q    Other than that; no?

A    No.

Q    Is there anywhere in your report where you give an opinion about the sufficiency of defendant's response -- or strike that.  Let me ask it again.

        MR. BLINN:  I'm just going to jump in.
    Just to be clear, my standing objection is
    still in place; right?  I mean, the report
    speaks for itself; and if he can't cite a
    paragraph, the report speaks for itself is my
    objection.  That's still in place; right?

        MS. PIERCE:  Yeah.  You can make that
    objection.

        MR. BLINN:  No.  I'm just making clear
    that my standing objection is still in place.

        MS. PIERCE:  Okay.

        MR. BLINN:  We're in agreement on that?

        MS. PIERCE:  Sure.  That's fine.

BY MS. PIERCE:

Q    Is there -- is there anywhere in your report where you give an opinion about the sufficiency of the response of ISP staff to other prison -- other fires at ISP other than the April 7th, 2017, fire?

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                    145
Cause No. 3:18-cv-00995-JD-MGG

A    No.

Q    Is there anywhere in your report where you give an opinion about the sufficiency of fire drills conducted at Indiana State Prison?

A    It's contained in my report with my discussion in multiple paragraphs, in multiple locations, the fact that maintaining accreditation by the American Correctional Association, being committed to that process addresses that situation.

And regarding the previous question that you asked, I didn't bring up other fires at Indiana State Prison in Michigan City.  Plaintiff's expert brought up other fires as a --

Q    Is --

A    Excuse me.

Q    I'm not asking about the -- my questions are not dealing with plaintiff's expert report. Again, I'm asking you to answer the question that I ask.

A    But it's in my report, ma'am.  I refer to it in my report.

Q    Okay.  Would you like to point me to the spot where you're referring to it?

A    "Plaintiff's expert mentions other incidents of fire emergencies at

**JOHN D. REES**                                    **146**
**Cause No. 3:18-cv-00995-JD-MGG**

Indiana State Prison, including one that resulted in a death, but no specifics of this incident were given other than it allegedly happened over 15 years prior to this event."

Q    Okay.  And my question is different.

In your report do you give any opinion about the sufficiency of the response of staff at Indiana State Prison to other fires that occurred at Indiana State Prison besides April 7, 2017?

A    No, I did not.

Q    Is there anywhere in your report where you give an opinion about the manner and sufficiency of the way that the ISP prisoner firefighter program was run?

A    No, not -- I don't think I specific-- I think they did a good job.  I think they --

Q    I'm not asking for what you think.  I'm asking for what's in your report.

A    I don't think I address specifically their function, other than to say, they were able to finally remove him from the cell, and they -- with the protective clothing, they were able to get the cell doors open --

Q    Well --

JOHN D. REES                    147
Cause No. 3:18-cv-00995-JD-MGG

A     -- damaged by the fire.

Q     Thank you for that clarification.  Sorry.
I interrupted.  Did you have additional --

A     No, that's fine.

Q     My question is slightly different.  I
appreciate that clarification.

Is there anywhere in your report
where you give an opinion about the way that ISP
staff ran and managed the prisoner firefighter
program at Indiana State Prison?

A     No.  From what I remember -- from what I
read about it --

Q     I'm just asking about in your report.

A     No.

Q     Mr. Rees, have you ever been sued before?

A     Have I ever been sued?

Q     Yes.

A     Yes, ma'am.

Q     How many times?

A     I have absolutely no idea, ma'am.  I've
had over forty years in correctional administration.
I have no idea.

Q     Fair to say that you've been sued by
prisoners a number of times?

A     Very fair.

JOHN D. REES                    148
Cause No. 3:18-cv-00995-JD-MGG

Q    More than ten times?

A    Yes, ma'am.

Q    More than fifty?

A    Yes, ma'am.

Q    More than a hundred?

A    I don't know.

Q    Were you sued in your official capacity?

A    Yes.

Q    Were you ever sued regarding your creation or implementation of policy?

A    I'm sure that's a part of many of them. You know, specifics or specific litigation, but policies and procedures are, you know, textbook on how you operate.

Q    Okay.  Were you ever sued in relation to your specific conduct as an employee of the corrections system?

A    I don't think so.  Specifically about something that I did.

Q    Okay.

A    Yeah, I don't -- I don't recall that.

Q    Okay.  So to the best of your recollection --

A    Right.

Q    -- you've never been sued for something

that you've done personally in your employment in corrections; correct?

A    Yeah.  I've been sued -- sued in regard to things that I've done, policies that I've changed, procedures that I've implemented and put forth. Inmate litigation is inmate litigation, and it -- you know, it -- it impacts things that you do.

Q    What do you mean by, "inmate litigation is inmate litigation"?

A    Well, inmate litigation is in many cases challenging something that particular institution did or allowed to happen or failed to do.

Q    Okay.  So you've been sued in relation to your responsibilities and duties while working as an employee in corrections; correct?

A    Yes.

Q    Okay.  And you said probably more than fifty times?

A    Yes, ma'am.

Q    Have you ever had any settlements paid out on your behalf in any of these lawsuits?

A    I'm sure I have.

Q    Have you ever personally paid out any settlements in any of these lawsuits?

A    Personally?  No.

Q    Have you ever gone to trial and have been -- had a judgment reached against you in any of these lawsuits?

A    Yes, I think I have a couple times.

Q    How many times?

A    One or two.  I remember early in my career we lost a case about something -- some procedure -- some procedure, but it was -- I don't remember the specifics of it.

Q    Okay.  Did you pay out those judgments personally?

A    No.

Q    Aside from these lawsuits that we just discussed, have you ever been accused of misconduct in your role as an employee in corrections?

A    Not that I'm aware of.

Q    Have you ever been suspended during your time working in corrections?

A    I don't think so -- well, when I was put on administrative leave one time.

Q    When was that?

A    1970 -- 1977 or -- yeah, '76 or -- 70-- It would have been '76.  Seventeen people were put on administrative leave as a result of a governor.

Q    Okay.  Why were you placed on

JOHN D. REES                         151
Cause No. 3:18-cv-00995-JD-MGG

administrative leave?

A    It was a political decision made by the new governor.

Q    Was there a reason provided to you about why you were placed on administrative leave?

A    No.

Q    Was this disciplinary?

A    No.

Q    Okay.  Have you ever been disciplined during your time working in corrections?

A    I'm sure I have.

Q    Any specific times that you recall?

A    No.

Q    Have any lawsuits brought against you ever involved a fire in a correctional setting?

A    Not that I recall, no.

Q    Have you ever been a victim of a crime?

A    Yes.

Q    What were the circumstances of which you were a victim of a crime?

A    I had things broken into my house and stolen.

Q    When was that?

A    That would have been -- was it -- it was Oklahoma or New Mexico.  It was in Oklahoma, we had

JOHN D. REES                152
Cause No. 3:18-cv-00995-JD-MGG

a burglary.

Q    Okay.  Any other times that you've been a victim of a crime?

A    No.  Not personally, no.

Q    Anyone close to you that has been a victim of a crime?

A    Yes, yes.

Q    Who was that?

A    My father.

Q    And what was the crime that he was a victim of?

A    It was another burglary, but it was burglary at a very bad time.

Q    What do you mean by that?

A    Well, it was during the time when my mother was dying of cancer.  And while he went to visit her at the nursing home, his house was burglarized and several things were stolen, including some things that were very sentimental to him.

Q    I'm sorry to hear that, Mr. Rees.

Is there any other individuals who are close to you that you know have victims of a crime?

A    Not that I realize.  No, not really.  I'm

sure that there have, but I'm not aware of it.

Q    I want to go back to your report for a second.  In your report you in conclude that Rodriguez's response to the April 7, 2017, fire was appropriate; correct?

A    Yes.

Q    Is that conclusion based on the assumption that Mr. Rodriguez responded immediately upon learning or realizing that there was a fire?

A    When he heard the voices, he responded.

Q    He responded immediately?

A    Yes.

Q    And that's -- your opinion is based on that assumption; correct?

A    Yes.

Q    Okay.  And with regard to Miss Blakely, you concluded in your report that Blakely responded appropriately to the fire; correct?

A    I think I said specifically they all did.

Q    I'm just going to ask individually just --

A    Okay.

Q    So Blakely -- your opinion is that Blakely responded appropriately in that fire; right?

A    Yes.

Q    And that assumption is -- or that opinion

JOHN D. REES                        154
Cause No. 3:18-cv-00995-JD-MGG

is based on the assumption that she responded to the fire immediately upon hearing the cries for help?

A    From Rodriguez.  She responded to Rodriguez's call to get the keys up there and get -- and call in -- I think it was a Code 71 to get the fire alarm put in place.

Q    Okay.  So your assumption -- your opinion that Blakely responded reasonably is based on the opinion -- or based on the assumption that she responded as soon as Rodriguez called for help by calling the Code 71?  Is that correct?

A    And other -- and taking the keys to him.

Q    And taking the keys to Mr. Rodriguez?

A    Yes.

Q    And then Sarah Abbassi.  Your opinion is that she responded appropriately to the fire; correct?

A    She went and did what the lieutenant told her to do.  I think he told her to go man the door and get people in to help.

Q    Okay.  So I just want to make sure that I understand your testimony, it's clear for the record.

So your opinion is that Miss Abbassi responded appropriately to the fire; correct?

BOSS REPORTERS
(219) 769-9090

JOHN D. REES                    155
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.

Q    And that's based on the assumption that as soon as she heard Rodriguez call for help, she followed his instruction and waited by the front door.

A    Yes.

Q    Anything -- would your opinion be different with regard to either of the three officers if, in fact, they delayed several minutes in responding to cries or yells for help?

A    If they sat there and listened to people cry for help and they didn't respond, then yes, they would be wrong.  That's not what happened.

Q    So would -- that's not the question.

So I think I understand your position is that the response would not have been appropriate if they had waited several minutes after hearing cries for help; correct?

A    Your assumption is correct; and no, it wouldn't have been.  But they didn't.  From the time you see the fire -- the footage of the fire, and Rodriguez's initial response happened almost simultaneously.

MS. PIERCE:  Okay.  I'm going to pull up another Exhibit.  I think 5; is that right?

JOHN D. REES                                              156
Cause No. 3:18-cv-00995-JD-MGG

THE REPORTER:  Correct.

MS. PIERCE:  Okay.  Thank you.

(Exhibit No. 5 marked for

identification.)

BY MS. PIERCE:

Q    Okay.  I'm going to share this with you now -- okay.  Can you see a document that says "Subpoena to Testify"?

A    Yes.

Q    Have you seen this document before?

A    I'm sorry?

Q    Have you seen this document before?

A    I think I have, yes.

Q    I'm going to -- so this document -- just for the record, it's not Bates labeled, but it's a subpoena asking for Mr. Rees to testify in this case and --

A    That's the initial subpoena for the initial time of the -- of the deposition, but it was changed because you guys had something come up.

Q    Correct.  Okay.  So this document is eight pages.  I'm going to go to the fourth page of the document labeled, "Subpoena Rider to John D. Rees."  Do you see that page?

A    Yes, ma'am.

JOHN D. REES                          157
Cause No. 3:18-cv-00995-JD-MGG

Q    Have you seen this document before?

A    I think I have.

Q    Okay.  I'm going to go down to Page 7 of the document, which is labeled, "Documents Requested."  The first one here is "Any and all documents and materials prepared by you and formed in your opinions in this case, including but not limited to notes, summaries, memoranda, and transcripts."  Did I read that correctly?

A    Yes.

Q    Did you do a review of your records for any documents responsive to this?

A    Yes.

Q    And what documents did you pull that are responsive to this?

A    My report and the attachments.

Q    This specifically requests notes.  You say that you took notes while you prepared your report; correct?

A    I did create notes; but once I write the report, I tear the notes up.  I don't need them anymore.

Q    Okay.  Are there any other summaries, memoranda, or transcripts that you relied on in creating your report?

A    No.  No, ma'am.

Q    Okay.  Item No. 2, "A stated estimate of revenue earned from any and all retained expert work conducted by you over the past four years."  Did you do a search for this information?

A    I -- I looked at it, and that's how I came up with the 20- to 25,000-dollar amount that I gave you earlier.

Q    Did you provide information to your attorneys?

A    No.

Q    Okay.  Did you look at actual bill -- billing statements or invoices to determine that you make about $25,000 a year?

A    Between 20 and 25,000.

Q    Okay.  Did you look at any billing or invoice statements for this?

A    No.  I looked at -- I looked at records but not individual records, no.

Q    You noted with regard to the first item that you tear up your notes after you write your report.  Why do you tear up your notes?

A    I think some wise attorney told me many, many years ago, We pay you to write the report.  You don't need anything else.  I've never -- I do that

JOHN D. REES                                    159
Cause No. 3:18-cv-00995-JD-MGG

all the time.  I do take notes while I'm reviewing stuff.  Once I put together my report, I destroy the notes.

Q    Okay.  So fair to say you destroy the notes so they aren't produced in litigation?

A    That's fair.

Q    Okay.  Did you do a search for Item 3, "All communications to or from you and defense or retaining counsel?

A    No, I -- no, because I'm not an attorney, so I don't know what Rule 26 is.  But I relied on my advice from my attorney and --

Q    Okay.  So you did not do a search for any emails or communications that you received?

A    No.

Q    No. 4 is, "All documents in your possession, custody, or control relating to the civil litigation; the April 7, 2017, fire at ISP; or Joshua Devine, excluding materials that have already been produced by the parties of this litigation." Did you do a search for these documents?

A    There are no documents other than the ones that you guys produced or my attorneys produced for me.

Q    You received the ACA accreditation

JOHN D. REES                              160
Cause No. 3:18-cv-00995-JD-MGG

documents; correct?

A    Yes, and I --

Q    You received those --

A    I have received those; and I submitted those to my attorney yesterday, I believe, or maybe the day before.

Q    And all of those documents were produced -- or given to your attorney; correct?

A    That is correct.

Q    Item 5 is, "A list of all cases in which you have been retained by the State of Indiana, Indiana Department of Correction, or any of the defendants in this case in the past ten years."  Did you do a search for this type of information?

A    I don't know what I would have searched, but I know from my own memory that I never worked on a case for the Department of Corrections in Indiana.

Q    Okay.  "Copies of any reports authored by you or transcripts of testimony provided by you in any case involving allegations of inadequate emergency response or fire safety in a correctional setting."  Did you do a review for these documents?

A    Yes.  They're not there.

Q    Okay.  "Copies of all documents relevant to your report in this case, including materials you

JOHN D. REES                                161
Cause No. 3:18-cv-00995-JD-MGG

contend are learned treatises, periodicals, or pamphlets that you reviewed prior to issuing your report and/or relied upon in preparing your report in this case that have not already been produced in litigation."  Did you look for such documents?

A    No.

Q    Are there any such documents?

A    No.

Q    You did not rely on any treatises, periodicals, other written scholarly reports --

A    No.

Q    -- when making your report?

A    No.

Q    "Copies of any communications between you and any third-party witnesses or parties to this case"?

A    You received that email from the accreditation manager within the Department of Corrections.

Q    Okay.  Nothing else that you have?

A    No, ma'am.

MS. PIERCE:  Okay.  I think, despite what I told you all, I am close to finishing up.  So I'd like to just take about 15 minutes just to review my notes, get myself organized and then,

JOHN D. REES                    162
Cause No. 3:18-cv-00995-JD-MGG

hopefully, we can wrap up fairly quickly.  Does that sound okay, everyone?

MR. BLINN:  That sounds fine.  I was going to say, it seemed like you were getting close to the end.  I'm like, why did you say three hours?

MS. PIERCE:  Always over estimate; right?

MR. BLINN:  You know, I was curious.

MS. PIERCE:  Yeah.  Okay.  Well, let's take a 15-minute break, and we'll come back just around 3:00 o'clock; okay?

THE WITNESS:  All right.

MR. BLINN:  Works for mere.  Thank you.

(A brief recess was taken from 2:42 to 2:49.)

BY MS. PIERCE:

Q   Okay.  Mr. Rees, have you -- do you hold yourself out as an expert on fire science?

A   No.

Q   Have you ever had any training on fire science, including assessing how fires started, how fires spread?

A   No.

Q   Have you had any training on fire science at all?

**JOHN D. REES**                  163
**Cause No. 3:18-cv-00995-JD-MGG**

A    Yes.

Q    What is that?

A    Emergency response, training about fire safety rate, you know, policies and procedures. Control of toxics and flammable materials, those type of things.

Q    So your training is more on fire training and response but not necessarily the fire science of how fires start and evolve and things like that?

A    Not a fire expert.  No, ma'am.

Q    So just to clarify, you haven't had training on fire science, but you have had training on fire safety.

A    That's correct.

MR. BLINN:  I'm just going to object to the form of that.  I think it's a little ambiguous, but...

BY MS. PIERCE:

Q    Okay.  Would you agree with me that the video surveillance -- the surveillance video from the B cellhouse on the night of the April 7, 2017, fire does not show inside Mr. Devine's cell?

A    No.  That's correct.

Q    We talked a little bit earlier about your method-- oh, I'm sorry.

JOHN D. REES                    164
Cause No. 3:18-cv-00995-JD-MGG

A    It does show -- the second burst of flame, the big burst of flame shows a -- you know, it's coming out of there.  So, you know, it's coming out of the cell.  So there was fire in the cell; there's no question about that.

Q    Okay.  But my question is, you know, you agree that you cannot actually see inside the cell; correct?

A    You can't.  No, you can't.

Q    Okay.  We talked a little bit about the methodology that you use for creating reports.

When you are reviewing an evidentiary record that's provided to you, what is your methodology when you come across competing or contradicting facts?

A    Make a note of them in my mind.  Make a note -- I may even make a written note of them.  It would depend.

Q    Okay.  And how do you treat those competing or contradictory facts?

A    Try to find out which is the true facts and which are not.

Q    Okay.  So you go about determining which are the true facts and then rely on those facts when making your report?

JOHN D. REES                    165
Cause No. 3:18-cv-00995-JD-MGG

A    Yes.  As I see it, yes.  I mean, one man's opinion.

Q    Okay.  Is it your practice to rely on statements or summaries from reports from the experts retained by opposing counsel in litigation?

A    I always review the expert's counsel [sic], yes.  I mean, the expert -- the plaintiff's expert, I review their reports, yes.

Q    And do you typically rely on statements of fact or summaries of fact from those reports?

A    I consider the report, the report.  I -- I'm somewhat confused as to what you're asking.

Q    Sure.  Let me ask it a little bit differently.

So do you -- is it your typical practice to look through the record yourself to determine the facts that you're relying on for your report, or do you at times look to the expert report provided by --

A    No.  I find my own facts.

Q    Okay.  Is there a reason that you departed from that practice in this case when looking at the deposition testimony from the four prisoners who were in the B cellhouse during the fire?

A    As I said, I didn't receive those.  I

JOHN D. REES                      166
Cause No. 3:18-cv-00995-JD-MGG

didn't -- I did not review them.

Q   Okay.  So you reviewed on -- what's the reason that you -- instead of reviewing them, you relied on the facts that were presented in the expert report from plaintiff's counsel?

A   Well, I -- there were statements in the expert's report concerning what those individuals said or what some individual inmates said.  I don't know whether they were the same.  And if you'll go -- if you'll refer back to -- my response to Mr. Blinn was, I don't think I need them unless you know -- you know of some critical -- or I forget the exact wording.  But, you know, if he felt that I needed to see them, he could have sent them and I would have reviewed it.

Q   Okay.

A   I didn't think -- but I didn't think I needed them.  I think I knew what they said already.

Q   So any -- any evidence or facts you believed were relevant to your report, you would look up and review yourself; correct?

A   Yes.

Q   Have you ever been to Indiana State Prison in Michigan City?

A   Yes, ma'am.  I think earlier in this

JOHN D. REES                          167
Cause No. 3:18-cv-00995-JD-MGG

deposition I told you that I did a security analysis there 10 or 12, 15 years ago with the Criminal Justice Institute out of Middletown, Connecticut.

Q   How much time did you spend at the facility?

A   I believe we were there for two, may have been three days.

