**RICHARD L. BARD**
1413 E. Willow Drive
Marion, IL 62959
618-841-1747
rickbard21@me.com

November 13, 2020

Megan Pierce
Loevy & Loevy
311 N. Aberdeen St
Chicago, IL 60607

**RE: Denise Dwyer v. Ron Neal, et al., Civil Action 18-cv-995**

Dear Ms. Pierce:

**I.      Basis for Expert Opinion, Qualifications and Methodology**

**A.      Basis for and Scope of Expert Opinion**

1.      I have been retained by Plaintiff's counsel in *Denise Dwyer v. Ron Neal, et al.*, Civil Action 18-cv-995, as an expert witness regarding the death of Joshua Devine, which occurred when he was left in a locked cell that had caught fire. My opinions are based on all of the materials that I have reviewed, which are listed below, and on my knowledge, experience, training and expertise in the daily operation and management of a prison derived from more than 30 years of experience in the field of corrections, as described below and reflected on my CV. I hold these opinions to a reasonable degree of professional certainty. I reserve the right to alter my opinions or form additional opinions in this case based on the disclosure of further information or materials in advance of my ultimate testimony at trial.

2.      In connection with my anticipated testimony, I may use as exhibits at trial various documents and other materials produced and testimony given in this case that refer or relate to the matters set forth in my report. In addition, I may create and use other

1

demonstrative exhibits to aid the Court and the jury in understanding my opinions and the relevant facts related to this case.

**B.     Expert Compensation and Qualifications**

3.      I am serving in this case as an expert consultant in the field of corrections. I charge a rate of $175 per hour for my time completing case review, consulting, calls, report-writing, etc. I charge a rate of $400 per hour for deposition and courtroom testimony. I charge the federal mileage rate for travel by car, and require reimbursement for out-of-pocket expenses such as lodging, meals, flights and other miscellaneous expenses.

4.      A copy of my *curriculum vitae* is attached to this report as Exhibit A.

5.      A copy of my list of prior testimony from the least four years is attached to this report as Exhibit B.

6.      As shown on my CV, I worked in prison/jail systems from 1978 through 2010 and now regularly consult about correctional operations.

7.      In 1978 I began my career as a Jailer at the Gallatin County Jail. In 1982, I was appointed Supervisor of the Jail and Dispatch System, responsible for all aspects of the Jail, which housed an average daily population of 2-3 inmates.

8.      In January 1985, I was hired as a Correctional Officer for the Illinois Department of Corrections for the Shawnee Correctional Center. At the time I was hired, I received 5 weeks of intensive training at the academy in Springfield. I also received annual training in that position called Cycle Training at the local Institution including courses on policies, procedures, and practices of correctional officers. My training included fire and emergency response policies and procedures. I have training regarding

the use of SCBA equipment as a first responder, including through drills, and completing fire drill evacuations. As a correctional officer, I served on the internal audit team, tasked with the process of ensuring the Institution met the American Correctional Association ("ACA") Accreditation Standards. I worked most assignments, including movement and tower officer.

9. During my time as a correctional officer I served several times as part of an emergency response team tasked with responding to an array of emergency situations including fires, medical emergencies, prisoner escapes, and fights.

10. From 1985 to 2003, I also worked at satellite facilities: Dixon Springs Work Camp and later Dixon Springs Impact Incarceration Center (*i.e.*, Boot Camp), as well as Hardin County Work Camp. The approximate population of these Camps was between 150 to 200 inmates.

11. In 2003, I was promoted and appointed as Deputy Director over the Southern 5 region. This region included minimum to super-maximum security facilities, including the prisons of Robinson, Lawrence, Big Muddy, Shawnee, Vienna, and Tamms Correctional Center, as well as the Work Camps of Hardin County and Tamms and the Boot Camp at Dixon Springs. I was responsible for the overall operations of these six facilities and their satellite facilities. In this position, I proposed, reviewed and signed off on various prison policies, including policies on inmate movement and tower security.

12. In September 2004, I was promoted to Chief of Labor Relations for the entire Illinois Department of Corrections. My job was to represent the Director in all contractual manners regarding Union contracts.

3

13.    Also, as Chief of Labor Relations, my job was to give direction to the Institutions, *i.e.* Wardens, about proper discipline in particular contexts. We handled hundreds, if not thousands, of these types of disciplinary issues. This experience was invaluable to me when I was appointed Chief of Operations, as it allowed me to understand what issues were prevalent at each particular institution and where I would focus my energy to try to correct situations.

14.    In July of 2006, I was promoted to Chief of Operations, known in some states as the Chief of Prisons. My responsibility was to oversee the operations of 27 Adult Institutions in the Illinois Department of Corrections, which included approximately 48,000 inmates. This included 10 work camps with 2 of those being Boot Camps and 7 Adult Transition Centers.

15.    The chain of the command was as follows: Wardens reported to the Deputy Directors, who reported to me; I in turn reported to the Director. In my position, I conferred with individual managers to resolve issues. As the Chief of Operations, I handed out discipline not only to Deputy Directors, but to Wardens, and also followed up on discipline down to the Correctional Officer level. I also provided guidance and direction on policies and procedures to ensure the overall accountability and responsibility regarding Operational matters, including emergency response. I directed and participated in researching and reporting on activities of programs and services. I directed development, reviewed and analyzed legislation required for the improvement of current agency programs and services, and the development of new programs. I planned and coordinated a network of systems and services on a Department multi-agency and regional basis. I worked with the investigations unit to ensure that the operations

4

divisions complied with all practices of investigations. I reviewed the activities of professional staff engaged in conducting investigations.

16. During my tenure as Chief of Operations, I established procedures for security reviews and also managed day-to-day operations in the prison system. In my time there, I re-emphasized a command and control mentality in the Operations Division. This brought accountability and discipline throughout the IDOC and their facilities. Per policy, we immediately instituted a review of any critical incidents that happened anywhere in the Illinois Department of Corrections. I also developed a new policy in the Operations Division that stated any significant changes in any facility in the state of Illinois would have to have my approval as Chief of Operations of the IDOC. I frequently observed and reviewed movement practices throughout the agency, with special emphasis on large mass movements such as yard and feeds. I observed the process and practice of operations on the walk and inside the dining room during large feeds. I put special emphasis on tower officers to be on alert and in open view to staff and inmates where applicable. This was to deter dangerous activity by the inmate population.

