# In the Matter Of:

*DENISE DWYER*

*-v-*

*RON NEAL, ET AL.*

_____

## Richard Bard, Volume II

*July 22, 2021*

_____



**Stewart Richardson**

DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENISE DWYER,                         )
                                      )
            Plaintiff,                )
                                      )
        -v-                           ) CASE NO.
                                      ) 3:18-cv-00995-JD-MCG
RON NEAL, et al.,                     )
                                      )
            Defendants.               )

        The deposition upon oral examination of

RICHARD BARD, VOLUME II, a witness produced and sworn

before me, Debbi S. Austin, RMR, CRR, Notary Public in

and for the County of Hendricks, State of Indiana,

taken on behalf of the Defendants via Zoom

videoconference on July 22, 2021, at 1:00 p.m.,

pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800)869-0873

Q   And that paragraph, I'm going to read a portion of it, "In addition to the prison and jail facilities in which I worked, I have also visited and toured various facilities during my career in the correctional system and in my capacity as an expert consultant.  This includes," and then it goes on to say Indiana State Prison.

A   Yes.

Q   Is that right?

A   Right.

Q   Okay.  When -- well, how many times have you visited Indiana State Prison?  And I'll refer to that as ISP, okay.

A   Right, one.

Q   Okay, you've visited once.  When was that?

A   Counselor, I think it was probably in 2009, approximately 2009.

Q   All right.  How long were you there for?

A   Could have been -- let me correct that.  It could have been 2010.  It was one of those two years, because I -- the new director came on, and we went to the -- how long was I in the prison for?  I was there for a few hours.

Q   What did you do while you were there?

A   We took a tour.  If I remember right, if my memory

serves me right on this, the warden, his staff, and I believe in Indiana they call them the secretary of prisons, not the director.  I think they're called Secretary of the department.  I think he was there, because my director was with me.  So he would be the equal to the Secretary of Indiana Department of Correction.

Q  Okay.  So you were still employed with the Illinois Department of Correction at that time?

A  Yes.

Q  Okay.  And which position did you hold at that time?

A  Chief of operations.

Q  All right.  What was the purpose of your visit to ISP?

A  Well, just getting out to other states, other prisons to see how they were running things and, you know, try to compare how we're doing things and just to educate ourself.

Q  Do you remember what parts of the prison you visited while you were there?

A  We went through cell houses.  We went through -- it seemed like it had a -- like a maintenance factory there or some type of deal, if I recall.  I know they were doing a lot of, it seemed like, when we

went to the cell house, they were doing some work inside the cell houses, some type of maintenance stuff, if I remember, my memory serves me right over a decade ago.  They had fans blowing through.

One thing stuck in my mind was I remember walking up to the main walk in front, and the director or the chief said, do you notice anything? I said, yes, Director, I notice free movement.  And the front walk, the inmates were moving in all the directions.  And basically then if one of the other staff that was -- I think it was referred to as chief of programs said that it reminded her of nightmares of Stateville.

And so I just remember that part because they had free movement there.  At that time, they had free movement.  We stopped free movement basically, the ideal was seen back in the late 1990s in our maximum security prisons -- in most of our prisons, actually.  But so that was something I noticed there.

Also, I noticed the first time I ever saw, if my memory serves me right, I believe it was at Indiana State Prison -- we saw three different prisons that day in Indiana -- they had cats.  The inmates had pet cats.  And I can't remember if that

was death row inmates or if that was just maximum security inmates in their cell houses.  But I found that different and actually thought about that, you know, that especially somebody in that position, I thought that was kind of a humane way of possibly something we would explore.

And I think after I left, I retired shortly after that, I think they did end up bringing dogs into one of our prisons.  I know we trained dogs at the White when I was there, but -- and I don't know that they brought dogs in the same like they had cats at Indiana State Prison.  It seemed to me they were there for pets of inmates to kind of give them, you know, a little bit of a security, and maybe it helped them with their safety and security situation as far as keeping the inmates more calm too, you know, if they had a pet.

And only certain cellmates had them, as I remember.  I remember it was an old prison.  It reminded me of Statesville, Pontiac -- our Stateville, our Pontiac, and our Menard.  I remember the cell houses being just like those three prisons that I've had, that I was over.  And everybody was nice, and everybody -- so it was a pleasant visit.

Q   Do you remember which cell houses you visited?

A   I think I was in B house, but I can't for sure, a hundred percent, say that.  I was in a house like B house, and maybe they had more than one -- houses like B house.  But B house reminded me of -- especially Menard, back in the '80s and '90s when -- before we kind of closed off.  You know, both sides.  Now we built a wall down where they kind of still had it where everything is open, completely open like that around, you know, so back then anyway.  So I can't tell you for sure which cell houses I was in.

Q   Okay.  And did you visit any more sort of dormitory style?

A   Yeah, I think we walked through the -- if my memory serves me right, we walked through a dorm style.

Q   Do you remember visiting any other parts of ISP besides what you've already told me about?  I think you mentioned maintenance, a maintenance shop of some sort and then some of the cell houses or dorms.  Is there anything else that you remember seeing when you were there?

        MR. HEPPELL:  Object to form.

        You can go ahead.