Q   And did you go to all the different cellhouses in the facility?

A   Yes, ma'am, I did.

Q   Have you been there since then?

A   No, ma'am.

Q   Is that the only time that you've been to Indiana State Prison?

A   I believe that's the case, yes.

Q   When you went there, you went inside B cellhouse?

A   I'm sure I did.  I toured the entire facility.

Q   Your opinions are limited to the materials that you reviewed in this case; correct?

A   Yes.

Q   Is it possible that your opinions would be different if you reviewed additional materials?

A   Absolutely.

JOHN D. REES                        168
Cause No. 3:18-cv-00995-JD-MGG

MS. PIERCE:  All right.  I don't think I have any additional questions.

MR. BLINN:  I am going to have just a few. We can go now; or if you want to break, I don't think I'm going to be very long.

THE WITNESS:  Let's go.

MS. PIERCE:  Go.

CROSS EXAMINATION

BY MR. BLINN:

Q    All right.  Go, go, go.

Mr. Rees, do you remember asking [sic] a line of questions earlier about the opinion in your report that the response is not perfect?

A    Yes.

Q    And just to be clear, the opinion that you made was that the response was not perfect; right?

A    Thank is correct.

MS. PIERCE:  Object to form.

BY MR. BLINN:

Q    And are you purporting to offer an opinion in this case as to each and every single thing that everyone in the case could have done differently?

A    No.

MS. PIERCE:  Object to the form.

JOHN D. REES                      169
Cause No. 3:18-cv-00995-JD-MGG

BY MR. BLINN:

Q    Go ahead and answer.

A    No.

Q    Okay.  Do you remember being asked some questions about Officer Rodriguez and when he responded?  Do you remember those questions?

A    Yes.

Q    Do you remember being asked some questions about what you had relied on?

A    Yes, I believe so.

Q    Did you read Officer Rodriguez's deposition?

A    Yes, I did.

        MS. PIERCE:  Object to form.

BY MR. BLINN:

Q    Did you rely on Officer Rodriguez's deposition in forming your opinions in this case?

        MS. PIERCE:  Object to form?

BY MR. BLINN:

Q    I'm sorry.  What was the answer?

A    Yes.

BY MR. BLINN:

Q    Okay.

        MS. PIERCE:  Just -- I'm sorry to interrupt, but maybe just wait a quick second,

JOHN D. REES                                170
Cause No. 3:18-cv-00995-JD-MGG

Mr. Rees, so I can get the objections on the record. I think that will help Pam and help keep a clean record.

THE WITNESS: All right.

BY MR. BLINN:

Q So maybe to try to address counsel's objection, I'll take a higher-level view.

Do you remember answering questions about the list of materials that you reviewed and that you relied on in forming the factual assumptions that -- in your opinion? Do you remember those questions?

A Yes, I do.

Q Okay. And so was Officer Rodriguez's deposition testimony on that list?

A Yes, it was.

MS. PIERCE: Object to form.

BY MR. BLINN:

Q Okay. So did you rely on Officer Rodriguez's deposition testimony in forming the assumptions that you based your opinion on?

MS. PIERCE: Object to form.

THE WITNESS: It was part of what I considered.

JOHN D. REES                  171
Cause No. 3:18-cv-00995-JD-MGG

BY MR. BLINN:

    Q    Okay.  What about Officer Blakely?  Did you rely on -- well, strike that.

        Did you review Officer Blakely's deposition transcript?

    A    Yes, I did.

        MS. PIERCE:  Objection to form.

        THE WITNESS:  Yes, I did.

BY MR. BLINN:

    Q    Just wait a second so she can get her objection in.

    A    All right.  Okay.  All right.

    Q    So I'll reask the question.

        Did you review Officer Blakely's deposition transcript?

        MS. PIERCE:  Object to form.

        THE WITNESS:  Yes.

BY MR. BLINN:

    Q    Did you rely on Officer Blakely's deposition transcript in forming the assumptions that your opinion is based on?

        MS. PIERCE:  Object to form.

        THE WITNESS:  It was included in what I developed my opinion on.

JOHN D. REES                    172
Cause No. 3:18-cv-00995-JD-MGG

BY MR. BLINN:

Q    Okay.  And same question with
Officer Abbassi.  Did you read Officer Abbassi's
deposition transcript?

        MS. PIERCE:  Object to form.

        THE WITNESS:  Yes.

BY MR. BLINN:

Q    All right.  And did you rely on
Officer Abbassi's deposition transcript in forming
the assumptions and that your opinions in this case
are based on?

        MS. PIERCE:  Object to form.

        THE WITNESS:  It was part of what I used
    to form my opinions.

        MR. BLINN:  Okay.  I don't have any other
    questions.

        MS. PIERCE:  No follow-up for me.  I think
    we're done.

        MR. BLINN:  Okay.  We will sign.

        MS. PIERCE:  Pam, I think you're muted
    still.

        THE REPORTER:  Are there any orders at
    this time?

        MS. PIERCE:  Not yet from plaintiff's
    counsel.

**JOHN D. REES**                                    173
Cause No. 3:18-cv-00995-JD-MGG

MR. BLINN:  So we'll -- we'll sign.  And if plaintiff offers it, just make sure we find out, and we'll get it to him and we'll sign it.

THE REPORTER:  Thank you.

(Deposition concluded at 3:10 p.m.)

(Signature reserved.)

--oo0oo--

Cause No. 3:18-cv-00995-JD-MGG                    174

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DENISE DWYER, as Personal     )
Representative of the         )
ESTATE OF JOSHUA DEVINE,      )Case No.
                             )3:18-cv-00995-JD-MGG
          Plaintiff,          )Judge Jon E. DeGuilio
                             )Magistrate Judge
vs.                           )Michael G. Gotsch, Sr.
                             )
RON NEAL, et al.,             )
                             )
          Defendants.         )

REPORTER'S CERTIFICATE

I, PAMELA S. OWEN, CSR, RPR, and Notary Public for the County of Lake, State of Indiana, do hereby certify that I reported in machine shorthand the foregoing proceedings had in the above-entitled matter, at the time and place herein before set forth; and I do further certify that the foregoing transcript, consisting of one hundred and seventy-three (173) typewritten pages, is a true and correct transcript of my said stenographic notes.

Signed this 17th day of February, 2023.

_____
PAMELA S. OWEN, CSR, RPR
IL Lic. No. 084-002294
Notary Public, Lake County, IN
My Commission Expires:  8/1/24

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DENISE DWYER, as Personal     )
Representative of the         )
ESTATE OF JOSHUA DEVINE,       )Case No.
                              )3:18-cv-00995-JD-MGG
         Plaintiff,           )Judge Jon E. DeGuilio
                              )Magistrate Judge
vs.                           )Michael G. Gotsch, Sr.
                              )
RON NEAL, et al.,             )
                              )
         Defendants.          )

              DEPONENT'S CERTIFICATE


     I, JOHN D. REES, deponent herein, do hereby certify that I have read the above and foregoing deposition and find the same to be a true, correct, and complete transcript of said deposition, and includes changes, if any, so made by me, given on the 26th day of May, 2021.
I further agreed to read and sign the same.

          WITNESS MY HAND this _____ day of _____, 2023.


          _____
          JOHN D. REES, DEPONENT
STATE OF _____)
                     ) SS:
COUNTY OF _____)
Before me, the undersigned, a Notary Public for _____ County, State of _____, appeared and acknowledged the execution of the foregoing instrument on this _____ day of _____, 2023.
(SEAL)


          _____
          NOTARY PUBLIC
          My Commission Expires:_____

Cause No. 3:18-cv-00995-JD-MGG                176

```
            E R R A T A   S H E E T

PAGE   LINE     CORRECTION                      REASON

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____

____  ____   _____
```

_____
JOHN D. REES, DEPONENT
Date of Deposition:  05-26-21

STATE OF _____ )
                      ) SS:
COUNTY OF _____ )

Before me, the undersigned, a Notary Public for _____ County, State of _____, appeared and acknowledged the execution of the foregoing instrument this _____ day of_____, 2023.
(SEAL)

_____
NOTARY PUBLIC
My Commission Expires:_____

**BOSS REPORTERS**
**(219) 769-9090**

USDC IND/ND case 3:18-cv-00995-JD   document 272-2   filed 03/20/23   page 178 of 196

**$**

**$25,000 (1)**
158:14

**[**

**[sic] (4)**
124:20;133:8;
165:7;168:12

**A**

**Abbassi (4)**
84:8;154:15,24;
172:3
**Abbassi's (2)**
172:3,9
**ability (2)**
5:12,15
**able (9)**
9:15;22:9;52:21;
69:22;79:15;122:6;
130:4;146:21,23
**absolutely (2)**
147:20;167:25
**absurd (1)**
118:12
**abuse (1)**
38:1
**ACA (13)**
51:6;69:3;70:2,3,9,
13,18;80:12;81:20;
91:12;139:22;
140:14;159:25
**academy (1)**
46:2
**access (3)**
37:24;39:1,6
**accident (10)**
113:5;114:5;119:9,
13;120:9,23;125:12,
15,18;127:6
**accidental (13)**
113:3;119:24;
120:3,8,12;124:21;
125:3,9,9,16;126:1,7;
127:3
**accidentally (1)**
126:4
**accidents (1)**
125:5
**accordance (3)**
55:11;56:19,20
**according (1)**
97:21
**accountant (1)**
16:22
**accredit (1)**
51:24
**accreditation (54)**
43:20;45:6,9;

47:25;51:8,21;52:5,
11,14,18,20;53:8;
54:17;55:15,17,22;
60:5,16,20,20,21;
65:5,14,25;66:2;74:4,
11,21,24;75:1,4;
76:20;78:2,14,22,25;
79:7;80:9,24;90:15,
20,25;91:7,13;
118:13;119:5;138:8;
140:14;141:20;
142:9;143:25;145:7;
159:25;161:18
**accreditations (1)**
66:2
**accredited (18)**
43:18;51:20;52:2,
9,10,22;53:1,3,11,17;
54:15,22;55:1,7;
79:10;118:2;139:22;
141:20
**accurate (5)**
34:14,18;107:4;
108:20;109:8
**accused (1)**
150:14
**achieve (6)**
51:8;55:16;118:7,
13;119:4;137:25
**achieving (1)**
118:4
**acknowledge (1)**
110:23
**acknowledgment (1)**
79:9
**across (3)**
41:22;49:11;
164:14
**act (2)**
109:20,21
**acting (1)**
13:8
**actions (1)**
139:9
**actively (1)**
67:11
**activities (4)**
47:18;48:20;60:3;
117:23
**actual (4)**
113:17;137:15,24;
158:12
**actually (7)**
22:3;27:6;34:3;
63:13;106:9;131:10;
164:7
**add (3)**
33:6,7,9
**added (2)**
32:4;34:11
**adding (3)**
33:8;34:11;51:11
**additional (10)**

37:10;62:13;81:20;
121:17,19,24;131:18;
147:3;167:24;168:2
**Additionally (1)**
117:8
**address (8)**
14:11;34:21;44:14;
56:23;138:19,19;
146:20;170:6
**addressed (4)**
44:13;45:13;56:8;
68:25
**addresses (2)**
57:1;145:9
**adjacent (1)**
85:25
**administration (3)**
48:13;73:20;
147:21
**administrative (8)**
6:14;7:12,20,24;
150:20,24;151:1,5
**administrator (4)**
54:10;59:20;63:21;
68:11
**adult (2)**
35:20;65:23
**advice (4)**
42:8;46:24;102:15;
159:12
**adviser (2)**
24:1,2
**advising (1)**
35:18
**Affairs (7)**
83:6,8,11,13,21;
88:19;89:16
**affect (2)**
5:12,15
**again (37)**
8:5,25;18:2,5;22:7;
27:25;34:4;48:11,24;
49:24;53:23,23;
58:12;61:24;82:4;
87:8;88:12;89:14;
90:2,6;105:9;106:17;
112:21;113:10,15;
120:21;125:20;
127:5;132:16;134:1;
138:13;139:15;
141:4,11;142:17;
144:6;145:18
**against (3)**
27:10;150:2;
151:14
**age (1)**
57:16
**agencies (3)**
13:20;35:17,19
**agency (1)**
13:15
**ago (8)**
7:6;14:2;15:1;

20:14;22:5;105:2;
158:24;167:2
**agree (6)**
57:18,22;58:16;
59:10;163:19;164:7
**agreed (4)**
10:12;11:7,10,17
**agreement (2)**
138:14;144:18
**ahead (6)**
9:2;40:25;128:22;
129:2;134:20;169:2
**alarm (3)**
110:23;114:22;
154:6
**allegation (1)**
140:8
**allegations (2)**
14:23;160:20
**allegedly (1)**
146:3
**allowed (2)**
39:11;149:12
**almost (4)**
22:4;69:8;136:9;
155:22
**along (1)**
15:14
**altercation (1)**
27:7
**Always (2)**
162:7;165:6
**ambiguous (1)**
163:17
**amending (1)**
47:21
**America (3)**
49:8,14,21
**American (10)**
51:2,8,16;53:5;
66:12;68:22;69:9;
90:14;140:5;145:8
**amount (3)**
36:10;40:12;158:7
**analysis (14)**
6:22;7:1;14:9;38:5,
5,19;39:25;106:24;
107:6,15;119:6,16;
121:21;167:1
**analyzed (1)**
14:14
**and/or (2)**
103:15;161:3
**Andy (2)**
78:1;81:6
**annual (9)**
47:15,25;68:12,24;
69:6,6,7,10,13
**answered (5)**
124:1;130:15;
132:21;139:17;
141:18
**anticipate (1)**

22:12
**anymore (1)**
157:22
**apologize (1)**
101:24
**appear (1)**
87:22
**appears (1)**
81:19
**appliances (1)**
117:4
**appreciate (4)**
23:21;84:25;110:4;
147:6
**Approach (1)**
65:24
**appropriate (7)**
45:1;111:17;
112:16,20,22;153:5;
155:16
**appropriate- (1)**
110:10
**appropriately (7)**
111:12,18;122:5;
153:18,23;154:16,25
**approximately (3)**
133:14,22;134:2
**April (10)**
83:20;90:2;94:24;
108:7;143:24;
144:25;146:9;153:4;
159:18;163:21
**architectural (1)**
37:17
**areas (3)**
55:11;57:3;61:2
**around (14)**
7:7;57:4;66:25;
67:16,21;69:14,14;
71:18;86:19;135:8,
13;136:15;139:5;
162:11
**arrive (3)**
131:7;135:3,11
**arrived (2)**
100:17,24
**arrives (1)**
134:13
**arson (2)**
119:13;120:2
**article (2)**
34:11;65:10
**Aside (1)**
150:13
**aspects (2)**
126:24;128:6
**assault (3)**
20:7,19;26:9
**assaulted (2)**
20:11;21:8
**assessing (1)**
162:21
**assessment (1)**

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 272-2   filed 03/20/23   page 179 of 196

24:10
**assigned (2)**
83:19;84:3
**assignments (2)**
70:23;71:5
**assist (1)**
21:23
**assistance (3)**
114:20,25;131:17
**assistant (2)**
60:7,22
**assistantship (1)**
62:18
**assists (1)**
60:13
**Associates (5)**
35:3,6,25;41:11;
48:12
**Association (10)**
51:2,9,16;66:13;
68:23;69:9;70:17;
90:14;140:6;145:8
**Associations (1)**
68:10
**assume (2)**
4:8;119:17
**assuming (1)**
133:21
**assumption (13)**
131:21;132:8,10;
133:14;134:1;153:7,
14,25;154:1,7,9;
155:2,19
**assumptions (6)**
11:21;141:14;
170:11,21;171:20;
172:10
**Attached (2)**
79:12,25
**attachment (6)**
79:6,14,16,16,19,
22
**attachments (3)**
30:6;82:5;157:16
**attack (1)**
19:7
**attainment (1)**
8:12
**attend (1)**
71:7
**attendance (2)**
68:10,13
**attended (3)**
69:8,9;70:3
**attending (1)**
70:7
**attention (1)**
117:9
**Attorney (14)**
4:14;13:5;21:4;
25:1,16;26:19;27:20,
22;30:7;158:23;
159:10,12;160:5,8

**attorneys (6)**
31:24,25;81:16;
88:8;158:10;159:23
**audit (2)**
51:15;53:19
**auditor (4)**
53:4;68:23;69:5,13
**auditors (1)**
80:12
**audits (3)**
53:8;69:11;80:12
**August (2)**
70:7,8
**authored (1)**
160:18
**autopsy (1)**
19:10
**available (2)**
45:1;47:1
**average (1)**
37:6
**award (1)**
81:21
**aware (8)**
29:24;30:3;45:15;
98:19;101:11;
105:15;150:16;153:1
**away (2)**
16:21;127:3

## B

**back (33)**
9:3;10:23;15:2;
18:15;25:9;28:2,12;
32:24;33:11,14,19;
41:9;65:21;69:15,18;
71:18;72:23;88:10,
12,18;93:17;99:11,
25;100:2;109:6;
121:8;134:15;136:1,
17,19;153:2;162:10;
166:10
**bad (1)**
152:13
**ballpark (2)**
22:22;136:3
**base (1)**
118:17
**based (19)**
29:23;88:15;
102:19;131:20;
132:10;133:6,9,10,
13,25;153:7,13;
154:1,8,9;155:2;
170:21;171:21;
172:11
**bases (2)**
140:16,22
**basic (3)**
3:25;39:24;75:4
**basically (5)**
39:18;42:17;48:16;

61:6;118:10
**basing (1)**
134:8
**basis (7)**
45:17;68:12;
124:15;126:21;
127:7;128:1;140:11
**Bates (4)**
41:2;77:18;87:10;
156:15
**Beal (2)**
97:7,21
**became (4)**
23:7;54:23;55:23;
62:12
**become (2)**
53:17;73:9
**began (6)**
11:18;106:24;
110:19;135:3,4,11
**begin (1)**
131:21
**beginning (1)**
8:23
**behalf (11)**
3:2;24:19;25:5;
26:1,15,16,21;28:20,
23;29:9;149:21
**behavior (2)**
110:17;120:16
**believer (1)**
52:7
**besides (10)**
15:21;26:13;74:10;
78:6,14;82:1;88:25;
93:7;142:8;146:9
**best (3)**
40:7;116:12;
148:22
**better (7)**
7:22;24:17;38:22;
58:8,9;123:7;129:17
**beyond (11)**
10:19;21:17;31:3;
74:19;81:10;83:10;
93:14,21;111:23;
114:4;130:18
**big (1)**
164:2
**biggest (2)**
17:5;72:21
**bill (1)**
158:12
**billed (2)**
91:19,23
**billing (4)**
16:9,14;158:13,16
**bit (11)**
7:17;23:16;48:25;
58:2;87:20;134:20;
137:4,14;163:24;
164:10;165:13
**Blakely (9)**

84:8;134:25;135:1;
153:16,17,22,22;
154:8;171:2
**Blakely's (3)**
171:4,14,19
**Blinn (69)**
5:18,24;6:4;9:4,9,
16;10:17,25;11:12,
14;28:4,9,11,14;30:9;
31:13;58:4,11;71:19;
72:8;73:15,25;80:2;
86:24;87:12;99:24;
101:16,20,25;102:2,
12;107:17;108:8;
123:17,25;128:12,15,
24;129:2;130:16;
132:19;136:2,8;
141:17;144:7,15,18;
162:3,8,13;163:15;
166:11;168:3,9,19;
169:1,15,19,22;
170:5,18;171:1,9,18;
172:1,7,15,19;173:1
**Blinn's (1)**
102:15
**books (1)**
35:14
**both (10)**
12:17;19:6,15;
44:11;54:24;68:23;
69:2;81:4;92:25;93:2
**bottom (2)**
134:17;139:25
**break (11)**
5:6,9;71:17,18,24;
72:2;99:21;136:1,17;
162:10;168:4
**breaking (1)**
55:19
**breathing (1)**
57:8
**brief (6)**
9:23;10:24;71:21;
99:22;136:20;162:14
**bring (1)**
145:11
**bringing (2)**
25:6;67:16
**broad (1)**
60:2
**broadly (1)**
137:4
**broke (1)**
57:14
**broken (1)**
151:21
**brought (2)**
145:13;151:14
**budget (3)**
43:3;45:5;60:15
**Bureau (5)**
38:4;42:1;60:23;
62:17,20