17. Both in my capacity as Deputy Director and then as Chief of Operations, I was responsible for reviewing and approving all policies related to fire and emergency response. In my capacity as Chief of Operations I also had extensive responsibilities setting policies related to fire and emergency response, as well as participating in a leadership role in actual emergency situations. As examples, I served as the highest on-scene ranking officer during a hostage situation, in which I oversaw the emergency response at the facility. As part of my supervision and oversight of prisons I regularly ran and supervised emergency response drills, including off-hours and unscheduled drills. I

5

also was part of the chain of command for emergency response to a number of significant emergencies, including fires.

18. I developed, proposed, reviewed, and approved new policies for the administrative directives covering the entire prison system. Through command and control from the Chief of Operations all the way down to Deputy Director and the Wardens, I implemented a policy of off-hour visitations by the Deputy Directors and required a review of particular parts of the prison facility. With these types of unscheduled visits we could find problems, resolve them and correct them.

19. I attended most IDOC level policy discussions, worked directly with the individuals on the Director's immediate staff as well as the Director. I met formally on a weekly basis with the Director and spoke several times on a daily basis with the Director regarding issues related to operations. I provided managerial and administrative input into planning for future IDOC initiatives, and directions for IDOC operations. I consulted with the Director on overall integrations, coordinating programs to resolve administrative problems, resulting in Agency improvement.

20. In most cases, I visited and inspected every facility in the state on an annual basis. I visited some facilities many times, such as Tamms, Menard, Stateville, and Boot Camps. I was involved in quality of care meetings at local institutions with medical staff, doctors, and also security staff. I learned what the issues were for that particular facility and observed how well the staff communicated with each other. If there were issues to be dealt with, I would bring them to the Warden's attention or to the respective Deputy Director's attention of that facility. When I would revisit that particular facility I would have my documentation to allow me to follow-up and ensure

issues were resolved. If there were outstanding issues, there would be accountability that could include discipline.

21.    During my time as the Chief of Operations over an approximately four-year period, the IDOC had over 80,000 inmate written grievances. As the Chief of Operations, I personally heard and resolved hundreds of oral grievances. I personally checked grievance boxes. I expected Wardens and their staff to ensure that the grievance process was operating in an efficient and fair manner. When I visited the facilities I would walk through and talk with staff and inmates. From the inmates, I would hear their concerns or grievances and I would resolve those grievances, if possible.

22.    As the Chief of Operations, I testified before the legislative body regarding operational issues. I also worked with other agencies, including the State Police, in achieving operational objectives and addressing issues. Not only have I testified before the legislature on corrections issues, I accompanied the Director as he testified before the legislature and was prepared to answer agency wide and facilities operational questions. As the Chief of Operations, I assigned work and provided guidance and training. I gave oral reprimands and referred employees for more severe discipline. I completed and signed performance evaluations, established annual goals and objectives, counseled staff on productivity, quality of work, and conduct. I reviewed activity reports. I ensured activities as designated or defined by the Director are availed to represent the standards of excellence of the Department. I served as Administrator providing special assistance to the Director or others as deemed necessary by the Director. I facilitated the completion of operational duties as assigned by the Director, legislators and the governor's office for the betterment of the Agency. I planned,

developed, organized, controlled and managed administrative programs. I formulated policies regarding IDOC Programs and Operations.

23. Since my retirement I have acted as a consultant and an expert on prison operations and policies. I have given presentations before interest groups, the Illinois Department of Corrections, and advised the Governor's office. I have also testified before a legislative committee.

24. In addition to the prison and jail facilities in which I worked, I have also visited and toured various facilities during my career in the correctional system and in my capacity as an expert consultant. This includes Indiana State Maximum and Super Max Security Prisons, including Indiana State Prison, as well as a medium security prison in Kinder, Louisiana. I have toured the Huntsville State Prison in Huntsville, Texas. I have toured the USP of Marion. I also participated in a tour of USP Terre Haute.

25. I have given professional presentations on "The History and the Future of the Illinois Department of Corrections" to a "Symposium on Corrections Issues" at the Northwestern University Law School. I have given this presentation to community leaders in Southern Illinois and at two other community colleges. I have also given presentations on the history and the future of the Illinois Department of Corrections to legislatures, legislative staff, US Senate staff, and the Governor's staff, including the Chief Legal Counsel for Governor Quinn. I was also involved in giving a video presentation entitled "Cuts in Prison Education Put Illinois at Risk," which was put together by John Macki, the Executive Director of the John Howard Association. I also served on the John Howard Association Board of Directors from 2010 to 2012. I sometimes advise them on Corrections issues.

8

## C.    Methodology

26.    My opinions disclosed in this report are based on reviewing testimony, documents, and other materials related to *Denise Dwyer v. Ron Neal, et al.*, Civil Action 18-cv-995, including:

- Plaintiff's Second Amended Complaint, *Devine v. Neal, et al.*
- Defendants' Joint Responses to Plaintiff's First Set of Request for Admission
- Internal Affairs Investigation into the April 7, 2017 Fire at Indiana State Prison and the Death of Prisoner Joshua Devine
- Report of Internal Affairs Investigation into the April 7, 2017 Fire at Indiana State Prison and the Death of Prisoner Joshua Devine
- B Cell House Fire Powerpoint
- Fire Marshall's report regarding B Cell House fire
- Case Narrative (Joshua Devine fire)
- After Action Review notes
- Indiana State Prison Post Orders and Facility Directives and Policy Indexes
- Indiana Department of Correction Policy and Administrative Procedures and Policy Indexes
- Indiana State Prison Emergency Manual
- Training files and materials for Justin Rodriguez, Promise Blakely and Sarah Abbassi
- Documents and Incident Reports related to other fires or electrical problems at Indiana State Prison
- Indiana State Prison Inspection Reports
- IDOC and Indiana State Prison Job descriptions
- List of B Cell House inmates
- List of radio signals
- Indiana State Prison evacuation plans
- Fire drill records
- Map/Layout, Photographs and Video Recordings of Cell 540, B Cell House, and Indiana State Prison
- Affidavits of:
  - Alvin Christmas
  - Stephen Lehman
  - Calvin Patton
- Internal Affairs interviews with:
  - Jeremy Dykstra
  - Sarah Abbassi
  - Promise Blakely
  - Ryan Statham