A   Those are the things that I -- I do -- you know, I

I'm saying probably most states have that.  They haven't had the -- they didn't reform --

Q  Most states have -- and I'm going to jump in.  Most states have that, meaning most states have open movement like you observed at ISP?

A  I think so.  Talking to other people, that they have the open movement.  But some states don't, and some states do.

Q  Other than the trip to ISP that we talked about just now in 2009 or 2010, have you ever been to ISP since then?

A  No.

Q  So you did not visit ISP in the course of forming your opinions in this case?

A  No.

Q  All right.  I'm going to ask you to turn to page 9 and 10.  And you see a list of bullet points there --

A  Yes.

Q  -- over pages 9 and 10.  And those are materials that you reviewed in the course of forming your opinions; correct?

A  Yes.

Q  Can you think of any specific materials, other than what's listed in these bullet points, that you

hear -- when the code was called, he could hear noise coming out of the cell house in a different building. I think it was Superintendent Gann said that he thought you could hear in the counselor's office.

So I just can't imagine, with my past experience, knowing how loud those cell houses can get, that they would not have heard that. And also, that Rodriguez, who was over in the officer's station, which didn't have any doors shut, which was open, and, in fact, had TV monitors in front of him, would have heard the commotion too.

Q So you're basing that -- that's inference based on deposition testimony that you've read; is that right?

A And my -- I'm sorry.

MR. HEPPELL: Object to form and to the extent it misstates his prior testimony.

You can go ahead.

MR. BLINN: I asked the question and said, "is that right," giving him a chance to response.

Q Go ahead.

A Based on the testimony of depositions plus based on my experience of 30 years of experience, yes.

Q In -- okay, your experience in other facilities?

A   And possibly in walking through facilities at ISP, I saw the way the facilities are laid out and old cell houses just like -- basically like Menard.

Q   Okay.  Did you do any kind of testing in terms of like sound levels, audibility, anything like that in forming this opinion?

A   No, sir.

Q   Review paragraph 44, please.  And that's 16 onto 17.

A   Okay.

Q   So, and you used the words "ignoring the yells from the prisoners and the commotion in the cell house"; correct?

A   Yes.

Q   So it's your opinion that they were aware of the commotion and chose not to act?

A   Yes.

Q   And the basis for your opinion as to their awareness is what?

A   Based on they could hear the commotion that I know that there was a fire in that cell house, that there was smoke coming out of that cell, that the inmates were verbally telling each other that there's a fire.  They have mirrors.  They have reflections.  They can see the fire.  The inmates

are --

Q   The offenders could?

MR. HEPPELL:  I'll just object to the extent he's giving an answer that -- laying out the bases for his opinions and you're interrupting him.

Q   Go ahead.  The offenders could see it?

MR. HEPPELL:  Object to form.

Q   Sir?

A   In my opinion, the offender -- I have testimony in the depositions that they did see it.  And in my opinion, they could see it because I know that inmates -- I know they do it through reflection, but it started basically, according to the video, and it could have started before because the video was old and grainy, but according to the video, it started at 9:35, and it took eight minutes for there to be any response.

My testimony is that they heard a commotion. They didn't know what the commotion was, but they failed to investigate what that commotion was.  If they would have investigated what that commotion was, they would have got there a lot sooner and would have had -- and they would have had the ability and the opportunity to respond to the emergency with an inmate.

A  Counselor?

Q  Yes.

A  Can we take a five-minute break?

MR. BLINN:  Absolutely.

THE WITNESS:  Okay, thank you.

(Recess taken.)

BY MR. BLINN:

Q  Mr. Bard, while we were on break, did you discuss your testimony in this deposition with anyone?

A  No.

Q  Please review on page 21, paragraph 54 through 56.

A  Okay.

Q  In your corrections career, did you ever work in a facility that had an offender fire department?

A  I worked at Vienna Correctional Center, and they did have one at one time, but I don't think they did while I was there.

Q  Okay.  And have you ever been responsible for supervising an offender fire department?

A  No.

Q  Are you forming an opinion -- strike that.

Are you forming an opinion as to whether a different response by the offender fire department would have made a difference to Mr. Devine?

MR. HEPPELL:  Object to form.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION


DENISE DWYER,                        )
                                     )
            Plaintiff,               )
                                     )
        -v-                          ) CASE NO.
                                     ) 3:18-cv-00995-JD-MCG
RON NEAL, et al.,                    )
                                     )
            Defendants.              )


                    Job No. 164054


        I, RICHARD BARD, state that I have read the foregoing transcript of the testimony given by me at my deposition on July 22, 2021, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.



                        _____
                        RICHARD BARD



            STEWART RICHARDSON & ASSOCIATES
            Registered Professional Reporters
            One Indiana Square, Suite 2425
                Indianapolis, IN  46204
                    (800)869-0873

STATE OF INDIANA

COUNTY OF HENDRICKS

        I, Debbi S. Austin, a Notary Public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

        That the foregoing deposition was taken on behalf of the Defendants; that said deposition was taken at the time and place heretofore mentioned between 1:00 p.m. and 3:28 p.m.;

        That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

        And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

        I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 4th day of August, 2021.

Debbi S. Austin
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0670274
My Commission Expires July 13, 2023

My Commission Expires:
July 13, 2023

Job No. 164054