**burglarized (1)**
152:18
**burglary (3)**
152:1,12,13
**burst (2)**
164:1,2
**business (1)**
49:7

## C

**call (9)**
74:14;104:4;
110:18,22;131:17;
134:23;154:4,5;
155:3
**called (6)**
3:2;75:13;114:20,
25;131:16;154:10
**calling (4)**
110:22;134:22,24;
154:11
**calls (1)**
27:21
**came (4)**
73:23;88:7;123:1;
158:6
**camera (4)**
94:24;98:24;
108:21;109:9
**Camp (1)**
6:20
**can (60)**
3:7;5:4;8:7,10;9:4,
22;10:22;13:2;17:20;
22:15,22;24:16;26:3;
28:2,12;30:7;53:10;
55:9;57:25;58:4,8;
64:3,16;65:17,18;
74:8;79:13;87:12;
101:16;106:20;
107:24;108:10,18;
109:1;112:18;
116:12;117:1,20;
118:24;119:2;124:3;
125:3,4,5;127:18;
129:2,20;136:18;
137:6,11;139:2;
140:21,25;141:8;
144:13;156:7;162:1;
168:4;170:1;171:10
**cancer (1)**
152:16
**capacities (1)**
38:21
**capacity (2)**
6:9;148:7
**captions (1)**
30:19
**captures (1)**
39:19
**care (1)**
134:7

USDC INND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 180 of 196

**career (15)**
    5:20;12:17;13:5,
    14;22:5,19;28:21,22;
    52:12;62:6;63:13,19;
    73:19,21;150:6
**careful (1)**
    95:19
**carefully (2)**
    4:4;123:13
**Carolina (1)**
    3:12
**carried (3)**
    58:25;59:14,16
**carry (1)**
    102:6
**carrying (1)**
    10:5
**case (82)**
    5:17;6:1;10:12;
    11:7,13,14,16,18,21;
    12:2,5,19;19:2,3,6,7,
    8,9;20:9,23,24;21:17,
    24,25;22:1;24:20;
    25:10,17;26:6,7,9,10,
    11,13,20;27:1,2,4,9,
    10,21,23;28:23;32:4,
    13;68:18;73:5,10,11;
    74:19;82:7,8,8;88:4,
    8;91:20;92:2,7,9,13;
    105:1;109:1;115:8;
    124:24;130:5,10;
    150:7;156:16;157:7;
    160:13,17,20,25;
    161:4,16;165:22;
    167:15,21;168:21,22;
    169:17;172:10
**cases (50)**
    13:10;15:7,9,12,17,
    22,25;16:10,14;
    17:12,23;18:4,7,9,21;
    19:13,15;20:3,10,17;
    21:7,17;22:17;23:3,
    15;27:17,20;29:2,5,6;
    30:20;31:15,18,23;
    32:7,10,15,18,24;
    33:4,7,8,9,19,24;
    36:13,23;96:4;
    149:10;160:10
**caseworker (1)**
    62:10
**cause (1)**
    141:24
**caused (1)**
    64:4
**causes (1)**
    19:6
**CD (1)**
    88:6
**cell (22)**
    37:24;39:1,7,10,11,
    16,18,19;75:9;83:7;
    108:24;109:12;
    110:9;112:19;123:9;

131:5;146:22,24;
    163:22;164:4,4,7
**cellhouse (22)**
    59:9;83:19;84:3,8,
    90:2;94:25;98:13;
    100:14,23;101:3;
    103:3,10,22;104:14;
    107:1;110:8;111:11;
    123:23;126:14;
    163:21;165:24;
    167:17
**cellhouses (1)**
    167:9
**cells (4)**
    57:2;86:1,5,7
**center (1)**
    29:16
**Central (11)**
    6:15;7:14;54:10;
    59:25;74:4,11,20,24;
    76:20;78:2;136:18
**certain (1)**
    136:16
**Certainly (3)**
    87:15;102:23;
    124:18
**certification (1)**
    67:6
**certifications (1)**
    70:11
**certified (6)**
    66:8,11,17,22;67:1,
    2
**certify (1)**
    66:21
**challenging (1)**
    149:11
**change (4)**
    48:2;53:19;62:12;
    103:19
**changed (4)**
    34:21;104:11;
    149:4;156:20
**chaotic (2)**
    112:14;123:12
**characterize (1)**
    110:6
**charge (1)**
    56:12
**charged (2)**
    20:6,19
**Charities (1)**
    41:23
**check (3)**
    25:19;57:5,6
**checked (1)**
    57:12
**checking (2)**
    44:15,16
**chemicals (6)**
    8:12,16,17;10:5;
    65:5,11
**chief (1)**

50:11
**circumstances (1)**
    151:19
**cite (1)**
    144:10
**City (13)**
    6:22,23,24,25;
    12:7;75:2;78:23;
    80:12;93:25;118:1;
    137:9;145:12;166:24
**civil (2)**
    20:24;159:18
**Claims (2)**
    114:9,13
**clarification (8)**
    4:7,7;13:11;84:25;
    110:5;119:11;147:2,
    6
**clarify (9)**
    13:2;28:25;36:15;
    46:9;115:4;125:6,6;
    128:16;163:11
**clarifying (3)**
    20:25;23:20;66:15
**clarity (1)**
    109:5
**class (3)**
    71:7,7,12
**classification (10)**
    14:1,5,6,8;21:24;
    24:3;60:4,12;62:21;
    66:5
**classified (1)**
    62:14
**classify (1)**
    14:7
**Clean (3)**
    66:9,14;170:3
**cleaning (1)**
    65:10
**clear (7)**
    4:21;22:16;102:3;
    144:8,15;154:22;
    168:15
**clearly (6)**
    8:7;17:20;115:23;
    116:2;133:12;140:8
**close (8)**
    58:2;76:17;105:16;
    138:6;152:5,23;
    161:23;162:4
**closing (1)**
    104:24
**clothing (1)**
    146:23
**Co-counsel (1)**
    4:17
**Code (5)**
    114:22;131:17;
    134:24;154:5,11
**coincides (2)**
    70:18;132:14
**collective (1)**

129:22
**com- (1)**
    57:10
**combustible (2)**
    57:2,3
**coming (7)**
    108:23;109:12;
    112:19;114:14;
    131:5;164:3,3
**Commission (3)**
    51:23;53:21;66:14
**commissioner (24)**
    7:19;25:12,13;
    42:20,25;43:11;44:7,
    18,21,22;46:16;
    47:19;52:19;60:23;
    61:3,7;74:12,15,19;
    75:14,19;76:1,6,14
**Commissioners (1)**
    70:17
**Commissioner's (2)**
    7:16;75:16
**commitment (3)**
    44:9;55:10;118:8
**committed (2)**
    140:5;145:9
**Committee (2)**
    66:10,14
**communicate (2)**
    76:13,16
**communication (1)**
    77:23
**communications (3)**
    159:8,14;161:14
**community (8)**
    35:21;38:2;41:25;
    42:5,7,13,18;76:9
**companies (3)**
    35:16;37:16;48:18
**company (6)**
    37:23;39:17;40:2,
    4;49:15,25
**compared (1)**
    36:18
**compensated (1)**
    13:9
**competing (2)**
    164:14,20
**complete (8)**
    32:17;33:2;68:4;
    69:22;83:3;94:20;
    95:23;102:20
**completed (3)**
    109:22;110:16;
    112:16
**completely (1)**
    5:7
**compliance (3)**
    45:17;51:12,18
**compliant (1)**
    55:24
**complicated (1)**
    39:24

**complied (2)**
    50:21;51:6
**complying (6)**
    65:22;77:22;
    116:24;117:18;
    118:25;121:3
**component (2)**
    60:21;69:4
**components (1)**
    56:17
**comprehensive (3)**
    98:25;104:8,16
**computer (1)**
    16:16
**concern (4)**
    73:11;103:8;
    118:14,14
**concerning (2)**
    90:14;166:7
**concerns (2)**
    61:8;117:3
**conclude (1)**
    153:3
**concluded (4)**
    27:9;125:8;153:17;
    173:5
**concluding (1)**
    126:22
**conclusion (15)**
    114:11;115:8;
    116:8;121:2,9,9,17,
    19;122:18;125:21,
    24;141:15;142:10,
    12;153:7
**conclusions (2)**
    73:18;121:13
**conditions (11)**
    5:11;14:21;21:24;
    22:18;23:3,15;24:7,
    16,24;120:16;137:4
**conduct (1)**
    148:16
**conducted (2)**
    145:4;158:4
**conferences (2)**
    68:13,14
**confident (1)**
    33:24
**Confidential (2)**
    87:7,14
**confinement (7)**
    14:22;21:24;22:18;
    23:3,15;24:16,24
**confused (1)**
    165:12
**confusing (3)**
    4:6;112:14;123:12
**confusion (1)**
    127:14
**Connecticut (2)**
    6:21;167:3
**consent (5)**
    23:4,25;24:6,6,13

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JOHN D. REES
May 26, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 181 of 196

**consider (5)**
76:1,3,3;103:20;
165:11
**considerable (1)**
39:12
**considered (3)**
103:23;104:21;
170:24
**consult (1)**
37:23
**consultant (17)**
13:17,24;14:12;
28:22;29:8;35:3,16,
24;36:3,18;37:11,19,
22;40:3;41:11;48:11;
71:2
**consultation (3)**
40:10;42:4,8
**consulted (2)**
6:11;13:19
**consulting (14)**
12:19;25:14;35:3,
7,25;38:17;40:5,12,
15;41:11;48:20;
52:15;70:23;75:23
**Contact (1)**
8:19
**contacted (1)**
86:24
**contained (3)**
32:23;89:1;145:5
**contains (4)**
33:4,18,24;105:24
**contend (1)**
161:1
**continual (1)**
109:25
**continue (1)**
28:2
**continued (1)**
67:24
**continues (2)**
109:14,19
**continuing (5)**
107:20,24;108:10,
11;109:20
**continuity (1)**
143:8
**continuum (1)**
42:17
**contraband (3)**
39:6,10,16
**contractor (1)**
57:13
**contradicting (1)**
164:15
**contradictory (1)**
164:20
**control (5)**
39:14;65:8;130:5;
159:17;163:5
**Controlling (3)**
65:5,9,10

**controls (1)**
39:20
**conversation (10)**
10:18;11:11,20;
12:1,4;76:22;78:7,
11;101:13,14
**conversations (5)**
74:18,23;76:19;
78:5;102:11
**coordinated (1)**
129:17
**copied (3)**
82:19,21;101:17
**copies (4)**
89:5;160:18,24;
161:14
**copy (10)**
9:12,17;17:23,25;
18:3,6;34:6;40:24;
82:22;106:4
**coroner (1)**
125:11
**Corporation (3)**
49:8,14,21
**Correction (7)**
10:9;13:12;37:17;
41:25;42:13;90:14;
160:12
**correctional (36)**
26:16;29:16;35:17,
22;38:2;40:3;42:3;
43:3,10;44:9;48:20;
49:12;51:2,9,16;62:7,
15,20;63:14;64:1;
65:1;66:11,12;68:22;
69:9;70:16;73:20;
76:9;117:22,22;
140:5;143:1;145:8;
147:21;151:15;
160:21
**Corrections (59)**
6:3,4,6,7,10;8:16;
13:18,21;19:18;
21:21;24:1,2;27:11,
12;31:19,20;38:3;
42:5,7,21;43:1,14;
44:1,6,18,23;46:15,
17;47:20;48:13;49:8,
14,21;60:1,9,23;62:7;
66:9,17,23;68:11;
74:5,6,16;75:21,23,
25;79:9;93:1;94:1;
119:3;148:17;149:2,
15;150:15,18;
151:10;160:17;
161:19
**correctly (3)**
112:6;135:5;157:9
**counsel (9)**
21:15,20;65:22;
103:4;159:9;165:5,6;
166:5;172:25
**Counselor's (1)**

114:21
**counsel's (1)**
170:6
**count (3)**
15:6,6;91:5
**country (2)**
41:22;49:11
**County (2)**
25:11,16
**couple (8)**
6:12;20:10;64:22;
65:4;70:6;84:14;
99:6;150:4
**course (2)**
9:21,21
**court (17)**
4:20;5:3;8:6;
17:20;23:15;28:19;
29:18,21,25;36:13,
22;39:21,23;54:23;
60:14;66:5;87:13
**courts (3)**
23:7;39:21,22
**covers (1)**
118:23
**crackling (1)**
55:19
**create (2)**
117:9;157:20
**created (2)**
95:17,19
**creating (3)**
47:21;157:25;
164:11
**creation (1)**
148:9
**credited (1)**
43:17
**crew (1)**
131:19
**cries (11)**
114:14,19,25;
131:14;132:3,9,11;
133:3;154:2;155:10,
18
**Crime (7)**
64:19;151:17,20;
152:3,6,10,24
**Criminal (4)**
6:21;20:23;48:13;
167:2
**critical (4)**
98:18;101:10;
107:1;166:12
**CROSS (1)**
168:8
**cry (2)**
131:21;155:12
**culture (1)**
44:9
**curious (1)**
162:8
**current (2)**

38:20;80:11
**currently (6)**
3:11;18:22;30:15;
37:3;38:7,12
**curriculum (2)**
46:23;47:4
**curriculums (1)**
46:19
**custody (8)**
61:23;62:23,25;
63:3,6,9,10;159:17
**customers (1)**
40:8
**cut (2)**
28:1,6
**CV (9)**
34:6,9,18,23;36:8;
41:7,9;49:18;70:23

**D**

**damaged (1)**
147:1
**date (6)**
7:18;33:13;34:15,
19;64:13,24
**dated (1)**
41:3
**day (1)**
160:6
**days (2)**
51:17;167:7
**dead (1)**
109:23
**deal (5)**
38:4;64:25;65:13;
68:20;110:14
**dealing (11)**
14:1;19:18;20:10;
23:3;35:19;39:15;
43:8;44:23;60:13;
69:3;145:17
**dealt (5)**
44:6;65:10;66:1;
69:2;94:13
**death (11)**
6:16;8:9;10:5,16;
19:6;122:2;124:21;
125:3,10,16;146:2
**deaths (1)**
19:5
**deceased (2)**
86:1;109:22
**December (1)**
17:6
**decide (1)**
51:23
**decision (5)**
102:18;103:1,4,7;
151:2
**declared (1)**
109:22
**decree (3)**

24:6,6,13
**decrees (2)**
23:5,25
**deeply (1)**
23:6
**defendant (4)**
20:21;27:18,19;
137:16
**defendants (13)**
5:25;19:13,14;
20:1;29:6;31:24;
88:8;91:19;103:4;
122:1;140:5;142:6;
160:13
**Defendants' (1)**
41:4
**defendant's (1)**
144:5
**defending (1)**
27:6
**defense (2)**
21:3;159:8
**deficiencies (2)**
24:7,9
**delayed (1)**
155:9
**delirium (1)**
19:11
**departed (1)**
165:21
**Department (52)**
6:2,4,5,6,10,11;
8:15;10:9;13:17;
14:10;21:23;22:19;
23:12,24;24:23;
26:18;27:11,11;
31:19,20;38:3;42:20,
25;43:13;44:1,5,23;
46:15,17,21;47:20;
59:23;60:8;61:18,19;
72:5,7,16;74:5,6,16;
75:23,25;79:8,11;
92:25;94:1;119:3;
124:20;160:12,17;
161:19
**departmental (1)**
56:12
**departments (3)**
37:16;46:25;75:20
**depend (1)**
164:18
**depending (2)**
51:17;57:16
**Depends (2)**
59:4;67:4
**deposed (1)**
3:15
**deposition (31)**
3:25;8:25;15:18;
28:20;29:9;30:21;
31:5;33:10;84:24;
96:20;97:6,12,15,16;
99:2,3;103:18;

USDC IN/ND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 182 of 196

140:19;156:19;
165:23;167:1;
169:12,17;170:15,20;
171:5,15,20;172:4,9;
173:5
**depositions (31)**
9:10;93:12,13,14;
94:19,20;95:7,25;
96:1,23;97:3,4,25;
98:5,11,17,19,23,23;
99:7,8,15,17;100:8,9;
101:10;103:16;
141:3,7;142:2,9
**deputy (13)**
46:4;52:18;60:7;
74:12,15,19;75:14,
15,18;76:1,5,14;
138:5
**describe (1)**
79:13
**described (2)**
46:14;73:22
**describes (1)**
73:11
**describing (1)**
109:15
**design (1)**
57:17
**despite (1)**
161:22
**destroy (3)**
16:24;159:2,4
**details (4)**
11:8,15,20;80:13
**determination (2)**
119:12;133:2
**determine (10)**
14:8;16:13;51:18;
73:13;98:20;101:5;
126:3;132:24;
158:13;165:17
**determined (9)**
101:6;114:5;119:9,
24;125:12;126:6,25;
131:15,24
**determining (2)**
24:12;164:23
**develop (4)**
44:8;51:13;55:5;
102:24
**developed (3)**
23:7;48:2;171:24
**developing (3)**
41:20;45:14;61:19
**development (6)**
35:18;49:7;52:8;
61:13,15,17
**Devine (18)**
87:11,17;107:2,2;
112:25;113:1;
114:17;120:9,13,19;
122:2;123:8;124:4,
17;125:11;127:2,9;

159:19
**Devine's (7)**
83:7;110:9;122:7;
124:9;126:18;128:9;
163:22
**died (12)**
11:6;12:6;19:2,4;
109:23;113:1;
124:17;125:11,15;
127:3,9;139:14
**Diego (1)**
70:5
**difference (1)**
115:14
**different (22)**
6:12;12:17;14:17;
15:20;20:11;23:13;
42:11;43:21;55:11;
59:8;63:24;67:14;
75:20,21;85:12;87:3;
111:1;146:5;147:5;
155:8;167:8,24
**differently (10)**
122:22;123:23;
126:10;128:19;
130:9,13;137:14;
143:12;165:14;
168:22
**difficult (2)**
118:5,6
**DIRECT (3)**
3:5;53:22;60:1
**directed (1)**
122:24
**directions (1)**
54:24
**directly (5)**
23:6;52:5;60:11;
84:5,16
**director (5)**
59:23;60:1,8,13;
61:11
**Director/Division (2)**
61:14;62:3
**disagreement (1)**
26:7
**disappear (1)**
28:7
**disciplinary (1)**
151:7
**disciplined (1)**
151:9
**disclosed (1)**
107:23
**Disclosures (1)**
41:4
**discuss (4)**
27:21;113:23;
137:18;138:16
**discussed (11)**
8:15;11:16;41:12,
15;71:1;78:11;89:23;
90:17;93:22;137:15;

150:14
**discussing (5)**
34:24;62:3;81:21;
113:15;139:17
**discussion (8)**
10:15;80:10,16,22;
81:1;112:2;116:7;
145:6
**Dismas (1)**
41:23
**dispute (1)**
81:22
**distinction (1)**
137:24
**division (2)**
60:15;61:11
**document (32)**
34:3;41:5;73:2,4;
77:13;79:24;80:8,14;
81:7,21;82:6;87:3,6,
10,20,23;88:1;92:10;
96:7;102:4,7;107:22,
23;138:25;156:7,10,
12,14,21,23;157:1,4
**documentation (1)**
79:3
**documents (43)**
16:25;17:4;32:15;
41:5;66:19;73:9,14;
78:14;80:25;82:1,7,
14;83:4;88:11;90:17;
91:10,15,17;92:1,6,
14;93:8;94:11;95:11,
14;97:17;98:6,7,8;
102:13;157:4,6,12,
14;159:16,21,22;
160:1,7,22,24;161:5,
7
**DOJ (2)**
13:20;22:1
**done (22)**
29:5;32:21;65:11;
89:15;122:21;123:6,
23;126:10,15;128:2,
11,19;129:13;130:9,
12,13;136:4,10;
149:1,4;168:22;
172:18
**door (3)**
77:11;154:19;
155:5
**doors (1)**
146:24
**dormitory (1)**
59:6
**down (15)**
4:21;5:4;8:7;
17:20;22:9;36:12;
49:17;64:16;65:18;
84:24;97:1;98:16;
118:8;127:15;157:3
**drills (7)**
44:15,15;57:5;