- o Justin Rodriguez
- o Patrick Brown
- o Anthony Watson
- o Timothy Redden
- o Dewayne Dunn
- o Lee Miller
- o Christopher Puetzer
- o Juan Ochoa
- Deposition transcripts for:
  - o Ron Neal
  - o Sarah Abbassi
  - o Justin Rodriguez
  - o Jeremy Dykstra
  - o Anthony Watson
  - o Timothy Redden
  - o Kenneth Gann
  - o Jason Nowatzke
  - o Christopher Beal
  - o Robert Engram
  - o Donald Mahone
  - o Daniel Milne
  - o Lee Miller
  - o LeeTravis Griffin
  - o Michael Johnfauno
  - o Oscar Hall

27. In addition to the discovery materials listed above, my opinions in this case are based upon my over 30 years of knowledge, experience, training and expertise in the field of corrections, including my knowledge of generally-accepted standards of correctional management and correctional officer conduct. For convenience, I include some citations to the discovery materials throughout my report in reference to certain specific facts, however, these do not imply that the cited reference is the only support in the record for these facts, nor that I am relying on only the specifically cited materials for my opinions. As stated above, I am relying on the entirety of the discovery materials with which I have been provided and my own extensive experience in the field. All the

information on which I have relied is of a type normally relied on by correctional administrators and experts.

## II.    Overview of Indiana State Prison and B Cell House

28.    Indiana State Prison is located at 1 Park Row in Michigan City, Indiana. The prison was built in 1860, and houses over 2,000 inmates. Indiana State Prison has 13 housing units that include both cell and dorm-style housing. The facility encompasses 100 acres, with the main walled compound consisting of 24 acres. Indiana State Prison serves male inmates with both medium and maximum security levels. Minimum-security inmates are housed on the same grounds outside the main walled compound.

## III.    Staff Roles Related to Plaintiff's Complaint

29.    Warden Neal, at all times relevant to this Complaint, was the chief executive at Indiana State Prison. In this position, he was ultimately responsible for safety and security at ISP. This includes having the responsibility and authority to approve all facility policies and performance standards, as well as ensuring that those policies and performance standards are implemented and satisfied. Warden Neal was also responsible for ensuring that ISP complied with all applicable agency, state and federal rules and regulations. He was further responsible for managing emergency incidents.[1]

30.    At all times relevant to the events in Plaintiff's compliant, Christopher Beal was the Correctional Training Officer 3 at Indiana State Prison. His responsibilities included analyzing the effectiveness of training at ISP, researching and developing training curricula to meet performance objectives, developing and compiling training

---

[1] Superintendent Job Description, Devine Production 005835-5836.

11

materials, and understanding and explaining the facility rules, policies and procedures to ISP staff.[2]

31.    At all times relevant to the events in Plaintiff's compliant, Jason Nowatzke was a Major and Custody Supervisor at Indiana State Prison. His responsibilities included the supervision of all custody staff, the maintenance of post orders, the development of procedures to implement Department of Correction and institution policies and communicate those policies to supervising staff, and the enforcement of rules and regulations, among other things.[3]

32.    At all times relevant to the events in Plaintiff's complaint, Kenneth Gann was the Assistant Superintendent of the Operations Division at Indiana State Prison. His responsibilities included developing, establishing and implementing institutional policies, procedures, and objectives; formulating operation procedures and making recommendation for operational or program improvements; supervising the custody department and enforcing discipline, safety, security, and custodial measures; and performing inspections to determine the effectiveness of operations, among other things.[4]

33.    At all times relevant to the events in Plaintiff's complaint, William Lessner worked as an Internal Affairs Investigator at Indiana State Prison. His responsibilities included investigating and monitoring misconduct by staff for the purpose of reducing departmental policy violations and other dysfunctional practices, among other things.

---

[2] Correctional Training Officer 3 Job Description, Devine Production 5826-5828; Christopher Beal Deposition 24:21-24, 92:11-93:6.
[3] Correctional Major Job Description, Devine Production 5829-5830.
[4] Assistant Superintendent Job Description, Devine Production 5847-5848.

34. At all times relevant to the events in Plaintiff's complaint, Steven Griffin was the Safety Hazard Manager at Indiana State Prison. His responsibilities included establishing and monitoring a safety program at the prison, ensuring compliance with all federal and state rules and regulations governing fire and safety, inspecting all fire and safety equipment, developing and conducting prisoner and staff safety educational programs, and conducting inspections and surveys to assure compliance with fire and other safety standards, among other things.[5]

35. At all times relevant to the events in Plaintiff's complaint, Jeremy Dykstra was a Correctional Captain and Shift Supervisor at Indiana State Prison. His responsibilities included directing and supervising the work of the Correctional Lieutenants, Correctional Sergeants, and Correctional Officers working under him, maintaining safety and security for both staff and prisoners, and training, evaluating and disciplining subordinate staff, among other things.[6]

36. At all times relevant to the events in Plaintiff's complaint, Anthony Watson and Timothy Redden were Correctional Lieutenants at Indiana State Prison. Their responsibilities included directing and supervising the work of the Correctional Sergeants and Correctional Officers working under them, maintaining safety and security for both staff and prisoners, and training, evaluating and disciplining subordinate staff, among other things.[7]

37. At all times relevant to the events in Plaintiff's complaint, Christopher Puetzer was a Correctional Sergeant at Indiana State Prison. His responsibilities included

---

[5] Safety Hazard Manager 2 Job Description, Devine Production 5833-5834.
[6] Correctional Captain Job Description, Devine Production 5815-5816.
[7] Correctional Lieutenant Job Description, Devine Production 5817-5818.