58:22,25;59:3;145:3
**drive (1)**
88:6
**dropped (1)**
8:19
**drug (3)**
19:10;41:21;42:15
**duly (1)**
3:3
**Dunigan (9)**
78:1,6;79:5;80:5;
81:6,10,13;90:18;
92:15
**duplicate (1)**
89:5
**duration (5)**
100:14;101:4;
103:3,11;104:15
**during (23)**
8:12;12:22,23;
13:5,14;23:2;28:21;
49:2;52:20;53:19;
55:3;59:2;61:5;
63:18;80:24;89:17;
104:16;121:22;
126:25;150:17;
151:10;152:15;
165:24
**duties (4)**
43:24;49:9;50:3;
149:14
**dying (1)**
152:16

**E**

**Eagle (1)**
81:21
**Earlier (13)**
7:9,17;21:25;
32:14;38:25;71:1;
78:19;95:6;121:16;
158:8;163:24;
166:25;168:12
**early (7)**
22:5,19,24;34:20;
70:7;86:24;150:6
**earned (1)**
158:3
**Eastern (2)**
19:3;46:21
**easy (1)**
22:12
**education (2)**
66:21;67:24
**efficiently (1)**
38:22
**effort (1)**
51:8
**efforts (1)**
137:25
**eight (4)**
131:1,4,9;156:21

**either (8)**
13:5;21:23,23;
31:19;39:14;42:1;
102:11;155:8
**electrical (2)**
117:4,7
**else (17)**
12:10;35:24;74:10;
78:10;80:4;83:10;
88:20;89:11,21;93:7;
117:24;130:18;
134:8;140:22;142:8;
158:25;161:20
**email (21)**
5:18,24;10:17;
75:6;77:7,21;78:6;
80:7;81:13;82:23;
92:14;96:16;97:2;
98:4;100:3,7;101:14,
18,20;102:15;161:17
**emailed (1)**
88:5
**emails (4)**
78:8;81:9,12;
159:14
**emergencies (2)**
116:23;145:25
**emergency (8)**
90:1;94:3;112:13,
14;123:11;138:12;
160:21;163:3
**emphasis (1)**
140:7
**employed (1)**
33:5
**employee (4)**
28:22;148:16;
149:15;150:15
**employees (1)**
10:9
**employment (1)**
149:1
**empty (1)**
59:9
**enclosing (1)**
41:4
**encompass (2)**
83:10;90:10
**encompassed (3)**
89:22;92:13,19
**encompasses (2)**
30:24;31:1
**end (4)**
8:25;70:15,19;
162:5
**ending (1)**
127:2
**ends (3)**
41:5;70:18,21
**engaged (1)**
71:4
**engaging (1)**
36:7

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021
USDC JNND case 3:18-cv-00995-JD   document 272-2   filed 03/20/23   page 183 of 196

**enough (2)**
5:10;102:23
**ensure (10)**
32:16,23;44:22;
46:18;50:20,22;51:5;
56:7;59:15;83:3
**ensured (6)**
33:1;45:3,6,11,14;
48:6
**ensuring (5)**
44:12,16,19;45:16;
137:20
**entail (2)**
6:19;7:2
**entailed (2)**
42:12,14
**entire (4)**
110:1;113:25;
114:15;167:18
**entirety (3)**
96:1;105:3,6
**entity (1)**
137:10
**environment (3)**
44:11;50:13,24
**equipment (4)**
44:16;45:4;57:6,8
**especially (3)**
117:2;143:4,5
**essentially (1)**
59:20
**established (2)**
9:24;12:25
**estimate (4)**
40:11,22;158:2;
162:7
**even (1)**
164:17
**evening (2)**
83:20;90:2
**event (12)**
57:20;58:18;84:2;
94:4,8,10,12,17;
102:21;109:25;
110:2;146:4
**everybody (1)**
63:5
**everybody's (1)**
45:8
**everyone (5)**
30:7;57:25;58:8;
162:2;168:22
**evidence (4)**
113:20;133:1;
141:13;166:19
**evidentiary (1)**
164:12
**evolve (1)**
163:9
**exacerbated (1)**
120:15
**exact (10)**
11:15,20;12:15;

15:6;25:15;33:13;
86:17;108:22;
109:11;166:13
**exactly (3)**
30:24;110:11;
122:25
**EXAMINATION (2)**
3:5;168:8
**example (2)**
24:5;44:14
**excluded (1)**
29:21
**excluding (1)**
159:19
**excuse (2)**
141:13;145:15
**execution (1)**
8:13
**executive (7)**
50:11;60:22;66:9,
12,17,23;75:24
**Exhibit (19)**
30:12;40:24;72:23;
77:14,15;82:3;87:3,
4;88:10;96:8,9,11,14;
99:14;100:3;104:24;
105:9;155:25;156:3
**expect (1)**
136:3
**expecting (1)**
136:9
**expenses (1)**
45:4
**experience (4)**
42:4;49:19;66:20;
72:3
**expert (83)**
6:1;10:8,13;11:7,
10;12:14,16,16,21,
25;13:7,8,10,23,24;
15:4,10,23;16:1,11,
15;17:1,4,13,24;18:8,
13,18,22;19:24,25;
20:5;27:9;29:3,8,15,
19,23;32:11;33:25;
35:20;36:3;37:4,7;
41:4;48:21;49:3;
72:25;77:19;82:4;
96:10,14,15;97:24;
103:21;104:22;
106:25;107:8,12;
108:14;110:13,14;
114:9,13;115:11,19;
116:22;118:10;
134:16;138:3;139:2,
6,13;145:13,17,24;
158:3;162:18;
163:10;165:7,8,18;
166:5
**experts (1)**
165:5
**expert's (8)**
97:4;98:5;103:15;

104:19;107:15;
140:8;165:6;166:7
**explain (4)**
8:10;39:8;40:8;
130:12
**explanation (1)**
130:11
**expressed (1)**
111:23
**expressing (1)**
111:8
**extinguisher (1)**
64:2
**extinguishers (3)**
44:16;57:5;135:4
**extra (1)**
123:2
**extremely (2)**
106:25;118:5

## F

**facilities (25)**
8:3;24:8;43:4,18;
46:5;52:12,14,20,22;
53:7,14;54:5,6,15,16;
56:7,23;58:24;59:3;
61:20,22;69:23;
72:13;79:10;80:9
**facility (43)**
43:17;50:6,7,17;
51:17,24;52:1,9,15,
16,17,25;54:1,3,4,10,
12;55:1,6,14,16,21,
23;58:19,21;59:4,6,
14,20,21;63:15;64:1;
72:4,6,18;75:4;93:3;
138:11;141:19;
144:1;167:5,9,19
**facility-wide (1)**
131:18
**fact (17)**
10:15;27:4;52:10;
103:6;107:13;
110:14;117:25;
118:23;120:7;
124:16;138:4;
141:19;142:9;145:7;
155:9;165:10,10
**facts (32)**
10:11;11:13,21;
27:3;107:7;111:5;
112:2;113:13,14,18,
21,23;115:8,11,15;
116:8,9;121:21;
133:1;141:9,9,13,14;
164:15,20,21,24,24;
165:17,20;166:4,19
**factual (3)**
113:20,20;170:10
**fading (1)**
58:1
**fail (2)**

53:9;54:16
**failed (4)**
53:8,8,15;149:12
**fair (28)**
4:9,10;5:10;7:8,10,
10;8:18;10:3;24:18;
29:7;31:14;40:22;
55:13,20;60:17;
62:22;110:6;111:14,
20,21;114:23;
119:16;136:25;
137:5;147:23,25;
159:4,6
**fairly (1)**
162:1
**familiar (3)**
3:24;73:10;87:22
**far (1)**
33:11
**farms (1)**
60:6
**Farr (1)**
97:24
**fast (3)**
96:4;110:11;
112:15
**faster (3)**
123:6;129:16,17
**father (1)**
152:9
**fault (1)**
111:3
**Fe (2)**
54:11;72:20
**February (5)**
48:4;86:25;97:3;
100:4,6
**federal (11)**
13:3,14,20;17:11;
23:6;38:4;41:25;
49:13;54:23,25;
60:14
**feed (1)**
8:19
**fellow (1)**
114:20
**felony (2)**
20:7,19
**felt (6)**
61:7;98:25;102:16,
20;104:8;166:13
**few (4)**
67:10;118:22;
142:17;168:3
**field (2)**
67:12;119:6
**fifth (1)**
134:25
**fifty (3)**
3:22;148:3;149:18
**fight (1)**
26:9
**figure (2)**

129:9;136:10
**files (1)**
16:17
**filling (2)**
110:15;129:18
**film (4)**
98:24;131:24,25;
132:5
**final (2)**
96:20;106:24
**Finally (2)**
117:10;146:22
**financially (1)**
45:3
**find (5)**
32:6;52:25;164:21;
165:20;173:2
**finding (1)**
53:20
**fine (8)**
5:7;9:9,12,18;
108:12;144:19;
147:4;162:3
**finish (8)**
4:22,23;5:23;8:6;
17:19;25:23;32:18;
80:20
**finished (1)**
18:16
**finishing (1)**
161:23
**fire (236)**
10:16;11:6;12:6;
31:16;43:12,13,18,
25,25;44:6,6,12,14,
15,15,24,24;45:3,13,
17;46:5,18,22,25,25;
47:2,16,22;48:8;
50:16;56:5,8,10,12,
16,16,23,25;57:4,5,6,
10,20;58:18,22,25;
59:3,17;60:18,21;
63:14,21;64:1,2,3;
65:1,1,4,7;68:21,21;
69:1,3;72:5,7,16;
75:3;78:17,20,25;
80:11,17,24;83:7,14;
84:16;88:19;89:9,17;
90:4,8;92:21;94:3,13,
25;98:13;100:14,17,
18,20,24;101:4;
103:4,11;104:15,15,
17;107:2,9;108:6,23;
109:11;110:8,19;
111:13,19;112:15;
113:2,3,5;114:3,4,5,
14,22;116:23;117:16,
21;118:3,11,15,16;
119:9,12,12,17,21,23,
23;120:1,7,12,13,14,
15,16,19,23;122:5,
22;124:5,5,21;125:1,
2,8,9,12,21,22,25,25;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 272-2   filed 03/20/23   page 184 of 196

126:3,6,24;127:4,8,
18;128:3,6;129:15;
130:11,14;131:14,16,
17,19,23,24;132:3,
25;133:14,22;
134:24;135:4,4;
137:3,16,19,20,24,
25;138:5,10,11,18,
19,21;139:7,10,13;
140:7,7,10,13,18,24;
141:11,16,22;142:14,
23,25;143:17,17,24,
24;144:25;145:3,25;
147:1;151:15;153:4,
9,18,23;154:2,6,16,
25;155:21,21;
159:18;160:21;
162:18,20,24;163:3,
7,8,10,12,13,22;
164:4;165:24

**firearm (1)**
85:24

**firefighter (2)**
146:14;147:9

**firefighters (7)**
99:4;100:17,24;
103:10;135:16,21;
140:24

**fireman (2)**
86:8;134:13

**firemen (6)**
85:23;86:10;99:10,
13,15;123:10

**fires (16)**
29:15;63:23;117:2,
7,9,10;125:3;143:2,3;
144:24;145:11,13;
146:8;162:21,22;
163:9

**fire's (1)**
110:23

**firing (1)**
64:4

**first (21)**
3:3;5:17;6:18;
18:17;66:22;97:5;
109:7;110:7;112:17;
122:16;127:17;
130:21,25;131:7;
134:4;135:3,11,15,
16;157:5;158:20

**fits (1)**
112:21

**five (10)**
33:15;81:20;84:5;
90:16,16;91:4,4;
97:5;105:2;136:19

**five-minute (1)**
136:1

**fix (1)**
53:10

**flame (2)**
164:1,2

**flames (1)**
112:18

**flammable (2)**
65:9;163:5

**flash (4)**
112:17;127:17;
133:20;134:5

**Fletcher (1)**
41:20

**floor (1)**
134:25

**focus (1)**
137:3

**follow (1)**
51:13

**followed (2)**
45:12;155:4

**Following (1)**
82:7

**follows (3)**
3:3;8:21;28:4

**follow-up (1)**
172:17

**food (1)**
50:8

**footage (3)**
108:21;109:9;
155:21

**forget (1)**
166:12

**forgetting (1)**
122:25

**forgot (2)**
8:22;40:23

**form (23)**
68:17;80:2;107:18,
20;128:12,16,21,25;
130:16;141:17;
163:16;168:18,24;
169:14,18;170:17,22;
171:7,16,22;172:5,
12,14

**formal (2)**
93:4,7

**formed (1)**
157:6

**forming (5)**
169:17;170:10,20;
171:20;172:9

**formulate (2)**
24:5,13

**forth (3)**
13:6;51:7;149:5

**forty (9)**
15:5;19:24;92:5,6,
6,8,8,9;147:21

**found (9)**
6:1;29:18,25;
53:14;55:14,21,25;
118:3;141:21

**four (24)**
15:8;17:13,24;
18:8,13;31:1,3,6;

33:15;34:1;40:19,21;
51:17;52:23,25;67:5,
12;84:4;98:10,11;
99:16;101:2;158:4;
165:23

**four-page (1)**
105:21

**fourth (1)**
156:22

**frame (1)**
30:24

**frequently (1)**
27:16

**Friday (2)**
70:15,19

**friend (1)**
76:2

**friends (2)**
76:4,18

**friendship (1)**
76:17

**front (4)**
19:9;40:17;106:4;
155:4

**frustrated (1)**
128:1

**full (5)**
42:17;43:9;44:17;
46:25;71:9

**function (1)**
146:21

**functioning (1)**
129:20

**further (3)**
8:10;109:15;122:9

**furthering (1)**
42:9

---

## G

**gain (1)**
117:9

**Gann (2)**
97:6,21

**gate (1)**
123:11

**gather (1)**
73:25

**gave (3)**
14:15;25:17;158:7

**general (11)**
10:14;11:11;12:1,
8,11;22:18;24:2,24;
48:19;61:6;137:19

**Generally (1)**
70:14

**generate (1)**
37:7

**gentleman's (1)**
74:8

**George (1)**
6:20

**Georgia (2)**

15:1;21:25

**gets (2)**
135:2,10

**given (8)**
15:18;30:21;31:5;
40:13;53:16,18;
146:3;160:8

**giving (2)**
4:12;24:9

**goal (1)**
124:19

**goes (2)**
109:14;114:3

**good (9)**
14:16;23:18,19;
27:10;71:17;86:19;
109:24;127:4;146:17

**Gotcha (1)**
66:15

**government (1)**
35:17

**governments (1)**
49:11

**governor (3)**
54:25;150:24;
151:3

**governor's (1)**
61:4

**Great (3)**
58:12;120:11;
133:11

**Green (2)**
66:9,14

**Griffin (1)**
100:12

**ground (1)**
3:25

**group (2)**
25:5;41:20

**growing (1)**
61:19

**guess (9)**
13:12;23:11;26:23;
29:4;44:3;61:6;69:8;
107:11;128:15

**guidance (1)**
35:21

**guys (2)**
156:20;159:23

---

## H

**Hall (1)**
100:13

**handling (1)**
114:18

**happen (5)**
27:15;63:24;
124:22,23;149:12

**happened (9)**
11:9;55:3;90:7;
104:9,16;135:12;
146:3;155:13,22

**happens (2)**
27:15,16

**happy (1)**
5:6

**head (4)**
5:2,3;26:9;91:8

**headphones (1)**
58:6

**headquarters (1)**
93:3

**health (1)**
42:15

**healthcare (1)**
43:6

**healthy (2)**
125:14,14

**hear (4)**
57:25;58:4,8;
152:21

**heard (8)**
110:18;114:19,24;
131:14;132:3,9;
153:10;155:3

**hearing (4)**
53:21;133:3;154:2;
155:17

**heart (1)**
19:7

**heavily (1)**
46:24

**held (3)**
10:24;70:4,6

**help (13)**
110:22;131:22;
132:11;133:4;154:2,
10,20;155:3,10,12,
18;170:2,2

**helping (1)**
24:5

**helps (2)**
35:14;58:7

**HEPPEL (1)**
30:10

**Heppell (2)**
4:14,18

**high (1)**
67:17

**higher (1)**
62:24

**higher-level (1)**
170:7

**highest (3)**
45:7;67:15;119:5

**highlighted (1)**
140:1

**himself (1)**
81:6

**hire (1)**
35:8

**hired (1)**
24:25

**history (4)**
73:19;75:4;78:22;

USDC INND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 185 of 196

79:7
**hit (1)**
26:8
**Hold (6)**
8:25;9:14;40:17;
92:4;130:23;162:17
**home (1)**
152:17
**hopefully (1)**
162:1
**horrible (1)**
113:2
**hour (3)**
76:24,24,25
**hours (15)**
71:16;91:18,19,22;
92:1,1,3,5,6,7,8,9,10;
136:9;162:6
**house (4)**
17:8,10;151:21;
152:17
**housing (5)**
38:1;41:21;42:16;
57:3;129:21
**hundred (1)**
148:5
**Hybrid (1)**
65:24

**I**

**ICE (3)**
69:2,16,19
**idea (6)**
3:19;32:25;75:11;
136:5;147:20,22
**identification (5)**
74:20;77:16;87:5;
96:12;156:4
**identified (6)**
8:9;30:12;31:6;
93:15;99:17;140:20
**identifies (1)**
70:23
**identify (20)**
24:7,9;32:10;97:3;
106:8,15,20;107:10;
108:4,18;109:1;
111:7;113:22;
116:14,18;119:2;
140:17,22;141:12,13
**illegal (1)**
39:19
**imagine (1)**
18:19
**immediate (4)**
129:1;132:18;
135:14;139:20
**immediately (9)**
111:12,19;131:15;
132:9,24;133:3;
153:8,11;154:2
**immigration (1)**

69:20
**impacts (1)**
149:7
**imperfect (2)**
124:9;126:17
**implement (1)**
24:6
**implementation (1)**
148:10
**implemented (1)**
149:5
**importance (1)**
45:8
**important (14)**
57:18,22;58:16,17,
21,24;59:11;88:13,
15;95:15;104:15;
115:22;117:22;
142:25
**improve (1)**
40:9
**improving (1)**
24:24
**in- (1)**
85:25
**inaccurate (2)**
107:15;114:16
**inadequate (1)**
160:20
**incident (16)**
99:1;109:3,15,16,
17,19,20,21;112:11;
121:22;122:17,19;
123:4;137:10;138:2;
146:2
**incidents (3)**
123:11,12;145:25
**include (1)**
18:24
**included (6)**
79:19,22;95:12;
97:16;120:22;171:23
**including (8)**
37:11;122:1;140:4;
146:1;152:19;157:7;
160:25;162:21
**income (4)**
37:3,10,19;40:14
**incorporated (1)**
111:24
**incorrectly (1)**
135:17
**Indiana (37)**
6:6,10;10:8;11:6;
34:21;74:5,16;75:2,
24;79:8;90:15;92:18,
25,25;93:24;117:25;
118:7;119:3,4;137:5,
9,9;140:4,9;143:15,
23;145:4,12;146:1,8,
9;147:10;160:11,12,
17;166:23;167:14
**Indianapolis (1)**