13

following Post Orders, maintaining safety and security for both staff and prisoners, and supervising subordinate staff, among other things.[8]

38.    At all times relevant to the events in Plaintiff's complaint, Ryan Statham, Justin Rodriguez, Sarah Abbassi, and Promise Blakely were Correctional Officers at Indiana State Prison. Their responsibilities included following Post Orders and maintaining safety and security for both staff and prisoners, among other things.[9]

## IV.    Findings and Opinions

### A.    Defendants' Improper Response and Failure to Follow Policies and Basic Correctional Standards Caused Joshua Devine's Death

39.    On April 7, 2017, correctional officers Justin Rodriguez, Sarah Abbassi, and Promise Blakely were on duty on the night shift in B Cell House at Indiana State Prison. At some point after the 9pm count, after the inmates in B Cell House had been locked in their cells for the night, a fire started in Joshua Devine's cell.[10]

40.    Indiana State Prison policy requires officers to do security checks throughout the cell house.[11] Records of these checks are created when the officers tap electronic wands against sensors fixed at various points throughout the cell house. Prison policy requires each sensor be touched by the officer's wand no less frequently than once every half hour.[12] The records from April 7, 2017 show that the officers completed their security check of the 500 range of B Cell House between 9:04pm and 9:07pm.[13] Following policy, one of the officers should have returned to the 500 range no later than

---

[8] Correctional Sergeant Job Description, Devine Production 5824-5825.
[9] Correctional Officer Job Description, Devine Production 5819-5820.
[10] Justin Rodriguez Deposition 115:3-14.
[11] B Cell House Post Orders § V.A, DEVINE 32880-32881
[12] B Cell House Post Orders § V.A, DEVINE 32880-32881.
[13] Internal Affairs Investigation, Indiana State Prison Patrol Report 4/7/2017, DEVINE 133799, 133807.

9:34pm. However, video from inside B Cell House shows that no officer went up to the 500 range prior to 9:43pm.

41.    After the security check, Rodriguez, Abbassi and Blakely went to the B Cell House officers' station.[14] Lt. Watson came to B Cell House and told Abbassi and Blakely to go to the counselor's office to complete payroll paperwork; Rodriguez remained in the officers' station.[15] Despite there being three officers on duty in B Cell House, none of the officers were out in the cell house monitoring what was happening on the ranges.

42.    According to witness statements and testimony from inmates who were present in B Cell House the night of the fire, Mr. Devine's cell was on fire for approximately 15 minutes before any of the officers who were in B Cell House (Rodriguez, Abbassi and Blakely) came out to respond to the emergency.[16] During this time, Mr. Devine and many of the other inmates in the cell house were yelling for help, which was a sharp contrast from the usually quiet environment in the cell house after the 9pm count had been completed and the calm and quiet that had followed count that night.[17] The record reflects that the cries for help began with Mr. Devine and nearby inmates, but that very quickly, virtually the entire cell house had joined in.[18]

43.    Based on this evidence, given the layout and size of the cell house and the location of these officers, and based on my experience in similar correctional environments, it is implausible that Rodriguez, Abbassi and Blakely would not have

---

[14] Justin Rodriguez Deposition 120:12-25.
[15] Justin Rodriguez Deposition 151:3-10, 121:15-19.
[16] LeeTravis Griffin Deposition 7:8-13. Oscar Hall Deposition 5:7-22. Michael Johnfauno Deposition 6:1-7:7; Lee Miller Deposition 10:12-22
[17] LeeTravis Griffin Deposition 6:3-8. Oscar Hall Deposition 7:18-7:22; 8:17-11:4. Michael Johnfauno Deposition 5:16-20, 8:11-18; Justin Rodriguez Deposition 101:18-102:6.
[18] Lee Miller Deposition 7:5-21.

heard these cries for help.[19] Whether or not they could hear the exact words being shouted by the inmates, they would at a minimum have been able to hear there was a significant commotion that indicated an emergency situation was occurring that required their immediate attention.[20] Despite being aware of this, Rodriguez, Abbassi and Blakely chose to do nothing—not even investigate what was going on—for approximately a quarter of an hour.[21]

     44.    This failure to respond to or investigate this emergency situation both violated prison policy and was a serious deviation from basic, generally-accepted standards of professional conduct as a correctional officer. The General Post Orders applicable to every staff member at the prison required staff to immediately report anything unusual or out of the ordinary to the Shift Supervisor.[22] Furthermore, the job description of a Correctional Officer at ISP lists among their "Essential Duties/Responsibilities" that each officer "remains alert for signs of disorder," and emphasizes that that they must "remain vigilant," be able to "react to emergency situations" and that "errors in judgment" could result in the death of an inmate.[23] Additionally, these officers knew that once the inmates were locked in their cells, they had no means of communicating with staff or requesting aid during an emergency other than yelling for help from inside their cells.[24] At a minimum, they had an obligation to investigate the disturbance to find out what was going on. Instead, they apparently chose

---

[19] LeeTravis Griffin Deposition 6:16-7:7; Oscar Hall Deposition 8:17-11:4; Michael Johnfauno Deposition 10:1-16; Lee Miller Deposition 10:1-11; Justin Rodriguez Deposition 115:10-14, 118:24-119:2, 165:16-166:14.

[20] Lee Miller Deposition 10:1-11; Justin Rodriguez Deposition 115:10-14, 118:24-119:2, 165:16-166:14.

[21] LeeTravis Griffin Deposition 7:8-13, 8:11-19, 9:3-20.

[22] General Post Orders, DEVINE 32761-62.

[23] Correctional Officer Job Description, Devine Production 5819-20.

[24] Justin Rodriguez Deposition 103:17-107:14.

to remain in the officer's station and counselor's office, completing paperwork, while the fire burned in Mr. Devine's cell, ignoring the yells from the prisoners and commotion in the cell house.

45.     The exact timeline of events in B Cell House on the night of the fire is subject to disputed facts, which I do not attempt to resolve in this report. However, the video surveillance footage from the night of the fire shows that there was a fire in Mr. Devine's cell at least as early as 9:35pm, although it is certainly possible that the fire and cries for help started earlier than that (because the surveillance video footage has no audio, has a limited quality of image resolution, and shows only a partial view into Mr. Devine's cell, it is not possible to pinpoint the exact moment the fire began from the video alone). The first signs on the video of any response to the emergency by any of the officers in B Cell House do not occur until 9:43pm. Thus, even relying solely on the video's visual depiction of the fire and not considering the other evidence regarding the timeline of when the fire began, at least 8 minutes passed before there was any response by any of the officers in the Cell House.