94:1
**indicates (5)**
101:12;108:21;
109:9;125:2;141:6
**indifferent (2)**
9:16,19
**individual (13)**
14:10;19:2;24:25;
48:18;74:13;85:3,15;
109:20,21;111:5;
138:17;158:19;166:8
**individually (1)**
153:20
**individuals (10)**
31:19;56:15;61:20;
90:3;100:12;101:2;
103:16;138:16;
152:22;166:7
**industries (1)**
60:5
**industry (2)**
35:22;42:5
**information (38)**
5:19;11:9,13,17;
16:9,17;19:9;32:10;
40:6;73:25;74:25;
75:1;77:1,3,5,8;
78:13;79:3,7,8,13,18,
21;81:5,22;86:22;
92:22;102:23;104:3,
10,18,21;113:24;
121:21;141:5;158:5,
9;160:14
**initial (6)**
68:23;133:18,19;
155:22;156:18,19
**initially (2)**
75:8;90:20
**initiate (1)**
131:18
**initiated (1)**
114:22
**inmate (25)**
10:16;12:6;14:1,5,
6,7;25:1,2;26:8;
38:23;60:3;86:8;
98:22;99:15;110:18;
114:15;131:19;
134:4,12;135:21;
149:6,6,8,9,10
**inmates (13)**
20:12;24:17;39:10;
43:8;50:13;85:12,25;
86:6;110:18;114:16,
17;117:4;166:8
**inside (4)**
94:25;163:22;
164:7;167:16
**inspect (1)**
69:22
**inspected (3)**
45:16;56:9,11
**inspection (3)**

45:15;57:2;107:7
**inspections (6)**
43:5;59:11,14,15;
69:2;92:21
**instances (2)**
116:22;139:7
**instead (2)**
5:2;166:3
**Institute (4)**
6:21;13:18,21;
167:3
**institution (9)**
14:10;50:12;57:16,
17,17;59:7;62:8;
118:6;149:11
**institutional (1)**
114:22
**institutions (8)**
60:8,16;61:1,2,17,
21;62:4;66:13
**instruction (1)**
155:4
**integral (3)**
43:20;44:12;45:5
**intended (1)**
117:5
**intentionally (3)**
119:14;120:2,14
**interacted (2)**
7:22;61:4
**interaction (2)**
6:3;70:10
**interdiction (4)**
37:24;39:2,7,15
**interested (1)**
118:16
**Internal (7)**
83:6,8,11,13,21;
88:18;89:16
**interrupt (2)**
27:24;169:25
**interrupted (1)**
147:3
**interview (1)**
83:21
**interviewed (1)**
85:12
**interviews (8)**
85:7,16;86:12,15;
88:24;89:2,15;99:7
**into (4)**
24:14;61:21;
111:24;151:21
**introduction (1)**
106:10
**investigate- (1)**
85:10
**investigated (1)**
125:1
**investigation (3)**
83:7,13;88:19
**investigator (1)**
85:11

**investigators (1)**
89:2
**invited (1)**
71:6
**invoice (1)**
158:17
**invoices (1)**
158:13
**involve (1)**
31:15
**involved (26)**
12:19;13:1,3;
20:18;21:8;22:3,18;
23:6,14;24:15;37:24;
47:21;52:3,4,11,13,
15;63:5,9,25;64:5;
76:17;84:6,16;85:23;
151:15
**involving (5)**
10:8;21:20;22:2;
29:15;160:20
**Island (1)**
3:12
**ISP (8)**
122:1;139:21;
142:23;144:23,24;
146:14;147:8;159:18
**issue (2)**
14:13;94:4
**issues (11)**
44:13;53:17;61:7;
69:1;75:3;78:17,20,
24;80:11,18,23
**issuing (1)**
161:2
**item (13)**
8:8;47:4,4;83:18;
84:24;89:22;92:13;
93:18;94:23;158:2,
20;159:7;160:10
**items (1)**
73:11

**J**

**jail (7)**
19:3,4;31:16;43:5;
45:15;65:16,23
**jailer (1)**
26:12
**jails (3)**
45:10,12,16
**January (2)**
70:5;86:25
**job (14)**
42:14,19;43:24;
45:2,20,25;46:8;
48:10;49:9;50:2,15;
126:2,3;146:17
**jobs (1)**
35:9
**JOHN (4)**
3:1,9;72:8;156:23

J-O-H-N (1)
3:9
Johnfauno (1)
100:13
joined (2)
4:14,18
Josh (1)
122:2
Joshua (1)
159:19
judge (4)
13:7,7;23:8;54:25
judges (1)
23:17
judgment (2)
51:19;150:2
judgments (1)
150:10
jump (6)
9:4;87:12;88:6;
101:16;107:17;144:7
jumping (1)
107:21
junior (1)
62:18
jurisdictions (2)
49:13;50:9
jury (1)
30:2
jury's (1)
115:7
Justice (9)
6:21;13:17;21:23;
22:19;23:12,24;
24:23;48:13;167:3
juvenile (2)
35:20;65:23

**K**

keep (18)
15:9,12,21,25;16:3,
6,9,14,16,21,23;67:3,
23;91:22;107:21;
124:19;131:10;170:3
Kentucky (28)
7:19;19:3,4;23:5,9,
16;25:11,16;26:12;
34:22;38:3;41:24;
42:3,20,25;43:13;
44:1,5,22;46:17,21;
47:20;50:4;54:9,21;
60:23;62:19;72:14
kept (2)
16:17;45:7
key (1)
60:20
keynote (1)
70:12
keys (11)
123:1,2;126:11,15;
127:14;128:4;
134:24;135:2;154:4,

12,13
kill (1)
39:23
killed (1)
125:18
kind (2)
87:19,21
kinds (2)
37:18;40:9
knew (2)
11:5;166:18

**L**

label (1)
87:13
labeled (4)
87:11;156:15,23;
157:4
LaGrange (2)
50:5;56:14
language (1)
108:19
large (2)
23:2;50:11
largest (1)
41:24
last (33)
9:3;15:8;17:3,24;
31:1,8,11;32:20;34:8,
10,12,13,17;40:19;
41:6,6;64:18;67:18;
70:3,4,13,24;71:4,7;
87:17;90:22;98:10,
11;104:25;105:5;
118:21;130:22,25
late (4)
22:24;69:12;71:9,
11
later (5)
7:9;23:16;53:21;
131:4,9
latest (1)
46:19
lawsuit (5)
25:6;26:2;31:4,24;
32:1
lawsuits (5)
149:21,24;150:3,
13;151:14
lawyer (2)
16:22;20:7
lawyers (1)
25:8
layout (1)
115:23
lead (1)
71:7
leaders (1)
70:16
leadership (3)
118:11;140:9,13
learn (3)

5:17;10:12;46:5
learned (3)
11:10;111:13;
161:1
learning (1)
153:9
least (4)
23:17;106:23;
136:12,15
leave (4)
150:20,24;151:1,5
led (1)
122:2
left (1)
7:18
legal (1)
35:21
legislative (1)
61:5
legislature (1)
61:5
less (7)
3:21;76:24,25;
84:5;86:18;91:4;92:1
letter (2)
41:1,3
letting (1)
58:5
level (8)
45:7;51:12;55:6;
62:25;67:14,15,17;
119:6
levels (1)
67:14
liability (2)
24:12,15
lieutenant (8)
62:9,15;84:13,19,
21;135:18,19;154:18
lieutenants (3)
84:14;135:20;
138:5
life (5)
122:7;124:9;
126:18,23;128:9
light (4)
112:17;127:17;
131:4;133:20
limited (2)
157:8;167:20
line (2)
122:16;168:12
link (1)
9:7
linked (1)
137:23
list (46)
15:7,22,25;17:12,
16,17;18:3,9;31:6,9,
12,23;32:3,3,17;33:2,
3,6,7,8,12;64:8,13;
66:18;68:3,4;82:10,
16;83:3;84:21;85:2;

88:11;93:12;94:20;
95:14,17,20,23;97:4,
17,18,21;98:5;
160:10;170:9,15
listed (7)
36:8;68:16;84:24;
99:9,9,15,16
listen (8)
4:4;113:10;119:19;
123:13,20;125:20;
127:25;142:18
listened (2)
85:13;155:11
Listing (1)
15:17
lists (2)
82:8;99:14
litigant (4)
24:20;26:2,15,21
litigation (37)
10:8;12:8,14;13:1,
4,15,23,25;14:18,20,
22,24;15:4;18:12;
19:18;21:20;24:12;
29:15,19;31:15;36:4;
37:4,8;48:22;49:4;
87:24;148:12;149:6,
6,8,9,10;159:5,18,20;
161:5;165:5
little (19)
7:17;15:19;23:16;
48:24;58:1;61:25;
70:21;87:20;111:1;
122:8;123:2;134:20;
137:4,13;143:11;
163:16,24;164:10;
165:13
living (1)
16:20
local (4)
46:25;49:12,13;
56:13
location (2)
16:20;131:15
locations (5)
13:4;38:9,20,21;
145:7
lock (4)
123:7;135:3,8,11
long (11)
9:19;20:13;70:13;
73:19;75:17;76:22,
23;91:12;108:15;
136:16;168:5
longer (1)
33:17
look (30)
8:2;18:16;23:12;
30:5;32:6,9;38:16;
74:9;81:12;84:18;
85:8;97:15;103:5;
108:4;111:6;116:14,
18,21;118:21;

130:21;131:8;
134:11;137:12;
141:12;158:12,16;
161:5;165:16,18;
166:21
looked (11)
7:3;14:14;32:12;
73:21;82:14;83:12;
84:20;85:6;158:6,18,
18
looking (6)
8:9;59:19;99:12;
107:8;134:21;165:22
Looks (8)
9:1;10:20;27:25;
71:23;97:2;106:10;
139:5;141:25
lost (3)
10:20;27:25;150:7
lot (2)
39:24;129:19
loudly (1)
58:14
Louisiana (3)
23:16,19;54:13
Louisville (1)
41:24
lsit (1)
33:9
Lubbock (1)
20:12

**M**

Ma'am (42)
3:19;14:25;16:8;
17:25;32:25;33:13,
20,20,22;64:12;
75:11;78:21;79:20,
23,23;80:1,6,14;
83:12;88:22;91:5,14;
93:16;95:13;105:12;
107:25;123:16;
127:10,10;145:20;
147:18,20;148:2,4;
149:19;156:25;
158:1;161:21;
163:10;166:25;
167:10,12
Madison (1)
34:21
main (5)
65:8;73:11;135:2,
8,11
maintain (6)
17:22;18:3,6,11;
50:23;119:5
maintained (4)
45:9;138:8;141:20;
144:1
maintaining (3)
33:3;35:18;145:7
major (2)

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021

110:14;117:3
**majority (1)**
29:5
**makes (4)**
110:14;118:16;
124:9;132:14
**making (3)**
144:15;161:12;
164:25
**man (1)**
154:19
**managed (6)**
37:24;39:1,6;
46:15;56:21;147:9
**management (6)**
43:5,7;44:8;47:6;
57:9;117:22
**manager (7)**
74:4,11,21,24;
76:20;78:2;161:18
**mandatory (1)**
53:9
**manner (1)**
146:13
**man's (1)**
165:1
**many (24)**
3:18;12:13;13:13;
15:3;18:21;19:21;
27:14;35:6;50:9;
69:6;75:24;76:19;
86:12,14,15;90:25;
93:10;136:9;147:19;
148:11;149:10;
150:5;158:23,24
**March (3)**
41:3;87:1;96:16
**mark (6)**
40:24;77:14;87:3;
96:7,8,9
**marked (5)**
77:15;87:4,7;
96:11;156:3
**marshal (11)**
46:25;113:5;114:4;
119:10,21,23;125:2,
2,8,21,25
**marshal's (2)**
56:10;119:12
**massive (1)**
64:3
**material (1)**
86:25
**materials (10)**
65:9;85:5;88:3;
157:6;159:19;
160:25;163:5;
167:20,24;170:9
**matter (6)**
10:13;18:24;20:20;
21:2,12;116:17
**matters (1)**
19:1

**maximum (1)**
59:8
**maximum-security (5)**
117:3;118:6;123:4;
143:4,5
**may (18)**
14:9;31:3;64:20;
81:4;85:11;89:4,4;
90:19;98:14;100:15;
103:16;120:15,15;
135:19,20;138:6;
164:17;167:6
**maybe (18)**
7:9,17;18:19;
23:19;33:17;36:9;
37:5;84:5;86:19;
91:8;124:6;127:22;
128:20;135:22;
143:10;160:5;
169:25;170:6
**mayor (1)**
50:6
**mean (29)**
6:6;11:24;13:2;
14:3;29:12;36:23;
39:4,23;47:9,12;
53:4;54:20;55:3;
59:5;63:6;74:15;
83:12;115:18;120:7;
123:18;135:12;
136:3,8;137:8;144:9;
149:8;152:14;165:1,
7
**Means (4)**
64:19;119:13;
120:1,12
**mechanism (2)**
39:15;51:7
**media (1)**
112:23
**medical (4)**
5:11;42:16;50:8;
60:3
**medication (1)**
5:14
**meet (8)**
30:1;38:23;51:11;
53:1,8,9;55:14,21
**meeting (2)**
4:18;70:3
**meetings (7)**
69:10;70:2,6,9,13,
19;76:8
**Megan (1)**
9:4
**member (4)**
20:6,18;26:17;
66:13
**members (2)**
89:17;138:17
**Memberships (1)**
66:8
**memo (1)**

82:23
**memoranda (2)**
157:8,24
**memory (1)**
160:16
**mention (1)**
142:5
**mentioned (9)**
38:25;70:2;78:3,
16,19;126:9;128:4;
129:5;130:19
**mentions (4)**
116:22;139:7,13;
145:24
**mere (1)**
162:13
**met (1)**
53:15
**method (1)**
117:10
**method- (1)**
163:25
**methodology (3)**
73:6;164:11,14
**metro (1)**
50:6
**Mexico (2)**
54:11;151:25
**mic (1)**
58:2
**Michael (1)**
5:24
**Michigan (16)**
6:22,23,24,25;
12:7;75:2;78:22,23;
80:12;93:25;118:1;
124:20;137:8,9;
145:12;166:24
**mid (1)**
22:25
**middle (1)**
134:19
**Middletown (1)**
167:3
**might (2)**
7:23;9:15
**Mike (2)**
10:21;27:25
**Miller (1)**
100:12
**mind (1)**
164:16
**minimum (2)**
51:11;61:23
**minimum-custody (2)**
61:1,20
**minimum-security (1)**
59:7
**minute (4)**
25:9;92:4;114:8;
140:25
**minutes (21)**
71:20;86:14;105:2;

107:3;112:16,18;
123:3;127:16,17,22;
128:11,20;129:6,8;
131:1,4,9;136:19;
155:9,17;161:24
**mischaracterizes (1)**
128:17
**misconduct (1)**
150:14
**Miss (3)**
90:22;153:16;
154:24
**mission (1)**
50:12
**misunderstanding (1)**
102:7
**modified (1)**
48:1
**moment (4)**
116:23;117:17;
118:24;121:1
**Monday (1)**
70:15
**months (5)**
53:23;54:22;55:2,
16,23
**more (25)**
3:20,22;27:20;
36:14;38:22;39:24;
61:21;65:6,6;76:24;
86:18;91:4,25;118:5,
22;121:9;126:11,15;
136:16;137:4;148:1,
3,5;149:17;163:7
**morning (1)**
10:21
**most (3)**
32:4,12;68:6
**mother (1)**
152:16
**move (11)**
61:20;65:17,18;
67:14;87:19;114:7;
115:3,4;117:15;
131:10,11
**moved (2)**
16:19;34:21
**moving (1)**
112:15
**much (6)**
24:14;36:2;37:6;
57:4;91:16;167:4
**multiple (9)**
13:4,4;54:5,6;
91:15;118:2;141:21;
145:6,6
**must (1)**
69:5
**mute (1)**
72:8
**muted (1)**
172:20
**myself (4)**

11:12;35:8;134:7;
161:25
**mythology (1)**
73:8

---

## N

**name (7)**
3:8;23:11;34:5;
74:8;82:8;84:17;
90:23
**named (2)**
122:1;140:4
**names (2)**
32:7;98:14
**narrowed (1)**
29:22
**Nashville (1)**
70:8
**National (2)**
13:18,20
**natural (1)**
22:8
**Neal (9)**
97:6,20;121:25;
138:20;139:9;
140:17,23;141:10,15
**nearby (3)**
85:25;86:5,7
**necessarily (2)**
116:7;163:8
**need (18)**
16:22;27:22;34:24;
46:8;76:15;98:17,19,
21;101:6,9,10;
102:17,19;113:23;
138:9;157:21;
158:25;166:11
**needed (6)**
48:2;102:12,16;
134:6;166:14,18
**needs (5)**
14:9,11;38:20,23;
65:11
**neighboring (1)**
114:17
**new (7)**
16:23;47:16;54:11;
64:21;121:11;151:3,
25
**next (8)**
48:10;49:17;70:22;
114:7;115:4;117:15;
118:22;120:21
**night (4)**
104:9,14;137:2;
163:21
**nine (3)**
97:4;100:7,9
**Nobody (1)**
125:18
**nodding (1)**
5:2

**BOSS REPORTERS**
**(219) 769-9090**

USDC IN/ND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 188 of 196

**noise (1)**
132:5
**noncompliance (3)**
56:1;118:3;141:22
**none (1)**
31:14
**non-litigation (1)**
37:21
**normal (2)**
36:18;110:17
**normally (1)**
59:2
**note (7)**
66:8;87:9;139:21,
24;164:16,17,17
**noted (2)**
134:12;158:20
**notes (13)**
91:6,9;157:8,17,18,
20,21;158:21,22;
159:1,3,5;161:25
**not-for-profit (2)**
41:18,20
**not-for-profits (3)**
37:15,25;41:15
**noting (1)**
114:4
**November (1)**
17:6
**Nowatzke (2)**
97:7,13
**number (14)**
12:15;23:2;42:2,2;
47:14;75:10,12,14,
16;86:17,20;92:19;
95:7;147:24
**numbers (1)**
93:5
**numerous (7)**
33:4;52:12,14;
63:16;85:3;91:18;
100:22
**nurses (5)**
20:11;21:8,11,15,
18
**nursing (1)**
152:17

**O**

**Oaklahoma (1)**
60:8
**oath (1)**
4:12
**Object (19)**
80:2;107:18;
123:17;128:12,16,24;
130:16;141:17;
163:15;168:18,24;
169:14,18;170:17,22;
171:16,22;172:5,12
**objecting (1)**
128:21

**objection (13)**
107:20,24;108:9,
10,11;123:25;144:8,
12,14,16;170:7;
171:7,11
**objections (2)**
128:24;170:1
**observed (2)**
108:22;109:10
**obviously (3)**
9:17;63:9;101:12
**occasion (1)**
64:3
**occasions (1)**
64:6
**occur (2)**
19:5;59:2
**occurred (4)**
63:14;100:23;
138:18;146:9
**occurrence (1)**
119:8
**occurs (1)**
70:9
**o'clock (1)**
162:11
**off (10)**
9:22;10:22;28:1,6;
40:12;48:24;62:10;
67:16;136:18;142:24
**offender (6)**
19:4;27:7;42:18;
43:6;60:4,12
**offenders (7)**
35:20;42:15;44:11;
99:6,10;104:1;117:8
**offer (5)**
24:19;26:1,15,20;
168:20
**offers (2)**
50:7;173:2
**Office (13)**
6:15;7:14,16;
56:10;59:25;61:5;
74:4,11,20,24;76:20;
78:2;114:21
**officer (33)**
26:16;62:7,13,20,
21,23;63:1;84:15;
108:15,21;109:10;
110:17;122:24,25;
131:6;134:22,25,25;
135:1,1,19;169:5,11,
16;170:14,20;171:2,
4,14,19;172:3,3,9
**officers (27)**
83:19,23;84:2,3,4,
7,11,14;85:4;88:24;
89:8;107:1;110:7,10,
15,22;111:11;
114:21;123:22;
124:12;126:14;
128:10;129:21;