46.     Other evidence in this case indicates that the fire started approximately 15 minutes before any officer responded. Either way, the failure of Rodriguez, Abbassi and Blakely to take any action in response to this obvious emergency situation during this period of delay was unacceptable.[25] It falls far short of generally-accepted standards of correctional practice, and defies any reasonable explanation. These officers knew that the inmates were locked in their cells, unable to escape from any danger or emergency that should arise, and entirely dependent on the officers for their safety and to rescue them in

---

[25] Robert Engram Deposition 32:21-34:22, 69:6-70:2

17

event of a danger such as a fire.[26] The officers thus knew that a failure to respond to a fire emergency or to take steps to investigate a potential emergency—even for 8 minutes—posed a serious danger to the inmates.

47.    Even with this period of unacceptable delay, Rodriguez, Abbassi and Blakely still had the opportunity and ability to save Mr. Devine's life. Starting from the time the surveillance video depicts the officers belatedly coming onto the 500 range to respond to the emergency situation, there is approximately two-and-a-half minutes before the video shows the fire taking over Mr. Devine's cell. Given the distances involved and the speed with which individuals are able to move throughout the cell house, this was more than enough time for one or more of these officers to take the keys and/or a fire extinguisher up to the 500 range.[27]

48.    Officer Rodriguez eventually went to Mr. Devine's cell, but he took neither the 500 range keys nor a fire extinguisher with him, so he was not able to do anything.[28] This failure is particularly unacceptable in light of the fact that he heard and understood the inmates to be yelling that there was a fire on the 500 range before he left the officers' station.[29] Rodriguez states that he did not return to Mr. Devine's cellfront until after the supervisory officers had arrived and the fire was raging out of control,[30] but the surveillance video appears to show him, accompanied by Officer Abbassi, running together down the 500 range. Yet again, neither officer appears to have obtained the correct keys or a fire extinguisher before going up on the range again—or at least they

---

[26] Lee Miller Deposition 7:13-18.
[27] Justin Rodriguez Deposition 109:11-14; Jeremy Dykstra Deposition 309:16-24.
[28] Justin Rodriguez Deposition 122:20-25, 127:12-128:24; Lee Miller Deposition 7:20-8:1
[29] Justin Rodriguez Deposition 115:10-14, 122:20-25, 160:8-19.
[30] Justin Rodriguez Deposition 128:15-130:22.

did not use them to extinguish the fire or release Mr. Devine from his cell. This further underscores that there was time available to rescue Mr. Devine if any of the officers had taken the basic and obvious steps of getting a fire extinguisher and the keys. Moreover, Abbassi and Rodriguez both gave statements and testimony that appear to conflict with what is shown on the video.[31]

49.     The response from all three officers was unacceptable and inadequate.[32] Rodriguez did not bring the keys to the 500-level of the Cell House with him, nor did he bring a fire extinguisher, despite the fact that the inmates in the cell house were telling him there was a fire on the 500 range.[33]

50.     Blakely never went to the 500 range, and Abbassi saw the fire but claims she never went to Joshua's cell at all.[34] Officer Blakely was the only officer with the keys to Joshua Devine's cell, but she never brought the keys to the cell.[35] Abbassi called a 10-71 fire code, but neither Blakely nor Abbassi took any other steps to try to help put out the fire.[36] Like Rodriguez, they waited unacceptably long to respond at all, and when they eventually emerged from the counselor's office they did not take basic and obvious steps to rescue Joshua Devine from his cell.[37]

51.     Even once the officers in the cell house belatedly began to respond to the emergency, there was an unacceptable delay in calling the fire code to alert supervisors of the emergency and to activate the inmate fire department. Rodriguez claims his radio was

---

[31] Justin Rodriguez Deposition 128:15-130:22, 127:20-128:2; Sarah Abbassi Deposition 125:15-126:25.
[32] Lee Miller Deposition 11:18-25, 21:23-22:13.
[33] Michael Johnfauno Deposition 10:16-11-6; Lee Miller Deposition 7:21-8:8, 11-18-25.
[34] Sarah Abbassi Deposition 128:22-130:6, 207:18-208:2.
[35] Sarah Abbassi Deposition 143:15-144:13.
[36] Sarah Abbassi Deposition 173:14-178:5.
[37] Donald Mahone Deposition 17:24-19:1; Daniel Milne Deposition 25:17-27:17; Sarah Abbassi Deposition 182:4-7.

not working, which is why he did not call the fire code right away.[38] But he knew that there were serious problems with the radios at Indiana State Prison, and he was required to check and use his radio regularly throughout his shift to ensure the radio was in working order.[39] And once he discovered the radio was not working, he could and should have immediately called down to either Abbassi or Blakely to have them call the fire code. Yet although the video shows Rodriguez running up towards the 500 range beginning at approximately 9:43:53pm, at which point he had already understood the inmates to be yelling that there was a fire, the fire code was not called until approximately 9:45pm (the number of seconds is not listed).[40] There is no explanation or justification for why it took over one minute (potentially up to two minutes) for any of the officers in B Cell House to call the fire code.

52.    Even when the fire code was eventually called, the video footage from Custody Hall and B Cell House shows Lt. Watson and Lt. Redden moving without any apparent sense of urgency. This is surprising and unacceptable given the serious emergency of which they had been made aware.

53.    Although Indiana State Prison designates a separate set of specially trained officers as First Responders, who can be called upon to respond to emergent situations, generally-accepted standards of correctional practice recognize that the front line officers in a cell house have an obligation to serve, in a literal sense, as the "first responders" to emergencies that take place in the areas of the prison where they are on duty. Rodriguez, Abbassi and Blakely demonstrated a complete abdication of this responsibility.

---

[38] Justin Rodriguez Deposition 115:16-21.
[39] Justin Rodriguez Deposition 65:19-67:2, 67:18-20:21.
[40] Internal Affairs Report of Investigation, p. 1.

20

54.    Indiana State Prison has an inmate fire department comprised of inmates who receive extensive training and certification in fire emergency response.