131:16;134:23;
138:17;155:9
**officers' (3)**
84:1;131:13;132:2
**official (2)**
93:23;148:7
**often (3)**
16:25;76:13;117:4
**oftentimes (1)**
117:8
**Oklahoma (8)**
23:5,8,15;52:6,18;
63:20;151:25,25
**old (2)**
59:6;118:6
**older (1)**
143:5
**Oldham (2)**
25:11,16
**once (7)**
18:16;33:9;67:1;
110:17;118:2;
157:20;159:2
**one (68)**
6:17,17,18;9:1,14,
15,21;13:11;19:7;
20:6,18;22:1;23:18;
26:3,14;30:18;37:25;
42:2;45:23;51:15;
52:19;54:4,24,24;
56:16,16;64:3,6,18,
21;65:8,9,12,20,21;
67:14;70:4;72:19,20,
22;76:21;77:12;78:7;
79:24;81:10,15,20;
85:11,25;86:6;88:13;
97:10;111:23,25;
115:4;116:15;
117:15;121:9;123:1;
125:6;126:9;137:1,3;
146:1;150:6,20;
157:5;165:1
**one-page (3)**
77:19;89:7;90:7
**one-paragraph (1)**
89:7
**ones (5)**
85:22;93:14;94:2;
97:19;159:22
**one's (1)**
70:20
**ongoing (1)**
18:21
**only (12)**
25:20,25;26:3;
33:19;67:4;77:4;
81:15;88:13;89:15;
119:21;141:2;167:13
**oo0oo- (1)**
173:8
**open (3)**
79:15;123:8;
146:24

**opened (3)**
135:3,8,11
**operate (1)**
148:14
**operation (1)**
43:3
**operational (5)**
117:23;118:14;
119:6;129:22;143:1
**operationally (1)**
56:21
**operations (2)**
43:9;63:10
**opinion (85)**
14:15;23:10;24:19;
25:5;26:1,15,21;
73:12,23;102:24,24,
24;104:12;106:8;
107:8,9,13,13,14;
108:3,13,16,25;
109:4,7,13,14;110:4,
7;111:8,11,20,25;
112:3,5,8;113:25;
114:1,2,12,24;115:1;
116:6;117:12;
119:22;120:4,18;
121:4,11,23,24;
122:21;123:24;
124:14;128:2;
131:20;134:9;135:7;
140:12,23;142:22;
143:14,21;144:5,22;
145:3;146:7,13;
147:8;153:13,22,25;
154:7,9,15,24;155:7;
165:2;168:12,15,20;
170:11,21;171:21,24
**opinions (45)**
26:22;29:22;30:1;
68:17;92:13;104:4;
105:24,25;106:11,14,
18,19,21,23;107:11,
23;108:6;109:1,6;
110:1;111:22;
113:17,22;115:11,15,
23;116:2,15,16,19,
25;117:19;118:18;
119:1,7;121:10;
133:13,21,25;157:7;
167:20,23;169:17;
172:10,14
**opportunity (2)**
53:16,18
**opposing (1)**
165:5
**oral (2)**
81:1,3
**orally (1)**
77:4
**order (4)**
4:20;39:23;54:23;
60:14
**Ordered (1)**

**opened** 66:6
**orders (1)**
172:22
**organization (2)**
7:15;68:12
**organizational (1)**
55:10
**organizations (4)**
37:18;38:6;39:13;
46:20
**organized (1)**
161:25
**Orner (3)**
41:2,3;96:16
**others (1)**
90:1
**out (35)**
6:21;10:5;23:11,
17;29:1;52:9;58:1,
25;59:14,16;61:25;
62:1;63:25;64:5;
67:16;108:23;
109:12;110:14,15;
112:19;123:8;124:4,
5;129:18;135:4;
136:10;149:20,23;
150:10;162:18;
164:3,3,21;167:3;
173:3
**outside (2)**
57:13;76:10
**over (28)**
7:6;12:8;16:19,20;
18:8,13;26:7;31:5;
36:12;40:18,20;
52:12;55:16,22;
60:20;63:9;75:3,6,7;
77:4;78:17,20;87:21;
127:14;146:3;
147:21;158:4;162:7
**overall (4)**
43:2,7;57:9;117:23
**overdose (1)**
19:11
**overseeing (3)**
52:17;60:25;61:7
**own (7)**
50:9,10;72:15;
100:16;141:23;
160:16;165:20

**P**

**packet (1)**
92:22
**Paducah (1)**
19:4
**page (51)**
4:1;30:15;34:4;
41:6,6;49:18,18;
64:11,11,16;65:14,
17,21;68:2,2;70:22,
22;72:24;82:6;87:18;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021
USDC IN/ND case 3:18-cv-00995-JD   document 272-2   filed 03/20/23   page 189 of 196

89:1;96:4,5;99:9;
105:9,10,10,10;
106:3,3,3,7,9,10,15,
17,21,24;122:10,10,
11,13,15;134:17;
138:23;139:5,25;
142:24;156:22,24;
157:3
**pages (4)**
87:13;90:16;
118:24;156:22
**paid (4)**
13:9,16;149:20,23
**Pam (5)**
9:2;10:22;22:8;
170:2;172:20
**pamphlets (1)**
161:2
**paper (3)**
16:17;55:8;117:8
**paperwork (2)**
110:15;129:18
**paragraph (30)**
90:7;106:24;109:2;
111:7,9,23;112:4;
114:1,8,8,12;115:5;
116:21;117:13,20;
118:19,21,22;119:2;
120:21;130:22,25;
131:11;134:12,16,20;
139:25;142:24;
143:3;144:11
**paragraphs (1)**
145:6
**Parish (2)**
56:14;72:22
**parole (1)**
43:4
**part (18)**
12:10;43:20;44:12;
45:5;47:24;48:3,7;
71:9;85:5;87:24;
91:14;124:18;
127:15;138:24;
143:1;148:11;
170:23;172:13
**participated (1)**
56:2
**participation (1)**
68:14
**particular (12)**
13:1;25:1,1;27:23;
51:24;52:21;56:17;
57:16;80:13;89:19;
99:1;149:11
**parties (2)**
159:20;161:15
**pass (1)**
66:20
**passed (2)**
127:3;140:14
**past (9)**
17:13;18:8,13;

31:6;34:1;40:21;
138:14;158:4;160:13
**pause (1)**
4:16
**Pawleys (1)**
3:12
**pay (2)**
150:10;158:24
**pdf (4)**
72:24;77:19;82:6;
105:10
**penalty (3)**
6:16;8:10;10:5
**pending (1)**
5:8
**penitentiary (6)**
12:7;75:2;78:22,
23;93:25;118:1
**people (12)**
35:6,8;46:7,12;
47:14;76:4;85:9;
124:19;125:4;
150:23;154:20;
155:11
**percent (11)**
36:5,5,7,9,13,14,
17,22,23;37:5;69:10
**percentage (1)**
37:2
**perfect (19)**
109:3;111:16;
112:11,24;122:17,19;
124:3,7,8,16;126:22,
25;127:1,9;128:7;
129:24;130:2;
168:13,16
**perfectly (2)**
111:19;128:2
**period (10)**
23:2;25:13;49:2;
52:23,24;55:4,16,22;
61:18;88:14
**periodic (2)**
44:15;57:4
**periodically (3)**
16:18;56:9;57:12
**periodicals (2)**
161:1,10
**permanent (1)**
35:10
**person (5)**
27:6;56:12,12;
70:4,7
**personal (2)**
39:11;75:9
**personally (6)**
102:19;149:1,23,
25;150:11;152:4
**personnel (3)**
6:15;63:8;131:19
**perspective (1)**
47:6
**phone (14)**

10:18;37:24;39:2,
7,18,23;75:6,7,9,12,
16;77:4;78:7,11
**phones (4)**
39:10,11,16,20
**phonetic (1)**
97:24
**physical (3)**
7:4;38:8,20
**pick (2)**
28:12;94:2
**piece (1)**
13:15
**PIERCE (83)**
3:6;4:16,19;8:22;
9:6,13,21;10:1,20;
11:2;27:24;28:6,10,
12,16;30:4,14;49:1;
57:25;58:5,12,15;
70:1;71:15,23;72:1,
12;77:17;80:3;87:2,
6,16;96:13;99:25;
100:1;101:25;102:9;
108:1,11,17;123:19;
124:10;128:23;
129:4;130:17;
132:20,22;135:25;
136:6,12,15,22,24;
142:3;144:13,17,19,
20;155:24;156:2,5;
161:22;162:7,9,16;
163:18;168:1,7,18,
24;169:14,18,24;
170:17,22;171:7,16,
22;172:5,12,17,20,24
**place (22)**
7:6;10:15;24:17,
17;44:17,19;56:6,23;
57:19;58:17;63:22;
68:25;109:15;110:1,
24;121:22;141:2;
143:23;144:9,12,16;
154:6
**place- (1)**
60:4
**placed (2)**
150:25;151:5
**placement (2)**
42:15;60:4
**places (1)**
140:6
**Plaintiff (8)**
3:2;19:12,17;20:4,
20,22;27:10;173:2
**plaintiffs (2)**
21:11,19
**plaintiff's (25)**
21:20;97:23;
103:14,21;104:22;
106:25;107:12,14;
108:14;110:13;
114:9,13;116:22;
118:10;134:16;

138:3;139:6,13;
140:8;145:12,17,24;
165:7;166:5;172:24
**Plan (1)**
136:12
**planning (4)**
37:18;60:14;70:7;
136:5
**plant (4)**
7:4;38:8,20;50:10
**please (14)**
3:7;4:6;5:1;9:17;
22:9;45:22;48:24;
58:3,13;80:20;87:14;
106:11,20;129:3
**plus (3)**
66:20;84:1;141:23
**pm (3)**
136:1,18;173:6
**point (12)**
5:7;62:6;63:6,12,
13;113:6;117:1,20;
119:11;125:7;
140:21;145:22
**pointing (1)**
29:1
**points (1)**
121:8
**policies (25)**
43:19;47:21;48:1,
7;51:10;55:6;56:5,
18,22;57:19;92:17,
20,23,24;93:4,10,18,
20,24;94:6,16;
143:22;148:13;
149:4;163:4
**policy (7)**
35:19;51:5;57:1,1;
93:4,7;148:10
**political (1)**
151:2
**poorly (2)**
111:3;143:11
**population (4)**
24:3;43:6;66:6;
114:15
**populations (1)**
38:24
**portion (2)**
127:11,12
**position (5)**
42:21;59:25;60:18;
62:2;155:15
**positions (2)**
7:21;63:7
**positive (1)**
23:9
**possessing (2)**
135:1,2
**possession (1)**
159:17
**possible (4)**
6:1;33:18;138:10;

167:23
**possibly (2)**
66:4;129:5
**potential (1)**
40:8
**practice (6)**
45:4;50:22;53:19;
165:3,16,22
**practiced (1)**
44:13
**practices (4)**
43:19;44:10,14;
51:13
**preface (1)**
52:4
**pre-pandemic (1)**
70:20
**preparation (3)**
60:15,15;82:15
**prepare (3)**
63:22;73:25;82:16
**prepared (8)**
7:5;31:13,23;
82:19;86:8,10;157:6,
18
**preparing (2)**
32:2;161:3
**present (3)**
39:12;89:17;90:4
**presentation (1)**
53:20
**presented (3)**
30:2;104:11;166:4
**president (2)**
40:4;49:7
**pretty (1)**
98:25
**prevent (2)**
124:23,25
**prevention (4)**
117:17,21;140:7;
142:25
**previous (3)**
72:3;80:12;145:10
**previously (3)**
75:22;78:16;125:4
**primarily (2)**
85:10,23
**primary (1)**
50:12
**prior (2)**
146:4;161:2
**prison (40)**
6:23,25;11:6;
31:16;39:19;42:18;
49:24;59:3;60:5;
63:5;90:15;92:18,25;
118:1,5,7,11;119:4;
123:4;124:20;137:5,
9,10,16,20;138:1,18;
140:4,9;143:15,23;
144:24;145:4,12;
146:1,8,9;147:10;

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
USDC NWND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 190 of 196
JOHN D. REES
May 26, 2021

166:23;167:14
**prisoner (18)**
  24:20,25;25:5;
  26:2,21;27:10;28:20;
  29:10;72:5,6;86:10;
  99:4;100:17,24;
  103:9;135:16;
  146:14;147:9
**prisoner-run (1)**
  72:15
**prisoners (19)**
  21:8;25:6;85:16,
  19,21;86:5;89:16;
  98:12;99:4,17;
  100:13;101:3;103:2,
  22;104:14,21;
  131:21;147:24;
  165:23
**Prisons (12)**
  38:4;39:9;42:1;
  57:19,23;58:17;
  62:17;117:2,3;143:4,
  4,5
**private (5)**
  37:16,17;48:19;
  49:15,24
**probably (26)**
  7:5,5,7,16;17:5,5;
  18:14,19;24:2;34:10,
  20;66:24;68:6;69:9,
  11,12,13;71:8,9;
  73:16;84:23;86:19;
  101:21;111:3;
  136:15;149:17
**probation (1)**
  43:4
**problem (3)**
  39:9,12;143:3
**Problems (1)**
  66:5
**procedure (3)**
  50:22;150:7,8
**procedures (20)**
  7:3;35:19;48:1;
  51:5,10,14;55:5;
  56:6;59:7;92:18,23;
  93:18,21,24;94:16;
  143:2,23;148:13;
  149:5;163:4
**proceeding (1)**
  143:2
**proceedings (2)**
  8:21;28:3
**process (23)**
  8:13;14:7;43:20;
  44:12;45:5;47:25;
  48:3;52:5,7;53:11,
  13;54:17;55:9,10;
  60:5,16;65:5,14;66:3,
  16;67:13;80:25;
  145:9
**procurement (1)**
  8:17

**produced (6)**
  159:5,20,23,23;
  160:8;161:4
**professional (7)**
  40:9;43:7;44:9;
  49:19;66:7;68:13;
  76:18
**professionally (1)**
  76:4
**professionals (1)**
  70:11
**professor (1)**
  71:12
**professors (1)**
  71:6
**program (7)**
  42:9;46:23;56:2;
  59:24;69:21;146:14;
  147:10
**programming (1)**
  49:12
**programs (2)**
  41:21;61:8
**project (2)**
  38:7,13
**projects (3)**
  6:12,13;38:5
**promoted (1)**
  62:10
**promotion (1)**
  62:11
**promptly (1)**
  110:8
**properly (2)**
  44:23;56:8
**prosecution (1)**
  21:2
**protecting (1)**
  50:14
**protective (1)**
  146:23
**proud (1)**
  52:10
**provide (18)**
  11:14;17:12;25:4;
  33:10;35:16;39:14;
  40:6;42:3,8;44:10;
  49:11;50:12;77:3,4;
  108:2;115:11;
  119:22;158:9
**provided (29)**
  11:22;15:22;16:1;
  17:13,22,23;29:9;
  30:6,20;31:5;33:25;
  34:5;46:18,20;47:3;
  79:14;81:6,12,16;
  82:5;87:23;88:3;
  113:24;121:11;
  143:15;151:4;
  160:19;164:13;
  165:19
**provider (1)**
  41:24

**providing (7)**
  35:17;38:2,18;
  39:25;43:8;106:19;
  121:12
**public (1)**
  50:14
**publications (6)**
  64:9,13,25;65:12,
  13;66:1
**pull (8)**
  30:4;72:23;77:12;
  87:2;99:11;105:8;
  155:24;157:14
**pulled (1)**
  30:15
**purge (7)**
  16:18,25;17:2,5;
  32:16,18,20
**purged (1)**
  17:3
**purporting (1)**
  168:20
**purpose (1)**
  136:5
**purposefully (1)**
  126:4
**purposes (1)**
  117:4
**pushed (1)**
  61:8
**put (12)**
  13:6;36:11;51:7;
  58:6;105:14;107:19;
  124:5;149:5;150:19,
  23;154:6;159:2
**putting (5)**
  62:13;63:25;64:5;
  82:15;135:4

## Q

**qualifications (2)**
  29:23;34:25
**qualified (1)**
  29:19
**question's (1)**
  15:19
**quick (2)**
  99:20;169:25
**quicker (2)**
  123:7,9
**quickly (4)**
  126:11,15;128:5;
  162:1
**quiet (1)**
  58:12
**quit (2)**
  69:11,12
**quite (3)**
  54:5;121:14;
  125:19

## R

**radar (1)**
  45:8
**radio (3)**
  113:6;131:17;
  134:23
**rage (1)**
  46:25
**ran (1)**
  147:9
**range (9)**
  43:9;44:17;47:17;
  57:15;60:2;64:5;
  110:19;126:12,15
**ranking (1)**
  62:24
**rarely (1)**
  112:13
**rate (1)**
  163:4
**rather (2)**
  113:6;133:19
**re- (1)**
  127:1
**reach (6)**
  73:17;102:24;
  117:19;127:2;
  141:14;142:11
**reached (21)**
  73:18;106:8;
  108:25;109:2;112:6,
  8;113:18,23;114:12;
  116:9,17,19;117:1,
  13;118:18;119:1;
  120:4;121:18,20;
  125:25;150:2
**reaching (3)**
  112:4;118:4;
  142:10
**read (19)**
  9:2;66:18;73:9;
  84:23;85:18;96:1,2,3,
  4;103:24;105:3,5;
  135:5,16;141:6;
  147:12;157:9;
  169:11;172:3
**reading (1)**
  98:2
**reads (1)**
  30:19
**ready (4)**
  51:15;65:17;100:2;
  136:22
**realize (1)**
  152:25
**realizing (1)**
  153:9
**really (11)**
  11:11,23,24;60:19,
  19;62:11;65:4;68:1,
  19;91:8;152:25

**reask (1)**
  171:13
**reason (6)**
  81:22;95:22;97:9;
  151:4;165:21;166:3
**reasonable (3)**
  112:20;123:5;
  127:19
**reasonably (1)**
  154:8
**recall (34)**
  11:22,25;12:4,10;
  19:10;22:6;25:2;
  27:5;29:17;48:6;
  75:13;78:10;79:18,
  21;81:3,8,25;83:12;
  84:17;85:22;86:24;
  91:14;93:11,20;94:7,
  10,14;95:12;98:2;
  102:11,14;148:21;
  151:12,16
**receive (3)**
  37:11;80:4;165:25
**received (19)**
  5:18;10:17;68:5,8,
  15;79:9;80:6,7;81:1,
  10,23;89:7;100:7;
  104:20;159:14,25;
  160:3,4;161:17
**receiving (2)**
  80:9;81:25
**Recent (4)**
  30:19,23;32:4,12
**recently (1)**
  16:19
**recess (6)**
  9:23;10:24;71:21;
  99:22;136:20;162:14
**recitation (2)**
  83:3;111:20
**recognize (2)**
  73:2;140:11
**recollection (1)**
  148:23
**recommendation (1)**
  51:20
**reconnects (1)**
  28:5
**record (24)**
  3:8;4:17,21;9:1,22;
  10:22;22:15;30:13;
  62:1;77:19;87:9;
  100:3;101:21;102:3;
  115:2,12,16;136:19;
  154:23;156:15;
  164:13;165:16;
  170:2,3
**recorded (1)**
  9:10
**recording (8)**
  8:24,24;9:5,6,17,
  24;71:23;85:15
**recordings (5)**

DENISE DWYER, et al. v.
RON NEAL, et al.