55.    On April 7, 2017, there were inmate firefighters housed throughout the prison, including at least one firefighter who was housed in B Cell House.[41] Whenever there was a fire emergency, officers were supposed to release the inmate firefighters so they could provide emergency assistance. None of the officers in B Cell House released the inmate firefighter who was living in the cell house at the time.[42]

56.    There were delays releasing the firefighters who were living in the other cell houses, causing a delay in their response to the fire.[43] Indeed, several of the reports written by the inmate firefighters about the fire response that evening detailed serious concerns both with how the officers were handling the situation that evening, and broader concerns about staff attitudes and competency in responding to emergency situations.[44] These reports were part of the Investigative Affairs file, but I saw no evidence in the materials I reviewed that these concerning reports from the firefighters were ever taken seriously or meaningfully investigated to improve fire response effectiveness. In my opinion, this reveals an attitude of carelessness and disregard at the highest levels of the facility administration.

57.    Mr. Devine should have been released from his cell immediately when officers realized his cell was on fire, and the emergency situation in B Cell House should have been investigated and responded to as soon as the officers heard inmates calling for

---

[41] Donald Mahone Deposition 32:24-33:24.
[42] Oscar Hall Deposition 7:23-8:3; 16:12-16. Michael Johnfauno Deposition 7:9-10; Robert Engram Deposition 28:20-29:5; Daniele Milne Deposition 32:9-33:1.
[43] Michael Johnfauno Deposition 7:11-12; Robert Engram Deposition 25:18, 26:17-21, 35:9-18; Daniel Milne Deposition 15:13-24; Internal Affairs Investigation, Devine 133736-133761.
[44] Internal Affairs Investigation, Devine 133736-133761.

help. Although the Post Orders were not very detailed or specific, the section on emergency Fire response should have made clear to these officers that they had an obligation to immediately respond to assist Mr. Devine, release him from his cell and try to extinguish the fire.[45] Defendants failed to do so, and this delay was critical. In a cell house you must always be alert for an emergency and respond immediately.

**B.      Defendants Were On Notice That Fires Were Regular Occurrences at Indiana State Prison, And That They Posed a Serious Risk to Inmates Locked In Their Cells**

58.      Fires at Indiana State Prison were extremely common in the months and years before the April 7, 2017 fire.[46] This included other serious fires, at least one resulting in the death of an inmate.[47] Sometimes these fires were started by hot pots, electrical sockets, or other electrical equipment.[48] Other times, fires were intentionally set.[49]

59.      Defendants knew that prevalent fires pose a serious risk in a correctional setting. Specifically, Defendants Neal, Nowatzke, Gann, and Griffin were informed when fires occurred and, based on their training and experience, would know that the prevalence of fires at Indiana State Prison was a serious problem that put inmates like Mr. Devine at risk.[50]

60.      Defendants also knew that there were widespread problems with the electrical system and electrical sockets at ISP, and that electrical sockets regularly

---

[45] General Post Orders § P, DEVINE 32767-32768.
[46] LeeTravis Griffin Deposition 11:8-10; 16:17-24; Michael Johnfauno Deposition 14:12-22; Lee Miller 8:21-22; Robert Engram 40:6-41:5; Donald Mahone Deposition 36:12-38:19; Christopher Beal Deposition 175:3-8.
[47] Donald Mahone Deposition 36:12-38:19.
[48] LeeTravis Griffin Deposition 16:17-24. Oscar Hall Deposition 6:2-7; 10:24 -11:3.
[49] Michael Johnfauno Deposition 14:12-22; 15:24-16:3; Donald Mahone Deposition 41:12-42:11.
[50] Ron Neal Deposition 82:25-83, 85:17-86:6, 89:16-21, 124:9-17; Kenneth Gann Deposition 52:2-4, 53:2-15; Jason Nowatzke Deposition 58:8-59:20.

sparked at the Prison.[51] Supervisors at ISP, including Defendants Griffin and Gann, were made aware of these issues and had a responsibility to address the serious risks they presented, but failed to adequately do so.[52]

61.     Defendants, including Defendants Nowatzke, Neal, Griffin, and Gann, did not take seriously their responsibility to make sure that the conditions at the facility were safe. Defendants Gann, Nowatzke and Griffin did not take adequate action to ensure that staff were conducting meaningful inspections of the facility, and staff were at times signing off that they had inspected equipment that did not exist.[53] And Defendant Gann did not ensure that cells were inspected before moving inmates into new cells.[54] This was part of and encouraged a culture of not taking safety and security seriously at Indiana State Prison. Neal, Griffin, and Gann, based on their experience and training, would know that these failures put inmates like Joshua Devine at risk of harm because they reflected an indifference to safe conditions of confinement at ISP.

### C. Defendants Did Not Implement Meaningful Policies or Training To Address This Risk.

62.     Fire drills are a vital part of a prison's fire safety regimen, to ensure that both officers and inmates are familiar with the procedures to be followed in case of emergency. However, at Indiana State Prison fire drills were not conducted regularly.[55] During the day shift, fire drills were held during chow time, when inmates were already

---

[51] LeeTravis Griffin Deposition 10:4-10:25; Lee Miller Deposition 12:10-24, 13:8-14:16; Robert Engram Deposition 43:4-45:8; Donald Mahone Deposition 33:24-36:5; Kenneth Gann Deposition 24:19-25:19.
[52] Donald Mahone Deposition 33:24-35:19; Daniel Milne Deposition 14:2-15:12, 41:16-20, 45:3-8; Kenneth Gann Deposition 24:19-25:19; Ron Neal Deposition 124:9-17, 89:16-21.
[53] Weekly Inspection Reports, Devine-DOC 2014001041, 2014001042, 2016001648; Ron Neal Deposition 91:5-19; Kenneth Gann Deposition 86:22-24, 87:15-18, 100:3-5; Assistant Superintendent Job Description, Devine Production 5847-5848.
[54] Sarah Abbassi Deposition 122:18-25; Declaration of Calvin Patton P713-714; Ron Neal Deposition 89:16-21; Assistant Superintendent Job Description, Devine Production 5847-5848.
[55] Sarah Abbassi Deposition 184:4-10; Kenneth Gann Deposition.