USDC NND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 191 of 196

Cause No. 3:18-cv-00995-JD-MGG

JOHN D. REES
May 26, 2021

83:21;85:7,7;
88:24;89:14
**records (11)**
15:9,12,14,16,21;
16:14;47:14;60:6;
157:11;158:18,19
**recovery (2)**
38:1;41:21
**recruit (1)**
47:16
**Redden (2)**
97:6,21
**reduce (4)**
128:11;129:13;
130:9,13
**reduced (5)**
127:21,22,23;
129:6,11
**Reductions (1)**
66:6
**REES (41)**
3:1,7,9,15;8:5;
10:3,7,11;11:4;
17:18;22:7;27:25;
28:18;30:16;35:3,6,
25;41:11;48:12;72:2;
80:21;87:20;102:10;
110:25;113:10;
115:6;119:18;
123:13;127:24;
130:4,4;132:16;
136:25;139:15;
147:15;152:21;
156:16,23;162:17;
168:11;170:1
**R-E-E-S (1)**
3:9
**re-established (1)**
8:20
**refer (6)**
42:7;50:25;88:25;
109:6;145:20;166:10
**referencing (1)**
20:18
**referred (1)**
103:21
**referring (10)**
42:6;51:1;77:24;
89:11,15;93:8;98:17;
131:2;135:23;145:23
**refers (8)**
83:8,15,16;88:20;
89:20;90:6,16;
103:25
**Reformatory (8)**
50:5;54:9,20,21;
56:14;62:9;63:18;
72:14
**reformatory's (1)**
72:21
**refutes (1)**
140:8
**regard (15)**

13:15;32:13;45:9,
12;50:21,21,22;73:5;
78:24;118:15;
138:24;149:3;
153:16;155:8;158:20
**regarding (9)**
12:1;35:21;57:19;
77:8;101:14;102:16;
138:20;145:10;148:9
**regular (2)**
58:22;59:11
**regularly (2)**
27:16;76:16
**regulations (1)**
45:18
**Reidsville (1)**
15:1
**rejoins (1)**
10:25
**related (21)**
14:18;16:9,14,25;
17:4;23:24;24:11;
31:15;32:15;43:12,
25;44:5;48:7;50:16;
66:5;79:3;80:23;
100:23;137:19;
143:17,24
**relating (4)**
47:22;91:9;92:20;
159:17
**relation (6)**
40:1;71:1;94:12;
138:2;148:15;149:13
**relationship (2)**
23:8,18
**relatively (1)**
16:23
**relevant (7)**
94:3,4,8,9,17;
160:24;166:20
**relied (16)**
46:23;68:17;95:15;
98:7;113:21;133:2;
141:5,14;142:10,11;
157:24;159:11;
161:3;166:4;169:9;
170:10
**rely (12)**
42:4;141:9,10;
161:9;164:24;165:3,
9;169:16;170:19;
171:3,19;172:8
**relying (5)**
92:12;102:14,15;
111:6;165:17
**remain (1)**
67:1
**remainder (1)**
19:23
**remem- (1)**
25:10
**remember (29)**
11:15,19;14:25;

20:9;24:21;25:11,15;
26:3;27:3,4;34:11;
47:23;48:4;64:3,6;
77:9;80:6,13;86:17;
98:1;147:11;150:6,8;
168:11;169:4,6,8;
170:8,12
**remembered (1)**
98:14
**remembrance (1)**
76:23
**remove (1)**
146:22
**render (1)**
73:12
**rendered (1)**
110:1
**Repaired (1)**
57:13
**repeat (3)**
45:22;55:18;129:3
**report (138)**
7:5;15:15,18;
17:17;25:17;26:22;
30:5,19,20;31:5;
32:5;33:10;34:5;
40:24;53:2;60:1;
63:22;68:17;72:25;
73:5,7,9,10;74:1;
82:4,15;83:8,11,13,
16;84:12;88:15,21;
89:1,1,5;91:17;
93:12;103:15,19,21,
25;104:5,19,22;
105:1,6,9,17,20,21,
23;106:2,4,7,9,22;
108:3,4,19;109:7;
111:6;113:16,21;
114:3;115:23;
116:14;119:22;
120:18;121:16;
122:10;134:12;
135:22,23,24;137:1,
19;138:3,16;139:2,6,
21;140:12,17,21,22,
25;141:4,6,9,12,25,
25;142:4,11,21;
143:8,8,9,13,20;
144:4,9,11,22;145:2,
5,17,20,21;146:6,12,
19;147:7,13;153:2,3,
17;157:16,18,21,25;
158:22,24;159:2;
160:25;161:3,3,12;
164:25;165:11,11,18,
18;166:5,7,20;168:13
**reporter (15)**
4:20;5:4;8:7;
17:20;30:8;48:23;
58:1,10;69:17,24;
87:13,15;156:1;
172:22;173:4
**reporting (1)**

123:10
**reports (23)**
16:3,6;18:11;
33:25;46:3,3;73:22;
81:7,20;88:14;90:13,
16,19,25;91:7,13;
134:4;160:18;
161:10;164:11;
165:4,8,10
**represent (4)**
29:4,5;81:18;101:3
**represent- (1)**
122:23
**representing (3)**
13:6;20:8;108:5
**request (1)**
51:15
**requested (5)**
71:13;79:13;96:20,
21;157:5
**requesting (1)**
77:8
**requests (1)**
157:17
**require (1)**
17:12
**required (1)**
67:24
**requirements (2)**
30:1;120:5
**rereviewed (1)**
47:13
**research (2)**
8:11,14
**researching (1)**
10:4
**reserved (1)**
173:7
**resolving- (1)**
22:2
**resources (5)**
38:8,9,14,17;47:1
**respected (1)**
23:10
**respond (8)**
63:23;108:16;
110:19;122:22;
128:19;130:6;
138:11;155:12
**respond- (1)**
100:20
**responded (33)**
63:14,20;84:2,12,
16;89:9;90:1,3;
100:20;110:8,10;
111:12,18;114:14,20,
25;122:5;131:15;
132:9,24;133:3;
153:8,10,11,17,23;
154:1,3,8,10,16,25;
169:6
**responders (4)**
131:7;135:3,11,15

**responding (2)**
139:19;155:10
**response (70)**
43:13,25;44:7,24;
50:16;65:1;68:21;
79:4;81:19;84:6,17;
90:8;95:1;97:2;
101:8;107:3,9;108:6;
109:3;111:17;
112:10,15,19,22;
122:17,18;123:3;
124:8,16;126:16,17,
22,24;127:8,16,18,
19;128:3,6,11;129:1,
6,15,24;130:3,9,14;
131:18;132:18;
135:14;137:2,15,24;
139:9,20;142:23;
143:18,24;144:6,23;
146:7;153:4;155:16,
22;160:21;163:3,8;
166:10;168:13,16
**responses (1)**
112:13
**responsibilities (12)**
42:24;43:12,24;
49:9;50:2,16;52:19;
60:9,24;61:11;63:7;
149:14
**responsibility (5)**
56:17;60:18;62:12;
115:7;118:15
**responsible (11)**
43:2;44:19;45:14;
49:10;56:15;59:17;
60:2,2,11,12,25
**responsive (3)**
123:18;157:12,15
**restarted (1)**
71:24
**restate (1)**
10:2
**result (8)**
10:16;113:2;
121:20;125:15;
126:17,23;127:3;
150:24
**resulted (1)**
146:1
**results (5)**
47:5,8,12,13;117:7
**resume (5)**
28:3;30:16;35:15;
59:19;64:11
**resumed (1)**
8:21
**retained (51)**
12:21;13:9;15:4,
10;16:1,10,15;17:1,4;
18:7,12,18,22;19:12,
17,25;20:4;21:1,3,14,
18,19;24:19;25:4,8,
15,21;26:1,14,15,20;

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NND case 3:18-cv-00995-JD   document 272-2   filed 03/20/23   page 192 of 196
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021

27:9,18,19;28:24;
29:3,7,8,14;31:18;
32:11;33:5,7;37:3,7;
48:21;49:3;115:19;
158:3;160:11;165:5
**retaining (1)**
159:9
**retired (2)**
67:9,22
**retirement (1)**
67:6
**retraining (1)**
47:16
**retrieved (1)**
128:5
**return (2)**
40:17;82:3
**revenue (1)**
158:3
**review (56)**
6:14,19;7:12,21;
25:17;46:3;47:2,4,5;
51:9;52:25;53:22,23;
73:14;77:21;81:18;
83:2,23;86:13,16,21;
88:4;91:1,15;92:10;
93:10,14;97:9,12;
98:21;99:2;101:6;
102:13,18,19;103:2,
9;106:6,9,11;114:8;
116:23;117:17;
118:24;121:1;
126:25;140:25;
157:11;160:22;
161:25;165:6,8;
166:1,21;171:4,14
**reviewed (53)**
27:8;31:8,11;
34:14,17;47:8,11;
55:7;82:7;83:4,25;
84:12;85:3;86:4,9,
25;87:24;88:11;
89:22;91:10;93:13,
19,21;94:11,12,19,
20;95:8,15,25;97:5,
17,19,20,24;98:1,2,
22,23,24;99:5,7;
100:8;105:1;106:13;
113:14;142:1;161:2;
166:2,15;167:21,24;
170:9
**reviewing (11)**
91:12,17;92:1,6;
95:12;116:9;133:6,
10;159:1;164:12;
166:3
**reviews (3)**
47:25;91:6;139:14
**rewriting (1)**
51:11
**Rider (1)**
156:23
**Right (35)**

9:1;22:11;28:8;
49:25;69:13;73:1;
81:15;85:1;96:6;
101:23;111:7;
114:18;116:20;
122:14;127:4;
129:12;130:1;134:5,
13;135:18;140:2;
144:9,12;148:24;
153:23;155:25;
162:7,12;168:1,10,
16;170:4;171:12,12;
172:8
**risk (1)**
56:8
**Rodriguez (19)**
84:9;108:15,21;
109:10;110:17;
114:19,24;122:24;
131:6,13;132:2;
134:22;135:8;153:8;
154:3,10,13;155:3;
169:5
**Rodriguez's (7)**
153:4;154:4;
155:22;169:11,16;
170:14,20
**role (4)**
23:23;49:9;115:10;
150:15
**Ron (1)**
121:25
**room (1)**
3:13
**rough (1)**
136:4
**rounds (1)**
110:16
**routine (2)**
15:22;17:2
**Rule (1)**
159:11
**rules (2)**
3:25;17:11
**rumors (1)**
113:8
**run (4)**
50:5,9,10;146:15
**running (5)**
50:11;108:22;
109:10;110:21;131:6

**S**

**safe (6)**
43:8;44:10;50:13,
23;65:6;124:19
**safety (71)**
43:12,18,25;44:6,
13,14,24;45:4,13,18;
46:5,18;47:2,17,22;
48:8;50:16;56:5,12,
16,16,24,25;57:10;

59:18;60:18,21;65:1,
4,7;68:21;69:1,4;
75:3;78:17,20,25;
80:11,17,24;92:21;
94:3,13;117:16,21;
118:3,12,15,16;
137:19,20,25;138:6,
10;139:10;140:7,10,
13,18,24;141:11,16,
22;142:14,23,25;
143:17,24;160:21;
163:4,13
**Sam (2)**
4:14,18
**same (17)**
4:1;7:17;16:20;
48:16,19;50:4,14;
52:24;89:4;108:8,22;
109:11;134:21;
135:13;138:23;
166:9;172:2
**San (1)**
70:5
**Santa (2)**
54:11;72:20
**Sarah (1)**
154:15
**sat (1)**
155:11
**save (3)**
32:15;122:7;124:8
**saving (3)**
126:18,23;128:8
**saw (5)**
65:20;97:23;
131:23;134:4;141:2
**saying (8)**
9:14;80:16;82:24;
96:19;107:11;
120:12;129:10;
141:24
**scan (1)**
96:3
**schedule (1)**
17:2
**scholarly (1)**
161:10
**science (5)**
162:18,21,24;
163:8,12
**scope (1)**
29:22
**screen (2)**
82:11;105:14
**scroll (1)**
101:17
**search (5)**
158:5;159:7,13,21;
160:14
**searched (1)**
160:15
**second (18)**
7:11;9:1,15,22;

21:7;77:12,20;97:10;
109:13;111:1;
122:10;130:25;
131:12;138:24;
153:3;164:1;169:25;
171:10
**section (4)**
107:10,12;121:9,
10
**sections (1)**
137:1
**sector (1)**
48:19
**secure (4)**
44:10;50:13;61:21;
124:19
**Security (15)**
6:14,19,22;7:1;
14:8;38:5;43:7;50:7;
59:8;63:7;94:23;
98:24;108:21;109:9;
167:1
**seemed (1)**
162:4
**semiretired (1)**
36:10
**send (8)**
5:19;8:24;9:14,17;
11:17;77:7;79:5;
96:25
**sending (1)**
96:19
**senior (1)**
62:18
**sense (2)**
116:10;132:14
**sent (24)**
25:18;73:15,16;
77:20;81:7;82:24;
85:5;86:22,23,23;
88:5,6;90:20;92:14,
20;94:2,13,16;96:23;
100:4,6;105:13,13;
166:14
**sentence (4)**
130:22,25;131:9,
12
**sentimental (1)**
152:19
**separate (5)**
121:11,17,19;
137:6,11
**Sergeant (2)**
131:13;132:2
**serious (3)**
138:6,7,9
**seriously (9)**
118:12;138:21;
140:10,13,18,24;
141:11,16;142:15
**serve (1)**
29:19
**served (8)**

12:13,16,16,21;
42:21;53:4;60:13;
62:21
**service (1)**
39:25
**services (24)**
15:23;16:1;35:16,
17;38:2,18;40:5,13,
15;41:25;42:7,13,16,
16,17;43:4,6,7,10;
50:8,8,8;59:24;60:3
**serving (1)**
115:19
**sessions (2)**
61:5;76:8
**set (4)**
45:12;119:14,23;
120:2
**sets (1)**
39:18
**setting (5)**
19:19;31:16;65:2;
151:15;160:22
**settings (1)**
76:11
**settlements (2)**
149:20,24
**seven (1)**
52:22
**Seventeen (1)**
150:23
**Several (10)**
3:19,20;13:13;
25:8;91:3;93:12;
105:24;152:18;
155:9,17
**sewer (1)**
50:9
**shaking (1)**
5:3
**share (6)**
34:3;77:13;96:7;
105:14;138:25;156:6
**sharing (2)**
96:7;138:25
**Shelbyville (1)**
26:12
**short (2)**
89:7;90:6
**shorter (1)**
70:21
**show (6)**
140:17;141:5,8,10;
163:22;164:1
**showed (1)**
88:21
**showing (1)**
94:25
**shows (1)**
164:2
**shutting (1)**
77:10
**sign (3)**

DENISE DWYER, et al. v.
RON NEAL, et al.

Cause No. 3:18-cv-00995-JD-MGG

JOHN D. REES
May 26, 2021

USDC IN/ND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 193 of 196

172:19;173:1,3
**signals (1)**
    39:20
**Signature (1)**
    173:7
**significant (4)**
    68:7;127:11,11;
    140:6
**simply (3)**
    108:20;109:8;
    127:9
**Simultaneously (2)**
    110:21;155:23
**single (3)**
    79:24;85:2;168:21
**sit (3)**
    11:22;33:23;92:11
**situation (9)**
    14:11;24:10;65:7;
    73:22;112:14;124:3,
    7;129:22;145:9
**situational (1)**
    129:19
**situations (2)**
    48:2;57:15
**six (3)**
    52:22;53:23;90:16
**size (1)**
    51:18
**skim (1)**
    87:21
**slightly (3)**
    42:10;43:21;147:5
**slow (3)**
    61:25;65:23;
    127:15
**slowed (1)**
    127:15
**slowly (1)**
    87:20
**small (1)**
    117:8
**smaller (2)**
    54:12;61:22
**Smart (1)**
    64:19
**smoke (4)**
    108:23;109:11;
    112:18;131:5
**social (1)**
    70:10
**socially (2)**
    76:6,7
**sold (2)**
    17:8,10
**sole (1)**
    126:21
**somebody (1)**
    139:14
**someone (1)**
    11:6
**sometime (3)**
    34:10,20;66:25

**sometimes (2)**
    22:12;117:10
**somewhat (1)**
    165:12
**somewhere (1)**
    67:20
**soon (5)**
    28:7;32:18;136:4;
    154:10;155:3
**sorry (40)**
    4:16;5:21,22,23;
    6:25;17:9;27:24;
    31:10;32:7;34:16;
    40:23;42:10;47:11;
    48:23;54:2;56:25;
    57:24,24;61:16;
    69:17;72:10;77:10;
    78:18;87:8;95:6;
    96:8,9;97:11;113:1;
    122:14;135:15;
    136:6,14;143:7;
    147:2;152:21;
    156:11;163:25;
    169:20,24
**sort (5)**
    12:9,11;120:22;
    137:1,22
**sound (3)**
    95:3,5;162:2
**sounding (1)**
    110:23
**sounds (1)**
    162:3
**South (2)**
    3:12;54:10
**speak (6)**
    73:24;74:3,10;
    75:5,5;133:11
**speakers (1)**
    70:12
**speaking (3)**
    58:14;102:5;
    128:24
**speaks (3)**
    107:22;144:10,11
**special (2)**
    60:25;62:4
**specialization (1)**
    24:3
**specialized (5)**
    68:3,4,7;69:20,21
**specific (24)**
    13:15;27:3;35:9;
    43:24;46:22;47:16,
    24;50:15;76:16;
    93:13;108:19;
    116:14;117:20;
    118:14;120:5,5;
    121:8;126:24;
    143:14,21,22;148:12,
    16;151:12
**specific- (2)**
    68:25;146:16

**specifically (20)**
    38:16;43:12;44:4,
    20;46:12;48:3,14;
    51:4;52:5;63:1;65:3,
    24;98:3;103:24;
    138:4;142:22;
    146:20;148:18;
    153:19;157:17
**specifics (7)**
    22:6;77:9;94:14;
    139:14;146:2;
    148:12;150:9
**speech (1)**
    129:9
**spell (1)**
    3:8
**spend (8)**
    36:16,17,22;51:16;
    76:5;91:12,16;167:4
**spent (5)**
    36:3,7;76:7,10;
    91:25
**spot (1)**
    145:23
**spread (1)**
    162:22
**sprinkled (1)**
    57:11
**sprinklers (2)**
    57:12,13
**staff (43)**
    7:25;20:6,18;
    24:17;26:17;27:11;
    35:11;43:8;44:11;
    45:1,15,20,25;46:5;
    47:3,17;50:13,23;
    55:6;57:20;58:18;
    59:17;63:9;64:4;
    75:24;83:22;85:12,
    16;89:16,16;90:1;
    98:23;107:3;118:8,
    11;121:25;138:17;
    140:3,9,12;144:23;
    146:8;147:9
**staffing (4)**
    7:4,12,14;38:5
**stairs (3)**
    108:22;109:10;
    131:6
**stamp (2)**
    41:2;131:25
**stamped (1)**
    77:18
**standard (3)**
    13:17;46:19;
    141:22
**standards (40)**
    43:5,19;45:7,11,13,
    18;47:22;48:7;50:20,
    25;51:1,3,6,19,23;
    52:8;53:1,9,10,15;
    55:12,14,21,24;56:1,
    19,21;65:8,23,25;

66:2;69:3,3;75:3;
    78:17,20;80:24;
    118:4;120:5;140:6
**standing (2)**
    144:8,16
**start (21)**
    4:22,24;8:23;51:9;
    52:9;65:14;67:13;
    70:14,19;72:24;
    106:3;117:8;120:10,
    13,14;134:20;139:6,
    8,16,19;163:9
**started (23)**
    27:6;28:7;62:10;
    67:16;100:18;
    109:16,17;113:4,9;
    114:4;119:17;
    120:15,19;124:6;
    125:4,22;126:4;
    132:11;133:14,22;
    134:1;136:23;162:21
**starting (2)**
    62:14;114:9
**starts (10)**
    41:1;49:18;70:17;
    117:16;118:23;
    131:1,9,12;134:16;
    142:24
**state (50)**
    3:7;8:15;11:6;
    37:16;39:21,22;42:3;
    43:10;46:24;48:18;
    49:12,13;50:5;54:9;
    56:10;68:11;72:14;
    75:2,20;78:22,23;
    90:15;92:18,25;
    93:24;117:25;118:1,
    7;119:4,9;124:20;
    125:1,2;137:5,8,9;
    140:3,4,9;143:15,23;
    145:4,12;146:1,8,9;
    147:10;160:11;
    166:23;167:14
**stated (2)**
    112:22;158:2
**statement (9)**
    84:18,20;85:1,3;
    89:20;90:3;118:17;
    124:15;127:8
**statements (29)**
    83:19,24;84:1,22;
    85:4,18,24;86:4,7,9;
    88:23,25;89:6,8,25;
    90:7;99:6;103:15,20,
    25;105:25;106:19;
    107:7;108:5;158:13,
    17;165:4,9;166:6
**states (2)**
    23:4;42:2
**station (2)**
    131:13;132:2
**status (5)**
    62:15;67:22;