23

being released from their cells to go to the dining hall, meaning that this was not a realistic or meaningful simulation of an actual cell house evacuation in case of an emergency.[56] And there were no meaningful "fire drills" conducted on the night shift at all.[57] In fact, none of the three officers on duty in B Cell House on the night of the fire had ever participated in an evacuation drill before.[58]

63.     Defendant Griffin was responsible for ensuring that fire drills were held regularly and conducted in a way that effectively prepared staff to respond to a fire at Indiana State Prison, including during the night shift.[59] Defendant Griffin failed to carry out this responsibility, despite the fact that, based on his experience and training, he would have known this failure created a serious risk of harm to prisoners like Joshua Devine.

64.     Staff at the prison were not taking fire drills, the risk of fires, or even actual fires seriously.[60] Officers did not bother to learn what they needed to do, and frequently failed to "activate" (i.e., release) the inmate firefighters in the case of a fire.[61] These and other issues that impacted fire safety and emergency response at the prison were reported to supervisory staff at ISP, including Defendants Griffin, Nowatzke, and Neal.[62]

---

[56] Jason Nowatzke Deposition 201:1-4.
[57] LeeTravis Griffin Deposition 4:14-16; 11:1-7. Oscar Hall Deposition 12:13-13:24. Michael Johnfauno Deposition 13:14-19; Robert Engram Deposition 14:21-15:19; Donald Mahone Deposition 31:2-32:6; Daniele Milne Deposition 34:4-13.
[58] Sarah Abbassi Deposition 38:13-39:8, 108:24-109:9; Internal Affairs Report p. 8.
[59] Jason Nowatzke Deposition 201:5-16.
[60] Robert Engram Deposition 16:11-17, 20:10-21:24, 41:6-42:8; Donald Mahone Deposition 27:10-25, 28:11-29:23; Daniel Milne Deposition 34:13-35:25, 39:15-41:20
[61] Jeremy Dykstra Deposition 300:7-301:21, 341:12-342:1, 344:4-19; Robert Engram Deposition 16:11-17, 20:10-21:24; Donald Mahone Deposition 24:7-26:20, 32:11-23; Daniel Milne Deposition 11:18 -12:25, 37:4-11.
[62] Donald Mahone Deposition 19:6-26:20, 30:8-23; Jason Nowatzke Deposition 58:8-59:20.

24

65. Despite this, little, if anything, was done to address these problems.[63] For example, Nowatzke did not take adequate corrective action, despite his responsibility to ensure that the prison's policies and procedures were being followed with regard to every incident that occurred at ISP, as well as that inmate firefighters were being timely released.[64] Griffin did not take action to increase the frequency or structure of fire drills, or to impart on staff the seriousness of fire response. Similarly, Beal stated that when an emergency incident like the April 7, 2017 fire occurred, it was his normal practice *not* to review what happened to determine if staff acted consistent with their training or to determine if changes needed to be made to the training program.[65] But his job responsibilities included ensuring that staff were properly trained with regard to fire response.[66] Nor did Beal or other supervisors monitor incidents occurring at ISP for any patterns or repeat problems that might reveal deficiencies relating to the training program.[67] Since becoming Correctional Training Officer 3 in 2013, Beal has failed to make or recommend any changes to the content, format or structure of on-the-job training at ISP.[68] Beal has similarly failed to make any recommendations or changes to training relating to fire safety, prevention, and response.[69]

66. The unacceptable response of Rodriguez, Abbassi and Blakely to the fire on April 7, 2017 is clear evidence that they were not properly trained regarding how to respond to a fire. Beyond that inadequate response, Rodriguez participated in a

---

[63] Daniel Milne Deposition 45:9-13; Christopher Beal Deposition 10:9-13:15, 156:2-157:6; Kenneth Gann Deposition 123:5-8.
[64] Jason Nowatzke Deposition 58:8-59:20; Kenneth Gann Deposition 123:9-11.
[65] Christopher Beal Deposition 15:5-21.
[66] Jason Nowatzke Deposition 44:4-45:25.
[67] Christopher Beal Deposition 103:18-104:4, 107:13-108:4, 133:11-16.
[68] Christopher Beal Deposition 101:21-103:21, 142:22-.
[69] Christopher Beal Deposition 142:22-143:4.

questionnaire regarding fire safety in the weeks after the B Cell House fire which revealed he still did not know what to do in the event of an emergency.[70] And in a similar questionnaire completed prior to the fire, Abbassi similarly demonstrated that she was not properly equipped or prepared to handle a fire emergency.[71]

67.    During any fire, time is critical and a rapid response can mean the difference between a fire that causes minor property damage and a fire that causes serious injury or death.[72] The need for a rapid response is particularly crucial in the correctional setting, where inmates are held in close quarters and spend much of their time locked in their cells and unable to escape from danger without the assistance of officers. In order to ensure a rapid and effective response by correctional staff in the event of a fire, there is an obvious need to have clear and concise policies directing officers on the steps they need to follow, and to train officers on what those policies and steps are. Despite this obvious need, at Indiana State Prison there was no clear policy about what officers should do in case of a fire emergency or how inmates should communicate emergencies to staff.[73] The prison relied on the use of inmate firefighters to be the main line of defense against fires, but the Post Orders, which were the only policies to which prison staff had ready access, did not give any clear guidance on when, if and how to activate the inmate fire department, leading to widespread delay and confusion.[74] Defendants Neal, Nowatzke, and Gann had the responsibility to ensure that ISP had adequate post orders

---

[70]Fire Drill Questions and Record, DEVINE 133032-133033.

[71] Robert Engram Deposition 20:10-21:8.

[72] Daniel Milne Deposition 20:1-7.

[73] Sarah Abbassi Deposition 43:13-44:7, 70:5-25, 72:24-74:17, 109:19-110:19, 154:3-155:4; Christopher Beal Deposition 151:1-13, 152:10-153:21; Kenneth Gann Deposition 59:4-7, 61:3-21, 67:2-69:2, 130:15-131:5, 131:25-132:6.

[74] General Post Orders, DEVINE 32761-32777; BCH Post Orders, DEVINE 32879-32886.

and other policies regarding emergency and fire response. [75] Despite the fact that they knew, based on their training and experience, that having inadequate emergency and fire safety policies would create a serious risk to prisoners like Mr. Devine, Defendants Nowatzke, Gann, and Neal did not take steps to correct these inadequacies.