118:13;119:5;138:8
**stay (1)**
    58:2
**staying (1)**
    3:11
**steps (3)**
    44:4,21;130:12
**still (6)**
    38:23;72:9;144:9,
    12,16;172:21
**stolen (2)**
    151:22;152:18
**stop (4)**
    39:13;96:6;108:10;
    110:25
**stopped (1)**
    138:25
**strictly (1)**
    125:22
**strike (8)**
    18:4;32:8;56:4;
    58:25;59:11;70:24;
    144:6;171:3
**strong (1)**
    52:6
**study (2)**
    6:15;66:18
**stuff (8)**
    16:18,21;44:18;
    48:16;57:3,4;93:2;
    159:2
**stumble (1)**
    123:10
**style (1)**
    44:8
**submit (1)**
    33:9
**submits (1)**
    39:20
**submitted (8)**
    15:7,14;17:17;
    18:10;32:5;39:22;
    97:18;160:4
**Subpoena (9)**
    77:19;81:19;96:10,
    15,15;156:8,16,18,23
**subsequent (1)**
    10:18
**subsequently (2)**
    12:18;23:9
**substance (1)**
    37:25
**substantiated (1)**
    134:3
**successful (4)**
    27:5;52:11;73:21;
    127:2
**successfully (2)**
    45:9;124:8
**sued (10)**
    147:15,16,23;
    148:7,9,15,25;149:3,
    3,13

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021

USDC IN/ND case 3:18-cv-00995-JD   document 272-2   filed 03/20/23   page 194 of 196

**sufficiency (7)**
142:22;143:22;
144:5,23;145:3;
146:7,13
**suggest (2)**
7:22;121:25
**suggesting (1)**
108:14
**suicide (1)**
117:11
**suing (1)**
26:11
**summaries (4)**
157:8,23;165:4,10
**summary (2)**
121:10,15
**Sunday (2)**
70:18,21
**supervisor (1)**
142:6
**supervisors (8)**
85:4;89:8;138:20;
139:10;140:18;
141:11,15;142:14
**supervisory (3)**
63:8,21;89:25
**support (3)**
92:12;106:19;
114:3
**supporting (5)**
41:5;105:24;107:6;
112:2;116:8
**supposed (1)**
47:7
**supression (1)**
57:6
**sure (67)**
3:24,25;5:1;7:18;
8:6;9:11;11:3;12:3;
18:2;20:15;22:8,12;
23:22;25:3;28:21,23;
34:14,18;38:10;39:5;
41:17;44:25;45:19,
23,24;46:7;47:6,23;
53:13;55:20,23;
56:18,20;58:13;
59:13;62:1;64:17;
65:19;72:21;77:6,7;
80:15;86:2;99:5,8;
100:5;102:25;107:5;
110:3;112:1;116:1,5,
13;119:19;124:13;
125:13;126:19;
136:13;144:19;
148:11;149:22;
151:11;153:1;
154:21;165:13;
167:18;173:2
**surveillance (2)**
163:20,20
**suspended (1)**
150:17
**sworn (6)**

3:3;98:12;99:3;
101:7;103:2,9
**system (9)**
39:14,18;50:7,10;
52:20;57:9,11;61:3;
148:17
**systems (1)**
48:18

**T**

**talk (7)**
46:3,4,4,6;106:25;
137:2;139:8
**talked (7)**
21:25;25:8;75:7;
77:6;80:8;163:24;
164:10
**talking (5)**
24:23;29:2;46:11;
72:3;138:14
**talks (2)**
103:15;138:3
**task (1)**
118:5
**taught (2)**
71:9,12
**tax (1)**
40:17
**teaching (2)**
70:23;71:5
**tear (3)**
157:21;158:21,22
**telephone (1)**
101:13
**television (1)**
113:6
**ten (10)**
3:20,21;7:6;71:8,
20;86:18,18,19;
148:1;160:13
**ten-minute (1)**
71:18
**Tennessee (1)**
72:20
**Ten's (1)**
86:19
**terms (1)**
136:8
**test (4)**
66:19;67:4,10,19
**tested (1)**
67:13
**testified (8)**
3:3;15:17;28:19,
23;30:20;32:14;
128:18;142:6
**testify (5)**
5:12,15;102:1;
156:8,16
**testimony (27)**
11:4;17:13,24;
29:9,22;30:25;33:10,

25;38:11;98:12;99:3,
3;100:16;101:7;
103:2,9,17;104:4,13;
128:17;140:19;
141:23;154:22;
160:19;165:23;
170:15,20
**testing (1)**
70:11
**Texas (3)**
20:10,12;54:10
**textbook (1)**
148:13
**texted (1)**
74:12
**therapeutic (1)**
61:21
**thereby (1)**
53:17
**therefore (1)**
53:2
**third (5)**
8:8,8;122:12,15;
131:12
**third-party (1)**
161:15
**thirty (5)**
14:2;15:1,5;19:23;
22:5
**thought (1)**
92:3
**thoughts (1)**
23:10
**three (28)**
15:8;18:23;19:22;
20:3,17;22:4;23:4,12,
14,17;33:15,19;
40:19,21;51:17;
52:23,24;67:5,12;
71:8;84:1,2,7;136:12,
16;155:8;162:5;
167:7
**threw (1)**
16:21
**throughout (1)**
12:17
**Thursday (2)**
70:14,17
**tied (1)**
137:23
**Tiffany (10)**
41:2,3;73:16;
77:20;82:23;90:22;
96:16;101:13,22;
102:12
**Tiffany's (1)**
90:22
**till (3)**
22:10;80:20;
139:18
**timeline (1)**
112:23
**times (31)**

3:18;12:13,15,17,
24;13:4,13,13;15:3,5;
19:21,24;27:14;
32:15;63:16,18,24;
69:6;71:8;75:21;
118:2;141:21;
147:19,24;148:1;
149:18;150:4,5;
151:12;152:2;165:18
**titled (1)**
82:6
**titles (2)**
93:5;94:6
**today (9)**
5:12,15;11:22;
30:25;33:23;34:24;
41:12;48:17;92:11
**together (2)**
82:15;159:2
**told (7)**
12:5;75:22;154:18,
19;158:23;161:23;
167:1
**tons (2)**
16:21,21
**took (19)**
7:6;10:15;54:21,
21;55:2,12;67:18;
68:24;108:15;
109:15;121:21;
123:2;140:13,18,24;
141:11,16;142:14;
157:18
**top (7)**
34:6;61:8;93:5;
118:8;122:11,12,14
**topics (3)**
94:5,7,10
**total (14)**
14:9,21,21;24:15;
36:23;37:1;40:12,14;
55:8;86:15;92:7,9;
126:16,16
**totally (2)**
9:19;15:11
**touch (2)**
93:17;121:8
**toured (1)**
167:18
**tower (1)**
39:18
**toxic (1)**
65:9
**toxics (1)**
163:5
**track (2)**
91:22;120:23
**tragedy (2)**
109:24;113:2
**tragic (3)**
119:8;120:23;
127:4
**tragically (1)**

122:6
**trailing (1)**
48:24
**trained (1)**
45:15
**training (52)**
45:1,24;46:2,6,18,
21,22;47:3,14,15,16,
17;50:21;51:5;56:20;
58:17;62:12,13,20;
64:4;68:3,4,7,8,11,
15,16,20,23,24,24;
69:2,5,7,13,13,15,19,
21;70:10;76:8;
117:23;142:23;
143:1,15;162:20,24;
163:3,7,7,12,12
**trainings (1)**
68:12
**training's (1)**
44:17
**transcript (5)**
171:5,15,20;172:4,
9
**transcripts (3)**
157:9,24;160:19
**transitional (1)**
42:16
**transitioning (1)**
42:18
**treat (1)**
164:19
**treating (1)**
20:12
**treatises (2)**
161:1,9
**treatment (5)**
14:9;38:1;41:21;
42:15;62:21
**treatment-oriented (1)**
61:22
**tremens (1)**
19:11
**trial (2)**
29:9;150:1
**tried (1)**
119:4
**trouble (1)**
10:21
**trucks (1)**
57:7
**true (3)**
114:16;164:21,24
**try (5)**
4:23;124:23;
138:18;164:21;170:6
**trying (9)**
24:21,21;39:13;
72:19;113:15,17;
116:16;127:24;
136:10
**Tuesday (2)**
70:15,19

DENISE DWYER, et al. v.
RON NEAL, et al.
Cause No. 3:18-cv-00995-JD-MGG
JOHN D. REES
May 26, 2021

**turmoil (1)**
117:9
**turn (1)**
42:19
**twenty (1)**
16:20
**twice (1)**
67:5
**twice-annual (1)**
45:17
**two (29)**
19:1,22;20:3,11;
21:7,17;22:4;23:12,
17;37:25;42:2;69:11;
71:8,16;84:13;85:11,
25;86:6;110:15,22;
118:23;134:22,23;
135:12,20;137:1,7;
150:6;167:6
**two-minute (1)**
99:20
**two-page (1)**
81:20
**type (7)**
40:5;41:17;48:16;
123:4,11;160:14;
163:6
**typed (1)**
83:1
**types (8)**
7:4;36:7;37:20;
46:17;48:6;56:5,22;
59:15
**typical (2)**
36:24;165:15
**typically (1)**
165:9

**U**

**ultimate (1)**
121:4
**ultimately (1)**
51:23
**unable (1)**
124:24
**under (3)**
4:12;23:4;54:22
**understood (5)**
4:8;21:6;53:25;
63:11;98:6
**unfolded (1)**
109:16
**Unfortunately (2)**
122:6;124:24
**unit (1)**
129:21
**University (2)**
46:22;62:19
**unless (3)**
98:18;101:9;
166:11
**unsuccessful (1)**

128:8
**up (47)**
15:6;28:13;30:4,
15,18;34:15,18;
39:14,18;55:19;
62:14;64:13,23;
65:15,21;67:3,14,23;
73:23;74:9;77:12;
79:15;82:10;87:2;
93:5;99:11;101:17;
105:8;108:22;
109:10;110:21;
122:8,9;123:1;131:6;
145:11,13;154:4;
155:24;156:20;
157:21;158:7,21,22;
161:23;162:1;166:21
**updated (2)**
31:25;34:8
**updates (1)**
34:23
**updating (1)**
32:3
**upon (5)**
116:9;133:3;153:8;
154:2;161:3
**upside (1)**
26:9
**use (6)**
8:12,16;32:10;
57:10;117:4;164:11
**used (6)**
21:22;25:19;32:7;
64:2;117:10;172:13
**using (1)**
46:10
**utilization (3)**
38:8,13,17
**utilize (1)**
38:22
**utilized (1)**
46:21

**V**

**varies (1)**
35:9
**various (16)**
38:23;39:13;43:3;
46:20;63:18;73:22;
83:18;84:4,22;85:9;
88:23;89:8,25;90:13;
92:17,20
**vent (1)**
90:17
**Venus (2)**
54:10;56:15
**verbal (1)**
5:2
**via (1)**
75:6
**vice (1)**
49:7

**victim (5)**
151:17,20;152:3,5,
11
**victims (1)**
152:23
**Video (20)**
8:19;83:20;85:6,7;
86:12,14,15;88:24;
89:14;94:24,24;95:3,
5;98:24;99:7;132:24;
133:7,10;163:20,20
**videoconference (2)**
4:15;11:1
**video-recorded (1)**
85:13
**videos (1)**
89:2
**view (4)**
98:25;104:8,16;
170:7
**virtual (1)**
70:6
**visible (1)**
102:4
**visit (2)**
46:2;152:17
**voices (1)**
153:10

**W**

**wait (8)**
17:18;22:10;25:9;
80:20;97:10;139:18;
169:25;171:10
**waited (2)**
155:4,17
**waiting (1)**
128:13
**walk (2)**
131:14;132:3
**warden (17)**
49:20;50:3,4,15;
54:4,8,8,9,12,23;
56:3,7;59:20,24;
63:23;121:25;138:4
**wardens (3)**
46:4,4;138:5
**watch (1)**
85:15
**watched (2)**
85:14;132:23
**water (1)**
50:10
**Watson (2)**
84:19,21
**way (8)**
7:22;14:16;38:21;
40:7;76:25;116:12;
146:14;147:8
**weren't (2)**
9:11;79:1
**What's (9)**

22:1;28:11;36:19;
40:7;46:6;64:18;
90:22;146:19;166:2
**whole (1)**
47:17
**whoops (1)**
87:8
**wide (1)**
57:15
**wife (2)**
35:12,13
**Winn (3)**
56:14;72:19,22
**wise (1)**
158:23
**within (14)**
31:3;39:9,19;42:5;
43:10;46:23;61:3;
62:15;75:22,24;76:8;
79:10;129:21;161:18
**without (3)**
79:15;118:8,13
**witness (34)**
3:2,4;30:11;35:20;
69:19;71:20;72:10;
77:10,22;101:19,23;
102:5,6;108:13;
116:24;117:18;
118:25;121:3;124:2;
128:13,18;129:1,3;
136:14;141:19;
162:12;168:6;170:4,
23;171:8,17,23;
172:6,13
**witnesses (1)**
161:15
**witness's (1)**
128:17
**word (4)**
46:10;54:12;96:3,3
**worded (1)**
143:10
**wording (1)**
166:13
**words (1)**
138:6
**work (29)**
6:16;15:13;17:1,4;
27:23;32:12;35:6;
36:7;37:15,15,16,17,
21,25;39:17;40:2;
41:8,10,17,19,23;
48:21;49:3;62:6,16;
71:1;72:3;76:11;
158:3
**worked (39)**
6:9;10:7;13:14;
15:3,8;16:10;18:4,7,
12,17;19:24;20:7,17;
23:4;32:11;39:1;
48:11,12,17,18,19;
49:20;54:3,6;55:15,
22;56:7;61:2;62:16,

17,23,25;63:2;72:4,6,
11;75:20,21;160:16
**working (36)**
6:20;11:18;12:18,
22,24,24;13:6;18:22;
19:25;20:4;23:24;
24:22;31:20;35:2;
36:3,12,17,22,24;
37:1,3,7;38:7,13;
39:1;49:10;52:16,17;
55:11;64:23;67:11;
92:7,9;149:14;
150:18;151:10
**workplace (1)**
43:9
**Works (5)**
28:14;63:5;71:19;
136:2;162:13
**workshops (1)**
70:11
**workweek (2)**
36:19,25
**wrap (1)**
162:1
**write (5)**
73:10;132:1;
157:20;158:21,24
**writing (3)**
73:7,9;77:5
**written (20)**
15:18;16:4,7;
56:19;80:25;81:4,5;
83:23;85:18;86:4,9;
89:6;91:9;92:24;
106:21;107:13;
108:18,19;161:10;
164:17
**wrong (2)**
108:14;155:13
**wrote (4)**
81:6;98:16;105:1,
21
**Wyoming (2)**
38:7,14

**Y**

**year (11)**
34:10,12;37:7;
40:13,20;53:24;
62:18;69:11;86:24;
87:1;158:14
**years (34)**
7:6;14:2;15:1,8;
16:21;17:14,24;18:8,
13;20:14;22:5;31:1,
3,6;33:4,15,19;34:1;
36:12;40:19,21;
52:23,25;66:20;67:5,
10,12;71:8;146:3;
147:21;158:4,24;
160:13;167:2
**yelling (2)**

DENISE DWYER, et al. v.
RON NEAL, et al.
USDC NWND case 3:18-cv-00995-JD    document 272-2    filed 03/20/23    page 196 of 196

Cause No. 3:18-cv-00995-JD-MGG

JOHN D. REES
May 26, 2021

132:10;134:1
**yells (1)**
155:10
**Yep (1)**
105:18
**Yesterday (2)**
105:7;160:5

**Z**

**zoom (2)**
9:7,24

**1**

**1 (17)**
30:12;40:24;62:25;
72:23;82:3;83:6,16;
88:10,12,18;99:14;
105:9;106:3,7,9,10,
15
**1:54 (1)**
136:21
**10 (8)**
20:13;36:5,22,23;
37:5;82:6;86:20;
167:2
**100 (1)**
40:18
**11 (6)**
20:13;127:23;
128:11,20;129:6,8
**11:56 (1)**
71:22
**12 (3)**
86:20;127:22;
167:2
**12:05 (2)**
71:18,22
**12:51 (1)**
99:23
**12:55 (2)**
99:23,25
**13 (1)**
42:2
**133 (1)**
87:11
**133808 (1)**
87:18
**13th (1)**
48:4
**14 (2)**
112:17;127:17
**15 (12)**
34:4;36:5,14,22,
23;37:5;84:24;86:20;
107:2;146:3;161:24;
167:2
**150,000 (2)**
40:18,20
**15-minute (1)**
162:10
**16 (2)**

94:18;95:7
**17 (1)**
94:23
**18 (3)**
54:22;55:2;95:8
**18-month (1)**
55:3
**19 (2)**
17:6;95:8
**1970 (1)**
150:22
**1977 (1)**
150:22
**1989 (1)**
49:21
**1994 (2)**
49:6,22
**1998 (6)**
18:19;25:14;48:10,
15;49:2,6
**19-page (1)**
41:5
**1st (1)**
96:16

**2**

**2 (7)**
49:18;77:14,15;
106:17,21;134:12;
158:2
**2:00 (2)**
136:1,18
**2:07 (1)**
136:21
**2:42 (1)**
162:15
**2:49 (1)**
162:15
**20 (7)**
36:9,14;37:5,9,12;
95:8;158:15
**20- (1)**
158:7
**2000 (2)**
66:24;67:16
**2001 (1)**
66:24
**2003 (2)**
25:14;67:20
**2004 (5)**
42:21;48:11,15;
49:3;67:20
**2006 (1)**
48:4
**2008 (2)**
35:2;42:22
**2009 (2)**
68:9;69:15
**2010 (1)**
7:7
**2017 (11)**
32:24;83:20;90:2;

94:24;108:7;143:24;
144:25;146:10;
153:4;159:18;163:21
**2019 (2)**
17:6;32:21
**2020 (2)**
34:20;70:5
**2021 (2)**
41:3;96:16
**21 (1)**
95:8
**22 (4)**
95:8;112:16;123:3;
127:16
**24-hour (1)**
50:7
**25,000 (1)**
158:15
**25,000-dollar (1)**
158:7
**26 (3)**
97:3;100:4;159:11
**26th (1)**
100:6

**3**

**3 (10)**
64:11;65:14;83:18;
87:3,4;89:20,22;
139:5,25;159:7
**3:00 (1)**
162:11
**3:10 (1)**
173:5
**30,000 (2)**
37:9,12
**365-day (1)**
50:8

**4**

**4 (14)**
64:11,16;65:17;
68:2,2;89:25;90:10;
96:9,11,14;100:3;
104:24;131:11;
159:16
**40-hour (2)**
36:19,24
**49 (3)**
96:8,10,15

**5**

**5 (7)**
41:3;70:22;90:13;
92:13;155:25;156:3;
160:10
**50 (5)**
36:13,17;91:25;
92:1;96:15
**500 (1)**

126:11
**57 (1)**
135:22

**6**

**6 (6)**
72:24;92:17;93:18;
98:10;105:10,10
**60 (2)**
36:13,17
**688 (1)**
77:19

**7**

**7 (9)**
83:20;90:2;94:24;
98:10;146:9;153:4;
157:3;159:18;163:21
**70- (1)**
150:22
**70s (1)**
22:24
**71 (3)**
114:22;154:5,11
**76 (2)**
150:22,23
**7th (2)**
108:7;144:25

**8**

**8 (3)**
94:18;95:6;98:10
**80s (4)**
22:25,25;71:10,11
**85 (1)**
36:6

**9**

**9 (3)**
98:10;105:10;
127:23
**9:34 (3)**
133:18,22;134:5
**9:34.43 (2)**
109:16;133:19
**9:43 (5)**
131:4,22;132:11;
133:15;134:2
**9:46 (2)**
130:22;131:7
**9:57 (2)**
134:13;135:8
**90 (2)**
36:6,7
**90s (1)**
69:12
**95 (1)**
69:10
**97 (1)**

89:1
**97-page (3)**
87:10;88:1,21
**98 (2)**
18:19;69:14
**99 (2)**
18:20;69:14