68.    Additionally, while the inmate fire department was staffed during the day,[76] at night the inmate firefighters were locked in cells, posing a major barrier and risk of delays in responding to a fire. From a security perspective, there was no reason that the inmate firefighters—by all measure a highly-trained and highly trusted set of inmates—could not have been permitted to staff the fire department around the clock, particularly given the prevalence of fires at the prison and the serious risk that a single fire poses to the safety of staff and inmates.

69.    Moreover, where policies did exist, officers were not provided with adequate training regarding these policies and therefore did not know what to do in the case of a fire or other emergency.[77] To the extent that officers were trained regarding emergency response, they were instructed that their responsibility was to call a small group of first responders.[78] This caused officers at ISP to abandon their responsibility to understand how to respond, to practice those skills through drills, and to actually respond to emergency situations adequately.[79] As a result, the three officers on duty in B Cell House on the night of the fire were not adequately trained in emergency response, resulting in their seriously inadequate response on April 7, 2027 to the fire in Joshua

---

[75] Jason Nowatzke Deposition 71:3-8; Devine Production 005835, 5847-5848.
[76] Ron Neal Deposition 24:7-12.
[77] Robert Engram Deposition 26:17-27:11, 32:21-34:22; Daniel Milne Deposition 11:18 -12:25. Sarah Abbassi Deposition 89:12-90:6, 103:20-25, 106:17-107:2, 115:18-21, 115:22-116:23; Christopher Beal Deposition 143:17-145:20, 148:23-150:23; Kenneth Gann Deposition 43:17-23, 44:23-45:3.
[78] Justin Rodriguez Deposition 46:5-10, 48:6-9, 49:4-16, 50:17-24.
[79] Sarah Abbassi Deposition 192:1-193:5, 231:25-232:14

Devine's cell.[80] Defendant Beal had the responsibility and knowledge to address the clear inadequacies to the staff training program, but failed to do so.[81]

70.     Critically, supervisors did not establish adequate policies and training regarding the need to continuously monitor the cell house for safety concerns or emergencies. This includes Neal, Notawzke, and Gann, who had the responsibility to ensure that all policies and training were adequate.[82] For example, there was confusion about the policy for conducting security checks, and supervising staff did not adequately instruct officers of the importance of continued monitoring of the cell house even when they were not conducting the required security checks.[83] This meant that on the night of the fire, Watson had instructed two of the three officers in the cell house to complete their time sheets in the counselor's office, which delayed their security checks.[84] While they were filling out their time sheets, the only other officer in the cell house, Rodriguez, remained in the officer's station rather than actively monitor the cell house for safety or other concerns.[85]

71.     The risks that staff would be unable to respond to an emergency at the Prison were significantly increased by the fact that cell houses, like B Cell House on the night of April 7, 2017, were staffed exclusively by inexperienced, junior officers.[86] Rodriguez, the most senior of the three officers staffed in B Cell House that night, had

---

[80] Daniel Milne Deposition 28:3-29:16, 50:20-51:3; Sarah Abbassi Deposition 33:1-3, 35:9-36:6, 37:2-16, 38:20-39:8, 39:12-23, 45:24-48:21, 77:17-80:7, 85:7-19, 109:19-110:19, 119:13-23, 125:15-20, 145:1-23, 150:9-151:1; Kenneth Gann Deposition 50:15-19.
[81] Christopher Beal Deposition 92:11-93:6; Jason Nowatzke Deposition 61:1-22.
[82] Christopher Beal Deposition 92:11-93:6; Jason Nowatzke Deposition 71:3-8; Devine Production 005835, 5847-5848.
[83] Sarah Abbassi Deposition 189:19-190:10, 222:17-223:10.
[84] Sarah Abbassi Deposition 125:5-6, 148:9-150:16.
[85] Sarah Abbassi Deposition 148:9-150:16; Justin Rodriguez Deposition 151:3-10, 121:15-19.
[86] Sarah Abbassi Deposition 17:18-18:2.

been hired as a correctional officer just six months earlier.[87] Despite knowing that cell houses were staffed by such officers, supervising staff with responsibility to oversee them—Dykstra, Redden, and Watson—did not take steps to adequately oversee, direct, and assist them.[88]

72.    In addition to the lack of clear fire response procedures, and the deficient training on those procedures, the prison in general and B Cell House in particular lacked the necessary equipment to properly address a fire emergency: only one officer had the key for each range, radios often failed, there was no sprinkler system, the cells had limited water use in the toilet and sinks, and there were no fire extinguishers on the ranges.[89] In the face of the risks these conditions created with regard to fire safety, there should have been detailed policies and procedures in place to minimize these risks. For example, the Prison should have specific policies and procedures regarding how and when to transfer keys in the event of an emergency. ISP supervisors, including Defendant Neal, failed to put these policies and procedures in place. Similarly, Neal, Griffin and Nowatzke failed to ensure that critical equipment and infrastructure at ISP was in working order.[90]

## VI.    Conclusions

73.    In summary, it is my expert opinion to a reasonable degree of professional certainty, based on my experience and review of the materials in this case, that the officers in B Cell House demonstrated an unacceptable delay in responding to an

---

[87] Justin Rodriguez Deposition 13:17-20.
[88] Correctional Lieutenant Job Description, Devine Production 5817-5818; Correctional Captain Job Description, Devine Production 5815-5816.
[89] Sarah Abbassi Deposition 39:12-19; Kenneth Gann Deposition 37:4-38:1, 110:9-24; Weekly Inspection Reports, Devine-DOC 2014001040; Justin Rodriguez Deposition 65:19-67:2, 67:18-69:11, 135:11-19.
[90] Jason Nowatzke Deposition 43:15-18; Ron Neal Deposition 94:11-18, 97:7-22.

emergency situation, followed by a failure to respond appropriately and effectively, which caused further unacceptable delays in any effort to rescue Joshua Devine from his cell. In addition, ISP was lacking in proper training for staff, especially in emergency situations. They had insufficient security procedures and enforcement, resulting in emergency response being absolutely a failure in all its forms. ISP lacked sufficient drills, planning and preparedness to deal with a major emergency such as the fire in 2017.

74.    I reserve the right to revise or supplement my report after further investigation and analysis and after consideration of any additional information that may become available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: November 13, 2020

Richard Bard